WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey D. Saferstein
Jessica Liou
Furqaan Siddiqui

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC.'S AND DCG INTERNATIONAL INVESTMENTS LTD.'S MOTION FOR AUTHORITY TO FILE THE OBJECTION TO CONFIRMATION OF THE DEBTORS' AMENDED PLAN UNDER SEAL**

Digital Currency Group, Inc. ("**DCG**") and DCG International Investments Ltd. ("**DCGI**," together the "**DCG Parties**") hereby submit this motion (the "**Motion**") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to sections 105(a) and 107(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9018-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), authorizing the DCG Parties to redact and file under seal portions of *Digital*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R) (collectively, the "**Debtors**"). For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

*Currency Group, Inc.'s and DCG International Investments LTD.'s Objection to Confirmation of the Debtors' Amended Plan* (the "**Plan Objection**"), attached hereto as <u>**Exhibit B,**</u> that quotes or references certain confidential or commercially sensitive testimony and documentation produced by certain parties during discovery related to confirmation of the Amended Plan. The DCG Parties are filing the Plan Objection with the proposed redactions contemporaneously herewith. In support of this Motion, the DCG Parties respectfully state as follows:

<u>**Background**</u>

1.      On April 20, 2023, the Court entered the *Stipulation and Confidentiality Agreement and Protective Order* (the "**Protective Order**") (Docket No. 238). Pursuant to paragraph 13 of the Protective Order, documents reflecting or referring to confidential information must be filed under seal. *Id.*, ¶13.

2.      On October 24, 2023, the Debtors filed an amended chapter 11 plan, commonly referred to as the "No Deal Plan." *See Debtors' Amended Joint Chapter 11 Plan* (Docket No. 838) (as amended, modified, or supplemented from time to time, the "**Amended Plan**"). The Debtors simultaneously filed a disclosure statement with the Amended Plan. *Amended Disclosure Statement with Respect to the Amended Joint Plain of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (Docket No. 839) (as amended, modified, or supplemented from time to time, the "**Disclosure Statement**").

3.      The Debtors revised their proposed chapter 11 plan several times, with the most recent version filed as the Amended Plan on November 28, 2023 (Docket No. 989), which the Court approved for solicitation on December 6, 2023. *See Order Authorizing Debtors' Motion to Approve (I) The Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and*

*(IV) Certain Dates with Respect Thereto (Docket No. 1027)* (the "**Disclosure Statement Order**")
(Docket No. 1031).

4.      The DCG Parties object to confirmation of the Amended Plan.

### Jurisdiction and Venue

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334
and the *Amended Standing Order of Reference* from the United States District Court for the
Southern District of New York, dated January 31, 2012.  This matter is a core proceeding within
the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.
The statutory predicates for the relief requested herein are sections 105(a) and 107(b) of the
Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1.

### Relief Requested

6.      The DCG parties respectfully request that this Court enter the Proposed Order,
substantially in the form attached hereto as **Exhibit A**, authorizing the DCG Parties to redact and
file confidential and commercially sensitive portions of the Plan Objection, and directing the Plan
Objection, and all exhibits attached thereto, remain under seal, confidential, and unavailable to any
third party without further order from the Court, *provided*, *however*, that copies shall be provided
on a confidential basis to the Court, the Debtors, the U.S. Trustee, the Committee and, subject to
the DCG Parties' and the Debtors' consent or an order of the Court, other parties that so request
and have assented to the terms of the Protective Order (as defined below).

### Basis for Relief

7.      Section 107(b) of the Bankruptcy Code is a codified exception to the general rule
of access and protects entities from potential harm caused by the disclosure of confidential
information.  Section 107(b)(1) provides, in relevant part, that a court may "protect an entity with
respect to a trade secret or confidential research, development, or commercial information."  11

3

U.S.C. § 107(b).  Bankruptcy Rule 9018 and Local Rule 9018-1 establish the procedure by which

a party in interest may obtain a protective order authorizing the filing of a document under seal

pursuant to section 107(b) of the Bankruptcy Code.  Bankruptcy Rule 9018 provides, in relevant

part, "[o]n motion or its own initiative, with or without notice, the court may make any order which

justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential

research, development, or commercial information . . . ."  Fed. R. Bank. P. 9018.  Section 105(a)

of the Bankruptcy Code further allows the court under its equitable powers to "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

8.      Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 are designed to

"protect business entities from disclosure of information that could reasonably be expected to

cause the entity commercial injury."  *In re Glob. Crossing*, Ltd., 295 B.R. 720, 725 (Bankr.

S.D.N.Y. 2003).  If the Court determines that filed documents are covered by Section 107(b), the

Court must issue a remedy that will protect the interested party and "has no discretion to deny the

application."  *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*,

21 F.3d 24, 27 (2d Cir. 1994); *see also In re Northstar Energy, Inc.*, 315 B.R. 425, 428 (Bankr.

E.D. Tex. 2004) ("In fact, § 107(b) *mandates* the protection of certain types of information,

including 'confidential commercial information.'") (emphasis in original); *In re Glob. Crossing*,

295 B.R. at 725.  Section 107(b) is "designed to protect 'business entities from disclosure of

information that could reasonably be expected to cause the entity commercial injury.'"  *In re

Northstar Energy, Inc.*, 315 B.R. at 429 (*citing In re Glob. Crossing, Ltd.*, 295 B.R. at 725).

9.      Courts have recognized the term "commercial information" is broad under section

107(b) of the Bankruptcy Code.  "Commercial information" need not rise to the level of a trade

secret to be protected by section 107(b) and the moving party is not required to demonstrate "good cause." *In re Orion Pictures*, 21 F.3d at 28.[1]   Once a court determines that a party in interest is seeking protection of information that falls within the ambit of section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." *Id*.   Courts have further held that the resulting sealing order should be broad (*i.e.*, "any order which justice requires").   *In re Glob. Crossing, Ltd.*, 295 B.R. at 724; *In re MF Global, Inc.*, 2012 WL 3260393, at *2 (Bankr. S.D.N.Y. 2012) (citing to *Orion*, 21 F.3d at 27 (emphasis in original)); *see also* Fed. R. Bankr. P. 9018.

10.      Moreover, a court has broad authority to issue an order under Bankruptcy Rule 9018.   *See, e.g.*, *In re Global Crossing*, 295 B.R. at 724 ("When the requirements of Rule 9018 are satisfied, the authority to issue the resulting order is broad – any order which justice requires.   The Court notes that the authority goes not just to the protection of confidential documents, but to other confidentiality restrictions that are warranted in the interests of justice.") (internal citations omitted); *In re MF Global*, at *3 ("In cases where protection is required, however, the form of protection that must be granted is not commanded by the statute.   The Court has discretion when deciding how to protect commercial information.").

11.      This Court has entered an order in these cases, pursuant to 11 U.S.C. § 107(b), to protect commercially sensitive and confidential information.[2]   Specifically, on April 20, 2023, the

---

[1]    This Court and other courts in this District have granted relief for similar requests to file commercially sensitive business information under seal. *See, e.g.*, Order, *In re Avianca Holdings S.A., et al.*, Case No. 20-11133 (MG) (S.D.N.Y. Bankr. June 19, 2020) (Docket No. 299) (business and personal information); Order, In re *Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (S.D.N.Y. Bankr. Dec. 13, 2017) (Docket No. 83) (business information).

[2]    The Court similarly entered an order authorizing the Debtors, pursuant to sections 107(c) and 105(a) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1, to redact the names, home addresses and email

Court entered the Protective Order, which established procedures to facilitate the production and exchange of Discovery Material (as defined in 2(b) of the Protective Order) that (i) contains confidential, trade secret, proprietary, or commercially sensitive business, financial, customer, or client information; (ii) contains private or confidential personal information; (iii) contains information that, pursuant to any domestic or foreign law, regulation, or court order, is kept confidential or is subject to restrictions on its use or disclosure; (iv) is subject to a confidentiality agreement or other form of non-disclosure agreement that (A) was entered into in good faith and for a legitimate business purpose and (B) was in effect on the date of entry of this Confidentiality Stipulation; (v) is otherwise entitled to protection under 11 U.S.C. § 107(b) or (c), Federal Rule of Civil Procedure 26(c), or Federal Rule of Bankruptcy Procedure 9018; and/or (vi) contains any other category of information given Confidential status by the Court. (Docket No. 238).  Pursuant to the Protective Order, producing parties can designate Discovery Material as Confidential Material or Highly Confidential Material as applicable.  Receiving parties may only use and disclose such material in accordance with the provisions of the Protective Order.  Pursuant to paragraph 13, any document reflecting or referring to information that a party has designated as confidential must comply with all relevant rules for electronic filing under seal.

12.    Here, the Plan Objection contains references to confidential and sensitive non-public information disclosed to DCG during discovery pursuant to a non-disclosure agreement. Moreover, the redacted documents and testimony have been marked as "Highly Confidential Materials" by the agreement of the Debtors, the UCC, and other parties participating in discovery

---

addresses of individuals listed on the consolidated creditors list and the addresses and email addresses of other creditors listed on the consolidated creditors list or other documents filed with this Court.  (Docket No. 694).

related to confirmation of the Amended Plan.  Pursuant to that non-disclosure agreement and the agreement of the parties, the DCG Parties have agreed to hold this information in the strictest confidence and not disclose the same without permission of the parties.  The DCG Debtors do not have the Debtors' or other parties' consent to disclose the redacted information.  Importantly, the relief requested in this Motion relates solely to (i) documents produced by the Debtors subject to the non-disclosure agreement and (ii) documents and testimony that the parties, during the course of discovery, have marked as highly confidential.

13.    It is necessary to file the Plan Objection under seal in order to prevent the disclosure of confidential and commercially sensitive information that would harm the Debtors and/or creditors.

14.    Courts regularly grant requests to seal information of this kind.  *In re Borders Group, Inc.*, 462 B.R. 42 (Bankr. S.D.N.Y. 2011) (sealing portions of a share purchase agreement containing commercial information); *In re Cred, Inc.*, Case No. 20-12836 (JTD), 2020 WL 13577187 (Bankr. D. Del. Sept. 21, 2020) (granting motion to redact the publication of personal identification information); *In re Zohar III, Corp., et al.*, Case No. 18-10512 (CSS) (Bankr. D. Del. May 17, 2018), D.I. 263 (authorizing debtors to file portions of settlement agreement and related information under seal).

15.    By this Motion, the DCG parties respectfully request the Court enter the Proposed Order authorizing the DCG Parties to redact and file confidential and commercially sensitive portions of the Plan Objection under seal in accordance with the Bankruptcy Code, Bankruptcy Rule 9018, Local Rule 9018-1, and directing the Plan Objection remain confidential and under seal, and that no such information shall be made available to anyone, other than as set forth in the order approving this Motion.  The DCG parties will also provide unredacted copies of the Plan

Objection to the Court, the Debtors, the UST, the Committee and, subject to the DCG Parties' and

the Debtors' consent or an order of the Court, such other parties that may request and have signed

the Protective Order.

### Notice

16.    The DCG Parties have provided notice of this Motion in accordance with the

procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures*

(Docket No. 44).  The DCG Parties submit that, in light of the nature of the relief requested, no

other or further notice need be provided.

### No Prior Request

17.    No prior request for the relief requested herein has been made to this or any other

Court.

### Conclusion

**WHEREFORE**, for the reasons set forth herein, the DCG Parties respectfully request that

this Court (a) enter an order, substantially in the form attached hereto as **Exhibit A** and (b) grant

such other and further relief as is just and proper.

Dated: February 5, 2024
          New York, New York

Respectfully submitted,

*/s/ Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
jeffrey.saferstein@weil.com
jonathan.polkes@weil.com
caroline.zalka@weil.com
jessica.liou@weil.com
furqaan.siddiqui@weil.com

*Attorneys for Digital Currency Group, Inc.
and DCG International Investments Ltd.*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*[1], | Case No.: 23-10063 (SHL) |
| Debtors | Jointly Administered |

**ORDER**
**AUTHORIZING DIGITAL CURRENCY GROUP, INC.'S AND DCG INTERNATIONAL**
**INVESTMENTS LTD.'S MOTION FOR AUTHORITY TO FILE THE OBJECTION TO**
**CONFIRMATION OF THE DEBTORS' AMENDED PLAN UNDER SEAL**

Upon the Motion[2] of Digital Currency Group, Inc. ("**DCG**") and DCG International

Investments Ltd. ("**DCGI**," together the "**DCG Parties**") for entry of an order (this "**Order**"),

authorizing the DCG Parties to redact and file the Plan Objection and directing that such

information remain confidential and under seal, as more fully described in the Motion; and the

Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the Southern District of

New York dated January 31, 2012; and the Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article

III of the United States Constitution; and the Court having found that venue of this proceeding and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

found that the relief requested in the Motion is in the best interests of the DCG Parties, the Debtors

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

and their estates, creditors and other parties in interest; and the Court having found that the DCG

Parties' notice of the Motion and opportunity for a hearing on the Motion was appropriate and no

other notice need be provided; and the Court having determined that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and all objections to the

Motion (if any) having been withdrawn or overruled; and upon all of the proceedings had before

the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      The DCG Parties are authorized (i) to file the Plan Objection on the public docket

of this case in its redacted form, and (ii) to deliver to the Clerk of the Court a signed, unredacted

copy of this Order, hard copies and electronic copies of the Plan Objection clearly labeled "FILED

UNDER PENDING MOTION TO SEAL."

3.      The Plan Objection shall remain under seal and shall not be made available, without

the consent of the DCG Parties and the Debtors or without further order of this Court, to anyone

other than (on a confidential basis) this Court, the Debtors, the UST, the Committee, and, subject

to the DCG Parties' and the Debtors' consent or an order of the Court, such other parties that may

request and have signed the Protective Order.

4.      To the extent that the Plan Objection is attached or referred to in any further

pleadings or document filed with this Court relating to these chapter 11 Cases, this Order shall

apply to such pleading or document.

5.      Upon the passing of forty-five (45) days after the final disposition of the chapter 11

Cases, any party that has filed materials under seal shall reclaim all documents filed under seal or,

alternatively, the Office of the Clerk of the Court shall be authorized to destroy said documents in a manner consistent with the need to preserve confidentiality.

6.      Nothing in this Order prejudices the rights of any party in interest, including the United States Trustee, to seek, on appropriate motion, the unsealing of the Plan Objection, or any part thereof.

7.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation, interpretation or enforcement of this Order.

