MEDINA LAW FIRM LLC
641 Lexington Avenue
Thirteenth Floor
New York, NY 10022
Telephone: (212) 404-1742
Facsimile: (888)-833-9534

*Attorneys for BAO Family Holding LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Capital, LLC *et al*[1] | Case No. 23- 10063 (SHL) |
| Debtor. | |

**OBJECTION AND RESERVATION OF RIGHTS**
**REGARDING DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

BAO Family Holding LLC ("BAO" or "Objecting Party"), by and through its undersigned counsel hereby files this objection and reservation of rights (this "Objection") with respect to confirmation of the Amended Plan of Genesis Global Holdco, LLC, *et al*., [Doc. No's 989, 1117, 1131, 1137, 1144] (as may be further amended, supplemented, or modified, the "Plan"). In support of its Objection, BAO respectfully represents as follows:

**PRELIMINARY STATEMENT**

The Plan's proposal to repay Gemini Lenders,[2] victims of fraud[3] which in large part appears to have been the basis for the initiation of these Chapter 11 Cases and continues to permeate them,

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number (as set forth on their respective petitions are: Genesis Global Holdco, LLC (8219) ("GGH"); Genesis Global Capital, LLC (8564) ("GGC"); and Genesis Asia Pacific Pte. Ltd. (2164R) ("GAP"). Their bankruptcy case numbers are as follows: 23-10063 for GGH; 23-10064 for GGC; and, 23-10065 for GAP. Collectively, GGH, GGC, and GAP are referred to herein as "Debtors". The Debtors' bankruptcy cases are referred to as the "Chapter 11 Cases".

[2] Capitalized terms not otherwise herein defined have the meanings ascribed in the Plan as filed as of the date of this Objection.

[3] Discussed by way of example *and not* limitation in the matter captioned *The People of the State of New York by Letitia James v. Gemini Trust Company, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific PTE., LTD; Genesis Global Holdco, LLC, Digital Currency Court, Inc.; Soichiro Moro (a.k.a Michael Moro) and Barry E.*

1

with the ill-gotten gains of that fraud (i.e. the increased value of the underlying crypto currency commodities detained by operation of the automatic stay) is incompatible with the standards for confirmation of a chapter 11 plan and are anathema to the fundamental objectives of the Bankruptcy Code.

The Plan's limitations for recovery of Objecting Party's claims and consequently those of Gemini Lenders which are limited to a range of the allowed Genesis Lender Claim or 100% of *petition date values*, with the *possibility* of some additional value (through Incremental in-Kind recoveries) cannot be the "ceiling" or "limit" by which Gemini Lender claims should be treated under the Plan. December 31, 2023, values calculated to monetize assets for implementation of the Plan to project distributions suggest that recovery for Gemini Lenders (and consequently the Objecting Party) *in-full* to Effective Date values with interest is both possible and highly plausible. Yet under the Plan, this legitimate imperative is marginalized in favor of recovery for other case participants whose claims against the Debtors are denominated in different assets types specifically fiat currencies, who had different agreements, and whose assets importantly did not increase in value during the (ongoing)[4] period in which by operation of the Bankruptcy Code-triggered automatic stay victims were unable to recoup their assets in order to make their own economic decisions concerning their assets. It is not *pro rata* recovery under the Bankruptcy Code that necessitates this result, but rather disparate favoritism for larger non-Gemini Lender constituents which yielded the present iteration of the Plan and in addition releases numerous persons and entities for so doing it. The Plan should appropriately conform to the objectives of maximizing distributions *for all creditors*, releases granted under the Plan should similarly clearly and

---

*Silbert*, Index No. 452784/2023 in the Supreme Court of the State of New York, New York County, Commercial Division (the "NYAG Complaint").

[4] To the contrary, the U.S. Dollar has witnessed historical devaluation by way of inflation.

unequivocally identify to whom they apply, be more narrowly tailored to remain within the confines of activity that the Bankruptcy Court was able to oversee and be subject to further disclosure in any type of post-confirmation environment. Finally, the Objecting Party submits that the Plan must be revised to provide more meaningful and thoughtful requirements as to the timing of distributions and the regulation of the Gemini Distribution Agent. It is imperative that constituents of the Objecting Party's class be given some meaningful assurances that there can be no further detainment of their assets under the color of Bankruptcy Code. For the foregoing reasons, the Objecting Party requests that the Court sustain the Objection:

## FACTUAL BACKGROUND

1. On January 19, 2023 (the "Petition Date"), the Debtors each commenced a voluntary case under Chapter 11 of the Bankruptcy Code.

