WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC. AND DCG INTERNATIONAL INVESTMENTS**
**LTD.'S OBJECTION TO CONFIRMATION OF THE DEBTORS' AMENDED PLAN**

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219) ("**GGH**"); Genesis Global Capital, LLC (8564) ("**GGC**"); Genesis Asia Pacific Pte. Ltd. (2164R) ("**GAP**," and collectively with GGH and GGC, the "**Debtors**").  For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich St., 38th Floor, New York, NY 10007.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................6

BURDEN OF PROOF ............................................................................................8

ARGUMENT .......................................................................................................9

I.    The Amended Plan violates multiple requirements of section 1129 and is
       unconfirmable. ...........................................................................................11

       A.    The Amended Plan is an impermissible cramdown plan that violates
              section 1129(b) of the Bankruptcy Code. .............................................11

              1.    The Amended Plan does not comply with section 502(b) of the
                     Bankruptcy Code by allowing creditors to recover more than the
                     Petition Date values of their claims. .........................................13

                     a)    Section 502(b) mandates that the value of a claim is fixed
                            in U.S. dollars as of the Petition Date. ............................13

                     b)    Section 502(b) of the Bankruptcy Code applies to all kinds
                            of claims, including cryptocurrency claims. ....................16

                     c)    The Distribution Principles allow creditors to recover more
                            than the amount of their claim as of the Petition Date in
                            violation of section 502(b). ............................................19

                     d)    No exception to section 502(b) applies here. ...................20

              2.    The Amended Plan would pay an unlawful amount of interest to
                     general unsecured creditors. .....................................................21

       B.    The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code. ............24

       C.    The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code. ............25

              1.    The Debtors have breached their fiduciary duties to DCG. ......................27

              2.    The Debtors propose in bad faith a plan that gives a small group of
                     influential creditors favorable treatment through the Setoff
                     Principles. ..........................................................................28

              3.    The Amended Plan impermissibly alters DCG's equity holder
                     rights in violation of applicable law. ..........................................32

              4.    Conditioning DCG's rights on the issuance of a Final Order
                     declaring all creditor claims Unimpaired has no basis in law,
                     equity, or otherwise. ..............................................................34

              5.    The Plan further cuts off DCG's beneficial interests in GGC and
                     GAP. ..................................................................................35

6.   DCG should have consent rights over the Debtors' Wind-Down..............35

D.   The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code. ...........37

II.   The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law...........37

A.   The Amended Plan improperly assumes and rejects only certain indemnification obligations. .................................................................38

B.   Allowance of certain creditors' fees and expenses against the Estates. ...............39

C.   Any subordination of DCG Claims is improper. ....................................................39

D.   The Amended Plan should not require a tax sharing agreement. .........................40

RESERVATION OF RIGHTS ........................................................................................40

CONCLUSION.................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*In re Aaura, Inc.*,
    No. 06-B-01853, 2006 WL 2568048 (Bankr. N.D. Ill. Sept. 1, 2006) .............................16, 17

*In re Adelphia Commc'ns Corp.*,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ...................................................................................39

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) .......................................................................................26, 31

*Am. United Mut. Life Ins. v. City of Avon Park*,
    311 U.S. 138 (1940) ........................................................................................................26

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*,
    528 F.3d 162 (2d Cir. 2008) ...........................................................................................25

*In re Axona Int'l Credit & Com. Ltd.*,
    88 B.R. 597 (Bankr. S.D.N.Y. 1988) ..............................................................................17

*Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*,
    361 B.R. 489 (B.A.P. 8th Cir. 2007) ...............................................................................14

*Bergquist v. Felland (In re O-Jay Foods Inc.)*,
    No. 3-89-281, 1991 WL 378164 (D. Minn. Nov. 21, 1991) .............................................32

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ..........................................................................8, 11

*Cadle Co. v. Mangan (In re Flanagan)*,
    503 F.3d 171 (2d Cir. 2007) ............................................................................................14

*In re Celsius Network LLC*,
    655 B.R. 301 (Bankr. S.D.N.Y. 2023) .........................................................................13, 19

*Chevron Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
    428 B.R. 590 (D. Del. 2010) ...........................................................................................32

*In re City Stores Co.*,
    21 B.R. 809 (Bankr. S.D.N.Y. 1982) ..............................................................................38

*Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    138 B.R. 687 (Bankr. S.D.N.Y. 1992) .............................................................................30

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)...............................................................................................27

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005)...............................................................................2, 36

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)...............................................................................................12

*In re Dernick*,
    624 B.R. 799 (Bankr. S.D. Tex. 2020) .................................................................26

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019)...............................................................8, 37

*In re Dow Corning Corp.*,
    237 B.R. 380 (Bankr. E.D. Mich. 1999) ...............................................................23

*EMAK Worldwide, Inc. v. Kurz*,
    50 A.3d 429 (Del. 2012) .......................................................................................32

*In re Eriksen*,
    647 B.R. 192 (Bankr. N.D. Ohio 2022) ................................................................16

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms*
    *and Explosives*,
    984 F.3d 30 (2d Cir. 2020)....................................................................................34

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................11

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999)..................................................................................17

*In re FTX Trading Ltd.*,
    No. 23-02297, 2024 WL 204456 (3d Cir. Jan. 19, 2024).......................................17

*In re Genever Holdings, LLC*,
    Case No. 20-12411-JLG, 2021 WL 3919826 (Bankr. S.D.N.Y. 2021)...................33

*In re Glob. Power Equip. Grp.*,
    No. 06-11045, 2008 WL 435197 (Bankr. D. Del. Feb. 14, 2008), *aff'd*, 400
    B.R. 17 (D. Del. 2009)..........................................................................................16

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011)..................................................................................31

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................................................11

*In re Groenleer-Vance Furniture Co.*,
   23 F. Supp. 713 (W.D. Mich. 1938) ......................................................................................15

*In re Hansen Bakeries*,
   103 F.2d 665 (3d Cir. 1939).................................................................................................15

*In re Hawker Beechcraft, Inc.*,
   486 B.R. 264 (Bankr. S.D.N.Y. 2013) ...................................................................................38

*In re Klaber Bros., Inc.*,
   173 F. Supp. 83 (S.D.N.Y. 1959) .........................................................................................38

*LaSalle Nat. Bank v. Perelman*,
   82 F. Supp. 2d 279 (D. Del. 2000)...................................................................................27, 31

*In re LATAM Airlines Group S.A.*,
   No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023) ...........................17

*In re LATAM Airlines Grp. S.A.*,
   No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ...........................23

*Law v. Siegel*,
   571 U.S. 415 (2014).............................................................................................................16

*In re Lehman Brothers Hldgs. Inc.*,
   602 B.R. 564 (Bankr. S.D.N.Y. 2019) ...................................................................................18

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998)...............................................................................................................16

*In re Madison 92nd St. Assocs. LLC*,
   472 B.R. 189 (Bankr. S.D.N.Y. 2012) ..............................................................................22, 23

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*,
   801 F.2d 60 (2d Cir. 1980)...................................................................................................33

*In re MatlinPatterson Global Opportunities Partners II L.P.*,
   644 B.R. 418 (Bankr. S.D.N.Y. 2022) ...................................................................................12

*In re Melenyzer*,
   143 B.R. 829 (Bankr. W.D. Tex. 1992)..................................................................................23

*In re Michaelis & Lindeman*,
   196 F. 718 (S.D.N.Y. 1912)..................................................................................................15

*Miller v. Mott (In re Team Sys. Int'l, LLC)*,
    2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) .................................................................11

*Moser v. Encore Cap. Grp., Inc.*,
    964 F. Supp. 2d 1224 (S.D. Cal. 2012) .................................................................................18

*In re MPM Silicones, LLC*,
    No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
    *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other*
    *grounds*, 874 F.3d 787 (2d Cir. 2017) ..................................................................................24

*In re Mushroom Transp. Co*.,
    382 F.3d 325 (3d Cir. 2004) ..................................................................................................30

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*,
    28 F.4th 357 (2d Cir. 2022) ...................................................................................................16

*In re New York City Off-Track Betting Corp.*,
    427 B.R. 256 (Bankr. S.D.N.Y. 2010) ..................................................................................14

*Paramount Comm'ns, Inc. v. QVC Network, Inc.*,
    637 A.2d 34 (Del. 1994) ........................................................................................................32

*In re Peak Broadcasting, LLC*,
    No. 12-10183 (MFW), 2012 WL 1452359 (Bankr. D. Del. Apr. 20, 2012) ..........................25

*Philbrook v. Glodgett*,
    421 U.S. 707 (1975) ..............................................................................................................14

*In re Promise Healthcare Grp., LLC*,
    No. 18-12491, 2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023) ........................................16

*In re PTM Techs., Inc.*,
    No. 10-50980C-11W, 2013 WL 4519306 (Bankr. M.D.N.C. Aug. 26, 2013) .......................24

*In re Quigley Co., Inc.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ....................................................................................9

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*,
    404 B.R. 793 (Bankr. M.D. Pa. 2009) ..............................................................................14, 16

*Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*,
    640 F.3d 53 (2d Cir. 2011) ......................................................................................................9

*Scully v. US WATS, Inc.*,
    238 F.3d 497 (3d Cir. 2001) ..................................................................................................18

*Sears v. Sears (In re Sears)*,
    863 F.3d 973 (8th Cir. 2017) ....................................................................................14

*Sexton v. Dreyfus*,
    219 U.S. 339 (1911).................................................................................................15

*In re SunEdison, Inc.*,
    575 B.R. 220 (Bankr. S.D.N.Y. 2017) .....................................................................11

*In re Tenney Village Co., Inc*.,
    104 B.R. 562 (Bankr. D.N.H. 1989) ........................................................................31

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)........................................................................34

*In re Trenton Ridge Invs.*,
    LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011) ...........................................................25

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .....................................................................11

*USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New*
    *England, Inc.)*,
    429 B.R. 437 (Bankr. D. Md. 2010), *aff'd sub nom. TransCanada Pipelines*
    *Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011)..............................17

*Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*,
    637 B.R. 781 (Bankr. D. Del. 2021) ...................................................................21, 23

*White v. Lambert*,
    370 F.3d 1002 (9th Cir. 2004) .................................................................................15

*Wilkow v. Forbes, Inc.*,
    241 F.3d 552 (7th Cir. 2001) ...................................................................................34

*In re Young Broadcasting Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) .........................................................................9

*In re Zamora*,
    No. 19-01040 (WLH), 2020 WL 4289926 (Bankr. E.D. Wash. July 27, 2020).....................32

## Statutes

11 U.S.C. § 365.............................................................................................................38, 39

11 U.S.C. § 502(b) ................................................................................................... *passim*

11 U.S.C. § 562.................................................................................................................21

11 U.S.C. § 550(a) ...........................................................................................................14

11 U.S.C. § 704(a)(5)......................................................................................................30

11 U.S.C. § 726(a)(5).................................................................................................22, 23

11 U.S.C. § 1106(a)(1)....................................................................................................30

11 U.S.C. § 1109(b).........................................................................................................9

11 U.S.C. § 1123(a)(6)...............................................................................................24, 25

11 U.S.C. § 1123(a)(7)....................................................................................................35

