PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550

*Counsel to the Ad Hoc Group of Genesis Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |
| | **Re:  Docket Nos. 989, 1202, 1238, and 1257** |

**OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES**
**OF THE AD HOC GROUP OF GENESIS LENDERS IN SUPPORT OF**
**CONFIRMATION OF THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................. 5

A.     Genesis and its Customer Relationships .................................................................... 5

B.     The Fraud Perpetrated on Creditors by the Debtors and DCG ................................... 6

C.     The November 2022 Freeze of Withdrawals and Formation of the Ad Hoc Group.......... 8

ARGUMENT .......................................................................................................................... 11

A.     The Distribution Principles Should Be Approved Pursuant to Bankruptcy Rule 9019.... 11

B.     The DCG Objection to the Distribution Principles Should be Overruled. ...................... 16

      1.     The Distribution Principles Pay Creditors Only up to Their Contractual Entitlements. ............................................................................................. 18

           a.     The Debtors Are Insolvent .................................................................... 18

      2.     Even if the Debtors Were Solvent, DCG Cannot Receive any Recovery Until Creditors Are Paid in Full in Accordance with the Distribution Principles ......... 23

C.     The Crypto AHG Objection Should be Overruled ........................................................ 26

      1.     The Crypto AHG Claims are not Entitled to Administrative Expense Treatment ................................................................................................................... 27

      2.     Section 562 of the Bankruptcy Code is Inapplicable to the Crypto AHG's Claims ................................................................................................... 28

D.     The Ad Hoc Group Restructuring Expenses Must Be Paid as an Administrative Expense ....................................................................................................................... 31

E.     The Plan Inappropriately Releases the Debtors' Employees, Officers, and Directors......35

CONCLUSION ....................................................................................................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ...................................................................14

*In re Ames Dep't Stores, Inc.*,
    450 B.R. 24 (Bankr. S.D.N.Y. 2011) ....................................................................18

*In re AMR Corp.*,
    2014 Bankr. LEXIS 3298 (Bankr. S.D.N.Y. Aug. 5, 2014) ....................................32

*In re Best Prods. Co..*,
    173 B.R. 862 (Bankr. S.D.N.Y. 1994) ..................................................................32

*In re Calpine Corp.*,
    2008 WL 3154763 (Bankr. S.D.N.Y. 2008) .........................................................29

*In re Chateaugay Corp.*,
    102 B.R. 335 (Bankr. S.D.N.Y. 1989) .............................................................29, 30

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................................14

*In re Country Club Estates at Aventura Maint. Ass'n*,
    227 B.R. 565 (Bankr. S.D. Fla. 1998) ..................................................................27

*In re Dow Corning Corp.*,
    456 F.3d 668 (6th Cir. 2006) ...............................................................................23

*In re Dressel Assocs., Inc.*,
    536 B.R. 158 (W.D. Pa. 2015) .............................................................................19

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 717 (Bankr. S.D.N.Y. 1992) ........................................................... 16-17

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    636 B.R. 1 (D. P.R. 2022) ....................................................................................35

*In re Gen. Growth Props., Inc.*,
    2011 WL 2974305 (Bankr. S.D.N.Y. July 20, 2011) ............................................24

*In re General Growth Props., Inc.*,
    451 B.R. 323 (Bankr. S.D.N.Y. 2011) ..................................................................29

*In re Hibbard Brown & Co., Inc.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) ................................................................13

*In re Johns-Manville*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................17

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .................................................................35

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) .................................................................35

*In re McLean Indus., Inc.*,
    88 B.R. 36 (Bankr. S.D.N.Y. 1988) ..................................................................32

*In re Oakland Homes Corp.*,
    449 F.3d 588 (3d Cir. 2006) .............................................................................20

*In re PG&E Corp.*,
    46 F.4th 1047 (9th Cir. 2022) ..........................................................................24

*In re Purofied Down Prods. Corp.*,
    150 B.R. 519 (S.D.N.Y. 1993) .........................................................................13

*In re Residential Cap., LLC*,
    2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013) ....................................35

*In re Revlon, Inc.*,
    No. 22-10769 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023) .....................................35

*In re Richton Int'l Corp.*,
    15 B.R. 854 (Bankr. S.D.N.Y. 1981) ................................................................32

*In re Sultan Realty, LLC*,
    2012 WL 6681845 (Bankr. S.D.N.Y. Dec. 21, 2012) ......................................24

*In re Ultra Petroleum Corp.*,
    943 F.3d 758 (5th Cir. 2019) ...........................................................................24

*In re Ultra Petroleum Corp.*,
    624 B.R. 178 (Bankr. S.D. Tex. 2020),
    *aff'd,* 51 F.4th 138 (5th Cir. 2022) ....................................................21, 24, 25

*In re U.S. Lines, Inc.*,
    103 B.R. 427 (Bankr. S.D.N.Y. 1989) ..............................................................32

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983) .............................................................................12

*In re Windstream Holdings, Inc.*,
    634 F.Supp.3d 99 (S.D.N.Y. 2022) ..................................................27

*In re Winstar Commc'ns, Inc.*,
    348 B.R. 234 (Bankr. D. Del. 2005) ..................................................21

*In re World Mktg. Chi., LLC*,
    574 B.R. 670 (Bankr. N.D. Ill. 2017) ..................................................19

*Mellon Bank, N.A. v. Metro Commc'n, Inc.*,
    945 F.2d 635 (3d Cir.1991) ..................................................19

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ..................................................13

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ..................................................12

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ..................................................29

### STATUTES

11 U.S.C. § 101 ..................................................18, 19

11 U.S.C. § 365 ..................................................29, 31

11 U.S.C. § 502 ..................................................*passim*

11 U.S.C. § 503 ..................................................31, 32, 34

11 U.S.C. § 562 ..................................................*passim*

11 U.S.C. § 1129 ..................................................5, 18, 20, 23

### OTHER AUTHORITIES

Fed. Bankr. R. 9019 ..................................................5, 12, 16

H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 347 ..................................................29

4–502 Collier on Bankruptcy ¶ 502.03 (5th rev. ed. 2005) ..................................................20

7–1129 Collier on Bankruptcy ¶ 1129.06 ..................................................21

The Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group") hereby submits this memorandum of points and authorities (this "Memorandum") (i) responding to (a) *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection to Confirmation of the Debtors' Amended Plan* [ECF No. 1257] (the "DCG Objection") filed by Digital Currency Group, Inc. and DCGI (collectively, "DCG"), (b) the *Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* [ECF No. 1238] (the "Crypto AHG Objection") filed by the Genesis Crypto Creditors Ad Hoc Group (the "Crypto AHG"), and (c) the *Objection of the United States Trustee to the Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1202] (the "UST Objection") filed by the Office of the United States Trustee for Region 2 (the "UST"), and (ii) in support of confirmation of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989] (the "Plan")[2] filed by the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").[3] In support of this Memorandum,[4] the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

The nature of the Debtors' assets and the claims asserted against such assets are complex, and present unique questions of fact and law.  But, the question posed by the DCG Objection is comparatively simple:  does the priority scheme of the Bankruptcy Code subordinate equity to *all*

---

[2]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[3]    The Ad Hoc Group also filed the *Reservation of Rights of the Ad Hoc Group of Genesis Lenders to Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1240] (the "AHG ROR").  As set forth therein, the AHG ROR relates solely to the Plan's release of the Debtors' employees, officers, and directors, and the Ad Hoc Group supports confirmation of an amended Plan with no such release.

[4]    The Ad Hoc Group acknowledges that other responses and objections to confirmation of the Plan have been interposed.  The Ad Hoc Group hereby joins in and supports the replies and memoranda in support of the Plan by the Debtors and the UCC filed contemporaneously herewith, except with respect to the Debtors' position regarding releases as described below.

contractual rights of creditors, or just a subset thereof?  The answer, developed across decades of caselaw, is equally clear: creditors are entitled to the *full* benefit of their bargain before subordinated creditors or equity holders may recover on their claims and interests—a principle reflected across the Bankruptcy Code and caselaw.  It is the reason an oversecured creditor can charge and collect fees, postpetition interest, and other damages against its collateral prior to any such excess value flowing to unsecured creditors.  It is also why unsecured creditors may recover postpetition interest before subordinated creditors and interest holders receive any recovery.

The unique and complex nature of the Debtors' assets and claims, and their constantly-shifting valuations, do not override bedrock principles of the Bankruptcy Code:  the next rung of the waterfall cannot recover until the rung above it has received the full compensation to which it is legally entitled pursuant to its contract.

