**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
Colin T. West
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

– and –

Amanda Parra Criste (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

*Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION**
**OF THE AMENDED JOINT CHAPTER 11 PLAN**
**AND OMNIBUS RESPONSE TO OBJECTIONS THERETO**

---

[1]      The Debtors in these chapter 11 cases along with the last four digits of each Debtor's tax identification number (as applicable) are as follows:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND .....................................................................................................5

I.      The Debtors Have Significant Prepetition Contractual Obligations to Their U.S. Dollar
        and Crypto Customers.......................................................................................................5

II.     The Committee Conducts an Investigation into DCG's Conduct, and Its Findings Are
        Confirmed by the NYAG's Complaint. .............................................................................7

III.    The Debtors Seek to Settle with the NYAG. .....................................................................8

IV.     The Committee Considers All Available Restructuring Options. .......................................9

V.      The August Agreement Lacked Sufficient Customer Support and Is No Longer
        Implementable in Light of the Filing of the NYAG Action. .............................................12

VI.     The Debtors, the Committee, and the Ad Hoc Group Develop the Plan that Is
        Overwhelmingly Supported by Creditors. ........................................................................13

VII.    The DP Settlement Is the Cornerstone of the Plan. ..........................................................14

ARGUMENT ............................................................................................................................16

I.      The DP Settlement Should Be Approved Under Bankruptcy Rule 9019 ..........................16

        A.      The DP Settlement Satisfies the 9019 Standards....................................... 18

                i.      The Balance Between the Litigation's Possibility of Success
                        and the DP Settlement's Future Benefits and Likelihood of
                        Protracted Litigation. .................................................................... 19

                ii.     The Paramount Interests of Creditors and Whether Other Parties
                        Support the DP Settlement............................................................ 19

                iii.    The Remaining *Iridium* Factors .................................................... 20

        B.      DCG's Arguments Against the DP Settlement Are Unpersuasive .......... 20

II.     The Court Should Overrule DCG's Confirmation Objections ..........................................23

        A.      Section 502(b) Does Not Apply Because No Party Objected to Digital
                Asset Denominated Claims........................................................................ 23

        B.      DCG Lacks Standing to Object to All Claims Because the DP
                Settlement Does Not Affect Its Direct Interests. ...................................... 24

        C.      Even If Section 502(b) Does Apply, It Does Not Operate as a Cap......... 25

D. The Plan Was Proposed in Good Faith ..................................................... 27

III. The Court Should Overrule the Crypto AHG's Objection that They Are Entitled to Administrative Priority Claims or Rejection Damage Claims Under Bankruptcy Code Section 562 ...................................................................................................................29

A. The Crypto AHG Is Not Entitled to Postpetition Administrative Expense Claims......................................................................................... 29

B. The Crypto AHG 562 Argument Fails and Constitutes an Election to Have Their Claims Treated as U.S. Dollar Claims. .................................. 32

CONCLUSION ....................................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Adelphia Commc'ns Corp.*,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) .................................................................... 16

*In re Adelphia Commn'cs Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ................................................................ 18

*In re Astria Health*,
    623 B.R. 793 (Bankr. E.D. Wash. 2021) ........................................................... 16

*In re Bradlees Stores, Inc.*,
    Nos. 00-16033, 00-16035, 00-16036, 2001 WL 34809984 (Bankr. S.D.N.Y. Mar. 28,
    2001) ..................................................................................................................... 35

*In re Calpine Corp.*,
    No. 05-60200 (BRL), 2008 WL 3154763 (Bankr. S.D.N.Y. Aug. 4, 2008) ....... 34

*In re Celsius Network LLC*,
    655 B.R. 301 (Bankr. S.D.N.Y. 2023) ................................................................ 24

*In re Chateaugay Corp.*,
    102 B.R. 335 (Bankr. S.D.N.Y. 1989) .......................................................... 34, 35

*In re Chateaugay Corp.*,
    156 B.R. 391 (S.D.N.Y. 1993) ............................................................................ 31

*Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.)*
    10 F.3d 944 (2d Cir. 1993) .................................................................................. 31

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .......................................................... 21, 23

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
    878 F.2d 620 (2d Cir. 1989) ................................................................................ 22

*Czyzeweski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) ............................................................................................ 21

*DJS Props., L.P. v. Simplot*,
    397 B.R. 493 (D. Idaho 2008) ............................................................................ 16

*Fin. of Am. LLC v. Mortg. Winddown LLC (In re Ditech Holding Corp.)*,
    630 F. Supp.3d 554 (S.D.N.Y. 2022) ................................................................. 30

*In re Gen. Growth Props., Inc.*,
  451 B.R. 323 (Bankr. S.D.N.Y. 2011)...................................................................... 34

*Harbinger Cap. Partners LLC v. Ergen (In re LightSquared Inc.)*,
  504 B.R. 321 (Bankr. S.D.N.Y. 2013)...................................................................... 26

*In re Hercules Offshore, Inc.*,
  565 B.R. 732 (Bankr. D. Del. 2016)........................................................................ 26

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*,
  188 B.R. 347 (Bankr. S.D.N.Y. 1995)...................................................................... 31

*In re Jartran, Inc.*,
  732 F.2d 584 (7th Cir. 1984) ................................................................................... 31

*JPMorgan Chase Bank, N.A. v. Charter Commcn's Operating, LLC (In re Charter
  Commcn's)*,
  419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009).............................................................. 18

*Law Debenture Tr. Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*,
  339 B.R. 91 (D. Del. 2006)...................................................................................... 17

*Lebetkin v. Giray*,
  Nos. 20-1374, 20-4229, 2021 WL 2965323 (2d Cir. July 14, 2021)....................... 32

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022)........................................................................ 17

*In re Mammoth Mart, Inc.*,
  536 F.2d 950 (1st Cir. 1976).................................................................................... 30

*In re MatlinPatterson Global Opportunities Partners II L.P.*,
  644 B.R. 418 (Bankr. S.D.N.Y. 2022)...................................................................... 21

*In re Miami Metals I, Inc.*,
  603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019).............................................................. 21

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir.2007)..................................................................................... 18

*In re NII Holdings, Inc.*,
  536 B.R. 61 (Bankr. S.D.N.Y. 2015)........................................................................ 18

*In re Old Carco LLC*,
  424 B.R. 633 (Bankr. S.D.N.Y. 2010)...................................................................... 31

*Ray Larsen Assocs. v. NIKKO Am., Inc.*,
  No. 89 Civ. 2809; 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996)................................. 30

*Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.)*,
    306 B.R. 295, 306 (B.A.P. 9th Cir 2004)..............................................................................26

*The Renco Grp., Inc. v. Wilmington Tr., Nat'l Ass'n (In re Magnesium Corp. of Am.)*,
    583 B.R. 637 (Bankr. S.D.N.Y. 2018)..................................................................................24

*RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*,
    No. 17-12899 (MEW), Adv. Proc. No. 17-01223 (MEW), 2019 WL 2553614 (Bankr.
    S.D.N.Y. June 20, 2019)......................................................................................................17

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)..................................................................................18

*In re Scrub Island Dev. Grp. Ltd.*,
    523 B.R. 862 (Bankr. M.D. Fla. 2015)................................................................................16

*TLA Claimholders Grp. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)*,
    55 F.4th 377 (2d Cir. 2022)................................................................................................26

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991)................................................................................................30

*Trs. of the Amalgamated Ins. Fund v. McFarlin's Inc.*,
    789 F.2d 98 (2d Cir. 1986)..................................................................................................30

## STATUTES AND RULES

11 U.S.C. § 502.....................................................................................................17, 25, 26

11 U.S.C. § 502(a)............................................................................................................23

11 U.S.C. § 502(b)..........................................................................3, 22, 23, 24, 25, 26

11 U.S.C. § 562.............................................................................16, 29, 32, 33, 34, 35

11 U.S.C. § 1123...............................................................................................................16

Fed. R. Bankr. P. 9019..........................................................................................16, 17, 18

The Official Committee of Unsecured Creditors (the "**Committee**")[2] appointed in the cases of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") respectfully states as follows in support of confirmation of the Debtors' Amended Joint Chapter 11 Plan [Docket No. 989] (as it may be altered, amended, modified, or supplemented, the "**Plan**") and in response to the objections to the Plan (collectively, the "**Objections**") and submits the *Declaration of Bradley Geer* (the "**Geer Declaration**") in support of this memorandum.

## PRELIMINARY STATEMENT

Despite the size, breadth, and novelty of these cases, the issues before the Court at confirmation are not exceedingly complex. The Debtors' assets being distributed pursuant to the Plan are known and consist largely of cash, cryptocurrency, and other Digital Assets. The claims pool is also largely fixed. The non-governmental claims in these cases are those of individual and institutional customers that lent the Debtors cash and Digital Assets prepetition. Substantial disputed customer and governmental claims that had been asserted against the Debtors have either been resolved or are the subject of pending settlements, including the billion-dollar claims asserted against the Debtors by various FTX entities, Three Arrows Capital, the New York Attorney General (the "**NYAG**"), and the claims asserted by the Securities and Exchange Commission. And the Plan that the Debtors seek to confirm is straightforward—it proposes to distribute the estates' liquid assets to customers in a manner that returns to them what they are contractually entitled to receive to the maximum extent possible and reserve distribution of the Debtors' illiquid assets— primarily substantial claims and causes of action against DCG—for a later date. The Plan is supported by nearly all of the creditors, affected governmental claimants holding billions of dollars of subordinated claims, the Ad Hoc Group, and, for the reasons set forth below, the Committee.

