CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF AMENDED JOINT CHAPTER 11 PLAN

**PLEASE TAKE NOTICE** that, on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Holdco") and certain of its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on January 20, 2023, the Debtors filed the *Debtors' Joint Chapter 11 Plan*, ECF No. 20.

**PLEASE TAKE FURTHER NOTICE** that, on June 13, 2023, the Debtors filed the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 427 (the "June 13 Plan")

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

**PLEASE TAKE FURTHER NOTICE** that, on October 24, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 838 (the "October 24 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on November 4, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 886 (the "November 4 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on November 7, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 897 (the "November 7 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on November 17, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 948 (the "November 17 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on November 27, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 979 (the "November 27 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on November 28, 2023, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 989 (the "November 28 Plan").

**PLEASE TAKE FURTHER NOTICE** that, on February 15, 2024, the Debtors filed a further revised version of the *Debtors' Amended Joint Chapter 11 Plan,* ECF No. 1325 (the "Amended Plan").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a full blackline comparison of the Amended Plan against the November 28 Plan.

**PLEASE TAKE FURTHER NOTICE** copies of the filings can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov, or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, at https://restructuring.ra.kroll.com/genesis or by calling +1 212 257 5450. Note that a PACER password is needed to access documents on the Court's website.

Dated:    February 15, 2024
         New York, New York

*/s/ Sean A. O'Neal*_____
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999


*Counsel to the Debtors and Debtors-in-Possession*

## EXHIBIT A

**Blackline Comparison of the Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

---

## DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

Dated: ~~November 28, 2023~~February 15, 2024

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

| | | |
|---|---|---|
| A. | *Defined Terms* | 1 |
| B. | *Rules of Interpretation* | ~~28~~30 |
| C. | *Computation of Time* | ~~29~~31 |
| D. | *Governing Law* | ~~29~~31 |
| E. | *Reference to Monetary Figures* | ~~29~~31 |
| F. | *Reference to the Debtors or the Wind-Down Debtors* | ~~29~~31 |
| G. | *Controlling Document* | ~~30~~32 |

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

| | | |
|---|---|---|
| A. | *Administrative Expense Claims* | ~~30~~32 |
| B. | *Professional Compensation* | ~~31~~33 |
| C. | *Priority Tax Claims* | ~~32~~34 |
| D. | *Statutory Fees* | ~~32~~34 |
| E. | *Restructuring Fees and Expenses* | ~~33~~35 |

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| A. | *Classification of Claims* | ~~33~~35 |
| B. | *Treatment of Claims Against and Interests in GGH* | ~~36~~38 |
| C. | *Treatment of Claims Against and Interests in GGC* | ~~41~~43 |
| D. | *Treatment of Claims Against and Interests in GAP* | ~~46~~48 |
| E. | *Special Provision Governing Unimpaired or Reinstated Claims* | ~~50~~53 |
| F. | *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* | ~~51~~53 |
| G. | *Elimination of Vacant Classes* | ~~51~~53 |
| H. | *Voting Classes; Presumed Acceptance by Non-Voting Classes* | ~~51~~54 |
| I. | *Intercompany Interests* | ~~51~~54 |
| J. | *Controversy Concerning Impairment* | ~~51~~54 |
| K. | *Subordinated Claims* | ~~51~~54 |

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

| | | |
|---|---|---|
| A. | *Wind-Down Debtors* | ~~52~~54 |
| B. | *Means for Implementation* | ~~59~~62 |
| C. | *GAP and GGC Intercompany Settlement* | ~~68~~70 |
| D. | *GGC and GGH Intercompany Settlement* | ~~68~~70 |

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases* .......... ~~68~~71
B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim Related Thereto* .......... ~~69~~72
C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* .......... ~~70~~72
D.    *Indemnification Obligations* .......... ~~71~~74
E.    *Insurance Policies* .......... ~~71~~74
F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements* .......... ~~71~~74
G.    *Reservation of Rights* .......... ~~72~~74
H.    *Nonoccurrence of Effective Date* .......... 72

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed* .......... ~~72~~75
B.    *Disbursing Agent and Gemini Distribution Agent.* .......... ~~73~~75
C.    *Delivery of Distributions and Undeliverable or Unclaimed Distribution* .......... ~~74~~77
D.    *Manner of Payment* .......... ~~76~~79
E.    *Compliance with Tax Requirements* .......... ~~77~~79
F.    *Foreign Currency Exchange Rate* .......... ~~77~~80
G.    *Surrender of Cancelled Instruments or Securities* .......... ~~77~~80
H.    *Allocations* .......... ~~78~~80
I.    *No Postpetition Interest on Claims* .......... ~~78~~80
J.    *Setoffs and Recoupment* .......... ~~78~~80
K.    *Claims Paid or Payable by Third Parties* .......... ~~78~~81

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims* .......... ~~79~~82
B.    *Claims and Interests Administration Responsibilities* .......... ~~80~~82
C.    *Estimation of Claims* .......... ~~80~~82
D.    *Adjustment to Claims or Interests Without Objection* .......... ~~80~~83
E.    *Time to File Objections to Claims* .......... ~~81~~83
F.    *Disallowance of Claims* .......... ~~81~~83
G.    *Amendments to Claims* .......... ~~81~~84
H.    *No Distributions Pending Allowance* .......... ~~82~~84
I.    *Disputed Claims Reserve* .......... 84
~~I~~J.    *Single Satisfaction of Claims* .......... ~~82~~85

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies* .......... ~~82~~85
B.    *Term of Injunctions or Stays* .......... ~~82~~86

| C. | *Release of Liens* | ~~83~~86 |
| D. | *Releases by the Debtors* | ~~83~~86 |
| E. | *Releases by Releasing Parties* | ~~85~~88 |
| F. | *Exculpation* | ~~86~~89 |
| G. | *Injunction* | ~~87~~90 |
| H. | *Additional Provisions Regarding Governmental Units* | ~~88~~91 |
| I. | *Protection Against Discriminatory Treatment* | ~~88~~91 |
| J. | *Recoupment* | ~~88~~92 |
| K. | *Reimbursement or Contribution* | ~~89~~92 |
| L. | *Document Retention* | ~~89~~92 |

### ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

| A. | *Conditions Precedent to the Effective Date* | ~~89~~93 |
| B. | *Waiver of Conditions* | ~~90~~94 |
| C. | *Substantial Consummation* | ~~91~~94 |
| D. | *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date* | ~~91~~94 |

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

| A. | *Modification and Amendments* | ~~91~~94 |
| B. | *Effect of Confirmation on Modifications* | ~~92~~95 |
| C. | *Revocation or Withdrawal of the Plan* | ~~92~~95 |

### ARTICLE XI.
### RETENTION OF JURISDICTION

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

| A. | *Immediate Binding Effect* | ~~94~~98 |
| B. | *Additional Documents* | ~~95~~98 |
| C. | *Reservation of Rights* | ~~95~~98 |
| D. | *Successors and Assigns* | ~~95~~98 |
| E. | *Service of Documents* | ~~95~~99 |
| F. | *Entire Agreement* | ~~97~~100 |
| G. | *Exhibits* | ~~97~~100 |
| H. | *Nonseverability of Plan Provisions* | ~~97~~100 |
| I. | *Votes Solicited in Good Faith* | ~~98~~101 |
| J. | *Request for Expedited Determination of Taxes* | ~~98~~101 |
| K. | *Closing of Chapter 11 Cases* | ~~98~~101 |
| L. | *No Stay of Confirmation Order* | ~~98~~102 |
| M. | *Waiver or Estoppel* | ~~98~~102 |
| N. | *Dissolution of the Committee* | ~~99~~102 |

> **THE PLAN IS THE PRODUCT OF EXTENSIVE AND ONGOING NEGOTIATION AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, GEMINI, AND THE AD HOC GROUP OF GENESIS LENDERS, AND REFLECTS SUBSTANTIAL AGREEMENT ON CERTAIN KEY ISSUES.**
>
> ~~**HOWEVER, DISCUSSIONS AMONG SUCH PARTIES REMAIN ONGOING. FOR THE AVOIDANCE OF DOUBT, AS OF THE DATE HEREOF, EACH OF THE DEBTORS, THE COMMITTEE, GEMINI, AND THE AD HOC GROUP RESERVE ALL RIGHTS WITH RESPECT TO THE PLAN.**~~

## INTRODUCTION

Genesis Global Holdco, LLC and its affiliated debtors, as Debtors and debtors-in-possession in the above-captioned chapter 11 cases, jointly propose this amended chapter 11 plan ~~for~~to address the ~~resolution of~~ outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "**3AC**" means Three Arrows Capital, Ltd. and any of its Affiliates.

2.    "**3AC/Genesis Settlement Agreement**" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with the Joint Liquidators of Three Arrows Capital, Ltd.* [Docket No. 906]~~.~~, which was approved by the Bankruptcy Court in the 3AC/Genesis Settlement Order, pursuant to which, among other things, 3AC holds a single Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC in the aggregate amount of

1

$33,000,000, the treatment of which for all purposes under the Plan shall be on the terms and conditions set forth in the 3AC/Genesis Settlement Agreement.

3. "***3AC Claims***" means, collectively, any Claims asserted by, or on behalf of, 3AC against a Debtor, including any alleged preference and other avoidance and related claims*./**Genesis Settlement Order*" means that certain *Order Approving Settlement Agreement Between the Genesis Debtors and the Joint Liquidators of Three Arrows Capital, Ltd.* [Docket No. 1012].

4. "***Ad Hoc Group***" means the ad hoc group of creditors of GGC represented by Proskauer Rose LLP, which ad hoc group of creditors is comprised of members purporting to hold no less than $2.3 billion in Claims asserted against GGC as of October 20, 2023.

5. "***Ad Hoc Group Counsel***" means Proskauer Rose LLP.

6. "***Ad Hoc Group Restructuring Expenses***" means, subject to the terms and conditions of the existing fee reimbursement letters executed by the Debtors, all accrued, but unpaid, documented fees and expenses of the Ad Hoc Group Counsel in connection with the Restructuring.

7. "***Ad Hoc Group SteerCo***" means the steering committee of the Ad Hoc Group, the composition of which may be modified from time to time.

8. "***Ad Hoc Group's Consent***" means the consent of the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Ad Hoc Group's Consent pursuant to the Plan, the Ad Hoc Group's Consent shall be deemed granted to the extent the PSA Creditors, through the Ad Hoc Group Counsel, have received written notice of such matter and the PSA Majority Creditors have not, within five (5) Business Days of the Ad Hoc Group Counsel's receipt of such notice, objected in writing to the Person requesting the Ad Hoc Group's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, none of the Ad Hoc Group, the Ad Hoc Group SteerCo, or any of the members of the Ad Hoc Group (including any PSA Creditors) shall have any consent rights with respect to any matter relating to any of the Definitive Documents if the PSA has been terminated by its terms as to all parties thereto.

9. "***Additional GBTC Shares***" means 31,180,804 GBTC shares held by the Debtors, against which Gemini has asserted a security interest on behalf of the Gemini Lenders.

10. "***Additional GBTC Shares Reserve***" means the amount of Additional GBTC Shares that is required to be held in reserve by the Debtors until the Gemini Additional Collateral Determination has occurred, the amount of which shall be established prior to the Effective Date by (i) the Debtors and Gemini, with the Committee's Consent and the Ad Hoc Group's Consent, or (ii) an order of the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order; *provided* that, prior to seeking a judicial determination pursuant to foregoing clause (ii), the Debtors and Gemini shall have engaged in good faith negotiations with

2

respect to the Additional GBTC Shares Reserve, and the Committee and the Ad Hoc Group shall have been given the opportunity to contemporaneously participate in such negotiations, through the date that is ten (10) days prior to the Voting Deadline; and, *provided, further,* that any determination by the Bankruptcy Court in accordance with clause (ii) above shall be limited to the amount of the Additional GBTC Shares Reserve during the pendency of the Gemini Additional Collateral DeterminationReserve Principles.

11.    "***Administrative Expense Claim***" means any Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses; (ii) Allowed Professional Fee Claims; (iii) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (iv) unless the PSA has been terminated by its terms as to all parties thereto prior to the Effective Date as a result of one or more breaches by the PSA Creditors, (a) the Ad Hoc Group Restructuring Expenses and (b) the Dollar Group Restructuring Fees and Expenses.

12.    "***Administrative Expense Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Expense Claims, which: (i) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be sixty (60) days after the Effective Date.

13.    "***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that directly or indirectly wholly ownswholly owns or controls such Entity other than a Debtor, or any other Entity that is directly or indirectly wholly-owned or controlled by such Entity other than a Debtor.

14.    "***Alameda/Genesis Settlement Agreement***" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [Docket No. 603], which was approved by the Bankruptcy Court in the Alameda/Genesis Settlement Order, pursuant to which, among other things, Alameda Research Ltd. holds a single Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC in the aggregate amount of $175,000,000, the treatment of which for all purposes under the Plan shall be on the terms and conditions set forth in the Alameda/Genesis Settlement Agreement.

15.    "***Alameda/Genesis Settlement Order***" means that certain *Order Approving the Settlement Agreement Between the Genesis Entities and the FTX Entities* [Docket No. 806].

16.    "***Allowed***" means, with reference to any Claim or Interest, except as otherwise provided herein, (i) (a) any Claim or Interest arising on or before the Effective Date that is either (x) evidenced by a Proof of Claim or Interest that is, as applicable, timely Filed by the applicable

Claims Bar Date, or (y) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed by the applicable Claims Bar Date, and (b) as to which no objection to allowance has been interposed within the time period set forth in the Plan and such Claim or Interest is not Disputed or as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder or (ii) any Claim or Interest expressly allowed under the Plan or by a Final Order of the Bankruptcy Court; *provided* that, notwithstanding the foregoing, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes to the applicable Debtor or Wind-Down Debtor; *provided further* that any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed.

17.     "***Alt-Coin***" means a type of Digital Asset that is not BTC, ETH, or a Stablecoin.

18.     "***Alt-Coin-Denominated Unsecured Claim***" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in an Alt-Coin.

19.     "***Assets***" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

20.     "***Average Price***" means the average price in U.S. dollars of the applicable type of Distributable Asset or the applicable GBTC shares or ETHE shares during the period commencing fifteen (15) calendar days prior to the entry of the Confirmation Order and ending fifteen (15) calendar days following the entry of the Confirmation Order.

21.     "***Avoidance Actions***" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

22.     "***Avoidance Recoveries***" means any proceeds arising from Avoidance Actions, including the proceeds from any settlements thereof.

23.     "***Ballots***" means the ballots, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent, approved pursuant to the Disclosure Statement Order and distributed to Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

24.     "***Bankruptcy Code***" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

25.    "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

27.    "***Bar Date Order***" means the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [Docket No. 200], which set the Claims Bar Date and the Governmental Bar Date.

28.    "***BCH***" means Bitcoin Cash, a Digital Asset that is a fork of BTC created in 2017.

29.    "***Bidding Procedures***" means the procedures governing the Sale Process approved in the *Order Authorizing the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 192], as such procedures may be modified in accordance with their terms.

30.    "***BTC***" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

31.    "***BTC-Denominated Unsecured Claim***" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in BTC.

32.    "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

33.    "***Cash***" or "***$***" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks, and other similar items.

34.    "***Cause of Action***" means, whether asserted against a Debtor or any other Person or Entity, any action, claim, cause of action, controversy, third-party claim, dispute, proceeding, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law.  For the

5

avoidance of doubt, a "Cause of Action" includes: (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of fiduciary duty, or violation of state or federal law, including securities laws, negligence, and gross negligence; (iii) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or Interests; (iv) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including any action under section 542 of the Bankruptcy Code or any Avoidance Actions); (v) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any state or foreign law fraudulent transfer or similar claim.

35.     "***Chapter 11 Cases***" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

36.     "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

37.     "***Claims Bar Date***" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim must be Filed for all Claims and Interests (other than for Administrative Expense Claims and Claims held by Governmental Units).

38.     "***Claims Objection Deadline***" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (i) one hundred eighty (180) days after the Effective Date, (ii) ninety (90) days after the Filing of a Proof of Claim, (iii) such other period of limitation as may be fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to a Claim, or (iv) such other date as is established by (a) if such date is on or prior to the date that is one (1) year after the Effective Date, the filing of a notice by the Wind-Down Debtors prior to the then-current Claims Objection Deadline or (b) if such date is after the date that is one (1) year after the Effective Date, an order of the Bankruptcy Court following the filing of a motion by the Wind-Down Debtors prior to the then-current Claims Objection Deadline.

