**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
Facsimile: (202) 857-0940
Joshua M. Wesneski

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC. AND DCG**
**INTERNATIONAL INVESTMENTS LTD.'S OBJECTION AND**
**RESERVATION OF RIGHTS TO DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER APPROVING A SETTLEMENT AGREEMENT BETWEEN THE**
**DEBTORS AND THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R) (collectively, the "**Debtors**"). For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................3

    I.    The NYAG Asserts Claims Against the Debtors.....................................3

    II.    The Debtors Have Initial Discussions With the NYAG but Do Not Engage in Genuine Negotiations ....................................................................4

    III.    The Debtors Propose the NYAG Agreement to Preempt Adverse Confirmation Rulings.........................................................................7

    IV.    The Debtors File the NYAG Motion .................................................10

    V.    ████████████████████████████████████████ ..........................................12

ARGUMENT ......................................................................................................13

    I.    The NYAG Agreement Violates the Bankruptcy Code..........................16

        A.    The NYAG Agreement Violates Bankruptcy Code Sections 1129 and 502(b) .......................................................................18

        B.    No Exception to Jevic Applies Here...........................................21

        C.    The NYAG Agreement Is an Impermissible Sub Rosa Plan ....................22

    II.    The NYAG Agreement Is Not Fair and Equitable and Should Not Be Approved......................................................................................24

        A.    The Debtors Did Not Sufficiently Weigh the Litigation's Possibility of Success Against the NYAG Agreement's Future Benefits ...................................................................................26

        B.    The Debtors Failed to Adequately Analyze the Likelihood of Complex and Protracted Litigation...........................................31

        C.    The Fact That the NYAG Agreement Benefits Certain Creditors Should Not Be Afforded Significant Weight...............................32

        D.    DCG, The Debtors' Sole Equity Holder Does Not Support the NYAG Agreement as It Is Unfair to DCG.................................32

        E.    The Parties Were Represented by Competent Counsel ............................33

        F.    The NYAG Agreement Does Not Provide for Releases for the Debtors' Officers and Directors...........................................34

        G.    The Debtors Have Not Demonstrated that the NYAG Agreement Is the Product of Arms-Length Bargaining.................................34

RESERVATION OF RIGHTS ...................................................................................37

CONCLUSION ....................................................................................................37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 60 E. 80th St. Equities, Inc.*,
218 F.3d 109 (2d Cir. 2000)...............................................................................15

*In re Aaura, Inc.*,
2006 WL 2568048 (Bankr. N.D. Ill. Sept. 1, 2006) ................................................20

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y.) .....................................................................32, 34

*In re Am. Motor Club, Inc.*,
149 B.R. 317 (Bankr. E.D.N.Y. 1993)...............................................................14

*In re Am. Reserve Corp.*,
841 F.2d 159 (7th Cir. 1987) ............................................................................31

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...............................................................32

*In re Claar Cellars LLC*,
2020 WL 1238924 (Bankr. E.D. Wash. Mar. 13, 2020).........................................17

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017).................................................................................. *passim*

*In re DiStefano*,
No. 16-10694, 2022 WL 4086979 (Bankr. N.D.N.Y. Sept. 6, 2022) ...............................26, 29

*In re Drexel Burnham Lambert Grp., Inc.*,
134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...............................................................24

*Finanz AG Zurich v. Banco Economico S.A.*,
192 F.3d 240 (2d Cir. 1999)..............................................................................20

*Freeman v. Journal Register Co.*,
452 B.R. 367 (Bankr. S.D.N.Y. 2010) ...............................................................15

*In re Fryar*,
570 B.R. 602 (Bankr. E.D. Tenn. 2017) ...............................................................17

*Geltzer v. Andersen Worldwide, S.C.*,
No. 05 CIV. 3339 (GEL), 2007 WL 273526 (S.D.N.Y. Jan. 30, 2007) ...................29

*Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*,
    506 B.R. 29 (Bankr. E.D.N.Y. 2014) ............................................... 24

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) .......................................................... 14

*In re Grand Jury Proc.*,
    219 F.3d 175 (2d Cir. 2000) .......................................................... 28

*Guippone v. BH S & B Holdings, LLC*,
    2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ................................. 34

*In re Interstate Cigar Co.*,
    240 B.R. 816 (Bankr. E.D.N.Y. 1999) ..................................... 27, 33

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) .................................................. *passim*

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) ........................................................ 14

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) .......................................................... 15

*In re Latam Airlines Grp. S.A.*,
    620 B.R. 722 (Bankr. S.D.N.Y. 2020) .......................................... 22

*In re Lehman Bros. Hldgs. Inc.*,
    602 B.R. 564 (Bankr. S.D.N.Y. 2019) .......................................... 20

*In re Magnesium Corp. of Am.*,
    583 B.R. 637 (Bankr. S.D.N.Y. Mar. 30, 2018) ........................... 15

*In re MF Global Inc.*,
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) .......................................... 24

*In re Miami Metals I, Inc.*,
    603 B.R. 531 (Bankr. S.D.N.Y. 2019) .......................................... 33

*Miller Tabak Hirsch & Co. v. Comm'r*,
    101 F.3d 7 (2d Cir. 1996) ............................................................. 17

*In re NETtel Corp.*,
    2020 WL 2047965 (Bankr. D.D.C. Apr. 28, 2020) ........................ 17

*In re New Era Co.*,
    115 B.R. 41 (Bankr. S.D.N.Y. 1990) ............................................ 14

*In re NII Holdings*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...............................................................26, 30

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ...............................................................33

*In re Paul A. Nelson, P.A.*,
203 B.R. 756 (Bankr. M.D. Fla. 1996) ...............................................................4

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016) .......................................................32, 33, 34

*In re SageCrest II, LLC*,
2011 WL 134893 (D. Conn. Jan. 14, 2011) ...............................................................23

*Se. Fed. Power Customers, Inc. v. Geren*,
514 F.3d 1316 (D.C. Cir. 2008) ...............................................................17

*Sec. & Exch. Comm'n v. Sec. Nw., Inc.*,
573 F.2d 662 (9th Cir. 1978) ...............................................................14

*In re SunEdison, Inc.*,
575 B.R. 220 (Bankr. S.D.N.Y. 2017) ...............................................................18

*In re Teligent, Inc.*,
640 F.3d 53 (2d Cir. 2011) ...............................................................14

*In re Texaco Inc.*,
84 B.R. 889 (Bankr. S.D.N.Y. 1988) ...............................................................14

*In re Tovan Constr., Inc.*,
2021 WL 1235359 (Bankr. E.D. Va. Mar. 31, 2021) ...............................................................16

*In re Vitta*,
409 B.R. 6 (Bankr. E.D.N.Y. 2009) ...............................................................4

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ...............................................................28

**Statutes**

11 U.S.C. § 502(b) ............................................................... *passim*

11 U.S.C. § 1109(b) ...............................................................14

11 U.S.C. § 1129 ...............................................................16, 18

11 U.S.C. § 1129(b) ...............................................................16, 18

Fed. R. Bankr. P. 9019 ............................................................................................... *passim*

Fed R. Civ. P. 30(b)(6) ........................................................................................17, 35

**Other Authorities**

*In re BlockFi Inc.*,
   No. 22-19361 (Bankr. D.N.J. Oct. 3, 2023) [Docket No. 1660] ..............................................20

*In re Celsius Network LLC*,
   No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023) [Docket No. 3577] ......................................20

*In re FTX Trading Ltd.*,
   No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31 Hr'g Tr.) ........................................................20

New York Executive Law § 63(12) ....................................................................................4

New York General Business Law §§ 352 *et seq.* ..............................................3, 27, 30

New York General Business Law § 359-e ........................................................................4

*In re Voyager Digital Holdings*,
   No. 22-10943 (Bankr. S.D.N.Y. Mar. 5, 2023) [Docket No. 1138] ........................................20

Digital Currency Group, Inc. and DCG International Investments Ltd. (collectively, "**DCG**") submit this objection (the "**Objection**") to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General)* [Docket No. 1275] (the "**NYAG Motion**")[2] and respectfully state as follows:[3]

## Preliminary Statement

1.      The basis for DCG's objection is simple:  the Debtors cannot, under the guise of a "settlement," take value from lower classes and redistribute it to preferred creditors in violation of absolute priority.  And they certainly cannot "settle" a case for ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    The NYAG Agreement should be rejected.

