Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  300 Quarropas Street, Room 248

13                  White Plains, NY 10601

14

15                  February 14, 2024

16                  10:06 AM

17

18

19

20

21   B E F O R E :

22   HON SEAN LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. # 1296 Notice of Agenda

4

5    HEARING re Doc. #1227 (Sale) Motion to Sell Property Free

6    and Clear of Liens Under Section 363(f) / Debtor's Motion

7    Seeking Entry of an Order Authorizing, But Not Directing,

8    (I) the Sale of Trust Assets and (II) Granting Related

9    Relief.

10

11    HEARING re Doc. #1241 (Sale) Order Shortening the Notice

12    Period for the Debtor's Motion Seeking Entry of an Order

13    Authorizing, But Not Directing, (I) the Sale of Trust Assets

14    and (II) Granting Related Relief

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WHITE CASE

4         Attorneys of Official Committee of Unsecured Creditors

5         1221 Avenue of the Americas

6         New York, NY 10020

7

8    BY:  PHIL ABELSON

9         COLIN WEST

10

11   CLEARY GOTTLIEB STEEN HAMILTON LLP

12        Attorneys for the Debtors

13        One Liberty Plaza

14        New York, NY 10006

15

16   BY:  LUKE BAREFOOT

17        SEAN A. O'NEAL

18        ANDREW WEAVER

19

20

21

22

23

24

25

1   HUGHES HUBBARD REED LLP

2        Attorneys for the Gemini Trust Company LLC

3        One Battery Park Plaza

4        New York, NY 10004

5

6   BY:  ANSON B. FRELINGHUYSEN

7        ELIZABETH BEITLER

8

9   PROSKAUER ROSE LLP

10        Attorneys for Ad Hoc Group of Genesis Lenders

11        11 Times Square

12        New York, NY 10036

13

14   BY:  PETER DOYL

15        BRIAN ROSEN

16

17   DAVIS POLK WARDWELL

18        Attorneys for Grayscale Investments, LLC

19        450 Lexington Avenue

20        New York, NY 10017

21

22   BY:  BENJAMIN S. KAMINETZKY

23

24

25

Page 5

1   WEIL GOTSHAL MANGES LLP

2        Attorneys for Digital Currency Group, Inc.

3        767 Fifth Avenue

4        New York, NY 10153

5

6   BY:  JEFFREY SAFERSTEIN

7        JESSICA LIOU

8        FURQAAN SIDDIQUI

9

10  MEDINA LAW FIRM LLC

11       Attorneys for BAO Family Holdings

12       641 Lexington Avenue

13       New York, NY 10022

14

15  BY:  ERIC C. MEDINA

16

17  ALSO PRESENT:

18  PAUL ARONZON

19  OLIVER BAKES

20  BRENDON BARNWELL

21  LUKE BARRETT

22  ANDREW BEHLMAN

23  BENJAMIN S. BELLER

24  JEFFREY BERNSTEIN

25  DANIEL BRENNER

Page 6

 1 | GABRIEL BRUNSWICK

 2 | BRIAN BULTHUIS

 3 | DAVID CHAN

 4 | SAM CASCANTE

 5 | ZHUOLUN CHENG

 6 | LOUIS CHERRONE

 7 | CHARU CHITWAN

 8 | TOM CONHEENEY

 9 | RICHARD CORBI

10 | WILLIAM DALSEN

11 | ERIC C. DAUCHER

12 | MICHAEL DIYANNI

13 | ERIN E. DIERS

14 | JAMES DREW

15 | STEPHANIE EBERHARDT

16 | MICHAEL S. ETKIN

17 | DEANDRA FIKE

18 | SEAN T. FLYNN

19 | DAN GIBBONS

20 | ANDREW GLANTZ

21 | ADAM J. GOLDBERG

22 | MADDIE HUNDLEY

23 | DERAR ISLIM

24 | ALI A. ISMAIL

25 | ZUL JAMAL

Page 7

1   LISS JEREMY

2   KEEFE JOHNSON

3   BARRY JONES

4   THOMAS S. KESSLER

5   PAUL KINEALY

6   BARAK KLEIN

7   OXANA KOZLOV

8   GLEN KRATOCHVIL

9   BRADLEY LENOX

10   KEN LUKASZEWSKI

11   THOMAS Q. LYNCH

12   MEI MA

13   MICHAEL MAGZAMEN

14   JEFFREY S. MARGOLIN

15   JACK MASSEY

16   BRETT MCMAHON

17   MICHELE MEISES

18   MATTHEW MELBON

19   RICHARD CHESTER MINOTT

20   ANAIS MITRA

21   FELIPE MONTOYA

22   JULIA MOSSE

23   WALT NEUSCHAEFER

24   JOHN NGUYEN

25   MICAEL PAPANDREA

Page 8

1    AMANDA PARRA CRISTE

2    GREGORY F. PESCE

3    REBEKAH PRESLEY

4    ARIANNA PRETTO-SAKMANN

5    STEVEN J. REISMAN

6    CHRISTIAN RIBEIRO

7    PHILIP RIES

8    SHAYA ROCHESTER

9    HEATH ROSENBLAT

10   RYAN ROWAN

11   GENESIS SANCHEZ TAVAREZ

12   JORDAN SAZANT

13   DAVID Z. SCHWARTZ

14   JOE SCIAMETTA

15   VIRGINIA T. SHEA

16   MATTHEW A. SILVERMAN

17   DUSTIN P. SMITH

18   JASON SOTO

19   PETER STROM

20   ANDREW SULLIVAN

21   GABE SUTHERLAND

22   ANDREW SWIFT

23   BRIAN TICHENOR

24   ANDREW TSANG

25   WILLIAM MATTHEW UPTEGROVE

1   JANE VANLARE

2   FRANCISCO VAZQUEZ

3   JOSHUA WESNESKI

4   IAN BERKMAN

5   ALEX VAN VOORHEES

6   MICHAEL ANSWERS

7   RICK ARCHER

8   ERIC IAN ASQUITH

9   DANA L. CASTRO HERMIDA

10  RODNIKA CARTER

11  MARKO DAMJANOVIC

12  JADE DYER-KENNEDY

13  ASHLYN GALLAGHER

14  UDAY GORREPATI

15  TAYLOR HARRISON

16  MIRANDA HATCH

17  HOO RI KIM

18  DIETRICH KNAUTH

19  LEONIE C. KOCH

20  MIKE LEGGE

21  SAMUEL LEVANDER

22  AKIKO MATSUDA

23  KEITH MCCORMACK

24  TYLER OKADA

25  KENNETH PASQUALE

1    JONATHAN RANDLES

2    KATIE ROSS

3    ANDRES FELIPE SAENZ

4    CAROLING SALLS

5    SAMIRA SARAN

6    ISAAC SASSON

7    PETER J. SPROFERA

8    VINCE SULLIVAN

9    GORDON SUN

10   CATHY TA

11   KATE THOMAS

12   GEMMA TUNG

13   MICHAEL WEINBERG

14   ALEX WITTENBERG

15   TIM WOLFE

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  This is Judge Sean Lane

3    in the United States Bankruptcy Court for the Southern

4    District of New York, and we're here for a ten o'clock

5    hearing on Genesis Global Holdco., LLC., a jointly

6    administered Chapter 11 case.  We'll start as we always do

7    by getting appearances, so let me start with the Debtors.

8              MR. ONEAL:  Good morning, Your Honor.  Sean

9    O'Neal, Cleary Gottlieb Steen and Hamilton on behalf of the

10   Debtors.  I have with me today Mr. Luke Barefoot and Mr.

11   Andrew Weaver.

12             THE COURT:  All right, good morning.

13             And let me find out who's here on behalf of the

14   official committee.

