Page 1



1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 23-10063-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENESIS GLOBAL HOLDCO, LLC,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    300 Quarropas Street, Room 248

13                    White Plains, NY 10601

14

15

16                    February 16, 2024

17                    2:33 PM

18

19

20

21  B E F O R E :

22  HON SEAN LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  RAI/ALIANNA/ART

1    HEARING re Discovery Conference Regarding Settlement Motions

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WHITE CASE

 4        Attorneys of Official Committee of Unsecured Creditors

 5        1221 Avenue of the Americas

 6        New York, NY 10020

 7

 8   BY:  COLIN WEST

 9        CHRIS SHORE

10

11   CLEARY GOTTLIEB STEEN HAMILTON LLP

12        Attorneys for the Debtors

13        One Liberty Plaza

14        New York, NY 10006

15

16   BY:  SEAN A. O'NEAL

17        THOMAS KESSLER

18        JANE VANLARE

19

20

21

22

23

24

25
```

Page 4

```
1    WEIL GOTSHAL MANGES LLP

2         Attorneys for Digital Currency Group, Inc.

3         767 Fifth Avenue

4         New York, NY 10153

5

6    BY:  JEFFREY SAFERSTEIN

7         FURQAAN SIDDIQUI

8         JOSHUA WESNESKI

9

10   PROSKAUER & ROSE

11        Attorneys for the Ad Hoc Group

12        11 Times Square

13        New York, NY 10036

14

15   BY:  WILLIAM DALSEN

16

17

18

19

20

21

22

23

24

25
```

1                 P R O C E E D I N G S

2            THE COURT:  Good afternoon.  This is Judge Sean

3     Lane in the United States Bankruptcy Court for the Southern

4     District of New York, and we're here for a recently

5     scheduled conference in Genesis Global Holdco dealing with

6     discovery, so let me find out who's here on behalf of the

7     requesting party, Digital Currency Group.

8            MR. WESNESKI:  Yes, Your Honor.  Joshua Wesneski

9     from Weil, Gotshal & Manges on behalf of Digital Currency

10    Group.  With me is Furqaan Siddiqui and Jeffrey Saferstein.

11           THE COURT:  All right.  And on behalf of the

12    debtors?

13           MR. KESSLER:  Good afternoon, Your Honor.  Tom

14    Kessler from Cleary, Gottlieb, Steen & Hamilton on behalf of

15    the debtors.  My partner is Sean O'Neal and Jane VanLare.

16           THE COURT:  All right.  And on behalf of the

17    committee?

18           MR. SHORE:  Good afternoon, Your Honor.  Chris

19    Shore from White & Case on behalf of the committee.  I'm

20    here with Colin West as well.

21           THE COURT:  All right.  And on behalf of the ad

22    hoc group?

23           MR. DALSEN:  Good afternoon, Your Honor.  William

24    Dalsen from Proskauer & Rose for the ad hoc group.

25           THE COURT:  All right.  Anyone else who needs to

Page 6

1    make an appearance?

2              MS. GRIFFITH:  Good afternoon, Your Honor.  Greer

3    Griffith on behalf of the crypto-creditor ad hoc group.

4              THE COURT:  All right.  Anyone else?

5              MS. BEITLER:  Good afternoon, Your Honor.

6    Elizabeth Beitler, Hughes, Hubbard & Reed on behalf of

7    Gemini Trust Company, LLC.

8              THE COURT:  All right.  Good afternoon.  Anyone

9    else?

10             All right.  So occasionally, I get e-mails or

11   letters about discovery.  It's always very difficult to

12   figure out what to do with them, frankly, because I'm not in

13   the room where it happens, and so I don't -- I really don't

14   know.  So what I try to do is schedule something to thus

15   avoid a motion practice and hopefully resolve issues, and --

16   but try not to do it -- try to do it promptly but not soon

17   as it'll somehow be used as a tactical weapon.

18             So with that, I have the -- and notwithstanding

19   seeing folks in this case earlier this week, I have the

20   letter from Digital Currency Group about disputes.  It's

21   fairly straightforward but brief, and so with that, let me

22   turn it over to DCG to tell me what the issues are.

23             MR. WESNESKI:  Thank you, Your Honor.  Josh

24   Wesneski from Weil Gotshal.

25             First off, we appreciate the Court making time on

Page 7

1    short notice for this conference.  Pleased to report we've

2    actually narrowed the issue significantly.  There's just one

3    issue outstanding that we are looking for Court guidance on.

4            So again, as Your Honor knows, the discovery we're

5    taking here relates to two settlements that are before the

6    Court, one with the New York Attorney General and one with

7    the SEC.

8            We've received documents from the debtors and from

9    some other parties, and this morning we took the deposition

10   of Mr. Paul Aronzon who was one of two independent directors

11   of the special committee for the debtors.  His deposition

12   was taken in both his personal capacity and as a 30(b)(6)

13   witness for the debtors.

14           What we're asking for here is to depose the other

