**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors*
*Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
|  | ) |  |
|  | ) | (Jointly Administered) |
|  | ) |  |

**THE GENESIS CRYPTO CREDITORS AD HOC GROUP'S**
**MOTION *IN LIMINE* TO PRECLUDE EVIDENCE REGARDING THE**
**PROPOSED RELEASES AND THE SPECIAL COMMITTEE INVESTIGATION**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Table of Authorities.................................................................................................. ii

PRELIMINARY STATEMENT...............................................................................2

BACKGROUND .......................................................................................................6

    A.    Mr. Aronzon and Mr. Sciametta are Deposed and Designated as
Fact Witnesses.......................................................................................................6

    B.    The Debtors Provide Conclusory Descriptions About the
Special Committee Investigation in the Amended Disclosure Statement
and the Plan Supplement.................................................................................... 11

    C.    The Debtors Refuse to Produce Discovery to the CCAHG
Related to the Proposed Releases and the Special Committee
Investigation on the Basis of Privilege ...........................................................15

    D.    The Debtors Continue to Seek the Court's Approval of the
Proposed Releases..............................................................................................17

ARGUMENT...........................................................................................................20

    A.    The Sword and Shield Doctrine Requires Precluding the
Debtors From Introducing Evidence Relating to the Proposed Releases
and the Special Committee Investigation .......................................................20

    B.    The Debtors Should Be Precluded From Relying on
Conclusions and Justifications for the Proposed Releases Based on the
Special Committee Investigation .....................................................................22

    C.    The Debtors Waived Privilege When They Disclosed the
Special Committee Investigation Findings to Other Parties ........................24

CONCLUSION........................................................................................................25

CERTIFICATE OF SERVICE ...............................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of New York*,
   168 F.R.D. 161, 165 (S.D.N.Y. 1996) ................................................................................. 20

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
   257 F. Supp. 2d 751 (S.D.N.Y. 2003) ................................................................................. 24

*Chesapeake Corp. v. Shore*,
   771 A.2d 293 (Del. Ch. 2000) ............................................................................................. 24

*In re Circle K Corp.*,
   1996 WL 529399 (Bankr. S.D.N.Y. May 30, 1996), *aff'd*, 1997 WL 31197
   (S.D.N.Y. Jan. 28, 1997) ..................................................................................................... 20

*Grunstein v. Silva*,
   2012 WL 5868896 (Del. Ch. Nov. 20, 2012) ................................................................. 21, 22

*In re Horowitz*,
   482 F.2d 72 (2d Cir. 1973) .................................................................................................. 25

*Pfizer Inc. v. Warner-Lambert Co.*,
   1999 WL 33236240 (Del. Ch. Dec. 8, 1999) ...................................................................... 21

*In re Quigley Co., Inc.*,
   2009 WL 9034027 (Bankr. S.D.N.Y. Apr. 24, 2009) ......................................................... 25

*In re Residential Capital, LLC*,
   491 B.R. 63 (Bankr. S.D.N.Y. 2013) ....................................................................... 22, 23, 24

*In re Subpoena Issued to Dennis Friedman, Esq.*,
   286 B.R. 505 (S.D.N.Y.2002) ............................................................................................. 23

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .............................................................................................. 20

**Statutes**

11 U.S.C. § 105(a) ................................................................................................................... 1

The Genesis Crypto Creditors Ad Hoc Group (the "CCAHG"), by and through its counsel, McDermott Will & Emery LLP ("McDermott"), hereby submits this motion *in limine* (the "Motion"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), to preclude Genesis Global Holdco, LLC, Genesis Global Capital, LLC ("Genesis"), and Genesis Asia Pacific Pte. Ltd. (collectively, the "Debtors"), and the Special Committee of Board of Directors (the "Special Committee") of Genesis Global Holdco, LLC, from presenting certain evidence at the plan confirmation hearing, including evidence concerning:  (1) the proposed releases in the *Debtors Amended Joint Chapter 11 Plan* [Docket No. 1325] (as amended, modified, or supplemented from time to time, the "Amended Plan") and the *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [Docket  No. 1117] (the "Plan Supplement") (collectively, the "Proposed Releases"), and (2) the investigation conducted by the Special Committee (the "Special Committee Investigation") as described in the *Amended Disclosure Statement With Respect to the Amended Joint Plan of Genesis Global Holdco, LLC Et Al., Under Chapter 11 of the Bankruptcy Code* [Docket No. 1031] (as amended, modified, or supplemented from time to time, the "Amended Disclosure Statement"), the Debtors' *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC Et Al., Under Chapter 11 of the Bankruptcy Code* [Docket No. 1330] (the "Omnibus Reply"), the *Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC in Support of Confirmation of the Debtors' Chapter 11 Plan* (the "Aronzon Declaration" or "Aronzon Decl.") [Docket No. 1330, Exhibit D], and the Deposition of Paul Aronzon on January 31, 2024 (the "Aronzon Deposition").

In support of this Motion, the CCAHG respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      While relying on the so-called Special Committee's investigation to support broad releases of more than 160 Genesis insiders, during a deposition Cleary Gottlieb Steen & Hamilton LLP ("Cleary") inappropriately directed the Special Committee not to answer factual questions concerning that investigation no less than 94 times.  The Debtors wrongly claim that those facts are cloaked in privilege because the Special Committee, who conducted zero interviews themselves, learned all the facts supporting the Proposed Releases from Cleary.  Cleary—counsel to both the Special Committee and the Debtors—wants it both ways.  Cleary wants to rely on the Special Committee's conclusions that the Proposed Releases are appropriate while concurrently blocking access to any facts supposedly relied on by the Special Committee to reach those conclusions.  Accordingly, this Court should preclude any declarations and testimony from the Special Committee and the Debtors' financial advisors in support of and about the Proposed Releases and the Special Committee Investigation, specifically, the testimony and declarations of Paul Aronzon ("Mr. Aronzon") and Mr. Sciametta ("Mr. Sciametta").

2.      According to Cleary, salient facts concerning the Proposed Releases are privileged solely because the Special Committee learned facts from Cleary, such as:  (i) whether released insiders withdrew assets within 90-days prior to the Petition Date;[2] (ii) whether released insiders participated in lending funds to Three Arrows Capital;[3] (iii) whether released insiders have consulting or other arrangements with Digital Currency Group, Inc. ("DCG");[4] (iv) whether released insiders participated in the decision-making or were involved with the Debtors lending to any DCG-owned entity;[5] (v) whether released insiders decided not to

---

[2] Declaration of J. Greer Griffith, dated February 21, 2024 (the "Griffith Decl."), Exhibit 3, Deposition of Paul Aronzon, January 31, 2024, the relevant portions of which are attached hereto (the "Aronzon Dep. Tr."), 164:06–168:05.

[3] Aronzon Dep. Tr. 194:18–196:05.

[4] Aronzon Dep. Tr. 155:04–196:05.

[5] Aronzon Dep. Tr. 185:19–188:22.

liquidate GBTC Grayscale ETF shares;[6] and (vi) what benefit any of the Genesis insiders will deliver to the estate in exchange for being released.[7]  Each of those fact-questions are highly relevant to test whether the Proposed Releases are appropriate, yet Cleary blocked the CCAHG from discovering any such information.

3.      Ninety-four (94) times during the deposition of Special Committee Member Paul Aronzon, the Debtors' counsel directed Mr. Aronzon not to answer questions seeking non-privileged, factual information about the Proposed Releases and the Special Committee Investigation.  Ten (10) times the Debtors' counsel "cautioned" Mr. Aronzon not to answer questions on these same topics.  Mr. Aronzon followed his counsel's improper advice for nearly every question.

4.      On the rare occasion that Mr. Aronzon did answer a question instead of relying on an improper privilege objection, it was abundantly clear he was not equipped to testify about even basic facts.  Indeed, Mr. Aronzon did not even know the number of individuals proposed to receive releases.  He could not even state whether there was "more than a hundred" or "more than five hundred" individuals on the Released Genesis Personnel list.[8]

5.      Aside from Cleary's obstruction, the Special Committee also is not competent to testify about the Special Committee Investigation or the Proposed Releases because the Special Committee has no personal, first-hand knowledge about these topics.  The Special Committee was appointed to conduct an investigation but the Special Committee relied entirely on Cleary to conduct the investigation and to decide whether to consent to the Proposed Releases.  Any Special Committee testimony would be based on multiple levels of hearsay because the Special Committee would be testifying about what Cleary told the Special Committee based on what Cleary learned in interviews of Genesis witnesses.  Accordingly,

---

[6] Aronzon Dep. Tr. 190:25–191:21.
[7] Aronzon Dep. Tr. 201:07–202:12.
[8] Aronzon Dep. Tr. 215:06-216:12

because the Special Committee has no personal, independent knowledge and failed to conduct any interviews themselves, there is no basis for Mr. Aronzon to be a fact witness concerning the Special Committee Investigation or the Proposed Releases.

6.    Indeed, even when asked "was there any separate analysis done without counsel" about the Proposed Releases, Special Committee member Mr. Aronzon followed Cleary's instructions to not answer the question on the basis of privilege.[9]

7.    At the deposition of Mr. Sciametta, financial advisor to the Debtors, the Debtors' counsel refused to allow the CCAHG's counsel the opportunity to question Mr. Sciametta about whether he financially analyzed the Proposed Releases.  The Debtors' counsel contended that Mr. Sciametta was not prepared or designated to testify about these topics.  There is thus no basis for Mr. Sciametta to be a fact witness concerning the Special Committee Investigation or the Proposed Releases.

8.    In response to the CCAHG's discovery requests served on the Debtors for the production of documents and interrogatories about the Proposed Releases and the Special Committee Investigation, the Debtors produced only a couple of documents that were both publicly-filed on the docket.  The Debtors refused to produce other documents or respond to interrogatories on the basis of attorney client privilege and attorney work product.

9.    It was not until the CCAHG learned that the Debtors had produced Special Committee meeting minutes to other parties – which were introduced as exhibits by DCG during a second deposition of Mr. Aronzon – that the Debtors agreed to produced Special Committee meeting minutes to the CCAHG.  And, even then, the Debtors waited to produce these documents until 10:43 p.m. on February 20, 2024.  The documents were also almost entirely redacted for privilege.

---

[9] Aronzon Dep. Tr. 182:11-183:21.

10.     The Amended Plan seeks to release an uncapped number of individuals and entities defined as a "Related Party", *see* Amended Plan ¶ 191,[10] and the Plan Supplement seeks to release more than 160 current and former executives, directors, managers, officers, and employees of the Debtors ("Released Genesis Personnel").

11.     The Debtors have indicated that they are designating Mr. Aronzon and Mr. Sciametta as witnesses at the plan confirmation hearing.  They also have filed the Aronzon Declaration in support of the Amended Plan.  That Declaration contains completely untested conclusions that releases are appropriate.

12.     Because Cleary blocked Mr. Sciametta and Mr. Aronzon from providing non-privileged, factual information about the Proposed Releases and the Special Committee Investigation, the Court should preclude the Debtors from offering any evidence at the plan confirmation hearing—including testimony from Mr. Sciametta and Mr. Aronzon and the Aronzon Declaration—concerning the Proposed Releases and the Special Committee Investigation.

13.     In the Omnibus Reply and Aronzon Declaration – filed after the close of discovery and the Aronzon Deposition – the Debtors stated for the first time that they "intend to modify the Plan to provide releases only to Released Genesis Personnel who agree to cooperate with assisting with litigation of the Retained Causes of Action by the Wind-Down

---

[10] The Amended Plan, Paragraph 191, states:  "Released Party" means (i) the Debtors, (ii) the Ad Hoc Group SteerCo and its members (solely in their capacities as such), (iii) the Committee and its members (solely in their capacities as such), and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such); provided, however, that, notwithstanding anything to the contrary in the Plan, neither the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date shall be Released Parties; and, provided, further, that any of the current or former employees, officers, or directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer, or director of the Debtors from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a similar arrangement (solely in their capacities as such) as of the Petition Date, shall be a Released Party only with the prior written consent and justifications of the Special Committee, which justifications shall be set forth in the Plan Supplement and which Persons shall be provided to the Ad Hoc Group Counsel and the Committee Counsel on a confidential, professional-eyes-only, basis, with the express exception of any current or former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, which Persons shall not be Released Parties.

Debtors (such agreements, the "Cooperation Agreements")." Despite the CCAHG's requests, it has received no information at all concerning those Cooperation Agreements and thus has no factual basis to determine whether that is a sufficient benefit to the estate to warrant releases. This is because Cleary blocked the CCAHG from any facts from which we could discern the value of any potential claims against the Released Parties.

## **BACKGROUND**

14.     Recognizing the Court's general familiarity with these chapter 11 proceedings, the CCAHG's focus here is on the background regarding the evidence and testimony that the Special Committee and the Debtors intend to use at the plan confirmation hearing concerning the Proposed Releases and the Special Committee Investigation.

A.     Mr. Aronzon and Mr. Sciametta are Deposed and Designated as Fact Witnesses

15.     On December 6, 2023, this Court entered the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 1027] (the "Scheduling Order"). On January 5, 2024, pursuant to the Scheduling Order, the Debtors served the *Debtors' Amended Witness List in Connection with the Confirmation Hearing* (the "Witness List"). *See* Griffith Decl., Exhibit 1. Among others, the Witness List identified Joseph Sciametta, Managing Director at Alvarez & Marsal North America, LLC, and Paul Aronzon, in his capacity as a member of the Special Committee, as fact witnesses in support of plan confirmation. *Id*.

16.     On January 30, 2024, Mr. Sciametta was deposed as one of the Debtors' 30(b)(6) designees and in his capacity as Managing Director at Alvarez & Marsal North America, LLC—the Debtors' financial advisor (the "Sciametta Deposition"). *See* Griffith Decl., Exhibit

2, Deposition of Joseph Sciametta, Jan. 30, 2024, the relevant portions of which are attached

hereto (the "Sciametta Dep. Tr.").

17.    Counsel for the CCAHG was prepared to examine Mr. Sciametta concerning his

financial analysis of the Proposed Releases and the value of the Proposed Releases to the

Debtors' estates, but his counsel refused to let him testify about these topics.

Q:  Okay.  I'm going to direct your attention to Exhibit F [of the Plan
Supplement], which is at the end of it.  And Exhibit F is titled "Justification for
Exculpated & Released Parties."

A:  Okay.

Q:  And the majority of my questions this evening are going to be about the
releases.  So, in this first paragraph, it refers to a defined term, the released
Genesis personnel?

MS. VANLARE:  I'm going to object.  This is outside the scope of the 30(b)(6)
testimony.

MS. GRIFFITH:  I disagree.  We noticed a 30(b)(6) witness for the debtors and
this would fall under topic 14, I believe, of that.[11]

***

Q:  Are you prepared to talk about topic 15 in DCG's Notice of deposition,
claims by the Genesis Crypto Creditors Ad Hoc Group including your
assessment and valuation of such claims under the plan and the impact of any
objections to the plan are the Genesis Crypto Creditors Ad Hoc Group on
potential recoveries?

MS. VANLARE:  Counsel, as is made clear in our responses and objections, the
debtors will not designate a witness to provide testimony with respect to this
topic.

Q:  How about topic 14, your communications with any member of the Genesis
Crypto Creditors Ad Hoc Group or the representative concerning, without
limitation, any anticipated objection to the plan, the basis for such objection and
any analysis under 11USC562?

MS. VANLARE:  The debtors have designated Mr. Paul Aaronson (sic) on that
topic.  Mr. Sciametta has not been designated on that topic.[12]

***

---

[11] Sciametta Dep. Tr. 280:08–280:21.
[12] Sciametta Dep. Tr. 284:01–284:23.

Q:  Have you evaluated in any way the value of the releases under the plan?

MS. VANLARE:  Objection.  I will instruct the witness not to answer for all the reasons that I've articulated.  This is outside the scope.  Again, I don't want to repeat myself.  But again, it's outside the scope of any topics that he has been designated for and he has not been noticed in his personal capacity.

Q:  Are you going to follow your counsel's instruction or are you able to answer the questions?

A:  I'll follow my counsel's instruction.[13]

18.     On January 31, 2024, Mr. Aronzon was deposed as another one of the Debtors' 30(b)(6) designees and in his capacity as a Special Committee member (the "Aronzon Deposition").  *See* Griffith Decl., Exhibit 3, Deposition of Paul Aronzon, January 31, 2024, the relevant portions of which are attached hereto (the "Aronzon Dep. Tr.").

19.     Counsel for the CCAHG examined Mr. Aronzon, seeking non-privileged, factual information about the Special Committee's Investigation, the Proposed Releases, and the basis for the Special Committee's decision to approve the broad Proposed Releases.  Cleary Gottlieb Steen & Hamilton LLP ("Cleary")—counsel to both the Debtors and the Special Committee—objected to nearly every question.

20.     During the course of the CCAHG counsel's examination of Mr. Aronzon, Cleary objected on the basis of attorney-client privilege more than 110 times, objected on the basis of attorney work product more than 50 times, directed Mr. Aronzon not to answer questions 94 times, and "cautioned" Mr. Aronzon to not answer questions 10 times.  Mr. Aronzon followed his counsel's advice for nearly every question.  *See generally* Griffith Decl., Exhibit 3.

21.     Cleary's improper and near constant objections were intended to prevent the CCAHG and other interested parties from obtaining any relevant information—even basic *factual* information.  This is evident in a myriad of examples, including these representative colloquies:

---

[13] Sciametta Dep. Tr. 284:24–285:13.

Q:  Is it the special committee's contention that the releases contemplated in the plan are appropriate?

MS. VANLARE:  Objection.  You may answer to the extent you can without revealing any attorney-client communication or attorney work product.

THE WITNESS: Yes.

Q:  Can you please explain each and every fact that you rely on to come to that conclusion?

MS. VANLARE:  Objection.  That calls for attorney-client communication and attorney work product, and as such, I would instruct the witness not to answer.

Q:  Are you following your counsel's direction?

A:  Yes.[14]

<p style="text-align:center">***</p>

Q:  So as a special committee member charged with authorizing releases in this matter, how did you feel comfortable that all of the people and entity that would fall under the definition of related party warrant a release?

MS. VANLARE:  Objection.  Objection to form and objection to the extent the answer calls for privileged communications.  I would instruct the witness not to answer to the extent your answer would involve any attorney-client communications or attorney work product.

THE WITNESS:  I can't really answer the specific questions without referring to the discussions with our counsel.[15]

<p style="text-align:center">***</p>

Q:  So did the special committee independently, separate from communications with counsel, consider whether releases of current or former employees should be granted?  Did it make an independent decision separate from counsel?

MS. VANLARE:  Objection.  To the extent that the question calls for any attorney-client privileged communications or attorney work product, I would instruct you not to answer.

Q:  Are you going to answer the question?

A:  I'm not sure how to answer it.

Q:  The special committee provided written consent for the release of certain former and current Genesis personnel; correct?

---

[14] Aronzon Dep. Tr. 251:06–252:12.
[15] Aronzon Dep. Tr. 244:15–245:10.

A:  That is exactly what the disclosure statement says.

Q:  And do you know that in your personal capacity separate and aside from just reading this piece of paper?

A:  Yes.

Q:  And let's talk about the process for that.  What is involved with you giving written consent?

MS. VANLARE:  Objection.

THE WITNESS:  I don't know how to answer this without talking about all the things we discussed with counsel.[16]

22.        When Cleary did permit Mr. Aronzon to answer a question, it was abundantly

clear he was not equipped to testify about even basic facts concerning the Proposed Releases.

For example:

Q:  There are more than a hundred individuals currently on the released Genesis personnel list; correct?

MS. VANLARE:  Objection.  I don't know if you know as a fact matter.  You may answer.   But otherwise, to the extent it calls for attorney-client communication or attorney work product, I would instruct you not to answer.

THE WITNESS:  I don't know the exact number.

Q:  Do you know if it's more than a hundred individuals on the Genesis released personnel list?

MS. VANLARE:  Same objection.  And to the extent what you know comes from conversation with counsel, I would instruct you not to answer that question.

THE WITNESS:  I don't know.

Q:  Do you know if it's more than five hundred people on the released Genesis personnel list?

MS. VANLARE:  Same objection.  To the extent any information you have on this comes from counsel, I'm going to instruct you not to answer.

THE WITNESS:  I don't know the number.[17]

---

[16] Aronzon Dep. Tr. 180:03–181:13.
[17] Aronzon Dep. Tr. 215:06–216:12.

23.    The CCAHG was not the only creditor that was blocked from obtaining even basic factual information about the Proposed Releases from Mr. Aronzon.  When counsel for another creditor, BAO Family Holdings, also attempted to examine Mr. Aronzon about the Proposed Releases, Cleary again objected on privilege grounds and instructed Mr. Aronzon not to answer the questions.[18]

24.    On February 6, 2024, the Debtors notified interested parties that they were designating Mr. Sciametta and Mr. Aronzon as fact witnesses for the plan confirmation hearing. Griffith Decl., Exhibit 4.

B.    <u>The Debtors Provide Conclusory Descriptions About the Special Committee Investigation in the Amended Disclosure Statement and the Plan Supplement</u>

25.    On December 6, 2023, the Debtors filed the Amended Disclosure Statement which contained a conclusory description of the Special Committee Investigation.  *See* Docket No. 1031.  The Amended Disclosure Statement contained the following explanation about the formation and responsibilities of the Special Committee:

> On November 18, 2022, the Holdco Board of Directors established the Special Committee, comprised of Paul Aronzon and Tom Conheeney, **with responsibility for making all decisions relating to the liquidity and restructuring of Holdco and its subsidiaries**. As part of its mandate, the Special Committee was charged with evaluating and approving transactions with affiliates including DCG Parties and investigating the Debtors' relationships and transactions with DCG Parties. One of the primary purposes of this investigation has been to assess whether the Debtors have potentially viable claims against the DCG Parties and to assist the Special Committee in the exercise of its fiduciary duties.

*Id*. at 50–51 (emphasis added).

26.    The Amended Disclosure Statement said that the Special Committee retained Cleary to commence an investigation "into the relationships and transactions between or among the Debtors and various DCG Parties." *Id.* at 51.  The Amended Disclosure Statement stated that, over the course of the Special Committee Investigation, Cleary "reviewed 294,000

---

[18] Aronzon Dep. Tr. 272:06–275:21.

documents and communications," "conducted more than 30 interviews with approximately twelve current and former employees," and "received over 50,000 documents from DCG." *Id.*

27.    In the Aronzon Deposition, Mr. Aronzon repeatedly refused to provide any non-privileged, factual information about the Special Committee Investigation.  The following are some representative examples:

Q:  Did you review any transcripts of these interviews?

MS. VANLARE:  Objection.  Again, I'm going to instruct the witness not to answer as this goes into the details of the investigation which are all privileged.

MS. GRIFFITH:  On what basis is whether Mr. Aronzon, who's a special committee member who's tasked with evaluating whether individuals should be released privileged if he reviewed an interview transcript?  I'm not asking his thoughts or analysis of the interview transcript, I'm asking whether he reviewed it.

MS. VANLARE:  Counsel, you're asking questions that relate to the conduct of an investigation that was done by counsel and you're asking about actions and conversations and events that took place in the context of a—again an investigation that is attorney-client communication and/or attorney work product.

Q:  So are you refusing to answer the question of whether the special committee reviewed any interview transcripts?

MS. VANLARE:  Again, objection.  The witness is not refusing.  I'm instructing the witness not to answer for the reasons that I identified earlier.

Q:  And just so the record is clear, are you refusing to identify which witnesses were interviewed as part of the special committee investigation that are listed here in the paragraph in the amended disclosure statement that we looked at?

MS. VANLARE:  Objection.  Again, as stated previously, the witness is not refusing.  I am instructing the witness not to answer, however, for the reasons I identified earlier in that it calls for attorney-client communication and attorney work product and is therefore privileged information.

Q:  And are you going to take your counsel's advice, Mr. Aronzon?

A:  I always do.[19]

*** 

---
[19] Aronzon Dep. Tr. 151:03–153:07.

Q:  Was anyone that was interviewed not a current or former employee of Genesis?

MS. VANLARE:  Objection.  Once again, the question calls for privileged information.  I would instruct the witness not to answer.

Q.  Are you doing to answer the question, Mr. Aronzon.

A.  No.[20]

28.    The Amended Disclosure Statement states that, beyond the limited public disclosures being made, "Cleary has shared the findings from the Investigation with the Special Committee and counsel to the UCC and the Ad Hoc Group."  *Id.*  After the Aronzon Deposition, counsel for the CCAHG repeated its request that the Debtors share "the findings from the Investigation" referenced in the Amended Disclosure Statement as this information is responsive to the CCAHG's discovery requests served on the Debtors.  Griffith Decl., Exhibit 5.  Cleary responded, "We will not be providing the findings from the investigation or information related to the interviews in connection with the investigation as these are privileged information, as objected to during Mr. Aronzon's deposition as well."  *Id.*.  Cleary's objection was particularly inappropriate here as Cleary already waived this privilege when it shared these findings with the UCC and the Ad Hoc Group as discussed in more detail herein.

29.    On December 29, 2023, the Debtors filed a Plan Supplement.  *See* Docket No. 1117.  Exhibit F to the Plan Supplement was titled "Justification for Exculpated & Released Parties."  *Id.*

30.    The Plan Supplement enumerated that the Special Committee had the responsibility of independently deciding whether to approve the Proposed Releases of the Released Genesis Personnel.  Specifically, the Plan Supplement stated:

> In accordance with the Debtors' Amended Joint Chapter 11 Plan (the "Amended Plan"), ***the Special Committee has, subject to the reservation of rights set forth herein, provided its prior written consent*** for the release of current or former employees, officers and directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer or director of the Debtors

---

[20] Aronzon Dep. Tr. 153:21–154:06.

from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, whose identities have been or will be provided, in writing, to the Ad Hoc Group Counsel and Committee Counsel on a confidential, professional-eyes-only basis on or prior to the Effective Date (the Persons covered by such release, collectively, the "Released Genesis Personnel"). For the avoidance of doubt, none of the Released Genesis Personnel are or were also DCG Parties.

*Id.* at 21 (emphasis added).

31.    The Plan Supplement had seven bullet points setting forth conclusory "justifications for the release of the Released Genesis Personnel." *Id.* at 22. Cleary again directed Mr. Aronzon to not answer the majority of the questions seeking non-privileged, factual information about these justifications. For example:

Q: The next bullet point states "the released Genesis personnel have knowledge and insight into the debtors' business and transactions that may be critical to the resolution of litigation against the DCG parties and the Gemini parties as well as various regulatory and enforcement actions relating to the debtors' prepetition business". Do you see that?

A: Yes.

Q: Do you know – and this is a number, not who, a number – how many of the individuals on the released Genesis personnel list have this knowledge and insight?

MS. VANLARE:   Objection.   I believe the answer calls for privileged information with counsel and attorney work product, and as such, I'm going to instruct the witness not to answer.

Q: Are you following the direction of your counsel?

A: Yes.
             …
Q: Do you know if any of the individuals on the released Genesis personnel list have overlapping "knowledge and insight into the debtors' business and transactions["]?

MS. VANLARE: Objection to form, but also I would instruct the witness not to answer to the extent it reveals any attorney-client communication or attorney work product.

Q: Are you following your counsel's direction?

A: Yes.

14

...

Q:  Have any of the individuals on the released Genesis personnel list refused to cooperate with resolution of litigation against the DCG parties and the Gemini parties as well as various regulatory and enforcement actions relating to the debtors' prepetition business unless they received released?

MS. VANLARE:  Objection.  I'm going to – to the extent it reveals attorney-client privilege, attorney work product, I'm going to instruct the witness not to answer.

Q:  Is this a factor that you considered in granting consent to these individuals?

MS. VANLARE:  Same objection.  Calls for privileged information and attorney work product.

Q:  Are you going to follow your counsel's advice?

A:  Yes.[21]

C.   The Debtors Refuse to Produce Discovery to the CCAHG Related to the Proposed Releases and the Special Committee Investigation on the Basis of Privilege

32.   On January 17, 2024, the CCAHG served Genesis Crypto Creditors Ad Hoc Group's *Second Requests for Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* (the "RFPs") and *Genesis Crypto Creditors Ad Hoc Group's Interrogatories to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* (the "Interrogatories").  See Griffith Decl., Exhibit 6.  These RFPs and Interrogatories sought factual information about the Special Committee Investigation, the basis for the Special Committee's decision to approve the Proposed Releases, and the Proposed Releases.

33.   On January 30, 2024, the night before the Aronzon Deposition, the Debtors served the Debtors' Responses and Objections to Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents (the "Debtors' R&Os to RFPs").  *See* Griffith Decl., Exhibit 7.  The Debtors' accompanying document production included a mere two documents—copies of the Debtors' bankruptcy petitions filed publicly at Docket Nos. 3 and

---

[21] Aronzon Dep. Tr. 211:14-215:05.

27 of the above-captioned matter.   These documents were produced at 10:50 PM the night

before the Aronzon Deposition.  See Griffith Decl., Exhibit 8.

34.     The Debtors did not produce any other documents in response to the RFPs.  The

Debtors objected to production of the requested discovery on the basis that the information

sought was "protected from disclosure by the attorney-client privilege, the work product

doctrine, common interest privilege, or any other applicable privilege or protection from

discovery." *Id.*  For example:

- Request No. 6:   All Documents and Communications Concerning
  investigations of any Released Party, any Released Genesis Personnel, and
  any Special Committee member conducted by the Estate, the UCC, or any
  other Person.

  Response to Request No. 6: . . . The Debtors further object to this Request
  to the extent that it seeks the production of Privileged Information . . . . The
  Debtors further object to this Request to the extent it . . . calls for publicly
  available information, including information in the [Disclosure Statement].
  *Id*.

- Request No. 10:   All copies of investigation interviews, deposition
  transcripts, sworn statements, or any other written or oral statements
  provided by any of the Released Parties and any of the Released Genesis
  Personnel in connection with any internal or external investigation that
  occurred . . . .

  Response to Request No. 10: . . . The Debtors further object to this Request
  . . . to the extent that such material is protected by the work product,
  investigative or other privilege.  *Id*.

35.     Also on January 30, 2024, the night before the Aronzon Deposition, the Debtors

served the Debtors' Responses and Objections to Genesis Crypto Creditors Ad Hoc Group's

First Set of Interrogatories to the Debtors (the "Debtors' R&Os to Interrogatories").  Griffith

Decl., Exhibit 7.  The Debtors again refused to provide a response to the majority of the

Interrogatories on the basis of privilege.  *Id.*  For example:

- Interrogatory No. 2:   Provide a description of the investigation(s) conducted
  Concerning each Released Party, including the identities of the Person(s) that
  conducted the investigation, the number of Documents reviewed, number of
  interviews conducted, the causes of action investigated, the findings of the

investigation, and identify any investigative reports or memorandum containing the findings of the investigation.

Response to Interrogatory No. 2:. . . The Debtors further object to this Interrogatory to the extent that it seeks Privileged Information. The Debtors further object to this Interrogatory on the grounds that it calls for publicly available information, including information in the Disclosure Statement. For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

- Interrogatory No. 4: For each Released Party, Released Genesis Personnel, and Special Committee member, Identify the reasons for the Releases, including the benefit the Estate will receive from providing the Releases.

