**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
Colin T. West
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

– and –

Amanda Parra Criste (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

*Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF BRADLEY GEER IN SUPPORT OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE AMENDED JOINT CHAPTER 11 PLAN
AND OMNIBUS RESPONSE TO OBJECTIONS THERETO**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

I, Bradley Geer, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.  I am above 18 years of age, and I am competent to testify. I am a Managing Director in the financial restructuring group of Houlihan Lokey ("**Houlihan**"). I am based in Houlihan's Minneapolis office, located at 225 South 6th St #4950, Minneapolis, MN 55402. Houlihan has been retained as the investment banker for the Committee in these cases.[2]

2.  I submit this fact declaration (the "**Declaration**") in connection with the Official Committee of Unsecured Creditors' (the "**Committee**") *Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto*.

3.  The statements in this Declaration are, except as otherwise noted, based on information that is publicly available, provided by the Debtors or their advisors, provided by the Committee or their advisors, and/or my personal knowledge. If called upon to testify, I would testify to the facts set forth herein.

4.  I have worked at Houlihan since August 1998. In my role at Houlihan, I have advised creditors' committees and other parties in interest in numerous large financial institution restructurings, including Lehman Brothers Holdings, Inc., Silicon Valley Bank Financial Group, Capmark Financial Group, Refco Inc., Conseco Services, LLC, Las Vegas Monorail (Ambac Financial Group, Inc.), Celsius Network LLC and Ritchie Capital Management, LLC. I have also led a number of other large restructuring transactions in other industries, including Northwestern Corp., Laidlaw Inc., NRG Energy Inc., Chiquita Brands International, and Polaroid Corp., among others. My roles in these engagements have included overseeing the disposition of numerous

---

[2] Capitalized terms used herein but otherwise not defined shall have the meanings given to such terms in the Plan.

2

classes of financial assets, resolving issues with the FDIC and other regulators regarding the recapitalization, wind-down and sale of banks, and the overall conceptualization, modeling, and negotiation of plans of reorganization to facilitate consensual reorganizations. I previously headed Houlihan's joint venture in South Korea, where I advised Korea Asset Management Co. (KAMCO)—the Korean government equivalent of Resolution Trust Corp. (RTC)—in its disposition of over $2.5 billion in non-performing loans from Korean banks, and private equity investors in their recapitalization/acquisition of Korea First Bank (KFB), Hanmi, and Hanvit banks.

5. Prior to working at Houlihan, I was a Director with Poongsan Corporation in Seoul, South Korea. For seven years, I oversaw the company's foreign investment interests. I also worked for one year as an associate with Churchill Capital, a private equity fund.

6. I received both a Bachelor's degree and a Master's degree in quantitative economics from Stanford University.

7. As set forth below, I have been involved in various capacities in negotiations among the Debtors, their creditors, and DCG on a near continuous basis since December 2022. The substance of those negotiations with DCG has been generally confidential and governed by mediation and other privileges. Accordingly, it is not my intent here to disclose the substance of the terms of any proposals exchanged with DCG, except with respect to the two proposals that were deliberately made public: the February Term Sheet and the August Agreement (each defined below). Otherwise, my summary of the negotiations is limited to pure issues of process and response to certain assertions made by DCG regarding the process of the negotiations.

I.      **Early Involvement with Genesis and These Chapter 11 Cases**

8.      My earliest involvement with Genesis came in early December 2022. On or around November 16, 2022, Genesis suspended redemptions and new loan originations in its lending business. Shortly thereafter, Houlihan was retained to assist an ad hoc group of Genesis customers in assessing their options in connection with a potential Genesis restructuring. This group included some of the creditors that later formed the group known as the Ad Hoc Group of Genesis Creditors, or "**Ad Hoc Group**," which has participated extensively in these chapter 11 cases. The Ad Hoc Group consisted of many of Genesis's largest customers, including creditors whose claims against Genesis were denominated in U.S. dollars and stablecoin ("**Dollar Creditors**") and creditors whose claims against Genesis were denominated in non-stablecoin cryptocurrency, such as Bitcoin (BTC), Ether (ETH), and other digital assets (the "**Crypto Creditors**").

