**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors*
*Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**THE GENESIS CRYPTO CREDITORS AD HOC GROUP'S OBJECTION TO CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN OF GENESIS GLOBAL HOLDCO, LLC, GENESIS GLOBAL CAPITAL, LLC, AND GENESIS ASIA PACIFIC PTE. LTD.**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## **TABLE OF CONTENTS**

Table of Contents ........................................................................................................i

Table of Authorities....................................................................................................ii

Preliminary Statement.................................................................................................1

Background ..................................................................................................................5

I.       The Genesis Investment Program and the Genesis Contracts .......................5

II.      Events Leading Up to Bankruptcy................................................................6

III.     These Chapter 11 Cases ...............................................................................7

Objection......................................................................................................................8

I.       The Plan Does Not Treat Claims Arising out of the Genesis Contracts as
Administrative Expenses .............................................................................................8

         A.      The Members' Claims Arose Out of Transactions with the
         Debtors................................................................................................................9

         B.      The Post-Petition Transactions Benefitted the Debtors' Estates.......................9

         C.      At a Minimum the Members' Claims Should be Granted
         Administrative Priority to the Extent of the Appreciation of Crypto
         Retained by the Debtors..................................................................................10

II.      Under Bankruptcy Code Section 562(a), the Members' Claims Should Be Valued at
the Date that the Debtors Reject the Genesis Contracts .........................................10

         A.      The Genesis Contracts Are Forward Contracts Under Section
         562…....................................................................................................................11

         B.      Alternatively, the Genesis Contracts Are Securities Contracts........................15

         C.      The Genesis Contracts Are Executory Contracts That Will Be
         Rejected on the Effective Date Under the Terms of the Plan ......................22

III.     Section 562 Should Apply in These Circumstances Because It Was Intended to Protect
Financial Markets from Systemic Risk......................................................................27

IV.      Section 562 Should be Applied to Members' Claims as a Matter of Public Policy.....28

V.       The Plan's Releases Render the Plan Incapable of Confirmation...............................31

Reservation of Rights.................................................................................................40

Conclusion .................................................................................................................40

CERTIFICATE OF SERVICE ..................................................................................42

## TABLE OF AUTHORITIES

**Cases**                                                                                                Page(s)

*In re Avianca Holdings S.A.*,
   618 B.R. 684 (Bankr. S.D.N.Y. 2020)................................................................25

*In re Bally Total Fitness of Greater N.Y., Inc.*,
   No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ..................31

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
   973 F.2d 51 (2d Cir. 1992)...........................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
   773 F.3d 411 (2d Cir. 2014)..........................................................................21

*In re BlockFi Inc., et al.*,
   Case No. 22-19361 (MBK) (Bankr. D. N. J.) .....................................................46

*In re Borden Chemicals & Plastics Operating Ltd.*,
   336 B.R. 214 (Bankr. D. Del. 2006) ..........................................................12, 13

*In re Celsius Network LLC, et al.*,
   Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) ....................................................29

*CFTC v. Eisenberg*,
   Case No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), Docket No. 1 ........................................11

*CFTC v. Erskine*,
   512 F.3d 309 (6th Cir. 2008) .........................................................................12

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y.) ....................................................................11

*In re Circle K Corp.*,
   1996 WL 529399 (Bankr. S.D.N.Y. May 30, 1996), *aff'd*, 1997 WL 31197
   (S.D.N.Y. Jan. 28, 1997)..............................................................................34

*In re Clean Burn Fuels, LLC*,
   540 B.R. 195 (Bankr. M.D.N.C. 2015)............................................................12

*In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan, Respondents*,
   CFTC Doc. No. 15-29 (Sep. 17, 2015) ............................................................11

*In re Congoleum Corp.*,
   362 B.R. 167 (Bankr. D.N.J. 2007) .............................................................37, 39

*Denney v. Jenkens & Gilchrist*,
   362 F. Supp. 2d 407 (S.D.N.Y. 2004)..............................................................35

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
   634 F.3d 79 (2d Cir. 2011)............................................................................31

*In re Ditech Holding Corporation*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) .................................................................. 28

*Friel v. Dapper Labs, Inc.*,
657 F. Supp. 3d 422 (S.D.N.Y. 2023) ................................................................... 19

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985) ......................................................................... 12, 19

*In re Gen. Dev. Corp.*,
84 F.3d 1364 (11th Cir. 1996) ............................................................................ 27

*In re Genesis Global Holdco, LLC*,
No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 21, 2023), Docket No. 146 .............. 1, 26, 33

*In re Hawker Beechcraft, Inc.*,
486 B.R. 264 (Bankr. S.D.N.Y. 2013) .................................................................. 25

*In re Helm*,
335 B.R. 528 (Bankr. S.D.N.Y. 2006) ............................................................. 22, 26

*In re Horowitz*,
482 F.2d 72 (2d Cir. 1973) ................................................................................. 34

*In re Ideal Mortg. Bankers, Ltd.*,
539 B.R. 409 (Bankr. E.D.N.Y. 2015) .................................................................. 22

*In re Ionosphere Clubs, Inc.*,
85 F.3d 992 (2d Cir. 1996) ................................................................................. 32

*Jing v. Yan Sun*,
No. CV 21-2350 (GRB) (AYS), 2022 U.S. Dist. LEXIS 1902 (E.D.N.Y.
Jan. 4, 2022) ..................................................................................................... 11

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re
Charter Commc'ns Operating LLC)*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................................. 30

*Kirschner v. JP Morgan Chase Bank, N.A.*,
79 F.4th 290 (2d Cir. 2023) ................................................................... 15, 16, 18

*Lebetkin v. Giray*,
No. 20-1374, 2021 WL 2965323 (2d Cir. July 14, 2021) ......................................... 9

*In re Lehman Bros. Inc.*,
533 B.R. 362 (S.D.N.Y. 2015) ............................................................................. 12

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*,
756 F.2d 1043 (4th Cir. 1985), *superseded by statute on other grounds* .......................... 26

*In re Magnesium Corp. of America*,
460 B.R. 360 (Bankr. S.D.N.Y. 2011) .............................................................. 12, 13

*In re Majestic Cap., Ltd.*,
    463 B.R. 289 (Bankr. S.D.N.Y. 2012) ............................................................21

*In re MBS Mgmt. Servs., Inc.*,
    690 F.3d 352 (5th Cir. 2012) ....................................................................13, 14

*McNabb v. SEC*,
    298 F.3d 1126 (9th Cir. 2002) ...................................................................17

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) .......................................................31, 37

*In re NanoDynamic, Inc.*,
    735 F. App'x 762 (2d Cir. 2018) ...............................................................21, 23

*In re NewPage Corporation*,
    586 B.R. 551 (Bankr. D. Del. 2018) ...........................................................23

*In re Old Carco LLC*,
    424 B.R. 633 (Bankr. S.D.N.Y. 2010) ........................................................9

*In re Olympic Nat. Gas Co.*,
    294 F.3d 737 (5th Cir. 2002) ....................................................................12, 13

*Pollack v. Laidlaw Holdings, Inc.*,
    27 F.3d 808 (2d Cir. 1994)........................................................................16

*In re Quigley Co., Inc.*,
    No. 04-15739 SMB, 2009 WL 9034027 (Bankr. S.D.N.Y. Apr. 24, 2009) ...............35, 36

*In re Residential Cap., LLC*,
    No. 12-12020 (MG), 2013 Bankr. LEXIS 5683 (Bankr. S.D.N.Y. Dec. 11,
    2013) .....................................................................................................37

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) .........................................................................19

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)...........................................................................*passim*

*In re Riodizio, Inc.*,
    204 B.R. 417 (Bankr. S.D.N.Y. 1997).........................................................22

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016).........................................................37

*SEC v. Celsius Network Ltd.*,
    No. 1:23-cv-6005 (S.D.N.Y. July 13, 2023), Docket No. 1 .............................25

*SEC v. Glob. Telecom Servs., L.L.C.*,
    325 F. Supp. 2d 94 (D. Conn. 2004)............................................................17

*SEC v. Ripple Labs, Inc.*,
No. 20-cv-10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023)......................................19

*SEC v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................................................................19

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)..............................................................................................*passim*

*SEC v. Wallenbrock*,
313 F.3d 532 (9th Cir. 2002) ...........................................................................................16

*SEC v. Xia*,
No. 21CV5350PKCRER, 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ........................21

*Stoiber v. SEC*,
161 F.3d 745 (D.C. Cir. 1998) .........................................................................................17

*In re Texaco Inc.*,
73 B.R. 960 (Bankr. S.D.N.Y. 1987)..........................................................................26, 27

*In re Tribune Co.*,
464 B.R. 126 (Bankr D Del, 2011) ..................................................................................38

*United States v. Leonard*,
529 F.3d 83 (2d Cir. 2008)...............................................................................................21

*In re Voyager Digital Holdings, Inc., et al.*,
Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).................................................................29

*In re Voyager Digital Holdings, Inc.*,
649 B.R. 111, 132 (Bankr. S.D.N.Y. 2023).......................................................................34

*Wallach v. Smith*,
No. 15-CV-1080 (LJV), 2017 WL 2957829 (W.D.N.Y. July 11, 2017)...........................23

*In re Westinghouse Elec. Co. LLC*,
No. 17-10751 (MEW), 2019 WL 4555990 (Bankr. S.D.N.Y. Sep. 19,
2019) ...................................................................................................................................8

*In re Windstream Holdings, Inc.*,
634 F. Supp. 3d 99 (S.D.N.Y. 2022)................................................................................23

**Statutes**

7 U.S.C. ch. 1 ....................................................................................................................11

7 U.S.C. § 1a(9) .................................................................................................................12

11 U.S.C. § 101(25) ...........................................................................................................11

11 U.S.C. § 101(49)(A)(xiv)...............................................................................................19

11 U.S.C. § 362 ........................................................................................................ 23

11 U.S.C. § 365 .................................................................................................. 22, 27

11 U.S.C. § 365(a) ................................................................................................. 21

11 U.S.C. § 503(b) ................................................................................................... 8

11 U.S.C. § 503(b)(1)(A) ......................................................................................... 8

11 U.S.C. § 562 ............................................................................................... *passim*

11 U.S.C. § 562(a) ........................................................................................ 8, 10, 11

11 U.S.C. § 741(7)(A)(i) ........................................................................................ 21

11 U.S.C. § 741(7)(A)(i), (vii), (x), (xiv) .............................................................. 15

11 U.S.C. § 761(4)(A) ........................................................................................... 12

11 U.S.C. § 1123(b)(3)(A) ..................................................................................... 31

15 U.S.C. § 78(a) *et seq* ....................................................................................... 21

15 U.S.C. § 78c(a)(13)–(14) .................................................................................. 21

Pub. L. No. 100-506, 102 Stat. 2538 (1988) ......................................................... 27

**Other Authorities**

H.R. Rep. No. 101-484 (1990) ............................................................................... 14

H.R. Rep. No. 95-595 (1977) ................................................................................. 22

The Genesis Crypto Creditors Ad Hoc Group (the "CCAHG"), by and through its counsel, McDermott Will & Emery LLP ("McDermott"), hereby submits this objection (the "Objection") to the *Amended Joint Chapter 11 Plan* [Docket No. 948] (as amended, modified, and supplemented from time to time, the "Plan")[2] of Genesis Global Holdco, LLC, Genesis Global Capital, LLC ("Genesis"), and Genesis Asia Pacific Pte. Ltd. ("GAP" and collectively, the "Debtors"). In support of this Objection, the CCAHG respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtors were once one of the most prominent and well-respected cryptocurrency ("crypto") companies in the world. Their rise to prominence was because thousands of crypto investors trusted the Debtors to keep their investment safe. After lying to those crypto investors and ultimately filing for bankruptcy, the Debtors are attempting to stunt the recoveries of these same investors by improperly valuing their claims as of the Petition Date. At the same time, the Debtors seek to protect their insiders by granting a still unknown number of broad releases for reasons that the Debtors refuse to disclose. The Court should reject the Plan's use of Petition Date pricing to value the claims of the CCAHG and reject the Plan's proposed releases.

