## **EXHIBIT D**

Extract of Deposition of Paul Aronzon, January 31, 2024

Page 1

1

2     UNITED STATES BANKRUPTCY COURT

       SOUTHERN DISTRICT OF NEW YORK

3     _____

4     In re:

5     GENESIS GLOBAL HOLDCO, LLC, et al.,

6                          Debtors.

7

       Case No.: 23-10063 (SHL)

8     _____

9

                            January 31, 2024

10                          8:39 a.m.

11

12

13

14            VIDEOCONFERENCE DEPOSITION of

15     PAUL ARONZON, pursuant to Notice, held at

16     8786 North Promontory Ridge Drive, Park

17     City, Utah before Wayne Hock, a Notary

18     Public of the State of New York.

19

20

21

22

23

24

25

1             P. Aronzon

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   EXAMINATION BY

24   MS. GRIFFITH:

25        Q.    Good afternoon, Mr. Aronzon.

Page 129

1                    P. Aronzon

2            Do you hear me okay?

3      A.    Yes.

4      Q.    Great.

5            My name is Greer Griffith.  I'm

6  with the law firm McDermott Will and

7  Emery, and I represent the ad hoc crypto

8  creditors group.

9            So this morning you testified

10  that you were one of two special committee

11  members; correct?

12      A.    Yes.

13      Q.    How frequently did the special

14  committee meet?

15      A.    It's impossible to say, but

16  several times, sometimes daily, and

17  certainly many times each week over the

18  entire time frame.  It's a very busy, busy

19  committee.

20      Q.    And when you met, was it in

21  person, over the phone, e-mail, a

22  combination?

23            MS. VANLARE: Objection.

24            THE WITNESS:  It is mostly

25      videoconference.  Certainly there

                              P. Aronzon

1

2        would have been phone calls.  There

3        were many in-person meetings, but I

4        usually attended by videoconference.

5        Q.    And was one of the purposes of

6    the special committee to conduct

7    investigations?

8              MS. VANLARE: Objection.

9              THE WITNESS:  Yes.

10             Sorry, I waited, I waited, I

11       wasn't sure.

12             MS. VANLARE: You did.

13       Q.    Did you run the special

14   committee investigations?

15             MS. VANLARE: Objection.

16             THE WITNESS:  Did I run them?

17       I'm not sure what you're asking me.

18       Q.    Were you in charge of the

19   special committee investigations?

20             MS. VANLARE: Objection.

21             THE WITNESS:  The special

22       committee obviously directs its

23       professionals, and the professional

24       here conducted an investigation on our

25       behalf.

Page 131

1                    P. Aronzon

2        Q.     What was your role regarding the

3   investigations then?

4              MS. VANLARE: Objection.  Asked

5         and answered.

6              THE WITNESS:  My role is that of

7         an independent director who's a member

8         of a special committee, and the

9         committee's job is to -- among all the

10        other things that we had on our plate,

11        to look into claims and causes of

12        action that might exist.

13        Q.     And you said that you advised

14   professionals who assisted with conducting

15   the investigation; correct?

16              MS. VANLARE: Objection.

17        Misstates testimony.

18              THE WITNESS:  I didn't advise

19        anybody.  But we, as a special

20        committee, did direct and make

21        business decisions about the

22        investigation to the extent we were

23        asked to do so.

24        Q.     And which professionals did you

25   work with as part of this investigation?

Page 132

1                    P. Aronzon

2            MS. VANLARE: Objection.

3            THE WITNESS:  The company's

4       professionals.  There's, as you know,

5       there's Cleary, that's the main --

6       they would be the main focus of the

7       discussions.  And then of course there

8       was support on the financial side from

9       A&M, Alvarez and Marsal, and also to

10      the extent necessary, Moelis and

11      Company.

12      Q.    And did all three of these

13   different professional groups provide

14   updates to the special committee?

15            MS. VANLARE: Objection.  Vague.

16            THE WITNESS:  On what?  We got

17      regular updates on a variety of

18      topics.

19      Q.    What did they update you about?

20   What type of topics?

21            MS. VANLARE: Objection.

22            THE WITNESS:  Everything we were

23      working on, whether it was the plan,

24      settlement negotiations, litigation

25      matters, claims disputes, legal issues

Page 133

1                      P. Aronzon

2        from time to time on a daily basis,

3        frankly, and certainly the

4        investigative issues.

5        Q.    Did they provide reports to you

6    about documents that they were collecting

7    or reviewing in connection with the

8    investigation?

9             MS. VANLARE: Objection.

10            And I would caution the witness

11       to the extent your answer would

12       disclose any client privilege.

13            THE WITNESS:  We did receive

14       reports.

15       Q.    And what type of reports?  I'm

16   not asking for you to reveal any

17   attorney-client privileged information,

18   but were these reports summarizing

19   documents that were collected from

20   individuals, were they summarizing

21   interviews that were conducted?

22            MS. VANLARE: Objection.

23            And again, to the extent your

24       answer would involve revealing any

25       client-attorney communications, I

Page 134

```
 1              P. Aronzon
 2      would instruct you not to answer.
 3              THE WITNESS:  They were very
 4      detailed reports about all of the
 5      activities of our investigative team.
 6      Q.    And do you consider those
 7   reports to be privileged information?
 8              MS. VANLARE: Objection.  Calls
 9      for a legal conclusion.
10              THE WITNESS:  I believe they are
11      privileged.
12              MS. GRIFFITH: And I have my
13      colleague Matthew Gibson on with me.
14              Matthew, could you upload the
15      amended disclosure statement.
16              (Whereupon, a document entitled
17      Amended Disclosure Statement With
18      Respect to The Amended Joint Plan of
19      Genesis Global Holdco, LLC
20      was marked Aronzon Exhibit 6
21      for identification.)
22      Q.    And when that's uploaded as an
23   exhibit, I believe we're at Exhibit 6.
24              I'm going to direct your
25   attention to the bottom of page
```

Page 135

1                      P. Aronzon

2    thirty-six.

3        A.    I'm closing the Exhibit 5; okay?

4              Page what now?

5        Q.    It's thirty-six on the bottom of

6    the page.  On the top it will say page

7    fifty-one of three hundred six.  But for

8    the record, this is the amended disclosure

9    statement with respect to the is amended

10   joint plan of Genesis Global Holdco, LLC,

11   et al., under Chapter 11 of the bankruptcy

12   code filed at document 1031 publicly on

13   the docket.

14       A.    Okay, I've got it.

15       Q.    And if you look at the bottom of

16   that page, it says, "Cleary has shared the

17   findings from the investigation with the

18   special committee and counsel to the UCC

19   and the ad hoc group".

20             Do you see that?

21       A.    Yes.

22       Q.    Are these detailed reports that

23   you're referencing that fall under the

24   findings that Cleary shared about its

25   investigation?

```
 1                    P. Aronzon
 2           MS. VANLARE: Objection.  Vague.
 3           MR. WEST: Objection.
 4           THE WITNESS:  Go ahead.
 5           MS. VANLARE: Objection.  Vague.
 6           And also I would add again, to
 7      the extent this would reveal any
 8      attorney-client privilege, I would
 9      instruct you not to answer.
10           THE WITNESS:  I heard somebody
11      else say something.
12           MS. VANLARE: I believe that was
13      Mr. West.
14           THE WITNESS:  I actually -- I
15      can't give you any substance, but what
16      I can tell you is I don't know exactly
17      what was shared.
18      Q.    Were the reports, the detailed
19   reports that were shared with you, also
20   shared with counsel to the UCC and the ad
21   hoc group?
22           MS. VANLARE: Objection.
23           THE WITNESS:  I don't know.
24      Q.    Who would have that information?
25      A.    Our counsel and probably the UCC
```

Page 137

1                           P. Aronzon

2    counsel and ad hoc group counsel.  They

3    can tell you what they got and what was

4    delivered.

5         Q.    And do you have these reports in

6    your possession, these detailed finding

7    reports?

8              MS. VANLARE: Objection.

9              THE WITNESS:  Sitting here right

10        now in my hand, no.

11        Q.    But if you were able to look in

12   your e-mail or in your personal

13   possession.

14             MS. VANLARE: Objection.

15             Counsel, you're misrepresenting

16        what's written on the page, so I would

17        caution the witness.

18             THE WITNESS:  I am sure that I

19        have reports that were provided by our

20        counsel.

21        Q.    Is the special committee

22   investigation still ongoing?

23        A.    I believe that we are still --

24   I'm not quite sure how to answer this.

25             There is work that is ongoing by

Page 138

```
 1                    P. Aronzon
 2   our counsel on a variety of issues having
 3   to do with a variety of different
 4   subjects.  I don't know how to describe it
 5   any better than that.  I mean, for
 6   instance, you know, we have work that
 7   we're doing in connection with plan
 8   releases.  That work is ongoing.  I don't
 9   know if that fits into your
10   categorization, but that is a topic that I
11   know is still in process.
12       Q.    How about an investigation into
13   potential claims the estate might have?
14             MS. VANLARE: Objection.
15             To the extent your answer would
16        reflect or reveal any attorney-client
17        privileged information, I would
18        instruct you not to answer.
19             THE WITNESS:  All I can really
20        say is there is continuing work being
21        done in certain areas.
22       Q.    Did the special committee
23   investigate all claims that the estate
24   might have?
25             MS. VANLARE: Objection.
```

Page 139

1                    P. Aronzon

2         Objection to form.

3              And again, Mr. Aronzon, to the

4         extent your answer would reveal any

5         attorney-client communications, I

6         would instruct you not to answer.

7              THE WITNESS:  I'm not quite sure

8         how to answer this.  The special

9         committee relied on its professionals

10        to assist in determining what to

11        investigate and what not to.

12        Q.    What type of claims did the

13    special committee investigate?

14             MS. VANLARE: Objection.

15             To the extent that your answer

16        would reveal any attorney-client

17        communication, I would instruct you

18        not to answer.

19             THE WITNESS:  I'll try to do

20        this generically; okay?

21             To the extent that a claim would

22        be, quote, an asset of our estate, we

23        looked at it through our

24        professionals.

25             To the extent a claim would

Page 140

1                    P. Aronzon

2        result in something to do with claims

3        that are asserted against the estate,

4        we would look at that.  And I'm doing

5        it really generally because I don't

6        know how to be specific without

7        revealing discussions and privileged

8        information.  And then obviously to

9        the extent people apprised us of

10       things they thought should be

11       investigated, if we thought there was

12       a reason to follow up, we would do so.

13       And there may be other types of things

14       that we would look at depending on the

15       issues and the timing and everything

16       else.

17       Q.     Did the special committee

18   investigate potential claims against

19   former directors, officers, and employees

20   at Genesis?

21            MS. VANLARE: Objection.

22            And again, Mr. Aronzon, to the

23       extent any part of your answer would

24       reveal attorney-client communication,

25       I would instruct you not to answer.

Page 141

                         P. Aronzon

1                        THE WITNESS:   I think the answer

2           is in certain circumstances, yes.

3           Q.     Did the special committee

4    investigate potential claims against

5    current directors, officers, and employees

6    at Genesis?

7                        MS. VANLARE: Objection.  Asked

8           and answered.

9                        And again --

10                       MS. GRIFFITH: The prior question

11          was about former.  This is current.

12                       MS. VANLARE: I'm referencing

13          your prior question in response to Mr.

14          Aronzon already testified all of the

15          types of claims and issues that were

16          considered by the special committee.

17                       MS. GRIFFITH: He did not specify

18          who he was investigating those claims

19          against, just the time frames.

20                       MS. VANLARE: His testimony

21          addresses this question.

22                       Mr. Aronzon, again to the extent

23          your answer would reflect or reveal

24          any client-attorney privileged

Page 142

1                    P. Aronzon

2        communications, I would instruct you

3        not to answer.

4              THE WITNESS:  It is a category

5        that we looked into.

6        Q.    Approximately how many

7    individuals were employed at Genesis at

8    any given time in 2022?

9        A.    I don't know.

10       Q.    Ballpark number.

11             MS. VANLARE: Objection.  Asked

12       and answered.

13             THE WITNESS:  I really have no

14       basis to make that determination.

15       Q.    Approximately how many directors

16   and officers were employed at Genesis at

17   any given time in 2022?

18             MS. VANLARE: Objection.

19             THE WITNESS:  I don't know the

20       exact number.

21       Q.    Ballpark estimate.

22             MS. VANLARE: Objection.

23             THE WITNESS:  Directors?  I came

24       in at the end of 2022 and I think

25       there were four directors.

Page 143

1              P. Aronzon

2          I'm really not certain of the

3      total number.  I'm more focused or

4      have been more focused on who is

5      around after I became a member of the

6      board.  And as I testified earlier

7      this morning, there were a few other

8      directors and the special committee at

9      some point a few months into the case,

10     two, three, four, five, I don't

11     remember, basically took over.

12     Q.    Do you know how many individuals

13  are currently employed at Genesis?

14          MS. VANLARE: Objection.

15          THE WITNESS:  No.  They've been

16     downsizing.  I don't know the number.

17     Q.    Do you know how many individuals

18  are current directors and officers at

19  Genesis?

20          MS. VANLARE: Objection.

21          THE WITNESS:  Directors, there's

22     Tom Conheeney and myself.  And as I

23     said earlier this morning, I'm not

24     sure whether the other directors, for

25     instance the DCG directors, I don't

Page 144

1                    P. Aronzon

2        recall whether they actually formally

3        resigned or not.  But the special

4        committee has functioned as the board

5        for many months now.

6                Officers, there's a handful,

7        two, three, four.

8        Q.    How many interviews have been

9    conducted as part of the special

10   committee's investigation?

11               MS. VANLARE: Objection.

12               THE WITNESS:  I don't know the

13       number.  Several.

14       Q.    And this will refresh your

15   recollection if we look at the amended

16   disclosure statement again, Exhibit 6,

17   page thirty-six on the bottom, page

18   fifty-one of three one six on the top.

