Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Genesis Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY IN SUPPORT OF MOTION FOR ENTRY OF**
**AN ORDER APPROVING A SETTLEMENT AGREEMENT BETWEEN THE**
**DEBTORS AND THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Genesis Debtors is 175 Greenwich Street, Floor 39, New York, NY 10007.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................ 1

BACKGROUND ........................................................................... 3

REPLY ........................................................................................ 7

I.      The Settlement Agreement is Fair and Equitable. .................................... 7

        a.      The Terms of the Settlement Are Fair and Equitable. ................. 7

        b.      The Settlement Agreement is the Product of Arms' Length
                Negotiations Between the Debtors and NYAG. ......................... 10

        c.      The Settlement Agreement Satisfies the Other
                *Iridium* Factors .......................................................................... 15

II.     The Settlement Agreement Does Not Violate the Bankruptcy Code
        or Run Afoul of *Jevic* or its Progeny ......................................................... 17

        a.      Bankruptcy Code Sections 1129 and 502(b) are
                Inapplicable to a Settlement Agreement ..................................... 17

        b.      The Settlement Agreement is Not a *Sub Rosa* Plan. .................... 18

        c.      The Settlement Agreement Does Not Run Afoul of *Jevic* or
                Its Progeny ................................................................................... 19

CONCLUSION .......................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 354 (S.D.N.Y. 2010)............................................................................ 8

*Arizona v. California*,
460 U.S. 605 (1983)....................................................................................................... 16

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y.).................................................................................. 16, 18

*In re Claar Cellars LLC*,
No. 20-00044-WLH11, 2020 WL 1238924 (Bankr. E.D. Wash. Mar. 13, 2020) ........ 20

*In re DiStefano*,
No. 16-10694, 2022 WL 4086979 (Bankr. N.D.N.Y. Sept. 6, 2022)........................... 16

*In re Fryar*,
570 B.R. 602 (Bankr. E.D. Tenn. 2017) ...................................................................... 20

*In re Grand Jury Proc.*,
219 F.3d 175 (2d Cir. 2000).......................................................................................... 16

*In re Health Diagnostic Lab., Inc.*,
No. 15-32919, 2016 WL 6068812 (Bankr. E.D. Va. Oct. 14, 2016).......................... 15

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007).......................................................................................... 10, 18

*In re Lee Way Holding Co.*,
120 B.R. 881 (Bankr. S.D. Ohio 1990).......................................................................... 15

*In Re Miami Metals I Inc*,
603 B.R. 531 (Bankr. S.D.N.Y. 2019).......................................................................... 18

*In re NETtel Corp.*,
2020 WL 2047965 (Bankr. D.D.C. Apr. 28, 2020) ....................................................... 20

**Page(s)**

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (D. Del. 2014) ........................................................................ 10

*In re Purofied Down Prods. Corp.*,
    150 B.R. 519 (S.D.N.Y. 1993) ..................................................................... 10

*In re Texaco Inc.*,
    84 B.R. 893 (Bankr.S.D.N.Y.1988) ............................................................. 10

*In re Tovan Constr., Inc.*,
    No. 19-12423-KHK, 2021 WL 1235359 (Bankr. E.D. Va. Mar. 31, 2021) ................. 20

*In re Tower Automotive*,
    241 F.R.D. 162 (Bankr. S.D.N.Y. 2006) ..................................................... 18

*Miller Tabak Hirsch & Co. v. Comm'r*,
    101 F.3d 7 (2d Cir. 1996) ......................................................................... 20

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003) ..................................................................... 16

*People ex rel. Schneiderman v. Greenberg*,
    27 N.Y.3d 490 (2016) ............................................................................... 8

*People v. Ernst & Young, LLP*,
    980 N.Y.S.2d 456 (2014) ........................................................................... 8

*Se. Fed. Power Customers, Inc. v. Geren*,
    514 F.3d 1316 (D.C. Cir. 2008) ................................................................. 20

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ................................................................... 16

**Rules and Statutes**

11 U.S.C. § 726 ............................................................................................... 13

NY CPLR § 5002 ............................................................................................ 8

**Other Authorities**

Fed. R. Bankr. P. 9019 ............................................................................... *passim*

Fed. R. Bankr. P. 510 .................................................................................... 19

**Page(s)**

Fed. R. Bankr. P. 1129.............................................................................................................. 17, 18

Genesis Global Capital, LLC ("GGC"), Genesis Asia Pacific Pte. Ltd. ("GAP"), and Genesis Global Holdco, LLC ("GGH") and, together, the "Debtors", by and through their undersigned counsel, hereby submit this reply in further support of the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* (ECF No. 1275, the "Motion")[1] and in response to *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* (ECF No. 1341, the "Objection.").

## PRELIMINARY STATEMENT

1.      The proposed Settlement Agreement fully resolves the NYAG's Martin Act lawsuit against the Debtors (and their associated Proofs of Claim) (collectively, the "NYAG Claims") without requiring the Debtors to pay a single dollar that would not ultimately flow to the Debtors' estates.  There is no disgorgement, no penalties, and no interest.  The Debtors are not required to admit or deny any of NYAG's allegations, nor spend millions of dollars defending against a sprawling lawsuit that targets a business the Debtors no longer operate.  The Settlement Agreement further ensures that the Debtors receive dollar-for-dollar credit for all plan distributions to creditors and, to the extent the Settlement Agreement results in *any* payment to NYAG, those funds will be used to provide restitution to the Debtors' third-party, general unsecured creditors.

2.      DCG stands alone in opposing the Settlement.  In a continuation of its singular focus on extracting value from the Debtors at the expense of creditors' recoveries, DCG's objection is premised on its unfounded belief that, absent the NYAG Settlement, it could void

---

[1]      Capitalized terms not otherwise defined in this Reply shall have the meanings given to them in the Motion.

obligations it created, and could receive distributions on account of its equity interests. The assumptions required to justify that belief are dizzying: first, DCG would need to prevail on its objection to the Plan; second, the Debtors would need to litigate the NYAG Claims to judgment and receive a complete acquittal; and third, either (a) more than $30 billion Governmental Units claims would need to be expunged in full, or (b) the Debtors' assets would need to appreciate in value far beyond any expectation and at a speed never before seen. Absent that specific confluence of events, the NYAG Settlement has no actual impact on DCG or its equity interests.

3.    DCG's legal arguments have no merit. Its central argument is that the settlement is not "fair and reasonable" because "the Debtors have simply given away the residual value of their estates" to NYAG. Obj. at ¶ 3. As discussed herein, this claim fails because (i) there *is* no residual value given that the creditors, including Governmental Units like NYAG, are owed far more than the assets available for distribution, (ii) DCG does not challenge the underlying NYAG lawsuit or its Proofs of Claim, and (iii) DCG completely ignores the obvious benefits of the Settlement Agreement, including NYAG's waiver of substantial monetary claims, the dollar-for-dollar reduction of the NYAG claims, and the meaningful cost and risk mitigation that settlement brings. Moreover, DCG wrongly presupposes that the Debtors are required to oppose NYAG's efforts to provide restitution to creditors who suffered real losses (something the Debtors themselves are proposing to do under the Plan).

4.    Without a credible argument on the merits of the Settlement Agreement, DCG desperately swipes at process points. The Objection argues that the Settlement Agreement was not arms'-length because, in DCG's view, the record does not reflect sufficient "written advocacy" and, says DCG, contains inadequate evidence of emails and teleconferences between the Debtors and NYAG. Obj. at ¶ 10. In reality, the record amply shows that, after an unsuccessful

2

round of initial negotiations, on the eve of the filing of NYAG's Amended Complaint and amid

███████████████████████████████████████████████, the Debtors made a reasonable

offer based on the parties' well-known common ground—maximizing recoveries for creditors—

which ripened into an advantageous settlement.  DCG's efforts to attack the other *Iridium* factors

are similarly unavailing, as is DCG's attempt to import legal concepts and provisions of the

Bankruptcy Code that have no applicability to the settlement of a claim against a Debtor.  As

described herein, the Settlement Agreement easily satisfies the requirement that a settlement under

Rule 9019 fall within the range of reasonableness.

## BACKGROUND

5.     In July 2023, NYAG filed the Proofs of Claim (the "NYAG Claims")

"exceeding an estimated $1.1 billion in restitution, plus additional amounts in disgorgement of ill-

gotten gains and damages, as well as injunctive and equitable relief" under the Martin Act.[2]  Proof

of Claim at ¶ 1.

6.     In  October  2023, ███████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████ *See* Ex. 1; Ex. 2.

7.     On October 19, 2023, NYAG filed its original complaint (the "Original

Complaint"), naming each of the Debtors, DCG, and others as defendants (collectively, the

---

[2]      The Martin Act, Article 23-A of N.Y. General Business Law, permits restitution, disgorgement, and other remedies for, *inter alia*, fraudulent activities in the dealing of securities and commodities.

"Defendants").  *See* Ex. 3.  The Original Complaint, much like the NYAG Claims filed in the

Debtors' cases, focused on the Defendants' actions in connection with the Gemini Earn Program,

and primarily sought injunctive relief, payment of damages, disgorgement, and restitution, as

against the Defendants collectively.  The Original Complaint alleges that Genesis, in concert with

DCG, defrauded creditors and the public by trying to "conceal more than $1 billion in losses."

Original Complaint at ¶ 2, 8.



8.    On November 1, 2023, ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████  *See*

Ex. 4.  ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████  *See* Ex. 5.

9.    Separately, ████████████████████████████

███████████████████████████████████████████

████████████████████  *See* Ex. 6; Ex. 7.  Following NYAG's filing of its

Original Complaint on October 19, 2023, ███████████████████████████

████████████████████████  Ex. 8.

10.    After November 2023, ████████████████████

███████████████████████████████  Ex. 9.  ████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████  *See* Ex. 11; *see also* Ex. 12.

4

11.    In parallel, as of January 23, 2024, the Debtors █████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 13.

12.    The very next day, on January 24, 2024, building upon the momentum ███

████████████████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 14. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████ Ex. 15. ████████████████████████████

████████████  ██████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ Ex. 16; Ex. 17.

13.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Ex. 18. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



14.    Over the next several days, the Debtors ████████████████████████

████████████████████████████████████████ *See, e.g.*, Ex. 19;

Ex. 20.  As part of that process, the parties exchanged at least eleven drafts, and the terms of the

deal developed, including: █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████ *See, e.g.,* Ex. 21; Ex. 22; Ex.

23. ██████████████████████████████████████████████████

██████████████████████████████ Ex. 24; Ex. 25.

15.    On February 9, 2024, as NYAG had warned all Defendants in the NY

Action, it filed an amended version of the Complaint (the "<u>Amended Complaint</u>"), expanding the

initial allegations to allege that *all* of the Debtors' customers were victims of the alleged conduct,

and asserting an additional $2 billion in liability against the Defendants collectively, including

claims of restitution and disgorgement (in addition to the damages and pre-judgment interest

claims).  *See generally* Ex. 26 (Amended Complaint).  In addition, the Amended Complaint

included numerous allegations that DCG had participated in a fraud against Genesis creditors and

had dominated and controlled Genesis to the detriment of Genesis creditors.  Amended Complaint

at ¶ 2, 8, 38.

6

16.     As outlined in the Aronzon Declaration, the Settlement Agreement is overwhelmingly beneficial to the estates because, among other things, it:  (i) eliminates the risk of an adverse outcome to the NY Action, (ii) avoids protracted litigation and associated costs over a business the Debtors no longer operate, (iii) waives any potential disgorgement and penalty claims, (iv) confirms subordination of the NYAG Claims to other general unsecured creditors, (v) provides a dollar-for-dollar reduction in the NYAG Claims based on any distributions made to creditors, and (vi) requires NYAG to turn over any distributions to creditors to provide restitution for their real losses.  More fundamentally, the Settlement Agreement fully aligns with the Debtors' own fiduciary duties to maximize the value of the estates to the benefit of the creditors who lent the currency that is at the heart of the NYAG Claims.

## REPLY

### I.     The Settlement Agreement is Fair and Equitable.

#### a.   The Terms of the Settlement Are Fair and Equitable.

17.     From the inception of the pending action, NYAG has sought three principal forms of monetary relief against the Defendants:  (i) restitution to creditors (or "investors," as NYAG termed them[3]) of all funds obtained in connection with alleged fraudulent acts (iii) disgorgement of all amounts obtained as a result of such alleged fraudulent acts, and (iii) payment of money damages, plus pre-judgment interest, arising from the alleged fraudulent acts.  Compl. at 56-57, Am. Compl. at 67.  As discussed above, these allegations originally focused on Gemini Earn customers but, in the Amended Complaint, were expanded to include *all* Genesis customers as of GGC's suspension of withdrawals on November 16, 2022.

---

3       *See generally* Original Complaint, Amended Complaint.

7

18.    Under New York law, restitution seeks to remedy the "loss to the victim," *People v. Ernst & Young, LLP*, 980 N.Y.S.2d 456, 457 (2014), and seeks to return fraudulently obtained property to its rightful owner, *see Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354, 368 (S.D.N.Y. 2010) ("The intent of [the NY statute calling for restitution to victims of fraudulent schemes] is that property derived by means of fraudulent practices shall go back, as far as possible, to the person from whom it was obtained."). Disgorgement under New York law goes further, "focus[ing] on the gain to the wrongdoer" and "require[ing] the return of wrongfully obtained profits," *see People ex rel. Schneiderman v. Greenberg*, 27 N.Y.3d 490, 497 (2016).[4] In addition to restitution and disgorgement, NYAG also sought "applicable pre-judgment interest," which compounds at the rate of 9% per annum. *See* NY CPLR § 5002 (2022).

19.    The Settlement Agreement contemplates the payment in respect of only one of NYAG's theories of relief: restitution, and even then, reduced dollar-for-dollar by the recovery the Debtors themselves provide to creditors. Critically, the Debtors are *not* required to disgorge any profits earned from the assets lent by their customers, nor is NYAG entitled to prejudgment interest on any portion of their claim (much less calculated on the more than $3 billion sought by the Amended Complaint). And, as discussed above, this comes with no need to litigate the merits of the Amended Complaint (which centers on a business the Debtors no longer operate) or to admit or deny any allegations, no risk of collateral consequences from that litigation, nor any follow-on litigation in the Bankruptcy Court to determine the priority of the NYAG Claims. Despite this, in DCG's view, these terms simply are not good enough.

20.    DCG argues that the fact that the record does not evidence significant

---

[4]    The Amended Complaint also seeks damages caused both "directly or indirectly" by the alleged actions of the defendant (which arguably could include both the principal amount loaned, as well as its appreciation over time).

friction with respect to a key aspect of the settlement—that the entirety of NYAG's claims could be settled via the Debtors' repayment of assets to creditors—demonstrates that the terms of the Settlement Agreement are unreasonable.  That is just wrong.  Although the Debtors have in the past disputed NYAG's allegations, the restitutionary relief NYAG seeks is not at all inconsistent with the Debtors' repeatedly stated intention to, as their fiduciary duties require, seek to make creditors whole to the greatest extent possible.  Where there was inconsistency between the Debtors' objectives and those of NYAG—namely the payment of any funds to NYAG that would not benefit the estates—the Debtors pursued and achieved their objectives without exception.

21.    As for DCG's contention regarding the calculation of the NYAG Claims, specifically the valuation of third-party unsecured creditors' claims as of the date of distributions, its complaint is not with the NYAG Settlement, but instead with the manner in which restitution claims like NYAG's are calculated under New York law.  There is nothing in New York law that would limit NYAG's restitution claim to Petition Date values, and DCG has no basis to claim that the Debtors should have insisted that NYAG voluntarily reduce its state-law claims based on DCG's improper reading of the Bankruptcy Code—which, not incidentally, benefits only DCG, at the direct expense of all unsecured creditors.

22.    DCG's complaint regarding the Debtors' agreement to allow the NYAG Claims as general unsecured claims subordinated to all other claims in that class fares no better. The Debtors' proposed subordination of government claims is not unique even among the major cryptocurrency cases.   The *BlockFi* and *Voyager* debtors have reached agreements with government entities in which their claims are voluntarily subordinated to those of unsecured creditors, the *Celsius* debtors agreed to "suspend" almost $5 billion in FTC claims pending full administration of their estates, and the *FTX* debtors have stated on the record that their intention is

9

to seek settlements with their government claimants to voluntarily subordinate their claims.[5]

> **b.  The Settlement Agreement is the Product of Arms' Length Negotiations Between the Debtors and NYAG.**

23.     DCG lavishes most of its *Iridium* factor attention on the seventh factor, which considers whether proposed settlements are the result of good faith, arms' length negotiations between the parties, including telephone conferences, exchanges of drafts, and other forms of negotiation, as contrasted against settlements that are determined to be the product of fraud or collusion.  *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).[6]  There is no requirement in the caselaw that negotiation of a settlement take place over a given number of days or weeks, nor that settlement negotiations take a particular form or be recorded in a particular way. *See In re Nortel Networks, Inc.*, 522 B.R. 491, 515–16 (D. Del. 2014) (finding that "ten days . . . is sufficient time in which to negotiate a settlement agreement, even regarding a matter as multi-faceted as the [now-settled] [d]ispute.").

24.     The Debtors' negotiations with NYAG amply meet this standard, comprising (i) initial discussions with NYAG regarding their Proofs of Claim and anticipated Original Complaint prior to its filing, (ii) further discussions after the filing of the Original Complaint, and (iii) renewed discussions in light of (a) the Debtors' desire to resolve disputes, including disputes about subordination of government penalty claims, ahead of plan confirmation,

---

[5]     *See In re BlockFi Inc.*, No. 22-19361 (Bankr. D.N.J. June 22, 2022), ECF No. 1099; *In re BlockFi Inc.*, No. 22-19361 (Bankr. D.N.J. Sep. 27, 2023), ECF No. 1613; *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (Bankr. S.D.N.Y. Oct. 6, 2023), ECF No. 1595; *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. July 26, 2023), ECF No. 3095; *See In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del.), ECF No. 6908.

[6]     Numerous cases other than *Iridium* have articulated similar factors for courts' consideration, and most emphasize that the required "arms' length" negotiations are intended to be the opposite of fraudulent or collusive actions.  *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr.S.D.N.Y.1988) (considering "[t]he extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion"); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (adopting the *Texaco* standard verbatim).

(b) the Debtors' agreement with the SEC to effectively subordinate its claim to ensure that its recovery would not come at the expense of restitution to creditors, (c) the looming amendment of the NY Action complaint, and (d) the ongoing settlement discussions ███████████████ ███████ concerning the NY Action.

        25.    The Objection contends these negotiations were insufficient, claiming that the settlement came "out of the blue … without any material effort to negotiate the merits or damages," Obj. at ¶ 1, and going so far as to retain a new lawyer as an "expert," to opine on what he would "expect" from a "typical" NYAG settlement.[7]  DCG's efforts to recast the negotiations by using an unqualified "expert" is wrong, disingenuous, and a waste of the Court's time.

        26.    *First*, DCG wrongly asserts that ████████████████████████ ███████████████████████████████████ in connection with its efforts to resolve the NY Action. *See* Obj. at ¶ 82.[8]  Of course, DCG points to nothing to suggest that ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████ [10]

---

    *See* Brown Decl., ECF No. 1342 at ¶¶ 7, 9, 11, 12, 13, 18.  Tellingly, although DCG refers to Mr. Brown as its "expert," Mr. Brown himself ████████████████████████████████████████ Ex. 27 (Brown Tr.) at 19:9-19.  At best, Mr. Brown ██████████ *Id.* at 45:16-19.

████████████████████████████████████████████████████████ *Id.* at 40:8-19, 95:23-96:10, 100:14-2437:7-17, 92:21-24, 97:15-98:2.

8    ██████████████████████████████████████

9    ████████████████████████████████████████████████

10    Brown Tr. at 29:12-30:2, 34:24-35:17.

27.    *Second,* DCG asserts that the Debtors' January 2024 settlement discussions

were solely the result of ███████████████████████████████████,[11]

going on to claim that the "real" impetus for the January 2024 negotiations was a scheme to secure

"insurance" against DCG's then-forthcoming plan objection, Obj. at ¶ 83.  But DCG's narrative is

based on conjecture and, worse still, ignores material facts known to DCG through its counsel yet

tellingly omitted from the Objection.  As discussed above, ten days after entry of an order setting

a February 9, 2024 deadline for NYAG to file its Amended Complaint,[12] ███████████████

██████████████████████████████████████████████ Ex.

12. ████████████████████████████████████████████████

████████████████████████████████████████████████

Exs. 14, 15. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ Exs. 1, 9.  The record demonstrates that there was a ███

████████████████████████████████████████████████

███████████████████████████████████████████████ the

Debtors had concerns about █████████████████████████████████

████████████████████████████████████████████████

█████████████████ *See* Ex. 10.

28.    Thus, the facts in the record reflect that █████████████████

---

[11]    The record shows that the Debtors were on notice of DCG's intention to object to the Plan at least as early as October 31, 2023, when DCG filed its objection to the Debtors' Disclosure Statement.  *See* ECF 867.  DCG does not explain why the Debtors would have waited almost three months to reach out to NYAG to initiate settlement discussions, ███████

[12]    *See* Stipulation Extending Time to Answer or Respond to Amended Complaint at 1, New York v. Gemini Trust Co., No. 452784/2023 (N.Y. Sup. Ct. Jan. 12, 2024) (setting deadline for amendment to Original Complaint).

████████████████████████████████████████████████████████████████

███████████████████████████████████████    What else could explain the fact that ███████

████████████████████████████████████████████████    Moreover, there

can be no surprise that the Debtors sought to resolve NYAG's potential objections to the plan,

particularly the treatment of government penalty claims, ahead of the confirmation hearing.  To be

sure, in the days and weeks approaching plan confirmation, Debtors typically seek settlements

with creditors on the proverbial (and sometimes literal) courthouse steps.

29.    *Third*, DCG asserts that the terms of the proposed settlement are a

"unilateral gift," Obj. at ¶ 83.  This fails because the NYAG Settlement provides significant benefit

to the estates and represents a fair and reasonable settlement of the NYAG Claims.  Further, DCG

assumes that the alternative to the NYAG Settlement is that the NYAG Claims disappear.  On the

contrary, the alternative to the settlement is that the Debtors would be forced to litigate the NYAG

Claims, and if the litigation were unsuccessful (beyond the costs that the Debtors would have

incurred and the potential collateral consequences that could result), the Debtors likely would have

to engage in a second round of litigation concerning whether the NYAG Claims, in whole or in

part, could be subordinated to other unsecured creditors.[13]

30.    *Fourth*, DCG asserts that the members of the Special Committee have less

than a complete command of the details of NYAG's claims and the settlement mechanics, cherry

picking testimony by Mr. Aronzon and Mr. Conheeney to make their point.  Obj. at ¶ 84.  But the

law does not require that the Special Committee have memorized all technicalities of a settlement.

Nor does the law require board members to know about every step of the negotiation history.  As

---

13      *See* 11 U.S.C. § 726(a)(4) (providing for subordination of penalty claims to other allowed unsecured claims).

13

discussed at length herein, the Special Committee, in consultation with counsel, carefully considered the relevant factors and determined that the settlement would benefit the estate.[14]

31.     *Fifth*, DCG suggests that the settlement is somehow tainted because the Debtors consulted their major creditor groups in considering its terms and mechanics. Obj. at ¶ 85-86. If consultation with creditor groups regarding a potential value-maximizing settlement is collusion, then all debtors, in all cases, are guilty of collusion. DCG's sole alleged evidence for this claim, ████████████████████████████████████████████████

████████████████████████████████████████     *See* Obj. at 85-86.

32.     At base, DCG's implicit claim that the Debtors should have staked out more aggressive negotiating positions or insisted on expending more estate resources on negotiation ignores a fundamental feature of these negotiations:  the parties' alignment on providing the Debtors' creditors with the full benefit of their bargain.[15] Zealous advocates pursue their clients' goals, which is precisely what happened here. The Debtors focused on achieving a settlement that eliminated litigation risk and cost (in particular given that the business no longer operates), eliminated the potential for value-draining penalties or disgorgement, established a clear



---

14 ████████████████████████████████████████████████████████, Objection at ¶ 12, n.6, but Mr. Aronzon and Mr. Conheeney both testified ████████████████████████
████████████████ *See* Ex. 28 Aronzon Dep. Tr., (the "Aronzon Tr."), 110:15-113:3, 116:20-118:3; Ex. 29 Conheeney Dep. Tr., (the "Conheeney Tr."), ████████████████████████

15 ████████████████████████████████████████████████████████████

framework for valuing NYAG's claims, including a dollar-for-dollar reduction upon the making
of distributions to creditors, and aligned with the Debtors' ultimate goal of maximizing value.

### c. The Settlement Agreement Satisfies the Other *Iridium* Factors

33.     With respect to the first and second *Iridium* factors, the Debtors balanced
the litigation's possibility of success and the settlement's future benefits against the likelihood and
costs of protracted litigation.[16] DCG's argument that the Debtors have failed to provide sufficient
evidence of the substance of those deliberations is unavailing, and their desire to have the Debtors
reveal privileged information and communications is unsupported by the law.