Dated: _____, 2024
          White Plains, New York


                                            _____
                                            HONORABLE SEAN H. LANE
                                            UNITED STATES BANKRUPTCY JUDGE

3

## EXHIBIT B

**Redacted Plan Objection**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC. AND DCG INTERNATIONAL INVESTMENTS**
**LTD.'S OBJECTION TO CONFIRMATION OF THE DEBTORS' AMENDED PLAN**

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219) ("**GGH**"); Genesis Global Capital, LLC (8564) ("**GGC**"); Genesis Asia Pacific Pte. Ltd. (2164R) ("**GAP**," and collectively with GGH and GGC, the "**Debtors**").  For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich St., 38th Floor, New York, NY 10007.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 6

BURDEN OF PROOF ........................................................................................................ 9

ARGUMENT ................................................................................................................... 10

I.     The Amended Plan violates multiple requirements of section 1129 and is unconfirmable. .......................................................................................................... 12

    A.     The Amended Plan is an impermissible cramdown plan that violates section 1129(b) of the Bankruptcy Code. ......................................................... 12

        1.     The Amended Plan does not comply with section 502(b) of the Bankruptcy Code by allowing creditors to recover more than the Petition Date values of their claims. ................................................. 14

            a)     Section 502(b) mandates that the value of a claim is fixed in U.S. dollars as of the Petition Date. ...................................... 15

            b)     Section 502(b) of the Bankruptcy Code applies to all kinds of claims, including cryptocurrency claims. ................................ 18

            c)     The Distribution Principles allow creditors to recover more than the amount of their claim as of the Petition Date in violation of section 502(b). ............................................... 22

            d)     No exception to section 502(b) applies here. ................................ 24

        2.     The Amended Plan would pay an unlawful amount of interest to general unsecured creditors. ......................................................... 25

    B.     The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code. ............ 28

    C.     The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code. ............ 29

        1.     The Debtors have breached their fiduciary duties to DCG. ....................... 32

        2.     The Debtors propose in bad faith a plan that gives a small group of influential creditors favorable treatment through the Setoff Principles. ............................................................................... 34

        3.     The Amended Plan impermissibly alters DCG's equity holder rights in violation of applicable law. ........................................... 40

        4.     Conditioning DCG's rights on the issuance of a Final Order declaring all creditor claims Unimpaired has no basis in law, equity, or otherwise. ............................................................... 41

        5.     The Plan further cuts off DCG's beneficial interests in GGC and GAP. ............................................................................... 43

6.      DCG should have consent rights over the Debtors' Wind-Down..............43

D.      The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code. ...........45

II.    The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law. ..........46

A.      The Amended Plan improperly assumes and rejects only certain indemnification obligations. ................................................................................46

B.      Allowance of certain creditors' fees and expenses against the Estates. ...............47

C.      Any subordination of DCG Claims is improper. ...................................................48

D.      The Amended Plan should not require a tax sharing agreement. ..........................48

RESERVATION OF RIGHTS ........................................................................................................49

CONCLUSION..............................................................................................................................49

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*In re Aaura, Inc.*,
  No. 06-B-01853, 2006 WL 2568048 (Bankr. N.D. Ill. Sept. 1, 2006) ........................17, 18, 20

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ....................................................................................26

*In re Adelphia Commc'ns Corp.*,
  441 B.R. 6 (Bankr. S.D.N.Y. 2010) .......................................................................................48

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)...........................................................................................30, 37

*Am. United Mut. Life Ins. v. City of Avon Park*,
  311 U.S. 138 (1940)...............................................................................................................30

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom
  Arg., S.A.)*,
  528 F.3d 162 (2d Cir. 2008)..................................................................................................29

*In re Axona Int'l Credit & Com. Ltd.*,
  88 B.R. 597 (Bankr. S.D.N.Y. 1988)...............................................................................20, 23

*Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*,
  361 B.R. 489 (B.A.P. 8th Cir. 2007)....................................................................................15

*In re Bellevue Place Associates*,
  171 B.R. 615 (Bankr. N.D. Ill. 1994) ..................................................................................33

*Bergquist v. Felland (In re O-Jay Foods Inc.)*,
  No. 3-89-281, 1991 WL 378164 (D. Minn. Nov. 21, 1991).....................................................39

*In re Breitburn Energy Partners LP*,
  582 B.R. 321 (Bankr. S.D.N.Y. 2018)...........................................................................10, 13

*Cadle Co. v. Mangan (In re Flanagan)*,
  503 F.3d 171 (2d Cir. 2007)..................................................................................................15

*In re Celsius Network LLC*,
  655 B.R. 301 (Bankr. S.D.N.Y. 2023).............................................................................15, 22

*Chevron Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
  428 B.R. 590 (D. Del. 2010)..................................................................................................39

*In re City Stores Co.*,
  21 B.R. 809 (Bankr. S.D.N.Y. 1982)....................................................................................46

i

*Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
138 B.R. 687 (Bankr. S.D.N.Y. 1992) ...................................................................36

*In re Combustion Eng'g Inc.*,
391 F.3d 190 (3d Cir 2004), *as amended* (Feb. 23, 2005) .....................................10

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985).................................................................................................32

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005)...........................................................................2, 36, 45

*COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*,
524 F.3d 373 (2d Cir. 2008)....................................................................................47

*Coster v. UIP Companies, Inc.*,
255 A.3d 952 (Del. 2021) ........................................................................................40

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017).................................................................................................13

*In re Dernick*,
624 B.R. 799 (Bankr. S.D. Tex. 2020) ...................................................................30

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................................9, 45

*In re Dow Corning Corp.*,
237 B.R. 380 (Bankr. E.D. Mich. 1999) .................................................................27

*EMAK Worldwide, Inc. v. Kurz*,
50 A.3d 429 (Del. 2012) ..........................................................................................40

*In re Eriksen*,
647 B.R. 192 (Bankr. N.D. Ohio 2022).................................................................18

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
984 F.3d 30 (2d Cir. 2020).......................................................................................42

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .........................................................................13

*Finanz AG Zurich v. Banco Economico S.A.*,
192 F.3d 240 (2d Cir. 1999)....................................................................................19

*In re FTX Trading Ltd.*,
No. 23-02297, 2024 WL 204456 (3d Cir. Jan. 19, 2024) .......................................................19

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..................................................................................29

*In re Genever Holdings, LLC*,
Case No. 20-12411-JLG, 2021 WL 3919826 (Bankr. S.D.N.Y. 2021)...................................40

*In re Glob. Power Equip. Grp.*,
No. 06-11045, 2008 WL 435197 (Bankr. D. Del. Feb. 14, 2008), *aff'd*, 400
B.R. 17 (D. Del. 2009) .........................................................................................................18

*In re Global Indus. Tech, Inc.*,
No. 02-21626 (JKF), 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013)............................37

*In re Global Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011)............................................................................................30, 37

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..................................................................................13

*In re Groenleer-Vance Furniture Co.*,
23 F. Supp. 713 (W.D. Mich. 1938) .....................................................................................17

*In re Hansen Bakeries*,
103 F.2d 665 (3d Cir. 1939).................................................................................................17

*In re Hawker Beechcraft, Inc.*,
486 B.R. 264 (Bankr. S.D.N.Y. 2013) ..................................................................................46

*In re Ira Haupt & Co.*,
361 F.2d 164 (2d Cir. 1966).................................................................................................44

*In re Klaber Bros., Inc.*,
173 F. Supp. 83 (S.D.N.Y. 1959) .........................................................................................46

*LaSalle Nat. Bank v. Perelman*,
82 F. Supp. 2d 279 (D. Del. 2000)...................................................................................33, 37

*In re LATAM Airlines Group S.A.*,
No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023) .........................19

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)....................26, 27

*Law v. Siegel*,
571 U.S. 415 (2014)..............................................................................................................18

*In re Lehman Brothers Hldgs. Inc.*,
602 B.R. 564 (Bankr. S.D.N.Y. 2019) ...................................................................20

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ................................................................................................18

*Lionel Corp. v. Committee of Equity Sec. Holders of Lionel Corp. (In re Lionel Corp.)*,
30 B.R. 327 (Bankr. S.D.N.Y. 1983) ...................................................................40

*In re Madison 92nd St. Assocs. LLC*,
472 B.R. 189 (Bankr. S.D.N.Y. 2012) ............................................................25, 26

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) .....................................................................48

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*,
801 F.2d 60 (2d Cir. 1980) ....................................................................................40

*In re MatlinPatterson Global Opportunities Partners II L.P.*,
644 B.R. 418 (Bankr. S.D.N.Y. 2022) ..................................................................13

*In re Melenyzer*,
143 B.R. 829 (Bankr. W.D. Tex. 1992) .................................................................27

*In re Michaelis & Lindeman*,
196 F. 718 (S.D.N.Y. 1912) ...................................................................................17

*Miller v. Mott (In re Team Sys. Int'l, LLC)*,
2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...............................................13

*Moser v. Encore Cap. Grp., Inc.*,
964 F. Supp. 2d 1224 (S.D. Cal. 2012) .................................................................20

*In re MPM Silicones, LLC*,
No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
*aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2017) ....................................................................28

*In re Mushroom Transp. Co.*,
382 F.3d 325 (3d Cir. 2004) ..................................................................................36

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*,
28 F.4th 357 (2d Cir. 2022) ...................................................................................19

*In re New York City Off-Track Betting Corp.*,
427 B.R. 256 (Bankr. S.D.N.Y. 2010) ..................................................................16

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) ....................................................33

*In re Pack Liquidating, LLC*,
    No. 22-10797 (Bankr. D. Del. Feb. 2, 2024), Docket No. 1231 ..............................33

*Paramount Comm'ns, Inc. v. QVC Network, Inc.*,
    637 A.2d 34 (Del. 1994) ....................................................40

*In re Peak Broadcasting, LLC*,
    No. 12-10183 (MFW), 2012 WL 1452359 (Bankr. D. Del. Apr. 20, 2012)..........................28

*Philbrook v. Glodgett*,
    421 U.S. 707 (1975)....................................................16

*In re Potter Instrument Co.*,
    593 F.2d 470 (2d Cir. 1979)....................................................40

*In re Promise Healthcare Grp., LLC*,
    No. 18-12491, 2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023)........................18

*In re PTM Techs., Inc.*,
    No. 10-50980C-11W, 2013 WL 4519306 (Bankr. M.D.N.C. Aug. 26, 2013) ......................28

*In re Quigley Co., Inc.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ....................................................10

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*,
    404 B.R. 793 (Bankr. M.D. Pa. 2009) ....................................................15, 18, 19

*Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*,
    640 F.3d 53 (2d Cir. 2011)....................................................10

*Scully v. US WATS, Inc.*,
    238 F.3d 497 (3d Cir. 2001)....................................................20

*Sears v. Sears (In re Sears)*,
    863 F.3d 973 (8th Cir. 2017) ....................................................15

*Sexton v. Dreyfus*,
    219 U.S. 339 (1911)....................................................17

*In re SunEdison, Inc.*,
    575 B.R. 220 (Bankr. S.D.N.Y. 2017) ....................................................13

*TD Bank, N.A. v. Landry*,
    479 B.R. 1 (D. Mass. 2012) ....................................................16

*In re Tenney Village Co., Inc.*,
    104 B.R. 562 (Bankr. D.N.H. 1989) ...................................................38

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..................................................42

*In re Trenton Ridge Invs.*,
    LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011) ........................................30

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .................................................13

*USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New
    England, Inc.)*,
    429 B.R. 437 (Bankr. D. Md. 2010), *aff'd sub nom. TransCanada Pipelines
    Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011).......................19, 23

*Van Siclen v. Bush (In re Bush Terminal Co.)*,
    78 F.2d 662 (2d Cir. 1935)...............................................................40

*Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*,
    637 B.R. 781 (Bankr. D. Del. 2021) ..............................................25, 27

*White v. Lambert*,
    370 F.3d 1002 (9th Cir. 2004) ..........................................................16

*Wilkow v. Forbes, Inc.*,
    241 F.3d 552 (7th Cir. 2001) ............................................................42

*In re Young Broadcasting Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) .................................................10

*In re Zamora*,
    No. 19-01040 (WLH), 2020 WL 4289926 (Bankr. E.D. Wash. July 27, 2020).....................38

**Statutes**

11 U.S.C. § 365.............................................................................46, 47

11 U.S.C. § 502(b) ........................................................................ *passim*

11 U.S.C. § 562..............................................................................24, 25

11 U.S.C. § 550(a) .............................................................................16

11 U.S.C. § 506(a)(1)..........................................................................16

11 U.S.C. § 704(a)(5)..........................................................................36

11 U.S.C. § 726(a)(5) .................................................................................................26

11 U.S.C. § 1106(a)(1) ...............................................................................................36

11 U.S.C. § 1107(a) ....................................................................................................36

11 U.S.C. § 1109(b) ....................................................................................................10

11 U.S.C. § 1123(a)(4) ...............................................................................................39

11 U.S.C. § 1123(a)(6) ..........................................................................................28, 29

11 U.S.C. § 1123(a)(7) ...............................................................................................43

11 U.S.C. § 1124(1) ....................................................................................................42

11 U.S.C. § 1128(b) ....................................................................................................10

11 U.S.C. § 1129 .................................................................................................. *passim*

11 U.S.C. § 1129(a) ..................................................................................2, 9, 12, 46

11 U.S.C. § 1129(a)(1) ............................................................................11, 28, 29, 48

11 U.S.C. § 1129(a)(3) ...................................................................................... *passim*

11 U.S.C. § 1129(a)(7) ....................................................................................12, 14, 45

11 U.S.C. § 1129(a)(7)(A)(ii) .....................................................................................26

11 U.S.C. § 1129(b) ........................................................................................... *passim*

11 U.S.C. § 1129(b)(2) ...............................................................................................41

28 U.S.C. § 1961 .........................................................................................................26

**Other Authorities**

Fed. R. Bankr. P. 9019 ................................................................................................13

*In re BlockFi Inc.*,
    No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660 ..................20

*In re Celsius Network LLC*,
    No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 27, 2023), Docket No. 3577 ............21

7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023) ..........................................12

*In re FTX Trading Ltd.*,
No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31 Hr'g Tr.) .......................................4, 19, 21, 22

S. Rep. No. 95-989 (1978). Section 502(b) ..................................................................................17

*In re Voyager Digital Holdings*,
No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ...........................21

www.gemini.com/earn.....................................................................................................................7

www.coinbase.com/price/bitcoin....................................................................................................8

Digital Currency Group, Inc. ("**DCG**") and DCG International Investments Ltd. ("**DCGI**") submit this objection (the "**Objection**")[2] to the approval of the *Debtors' Amended Joint Chapter 11 Plan* (Docket No. 989) (as amended, modified or supplemented, the "**Amended Plan**")[3] and respectfully states as follows:

<u>**Preliminary Statement**</u>

1.    DCG would support a plan that pays creditors one hundred cents on the dollar, and the Estates currently have sufficient assets to do so.  But the Debtors have not proposed such a plan.  Instead, the Debtors, in concert with the UCC and Ad Hoc Group, have devised a cramdown plan that pays unsecured creditors hundreds of millions of dollars *more* than the full amount of their petition date claims—and which disproportionately favors a small controlling group of creditors over others—in violation of the Bankruptcy Code.  It also strips DCG of other valuable economic and corporate governance rights further violating the Bankruptcy Code and demonstrating a lack of good faith.  DCG cannot support such a plan, and the Court should not approve it.