2. On February 3, 2023, the United States Trustee appointed a seven-member committee of unsecured creditors, which is the only statutory committee appointed in these cases. [Doc. No. 53].

3. The Debtor filed the Plan on November 28, 2023, and has continued through January of this year to make additional amendments and supplements to the Plan.

4. The Objecting Party, a Gemini Lender, was classified in Class 7 under the Plan and by its terms deemed impaired its claim impaired.

**A.    The Plan**

5. The Plan *is not* a reorganization plan, rather, the Plan is styled as a liquidating plan. Nevertheless, the Plan provides for broad exculpation provisions and releases of persons and related entities in connection with the confirmation of the Plan. The Plan itself relies on the

3

concept of a "rebalancing of assets," which, in this case is in part the conversion of GBTC Shares into a digital assets.

**B.      Open Ended Exculpation and Releases**

6.      The Exculpation provisions exculpate the following types of activities:

> Except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, a*ny Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases*, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), **or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence,** but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. **The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.** Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.F shall, nor shall it be deemed to, release or exculpate any DCG Party.

*See* Plan, Art. VIII, Section F.  There little to no justification for such sweeping exculpation provisions in a liquidating reorganization plan.  The Plan defines "DCG Parties" as

4885-4864-9889, v. 3

*DCG Parties* means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; *provided* that DCG Parties shall not include any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date.

Plan, Art. I, 55.  An "Exculpated Party" is:

"Exculpated Party" means (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Committee and its members (solely in their capacities as such), (iv) the members of the Ad Hoc Group SteerCo (solely in their capacities as such), (v) the PA Officer (solely in its capacity as such), (vi) the members of the Wind-Down Oversight Committee (solely in their capacities as such), (vii) the members of the Litigation Oversight Committee (solely in their capacities as such), (viii) the Gemini Distribution Agent (solely in its capacity as such and solely to the extent that the Gemini Distribution Agent is implementing the Plan), and (ix) each Related Party of each Entity described in the foregoing clauses (i)–(viii) (in each case, solely in such Person's capacity as such); provided that the Related Parties of the Gemini Distribution Agent shall only be Exculpated Parties in respect of actions that are directly in furtherance of the performance by the Gemini Distribution Agent of its duties under the Plan; provided further that, notwithstanding anything to the contrary in the Plan, the DCG Parties shall not be Exculpated Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date shall not be Exculpated Parties; provided still further that any of the current and former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as employees, officers, or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Exculpated Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, who shall not be Exculpated Parties.

Plan, Art. I, 88.  According to the Disclosure Statement, the Plan is the product of negotiation and agreement between the Debtors, the Committee and the Ad Hoc Group.  *See* Disclosure Statement, Art. VII.  Based on the pleadings and filings to date in the Chapter 11 Cases, it appears that certain members of the Committee were or are Gemini Lenders.  Due to confidentiality restrictions,

5

employed in the case, little is known about claims by or against the Debtors that are held by constituents of the various committees, including the Committee, the Litigation Oversight Committee, the Ad Hoc Committee and the Litigation Oversight Committee.

7.  In connection with a Plan Supplement filed on December 29, 2023, the Debtor provided an Exhibit "F," in support of the proposed releases and exculpations set forth in the Plan. As part of that document, the Debtors disclosed that the Special Committee (i.e. the sole decision makers of the Debtor)[5] had "subject to the reservation of rights set forth therein" provided prior written consent for the release of current or former officers and directors of the Debtors "who served or functioned as employees of a Debtor pursuant to a shared services agreement" who identities will be or have been provided in writing to the Ad Hoc Group and the counsel for the Committee prior to the Effective Date. *See* Plan Supplement, [Doc. No. 1117] 21-22. Creditors are entitled to know who is being released in connection with a case involving a fraud such as this one.