11 U.S.C. § 1124(1).........................................................................................................34

11 U.S.C. § 1128(b).........................................................................................................9

11 U.S.C. § 1129 ....................................................................................................... passim

11 U.S.C. § 1129(a) ...........................................................................................2, 8, 11, 37

11 U.S.C. § 1129(a)(1)........................................................................................10, 24, 25, 39

11 U.S.C. § 1129(a)(3)................................................................................................ passim

11 U.S.C. § 1129(a)(7)........................................................................................10, 13, 37

11 U.S.C. § 1129(a)(7)(A)(ii) ........................................................................................22

11 U.S.C. § 1129(b).................................................................................................... passim

11 U.S.C. § 1129(b)(2) ....................................................................................................34

28 U.S.C. § 1961..............................................................................................................22

**Other Authorities**

Fed. R. Bankr. P. 9019....................................................................................................12

*In re BlockFi Inc.*,
   No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660...................................18

*In re Celsius Network LLC*,
   No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 27, 2023), Docket No. 3577 ...........................18

7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023) .........................................................11

*In re FTX Trading Ltd.*,
　No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31 Hr'g Tr.) ........................................4, 17, 18, 19

S. Rep. No. 95-989 (1978). Section 502(b) ...................................................................................15

*In re Voyager Digital Holdings*,
　No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ...........................18

www.coinbase.com/price/bitcoin...................................................................................................7

Digital Currency Group, Inc. ("**DCG**") and DCG International Investments Ltd. ("**DCGI**")

submit this objection (the "**Objection**")[2] to the approval of the *Debtors' Amended Joint Chapter*

*11 Plan* (Docket No. 989) (as amended, modified or supplemented, the "**Amended Plan**")[3] and

respectfully states as follows:

<u>**Preliminary Statement**</u>

1.     DCG would support a plan that pays creditors one hundred cents on the dollar, and

the Estates currently have sufficient assets to do so.  But the Debtors have not proposed such a

plan.  Instead, the Debtors, in concert with the UCC and Ad Hoc Group, have devised a cramdown

plan that pays unsecured creditors hundreds of millions of dollars *more* than the full amount of

their petition date claims—and which disproportionately favors a small controlling group of

creditors over others—in violation of the Bankruptcy Code.  It also strips DCG of other valuable

economic and corporate governance rights further violating the Bankruptcy Code and

demonstrating a lack of good faith.  DCG cannot support such a plan, and the Court should not

approve it.

2.     Through the complex and convoluted Distribution Principles, the Amended Plan

violates two black letter requirements of the Bankruptcy Code for confirming a cram down plan:

(1) senior classes may not receive more than the full value of their claims, and (2) distributions

must comply with the absolute priority rule.  Indeed, rather than maximizing the value of the

Estates for the benefit of all constituents—as the Debtors' fiduciary obligations to the Estates

require—the Amended Plan proposes to grant general unsecured creditors all the upside from the

---

[2]     Unless explicitly stated otherwise, all references to DCG's positions are fully adopted by DCGI.

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Plan Supplement, or the Disclosure Statement (each as defined herein).

increasing market value of the Estates' digital assets through valuation dates and interest rates prohibited by the Bankruptcy Code.  The Amended Plan goes further to give certain favored creditors—to the disadvantage of all other creditors and equity holders—an even greater distribution through the lopsided Setoff Principles that minimize the favored creditors' obligations to the Estates while maximizing their payout from the Estates.  Certain creditors will be paid a premium, while equity holders receive nothing.  Such a result is not fair and equitable to those creditors and equity holders, whose rights are violated by the Amended Plan.  The Debtors have sought expediency by proposing a plan that creditors would support, but at the cost of complying with their duties and obligations under the Bankruptcy Code.  This, in violation of the principle that "efficiency must not be obtained at the price of diminishing the integrity of the process."[4]  The Bankruptcy Code is clear: the Amended Plan may not be confirmed.

3.      The undisputed record demonstrates the Amended Plan does not comport with section 1129 of the Bankruptcy Code because it does not comply with applicable provisions of the Bankruptcy Code and was proposed in bad faith.  Section 502(b) of the Bankruptcy Code requires that claims be valued in U.S. dollars as of the petition date.  In plain violation of that provision, the Amended Plan proffers a distribution scheme that allows certain unsecured claims to grow to an extreme degree as the Estates' assets increase in value.  The Amended Plan does so by valuing certain creditor claims based on the value of the reference assets as of the distribution date under the so-called Distribution Principles:  The more the assets of the Estates appreciate, the more those creditors will receive as allowable claims, and the more value they will be permitted to take in excess of their Petition Date claims.  These assets are overwhelmingly cryptocurrencies which have increased in value since the Petition Date, and these senior creditors will be the sole

---

[4]     *In re Congoleum Corp.*, 426 F.3d 675, 693 (3d Cir. 2005).

beneficiaries of that appreciation under the Amended Plan.  It is likely no coincidence that this

distribution construct was introduced when cryptocurrency prices began to increase.[5]

4.      If allowed, this unlawful diversion would allow these creditors to take far more than

what is permitted by the Bankruptcy Code.  ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████  This taking of DCG's

interests as the ultimate equity holder of the Debtors comes despite DCG's direct channeling of

hundreds of millions of dollars of liquidity and capital to the Debtors in the year leading up to the

filing of these cases.  Were DCG ultimately to receive some equity value, it would merely be a

return of some of the massive investment DCG made in the Debtors pre-filing.

5.      ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████  And this is hardly the first cryptocurrency

bankruptcy filing.  Importantly, every other cryptocurrency case has used the normal claim

valuation mechanism prescribed by the Bankruptcy Code.  Indeed, just days ago, the Bankruptcy

---

[5]  ████████████████████████████████████████████

Court in the FTX bankruptcy cases overruled objections to the petition date claims valuation proffered by the debtor, stating: "I conclude that debtors' use of the petition date as the date for determining the value of the digital asset claims is appropriate. I have no wiggle room on that."[6] The same is true here, and the Debtors are left unable to explain why this Court would have the authority under the Bankruptcy Code to rule differently.

6. Moreover, the Amended Plan is the product of a gross breach of the fiduciary duties owed by the Debtors and their directors to DCG as the ultimate equity holder in the solvent Debtors and is, therefore, not proposed in good faith. Because of the unlawful Distribution Principles outlined above, the illustrative waterfall offered in the Amended Plan is a sham, provided to create the illusion that the subordinated creditors and equity interests will receive value after the unsecured claims are paid in full, while deliberately obscuring that under the formulation, the Estates' excess value will instead continually flow to general unsecured creditors. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

7. Not surprisingly, the Amended Plan was the product of a clandestine process. The Debtors engaged in months of back room discussions with the UCC and the Ad Hoc Group, which deliberately excluded DCG, the ultimate equity holder in these solvent Estates. Even worse, they have hidden their self-dealing behind assertions of common-interest privilege, preventing any

---

[6]    *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr.) (the "**FTX Hearing Transcript**"), (attached hereto as **Exhibit A**) at 15:2–11.

review by the Court.  It is no accident that this process resulted in a structure that disenfranchises the equity interests, imposes a distribution plan that gives the general unsecured creditors practically limitless upside potential on the appreciation of digital assets right up through the final distributions, and puts forth a sham waterfall that conceals this fact.

8.      The UCC and Ad Hoc Group also helped themselves—with the Debtors as their accomplice—to a host of other advantages, all at the expense of DCG:

- Granting unsecured creditors post-petition interest at rates not recognized by this District and in violation of 1129(a)(7), as well as an improper sweetener of additional post-Effective Date interest at an arbitrary rate, further siphoning value away from DCG for the benefit of general unsecured creditors;

- Restricting DCG's rights to exercise any rights or remedies as sole equity holder;

- Removing DCG's economic interests, voting interests, and governance rights with respect to GGC or its subsidiaries;

- Removing DCG's rights to any dividends or distributions as a result of its ownership of interests in GGH;

- Removing DCG's right to transfer its interests in GGH or take a worthless stock deduction;

- Limiting DCG's right to appoint the directors of GGH;

- Excluding DCG from the parties who have consent rights over the New Governance Documents; and

- Providing DCG no representation on the various Wind-Down committees set up by the Amended Plan, despite DCG's interests in the Estates.

On top of all of this, a small group of particularly powerful creditors have also inserted favorable setoff provisions that allow them to minimize their obligations to the Debtors while maximizing their recoveries.  Put simply, the influential creditors controlling the UCC and Ad Hoc Group have sought to enrich themselves by literally taking value from other stakeholders, and the Debtors caved to their demands in violation of their fiduciary duties.

9.      Again, DCG would fully support a plan that provides a 100% recovery for creditors—par plus post-petition interest.  But rather than move expeditiously to confirm a plan that pays creditors one-hundred cents on the dollar, the UCC and Ad Hoc Group, with the willing participation of the Debtors, conspired to formulate a plan that deliberately—in violation of the Bankruptcy Code, applicable non-bankruptcy law, and the Debtors' fiduciary obligations to equity—disenfranchises the sole equity holder in this fully solvent estate, DCG.  This is the definition of bad faith.

10.      Additionally, the assertion that this distribution scheme is somehow a settlement is completely disingenuous.  If this was truly a settlement, DCG would have been included as one the beneficiaries of the excess value of the Estates and would have, at a minimum, been provided some recovery as equity holder.  Instead, the Debtors, UCC, and Ad Hoc Group took all the additional value and then decided how to allocate it to benefit themselves, leaving nothing for other stakeholders.  That is not a fair settlement among interested parties.

11.      For these reasons, and as discussed below, the Debtors have not met the requirements to confirm a plan under section 1129 of the Bankruptcy Code and, therefore, the Amended Plan should not be confirmed.

## **Background**

12.      On November 28, 2023, the Debtors filed the Amended Plan, which is supported by the official committee of unsecured creditors (the "**UCC**") and the ad hoc group of Genesis lenders (the "**Ad Hoc Group**") (collectively, the "**Plan Support Parties**").  *See Plan Support Agreement* (Docket No. 1008), filed November 29, 2023; *see also* Nov. 28, 2023 Hr'g Tr. (Docket No. 1148) at 15:22–16:6, 22:20–23:3.

13.      Most significantly, the Amended Plan and its Distribution Principles contemplate distributions to creditors with claims denominated in digital assets in excess of what the

Bankruptcy Code permits.  To do so, the Amended Plan allows creditors to recover the cash value as of the Petition Date of the digital assets underlying their bankruptcy claims, but then also allows those same creditors to receive ***additional*** payouts based on the ***current*** value of those digital assets.  Distribution Principles at 8–9; ███████████████████████

███  The higher the value of the digital assets goes, the greater the recovery to the creditors—at no point does the excess value from those digital assets flow to the subordinated creditors or to DCG as the ultimate equity holder.  And since the Petition Date, the market values of the digital assets of the Estates have increased significantly.  ████████████████████

█████████████████  Indeed, by today's valuation, the market value of certain digital assets has increased dramatically—for example, as of February 4, 2024, the market value of Bitcoin had increased by almost 102.5% since the Petition Date.[7]  There is, accordingly, no practical cap on the payout to these creditors.