With the complex nature of the Debtors' assets and claims, and a multitude of competing interests, concerns, and viewpoints as to the appropriate valuation methodology to apply, the Debtors and their creditors, including those in the Ad Hoc Group, engaged in months of arms'-length, hard-fought negotiations to reach the compromise represented by the Distribution Principles.  The Distribution Principles delicately balance the interests and litigation positions of the Debtors, creditors holding claims denominated in U.S. Dollars ("USD"), and creditors holding claims denominated in Digital Assets.  None of the parties may be perfectly content with the outcome, and each subset of creditors continues to hold strong views regarding the concessions ultimately reached.  But, the difficult negotiations were worth the time and effort, resulting, as evidenced by the results of the Plan solicitation process, in overwhelming support from every creditor constituency.  *See Declaration of Alex Orchowski of Kroll Restructuring Administration*

*LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended*
*Chapter 11 Plan* [ECF No. 1196] (the "Voting Declaration").

DCG's opportunistic objection seeks to take advantage of the complex nature of the Debtors' estates to pervert the purposes of the Bankruptcy Code. By adopting DCG's construct, a parent company—one alleged, not only by the Debtors and their creditors, but also, by multiple governmental regulatory bodies, including the Securities and Exchange Commission (the "SEC") and Office of the New York Attorney General (the "NYAG"), to have defrauded the Debtors' creditors—can drain its subsidiary of resources through improper transfers of assets, reneging repeatedly on the repayment of undisputed loans owed in excess of $600 million, implementing a blockade of withdrawals and payments on ordinary course obligations, causing havoc in the marketplace, forcing a bankruptcy filing in advance of a "bull run" on the Debtors' assets, and then attempting to capture the entirety of the increase in value generated by creditors' loaned assets, and leaving those same creditors holding the bag, as empty as it would be. This simply cannot be, and was not, Congress' intent.

Even if DCG were correct that section 502(b) of the Bankruptcy Code requires creditors to turn over any value generated by their loaned assets to the perpetrator of their fraud, DCG is not harmed by the Distribution Principles. First, DCG has no standing to raise its objection to the Distribution Principles because there are billions of dollars of asserted governmental penalty claims which stand between DCG and any recovery. DCG has not objected to or even addressed the amount of such claims, and the analysis propounded by Mr. Verost, DCG's financial advisor, with respect to claim recoveries completely ignores the subordinated claims as if they did not exist.

In contrast to DCG, the subordinated creditors, the only true economic parties potentially impacted by the Distribution Principles if the DCG Objection were correct, have not objected to

the Plan or the Distribution Principles. Indeed, some have settled their claims and agreed to support confirmation of the Plan and the Distribution Principles embedded therein. This includes, most notably, the SEC and the NYAG, which have agreed to claims subordinated in payment to all general unsecured creditors under the Plan. Furthermore, the NYAG has agreed to size its claim by reference to the damages suffered by creditors from the fraud perpetrated upon them by the Debtors and DCG. *See Stipulation and Consent to Judgment* [ECF No. 1275, Ex. C] (the "NYAG Settlement"). Specifically, the NYAG's claim is to be allowed in the amount equivalent to the difference between the in-kind value of all creditors' claims and the value recovered by creditors. NYAG Settlement ¶ 7. Moreover, understanding the absolute harm caused by DCG and the readily apparent inequity resulting therefrom, the NYAG has agreed to establish and contribute all recoveries to a victims' fund to distribute recoveries on its subordinated claim to general unsecured creditors in accordance with the Distribution Principles. *Id*. ¶ 9.

The Ad Hoc Group and the Debtors' other creditors are all victims of DCG's fraud. They are entitled to recover the full amount they are owed pursuant to their valid and enforceable contracts before DCG receives any value. While there may have been disagreement among the creditors regarding the valuation of certain assets and claims, the Ad Hoc Group, representing creditors holding claims of all varieties (in the aggregate amounts of greater than two-thirds of all general unsecured claims), the Dollar Creditor Group, representing a subset thereof, and the Official Committee of Unsecured Creditors (the "UCC"), a fiduciary for all creditor constituencies, worked together to develop a middle-ground methodology for the distribution of assets until all creditors have recovered their full contractual entitlements, after which any excess value flows to subordinated claims and, ultimately, equity interest holders, in accordance with the dictates of the Bankruptcy Code. The Distribution Principles constitute a hard-fought compromise and

settlement among the various creditor constituencies and the estate as to the flow of distributions under the Plan, but do not have any impact on creditor entitlements to recover in full on account of their contractual obligations.  This compromise and settlement should be approved pursuant to Bankruptcy Rule 9019, the DCG Objection should be overruled, and, as a result, subject to the AHG ROR, the Plan should be confirmed in accordance with the provisions of section 1129 of the Bankruptcy Code.

## **RELEVANT BACKGROUND**

### **A.  Genesis and its Customer Relationships**

For years prior to the Petition Date, the Debtors offered certified participants, among other services, the opportunity to lend and borrow fiat and cryptocurrency assets pursuant to "form" master borrow agreements and loan term sheets issued thereunder.  The Debtors periodically advertised lending and borrowing tables delineating the interest rates at which they would be willing to borrow for various cryptocurrency asset classes (i.e., BTC, ETH, and many others) for certain periods of time (ranging from open-term, callable on demand by either party, to fixed term loans up to one year).  Accordingly, the term sheets underlying the creditors' claims vary between claims that matured pre-petition, and, but for the automatic acceleration due to the commencement of the Chapter 11 Cases, others were due to mature during these Chapter 11 Cases or were open-term in length.  The Debtors' purported business model was simple (in theory)—borrow fiat and cryptocurrency from various creditors, and loan those assets in large quantities to other parties at higher interest rates, profiting from the difference in yield between the two.  To become a certified participant in the Debtors' lending and borrowing program, creditors were required to submit documentation evidencing their financial status as an accredited investor and high net worth individual or institution, thereby meeting certain elevated asset and loan thresholds, including

holding assets equal to or greater than $10 million and lending at least 100 Bitcoin, 1,000 Ethereum, or $2 million USD in cash or stablecoins.

The Debtors touted their status as regulated and licensed entities operating in the State of New York[5] and provided lenders with direct insight into the Debtors' lending book and balance sheet. In the years prior to the Petition Date, many of the Debtors' customers felt fortunate to be among the select group of certified lenders to what customers then perceived to be a reliable and trustworthy counterparty. Ultimately, that trust proved to be sorely misplaced.

### B. The Fraud Perpetrated on Creditors by the Debtors and DCG

In contrast to their external representations to their lenders, the Debtors' loan book was highly concentrated among a small handful of counterparties and was not overcollateralized. From December 2020 through September 2022, the Debtors' collateral coverage ratio varied between 60-90%.[6] One of the Debtors' largest borrowers at this time was cryptocurrency hedge fund Three Arrows Capital ("3AC"). 3AC was permitted to borrow billions of dollars in fiat and cryptocurrency assets from the Debtors on an undercollateralized basis.[7]

In May 2022, LUNA and TerraUSD collapsed, causing significant disruption in the cryptocurrency markets. Shortly thereafter, 3AC commenced liquidation proceedings and its founders fled. 3AC had approximately $2.4 billion in loan obligations outstanding to the Debtors and, by the time the Debtors foreclosed on their collateral, the value of the collateral was

---

[5]   *See Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* [ECF No. 17] ("Islim FDD"), ¶¶ 9-10 (Genesis Global Capital, LLC "is registered as a Money Services Business with the Financial Crimes Enforcement Network" and Genesis Asia Pacific Pte. Ltd. "has received an In-principle Approval for a Major Payment Institution license under the Payment Services Act 2019 by the Monetary Authority of Singapore").

[6]   *See The People of the State of New York v. Gemini Trust Co., et al.*, Case No. 452784/2023 filed in the Supreme Court of the State of New York, County of New York (the "NYAG Complaint"), ¶ 73.