---

[2]       Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Plan or the Disclosure Statement, as applicable.

There are only two principal objectors to the Plan: (i) DCG, the Debtors' ultimate parent and (ii) a small group of creditors holding BTC-denominated claims (the "**Crypto AHG**"). DCG's central argument is that the Plan proposes to give customers "too much" value, leaving little to no residual value for its equity interests. The Crypto AHG's main argument is that the Plan gives them "too little"; contending that their crypto-denominated claims should be valued based on the price of BTC as of the Plan effective date and should be entitled to administrative expense priority. Confirmation of the Plan therefore comes down to resolving one issue—how should the claims asserted by customers who lent the Debtors BTC, ETH, or any other type of Digital Assets be determined for purposes of allocating estate assets and making distributions?

The answer comes in an arms'-length, hard-fought claims settlement between substantially all customers and the Debtors which is reflected in the Distribution Principles incorporated in the Plan as Exhibit A (the "**DP Settlement**"). Though admittedly complex, the DP Settlement fundamentally provides for the estates' assets to be allocated equitably among customers, while capping their distributions at their full contractual customer entitlements. In this way, the DP Settlement serves as an elegant resolution of a core issue that has pervaded these cases and otherwise could have resulted in protracted litigation, significant waste of estate assets, and potential liquidation under chapter 7. Indeed, DCG's allegation that customers are getting too much while the Crypto AHG alleges that customers with claims denominated in Digital Assets are getting too little plainly demonstrates the reasonableness of the settlement.

DCG spends the majority of its objection arguing that the Plan and DP Settlement cannot be confirmed because the claims of customers that are denominated in Digital Assets must, as a matter of law and for all purposes, be "capped" at the U.S dollar value as of the Petition Date under section 502(b) of the Bankruptcy Code. This argument fails for a number of reasons. *First*, the Debtors, during their exclusive period, have the ability to fashion a chapter 11 plan and resolve

2

disputes regarding prepetition claims by utilizing a number of tools provided by the Bankruptcy Code. Unlike the debtors in other recent crypto cases, the Debtors here have reasonably exercised their discretion to propose a Plan that accomplishes the goal of equitably allocating the estates assets, while maximizing the return of what customers are contractually owed. Notably, __*no*__ customer will ever receive more than what he or she is contractually owed. *Second*, section 502(b) does not apply absent an actual objection to customers' claims. No such objection has been filed and DCG lacks standing to raise any such objection. *Third,* even in the face of a legitimate objection, section 502(b) does not restrict the Debtors' discretion to fashion an appropriate treatment for their prepetition contractual commitments nor serve as an absolute cap on claims. Section 502(b) must be read together with other provisions of the Bankruptcy Code that do, in fact, impose strict caps on certain specific claims (e.g., landlord claims). Indeed, reading a blanket cap into section 502(b) would mean that a debtor could never reinstate debt or assume its executory contracts—actions that would of course impact the residual value that might be available to equity. *Fourth*, and finally, the DP Settlement respects section 502(b)'s fundamental purpose—ensuring an equitable distribution of the estates' assets—by valuing Digital Asset-denominated claims based on their U.S. dollar Petition Date value for purposes of determining how estate assets are allocated. For these reasons, DCG's position that this Court should deny confirmation because section 502(b) categorically prohibits a debtor from ever settling existential claims allowance disputes is simply untenable.

Equally important, DCG's equity is so far out of the money that its objection should be dismissed outright. Even assuming section 502(b) were to operate as a cap (which it does not), the face amount of the claims asserted by government agencies and regulators that are proposed to be subordinated under the Plan is over $33 billion. Because none of these claims have been objected to by any party, including DCG, they are all "deemed allowed" for purposes of the record

of the confirmation hearing and are entitled to a recovery after the customers' claims are paid in full. And should the Court approve the NYAG settlement prior to the start of the confirmation hearing, that one claim will not be "deemed" anything, but instead will be "allowed" in fact. Under such settlement, the NYAG will have an allowed claim against the Debtors that is subordinated to the customers' claims and equal to the amount that would be required to return to customers their full contractual entitlement after accounting for any distributions customers have received under the Plan. The NYAG has agreed to turn over any recoveries it receives on its claim to the customers. In short, any alleged "surplus" over customers' allowed claims by definition will flow to the NYAG (and back to customers), not to DCG. As DCG itself admits, this Court's approval of this settlement will therefore "neuter" DCG's argument that it should be entitled to equity value, and its Plan objection should be overruled on this basis alone.

Finally, DCG's lurid allegations of bad faith are severely misplaced given the record in these cases, which fully belies any assertion that the Plan and the DP Settlement were some sort of "secret" "backroom" deal. The Debtors, the Committee, and the Ad Hoc Group spent months negotiating a potential global resolution to these cases **_with DCG_**. The treatment of Digital Asset-denominated claims was an issue that was always at the forefront of those deal discussions. That DCG did not obtain the Plan treatment it wanted out of those negotiations does not indicate bad faith on the part of the settling parties; it just indicates that DCG never put enough on the table to garner creditor support. The Court should therefore give no weight to DCG's allegations of bad faith.

Turning now to the Crypto AHG's arguments that they should receive more than what the DP Settlement provides, none prevent confirmation of the Plan. The Crypto AHG's first argument—that their claims are entitled to postpetition administrative expense priority—fails as a matter of law. The automatic renewal provisions in the Crypto AHG members' master lending or

4

master borrowing agreements ("**MLAs**") do not transform prepetition MLAs into postpetition transactions, nor did the Debtors "induce performance" by the Crypto AHG members simply by holding on to the assets the Crypto AHG members lent them prepetition. The Crypto AHG's second argument, that their claims should be measured as of the effective date of the Plan because their contracts are executory covered contracts being rejected under the Plan, is also not a basis to derail confirmation. As an initial matter, the Crypto AHG's objection must be treated as an election by its members to opt out of the DP Settlement and instead have their claims treated as U.S. dollar General Unsecured Claims under the Plan. Any other reading would provide its members with a free option. The sole remaining issue, then, is whether their claims can ever be based on Effective Date values. This dispute, however, is just a claims allowance dispute that can be resolved after confirmation, but nevertheless fails on the merits as the Crypto AHG members' MLAs are not executory under any applicable test.

To be clear, the Committee supports each of the Debtors' arguments in their memorandum of law in support of the Plan and reply to each of the Objections and will not repeat them here. The Committee will instead focus on addressing the following: (i) the propriety of approving the Plan and the Distribution Principles; (ii) certain issues raised in the Amended Objection of DCG [Docket No. 1257] (the "**DCG Objection**"); and (iii) the Objection of the Crypto Creditor Ad Hoc Group [Docket No. 1238] (the "**Crypto AHG Objection**").

## RELEVANT BACKGROUND

### I.    The Debtors Have Significant Prepetition Contractual Obligations to Their U.S. Dollar and Crypto Customers.

1.    The main creditors in these Chapter 11 Cases are a combination of individual and institutional investors that lent an aggregate of almost $6.4 billion worth of U.S. Dollars, Digital

Assets, or both to the Debtors prior to the Petition Date.[3]  They did so pursuant to master lending or master borrowing agreements executed with the Debtors.  Though these MLAs were individually negotiated, they were largely of the same form.  As contemplated by the MLAs, individual loan term sheets were executed by the customers and the Debtors separately to memorialize the specific terms of individual loan transactions conducted under the MLAs.  These loan term sheets included the denomination, amount, and fees associated with each loan, and whether the loan had an open term or fixed maturity.[4]  The MLAs specifically permitted customers to recall their open term loans at any time.[5]

2.    Almost all of these MLAs unambiguously provide that the customer was to be repaid by the Debtors with the same Digital Assets the customer lent the Debtors.[6]  Specifically, the standard repayment provision of the MLAs required the Debtors to repay the entirety of the "Loan Balance" to the lender upon the earlier of the maturity, recall, or redelivery date of the loan. "Loan Balance" is defined to mean all outstanding amounts of "Loaned Assets," which is further defined to include the specific quantity and type of any Digital Assets transferred to the Debtors in a loan under the MLA.[7]

3.    On November 16, 2022, the Debtors shut down all customer withdrawals as a result of a liquidity crisis.  These Chapter 11 Cases soon followed on January 19, 2023.  To date, all of the Debtors' customers, many of whom were induced to infuse additional loans in the months leading up to the halt of withdrawals, have gone over fourteen months without receiving any of the cash or Digital Assets they are contractually owed.

---

[3]    Based on Digital Asset values as of February 9, 2024, and not accounting for any applicable offsets (such as a reduction of the Gemini Lender Claims based on the value of the GBTC Shares currently in Gemini's possession).

[4]    *See, e.g.*, Geer Declaration, Ex. A at CCAHG00000007; *id.*, Ex. B at CCAHG00000122.

[5]    *See, e.g.*, *id.*, Ex. A at CCAHG00000008; *id.*, Ex. B at CCAHG00000123.

[6]    *See, e.g.*, *id.*, Ex. A at CCAHG00000006; *id.*, Ex. B at CCAHG00000121.