39.     "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

40.     "***Claims Reserve***" means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date and comprised of Cash (or, at the option of the Debtors in the case of Secured Claims that are secured by Digital Assets, Digital Assets)as applicable, according to the Distribution Principles, in the amount of the applicable Claims Reserve Amount, less any portion of such amount that is distributed on the Effective Date pursuant to the Plan, which reserve shall vest in the applicable Wind-Down Debtor as of the Effective Date.

41.     "***Claims Reserve Amount***" means, with respect to each Debtor, the sum of (i) the applicable Priority Claims Reserve Amount, (ii) the applicable Secured Claims Reserve Amount, and (iii) the applicable Disputed Claims Reserve Amount for the initial Distribution Date, and

(iv) the estimated aggregate face amount of accrued but unpaid Administrative Expense Claims (excluding Professional Fee Claims) against such Debtor as of the Effective Date.

42.    "*Class*" means a category of Claims against or Interests in the Debtors, pursuant to section 1122(a) of the Bankruptcy Code, as set forth in Article III of the Plan.

43.    "*Committee*" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee on February 3, 2023, as described in further detail in the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 53].

44.    "*Committee Counsel*" shall mean White & Case LLP, in its capacity as counsel to the Committee.

45.    "*Committee's Consent*" means the consent of the Committee (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Committee's Consent pursuant to the Plan, the Committee's Consent shall be deemed granted to the extent the Committee has received written notice of such matter and has not, within five (5) Business Days of the Committee's receipt of such notice, objected in writing to the Person requesting the Committee's Consent as to such matter.

46.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

47.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

48.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

49.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, with respect to which the Debtors shall have obtained (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent, and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares, (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Confirmation Order is not consistent with the terms set forth in the Plan (including the Distribution Principles and the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing as of the entry of such order).

50.    "*Consummation*" means the occurrence of the Effective Date.

51.     "**_Cure Claim_**" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

52.     "**_Cure Notice_**" means a notice of a proposed amount, including an amount of $0.00, to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (i) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (ii) Cure Claims to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes; _provided_ that, if no Cure Claim is listed for any assumed Executory Contract or Unexpired Lease, the Cure Claim shall be $0.00.

53.     "**_D&O Liability Insurance Policies_**" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of the Debtors and any agreements, documents, and instruments related thereto.

54.     "**_DCG_**" means Digital Currency Group, Inc.

55.     "**_DCG Claim_**" means any Claim asserted by, or on behalf of, any of the DCG Parties.

56.     "**_DCG Loans_**" means, collectively, those certain loans, and all obligations of DCG thereunder, issued under a certain Amended and Restated Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated November 10, 2022 between GGC (as lender) and DCG (as borrower), including (i) that certain loan issued under a loan term sheet originally dated January 24, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the initial principal amount of $100 million and current principal amount of $41.5 million due May 11, 2023, (ii) that certain loan issued under a loan term sheet originally dated February 23, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the initial principal amount of $100 million due on May 11, 2023, (iii) that certain loan issued under a loan term sheet dated May 9, 2022 in the initial principal amount of $200 million due on May 9, 2023, and (iv) that certain loan issued under a loan term sheet dated May 10, 2022 in the initial principal amount of $100 million due May 10, 2023.

57.     "**_DCG Note_**" means that certain unsecured $1.1 billion promissory note, dated as of June 30, 2022 and due on June 30, 2032, issued by DCG to GGC with an interest rate of one percent (1%) per annum, which interest, per the terms of the DCG Note, may be paid in kind at DCG's option.

58.     "**_DCG Parties_**" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; _provided_ that DCG Parties shall not include any

employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a similar arrangement (solely in their capacities as such) as of the Petition Date. For the avoidance of doubt, a DCG Party may also be an Excluded Party.

59.     "*DCG Tax Receivable*" means any receivable relating to taxes that is owed by any DCG Party to any Debtor.

60.     "*DCGI*" means DCG International Investments Ltd.

61.     "*DCGI Loans*" means, collectively, (i) that certain loan issued under a certain Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated June 21, 2019 and loan term sheet originally dated June 22, 2022, as amended by the loan term sheet dated November 10, 2022, by and between GGC (as lender) and DCGI (as borrower) due on May 11, 2023 in the initial principal amount of 4,550.45173345 BTC and current principal amount of 3,990.90560624 BTC, (ii) that certain term loan dated September 21, 2020 with aan initial principal amount equal to 8,948 BCH, and (iii) that certain term loan dated December 21, 2020 with aan initial principal amount equal to 5,107 BCH, in each case, including all obligations of DCGI thereunder.

62.     "*Debtors*" means, collectively, GGH, GGC, and GAP.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors from and after the Effective Date shall mean the Wind-Down Debtors to the extent context requires.

63.     "*Debtors' Fiduciary Duty Action*" means any action that a Debtor takes, or refrains from taking, with ten (10) calendar days advance notice to and in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, upon the good faith determination by the Special Committee, upon the advice of counsel, that fiduciary obligations of such Debtor under applicable law require such Debtor to take or refrain from taking such action.

64.     "*Definitive Documents*" means: (i) the Plan (and any and all exhibits, annexes, and schedules thereto); (ii) the Confirmation Order; (iii) the Disclosure Statement and all other solicitation materials with respect to the Plan; (iv) the Disclosure Statement Order; (v) the Plan Supplement; (vi) the New Governance Documents; (vii) the Plan Administration Agreement; (viii) the Litigation Oversight Committee Bylaws and the Wind-Down Oversight Committee Bylaws; (ix) the Alameda/Genesis Settlement Agreement, (x) the Turnover Actions; (xi) any new material employment, consulting, or similar agreements; and (xii) all documentation with respect to any post-emergence management incentive plan; and (xiii) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

65.     "*Digital Asset*" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by

a centralized authority, including Stablecoins, digital coins, and tokens, such as security tokens, utility tokens, nonfungible tokens, and governance tokens.

66.   "**Digital Assets Conversion Table**" means the conversion table showing Digital Asset values in their equivalent U.S. dollar values using the price of the applicable Digital Asset as of 11:11 p.m. (prevailing Eastern time) on the Petition Date, the form of which shall be included in the Plan Supplement.

67.   "**Disallowed**" means any Claim or Interest, or any portion thereof, that: (i) has been disallowed by Final Order, settlement, the Plan, or Confirmation; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; or (iii) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; *provided*, *however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

68.   "**Disbursing Agent**" means the PA Officer or the Entity or Entities selected by the ~~PA Officer~~Debtors, with the Ad Hoc Group's Consent and the Committee's Consent with respect to distributions made on the Effective Date, and thereafter by the ~~consent of~~PA Officer with the Wind-Down Oversight Committee's Consent, to make or facilitate distributions pursuant to the Plan.

69.   "**Disclosure Statement**" means the disclosure statement with respect to the Plan, as may be amended, supplemented, or modified from time to time, subject to the Committee's Consent and the Ad Hoc Group's Consent.

70.   "**Disclosure Statement Order**" means the ~~o~~Order *Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 1027] (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof), subject to the Committee's Consent and the Ad Hoc Group's Consent.

71.   "**Disputed**" means, with respect to any Claim or Interest, that such Claim or Interest (or a portion thereof) (i) is not yet Allowed, (ii) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (iii) ~~as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with~~is subject to a pending objection that has been Filed and has not been resolved pursuant to a Final Order of the ~~non-b~~Bankruptcy ~~law~~Court, or (iv) is or is hereafter listed in the Schedules as contingent, unliquidated, or disputed

and for which a Proof of Claim is or has been timely Filed in accordance with the Bar Date Order.

72.    "*Disputed Claims Reserve*" means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date, supplemented on or before each Distribution Date, and comprised of Cash or Digital Assets, as applicable, according to the Distribution Principles, in the amount of the applicable Disputed Claims Reserve Amount, which reserve shall vest in the applicable Wind-Down Debtor as of the applicable Distribution Date.

73.    "*Disputed Claims Reserve Amount*" means, for each Distribution Date, Distributable Assets in an amount to be determined by the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer for distributions on account of Disputed Claims that are subsequently Allowed after the applicable Distribution Date, in accordance with Article VII.I of the Plan.

74.    72.  "*Distributable Assets*" means, in accordance with and pursuant to the Distribution Principles, for each Debtor or Wind-Down Debtor, after the Debtors have made the Required Reserve Payments, such Debtor's or Wind-Down Debtor's (i) Cash, (ii) Digital Assets, and (iii) to the extent allocated to such Debtor or Wind-Down Debtor in the discretion of the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or, following the Effective Date, the discretion of the PA Officer, (a) Avoidance Recoveries, including any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties, (b) proceeds from the Partial Repayment Agreement, (c) proceeds from any Monetization Transactions (other than those allocated to GGT, and with respect to a Monetization Transaction performed by the Gemini Distribution Agent to the extent permitted under the Plan, only for the benefit of the Holders of Allowed Gemini Lender Claims subject to the Gemini Reserve Principles), and (d) proceeds from the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof; *provided*, *however*, that Digital Assets shall only constitute Distributable Assets (x) on the Effective Date if the Debtors determine, no later than seven (7) Business Days prior to the Effective Date, and in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, after considering legal, financial, tax, and other factors in good faith, that such Digital Assets are available for distribution to Holders of Allowed Claims or Interests on the Effective Date or (y) at any time after the Effective Date if the PA Officer determines, with the Wind-Down Oversight Committee's Consent, and after considering legal, financial, tax, and other factors in good faith, that such Digital Assets held by such Wind-Down Debtor are available for distribution to Holders of Allowed Claims or Interests as provided for under the Plan; *provided*, *however*, that, if the Committee or PSA Majority Creditors disagree with the Debtors on whether any Digital Assets held by a Debtor should constitute Distributable Assets of such Debtor on the Effective Date, the Committee or the PSA Majority Creditors may seek a determination from the Bankruptcy Court on an expedited basis.

75.    "*Distribution Calculation Date*" means (i) for the initial Distribution Date, the date determined by the Debtors (in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors), the PA Officer (in consultation with the Wind-Down Oversight Committee), or as designated in a Final Order, and (ii) for each subsequent

Distribution Date (if any), such date(s) determined by the PA Officer (in consultation with the Wind-Down Oversight Committee) or as designated in a Final Order.

76.    73. "***Distribution Date***" means, except as otherwise set forth herein, the date or dates determined by the Debtors, the Wind-Down Debtors, or the PA Officer, in consultation with the Committee, the Ad Hoc Group, or the Wind-Down Oversight Committee, as applicable, on or after the Effective Date upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

77.    74. "***Distribution Principles***" means the distribution mechanics described in Exhibit A attached to the Plan, which shall be subject to in all respects (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent, and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan (including the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing); *provided* that, for the avoidance of doubt, the calculation of the Individual Claim Value (as defined in the Distribution Principles) asserted against the Debtors' Estates is solely for purposes of allocating the Debtors' Assets to Holders of such Claims under the Plan and does not change the nature or denomination of any Claim and is not intended to operate, nor be construed, as an admission or waiver by any Person as to the value of any Claim denominated in a type of Digital Asset.

78.    75. "***Distribution Record Date***" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date announced by the Debtors (in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors), the PA Officer (in consultation with the Wind-Down Oversight Committee), or as designated in a Final Order.

79.    76. "***Dollar Group Counsel***" means Pryor Cashman LLP.

80.    77. "***Dollar Group Restructuring Fees and Expenses***" means, subject to the terms and conditions of the PSA, all accrued, but unpaid, documented fees and expenses of the Dollar Group Counsel in connection with the Restructuring.

81.    78. "***Effective Date***" means the date on which: (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX hereof have been satisfied or waived (in accordance with Article IX.B hereof); and (iii) the Plan is declared effective in accordance with its terms; *provided*, *however*, that, if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

82.    79. "***Enjoined Actions***" has the meaning set forth in Article VIII.G of the Plan.

83.    80. "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

84.    ~~81.~~ "***Equity Security***" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

85.    ~~82.~~ "***Estate***" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

86.    "***ETCG***" means shares of Grayscale Ethereum Classic Trust.

87.    ~~83.~~ "***ETH***" means ether, the native Digital Asset of the Ethereum blockchain, as described in https://ethereum.org/en/what-is-ethereum/.

88.    ~~84.~~ "***ETH-Denominated Unsecured Claim***" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in ETH.

89.    ~~85.~~ "***ETHE***" means that certain Grayscale Ethereum Trust, a trust managed and operated by DCG.

90.    ~~86.~~ "***Exchange Act***" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

91.    ~~87.~~ "***Excluded Claim***" means (i) any claim, Cause of Action, or other item expressly provided for or preserved in this Plan and (ii) any claim for intercompany amounts (including any amounts owed between a Debtor and a subsidiary of GGH that is not a Debtor) as set forth in a schedule to be Filed as an exhibit to the Plan Supplement.

92.    "***Excluded Party***" means, in their individual capacities, (i) Barry Silbert, (ii) Mark Murphy, (iii) Michael Kraines, and (iv) Ducera Partners LLC and its Affiliates and subsidiaries, and any current or former employee, officer, or director of Ducera Partners LLC or its Affiliates and subsidiaries who was engaged by, or performed services for, DCG, DCGI, or any of their respective Affiliates and subsidiaries during the one (1)-year period prior to the Petition Date. For the avoidance of doubt, an Excluded Party may also be a DCG Party.

93.    "***Excluded Party Claim***" means any Claim asserted by, or on behalf of, any Excluded Party.

94.    ~~88.~~ "***Exculpated Party***" means (i) the Debtors, (ii) the ~~Wind-Down Debtors, (iii) the~~ Committee and its members (solely in their capacities as such), (iv~~iii~~) the members of the Ad Hoc Group SteerCo (solely in their capacities as such), ~~(v) the PA Officer (solely in its capacity as such), (vi) the members of the Wind-Down Oversight Committee (solely in their capacities as such), (vii) the members of the Litigation Oversight Committee (solely in their capacities as such), (viii~~iv) the Gemini Distribution Agent (solely in its capacity as such and any exculpation limited solely to the extent the Gemini Distribution Agent is implementing the Plan), and (ix~~v~~) each Related Party of each Entity described in the foregoing clauses (i)–(viii~~iv~~) (in each case, solely in such Person's capacity as such); *provided* that the Related Parties of the Gemini Distribution Agent shall only be Exculpated Parties in respect of actions that are directly in

furtherance of the performance by the Gemini Distribution Agent of its duties under the Plan; *provided further* that, notwithstanding anything to the contrary in the Plan, the DCG Parties shall not be Exculpated Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date shall not be Exculpated Parties; *provided still further* that any of the current and former employees, officers, and directors of the Debtors (solely in ~~such Person's~~their capacit~~y~~ies as such) who served as employees, officers, or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a similar arrangement (solely in their capacities as such) as of the Petition Date, shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Exculpated Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, who shall not be Exculpated Parties.

95. ~~89.~~ "***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

96. ~~90.~~ "***Federal Judgment Rate***" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

97. ~~91.~~ "***Fiat-or-Stablecoin-Denominated Unsecured Claim***" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in Cash, Foreign Currency, or a Stablecoin.

98. ~~92.~~ "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent or the Bankruptcy Court through the PACER or CM/ECF website.

99. ~~93.~~ "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

100. ~~94.~~ "***Final Order***" means an order or judgment of the Bankruptcy Court or another a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which is in full force and effect and has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for writ of certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or writ of certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however,* for the avoidance of doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; and, *provided, further*, that no

14

order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

101. 95. "***Foreign Currency***" means, any government-issued currency other than Cash and, solely for purposes of the Plan, not including any Digital Assets.

102. 96. "***GAP***" means Genesis Asia Pacific Pte. Ltd.

103. 97. "***GAP/GGC Settlement***" means the compromise, settlement, and resolution of Intercompany Claims by and between GAP and GGC pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.C of the Plan.

104. "***GAP Director***" means the Person selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, which person shall be a resident of Singapore; *provided* that, if the GAP Director needs to be replaced from or after the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any such replacement.