2.      The NYAG Agreement[4] is the product of a careful scheme to provide insurance against an adverse decision on the Debtors' plan.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such term in the NYAG Motion.

[3]     Contemporaneously herewith, DCG filed the *Direct Testimony of Jason Brown in Support of Digital Currency Group Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* (the "**Brown Decl.**") and the *Direct Testimony of Adam W. Verost in Support of Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General.*

[4]     "**NYAG Agreement**" means that certain Stipulation and Consent to Judgment, attached to the NYAG Motion as **Exhibit C**.

1

3.      Despite the Debtors' characterization otherwise, the NYAG Agreement is not a

settlement. ███████████████████████████ the Debtors have simply

given away the entire residual value of their estates to the NYAG after unsecured creditors are

paid in full in accordance with a lawful plan.  The NYAG is then obligated to funnel the value

received from the Debtors to unsecured creditors.  In other words, if the Debtors' plan—which

currently proposes to pay unsecured creditors based on the valuation of their claims as of the

distribution date, rather than as of the petition date as required by the Bankruptcy Code—is not

confirmed, the NYAG Agreement would still allow unsecured creditors to recover the value of

their claims as of the distribution date.  Assuming current values for the Debtors' estates' digital

assets and assuming the final plan complies with the Bankruptcy Code and section 502(b), the

ultimate payout under the NYAG Agreement could be in the ██████████████████

████    *See* Brown Decl. ¶ 17.

4.      There is no ambiguity about what the Debtors intended:  in the Debtors' own words,

the NYAG Agreement is designed to ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

attached hereto as **<u>Exhibit A</u>**.  The Ad Hoc Group of Genesis Lenders (the "**Ad Hoc Group**")—

████████████████████████████████████████████

████████—observed that the NYAG Agreement ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ attached hereto as

**Exhibit B** ███████████████████

5.      To be clear, the NYAG Agreement is a blatant and desperate attempt by the Debtors—in haste and with no apparent negotiation—to rig the outcome of the confirmation hearing.  Even if the NYAG were to prevail on every claim against the Debtors and recover the full damages allowed by law, that would still not justify the NYAG Agreement's distribution scheme, which simply hands over to the NYAG (and ultimately unsecured creditors) all residual value left in the Debtors' estates after unsecured creditors are paid in full in accordance with the plan.  Approving the Debtors' "settlement" with the NYAG would rob DCG, a creditor and equity holder, of a fair opportunity to participate in the waterfall under the Debtors' plan, and would require this Court to violate numerous provisions of the Bankruptcy Code as well as U.S. Supreme Court precedent in *Jevic*, which holds that a settlement providing for final distributions cannot violate the Bankruptcy Code's priority scheme or accomplish outside of a plan what would be prohibited under a plan.  This Court should not allow this work-around of the Bankruptcy Code.

## Background

### I.      The NYAG Asserts Claims Against the Debtors.

6.      Sometime following the Debtors' suspension of digital-asset lender redemptions in November 2022, the NYAG launched an investigation into the Debtors and Other Defendants, including DCG, for, among other things, use of fraudulent practices and engagement in repeated fraudulent or illegal acts to defraud investors in violation of New York General Business Law

§§ 352 *et seq.* (the "**Martin Act**") (which provides the NYAG a right of action to prosecute securities fraud),[5] New York Executive Law § 63(12), and General Business Law § 359-e.

7.      On July 14, 2023, NYAG filed proofs of claim numbered 855, 856, and 857 (the "**Proofs of Claim**") against GGH, GGC and GAP respectively, in these    chapter 11 proceedings.  The NYAG asserted claims for more than $1.1 billion in restitution, plus additional amounts in disgorgement and damages, as well as injunctive and other equitable relief, all pursuant to alleged violations of the Martin Act, New York Executive Law § 63(12), and General Business Law § 359-e.

8.      On October 19, 2023, the NYAG filed a Complaint in the Supreme Court of the State of New York, County of New York against certain of the Debtors, Gemini, DCG, and other related parties, captioned *The People of the State of New York v. Gemini Trust Co. et. al.,* Case No. 452784/2023 (the "**NYAG Complaint**").  The NYAG Complaint also asserted causes of action based on the Debtors' alleged violations of the Martin Act, New York Executive Law § 63(12), and General Business Law § 359-e.

## II.    The Debtors Have Initial Discussions With the NYAG but Do Not Engage in Genuine Negotiations.

9.      On the eve of the NYAG Complaint, the Debtors represented to the NYAG that █

████████████████████████████████████████████████████████████

---

[5]    Of note, forfeiture claims brought under New York law for violations of the Martin Act, unlike federal forfeiture statutes, do not relate back to the date of the alleged crime and thus, "title does not vest in the claiming authority until after a valid order of forfeiture has been entered." *In re Vitta,* 409 B.R. 6, 18 (Bankr. E.D.N.Y. 2009).  In other words, any forfeiture arising from the NYAG's Martin Act causes of action would be deemed a prepetition claim, and the Debtors cannot argue that any of the assets they are distributing pursuant to the NYAG Agreement is not property of the estate or otherwise outside the reach of the absolute priority rule and its corollary.  Nor does a claim of restitution under state law allow a governmental unit to exercise control over property of the estate such that it would be exempted from the Bankruptcy Code's priority scheme.  *In re Paul A. Nelson, P.A.,* 203 B.R. 756, 764 (Bankr. M.D. Fla. 1996) (noting that a state court order for restitution would create an advantage for some creditors over others, and that "restitution cannot be assessed postpetition against property of [the debtor's] bankruptcy estate").

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ The Debtors argued that the NYAG ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

10.    The record shows, however, ████████████████████████████

███████████████████████████████████████████████

████████████████████████████ ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████

11.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███ attached hereto as **Exhibit D**.  According to the draft ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ attached

hereto as **Exhibit E** ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

attached hereto as **Exhibit F**████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ attached hereto as **Exhibit G**███

████████████████████████████████████ attached hereto as

**Exhibit H**████████████████████████████████████████████████

██████████████████

12.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ attached hereto as

**Exhibit I**████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ attached hereto as **Exhibit J**████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ [6]

13.    ████████████████████████████████████████████████████

████████████████████████████████████ the Debtors continued to "dispute the allegations in the NYAG Complaint regarding the involvement of GGC, GAP, GGH, and any of their directors and officers in the "DCG Scheme" or any other fraudulent conduct related to the Gemini Earn Program or the DCG Note." *Amended Disclosure Statement With Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [Docket No. 1031] at 61.

14.    During the same timeframe, ████████████████████████████████

████████████████████████████████████████████████████ ████████

██████████████████████████████████

15.    On November 28, 2023, the Debtors filed the *Debtors' Amended Joint Chapter 11 Plan* [Docket No. 989].

### III.    The Debtors Propose the NYAG Agreement to Preempt Adverse Confirmation Rulings.

16.    In January and early February 2024, DCG was engaged in expedited plan discovery in support of its objection to the plan, which was then scheduled for a confirmation hearing commencing on February 14, 2024.[7] ████████████████████████████████████

████████████████████████████████████

---

[6]    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

[7]    In that regard, DCG served document requests on December 27, 2023, and took the 30(b)(6) depositions of two Debtor witnesses—Paul Aronzon (a member of the Special Committee) and Joe Sciametta (Alvarez & Marsal, financial advisor to the Debtors) on January 30 and 31, as well as 30(b)(6) depositions of the Official Committee of Unsecured Creditors (the "**UCC**") and the Ad Hoc Group, on January 24 and 26, 2024. DCG served its

17.    On January 25, 2024, the Debtors ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████    Debtors' counsel stated ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████    Debtors' counsel asserted his belief

████████████████████████████████████████

18.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

attached  hereto  as  **Exhibit  K**████████████████████████████████████

attached hereto as **Exhibit L**████████████

19.    On January 31, 2024, counsel for the Ad Hoc Group ████████████████

████████████████████████████████████████████████    In a follow-up email to

that call, counsel to the Ad Hoc Group ████████████████████████████████

████████████████████    Counsel to the Ad Hoc Group ████████████████████

---

objection to the Amended Plan on February 6, 2024.  *See Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection to Confirmation of the Debtors' Amended Plan* [Docket No. 1257] (the "**DCG Plan Objection**").