15             MR. SHORE:  Good morning, Your Honor.  Chris Shore

16   from White and Case on behalf the committee.  I think I have

17   Phil Abelson and Colin West on with me today as well.

18             THE COURT:  Good morning.

19             On behalf of Digital Currency Group?

20             MR. SAFERSTEIN:  Good morning, Your Honor.

21   Jeffrey Saferstein from Weil Gotshal and Manges on behalf of

22   DCG.  I believe I'm joined by Jessica Liou and Furqaan

23   Siddiqui.

24             THE COURT:  Good morning.

25             On behalf of Grayscale Investments?

1          MR. KAMINETZKY:  Good morning, Your Honor.

2    Benjamin Kaminetzky of Davis Polk on behalf of Grayscale.

3          THE COURT:  Good morning.

4          On behalf of the ad hoc group?

5          MR. ROSEN:  Good morning, Your Honor.  Brian

6    Rosen, Peter Doyle Proskauer Rose on behalf of the ad hoc

7    group, Genesis Lenders.

8          THE COURT:  Good morning.  On behalf of Gemini?

9          MR. FRELINGHUYSEN:  Good morning, Your Honor.

10   Anson Frelinghuysen, Hughes Hubbard and Reed, on behalf of

11   Gemini Trust Company.  I'm joined by my colleague, Elizabeth

12   Beitler.

13         THE COURT:  Good morning.

14         And at this point, there are quite a few other

15   appearances on the Zoom appearance sheet.  Also, I'll just

16   open it up to anybody else who feels they need to make an

17   appearance on the record this morning.

18         MR. BARRETT:  Good morning, Your Honor.  Luke

19   Barrett with McDermott Will and Emery on behalf of the

20   Genesis Crypto Creditors ad hoc group.

21         THE COURT:  All right, good morning.

22         Anyone else?

23         MR. MEDINA:  Good morning, Your Honor.  Eric

24   Medina on behalf of BAO Family Holdings.

25         THE COURT:  Good morning.

Page 13

1        Anyone else?

2        All right, with that, I'll turn it over to Mr.

3   O'Neal to set the stage for this morning.  I do have in

4   front of me the amended agenda.  And with that, Mr. O'Neal?

5        MR. ONEAL:  Certainly, thank you, Your Honor.

6   There is only one matter on today's hearing, and that is

7   what we call the trust asset sale motion.

8        On February 2nd, we filed this motion, and it

9   seeks authority to transfer or redeem certain shares that we

10  have in three trusts that are managed by Grayscale, which is

11  an affiliate of DCG.  Those three trusts are known as GBDC,

12  ETHE, and ETH Classic Trust.  Just to give you an idea of

13  what the value that we're talking about, the bulk of the

14  value is in connection with the GBTC shares, and the value

15  of those shares on a market basis, as of February 13th, is

16  approximately $1.6 billion today, or yesterday, I should

17  say.

18       And Your Honor, the motion also covers the GBTC

19  shares, sometimes the Tranche I shares, that are currently

20  held by Gemini.  We included those shares in this motion,

21  even though they're held by Gemini, because there is a

22  dispute, as you know, Your Honor, about the Tranche I

23  shares, as to the ownership of those shares.  We don't need

24  to resolve that dispute today, thankfully.  Gemini supports

25  this motion and was involved in reviewing and commenting on

Page 14

1    it today.

2          This motion is also supported by the ad hoc group

3    and the creditors committee.  And in addition, in response

4    to the SEC comments, we added language that the Debtors will

5    comply with all applicable securities laws, thereby

6    resolving any objection that the SEC may have had.

7          There are -- there were two limited objections

8    that were filed.  One was by DCG and another by its

9    affiliate, Grayscale.  As you saw last night, or maybe you

10   didn't, but perhaps you saw it this morning, we filed a

11   revised proposed order at about 8 p.m.  That's Docket Number

12   1307, and we disclosed at that point that we had actually

13   resolved the objection by Grayscale.  So at this point, we

14   have only one objection, and that is the objection of DCG,

15   which as of last night, they were proceeding with today.

16         Your Honor, I'd like to begin by asking the Court

17   to admit into evidence as direct testimony the declarations

18   of Michael DiYanni of Moelis and Company, which can be found

19   at Exhibit A to the motion, Docket 1227, and then also

20   Docket Number 1293 for the supplemental declaration.

21         THE COURT:  All right, any objection to the Court

22   receiving those declarations in support of the motion today?

23         All right, hearing no objections, those

24   declarations are received as evidence.

25         (Debtor's Exhibit A was received in evidence.)

Page 15

1           MR. ONEAL:  Thank you, Your Honor.  And I'll just

2    say a few words, Your Honor.  This is not a very complicated

3    motion.  We need to redeem or transfer these shares or cause

4    the redemption or transfer of these shares.  With respect to

5    GBTC, our goal is to work with an authorized participant to

6    redeem the shares, effectively converting GBTC into BTC for

7    cash.  And we don't need GBTC because we don't have GBTC

8    lenders.  Right?  Nobody lent us GBTC, but we do have BTC

9    lenders, and we do have US dollar lenders, so we need to

10   convert the GBTC to GBT -- to -- sorry, BTC or US dollars.

11          We, like other holders of GBTC, have been waiting

12   for the GBTC conversion to an ETF.  That occurred on January

13   10th, as you saw, from Mr. DiYanni's declaration.  And we've

14   been waiting, because that narrowed the discount.  The

15   shares have become more valuable with the conversion to an

16   ETF, and so now, we would like to have the flexibility to

17   effectively convert those GBTC shares into consideration

18   that we would pay to our Creditors.

19          With respect to the ETHE and the ETH Classic

20   shares, we may seek to transfer them.  We may transfer them

21   at some point in time, but we cannot redeem them.  Those

22   trusts have not been converted to ETFs.  We do want to be in

23   position, however, to maximize value here.  And in

24   consultation with brokers and other advisors, we'd like to

25   have the authority to engage in opportunistic transfers.

1          As mentioned, there's only one outstanding

2     objection.  That's the objection of DCG.  They make

3     basically four points.  First, DCG asked for an adjournment

4     of the motion until after Your Honor makes a determination

5     on confirmation.  Second, DCG said that we should be

6     required to hire a broker and to use authorized

7     participants.  Third, DCG said that they should have

8     consultation rights with respect to any sales or transfers

9     or redemptions.  And then, finally, DCG suggested that we

10    might not be seeking to maximize value.

11         I'll turn to each one of those points, but what's

12    interesting is what DCG didn't say in its objection, or at

13    least I didn't see it, and if I missed it, I apologize,

14    didn't say that DCG has an economic interest here.  They

15    have an economic interest in delaying or preventing the

16    transfer redemption of these shares, as noted in Mr.

17    DiYanni's declaration.  An affiliate of DCG, that is

18    Grayscale, receives more than $2 million a month in

19    management fees, attributable to the trust shares that are

20    currently held by the Debtors.

21         Notably, as we noted in both the DiYanni

22    declaration and our reply, this GBTC management fee is about

23    1.5 percent of the net asset value of the trust, which is

24    significantly higher than the .30 percent that most asset

25    managers charge for comparable trust.  These management fees

Page 17

1    really diminish the value of the assets in the hands of the

2    Debtors, and that is part of the reason that we would like

3    to redeem or transfer these shares.  And Your Honor, we are

4    not alone.  There have been over 170 million shares that

5    have been redeemed since the ETF conversion on January 10th,

6    as Mr. DiYanni noted in his declaration.