15   independent director of the special committee, Mr. Tom

16   Conhini.  I don't think there's any dispute between the

17   parties -- my friends will correct me if I'm wrong -- that

18   his testimony is relevant to the issues in dispute with

19   respect to the settlement motions.  He is one of the two

20   people that reviewed the settlements and was required to

21   vote in their favor for them to go forward.  He has relevant

22   information regarding his knowledge about the special

23   committee's assessment of the settlements, and the process

24   by which those settlements were evaluated.

25           The only objection we have heard so far from the

Page 8

1    debtors is that his deposition testimony would be

2    duplicative of that of Mr. Aronzon's.  And respectfully,

3    that is part of the reason we want to test that in a

4    deposition.  He may have a different perspective from Mr.

5    Aronzon on the relative risk of litigation and the benefits

6    of settlement, or he may or may not be aware of different

7    procedural issues or discussions that were undertaken in

8    connection with the settlement.  He may contradict or

9    undermine Mr. Aronzon's testimony about the basis for the

10   settlement or the reasonable range of exposure.  And so

11   testing the consistency between the two witness who are

12   central -- and to be clear, Mr. Aronzon at this point is the

13   only deposition that has been taken and -- except for Mr.

14   Conhini -- will be the only deposition taken in connection

15   with these motions.  So all we're asking for is the other

16   half of the story from the other special director.

17          And I'll note as well, just for the Court's --

18   just for color for the Court that earlier this morning when

19   Mr. Aronzon was deposed, he answered "I don't know" some 31

20   times.  So I think at the very least, we are entitled to see

21   if Mr. Conhini knows the answers to those questions too.

22          We don't want to be a burden.  We want to minimize

23   it.  We did Mr. Aronzon's deposition in three hours this

24   morning.  We can do Mr. Conhini's deposition in three hours

25   as well, and, you know, for an independent director of a

Page 9

1   Chapter 11 debtor who is seeking approval of settlements

2   that will dispose of potentially billions of dollars of

3   assets, we don't think a three-hour deposition is too much

4   of a burden to impose.

5          So for that reason, Your Honor, we are asking that

6   the Court direct the deposition of Mr. Conhini for a period

7   of three hours in connection with the pending motions to

8   approve the settlement.

9          THE COURT:  All right.  Let me hear from the

10  debtors.

11         MR. KESSLER:  Good afternoon, Your Honor.  Tom

12  Kessler from Cleary Gottlieb from the debtors.

13         There are a couple things I wanted to touch on.  I

14  think Mr. Wesneski is correct that our primary position is

15  that a deposition of Mr. Conhini is cumulative and

16  duplicative of the record that's already been developed with

17  respect to Mr. Aronzon.

18         Respectfully, I don't think that the suggestion

19  that there is special knowledge of the process or of the way

20  that the special committee went about engaging in its review

21  is borne out by the record.

22         Of course, as Mr. Aronzon testified, there were

23  deliberations that occurred in special committee meetings.

24  Mr. Conhini is in those meetings.  As we -- again, as we've

25  said to our colleagues at Weil, their knowledge of the

Page 10

1  process that the special committee went through to consider

2  and approve the settlement and the factors that they

3  considered is co-extensive.  To the extent that there's a

4  suggestion that he might be asked detailed questions about

5  what were the risks that were considered, what were the

6  benefits that were considered, how did you weigh them, those

7  sorts of process questions, Mr. Conhini is not going to

8  answer because the answer is privileged, and I think that

9  again was borne out by the deposition this morning of Mr.

10  Aronson.

11         Similarly, with respect to the contention that Mr.

12  Aronzon answered I don't know to a number of questions, the

13  lion's share of those questions were about whether certain

14  facts exist in the world.  Is he aware of those facts?  Is

15  he not aware of those facts?  That's of exceedingly marginal

16  relevance, if any relevance, to the issues in this case and

17  the considerations that --

18         THE COURT:  Can you give me an example of what you

19  mean by that?

20         MR. KESSLER:  Sure.  So for example, Mr. Aronzon

21  was asked if he was aware of conversations between Counsel

22  for the debtors and various parties.  Is he aware that there

23  were conversations that were or were not occurring?  And on

24  some occasions, he answered, "I am.  I do have an

25  awareness," on some occasions, "I do not have an awareness,"

1    on some occasions, "I don't know either way."