Response to Interrogatory No. 4:. . . The Debtors further object to this Interrogatory to the extent that it seeks Privileged Information… For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

\*\*\*

36.    At another deposition of Mr. Aronzon, conducted on February 16, 2024, DCG introduced Special Committee meeting minutes as exhibits. This made it abundantly clear that the Debtors had Special Committee meeting minutes in their possession which they produced to other parties but failed to produce to the CCAHG. After the deposition, CCAHG repeated its request that the Debtors produce "all Special Committee meeting minutes, notes, and memos" given their responsiveness to the RFPs. *See* Griffith Decl., Exhibit 10. In response, Cleary indicated for the first time its intent to produce "minutes from special committee meetings to the extent responsive to the second set of requests." *Id*.

37.    At 10:43 p.m. on February 20, 2024, Cleary "produced" nine Special Committee meeting minutes. *See* Griffith Decl., Ex 11. These documents were almost entirely redacted for privilege except for the date and time of the meeting, attendees, and—in one sole instance—the stand alone phrase "released parties". *Id.* ¶ 13.

D.    The Debtors Continue to Seek the Court's Approval of the Proposed Releases

38.    Counsel for the CCAHG informed the Debtors of its intent to file this Motion by email on February 7, 2024. *See* Griffith Decl., Exhibit 4. In that email, counsel for the

17

CCAHG offered to meet-and-confer to explore reasonable solutions that might obviate the filing of this Motion. *Id.*

39.     On February 16, 2024, the Debtors filed the Omnibus Reply, attaching as exhibits the *Declaration of Joseph J. Sciametta, Managing Declaration of Alvarez & Marsal North America LLC, in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* (the "Sciametta Declaration") and the Aronzon Declaration. *See* Docket No. 1330.

40.     The Aronzon Declaration contains new, conclusory statements concerning the Proposed Releases and the Special Investigation that should be precluded as evidence based on the repeated invocation of privilege during Mr. Aronzon's deposition about the very same topics. For example, Mr. Aronzon refers to previously filed statements in Exhibit F of the Plan Supplement [Docket No. 1117] and Sections III.W and VI.F of the Amended Disclosure Statement [Docket No. 1031]. Mr. Aronzon declared:

> Each of these provisions provide for and describe the justification for these releases and the process that preceded their approval. I believe those documents are a fair and accurate representation of the process that led to the Special Committee's approval of the releases of Released Genesis Personnel and the justifications for that decision.

Aronzon Decl, ¶ 83. Counsel for the CCAHG sought to proactively test a proposition like this during the Aronzon Deposition but was blocked from doing so.[22]

41. Similarly, Mr. Aronzon stated in the Aronzon Declaration:

> The Special Committee has investigated and analyze potential litigation Causes of Action against various parties, including, but not limited to, preferences. The Special Committee carefully considered the merits and defenses in respect of Causes of Action related to preferences prior to granting release or waiver of any resolved Preference Claims . . . .

42.     Aronzon Decl. ¶ 89. Counsel for the CCAHG anticipated a statement like this and sought to openly depose Mr. Aronzon concerning this topic. However, Cleary had denied

---

[22] *See, e.g.*, Aronzon Dep. Tr. 181:05–181:13. "Q: And let's talk about the process for that. What is involved with you giving written consent? MS. VANLARE: Objection. THE WITNESS: I don't know how to answer this without talking about all the things we discussed with counsel."

the CCAHG the opportunity to examine Mr. Aronzon on this topic by improperly invoking

privilege.[23]

43.      For the first time in the course of these proceedings, the Debtors also raised the

concept of "Cooperation Agreements".  The Debtors' Omnibus Reply states:

> The Debtors intend to modify the Plan to provide releases only to those Released
> Genesis Personnel who agree to cooperate with assisting with litigation of the
> Retained Causes of Action by the Wind-Down Debtors (such agreements, the
> "Cooperation Agreements"), which will be critical to the resolution of litigation
> against DCG and Gemini as well as enforcement actions relating to the Debtors'
> pre-petition business.

*See* Omnibus Reply ¶ 72.  Mr. Aronzon's Declaration states:

> I also understand that, in order to be considered a "Released Genesis Personnel,"
> each potential releasee will need to have executed an agreement to cooperate
> with assisting with litigation of the Retained Causes of Action by the Wind-
> Down Debtors (such agreements, the "Cooperation Agreements"), which will
> ensure the Debtors are able to rely on the knowledge and services of many of
> the Released Parties Post-Effective Date.

Aronzon Decl. ¶ 84.

44.      The CCAHG and any other interested party could not examine or seek discovery

about these Cooperation Agreements as they were brought up only *after* Mr. Aronzon's

deposition.  Despite this, the CCAHG sent an e-mail to the Debtors requesting information

about these Cooperation Agreements and the intended modification to the Amended Plan.  *See*

Griffith Decl., Exhibit 9.  However, as of the filing of this Motion, the Debtors have informed

the CCAHG that they "are not in a position at this moment to provide further details".  *Id.*

45.      By announcing the Cooperation Agreements for the first time in the Omnibus

Reply and its supporting Aronzon Declaration—well after the close of the scheduled discovery

period—the Debtors have yet again denied creditors the ability to investigate the sufficiency

of the Proposed Releases in the Amended Plan and Plan Supplement.

---

[23] *See, e.g.*, Aronzon Dep. Tr. 162:13-152:25.  "Q: Do you know if any of the individuals that are currently set to receive releases have preference liability to the estate?"  MS. VANLARE:  Objection.  Attorney-client privilege and work product.  I would instruct the witness not to answer.  Q:  Are you going to answer the question?  A.  I was waiting for you to ask.  No, I'm not."

**ARGUMENT**

A.    <u>The Sword and Shield Doctrine Requires Precluding the Debtors From Introducing
Evidence Relating to the Proposed Releases and the Special Committee Investigation</u>

46.    Privilege cannot be used as a sword and a shield.  *See United States v. Bilzerian*,
926 F.2d 1285, 1292 (2d Cir. 1991); *see also In re Circle K Corp.*, 1996 WL 529399, at *4
(Bankr. S.D.N.Y. May 30, 1996), *aff'd*, 1997 WL 31197 (S.D.N.Y. Jan. 28, 1997) ("A client
cannot use the privilege as both a sword and a shield. Thus, the client waives the privilege when
he places the privileged communication at issue, and fairness requires that it be disclosed to
the adversary.").

47.    Cleary inappropriately refused to permit Mr. Aronzon to provide non-
privileged, factual responses to questions posed during his deposition about the Proposed
Releases and the Special Committee Investigation.  But "the attorney-client privilege simply
does not extend to facts known to a party that are central to that party's claims, even if such
facts came to be known through communications with counsel who had obtained knowledge
of those facts through an investigation into the underlying dispute."  *See B.C.F. Oil Ref., Inc. v.
Consol. Edison Co. of New York*, 168 F.R.D. 161, 165 (S.D.N.Y. 1996).

48.    Even a cursory review of the Aronzon Deposition transcript makes it abundantly
clear that Cleary inappropriately directed Mr. Aronzon to not respond to factual questions on
the basis of privilege and that Mr. Aronzon followed his counsel's instructions.  *See* Griffith
Decl., Ex. 3.  For example:

> Q:  In addition to the information in the plan supplement and the disclosure
> statement, what facts did you rely on in deciding that the releases in the plan are
> appropriate?
>
> MS. VANLARE:  Objection.  Calls for attorney-client communication and
> attorney work product and, as such, I would instruct the witness not to answer.
>                                …
> MS. VANLARE:  []… The scope of the investigation is attorney work product.
> Any communications that may have occurred between counsel and the witness
> are privileged communications and, as such, questions that call for the witness

20

to reveal any of that information are not allowed, and I am instructing the witness not to answer them.

MS. GRIFFITH:  And to be clear, for the record, I am not asking about your communications with counsel, I am asking about the underlying facts which are not privileged information that you considered and relied on in coming to the conclusion that the releases contemplated in the plan are appropriate. [24]

Thereafter, Cleary directed Mr. Aronzon to not answer the question seeing factual information on the basis of privilege and Mr. Aronzon followed his counsel's instructions.[25]

49.    Moreover, where, as here, witnesses offer conclusory assertions but withhold factual information about the basis for those assertions on privilege grounds, the conclusory assertions should be precluded.  *See Pfizer Inc. v. Warner-Lambert Co.*, 1999 WL 33236240, at *1 (Del. Ch. Dec. 8, 1999) (discussing that "a party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.").

50.    In *Grunstein v. Silva*, 2012 WL 5868896, at *1 (Del. Ch. Nov. 20, 2012), the defendants/counterclaimants raised attorney client privilege as a shield during the litigation to avoid disclosing the basis for their claims.  The *Grunstein* court discussed that decisions involving the "'sword and shield' concept have precluded a party from shielding evidence from an opposing party and then relying on the evidence at trial to meet its burden of proof on an issue central to the resolution of the parties' dispute."  *Id.* (internal quotations omitted).  The *Grunstein* court granted plaintiff's motion *in limine* precluding evidence the defendant shielded from discovery based on privilege.

51.    The Debtors made a strategic choice to obstruct the CCAHG from receiving discovery about the conclusory justifications and basis for the Proposed Releases based on frequent invocations of the attorney client privilege.  "Because [the Special Committee's] knowledge and understanding of these issues are based on the advice of counsel, the Court

---

[24] Aronzon Dep. Tr. 254:14-258:25.
[25] *Id.*

[should] not allow [the Debtors] to use this evidence when [creditors] have been shielded from it." *Grunstein*, 2012 WL 5868896, at *1. Any arguments that the Mr. Aronzon "should be permitted to testify as to his own understanding of the privileged communications would circumvent the sword and shield doctrine. Such a result would hinder [creditors'] ability to contest [the Debtors'] claims." *Id.*

52.    Notions of fairness are critical at this juncture. The Debtors, having impermissibly used privilege to shield themselves from discovery about non-privileged, factual information concerning the Proposed Releases and the Special Committee Investigation, should be precluded from introducing evidence and testimony on these topics.

B.    The Debtors Should Be Precluded From Relying on Conclusions and Justifications for the Proposed Releases Based on the Special Committee Investigation

53.    The Debtors should not be permitted to selectively disclose and rely upon documents and information about the Special Committee Investigation and its counsel's oversight and involvement therein, while also claiming privilege as to the full set of materials relevant to such investigation. This violates well-settled case law and fundamental fairness. *See In re Residential Capital, LLC*, 491 B.R. 63, 68 (Bankr. S.D.N.Y. 2013) (a party may not use privilege to "prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").

54.    "A party who argues that it made a business decision because of its reliance on counsel, regardless of whether it is asserted as a 'defense' to a 'due care' challenge, still waives its attorney-client privilege by placing its reliance on counsel directly at issue." *See In re Residential Capital, LLC*, at 71. *See also In re Subpoena Issued to Dennis Friedman, Esq.*, 286 B.R. 505, 509 n. 4 (S.D.N.Y.2002) (stating that directors who proposed to use advice of counsel to substantiate their due care "created the situation where their attorney's advice is both relevant and possibly crucial to the plaintiff's preparation of its case").

55.     Here, for example, in the Plan Supplement, the Debtors concluded that: "[t]he Special Committee's investigation has not identified wrongdoing on the part of the Released Genesis Personnel that would give rise to Claims or Causes of Action that are likely to provide value to the Debtors' Estates." *See* Docket No. 1117, at 22.  But this conclusory statement raises far more questions than it answers.  It demands scrutiny of: (i) what claims were investigated; (ii) the extent of the investigation into such claims; (iii) whether the cost to pursue the claims would exceed the benefits; and (iv) the value that the Proposed Releases are providing to the estates.  Yet, Mr. Aronzon refused to answer questions exploring these areas of inquiry based on privilege.

56.     Moreover, despite contentions to the contrary from Cleary during the discovery process, sufficient information about the Special Committee Investigation is not publicly available on the docket.  The information that is available in these dockets is conclusory, sparse, and vague.  Indeed, even Mr. Aronzon – the Special Committee Member charged with approving the Proposed Releases – did not know how many individuals were on the Released Genesis Personnel list.[26]  Without access to the Special Committee Investigation findings and underlying facts, creditors are unable to fully test whether granting Proposed Releases is in the best interest of the Debtors' estates and adds value to the Debtors' estates.

57.     The matter of *In re Residential Capital, LLC* is instructive.  In that case, an Unsecured Creditors Committee (the "Residential Capital Committee") objected to a settlement approved by the directors of a bankrupt organization.  *See Residential Capital*, 491 B.R. at 65–66.  The Residential Capital Committee sought written discovery and depositions concerning the evaluation and approval of the decision to approve the settlement.  *Id.*  In response, the Debtors withheld thousands of documents on the basis of attorney-client privilege and asserted the same objection during the depositions of the Debtors' witnesses.  *Id.*  During

---

[26] *See* Aronzon Dep. 215:06–216:12.

a hearing on the issue of privilege, the Court informed the Debtors' counsel: "You're going to have a real problem if you're going to assert privilege with respect to communications from counsel that form any part of the basis for directors approving the settlement." *Id.* at 66. The *Residential Capital* court recognized that "a court should exclude any testimony or evidentiary presentations by the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during discovery based on attorney-client privilege." *Residential Capital*, 491 B.R. at 68 (quoting *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751 (S.D.N.Y. 2003)).

58.    The court in *Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 (Del. Ch. 2000). reached a similar conclusion. Defendants had invoked the attorney-client privilege to block from discovery much of the professional advice they had received in their capacity as directors of a corporation's board. *Id.* Those same defendants later argued that the board of directors had considered several pieces of information that the opposing party not been able to receive in discovery. *Id.* The *Chesapeake Corp.* court condemned that tactic as "inequitable" and refused to consider any evidence concerning the professional advice that had been given to the board. *Id.* at 301, n.8.

59.    The Debtors here should be precluded from introducing evidence that pertain to conclusions and justifications about the Proposed Releases since the Special Committee information about the investigation was withheld during discovery and depositions.

C.    The Debtors Waived Privilege When They Disclosed the Special Committee Investigation Findings to Other Parties

60.    Privilege is waived when information is disclosed outside of the attorney-client relationship. *See In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("[S]ubsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication originally possessed . . . ."); *In re Quigley Co., Inc.*, 2009 WL 9034027, at *3 (Bankr. S.D.N.Y. Apr. 24, 2009), *supplemented*, 2009 WL 2913450 (Bankr. S.D.N.Y. June 19, 2009) ("As a rule, the attorney-client privilege is waived when a protected communication

is disclosed to a third party."). Work product privilege is similarly waived when such information is disclosed to third parties. *In re Quigley Co., Inc.*, No. 04-15739 SMB, 2009 WL 9034027, at *8 (Bankr. S.D.N.Y. Apr. 24, 2009*), supplemented*, No. 04-15739 (SMB), 2009 WL 2913450 (Bankr. S.D.N.Y. June 19, 2009) ("Waiver of work-product immunity is found whenever a party has disclosed the work-product in such a manner that it is likely to be revealed to his adversary.") (internal quotation marks and citation omitted).

61.      The Debtors and the Special Committee waived any privilege that may have existed concerning the Proposed Releases and the Special Committee when they shared the Special Committee Investigation's findings with other parties, specifically the UCC and the Ad Hoc Group. *See* Docket No. 1031, at 36 ("Cleary has shared the findings from the Investigation with the Special Committee and counsel to the UCC and the Ad Hoc Group."). Despite clearly waiving both attorney-client communication and work product privilege, the Debtors and the Special Committee refused to answer questions seeking factual information about the Special Committee Investigation during the Aronzon Declaration and continue to refuse to produce the findings from the Special Committee Investigation to the CCAHG *See* Griffith Decl., Exhibits 3 & 9.

## **CONCLUSION**

62.      WHEREFORE, for the reasons set forth above, the CCAHG respectfully requests that the Court grant this Motion, and enter the Proposed Order, attached as Exhibit A, precluding the declarations or testimony of Paul Aronzon or any other Special Committee member and Joseph Sciametta or any other financial advisor to the Special Committee at the confirmation hearing in support of or about the Proposed Releases sought by the Debtors and the Special Committee Investigation.

Dated:  February 21, 2024
        New York, New York

**MCDERMOTT WILL & EMERY LLP**

/s/ Darren Azman
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com
E-mail: ggriffith@mwe.com
E-mail: lbarrett@mwe.com

*- and -*

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Genesis Crypto
Creditors Ad Hoc Group*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 21st day of February 2024, he caused a true and correct copy of the foregoing *The Genesis Crypto Creditors Ad Hoc Group's Motion* In Limine *to Preclude Evidence Regarding the Proposed Releases on Which the Special Committee and Its Counsel Withheld Critical Information* (the "<u>Motion</u>") to be filed using this Court's CM/ECF System (the "<u>CM/ECF System</u>") which caused the Motion to be served on all registered users of the CM/ECF System who have consented to receive such notice in this case.

<div style="text-align:center">

*/s/ Darren Azman*
Darren Azman

</div>

# <u>EXHIBIT A</u>

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

## ORDER APPROVING GENESIS CRYPTO CREDITORS AD HOC GROUP'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE REGARDING THE PROPOSED RELEASES AND THE SPECIAL COMMITTEE INVESTIGATION

Upon consideration of the motion (the "Motion")[2] of the Crypto Creditors Ad Hoc Group

("CCAHG") to preclude the Debtors from offering declaration and testimony from Paul Aronzon

or any other Special Committee member and Joseph Sciametta or any other financial adviser to

the Special Committee at the confirmation hearing in support of the proposed releases sought by

the Debtors and the investigation conducted by the Special Committee; and due and proper

notice of the Motion having been provided; and the Court having reviewed the Motion; and the

Court having determined that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and this Court having jurisdiction to order the relief provided

herein in accordance with 28 U.S.C. §§157 and 1334; and this being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Debtors' estates, and that the legal and factual bases set forth in the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefore:

**IT IS HEREBY FOUND AND ORDERED THAT:**

A.    The Motion is hereby granted to the extent provided herein.

B.    The Debtors shall be precluded from introducing the declarations or

testimony of Paul Aronzon or any other Special Committee member and

Joseph Sciametta or any other financial adviser to the Special Committee

at the confirmation hearing in support of the proposed releases sought by

the Debtors and the investigation conducted by the Special Committee.

C.    The Court retains jurisdiction with respect to all matters arising from or

related to the interpretation and implementation of this Order.

Dated: _____, 2024
         New York, New York

_____
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT B**

Declaration of J. Greer Griffith, February 21, 2024

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

### DECLARATION OF J. GREER GRIFFITH IN SUPPORT OF THE GENESIS CRYPTO CREDITORS AD HOC GROUP'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE REGARDING THE PROPOSED RELEASES AND THE SPECIAL COMMITTEE INVESTIGATION

I, J. Greer Griffith, declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am a partner at the law firm McDermott Will & Emery LLP ("McDermott"), counsel to the Genesis Crypto Creditors Ad Hoc Group in the above-captioned chapter 11 cases.

2.    I respectfully submit this declaration in support of the *Genesis Crypto Creditors Ad Hoc Group's Motion* In Limine *to Preclude Evidence Regarding the Proposed Releases and the Special Committee Investigation* (the "Motion").

3.    Attached as Exhibit 1 is a true copy of the *Debtors' Amended Witness List in Connection with the Confirmation Hearing*, dated January 5, 2024.

4.    Attached as Exhibit 2 is a true copy of the transcript of the deposition of Joseph Sciametta, dated January 30, 2024, excerpted to include portions relevant to this Motion.

5.    Attached as Exhibit 3 is a true copy of the transcript of the deposition of Paul Aronzon, dated January 31, 2024, excerpted to include portions relevant to this Motion.

6.    Attached as Exhibit 4 is a true copy of emails exchanged between McDermott and

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

Cleary Gottlieb Stein & Hamilton LLP ("Cleary"), dated February 6–7, 2024.

7.    Attached as Exhibit 5 is a true copy of emails exchanged between McDermott and Cleary, dated February 3–4, 2024.

8.    Attached as Exhibit 6 is a true copy of the *Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* and the *Genesis Crypto Creditors Ad Hoc Group's Interrogatories to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.*, both dated January 17, 2024.

9.    Attached as Exhibit 7 is a true copy of the *Debtors' Responses and Objections to* the *Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents* and the *Debtors' Responses and Objections to Genesis Crypto Creditors Ad Hoc Group's First Set of Interrogatories to the Debtors*, both dated January 30, 2024.

10. Attached as Exhibit 8 is a true copy of emails exchanged between McDermott and Cleary, dated January 30, 2024.    I further declare that attached to this email, as "GENESIS_CCG_CONF_V001.zip", was a production of three publicly available Voluntary Petitions for Non-Individuals Filing for Bankruptcy of Genesis Global Capital, LLC, Genesis Asia Pacific PTE. LTD., and Genesis Global Holdco, LLC.

11. Attached as Exhibit 9 is a true copy of emails exchanged between McDermott and Cleary, dated February 20–21, 2024.

12. Attached as Exhibit 10 is a true copy of emails exchanged between McDermott and Cleary, dated February 16–19, 2024.

13.    Attached as Exhibit 11 is a true copy of an email sent by Cleary to McDermott, dated February 20, 2024.  Accompanying this email was a production of nine Special Committee

meeting minutes, which were almost entirely redacted for privilege except for the date and time of

the meeting, attendees, and—in one sole instance—the stand alone phrase "released parties."


Dated: February 21, 2024
      New York, New York


                                  */s/ J. Greer Griffith*
                                  J. Greer Griffith
                                  MCDERMOTT WILL & EMERY LLP
                                  One Vanderbilt Avenue
                                  New York, NY 10017-3852
                                  Telephone: (212) 547-5578
                                  Facsimile: (212) 547-5444
                                  E-mail: ggriffith@mwe.com

                                  *Counsel to the Genesis Crypto*
                                  *Creditors Ad Hoc Group*

# **<u>EXHIBIT 1</u>**

Debtors' Amended Witness List in Connection with the Confirmation Hearing

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' AMENDED WITNESS LIST**
**IN CONNECTION WITH THE CONFIRMATION HEARING**

Genesis Global Holdco, LLC and its affiliated debtors Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd. (collectively, the "Debtors"), as debtors and debtors-in-possession in the above-captioned cases (the "Chapter 11 Cases"), by their undersigned counsel, submit the following list of witnesses in connection with the hearing on confirmation of the Debtors' chapter 11 plan on February 14, 2023 at 10:00am (ET) (the "Confirmation Hearing"):

1.  Paul Aronzon, in his capacity as a member of the Special Committee of the Board of Directors of Genesis Global Holdco, LLC;

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

2.    Joseph Sciametta, Managing Director at Alvarez & Marsal North America, LLC;

3.    Brad Geer, Managing Director at Houlihan Lokey Capital, Inc.;

4.    Any witness listed, offered or called by any other party; and

5.    Any witness required for rebuttal or impeachment.

The Debtors reserve their rights to supplement and amend their list of witnesses in connection with the Confirmation Hearing.  The Debtors further reserve their rights to cross examine all witnesses called by other parties in interest.

Dated:  January 5, 2024
      New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Jane VanLare*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel for the Debtors*
*and Debtors-in-Possession*

# EXHIBIT 2

Excerpts of the Deposition Transcript of Joseph Sciametta, Dated January 30, 2024

PROFESSIONALS' EYES ONLY

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------------- x

4    In re:

5    GENESIS GLOBAL HOLDCO, LLC, et al.,

6         DEBTORS.

7                    CASE NO. 23-10063 (SHL)

8    --------------------------------------------- x

9          * PROFESSIONALS' EYES ONLY *

10

                    January 30, 2024
11                    10:13 a.m.

12

13

14

15        DEPOSITION of JOSEPH SCIAMETTA, taken

16    pursuant to Notice, before Fran Insley, at Weil

17    Gotshal & Manges, LLP, 767 Fifth Avenue, New

18    York, NY, a Notary Public of the States of New

19    York and New Jersey.

20

21

22

23

24

25

PROFESSIONALS' EYES ONLY

Page 281

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          Q.    Hi.  So I have a series of questions

18    concerning the plan specifically concerning

19    your financial analysis regarding proposed

20    releases, the value of claims being released,

21    the value that will be derived to the estate

22    from the persons and entities being released,

23    whether releases in the plan are appropriate

24    and the investigation that was conducted into

25    the released parties and entities.  It's my

PROFESSIONALS' EYES ONLY

Page 282

1    understanding from my communications with your

2    counsel that there they are objecting to each

3    of these areas of inquiry.  However, you are

4    permitted to answer these questions, and so

5    sitting here today, are you going to refuse to

6    answer questions concerning all of these

7    topics?

8              MS. VANLARE:  I object to what has

9         been just said.  Mr. Sciametta has not

10        been designated as a 30(b)(6) witness on

11        any of those topics.  My understanding is

12        we had a prior -- we, being the debtors

13        counsel, had an understanding with the

14        crypto group counsel, McDermott, that

15        McDermott had withdrawn its own 30 (b)(6)

16        topics.

17             Irrespective of that, however,

18        Mr. Sciametta has not been designated on

19        any of those topics and so will not be

20        testifying on those topics today.  He has

21        not been noticed in his personal capacity.

22             To the extent that you have any

23        questions that would fall within the

24        purview of the designated topics for

25        Mr. Sciametta in response to DCG's notice,

PROFESSIONALS' EYES ONLY

Page 283

1          subject to our objections, we can proceed.

2          And that's -- that -- you can proceed and

3          ask those questions, but anything outside

4          that scope, we will object to and not

5          permit questioning of Mr. Sciametta.

6               MS. GRIFFITH:  We did not withdraw

7          our 30 (b)(6) notice and it's our

8          understanding that we were going to be

9          permitted to have time to examine you

10         today.  We are here.  We are prepared.  We

11         are ready to ask those questions.

12              It's our understanding that you're a

13         financial advisor to the estate and that

14         you should have information regarding the

15         financial analysis that was done on the

16         value of the releases to the estate.  If

17         that is not the case and you're not

18         prepared, we are going to continue to

19         notice the deposition until we have the

20         opportunity to ask this line of

21         questioning and keep the deposition open.

22              MS. VANLARE:  We object to that

23         characterization of the agreement and we

24         understand your reservation of rights but

25         we object to it.

Page 284

1        Q.    Are you prepared to talk about topic

2    15 in DCG's Notice of Deposition, claims by the

3    Genesis Crypto Creditors Ad Hoc Group including

4    your assessment and valuation of such claims

5    under the plan and the impact of any objections

6    to the plan are the Genesis Crypto Creditors Ad

7    Hoc Group on potential recoveries?

8            MS. VANLARE:  Counsel, as is made

9        clear in our responses and objections, the

10        debtors will not designate a witness to

11        provide testimony with respect to this

12        topic.

13        Q.    How about for topic 14, your

14    communications with any member of the Genesis

15    Crypto Creditors Ad Hoc Group or the

16    representative concerning, without limitation,

17    any anticipated objection to the plan, the

18    basis for such objection and any analysis under

19    11USC562?

20            MS. VANLARE:  The debtors have

21        designated Mr. Paul Aaronson on that

22        topic.  Mr. Sciametta has not been

23        designated on that topic.

24        Q.    Have you evaluated in any way the

25    value of the releases under the plan?

PROFESSIONALS' EYES ONLY

Page 285

1          MS. VANLARE:  Objection.  I will

2      instruct the witness not to answer for all

3      the reasons that I've articulated.  This

4      is outside the scope.  Again, I don't want

5      to repeat myself.  But again, it's outside

6      the scope of any topics that he has been

7      designated for and he has not been noticed

8      in his personal capacity.

9          Q.    Are you going to follow your

10  counsel's instruction or are you able to answer

11  the question?

12         A.    I'll follow my counsel's

13  instruction.

14         Q.    Have you at all as the financial

15  advisor to debtors valued what will be derived

16  to the estate from the persons and entities

17  being released?

18         MS. VANLARE:  Again, this is not

19      appropriate.  It's not within the scope.

20      It's not within the scope of the 30(b)(6).

21      Mr. Sciametta is not a personal witness

22      as -- there has not been a notice of him

23      as a personal fact witness.

24         MS. GRIFFITH:  But he's a financial

25      advisor.

PROFESSIONALS' EYES ONLY

Page 286

```
 1              MS. VANLARE:  He's a financial
 2         advisor, that's correct.
 3         Q.    So, are you able to answer that
 4    question in your capacity as a financial
 5    advisor?
 6              MS. VANLARE:  Again, this is not
 7         about whether he is able to or not.  He is
 8         here in his capacity as a 30(b)(6) witness
 9         on designated topics that have been agreed
10         to subject to our objections.  That is
11         what he is here for.  Any other questions
12         are not appropriate or within scope.
13              MS. GRIFFITH:  Then we will keep the
14         deposition open pursuant to the fact that
15         we never withdrew and there is no evidence
16         of us withdrawing our notice of 30(b)(6)
17         deposition on these topics and that we had
18         a prior agreement with other of your
19         colleagues that we would be permitted the
20         opportunity to ask questions during the
21         deposition.
22              MS. VANLARE:  We strongly disagree
23         with that statement.  We believe there was
24         an agreement and you did withdraw.  We
25         reserve all our rights.
```

# **<u>EXHIBIT 3</u>**

Excerpts of the Deposition Transcript of Paul Aronzon, Dated January 31, 2024

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------

4   In re:

5   GENESIS GLOBAL HOLDCO, LLC, et al.,

6                  Debtors.

7

    Case No.: 23-10063 (SHL)

8   ------------------------------------------

9

                    January 31, 2024

10                  8:39 a.m.