9.      Following the Ad Hoc Group's retention of Houlihan, the Debtors, the Debtors' ultimate parent, Digital Currency Group, Inc. ("**DCG**"), Gemini Trust Company, LLC ("**Gemini**"), and the Ad Hoc Group engaged in extensive pre-bankruptcy negotiations. Those discussions began in December 2022 and continued through the January 19, 2023 petition date (the "**Petition Date**") in these cases. The Committee was appointed on February 3, 2023, and Houlihan was retained as the investment banking advisor to the Committee shortly thereafter.

10.     On February 10, 2023, the Debtors, DCG, Gemini and the Ad Hoc Group announced a non-binding term sheet (the "**February Term Sheet**"), which can be found at Docket No. 80. At a high level, the February Term Sheet contemplated the restructuring of DCG's then-existing obligations to the Debtors of over $1.6 billion in exchange for a release of DCG and its non-debtor affiliates, and each of their officers, directors, and shareholders, which release was subject to the completion of the Debtors' investigation into potential causes of action against

4

DCG.[3]  The February Term Sheet proposed to monetize the Genesis platform via sale or wind-down, or alternatively, if no sale was achieved, an equitization of Genesis Global Holdco, LLC ("**Holdco**") resulting in creditors of Genesis Global Capital, LLC ("**GGC**") receiving 100% of the equity interests in reorganized Holdco.  It also proposed to convert debt owed by DCG and DCG International Investments Ltd. ("**DCGI**") into a second lien term loan due June 2024 and convert a $1.1 billion promissory note due from DCG to GGC in 2032 (the "**DCG Note**") to $575 million of convertible preferred stock.

11.    Under the February Term Sheet, it was understood that all the assets of the estate, including DCG's contribution, whether denominated in cryptocurrency or U.S. dollars, would be distributed to the Debtors' customers, which consisted almost exclusively of customers with outstanding loan balances.  In connection with the February Term Sheet, DCG did not assert a right to receive recoveries in excess of the U.S. dollar value of the customers' claims as of the Petition Date, notwithstanding that all parties understood that cryptocurrencies are highly volatile relative to the U.S. dollar and it was conceivable that, by the time of the execution of any deal, the value of cryptocurrencies could have increased sufficiently to pay Genesis's customers the Petition Date dollar value of their claims in full.  The February Term Sheet also contemplated in-kind payments to creditors pursuant to their contractual entitlements:

> **GGC Creditor Recoveries In-Kind**
>
> The Genesis Debtors and DCG will use commercially reasonable efforts, in consultation with the Ad Hoc Group Advisors and the Required Consenting GGC Creditors, to provide recoveries to GGC Creditors under the Amended Plan in kind in the form of crypto or fiat currency in which their claim is denominated . . . .

February Term Sheet at 1.

---

[3]  *See Notice of Filing of the Restructuring Term Sheet* [Docket No. 80], Ex. A at 17 and n.20.

12. Given the timing of the Committee's appointment on February 3, 2023, the non-binding February Term Sheet was negotiated without any involvement or input by the Committee. It was also negotiated before creditors, including the Ad Hoc Group, were given access to non-public information concerning the prepetition conduct that led to the Genesis bankruptcy.

### II. Continued Negotiations with DCG on Behalf of the Committee

13. I understand that the Committee serves as a fiduciary for the Debtors' unsecured creditors. Based on my work in these cases, I understand that the non-governmental creditors in this case consist primarily of holders of claims based on individually-negotiated Master Loan Agreements ("**MLAs**"). The MLAs set out the terms of the customers' lending relationship with the Debtors, including repayment upon termination of their loans, pursuant to which customers are entitled to receive repayment of the same loaned assets (in each case, either U.S. dollars, cryptocurrency or other digital assets). For example, when loans were made in a specified cryptocurrency, it is my understanding that the terms of the MLAs explicitly required that the Debtors return "Digital Currency of the same quantity and type as the Digital Currency" that was loaned.[4]

14. After retaining Houlihan as the Committee's investment banking advisor, one of the first acts of the Committee was to commence an investigation into the prepetition affairs that led to the Genesis bankruptcy, including DCG's role in certain transactions that took place throughout 2022.

15. As the investigation progressed, it became clear to the Committee that the February Term Sheet, and DCG's contribution specifically, provided insufficient consideration for the

---

[4] *See, e.g.*, Exhibit A (Master Borrow Agreement, dated Aug. 3, 2021 [CCAHG00000004]) at CCAHG00000006; Exhibit B (Master Borrow Agreement, dated Apr. 10, 2021 [CCAHG00000119]) at CCAHG00000121.