2.      Bitcoin, Ethereum, and other crypto assets have doubled in value since the Petition Date. The value of the Debtors' estates has massively increased because the Debtors are in possession of crypto that creditors deposited. The Plan redirects this crypto price appreciation to others. At best, the Plan takes hundreds of millions of dollars away from crypto creditors and distributes it to fiat and stablecoin creditors. At worst, if Digital Currency Group's ("DCG") objection is successful, this approach takes hundreds of millions of dollars away from crypto creditors and distributes it to DCG.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

3.      The valuation of crypto claims arising out of the contracts between the CCAHG's members and the Debtors as of the Petition Date must be rejected. As the Debtors concede, such contracts are "covered contracts" under Bankruptcy Code section 562. And, given that such contracts are executory, they are deemed rejected as of the Effective Date under Article V of the Plan. Thus, in accordance with section 562, the value of the crypto claims arising out of the rejection of these contracts must be the Effective Date. Accordingly, the CCAHG's claims should not be valued as of the Petition Date, but rather the date of rejection of the contracts—*i.e.*, the Plan's Effective Date.

4.      The Plan is also deficient because it fails to treat the CCAHG's claims as having administrative priority. Each of the CCAHG's contracts contain automatic renewal provisions for successive one-year terms, which occurred post-petition. This automatic renewal is considered a transaction induced by the Debtors that warrants administrative expense treatment, yet the Plan fails to treat the CCAHG's claims as such.

5.      Despite the Plan's shortfalls as to crypto claims, the Debtors have taken substantial efforts to protect their insiders via inappropriate and overbroad releases. The Debtors seek to release more than 160 current and former executives, directors, managers, officers, and employees of the Debtors ("Released Genesis Personnel") as well as an uncapped number of "Related Parties" without any justifiable basis. The inclusion of such broad releases in the Plan does not represent a valid exercise of the Debtors' business judgment.

6.      The Special Committee was responsible for conducting investigations and providing independent written consent for the releases of more than 160 Released Genesis Personnel. However, the Debtors have failed to provide sufficient information to demonstrate that the Special Committee vetted the merits of releasing *each* of the proposed releasees. Indeed, the Special Committee member was unable to identify within a *five hundred* person

range how many individuals were being released.[3] The released parties have not provided any value in exchange for their releases that they have not already been compensated for as Debtors' employees.

7.      Further, only a fraction of the released parties have been interviewed. The Special Committee did not partake in any of these interviews. Instead, Cleary Gottlieb Steen & Hamiliton LLP ("Cleary"), counsel to both the Debtors and the Special Committee, conducted the few interviews that have occurred. During the deposition of a Special Committee member, Cleary repeatedly directed him to not answer questions concerning the facts that he used to determine releases were appropriate, arguing that it would reveal communications between the Special Committee and Cleary. Cleary claims that facts relied on by the Special Committee have become cloaked in privilege because the Special Committee learned them through Cleary. They are not. Since the Special Committee conducted none of its own interviews, this tactic has blocked the CCAHG from testing any facts related to the releases other than those Cleary selectively chose to disclose in public filings.

8.      Cleary also claims that the findings from its investigation that it shared with the Special Committee, the Official Committee of Unsecured Creditors ("UCC"), and the Ad Hoc Group are privileged. They are not. If findings were shared with the UCC and the Ad Hoc Group, any privilege that may apply has been waived. These findings should be shared with creditors and not improperly withheld on the basis of privilege.

9.      The reasons for the releases are shrouded in secrecy. The Debtors, the Special Committee, and Cleary have attempted to shield every fact needed to evaluate whether *any* of the releases are appropriate from creditors and to evaluate how the Debtors' estates are benefiting from the releases (if at all). The Debtors filed a *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [Docket No. 1117] (the "Plan Supplement") that purports to

---

[3] *See* Deposition of Paul Aronzon, Jan. 31, 2024, the relevant portion of which is attached hereto as **Exhibit D** (the "Aronzon Deposition"), 215:18–216:12.

provide justifications for the releases. In reality, this Plan Supplement offers nothing more than conclusory statements that the releases are appropriate and that no "wrongdoing" against the releasees that could give rise to valuable causes of action to the Debtors' estates has been identified. The Plan Supplement states that the benefits of the releases are that the releasees contributed to the Debtors' restructuring efforts in the chapter 11 case. But neither the Debtors nor the Special Committee have explained to creditors what these contributions are, whether each of the proposed releasees is making a contribution, the value of these contributions, and why contributions are needed because it is a liquidating plan. The only other value to the estates that is listed in the Plan Supplement is that the releasees may have knowledge and insight that will be useful in litigation against the DCG Parties and the Gemini Parties as well as various regulatory and enforcement actions. However, Cleary also directed the Special Committee to not answer any questions about this justification on the basis of privilege, including whether: (i) any of the releasees refused to assist the Debtors unless they were granted releasees; (ii) each of the more than 160 Released Genesis Personnel have this alleged critical information; and (iii) any of the more than 160 Released Genesis Personnel have overlapping knowledge.

10.     The Debtors should not be rewarded for their attempt to conceal wrongdoing committed by insiders and their blocking of critical information from creditors. The proposed releases in the Plan should be rejected. The Debtors have not shown the existence of any value to the estates to justify the releases.

11.     To be clear, the CCAHG does not object to confirmation of the Plan. However, certain of the provisions in the Plan—namely, the valuation of the CCAHG's claims and the releases—prevent the Plan from being confirmed. Such provisions must be amended to bring the Plan in compliance with the Bankruptcy Code and applicable law so that it can be confirmed and creditors can begin receiving distributions.

4

# BACKGROUND

## I.      The Genesis Investment Program and the Genesis Contracts

12.      Before the Petition Date, the Debtors generally offered, among other things, what the Debtors termed a "lending and borrowing service" (the "Genesis Investment Program" or "Investment Program"). *See* Docket No. 1031 (the "Disclosure Statement") at 25–26. Genesis broadly offered information about the Genesis Investment Program to the public through its website, public statements in press releases, and through its executives. *See* Jassin Decl. ¶ 6–12.[4] To join the Genesis Investment Program, individuals were required to fill out a questionnaire on Genesis's website and receive approval to become an investor, which was based on net worth and minimum investments. *See* Jassin Decl. ¶7, 11.

13.      Once approved, a customer service representative was assigned to each investor to answer questions, request transactions, and provide insight into Genesis's offerings. *See* Jassin Decl. ¶ 12. The members of the CCAHG (each a "Member," and collectively, the "Members") almost exclusively communicated with their assigned customer service representatives over Telegram. *See* Jassin Decl. ¶ 7, 17. The Members then entered into Master Borrow Agreements ("MBAs") with Genesis. *See* Jassin Decl. ¶ 12. Genesis claims these were bespoke agreements, but in reality, many investors accepted the form contracts Genesis initially offered. *See* Fernandez Decl. ¶ 17.[5] The MBAs set forth obligations, procedures, and responsibilities for each party under which Genesis could ask the investor to execute a transaction. *See* Jassin Decl. ¶ 15. *See* Jassin Decl. ¶15. If the investor accepted, both parties entered into "term sheets" ("Term Sheets" and together with the MBAs, the "Genesis Contracts") that contained specific terms of the transaction, including the principal amount of

---

[4] The *Declaration of Dr. Basem M. Jassin in Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of Reorganization*, attached hereto as **Exhibit A** (the "Jassin Declaration").

[5] The *Declaration of Isaac Fernandez in Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of Reorganization* attached hereto as **Exhibit B** (the "Fernandez Declaration").

fiat or crypto, profit rates, and maturity dates. *See* Jassin Decl. ¶ 16. Although Genesis nominally labeled these contracts "loans," the Genesis Contracts were unique agreements and did not resemble a typical loan or note to purchase a car or home. *See, e.g.*, Jassin Decl., Ex. A, Ex. D; Fernandez Decl. Ex. B, Ex. D. The yield on the transaction was paid in-kind in crypto or in fiat, the value of which fluctuated with market conditions. *See id*. The Genesis Contracts are more akin to loans of stock whereby on the maturity date, the "borrower" returns the stock with additional stock as yield at a set interest rate. Members entered into MBAs and executed at least one Term Sheet before the Petition Date. Each Member has at least one Genesis Contract outstanding that the Debtors did not fulfill prior to or after the Petition Date.

## II.    Events Leading Up to Bankruptcy

14.    The events leading up to the Debtors' collapse are well-documented. Genesis faced a more than $1 billion hole as a result of the default and insolvency of Three Arrows Capital, Ltd., one of Genesis's largest borrowers, in May 2022. GAP had extended loans to 3AC worth approximately $2.4 billion, while 3AC's collateral, which depended largely on the price of GBTC, was worth only half of the loans. *See* Islim Decl. ¶ 31. GAP's loans in turn were funded from loans from Genesis. 3AC's collapse meant that GAP could not repay those loans to Genesis. To cure the hole in its subsidiaries' balance sheets, DCG provided Genesis with a $1.1 billion promissory note with a maturity date nearly ten years in the future. *See* Islim Decl. ¶ 32. Genesis misleadingly recorded this note on its balance sheet as a current asset without specifying that it did not come due for another ten years.

15.    3AC's insolvency caused a domino effect in the crypto industry, leading to the collapse of major market leaders such as Celsius Network LLC and Voyager Digital Holdings, Inc. by July 2022. The implosion of FTX Trading Ltd. and Alameda Research Ltd., further destabilized the crypto industry, resulting in severely decreased consumer confidence. The

Debtors experienced a tidal wave of withdrawals and halted all lending and borrowing activities on November 16, 2022. *See* Islim Decl. ¶ 39.

16.    In the lead up to the withdrawal pause, the Members became concerned that their investments in Genesis were no longer safe. During the so-called crypto winter (*i.e.*, from May through July 2022), Genesis repeatedly represented to the Members that their investments were safe. For example, on June 17, 2022, Michael Moro, Genesis' then-CEO, tweeted that Genesis "had shed the risk and moved on," assuring customers that Genesis' "potential loss is finite."[6] This was followed days later by an assurance that Genesis had "carefully and thoughtfully mitigated [its] losses," collateral had been liquidated or hedged to "minimize any downside," and "no client funds [were] impacted."[7] Genesis also represented that it constantly reviewed its risk profile in light of changing market conditions, and, as things worsened in the industry, that it was actively working to de-risk its balance sheets. In fact, in response to some Members' questions, Genesis representatives stated that Genesis was the safest player in the crypto industry to invest with during uncertain times. *See, e.g.*, Jassin Decl. ¶ 22. And, on more than one occasion, Genesis provided Members with a balance sheet that the Members now believe falsely or misleadingly represented Genesis as a safe haven for crypto investments. *See, e.g.*, *id*. These false representations induced some Members to increase their investments.

## III.    These Chapter 11 Cases

17.    In May 2023, loans previously extended by Genesis to DCG and DCGI matured, and DCG and DCGI defaulted. *See* Disclosure Statement § VI(U)(iii). At the time, the value of the outstanding principal on the loans totaled approximately $627 million. *See id*. Rather than immediately seek to recover against those loans, the Debtors waited nearly four months before commencing the turnover actions. *See id*. The turnover actions resulted in the Partial

---

[6] *See* https://x.com/michaelmoro/status/1537822427790680066.
[7] *See* https://x.com/michaelmoro/status/1537822426536546306.