19               MS. VANLARE: I'm sorry, counsel,

20       what page was that again?

21               MS. GRIFFITH: Sure.

22               So on the bottom, it's numbered

23       page thirty-six.  At the top of the

24       PDF, it says page fifty-one of three

25       hundred six.

Page 145

1              P. Aronzon

2         MS. VANLARE: Thank you.

3    Q.    Are you on that page?

4    A.    Yes.

5    Q.    And if you look right in the

6    middle of that page, there's a paragraph

7    that states, "as part of the

8    investigation, Cleary conducted more than

9    thirty interviews with approximately

10   twelve current and former employees

11   allocated to the company".

12          Do you see that?

13   A.    Yes.

14   Q.    And if you keep reading, it

15   says, "between December 4, 2022 and

16   January 24, 2023, Cleary conducted ten

17   preliminary interviews with current

18   employees".

19          Do you see that?

20   A.    Yes.

21   Q.    And then the next sentence

22   states that Cleary -- states in part,

23   "Cleary conducted at least nineteen more

24   substantive interviews with both current

25   and former employees".

Page 146

1                    P. Aronzon

2          Do you see that?

3     A.    Yes.

4     Q.    So it looks like there's ten

5   preliminary interviews, nine substantive

6   interviews that took place.  But the first

7   sentence states approximately twelve

8   current and former employees were

9   interviewed.  And so I'm trying to figure

10   that out.

11          Does that mean that similar --

12   the same individuals were interviewed

13   twice, both for the preliminary interviews

14   and the substantive interviews?

15          MS. VANLARE: Objection.

16          THE WITNESS:  I don't know.

17     Q.    Do you know who Cleary

18   interviewed?

19          MS. VANLARE: Objection.

20          And to the extent this would

21      reveal attorney-client communication,

22      I would instruct the witness not to

23      answer.

24          THE WITNESS:  I can't answer it

25      without talking about the reports that

Page 147

1                        P. Aronzon

2        we received.

3        Q.      You publicly filed details about

4    the results of the special committee

5    investigation here on the docket in the

6    amended disclosure statement.  You can't

7    really pick and choose what is considered

8    privilege or what's not considered

9    privilege.  You put the topic of

10   interviews in the amended disclosure

11   statement revealing what you investigated.

12   And so I'm asking who were the targets of

13   these interviews.

14           Do you know who they were?

15           MS. VANLARE: Objection.

16           The information that is in the

17       disclosure statement is by definition

18       public.  Other information relating to

19       the investigation is privileged.  The

20       witness has already testified that he

21       can't answer your question without

22       revealing privileged information.

23       Therefore, I would instruct the

24       witness not to answer the question.

25       Q.      Are you claiming that it's

Page 148

1                          P. Aronzon

2    privileged information whether you know

3    who was interviewed or not?

4              MS. VANLARE: I'm not sure if

5         you're referencing -- if you're

6         addressing your question to the

7         witness or to me.

8              However, in response to your

9         question, my objection stands.  And

10        again, I would instruct the witness

11        not to answer to the extent the answer

12        reveals privileged communication,

13        which he said it would.

14    Q.    Mr. Aronzon, I'm asking is the

15    identity of the witnesses who were

16    interviewed privileged information, in

17    your opinion?

18             MS. VANLARE: Ms. Griffith,

19        objection.

20             Again, I'm happy to repeat what

21        I just said, but it's the same

22        objection and same instruction to the

23        witness.

24    Q.    Did you sit in on any of these

25    interviews?

Page 149

1                    P. Aronzon

2              MS. VANLARE: Objection.

3              You may answer yes or no.

4              THE WITNESS:  No.

5        Q.    Did you ask any questions during

6    any of these interviews via prewritten

7    questions that were sent?

8              MS. VANLARE: Objection.

9              And again, Mr. Aronzon, I would

10        instruct you not to reveal any

11        attorney-client communications or

12        attorney work product in connection

13        with the investigations.

14             THE WITNESS:  Are you asking did

15        I ask our lawyers to ask specific

16        questions?

17       Q.    Yes.

18             MS. VANLARE: Objection.

19             I would instruct the witness not

20        to answer to the extent it reveals any

21        attorney work product or

22        attorney-client communications.

23       Q.    I'm not asking the substance of

24    the questions, I'm asking your involvement

25    and if you were -- the level of your

Page 150

```
 1                    P. Aronzon
 2   involvement.
 3            MS. VANLARE: If you're asking
 4        the witness if he spoke to his counsel
 5        about the investigations; is that your
 6        question?
 7            MS. GRIFFITH: Yes, did he help
 8        prepare for the interviews.
 9            MS. VANLARE: Again --
10            MS. GRIFFITH: I'm not asking
11        which questions he prepared, I'm
12        asking whether he was part of the
13        process for preparing for the
14        interviews that were conducted on
15        behalf of the special committee.
16            MS. VANLARE: Counsel, again
17        objection to your questions.
18            And I would instruct the witness
19        not to answer as it all calls for
20        privileged information.
21    Q.    Did you -- do you know if these
22   interviews were recorded?
23            MS. VANLARE: Same objection.
24            You may answer yes or no, if you
25        know.
```

Page 151

1                    P. Aronzon

2            THE WITNESS:  I don't know.

3      Q.    Did you review any transcripts

4   of these interviews?

5            MS. VANLARE: Objection.

6            Again, I'm going to instruct the

7       witness not to answer as this goes

8       into the details of the investigation

9       which are all privileged.

10           MS. GRIFFITH: On what basis is

11      whether Mr. Aronzon, who's a special

12      committee member who's tasked with

13      evaluating whether individuals should

14      be released privileged if he reviewed

15      an interview transcript?  I'm not

16      asking his thoughts or analysis of the

17      interview transcript, I'm asking

18      whether he reviewed it.

19           MS. VANLARE: Counsel, you're

20      asking questions that relate to the

21      conduct of an investigation that was

22      done by counsel and you're asking

23      about actions and conversations and

24      events that took place in the context

25      of a -- again an investigation that is

Page 152

```
 1                        P. Aronzon
 2        attorney-client communication and/or
 3        attorney work product.
 4        Q.     So are you refusing to answer
 5   the question of whether the special
 6   committee reviewed any interview
 7   transcripts?
 8             MS. VANLARE: Again, objection.
 9        The witness is not refusing.  I'm
10        instructing the witness not to answer
11        for the reasons that I identified
12        earlier.
13        Q.     And just so the record is clear,
14   are you refusing to identify which
15   witnesses were interviewed as part of the
16   special committee investigation that are
17   listed here in the paragraph in the
18   amended disclosure statement that we
19   looked at?
20             MS. VANLARE: Objection.
21             Again, as stated previously, the
22        witness is not refusing.  I am
23        instructing the witness not to answer,
24        however, for the reasons I identified
25        earlier in that it calls for
```

Page 153

1              P. Aronzon

2      attorney-client communication and

3      attorney work product and is therefore

4      privileged information.

5      Q.    And are you going to take your

6  counsel's advice, Mr. Aronzon?

7      A.    I always do.

8      Q.    How were the individuals that

9  were interviewed selected to be

10 interviewed?

11          MS. VANLARE: Again, objection,

12     for the same reason.  This goes into

13     the details of the investigation and

14     is all subject to attorney-client

15     privilege and attorney work product,

16     and I would instruct the witness not

17     to answer.

18     Q.    Are you following that

19 instruction again?

20     A.    I always do.

21     Q.    Was anyone that was interviewed

22 not a current or former employee of

23 Genesis?

24          MS. VANLARE: Objection.

25          Once again, the question calls

Page 154

1                    P. Aronzon

2        for privileged information.  I would

3        instruct the witness not to answer.

4        Q.    Are you going to answer the

5    question, Mr. Aronzon?

6        A.    No.

7        Q.    During the course of your

8    investigation, did the special committee

9    investigate communications that Genesis

10   had with Genesis customers?

11            MS. VANLARE: Objection once

12       again for the same reason.  Calls for

13       privileged communication.

14            And I would instruct the witness

15       not to answer.

16       Q.    Once again, Mr. Aronzon, are you

17   going to answer the question or not?

18       A.    No.  And when I'm instructed not

19   to answer, I'm not going to answer.

20       Q.    The special committee

21   investigated DCG; correct?

22            MS. VANLARE: Mr. Aronzon, you

23       may answer yes or no, but beyond that

24       I would caution -- well, I would

25       instruct you to answer yes or no to

Page 155

1                    P. Aronzon

2        that question.

3                THE WITNESS:  Yes.

4        Q.     And if we look at the top of

5    page thirty-six, there's much more than a

6    yes or no answer that was publicly filed

7    on the docket about the special

8    committee's investigation into DCG.  I'll

9    read the line into the record.

10               It says, "as part of its

11   mandate, the special committee was charged

12   with evaluating and improving transactions

13   with affiliates, including DCG parties and

14   investigating the debtors' relationships

15   and transactions with DCG parties.  One of

16   the primary purposes of this investigation

17   has been to assess whether the debtors

18   have potentially viable claims against the

19   DCG parties and to assist the special

20   committee in the exercise of its fiduciary

21   duties".

22               Do you see that?

23        A.     Yes.

24        Q.     Has the special committee

25   determined whether the debtors have

Page 156

1              P. Aronzon

2    potentially viable claims against the DCG

3    parties?

4              MS. VANLARE: Objection.

5              Counsel, the language is what it

6         is.  You're misstating the language.

7         Obviously the witness can refer to

8         what is in the disclosure statement.

9              THE WITNESS:  At the bottom of

10        the page there's a sentence that says,

11        "the special committee concluded that

12        there are colorable claims against

13        certain DCG parties for various causes

14        of action", and it goes on to say,

15        "including potential claims based on

16        alter ego, preference, and other legal

17        cognizable rights".

18    Q.    And has the special committee

19    ever calculated a value of these claims?

20             MS. VANLARE: Objection.

21             I'm going to instruct the

22        witness not to answer as it would

23        reveal attorney work product and

24        attorney-client communication.

25    Q.    And you're following that advice

Page 157

1                        P. Aronzon

2  again, Mr. Aronzon?

3       A.      As I said earlier.

4       Q.      I have to keep asking for the

5  record.

6       A.      I understand.

7       Q.      Thank you for your cooperation.

8               Did the special committee

9  investigate potential preference claims

10 against DCG parties?

11              MS. VANLARE: You may answer yes

12      or no, Mr. Aronzon.

13              THE WITNESS:  Yes.

14      Q.      And did the special committee

15 also investigate preference claims against

16 Gemini and Gemini lenders?

17              MS. VANLARE: Objection.

18              To the extent your answer would

19      reveal any attorney-client

20      communication or attorney work

21      product, again the disclosure

22      statement is a publicly filed document

23      and has information relating to the

24      investigations.

25              THE WITNESS:  Can I ask a

Page 158

P. Aronzon

1      question?  Is there a paragraph that

2      talks about preference claims so I can

3      see what we said publicly?

4      Q.     Yes.  On page forty-five at the

5  bottom, page sixty of three hundred six at

6  the top, there's a paragraph on the

7  special committee's investigation and its

8  analysis of preference claims relating to

9  Gemini and/or the Gemini lenders.

10          Do you see that?

11      A.     It's paragraph A?

12      Q.     Yes.

13      A.     Little A?  Yes.

14      Q.     So were you involved with the

15  investigation into preference claims

16  against Gemini and the Gemini lenders?

17          MS. VANLARE: Objection.

18          You can answer yes or no.

19          THE WITNESS:  Involved, I'm not

20      sure what that means, but our

21      professionals did this work.

22      Q.     And did your professionals

23  report their findings on this work to the

24  special committee?

Page 159

1                    P. Aronzon
2              MS. VANLARE: Objection, but you
3       can answer yes or no.
4              THE WITNESS:  I believe they
5       did.
6       Q.    So you just testified that the
7   special committee investigated potential
8   preference claims against the DCG parties,
9   Gemini, and the Gemini lenders.
10             Did the special committee
11  investigate potential preference claims
12  against parties other than those entities?
13             MS. VANLARE: Objection.
14             You may answer yes or no, but
15      anything revealing attorney-client
16      communication or work product I would
17      instruct you not to answer.
18             THE WITNESS:  I believe the
19      answer is yes.
20      Q.    Did the special committee
21  investigate preference claims against
22  former directors and officers of Gemini?
23             MS. VANLARE: Objection.  Calls
24      for -- again, calls for privileged
25      communication.

Page 160

1                    P. Aronzon

2              You may answer yes or no to the

3        extent it would not reveal attorney

4        work product or privileged

5        communications.

6              THE WITNESS:  I actually don't

7        recall all of the individuals or

8        entities that we looked at besides

9        those identified in the disclosure

10       statement.  I'd have to go digging

11       around to see.

12       Q.    So sitting here today, you can't

13  recall if the special committee

14  investigated potential preference claims

15  against directors, former directors and

16  officers at Gemini?

17             MS. VANLARE: Objection.

18       Misstates his testimony.

19             Counsel, if you want to point

20       him to a section of the disclosure

21       statement, please do so.  The

22       disclosure statement or the plan.

23             MS. GRIFFITH: I'm asking from

24       his recollection as someone who was

25       critical to approving whether

Page 161

1              P. Aronzon

2       directors and officers at Gemini are

3       getting releases, if he considered

4       preference claims against those

5       individuals as part of that analysis.

6           MS. VANLARE: Mr. Aronzon, you

7       may answer yes or no, but beyond that

8       I would instruct you not to answer as

9       it would call for privileged

10      communications and attorney work

11      product.

12          THE WITNESS:  Well, I'm not

13      quite sure how to answer this, because

14      the releases don't apply to former

15      directors and officers.  It only

16      relates to people who were working for

17      the company from and after the

18      petition date.  I don't recall the

19      group of people we looked at, but we

20      certainly looked at a number of

21      different entities and individuals.

22      Q.    And when you're saying you

23  looked at a number of different entities

24  and individuals, you're talking about

25  looking at them and whether there was

Page 162

1                    P. Aronzon

2      preference claims against them; that's

3      what you meant by looking at them?