34.     "The Court is not required to delve into privileged matters" in order to
consider the reasonableness of a debtor's proposed settlement. *In re Health Diagnostic Lab., Inc.*,
2016 WL 6068812, *5-6 (Bankr. E.D. Va. Oct. 14, 2016). Nor are the Debtors required "to waive
the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood
they would win on the claims being settled." *Id.* at *5. *See also In re Lee Way Holding Co.*, 120
B.R. 881, 897 (Bankr. S.D. Ohio 1990) (approving settlement where trustee's counsel "reviewed
documents which . . . [were] successfully withheld . . . under assertions of privilege").

35.     Contrary to the law, DCG argues that in order to justify the NYAG
Settlement, the Debtors must reveal the privileged discussions[17] between the Special Committee

---

16      *See* Aronzon Decl. at ¶ 8-11 (describing the risks of an adverse judgment compared to the benefits of
settlement); Aronzon Tr. 121:12-122:8 (explaining the Settlement Agreement "eliminates the risk of litigation, and
litigation is very costly and expensive and can result in all sorts of different -- … What I like about this settlement is
that it caps the claim and it provides for a reduction in the claim based on distributions that I'm hoping we will make
under our plan or any plan.").

17      When it comes to its own witnesses, DCG agrees with the Debtors' view of the law. ████████████████
████████████████████████████████████████████████████████████████████████████

that approved the Settlement Agreement and their counsel.[18]  In fact, this Court has already rejected

the same claim DCG makes here, *i.e.*, that the Debtors should be required to divulge their views

on the likelihood of success on the merits, the potential costs of litigation, or the risks of an adverse

outcome.  *See Memorandum of Decision*, ECF 781, at 19-21 (holding, in approving a settlement

agreement between the Debtors and another claimant, that "the Court is not required to delve into

privileged matters" . . . and holding that testimony regarding the outcome of the Debtors'

deliberations regarding the balance of risks and benefits underlying a settlement was sufficient to

support a finding that the Debtors had satisfied the first *Iridium* factor).[19]  The undisputed record

in these cases is that the Debtors analyzed the relevant factors, and determined that the settlement

was in the best interests of the estates, thereby satisfying the first and second *Iridium* factors.

        36.     With respect to the third and fourth *Iridium* factors, the "paramount interests

of the creditors"—DCG concedes that no creditor has objected to the Settlement, instead arguing

that the total absence of creditor support should be ignored.  *See* Obj. ¶ 75.  But the case law DCG

relies on merely notes that the third factor is not a mere tallying of ayes and nays, but instead

requires consideration of the settlement "in light of the reasons for any opposition," along with

each affected class of creditor's relative benefits.  *In re Adelphia Commc'ns Corp.*, 327 B.R. 143,

---

[18]     DCG selectively quotes three cases in support of its argument that the Debtors should be required to
divulge privileged materials in this context.  *In re Grand Jury Proc.*, 219 F.3d 175, 182 (2d Cir. 2000) holds that a
party cannot "affirmatively rely on privileged communications to support is claim or defense and then shield the
underlying communications from scrutiny by the opposing party."  The Debtors do nothing of the sort:  they have
described the process they undertook to reach this settlement, without putting at issue the substance of the
deliberations themselves.  *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991), only discusses the truism
that privilege cannot be used as both a sword and shield, and says nothing of particular relevance to the case at hand.
Finally, *In re DiStefano*, 2022 WL 4086979, at *6-7 (Bankr. N.D.N.Y. Sept. 6, 2022) declines to approve a
settlement where the basic facts have not been disclosed to the court—which is not the case here.

[19]     It is well established that "when a court decides upon a rule of law, that decision should govern the same
issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). This rule rests on the
principle, rooted in judicial economy and fairness, that "'where litigants have once battled for the court's decision,
they should neither be required, nor without good reason permitted, to battle for it again.'" *See Off. Comm. of
Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003).

16

166 (Bankr. S.D.N.Y.), Obj. at ¶ 75.  DCG does not contest that the settlement benefits general unsecured creditors, whose claims are all senior to the NYAG Claims (and whose distributions will reduce the NYAG Claims on a dollar-for-dollar basis).  *See* Stipulation and Consent to Judgment at ¶ 6.  Nor do they contest the total absence of any objection from holders of more junior Government Penalty Claims or Subordinated Claims.  As for "the reasons for [DCG's] opposition," the Objection makes that clear:  DCG reads the NYAG Settlement as affecting the chance that they might see recovery in these Chapter 11 Cases.  That reading ignores the plain reality that the NYAG has asserted a $3 billion claim against the Debtors and there are more than $30 billion in other claims senior to DCG's equity interests.[20]  With respect to the fifth *Iridium* factor, the Debtors' and NYAG's representation by competent counsel weighs in favor of the settlement,[21] notwithstanding DCG's attempt to twist the factor into a rehash of its other arguments against the Settlement (which fail for all the reasons discussed herein).

## II.   The Settlement Agreement Does Not Violate the Bankruptcy Code or Run Afoul of *Jevic* or its Progeny

### a.   Bankruptcy Code Sections 1129 and 502(b) are Inapplicable to a Settlement Agreement

37.   The Objection devotes considerable space to DCG's views regarding the scope and operation of Sections 1129, which applies only to confirmation of a Chapter 11 plan, and 502(b), which applies only to claims subject to objection.  Neither has bearing on the settlement of a claim, which is the gravamen of the Motion.  DCG seems to suggest that these sections apply because, in their view, the Settlement Agreement "obtains the same result" as the

---

[20]    Contrary to DCG's focus on whether it has technical standing, the economic realities of the Chapter 11 Cases are important because they bear on the weight that DCG's objection should be afforded as the Court considers the *Iridium* factors.

[21]    The sixth *Iridium* factor is irrelevant to the Settlement Agreement.

17

proposed Plan.  Obj. at ¶ 44.  As discussed *infra*, the Settlement Agreement does no such thing.

More importantly, DCG provides no legal basis for the proposition that a settlement of a claim

against a debtor (however characterized) must adhere to these sections of the Bankruptcy Code,

which are specifically aimed at confirmation of a plan or the calculation of objected-to claims.[22]

### b.    The Settlement Agreement is Not a *Sub Rosa* Plan.

38.    DCG half-heartedly claims in a single substantive paragraph that the

Settlement Agreement constitutes a *sub rosa* plan.  Obj. at ¶ 54.  This argument is without merit.

A settlement or transaction constitutes an impermissible *sub rosa* plan only where it "shorts circuit

the requirements of Chapter 11 for confirmation of a reorganization plan," *In re Iridium Operating

LLC*, 478 F.3d 452, 466-67 (2d Cir. 2007), where it constitutes an "end run around the protection

granted creditors in Chapter 11," *In Re Miami Metals I Inc*, 603 B.R. 531, 536 (Bankr. S.D.N.Y.

2019), or where it "dictate[s]… the terms of a future plan of reorganization … restructure[s] the

Debtor's business or finances generally, [or]… restrict[s] any rights afforded to creditors in the

chapter 11 process, such as the right to vote on a proposed plan of reorganization in the manner

they see fit."  *In re Tower Automotive*, 241 F.R.D. 162, 166 (Bankr. S.D.N.Y. 2006).  The

Settlement Agreement does none of these things—it does not subvert any of Chapter 11's

requirements for confirmation of a plan, which of course is happening in parallel, nor does it

infringe any of Chapter 11's enumerated or structural protections for creditors in Chapter 11.

39.    In fact, in *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr.

S.D.N.Y. 2019), this court considered this exact argument.  The *Adelphia* settlement was between

a debtor and multiple government entities, and provided that the government claims would be

---

[22]    Furthermore, as discussed *supra*, the NYAG Claims are based in the monetary relief available under the
Martin Act, and DCG's attempt to import the analysis that DCG seeks to apply to customer crypto claims simply
does not withstand scrutiny, particularly in light of established New York law on calculation of restitution claims.

subordinated and that recoveries could be used to fund a "victims' restitution fund." *Id.* at 157. Creditors objected out of concern that the fund in turn could be used, "in major part," to provide distributions to holders of equity securities or creditor claims that would otherwise be subordinated pursuant to Bankruptcy Code Section 510(b). *Id.* at 168. The Court nonetheless approved the settlement, observing that that the concerns regarding how the government claimants might distribute the settlement proceeds were "twice removed" from the requirements of section 510(b) and the absolute priority rule. *Id.* DCG's complaints about the victims' fund is similarly twice removed from the question of whether the Settlement Agreement may be approved. The Bankruptcy Code favors settlements of claims such as the NYAG Claims, it permits claims to be voluntarily subordinated as the Settlement Agreement proposes, and it places no limitations on what a creditor may do with its recovery once distributions are made on account of its claim—and it particularly does not contain any limitation on a government entity choosing to use its recoveries to make restitutionary payments to creditors.

### c. The Settlement Agreement Does Not Run Afoul of *Jevic* or Its Progeny

40. As a threshold matter, contrary to DCG's arguments, the Supreme Court's holding in *Jevic* is plainly inapplicable in this case: *Jevic* dealt with a debtor that proposed to settle with its major creditor groups and to effectuate a "structured dismissal"—and, in the process, to effectively make distributions that would violate the absolute priority scheme if proposed in the context of a plan. The proposed Settlement Agreement is entirely different in kind: it deals with only one claimant, does not propose a structured dismissal, dictate the terms of a Plan or force creditors to waive their claims against the Debtor, and does not contemplate Debtor payments in violation of the absolute priority rule (or to anyone other than NYAG)—and DCG, unlike the aggrieved creditors in *Jevic*, is junior to all of the relevant claims. To the extent DCG takes issue

19

with NYAG's agreement to distribute any funds received to the creditors to whom restitution is owed, it has marshalled not a single shred of authority to suggest that this state-law sanctioned distribution by a third party to another third party is a concern of the Bankruptcy Code.

41.    DCG cites a raft of cases from courts across the country for the proposition that "bankruptcy courts have consistently evaluated, as a threshold matter, whether a proposed settlement would conflict with the Bankruptcy Code, including the rule of absolute priority," Obj. at ¶ 16.  None of these cases supports the relief DCG seeks.[23]

## <u>CONCLUSION</u>

For the reasons articulated above, the Genesis Debtors respectfully request that this Court overrule the Objections and grant the relief requested in the Motion and any other and further relief as it deems proper.

---

[23]    *See, e.g., Miller Tabak Hirsch & Co. v. Comm'r*, 101 F.3d 7 (2d Cir. 1996) and *Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008) (both non-bankrutpcy cases); *In re Tovan Constr., Inc.*, No. 19-12423-KHK, 2021 WL 1235359, at *2 (Bankr. E.D. Va. Mar. 31, 2021) (a chapter 7 liquidation); *In re Fryar*, 570 B.R. 602, 610 (Bankr. E.D. Tenn. 2017) (denying proposed settlement as "more of a preamble to a conversion or structured dismissal"); *In re NETtel Corp.*, 2020 WL 2047965, at *1 (Bankr. D.D.C. Apr. 28, 2020) (dealing with disgorgement of administrative expense payments to counsel); *In re Claar Cellars LLC*, 2020 WL 1238924, at *8 (a ruling under section 363(b)(1)).

Dated:   February 23, 2024          /s/ Thomas S. Kessler
         New York, New York        Sean A. O'Neal
                                    Luke A. Barefoot
                                    Jane VanLare
                                    Thomas S. Kessler
                                    Andrew Weaver
                                    CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                    One Liberty Plaza
                                    New York, New York 10006
                                    Telephone: (212) 225-2000
                                    Facsimile: (212) 225-3999

                                    *Counsel to the Genesis Debtors
                                    and Debtors-in-Possession*

21

**Exhibit 1**

**<u>Exhibit 2</u>**

### Exhibit 3

**Complaint Captioned *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Gemini Trust Co., LLC; Genesis Global Capital, LLC; Genesis Asia Pacific PTE Ltd.; Genesis Global Holdco, LLC; Digital Currency Group, Inc.; Soichiro Moro (a.k.a. Michael Moro); and Barry E. Silbert*, Case No. 452784/2023, dated October 19, 2023.  ("Original Complaint")**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK, by    :    Index No.:
LETITIA JAMES, Attorney General of the State of
New York,                                  :

     Plaintiff,         :    **COMPLAINT**

  -against-                            :

GEMINI TRUST COMPANY, LLC; GENESIS         :
GLOBAL CAPITAL, LLC; GENESIS ASIA PACIFIC
PTE. LTD.; GENESIS GLOBAL HOLDCO, LLC;      :
DIGITAL CURRENCY GROUP, INC.; SOICHIRO
MORO (a.k.a. MICHAEL MORO); and BARRY E.    :
SILBERT.
                                           :
     Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

   Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the

State of New York ("OAG" or "Plaintiff"), alleges the following against Gemini Trust Company,

LLC ("Gemini"); Genesis Global Capital, LLC ("Genesis Capital"); Genesis Asia Pacific Pte.

Ltd. ("Genesis Asia Pacific"); Genesis Global Holdco, LLC ("Genesis Holdco," collectively with

Genesis Capital and Genesis Asia Pacific, the "Genesis Entities"); Digital Currency Group, Inc.

("DCG"); Soichiro "Michael" Moro ("Moro"); and Barry E. Silbert ("Silbert") (together the

"Defendants"):

### NATURE OF THE ACTION

   1.  In February 2021, Gemini, a New York cryptocurrency[1] platform, and Genesis

Capital, a New York cryptocurrency lender, launched an investment program called Gemini Earn

(or "Earn"). Gemini and Genesis Capital promoted Earn using their social media accounts, a

---

[1] Cryptocurrency—also referred to as a digital asset—refers to an asset issued or transferred
using a blockchain, or a distributed ledger that maintains a system of payments and receipts for
transactions. Cryptocurrency acts as a digital representation of value that functions as a medium
of exchange, a unit of account, and a store of value.

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 39 of 1132

mass email campaign, media outlets, and their own websites. Gemini and Genesis Capital marketed Earn to the public as a high-yield investment program where Gemini customers could profit by passively investing their cryptocurrencies with Genesis Capital. Within months of its launch, Genesis Capital held several billion dollars in Earn investor assets.

2.      On November 16, 2022, Genesis Capital announced that it was suspending all withdrawals from Earn, leaving at least 232,000 Earn investors with more than $1 billion in losses. These losses were the result of two distinct fraudulent schemes: one perpetrated by Gemini (the "Gemini Scheme"), and one perpetrated by Genesis Capital and its Chief Executive Officer ("CEO") Moro, in coordination with Genesis Capital's parent company DCG, DCG's CEO Silbert, and the other Genesis Entities (the "DCG Scheme"). Under the Gemini Scheme, Gemini solicited money from the public with false assurances that Earn was a highly liquid investment and that Genesis Capital was creditworthy based on Gemini's ongoing risk monitoring. In reality, however, Gemini's confidential risk reports found that Genesis Capital posed a high risk of default. Under the DCG Scheme, the Genesis Entities, Moro, DCG, and Silbert disguised $1.1 billion in losses through a months-long campaign of misstatements, omissions, and concealment.

3.      Under the Gemini Scheme, from February 2021, through November 16, 2022, Gemini advertised Earn on its website as a low-risk, highly liquid "investment" that could be "redeem[ed] at any time." Throughout this same period, Gemini promised that Gemini vetted Genesis Capital "through a risk management framework that reviews [Genesis Capital's] collateralization management process," and that "on a periodic basis [Gemini] conducts analysis of [Genesis Capital's] cash flow, balance sheet, and financial statements." Gemini further

advertised that Genesis Capital was a "trusted" and "accredited" partner and that Gemini would

ensure Genesis Capital had "appropriate risk ratios" and a "healthy financial condition."

4.      During the same period, Gemini encouraged the public and Earn investors to

place a heightened degree of "trust and confidence" in Gemini.  On its website and social media

accounts, Gemini pledged to its customers "the highest level of fiduciary obligations."  In

September 2022, Gemini's President Cameron Winklevoss told investors with concerns about

the safety of investing in Genesis Capital and Earn that Gemini "ha[s] always and will continue

to prioritize risk management and disclosure as key pillars of our business."

5.      Gemini's internal risk analyses, however, contradicted its assurances about

Genesis Capital.  From the start of the program in February 2021, through November 16, 2022,

Gemini's internal risk analyses showed that Genesis Capital's loan book was undercollateralized.

Only a year into the program, in February 2022, Gemini revised its estimate of Genesis Capital's

credit rating from BBB (*i.e.*, investment grade) to CCC (*i.e.*, non-investment, or junk grade).

Indeed, from May 2022 through November 2022, Genesis Capital routinely reported to Gemini

that it had failed its own internal loan book risk assessments. When advised of Genesis Capital's

financial condition in July 2022, one Gemini board member compared Genesis Capital to

Lehman Brothers prior to its collapse.

6.      On September 2, 2022, Gemini decided to terminate Earn.  A month later, on

October 13, 2022, Gemini formally notified Genesis Capital of its decision and sent a

confidential written notice to Genesis Capital terminating all Earn agreements and demanding

the return of all investors' assets under Earn.  Yet even after Gemini decided to terminate Earn

and provided formal notification to Genesis Capital, Gemini continued to take tens of millions of

3

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 41 of 1132
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

dollars' worth of additional cryptocurrencies from Earn investors and hand those assets over to Genesis Capital.

7.      Gemini failed to disclose to Earn investors the risks of investing in Earn and Gemini's termination of the Earn program.  Gemini did so even while certain Gemini employees, including an officer of Gemini, closed out their own personal positions in Gemini Earn.

8.      Earn investors were not only defrauded by Gemini, but they were also victims of the DCG Scheme to conceal more than $1 billion in losses at the Genesis Entities.  On June 13, 2022, one of the Genesis Entities' largest borrowers, Three Arrows Capital, Ltd. ("Three Arrows"), defaulted on billions of dollars in loans. The resulting losses created, in Genesis Capital's words, a "structural hole" at Genesis Capital that impaired its ability to repay its open-term liabilities—including to Earn investors.

9.      Starting in June 2022, the Genesis Entities, DCG, Moro, and Silbert conspired to and did in fact falsely represent Genesis Capital's financial condition to conceal this structural hole.  As part of that scheme, the Genesis Entities, DCG, Silbert, and Moro engaged in concerted communications with the public and with counterparties to instill false confidence in Genesis Capital's financial health.  For example, on June 15 and June 17, Genesis Capital, Silbert, Moro, and/or DCG published tweets claiming the Genesis Entities' balance sheet was "strong," that Genesis Capital was functioning "normally," and that it had "shed the risk and moved on."  In reality, Three Arrows' default on June 13, 2022, created an equity deficiency at the Genesis Entities, and Silbert had ordered Genesis Capital to limit its extension of new loans.

10.      On June 30, 2022—the last day of the financial reporting quarter—Moro and Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis Capital $1.1 billion *in a decade* at only a 1% per annum interest rate (the "Promissory Note") to

4

purportedly backstop losses from the Three Arrows loans.  DCG never made principal or interest payments under the Promissory Note and the structural hole remained unchanged.  Nevertheless, Genesis Capital reported this Promissory Note as an asset on its balance sheet without disclosing to Gemini or the Earn investors its true terms.

11.     Instead of disclosing the terms of the Promissory Note to the Earn investors, the Genesis Entities, DCG, Moro, and Silbert falsely assured counterparties and the public that Genesis Capital was "well-capitalized" and that DCG "absorbed the losses" from the Genesis Entities.  Genesis Capital's CEO, Moro, also tweeted that DCG had "assumed certain liabilities of Genesis" associated with Three Arrows, leaving Genesis Capital with "adequate capital" to continue "business as usual."  Through these statements, Genesis Capital solicited additional assets through Earn under false pretenses.

12.     These statements were misleading descriptions of the Promissory Note and omitted material information.  DCG did not "absorb" the Genesis Entities' losses arising from Three Arrows' default.  Rather, those losses were reflected on financial statements that the Genesis Entities concealed from counterparties.  Nor did the Promissory Note address the structural hole created by those losses, which elevated the risk of Genesis Capital being unable to repay the Earn investors.  Indeed, an officer at Genesis Capital objected to informing counterparties that DCG "absorbed the loss" because they would be unable to defend this statement in calls with counterparties.

13.     Further, DCG did not simply assume liabilities of Genesis relating to Three Arrows. Instead, DCG *replaced* those short-term liabilities with an illiquid obligation that was payable in 10 years at 1% interest.  On its face, the Promissory Note failed to plug the structural hole created by the Three Arrows default.

5

14.     In furtherance of the DCG Scheme, from July 2022 through November 2022, Genesis Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Capital's financial condition.  For example, these reports falsely included the Promissory Note as an asset that could be reduced to cash within a year.  To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022.  Genesis Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the Promissory Note's true nature.  Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition.  Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms.

15.     Meanwhile, from July 2022 to November 2022, DCG further widened Genesis Capital's structural hole when it forced Genesis Capital to extend the maturity date for hundreds of millions of dollars' worth of loans to DCG.  To date, DCG has failed to repay these loans.

16.     Finally, from February 2021, through November 16, 2022, Gemini and Genesis Capital falsely claimed they had all "necessary governmental and other consents, approvals and licenses" to perform their obligations under Earn.  This was false because the Earn accounts were securities and Genesis Capital failed to register in New York as a securities dealer, broker, or salesperson as defined in GBL § 359-(e).

17.     On November 16, 2022, Genesis Capital announced that it faced a liquidity crunch and would not return cryptocurrencies invested under Earn, leaving Earn investors unable to redeem more than $1 billion of their investments.  Some of these unsuspecting investors lost their life savings.  On November 29, 2022, one New Yorker pleaded with Gemini for the return

of her $199,000 investment, writing: "Are you going to be able to give us our money any time

soon? I am crying all day. I am 73 years old and without that money I am doomed." No

Defendant has returned the Earn investors' assets since the close of the program on November

16, 2022. Instead, on January 19, 2023, the Genesis Entities declared bankruptcy.

18. Defendants' fraudulent acts violated New York General Business Law ("GBL")

§§ 352 *et seq.* (the "Martin Act"), and New York Executive Law § 63(12). Additionally, the

Genesis Entities, DCG, Silbert, and Moro violated state criminal laws, constituting repeated and

persistent illegality in violation of Executive Law § 63(12), including: New York Penal Law §

190.65 (Scheme to Defraud); and New York Penal Law § 105.05 (Conspiracy).

19. This action seeks to permanently enjoin Defendants from engaging in fraudulent,

deceptive, and illegal acts in violation of the Martin Act and Executive Law; to permanently

enjoin Defendants from engaging in any business related to the issuance, distribution, exchange,

promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or

commodities within or from this state; and to direct Defendants to pay damages, restitution, and

disgorgement of all funds and cryptocurrencies Defendants obtained in connection with its

unlawful, fraudulent, or illegal conduct, and for such other equitable relief as may be necessary.

## **PARTIES**

20. Plaintiff, the Attorney General of the State of New York, is authorized to bring

this action and to assert the causes of action set forth below in the name and on behalf of the

People of the State of New York pursuant to the Martin Act and Executive Law § 63(12).

21. Defendant Gemini is a New York trust company chartered by the New York State

Department of Financial Services with a principal place of business at 315 Park Avenue South,

in New York County, New York. Cameron Winklevoss and his brother Tyler Winklevoss co-

7

founded Gemini.  From February 2, 2021, through November 16, 2022 (the "Relevant Period"),

Cameron Winklevoss served as Gemini's President and Tyler Winklevoss served as its CEO.

22.     Defendant Genesis Capital is a Delaware limited liability company with a

principal place of business at 250 Park Avenue South, in New York County, New York.

23.     Defendant Genesis Asia Pacific is a Singapore corporation with a business

address at 30 Raffles Place, # 23-01 Oxley @ Raffles, Singapore 048583.  During the Relevant

Period, directors, officers, and employees of Genesis Asia Pacific worked from 250 Park Avenue

South, in New York County, New York.

24.     Defendant Genesis Holdco is a Delaware limited liability company with a

principal place of business at 250 Park Avenue South, in New York County, New York.

Throughout the Relevant Period, Genesis Holdco wholly owned Genesis Capital and Genesis

Asia Pacific.

25.     The Genesis Entities operated as a single entity during the Relevant Period.  They

shared officers, capital, offices, IT infrastructure, and back-office functions.

26.     Genesis Holdco and Genesis Capital had no independent board of directors until

after June 30, 2022.  Instead, non-party Genesis Global Trading, Inc.'s ("Genesis Trading")

board of directors heard matters pertaining to Genesis Holdco and Genesis Capital through at

least June 30, 2022.

27.     On January 19, 2023, the Genesis Entities filed for bankruptcy in the United

States District Court for the Southern District of New York.

28.     Defendant Moro served as the CEO or its functional equivalent of the Genesis

Entities, as well as their non-party affiliates, from at least February 2, 2021, through August 17,

2022.  For the same period, Moro also served on Genesis Trading's board of directors, which

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 46 of 1132

served as the *de facto* board of directors for Genesis Holdco through at least June 30, 2022.

Throughout the Relevant Period, Moro worked from and resided in the State of New York.