2.    Through the complex and convoluted Distribution Principles, the Amended Plan violates two black letter requirements of the Bankruptcy Code for confirming a cram down plan: (1) senior classes may not receive more than the full value of their claims, and (2) distributions must comply with the absolute priority rule.  Indeed, rather than maximizing the value of the Estates for the benefit of all constituents—as the Debtors' fiduciary obligations to the Estates require—the Amended Plan proposes to grant general unsecured creditors all the upside from the

---

[2]    Unless explicitly stated otherwise, all references to DCG's positions are fully adopted by DCGI.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Plan Supplement, the Disclosure Statement Order, or the Disclosure Statement (each as defined herein).

increasing market value of the Estates' digital assets through valuation dates and interest rates prohibited by the Bankruptcy Code. The Amended Plan goes further to give certain favored creditors—to the disadvantage of all other creditors and equity holders—an even greater distribution through the lopsided Setoff Principles that minimize the favored creditors' obligations to the Estates while maximizing their payout from the Estates. Certain creditors will be paid a premium, while equity holders receive nothing. Such a result is not fair and equitable to those creditors and equity holders, whose rights are violated by the Amended Plan. The Debtors have sought expediency by proposing a plan that creditors would support, but at the cost of complying with their duties and obligations under the Bankruptcy Code. This, in violation of the principle that "efficiency must not be obtained at the price of diminishing the integrity of the process."[4] The Bankruptcy Code is clear: the Amended Plan may not be confirmed.

3.       The undisputed record demonstrates the Amended Plan does not comport with section 1129 of the Bankruptcy Code because it does not comply with applicable provisions of the Bankruptcy Code and was proposed in bad faith. Section 502(b) of the Bankruptcy Code requires that claims be valued in U.S. dollars as of the petition date. In plain violation of that provision, the Amended Plan proffers a distribution scheme that allows certain unsecured claims to grow to an extreme degree as the Estates' assets increase in value. The Amended Plan does so by valuing certain creditor claims based on the value of the reference assets as of the distribution date under the so-called Distribution Principles: The more the assets of the Estates appreciate, the more those creditors will receive as allowable claims, and the more value they will be permitted to take in excess of their Petition Date claims. These assets are overwhelmingly cryptocurrencies which have increased in value since the Petition Date, and these senior creditors will be the sole

---

[4]      *In re Congoleum Corp.*, 426 F.3d 675, 693 (3d Cir. 2005).

beneficiaries of that appreciation under the Amended Plan.  It is likely no coincidence that this

distribution construct was introduced when cryptocurrency prices began to increase.[5]

4.      If allowed, this unlawful diversion would allow these creditors to take far more than

what is permitted by the Bankruptcy Code.  ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  This taking of DCG's

interests as the ultimate equity holder of the Debtors comes despite DCG's direct channeling of

hundreds of millions of dollars of liquidity and capital to the Debtors in the year leading up to the

filing of these cases.  Were DCG ultimately to receive some equity value, it would merely be a

return of some of the massive investment DCG made in the Debtors pre-filing.

5.      ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████  And this is hardly the first cryptocurrency

bankruptcy filing.  Importantly, every other cryptocurrency case has used the normal claim

valuation mechanism prescribed by the Bankruptcy Code.  Indeed, just days ago, the Bankruptcy

---

[5]   ███████████████████████████████████████████

Court in the FTX bankruptcy cases overruled objections to the petition date claims valuation proffered by the debtor, stating: "I conclude that debtors' use of the petition date as the date for determining the value of the digital asset claims is appropriate. I have no wiggle room on that."[6] The same is true here, and the Debtors are left unable to explain why this Court would have the authority under the Bankruptcy Code to rule differently.

6.      Moreover, the Amended Plan is the product of a gross breach of the fiduciary duties owed by the Debtors and their directors to DCG as the ultimate equity holder in the solvent Debtors and is, therefore, not proposed in good faith. Because of the unlawful Distribution Principles outlined above, the illustrative waterfall offered in the Amended Plan is a sham, provided to create the illusion that the subordinated creditors and equity interests will receive value after the unsecured claims are paid in full, while deliberately obscuring that under the formulation, the Estates' excess value will instead continually flow to general unsecured creditors. ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

7.      Not surprisingly, the Amended Plan was the product of a clandestine process. The Debtors engaged in months of back room discussions with the UCC and the Ad Hoc Group, which deliberately excluded DCG, the ultimate equity holder in these solvent Estates. Even worse, they have hidden their self-dealing behind assertions of common-interest privilege, preventing any

---

[6]      *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr.) (the "**FTX Hearing Transcript**"), (attached hereto as <u>**Exhibit A**</u>) at 15:2–11.

review by the Court.  It is no accident that this process resulted in a structure that disenfranchises the equity interests, imposes a distribution plan that gives the general unsecured creditors practically limitless upside potential on the appreciation of digital assets right up through the final distributions, and puts forth a sham waterfall that conceals this fact.

8.    The UCC and Ad Hoc Group also helped themselves—with the Debtors as their accomplice—to a host of other advantages, all at the expense of DCG:

- Granting unsecured creditors post-petition interest at rates not recognized by this District and in violation of 1129(a)(7), as well as an improper sweetener of additional post-Effective Date interest at an arbitrary rate, further siphoning value away from DCG for the benefit of general unsecured creditors;

- Restricting DCG's rights to exercise any rights or remedies as sole equity holder;

- Removing DCG's economic interests, voting interests, and governance rights with respect to GGC or its subsidiaries;

- Removing DCG's rights to any dividends or distributions as a result of its ownership of interests in GGH;

- Removing DCG's right to transfer its interests in GGH or take a worthless stock deduction;

- Limiting DCG's right to appoint the directors of GGH;

- Excluding DCG from the parties who have consent rights over the New Governance Documents; and

- Providing DCG no representation on the various Wind-Down committees set up by the Amended Plan, despite DCG's interests in the Estates.

On top of all of this, a small group of particularly powerful creditors have also inserted favorable setoff provisions that allow them to minimize their obligations to the Debtors while maximizing their recoveries.  Put simply, the influential creditors controlling the UCC and Ad Hoc Group have sought to enrich themselves by literally taking value from other stakeholders, and the Debtors caved to their demands in violation of their fiduciary duties.

9.      Again, DCG would fully support a plan that provides a 100% recovery for creditors—par plus post-petition interest.  But rather than move expeditiously to confirm a plan that pays creditors one-hundred cents on the dollar, the UCC and Ad Hoc Group, with the willing participation of the Debtors, conspired to formulate a plan that deliberately—in violation of the Bankruptcy Code, applicable non-bankruptcy law, and the Debtors' fiduciary obligations to equity—disenfranchises the sole equity holder in this fully solvent estate, DCG.  This is the definition of bad faith.

10.     Additionally, the assertion that this distribution scheme is somehow a settlement is completely disingenuous.  If this was truly a settlement, DCG would have been included as one the beneficiaries of the excess value of the Estates and would have, at a minimum, been provided some recovery as equity holder.  Instead, the Debtors, UCC, and Ad Hoc Group took all the additional value and then decided how to allocate it to benefit themselves, leaving nothing for other stakeholders.  That is not a fair settlement among interested parties.

11.     For these reasons, and as discussed below, the Debtors have not met the requirements to confirm a plan under section 1129 of the Bankruptcy Code and, therefore, the Amended Plan should not be confirmed.

## **Background**

12.     On October 24, 2023, the Debtors filed a plan that did not contemplate a deal with DCG—after nearly a year of negotiations and multiple deals reached, including one facilitated by a court-ordered mediation process—and instead prioritized the pursuit of various litigation claims against DCG and other parties, *see Debtors' Amended Joint Chapter 11 Plan* (Docket No. 838), along with a disclosure statement, *Amended Disclosure Statement with Respect to the Amended Joint Plain of Genesis Global Holdco, LLC* et al., *Under Chapter 11 of the Bankruptcy Code*

(Docket No. 839) (as amended, modified, or supplemented from time to time, the "**Disclosure**

**Statement**").

13.     The Debtors have since revised the plan several times, with the most recent version

filed as the Amended Plan on November 28, 2023.  In addition to the Debtors, the Amended Plan

is supported by the official committee of unsecured creditors (the "**UCC**") and the ad hoc group

of Genesis lenders (the "**Ad Hoc Group**") (collectively, the "**Plan Support Parties**").  *See Plan*

*Support Agreement* (Docket No. 1008), filed November 29, 2023; *see also* Nov. 28, 2023 Hr'g Tr.

(Docket No. 1148) at 15:22–16:6, 22:20–23:3.  Additionally, Gemini Trust Company, LLC

("**Gemini**") recommended that the Gemini Lenders vote in favor of the Amended Plan, while

noting that the Amended Plan contains flaws that it sought to resolve with the Debtors.  *See*

www.gemini.com/earn.  Prior to the Disclosure Statement hearing, the ad hoc group of "crypto

creditors" (the "**Crypto Creditors Group**") filed an objection to the Disclosure Statement

(Docket No. 982).

14.     After several continued hearings and revisions to the Disclosure Statement to

resolve objections, the Court ultimately approved the Disclosure Statement, the solicitation version

of which was filed on December 6, 2023 (Docket No. 1031).  *Order Authorizing Debtors' Motion*

*to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and*

*Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection*

*Therewith, and (IV) Certain Dates with Respect Thereto* (Docket No. 1027) (the "**Disclosure**

**Statement Order**").  The Disclosure Statement Order set forth a timeline for confirmation,

including a discovery schedule. *Id.* at 5–6.

15.     Most significantly, the Amended Plan and its Distribution Principles contemplate

distributions to creditors with claims denominated in digital assets in excess of what the

Bankruptcy Code permits.  To do so, the Amended Plan allows creditors to recover the cash value

as of the Petition Date of the digital assets underlying their bankruptcy claims, but then also allows

those same creditors to receive ***additional*** payouts based on the ***current*** value of those digital

assets.  Distribution Principles at 8–9; ███████████████████████████████

████ .  The higher the value of the digital assets goes, the greater the recovery to the creditors—at

no point does the excess value from those digital assets flow to the subordinated creditors or to

DCG as the ultimate equity holder.  And since the Petition Date, the market values of the digital

assets of the Estates have increased significantly.  ████████████████████████

████████████████████ .  Indeed, by today's valuation, the market value of certain digital assets

has increased dramatically—for example, as of February 4, 2024, the market value of Bitcoin had

increased by almost 102.5% since the Petition Date.[7]  There is, accordingly, no practical cap on

the payout to these creditors.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7]    See Disclosure Statement Ex. D at 5; https://www.coinbase.com/price/bitcoin.



**Burden of Proof**

18.    A chapter 11 plan may be confirmed only if it satisfies the requirements of section 1129(a) of the Bankruptcy Code, which include, *inter alia*, that the plan "complies with the applicable provisions of" the Bankruptcy Code, that the plan "has been proposed in good faith," and that holders of an impaired claim or interest either have accepted the plan or will receive at least as much under the plan as they would in a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a). The plan's proponent bears the burden of showing, by a preponderance of the evidence, that all of the applicable elements of section 1129(a) have been satisfied. *See In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019). Additionally, a plan that is not fully consensual must satisfy the requirements of section 1129(b), which too must be demonstrated by the plan proponent by a preponderance of the evidence. *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). The Court also has an independent duty to ensure all requirements of

section 1129 (including both subsections (a) and (b)) of the Bankruptcy Code are met before a plan

is confirmed, whether it sustains objections or not.  *See, e.g.*, *In re Young Broadcasting Inc.*, 430

B.R. 99, 139 (Bankr. S.D.N.Y. 2010) ("The Court need not reach the issues of waiver and standing

because it has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are

satisfied, even if no objections to confirmation have been made.").

## Argument

19.    The Amended Plan cannot be confirmed because it violates multiple requirements

of section 1129 of the Bankruptcy Code.[8]

20.    *First*, the Amended Plan constitutes an impermissible cramdown plan in violation

of section 1129(b).  The Amended Plan is not fair or equitable to impaired classes that have rejected

or are deemed to reject the Amended Plan because the Distribution Principles would pay a

premium of approximately ███████[9] in excess value, if not more, at the expense of

subordinated claimholders and equity holders in violation of section 502(b) of the Bankruptcy

---

[8]    The Bankruptcy Code provides that "[a] party in interest may object to confirmation of a plan."  11 U.S.C. § 1128(b).  Section 1109(b) of the Bankruptcy Code further describes "party in interest" to include, among other things, "a creditor" and "an equity security holder."  11 U.S.C. § 1109(b).  Section 1109(b) is not intended to be an exclusive list; rather, courts broadly define a party in interest to include anyone with a financial interest, or in some cases a legal interest, in the case.  *See Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*, 640 F.3d 53, 60 (2d Cir. 2011); *see also In re Combustion Eng'g Inc.*, 391 F.3d 190, 214 n.21 (3d Cir 2004), *as amended* (Feb. 23, 2005) (noting that 1109(b) is not an exclusive list of potential parties and "has been construed to create a broad right of participation in Chapter 11 cases.").

DCG qualifies as both a creditor and an equity security holder of the Debtors.  DCG and DCGI filed proofs of claim against the Debtors.  Claim Nos. 464, 487, 511, 478.  And DCG is GGH's sole equity holder.  Both DCG and DCGI therefore have financial and legal interests in the outcome of these chapter 11 cases and the plan confirmation process.  *See id.*  Additionally, DCG and DCGI only seek to challenge those portions of the Amended Plan that affect their direct interests.  *See In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) (noting that a "party in interest" must still satisfy the general requirements of the standing doctrine, including by demonstrating prudential standing).

[9]    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

Code and a bedrock principle of bankruptcy law: the corollary to the absolute priority rule requiring that senior classes of creditors not receive more than full compensation for their allowed claims. Additionally, excess value after the Recovery Cap is reached will flow to general unsecured creditors through payments of interest at rates not permitted in this District or under the Bankruptcy Code, further depriving subordinated claimholders and equity holders of value they are entitled to receive under the Bankruptcy Code.

21.     *Second*, and again by violating section 502(b) of the Bankruptcy Code through the Distribution Principles, the Amended Plan fails to comply with section 1129(a)(1) of the Bankruptcy Code.