8.  The Plan defines Released Parties as:

> "Released Party" means (i) *the Debtors*, (ii) th*e Ad Hoc Group SteerCo and its members* (solely in their capacities as such), (iii) the *Committee and its members (solely in their capacities as such), and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such);* provided, however, that, notwithstanding anything to the contrary in the Plan, neither the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date shall be Released Parties; and, provided, further, t*hat any of the current or former employees, officers, or directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer, or director of the Debtors from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be a Released Party only with the prior written consent and justifications of the Special Committee, which justifications shall be set forth in the Plan Supplement and which Persons shall be provided to the Ad Hoc Group Counsel and the Committee Counsel on a confidential, professional-eyes-only, basis, with the express exception of any current or former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, which Persons shall not be Released Parties.*

---

[5] Plan Art. I., 195.

6

*See* Plan, Art. I., 180. The Ad Hoc Group purports to own $2.3 billion in claims. The identify of its membership is unknown although it appears that its membership is comprised largely of institutional investors acting on behalf of others:

**Exhibit A**

**Disclosable Economic Interests of the Members of the Ad Hoc Group of Genesis Lenders[3]**

| NAME[4] | NATURE AND AMOUNT OF DISCLOSABLE ECONOMIC INTEREST[5]<br>As of January 19, 2023[6] |
|---|---|
| Lender 1 | • 120 Bitcoin (BTC) |
| Lender 2 | • 46.4356839 BTC |
| Lender 3 | • 335.83724574 BTC<br>• 335.95423787 Binance Coin (BNB)<br>• $50,805,053.38 USD<br>• 8,019,349.89 USD Coin (USDC) |
| Lender 4 | • 1,000 BTC<br>• $11,000,000.00 USD |
| Lender 5 | • $407,758.06 USD |
| Lender 6 | • 27.326553 BTC<br>• $1,250,000.00 USD<br>• 49.549461 Ethereum (ETH) |

[3] To the best of Proskauer's knowledge, the information included herein is accurate as of March [2], 2023.
[4] Each entity on this **Exhibit A** holds disclosable economic interests, or acts as investment advisor or manager to funds, entities, accounts and/or their respective subsidiaries that hold disclosable economic interests, in relation to the Chapter 11 Cases.
[5] All interests listed are in Debtor GGC.
[6] All amounts listed herein refer to the principal balance outstanding and do not include prepetition or postpetition interest accrued.

*See* Verified Statement of Ad Hoc Group [Doc. No. 114]. The Ad Hoc Group appears to be the recipient of a release under the Plan.

**C.    The Setoff Principles**

9.    The Plan provides in Art. 4, 16 that under its means for implementation with respect to setoff that:

> The Debtors and the Wind-Down Debtors are authorized, but shall not be required to, for purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Plan, set off (i) any Claim against the Debtors with the value of any <u>Loan Collateral that the applicable Debtor delivered to the Holder of such Claim, (ii) the value of any debt owed by the Holder of such Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor, and/or (iii) any Claim against a Debtor with the value of any debt owed by the Holder of</u>

7

> such Claim to the applicable Debtor; provided, however, that, in the event that, <u>from and after the date hereof, the Debtors formulate one or more proposals, based upon the individual circumstances of Holders of Claims who may have setoff rights or other rights with respect to Loan Collateral posted with the Debtors, to compromise or settle such rights, including with respect to the value of such Loan Collateral, either through an amendment to the Plan or an order of the Bankruptcy Court, such proposals shall be set forth in a filing with the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline and, upon acceptance thereof by a Holder of Claims, shall be presented to the Bankruptcy Court, in each case, upon notice and an opportunity for a hearing.</u>

*See Id.* Art. IV B, 16. This blanket authorization for authority was later described in the Plan Supplement of January 9, 2024 [Doc. No. 1144]. The Plan further defines "Loan Collateral" as:

> means collateral in the form of Digital Assets provided in connection with any loan taken or extended by the Debtors; provided, *however, that the Additional GBTC Shares and the Gemini GBTC Shares shall not constitute Loan Collateral for purposes of Article IV.B.16 of the Plan.*

*See* Plan, Art. I, 152.

10. The underlined and italic language above expressly carves out from the definition of Loan Collateral the additional Gemini GBTC Shares and the Additional GBTC Shares which are the subject of ongoing related adversary proceeding disputes (transactions, which took place in the weeks and months leading to the Petition Date which are likely the most important collateral assets to ensure distribution to Gemini Lenders like BAO). To the extent that the Debtor elects to setoff a claim against the Holder of a Claim against the Debtors, the value to be used by the Debtor in recovering such value *is tied to Petition Date pricing* in the applicable digital token set forth in the Digital Assets Conversion Table.