████████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[7]    See Disclosure Statement Ex. D at 5; https://www.coinbase.com/price/bitcoin.



**Burden of Proof**

16.    A chapter 11 plan may be confirmed only if it satisfies the requirements of section 1129(a) of the Bankruptcy Code, which include, *inter alia*, that the plan "complies with the applicable provisions of" the Bankruptcy Code, that the plan "has been proposed in good faith," and that holders of an impaired claim or interest either have accepted the plan or will receive at least as much under the plan as they would in a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a). The plan's proponent bears the burden of showing, by a preponderance of the evidence, that all of the applicable elements of section 1129(a) have been satisfied. *See In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019). Additionally, a plan that is not fully consensual must satisfy the requirements of section 1129(b), which too must be demonstrated by the plan proponent by a preponderance of the evidence. *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). The Court also "has an independent duty to ensure that the requirements

of 11 U.S.C. § 1129 are satisfied," whether the plan sustains objections or not.  *See, e.g.*, *In re Young Broadcasting Inc.*, 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010) (noting that the court "has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied").

<u>**Argument**</u>

17.    The Amended Plan cannot be confirmed because it violates multiple requirements of section 1129 of the Bankruptcy Code.[8]

18.    *First*, the Amended Plan constitutes an impermissible cramdown plan in violation of section 1129(b).  The Amended Plan is not fair or equitable to impaired classes that have rejected or are deemed to reject the Amended Plan because the Distribution Principles would pay a premium of approximately ███████ in excess value, if not more, at the expense of subordinated claimholders and equity holders in violation of section 502(b) of the Bankruptcy Code and a bedrock principle of bankruptcy law: the corollary to the absolute priority rule requiring that senior classes of creditors not receive more than full compensation for their allowed claims.  Additionally, excess value after the Recovery Cap is reached will flow to general unsecured creditors through payments of interest at rates not permitted in this District or under the

---

[8]    The Bankruptcy Code provides that "[a] party in interest may object to confirmation of a plan."  11 U.S.C. § 1128(b).  Section 1109(b) of the Bankruptcy Code further describes "party in interest" to include, among other things, "a creditor" and "an equity security holder."  11 U.S.C. § 1109(b).  Section 1109(b) is not intended to be an exclusive list; rather, courts broadly define a party in interest to include anyone with a financial interest, or in some cases a legal interest, in the case.  *See Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*, 640 F.3d 53, 60 (2d Cir. 2011).  DCG qualifies as both a creditor and an equity security holder of the Debtors.  DCG and DCGI filed proofs of claim against the Debtors.  Claim Nos. 464, 487, 511, 478.  And DCG is GGH's sole equity holder.  Both DCG and DCGI therefore have financial and legal interests in the outcome of these chapter 11 cases and the plan confirmation process.  *See id*.  Additionally, DCG and DCGI only seek to challenge those portions of the Amended Plan that affect their direct interests.  *See In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) (noting that a "party in interest" must still satisfy the general requirements of prudential standing).

[9]    ████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████

Bankruptcy Code, further depriving subordinated claimholders and equity holders of value they are entitled to receive under the Bankruptcy Code.

19.    *Second*, and again by violating section 502(b) of the Bankruptcy Code through the Distribution Principles, the Amended Plan fails to comply with section 1129(a)(1) of the Bankruptcy Code.

20.    *Third*, the Amended Plan violates section 1129(a)(3) of the Bankruptcy Code because the Amended Plan and its Distribution Principles have not been proposed in good faith and violate applicable law.  The Amended Plan was designed in secret by a select group of influential creditors—to the exclusion of DCG—to ensure maximum recovery to those creditors, well beyond what is allowed under the Bankruptcy Code.  It also gives a small group of creditors favorable treatment through the Setoff Principles, to the detriment of other creditors and equity holders.  The icing on the cake is a series of provisions that ostensibly keep DCG as existing equity holder while simultaneously stripping it of numerous attendant economic and governance rights, perhaps most significantly its voting rights, as the ultimate equity holder of the Debtors, and in violation of multiple provisions of the Bankruptcy Code and applicable law.

21.    *Fourth*, the Amended Plan violates section 1129(a)(7) because it is not in the best interest of subordinated creditors and equity holders.  As noted, the Amended Plan proposes to impermissibly increase general unsecured creditor recoveries by not tying such recoveries to Petition Date value, and paying interest on claims that is not permitted under the Bankruptcy Code. This leaves junior classes of claims and interests to receive less than they would in a hypothetical liquidation where the distribution scheme follows the Bankruptcy Code.

22.     Lastly, the Amended Plan further disenfranchises DCG of its corporate governance rights and rights as the sole owner of interests in GGH by restricting its right to transfer its interests in GGH and take a worthless stock deduction for tax purposes if and when appropriate.

23.     For these reasons, and as discussed below, the Amended Plan is unconfirmable.

## I.     The Amended Plan violates multiple requirements of section 1129 and is unconfirmable.

24.     A chapter 11 plan may not be confirmed unless it satisfies all requirements of section 1129(a) of the Bankruptcy Code, which includes the requirements of section 1129(b) for a plan that has not been accepted by all classes.  The Debtors' Amended Plan cannot be confirmed because it violates multiple requirements of sections of 1129 of the Bankruptcy Code, namely the cramdown requirements of section 1129(b), as well as sections 1129(a)(1), (3), and (7).

### A.     The Amended Plan is an impermissible cramdown plan that violates section 1129(b) of the Bankruptcy Code.

25.     A cramdown plan is permissible only if, among other things, the plan is "fair and equitable" with respect to classes of claims or interests that are impaired under and have not accepted the plan.  11 U.S.C. § 1129(b).  To be fair and equitable, a plan must comport with (i) the absolute priority rule; and (ii) the principle that no creditor be paid more than it is owed.  *See* 7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023).  "An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation[10] for its claims" because "shareholders are entitled to the surplus."  *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017) (citations omitted).[11]

---

[10]     As discussed herein, the "solvent debtor exception" may allow creditors to recover a certain amount of post-petition interest on their claims before they are considered paid in full.  However, even here, the Debtors have departed from the legally permissible rate to further detrimentally impact DCG's interests, as explained herein.

[11]     *See also In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (same); *In re Tronox Inc.*, 503 B.R. 239, 337 (Bankr. S.D.N.Y. 2013) (same); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (same); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (same); *Miller v. Mott (In re*

26.    Notably, the requirements of section 1129 cannot be avoided by deeming the Amended Plan and Distribution Principles a "settlement" among creditors.  There is no settlement where, as here, interested parties were wholly excluded from discussions and the Estates appear to receive nothing in return for these unlawful distributions of value. As recently reiterated by the United States Supreme Court, section 1129(b) cannot be sidestepped by a settlement of only certain parties.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) (finding impermissible a settlement for a structured dismissal that violated the absolute priority rule).[12]

27.    As explained below, the Amended Plan violates section 1129(b) in two ways, either of which is sufficient on its own to deny confirmation.

28.    *First*, for ultimate distributions, the Amended Plan impermissibly values creditors' claims in cryptocurrency as of the date of distribution, rather than in U.S. dollars as of the Petition Date, in violation of section 502(b) of the Bankruptcy Code.  As a result of this improper valuation, the Amended Plan proposes to divert nearly ███████████ in value—and potentially many millions more if the digital assets continue to appreciate—to creditors, which should instead flow to equity under the Bankruptcy Code.  Because the Distribution Principles grant certain creditors more on account of their claims than is allowed under the Bankruptcy Code, the Amended Plan plainly violates the corollary to the absolute priority rule and, as a result, violates section 1129(b).

29.    *Second*, the Amended Plan contemplates the payment of interest to general unsecured creditors at rates not recognized by this District and in excess of what is allowed by

---

*Team Sys. Int'l, LLC)*, 2023 WL 1428572, at *12 (Bankr. D. Del. Jan. 31, 2023) ("[O]nce creditors are paid, any remaining value would be distributed to the debtor, which would presumably dividend that distribution to its equity holders.").

[12]    Even if the Distribution Principles were treated as a settlement pursuant to Bankruptcy Rule 9019—rather than as a plan for distribution—the Court would still have to evaluate whether "the proposed settlement would 'unduly prejudice' a non-settling creditor or other party."  *In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 428 (Bankr. S.D.N.Y. 2022).

section 1129(a)(7) of the Bankruptcy Code.  This impermissible diversion of Estate assets to

creditors likewise violates the absolute priority rule by paying creditors more on account of their

claims than what the Bankruptcy Code allows.  As a result, the Distribution Principles, as

incorporated by the Amended Plan, violate section 1129(b).

> 1.     **The Amended Plan does not comply with section 502(b) of the Bankruptcy Code by allowing creditors to recover more than the Petition Date values of their claims.**

30.     The Amended Plan violates section 502(b) because it proposes to pay creditors

based on the value of their claims for digital assets as of the distribution date, rather than in lawful

currency of the United States ("**U.S. dollars**") as of the Petition Date.  Although creditors' initial

pro rata distributions are based on their claims being valued as of the Petition

Date, *see* Distribution Principles at 4, the Recovery Cap for each creditor floats with the underlying

asset prices, *see* Distribution Principles at 8–9.  That is, claims are effectively being valued at the

average price of the asset during the 15-day period before and after the date the Confirmation

Order is entered (termed the "**Initial Conversion Rate**"), or at a later distribution date, not the

Petition Date.  *Id.*  Put differently, the Distribution Principles would allow certain creditors, whose

claims are based on digital assets that have significantly appreciated in value since the Petition

Date, to recover more than the value of their claims in U.S. dollars as of the Petition Date.

> a)     *Section 502(b) mandates that the value of a claim is fixed in U.S. dollars as of the Petition Date.*

31.     Section 502(b) is unambiguous:  A bankruptcy court "shall allow" a claim against

which an objection has been raised only in "the amount of such claim in lawful currency of the

United States of the date of the filing of the petition."[13]  11 U.S.C. § 502(b).  There are two

---

[13]     Although section 502(b) only explicitly refers to determination of claims that have been objected to, courts value claims as of the petition date in U.S. dollars in other contexts, such as allowance of claims for plan distributions.

elements to this mandate.  First, a claim is valued as of "the date of the filing of the petition."  *Id.*[14]

Second, that valuation is to be made in U.S. dollars, not in some other denomination.  *See, e.g.*,

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*, 404 B.R. 793, 799 (Bankr. M.D. Pa. 2009) (converting

claim in Canadian dollars to U.S. dollars based on the petition date exchange rate).

32.    The meaning of section 502(b) is clear on its face, and "[i]n the usual case, if the

words  of  a  statute  are  unambiguous,  judicial  inquiry  should  end,  and  the  law

is interpreted according to the plain meaning of its words."  *In re New York City Off-Track Betting*

*Corp.*, 427 B.R. 256, 268 (Bankr. S.D.N.Y. 2010) (quoting *Devine v. U.S.*, 202 F.3d 547, 551 (2d

Cir. 2000)).  In any event, other sources of statutory meaning reinforce the plain language of

section 502(b).