[7]   *See* Islim FDD, ¶¶ 31–32.

approximately $1.2 billion, leaving a $1.2 billion deficit that blew a crater in the Debtors' balance sheets and left them insolvent.[8]

Instead of acknowledging their insolvency, the Debtors and DCG, which already owed the Debtors hundreds of millions of dollars in unsecured loans, conspired to falsely represent the Debtors' capital structure and financial circumstances.[9] "For example, on June 15 and June 17, [the Debtors], [Barry] Silbert, [Michael] Moro, and/or DCG published tweets claiming the [Debtors'] balance sheet was 'strong,' that [the Debtors were] functioning 'normally,' and that [they] had 'shed the risk and moved on.'"[10] None of those statements were accurate, and each were designed to both prevent or avoid withdrawals from current lenders and to attract new lenders to try and maintain what little liquidity the Debtors had to continue to kick the can down the road.[11]

The Debtors typically reported quarterly financials. With the end of the financial reporting quarter approaching quickly, DCG devised a plan to conceal the Debtors' insolvency. "On June 30, 2022—the last day of the financial reporting quarter—[Michael] Moro and [Barry] Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis [Global] Capital $1.1 billion *in a decade* at only a 1% per annum interest rate (the "Promissory Note") to purportedly backstop losses from the [3AC] loans. DCG never made principal or interest payments under the Promissory Note and the structural hole [in the Debtors' balance sheet] remained unchanged."[12]

Following the execution of the Promissory Note, the Debtors and DCG continued issuing public statements and communicating privately with lenders that DCG had "assumed the

---

8    *Id.*
9    NYAG Complaint at ¶ 9.
10   *Ibid.*
11   NYAG Complaint at ¶ 9.
12   *Id.*, ¶ 10.

liabilities" and "absorbed the loss" relating to 3AC.  Of course, DCG did no such thing.  Instead, DCG replaced the undercollateralized, but callable-at-will, short-term loans to 3AC with an entirely uncollateralized illiquid obligation payable only in 10 years, with 1% per annum interest payable in kind at DCG's election.[13]  To continue attracting investment from lenders, the Debtors sent many lenders financial reports which listed the Debtors' assets and liabilities.  Among their assets was the Promissory Note, falsely listed as a "Current Asset" (i.e., <u>an asset that could be reduced to cash within one year</u>).  Without this Promissory Note as a "Current Asset," the Debtors' severe liquidity constraints would have become apparent to current and prospective lenders.  Instead, this information was concealed and obfuscated.

### C.  The November 2022 Freeze of Withdrawals and Formation of the Ad Hoc Group

In early November, FTX Trading and Alameda Research collapsed, causing another wave of turmoil in the cryptocurrency markets.  Following the collapse, the Debtors received calls on their open-term loan commitments totaling approximately $827 million.[14]  Given the Debtors' pre-existing structural hole in their balance sheet, which had been hidden from the public, the Debtors did not have the liquidity to satisfy the calls on their loan obligations.  As a consequence, on November 16, 2022, the Debtors announced they were freezing all lending and borrowing activities, and no loan call requests, withdrawal requests, or other transaction requests would be honored.  The Debtors also ceased making both USD and Digital Asset interest payments to their lenders as required by the MBAs.[15]

---

[13]  *Id.*, ¶ 10.

[14]  Islim FDD, ¶ 37.

[15]  The MBAs provide that a "Loan Fee," accruing from the date on which loaned digital currency or U.S. Dollars was transferred to GGC, accrues on a daily basis based on all outstanding loaned digital currency or U.S. Dollars, and is payable on a monthly basis.  *See* MBA § III.

Shortly thereafter, the Ad Hoc Group was formed and retained Proskauer to represent the lenders' interests in connection with restructuring and repaying the Debtors' obligations to their lenders.  Since that time, as the Court is aware, the Ad Hoc Group has grown to represent creditors holding approximately $2.5 billion in claims against Genesis Global Capital, LLC ("GGC"), including majorities in amount of asserted USD, Bitcoin, and Ethereum claims against GGC.  The Ad Hoc Group's members each loaned USD or Digital Assets to the Debtors pursuant to substantially identical master borrow agreements ("MBAs"), a sample of which is attached hereto as **Exhibit A**.[16]  Following the freeze of withdrawals and loan repayments by GGC, the Ad Hoc Group began negotiating with the Debtors, DCG, and Gemini Trust Company, LLC ("Gemini") regarding a potentially consensual holistic restructuring of the claims asserted against the Debtors.

Initially, the Ad Hoc Group was formed with the goal of working with the Debtors to avoid bankruptcy and establish a process for the full repayment of creditors' loans and the maximization of creditor recoveries and the return of lenders' Digital Assets and fiat currency loans.  At the outset of these Chapter 11 Cases, the Ad Hoc Group's efforts resulted in a non-binding term sheet providing for a proposed compromise and settlement of the claims and causes of action held by the Debtors' estates against DCG.  Shortly thereafter, and following the appointment of the UCC, critical additional diligence information was obtained from the Debtors and DCG, which information led the Ad Hoc Group and the UCC to determine that proceeding with the transaction proposed by the term sheet was not viable.

Thereafter, the parties resumed negotiations and the Ad Hoc Group continued to pursue a value-maximizing transaction that would provide (a) significant in-kind recoveries through an

---

[16]  Realizing the importance and role of the Ad Hoc Group, by letter agreement, dated January 3, 2023, a copy of which is annexed hereto as **Exhibit B**, and as is customary in a restructuring, the Debtors agreed to pay all fees and expenses incurred by the Ad Hoc Group.

initial distribution, including the proceeds of the approximately $630 million in loans payable by DCG to GGC by no later than May 11, 2023 (and which were initially due in November 2022 prior to being unilaterally extended by DCG) (the "DCG Loans"), (b) value in exchange for the release of any estate claims against DCG and its directors and officers on account of preference claims potentially valued in the hundreds of millions of dollars, fraud, alter ego liability, and more, (c) a restructuring of the $1.1 billion Promissory Note due in 2032, and (d) additional long-term in-kind recoveries to creditors. While the parties continued negotiating under the auspices of Court-ordered mediation, DCG defaulted on its obligations to pay the DCG Loans, which heightened the Ad Hoc Group's concerns about the parties' ability to reach a consensus.

Nevertheless, the Ad Hoc Group continued to participate in mediation and informal discussions with DCG, the Debtors, and the UCC, with the goal of developing a chapter 11 plan that either provided for fair value from DCG in resolution of the claims asserted against it, or enabled the estates to pursue litigation. However, on August 29, 2023, the Debtors terminated mediation and filed the *Public Update on Plan Discussions* [Docket No. 625], disclosing the terms of an agreement in principle reached among the Debtors, DCG, and the UCC. The Ad Hoc Group believed that the plan proposed by such agreement was unconfirmable, and continued to negotiate with parties in interest to develop a confirmable plan that was in the best interest of creditors.

Ultimately, the Ad Hoc Group delivered a letter to the Debtors with respect to its position on the agreement in principle, making clear that its constituents would not support such a concept and that, as a consequence, the votes were simply not attainable to confirm any such chapter 11 plan. When it became clear that no alternative agreement would be reached with DCG, the Ad Hoc Group worked with the Debtors and UCC to develop a "No Deal Plan" providing for the distribution of assets to creditors and the commencement of litigation against DCG.

On November 28, 2023, members of the Ad Hoc Group holding approximately $2.5 billion in claims entered into that certain *Plan Support Agreement (No Deal)* [ECF No. 1008] (the "PSA") with the Debtors and the UCC.  The PSA obligated its parties to file, support, and consummate a chapter 11 plan embodying the Distribution Principles, which were heavily-negotiated among the parties, as well as other creditor representatives, and provide the mechanics for the distribution of assets to creditors pursuant to the Plan.  Also on November 28, 2023, the Debtors filed the Plan, reflecting the parties' settlements pursuant to the PSA.  As noted above, the Plan has been virtually universally accepted.  It has received the support of greater than 80% in both number and amount of every voting class, totaling over $3 billion in claims against the Debtors voting to approve the Plan.  The Plan is opposed only by DCG, the UST, BAO Family Holdings LLC, SOF International, LLC, and the Texas State Securities Board.[17]  This Memorandum addresses only the objections filed by DCG, the Crypto AHG, and the UST and relies upon and joins in the replies filed by the Debtors and the UCC with respect to those and other objections, except with respect to the Debtors' positions regarding releases as described below.[18]

## ARGUMENT

### A.  The Distribution Principles Should Be Approved Pursuant to Bankruptcy Rule 9019

The Distribution Principles are a settlement resulting from extensive negotiations among the Ad Hoc Group, the UCC, the Dollar Creditor Group, and the Debtors that reflect a compromise among digital currency and USD creditors, establishing the mechanics for claim valuation, allocation and distribution of estate assets, and resolving other complex contested issues among

---

[17]    While other parties, including the Crypto AHG have filed reservations of rights or objections to certain aspects of the Plan, they do not object to confirmation of the Plan itself or its general construct.  *See*, e.g., Crypto AHG Objection, ¶ 11 ("To be clear, the CCAHG does not object to confirmation of the Plan.").

[18]    Pursuant to the AHG ROR, the Ad Hoc Group reserved its rights to supplement the AHG ROR and make arguments with respect to the Plan's releases at confirmation.  As set forth in Section E below, the Ad Hoc Group reserves its rights with respect to the releases.

creditors. On the one hand, the Dollar Creditor Group asserted, similar to DCG, that claims asserted must be "dollarized" such that creditors must recover against the estate in proportion to the Petition Date value of such creditor's claim, whether asserted in fiat currency or Digital Assets. On the other hand, creditors who loaned Digital Assets held by the Debtors, and thus caused over $1.8 billion of additional value being generated by the Debtors' estates during these Chapter 11 Cases,[19] argued they are entitled to administrative expense treatment on account of their claims and, if not, that such claims must be valued on a date other than the Petition Date as covered contracts pursuant to section 562. Ultimately, both estate fiduciaries and the vast majority of creditors agreed that to avoid such costly and lengthy litigation, which would only further reduce creditor recoveries, was in the best interests of all parties, and agreed to settle these disputes.