[7]    *See, e.g.*, *id.*, Ex. A at CCAHG00000006; *id.*, Ex. B at CCAHG00000121.

4.      Since its appointment on February 3, 2023,[8] the Committee, which consists of customers who lent the Debtors U.S. Dollars, Digital Assets, or both, has focused on ensuring that all unsecured creditors obtain recoveries as bargained for under their respective prepetition entitlements.

**II.    The Committee Conducts an Investigation into DCG's Conduct, and Its Findings Are Confirmed by the NYAG's Complaint.**

5.      In the context of DCG's argument that the Debtors acted in "bad faith," DCG's prepetition conduct leading to these Chapter 11 Cases seems at least marginally relevant to the Court's assessment.  Specifically, as set forth below, the Committee's extensive investigation into the prepetition affairs that led to these Chapter 11 Cases demonstrates that that DCG is far from the beneficent parent company it portrays itself to be.  In an effort to foster the best possible environment for a consensual resolution, the Committee has not, to date, raised the findings of its investigation to the Court.  Many of the Committee's findings, however, ultimately became public with the filing of the action (the "**NYAG Action**") by the NYAG in October 2023, as amended in February 2024, against the Debtors, Gemini, DCG, Barry Sibert, and Michael Moro for violations of New York law.[9]  Under the circumstances, including the NYAG Action, and, more recently, DCG's accusations of "bad faith" conduct and negotiations in relation to the Plan, the Committee believes it is now appropriate for the Court to start to understand the Committee's general views with respect to DCG's prepetition misconduct, which are consistent with the following allegations of the NYAG Action:

- In the first half of 2022, DCG and DCGI, for their own purposes, siphoned from the Debtors, in the form of intercompany loans, hundreds of millions of dollars in cash and digital assets that creditors had loaned to the Debtors.  *See* NYAG Action ¶¶ 223-35.  As the Debtors' ultimate parent, DCG dictated the terms of these loans and, and as set forth

---

[8]      Notice of Appointment of Official Committee of Unsecured Creditors (Feb. 3, 2023) [Docket No. 53].

[9]      *See* Amended Complaint, *New York v. Gemini Trust Co., LLC et al.*, No. 452784/2023 (N.Y. Sup. Ct. Feb. 9, 2024), ECF No. 17.

below, DCG dictated the extension of their maturities whenever it suited DCG's needs. *See id.* ¶¶ 224-33.

- The Three Arrows Capital default in June 2022 created a significant liquidity and solvency hole at the Debtors. *See id*. ¶¶ 122-23, 145. Despite the Debtors' desperate need for liquidity at the time, DCG forced the Debtors to extend the maturity dates of the loans by which DCG had borrowed hundreds of millions of dollars from the Debtors to May 2023 (the "**May Loans**"). *See id.* ¶¶ 15, 224-31. Instead of returning actual cash and crypto, DCG purported to fill the Debtors' liquidity hole by issuing a $1.1 billion promissory note, payable to Debtor GGC in ten years, and accruing interest at a rate of 1% (the "**DCG Note**"). *See id.* at ¶¶ 10, 156, 163, 169. DCG dictated the terms of the DCG Note. *See id.* at ¶ 159.

- Obviously, the value of the DCG Note on such meager, non-market terms was a small fraction of its face value and therefore it did not fill the "structural hole." *See id.* at ¶¶ 10, 13-14, 164. Nevertheless, DCG and its founder, Barry Silbert, participated in a scheme—what the NYAG refers to as "the DCG Scheme"—to defraud the Debtors' creditors through a series of false statements about the Debtors' solvency and liquidity to conceal more than $1 billion in the Debtors' losses. *See id.* ¶¶ 2, 117, 137, 139, 143-50, 161, 163, 167, 168, 176, 184, 188.

- The DCG Scheme was successful. The unsecured creditor body today largely consists of customers who, in reliance on the DCG Scheme, made new loans to the Debtors or could have, but elected not to, withdraw their loans from the Debtors, following the Three Arrows Capital default. *See id.* at ¶¶190-222. Those loans remain unpaid to this day.

6.    In light of the allegations that have now been made public by the NYAG, DCG's argument that it is legally entitled to benefit from the increase in the value of cryptocurrency since the Petition Date should more appropriately be viewed as DCG's attempt to profit from its own fraud (as alleged by the NYAG), at the direct expense of the defrauded customers who loaned such cryptocurrency to the Debtors.

## III.    The Debtors Seek to Settle with the NYAG.

7.    On February 8, 2024, the Debtors filed a motion seeking approval of a settlement resolving the serious allegations made in the NYAG Action as against the Debtors as well as the $1.1 billion proof of claim filed by the NYAG against each of the Debtors (the "**NYAG Settlement**").[10]    The NYAG Settlement provides that the NYAG will have an allowed claim

---

[10]    *See* Proof of Claim Nos. 855, 856, and 857.

against GGC that is subordinated to the customers' claims in an amount equal to the difference between the amount of the customers' full contractual entitlements and the distributions customers actually receive under the Plan.[11]  As part of the NYAG Settlement, any amounts received by the NYAG on account of its allowed claim will be re-directed to customers via a Victims Fund.  The NYAG, as part of the NYAG Settlement, has also agreed to not object to the Plan on any basis. The NYAG Settlement is scheduled to be heard on February 26 at the hearing to confirm the Plan.

## IV.    The Committee Considers All Available Restructuring Options.

8.      Throughout the course of these Chapter 11 Cases, the Committee has continued to consider all potential restructuring options for the Debtors and engaged in multiple negotiations with DCG, together with the Debtors and the Ad Hoc Group, on a comprehensive restructuring.

9.      *First*, the Committee analyzed and engaged in discussions with the parties on the terms of the restructuring term sheet filed by the Debtors on February 10, 2023 [Docket No. 80] (the "**February Term Sheet**"), which contemplated a full release of all claims and causes of action against DCG.[12]  It also proposed to convert the May Loans to a second lien term loan due in June 2024 and convert the DCG Note to $575 million of convertible preferred stock.[13]  The Committee ultimately determined that the February Term Sheet did not provide sufficient consideration for the proposed broad releases to DCG and its affiliates and also contained significant tax, securities, and regulatory risks.

10.     In May 2023, the parties began what would end up being a 3-month long mediation. During mediation, the Committee, the Debtors, and the Ad Hoc Group continued to negotiate with DCG and other parties to address the issues with the February Term Sheet in the hopes of

---

[11]      Debtor's Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General, Ex. C, ¶ 6 (Feb. 8, 2024) [Docket No. 1275].

[12]      February Term Sheet at 17.

[13]      February Term Sheet at 7.

developing a viable restructuring solution. The Committee sought to ensure that any deal with DCG would (i) appropriately compensate the Debtors for the amounts owed to them by DCG, (ii) sufficiently compensate the Debtors and creditors for the proposed releases of claims against the DCG Parties, and (iii) provide unsecured creditors with their bargained-for rights to the maximum extent possible.

11.     In parallel with global deal discussions, the Committee began to work collaboratively with the Debtors and the Ad Hoc Group to formulate a chapter 11 plan that retained claims against DCG and Gemini as a back-up option in the event mediation was unsuccessful. That plan was filed on June 13, 2023 [Docket No. 427] (the "**June Plan**"). The June Plan was designed to maximize in-kind distributions by ensuring that the lenders' MLAs vested with the Wind-Down Debtors[14] and permitted customers to retain their claims against the Wind-Down Debtors solely for the purpose of receiving distributions thereunder.[15] The June Plan, however, had one critical open issue that was still under consideration—how to handle the allowance and treatment of customer claims.[16] Despite this concept being bracketed and footnoted as under consideration in the June Plan, customer feedback on this point was loud and negative. U.S. Dollar and Stablecoin creditors believed the brackets should simply come off and all crypto customers' claims should be valued by multiplying the number of coins owed to a customer by Petition Date "prices" for those coins. Crypto-denominated creditors argued they should be entitled to receive their full contractual entitlements to coins regardless of fluctuation in prices.[17] And, it soon

---

[14]     June Plan, Art III.C.3.b.

[15]     June Plan, Art. VII.D.ii ("Allowed Other Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII of the Plan), remain obligations of Wind-Down GGC after the Effective Date.").

[16]     The June Plan noted that Digital Assets would be valued "as of the [Petition Date]." June Plan, Art. I.A.62.

[17]     *See* Geer Declaration ¶ 32.

became clear that crypto creditors, who comprise approximately half of the creditor body, would likely not support a plan that would provide them with anything other than their bargained-for rights to the maximum extent possible (as opposed to "dollarizing" claims as of the Petition Date).

12.     In late August 2023, the Debtors, the Committee, and DCG reached an agreement (the "**August Agreement**") on the terms of a consensual restructuring.[18]  The August Agreement was subject to definitive documentation and continued negotiation over the terms and conditions of an amended chapter 11 plan.  Importantly, the August Agreement was designed to maximize the return to customers of the Digital Assets they were contractually entitled to receive as of the Petition Date and did not require their claims to be capped at Petition Date U.S. Dollar values.  Specifically, it provided that the May Loans and the DCG Note would be restructured into new first lien and second lien debt facilities, with certain principal amounts to be denominated in Digital Assets to match what customers are contractually owed.[19]  It also provided for certain repayments (including in BTC) on the May Loans in exchange for a limited forbearance.[20]  Consistent with this, the Committee made sure that the filing announcing the August Agreement provided customers with recovery estimates based on the percentage of like-kind Digital Assets that would be returned.[21]  It was only after the deal fell apart that DCG decided that this Court must cap customer crypto claims at Petition Date U.S. dollar values.