105. 98. "***GBTC***" means that certain Grayscale Bitcoin Trust, a trust managed and operated by DCG.

106. 99. "***Gemini***" means Gemini Trust Company, LLC.

107. 100. "***Gemini Acceptance Event***" means Gemini has agreed, in writing prior to the Confirmation Hearing, to (i) support the Plan, (ii) not object to, delay, impede, or take any other action that interferes with acceptance or implementation of the Plan, and (iii) encourage the Gemini Lenders to vote to accept the Plan.

108. 101. "***Gemini Additional Collateral Determination***" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining whether Gemini, on behalf of the Gemini Lenders, has a ~~valid~~non-avoidable security interest in or constructive trust over the Additional GBTC Shares.

109. 102. "***Gemini Asset Value***" means the sum of the value of (i) solely to the extent that the Gemini GBTC Shares Determination is determine~~s~~d ~~that Gemini, on behalf of the Gemini Lenders, has a valid security interest in the Gemini GBTC Shares~~in favor of Gemini, the Gemini GBTC Shares, as determined by the Gemini Deficiency Claim Determination, (ii) the Gemini Reserved Coins using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent, (iii) the Gemini Earn Operations Assets using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent, and (iv) solely to the extent that the Gemini Additional Collateral Determination is determine~~s~~d ~~that Gemini, on behalf of the Gemini Lenders, has a valid security interest in or constructive trust over the Additional GBTC Shares~~in favor of Gemini, the Additional GBTC Shares as of the Gemini Additional Collateral

Determination; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from the calculation of the Gemini Asset Value if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated; and, *provided*, *further*, that (1) for each Distribution Date prior to the Gemini Deficiency Claim GBTC Shares Determination, the Gemini GBTC Shares shall be excluded from the calculation of Gemini Asset Value, including for purposes of calculating the Remainder Gemini Lender Claims (as defined in the Distribution , and (2) if the Gemini GBTC Shares Determination is determined in favor of Gemini, for each Distribution Date prior to the Gemini Deficiency Claim Determination, distributions under the Plan will be made in accordance with Section 2(c)(ii) of the Gemini Reserve Principles).

110.    103.  "***Gemini Deficiency Claim Determination***" means, solely if the Gemini GBTC Shares Determination results in the entry of an order providing that the Gemini GBTC Shares are not property of GGC or are not recoverable by GGC on account of any Avoidance Actions is determined in favor of Gemini, the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining the value of the Gemini GBTC Shares (and any counterclaims or defenses thereto) for purposes of determining the Gemini Asset Value and making distributions to Holders of Allowed General Unsecured Claims under the Plan (including the Gemini Reserve Principles and the Gemini Lender Distribution Principles).

111.    104.  "***Gemini Determinations***" means, together, the Gemini Additional Collateral Determination, the Gemini GBTC Shares Determination, and the Gemini Deficiency Claim Determination.

112.    105.  "***Gemini Distribution Agent***" means Gemini or an entity appointed by Gemini, with the prior written consent of the Debtors and with the Committee's Consent and the Ad Hoc Group's Consent if appointed before the Effective Date, and thereafter with the prior written consent of the Wind-Down Oversight Committee, solely in its capacity as agent for the Debtors and the Wind-Down Debtors to make or facilitate distributions to Gemini Lenders pursuant to the Plan.

113.    106.  "***Gemini Earn Agreements***" means those certain Master Digital Loan Agreements entered into among GGC, Gemini, and certain users of Gemini pursuant to which such users agreed to lend certain Digital Assets to GGC, with Gemini acting as custodian and agent for such users in certain respects.

114.    "***Gemini Earn Operations Assets***" means the Cash and Digital Assets held by Gemini and owed to the Debtors, as set forth on the Gemini Earn Operations Assets Schedule.

115.    "***Gemini Earn Operations Assets Schedule***" means the schedule of Cash and Digital Assets held by Gemini and owed to the Debtors attached as Exhibit H to the Disclosure Statement.

116.    ~~107.~~ "**Gemini Earn Program**" means the transactional arrangement among GGC, Gemini, and the Gemini Lenders as set forth in the Gemini Earn Agreements.

117.    ~~108.~~ "**Gemini GBTC Shares**" means the 30,905,782 GBTC shares provided by GGC and maintained by Gemini for the benefit of the Gemini Lenders, which were purportedly foreclosed upon by Gemini on November 16, 2022.

118.    ~~109.~~ "**Gemini GBTC Shares Determination**" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining (i) ownership of the Gemini GBTC Shares, including whether any foreclosure by Gemini took place, or (ii) whether the Gemini GBTC Shares are subject to Avoidance Actions, including, but not limited to, on account of theories of preferential or fraudulent transfers, for purposes of determining whether Gemini (x) is required to apply the value of the Gemini GBTC Shares to satisfy the Allowed Gemini Lender Claims and/or (y) is required to return the Gemini GBTC Shares to the Debtors' Estates for distribution among all Holders of Allowed General Unsecured Claims under the Plan, in each case in accordance with the Gemini Reserve Principles.

119.    ~~110.~~ "**Gemini GBTC Shares Reserve**" means the amount of Gemini GBTC Shares that is required to be held in reserve by Gemini or the Gemini Distribution Agent ~~until the Gemini GBTC Shares Determination and the Gemini Deficiency Claim Determination have occurred, which shall mean all of the Gemini GBTC Shares or such other amount that is established prior to the Effective Date by (i) the Debtors and Gemini, with the Committee's Consent and the Ad Hoc Group's Consent, or (ii) an order of the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order; *provided* that, prior to seeking a judicial determination pursuant to foregoing clause (ii) or reserving all of the Gemini GBTC Shares, the Debtors and Gemini shall have engaged in good faith negotiations, and the Committee and the Ad Hoc Group shall have been given the opportunity to contemporaneously participate in such negotiations, with respect to the Gemini GBTC Shares Reserve through the date that is ten (10) days prior to the Voting Deadline; *provided*, *however*, that any determination by the Bankruptcy Court under the foregoing clause (ii) shall be limited to the amount of the Gemini GBTC Shares Reserve during the pendency of the Gemini GBTC Shares Determination and the Gemini Deficiency Claim Determination.~~in accordance with the Gemini Reserve Principles.

120.    ~~111.~~ "**Gemini Lender Claim**" means a General Unsecured Claim held by a Gemini Lender in connection with the Gemini Earn Program.

121.    "***Gemini Lender Distribution Principles***" means the principles governing the distributions on account of Allowed Gemini Lender Claims described in Exhibit [●] of the Plan Supplement, which reflect the agreement of the Debtors, Gemini, the Committee, and the Ad Hoc Group.

122.    112. "**Gemini Lenders**" means the users of Gemini participating in the Gemini Earn Program pursuant to the Gemini Earn Agreements.

123.    113. "**Gemini Parties**" means, collectively, Gemini, its predecessors, successors and assigns, parents, subsidiaries, and Affiliates, and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies and such persons' respective heirs, executors, estates, servants, and nominees.

124.    114. "**Gemini Preference Action**" means the adversary proceeding seeking to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01203 (SHL) against Gemini and the Gemini Lenders.

125.    115. "**Gemini Preference Determination**" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining whether GGC is entitled to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders.

126.    "**Gemini Recovery Event**" means the payment in full in accordance with the Distribution Principles of the Gemini Lender Claims (after accounting for the Gemini Determinations).

127.    "**Gemini Reserve Principles**" means the principles governing the Additional GBTC Shares Reserve and the Gemini GBTC Shares Reserve described in Exhibit [●] of the Plan Supplement, which reflect the agreement of the Debtors, Gemini, the Committee, and the Ad Hoc Group.

128.    116. "**Gemini Reserved Coins**" means those Digital Assets, identified on Exhibit D to the Proof of Claim Filed by Gemini against GGC at Claim No. 356, that Gemini holds on behalf of the Gemini Lenders.

117. "**Gemini Earn Operations Assets**" means the Cash and Digital Assets held by Gemini and owed to the Debtors, as set forth on the Gemini Earn Operations Assets Schedule.

118. "**Gemini Earn Operations Assets Schedule**" means the schedule of Cash and Digital Assets that the Debtors, in consultation with Gemini, identify as being held by Gemini and owed to the Debtors.

119. "**Gemini Insider**" means Gemini, its predecessors, successors and assigns, parents, subsidiaries, and Affiliates, and any of their respective insiders, including any Person that is (i) a member of Gemini, (ii) an officer of Gemini, (iii) a Person in control of Gemini, (iv) a partnership in which Gemini is a general partner, (v) a general partner of Gemini, or (vi) a relative of a general partner, member, officer, or Person in control of Gemini.

129. ~~120.~~ "*Gemini's Consent*" means the consent of Gemini (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on Gemini's Consent pursuant to the Plan, Gemini's Consent shall be deemed granted to the extent Gemini's Counsel has received written notice of such matter and has not, within five (5) Business Days of Gemini Counsel's receipt of such notice, objected in writing to the Person requesting Gemini's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, Gemini shall have no consent rights (i) with respect to any matter relating to any of the Definitive Documents unless the Gemini Acceptance Event has occurred and is continuing and (ii) with respect to any matters pertaining to (a) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (b) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

130. ~~121.~~ "*General Unsecured Claim*" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than a Government Penalty Claim, an Intercompany Claim, or a Subordinated Claim). Any Government Penalty Claims, Intercompany Claims, or Subordinated Claims shall not constitute General Unsecured Claims.

131. ~~122.~~ "*Genesis Platform*" means, in consultation with the Committee, one or more of the following: (i) GGML, (ii) GGCI, and (iii) any other subsidiaries of GGH.

132. ~~123.~~ "*GGC*" means Genesis Global Capital, LLC.

133. ~~124.~~ "*GGC/GGH Settlement*" means the compromise, settlement, and resolution of Intercompany Claims by and between GGC and GGH pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.D of the Plan.

134. ~~125.~~ "*GGCI*" means GGC International Limited.

135. ~~126.~~ "*GGH*" means Genesis Global Holdco, LLC.

136. ~~127.~~ "*GGML*" means Genesis Global Markets Limited.

137. ~~128.~~ "*GGT*" means Genesis Global Trading, Inc.

138. ~~129.~~ "*Governmental Bar Date*" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

139. ~~130.~~ "*Government Penalty Claims*" means any Claims asserted by Governmental Units for any fine, penalty, forfeiture, or damages to the extent such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss as provided for by section 726(a)(4) of the Bankruptcy Code, including~~, for~~ the ~~avoidance of doubt, any~~ Claims asserted ~~against the Debtors by the Attorney General of the State of New York in that certain complaint, dated as of October 19, 2023, styled *N.Y. v. Gemini, et al*. and filed before the Supreme Court of the State of New York.~~in Claim Nos. 740, 768, 769, 770, 842, 843, 855, 856, 857, 861, 862, 863, 879, 880, 881, 882, 883, 884, 886, 888, 889, 890, 891, 892, 893, and 894 solely to the extent the

classification of such Claims is not otherwise agreed or resolved in accordance with an order of the Bankruptcy Court.

140. 131. "***Governmental Unit***" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

141. 132. "***Holder***" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

142. 133. "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

143. 134. "***Indemnification Obligations***" means each of the Debtors' existing indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company in management agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for any Persons who served as an employee, director, or officer of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a similar arrangement (solely in their capacities as such) as of the Petition Date, other than any Persons who are also DCG Parties or Gemini Parties.  For the avoidance of doubt, the Debtors or Wind-Down Debtors shall not indemnify any Person for any claims or Causes of Action arising out of or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct.

144. 135. "***Insider***" has the meaning set forth in section 101(31) of the Bankruptcy Code.

145. 136. "***Intercompany Claim***" means any Claim against a Debtor held by another Debtor.

146. 137. "***Intercompany Interest***" means any Interest in a Debtor held by another Debtor.

147. 138. "***Interest***" means any Equity Security in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in such Debtor, whether or not transferable, including any option, warrant, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

148. 139. "***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended.

149. 140. "***IRS***" means the Internal Revenue Service.

150.    141. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

151.    142. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

152.    143. "*Litigation Oversight BTC Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

153.    144. "*Litigation Oversight Committee*" means an oversight committee of seven (7) members mutually appointed by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, pursuant to Article IV.A.4 of the Plan to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws.

154.    145. "*Litigation Oversight Committee Bylaws*" means the bylaws to be adopted by the Litigation Oversight Committee on the Effective Date, which shall set forth the governance of the Litigation Oversight Committee and its members, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent, and in substantially the form included in the Plan Supplement.

155.    146. "*Litigation Oversight Committee's Consent*" means the consent of the Litigation Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Litigation Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Litigation Oversight Committee's Consent pursuant to the Plan, the Litigation Oversight Committee's Consent shall be deemed granted to the extent the Litigation Oversight Committee has received written notice of such matter and has not, within five (5) Business Days of the Litigation Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Litigation Oversight Committee's Consent as to such matter.

156.    147. "*Litigation Oversight Crossover Member*" means at least one (1) member of the Litigation Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

157.    148. "*Litigation Oversight ETH Member*" means the one (1) member of the Litigation Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

158.    149. "*Litigation Oversight Fiat-or-Stablecoin Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are

21

Fiat-or-Stablecoin-Denominated Unsecured Claims; *provided*, *however*, that such positions shall be eliminated from the Litigation Oversight Committee upon the occurrence of a USD Recovery Event.

159.   150.  "***Litigation Oversight Gemini Lender Member***" means at least one (1) member of the Litigation Oversight Committee (unless a Gemini Recovery Event occurs), the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in either (i) BTC or (ii) such other Digital Asset denomination (which Digital Asset denomination will not consist solely of Stablecoin or Alt-Coin) as jointly determined by the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) and the Committee.

160.   151.  "***Litigation Reserve***" means the Cash allocated in the Wind-Down Budget with respect to the litigation of any Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties, the amount of which shall be subject to the Committee's Consent and the Ad Hoc Group's Consent and is currently estimated at up to $40 million.[70] million.  For the avoidance of doubt, all fees and expenses incurred by the Litigation Oversight Committee, including through its retention of professionals (if any), shall be satisfied through the Litigation Reserve.

161.   152.  "***Loan Collateral***" means collateral in the form of Digital Assets provided in connection with any loan taken or extended by the Debtors; *provided*, *however*, that the Additional GBTC Shares and the Gemini GBTC Shares shall not constitute Loan Collateral for purposes of Article IV.B.16 of the Plan.

162.   153.  "***Local Rules***" means the Local Bankruptcy Rules for the Southern District of New York.

163.   154.  "***Monetization Transaction***" means any transaction that results in the sale, monetization, or liquidation of any of the assets of the Debtors or the Wind-Down Debtors, including any such transaction performed by the Gemini Distribution Agent with respect to the Gemini GBTC Shares, the Gemini Earn Operations Assets, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), or any assets of the Debtors or the Wind-Down Debtors distributed to the Gemini Distribution Agent.

155.  "***Money Transmitter Licenses***" means any license or similar authorization of a Governmental Unit that an Entity is required to obtain to operate as a broker of Digital Assets.

164.   156.  "***New Board***" means the fivethree (53)-member board of Wind-Down GGH, as determined pursuant to Article IV.B.7 of the Plan and the Plan Supplement.  For the avoidance of any doubt, the New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of sevenfive (75) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors; *provided*, *however*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace any members of the New Board who needs to be replaced by submitting a

22

list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board.

165. ~~157.~~ "***New Governance Documents***" means the organizational and corporate governance documents of the Wind-Down Debtors and each of their subsidiaries, including certificates of incorporation, certificates of formation, certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents), which shall be in form and substance reasonably acceptable to the Debtors, subject to the Committee's Consent and the Ad Hoc Group's Consent.

166. "***OAG***" means the New York State Office of the Attorney General.