[8]    *See also, e.g.,* ████████████████████████████████    attached hereto as **Exhibit M**
████████████████████████    attached hereto as **Exhibit N**
████████████████████████████████    attached hereto as **Exhibit O**
████████████████████████    attached hereto as **Exhibit P**
████████████████████    attached hereto as **Exhibit Q**
████████████████████    attached  hereto  as  **Exhibit  R**
████████████████████

██████████████████████████████████████████████████████████ Most

relevant here, the Ad Hoc Group's counsel ████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

██

20.     Thus, the final proposed NYAG Agreement provides that:  (1) the Debtors stipulate

to an allowed general unsecured claim in favor of the NYAG in an amount equal to the difference

between (i) the "Aggregate Claim Amount" (which is calculated to capture not just the dollarized

value on the petition date of claims held by unsecured creditors but also the appreciation of digital

assets during the chapter 11 cases) and (ii) the aggregate value of the distributable assets to holders

of general unsecured claims (excluding Other Defendants); and (2) the NYAG "agrees that any

distributions it receives in respect of the [NYAG] Claims will be turned over to holders of allowed

general unsecured claims [of the Debtors]."  NYAG Agreement ¶¶ 6-8.  In this way, the proposed

settlement accomplishes the same ends sought to be achieved in the Amended Plan:  to distribute

to unsecured creditors more than the maximum value of their claims as of the petition date.  *See*

*id*.; ██████████████ attached hereto as **Exhibit S** ████████████████████

21.     Crucially ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ For this reason, the Debtors ████████████████

9



[9] Likewise, the final version of the proposed settlement also provides that "[o]nce approved by the Bankruptcy Court, the [NYAG Agreement] shall be binding . . . . *regardless of whether the Bankruptcy Court confirms the Amended Plan*." NYAG Agreement ¶ 21 (emphasis added).

## IV.    The Debtors File the NYAG Motion

22.

attached hereto as **Exhibit T**.  The parties executed the NYAG Agreement the next day,

attached hereto as **Exhibit U**.

23.    Also on February 8, 2024, the Debtors filed the NYAG Motion, along with a declaration in support from Paul Aronzon, a member of the Debtors' Special Committee.  The

---

[9]    *See* NYAG Agreement ¶ 7 ("*Notwithstanding anything contained herein, in the Amended Plan, or in the order confirming the Amended Plan to the contrary,* with respect to any allowed claim that is arising from, related to, or denominated in digital assets, the Aggregate Claim Amount shall be calculated as if any allowed claim based on a loan or investment denominated in a digital asset is converted into the equivalent U.S. dollar value using the price of the applicable digital asset on the applicable distribution calculation date, which distribution calculation date, which distribution calculation date shall be no earlier than thirty (30) days before the applicable distribution date.") (emphasis added).

declaration asserts, among other things, that the NYAG Agreement was the product of "months of hard-fought negotiations between the NYAG and the Debtors' counsel." Aronzon Decl. ¶ 7. ███

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ For instance. ██████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Questions concerning ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

24.    On the same day as the filing of the NYAG Motion, the Debtors filed the *Debtors' Motion to Shorten the Notice Period with Respect to the Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* (Docket No. 1276) (the "**NYAG Motion to Shorten Notice**") to have the NYAG Motion heard on February 14, 2024, merely three (3) business days after filing the NYAG Motion.

25.    The next day, on February 9, 2024, DCG submitted the *Letter to the Honorable Sean H. Lane Regarding Request for Emergency Chambers Conference Regarding Debtors' Material Motions and Motions to Shorten Notice* (Docket No. 1279) (the "**DCG Letter**"), requesting an emergency conference to discuss the Debtors' attempt to circumvent plan

confirmation requirements by re-routing ██████████ of the estates' excess value from junior stakeholders to the NYAG under the guise of a settlement, and the Debtors' abuse of process in requesting that the Court rubber stamp the settlement within three (3) business days.

26.    In response to the DCG Letter, the Court scheduled a conference on February 9th, at 3:00 P.M. (the "**Conference**"), which included, among others, representatives from the Debtors, DCG, the UCC, the Ad Hoc Group, and Gemini Trust Company, LLC.  At the Conference, the Court denied the NYAG Motion to Shorten Notice, set February 21, 2024 as the objection deadline for the NYAG Motion, and set February 26, 2024 as the hearing date for both the NYAG Motion and plan confirmation.

27.    On February 16, 2024, the Debtors filed the *Debtors' Amended Joint Chapter 11 Plan* [Docket No. 1331], (as amended, modified or supplements, the "**Amended Plan**").

**V.**     ████████████████████████████████████
████████████

28.    On February 16, 2024, DCG deposed Paul Aronzon, one of two members of the Special Committee. ████████████████████████████████████
██████████████████████████████████During the deposition, ███
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

29.    On February 20, 2024, DCG deposed Tom Conheeney, the other member of the Special Committee. ███████████████████████████████████
████████████████████████████████████████████attached

hereto as **Exhibit V** 

30.

**Argument**

31.    The NYAG Agreement should not be approved because it (a) violates the Bankruptcy Code, and (b) does not satisfy the factors for approval of settlements pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Rule 9019**") set forth in *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).

32.    As a threshold matter—and because the Debtors have contested the issue in related contexts—there is no question that DCG has standing to file this Objection.  Section 1109(b) of



the Bankruptcy Code provides that "[a] party in interest, including . . . an equity security holder . . . , may raise and may appear and be heard on any issue in a case under" chapter 11. 11 U.S.C. § 1109(b). Courts have thus repeatedly recognized that in the chapter 11 context, an equity holder of a debtor has standing to object to plan confirmation or settlements, even if the estate is likely to be insolvent. *See, e.g.*, *In re Am. Motor Club, Inc.*, 149 B.R. 317, 322 (Bankr. E.D.N.Y. 1993); *In re New Era Co.*, 115 B.R. 41, 45–46 (Bankr. S.D.N.Y. 1990); *In re Texaco Inc.*, 84 B.R. 889, 891 (Bankr. S.D.N.Y. 1988). The right for an interested party to be heard "is manifestly intended to provide those with a palpable financial interest in the future of the corporation following reorganization with an opportunity to participate in the proceedings in order to promote and protect those present and continuing interests." *Sec. & Exch. Comm'n v. Sec. Nw., Inc.*, 573 F.2d 662, 625 (9th Cir. 1978); *see also In re Teligent, Inc.*, 640 F.3d 53, 60 (2d Cir. 2011) ("The general theory behind the section is that anyone holding a direct financial stake in the outcome of the case should have an opportunity to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest.") (internal citations and quotation marks omitted); *Id.* at 61 ("[A]ny construction of the term 'party in interest' must be mindful of the fact that Chapter 11 is structured the way that it is because Congress believed that 'creditors and equity security holders are very often better judges of the debtor's economic viability and their economic self-interest'. . . .") (citations omitted).[12] There is no question DCG, as the ultimate equity holder of the Debtors, has "legally protected interests" under the Bankruptcy Code such that it has standing to enforce those interests.

---

[12]    *See also In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) (holding that the relevant question is whether the objectors "have legally protected interests that could be affected by the [challenged action]."); *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) ("[A]nyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains . . . .").