7            Turning now to the substance of the objections,

8    with respect to the request to adjourn, I think Your Honor

9    has already denied that request at the status conference on

10   Friday when we scheduled this hearing.  With respect to the

11   request that we be required to use a broker and authorize

12   participants, we had always intended to do that.  That's

13   what you do.  That's how you do this.  This is not our first

14   rodeo.  We know how to do these kinds of transactions.  And

15   so as you'll see, though, in the order, we modified it to

16   make it very clear in both, I think it's Paragraph 2E and

17   Paragraph 2A.  We have noted that we will be retaining a

18   broker and an authorized participant.

19           And finally, with respect to DCG's request for

20   consultation rights, we respectfully decline that request.

21   We already have a lot of cooks in the kitchen here, aside

22   from the Debtor's professionals and the Debtor's management,

23   who know this business well, we have authorized

24   participants, liquidity providers, the broker, the

25   Creditor's committee, and the ad hoc group advisors.  Having

1    another party with consultation rights could drag out the

2    process, but perhaps more importantly, DCG is simply

3    conflicted here.

4         DCG is trying to generate through its affiliate $2

5    million in monthly management fees.  And we also have to

6    just take a step back and realize that DCG is without

7    question our largest borrower.  DCG owes us $1.1 billion,

8    actually, at least $1.1 billion.  There's more that they owe

9    us on top of that.  That puts them in a conflicted

10   situation.  It's the very reason that we set up a special

11   committee.  There is nothing that the Debtors can do that do

12   not impact the $1.1 billion that DCG owes us, and so Your

13   Honor, we really think that giving them consultation rights

14   would give rise to tremendous conflicts with respect to this

15   matter.

16        And with respect -- I guess I should just respond,

17   though it feels somewhat unnecessary, to the suggestion that

18   the Debtors may not be focused on maximizing value.  That's

19   just wrong.  That's what we do every day.  The Debtors have

20   been singularly focused on maximizing value for the estates

21   ever since we've been involved in this situation.  And in

22   fact, there's even a provision in the order, requiring both

23   the Debtors and Gemini on a good-faith basis to use

24   reasonable best efforts to maximize the market price of any

25   of the trust assets for Tranche I GBTC shares.  And you'll

Page 19

1    see that, Your Honor, in Paragraph 2C of the order.  It's in

2    the order.  We're going to do it anyway, but it's in the

3    order.

4           So Your Honor, I think that's all we have, and we

5    would ask that Your Honor overrule the DCG objection and

6    enter in the order as amended and proposed in last night's

7    file.

8           THE COURT:  All right, thank you very much.  In

9    terms of orderly business, I think it makes sense to hear

10   from any parties who want to speak in support of the motion

11   first, and then I'll hear from any parties that wish to

12   oppose it.  So let me start, then, with the committee.

13          MR. SHORE:  Thank you, Your Honor.  Again, Chris

14   Shore from White and Case on behalf of the committee.  I'll

15   be extremely brief.  The committee fully supports the

16   Debtor's motion, in particular, its efforts to derisk the

17   estate.  As we come up towards confirmation, there only

18   appears to be one party who is interested in adding more

19   risk to the estate, and that's DCG, and we'd ask that Your

20   Honor overrule their objection and allow the Debtors to go

21   forward and monetize these assets.

22          THE COURT:  All right, thank you very much.

23          Any other parties that wish to be heard in

24   support?  I see the ad hoc group on.  Let me turn to them.

25          Oh, you're on mute, counsel.  It's the joys of

1    technology.

2            All right, so I'm going to circle through some

3    other folks as you work through those issues.  All good.

4            Anyone else who wishes to be heard in favor of the

5    motion?

6            MR. FRELINGHUYSEN:  I, Your Honor, the -- Anson

7    Frelinghuysen from Hughes Hubbard for Gemini Trust Company.

8    I can understand Mr. Rosen's hand signals.  He's saying he

9    supports the motion, and in the meantime, we can move on to

10   me.

11           I think, from Gemini's perspective, we support

12   this motion.  It's a very important asset of the -- of

13   Gemini's or the estates, and we worked very carefully with

14   the Debtors to make sure that there was no -- nothing wrong

15   with either side's position.  We could move forward with our

16   litigation on that matter without impacting the need to move

17   ahead with this relief, which is to, as Mr. Shore said,

18   derisk and get ready for the eventual confirmation that's

19   coming up, a highly important step in this bankruptcy, and

20   we urge the Court to rule in favor of the Debtors.

21           THE COURT:  All right, thank you very much,

22   particularly for your interpreter skills on the hand

23   gestures.

24           Anyone else who wishes to be heard in support?

25           All right, with that, I'll turn to DCG.

1           MR. SAFERSTEIN:  Good morning, again, Your Honor.

2   Jeffrey Saferstein from Weil Gotschal and Manges on behalf

3   of DCG.  Your Honor, we're not necessarily opposed to a sale

4   here, but if they're going to go forward with sales, we

5   obviously want to make sure it's done right and that it

6   maximizes value.  We attempted to settle our objection by

7   inclusion of a couple of things in the order, but the

8   Debtors were unwilling to do that, so I'll go through that.

9           But again, the Debtors have held these shares

10  since November of 2022.  And now all of a sudden, it's an

11  emergency done on short notice, and their only justification

12  to sell is that it's in anticipation of a confirmed Chapter

13  11 plan here, but that's not a certainty.  And as Your Honor

14  knows, we're objecting to the plan and don't believe that

15  it's confirmable.  So we believe that the sales should await

16  a confirmation ruling here, and it's only a couple of weeks.

17  We have a confirmation hearing scheduled for the 26th now,

18  so again, we think that the sales themselves should wait.

19           The Debtor can hire a broker.  The Debtor can

20  prepare itself, but to the extent that the Court does not

21  confirm the plan, it may not be necessary to sell these

22  shares or sell all of them, or certainly not all -- some of

23  them or all of them.  So again, we would ask that the sales

24  themselves await that.

25           And additionally, there's an important point that

Page 22

1    has not been raised, which is, because of the rise in crypto

2    prices, there will likely be significant taxes that will be

3    incurred in connection with the sales or redemptions.  And

4    these taxable gains will be triggered irrevocably once the

5    shares are transferred or sold.  And so again, for that

6    reason, we don't see why the Debtor can't wait a couple of

7    weeks to sell before that happens.  And that's, again,

8    irrevocable.  And those taxes will be incurred.  So again,

9    we think that if they're going to sell it, they should --

10   that should await a confirmation ruling for those reasons.

11          Now, a lot has been said about that this is a

12   delay tactic on our part for the fees.  And I want to

13   address that, because it's, from our perspective, very

14   disingenuous.  First of all, the Debtors have held these

15   assets, again, since November of 2022.  And again, their

16   only justification is anticipation of a plan.  So they've

17   been paying these fees all along, and now, all of a sudden,

18   it's become a huge issue for them.  So again, I think that's

19   pretty disingenuous, but I think more importantly, the fees

20   are paid to Grayscale, not to DCG.  And so they kind of

21   blend us together in their reply.  I think most of the reply

22   actually relates to the fees, but the fees do not go to DCG.

23   They go to Grayscale.

24          Now, just to be completely upfront with Your

25   Honor, because I know Mr. O'Neal will raise it, we do get a

Page 23

1    dividend out of Grayscale, and but that is completely in

2    Grayscale's discretion about the dividend we get, so again,

3    I think the fee is a red herring here.  It's -- it shouldn't

4    be the focus of this.  This is not a delay tactic.  We want

5    to make sure that value is maximized and that this is done

6    right.