2              THE COURT:  All right.

3              MR. KESSLER:  I'm happy to compile examples.  The

4    deposition closed about an hour ago.

5              THE COURT:  Yeah.  No, I'm just trying to get a

6    flavor.  You had a colorful interesting way of labeling

7    that, so I just wanted to see what -- a little bit more.  So

8    that's fine.  That'll do for right now.

9              MR. KESSLER:  Okay.  Thank you, Your Honor.  I

10   think -- the last thing I'll say is that we think Mr.

11   Aronzon is the right person to speak to these things.  As

12   Mr. Wesneski noted, he was deposed in his personal capacity.

13   He was deposed as a designee from the debtors.  He is the

14   declarant with respect to the pending motions, and we simply

15   don't see a need to further burden the record in this case,

16   particularly with the issues at hand.

17             I fully respect the gravity of the situation, but

18   I'll submit that Mr. Aronzon was level to the task.  He

19   also, I'll note, was the only deponent of the debtors that

20   was deposed in connection with plan confirmation, and the

21   record is sufficiently developed there as well, and we see

22   no reason why we should need to do what is unnecessary and

23   cumulative work on such a short timeline.

24             THE COURT:  All right.  I'm assuming -- just

25   before I hear from the committee, just to go back to DCG for

1    a second.  I'm assuming the request is dealing with the

2    settlements and not confirmation.

3            MR. WESNESKI:  That's correct, Your Honor.

4            THE COURT:  Okay.

5            MR. WESNESKI:  And specifically, you know, there's

6    a number of factors the Court is, you know, supposed to

7    consider with respect to settlement approval.  Some of those

8    relate to arm's length bargaining, the consideration that

9    the special committee gave or didn't give, so I do think

10    it's relevant whether Mr. Aronzon or Mr. Conhini --

11            THE COURT:  All right.  No, no.  I heard from you.

12    I just wanted --

13            MR. WESNESKI:  Okay.

14            THE COURT:  -- just to clarify that so I

15    understood the scope of what you're asking for.  All right.

16            MR. WESNESKI:  Thank you, Your Honor.

17            THE COURT:  Let me hear from the committee.

18            MR. SHORE:  Thank you, Your Honor.  Again, Chris

19    Shore from White & Case.

20            We object to the additional deposition on the

21    basis of proportionality.

22            Let me start here.  It's not just the depositions.

23    DCG sent out document requests to the debtors, the

24    committee, and I believe the ad hoc committee, which we've

25    all been scrambling to respond to, so it's not as if they've

Page 13

1    been surgical in the way they've approached their discovery.

2              But in any event, if we roll back to the 60,000-

3    foot view, obviously DCG is trying to establish that the

4    debtor is "solvent" and that they should be making equity

5    distributions.

6              When this issue was first raised almost a month

7    ago, I raised it with DCG's counsel and have in various

8    meet-and-confers raised the issue of the subordinated

9    claims, which include the New York AG.  There are dozens of

10   proofs of claim of governmental entities that have been

11   filed that on a liquidated basis total more than $30 billion

12   plus alleged unliquidated amounts.

13             I raised with Counsel for DCG on multiple

14   occasions, "Are you going to object to those claims on the

15   basis that the debtor is not liable for conduct pre-petition

16   to governmental agencies?"  And I said, "If you're going to

17   do that, you better get objecting to those claims."

18             I recognized and everybody should recognize it

19   puts DCG in a very difficult position.  Are they really

20   going to take the position in front of the Court that the

21   debtor is not liable to the New York AG because that will

22   obviously have blowback effects on them if Your Honor were

23   to rule then in fact there were frauds that occurred that

24   DCG participated in.

25             So roll forward.  There are no pending objections

Page 14

1    to any subordinated claim, including to the New York AG

2    claim, despite DCG being on notice for more than a month

3    that if they weren't going to object to the claim, we were

4    going to be taking the position in front of the Court that

5    under 502(a), those claims are deemed allowed.

6              So the status quo right now is there is a New York

7    AG proof of claim on file.  It alleges $1 billion plus

8    unliquidated amounts on a non-subordinated basis against the

9    debtors.  The committee is obviously laser focused on that

10   claim and the subordination of that claim, which under this

11   settlement the New York AG is agreeing to.

12             But in the committee's view, based upon the

13   investigation we've done and months of diligence and to the