11

12

13

14       VIDEOCONFERENCE DEPOSITION of

15   PAUL ARONZON, pursuant to Notice, held at

16   8786 North Promontory Ridge Drive, Park

17   City, Utah before Wayne Hock, a Notary

18   Public of the State of New York.

19

20

21

22

23

24

25

Page 128

1                          P.  Aronzon

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    EXAMINATION BY

24    MS.  GRIFFITH:

25          Q.     Good afternoon, Mr. Aronzon.

Page 129

```
 1                    P. Aronzon
 2           Do you hear me okay?
 3      A.    Yes.
 4      Q.    Great.
 5           My name is Greer Griffith.  I'm
 6  with the law firm McDermott Will and
 7  Emery, and I represent the ad hoc crypto
 8  creditors group.
 9           So this morning you testified
10  that you were one of two special committee
11  members; correct?
12      A.    Yes.
13      Q.    How frequently did the special
14  committee meet?
15      A.    It's impossible to say, but
16  several times, sometimes daily, and
17  certainly many times each week over the
18  entire time frame.  It's a very busy, busy
19  committee.
20      Q.    And when you met, was it in
21  person, over the phone, e-mail, a
22  combination?
23           MS. VANLARE: Objection.
24           THE WITNESS:  It is mostly
25      videoconference.  Certainly there
```

Page 130

```
 1                    P. Aronzon
 2       would have been phone calls.  There
 3       were many in-person meetings, but I
 4       usually attended by videoconference.
 5       Q.   And was one of the purposes of
 6    the special committee to conduct
 7    investigations?
 8              MS. VANLARE: Objection.
 9              THE WITNESS:  Yes.
10              Sorry, I waited, I waited, I
11       wasn't sure.
12              MS. VANLARE: You did.
13       Q.   Did you run the special
14    committee investigations?
15              MS. VANLARE: Objection.
16              THE WITNESS:  Did I run them?
17       I'm not sure what you're asking me.
18       Q.   Were you in charge of the
19    special committee investigations?
20              MS. VANLARE: Objection.
21              THE WITNESS:  The special
22       committee obviously directs its
23       professionals, and the professional
24       here conducted an investigation on our
25       behalf.
```

Page 131

```
 1                    P. Aronzon
 2      Q.      What was your role regarding the
 3  investigations then?
 4              MS. VANLARE: Objection.  Asked
 5          and answered.
 6              THE WITNESS:  My role is that of
 7          an independent director who's a member
 8          of a special committee, and the
 9          committee's job is to -- among all the
10          other things that we had on our plate,
11          to look into claims and causes of
12          action that might exist.
13      Q.      And you said that you advised
14  professionals who assisted with conducting
15  the investigation; correct?
16              MS. VANLARE: Objection.
17          Misstates testimony.
18              THE WITNESS:  I didn't advise
19          anybody.  But we, as a special
20          committee, did direct and make
21          business decisions about the
22          investigation to the extent we were
23          asked to do so.
24      Q.      And which professionals did you
25  work with as part of this investigation?
```

Page 132

```
 1                    P. Aronzon
 2            MS. VANLARE: Objection.
 3            THE WITNESS:  The company's
 4      professionals.  There's, as you know,
 5      there's Cleary, that's the main --
 6      they would be the main focus of the
 7      discussions.  And then of course there
 8      was support on the financial side from
 9      A&M, Alvarez and Marsal, and also to
10      the extent necessary, Moelis and
11      Company.
12      Q.    And did all three of these
13   different professional groups provide
14   updates to the special committee?
15            MS. VANLARE: Objection.  Vague.
16            THE WITNESS:  On what?  We got
17      regular updates on a variety of
18      topics.
19      Q.    What did they update you about?
20   What type of topics?
21            MS. VANLARE: Objection.
22            THE WITNESS:  Everything we were
23      working on, whether it was the plan,
24      settlement negotiations, litigation
25      matters, claims disputes, legal issues
```

Page 133

```
 1                    P. Aronzon
 2        from time to time on a daily basis,
 3        frankly, and certainly the
 4        investigative issues.
 5        Q.    Did they provide reports to you
 6   about documents that they were collecting
 7   or reviewing in connection with the
 8   investigation?
 9              MS. VANLARE: Objection.
10              And I would caution the witness
11        to the extent your answer would
12        disclose any client privilege.
13              THE WITNESS:  We did receive
14        reports.
15        Q.    And what type of reports?  I'm
16   not asking for you to reveal any
17   attorney-client privileged information,
18   but were these reports summarizing
19   documents that were collected from
20   individuals, were they summarizing
21   interviews that were conducted?
22              MS. VANLARE: Objection.
23              And again, to the extent your
24        answer would involve revealing any
25        client-attorney communications, I
```

Page 134

```
 1                    P. Aronzon
 2      would instruct you not to answer.
 3            THE WITNESS:  They were very
 4      detailed reports about all of the
 5      activities of our investigative team.
 6      Q.    And do you consider those
 7    reports to be privileged information?
 8            MS. VANLARE: Objection.  Calls
 9      for a legal conclusion.
10            THE WITNESS:  I believe they are
11      privileged.
12            MS. GRIFFITH: And I have my
13      colleague Matthew Gibson on with me.
14            Matthew, could you upload the
15      amended disclosure statement.
16            (Whereupon, a document entitled
17      Amended Disclosure Statement With
18      Respect to The Amended Joint Plan of
19      Genesis Global Holdco, LLC
20      was marked Aronzon Exhibit 6
21      for identification.)
22      Q.    And when that's uploaded as an
23    exhibit, I believe we're at Exhibit 6.
24            I'm going to direct your
25    attention to the bottom of page
```

Page 135

```
 1                    P. Aronzon
 2   thirty-six.
 3        A.    I'm closing the Exhibit 5; okay?
 4              Page what now?
 5        Q.    It's thirty-six on the bottom of
 6   the page.  On the top it will say page
 7   fifty-one of three hundred six.  But for
 8   the record, this is the amended disclosure
 9   statement with respect to the is amended
10   joint plan of Genesis Global Holdco, LLC,
11   et al., under Chapter 11 of the bankruptcy
12   code filed at document 1031 publicly on
13   the docket.
14        A.    Okay, I've got it.
15        Q.    And if you look at the bottom of
16   that page, it says, "Cleary has shared the
17   findings from the investigation with the
18   special committee and counsel to the UCC
19   and the ad hoc group".
20              Do you see that?
21        A.    Yes.
22        Q.    Are these detailed reports that
23   you're referencing that fall under the
24   findings that Cleary shared about its
25   investigation?
```

Page 136

1              P. Aronzon

2          MS. VANLARE: Objection.  Vague.

3          MR. WEST: Objection.

4          THE WITNESS:  Go ahead.

5          MS. VANLARE: Objection.  Vague.

6          And also I would add again, to

7      the extent this would reveal any

8      attorney-client privilege, I would

9      instruct you not to answer.

10          THE WITNESS:  I heard somebody

11      else say something.

12          MS. VANLARE: I believe that was

13      Mr. West.

14          THE WITNESS:  I actually -- I

15      can't give you any substance, but what

16      I can tell you is I don't know exactly

17      what was shared.

18      Q.    Were the reports, the detailed

19  reports that were shared with you, also

20  shared with counsel to the UCC and the ad

21  hoc group?

22          MS. VANLARE: Objection.

23          THE WITNESS:  I don't know.

24      Q.    Who would have that information?

25      A.    Our counsel and probably the UCC

Page 137

                              P. Aronzon

 1

 2    counsel and ad hoc group counsel.  They

 3    can tell you what they got and what was

 4    delivered.

 5        Q.    And do you have these reports in

 6    your possession, these detailed finding

 7    reports?

 8            MS. VANLARE: Objection.

 9            THE WITNESS:  Sitting here right

10        now in my hand, no.

11        Q.    But if you were able to look in

12    your e-mail or in your personal

13    possession.

14            MS. VANLARE: Objection.

15            Counsel, you're misrepresenting

16        what's written on the page, so I would

17        caution the witness.

18            THE WITNESS:  I am sure that I

19        have reports that were provided by our

20        counsel.

21        Q.    Is the special committee

22    investigation still ongoing?

23        A.    I believe that we are still --

24    I'm not quite sure how to answer this.

25            There is work that is ongoing by

Page 138

                    P. Aronzon

1

2  our counsel on a variety of issues having

3  to do with a variety of different

4  subjects.  I don't know how to describe it

5  any better than that.  I mean, for

6  instance, you know, we have work that

7  we're doing in connection with plan

8  releases.  That work is ongoing.  I don't

9  know if that fits into your

10 categorization, but that is a topic that I

11 know is still in process.

12      Q.    How about an investigation into

13 potential claims the estate might have?

14           MS. VANLARE: Objection.

15           To the extent your answer would

16      reflect or reveal any attorney-client

17      privileged information, I would

18      instruct you not to answer.

19           THE WITNESS:  All I can really

20      say is there is continuing work being

21      done in certain areas.

22      Q.    Did the special committee

23 investigate all claims that the estate

24 might have?

25           MS. VANLARE: Objection.

Page 139

```
 1                        P. Aronzon
 2          Objection to form.
 3                And again, Mr. Aronzon, to the
 4          extent your answer would reveal any
 5          attorney-client communications, I
 6          would instruct you not to answer.
 7                THE WITNESS:  I'm not quite sure
 8          how to answer this.  The special
 9          committee relied on its professionals
10          to assist in determining what to
11          investigate and what not to.
12          Q.    What type of claims did the
13    special committee investigate?
14                MS. VANLARE: Objection.
15                To the extent that your answer
16          would reveal any attorney-client
17          communication, I would instruct you
18          not to answer.
19                THE WITNESS:  I'll try to do
20          this generically; okay?
21                To the extent that a claim would
22          be, quote, an asset of our estate, we
23          looked at it through our
24          professionals.
25                To the extent a claim would
```

Page 140

                              P. Aronzon

1

2        result in something to do with claims

3        that are asserted against the estate,

4        we would look at that.  And I'm doing

5        it really generally because I don't

6        know how to be specific without

7        revealing discussions and privileged

8        information.  And then obviously to

9        the extent people apprised us of

10       things they thought should be

11       investigated, if we thought there was

12       a reason to follow up, we would do so.

13       And there may be other types of things

14       that we would look at depending on the

15       issues and the timing and everything

16       else.

17       Q.    Did the special committee

18   investigate potential claims against

19   former directors, officers, and employees

20   at Genesis?

21            MS. VANLARE: Objection.

22            And again, Mr. Aronzon, to the

23       extent any part of your answer would

24       reveal attorney-client communication,

25       I would instruct you not to answer.

Page 141

                        P. Aronzon

1

2              THE WITNESS:  I think the answer

3      is in certain circumstances, yes.

4      Q.      Did the special committee

5  investigate potential claims against

6  current directors, officers, and employees

7  at Genesis?

8              MS. VANLARE: Objection.  Asked

9      and answered.

10             And again --

11             MS. GRIFFITH: The prior question

12     was about former.  This is current.

13             MS. VANLARE: I'm referencing

14     your prior question in response to Mr.

15     Aronzon already testified all of the

16     types of claims and issues that were

17     considered by the special committee.

18             MS. GRIFFITH: He did not specify

19     who he was investigating those claims

20     against, just the time frames.

21             MS. VANLARE: His testimony

22     addresses this question.

23             Mr. Aronzon, again to the extent

24     your answer would reflect or reveal

25     any client-attorney privileged

Page 142

1                    P. Aronzon

2       communications, I would instruct you

3       not to answer.

4              THE WITNESS:  It is a category

5       that we looked into.

6       Q.     Approximately how many

7    individuals were employed at Genesis at

8    any given time in 2022?

9       A.     I don't know.

10      Q.     Ballpark number.

11             MS. VANLARE: Objection.  Asked

12      and answered.

13             THE WITNESS:  I really have no

14      basis to make that determination.

15      Q.     Approximately how many directors

16   and officers were employed at Genesis at

17   any given time in 2022?

18             MS. VANLARE: Objection.

19             THE WITNESS:  I don't know the

20      exact number.

21      Q.     Ballpark estimate.

22             MS. VANLARE: Objection.

23             THE WITNESS:  Directors?  I came

24      in at the end of 2022 and I think

25      there were four directors.

Page 143

1          P. Aronzon

2          I'm really not certain of the

3      total number.  I'm more focused or

4      have been more focused on who is

5      around after I became a member of the

6      board.  And as I testified earlier

7      this morning, there were a few other

8      directors and the special committee at

9      some point a few months into the case,

10     two, three, four, five, I don't

11     remember, basically took over.

12     Q.    Do you know how many individuals

13  are currently employed at Genesis?

14          MS. VANLARE: Objection.

15          THE WITNESS:  No.  They've been

16     downsizing.  I don't know the number.

17     Q.    Do you know how many individuals

18  are current directors and officers at

19  Genesis?

20          MS. VANLARE: Objection.

21          THE WITNESS:  Directors, there's

22     Tom Conheeney and myself.  And as I

23     said earlier this morning, I'm not

24     sure whether the other directors, for

25     instance the DCG directors, I don't

Page 144

```
 1                        P. Aronzon
 2        recall whether they actually formally
 3        resigned or not.  But the special
 4        committee has functioned as the board
 5        for many months now.
 6              Officers, there's a handful,
 7        two, three, four.
 8        Q.    How many interviews have been
 9     conducted as part of the special
10     committee's investigation?
11              MS. VANLARE: Objection.
12              THE WITNESS:  I don't know the
13        number.  Several.
14        Q.    And this will refresh your
15     recollection if we look at the amended
16     disclosure statement again, Exhibit 6,
17     page thirty-six on the bottom, page
18     fifty-one of three one six on the top.
19              MS. VANLARE: I'm sorry, counsel,
20        what page was that again?
21              MS. GRIFFITH: Sure.
22              So on the bottom, it's numbered
23        page thirty-six.  At the top of the
24        PDF, it says page fifty-one of three
25        hundred six.
```

Page 145

1                        P. Aronzon

2              MS. VANLARE: Thank you.

3      Q.     Are you on that page?

4      A.     Yes.

5      Q.     And if you look right in the

6   middle of that page, there's a paragraph

7   that states, "as part of the

8   investigation, Cleary conducted more than

9   thirty interviews with approximately

10  twelve current and former employees

11  allocated to the company".

12             Do you see that?

13     A.     Yes.

14     Q.     And if you keep reading, it

15  says, "between December 4, 2022 and

16  January 24, 2023, Cleary conducted ten

17  preliminary interviews with current

18  employees".

19             Do you see that?

20     A.     Yes.

21     Q.     And then the next sentence

22  states that Cleary -- states in part,

23  "Cleary conducted at least nineteen more

24  substantive interviews with both current

25  and former employees".

Page 146

1                    P. Aronzon
2           Do you see that?
3      A.    Yes.
4      Q.    So it looks like there's ten
5    preliminary interviews, nine substantive
6    interviews that took place.  But the first
7    sentence states approximately twelve
8    current and former employees were
9    interviewed.  And so I'm trying to figure
10   that out.
11          Does that mean that similar --
12   the same individuals were interviewed
13   twice, both for the preliminary interviews
14   and the substantive interviews?
15          MS. VANLARE: Objection.
16          THE WITNESS:  I don't know.
17     Q.    Do you know who Cleary
18   interviewed?
19          MS. VANLARE: Objection.
20          And to the extent this would
21      reveal attorney-client communication,
22      I would instruct the witness not to
23      answer.
24          THE WITNESS:  I can't answer it
25      without talking about the reports that

Page 147

                    P. Aronzon

1

2      we received.

3      Q.    You publicly filed details about

4  the results of the special committee

5  investigation here on the docket in the

6  amended disclosure statement.  You can't

7  really pick and choose what is considered

8  privilege or what's not considered

9  privilege.  You put the topic of

10 interviews in the amended disclosure

11 statement revealing what you investigated.

12 And so I'm asking who were the targets of

13 these interviews.

14          Do you know who they were?

15          MS. VANLARE: Objection.

16          The information that is in the

17      disclosure statement is by definition

18      public.  Other information relating to

19      the investigation is privileged.  The

20      witness has already testified that he

21      can't answer your question without

22      revealing privileged information.

23      Therefore, I would instruct the

24      witness not to answer the question.

25      Q.    Are you claiming that it's

Page 148

```
 1                          P. Aronzon
 2     privileged information whether you know
 3     who was interviewed or not?
 4                 MS. VANLARE: I'm not sure if
 5          you're referencing -- if you're
 6          addressing your question to the
 7          witness or to me.
 8                 However, in response to your
 9          question, my objection stands.  And
10          again, I would instruct the witness
11          not to answer to the extent the answer
12          reveals privileged communication,
13          which he said it would.
14     Q.    Mr. Aronzon, I'm asking is the
15     identity of the witnesses who were
16     interviewed privileged information, in
17     your opinion?
18                 MS. VANLARE: Ms. Griffith,
19          objection.
20                 Again, I'm happy to repeat what
21          I just said, but it's the same
22          objection and same instruction to the
23          witness.
24     Q.    Did you sit in on any of these
25     interviews?
```

Page 149

```
 1                          P. Aronzon
 2                MS. VANLARE: Objection.
 3                You may answer yes or no.
 4                THE WITNESS:  No.
 5        Q.    Did you ask any questions during
 6    any of these interviews via prewritten
 7    questions that were sent?
 8                MS. VANLARE: Objection.
 9                And again, Mr. Aronzon, I would
10        instruct you not to reveal any
11        attorney-client communications or
12        attorney work product in connection
13        with the investigations.
14                THE WITNESS:  Are you asking did
15        I ask our lawyers to ask specific
16        questions?
17        Q.    Yes.
18                MS. VANLARE: Objection.
19                I would instruct the witness not
20        to answer to the extent it reveals any
21        attorney work product or
22        attorney-client communications.
23        Q.    I'm not asking the substance of
24    the questions, I'm asking your involvement
25    and if you were -- the level of your
```

Page 150

                              P. Aronzon

 1

 2   involvement.

 3            MS. VANLARE: If you're asking

 4        the witness if he spoke to his counsel

 5        about the investigations; is that your

 6        question?

 7            MS. GRIFFITH: Yes, did he help

 8        prepare for the interviews.

 9            MS. VANLARE: Again --

10            MS. GRIFFITH: I'm not asking

11        which questions he prepared, I'm

12        asking whether he was part of the

13        process for preparing for the

14        interviews that were conducted on

15        behalf of the special committee.

16            MS. VANLARE: Counsel, again

17        objection to your questions.

18            And I would instruct the witness

19        not to answer as it all calls for

20        privileged information.

21     Q.    Did you -- do you know if these

22   interviews were recorded?

23            MS. VANLARE: Same objection.

24            You may answer yes or no, if you

25        know.

Page 151

```
 1                    P. Aronzon
 2            THE WITNESS:  I don't know.
 3       Q.    Did you review any transcripts
 4    of these interviews?
 5            MS. VANLARE: Objection.
 6            Again, I'm going to instruct the
 7       witness not to answer as this goes
 8       into the details of the investigation
 9       which are all privileged.
10            MS. GRIFFITH: On what basis is
11       whether Mr. Aronzon, who's a special
12       committee member who's tasked with
13       evaluating whether individuals should
14       be released privileged if he reviewed
15       an interview transcript?  I'm not
16       asking his thoughts or analysis of the
17       interview transcript, I'm asking
18       whether he reviewed it.
19            MS. VANLARE: Counsel, you're
20       asking questions that relate to the
21       conduct of an investigation that was
22       done by counsel and you're asking
23       about actions and conversations and
24       events that took place in the context
25       of a -- again an investigation that is
```

Page 152

1                    P. Aronzon

2          attorney-client communication and/or

3          attorney work product.

4          Q.    So are you refusing to answer

5     the question of whether the special

6     committee reviewed any interview

7     transcripts?

8               MS. VANLARE: Again, objection.

9          The witness is not refusing.  I'm

10         instructing the witness not to answer

11         for the reasons that I identified

12         earlier.

13         Q.    And just so the record is clear,

14    are you refusing to identify which

15    witnesses were interviewed as part of the

16    special committee investigation that are

17    listed here in the paragraph in the

18    amended disclosure statement that we

19    looked at?

20              MS. VANLARE: Objection.

21              Again, as stated previously, the

22         witness is not refusing.  I am

23         instructing the witness not to answer,

24         however, for the reasons I identified

25         earlier in that it calls for

Page 153

```
 1                    P. Aronzon

 2        attorney-client communication and

 3        attorney work product and is therefore

 4        privileged information.

 5        Q.    And are you going to take your

 6   counsel's advice, Mr. Aronzon?

 7        A.    I always do.

 8        Q.    How were the individuals that

 9   were interviewed selected to be

10   interviewed?

11             MS. VANLARE: Again, objection,

12        for the same reason.  This goes into

13        the details of the investigation and

14        is all subject to attorney-client

15        privilege and attorney work product,

16        and I would instruct the witness not

17        to answer.

18        Q.    Are you following that

19   instruction again?

20        A.    I always do.

21        Q.    Was anyone that was interviewed

22   not a current or former employee of

23   Genesis?

24             MS. VANLARE: Objection.

25             Once again, the question calls
```

Page 154

1                          P. Aronzon

2          for privileged information.  I would

3          instruct the witness not to answer.

4          Q.    Are you going to answer the

5     question, Mr. Aronzon?

6          A.    No.

7          Q.    During the course of your

8     investigation, did the special committee

9     investigate communications that Genesis

10    had with Genesis customers?

11               MS. VANLARE: Objection once

12          again for the same reason.  Calls for

13          privileged communication.

14               And I would instruct the witness

15          not to answer.

16          Q.    Once again, Mr. Aronzon, are you

17    going to answer the question or not?

18          A.    No.  And when I'm instructed not

19    to answer, I'm not going to answer.

20          Q.    The special committee

21    investigated DCG; correct?

22               MS. VANLARE: Mr. Aronzon, you

23          may answer yes or no, but beyond that

24          I would caution -- well, I would

25          instruct you to answer yes or no to

Page 155

```
 1                    P. Aronzon
 2       that question.
 3              THE WITNESS:  Yes.
 4       Q.     And if we look at the top of
 5   page thirty-six, there's much more than a
 6   yes or no answer that was publicly filed
 7   on the docket about the special
 8   committee's investigation into DCG.  I'll
 9   read the line into the record.
10              It says, "as part of its
11   mandate, the special committee was charged
12   with evaluating and improving transactions
13   with affiliates, including DCG parties and
14   investigating the debtors' relationships
15   and transactions with DCG parties.  One of
16   the primary purposes of this investigation
17   has been to assess whether the debtors
18   have potentially viable claims against the
19   DCG parties and to assist the special
20   committee in the exercise of its fiduciary
21   duties".
22              Do you see that?
23       A.     Yes.
24       Q.     Has the special committee
25   determined whether the debtors have
```

```
                                        Page 156

 1                       P. Aronzon
 2     potentially viable claims against the DCG
 3     parties?
 4              MS. VANLARE: Objection.
 5              Counsel, the language is what it
 6         is.  You're misstating the language.
 7         Obviously the witness can refer to
 8         what is in the disclosure statement.
 9              THE WITNESS:  At the bottom of
10         the page there's a sentence that says,
11         "the special committee concluded that
12         there are colorable claims against
13         certain DCG parties for various causes
14         of action", and it goes on to say,
15         "including potential claims based on
16         alter ego, preference, and other legal
17         cognizable rights".
18     Q.    And has the special committee
19     ever calculated a value of these claims?
20              MS. VANLARE: Objection.
21              I'm going to instruct the
22         witness not to answer as it would
23         reveal attorney work product and
24         attorney-client communication.
25     Q.    And you're following that advice
```

Page 157

```
 1                    P. Aronzon
 2    again, Mr. Aronzon?
 3        A.    As I said earlier.
 4        Q.    I have to keep asking for the
 5    record.
 6        A.    I understand.
 7        Q.    Thank you for your cooperation.
 8              Did the special committee
 9    investigate potential preference claims
10    against DCG parties?
11              MS. VANLARE: You may answer yes
12         or no, Mr. Aronzon.
13              THE WITNESS:  Yes.
14        Q.    And did the special committee
15    also investigate preference claims against
16    Gemini and Gemini lenders?
17              MS. VANLARE: Objection.
18              To the extent your answer would
19         reveal any attorney-client
20         communication or attorney work
21         product, again the disclosure
22         statement is a publicly filed document
23         and has information relating to the
24         investigations.
25              THE WITNESS:  Can I ask a
```

1                          P. Aronzon

2          question?  Is there a paragraph that

3          talks about preference claims so I can

4          see what we said publicly?

5          Q.     Yes.  On page forty-five at the

6    bottom, page sixty of three hundred six at

7    the top, there's a paragraph on the

8    special committee's investigation and its

9    analysis of preference claims relating to

10   Gemini and/or the Gemini lenders.

11              Do you see that?

12         A.     It's paragraph A?

13         Q.     Yes.

14         A.     Little A?  Yes.

15         Q.     So were you involved with the

16   investigation into preference claims

17   against Gemini and the Gemini lenders?

18              MS. VANLARE: Objection.

19              You can answer yes or no.

20              THE WITNESS:  Involved, I'm not

21         sure what that means, but our

22         professionals did this work.

23         Q.     And did your professionals

24   report their findings on this work to the

25   special committee?

Page 159

```
 1                    P. Aronzon
 2            MS. VANLARE: Objection, but you
 3       can answer yes or no.
 4            THE WITNESS:  I believe they
 5       did.
 6       Q.    So you just testified that the
 7  special committee investigated potential
 8  preference claims against the DCG parties,
 9  Gemini, and the Gemini lenders.
10            Did the special committee
11  investigate potential preference claims
12  against parties other than those entities?
13            MS. VANLARE: Objection.
14            You may answer yes or no, but
15       anything revealing attorney-client
16       communication or work product I would
17       instruct you not to answer.
18            THE WITNESS:  I believe the
19       answer is yes.
20       Q.    Did the special committee
21  investigate preference claims against
22  former directors and officers of Gemini?
23            MS. VANLARE: Objection.  Calls
24       for -- again, calls for privileged
25       communication.
```

Page 160

1              P. Aronzon

2          You may answer yes or no to the

3      extent it would not reveal attorney

4      work product or privileged

5      communications.

6          THE WITNESS:  I actually don't

7      recall all of the individuals or

8      entities that we looked at besides

9      those identified in the disclosure

10     statement.  I'd have to go digging

11     around to see.

12     Q.    So sitting here today, you can't

13  recall if the special committee

14  investigated potential preference claims

15  against directors, former directors and

16  officers at Gemini?

17          MS. VANLARE: Objection.

18      Misstates his testimony.

19          Counsel, if you want to point

20      him to a section of the disclosure

21      statement, please do so.  The

22      disclosure statement or the plan.

23          MS. GRIFFITH: I'm asking from

24      his recollection as someone who was

25      critical to approving whether

Page 161

                    P. Aronzon

1                 P. Aronzon

2       directors and officers at Gemini are

3       getting releases, if he considered

4       preference claims against those

5       individuals as part of that analysis.

6           MS. VANLARE: Mr. Aronzon, you

7       may answer yes or no, but beyond that

8       I would instruct you not to answer as

9       it would call for privileged

10      communications and attorney work

11      product.

12          THE WITNESS:  Well, I'm not

13      quite sure how to answer this, because

14      the releases don't apply to former

15      directors and officers.  It only

16      relates to people who were working for

17      the company from and after the

18      petition date.  I don't recall the

19      group of people we looked at, but we

20      certainly looked at a number of

21      different entities and individuals.

22      Q.    And when you're saying you

23  looked at a number of different entities

24  and individuals, you're talking about

25  looking at them and whether there was

Page 162

                        P. Aronzon

1

2    preference claims against them; that's

3    what you meant by looking at them?

4              MS. VANLARE: Objection.

5              THE WITNESS:  It was all done

6         professionals, that's number one.

7              And number two, when I say

8         looking at them, we would have looked

9         at preference claims, and we may have

10        looked at other things, too, depending

11        on what we know or didn't know at the

12        time.

13   Q.    Do you know if any of the

14   individuals that are currently set to

15   receive releases have preference liability

16   to the estate?

17             MS. VANLARE: Objection.

18        Attorney-client privilege and work

19        product.

20             I would instruct the witness not

21        to answer.

22   Q.    Are you going to answer the

23   question?

24   A.    I was waiting for you to ask.

25             No, I'm not.

Page 163

1                      P. Aronzon

2       Q.     Do you know the answer to that

3    question without revealing the answer?

4    Just in general, do you know if any of the

5    individuals on the released Genesis

6    personnel list have preference liability

7    to the estate?

8             MS. VANLARE: Objection to the

9        extent answering that would reveal

10        attorney-client communication.

11             THE WITNESS:  I don't know how

12        to answer it without talking about

13        what we learned from our

14        professionals, so it's -- I don't

15        think I can answer it without that.

16       Q.     Whether you know or do not know

17    a fact is not privileged information.

18             MS. VANLARE: Counsel, you're

19        using legal terminology, for example

20        "preference liability", that is

21        inherently a legal question, and so

22        how the witness would answer that, it

23        would be of course informed by

24        communications with counsel and legal

25        analysis.

Page 164

                    P. Aronzon

1

2      Q.     You could answer.

3      A.     I can't.

4             MS. VANLARE: I think he can't.

5      I think he's answered the question.

6      Q.     Do you know if any of the

7   individuals set to get releases withdrew

8   any assets from Genesis within ninety days

9   prior to the petition date?

10            MS. VANLARE: Objection.

11       Objection to form.

12            If you know the answer.

13            THE WITNESS:  What I know I

14       learned through all of our

15       professionals' work, so it's hard for

16       they to answer that.

17      Q.     You can still answer yes or no

18   if you know that fact or not.

19            MS. VANLARE: He's already

20       answered the question.

21            THE WITNESS:  Yeah.

22      Q.     You did not answer yes or no.

23      A.     I don't know how to answer it

24   without talking about what I learned from

25   our professionals.  That's my problem

Page 165

1              P. Aronzon

2    here.  I don't want an inadvertent comment

3    to be made to argue for some kind of

4    waiver.

5         Q.    Whether individuals withdrew

6    assets from Genesis is not privileged

7    information.

8              MS. VANLARE: Objection.  It's

9         not clear what you mean by your

10        question, first of all.

11        Q.    Individuals that are set to get

12   releases, if they withdrew any assets of

13   any kind, crypto included, from Genesis

14   within ninety days of the petition date is

15   not a privileged fact.  That's just a

16   fact.

17             MS. VANLARE: Mr. Aronzon, again

18        if -- to the extent you can answer

19        without conversations with counsel,

20        you may answer.  But to the extent

21        this is -- that your knowledge comes

22        from conversations with counsel and is

23        informed by conversations with

24        counsel, I would instruct you not to

25        answer.

Page 166

                    P. Aronzon

 1

 2          THE WITNESS:  I believe it is

 3      informed by conversations with

 4      counsel.

 5      Q.    So separate from communications

 6  with counsel, I don't want you to reveal

 7  that, I just want to know yes or no if you

 8  know whether any of the individuals that

 9  are set to get releases withdrew any

10  assets from Genesis within the ninety-day

11  period.

12          MS. VANLARE: Ms. Griffith,

13      you've asked -- I didn't mean to

14      interrupt.

15          MS. GRIFFITH: I'm not asking the

16      substance, I'm asking the fact, does

17      he know that fact or does he not know

18      that fact.  That is not a privileged

19      question.  Whether or not he knows

20      that, that's a yes or no answer.

21          MS. VANLARE: Ms. Griffith, the

22      witness has answered at least three

23      times that he is unable to answer that

24      question without revealing

25      conversations that he's had with

Page 167

                              P. Aronzon

1    counsel.

2    Q.    So you're refusing to answer the

3    question whether, as a special committee

4    member, you know that in a way that would

5    not reveal privileged communications; is

6    that correct?

7        MS. VANLARE: Objection to that

8        comment.  He's not refusing to answer.

9        He has answered the question and you

10       can review the transcript as to his

11       answer.

12   Q.    My question's still pending.

13       Is that correct?

14       MS. VANLARE: Objection.  He's

15       answered the question.

16   Q.    Are you still going to refuse to

17   answer the question, Mr. Aronzon, so we

18   can wrap up this part?

19       MS. VANLARE: Objection to your

20       characterization.  He's not refusing.

21       He has answered the question.

22       Mr. Aronzon, if you want to

23       clarify that your answer stands, you

24       can do so, and hopefully we can move

```
                                              Page 168

 1                    P. Aronzon

 2        on.

 3               THE WITNESS:  I believe all of

 4        the information I have here came from

 5        counsel.

 6               MS. GRIFFITH: I'm going to

 7        introduce as a new exhibit, Exhibit 7.

 8               (Whereupon, a document entitled

 9        Exhibit F was marked Aronzon

10        Exhibit 7 for identification.)

11               THE WITNESS: Can I close the

12        disclosure statement?  Are we done

13        with it?

14               MS. GRIFFITH: Yes.  We might go

15        back to it at one point, but for now

16        we're done with it.

17               And this, for the record, is a

18        notice of filing for plan supplement

19        for the debtors' amended joint

20        Chapter 11 plan filed publicly on the

21        docket as number 1117.

22        Q.    Tell me when you're able to

23   access that, please.

24        A.    I have it.

25        Q.    And if you could flip to the end
```

Page 169

                              P. Aronzon

 1                              P. Aronzon

 2     of this document, page twenty-one of

 3     twenty-two, that's Exhibit S and it's

 4     titled Justification For Exculpated and

 5     Released Parties.

 6          A.     I have it.

 7          Q.     The first paragraph of this page

 8     has a defined term in it called the

 9     released Genesis personnel.

10               Do you see that?

11          A.     Yes.

12          Q.     Were current Genesis employees

13     included in the released Genesis personnel

14     list?

15               MS. VANLARE: Objection.

16               THE WITNESS:  Current as of

17          when?

18          Q.     You tell me.

19               MS. VANLARE: Objection.

20               THE WITNESS:  Well, I'm reading

21          the language.