6

proposed broad releases to DCG and its non-debtor affiliates. The Committee also recognized, upon gaining access to diligence information, that the agreement contemplated by the February Term Sheet included certain unresolved matters.

16. Over the next several months, the Committee continued to negotiate with DCG, the Debtors, and the Ad Hoc Group to address these issues. After a series of proposals and counter-proposals, the Debtors announced that they would seek an order from the Court appointing a mediator to assist the various constituencies with resolving their disputes concerning, among other things, the amount, form, timing, and other terms and conditions of DCG's contribution to the Debtors' plan of reorganization. On May 1, 2023, the Court entered a mediation order, which appointed the Hon. (Ret.) Randall J. Newsome as mediator (the "**Mediator**") and ordered the mediating parties to hold at least two substantive mediation sessions on or before May 8, 2023.

17. On May 4 and 5, 2023, representatives of the Committee (including myself), the Debtors, the Ad Hoc Group, Gemini, and DCG attended a two-day in-person mediation with the Mediator. The in-person mediation session concluded without an agreement, but the parties continued their discussions.

18. While the negotiations progressed, the Committee worked collaboratively with the Debtors and the Ad Hoc Group to formulate a chapter 11 plan that retained claims and causes of action against DCG and Gemini, with the litigation proceeds augmenting creditor recoveries. That plan was filed on June 13, 2023 (the "**June Plan**"), which can be found at Docket No. 427.

19. Negotiations with DCG continued after the filing of the June Plan, including a renewed in-person mediation session held on August 16, 2023. These negotiations resulted in a deal in principle reached between the Debtors, the Committee, and DCG (the "**August Agreement**"), which remained subject to definitive documentation and continued negotiation over

the terms and conditions of an amended chapter 11 plan. The August Agreement is described in the presentation attached to the *Notice of Mediation Termination*, filed on August 29, 2023 at Docket No. 625. The published terms of the August Agreement expressly contemplate that the agreement would be incorporated into an Amended Plan. August Agreement at 1.

20. The August Agreement provided that, in exchange for certain releases, DCG would enter into new debt facilities and a debt repayment agreement on account of the existing loans due to GGC from DCG and DCGI maturing in May 2023 in satisfaction of all obligations to the Debtors. Close to half of DCG's debt consideration would be repaid in digital assets to facilitate distributions based on creditors' contractual entitlements. The filing announcing the August Agreement provided creditors with estimated recoveries based on such distributions.

21. Nothing in the now-published August Agreement contemplated that creditor recoveries would be capped at the U.S. dollar value of crypto-denominated claims as of the Petition Date, or that any value in excess of the Petition Date price due to crypto market fluctuations would be distributed to holders of subordinated claims or equity. To the contrary, the only caps in the August Agreement were those demanded by DCG to prevent the U.S. dollar equivalent of the quantity of crypto-denominated debt that DCG would be obligated to repay under the agreement from exceeding a certain U.S. dollar threshold. The August Agreement expressly contemplated that "[l]oans denominated in BTC and ETH benefit from price appreciation up to $85,000 for BTC and up to $8,500 for ETH." August Agreement at 3. These prices are well in excess of today's prices and, of course, well in excess of Petition Date prices.[5] To be clear, these "caps" were not caps on Crypto Creditor recoveries, but rather were caps on <u>DCG's</u> obligations. Essentially, by

---

[5] As of 4:00 p.m. (ET) on February 15, 2024, the date of this Declaration, the published price of BTC was $51,732 and the published price of ETH was $2,830.

8

demanding the caps, DCG was trying to mitigate the exact phenomena that faces the Debtors in the current rising crypto environment in which the repayment of the quantity of coins associated with a crypto-denominated claim liability becomes more expensive as the exchange rate of that coin increases.

22. In fact, the August Agreement contained no caps on Crypto Creditor recoveries beyond the contractual entitlement under their respective MLAs. The filing announcing the August Agreement also contained a "Distribution Mechanic," agreed upon between the Committee and the Debtors, which contemplated "in-kind distributions to the extent possible" for initial distributions. August Agreement at 4. For longer term distributions, it contemplated "coin-denominated creditors would bear the upside and downside risk of coin price fluctuations post-settlement date." *Id.* In short, although DCG was focused on protecting its own balance sheet from the impact of further increases in crypto prices, DCG was prepared to support a plan under which Crypto Creditors would receive in-kind distributions to the maximum extent possible up to their full prepetition contractual entitlements, with no recoveries to subordinated creditors or equity resulting from crypto price increases, regardless of fluctuations in the price of crypto.