Repayment Agreement, under which the Debtors will recover $550 million instead of the $627 million indisputably due under the loans. *See* Disclosure Statement § VI(P)(ii).

18.     In November 2023, the CCAHG was formed. *See* Docket No. 976. The CCAHG was formed to press their objection to the Plan's method of valuing their claims at a time when BTC was trading at less than half the price it is currently trading at. *See, e.g.*, https://www.coingecko.com/en/coins/bitcoin (reflecting a BTC price of $21,081.67 as of January 19, 2023 and $43,546.32 as of January 30, 2024).

## OBJECTION

19.     The Plan should not be confirmed because: (i) it does not provide administrative expense claim treatment to claims arising out of the Genesis Contracts, (ii) it violates the rights of the CCAHG under Bankruptcy Code section 562(a); (iii) confirming the Plan would be injurious to public policy; and (iv) the releases proposed in the Plan are inappropriate.

## I.     The Plan Does Not Treat Claims Arising out of the Genesis Contracts as Administrative Expenses

20.     Claims that are based on "the actual, necessary costs and expenses of preserving the estate" are entitled to allowance as administrative expenses of the Debtors' under Bankruptcy Code section 503(b). *See* 11 U.S.C. § 503(b)(1)(A). Transactions with a debtor that provide a benefit to the debtors' estates are regularly allowed as administrative expenses. *See In re Westinghouse Elec. Co. LLC*, 2019 WL 4555990, at *8 (Bankr. S.D.N.Y. Sep. 19, 2019) (an administrative expense arises out of a transaction between the creditor and the debtor when considered "was both supplied to and beneficial to the debtor-in-possession"). The Members' claims qualify as costs and expenses of preserving the estates because they are based on postpetition transactions between the Debtors and the Members; the renewal of the Genesis Contracts. *See, e.g.*, Jassin Decl., Ex. B at 1 (MBA expired on June 18, 2023), § XXIII; Fernandez Decl., Ex. B at 1 (MBA expired on April 10, 2023), § XXIII. Accordingly, such claims are entitled to allowance as administrative expenses.

**A.    The Members' Claims Arose Out of Transactions with the Debtors**

21.    Each Genesis Contract includes a renewal option that renews the contract for successive terms upon its expiration. *See, e.g.*, Jassin Decl., Ex. B § XXIII; Fernandez Decl., Ex. B § XXIII. Since the Petition Date, each Genesis Contract renewed.[8] That renewal was a transaction with Genesis. Moreover, the transaction was induced by the Debtors. *See, e.g.*, *In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010) (to support an administrative expense claim the transaction "must have been 'induced' by the debtor"). A finding of inducement by the debtor requires: (i) the performance of services in good faith; (ii) the acceptance of the services by the person to whom they are rendered; (iii) an expectation of compensation therefor; and (iv) the reasonable value of the services. *Lebetkin v. Giray*, 2021 WL 2965323, at *3 (2d Cir. July 14, 2021).

22.    Here, the Members have performed under the Genesis Contracts by providing Genesis with the ability to: (i) retain their crypto; (ii) obtain the benefit of the increase in crypto prices; and (iii) use that crypto to increase potential recoveries. They have done so with the good-faith expectation that they would be compensated for allowing their crypto to be used. The Debtors have accepted this performance by permitting the Genesis Contracts to renew and retaining the Members' crypto. Thus, the Debtors induced the Members' performance.

**B.    The Post-Petition Transactions Benefitted the Debtors' Estates.**

23.    The Debtors' estates have benefited from the retention of the Members' crypto. Indeed, as noted herein, the Debtors are proposing to freeze the Members' claims as of the Petition Date. Meanwhile, the value of crypto retained by the Debtors has risen significantly, adding value and liquidity to their estates. The Debtors' retention of these appreciating assets following the renewal of the Genesis Contracts provided clear value to the Debtors at the expense of the Members who could otherwise have used their crypto for their own purposes.

---

[8] Although certain of the Members' Genesis Contracts have not renewed as of the date hereof, they will renew prior to the Confirmation Hearing.

The Members should be compensated for this value with allowed administrative expense claims. The Plan's failure to provide for such treatment renders it unconfirmable.

### C. At a Minimum the Members' Claims Should be Granted Administrative Priority to the Extent of the Appreciation of Crypto Retained by the Debtors

24.    If the Court does not find that the Members' claims are entitled to be allowed as administrative expense claims, the Court should grant the Members an allowed administrative expense claim to the extent of the appreciation of crypto retained by the Debtors. To do otherwise would simply be inequitable.

25.    Under the Plan, the Debtors' other stakeholders stand to recover value generated not through the Debtors' actions, but due to the increase in value of the Members' crypto. This increase in value has led to a situation where the Debtors may be in a position to make distributions to equity. It is difficult to conceive of a more inequitable result. The Members have their claims frozen at a significant discount and receive distributions based on that artificially low value, while DCG, having misled the Debtors' customers and having resisted complying with its contractual obligations to the Debtors, receives a distribution funded almost entirely by the appreciation in that crypto. The Court should not countenance such a result.

### II. Under Bankruptcy Code Section 562(a), the Members' Claims Should Be Valued at the Date that the Debtors Reject the Genesis Contracts

26.    The Bankruptcy Code provides for post-petition date valuation of claims arising out of specified types of contracts. Bankruptcy Code section 562(a) provides:

> If the trustee rejects a swap agreement, securities contract (as defined in section 741), forward contract, commodity contract (as defined in section 761), repurchase agreement, or master netting agreement [the "Covered Contracts"] pursuant to section 365(a), or if a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant [the "Protected Entities"] liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of—(1) the date of such rejection; or (2) the date or dates of such liquidation, termination, or acceleration.

11 U.S.C. § 562(a).

10

27.   The Court has So Ordered the stipulation between the CCAHG and Debtors in which the Debtors have stipulated for purposes of this Objection that the Genesis Contracts qualify as a Covered Contract. *See Limited Stipulation and Order Between the Debtors and the Crypto Creditor Ad Hoc Group* [Docket No. 1216]. Specifically, the Debtors conceded: "To the extent necessary to resolve the Relevant Dispute and any subsequent related appeals (if any), ***the Court may take as an established fact that the Genesis-AHG Contracts qualify as Covered Contracts for purposes of the application of 11 U.S.C. § 562 without requiring the Crypto Creditors Ad Hoc Group to present admissible evidence to establish, demonstrate or otherwise support that fact***." *See id.* (emphasis added). Further, the Genesis Contracts are executory under any test for executory classification. Finally, pursuant to the Plan, all executory contracts will be rejected on the Effective Date. Because the Genesis Contracts meet all the requirements of section 562, the Members' claims must be valued on the Effective Date.

### A.   The Genesis Contracts Are Forward Contracts Under Section 562

28.   Pursuant to Bankruptcy Code section 101, a "forward contract" is (1) a contract for the purchase, sale, or transfer (including a loan) of a commodity, (2) that is not a commodity contract, and (3) has a maturity date more than two days after the date the contract is entered into. *See* 11 U.S.C. § 101(25). The Genesis Contracts are forward contracts because: (i) BTC and ETH are commodities; (ii) the Members delivered crypto to Genesis over two days after the MBAs were executed; and (iii) the Members' investments in the Genesis Investment Program were to hedge the downside risk in the price of crypto they owned.

### 1.   The Contracts are contracts for the purchase, sale or loan of a commodity

29.   The CFTC and multiple federal courts have determined that BTC and ETH are commodities. The Bankruptcy Code definition of "commodity" cross-references the definition of the same term in the Commodities Exchange Act (the "CEA"). The definition of "commodity" is extraordinarily broad and includes "all other goods and articles . . . and all

services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). BTC and ETH, "fall well-within . . . the CEA's definition of 'commodities'" in 7 U.S.C. § 1a(9). *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018); *see CFTC v. Eisenberg*, Case No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), Docket No. 1 at 6, 13 (noting that ETH is a commodity under the CEA); *Jing v. Yan Sun*, 2022 U.S. Dist. LEXIS 1902, at *49 (E.D.N.Y. Jan. 4, 2022) ("Bitcoin is a commodity."); *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan, Respondents*, CFTC Doc. No. 15-29 (Sep. 17, 2015) ("Bitcoin and other virtual currencies are encompassed in the definition [of 'commodity' under the CEA] and are properly defined as commodities."). Thus, BTC and ETH are commodities under the CEA, or any other protected contract under section 562.

### 2. The Contracts are not commodities contracts within the meaning of the CEA

30.     Bankruptcy Code section 761(4)(A) defines "commodity contract" as "[a] contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade." "The commodities market is divided into only two categories: (i) on-exchange futures transactions; and (ii) off-exchange forward contracts." *In re Olympic Nat. Gas Co.*, 294 F.3d 737, 741 (5th Cir. 2002). As the Sixth Circuit explained, in the commodities market, "it is the *agreement* or *contract* that is traded on an exchange. It is unremarkable (though easily enough mistaken as relevant) that the underlying commodity is also traded on a market exchange." *CFTC v. Erskine*, 512 F.3d 309, 323–24 (6th Cir. 2008). It is irrelevant that regulators have treated crypto as a commodity and that some crypto exchanges may qualify as contract markets or boards of trade. Where a contract is simply for the actual sale of a commodity, it is not a commodity contract as defined in section 761(4)(A). *See In re Clean Burn Fuels, LLC*, 540 B.R. 195, 205 (Bankr. M.D.N.C. 2015) ("[T]he contracts at issue were not commodity contracts as defined in § 761 [because] the contracts were for the sale of

corn."); *In re Magnesium Corp. of America*, 460 B.R. 360, 372 (Bankr. S.D.N.Y. 2011) (rejecting argument that "*any* contract for the purchase of a commodity" is a commodity contract). By contrast, courts will find an agreement is a commodity contract when the actual agreement itself is traded on a commodity exchange. *In re Borden Chemicals & Plastics Operating Ltd.*, 336 B.R. 214, 218 (Bankr. D. Del. 2006) ("[T]he Code defines 'commodity contract' to include futures contracts that are traded on exchanges."; *cf. In re Lehman Bros. Inc.*, 533 B.R. 362, 378 (S.D.N.Y. 2015) (finding that agreement was not a commodity contract because they were not traded on an exchange).

31.     The Genesis Contracts were not subject to a contract market or a board of trade because they were never traded on an exchange. In fact, Genesis was not permitted to assign them to any party without the investor's consent, and the investor could only assign the Genesis Contracts to a third party upon notice to Genesis. *See, e.g.*, Fernandez Decl., Ex. B § XVII; Jassin Decl., Ex. B § XVII. In terms of the commodity markets, the assets at issue here were traded "over the counter," and thus, are not commodities contracts.

### 3.   The Contracts had maturity dates of more than two days after execution

32.     "Maturity date" is not defined in the Bankruptcy Code. Some courts hold that the "maturity date" is the date the underlying commodity is delivered to the counterparty. *See Magnesium Corp.*, 460 B.R. at 373; *Olympic Nat. Gas Co.*, 294 F.3d at 739 (substituting delivery date for maturity date). The Genesis Contracts have a maturity date greater than two days because crypto was delivered to Genesis more than two days after the MBAs were executed. The court in *Magnesium Corp.* recognized that a commodity contract could "giv[e] rise to many individual contracts . . . and then with many deliveries" such that "[e]ach of those delivery dates would at least seemingly be appropriately regarded as the maturity date." 460 B.R. at 373; *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 356 (5th Cir. 2012) (finding that no case "suggest[s] that contracts that do not *specify* a maturity date do not *have* one"). The same

is true of the MBAs and Term Sheets. The Members could not engage in transactions with Genesis unless they first entered into an MBA. The transactions were then completed, and the relevant commodity delivered, on the same day the parties executed the Term Sheets. Each of the MBAs was executed before the Members transferred (*i.e.*, delivered) crypto to Genesis. *See* Fernandez Decl., Exs. B–D; Jassin Decl., Exs. B, D, G. The maturity dates of the Genesis Contracts therefore were more than two days after the Contracts were entered into.