4                    MS. VANLARE: Objection.

5                    THE WITNESS:  It was all done

6           professionals, that's number one.

7                    And number two, when I say

8           looking at them, we would have looked

9           at preference claims, and we may have

10          looked at other things, too, depending

11          on what we know or didn't know at the

12          time.

13     Q.    Do you know if any of the

14     individuals that are currently set to

15     receive releases have preference liability

16     to the estate?

17                   MS. VANLARE: Objection.

18          Attorney-client privilege and work

19          product.

20                   I would instruct the witness not

21          to answer.

22     Q.    Are you going to answer the

23     question?

24     A.    I was waiting for you to ask.

25                   No, I'm not.

Page 163

```
 1                    P. Aronzon
 2      Q.    Do you know the answer to that
 3   question without revealing the answer?
 4   Just in general, do you know if any of the
 5   individuals on the released Genesis
 6   personnel list have preference liability
 7   to the estate?
 8           MS. VANLARE: Objection to the
 9      extent answering that would reveal
10      attorney-client communication.
11           THE WITNESS:  I don't know how
12      to answer it without talking about
13      what we learned from our
14      professionals, so it's -- I don't
15      think I can answer it without that.
16      Q.    Whether you know or do not know
17   a fact is not privileged information.
18           MS. VANLARE: Counsel, you're
19      using legal terminology, for example
20      "preference liability", that is
21      inherently a legal question, and so
22      how the witness would answer that, it
23      would be of course informed by
24      communications with counsel and legal
25      analysis.
```

Page 164

1                    P. Aronzon

2       Q.     You could answer.

3       A.     I can't.

4              MS. VANLARE: I think he can't.

5       I think he's answered the question.

6       Q.     Do you know if any of the

7   individuals set to get releases withdrew

8   any assets from Genesis within ninety days

9   prior to the petition date?

10             MS. VANLARE: Objection.

11      Objection to form.

12             If you know the answer.

13             THE WITNESS:  What I know I

14      learned through all of our

15      professionals' work, so it's hard for

16      they to answer that.

17      Q.     You can still answer yes or no

18  if you know that fact or not.

19             MS. VANLARE: He's already

20      answered the question.

21             THE WITNESS:  Yeah.

22      Q.     You did not answer yes or no.

23      A.     I don't know how to answer it

24  without talking about what I learned from

25  our professionals.  That's my problem

Page 165

1                    P. Aronzon

2     here.  I don't want an inadvertent comment

3     to be made to argue for some kind of

4     waiver.

5          Q.     Whether individuals withdrew

6     assets from Genesis is not privileged

7     information.

8               MS. VANLARE: Objection.  It's

9          not clear what you mean by your

10         question, first of all.

11         Q.     Individuals that are set to get

12    releases, if they withdrew any assets of

13    any kind, crypto included, from Genesis

14    within ninety days of the petition date is

15    not a privileged fact.  That's just a

16    fact.

17              MS. VANLARE: Mr. Aronzon, again

18         if -- to the extent you can answer

19         without conversations with counsel,

20         you may answer.  But to the extent

21         this is -- that your knowledge comes

22         from conversations with counsel and is

23         informed by conversations with

24         counsel, I would instruct you not to

25         answer.

Page 166

1          P. Aronzon

2          THE WITNESS:  I believe it is

3      informed by conversations with

4      counsel.

5      Q.    So separate from communications

6  with counsel, I don't want you to reveal

7  that, I just want to know yes or no if you

8  know whether any of the individuals that

9  are set to get releases withdrew any

10  assets from Genesis within the ninety-day

11  period.

12          MS. VANLARE: Ms. Griffith,

13      you've asked -- I didn't mean to

14      interrupt.

15          MS. GRIFFITH: I'm not asking the

16      substance, I'm asking the fact, does

17      he know that fact or does he not know

18      that fact.  That is not a privileged

19      question.  Whether or not he knows

20      that, that's a yes or no answer.

21          MS. VANLARE: Ms. Griffith, the

22      witness has answered at least three

23      times that he is unable to answer that

24      question without revealing

25      conversations that he's had with

Page 167

1                    P. Aronzon

2        counsel.

3        Q.    So you're refusing to answer the

4    question whether, as a special committee

5    member, you know that in a way that would

6    not reveal privileged communications; is

7    that correct?

8              MS. VANLARE: Objection to that

9        comment.  He's not refusing to answer.

10       He has answered the question and you

11       can review the transcript as to his

12       answer.

13       Q.    My question's still pending.

14             Is that correct?

15             MS. VANLARE: Objection.  He's

16       answered the question.

17       Q.    Are you still going to refuse to

18   answer the question, Mr. Aronzon, so we

19   can wrap up this part?

20             MS. VANLARE: Objection to your

21       characterization.  He's not refusing.

22       He has answered the question.

23             Mr. Aronzon, if you want to

24       clarify that your answer stands, you

25       can do so, and hopefully we can move

Page 168

1                    P. Aronzon

2        on.

3              THE WITNESS:  I believe all of

4        the information I have here came from

5        counsel.

6              MS. GRIFFITH: I'm going to

7        introduce as a new exhibit, Exhibit 7.

8              (Whereupon, a document entitled

9        Exhibit F was marked Aronzon

10       Exhibit 7 for identification.)

11             THE WITNESS: Can I close the

12       disclosure statement?  Are we done

13       with it?

14             MS. GRIFFITH: Yes.  We might go

15       back to it at one point, but for now

16       we're done with it.

17             And this, for the record, is a

18       notice of filing for plan supplement

19       for the debtors' amended joint

20       Chapter 11 plan filed publicly on the

21       docket as number 1117.

22       Q.    Tell me when you're able to

23   access that, please.

24       A.    I have it.

25       Q.    And if you could flip to the end

Page 169

1                    P. Aronzon

2    of this document, page twenty-one of

3    twenty-two, that's Exhibit S and it's

4    titled Justification For Exculpated and

5    Released Parties.

6        A.    I have it.

7        Q.    The first paragraph of this page

8    has a defined term in it called the

9    released Genesis personnel.

10            Do you see that?

11       A.    Yes.

12       Q.    Were current Genesis employees

13   included in the released Genesis personnel

14   list?

15            MS. VANLARE: Objection.

16            THE WITNESS:  Current as of

17       when?

18       Q.    You tell me.

19            MS. VANLARE: Objection.

20            THE WITNESS:  Well, I'm reading

21       the language.

22            "Subject to our reservation of

23       rights, the special committee has

24       provided its prior written consent for

25       the release of current or former

Page 170

1                    P. Aronzon

2         employees, officers, directors of the

3         debtors solely in such person's

4         capacity as such who served as an

5         employee, officer, or director of the

6         debtors pursuant" -- no, "of the

7         debtors from and after the petition

8         date, including any employees of GGT

9         who served or functioned as employees

10        of the debtor pursuant to a shared

11        services arrangement with GGT".

12              So when you use the word

13        "current", if you're using it the way

14        it's included here, then the answer is

15        yes.

16        Q.    And are you, as a special

17   committee member, familiar with the

18   individuals that are on the -- with the

19   released --

20              MS. GRIFFITH: Strike that.

21        Q.    Are you familiar, as a special

22   committee member, with who is on the

23   released Genesis personnel list?

24              MS. VANLARE: Objection.

25              To the extent you know, you can

Page 171

```
 1                    P. Aronzon
 2        answer, but I would caution to the
 3        extent it would reveal any
 4        attorney-client communications.
 5              THE WITNESS:  Am I familiar with
 6        who's on the list?
 7        Q.    Yes, have you reviewed the list?
 8        A.    I believe I've seen it, yes, or
 9   a list.  And the work is not done yet, so
10   the list could change.
11        Q.    The list as it stands now, does
12   it contain current Genesis employees on
13   it?
14              MS. VANLARE: Objection.
15              THE WITNESS:  Genesis meaning
16        the whole empire of Genesis?
17        Q.    Yes.
18              MS. VANLARE: Objection.
19              THE WITNESS:  I believe it does.
20              Sorry, Jane.
21        Q.    And are any individuals that are
22   currently on the released Genesis
23   personnel list former employees, officers,
24   or directors of Genesis?
25              MS. VANLARE: Objection.
```

Page 172

```
 1                    P. Aronzon
 2            You may answer if you know.
 3            THE WITNESS:  If people were
 4       there on the petition date who fit in
 5       those categories and they left
 6       subsequently, then I believe the
 7       answer is yes.
 8       Q.    How many of the individuals that
 9  are currently on the released Genesis
10  personnel list have been interviewed?
11            MS. VANLARE: Objection.
12            This goes into the investigation
13       which again is subject to attorney
14       work product and attorney-client
15       privilege and I would instruct the
16       witness not to answer.
17       Q.    And once again, I'm not asking
18  for you to reveal your discussions with
19  counsel.  I'm asking if you know, as a
20  special committee member, the number of
21  employees on the list that were
22  interviewed or not as a fact.
23            MS. VANLARE: Again, that goes
24       into the way in which the
25       investigation was conducted which is
```

Page 173

P. Aronzon

1    subject to privilege, and I would

2    instruct the witness not to answer the

3    question.

4    Q.    Are you going to answer the

5  question?

6    A.    No.

7    Q.    Do you know if the special

8  committee is planning on interviewing all

9  of the individuals on the list prior to

10  the list being finalized?

11            MS. VANLARE: Same objection.

12    This again calls for privileged

13    communication and attorney work

14    product, and I would instruct the

15    witness not to answer.

16    Q.    Are you going to answer the

17  question?

18    A.    I follow the instructions of my

19  counsel.

20    Q.    In your opinion, as a special

21  committee member, separate from the advice

22  of your counsel, do you think it's

23  necessary to interview all of the people

24  that are set to get releases prior to them

Page 174

```
 1                      P. Aronzon
 2   being released?
 3              MS. VANLARE: Objection.  Calls
 4        for privileged communication and
 5        attorney work product, and I would
 6        instruct the witness not to answer.
 7        Q.    Are you going to answer that
 8   question?
 9        A.    No.
10        Q.    Have you personally interviewed
11   anyone that is set to be released on the
12   released Genesis personnel list?
13              MS. VANLARE: Objection.  Again
14        calls for the details of the
15        investigation which is subject to
16        attorney-client privilege and attorney
17        work product, and I would instruct the
18        witness not to answer.
19        Q.    Are you claiming that whether
20   you, as a special committee --
21              MS. GRIFFITH: Strike that.
22        Q.    Earlier in this deposition, you
23   testified that you were not working on the
24   special committee as an attorney; correct?
25        A.    I'm not working as an attorney
```

Page 175

1               P. Aronzon

2    for anybody anywhere since 2019.

3        Q.    So if you were to interview a

4    witness personally, that would not be an

5    interview conducted in an attorney

6    fashion; correct?

7            MS. VANLARE: Objection.

8            Anything relating to the

9        investigation is subject to privilege

10       as it was conducted by counsel and

11       under the direction of counsel and as

12       such, I would instruct the witness not

13       to answer.

14       Q.    I'm not asking whether counsel

15   conducted these interviews.  I'm asking

16   whether you, Mr. Aronzon, you, as a

17   special committee member, conducted any

18   interviews of any person that is set to be

19   released.

20           MS. VANLARE: And again, my

21       comment was broader than what you just

22       stated, which is to say that the way

23       in which the investigation was

24       conducted was directed by counsel, and

25       so any details relating to the

Page 176

1                      P. Aronzon

2          investigation, unless they're made

3          public through the disclosure

4          statement or the plan supplement, are

5          subject to privilege, and I would

6          instruct the witness not to answer

7          those questions.

8          Q.     You previously testified that

9     you did not conduct any interviews.  So

10    I'm just asking if you personally

11    interviewed anyone that's going to be

12    released.

13              MS. VANLARE: Objection.

14              MS. GRIFFITH: It's a yes or no

15          answer.

16              MS. VANLARE: You have the

17          testimony that you have.  You can

18          refer to the transcript.

19          Q.     Are you going to answer the

20    question, Mr. Aronzon?

21          A.     Was I instructed not to?

22              MS. VANLARE: I object to the

23          question.  You can refer to prior

24          testimony.

25              If you want to repeat the

Page 177

                          P. Aronzon

1

2        question and prior testimony to

3        refresh the witness' recollection, I

4        would have no objection to that.

5        Q.    Have you personally interviewed

6    any person or entity, so a representative

7    of an entity, that is currently set to

8    receive a release?

9             MS. VANLARE: What was his prior

10       testimony?  Are you reading his prior

11       testimony, counsel?

12            MS. GRIFFITH: No, I'm repeating

13       the question that I had which you

14       objected to.

15            MS. VANLARE: Correct.

16            I am asking you if you are

17       asking -- if you are representing that

18       he testified to something, please --

19            MS. GRIFFITH: This is a

20       different question.

21            MS. VANLARE: Okay.

22       Q.    Have you personally interviewed,

23   Mr. Aronzon, any person that is --

24       A.    It's Aronzon, Aronzon.

25       Q.    My apologies.

Page 178

P. Aronzon

1   A.    Ignore the Z.  I have no idea

2   where it came from.  It's Aronzon.

3

4   Q.    My apologies, Aronzon.

5       Have you personally interviewed

6   anyone or a representative of any entity

7   that is set to get a release?

8       MS. VANLARE: Objection.  Again

9       calls for information relating to the

10      way in which the investigation was

11      conducted, and as such, I would

12      instruct the witness not to answer.

13      Q.    Sorry, you're refusing to answer

14   that question?

15      A.    I'm instructed not to.

16      Q.    Looking at the first paragraph

17   that we looked at previously which you

18   read out loud in part on the record, it

19   says that "the special committee has,

20   subject to the reservation of rights set

21   forth herein, provided its prior written

22   consent for the release of current or

23   former employees, officers, and directors

24   of the debtors, solely in such person's

25   capacity as such who served as an

Page 179

1              P. Aronzon

2      employee, officer, or director of the

3      debtors from or after the petition date".