29.     Defendant DCG is a Delaware corporation doing business in the State of New

York.  DCG maintains an office at 262 Harbor Drive, Stamford, CT 06902.  DCG wholly owns

the Genesis Entities.  During the Relevant Period, DCG's officers also worked from the Genesis

Entities' office at 250 Park Avenue South, in New York County, New York.

30.     Silbert was the CEO, founder, and a beneficial owner of DCG at all times during

the Relevant Period.  Silbert was one of three members of DCG's board of directors during the

Relevant Period.  Officers at DCG reported directly to Silbert.  Silbert is also the single-largest

shareholder of DCG.  During the Relevant Period, Silbert worked from DCG's offices in

Connecticut, as well as from Genesis's offices at 250 Park Avenue South, in New York County,

New York.  Silbert founded the Genesis Entities and served on Genesis Trading's board of

directors from its founding until June 22, 2022.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action, personal

jurisdiction over the Defendants, and authority to grant the relief requested pursuant to the

Martin Act and Executive Law § 63(12).

32.     Pursuant to CPLR § 503, venue is proper in New York County because Plaintiff is

located in New York County, with its address at 28 Liberty Street, in the County and State of

New York, and because a substantial part of the conduct, events, or omissions giving rise to the

claims occurred in New York County.  Additionally, Gemini, DCG, and the Genesis Entities are

either domestic or foreign entities that transacted or were authorized to transact business in the

state or maintained a principal office in New York County. Similarly, Defendants Moro and

Silbert transacted business at 250 Park Avenue South, in New York County, New York.

## FACTUAL ALLEGATIONS

**I.    Background Information**

### A.  Gemini Held Itself Out as a Cryptocurrency Exchange Throughout the Relevant Period

33.    Throughout the Relevant Period, Gemini held itself out to the public as a New

York cryptocurrency exchange that facilitated the buying, selling, exchange, and storage of

cryptocurrencies.

34.    Gemini offered securities to the public, in the form of the Earn investment

product.

### B.  DCG Owns and Operates the Genesis Entities

35.    Defendant DCG owns and operates cryptocurrency businesses.

36.    DCG marketed the Genesis Entities and non-party Genesis Trading collectively as

a premier institutional cryptocurrency and financial services company. DCG marketed Genesis

Capital as its leading lending desk with billions of dollars in cryptocurrency loan originations.

37.    During the Relevant Period, DCG controlled the Genesis Entities' key hiring

decisions, business strategy, and budget. DCG and the Genesis Entities also shared IT

infrastructure and DCG had direct access to the Genesis Entities' books and records. Members

of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat

on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the

Genesis Entities' lending business.

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 48 of 1132

C.  **The Genesis Entities Maintained a Consolidated Lending Book**

38.     Genesis Capital lent cryptocurrency and fiat currency to institutions and high-net-worth clients.  Genesis Capital funded these loans by receiving financing from third parties, including the Earn investors.

39.     Genesis Capital profited by making money on the difference between the interest it paid to borrow fiat currency and cryptocurrency and the interest it received from lending the same assets to institutional and high-net-worth clients.

40.     Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund Three Arrows, on behalf of Genesis Capital.  Genesis Capital provided virtually all of Genesis Asia Pacific's lending capital.  Genesis Asia Pacific, in turn, repaid Genesis Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific.  Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.

41.     Genesis Capital and Genesis Asia Pacific maintained separate financial statements, including separate balance sheets.

II.    **Gemini and Genesis Capital Operated Earn as an Investment Contract**

42.     On February 2, 2021, DCG subsidiary CoinDesk published a news story announcing that Gemini and Genesis Capital had partnered to launch Earn.  The news article stated: "Gemini, the crypto exchange and custodian, is allowing its customers to earn up to 7.4% annual percentage yield (APY) on their holdings through a partnership with crypto lender Genesis [Capital]."

43.     To invest in Earn, investors first had to buy or hold cryptocurrency on Gemini's cryptocurrency platform.  Gemini induced investors to purchase assets on its cryptocurrency platform to invest in Earn.  For example, beginning in March 2021, Gemini emailed its

customers to advertise a new feature allowing users "to buy and transfer [cryptocurrency]
directly into [Earn]" with a single mouse click. Gemini earned commissions on those purchases.

44.     Gemini published a list of the cryptocurrencies eligible for Earn on its webpage.
The list included bitcoin, ether, and Gemini dollar.

45.     Gemini selected Genesis Capital as the sole "approved borrower" to receive
investors' assets under Earn.

46.     Gemini and Genesis Capital required Earn investors to enter into a "Master
Digital Asset Loan Agreement" with Gemini (as "custodian" and the "agent" of the investor) and
Genesis Capital (herein the "Earn Master Agreement").

47.     The Earn Master Agreement set forth terms concerning the transfer and return of
cryptocurrencies and the payment of fees.  The Earn Master Agreement also contained
representations and warranties, including a warranty that the parties were not insolvent.

48.     When investors elected to invest in Earn, Gemini pooled their assets in a wallet
with other investors' assets and transferred them to Genesis Capital's wallets on Gemini's
platform.  Genesis Capital, in turn transferred these assets from Gemini's platform into its
external accounts and wallets, where the assets were pooled and commingled with Genesis
Capital's other assets.  Genesis Capital then used these pooled assets in its lending business.
Genesis Capital accounted for these cryptocurrencies in combined categories on its balance
sheets and financial statements, including in the balance sheet category "[i]nvestments in digital
currencies and trusts."

49.     When Earn investors withdrew their assets, Genesis Capital had five days from
the date of the withdrawal request to return the investor's assets, along with the yield promised to

the investor.  For its services in Earn, Gemini received an agent fee, which was deducted from the Earn investors' assets and yield.

50.     As a large institutional lender in the cryptocurrency industry, Genesis Capital negotiated more favorable loan terms and interest rates with borrowers than Earn investors could negotiate on their own.  Genesis Capital paid yield to the Earn investors from the interest it earned on its loans to third parties. Thus, the Earn investors' fortunes were tied to the effort and expertise of Genesis Capital, and the investors shared in the profits made by Genesis Capital.

51.     During the Relevant Period, Gemini devoted a page on its website to Earn (the "Earn Page").  On the Earn Page, Gemini advised investors to "[m]ake your crypto work for you," advertised that Earn investors would "receive up to 8.05% [previously 7.4%] on the cryptocurrency you custody with Gemini," and claimed that "[u]nlike other opportunities to earn interest on your cryptocurrency, [with Earn] you can redeem your cryptocurrency at any time, with no penalties, and receive it at its current market value—plus the interest you've earned!" The Earn Page referred to Earn as a "yield-generating cryptocurrency investment."

52.     The yield paid to Earn investors fluctuated.  On a monthly basis, Genesis Capital determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to pay for each type of asset. After determining its agent fees, Gemini published the yield rates for different assets on the Earn Page.  On February 1, 2021, the Earn Page set forth yield rates that Earn investors would receive on their invested cryptocurrencies as follows:

13

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 51 of 1132

## Interest Rates

| Asset | APY | Asset | APY | Asset | APY |
|---|---|---|---|---|---|
| Aave — AAVE | 5.83% | Amp — AMP | 1.98% | Balancer — BAL | 1.54% |
| Basic Attention Token — BAT | 3.49% | Bitcoin Cash — BCH | 4.55% | Bitcoin — BTC | 3.05% |
| Compound — COMP | 2.47% | Curve — CRV | 1.98% | Dai — DAI | 4.16% |
| Ether — ETH | 3.05% | Filecoin — FIL | 7.40% | Kyber Network — KNC | 2.58% |
| Chainlink — LINK | 4.46% | Litecoin — LTC | 5.10% | Decentraland — MANA | 1.80% |
| Maker — MKR | 1.98% | Orchid — OXT | 2.47% | PAX Gold — PAXG | 3.92% |
| Ren — REN | 2.71% | Synthetix — SNX | 2.69% | Storj — STORJ | 1.98% |
| Uma — UMA | 2.69% | Uniswap — UNI | 3.59% | Yearn.finance — YFI | 3.29% |
| Zcash — ZEC | 2.25% | 0x — ZRX | 3.68% | | |

53.     These rates frequently changed.  For example, an Earn investor who invested one bitcoin at the start of Earn could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022.  On the Earn page, Gemini claimed the rates it offered were "more than 100x the average national interest rate, among the highest rates on the market."

54.     Gemini and Genesis Capital controlled the interest rates and cautioned their investors: "rates may increase or decrease in the future."

55.     From February 2, 2021, through November 16, 2022, Earn investors invested billions of dollars in cryptocurrencies in Genesis Capital.  By reason of these investments, Gemini earned more than $22 million in agent fees, plus more than $10 million in commissions when investors purchased cryptocurrency to invest in Earn.

14

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
RECEIVED NYSCEF: 10/19/2023
Pg 52 of 1132

### III. Gemini Scheme: Gemini Falsely Assured the Public That Earn Was a Low Risk, Highly Liquid Investment That Could Be Redeemed "At Any Time" and That Genesis Capital Was Creditworthy Based on Gemini's Ongoing Risk Monitoring

#### A. Gemini Built Its Brand and That of Earn on Trust, Confidence, and Fiduciary Obligations

56.     During the Relevant Period, Gemini marketed itself as a trust company "that is held to the highest level of fiduciary obligations." Gemini published this claim on its LinkedIn, Facebook, and other social media pages throughout 2021 and 2022.

57.     Gemini has long sought to differentiate itself from other cryptocurrency companies by claiming to embrace legal regulation and encouraging its customers to place a heightened degree of trust and confidence in Gemini and its products. In January 2019, Gemini's head of marketing told the Wall Street Journal: "[w]e [at Gemini] believe that investors coming into cryptocurrency deserve the exact same protections as investors in more traditional markets, adhering to the same standards, practices, regulations and compliance protocols."

58.     In a September 2019 statement, Gemini co-founder Tyler Winklevoss stated, "Gemini's philosophy of asking for permission, not forgiveness, is a first in the crypto industry." That year, Gemini published advertisements in the New York Times, at New York subway stops, and on New York City taxis, declaring: "The Revolution Needs Rules" and "Crypto Without Chaos."

59.     Also in September 2019, Tyler Winklevoss informed customers in a blog post that Gemini "strive[d] to always … put the interests of our customers ahead of our own and provide proper disclosures and transparency."

60.     Throughout 2021 and 2022, the concepts of "trust" and adherence to its "fiduciary obligations" were central to Gemini's marketing. Gemini's website advertised that it was a "fiduciary," "[t]he most trusted crypto-native finance platform," and that it "worked hard to

provide [customers] with a high-integrity choice and … look[ed] forward to earning and maintaining your trust."

61.     Gemini also owed its customers fiduciary obligations under the New York Banking Law.  During the Relevant Period, Gemini stated in its user agreement that it is "a fiduciary under § 100 of the New York Banking Law… and a custodian that is licensed to custody [its customers'] Digital Assets in trust on [its customers'] behalf."

62.     Gemini deployed this trust-based branding in its promotion of Earn.  In August 2021, Gemini published a blog post announcing that "more than $3 billion in loans [have been] originated through [Earn]" and that "[i]nstilling trust in our products is central to Gemini's ethos, and crossing this milestone is indicative of the confidence our customers have in our business."

63.     On September 22, 2022, Gemini's President Cameron Winklevoss conducted an "Ask Me Anything" (or "AMA") on Reddit, a social media platform, where he encouraged the public to ask questions and get real-time answers about Gemini's products.  During that AMA, one Reddit user asked Winklevoss: "Can you please talk more about partnering with Genesis? There is still so much fear to get back to [Earn]."  Winklevoss responded:

> We selected Genesis as a partner due to their experience in managing a large loan portfolio and reputation for compliance. Since we launched Earn in Jan 2021, Genesis has never failed to return assets when Gemini customers called back their loans. This was the case even when the broader market was experiencing liquidity issues earlier this year. That said, loaning your assets always carries some risk, and we encourage you to review the Master Loan Agreement to understand your rights as a lender. ***We have always and will continue to prioritize risk management and disclosure as key pillars of our business.***

(emphasis added).

64.     On November 11, 2022—just five days before Genesis Capital suspended redemptions leaving Earn investors unable to withdraw their cryptocurrencies—Cameron and Tyler Winklevoss shared a blog post on Gemini's website that repeated "Gemini Is Built on

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 54 of 1132

Trust, Safety, and Compliance: Ask For Permission, Not For Forgiveness." That blog post

assured investors:

> [s]ince its inception eight years ago, Gemini has worked with regulatory
> stakeholders and lawmakers to help shape thoughtful regulation that fosters both
> consumer protection and innovation. We will continue to do this work. We have
> spent considerable time applying for and becoming licensed and regulated in
> various jurisdictions across the world. This is not the easier path (it is expensive
> and time consuming) but we believe it is the right one.

65.     As a fiduciary, Gemini had an affirmative duty to disclose material information to

its customers concerning Earn and Genesis Capital.

**B.      Gemini Falsely Assured Its Customers That Investing in Earn Was Liquid and That
Genesis Capital Was a Trusted and Accredited Counterparty**

66.     From February 9, 2021, through at least November 14, 2022, Gemini referred to

Genesis Capital on the Earn Page as a "trusted partner[]" and "accredited third party borrower[]"

that Gemini "vetted through a risk management framework which reviews [Genesis Capital's]

collateralization management process." Throughout the same period, Gemini assured investors

on the Earn Page that "on a periodic basis [Gemini] will conduct analysis of [Genesis Capital's]

cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and

healthy financial condition of [Genesis Capital]" and that Genesis Capital was required to "return

[Earn investors'] funds [to Earn investors] within five business days" of an investor's withdrawal

request.

67.     In mass marketing emails sent to Gemini customers in and after February 2021,

Gemini repeated the quote set forth in the preceding paragraph.

68.     Because Gemini promised Earn investors the ability to redeem their investments

and profit "at any time," Genesis Capital needed to carefully manage its liquidity, loan book

asset durations, and financial condition. Thus, Genesis Capital agreed to share quarterly its

financial statements and information about its collateral management process with Gemini.

17

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 55 of 1132
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

Gemini used this information to conduct ongoing due diligence and to monitor Genesis Capital's financial condition on behalf, and as an agent, of the Earn investors.

69.    Gemini had authority to terminate Earn or demand the withdrawal of all assets on behalf of the investors at any time.

70.    Gemini's public assurances to Earn investors concerning Genesis Capital and Earn were contradicted by Gemini's internal risk assessments. These assurances were, therefore, false, misleading, and contained material omissions.

### C. Gemini Falsely Assured the Public that Genesis Capital's Loan Book Was Overcollateralized

71.    On February 2, 2021, Gemini's Head of Risk stated in a press release that, "Gemini reviewed Genesis [Capital's] financial statements and verified that the lender's loans are overcollateralized." Overcollateralization means the collateral supporting outstanding loans is worth more than 100% of those loans. This press release, and Gemini's statement, remained accessible on the internet throughout the Relevant Period.

72.    Gemini made similar claims directly to investors. For example, on March 5, 2021, a business development employee at Gemini responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."

73.    Contrary to Gemini's claim, Genesis Capital's loan book was not overcollateralized, either when Gemini claimed it was or at any time thereafter. The below chart shows the approximate collateral coverage ratio for each financial quarter:

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

74. Gemini internally acknowledged this misrepresentation. On March 9, 2021, a risk management employee reporting directly to Gemini's Head of Risk corrected a similar misstatement by stating: "[l]ending is 'collateralized' but not necessarily 'overcollateralized'." However, the false statement was never corrected, and the February 2, 2021 article by CoinDesk, a DCG subsidiary, containing the misstatement remained accessible to Earn investors and the public throughout the Relevant Period.

**D. Gemini's Risk Analyses Revealed Genesis Capital Had Inappropriate Risk Ratios, Was a "Junk" Grade Investment, and Was Neither Trusted Nor Accredited**

75. Contrary to Gemini's claims, Earn investors faced a high risk that Genesis Capital would default.

76. Shortly after the launch of Earn, Gemini's internal risk analysis of Genesis Capital revealed concerns regarding Genesis Capital's liquidity and financial ratios. In a confidential internal document dated May 14, 2021, Gemini's risk management team determined that Genesis Capital was "highly leveraged, with over 95% debt to asset ratio" and the "majority of [Genesis Capital's] assets are from debts." The risk management team also determined "Genesis [Capital]… has low liquidity. The business is just able to cover its short-term obligations." Further, Gemini's risk management team stated that while "Genesis [Capital] ha[d] cash inflows in 2020," those inflows were "mainly from financing activities [*i.e.*, borrowing]" and its 2020 "[c]ash flow from operating activities [was] negative." Gemini further concluded that Genesis posed a higher risk than other potential partners that Gemini considered for Earn.

77. By May 2021, Earn investors had already placed more than $2 billion in assets into the program. By August 2021, that number increased to $3 billion.

1.  **Gemini Secretly Rated Genesis Capital as "Junk"**

78.     Around February 2022, Gemini's risk management team analyzed Genesis

Capital's financial statements for the third quarter of 2021.  They stated that "[c]ompared with

peers and the overall market, Genesis[] [Capital's] financials are generally weaker with a high

leverage ratio and low liquidity ratio, similar to companies with CCC/C rating" (also known as a

"junk" rating).  Based on this credit rating, the risk management team projected that in a market

downturn, "a 50-60% default rate for Genesis [Capital] [wa]s an appropriate assumption, given

additional risks in Crypto industry vs traditional industry."

79.     Gemini's risk management team repeated this same language in several

documents presented to the head of Gemini's market risk team between February 2022 and July

2022.

80.     Gemini's CCC rating estimate reflected a marked decline in Genesis Capital's

financial condition; before the launch of Earn, Gemini had analyzed Genesis Capital's 2019

financial statements and estimated that Genesis Capital was a "moderate risk" and comparable to

companies with a "BBB" (*i.e.*, investment grade) credit rating.

81.     According to Fitch Ratings, any credit rating below "BBB" is "speculative grade"

and not "investment grade."  A "CCC" issuer rating indicates a "[s]ubstantial credit risk" with

"[v]ery low margin for safety" and for whom "[d]efault is a real possibility."

82.     Because of the risks posed by Genesis Capital's default, beginning in May 2022,

Gemini's management team, including its President, Cameron Winklevoss, began privately

discussing whether to terminate Earn.  In May 2022, Winklevoss requested "a 1-pager on the risk

profile of [Earn] and Genesis [Capital]" to understand whether Earn "adequately compensates

[Gemini] for the risk."  That one-pager, dated June 6, 2022, reiterated the projected 50-60%

default rate for CCC companies in the event of a market downturn and predicted a potential loss

in the hundreds of millions of dollars based on that default rate.

83.  Gemini continued discussing whether to terminate Earn through the summer of

2022.  On or around July 18, 2022, Gemini's risk management and product teams compiled a

slide titled "Gemini Earn: Risk vs. Reward."  Gemini's Associate Director of Risk and its

Command Pilot (or head) of NeoBanking (the business unit at Gemini managing Earn) reviewed

this document.

84.  In this document, Gemini acknowledged:

> [the market risk team] believes Genesis [Capital] financial [sic] is similar to a
> CCC company, which would be required to pay a 14%+ yield in the public debt
> market.  Therefore, lenders would require a *~14% yield* to compensate for
> Genesis [Capital]'s default risk.

(emphasis in original).

85.  The same document also indicated that Genesis Capital could lose up to $1.4

billion from a single borrower's default.

86.  Rather than disclose the risk to Earn investors so that they could take steps to

protect themselves, Gemini instead proposed using this information to protect itself.  In the same

document, Gemini's risk management team concluded Gemini was "not compensated enough" to

assume Genesis Capital's risk of default, and that Gemini should accordingly "[w]eaken the

connection between Earn and Gemini" by changing Earn's branding, or "[e]ducate clients on the

potential losses" to "properly set clients' expectations."  Gemini's risk management team

proposed these solutions to "[r]educe [the] reputational risk [to Gemini] arising from a Genesis

default."

87.  On or around July 28, 2022, Gemini's Board of Managers met to discuss how to

close "the disconnect between the risk profile the program has been designed for—as an agent,

Gemini is not liable for losses in case of Genesis default—and the expectation of having to make a hard choice in case of Genesis becoming insolvent." According to a document prepared for this meeting, "[o]ne option [to close that disconnect] [wa]s to judge the disconnect inherently unfixable and proceed with an orderly shutdown of Gemini Earn."

88. During this meeting, Gemini's Board of Managers, Cameron Winklevoss, and Tyler Winklevoss discussed the credit and liquidity risks associated with Genesis Capital and Earn. Gemini's Associate Director of Risk and its Command Pilot of NeoBanking presented to the Board during that meeting regarding Genesis Capital's credit and liquidity risks.

89. During that meeting, several board members expressed doubts about Genesis Capital's creditworthiness. Cameron Winklevoss began the meeting by noting that Genesis Capital's "[b]orrowers [were] lying about their financials" and asked, "can we trust that 'A players' are running Genesis and are going to make good decisions/avoid getting duped?" One board member compared Genesis Capital's debt-to-equity ratio to that of Lehman Brothers prior to its collapse and said, "[i]f the market sneezes, you're in the same situation again." A board member also questioned whether Genesis Capital had misrepresented information to Gemini about its largest borrower at the time, Alameda.

90. Immediately after this discussion, the Board of Managers and the Winklevosses discussed whether to wind down Earn to avoid reputational damage from Genesis Capital's default. Between this meeting and when the Earn program was terminated, Gemini gave Genesis Capital an additional hundreds of millions of dollars' worth of investor assets.

**2. Gemini Received Risk Reports From Genesis Capital That Showed Continued Deterioration**

91. In addition to Genesis Capital's financial statements, Genesis Capital also gave Gemini risk reports indicating that Genesis Capital's credit risk grew from May 1, 2022. In May

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 10/19/2023
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 60 of 1132

2022, Genesis Capital provided Gemini with weekly Credit Portfolio Metrics reports regarding its key risk metrics, such as the percentage of Genesis Capital's loans secured by collateral. Each metric had a threshold that indicated Genesis Capital's ordinary risk tolerance.

92.    From May 1, 2022, through November 16, 2022, Gemini observed that Genesis Capital routinely exceeded these thresholds for several key risk metrics.

93.    Genesis Capital's excesses of key risk metric thresholds grew more frequent and consistent as this period continued. From August 16, 2022, through November 16, 2022, Genesis Capital exceeded at least two—and as many as five—key risk metric thresholds out of nine threshold-bearing metrics in every report it provided to Gemini.

94.    Genesis Capital's consistent failures to manage its key risk metrics demonstrated—or should have demonstrated—to Gemini that Genesis Capital's collateralization management process was failing and that Genesis Capital took inadequate steps to reduce risk.

### 3. Gemini Failed to Disclose to Earn Investors Overconcentration in Genesis Capital's Loan Book

#### i. Overconcentration in Alameda

95.    On July 6, 2022, Genesis Capital began to provide reports to Gemini regarding additional risk metrics. From July 6, 2022, through August 16, 2022, these reports showed that Genesis Capital's loans were heavily concentrated in a single counterparty, cryptocurrency trading firm Alameda, which was the borrower for nearly 60% of all outstanding loans from Genesis Capital to unaffiliated counterparties (*i.e.*, excluding loans to DCG and its affiliates). Further, Genesis Capital's loans to Alameda were mostly secured with FTT tokens issued by

Alameda's affiliate, cryptocurrency platform FTX Trading, Ltd.  This counterparty concentration and poor-quality collateral created a risk of massive losses if Alameda defaulted.

96.     On August 8, 2022, Cameron Winklevoss spoke to Genesis Capital's Managing Director No. 1 regarding Gemini's concerns about Genesis Capital's risk management practices. During that conversation, Winklevoss said that unless DCG itself guaranteed repayment of the Earn investments, Gemini would wind down Earn.  Gemini never informed Earn investors of these actions.  Nor did Gemini ever receive a guarantee from DCG.

97.     On August 16, 2022, Genesis Capital recalled nearly $2 billion in loans to Alameda.  However, Gemini's risk assessments showed that Genesis Capital's risk ratios remained above Genesis Capital's own tolerance levels even after recalling these loans.

### ii.     Overconcentration in Related Parties

98.     Without Alameda, Genesis Capital's loan book was overconcentrated in loans to related parties like DCG.

99.     From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.

100.    Gemini failed to disclose any of these material facts to Earn investors.

### E.  Gemini Misled Investors Who Expressed Concern About Earn

101.    From February 2021 through at least November 14, 2022, Gemini never adjusted, amended, or corrected its representations about the Earn investment program, the quality of its "trusted" and "accredited" partner or the fulsomeness of its own risk management processes.  In

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023

RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 62 of 1132

fact, Gemini repeated these misrepresentations directly to Earn investors when they were at their

most vulnerable.

102.    June 2022 marked a period of rapid deterioration and instability in the crypto

markets, with the collapse of TerraUSD and Luna causing losses at Three Arrows and other

cryptocurrency companies.