22.     *Third*, the Amended Plan violates section 1129(a)(3) of the Bankruptcy Code because the Amended Plan and its Distribution Principles have not been proposed in good faith and violate applicable law. Indeed, the Amended Plan was designed in secret by a select group of influential creditors—to the exclusion of DCG—to ensure maximum recovery to those creditors, well beyond what is allowed under the Bankruptcy Code. The Amended Plan increases the effective claims of unsecured creditors as needed to absorb increases in the Debtors' digital asset value such that equity holders (and subordinated creditors) are unlikely to ever see a penny. It further gives a small group of creditors favorable treatment through the Setoff Principles, to the detriment of other creditors and equity holders. The icing on the cake is a series of provisions that ostensibly keep DCG as existing equity holder while simultaneously stripping it of numerous attendant economic and governance rights, perhaps most significantly its voting rights, as the ultimate equity holder of the Debtors, and in violation of multiple provisions of the Bankruptcy Code and applicable law.

23.     *Fourth*, the Amended Plan violates section 1129(a)(7) because it is not in the best

interest of subordinated creditors and equity holders.  As noted, the Amended Plan proposes to

impermissibly increase general unsecured creditor recoveries by not tying such recoveries to

Petition Date value, and paying interest on claims that is not permitted under the Bankruptcy Code.

Accordingly, this leaves junior classes of claims and interests to receive less than they would in a

hypothetical liquidation where the distribution scheme follows the Bankruptcy Code.

24.     Lastly, the Amended Plan further disenfranchises DCG of its corporate governance

rights and rights as the sole owner of interests in GGH by restricting its right to transfer its interests

in GGH and take a worthless stock deduction for tax purposes if and when appropriate.

25.     For these reasons, and as discussed below, the Amended Plan is unconfirmable.

## I.     The Amended Plan violates multiple requirements of section 1129 and is unconfirmable.

26.     A chapter 11 plan may not be confirmed unless it satisfies all requirements of

section 1129(a) of the Bankruptcy Code, which includes the requirements of section 1129(b) for a

plan that has not been accepted by all classes.  The Debtors' Amended Plan cannot be confirmed

because it violates multiple requirements of sections of 1129 of the Bankruptcy Code, namely the

cramdown requirements of section 1129(b), as well as sections 1129(a)(1), (3), and (7).

### A.     The Amended Plan is an impermissible cramdown plan that violates section 1129(b) of the Bankruptcy Code.

27.     A cramdown plan is permissible only if, among other things, the plan is "fair and

equitable" with respect to classes of claims or interests that are impaired under and have not

accepted the plan.  11 U.S.C. § 1129(b).  To be fair and equitable, a plan must comport with (i) the

absolute priority rule; and (ii) the principle that no creditor be paid more than it is owed.  *See*

7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023).  "An unwritten corollary to the absolute

priority rule is that a senior class cannot receive more than full compensation[10] for its claims"
because "shareholders are entitled to the surplus." *In re SunEdison, Inc.*, 575 B.R. 220, 227
(Bankr. S.D.N.Y. 2017) (citations omitted); *see also In re Breitburn Energy Partners LP*, 582 B.R.
321, 350 (Bankr. S.D.N.Y. 2018) (same); *In re Tronox Inc.*, 503 B.R. 239, 337 (Bankr. S.D.N.Y.
2013) (same); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (same); *In
re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (same); *Miller v. Mott (In re Team Sys.
Int'l, LLC)*, 2023 WL 1428572, at *12 (Bankr. D. Del. Jan. 31, 2023) ("[O]nce creditors are paid,
any remaining value would be distributed to the debtor, which would presumably dividend that
distribution to its equity holders.").

28.    Notably, the requirements of section 1129 cannot be avoided by deeming the
Amended Plan and Distribution Principles a "settlement" among creditors.    There is no
"settlement" where, as here, interested parties were wholly excluded from discussions and the
Estates appear to receive nothing in return for these unlawful distributions of value.    Additionally,
as recently reiterated by the United States Supreme Court, section 1129(b) cannot be sidestepped
by a settlement of only certain parties.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471
(2017) (finding impermissible a settlement for a structured dismissal that violated the absolute
priority rule).[11]

29.    As explained below, the Amended Plan violates section 1129(b) in two ways, either
of which is sufficient on its own to deny confirmation.

---

[10]    As discussed herein, the "solvent debtor exception" may allow creditors to recover a certain amount of post-petition interest on their claims before they are considered paid in full.  However, even here, the Debtors have departed from the legally permissible rate to further detrimentally impact DCG's interests, as explained herein.

[11]    Even if the Distribution Principles were treated as a settlement pursuant to Bankruptcy Rule 9019—rather than as a plan for distribution—the Court would still have to evaluate whether "the proposed settlement would 'unduly prejudice' a non-settling creditor or other party."  *In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 428 (Bankr. S.D.N.Y. 2022).

30.     *First*, for ultimate distributions, the Amended Plan impermissibly values creditors'
claims in cryptocurrency as of the date of distribution, rather than in U.S. dollars as of the Petition
Date, in violation of section 502(b) of the Bankruptcy Code.  As a result of this improper valuation,
the Amended Plan proposes to divert nearly ████████ in value—and potentially many millions
more if the digital assets continue to appreciate—to creditors, which should instead flow to equity
under the Bankruptcy Code.  Because the Distribution Principles grant certain creditors more on
account of their claims than is allowed under the Bankruptcy Code, the Amended Plan plainly
violates the corollary to the absolute priority rule and, as a result, violates section 1129(b).

31.     *Second*, the Amended Plan contemplates the payment of interest to general
unsecured creditors at rates not recognized by this District and in excess of what is allowed by
section 1129(a)(7) of the Bankruptcy Code.  This impermissible diversion of Estate assets to
creditors likewise violates the absolute priority rule by paying creditors more on account of their
claims than what the Bankruptcy Code allows.  As a result, the Distribution Principles, as
incorporated by the Amended Plan, violate section 1129(b).

   **1.  The Amended Plan does not comply with section 502(b) of the
Bankruptcy Code by allowing creditors to recover more than the
Petition Date values of their claims.**

32.     The Amended Plan violates section 502(b) because it proposes to pay creditors
based on the value of their claims for digital assets as of the distribution date, rather than in lawful
currency of the United States ("**U.S. dollars**") as of the Petition Date.  Although creditors' initial
pro rata distributions are based on their claims being valued as of the Petition
Date, *see* Distribution Principles at 4, the Recovery Cap for each creditor floats with the underlying
asset prices, *see* Distribution Principles at 8–9.  That is, claims are effectively being valued at the
average price of the asset during the 15-day period before and after the date the Confirmation
Order is entered (termed the "**Initial Conversion Rate**"), or at a later distribution date, not the

Petition Date.  *Id.*  Put differently, the Distribution Principles would allow certain creditors, whose claims are based on digital assets that have significantly appreciated in value since the Petition Date, to recover more than the value of their claims in U.S. dollars as of the Petition Date.

> a)   *Section 502(b) mandates that the value of a claim is fixed in U.S. dollars as of the Petition Date.*

33.   Section 502(b) is unambiguous:  A bankruptcy court "shall allow" a claim against which an objection has been raised only in "the amount of such claim in lawful currency of the United States of the date of the filing of the petition."[12]   11 U.S.C. § 502(b).   There are two elements to this mandate.  First, a claim is valued as of "the date of the filing of the petition."  *Id.*; *see also Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 179 (2d Cir. 2007) ("A plain reading of [section 502(b)] suggests that the bankruptcy court should determine whether a creditor's claim is enforceable against the debtor as of the date the bankruptcy petition was filed."); *Sears v. Sears (In re Sears)*, 863 F.3d 973, 978 (8th Cir. 2017) ("When a party in interest objects to a creditor's claim, the bankruptcy court 'shall determine the amount of such claim . . . as of the date of the filing of the petition.'" (citation omitted)); *Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*, 361 B.R. 489, 497 (B.A.P. 8th Cir. 2007) ("The petition date controls the allowance of claims in bankruptcy.").   Second, that valuation is to be made in U.S. dollars, not in some other denomination.  *See, e.g.*, *S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*, 404 B.R. 793, 799 (Bankr. M.D. Pa. 2009) (converting claim in Canadian dollars to U.S. dollars based on the petition date exchange rate).

---

[12]   Although section 502(b) only explicitly refers to determination of claims that have been objected to, courts value claims as of the petition date in U.S. dollars in other contexts, such as allowance of claims for plan distributions. *See, e.g.*, *In re Celsius Network LLC*, 655 B.R. 301, 312 (Bankr. S.D.N.Y. 2023) ("Whether under a chapter 11 plan or liquidation, creditors are entitled to their share of the value of the Debtors' Estates on the Petition Date.").

34.    The meaning of section 502(b) is clear on its face, and "[i]n the usual case, if the words of a statute are unambiguous, judicial inquiry should end, and the law is interpreted according to the plain meaning of its words." *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 268 (Bankr. S.D.N.Y. 2010) (quoting *Devine v. U.S.*, 202 F.3d 547, 551 (2d Cir. 2000)).  In any event, other sources of statutory meaning reinforce the plain language of section 502(b).

35.    *First*, other sections of the Bankruptcy Code support strict application of section 502(b).  *See Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) (noting that, in interpreting one part of a statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy").  For example, section 550(a) of the Bankruptcy Code—which governs what the trustee or debtor-in-possession can recover for the benefit of the estate through avoidance claims—states that the trustee may recover "the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a).  Thus, unlike section 502(b), section 550(a) allows the bankruptcy court to disburse from the estate *either* the "property transferred" or "the value of such property." *Id.*  Section 506(a)(1)—which governs how courts are to determine whether a claim is secured—directs courts to value the creditor's security interest "in light of the purpose of the valuation and of the proposed disposition or use of such property."  11 U.S.C. § 506(a)(1); *see also TD Bank, N.A. v. Landry*, 479 B.R. 1, 4–8 (D. Mass. 2012) (discussing application of the section).  By expressly allowing for alternative valuation methodologies in these sections while limiting section 502(b) to the value of the claim as of the petition date, Congress evinced its intent that section 502(b) be ***strictly applied***.  *See White v. Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004) ("It is axiomatic that when Congress uses different text in 'adjacent' statutes it intends that the different terms carry a different meaning.").

16

36.    *Second*, valuing assets as of the petition date is consistent with historical practice. The prior statute providing for allowance of claims—section 57(d) of the 1898 Bankruptcy Act—was ambiguous as to the date and methodology for valuation of claims: "Claims which have been duly proved shall be allowed, upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest, or their consideration to be continued for cause by the court upon its own motion." The Supreme Court, however, interpreted section 57(d) as incorporating the "English rule" that claims in bankruptcy are "fixe[d] the moment . . . the petition is filed." *Sexton v. Dreyfus*, 219 U.S. 339, 345 (1911). Such a rule, the Court explained, "simply fixes the moment when the affairs of the bankrupt are supposed to be wound up." *Id.* at 344. Courts thereafter repeatedly affirmed that "the rights of the creditors of a bankrupt become fixed on the date of the filing of the bankruptcy petition." *In re Hansen Bakeries*, 103 F.2d 665, 666–67 (3d Cir. 1939); *see also In re Groenleer-Vance Furniture Co.*, 23 F. Supp. 713, 715 (W.D. Mich. 1938) ("[T]he rights of creditors become fixed at the moment of bankruptcy and that they then acquire a right in rem against the [debtor's] assets."); *In re Michaelis & Lindeman*, 196 F. 718, 719 (S.D.N.Y. 1912) ("[T]here must come a time as of which claims against a bankrupt's estate are to be liquidated and stated. . . . [T]his time has been fixed as the date of filing petition").

37.    When section 502(b) was enacted as part of the Bankruptcy Reform Act of 1978, it was intended to codify the notion that "bankruptcy operates as the acceleration of the principal amount of all claims against the debtor" as of the petition date. S. Rep. No. 95-989 at 63 (1978). Section 502(b) thus carries through the principle, recognized in *Sexton*, that a bankruptcy fixes the creditors' rights as of the date of the petition, and those rights are not subject to diminishment—or enlargement—based on post-petition changes. *See Aaura*, 2006 WL 2568048, at *4 (noting that the plain language of section 502(b) incorporates the understanding articulated in *Sexton*).

17

38.     *Third*, fixing creditors' rights based on the U.S. dollar value of their claims as of the petition date furthers the purpose of the Bankruptcy Code.  By fixing value as of the time of the petition, the petition date provides "a 'day of reckoning,' consolidating the debtors' present and future obligations into one moment for prompt resolution."  *In re Promise Healthcare Grp., LLC*, No. 18-12491, 2023 WL 3026715, at *5 (Bankr. D. Del. Apr. 20, 2023).  The petition "freezes all parties' rights as they existed on the petition date."  *Id.*; *see also In re Glob. Power Equip. Grp.*, No. 06-11045, 2008 WL 435197, at *5 (Bankr. D. Del. Feb. 14, 2008) (noting that section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars" (citation omitted)), *aff'd*, 400 B.R. 17 (D. Del. 2009).  This frees the bankruptcy estate—and the creditors—from the unpredictability of the markets, while also preventing creditors from obtaining a windfall.  *See, e.g.*, *In re Eriksen*, 647 B.R. 192, 195 (Bankr. N.D. Ohio 2022) ("Section 502(b) makes it clear that the time for determination of a claim is 'as of the date of the filing of the petition,' not some indeterminate later time depending on post-petition developments in the law and the facts and estate administration."); *In re LeBlanc*, 404 B.R. at 799 ("[Section] 502(b) specifically bars the fluctuation of the proof of claim value due to exchange rates in effect post-petition."); *Aaura*, 2006 WL 2568048, at *4 n.5 (Section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to the United States dollars").

> b)     *Section 502(b) of the Bankruptcy Code applies to all kinds of claims, including cryptocurrency claims.*

39.     The clear mandate of section 502(b) cannot be evaded on grounds of equity or convenience.  *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code"). The term "shall" "normally creates an obligation impervious to judicial discretion."  *Lexecon Inc.*

*v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 27 (1998); *see also N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 28 F.4th 357, 371 (2d Cir. 2022) ("The word 'shall' in a statute, indicates a command."). The Third Circuit recently recognized and applied that principle in the context of the Bankruptcy Code, holding that a provision directing that a court "shall" appoint an examiner if certain requirements were satisfied was non-discretionary. *See In re FTX Trading Ltd.*, No. 23-02297, 2024 WL 204456, at *4 (3d Cir. Jan. 19, 2024); ("'[S]hall' signals when a court must follow a statute's directive regardless of whether it agrees with the result." (citation omitted)). The same principles apply here—a court has *no* discretion to deviate from the valuation principles of section 502(b), no matter the perceived equity or fairness of those principles. Doing so, as in *FTX Trading*, would be reversible error.