11. The Setoff Principles supplement is significant to the recovery on claims for Gemini Lenders like BAO since valuation calculus leads to hundreds of millions that are off the table[6] since borrowers of the Debtors' digital assets may engage in setoff transactions with the Debtors and may *retain any the applicable increase in value* of the digital asset which is the subject

---

[6] Using today's pricing.

8

of the transaction borrowed from the Debtors. This setoff results in the Debtors thereby reducing the amount of available assets that the Debtors may have on hand for use for in distributions.

12. This provision also has the effect of treating creditors with similar claims disparately by virtue only of their prepetition business dealings with the Debtors a time period which skeptics and parties who have been victims of fraud liken to a tumultuous period of time involving far reaching wrongdoing as described in the NYAG complaint, amongst others.

D.   **The Distribution Principles Improperly tie recovery to Petition Date Values**

13. The centerpiece of the Distribution Principles is a five (5) step process that identifies what the proportionate *pro rata* share is of Allocable Assets to Allowed Holders of Claims. The objectionable portion of the Distribution principles is step one (1): which states in determining: "the numerator to determine the share of will equal the Petition Date Value of such Holder's Claim Assets, less certain collateral and payable offsets." *See* Plan, Ex. A. The Distribution Principles first improperly "dollarize" a Genesis Lender's claim and then purports to do so on the date *least* favorable to Gemini Lenders like BAO since asset values for conversion purpose have roughly doubled. Then remainder of the Distribution Principles then require engaging in "market transactions" to deliver in the case of Gemini Lenders, digital assets to the Gemini Distribution Agent.

E.   **Distributions and Lack of Procedures to Effect Timing**

14. The Plan provides with respect to the timing of distributions to the Objecting Party that:

> As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Amended Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims on a pro rata basis.

*See* Plan, Art. VI, C (79 of 114). Further the Disclosure Statement states that:

> Except as otherwise provided in the Amended Plan (including the Distribution Principles), *Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Amended Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.*

*Id*. (emphasis added).

> In addition, <u>the Gemini Distribution Agent shall arrange</u> to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution to the Gemini Lenders, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value) and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve), the proceeds of such Monetization Transaction of Gemini GBTC Shares, *in each case to the Holders of Allowed Gemini Lender Claims on a pro rata basis*. Any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from such dollar-for-dollar reduction if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group s Consent, or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

15. With regard to its role as the Gemini Distribution Agent, the Plan provides that:

> Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Plan.

Plan, Art. VI, B, 3. The Objecting Party like other constituents of the Gemini Lenders should not in any manner be limited with respect to any potential claims against Gemini for any conduct whatsoever.

16. The Plan provides the following limited description of the Gemini Distribution Agent's directives following taking custody of distributions for Allowed Gemini Lender Claims:

> distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent <u>and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims</u>.

10

*See* Plan, Art. VI, B.  The Plan further conditions the receipt of distributions on allowed claims as follows:

> Subject to the Distribution Principles, the Debtors and the Wind-Down Debtors will use commercially reasonable efforts, subject to applicable law and the terms of this Plan, to provide recoveries in respect of Claims denominated in Digital Assets in the like-kind form of Digital Asset in which such Claims are denominated, including by buying Digital Assets with the Debtors' or Wind-Down Debtors' Cash, selling Digital Assets for Cash, or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; provided, however, that no distribution in the form of Digital Assets shall be made to any *Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder; and, provided, further, that, upon the request of a Holder of an Allowed Fiat-or-Stablecoin Denominated Claim or the Gemini Distribution Agent, on behalf of any Holder of Allowed Gemini Lender Claims in respect of its Claims to the extent denominated in Cash, Foreign Currency, or Stablecoin, the Debtors or the Wind-Down Debtors, as applicable, will use commercially reasonable efforts, subject to applicable law (including any regulatory or tax considerations) and the terms of this Plan*,

*See* Plan, Art. VI, C (79 of 114).