33.    *First*, other sections of the Bankruptcy Code support strict application of section

502(b).  *See Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) (noting that, in interpreting one part

of a statute, "we must not be guided by a single sentence or member of a sentence, but look to the

provisions  of  the  whole  law,  and  to  its  object  and  policy").  For example, section 550(a) of the

Bankruptcy Code—which governs what the trustee or debtor-in-possession can recover for the

benefit of the estate through avoidance claims—states that the trustee may recover "the property

transferred, or, if the court so orders, the value of such property."  11 U.S.C. § 550(a).  Thus, unlike

section 502(b), section 550(a) allows the bankruptcy court to disburse from the estate ***either*** the

---

*See, e.g.*, *In re Celsius Network LLC*, 655 B.R. 301, 312 (Bankr. S.D.N.Y. 2023) ("Whether under a chapter 11 plan or liquidation, creditors are entitled to their share of the value of the Debtors' Estates on the Petition Date.").

[14]    *See also Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 179 (2d Cir. 2007) ("A plain reading of [section 502(b)] suggests that the bankruptcy court should determine whether a creditor's claim is enforceable against the debtor as of the date the bankruptcy petition was filed."); *Sears v. Sears (In re Sears)*, 863 F.3d 973, 978 (8th Cir. 2017) ("When a party in interest objects to a creditor's claim, the bankruptcy court 'shall determine the amount of such claim . . . as of the date of the filing of the petition.'" (citation omitted)); *Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*, 361 B.R. 489, 497 (B.A.P. 8th Cir. 2007) ("The petition date controls the allowance of claims in bankruptcy.").

"property transferred" or "the value of such property." *Id.* By expressly allowing for alternative

valuation methodologies in this section while limiting section 502(b) to the value of the claim as

of the petition date, Congress evinced its intent that section 502(b) be ***strictly applied***. *See White*

*v. Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004) ("It is axiomatic that when Congress uses different

text in 'adjacent' statutes it intends that the different terms carry a different meaning.").

34.     *Second*, valuing assets as of the petition date is consistent with historical practice.

The prior statute providing for allowance of claims—section 57(d) of the 1898 Bankruptcy Act—

was ambiguous as to the date and methodology for valuation of claims:  "Claims which have been

duly proved shall be allowed, upon receipt by or upon presentation to the court, unless objection

to their allowance shall be made by parties in interest, or their consideration to be continued for

cause by the court upon its own motion."  The Supreme Court, however, interpreted section 57(d)

as incorporating the "English rule" that claims in bankruptcy are "fixe[d] the moment . . . the

petition is filed." *Sexton v. Dreyfus*, 219 U.S. 339, 345 (1911).  Such a rule, the Court explained,

"simply fixes the moment when the affairs of the bankrupt are supposed to be wound up." *Id.* at

344.  Courts thereafter repeatedly affirmed that "the rights of the creditors of a bankrupt become

fixed on the date of the filing of the bankruptcy petition." *In re Hansen Bakeries*, 103 F.2d 665,

666–67 (3d Cir. 1939).[15]

35.     When section 502(b) was enacted as part of the Bankruptcy Reform Act of 1978, it

was intended to codify the notion that "bankruptcy operates as the acceleration of the principal

amount of all claims against the debtor" as of the petition date.  S. Rep. No. 95-989 at 63 (1978).

---

[15]     *See also In re Groenleer-Vance Furniture Co.*, 23 F. Supp. 713, 715 (W.D. Mich. 1938) ("[T]he rights of
creditors become fixed at the moment of bankruptcy and that they then acquire a right in rem against the
[debtor's] assets."); *In re Michaelis & Lindeman*, 196 F. 718, 719 (S.D.N.Y. 1912) ("[T]here must come a time
as of which claims against a bankrupt's estate are to be liquidated and stated. . . .  [T]his time has been fixed as
the date of filing petition").

Section 502(b) thus carries through the principle, recognized in *Sexton*, that a bankruptcy fixes the creditors' rights as of the date of the petition, and those rights are not subject to diminishment—or enlargement—based on post-petition changes.  *See Aaura*, 2006 WL 2568048, at *4 (noting that the plain language of section 502(b) incorporates the understanding articulated in *Sexton*).

36.    *Third*, fixing creditors' rights based on the U.S. dollar value of their claims as of the petition date furthers the purpose of the Bankruptcy Code.  By fixing value as of the time of the petition, the petition date provides "a 'day of reckoning,' consolidating the debtors' present and future obligations into one moment for prompt resolution."  *In re Promise Healthcare Grp., LLC*, No. 18-12491, 2023 WL 3026715, at *5 (Bankr. D. Del. Apr. 20, 2023).  The petition "freezes all parties' rights as they existed on the petition date."  *Id.*[16]  This frees the bankruptcy estate—and the creditors—from the unpredictability of the markets, while also preventing creditors from obtaining a windfall.[17]

        b)        *Section 502(b) of the Bankruptcy Code applies to all kinds of claims, including cryptocurrency claims.*

37.    The clear mandate of section 502(b) cannot be evaded on grounds of equity or convenience.  *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code").  The term "shall" "normally creates an obligation impervious to judicial discretion."  *Lexecon Inc.*

---

[16]    *See also In re Glob. Power Equip. Grp.*, No. 06-11045, 2008 WL 435197, at *5 (Bankr. D. Del. Feb. 14, 2008) (noting that section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars" (citation omitted)), *aff'd*, 400 B.R. 17 (D. Del. 2009).

[17]    *See, e.g.*, *In re Eriksen*, 647 B.R. 192, 195 (Bankr. N.D. Ohio 2022) ("Section 502(b) makes it clear that the time for determination of a claim is 'as of the date of the filing of the petition,' not some indeterminate later time depending on post-petition developments in the law and the facts and estate administration."); *In re LeBlanc*, 404 B.R. at 799 ("[Section] 502(b) specifically bars the fluctuation of the proof of claim value due to exchange rates in effect post-petition."); *Aaura*, 2006 WL 2568048, at *4 n.5 (Section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to the United States dollars").

*v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 27 (1998); *see also N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 28 F.4th 357, 371 (2d Cir. 2022) ("The word 'shall' in a statute, indicates a command.").  Applying the Bankruptcy Code, the Third Circuit recently held that a provision directing that a court "shall" appoint an examiner was non-discretionary.  *See In re FTX Trading Ltd.*, No. 23-02297, 2024 WL 204456, at *4 (3d Cir. Jan. 19, 2024); ("'[S]hall' signals when a court must follow a statute's directive regardless of whether it agrees with the result." (citation omitted)).  The same principles apply here—a court has *no* discretion to deviate from the valuation principles of section 502(b), no matter the perceived equity or fairness of those principles.  Doing so, as in *FTX Trading*, would be reversible error.

38.    Section 502(b) applies to all kinds of claims.  For example, claims denominated in foreign currencies are converted to U.S. dollars at the prevailing exchange rate as of the petition date.  *See, e.g.*, *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir. 1999) (observing that, under U.S. bankruptcy law, claims in foreign currency are determined by converting them to U.S. dollars as of the petition date).[18]

39.    Likewise, claims stated in commodities (like gold) are valued in U.S. dollars as of the petition date, explaining that the denomination of claims in U.S. dollars is consistent with the clear reading of section 502(b) of the Bankruptcy Code, which "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars."

---

[18]    *See also In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *8 (Bankr. S.D.N.Y. May 19, 2023) (applying the accepted market rate "in effect as of the applicable Petition Date" to conversion of Brazilian currency to U.S. dollars); *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.)*, 429 B.R. 437, 492 (Bankr. D. Md. 2010) ("[U]nder the plain meaning of 11 U.S.C. § 502(b), the Court shall use the exchange rate in effect on the Petition Date to convert the claim to U.S. dollars."), *aff'd sub nom. TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011); *In re Axona Int'l Credit & Com. Ltd.*, 88 B.R. 597, 608 n.19 (Bankr. S.D.N.Y. 1988), *as amended* (Aug. 11, 1988) (noting that section 502(b) refers to the date of the entry of the order for relief as the appropriate date for conversion of foreign currency claims).

*See In re Aaura, Inc.*, No. 06-B-01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1,

2006). The same goes for securities. *See In re Lehman Brothers Hldgs. Inc.*, 602 B.R. 564, 586–

87 (Bankr. S.D.N.Y. 2019) (holding that, if the 11 U.S.C. § 562 exception does not apply to a

securities contract, "the [assets] must be valued on or about the Petition Date pursuant to section

502").[19]

40.     Cryptocurrency is no different. Debtors and bankruptcy courts have repeatedly and

consistently valued claims based on digital assets as of the applicable petition date in recent large

chapter 11 cases.[20] In fact, just days ago, the *FTX Trading* bankruptcy court squarely rejected the

same valuation method set forth in the Amended Plan. Overruling objections by creditors without

hearing argument, the court stated: "[T]he [Bankruptcy] [C]ode is very clear. The [C]ode says

that a claim is to be determined in U.S. dollars as of the petition date." FTX Hearing Transcript at

14:23–25. The court acknowledged there was "no wiggle room on that," and that some creditors'

view that such valuation was "unfair to them because the value may have increased" did not alter

---

[19]    Indeed, the same rule applies in the context of breach-of contract actions, where courts have held that damages must be measured at the date of the breach, in order to "avoid[] the speculativeness and hindsight problems attendant to" a theory of recovery based on a later valuation date. *Scully v. US WATS, Inc.*, 238 F.3d 497, 512 (3d Cir. 2001). Thus, "[i]f a plaintiff is permitted to select any point during the period between the breach and the end of the litigation to value his [claim], he not only injects uncertainty and speculation into the damages calculation, he also gets 'the benefit of hindsight, thereby putting him in a better position than if the breach . . . had never occurred.'" *Moser v. Encore Cap. Grp., Inc.*, 964 F. Supp. 2d 1224, 1226 (S.D. Cal. 2012) (internal quotation marks omitted). The same rationale applies in the bankruptcy context: Any recovery to creditors beyond that available at the petition date would rest on speculation and hindsight, and potentially leave creditors better off than had there been no bankruptcy at all.

[20]    *See, e.g.*, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660 ("As is required by section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Digital Assets (based in United States dollars pursuant to the Digital Assets Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11.59 p.m. UTC. This process is generally referred to as a 'dollarization.' Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the Bankruptcy Code."); *In re Voyager Digital Holdings*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ("Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code."); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 27, 2023), Docket No. 3577 ("[T]he value of a Claim denominated in Cryptocurrency shall be calculated by converting the value of the Claim into Cash as of the Petition Date . . . .").

the court's "obligat[ion] to follow the [Bankruptcy] [C]ode." *Id.* at 15:10–11. On that basis, the *FTX Trading* court concluded that "use of the petition date as the date of determining the value of digital asset claims is appropriate." *Id.* at 15:7–10. There can be no more on-point precedent than that.[21] And, in contrast to the Amended Plan, because creditor claims in *FTX Trading* are measured by their petition date value, the waterfall distribution mechanics would allow recoveries to flow to equity holders after creditors are paid in full based on such value.[22] The priority scheme designed by Congress is clear and must be followed, regardless of who holds the equity.[23]

>    c)    *The Distribution Principles allow creditors to recover more than the amount of their claim as of the Petition Date in violation of section 502(b).*

41.    Although section 502(b) requires claims to be valued as of the Petition Date, the Distribution Principles incorporated in the Amended Plan allow creditors whose claims were denominated in digital assets (*e.g.*, cryptocurrency) to recover from the Estates based on the value of those digital assets at or around the time of distribution, inflating the value of their claims by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Distribution Principles at 8–9. That distribution mechanism squarely contravenes section 502(b), and significantly, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That experience is consistent with

---

[21]    Notably, both the debtors and the official committee of unsecured creditors in FTX acknowledged that section 502(b) mandates valuation of claims as of the petition date. *See In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Dec. 27, 2023), Docket No. 5202 ¶¶ 11–13; Docket No. 5619 at ¶¶ 2, 4.