Bankruptcy Rule 9019 provides that a court may approve a debtor's "compromise and settlement" after notice and a hearing. Bankruptcy Rule 9019(a). Only DCG objects to the Distribution Principles. The DCG Objection should be overruled. Courts apply a deferential business judgment standard to the approval of settlements pursuant to Bankruptcy Rule 9019, which merely requires the court to ensure the settlement does not fall below the lowest point in the range of reasonableness in terms of benefits to the debtor. Courts should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'" when determining whether to approve a settlement pursuant to Bankruptcy Rule 9019. *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). The approval of a settlement is within the court's broad discretion, which "discretion should be

---

[19]   *Compare Notice of Filing Cash and Coin Report* [ECF No. 141] (reporting approximately $1.1 billion in cash, digital assets, and shares held in brokerage accounts as of the Petition Date) *with Notice of Filing Cash and Coin Report* [Docket No. 1214] (reporting approximately $2.9 billion in cash, digital assets, and shares held in brokerage accounts as of December 31, 2023).

exercised in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). Settlements are favored by courts, and they will rarely be set aside. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged.").

Courts in the Second Circuit apply an eight-factor test to determine whether a proposed settlement is within the 'range of reasonableness' sufficient for its approval:

> (1) the probability of success in litigation, with due consideration for the uncertainty of fact and law; (2) the difficulties in collecting any litigated judgment; (3) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (4) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (5) the competence and experience of counsel who support the settlement; (6) the relative benefits to be received by members of any affected class; (7) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and (8) the debtor's informed judgment that the settlement is fair and reasonable.

*In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). The Ad Hoc Group respectfully submits that each of the above factors either weighs in favor of approval of the Distribution Principles or is inapplicable to the current circumstances.

***Probability of Success in Litigation, Complexity, and Likely Cost/Duration***. The Distribution Principles settle complex, unprecedented issues between Digital Asset creditors, USD creditors, and the Debtors. Digital Asset creditors initially sought full in-kind recoveries, while USD creditors sought to receive distributions of USD as soon as possible. The Distribution Principles reflect a compromise that is supported by the vast majority of USD and Digital Asset creditors—USD creditors will receive near-term distributions, funded in party by the monetization of certain Digital Assets, and Digital Asset creditors will receive "in-kind" distributions to the maximum extent possible. The Distribution Principles adhere to section 502 of the Bankruptcy Code by applying pro rata recoveries to creditors based on the "dollarized" values of their claims. Further, general unsecured creditors are entitled to receive up to 100% of the assets underlying

their claims, and postpetition interest is not payable until all general unsecured creditors have received such recovery; provided that, if USD creditors do not receive such recovery within two years, all general unsecured creditors will be entitled to interest. Absent agreement among creditors on mechanics for the distribution of the Debtors' assets and valuation methodologies regarding creditors' claims, there certainly would have been extensive, complex litigation regarding the distribution of assets. Among the disputes that would have arisen are disputes regarding the nature of the Debtors' contracts with creditors and the loaned assets thereunder, the impact of sections 502, 562, and other provisions of the Bankruptcy Code, and more. These are complex, unprecedented, disputes where the outcome for either party is unknown and would be heavily litigated at great cost. Significant uncertainty regarding the likelihood of success in litigation weighs towards approval of a settlement. *See In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) (holding the first factor of the *Purofied* test satisfied where conflicting caselaw made the outcome of litigation uncertain); *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 160 (Bankr. S.D.N.Y. 2005) (approving settlement where "[the Debtor] faces litigation risks of extraordinary magnitude" and "[t]he Settlement Agreements provide the Debtors with certainty"). Litigation would simply prolong these chapter 11 cases and, given the extensive projected cost of litigating such disputes and any potential appeals arising therefrom, severely deplete estate assets with no resulting benefit to creditors. For these reasons, the Ad Hoc Group submits the Distribution Principles satisfy factors 1 and 3 of the *Purofied* test.

*Extent of Creditor Support*. After months of negotiations, the Distribution Principles were agreed upon among the parties, and, after the Plan being submitted for a vote by the creditors, are supported by the vast majority of every class of cryptocurrency and USD creditors, avoiding the need for protracted litigation on the aforementioned complex issues. The settlement embodied by

the Distribution Principles, as incorporated into the Plan, has received the affirmative vote of greater than 80% of every single voting class. The Distribution Principles are opposed only by DCG, a small creditor and the Debtors' equityholder which is not entitled to any recovery on account of such equity for the reasons explained below, and which opposes the Distribution Principles in an opportunistic attempt to further usurp assets lent to the Debtors by creditors and to back out of its obligations to finally pay the $1.1 billion promissory note it fraudulently advertised as having been paid over 18 months ago. Accordingly, the Distribution Principles satisfy factor 4 of the *Purofied* test.

**Competence of Counsel and Arms'-Length Negotiations.** The Distribution Principles are the result of months of arms'-length negotiation among multiple parties with competing interests and different perspectives on the application of the law, and negotiated heavily to reach a compromise acceptable to all parties. Involved in these negotiations were counsel to the Debtors, the Ad Hoc Group, the UCC, and the Dollar Creditor Group, each of which have been intimately involved in these proceedings and has extensive bankruptcy and litigation experience. There is no dispute that the Distribution Principles were negotiated by competent and experienced counsel, and, therefore, the Distribution Principles satisfy factors 5 and 7 of the *Purofied* test. And, given the Debtors' support and involvement in the negotiations, and the inclusion of the Distribution Principles in the Plan, factor 8 is satisfied as well.

**Benefits to Affected Creditors.** Going into these negotiations, creditors held staunch views as to the applicable law, the valuation of claims based on different asset classes, and entitlement to the appreciation of the assets held by the Debtors' estates. At the extremes, the Dollar Creditor Group argued for all claims to be "dollarized" as of the Petition Date and an entitlement to share equally in any post-petition interest thereafter. Meanwhile, many creditors with claims

denominated in cryptocurrency argued, among other things, that they were entitled to receive distributions based on claims valued as of any given distribution date, and to recover in full in-kind based on coin quantity at the same rate as all other creditors.  Still others claimed an entitlement to administrative expense priority on account of the appreciation of the assets held by the Debtors during these Chapter 11 Cases because all appreciation was the result of such creditors having lent their cryptocurrency to the Debtors prepetition.  At the end of the negotiation, the parties brokered an agreement to compromise the extreme positions held by the various creditor constituencies and to reflect the principles and purposes of the Bankruptcy Code.  The Distribution Principles provide for all creditors to recover *pro rata* in accordance with the Petition Date (i.e., dollarized) value of their claims, while maintaining the ability for cryptocurrency-denominated creditors to recover the full amount of coins underlying their claims on a subsequently staggered basis.  There is no question that the Distribution Principles benefit the Debtors' estates and their stakeholders given this compromise.  Additionally, approval of the Distribution Principles will enable the Debtors to emerge from chapter 11 and begin to make distributions to creditors who have been awaiting the return of their loaned assets since November 2022.  The Ad Hoc Group respectfully submits that the Distribution Principles satisfy factor 6 of the *Purofied* test.

For these reasons, the Distribution Principles are a reasonable settlement among creditors and should be approved by this Court pursuant to Bankruptcy Rule 9019.

**B.  The DCG Objection to the Distribution Principles Should be Overruled.**

The DCG Objection is merely an extension of its remorseless effort to seize the Debtors' assets and value to the detriment of creditors which it misled, and should be overruled for multiple reasons.  First, DCG lacks standing to challenge the Distribution Principles.  To establish standing, DCG must demonstrate it has a stake in the outcome.  *See In re Drexel Burnham Lambert Group,*

*Inc.*, 138 B.R. 717, 721 (Bankr. S.D.N.Y. 1992) (holding that, where equity was worthless, equityholder had no stake in a settlement of a controversy between creditors).  Only parties adversely affected by a plan may raise an objection to confirmation.  *See In re Johns-Manville*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986).  It is undisputed that tens of billions of dollars in Claims— far in excess of the Debtors' assets—have been asserted by governmental units.  No party in interest, including DCG, has objected to such claims and, accordingly, they are deemed allowed pursuant to section 502(a) of the Bankruptcy Code and are entitled to a recovery before any value may flow to DCG.  Therefore, DCG has no economic interest and lacks standing to object to the Distribution Principles.