---

[18]     *Notice of Mediation Termination* (Aug. 29, 2023) [Docket No. 625].

[19]     *Id.*

[20]     *Id.*

[21]     *Id.*

### V.    The August Agreement Lacked Sufficient Customer Support and Is No Longer Implementable in Light of the Filing of the NYAG Action.

13.    The Ad Hoc Group and Gemini[22] were not supportive of the August Agreement, both reasoning that the economic consideration for creditors thereunder was not acceptable and labeling it as "wholly insufficient" and "woefully light," respectively.[23]

14.    The Committee made clear that it would only support the Debtors' continued exclusivity so long as DCG continued to negotiate the definitive terms of the August Agreement in good faith.  In a filed statement in support of extending the Debtors' exclusivity, the Committee reserved all rights with respect to the deal in principle "***should such plan not feature the mechanics necessary to drive the estimated in-kind recoveries***."[24]

15.    While the parties attempted to finalize the August Agreement, the NYAG filed the NYAG Action.  That filing created a concrete and foreseeable threat that DCG would no longer be able to conduct business in New York and a risk that other state regulators would bring similar actions.  This made DCG a significant credit risk and severely impacted the value of the new debt to be issued under the August Agreement.  Considering this threat, the lack of progress made on documenting the definitive documents, and the lack of creditor support, the Committee and the Debtors determined the August Agreement was no longer the best path forward.

---

[22]    Another ad hoc group of creditors represented by Brown Rudnick that called themselves the "Fair Deal Group" also appeared in these Cases [Docket No. 649] and objected to the August Agreement.  *See* Objection of the Fair Deal Group to Debtors' Third Motion to Extend Exclusivity [Docket No. 815].

[23]    Statement of Ad Hoc Group of Genesis Lenders in Respect of Public Update on Plan Discussions (Aug. 29, 2023) [Docket No. 632]; Objection of Gemini Trust Company, LLC to Debtors' Second Motion to Extend Exclusivity, (Aug. 30, 2023) [Docket No. 634].

[24]    Reply, Statement in Support, and Reservation of Rights of the Official Committee of Unsecured Creditors with Respect to the Debtors' Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods ¶ 6 (Sept. 1, 2023) [Docket No. 654].

## VI.    The Debtors, the Committee, and the Ad Hoc Group Develop the Plan that Is Overwhelmingly Supported by Creditors.

16.    Despite moving away from the August Agreement, the Committee did **_not_** abandon its efforts to achieve a global resolution with all parties, including DCG.  To the contrary, it ramped up settlement negotiations and attempted to strike a global deal that would resolve the NYAG Action while also providing unsecured creditors with their contractual entitlements under their respective MLAs.

17.    With these continued settlement negotiations as a backdrop, the Committee worked hand-in-hand with the Debtors and the Ad Hoc Group to amend the June Plan to make it confirmable.  The Plan now before the Court features the same fundamental structure as the June Plan in that it facilitates providing customers with recoveries based on their contractual entitlements.  In fact, one of the key changes to the June Plan was the creation of creditor classes based on claim denomination (Fiat-or-Stablecoin, BTC, ETH, and Alt-Coin) to ensure all creditors within a Class can receive distributions in their applicable asset denomination.

18.    Creditor support for the Plan, however, hinged on resolving the numerous disputes that had arisen between U.S. Dollar customers and crypto-denominated customers regarding the allowance of claims.  The DP Settlement settled those issues by accomplishing the Committee's oft-repeated goal of ensuring that unsecured creditors receive as much of their contractual entitlements under their respective MLAs as possible, which unlocked overwhelming support for the Plan.  On November 28, 2023, the Debtors, the Committee, and the Ad Hoc Group memorialized this support for the Plan in the Plan Support Agreement ("**PSA**").[25]  Further context is required, however, to understand how the Debtors, the Committee, the Ad Hoc Group, and the Ad Hoc Group of Dollar Lenders ("**Dollar Group**") ultimately reached the DP Settlement.

---

[25]    Notice of Filing of Plan Support Agreement (Nov. 29, 2023) [Docket No. 1008].

**VII.    The DP Settlement Is the Cornerstone of the Plan.**

19.    As stated above, the DP Settlement was heavily negotiated between the Debtors, the Committee, the Ad Hoc Group, and the Dollar Group.[26]  The DP Settlement resolves myriad novel and complex legal issues that, if forced to be adjudicated, could result in the Debtors' inability to confirm any chapter 11 plan, or having to convert the Chapter 11 Cases.

20.    Fundamentally, the DP Settlement is designed to maximize all customers' ability to fully recover their prepetition contractual entitlements and nothing more.  The DP Settlement also levels out an inequality between U.S. dollar and crypto customers caused by the postpetition volatility in crypto prices.  If crypto customer claims are determined as of the Petition Date in U.S. Dollars, crypto customers would receive a fraction of the Digital Assets they are legally entitled to receive, whereas U.S. dollar customers would receive the full return of their loaned assets.[27] Conversely, if crypto denominated claims were to float freely with crypto price movements, dollar customers would be diluted to the point of significant impairment.  The DP Settlement simply fixes the inequality of having "winners and losers" chosen by postpetition volatility in the value of Digital Assets that the Debtors (and ultimately DCG) took from customers and have not returned.

21.    As explained in the Geer Declaration, the DP Settlement establishes a five-step process that determines how the estates' assets will be allocated across creditors, and the amount of distributions creditors will receive on account of their respective allowed claims.  *See* Geer Declaration ¶ 36.  This process is summarized as follows:  (1) each allowed general unsecured claim is valued as of the Petition Date *for asset allocation purposes only*;[28] (2) all such claim

---

[26]      *See* Geer Declaration ¶¶ 31-34.

[27]      *See* Geer Declaration ¶ 35.

[28]      These claim values are reduced by collateral and payable offsets, calculated as of the Effective Date and the Petition Date respectively.

values are aggregated to determine each claimant's "*Pro Rata* Share," which is the claimant's individual claim valued as of the Petition Date divided by the aggregate Petition Date value of all allowed general unsecured claims; (3) the Debtors' assets are valued based on a prescribed time period for each distribution date; (4) the Debtors' assets are then allocated to each class of claimants in accordance with a prescribed order; and finally (5) the Debtors' assets are distributed in-kind to the maximum extent possible.

22.     The distributions effectuated through the above-described process are subject to a "Recovery Cap," which reflects an agreement among the customers and the Debtors to allow crypto customers to receive some of the benefit of the significant postpetition Digital Asset price appreciation.  Because of the Recovery Cap, customers can receive distributions up to 100% of the principal amount of their claim; as soon as a customer has received 100% of their full principal debt entitlement (including Holders of Fiat-or-Stablecoin denominated claims), their *Pro Rata* Share (Step 2 above) is reduced to zero for any future distributions until all other holders of allowed claims have received 100% of the principal debt obligations owed by the Debtors.  After all customers receive up to 100% of their original contractual entitlements, then all customers will be entitled to receive postpetition interest at the rate set forth in their respective MLAs or loan term sheets and their *Pro Rata* Share will be adjusted to the extent of such accrued postpetition interest. The DP Settlement also reflects an agreement that, if holders of allowed Fiat-or-Stablecoin denominated claims do not receive 100% repayment of their principal prepetition debt within two years of the Effective Date, they will be entitled to, and start accruing, interest at the federal judgment rate on the unpaid portions of their claims.[29]

23.     As discussed below, the DP Settlement not only avoids costly litigation over complex issues that could have had disastrous consequences for one denominated creditor group

---

[29]     *See* Geer Declaration ¶ 37.

over another, but also accomplishes what the Committee set out to do since its appointment—get crypto back into the hands of crypto creditors without adversely affecting holders of allowed Fiat-or-Stablecoin denominated claims.

## ARGUMENT

### I.    The DP Settlement Should Be Approved Under Bankruptcy Rule 9019

24.    From the beginning, customers have been focused on receiving, as quickly as possible, what they are contractually owed under their MLAs.  But a few months into the case, intercreditor disputes began to materialize and multiple ad hoc groups formed to represent the views of various asset-type customers.  On one end of the spectrum, U.S. dollar denominated customers asserted that all claims should be allowed at the U.S. dollar Petition Date value.  On the other end of the spectrum, customers with claims denominated in Digital Assets argued that their claims were entitled to receive larger distributions on account of the rising crypto markets, and most recently asserting that their claims are entitled to administrative expense priority or were contracts covered under section 562 such that their claims should be valued as of the effective date of the Plan.  These book end valuation methodologies would have had significant impacts on creditor recoveries and even on whether a chapter 11 plan could even be confirmed.[30]

25.    The Debtors here, as fiduciaries for the estate, have proposed a Plan, fully supported by the Committee, that resolves these disputes. This is entirely consistent with the fundamental premise of the Bankruptcy Code to provide the Debtors, as plan proponents, with the flexibility to accommodate the unique aspects of a chapter 11 case and "tailor a plan to the specific needs of the case so long as the plan terms are not inconsistent with specific provisions [of] the Bankruptcy Code." *In re Astria Health*, 623 B.R. 793, 797-98 (Bankr. E.D. Wash. 2021).[31]

---

[30]    *See id.* ¶ 32.