167. "***OAG/Genesis Settlement Agreement***" means that certain settlement agreement between OAG and the Debtors, as described in that certain Stipulation and Consent to Judgment and that certain Order and Judgment on Consent attached as Exhibit C and Exhibit D, respectively, to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [Docket No. 1275], pursuant to which, if the OAG/Genesis Settlement Agreement is approved by a Final Order of the Bankruptcy Court, among other things, OAG would hold a single Allowed General Unsecured Claim against each of the Debtors in the aggregate amount of the OAG Claims Amount that, notwithstanding anything to the contrary in the Plan (including the Distribution Principles), would be paid after payment in full in accordance with the Distribution Principles of all Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Intercompany Claims and other Allowed General Unsecured Claims against the Debtors (subject to the exceptions set forth in the OAG/Genesis Settlement Agreement) on the terms and conditions set forth in the OAG/Genesis Settlement Agreement, including that any distributions made in respect of the OAG Claims Amount would be turned over to the Holders of Allowed General Unsecured Claims against the Debtors in a manner consistent with the Distribution Principles (in accordance with, and subject to the exceptions set forth in, the OAG/Genesis Settlement Agreement).  For the avoidance of doubt, OAG is not a Releasing Party and does not release any claim it has or may have against any of the Other Defendants (as defined in the OAG/Genesis Settlement Agreement) or, except to the extent provided in the OAG/Genesis Settlement Agreement, against the Debtors.

168. "***OAG Claims Amount***" shall have the meaning ascribed to it in the OAG/Genesis Settlement Agreement.

169. ~~158.~~ "***Other Genesis Entities***" means, collectively, the following subsidiaries of GGH other than GGC and GAP: Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited, GGC International Limited, GGA International Limited, Genesis Global Markets Limited, GSB 2022 II LLC, GSB 2022 III LLC and GSB 2022 I LLC.

170.    159.  "*Other Priority Claim*" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

171.    160.  "*PA Officer*" means the Person or Entity appointed pursuant to Article IV.A of the Plan (or any successor), in his or her capacity as such.

161.  "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

162.  "*Petition Date*" means January 19, 2023.

172.    163.  "*Partial Repayment Agreement*" means that certain Partial Repayment Agreement, dated September 12, 2023 and filed at ECF No. 4, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Case No. 23-01168 (Bankr. S.D.N.Y. Sept. 13 12, 2023), and ECF No. 6, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Case No. 23-01169 (Bankr. S.D.N.Y. Sept. 12, 2023), entered into by and among GGC, DCG, and DCGI, as it may be amended, modified, or supplemented from time to time., including as amended pursuant to that certain Amendment to Partial Repayment Agreement, dated November 28, 2023 and filed at ECF No. 11, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Case No. 23-01168 (Bankr. S.D.N.Y. Nov. 28, 2023), and ECF No. 11, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Case No. 23-01169 (Bankr. S.D.N.Y. Nov. 28, 2023).

173.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

174.    "*Petition Date*" means January 19, 2023.

175.    164.  "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, including, for the avoidance of doubt, the Distribution Principles.  For the avoidance of doubt, subject to the terms of Article X.A hereof, any alterations, amendments, or modifications to the Plan are subject to the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification).

176.    165.  "*Plan Administration Agreement*" means that certain agreement by and among the Wind-Down Debtors and the PA Officer, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors, the Committee, and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), and in substantially the form included in the Plan Supplement.

177.    166.  "*Plan Supplement*" means the forms of documents effectuating the Restructuring, each of which shall be subject to the Committee's Consent and the Ad Hoc Group's Consent, including, to the extent applicable, (i) the New Governance Documents, (ii) the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, and the

Wind-Down Oversight Committee Bylaws, (iii) an exhibit disclosing the identity and affiliations of the PA Officer and any Person proposed to serve on the New Board or proposed to serve as an officer of any of the Wind-Down Debtors, (iv) the Schedule of Assumed Executory Contracts and Unexpired Leases, (v) an exhibit identifying the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee, (vi) an exhibit identifying the intercompany claims that shall constitute Excluded Claims, (vii) an exhibit identifying Retained Causes of Action, ~~and~~ (viii) the Gemini Reserve Principles, (ix) the Gemini Lender Distribution Principles, and (x) the Digital Assets Conversion Table, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline or as soon as reasonably practicable thereafter.

178. ~~167.~~ "*Preference Claims*" means all claims and Causes of Action~~s~~ that may be asserted pursuant to section 547 of the Bankruptcy Code by the Debtors and the Debtors' Estates, including, without limitation, any successors in interest thereto~~, against a Holder of Claims (excluding any DCG Party, Gemini Party, or officers and directors of the Debtors who did not have such position as of or after the Petition Date) with respect to payments or transfers that any such Holder may have received, in each case, during the ninety (90)-day period prior to the Petition Date.~~.

179. ~~168.~~ "*Priority Claims Reserve Amount*" means, with respect to each Debtor, the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Expense Claims, against such Debtor that are either (i) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code or (ii) asserted to be entitled to such priority in a Proof of Claim validly submitted on or before the Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims.

180. ~~169.~~ "*Priority Tax Claim*" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

181. ~~170.~~ "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

182. ~~171.~~ "*Professional Fee Claims*" means a Claim for the compensation of any Professional and the reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been previously paid pursuant to an order of the Bankruptcy Court, including, for the avoidance of doubt, any costs,

fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring.

183. ~~172.~~ "***Professional Fee Escrow Account***" means an interest-bearing escrow account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B hereof.

184. ~~173.~~ "***Professional Fee Reserve Amount***" means the total amount of Professional Fee Claims estimated in accordance with Article II.B hereof.

185. ~~174.~~ "***Proof of Claim***" means a timely-filed proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

186. ~~175.~~ "***PSA***" means that certain Plan Support Agreement (No Deal) entered into by and among (a) the Debtors, (b) certain Holders of Allowed General Unsecured Claims, and (c) the Committee, dated as of November 20, 2023.

187. ~~176.~~ "***PSA Creditors***" means, collectively, the Holders of Allowed General Unsecured Claims who are parties to the PSA at any given time.

188. ~~177.~~ "***PSA Majority Creditors***" means, collectively, as of the relevant date, PSA Creditors holding in excess of fifty percent (50%) of the aggregate principal amount of asserted General Unsecured Claims held or controlled by PSA Creditors.

189. ~~178.~~ "***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

190. ~~179.~~ "***Related Party***" means, in their capacities as such, with respect to any Entity, such Entity's predecessors, successors and assigns, parents, subsidiaries, Affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees; *provided* that, for the avoidance of doubt, with respect to the Gemini Distribution Agent, the term "Related Party" shall include any Entity that is under common control with the Gemini Distribution Agent.

191. ~~180.~~ "***Released Party***" means (i) the Debtors, (ii) the Ad Hoc Group SteerCo and its members (solely in their capacities as such), (iii) the Committee and its members (solely in their capacities as such), and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such); *provided, however*, that, notwithstanding anything to the contrary in the Plan, neither the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date shall be Released Parties; and, *provided*, *further*, that any of the current or former employees, officers, or directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer, or director of the Debtors from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a

similar arrangement (solely in their capacities as such) as of the Petition Date, shall be a Released Party only with the prior written consent and justifications of the Special Committee, which justifications shall be set forth in the Plan Supplement and which Persons shall be provided to the Ad Hoc Group Counsel and the Committee Counsel on a confidential, professional-eyes-only, basis, with the express exception of any current or former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, which Persons shall not be Released Parties.

192.   181.   "*Releasing Party*" means each of the following: (i) all Released Parties and (ii) all Holders of Claims who affirmatively (a) cast a timely Ballot to accept the Plan with respect to any Claim held by such Holder (regardless of whether any such Holder casts a timely ballot to reject the Plan with respect to any other separately-classified Claims) and (b) indicate on such Ballot that they opt into in to the releases provided by provisions in Article VIII of the Plan on their Ballots.

193.   "*Remainder Gemini Lender Claims*" shall have the meaning ascribed to it in the Distribution Principles.

194.   182.   "*Required Reserve Payments*" means the Debtors' payments to fund, in accordance with the terms of this Plan and on or prior to the Effective Date, (i) the Claims Reserves, (ii) the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount, (iii) the Wind-Down Reserves, and (iv) the Litigation Reserve.

195.   "*Resolved Preference Claims*" means, if a Class of Claims entitled to vote on the Plan votes to accept the Plan, any Preference Claims against (i) any Holder of Claims in such Class (excluding any DCG Party, Excluded Party, or officer or director of the Debtors who did not have such position as of or after the Petition Date) or (ii) any Person (excluding any DCG Party, Excluded Party, or officers or directors of the Debtors who did not have such position as of or after the Petition Date) that is not entitled to vote on the Plan because it received payment in full on its claims against the Debtors prior to the Petition Date and whose claims, if they had not been paid in full prior to the Petition Date, would be Claims in such Class; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, none of the Debtors' or the Wind-Down Debtors' claims or Causes of Action related to the Additional GBTC Shares or the Gemini GBTC Shares shall constitute Resolved Preference Claims for purposes of the Plan or the Confirmation Order.

196.   183.   "*Restructuring*" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, or contemplated by the Plan.

197.   184.   "*Retained Causes of Action*" means those Causes of Action, if any, that belong to the Debtors or their Estates under section 1123(b)(3) of the Bankruptcy Code (including any Causes of Action that belong to the Other Genesis Entities) and are preserved and retained by the Wind-Down Debtors under the Plan, including any Preference Claims (other than the Resolved Preference Claims), and are not released, waived, or transferred to another Person pursuant to the Plan, which shall include (but not be limited to) (i) all such Causes of Action or

other claims against any of the Gemini Parties, any of the Excluded Parties, or any of the DCG Parties and (ii) any other Causes of Action or other claims identified in a schedule attached to the Plan Supplement.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the Retained Causes of Action shall not include (x) any claim or Cause of Action belonging solely to a Holder of a Claim (other than a Debtor or an Other Genesis Entity), including any such claim or Cause of Action that is based on gross negligence, fraud, or willful misconduct of another Person, or (y) if a Class of Claims entitled to vote on the Plan votes to accept the Plan, anyany Resolved Preference Claims against any Holder of Claims in such Class (excluding any DCG Party, Gemini Insider, or officers or directors of the Debtors who did not have such position as of or after the Petition Date).

198.  185.  "*Sales Process*" means the marketing and sales process for the Genesis Platform conducted pursuant to the Bidding Procedures.

199.  186.  "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors or the Wind-Down Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time prior to the Effective Date, which shall be in form and substance subject to the Committee's Consent.

200.  187.  "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

201.  188.  "*SEC*" means the United States Securities and Exchange Commission.

202.  "*SEC/Genesis Settlement Agreement*" means that certain settlement agreement between the SEC and GGC, as described in the Consent of Genesis Global Capital, LLC, in the form attached as Exhibit C, and Final Judgment as to Genesis Global Capital, LLC, in the form attached as Exhibit D, to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between Genesis Global Capital, LLC and the U.S. Securities and Exchange Commission* [Docket No. 1220], pursuant to which, if the SEC/Genesis Settlement Agreement is approved by a Final Order of the Bankruptcy Court, among other things, the SEC would hold a single Allowed General Unsecured Claim against GGC in the aggregate amount of $21,000,000 that, notwithstanding anything to the contrary in the Plan (including the Distribution Principles), would be paid after payment in full in accordance with the Distribution Principles of all Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Intercompany Claims and other Allowed General Unsecured Claims against GGC on the terms and conditions set forth in the SEC/Genesis Settlement Agreement.

203.  189.  "*Secured Claim*" means a Claim (i) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law, as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy

Code, (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code, or (iii) Allowed, pursuant to a Final Order of the Bankruptcy Court, as a secured Claim.

204. 190. "*Secured Claims Reserve Amount*" means, with respect to each Debtor, the aggregate amount of Claims against such Debtor that are deemed by Final Order of the Bankruptcy Court to be a Secured Claim.

205. 191. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

206. 192. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

207. 193. "*Solicitation Agent*" means Kroll Restructuring Administration LLC, the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

208. 194. "*Solicitation Materials*" means all solicitation materials in respect of the Plan together with the Disclosure Statement, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent.

209. 195. "*Special Committee*" means that certain Special Committee of the Board of Directors of GGH, established on November 18, 2022, comprised of Paul Aronzon and Thomas Conheeney.

210. 196. "*Stablecoin*" means a type of Digital Asset designed to reduce price volatility through either (i) pegging the value of the Digital Asset to a reserve asset, such as a fiat currency, exchange-traded commodity, or another Digital Asset, or (ii) algorithmically regulating the supply of the Digital Asset.

211. 197. "*Subordinated Claim*" means any Claim against a Debtor (i) arising from (a) rescission of a purchase or sale of a Security in any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim or (ii) that is equitably or otherwise subordinated, including pursuant to section 510(c) of the Bankruptcy Code.

212. 198. "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

213. 199. "*Turnover Actions*" means, collectively, the adversary proceedings seeking turnover of certain property from DCG and DCGI pursuant to Ssection 542(b) of the Bankruptcy Code by filing the *Complaint*, ECF No. 1, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. No. 23-01168 (Bankr. SHL.D.N.Y. Sept. 6, 2023) against DCG and the

*Complaint*, ECF No. 1, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Adv. Pro. No. 23-01169 (Bankr. S~~HL~~.D.N.Y. Sept. 6, 2023) against DCGI.

214. ~~200.~~ "***Unclaimed Distribution***" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (i) accepted such distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (ii) given notice to the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agents, or the Gemini Distribution Agent, as applicable, of an intent to accept such distribution within one year of receipt; (iii) responded to the Debtors', the Wind-Down Debtors', the PA Officer's, the Disbursing Agent's, or the Gemini Distribution Agent's, as applicable, requests for information necessary to facilitate such distribution prior to the deadline included in such request for information; or (iv) timely taken any other action necessary to facilitate such distribution.

215. ~~201.~~ "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

216. ~~202.~~ "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, ~~including through payment in full in Cash~~and in accordance with the Distribution Principles or Reinstatement.

217. ~~203.~~ "***Unsecured***" means, with respect to a Claim, not a Secured Claim.

218. ~~204.~~ "***USD Recovery Event***" means the allocation or distribution, in accordance with the Distribution Principles, to Holders of Fiat-or-Stablecoin Denominated Unsecured Claims of Distributable Assets, the value of which ~~are~~is equal to the amount of such Holders' Fiat-or-Stablecoin Denominated Unsecured Claims.

219. ~~205.~~ "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of New York.

220. ~~206.~~ "***U.S. Trustee Fees***" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

221. ~~207.~~ "***Voting Deadline***" means the date established by the Disclosure Statement Order by which the Solicitation Agent must actually receive an otherwise valid vote on the Plan for such vote to count as a vote to accept or reject the Plan, subject to Article XII.H ~~hereof~~of the Plan.

222. ~~208.~~ "***Wind-Down Accounts***" means the bank accounts to be held in the name of the Wind-Down Debtors that are created pursuant to Article IV.A of the Plan.

223. ~~209.~~ "***Wind-Down Budget***" means that certain budget governing the fees, expenses, and disbursements required to fund the Wind-Down Debtors' Expenses until all distributions required to be made from the Wind-Down Debtors under the Plan are made, which shall be in form and substance reasonably acceptable to (i) prior to the Effective Date, the

Debtors and with respect to which the Debtors shall have obtained (i~~a~~) the Committee's Consent, (ii~~b~~) the Ad Hoc Group's Consent, and (iii~~c~~) solely as to matters pertaining to the Gemini Distribution Agent, Gemini's Consent and (ii) from and after the Effective Date, the PA Officer and with respect to which the PA Officer shall have obtained (a) the Wind-Down Oversight Committee's Consent and (b) solely as to matters pertaining to the Gemini Distribution Agent, Gemini's Consent.

224. ~~210.~~ "***Wind-Down Debtor Parties***" means the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and solely in their capacities as such, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives.

225. ~~211.~~ "***Wind-Down Debtors***" means Wind-Down GGC, Wind-Down GAP, and Wind-Down GGH, or any successor thereto, by merger, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.A hereof to, among other things, effectuate the wind down of such Debtors' Estates following the Effective Date, commence, litigate, and settle the Retained Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan, and make distributions pursuant to the terms of the Plan and the Plan Administration Agreement; *provided*, *however*, that, for the avoidance of doubt, the Wind-Down Debtors shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

226. ~~212.~~ "***Wind-Down Debtors' Assets***" means, for each Wind-Down Debtor, all Assets of the applicable Debtor's Estate.