33.     Nonetheless, the Debtors have argued that because they believe it is unlikely the Debtors' estates will be solvent at the time of distribution, DCG lacks standing to object to the distribution of estate assets.   That is incorrect:   the cases limiting the standing of equity stakeholders arose either in the context of chapter 7 (under which section 1109(b) does not apply and, standing requirements, even for the *debtor*, are stricter), *see In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000); *In re Magnesium Corp. of Am.*, 583 B.R. 637, 649–51 (Bankr. S.D.N.Y. Mar. 30, 2018), or where the objectors' recovery from the estate was categorically foreclosed "no matter the terms of a plan," *Freeman v. Journal Register Co.*, 452 B.R. 367, 371 (Bankr. S.D.N.Y. 2010).

34.     Neither circumstance is present here.   These are chapter 11 cases, and there is nothing categorically foreclosing DCG from recovering under a properly designed plan.   The majority of claims have not been objected to, given that the claims objection deadline has not yet passed.   Moreover, the total value of the Debtors' estates is in substantial flux as a result of changes in the value of the Debtors' digital assets—which has further grown by hundreds of millions of dollars just in the past few weeks.   *See* Brown Decl. ¶ 17.   The possibility that DCG "might do better . . . under alternative plans" to what the Debtors have proposed is sufficient to confer standing.   *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988).   Indeed, one might reasonably ask why DCG has devoted such resources to this case if its recovery actually were foreclosed.   The simple answer is that there is no such foreclosure to recovery—DCG remains an interested party in this contested chapter 11 bankruptcy proceeding, where the value of the Debtors' estates and the amount of allowed claims are still undetermined.

I.    **The NYAG Agreement Violates the Bankruptcy Code.**

35.    Counsel for other interested parties—including counsel for the Ad Hoc Group—has repeatedly and incorrectly asserted that DCG's only ground for objection is to dispute the merits of the underlying NYAG claims against the Debtors.  But this Court need not undertake any examination of the merits of the NYAG claims because the Supreme Court has squarely held that a bankruptcy court cannot approve a settlement by a chapter 11 debtor if the settlement violates the Bankruptcy Code, including the priority of distributions set forth in section 1129(b).  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see also Iridium*, 478 F.3d at 464 ("In the Chapter 11 context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be the dispositive factor" on whether to approve a Rule 9019 settlement).

36.    In *Jevic*, the Supreme Court held that a bankruptcy court lacked authority to approve a settlement providing distributions to unsecured creditors and a dismissal of the chapter 11 cases without providing any recovery to a class of more senior creditors.  *See* 580 U.S. at 460.  Relying on section 1129 of the Bankruptcy Code, the *Jevic* court explained that a bankruptcy settlement cannot "deviate from the basic priority rules that apply under the primary mechanisms the [Bankruptcy] Code establishes for final distributions of estate value in business bankruptcies" without "the consent of the affected [creditors]."  *Id*. at 455.  The Supreme Court therefore declined to approve the settlement despite the fact the petition *did not challenge* the lower court's finding that the settlement satisfied the multi-factor standard for approval of a Rule 9019 motion.

37.    Both before and after *Jevic*, bankruptcy courts have consistently evaluated, as a threshold matter, whether a proposed settlement would conflict with the Bankruptcy Code, including the rule of absolute priority.  *See, e.g.*, *In re Tovan Constr., Inc.*, No. 19-12423-KHK, 2021 WL 1235359, at *3 (Bankr. E.D. Va. Mar. 31, 2021) ("[G]iven that the settlement purports

16

to settle estate claims, the distributions provided for by the settlement are proceeds of property of the estate and therefore must adhere to the Code's priority schemes."); *In re Fryar*, 570 B.R. 602, 610 (Bankr. E.D. Tenn. 2017) ("In light of the Supreme Court's recent ruling in *Jevic,* parties who seek approval of settlements that provide for a distribution in a manner contrary to the Code's priority scheme should be prepared to prove . . . any deviation from the priority scheme for a portion of the assets is justified because it serves a significant Code-related objective.").[13]  This requirement that settlements comply with the Bankruptcy Code is consistent with longstanding Second Circuit precedent, which holds that debtors may only settle litigation in a "manner not violative of law or public policy."  *Miller Tabak Hirsch & Co. v. Comm'r*, 101 F.3d 7, 10 (2d Cir. 1996); *see also Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1321 (D.C. Cir. 2008) ("[T]he district court could hardly approve a settlement agreement that violates a statute . . . .").

38.     As set forth below, the NYAG Agreement proposes a distribution that provides the NYAG an *uncapped* recovery untethered to the dollarized value of its claims as of the Petition Date (the "**Dollarized Value**").  But the Bankruptcy Code does not allow a creditor—even one with an unliquidated claim—to recover more than its Dollarized Value.  The NYAG Agreement therefore violates the Bankruptcy Code for all the same reasons as the Amended Plan, and cannot be approved for that reason.  Indeed, ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[13]   Other courts have applied the standards set forth in *Jevic* in non-settlement contexts.  *See, e.g., In re NETtel Corp.*, 2020 WL 2047965, at *3 (Bankr. D.D.C. Apr. 28, 2020) (applying *Jevic* to a motion to amend a judgment that disgorged administrative expense payments made to trustee in order to ensure pro rata distribution among administrative expense creditors); *In re Claar Cellars LLC*, 2020 WL 1238924, at *8 (Bankr. E.D. Wash. Mar. 13, 2020) (applying *Jevic* to a section 363 sale).

███████████████████████████████████

████████████████████

**A.      The NYAG Agreement Violates Bankruptcy Code Sections 1129 and 502(b).**

39.      Where a debtor seeks to "cram down" creditors or equity holders who object to a plan, as is the case here, the plan must comply with the absolute priority rule.  *See* 11 U.S.C. § 1129(b).  "An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims" because "shareholders are entitled to the surplus."  *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017) (citation omitted).   Under the Bankruptcy Code, a creditor's recovery is limited by section 502(b) to the value of its proof of claim "in lawful currency of the United States as of the date of the filing of the petition."  11 U.S.C. § 502(b).[14]

40.      The NYAG Agreement contravenes this limitation by providing the NYAG—and, ultimately, the unsecured creditors—with a recovery greater than the Dollarized Value.  As set forth above, the NYAG filed its Proofs of Claim for $1.1 billion plus unspecified restitution and disgorgement.  The Debtors have not even attempted to provide the Dollarized Value of the NYAG's Proofs of Claim—even though the Ad Hoc Group ███████████████████████

███████████████████████████████████

---

[14]      The Debtors and the interested creditor committees have argued that section 502(b) does not apply here because there has been no "objection" to the creditors' claims, including the NYAG's.  *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [Docket No. 1330] (the "**Debtors' Confirmation Br.**") ¶ 30; *The Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [Docket No. 1326] ¶¶ 42–43; *Omnibus Memorandum of Points and Authorities of the Ad Hoc Group of Genesis Lenders in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [Docket No. 1321] at 19.  The deadline for objections—including to the NYAG's Proofs of Claim—is not until 180 days after the effective date of the Amended Plan.  Amended Plan at § I.38.  Moreover, unlike certain other creditors—who denominated their proofs of claim in digital currency—the NYAG denominated its proof of claim in U.S. dollars.  *See* Proofs of Claim.

████████████████████████ The NYAG Agreement attempts to "avoid that issue" by valuing the Proofs of Claim "*as of the chapter 11 plan effective date*," rather than the petition date. *Id.* (emphasis added). The proposed Order and Judgment on Consent is clear on this point, stating that "notwithstanding anything contained herein, *in the Amended Plan*, or in the *order confirming the Amended Plan*," the allowed claim amount "shall be calculated as if any allowed claim based on a loan or investment denominated in a digital asset is converted into the equivalent U.S. dollar value using the price of applicable digital asset on the applicable distribution calculation date." Order and Judgment on Consent ¶ 4 (emphases added).