7            If Your Honor is inclined to approve the sale,

8    we'd ask for essentially three things; one, we wanted a

9    broker hired.  It was uncertain in the order whether or not

10   they were.  And I appreciate that Mr. O'Neal has now agreed

11   to do that and took our objection into consideration by

12   agreeing to require a broker here, so again, I think that

13   resolves that issue.  Second, and Mr. O'Neal addressed this,

14   which is, we'd like to be consulted just like the UCC and

15   the ad hoc group.  There's no reason we shouldn't be

16   involved.  Depending on the outcome of confirmation here, we

17   may have a real interest in the sales and the value here.

18           We are the probably the -- DCG is the most

19   knowledgeable party with respect to these assets that has a

20   stake here in the case.  So we don't understand why we

21   wouldn't be consulted.  We're not asking for consent rights,

22   but just consultation rights.  And I think Mr. O'Neal talked

23   about conflicts and the fact that we owe $1.1 billion.

24   First of all, $1.1 billion is owed in about eight years.  We

25   fully intend to honor our obligations under the $1.1 billion

Page 24

1    obligation.  I don't see a conflict here.

2            Again, we're not asking for any kind of consent

3    rights.  We think we should be consulted.  We are the most

4    knowledgeable party here, and I don't know why they wouldn't

5    want to consult us to maximize value.  So again, we would

6    ask for consultation rights with respect to the sales here.

7    We're talking about, with respect to the Tranche I, a

8    billion six of value.  You put it all together, it's

9    significantly more.  So again, we'd like consultation

10   rights.

11           And then, last, was -- is really the tax point.

12   To the extent that there are sales, we'd like it to be clear

13   in the order that any taxes that are incurred are the

14   Debtor's responsibility and that there are administrative

15   expenses.  I don't think there should be any controversy

16   with respect to that, but I think we want that to be clear.

17   We are part of a consolidated tax group, and if the Debtor's

18   going to sell this and incur --

19           THE COURT:  Well, wouldn't that, counsel, that --

20   I'm going to stay away from that, and the taxes are owed for

21   whoever owes the taxes.  I'm not the taxing authority.  I'm

22   not the IRS.  I -- and frankly, we spent not much time, if

23   any, on the -- on tax issues in this case.  Every case is

24   different.  Sometimes you spend a lot of time.  Sometimes

25   you spend no time.  And I -- again, whoever owes the taxes

1    owes the taxes.  I don't know that this order, one line in

2    this order, is the place to scale that mountain.

3              MR. ONEAL:  Correct.

4              MR. SAFERSTEIN:  Your Honor, that's fine.  I just

5    wanted to be clear that it's our position that, obviously,

6    if the Debtors incur this tax liability, it should be

7    theirs, not ours.  Again, we, for a lot of reasons --

8              THE COURT:  I think if you want to reserve your

9    rights, I think it's entirely appropriate to say nothing in

10   this order affects the -- who is owed the tax liability,

11   which is an issue for another day, and everybody reserves

12   their rights.  I'm fine with that.

13             MR. SAFERSTEIN:  Okay, Your Honor.  That's fine

14   with us, Your honor.  I think we just wanted to be clear on

15   that point.  And again, these taxes will be triggered, and

16   the justification is, for these sales, as an anticipation of

17   a plan, and if the plan doesn't go forward, there may not be

18   a need to sell these shares.  Maybe they'll want to do

19   something different with them, so --

20             THE COURT:  Well, isn't that -- isn't that always

21   true, right, if we do that, then we're not -- the estate

22   isn't getting itself ready ever until the confirmation order

23   is actually -- the ink is ready to be spilled on the

24   signature line, and so -- and it can't be given all the

25   steps that need to be taken, which were the sort of -- one

Page 26

1    of the issues you raised and one of the issues, sort of,

2    that's raised in a more exploded view in the Grayscale

3    objection that was resolved, that there are steps to take,

4    and there's also a concern about having to sell everything

5    at once, and the effect on share prices and other things, so

6    I can't see that that alternative is a better alternative.

7             MR. SAFERSTEIN:  Well, I think we're looking for

8    two weeks.  I don't think we're looking for more.  The

9    confirmation's on the 26th, so they could have filed this

10   motion a month ago.  They didn't.  Now we're on the eve of

11   confirmation, and if the plan is not confirmed, then there

12   may be -- things may happen that may be irrevocable, such as

13   the taxes, which could be -- which could take

14   (indiscernible) --

15            THE COURT:  But they're taxes on gain.  Right?  I

16   mean, they're not taxes that are going to be avoidable if

17   they're sold for a gain at a later time.  I mean, they're

18   whatever taxes flow from the eventual sale, and so listen, I

19   will concede.  And you probably can get ten out of ten

20   judges on your side in terms of the desire to stay away from

21   motions on short notice.  We -- I get that, but we are where

22   we are.  And so the sale is being teed up, and confirmation

23   is teed up shortly, and so it doesn't -- again, how does

24   your objection square with the business judgment rule, which

25   says that the Debtors are saying, well, we think this is the

Page 27

1   way to maximize value and to protect ourselves against risk,

2   and in this case, they have the Creditors whose ox would be

3   gored, lined up on their side, singing from the same hymnal.

4   So how does your objection comport with the business

5   judgment rule in that circumstance?

6           MR. SAFERSTEIN:  Well, Your Honor, I think -- I'll

7   make one last point on this to answer that question and the

8   one you asked before about eventual sales.  One way to

9   proceed, if the plan is not confirmed, is that the GBTC

10  could be given in kind and therefore not trigger taxes.  So

11  there is an alternative to it.

12          THE COURT:  Well, but that's not any objection.  I

13  mean, that's a new argument.

14          MR. SAFERSTEIN:  Yes.

15          THE COURT:  So I'm not here to entertain arguments

16  of that sort, which are substantive and would require a

17  detailed response.  And that also deals with what the plan

18  should do or not do, which is also what we're not here today

19  for, and again, there's plenty of conversations to be had on

20  that.  Anything else?

21          MR. SAFERSTEIN:  No, Your Honor.  I actually think

22  it's in our objection, but I don't need to go on about it.

23  It relates to the fact that we think that the sales should

24  be delayed, because there are alternatives, and the fact

25  that the plan may not be confirmed, but no, I think that's

Page 28

```
 1   it, Your Honor.  I --

 2              THE COURT:  Well, I understand your point that it

 3   should be delayed.

 4              MR. SAFERSTEIN:  Yeah.

 5              THE COURT:  I didn't understand your point to be

 6   something as specific as what you just said, which is that

 7   essentially distribution should be handled a different way.

 8   That I don't see, unless I'm missing something, and if I'm

 9   missing something, please feel free to point it out.

10              MR. SAFERSTEIN:  No, it's just an offshoot, Your

11   Honor, of the argument that it should be delayed.

12              THE COURT:  Haha.

13              MR. SAFERSTEIN:  But the plan may not be

14   confirmed, but (indiscernible) --

15              THE COURT:  You say "offshoot," I think it's

16   pretty --

17              MR. SAFERSTEIN:  -- (indiscernible) --

18              THE COURT:  -- it's pretty distinct in that, in

19   terms of making that kind of objection as opposed to simply

20   delay the sale, but it is what it is, so I think --

21              MR. SAFERSTEIN:  Your Honor, I -- yeah.  I don't

22   need -- we don't need to debate the point.  I take your

23   point on that.  So look, obviously, it appears that your

24   Honor is going to approve the sale.  We would ask again for

25   consultation rights.  We don't see why the Debtor wouldn't
```

Page 29

1   give us that.  We -- we're here to maximize value for

2   everybody.  There's no delay tactic --

3          THE COURT:  Well, let's talk about that.  What I -

4   - I haven't seen anything about the process that's laid out

5   here that gives rise to concern that people don't know what

6   they're doing or have a plan to do this in a way that would

7   maximize value.  And in fact, everybody on this -- at this

8   hearing has an interest in maximizing value, so I -- that

9   I'm struggling with on that point.  There are a lot of cooks

10  in the kitchen.  Some of them are statutorily invited into

11  the kitchen, such as the committee, and so that's my

12  concern, is that sometimes more is not necessarily more on

13  something like this.