14   debtor's prepetition conduct, we don't believe the New York

15   AG is wrong about serious wrongdoing having occurred,

16   especially as it pertains to DCG.  So we want to see this

17   claim settled.

18             So point number one on proportionality, the win

19   here on blocking the 9019 only returns DCG to the status

20   quo.  There is still an allowed -- deemed allowed $1 billion

21   claim of the New York AG which is not subordinated that

22   stands between them and their purported equity distribution.

23             But it's worse than that because unless Mr.

24   Wesneski surprises me now, I don't think DCG is going to

25   tell you that they're contesting the merits of the claim.

Page 15

1    That is the 9019 hearing.  They will not be taking the

2    position that their view is that there is no liability there

3    because if they were to take that position based upon the

4    meet-and-confers we've been having, we'd among other things

5    subpoena Mr. Silbert to come testify, and he'd have to

6    answer whether in fact he has knowledge about whether or not

7    there was wrongdoing, which is the subject of the New York

8    AG complaint.

9          So this whole settlement objection is not that the

10   settlement falls outside the range of reasonableness.  That

11   is DCG's position that the debtor is in no way liable to the

12   New York AG, which they're going to substantiate with

13   evidence.  They want to go forward with an argument that it

14   may be a proper settlement, but it's being done for an

15   improper purpose.  That is it's just being done for the

16   improper purpose of trying to get a plan confirmed.

17         Now whether or not that's an improper purpose,

18   I'll let the debtors defend that, but they don't need all

19   this discovery.  Depositions are the most expensive form of

20   discovery with I don't know how many people were on the

21   deposition this morning.  They don't need another deposition

22   in addition to the documents they're getting to try to blow

23   up a settlement on the basis that it's proper but being done

24   for an improper purpose when the effect is it has no impact

25   whatsoever on the confirmation hearing.

1           THE COURT:  All right.

2           MR. SHORE:  Thank you, Your Honor.

3           THE COURT:  Thank you.  Thank you.  Anyone else

4     that wants to be heard before I loop back to DCG?

5           MR. DALSEN:  Yes, Your Honor, from the ad hoc

6     group, if I may.

7           THE COURT:  Sure.  Briefly.

8           MR. DALSEN:  Thank you, Your Honor.  William

9     Dalsen from Proskauer for the ad hoc group.

10          We would also object to the deposition of Mr.

11    Conhini as duplicative.  I think I would stress a few

12    points.  We certainly agree with what Mr. Shore was saying,

13    that the discovery efforts thus far, given the limited

14    nature of what we're talking about here, our 9019 motions,

15    has been far from surgical.

16          The need to test the recollection of another

17    person is -- and try to compare that to the recollection of

18    Mr. Aronzon who was deposed this morning seems awfully

19    duplicable in our view.  In particular, as Mr. Kessler

20    pointed out, we're talking about now deposing someone who's

21    not a declarant in support of the motion.  And from our

22    perspective, having another deposition with a cast of

23    thousands to revisit questions about a declaration that

24    someone did not file, or to revisit, for example, many of

25    the hypothetical questions posed to the witness this morning

Page 17

1    in our view would be duplicative.

2              That's what we would say, Your Honor.

3              THE COURT:  All right.  Anyone else before I hear

4    from DCG?

5              So let me ask a question here.  I'm trying to sort

6    of get the 3,000-foot view here.  There obviously is a

7    pending claim that's not objected to.  I can only infer from

8    that that no one objects to it, and so it would be something

9    that would be addressed in terms of a claim that's made as a

10   result of confirmation.

11             I'm trying to figure out, one, the numbers here.

12   If there's a billion-dollar claim, under what circumstances

13   would DCG actually -- what changes in the economics would be

14   required for DCG to actually recover anything based on their

15   equity holder -- based on being an equity holder?

16             MR. WESNESKI:  Yes, Your Honor.  I think that the

17   parties probably have substantial disagreement about how

18   much excess value there is in the estate right now, but what

19   I'll tell the Court is that we filed our objection to the

20   plan -- I can't remember now -- two weeks ago.  We

21   calculated something in the order of $900 million in excess

22   value without accounting for the New York Attorney General

23   claim.

24             Since that time, the value of the assets in the

25   estate has continued to go up significantly, and we're now

Page 18