22               "Subject to our reservation of

23          rights, the special committee has

24          provided its prior written consent for

25          the release of current or former

Page 170

```
 1                    P. Aronzon
 2       employees, officers, directors of the
 3       debtors solely in such person's
 4       capacity as such who served as an
 5       employee, officer, or director of the
 6       debtors pursuant" -- no, "of the
 7       debtors from and after the petition
 8       date, including any employees of GGT
 9       who served or functioned as employees
10       of the debtor pursuant to a shared
11       services arrangement with GGT".
12            So when you use the word
13       "current", if you're using it the way
14       it's included here, then the answer is
15       yes.
16       Q.    And are you, as a special
17   committee member, familiar with the
18   individuals that are on the -- with the
19   released --
20            MS. GRIFFITH: Strike that.
21       Q.    Are you familiar, as a special
22   committee member, with who is on the
23   released Genesis personnel list?
24            MS. VANLARE: Objection.
25            To the extent you know, you can
```

Page 171

1                    P. Aronzon

2        answer, but I would caution to the

3        extent it would reveal any

4        attorney-client communications.

5             THE WITNESS:  Am I familiar with

6        who's on the list?

7        Q.    Yes, have you reviewed the list?

8        A.    I believe I've seen it, yes, or

9    a list.  And the work is not done yet, so

10   the list could change.

11       Q.    The list as it stands now, does

12   it contain current Genesis employees on

13   it?

14            MS. VANLARE: Objection.

15            THE WITNESS:  Genesis meaning

16       the whole empire of Genesis?

17       Q.    Yes.

18            MS. VANLARE: Objection.

19            THE WITNESS:  I believe it does.

20            Sorry, Jane.

21       Q.    And are any individuals that are

22   currently on the released Genesis

23   personnel list former employees, officers,

24   or directors of Genesis?

25            MS. VANLARE: Objection.

Page 172

```
 1                    P. Aronzon
 2              You may answer if you know.
 3              THE WITNESS:  If people were
 4         there on the petition date who fit in
 5         those categories and they left
 6         subsequently, then I believe the
 7         answer is yes.
 8         Q.    How many of the individuals that
 9    are currently on the released Genesis
10    personnel list have been interviewed?
11              MS. VANLARE: Objection.
12              This goes into the investigation
13         which again is subject to attorney
14         work product and attorney-client
15         privilege and I would instruct the
16         witness not to answer.
17         Q.    And once again, I'm not asking
18    for you to reveal your discussions with
19    counsel.  I'm asking if you know, as a
20    special committee member, the number of
21    employees on the list that were
22    interviewed or not as a fact.
23              MS. VANLARE: Again, that goes
24         into the way in which the
25         investigation was conducted which is
```

Page 173

                        P. Aronzon

1

2      subject to privilege, and I would

3      instruct the witness not to answer the

4      question.

5      Q.    Are you going to answer the

6   question?

7      A.    No.

8      Q.    Do you know if the special

9   committee is planning on interviewing all

10  of the individuals on the list prior to

11  the list being finalized?

12          MS. VANLARE: Same objection.

13      This again calls for privileged

14      communication and attorney work

15      product, and I would instruct the

16      witness not to answer.

17      Q.    Are you going to answer the

18  question?

19      A.    I follow the instructions of my

20  counsel.

21      Q.    In your opinion, as a special

22  committee member, separate from the advice

23  of your counsel, do you think it's

24  necessary to interview all of the people

25  that are set to get releases prior to them

Page 174

1                    P. Aronzon

2   being released?

3            MS. VANLARE: Objection.  Calls

4        for privileged communication and

5        attorney work product, and I would

6        instruct the witness not to answer.

7        Q.    Are you going to answer that

8   question?

9        A.    No.

10       Q.     Have you personally interviewed

11  anyone that is set to be released on the

12  released Genesis personnel list?

13           MS. VANLARE: Objection.  Again

14       calls for the details of the

15       investigation which is subject to

16       attorney-client privilege and attorney

17       work product, and I would instruct the

18       witness not to answer.

19       Q.     Are you claiming that whether

20  you, as a special committee --

21           MS. GRIFFITH: Strike that.

22       Q.     Earlier in this deposition, you

23  testified that you were not working on the

24  special committee as an attorney; correct?

25       A.     I'm not working as an attorney

Page 175

1                         P. Aronzon

2    for anybody anywhere since 2019.

3        Q.    So if you were to interview a

4    witness personally, that would not be an

5    interview conducted in an attorney

6    fashion; correct?

7                MS. VANLARE: Objection.

8                Anything relating to the

9        investigation is subject to privilege

10       as it was conducted by counsel and

11       under the direction of counsel and as

12       such, I would instruct the witness not

13       to answer.

14       Q.    I'm not asking whether counsel

15   conducted these interviews.  I'm asking

16   whether you, Mr. Aronzon, you, as a

17   special committee member, conducted any

18   interviews of any person that is set to be

19   released.

20                MS. VANLARE: And again, my

21       comment was broader than what you just

22       stated, which is to say that the way

23       in which the investigation was

24       conducted was directed by counsel, and

25       so any details relating to the

Page 176

```
 1                    P. Aronzon
 2        investigation, unless they're made
 3        public through the disclosure
 4        statement or the plan supplement, are
 5        subject to privilege, and I would
 6        instruct the witness not to answer
 7        those questions.
 8        Q.    You previously testified that
 9   you did not conduct any interviews.  So
10   I'm just asking if you personally
11   interviewed anyone that's going to be
12   released.
13             MS. VANLARE: Objection.
14             MS. GRIFFITH: It's a yes or no
15        answer.
16             MS. VANLARE: You have the
17        testimony that you have.  You can
18        refer to the transcript.
19        Q.    Are you going to answer the
20   question, Mr. Aronzon?
21        A.    Was I instructed not to?
22             MS. VANLARE: I object to the
23        question.  You can refer to prior
24        testimony.
25             If you want to repeat the
```

Page 177

```
 1                        P. Aronzon
 2          question and prior testimony to
 3          refresh the witness' recollection, I
 4          would have no objection to that.
 5          Q.    Have you personally interviewed
 6    any person or entity, so a representative
 7    of an entity, that is currently set to
 8    receive a release?
 9                MS. VANLARE: What was his prior
10          testimony?  Are you reading his prior
11          testimony, counsel?
12                MS. GRIFFITH: No, I'm repeating
13          the question that I had which you
14          objected to.
15                MS. VANLARE: Correct.
16                I am asking you if you are
17          asking -- if you are representing that
18          he testified to something, please --
19                MS. GRIFFITH: This is a
20          different question.
21                MS. VANLARE: Okay.
22          Q.    Have you personally interviewed,
23    Mr. Aronzon, any person that is --
24          A.    It's Aronzon, Aronzon.
25          Q.    My apologies.
```

Page 178

                              P. Aronzon

1

2       A.      Ignore the Z.  I have no idea

3    where it came from.  It's Aronzon.

4       Q.      My apologies, Aronzon.

5              Have you personally interviewed

6    anyone or a representative of any entity

7    that is set to get a release?

8              MS. VANLARE: Objection.  Again

9         calls for information relating to the

10        way in which the investigation was

11        conducted, and as such, I would

12        instruct the witness not to answer.

13       Q.      Sorry, you're refusing to answer

14    that question?

15       A.      I'm instructed not to.

16       Q.      Looking at the first paragraph

17    that we looked at previously which you

18    read out loud in part on the record, it

19    says that "the special committee has,

20    subject to the reservation of rights set

21    forth herein, provided its prior written

22    consent for the release of current or

23    former employees, officers, and directors

24    of the debtors, solely in such person's

25    capacity as such who served as an

Page 179

1                    P. Aronzon
2     employee, officer, or director of the
3     debtors from or after the petition date".
4          Do you see that?
5     A.    Yes.
6     Q.    What did you do as a special
7     committee member to feel confident that
8     releases were warranted prior to granting
9     written consent?
10          MS. VANLARE: Objection to the
11      extent it would reveal any
12      attorney-client communications.
13          But to the extent that -- you
14      can answer the question without
15      revealing any attorney-client
16      communication, you may do so.
17          THE WITNESS:  Without revealing
18      anything I was told, he relied on our
19      professionals, including our counsel.
20     Q.    Did the special committee make
21     any independent decisions separate from
22     counsel?
23          MS. VANLARE: Objection.  Vague.
24          THE WITNESS:  I can't answer
25      that one without revealing

Page 180

```
 1                    P. Aronzon
 2        conversation with counsel.
 3        Q.    So did the special committee
 4   independently, separate from
 5   communications with counsel, consider
 6   whether releases of current or former
 7   employees should be granted?  Did it make
 8   an independent decision separate from
 9   counsel?
10             MS. VANLARE: Objection.
11             To the extent that the question
12        calls for any attorney-client
13        privileged communications or attorney
14        work product, I would instruct you not
15        to answer.
16        Q.    Are you going to answer the
17   question?
18        A.    I'm not sure how to answer it.
19        Q.    The special committee provided
20   written consent for the release of certain
21   former and current Genesis personnel;
22   correct?
23        A.    That is exactly what the
24   disclosure statement says.
25        Q.    And do you know that in your
```

```
 1                    P. Aronzon
 2   personal capacity separate and aside from
 3   just reading this piece of paper?
 4        A.    Yes.
 5        Q.    And let's talk about the process
 6   for that.
 7              What is involved with you giving
 8   written consent?
 9              MS. VANLARE: Objection.
10              THE WITNESS:  I don't know how
11        to answer this without talking about
12        all the things we discussed with
13        counsel.
14              MS. VANLARE: I'm sorry, are you
15        asking the mechanics as in e-mail
16        or --
17        Q.    To decide whether to release
18   someone or not, you considered a variety
19   of factors; correct?
20              MS. VANLARE: Objection.
21              To the extent you can answer
22        without attorney-client privilege, a
23        yes or no question.
24              THE WITNESS:  We considered a
25        variety of facts, correct.
```

Page 182

                    P. Aronzon

1

2      Q.     And was your analysis of those

3   factors completely in alignment with

4   everything your counsel told you or did

5   you ever disagree with anything counsel

6   said?

7              MS. VANLARE: Objection.

8              I'm going to instruct the

9        witness not to answer as it calls for

10       attorney-client communication.

11     Q.     In your opinion, did you just

12   rubber stamp what your counsel told you

13   about whether employees should be on the

14   released list, or did you, as a special

15   committee member, make your own

16   independent assessment?

17             MS. VANLARE: Objection to the

18       form.

19             As to the substance of the

20       question again, I would caution the

21       witness to the extent your answer

22       would reveal any attorney-client

23       communication or work product, I would

24       instruct you not to answer.  To the

25       extent there's any part of the answer

Page 183

1                      P. Aronzon

2         that you can speak to about the

3         process that would not reveal

4         attorney-client communication, you may

5         do so.

6              THE WITNESS:  There was

7         extensive discussion between us and

8         our counsel about all of this.

9         Q.    Was there any separate analysis

10   done without counsel?

11             MS. VANLARE: Objection.

12             I believe the witness has

13        already testified that the information

14        and the deliberations were with

15        counsel or on the basis of attorney

16        work product.

17             As such, I would instruct the

18        witness not to answer.

19        Q.    Are you not going to answer that

20   question?

21        A.    I'm not.

22        Q.    Are releases being sought for

23   those on the released Genesis personnel

24   list for both pre and post-petition

25   conduct of individuals on the list?

Page 184

```
 1                    P. Aronzon
 2              MS. VANLARE: Objection.
 3              THE WITNESS:  I'd have to look
 4      at the actual release language.  It's
 5      pretty dense.  But I believe it is for
 6      pre and post conduct.
 7      Q.    And how is the prepetition
 8  conduct of the individuals on the Genesis
 9  released personnel list investigated prior
10  to these individuals being put on the
11  list?
12              MS. VANLARE: Again, objection.
13      This directly calls for the results of
14      an investigation conducted by counsel
15      and would reveal attorney-client
16      communication and as such, I would
17      instruct the witness not to answer.
18      Q.    Are you going to answer the
19  question?
20      A.    No.
21      Q.    Do you know if any individual on
22  the Genesis released personnel list ever
23  was employed by or served as a director of
24  any digital currency group entity other
25  than the debtors?
```

Page 185

1                    P. Aronzon

2              MS. VANLARE: Objection.

3          To the extent this would reveal

4      attorney-client privileged

5      information, to the extent you know as

6      a fact matter, you may answer.

7              THE WITNESS:  I believe in the

8      very first paragraph at the end

9      there's a sentence that says, "for the

10     avoidance of doubt, none of the

11     released Genesis personnel are or also

12     DCG parties".  I've have to go look at

13     the definition of DCG parties, but I

14     believe the answer -- if you're asking

15     me were any of those people who were

16     employed at Genesis also employed at

17     DCG and are they getting a release, I

18     think the answer is no, they're not.

19     Q.     Do you know if any of the

20 individuals currently on the Genesis

21 released personnel list ever were involved

22 in any way with debtors lending to any DCG

23 entity?

24             MS. VANLARE: Objection.

25             I would caution to the extent

Page 186

```
 1                    P. Aronzon
 2         this would reveal any attorney-client
 3         privilege or work product.
 4              To the extent you know as a fact
 5         matter, you may answer.
 6              THE WITNESS:  Ask it again.
 7         Q.    Do you know if any of the
 8    individuals currently on the released
 9    Genesis personnel list ever were involved
10    with debtors lending to any DCG-owned
11    entity?
12              MS. VANLARE: Objection.
13              To the extent the witness would
14         have this information, to the extent
15         he does that results from
16         attorney-client communications or
17         attorney work product, I would
18         instruct the witness not to answer.
19         Q.    It's your knowledge as a fact.
20    So it's a yes or no question whether,
21    sitting here today, you know that.
22              MS. VANLARE: To the extent that
23         the information that the witness knows
24         came from an investigation subject to
25         privilege and -- to the extent it came
```

Page 187

```
 1                    P. Aronzon
 2        from attorney-client communications,
 3        it is privileged.  The witness
 4        obviously doesn't have fact -- well, I
 5        don't believe the witness is a fact
 6        witness as to the period of time that
 7        you're asking about because he was not
 8        appointed -- he was not an employee
 9        and he was only appointed to the
10        special committee, as he testified to
11        previously, in November of 2022.
12             MS. GRIFFITH: The special
13        committee is charged with the ultimate
14        authority of granting releases and the
15        witness testified that prepetition
16        conduct was considered in whether to
17        grant these releases.  So I'm asking
18        about prepetition conduct and whether
19        he is aware, if he has the knowledge,
20        as a special committee member with the
21        authority to grant these releases, if
22        any of the individuals that are
23        currently on the released Genesis
24        personnel list were ever involved with
25        debtors lending to any DCG-end entity.
```

Page 188

1                     P. Aronzon

2           MS. VANLARE: Again, objection.

3                To the extent the information

4       came from counsel and is -- and came

5       from an investigation conducted by

6       counsel, it is privileged, and I would

7       instruct the witness not to answer.

8       Q.    So are you saying the fact --

9    I'm not asking the substance, I'm not

10   asking who was involved or what was

11   investigated, I'm asking the fact about

12   whether debtors lending to any DCG-owned

13   entities was investigated.

14                That's privileged?  That's what

15   you're claiming?

16           MS. VANLARE: The subject of the

17       investigation that was conducted and

18       the topics of that investigation are

19       attorney work product and are subject

20       to privilege.

21                I would instruct the witness not

22       to answer.

23       Q.    If, in your opinion as a special

24   committee member, you were to find out

25   that any individual on the released

Page 189

                    P. Aronzon

1

2    Genesis personnel list was ever involved

3    with debtors lending to any DCG-owned

4    entity, would that impact your decision on

5    whether to grant that individual or entity

6    a release?

7              MS. VANLARE: Objection.

8              Again, calls for speculation.

9              But secondly again, you're

10        asking for what the witness knows and

11        may have discussed or assessed in the

12        context of an investigation that is

13        conducted by counsel at the direction

14        of counsel and is therefore

15        privileged.

16             As such, I would instruct the

17        witness not to answer.

18   Q.    Are you refusing to answer the

19   question?

20   A.    I'm not instructed not to.

21   Q.    The subject of releases and the

22   justification for released parties is

23   publicly filed on the docket and it's a

24   matter that will be heard in court.  It's

25   a matter of whether the plan will be

Page 190

```
 1                    P. Aronzon

 2    confirmed.  So we're allowed to ask facts

 3    about the releases and what was done to

 4    determine if the releases are appropriate

 5    or not.

 6             MS. VANLARE: Ms. Griffith, the

 7          information -- you're right in that

 8          there was information about the

 9          releases and the justification for

10          exculpating released parties was filed

11          as part of the plan supplement.

12          There's also disclosure in the

13          disclosure statement.

14             However, a lot of the

15          information relating to this topic is

16          privileged therefore, your questions

17          call for privileged information and I

18          therefore, depending on the question,

19          have instructed the witness not to

20          answer in accordance with the fact

21          that again it is subject to privilege.

22             If you have an issue with that,

23          we can discuss it.

24    Q.      I'm move on to my next question.

25             Do you know if any of the
```

Page 191

```
 1                    P. Aronzon
 2   individuals currently on the released
 3   Genesis personnel list were ever involved
 4   with Genesis' lending to Grayscale Bitcoin
 5   Trust?
 6             MS. VANLARE: Objection.
 7             Once again, you've asked this
 8        question multiple times.
 9             MS. GRIFFITH: I've never asked
10        about Grayscale Bitcoin Trust.
11             MS. VANLARE: You're right, I
12        stand corrected, it's a different
13        question.  However, I'm going to have
14        a similar instruction to the witness,
15        which is to say that, to the extent
16        that anything you know about this came
17        from your conversations with counsel,
18        I will instruct you not to answer.
19        Q.    And are you going to answer the
20   question?
21        A.    I follow my instructions.
22        Q.    Sitting here today as a special
23   committee member, would it impact your
24   decision on whether to authorize releases
25   if you were to find out that any of the
```

Page 192

```
 1                    P. Aronzon
 2   individuals on the released Genesis
 3   personnel list ever were involved with
 4   Genesis' lending to Grayscale Bitcoin
 5   Trust?
 6            MS. VANLARE: I'm going to object
 7        and once again instruct the witness
 8        not to answer as it calls for
 9        privileged information and attorney
10        work product done as part of the
11        investigation.
12            And with that, we don't have to
13        stop now, but I do note the time,
14        we've been going on for some time, and
15        I don't know if Mr. Aronzon would like
16        a lunch break.  I raise that.  We
17        don't have to do it right now.  If the
18        witness would like to, I think it's
19        going to be time for a break soon.
20            MS. GRIFFITH: We can take a
21        break now.  That's fine.
22            THE WITNESS:  Let's not take too
23        long.
24            MS. VANLARE: If you'd rather
25        not, Mr. Aronzon, it's up to you.
```

Page 193

```
 1                    P. Aronzon
 2           THE VIDEOGRAPHER: I do have to
 3      reset the video though, counsel.  It
 4      only takes a few seconds.  Whatever
 5      you want to do.
 6           Should we go off for a few
 7      minutes?
 8           THE WITNESS:  Sure.  Let's --
 9      five minutes, ten minutes, what do you
10      want?
11           MS. GRIFFITH: Let's take a
12      ten-minute break.
13           THE WITNESS:  You've got it.
14           THE VIDEOGRAPHER: The time is
15      12:44.
16           We are off the record.
17           (Whereupon a break was taken)
18           THE VIDEOGRAPHER: The time is
19      1:05.
20           We are on the record.
21      Q.    So to jump back in, we were
22   talking about the released Genesis
23   personnel list and what the special
24   committee considered prior to providing
25   written consent for the release of
```

```
                                    Page 194

 1                      P. Aronzon
 2     individuals on this list.
 3              So my next question is: Do you
 4     know as a fact if any of the Genesis
 5     released personnel ever held any Grayscale
 6     ETF?
 7              MS. VANLARE: Objection.
 8              As previously noted, the answer
 9          would reflect communications with
10          counsel and attorney work product as a
11          result of the investigation or created
12          as part of the investigation and as
13          such, I would instruct the witness not
14          to answer.
15          Q.    Are you going to answer the
16     question?
17          A.    No.
18          Q.    Do you know, as a fact, if any
19     of the individuals on the released Genesis
20     personnel list were ever involved with
21     debtors lending to Three Arrows Capital?
22              MS. VANLARE: Objection.
23              I believe the answer calls for
24          attorney-client communications and
25          attorney work product and, as such, I
```

Page 195

```
 1                    P. Aronzon
 2      would instruct the witness not to
 3      answer.
 4      Q.    Are you going to answer the
 5   question?
 6      A.    No.
 7      Q.    Was whether individuals on the
 8   Genesis released personnel list was ever
 9   involved with debtors lending to Three
10   Arrows Capital a fact that was considered
11   prior to the special committee granting
12   consent for the releases?
13            MS. VANLARE: Objection.  Calls
14      for attorney-client communications,
15      attorney work product.
16            I'm going to instruct the
17      witness not to answer.
18      Q.    You can answer.
19            MS. VANLARE: I'm going to
20      instruct the witness not to answer for
21      the reasons I just noted.
22      Q.    If your answer is that you're
23   not going to your answer, that could be
24   your answer.
25            MS. VANLARE: I am instructing
```

Page 196

```
 1                    P. Aronzon
 2        the witness not to answer.
 3        Q.    Are you following your counsel's
 4   instructions?
 5        A.    Yes.
 6        Q.    Was a fact considered by the
 7   special committee whether any of the
 8   individuals on the released Genesis
 9   personnel list were ever involved with
10   debtors lending to FTX or Alameda
11   Research?
12             MS. VANLARE: Same objection.
13             The answer to this question
14        would reveal attorney-client
15        communication and attorney work
16        product and as such, I would instruct
17        the witness not to answer.
18        Q.    And are you following your
19   counsel's instruction?
20        A.    Yes.
21        Q.    Back to that first paragraph
22   that we looked at where it states that it
23   was the special committee which provided
24   prior written consent for the releases of
25   current and former employees.
```

Page 197

1              P. Aronzon

2         I just wanted to ask your

3    opinion, does that written consent mean

4    that the decision was the special

5    committee's decision or Cleary's decision?

6              MS. VANLARE: Objection.

7              First, are you referring to

8         paragraph -- the first paragraph of

9         Exhibit 7?

10             MS. GRIFFITH: Yes, Exhibit --

11        yes, Exhibit 7 but first paragraph of

12        Exhibit F of Exhibit 7.

13             MS. VANLARE: Then objection to

14        form.

15             THE WITNESS:  This I can answer;

16        correct?

17             MS. VANLARE: You may answer.

18             THE WITNESS:  It's the special

19        committee's decision.

20        Q.   Did you have to -- I'm sorry,

21    did I cut you off?

22        A.   No.

23        Q.   My video might have a slight

24    lag.

25             In making this decision, did you

Page 198

```
 1                    P. Aronzon
 2   have to accept Cleary's recommendations or
 3   could the special committee make its own
 4   separate decision about whether releases
 5   were appropriate or not?
 6             MS. VANLARE: Objection to form.
 7             To the extent this would reveal
 8        attorney-client communications, I
 9        would instruct the witness not to
10        answer.
11             THE WITNESS:  So the question is
12        did we have to accept advice from our
13        professionals?
14   Q.     Yes.
15   A.     No, we don't have to accept it.
16   Q.     Did you accept all of the advice
17   from your professionals in making your
18   independent decision about whether
19   releases were appropriate?
20             MS. VANLARE: Objection.  Calls
21        for attorney-client communication.
22             I'm going to instruct the
23        witness not to answer.
24   Q.     Are you going to follow the
25   advice of your counsel?
```

Page 199

P. Aronzon

1
2      A.    I am.

3      Q.    Do you know if there's currently

4  any litigation between the debtors and any

5  of the individuals or entities on the

6  released Genesis personnel list?

7           MS. VANLARE: Objection.

8           The answer calls for

9      attorney-client communications and

10     attorney work product.

11          I'm going to instruct the

12     witness not to answer.

13     Q.    Are you going to follow your

14  counsel's advice?

15     A.    Yes.

16     Q.    Are you aware of any publicly

17  filed litigation or claims against any

18  individual on the Genesis released

19  personnel list?

20          MS. VANLARE: Objection.

21          I believe the answer calls for

22     attorney-client communications and

23     attorney work product.

24          I instruct the witness not to

25     answer.

Page 200

```
 1                    P. Aronzon
 2       Q.     Have you separately considered
 3   as a factor in whether to grant releases
 4   whether there are any currently litigation
 5   between the debtors and any of the
 6   individuals on the Genesis released
 7   personnel list?
 8             MS. VANLARE: Objection.
 9             The question calls for
10        attorney-client communications and
11        work product, and as such, I'm going
12        to instruct the witness not to answer.
13       Q.     Are you going to follow your
14   counsel's advice?
15       A.     Yes.
16       Q.     Are you aware if any of the
17   releases being granted to the individuals
18   and individuals on the released Genesis
19   personnel list are being granted as part
20   of any settlement of any existing
21   litigation or claims against released
22   Genesis personnel?
23             MS. VANLARE: Objection.
24             Objection to form and calls for
25        attorney-client communications and
```

```
                                        Page 201
 1                     P. Aronzon
 2        work product and, as such, I would
 3        instruct the witness not to answer.
 4        Q.    And are you following your
 5   counsel's advice?
 6        A.    Yes.
 7        Q.    What is the total potential
 8   litigation value of claims the estate may
 9   have against all of the individuals listed
10   on the released Genesis personnel list?
11             MS. VANLARE: Objection.
12             I'm going to instruct the
13        witness not to answer beyond what is
14        publicly available.  The question
15        calls for information that is
16        privileged and, as such, I will
17        instruct the witness not to answer.
18             MS. GRIFFITH: I'm going for a
19        number.  A number is not privileged
20        information.
21             MS. VANLARE: I disagree.  I
22        think you're asking for privileged
23        information, and I will instruct the
24        witness not to answer.
25        Q.    Yes or no, was the total
```

Page 202

```
 1                    P. Aronzon
 2   potential litigation value of claims
 3   something that was calculated or
 4   considered by the special committee?
 5            MS. VANLARE: Objection.  Calls
 6        for attorney-client communications and
 7        attorney work product.
 8            I'm going to instruct the
 9        witness not to answer.
10   Q.     And are you going to follow your
11   counsel's instruction?
12   A.     Yes.
13   Q.     Would it be a relevant factor to
14   your decision in granting releases the
15   potential litigation value of claims the
16   estate may have against all of those
17   listed on the released Genesis personnel
18   list?
19            MS. VANLARE: Objection to form.
20            You may answer yes or no.
21            THE WITNESS:  It's a factor.
22   Q.     And yes or no, was it something
23   you considered?
24            MS. VANLARE: That's not the
25        question you asked.
```

*Page 203*

```
                                   P. Aronzon

 1                      MS. GRIFFITH: That's a new

 2         question.

 3                      MS. VANLARE: If that's a new

 4         question, objection, that question

 5         calls for privileged communication

 6         and, as such, I would instruct the

 7         witness not to answer.

 8         Q.    And are you following your

 9    counsel's advice?

10    A.    Yes.

11    Q.    Then moving to section two of

12    Exhibit 7, the Exhibit F part of

13    Exhibit 7, and if we look down to section

14    two, it says justifications for the

15    release, and it lists several

16    justifications for the releases.

17              Are you familiar with those

18    justifications?

19    A.    Yes.

20    Q.    Were these justifications

21    something you considered when granting

22    consent to release the individuals on the

23    Genesis released personnel list?

24                      MS. VANLARE: I would caution the
```


Page 204

```
 1                    P. Aronzon
 2        witness not to reveal any
 3        attorney-client communications, but I
 4        believe you can answer the question.
 5             THE WITNESS:  Yes.
 6        Q.     The first bullet point reads,
 7    "the releases of the released Genesis
 8    personnel apply only to officers,
 9    directors, and employees who have provided
10    services to the estates on or after the
11    petition date.  The special committee
12    believes that such person contributed,
13    either directly or indirectly, to the
14    debtors' restructuring efforts in the
15    Chapter 11 cases".
16             Do you see that?
17        A.     Yes.
18        Q.     What is meant by "such persons
19    contributed" in this paragraph?
20             MS. VANLARE: Objection.
21             I believe the question calls for
22        attorney-client communications and, as
23        such, I would instruct the witness not
24        to answer.
25             MS. GRIFFITH: I'm asking what is
```

Page 205

1              P. Aronzon

2      meant on a publicly filed document

3      that's a justification for a release

4      being granted.  What contributions did

5      people that are getting releases offer

6      the estate?  That's a fact.

7              MS. VANLARE: Objection.  The

8      question calls for attorney-client

9      communications and attorney work

10     product as a result of an

11     investigation that was conducted and

12     discussions that took place with

13     counsel and, as such, I would instruct

14     the witness not to answer the

15     question.

16     Q.    Separate and aside from any

17   communications with counsel, are you aware

18   of any contributions that any employee

19   currently set to get a release has offered

20   the estate?

21             MS. VANLARE: Objection.

22             I would -- to the extent your

23     answer -- what you know and to the

24     extent your answer reflects

25     discussions with counsel, I would

Page 206

```
 1                    P. Aronzon
 2        instruct you not to answer.
 3        Q.     You can answer.
 4        A.     Everything I know about this
 5   comes out of our discussions with our
 6   professionals, especially our counsel.  So
 7   I don't know how to answer other than
 8   that.
 9        Q.     So sitting here as a special
10   committee member, you don't know any
11   contributions that any person getting a
12   release contributed to the estate that you
13   would not consider a privileged
14   contribution that you could not reveal?
15             MS. VANLARE: Objection to form
16        and asked and answered.  I believe the
17        witness answered the question you
18        previously posed.
19        Q.     Would you --
20        A.     Am I supposed to say something
21   or no?
22        Q.     Do you have anything to add?
23        A.     No.  What I learned about the
24   contributions I learned in our discussions
25   with counsel.
```

Page 207

                                    P. Aronzon

1

2       Q.      So you have no nonprivileged

3    information about contributions that those

4    set to get releases under the plan

5    contributed to the estate?

6            MS. VANLARE: Objection.  Asked

7         and answered.

8            THE WITNESS:  Correct.

9       Q.      Do you know if all of the

10   individuals on the released Genesis

11   personnel list have made contributions

12   either directly or indirectly to the

13   estate?

14           MS. VANLARE: Objection.  It goes

15        into attorney-client communications

16        and attorney work product and, as

17        such, I would instruct the witness not

18        to answer.

19      Q.      I'm asking about your personal

20   knowledge as a special committee member

21   who you testified has the ultimate

22   decision whether or not to grant releases

23   separate and apart from your counsel's

24   advice.

25           MS. VANLARE: Objection.  Asked

Page 208

```
 1                    P. Aronzon
 2      and answered.  Misstates his
 3      testimony.  And again, I think the
 4      witness has already testified several
 5      times that what he learned about this
 6      topic came from conversations with
 7      counsel.
 8            Same objection.  Same
 9      instruction.
10      Q.    And so are you not going to
11   answer the question?
12      A.    I'm following my counsel's
13   advice.
14      Q.    Have you ever calculated or
15   considered the total dollar value of
16   contributions that those are on the
17   released Genesis personnel list offered to
18   the estate?
19            MS. VANLARE: Objection.
20            You can answer yes or no if you
21      think you can without revealing
22      attorney-client information -- excuse
23      me, attorney-client communication or
24      attorney work product.
25            THE WITNESS:  I don't know how
```

Page 209

1                    P. Aronzon

2          to answer it without referring to the

3          discussions we've had with counsel.