23. At the same time that the negotiations with DCG described above were taking place, the various creditor groups and the Debtors had parallel discussions regarding how any recoveries from a DCG deal would be distributed among the creditors. As set forth above, the inclusion of the "Distribution Mechanic" in the August Agreement, negotiated and agreed between the Committee and the Debtors, reflects that the DCG understood that such parallel discussions regarding the allocation of recoveries were occurring. To my knowledge, however, DCG did not request to participate in such discussions.

24. Ultimately, the August Agreement did not garner sufficient creditor support around which to structure a confirmable plan. Accordingly, the Debtors, the Committee, and the Ad Hoc Group continued to negotiate with DCG over the next several months. In late October 2023, the Office of the New York Attorney General ("**NYAG**") filed a civil action against the Debtors, DCG, and Gemini (the "**NYAG Action**") that fundamentally altered the Committee's (and, to my understanding, the Debtors' and the Ad Hoc Group's) expectations with respect to ongoing negotiations and the most viable path out of chapter 11.

25. Having considered the potential risks posed by the NYAG Action to DCG's ability to perform any settlement, the Debtors, the Committee, and the Ad Hoc Group determined to move forward with an amended version of the June Plan, which the Debtors ultimately filed on November 28, 2023 ("the **Plan**") and which can be found on Docket No. 989. Before this plan was filed, however, the significant open issue left to address concerned how recoveries would be distributed among creditors under the Plan.

26. Although the Committee agreed that it was in the best interests of creditors to pursue the Plan, the Committee, the Debtors, and the Ad Hoc Group nevertheless continued discussions with DCG, as well as Gemini, in the hope of reaching a global resolution with all parties.

### III. The Distribution Principles Settlement

27. With negotiations with DCG continuing in the background, the Committee began an intensive round of negotiations with the Debtors, the Ad Hoc Group, and other parties concerning the distribution mechanics under the Plan. The other parties included a group known as the Ad Hoc Group of Dollar Lenders (the "**Dollar Group**"), which has appeared in these cases.[6]

---

[6] *See* Dollar Group's *Notice of Appearance and Demand for Notice and Papers* [Docket No. 924].

10

28.     As discussed below, the distribution mechanics took on particular importance because of the significant volatility in cryptocurrencies, including BTC and ETH, relative to the U.S. dollar. By way of example, the price of BTC was $21,084 on the Petition Date and the price of ETH was $1,551 on the Petition Date. As of November 17, 2023, when the parties reached a settlement on the Distribution Principles (see below), the price of BTC was $36,597 and the price of ETH was $1,961. Under the MLAs, the Debtors have contractual obligations to return to the Crypto Creditors approximately 63,858 BTC[7] and 449,210 ETH[8] coins.[9] The Debtors, however, only have on hand approximately 12,632 BTC and 118,765 ETH coins,[10] resulting in a large shortfall (the "**Coin Shortfall**"). The only means to fill the Coin Shortfall with like-kind coins is for the Debtors to buy them by converting U.S. dollars or other assets into BTC or ETH (such as Grayscale Bitcoin Trust shares, or GBTC, in which no claims are denominated).

29.     Even taking into account the ability of the Debtors to convert U.S. dollars or other assets into coins, the Debtors' available assets are insufficient to pay all creditors the full amount of their claims in the currency in which customers are contractually entitled to be repaid (the "**Total Claims Shortfall**").[11] The negotiation of the Distribution Principles was, ultimately, a negotiation over how best to fill the Total Claims Shortfall so that no one group of customers was overly benefitted or prejudiced by the manner and form of distribution. Based on the prices of the digital assets held by the Debtors at the time the Distribution Principles were being negotiated, it was not

---

[7]     This figure is comprised of the sum of 49,635 BTC in post set-off non-Gemini claims and 14,223 BTC in pre set-off Gemini claims.

[8]     This figure is comprised of the sum of 291,279 ETH in post set-off non-Gemini claims and 157,931 ETH in pre set-off Gemini claims.