### 4.   The Genesis Contracts served a hedging purpose for the Members

33.   Some courts have imposed an additional requirement—not required by the plain language of the statute—that the party arguing an agreement is a forward contract must also show that the agreement served a "hedging purpose." *Borden*, 336 B.R. at 221 ("Congress intended to reach agreements whose purpose was to protect against the uncertainty of price fluctuations."). These cases find that legislative history and precedent addressing forward contracts supports the view that the primary purpose of such contracts is to "hedge against possible fluctuations" in commodity prices." *See* H.R. Rep. No. 101-484, at 4 (1990).[9]

34.   As Mr. Fernandez stated in his declaration, he "considered the Genesis Investment Program to be an important strategy to hedge risk." Fernandez Decl. ¶ 25. The price volatility of BTC was well known in the crypto industry, and Mr. Fernandez invested in the Genesis Investment Program to "hedge against the decrease in the price of BTC in [his] portfolio." *Id.* Because "Genesis guaranteed monthly profit payments," Mr. Fernandez therefore "would have still received these monthly profit payments and thus hedged some of that risk" in the price of BTC. *Id.* Dr. Jassin similarly stated in his declaration that the Genesis Investment Program was an important strategy to hedge risk. Jassin Decl. ¶ 27. Both Dr. Jassin

---

[9] Many courts have rejected this judicially imposed requirement as foreclosed by the plain text of the statutory definition of forward contract. *See, e.g.*, *MBS Mgmt. Servs., Inc.*, 690 F.3d at 356 (rejecting a trustee's argument that forward contracts require specific quantities and delivery dates as "the definition of a forward contract [does not] contain such limitations"). Although the CCAHG does not believe it is necessary to make such a showing, the Genesis Contracts, as explained below, clearly satisfy this extratextual requirement.

and Mr. Fernandez stated that "[b]ased on extensive conversations with other members of the [CCAHG]," they understand that "all members of the [CCAHG] invested in the Genesis Investment Program for similar reasons." Fernandez Decl. ¶ 26; Jassin Decl. ¶ 28. Thus, investors strategically used the Genesis Investment Program to hedge against downside risk in the price of their crypto. For the foregoing reasons, the Genesis Contracts are forward contracts.

### B.    Alternatively, the Genesis Contracts Are Securities Contracts

35.    Section 562(a) also applies to securities contracts. Section 741 defines securities contract as, (i) a contract for the purchase, sale, or loan of a security . . . ; (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph; . . . (x) a master agreement that provides for an agreement or transaction referred to in clause (i), (iv), [or] (vii); . . . [or] (xiv) other claim or interest commonly known as "security". 11 U.S.C. § 741. The Supreme Court has articulated two tests to further refine the definition of security in the context of the federal securities laws. The *Reves* test, which provides factors courts consider when deciding whether a note is truly a security, and the *Howey* test, which provided the analytical framework for determining whether an investment contract qualifies as a security. The Genesis Investment Program is a security under both tests.

### 1.    The Genesis Contracts are securities contracts under Reves

36.    In *Reves*, the Supreme Court recognized that although the federal securities laws' definition of "security" includes "any note," the "phrase 'any note' should not be interpreted to mean literally 'any note.'" 494 U.S. at 63. To determine whether a note is a security, courts apply a "family resemblance" test. *Id.* Under the test, only "notes issued in an investment context" are "securities." *Id.*

37.    The test "begin[s] with the presumption that every note is a security." *Id.* at 65. "Under the family resemblance test, a note is presumed to be a security unless an examination of the note, based on four factors, reveals a strong resemblance between the note and one of a

judicially-enumerated list of instruments that are not securities." *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992). Those four factors are: (1) "the motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (2) "the plan of distribution of the instrument"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 304 (2d Cir. 2023) (quoting *Reves*, 494 U.S. at 66–67). "Failure to satisfy one of the factors is not dispositive." *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002).

38.     <u>Motivations of the Parties</u>: "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994). "A buyer's motivation is investment if it expects to profit from its investment . . . . A seller's motivation is investment if its 'purpose is to raise money for the general use of a business enterprise or to finance substantial investments.'" *Kirschner*, 79 F.4th at 305 (quoting *Reves*, 494 U.S. at 66) (footnote and citations omitted).[10] Here, there is no question that Members expected to profit from their loans through the attractive interest rates Genesis offered as part of the Investment Program. *Kirschner*, 79 F.4th at 306. For example, Dr. Jassin and Mr. Fernandez both stated that they expected to profit from their investments. Fernandez Decl. ¶¶ 19, 21; Jassin Decl. ¶¶ 17, 19. Michael Moro stated in an interview that "high-net-worth individuals" and "family offices" "who are lending their assets out through Genesis . . . generate returns of 5% to 13% on those

---

[10] Under *Reves*, it makes no difference if the seller benefits from a fixed as opposed to variable interest rate, and it does not matter that the rate of return is not tied to the borrower's market performance. For purposes of the *Reves* test, the Supreme Court "explicitly rejected a definition of 'profit' that would 'suggest that notes paying a rate of interest not keyed to the earning of the enterprise are "notes" within the meaning of the securities act.'" *Id.* at 305 n.75 (quoting *Reves*, 494 U.S. at 68 n.4); *see Pollack*, 27 F.3d at 813 (finding that buyers of a bond had an investment motivation where they would earn 'a fixed rate of return in the form of interest' on the bonds).

loans."[11] A November 17, 2022, version of the Genesis "Yield Services" website advertised

that investors could "[e]arn yields up to 10% based on supply and demand mechanics."[12] And

Genesis borrowed for general business purposes, particularly to fund its own lending activities

to other parties.[13] Dr. Jassin and Mr. Fernandez recognized that Genesis used proceeds from

their investments to fund general business activities. Fernandez Decl. ¶ 19; Jassin Decl. ¶ 17.

39.     Moreover, the Genesis Investment Program was similar to other interest-bearing

accounts that are securities under the *Reves* test. For example, the SEC has alleged that Celsius

"Earn Interest Program" was an unregistered securities offering.[14] The Earn Interest Program

allowed investors to tender crypto assets to Celsius in exchange for periodic interest

payments.[15] The SEC alleged that the Earn Interest Program would generate returns for

investors and that Celsius pooled the assets and used them for business purposes, including

deploying the assets to generate revenue through its lending activities.[16] The Genesis

Investment Program mirrors the facts as alleged in the SEC complaint.[17] This factor clearly

favors a finding that the Investment Program was a security.

40.     Plan of Distribution: The second *Reves* factor considers whether the note is

"offered and sold to a broad segment of the public." *Reves*, 494 U.S. at 68. "However, the lack

of broad sales is not dispositive." *SEC v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 114

(D. Conn. 2004). Courts have found that this factor is met where the notes are sold to

individuals rather than "sophisticated institutions." *Stoiber v. SEC*, 161 F.3d 745, 751 (D.C.

---

[11] Natalie DiCamillo, *ETH Gobbles Up Larger Share of Genesis Loan Book as Trading Firms Feast on DeFi Summer*, CoinDesk (Oct. 30, 2020, 9:00 AM), https://www.coindesk.com/business/2020/10/30/eth-gobbles-up-larger-share-of-genesis-loan-book-as-trading-firms-feast-on-defi-summer/.
[12] Available at https://web.archive.org/web/20221117001537/https:/genesistrading.com/services/yield-services.
[13] *See, e.g.*, N.Y. Compl. ¶ 39.
[14] *See* Compl. ¶¶ 1–3, *SEC v. Celsius Network Ltd.*, No. 1:23-cv-6005 (S.D.N.Y. July 13, 2023), Docket No. 1 (the "Celsius Complaint").
[15] *Id.* ¶ 61.
[16] *Id.* ¶ 63.
[17] *See, e.g.*, N.Y. Compl. ¶ 39.

Cir. 1998). Finally, this factor "must be weighed against the purchasing individual's need for the protection of the securities laws." *McNabb v. SEC*, 298 F.3d 1126, 1132 (9th Cir. 2002).

41.    Genesis offered the Genesis Investment Program primarily to high-net-worth individuals and some institutional investors.[18] Additionally, the facts of this bankruptcy indicate that there was no adequate regulation of the Genesis Investment Program to provide these individuals with the protection of the federal securities laws. This factor therefore also weighs in favor of finding that the Genesis Investment Program is a security.

42.    <u>Public's Perceptions</u>: The public's perception of the lending program as a security weighs in favor of treating it as a security, even if an economic analysis suggests that it is not. *See Kirschner*, 79 F.4th at 307-08. The Members perceived the Genesis Investment Program as a security investment in Genesis's business, as described in the declarations of Dr. Jassin and Mr. Fernandez. Fernandez Decl. ¶¶ 16–21, Jassin Decl. ¶¶ 17, 19–24.

43.    <u>Other Risk-Reducing Factors</u>: The final *Reves* factor considers "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67. Courts also consider "whether the instrument is secured by collateral or is insured and whether specific policy guidelines issued by federal regulators address the type of instrument at issue." *Kirschner*, 79 F.4th at 309 (footnote and citations omitted). The SEC has acknowledged that there is no alternative regulatory scheme or risk reducing factors with respect to similar interest earning programs.[19] Indeed, the facts leading to the crypto winter and this bankruptcy in particular suggest there was no regulatory framework in place to protect the

---

[18] *See* Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs at 55–210, *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 21, 2023), Docket No. 146.

[19] BlockFi SEC Order at 8; SEC Compl. ¶¶ 51–55 (noting that (i) the Gemini Earn Program was not subject to SIPC insurance, FDIC protection, NYSDFS oversight, or capital reserve requirements, (ii) Genesis was not required to post collateral, and (iii) the collapse of the Gemini Earn Program showed that no regulatory program adequately reduced the risk of harm to Gemini's customers).

CCAHG's investments in Genesis. This factor weighs in favor of finding that the Genesis Investment Program is a security.

44.      Three of the four *Reves* factors weigh heavily in favor of finding that the Genesis Investment Program is a security. And even if the Court finds the "plan of distribution" factor does not weigh in favor, this single factor is not dispositive. Because the Investment Program is a security under the *Reves* test, it is also an "interest commonly known as 'security'" and therefore a security under the Bankruptcy Code definition. 11 U.S.C. §101(49)(A)(xiv).

### 2.   The Genesis Contracts are securities contracts under Howey

45.      In *Howey*, the Supreme Court set out the factors a court should consider to determine whether an agreement is an investment contract and thus a security. 328 U.S. at 298-99. "[A]n investment contract . . . means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promotor or a third party." *Gary Plastic Packaging Corp.*, 756 F.2d at 239 (quoting *Howey*, 328 U.S. at 298–99).

46.      <u>Investment</u>: The first prong is satisfied by the lending program. For this element, courts have noted that "[t]he proper inquiry is whether [participants] provided the capital . . . put up their money . . . or provided cash" to an enterprise. *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023). Courts have specifically held that this element is satisfied where participants provided fiat or crypto to an enterprise. *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368–69 (S.D.N.Y. 2020) (investment of money satisfied where "Initial Purchasers invested money by providing [cash] in exchange for the future delivery of" crypto). The investors here clearly provided crypto to Genesis, so this element is satisfied.