4              Do you see that?

5      A.    Yes.

6      Q.    What did you do as a special

7      committee member to feel confident that

8      releases were warranted prior to granting

9      written consent?

10             MS. VANLARE: Objection to the

11        extent it would reveal any

12        attorney-client communications.

13             But to the extent that -- you

14        can answer the question without

15        revealing any attorney-client

16        communication, you may do so.

17             THE WITNESS:  Without revealing

18        anything I was told, he relied on our

19        professionals, including our counsel.

20     Q.    Did the special committee make

21     any independent decisions separate from

22     counsel?

23             MS. VANLARE: Objection.  Vague.

24             THE WITNESS:  I can't answer

25        that one without revealing

Page 180

```
 1                    P. Aronzon
 2       conversation with counsel.
 3       Q.    So did the special committee
 4   independently, separate from
 5   communications with counsel, consider
 6   whether releases of current or former
 7   employees should be granted?  Did it make
 8   an independent decision separate from
 9   counsel?
10            MS. VANLARE: Objection.
11            To the extent that the question
12       calls for any attorney-client
13       privileged communications or attorney
14       work product, I would instruct you not
15       to answer.
16       Q.    Are you going to answer the
17   question?
18       A.    I'm not sure how to answer it.
19       Q.    The special committee provided
20   written consent for the release of certain
21   former and current Genesis personnel;
22   correct?
23       A.    That is exactly what the
24   disclosure statement says.
25       Q.    And do you know that in your
```

Page 181

                        P. Aronzon

1

2   personal capacity separate and aside from

3   just reading this piece of paper?

4        A.    Yes.

5        Q.    And let's talk about the process

6   for that.

7              What is involved with you giving

8   written consent?

9              MS. VANLARE: Objection.

10             THE WITNESS:  I don't know how

11        to answer this without talking about

12        all the things we discussed with

13        counsel.

14             MS. VANLARE: I'm sorry, are you

15        asking the mechanics as in e-mail

16        or --

17        Q.    To decide whether to release

18   someone or not, you considered a variety

19   of factors; correct?

20             MS. VANLARE: Objection.

21             To the extent you can answer

22        without attorney-client privilege, a

23        yes or no question.

24             THE WITNESS:  We considered a

25        variety of facts, correct.

Page 182

1                      P. Aronzon

2       Q.    And was your analysis of those

3    factors completely in alignment with

4    everything your counsel told you or did

5    you ever disagree with anything counsel

6    said?

7              MS. VANLARE: Objection.

8              I'm going to instruct the

9         witness not to answer as it calls for

10        attorney-client communication.

11      Q.    In your opinion, did you just

12   rubber stamp what your counsel told you

13   about whether employees should be on the

14   released list, or did you, as a special

15   committee member, make your own

16   independent assessment?

17             MS. VANLARE: Objection to the

18        form.

19             As to the substance of the

20        question again, I would caution the

21        witness to the extent your answer

22        would reveal any attorney-client

23        communication or work product, I would

24        instruct you not to answer.  To the

25        extent there's any part of the answer

Page 183

```
 1                    P. Aronzon

 2        that you can speak to about the

 3        process that would not reveal

 4        attorney-client communication, you may

 5        do so.

 6             THE WITNESS:  There was

 7        extensive discussion between us and

 8        our counsel about all of this.

 9        Q.    Was there any separate analysis

10   done without counsel?

11             MS. VANLARE: Objection.

12             I believe the witness has

13        already testified that the information

14        and the deliberations were with

15        counsel or on the basis of attorney

16        work product.

17             As such, I would instruct the

18        witness not to answer.

19        Q.    Are you not going to answer that

20   question?

21        A.    I'm not.

22        Q.    Are releases being sought for

23   those on the released Genesis personnel

24   list for both pre and post-petition

25   conduct of individuals on the list?
```

Page 184

1                    P. Aronzon

2           MS. VANLARE: Objection.

3           THE WITNESS:  I'd have to look

4      at the actual release language.  It's

5      pretty dense.  But I believe it is for

6      pre and post conduct.

7      Q.    And how is the prepetition

8  conduct of the individuals on the Genesis

9  released personnel list investigated prior

10 to these individuals being put on the

11 list?

12          MS. VANLARE: Again, objection.

13     This directly calls for the results of

14     an investigation conducted by counsel

15     and would reveal attorney-client

16     communication and as such, I would

17     instruct the witness not to answer.

18     Q.    Are you going to answer the

19 question?

20     A.    No.

21     Q.    Do you know if any individual on

22 the Genesis released personnel list ever

23 was employed by or served as a director of

24 any digital currency group entity other

25 than the debtors?

Page 185

1                    P. Aronzon

2            MS. VANLARE: Objection.

3            To the extent this would reveal

4       attorney-client privileged

5       information, to the extent you know as

6       a fact matter, you may answer.

7            THE WITNESS:  I believe in the

8       very first paragraph at the end

9       there's a sentence that says, "for the

10      avoidance of doubt, none of the

11      released Genesis personnel are or also

12      DCG parties".  I've have to go look at

13      the definition of DCG parties, but I

14      believe the answer -- if you're asking

15      me were any of those people who were

16      employed at Genesis also employed at

17      DCG and are they getting a release, I

18      think the answer is no, they're not.

19      Q.    Do you know if any of the

20  individuals currently on the Genesis

21  released personnel list ever were involved

22  in any way with debtors lending to any DCG

23  entity?

24            MS. VANLARE: Objection.

25            I would caution to the extent

Page 186

1                    P. Aronzon

2       this would reveal any attorney-client

3       privilege or work product.

4               To the extent you know as a fact

5       matter, you may answer.

6               THE WITNESS:  Ask it again.

7       Q.    Do you know if any of the

8  individuals currently on the released

9  Genesis personnel list ever were involved

10  with debtors lending to any DCG-owned

11  entity?

12              MS. VANLARE: Objection.

13              To the extent the witness would

14       have this information, to the extent

15       he does that results from

16       attorney-client communications or

17       attorney work product, I would

18       instruct the witness not to answer.

19       Q.    It's your knowledge as a fact.

20  So it's a yes or no question whether,

21  sitting here today, you know that.

22              MS. VANLARE: To the extent that

23       the information that the witness knows

24       came from an investigation subject to

25       privilege and -- to the extent it came

Page 187

1                    P. Aronzon

2        from attorney-client communications,

3        it is privileged.  The witness

4        obviously doesn't have fact -- well, I

5        don't believe the witness is a fact

6        witness as to the period of time that

7        you're asking about because he was not

8        appointed -- he was not an employee

9        and he was only appointed to the

10       special committee, as he testified to

11       previously, in November of 2022.

12             MS. GRIFFITH: The special

13       committee is charged with the ultimate

14       authority of granting releases and the

15       witness testified that prepetition

16       conduct was considered in whether to

17       grant these releases.  So I'm asking

18       about prepetition conduct and whether

19       he is aware, if he has the knowledge,

20       as a special committee member with the

21       authority to grant these releases, if

22       any of the individuals that are

23       currently on the released Genesis

24       personnel list were ever involved with

25       debtors lending to any DCG-end entity.

Page 188

1                    P. Aronzon

2              MS. VANLARE: Again, objection.

3              To the extent the information

4        came from counsel and is -- and came

5        from an investigation conducted by

6        counsel, it is privileged, and I would

7        instruct the witness not to answer.

8        Q.    So are you saying the fact --

9    I'm not asking the substance, I'm not

10   asking who was involved or what was

11   investigated, I'm asking the fact about

12   whether debtors lending to any DCG-owned

13   entities was investigated.

14             That's privileged?  That's what

15   you're claiming?

16             MS. VANLARE: The subject of the

17        investigation that was conducted and

18        the topics of that investigation are

19        attorney work product and are subject

20        to privilege.

21             I would instruct the witness not

22        to answer.

23        Q.    If, in your opinion as a special

24   committee member, you were to find out

25   that any individual on the released

1                    P. Aronzon

2  Genesis personnel list was ever involved

3  with debtors lending to any DCG-owned

4  entity, would that impact your decision on

5  whether to grant that individual or entity

6  a release?

7           MS. VANLARE: Objection.

8           Again, calls for speculation.

9           But secondly again, you're

10      asking for what the witness knows and

11      may have discussed or assessed in the

12      context of an investigation that is

13      conducted by counsel at the direction

14      of counsel and is therefore

15      privileged.

16           As such, I would instruct the

17      witness not to answer.

18      Q.    Are you refusing to answer the

19  question?

20      A.    I'm not instructed not to.

21      Q.    The subject of releases and the

22  justification for released parties is

23  publicly filed on the docket and it's a

24  matter that will be heard in court.  It's

25  a matter of whether the plan will be

Page 190

1                         P. Aronzon

2     confirmed.  So we're allowed to ask facts

3     about the releases and what was done to

4     determine if the releases are appropriate

5     or not.

6                 MS. VANLARE: Ms. Griffith, the

7            information -- you're right in that

8            there was information about the

9            releases and the justification for

10           exculpating released parties was filed

11           as part of the plan supplement.

12           There's also disclosure in the

13           disclosure statement.

14                 However, a lot of the

15           information relating to this topic is

16           privileged therefore, your questions

17           call for privileged information and I

18           therefore, depending on the question,

19           have instructed the witness not to

20           answer in accordance with the fact

21           that again it is subject to privilege.

22                 If you have an issue with that,

23           we can discuss it.

24      Q.    I'm move on to my next question.

25                 Do you know if any of the

Page 191

1              P. Aronzon

2    individuals currently on the released

3    Genesis personnel list were ever involved

4    with Genesis' lending to Grayscale Bitcoin

5    Trust?

6              MS. VANLARE: Objection.

7              Once again, you've asked this

8         question multiple times.

9              MS. GRIFFITH: I've never asked

10        about Grayscale Bitcoin Trust.

11             MS. VANLARE: You're right, I

12        stand corrected, it's a different

13        question.  However, I'm going to have

14        a similar instruction to the witness,

15        which is to say that, to the extent

16        that anything you know about this came

17        from your conversations with counsel,

18        I will instruct you not to answer.

19   Q.    And are you going to answer the

20   question?

21   A.    I follow my instructions.

22   Q.    Sitting here today as a special

23   committee member, would it impact your

24   decision on whether to authorize releases

25   if you were to find out that any of the

1              P. Aronzon

2    individuals on the released Genesis

3    personnel list ever were involved with

4    Genesis' lending to Grayscale Bitcoin

5    Trust?

6              MS. VANLARE: I'm going to object

7         and once again instruct the witness

8         not to answer as it calls for

9         privileged information and attorney

10        work product done as part of the

11        investigation.

12             And with that, we don't have to

13        stop now, but I do note the time,

14        we've been going on for some time, and

15        I don't know if Mr. Aronzon would like

16        a lunch break.  I raise that.  We

17        don't have to do it right now.  If the

18        witness would like to, I think it's

19        going to be time for a break soon.

20             MS. GRIFFITH: We can take a

21        break now.  That's fine.

22             THE WITNESS:  Let's not take too

23        long.

24             MS. VANLARE: If you'd rather

25        not, Mr. Aronzon, it's up to you.

Page 193

```
 1                      P. Aronzon
 2            THE VIDEOGRAPHER: I do have to
 3       reset the video though, counsel.  It
 4       only takes a few seconds.  Whatever
 5       you want to do.
 6            Should we go off for a few
 7       minutes?
 8            THE WITNESS:  Sure.  Let's --
 9       five minutes, ten minutes, what do you
10       want?
11            MS. GRIFFITH: Let's take a
12       ten-minute break.
13            THE WITNESS:  You've got it.
14            THE VIDEOGRAPHER: The time is
15       12:44.
16            We are off the record.
17            (Whereupon a break was taken)
18            THE VIDEOGRAPHER: The time is
19       1:05.
20            We are on the record.
21       Q.    So to jump back in, we were
22  talking about the released Genesis
23  personnel list and what the special
24  committee considered prior to providing
25  written consent for the release of
```

Page 194

```
 1                      P. Aronzon
 2    individuals on this list.
 3              So my next question is: Do you
 4    know as a fact if any of the Genesis
 5    released personnel ever held any Grayscale
 6    ETF?
 7              MS. VANLARE: Objection.
 8              As previously noted, the answer
 9         would reflect communications with
10         counsel and attorney work product as a
11         result of the investigation or created
12         as part of the investigation and as
13         such, I would instruct the witness not
14         to answer.
15         Q.    Are you going to answer the
16    question?
17         A.    No.
18         Q.    Do you know, as a fact, if any
19    of the individuals on the released Genesis
20    personnel list were ever involved with
21    debtors lending to Three Arrows Capital?
22              MS. VANLARE: Objection.
23              I believe the answer calls for
24         attorney-client communications and
25         attorney work product and, as such, I
```

1           P. Aronzon

2       would instruct the witness not to

3       answer.

4       Q.    Are you going to answer the

5   question?

6       A.    No.

7       Q.    Was whether individuals on the

8   Genesis released personnel list was ever

9   involved with debtors lending to Three

10  Arrows Capital a fact that was considered

11  prior to the special committee granting

12  consent for the releases?

13          MS. VANLARE: Objection.  Calls

14      for attorney-client communications,

15      attorney work product.

16          I'm going to instruct the

17      witness not to answer.

18      Q.    You can answer.

19          MS. VANLARE: I'm going to

20      instruct the witness not to answer for

21      the reasons I just noted.

22      Q.    If your answer is that you're

23  not going to your answer, that could be

24  your answer.