103.    On June 16, 2022, one retail Earn investor asked Gemini via email whether "any

of [the Earn investor's] funds have been placed with [Three Arrows.  If so, are [the investor's]

funds in jeopardy?"  Gemini responded:

> Your funds in Earn are not insured by Gemini but are held with our trusted
> partners. Our partners are vetted through our risk management framework and
> always disclosed to you, so you know which institution has borrowed your funds.
> Currently, Gemini is partnering with accredited third party borrower Genesis.
>
> …. All loans are open-term and callable, and the customer's experience is
> seamless with Gemini's platform, allowing quick access to earn interest and
> redeem funds.

104.    Likewise, on June 27, 2022, one retail Earn investor wrote to Gemini: "[w]ith the

layoffs and what is happening with other exchanges like Celsius and Blockfi I am concerned

about Gemini.  Does Gemini have any similar vulnerabilities?"  Gemini responded in part: "We

founded Gemini with a security-first mentality and ethos of asking for permission, not

forgiveness. We have worked hard to provide you with a high-integrity choice and we look

forward to earning and maintaining your trust."

105.    When this Earn investor asked about "liquidity vulnerabilities" and "risky

investments/loans that would risk my assets or cause Gemini to halt withdrawals" for Earn,

Gemini responded:

> Gemini is partnering with accredited third party borrowers including Genesis,
> who are vetted through a risk management framework which reviews our
> partners' collateralization management process. On a periodic basis we will

> conduct an analysis of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners. We will notify you when interest payments hit your account, and you can then check balances in real time. Gemini will continue to add high-quality partners in order to ensure competitive rates and allow you to diversify your borrowers.

Two days later, this investor made an additional $1,000 ACH transfer into his Gemini account.

106.    Similarly, on July 24, 2022, another retail Earn investor asked Gemini in an email whether it was "involved with any of the drama surrounding [Three Arrows]," and more specifically, how events surrounding Three Arrows impacted Genesis Capital and Earn investors. A Gemini customer service representative responded, "we are not involved in anything regarding [Three Arrows]" and followed up with:

> Genesis [is] vetted through a risk management framework which reviews our partners' collateralization management process. On a periodic basis we will conduct an analysis of our partner's cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners.

107.    After the same investor requested additional details, Gemini's customer service representative responded: "all of Gemini's business operations continue to function normally, including Earn. Unfortunately, I do not have any more information at this time."

108.    Through these statements, Gemini assured investors that it was safe to invest their cryptocurrencies in Genesis Capital through Earn.

109.    During this same period, Gemini risk management personnel withdrew their own investments from Earn. A Gemini Senior Risk Associate working on Earn withdrew his entire remaining Earn investment—totaling over $4,000—between June 26, 2022, and September 5, 2022.

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
RECEIVED NYSCEF: 10/19/2023
Pg 64 of 1132

110.    Likewise, Gemini's Chief Operations Officer, who also sat on Gemini's Enterprise Risk Management Committee, withdrew his entire remaining Earn investment— totaling more than $100,000—on June 16 and June 17, 2022.

**F.  Gemini Secretly Sought to Terminate Earn in October 2023 While Continuing to Induce Investments in Earn from the Public and Continuing to Turn Over Investor Assets to Genesis Capital**

111.    On September 2, 2022, Gemini's leadership, including Cameron and Tyler Winklevoss, decided to terminate Earn due to the reputational risk that Gemini would suffer if Genesis Capital defaulted.  On October 13, 2022, Gemini sent a confidential formal written notice to Genesis Capital terminating all Earn Agreements on behalf of Earn investors and demanding the return of all Earn investors' assets.  Gemini did not announce this decision to the Earn investors and instead kept soliciting investor assets.

112.    On October 20, 2022, DCG's CEO, Silbert, met with Gemini's president Cameron Winklevoss.  During that meeting, according to internal DCG documents, Silbert informed Winklevoss that Gemini was Genesis Capital's largest and most important source of capital and that Genesis Capital could not redeem Earn investors' funds without Genesis Capital declaring bankruptcy.

113.    Gemini secretly granted Genesis Capital multiple extensions to return investor funds.

114.    Even after Gemini privately demanded the return of investor funds on October 13, 2022, it transferred tens of millions of dollars' worth of Earn investors' assets to Genesis Capital.

115.    Neither Gemini nor Genesis Capital disclosed to Earn investors the termination notice, the extensions of the redemption date, or the risk that Genesis Capital would go into bankruptcy.  These were material facts for investors.

IV.     **DCG Scheme: The Genesis Entities, DCG, Moro and Silbert Concealed a $1 Billion Loss From Earn Investors**

116.    The Earn investors were also the victims of a separate scheme perpetrated by the Genesis Entities, DCG, and their respective CEOs Moro and Silbert to conceal more than $1 billion in losses at Genesis Capital.

A.  **The Genesis Entities Suffer Around $1.1 Billion in Losses**

117.    In the days leading up to June 13, 2022, Three Arrows was the Genesis Entities' second-largest borrower. Although Three Arrows nominally borrowed from Genesis Asia Pacific, Genesis Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to Three Arrows. Genesis Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific. Three Arrows paid between 8-15% interest on these loans.

118.    When Genesis Capital funded these loans, it categorized them as "receivables from related parties" on its balance sheet, which reflected the amount that Genesis Capital gave to Genesis Asia Pacific to lend to Three Arrows. Genesis Asia Pacific repaid Genesis Capital around the same time that Three Arrows repaid its loans to Genesis Asia Pacific. For its part, Genesis Asia Pacific recorded the amounts it owed to Genesis Capital in connection with these loans as "current liabilities" on its balance sheet—*i.e.*, liabilities payable within one year.

119.    Neither Gemini nor Genesis Capital informed Earn investors that their assets were being passed to Genesis Asia Pacific. Indeed, Gemini did not conduct ongoing diligence into Genesis Asia Pacific, and did not receive Genesis Asia Pacific's financial statements on a quarterly basis.

120.    Genesis Capital and Genesis Asia Pacific failed to conduct adequate due diligence on Three Arrows. Contrary to assurances to Gemini on February 18, 2022, that Genesis Capital reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence,"

neither Genesis Capital nor Genesis Asia Pacific had received audited financial statements from

Three Arrows since July 2020.  Genesis Capital and Genesis Asia Pacific also accepted from

Three Arrows illiquid collateral to secure more than $500 million in loans.

121.     On June 13, 2022, Three Arrows defaulted on billions in loans from Genesis Asia

Pacific.  As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business

generally) incurred a loss of approximately $1 billion in open-term, on-demand assets.  Around

the same time as Three Arrows' default, Genesis Capital also incurred more than $100 million in

losses arising from the default of another borrower, Babel Finance.

122.     The losses from Three Arrows and Babel created negative equity value at the

Genesis Entities and created a deficit in the open-term assets available to repay Earn investors.

Genesis Capital's internal documents stated that these losses opened a $1.1 billion structural hole

in Genesis Capital's loan book.

**B.  The Genesis Entities, DCG, Moro and Silbert Plug the Structural Hole With Deceit
     and Misrepresent Genesis Capitals' Financial Condition to Counterparties**

123.     DCG and Genesis Capital engaged in a communications campaign designed to

conceal Genesis Capital's financial condition and mislead counterparties into believing Genesis

Capital was operating "business as usual."  Those counterparties included Gemini, which

conducted ongoing due diligence on behalf of the Earn investors.

124.     From June 13, 2022, through July 2022, DCG employees and executives

(including Silbert and DCG's Chief Operating Officer ("COO")) met with Genesis Capital's

leadership daily, often multiple times a day.  During these meetings, DCG and Genesis Capital

employees discussed how to communicate with counterparties about Three Arrows, and how to

bolster the Genesis Entities' financial condition in the wake of these losses.  During the same

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document

period, DCG's COO and DCG's Head of Communications helped draft talking points documents for use by DCG and Genesis Capital personnel in conversations with counterparties.

125.    On June 13, 2022, Silbert directed Moro and Genesis Capital's COO to lead the company's response to the Three Arrows' situation "with support and guidance from DCG."

126.    On June 13, 2022, Silbert reported to DCG's board that Three Arrows defaulted and that Genesis Capital's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well over $500 mm now)." Silbert went on to explain that some of the collateral provided by Three Arrows was illiquid as it consisted of shares of the Grayscale Bitcoin Trust ("GBTC") issued by DCG-subsidiary Grayscale Investments, LLC, which Genesis Capital could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert reported to DCG's board that Genesis Capital was preparing for a bank run, and that DCG would seek additional financing both for itself and Genesis. In Silbert's words: "Everything needs to be on the table" regarding financing.

127.    Then, on June 14, 2022, Silbert, on behalf of DCG's board, instructed Moro and Genesis "to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."

128.    Also on June 14, 2022, Silbert reported to DCG's board of directors regarding Genesis Capital's strategy after Three Arrows' default. In doing so, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Capital with additional capital to strengthen its balance sheet.

129.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis Entities tweeted via their shared Twitter account:



Genesis @GenesisTrading · Jun 15, 2022  ...
Despite continued heightened market volatility, the Genesis balance sheet is strong and our business is operating normally. Our lending business continues to meet client demand. Our trading business remains an essential liquidity provider in the spot and derivatives markets.

💬 19    ↺ 38    ♡ 232

130.    Silbert and DCG both re-tweeted this statement on June 15, 2022.

131.    Indeed, that same day, Silbert wrote to Moro and other Genesis Capital personnel in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this mess…. we need to continue to perpetuate that of course."  In other words, Silbert directed Genesis Capital personnel to perpetuate the idea that, within the cryptocurrency industry, Genesis Capital was akin to highly stable "blue chip" companies.

132.    Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:



Michael Moro @michaelmoro · Jun 17, 2022  ...
3/Genesis can confirm that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week. No client funds are impacted. We sold and/or hedged all of the liquid collateral on hand to minimize any downside.

💬 10    ↺ 114    ♡ 520

Michael Moro @michaelmoro · Jun 17, 2022  ...
4/We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.

💬 9    ↺ 36    ♡ 414

133.    DCG's COO reviewed and edited these tweets before Moro posted them.  In strategizing the release of the tweets, DCG's COO directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account.  The Genesis Entities reposted Moro's tweets that same day.

31

134.    Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 stated, "Genesis remains solvent and operates [business as usual] at the moment.  With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations."  In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."

135.    After the call with Gemini, Silbert and DCG's COO were updated that same day that Gemini "asked hard [questions] about [Three Arrows]," but that Managing Director No. 1 "fended it off."

136.    Gemini continued to send Genesis Capital additional investor funds after June 17, 2022.

137.    The tweets and statements to Gemini set forth above were false and misleading in at least five ways.

138.    First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Capital's ability to repay its counterparties, including Earn investors.

139.    Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity.  Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."  Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

23-10063-shl   Doc 1367   Filed 02/23/24   Entered 02/23/24 13:28:26   Main Document
Pg 70 of 1132

140.    Third, the tweets discussed the sale or hedging of all "liquid" collateral while
concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid
collateral that could not be sold and was not hedged.

141.    Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17,
2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible
asset on its balance sheet.

142.    Fifth, Genesis Capital was not operating "business as usual"; the business was
seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the
origination of new loans and started shrinking its loan book.

143.    On June 27, 2022, Genesis Capital's then CEO, Moro, emailed DCG and Genesis
Capital executives, explaining the need to show a "well-capitalized" balance sheet to
counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve.
> I think we'll find people to lend us additional [cryptocurrency] with a well-
> capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [Three Arrows] and potentially Babel will
> become public.  But if we're able to show our balance sheet after all of that
> happened and it still looks strong, I think that 1) people will care less about the
> losses and 2) we'll be better able to operate from a place of strength going
> forward.
>
> But as I told Barry this evening, we have a lot of work to do before we can get
> back to full-steam-ahead on lending.  Better to think of it in wind-down mode for
> the time being, and just manage liquidity as loans roll off. Then we can look to
> rebuild.

144.    The next day, in a June 28, 2022 email, Moro wrote to Silbert that he had
discussed with other Genesis Capital representatives how to "best fill the equity hole",
euphemistically referring to the Genesis Entities' negative equity value caused by the more than
$1 billion in losses.  Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number

one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

145.    At this time, the Earn investors were one of Genesis Capital's largest sources of unsecured funding.

146.    Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.

147.    On June 30, 2022, Moro and Silbert entered into the $1.1 billion Promissory Note. Under the Promissory Note, DCG agreed to pay Genesis Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Capital would have otherwise received from Genesis Asia Pacific for the Three Arrows loans. Genesis Capital categorized this $1.1 billion as an asset on its balance sheet.

148.    Silbert signed the Promissory Note as CEO of DCG.

149.    Moro signed the Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 72 of 1132

150.    DCG dictated the terms of the Promissory Note, including the ten-year duration

and 1% interest rate.  DCG provided no collateral to secure its obligations under the Promissory

Note.  To the contrary, DCG's repayment of the Promissory Note was subordinate to DCG's

repayment of an over $350 million credit facility to unrelated third parties.  DCG's pre-existing

$350 million obligation reduced the likelihood that DCG could repay the Promissory Note.

151.    On July 6, 2022, in reference to Three Arrows, Moro tweeted:



152.    DCG's COO and Head of Communications edited and helped draft these tweets.

Silbert reviewed these tweets before Moro posted them.

153.    The tweets were false, misleading, and omitted material facts.  DCG did not

simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be

called at any time; it *replaced* that liability with an illiquid ten-year Promissory Note.

154.    The Promissory Note failed to ensure that Genesis Capital had sufficient capital to

operate its business.  The Promissory Note required DCG to provide cash payments in no sooner

than 10 years, whereas the Three Arrows-related liabilities DCG purportedly "assumed" were

callable on demand; this created a mismatch between the Promissory Note and Genesis Capital's

billions of dollars' worth of on-demand obligations to Earn users. Genesis Capital's and DCG's

35

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 73 of 1132

internal documents reveal that the Promissory Note's ten-year duration and 1% interest rate

failed to address the "structural hole" caused by the Three Arrows losses.  In an internal

document, Genesis Capital's Chief Risk Officer acknowledged that the Promissory Note "wreaks

havoc on our balance sheet impacting everything we do."

155.    Earn investors reviewed Moro's July 6, 2022 tweets and determined them to be

material.  Indeed, some Earn investors emailed Gemini customer service representatives asking

about Genesis Capital's financial condition in the wake of Three Arrows; in response, Gemini

"encourage[d] [these investors] to take a look at Genesis's public statements [from July 2022] for

more detailed information on its exposure to" Three Arrows—*i.e.*, Moro's July 6, 2022 tweets.

Thereafter, these retail investors provided additional assets to Genesis Capital.  For example, one

of these retail investors invested more than $1,000 in Gemini Earn on July 20, 2022, shortly after

Gemini directed this investor to Moro's tweets.  This investor lost more than $10,000 in Gemini

Earn when Genesis Capital suspended withdrawals on November 16, 2022.

156.    Likewise, on July 13, 2022, Gemini observed in internal documents that "several

customers [using the social media website Reddit] were reassured by statements from Genesis re

[Three Arrows]."

157.    On July 6, 2022, Genesis Capital's Head of Communications and Public Relations

sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's

COO, DCG's Head of Communications, and various other senior employees at Genesis Capital

and DCG with instructions to "review and approve."  DCG's Head of Communications helped

draft these talking points.  DCG's COO also reviewed these talking points on July 6, 2022.

These talking points were to be used by Genesis Capital personnel in conversations with

counterparties, including Gemini.

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 74 of 1132

158.    These talking points did not provide any information regarding the Promissory

Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Capital's

losses.  Instead, the talking points included the misrepresentations that DCG "absorbed" the

losses, that Genesis Capital was "well capitalized," and that "DCG has assumed certain liabilities

of Genesis related to [Three Arrows] to ensure [Genesis Capital] ha[d] more than adequate

capital to operate and scale our business for the long-term."

159.    Relying on these talking points, on July 6, 2022, Genesis Entities' Co-Head of

Trading and Lending, Managing Director No.1, informed Gemini, both over the phone and in

writing, that the Three Arrows "[l]osses [were] predominantly absorbed by and netted against

DCG balance sheet" and that Genesis Capital remained "well-capitalized."  Genesis Capital

misled investors and omitted material facts regarding its financial condition during these

communications, including that Genesis Capital's balance sheet contained an illiquid $1.1 billion

Promissory Note.

160.    On July 18, 2022, DCG filed a bankruptcy claim against Three Arrows for more

than $1 billion.  The same day, DCG's COO instructed Managing Director No. 1 in writing to

"manage [G]emini and the other largest counterparties" because DCG was concerned that Earn

investors would withdraw their assets.  Thus, on July 18, 2022, Managing Director No.1 told

Gemini's risk personnel conducting due diligence for Earn investors: "There might be some

information relating to DCG's claim against [Three Arrows] that gets published today or

tomorrow. None of this is new information and all of our loses [sic] have already been absorbed

by DCG/realized on our balance sheet.…  All of the losses have already been reflected and are

with DCG."

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 75 of 1132

161.    Even after July 18, 2022, Gemini transferred hundreds of millions of dollars'

worth of investor assets to Genesis Capital under Earn.

162.    These statements on July 6 and 18, 2022, were false, misleading, and omitted

material information.  DCG did not "absorb" the Genesis Entities' losses.  The Promissory Note

concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-term

assets.  On July 7, 2022, Managing Director No. 1 described the issue to DCG's COO as follows:

> the issue is more structural … even though DCG took on liability from [Genesis
> Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the
> book down to nothing, the liquidity hole long-term = the $900 m2m loss on
> [Three Arrows] + the lack of liquidity on the GBTC collateral which is another
> $450mm, so structurally, we have about 1.345B we'd need to get in the form of
> long-term debt or equity to ultimately have enough liquid capital to wind
> everything down.

163.    In another communication dated July 22, 2022, Managing Director No. 1

explained to a high-level DCG employee that the Three Arrows losses created a "[d]uration

mismatch [at Genesis Capital] because we had [one billion] of open term assets with [Three

Arrows] which no longer exist and thus cannot be used to offset all of our open term liabilities"

including liabilities to the Earn investors.  Managing Director No. 1 continued to explain that

there was an additional "asset quality mismatch because $500 [million] of the collateral we

absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So both of these

things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an

organization."

164.    Further, the losses were not reflected on Genesis Capital's balance sheet—they

were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital

never provided to Gemini.

165.    On July 21, 2022, Genesis Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss." The same day, Genesis Capital's CFO also messaged Managing Director No. 1 and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."

166.    On July 21, 2022, Genesis Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points. Neither DCG nor Genesis Capital corrected any prior misstatements made to Gemini or the Earn investors.

167.    Genesis Capital's CFO objected to these false statements to further conceal Genesis Capital's financial condition. As Genesis Capital's CFO explained to Genesis Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."

168.    Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition. Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms. In a private message dated August 30, 2022, Genesis Capital's CFO confided to a colleague:

> We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot. It's putting the firm on the spot. That's what we have to convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."

169.    Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Capital provided reports to Gemini that listed the value of Genesis Capital's

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 77 of 1132

"current assets." A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year. These reports fraudulently categorized the Promissory Note as a current asset, even though it was payable ten years later. In response to inquiries from Gemini, on July 28, 2022, Genesis Capital's CFO helped Genesis Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the Promissory Note. This email to Gemini omitted any reference to the Promissory Note's duration or other terms.

### C. DCG and Genesis Capital Concealed Information That Would Have Revealed Their Deceit

170. Genesis Capital's CFO and other personnel directed employees not to disclose the Promissory Note to counterparties such as Gemini. Indeed, many Genesis Capital employees were not informed of the Promissory Note until months after its signature.

171. When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Capital continued to conceal and suppress information that would have revealed the Promissory Note or losses on counterparty defaults. In July 2022, Genesis Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Capital's balance sheet—which would have explained the Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false. Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

172. In a July 2022 Microsoft Teams chat, Genesis Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 10/19/2023
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 78 of 1132

will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the Promissory Note.

173.    In another Microsoft Teams chat, in September 2022, Genesis Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the Promissory Note from the balance sheet alone.

174.    After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties.  These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

175.    Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors.  Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.

176.    Genesis Capital ignored these requests and Gemini allowed them to do so.

177.    Before executing the Promissory Note, Genesis Capital executives, including Moro, Genesis Capital's CFO, and Managing Director No 1, informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini.  Thus, both DCG and Genesis Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.

178.    Genesis Capital personnel soon grew concerned that Genesis Capital had provided false information to counterparties.  On September 1, 2022, Genesis Capital's Director of Lending reported to its interim CEO: "I'm hearing concerns from front office folks…. They're

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023

RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 79 of 1132

concerned about the accuracy of information we have shared with clients re liquidity and

variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and

instead we have a 'note'." Nevertheless, neither DCG nor Genesis Capital corrected the

misstatements that Genesis Capital employees made to counterparties, including the Earn

investors.

179.    On October 28, 2022, Silbert authorized Genesis Capital's Director of Lending to

disclose the Promissory Note to Gemini—a mere two weeks before Genesis Capital suspended

withdrawals and weeks after Gemini notified Genesis Capital that it was terminating Earn.

**D.    DCG Created a Liquidity Crunch at Genesis Capital While Misleading Investors into Believing the Opposite**

180.    From January 2022 through July 2022, DCG and its subsidiary, DCG

International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from

Genesis Capital.

181.    On January 24, 2022, Genesis Capital lent DCG $100 million in cash on an

unsecured basis, with a stated maturity date of July 24, 2022. DCG failed to repay that loan on

or before its maturity date. Instead, on July 25, 2022, a DCG executive informed Managing

Director No. 1 that DCG "literally [did not] have the money right now" to repay the loan.

182.    Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's

COO and Managing Director No. 1:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th
> maturity) from Genesis to DCG by 10 months (until May 2023). Please let us
> know what documentation is needed to execute on the new loan. Also, we need
> to include language that the loan could be repaid early without any penalty.

183.    Managing Director No. 1 objected, stating: "given the continued pressure from

major lenders such as … Gemini … this duration mismatch will certainly put Genesis in a much

worse spot." The same day, on July 25, 2022, DCG's Treasurer responded that DCG "need[ed]

to preserve liquidity to meet our operating cash needs over the next few months." After

additional objections, the next day, Managing Director No.1 relented stating: "it sounds like we

don't have much room to push back, so we will do what DCG needs us to do." DCG also

dictated the interest rate for this loan.

   184. Similarly, on February 23, 2022, Genesis Capital lent DCG another $100 million

in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022. After the

payment became due, at DCG's insistence, Genesis Capital extended the maturity date of this

loan to May 2023.

   185. On or about June 18, 2022, Genesis Capital lent approximately 18,697 bitcoin

(valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis.

Rather than repaying this loan in bitcoin—the denomination of the loan—DCGI partially repaid

that loan on November 10, 2022, with 25,999,457 shares of GBTC which were worth

approximately $250 million as of November 10, 2022.

   186. This repayment deprived Genesis Capital of liquidity because unlike bitcoin,

Genesis Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due

to affiliate sales restrictions as referenced in paragraph 126 above.

   187. After this repayment, 4,550.45 bitcoin (approximately $80 million as of

November 10, 2022) remained outstanding on Genesis Capital's loan to DCGI. On November

10, 2022, DCG made Genesis Capital extend the maturity date for the remaining amount to May

11, 2023. These loans all remain unpaid.

## V. Gemini and Genesis Capital Misrepresented the Licensed Status of Genesis Capital

   188. Gemini and Genesis Capital also systematically deceived Earn investors regarding

the regulatory oversight of Genesis Capital. Both parties led Earn investors to believe Genesis

Capital had met its regulatory burdens to receive investments through Earn lawfully. However, this was not the case.

189.    To invest in Earn, all Earn investors had to agree to the Earn Master Agreement between the Earn investor, Genesis Capital, and Gemini as "custodian" and "agent" for the Earn investors. Earn investors accessed this agreement through Gemini's platform.

190.    The Earn Master Agreement contained several "Representations and Warranties," including that "[e]ach Party represent[ed] and warrant[ed] that to its knowledge the transaction contemplated in th[e] [Earn Master Agreement] [we]re not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement." Further, "[e]ach Party represent[ed] and warrant[ed] that it ha[d] all necessary governmental and other consents, approvals and licenses to perform its obligations" under Earn.

191.    Genesis Capital's Chief Legal Officer acknowledged several months before the launch of Earn that the program "may be viewed as an investment contract under the securities laws."

192.    By promoting Earn on its website and social media accounts and entering into Earn Master Agreements with Earn customers, Genesis Capital offered for sale and sold securities without registering with the OAG as a securities dealer or a securities salesperson.

193.    Earn is a security under the Martin Act because Earn investors provided their cryptocurrency assets to Genesis Capital with the expectation of receiving promised yields from Genesis Capital's efforts in deploying investors' pooled assets.

194.     Despite its failure to register with the OAG, Genesis Capital continued to represent that it was authorized to enter into transactions with Earn investors in New York and entered into tens of thousands of Earn Master Agreements with New Yorkers.

195.     Months before the launch of the Gemini Earn program, Gemini knew that Genesis Capital was regulated only by FinCEN and, in fact, categorized Genesis Capital's lack of regulation as a "high" risk factor in internal documents.