40. Section 502(b) applies to all kinds of claims. *See In re LeBlanc*, 404 B.R. at 798 (emphasis added) ("Section 502(b) mandates the Court to 'determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition . . .'"). For example, claims denominated in foreign currencies are converted to U.S. dollars at the prevailing exchange rate as of the petition date. *See, e.g.*, *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir. 1999) (observing that, under U.S. bankruptcy law, claims in foreign currency are determined by converting them to U.S. dollars as of the petition date); *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *8 (Bankr. S.D.N.Y. May 19, 2023) (applying the accepted market rate "in effect as of the applicable Petition Date" to conversion of Brazilian currency to U.S. dollars); *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.)*, 429 B.R. 437, 492 (Bankr. D. Md. 2010) ("[U]nder the plain meaning of 11 U.S.C. § 502(b), the Court shall use the exchange rate in effect on the Petition Date to convert the claim to U.S. dollars."), *aff'd sub nom. TransCanada Pipelines Ltd. v. USGen New England, Inc.*,

458 B.R. 195 (D. Md. 2011); *In re Axona Int'l Credit & Com. Ltd.*, 88 B.R. 597, 608 n.19 (Bankr. S.D.N.Y. 1988), *as amended* (Aug. 11, 1988) (noting that section 502(b) refers to the date of the entry of the order for relief as the appropriate date for conversion of foreign currency claims).

41.   Likewise, claims stated in commodities (like gold) are valued in U.S. dollars as of the petition date, explaining that the denomination of claims in U.S. dollars is consistent with the clear reading of section 502(b) of the Bankruptcy Code, which "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars." *See In re Aaura, Inc.*, No. 06-B-01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1, 2006). The same goes for securities. *See In re Lehman Brothers Hldgs. Inc.*, 602 B.R. 564, 586– 87 (Bankr. S.D.N.Y. 2019) (holding that, if the 11 U.S.C. § 562 exception does not apply to a securities contract, "the [assets] must be valued on or about the Petition Date pursuant to section 502").[13]

42.   Cryptocurrency is no different. Debtors and bankruptcy courts have repeatedly and consistently valued claims based on digital assets as of the applicable petition date in recent large chapter 11 cases. *See, e.g.*, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660 ("As is required by section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Digital Assets (based in United States dollars pursuant to the Digital Assets Conversion Table) held by the Account Holder at the Debtors

---

[13]   Indeed, the same rule applies in the context of breach-of contract actions, where courts have held that damages must be measured at the date of the breach, in order to "avoid[] the speculativeness and hindsight problems attendant to" a theory of recovery based on a later valuation date. *Scully v. US WATS, Inc.*, 238 F.3d 497, 512 (3d Cir. 2001). Thus, "[i]f a plaintiff is permitted to select any point during the period between the breach and the end of the litigation to value his [claim], he not only injects uncertainty and speculation into the damages calculation, he also gets 'the benefit of hindsight, thereby putting him in a better position than if the breach . . . had never occurred.'" *Moser v. Encore Cap. Grp., Inc.*, 964 F. Supp. 2d 1224, 1226 (S.D. Cal. 2012) (internal quotation marks omitted). The same rationale applies in the bankruptcy context: Any recovery to creditors beyond that available at the petition date would rest on speculation and hindsight, and potentially leave creditors better off than had there been no bankruptcy at all.

as of the Petition Date at 11.59 p.m. UTC.  This process is generally referred to as a 'dollarization.'

Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate

recoveries in accordance with the requirements of the Bankruptcy Code."); *In re Voyager Digital*

*Holdings*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ("Account

Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b)

of the Bankruptcy Code."); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y.

Sept. 27, 2023), Docket No. 3577 ("[T]he value of a Claim denominated in Cryptocurrency shall

be calculated by converting the value of the Claim into Cash as of the Petition Date . . . .").

43.     In fact, just days ago, the *FTX Trading* bankruptcy court squarely rejected the same

valuation method set forth in the Amended Plan.  Overruling objections by creditors without

hearing argument, the court stated:  "[T]he [Bankruptcy] [C]ode is very clear.  The [C]ode says

that a claim is to be determined in U.S. dollars as of the petition date."  FTX Hearing Transcript at

14:23–25.  The court acknowledged there was "no wiggle room on that," and that some creditors'

view that such valuation was "unfair to them because the value may have increased" did not alter

the court's "obligat[ion] to follow the [Bankruptcy] [C]ode."  *Id.* at 15:10–11.  On that basis, the

*FTX Trading* court concluded that "use of the petition date as the date of determining the value of

digital asset claims is appropriate."  *Id.* at 15:7–10.  There can be no more on-point precedent than

that.[14]

44.     Additionally, in contrast to the Amended Plan, because creditor claims in *FTX*

*Trading* are measured by their petition date value, the waterfall distribution mechanics would

---

[14]    Notably, both the debtors and the official committee of unsecured creditors in FTX acknowledged that section
502(b) mandates valuation of claims as of the petition date.  *See In re FTX Trading Ltd.*, No. 22-11068 (JTD)
(Bankr. D. Del. Dec. 27, 2023), Docket No. 5202 ¶¶ 11–13; Docket No. 5619 at ¶¶ 2, 4.

allow recoveries to flow to equity holders after creditors are paid in full based on such value.[15]
The priority scheme designed by Congress is clear and must be followed, regardless of who holds
the equity.

45.     The *FTX Trading* court's ruling follows on the heels of *In re Celsius Network LLC*,
wherein Judge Glenn concluded "creditors are entitled to their share of the value of the Debtors'
Estates on the Petition Date."  655 B.R. at 312.  At issue in *Celsius* was the valuation of the "CEL
Token," a speculative digital currency coined for use on Celsius's own platform.  *Id.* at 310.  Upon
Celsius' bankruptcy filing, the utility value of the CEL Token had evaporated, and its remaining
value was speculative and "buffeted by the chaotic market forces at play."  *Id.*  In determining the
value of CEL Token for the purpose of claim allowance, the Court accepted the proper valuation
date as the petition date.  *Id.* at 312 ("Whether under a chapter 11 plan or liquidation, creditors are
entitled to their share of the ***value*** of the Debtors' Estates on the Petition Date." (emphasis in
original)).

> c)    *The Distribution Principles allow creditors to recover more than
> the amount of their claim as of the Petition Date in violation of
> section 502(b).*

46.     Although section 502(b) requires claims to be valued as of the Petition Date, the
Distribution Principles incorporated in the Amended Plan allow creditors whose claims were
denominated in digital assets (*e.g.*, cryptocurrency) to recover from the Estates based on the value
of those digital assets at or around the time of distribution, inflating the value of their claims by
██████████████.  Distribution Principles at 8–9.  That distribution mechanism
squarely contravenes section 502(b), and significantly, ████████████████████
████████████████████████████████████████

---

[15]     *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Dec. 16, 2023), Docket No. 4861 ¶ 4.3.

████████████████████████████████████████████████████████

███████████████████████████████████████████ That experience is consistent with

the precedent cited above, in which commodities, securities, foreign currencies, and

cryptocurrencies were all valued as of the petition date.

47.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████. That is no answer:  As noted above, cryptocurrency is treated

like other assets for purposes of section 502(b).

48.    Limiting disbursements for claims arising out of digital assets based on the U.S.

dollar value of those assets as of the Petition Date also is consistent with courts' treatment of claims

denominated in foreign currency.  As noted above, courts have consistently held that where a

creditor files a claim denominated in foreign currency, "the Court shall use the exchange rate in

effect on the Petition Date to convert the claim to U.S. dollars."  *In re USGen New England, Inc.*,

429 B.R. at 492–93; *In re Axona Int'l Credit & Com. Ltd.*, 88 B.R. 597, 608 n.19 (Bankr. S.D.N.Y.

1988) (noting that section 502(b) refers to the date of the entry of the order for relief as the

appropriate date for conversion of foreign currency claims).  Digital assets like cryptocurrency are

functionally no different from foreign currencies in this respect, and merit the same treatment

under the Bankruptcy Code.

49.    But here, the Debtors have turned section 502(b) on its head.  █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



It is entirely impermissible for creditors— ████████████████

████████████ —to receive ████████ of value in excess of their allowed prepetition claims,

all at the expense of subordinated creditors and equity holders, which likely would receive

***nothing***.  This is a clear violation of section 502(b), and the Court cannot sanction such a result.

      *d)*     *No exception to section 502(b) applies here.*

    50.    To date, with one minor exception, no party supporting the Amended Plan has

formally or specifically articulated any arguments as to why section 502(b) should not apply here.

Instead, it appears to be a results-driven determination; proponents of the Amended Plan dislike

the result that section 502(b) requires, so they ignore it (perhaps hoping that more time will enable

them to conjure up some ex post justification).  The one exception is a brief discussion in one filing

that the safe harbor under section 562 of the Bankruptcy Code could apply to alter the valuation

date for claims based on digital assets**.**  In an objection to the Disclosure Statement, the Crypto

Creditors Group stated, among other things:

> Aside from being unfair, "dollarizing" crypto claims in this way runs afoul of Bankruptcy
> Code section 562. More specifically, the contracts between Bitcoin (BTC) and Ethereum
> (ETH) creditors, on the one hand, and the Debtors, on the other, are "safe harbored"
> contracts under Bankruptcy Code section 562. This means that BTC and ETH claims
> cannot be valued using Petition Date pricing under Bankruptcy Code section 502, but
> instead must be valued at a later date.

*Objection of the Genesis Crypto Creditors Ad Hoc Group to Debtors' Disclosure Statement*

*Motion* (Docket No. 982), at 2.

51.    Ahead of its confirmation objection, the Crypto Creditors Group had not specified why it believes the section 562 safe harbor applies to its members' agreements for loans of digital currencies.  Moreover, the Amended Plan itself does not apply section 562 to any subset of claims in the Amended Plan, suggesting that the Plan Support Parties do not agree with the Crypto Creditors' Group's view.  Indeed, there is no basis to find that there has been, or will be, a rejection, liquidation, termination, or acceleration of any contracts held by the Crypto Creditors Group, much less that those contracts are protected by section 562 of the Bankruptcy Code.

52.    DCG reserves its right to reply to any specific arguments raised by the Crypto Creditors Group or any other party that asserts the section 562 safe harbor applies to any claims asserted against the Debtors.

## 2. The Amended Plan would pay an unlawful amount of interest to general unsecured creditors.

53.    The Bankruptcy Code only provides for payment of post-petition interest to unsecured creditors when a debtor is solvent.  *See Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (holding that both unimpaired and impaired creditors are entitled to post-petition interest at the federal judgment rate before any distribution can be made to equity); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y. 2012) (citing *In re Cardelucci*, 285 F.3d 1231, 1234–35 (9th Cir. 2002)).  To the extent the Estates are insolvent, general unsecured creditors are not entitled to interest on their claims under the Bankruptcy Code.

54.    Even if the Estates are solvent, the Amended Plan must still be rejected because it seeks to pay general unsecured creditors a greater interest rate on their claims than what the Bankruptcy Code allows.  The Debtors submit that "[a]ll unsatisfied Allowed General Unsecured Claims shall, from the Petition Date, accrue interest at the rate (inclusive of both the loan fee and

the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the relevant Holder" under the Distribution Principles. Distribution Principles at 9. Such interest only factors into each holder's pro rata share once the Recovery Cap for all unsecured claimants has been met. *Id.* However, the proper measure of interest here—assuming the Estates are solvent— is not the contract rate, but rather the federal judgment rate under 28 U.S.C. § 1961.

55.    Where a bankruptcy estate is solvent, the right of unsecured creditors to receive post-petition interest arises under section 726(a)(5) of the Bankruptcy Code. *See* 11 U.S.C. § 726(a)(5). Section 726(a)(5) is made applicable to the chapter 11 cases by virtue of section 1129(a)(7)(A)(ii), which imposes a "best interests test." *See* 11 U.S.C. 1129(a)(7)(A)(ii); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 256 (Bankr. S.D.N.Y. 2007). The best interests test requires that, for a plan to be confirmed, dissenting members of a class must receive, as of the effective date of the plan, the value of their allowed claims that is not less than the amount such creditors would receive if the debtor was liquidated under chapter 7 on such date. *See* 11 U.S.C. § 1129(a)(7)(A)(ii). Section 726(a)(5) of the Bankruptcy Code provides that, after payment of all amounts due under sections 726(a)(1) through (a)(5), post-petition interest is payable on all allowed unsecured claims "at the legal rate" from the petition date until the payment of such claims. *Id.* § 726(a)(5).

56.    Numerous courts have recognized that "the legal rate of interest" referred to in section 726(a)(5) is the federal interest rate applicable to judgments. *See In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y. 2012); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *20 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *motion to certify appeal denied*, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *aff'd*, 643 B.R. 756

(S.D.N.Y. 2022), *aff'd*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom.*, *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023); *see also In re Dow Corning Corp.*, 237 B.R. 380, 387 (Bankr. E.D. Mich. 1999); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D. Tex. 1992); *In re Hertz Corp.*, 637 B.R. at 801. Moreover, a bankruptcy claim is the equivalent of a money judgment, and the use of the federal judgment rate assures equitable treatment among creditors, is efficient, and practical. *Madison 92nd St. Assocs.*, 472 B.R. at 200.

57. By contrast, "neither the Bankruptcy Code nor the Legislative History expressly state that unimpaired creditors are entitled to their contract rate of interest." *Hertz Corp.*, 637 B.R. at 800; *see also LATAM Airlines*, 2022 WL 2206829, at *20. "Instead, the Legislative History provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11 debtor case to receive post-petition interest only in accordance with sections 1129(a)(7) and 726(a)(5)." *LATAM Airlines*, 2022 WL 2206829, at *20. Accordingly, in the event the Debtors are solvent, unsecured creditors should receive the federal judgment rate of post-petition interest.

58. In what appears to be a sweetener for unsecured creditors who are not paid in full within a certain amount of time under the Amended Plan, the Debtors propose to pay certain claimants ***additional*** interest on the "unpaid portion" of their claims, accruing (arbitrarily) at the federal judgment rate, if they do not receive distributions sufficient to reach the Recovery Cap within two years of the Effective Date (termed "**Post-Effective Date Interest**"). *See* Distribution Principles at 9. And, because the Recovery Cap improperly values claims around the time of confirmation or later distributions, this provision would permit unsecured creditors to receive interest on amounts far exceeding the Petition Date valued claim to which they are entitled. There is no authority under the Bankruptcy Code to support the additional interest.

* * *

59.    Because the Amended Plan would provide greater recoveries to general unsecured creditors than they are entitled—by (i) failing to dollarize claims in accordance with section 502(b), and (ii) paying unsecured creditors Post-Petition Interest and Post-Effective Date Interest to which they are not entitled—it is not "fair and equitable" with respect to DCG's interests.  The Amended Plan is therefore unconfirmable.