## LEGAL ARGUMENT

### I. Confirmation Standards Applicable.

The Bankruptcy Court has an independent duty to ensure that a plan satisfies all of the elements of §1129 before ordering confirmation.  *In re Friese*, 103 B.R. 90 (Bankr. S.D. N.Y. 1989).  To confirm the a plan, a debtor must demonstrate, "by a preponderance of the evidence, that it satisfies section 1129(a) of the Bankruptcy Code."  *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018).

### II. Best Interests of Creditors Test

A debtor bears the burden of demonstrating its plan satisfies the "best interest" test. *See, e.g., In re GSC, Inc.*, 453 B.R. 132, 179 n.66 (Bankr. S.D.N.Y. 2011) ("The proponents of a plan bear the burden of proof under section 1129(a)(7)." "It is an individual guaranty to each creditor or interest holder that it will receive as much in reorganization as it would in liquidation." *See* 7 Collier on Bankruptcy ¶ 1129.02[7]; *See also In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279,

11

297 (Bankr. S.D.N.Y. 1990) ("To be sure, the command of section 1129(a)(7)(A)(ii) is perhaps the strongest protection creditors have in chapter 11."). Here however, the increases in the underlying asset value of BTC (more than double as of today's date) and ETH (nearly 50% higher) are not accounted for on the Effective Date of the Plan. Instead, the Plan unfairly uses Petition Date pricing. This however is not the norm, it is the "Effective date of the plan," as of which creditors' claims are valued in Chapter 11 case, a date on which provisions of plan of reorganization become effective and binding on parties, which, statutorily, occurs 14 days after entry of confirmation order in most Chapter 11 cases." 11 U.S.C §§ 1129, 1141(a); Fed. Rules Bankr. Proc.Rule 3020(e), 11 U.S.C.A. *In re Good*, 428 B.R. 235 (Bankr. E.D. Tex. 2010).

**III.    The Exculpation Provisions Go Too Far as they Relates to Gemini Lenders and Parties whose Conduct has not been reviewed by the Court due to Confidentiality**

While a bankruptcy court has *in rem* jurisdiction over a debtor's property and the disposition of that property, " third-party claims belong to third parties," not the estate. *In re Aegean Mar. Petroleum Network Inc.*, 599 BR 717, 723 (Bankr S.D.N.Y. 2019). As a general rule, a bankruptcy court h*as no power to say what happens to property that belongs to a third party*, even if that third party is a creditor or otherwise is a party in interest. *See Callaway v. Benton*, 336 U.S. 132, 136-41 (1949). Here the exculpation provisions described above include provisions for exculpation of Gemini and related parties, these types of exculpation provisions are improper here where the Plan lacks specific procedures as described above to ensure the delivery of assets to Gemini Lenders like BAO. For the above reasons and the for the reasons cited by the U.S. Trustee in its Objection to the Confirmation of the Debtor's Plan [Doc. No. 1202] the Objecting Party submits the definition of Exculpation Party definition and breadth of the exculpation therein which extends to be pre-petition activity and activity before the Objecting Party's claims are fully resolved, is improper.

### IV. Joinder to Certain Objections

BAO further joins in the objections asserted by the Crypto Creditors Committee's forward contracts arguments that recovery must be "in-kind" adopting specifically the requirements that the Plan improperly dollarizes claims denominated in crypto assests.  BAO further joints in the objection raised by SOF International, LLC ("SOF") that the Plan does not distinguish between distribution of the Gemini Proprietary Claim [Doc. No. 1218], ¶12[7] and the Gemini Master claim which was filed on behalf of Gemini Lenders like the Objecting Party.  The Objecting Party goes one step further however to state that absent some type of restriction on Gemini itself, the transfer to Gemini of assets on account of Gemini Lender claims leaves a *gaping* prospect that Gemini may further detain those proceeds from Gemini Lenders like BAO, as such the Plan must be modified and procedures must be in place to ensure value reaches its intended target.

### CONCLUSION

**WHEREFORE**, BAO respectfully requests that the Court sustain its Objection and grant such other and further relief as is just and proper.

Respectfully submitted,

By: */s/ Eric S. Medina*
Eric S. Medina, Esq.
MEDINA LAW FIRM LLC
641 Lexington Avenue
Thirteenth Floor
New York, NY 10174
Tel. (212) 404-1742
Fax (888) 833-9534
emedina@medinafirm.com

Dated: February 5, 2024

---

[7] As defined therein.