[22]    *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Dec. 16, 2023), Docket No. 4861 ¶ 4.3.

[23]    The *FTX Trading* court's ruling follows *In re Celsius Network LLC*, wherein Judge Glenn noted, "[w]hether under a chapter 11 plan or liquidation, creditors are entitled to their share of the ***value*** of the Debtors' Estates on the Petition Date." 655 B.R. at 312 (emphasis in original).

the precedent cited above, in which commodities, securities, foreign currencies, and

cryptocurrencies were all valued as of the petition date.

42. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    That is no answer: As noted above, cryptocurrency is treated

like other assets for purposes of section 502(b).

43.    But here, the Debtors have turned section 502(b) on its head. █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████    It is entirely impermissible for creditors—██████████████

██████████████—to receive ████████ of value in excess of their allowed prepetition claims,

all at the expense of subordinated creditors and equity holders, which likely would receive

***nothing***. This is a clear violation of section 502(b), and the Court cannot sanction such a result.

> d)    *No exception to section 502(b) applies here.*

44.    To date, with one minor exception, no party supporting the Amended Plan has

formally or specifically articulated any arguments as to why section 502(b) should not apply here.

Instead, it appears to be a results-driven determination; proponents of the Amended Plan dislike

20

the result that section 502(b) requires, so they ignore it.  As the only exception, in an objection to

the Disclosure Statement,[24] the ad hoc group of "crypto creditors" (the "**Crypto Creditors**

**Group**") stated, among other things, that "dollarizing" crypto claims runs afoul of  section 562 of

the Bankruptcy Code, such that those claims cannot be valued using Petition Date pricing.[25]

45.    Ahead of its confirmation objection, the Crypto Creditors Group had not specified

why it believes the section 562 safe harbor applies to its members' agreements for loans of digital

currencies.  Moreover, the Amended Plan itself does not apply section 562 to any subset of claims

in the Amended Plan, suggesting that the Plan Support Parties do not agree with the Crypto

Creditors' Group's view.  Indeed, there is no basis to find that there has been, or will be, a rejection,

liquidation, termination, or acceleration of any contracts held by the Crypto Creditors Group, much

less that those contracts are protected by section 562 of the Bankruptcy Code.

46.    DCG reserves its right to reply to any specific arguments raised by the Crypto

Creditors Group or any other party that asserts the section 562 safe harbor applies to any claims

asserted against the Debtors.

> **2.    The Amended Plan would pay an unlawful amount of interest to general unsecured creditors.**

47.    The Bankruptcy Code only provides for payment of post-petition interest to

unsecured creditors when a debtor is solvent.  *See Wells Fargo Bank, N.A. v. Hertz Corp. (In re*

*Hertz Corp.)*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (holding that both unimpaired and impaired

creditors are entitled to post-petition interest at the federal judgment rate before any distribution

---

[24]    *Amended Disclosure Statement with Respect to the Amended Joint Plain of Genesis Global Holdco, LLC* et al., *Under Chapter 11 of the Bankruptcy Code* (Docket No. 839) (as amended, modified, or supplemented from time to time, the "**Disclosure Statement**").

[25]    *Objection of the Genesis Crypto Creditors Ad Hoc Group to Debtors' Disclosure Statement Motion* (Docket No. 982), at 2.

can be made to equity); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y.

2012).  To the extent the Estates are insolvent, general unsecured creditors are not entitled to

interest on their claims under the Bankruptcy Code.

48.    Even if the Estates are solvent, the Amended Plan must still be rejected because it

seeks to pay general unsecured creditors a greater interest rate on their claims than what the

Bankruptcy Code allows.  The Debtors submit that "[a]ll unsatisfied Allowed General Unsecured

Claims shall, from the Petition Date, accrue interest at the rate (inclusive of both the loan fee and

the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the

relevant Holder" under the Distribution Principles.  Distribution Principles at 9.  Such interest only

factors into each holder's pro rata share once the Recovery Cap for all unsecured claimants has

been met.  *Id.*  However, the proper measure of interest here—assuming the Estates are solvent—

is not the contract rate, but rather the federal judgment rate under 28 U.S.C. § 1961.

49.    Where a bankruptcy estate is solvent, the right of unsecured creditors to receive

post-petition interest arises under section 726(a)(5) of the Bankruptcy Code.  *See* 11 U.S.C.

§ 726(a)(5).  Section 726(a)(5) is made applicable to the chapter 11 cases by virtue of section

1129(a)(7)(A)(ii), which imposes a "best interests test."  *See* 11 U.S.C. 1129(a)(7)(A)(ii).  The

best interests test requires that, for a plan to be confirmed, dissenting members of a class must

receive, as of the effective date of the plan, the value of their allowed claims that is not less than

the amount such creditors would receive if the debtor was liquidated under chapter 7 on such date.

*See* 11 U.S.C. § 1129(a)(7)(A)(ii).  Section 726(a)(5) of the Bankruptcy Code provides that, after

payment of all amounts due under sections 726(a)(1) through (a)(5), post-petition interest is

payable on all allowed unsecured claims "at the legal rate" from the petition date until the payment

of such claims.  *Id.* § 726(a)(5).

50.    Numerous courts have recognized that "the legal rate of interest" referred to in section 726(a)(5) is the federal interest rate applicable to judgments.[26]  Moreover, a bankruptcy claim is the equivalent of a money judgment, and the use of the federal judgment rate assures equitable treatment among creditors, is efficient, and practical.  *Madison 92nd St. Assocs.*, 472 B.R. at 200.

51.    By contrast, "neither the Bankruptcy Code nor the Legislative History expressly state that unimpaired creditors are entitled to their contract rate of interest."  *Hertz Corp.*, 637 B.R. at 800; *see also LATAM Airlines*, 2022 WL 2206829, at *20.  "Instead, the Legislative History provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11 debtor case to receive post-petition interest only in accordance with sections 1129(a)(7) and 726(a)(5)."  *LATAM Airlines*, 2022 WL 2206829, at *20.  Accordingly, in the event the Debtors are solvent, unsecured creditors should receive the federal judgment rate of post-petition interest.

52.    In what appears to be a sweetener for unsecured creditors who are not paid in full within a certain amount of time under the Amended Plan, the Debtors propose to pay certain claimants **additional** interest on the "unpaid portion" of their claims, accruing (arbitrarily) at the federal judgment rate, if they do not receive distributions sufficient to reach the Recovery Cap within two years of the Effective Date (termed "**Post-Effective Date Interest**").  *See* Distribution Principles at 9.  And, because the Recovery Cap improperly values claims around the time of confirmation or later distributions, this provision would permit unsecured creditors to receive

---

[26]    *See In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y. 2012); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *20 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *motion to certify appeal denied*, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *aff'd*, 643 B.R. 756 (S.D.N.Y. 2022), *aff'd*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom.*, *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023); *see also In re Dow Corning Corp.*, 237 B.R. 380, 387 (Bankr. E.D. Mich. 1999); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D. Tex. 1992); *In re Hertz Corp.*, 637 B.R. at 801.

interest on amounts far exceeding the Petition Date valued claim to which they are entitled.  There

is no authority under the Bankruptcy Code to support the additional interest.

* * *

53.     Because the Amended Plan would provide greater recoveries to general unsecured

creditors than they are entitled—by (i) failing to dollarize claims in accordance with section

502(b), and (ii) paying unsecured creditors Post-Petition Interest and Post-Effective Date Interest

to which they are not entitled—it is not "fair and equitable" with respect to DCG's interests.  The

Amended Plan is therefore unconfirmable.

**B.     The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code.**

54.     As discussed, section 502(b) of the Bankruptcy Code requires payment of creditor

claims valued as of the Petition Date.  The Amended Plan's Distribution Principles allow

distributions to creditors in excess of their Petition Date-valued claims.  This is a clear violation

of section 502(b) and renders the Amended Plan unconfirmable.[27]

55.     Additionally, the Debtors' Amended Plan seeks to prevent DCG, which will

continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its

fundamental right to elect directors under Delaware law.  *See* Amended Plan at Section IV.B.9

(requiring that DCG select a new board solely from candidates selected by the Debtors and certain

influential creditor groups).  The Bankruptcy Code rejects such a reallocation of voting rights.

Section 1123(a)(6) prohibits the issuance of new, non-voting equity securities.  *See* 11 U.S.C.

---

[27]     *See In re PTM Techs., Inc.*, No. 10-50980C-11W, 2013 WL 4519306, at *5 (Bankr. M.D.N.C. Aug. 26, 2013)
        (finding a plan was unconfirmable under section 1129(a)(1) by violating section 502(b)(2)); *In re MPM Silicones,*
        *LLC*, No. 14-22503 (RDD), 2014 WL 4436335, at *2 (Bankr. S.D.N.Y. Sept. 9, 2014) (noting that section
        1129(a)(1) requires compliance with applicable provisions in the Bankruptcy Code, including section 510(a)),
        *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2017).

§ 1123(a)(6).[28]  By stripping DCG of its voting rights—including those regarding election of directors—the Amended Plan effectively seeks to convert DCG's membership interests into non-voting shares, which is expressly prohibited by section 1123(a)(6).  For this reason too, the Amended Plan is unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

### C.   The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code.

56.    The Court need go no further to reject the Amended Plan—the two independent violations of section 1129 outlined above are more than sufficient to sustain this objection.  But those violations—and the impermissible distribution of value to creditors they contemplate—arise out of another fundamental problem with the Amended Plan:  It was not proposed in good faith.  The Debtors' calculated (and surreptitious) inclusion of such value-distorting provisions—with full knowledge of the consequences for equity holders—the stripping of DCG's equity rights, and the exclusion of DCG from any negotiations or discussions regarding the Amended Plan provide an independent ground to reject the Amended Plan.

57.    One of the core tenets of bankruptcy confirmation is that a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S. Code § 1129(a)(3).  "Good faith," as used in this section, is not defined in the Bankruptcy Code, but the term is generally interpreted to mean that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008).  "In assessing whether a plan complies with [section] 1129(a)(3)'s good faith standard, a bankruptcy court must examine the totality of the circumstances."  *In re Trenton Ridge Invs.*, LLC, 461 B.R. 440, 468

---

[28]    *See also In re Peak Broadcasting, LLC*, No. 12-10183 (MFW), 2012 WL 1452359, *4 (Bankr. D. Del. Apr. 20, 2012) (requiring each reorganized debtor being formed as a limited liability company to include language in its charter and bylaws that prohibits the issuance of non-voting equity securities under section 1123(a)(6)).