Even if DCG maintains standing to object to the Distribution Principles, which it does not, the DCG Objection fails.  *First*, DCG asserts the Debtors are solvent and that, as a result, DCG should be entitled to receive the full benefit of all cryptocurrency appreciation during these Chapter 11 Cases, *while the creditors who lent those assets receive less than half of what they are owed*. DCG is incorrect, and the Distribution Principles appropriately provide for the repayment of creditors' claims within the confines of the Bankruptcy Code (after application of pro rata recoveries based upon dollarized values), specifically allocating any excess value in accordance with the priority structure of the Bankruptcy Code—first to subordinated creditors, and next to equity.  *Second*, DCG objects to the inclusion of post-petition interest in the Distribution Principles, and the rate at which such interest is calculated.  The Distribution Principles only provide for the payment of post-petition interest if the estate is somehow solvent, as required by the Bankruptcy Code, and many courts have approved the application of contract interest rates under such circumstances.  *Third*, regardless of the merits of DCG's argument that section 502(b)

17

of the Bankruptcy Code provides for an automatic cap on recoveries (which is incorrect), DCG's argument is moot as a result of the NYAG Settlement.[20]

> ### 1. The Distribution Principles Pay Creditors Only up to Their Contractual Entitlements.

The DCG Objection to the Distribution Principles hinges entirely on its bare assertion that the Debtors are solvent and are paying creditors more than they are owed on account of their Claims. Neither assertion is correct.

> #### a. The Debtors Are Insolvent

DCG asserts, without any analysis or support for its statements (including the Verost Declaration (Docket No. 1281) being devoid of any substance), that the Debtors' estates are solvent. DCG's unsupported statements do not make it so. The unfortunate reality is the complete opposite: creditors are not going to be repaid the full amount of assets they are owed unless and until the estate recovers on its Retained Causes of Action against DCG for, among other things, fraud and alter ego liability. DCG's unsupported statements, which are merely attempts to pervert the bankruptcy process to siphon *even more* value than it already has from creditors, are insufficient to rebut the estates' deep insolvency.

Section 101(32) of the Bankruptcy Code defines "insolvency" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32). Determining solvency is a matter of valuation—the values of assets and liabilities are used to evaluate a debtor's solvency. *See In re Ames Dept. Stores, Inc.*, 450 B.R. 24, 31 (Bankr. S.D.N.Y. 2011) ("As the statutory definition of insolvency makes clear,

---

[20]    DCG also objects on certain other grounds, including that the Plan is not offered in good faith in violation of section 1129(a)(3) of the Bankruptcy Code, that the Debtors have violated their fiduciary duties to DCG, and that the Plan impermissibly alters DCG's equity holder rights. While this Memorandum does not address those arguments, the Ad Hoc Group believes such arguments are meritless and joins in the confirmation brief and replies to objections that will be filed concurrently herewith by the Debtors and the UCC.

establishing solvency requires evidence of the value of Ames' assets and liabilities . . . *at a fair market value*.") (emphasis in original); *In re Dressel Assocs., Inc.*, 536 B.R. 158, 164 (W.D. Pa. 2015) (citing *Mellon Bank, N.A. v. Metro Commc'n, Inc.,* 945 F.2d 635, 648 (3d Cir.1991)) ("[The definition of solvency set forth in section 101(32)(A)] is referred to as the 'balance sheet test,' and a debtor's assets and liabilities are to be 'tallied at a fair valuation.'"); *In re World Mktg. Chi., LLC*, 574 B.R. 670, 679 (Bankr. N.D. Ill. 2017) (recognizing insolvency is a question of fact and noting the valuation of assets and liabilities for the purpose of performing the insolvency analysis should be determined by expert testimony or recent appraisals).

DCG argues that, for purposes of solvency, the Debtors' assets should be valued at their current market prices, while their liabilities should be valued as of the Petition Date, focusing on section 502(b) of the Bankruptcy Code. However, DCG ignores that section 502(b) follows, and is predicated upon section 502(a) of the Bankruptcy Code, which provides that all claims for which there is a filed proof of claim are "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Neither DCG, nor any other party in interest, has objected to the vast majority of claims filed in these Chapter 11 Cases, which claims were filed on an in-kind basis.[21] Moreover, neither DCG nor any other party in interest has objected to the tens of billions of dollars of asserted government penalty claims filed on account of the Debtors' and DCG's fraudulent conduct.[22] There is no argument the Debtors' estates are solvent in the face of the colossal magnitude of these Claims, each of which is deemed *prima facie* valid and will recover in advance of equity holders.

---

[21]    While numerous omnibus claim objections have been interposed, they have been non-substantive in nature and dedicated to cleaning up the claims registry.

[22]    *See, e.g.*, Claim numbers 882, 883, and 884 (each asserted in the amount of approximately $8.6 billion); Claim numbers 855, 856, and 857 (each asserted in the amount of $1.1 billion); Claim numbers 842 and 843 (each asserted in the amount of $960 million); Claim numbers 880 and 881 (each asserted in the amount of approximately $588 million)

Further, even if DCG had objected to all of these governmental Claims, which it has not, the Debtors are still insolvent. Section 502(b) speaks to the allowance of *claims*, while section 101(32), which defines solvency, refers to *debts*. Section 502(b) provides, in relevant part, that, if an objection to a claim is made, the court "shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition." 11 U.S.C. § 502(b). As the Court is aware, claims may be allowed in amounts that differ from contractual debts or liabilities. For purposes of solvency, the proper analysis turns on the Debtors' liabilities, rather than the allowed amounts of claims. It is clear the Debtors are obligated to pay their lenders the amount of digital assets or USD that were loaned pursuant to the MBAs and associated term sheets.

The Third Circuit has held section 502(b) does not require discounting claims to their petition date value. In *In re Oakland Homes Corp.*, the Third Circuit explained: "[v]iewed against the remainder of the Bankruptcy Code, 'amount of such claim . . . as of the date of the filing of the petition' simply does not clearly and unambiguously require discounting a claim to present value. Rather, 'the *full face amount* of a debt instrument is the *proper amount of claim* in a bankruptcy case' where, as here, original issue discount is not at issue." 449 F.3d 588, 596–97 (3d Cir. 2006) (quoting 4–502 Collier on Bankruptcy ¶ 502.03 (5th rev. ed. 2005)). The Third Circuit focused on the Bankruptcy Code's use of the word "amount," rather than "value," in section 502(b). The court rejected an argument that "amount . . . as of the date of the filing of the petition" requires a present value calculation to be performed on the amount of the claim as of the petition date. The court explained: "where the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term "value, as of" a certain date. *See, e.g.,* 11 U.S.C. §§ 1129 ("value, as of the effective date of the plan"), 1173 (same), 1225 (same), 1325 (same), 1328 (same)." Accordingly, the Third Circuit concluded: "Viewing the Bankruptcy Code holistically,

we cannot say that the language of 11 U.S.C. § 502(b) clearly and unambiguously requires the same discounting to present value as is required in other sections of the Code." *Id.* at 698 ("The relevant date for *all determinations of present value* required by the Code is the 'effective date' of the plan.") (quoting 7–1129 Collier On Bankruptcy ¶ 1129.06).

To evaluate the Debtors' solvency, the Court must look to the face amount of the Debtors' liabilities—the amounts of Digital Assets and USD owed pursuant to the MBAs—rather than the Petition Date values of such digital assets. To do otherwise would mean valuing assets and liabilities with different methodologies, resulting in a skewed view of the solvency of the Debtors, which clearly do not have sufficient assets to perform their obligations under the MBAs. *See In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 278 (Bankr. D. Del. 2005) ("Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value."). Although courts have recognized that the increase in value of property subject to market fluctuations can lead to a debtor's solvency, those cases involve only *assets* that fluctuate in value, not liabilities, which are denominated in USD. *See In re Ultra Petroleum Corp.*, 624 B.R. 178, 181 (Bankr. S.D. Tex. 2020) (explaining that as a result of a postpetition increase in natural gas prices, the debtors "became massively solvent"). Here, where the Debtors' liabilities are denominated in cryptocurrency rather than USD, it is not appropriate to find the Debtors to be solvent based on a fluctuation in the U.S. Dollar value of the Debtors' assets (which assets are the product of creditors' lent fiat and cryptocurrency) without similarly applying such effect to the Debtors' liabilities. The Debtors' liabilities pursuant to the MBAs exceed their assets and the Debtors are unable to fulfill their obligations under the MBAs.

DCG references Judge Dorsey's recent decision in *In re FTX Trading Ltd.*, which valued certain cryptocurrency claims as of the petition date, in asserting that creditors cannot receive the

full in-kind distributions they are entitled to and their recovery must be capped at the Petition Date values of their digital assets. *See* DCG Obj. ¶ 40 (citing *In re FTX Trading Ltd.*, No. 22-11068 (JTD) Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr.) (the "FTX Transcript") at 14:23-25). However, DCG's reliance on *FTX* is misplaced. In *FTX*, in the context of a motion seeking to estimate the value of asserted claims, the court held estimation of *all* claims was appropriate because the value of such claims could not be determined through the ordinary claims allowance process without undue delay. FTX Transcript at 130:10-12. Unlike the instant case, in *FTX*, the Debtors (and not an out-of-the-money equity holder) sought to estimate over two million unliquidated claims asserted against the debtors for claims administration purposes, and the court's decision was premised on a finding that a claims allowance process would require an inordinate amount of time and expense. *Id.* at 84:8-9, 129:20-22, 130:13-16.