[31]    *See also DJS Props., L.P. v. Simplot*, 397 B.R. 493, 504 (D. Idaho 2008) (noting that section 1123(b)(6) is one of "several Code provisions that grant sweeping power to plan proponents in creating reorganization plans that address the intricacies of a particular case"); *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 865 (Bankr. M.D. Fla.

26.     Indeed, the Bankruptcy Code provides a number of tools to foster that flexibility. One of these tools is the ability to reinstate debt obligations.   Another is the ability to settle allowance and treatment issues with respect to claims.   In fact, claims allowance and treatment settlements like the DP Settlement are both favored and strongly encouraged in chapter 11 cases, as highlighted by the fact that courts routinely approve claims settlements over pending section 502 objections to such claims.   *See In re Mallinckrodt PLC*, 639 B.R. 837, 908 (Bankr. D. Del. 2022) ("Even if [shareholder] had filed a claim objection under Section 502, which he has not, there is no direct conflict between Section 502 and Rule 9019 that would require a resolution of the claim objection before approving [the settlement because] such a requirement would undermine the important policy of promoting settlements in bankruptcies as it would require parties to litigate the very issues the settlement seeks to resolve.")[32]

27.     Here, rather than choosing to engage in costly, time-consuming, and ultimately value-destructive litigation, the Debtors have employed a hybrid of these tools to settle a variety of complex and novel claims allowance issues and create a fair and equitable path to exit.   At heart, the DP Settlement is a variation on the theme of reinstatement in that it preserves customers' claims and contracts against the Wind-Down Debtors and permits customers to recover up to, but no more than, their full legal entitlement on these claims with the agreed-upon modification that the parties will walk away once the Debtors' assets are fully liquidated and distributed.

---

2015) ("The Bankruptcy Code provides a chapter 11 debtor with great flexibility to formulate a plan—limited only by the debtor's creativity and the prohibition in § 1123(b)(6) that the plan provisions not be . . . 'inconsistent' with the Bankruptcy Code."); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 19 (Bankr. S.D.N.Y. 2010) (recognizing importance of "maintaining the necessary flexibility for plan proponents" and that "[s]ection 1123(b)(6), by its terms, is plainly a broad grant of authority. . . . [R]eorganization plans, after they get the requisite assent, may allocate and distribute the value of debtors' estates by a broad array of means.").

[32]     *See also RWNIH-DL 122nd St. 1 LLC v. Futterman (In re Futterman)*, 2019 WL 2553614 (Bankr. S.D.N.Y. June 20, 2019) (providing that as so long as the court approves, the trustee has the authority to settle claims, and that is true even if other parties in interest have filed objections to those claims); *Law Debenture Tr. Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 96 (D. Del. 2006) (affirming bankruptcy court's approval of a settlement by a chapter 11 trustee of one creditor's proof of claim despite another creditor's objection to the claim).

28.     As set forth below, the DP Settlement is a valid and proper exercise of the Debtors'
reasonable business judgment and satisfies the Rule 9019 standards.

### A.     The DP Settlement Satisfies the 9019 Standards

29.     Courts review settlements embodied in a chapter 11 plan in accordance with
Bankruptcy Rule 9019 and applicable case law.  *In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr.
S.D.N.Y. 2015).   The Court must make an informed and independent judgment as to whether the
settlement is fair and equitable and in the best interests of the estate, and determine whether the
settlement falls below the lowest point in the range of reasonableness.  *See JPMorgan Chase Bank,
N.A. v. Charter Commcn's Operating, LLC (In re Charter Commcn's)*, 419 B.R. 221, 252 (Bankr.
S.D.N.Y. 2009); *In re Adelphia Commn'cs Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).   In
determining whether a settlement is fair and equitable, the Second Circuit in *Iridium* directed
courts to balance seven interrelated factors.[33]   In conducting its analysis, the Court may rely on
"the opinions of the debtor, the parties to the settlement, and professionals in evaluating the
necessary facts, and it should factor in the debtor's exercise of its business judgment in
recommending the settlement." *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y.
2016).  The decision whether to accept a compromise or settlement lies within the sound discretion
of the Court.  *See Adelphia*, 327 B.R. at 159.

30.     The Committee submits that the DP Settlement is fair and equitable and that each
of the *Iridium* factors weigh heavily in favor of this Court's approval.

---

[33]     The *Iridium* factors are (i) the balance between the litigation's possibility of success and the settlement's
future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and
delay, including the difficulty in collecting on the judgment; (iii) the paramount interests of the creditors (including
each affected class's relative benefits and the degree to which creditors either do or do not object to or affirmatively
support the proposed settlement); (iv) whether other parties in interest support the settlement; (v) the competency and
experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing the
settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which
the settlement is the product of arm's-length bargaining.  *Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re
Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir.2007).

      i.    The Balance Between the Litigation's Possibility of Success and the DP Settlement's Future Benefits and Likelihood of Protracted Litigation.

31.    The DP Settlement reflects a fair compromise of the various creditor positions regarding the allowance and treatment of their claims.  It (a) allocates the estates' assets based on the U.S. dollar values of the Petition Date, (b) provides that a U.S. dollar-denominated customer claim is allowed in U.S. dollars as of the Petition Date, (c) provides that a Digital Asset-denominated claim is allowed in its applicable Digital Asset based on the number of coins contractually owed as of the Petition Date, and (d) provides that all customer claims are capped at distributions that result in return of 100% of the assets they are contractually owed.  Additionally, holders of U.S. dollar denominated claims are forgoing the ability to assert the right to collect postpetition interest on their claims until holders of claims denominated in Digital Assets receive distributions of 100% of their contractual entitlements.  The DP Settlement epitomizes fairness and equity rather than disadvantaging one creditor group at the expense of the other.

32.    As discussed above, without the DP Settlement, the Debtors, the Committee, and the major creditor constituencies would have had no choice but to litigate all the issues that were resolved through the DP Settlement, which would have intensified intercreditor disputes and led to uncertainty as to the Debtors' ability to exit chapter 11.  Because these issues are novel and highly complex, the likelihood of costly and protracted litigation are manifest.  These factors weigh heavily in favor approval of the DP Settlement.

      ii.    The Paramount Interests of Creditors and Whether Other Parties Support the DP Settlement

33.    As demonstrated by the support of the Committee, the Ad Hoc Group, the Dollar Group, and the overwhelming acceptance of the Plan by all Classes of creditors entitled to vote, the DP Settlement is in the paramount interest of creditors.[34]  All but a handful of customers

---

[34]    All Classes of claims who are entitled to vote accepted the Plan and in each case with no less than 82.45% in number or amount accepting.  *See Declaration of Alex Orchowski of Kroll Restructuring Administration LLC*

(i.e., the Crypto AHG members) have made clear that they strongly approve of the DP Settlement and the allocation and distribution of estate assets thereunder. Further underscoring its fairness, other parties in interest, such as the NYAG and Securities and Exchange Commission, have not objected to the DP Settlement.

###### iii.    The Remaining *Iridium* Factors

34.    The remaining *Iridium* factors weigh in favor of approval of the DP Settlement. The DP Settlement does not independently provide releases for officers and directors of the Debtors.[35] Additionally, each of the parties to the DP Settlement were represented by counsel with decades of experience in high-stakes chapter 11 cases. *Finally*, as discussed in detail in Section IV above and the Geer Declaration, the DP Settlement is clearly the product of arm's-length negotiations. To their credit, as they have done throughout these Chapter 11 Cases, the Debtors (along with the Committee and the AHG) fostered an environment that allowed creditor groups to engage in healthy debate about their entitlements under their prepetition contracts and their entitlements as creditors of the Genesis estates. The product of these negotiations is the DP Settlement, which the Committee submits is a sound exercise of the Debtors' business judgment, well within the range of reasonableness, and should be approved.

### B.    *DCG's Arguments Against the DP Settlement Are Unpersuasive*

35.    DCG's argument that the DP Settlement is not a settlement because, if it were, DCG would have "been provided some recovery as equity holder" defies logic.[36] DCG has not cited a single decision holding that equity holders of an insolvent debtor must receive some distribution for a settlement incorporated in a chapter 11 plan to be (i) considered a settlement and (ii)

---

*Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Chapter 11 Plan* (Jan. 25, 2024) [Docket No. 1196].

[35]    The Debtors' officers and directors are receiving releases under Article VIII of the Plan with the consent of the Releasing Parties in accordance with applicable Second Circuit law.

[36]    DCG Obj. ¶ 10.

approved.  Nor can it.  While it is true that the Court cannot approve a settlement without considering the implicated rights of nonsettling parties,[37] the Court is not required to deny a settlement and order that equity holders must receive a distribution simply because an equity holder demands it, particularly when the settlement is incorporated in a plan accepted by all creditors.  Indeed, courts routinely approve settlements incorporated into chapter 11 plans that resolve disputes over prepetition contractual entitlements.  *See, e.g., In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010) (approving settlement of disputes related to prepetition contractual entitlements (makewhole and no-call provisions) over objection of the official equity committee that such creditors were being paid "more than in full").