227. ~~213.~~ "***Wind-Down Debtors' Beneficiaries***" means Holders in respect of their Allowed Claims or Allowed Interests that are entitled to receive distributions from the Wind-Down Debtors pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

228. ~~214.~~ "***Wind-Down Debtors' Expenses***" means, for each Wind-Down Debtor, any and all reasonable and documented fees, costs, and expenses incurred by such Wind-Down Debtor or the PA Officer (or any Disbursing Agent, Person, Entity, or professional engaged by the applicable Wind-Down Debtor or the PA Officer to effect distributions or otherwise assist the PA Officer with his or her duties under the Plan Administration Agreement) in connection with any of their duties under the Plan and the Plan Administration Agreement, including any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses, and the U.S. Trustee Fees, or costs to maintain certain assets while they are held.

229. ~~215.~~ "***Wind-Down GAP***" means GAP on and after the Effective Date.

230. ~~216.~~ "***Wind-Down GGC***" means GGC on and after the Effective Date.

231. ~~217.~~ "***Wind-Down GGH***" means GGH on and after the Effective Date.

232.   218. "***Wind-Down Oversight BTC Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

233.   219. "***Wind-Down Oversight Committee***" means an oversight committee of seven (7) members mutually appointed by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), pursuant to Article IV.A.3 of the Plan to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan and the Wind-Down Oversight Committee Bylaws.

234.   220. "***Wind-Down Oversight Committee Bylaws***" means the bylaws to be adopted by the Wind-Oversight Committee on the Effective Date, which shall set forth the governance of the Wind-Down Oversight Committee and its members, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent, and in substantially the form included in the Plan Supplement.

235.   221. "***Wind-Down Oversight Committee's Consent***" means the consent of the Wind-Down Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Wind-Down Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Wind-Down Oversight Committee's Consent pursuant to the Plan, the Wind-Down Oversight Committee's Consent shall be deemed granted to the extent the Wind-Down Oversight Committee has received written notice of such matter and has not, within five (5) Business Days of the Wind-Down Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Wind-Down Oversight Committee's Consent as to such matter.

236.   222. "***Wind-Down Oversight Crossover Member***" means at least one (1) member of the Wind-Down Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

237.   223. "***Wind-Down Oversight ETH Member***" means at least one (1) member of the Wind-Down Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

238.   224. "***Wind-Down Oversight Fiat-or-Stablecoin Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims.

239.   225. "***Wind-Down Oversight Gemini Lender Member***" means at least one (1) member of the Wind-Down Oversight Committee (unless a Gemini Recovery Event occurs), the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in either (i) BTC or (ii) such other Digital Asset

denomination (which Digital Asset denomination will not consist solely of Stablecoin or Alt-Coin) as jointly determined by the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) and the Committee.

240.    226. "*Wind-Down Reserve*" means, with respect to each Wind-Down Debtor, the amount set forth in the Wind-Down Budget to pay the Wind-Down Debtors' Expenses incurred in connection with making distributions or otherwise carrying out the PA Officer's duties under the Plan; *provided* that the Wind-Down Reserve shall exclude any Wind-Down Debtors' Expenses budgeted in connection with the Wind-Down Debtors' pursuit of the Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve. For the avoidance of doubt, all fees and expenses incurred by the Litigation Oversight Committee, including through its retention of professionals (if any), will be satisfied through the Litigation Reserve.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) the words "include" and "including" and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (10) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any effectuating provisions may be interpreted by the Debtors (or after the Effective Date, the Wind-Down Debtors or the PA Officer) in their or its sole discretion in a

manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity; and (14) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Wind-Down Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein. Unless otherwise expressly provided herein, references to Digital Assets denoted with a U.S. dollar value or "$" refer to the value of such Digital Assets in Cash as of the Petition Date, utilizing the conversion rates provided in the Digital Assets Conversion Table.

F.      *Reference to the Debtors or the Wind-Down Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires. References to the Wind-Down Debtors mean the Wind-Down Debtors or the PA Officer, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing, including the Distribution Principles but excluding the Plan Supplement), the terms of the Plan shall control in

34

all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order, the Plan, and the Plan Supplement, the Confirmation Order shall control.

<h2 style="text-align:center">ARTICLE II.<br>ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS</h2>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and statutory fees under section 1930 of the Judicial Code have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Expense Claims*

Except with respect to Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or, from and after the Effective Date, the applicable Wind-Down Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed, but in any event no later than ninety (90) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order; (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; (d) such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; and (e) such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date. Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors or, from and after the Effective Date, the Wind-Down Debtors a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or, from and after the Effective Date, the Wind-Down Debtors, or their respective assets or property. Objections to such requests, if any, must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors (if not the objecting party) and the requesting party no later than ninety (90) days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an

Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim that has been previously Allowed.

B.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors no later than sixty (60) days after the Effective Date.  Each such final request ~~will~~shall be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash ~~from the Professional Fee Escrow Account~~ up to their full Allowed amount <u>to the Professionals by the Disbursing Agent for the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed</u>.

If the Professional Fee Escrow Account is insufficient to ~~fund~~pay the full Allowed amounts of Professional Fee Claims, <u>the</u> remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Wind-Down Debtors, without any further <u>notice to or</u> action~~or~~, order<u>, or approval</u> of the Bankruptcy Court.  Obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and the requesting ~~party~~<u>Professional</u> no later than twenty (20) days after such <u>final request for payment of</u> Professional Fee Claim<u>s</u> is Filed with the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" ~~described~~<u>calculated</u> in Article II.B.3 of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals<u>, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way</u>.  Such funds shall not be considered property of the Estates of the Debtors or of the Wind-Down Debtors.  ~~The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Disbursing Agent for the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  After all such~~<u>After all</u> Allowed Professional Fee Claims have been <u>irrevocably</u> paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Wind-Down Debtors in accordance with Article IV.B.2.b <u>of the Plan</u> without any further <u>notice to or</u> action~~or~~, order<u>, or approval</u> of the Bankruptcy Court~~, but such estimate shall in no way limit or be deemed to limit such Professional's Allowed Professional Fee Claims~~.

3.      Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Effective Date, the Debtors shall request from Professionals estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such reasonable, good faith estimate to the Debtors in writing via e-mail two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter (including if such Allowed Priority Tax Claim will not be due and payable until after the Effective Date) or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

D.      *Statutory Fees*

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash.

After the Effective Date, each Wind-Down Debtor ~~will~~shall pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its respective Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first.  The Wind-Down Debtors shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

37

E.   *Restructuring Fees and Expenses*

Unless the PSA has been terminated by its terms as to all parties thereto prior to the Effective Date as a result of one or more breaches by the PSA Creditors, (i) the Ad Hoc Group Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date pursuant to (and subject to) the terms and conditions of the existing fee reimbursement letters executed by the Debtors, without the need to file a proof of such Claim and without further order of the Bankruptcy Court and (ii) the Dollar Group Restructuring Fees and Expenses incurred up to and including the Effective Date shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the PSA, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.   *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.   Classification of Claims Against and Interests in GGH

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept |

38

| | | | or Deemed to Reject |
|---|---|---|---|
| 10 | Interests | Impaired | Deemed to Reject |

2.   Classification of Claims Against and Interests in GGC

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Gemini Lender Claims | Impaired | Entitled to Vote |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

3.   Classification of Claims Against and Interests in GAP

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

39

| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
|----|------------------------|------------------------|----------------------------------------|

B.    *Treatment of Claims Against and Interests in GGH*

    1.    <u>Class 1 — Other Priority Claims</u>

        a.    *Classification*: Class 1 consists of all Other Priority Claims against GGH.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGH will, at the option of GGH or Wind-Down GGH, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGH, in each case, or as soon as reasonably practicable thereafter.

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 — Secured Claims</u>

        a.    *Classification*: Class 2 consists of all Secured Claims against GGH.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGH or Wind-Down GGH, as applicable, such Holder <u>of an Allowed Secured Claim against GGH</u> will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGH, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGH Unimpaired pursuant to section 1124 of the Bankruptcy Code.

        c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

    a.    *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

    b.    *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

4.    Class 4 — BTC-Denominated Unsecured Claims

    a.    *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGH.

    b.    *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.  *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

5.  Class 5 — ETH-Denominated Unsecured Claims

a.  *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGH.

b.  *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.  *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

6.  Class 6 — Alt-Coin-Denominated Unsecured Claims

a.  *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGH.

b.  *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such

42

Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.   *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

7.   <u>Class 7 — Subordinated Claims</u>

a.   *Classification*: Class 7 consists of all Subordinated Claims against GGH.

b.   *Treatment*: ~~Holders of~~The Subordinated Claims against GGH shall be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GGH, and the Subordinated Claims against GGH will not receive any distribution on account of such Subordinated Claims. ~~On the Effective Date, all such Subordinated Claims shall be cancelled, released, and extinguished.~~ until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty Claims against GGH.

c.   *Voting*: Class 7 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 7 Subordinated Claims against GGH shall not receive any distribution on account of such Subordinated Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.   <u>Class 8 — Government Penalty Claims</u>

a.   *Classification*: Class 8 consists of the Government Penalty Claims against GGH.

b.   *Treatment*: The Government Penalty Claims against GGH shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGH, and the Government Penalty Claims against GGH will not receive any distribution on account of such Government Penalty Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGH ~~are paid in full~~; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGH should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

43

c.  *Voting*: Class 8 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GGH shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.  <u>Class 9 — Intercompany Claims</u>

a.  *Classification*: Class 9 consists of all Intercompany Claims against GGH.

b.  *Treatment*: All Intercompany Claims (subject to the GGC/GGH Settlement) against GGH will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

c.  *Voting*: Class 9 is Unimpaired/Impaired under the Plan.  Holders of Class 9 Intercompany Claims against GGH are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.  <u>Class 10 — Interests</u>

a.  *Classification*: Class 10 consists of all Interests in GGH.

b.  *Treatment*: (i) Holders of Interests in GGH shall not receive any distribution on account of such Interests unless all <u>Allowed</u> Claims against ~~any~~all of the Debtors ~~are ultimately determined by a Final Order to have been rendered Unimpaired~~ <u>or the Wind-Down Debtors, as applicable, have been paid in full in accordance with the Distribution Principles</u> and (ii) all Interests in GGH shall, solely for Plan administrative purposes, continue to be held by the Holders of such Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, unless all <u>Allowed</u> Claims against <u>all of the Debtors or</u> the Wind-Down Debtors ~~are ultimately determined by a Final Order to have been rendered Unimpaired~~, <u>as applicable, have been paid in full in accordance with the Distribution Principles</u>, the Holders of Interests in GGH shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests (other than those limited voting rights expressly set forth in Article IV.B.7 of the Plan), or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGH.

c.  *Voting*: Class 10 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 10 Interests in GGH shall not receive

any distribution on account of such Interests and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

C.    *Treatment of Claims Against and Interests in GGC*

    1.    <u>Class 1 — Other Priority Claims</u>

        a.    *Classification*: Class 1 consists of all Other Priority Claims against GGC.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGC will, at the option of the GGC or Wind-Down GGC, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGC, in each case, or as soon as reasonably practicable thereafter.

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGC are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 — Secured Claims</u>

        a.    *Classification*: Class 2 consists of all Secured Claims against GGC.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGC or Wind-Down GGC, as applicable, such Holder <u>of an Allowed Secured Claim against GGC</u> will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGC, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGC Unimpaired pursuant to section 1124 of the Bankruptcy Code.

        c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGC are conclusively presumed to have accepted the Plan

45

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.   Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

   a.   *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

   b.   *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

   c.   *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

4.   Class 4 — BTC-Denominated Unsecured Claims

   a.   *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGC.

   b.   *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed

46

BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.   *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

5.   Class 5 — ETH-Denominated Unsecured Claims

a.   *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGC.

b.   *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.   *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

6.   Class 6 — Alt-Coin-Denominated Unsecured Claims

a.   *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGC.

b.   *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall have no

47

rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

7.    <u>Class 7 — Gemini Lender Claims</u>

a.    *Classification*: Class 7 consists of all Gemini Lender Claims (however denominated) against GGC.

b.    *Treatment*: Each Holder of an Allowed Gemini Lender Claim against GGC shall (x) have the amount of its Allowed Gemini Lender Claim reduced by its pro rata share of the Gemini Asset Value in accordance with the <u>Gemini Lender</u> Distribution Principles <u>and</u> (y) after accounting for the foregoing reduction, receive the treatment provided to such Holder under the Distribution Principles <u>and the Gemini Lender Distribution Principles</u>; *provided*, *however*, that~~,~~ <u>(i)</u> for each Distribution Date prior to the Gemini ~~Deficiency Claim~~<u>GBTC Shares</u> Determination, the Gemini GBTC Shares shall be excluded from the calculation of Gemini Asset Value, including for purposes of calculating the Remainder Gemini Lender Claims (~~as defined in the Distribution~~<u>and (ii) if the Gemini GBTC Shares Determination is determined in favor of Gemini, for each Distribution Date prior to the Gemini Deficiency Claim Determination, distributions under the Plan will be made in accordance with Section 2(c)(ii) of the Gemini Reserve</u> Principles~~)~~. Allowed Gemini Lender Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Gemini Lender Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Gemini Lender Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 7 is Impaired under the Plan. Holders of Class 7 Gemini Lender Claims against GGC will be entitled to vote to accept or reject the Plan.

8.    <u>Class 8 — Subordinated Claims</u>

    a.    *Classification*: Class 8 consists of all Subordinated Claims against GGC.

    b.    *Treatment*: ~~Holders of~~The Subordinated Claims against GGC shall <u>be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GGC, and the Subordinated Claims against GGC will</u> not receive any distribution on account of such Subordinated Claims. ~~On the Effective Date, all Subordinated~~ <u>until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty</u> Claims against GGC ~~shall be cancelled, released, and extinguished~~.

    c.    *Voting*: Class 8 is Impaired under the Plan. <u>For purposes of solicitation, it is presumed that</u> Holders of Class 8 Subordinated Claims against GGC <u>shall not receive any distribution on account of such Subordinated Claims and</u> will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.    <u>Class 9 — Government Penalty Claims</u>

    a.    *Classification*: Class 9 consists of the Government Penalty Claims against GGC.

    b.    *Treatment*: The Government Penalty Claims against GGC shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGC, and the Government Penalty Claims against GGC will not receive any distribution on account of such Government Penalty Claims until <u>after payment in full in accordance with the Distribution Principles of</u> all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGC ~~are paid in full~~; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGC should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

    c.    *Voting*: Class 9 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 9 Government Penalty Claims against GGC shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

10.    Class 10 — Intercompany Claims

    a.    *Classification*: Class 10 consists of all Intercompany Claims against GGC.

    b.    *Treatment*:   All Intercompany Claims (subject to the GAP/GGC Settlement and the GGC/GGH Settlement) against GGC will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

    c.    *Voting*: Class 10 is Unimpaired/Impaired under the Plan.  Holders of Class 10 Intercompany Claims against GGC are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

11.    Class 11 — Intercompany Interests

    a.    *Classification*: Class 11 consists of all Intercompany Interests in GGC.

    b.    *Treatment*: Holders of Intercompany Interests in GGC shall not receive any distribution on account of such Intercompany Interests unless all ~~senior~~Allowed Claims against GGC are paid in full ~~or otherwise treated as Unimpaired~~in accordance with the Distribution Principles.  All Intercompany Interests in GGC shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GGC shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGC.