41.    To effectuate the distribution of claims valued as of the distribution date, the NYAG Agreement calculates the NYAG's claim amount as the difference between the aggregate "in kind recoveries" purportedly owed to unsecured creditors as of the plan effective date, minus the actual distributions paid to such creditors from the Debtors' estates. NYAG Agreement ¶ 6; ████████

████████ Then, the NYAG Agreement provides that any distributions made to the NYAG must be redistributed to the unsecured creditors on a pro rata basis. NYAG Agreement ¶ 8; ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████

42.    The NYAG Agreement is thus, in reality, not a settlement at all: it is insurance in the event this Court rejects the Amended Plan (as it should). The Debtors ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

43.     This scheme plainly violates the Bankruptcy Code, as set forth in the DCG Plan

Objection.  *See, e.g.*, DCG Plan Objection.  Because a creditor cannot recover (over the objection

of other creditors or equity holders) more than the Dollarized Value, proofs of claims denominated

in foreign currencies, *see Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir.

1999), commodities, *see In re Lehman Bros. Hldgs. Inc.*, 602 B.R. 564, 586–87 (Bankr. S.D.N.Y.

2019); *In re Aaura, Inc.*, No. 06-B-01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1,

2006), and, most critically here, digital assets (including cryptocurrencies), *see In re BlockFi Inc.*,

No. 22-19361 (Bankr. D.N.J. Oct. 3, 2023) [Docket No. 1660]; *In re Voyager Digital Holdings*,

No. 22-10943 (Bankr. S.D.N.Y. Mar. 5, 2023) [Docket No. 1138]; *In re Celsius Network LLC*,

No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023) [Docket No. 3577], are all capped at the value of

the relevant asset or currency as of the petition date, not as of the distribution date.  This principle

was upheld by the bankruptcy court in *FTX Trading* just weeks ago.  *See, e.g.*, *In re FTX Trading

Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr.) (attached to the DCG Plan

Objection as **Exhibit A**) at 15:2–11.[15]

44.     Simply put, upon realizing that DCG intended to object to the Amended Plan, the

Debtors and interested creditors structured a deal with the NYAG that obtains the same result

regardless of the result of the confirmation hearing—violation of absolute priority in contravention

---

[15]     Aside from a baseless argument on standing, *compare* Debtors' Confirmation Br. ¶¶ 24-29, *with* DCG Plan
Objection at 9 n.8, the Debtors' principal response to section 502(b) is that it does not impose a *cap* on creditor
recovery, *see* Debtors' Confirmation Br. ¶¶ 32-34.  This lack of a cap runs contrary to all of the cases cited by
DCG—in which creditor recoveries *were* capped by the petition date value of the currency or commodity—and
also makes no sense:  If section 502(b) does not cap creditor recovery, then what is the point of dollarizing a
creditor's claim as of the petition date?

of the Bankruptcy Code.  Under *Jevic*, the Debtors cannot accomplish indirectly what they are prohibited from accomplishing directly under the Amended Plan.

**B.     No Exception to *Jevic* Applies Here.**

45.     There is no applicable exception to *Jevic*'s holding that bankruptcy settlements may not violate absolute priority.

46.     In *Jevic*, the Supreme Court identified only one exception to its holding:  interim distributions that further "significant [Bankruptcy] Code-related objectives that the priority-violating distributions serve."  *Jevic*, 580 U.S. at 467–68.  For example, the *Jevic* court observed that some lower courts had "approved 'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders to continue financing the debtor to be paid first on their prepetition claims."  *Id.* at 468.  These kinds of distributions can "enable a successful reorganization and make even the disfavored creditors better off."  *Id.* (quotation marks omitted).  But the *Jevic* court found this exception for certain interim distributions inapplicable where "the priority-violating distribution is attached to a final disposition; it does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a confirmable plan; it does not help to restore the *status quo ante*; and it does not protect reliance interests."  *Id.*  All of those elements are present here.

47.     *First*, the NYAG Agreement is explicitly attached to a final disposition of assets: The terms of the NYAG Agreement apply to "any chapter 11 plan that is confirmed by the Court or otherwise by a chapter 7 trustee appointed in the Chapter 11 Cases."  NYAG Agreement ¶ 6.  Nothing is paid out of the Debtors' estates now:  it is only after the Amended Plan is confirmed (or rejected and then confirmed as amended) that the NYAG Agreement comes into effect.

48. *Second*, the NYAG Agreement does not preserve the Debtors as a going concern. The Debtors do not intend to operate its business following the effective date of the Amended Plan, regardless of whether the NYAG Agreement is approved.

49. *Third*, the NYAG Agreement makes disfavored creditors—including DCG and all claims subordinated to the NYAG—worse off, not better. Any value that remains after the unsecured creditor claims are fully paid pursuant to a lawful plan (*i.e.*, pursuant to the dollarized value of their claims as of the petition date) is re-routed to the same unsecured creditors through the NYAG Agreement. Nobody benefits except unsecured creditors, whose representatives worked with the NYAG to design the NYAG Agreement.

50. *Fourth*, the NYAG Agreement does not improve the possibility of a confirmable plan; the NYAG Agreement's entire purpose is to serve as a backstop in case the Amended Plan is rejected. It does not, for example, increase the chances of a successful reorganization by providing the Debtors additional liquidity to fund their chapter 11 cases.

51. *Fifth*, the NYAG Agreement does not restore the parties' *status quo ante*, and instead leaves the Debtors worse off than if they had simply litigated the NYAG's claims to judgment.

52. *Finally*, there is no protection of reliance interests. In fact, the NYAG Agreement infringes upon DCG's reliance interest by depriving it of even the possibility of retaining the excess value of the Debtors' estates after creditors' claims are paid in full.

## C.   The NYAG Agreement Is an Impermissible *Sub Rosa* Plan.

53. Relatedly, the NYAG Agreement represents an improper effort to "circumvent the chapter 11 requirements for confirmation of a plan" and therefore is an unlawful "*sub rosa*" plan. *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 812 (Bankr. S.D.N.Y. 2020). A *sub rosa* plan is one that seeks to "short circuit the requirements of chapter 11 for confirmation of a reorganization

plan," and is typified by a debtor transaction that adversely impacts on interested parties' rights to participate in the restructuring process." *Iridium*, 478 F.3d at 466.  For example, in *In re Braniff Airways, Inc.*, the Fifth Circuit held that a proposed asset sale was an impermissible *sub rosa* plan because if approved, it would have dictated some of the terms of any future reorganization plan, restructured the rights of creditors, and required all parties to release all claims against the debtor, its officers, directors, and secured creditors.  700 F.2d 935, 940 (5th Cir. 1983); *see also, In re SageCrest II, LLC*, 2011 WL 134893, at *11 (D. Conn. Jan. 14, 2011) ("Factors that can turn a settlement agreement into a *sub rosa* plan include (1) the agreement has the practical effect of dictating the debtor's reorganization; (2) the agreement infringes creditor voting rights on the debtor's reorganization; (3) the agreement disposes of large assets belonging to the debtor; and (4) the agreement forced creditors to waive their claims against the debtor.") (citations omitted).

54.    Here, the NYAG Agreement clearly seeks to dictate the distribution of estate assets, not by compromising one creditor's recovery, but by literally directing the disposition of the Debtors' residual assets after satisfaction of the unsecured creditors' claims.  By allocating the Debtors' assets under the guise of a settlement—and doing so in a way that plainly violates the absolute priority rule—the NYAG Agreement is a bare *sub rosa* plan that seeks to provide insurance in the event the Court (correctly) rejects the Amended Plan's proposed distribution of assets.  Such circumvention of the chapter 11 confirmation requirements is a misuse of Rule 9019 and cannot be sanctioned.

* * *

55.    The NYAG Agreement is unlawful under section 1129(b), section 502(b), and *Jevic*.  It is a transparent and admitted effort to provide insurance to the unsecured creditors if the unlawful Amended Plan is rejected.  It cannot be approved.