14         Again, we already have a bunch of people rowing in

15  that direction who were paying attention to this issue, so I

16  just -- I'm struggling with understanding what it is that

17  would be gained by -- particularly by giving your client

18  consultation rights, given that you say your client's not

19  conflicted, but your client certainly sits in a different

20  posture than the Creditors represented by the Creditors

21  committee or even the ad hoc groups.

22         They -- your client has other relationships and

23  things going on and certainly hopes to get a recovery as an

24  equity holder, but it does have other things going on that

25  make it in a different position, where understanding that

Page 30

1    can get a little bit cloudy.  So what's your view on that in

2    terms of the need for your client to have consultation

3    rights?

4              MR. SAFERSTEIN:  Well, first of all, it's

5    consultation, not consent rights, just to be clear.  And

6    two, nobody knows this asset better than my client.  My

7    client invented the asset.  And so, the fact that -- you

8    know, how they sell it in, for instance, how much you sell

9    at a time, how much you redeem at a time, all has an impact

10   on the value here.  And --

11             THE COURT:  I understand that, but that -- I mean,

12   I get that.  It's obvious enough that as someone who's not a

13   cryptocurrency expert, I get it, and I'm, just again, I

14   haven't read anything that tells me that the folks involved

15   don't get it and that they don't have a process, that they

16   don't have an understanding of what needs to be done.  And

17   certainly, it's kind of a circumstance where I think

18   everyone would expect, if there was concerns about that, the

19   Creditor committee would be screaming from the highest

20   mountain top about that, as they should, given their

21   statutory position.

22             So I guess I understand, and I'm not trying to in

23   any way disrespect your client's expertise, but I'm just --

24   this doesn't seem, from a -- when you reduce it down to what

25   it is, which is sell the assets in a way that maximizes the

Page 31

 1    value, and there's a market for that, and there's a process

 2    for that, we do this all the time in bankruptcy.  I know

 3    this is -- there's some unique assets here, but I get it.

 4         And again, I'm not hearing anything that makes

 5    your client's participation crucial to maximizing the value,

 6    particularly given that its own situation here is not as

 7    straightforward as that of the Creditors who are very

 8    involved in the process.  But again, that may not be a

 9    question to answer.  It may just be a speech on my part.

10    I'll leave the last word with you, Mr. Saferstein.

11         MR. SAFERSTEIN:  That's fine, Your Honor.  Look, I

12    think the Debtor -- if the Debtor's plan with their brokers

13    and others involved maximizes value, we'll have nothing to

14    say.  We will agree with it.  All we want to do is see value

15    maximized here.  Mr. O'Neal talked about having flexibility

16    with respect to the sales, because it's not so simple.  It's

17    not so straightforward.  You have 35 million shares that all

18    of a sudden will become available on the market, so how you

19    do it is critical.

20         And again, if their experts have the right plan

21    and the right way to do it, we will have nothing to say, but

22    I don't see why they wouldn't want to consult with us when

23    we know the asset, as I said, better than anybody.  So I'll

24    leave it with that.  We don't mean to be difficult here.  We

25    just want to understand what's going on.  And again, if

Page 32

1    they're doing the right thing, we'll say nothing.  But if we

2    have a different view, we don't know why they couldn't take

3    our view into consideration.  They don't have to follow us,

4    but we would ask that they take it into consideration.

5             THE COURT:  All right, I think I understand.  I do

6    see the hand up of the ad hoc group, and hopefully, the

7    technical issues are resolved.

8             So with that, Mr. Rosen?

9             MR. ROSEN:  Thank you very much, Your Honor.  I

10   apologize for the inconvenience before.  And Mr.

11   Frelinghuysen was correct.  We do support this motion very

12   much.  We believe in the process that is already being

13   undertaken by the Debtors and their advisors, and we have

14   been working with them to try and do exactly what is said in

15   the motion, which is to maximize the value of the assets for

16   all parties.

17            The only thing I will take up with what Mr.

18   Saferstein said was the timing of this, which as Mr. O'Neal

19   already laid out, the timing of this was specific to the

20   conversion to the ETF process and trying to move as quickly

21   thereafter as possible.  There was no delay on the part of

22   the estate.  There was an inability to do things previously,

23   so we support the Debtors in their efforts right now, and we

24   believe that the Court should grant the motion as revised,

25   pursuant to the order.  Thank you, Your Honor.

Page 33

1            THE COURT:  All right, thank you.

2            So I'll turn back to Mr. O'Neal for any response

3    to the comments of DCG's counsel.

4            MR. ONEAL:  Certainly.  Your Honor, I have so much

5    to say, but I think I'll keep it limited, because I don't

6    think I need to say it.  But let me just say that Mr. Rosen

7    is absolutely correct.  The timing was driven by the ETF

8    conversion happening on January 10th.  We filed a motion on

9    February 2nd, which is pretty good.

10           Secondly, we -- whatever we do, we're going to

11   need to convert the GBTC shares to BTC or dollars.  We need

12   to do that for distribution.  We don't have any GBTC

13   lenders.  Nobody ever lent us GBTC.  They lent us Bitcoin or

14   ETH or they lent us dollars.  They didn't lend us GBTC, so

15   we need to do the conversion.  We don't have enough dollars.

16   We don't have enough BTC without this conversion in order to

17   make distributions.

18           Second -- I guess, third, I just want to address

19   this tax point.  I don't think I need to, because I've heard

20   Your Honor.  It's kind of like the invisible offshoot, the

21   translucent weed hidden in the bushes.  There was nothing,

22   nothing about taxes in any of their pleadings.  I just did a

23   control F on their pleading, and the only time the word

24   "tax" is mentioned is when they mention our tax ID in

25   Footnote 1.  There was nothing about taxes.  And taxes is

Page 34

1    what it is.  We're not going to use this order to change the

2    Internal Revenue Code.  And so everybody's rights on the tax

3    issues will be reserved as if the order was never entered or

4    entered.  It's just beside the point and not an issue for

5    today.

6            And I'll say for the record, this was not

7    discussed last night when I spoke with Mr. Saferstein.  So

8    it's kind of a new issue that developed live at the hearing,

9    but it sounds like I don't really need to address it.

10           And then finally, with respect to consultation

11   rights, there's a conflict.  It's an inherent conflict.

12   It's not just the $1.1 billion note.  I'm sure Your Honor

13   has noticed that we filed a complaint to collect $33 million

14   in connection with the Three Arrows Capital situation.  We

15   filed an arbitration demand to recover more than $27 million

16   in late fees, and there are other amounts that are owed to

17   the estate.  It's not just the $1.1 billion, though that's

18   an awful lot that they owe us.  It puts them in an

19   inherently conflicted position, particularly when you then

20   add to it the dividends that they get from the management

21   fees.

22           And then finally, I should just say that we're in

23   litigation with DCG right now.  DCG has a pleading that they

24   are accusing the Debtors and the special committee of

25   breaching their fiduciary duties, simply because we're

Page 35

1    trying to maximize Creditor value.  To us, this kind of

2    information request and consultation rights could really be

3    just a litigation tactic, a way to collect more information.