```
 1    far above -- far, far above $900 million.  So I would say

 2    that if all the claims are properly valued as we contend

 3    that they should be, as of the petition date, in U.S.

 4    dollars -- and that's an issue that I know the Court is

 5    going to address, you know, at the confirmation hearing and

 6    on full briefing.  But if the claims are property valued as

 7    -- in U.S. dollars as of the petition date, I would submit

 8    that we are potentially already in a circumstance in which

 9    the value of the estate could potentially flow to DCG.

10          Now, I want to be clear too that we're -- you

11    know, what Mr. Shore said is correct to an extent, that we

12    are not going into the hearing in a week and a half

13    intending to litigate the full merits of the New York

14    Attorney General claim.  We don't think that that's what --

15          THE COURT:  I don't know exactly what -- litigate

16    the full merits.  You're either litigating the merits or

17    you're not litigating the merits.  There's either a claim

18    objection or there isn't.  So I don't -- I don't know of

19    another category that you're not going to fully litigate it,

20    so what does that actually mean?

21          MR. WESNESKI:  Well, let me just say --

22          THE COURT:  I understand you to be challenging the

23    settlement but not challenging the claim.

24          MR. WESNESKI:  That is where it stands now.  We

25    are not challenging the claim, and my colleague, Mr.
```

Page 19

1    Saferstein can jump in if I say something inaccurate here.

2    But I do understand that -- well, let me be clear.  We are

3    not going to litigate the merits at the 9019 hearing.  We

4    believe that there are defects with the settlement that go

5    far beyond any questions of what Genesis's actual likelihood

6    of liability is, and we'll be briefing those for Your Honor.

7            THE COURT:  All right.  I'm -- again, I -- people

8    are being very cautious probably for lots of interesting

9    reasons about how -- about what they're saying.  I don't

10   quite know what that means.  If there's no objection to the

11   claim and the settlement -- the settlement is usually

12   something that is either the size of the claim or less --

13   then I'm just having trouble understanding what line DCG is

14   trying to walk.

15           MR. WESNESKI:  Yeah.  I want to be clear.  We're

16   not waiving our objection to the claim, but that objection

17   is not due right now.  We have time to object to it on its

18   merits in due course at whatever deadline that is, but

19   that's not what we're litigating here on the 9019 settlement

20   motion or in the plan confirmation.

21           THE COURT:  All right.  I guess I'll look at --

22   I'll sort through it as I get to it.

23           Let me actually ask you a question that nobody

24   addressed but is hard to miss, and I don't know exactly how

25   the mechanics of this work, but humor me for a minute.  The

Page 20

1    AG lawsuit is against GGC, the debtor.  It's against Gemini,

2    who's a creditor.  It's also against DCG.  And it's -- but

3    while it has a number of parties that it's suing, the crux

4    of it is that the customers -- the allegation is the

5    customers were defrauded, meaning the customers didn't get

6    the benefit of their bargain.

7            And so if I'm understanding that correctly, I have

8    been wondering about whether various actions taken here will

9    (indiscernible) the benefit of various folks in a way that

10   isn't really being discussed.  Meaning if you're talking

11   about damages and the damages that flow to customers, and

12   various people are being sued, I'm -- this is why -- the

13   fact that people don't seem to be talking to each other

14   confuse me a little bit.  If DCG, GGC, and Gemini are being

15   sued based on the harm to the customers, the alleged

16   defrauding of the customers, and the plan is designed in the

17   debtor's view, and the ad hoc's view, and the committee's

18   view to pay the customers what they're due, doesn't that

19   lower the exposure of all the defendants in the AG suit?

20           MR. WESNESKI:  I think the New York Attorney

21   General may or may not have a view as to the actual

22   limitation of damage that it could recover.  The basis for -

23   -

24           THE COURT:  Well, no.  Well, that's a different --

25   but that's a different question.  I can't see as how it

 1    wouldn't limit the liability of folks because the damages

 2    are customer based, and so there's various folks who are

 3    alleged to have taken actions that together or separately

 4    harmed the customers, but the customers are creditors here.

 5    And so in some sense, whether you deal with them as

 6    claimants in the case, which they all are, or if you deal

 7    with them as folks who are victims for purposes of the AG's

 8    lawsuit, you're talking about what ultimate recovery they

 9    will get, which has to affect the exposure of the

10    defendants.

11             And in that way -- well, it's markedly different

12    in many, many, many respects from cases like Dreier and

13    Madoff.  It reminds me of them in the sense that there's

14    several ways to compensate people who are alleged victims.

15             And so the reason why I mention all of this is I -

16    - again, I'm not getting the sense that anybody's talking to

17    one another necessarily, and I'm a bit confused about that

18    given that some of these various aspects of the case,

19    whether it's a settlement, whether it's a claim being paid,

20    whether it's adversary proceedings where people are suing

21    each other for damages are all going to be affected by what

22    ultimate recovery the creditors get.

23             And so I mention that because people should be

24    talking to one another, or you all will spend millions and

25    millions and millions of dollars litigating unnecessarily,

Page 22

1    and that may be a circumstance where clients have very

2    strong views but need to be educated by the fine lawyers

3    like I see on the screen about the complexities of these

4    things because they're not easy to figure out.

5              So I think with that, I'll let it go unless

6    somebody else wants to talk about it some more.  But it does

7    seem sort of an inescapable issue in terms of how to

8    strategically think about these things.  And so that's one

9    of the things I'm struck about in terms of the AG

10   settlement.  I recognize DCG hasn't settled, but any

11   settlement that gets money back to the customers would seem

12   to address the damages that are sought in the lawsuit.

13             So again, I spent a little bit of time litigating

14   for the government, so it doesn't -- it doesn't seem --

15   again, maybe I'm missing something.  You can all educate me,

16   but I just wanted to mention it to the extent that my

17   mentioning it might facilitate any conversations.

18             MR. WESNESKI:  I appreciate that.

19             MR. O'NEAL:  Your Honor.

20             THE COURT:  Let me hear from Mr. Wesneski again.

21   I'm happy to hear from you in a minute.

22             So Mr. Wesneski, that's one thing I wanted to

23   address.  The other more specific question I wanted to

24   address is there's a 30(b)(6) issue.  I'm not sure whether

25   the questions that I don't know are things that were asked

Page 23

```
 1    in the 30(b)(6).  That's where the person is actually the

 2    authorized person to provide the answer.  That is the formal

 3    position of the client, so I'm not sure how the 30(b)(6)

 4    impacts the things that you say are left unanswered.  Again,

 5    it sounds like the deposition just closed, so I don't have a

 6    list of what the I don't knows were in response to.

 7              MR. WESNESKI:  Yeah.  Thank you, Your Honor.  Let

 8    me -- let me just make a couple points, and I want to make

 9    sure I address that question.

10              So I'll start with the 30(b)(6) piece, which is in

11    a way, because we're dealing with a settlement and we need

12    to examine the process and whether or not each of these

13    independent directors actually made the level of inquiry and

14    thought and negotiation that is required to enter in a 9019

15    settlement, I think each of their individual knowledge is

16    relevant.  I don't think that Mr. Aronzon can, even as a

17    30(b)(6) witness testify to what was in the mind of Mr.

18    Conhini, what Mr. Conhini knew, what Mr. Conhini believes,

19    even as a 30(b)(6) witness.

20              THE COURT:  I'm -- so -- but that's why I asked

21    about the 30(b)(6) witness.  Who's the declarant?  Who's

22    offering the official testimony on behalf of the special

23    committee?