4          And you asked me this before and I

5          said the same thing.

6          Q.    Did you consider whether you

7     could hire any new individuals or

8     consultants that would make the same

9     contributions that those that fall on this

10    released Genesis personnel list were

11    contributing to the estate instead?

12              MS. VANLARE: Objection.  The

13          question is vague.

14              THE WITNESS:  Are you asking

15          could we have hired other people to do

16          the job that our people did?

17          Q.    Yes.

18          A.    Why would I do that?

19          Q.    A potential reason could be so

20    you do not have to release them and

21    therefore forfeit any potential causes or

22    claims of action against those individuals

23    if it was to be revealed at any point in

24    time that they were involved in

25    misconduct.

```
                                        Page 210

 1                    P. Aronzon

 2              MS. VANLARE:  Is there a

 3       question, Ms. Griffith?

 4       Q.    Yes.

 5              Did you ever consider whether

 6   new employees or consultants could be

 7   hired to do the job that the current

 8   employees that are set to get releases are

 9   doing?

10              MS. VANLARE:  Objection.

11       Objection to form.

12              To the extent you can answer

13       this question without revealing

14       attorney-client communications or

15       attorney work product, you may answer.

16              THE WITNESS:  I guess I have a

17       couple of comments.

18              One, I don't make decisions

19       about hiring people for Genesis.  We

20       have management that does that.

21              Two, the answer is no, I did not

22       consider it.

23       Q.    And who is management at Genesis

24   that makes those decisions?

25       A.    We have a number of officers and
```

Page 211

```
 1                    P. Aronzon
 2    directors who make hiring and firing
 3    decisions.
 4        Q.     And are any of those individuals
 5    on the released Genesis personnel list?
 6                MS. VANLARE: Objection.
 7                I'm going to instruct the
 8         witness not to answer.  It reflects
 9         attorney-client communication and
10         attorney work product.
11        Q.     Are you following your counsel's
12    directions?
13        A.     Yes.
14        Q.     The next bullet point states,
15    "the released Genesis personnel have
16    knowledge and insight into the debtors'
17    business and transactions that may be
18    critical to the resolution of litigation
19    against the DCG parties and the Gemini
20    parties as well as various regulatory and
21    enforcement actions relating to the
22    debtors' prepetition businesses".
23                Do you see that?
24        A.     Yes.
25        Q.     Do you know -- and this is a
```

Page 212

```
 1                    P. Aronzon
 2   number, not who, a number -- how many of
 3   the individuals on the released Genesis
 4   personnel list have this knowledge and
 5   insight?
 6            MS. VANLARE: Objection.
 7            I believe the answer calls for
 8        privileged information with counsel
 9        and attorney work product, and as
10        such, I'm going to instruct the
11        witness not to answer.
12       Q.    Are you following the direction
13   of your counsel?
14       A.    Yes.
15       Q.    Who would have this knowledge
16   about which Genesis employees have, quote,
17   knowledge and insight into the debtors'
18   businesses and transactions?
19            MS. VANLARE: Objection.  Calls
20        for privileged communication and
21        attorney work product.
22            As such, I would instruct the
23        witness not to answer.
24       Q.    Are you following the advice of
25   your counsel?
```

Page 213

1              P. Aronzon

2        A.     Yes.

3        Q.     Do you know if any of the

4    individuals on the released Genesis

5    personnel list have overlapping, quote,

6    knowledge and insight into the debtors'

7    business and transactions?

8              MS. VANLARE: Objection to form,

9         but also I would instruct the witness

10        not to answer to the extent it reveals

11        any attorney-client communication or

12        attorney work product.

13       Q.     Are you following your counsel's

14   direction?

15       A.     Yes.

16       Q.     Have you or the special

17   committee calculated or considered dollar

18   value that could be assigned to this

19   contribution to the estate being the

20   knowledge and insight into the debtors'

21   business and transactions that those on

22   the released Genesis personnel was tasked?

23             MS. VANLARE: Objection.

24             To the extent this question

25        calls for privileged information,

Page 214

                    P. Aronzon

1                  P. Aronzon

2       attorney-client communications, and/or

3       attorney work product, I would

4       instruct the witness not to answer.

5       Q.    And are you following your

6    counsel's direction?

7       A.    Yes.

8       Q.    Have any of the individuals on

9    the released Genesis personnel list

10   refused to cooperate with resolution of

11   litigation against the DCG parties and the

12   Gemini parties as well as various

13   regulatory and enforcement actions

14   relating to the debtors' prepetition

15   business unless they received releases?

16             MS. VANLARE: Objection.

17             I'm going to -- to the extent it

18       reveals attorney-client privilege,

19       attorney work product, I'm going to

20       instruct the witness not to answer.

21       Q.    Is this a factor that you

22   considered in granting consent to these

23   individuals?

24             MS. VANLARE: Same objection.

25       Calls for privileged information and

Page 215

1                    P. Aronzon

2        attorney work product.

3        Q.     Are you going to follow your

4    counsel's advice?

5        A.     Yes.

6        Q.     There are more than a hundred

7    individuals currently on the released

8    Genesis personnel list; correct?

9             MS. VANLARE: Objection.

10            I don't know if you know as a

11       fact matter.  You may answer.  But

12       otherwise, to the extent it calls for

13       attorney-client communication or

14       attorney work product, I would

15       instruct you not to answer.

16            THE WITNESS:  I don't know the

17       exact number.

18       Q.     Do you know if it's more than a

19   hundred individuals on the Genesis

20   released personnel list?

21            MS. VANLARE: Same objection.

22            And to the extent what you know

23       comes from conversations with counsel,

24       I would instruct you not to answer

25       that question.

Page 216

1      P. Aronzon

2           THE WITNESS:  I don't know.

3      Q.    Do you know if it's more than

4   five hundred people on the released

5   Genesis personnel list?

6           MS. VANLARE: Same objection.

7           To the extent any information

8       you have on this comes from counsel,

9       I'm going to instruct you not to

10      answer.

11          THE WITNESS:  I don't know the

12      number.

13     Q.    Do you know -- referring back to

14  that second bullet point on the Exhibit F

15  page of Exhibit 7 referring to the

16  knowledge and insight, do you know if some

17  individuals are getting released solely

18  because they have knowledge and insight

19  into the debtors' business and

20  transactions?

21          MS. VANLARE: Objection.  Calls

22      for privileged communication, attorney

23      work product.

24          I'm going to instruct the

25      witness not to answer.

Page 217

                         P. Aronzon

1

2        Q.      Are you going to follow your

3    counsel's advice?

4        A.      Yes.

5        Q.      If we flip to the next page,

6    page twenty-two of twenty-two of this PDF,

7    the second bullet point down states, "the

8    special committee's investigation has not

9    identified wrongdoing on the part of the

10   released Genesis personnel that would give

11   rise to claims or causes of action that

12   are likely to provide value to the

13   debtors' estates".

14           Do you see that?

15       A.      Yes.

16       Q.      What is meant by "provide value

17   to the debtors' estates" here?

18           MS. VANLARE: Objection.  I

19       believe the document is clear.

20       Anything that's not publicly available

21       is going to be subject to privilege,

22       and I'm going to instruct the witness

23       not to answer.

24       Q.      And are you following your

25   counsel's advice?

Page 218

1                    P. Aronzon

2       A.     Yes.

3       Q.     As a special committee member,

4    what would you consider value to the

5    debtors' estates here, in your opinion,

6    separate and apart from discussions with

7    counsel?

8              MS. VANLARE: Objection.  Vague.

9              Are you talking about generally

10        what is value?  More context.

11             MS. GRIFFITH: I'm talking about

12        what the witness would consider value

13        to the debtors' estates here in his

14        opinion as a special committee member

15        separate and apart from his

16        discussions with counsel.

17             MS. VANLARE: If there's any --

18        so objection to form.

19             But if there is anything that

20        you know that doesn't come from your

21        discussions with counsel, you may

22        answer.  But otherwise, to the extent

23        the question calls for privileged

24        communications or attorney work

25        product, I'm going to instruct not to

Page 219

```
 1                    P. Aronzon
 2       answer.
 3              THE WITNESS:  Are you asking me
 4       my own opinion of the word "value",
 5       what does it mean?
 6       Q.    Yes, in this paragraph, how you
 7  would interpret that, what that means.
 8       A.    In this paragraph relates to
 9  attorney-client communication and
10  discussion.
11              Away from this paragraph, if you
12  give me a minute, I'll go get a
13  dictionary.  It will tell me whether I
14  agree with it or not.
15       Q.    So without a dictionary, do you
16  have an opinion as to what value to the
17  debtors' estates would be?
18              MS. VANLARE: Objection.  Vague.
19              THE WITNESS:  Just my own
20       personal opinion is that value can be
21       a lot of different things.  It can be
22       -- I'm just going to go through a
23       list.  There's no priority here.  It's
24       whatever comes into my head at the
25       moment as I'm talking to you as if
```

Page 220

```
 1                    P. Aronzon
 2        this were a conversation.
 3             But there's things like spending
 4        time helping us in some manner or
 5        fashion, working for us above and
 6        beyond just normal salaries, because
 7        we're talking about personnel here.
 8        It can be paying money back to us.  It
 9        can be transferring assets to us other
10        than cash or paying money.  It can be
11        a lot of things.  It can be providing
12        assistance that is, you know, hard to
13        quantify.  It's just a whole variety
14        of different things that any one of us
15        would consider valuable.
16        Q.    Was everything that you
17   considered value as part of your analysis
18   of whether or not to grant releases
19   included on this justifications for the
20   release section?
21             MS. VANLARE: Objection.
22        Objection to form.  Unclear.
23             Are you talking about the
24        entirety of the exhibit or are you
25        talking about the bullet point that
```

Page 221

1              P. Aronzon
2        talks about wrongdoing and claims that
3        would or would not provide value?
4              MS. GRIFFITH: The entirety of
5        the exhibit.  I was just responding to
6        the witness' last response.
7              THE WITNESS:  Are you asking me
8        if, in the conversations with counsel,
9        we considered all those things that I
10       just like off the top of my head
11       mentioned as possible value
12       propositions?
13       Q.    I was trying to understand if
14  those were actual value propositions that
15  you considered for this matter or if that
16  was just hypothetical examples of value
17  unconnected to this case.
18             MS. VANLARE: Objection.
19       Objection to form.
20             You may answer unless the --
21       however, to the extent the question
22       would reveal any attorney-client
23       privilege, I would caution you on that
24       point.
25             THE WITNESS:  You asked me my

```
                                    Page 222

 1                   P. Aronzon
 2       own opinion of value.  I gave you some
 3       ideas.
 4            To the extent you're asking
 5       about things on this page or in our
 6       decision-making, you're asking about
 7       the conversations with our counsel.
 8       Q.    If an employee was found to have
 9   committed misconduct such that a claim or
10   cause of action could be brought against
11   that employee, would you consider any
12   recovery from that claim or cause of
13   action against that employee to be able to
14   fall under the value bucket to the estate
15   or could add value to the estate?
16            MS. VANLARE: Objection to form.
17            Again, counsel, are you asking
18       about the Exhibit 7 and the bullet
19       point that talks about claims not
20       providing value to the estate or
21       something else?
22            MS. GRIFFITH: No, that was not
23       connected to that.  That was me trying
24       to understand the special committee
25       members' understanding of what could
```

Page 223

```
 1                    P. Aronzon
 2      constitute value.
 3               MS. VANLARE: Could you maybe
 4      restate the question?
 5               MS. GRIFFITH: Sure.
 6      Q.     If an employee -- this is
 7   separate and apart from what's on the page
 8   here.
 9               If a Genesis employee committed
10   misconduct.
11               Are you following that?
12      A.     Are you asking me?
13      Q.     Yes.
14      A.     I'm following that, yes.
15      Q.     This is a hypothetical.
16      A.     Okay.
17      Q.     If a Genesis employee committed
18   misconduct, the estate could potentially
19   bring litigation asserting a claim against
20   that employee for such misconduct;
21   correct?
22               MS. VANLARE: Objection.
23               THE WITNESS:  Theoretically
24      possible.
25               Did you tell me not to answer
```

Page 224

1                    P. Aronzon

2        that or no?

3              MS. VANLARE: No, I was objecting

4        to the form.

5              THE WITNESS:  Theoretically,

6        yes, we could.

7        Q.    And if there was a recovery from

8    the pursuit of that cause of action or

9    claim against that employee, would you

10   consider that recovery to be value for the

11   estate?

12             MS. VANLARE: Objection.

13             I would caution you not to

14        reveal any attorney-client

15        communication, and I object to form.

16             To the extent you can answer the

17        question without revealing

18        attorney-client communication, you may

19        do so.

20             THE WITNESS:  We're not talking

21        about this page, we're talking about

22        just my own understanding here?

23        Q.    Correct.

24        A.    So without referring to this

25   page or any of the prior questions about

Page 225

1                        P. Aronzon

2     our employees, if we're going to bring an

3     action against somebody -- and it doesn't

4     even have to be an employee, it could be

5     anybody -- one of the things we look at is

6     whether they could actually pay us back,

7     so creditworthiness and is it worth it.

8              So in that respect, I would

9     consider payments, if people have the

10    capacity to do so, to be valuable.

11             I'm sorry, did somebody say

12    something?

13             So I don't know if that answers

14    your question or not.  But if somebody can

15    pay me back and I believe we have a claim

16    against them, then that's value that we

17    would certainly consider.

18        Q.    So we're on the same page, I

19    just wanted to make sure we had the same

20    understanding about potential types of

21    value to the estate.

22             So now directing your attention

23    away from that hypothetical and back to

24    the bullet point in Exhibit 7 which states

25    "the special committee's investigation has

Page 226

```
 1                    P. Aronzon
 2   not identified wrongdoing on the part of
 3   released Genesis personnel that would give
 4   rise to claims or causes of action that
 5   are likely to provide value to the
 6   debtors' estate", what type of wrongdoing
 7   was considered?
 8            MS. VANLARE: Objection.  I
 9        believe the answer calls for
10        attorney-client communication and
11        attorney work product and, as such, I
12        would instruct the witness not to
13        answer.
14        Q.    Are you following your counsel's
15   advice?
16        A.    Yes.
17        Q.    In your opinion, if a -- what
18   the publicly filed words on the page
19   state, "the special committee's
20   investigation has not identified
21   wrongdoing", why would a release be
22   necessary of individuals who committed no
23   wrongdoing?
24            MS. VANLARE: Objection.  Calls
25        for a legal conclusion.
```

Page 227

1              P. Aronzon

2              To the extent your answer would

3      reveal any attorney-client

4      communications, I would instruct you

5      not to answer the question.

6      Q.    And I'm asking this in your

7  opinion as a special committee member that

8  had to make an independent decision on

9  these releases about whether or not to

10  accept recommendations and advice from

11  counsel.

12              So in your independent thought

13  process about whether to grant these

14  releases, have you considered why an

15  individual that the special committee has

16  not identified any wrongdoing on the part

17  of would need to be released?

18              MS. VANLARE: Objection.  Calls

19      for a legal conclusion.

20              And also, to the extent your

21      answer would reveal any

22      attorney-client communications, I

23      would instruct you not to answer.

24      Q.    Have you considered this

25  separate and apart from counsel?

Page 228

```
 1                    P. Aronzon
 2        A.     Not in the context of our case,
 3   no.
 4        Q.     Okay.
 5             The next bullet point on this
 6   page states, "any surviving claims against
 7   the released Genesis personnel would be
 8   costly and unlike to result in significant
 9   recoveries for the debtors' estates
10   because of the very limited directors and
11   officers insurance coverage, which at
12   present provides no more than 8.7 million
13   in coverage".
14             What was the estimated cost of
15   bringing any surviving claims against the
16   released Genesis personnel?
17             MS. VANLARE: Objection.
18             The answer calls for attorney
19        work product and, as such, I would
20        instruct the witness not to answer.
21        Q.     Are you following your counsel's
22   advice?
23        A.     Yes.
24        Q.     Was the estimated cost of
25   bringing any surviving claims against the
```

Page 229

                        P. Aronzon

1
2    released Genesis personnel a fact that the
3    special committee considered when deciding
4    whether or not to grant releases?
5            MS. VANLARE: Objection.
6            To the extent you can answer
7        without revealing attorney-client
8        communication, you may do so.
9            THE WITNESS:  I can't answer it
10       without referring to what we discussed
11       with counsel.
12       Q.    What surviving claims against
13   the released Genesis personnel are
14   referred to in this bullet point as a
15   justification for why these individuals
16   should be released?
17           MS. VANLARE: Objection.
18           Calls for privileged
19       communication and attorney work
20       product and, as such, I would instruct
21       the witness not to answer.
22       Q.    Are you following your counsel's
23   advice?
24       A.    Yes.
25       Q.    Do you know if all of the

Page 230

```
 1                     P. Aronzon
 2    individuals that are currently on the
 3    released Genesis personnel list were
 4    covered by directors and officers
 5    insurance?
 6              MS. VANLARE: Objection.
 7              If you have any knowledge
 8        separate and apart from discussions
 9        with counsel, you may answer.
10              Otherwise, I would instruct you
11        not to answer.
12        Q.    You may answer.
13        A.    I'm trying to figure out if I
14    know anything away from our discussions
15    with counsel.
16              What's the question again?  I'm
17    sorry.
18              You're asking me if people are
19    not insured; is that what you're asking
20    me?
21        Q.    No, I'm asking you if all of the
22    individuals that are currently on the
23    released Genesis personnel list would be
24    covered by directors and officers
25    insurance.
```

Page 231

```
 1                    P. Aronzon
 2            Was that a fact or something
 3    that the special committee looked into as
 4    part of its investigation?
 5            MS. VANLARE:  Objection.  Calls
 6       for attorney work product.
 7            As such, I would instruct the
 8       witness not to answer.
 9       Q.    Are you following your counsel's
10    advice?
11       A.    Yes.
12       Q.    The first bullet point on this
13    page -- and I'll just read the first
14    sentence out loud but feel free to read
15    the whole paragraph -- states, "the
16    released Genesis personnel are entitled to
17    indemnification pursuant to the debtors'
18    governing documents".
19            THE WITNESS:  This is the first
20       bullet on this page?
21       Q.    Do you see that first paragraph?
22       A.    Yes.
23       Q.    In granting releases to those on
24    the released Genesis personnel list, was a
25    factor considered by the special committee
```

Page 232

```
 1                    P. Aronzon
 2   whether an individual was entitled to
 3   indemnification pursuant to the debtors'
 4   governing documents?
 5            MS. VANLARE: Objection to form.
 6            You may answer yes or no.
 7            THE WITNESS:  Yes.
 8       Q.    Did the special committee
 9   confirm that each and every one of the
10   individuals on the released Genesis
11   personnel list was, in fact, entitled to
12   indemnification pursuant to debtors'
13   governing documents?
14            MS. VANLARE: Objection.  Calls
15       for privileged communication and
16       attorney work product.
17            I'm going to instruct the
18       witness not to answer.
19       Q.    And are you following your
20   counsel's advice?
21       A.    Yes.
22       Q.    Another bullet point on this
23   page states that "the debtors' releases of
24   the released Genesis personnel expressly
25   exclude any claims arising out of gross
```

Page 233

```
 1                    P. Aronzon

 2   negligence, fraud, or willful misconduct

 3   as determined by a final order".

 4            Do you see that?

 5       A.    Yes.

 6       Q.    Has the special committee

 7   estimated or considered an estimated value

 8   of the total claims that would arise out

 9   of gross negligence, fraud, or willful

10   misconduct that could be brought against

11   released Genesis personnel?

12            MS. VANLARE: Objection.  Calls

13       for privileged communication and

14       attorney work product.

15            As such, I'm going to instruct

16       the witness not to answer.

17       Q.    Are you following your counsel's

18   direction?

19       A.    Yes.

20       Q.    Is it your understanding that

21   individuals on the released Genesis

22   personnel list are being released from all

23   claims besides gross negligence, fraud, or

24   willful misconduct?

25            MS. VANLARE: Objection.
```

Page 234

1                    P. Aronzon

2              To the extent you know the

3         answer to that, you may answer it.

4         However, I would caution you not to

5         reveal any attorney-client

6         communication or attorney work

7         product.

8              THE WITNESS:  I'd have to look

9         at the release together with you, but

10        I think that's correct, they are being

11        released from any and all claims other

12        than the ones specified in this

13        bullet.

14        Q.    And does any and all claims

15    include known and unforeseen claims?

16             MS. VANLARE: Objection.

17             THE WITNESS:  Again, I'd have to

18        look at the release, but I believe

19        that's correct.

20        Q.    What benefit is the estate

21    receiving from releasing individuals from

22    unforeseen claims?

23             MS. VANLARE: Objection.

24             You have publicly filed

25        documents.  Anything beyond that is

Page 235

                        P. Aronzon

1

2        subject to attorney-client privilege

3        and attorney work product, and as

4        such, I would instruct the witness not

5        to answer.

6              MS. GRIFFITH: What publicly

7        filed documents are you referencing?

8              MS. VANLARE: The disclosure

9        statement in the plan supplement.

10       Q.     Would you be able to point me,

11    Mr. Aronzon, to where it talks about that

12    in the publicly filed documents?  Are you

13    familiar with that?

14             MS. VANLARE: Objection.

15             THE WITNESS:  Well -- go ahead,

16       Jane.

17             MS. VANLARE: Objection to form.

18             If you know, you may answer.

19             THE WITNESS:  I know that there

20       are provisions in the plan that

21       provide for the release and carveouts.

22       I know that there is some language in

23       the disclosure statement, I don't know

24       page numbers for either, and you have

25       on the screen in front of you the

Page 236

1                    P. Aronzon

2        answer to the questions you just asked

3        me, which is, you know, what is it

4        that -- I guess it's what is the

5        estate receiving and why are you doing

6        this.  It's all listed there.

7        Q.    So because I need to hear it,

8    there was a lot of attorney-client

9    privilege objections.

10            In your voice and in your

11   opinion, what value is the estate

12   receiving?

13            MS. VANLARE: Objection.

14       Q.    For granting releases of all of

15   the individuals listed on the released

16   Genesis personnel list.

17            MS. VANLARE: Objection.  Asked

18       and answered.  The witness has

19       answered your question.

20       Q.    You can answer.

21       A.    The values listed on these pages

22   that we're looking at in this exhibit, is

23   it number seven or Exhibit F, I guess it

24   is.  And they're laid out here.

25       Q.    Which -- are you referring to

Page 237

                        P. Aronzon

1
2    bullet points?  What bullet points are you
3    referring to?
4        A.    All of them under section two.
5        Q.    So help me understand that.
6              The one we referred to, "the
7    special committee's investigation has not
8    identified wrongdoing on the part of the
9    released Genesis personnel that would give
10   rise to claims or causes of action that
11   are likely to provide value to the
12   debtors' estates".
13             How does that add value to the
14   debtors' estates?
15             MS. VANLARE: Objection.  Being
16       argumentative.  The witness has
17       already explained that the exhibit
18       provides justifications for the
19       releases and it does that and that's
20       what it states on the page.  He's
21       already answered the question many
22       times.
23       Q.    You can answer.
24       A.    If we can't recover value, we'd
25   be wasting money, creditors' money, in

Page 238

1                    P. Aronzon

2    chasing it.

3        Q.    Are all -- is all of the value

4    that the estate gets from consenting to

5    the release of those on the released

6    Genesis personnel list included in this

7    Exhibit F or are there things outside of

8    that's listed on Exhibit F?

9            MS. VANLARE: Objection.  Calls

10       for privileged communications and

11       attorney work product and, as such, I

12       will instruct the witness not to

13       answer.

14       Q.    I'm not asking about his

15   communications with counsel, I'm asking is

16   all of the value on this publicly filed

17   page or is there something else that you

18   discussed with counsel.  I don't want to

19   know the substance, I don't want to know

20   what you discussed with counsel.  I just

21   want to know is this a comprehensive

22   summary or is there something else out

23   there?

24           MS. VANLARE: Objection.

25           To the extent you can answer

Page 239

```
 1                    P. Aronzon
 2        without revealing any attorney-client
 3        communications or attorney work
 4        product, you may do so.
 5             THE WITNESS:  I can't answer it
 6        without disclosing conversations with
 7        counsel.
 8        Q.    Then I'm going to refer us back
 9   to the amended disclosure statement, which
10   was Exhibit 6.
11        A.    So I can close this Exhibit 7?
12        Q.    And on page one hundred three on
13   the bottom part of the page, page one
14   hundred eighteen of three hundred six of
15   the PDF, there's a footnote sixteen.
16        A.    Hold on.
17             MS. VANLARE: I apologize, what
18        was the page numbers?
19             MS. GRIFFITH: Sure.
20             So the bottom page number is
21        page one hundred three and the top
22        page number is page one hundred
23        eighteen of three hundred six of the
24        PDF.
25             THE WITNESS:  Page one hundred
```

Page 240

```
 1                    P. Aronzon

 2        eighteen of three hundred six.

 3        Q.    And do you see footnote sixteen

 4   contains a definition for released party

 5   in the amended plan?

 6        A.    Yes.

 7        Q.    And this definition of released

 8   party is different than the definition of

 9   released Genesis personnel that we were

10   just looking at in the plan supplement;

11   correct?

12        A.    If you say so.  I don't have the

13   definition of released Genesis parties in

14   front of me, but I believe you're correct.

15        Q.    And released party as defined in

16   the amended plan includes the debtors;

17   right?

18        A.    Yes.

19        Q.    The ad hoc group's steerco and

20   its members solely in their capacities as

21   such; correct?

22        A.    Yes.

23        Q.    The committee and its members

24   solely in their capacities as such?

25        A.    Yes.
```

Page 241

1                      P. Aronzon

2        Q.      And each related party of each

3   entity described in the foregoing clauses

4   little Roman numeral I through three, in

5   each case solely in its capacity as such?

6        A.      Yes, that's what this says.

7        Q.      Do you know why the umbrella

8   term "related party" is being used instead

9   of individually listing individuals and

10  entities that would constitute a related

11  party in this definition?

12             MS. VANLARE: Objection.

13             Calls for a legal conclusion.

14             To the extent -- to the extent

15        answering this question would reveal

16        any attorney-client communications or

17        attorney work product, I would caution

18        the witness on that fact and instruct

19        the witness not to answer.

20        Q.      You may answer if you're able

21   to.

22        A.      I'd have to see the definition

23   of related party, and then I'd have to

24   consider what was just stated in the

25   objection.

1                    P. Aronzon

2       Q.    Could you, sitting here today,

3   tell me any person or entity that's

4   considered a related party?

5            MS. VANLARE: Objection.

6            THE WITNESS:  Without looking at

7       the definition, I'm guessing.

8       Q.    You could -- where in this

9   disclosure statement is related party

10  defined?

11           MS. VANLARE: Objection.

12      Q.    Do you know?

13      A.    I would -- I'm guessing.  But if

14  you look at the plan definition, there's

15  probably a definition of related party,

16  but I'd have to go look.

17           Do you want to show it to me?

18  Do you want to find it and pull it out?

19      Q.    While we have this exhibit open,

20  it's page one hundred eighty-three of

21  three hundred six.

22      A.    One hundred eighty-three?

23      Q.    And it's defined term number one

24  hundred seventy-nine.

25      A.    I'm looking at page one hundred

Page 243

                              P. Aronzon

1
2       eighty-three of three hundred six, and I
3       don't see that.
4              One hundred seventy-nine?  Okay,
5       it is on page one hundred eighty-four of
6       what I'm looking at.
7          Q.    And I'll read the definition out
8       loud.
9              So related party means, with
10      respect to any entity, such entity's
11      predecessors, successors, and assigns,
12      parents, subsidiaries, affiliates, and all
13      of the respective current and former
14      officers and directors, principals,
15      shareholders, members, managers, partners,
16      employees, agents, trustees, advisory
17      board members, financial advisors,
18      attorneys, accountants, actuaries,
19      investment bankers, consultants,
20      representatives, management companies, and
21      such persons respective of heirs,
22      executors, estates, servants, and
23      nominees.
24             Do you see that?
25         A.    Yes.

Page 244

1                        P. Aronzon

2        Q.      That covers potentially a lot of

3    different people and entities; correct?

4                MS. VANLARE: Objection.

5                THE WITNESS:  I'm sorry, I

6          didn't hear what you said.

7        Q.      In your opinion --

8        A.      Jane, Jane.

9                MS. VANLARE: Objection to form,

10         but you may answer.

11               THE WITNESS:  Okay, okay.

12               So it covers -- your statement

13         is it covers a lot of different people

14         and entities?  Yes, it does.

15       Q.      So as a special committee

16   members charged with authorizing releases

17   in this matter, how did you feel

18   comfortable that all of the people and

19   entity that would fall under the

20   definition of related party warrant a

21   release?

22               MS. VANLARE: Objection.

23         Objection to form and objection to the

24         extent the answer calls for privileged

25         communications.

Page 245

                    P. Aronzon

1

2          I would instruct the witness not

3     to answer to the extent your answer

4     would involve any attorney-client

5     communications or attorney work

6     product.

7          THE WITNESS:  I can't really

8     answer the specific question without

9     referring to the discussions with our

10    counsel.

11    Q.     Did you consider whether a list

12  of the specific individuals and entities

13  should be used instead of the umbrella

14  definition term "related party"?

15         MS. VANLARE: Objection.  Calls

16    for privileged communications and

17    attorney work product, and as such, I

18    would instruct the witness not to

19    answer.

20    Q.     Are you following your counsel's

21  instructions?

22    A.     Yes.

23    Q.     Can you, sitting here today,

24  name even one example of an entity or

25  individual that potentially could fall

Page 246

```
 1                    P. Aronzon
 2   under the definition of related party?
 3             MS. VANLARE: Objection.
 4             I would just caution the
 5         witness, to the extent we are subject
 6         to a reaction order, we would -- I
 7         don't know if your answer would call
 8         for revealing any specific individuals
 9         or institutions, but I would caution
10         the witness, in the event that it may,
11         given the confidentiality
12         considerations and the judge's rulings
13         and instructions on the record on that
14         point.
15             THE WITNESS:  I have no idea
16         what you just said in terms of the
17         limitations on what I can and can't
18         say.
19             Can I answer it like about
20         myself?
21             MS. VANLARE: Yes.
22             THE WITNESS:  Fine.
23             I'm a director, and to the
24         extent the debtor is granting a
25         director release, I would get one.
```

Page 247

1                           P. Aronzon

2          Q.      What investigation did the

3    special committee conduct into potential

4    causes of actions or claims that may exist

5    against related parties?

6               MS. VANLARE: Objection.  Calls

7          for attorney-client privilege and

8          attorney-client communication and, as

9          such, I would instruct the witness not

10         to answer.

11         Q.      Are you following your counsel's

12   instruction?

13         A.      Yes.

14         Q.      Did the special committee

15   conduct an investigation into potential

16   causes of actions or claims against

17   related parties?

18              MS. VANLARE: Objection.

19              The investigation -- the

20         information relating to the

21         investigation is in the publicly filed

22         documents.

23              To the extent the information is

24         not there, it would be subject to

25         privilege and, as such, I would

Page 248

                           P. Aronzon

 1

 2        instruct the witness not to answer.

 3        Q.     Are you following your counsel's

 4   advice there?

 5        A.     Yes.

 6        Q.     Do you know of any going back to

 7   the definition of released party which was

 8   on page one hundred eighteen of three

 9   hundred six of this exhibit?

10        A.     Is it also the definition right

11   below the one I just looked at so I don't

12   have to change pages?

13        Q.     I believe so.  So let's look at

14   it there to make it easy.