[9]     For illustrative purposes, I only discuss here BTC and ETH, which are the digital assets in which the Debtors have the largest contractual obligations. I note, however, that the shortfall issue described here also refers to obligations to creditors denominated in certain alternative coins, collective known as "Alt-coins."

[10]    These coin quantities on hand exclude conversion of GBTC, ETHE, and ETCH shares.

[11]    I do not include here the Debtors' litigation claims, the value of which is unknown.

anticipated that either Dollar Creditors or Crypto Creditors would be paid the full balance of their loans in their respective currencies. However, based on the ultimate resolution of the Distribution Principles (as described below), and as a result of the increase in the price of digital assets since the parties reached such resolution, it is currently anticipated that the Total Claims Shortfall would be borne by Crypto Creditors, with Dollar Creditors receiving 100% of their loan balance (deferring current payment of postpetition interest).[12]

30.    As of the date of this Declaration, I estimate that the Total Claims Shortfall, after appropriate conversion of available assets to digital assets, would be greater than $900 million in U.S. dollar equivalent. And as the conversion price of BTC or ETH increases, the Total Claims Shortfall grows because fewer coins can be purchased with each available U.S. dollar. Simply put, as the price of digital assets increases, it becomes harder to pay back the Crypto Creditors the digital assets that they loaned to the Debtors.

31.    The Distribution Principles were heavily negotiated by the various creditor groups and the Debtors. The parties' discussions covered a range of topics concerning the distribution mechanics under the Plan, including how the value of assets would be determined for calculating overall recovery rates, any definitive recovery cap, what would happen in the event that the recovery cap was met, postpetition interest and how it would accrue, and post-effective date interest.

32.    The parties whose recoveries were at stake came to the negotiating table with different positions. The Crypto Creditors involved in the negotiations took the position that they were entitled to the full quantity of cryptocurrency they had lent to the Debtors under their respective MLAs. On the other hand, the Dollar Creditors took the view that all claims, whether

---

[12]    Once again, this excludes any recovery from Debtors' litigation claims, the value of which is unknown.

denominated in U.S. dollars or digital assets, should be determined as the dollar-equivalent value based on Petition Date pricing. These positions marked the "bookends" of the debate on this subject that was the center of negotiations for months among the creditor groups and which led to the compromise that is embedded in the Distribution Principles. I note further that the Crypto Creditors Ad Hoc Group (the "**Crypto AHG**") have now asserted a third position, which is that the termination of their crypto-denominated loans should result in an administrative priority claim.[13] If the Crypto Creditors were given administrative priority status, payable before general unsecured creditors (i.e., Dollar Creditors, in this scenario), the Coin Shortfall problem would be significantly magnified to the detriment of Dollar Creditors, because the entirety of the Coin Shortfall would have to be filled prior to Dollar Creditors receiving any recovery.

33. In late October and early November, I participated in many meetings and calls regarding the negotiation of the distribution mechanics. In addition to these calls and meetings, the parties exchanged numerous emails and proposals in connection with their various positions. The negotiations were intense and hard fought, with each party advocating strongly for their respective positions. One party to the negotiations described the situation as a "Gordian knot," reflecting the difficulty of the negotiations.

34. On November 17, 2023, the parties resolved their different positions and came to agreement on the Distribution Principles settlement (the "**Distribution Principles Settlement**"), which is embodied in the Plan now sponsored by the Debtors. Under the Plan, although it is not currently contemplated based on the Debtors' distributable assets, if the Total Claims Shortfall

---

[13] *Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* [Docket No. 1238] ¶¶ 20-25.

13

were to be filled through application of the Distribution Principles (including postpetition interest), value would next flow to subordinated creditors, and next to equity.

35. The Distribution Principles Settlement was designed to address disparity among unsecured creditors by maximizing their ability to recover up to their full contractual entitlements. To do so, the Distribution Principles Settlement includes a multi-step process that allocates assets to creditors by claim denomination and values these assets for distribution purposes. Distributions pursuant to the terms of creditors' prepetition agreements (or "like-kind" distributions) is critical because I understand that the position could be taken that such distributions do not trigger upfront tax for U.S. holders whose underlying claims have appreciated, whereas a recovery in any form other than the form of consideration lent to the Debtors is expected to trigger taxable gain. The final Distribution Principles Settlement also reduces the negative impact on Crypto Creditors whose claims are denominated in digital assets that have increased in value since the Petition Date, including BTC, ETH, and certain Alt-Coins. Because of the current increase in value, these creditors would receive less of their contractual entitlement (i.e., fewer of their coins back) without the negotiated compromise that was reached in the Distribution Principles.