47.      <u>Common Enterprise</u>: A court may find the existence of a common enterprise if the enterprise exhibits "horizontal commonality." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87–88 (2d Cir. 1994). Horizontal commonality is "the tying of each individual investor's fortunes

19

to the fortunes of the other investors by the pooling of assets." *Id.* at 87. "Generally, pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business. In turn, such reinvestment increases the value of the instrument offered." *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023). Genesis's business model depended on borrowing funds from investors and pooling those funds to lend to other borrowers in the crypto industry. Fernandez Decl. ¶¶ 19, 21; Jassin Decl. ¶¶ 17, 19. Genesis's fortunes were tied to the difference between the rates it received from its borrowers and the rates it offered to its investors. This factor therefore weighs heavily in favor of finding that the Genesis Investment Program is a security.

48.     <u>Expectation of Profits</u>: A court will find an expectation of profit if the investor's motivation to partake in the "contract, transaction or scheme" was "the prospects of a return on their investment." *Howey*, 328 U.S. at 301. The investors expected to profit from Genesis. Fernandez Decl. ¶¶ 19, 21; Jassin Decl. ¶¶ 17, 19. The fixed profit rate guaranteed that the investors would make money off the principal they provided. Indeed, Genesis regularly touted the yields investors could expect by loaning to Genesis stating, it "offers . . . a fully integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties."[20] Additionally, Genesis made direct representations to investors that it was solvent, de-risked its portfolio, and was in a strong financial position after the alleged infusion of $1.1 billion in financing in the middle of the crypto winter.[21] These representations induced Members of the CCAHG to either continue or recommence their lending activities to Genesis.[22]

---

[20] Genesis, *Q4 Market Observations* 21 (2021). *See also* ¶ 16, above.

[21] *See, e.g.*, N.Y. Compl. ¶¶ 147-154; Unchained Crypto, *2 Genesis Creditors Discuss Frustrations with the Bankrupt Crypto Lender*, YouTube (Nov. 4, 2023), https://www.youtube.com/watch?v=Slp_cm-fUk4 (discussion of Genesis's solvency and alleged loan at approximately 12:00 mark).

[22] Unchained Crypto, *2 Genesis Creditors Discuss Frustrations with the Bankrupt Crypto Lender*, YouTube (Nov. 4, 2023), https://www.youtube.com/watch?v=Slp_cm-fUk4 (discussion of reliance on representations at approximately 22:00 mark).

49.    <u>Solely from Efforts of Third Party</u>: The fourth *Howey* factor considers whether the profits investors expected to receive were "solely from the efforts of the promoter or a third party." *Id.* at 298–99. The purpose of this factor is to "narrow[] the universe of transactions that securities laws reach and ensure[] that the allegedly defrauded purchasers were mere passive investors[,] and the sale of the investment contracts gave rise to all the evils inherent in the securities transactions which it was the aim of the Securities Acts to end." *SEC v. Xia*, 2022 WL 17539124, at *23 (E.D.N.Y. Dec. 8, 2022). "The question is whether an investor, as a result of the investment agreement itself *or the factual circumstances that surround it,* is left unable to exercise meaningful control over his investment." *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008). The investors here were passive investors. Investors provided crypto to Genesis and profited off the interest rates Genesis offered. In turn, Genesis's investing efforts increased the size and stability of its lending business, attracting even more investors to earn yield off their investments in Gemini. Fernandez Decl. ¶¶ 19, 21; Jassin Decl. ¶¶ 17, 19. This factor weighs in favor of finding that the Gemini Investment Program was a security.

50.    Under either the *Reves* or *Howey* tests, the Genesis Investment Program is a security under the Bankruptcy Code, and the Genesis Contracts are security contracts. A securities contract is "a contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). The Bankruptcy Code does not define "purchase", but the Second Circuit has imported the definition of "purchase" as used in the Securities Exchange Act of 1934 for purposes of the Safe Harbor. Thus, "purchase" "include[s] *any* contract to buy, purchase, or *otherwise acquire*" a security. *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014) (quoting 15 U.S.C. § 78c(a)(13)-(14)). There was no other way for a customer to participate in the Genesis Investment Program and therefore acquire the benefits of the security without entering into the MBA. Further, even if the customer had an MBA, the customer could

not actually invest in Genesis without executing a Term Sheet. Thus, the MBAs and the Term

Sheets, taken together, are securities contracts.

C.     **The Genesis Contracts Are Executory Contracts That Will Be Rejected on the Effective Date Under the Terms of the Plan**

51.     Bankruptcy Code section 365(a) states that "the trustee, subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor." Given

the plain language of section 365, many courts hold that "[t]he option to assume or reject is

limited to contracts that are executory." *In re Majestic Cap., Ltd.*, 463 B.R. 289, 299 (Bankr.

S.D.N.Y. 2012). The Bankruptcy Code does not define "executory contract," and the Second

Circuit has not formally adopted a test to determine whether a contract is executory. *See In re*

*NanoDynamic, Inc.*, 735 F. App'x 762, 764 (2d Cir. 2018) (discussing various tests for

executoriness and ultimately holding that "[w]e need not resolve the question of which test

applies because the Agreement is an executory contract under either test"). Courts within the

Second Circuit, however, have generally applied one of three tests. The first is the "some

performance due" test, which is derived from legislative history stating that the definition of

"executory contract" "generally includes contracts on which performance remains due to some

extent on both sides." *In re Riodizio, Inc.*, 204 B.R. 417, 420 (Bankr. S.D.N.Y. 1997) (quoting

H.R. Rep. No. 95-595, at 347 (1977)); *see In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 998–99

(2d Cir. 1996) (applying the "some performance due" test). The second test is the so-called

"Countryman test." Under the Countryman test, "an executory contract [is] one that is not so

fully performed that a breach by either side would constitute a material breach of the contract."

*In re Helm*, 335 B.R. 528, 534 (Bankr. S.D.N.Y. 2006). The third test is the "functional

approach," which is "a more flexible" test that recognizes if a assumption or rejection would

benefit the estate and its creditors then the contract is executory "even though there may be

material obligations outstanding on the part of only one of the parties to the contract." *In re*

*Ideal Mortg. Bankers, Ltd.*, 539 B.R. 409, 437 (Bankr. E.D.N.Y. 2015). The Genesis Contracts are executory under all three tests.

52.    As an initial matter, the Genesis Contracts are executory under all three tests because they all contain automatic renewal provisions.[23] The Southern District of New York has explained that "an automatically renewing subscriber agreement, requiring notice of termination, would be an executory contract subject to the automatic stay" under Bankruptcy Code section 362. *In re Windstream Holdings, Inc.*, 634 F. Supp. 3d 99, 108 (S.D.N.Y. 2022). The *Windstream* court relied on cases finding that an "evergreen contract" that "continued through both the Petition Date and the Confirmation Date" was an executory contract that must be assumed under the plain terms of the plan at issue. 634 F. Supp. 3d at 108 (citing *NewPage Corporation*, 586 B.R. 551, 564 (Bankr. D. Del. 2018). As in *Windstream* and *NewPage*, the Genesis Contracts are perpetual evergreen contracts that renew automatically without notice of termination that imposes continuing obligations on the parties despite the filing of the Petition. The Genesis Contracts are executory contracts that can and will be rejected under the Plan.

53.    Indeed, the Debtors have acknowledged that the MBAs and Term Sheets are executory contracts. On March 20, 2023, the Debtors filed their "Schedules of Assets and Liabilities and Statements of Financial Affairs,"[24] which listed a large number of anonymized "Master Borrow Agreements" (i.e., the MBAs and term sheets) as executory contracts.[25] The listing of the outstanding MBAs on the Debtors' schedule of executory contracts indicates that the Debtors considered the MBAs to be executory. *See Wallach v. Smith*, 2017 WL 2957829, at *6 (W.D.N.Y. July 11, 2017) (finding that post-petition action indicating a contract was

---

[23] Under the Contracts' Term and Termination provision, "[t]he Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period." Fernandez Decl., Ex. B § XXIII; Jassin Decl., Ex. B § XXIII; *see, e.g.*, Jassin Decl., Ex. G, ▮▮▮▮ MBA § XXIIII, ▮▮▮▮ MBA § XXIIII, ▮▮▮▮ MBA § XXIIII.

[24] *See* Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 21, 2023), Docket No. 146.

[25] *Id.* at 55–210.

executory relevant to determine whether it was in fact executory), *aff'd sub nom. In re NanoDynamics, Inc.*, 735 F. App'x 762 (2d Cir. 2018) (finding postpetition conduct sufficient to conclude contracts are executory).

54.     Moreover, the plain terms of the Genesis Contracts establish that there were many substantial, material obligations owing on both sides of the contracts. For example:

a) Genesis is entitled to request a transaction from the Member.

b) Genesis must repay the principal amount of the transactions to the Members by the maturity dates.

c) Genesis is required to pay a late fee for each day after Genesis failed to complete the transaction on the maturity date.

d) Genesis must provide yield at the agreed upon rate and on the agreed upon schedule as specified in the MBAs and Term Sheets.

e) If the transaction is open term Genesis must transfer the principal amount of crypto within seven days of the "Recall Request Day."

f) In the event of an "Illiquid Market", Genesis has the right to repay the transaction in U.S. Dollars equal to the value of crypto as determined by a preset formula, as opposed to repaying the principal in-kind as required when the market was functioning normally.

g) Genesis must report all yield it paid to the Members to the IRS and provide applicable forms to the Members that documented the amount of yield it reported to the IRS.

h) If a transaction is collateralized, Genesis has the right to demand a "Collateral Refund" in the event the value of crypto transferred to Genesis drops below the value of the Collateral the Members provided. The Member's failure to provide the Collateral Refund constitutes an Event of Default.

i) Genesis made a number of representations and warranties that are required to be true and continuing through the term of the Genesis Contracts, including, among others, that: (1) it is a sophisticated party voluntarily taking responsibility for any risk of the transaction; (2) it is not insolvent; (3) there are no proceedings that could have an adverse effect on the transaction; (4) the transactions are not prohibited by law; (5) it has the right to transfer crypto; and (6) it has the right to grant a first priority security interest in any Collateral transferred by a Member. The Genesis Contracts deem it an Event of Default if any of these representations or warranties prove to be untrue or incorrect.

j) Genesis may not assign the Genesis Contracts without first notifying the Members.

k) In the event Genesis requests a transaction, the Member must accept the request to enter into a Term Sheet.

l) In order to obtain repayment of the principal and profit, the Member was required to create a cryptographically secure wallet address for delivery of the payment. To satisfy this

obligation, Members need to complete a complicated process of creating a secure address using a multistep procedure. This is an intensely burdensome task for an individual investor that requires an investor to create, store, and secure private keys on a physical medium. After creating private keys, investors have an ongoing obligation to physically secure private keys to prevent theft where only the investor has physical access to private keys. Other burdens incurred by the Members in securing private keys involve taking steps to ensure their estates might gain access to their funds in case of their death.[26]

m) For open term contracts, the Members had the ability to leave the contracts open as long as they liked and had to exercise the call option to get Genesis to pay the principal and profit.

n) In the event a transaction was collateralized, the Member is entitled to retain the collateral if Genesis refuses to return crypto to the Member.

o) The Member has the right to demand "Additional Collateral" in the event crypto transferred to Genesis becomes more valuable than the collateral Genesis provided to the Member. Genesis's failure to provide the Additional Collateral constitutes an Event of Default under the Genesis Contracts.

p) The Members may not assign their Genesis Contracts to third parties without the prior written consent of Genesis.

q) The Members are required to indemnify and hold harmless Genesis from any third-party claim arising out of the transactions (except for claims based on Genesis's bad faith, gross negligence, or willful misconduct).

r) Each party is bound to arbitrate any dispute arising out of or relating to the Genesis Contracts.

s) Both parties are bound to "hold in confidence all information obtained from the other Party in connection with [the Genesis Contracts] and the transactions contemplated hereby." The confidentiality obligations extend for three years from the date of the MBA.