25          MS. VANLARE: I am instructing

Page 196

```
 1                     P. Aronzon
 2       the witness not to answer.
 3       Q.    Are you following your counsel's
 4   instructions?
 5       A.    Yes.
 6       Q.    Was a fact considered by the
 7   special committee whether any of the
 8   individuals on the released Genesis
 9   personnel list were ever involved with
10   debtors lending to FTX or Alameda
11   Research?
12             MS. VANLARE: Same objection.
13             The answer to this question
14       would reveal attorney-client
15       communication and attorney work
16       product and as such, I would instruct
17       the witness not to answer.
18       Q.    And are you following your
19   counsel's instruction?
20       A.    Yes.
21       Q.    Back to that first paragraph
22   that we looked at where it states that it
23   was the special committee which provided
24   prior written consent for the releases of
25   current and former employees.
```

Page 197

1          P. Aronzon

2              I just wanted to ask your

3      opinion, does that written consent mean

4      that the decision was the special

5      committee's decision or Cleary's decision?

6              MS. VANLARE: Objection.

7              First, are you referring to

8          paragraph -- the first paragraph of

9          Exhibit 7?

10             MS. GRIFFITH: Yes, Exhibit --

11         yes, Exhibit 7 but first paragraph of

12         Exhibit F of Exhibit 7.

13             MS. VANLARE: Then objection to

14         form.

15             THE WITNESS:  This I can answer;

16         correct?

17             MS. VANLARE: You may answer.

18             THE WITNESS:  It's the special

19         committee's decision.

20     Q.    Did you have to -- I'm sorry,

21     did I cut you off?

22     A.    No.

23     Q.    My video might have a slight

24     lag.

25             In making this decision, did you

Page 198

```
 1                    P. Aronzon
 2   have to accept Cleary's recommendations or
 3   could the special committee make its own
 4   separate decision about whether releases
 5   were appropriate or not?
 6            MS. VANLARE: Objection to form.
 7            To the extent this would reveal
 8        attorney-client communications, I
 9        would instruct the witness not to
10        answer.
11            THE WITNESS:  So the question is
12        did we have to accept advice from our
13        professionals?
14   Q.    Yes.
15   A.    No, we don't have to accept it.
16   Q.    Did you accept all of the advice
17   from your professionals in making your
18   independent decision about whether
19   releases were appropriate?
20            MS. VANLARE: Objection.  Calls
21        for attorney-client communication.
22            I'm going to instruct the
23        witness not to answer.
24   Q.    Are you going to follow the
25   advice of your counsel?
```

**Page 199**

```
 1                    P. Aronzon
 2      A.    I am.
 3      Q.    Do you know if there's currently
 4  any litigation between the debtors and any
 5  of the individuals or entities on the
 6  released Genesis personnel list?
 7           MS. VANLARE: Objection.
 8           The answer calls for
 9      attorney-client communications and
10      attorney work product.
11           I'm going to instruct the
12      witness not to answer.
13      Q.    Are you going to follow your
14  counsel's advice?
15      A.    Yes.
16      Q.    Are you aware of any publicly
17  filed litigation or claims against any
18  individual on the Genesis released
19  personnel list?
20           MS. VANLARE: Objection.
21           I believe the answer calls for
22      attorney-client communications and
23      attorney work product.
24           I instruct the witness not to
25      answer.
```

```
                                    Page 200

 1                    P. Aronzon

 2        Q.    Have you separately considered

 3   as a factor in whether to grant releases

 4   whether there are any currently litigation

 5   between the debtors and any of the

 6   individuals on the Genesis released

 7   personnel list?

 8              MS. VANLARE: Objection.

 9              The question calls for

10        attorney-client communications and

11        work product, and as such, I'm going

12        to instruct the witness not to answer.

13        Q.    Are you going to follow your

14   counsel's advice?

15        A.    Yes.

16        Q.    Are you aware if any of the

17   releases being granted to the individuals

18   and individuals on the released Genesis

19   personnel list are being granted as part

20   of any settlement of any existing

21   litigation or claims against released

22   Genesis personnel?

23              MS. VANLARE: Objection.

24              Objection to form and calls for

25        attorney-client communications and
```

Page 201

1           P. Aronzon

2      work product and, as such, I would

3      instruct the witness not to answer.

4      Q.    And are you following your

5  counsel's advice?

6      A.    Yes.

7      Q.    What is the total potential

8  litigation value of claims the estate may

9  have against all of the individuals listed

10 on the released Genesis personnel list?

11          MS. VANLARE: Objection.

12          I'm going to instruct the

13     witness not to answer beyond what is

14     publicly available.  The question

15     calls for information that is

16     privileged and, as such, I will

17     instruct the witness not to answer.

18          MS. GRIFFITH: I'm going for a

19     number.  A number is not privileged

20     information.

21          MS. VANLARE: I disagree.  I

22     think you're asking for privileged

23     information, and I will instruct the

24     witness not to answer.

25     Q.    Yes or no, was the total

Page 202

1                    P. Aronzon

2   potential litigation value of claims

3   something that was calculated or

4   considered by the special committee?

5           MS. VANLARE: Objection.  Calls

6       for attorney-client communications and

7       attorney work product.

8           I'm going to instruct the

9       witness not to answer.

10      Q.    And are you going to follow your

11  counsel's instruction?

12      A.    Yes.

13      Q.    Would it be a relevant factor to

14  your decision in granting releases the

15  potential litigation value of claims the

16  estate may have against all of those

17  listed on the released Genesis personnel

18  list?

19          MS. VANLARE: Objection to form.

20          You may answer yes or no.

21          THE WITNESS:  It's a factor.

22      Q.    And yes or no, was it something

23  you considered?

24          MS. VANLARE: That's not the

25      question you asked.

1               P. Aronzon

2          MS. GRIFFITH: That's a new

3     question.

4          MS. VANLARE: If that's a new

5     question, objection, that question

6     calls for privileged communication

7     and, as such, I would instruct the

8     witness not to answer.

9     Q.    And are you following your

10   counsel's advice?

11   A.    Yes.

12   Q.    Then moving to section two of

13   Exhibit 7, the Exhibit F part of

14   Exhibit 7, and if we look down to section

15   two, it says justifications for the

16   release, and it lists several

17   justifications for the releases.

18          Are you familiar with those

19   justifications?

20   A.    Yes.

21   Q.    Were these justifications

22   something you considered when granting

23   consent to release the individuals on the

24   Genesis released personnel list?

25          MS. VANLARE: I would caution the

Page 204

1                    P. Aronzon

2          witness not to reveal any

3          attorney-client communications, but I

4          believe you can answer the question.

5                  THE WITNESS:  Yes.

6          Q.    The first bullet point reads,

7     "the releases of the released Genesis

8     personnel apply only to officers,

9     directors, and employees who have provided

10    services to the estates on or after the

11    petition date.  The special committee

12    believes that such person contributed,

13    either directly or indirectly, to the

14    debtors' restructuring efforts in the

15    Chapter 11 cases".

16                Do you see that?

17         A.    Yes.

18         Q.    What is meant by "such persons

19    contributed" in this paragraph?

20                MS. VANLARE: Objection.

21                I believe the question calls for

22         attorney-client communications and, as

23         such, I would instruct the witness not

24         to answer.

25                MS. GRIFFITH: I'm asking what is

Page 205

```
 1                    P. Aronzon
 2      meant on a publicly filed document
 3      that's a justification for a release
 4      being granted.  What contributions did
 5      people that are getting releases offer
 6      the estate?  That's a fact.
 7           MS. VANLARE: Objection.  The
 8      question calls for attorney-client
 9      communications and attorney work
10      product as a result of an
11      investigation that was conducted and
12      discussions that took place with
13      counsel and, as such, I would instruct
14      the witness not to answer the
15      question.
16      Q.    Separate and aside from any
17  communications with counsel, are you aware
18  of any contributions that any employee
19  currently set to get a release has offered
20  the estate?
21           MS. VANLARE: Objection.
22           I would -- to the extent your
23      answer -- what you know and to the
24      extent your answer reflects
25      discussions with counsel, I would
```

Page 206

```
 1                    P. Aronzon
 2        instruct you not to answer.
 3        Q.     You can answer.
 4        A.     Everything I know about this
 5   comes out of our discussions with our
 6   professionals, especially our counsel.  So
 7   I don't know how to answer other than
 8   that.
 9        Q.     So sitting here as a special
10   committee member, you don't know any
11   contributions that any person getting a
12   release contributed to the estate that you
13   would not consider a privileged
14   contribution that you could not reveal?
15            MS. VANLARE: Objection to form
16        and asked and answered.  I believe the
17        witness answered the question you
18        previously posed.
19        Q.     Would you --
20        A.     Am I supposed to say something
21   or no?
22        Q.     Do you have anything to add?
23        A.     No.  What I learned about the
24   contributions I learned in our discussions
25   with counsel.
```

Page 207

1                          P. Aronzon

2          Q.      So you have no nonprivileged

3    information about contributions that those

4    set to get releases under the plan

5    contributed to the estate?

6                  MS. VANLARE: Objection.  Asked

7          and answered.

8                  THE WITNESS:  Correct.

9          Q.      Do you know if all of the

10   individuals on the released Genesis

11   personnel list have made contributions

12   either directly or indirectly to the

13   estate?

14                 MS. VANLARE: Objection.  It goes

15         into attorney-client communications

16         and attorney work product and, as

17         such, I would instruct the witness not

18         to answer.

19         Q.      I'm asking about your personal

20   knowledge as a special committee member

21   who you testified has the ultimate

22   decision whether or not to grant releases

23   separate and apart from your counsel's

24   advice.

25                 MS. VANLARE: Objection.  Asked

Page 208

                              P. Aronzon

1

2        and answered.  Misstates his

3        testimony.  And again, I think the

4        witness has already testified several

5        times that what he learned about this

6        topic came from conversations with

7        counsel.

8              Same objection.  Same

9        instruction.

10       Q.    And so are you not going to

11   answer the question?

12       A.    I'm following my counsel's

13   advice.

14       Q.    Have you ever calculated or

15   considered the total dollar value of

16   contributions that those are on the

17   released Genesis personnel list offered to

18   the estate?

19             MS. VANLARE: Objection.

20             You can answer yes or no if you

21       think you can without revealing

22       attorney-client information -- excuse

23       me, attorney-client communication or

24       attorney work product.

25             THE WITNESS:  I don't know how

Page 209

1                        P. Aronzon

2         to answer it without referring to the

3         discussions we've had with counsel.

4         And you asked me this before and I

5         said the same thing.

6         Q.    Did you consider whether you

7    could hire any new individuals or

8    consultants that would make the same

9    contributions that those that fall on this

10   released Genesis personnel list were

11   contributing to the estate instead?

12            MS. VANLARE: Objection.  The

13       question is vague.

14            THE WITNESS:  Are you asking

15       could we have hired other people to do

16       the job that our people did?

17       Q.    Yes.

18       A.    Why would I do that?

19       Q.    A potential reason could be so

20   you do not have to release them and

21   therefore forfeit any potential causes or

22   claims of action against those individuals

23   if it was to be revealed at any point in

24   time that they were involved in

25   misconduct.

Page 210

1                    P. Aronzon

2              MS. VANLARE: Is there a

3         question, Ms. Griffith?

4         Q.    Yes.

5              Did you ever consider whether

6    new employees or consultants could be

7    hired to do the job that the current

8    employees that are set to get releases are

9    doing?

10             MS. VANLARE: Objection.

11        Objection to form.

12             To the extent you can answer

13        this question without revealing

14        attorney-client communications or

15        attorney work product, you may answer.

16             THE WITNESS:  I guess I have a

17        couple of comments.

18             One, I don't make decisions

19        about hiring people for Genesis.  We

20        have management that does that.

21             Two, the answer is no, I did not

22        consider it.

23        Q.    And who is management at Genesis

24    that makes those decisions?

25        A.    We have a number of officers and

Page 211

1               P. Aronzon

2    directors who make hiring and firing

3    decisions.

4        Q.    And are any of those individuals

5    on the released Genesis personnel list?

6            MS. VANLARE: Objection.

7            I'm going to instruct the

8        witness not to answer.  It reflects

9        attorney-client communication and

10       attorney work product.

11       Q.    Are you following your counsel's

12   directions?

13       A.    Yes.

14       Q.    The next bullet point states,

15   "the released Genesis personnel have

16   knowledge and insight into the debtors'

17   business and transactions that may be

18   critical to the resolution of litigation

19   against the DCG parties and the Gemini

20   parties as well as various regulatory and

21   enforcement actions relating to the

22   debtors' prepetition businesses".

23           Do you see that?

24       A.    Yes.

25       Q.    Do you know -- and this is a

Page 212

1              P. Aronzon

2   number, not who, a number -- how many of

3   the individuals on the released Genesis

4   personnel list have this knowledge and

5   insight?

6          MS. VANLARE: Objection.

7          I believe the answer calls for

8      privileged information with counsel

9      and attorney work product, and as

10     such, I'm going to instruct the

11     witness not to answer.

12     Q.    Are you following the direction

13  of your counsel?

14     A.    Yes.

15     Q.    Who would have this knowledge

16  about which Genesis employees have, quote,

17  knowledge and insight into the debtors'

18  businesses and transactions?

19         MS. VANLARE: Objection.  Calls

20     for privileged communication and

21     attorney work product.

22         As such, I would instruct the

23     witness not to answer.

24     Q.    Are you following the advice of

25  your counsel?

Page 213

P. Aronzon

1

2      A.     Yes.

3      Q.     Do you know if any of the

4  individuals on the released Genesis

5  personnel list have overlapping, quote,

6  knowledge and insight into the debtors'

7  business and transactions?

8             MS. VANLARE: Objection to form,

9      but also I would instruct the witness

10     not to answer to the extent it reveals

11     any attorney-client communication or

12     attorney work product.

13     Q.     Are you following your counsel's

14  direction?

15     A.     Yes.

16     Q.     Have you or the special

17  committee calculated or considered dollar

18  value that could be assigned to this

19  contribution to the estate being the

20  knowledge and insight into the debtors'

21  business and transactions that those on

22  the released Genesis personnel was tasked?

23             MS. VANLARE: Objection.

24             To the extent this question

25      calls for privileged information,

Page 214

1                    P. Aronzon

2         attorney-client communications, and/or

3         attorney work product, I would

4         instruct the witness not to answer.