196.     Neither Genesis Capital nor Gemini corrected the misstatement made in the Earn Master Agreement.

**VI.     Genesis Capital Announces It Cannot Repay More Than 232,000 Earn Investors**

197.     On or about November 12, 2022, Genesis Capital privately sought an emergency loan of between $750 million and $1 billion from a third party, and informed the proposed lender that it was facing a "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [Three Arrows]" including (1) the Promissory Note; (2) GBTC; and (3) unsecured loans to DCG.  Genesis Capital did not—or could not—obtain this emergency loan.

198.     On November 16, 2022, Genesis Capital, using the Twitter handle (@GenesisTrading), announced:



Genesis @GenesisTrading · Nov 16
Our #1 priority is to serve our clients and preserve their assets. Therefore, in consultation with our professional financial advisors and counsel, we have taken the difficult decision to temporarily suspend redemptions and new loan originations in the lending business.

    86          170          240

Show this thread

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023

RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 83 of 1132

## VII.    Earn Investors Lost Over One Billion Dollars Due to Defendants' Fraud

199.    When Genesis Capital suspended withdrawals on November 16, 2022, it owed more than $1 billion to more than 232,000 Earn investors, including at least 29,000 New Yorkers.  Many of these investors unsuccessfully attempted to withdraw their investments in the days around November 16, 2022.

200.    One of the Earn investors was Complainant No. 1, a 73-year-old mother, grandmother, and resident of the State of New York.  She and her husband, who are both retired, invested their life savings of over $199,000 in Earn because they believed Gemini's marketing statements that Gemini was a safe and secure choice.  Complainant No. 1 had hoped to use this money to pay for her grandchild's education.  Outside of her Earn investment, she and her husband have little savings.  Defendants have failed to return any of her assets or the profits she expected to receive.

201.    Another Earn investor, Complainant No. 2, is a 56-year-old resident of the State of New York.  Complainant No. 2 invested approximately $20,500 in Earn, virtually all his savings.  Complainant No. 2 chose Earn because he researched the product and came to believe, based on Gemini's statements, that Earn was more secure than other interest-bearing cryptocurrency investments.

202.    These complainants are just two of the 232,000 investors who placed their trust in Earn and are now desperate for relief.  To date, Genesis Capital has not lifted this "temporar[y] suspen[sion]" and neither Genesis Capital nor Gemini have returned the Earn investors' assets.  Instead, Genesis Capital filed for bankruptcy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

*Martin Act Securities Fraud—Article 23-A of the General Business Law*

(Against Defendant Gemini**)**

203.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

204.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

205.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ a device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

206.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ deception, concealment, suppression, fraud, false pretense, false promise, or materially false and misleading representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

207.    The acts and practices alleged herein violated GBL§ 352-c(1)(a) in that Gemini used or employed fraud, deception, concealment, suppression, or false pretense, where engaged

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023

RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 85 of 1132

in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within

or from this state of securities or commodities, as defined in GBL § 352, regardless of whether

issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted

fraudulent practices as defined in GBL § 352 *et seq*.

208.    The acts and practices alleged herein violated GBL§ 352-c(1)(b), in that Gemini

made promises or representations as to the future which were beyond reasonable expectation or

unwarranted by existing circumstances where engaged in to induce or promote the issuance,

distribution, exchange, sale, negotiation, or purchase within or from this state of securities or

commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange,

sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL

§ 352 *et seq*.

209.    The acts and practices alleged herein violated GBL§ 352-c(1)(c) in that Gemini

made representations or statements which were false, and with regard to which Gemini (i) knew

the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort

to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement

made, where engaged in to induce or promote the issuance, distribution, exchange, sale,

negotiation, or purchase within or from this state of securities or commodities, as defined in GBL

§ 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase

resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

210.    The acts and practices alleged herein violated GBL§ 352-c(6) in that Gemini

intentionally engaged in fraud, deception, concealment, suppression, false pretense or fictitious

or pretended purchase or sale, or made a material false representation or statement with intent to

deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange,

sale, negotiation or purchase within or from this state of securities or commodities, as defined in

GBL § 352, and thereby wrongfully obtained property of a value in excess of two hundred fifty

dollars, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

### SECOND CAUSE OF ACTION
*Martin Act Securities Fraud—Article 23-A of the General Business Law*

(Against Genesis Global Holdco, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte.
Ltd., Digital Currency Group, Inc., Barry Silbert and Soichiro Moro (a.k.a. Michael Moro) (the
"Genesis/DCG Defendants"))

211.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

212.    The acts and practices alleged herein violated Article 23-A of the GBL in that the

Genesis/DCG Defendants employed, or employs, or are about to employ a device, scheme or

artifice to defraud or for obtaining money or property by means of any false pretense,

representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation,

advertisement, investment advice or distribution within or from this state of securities or

commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

213.    The acts and practices alleged herein violated Article 23-A of the GBL in that the

Genesis/DCG Defendants employed, or employs, or are about to employ deception,

concealment, suppression, fraud, false pretense, false promise, or materially false and misleading

representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion,

negotiation, advertisement, investment advice or distribution within or from this state of

securities or commodities, and constituted fraudulent acts and fraudulent practices as defined in

GBL § 352 *et seq.*

214.    The acts and practices alleged herein violated GBL § 352-c(1)(a) in that the

Genesis/DCG Defendants used or employed fraud, deception, concealment, suppression, or false

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2

INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 87 of 1132

pretense, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

215.    The acts and practices alleged herein violated GBL § 352-c(1)(b) in that the Genesis/DCG Defendants made promises or representations as to the future which were beyond reasonable expectation or unwarranted by existing circumstances where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

216.    The acts and practices alleged herein violated GBL § 352-c(1)(c) in that the Genesis/DCG Defendants made representations or statements which were false, and with regard to which the Genesis/DCG Defendants: (i) knew the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

217.    The acts and practices alleged herein violated GBL § 352-c(6) in that the Genesis/DCG Defendants intentionally engaged in fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, or made a material false representation

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 88 of 1132

or statement with intent to deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities, as defined in GBL § 352, and thereby wrongfully obtains property of a value in excess of two hundred fifty dollars, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

## THIRD CAUSE OF ACTION

*Martin Act Failure to Register—General Business Law § 359-e and Regulations Promulgated thereunder, 13 NYCRR § 10*

(Against Defendant Genesis Capital)

218.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

219.    The acts and practices alleged herein violated GBL § 359-e and regulations promulgated thereunder, including provision of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.

220.    Genesis Capital has not registered with OAG as a securities broker or dealer and is not exempt from such registration requirement.

221.    Each security transaction offered or effected by the referenced Defendant within New York constituted fraudulent practices as defined in GBL § 352 *et seq*.

222.    The referenced Defendant have repeatedly and persistently violated GBL § 359-e(3) and the Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10.

51

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
RECEIVED NYSCEF: 10/19/2023
Pg 89 of 1132

## FOURTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*

(Against Defendant Gemini)

223.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

224.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that Gemini engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.

## FIFTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*

(Against the Genesis/DCG Defendants)

225.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

226.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.

## SIXTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*

(Against Defendant Gemini)

227.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

228.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that Gemini engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.

229.    Accordingly, Gemini engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SEVENTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*

### (Against the Genesis/DCG Defendants)

230.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

231.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.

232.    Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## EIGHTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Scheme to Defraud under New York Penal Law*

### (Against Genesis/DCG Defendants)

233.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

234.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 190.65(1)(b), Scheme to Defraud in the First Degree.

235.    Pursuant to NY Penal Law § 190.65(1)(b), a person commits a scheme to defraud in the first degree when he or she engages in a scheme constituting a systematic ongoing course

of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons.

236.    The Genesis/DCG Defendants, through their conduct described above, have engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtained property with a value in excess of one thousand dollars from one or more such persons.

237.    With respect to the Genesis/DCG Defendants that are not natural persons, they are liable for the additional reasons that the conduct constituting the offense is engaged in, authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation.

238.    Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

### NINTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Conspiracy in the Fifth Degree under New York Penal Law*
(Against the Genesis/DCG Defendants)

239.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

240.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 105.05(1), Conspiracy in the Fifth Degree.

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 92 of 1132

241.    Pursuant to NY Penal Law § 105.05(1), a person commits conspiracy in the fifth degree when, with intent that conduct constituting a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.

242.    At least one of the Genesis/DCG Defendant co-conspirators engaged in an overt act, such as preparing the Promissory Note, financial statements, and risk reports, drafting talking points and communication related messaging, and/or corresponding with Gemini and the public concerning Genesis Capital's financial condition, in furtherance of the agreement.

243.    Overt acts in furtherance of the conspiracy occurred as late as 2022.

244.    With respect to the Genesis/DCG Defendants that are not natural persons, they are liable for the additional reasons that the conduct constituting the offense is: i) engaged in, authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation, or ii) is engaged in by an agent of the corporation while acting within the scope of his employment and on behalf of the corporation, and the offense is a misdemeanor or a violation.

245.    Thus, the Genesis/DCG Defendant engaged in a conspiracy to engage in a scheme to defraud, and violated the Martin Act, as referenced above.

246.    Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

**TENTH CAUSE OF ACTION**
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Martin Act – Failure to Register*

(Against Defendant Genesis Capital)

247.     The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

248.     The acts and practices alleged herein constitute conduct proscribed by Executive

Law § 63(12), in that the Genesis Capital violated GBL§ 359-e and regulations promulgated

thereunder, including provision of Official Compilation of Codes, Rules, and Regulations of the

State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as Genesis Capital's acts

and practices constituted the sale or offer for sale to or purchase or offer to purchase from the

public within or from New York, any securities issued or to be issued without filing a

registration statement.

249.     Genesis Capital has not registered with OAG as a securities broker or dealer and

is not exempt from such registration requirement.

250.     Each security transaction offered or effected by the referenced Defendant within

New York constituted fraudulent practices as defined in GBL § 352 *et seq.*

251.     Accordingly, Genesis Capital engaged in repeated fraudulent or illegal acts or

otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction

of business.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Permanently enjoining Defendants from violating the Martin Act, Article 23-A of

the General Business Law, and Executive Law § 63(12) and from engaging in the fraudulent,

deceptive and illegal acts alleged herein;

B.     Permanently enjoining Defendants from engaging in any business related to the

issuance, offer, distribution, exchange, promotion, advertisement, negotiation, purchase,

investment advice, or sale of securities or commodities within or from this state;

56

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
NYSCEF DOC. NO. 2
INDEX NO. 452784/2023
RECEIVED NYSCEF: 10/19/2023

23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 94 of 1132

C.      Directing Defendants to pay damages caused, directly or indirectly, by the fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein plus applicable pre-judgment interest;

D.      Directing Defendants to disgorge all amounts obtained in connection with or as a result of fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

E.      Directing Defendants to make restitution of all funds obtained by Defendants from investors in connection with the fraudulent and deceptive acts fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

F.      Directing Defendants to each pay the sum of $2,000 to Plaintiff pursuant to GBL § 353(1);

G.      Directing such other equitable relief as may be necessary to redress Defendants' violations of New York Law; and

*[Continued on next page]*

FILED: NEW YORK COUNTY CLERK 10/19/2023 12:54 AM
INDEX NO. 452784/2023
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 10/19/2023
23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document
Pg 95 of 1132

H.      Granting such other and further relief as may be just and proper.

Dated: New York, New York
        October 19, 2023

LETITIA JAMES
Attorney General of the State of New York

By: _____
        Geoffrey Andreu
        John Ruth
        Assistant Attorneys General

        Gabriel Tapalaga
        Senior Enforcement Counsel

        Kenneth Haim
        Deputy Chief, Investor Protection Burau

        Shamiso Maswoswe
        Chief, Investor Protection Bureau
        28 Liberty Street
        New York, New York 10005
        Tel.: (212) 416-8769

        *Counsel for the People of the State of New York*

**Exhibit 4**

**Exhibit 5**

**Exhibit 6**

**Exhibit 7**

**<u>Exhibit 8</u>**

**Exhibit 9**

**Exhibit 10**

**Exhibit 11**

**Exhibit 12**

**Exhibit 13**

**Exhibit 14**

**Exhibit 15**

**Exhibit 16**

**<u>Exhibit 17</u>**

**Exhibit 18**

**Exhibit 19**

**Exhibit 20**

**<u>Exhibit 21</u>**

**Exhibit 22**

**Exhibit 23**

**Exhibit 24**

**Exhibit 25**

### Exhibit 26

**Complaint Captioned** ***The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Gemini Trust Co., LLC; Genesis Global Capital, LLC; Genesis Asia Pacific PTE Ltd.; Genesis Global Holdco, LLC; Digital Currency Group, Inc.; Soichiro Moro (a.k.a. Michael Moro); and Barry E. Silbert***, **Case No. 452784/2023, dated February 9, 2024.  ("Amended Complaint")**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

               Plaintiff,

      -against-

GEMINI TRUST COMPANY, LLC; GENESIS
GLOBAL CAPITAL, LLC; GENESIS ASIA PACIFIC
PTE. LTD.; GENESIS GLOBAL HOLDCO, LLC;
DIGITAL CURRENCY GROUP, INC.; SOICHIRO
MORO (a.k.a. MICHAEL MORO); and BARRY E.
SILBERT.

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.: 452784/2023

**<u>AMENDED COMPLAINT</u>**

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the

State of New York ("OAG" or "Plaintiff"), alleges the following against Gemini Trust Company,

LLC ("Gemini"); Genesis Global Capital, LLC ("Genesis Capital"); Genesis Asia Pacific Pte.

Ltd. ("Genesis Asia Pacific"); Genesis Global Holdco, LLC ("Genesis Holdco," collectively with

Genesis Capital and Genesis Asia Pacific, the "Genesis Entities"); Digital Currency Group, Inc.

("DCG"); Soichiro "Michael" Moro ("Moro"); and Barry E. Silbert ("Silbert") (together the

"Defendants"):

**<u>NATURE OF THE ACTION</u>**

1.     In February 2021, Gemini, a New York cryptocurrency[1] platform, and Genesis

Capital, a New York cryptocurrency lender, launched an investment program called Gemini Earn

(or "Earn"). Gemini and Genesis Capital promoted Earn using their social media accounts, a

_____

[1] Cryptocurrency—also referred to as a digital asset—refers to an asset issued or transferred
using a blockchain, or a distributed ledger that maintains a system of payments and receipts for
transactions. Cryptocurrency acts as a digital representation of value that functions as a medium
of exchange, a unit of account, and a store of value.

1

INDEX NO. 452784/2023
NYSCEF DOC. NO. 17
RECEIVED NYSCEF: 02/09/2024

mass email campaign, media outlets, and their own websites.  Gemini and Genesis Capital

marketed Earn to the public as a high-yield investment program where Gemini customers could

profit by passively investing their cryptocurrencies with Genesis Capital.  Within months of its

launch, Genesis Capital held several billion dollars in Earn investor assets.

2.       On November 16, 2022, Genesis Capital announced that it was suspending all

withdrawals from Earn, leaving at least 232,000 Earn investors with more than $1 billion in

losses.  These losses were the result of two distinct fraudulent schemes: one perpetrated by

Gemini (the "Gemini Scheme"), and one perpetrated by Genesis Capital and its Chief Executive

Officer ("CEO") Moro, in coordination with Genesis Capital's parent company DCG, DCG's

CEO Silbert, and the other Genesis Entities (the "DCG Scheme").  Under the Gemini Scheme,

Gemini solicited money from the public with false assurances that Earn was a highly liquid

investment and that Genesis Capital was creditworthy based on Gemini's ongoing risk

monitoring.  In reality, however, Gemini's confidential risk reports found that Genesis Capital

posed a high risk of default.  Under the DCG Scheme, the Genesis Entities, Moro, DCG, and

Silbert disguised $1.1 billion in losses through a months-long campaign of misstatements,

omissions, and concealment.

3.       Under the Gemini Scheme, from February 2021, through November 16, 2022,

Gemini advertised Earn on its website as a low-risk, highly liquid "investment" that could be

"redeem[ed] at any time."  Throughout this same period, Gemini promised that Gemini vetted

Genesis Capital "through a risk management framework that reviews [Genesis Capital's]

collateralization management process," and that "on a periodic basis [Gemini] conducts analysis

of [Genesis Capital's] cash flow, balance sheet, and financial statements."  Gemini further

INDEX NO. 452784/2023
NYSCEF DOC. NO. 17
RECEIVED NYSCEF: 02/09/2024

advertised that Genesis Capital was a "trusted" and "accredited" partner and that Gemini would

ensure Genesis Capital had "appropriate risk ratios" and a "healthy financial condition."

4.       During the same period, Gemini encouraged the public and Earn investors to

place a heightened degree of "trust and confidence" in Gemini.  On its website and social media

accounts, Gemini pledged to its customers "the highest level of fiduciary obligations."  In

September 2022, Gemini's President Cameron Winklevoss told investors with concerns about

the safety of investing in Genesis Capital and Earn that Gemini "ha[s] always and will continue

to prioritize risk management and disclosure as key pillars of our business."

5.       Gemini's internal risk analyses, however, contradicted its assurances about

Genesis Capital.  From the start of the program in February 2021, through November 16, 2022,

Gemini's internal risk analyses showed that Genesis Capital's loan book was undercollateralized.

Only a year into the program, in February 2022, Gemini revised its internal estimate of Genesis

Capital's credit rating from BBB (*i.e.*, investment grade) to CCC (*i.e.*, non-investment, or junk

grade).  Indeed, from May 2022 through November 2022, Genesis Capital routinely reported to

Gemini that it had failed its own internal loan book risk assessments. When advised of Genesis

Capital's financial condition in July 2022, one Gemini board member compared Genesis Capital

to Lehman Brothers prior to its collapse.

6.       On September 2, 2022, Gemini decided to terminate Earn.  A month later, on

October 13, 2022, Gemini formally notified Genesis Capital of its decision and sent a

confidential written notice to Genesis Capital terminating all Earn agreements and demanding

the return of all investors' assets under Earn.  Yet even after Gemini decided to terminate Earn

and provided formal notification to Genesis Capital, Gemini continued to take tens of millions of

dollars' worth of additional cryptocurrencies from Earn investors and hand those assets over to Genesis Capital.

7.        Gemini failed to disclose to Earn investors the risks of investing in Earn and Gemini's termination of the Earn program.  Gemini did so even while certain Gemini employees, including an officer of Gemini, closed out their own personal positions in Gemini Earn.

8.        Earn investors were not only defrauded by Gemini, but they were also victims of the DCG Scheme to conceal more than $1 billion in losses at the Genesis Entities.  Other investors who transferred assets directly to Genesis Capital were also defrauded pursuant to the DCG Scheme.  On June 13, 2022, one of the Genesis Entities' largest borrowers, Three Arrows Capital, Ltd. ("Three Arrows"), defaulted on billions of dollars in loans. The resulting losses created, in Genesis Capital's words, a "structural hole" at Genesis Capital that impaired its ability to repay its open-term liabilities—including to Earn investors.

9.        Starting in June 2022, the Genesis Entities, DCG, Moro, and Silbert conspired to and did in fact falsely represent Genesis Capital's financial condition to conceal this structural hole.  As part of that scheme, the Genesis Entities, DCG, Silbert, and Moro engaged in concerted communications with the public and with counterparties to instill false confidence in Genesis Capital's financial health.  For example, on June 15 and June 17, Genesis Capital, Silbert, Moro, and/or DCG published tweets claiming the Genesis Entities' balance sheet was "strong," that Genesis Capital was functioning "normally," and that it had "shed the risk and moved on."  In reality, Three Arrows' default on June 13, 2022, created an equity deficiency at the Genesis Entities, and Silbert had ordered Genesis Capital to limit its extension of new loans.

10.        On June 30, 2022—the last day of the financial reporting quarter—Moro and Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis Capital

$1.1 billion *in a decade* at only a 1% per annum interest rate (the "Promissory Note") to purportedly backstop losses from the Three Arrows loans.  DCG never made principal or interest payments under the Promissory Note and the structural hole remained unchanged.  Nevertheless, Genesis Capital reported this Promissory Note as an asset on its balance sheet without disclosing to Gemini or the Earn investors its true terms.

11.     Instead of disclosing the terms of the Promissory Note to the Earn investors, the Genesis Entities, DCG, Moro, and Silbert falsely assured counterparties and the public that Genesis Capital was "well-capitalized" and that DCG "absorbed the losses" from the Genesis Entities.  Genesis Capital's CEO, Moro, also tweeted that DCG had "assumed certain liabilities of Genesis" associated with Three Arrows, leaving Genesis Capital with "adequate capital" to continue "business as usual."  Through these statements, Genesis Capital solicited additional assets through Earn and directly from other investors under false pretenses.

12.     These statements were misleading descriptions of the Promissory Note and omitted material information.  DCG did not "absorb" the Genesis Entities' losses arising from Three Arrows' default.  Rather, those losses were reflected on financial statements that the Genesis Entities concealed from counterparties.  Nor did the Promissory Note address the structural hole created by those losses, which elevated the risk of Genesis Capital being unable to repay the Earn investors.  Indeed, an officer at Genesis Capital objected to informing counterparties that DCG "absorbed the loss" because they would be unable to defend this statement in calls with counterparties.

13.     Further, DCG did not simply assume liabilities of Genesis relating to Three Arrows. Instead, DCG *replaced* those short-term liabilities with an illiquid obligation that was

payable in 10 years at 1% interest. On its face, the Promissory Note failed to plug the structural hole created by the Three Arrows default.

14.    In furtherance of the DCG Scheme, from July 2022 through November 2022, Genesis Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Capital's financial condition. For example, these reports falsely included the Promissory Note as an asset that could be reduced to cash within a year. To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022. Genesis Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the Promissory Note's true nature. Genesis Capital's Chief Financial Officer ("CFO") and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition. Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms. Individuals and institutions that directly invested with Genesis Capital from June 2022 through November 2022 were also defrauded when defendants repeated the same misrepresentations and omissions.

15.    Meanwhile, from July 2022 to November 2022, DCG further widened Genesis Capital's structural hole when it forced Genesis Capital to extend the maturity date for hundreds of millions of dollars' worth of loans to DCG. DCG has only recently purported to have repaid these loans—after the OAG commenced this action, and well past their original maturity dates. Further, it is disputed whether DCG has in fact repaid these loans in full.

16.    Finally, from February 2021, through November 16, 2022, Gemini and Genesis Capital falsely claimed they had all "necessary governmental and other consents, approvals and

licenses" to perform their obligations under Earn. This was false because the Earn accounts were securities and Genesis Capital failed to register in New York as a securities dealer, broker, or salesperson as defined in GBL § 359-(e).

17.     On November 16, 2022, Genesis Capital announced that it faced a liquidity crunch and would not return cryptocurrencies invested under Earn or obtained directly from other investors, leaving investors unable to redeem more than $3 billion worth of assets. Some of these unsuspecting investors lost their life savings. On November 29, 2022, one New Yorker pleaded with Gemini for the return of her $199,000 investment, writing: "Are you going to be able to give us our money any time soon? I am crying all day. I am 73 years old and without that money I am doomed." No Defendant has returned the investors' assets since the close of the program on November 16, 2022. Instead, on January 19, 2023, the Genesis Entities declared bankruptcy.

18.     Defendants' fraudulent acts violated New York General Business Law ("GBL") §§ 352 *et seq.* (the "Martin Act"), and New York Executive Law § 63(12). Additionally, the Genesis Entities, DCG, Silbert, and Moro violated state criminal laws, constituting repeated and persistent illegality in violation of Executive Law § 63(12), including: New York Penal Law § 190.65 (Scheme to Defraud); and New York Penal Law § 105.05 (Conspiracy).

19.     This action seeks to permanently enjoin Defendants from engaging in fraudulent, deceptive, and illegal acts in violation of the Martin Act and Executive Law; to permanently enjoin Defendants from engaging in any business related to the issuance, distribution, exchange, promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or commodities within or from this state; and to direct Defendants to pay damages, restitution, and

disgorgement of all funds and cryptocurrencies Defendants obtained in connection with its

unlawful, fraudulent, or illegal conduct, and for such other equitable relief as may be necessary.

## **PARTIES**

20.     Plaintiff, the Attorney General of the State of New York, is authorized to bring

this action and to assert the causes of action set forth below in the name and on behalf of the

People of the State of New York pursuant to the Martin Act and Executive Law § 63(12).

21.     Defendant Gemini is a New York trust company chartered by the New York State

Department of Financial Services with a principal place of business at 315 Park Avenue South,

in New York County, New York.  Cameron Winklevoss and his brother Tyler Winklevoss co-

founded Gemini.  From February 2, 2021, through November 16, 2022 (the "Relevant Period"),

Cameron Winklevoss served as Gemini's President and Tyler Winklevoss served as its CEO.

22.     Defendant Genesis Capital is a Delaware limited liability company.  Throughout

the Relevant Period, Genesis Capital maintained a principal place of business at 250 Park

Avenue South, in New York County, New York.  Its current principal place of business is 175

Greenwich Street, Floor 38, New York, NY 10007.

23.     Defendant Genesis Asia Pacific is a Singapore corporation with a business

address at 30 Raffles Place, # 23-01 Oxley @ Raffles, Singapore 048583.  During the Relevant

Period, directors, officers, and employees of Genesis Asia Pacific worked from 250 Park Avenue

South, in New York County, New York.