**B.    The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code.**

60.    As discussed, section 502(b) of the Bankruptcy Code requires payment of creditor claims based upon the value of creditor claims as of the Petition Date.  The Amended Plan's Distribution Principles allow distributions to creditors in excess of their Petition Date-valued claims.  This is a clear violation of section 502(b) and renders the Amended Plan unconfirmable. *See In re PTM Techs., Inc.*, No. 10-50980C-11W, 2013 WL 4519306, at *5 (Bankr. M.D.N.C. Aug. 26, 2013) (finding a plan was unconfirmable under section 1129(a)(1) by violating section 502(b)(2)); *In re MPM Silicones, LLC*, No. 14-22503 (RDD), 2014 WL 4436335, at *2 (Bankr. S.D.N.Y. Sept. 9, 2014) (noting that section 1129(a)(1) requires compliance with applicable provisions in the Bankruptcy Code, including section 510(a)), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2017).

61.    Additionally, the Debtors' Amended Plan seeks to prevent DCG, which will continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its fundamental right to elect directors under Delaware law.  *See* Amended Plan at Section IV.B.9 (requiring that DCG select a new board solely from candidates selected by the Debtors and certain influential creditor groups).  The Bankruptcy Code rejects such a reallocation of voting rights. Section 1123(a)(6) prohibits the issuance of new, non-voting equity securities.  *See* 11 U.S.C. § 1123(a)(6); *see also In re Peak Broadcasting, LLC*, No. 12-10183 (MFW), 2012 WL 1452359,

28

*4 (Bankr. D. Del. Apr. 20, 2012) (requiring each reorganized debtor being formed as a limited liability company to include language in its charter and bylaws that prohibits the issuance of non-voting equity securities under section 1123(a)(6)).  By stripping DCG of its voting rights—including those regarding election of directors—the Amended Plan effectively seeks to convert DCG's membership interests into non-voting shares, which is expressly prohibited by section 1123(a)(6).  For this reason too, the Amended Plan is unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

### C.    The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code.

62.    The Court need go no further to reject the Amended Plan—the two independent violations of section 1129 outlined above are more than sufficient to sustain this objection.  But those violations—and the impermissible distribution of value to creditors they contemplate—arise out of another fundamental problem with the Amended Plan:  It was not proposed in good faith.  The Debtors' calculated (and surreptitious) inclusion of such value-distorting provisions—with full knowledge of the consequences for equity holders—the stripping of DCG's equity rights, and the exclusion of DCG from any negotiations or discussions regarding the Amended Plan provide an independent ground to reject the Amended Plan.

63.    One of the core tenets of bankruptcy confirmation is that a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S. Code § 1129(a)(3).  "Good faith," as used in this section, is not defined in the Bankruptcy Code, but the term is generally interpreted to mean that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008).  A plan submitted with ulterior motives is not in good faith.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014).  "In assessing whether a plan complies with [section] 1129(a)(3)'s

good faith standard, a bankruptcy court must examine the totality of the circumstances." *In re Trenton Ridge Invs.*, LLC, 461 B.R. 440, 468 (Bankr. S.D. Ohio 2011). Importantly, "[t]he burden of proof is on Debtors to show by a preponderance of the evidence that the Plan was proposed in good faith." *In re Dernick*, 624 B.R. 799, 811 (Bankr. S.D. Tex. 2020). Furthermore, the U.S. Supreme Court has emphasized that bankruptcy courts must ensure both the process and practical impact of a plan are fair, equitable and open before confirming the plan. *See Am. United Mut. Life Ins. v. City of Avon Park*, 311 U.S. 138, 146 (1940) (Douglas, J.) (stating it is the "responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle"). This is particularly important where the facts and circumstances surrounding a plan reveals the existence of unfair dealing, breach of fiduciary obligations, or other untoward behavior. *Id.*

64.     Decisions by other courts analyzing similar scenarios also support the conclusion that a bankruptcy court should not confirm a plan if, instead of negotiating at arm's length with creditors, a debtor aligns with creditors in a way that potentially increases the extent of liabilities owed by the estate and causes injury to third-parties. For example, in *In re Am. Cap. Equip.*, LLC, 688 F.3d 145, 158–59 (3d Cir. 2012), the Third Circuit found that a chapter 11 plan violated section 1129(a)(3) where the debtor was incentivized to side with plaintiffs in increasing claim values instead of seeking to limit the claims, to the detriment of the debtor's insurers. Similarly, in *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 214 (3d Cir. 2011), the court reversed confirmation of a plan because of "profoundly serious" allegations that it found impacted "the integrity of the bankruptcy proceeding," where to receive the requisite creditor votes in favor of the plan, the

debtor sided with plaintiffs in a manner that impermissibly inflated the creditors' claims and injured the insurers.

65.     Likewise here, the Amended Plan is not the product of good faith, because, among other reasons, it impermissibly inflates claim values. ████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ That construct is in plain violation of section 502(b), but even if it were not, ████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████ , cannot possibility have been designed and proposed in good faith. ████████████ ██████████████████████████████████████████████████████████████████████ ████

66.     It is little surprise that the Amended Plan contains these one-sided provisions.  The Distribution Principles are the product of several months of closed-door negotiations between the Debtors, the UCC, and the Ad Hoc Group—without DCG. ██████████████████████████████ ████████████████████ . This, despite DCG's repeated willingness to reach a resolution that would have allowed for 100% creditor recoveries in compliance with the Bankruptcy Code.  Instead, the Debtors, the UCC, and the Ad Hoc Group have worked in concert to develop a chapter 11 plan that provides for unprecedented distributions to creditors that the Bankruptcy Code does not support.  The creditors put pressure on the Debtors to distribute DCG's value to creditors, and the Debtors caved to pressure rather than standing up for what is right. ████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  It is clear now

that this effort was designed to deprive DCG of the recovery to which it is entitled under the

Bankruptcy Code.

67.    Moreover, the Debtors did not stop at limiting or eliminating any prospect of

DCG's recoveries under the Amended Plan.  The Amended Plan also seeks to disenfranchise DCG

in a myriad of other ways, including stripping DCG of essentially all its rights in its capacity as an

equity holder with no legal authority to do so.  Most relevant here, the Amended Plan declares that

unless and until **all** creditor claims against the Debtors "are ultimately determined by a Final Order

to have been rendered **Unimpaired**," DCG (1) will receive no distributions from the Estates,

(2) may not exercise **any** rights as an equity holder, including voting or corporate governance

powers, (3) may not receive any dividends or distributions through its equity ownership, and

(4) may not even **transfer** its equity interests.  Amended Plan ¶ III.B.10 (emphasis added).  The

Amended Plan additionally limits DCG's right to appoint the directors of GGH, *see id.* § IV.B.9,

and excludes DCG from the parties who have consent rights over the New Governance Documents,

*see id.* § I.A.157.  In short, the Amended Plan renders DCG an equity holder in name only.

68.    This kind of naked seizure of equity holder rights in direct contravention of law and

public policy is the very definition of bad faith.  Because the Amended Plan was not proposed in

good faith and violates numerous principles of law, it should be rejected.

### 1.    The Debtors have breached their fiduciary duties to DCG.

69.    First and foremost, in proposing the Amended Plan, the Debtors have breached their

fiduciary duties owed to DCG.  "[T]he fiduciary duty of the trustee runs to shareholders as well as

to creditors."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

Accordingly, "[t]he debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest

of the estate as a whole, including its creditors, equity interest holders and other parties in interest."

*LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000); *see also In re Nortel Networks, Inc.*, 522 B.R. 491, 516 (Bankr. D. Del. 2014) ("But the Court also observes that the U.S. Debtors, as debtors in possession, have a fiduciary duty to act in the best interest of all creditors and equity holders."); *In re Bellevue Place Associates*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) ("Chief among these, for present purposes, is that the debtor-in-possession is a fiduciary to all of to its creditors and equity security holders." (citation omitted)).  *See also In re Pack Liquidating, LLC*, No. 22-10797 (Bankr. D. Del. Feb. 2, 2024), Docket No. 1231 at 38 (noting the "federal bankruptcy policy of ensuring that the party in charge of a bankruptcy estate serves as a faithful trustee looking out for the estate's ultimate beneficiaries.").

70.    It is clear from the Amended Plan that no consideration was given to the rights or interests of DCG whatsoever.  Not only did the Debtors exclude DCG from participating in the plan negotiations entirely, but ███████████████████████████████████████████ ██████████████████████████████. If the value of the Estates' digital assets continues to rise, creditor claims will continue to balloon, devouring value in excess of the creditor's Petition Date claims and leaving none of that extra value left for equity holders.  ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████. A failure to understand how a transaction affects stakeholders is a textbook breach of fiduciary obligation.

71.    There is a reason the Bankruptcy Code puts the debtor in possession in control of its chapter 11 case—and not a creditors' committee.  Debtors are tasked with the responsibility of working to reach a consensual resolution with their creditors—not through capitulation—but

through an adversarial and arms' length negotiations. Here, the Debtors ultimately have become enablers for certain influential creditors even after their intentions to extract improper value from the Estate became clear, ignoring the fact that this departs from what the Bankruptcy Code mandates and negatively impacts the Debtors' equity holder DCG.

72.     To be clear, DCG would not be objecting to a distribution plan that contemplated a 100% recovery for creditors and would support the implementation of such a plan. DCG is objecting to the Amended Plan because the Debtors, the UCC, and the Ad Hoc Group have tied themselves in knots to formulate Distribution Principles that avoid making distribution to DCG.

73.     Moreover, as set forth in more detail below, the Amended Plan purports to divest DCG of virtually all of its rights as an equity holder. And the Debtors have failed to object to a number of large governmental claims, seemingly to preserve the argument that the Debtors' estates are insolvent at the plan confirmation stage and to justify limiting DCG's recoveries. Debtors in possession must of course make difficult decisions when formulating a plan, some of which will benefit some parties to the detriment of others. But where, as here, the proposed plan gives *no* consideration to the interests of equity holders, it cannot be confirmed.

>    **2.     The Debtors propose in bad faith a plan that gives a small group of influential creditors favorable treatment through the Setoff Principles.**

74.     The Debtors' proposed Setoff Principles for Allowance of Certain Claims, as embodied in <u>Exhibit M</u> to the Plan Supplement (Docket No. 1144) (the "**Setoff Principles**"), violate the Bankruptcy Code and applicable law, and were proposed in bad faith in violation of section 1129(a)(3). As explained below, if implemented as the Debtors intend, the Setoff Principles would provide a select group of only twenty-one creditors—presently unknown to the public due to the Debtors' extensive redactions—with a collective windfall of ███████ of

additional claims, with *one* creditor to receive ██████ of additional claims prohibited by law. Setoff Principles, Ex. 1.  The Court should not sanction this result.

75.     Pursuant to the Setoff Principles, the Debtors may set off (a) the value of any debt owed to a Debtor by a creditor entitled to receive distributions under the Amended Plan against the value of any collateral that the creditor delivered to the applicable Debtor to secure a loan (to the extent not yet returned), or (b) any claim entitled to receive distributions under the Amended Plan against the value of any debt owed by the holder of such claim to the applicable Debtor, and all digital asset values in (a) and (b) "shall be determined as set forth in the Digital Assets Conversion Table."  *See* Setoff Principles at 1.  The Digital Assets Conversion Table, in turn, provides a list of digital assets along with their corresponding Petition Date prices.  *See* Setoff Principles Ex. 1.

76.     In plain language, in a scenario where a party is owed a digital asset from the Debtor on account of a loan payable by the Debtor, and the same party also owes to the Debtor a digital asset on account of a loan receivable by the Debtor, under the Setoff Principles, the Debtor is obligated to value the loan receivable using Petition Date pricing and set off the value of the loan receivable against the loan payable.  Since Petition Date prices are lower than current prices, this process inappropriately values loans receivable (importantly, these are assets of the Debtor) at less than current value and, by reducing the set off, allows parties greater claims against the Debtor. In other words, the Debtors are artificially depressing the value of the Estates' assets, while inflating the creditor's claim—in effect, forgiving a significant portion of the Debtors' claim against the creditor.

77.     This approach compounds other deficiencies of the Debtors' Amended Plan, specifically insofar as the increased claim resulting from the Setoff Principles is entitled through

the Distribution Principles to receive more than 100% of its Petition Date claim valued in U.S.

dollars. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

78.     This outcome is truly bizarre and fundamentally at odds with the Debtors' fiduciary

duties to maximize value of the Estates, and it exemplifies the Debtors' unprincipled conduct

throughout this process.  Chapter 11 debtors are obligated to ***maximize*** the value of the estate as a

whole—not ***minimize*** the value of the estate and ***maximize*** the value of certain creditors' residual

deficiency claims to the detriment of the overall estate.  *See Cohen v. Drexel Burnham Lambert*

*Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992)

(trustees have routine duties "to minimize the pre-petition claims against the estate"); *see also In*

*re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004) (citations and internal quotation marks

omitted) ("Along with [the powers of a trustee], comes the trustee's fiduciary duty to maximize

the value of the bankruptcy estate.  The debtor-in-possession's fiduciary duty to maximize includes

the duty to protect and conserve property in its possession for the benefit of creditors.").[16]

79.     Furthermore, the Debtors are required under the Bankruptcy Code to "examine

proofs of claims and object to the allowance of any claim that is improper . . . if a purpose would

be served."  11 U.S.C. § 704(a)(5).[17]  By completely acquiescing to the select creditors' demands,

---

[16]   *In re Congoleum Corp.,* 426 F.3d 675, 690 (3d Cir. 2005) (The debtor's "interests called for a reduction in the
number of claims approved that would likely be included in a settlement package presented to the insurers. . . .
To the extent that the claims were not valid, it was [the debtor's counsel's] responsibility in representing [the
debtor] to see that they were rejected.").

[17]   Section 1106 of the Bankruptcy Code incorporates the duties of chapter 7 trustees under section 704(a)(5) (and
other sections) into the duties of chapter 11 trustees.  11 U.S.C. § 1106(a)(1).  Section 1107 then incorporates
the duties of a chapter 11 trustee into the duties of the debtor-in-possession.  11 U.S.C. § 1107(a).

despite the more logical approach that would value the Debtors' assets as of the time of setoff, the
Debtors—through the Setoff Principles—have turned the concept of setoff valuation upside down
for the benefit of a select few and have completely abdicated any sense of duty to the Estate as a
whole. *See LaSalle Nat. Bank*, 82 F. Supp. 2d at 292 (D. Del. 2000) ("The debtor in a Chapter 11
bankruptcy has a fiduciary duty to act in the best interest of the estate as a whole, including its
creditors, equity interest holders and other parties in interest.").