(Bankr. S.D. Ohio 2011). Importantly, "[t]he burden of proof is on Debtors to show by a preponderance of the evidence that the Plan was proposed in good faith." *In re Dernick*, 624 B.R. 799, 811 (Bankr. S.D. Tex. 2020). Furthermore, the U.S. Supreme Court has emphasized that bankruptcy courts must ensure both the process and practical impact of a plan are fair, equitable and open before confirming the plan. *See Am. United Mut. Life Ins. v. City of Avon Park*, 311 U.S. 138, 146 (1940).

58.    A chapter 11 plan should not be confirmed where, instead of negotiating at arm's length with creditors, a debtor aligns with creditors in a way that potentially increases the extent of liabilities owed by the estate and causes injury to third-parties. *See, e.g.*, *In re Am. Cap. Equip.*, *LLC*, 688 F.3d 145, 158–59 (3d Cir. 2012) (finding a chapter 11 plan violated section 1129(a)(3) where the debtor was incentivized to side with plaintiffs in increasing claim values, to the detriment of the debtor's insurers).

59.    Likewise here, the Amended Plan is not the product of good faith, because, among other reasons, it impermissibly inflates claim values. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ That construct is in plain violation of section 502(b), but even if it were not, ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████, cannot possibility have been designed and proposed in good faith.

60.    It is little surprise that the Amended Plan contains these one-sided provisions. The Distribution Principles are the product of several months of closed-door negotiations between the Debtors, the UCC, and the Ad Hoc Group—without DCG. ████████████████████

██████████████████.  Instead of working with DCG, the Debtors, the UCC, and the Ad Hoc

Group have worked in concert to develop a chapter 11 plan that provides for unprecedented

distributions to creditors that the Bankruptcy Code does not support.  The Debtors caved to creditor

pressure rather than standing up for what is right.  ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████  It is clear now that this effort was

designed to deprive DCG of the recovery to which it is entitled under the Bankruptcy Code.  Not

one witness identified a single chapter 11 bankruptcy plan that distributed assets this way.

61.    The Amended Plan also seeks to disenfranchise DCG in a myriad of other ways,

including stripping DCG of essentially all its rights in its capacity as an equity holder with no legal

authority to do so.  In short, the Amended Plan renders DCG an equity holder in name only.  This

kind of naked seizure of equity holder rights in direct contravention of law and public policy is the

very definition of bad faith.  Because the Amended Plan was not proposed in good faith and

violates numerous principles of law, it should be rejected.

## 1.    The Debtors have breached their fiduciary duties to DCG.

62.    First and foremost, in proposing the Amended Plan, the Debtors have breached their

fiduciary duties owed to DCG.  "[T]he fiduciary duty of the trustee runs to shareholders as well as

to creditors."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

Accordingly, "[t]he debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest

of the estate as a whole, including its creditors, equity interest holders and other parties in interest."

*LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000).

63.    The Amended Plan gives no consideration to the rights or interests of DCG

whatsoever.  Not only did the Debtors exclude DCG from participating in the plan negotiations

entirely, but ███████████████████████████████████████████████████

███████████████████. If the value of the Estates' digital assets continues to rise, creditor claims

will continue to balloon, devouring value in excess of the creditor's Petition Date claims and

leaving no extra value for equity holders. ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████. Failing to understand

how a transaction affects stakeholders is a breach of fiduciary obligation.

64. To be clear, DCG would not be objecting to a distribution plan that contemplated a

100% recovery for creditors and would support such a plan. DCG is objecting to the Amended

Plan because the Debtors, the UCC, and the Ad Hoc Group have tied themselves in knots to

formulate Distribution Principles that avoid making distribution to DCG.

65. Moreover, as set forth in more detail below, the Amended Plan purports to divest

DCG of virtually all of its rights as an equity holder. And the Debtors have failed to object to a

number of large governmental claims, seemingly to preserve the argument that the Debtors' estates

are insolvent at the plan confirmation stage and to justify limiting DCG's recoveries. Debtors in

possession must make difficult decisions when formulating a plan, some of which will benefit

some parties to the detriment of others. But where, as here, the proposed plan gives *no*

consideration to the interests of equity holders, it cannot be confirmed.

> **2. The Debtors propose in bad faith a plan that gives a small group of influential creditors favorable treatment through the Setoff Principles.**

66. The Debtors' proposed Setoff Principles for Allowance of Certain Claims, as

embodied in <u>Exhibit M</u> to the Plan Supplement (Docket No. 1144) (the "**Setoff Principles**"),

violate the Bankruptcy Code and applicable law, and were proposed in bad faith in violation of

section 1129(a)(3). As explained below, if implemented as the Debtors intend, the Setoff Principles would provide a select group of only twenty-one creditors—presently unknown to the public due to the Debtors' extensive redactions—with a collective windfall of ▮▮▮▮▮▮ of additional claims, with *one* creditor to receive ▮▮▮▮▮▮ of additional claims prohibited by law. Setoff Principles, Ex. 1. The Court should not sanction this result.

67. Pursuant to the Setoff Principles, the Debtors may set off (a) the value of any debt owed to a Debtor by a creditor entitled to receive distributions under the Amended Plan against the value of any collateral that the creditor delivered to the applicable Debtor to secure a loan (to the extent not yet returned), or (b) any claim entitled to receive distributions under the Amended Plan against the value of any debt owed by the holder of such claim to the applicable Debtor, and all digital asset values in (a) and (b) "shall be determined as set forth in the Digital Assets Conversion Table." *See* Setoff Principles at 1. The Digital Assets Conversion Table, in turn, provides a list of digital assets along with their corresponding Petition Date prices. *See* Setoff Principles Ex. 1.

68. In plain language, in a scenario where a party is owed a digital asset from the Debtor on account of a loan payable by the Debtor, and the same party also owes to the Debtor a digital asset on account of a loan receivable by the Debtor, under the Setoff Principles, the Debtor is obligated to value the loan receivable using Petition Date pricing and set off the value of the loan receivable against the loan payable. Since Petition Date prices are lower than current prices, this process inappropriately values loans receivable (importantly, these are assets of the Debtor) at less than current value and, by reducing the set off, allows parties greater claims against the Debtor. In other words, the Debtors are artificially depressing the value of the Estates' assets, while

inflating the creditor's claim—in effect, forgiving a significant portion of the Debtors' claim against the creditor.

69.     This approach compounds other deficiencies of the Debtors' Amended Plan, specifically insofar as the increased claim resulting from the Setoff Principles is entitled through the Distribution Principles to receive more than 100% of its Petition Date claim valued in U.S. dollars. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

70.     This outcome is truly bizarre and fundamentally at odds with the Debtors' fiduciary duties to maximize value of the Estates, and it exemplifies the Debtors' unprincipled conduct throughout this process.  Chapter 11 debtors are obligated to **maximize** the value of the estate as a whole—not **minimize** the value of the estate and **maximize** the value of certain creditors' residual deficiency claims to the detriment of the overall estate.  *See Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992) (trustees have routine duties "to minimize the pre-petition claims against the estate"); *see also In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004) (citations and internal quotation marks omitted) ("Along with [the powers of a trustee], comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.  The debtor-in-possession's fiduciary duty to maximize includes the duty to protect and conserve property in its possession for the benefit of creditors.").

71.     The Debtors are required under the Bankruptcy Code to "examine proofs of claims and object to the allowance of any claim that is improper . . . if a purpose would be served."  11 U.S.C. §§ 704(a)(5), 1106(a)(1).  By acquiescing to the select creditors' demands, the Debtors—

through the Setoff Principles—have turned the concept of setoff valuation upside down for the

benefit of a select few and have completely abdicated any sense of duty to the Estate as a whole.

*See LaSalle Nat. Bank*, 82 F. Supp. at 292 (noting chapter 11 debtors have a fiduciary duty to act

in the best interest of the estate as a whole, including equity interest holders).

72.     Other courts have also struck down similar attempts by debtors to pay unreasonably

high amounts to certain parties.   In *In re Global Indus. Techs., Inc*., the Third Circuit ruled a

bankruptcy court must ensure a trust created under a plan is negotiated fairly between a debtor and

its creditors and does not negatively impact a third party (in that case, insurers) by increasing the

number of claims or permitting the payment of skeptically high claim amounts.   645 F.3d 201,

212–15 (3d Cir. 2011).   It is patently improper for a debtor to simply acquiesce to creditors'

demands and give up defenses to those creditors' claims.[29]

73.     It seems clear that these inequitable Setoff Principles were devised, in large part, to

engender support for the Debtors' Amended Plan by one particularly influential creditor sitting on

the UCC.   The Debtors' own 30(b)(6) witness, ███████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████

74.     The conveniently redacted nature of the Setoff Principles further underscores the

Debtors' unprincipled conduct.   The Debtors have a duty to both their creditors and to this Court

---

[29]   *See In re Tenney Village Co., Inc*., 104 B.R. 562, 567–68 (Bankr. D.N.H. 1989) (denying approval of a financing
agreement under which debtors agreed to cede control to their lenders over critical issues, and waived their
defenses to the lenders' claims, stating that the plan "would disarm the Debtor of all weapons usable against it
for the bankruptcy estate's benefit"); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 158–59 (3d Cir. 2012)
(reiterating that a court cannot confirm a plan that prejudices parties-in-interest because of the debtors' failure to
oppose creditors appropriately).

to provide full and complete disclosure with respect to important facts and relevant information. *See In re Zamora*, No. 19-01040 (WLH), 2020 WL 4289926, at *5 (Bankr. E.D. Wash. July 27, 2020) ("full disclosure, transparency, and candor by all parties is necessary to protect the fairness and integrity of the process"). Although the Debtors might argue that they are simply protecting the identities of these creditors, there is no reason that the ██████ of value going to just a small handful of creditors is hidden from the Court and other creditors.

75.    Ultimately, these Setoff Principles demonstrate yet another attempt by the Debtors—in violation of their fiduciary obligations to the Estates—to siphon significant value away from the general creditor body, as well as equity, in violation of the "primary goal of the Bankruptcy Code to ensure equal and fair treatment among similarly situated creditors," *Chevron Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 428 B.R. 590, 594 (D. Del. 2010), as well as the spirit of the Bankruptcy Code which requires debtors to treat all claimants and interest-holders "fairly, equally and in accordance with the priority of their claims under law." *Bergquist v. Felland (In re O-Jay Foods Inc.)*, No. 3-89-281, 1991 WL 378164, at *16 (D. Minn. Nov. 21, 1991). Accordingly, the Amended Plan should not be confirmed. If the Debtors want to propose setoffs, each should be brought to the Court with all of the facts laid out so the Court and all other parties in interest can consider the impact to the Estates. The Setoff Principles hide the true facts.

### 3.    The Amended Plan impermissibly alters DCG's equity holder rights in violation of applicable law.

76.    The Amended Plan is not proposed in good faith also because it impermissibly purports to alter DCG's rights as an equity holder of the Debtors. "Shareholder voting rights are sacrosanct" under Delaware law. *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). "The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *Id.* Delaware courts therefore "have consistently acted

to protect stockholders from unwarranted interference with such rights." *Paramount Comm'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994).