A motion to estimate claims is made pursuant to section 502(c) of the Bankruptcy Code, which provides, in relevant part, that "[t]here shall be estimated for purpose of *allowance under this section* any contingent or unliquidated claim, the fixing or liquidation of which . . . *would unduly delay the administration of the case*." 11 U.S.C. § 502(c)(1) (emphasis added). Section 502(a), in turn, provides that a claim is deemed allowed unless a party in interest objects, and section 502(b) provides that, if such an objection to a claim is made, the court shall determine the amount of such claim in U.S. Dollars as of the petition date and shall allow the claim in that amount. *See* 11 U.S.C. §§ 502(a), 502(b). Accordingly, a claims estimation proceeding under section 502(c) of the Bankruptcy Code, which provides only for estimation of a claim "under this section," is analogous to sections 502(a) and (b), which provide for allowance of a claim as-filed unless an objection is made.

DCG has made no request to estimate claims, and has not objected to any claims.  Further, the Ad Hoc Group lenders' claims are not contingent or unliquidated, and estimation is not required to avoid delay in the administration of the case, as is required for estimation pursuant to section 502(c).  Unlike *FTX*, which involved millions of unliquidated customer claims, the claims at issue here are limited in number and supported by loan documentation providing for the return of lenders' digital assets in-kind.  There is no basis to estimate creditors' claims pursuant to section 502(c) and, as is explained above, section 502(b) is inapplicable because no objection to the claims has been raised.  DCG's reliance on *FTX* is simply an attempt to leverage a recent cryptocurrency case for its benefit, ignoring the fact that the context and applicable law are entirely distinct.  Accordingly, *FTX* does not require the valuation of the Debtors' liabilities as of the Petition Date.

For the foregoing reasons, the Debtors are insolvent.

### 2. Even if the Debtors Were Solvent, DCG Cannot Receive any Recovery Until Creditors Are Paid in Full in Accordance with the Distribution Principles

It is a fundamental principle of bankruptcy law that equityholders cannot receive any recovery until creditors have been paid in full.  *See* 11 U.S.C. 1129(b)(2).  Even if the Debtors were solvent, creditors must receive their full bargained-for rights, including amounts above their petition date claim, prior to any distribution to equity.  In a solvent debtor case, the "fair and equitable" requirement for confirmation and the absolute priority rule require that "absent compelling equitable considerations," a chapter 11 plan must pay creditors in full, in accordance with their prepetition rights, including all of their contractual rights.  *See In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006).  This means full payment of each claim, including amounts above the petition date value of the claim, including, for example, post-petition interest at the contractual rate, attorneys' fees, and any other damages under the prepetition contracts which give rise to such claims.  *See id.* at 678, 680, 683.  "[A]bsent compelling equitable considerations, when

a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights." *In re Ultra Petroleum*, 943 F.3d 758, 765 (5th Cir. 2019).

When a debtor is solvent, allowing a recovery to equity without paying creditors in full creates a windfall to equity, at the creditors' expense. Creditors must be made whole in accordance with their *bargained-for rights* before any value can flow to equity. *See In re PG&E Corp.*, 46 F.4th 1047, 1054 (9th Cir. 2022) ("Without a solvent-debtor exception, a solvent bankrupt could reap a windfall at their creditors' expense, pocketing 'money which the debtor had promised to pay promptly to the creditor.'"); *In re Sultan Realty, LLC*, 2012 WL 6681845 at *7 (Bankr. S.D.N.Y. Dec. 21, 2012). ("Reducing the contract interest payable by a solvent debtor would unfairly grant a windfall to its equity.'"). Holding otherwise would "run counter to a 'monolithic mountain of authority,' developed over nearly three hundred years in both English and American courts, holding that a solvent debtor must make its creditors whole." *In re Ultra Petroleum Corp.*, 624 B.R. 178, 200 (Bankr. S.D. Tex. 2020), *aff'd*, 51 F.4th 138 (5th Cir. 2022).

Courts are reluctant to undo negotiated contractual provisions related to payment to creditors in a solvent debtor case. *See In re Gen. Growth Properties, Inc.*, 2011 WL 2974305, at *4 (Bankr. S.D.N.Y. July 20, 2011) ("Courts in this and other circuits have been reluctant to modify private contractual arrangements imposing default interest rates—particularly in cases involving a solvent debtor."); *In re Ultra Petroleum Corp.*, 624 B.R. 184 ("Awarding the contractual default rates is consistent with the underlying principle of the solvent-debtor exception, that creditors must be paid what they are owed under the contract before the debtor may receive a windfall"); *In re Sultan Realty LLC*, 2012 WL 6681845 at *7 (Bankr. S.D.N.Y. Dec. 21, 2012) (acknowledging that while the contractual default interest rate was four times the non-default rate, it was nevertheless the appropriate rate under the contract).

24

Here, creditors' contractual rights are clear—*the MBAs provide that the Debtors must return digital assets and U.S. Dollars to their lenders*.  There is no provision in the MBAs that would permit the payment of the USD value of any digital asset, it must be returned in-kind.  If the Court finds the Debtors are solvent (which they are not), then the Court cannot override creditors' contractual rights and provide a windfall to DCG.  That courts have primarily addressed this issue in the context of payment of postpetition interest, fees, and other contractual damages does not mean the same principles do not apply here.  It is clear that, in a solvent debtor case, creditors are entitled to receive the full benefit of their bargain with the debtor, including recovery above the arbitrarily-selected petition date value of their claims.  *See, e.g.*, *In re Ultra Petroleum Corp.*, 624 B.R. at 201 (holding that in a solvent debtor case creditors are entitled to postpetition interest).  Creditors must receive the Digital Assets they are entitled to under the MBAs before there can be any recovery to DCG.  To hold otherwise would interfere with the purposes of the Bankruptcy Code and create perverse incentives for controlling equityholders of companies with volatile assets and liabilities to file bankruptcy upon any downturn and get a free option—either asset values increase and equity can exclusively reap all rewards, or asset values decrease and only creditors' recoveries are impaired.  No court of equity should countenance this argument.

Accordingly, until the Debtors' lenders receive the full benefit of their bargain pursuant to the MBAs and other creditors are paid in full, there can be no recovery to DCG.  The DCG Objection should be overruled.

### C. The Crypto AHG Objection Should be Overruled

The Crypto AHG was formed in November 2023 and represents nine creditors holding approximately $112 million in petition date value claims, largely denominated in Bitcoin.[23]  The majority of the Crypto AHG's members are former members of the Ad Hoc Group, who believed the delicate balance and compromise embodied within the Distribution Principles undervalued their Claims.  The Crypto AHG does not object to the Plan as a whole, but complains that its creditors deserve preferential treatment on account of their substantially identical MBAs.  Crypto AHG Obj., ¶ 19.  Specifically, the Crypto AHG asserts (a) entitlement to treatment as an administrative expense claim, and (b) entitlement to an increased *pro rata* share pursuant to the Distribution Principles because their Claims allegedly arise under section 562 of the Bankruptcy Code.  Interestingly, these two arguments are completely contradictory.  On the one hand, the Crypto AHG argues that the automatic renewal of its contracts (a term that is in every single MBA) renders such MBA a postpetition contract entitled to administrative expense treatment.  Crypto AHG Obj., ¶ 20.  On the other hand, the Crypto AHG argues that the MBAs are prepetition contracts being rejected by the Debtors.  Crypto AHG Obj., ¶ 27.  Both arguments are incorrect. Contrary to the Crypto AHG's assertions, (a) automatic renewal provisions of debtor contracts do not convert prepetition claims into post-petition administrative obligations, and (b) the Debtors' MBAs, which are loan agreements between the Debtors and their creditors, are not executory contracts subject to section 562 of the Bankruptcy Code and are not being rejected.

Nonetheless, recognizing the stark differences in treatment between creditors proposed by the Dollar Creditors Group and creditors holding cryptocurrency Claims, the Ad Hoc Group,

---

[23]  *Second Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of the Genesis Crypto Creditors Ad Hoc Group* [ECF No. 1079].

Debtors, and UCC settled such disputes among the vast majority of creditors, as supported by the affirmative votes of 15,545 creditors, including approximately 94% in number and over 99% in amount of BTC Claims.[24]  The Ad Hoc Group strongly supports the consensual resolution and believes it is in the best interests of all creditors.  Regardless of whether the Distribution Principles are approved, however, the Crypto AHG Objection is misguided and should be overruled.