36.    DCG's companion assertion that the DP Settlement was manufactured solely to prevent any recovery on account of its Interests is similarly misguided.[38]  The DP Settlement was, in fact, manufactured to provide creditors the benefit of their prepetition bargain and nothing more. The Plan and DP Settlement do not entirely foreclose the possibility of an equity recovery.  It simply provides any such recovery is subordinated to the full contractual obligations of customers and the allowed Government Penalty Claims.  (To be clear, the NYAG Settlement, which ensures full restitution for customers, does make it highly unlikely that DCG will receive any value on account of its equity interests unless substantially more assets come into the estate, such as if the Wind-Down Debtors obtain a multibillion-dollar judgment against DCG.[39])

---

[37]    *See In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019).

[38]    DCG Obj. ¶ 62.

[39]    Contrary to DCG's assertions, the Plan and DP Settlement do not violate section 1129(b) and DCG's reliance on *Czyzeweski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) is of no relevance.  *Jevic* involved a bankruptcy court's approval of a structured dismissal that cost certain creditors the ability to obtain a settlement that respected their priority.  Petitioners challenged a priority-skipping distribution scheme that permitted lower priority general unsecured creditors to receive distributions while petitioners received nothing for their higher priority claims.  In contrast, DCG is an equity holder and thus has lower priority and would not be entitled to any recovery regardless of the whether the DP Settlement is approved.  Notably, the Supreme Court observed that the structured dismissal "does not promote the possibility of a confirmable plan" and "could not "find in the violation of ordinary priority rules . . . any significant offsetting bankruptcy-related justification."  *Id.* at 468.  Ironically, by insisting that it receive distributions before unsecured creditors are paid in full, it is DCG that seeks to sidestep section 1129(b).  For similar reasons, the

37.    Even more baffling is DCG's argument that the Debtors have breached their fiduciary duties by not taking all possible actions, no matter how divisive, to limit creditor claims for the benefit of their equity interests.  As discussed, a debtor has broad discretion in its business judgment to treat claims in the manner it sees fit and in accordance with its fiduciary duties. Debtors are permitted to assume contracts, reinstate debt, and enter into settlements with creditors. All of these actions impact equity value but are undoubtedly permissible under the Bankruptcy Code.

38.    The reasoning of courts in solvent debtor cases highlights the absurdity of DCG's "equity-at-all-costs" position.  Solvent debtor cases typically address the issue of whether unsecured creditors are entitled to recover postpetition interest that is otherwise expressly disallowed by section 502(b)(2).   In this context, courts have permitted recovery of postpetition interest at the rate set forth in the creditor's contract because such interest provides the creditor with the "benefit of the bargain."  *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 625 (2d Cir. 1989) (affirming order granting payment of default interest in a solvent-debtor case because the "default rate was simply part of [the creditor's] bargain").

39.    Indeed, an opinion from this District reiterates the Court's obligation to enforce a creditor's prepetition bargain:

> The Sixth Circuit has held that in a solvent debtor case, a "bankruptcy judge does not have free floating discretion to redistribute rights in accordance with his personal views of justice and fairness;" rather, "it is the role of the bankruptcy court to enforce the creditors' contractual rights."  Similarly, the First Circuit, upholding the award of what it referred to as a "prepayment penalty" from a solvent debtor, has held that "[w]hen the debtor is solvent, 'the bankruptcy rule is that where there is a contractual provision, valid under state law, ... the bankruptcy court will enforce the contractual provision." . . .  With a solvent debtor, issues as to fairness amongst creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole provision, or for damages for breach of a no-call, no longer comes at the expense of other creditors.

proposition for which DCG cites *In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418 (Bankr. S.D.N.Y. 2022) is inapposite because the DP Settlement is not unduly prejudicing DCG; there simply is not enough distributable assets in the estates to provide distributions to equity holders after paying creditors in full.

*Chemtura*, 439 B.R. at 605 (citations omitted).

40.     The unremarkable, and central thesis of the Plan is that the Debtors' customers should be entitled to the benefit of their bargain—i.e., full contractual entitlements—before the Debtors are considered solvent and value is distributed to equity interests.  The DP Settlement is entirely consistent with this principle.

**II.     The Court Should Overrule DCG's Confirmation Objections**

41.     If the DP Settlement is approved, which it should be, all of DCG's remaining confirmation arguments must fail.

*A.     Section 502(b) Does Not Apply Because No Party Objected to Digital Asset Denominated Claims.*

42.     Despite DCG's constant insistence on the strict application of section 502(b), section 502(b) by its plain terms does not even apply here.  Section 502(a) states that a claim is "deemed allowed, ***unless a party in interest….objects***."[40]  Section 502(b), in turn, provides that "***if such objection to a claim is made,*** the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount."[41]  Here, all claims of the crypto customers were asserted in the amount of Digital Assets owed by the Debtors as of the Petition Date.  No party in interest has objected to these claims, and therefore, the confirmation record should reflect that the claims are deemed allowed as filed or scheduled.

43.     DCG pays this fundamental gating issue short shrift, simply dropping a footnote that courts "value" claims as of the petition date in other contexts, including allowance of claims

---

[40]     11 U.S.C. § 502(a) (emphasis added).

[41]     *Id.* § 502(a)–(b) (emphasis added).

for plan distributions.[42]   The sole case that DCG cites for the proposition that section 502(b) applies outside of the context of a claim objection is *In re Celsius Network LLC*, quoting the following language:  "Whether under a chapter 11 plan or liquidation, creditors are entitled to their ***share*** of the value of the Debtors' Estates on the Petition Date."  655 B.R. 301, 312 (Bankr. S.D.N.Y. 2023) (emphasis added).   This statement, however, simply underscores the appropriateness of the DP Settlement because it effectively describes its Steps 1 and 2 whereby all general unsecured claims are valued as of the Petition Date to determine each claim holder's *Pro Rata* Share of the Debtors' assets.  *See supra* at 14-15.  In this manner, the DP Settlement puts all creditors on a level playing field by making sure each creditor gets its entitled-to "share" of the Debtors' estates without disadvantaging other creditors.

> **B.**      *DCG Lacks Standing to Object to All Claims Because the DP Settlement Does Not Affect Its Direct Interests.*

44.      Even had DCG properly sought to invoke section 502(b) with a claims objection to all crypto-denominated claims, DCG cannot interpose a valid objection to such claims because it lacks appropriate standing.  *See The Renco Grp., Inc. v. Wilmington Tr., Nat'l Ass'n (In re Magnesium Corp. of Am.)*, 583 B.R. 637, 650 (Bankr. S.D.N.Y. 2018) ("an equity holder. . . lacks standing to object to claims against the estate unless there is a reasonable possibility of a surplus after all claims against the debtor's estate are paid in full.").  Under the Plan, after customers receive their legal distributions, any excess value would next flow to holders of allowed Government Penalty Claims, which is the next senior class of claims.[43]   DCG completely ignores the quantum of the allowed Government Penalty Claims, which presently have allowed claims upwards of $33 billion, resulting in DCG's being out of the money (even if crypto claims are dollarized) by

---

[42]      DCG Obj. ¶ 31.

[43]      *See, e.g.*, Plan, Art. III.C.8.b.

billions.[44]  As a result, any issues of valuation of claims that have been settled under the DP Settlement do not impact DCG.

45.  Notably, no government regulator objected to the DP Settlement notwithstanding that they are the ones with a real interest in the valuation of customer claims as they are next in line after distributions to customers under the Plan.  On the contrary, several are supporting the Plan.  Moreover, the proposed NYAG Settlement, if approved, would result in the NYAG having an allowed claim equal to an amount necessary to provide customers with their full contractual entitlement, which the NYAG has agreed to turn over to customers.  While the NYAG's allowed claim is subordinated to customers' claims, it is senior to DCG's equity interests.  Therefore, the NYAG Settlement effectively leads to the same result achieved by the DP Settlement—all customers receive 100% of the Digital Assets they are owed before any value flows to equity.  On this basis alone, and as DCG recently admits in its letter to the Court regarding the NYAG Settlement, DCG's objection as to the proper value of claims has been rendered moot.[45]

C.  *Even If Section 502(b) Does Apply, It Does Not Operate as a Cap.*

46.  DCG's argument that section 502(b) acts as a strict cap on all unsecured claims in all circumstances is equally flawed.  Nowhere does section 502(b) prohibit the Court from allowing a claim in excess of the amount determined, nor does it provide that the Court shall not allow a claim denominated in anything other than U.S. dollars.  In fact, such a reading of section 502(b) would effectively mean that a debtor could never reinstate a debt or assume an executory contract.  Moreover, specific provisions in section 502 (i.e., sections 502(b)(6) and 502(b)(7)) explicitly impose a statutory cap on claims, whereas the relevant portion of section 502(b) does not.  According to the maxim *expressio unius est exclusio alterius*, Congress, when drafting the section,

---

[44]    *Amended Disclosure Statement* (Dec. 6, 2023) [Docket No. 1031].

[45]    Letter Requesting Emergency Chambers Conference (Feb. 9, 2024) [Docket No. 1279].

intended to exclude the imposition of a cap in section 502(b) except in the subsections where a mandatory disallowance is explicitly imposed.