        *Voting*: Class 11 is Impaired under the Plan. Holders of Class 11 Intercompany Interests in GGC are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

D.    *Treatment of Claims Against and Interests in GAP*

1.    Class 1 — Other Priority Claims

    a.    *Classification*: Class 1 consists of all Other Priority Claims against GAP.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GAP agrees to less favorable treatment, in full and final

satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GAP will, at the option of GAP or Wind-Down GAP, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GAP, in each case, or as soon as reasonably practicable thereafter

c.  *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.  Class 2 — Secured Claims

a.  *Classification*: Class 2 consists of all Secured Claims against GAP.

b.  *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GAP or Wind-Down GAP, as applicable, such Holder of an Allowed Secured Claim against GAP will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GAP, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GAP Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.  *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.  Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

a.  *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

b.  *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan

51

and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.  *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

4.  Class 4 — BTC-Denominated Unsecured Claims

a.  *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GAP.

b.  *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.  *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

5.  Class 5 — ETH-Denominated Unsecured Claims

a.  *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GAP.

b.  *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the

52

Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

6.    Class 6 — Alt-Coin-Denominated Unsecured Claims

a.    *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GAP.

b.    *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.   Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

7.    Class 7 — Subordinated Claims

a.    *Classification*: Class 7 consists of all Subordinated Claims against GAP.

b.    *Treatment*: ~~Holders of~~The Subordinated Claims against GAP shall be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GAP, and the Subordinated Claims against GAP will not receive any distribution on account of such

53

Subordinated Claims. ~~On the Effective Date, all Subordinated~~ until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty Claims against GAP ~~shall be cancelled, released, and extinguished~~.

c.    *Voting*: Class 7 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 7 Subordinated Claims against GAP shall not receive any distribution on account of such Subordinated Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.    Class 8 — Government Penalty Claims

a.    *Classification*: Class 8 consists of the Government Penalty Claims against GAP.

b.    *Treatment*: The Government Penalty Claims against GAP shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GAP, and the Government Penalty Claims against GAP will not receive any distribution on account of such Government Penalty Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims and Allowed Intercompany Claims against GAP ~~are paid in full~~; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GAP should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

c.    *Voting*: Class 8 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GAP shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.    Class 9 — Intercompany Claims

a.    *Classification*: Class 9 consists of all Intercompany Claims against GAP.

b.    *Treatment*: All Intercompany Claims (subject to the GAP/GGC Settlement) against GAP will be adjusted, Reinstated, or compromised on

54

the Effective Date in the Debtors' discretion, with the Committee's Consent.

c.    *Voting*: Class 9 is Unimpaired/Impaired under the Plan.  Holders of Class 9 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.   <u>Class 10 — Intercompany Interests</u>

a.    *Classification*: Class 10 consists of all Intercompany Interests in GAP.

b.    *Treatment*: Holders of Intercompany Interests in GAP shall not receive any distribution on account of such Intercompany Interests unless all ~~senior~~<u>Allowed</u> Claims against GAP are paid in full ~~or otherwise treated as Unimpaired~~<u>in accordance with the Distribution Principles</u>. All Intercompany Interests in GAP shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GAP shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GAP.

c.    *Voting*: Class 10 is Impaired under the Plan. Holders of Class 10 Intercompany Interests in GAP are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

E.    *Special Provision Governing Unimpaired or Reinstated Claims*

Except as otherwise provided in the Plan, nothing ~~under~~<u>in</u> the Plan shall affect the Debtors' or the Wind-Down Debtors' claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B–D of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the

Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not contain an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.    *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by Holders of such Claims or Interests in such Class but such Class shall not constitute the sole impaired accepting Class for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code.

I.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' or the Wind-Down Debtors' agreement under the Plan to make certain distributions to Holders of Allowed Claims.

J.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

K.    *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. The Debtors and the Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the 3AC Claims and the DCG Claims; *provided* that,

56

for the avoidance of doubt, with respect to the ~~3AC Claims, any such subordination shall not be pursuant to the Plan or Confirmation Order~~DCG Claims and/or the Excluded Party Claims.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.  *Wind-Down Debtors*

1.  The Wind-Down Debtors' Activities

The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the ~~Wind-Down~~ Debtors' Assets.  The Wind-Down Debtors will not conduct business operations and will be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Debtors' Beneficiaries.  Each Wind-Down Debtor shall be managed by the PA Officer and the New Board, which shall consult with or be directed by the Wind-Down Oversight Committee and the Litigation Oversight Committee, in accordance with the Plan Administration Agreement and the applicable New Governance Documents and shall be subject to the Wind-Down Budget.

On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement.  In the event of any conflict between the terms of this Article IV.A and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

2.  PA Officer

The PA Officer shall be selected by mutual consent of the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the PA Officer shall be approved in the Confirmation Order, and the PA Officer's duties shall commence as of the Effective Date.  The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries in accordance with and pursuant to the Distribution Principles and shall serve as the successor to and representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates (including any Causes of Action that belong to the Other Genesis Entities) that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan.  Other rights and duties of the PA Officer and the Wind-Down Debtors' Beneficiaries shall be as set forth in the Plan Administration Agreement.  Pursuant hereto and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.

In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved

in accordance with the Plan and the Plan Administration Agreement, and (ii) the date on which the PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement and the Wind-Down Oversight Committee Bylaws), or is otherwise unable to serve; *provided*, *however*, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the Wind-Down Oversight Committee shall elect a successor to be appointed by the New Board to serve as a PA Officer in accordance with the Plan Administration Agreement. If the Wind-Down Oversight Committee does not elect a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

3.      The Wind-Down Oversight Committee

The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement. On the Effective Date, the Wind-Down Oversight Committee shall be deemed to have adopted the Wind-Down Oversight Committee Bylaws, which shall require the membership of the Wind-Down Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Member, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member (unless a Gemini Recovery Event has occurred), and (v) the Wind-Down Oversight Crossover Member; *provided*, *however*, that the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

The Wind-Down Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the distribution or other disposition of the Distributable Assets in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement and (ii) approving any material amendments to the Distribution Principles. For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan. Vacancies on the Wind-Down Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Wind-Down Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed, in accordance with the Wind-Down Oversight Committee Bylaws. If a vacancy on the Wind-Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written

58

consent, to the Wind-Down Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause.

    4.    <u>The Litigation Oversight Committee</u>

The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors, a committee of seven (7) members identified in the Plan Supplement to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws. On the Effective Date, the Litigation Oversight Committee shall be deemed to have adopted the Litigation Oversight Committee Bylaws, which shall require the membership of the Litigation Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member, (iv) at least one (1) Litigation Oversight Crossover Member; and (v) at least one (1) Litigation Oversight Gemini Lender Member (unless a Gemini Recovery Event occurs); *provided*, *however*, that the Litigation Oversight Committee Bylaws shall expressly provide that the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413; and, *provided*, *further*, that upon the occurrence of a USD Recovery Event, the Litigation Oversight Fiat-or-Stablecoin Members shall be deemed to resign their positions, and the Litigation Oversight Committee shall be reduced to five (5) members.

The Litigation Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the strategy and pursuit of Retained Causes of Action, including the selection, management, and direction of counsel and other advisors retained to investigate, analyze, and pursue the Retained Causes of Action, (ii) approving settlements on account of any Retained Causes of Action, and (iii) managing the Litigation Reserve. For the avoidance of doubt, in advising the PA Officer, the Litigation Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan. Vacancies on the Litigation Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Litigation Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Litigation Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Litigation Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Litigation Oversight Committee for cause.

5.    Plan Administration Agreement

The Plan Administration Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the PA Officer; (ii) the payment of other expenses of the Wind-Down Debtors by the PA Officer; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the PA Officer within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Wind-Down Debtors and the Debtors and the payment of taxes or other obligations owed by the Wind-Down Debtors and the Debtors; (vi) the PA Officer's orderly liquidation of the Wind-Down Debtors' Assets subject to the oversight of the New Board and the Wind-Down Oversight Committee as set forth herein; and (vii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action and any other claims, rights, or causes of action assigned to the Wind-Down Debtors subject to the oversight of the Litigation Oversight Committee as set forth herein.

6.    Reports to Be Filed by the PA Officer

The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

For each reporting period until the Gemini Distribution Agent shall have completed its final distribution to the Gemini Lenders, the Gemini Distribution Agent shall provide to the PA Officer, for inclusion in its semi-annual report, information pertaining to (i) the aggregate distributions, by Asset type, received by the Gemini Distribution Agent from the Estates on behalf of the Allowed Gemini Lender Claims, and (ii) the aggregate distributions of Digital Assets made by the Gemini Distribution Agent directly to the Gemini Lenders on behalf of their Allowed Gemini Lender Claims.

7.    Fees and Expenses of the Wind-Down Debtors

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.  The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.  The PA Officer, on behalf of the Wind-Down Debtors, may employ (with the consent of the Wind-Down Oversight Committee or the Litigation Oversight Committee, as applicable), without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by

the Plan Administration Agreement.   For the avoidance of doubt, the PA Officer, the Wind-Down Oversight Committee, and the Litigation Oversight Committee may employ the same professionals to the extent appropriate, as determined by each in its reasonable discretion and in accordance with the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws, as applicable.

8.    Liability of the Wind-Down Debtors; Indemnification

The Plan Administration Agreement and the New Governance Documents may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and/or other parties.  Any such indemnification shall be the sole responsibility of the Wind-Down Debtors and payable solely from the Wind-Down Debtors' Assets.

The Wind-Down Debtor Parties shall not be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers, and authority conferred, or in good faith believed to be conferred, by the Plan Administration Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud.   Subject to the Plan Administration Agreement, the PA Officer shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the New Board shall be entitled to enjoy all of the rights, powers, immunities, and privileges provided in the New Governance Documents.  The PA Officer or the New Board, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.   Notwithstanding such authority, none of the Wind-Down Debtor Parties shall be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the any of the Wind-Down Debtor Parties, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Debtor Parties shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein in the Plan, and no implied covenants or obligations shall be read into the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws against any of them.   The Wind-Down Debtors shall promptly, upon submission of invoices therefor, pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party and which arises out of or due to such Wind-Down Debtor Party's duties, acts, or omissions, or the consequences of such duties, acts, or omissions, with respect to the implementation of the Plan or otherwise in connection with the affairs of the Wind-Down Debtors, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; *provided*, *however*, that no expenses will be paid to a Wind-Down Debtor Party to the extent such expenses result from such

Wind-Down Debtor Party's violation of the Plan or the Confirmation Order, willful misconduct, gross negligence, or actual fraud.

9.    Tax Treatment

The Debtors will not issue an IRS Form 1099-B to any Holder of a Claim in respect of any return of Digital Assets to such Holder, to the extent the Holder receives Digital Assets of the same type as those deposited with a Debtor in an amount not in excess of the amount of such Digital Assets so deposited, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Internal Revenue Code or as the result of a change in law.

10.    Insurance; Bond

The PA Officer may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the ~~PA Officer~~Wind-Down Debtors under the Plan Administration Agreement. Unless otherwise agreed to by the New Board, the PA Officer shall serve with a bond, the terms of which shall be agreed to by the New Board, and the cost and expense of which shall be paid by the Wind-Down Debtors.

11.    Settlement of Claims

Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; *provided, however*, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; *provided further* that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided herein and in the Plan Administration Agreement.

12.    Sales of Assets by the Wind-Down Debtors

The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets (except for Retained Causes of Action, GBTC shares, ~~and~~ ETHE shares, and ETCG shares) on any terms it deems reasonable, without further order of the Bankruptcy Court. The PA Officer may conduct any Monetization Transactions of Retained Causes of Action without further order of the Bankruptcy Court, but only to the extent the PA Officer has obtained the prior consent of the New Board and the Litigation Oversight Committee's Consent, subject to the provisions of the Plan Administration Agreement. Subject to subsection (a) below, the PA Officer may conduct any Monetization Transactions of GBTC shares ~~or~~, ETHE shares, or ETCG shares without further order of the Bankruptcy Court and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable to such shares, but only in accordance with the Distribution Principles. Upon the sale, liquidation, transfer, or

other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts (and such proceeds shall become and be deemed to be Distributable Assets).

a.    Additional GBTC Shares Reserve

~~Notwithstanding anything to the contrary in the Plan (including the Distribution Principles), until the Gemini Additional Collateral Determination has occurred, the Additional GBTC Shares Reserve shall be held in reserve by the Wind-Down Debtors and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent.~~

The Additional GBTC Shares Reserve shall be governed by the Gemini Reserve Principles.

b.    Gemini GBTC Shares Reserve

~~Notwithstanding anything to the contrary in the Plan (including the Distribution Principles), until the Gemini GBTC Shares Determination and the Gemini Deficiency Claim Determination have occurred, the Gemini GBTC Shares Reserve shall be held in reserve by Gemini or the Gemini Distribution Agent and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent and the Wind-Down Oversight Committee's Consent.~~

The Gemini GBTC Shares Reserve shall be governed by the Gemini Reserve Principles.

13.    Abandonment of Assets by the Wind-Down Debtors

With five (5) Business Days' prior notice to the New Board, the Wind-Down Oversight Committee, and, with respect the abandonment of any Retained Cause of Action, the Litigation Oversight Committee, the PA Officer may abandon any Wind-Down Debtors' Assets that the PA Officer determines in his, her, or its reasonable discretion to be of *de minimis* value or burdensome to the Wind-Down Debtors, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtors prior to the Effective Date.

14.    Dissolution of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors, subject to the remaining provisions of this Article IV.A.14 shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates. As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.

Upon making all distributions provided for under the Plan, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any ~~state~~jurisdiction in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Plan, shall be deemed to have cancelled all Interests pursuant to the Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. ~~Pursuant to the terms of this Plan, on the Effective Date, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtors to effectuate such withdrawal; *provided* that, following the Effective Date, the Wind-Down Debtors shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, the Debtors, the Wind-Down Debtors, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with Money Transmitter Licenses.~~

The Wind-Down Debtors ~~will~~shall dissolve on the earlier of the date on which: (i) (a) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Plan, and the PA Officer has fully performed all other duties and functions as set forth under the Plan, the Confirmation Order, and/or the Plan Administration Agreement and (b) the Chapter 11 Cases of the Debtors have been closed; or (ii) the PA Officer determines in his, her, or its reasonable judgment, with notice to the New Board and in consultation with the Wind-Down Oversight Committee, that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Plan, the Confirmation Order, and/or the Plan Administration Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states. Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

B.    *Means for Implementation*

1.    Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring,

conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan or as otherwise agreed by the Debtors with the Committee's Consent and the Ad Hoc Group's Consent; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities (if any), which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any; (7) the implementation of the terms and conditions of the Alameda/Genesis Settlement Agreement, the OAG/Genesis Settlement Agreement (if approved by a Final Order of the Bankruptcy Court), the 3AC/Genesis Settlement Agreement, and the SEC/Genesis Settlement Agreement (if approved by a Final Order of the Bankruptcy Court); and (8) all other actions that the Debtors or the Wind-Down Debtors, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, and 1123 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Distribution Principles and the Monetization Transactions.

2.    Segregated Accounts for Plan Distributions

a.    Claims Reserve

The Claims Reserve for each Debtor shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions and/or payment in accordance with the terms of Articles II and III of the Plan.  Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Claims Reserve after all applicable distributions are made to Holders of Allowed Claims entitled to the Cash or Digital Assets in such applicable Claims Reserve under the Plan and (ii) any surplus Cash or Digital Assets in the applicable Claims Reserve, which surplus shall be determined by the PA Officer based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Secured Claims that remain unpaid as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

b.    Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind-Down Debtors solely for distributions or payments in accordance with the terms of Article II of the Plan.  Each Wind-Down Debtor shall be entitled to its pro rata share (based on the percentage of the Professional Fee Reserve Amount funded by

such Entity or the applicable Debtor) of any Cash held in the Professional Fee Escrow Account after all Allowed Professional Fee Claims are satisfied in full in Cash and any such remaining Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

        c.      Litigation Reserve

The Litigation Reserve shall be held in a separate segregated account from the Wind-Down Reserve and used by the Wind-Down Debtors to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action; *provided, however*, that the Litigation Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' other wind down efforts, which expenses shall be paid from the Wind-Down Reserve unless otherwise ordered by the Bankruptcy Court. The Wind-Down Debtors shall be entitled to any (i) Cash held in the Litigation Reserve after all Retained Causes of Action have been settled or determined by a Final Order and (ii) surplus Cash in the Litigation Reserve, which surplus shall be determined by the PA Officer in consultation with the Litigation Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles) unless otherwise ordered by the Bankruptcy Court.

        d.      Wind-Down Reserve

The Wind-Down Reserve for each Wind-Down Debtor shall be held in trust in a segregated account by such Wind-Down Debtor to pay the applicable Wind-Down Debtors' Expenses; *provided, however*, that the Wind-Down Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve.  Each Wind-Down Debtor shall be entitled to any (i) Cash held in the applicable Wind-Down Reserve after all Wind-Down Debtors' Expenses of such Wind-Down Debtor have been paid and (ii) surplus Cash in the applicable Wind-Down Reserve, which surplus shall be determined by the PA Officer in consultation with the Wind-Down Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

        3.      <u>Sources of Consideration for Plan Distributions; Digital Asset Rebalancing</u>

The Wind-Down Debtors shall make distributions under and in accordance with the Plan from Distributable Assets, the Additional GBTC Shares Reserve (subject to the Gemini Reserve Principles), the Gemini GBTC Shares Reserve (subject to the Gemini Reserve Principles), the Claims Reserve, the Disputed Claims Reserve, and the Professional Fee Escrow Account, as applicable.