**II.     The NYAG Agreement Is Not Fair and Equitable and Should Not Be Approved.**

56.     Because the NYAG Agreement is unlawful, the Court need not even evaluate the
equitable factors courts in this district consider to determine if a settlement can be approved
pursuant to Bankruptcy Rule 9019—which are laid out in *In re Iridium Operating LLC*.  *See
Iridium*, 478 F.3d at 462.  But even if the Court could set aside those legal infirmities, the NYAG
Agreement does not satisfy the *Iridium* factors.

57.     The proponents of a Rule 9019 settlement bear the burden of proof and persuasion
in seeking court approval.  *See In re MF Global Inc.*, 466 B.R. 244, 248 (Bankr. S.D.N.Y. 2012)
(the settlement proponent bears the burden "to persuade the court that the settlement is in the best
interests of the estate."); *Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*, 506 B.R.
29, 44 (Bankr. E.D.N.Y. 2014) ("[A] debtor may seek approval of a settlement over major creditor
objections as long as it carries its burden, . . . including [that] the paramount interests of creditors[]
weighs in favor of settlement.").  A debtor may not carry that burden simply by invoking its
business judgment:  it is incumbent on the bankruptcy court to independently assess whether the
settlement is "fair, equitable, and in the best interests of the estate."  *Soup Kitchen Int'l*, 506 B.R.
at 36-37 (quoting *In re Residential Capital, LLC,* 497 B.R. 720, 749 (Bankr.S.D.N.Y.2013)); *see
also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (holding
that the bankruptcy court should "make an informed, independent judgment as to whether a
settlement is 'fair and equitable' and 'in the best interests of the estate.'") (citations omitted).

58.     Under *Iridium*, a bankruptcy court evaluating a Rule 9019 motion for approval of
a settlement should consider:

> (1) the balance between the litigation's possibility of success and the settlement's future
> benefits;  (2) the likelihood of complex and protracted litigation, "with its attendant
> expense, inconvenience, and delay," including the difficulty in collecting on the judgment;
> (3) "the paramount interests of the creditors," including each affected class's relative
> benefits "and the degree to which creditors either do not object to or affirmatively support

the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Iridium*, 478 F.3d at 462 (citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

59.     The NYAG Agreement is not a settlement—it provides *no* value to the Debtors. If the Debtors were to instead litigate the NYAG claims to judgment, they would be no worse off (even if they spent millions of dollars to do so and suffered complete defeat on liability and damages) because the NYAG Agreement simply takes all residual value of the Debtors' estates— if any—left after distribution to the unsecured creditors, gifts it to the NYAG, and then redistributes those assets back to the unsecured creditors. The Debtors' estates preserve no assets from the NYAG Agreement that they otherwise would not retain.

60.     Once again, DCG is not seeking here to challenge or litigate the merits of the NYAG's underlying claims against the Debtors. If appropriate, DCG will object to the NYAG's claims in due course. The issue here is that a chapter 11 debtor cannot abrogate its responsibilities to creditors by simply throwing its hands up and giving away the entire value of the estate. It must justify a proposed settlement with evidence that it considered the merits of the claims, evaluated options for resolving those claims, sought the best deal for the estate, and initiated arm's length negotiations to maximize the value of the estate as a whole. █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

61.    Based on the *Iridium* factors and the undisputed factual record, the NYAG Agreement cannot be approved.[16]

### A.    The Debtors Did Not Sufficiently Weigh the Litigation's Possibility of Success Against the NYAG Agreement's Future Benefits.

62.    As a threshold matter, the Debtors abjectly failed to carry their burden of showing that they adequately weighed the NYAG claims' possibility of success and the resulting damages against the NYAG Agreement's future benefits.    Courts evaluating Rule 9019 motions are "mandated by Iridium" to review in detail the litigation's possibility of success.    *In re NII Holdings*, 536 B.R. 61, 122 (Bankr. S.D.N.Y. 2015) ("In considering the likelihood of success on the merits, as mandated by Iridium, the Court has reviewed each of the Settled Claims and Disputes and has discussed in detail, supra, the merits of each category of Disputed Claims, including the Transferred Guarantor Claims, the sole piece of the integrated Settlement that is being challenged.").    And to do so, a settlement's proponent must come forward with "legal or factual support" sufficient for the court to "evaluate the reasonableness" of the settlement.    *In re DiStefano*, No. 16-10694, 2022 WL 4086979, at *6 (Bankr. N.D.N.Y. Sept. 6, 2022) (denying settlement motion due to "dearth of information provided").

63.    The Court does not have sufficient evidence before it to allow evaluation of the reasonableness of the NYAG Agreement.    There is no evidence that the Debtors even considered the likelihood of success of the NYAG's claims.    Through documents and deposition testimony,

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████    The declaration of independent director Paul Aronzon

---

[16]    A comparison of the NYAG and other government-entity settlements is annexed hereto as **Exhibit Y**.

submitted in connection with the motion for approval consists of nothing but empty platitudes that the NYAG claims "could result in civil penalties, disgorgement, and pre-judgment interest far in excess of the Allowed NYAG Claims." Aronzon Decl. ¶ 9. Of course the NYAG claims "*could*" result in liability for the Debtors, but that says nothing about the *likelihood* of liability or the magnitude of damages or penalties. There is thus no evidence that the NYAG Agreement "maximize[s]" the value of the Debtors' estates for all creditors and/or equity holders. *In re Interstate Cigar Co.*, 240 B.R. 816, 825 (Bankr. E.D.N.Y. 1999).

64.     The absence of a serious evaluation of the merits is ███████████████████ ███████████████████████████████████████████████Neither the documents produced nor the deposition testimony ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████The record here is in stark contrast to the proposed settlement with the SEC, in which the Debtors████████████████████████████████████ ███████████████████████████attached hereto as **<u>Exhibit W</u>** █████████████████████████████████████attached hereto as **<u>Exhibit X</u>**. In other words, the Debtors ███████████████████████████████████████ █████████████████████████

65.     DCG's expert, a former Co-Chief Deputy to the NYAG, explains the abnormality of this record: negotiation over the merits and possible damages is "an absolutely universal practice" for NYAG Martin Act settlements, requiring "aggressive advocacy on both sides." Brown Decl. ¶ 12. That advocacy typically includes "multiple advocacy submissions such as memorandum of law and white papers relating to the policy, equitable considerations, precedent

under the Martin Act, [and] proposals to limit damages." *Id.* Yet the record here ▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌ and even if there were, it would be "highly unusual" for a defendant to enter into a settlement with the NYAG for ▌▌▌▌▌▌ "within one week of circulating an initial draft of the relevant terms." Brown Decl. ¶ 17.

66.    ▌▌▌▌▌▌▌▌ is notable in view of the Debtors' position—at least as of October 18, 2023—that ▌▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌▌▌ A defendant's denial of liability of course does not prove the underlying claims have no merit, but it at the very least raises a question as to whether, when, and why the defendant's view so radically changed just months later. *See* Brown Decl. ¶ 17. As DCG's expert confirms, vigorous advocacy is the hallmark of NYAG settlements, *id*. ¶ 12, ▌▌▌▌▌▌

67.    The Debtors cannot compensate for this evidentiary deficiency—for an issue on which they bear the burden—by pointing to privileged conversations with counsel. A party cannot "affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proc.*, 219 F.3d 175, 182 (2d Cir. 2000). The "quintessential example" of such improper use is a party "who asserts an advice-of-counsel" argument. *Id.* at 182–83 (citations and quotation marks omitted); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292–93 (2d Cir. 1991) (similar). The Debtors recognize this limitation, stipulating in discovery that they will not seek to introduce as evidence any documents, information, or testimony over which they are claiming privilege.