4    And we just think it's inappropriate because of the conflict

5    and the conflict alone, but there's a lot of other reasons,

6    in addition to the conflict and the fact that there's

7    already so much, so much consultation.

8           And if you look at the order, again, Page 7,

9    maximization of sale proceeds, you are ordered, both the

10   Debtors and Gemini, to use reasonable best efforts to

11   maximize the market price of the trust assets or the initial

12   GBTC shares.  That's part of the order.  We have that

13   obligation anyway, but we were happy to put it in the order,

14   because we have that obligation, and that's what we stand

15   by.  Thank you.

16          THE COURT:  All right, thank you very much.  With

17   that, anyone else who has not been heard who wishes to be --

18          MR. KAMINETZKY:  Your Honor -- Your Honor,

19   Benjamin Kaminetzky of Davis Polk.  If I could have 30

20   seconds.  As Your Honor knows, we represent Grayscale, and I

21   just want to supplement what Mr. O'Neal said about the

22   resolution of our objection.

23          The motion with respect to Grayscale focused on

24   our consent rights, and what we made clear is that

25   Grayscale's consent rights are there to ensure compliance

Page 36

1    with a complex set of securities laws that could subject

2    Grayscale to liability if they're not followed to a tee.  So

3    the revised order that was submitted yesterday, Your Honor,

4    makes clear that our consent will not be withheld if we're

5    satisfied that transaction has complied with the securities

6    laws.  I just wanted to explain why it is or how it is that

7    we resolved our objection.  Unless Your Honor has any

8    questions, I just thought I should make Your Honor aware of

9    the basis of the resolution before you ruled.

10          THE COURT:  All right, no, thank you very much.

11   It's entirely appropriate and sensible to put that on the

12   record, and I did see the consent, "which shall not be

13   unreasonably withheld" language, which seems like an

14   eminently sensible way to address the situation you're in,

15   where requirements with how things are done for purposes of

16   securities law are very important and have potential

17   consequences for liability, at the same time, allowing this

18   -- these transactions to come forward as needed to sell the

19   assets.  So thank you for your comments, and I appreciate

20   the obvious work that went into resolving the objection.

21          All right, anyone else?

22          All right, so before the Court is the Debtor's

23   motion seeking entry of an order authorizing but not

24   directing the sale of trust assets and granting related

25   relief.  It's at Docket 1227, and the amended agenda lists

Page 37

1    today there were two objections that were filed, one by

2    Grayscale Investments, LLC, and one by Digital Currency

3    Group, Inc. and DCG International Investments, Ltd.  The

4    Grayscale Investments objection has been resolved, as

5    reflected in their revised proposed order that was filed on

6    the docket at Docket 1307, and that was just discussed on

7    the record.  Digital Currency Group continues with its

8    objection, which was discussed here today.

9           So the standard here is Section 363 of the

10   Bankruptcy Code, and Section (b)(1) of that statue provides

11   that the trustee after notice and hearing may use, sell, or

12   lease, other than the ordinary course of business, property

13   of the estate.  And the standard applied to determine

14   whether such a sale should be authorized is the business

15   judgment standard, something that is much discussed here in

16   bankruptcy court.  See In re Lionel Corporation 722 F.2d

17   1063 and 1070, Second Circuit (1983).

18          To satisfy the business judgment standard, it's

19   only a modest showing, as the case law makes clear.  The

20   Debtor need only articulate a reasonable basis for its

21   decision, and that's to distinguish that kind of decision

22   making from a decision made arbitrarily or capriciously.

23   See John -- In re John-Manville 60 B.R. 612 and 616 (Bankr.

24   S.D.N.Y. 1986).  And the age of the sites tell you how well

25   established the principles are that we're applying here

1    today.

2          And once the Debtor articulates a valid business

3    justification, the business judgment rule presumes that in

4    making a business decision, the Debtor acted on an informed

5    basis in good faith and honest belief that the action was in

6    the best interest of the Debtor, and there are more cases

7    than one could shake a stick at for that proposition.  So

8    but one of them is In re Integrated Res. Inc. 147 B.R. 650

9    and 656 (S.D.N.Y. 1992).

10         So in this circumstance, the Court finds that the

11   sale or redemption of the trust assets is in the sound

12   exercise of the business judgment for all the reasons that

13   are set forth in the motion in the declarations and

14   highlighted here this morning.  The utility of the Debtor's

15   holding, the trust shares, will be maximized if the Debtors

16   have the flexibility to transfer or redeem the shares at an

17   appropriate time.  That -- with that flexibility, the

18   Debtors are hoping to maximize the value of the trust assets

19   and position the sales to facilitate distributions to their

20   Creditors.

21         And I would just note here that there's much

22   discussion of the timing in terms of maximizing value.  I've

23   seen nothing on the record here that suggests the timing

24   proposed by the Debtors here does not do that.  It gives

25   them the flexibility.  It's in, actually, the title of the

1    motion.  It is the authority but not direction to sell the

2    trust assets, and it's very clear from the motion that it's

3    going to be done at the appropriate time to maximize the

4    value.  And so Debtors in fact explained that they believe

5    obtaining authority to redeem or sell the shares is

6    necessary now so that they can, given the impact on the

7    market price from selling large quantities of trust shares

8    at the same time, gives an ability to do it as is

9    appropriate and provides the Debtors with the ability to use

10   their discretion in terms of the timing for such sales or

11   redemptions.

12        And I also find that the request to use cash on

13   hand to purchase BTC or ETH is appropriate.  It's explained

14   and no one's challenged that selling routinely with trust

15   assets is a multi-step process that may entail delay between

16   the decision to sell and redeem on the time that proceeds

17   are obtained.  And thus, it's in the sound exercise of

18   business judgment to use cash on hand to purchase BTC/ETH

19   rather than having to wait until the Debtors receive cash

20   proceeds.

21        The Court notes that the Debtors submit and

22   explain, I think, in the motion and make it even more clear

23   in the revised order that the retention of one or more of

24   the brokers in connection with the sale is appropriate and

25   how they intend to proceed so as to assist in the time of

Page 40

1    the sales, appropriate venues for selling and sale

2    counterparties, as well as to ensure compliance with all

3    applicable law.

4         In a similar vein, I'm happy to approve the

5    requested authority for Gemini to begin conducting sales or

6    redemptions of the initial GBTC shares in anticipation of

7    its role as Gemini's distribution agent, as defined in the

8    plan.  As explained, this is a prudent step, which allows

9    the Creditors to realize the benefits of selling such shares

10   immediately without a need for delay on awaiting

11   determination of pending disputes between the parties that

12   might otherwise delay things.

13        So a couple of notes, again, one objection has

14   been resolved to everyone's satisfaction, and I'm including

15   my own satisfaction, looking at the revised order, which

16   makes eminent sense.  As to DCG's objection, I am going to

17   overrule it for a variety of reasons.  One is the broker

18   issue, I think, has clearly been addressed, if not in the

19   initial motion.  One can argue it was addressed there, but

20   it's crystal clear in the current state of the record.

21        I think the tax issue is a red herring.  There's

22   nothing in the motion that purports to address taxes.  And

23   if taxes are incurred that are irrevocable for -- from any

24   gains, then that's what they are.  That's how the tax code

25   works.  It's all part and parcel of maximizing the value and

Page 41

1   the timing and the way that these assets may be sold.  And

2   again, I have no reason to question the Debtor's proposed

3   method of going forward.  So nothing here affects the tax

4   issues or affects anybody's rights in the tax issues.  And

5   the less said about the taxes, the better.  In fact, taxes

6   are not raised by anybody in any pleading in connection with

7   this motion.  So that takes care of taxes.