24              MR. WESNESKI:  Right and --

25              MR. KESSLER:  That was Mr. Aronzon.
```

1           MR. WESNESKI:  Yeah.  Mr. Aronzon is the 30(b)(6)

2    deponent, and he was the declarant who submitted the

3    declaration in support of the motion for settlement.

4           Our point is that regardless of --

5           THE COURT:  No, no.  I understand your point, but

6    usually --

7           MR. WESNESKI:  Okay.

8           THE COURT:  -- the request for an additional

9    declaration -- I'm sorry -- additional deposition is this is

10   what this person knows that this other person doesn't know

11   and that there's some additional -- right?  So it's pretty

12   clear under the federal rules that discovery is supposed to

13   be proportional.  It's supposed to be sensible.  No one's

14   entitled to perfect discovery.  You're entitled to things

15   that are reasonably -- even reasonably calculated to lead to

16   discovery of admissible evidence has been more recently

17   frowned upon when thinking about proportionality.

18          So usually I hear, "This is what this person

19   knows.  This is what access to information or role that they

20   played that's distinct."  If he's going to be testifying

21   about the exact same meetings, the exact same e-mails, I'm -

22   - it just seems designed to sort of see if there's any --

23   and maybe you that's your answer, just for daylight.  But it

24   doesn't seem like there's -- I'm not hearing something

25   that's sort of an independent thing that this witness can

Page 25

1    talk about that the other witness could not.

2         MR. WESNESKI:  A couple points there, Your Honor.

3    First off, we don't know whether they're going to speak to

4    the same meetings because we don't know whether they were in

5    all the same meetings together.  Certainly the official

6    special committee meetings for which there are minutes we

7    would expect them both to attend, but there might be other

8    discussions that are non-privileged.

9         The second thing I would note, Your Honor -- let

10   me just clarify the record on the discovery that we've taken

11   to date.  We served discovery requests on the UCC and the ad

12   hoc group and the debtors.  UCC has produced zero documents

13   and is not producing a witness for deposition.  The ad hoc

14   group I believe produced two documents and is not producing

15   a witness for deposition.  The debtors have produced what we

16   believe to be satisfactory for our response -- request for

17   production, but they are exclusively communications between

18   outside counsel and the New York Attorney General or the

19   SEC.

20        So we do not currently have any documents that

21   reflect that thinking -- the actual thinking, the actual

22   deliberation and conclusion that either Mr. Aronzon or Mr.

23   Conhini went through in order to reach the determination to

24   prove these settlements.  So the only avenue we have to get

25   any of that information is through a deposition.

1              And again, I think that we are -- regardless of

2      who the debtor elects to put up as their 30(b)(6) witness,

3      the factual reality is that both these independent

4      directors' votes were required in order to accept the

5      settlement, and both of their perspectives on those

6      settlements are in our view relevant to the factors that the

7      Court's required to consider under 9019.

8              THE COURT:  Tom --

9              MR. WESNESKI:  The last thing I'll -- I'm sorry.

10     Your Honor.

11             THE COURT:  No, go ahead.

12             MR. WESNESKI:  The last thing I'll say is, you

13     know, I'm sure we're going to hear more from Mr. Shore and

14     the UCC about DCG's standing or its stake in the matter or

15     how the numbers shake down.  We're here to talk about

16     discovery on a settlement that undoubtedly, you know,

17     affects billions of dollars of the estates.  I don't think

18     that, you know, we're here to litigate those ultimate issues

19     that are going to be hashed out in a week and a half.

20             THE COURT:  Well, All right.  Thank you.  I know

21     that debtor wanted to jump in earlier, so let me give

22     Counsel a chance to do that.

23             MR. KESSLER:  Thanks, Your Honor.  I think it may

24     have been Mr. O'Neal who was champing at the bit.

25             THE COURT:  Yeah.

Page 27

1          MR. KESSLER:  But I'll take his place.

2          THE COURT:  I think that's right.

3          MR. KESSLER:  Which is to say --

4          THE COURT:  And that's fine.  That's the challenge

5    of a Zoom hearing, and so I'm -- you know, I'm pretty

6    liberal about that because it's the only thing that makes

7    sense.  So Mr. O'Neal.

8          MR. O'NEAL:  I just want -- I should -- I'm going

9    to defer to Tom on this on the basic discussion about -- or

10   Mr. Kessler.  I apologize -- on the basic discussion about

11   the merits of the request of DCG's counsel.  I just wanted

12   to pick up on something you had said about settlement.  So

13   what I would like to do -- or settlement discussions.  I'd

14   like to pick that up at the end, if we could, so we don't

15   interfere with the --

16         THE COURT:  All right.  That's fine.  All right.

17   Anything from anyone else?

18         MR. KESSLER:  Very briefly, Your Honor.  Tom

19   Kessler for the debtors.  Three very brief points.

20         Number one, as Your Honor suggested, this

21   morning's deposition was a 30(b)(6) of the debtors.  And so

22   to the extent that the answers were given by Mr. Aronzon,

23   they represent the scope of the debtor's non-privileged

24   knowledge about the questions that were asked.

25         Number two, you haven't heard anything today about

Page 28

1    any suggestion the documentary record or the record more

2    generally that there is a basis to think that Mr. Conhini

3    has special unique knowledge that's not available to Mr.

4    Aronzon that would otherwise be discoverable.

5           And number three, to the extent that the concern

6    is whether or not Mr. Conhini was having non-privileged

7    discussions outside of the presence of Mr. Aronzon that he

8    uniquely could testify to, we're happy to represent and

9    stipulate that there are no such communications or

10   discussions, and we think that's (indiscernible).

11          THE COURT:  Thank you very much.  Anyone else?

12          MR. SHORE:  Quickly, Your Honor, Chris Shore

13   following up on your -- or Counsel's answer to your question

14   with respect to litigating the merits.

15          DCG has a decision to make, as I've discussed.

16   Are they going to say that there's no liability on the part

17   of the debtors, which would lead to in the confirmation

18   hearing or in a claim objection, a ruling by the Court on

19   whether or not the governmental entity has a claim for which

20   DCG -- for conduct which DCG participated in?  And on the

21   9019 settlements, it could be that Your Honor would rule

22   that there is serious concern here with respect to liability

23   of the debtors to the New York AG under the Martin Act,

24   which is what DCG doesn't want.

25          To date, they have been consistent in saying

Page 29