15        A.     Okay.

16        Q.     Do you know if any individual or

17   entity on this list withdrew any assets

18   from Genesis within one year of the

19   petition date?

20             MS. VANLARE: Counsel, objection.

21        You asked these questions before.

22             So objection to form.

23        Objection.  Asked and answered.

24             And again, as before, I'm going

25        to instruct the witness not to answer

Page 249

1                    P. Aronzon
2          as your question calls for privileged
3          communication and attorney work
4          product.
5          Q.    Are you following your counsel's
6     directions?
7          A.    Yes.
8          Q.    Who investigated whether the
9     special committee members should be
10    released is?
11               MS. VANLARE: Objection.
12               To the extent the question calls
13          for attorney-client privilege or
14          attorney work product, I'm going to
15          instruct you not to answer.
16         Q.    You can answer.
17         A.    The question is who
18    investigated?
19         Q.    Yes.
20         A.    I don't know how to answer this
21    without referring to counsel, so --
22    because counsel investigated it.
23         Q.    And when you say "counsel", does
24    that mean Cleary?
25         A.    Yes.

Page 250

1                      P. Aronzon

2       Q.     So a couple of more questions on

3   a different topic.

4            But before moving on to that

5   topic, is it your contention, sitting here

6   today, that the releases that will be

7   granted to those that fall under the

8   definition of released party and those

9   that are on the released Genesis personnel

10  list are valid?

11           MS. VANLARE: Objection.

12       Objection to the form.  Calls for a

13       legal conclusion.

14           And to the extent the answer

15       calls for privileged communication and

16       attorney work product, I would

17       instruct the witness not to answer.

18       Q.     I'm asking the special committee

19  member.

20           Is it the special committee's

21  contention that the releases contemplated

22  in the plan are valid?

23           MS. VANLARE: Objection to form.

24       I don't know what you mean by this.

25           And again, I would caution the

Page 251

1                          P. Aronzon

2          witness not to reveal any

3          attorney-client communication or

4          attorney work product.

5                  MS. GRIFFITH: I'll rephrase.

6          Q.    Is it the special committee's

7    contention that the releases contemplated

8    in the plan are appropriate?

9                  MS. VANLARE: Objection.

10                 You may even to the extent you

11         can without revealing any

12         attorney-client communication or

13         attorney work product.

14                 THE WITNESS:  Yes.

15         Q.    Can you please explain each and

16   every fact that you rely on to come to

17   that conclusion?

18                 MS. VANLARE: Objection.

19                 That calls for attorney-client

20         communication and attorney work

21         product, and as such, I would instruct

22         the witness not to answer.

23         Q.    Are you following your counsel's

24   direction?

25         A.    Yes.

Page 252

1                    P. Aronzon

2        Q.    Do you or your fellow special

3    committee member plan to testify at the

4    plan confirmation hearing?

5              MS. VANLARE: Objection.  Calls

6         for attorney-client communication,

7         attorney work product.

8              I would instruct the witness not

9         to answer.

10        Q.    Are you following your counsel's

11    advice?

12        A.    Yes.

13        Q.    So it's clear for the record,

14    are you refusing to provide an answer

15    about any fact that you will rely on to

16    come to your conclusion about why the

17    releases in the plan are appropriate?

18              MS. VANLARE: Counsel, objection.

19         You are -- the witness is not refusing

20         to answer.  The witness has been

21         answering your questions for several

22         hours now.  There is -- as we reviewed

23         during this deposition, there are

24         justifications for releases and

25         exculpations that are provided as part

Page 253

                              P. Aronzon
1
2          of the plan supplement and in the
3          disclosure statement, the witness has
4          testified about that information, so
5          objection to your characterization.
6          It is absolutely not the case that the
7          witness is refusing.
8               To the extent your questions
9          called for attorney work product or
10         attorney-client communications, I am
11         instructing the witness not to answer
12         those questions.
13    Q.    So are you following your
14    counsel's directions to not respond to my
15    question right now about what facts you're
16    relying on in coming to the condition
17    conclusion that the releases in the plan
18    are appropriate?
19              MS. VANLARE: Objection.  All the
20         same objections.  Asked and answered.
21              And again, as your question
22         calls for privileged communication and
23         attorney work product, I would
24         instruct the witness not to answer.
25    Q.    Are you following your counsel's

Page 254

```
 1                    P. Aronzon
 2   directions?
 3        A.    Yes.
 4        Q.    Are you refusing to answer this
 5   question on the basis of privilege?
 6             MS. VANLARE: Objection.
 7             He is not refusing to answer the
 8        question.  I am instructing the
 9        witness not to answer the question.
10        Q.    Are you following your counsel's
11   instruction not to answer the question on
12   the basis of privilege?
13        A.    Yes.
14        Q.    In addition to the information
15   in the plan supplement and the disclosure
16   statement, what facts did you rely on in
17   deciding that the releases in the plan are
18   appropriate?
19             MS. VANLARE: Objection.  Calls
20        for attorney-client communication and
21        attorney work product and, as such, I
22        would instruct the witness not to
23        answer.
24             MS. GRIFFITH:  On what basis are
25        the facts that the special committee
```

Page 255

1                    P. Aronzon

2      member relied on in making an

3      independent determination about

4      whether the releases in the plan are

5      appropriate attorney-client

6      privileged?

7           MS. VANLARE: Objection.  That's

8      not an appropriate question.

9           MS. GRIFFITH: That's my question

10     to you.  I'm challenging your

11     objection.

12          MS. VANLARE: I see.

13          The scope of the investigation

14     is attorney work product.  Any

15     communications that may have occurred

16     between counsel and the witness are

17     privileged communications and, as

18     such, questions that call for the

19     witness to reveal any of that

20     information are not allowed, and I am

21     instructing the witness not to answer

22     them.

23     Q.    And to be clear, for the record,

24   I am not asking about your communications

25   with counsel, I am asking about the

Page 256

1                      P. Aronzon

2    underlying facts which are not privileged

3    information that you considered and relied

4    on in coming to the conclusion that the

5    releases contemplated in the plan are

6    appropriate.

7              MS. VANLARE: Counsel, we have

8         discussed for again many hours the --

9         you've asked many questions on the

10        topic, the witness has responded to

11        many questions on the topic to the

12        extent that he has any facts

13        independent of client communications.

14              To the extent your questions

15        call for information, facts, or legal

16        conclusions that he has based on

17        conversations with counsel and that

18        are a result of attorney work product,

19        those are privileged.

20              MS. GRIFFITH: So are you

21        directing your attention not to answer

22        my question?

23              MS. VANLARE: I need to look back

24        to what your question was, but I

25        believe that was my objection, yes,

Page 257

1                    P. Aronzon

2      and my instruction.

3            MS. GRIFFITH: Court reporter,

4      could you read back my question,

5      please.

6            (Whereupon the requested portion

7      was read back by the reporter)

8            MS. VANLARE: I believe you said

9      that that was not a question for the

10     witness.

11           MS. GRIFFITH: No, my -- I had a

12     separate comment to you which I could

13     scroll back.

14           That was a question for the

15     witness.  The one I asked you is

16     further up.

17           My question to you is.

18     Question: "On what basis are the facts

19     that the special committee member

20     relied on in making an independent

21     determination about whether the

22     releases in the plan are appropriate

23     attorney-client privileged".

24           The question that the court

25     reporter just read back is the

Page 258

```
1                      P. Aronzon
2        question that I posed to the witness,
3        which is pending.
4              MS. VANLARE: Sorry, can you read
5        that question again?
6              (Whereupon the requested portion
7        was read back by the reporter)
8              MS. VANLARE: I have stated my
9        objection on the many times.  Again,
10       the witness has testified to his
11       knowledge separate and apart from
12       counsel.  Any information beyond
13       what's already publicly available in
14       the disclosure statement and the plan
15       supplement and the information he's
16       already testified to as to his own
17       knowledge, that would be privileged
18       communications with counsel and
19       attorney work product and, as such, I
20       would instruct the witness not to
21       answer.
22       Q.    And are you following your
23   counsel's directions not to answer on the
24   basis of privilege?
25       A.    Yes.
```

Page 259

1                    P. Aronzon

2      Q.    Then shifting topics, only a

3   couple of questions left -- and thank you

4   very much for your endurance here --

5              MS. GRIFFITH: Matthew, if you

6      could bring up the final exhibit, and

7      we will call this Exhibit 8.

8              (Whereupon, a document entitled

9      Notice of Filing of Plan Supplement

10     was marked Aronzon Exhibit 8

11     for identification.)

12             THE WITNESS: I'm closing six; is

13     that okay?

14     Q.    Yes.

15             And are you able to open this

16  exhibit?

17     A.    Yes.

18     Q.    And this exhibit is notice of

19  filing of plan supplement for the debtors'

20  amended joint Chapter 11 plan publicly

21  filed on the docket as document 1144.

22             And if you scroll down in the

23  exhibit, there's an Exhibit M which is

24  titled Setoff Principles For Allowance of

25  Certain Claims.

Page 260

                         P. Aronzon

1

2        A.      Okay.

3        Q.      And my question to you is: Why

4   is the debtor using the petition date

5   valuation for claims that the debtor has

6   against creditors who borrowed crypto from

7   the debtor?

8               MS. VANLARE: Objection.

9        Objection to form.

10              To the extent the question would

11       reveal any privileged communication, I

12       would caution you.  If you know the

13       answer to the question aside from

14       privileged communication, you may

15       answer it.

16              THE WITNESS:  I really can't

17       answer this without going into

18       privileged information.

19       Q.      If the debtor is using current

20   pricing for claims the debtor has against

21   creditors that borrowed crypto, would that

22   impact the net claim values?

23              MS. VANLARE: Objection.

24              Counsel, it's not clear to me

25       what you're asking.  I don't know if

Page 261

```
 1                      P. Aronzon
 2        it's clear to the witness.
 3              Are you referring to a specific
 4        part of the exhibit?
 5              MS. GRIFFITH: I'm referring to
 6        the setoff principles.
 7        Q.    And so the setoff principles
 8    have the debtor using petition date
 9    valuation for claims the debtor have
10    against creditors that borrowed crypto;
11    correct?  Do you know if that's correct?
12              MS. VANLARE: Objection.
13              You may answer if you understood
14        the question.
15              THE WITNESS:  I'm not sure I do.
16        Q.    Are you aware that the debtor
17    has some claims against creditors that
18    borrowed crypto?
19              MS. VANLARE: Objection.
20              You may answer.
21              THE WITNESS:  Okay.
22              I don't know how to answer this.
23        Because as I'm sitting right here
24        looking at the language, I'm not
25        seeing what you're referring to.
```

Page 262

                    P. Aronzon

1

2       Q.     Well, we can ask this question

3   apart from the document.

4              So you can put the document

5   aside and I could just ask in general with

6   your understanding of the plan, are you

7   aware that the debtors have claims against

8   creditors that borrowed cryptocurrency

9   from the debtors?

10      A.     So we -- the debtor loaned

11  crypto assets to an individual; is that

12  your -- is that what you're saying?

13      Q.     Yes, that's what I'm asking.

14             Are you aware if that is the

15  case?

16      A.     And if we did loan it, those

17  people owe us something; is that your

18  point?

19      Q.     Yes, that's what I'm asking you

20  to confirm, if that's your understanding.

21             MS. VANLARE: Objection.

22             You may answer.

23             THE WITNESS:  Yeah, I'm trying

24      to think about this and I'm looking at

25      this exhibit to see if it helps me.

```
                                        Page 263
 1                   P. Aronzon
 2            Look, we were in the lending
 3       business, so Genesis would loan cash
 4       or digital assets to counterparties
 5       and in some instances those
 6       counterparties would pledge cash or
 7       digital assets to collateralize our
 8       loan.  In other instances, we would
 9       loan cash or digital assets to a
10       counterparty and sometimes we would
11       borrow cash or digital assets from the
12       same counterparty.  Those are two
13       categories that I know of that we
14       attempted to I guess describe in this
15       exhibit.  In those settings, there may
16       be setoff principles that come to
17       apply so that you get to a net number
18       for the claim.
19       Q.    And in those instances that you
20  just described where Genesis would loan
21  cash or digital assets to counterparties,
22  Genesis would have a claim against those
23  individuals that it loaned cash or digital
24  assets to; correct?
25       A.    Those people would owe us money,
```

Page 264

                              P. Aronzon

1                             P. Aronzon

2    correct.

3        Q.    And to determine the amount that

4    those people owe under the setoff

5    principles as it's currently drafted, is

6    it correct that petition date valuation is

7    being used to calculate the amount that is

8    currently owed?

9            MS. VANLARE: Objection.

10           THE WITNESS:  There's no set off

11       unless they also pledged collateral or

12       we separately from the identical party

13       borrowed assets or cash.  So there's

14       two parts to this.  You don't get one

15       without the other.

16           In either of those two cases, we

17       would net one against the other to

18       come up with a claim, either they owe

19       us or we owe them depending on the

20       netting.

21           If your question is did we use

22       the petition date for both of those

23       purposes, I believe the answer is yes.

24       Q.    And by using petition date

25    valuation for both of those consensus, as

Page 265

1    P. Aronzon
2    I just said, wouldn't that result in
3    creditors that borrowed cryptocurrency
4    receiving a higher value than creditors
5    that did not borrow cryptocurrency?
6         MS. VANLARE: Objection.
7         THE WITNESS:  The claim on the
8         petition date is a certain amount and
9         the value of where it's coined is a
10        certain amount and the net amount
11        results in a net claim for or against
12        depending on the numbers.  So without
13        looking at a specific claim or an
14        example, it's almost impossible for me
15        to guess to answer you directly, but
16        it could result in a claim being
17        bigger because the value of crypto on
18        the petition date might have been less
19        than, for instance, it is today or
20        some other date.
21        You look at the petition date
22        for the two numbers and you do a
23        netting and it goes one way or the
24        other.  If you pick a different date
25        for the netting, you'd get a different

Page 266

1                    P. Aronzon

2        answer.

3             MS. GRIFFITH: Okay.

4             I have no further questions, and

5        I'm very appreciative of your time

6        today.

7             THE WITNESS:  Okay.

8             MS. GRIFFITH: Thank you very

9        much.

10             I don't know if any other

11        counsel has questions on the line, but

12        no further questions from me.

13             Thank you again.

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 4**

Emails Exchanged Between McDermott and Cleary, Dated February 6-7, 2024

| | |
|---|---|
| **From:** | Evans, Joseph |
| **To:** | Hatch, Miranda; O'Neal, Sean A.; VanLare, Jane; Weaver, Andrew; Kessler, Thomas; Kim, Hoori; Kowiak, Michael |
| **Cc:** | Azman, Darren; Griffith, Greer; Steinman, Gregg; Gibson, Matthew; Herbert, Campbell |
| **Subject:** | RE: Genesis - Confirmation Hearing Schedule |
| **Date:** | Wednesday, February 7, 2024 10:21:25 AM |

Counsel,

The Crypto Creditors Ad Hoc Group objects to the testimony of Paul Aronzon and Joseph Sciametta, but only to the extent that their fact declarations or testimony concerns the proposed releases. We plan to file a motion on this subject on the grounds that these witnesses (and by extension the Special Committee and A&M) were directed to not answer factual questions concerning the basis for the releases during the depositions, took that direction and refused to answer such questions, and otherwise refused to provide any factual information supporting the proposed releases. Similarly, the Debtors refused to provide any information concerning the releases other than the identities of the Released Genesis Personnel and a single public filing. We are available to meet and confer on this issue at your earliest convenience.

Joe

JOSEPH B. EVANS
Partner
**McDermott Will & Emery LLP** One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5767    **Mobile** +1 917 841 4738    **Email** jbevans@mwe.com
**Biography** | **Website** | **vCard** | **LinkedIn**

Mabel Albino, Assistant to Joseph B. Evans
**Tel** 212-547-5499    **Email** malbino@mwe.com

**From:** Hatch, Miranda <mhatch@cgsh.com>
**Sent:** Tuesday, February 6, 2024 6:29 PM
**To:** O'Neal, Sean A. <soneal@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Kim, Hoori <hokim@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>
**Subject:** RE: Genesis - Confirmation Hearing Schedule

**[ External Email ]**
All –

Below is the final list of the designated confirmation hearing witnesses. Please let us know if you have any objections to the below list. Pursuant to the schedule, if there are any objections, we will schedule a meet and confer by 12:00 P.M. (Eastern Time) tomorrow to discuss. We will file the witness list noting the identity of any party objecting to a witness with the Court by 4:00 P.M. (Eastern Time) tomorrow.

**Debtors**
Paul Aronzon
Joseph Sciametta

Alex Orchowski, on behalf of Kroll Restructuring Administration, LLC

**UCC**
Brad Geer
-
**DCG**
Adam Verost
-
**Crypto Creditor Ad Hoc Group**
Crypto Creditor Group Declarant #1
Crypto Creditor Group Declarant #2

Best,
Miranda Hatch

———

**Miranda Hatch**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2662
mhatch@cgsh.com   |   clearygottlieb.com

---

**From:** Hatch, Miranda
**Sent:** Tuesday, February 6, 2024 2:17 PM
**To:** sean o neal (soneal@cgsh.com) <soneal@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Kim, Hoori <hokim@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>
**Subject:** Genesis - Confirmation Hearing Schedule

All —

See attached for the pre-hearing confirmation schedule and the form spreadsheet for exhibits. Please return this filled out form by Wednesday (2/7) at 3:00 P.M. (Eastern Time). The Debtors will compile and circulate a combined list and the parties will then work to finalize Joint Exhibits.

Further, pursuant to the attached schedule, please confirm whether you plan to call any witnesses for the hearing so we can finalize the witness list for the Court and circulate among the parties.

Best,
Miranda Hatch

———

**Miranda Hatch**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2662
mhatch@cgsh.com   |   clearygottlieb.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at: https://www.clearygottlieb.com/footer/privacy-statement

# EXHIBIT 5

Emails Exchanged Between McDermott and Cleary, Dated February 3-4, 2024

| | |
|---|---|
| **From:** | Kim, Hoori |
| **To:** | Griffith, Greer; VanLare, Jane; Kessler, Thomas; O'Neal, Sean A.; Weaver, Andrew |
| **Cc:** | Azman, Darren; Evans, Joseph; Steinman, Gregg; Gibson, Matthew; Kowiak, Michael; Wolfe, Timothy |
| **Subject:** | RE: Genesis - Discovery Issues |
| **Date:** | Sunday, February 4, 2024 3:16:51 PM |

Some people who received this message don't often get email from hokim@cgsh.com. Learn why this is important

**[ External Email ]**

Greer,

We are fine with declassifying pages 128:25 - 266:13 of the Paul Aronzon transcript being designated as Confidential Information.

We will not be providing the findings from the Investigation or information related to the interviews in connection with the Investigation as these are privileged information, as objected to during Mr. Aronzon's deposition as well.

Best,
Hoori

---

**Hoori Kim**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: casanchez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2392
hokim@cgsh.com | clearygottlieb.com

---

**From:** Griffith, Greer <Ggriffith@mwe.com>
**Sent:** Saturday, February 3, 2024 5:10 PM
**To:** VanLare, Jane <jvanlare@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Massey, Jack <jamassey@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Kim, Hoori <hokim@cgsh.com>; Weinberg, Michael <mdweinberg@cgsh.com>; Minott, Richard C. <rminott@cgsh.com>; Ribeiro, Christian <cribeiro@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Zutshi, Rishi N. <rzutshi@cgsh.com>; sabremer@cgsh.com
**Cc:** Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Gibson, Matthew <Mgibson@mwe.com>
**Subject:** Genesis - Discovery Issues

Jane and Tom,

It is our understanding that the deposition transcript of Paul Aronzon is presumptively treated as Confidential Information.  We are writing to object to pages 128:25 - 266:13 of the Paul Aronzon transcript being designated as Confidential Information.  Please let us know whether you will agree to declassify this testimony as Protected Information.

Additionally, page 36 of the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [Doc. 1031] ("Amended Disclosure Statement") states, "Cleary has shared the findings from the Investigation with the Special Committee and counsel to the UCC and the Ad Hoc Group."  Please immediately produce these findings as they are squarely responsive to Request No. 6 in the Crypto Ad Hoc Group's Second Request for Production.  Please also immediately confirm whether the detailed investigation reports that were shared with the Special Committee (which Mr. Aronzon testified about during his deposition) were shared with counsel to the UCC and the Ad Hoc Group.  If so, please immediately produce these detailed reports as well.

Request No. 10 of the Crypto Ad Hoc Group's Second Request for Production requested "All copies of investigation interviews, deposition transcripts, sworn statements, or any other written or oral statements provided by any of the Released Parties and any of the Released Genesis Personnel in connection with any internal or external investigation that occurred during period of two years prior to the Petition Date to the present."  Please immediately produce copies of the list of individuals interviewed, interview notes, interview memos, interview transcripts, and/or witness statements in connection with the 30 interviews that Cleary conducted which are referenced on page 36 of the Amended Disclosure Statement and were referenced during the deposition of Mr. Aronzon.

Please confirm whether you will agree to declassify Mr. Aronzon's deposition testimony and produce the requested documents by Monday, February 5 at 10 a.m.

Greer

GREER GRIFFITH
Partner
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5578    **Mobile** +1 215 913 1418    **Email** ggriffith@mwe.com
**Biography** | **Website** | **vCard** | **LinkedIn**

**************************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
**************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at: https://www.clearygottlieb.com/footer/privacy-statement

# **EXHIBIT 6**

Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.

and

Genesis Crypto Creditors Ad Hoc Group's Interrogatories to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.

**MCDERMOTT WILL & EMERY LLP**
Darren Azman
Joseph B. Evans
Lucas Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (*pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors
Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC., *et al.*,[1] | Case No. 23-10063 (SHL) |
|  | (Jointly Administered) |

**GENESIS CRYPTO CREDITORS AD HOC GROUP'S SECOND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO GENESIS GLOBAL HOLDCO, LLC, GENESIS
GLOBAL CAPITAL, LLC, AND GENESIS ASIA PACIFIC PTE. LTD.**

       **PLEASE TAKE NOTICE** that, pursuant to Rules 26 and 34 of the Federal Rules of Civil

Procedure (the "Federal Rules"), made applicable to this proceeding by Rules 7026, 7034, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and pursuant to the

Court's *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number
(as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia
Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175
Greenwich Street, Floor 38, New York, NY 10007.

*Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 1027], the Genesis Crypto Creditors Ad Hoc Group (the "Crypto Creditors Group"), by and through their counsel, McDermott Will & Emery LLP ("McDermott"), hereby requests that Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte Ltd. (the "Debtors") (as defined below), produce the communications, documents, and electronic information identified below (the "Requests") in its possession, custody, or control to the offices of McDermott Will & Emery LLP, One Vanderbilt Avenue, New York, NY 10017, on or before January 22, 2024 at 5:00 p.m. Eastern Time, or such other time to which the Crypto Creditors Group agrees.

PLEASE TAKE FURTHER NOTICE that the Crypto Creditors Group reserves its rights under the Bankruptcy Code and any applicable law regarding the subject matter hereof and to amend, supplement, and/or modify the Requests in accordance with the Bankruptcy Code, the Bankruptcy Rules, and other applicable law.

## DEFINITIONS

These Requests incorporate by reference the definitions and rules of construction set forth in Local Civil Rule 26.3 of the Southern District of New York and Rules 34 and 45 of the Federal Rules, as incorporated by the Bankruptcy Rules, as well as any other applicable laws or rules. Unless otherwise defined herein, all words and phrases used herein shall first be defined according to Article I of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989] and the *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117], or thereafter be accorded their usual meaning and shall be interpreted in their common, ordinary sense. Notwithstanding any definition set forth below, each word, term, or phrase used in these

Requests is intended to have the broadest meaning permitted under the Federal Rules.  The following definitions of terms apply to these Requests:

1.      Any references to a corporation, partnership, proprietorship, association, organization, or any other business or legal entity (including any of the Debtors) shall be deemed to include the corporation's, partnership's, proprietorship's, association's, organization's, or other business or legal entities' current or former agents, accountants, advisors, employees, attorneys, officers, directors, direct or indirect shareholders, members, representatives, affiliates, subsidiaries, predecessors, successors, assigns, or any other person acting or purporting to act (or who acted or purported to act) on behalf of the corporation, partnership, proprietorship, association, organization, or other business or legal entity.

2.      The use of any singular noun shall be construed to include the plural, and vice versa, and a verb in any tense shall be construed as the use of the verb in all other tenses.

3.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      "3AC" means Three Arrows Capital, Ltd., including, as applicable, each of its predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf.

6.      "3AC MLAs" means the loans that Debtors extended to 3AC between January 2019 and the date of 3AC's default in June 2022 pursuant to a Master Loan Agreement, dated January

10, 2019, and a Master Loan Agreement, dated January 24, 2020, as defined in the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 980] and any other loan Debtors extended to 3AC.

7.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).  For the avoidance of doubt, this may encompass any oral, written, or electronic transmission of information, including, without limitation, meetings, discussions, conversations, telephone calls, e-mail messages, text messages, chats, iMessages, Bloomberg, Telegram, WhatsApp, Groupme, WeChat, Signal, Dust, Slack, Proton, memoranda, letters, analyst reports, telecopies, telefaxes, telexes, conferences, seminars, messages, notes, videotapes, photographs, microfilm, microfiche, magnetic disks, or other media of any kind.  Requests for "Communication" include pictures or snapshots of any "Communication."

8.      "Concerning" means relating to, referring to, describing, evidencing or constituting.

9.      "Cryptocurrency" or "Crypto" means all digital assets that are traded on a blockchain, broadly defined to include all types of digital assets, including virtual currency, tokens, ERC-20 compliant tokens, security tokens, utility tokens, stablecoins, and any other digital assets. This includes, but is not limited to, Bitcoin, Bitcoin Cash, Ethereum (ETH), USD Coin, Tether (USDt), Dai, IDOL, XRP, Cardano, Polkadot, Binance Coin, Litecoin, Chainlink, Stellar, Dogecoin, Aave, Uniswap, Wrapped Bitcoin, Bitcoin SV, EOS, Monero, Maker, Cosmos, TRON, NEM, Synthetix, Tezos, THETA, Compound, VeChain, Neo SushiSwap, Huobi Token, UMA, Elrond, IOTA, Solana, and any other digital asset.

10.    "Crypto Creditors Group" means the Genesis Crypto Creditors Ad Hoc Group as identified in the unredacted *Second Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of the Genesis Crypto Creditors Ad Hoc Group* [ECF No. 1079]

11.    "DCG Loans" means any loans between Digital Currency Group, Inc. and Genesis.

12.    "Debtors", "Genesis", "You", or "Your" means Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., including, as applicable, each of their predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf.  For the avoidance of doubt, "Debtors" includes the "Wind-Down Debtors" as defined in the Plan.

13.    "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

14.    "Estate" means, as to each Debtors, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

15.    "Grayscale Bitcoin ETF" means the exchange-traded fund commonly known as "GBTC" (https://etfs.grayscale.com/gbtc).

16.    "Include" and "Including" means "include without limitation" and "including without limitation," respectively, so that these terms are as inclusive as possible.

17.    "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

18.    "Petition Date" means January 19, 2023.

19.     "Plan" means the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989], filed on November 28, 2023.

20.     "Plan Supplement" means the Debtors' *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117], filed on December 29, 2023.

21.     "Pledge Agreements" means the exchanges of collateral in connection with the 3AC Loans that were governed by a Pledge Agreement, dated May 28, 2020, a Pledge Agreement, dated November 16, 2021, and a Pledge Agreement, dated January 27, 2022, as defined in the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 980].

22.     "Released Genesis Personnel" means the Released Genesis Personnel as defined and identified in the Plan Supplement, Exhibit F, Section I.

23.     "Released Party" means the Released Parties as defined and identified in the Plan, Article I(A)(180).

24.     "Releases" means Article VIII, Section D: *Releases by the Debtors* of the Plan.

25.     "Special Committee" means that certain Special Committee of the Board of Directors of GGH, established on November 18, 2022, comprised of Paul Aronzon and Thomas Conheeney, as defined in the Plan, Article I(A)(195).

26.     "UCC" or "Committee" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee on February 3, 2023, as described in further detail in the *Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 53].

## **INSTRUCTIONS**

6

The following instructions apply to these Requests in addition to the instructions and obligations set forth in Rules 26 and 34 of the Federal Rules:

1.      The preceding definitions apply to these Instructions and each of the succeeding Requests.

2.      All terms defined above shall have the meanings set forth therein, whether capitalized in the Requests or not.

3.      The use of any definition for the purposes of Requests shall not be deemed to constitute an agreement or acknowledgement on the part of the Crypto Creditors Group that such definition is accurate, meaningful, or appropriate for any other purpose in the Chapter 11 Cases or any other proceeding.

4.      Debtors are required to produce all responsive documents in Debtors' possession, custody, or control, wherever located, including without limitation those in the custody of Debtors' employees, agents, representatives, consultants, attorneys, auditors, accountants, consultants, or any other person(s) now or heretofore under the control of the foregoing or acting or purporting to act on its behalf.

5.      These Requests are continuing requests pursuant to the Bankruptcy Rules.  Debtors must supplement any production of documents that are received, discovered, or created after any of Debtors' responses to the Requests, or that are otherwise within Debtors' possession, custody, or control, wherever located, including without limitation those in the custody of Debtors' representatives, agents, professionals, affiliates, or anyone acting on Debtors' behalf.

6.      If Debtors object to any part of any Request, Debtors must produce all documents that are responsive to the portions of the Request to which Debtors do not object.  Debtors also must state the nature of, and grounds for, the objection.

7.      If Debtors cannot comply with any Request in full, Debtors must comply to the fullest extent possible, and Debtors must provide an explanation as to why full compliance is not possible.

8.      Where Debtors assert a claim of privilege in objecting to a Request and withhold a responsive document on this basis, Debtors must provide a privilege log setting forth:  (a) the nature of the privilege being claimed, (b) the type of document being withheld, (c) the general subject matter of the document, (d) the date of the document, and (e) such other information sufficient to identify the document, including, where appropriate, the author of the document, the title or subject line of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other.

9.      If a document contains both privileged and non-privileged material, Debtors must disclose the non-privileged material to the fullest extent possible without thereby disclosing the privileged material.  If a party asserts a privilege to part of the material contained in a document, the party asserting the privilege must clearly indicate the portions as to which it claims the privilege.  When a document has been redacted or altered in any fashion, Debtors must identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted documents.

10.     All documents produced in electronic format shall be in their native format and shall be OCR (Optical Character Recognition) capable and shall be produced with Relativity compatible load files.

11.     Additional special processing of certain electronically stored information shall be as follows:  Microsoft Excel spreadsheet fields shall not be converted to TIFF files and shall be

8

produced in native format.  A placeholder TIFF image shall be created, Bates numbered, and the produced Excel file shall be renamed to match the Bates number on its corresponding placeholder page.  The exception shall be for redacted spreadsheets which shall be produced in TIFF format. Images for the redacted spreadsheets shall display the content in the same manner as if it were printed.  The extractable metadata and text shall be provided for native files, and OCR will be provided for the un-redacted portions of the documents.

12.    If any document called for by these Requests has been destroyed or discarded, Debtors must identify that document in writing by providing the following information:  (a) any sender/author and any addressee; (b) any indicated or blind copies; (c) the document's date, subject matter, number of pages, and attachments or appendices; (d) all persons to whom the document was distributed, shown, or explained; (e) its date of destruction or discard, manner of destruction or discard, and reason for destruction or discard; (f) the persons who authorized and carried out such destruction or discard; and (g) whether any copies of the document presently exist and, if so, the name of the custodian of each copy.