36. Under the Distribution Principles Settlement, the following five steps determine the amount of distribution creditors will receive on account of their respective Allowed Claims:

| Distribution Principles Settlement | |
|---|---|
| **Step** | **Description** |
| ***Step 1:***<br>**Individual Claim Value** | Each Allowed General Unsecured Claim is valued as of the Petition Date for asset allocation purposes only, reduced by certain collateral held by the claimant (calculated as of the Effective Date) and payable offsets (calculated as of the Petition Date). |
| ***Step 2:***<br>***Pro Rata* Share** | Each Holder's *Pro Rata* Share is its respective Individual Claim Value divided by the aggregate of the Individual Claim Values (from Step 1). |
| ***Step 3:*** | The value of the full pool of the Debtors' assets that will be allocated to Holders of Allowed General Unsecured Claims is based on each Holder's |

14

| | |
|---|---|
| **Valuing Allocable Assets** | *Pro Rata* Share and is calculated for each Distribution Date based on the prescribed time period for such date.[14] |
| ***Step 4:*** **Allocating Allocable Assets** | This step determines the *order* in which the Debtors' Cash, Digital Assets, GBTC Shares, and ETHE Shares will be allocated on each Distribution Date based on the converted asset values from Step 3. |
| ***Step 5:*** **Distributions** | In order to maximize recoveries, to the extent that the Allocable Assets allocated to Holders of Allowed General Unsecured Claims consist of assets having the same denomination as the Claims ("**Matching Assets**"), such Matching Assets will be distributed to such Holders.<br><br>To the extent the Debtors' assets that have been allocated for distribution consist of assets having different denominations from the Holders' Claims ("**Mis-Matching Assets**"), the PA Officer, as applicable, will endeavor to engage in market transactions and distribute the proceeds to the relevant Holders. To the extent such transactions are not able to be completed, the PA Officer will engage in liquidation transactions or distribute Mis-Matching Assets. |

37. The key aspect of the Distribution Principles Settlement, which allows Holders of Claims denominated in digital assets to potentially receive some additional amount of their contractual entitlement is the agreement amongst all unsecured creditors to the "Recovery Cap." Under the Recovery Cap, no Holder of an Allowed General Unsecured Claim can receive post-petition interest or penalties that would result in distributions exceeding 100% of the principal debt of their Claim unless or until all General Unsecured Creditors have received the full contractual entitlement under their MLA (i.e., repayment of the full quantity of coins that they are owed); as soon as the Holder has received 100% of their full prepetition principal debt entitlement (including Holders of Fiat-or-Stablecoin denominated creditors), then their *Pro Rata* Share (Step

---

[14] ***Initial Distribution Date*** (on or around the Effective Date): (i) Distributable Assets (as defined in the Plan) are valued using the "Average Price" of such asset in USD during the period 15 days before and after entry of the Confirmation Order; (ii) GBTC Shares/ETHE Shares: The same conversion rate is applied, minus certain costs incurred when monetizing such shares for distribution.

***Subsequent Distributions***: (i) Distributable Assets will be valued based on a 7-day time-weighted average price; (ii) GBTC Shares/ETHE Shares: The same conversion rate is applied, minus certain costs incurred when monetizing such shares for distribution. Assets allocated after the Initial Distribution Date will be allocated pro rata with no conversion rate and will instead be allocated in Step 4.

2 above) is reduced to zero for any future distributions until all other Holders of Allowed Claims have received 100% of the prepetition principal debt obligations owed by the Debtors. Notwithstanding the foregoing, the parties to the Distribution Principles Settlement agreed that, if Holders of Allowed Fiat-or-Stablecoin Denominated Claims do not receive 100% repayment of their principal prepetition debt within two years of the Effective Date, they will be entitled to, and start accruing, interest at the federal judgment rate on the unpaid portions of their Claims.