*See generally* Jassin Decl. Ex. B.

55.      Given the extensive rights and obligations due and owing on both sides of the contracts,[27] the Genesis Contracts are executory even under the more restrictive Countryman definition. "When parties to a contract define a breach of one party's obligations as a terminable breach, such obligations are material obligations." *In re Avianca Holdings S.A.*, 618 B.R. 684, 699 (Bankr. S.D.N.Y. 2020). Multiple obligations set forth above constitute an Event of Default

---

[26] The process of managing private keys is so burdensome that there are companies, such as CASA and Unchained Capital, Inc., who charge fees to help customers create, secure, and maintain secure wallet addresses. *See* https://support.keys.casa/hc/en-us; https://unchained.com/.

[27] To the extent some of these obligations may be considered contingent, the case law is clear that "contingent obligations are sufficient to render a contract executory." *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013).

that permits the non-defaulting party to terminate. For example, in the event an insolvency proceeding is instituted against a Member, the Debtors would have the right to declare an Event of Default and terminate the Genesis Contract. Jassin Decl., Ex. B §§ VII(e), VIII(b). If a Member fails to transfer Collateral, Genesis would have the right to terminate. Jassin Decl., Ex. B §§ VII(c), VIII(b). If either party fails to perform in the event of a Hard Fork or Airdrop (described in the contract), the non-defaulting party may declare an Event of Default and terminate. Jassin Decl., Ex. B §§ V, VII(d), VIII(b). Similarly, the parties made a number of representations that must continue to be true or risk termination. Jassin Decl., Ex. B §§ VI, VII(f), VIII(b). Again, that any of these obligations might be contingent is insufficient to defeat executoriness. *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013). Thus, because there are multiple obligations the failure of which to perform would constitute a material breach, the Genesis Contracts are executory.

56.     Because the Genesis Contracts are executory under the more restrictive Countryman test, they are necessarily executory under the more relaxed "some performance due" test. Courts have found contracts to be executory when far less substantial obligations remained on both sides of the contract. For example, the court in *In re Texaco Inc.*, 73 B.R. 960 (Bankr. S.D.N.Y. 1987) found a notes indenture with similar outstanding rights and obligations to be executory for purposes of the Bankruptcy Code:

> (a) Maintaining an office where the Notes may be presented for payment. (b) Maintaining a current list of names and addresses of security holders. (c) Effecting transfers and exchanges of securities. (d) Replacing lost, mutilated or destroyed securities. (e) Delivery of securities to the Trustee for cancellation. (f) Redeeming securities. (g) Depositing the redemption price. Similarly, the Indenture Trustee has continuing obligations under the Indenture such as (a) The commencement of litigation to enforce the Indenture. (b) filing proofs of claim. (c) Fixing record and payment dates. (d) Giving notices of default. (e) Submission of reports to Note holders. (f) Filing reports in compliance with 15 U.S.C. §§ 77aaa–77bbb . . . . In light of the fact that performance remains due on both sides, the Indenture may be classified as an executory contract.

*Id.* at 961–62. The outstanding contractual provisions are at the very least equal in materiality to those described by the *Texaco* court, and the Genesis Contracts are therefore executory.[28]

57.     Finally, the Genesis Contracts should be treated as executory under the functional approach. "Under this approach, the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate." *In re Gen. Dev. Corp.*, 84 F.3d 1364, 1375 (11th Cir. 1996). Rejection of the Genesis Contracts offers an enormous benefit to the estates. Assuming and curing defaults under the Contracts would significantly decrease the recovery of Genesis's fiat creditors and equity holders, and likely render the estates insolvent. Rejection, on the other hand, allows the Debtors to retain crypto Genesis received under the Genesis Contracts and use that crypto to pay *all* of its creditors. The Genesis Contracts therefore should be deemed executory under the functional approach. Because the Genesis Contracts are executory contracts within the meaning of section 365, they will be rejected as of the Effective Date. *See* Plan § V(A).

## III.   Section 562 Should Apply in These Circumstances Because It Was Intended to Protect Financial Markets from Systemic Risk

58.     Section 562 represents the latest expansion of a series of so-called "safe harbors" that were added to the Bankruptcy Code to mitigate disruption and reduce systemic risk to financial markets. Applying section 562 here is consistent with those purposes. As drafted, Bankruptcy Code section 562 primarily provides protection to large financial

---

[28] The Debtors may rely on cases that have been misconstrued as holding that notes under which only repayment remains due cannot be executory contracts under the Code. This line of cases, beginning with *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), *superseded by statute on other grounds*, Pub. L. No. 100-506, 102 Stat. 2538 (1988), "a contract is not executory as to a party simply because the party is obligated to make payments of money to the other party." *Id.* at 1046. But as the court in *In re Helm*, 335 B.R. 528 (Bankr. S.D.N.Y. 2006), this holding rests on a misreading of the legislative history and a misunderstanding of the policies reasons behind the executory requirement. In reality, the legislative history's "clarification of the nature of executory contracts applies only where all parties have *fully* performed under the contract and the only remaining obligation, on both sides, is the payment of money." *Id.* at 535 (citing *In re Teligent, Inc.*, 268 B.R. 723, 732 (Bankr. S.D.N.Y. 2001)). As the *Helm* court explained, "where one party has fully performed, and awaits only payment by the other party, as in the instance of accounts payable and accounts receivable, an agreement is not executory, as performance is complete, with only payment owed." *Id.* Thus, even if the Court were to ignore all of Genesis's obligations listed above except repayment, this principle still would not apply given the Members' extensive rights and responsibilities under the Genesis Contracts.

institutions engaging in transactions with a certain frequency, dollar amount or both. This construct made sense at the time it was drafted because it was these types of institutions that posed a danger of disrupting financial markets if they were not protected from the insolvency.

59.     However, since section 562 was enacted, crypto has become a significant portion of nation and worldwide financial markets.[29] What is more, there are unique aspects of the crypto financial markets that suggest that limiting the application of section 562 and the other safe harbors to large financial institutions will not adequately serve their purpose. Indeed, certain individuals have a similar power to cause disruption in the crypto markets as large financial institutions do in traditional markets. This concern is particularly prevalent here due to the Genesis Investment Program, which was only offered to accredited investors and high-net-worth individuals. Said differently, the Genesis Investment Program was targeted at exactly the entities that posed the greatest risk of causing disruption in the crypto markets in the event of Genesis' failure. Accordingly, even if the Court does not agree that section 562 strictly applies to the Genesis Contracts it should nonetheless apply section 562, or identical relief in order to fulfill the purpose of section 562 as enacted, to mitigate disruption and reduce systemic risk to financial markets. The fact that financial markets have evolved, and new markets have come to be since the enactment of section 562 suggests that a liberal reading of the provision is appropriate in order to fulfill its purpose and protect these new markets from similar threats.

## IV.     Section 562 Should be Applied to Members' Claims as a Matter of Public Policy

60.     The Bankruptcy Code should not be used as a weapon—particularly when, as is the case here, there is no going concern value to preserve. Instead, all efforts should be taken to maximize value for general unsecured creditors. Confirmation of the Plan with Members' claims valued as of the Petition Date is injurious to the public because it incentivizes equity holders in flailing crypto custodial businesses to take advantage of a down market to

---

[29] *See* e.g. https://www.coingecko.com/en/global-charts (reflecting a total global crypto market capitalization of $1,661,441,770.00 as of April 28, 2013 and $1,726,150,031,894.00 as of January 30, 2024).

manufacture upside for equity holders, thus generating a result counter to a number of the primary purposes of chapter 11. Indeed, the Plan fails to maximize value for general unsecured creditors, encourages Debtor misconduct, and is fundamentally unfair and unjust. *See In re Ditech Holding Corporation*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019) ("Chapter 11 policies, or objectives, include, preserving going concerns and maximizing property available to satisfy creditors . . . ., discourage[ing] debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice."

61.     In other words, distressed crypto companies reliant on customer investments can create a win-win scenario for equity by filing bankruptcy during a down market, thereby taking advantage of petition date claim valuation. By filing petitions when asset values are low, debtors can preserve upside value for equity. Indeed, even if asset values were then to fall below claim values, it would be of no matter, as the harm to the debtors would only reduce general unsecured creditor recovery. However, as has been the case in the majority of crypto cases, crypto prices have only increased in the time between the petition date and the plan effective date. This is because a critical factor in both crypto volatility and the success of crypto companies is market reaction to other events. Said differently, negative crypto news results in depressed crypto pricing, which results in crypto bankruptcies.

62.     For example, 3AC's ultimate collapse resulted in chapter 11 filings by Voyager and Celsius. *See In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.); *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.). At the beginning of May 2022 (one month before news about 3AC was made public), BTC was valued at approximately $38,000. *See* https://www.coingecko.com/en/coins/bitcoin. At the beginning of July 2022, the price had plummeted to approximately $19,000, and shortly after,

Voyager and Celsius filed chapter 11.[30] *See* https://www.coingecko.com/en/coins/bitcoin. Additional negative market events towards the end of 2022 (e.g., FTX and BlockFi's chapter 11 filings) continued to depress crypto prices.[31] Since January 2023, there have been relatively few negative market events and the crypto market has steadily increased in value. As a result, Genesis's equity holders are in a position to recover despite the company ceasing operations more than one year ago. Outside of bankruptcy, this would not be possible.

63.     The Plan as drafted provides the blueprint for future insolvent debtors in similar business lines, and their equity holders, to preserve upside for themselves and deliver a lose-lose scenario to their customers. Worse yet, the upside delivered to equity is actually generated by the customers' assets. Sanctioning such a scheme would present a threat to the greater public by encouraging custodians to pervert the Bankruptcy Code for their purposes and deliver results that, like the results of the Plan here, shock the conscience due to their inequity. Although section 562 was enacted prior to the existence of crypto, it should be applied here to: (i) protect participants in the crypto markets (and the sanctity of chapter 11); (ii) further the objectives of chapter 11 (including maximizing value for creditors); (iii) discourage debtor misconduct; (iv) achieve fundamental fairness and justice; and (v) create a fair and just result for creditors.

---

[30] BTC was valued at approximately $27,000 when Voyager's chapter 11 plan became effective and is currently valued at approximately $42,000 (Celsius' chapter 11 plan is assumed to become effective on January 31, 2024). *See Notice of (I) Entry of Corrected and Amended Order (A) Approving the Second Amended Disclosure Statement and (B) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) Occurrence of Effective Date* Voyager Chapter 11 Cases [Docket No. 1405]; https://www.coingecko.com/en/coins/bitcoin (reflecting a BTC price of $26,844.37 as of May 19, 2023 and $42,892.03 as of January 30, 2024).

[31] BTC was valued at approximately $16,000 when BlockFi commenced chapter 11 and was valued at approximately $34,000 when BlockFi's chapter 11 plan became effective. BTC was valued at approximately $17,000 when FTX commenced chapter 11 (FTX's chapter 11 plan was filed in December 2023, but no confirmation hearing date has been set). *See Voluntary Petition for Non-Individuals Filing for Bankruptcy* BlockFi Chapter 11 Cases [Docket No. 1]; *Notice of (I) Entry of the Order (A) Approving the Disclosure Statement on a Final Basis and (B) Confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications) and (ii) Occurrence of the Effective Date* BlockFi Chapter 11 Cases [Docket No. 1788]; *Voluntary Petition for Non-Individuals Filing for Bankruptcy* FTX Chapter 11 Cases [Docket No. 1]; https://www.coingecko.com/en/coins/bitcoin (reflecting a BTC price of $16,278.74 as of November 28, 2022 and $33,846.72 as of October 24, 2023 and $16,881.19 as of November 11, 2022).