5         Q.    And are you following your

6    counsel's direction?

7         A.    Yes.

8         Q.    Have any of the individuals on

9    the released Genesis personnel list

10   refused to cooperate with resolution of

11   litigation against the DCG parties and the

12   Gemini parties as well as various

13   regulatory and enforcement actions

14   relating to the debtors' prepetition

15   business unless they received releases?

16              MS. VANLARE: Objection.

17              I'm going to -- to the extent it

18        reveals attorney-client privilege,

19        attorney work product, I'm going to

20        instruct the witness not to answer.

21        Q.    Is this a factor that you

22   considered in granting consent to these

23   individuals?

24              MS. VANLARE: Same objection.

25        Calls for privileged information and

Page 215

```
 1                    P. Aronzon
 2        attorney work product.
 3        Q.    Are you going to follow your
 4    counsel's advice?
 5        A.    Yes.
 6        Q.    There are more than a hundred
 7    individuals currently on the released
 8    Genesis personnel list; correct?
 9              MS. VANLARE: Objection.
10              I don't know if you know as a
11        fact matter.  You may answer.  But
12        otherwise, to the extent it calls for
13        attorney-client communication or
14        attorney work product, I would
15        instruct you not to answer.
16              THE WITNESS:  I don't know the
17        exact number.
18        Q.    Do you know if it's more than a
19    hundred individuals on the Genesis
20    released personnel list?
21              MS. VANLARE: Same objection.
22              And to the extent what you know
23        comes from conversations with counsel,
24        I would instruct you not to answer
25        that question.
```

Page 216

1                    P. Aronzon

2              THE WITNESS:  I don't know.

3      Q.    Do you know if it's more than

4  five hundred people on the released

5  Genesis personnel list?

6              MS. VANLARE: Same objection.

7              To the extent any information

8       you have on this comes from counsel,

9       I'm going to instruct you not to

10      answer.

11             THE WITNESS:  I don't know the

12      number.

13     Q.    Do you know -- referring back to

14  that second bullet point on the Exhibit F

15  page of Exhibit 7 referring to the

16  knowledge and insight, do you know if some

17  individuals are getting released solely

18  because they have knowledge and insight

19  into the debtors' business and

20  transactions?

21             MS. VANLARE: Objection.  Calls

22      for privileged communication, attorney

23      work product.

24             I'm going to instruct the

25      witness not to answer.

Page 217

1                      P. Aronzon

2       Q.    Are you going to follow your

3  counsel's advice?

4       A.    Yes.

5       Q.    If we flip to the next page,

6  page twenty-two of twenty-two of this PDF,

7  the second bullet point down states, "the

8  special committee's investigation has not

9  identified wrongdoing on the part of the

10  released Genesis personnel that would give

11  rise to claims or causes of action that

12  are likely to provide value to the

13  debtors' estates".

14           Do you see that?

15       A.    Yes.

16       Q.    What is meant by "provide value

17  to the debtors' estates" here?

18           MS. VANLARE: Objection.  I

19       believe the document is clear.

20       Anything that's not publicly available

21       is going to be subject to privilege,

22       and I'm going to instruct the witness

23       not to answer.

24       Q.    And are you following your

25  counsel's advice?

Page 218

1                       P. Aronzon

2       A.      Yes.

3       Q.      As a special committee member,

4    what would you consider value to the

5    debtors' estates here, in your opinion,

6    separate and apart from discussions with

7    counsel?

8               MS. VANLARE: Objection.  Vague.

9               Are you talking about generally

10         what is value?  More context.

11              MS. GRIFFITH: I'm talking about

12         what the witness would consider value

13         to the debtors' estates here in his

14         opinion as a special committee member

15         separate and apart from his

16         discussions with counsel.

17              MS. VANLARE: If there's any --

18         so objection to form.

19              But if there is anything that

20         you know that doesn't come from your

21         discussions with counsel, you may

22         answer.  But otherwise, to the extent

23         the question calls for privileged

24         communications or attorney work

25         product, I'm going to instruct not to

Page 219

1                         P. Aronzon

2         answer.

3                 THE WITNESS:  Are you asking me

4         my own opinion of the word "value",

5         what does it mean?

6         Q.    Yes, in this paragraph, how you

7    would interpret that, what that means.

8         A.    In this paragraph relates to

9    attorney-client communication and

10   discussion.

11               Away from this paragraph, if you

12   give me a minute, I'll go get a

13   dictionary.  It will tell me whether I

14   agree with it or not.

15        Q.    So without a dictionary, do you

16   have an opinion as to what value to the

17   debtors' estates would be?

18               MS. VANLARE: Objection.  Vague.

19               THE WITNESS:  Just my own

20        personal opinion is that value can be

21        a lot of different things.  It can be

22        -- I'm just going to go through a

23        list.  There's no priority here.  It's

24        whatever comes into my head at the

25        moment as I'm talking to you as if

Page 220

1            P. Aronzon
2        this were a conversation.
3              But there's things like spending
4        time helping us in some manner or
5        fashion, working for us above and
6        beyond just normal salaries, because
7        we're talking about personnel here.
8        It can be paying money back to us.  It
9        can be transferring assets to us other
10       than cash or paying money.  It can be
11       a lot of things.  It can be providing
12       assistance that is, you know, hard to
13       quantify.  It's just a whole variety
14       of different things that any one of us
15       would consider valuable.
16       Q.    Was everything that you
17   considered value as part of your analysis
18   of whether or not to grant releases
19   included on this justifications for the
20   release section?
21              MS. VANLARE: Objection.
22       Objection to form.  Unclear.
23              Are you talking about the
24       entirety of the exhibit or are you
25       talking about the bullet point that

Page 221

1                    P. Aronzon

2       talks about wrongdoing and claims that

3       would or would not provide value?

4            MS. GRIFFITH: The entirety of

5       the exhibit.  I was just responding to

6       the witness' last response.

7            THE WITNESS:  Are you asking me

8       if, in the conversations with counsel,

9       we considered all those things that I

10      just like off the top of my head

11      mentioned as possible value

12      propositions?

13      Q.    I was trying to understand if

14  those were actual value propositions that

15  you considered for this matter or if that

16  was just hypothetical examples of value

17  unconnected to this case.

18            MS. VANLARE: Objection.

19      Objection to form.

20            You may answer unless the --

21      however, to the extent the question

22      would reveal any attorney-client

23      privilege, I would caution you on that

24      point.

25            THE WITNESS:  You asked me my

Page 222

1                    P. Aronzon

2      own opinion of value.  I gave you some

3      ideas.

4              To the extent you're asking

5      about things on this page or in our

6      decision-making, you're asking about

7      the conversations with our counsel.

8      Q.    If an employee was found to have

9   committed misconduct such that a claim or

10  cause of action could be brought against

11  that employee, would you consider any

12  recovery from that claim or cause of

13  action against that employee to be able to

14  fall under the value bucket to the estate

15  or could add value to the estate?

16             MS. VANLARE: Objection to form.

17             Again, counsel, are you asking

18      about the Exhibit 7 and the bullet

19      point that talks about claims not

20      providing value to the estate or

21      something else?

22             MS. GRIFFITH: No, that was not

23      connected to that.  That was me trying

24      to understand the special committee

25      members' understanding of what could

Page 223

1                    P. Aronzon

2        constitute value.

3              MS. VANLARE: Could you maybe

4        restate the question?

5              MS. GRIFFITH: Sure.

6        Q.    If an employee -- this is

7     separate and apart from what's on the page

8     here.

9              If a Genesis employee committed

10    misconduct.

11             Are you following that?

12       A.    Are you asking me?

13       Q.    Yes.

14       A.    I'm following that, yes.

15       Q.    This is a hypothetical.

16       A.    Okay.

17       Q.    If a Genesis employee committed

18    misconduct, the estate could potentially

19    bring litigation asserting a claim against

20    that employee for such misconduct;

21    correct?

22             MS. VANLARE: Objection.

23             THE WITNESS:  Theoretically

24       possible.

25             Did you tell me not to answer

Page 224

                      P. Aronzon

1

2      that or no?

3            MS. VANLARE: No, I was objecting

4      to the form.

5            THE WITNESS:  Theoretically,

6      yes, we could.

7      Q.    And if there was a recovery from

8  the pursuit of that cause of action or

9  claim against that employee, would you

10  consider that recovery to be value for the

11  estate?

12            MS. VANLARE: Objection.

13            I would caution you not to

14      reveal any attorney-client

15      communication, and I object to form.

16            To the extent you can answer the

17      question without revealing

18      attorney-client communication, you may

19      do so.

20            THE WITNESS:  We're not talking

21      about this page, we're talking about

22      just my own understanding here?

23      Q.    Correct.

24      A.    So without referring to this

25  page or any of the prior questions about

Page 225

1                    P. Aronzon

2    our employees, if we're going to bring an

3    action against somebody -- and it doesn't

4    even have to be an employee, it could be

5    anybody -- one of the things we look at is

6    whether they could actually pay us back,

7    so creditworthiness and is it worth it.

8              So in that respect, I would

9    consider payments, if people have the

10   capacity to do so, to be valuable.

11             I'm sorry, did somebody say

12   something?

13             So I don't know if that answers

14   your question or not.  But if somebody can

15   pay me back and I believe we have a claim

16   against them, then that's value that we

17   would certainly consider.

18        Q.   So we're on the same page, I

19   just wanted to make sure we had the same

20   understanding about potential types of

21   value to the estate.

22             So now directing your attention

23   away from that hypothetical and back to

24   the bullet point in Exhibit 7 which states

25   "the special committee's investigation has

Page 226

1                    P. Aronzon

2    not identified wrongdoing on the part of

3    released Genesis personnel that would give

4    rise to claims or causes of action that

5    are likely to provide value to the

6    debtors' estate", what type of wrongdoing

7    was considered?

8              MS. VANLARE: Objection.  I

9         believe the answer calls for

10        attorney-client communication and

11        attorney work product and, as such, I

12        would instruct the witness not to

13        answer.

14        Q.    Are you following your counsel's

15   advice?

16        A.    Yes.

17        Q.    In your opinion, if a -- what

18   the publicly filed words on the page

19   state, "the special committee's

20   investigation has not identified

21   wrongdoing", why would a release be

22   necessary of individuals who committed no

23   wrongdoing?

24              MS. VANLARE: Objection.  Calls

25        for a legal conclusion.

Page 227

1              P. Aronzon

2         To the extent your answer would

3     reveal any attorney-client

4     communications, I would instruct you

5     not to answer the question.

6     Q.    And I'm asking this in your

7  opinion as a special committee member that

8  had to make an independent decision on

9  these releases about whether or not to

10  accept recommendations and advice from

11  counsel.

12         So in your independent thought

13  process about whether to grant these

14  releases, have you considered why an

15  individual that the special committee has

16  not identified any wrongdoing on the part

17  of would need to be released?

18         MS. VANLARE: Objection.  Calls

19     for a legal conclusion.

20         And also, to the extent your

21     answer would reveal any

22     attorney-client communications, I

23     would instruct you not to answer.

24     Q.    Have you considered this

25  separate and apart from counsel?

Page 228

1                    P. Aronzon

2        A.      Not in the context of our case,

3    no.

4        Q.      Okay.

5               The next bullet point on this

6    page states, "any surviving claims against

7    the released Genesis personnel would be

8    costly and unlike to result in significant

9    recoveries for the debtors' estates

10   because of the very limited directors and

11   officers insurance coverage, which at

12   present provides no more than 8.7 million

13   in coverage".

14              What was the estimated cost of

15   bringing any surviving claims against the

16   released Genesis personnel?

17              MS. VANLARE: Objection.

18              The answer calls for attorney

19       work product and, as such, I would

20       instruct the witness not to answer.

21       Q.      Are you following your counsel's

22   advice?

23       A.      Yes.

24       Q.      Was the estimated cost of

25   bringing any surviving claims against the

Page 229

1                          P. Aronzon
2     released Genesis personnel a fact that the
3     special committee considered when deciding
4     whether or not to grant releases?
5               MS. VANLARE: Objection.
6               To the extent you can answer
7          without revealing attorney-client
8          communication, you may do so.
9               THE WITNESS:  I can't answer it
10         without referring to what we discussed
11         with counsel.
12         Q.    What surviving claims against
13    the released Genesis personnel are
14    referred to in this bullet point as a
15    justification for why these individuals
16    should be released?
17              MS. VANLARE: Objection.
18              Calls for privileged
19         communication and attorney work
20         product and, as such, I would instruct
21         the witness not to answer.
22         Q.    Are you following your counsel's
23    advice?
24         A.    Yes.
25         Q.    Do you know if all of the

Page 230

P. Aronzon

1   individuals that are currently on the

2   released Genesis personnel list were

3   covered by directors and officers

4   insurance?

5           MS. VANLARE: Objection.

6           If you have any knowledge

7       separate and apart from discussions

8       with counsel, you may answer.

9           Otherwise, I would instruct you

10      not to answer.

11      Q.   You may answer.

12      A.   I'm trying to figure out if I

13  know anything away from our discussions

14  with counsel.

15          What's the question again?  I'm

16  sorry.

17          You're asking me if people are

18  not insured; is that what you're asking

19  me?

20      Q.   No, I'm asking you if all of the

21  individuals that are currently on the

22  released Genesis personnel list would be

23  covered by directors and officers

24  insurance.

Page 231

1              P. Aronzon

2              Was that a fact or something

3    that the special committee looked into as

4    part of its investigation?

5              MS. VANLARE: Objection.  Calls

6         for attorney work product.

7              As such, I would instruct the

8         witness not to answer.

9         Q.    Are you following your counsel's

10   advice?

11        A.    Yes.

12        Q.    The first bullet point on this

13   page -- and I'll just read the first

14   sentence out loud but feel free to read

15   the whole paragraph -- states, "the

16   released Genesis personnel are entitled to

17   indemnification pursuant to the debtors'

18   governing documents".