24.     Defendant Genesis Holdco is a Delaware limited liability company.  During the

Relevant Period, Genesis Holdco maintained a principal place of business at 250 Park Avenue

South, in New York County, New York.  Its current principal place of business is 175 Greenwich

Street, Floor 38, New York, NY 10007.  Throughout the Relevant Period, Genesis Holdco

wholly owned Genesis Capital and Genesis Asia Pacific.

25.     The Genesis Entities operated as a single entity during the Relevant Period.  They shared officers, capital, offices, IT infrastructure, and back-office functions.

26.     Genesis Holdco and Genesis Capital had no independent board of directors until after June 30, 2022.  Instead, non-party Genesis Global Trading, Inc.'s ("Genesis Trading") board of directors heard matters pertaining to Genesis Holdco and Genesis Capital through at least June 30, 2022.

27.     On January 19, 2023, the Genesis Entities filed for bankruptcy in the United States District Court for the Southern District of New York.

28.     Defendant Moro served as the CEO or its functional equivalent of the Genesis Entities, as well as their non-party affiliates, from at least February 2, 2021, through August 17, 2022.  For the same period, Moro also served on Genesis Trading's board of directors, which served as the *de facto* board of directors for Genesis Holdco through at least June 30, 2022.  Throughout the Relevant Period, Moro worked from and resided in the State of New York.

29.     From February 2, 2021, through August 17, 2022, Moro reported to Silbert.

30.     Defendant DCG is a Delaware corporation doing business in the State of New York.  DCG maintains an office at 262 Harbor Drive, Stamford, CT 06902.  DCG wholly owns the Genesis Entities.  During the Relevant Period, DCG's officers also worked from the Genesis Entities' office at 250 Park Avenue South, in New York County, New York.

31.     Silbert was the CEO, founder, and a beneficial owner of DCG at all times during the Relevant Period.  Silbert was one of three members of DCG's board of directors during the Relevant Period.  Officers at DCG reported directly to Silbert.  Silbert is also the single-largest shareholder of DCG.  During the Relevant Period, Silbert worked from DCG's offices in Connecticut, as well as from Genesis's offices at 250 Park Avenue South, in New York County,

9

New York.  Silbert founded the Genesis Entities and served on Genesis Trading's board of directors from its founding until June 22, 2022.

<u>**JURISDICTION AND VENUE**</u>

32.     This Court has jurisdiction over the subject matter of this action, personal jurisdiction over the Defendants, and authority to grant the relief requested pursuant to the Martin Act and Executive Law § 63(12).

33.     Pursuant to CPLR § 503, venue is proper in New York County because Plaintiff is located in New York County, with its address at 28 Liberty Street, in the County and State of New York, and because a substantial part of the conduct, events, or omissions giving rise to the claims occurred in New York County.  Additionally, Gemini, DCG, and the Genesis Entities are either domestic or foreign entities that transacted or were authorized to transact business in the state or maintained a principal office in New York County.  Similarly, Defendants Moro and Silbert transacted business at 250 Park Avenue South, in New York County, New York.

<u>**FACTUAL ALLEGATIONS**</u>

**I.     Background Information**

**A.  Gemini Held Itself Out as a Cryptocurrency Exchange Throughout the Relevant Period**

34.     Throughout the Relevant Period, Gemini held itself out to the public as a New York cryptocurrency exchange that facilitated the buying, selling, exchange, and storage of cryptocurrencies.

35.     Gemini offered securities to the public, in the form of the Earn investment product.

**B.  DCG Owns and Operates the Genesis Entities**

36.     Defendant DCG owns and operates cryptocurrency businesses.

10

37.    DCG marketed the Genesis Entities and non-party Genesis Trading collectively as a premier institutional cryptocurrency and financial services company.  DCG marketed Genesis Capital as its leading lending desk with billions of dollars in cryptocurrency loan originations.

38.    During the Relevant Period, DCG controlled the Genesis Entities' key hiring decisions, business strategy, and budget.  DCG and the Genesis Entities also shared IT infrastructure and DCG had direct access to the Genesis Entities' books and records.  Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.

### C.  The Genesis Entities Maintained a Consolidated Lending Book

39.    Genesis Capital lent cryptocurrency and fiat currency to institutions and high-net-worth clients.  Genesis Capital funded these loans by receiving financing from third parties, including the Earn investors.

40.    Genesis Capital profited by making money on the difference between the interest it paid to borrow fiat currency and cryptocurrency and the interest it received from lending the same assets to institutional and high-net-worth clients.

41.    Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund Three Arrows, on behalf of Genesis Capital.  Genesis Capital provided virtually all of Genesis Asia Pacific's lending capital.  Genesis Asia Pacific, in turn, repaid Genesis Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific. Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.

42.    Genesis Capital and Genesis Asia Pacific maintained separate financial statements, including separate balance sheets.

## II.    Gemini and Genesis Capital Operated Earn as an Investment Contract

43.    On February 2, 2021, DCG subsidiary CoinDesk published a news story announcing that Gemini and Genesis Capital had partnered to launch Earn. The news article stated: "Gemini, the crypto exchange and custodian, is allowing its customers to earn up to 7.4% annual percentage yield (APY) on their holdings through a partnership with crypto lender Genesis [Capital]."

44.    To invest in Earn, investors first had to buy or hold cryptocurrency on Gemini's cryptocurrency platform. Gemini induced investors to purchase assets on its cryptocurrency platform to invest in Earn. For example, beginning in March 2021, Gemini emailed its customers to advertise a new feature allowing users "to buy and transfer [cryptocurrency] directly into [Earn]" with a single mouse click. Gemini earned commissions on those purchases.

45.    Gemini published a list of the cryptocurrencies eligible for Earn on its webpage. The list included bitcoin, ether, and Gemini dollar.

46.    Gemini selected Genesis Capital as the sole "approved borrower" to receive investors' assets under Earn.

47.    Gemini and Genesis Capital required Earn investors to enter into a "Master Digital Asset Loan Agreement" with Gemini (as "custodian" and the "agent" of the investor) and Genesis Capital (herein the "Earn Master Agreement").

48.    The Earn Master Agreement set forth terms concerning the transfer and return of cryptocurrencies and the payment of fees. The Earn Master Agreement also contained representations and warranties, including a warranty that the parties were not insolvent.

49.    When investors elected to invest in Earn, Gemini pooled their assets in a wallet with other investors' assets and transferred them to Genesis Capital's wallets on Gemini's platform. Genesis Capital, in turn transferred these assets from Gemini's platform into its

external accounts and wallets, where the assets were pooled and commingled with Genesis

Capital's other assets.  Genesis Capital then used these pooled assets in its lending business.

Genesis Capital accounted for these cryptocurrencies in combined categories on its balance

sheets and financial statements, including in the balance sheet category "[i]nvestments in digital

currencies and trusts."

50.    When Earn investors withdrew their assets, Genesis Capital had five days from

the date of the withdrawal request to return the investor's assets, along with the yield promised to

the investor.  For its services in Earn, Gemini received an agent fee, which was deducted from

the Earn investors' assets and yield.

51.    As a large institutional lender in the cryptocurrency industry, Genesis Capital

negotiated more favorable loan terms and interest rates with borrowers than Earn investors could

negotiate on their own.  Genesis Capital paid yield to the Earn investors from the interest it

earned on its loans to third parties. Thus, the Earn investors' fortunes were tied to the effort and

expertise of Genesis Capital, and the investors shared in the profits made by Genesis Capital.

52.    During the Relevant Period, Gemini devoted a page on its website to Earn (the

"Earn Page").  On the Earn Page, Gemini advised investors to "[m]ake your crypto work for

you," advertised that Earn investors would "receive up to 8.05% [previously 7.4%] on the

cryptocurrency you custody with Gemini," and claimed that "[u]nlike other opportunities to earn

interest on your cryptocurrency, [with Earn] you can redeem your cryptocurrency at any time,

with no penalties, and receive it at its current market value—plus the interest you've earned!"

The Earn Page referred to Earn as a "yield-generating cryptocurrency investment."

53.    The yield paid to Earn investors fluctuated.  On a monthly basis, Genesis Capital

determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to

pay for each type of asset. After determining its agent fees, Gemini published the yield rates for different assets on the Earn Page.  On February 1, 2021, the Earn Page set forth yield rates that Earn investors would receive on their invested cryptocurrencies as follows:

### Interest Rates

| Asset | APY | Asset | APY | Asset | APY |
|---|---|---|---|---|---|
| Aave AAVE | 5.83% | Amp AMP | 1.98% | Balancer BAL | 1.54% |
| Basic Attention Token BAT | 3.49% | Bitcoin Cash BCH | 4.55% | Bitcoin BTC | 3.05% |
| Compound COMP | 2.47% | Curve CRV | 1.98% | Dai DAI | 4.16% |
| Ether ETH | 3.05% | Filecoin FIL | 7.40% | Kyber Network KNC | 2.58% |
| Chainlink LINK | 4.46% | Litecoin LTC | 5.10% | Decentraland MANA | 1.80% |
| Maker MKR | 1.98% | Orchid OXT | 2.47% | PAX Gold PAXG | 3.92% |
| Ren REN | 2.71% | Synthetix SNX | 2.69% | Storj STORJ | 1.98% |
| Uma UMA | 2.69% | Uniswap UNI | 3.59% | Yearn.finance YFI | 3.29% |
| Zcash ZEC | 2.25% | 0x ZRX | 3.68% | | |

54.    These rates frequently changed.  For example, an Earn investor who invested one bitcoin at the start of Earn could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022.  On the Earn page, Gemini claimed the rates it offered were "more than 100x the average national interest rate, among the highest rates on the market."

55.    Gemini and Genesis Capital controlled the interest rates and cautioned their investors: "rates may increase or decrease in the future."

56.    From February 2, 2021, through November 16, 2022, Earn investors invested billions of dollars in cryptocurrencies in Genesis Capital.  By reason of these investments,

Gemini earned more than $22 million in agent fees, plus more than $10 million in commissions when investors purchased cryptocurrency to invest in Earn.

## III. Gemini Scheme: Gemini Falsely Assured the Public That Earn Was a Low Risk, Highly Liquid Investment That Could Be Redeemed "At Any Time" and That Genesis Capital Was Creditworthy Based on Gemini's Ongoing Risk Monitoring

### A. Gemini Built Its Brand and That of Earn on Trust, Confidence, and Fiduciary Obligations

57.    During the Relevant Period, Gemini marketed itself as a trust company "that is held to the highest level of fiduciary obligations." Gemini published this claim on its LinkedIn, Facebook, and other social media pages throughout 2021 and 2022.

58.    Gemini has long sought to differentiate itself from other cryptocurrency companies by claiming to embrace legal regulation and encouraging its customers to place a heightened degree of trust and confidence in Gemini and its products. In January 2019, Gemini's head of marketing told the Wall Street Journal: "[w]e [at Gemini] believe that investors coming into cryptocurrency deserve the exact same protections as investors in more traditional markets, adhering to the same standards, practices, regulations and compliance protocols."

59.    In a September 2019 statement, Gemini co-founder Tyler Winklevoss stated, "Gemini's philosophy of asking for permission, not forgiveness, is a first in the crypto industry." That year, Gemini published advertisements in the New York Times, at New York subway stops, and on New York City taxis, declaring: "The Revolution Needs Rules" and "Crypto Without Chaos."

60.    Also in September 2019, Tyler Winklevoss informed customers in a blog post that Gemini "strive[d] to always … put the interests of our customers ahead of our own and provide proper disclosures and transparency."

61.    Throughout 2021 and 2022, the concepts of "trust" and adherence to its "fiduciary" obligations" were central to Gemini's marketing.  Gemini's website advertised that it was a "fiduciary," "[t]he most trusted crypto-native finance platform," and that it "worked hard to provide [customers] with a high-integrity choice and … look[ed] forward to earning and maintaining your trust."

62.    Gemini also owed its customers fiduciary obligations under the New York Banking Law.  During the Relevant Period, Gemini stated in its user agreement that it is "a fiduciary under § 100 of the New York Banking Law… and a custodian that is licensed to custody [its customers'] Digital Assets in trust on [its customers'] behalf."

63.    Gemini deployed this trust-based branding in its promotion of Earn.  In August 2021, Gemini published a blog post announcing that "more than $3 billion in loans [have been] originated through [Earn]" and that "[i]nstilling trust in our products is central to Gemini's ethos, and crossing this milestone is indicative of the confidence our customers have in our business."

64.    On September 22, 2022, Gemini's President Cameron Winklevoss conducted an "Ask Me Anything" (or "AMA") on Reddit, a social media platform, where he encouraged the public to ask questions and get real-time answers about Gemini's products.  During that AMA, one Reddit user asked Winklevoss: "Can you please talk more about partnering with Genesis? There is still so much fear to get back to [Earn]."  Winklevoss responded:

> We selected Genesis as a partner due to their experience in managing a large loan portfolio and reputation for compliance. Since we launched Earn in Jan 2021, Genesis has never failed to return assets when Gemini customers called back their loans. This was the case even when the broader market was experiencing liquidity issues earlier this year. That said, loaning your assets always carries some risk, and we encourage you to review the Master Loan Agreement to understand your rights as a lender. ***We have always and will continue to prioritize risk management and disclosure as key pillars of our business.***

(emphasis added).

65.     On November 11, 2022—just five days before Genesis Capital suspended redemptions leaving Earn investors unable to withdraw their cryptocurrencies—Cameron and Tyler Winklevoss shared a blog post on Gemini's website that repeated "Gemini Is Built on Trust, Safety, and Compliance: Ask For Permission, Not For Forgiveness." That blog post assured investors:

> [s]ince its inception eight years ago, Gemini has worked with regulatory stakeholders and lawmakers to help shape thoughtful regulation that fosters both consumer protection and innovation. We will continue to do this work. We have spent considerable time applying for and becoming licensed and regulated in various jurisdictions across the world. This is not the easier path (it is expensive and time consuming) but we believe it is the right one.

66.     As a fiduciary, Gemini had an affirmative duty to disclose material information to its customers concerning Earn and Genesis Capital.

**B.     Gemini Falsely Assured Its Customers That Investing in Earn Was Liquid and That Genesis Capital Was a Trusted and Accredited Counterparty**

67.     From February 9, 2021, through at least November 14, 2022, Gemini referred to Genesis Capital on the Earn Page as a "trusted partner[]" and "accredited third party borrower[]" that Gemini "vetted through a risk management framework which reviews [Genesis Capital's] collateralization management process." Throughout the same period, Gemini assured investors on the Earn Page that "on a periodic basis [Gemini] will conduct analysis of [Genesis Capital's] cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of [Genesis Capital]" and that Genesis Capital was required to "return [Earn investors'] funds [to Earn investors] within five business days" of an investor's withdrawal request.

68.     In mass marketing emails sent to Gemini customers in and after February 2021, Gemini repeated the quote set forth in the preceding paragraph.

69.    Because Gemini promised Earn investors the ability to redeem their investments and profit "at any time," Genesis Capital needed to carefully manage its liquidity, loan book asset durations, and financial condition.  Thus, Genesis Capital agreed to share quarterly its financial statements and information about its collateral management process with Gemini.  Gemini used this information to conduct ongoing due diligence and to monitor Genesis Capital's financial condition on behalf, and as an agent, of the Earn investors.

70.    Gemini had authority to terminate Earn or demand the withdrawal of all assets on behalf of the investors at any time.

71.    Gemini's public assurances to Earn investors concerning Genesis Capital and Earn were contradicted by Gemini's internal risk assessments.  These assurances were, therefore, false, misleading, and contained material omissions.

## C. Gemini Falsely Assured the Public that Genesis Capital's Loan Book Was Overcollateralized

72.    On February 2, 2021, Gemini's Head of Risk stated in a press release that, "Gemini reviewed Genesis [Capital's] financial statements and verified that the lender's loans are overcollateralized."  Overcollateralization means the collateral supporting outstanding loans is worth more than 100% of those loans.  This press release, and Gemini's statement, remained accessible on the internet throughout the Relevant Period.

73.    Gemini made similar claims directly to investors.  For example, on March 5, 2021, a business development employee at Gemini responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."

18

INDEX NO. 452784/2023

NYSCEF DOC. NO. 17          23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document    RECEIVED NYSCEF: 02/09/2024

Pg 462 of 1132

74.     Contrary to Gemini's claim, Genesis Capital's loan book was not overcollateralized, either when Gemini claimed it was or at any time thereafter.  The below chart shows the approximate collateral coverage ratio for each financial quarter:

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

75.     Gemini internally acknowledged this misrepresentation.  On March 9, 2021, a risk management employee reporting directly to Gemini's Head of Risk corrected a similar misstatement by stating: "[l]ending is 'collateralized' but not necessarily 'overcollateralized'."  However, the false statement was never corrected, and the February 2, 2021 article by CoinDesk, a DCG subsidiary, containing the misstatement remained accessible to Earn investors and the public throughout the Relevant Period.

**D.  Gemini's Risk Analyses Revealed Genesis Capital Had Inappropriate Risk Ratios, Was a "Junk" Grade Investment, and Was Neither Trusted Nor Accredited**

76.     Contrary to Gemini's claims, Earn investors faced a high risk that Genesis Capital would default.

77.     Shortly after the launch of Earn, Gemini's internal risk analysis of Genesis Capital revealed concerns regarding Genesis Capital's liquidity and financial ratios.  In a confidential internal document dated May 14, 2021, Gemini's risk management team determined that Genesis Capital was "highly leveraged, with over 95% debt to asset ratio" and the "majority of [Genesis Capital's] assets are from debts."  The risk management team also determined "Genesis [Capital]… has low liquidity.  The business is just able to cover its short-term obligations."  Further, Gemini's risk management team stated that while "Genesis [Capital] ha[d] cash inflows in 2020," those inflows were "mainly from financing activities [*i.e.*, borrowing]"

and its 2020 "[c]ash flow from operating activities [was] negative." Gemini further concluded that Genesis posed a higher risk than other potential partners that Gemini considered for Earn.

78.     By May 2021, Earn investors had already placed more than $2 billion in assets into the program. By August 2021, that number increased to $3 billion.

### 1. Gemini Secretly Rated Genesis Capital as "Junk"

79.     Around February 2022, Gemini's risk management team analyzed Genesis Capital's financial statements for the third quarter of 2021. They stated that "[c]ompared with peers and the overall market, Genesis[] [Capital's] financials are generally weaker with a high leverage ratio and low liquidity ratio, similar to companies with CCC/C rating" (also known as a "junk" rating). Based on this credit rating, the risk management team projected that in a market downturn, "a 50-60% default rate for Genesis [Capital] [wa]s an appropriate assumption, given additional risks in Crypto industry vs traditional industry."

80.     Gemini's risk management team repeated this same language in several documents presented to the head of Gemini's market risk team between February 2022 and July 2022.

81.     Gemini's CCC rating estimate reflected a marked decline in Genesis Capital's financial condition; before the launch of Earn, Gemini had analyzed Genesis Capital's 2019 financial statements and estimated that Genesis Capital was a "moderate risk" and comparable to companies with a "BBB" (*i.e.*, investment grade) credit rating.

82.     According to Fitch Ratings, any credit rating below "BBB" is "speculative grade" and not "investment grade." A "CCC" issuer rating indicates a "[s]ubstantial credit risk" with "[v]ery low margin for safety" and for whom "[d]efault is a real possibility."

83.     Because of the risks posed by Genesis Capital's default, beginning in May 2022, Gemini's management team, including its President, Cameron Winklevoss, began privately

discussing whether to terminate Earn.  In May 2022, Winklevoss requested "a 1-pager on the risk profile of [Earn] and Genesis [Capital]" to understand whether Earn "adequately compensates [Gemini] for the risk."  That one-pager, dated June 6, 2022, reiterated the projected 50-60% default rate for CCC companies in the event of a market downturn and predicted a potential loss in the hundreds of millions of dollars based on that default rate.

84.     Gemini continued discussing whether to terminate Earn through the summer of 2022.  On or around July 18, 2022, Gemini's risk management and product teams compiled a slide titled "Gemini Earn: Risk vs. Reward."  Gemini's Associate Director of Risk and its Command Pilot (or head) of NeoBanking (the business unit at Gemini managing Earn) reviewed this document.

85.     In this document, Gemini acknowledged:

[the market risk team] believes Genesis [Capital] financial [sic] is similar to a CCC company, which would be required to pay a 14%+ yield in the public debt market.  Therefore, lenders would require a *~14% yield* to compensate for Genesis [Capital]'s default risk.

(emphasis in original).

86.     The same document also indicated that Genesis Capital could lose up to $1.4 billion from a single borrower's default.

87.     Rather than disclose the risk to Earn investors so that they could take steps to protect themselves, Gemini instead proposed using this information to protect itself.  In the same document, Gemini's risk management team concluded Gemini was "not compensated enough" to assume Genesis Capital's risk of default, and that Gemini should accordingly "[w]eaken the connection between Earn and Gemini" by changing Earn's branding, or "[e]ducate clients on the potential losses" to "properly set clients' expectations."  Gemini's risk management team

proposed these solutions to "[r]educe [the] reputational risk [to Gemini] arising from a Genesis default."

88.    On or around July 28, 2022, Gemini's Board of Managers met to discuss how to close "the disconnect between the risk profile the program has been designed for—as an agent, Gemini is not liable for losses in case of Genesis default—and the expectation of having to make a hard choice in case of Genesis becoming insolvent." According to a document prepared for this meeting, "[o]ne option [to close that disconnect] [wa]s to judge the disconnect inherently unfixable and proceed with an orderly shutdown of Gemini Earn."

89.    During this meeting, Gemini's Board of Managers, Cameron Winklevoss, and Tyler Winklevoss discussed the credit and liquidity risks associated with Genesis Capital and Earn. Gemini's Associate Director of Risk and its Command Pilot of NeoBanking presented to the Board during that meeting regarding Genesis Capital's credit and liquidity risks.

90.    During that meeting, several board members expressed doubts about Genesis Capital's creditworthiness. Cameron Winklevoss began the meeting by noting that Genesis Capital's "[b]orrowers [were] lying about their financials" and asked, "can we trust that 'A players' are running Genesis and are going to make good decisions/avoid getting duped?" One board member compared Genesis Capital's debt-to-equity ratio to that of Lehman Brothers prior to its collapse and said, "[i]f the market sneezes, you're in the same situation again." A board member also questioned whether Genesis Capital had misrepresented information to Gemini about its largest borrower at the time, Alameda.

91.    Immediately after this discussion, the Board of Managers and the Winklevosses discussed whether to wind down Earn to avoid reputational damage from Genesis Capital's

default.  Between this meeting and when the Earn program was terminated, Gemini gave Genesis Capital an additional hundreds of millions of dollars' worth of investor assets.

### 2. Gemini Received Risk Reports From Genesis Capital That Showed Continued Deterioration

92.      In addition to Genesis Capital's financial statements, Genesis Capital also gave Gemini risk reports indicating that Genesis Capital's credit risk grew from May 1, 2022.  In May 2022, Genesis Capital provided Gemini with weekly Credit Portfolio Metrics reports regarding its key risk metrics, such as the percentage of Genesis Capital's loans secured by collateral. Each metric had a threshold that indicated Genesis Capital's ordinary risk tolerance.

93.      From May 1, 2022, through November 16, 2022, Gemini observed that Genesis Capital routinely exceeded these thresholds for several key risk metrics.

94.      Genesis Capital's excesses of key risk metric thresholds grew more frequent and consistent as this period continued.  From August 16, 2022, through November 16, 2022, Genesis Capital exceeded at least two—and as many as five—key risk metric thresholds out of nine threshold-bearing metrics in every report it provided to Gemini.

95.      Genesis Capital's consistent failures to manage its key risk metrics demonstrated—or should have demonstrated—to Gemini that Genesis Capital's collateralization management process was failing and that Genesis Capital took inadequate steps to reduce risk.

### 3. Gemini Failed to Disclose to Earn Investors Overconcentration in Genesis Capital's Loan Book

#### i.      Overconcentration in Alameda

96.      On July 6, 2022, Genesis Capital began to provide reports to Gemini regarding additional risk metrics.  From July 6, 2022, through August 16, 2022, these reports showed that Genesis Capital's loans were heavily concentrated in a single counterparty, cryptocurrency trading firm Alameda, which was the borrower for nearly 60% of all outstanding loans from

NYSCEF DOC. NO. 17    23-10063-shl    Doc 1367    Filed 02/23/24    Entered 02/23/24 13:28:26    Main Document    INDEX NO. 452784/2023    RECEIVED NYSCEF: 02/09/2024

Pg 467 of 1132

Genesis Capital to unaffiliated counterparties (*i.e.*, excluding loans to DCG and its affiliates). Further, Genesis Capital's loans to Alameda were mostly secured with FTT tokens issued by Alameda's affiliate, cryptocurrency platform FTX Trading, Ltd.  This counterparty concentration and poor-quality collateral created a risk of massive losses if Alameda defaulted.