80.     Other courts have also struck down similar attempts by debtors to pay unreasonably
high amounts to certain parties.  In *In re Global Indus. Techs., Inc*., the Third Circuit ruled a
bankruptcy court must ensure a trust created under a plan is negotiated fairly between a debtor and
its creditors and does not negatively impact a third party (in that case, insurers) by increasing the
number of claims or permitting the payment of skeptically high claim amounts. 645 F.3d at 212–
15.  Although the exact issue the Third Circuit analyzed was whether the lower court improperly
denied the insurers standing, the court expressed the clear view the plan could not be confirmed if
the insurers' allegations were true, as they were "profoundly serious" and spoke to the "integrity"
of the process.  *Id*. at 214–15.  On remand, the bankruptcy court "agree[d]" that a process leading
to inflated liabilities would be wholly improper and that the "function of judicial approval" was to
prevent this outcome: "Whatever else the normal course of the insurance business may entail . . . it
certainly ought not to include judicial approval for liability manufactured by and for the benefit of
the [debtor] insured."  *In re Global Indus. Tech, Inc*., No. 02-21626 (JKF), 2013 WL 587366, at
*50 (Bankr. W.D. Pa. Feb. 13, 2013); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 158–59
(3d Cir. 2012) (reiterating that a court cannot confirm a plan that prejudices parties-in-interest
because of the debtors' failure to oppose creditors appropriately).

81.    Such a result is consistent with the testimony of the Debtors' own 30(b)(6) witness.

████████████████████████████████████████████████████████████████████

████████████████████████████████    It is patently improper for a debtor to simply acquiesce to creditors' demands and give up defenses to those creditors' claims—even where the debtor's motives might be pure, which, in this instance, they are not.  *See In re Tenney Village Co., Inc*., 104 B.R. 562, 567–68 (Bankr. D.N.H. 1989) (denying approval of a financing agreement under which debtors agreed to cede control to their lenders over critical issues, such as formulation of their plan (including granting approval rights over any plan), and waived their defenses to the lenders' claims, stating that the plan "would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit").

82.    It seems clear that these inequitable Setoff Principles were devised, in large part, to engender support for the Debtors' Amended Plan by one particularly influential creditor sitting on the UCC.  ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

83.    Furthermore, the conveniently redacted nature of the Setoff Principles further underscores the Debtors' unprincipled conduct.  The Debtors have a duty to both their creditors and to this Court to provide full and complete disclosure with respect to important facts and relevant information.  *See In re Zamora*, No. 19-01040 (WLH), 2020 WL 4289926, at *5 (Bankr. E.D. Wash. July 27, 2020) ("Bankruptcy is not a haven for dishonest or evasive behavior; rather, full disclosure, transparency, and candor by all parties is necessary to protect the fairness and integrity of the process.")  While the Debtors might argue that redactions were necessary to protect

the identities of these creditors—there is no justifiable reason that the ███████ of value that

is going to just a small handful of creditors should be hidden from this Court or other creditors.

84.    Ultimately, these Setoff Principles demonstrate yet another attempt by the

Debtors—in violation of their fiduciary obligations to the Estates—to siphon significant value

away from the general creditor body, as well as equity, in violation of the "primary goal of the

Bankruptcy Code to ensure equal and fair treatment among similarly situated creditors," *Chevron*

*Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 428 B.R. 590, 594 (D. Del. 2010), as well

as the spirit of the Bankruptcy Code which requires debtors to treat all claimants and interest-

holders "fairly, equally and in accordance with the priority of their claims under law." *Bergquist*

*v. Felland (In re O-Jay Foods Inc.)*, No. 3-89-281, 1991 WL 378164, at *16 (D. Minn. Nov. 21,

1991).    As such, the Amended Plan should not be confirmed.    If the Debtors want to propose

setoffs, each one should be brought to the Court with all of the facts laid out so the Court and all

other parties in interest can consider the impact to the Estates.    The Setoff Principles hide the true

facts.

85.    Additionally, section 1123(a)(4) of the Bankruptcy Code—which requires that the

plan "provide the same treatment for each claim or interest of a particular class, unless the holder

of a particular claim or interest agrees to a less favorable treatment of such particular claim or

interest"—serves as yet another basis to strike down the Setoff Principles.    Namely, the Debtors

are treating the small group of creditors participating in the Setoff Principles more favorably by

increasing the portion of their claims that receive secured status and reducing the portion treated

as unsecured.    This dissimilar treatment of unsecured claims violates section 1123(a)(4), which

provides an additional reason for the Court to deny confirmation of the Amended Plan.

### 3.    The Amended Plan impermissibly alters DCG's equity holder rights in violation of applicable law.

86.    The Amended Plan is not proposed in good faith also because it impermissibly purports to alter DCG's rights as an equity holder of the Debtors.   Delaware corporate law regarding equity holder rights is clear:  "Shareholder voting rights are sacrosanct" under Delaware law. *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).  "The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm."  *Id.*; *see also Coster v. UIP Companies, Inc.*, 255 A.3d 952, 960–61 (Del. 2021) ("Delaware law recognizes that the stockholder franchise is the 'ideological underpinning' upon which the legitimacy of the directors managerial power rests.").   "Because of the overriding importance of voting rights," Delaware courts "have consistently acted to protect stockholders from unwarranted interference with such rights."  *Paramount Comm'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994).

87.    Delaware public policy protecting equity holders does not lose force simply because the Debtors are in bankruptcy.  "Post-petition, the Debtor[s'] state law governance rights persist" and are "unaffected by a chapter 11 filing."  *In re Genever Holdings, LLC*, Case No. 20-12411-JLG, 2021 WL 3919826, *13 (Bankr. S.D.N.Y. 2021) (citing *In re K.G. IM, LLC*, 620 B.R. 469, 482 (Bankr. S.D.N.Y. 2020)); *see also Van Siclen v. Bush (In re Bush Terminal Co.)*, 78 F.2d 662, 664 (2d Cir. 1935); *Lionel Corp. v. Committee of Equity Sec. Holders of Lionel Corp. (In re Lionel Corp.)*, 30 B.R. 327, 330 (Bankr. S.D.N.Y. 1983).  The Second Circuit has expressly held that shareholders' rights to govern the debtor is a "prerogative ordinarily uncompromised by reorganization," and the "law of this circuit direct that the shareholders' natural wish to participate in this matter of corporate governance be respected."  *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1980); *see also In re Potter*

*Instrument Co.*, 593 F.2d 470, 475 (2d Cir. 1979) (the right of shareholders "to be represented by directors of their own choice and thus to control corporate policy is paramount").

88.     As noted, the Debtors' Amended Plan seeks to prevent DCG, which will continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its fundamental right to elect directors under Delaware law.  *See* Amended Plan at Section IV.B.9.  This elimination of DCG's rights is in direct contravention of Delaware law, and it cannot be squared with the Bankruptcy Code's requirement that director election rights be allocated consistently with public policy.

89.     The Amended Plan further seeks to burden DCG, by preventing DCG, as sole equity holder of GGH, from transferring its interests in GGH and taking a worthless stock deduction with respect to its interests in GGH if and when it would otherwise be entitled to do so under applicable tax law.  If DCG is not able to claim its worthless stock deduction at the appropriate time, it could result in a permanent loss of such deduction and loss of a valuable tax attribute that DCG is otherwise entitled.  This would be tantamount to a permanent injunction. Denying DCG, as sole equity holder of GGH, its rights to appoint directors, transfer its interests, and claim tax deductions when allowable is the epitome of bad faith.

### 4.     Conditioning DCG's rights on the issuance of a Final Order declaring all creditor claims Unimpaired has no basis in law, equity, or otherwise.

90.     The Amended Plan's systematic evisceration of DCG's rights as an equity holder is not saved by the illusory provision that "restores" certain of DCG's rights upon the issuance of a "Final Order" declaring that all creditor claims are "Unimpaired," and in fact, this provision exacerbates the Amended Plan's defects.

91.     As discussed above, the absolute priority rule requires that senior classes of creditors be paid in full before any payments are made to junior interests.  *See* 11 U.S.C.

§ 1129(b)(2).  But nothing in section 1129 requires senior classes to be *unimpaired* before junior

classes may receive distributions, let alone that such a determination must be made by a final order

from a court of competent jurisdiction.  Section 1129 requires only that creditors be paid in full.

*See, e.g.*, *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984) (emphasis

added) ("[A] plan must provide either that an impaired non-accepting class of creditors be ***paid in***

***full*** with respect to their claims, or that no interest junior to that class of creditors receive any

distribution under the plan with respect to the junior claimants' prepetition claims or interests.");

*Wilkow v. Forbes, Inc.*, 241 F.3d 552, 554 (7th Cir. 2001) (emphasis added) ("[C]reditors may

insist on priority of payment: secured creditors must be ***paid in full*** before unsecured creditors

retain any interest, and unsecured creditors must be ***paid off*** before equity holders retain an

interest.").  And had Congress intended "paid in full" to mean the same thing as "unimpaired," it

would have said so.  *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco,*

*Firearms and Explosives*, 984 F.3d 30, 44 (2d Cir. 2020) (cleaned up) ("When Congress uses

certain language in one part of the statute and different language in another we assume different

meanings were intended." (citation omitted)).

92.    "Unimpairment" is an entirely different concept:  A claim remains "impaired"

unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim

or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  By restricting

payment of DCG's claims until the senior classes claims are judicially declared to be

"unimpaired," the Amended Plan seeks to apply an impermissibly high standard for resolution of

creditor claims (and one that otherwise conflicts with the Amended Plan's treatment of creditor

classes as impaired), to the clear detriment of DCG.  The Debtors have no reasonable basis—in

law, equity, or otherwise—to impose this high burden as a prerequisite for DCG to receive any distributions on account of its Interests in GGH.

### 5.    The Plan further cuts off DCG's beneficial interests in GGC and GAP.

93.    The Debtors also have no basis in law, equity, or otherwise for their proposed treatment of Intercompany Interests in GGC and Intercompany Interests in GAP. *See* Amended Plan §§ III.C.11, III.D.10. DCG is the sole equity holder of GGH, and GGC and GAP are wholly-owned subsidiaries of GGH. Holders of Intercompany Interests in GGC and Intercompany Interests in GAP are treated the same as holders of Interests in GGH. Therefore, the Amended Plan essentially cuts off DCG's beneficial interests in GGC and GAP by cutting off GGH's Interests.

### 6.    DCG should have consent rights over the Debtors' Wind-Down.

94.    Finally, the Amended Plan is not proposed in good faith because it excludes DCG from certain rights over the Wind-Down, including the selection of the PA Officer[18] and the selection of members of the Wind-Down Oversight Committee.[19] Section 1123(a)(7) of the Bankruptcy Code requires plan provisions to be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). Because it appears that DCG could receive distributions under the

---

[18]    *See* Amended Plan at Section IV.A.2 ("The PA Officer shall be selected by mutual consent of the Committee and PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and shall be identified in the Plan Supplement.").

[19]    *See* Amended Plan at Section IV.A.3 ("The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement.").

Amended Plan (once the unlawful senior claim valuations are corrected), it should have consent and consultation rights over the Wind-Down, regardless of the Debtors' solvency.

95.    As discussed herein, the Amended Plan is improperly structured to preclude DCG from receiving any recoveries as sole equity holder of GGH in any plausible scenario.  But assuming the Amended Plan is revised to comply with the Bankruptcy Code's priority scheme, and that the Debtors are solvent such that creditors are paid in full, the residual value of the bankruptcy estate should flow to DCG.  In that scenario, DCG would be the only party with an interest in maximizing the value of the Debtors' Estates, because the creditors would be paid in full regardless of how the Wind-Down is administered.  Therefore, since the Debtors are solvent, DCG should be given consent rights over the appointment of certain individuals in charge of the Wind-Down.  Such consent rights would not encompass the Litigation Oversight Committee for matters in which the Debtors are bringing claims against DCG, but they should encompass selection of the PA Officer and the Wind-Down Oversight Committee in the event the Debtors are solvent.

* * *

96.    The Amended Plan is the result of a concerted effort by the Debtors, the UCC, and the Ad Hoc Group—over several months of secret negotiations—to deprive DCG of valuable economic and corporate governance rights.  It is no wonder that such a concealed process has led to a plan that violates the Bankruptcy Code.  *In re Ira Haupt & Co.,* 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").  The Debtors are not only stripping DCG of all excess value of the Estates—currently sitting at almost ███████ and poised to grow more—through Distribution Principles that violate the Bankruptcy Code, but also are methodically dismantling DCG's rights to govern as GGH's sole

equity holder as well as its economic rights.  Although a debtor may desire quick emergence from bankruptcy, it cannot achieve that goal by capitulating to creditor demands and imposing harm on third parties.  "[E]fficiency must not be obtained at the price of diminishing the integrity of the process."  *Century Indemnity Co. v. Congoleum Corp. (In re Congoleum Corp.)*, 426 F.3d 675, 693 (3d Cir. 2005).  When considering both the process of proposing the Amended Plan, as well its terms, the totality of the circumstances demands the conclusion that the Amended Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.  Accordingly, the Amended Plan should not be confirmed.

**D.     The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code.**

97.     Section 1129(a)(7) provides that a plan may not be confirmed over the objection of a holder of an impaired class of claims or interests unless that holder will receive from the estate at least as much as it would receive if the debtor were liquidated under chapter 7.  *See* 11 U.S.C. § 1129(a)(7); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 606–07 (Bankr. S.D.N.Y. 2019).

98.     As discussed above, the Amended Plan proposes to distribute assets of the Estates to creditors in excess of what they are entitled by: (1) failing to value claims as of the Petition Date in U.S. dollars, as required by section 502(b); and (2) proposing to pay interest at excessive rates not allowed by the Bankruptcy Code.  Because senior classes of creditors receive more on account of their claims than they would be entitled to in a chapter 7 liquidation, the Amended Plan fails to satisfy the best interests test as to junior classes of creditors and interest holders, which are entitled to residual value.

\* \* \*

99.     The Debtors' plan does not comply with the requirements of section 1129 of the Bankruptcy Code.  Specifically, the Amended Plan is unconfirmable as it violates the cram down requirements of section 1129(b), and sections 1129(a)(1), (3), and (7).

II.    **The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law.**

100.    Beyond the clear infirmities identified above, the Amended Plan violates both bankruptcy law and applicable non-bankruptcy law in ways that further render it unconfirmable under sections 1129(a).

A.    **The Amended Plan improperly assumes and rejects only certain indemnification obligations.**

101.    Under section 365 of the Bankruptcy Code, executory contracts must be assumed or rejected in their entirety.  *See In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) ("Nevertheless, because a debtor must assume or reject an entire contract, and cannot cherry-pick the provisions it does not like, a court must consider the entire agreement."); *In re City Stores Co.*, 21 B.R. 809, 812 (Bankr. S.D.N.Y. 1982) ("An executory contract cannot be rejected in part and assumed in part."); *In re Klaber Bros., Inc.*, 173 F. Supp. 83, 85 (S.D.N.Y. 1959) (citing *Collier on Bankruptcy*, 14th Ed., Vol. 8, p. 163) ("An executory contract cannot be rejected in part, and assumed in part.  The Debtor, or the trustee, is not free to retain the favorable features of the contract, and reject only the unfavorable ones.").