77.     Delaware public policy protecting equity holders does not lose force simply because the Debtors are in bankruptcy.  "Post-petition, the Debtor[s'] state law governance rights persist" and are "unaffected by a chapter 11 filing." *In re Genever Holdings, LLC*, Case No. 20-12411-JLG, 2021 WL 3919826, *13 (Bankr. S.D.N.Y. 2021).  The Second Circuit has expressly held that shareholders' rights to govern the debtor is a "prerogative ordinarily uncompromised by reorganization," and the "law of this circuit direct that the shareholders' natural wish to participate in this matter of corporate governance be respected." *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1980).

78.     As noted, the Debtors' Amended Plan seeks to prevent DCG, which will continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its fundamental right to elect directors under. *See* Amended Plan at Section IV.B.9.  This elimination of DCG's rights is in direct contravention of Delaware law, and it cannot be squared with the Bankruptcy Code's requirement that director election rights be allocated consistent with public policy.

79.     The Amended Plan further seeks to burden DCG, as sole equity holder of GGH, by preventing DCG from transferring its interests in GGH and taking a worthless stock deduction with respect to its interests in GGH if and when it would otherwise be entitled to do so under applicable tax law.  If DCG is not able to claim its worthless stock deduction at the appropriate time, it could result in a permanent loss of such deduction and loss of a valuable tax attribute that DCG is otherwise entitled.  This would be tantamount to a permanent injunction.  Denying DCG its rights to appoint directors, transfer its interests, and claim tax deductions when allowable is the epitome of bad faith.

### 4.    Conditioning DCG's rights on the issuance of a Final Order declaring all creditor claims Unimpaired has no basis in law, equity, or otherwise.

80.    The Amended Plan's systematic evisceration of DCG's rights as an equity holder is not saved by the illusory provision that "restores" certain of DCG's rights upon the issuance of a "Final Order" declaring that all creditor claims are "Unimpaired," and in fact, this provision exacerbates the Amended Plan's defects.

81.    As discussed above, the absolute priority rule requires that senior classes of creditors be paid in full before any payments are made to junior interests.  *See* 11 U.S.C. § 1129(b)(2).  But nothing in section 1129 requires senior classes to be ***unimpaired*** before junior classes may receive distributions, let alone that such a determination must be made by a final order from a court of competent jurisdiction.  Section 1129 requires only that creditors be paid in full.[30] And had Congress intended "paid in full" to mean the same thing as "unimpaired," it would have said so.  *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 984 F.3d 30, 44 (2d Cir. 2020).

82.    "Unimpairment" is an entirely different concept:  A claim remains "impaired" unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  By restricting payment of DCG's claims until the senior classes claims are judicially declared to be "unimpaired," the Amended Plan seeks to apply an impermissibly high standard for resolution of creditor claims (and one that otherwise conflicts with the Amended Plan's treatment of creditor

---

[30]    *See, e.g.*, *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984) (emphasis added) ("[A] plan must provide either that an impaired non-accepting class of creditors be ***paid in full*** with respect to their claims, or that no interest junior to that class of creditors receive any distribution under the plan with respect to the junior claimants' prepetition claims or interests."); *Wilkow v. Forbes, Inc.*, 241 F.3d 552, 554 (7th Cir. 2001) (emphasis added) ("[C]reditors may insist on priority of payment: secured creditors must be ***paid in full*** before unsecured creditors retain any interest, and unsecured creditors must be ***paid off*** before equity holders retain an interest.").

classes as impaired), to the clear detriment of DCG.  The Debtors have no reasonable basis—in law, equity, or otherwise—to impose this high burden as a prerequisite for DCG to receive any distributions on account of its Interests in GGH.

### 5. The Plan further cuts off DCG's beneficial interests in GGC and GAP.

83.    The Debtors also have no basis in law, equity, or otherwise for their proposed treatment of Intercompany Interests in GGC and Intercompany Interests in GAP.  *See* Amended Plan §§ III.C.11, III.D.10.  DCG is the sole equity holder of GGH, and GGC and GAP are wholly-owned subsidiaries of GGH.  Holders of Intercompany Interests in GGC and GAP are treated the same as holders of Interests in GGH.  Therefore, the Amended Plan essentially cuts off DCG's beneficial interests in GGC and GAP by cutting off GGH's Interests.

### 6. DCG should have consent rights over the Debtors' Wind-Down.

84.    Finally, the Amended Plan is not proposed in good faith because it excludes DCG from certain rights over the Wind-Down, including the selection of the PA Officer[31] and the selection of members of the Wind-Down Oversight Committee.[32]  Section 1123(a)(7) of the Bankruptcy Code requires plan provisions to be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).  Because DCG could receive distributions under the Amended Plan (once

---

[31]    *See* Amended Plan at Section IV.A.2 ("The PA Officer shall be selected by mutual consent of the Committee and PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and shall be identified in the Plan Supplement.").

[32]    *See* Amended Plan at Section IV.A.3 ("The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement.").

the unlawful claim valuations are corrected), it should have consent and consultation rights over the Wind-Down, regardless of the Debtors' solvency.

85.     As discussed herein, the Amended Plan is improperly structured to preclude DCG from receiving any recoveries as sole equity holder of GGH in any plausible scenario.  But assuming the Amended Plan is revised to comply with the Bankruptcy Code's priority scheme, and that the Debtors are solvent such that creditors are paid in full, the residual value of the bankruptcy estate should flow to DCG.  In that scenario, DCG would be the only party with an interest in maximizing the value of the Debtors' Estates, because the creditors would be paid in full regardless of how the Wind-Down is administered.  Because the Debtors are solvent, DCG should be given consent rights over the appointment of certain individuals in charge of the Wind-Down.  Such consent rights would not encompass the Litigation Oversight Committee for matters in which the Debtors are bringing claims against DCG, but they should encompass selection of the PA Officer and the Wind-Down Oversight Committee in the event the Debtors are solvent.

* * *

86.     It is no wonder the concerted efforts of the Debtors, the UCC, and the Ad Hoc Group to deprive DCG of valuable economic and corporate governance rights has resulted in a plan that violates the Bankruptcy Code.  *In re Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").  The Debtors are not only stripping DCG of all excess value of the Estates through Distribution Principles that violate the Bankruptcy Code, but also are methodically dismantling DCG's governance and economic rights as GGH's sole equity holder.  Although a debtor may desire quick emergence from bankruptcy, it cannot achieve that goal by capitulating to creditor demands and imposing harm on third parties.  "[E]fficiency must not be obtained at the price of diminishing the

integrity of the process." *Congoleum Corp.*, 426 F.3d at 693. When considering both the process of proposing the Amended Plan, as well its terms, the totality of the circumstances demands the conclusion that the Amended Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code. Accordingly, the Amended Plan should not be confirmed.

**D.      The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code.**

87.      Section 1129(a)(7) provides that a plan may not be confirmed over the objection of a holder of an impaired class of claims or interests unless that holder will receive from the estate at least as much as it would receive if the debtor were liquidated under chapter 7. *See* 11 U.S.C. § 1129(a)(7); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 606–07 (Bankr. S.D.N.Y. 2019).

88.      As discussed above, the Amended Plan proposes to distribute assets of the Estates to creditors in excess of what they are entitled by: (1) failing to value claims as of the Petition Date in U.S. dollars, as required by section 502(b); and (2) proposing to pay interest at excessive rates not allowed by the Bankruptcy Code. Because senior classes of creditors receive more on account of their claims than they would be entitled to in a chapter 7 liquidation, the Amended Plan fails to satisfy the best interests test as to junior classes of creditors and interest holders, which are entitled to residual value.

* * *

89.      The Debtors' plan does not comply with the requirements of section 1129 of the Bankruptcy Code. Specifically, the Amended Plan is unconfirmable as it violates the cram down requirements of section 1129(b), and sections 1129(a)(1), (3), and (7).

**II.      The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law.**

90.      The Amended Plan also violates both bankruptcy law and applicable non-bankruptcy law in ways that further render it unconfirmable under sections 1129(a).

A.     **The Amended Plan improperly assumes and rejects only certain indemnification obligations.**

91.     Under section 365 of the Bankruptcy Code, executory contracts must be assumed or rejected in their entirety.[33]  The Amended Plan expressly treats Indemnification Obligations[34] for Persons who served as an employee, director, or officer of the Debtors (collectively, the "**Debtor Employees**") as of the Petition Date as executory contracts assumed by the Debtors.  *See* Amended Plan § V.D.  However, the Amended Plan carves out Debtor Employees who are also DCG Parties[35]—which includes current and former employees of DCG, DCGI, and each of their respective Affiliates and subsidiaries—from the assumed Indemnification Obligations.  *See id.*

92.     The Debtors cannot cherry-pick those Indemnification Obligations they wish to assume.  The Indemnification Obligations contained in the Debtors' corporate governance documents[36] must be assumed or rejected in their entirety, meaning the Debtors cannot alter the

---

[33]     *See In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) ("Nevertheless, because a debtor must assume or reject an entire contract, and cannot cherry-pick the provisions it does not like, a court must consider the entire agreement."); *In re City Stores Co.*, 21 B.R. 809, 812 (Bankr. S.D.N.Y. 1982) ("An executory contract cannot be rejected in part and assumed in part."); *In re Klaber Bros., Inc.*, 173 F. Supp. 83, 85 (S.D.N.Y. 1959) (citing *Collier on Bankruptcy*, 14th Ed., Vol. 8, p. 163) ("An executory contract cannot be rejected in part, and assumed in part.  The Debtor, or the trustee, is not free to retain the favorable features of the contract, and reject only the unfavorable ones.").

[34]     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for any Persons who served as an employee, director, or officer of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, other than any Persons who are also DCG Parties or Gemini Parties.

[35]     "*DCG Parties*" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; provided that DCG Parties shall not include any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date.

[36]     The Corporate Governance Documents include:  (1) Constitution of Genesis Asia Pacific Pte. Ltd. (attached hereto as **Exhibit G**), (2) Genesis Global Capital, LLC Amended and Restated Operating Agreement (attached

assumed Indemnification Obligations as to some individuals covered under the applicable executory contract, but not all. Because the Amended Plan contemplates carving out indemnification obligations in violation of section 365 of the Bankruptcy Code, the Amended Plan is unconfirmable pursuant to 1129(a)(1).

**B.      Allowance of certain creditors' fees and expenses against the Estates.**

93.      Section II.E the Amended Plan proposes to allow as Administrative Expense Claims the fees and expenses incurred by the Ad Hoc Group and the Dollar Group (up to $300,000). DCG objects to such allowance, whether under authority of section 503(b)(3)(D) (which requires notice and a hearing, and that the creditor has made a "substantial contribution" to the chapter 11 cases), or under section 1129(a)(4) (which requires that any such expenses be subject to court approval as reasonable). *See generally*, *In re Adelphia Commc'ns Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010). It is not reasonable to pay out of the Estates the fees and expenses of these creditor groups given their limited contributions to the Estates themselves and the bad faith under which the Amended Plan was constructed, and the Amended Plan fails to satisfy section 1129(a)(4) by not requiring court approval of the fees and expenses. Accordingly, the plan violates section 1129(a)(1) of the Bankruptcy Code and is unconfirmable.