### 1.   The Crypto AHG Claims are not Entitled to Administrative Expense Treatment

The Crypto AHG asserts entitlement to treatment as an administrative expense, claiming the contracts automatically renewed postpetition.  Of course, the same is true of every creditor who has an MBA with the Debtors as well, as recognized by the Crypto AHG.  *See* Crypto AHG Obj., ¶ 13 ("Genesis claims these were bespoke agreements, but in reality, many investors accepted the form contracts Genesis initially offered.").  Moreover, the Crypto AHG offers no support for its claims that the mere automatic renewal of a contract postpetition renders prepetition claims arising under such contract administrative in nature.  Rather, courts are clear that is not the case.  *See, e.g.*, *In re Windstream Holdings, Inc.*, 634 F.Supp.3d 99, 107-08 (S.D.N.Y. 2022) ("an automatically renewing [contract], requiring notice of termination, would be an executory contract subject to the automatic stay.") (citing *In re Country Club Estates at Aventura Maint. Ass'n*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998) ("This court adopts the majority position that a contract which is renewed pursuant to an automatic renewal provision is merely a continuation of the original contract . . . the renewal period constitutes a continuation of the original prepetition contract . . . .").

This is unsurprising, of course.  Had the Crypto AHG believed its members' contracts were postpetition agreements as a result of such renewals, and thus no longer subject to the automatic

---

[24]    Voting Declaration, Ex. A.  Notably, despite the Crypto AHG's $108 million in BTC-denominated Claims, the Plan was curiously only rejected by less than $9 million in BTC-denominated Claims.

stay, the Crypto AHG would have asserted its rights thereunder to close out its members' loans and recover their assets in-kind (plus interest) from the estate. It did not, because it could not.

The Crypto AHG seemingly asserts that the automatic renewal of its members' MBAs somehow converts their prepetition loaned assets into postpetition transactions entitled to administrative expense treatment. Crypto AHG Obj., ¶ 22. That assertion is equally incorrect. The Crypto AHG argues that its members permitted the Debtors to retain their loaned digital assets, and that the Debtors accepted such performance, entitling the members to administrative expense priority treatment. But, the Crypto AHG fails to explain what performance its members provided and what performance was accepted by the Debtors. The Crypto AHG's members did not provide any performance under the MBAs; they did not take any action with respect to the MBAs. They similarly did not "provide Genesis with the ability to retain their crypto"—that is the basic operation of the Bankruptcy Code and the automatic stay, not contractual performance. The Crypto AHG's theory would, for example, render almost every prepetition property lease claim a postpetition administrative expense claim if the bankruptcy case extends long enough for such contract to be renewed per its terms. This argument borders on frivolous, and should be overruled.

## 2. Section 562 of the Bankruptcy Code is Inapplicable to the Crypto AHG's Claims

Pursuant to the *Limited Stipulation and Order Between the Debtors and the Crypto Creditor Ad Hoc Group* [ECF No. 1216] (the "Crypto AHG Stipulation"), (1) "the Court may take as an established fact that the Genesis-AHG Contracts qualify as Covered Contracts for purposes of application of 11 U.S.C. § 562," and (2) "the Court may take as an established fact that no member of the Crypto Creditors Ad Hoc Group is or shall be deemed to be a [Covered Entity]" under 11 U.S.C. § 562. In reliance upon this stipulation, the Crypto AHG argues the MBAs are forward contracts that the Debtors are rejecting pursuant to the Plan, and therefore section 562 of

the Bankruptcy Code requires claims arising under the MBAs to be calculated as of the Effective

Date.  But, the Crypto AHG is mistaken.  Section 562 is not applicable to the circumstances here.

Section 562(a) provides, in relevant part, that (a) *if a debtor rejects* a forward contract

pursuant to section 365(a) of the Bankruptcy Code, or (b) if a covered entity liquidates, terminates,

or accelerates such contract, then damages are measured as of the earlier of (1) the date of such

rejection, or (2) the date of such liquidation, termination, or acceleration.  *See* 11 U.S.C. § 562(a).

As a preliminary matter, because the Crypto AHG has stipulated that its members are not covered

entities described in section 562, only subpart (a), the rejection of such contract by the Debtors, is

applicable here.  *See* Crypto AHG Stipulation, ¶ 2.

Pursuant to section 365(a) of the Bankruptcy Code, a debtor may assume or reject any

executory contract.  *See* 11 U.S.C. § 365(a).  The MBAs are not executory contracts, and therefore

cannot be rejected pursuant to the Plan.  Executory contracts are contracts for which "performance

remains due to some extent on both sides."  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523

n.6 (1984).  "[L]oan agreements are generally not considered to be executory contracts."  *In re

General Growth Properties, Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011).  This is particularly

true when the only performance remaining is the repayment of the loan.  *See In re Calpine Corp.*,

2008 WL 3154763 at *4 (Bankr. S.D.N.Y. 2008) (holding loan agreement was not executory when

the lender had already loaned funds and was seeking to collect amounts owed by the borrower); *In

re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) (holding obligations for the

payment of money are insufficient to make an agreement executory); H.R. Rep. No. 95–595, 95th

Cong., 2d Sess. 347, reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 5963, 6303–04 (a

"note is not usually an executory contract if the only performance that remains is repayment").

Further, any obligations that are immaterial, *de minimis*, remote, or contingent are insufficient to render a contract executory. *See In re Chateaugay Corp.*, 102 B.R. 335.

The only material outstanding obligation under the MBAs is the Debtors' obligation to return its lenders' digital assets or U.S. Dollars. Any remaining obligations of the lenders such as, for example, the obligation to indemnify GGC (*see* MBA § XXII), do not render the MBAs executory. *See id.* at 349 (holding indemnification obligations "are immaterial, *de minimis* and remote" and "[e]ven if these obligations did come to fruition, they merely require the payment of money, and are thus not executory in nature").

The Crypto AHG lists nineteen asserted obligations that render the MBAs executory. *See* Crypto AHG Obj., ¶ 54 (a)-(s). But, of the nineteen items listed, the vast majority are not obligations of either party, but rather entitlements. *See, e.g., Id.*, ¶ 54 (a) ("Genesis is entitled to request a transaction from the Member."; ¶ 54 (k) "In the event Genesis requests a transaction, the Member must accept the request to enter into a Term Sheet"[25]). Indeed, only items (b) through (e), (l), (g), and (q) through (s) are obligations of either party, the majority of which are obligations of the Debtors. The only obligations of the Crypto AHG Members described are indemnification obligations and the obligation to establish a digital asset wallet if a creditor desired to be repaid in cryptocurrency, which requirement (a) has already been performed, and (b) is not an obligation that would give rise to an event of default, as the MBAs provide that, if not done, "such Loan will become an Open Loan on said Maturity Date." *See* Crypto AHG Obj., Exh. A-G, Art. II(c)(ii).

---

[25] To the extent the Crypto AHG misleadingly describes this term of the MBAs as an obligation of the Member, the terms of the MBA are clear that, upon receipt of a lending request from the Debtors, the lender has the option to enter into a Term Sheet or to decline to lend, and that "[i]f Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender." *See, e.g.*, Crypto AHG Obj., Exh. A-G, Art. II(b).

Simply put, the Crypto AHG members have satisfied all of their material obligations under the MBAs by lending the digital assets underlying their claims. There is no performance due and owing to the Debtors. Accordingly, the MBAs are not executory contracts, cannot be rejected pursuant to section 365 of the Bankruptcy Code, and section 562 is therefore inapplicable.

The Crypto AHG Objection amounts to creditor-on-creditor violence, prioritizing payment in full of creditors holding Digital Assets prior to any value flowing to creditors holding fiat-denominated Claims. Further, the Crypto AHG Objection would result in the members of the Crypto AHG, whose claims arise pursuant to MBAs substantially identical to those of the Ad Hoc Group members, receiving a different, greater, recovery than all other Digital Asset creditors. There is no principled justification for the nine members of the Crypto AHG to benefit over all other creditors. Just as the Court should not countenance DCG's efforts to pickpocket creditors, so too should the Court deny the Crypto AHG's attempts to do the same. The Distribution Principles represent a fair and balanced distribution methodology among the creditors, and are supported by the vast majority of all creditors. The Crypto Group Objection should be overruled.

### D. The Ad Hoc Group Restructuring Expenses Must Be Paid as an Administrative Expense

The UST and DCG argue that the Plan improperly provides for the allowance and payment of the Ad Hoc Group Restructuring Expenses as administrative expenses. However, the Ad Hoc Group has been intimately involved in the Debtors' restructuring since the Debtors froze withdrawals in November 2022 and has made a substantial contribution to these Chapter 11 Cases warranting such treatment. Accordingly, the Ad Hoc Group is entitled to payment of the Ad Hoc Group Restructuring Expenses.