47.     As the legislative history makes clear, Congress's intent in enacting section 502(b)(6) was to "compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." H.R.Rep. No. 95–595; S.Rep. No. 95–989. *See also Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.)*, 306 B.R. 295, 306 (B.A.P. 9th Cir 2004) (noting that statutory caps in sections 502(b)(6) and 502(b)(7) "reflect a Congressional balance between allowing the creditor with the big rent or employment termination claim to be paid a reasonable sum without unfairly diluting or squeezing out other creditors."). The DP Settlement, however, does not "unfairly dilute or squeeze out" other creditors because all creditors are allocated assets using U.S. dollar asset values as of the Petition Date. In this way, the DP Settlement is an elegant solution that permits the Debtors to satisfy their prepetition contractual obligations to the greatest extent possible while putting all creditors on a level playing field.

48.     While section 502(b)(2) expressly disallows payment on unsecured claims for "unmatured interest," *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)*, 55 F.4th 377, 383 (2d Cir. 2022),[46] that is not what DCG seeks to disallow. Rather, DCG essentially asks this Court to equitably disallow portions of prepetition contractual claims for the return of Digital Assets due, which are not subject to any explicit statutory caps or disallowance under the Bankruptcy Code. This Court should deny DCG's blatant ploy to "equitably disallow" structurally senior debt.[47]

---

[46]     *LATAM* provides that payment of unmatured or postpetition interest is permissible, however, if the debtor is solvent. *LATAM Airlines*, 55 F.4th at 383.

[47]     *See Harbinger Cap. Partners LLC v. Ergen (In re LightSquared Inc.)*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[I]n accordance with the general rules of statutory interpretation, a plain reading of section 502 of the Bankruptcy Code does not permit equitable disallowance, as it is not among the enumerated exceptions to allowance of a claim."); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del. 2016) ("The 'equitable disallowance'

49.     As its primary authority for its statutory cap argument, DCG points to a recent hearing in the *FTX Trading Ltd.* chapter 11 cases.[48]  But what DCG ignores, although abundantly clear from that hearing record, is that the FTX debtors *chose* to liquidate all their cryptocurrencies and "dollarize" their customers' claims.  In response to the question of whether it "needed" to dollarize proofs of claim, the FTX debtors' financial advisor testified that "[w]e **want** to dollarize all of the filed claims."[49]  Counsel to the FTX debtors noted that "the plan on file is premised on providing U.S. dollar recoveries to creditors, and it is therefore necessary for these claims to all be dollarized and to permit them to be addressed alongside fiat and stablecoin claims."  FTX Hearing Transcript, 85:1-5.  In short, the FTX debtors elected to transact in cash as their preferred distributable value.  In contrast, the Plan before this Court is not premised on transacting in cash.  Rather, this Plan seeks to have the Debtors fully satisfy prepetition contractual obligations in-kind and up to the amount permissible by the Bankruptcy Code, with cash distributed to U.S. dollar creditors and crypto distributed (to the fullest extent possible) to crypto creditors.

D.     *The Plan Was Proposed in Good Faith*

50.     The Committee will not repeat all the specific requirements the Debtors capably describe as being met in its brief.  Debtors' Brief at ¶¶ 38-39; 109-115.  The Committee takes special exception, however, with DCG's claim that the Plan was not proposed in good faith.

51.     DCG's allegations that the Debtors and its creditors "conspired" to formulate a plan that disenfranchises DCG contradicts the undisputed history of these cases.[50]  As this Court is fully aware, DCG was party to the months-long mediation where the parties attempted to resolve these

---

claim is not typically recognized by bankruptcy courts.  The exceptions to the allowance of a claim are specifically enumerated in Bankruptcy Code section 502(b) . . . .").

[48]     DCG Obj. ¶¶ 5, 40.

[49]     *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr. 47:22-23) (the "**FTX Hearing Transcript**") (emphasis added).

[50]     DCG Obj. ¶ 9.

Chapter 11 Cases consensually.  The mediation began in early May 2023—the same time that DCG decided it did not need to pay well over $600 million in intercompany debt that was due and owing to the Debtors.[51]  The mediation lasted until late August 2023, when the Debtors and the Committee (despite DCG still not having paid *any* of its outstanding intercompany debt) entered into the August Agreement with DCG in hopes of getting cash and crypto into creditors' hands quickly.

52.     Even after the filing of the NYAG Action, the Committee and the Debtors *still* engaged in deal discussions with DCG despite the tremendous regulatory overhang.[52]  Ultimately, however, the Debtors and their creditors needed a backup option given DCG's track record of utterly failing to meet creditors halfway and atone for its prepetition bad faith conduct (that, based on the Committee's investigation, indisputably contributed and likely caused the filing of these Chapter 11 Cases).

53.     The DCG Objection identifies only one specific example of the Debtors' "bad faith"—the Setoff Principles for the Allowance of Certain Claims reflected in Exhibit M of the Plan Supplement.[53]  Though the Committee was not directly involved in the negotiation of the Setoff Principles, the Committee did assess their appropriateness and agrees with the Debtors that, just as the DP Settlement is a sound exercise of their business judgment, so are the Setoff Principles.  The Committee understands that the Debtors considered all the facts and circumstances surrounding the claims of creditors that are subject to the Debtors' rights of setoff and arrived at an appropriate and equitable approach for resolving the many factual and legal issues involved.

---

[51]     DCG eventually got around to paying most of the outstanding by December 2023, albeit a substantial portion was repaid in the wrong consideration in contravention of the clear terms of the MLA.

[52]     *See* Geer Declaration ¶ 26.

[53]     DCG Obj. ¶ 66.

54.     In sum, the DP Settlement and Plan (including the Setoff Principles) are not the result of "clandestine" or "backroom" discussions.[54]  They are the result of necessity after DCG's inappropriate conduct left the Debtors and their creditors with no choice but to reach an agreement without DCG.  DCG was given every opportunity to reach a consensual resolution in these cases— they failed and are now crying foul in a desperate attempt to forestall a reasonable Plan that has been accepted by the near-total majority of creditors.

**III.    The Court Should Overrule the Crypto AHG's Objection that They Are Entitled to Administrative Priority Claims or Rejection Damage Claims Under Bankruptcy Code Section 562**

55.     As noted above, the Crypto AHG Objection is not properly viewed as an objection to either the Plan or the DP Settlement.[55]  In fact, it appears that only one creditor in the Crypto AHG voted to reject the Plan and that the remaining eight abstained.[56]  Instead, the Crypto AHG Objection asserts two primary protests to the Plan.  *First*, it argues that its members should be entitled to postpetition administrative expense claims because of the postpetition appreciation in value of the crypto they lent the Debtors.  *Second*, the Crypto AHG argues that its members' MLAs and loan term sheets are executory covered contracts that are being rejected under the Plan and therefore section 562 of the Bankruptcy Code requires their damages to be measured as of the Effective Date.  Both arguments fail as a matter of law.

*A.    The Crypto AHG Is Not Entitled to Postpetition Administrative Expense Claims.*

56.     The Crypto AHG's assertion that its members' claims are entitled to administrative expense priority is unsupported by law and fact and should be overruled.

---

[54]     DCG Obj. ¶ 7.

[55]     Crypto AHG Obj. ¶ 11 ("To be clear, the CCAHG does not object to confirmation of the Plan."). The Crypto AHG's position as to whether the Plan should be confirmed, however, is unclear.  Crypto AHG Obj. ¶ 19 ("The Plan should not be confirmed because . . . [.]).

[56]     Amended Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Chapter 11 Plan (Feb. 12, 2024) [Docket No. 1295].

57.     To qualify for administrative priority, a postpetition expense must arise "out of a transaction between the creditor and bankrupt's trustee or debtor in possession . . . and 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'" *Trs. of the Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (internal citations omitted) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).   Courts must construe priority statutes narrowly.   *See Fin. of Am. LLC v. Mortg. Winddown LLC (In re Ditech Holding Corp.)*, 630 F. Supp.3d 554, 567 (S.D.N.Y. 2022) ("As a general rule, the Bankruptcy Code's priority statutes are construed narrowly because they 'cut against the general goal in bankruptcy law to distribute limited debtor assets equally among similarly situated creditors[.]'") (citations omitted). The Crypto AHG has not met this high bar for administrative expense priority.

58.     The Crypto AHG asserts that its members' MLAs and loan term sheets are "postpetition transactions between the Debtors and the Members" that were induced by the Debtors because of their automatic renewal provisions.[57]  As an initial matter, this argument fails as to the loan term sheets, which are the agreements pursuant to which the members' loans were issued under the MLAs, because they do not contain automatic renewal provisions.   While the MLAs may contain automatic renewal provisions, the Crypto AHG cites no authority for its position that those provisions transform a prepetition contract into postpetition transactions.   To the contrary, courts in this District routinely hold that automatic renewal of contracts with unmodified terms are not "postpetition transactions" and instead are merely continuations of the same contract.   *See Ray Larsen Assocs. v. NIKKO Am., Inc.*, No. 89 Civ. 2809 (BSJ), 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) (holding that automatic renewals are not creations of new contracts and do not alter the original date of formation); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d

---

[57]     Crypto AHG Obj. ¶¶ 21-22.