The Debtors and the Wind-Down Debtors shall, in consultation with the Wind-Down Oversight Committee and to the maximum extent permitted by law, be authorized to rebalance their Cash and Digital Assets to enable the Debtors or the Wind-Down Debtors, as applicable, to

make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such respective Claims are denominated. The Debtors and the Wind-Down Debtors, to the maximum extent permitted by law, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided, however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.

The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

4. Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Governance Documents.

5. Vesting of Assets

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date: all Assets in each Estate, including all books, records, electronically stored information (including documents and communications), Retained Causes of Action and any Assets owned or acquired by any of the Debtors, including all assets of GGT that relate to the Debtors, shall vest in each applicable Wind-Down Debtor free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims, Allowed Government Penalty Claims, and Allowed Subordinated Claims), including any prohibition on assignability or transfer under applicable non-bankruptcy law. The vesting of Assets pursuant to the Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors as if the asset or right was still held by the Debtors. On and after the Effective Date, except as otherwise provided in the Plan, the New Governance Documents, or the Plan Administration Agreement, each Wind-Down Debtor may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable.

Notwithstanding any prohibition on assignability or transfer under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such

additional Assets shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code. All such Assets shall automatically vest in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims pursuant to the terms of the Plan).

Except as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary to cancel and/or extinguish such Liens and/or security interests.

On and after the Effective Date, the Wind-Down Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors. The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with ~~the foregoing paragraph~~this Article IV.B.5 shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

6.    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (a) all Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released; *provided* that, notwithstanding the releases set forth in Article VIII of the Plan, the Confirmation Order, or the occurrence of the Effective Date, any ~~such~~ indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as

68

provided herein, including the Distribution Principles; *provided further* that, absent the consent of the Debtors and the Committee's Consent, nothing in this Article IV.B.6 shall effectuate a cancellation of any Intercompany Interests, Intercompany Claims (except for claims settled as part of the GAP/GGC Settlement or the GGC/GGH Settlement), or Interests.

Notwithstanding anything to the contrary in this Article IV.B.6, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article IV.B.6 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, or release the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such ~~e~~Executory ~~c~~Contract or ~~u~~Unexpired ~~l~~Lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

7.   Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the appointment of the New Board, the PA Officer, ~~and other directors and officers for the Wind-Down Debtors, including~~the GAP Director, and the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee; (2) the implementation of the Restructuring; (3) the re-vesting of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the transactions and distributions contemplated under the Plan and the Distribution Principles, including any rebalancing of Distributable Assets; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (5) all other actions contemplated by the Plan and the Definitive Documents. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors ~~or the Wind-Down Debtors~~ shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Wind-Down Debtors to the extent not previously authorized by the Bankruptcy Court. The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to ~~choose~~appoint those Persons ~~that~~who are identified on a list of ~~seven~~five (~~7~~5) candidates ~~that is delivered to DCG~~selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors ~~and with~~ the Ad Hoc Group's ~~Consent~~. The authorizations and approvals contemplated by this Article IV.B.7 ~~of the Plan~~ shall be effective notwithstanding any requirements under non-bankruptcy law.

8.    New Governance Documents

To the extent required under the Plan or applicable non-bankruptcy law, the Wind-Down Debtors ~~will~~shall, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Wind-Down Debtors may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

9.    Directors and Officers of the Wind-Down Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically.  The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of ~~seven~~five (~~7~~5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors ~~and with the Ad Hoc Group's Consent; and~~,: *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace any member~~s~~ of the New Board who needs to be replaced by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board.  The New Board shall govern each of the Wind-Down Debtors and consult with the Wind-Down Oversight Committee on various matters identified in the Plan and the Plan Administration Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors ~~will~~shall, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board~~, as well as those Persons that will serve as an officer of any of the Wind-Down~~ and the GAP Dire~~bc~~ctors.  If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of each of the Wind-Down Debtors.

70

10.     <u>Effectuating Documents; Further Transactions</u>

On and after the Effective Date, the Wind-Down Debtors, their respective officers, the PA Officer, and the members of the New Board are, subject to the New Governance Documents and the Plan Administration Agreement, authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan (if any) in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

11.     <u>Reserved</u>

12.     <u>Exemption from Certain Taxes and Fees</u>

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (if any), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any sale, liquidation, or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any Assets to the Wind-Down Debtors and any rebalancing of Distributable Assets, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

13.     <u>Exemption from Registration Requirements</u>

Any Securities offered, issued, or distributed pursuant to the Plan will be so offered, issued, or distributed pursuant to an exemption from registration under the Securities Act and all rules and regulations promulgated thereunder, including sections 4(a)(1) and 4(a)(2), Rule 506 of Regulation D, Regulation S, and/or Rule 144.

Notwithstanding anything to the contrary in the Plan, no Person <u>other than the Wind-Down Debtors</u> shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether any Securities are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

14.     <u>Preservation of Causes of Action</u>

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII <u>of the Plan</u>, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates (including any Causes of Action that belong to the Other Genesis

Entities), whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. Notwithstanding anything to the contrary herein, all rights in any Retained Causes of Action shall vest in the Wind-Down Debtors as of the Effective Date, and may be pursued by the PA Officer in accordance with the provisions of this Plan and the Plan Administration Agreement. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action against** ~~it~~**such Entity. The Debtors or the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court ~~order~~or any other court, including pursuant to Article VIII of the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.B.14 include (a) any claim or Cause of Action with respect to, or against, a Released Party or ~~(b) if a Class of Claims entitled to vote on the Plan votes to accept the Plan, any~~Exculpated Party, subject in all respects to Article VIII of the Plan, or (b) any Resolved Preference Claims ~~against any Holder of Claims in such Class (excluding any DCG Party, Gemini Insider, or officer or director of the Debtors who did not have such position as of or after the Petition Date), which Preference Claims are expressly waived~~.

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity (including any Causes of Action that belong to the Other Genesis Entities) shall vest in the applicable Wind-Down Debtor. The applicable Wind-Down Debtors, through their authorized agents or representatives (including the PA Officer), shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Litigation Oversight Committee) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the Litigation Oversight Committee's Consent. The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any

other court that relates to a Wind-Down Debtors' Asset (including any Causes of Action that belong to the Other Genesis Entities) without the need for filing any motion for such relief.

15.    Director and Officer Liability Insurance

The Wind-Down Debtors shall be authorized to obtain directors', managers', and officers' liability insurance policies. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Wind-Down Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts. ~~Notwithstanding~~ anything to the contrary ~~contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the~~, and all D&O Liability Insurance Policies~~,~~ and ~~each such indemnity~~ obligations ~~will be deemed and treated as an Executory Contract that has been assumed by the Wind-Down Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.~~thereunder shall remain in full force and effect in accordance with their terms.

16.    Offsetting of Collateral

~~The  Debtors and the Wind-Down Debtors are authorized, but shall not be required  to, forFor~~ purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Plan, the Debtors and the Wind-Down Debtors are authorized, but shall not be required, to set off (i) any Claim against the Debtors with the value of any Loan Collateral that the applicable Debtor delivered to the Holder of such Claim, (ii) the value of any debt owed by the Holder of such Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor, and/or (iii) any Claim against a Debtor with the value of any debt owed by the Holder of such Claim to the applicable Debtor; *provided*, *however*, that, ~~in the event that, from and after the date hereof, the Debtors formulate one or more proposals,~~ based upon the individual circumstances of certain Holders of Claims who may have setoff rights or other rights with respect to Loan Collateral posted with the Debtors, to compromise or settle such rights, including with respect to the value of such Loan Collateral, ~~either through an amendment to the Plan or an order of the Bankruptcy Court, such proposals shall be set forth in a filing~~the Debtors have proposed the Setoff Principles for Allowance of Certain Claims attached as Exhibit M to the Plan Supplement, with respect to which the Debtors shall file a motion with the Bankruptcy Court ~~on or before ten (10) days prior to the Voting Deadline and, upon acceptance thereof by a Holder of Claims, shall be presented to the Bankruptcy Court, in each case,~~to be heard upon notice and an opportunity for a hearing.

C.    *GAP and GGC Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GAP and provides for GGC to make a settlement contribution to GAP in an amount necessary for (i)

Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC, (ii) Allowed BTC-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed BTC-Denominated Unsecured Claims against GGC, (iii) Allowed ETH-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed ETH-Denominated Unsecured Claims against GGC, and (iv) Allowed Alt-Coin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Alt-Coin-Denominated Unsecured Claims against GGC.

D.    *GGC and GGH Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GGH and provides for GGC or Wind-Down GGC, as applicable, to receive the proceeds of any Monetization Transaction(s) allocated to any portion of the Genesis Platform other than GGT.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is ~~after~~any date other than the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases with the Committee's Consent and the Wind-Down Oversight Committee's Consent, as applicable, at any

74

time on or prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim Related Thereto*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property (as applicable), without the need for any objection by the Debtors or the Wind-Down Debtors, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in the Proof of Claim, if any, to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease assumed by the Debtors, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section

75

365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind-Down Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be ~~zero~~$0.00.

Any Cure Claim shall be deemed fully satisfied, and released upon payment by the Debtors or the Wind-Down Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; and, *provided*, *further*, that nothing herein shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Wind-Down Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease (subject to the Committee's Consent and the Ad Hoc Group's Consent) prior to the resolution of any such dispute; *provided*, *however*, that ~~the~~such Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; and, *provided*, *further*, that, following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the

right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Indemnification Obligations*

The Indemnification Obligations shall remain in full force and effect and shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall not indemnify (i) employees, directors, or officers of the Debtors for any ~~Cc~~laims or Causes of Action arising out of or relat~~ing~~ed to any act or omission that constitutes ~~knowing and intentional~~ fraud, gross negligence, or willful misconduct or (ii) any current or former employees, directors, or officers of the Debtors that are also DCG Parties.

E.    *Insurance Policies*

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Wind-Down Debtors on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors.

F.    *Modifications*, *Amendments*, *Supplements*, *Restatements*, *or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

77

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Wind-Down Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Wind-Down Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H. *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan (including the Distribution Principles), on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim or a Disallowed Claim, shall, with respect to the portion of the Claim that is an Allowed Claim, receive the full amount of the distributions that the Plan (including the Distribution Principles) provides for Allowed Claims in each applicable Class and in the manner provided in the Plan (including the Distribution Principles).  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan and subject to the Distribution Principles.  Notwithstanding any provision of the Plan to the contrary, to the extent a Claim is disallowed by an order of the Bankruptcy Court, the Disbursing Agent or the Gemini Distribution Agent, as applicable, shall not be required to reserve any amount for payment of such Claim, regardless of whether the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has not expired or whether an appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing is pending with respect to such order.

Except as otherwise provided in the Plan (including the Distribution Principles), Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent and Gemini Distribution Agent.*

All distributions under the Plan shall be made by the Disbursing Agent and, in the case of distributions on Allowed Gemini Lender Claims, the Gemini Distribution Agent.    The Disbursing Agent and the Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.    Additionally, in the event that the Disbursing Agent or the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

1.      Powers of the Disbursing Agent and the Gemini Distribution Agent

The Disbursing Agent and the Gemini Distribution Agent, as applicable, shall be empowered and directed to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) take all actions required of it by the Distribution Principles; (d) employ professionals to represent it with respect to its responsibilities; and (e) exercise such other powers as may be vested in the Disbursing Agent or the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, the Distribution Principles, and the Gemini Lender Distribution Principles, or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be necessary and proper to implement the provisions of the Plan and, the Distribution Principles, and the Gemini Lender Distribution Principles.

The Gemini Distribution Agent shall, at its sole discretion and to the maximum extent permitted by law, be authorized to (i) enter into a Monetization Transaction of assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Plan the Gemini Reserve Principles), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, and (ii) rebalance the Cash and Digital Assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Plan the Gemini Reserve Principles), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, in each case, to enable the Gemini Distribution Agent to make distributions in respect of Gemini Lender Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated; *provided*, *however*, that in no event shall the Gemini Distribution Agent be authorized to provide any Holder of an Allowed Claim with any lesser treatment than such Holder was entitled to under the Plan.    The Gemini Distribution Agent, to the maximum extent permitted by law, is authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

2.      Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such solely with respect to its duties in such capacity) on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such), shall be paid in Cash by the Wind-Down Debtors from the Wind-Down Reserve; *provided*, *however*, that the fees and expenses incurred by the Disbursing Agent and the Gemini Distribution Agent shall be subject to and limited by the Wind-Down Budget; and, *provided*, *further*, that the amount of fees and expenses budgeted for the Gemini Distribution Agent in the Wind-Down Budget shall be determined in the Debtors' reasonable discretion, with the Committee's Consent, Gemini's Consent, and the Ad Hoc Group's Consent, and the Gemini Distribution Agent shall not incur any fees and expenses in excess of the Wind-Down Budget without the prior written consent of the PA Officer, which consent shall not be unreasonably withheld, conditioned, or delayed.

3.      No Liability

Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall be exculpated and have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Plan.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Distribution*

1.      Delivery of Distributions on Allowed Claims and Allowed Interests

a.      Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent and the Gemini Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring after the close of business on the Distribution Record Date.

b.      Delivery of Distributions in General

Subject to the Distribution Principles and except as otherwise provided in the Plan (including in the next paragraphArticle VI.C.1.c hereof), the Disbursing Agent shall make distributions to Holders of Allowed Claims (other than Gemini Lender Claims) and Allowed Interests (if any) as of the Distribution Record Date at the address (physical address or digital

80

wallet, as applicable) for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Wind-Down Debtors. Holders of Claims may notify the Disbursing Agent by e-mail of any changes to their address for receipt of distributions.

c.    Delivery of Distributions on Claims Denominated in Digital Assets

Subject to the Distribution Principles, the Debtors and the Wind-Down Debtors ~~will~~shall use commercially reasonable efforts, subject to applicable law and the terms of this Plan, to provide recoveries in respect of Claims denominated in Digital Assets in the like-kind form of Digital Asset in which such Claims are denominated, including by buying Digital Assets with the Debtors' or Wind-Down Debtors' Cash, selling Digital Assets for Cash, or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided*, *however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder; and, *provided*, *further*, that, upon the request of a Holder of an Allowed Fiat-or-Stablecoin Denominated Claim or the Gemini Distribution Agent, on behalf of any Holder of Allowed Gemini Lender Claims in respect of its Claims to the extent denominated in Cash, Foreign Currency, or Stablecoin, the Debtors or the Wind-Down Debtors, as applicable, ~~will~~shall use commercially reasonable efforts, subject to applicable law (including any regulatory or tax considerations) and the terms of this Plan, to provide recoveries to such Holder in Cash in respect of such Allowed Fiat-or-Stablecoin Denominated Claim or Allowed Gemini Lender Claim; and, *provided*, *further*, that, notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors or the Wind-Down Debtors, as applicable, shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) before buying or selling any type of Digital Asset other than BTC or ETH.

d.    Delivery of Distributions on Gemini Lender Claims.

Subject to the Distribution Principles, for purposes of distributions and treatment under the Plan only (and not for voting purposes), Gemini shall be deemed to be the Holder of all Gemini Lender Claims and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims.  As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims ~~on a pro rata basis~~in accordance with the Gemini Lender Distribution Principles. In addition, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution

81

to the Gemini Lenders, the Gemini Reserved Coins ~~(solely to the extent included in the Gemini Asset Value)~~, and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in the Gemini Reserve Principles), the proceeds of such Monetization Transaction of Gemini GBTC Shares, in each case to the Holders of Allowed Gemini Lender Claims ~~on a pro rata basis~~in accordance with the Gemini Lender Distribution Principles.  Any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from such dollar-for-dollar reduction if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

e.    Minimum Distributions

Subject to the Distribution Principles and the Gemini Lender Distribution Principles, no distribution shall be made by the Disbursing Agent or the Gemini Distribution Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250, *provided*, *however*, that the Gemini Distribution Agent may elect to make such distributions to Gemini Lenders in its sole discretion.