68.    ▌▌▌▌▌▌▌▌▌▌▌▌

████████████████████████████████████████████████████

████████████████████████████████████████████████ the Debtors may not rely on

those privileged conversations to establish the reasonableness of the proposed settlement.  It is the

Debtors' burden to come forward with "legal or factual support" for the NYAG Agreement, *In re

DiStefano*, 2022 WL 4086979, at *7, and by claiming privilege, the Debtors have tied their own

hands.  What the Court is left with are the barebones declaration of Mr. Aronzon and the testimony

from the two members of the Special Committee, ████████████████████████████

████████████████████████████████

69.    Further inhibiting the Court's ability to examine the merits of the NYAG

Agreement is that the proposed distribution structure does not even set forth a firm settlement

amount.  *See Geltzer v. Andersen Worldwide, S.C.*, No. 05 CIV. 3339 (GEL), 2007 WL 273526,

at *4 (S.D.N.Y. Jan. 30, 2007) (holding "the amount of the settlement is the critical factor in the

Court's ability to assess whether the settlement should be approved" and denying settlement that

did not disclose amount).  The "settlement" amount here is not a fixed number or even an

agreed-upon measure of damages; it is simply whatever is left over in the Debtors' estates after

payment to the unsecured creditors (assuming those creditors have not already taken all of the

value of the Debtors' estates through the distributions provided in the Amended Plan).  Particularly

in view of the ████████████████████████████████████████████

████████████████████████████████████████ yet here, the NYAG Agreement

does not even purport to limit the NYAG's recovery.  Even Mr. Conheeney, one of two

independent directors of the Special Committee for the Debtors, could not explain the total value

or amount of the settlement.  Conheeney Tr. 65:4-6.  The NYAG Agreement is thus not a

"settlement"—it is simply the re-routing of all residual value from junior stakeholders to unsecured creditors.

70.      Indeed, assuming current values for the Debtors' estates' digital assets—and assuming the final plan complies with the Bankruptcy Code and section 502(b)—the ultimate payout under the NYAG Agreement could be in the ██████████████████████████. *See* Brown Decl. ¶ 17.  This figure is potentially many orders of magnitude higher than typical Martin Act settlements, which often settle for less than $500 million.  Brown Decl. ¶ 9.

71.      On the other side of the ledger, the NYAG Agreement offers *no* benefit to the Debtors or their estates.  *See, e.g.*, *NII Holdings*, 536 B.R. at 122 (noting that an important analysis in the first factor is whether the litigation of the settled claims will augment the estates and increase the aggregate amount available for all creditors).  Under the NYAG Agreement, all remaining value in the Debtors' estates after payment to the unsecured creditors is circulated through the NYAG and back to the unsecured creditors.  *See* NYAG Agreement ¶ 8.  In the absence of the NYAG Agreement, the Debtors may be required to litigate the NYAG claims to judgment, incurring expenses and fees and assuming the risk of an adverse judgment on liability and damages.  But even if the NYAG obtained a judgment for the full damages asserted in their proofs of claim, the Debtors' estates would be no worse off—the lost value spent litigating the NYAG claims would serve only to reduce the NYAG's recovery.  By contrast, if the Debtors litigated the NYAG claims to judgment and *won*, that value would be preserved for all other parties in interest.  All the NYAG Agreement does is remove the NYAG's litigation risks—it does nothing to reduce the Debtors' exposure or preserve assets of the Debtors' estates for distribution to other creditors.

72.      Based on the foregoing, the first *Iridium* factor is not satisfied.

### B.    The Debtors Failed to Adequately Analyze the Likelihood of Complex and Protracted Litigation.

73.    Similarly, the Debtors appear to have undertaken no assessment of the complexity, cost, or length of litigation in the absent of an agreement with the NYAG.  Mr. Aronzon avers that the NYAG Agreement "will allow the Debtors to avoid extensive litigation costs," Aronzon Decl. ¶ 10, but he does not say what those costs might be or how they differ from the litigation costs that *every* settlement necessarily avoids.  Equally devoid of substance is Mr. Aronzon's assertion that the litigation "would entail significant professional fees, including but not limited to potential discovery, preparation of experts, motion practice, trial and a post-trial remedies phase." *Id.*  Those are simply the stages of any litigation.  Mr. Aronzon does not attempt to quantify—████████ ██████████████████████████████████████████████—those fees and costs.

74.    This kind of *ipso facto* explanation does not suffice for any settlement, let alone one of this magnitude.  In analyzing this *Iridium* factor, judges are expected to "form an educated estimate of the complexity, expense, and likely duration of [the] litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016).  A bankruptcy court may not simply "t[ake] the trustee's word on litigation costs." *In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987).  There must be "evidence of what the expected litigation costs were," such that the bankruptcy court may "independently evaluat[e]" the asserted risks.  *Id.*  The record here makes any such analysis impossible—all litigation imposes costs, but the question here is how those costs compare to the virtually uncapped recovery amount contemplated under the NYAG Agreement.  Mr. Aronzon's declaration does not allow for such an evaluation, and the second *Iridium* factor cuts strongly against approval.

**C.      The Fact That the NYAG Agreement Benefits Certain Creditors Should Not Be Afforded Significant Weight**

75.      Courts have considered this *Iridium* factor to have "limited applicability in bankruptcy cases," where there are natural constituencies that will support a settlement and others that will not. *See In re Chemtura Corp.*, 439 B.R. 561, 607 (Bankr. S.D.N.Y. 2010) ("[T]his factor, which has its origin in nonbankruptcy litigation (and particularly the review of class action settlements, which usually focus on fairness to the plaintiff and class member communities, as contrasted to the defendant putting value on the table), has limited applicability in bankruptcy cases."); *see also In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 166 (Bankr. S.D.N.Y.), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005) ("[T]he approval of a settlement cannot be regarded as a counting exercise [of who supports the settlement]. . . it must be considered in light of the reasons for any opposition . . .").

**D.      DCG, The Debtors' Sole Equity Holder Does Not Support the NYAG Agreement as It Is Unfair to DCG**

76.      The Ad Hoc Group and the UCC support the NYAG Settlement. This support is unsurprising. The unsecured creditors stand to *gain* from the NYAG Agreement by way of the circular distribution principles that redirect all recovery by the NYAG back to themselves. The losers from the NYAG Agreement are all junior stakeholders of the Debtors. In effect, the NYAG Agreement takes money from junior stakeholders' pockets and puts it in the pockets of general unsecured creditors, all without any input from those junior stakeholders.[17]

77.      For the foregoing reasons, DCG, the Debtors' sole equity holder, opposes the NYAG Agreement. When determining whether a settlement is fair and equitable, courts consider

---

[17]      While it is true that DCG was also a named defendant in the NYAG Complaint and the NYAG Agreement may thus reduce any liability DCG may have, it is DCG's position that it has no liability to begin with (and DCG has defenses unique to those that the Debtors could raise) and therefore the NYAG Agreement does not benefit DCG at all.

whether a settlement is fair to non-settling parties. *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016) ("Moreover, courts are to look to the fairness of the settlement to other persons, *i.e* ., the parties who did not settle.") (internal quotations omitted); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008) (same). A "strenuous[] object[ion]" by the party who has "the most to lose in the event the [s]ettlement is approved" is a "substantial factor to take into consideration." *In re Interstate Cigar Co.*, 240 B.R. at 825. This Court has held that "when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties." *In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019) (quoting *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007)); s*ee also, In re Nutritional Sourcing Corp.*, 398 B.R. 816, 838 (Bankr. D. Del. 2008) ("I cannot hold that a settlement was fair and equitable under Rule 9019 when those parties whose rights were severely adversely impacted were not afforded meaningful participation in the negotiations.").

78.     Based on the foregoing, the fourth *Iridium* factor is not satisfied.

**E.      The Parties Were Represented by Competent Counsel.**

79.     There is no question that Debtors' counsel at Cleary Gottlieb Steen & Hamilton LLP is competent and capable. But counsel's competency is immaterial in the absence of evidence that counsel used its expertise to maximize the value of the Debtors' estates. The record here shows that counsel did not negotiate a settlement that compromised the value of the NYAG's claims in exchange for relieving the NYAG of the uncertainties associated with litigation. Instead, counsel simply proposed a distribution structure that would satisfy other creditors with whom the Debtors have been collaborating, offering nothing of value to the Debtors' estates. Thus, this factor at best is neutral, and at worse, reinforces the absence of adequate evidence or analysis supporting the NYAG Agreement.