8           As for timing, I think I've already made clear

9   that I don't believe that there's any concern about timing.

10  And this sort of bleeds into the issue of consultation

11  rights to some extent.  There are quite a few cooks in the

12  kitchen.  That includes the UCC, the ad hoc group, and

13  (indiscernible).  And these are folks who are not -- have

14  not always been on the same page in this case, because they

15  have parted company on various issues at various times,

16  represent -- best represent the interest of the folks or

17  their clients.  And today, they all stand together in

18  support of this motion, saying it is appropriate, noting

19  that the timing is driven by the conversion, and that the

20  flexibility is needed now to be able to conduct these sales

21  appropriately.

22          So I haven't seen anything that, in the papers,

23  that suggests that there's a need for DCG to be involved as

24  a party with consultation rights.  That said, of course, I

25  would trust that the Debtors, in exercising their fiduciary

Page 42

1    duties, if they thought it was appropriate to reach out for

2    another view, they would, but again, this is an asset sale.

3    They're trying to monetize the assets, and I think there

4    certainly is considerable expertise on behalf of the

5    Debtors, the committee, the ad hoc groups, and Gemini in

6    order to do that.

7           And last but not least, in any event, DCG is in,

8    at best, an awkward position for asking for consultation

9    rights here.  There is an inherent conflict.  They are

10   getting -- they have a monetary interest in the continuation

11   of the existing relationship.  That's undisputed.  It's,

12   frankly, a bit surprising that it's not at least addressed

13   in the objection.  That's kind of playing with fire,

14   frankly, but there's a whole host of disputes and

15   litigation, and there's a pending confirmation objection,

16   and it makes clear that DCG has an interest in pursuing its

17   own agenda, its own interest, as it is allowed to do under

18   the Bankruptcy Code.  No one begrudges its ability to look

19   out for itself.  That's kind of how this has gone, and

20   that's the way it is.

21          So but at the same time, those different

22   interests, which I'm not going to go through, I think they

23   were addressed on the record by Mr. O'Neal in some depth,

24   make it clear that DCG is not in an ideal position to offer

25   dispassionate and -- advice untainted by its own interest.

Page 43

1    It's just not, so I'm not sure that it needs to be a

2    consultation party in any right but the fact that it has --

3    those circumstances in this case mean that it really

4    shouldn't be a consultation party.  And so I'm going to

5    reject that request.

6              So I understand that the issues about the

7    mechanics have, while I said, been addressed with the

8    Grayscale objection, so really, we're talking about timing

9    and consultation rights at the end of the day.  I find the

10   time to be appropriate, and I find the consultation rights

11   not to be.  So that's my ruling on the pending motion.

12             I will say that, since we're talking about the

13   Debtors and DCG, sometimes conflict presents opportunity.

14   It certainly has struck me in various things that I've read

15   over the last few months, including things more recently,

16   that a lot of the disputes really are in some ways, at least

17   some of the aspects of it, are flipsides of the same coin.

18   That is, when you start talking about what recovery the

19   creditors get, you start talking about what impact that has

20   on litigation among other parties who were suing for

21   damages.  That is, if the Creditors are fully made whole and

22   what that looked like.

23             There's obviously the New York AG's complaint,

24   which is focused on that, which the Debtors have settled,

25   but I understand other parties have not, but there's also

Page 44

1    litigation.  And that means there's a lot of moving pieces,

2    but a lot of those moving pieces affect more than one set of

3    disputes or conflicts.  And that presents opportunities for

4    parties to try to have meaningful discussions.

5            And so given the quality of the professionals

6    here, I trust that those discussions are happening or should

7    happen.  If there's anything that I can do to assist, please

8    let me know.  But the alternative is obviously to spend a

9    considerable amount of time and effort in the ongoing

10   litigation, which again, my experience dealing with large

11   cases, I think, is much like yours, meaning that the parties

12   often say, Judge, we need a couple of rulings, and once we

13   get a couple of rulings, we'll be able to better handicap

14   what an appropriate result looks like here.  So I trust

15   that's happening in this case.

16           Again, there's a lot of things that happen in the

17   room with settlement discussions or the like.  I'm not in

18   the room where it happens, so I'm acutely aware of that, so

19   my comments could be very much out of sync with what's

20   actually going on, but I feel duty bound to give the

21   obligation to the extent that there's any resistance at any

22   level where you can hopefully use me as the -- as to blame

23   for the need for continued discussions.  But if I can be of

24   any assistance, let me know, but that certainly struck me in

25   the context of discussing DCG's issues today and what the

1    path looks like going forward.  But you have my ruling, and

2    with that, Mr. O'Neal, is there anything else we should

3    discuss here today from the Debtor?

4            MR. ONEAL:  Your Honor, the Debtor has nothing

5    further.  We thank you for your time.  There may be -- it

6    looks like Mr. Medina may have something to say as to which

7    that mean that Mr. Weaver will have something to say.

8            THE COURT:  All right.  Before I get to Mr.

9    Medina, let me ask the committee if they have anything that

10   they wanted to address.

11           MR. SHORE:  Nothing, Your Honor.

12           THE COURT:  All right, anything from anybody else

13   before I hear from Mr. Medina?

14           MR. ROSEN:  Nothing, Your Honor.

15           MR. SAFERSTEIN:  Nothing, Your Honor, thank you.

16           THE COURT:  All right, hearing nothing else from

17   any other party, I'll turn to Mr. Medina.

18           Mr. Medina?

19           MR. MEDINA:  Thank you, Your Honor.  Your Honor,

20   just in the spirit of what Your Honor raised with respect to

21   timing and moving this matter along as quickly as possible

22   with confirmation being on the 26th, I wanted to raise to

23   Your Honor an issue I'm having with regards to just

24   receiving some exhibits that the parties intend to rely on

25   at the confirmation hearing.

1          THE COURT:  Yeah, I saw your -- I guess you had an

2     email or a letter to chambers on that.  I could not tell

3     whether the Court was being asked to intervene after the

4     parties had exhausted all conversations or whether people

5     were communicating through me.  Obviously, one is

6     appropriate, but the second is not, and I certainly want to

7     encourage parties to talk to one another.  And we are also -

8     - the 26th is sufficient time away that I would think

9     parties can address those issues, so that's why I did not

10    jump on that issue before now.

11          MR. MEDINA:  No, understood, Your Honor, of

12    course.  And I think it was the former, not the latter.  I

13    think an order was submitted.  There was an objection.

14    There just wasn't an opportunity to clarify what the issue

15    was.  But Your Honor, to just summarize very quickly, under

16    an email that I got yesterday, Exhibits -- it looks like the

17    parties can submit exhibits to one another up until February

18    20th, the day after, that Presidents Day.  And under Your

19    Honor's order, in limine motions are due the next day, 24

20    hours later.  My concern is, Your Honor, just for simple

21    procedural fairness, there is -- it looks to be about 170

22    exhibits that could potentially be offered by any one of

23    three parties.

24          THE COURT:  But what -- all right, what is your

25    issue that is in your head about a motion in limine?  What

Page 47

1   is it that you were concerned about being introduced into

2   evidence at the confirmation in terms of a type of evidence

3   or a type of issue or -- so I will say I had a different

4   view of what motions in limine was in practice than I do on

5   the bench.