```
 1   they're not going to litigate the merits -- that is take the

 2   position that this settlement falls outside the range of

 3   reasonableness.  If they are going to take that position in

 4   their papers this week, then we're going to have to come

 5   back to the Court and either ask to strike it, or we're

 6   going to seek depositions because they're not going to at

 7   the last second spring it and say, "Actually, we don't think

 8   the debtors are liable at all."

 9           I do believe their objection is going to be -- and

10   maybe Counsel can clarify -- their objection is going to be,

11   "It may be a good settlement, but it's being done for an

12   improper purpose."

13           THE COURT:  All right.  So let me tell you where I

14   am.  I will say I think what I heard so far in terms of a

15   justification is a bit thin.  It's a bit thin for a couple

16   of reasons.  No one has identified any specific thing that

17   this individual knows or may know that's distinct from the

18   witness who was provided -- who was already provided, who's

19   been deposed, who's provided declaration, who's the 30(b)(6)

20   witness.  And simply the notion of that person may have

21   other things in their head is awful thin when you apply the

22   principles for discovery.

23           I also am a bit concerned, and I can't put the

24   pieces together, so I can't ultimately make any conclusions

25   that are dispositive here about the line that's trying to be
```

Page 30

1    walked here, which seems to be we're not going to challenge

2    the merits of the settlement.  We are going to somehow

3    challenge the settlement -- I'm sorry -- the merits of the

4    claim.  We're going to challenge the settlement because the

5    settlement obviously is more than the claim, so it leads me

6    to wonder what precisely people are trying to navigate.  And

7    the law can be a little award when things can be exceedingly

8    clever.  Clever is not a great place to be.

9            So all that said, I'm going to grant the request

10   for the following reasons.  I can't put the pieces together

11   today, and so I have concerns, and a number of things people

12   have said seem to have a considerable amount of traction,

13   but I'm not making any rulings.  I don't have those things

14   in front of me, so they're not basis for me to rule.  It's a

15   sizeable significant event.

16           All right.  And so, there's a request for three

17   hours.  That's what I'm going to give.  And frankly, it

18   doesn't seem worthwhile to have this kind of a procedural

19   issue hang over the case.  We have enough issues to deal

20   with, and the notion of, "Well, I didn't get a chance to

21   take this deposition," is one of the many issues that may

22   linger long after we talk.  It's frankly just not worth it.

23   We should be trying to resolve issues rather than try to

24   create issues.  And so as a matter of the record, it seems

25   to be a sensible thing to do.

Page 31