13.    Any copy of a document that varies in any way whatsoever from the original or from any other copy of the document, whether by reason or any handwritten mark or other notation or any omission, is a separate document and must be produced, whether or not the original of such a document is within Debtors' possession, custody, or control. A request for any document includes a request for all drafts thereof, and all revisions and modifications thereto, including any red-lined versions or document comparisons, in addition to the document itself. Each document is to be produced in its entirety, without abbreviation or expurgation.

14.     In producing documents, all documents that are physically attached to each other, or segregated or separated from other documents, when originally located, should be produced as is. If no document exists that is responsive to a particular request, Debtors' must state so in writing.

## DOCUMENT REQUESTS[2]

1.     All Documents and Communications Concerning due diligence performed on the 3AC MLAs, including all Documents received from 3AC, notes Concerning diligence calls, committee minutes, and reports.

2.     All Documents and Communications Concerning due diligence performed on the Pledge Agreements, including all notes Concerning diligence calls, committee minutes, and reports.

3.     All Documents and Communications Concerning due diligence performed on or analysis of any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the DCG Loans, including all notes Concerning diligence calls, committee minutes, and reports.

4.     All Documents and Communications Concerning due diligence performed on or analysis of any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the Grayscale Bitcoin ETF, including all notes Concerning diligence calls committee minutes, and reports.

5.     Documents and Communications sufficient to show any deleted documents, communications, or records, including deleted Telegram chats.

6.     All Documents and Communications Concerning investigations of any Released Party, any Released Genesis Personnel, and any Special Committee member conducted by the Estate, the UCC, or any other Person.

---

[2]     Per the definition of "Documents," each of these document requests seek information stored on personal mobile devices, messaging applications, and other modes of communication.

7.      All Documents sufficient to show all payments, transfers, or compensation of any kind in fiat or crypto received by each of the Released Parties and Released Genesis Personnel and remitted by the Debtors in the two years prior to the Petition Date.

8.      All copies of any demand letters, draft complaints, claims, complaints, or Documents and Communications Concerning disputes Concerning any of the Released Parties and any of the Released Genesis Personnel.

9.      All copies of any subpoenas, cease-and-desist orders, and formal or informal requests for information from any federal or state regulatory or law enforcement agency which reference, mention, or otherwise Concern any of the Released Parties and any of the Released Genesis Personnel.

10.      All copies of investigation interviews, deposition transcripts, sworn statements, or any other written or oral statements provided by any of the Released Parties and any of the Released Genesis Personnel in connection with any internal or external investigation that occurred during period of two years prior to the Petition Date to the present.

11.      All Documents sufficient to assess the benefit the Estate will receive from providing the Releases.

12.      All Documents sufficient to assess the anticipate value of the Estate's litigation claims against each of the Released Parties and each of the Released Genesis Personnel.

13.      All copies of all expense reports, requests for reimbursement, personal expenses, entertainment expenses, business development expenses, or any other requests for payment or reimbursement made by the Released Parties and the Released Genesis Personnel and submitted to the Debtors.

11

Dated:  New York, New York
        January 17, 2024

MCDERMOTT WILL & EMERY LLP

/s/ Joseph B. Evans
Darren Azman
Joseph B. Evans
Lucas Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com
E-mail: lbarrett@mwe.com

- and -

Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Genesis Crypto
Creditors Ad Hoc Group*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 17th day of January 2024, he caused a true and correct copy of the foregoing *Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte Ltd.* to be served via electronic mail to the following:

Thomas S. Kessler
Jack Massey
Sean O'Neal
Jane VanLare
Hoo Ri Kim
Michael Weinberg
Richard C. Minott
Christian Ribeiro
Luke A. Barefoot
Andrew Weaver
Rishi Zutshi
Sabrina A. Bremer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

tkessler@cgsh.com
jamassey@cgsh.com
soneal@cgsh.com
jvanlare@cgsh.com
hokim@cgsh.com
mdweinberg@cgsh.com
rminott@cgsh.com
cribeiro@cgsh.com
lbarefoot@cgsh.com
aweaver@cgsh.com
rzutshi@cgsh.com
sabremer@cgsh.com

<div align="right">

_/s/ Matthew G. Gibson_
Matthew G. Gibson

</div>

**McDermott Will & Emery LLP**
Darren Azman
Joseph B. Evans
Lucas Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**McDermott Will & Emery LLP**
Gregg Steinman (*pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors*
*Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) Case No. 23-10063 (SHL) |
| | ) |
| | ) (Jointly Administered) |
| | ) |

## GENESIS CRYPTO CREDITORS AD HOC GROUP'S INTERROGATORIES TO GENESIS GLOBAL HOLDCO, LLC, GENESIS GLOBAL CAPITAL, LLC, AND GENESIS ASIA PACIFIC PTE. LTD.

**PLEASE TAKE NOTICE** that, pursuant to Rules 26 and 33 of the Federal Rules of Civil

Procedure (the "Federal Rules"), made applicable to this proceeding by Rules 7026, 7033, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and pursuant to the

Court's *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

*Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 1027], the Genesis Crypto Creditors Ad Hoc Group (the "Crypto Creditors Group"), by and through their counsel, McDermott Will & Emery LLP ("McDermott"), hereby requests that Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd. (the "Debtors") (as defined below), respond to the following interrogatories below (collectively, the "Interrogatories") fully, separately, in writing, and under oath.   Responses to these Interrogatories must be served on counsel for the Crypto Creditors Group, McDermott Will & Emery LLP, One Vanderbilt Avenue, New York, NY 10017, on or before January 22, 2024, at 5:00 p.m. Eastern Time, or such other time to which the Crypto Creditors Group agrees.

**PLEASE TAKE FURTHER NOTICE** that the Crypto Creditors Group reserves its rights under the Bankruptcy Code and any applicable law regarding the subject matter hereof and to amend, supplement, and/or modify the Interrogatories in accordance with the Bankruptcy Code, the Bankruptcy Rules, and other applicable law.

## <u>DEFINITIONS</u>

These Interrogatories incorporate by reference the definitions and rules of construction set forth in Local Civil Rule 26.3 of the Southern District of New York and Rule 33 of the Federal Rules, as incorporated by the Bankruptcy Rules, as well as any other applicable laws or rules.   Unless otherwise defined herein, all words and phrases used herein shall first be defined according to Article I of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989] and the *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117], or thereafter be accorded their usual meaning and shall be interpreted in their common, ordinary sense.   Notwithstanding any definition set forth below, each word, term, or phrase used in these

Interrogatories is intended to have the broadest meaning permitted under the Federal Rules.  The following definitions of terms apply to these Interrogatories:

1.      Any references to a corporation, partnership, proprietorship, association, organization, or any other business or legal entity (including any of the Debtors) shall be deemed to include the corporation's, partnership's, proprietorship's, association's, organization's, or other business or legal entities' current or former agents, accountants, advisors, employees, attorneys, officers, directors, direct or indirect shareholders, members, representatives, affiliates, subsidiaries, predecessors, successors, assigns, or any other person acting or purporting to act (or who acted or purported to act) on behalf of the corporation, partnership, proprietorship, association, organization, or other business or legal entity.

2.      The use of any singular noun shall be construed to include the plural, and vice versa, and a verb in any tense shall be construed as the use of the verb in all other tenses.

3.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      "3AC" means Three Arrows Capital, Ltd., including, as applicable, each of its predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf.

6.      "3AC MLAs" means the loans that Debtors extended to 3AC between January 2019 and the date of 3AC's default in June 2022 pursuant to a Master Loan Agreement, dated January

10, 2019, and a Master Loan Agreement, dated January 24, 2020, as defined in the *Amended Disclosure Statement with Respect to the Amended Joint Plan Of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 980] and any other loan Debtors extended to 3AC.

7.      "Concerning" means relating to, referring to, describing, evidencing or constituting.

8.      "Cryptocurrency" or "Crypto" means all digital assets that are traded on a blockchain, broadly defined to include all types of digital assets, including virtual currency, tokens, ERC-20 compliant tokens, security tokens, utility tokens, stablecoins, and any other digital assets. This includes, but is not limited to, Bitcoin, Bitcoin Cash, Ethereum (ETH), USD Coin, Tether (USDt), Dai, IDOL, XRP, Cardano, Polkadot, Binance Coin, Litecoin, Chainlink, Stellar, Dogecoin, Aave, Uniswap, Wrapped Bitcoin, Bitcoin SV, EOS, Monero, Maker, Cosmos, TRON, NEM, Synthetix, Tezos, THETA, Compound, VeChain, Neo SushiSwap, Huobi Token, UMA, Elrond, IOTA, Solana, and any other digital asset.

9.      "Crypto Creditors Group" means the Genesis Crypto Creditors Ad Hoc Group as identified in the unredacted *Second Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of the Genesis Crypto Creditors Ad Hoc Group* [ECF No. 1079]

10.     "DCG Loans" means any loans between Digital Currency Group, Inc. and Genesis.

11.     "Debtors", "Genesis", "You", or "Your" means Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., including, as applicable, each of their predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons

acting or purporting to act on their behalf.  For the avoidance of doubt, "Debtors" includes the "Wind-Down Debtors" as defined in the Plan.

12.    "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

13.    "Estate" means, as to each Debtors, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

14.    "Grayscale Bitcoin ETF" means the exchange-traded fund commonly known as "GBTC" (https://etfs.grayscale.com/gbtc).

15.    "Identify" means, when used in reference to:

a.    A natural person, his or her:

i.    Full name;

ii.    Present or last-known home and business address;

iii.    Present or last-known telephone number; and

iv.    Present or last-known position, business affiliation, and job description.

b.    A company, corporation, association, partnership, or any legal entity other than a natural person, its:

i.    Full name and type of organization or entity;

ii.    Address of principal place of business; and

iii.    Jurisdiction and date of incorporation or organization, if known.

c.    An object or process, its:

i.    Name; and

ii.    A sufficiently detailed description.

16.    "Include" and "Including" means "include without limitation" and "including without limitation," respectively, so that these terms are as inclusive as possible.

17.    "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

18.    "Petition Date" means January 19, 2023.

19.    "Plan" means the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989], filed on November 28, 2023.

20.    "Plan Supplement" means the Debtors' *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117], filed on December 29, 2023.

21.    "Pledge Agreements" means the exchanges of collateral in connection with the 3AC Loans that were governed by a Pledge Agreement, dated May 28, 2020, a Pledge Agreement, dated November 16, 2021, and a Pledge Agreement, dated January 27, 2022, as defined in the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 980].

22.    "Released Genesis Personnel" means the Released Genesis Personnel as defined and identified in the Plan Supplement, Exhibit F, Section I.

23.    "Released Party" means the Released Parties as defined in the Plan, Article I(A)(180).

24.    "Releases" means Article VIII, Section D: *Releases by the Debtors* of the Plan.

25.    "Special Committee" means that certain Special Committee of the Board of Directors of GGH, established on November 18, 2022, comprised of Paul Aronzon and Thomas Conheeney, as defined in the Plan, Article I(A)(195).

**INSTRUCTIONS**

The following instructions apply to these Interrogatories in addition to the instructions and obligations set forth in Rules 26 and 33 of the Federal Rules:

1.      The preceding definitions apply to these Instructions and each of the succeeding Interrogatories.

2.      All terms defined above shall have the meanings set forth therein, whether capitalized in the Interrogatories or not.

3.      The use of any definition for the purposes of the Interrogatories shall not be deemed to constitute an agreement or acknowledgement on the part of the Crypto Creditors Group that such definition is accurate, meaningful, or appropriate for any other purpose in the Chapter 11 Cases or any other proceeding.

4.      As used in the Interrogatories, and as necessary to bring within the scope of an Interrogatory any information that might otherwise be construed to be outside its scope: (a) the connectors "and" and "or" shall be construed both conjunctively and disjunctively; (b) the terms "all," "any," and "each" shall be construed as "any and all"; (c) the singular of any word shall include the plural and vice versa; (d) the use of any verb in any tense shall be construed as the use of that verb in all other tenses; (e) the use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and (f) the use of the conjunctive or disjunctive, respectively, shall be construed as necessary to be inclusive rather than exclusive.

5.      The specificity of any Interrogatory shall not be construed or understood as limiting the generality or breadth of any other Interrogatory.

6.      Each Interrogatory is to be answered separately and in order, and shall be construed independently and not by reference to any other Interrogatory.

7.      For the convenience of the Court and the parties, each Interrogatory should be quoted in full immediately preceding the response.

8.      You are required to identify all non-privileged, responsive information in Debtors' possession, custody, or control, wherever located, including, without limitation information in the custody of Debtors' employees, agents, representatives, consultants, attorneys, auditors, accountants, consultants, or any other person(s) now or heretofore under the control of the foregoing or acting or purporting to act on its behalf.

9.      In accordance with the Federal Rules, Debtors must answer each Interrogatory fully and completely in writing under oath, to the extent that it is not objected to, after exercising due diligence to make an inquiry and secure the information necessary to do so.

10.     These Interrogatories are continuing in nature and must be supplemented as necessary in accordance with Rule 26(e) of the Federal Rules.  Debtors must supplement any response with information received after responding to any of the Interrogatories.

11.     If Debtors object to any Interrogatory, in full or in part, specify the portion of the Interrogatory to which Debtors object, state in full the basis for Debtors' objection, and answer so much of the Interrogatory as is not objectionable.  The grounds for objecting to an Interrogatory, in full or in part, must be stated with specificity.

12.     If Debtors cannot answer an Interrogatory fully and completely after exercising due diligence, Debtors must provide a written response so stating, specifying the portion of the Interrogatory that Debtors are unable to answer fully and completely, together with the facts on which Debtors rely to support that contention, and answer so much of the Interrogatory as is possible.

13.      When responding to any Interrogatory, identify all Documents that Debtors reviewed or relied upon in answering the Interrogatory.

14.      The instructions relating to the assertion of claims of privilege set forth in Rule 26(b)(5) of the Federal Rules are hereby incorporated by reference.  Information called for by the Interrogatories that is withheld based on a claim of privilege, in full or in part, shall be described in a manner sufficient to allow the Crypto Creditors Group and the Court to assess the claim of privilege.

15.      The Crypto Creditors Group reserves the right to amend the Interrogatories.

## **<u>INTERROGATORIES</u>**

**INTERROGATORY NO. 1**:  Identify each person and entity that is a Released Party.

**INTERROGATORY NO. 2:**  Provide a description of the investigation(s) conducted Concerning each Released Party, including the identities of the Person(s) that conducted the investigation, the number of Documents reviewed, number of interviews conducted, the causes of action investigated, the findings of the investigation, and identify any investigative reports or memorandum containing the findings of the investigation.

**INTERROGATORY NO. 3:**  Provide a description of the investigation(s) conducted Concerning each Released Genesis Personnel, including the identities of the Person(s) that conducted the investigation, the number of Documents reviewed, number of interviews conducted, the causes of action investigated, the findings of the investigation, and identify any investigative reports or memorandum containing the findings of the investigation.

**INTERROGATORY NO. 4:**  Provide a description of the investigation(s) conducted Concerning each Special Committee member, including the identities of the Person(s) that conducted the investigation, the number of Documents reviewed, number of interviews conducted, the causes of

action investigated, the findings of the investigation, and identify any investigative reports or memorandum containing the findings of the investigation.

**INTERROGATORY NO. 4:**  For each Released Party, Released Genesis Personnel, and Special Committee member, Identify the reasons for the Releases, including the benefit the Estate will receive from providing the Releases.

**INTERROGATORY NO. 5:**  Identify the anticipated value of the Estate's litigation claims against each of the Released Parties and each of the Released Genesis Personnel.

**INTERROGATORY NO. 6:**  Identify all payments, transfers, or compensation of any kind in fiat or crypto received by each Released Party and each Released Genesis Personnel in the two years prior to the Petition Date.

**INTERROGATORY NO. 7:**  Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the 3AC MLAs.

**INTERROGATORY NO. 8:**  Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the Pledge Agreements.

**INTERROGATORY NO. 9:**  Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the DCG Loans.

**INTERROGATORY NO. 10:**  Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the Grayscale Bitcoin ETF.

Dated:   New York, New York
         January 17, 2024

MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP

/s/ Joseph B. Evans
Darren Azman
Joseph B. Evans
Lucas Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com
E-mail: lbarrett@mwe.com

- and -

Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Genesis Crypto*
*Creditors Ad Hoc Group*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th of January 2024, he caused a true and correct copy of the foregoing *Genesis Crypto Creditors Ad Hoc Group's Interrogatories to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte Ltd.* to be served via electronic mail to the following:

Thomas S. Kessler
Jack Massey
Sean O'Neal
Jane VanLare
Hoo Ri Kim
Michael Weinberg
Richard C. Minott
Christian Ribeiro
Luke A. Barefoot
Andrew Weaver
Rishi Zutshi
Sabrina A. Bremer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

tkessler@cgsh.com
jamassey@cgsh.com
soneal@cgsh.com
jvanlare@cgsh.com
hokim@cgsh.com
mdweinberg@cgsh.com
rminott@cgsh.com
cribeiro@cgsh.com
lbarefoot@cgsh.com
aweaver@cgsh.com
rzutshi@cgsh.com
sabremer@cgsh.com

_/s/ Matthew G. Gibson_
Matthew G. Gibson

# <u>EXHIBIT 7</u>

Debtors' Responses and Objections to Genesis Crypto Creditors Ad Hoc Group's
Second Requests for Production of Documents

and

Debtors' Responses and Objections to Genesis Crypto Creditors Ad Hoc Group's
First Set of Interrogatories to the Debtors

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' RESPONSES AND OBJECTIONS TO GENESIS CRYPTO CREDITORS**
**AD HOC GROUP'S SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, as made applicable and

modified by Rules 7034 of the Federal Rules of Bankruptcy Procedure, and the Local Rules of

this Court, Genesis Global Holdco ("Holdco") and its affiliated debtors and debtors-in-

possession (collectively, the "Debtors"), by their undersigned counsel, hereby respond and object

(the "Responses and Objections") to the *Genesis Crypto Creditors Ad Hoc Group's Second*

*Requests For Production Of Documents To Genesis Global Holdco, LLC, Genesis Global*

*Capital, LLC, and Genesis Asia Pacific Pte. Ltd.*, dated January 17, 2024 (the "Requests"), issued

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

by the Genesis Crypto Creditors Ad Hoc Group (the "<u>Crypto Creditors Group</u>") in the above captioned cases (the "<u>Chapter 11 Cases</u>") concerning the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 989 (as may be amended or modified from time to time, the "<u>Plan</u>").

Counsel for the Debtors are available to meet and confer with respect to their Responses and Objections to the Requests, should counsel for the Crypto Creditors Group wish to do so.

<div align="center"><b><u>GENERAL OBJECTIONS</u></b></div>

The Debtors assert the following general objections ("<u>General Objections</u>") to the Requests. The General Objections apply to each Request and are incorporated by reference into each response made herein, in addition to any specific responses and objections (the "<u>Response</u>") included herein. The assertion of the same, similar or additional objections, or the provision of partial answers in any specific response or objection, does not waive any of the General Objections. The Debtors' failure to object to a specific Request on a particular ground shall not be construed as a waiver of their right to object on any ground.

The Responses are made to the best of the Debtors' knowledge at the present time, and the Debtors explicitly reserve the right to revise, amend, correct, supplement, or clarify their responses, objections, and productions, without in any way obligating them to do so.

1.    The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they are not relevant generally to the Plan and specifically to any objection by the Crypto Creditors Group to the confirmation of the Plan ("<u>Plan Confirmation</u>"), and are not proportional to the needs of the case, or purport to impose any obligation on the Debtors beyond that required or permitted by the Federal Rules, the Bankruptcy Rules, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

<div align="center">2</div>

2.      The Debtors object to the Requests on the grounds that they are untimely under the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto*, ECF No. 1027 (the "Disclosure Statement Order"), which established the last day to serve discovery requests as December 27, 2023.

3.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they are overly broad, unduly burdensome, and unreasonably duplicative or cumulative.

4.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they are unduly burdensome because they purport to require production of documents and communications and information whose likely benefit would be outweighed by the burden and expense of production of such documents in light of the limited resources and administrative capacities of the Debtors.

5.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they seek documents and communications or information that are already in the Crypto Creditors Group or its counsel's possession, custody, or control, including as provided to the Crypto Creditors Group and its counsel by the Debtors' advisors; that are publicly available; or that are available to the Crypto Creditors Group and its counsel from sources other than the Debtors for which responding to the requests would be more convenient, less expensive, or less burdensome than responding would be for the Debtors.

6.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they are vague, ambiguous or require the Debtors to speculate as to the information the Crypto Creditors Group seeks.

7.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they purport to require the production of "all" documents and communications under circumstances in which a subset of all documents would be sufficient to show the pertinent information, on the grounds that such requests for production of "all" documents are overly broad, unduly burdensome and unnecessarily duplicative and cumulative.

8.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they purport to require the Debtors to collect, review or produce documents or communications or provide information, including but not limited to electronically stored information, that is outside of the possession, custody or control of the Debtors.  The Debtors will respond to these Requests only with respect to documents and information within their possession, custody or control.

9.      The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they seek documents or communications or information protected by the attorney-client privilege, the work product doctrine, common interest privilege, or any other applicable privilege or protection from discovery ("Privileged Information").  Documents and communications or information covered by such privileges are not subject to disclosure and, therefore, the Requests will not be construed to seek such documents or information ("Non-Privileged Information").  Any inadvertent disclosure of any information or document or communication protected by such privileges shall not be deemed or construed a waiver of any privilege, immunity, protection, or right of the Debtors, and the Debtors reserve their rights to

4

demand that the Crypto Creditors Group return to the Debtors any such documents and all copies thereof.

10.    The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they imply the existence of facts or circumstances that do not or did not exist and insofar as they state or assume legal conclusions. Nothing contained in any response herein, nor the production of any document and communication or information, shall be deemed to be an admission, concession or waiver by the Debtors as to any question of fact or law at issue in or pertaining to the Plan.

11.    The Debtors object to the Requests, including the definitions and instructions contained therein, insofar as they purport to seek collection or review of documents and communications that are not reasonably accessible and which the Debtors cannot attempt to access without incurring significant burden and expense, including but not limited to data existing on media used for the purpose of system recovery, disaster recovery or information restoration, including system recovery backup tapes, continuity of operations systems and data or system mirrors or shadows, if such data are routinely purged, overwritten or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy. Retrieval of any such material would not be proportional to the needs of the case in light of the accompanying cost and the Debtors' difficulty in retrieving and searching such information.

12.    The Debtors object to the Requests to the extent they seek trade secrets or information unrelated to the Plan and Plan Confirmation that is (i) confidential, proprietary, or commercially or competitively sensitive to the Debtors and/or their affiliates, employees, clients, customers, or counterparties; (ii) subject to privacy laws, protective orders, nondisclosure agreements, or other confidentiality undertakings, including any protective order entered in the

Bankruptcy or the *Order Appointing Mediator*, ECF No. 279; or (iii) otherwise prohibited from disclosure by law.

13.     The Debtors object to the Requests on the grounds that the lack of a relevant time period renders the Requests overly broad and unduly burdensome, and calls for the inclusion of documents that are not relevant to the subject matter of Plan Confirmation.   Unless otherwise specified, the Debtors define the relevant period to be July 1, 2023 to January 4, 2024 for all Requests (the "Relevant Time Period").

14.     The Debtors object to the Requests, including the definitions and instructions contained therein, as overly broad, unduly burdensome and improperly demanding discovery that is not proportional to the needs of the case, insofar as they purport to require the Debtors to collect or review documents and communications from custodians who do not possess non-duplicative documents and communications reasonably calculated to lead to the discovery of admissible evidence or insofar as they would require the Debtors to collect or review documents and communications not captured by the application of reasonable search criteria.   Where the Debtors agree to produce information, only responsive, Non-Privileged Information, if any, located through a reasonable and diligent search of the reasonably accessible files or of relevant custodians expected to be in the possession, custody or control of responsive and non-duplicative documents and communications, limited to the relevant period ("Reasonable Search"), will be produced.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     The Debtors object to the Definitions to the extent they purport to extend beyond a reasonable scope and/or their natural meaning.   The Debtors will interpret the Requests

reasonably and in good faith in accordance with common English usage as supplemented by their understanding of the common meaning of terms.

2.      The Debtors object to the definition of "Debtors" and "Genesis" to the extent that it includes indirect subsidiaries and direct subsidiaries that are not debtors, including "each of their predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf" on the grounds that the definition is overbroad, unduly burdensome, and not proportional to the needs of the Chapter 11 Cases. The Debtors further object to the definition of "Debtors" and "Genesis" to the extent that it seeks the discovery of information that is not relevant to the Plan, seeks the discovery of information that is not under the Debtors' custody or control, and seeks the discovery of information that could otherwise be protected from discovery. The Debtors further object to the definition of "Debtors" and "Genesis" to the extent that it seeks the discovery of internal Documents from the Debtors' advisors or privileged Communications between the Debtors and their advisors. The Debtors will interpret the term "Debtors" and "Genesis" to mean Genesis Global Holdco, LLC and certain of its affiliates as defined in footnote 1.

3.      The Debtors object to the definitions of "You" and "Your" to the extent that they include "each of their predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf" on the grounds that the definitions are overbroad, unduly burdensome, and not proportional to the needs of the Plan and Plan Confirmation. The Debtors further object to the definitions of "You" and "Your" to the extent that they seek the discovery of information that is not relevant to the Plan and Plan

7

Confirmation, seek the discovery of information that is not under the Debtors' custody or control, and seek the discovery of Privileged Information or information that could otherwise be protected from discovery.

4.    The Debtors object to Instruction 4 on the grounds that it is overly broad and unduly burdensome.  The Debtors further object to Instruction 3 to the extent it seeks Privileged Information.

5.    The Debtors object to Instruction 5 on the grounds that it is overly broad, unduly burdensome, and purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

6.    The Debtors object to Instruction 8 to the extent it purports to require the Debtors to identify "the title or subject line of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other", on the grounds that such an obligation is overly broad, unduly burdensome, seeks the discovery of Privileged Information, and purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

7.    The Debtors object to Instruction 10 to the extent it purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

8.    The Debtors object to Instruction 11 to the extent it purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy

Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

9.      The Debtors object to Instruction 12 to the extent that it purports to require the Debtors to produce a log describing any document that "has been destroyed or discarded" on the grounds that such a purported obligation is overly broad, unduly burdensome, and purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

10.     Subject to, and without waiving, any objections, the Debtors specifically object and respond to each Request below.

<div align="center">**SPECIFIC RESPONSES AND OBJECTIONS**</div>

**Request No. 1:**

   All Documents and Communications Concerning due diligence performed on the 3AC MLAs, including all Documents received from 3AC, notes Concerning diligence calls, committee minutes, and reports.

**Response to Request No. 1:**

   The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it is not relevant to any objection by the Crypto Creditors Group to Plan Confirmation.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 2:**

All Documents and Communications Concerning due diligence performed on the Pledge Agreements, including all notes Concerning diligence calls, committee minutes, and reports.

**Response to Request No. 2:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it is not relevant to the Plan or Plan Confirmation.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 3:**

All Documents and Communications Concerning due diligence performed on or analysis of any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the DCG Loans, including all notes Concerning diligence calls, committee minutes, and reports.

**Response to Request No. 3:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given

subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it is not relevant to the Plan or Plan Confirmation.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 4:**

All Documents and Communications Concerning due diligence performed on or analysis of any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the Grayscale Bitcoin ETF, including all notes Concerning diligence calls committee minutes, and reports.

**Response to Request No. 4:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it is not relevant to the Plan or Plan Confirmation.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 5:**

Documents and Communications sufficient to show any deleted documents, communications, or records, including deleted Telegram chats.

**Response to Request No. 5:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it is not relevant to the Plan or Plan Confirmation.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 6:**

All Documents and Communications Concerning investigations of any Released Party, any Released Genesis Personnel, and any Special Committee member conducted by the Estate, the UCC, or any other Person.

**Response to Request No. 6:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to

12

this Request to the extent that it seeks the production of Privileged Information, and to the extent

that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors

as to what documents are requested.  The Debtors further object to this Request to the extent it

seeks information already known by the Crypto Creditors Group and calls for publicly available

information, including information in the *Amended Disclosure Statement with Respect to the

Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy

Code*, ECF No. 1031 (the "Disclosure Statement").

For the foregoing reasons, the Debtors will not produce documents in response to this

Request.

**Request No. 7:**

All Documents sufficient to show all payments, transfers, or compensation of any kind in
fiat or crypto received by each of the Released Parties and Released Genesis Personnel
and remitted by the Debtors in the two years prior to the Petition Date.

**Response to Request No. 7:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional,

insofar as it requests "all Documents" concerning a given subject matter under circumstances in

which a production of a subset of documents would be sufficient to show pertinent information.

The Debtors further object to this Request to the extent that it seeks the production of Privileged

Information, and to the extent that it is vague or ambiguous and therefore requires substantive

judgment on the part of the Debtors as to what documents are requested.  The Debtors further object

to this Request to the extent it seeks information already known by the Crypto Creditors Group and

calls for publicly available information, including information in ECF Nos. 142, 143, 144, 145,

146, 147, and 450 (collectively, the "Debtors' Schedules").

13

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 8:**

All copies of any demand letters, draft complaints, claims, complaints, or Documents and Communications Concerning disputes Concerning any of the Released Parties and any of the Released Genesis Personnel.

**Response to Request No. 8:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested.

For the foregoing reasons, the Debtors will not produce documents in response to this Request.

**Request No. 9:**

All copies of any subpoenas, cease-and-desist orders, and formal or informal requests for information from any federal or state regulatory or law enforcement agency which reference, mention, or otherwise Concern any of the Released Parties and any of the Released Genesis Personnel.

**Response to Request No. 9:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents and Communications" concerning a given subject matter under circumstances in which a production of a subset of documents would be

sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent it calls for the production or disclosure of material provided to any state or federal regulatory or investigative body and to the extent that such material is protected by the work product, investigative or other privilege. The Debtors further object to the Request to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 10:**

All copies of investigation interviews, deposition transcripts, sworn statements, or any other written or oral statements provided by any of the Released Parties and any of the Released Genesis Personnel in connection with any internal or external investigation that occurred during period of two years prior to the Petition Date to the present.

**Response to Request No. 10:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all copies of investigation interviews, deposition transcripts, sworn statements, or any other written or oral statements" when a production of a subset of documents would be sufficient to show pertinent information. The Debtors further object to this Request to the extent it calls for the production or disclosure of material provided to any state or federal regulatory or investigative body and to the extent that such material is protected by the work product, investigative or other privilege. The Debtors further object to the Request to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 11:**

All Documents sufficient to assess the benefit the Estate will receive from providing the Releases.

**Response to Request No. 11:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents" concerning a given subject matter under circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period. The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested. The Debtors further object to this Request to the extent it seeks information already known by the Crypto Creditors Group and calls for publicly available information, including information in the Disclosure Statement.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 12:**

All Documents sufficient to assess the anticipate value of the Estate's litigation claims against each of the Released Parties and each of the Released Genesis Personnel.

**Response to Request No. 12:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all Documents" concerning a given subject matter under

16

circumstances in which a production of a subset of documents would be sufficient to show pertinent information and it is not limited to a specific time period.  The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested.   The Debtors further object to this Request to the extent it seeks information already known by the Crypto Creditors Group and calls for publicly available information, including information in the Disclosure Statement.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

**Request No. 13:**

All copies of all expense reports, requests for reimbursement, personal expenses, entertainment expenses, business development expenses, or any other requests for payment or reimbursement made by the Released Parties and the Released Genesis Personnel and submitted to the Debtors.