### IV.  Response to DCG's Argument Concerning Equity Distributions

38.     I understand that DCG's has asserted in its objection that the claims of Crypto Creditors must be capped at the U.S. dollar value of their outstanding cryptocurrency balance as of the Petition Date, plus postpetition interest, notwithstanding the fact that this would mean that Crypto Creditors would receive significantly less crypto than they loaned to the Debtors. I understand that DCG makes this argument because it asserts an entitlement to an equity distribution. In other words, I understand that DCG asserts that it, and not the creditors who loaned crypto to Debtors, should benefit from the increase in U.S. dollar value of that crypto since the Petition Date and that DCG believes it should be entitled to what is essentially a dividend on its equity while the Debtors' crypto-denominated customers are left recovering only a fraction of the coin quantity that they lent to the Debtors.

39.     As an additional matter, I understand that the Debtors and the NYAG have reached a settlement (the "**NYAG Settlement**") pursuant to which the Debtors have agreed that the NYAG's claim, which is a Subordinated Claim (as defined below) will be allowed in an amount equal to the difference between the amount distributed to unsecured creditors and the total amount of their claims, calculated (in the case of Crypto Creditors) based on "the equivalent U.S. dollar

16

value using the price of the applicable digital asset on the applicable distribution calculation date" (the "**NYAG Settlement Claim**").[15]

40. If the NYAG Settlement is approved, then, mathematically, even under DCG's argument that Crypto Creditors' claims should be capped at the Petition Date U.S. dollar value of the digital assets they are owed, DCG would still not be entitled to an equity distribution based on the Debtors' known assets (not including litigation claims) at today's prices. This is because the value of such known assets does not exceed the value of the customers' claims plus the NYAG Settlement Claim, nor would such value exceed such claims even if the price of digital assets were to rise further.

41. Even setting aside the issue of the NYAG Settlement, I further understand from the Debtors that government entities have asserted claims, including penalty claims, which are proposed to be subordinated (or to receive subordinated recoveries) under the Plan, totaling in excess of $32 billion (the "**Subordinated Claims**").

42. I have not analyzed or assessed the Subordinated Claims. However, I note that under even under DCG's argument, based on the Debtors' latest recovery analyses, there would be approximately $900 million or $0 million under the high and low recovery cases, respectively, to distribute to stakeholders junior to the general unsecured creditors – putting equity out of the money by over $31 billion, even in the Debtor's high case. Using the high case as an example, this would mean that more than $32 billion in filed Subordinated Claims would need to be reduced to no greater than $900 million in order for DCG to receive an equity distribution, even under DCG's argument. I have not been made aware of any objections to such Subordinated Claims or any argument asserted by any party that would result in the $32 billion of Subordinated Claims

---

[15] See *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [Docket No. 1275] at Ex. C ¶ 5.

being reduced by more than $31 billion, or anywhere close to that amount. Therefore, even under DCG's argument and even setting aside the NYAG Settlement, equity is still woefully out of the money as a result of the existing Subordinated Claims to which no party has objected.

V. **Response to DCG's Argument Concerning Its Alleged Exclusion from Negotiations**

43. I understand DCG has argued that "the Amended Plan was the product of a clandestine process" and involved "months of back room discussions" with the Committee and the Ad Hoc Group, which "deliberately excluded DCG, the ultimate equity holder in these solvent Estates." *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection to Confirmation of the Debtors' Amended Plan* [Docket No. 1257] ¶ 7.

44. This is not, in my view, accurate. As set forth above, DCG was heavily involved in negotiations with the Debtors and various creditor groups. Those discussions have been near continuous from December 2022, when I first became involved in the case, until today. With respect to the parallel negotiations among creditors and the Debtors regarding the allocations of recovery, DCG clearly was aware that such discussions were occurring (see paragraph 23 above). To my knowledge, however, DCG did not request to participate in such discussions. Again, without disclosing the details of the DCG negotiations, neither the February Term Sheet nor the August Agreement reflect an understanding that DCG would ever receive a recovery, even if the prices of digital assets increased. Nor did either of those documented agreements contemplate that recoveries would be distributed to subordinated creditors. To the contrary, it was my understanding that, throughout the time DCG participated in settlement discussions, there was no dispute that all recoveries would be distributed to general unsecured creditors regardless of any movement in crypto prices, which would explain why DCG did not seek to be involved in the parallel discussions among creditors.

Dated: February 15, 2024,
       Minneapolis, Minnesota

/s/ *Bradley Geer*
Name: Bradley Geer
Title: Managing Director
       Houlihan Lokey