## V.    The Plan's Releases Render the Plan Incapable of Confirmation

64.    Under Article VIII.D of the Plan, the Debtors are releasing a broad number of claims (the "Debtors' Releases") they may have against released parties, which includes the more than 160 individuals on the Released Genesis Personnel list whose identities have not been disclosed to creditors. The Debtors' Releases are unjustified, factually unsupported, and unnecessary to the Debtors' ability to confirm the Plan.

65.    Bankruptcy Code section 1123(b) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A). *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns Operating LLC)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) (citing to section 1123(b)(3)(A) for the proposition that "[d]ebtors are authorized to settle or release their claims in a chapter 11 plan") (emphasis added). Such releases, however, must represent "a valid exercise of the debtor's business judgment" and be "fair, reasonable, and in the best interests of the estate." *DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79 (2d Cir. 2011) (approving debtor releases where such releases "represent[ed] a valid exercise of the Debtors' business judgment, and [were] fair, reasonable and in the best interests of the estate"); *see also Charter Commc'n*, 419 B.R. at 257 (approving debtor releases that were "an integral part of a comprehensive Plan that provide[d] substantial value to the estates" and were "procedurally efficient"); *In re Bally Total Fitness of Greater N.Y., Inc.*, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) (same).

66.    A court evaluating a debtor's release of claims "is not required to go so far as to conduct a trial on the terms to approve a settlement." *In re Motors Liquidation Co.*, 555 B.R. 355, 365 (Bankr. S.D.N.Y. 2016). "Before making a determination, however, the court must

inform itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" *Id*. (internal quotations omitted).

67.     Counsel to the CCAHG has repeatedly requested information to no avail about the facts underlying the justifications for the broad Debtors' Releases, the investigation into the released parties, and the value that the Debtors' estates are deriving from the Debtors' Releases. The Special Committee, Debtors, and Cleary have refused to provide creditors with this information and instead have proceeded with a Plan that prioritizes releasing insiders over maximizing value for creditors. Obtaining information necessary to support a release, both legally and factually, requires an investigation. The Special Committee, on behalf of the Debtors, was charged with independently investigating and authorizing the sweeping releases proposed in the Plan. However, the Special Committee failed to evaluate material information and conduct a sufficient investigation into the potential: (1) claims and causes of action they seek to release; (2) the wrongdoing committed by those set to be released; and (3) the value derived to the Debtors' estates from granting each of the releases. Accordingly, the Debtors' Releases cannot be a valid exercise of the debtor's business judgment.

68.     The Special Committee member could not testify as to the number of individuals on the Genesis Released Personnel list within a five hundred number range.[32] Without knowing the number of individuals set to be released or who would be released, it is clear the Special Committee could not have carefully vetted and considered whether the releases of *each* of the individuals and entities proposed under the Plan were warranted and benefited the estate. Further, more than 160 former and current employees, officers, and directors of the Debtors are set to be released under the Plan, yet only twelve of these

---

[32] Aronzon Dep. 215:6-216:12 ("Q. There are more than a hundred individuals currently on the released Genesis personnel list; correct? . . . THE WITNESS: I don't know the exact number. Q. Do you know if it's more than a hundred individuals on the Genesis released personnel list? . . . THE WITNESS: I don't know. "Q. Do you know if it's more than five hundred people on the released Genesis personnel list? . . . THE WITNESS: I don't know the number.").

individuals have been interviewed. Disclosure Statement § VI(F). The Special Committee has

not participated in any of these interviews and has refused to answer questions seeking relevant

information about these interviews on the basis of privilege, such as who was interviewed, the

topics of these interviews, the pre-petition conduct of the releasees investigated, and whether

the Special Committee reviewed any interview transcripts.[33] The Debtors' Releases also

include sweeping releases of an uncapped number of undisclosed "Related Parties" instead of

a list of individuals and entities that would constitute related parties that should be released.

When asked for facts about the investigation that was conducted into granting releases to

"Related Parties", including whether the Special Committee investigated potential causes of

actions against "Related Parties" or the total potential value of the released claims, the Special

Committee was inappropriately directed not to answer the question on the basis of privilege.[34]

69.    Cleary, on behalf of the Special Committee, also conducted the investigation

into the Debtors' Releases, including whether the Special Committee members should be

---

[33] Aronzon Dep. 148:24-153:7 ("Q. Did you sit in on any of those interviews? . . . THE WITNESS: No. . . . Q. Did you ask any questions during any of these interviews via prewritten questions that were sent? MS. VANLARE: Objection. I would instruct the witness not to answer to the extent it reveals any attorney work product or attorney-client communications. . . . Q. Did you review any transcripts of these interviews? MS. VANLARE: Objection. Again, I'm going to instruct the witness not to answer as this goes into the details of the investigation which are all privileged. . . Q. So are you refusing to answer the question of whether the special committee reviewed any interview transcripts. MS. VANLARE: Again, objection. The witness is not refusing. I'm instructing the witness not to answer for the reasons that I identified earlier."); 153:8-154:19 ("Q. How were the individuals that were interviewed selected to be interviewed? MS. VANLARE: Again, objection . . . This goes into the details of the investigation and is all subject to attorney-client privilege and attorney work product, and I would instruct the witness not to answer. Q. Are you following that instruction again? A. I always do. Q. Was anyone that was interviewed not a current or former employee of Genesis? . . . Q. Are you going to answer the question, Mr. Aronzon? A. No."); 177:22-178:15 ("Q. Have you personally interviewed anyone or a representative of any entity that is set to get a release? MS. VANLARE: Objection. Again calls for information relating to the way in which the investigation was conducted . . . Q. Sorry, you're refusing to answer that question? A. I'm instructed not to.").
[34] Aronzon Dep. 247:2-248:5 ("Q. What investigation did the special committee conduct into potential causes of actions or claims that may exist against related parties? MS. VANLARE: Objection. Calls for attorney-client privilege and attorney-client communication and, as such, I would instruct the witness not to answer. Q. Are you following your counsel's instruction? A. Yes. Q. Did the special committee conduct an investigation into potential causes of actions or claims against related parties? MS. VANLARE: Objection. . . . I would instruct the witness not to answer. Q. Are you following your counsel's advice there? A. Yes."). *See also Id* 162:13-25; 201:7-203:11. The Debtors also simply refused to allow Mr. Sciametta to be questioned as to the value of the claims being released. *See* Deposition of Joseph Sciametta, Jan. 30, 2024, the relevant portion of which is attached hereto as **Exhibit C** (the "Sciametta Deposition"), 281:17-286:25.

released.[35] In other words, the Special Committee's members' lawyers investigated whether the Special Committee's members should be released. The Debtors justify the sweeping releases by stating that the Special Committee "has not identified wrongdoing on the part of the Released Genesis Personnel that would give rise to Claims or Causes of Action that are likely to provide value to the Debtors' Estates." Plan Supp., Ex. F. They also contend that the Released Genesis Personnel are entitled to indemnification and D&O insurance is limited. *Id.* However, these blanket conclusory statements that are supposed to apply to more than 160 individuals – without any supporting facts or facts specific to each individual proposed to be released – are not sufficient to warrant the Court granting the broad Debtors' Releases. *See, e.g.*, *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 132 (Bankr. S.D.N.Y. 2023) ("As I said during oral argument, this is not a release that is tailored to claims that have actually been reviewed and assessed by the Debtors. Instead, it is a release that is deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release.")

70.     Privilege cannot be used as a shield and a sword. *See In re Circle K Corp.*, 1996 WL 529399, at *4 (Bankr. S.D.N.Y. May 30, 1996), *aff'd*, 1997 WL 31197 (S.D.N.Y. Jan. 28, 1997) ("A client cannot use the privilege as both a sword and a shield. Thus, the client waives the privilege when he places the privileged communication at issue, and fairness requires that it be disclosed to the adversary.") (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). Yet, Cleary inappropriately has been claiming privilege to obstruct the CCAHG and its counsel from receiving critical information relating to the Debtors' Releases. The Disclosure Statement provides, "Cleary has shared the findings from the Investigation with the

---

[35] Aronzon Dep. 139:7 ("The special committee relied on its professionals to assist in determining what to investigate and what not to."); 141:5-142:5 ("Q. Did the special committee investigate potential claims against current directors, officers, and employees at Genesis? . . . THE WITNESS: It is a category that we looked into."); 149:5-17; 249:8-249:25 ("Q. Who investigated whether the special committee members should be released[]? MS. VANLARE: Objection. . . . A. I don't know how to answer this without referring to counsel, so -- because counsel investigated it. Q. And when you say "counsel", does that mean Cleary? A. Yes.").

Special Committee and counsel to the UCC and the Ad Hoc Group." Disclosure Statement at 36. This sharing of investigation findings with the UCC and the Ad Hoc Group is a clear waiver of privilege. *See In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("[S]ubsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication originally possessed . . . ."); *In re Quigley Co., Inc.*, 2009 WL 9034027, at *3 (Bankr. S.D.N.Y. Apr. 24, 2009), *supplemented*, 2009 WL 2913450 (Bankr. S.D.N.Y. June 19, 2009) ("As a rule, the attorney-client privilege is waived when a protected communication is disclosed to a third party.").

71.     Despite this clear waiver of privilege, the Debtors and the Special Committee continue to refuse to produce relevant information to the CCAHG. Indeed, after the deposition of the Special Committee member, counsel to the CCAHG repeated its request that Debtors produce the investigation findings referenced in the Disclosure Statement that were shared with the UCC and the Ad Hoc Group as they would be squarely responsive to the CCAHG's discovery requests. Debtors' counsel responded, "We will not be providing the findings from the investigation or information related to the interviews in connection with the investigation as these are privileged information, as objected to during Mr. Aronzon's deposition as well."[36]

72.     The Special Committee should not be permitted to conceal from the Court and a broader creditor audience facts and information critical to assessment of the Debtors' Releases while at the same time leveraging that very same information to justify their position. *See Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004) ("It is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship."). The Special Committee has made conclusions and some selective details about the investigation's methodology and scope a cornerstone of

---

[36] *See Declaration of J. Greer Griffith*, February 5, 2024, attached hereto as **Exhibit E,** Ex. 1.

their advocacy in support of the Debtors' Releases, as evident by statements in the publicly filed Disclosure Statement and the Plan Supplement. *Quigley Co., Inc.*, 2009 WL 9034027 at *8 ("Waiver of work-product immunity is found whenever a party has disclosed the work-product in such a manner that it is likely to be revealed to his adversary."). But this sort of strategic duplicity is wholly improper. Privilege is intended to protect the confidentiality of communications with counsel – not confer a tactical advantage through selective disclosure.