19              THE WITNESS:  This is the first

20        bullet on this page?

21        Q.    Do you see that first paragraph?

22        A.    Yes.

23        Q.    In granting releases to those on

24   the released Genesis personnel list, was a

25   factor considered by the special committee

Page 232

1                        P. Aronzon

2      whether an individual was entitled to

3      indemnification pursuant to the debtors'

4      governing documents?

5              MS. VANLARE: Objection to form.

6              You may answer yes or no.

7              THE WITNESS:  Yes.

8      Q.      Did the special committee

9      confirm that each and every one of the

10     individuals on the released Genesis

11     personnel list was, in fact, entitled to

12     indemnification pursuant to debtors'

13     governing documents?

14             MS. VANLARE: Objection.  Calls

15         for privileged communication and

16         attorney work product.

17             I'm going to instruct the

18         witness not to answer.

19     Q.      And are you following your

20     counsel's advice?

21     A.      Yes.

22     Q.      Another bullet point on this

23     page states that "the debtors' releases of

24     the released Genesis personnel expressly

25     exclude any claims arising out of gross

Page 233

1                        P. Aronzon

2     negligence, fraud, or willful misconduct

3     as determined by a final order".

4              Do you see that?

5         A.    Yes.

6         Q.    Has the special committee

7     estimated or considered an estimated value

8     of the total claims that would arise out

9     of gross negligence, fraud, or willful

10    misconduct that could be brought against

11    released Genesis personnel?

12             MS. VANLARE: Objection.  Calls

13        for privileged communication and

14        attorney work product.

15             As such, I'm going to instruct

16        the witness not to answer.

17        Q.    Are you following your counsel's

18    direction?

19        A.    Yes.

20        Q.    Is it your understanding that

21    individuals on the released Genesis

22    personnel list are being released from all

23    claims besides gross negligence, fraud, or

24    willful misconduct?

25             MS. VANLARE: Objection.

Page 234

```
 1                    P. Aronzon
 2           To the extent you know the
 3      answer to that, you may answer it.
 4      However, I would caution you not to
 5      reveal any attorney-client
 6      communication or attorney work
 7      product.
 8                THE WITNESS:  I'd have to look
 9      at the release together with you, but
10      I think that's correct, they are being
11      released from any and all claims other
12      than the ones specified in this
13      bullet.
14      Q.    And does any and all claims
15  include known and unforeseen claims?
16                MS. VANLARE: Objection.
17                THE WITNESS:  Again, I'd have to
18      look at the release, but I believe
19      that's correct.
20      Q.    What benefit is the estate
21  receiving from releasing individuals from
22  unforeseen claims?
23                MS. VANLARE: Objection.
24                You have publicly filed
25      documents.  Anything beyond that is
```

Page 235

                              P. Aronzon

1        subject to attorney-client privilege

2        and attorney work product, and as

3        such, I would instruct the witness not

4        to answer.

5             MS. GRIFFITH: What publicly

6        filed documents are you referencing?

7             MS. VANLARE: The disclosure

8        statement in the plan supplement.

9   Q.        Would you be able to point me,

10  Mr. Aronzon, to where it talks about that

11  in the publicly filed documents?  Are you

12  familiar with that?

13            MS. VANLARE: Objection.

14            THE WITNESS:  Well -- go ahead,

15        Jane.

16            MS. VANLARE: Objection to form.

17            If you know, you may answer.

18            THE WITNESS:  I know that there

19        are provisions in the plan that

20        provide for the release and carveouts.

21        I know that there is some language in

22        the disclosure statement, I don't know

23        page numbers for either, and you have

24        on the screen in front of you the

Page 236

```
 1                    P. Aronzon
 2        answer to the questions you just asked
 3        me, which is, you know, what is it
 4        that -- I guess it's what is the
 5        estate receiving and why are you doing
 6        this.  It's all listed there.
 7        Q.    So because I need to hear it,
 8   there was a lot of attorney-client
 9   privilege objections.
10             In your voice and in your
11   opinion, what value is the estate
12   receiving?
13             MS. VANLARE: Objection.
14        Q.    For granting releases of all of
15   the individuals listed on the released
16   Genesis personnel list.
17             MS. VANLARE: Objection.  Asked
18        and answered.  The witness has
19        answered your question.
20        Q.    You can answer.
21        A.    The values listed on these pages
22   that we're looking at in this exhibit, is
23   it number seven or Exhibit F, I guess it
24   is.  And they're laid out here.
25        Q.    Which -- are you referring to
```

Page 237

```
1                    P. Aronzon
2    bullet points?  What bullet points are you
3    referring to?
4        A.    All of them under section two.
5        Q.    So help me understand that.
6              The one we referred to, "the
7    special committee's investigation has not
8    identified wrongdoing on the part of the
9    released Genesis personnel that would give
10   rise to claims or causes of action that
11   are likely to provide value to the
12   debtors' estates".
13             How does that add value to the
14   debtors' estates?
15             MS. VANLARE: Objection.  Being
16       argumentative.  The witness has
17       already explained that the exhibit
18       provides justifications for the
19       releases and it does that and that's
20       what it states on the page.  He's
21       already answered the question many
22       times.
23       Q.    You can answer.
24       A.    If we can't recover value, we'd
25   be wasting money, creditors' money, in
```

Page 238

1                         P. Aronzon

2       chasing it.

3           Q.    Are all -- is all of the value

4       that the estate gets from consenting to

5       the release of those on the released

6       Genesis personnel list included in this

7       Exhibit F or are there things outside of

8       that's listed on Exhibit F?

9                 MS. VANLARE: Objection.  Calls

10              for privileged communications and

11              attorney work product and, as such, I

12              will instruct the witness not to

13              answer.

14          Q.    I'm not asking about his

15      communications with counsel, I'm asking is

16      all of the value on this publicly filed

17      page or is there something else that you

18      discussed with counsel.  I don't want to

19      know the substance, I don't want to know

20      what you discussed with counsel.  I just

21      want to know is this a comprehensive

22      summary or is there something else out

23      there?

24                MS. VANLARE: Objection.

25                To the extent you can answer

Page 239

```
 1                        P. Aronzon

 2         without revealing any attorney-client

 3         communications or attorney work

 4         product, you may do so.

 5               THE WITNESS:  I can't answer it

 6         without disclosing conversations with

 7         counsel.

 8         Q.     Then I'm going to refer us back

 9    to the amended disclosure statement, which

10    was Exhibit 6.

11         A.     So I can close this Exhibit 7?

12         Q.     And on page one hundred three on

13    the bottom part of the page, page one

14    hundred eighteen of three hundred six of

15    the PDF, there's a footnote sixteen.

16         A.     Hold on.

17               MS. VANLARE: I apologize, what

18         was the page numbers?

19               MS. GRIFFITH: Sure.

20               So the bottom page number is

21         page one hundred three and the top

22         page number is page one hundred

23         eighteen of three hundred six of the

24         PDF.

25               THE WITNESS:  Page one hundred
```

Page 240

```
1                     P. Aronzon
2       eighteen of three hundred six.
3       Q.    And do you see footnote sixteen
4   contains a definition for released party
5   in the amended plan?
6       A.    Yes.
7       Q.    And this definition of released
8   party is different than the definition of
9   released Genesis personnel that we were
10  just looking at in the plan supplement;
11  correct?
12      A.    If you say so.  I don't have the
13  definition of released Genesis parties in
14  front of me, but I believe you're correct.
15      Q.    And released party as defined in
16  the amended plan includes the debtors;
17  right?
18      A.    Yes.
19      Q.    The ad hoc group's steerco and
20  its members solely in their capacities as
21  such; correct?
22      A.    Yes.
23      Q.    The committee and its members
24  solely in their capacities as such?
25      A.    Yes.
```

Page 241

```
 1                        P. Aronzon
 2        Q.     And each related party of each
 3   entity described in the foregoing clauses
 4   little Roman numeral I through three, in
 5   each case solely in its capacity as such?
 6        A.     Yes, that's what this says.
 7        Q.     Do you know why the umbrella
 8   term "related party" is being used instead
 9   of individually listing individuals and
10   entities that would constitute a related
11   party in this definition?
12                MS. VANLARE: Objection.
13                Calls for a legal conclusion.
14                To the extent -- to the extent
15        answering this question would reveal
16        any attorney-client communications or
17        attorney work product, I would caution
18        the witness on that fact and instruct
19        the witness not to answer.
20        Q.     You may answer if you're able
21   to.
22        A.     I'd have to see the definition
23   of related party, and then I'd have to
24   consider what was just stated in the
25   objection.
```

Page 242

1                         P. Aronzon

2        Q.    Could you, sitting here today,

3    tell me any person or entity that's

4    considered a related party?

5              MS. VANLARE: Objection.

6              THE WITNESS:  Without looking at

7        the definition, I'm guessing.

8        Q.    You could -- where in this

9    disclosure statement is related party

10   defined?

11             MS. VANLARE: Objection.

12       Q.    Do you know?

13       A.    I would -- I'm guessing.  But if

14   you look at the plan definition, there's

15   probably a definition of related party,

16   but I'd have to go look.

17             Do you want to show it to me?

18   Do you want to find it and pull it out?

19       Q.    While we have this exhibit open,

20   it's page one hundred eighty-three of

21   three hundred six.

22       A.    One hundred eighty-three?

23       Q.    And it's defined term number one

24   hundred seventy-nine.

25       A.    I'm looking at page one hundred

Page 243

1                    P. Aronzon

2    eighty-three of three hundred six, and I

3    don't see that.

4              One hundred seventy-nine?  Okay,

5    it is on page one hundred eighty-four of

6    what I'm looking at.

7        Q.    And I'll read the definition out

8    loud.

9              So related party means, with

10   respect to any entity, such entity's

11   predecessors, successors, and assigns,

12   parents, subsidiaries, affiliates, and all

13   of the respective current and former

14   officers and directors, principals,

15   shareholders, members, managers, partners,

16   employees, agents, trustees, advisory

17   board members, financial advisors,

18   attorneys, accountants, actuaries,

19   investment bankers, consultants,

20   representatives, management companies, and

21   such persons respective of heirs,

22   executors, estates, servants, and

23   nominees.

24              Do you see that?

25       A.    Yes.

Page 244

P. Aronzon

1

2      Q.     That covers potentially a lot of

3   different people and entities; correct?

4             MS. VANLARE: Objection.

5             THE WITNESS:  I'm sorry, I

6        didn't hear what you said.

7      Q.     In your opinion --

8      A.     Jane, Jane.

9             MS. VANLARE: Objection to form,

10       but you may answer.

11            THE WITNESS:  Okay, okay.

12            So it covers -- your statement

13       is it covers a lot of different people

14       and entities?  Yes, it does.

15     Q.     So as a special committee

16   members charged with authorizing releases

17   in this matter, how did you feel

18   comfortable that all of the people and

19   entity that would fall under the

20   definition of related party warrant a

21   release?

22            MS. VANLARE: Objection.

23       Objection to form and objection to the

24       extent the answer calls for privileged

25       communications.

Page 245

1        P. Aronzon

2            I would instruct the witness not

3        to answer to the extent your answer

4        would involve any attorney-client

5        communications or attorney work

6        product.

7            THE WITNESS:  I can't really

8        answer the specific question without

9        referring to the discussions with our

10       counsel.

11       Q.    Did you consider whether a list

12   of the specific individuals and entities

13   should be used instead of the umbrella

14   definition term "related party"?

15            MS. VANLARE: Objection.  Calls

16       for privileged communications and

17       attorney work product, and as such, I

18       would instruct the witness not to

19       answer.

20       Q.    Are you following your counsel's

21   instructions?

22       A.    Yes.

23       Q.    Can you, sitting here today,

24   name even one example of an entity or

25   individual that potentially could fall

Page 246

1                        P. Aronzon
2    under the definition of related party?
3              MS. VANLARE: Objection.
4              I would just caution the
5         witness, to the extent we are subject
6         to a reaction order, we would -- I
7         don't know if your answer would call
8         for revealing any specific individuals
9         or institutions, but I would caution
10        the witness, in the event that it may,
11        given the confidentiality
12        considerations and the judge's rulings
13        and instructions on the record on that
14        point.
15             THE WITNESS:  I have no idea
16        what you just said in terms of the
17        limitations on what I can and can't
18        say.
19             Can I answer it like about
20        myself?
21             MS. VANLARE: Yes.
22             THE WITNESS:  Fine.
23             I'm a director, and to the
24        extent the debtor is granting a
25        director release, I would get one.

Page 247

1              P. Aronzon

2      Q.     What investigation did the

3  special committee conduct into potential

4  causes of actions or claims that may exist

5  against related parties?

6              MS. VANLARE: Objection.  Calls

7      for attorney-client privilege and

8      attorney-client communication and, as

9      such, I would instruct the witness not

10     to answer.

11     Q.     Are you following your counsel's

12  instruction?

13     A.     Yes.

14     Q.     Did the special committee

15  conduct an investigation into potential

16  causes of actions or claims against

17  related parties?

18             MS. VANLARE: Objection.

19             The investigation -- the

20     information relating to the

21     investigation is in the publicly filed

22     documents.

23             To the extent the information is

24     not there, it would be subject to

25     privilege and, as such, I would

Page 248

1                        P. Aronzon

2          instruct the witness not to answer.

3          Q.    Are you following your counsel's

4     advice there?

5          A.    Yes.

6          Q.    Do you know of any going back to

7     the definition of released party which was

8     on page one hundred eighteen of three

9     hundred six of this exhibit?

10         A.    Is it also the definition right

11    below the one I just looked at so I don't

12    have to change pages?

13         Q.    I believe so.  So let's look at

14    it there to make it easy.

15         A.    Okay.

16         Q.    Do you know if any individual or

17    entity on this list withdrew any assets

18    from Genesis within one year of the

19    petition date?