97.    On August 8, 2022, Cameron Winklevoss spoke to Genesis Capital's Managing Director No. 1 regarding Gemini's concerns about Genesis Capital's risk management practices. During that conversation, Winklevoss said that unless DCG itself guaranteed repayment of the Earn investments, Gemini would wind down Earn.  Gemini never informed Earn investors of these actions.  Nor did Gemini ever receive a guarantee from DCG.

98.    On August 16, 2022, Genesis Capital recalled nearly $2 billion in loans to Alameda.  However, Gemini's risk assessments showed that Genesis Capital's risk ratios remained above Genesis Capital's own tolerance levels even after recalling these loans.

**ii.    Overconcentration in Related Parties**

99.    Without Alameda, Genesis Capital's loan book was overconcentrated in loans to related parties like DCG.

100.    From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.

101.    Gemini failed to disclose any of these material facts to Earn investors.

**E.  Gemini Misled Investors Who Expressed Concern About Earn**

102.    From February 2021 through at least November 14, 2022, Gemini never adjusted, amended, or corrected its representations about the Earn investment program, the quality of its "trusted" and "accredited" partner or the fulsomeness of its own risk management processes.  In

fact, Gemini repeated these misrepresentations directly to Earn investors when they were at their most vulnerable.

103.    June 2022 marked a period of rapid deterioration and instability in the crypto markets, with the collapse of TerraUSD and Luna causing losses at Three Arrows and other cryptocurrency companies.

104.    On June 16, 2022, one retail Earn investor asked Gemini via email whether "any of [the Earn investor's] funds have been placed with [Three Arrows]. If so, are [the investor's] funds in jeopardy?" Gemini responded:

> Your funds in Earn are not insured by Gemini but are held with our trusted partners. Our partners are vetted through our risk management framework and always disclosed to you, so you know which institution has borrowed your funds. Currently, Gemini is partnering with accredited third party borrower Genesis.
>
> …. All loans are open-term and callable, and the customer's experience is seamless with Gemini's platform, allowing quick access to earn interest and redeem funds.

105.    Likewise, on June 27, 2022, one retail Earn investor wrote to Gemini: "[w]ith the layoffs and what is happening with other exchanges like Celsius and Blockfi I am concerned about Gemini. Does Gemini have any similar vulnerabilities?" Gemini responded in part: "We founded Gemini with a security-first mentality and ethos of asking for permission, not forgiveness. We have worked hard to provide you with a high-integrity choice and we look forward to earning and maintaining your trust."

106.    When this Earn investor asked about "liquidity vulnerabilities" and "risky investments/loans that would risk my assets or cause Gemini to halt withdrawals" for Earn, Gemini responded:

> Gemini is partnering with accredited third party borrowers including Genesis, who are vetted through a risk management framework which reviews our partners' collateralization management process. On a periodic basis we will

conduct an analysis of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners. We will notify you when interest payments hit your account, and you can then check balances in real time. Gemini will continue to add high-quality partners in order to ensure competitive rates and allow you to diversify your borrowers.

Two days later, this investor made an additional $1,000 ACH transfer into his Gemini account.

107.    Similarly, on July 24, 2022, another retail Earn investor asked Gemini in an email whether it was "involved with any of the drama surrounding [Three Arrows]," and more specifically, how events surrounding Three Arrows impacted Genesis Capital and Earn investors. A Gemini customer service representative responded, "we are not involved in anything regarding [Three Arrows]" and followed up with:

Genesis [is] vetted through a risk management framework which reviews our partners' collateralization management process. On a periodic basis we will conduct an analysis of our partner's cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners.

108.    After the same investor requested additional details, Gemini's customer service representative responded: "all of Gemini's business operations continue to function normally, including Earn.  Unfortunately, I do not have any more information at this time."

109.    Through these statements, Gemini assured investors that it was safe to invest their cryptocurrencies in Genesis Capital through Earn.

110.    During this same period, Gemini risk management personnel withdrew their own investments from Earn.  A Gemini Senior Risk Associate working on Earn withdrew his entire remaining Earn investment—totaling over $4,000—between June 26, 2022, and September 5, 2022.

111.     Likewise, Gemini's Chief Operations Officer, who also sat on Gemini's Enterprise Risk Management Committee, withdrew his entire remaining Earn investment—totaling more than $100,000—on June 16 and June 17, 2022.

**F.  Gemini Secretly Sought to Terminate Earn in October 2023 While Continuing to Induce Investments in Earn from the Public and Continuing to Turn Over Investor Assets to Genesis Capital**

112.     On September 2, 2022, Gemini's leadership, including Cameron and Tyler Winklevoss, decided to terminate Earn due to the reputational risk that Gemini would suffer if Genesis Capital defaulted.  On October 13, 2022, Gemini sent a confidential formal written notice to Genesis Capital terminating all Earn Agreements on behalf of Earn investors and demanding the return of all Earn investors' assets.  Gemini did not announce this decision to the Earn investors and instead kept soliciting investor assets.

113.     On October 20, 2022, DCG's CEO, Silbert, met with Gemini's president Cameron Winklevoss.  During that meeting, according to internal DCG documents, Silbert informed Winklevoss that Gemini was Genesis Capital's largest and most important source of capital and that Genesis Capital could not redeem Earn investors' funds without Genesis Capital declaring bankruptcy.

114.     Gemini secretly granted Genesis Capital multiple extensions to return investor funds.

115.     Even after Gemini privately demanded the return of investor funds on October 13, 2022, it transferred tens of millions of dollars' worth of Earn investors' assets to Genesis Capital.

116.     Neither Gemini nor Genesis Capital disclosed to Earn investors the termination notice, the extensions of the redemption date, or the risk that Genesis Capital would go into bankruptcy.  These were material facts for investors.

IV.    **DCG Scheme: The Genesis Entities, DCG, Moro and Silbert Concealed a $1 Billion Loss From Investors**

117.    The Earn investors, as well as individuals and institutions who directly invested in Genesis Capital, were also the victims of a separate scheme perpetrated by the Genesis Entities, DCG, and their respective CEOs Moro and Silbert to conceal more than $1 billion in losses at Genesis Capital.

A.    **The Genesis Entities Suffer Around $1.1 Billion in Losses**

118.    In the days leading up to June 13, 2022, Three Arrows was the Genesis Entities' second-largest borrower.  Although Three Arrows nominally borrowed from Genesis Asia Pacific, Genesis Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to Three Arrows.  Genesis Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific.  Three Arrows paid between 8-15% interest on these loans.

119.    When Genesis Capital funded these loans, it categorized them as "receivables from related parties" on its balance sheet, which reflected the amount that Genesis Capital gave to Genesis Asia Pacific to lend to Three Arrows.  Genesis Asia Pacific repaid Genesis Capital around the same time that Three Arrows repaid its loans to Genesis Asia Pacific.  For its part, Genesis Asia Pacific recorded the amounts it owed to Genesis Capital in connection with these loans as "current liabilities" on its balance sheet—*i.e.*, liabilities payable within one year.

120.    Neither Gemini nor Genesis Capital informed Earn investors that their assets were being passed to Genesis Asia Pacific.  Indeed, Gemini did not conduct ongoing diligence into Genesis Asia Pacific, and did not receive Genesis Asia Pacific's financial statements on a quarterly basis.

121.    Genesis Capital and Genesis Asia Pacific failed to conduct adequate due diligence on Three Arrows.  Contrary to assurances to Gemini on February 18, 2022, that Genesis Capital

reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence," neither Genesis Capital nor Genesis Asia Pacific had received audited financial statements from Three Arrows since July 2020. Genesis Capital and Genesis Asia Pacific also accepted from Three Arrows illiquid collateral to secure more than $500 million in loans.

122.    On June 13, 2022, Three Arrows defaulted on billions in loans from Genesis Asia Pacific. As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business generally) incurred a loss of approximately $1 billion in open-term, on-demand assets. Around the same time as Three Arrows' default, Genesis Capital also incurred more than $100 million in losses arising from the default of another borrower, Babel Finance.

123.    The losses from Three Arrows and Babel created negative equity value at the Genesis Entities and created a deficit in the open-term assets available to repay investors, including Earn investors. Genesis Capital's internal documents stated that these losses opened a $1.1 billion structural hole in Genesis Capital's loan book.

**B. The Genesis Entities, DCG, Moro and Silbert Plug the Structural Hole With Deceit and Misrepresent Genesis Capitals' Financial Condition to Counterparties**

124.    DCG and Genesis Capital engaged in a communications campaign designed to conceal Genesis Capital's financial condition and mislead counterparties into believing Genesis Capital was operating "business as usual." Those counterparties included Gemini, which conducted ongoing due diligence on behalf of the Earn investors.

125.    From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's Chief Operating Officer ("COO")) met with Genesis Capital's leadership daily, often multiple times a day. During these meetings, DCG and Genesis Capital employees discussed how to communicate with counterparties about Three Arrows, and how to bolster the Genesis Entities' financial condition in the wake of these losses. During the same

period, DCG's COO and DCG's Head of Communications helped draft talking points documents

for use by DCG and Genesis Capital personnel in conversations with counterparties.

126.    On June 13, 2022, Silbert directed Moro and Genesis Capital's COO to lead the

company's response to the Three Arrows' situation "with support and guidance from DCG."

127.    On June 13, 2022, Silbert reported to DCG's board that Three Arrows defaulted

and that Genesis Capital's "unsecured exposure," or expected loss at the time, was

"uncomfortably big (well over $500 mm now)." Silbert went on to explain that some of the

collateral provided by Three Arrows was illiquid as it consisted of shares of the Grayscale

Bitcoin Trust ("GBTC") issued by DCG-subsidiary Grayscale Investments, LLC, which Genesis

Capital purportedly could not liquidate due to restrictions on sales of stock by the issuing

company's affiliates.

128.    Indeed, just a few days later, Silbert wrote to Genesis Capital's management

team: "Just want to make sure everybody is clear that Genesis [Capital] is not to sell th[e]

[GBTC] shares or enter into any transaction without consulting with me first."

129.    On June 13, 2022, Silbert also reported to DCG's board that Genesis Capital was

preparing for a bank run, and that DCG would seek additional financing both for itself and

Genesis. In Silbert's words: "Everything needs to be on the table" regarding financing.

130.    Then, on June 14, 2022, Silbert, on behalf of DCG's board, instructed Moro and

Genesis "to continue aggressively shrinking the loan book and, until such time as we have the

right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the

extension of any new loans to counterparties."

131.    Also on June 14, 2022, Silbert reported to DCG's board of directors regarding

Genesis Capital's strategy after Three Arrows' default. In doing so, Silbert presented the option

30

to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Capital with additional

capital to strengthen its balance sheet.

132.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis

Entities tweeted via their shared Twitter account:



133.    Silbert and DCG both re-tweeted this statement on June 15, 2022.

134.    Indeed, that same day, Silbert wrote to Moro and other Genesis Capital personnel

in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this

mess…. we need to continue to perpetuate that of course."  In other words, Silbert directed

Genesis Capital personnel to perpetuate the idea that, within the cryptocurrency industry,

Genesis Capital was akin to highly stable "blue chip" companies.

135.    Genesis Capital's investors deemed these statements material.  For example, on

June 15, 2022, one investor stated Genesis Capital:  "We … appreciate your public statements

that were made on Genesis' solvency, following … spec on [Three Arrows] it is certainly

reassuring."  The same day, that investor transferred bitcoin to Genesis Capital for a three-month

term.

136.    Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:

**Michael Moro** @michaelmoro · Jun 17, 2022

3/Genesis can confirm that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week. No client funds are impacted. We sold and/or hedged all of the liquid collateral on hand to minimize any downside.

💬 10        ↻ 114        ♡ 520        ılıl        ⬆

**Michael Moro** @michaelmoro · Jun 17, 2022

4/We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.

💬 9        ↻ 36        ♡ 414        ılıl        ⬆

137.    DCG's COO reviewed and edited these tweets before Moro posted them.  In strategizing the release of the tweets, DCG's COO directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account.

138.    The Genesis Entities reposted Moro's tweets that same day.

139.    DCG also re-tweeted these messages on June 17, 2022.

140.    Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 stated, "Genesis remains solvent and operates [business as usual] at the moment.  With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations."  In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."

141.    After the call with Gemini, Silbert and DCG's COO were updated that same day that Gemini "asked hard [questions] about [Three Arrows]," but that Managing Director No. 1 "fended it off."

32

142.    Gemini continued to send Genesis Capital additional investor funds after June 17, 2022.

143.    The tweets and statements to Gemini set forth above were false and misleading in at least five ways.

144.    First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Capital's ability to repay its investors, including Earn investors.

145.    Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity.

146.    Indeed, by June 16, 2022, Managing Director No. 1, Moro, and DCG's COO were already discussing in internal communications "how to think about the equity hole on the balance sheet and plan to minimize that" due to the Three Arrows losses.

147.    In a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us." Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

148.    Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

149.    Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.

150.    Fifth, Genesis Capital was not operating "business as usual"; the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.

151.    Also on June 17, 2022, shortly after Moro published his tweets, Silbert tweeted: "Feels like we have hit max pain and uncertainty in the crypto market[.]  We're buying BTC here.  Let's go!"  Silbert sent this tweet to Genesis Capital's management team, including Moro, in an internal Microsoft Teams communication, after he published it to Twitter.

152.    On June 27, 2022, Genesis Capital's then CEO, Moro, emailed DCG and Genesis Capital executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [Three Arrows] and potentially Babel will become public.  But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.
>
> But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending.  Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

153.    The next day, in a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Capital representatives how to "best fill the equity hole", euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses.  Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number one focus, [they] only ha[d] a couple of days until quarter-end."  Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent

messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

154.     At this time, the Earn investors were one of Genesis Capital's largest sources of unsecured funding.

155.     Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.

156.     On June 30, 2022, Moro and Silbert entered into the $1.1 billion Promissory Note. Under the Promissory Note, DCG agreed to pay Genesis Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Capital would have otherwise received from Genesis Asia Pacific for the Three Arrows loans. Genesis Capital categorized this $1.1 billion as an asset on its balance sheet.

157.     Silbert signed the Promissory Note as CEO of DCG.

158.     Moro signed the Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.

159.     DCG dictated the terms of the Promissory Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the Promissory Note. To the contrary, DCG's repayment of the Promissory Note was subordinate to DCG's

repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the Promissory Note.

160.    On July 6, 2022, in reference to Three Arrows, Moro tweeted:



161.    DCG's COO and Head of Communications edited and helped draft these tweets. Silbert reviewed these tweets before Moro posted them. DCG approved these tweets before they were published.

162.    That same day, Genesis Capital directed the company's sales representatives to send these July 6 tweets to: "any clients … that have either halted doing business with us or slowed down materially citing concerns over our exposure to [Three Arrows]." Genesis Capital subsequently sent the link to these tweets to Gemini and certain investors.

163.    The tweets were false, misleading, and omitted material facts. DCG did not simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be called at any time; it *replaced* that liability with an illiquid ten-year Promissory Note.

164.    The Promissory Note failed to ensure that Genesis Capital had sufficient capital to operate and scale its business. The Promissory Note required DCG to provide cash payments in no sooner than 10 years, whereas the Three Arrows-related liabilities DCG purportedly

36

"assumed" were callable on demand; this created a mismatch between the Promissory Note and Genesis Capital's billions of dollars' worth of on-demand obligations to Earn users. Genesis Capital's and DCG's internal documents reveal that the Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the Three Arrows losses. In an internal document, Genesis Capital's Chief Risk Officer ("CRO") acknowledged that the Promissory Note "wreaks havoc on our balance sheet impacting everything we do."

165.    Earn investors reviewed Moro's July 6, 2022 tweets and determined them to be material. Indeed, some Earn investors emailed Gemini customer service representatives asking about Genesis Capital's financial condition in the wake of Three Arrows; in response, Gemini "encourage[d] [these investors] to take a look at Genesis's public statements [from July 2022] for more detailed information on its exposure to" Three Arrows—*i.e.*, Moro's July 6, 2022 tweets. Thereafter, these retail investors provided additional assets to Genesis Capital. For example, one of these retail investors invested more than $1,000 in Gemini Earn on July 20, 2022, shortly after Gemini directed this investor to Moro's tweets. This investor lost more than $10,000 in Gemini Earn when Genesis Capital suspended withdrawals on November 16, 2022.

166.    Likewise, on July 13, 2022, Gemini observed in internal documents that "several customers [using the social media website Reddit] were reassured by statements from Genesis re [Three Arrows]."

167.    On July 6, 2022, Genesis Capital's Head of Communications and Public Relations sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO, DCG's Head of Communications, and various other senior employees at Genesis Capital and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022.

These talking points were to be used by Genesis Capital personnel in conversations with counterparties, including Gemini.

168.    These talking points did not provide any information regarding the Promissory Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Capital's losses. Instead, the talking points included the misrepresentations that DCG "absorbed" the losses, that Genesis Capital was "well capitalized," and that "DCG has assumed certain liabilities of Genesis related to [Three Arrows] to ensure [Genesis Capital] ha[d] more than adequate capital to operate and scale our business for the long-term."

169.    Relying on these talking points, on July 6, 2022, Genesis Entities' Co-Head of Trading and Lending, Managing Director No. 1, informed Gemini, both over the phone and in writing, that the Three Arrows "[l]osses [were] predominantly absorbed by and netted against DCG balance sheet" and that Genesis Capital remained "well-capitalized." Genesis Capital misled investors and omitted material facts regarding its financial condition during these communications, including that Genesis Capital's balance sheet contained an illiquid $1.1 billion Promissory Note.

170.    On July 18, 2022, DCG filed a bankruptcy claim against Three Arrows for more than $1 billion. The same day, DCG's COO instructed Managing Director No. 1 in writing to "manage [G]emini and the other largest counterparties" because DCG was concerned that Earn investors would withdraw their assets. Thus, on July 18, 2022, Managing Director No.1 told Gemini's risk personnel conducting due diligence for Earn investors: "There might be some information relating to DCG's claim against [Three Arrows] that gets published today or tomorrow. None of this is new information and all of our loses [sic] have already been absorbed

by DCG/realized on our balance sheet.… All of the losses have already been reflected and are with DCG."

171.    Even after July 18, 2022, Gemini transferred hundreds of millions of dollars' worth of investor assets to Genesis Capital under Earn.

172.    These statements on July 6 and 18, 2022, were false, misleading, and omitted material information. DCG did not "absorb" the Genesis Entities' losses. The Promissory Note concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-term assets. On July 7, 2022, Managing Director No. 1 described the issue to DCG's COO as follows:

> the issue is more structural … even though DCG took on liability from [Genesis Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the book down to nothing, the liquidity hole long-term = the $900 m2m loss on [Three Arrows] + the lack of liquidity on the GBTC collateral which is another $450mm, so structurally, we have about 1.345B we'd need to get in the form of long-term debt or equity to ultimately have enough liquid capital to wind everything down.

173.    In another communication dated July 22, 2022, Managing Director No. 1 explained to a high-level DCG employee that the Three Arrows losses created a "[d]uration mismatch [at Genesis Capital] because we had [one billion] of open term assets with [Three Arrows] which no longer exist and thus cannot be used to offset all of our open term liabilities" including liabilities to the Earn investors. Managing Director No. 1 continued to explain that there was an additional "asset quality mismatch because $500 [million] of the collateral we absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So both of these things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an organization."

174.    Further, the losses were not reflected on Genesis Capital's balance sheet—they were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital never provided to Gemini.

175.    On July 21, 2022, Genesis Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss."  The same day, Genesis Capital's CFO also messaged Managing Director No. 1 and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."

176.    On July 21, 2022, Genesis Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points.  Neither DCG nor Genesis Capital corrected any prior misstatements made to Gemini or the Earn investors.

177.    Genesis Capital's CFO objected to these false statements to further conceal Genesis Capital's financial condition.  As Genesis Capital's CFO explained to Genesis Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."

178.    Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition.  Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms.  In a private message dated August 30, 2022, Genesis Capital's CFO confided to a colleague:

> We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot.  It's putting the firm on the spot.  That's what we have to

40

convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."

179.    Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Capital provided reports to Gemini that listed the value of Genesis Capital's "current assets."  A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year.  These reports fraudulently categorized the Promissory Note as a current asset, even though it was payable ten years later.  In response to inquiries from Gemini, on July 28, 2022, Genesis Capital's CFO helped Genesis Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the Promissory Note.  This email to Gemini omitted any reference to the Promissory Note's duration or other terms.

### C.  DCG and Genesis Capital Concealed Information That Would Have Revealed Their Deceit

180.    Genesis Capital's CFO and other personnel directed employees not to disclose the Promissory Note to counterparties such as Gemini.  Indeed, many Genesis Capital employees were not informed of the Promissory Note until months after its signature.

181.    When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Capital continued to conceal and suppress information that would have revealed the Promissory Note or losses on counterparty defaults.  In July 2022, Genesis Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Capital's balance sheet—which would have explained the Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false.  Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

182.    In a July 2022 Microsoft Teams chat, Genesis Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the Promissory Note.

183.    In another Microsoft Teams chat, in September 2022, Genesis Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the Promissory Note from the balance sheet alone.

184.    After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties.  These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

185.    Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors.  Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.

186.    Genesis Capital ignored these requests and Gemini allowed them to do so.

187.    Before executing the Promissory Note, Genesis Capital executives, including Moro, Genesis Capital's CFO, and Managing Director No 1, informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini.  Thus, both DCG and Genesis Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.

42

188.    Genesis Capital personnel soon grew concerned that Genesis Capital had provided false information to counterparties.  On September 1, 2022, Genesis Capital's Director of Lending reported to its interim CEO: "I'm hearing concerns from front office folks….  They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity….  There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'."  Nevertheless, neither DCG nor Genesis Capital corrected the misstatements that Genesis Capital employees made to counterparties, including the Earn investors.

189.    On October 28, 2022, Silbert authorized Genesis Capital's Director of Lending to disclose the Promissory Note to Gemini—a mere two weeks before Genesis Capital suspended withdrawals and weeks after Gemini notified Genesis Capital that it was terminating Earn.

D.    **DCG and the Genesis Entities Made These Same Misrepresentations to Genesis Capital's Direct Investors**

190.    In addition to obtaining cryptocurrencies from Earn investors, Genesis Capital also solicited and obtained fiat and cryptocurrencies directly from individuals and institutions (the "Direct Investors").  Pursuant to the DCG Scheme, the Direct Investors were defrauded through the same misrepresentations and omissions as the Earn investors.

191.    Many of these Direct Investors were retail investors without any professional financial background or specialized knowledge.

192.    Often, these individuals accumulated bitcoin at low prices in the 2010s, and subsequently invested that bitcoin with Genesis Capital.

193.    For example, Complainant No. 1 is a chiropractor who lives and works in New York County, New York.  Complainant No. 1 purchased bitcoin and held it for years before investing it with Genesis Capital.

194.    On January 8, 2022, Complainant No. 1 transferred 50 bitcoin (worth approximately $2 million as of that date) to Genesis Capital for a six-month term.

195.    On June 17, 2022, Complainant No. 1 contacted Genesis Capital via Telegram and asked: "How is Genesis weathering the current conditions?  I have 50 btc on loan with you. Is it at risk, now or upcoming?"

196.    On June 17, 2022, Genesis Asia Pacific's Head of Institutional Lending responded to that question via Telegram by repeating statements similar to those contained in Moro's June 17, 2022 tweet:

> Totally understand you inquiring—definitely a lot of rumors out there— we're actively managing our exposure, have a lot of asset recourse and liquid collateral on hand— not concerned about our overall position with [Three Arrows] as a CP. Generally, we still have robust working capital on hand, just managing daily ebbs/flows of book etc, but business as usual.
>
> Most all of the exposure there was secured in liquid collateral that we can sell/hedge and any residual exposure we have recourse through to against the general assets held in the fund. We're actively monitoring, but feel good about the overall position and ability to collect in the event we have to on any loss we realize.

197.    Complainant No. 1 also monitored Twitter for news regarding Genesis Capital, and reviewed Moro's and Genesis Capital's June and July 2022 tweets referenced above.

198.    On or around July 8, 2022, Complainant No. 1's 50 bitcoin investment from January was due to be repaid.  On July 8, 2022, Complainant No. 1 again reinvested 50 bitcoin with Genesis Capital for a six-month term.

199.    When asked questions regarding Three Arrows, Genesis Capital directed Direct Investors to Moro's tweets.

200.    For example, in a June 27, 2022 Telegram chat, Complainant No. 2 asked Genesis Capital: "client funds re[main] safe with the 3AC exposure and all that?"  In response, Genesis

44

Capital sent Complainant No. 2 a link to Moro's June 17, 2022 tweets.  Complainant No. 2 then

wrote: "I saw the tweet thread. It was helpful. Good to know that there are no issues meetin[g]

withdraw[a]ls and you do not see any.  Appreciate the dil[]igence."

201.    On June 27, 2022, Complainant No. 2 invested 50 bitcoin (worth approximately

$1 million as of that date) with Genesis Capital.

202.    Likewise, Genesis Capital sent Moro's July 6, 2022 tweets to several of Genesis

Capital's Direct Investors via Telegram and email on and after July 6, 2022.  For example, on

July 8, 2022, Genesis Capital emailed a link to Moro's July 6 tweets to Complainant No. 3.