102.    The Amended Plan expressly treats Indemnification Obligations[20] for any Persons who served as an employee, director, or officer of the Debtors (collectively, the "**Debtor Employees**") as of the Petition Date as executory contracts assumed by the Debtors.  *See* Amended Plan § V.D.  However, the Amended Plan carves out Debtor Employees who are also DCG

---

[20]  "*Indemnification Obligations*" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for any Persons who served as an employee, director, or officer of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, other than any Persons who are also DCG Parties or Gemini Parties.

Parties[21]—which includes current and former employees of DCG, DCGI, and each of their respective Affiliates and subsidiaries—from the Debtors' assumed Indemnification Obligations. *See id.*

103.    The Debtors cannot cherry-pick those Indemnification Obligations they wish to assume.    The Indemnification Obligations contained in the Debtors' corporate governance documents[22] must be assumed or rejected in their entirety, meaning the Debtors cannot alter the assumed Indemnification Obligations as to some individuals covered under the applicable executory contract, but not all.    *See COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008) ("The Code provisions permitting a debtor to accept or reject an executory contract do not alter the parties' contractual rights.    The terms of the contract are unchanged . . . .").    Because the Amended Plan contemplates carving out indemnification obligations in violation of section 365 of the Bankruptcy Code, the Amended Plan is unconfirmable pursuant to 1129(a)(1).

**B.    Allowance of certain creditors' fees and expenses against the Estates.**

104.    Section II.E the Amended Plan proposes to allow as Administrative Expense Claims the fees and expenses incurred by the Ad Hoc Group and the Dollar Group (up to $300,000).    DCG objects to such allowance, whether under authority of section 503(b)(3)(D) (which requires notice and a hearing, and that the creditor has made a "substantial contribution"

---

[21]    "***DCG Parties***" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; provided that DCG Parties shall not include any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date.

[22]    The Corporate Governance Documents include:  (1) Constitution of Genesis Asia Pacific Pte. Ltd. (attached hereto as **Exhibit G**), (2) Genesis Global Capital, LLC Amended and Restated Operating Agreement (attached hereto as **Exhibit H**), and (3) the Genesis Global Holdco, LLC Operating Agreement (attached hereto as **Exhibit I**).

to the chapter 11 cases), or under section 1129(a)(4) (which requires that any such expenses be subject to court approval as reasonable). *See generally*, *In re Adelphia Commc'ns Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010) (cited by *In re Mallinckrodt PLC*, 639 B.R. 837, 906 (Bankr. D. Del. 2022)). It is not reasonable to pay out of the Estates the fees and expenses of these creditor groups given their limited contributions to the Estates themselves and the bad faith under which the Amended Plan was constructed, and the Amended Plan fails to satisfy section 1129(a)(4) by not requiring court approval of the fees and expenses. Accordingly, the plan violates section 1129(a)(1) of the Bankruptcy Code and is unconfirmable.

### C.   Any subordination of DCG Claims is improper.

105.   The Amended Plan includes a reservation of rights for the Debtors or Wind-Down Debtors to seek to subordinate DCG Claims. *See* Amended Plan, Section III.K. DCG intends to vigorously defend against any attempts to subordinate the DCG Claims, which, for clarity, also seems to include personal funds deposited by DCG employees in GGC for no apparent reason other than the employees' affiliation with DCG.

106.   Furthermore, this generalized subordination attempt would also seek to subordinate all the claims asserted by the DCG Parties in the proofs of claim filed on May 22, 2023, including approximately $52.5 million owed to DCG by GGC in connection with the Luno Setoff and approximately $3.4 million of collateral owed to DCGI by GGC in connection with a November 2022 loan. DCG and DCGI will similarly vigorously defend against any attempt to subordinate these claims.

### D.   The Amended Plan should not require a tax sharing agreement.

107.   Article IV.B.1 of the Amended Plan states: "On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including . . . the execution and delivery of a tax sharing agreement allocating the

benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any." While DCG has agreed to negotiate a tax sharing agreement in good faith with the Debtors, DCG has no obligation to do so and in fact has reserved all rights with respect to entry into such an agreement. Therefore, the Amended Plan should not require that DCG enter into a tax sharing agreement and should be revised accordingly.

* * *

108.    Taken together with the Debtor's plan to limit DCG's recoveries, the foregoing further highlights the Debtors' plan, with the assistance of the UCC and Ad Hoc Group, to completely disenfranchise equity in contravention of applicable law. Accordingly, the Debtors' plan should not be confirmed.

## Reservation of Rights

109.    DCG's and DCGI's Objection to the Debtors' Amended Plan and Distribution Principles shall not be construed as waiver of argument or objection to the Debtors' Amended Plan and Distribution Principles not raised herein. DCG and DCGI expressly reserve all rights to raise any and all further objections to the Debtors' Amended Plan and Distribution Principles at any time up to and including the confirmation hearing.

## Conclusion

WHEREFORE, for the reasons set forth above, DCG and DCGI respectfully request that the Court deny confirmation of the Amended Plan.

Dated: February 5, 2024
      New York, New York

Respectfully submitted,

*/s/ Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
    Jeffrey.Saferstein@weil.com
    Jonathan.Polkes@weil.com
    Caroline.Zalka@weil.com
    Jessica.Liou@weil.com
    Furqaan.Siddiqui@weil.com

*Attorneys for Digital Currency Group, Inc.
and DCG International Investments Ltd.*

## EXHIBIT A

**FTX Hearing Transcript**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .  (Jointly Administered)
 5        Debtors.               .
     . . . . . . . . . . . . . . .
 6                               .
     FTX TRADING LTD., WEST      .
 7   REALM SHIRES SERVICES, INC.,.
     AND ALAMEDA RESEARCH LTD.,  .
 8                               .
          Plaintiffs,            .
 9                               .
            -against-            .  Adv. Pro. No. 23-50759 (JTD)
10                               .
     MIRANA CORP., BYBIT FINTECH .
11   LTD., TIME RESEARCH LTD.,   .
     SIN WEI "SEAN" TAN, WEI LIN .
12   "GERMAINE" TAN, WEIZHENG YE,.
     AND NASHON LOO SHUN LIANG,  .
13                               .
          Defendants.            .
14   . . . . . . . . . . . . . . .
                                 .
15   ALAMEDA RESEARCH LLC, FTX   .  Adv. Pro. No. 23-50419 (JTD)
     TRADING LTD., WEST REALM    .
16   SHIRES, INC., AND WEST      .
     REALM SHIRES SERVICES INC.  .
17   (D/B/A FTX.US),             .
                                 .
18        Plaintiffs,            .
                                 .
19     v.                        .  Courtroom No. 5
                                 .  824 North Market Street
20   DANIEL FRIEDBERG,           .  Wilmington, Delaware 19801
                                 .
21        Defendant.             .  Wednesday, January 31, 2024
     . . . . . . . . . . . . . . .  10:30 a.m.
22

23                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
24                 UNITED STATES BANKRUPTCY JUDGE

25
```

```
 1   APPEARANCES:

 2   For the Debtors:           Adam Landis, Esquire
                                LANDIS RATH & COBB LLP
 3                              919 Market Street
                                Suite 1800
 4                              Wilmington, Delaware 19801

 5                              Andrew Dietderich, Esquire
                                Brian Glueckstein, Esquire
 6                              Alexa Kranzley, Esquire
                                SULLIVAN & CROMWELL LLP
 7                              125 Broad Street
                                New York, New York 10004
 8
     For the U.S. Trustee:      Jonathan Lipshie, Esquire
 9                              Linda Richenderfer, Esquire
                                Benjamin Hackman, Esquire
10                              OFFICE OF THE UNITED STATES TRUSTEE
                                844 King Street, Suite 2207
11                              Lockbox 35
                                Wilmington, Delaware 19801
12
     For the Official
13   Committee:                 Kenneth Pasquale, Esquire
                                Kris Hansen, Esquire
14                              PAUL HASTINGS LLP
                                200 Park Avenue
15                              New York, New York 10166

16   For the Joint Official
     Liquidators of FTX:        Brett Bakemeyer, Esquire
17                              WHITE & CASE LLP
                                1221 6th Avenue
18                              New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Dana L. Moore, ECRO

21   Transcription Company:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

3

```
 1  APPEARANCES (CONTINUED):

 2  For Aurus Tech LTD:      David Klauder, Esquire
                             BIELLI & KLAUDER, LLC
 3                           1204 North King Street
                             Wilmington, Delaware 19801
 4
                             Thomas Bielli, Esquire
 5                           BIELLI & KLAUDER, LLC
                             1095 Spruce Street
 6                           Philadelphia, Pennsylvania 19103

 7  For TMSI:                Mark Minuti, Esquire
                             SAUL EWING LLP
 8                           1201 North Market Street
                             Suite 2300
 9                           Wilmington, Delaware 19801

10  For MAPS Vault:          Dennis O'Donnell, Esquire
                             DLA PIPER (US) LLP
11                           1251 Avenue of the Americas
                             New York, New York 10020
12
    For BOBA Foundation:     John Weiss, Esquire
13                           PASHMAN STEIN WALDER HAYDEN P.C.
                             Court Plaza South, East Wing
14                           21 Main Street
                             Suite 200
15                           Hackensack, New Jersey 07601

16  For Steadview Capital:   Douglas Mintz, Esquire
                             SCHULTE ROTH & ZABEL
17                           555 13th Street, NW
                             Suite 6W
18                           Washington, DC 20004

19  For Foundation
    Serendipity/Elements:    Kurt Gwynne, Esquire
20                           REED SMITH LLP
                             1201 North Market Street
21                           Suite 1500
                             Wilmington, Delaware 19801
22
    For Michael Lusk:        Michael Lusk, Esquire
23                           MICHAEL LUSK ATTORNEY AT LAW
                             1030 Noble Street
24                           Anniston, Alabama

25
```

4

1                                   INDEX

2   BENCH RULING:                                          PAGE

3       JUDGE'S RULING ON IRS ESTIMATION MOTION             7

4
    MOTIONS:                                               PAGE
5
    Agenda
6   Item 24: Update Regarding Chapter 11 Cases             17

7   Agenda
    Item 25: Motion of Debtors to Estimate Claims          34
8           Based on Digital Assets
            [D.I. 5202; Filed 12/27/23]
9
            Court's Ruling:                                128
10

11  EXAMINATIONS:                                          PAGE

12      EDWARD MOSLEY
        Cross-examination by Mr. Bielli                    39
13      Cross-examination by Mr. Gwynne                    46
        Redirect examination by Mr. Glueckstein            58
14
        KEVIN LU
15      Direct examination by Mr. Glueckstein              64

16      SABRINA HOWELL
        Direct examination by Mr. Glueckstein              69
17      Cross-examination by Mr. Bielli                    73

18
    DECLARATIONS:                                          PAGE
19
    1) Edward Mosley                                       37
20
    2) Sabrina Howell                                      72
21

22

23

24

25

1          (Proceedings commence at 10:34 a.m.)

2          (Call to Order of the Court)

3              THE COURT:  Good morning, everyone.  Thank you.

4   Please be seated.

5              Before we begin, Mr. Landis, I want to lay out how

6   we are going to proceed today.  First, I am going to give the

7   ruling that I said I would give on the burden of proof issue

8   for the IRS estimation hearing.  We will do that first and

9   get that out of the way.

10             As for timing, today we will take a break for

11  lunch at 12:10. I have an internal meeting I have to attend.

12  We will take an hour lunch break and then we will come back.

13  We will end at 5 p.m. today. I am assuming we will finish

14  today, but if we don't I have tomorrow and Friday available

15  so we can continue the hearing if we need to.

16             Today, for this hearing, we took a little bit

17  different approach on access to the Zoom.  Under our new

18  procedures parties and counsel have access to the live Zoom.

19  They can see the proceedings on the Zoom call.  Those who are

20  not participants normally would sign up and receive a

21  telephone number to dial in.  In this case we have, and

22  because we expected a large number of people interested, a

23  YouTube channel and those who tried to sign up for the phone

24  number received an email saying go to the YouTube channel.

25             During the course of the hearing, if we have --

1  correct," D.I. 5410 at 4.  That case acknowledges one example

2  of a Court treating a proof of claim as though it were an

3  assessment but the Court ultimately refused to attach the

4  presumption of correctness to the proof of claim precisely

5  because "There had been no prepetition IRS tax assessment,"

6  1990 Westlaw 299418 at 6, Bankruptcy Eastern District of

7  Pennsylvania, February 8th, 1990.

8          For these reasons I disagree with the United

9  States contention that all reasonable IRS estimates made

10 without formal assessments are entitled to a presumption of

11 correctness.  Claim estimation of bankruptcy is an imprecise

12 process that is neither designed nor intended to yield exact

13 numbers.  Nevertheless, I conclude that the IRS bears the

14 burden of substantiating suggested estimation of the debtors'

15 tax liabilities where there has been no formal assessment.

16          Any questions?

17     (No verbal response)

18          THE COURT:  One other issue before we get started.

19 On the question of the estimation hearing for today I

20 received a number of objections that the debtors selection of

21 the petition date as the date for determining the value of

22 the digital assets that are being estimated today is

23 inappropriate because it's unfair; however, the code is very

24 clear.  The code says that a claim is to be determined in

25 U.S. dollars as of the petition date. I think that is Section

1   502(b).

2          Its no different in the context of a determination

3   of the validity of a claim as it is for the estimation

4   hearing under 502(c).  There are limited exceptions to this

5   requirement, none of which are applicable here and,

6   therefore, based on the filings that I received, and the

7   objections that I reviewed, the debtors' position as well, I

8   conclude that the debtors' use of the petition date as the

9   date for determining the value of the digital asset claims is

10   appropriate.  I have no wiggle room on that. The code says

11   what it says and I am obligated to follow the code.

12          I understand those who have filed objections,

13   mostly, I think all of them were pro se litigants, feel that

14   this is unfair to them because of value of certain of the

15   digital assets may have increased since the filing of the

16   petition date.  The opposite is also true, some of the

17   digital assets decreased in value since the petition date.

18   Congress determined that we have to pick a date and they

19   chose the petition date.  And, therefore, I am bound by that

20   obligation under 502.

21          So, all objections to the timing of the date upon

22   which the debtors chose to determine the estimated value of

23   the claims are overruled on that basis; therefore, I don't

24   need to hear argument on those issues.

25          Mr. Landis.

**EXHIBIT B**

**<u>EXHIBIT C</u>**

**<u>EXHIBIT D</u>**

**<u>EXHIBIT E</u>**

**<u>EXHIBIT F</u>**

## **Exhibit G**

**Constitution of Genesis Asia Pacific Pte. Ltd.**



## Exhibit H

**Genesis Global Capital, LLC Amended and Restated Operating Agreement**

## **Exhibit I**

**Genesis Global Holdco, LLC Operating Agreement**