**C.      Any subordination of DCG Claims is improper.**

94.      The Amended Plan includes a reservation of rights for the Debtors or Wind-Down Debtors to seek to subordinate DCG Claims. *See* Amended Plan, Section III.K. DCG intends to vigorously defend against any attempts to subordinate the DCG Claims, which, for clarity, also seems to include personal funds deposited by DCG employees in GGC for no apparent reason other than the employees' affiliation with DCG.

---

hereto as **Exhibit H**), and (3) the Genesis Global Holdco, LLC Operating Agreement (attached hereto as **Exhibit I**).

95.     Furthermore, this generalized subordination attempt would also seek to subordinate all the claims asserted by the DCG Parties in the proofs of claim filed on May 22, 2023, including approximately $52.5 million owed to DCG by GGC in connection with the Luno Setoff and approximately $3.4 million of collateral owed to DCGI by GGC in connection with a November 2022 loan.  DCG and DCGI will vigorously defend against any subordination attempts.

**D.     The Amended Plan should not require a tax sharing agreement.**

96.     Article IV.B.1 of the Amended Plan states: "On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including . . . the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any."  While DCG has agreed to negotiate a tax sharing agreement in good faith with the Debtors, DCG has no obligation to do so and in fact has reserved all rights with respect to entry into such an agreement.  Therefore, the Amended Plan should not require that DCG enter into a tax sharing agreement and should be revised accordingly.

## Reservation of Rights

97.     DCG and DCGI expressly reserve all rights to raise any and all further objections to the Debtors' Amended Plan and Distribution Principles at any time up to and including the confirmation hearing.

## Conclusion

WHEREFORE, for the reasons set forth above, DCG and DCGI respectfully request that the Court deny confirmation of the Amended Plan.

Dated:  February 5, 2024
        New York, New York

Respectfully submitted,

/s/ Jeffrey D. Saferstein
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
        Jeffrey.Saferstein@weil.com
        Jonathan.Polkes@weil.com
        Caroline.Zalka@weil.com
        Jessica.Liou@weil.com
        Furqaan.Siddiqui@weil.com

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

# EXHIBIT A

## FTX Hearing Transcript

```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .  (Jointly Administered)
 5          Debtors.            .
     . . . . . . . . . . . . . . .
 6                              .
     FTX TRADING LTD., WEST      .
 7   REALM SHIRES SERVICES, INC.,.
     AND ALAMEDA RESEARCH LTD.,  .
 8                              .
          Plaintiffs,           .
 9                              .
          -against-            .  Adv. Pro. No. 23-50759 (JTD)
10                             .
     MIRANA CORP., BYBIT FINTECH .
11   LTD., TIME RESEARCH LTD.,   .
     SIN WEI "SEAN" TAN, WEI LIN .
12   "GERMAINE" TAN, WEIZHENG YE,.
     AND NASHON LOO SHUN LIANG,  .
13                             .
          Defendants.          .
14   . . . . . . . . . . . . . . .

15   ALAMEDA RESEARCH LLC, FTX   .  Adv. Pro. No. 23-50419 (JTD)
     TRADING LTD., WEST REALM     .
16   SHIRES, INC., AND WEST       .
     REALM SHIRES SERVICES INC.   .
17   (D/B/A FTX.US),              .
                                 .
18          Plaintiffs,          .
                                 .
19     v.                        .  Courtroom No. 5
                                 .  824 North Market Street
20   DANIEL FRIEDBERG,           .  Wilmington, Delaware 19801
                                 .
21          Defendant.           .  Wednesday, January 31, 2024
     . . . . . . . . . . . . . . .  10:30 a.m.
22

23                TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JOHN T. DORSEY
24             UNITED STATES BANKRUPTCY JUDGE

25
```

```
 1   APPEARANCES:

 2   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
 3                             919 Market Street
                               Suite 1800
 4                             Wilmington, Delaware 19801

 5                             Andrew Dietderich, Esquire
                               Brian Glueckstein, Esquire
 6                             Alexa Kranzley, Esquire
                               SULLIVAN & CROMWELL LLP
 7                             125 Broad Street
                               New York, New York 10004
 8
     For the U.S. Trustee:     Jonathan Lipshie, Esquire
 9                             Linda Richenderfer, Esquire
                               Benjamin Hackman, Esquire
10                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
11                             Lockbox 35
                               Wilmington, Delaware 19801
12
     For the Official
13   Committee:                Kenneth Pasquale, Esquire
                               Kris Hansen, Esquire
14                             PAUL HASTINGS LLP
                               200 Park Avenue
15                             New York, New York 10166

16   For the Joint Official
     Liquidators of FTX:       Brett Bakemeyer, Esquire
17                             WHITE & CASE LLP
                               1221 6th Avenue
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Dana L. Moore, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES (CONTINUED):

 2   For Aurus Tech LTD:        David Klauder, Esquire
                                BIELLI & KLAUDER, LLC
 3                              1204 North King Street
                                Wilmington, Delaware 19801

 4
                                Thomas Bielli, Esquire
 5                              BIELLI & KLAUDER, LLC
                                1095 Spruce Street
 6                              Philadelphia, Pennsylvania 19103

 7   For TMSI:                  Mark Minuti, Esquire
                                SAUL EWING LLP
 8                              1201 North Market Street
                                Suite 2300
 9                              Wilmington, Delaware 19801

10   For MAPS Vault:            Dennis O'Donnell, Esquire
                                DLA PIPER (US) LLP
11                              1251 Avenue of the Americas
                                New York, New York 10020
12
                                John Weiss, Esquire
     For BOBA Foundation:
13                              PASHMAN STEIN WALDER HAYDEN P.C.
                                Court Plaza South, East Wing
14                              21 Main Street
                                Suite 200
15                              Hackensack, New Jersey 07601

16   For Steadview Capital:     Douglas Mintz, Esquire
                                SCHULTE ROTH & ZABEL
17                              555 13th Street, NW
                                Suite 6W
18                              Washington, DC 20004

19   For Foundation
     Serendipity/Elements:      Kurt Gwynne, Esquire
20                              REED SMITH LLP
                                1201 North Market Street
21                              Suite 1500
                                Wilmington, Delaware 19801
22
     For Michael Lusk:          Michael Lusk, Esquire
23                              MICHAEL LUSK ATTORNEY AT LAW
                                1030 Noble Street
24                              Anniston, Alabama

25
```

1                              INDEX

2    BENCH RULING:                                    PAGE

3        JUDGE'S RULING ON IRS ESTIMATION MOTION        7

4
     MOTIONS:                                          PAGE
5
     Agenda
6    Item 24: Update Regarding Chapter 11 Cases        17

7    Agenda
     Item 25: Motion of Debtors to Estimate Claims     34
8            Based on Digital Assets
             [D.I. 5202; Filed 12/27/23]
9
             Court's Ruling:                          128
10

11   EXAMINATIONS:                                     PAGE

12       EDWARD MOSLEY
         Cross-examination by Mr. Bielli               39
13       Cross-examination by Mr. Gwynne               46
         Redirect examination by Mr. Glueckstein       58
14
         KEVIN LU
15       Direct examination by Mr. Glueckstein         64

16       SABRINA HOWELL
         Direct examination by Mr. Glueckstein         69
17       Cross-examination by Mr. Bielli               73

18
     DECLARATIONS:                                     PAGE
19
     1) Edward Mosley                                  37
20
     2) Sabrina Howell                                 72
21
22

23

24

25

1          (Proceedings commence at 10:34 a.m.)

2          (Call to Order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4   Please be seated.

5               Before we begin, Mr. Landis, I want to lay out how

6   we are going to proceed today.  First, I am going to give the

7   ruling that I said I would give on the burden of proof issue

8   for the IRS estimation hearing.  We will do that first and

9   get that out of the way.

10              As for timing, today we will take a break for

11  lunch at 12:10. I have an internal meeting I have to attend.

12  We will take an hour lunch break and then we will come back.

13  We will end at 5 p.m. today. I am assuming we will finish

14  today, but if we don't I have tomorrow and Friday available

15  so we can continue the hearing if we need to.

16              Today, for this hearing, we took a little bit

17  different approach on access to the Zoom.  Under our new

18  procedures parties and counsel have access to the live Zoom.

19  They can see the proceedings on the Zoom call.  Those who are

20  not participants normally would sign up and receive a

21  telephone number to dial in.  In this case we have, and

22  because we expected a large number of people interested, a

23  YouTube channel and those who tried to sign up for the phone

24  number received an email saying go to the YouTube channel.

25              During the course of the hearing, if we have --

1   correct," D.I. 5410 at 4.  That case acknowledges one example

2   of a Court treating a proof of claim as though it were an

3   assessment but the Court ultimately refused to attach the

4   presumption of correctness to the proof of claim precisely

5   because "There had been no prepetition IRS tax assessment,"

6   1990 Westlaw 299418 at 6, Bankruptcy Eastern District of

7   Pennsylvania, February 8th, 1990.

8          For these reasons I disagree with the United

9   States contention that all reasonable IRS estimates made

10  without formal assessments are entitled to a presumption of

11  correctness.  Claim estimation of bankruptcy is an imprecise

12  process that is neither designed nor intended to yield exact

13  numbers.  Nevertheless, I conclude that the IRS bears the

14  burden of substantiating suggested estimation of the debtors'

15  tax liabilities where there has been no formal assessment.

16          Any questions?

17      (No verbal response)

18          THE COURT:  One other issue before we get started.

19  On the question of the estimation hearing for today I

20  received a number of objections that the debtors selection of

21  the petition date as the date for determining the value of

22  the digital assets that are being estimated today is

23  inappropriate because it's unfair; however, the code is very

24  clear.  The code says that a claim is to be determined in

25  U.S. dollars as of the petition date. I think that is Section

1  502(b).

2          Its no different in the context of a determination

3  of the validity of a claim as it is for the estimation

4  hearing under 502(c).  There are limited exceptions to this

5  requirement, none of which are applicable here and,

6  therefore, based on the filings that I received, and the

7  objections that I reviewed, the debtors' position as well, I

8  conclude that the debtors' use of the petition date as the

9  date for determining the value of the digital asset claims is

10 appropriate.  I have no wiggle room on that. The code says

11 what it says and I am obligated to follow the code.

12         I understand those who have filed objections,

13 mostly, I think all of them were pro se litigants, feel that

14 this is unfair to them because of value of certain of the

15 digital assets may have increased since the filing of the

16 petition date.  The opposite is also true, some of the

17 digital assets decreased in value since the petition date.

18 Congress determined that we have to pick a date and they

19 chose the petition date.  And, therefore, I am bound by that

20 obligation under 502.

21         So, all objections to the timing of the date upon

22 which the debtors chose to determine the estimated value of

23 the claims are overruled on that basis; therefore, I don't

24 need to hear argument on those issues.

25         Mr. Landis.

**EXHIBIT B**

**EXHIBIT C**

**EXHIBIT D**

**<u>EXHIBIT E</u>**

**EXHIBIT F**

**<u>Exhibit G</u>**

**Exhibit H**

**Exhibit I**