Bankruptcy Code section 503(b)(3)(D) grants administrative expense priority to a claim for the "actual, necessary expenses" incurred by a creditor "in making a substantial contribution

in a case under chapter 9 or 11." 11 U.S.C. § 503(b)(3)(D).  Section 503(b)(4) provides for the

allowance as an administrative expense reasonable compensation for professional services

rendered to a creditor entitled to recover pursuant to section 503(b)(3)(D).  11 U.S.C. § 503(b)(4).

The "substantial contribution" test is satisfied "where the services rendered have

substantially contributed to an actual and demonstrable benefit to the debtor's estate, its creditors,

and to the extent relevant, the debtor's shareholders."  *In re United States Lines, Inc.*, 103 B.R.

427, 429 (Bankr. S.D.N.Y. 1989); *In re Best Prods. Co.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y.

1994).  This test is intended to promote meaningful participation by creditors in a restructuring.

*See id.*; *In re Richton Int'l Corp.*, 15 B.R. 854, 855–56 (Bankr. S.D.N.Y. 1981) ("The policy aim

of authorization of such compensation is to promote meaningful creditor participation in the

reorganization process . . . the appropriate test of compensable services is whether they

substantially contributed to the successful result.").  Courts consider several factors in determining

evaluating substantial contribution, including "(i) whether the services benefited a creditor, the

estate itself, or all interested parties; (ii) whether the services resulted in an actual significant and

demonstrable benefit to the estate; and (iii) whether the services were duplicated by the efforts of

others involved in the case."  *See In re AMR Corp.*, 2014 Bankr. LEXIS 3298 at *4 (Bankr.

S.D.N.Y. Aug. 5, 2014); *In re McLean Indus., Inc.*, 88 B.R. 36, 38–39 (Bankr. S.D.N.Y. 1988).

The Ad Hoc Group's participation in these Chapter 11 Cases has provided a significant

and demonstrable benefit to the Debtors' estates and creditors.  The Debtors acknowledged this

benefit and the role of the Ad Hoc Group by executing the letter agreement annexed as Exhibit

"B" hereto, providing for the reimbursement of all fees and expenses.  Further, the Debtors entered

into the MBAs, which provide for payment of the fees and costs incurred by lenders in enforcing

the MBAs.  *See* MBA § XI.  The members of the Ad Hoc Group relied on such commitments, and

32

the Ad Hoc Group has been intimately engaged in negotiations with the Debtors and other parties in interest since November 2022. Besides services discussed at length above, it drafted and developed the PSA (uniting all of the Debtors' creditor constituencies, as well as the Debtors), Plan, and Distribution Principles, which represent an almost-entirely consensual resolution with respect to the distribution of assets to creditors and are supported by the Debtors and the vast majority of every single class of creditors. The PSA and resulting Plan were extraordinary accomplishments in these Chapter 11 Cases that resolved complex disputes among Digital Asset and USD creditors, as well as the Debtors and the UCC, paving the way for confirmation of the Plan, which will allow the Debtors to emerge from chapter 11, creditors to finally begin receiving recoveries on account of their loaned assets, and litigation against DCG to commence. Additionally, the Ad Hoc Group was instrumental in relaying creditor concerns to the NYAG and brokering the NYAG Settlement, further limiting litigation costs and benefiting the entire estate. Through its efforts in negotiating and formulating the Plan, the Ad Hoc Group made a substantial contribution to these Chapter 11 Cases that benefitted the Debtors' estates and all stakeholders.[26]

The Ad Hoc Group did not duplicate the efforts of others involved in the Chapter 11 Cases and, as referenced below, sought to limit its role while deferring to others. The UCC did not represent the interests of the Ad Hoc Group, and, oftentimes, the UCC and the Ad Hoc Group took differing positions, as demonstrated by the agreement in principle entered into between the UCC,

---

[26] The UST argues it would be "virtually impossible" for the Ad Hoc Group to satisfy the substantial contribution standard because a prior version of the Plan conditioned the payment of the Ad Hoc Group Restructuring Expenses on members of the Ad Hoc Group holding at least $1.5 billion in claims against GGC supporting and not objecting to the Plan, asserting the payment of the Ad Hoc Group Restructuring Expenses was an inducement to support the Plan rather than payment on account of a bona fide substantial contribution. *See* U.S. Trustee Obj. at 17. However, the UST's reliance on a prior Plan, which has been amended multiple times throughout these Chapter 11 Cases, is unavailing. Regardless, the provisions of the prior Plan cited by the UST were not intended to induce support for the Plan and the Ad Hoc Group has, in fact, filed a reservation of rights with respect to the Plan. Further, for all of the reasons stated herein, the Ad Hoc Group made a substantial contribution to these Chapter 11 Cases.

Debtors, and DCG, which the Ad Hoc Group, on behalf of the majority of creditors in each Class, vehemently opposed, saving the Debtors' estates both time and significant wasted expense pursuing a plan that had no viability. The Ad Hoc Group negotiated extensively with the UCC and the Debtors to instead formulate a Plan that maximizes recoveries for all creditors.

The Ad Hoc Group Restructuring Expenses are reasonable and customary. Pursuant to section 503(b) of the Bankruptcy Code, the reasonableness of professional fees is measured based on the time, nature, extent, and value of the services rendered and whether related expenses are actual and necessary. 11 U.S.C. § 503(b). The Ad Hoc Group's professional fees and expenses satisfy the requirements of section 503(b), considering the time, labor, and skills necessary to negotiate the complex issues addressed by the Plan for well over a year. Further, the fees charged by the Ad Hoc Group's counsel are customary and consistent with fees charged to clients in similarly complex bankruptcy and non-bankruptcy cases. The fees and expenses incurred by the Ad Hoc Group since the Petition Date are only approximately 14.7% of those incurred by the Debtors, and only approximately 28.3% of those incurred by the UCC, further demonstrating the reasonableness of the Ad Hoc Group Restructuring Expenses.

In addition, the payment of fees and expenses of an ad hoc group is frequently approved in connection with a chapter 11 plan, rather than a separate motion for allowance of administrative expenses which the UST asserts is required. The Debtors' request for confirmation of the Plan and the solicitation and discovery procedures approved by this Court provided sufficient notice to all parties in interest. Specifically, the Plan provides for the payment of fees and expenses of the Ad Hoc Group pursuant to the terms and conditions of a prepetition fee reimbursement letter, which is attached hereto as Exhibit "B". *See* Plan Arts. I.A.6, II.E. Courts regularly confirm chapter 11 plans that provide for payment of creditor groups' fees, and approval of the payment of

the Ad Hoc Group Restructuring Expenses is appropriate here.  *See In re Residential Cap., LLC*, 2013 WL 12161584 at *7 (Bankr. S.D.N.Y. Dec. 11, 2013) (confirming a plan that provided for payment of creditors' attorneys' fees); *In re Revlon, Inc.*, No. 22-10769 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023) (confirming chapter 11 plan that provided for the payment of fees and expenses of three creditor groups); *In re Mallinckrodt PLC*, 639 B.R. 837, 906–07 (Bankr. D. Del. 2022) (confirming a plan that provided for payment of numerous creditor groups).

It is customary and unremarkable for debtors to agree to reimburse settling parties for professional expenses in connection with the execution of plan support agreements pursuant to which creditors undertake obligations, such as to support the plan.  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 636 B.R. 1 (D. P.R. 2022) (confirming plan of adjustment that provided for payment of settling creditors' professional fees); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 300 (Bankr. D. Del. 2013) (approving payment of professional fees of lenders party to a restructuring support agreement as actual, necessary costs of the reorganization).

Accordingly, the payment of the Ad Hoc Group Restructuring Expenses pursuant to the Plan is appropriate, and the UST Objection should be overruled.

**E.  The Plan Inappropriately Releases the Debtors' Employees, Officers, and Directors**

The Ad Hoc Group supports the substance of the Plan for all of the reasons set forth above. However, as the Ad Hoc Group stated in the AHG ROR, the Plan contains releases of the Debtors' current and former employees, officers, and directors (the "Released Personnel") that are not in the best interests of the estates, and, at this time, cannot be justified.  The Ad Hoc Group is continuing to discuss the proposed release of the Released Personnel with the Debtors, and hopes to reach a consensual resolution of this issue.  The Ad Hoc Group reserves the right to raise

additional arguments at the Confirmation Hearing with respect to the scope of the releases and the

consideration being provided in exchange for such releases.

## **CONCLUSION**

For the foregoing reasons, and subject to the AHG ROR, the Ad Hoc Group respectfully

requests that the Court confirm the Plan, and grant such other and further relief as is just.


Dated: February 15, 2024
      New York, New York

**PROSKAUER ROSE LLP**

*/s/ Brian S. Rosen*
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: brosen@proskauer.com


-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Email:  jsazant@proskauer.com

*Counsel to the Ad Hoc Group of
Genesis Lenders*