566, 570 (2d Cir. 1991) ("Renewal normally involves 'a continuation of the relationship on essentially the same terms and conditions as the original contract'") (citations omitted). The Debtors have not affirmatively assumed any of the MLAs by allowing automatic renewal or otherwise. Here, the Debtors have simply maintained the status quo under the automatically renewed contracts. This does not constitute postpetition performance under a contract, and it is black letter law that there is no "implied" assumption of contracts in bankruptcy. *See Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 188 B.R. 347, 356 (Bankr. S.D.N.Y. 1995) ("[B]ecause the plain language of the Code provides that an executory contract cannot be assumed without court order, the notion of 'assumption by conduct' is almost universally rejected.").

59. Even if the Court were to find that postpetition automatic renewals of the MLAs did constitute postpetition transactions, the Debtors did not induce the Crypto AHG members to renew the contracts. Postpetition inducement by the Debtors is a crucial element in determining whether administrative priority should be granted. *See, e.g.*, *In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010) ("The services performed by the claimant must have been 'induced' by the debtor-in-possession, not the pre-petition debtor. . . . [B]enefit to the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority[.]"); *see also In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) ("To serve the policy of the priority, inducement of the creditor's performance by the *debtor-in-possession* is crucial to a claim for administrative priority . . . ."); *In re Chateaugay Corp.*, 156 B.R. 391, 399 (S.D.N.Y. 1993) ("the Bankruptcy Code confers an administrative priority only when a debtor . . . induces a creditor to confer a post-petition benefit up on the estate"), *aff'd*, 10 F.3d 944 (2d Cir. 1993). There is no evidence that the Debtors induced the performance of the Crypto AHG by allowing the automatic renewal of their MLAs at various intervals throughout the Chapter 11 Cases.

60.     To be sure, the Crypto AHG asserts that "providing Genesis with the ability to: (i) retain their crypto; (ii) obtain the benefit of the increase in crypto prices; and (iii) use that crypto to increase potential recoveries" establishes their performance under the four-prong test for inducement under New York law.[58]  The Crypto AHG emphasizes that "the Debtors' retention of these appreciating assets following the renewal of the Genesis Contracts provided clear value to the Debtors."[59]  At bottom, though, the Crypto AHG Objection seeks administrative claims *for the appreciation in the crypto market since the Petition Date*—which appreciation was caused neither by the Debtors nor the members of the Crypto AHG.  If administrative claims for an appreciation in value were approved, debtors-in-possession—particularly crypto debtors—could potentially be exposed to myriad claims for administrative expense priority based on unforeseen circumstances wholly out of the debtors', and their transacting counterparties', control.

61.     Accordingly, for the reasons set forth herein and in the Debtors' confirmation brief, the Committee respectfully requests that the Crypto AHG's request for administrative expense priority on account of any appreciation in value of their crypto holdings be overruled.

B.      *The Crypto AHG 562 Argument Fails and Constitutes an Election to Have Their Claims Treated as U.S. Dollar Claims.*

62.     The Crypto AHG's second objection is that section 562(a) of the Bankruptcy Code applies to its members' claims because their MLAs are executory contracts subject to safe harbors that will be rejected by the terms of the Plan on the Effective Date.[60]  As a result, the group argues, its members' claims should be measured as of the date of "rejection," i.e., the Effective Date.[61]

---

[58]     *Lebetkin v. Giray*, Nos. 20-1374, 20-4229, 2021 WL 2965323, at *3 (2d Cir. July 14, 2021) (inducement under New York law requires "(1) *the performance of services in good faith*, (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services.") (emphasis added) (quotations and citations omitted).

[59]     Crypto AHG Obj. ¶ 23.

[60]     Crypto AHG Obj. ¶¶ 51-57.

[61]     *Id.* ¶ 57.

63.    As an initial matter, the Crypto AHG's Objection is properly viewed as an election to have their claims treated as U.S. dollar denominated claims.  As previously noted, the Plan is grounded in the DP Settlement reached between the Debtors and groups of customers holding crypto and U.S. dollar claims.  The fundamental premise of the DP Settlement is that crypto creditors will receive their contractual entitlements to the fullest extent possible.  Based on consistent and persistent customer feedback, that premise has been one of the Committee's goals from the beginning of these cases.  Notwithstanding this nearly unanimous chorus from crypto creditors, the Crypto AHG (comprised of nine crypto creditors) organized and now expresses a different preference—to have their contracts deemed rejected under the Plan, and by consequence have their resulting claims classified and treated under the Plan as U.S. dollar claims.  The Committee views this stated preference as an election to opt out of the DP Settlement underlying the Plan and be treated differently from all other crypto creditors.

64.    Having made this election (and by continuing to prosecute their Objection at confirmation), the electing creditors should be bound to that decision and treated as U.S. dollar creditors for all purposes, even if the Court rejects their stated section 562 arguments.  To do otherwise would give the members of the Crypto AHG a one-way, free option at the expense of the estates and all their peer creditors.  The Crypto AHG's desire for optionality explains their rather curious (and contradictory) statement that they do not actually object to confirmation of the Plan.[62]  Essentially, the Crypto AHG's gambit is as follows:  if they win on section 562, they get more of the estate at the expense of other similarly situated creditors, and if they lose on section 562, they get the treatment they otherwise have stated they do not object to.  This Court should not countenance such gamesmanship, and instead should hold the Crypto AHG members to their

---

[62]    Crypto AHG Obj. ¶ 11 ("to be clear, the CCAHG does not object to confirmation of the Plan. However, certain of the provisions in the Plan—namely, the valuation of the CCAHG's claims and the releases—prevent the Plan from being confirmed.").

election to have their claims treated as U.S. dollar claims. The only question then would be whether these U.S. dollar claims should be valued in U.S. dollars as of the Petition Date or the Effective Date.

65.     As to this issue, the answer is clear. To have their U.S. dollar claims valued as of the Effective Date, the Crypto AHG must prevail on its argument that its members' MLAs are executory contracts that are rejected under the Plan in addition to meeting the other requirements of section 562. But the Crypto AHG's argument under section 562 suffers from the fatal and obvious flaw that the MLAs and loan term sheets are not executory.

66.     The reason the MLAs and loan term sheets are not executory is self-evident from the face of the agreements themselves, which are contracts for the loaning of an asset by the customer to the Debtors, with a resulting liability from the Debtors to the customer for the return of the asset. Once the loan was made, the only performance remaining under the MLAs was the repayment of such loan. A number of courts in this Circuit have found a loan agreement to not be executory when the only material obligation remaining is repayment of a loan previously extended. *See In re Chateaugay Corp*. 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) ("[I]t is undisputed that 'where one party to a contract has no post-petition obligation (*or no such obligation other than payment of money*), the contract will not be found to be executory.'") (citations omitted); *see also In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 3154763 at *4 (Bankr. S.D.N.Y. Aug. 4, 2008) (finding contracts to not be executory where debtor "would not gain any benefit by assuming the [agreement] because [the counterparty] had nothing left to give [the debtor] under that agreement"); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011) (contract counterparty "does not assert that the . . . Note is an executory contract . . . , accepting the obvious fact that the only obligation remaining to be performed by [the debtors] under the . . . Note is repayment and that loan agreements are generally not considered to be executory contracts").

67.    Executory contracts by their nature are a bundle of assets and liabilities for the estate.  If the value to the estate of the assets outweighs the burden of performance by the estate, then the estate will assume that contract, but if the burdens outweigh the benefits of the assets under the contract, then the debtor will reject the contract.  *See In re Bradlees Stores, Inc.*, Nos. 00-16033, 00-16035, 00-16036, 2001 WL 34809984 at *6 (Bankr. S.D.N.Y. Mar. 28, 2001) ("the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate") (internal citations omitted)).  Here, there is no benefit to the Debtors from rejecting the MLAs, as the Debtors have no postpetition obligations other than the obligation to pay the customers back for their loans, which is a burden that cannot be relieved by rejection.  Indeed, upon information and belief, in the more than one-year period these cases have been pending, neither the Debtors nor any of the customers have performed in any way under these contracts.  That is itself evidence that these are not executory contracts.

68.    The existence of incidental or *de minimis* outstanding obligations does not make a contract executory.  *See Chateaugay*, 102 B.R. at 347-48 ("immaterial, *de minimis*, remote and contingent obligations . . . are not sufficient to make [the a]greements executory contracts for purposes of § 365 of the Code").  Here, the material purpose of the MLAs and loan term sheets was the loaning of U.S. dollars or Digital Assets. Each of the items listed by the Crypto AHG as unperformed obligations are not material, but rather incidental and *de minimis* to this main purpose, and in most instances are not mutual obligations (but rather one way).

69.    Because the MLAs are not executory contracts, the Crypto AHG's section 562 argument fails.  To be clear one last time, if the Crypto AHG presses its section 562 objection and fails, the appropriate result should be that their claims must be paid in U.S. dollars, which under the Plan are valued as of the Petition Date.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court (i) approve the DP Settlement, (ii) overrule the Objections, (iii) enter the Confirmation Order, and (iv) grant such other relief as the Court deems just, proper, and equitable.

Dated: February 15, 2024
New York, New York

Respectfully submitted,

By: */s/ J. Christopher Shore*

**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
Colin T. West
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
        philip.abelson@whitecase.com
        colin.west@whitecase.com
        michele.meises@whitecase.com

– and –

Amanda Parra Criste (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: aparracriste@whitecase.com

*Counsel to Official Committee of Unsecured Creditors*