2.    Undeliverable Distributions and Unclaimed Property

In the event that (a) any distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, shall have determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall be deemed to be "Distributable Assets" and distributed to Holders of Allowed Claims in accordance with the Plan and the Distribution Principles (it being understood that, for purposes of this Article VI.C, the Claim underlying such unclaimed distribution shall be treated as Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred and shall not be entitled to any distributions under the Plan.

D.      *Manner of Payment*

At the option of the Disbursing Agent or the Gemini Distribution Agent, as applicable, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in Foreign Currency shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable Foreign Currency as published in The Wall Street Journal, National Edition, on the Petition Date.

G.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving a full and final distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other

documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

H.    *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim ~~will~~shall be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

I.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan (including the Distribution Principles), or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.    *Setoffs and Recoupment*

The Debtors or the Wind-Down Debtors may, but shall not be required to, set off against, or recoup from, any Allowed Claim against a Debtor any claim, right, or Cause of Action of any nature whatsoever that the applicable Debtor or Wind-Down Debtor may have against the Holder of such Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor or Wind-Down Debtor of any such Claim it may have against the Holder of such Allowed Claim.

K.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtors shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full <u>in accordance with the Distribution Principles</u> on account of such Claim from a party that is not a Debtor or a Wind-Down Debtor; *provided* <u>that, for the</u> <u>avoidance of doubt, the amount attributed to the Gemini GBTC Shares or any proceeds thereof</u> <u>for purposes of this Article VI.K.1 shall be as determined by the Gemini Deficiency Claim</u> <u>Determination; *provided*</u>, *however*, that the Debtors or the Wind-Down Debtors shall provide <u>twenty-one (</u>21) days' written notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof,

repay or return the distribution to the Debtors or the Wind-Down Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

2.      Claims Payable by Insurers

No distributions under the Plan shall be made on account The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim that is payable pursuant to one of the Debtors' shall be determined by the terms of the insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy of the Debtors or Wind-Down Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

On or after the Effective Date, the Wind-Down Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, if applicable, the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim. Any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed for any purpose hereunder. All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the

Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

Notwithstanding anything in this Plan to the contrary, (1) Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code, and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable ~~claimant~~Holder.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors, ~~by order of the Bankruptcy Court~~pursuant to the Confirmation Order, shall together have the sole authority to, with five (5) days prior notice to the Wind-Down Oversight Committee: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, *provided* that any settlement or compromise of a Disputed Claim that results in an Allowed Claim equal to or greater than $5 million shall require the Wind-Down Oversight Committee's Consent; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Claim are preserved as if the Chapter 11 Cases had not been commenced.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Wind-Down Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Wind-Down Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after ~~the date on which~~entry of the Bankruptcy Court order estimating such Claim ~~is estimated~~. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one

another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.    *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a <u>Bankruptcy</u> Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtors; *provided*, *however*, that, notwithstanding the foregoing and the commencement of the Gemini Preference Action, the Holders of Allowed Gemini Lender Claims ~~(other than any Gemini Insider)~~ shall be entitled to receive distributions in accordance with the Plan (including the Distribution Principles) until the Gemini Preference Determination~~; and, *provided*, *further*, that any distribution on account of any Gemini Insider shall be held by the Gemini Distribution Agent on behalf of such Gemini Insider until such time as the Gemini Determinations are Final Orders and then in accordance therewith, unless otherwise ordered by an order by the Bankruptcy Court that has not been stayed or vacated or a Final Order.~~.

**<u>ON THE EFFECTIVE DATE,</u> ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND**

**EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN ALLOWED BY A FINAL ORDER.**

G.    *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed without the Bankruptcy Court's prior approval shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made on account of any Claim to the extent that all or any portion of such Claim is a Disputed Claim, including if an objection to such Claim or portion thereof is Filed as set forth in this Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan ~~thereon~~for such Allowed portion notwithstanding that ~~any an~~other portion of such Claim is a Disputed Claim.

I.    *Disputed Claims Reserve*

On each Distribution Date, the Disputed Claims Reserve shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after such Distribution Date.  All taxes imposed on assets or income of the Disputed Claims Reserve shall be payable by the Disbursing Agent from the assets of the Disputed Claims Reserve.  Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Disputed Claims Reserve after all Disputed Claims have been resolved and (ii) any surplus Cash or Digital Assets in the applicable Disputed Claims Reserve, which surplus shall be determined by the PA Officer based on the amount of Disputed Claims that remain unresolved as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

For the Disputed Claims Reserve, the Debtors or the Wind-Down Debtors, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to the Disputed Claims Reserve, for all U.S. federal income tax purposes, the beneficiaries of the any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that such Disputed Claims Reserve would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or

88

fund's assets and then contributed such interests to such account or fund. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors or Wind-Down Debtors would be required to comply with the relevant rules.

J.      I. *Single Satisfaction of Claims*

        Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim in accordance with, and except as provided in, the Distribution Principles.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

        Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan (including the Distribution Principles), and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

        The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, subject to any applicable consent rights and procedures set forth herein.

B.      *Term of Injunctions or Stays*

        Unless otherwise provided herein, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing

for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

C.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Plan Supplement, or in any other contract, instrument, agreement, or document created pursuant to the Plan or the Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Wind-Down Debtors or the PA Officer.**

From and after the Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under this Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Wind-Down Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

D.    *Releases by the Debtors*

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, their Estates, and the Wind-Down Debtors (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates),**

whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Person or its estate, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, ~~any Monetization Transaction~~the OAG/Genesis Settlement Agreement, the SEC/Genesis Settlement Agreement, the related agreements, instruments, and other documents (including the Definitive Documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.D shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the

Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

E.    *Releases by Releasing Parties*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, to the fullest extent allowed by applicable law, each Releasing Party hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases each Debtor, Estate, Wind-Down Debtor, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its ~~estate, heirs, executors, administrators,~~ successors, assigns, ~~managers, accountants, attorneys,~~or representatives~~, consultants, agents, and any other persons~~ claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' ~~in or out-of-court~~in-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, ~~any Monetization Transaction~~the OAG/Genesis Settlement Agreement, the SEC/Genesis Settlement Agreement, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of

the Debtors or the Wind-Down Debtors on account of any Allowed Claims that are treated under the Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.E shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties. **For the avoidance of doubt, OAG is not a Releasing Party and does not release any claim it has or may have against the Other Defendants (as defined in the OAG/Genesis Settlement Agreement) or, except to the extent provided in the OAG/Genesis Settlement Agreement, against the Debtors.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Releasing Parties set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties **for the reasons set forth in Exhibit F of the Plan Supplement and otherwise as stated on the record at the Confirmation Hearing**; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases except as expressly set forth in the Plan.

F.    *Exculpation*

Except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, ~~any Monetization Transaction~~**the OAG/Genesis Settlement Agreement (except as otherwise provided therein with respect to the Debtors), the SEC/Genesis Settlement Agreement**, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or

entered into in connection with the Debtors' ~~in or out-of-court~~ in-court restructuring efforts, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the **pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the** solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.F shall, nor shall it be deemed to, release or exculpate **(i) any Exculpated Party for any act or omission after the Effective Date or (ii)** any DCG Party.

G.    *Injunction*

**From and after the Effective Date through and until the date on which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed to Holders of Claims or otherwise in accordance with the terms of the Plan and the Plan Administration Agreement and the Plan has been fully administered, E**e~~x~~cept as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, together with their respective present or former employees, agents, officers, directors, principals, and Affiliates, are enjoined~~, from and after the Effective Date through and until the date on which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed to Holders of Claims or otherwise in accordance with the terms of the Plan and the Plan Administration Agreement and the Plan has been fully administered,~~ from taking any of the following actions against, as applicable, the Debtors~~, or~~ the Wind-Down Debtors~~, the Released Parties, or the Exculpated Parties~~ (collectively, the "*Enjoined Actions*"): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests;

**(ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action in the Bankruptcy Court to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan. Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors. Nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.**

H.     *Additional Provisions Regarding Governmental Units*

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

The enforcement of any money judgment by the SEC or other Governmental Units against the Debtors or the Wind-Down Debtors shall be subject to the Plan. In addition, the SEC and other Governmental Units reserve their rights to amend any Filed Proofs of Claim and the Debtors and the Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, or any findings announced in connection with the Plan, the Disclosure Statement, or the Confirmation Order, nothing in the Plan, the Disclosure Statement, or the Confirmation Order shall constitute a finding under either federal or state (including New York State) securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC or other Governmental Units to challenge transactions involving crypto tokens on any basis is expressly reserved. The Bankruptcy Court is not making any findings as to the availability of any exemptions under the securities laws.

I.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors, deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors, or condition such a grant to, or discriminate with respect to such a grant against, the Wind-Down Debtors or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, or has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases).

J.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

L.    *Document Retention*

On and after the Effective Date, theall of the Debtors' books, records, electronically stored information, and other documents shall become the books, records, electronically stored information, and other documents of the Wind-Down Debtors.  The Wind-Down Debtors or the PA Officer may maintain documents in accordance with the Debtors' existing standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors or the PA Officer; *provided*, *however*, that the Wind-Down Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, or other documents without providing advance notice to the SEC (c/o William M Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment, and with the permission of the PA Officer or authorization from the Bankruptcy Court; *provided further* that, nothing in the Plan or the Confirmation Order shall

affect the obligations of the Debtors, the Wind-Down Debtors, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.*; provided further that the Debtors and the Wind-Down Debtors shall not be permitted to destroy or otherwise abandon any documents relevant to the Retained Causes of Action without the Ad Hoc Group's Consent and the Committee's Consent prior to the Effective Date or the Litigation Oversight Committee's Consent from and after the Effective Date.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1.    the Confirmation Order, with respect to which the Debtors shall have obtained the Committee's Consent, the Ad Hoc Group's Consent, and, to the extent applicable, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing), shall have been entered, and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

2.    the New Governance Documents, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent, and the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

3.    all other Definitive Documents shall have been effected or executed and delivered in accordance with the terms of the Plan;

4.    all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

5.    all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents and agreements;

6. to the extent any 3AC Claims are not disallowed by an order of the Bankruptcy Court prior to the Effective Date, a reserve shall have been established in respect of such 3AC Claims

97

in an amount, manner, and form of consideration satisfactory to the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent;

6.     7.  each Claims Reserve shall have been funded in an amount equal to the applicable Claims Reserve Amount, with the Committee's Consent and the Ad Hoc Group's Consent;

7.     8.  (a) the Gemini Determinations shall have occurred or (b) the Gemini Additional Collateral Determination shall have occurred and the Gemini GBTC Shares Reserve shall have been established by Gemini or the Gemini Distribution Agent in the manner provided for in the definition of Plan (including the Gemini GBTC Shares Reserve Principles);

8.     9.  each Wind-Down Reserve and the Litigation Reserve shall have been funded in the amounts set forth in the Wind-Down Budget, with the Committee's Consent and the Ad Hoc Group's Consent; and

9.     10.  the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Reserve Amount.

B.     *Waiver of Conditions*

The Debtors, with the Committee's Consent, the Ad Hoc Group's Consent, and, solely with respect to Article IX.A.1 and IX.A.8 7 of the Plan, Gemini's Consent (solely with respect to Article IX.A.1, if the Gemini Acceptance Event has occurred and is continuing), may waive any of the conditions precedent to the Effective Date of the Plan set forth in Article IX.A at any time, without any notice to any other parties in interest, any further notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Plan.

C.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.     *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including the Distribution Principles) prior to Confirmation (including any exhibit or Plan Supplement) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) of any alteration, amendment, or modification of the Distribution Principles.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan in accordance with Article X.A of the Plan occurring after the solicitation thereof but before entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such revocation or withdrawal) or in the exercise of the Debtors' Fiduciary Duty Action, to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests),

assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and the authority and power to adjudicate all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction, power, and authority to:

1.     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured, unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.     resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5.     consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings (including the Turnover Actions), contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10.      enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.      resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

15.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.      adjudicate any and all disputes arising from or relating to distributions under the Plan (including the Distribution Principles) or any transactions contemplated therein;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter involving the Wind-Down Debtors or relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     enter an order concluding or closing the Chapter 11 Cases;

23.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Wind-Down Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Wind-Down Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or the Committee with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or the Committee with respect to the Holders of Claims or Interests.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtors, as applicable, shall be served on:

| | |
|---|---|
| **The Debtors or the Wind-Down Debtors** | **Genesis Global Holdco, LLC**<br>175 Greenwich Street, Floor 38<br>New York, NY 10007<br>Attn:  A. Derar Islim |
| **Attorneys to the Debtors** | **Cleary Gottlieb Steen & Hamilton LLP**<br>One Liberty Plaza<br>New York, NY 10006<br>Attn:  Sean A. O'Neal<br>        Luke A. Barefoot<br>        Jane VanLare |
| **Committee** | **White & Case LLP**<br>1221 Avenue of the Americas<br>New York, NY 10020-1095<br>Attn:  Christopher Shore<br>        Philip Abelson<br>        Michele J. Meises<br><br>Southeast Financial Center<br>200 South Biscayne Blvd, Suite 4900<br>Miami, FL 33131<br>Attn: Amanda Parra Criste |
| **Ad Hoc Group** | **Proskauer Rose LLP** |

103

Eleven Times Square
New York, NY 100363-8299
Attn: Brian S. Rosen

70 West Madison
Suite 3800
Chicago, IL 60602
Attn: Jordan E. Sazant

| | |
|---|---|
| **Litigation Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **Wind-Down Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **PA Officer** | To be included in the Plan attached to the Confirmation Order. |
| **Gemini Distribution Agent** | **Hughes Hubbard & Reed LLP**<br>One Battery Park Plaza<br>New York, New York 10004<br>Attn: Anson B. Frelinghuysen<br>        Dustin P. Smith<br>        Erin E. Diers |

F.    *Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/genesis/ or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

H.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter

and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan ~~will~~shall remain in full force and effect and ~~will~~shall in no way be affected, impaired, or invalidated by such alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, the Committee's Consent, the Ad Hoc Group's Consent, and solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan (including the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing); and (3) nonseverable and mutually dependent. Notwithstanding anything to the contrary in the Plan, if an order of the Bankruptcy Court (including the Confirmation Order) or applicable law at any time renders the release and waiver of Resolved Preference Claims under the Plan invalid, void, or otherwise unenforceable, prior to confirmation of the Plan, (A) the Debtors shall provide Holders of Claims that submitted a Ballot to accept or reject the Plan a notice regarding such determination and the opportunity to change their vote to accept or reject the ~~Amended~~ Plan, (B) such Holders shall have twenty-one (21) days from the receipt of such notice to change their votes to accept or reject the Plan, and (C) in the event that any such Holder does not tender a replacement Ballot, such Holder's original vote with respect to the Plan shall remain in full force and effect.

I.     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and to the extent that any Digital Asset is deemed to be a "security" by the SEC or any Governmental Unit, ~~pursuant to~~to the extent that section 1125(e) of the Bankruptcy Code applies, the Debtors, ~~the Wind Down Debtors, the Disbursing Agent, the Gemini Distribution Agent, and the PA Officer~~ and each of their respective Affiliates, agents (including, for the avoidance of doubt, Gemini in its role prescribed in the Disclosure Statement Order), representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold, and in the distribution of Digital Assets, under the Plan and any previous plan, and, therefore, none of such parties or individuals ~~will~~shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

J.      *Request for Expedited Determination of Taxes*

The Debtors or the Wind-Down Debtors, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

K.      *Closing of Chapter 11 Cases*

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

M.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors' or the Wind-Down Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or ~~papers~~a pleading Filed with the Bankruptcy Court or the Solicitation Agent prior to the Confirmation Date.

N.      *Dissolution of the Committee*

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Bankruptcy Court with respect to (1) the preparation and prosecution of any final fee applications of the Committee's Professionals and (2) all final fee applications Filed with the Bankruptcy Court.

\* \* \* \*

106

Respectfully submitted, as of the date first set forth below,

Dated:      ~~November 28, 2023~~February 15, 2024
            Park City, Utah

                              GENESIS GLOBAL HOLDCO, LLC
                              on behalf of itself and all other Debtors


                              _/s/ Paul Aronzon_____
                              Paul Aronzon
                              Member of the Special Committee