### F.   The NYAG Agreement Does Not Provide for Releases for the Debtors' Officers and Directors.

80.    The NYAG Agreement does not provide releases for the Debtors' officers and directors, and this factor is therefore neutral.

### G.   The Debtors Have Not Demonstrated that the NYAG Agreement Is the Product of Arms-Length Bargaining.

81.    Finally, and perhaps most disturbingly, the evidence firmly shows that the NYAG Agreement is not the product of arms-length bargaining.  This factor is entitled to "great[] weight" where there is good reason to believe "it ha[s] not been satisfied."  *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005).  Courts finding that a settlement satisfies the seventh *Iridium* factor typically point to extensive records of communications, bargaining, compromise, and other facts demonstrating good faith negotiations.  *See, e.g., In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 295 (Bankr. S.D.N.Y. 2016) ("The record includes evidence of months of negotiation . . . among parties with adverse interests, as well as participation by all parties in mediation . . . After the Debtors filed the Standalone Plan in January 2016, which no party supported but which the Debtors filed to establish a 'framework for the mediation,' the Debtors and the Supporting Parties expended significant time and effort negotiating the terms of the Settlement, multiple parties gave concessions, and agreement ultimately was reached."); *Guippone v. BH S & B Holdings, LLC*, No. 09 CIV. 01029 CM, 2011 WL 5148650, at *10 (S.D.N.Y. Oct. 28, 2011) ("The settlement negotiations between Trustee's predecessor, the Chapter 11 debtor, and the Trustee were, together, protracted and conducted in good faith and at arms' length.  These negotiations involved the exchange of their respective legal theories and research, and the exchange of a multitude of settlement proposals via telephone and mail, when initial negotiations were unsuccessful, before an agreement was ultimately reached.").

82.    As outlined above, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ The

absence of such evidence is highly unusual in the context of an NYAG settlement—and even more

so in a settlement of this magnitude—and contrary to settled practice.  Brown Decl. ¶¶ 17, 19.

83.    Instead, after DCG disclosed that it intended to object to confirmation of the

Amended Plan, the Debtors ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Rather than a compromise representing the risks to each side from the litigation, the

NYAG Agreement represents simply a unilateral gift of estate assets to satiate the unsecured

creditors' demand for the entire value of the Debtors' estates.

84.    Crucially, it is not clear the Debtors even know what they have agreed to.  ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ While

this is true as a legal matter because a Rule 9019 settlement cannot violate the Bankruptcy Code

any more than a proposed plan, it is contrary to the actual terms of the NYAG Agreement, which

provides that once it is approved, the NYAG Agreement "shall be binding on the [NYAG] and

[the Debtors] *regardless of whether the Bankruptcy Court confirms the Amended Plan*." NYAG Agreement ¶ 21 (emphasis added).  As another example, the Debtors' Rule 30(b)(6) witness testified that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ when in fact the NYAG Agreement expressly provides that the NYAG will be paid *before* "any general unsecured claims of Governmental Units" or "any subordinated claims," NYAG Agreement ¶ 5. And Mr. Conheeney, who was deposed in his individual capacity, did not know how the NYAG's claims against the Estates were classified in the recovery before or after the NYAG Agreement was exected.  Conheeny Tr. 83:22, 86:25-87:2.  The Debtors' own witnesses █████████ ███████████████████████████████████████████████ again calling into question how the NYAG Agreement could possibly represent a fair evaluation of the merits and risks of litigation.

85.    Even setting aside the Debtors' abdication of their fiduciary duties to creditors and the estates, any assertion by the Debtors that the NYAG Agreement was in fact the product of arms-length negotiation is belied by ██████████████████████████████████████████ ███████████████████████████████████ As discussed above, attorneys for the Ad Hoc Group were ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████

86.    This course of conduct is not negotiation—it is collusion.  Faced with the prospect that this Court may reject the unlawful Amended Plan, the creditors apparently persuaded the Debtors to concede not just the damages asserted by the NYAG in its Proofs of Claim, but *all* residual value of the Debtors' estates, regardless of whether they could or should be paid as damages in satisfaction of the NYAG's claims.

87.    The seventh *Iridium* factor is emphatically not satisfied.

## RESERVATION OF RIGHTS

88.    DCG reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the NYAG Motion in the event DCG's objections are not resolved prior to such hearing and to seek to introduce documents or other relevant information in support of the positions set forth in this Objection.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, DCG respectfully requests that the Court not grant the NYAG Motion until such time that the Debtors address the concerns as described herein and grant such further relief as the Court may deem appropriate.

Dated: February 21, 2024
     New York, New York

Respectfully submitted,

*/s/  Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
     Jeffrey.Saferstein@weil.com
     Jonathan.Polkes@weil.com
     Caroline.Zalka@weil.com
     Jessica.Liou@weil.com
     Furqaan.Siddiqui@weil.com

Joshua M. Wesneski
**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Tel:  (202) 682-7248
Fax:  (202) 857-0940
     Joshua.Wesneski@weil.com

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**Exhibit A**

**Exhibit B**

**Exhibit C**

**<u>Exhibit D</u>**

**Exhibit E**

**Exhibit F**

**Exhibit G**

**Exhibit H**

**Exhibit I**

**<u>Exhibit J</u>**

**Exhibit K**

**<u>Exhibit L</u>**

**<u>Exhibit M</u>**

**<u>Exhibit N</u>**

**<u>Exhibit O</u>**

**<u>Exhibit P</u>**

**Exhibit Q**

**<u>Exhibit R</u>**

**<u>Exhibit S</u>**

**<u>Exhibit T</u>**

**<u>Exhibit U</u>**

**<u>Exhibit V</u>**

**<u>Exhibit W</u>**

**<u>Exhibit X</u>**

**<u>Exhibit Y</u>**

**Comparison of NYAG Agreement to Other Government-Entity Settlements**

| Fact | *Takata*[1] Settlements | *Adelphia*[2] Settlements | *WorldCom*[3] Settlement | NYAG Settlement |
|---|---|---|---|---|
| **Debtors Reported Fraud** | ✔ | ✔ | ✔ | ✖ |
| **Settlement Negotiations Began Prepetition** | ✔ | ✔ | ✔ | ✖ |
| **Significant Due Diligence/Investigation Performed in Support of Settlement Terms** | ✔ | ✔ | ✔ | ✖ |
| **Settlement Agreement Negotiated or Entered Into Prepetition** | ✔ | ✖ | ✔ | ✖ |
| **Settlement Motion Contained Adequate Evidence and Explanation of Process, Risks, and Benefits** | ✔ | ✔ | ✔ | ✖ |
| **Civil Penalties Capped (Penalty was either a certain amount or percentage from the estate)** | ✔ | ✔ | ✔ | ✖ |
| **After Penalties Were Paid, Residual Value Flowed to Other Stakeholders in Conformity with the Bankruptcy Code** | ✔ | ✔ | ✔ | ✖ |
| **Settlement Objected to by Non-Settling Parties** | ✖ | ✔ | ✔ | ✔ |
| **Absolute Priority Altered** | ✖ | ✖ | ✖ | ✔ |

---

[1] *In re TK Holdings, Inc., et al.*, Ch. 11 Case No. 17-11375 (BLS) (Bankr. D. Del. 2018) ("***Takata***").

[2] *In re Adelphia Communications Corp..,* et al., Ch. 11 Case No. 02-41729 (REG) (Bankr. S.D.N.Y. 2005) ("***Adelphia***").

[3] *In re WorldCom, Inc., et al.*, Ch. 11 Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. 2002) ("***WorldCom***").