6           In bench trials, judges, I will confess, are not

7   necessarily huge fans of motions in limine.  We just argue

8   about the significance of the exhibits and their relevance,

9   because you're not worried about a jury being tainted.  They

10  pay me to be able to separate out the legal issues.  So what

11  is it -- is there something currently on your radar screen,

12  an issue or a document or something that is motivating this

13  concern about motions in limine?

14          MR. MEDINA:  Sure, Your Honor.  The answer is no.

15  It's purely deadline-driven, Your Honor.  We don't know what

16  we don't know.  I haven't seen any of the documents.  They

17  just simply have never been provided, so --

18          THE COURT:  Well, but aren't parties exchanging

19  them on the -- all right, so let me hear from the Debtors

20  and see where they are, and then we can -- I frankly really

21  don't want to spend a lot of time on motions in limine

22  today, but --

23          MR. MEDINA:  Yeah, I get it.

24          THE COURT:  -- let me hear from Debtors.

25          MR. WEAVER:  Thank you, Your Honor.  Andrew

Page 48

1    Weaver, Cleary Gottlieb Steen and Hamilton on behalf of the

2    Debtors.  Your Honor, I think the issue here that we've been

3    trying to manage is the parties obviously are exchanging

4    potential exhibits that will be used at the confirmation

5    hearing.  And obviously, there are different objections by

6    different parties that relate to different documents, and so

7    it's a little bit complicated to a certain extent, because

8    it's not the same parties, the same objections, et cetera.

9            So what we've tried to do, and I'm sorry to have

10   to get into this level of detail with you, Your honor, but

11   we've tried to facilitate the exchange of exhibits that are

12   not objected to so that we can have those prepared and

13   delivered to you ahead of time, as you had requested.

14           During the course of that process, there were

15   documents identified by the committee related to the DCG

16   objection, that the DCG parties objected to, and that the

17   DCG parties encountered designated documents that are

18   objected to.  And those parties are working out as to that

19   objection, as to those documents, what they're going to do.

20   And so we've not circulated those documents to all of the

21   potential objectors, because that issue is still being

22   worked through, and that issue may or may not be resolved.

23           To the extent it's not resolved and a party wishes

24   to use those documents at confirmation, we will provide them

25   to all of the objecting parties so folks do have a chance to

Page 49

1   see them before the hearing.  But the issue that, I think,

2   Mr. Medina was raising is just the fact that there is a

3   dispute among parties that don't relate to his objection,

4   documents that don't relate to his objection, that are being

5   worked out.  And until it's worked out, we're not

6   anticipating circulating every potential document amongst

7   the parties.  That was not -- and these documents in

8   particular were not produced as a part of confirmation

9   discovery.

10          So as the parties work through those issues, Your

11   Honor, we have sufficient time to come to a resolution on

12   that.  And to the extent that those document will be used at

13   the hearing, the parties will have an opportunity to see

14   them ahead of time.  And as you noted, I don't expect

15   there'll be motions in limine as to exhibits.  There may be

16   discussions during the hearing about exhibits.  We talked

17   about that previously.  But this isn't an issue about not

18   sharing information relevant to Mr. Medina and his

19   objections that he's filed and the discovery that he's

20   received and the documents that he's notified and the

21   documents the Debtors have identified related to his

22   objection.

23          So it's a little premature.  I think the parties

24   are trying to work through some of these issues, and we're

25   obviously looking to facilitate the smoothest process on

Page 50

1    these issues as possible before confirmation.

2         THE COURT:  All right, so today is the 14th.

3    Nothing says Valentine's Day more than discussions about

4    motions in limine.  So listen, it's a bench trial.  I am not

5    going to cut any -- off anybody's rights to be heard and

6    objecting to exhibits.  Right?  And motions in limine work

7    best, frankly, when they are identified to a particular

8    issue.  Right?  Where someone says, I know somebody wants to

9    go down this rabbit hole, but it's a waste of time.  It will

10   cut the trial in half or significantly and it will -- it'll

11   prejudice the jury or the judge or whatever it is in terms

12   of how to look at the case.

13        And that's why I asked that question, Mr. Medina.

14   I'm not asking you to pull a rabbit out of your hat.

15   Sometimes, there are some cases where people say, I know

16   that this party wants to go here, and I have a problem with

17   that, and I want to let the Court know early.  So but

18   barring that circumstance, everybody will have a chance at

19   the hearing to object to any exhibits, and we'll get through

20   it.

21        The other reason why judges favor that is because

22   then I have a context for the objection, so you know, that's

23   the way it works.  I understand people want to see exhibits

24   ahead of time.  I don't see exhibits ahead of time, because

25   they're not evidence until they're admitted, and so until

Page 51

1    people tell me what they want to rely upon in the exhibit,

2    so I try to stay away from it, frankly.  And it's the last

3    thing I want if people show up with their binders the day of

4    the trial.  It's fine with me, because it's -- none of it's

5    in until we get through it.

6            So given that today's the 14th, and we're getting

7    together for confirmation on the 26th, I'm going to impose

8    on you all to cooperate and communicate good faith, and if

9    there's some specific issue that comes up, again, to do what

10   you always do in discovery under the local rules, which is

11   meet, confer, and see where you end up.  But it is, we're

12   all at our worst when we're talking about theoretical issue

13   rather than actual issues.  And so, Mr. Medina, I promise

14   you will get a chance to be heard on evidence that you

15   object to.

16           MR. MEDINA:  I appreciate that, Your Honor.  I

17   just -- one point, and I understand Your Honor's procedures,

18   and I think they make good sense, particularly with regards

19   to the way Your Honor handles trials.  I think really just

20   to respond very shortly to what was -- what's said, this is

21   really about knowing what we know.  Without knowing the

22   documents, it's basically trial by fire, Your Honor.  There

23   is no information.  There's no predicate, so it's not

24   necessarily about any desire to file any kind of in limine

25   motions.  It's literally a desire to just be prepared for

1    trial, Your Honor.

2            THE COURT:  Right, but I would think that the

3    confirmation discovery that occurred in response to your

4    requests is -- the reason why that happens is to address

5    that kind of concern, right?  What is it you want to know?

6    What is it you want to get?  And that you have that.  So if

7    there's something that was produced to you that you clearly

8    have a problem with, then you know that now and can handle

9    that appropriately.  And again, beyond that, we'll get to

10   it, and I appreciate all the effort that the parties will

11   make on that.

12           Another reason why I try to stay out of this at

13   this point is, and again, I'm sorry, I don't mean to be

14   pedantic about all this stuff, but judges, when asked to

15   weigh in on certain things prematurely, we get -- that's --

16   we get closer and closer to throwing darts at a dartboard as

17   opposed to making intelligent and subtle decisions, and so

18   that's why talking about evidence too early out of context,

19   you're not going to get a whole lot of high-quality wisdom

20   from me, despite my best efforts, just because I'm not

21   nearly as versed in the ins and outs.

22           So I'm going to let the process play out, given

23   that we're the -- we're on the 14th and we're talking about

24   the 26th, so there's more than a week and a half to get

25   there.  And I trust you all will, again, communicate and

Page 53

1    cooperate in good faith.  All right.

2              MR. MEDINA:  Thank you, Your Honor.

3              THE COURT:  With that, anything else form any

4    other party?

5              MR. WEAVER:  Nothing from the Debtors, Your Honor.

6              THE COURT:  All right, thank you all very much.

7    Have a good afternoon, and I will see you all soon.

8              (Whereupon these proceedings were concluded at

9    12:15 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1                           I N D E X

2

3                           RULINGS

4                                              Page      Line

5    Debtor's motion granted                   36        22

6    Gemini sales/redemptions approved         40        4

7    DCG's objection overruled                 40        16

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 16, 2024