```
 1              That wouldn't be -- that's not dispositive.  If I
 2    -- if I was in a position to make certain legal calls at
 3    this point, I might have a different view, but I'm sort of -
 4    - I guess I would say I'm mindful of that consideration.
 5              So three hours.  That's it.  No more.  And I will
 6    say that people in the questioning need to be mindful that
 7    there is a 30(b)(6) witness, and that's -- that has
 8    significance.  What significance it has in terms of framing
 9    the questions I'll leave to you, and that's where we'll end
10    up.
11              So with that, I know Mr. O'Neal wanted to say
12    something, and then I also had one other thing.  Let me just
13    throw it out so I don't forget.
14              I asked for you nice -- to get together with your
15    nice people next week.  It seems we'll see a lot of each
16    other, and it really has to do with the various things that
17    have been filed where people have sought to keep it under
18    seal, and I think some people may have misunderstood where
19    the line was in terms of sealing.  That is if you inject
20    yourself into it and you want to be an active participant,
21    you can't -- you can't be under seal.
22              And that's consistent with what I know the judge
23    has done in FTX.  And I think that's consistent with the
24    opinion that was issued as sealing in this case by me.  It's
25    also consistent with the protocol that was developed and the
```

Page 32

1    form developed saying, "They're you're filing this.  You

2    understand your information is going to be made public."  I

3    think the response that a number of people have taken to

4    that is, "I'll just file a motion to seal."

5            And so essentially, I wanted to give you at least

6    a preview because what I'd like to do is seek guidance as to

7    the best way to handle that problem.  I don't want to

8    surprise anybody, and I want to handle it appropriately.

9            People may not realize the significance of what

10   they want to do.  They may not understand the niceties and

11   subtleties between these various lines, so I wanted to at

12   least give you a preview.  There's nothing mysterious about

13   it, but I will be seeking your assistance as to how to deal

14   with that for the various things that have been filed where

15   people have requested sealing.  I normally wait to deal with

16   sealing at the hearing, but I realize in this particular

17   instance, that's not probably the best way to handle it

18   because it's a gating issue on whether to address certain

19   pleadings at all.

20           And so that's what I wanted to talk to you about

21   Tuesday.  We'll chat then, but I do appreciate your help on

22   that, and my apologies for adding something else onto your

23   already lengthy to-do lists no doubt.

24           So with that, Mr. O'Neal, you wanted to chime in.

25           MR. O'NEAL:  Certainly.  And just on that score,

Page 33

1    Your Honor, thanks for raising it.  We've already been

2    having discussions amongst the parties about that, and so

3    when we saw your request for a status conference on Tuesday

4    on this issue, it made a lot of sense to us.

5            And let us see what we can try to get done before

6    then because I think you're right that there are some things

7    that have been redacted that we can -- we can -- we can deal

8    with.

9            THE COURT:  Yeah.  And again, I thought about just

10   writing an order and was drafting one in my head, and then I

11   realized that the potential for creating more work and

12   confusion rather than less was considerable, so I thought it

13   was appropriate to get together and think about it

14   collectively.  So thank you in advance for all of your

15   assistance.

16           MR. O'NEAL:  Certainly.  And then with respect to

17   your suggestion about discissions, and you will recall that

18   you raised this same very point at the last hearing with

19   respect to the GBTC sales and redemption motion.

20           We do agree with you that the parties involved in

21   litigating these cases and confirmation should be engaged in

22   discussions as we are preparing for confirmation hearing and

23   perhaps after.  We have made -- we have an open invitation

24   to all parties to have those discussions.  Of course, we can

25   always host a party, but somebody has to come.

1          And so that's where we are right now, Your Honor.

2     We very much agree that now is ripe for the parties to

3     continue discussions that are somewhat latent but have been

4     going on since November of 2022.

5          THE COURT:  Yep.  All right.  Well, I appreciate

6     that.  Again, I learned on the other side of the bench way

7     before taking this job that judges don't know everything

8     that's going on.  They're not supposed to know, and attempts

9     to go a little too far and draw too many conclusions can be

10    dangerous because you can draw very misleading conclusions.

11         But certainly when thinking Abou the AG and a

12    lawsuit like this, you know, that's a non-bankruptcy issue.

13    I read the complaint.  You know, so it does strike me that

14    there are certain levers that affect a lot of different

15    things when parties are seeking to recover from one another,

16    often acting in their role as protecting the customers, and

17    those are the creditors who are being -- who are being

18    compensated under the plan.

19         So you all will do what you need to do.  If you

20    need any help, you'll let me know, and unless anyone has

21    anything else, then I'll chat with you all on Tuesday about

22    the much more technical issues dealing with sealing, and

23    thank you all for being here today.

24         MR. KESSLER:  Thank you, Your Honor.  It's Tom

25    Kessler from Cleary Gottlieb.  Just one last housekeeping

1   piece.  We're mindful of the Court's admonishment to sort of

2   look for resolutions and not problems.  We have one sort of

3   extent discussion we're having with our colleagues at Weil

4   about some requests that we've made of them in connection

5   with the New York Attorney General settlement.

6          THE COURT:  Sure.  While we're here, so -- we're

7   here.

8          MR. KESSLER:  Yeah.

9          THE COURT:  Yeah.  That's fine.

10         MR. KESSLER:  All I mean to say, Your Honor, is

11   that I'm confident -- I'm hopeful that Mr. Wesneski and I

12   can find some common ground, particularly around a couple of

13   very narrow categories, and we hope this is the first and

14   last, you'll hear of it.

15         THE COURT:  All right.  So here's what I would say

16   is if you can't get where you need to get, we already are

17   getting together on Tuesday, and we'll use that as a sort of

18   holding date for having that discussion if we need to get

19   there.  Does that work for you?

20         MR. KESSLER:  Very good, Your Honor.  Thank you.

21         THE COURT:  All right.

22         MR. WESNESKI:  Thank you, Your Honor.

23         THE COURT:  All right.  Anything for anyone else?

24   All right.  Thank you very much.  Be well.

25         MR. KESSLER:  Thank you.

Page 36

1              MR. WESNESKI:   Thank you, Your Honor.

2              (Whereupon these proceedings were concluded at

3      3:20 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 37

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  February 20, 2024