**Response to Request No. 13:**

The Debtors object to this Request as overbroad, unduly burdensome, and not proportional, insofar as it requests "all copies of all expense reports, requests for reimbursement, personal expenses, entertainment expenses, business development expenses, or any other requests for payment or reimbursement" when a production of a subset of documents would be sufficient to show pertinent information, and it is not limited to a specific time period.  The Debtors further object to this Request to the extent that it seeks the production of Privileged Information, and to the extent that it is vague or ambiguous and therefore requires substantive judgment on the part of the Debtors as to what documents are requested.

Subject to the foregoing specific and General Objections, the Debtors are willing to meet and confer to determine whether a Reasonable Search can be conducted for documents and communications responsive to this Request.

Dated:    January 30, 2024                    /s/ Thomas S. Kessler
          New York, New York                 Sean A. O'Neal
                                             Luke A. Barefoot
                                             Jane VanLare
                                             Thomas S. Kessler
                                             CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                             One Liberty Plaza
                                             New York, New York 10006
                                             Telephone: (212) 225-2000
                                             Facsimile: (212) 225-3999

                                             *Counsel for the Debtors*
                                             *and Debtors-in-Possession*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' RESPONSES AND OBJECTIONS TO GENESIS CRYPTO CREDITORS
AD HOC GROUP'S FIRST SET OF INTERROGATORIES TO THE DEBTORS**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Rules 7026, 7033

and 9014 of the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court, Genesis

Global Holdco ("Holdco") and its affiliated debtors and debtors-in-possession (collectively, the

"Debtors"), by their undersigned counsel, hereby respond and object (the "Responses and

Objections") to *Genesis Crypto Creditors Ad Hoc Group's Interrogatories to Genesis Global*

*Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.*, dated January 17,

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

2024 (the "Interrogatories"), issued by the Genesis Crypto Creditors Ad Hoc Group (the "Crypto Creditors Ad Hoc Group") in the above captioned cases (the "Chapter 11 Cases") concerning the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 989 (as may be amended or modified from time to time, the "Plan").

Counsel for the Debtors are available to meet and confer with respect to their Responses and Objections to the Interrogatories, should counsel for the Crypto Creditors Ad Hoc Group wish to do so.

**GENERAL OBJECTIONS**

The Debtors assert the following general objections ("General Objections") to the Interrogatories. The General Objections apply to each Interrogatory and are incorporated by reference into each response made herein, in addition to any specific responses and objections (the "Response") included herein. The assertion of the same, similar or additional objections, or the provision of partial answers in any specific response or objection, does not waive any of the General Objections. The Debtors' failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of their right to object on any ground.

The Response is made to the best of the Debtors' knowledge at the present time, and the Debtors explicitly reserve the right to revise, amend, correct, supplement, or clarify their responses and objections.

1.    The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they are not relevant generally to the Plan and specifically to any objection by the Crypto Creditors Ad Hoc Group to the confirmation of the Plan ("Plan Confirmation"), and are not proportional to the needs of the case, or purport to impose any obligation on the Debtors beyond that required or permitted by the Federal Rules, the

2

Bankruptcy Rules, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

2.      The Debtors further object on the grounds that the Interrogatories are untimely under the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto*, ECF No. 1027 (the "Disclosure Statement Order"), which established the last day to serve discovery requests as December 27, 2023.

3.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they are overly broad, unduly burdensome, and unreasonably duplicative or cumulative.

4.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they are unduly burdensome because they purport to seek information whose likely benefit would be outweighed by the burden and expense of providing such information in light of the limited resources and administrative capacities of the Debtors.

5.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they seek information that is already in the Crypto Creditors Ad Hoc Group or its counsel's possession, custody, or control, including as provided to the Crypto Creditors Ad Hoc Group by the Debtors' advisors; that are publicly available; or that is available to the Crypto Creditors Ad Hoc Group from sources other than the Debtors for which responding to the Interrogatories would be more convenient, less expensive, or less burdensome than responding would be for the Debtors.

6.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they are vague, ambiguous, require the Debtors to speculate as to the information the Crypto Creditors Ad Hoc Group seeks or lack sufficient precision to allow the Debtors to formulate an appropriate response.

7.      The Debtors object to the Interrogatories to the extent they seek a response based on information from sources that are not reasonably accessible because of undue burden or cost.

8.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they seek "any" and "all" information under circumstances in which a subset of all information would be sufficient to show the pertinent information, on the grounds that such Interrogatories seeking "any" and "all" information are overly broad, unduly burdensome, and unnecessarily duplicative and cumulative.

9.      The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they seek information protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or protection from discovery ("Privileged Information").  Information covered by such privileges is not subject to disclosure and, therefore, the Interrogatories will not be construed to seek such information.   Any inadvertent disclosure of any information or document or communication protected by such privileges shall not be deemed or construed a waiver of any privilege, immunity, protection, or right of the Debtors, and the Debtors reserve their rights to demand that the Crypto Creditors Ad Hoc Group return to the Debtors any such documents and all copies thereof.

10.     The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they imply the existence of facts or circumstances that do not or did not exist and insofar as they state or assume legal conclusions.  Nothing contained in any response

herein, nor the production of any document and communication or information, shall be deemed to be an admission, concession or waiver by the Debtors as to any question of fact or law at issue pertaining to the Plan or Plan Confirmation.

11.    The Debtors object to the Interrogatories, including the definitions and instructions contained therein, insofar as they purport to seek information that is not reasonably accessible and which the Debtors cannot attempt to access without incurring significant burden and expense, including but not limited to data existing on media used for the purpose of system recovery, disaster recovery or information restoration, including system recovery backup tapes, continuity of operations systems and data or system mirrors or shadows, if such data are routinely purged, overwritten or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy.   Retrieval of any such material would not be proportional to the needs of the case in light of the accompanying cost and the Debtors' difficulty in retrieving and searching such information.

12.    The Debtors object to the Interrogatories to the extent they seek an answer involving an opinion or contention and the basis for that opinion or contention, which is improper at this stage of this contested matter.

13.    The Debtors object to the Interrogatories to the extent they seek trade secrets or information unrelated to the Plan and Plan Confirmation that is (i) confidential, proprietary, or commercially or competitively sensitive to the Debtors and/or their affiliates, employees, clients, customers, or counterparties; (ii) subject to privacy laws, protective orders, nondisclosure agreements, or other confidentiality undertakings, including any protective order entered in the Bankruptcy or the *Order Appointing Mediator*, ECF No. 279; or (iii) otherwise prohibited from disclosure by law.

5

14.     The Debtors object to the Interrogatories on the grounds that the lack of a relevant time period renders the Interrogatories overly broad and unduly burdensome, and calls for the inclusion of information that is not relevant to the subject matter of Plan Confirmation.  Unless otherwise specified, the Debtors define the relevant period to be July 1, 2023 to January 4, 2024 for all Interrogatories (the "Relevant Time Period").

15.     The Debtors object to the Interrogatories, including the definitions and instructions contained therein, as overly broad, unduly burdensome, and improperly demanding responses that are not proportional to the needs of the case, insofar as they purport to require the Debtors in the course of responding to the Interrogatories to collect or review documents, communications, and information from custodians who do not possess non-duplicative documents, communications, or information reasonably calculated to lead to the discovery of admissible evidence or insofar as they would require the Debtors to collect or review documents, communications, and information not captured by the application of reasonable search criteria.  Where the Debtors agree to provide information, it will be based only on responsive, non-privileged information ("Non-Privileged Information"), if any, located through a reasonable and diligent search of the reasonably accessible files or of relevant custodians expected to be in the possession, custody, or control of responsive and non-duplicative documents, communications, or information, limited to the Relevant Period (a "Reasonable Search").

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

16.     The Debtors object to the Definitions to the extent they purport to extend beyond a reasonable scope and/or their natural meaning.  The Debtors will interpret the Interrogatories reasonably and in good faith in accordance with common English usage as supplemented by their understanding of the common meanings of terms.

17.    The Debtors object to the definitions of "Debtors," "Genesis," "You," and "Your" to the extent that they include "predecessors, successors, subsidiaries, partners, principals, officers, directors, attorneys, managers, professionals, and other advisors, agents, employees, representatives, and persons acting or purporting to act on their behalf" on the grounds that the definitions are overbroad, unduly burdensome, and not proportional to the needs of the Plan and Plan Confirmation.  The Debtors further object to the definitions of "Debtors," "Genesis," "You," and "Your" to the extent that they seek the discovery of information that is not relevant to the Plan and Plan Confirmation, seek the discovery of information that is not under the Debtors' custody or control, and seek the discovery of Privileged Information or information that could otherwise be protected from discovery.

18.    The Debtors object the definition of "Document(s)" to the extent that it seeks the discovery of information that is not relevant to the Plan Confirmation, seeks the discovery of information based on sources that are not under the Debtors' possession, custody, or control, and seeks the discovery of Privileged Information or information that could otherwise be protected from discovery.  The Debtors further object to the definition of "Document(s)" to the extent that it seeks the discovery of information based on internal Documents from the Debtors' agents, advisors, or attorneys, or based on privileged Communications between the Debtors and their agents, advisors, or attorneys.

19.  The Debtors object to Instruction 8, that "You are required to identify all non-privileged, responsive information in Debtors' possession, custody, or control, wherever located, including, without limitation information in the custody of Debtors' employees, agents, representatives, consultants, attorneys, auditors, accountants, consultants, or any other person(s) now or heretofore under the control of the foregoing or acting or purporting to act on its behalf,"

on the grounds that it is vague, overbroad, unduly burdensome, and not proportional to the needs of the Plan Confirmation.

20. The Debtors object to Instruction 13 to the extent it purports to require the Debtors to "identify all Documents that Debtors reviewed or relied upon in answering the Interrogatory," on the basis that it seeks the discovery of Privileged Information or information that could otherwise be protected from discovery or subject to the *Order Granting the Debtors' and the Official Committee of Unsecured Creditors' Motion for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information*, ECF No. 694 (the "Redaction Order"). The Debtors further object on the grounds that such an obligation is overly broad, unduly burdensome and purports to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court or other rules or practices applicable to cases in this Court.

18. Subject to, and without waiving any objections, the Debtors specifically object and respond to each Interrogatory below.

## SPECIFIC RESPONSES AND OBJECTIONS

**Interrogatory No. 1**:

Identify each person and entity that is a Released Party.

**Response to Interrogatory No. 1**:

The Debtors object to this Interrogatory to the extent it seeks information already provided to or known by the Crypto Ad Hoc Group. The Debtors further object to this Interrogatory to the extent it is cumulative and duplicative of, and seeks information that has been provided in the Plan, *Genesis Crypto Creditors Ad Hoc Group's Requests For Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.*, dated December 27, 2023 ("Crypto Ad Hoc Group's RFPs"). The Debtors further object to this

Interrogatory on the grounds that it calls for publicly available information, including information

in the Plan, the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis*

*Global Holdco, LLC* et al*., Under Chapter 11 of the Bankruptcy Code*, ECF No. 1031 (the

"<u>Disclosure Statement</u>") and Exhibit F of the *Notice of Filing of Plan Supplement for the Debtors'*

*Amended Joint Chapter 11 Plan*, ECF No. 1117.

Subject to and without waiving the General Objections and Specific Objections, the Debtors

are willing to meet and confer regarding this Interrogatory.

**<u>Interrogatory No. 2</u>**:

Provide a description of the investigation(s) conducted Concerning each Released Party, including the identities of the Person(s) that conducted the investigation, the number of Documents reviewed, number of interviews conducted, the causes of action investigated, the findings of the investigation, and identify any investigative reports or memorandum containing the findings of the investigation.

**<u>Response to Interrogatory No. 2</u>**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not

proportional.  The Debtors further object to this Interrogatory to the extent that it seeks Privileged

Information.  The Debtors further object to this Interrogatory on the grounds that it calls for publicly

available information, including information in Disclosure Statement.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**<u>Interrogatory No. 3</u>**:

Provide a description of the investigation(s) conducted Concerning each Released Genesis Personnel, including the identities of the Person(s) that conducted the investigation, the number of Documents reviewed, number of interviews conducted, the causes of action investigated, the findings of the investigation, and identify any investigative reports or memorandum containing the findings of the investigation PSA.

**Response to Interrogatory No. 3**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional. The Debtors further object to this Interrogatory to the extent that it seeks Privileged Information. The Debtors further object to this Interrogatory on the grounds that it calls for publicly available information, including information in Disclosure Statement.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 4:**

For each Released Party, Released Genesis Personnel, and Special Committee member, Identify the reasons for the Releases, including the benefit the Estate will receive from providing the Releases.

**Response to Interrogatory No. 4:**

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional. The Debtors further object to this Interrogatory to the extent that it seeks Privileged Information. The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 5:**

Identify the anticipated value of the Estate's litigation claims against each of the Released Parties and each of the Released Genesis Personnel.

**Response to Interrogatory No. 5:**

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional. The Debtors further object to this Interrogatory to the extent that it seeks Privileged Information. The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted

by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 6:**

Identify all payments, transfers, or compensation of any kind in fiat or crypto received by each Released Party and each Released Genesis Personnel in the two years prior to the Petition Date.

**Response to Interrogatory No. 6:**

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional.  The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 7**:

Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the 3AC MLAs.

**Response to Interrogatory No. 7**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional.  The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 8**:

Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the Pledge Agreements.

**Response to Interrogatory No. 8**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional.  The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 9**:

Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in the DCG Loans.

**Response to Interrogatory No. 9**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional.  The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

**Interrogatory No. 10**:

Identify all Persons who conducted diligence on, agreed to, or was otherwise involved in any decision to purchase, sell, pledge, liquidate, not liquidate, or hold the Grayscale Bitcoin ETF.

**Response to Interrogatory No. 10**:

The Debtors object to this Interrogatory as overbroad, unduly burdensome, and not proportional.  The Debtors further object to this Interrogatory on the grounds that the Crypto Ad Hoc Group have exceeded the number of allowable interrogatories, including subparts, permitted by the Disclosure Statement Order.

For the foregoing reasons, the Debtors will not provide a response to this Interrogatory.

WITH RESPECT TO ALL                GENESIS GLOBAL HOLDCO, LLC
RESERVATION OF RIGHTS              GENESIS GLOBAL CAPITAL, LLC
AND OBJECTIONS                     GENESIS ASIA PACIFIC PTE. LTD
                                   By its attorneys,


Dated:    January 30, 2024         _/s/ Thomas S. Kessler_
          New York, New York       Sean A. O'Neal
                                   Luke A. Barefoot
                                   Jane VanLare
                                   Thomas S. Kessler
                                   Andrew Weaver
                                   CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                   One Liberty Plaza
                                   New York, New York 10006
                                   Telephone: 212-225-2000

# **<u>EXHIBIT 8</u>**

Emails Exchanged Between McDermott and Cleary, Dated January 30, 2024

| | |
|---|---|
| **From:** | Ribeiro, Christian |
| **To:** | Evans, Joseph; Azman, Darren; Steinman, Gregg; Griffith, Greer; Ray, Cris; Gibson, Matthew |
| **Cc:** | Kessler, Thomas; O"Neal, Sean A.; VanLare, Jane; Weaver, Andrew; Team-Genesis-Plan-Associates-CGSHOnly |
| **Subject:** | Genesis | Debtors" First Production |
| **Date:** | Tuesday, January 30, 2024 10:50:58 PM |
| **Attachments:** | GENESIS_CCG_CONF_V001.zip |

Some people who received this message don't often get email from cribeiro@cgsh.com. Learn why this is important

**[ External Email ]**

Counsel,

Please see attached.  Password has been provided under separate cover.

Best,

Christian

———

**Christian Ribeiro**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: jvitale@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2701
cribeiro@cgsh.com  | clearygottlieb.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at: https://www.clearygottlieb.com/footer/privacy-statement

# EXHIBIT 9

Emails Exchanged Between McDermott and Cleary, Dated February 20-21, 2024

| | |
|---|---|
| **From:** | Kessler, Thomas |
| **To:** | Griffith, Greer; VanLare, Jane; Weaver, Andrew; Kowiak, Michael; Kim, Hoori; Hatch, Miranda; Levy, Jennifer |
| **Cc:** | Azman, Darren; Evans, Joseph; Steinman, Gregg; Herbert, Campbell; Ray, Cris; Gibson, Matthew |
| **Subject:** | RE: In re Genesis Global Holdco - Cooperation Agreements |
| **Date:** | Wednesday, February 21, 2024 12:09:27 PM |

**[ External Email ]**

Greer,

We anticipating having a further update on this in short order, but are not in a position at this moment to provide further details.

Thanks,
Tom

———

**Thomas S. Kessler**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: ithompson@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2884
tkessler@cgsh.com  | clearygottlieb.com
Pronouns: he/him/his

**From:** Griffith, Greer <Ggriffith@mwe.com>
**Sent:** Tuesday, February 20, 2024 3:56 PM
**To:** VanLare, Jane <jvanlare@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>; Kim, Hoori <hokim@cgsh.com>; Hatch, Miranda <mhatch@cgsh.com>; Levy, Jennifer <jlevy@cgsh.com>
**Cc:** Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Herbert, Campbell <cherbert@mwe.com>; Ray, Cris <cray@mwe.com>; Gibson, Matthew <Mgibson@mwe.com>
**Subject:** In re Genesis Global Holdco - Cooperation Agreements

Counsel,

Paragraph 72 of the *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC Et Al., Under Chapter 11 of the Bankruptcy Code* [Doc. 1330] states that "The Debtors intend to modify the Plan to provide releases only to those Released Genesis Personnel who agree to cooperate with assisting with litigation of the Retained Causes of Action by the Wind-Down Debtors (such agreements, the "Cooperation Agreements"), which will be critical to the resolution of litigation against DCG and Gemini as well as enforcement actions relating to the Debtors' pre-petition business."

Please advise when Debtors intend to make this modification to the Plan. In addition, please send us the form Cooperation Agreements you plan on having Released Genesis Personnel execute.

Best,
Greer

GREER GRIFFITH
Partner
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5578    **Mobile** +1 215 913 1418    **Email** ggriffith@mwe.com
**Biography** | **Website** | **vCard** | **LinkedIn**

*******************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private
communication sent by a law firm and may be confidential or protected by privilege. If you are not the
intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the
information contained in or attached to this message is strictly prohibited. Please notify the sender of the
delivery error by replying to this message, and then delete it from your system. Our Privacy Policy
explains how we may use your personal information or data and any personal information or data
provided or made available to us. Thank you.
*******************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient,
please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in
certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at:
https://www.clearygottlieb.com/footer/privacy-statement

# EXHIBIT 10

Emails Exchanged Between McDermott and Cleary, Dated February 16-19, 2024

| | |
|---|---|
| **From:** | Kessler, Thomas <tkessler@cgsh.com> |
| **Sent:** | Monday, February 19, 2024 6:19 PM |
| **To:** | Griffith, Greer; Kim, Hoori |
| **Cc:** | Hatch, Miranda; VanLare, Jane; Weaver, Andrew; Kowiak, Michael; Levy, Jennifer; Azman, Darren; Evans, Joseph; Steinman, Gregg; Barrett, Lucas; Herbert, Campbell; Ray, Cris; Gibson, Matthew |
| **Subject:** | RE: Confirmation Hearing Schedule |

**[ External Email ]**

Greer –

While reserving all rights and without waiver of our objections to MWE's requests for production, we intend to produce minutes from special committee meetings to the extent responsive to the second set of requests.

Regards,
Tom

———

**Thomas S. Kessler**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: ithompson@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2884
tkessler@cgsh.com | clearygottlieb.com
Pronouns: he/him/his

**From:** Griffith, Greer <Ggriffith@mwe.com>
**Sent:** Monday, February 19, 2024 6:07 PM
**To:** Kim, Hoori <hokim@cgsh.com>
**Cc:** Hatch, Miranda <mhatch@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Levy, Jennifer <jlevy@cgsh.com>; Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Barrett, Lucas <lbarrett@mwe.com>; Herbert, Campbell <cherbert@mwe.com>; Ray, Cris <cray@mwe.com>; Gibson, Matthew <Mgibson@mwe.com>
**Subject:** RE: Confirmation Hearing Schedule

Yes along with the issue concerning production of the Special Committee meeting minutes and notes unless you are able to confirm that these will be sent to the CCAHG.

Best,
Greer

GREER GRIFFITH
Partner
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5578  **Mobile** +1 215 913 1418   **Email** ggriffith@mwe.com
**Biography | Website | vCard | LinkedIn**

**From:** Kim, Hoori <[hokim@cgsh.com](mailto:hokim@cgsh.com)>
**Sent:** Monday, February 19, 2024 6:05 PM
**To:** Griffith, Greer <[Ggriffith@mwe.com](mailto:Ggriffith@mwe.com)>
**Cc:** Hatch, Miranda <[mhatch@cgsh.com](mailto:mhatch@cgsh.com)>; VanLare, Jane <[jvanlare@cgsh.com](mailto:jvanlare@cgsh.com)>; Weaver, Andrew <[aweaver@cgsh.com](mailto:aweaver@cgsh.com)>; Kowiak, Michael <[mkowiak@cgsh.com](mailto:mkowiak@cgsh.com)>; Kessler, Thomas <[tkessler@cgsh.com](mailto:tkessler@cgsh.com)>; Levy, Jennifer <[jlevy@cgsh.com](mailto:jlevy@cgsh.com)>; Azman, Darren <[Dazman@mwe.com](mailto:Dazman@mwe.com)>; Evans, Joseph <[Jbevans@mwe.com](mailto:Jbevans@mwe.com)>; Steinman, Gregg <[Gsteinman@mwe.com](mailto:Gsteinman@mwe.com)>; Barrett, Lucas <[lbarrett@mwe.com](mailto:lbarrett@mwe.com)>; Herbert, Campbell <[cherbert@mwe.com](mailto:cherbert@mwe.com)>; Ray, Cris <[cray@mwe.com](mailto:cray@mwe.com)>; Gibson, Matthew <[Mgibson@mwe.com](mailto:Mgibson@mwe.com)>
**Subject:** Re: Confirmation Hearing Schedule

You don't often get email from [hokim@cgsh.com](mailto:hokim@cgsh.com). Learn why this is important

**[ External Email ]**

Thanks. Do you mean including with respect to the documents that have been withdrawn by DCG and the UCC?

Best,
Hoori

On Feb 19, 2024, at 5:55 PM, Griffith, Greer <[Ggriffith@mwe.com](mailto:Ggriffith@mwe.com)> wrote:

Thank you, Hoori. We plan on reaching out to the Court to raise these pending issues as it appears we are at an impasse for the reasons we previously have communicated.

GREER GRIFFITH
Partner
**McDermott Will & Emery LLP** One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5578  **Mobile** +1 215 913 1418   **Email** ggriffith@mwe.com
**Biography | Website | vCard | LinkedIn**

**From:** Kim, Hoori <[hokim@cgsh.com](mailto:hokim@cgsh.com)>
**Sent:** Monday, February 19, 2024 2:41 PM
**To:** Griffith, Greer <[Ggriffith@mwe.com](mailto:Ggriffith@mwe.com)>; Hatch, Miranda <[mhatch@cgsh.com](mailto:mhatch@cgsh.com)>; VanLare, Jane <[jvanlare@cgsh.com](mailto:jvanlare@cgsh.com)>; Weaver, Andrew <[aweaver@cgsh.com](mailto:aweaver@cgsh.com)>; Kowiak, Michael <[mkowiak@cgsh.com](mailto:mkowiak@cgsh.com)>; Kessler, Thomas <[tkessler@cgsh.com](mailto:tkessler@cgsh.com)>; Levy, Jennifer <[jlevy@cgsh.com](mailto:jlevy@cgsh.com)>
**Cc:** Azman, Darren <[Dazman@mwe.com](mailto:Dazman@mwe.com)>; Evans, Joseph <[Jbevans@mwe.com](mailto:Jbevans@mwe.com)>; Steinman, Gregg <[Gsteinman@mwe.com](mailto:Gsteinman@mwe.com)>; Barrett, Lucas <[lbarrett@mwe.com](mailto:lbarrett@mwe.com)>; Herbert, Campbell <[cherbert@mwe.com](mailto:cherbert@mwe.com)>; Ray, Cris <[cray@mwe.com](mailto:cray@mwe.com)>; Gibson, Matthew <[Mgibson@mwe.com](mailto:Mgibson@mwe.com)>
**Subject:** RE: Confirmation Hearing Schedule

You don't often get email from [hokim@cgsh.com](mailto:hokim@cgsh.com). Learn why this is important

**[ External Email ]**
Greer,

Following up on the second request, DCG and the UCC have withdrawn their requests to include those documents on the exhibit list. We will follow up further on the first request.

Best,

Hoori

_____

**Hoori Kim**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: casanchez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2392
hokim@cgsh.com | clearygottlieb.com

---

**From:** Kim, Hoori
**Sent:** Friday, February 16, 2024 8:08 PM
**To:** Griffith, Greer <Ggriffith@mwe.com>; Hatch, Miranda <mhatch@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Levy, Jennifer <jlevy@cgsh.com>
**Cc:** Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Barrett, Lucas <lbarrett@mwe.com>; Herbert, Campbell <cherbert@mwe.com>; Ray, Cris <cray@mwe.com>; Gibson, Matthew <Mgibson@mwe.com>
**Subject:** RE: Confirmation Hearing Schedule

Greer,

We are considering these and will get back to you.

Best,
Hoori

_____

**Hoori Kim**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: casanchez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2392
hokim@cgsh.com | clearygottlieb.com

---

**From:** Griffith, Greer <Ggriffith@mwe.com>
**Sent:** Friday, February 16, 2024 5:11 PM
**To:** Kim, Hoori <hokim@cgsh.com>; Hatch, Miranda <mhatch@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kowiak, Michael <mkowiak@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Levy, Jennifer <jlevy@cgsh.com>
**Cc:** Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>; Barrett, Lucas <lbarrett@mwe.com>; Herbert, Campbell <cherbert@mwe.com>; Ray, Cris <cray@mwe.com>; Gibson, Matthew <Mgibson@mwe.com>
**Subject:** RE: Confirmation Hearing Schedule

Counsel,

During the Deposition of Paul Aronzon on February 16, 2024, there were Special Committee Meeting Minutes that were introduced as exhibits.  It is thus clear that the Special Committee kept meeting minutes and notes and that Debtors have produced these meeting minutes to other parties.  Please produce all Special Committee meeting minutes, notes, and memos by **12 p.m., on Monday, February 19, 2024.**  If you do not produce these documents by then, we will proceed to raise this as a discussion

point during the next Court hearing.  To the extent privilege is claimed over any responsive documents, those documents must be disclosed in their entirety with any portions over which privilege is claimed redacted, and the basis on which such privilege is claimed noted.

These Special Committee documents are responsive to the *Genesis Crypto Creditors Ad Hoc Group's Second Requests for Production of Documents to Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific PTE. LTD*, dated January 17, 2024 (the "Second RFP").  The Second RFP sought, among other things, the production of documents "Concerning investigations of any Released Party, any Released Genesis Personnel, and any Special Committee member conducted by the Estate, the UCC, or any other Person" (Request No. 6), "Documents […] Concerning disputes Concerning any of the Released Parties and any of the Released Genesis Personnel" (Request No. 8), "All Documents sufficient to assess the benefit the Estate will receive from providing the Releases" (Request No. 11) and "All Documents sufficient to assess the anticipate value of the Estate's litigation claims against each of the Released Parties and each of the Released Genesis Personnel." (Request No. 12).  The Debtors' production obligations in connection with the Second RFP are also continuing.  *See* Second RFP, Paragraph 5.  Notwithstanding the clear scope of each of these requests, and the Debtors' continuing disclosure obligations, the Debtors did not produce any documents in response to any of those requests in their response of January 30, 2024.  Nor have they produced any responsive documents since then. Indeed, to-date, the Debtors have produced only two—publicly available—documents.

Separately, we again reiterate our repeated request that we also immediately be sent all of the documents that were listed on the version of the exhibit list shared during the meet-and-confer, dated February 8, 2024, which are plainly relevant to Plan Confirmation.  This is our seventh time making this request, with it most recently being discussed during my phone call with you yesterday.  If these documents are not produced, we also will proceed with raising this as a discussion point during the next Court hearing.

| |
|---|
| DCG_SC00208763 |
| DCG_SC00265705 |
| DCG_SC00274421 |
| DCG_SC00425927 |
| DCG_SC00487223 |
| DCG_UCC00006017 |
| DCG_UCC00006030 |
| DCG_UCC00006951 |
| DCG_UCC00007319 |
| DCG_UCC00009731 |
| DCG_UCC00009872 |
| DCG_UCC00010513 |
| DCG_UCC00010519 |
| DCG_UCC00011901 |
| DCG_UCC00013077 |

| |
|---|
| DCG_UCC00013386 |
| DCG_UCC00013639 |
| DCG_UCC00013906 |
| DCG_UCC00014699 |
| DCG_UCC00015215 |
| DCG_UCC00016114 |
| DCG_UCC00018820 |
| DCG_UCC00020385 |
| DCG_UCC00022082 |
| DCG_UCC00022814 |
| DCG_UCC00023187 |
| DCG_UCC00023242 |
| DCG_UCC00023780 |
| DCG_UCC00023895 |
| DCG_UCC00023960 |
| DCG_UCC00025676 |
| DCG_UCC00027110 |
| DCG_UCC00028122 |
| DCG_UCC00029610 |
| DCG_UCC00030305 |
| DCG_UCC00038014 |
| DCG_UCC00045100 |
| DCG_UCC00045103 |
| DCG_UCC00045198 |
| DCG_UCC00047291 |
| DCG_UCC00047361 |
| DCG_UCC00047385 |
| DCG_UCC00048312 |
| DCG_UCC00048562 |
| DCG_UCC00048974 |
| DCG_UCC00051642 |
| DCG_UCC00051892 |
| GENESIS_DCG_00010665 |
| GENESIS_DCG_00012630 |
| GENESIS_DCG_00020077 |
| GENESIS_DCG_00035386 |
| GENESIS_DCG_00088209 |
| GENESIS_DCG_00089201 |
| GENESIS_DCG_00089560 |
| GENESIS_DCG_00095980 |
| GENESIS_DCG_00119282 |

GENESIS_DCG_00155030

GREER GRIFFITH
Partner

**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5578    **Mobile** +1 215 913 1418    **Email** ggriffith@mwe.com
**Biography** | **Website** | **vCard** | **LinkedIn**

# **<u>EXHIBIT 11</u>**

Email Sent by Cleary to McDermott, Dated February 20, 2024

**From:** Kowiak, Michael <mkowiak@cgsh.com>
**Sent:** Tuesday, February 20, 2024 10:39 PM
**To:** Azman, Darren <Dazman@mwe.com>; Evans, Joseph <Jbevans@mwe.com>; Griffith, Greer <Ggriffith@mwe.com>; Barrett, Lucas <lbarrett@mwe.com>; Steinman, Gregg <Gsteinman@mwe.com>
**Cc:** O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Weaver, Andrew <aweaver@cgsh.com>; Kessler, Thomas <tkessler@cgsh.com>; Massey, Jack <jamassey@cgsh.com>; Kim, Hoori <hokim@cgsh.com>
**Subject:** Genesis - Production from Debtors

**[ External Email ]**
Counsel,

Please find attached a production from the Debtors' plus an accompanying cover letter.

The password will be provided under separate cover.

Best,
Michael

———

**Michael Kowiak**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2929
mkowiak@cgsh.com │ clearygottlieb.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at:
https://www.clearygottlieb.com/footer/privacy-statement