73.     It would be patently unfair for the Debtors and the Special Committee to be able to rely on Cleary's conclusion that the Debtors' Releases is in the Debtors' best interest, while at the same time refusing to reveal to the Court and creditors the underlying facts that support this conclusion. The transcript from the deposition of the Special Committee member makes it abundantly clear that the Special Committee member inappropriately refused to provide any facts it relied on in concluding that the Debtors' Releases is appropriate.[37] As the Debtors and the Special Committee have not provided any information that would allow the Court and interested parties to understand:  (i) what claims were investigated in relation to *each* individual

---

[37] *See* Aronzon Dep. 128:25-266:13; s*ee, e.g.*, Aronzon Dep. 179:6-183:21 ("Q. What did you do as a special committee member to feel confident that releases were warranted prior to granting written consent? MS. VANLARE: Objection to the extent it would reveal any attorney-client communications. But to the extent that -- you can answer the question without revealing any attorney-client communication, you may do so. THE WITNESS: Without revealing anything I was told, [we] relied on our professionals, including our counsel."); 195:7-196:20 ("Q. Was whether [an] individual[] on the Genesis released personnel list [] ever involved with debtors lending to Three Arrows Capital a fact that was considered prior to the special committee granting consent for the releases? MS. VANLARE: . . . I'm going to instruct the witness not to answer. . . Q. Are you following your counsel's instructions? A. Yes. Q. Was a fact considered by the special committee whether any of the individuals on the released Genesis personnel list were ever involved with debtors lending to FTX or Alameda Research? MS. VANLARE: Same objection. . . . Q. And are you following your counsel's instruction? A. Yes."); 200:2-201:6 ("Q. Have you separately considered as a factor in whether to grant releases whether there are any currently litigation between the debtors and any of the individuals on the Genesis released personnel list? MS. VANLARE: . . . I'm going to instruct the witness not to answer. Q. Are you going to follow your counsel's advice? A. Yes."); 251:15-25 ("Q. Can you please explain each and every fact that you rely on to come to [the] conclusion [that the releases contemplated in the plan are appropriate]? MS. VANLARE: Objection. That calls for attorney-client communication and attorney work product and, as such, I would instruct the witness not to answer. Q. Are you following your counsel's direction? A. Yes."); 254:14-258:25 ("Q. In addition to the information in the plan supplement and the disclosure statement, what facts did you rely on in deciding that the releases in the plan are appropriate? MS. VANLARE: Calls for attorney-client communication and attorney work product and, as such, I would instruct the witness not to answer. . . . Q. And to be clear, for the record, I am not asking about your communications with counsel, I am asking about the underlying facts which are not privileged information that you considered and relied on in coming to the conclusion that the releases contemplated in the plan are appropriate. MS. VANLARE: . . . I would instruct the witness not to answer. Q. And are you following your counsel's directions not to answer on the basis of privilege? A. Yes.").

and entity proposed to be granted a release under the Plan; (ii) the extent of the investigation into such claims; (iii) whether the cost to pursue the claims would exceed the benefits; and (iv) the value that the Debtors' Releases are providing to the estates, the Debtors' Releases should be rejected. *See Motors Liquidation Co.*, 555 B.R. at 365 ("Before making a determination, however, the court must inform itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.").

74.    In addition to not representing a valid exercise of business judgment, the Debtors' Releases are not in the estates' best interests. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 309 (Bankr. S.D.N.Y. 2016). Paramount to this assessment is whether the party receiving the release is making a contribution to the estate commensurate in value to whatever the estate is surrendering through the release. *See, e.g., id.* (approving a debtor release where "the benefits of settlement to the estates and to the Debtors' creditors more than outweigh any benefit which could be achieved through litigating such claims" and where "without the Debtors' agreement to provide releases, the Debtors would have been unable to attract the meaningful new funding commitments provided. . . ."); *In re Residential Cap., LLC*, 2013 Bankr. LEXIS 5683, at *47 (Bankr. S.D.N.Y. Dec. 11, 2013) (finding that the Debtor Release was a "valid exercise of the Debtors' business judgment" because the Debtor release was in exchange for "good and valuable consideration"). Releases are commonly refused in circumstances in which, as here, no such contribution has been made. *See e.g., In re Tribune Co.*, 464 B.R. 126, 188 (Bankr D Del, 2011) (finding that releases are not fair when "[t]here is no basis in the record to support any finding that a "substantial contribution" has been made by the Debtors' Related Persons or that a release is necessary to the reorganization."); *In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr NJ, 2007)  (declining to confirm a release noting "the Debtors' Representatives have not contributed any assets to the reorganization.").

75.    Here, the Released Genesis Personnel have not provided any contribution to justify their release and the sweeping releases do not make sense in the context of a liquidating plan where nothing is being settled. The Court discussed releases during the Disclosure Statement hearing, stating: "It's a liquidating plan. Nobody is contributing anything at all or liquidating the estate assets. And typically releases are tied to something of value . . . I'm just trying to figure out why in a liquidating plan we're even talking about releases." *See* Omnibus Hearing on November 7, 2023, Transcript, 50:19–51:7. A similar logic should be applied here when evaluating whether each of the released parties has made a contribution to the Debtors' estates that warrants a release. Pursuant to the Plan, the Debtors are relinquishing potential (and possibly unidentified) claims and receiving nothing in return. The *only* benefit of the releases accrues to the released parties. This should not be. If there are no claims, then a release is unnecessary. If there are claims, then the release of those claims needs to be justified. The *absence* of identified potential claims is not a justification. All claims should be preserved if their release provides no benefit to the estates.

76.    The Debtors attempt to side-step this issue by asserting that the released parties contribution to the estates is their assistance to the Debtors' restructuring efforts. Plan Supp., Ex. F. However, the "contribution" that they are said to have made (or are making) to the Debtors' estates is simply a discharge of obligations that they owed (or owe) to the Debtors as a consequence of their positions for which they are remunerated. Moreover, the Debtors and the Special Committee refuse to answer any questions about what specific contribution each releasee has or is making.[38] The Special Committee admitted that it did not consider whether

---

[38] Aronzon Dep. 204:6-209:5 ("Q. What is meant by "such persons contributed" in this paragraph [of the Plan Supplement]? MS. VANLARE: Objection. I believe the question calls for attorney-client communications and, as such, I would instruct the witness not to answer. MS. GRIFFITH: I'm asking what is. meant on a publicly filed document that's a justification for a release being granted. What contributions did people that are getting releases offer the estate? That's a fact. MS. VANLARE: Objection. The question calls for attorney-client communications and attorney work product as a result of an investigation that was conducted and discussions that took place with counsel and, as such, I would instruct the witness not to answer the question. Q. Separate and aside from any communications with counsel, are you aware of any contributions that any employee currently set to get a release

new employees or consultants could be hired to do the job and "contributions" that are being

done by those individuals set to be released under the Plan.[39]

77.     Courts in this and other jurisdictions have routinely observed that contributions

of these kinds are not sufficient. As it was bluntly put in *Aegean Marine*, "the directors did

what they were paid to do, and that does not mean they are entitled to releases." 599 B.R. 717,

728 (Bankr S.D.N.Y. 2019); *see also Congoleum Corp.*, 362 B.R. at 193 ("Debtors claim that

the officers and directors of Congoleum have contributed by 'negotiat[ing] the consensual

[Plan] in the face of substantial [ ] opposition' . . . That justification is unpersuasive because

the officers and directors have been paid millions of dollars post-petition to do just that."). "If

the argument is that the directors have done a spectacular job, then maybe they should ask for

a bonus." *Aegean Marine*, 599 B.R. at 728. Thus, the Debtors' Releases should be denied.

78.     The Debtors also contend that the Debtors' Releases are appropriate because the

individuals being released "have knowledge and insight into the Debtors' business and

transactions that may be critical to the resolution of litigation against the DCG Parties and the

Gemini Parties, as well as various regulatory and enforcement actions relating to the Debtors'

prepetition business." Plan Supp., Ex. F. However, the Debtors and the Special Committee

refuse to answer what allegedly critical information any of the individuals possess and whether

---

has offered the estate? MS. VANLARE: Objection. . . . Q. So sitting here as a special committee member, you
don't know any contributions that any person getting a release contributed to the estate that you would not consider
a privileged contribution that you could not reveal? MS. VANLARE: Objection to form and asked and
answered. . . . Q. Do you know if all of the individuals on the released Genesis personnel list have made
contributions either directly or indirectly to the estate? MS. VANLARE: Objection. It goes into attorney-client
communications and attorney work product and, as such, I would instruct the witness not to answer. "); 217:5-
222:7 *et seq* ("Q. What is meant by "provide value to the debtors' estates" here [in the Plan Supplement]? MS.
VANLARE: . . . I'm going to instruct the witness not to answer. Q. And are you following your counsel's
advice? A. Yes. Q. As a special committee member, what would you consider value to the debtors' estates here,
in your opinion, separate and apart from discussions with counsel? . . . THE WITNESS: Are you asking me my
own opinion of the word "value", what does it mean? Q. Yes, in this paragraph, how you would interpret that,
what that means. A. In this paragraph relates to attorney-client communication and discussion.").
[39] Aronzon Dep. 209:6-210:22 ("Did you ever consider whether new employees or consultants could be hired to
do the job that the current employees that are set to get releases are doing? . . . THE WITNESS: I guess I have a
couple of comments. . . . Two, the answer is no, I did not consider it.").

any of the proposed releasees have conditioned their assistance on being granted a release.[40] They also refuse to answer whether each one—or even how many—of the more than 160 Released Genesis Personnel (and their "Related Parties") possess this allegedly critical information and whether any of them have overlapping knowledge.[41]

79.     At bottom, the Debtors' Releases eliminate a potential source of recovery for unsecured creditors while giving away a substantial benefit to parties who are making no contributions toward those recoveries.[42] Thus, the Debtors' Release are not fair nor in the best interests of the Debtors' estates.

## RESERVATION OF RIGHTS

80.     The CCAHG reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Plan in the event the CCAHG's objections are not resolved prior to such hearing, and to seek to introduce documents or other further relevant information in support of the positions set forth in this Objection.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the CCAHG respectfully requests that the Court not approve the Plan until such time that the Debtors address the deficiencies in the Plan as described herein, and grant such further relief as the Court may deem appropriate.

---

[40] Aronzon Dep. 212:15-213:15 ("Q. Have any of the individuals on the released Genesis personnel list refused to cooperate with resolution of litigation against the DCG parties and the Gemini parties as well as various regulatory and enforcement actions relating to the debtors' prepetition business unless they received releases? MS. VANLARE: . . . I'm going to instruct the witness not to answer. Q. Is this a factor that you considered in granting consent to these individuals? MS. VANLARE: Same objection. Calls for privileged information and attorney work product. Q. Are you going to follow your counsel's advice? A. Yes.").

[41] Aronzon Dep. 213:3-215:15 ("Q. Do you know if any of the individuals on the released Genesis personnel list have overlapping, quote, knowledge and insight into the debtors' business and transactions? MS. VANLARE: Objection to form, but also I would instruct the witness not to answer to the extent it reveals any attorney-client communication or attorney work product. Q. Are you following your counsel's direction? A. Yes."). *See also Id.* 211:25-212:14; 214:8-215:5.

[42] The Debtors refused to allow Mr. Sciametta, a financial advisor, to be questioned about any financial analysis that was performed regarding proposed releases, the value of claims being released, the value that will be derived to the estate from the persons and entities being released, whether releases in the plan are appropriate, and the investigation that was conducted into the released parties and entities. *See* Sciametta Dep. 281:17-286:25.

Dated:  February 22, 2024
        New York, New York

McDermott Will & Emery LLP

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com
E-mail: ggriffith@mwe.com
E-mail: lbarrett@mwe.com

*- and -*

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Genesis Crypto*
*Creditors Ad Hoc Group*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of February 2024, he caused a true and correct copy of the foregoing *Genesis Crypto Creditors Ad Hoc Group Objection to the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.* (the "Plan Objection") to be filed using this Court's CM/ECF System (the "CM/ECF System") which caused the Plan Objection to be served on all registered users of the CM/ECF System who have consented to receive such notice in this case.

*/s/ Darren Azman*
Darren Azman