20              MS. VANLARE: Counsel, objection.

21         You asked these questions before.

22              So objection to form.

23         Objection.  Asked and answered.

24              And again, as before, I'm going

25         to instruct the witness not to answer

Page 249

```
 1                        P. Aronzon
 2        as your question calls for privileged
 3        communication and attorney work
 4        product.
 5        Q.    Are you following your counsel's
 6   directions?
 7        A.    Yes.
 8        Q.    Who investigated whether the
 9   special committee members should be
10   released is?
11              MS. VANLARE: Objection.
12              To the extent the question calls
13        for attorney-client privilege or
14        attorney work product, I'm going to
15        instruct you not to answer.
16        Q.    You can answer.
17        A.    The question is who
18   investigated?
19        Q.    Yes.
20        A.    I don't know how to answer this
21   without referring to counsel, so --
22   because counsel investigated it.
23        Q.    And when you say "counsel", does
24   that mean Cleary?
25        A.    Yes.
```

Page 250

1              P. Aronzon

2        Q.    So a couple of more questions on

3   a different topic.

4              But before moving on to that

5   topic, is it your contention, sitting here

6   today, that the releases that will be

7   granted to those that fall under the

8   definition of released party and those

9   that are on the released Genesis personnel

10  list are valid?

11             MS. VANLARE: Objection.

12        Objection to the form.  Calls for a

13        legal conclusion.

14             And to the extent the answer

15        calls for privileged communication and

16        attorney work product, I would

17        instruct the witness not to answer.

18        Q.    I'm asking the special committee

19  member.

20             Is it the special committee's

21  contention that the releases contemplated

22  in the plan are valid?

23             MS. VANLARE: Objection to form.

24        I don't know what you mean by this.

25             And again, I would caution the

Page 251

1                       P. Aronzon

2           witness not to reveal any

3           attorney-client communication or

4           attorney work product.

5                 MS. GRIFFITH: I'll rephrase.

6           Q.     Is it the special committee's

7    contention that the releases contemplated

8    in the plan are appropriate?

9                 MS. VANLARE: Objection.

10                You may even to the extent you

11          can without revealing any

12          attorney-client communication or

13          attorney work product.

14                THE WITNESS:  Yes.

15          Q.     Can you please explain each and

16   every fact that you rely on to come to

17   that conclusion?

18                MS. VANLARE: Objection.

19                That calls for attorney-client

20          communication and attorney work

21          product, and as such, I would instruct

22          the witness not to answer.

23          Q.     Are you following your counsel's

24   direction?

25          A.     Yes.

Page 252

1                    P. Aronzon

2      Q.    Do you or your fellow special

3   committee member plan to testify at the

4   plan confirmation hearing?

5           MS. VANLARE: Objection.  Calls

6       for attorney-client communication,

7       attorney work product.

8           I would instruct the witness not

9       to answer.

10     Q.    Are you following your counsel's

11  advice?

12     A.    Yes.

13     Q.    So it's clear for the record,

14  are you refusing to provide an answer

15  about any fact that you will rely on to

16  come to your conclusion about why the

17  releases in the plan are appropriate?

18          MS. VANLARE: Counsel, objection.

19      You are -- the witness is not refusing

20      to answer.  The witness has been

21      answering your questions for several

22      hours now.  There is -- as we reviewed

23      during this deposition, there are

24      justifications for releases and

25      exculpations that are provided as part

Page 253

1                    P. Aronzon
2        of the plan supplement and in the
3        disclosure statement, the witness has
4        testified about that information, so
5        objection to your characterization.
6        It is absolutely not the case that the
7        witness is refusing.
8              To the extent your questions
9        called for attorney work product or
10       attorney-client communications, I am
11       instructing the witness not to answer
12       those questions.
13   Q.    So are you following your
14   counsel's directions to not respond to my
15   question right now about what facts you're
16   relying on in coming to the condition
17   conclusion that the releases in the plan
18   are appropriate?
19             MS. VANLARE: Objection.  All the
20       same objections.  Asked and answered.
21             And again, as your question
22       calls for privileged communication and
23       attorney work product, I would
24       instruct the witness not to answer.
25   Q.    Are you following your counsel's

Page 254

1                    P. Aronzon
2    directions?
3        A.    Yes.
4        Q.    Are you refusing to answer this
5    question on the basis of privilege?
6            MS. VANLARE: Objection.
7            He is not refusing to answer the
8        question.  I am instructing the
9        witness not to answer the question.
10       Q.    Are you following your counsel's
11   instruction not to answer the question on
12   the basis of privilege?
13       A.    Yes.
14       Q.    In addition to the information
15   in the plan supplement and the disclosure
16   statement, what facts did you rely on in
17   deciding that the releases in the plan are
18   appropriate?
19           MS. VANLARE: Objection.  Calls
20       for attorney-client communication and
21       attorney work product and, as such, I
22       would instruct the witness not to
23       answer.
24           MS. GRIFFITH:  On what basis are
25       the facts that the special committee

Page 255

1                    P. Aronzon

2        member relied on in making an

3        independent determination about

4        whether the releases in the plan are

5        appropriate attorney-client

6        privileged?

7             MS. VANLARE: Objection.  That's

8        not an appropriate question.

9             MS. GRIFFITH: That's my question

10       to you.  I'm challenging your

11       objection.

12            MS. VANLARE: I see.

13            The scope of the investigation

14       is attorney work product.  Any

15       communications that may have occurred

16       between counsel and the witness are

17       privileged communications and, as

18       such, questions that call for the

19       witness to reveal any of that

20       information are not allowed, and I am

21       instructing the witness not to answer

22       them.

23       Q.   And to be clear, for the record,

24    I am not asking about your communications

25    with counsel, I am asking about the

Page 256

1               P. Aronzon

2    underlying facts which are not privileged

3    information that you considered and relied

4    on in coming to the conclusion that the

5    releases contemplated in the plan are

6    appropriate.

7               MS. VANLARE: Counsel, we have

8          discussed for again many hours the --

9          you've asked many questions on the

10         topic, the witness has responded to

11         many questions on the topic to the

12         extent that he has any facts

13         independent of client communications.

14              To the extent your questions

15         call for information, facts, or legal

16         conclusions that he has based on

17         conversations with counsel and that

18         are a result of attorney work product,

19         those are privileged.

20              MS. GRIFFITH: So are you

21         directing your attention not to answer

22         my question?

23              MS. VANLARE: I need to look back

24         to what your question was, but I

25         believe that was my objection, yes,

Page 257

```
 1                    P. Aronzon
 2      and my instruction.
 3           MS. GRIFFITH: Court reporter,
 4      could you read back my question,
 5      please.
 6           (Whereupon the requested portion
 7      was read back by the reporter)
 8           MS. VANLARE: I believe you said
 9      that that was not a question for the
10      witness.
11           MS. GRIFFITH: No, my -- I had a
12      separate comment to you which I could
13      scroll back.
14           That was a question for the
15      witness.  The one I asked you is
16      further up.
17           My question to you is.
18      Question: "On what basis are the facts
19      that the special committee member
20      relied on in making an independent
21      determination about whether the
22      releases in the plan are appropriate
23      attorney-client privileged".
24           The question that the court
25      reporter just read back is the
```

Page 258

1                        P. Aronzon

2           question that I posed to the witness,

3           which is pending.

4                  MS. VANLARE: Sorry, can you read

5           that question again?

6                  (Whereupon the requested portion

7           was read back by the reporter)

8                  MS. VANLARE: I have stated my

9           objection on the many times.  Again,

10          the witness has testified to his

11          knowledge separate and apart from

12          counsel.  Any information beyond

13          what's already publicly available in

14          the disclosure statement and the plan

15          supplement and the information he's

16          already testified to as to his own

17          knowledge, that would be privileged

18          communications with counsel and

19          attorney work product and, as such, I

20          would instruct the witness not to

21          answer.

22          Q.    And are you following your

23     counsel's directions not to answer on the

24     basis of privilege?

25          A.    Yes.

Page 259

1                        P. Aronzon

2      Q.    Then shifting topics, only a

3    couple of questions left -- and thank you

4    very much for your endurance here --

5            MS. GRIFFITH: Matthew, if you

6        could bring up the final exhibit, and

7        we will call this Exhibit 8.

8            (Whereupon, a document entitled

9        Notice of Filing of Plan Supplement

10        was marked Aronzon Exhibit 8

11        for identification.)

12            THE WITNESS: I'm closing six; is

13        that okay?

14      Q.    Yes.

15            And are you able to open this

16    exhibit?

17      A.    Yes.

18      Q.    And this exhibit is notice of

19    filing of plan supplement for the debtors'

20    amended joint Chapter 11 plan publicly

21    filed on the docket as document 1144.

22            And if you scroll down in the

23    exhibit, there's an Exhibit M which is

24    titled Setoff Principles For Allowance of

25    Certain Claims.

Page 260

1                        P. Aronzon

2        A.      Okay.

3        Q.      And my question to you is: Why

4    is the debtor using the petition date

5    valuation for claims that the debtor has

6    against creditors who borrowed crypto from

7    the debtor?

8                MS. VANLARE: Objection.

9        Objection to form.

10               To the extent the question would

11           reveal any privileged communication, I

12           would caution you.  If you know the

13           answer to the question aside from

14           privileged communication, you may

15           answer it.

16               THE WITNESS:  I really can't

17           answer this without going into

18           privileged information.

19       Q.      If the debtor is using current

20    pricing for claims the debtor has against

21    creditors that borrowed crypto, would that

22    impact the net claim values?

23               MS. VANLARE: Objection.

24               Counsel, it's not clear to me

25           what you're asking.  I don't know if

Page 261

1                    P. Aronzon

2       it's clear to the witness.

3               Are you referring to a specific

4       part of the exhibit?

5               MS. GRIFFITH: I'm referring to

6       the setoff principles.

7       Q.      And so the setoff principles

8    have the debtor using petition date

9    valuation for claims the debtor have

10   against creditors that borrowed crypto;

11   correct?  Do you know if that's correct?

12              MS. VANLARE: Objection.

13              You may answer if you understood

14      the question.

15              THE WITNESS:  I'm not sure I do.

16      Q.      Are you aware that the debtor

17   has some claims against creditors that

18   borrowed crypto?

19              MS. VANLARE: Objection.

20              You may answer.

21              THE WITNESS:  Okay.

22              I don't know how to answer this.

23      Because as I'm sitting right here

24      looking at the language, I'm not

25      seeing what you're referring to.

Page 262

1                    P. Aronzon
2       Q.    Well, we can ask this question
3    apart from the document.
4             So you can put the document
5    aside and I could just ask in general with
6    your understanding of the plan, are you
7    aware that the debtors have claims against
8    creditors that borrowed cryptocurrency
9    from the debtors?
10      A.    So we -- the debtor loaned
11   crypto assets to an individual; is that
12   your -- is that what you're saying?
13      Q.    Yes, that's what I'm asking.
14            Are you aware if that is the
15   case?
16      A.    And if we did loan it, those
17   people owe us something; is that your
18   point?
19      Q.    Yes, that's what I'm asking you
20   to confirm, if that's your understanding.
21            MS. VANLARE: Objection.
22            You may answer.
23            THE WITNESS:  Yeah, I'm trying
24       to think about this and I'm looking at
25       this exhibit to see if it helps me.

Page 263

1          P. Aronzon

2          Look, we were in the lending

3     business, so Genesis would loan cash

4     or digital assets to counterparties

5     and in some instances those

6     counterparties would pledge cash or

7     digital assets to collateralize our

8     loan.  In other instances, we would

9     loan cash or digital assets to a

10    counterparty and sometimes we would

11    borrow cash or digital assets from the

12    same counterparty.  Those are two

13    categories that I know of that we

14    attempted to I guess describe in this

15    exhibit.  In those settings, there may

16    be setoff principles that come to

17    apply so that you get to a net number

18    for the claim.

19    Q.    And in those instances that you

20    just described where Genesis would loan

21    cash or digital assets to counterparties,

22    Genesis would have a claim against those

23    individuals that it loaned cash or digital

24    assets to; correct?

25    A.    Those people would owe us money,

Page 264

1                    P. Aronzon

2    correct.

3        Q.    And to determine the amount that

4    those people owe under the setoff

5    principles as it's currently drafted, is

6    it correct that petition date valuation is

7    being used to calculate the amount that is

8    currently owed?

9             MS. VANLARE: Objection.

10            THE WITNESS:  There's no set off

11        unless they also pledged collateral or

12        we separately from the identical party

13        borrowed assets or cash.  So there's

14        two parts to this.  You don't get one

15        without the other.

16            In either of those two cases, we

17        would net one against the other to

18        come up with a claim, either they owe

19        us or we owe them depending on the

20        netting.

21            If your question is did we use

22        the petition date for both of those

23        purposes, I believe the answer is yes.

24        Q.    And by using petition date

25    valuation for both of those consensus, as

Page 265

1              P. Aronzon

2    I just said, wouldn't that result in

3    creditors that borrowed cryptocurrency

4    receiving a higher value than creditors

5    that did not borrow cryptocurrency?

6              MS. VANLARE: Objection.

7              THE WITNESS:  The claim on the

8         petition date is a certain amount and

9         the value of where it's coined is a

10        certain amount and the net amount

11        results in a net claim for or against

12        depending on the numbers.  So without

13        looking at a specific claim or an

14        example, it's almost impossible for me

15        to guess to answer you directly, but

16        it could result in a claim being

17        bigger because the value of crypto on

18        the petition date might have been less

19        than, for instance, it is today or

20        some other date.

21             You look at the petition date

22        for the two numbers and you do a

23        netting and it goes one way or the

24        other.  If you pick a different date

25        for the netting, you'd get a different

Page 266

1                    P. Aronzon

2      answer.

3            MS. GRIFFITH: Okay.

4            I have no further questions, and

5      I'm very appreciative of your time

6      today.

7            THE WITNESS:  Okay.

8            MS. GRIFFITH: Thank you very

9      much.

10            I don't know if any other

11      counsel has questions on the line, but

12      no further questions from me.

13            Thank you again.

14

15

16

17

18

19

20

21

22

23

24

25