Complainant No. 3 continued investing assets with Genesis Capital after July 8, 2022.

203.    Similarly, on July 19, 2022, Complainant No. 4 emailed Genesis Capital: "We

wanted to know a bit more about how the risk of 3AC was mitigated.  Did Genesis simply cover

all the funds that were lost?"  On July 21, 2022, Genesis Capital responded: "Our CEO, Michael

Moro, has published two separate announcements regarding our operational exposure as a firm

following the events of the last few months."  This email response included links to Moro's June

17, 2022 and July 6, 2022 tweets.

204.    On July 22, 2022—the day after Genesis Capital sent this response—Complainant

No. 4 invested with Genesis Capital an additional 129.82 bitcoin (worth more than $2.5 million

as of that date) for a one-year term, 473.39 ether (worth more than $709,000 as of that date) for a

one-year term, and $108,843.63 U.S. dollars for an eight-month term.

205.    Direct Investors received the same misleading documents and communications

that Genesis Capital sent to Gemini regarding the Three Arrows losses.  For example, on July 7,

2022, Managing Director No. 1 sent Gemini and Bitvavo Custody B.V. ("Bitvavo")—a Genesis

Capital Direct Investor—the same document titled "Three Arrows Post-Mortem."  This

45

document reiterated Moro's July 6, 2022 tweet and included the claim: "[l]osses predominantly absorbed by and netted against DCG balance sheet, leaving Genesis with adequate capitalization to continue [business as usual]." In both cover emails, Managing Director No. 1 separately informed Gemini and Bitvavo: "[t]his information is not shared with anyone other than you, and we take this incredibly seriously."

206. DCG also spoke directly with Bitvavo regarding the Three Arrows losses. For example, on July 19, 2022, DCG's COO spoke on the phone with Bitvavo's CEO and repeated the same misleading statements regarding Three Arrows that were contained in the "Three Arrows Post-Mortem" document discussed above. DCG's COO did not disclose to Bitvavo the terms of the Promissory Note on this call or at any other time before November 16, 2022.

207. Many of the Direct Investors also received the reports described in paragraph 179, which falsely categorized the Promissory Note as a current asset. For example, on or about October 21, 2022, Genesis Capital sent this report to Complainant No. 5. On November 1, 2022, Complainant No. 5 invested $3 million with Genesis Capital for a five-month term.

208. Likewise, Genesis Capital sent this report to Complainant No. 6, who by profession is an ear, nose, and throat doctor, on or around October 17, 2022. On or around that date, Genesis Capital spoke with Complainant No. 6 on a video call and assured Complainant No. 6 that because this report showed a positive equity value, Genesis Capital had sufficient assets to repay all its liabilities.

209. Around the same time, Complainant No. 6 advised his spouse to invest in Genesis Capital. On October 20, 2022, Complainant No. 6's spouse invested 200 bitcoin (worth approximately $3.8 million as of that date) with Genesis Capital for a ten-month term. On

October 24, 2022, Complainant No. 6's spouse invested an additional 300 bitcoin (worth approximately $5.7 million as of that date) with Genesis Capital for a one-year term.

210.    DCG and Genesis Capital repeated their misrepresentations and omissions to Direct Investors even as they sought to address a liquidity crisis caused in part by the Promissory Note.

211.    For example, in a September 8, 2022 presentation to Silbert and other members of DCG's management team, Genesis Capital's CRO wrote that because of the $1.5 billion "[l]iquidity [h]ole" consisting of the Promissory Note, and GBTC collateral: "[i]f too many lenders leave, we don't have enough money."

212.    Further, in an October 4, 2022, Genesis Capital's CRO directed Genesis Capital to begin "[p]lanning in the event of a balance sheet liquidity crunch."

213.    Nevertheless, on October 5, 2022, Genesis Capital messaged Complainant No. 7, a retired computer programmer who owns a non-profit, "to see if you have any [bitcoin] to deploy."  Complainant No. 7 asked:  "What is Genesis' exposure to Three Arrows?"  Genesis Capital provided a response from the DCG-approved talking points from earlier in the summer: "happy to jump on the phone and give you the play by play but we are past the TAC situation. We've managed through that with DCG assuming the liability back in June."  That same day, Complainant No. 7 invested 3,000 bitcoin (worth approximately $60 million as of that date) with Genesis Capital for a six-month term.

214.    Likewise, in an October 24, 2022 meeting with Silbert and other DCG management, Genesis Capital reminded DCG that "[t]here remains a 1.5B structural hole in the balance sheet" that contributed to Genesis Capital's liquidity problem.  In this presentation,

Genesis Capital also stated that "[t]he complex financing relationships between Genesis and DCG contribute to the [liquidity] problem as DCG borrows $850M unsecured from Genesis."

215.    In an October 28, 2022 email, Genesis Capital's interim CEO wrote to Genesis Holdco's board of directors, including DCG's COO and CFO that Genesis Capital should retain its own independent counsel as it explored "possible avenues towards resolving the liquidity crisis that affects the Genesis group of companies."

216.    On or around October 31, 2022, Complainant No. 8, a stay-at-home father who previously worked in customer service at a cryptocurrency company, contacted Genesis Capital to negotiate an investment.

217.    On or around November 1, 2022, in connection with that potential investment, Complainant No. 8 emailed a Genesis Capital sales representative: "I know the [Three Arrows] blowup had a lot of contagion and that Genesis was a counter party which ultimately led to some personnel shakeups at Genesis.  I want to ensure that any deposit made by me isn't affected by any potential bad debt/loans in the made past."  In response, Genesis Capital wrote: "We completely understand.  Our parent company, [DCG], assumed the liabilities related to [Three Arrows].  Please let me know if you would like to discuss further and I would be happy to arrange a call at your convenience!"

218.    On or around November 1, 2022, Complainant No. 8 joined a call with Genesis Capital to discuss the company's exposure to Three Arrows.

219.    During that call, Genesis Capital reiterated the same claims contained in the DCG-approved talking points documents, including that DCG stepped in to fill Genesis Capital's losses arising from Three Arrows.

220.    During that call, Genesis Capital failed to disclose the existence of the Promissory Note or its material terms, including its ten-year duration or 1% interest rate.

221.    On November 1, 2022, Complainant No. 8 invested 105 bitcoin (worth more than $2 million as of that date) with Genesis Capital for a five-month term.

222.    This 105-bitcoin investment represented the majority of Complainant No. 8's assets.

E.    **DCG Created a Liquidity Crunch at Genesis Capital While Misleading Investors into Believing the Opposite**

223.    From January 2022 through July 2022, DCG and its subsidiary, DCG International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from Genesis Capital.

224.    On January 24, 2022, Genesis Capital lent DCG $100 million in cash on an unsecured basis, with a stated maturity date of July 24, 2022.  DCG failed to repay that loan on or before its maturity date.  Instead, on July 25, 2022, a DCG executive informed Managing Director No. 1 that DCG "literally [did not] have the money right now" to repay the loan.

225.    Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's COO and Managing Director No. 1:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th maturity) from Genesis to DCG by 10 months (until May 2023).  Please let us know what documentation is needed to execute on the new loan.  Also, we need to include language that the loan could be repaid early without any penalty.

226.    Managing Director No. 1 objected, stating: "given the continued pressure from major lenders such as … Gemini … this duration mismatch will certainly put Genesis in a much worse spot."  The same day, on July 25, 2022, DCG's Treasurer responded that DCG "need[ed] to preserve liquidity to meet our operating cash needs over the next few months."  After

INDEX NO. 452784/2023
NYSCEF DOC. NO. 17                                                    RECEIVED NYSCEF: 02/09/2024

additional objections, the next day, Managing Director No.1 relented stating: "it sounds like we

don't have much room to push back, so we will do what DCG needs us to do."

227.    This loan remained outstanding until November 11, 2022, at which time, at

DCG's insistence, DCG and Genesis Capital entered into a term sheet extending the maturity

date until May 2023.

228.    DCG also dictated the interest rate for this loan.

229.    Similarly, on February 23, 2022, Genesis Capital lent DCG another $100 million

in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022.

230.    DCG failed to repay this loan on or before August 23, 2022.  Instead, this loan

remained outstanding until November 11, 2022, at which time, at DCG's insistence, DCG and

Genesis Capital entered into a term sheet extending the maturity date of this loan to May 2023.

231.    On or about June 18, 2022, Genesis Capital entered into a term sheet for an open-

term loan of approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to

DCG affiliate, DCGI.  Rather than repaying this loan in bitcoin—the denomination of the loan—

DCGI partially repaid that loan on November 10, 2022, with 25,999,457 shares of GBTC which

were worth approximately $250 million as of November 10, 2022.

232.    This repayment deprived Genesis Capital of liquidity because unlike bitcoin,

Genesis Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares for

the reasons set forth in paragraphs 127 and 128 above.

233.    After this repayment, 4,550.45 bitcoin (approximately $80 million as of

November 10, 2022) remained outstanding on Genesis Capital's loan to DCGI.  On or about

November 10, 2022, DCG made Genesis Capital extend the maturity date for the remaining

amount to May 11, 2023.

234.    DCG purports to have repaid all these loans on or about January 5, 2024.

235.    Genesis Capital disputes that DCG has repaid these loans in full.

## V.    Gemini and Genesis Capital Misrepresented the Licensed Status of Genesis Capital

236.    Gemini and Genesis Capital also systematically deceived Earn investors regarding the regulatory oversight of Genesis Capital.  Both parties led Earn investors to believe Genesis Capital had met its regulatory burdens to receive investments through Earn lawfully.  However, this was not the case.

237.    To invest in Earn, all Earn investors had to agree to the Earn Master Agreement between the Earn investor, Genesis Capital, and Gemini as "custodian" and "agent" for the Earn investors.  Earn investors accessed this agreement through Gemini's platform.

238.    The Earn Master Agreement contained several "Representations and Warranties," including that "[e]ach Party represent[ed] and warrant[ed] that to its knowledge the transaction contemplated in th[e] [Earn Master Agreement] [we]re not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement."  Further, "[e]ach Party represent[ed] and warrant[ed] that it ha[d] all necessary governmental and other consents, approvals and licenses to perform its obligations" under Earn.

239.    Genesis Capital's Chief Legal Officer acknowledged several months before the launch of Earn that the program "may be viewed as an investment contract under the securities laws."

240.    By promoting Earn on its website and social media accounts and entering into Earn Master Agreements with Earn customers, Genesis Capital offered for sale and sold securities without registering with the OAG as a securities dealer or a securities salesperson.

241. Earn is a security under the Martin Act because Earn investors provided their cryptocurrency assets to Genesis Capital with the expectation of receiving promised yields from Genesis Capital's efforts in deploying investors' pooled assets.

242. Despite its failure to register with the OAG, Genesis Capital continued to represent that it was authorized to enter into transactions with Earn investors in New York and entered into tens of thousands of Earn Master Agreements with New Yorkers.

243. Months before the launch of the Gemini Earn program, Gemini knew that Genesis Capital was regulated only by FinCEN and, in fact, categorized Genesis Capital's lack of regulation as a "high" risk factor in internal documents.

244. Neither Genesis Capital nor Gemini corrected the misstatement made in the Earn Master Agreement.

## VI.    Genesis Capital Again Seeks to Re-Assure the Market Through False Statements

245. Starting on or around November 2, 2022, the cryptocurrency market faced increased volatility due to allegations that cryptocurrency exchange FTX and its sister company Alameda engaged in fraud.

246. From on or around November 2, 2022 through November 16, 2022, Genesis Capital faced increasing volumes of withdrawal requests. Thus, DCG and Genesis Capital once again sought to engage in a communications campaign that misled investors.

247. For example, on November 11, 2022, Genesis Capital sent Gemini and the Direct Investors the following message via email and other messaging platforms:

> I wanted to reach out and highlight an email we've sent through to our client base providing an update on our current balance sheet as we position Genesis for its next phase of growth.
>
> While the operation of our lending and trading businesses have not been impacted by recent market events, Genesis has taken steps to strengthen its balance sheet

with an additional equity infusion of $140M from our parent company, Digital Currency Group.

This additional capital will bolster our position as a global leader in crypto capital markets and allow us to support our clients and the growing demand for our services.

Genesis continues to operate with transparency as we always have, and we remain steadfastly committed to our clients throughout all market conditions.

248.    DCG drafted this message and authorized Genesis Capital to send this message to Genesis Capital's investors on November 11, 2022.

249.    This message encouraged investors to continue financing Genesis Capital, and to discourage them from withdrawing their assets from Genesis Capital.

250.    This message was misleading in at least two ways.  First, Genesis Capital did not receive a $140 million equity injection—DCG provided that injection to Genesis Global Capital International, Ltd. ("GGCI"), which, as of November 11, 2022, was no longer a subsidiary of Genesis Capital.  Thus, an equity infusion into GGCI did not benefit investors who provided their assets to Genesis Capital.

251.    Genesis Capital's Chief Compliance Officer objected to DCG's COO that the tweet was misleading on this basis, stating: "Non [GGCI] client[s] may derive comfort from an infusion that does not necessarily benefit them."

252.    DCG nevertheless approved Genesis Capital to distribute this message.

253.    Complainant No. 9 was both an Earn investor and a Direct Investor as of November 11, 2022.  On November 11, 2022, Complainant No. 9 received the email set forth above in paragraph 247.  In response to this email, Complainant No. 9 wrote to Genesis Capital: "That does settle some fears I've had.  Thanks I appreciate the update!"

254.    Genesis Capital personnel did not clarify which entity received the capital injection referenced in the November 11, 2022 email unless counterparties asked follow-up

NYSCEF DOC. NO. 17    **23-10063-shl**    **Doc 1367**    **Filed 02/23/24**    **Entered 02/23/24 13:28:26**    **Main Document**    INDEX NO. 452784/2023

RECEIVED NYSCEF: 02/09/2024

Pg 497 of 1132

questions.  For example, Genesis Capital never informed Complainant No. 9 that the equity injection benefitted only GGCI, which Complainant No. 9 did no business with.

255.    In addition to the reason set forth in paragraph 250, the second way in which the November 11, 2022 email was misleading was that Genesis falsely claimed that the "operation of our lending and trading businesses have not been impacted by recent market events."

256.    In reality, Genesis Capital was in the midst of a liquidity crisis.  In a November 12, 2022 emergency application for a $750 million to $1 billion loan, Genesis Capital admitted that its lending business was facing a liquidity crunch due to an "ongoing demand for liquidity and deposits driven mainly by retail programs and partners of Genesis, (i.e., Gemini Earn) and institutional clients testing liquidity."

257.    This emergency loan application further conceded that Genesis Capital faced this "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [Three Arrows]" including (1) the Promissory Note; (2) GBTC; and (3) unsecured loans to DCG.

258.    Silbert provided instructions to Genesis Capital regarding the preparation of this emergency loan application, reviewed the application, and ultimately sent the application to a proposed lender.

259.    Genesis Capital did not—or could not—obtain this emergency loan.

## VII.    Genesis Capital Suspends Withdrawals, Leaving Earn Investors and Direct Lenders Unable to Withdraw More than $3 Billion

260.    On November 16, 2022, Genesis Capital, using the Twitter handle (@GenesisTrading), announced:

Genesis @GenesisTrading · Nov 16
Our #1 priority is to serve our clients and preserve their assets. Therefore, in consultation with our professional financial advisors and counsel, we have taken the difficult decision to temporarily suspend redemptions and new loan originations in the lending business.

💬 86          🔁 170          ♡ 240          ↑

Show this thread

261.    In communications with Direct Investors on November 16, 2022, Genesis Capital admitted that this step was being taken because "[t]he default of 3AC negatively impacted the liquidity and duration profiles of our lending entity Genesis Capital."

262.    When Genesis Capital suspended withdrawals on November 16, 2022, it owed more than $1 billion in cryptocurrencies and dollar-denominated assets to more than 232,000 Earn investors, including at least 29,000 New Yorkers.  Many of these investors unsuccessfully attempted to withdraw their investments in the days around November 16, 2022.

263.    Likewise, Genesis Capital owed dozens of Direct Investors more than $2 billion in cryptocurrencies, U.S. dollars, and dollar-denominated assets as of November 16, 2022.

264.    One of the Earn investors was Complainant No. 10, a 73-year-old mother, grandmother, and resident of the State of New York.  She and her husband, who are both retired, invested their life savings of over $199,000 in Earn because they believed Gemini's marketing statements that Gemini was a safe and secure choice.  Complainant No. 10 had hoped to use this money to pay for her grandchild's education.  Outside of her Earn investment, she and her husband have little savings.  Defendants have failed to return any of her assets or the profits she expected to receive.

265.    Another Earn investor, Complainant No. 11, is a 56-year-old resident of the State of New York.  Complainant No. 11 invested approximately $20,500 in Earn, virtually all his

savings.  Complainant No. 11 chose Earn because he researched the product and came to believe, based on Gemini's statements, that Earn was more secure than other interest-bearing cryptocurrency investments.

266.    The eleven complainants identified in this Amended Complaint are just some of the dozens of individuals who have written to the OAG to request help getting their assets back from DCG, the Genesis Entities, and Gemini.  In turn, the dozens of individuals who have written to the OAG are just a small percentage of the hundreds of thousands of victims of the schemes described in this Amended Complaint.

267.    To date, Genesis Capital has not lifted this "temporar[y] suspen[sion]" and neither Genesis Capital nor Gemini have returned the investors' assets.  Instead, Genesis Capital filed for bankruptcy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Martin Act Securities Fraud—Article 23-A of the General Business Law*
(Against Defendant Gemini)

268.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

269.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

270.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ a device, a scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the

issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

271.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ deception, concealment, suppression, fraud, false pretense, false promise, or materially false and misleading representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

272.    The acts and practices alleged herein violated GBL§ 352-c(1)(a) in that Gemini used or employed fraud, deception, concealment, suppression, or false pretense, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

273.    The acts and practices alleged herein violated GBL§ 352-c(1)(b), in that Gemini made promises or representations as to the future which were beyond reasonable expectation or unwarranted by existing circumstances where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

274.    The acts and practices alleged herein violated GBL § 352-c(1)(c) in that Gemini made representations or statements which were false, and with regard to which Gemini (i) knew the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

275.    The acts and practices alleged herein violated GBL § 352-c(6) in that Gemini intentionally engaged in fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, or made a material false representation or statement with intent to deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities, as defined in GBL § 352, and thereby wrongfully obtained property of a value in excess of two hundred fifty dollars, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

### SECOND CAUSE OF ACTION
*Martin Act Securities Fraud—Article 23-A of the General Business Law*

(Against Genesis Global Holdco, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte. Ltd., Digital Currency Group, Inc., Barry Silbert and Soichiro Moro (a.k.a. Michael Moro) (the "Genesis/DCG Defendants"))

276.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

277.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program

that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

278.    The acts and practices alleged herein violated Article 23-A of the GBL in that the Genesis/DCG Defendants employed, or employ, or are about to employ a device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

279.    The acts and practices alleged herein violated Article 23-A of the GBL in that the Genesis/DCG Defendants employed, or employ, or are about to employ deception, concealment, suppression, fraud, false pretense, false promise, or materially false and misleading representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent acts and fraudulent practices as defined in GBL § 352 *et seq*.

280.    The acts and practices alleged herein violated GBL § 352-c(1)(a) in that the Genesis/DCG Defendants used or employed fraud, deception, concealment, suppression, or false pretense, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

281.    The acts and practices alleged herein violated GBL § 352-c(1)(b) in that the Genesis/DCG Defendants made promises or representations as to the future which were beyond

reasonable expectation or unwarranted by existing circumstances where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

282.    The acts and practices alleged herein violated GBL § 352-c(1)(c) in that the Genesis/DCG Defendants made representations or statements which were false, and with regard to which the Genesis/DCG Defendants: (i) knew the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made, where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities or commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

283.    The acts and practices alleged herein violated GBL § 352-c(6) in that the Genesis/DCG Defendants intentionally engaged in fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, or made a material false representation or statement with intent to deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of securities or commodities, as defined in GBL § 352, and thereby wrongfully obtains property of a value in excess of two hundred fifty dollars, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

### THIRD CAUSE OF ACTION
*Martin Act Failure to Register—General Business Law § 359-e and Regulations Promulgated thereunder, 13 NYCRR § 10*

(Against Defendant Genesis Capital)

284.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

285.    The acts and practices alleged herein violated GBL § 359-e and regulations promulgated thereunder, including provision of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.

286.    Genesis Capital has not registered with OAG as a securities broker or dealer and is not exempt from such registration requirement.

287.    Each security transaction offered or effected by the referenced Defendant within New York constituted fraudulent practices as defined in GBL § 352 *et seq.*

288.    The referenced Defendant has repeatedly and persistently violated GBL § 359-e(3) and the Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10.

### FOURTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*

(Against Defendant Gemini)

289.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

290.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that Gemini engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.

### FIFTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*
(Against the Genesis/DCG Defendants)

291.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

292.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.

### SIXTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*
(Against Defendant Gemini)

293.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

294.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

295.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that Gemini engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.

296.    Accordingly, Gemini engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SEVENTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*

### (Against the Genesis/DCG Defendants)

297.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

298.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

299.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.

300.    Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## EIGHTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Scheme to Defraud under New York Penal Law*

### (Against Genesis/DCG Defendants)

301.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

302.     The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 190.65(1)(b), Scheme to Defraud in the First Degree.

303.     Pursuant to NY Penal Law § 190.65(1)(b), a person commits a scheme to defraud in the first degree when he or she engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons.

304.     The Genesis/DCG Defendants, through their conduct described above, have engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtained property with a value in excess of one thousand dollars from one or more such persons.

305.     With respect to the Genesis/DCG Defendants that are not natural persons, they are liable for the additional reasons that the conduct constituting the offense is engaged in, authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation.

306.     Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

23-10063-shl

## NINTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Conspiracy in the Fifth Degree under New York Penal Law*

(Against the Genesis/DCG Defendants)

307.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

308.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 105.05(1), Conspiracy in the Fifth Degree.

309.    Pursuant to NY Penal Law § 105.05(1), a person commits conspiracy in the fifth degree when, with intent that conduct constituting a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.

310.    At least one of the Genesis/DCG Defendant co-conspirators engaged in an overt act, such as preparing the Promissory Note, financial statements, and risk reports, drafting talking points and communication related messaging, and/or corresponding with Gemini, Direct Investors, and the public concerning Genesis Capital's financial condition, in furtherance of the agreement.

311.    Overt acts in furtherance of the conspiracy occurred as late as 2022.

312.    With respect to the Genesis/DCG Defendants that are not natural persons, they are liable for the additional reasons that the conduct constituting the offense is: i) engaged in, authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation, or ii) is engaged in by an agent of the corporation while acting within the scope of his employment and on behalf of the corporation, and the offense is a misdemeanor or a violation.

313.     Thus, the Genesis/DCG Defendant engaged in a conspiracy to engage in a scheme to defraud, and violated the Martin Act, as referenced above.

314.     Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## TENTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Martin Act – Failure to Register*

(Against Defendant Genesis Capital)

315.     The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

316.     The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis Capital violated GBL§ 359-e and regulations promulgated thereunder, including provision of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.

317.     Genesis Capital has not registered with OAG as a securities broker or dealer and is not exempt from such registration requirement.

318.     Each security transaction offered or effected by the referenced Defendant within New York constituted fraudulent practices as defined in GBL § 352 *et seq*.

319.     Accordingly, Genesis Capital engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Permanently enjoining Defendants from violating the Martin Act, Article 23-A of the General Business Law, and Executive Law § 63(12) and from engaging in the fraudulent, deceptive and illegal acts alleged herein;

B.      Permanently enjoining Defendants from engaging in any business related to the issuance, offer, distribution, exchange, promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or commodities within or from this state;

C.      Directing Defendants to pay damages caused, directly or indirectly, by the fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein plus applicable pre-judgment interest;

D.      Directing Defendants to disgorge all amounts obtained in connection with or as a result of fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

E.      Directing Defendants to make restitution of all funds obtained by Defendants from investors in connection with the fraudulent and deceptive acts fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

F.      Directing Defendants to each pay the sum of $2,000 to Plaintiff pursuant to GBL § 353(1);

G.      Directing such other equitable relief as may be necessary to redress Defendants' violations of New York Law; and

H.    Granting such other and further relief as may be just and proper.

Dated: New York, New York
February 9, 2024

LETITIA JAMES
Attorney General of the State of New York

By: _____
Geoffrey Andreu
John Ruth
Assistant Attorneys General

Gabriel Tapalaga
Senior Enforcement Counsel

Kenneth Haim
Deputy Chief, Investor Protection Bureau

Shamiso Maswoswe
Chief, Investor Protection Bureau
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-8769

*Counsel for the People of the State of New York*

**<u>Exhibit 27</u>**

**Brown Tr.**

## **Exhibit 28**

**Aronzon Tr.**



















































































































































































































































































































































## Exhibit 29

**Conheeney Tr.**























































































































































Based on my analysis of this image, it appears to be almost entirely black with only a header line visible at the top.



















































































































































































































































