PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550

*Counsel to the Ad Hoc Group of Genesis Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |
| | **Re: Docket No. 1341** |

### CORRECTED REPLY OF THE AD HOC GROUP OF GENESIS LENDERS IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

The Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group") hereby submits this reply (the "Reply") (a) in support of the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1275] (the "Settlement Motion") and (b) to *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1341] (the "Objection") filed by Digital Currency Group, Inc. and DCGI (collectively, "DCG"). In support of this Reply, the Ad Hoc Group respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      In a redux of its objection to the confirmation of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1325] (the "Plan"),[2] DCG objects to the arms'-length settlement brokered between the Debtors and the Office of the New York Attorney General (the "NYAG," and the settlement reached between the NYAG and the Debtors, the "NYAG Settlement") on the grounds that not enough effort, fees and expenses were expended in fighting with the NYAG and that the NYAG Settlement allegedly violates the absolute priority rule and "take[s] value from lower classes and redistribute[s] it to preferred creditors." Obj., ¶ 1.

2.      DCG's overblown rhetoric—accusing the creditors of "colluding" with the Debtors and NYAG to harm DCG—is a paper-thin cover for its complete mischaracterization and misunderstanding of the NYAG Settlement. Most glaring among them, DCG asserts the NYAG Settlement "simply hands over to the NYAG (and ultimately unsecured creditors) all residual value left in the Debtors' estates after unsecured creditors are paid in full in accordance with the plan."

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

Obj., ¶ 3.  The NYAG Settlement does no such thing.  In fact, the NYAG Settlement reduces the

NYAG's asserted claim dollar-for-dollar by all payments made to creditors and sizes such claim

as the actual measure of damages suffered on account of DCG's and the Debtors' fraudulent acts:

any amounts of fiat or cryptocurrency loaned but not returned.  To the extent creditors are paid in

full in accordance with their contractual rights, the NYAG Settlement provides the NYAG with

*no damages claim at all*.  Indeed, any excess after payment of subordinated claims would go to

DCG on account of its equity interests, in accordance with the priority scheme established by the

Bankruptcy Code.  As a result, contrary to DCG's assertions, the NYAG Settlement materially

limits the NYAG's asserted claim and litigation damages from those set forth in its proof of claim,

enhancing DCG's chances of receiving a recovery on account of its equity interests.[3]

3.      While DCG accuses the NYAG Settlement of violating the absolute priority rule of

the Bankruptcy Code, it fails to explain how that could possibly be the case where the NYAG

asserted claims against each of the Debtors "exceeding an estimated $1.1 billion in restitution, plus

additional amounts in disgorgement of ill-gotten gains and damages, as well as injunctive and other

equitable relief . . . ."[4]  The NYAG thus asserted claims against each of the Debtors for the full

value of the loaned assets not returned to creditors *plus* additional sums for disgorgement and other

relief.  The NYAG Settlement reduces such damages directly on account of the proceeds returned

to creditors, and eliminates additional asserted damages.  DCG argues, but fails to explain, how

this could possibly violate the absolute priority rule, particularly in light of the other approximately

---

[3]     That such recovery may only be possible if the Wind-Down Debtors are meritorious in pursuing Retained Causes
of Action against DCG and receiving the $1.1 billion promissory note issued by DCG is of no import when
repaying the estates' creditors and interest holders in accordance with the Bankruptcy Code, but does reveal
DCG's true motivation for its objections to both the Plan and the NYAG Settlement—a desperate attempt to once
again slither out of its obligations to the Debtors.

[4]     *See, e.g.*, Proof of Claim Number 857, Schedule 1 at ¶ 1.  Notably, as discussed in greater detail below, the NYAG
later filed an amended complaint against the Debtors and DCG asserting damages relating to such claims exceeded
$3 billion in restitution, while continuing to seek full disgorgement of ill-gotten gains, damages, and other relief.

$30 billion in asserted governmental penalty claims (by numerous other governmental agencies and authorities) that would also be required to be satisfied in advance of any recovery by DCG on account of its equity interests.

4.      DCG further asserts the NYAG Settlement violates the Supreme Court's precedent in *Jevic*, but again, fails to explain how that may be the case where the NYAG Settlement does not involve any priority-skipping or other class-skipping.  It appears that DCG's primary complaint is that the NYAG is agreeing to allocate any recovery it may receive to DCG's fraud victims.  But, what the NYAG elects to do outside of the Plan with its proper recovery provided in accordance with the priority scheme of the Bankruptcy Code is of no moment to DCG and is not proper grounds for objection.

5.      Contrary to DCG's assertions that the NYAG Settlement arose out of the blue, the documentary evidence cited by DCG demonstrates that the parties have been in contact with respect to the NYAG's claims for months since before the filing of the NYAG Complaint and continuing up to the filing of the amended complaint.  Indeed, settlement discussions appear to have commenced no later than November 1, 2023.  That the proposed construct that ultimately became the NYAG Settlement was proposed in January 2024 does not render irrelevant the months of discussion that led to that point.  Moreover, to the extent DCG implies it is improper that the Ad Hoc Group was involved in discussions with the NYAG, DCG is wholly mistaken.  It should not come as a surprise that the NYAG, whose claims arise as a result of the fraud perpetrated unto creditors by the Debtors and NYAG, would be interested in considering the perspective of such victims into any proposed settlement construct.

6.      As described in greater detail in the Settlement Motion, the Debtors easily satisfy each of the *Iridium* factors relevant to evaluating a proposed settlement in bankruptcy, and DCG

has made no showing that the settlement falls below the "lowest point in the range of reasonableness." The DCG Objection should be overruled, the Settlement Motion granted and the NYAG Settlement approved in all respects.

## **RELEVANT BACKGROUND**

### A. **The Fraud Perpetrated on Creditors by the Debtors and DCG**

7.     The Debtors' business model was relatively simple in theory: borrow fiat and cryptocurrency assets from lenders, paying agreed-upon interest rates, and pool the assets together to loan them to third parties at higher interest rates, collecting the difference in yield. Unfortunately, in practice, this is not how the Debtors operated their businesses. In contrast to their external representations to their lenders, the Debtors' loan book was highly concentrated among a small handful of counterparties and was not overcollateralized. From December 2020 through September 2022, the Debtors' collateral coverage ratio varied between 60-90%.[5] One of the Debtors' largest borrowers at this time was cryptocurrency hedge fund Three Arrows Capital ("3AC"). 3AC was permitted to borrow billions of dollars in fiat and cryptocurrency assets from the Debtors on an undercollateralized basis.[6]

8.     When 3AC commenced liquidation proceedings in June 2022,v 3AC had approximately $2.4 billion in loan obligations outstanding to the Debtors and, by the time the Debtors foreclosed on their collateral, the value of the collateral was approximately $1.2 billion, leaving a $1.2 billion deficit that blew a crater in the Debtors' balance sheets and left them insolvent.[7]

---

[5]     *See The People of the State of New York v. Gemini Trust Co., et al.*, Case No. 452784/2023 filed in the Supreme Court of the State of New York, County of New York [NYSCEF Doc. No. 17] (the "NYAG Complaint"), ¶ 74.

[6]     *See* Islim FDD, ¶¶ 31–32.

[7]     *Id.*

9.    Instead of acknowledging their insolvency, the Debtors and DCG, which already owed the Debtors hundreds of millions of dollars in unsecured loans, conspired to falsely represent the Debtors' capital structure and financial circumstances.[8]  "For example, on June 15 and June 17, [the Debtors], [Barry] Silbert, [Michael] Moro, and/or DCG published tweets claiming the [Debtors'] balance sheet was 'strong,' that [the Debtors were] functioning 'normally,' and that [they] had 'shed the risk and moved on.'"[9]  None of those statements were accurate, and each were designed to both prevent or avoid withdrawals from current lenders and to attract new lenders to try and maintain what little liquidity the Debtors had to continue to kick the can down the road.[10]

10.    The Debtors typically reported quarterly financials.  With the end of the financial reporting quarter approaching quickly, DCG devised a plan to conceal the Debtors' insolvency. "On June 30, 2022—the last day of the financial reporting quarter—[Michael] Moro and [Barry] Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis [Global] Capital $1.1 billion *in a decade* at only a 1% per annum interest rate (the "Promissory Note") to purportedly backstop losses from the [3AC] loans.  DCG never made principal or interest payments under the Promissory Note and the structural hole [in the Debtors' balance sheet] remained unchanged."[11]

11.    Following the execution of the Promissory Note, the Debtors and DCG continued issuing public statements and communicating privately with lenders that DCG had "assumed the liabilities" and "absorbed the loss" relating to 3AC.  Of course, DCG did no such thing.  Instead, DCG replaced the undercollateralized, but callable-at-will, short-term loans to 3AC with an

---

[8]    NYAG Complaint at ¶ 9.

[9]    *Ibid.*

[10]    NYAG Complaint at ¶ 9.

[11]    *Id.*, ¶ 10.

entirely uncollateralized illiquid obligation payable only in 10 years, with 1% per annum interest payable in kind at DCG's election.[12]  To continue attracting investment from lenders, the Debtors sent many lenders financial reports which listed the Debtors' assets and liabilities.  Among their assets was the Promissory Note, falsely listed as a "Current Asset" (i.e., <u>an asset that could be reduced to cash within one year</u>).  Without this Promissory Note as a "Current Asset," the Debtors' severe liquidity constraints would have become apparent to current and prospective lenders.  Instead, this information was concealed and obfuscated.

## B.  The November 2022 Freeze of Withdrawals and Resulting Damages

12.    In early November, FTX Trading and Alameda Research collapsed, causing another wave of turmoil in the cryptocurrency markets.  Following the collapse, the Debtors received calls on their open-term loan commitments totaling approximately $827 million.[13]  Given the Debtors' pre-existing structural hole in their balance sheet, which had been hidden from the public, the Debtors did not have the liquidity to satisfy the calls on their loan obligations.  As a consequence, on November 16, 2022, the Debtors announced they were freezing all lending and borrowing activities, and no loan call requests, withdrawal requests, or other transaction requests would be honored.  The Debtors also ceased making both USD and Digital Asset interest payments to their lenders as required by the MBAs,[14] "leaving investors unable to redeem more than $3 billion worth of assets."[15]

---

[12]   *Id.*, ¶ 10.

[13]   Islim FDD, ¶ 37.

[14]   The MBAs provide that a "Loan Fee," accruing from the date on which loaned digital currency or U.S. Dollars was transferred to GGC, accrues on a daily basis based on all outstanding loaned digital currency or U.S. Dollars, and is payable on a monthly basis.  *See* MBA § III.

[15]   NYAG Complaint, ¶ 17.

13.     Shortly thereafter, the Ad Hoc Group was formed and retained Proskauer to represent the lenders' interests in connection with restructuring and repaying the Debtors' obligations to their lenders.  Since that time, as the Court is aware, the Ad Hoc Group has grown to represent creditors holding approximately $2.5 billion in claims against Genesis Global Capital, LLC ("GGC"), including majorities in amount of asserted USD, Bitcoin, and Ethereum claims against GGC.  The Ad Hoc Group immediately began negotiating with the Debtors and other parties in interest a potential consensual restructuring that would provide for creditors to recover the assets they had loaned.

14.     As a result of the November 2022 freeze, the NYAG commenced an investigation into the Debtors and DCG on account of the same fraudulent acts described herein.

**C.  The NYAG Complaint, the NYAG Claims, and the NYAG Settlement.**

15.     In the midst of its investigative process, "to preserve claims against the Debtors . . . while the [NYAG] continues its investigation of the underlying facts,"[16] the NYAG filed proofs of claim numbers 855, 856, and 857 (collectively, the "NYAG Claims") against each of the Debtors, asserting claims "exceeding an estimated $1.1 billion in restitution, plus additional amounts in disgorgement of ill-gotten gains and damages, as well as injunctive and other equitable relief . . . ."[17]  Following the filing of the NYAG Claims, the NYAG continued its investigation into the fraudulent conduct of the Debtors and DCG, and, in October 2023, filed its initial complaint (the "Initial Complaint").

16.     While the Debtors seemingly attempted to prevent the filing of the Initial Complaint by submitting a letter to the NYAG ██████████████████████████████████████

---

[16]    Proof of Claim No. 857, Schedule 1 at 2, n.3.

[17]    NYAG Claims, Schedule 1, ¶ 1.

████████████████████████████████████████████[18] such efforts were not successful and

the Initial Complaint was filed, asserting causes of action based on, among other things, the fraud

perpetrated by the Debtors, DCG, Gemini Trust Company, Barry Silbert, and Michael Moro upon

the Gemini Earn customers, who collectively held approximately $1.1 billion in asserted fiat and

cryptocurrency claims against the Debtors.

17.    Following the filing of the Initial Complaint, the Debtors and NYAG engaged in

arms'-length negotiations and discussions regarding the terms of a potential settlement of the

Initial Complaint and the NYAG Claims.  Specifically, the NYAG proposed a *Stipulation and

Consent to Judgment and Proposed Order and Judgment on Consent,*[19] ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████[20]   The

Debtors responded with a counterproposal providing that ██████████████████████████

████████████████████████████████████████████[21] The parties were

unable to reach agreement on any settlement at this time.

18.    While such settlement discussions were ongoing, the NYAG was continuing its

investigation into the harms caused by the Debtors' and DCG's fraudulent actions.  The NYAG

determined to amend the Initial Complaint to expand the focus from just the Gemini Earn users to

include *all* victims of the Debtors' and DCG's fraudulent conduct.  This would increase the

damages asserted in the NYAG Claims to an amount that exceeds $3 billion.[22]  After informing

---

[18]    *See* Objection, Ex. C.

[19]    *See* Obj., Ex. D.

[20]    Obj., Ex. E.

[21]    Obj., Ex. F.

[22]    *See* NYAG Complaint, ¶ 17.

the Debtors of its intent to file the NYAG Complaint, the Debtors and NYAG re-engaged in settlement discussions to attempt once again to resolve the NYAG Claims.

19.    Over a period of approximately three weeks, the Debtors and NYAG traded settlement proposals and constructs that would reduce the Debtors' potential liability on account of the NYAG Complaint, including ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████[23]

20.    After much back-and-forth between the parties, the Debtors and NYAG reached an agreement on the terms of the NYAG Settlement and the Debtors filed the Settlement Motion. The NYAG Settlement provides for the NYAG Claims to be satisfied, and the NYAG Complaint to be resolved solely as to the Debtors. In exchange, the NYAG Claims will be allowed in the amount equal to (x) the total amount of third party, allowed general unsecured claims asserted against the Debtors (calculated as of the date of distributions), minus (y) all recoveries paid to those creditors under a plan of reorganization. In addition, the NYAG agrees that any such recoveries will be used to repay creditors on account of their fraud damages, as opposed to being retained by the government.

## REPLY

### A. The Objection Should be Overruled.

21.    The Settlement Motion is opposed only by DCG on the grounds that the NYAG Settlement allegedly (a) violates the Bankruptcy Code by failing to "dollarize" the NYAG Claims as of the Petition Date, and thus violates the absolute priority rule of 11 U.S.C. § 1129(b), and

---

[23]    *See, e.g.*, Objection, Exs. J-R.

(b) the NYAG Settlement is not a fair and equitable settlement that satisfies the requirements of Bankruptcy Rule 9019. DCG is incorrect on both fronts. *First*, DCG fails to explain the basis for its assertion that the NYAG Claims, which assert continuing damages caused by the Debtors' and DCG's fraudulent conduct, would be limited to the prepetition amount of such damages and, in any case, fails to explain how (even if true) the NYAG is receiving greater than 100% on account of its claims. *Second*, DCG fails to explain how it is damaged by the NYAG Settlement in any case, given the $30 billion of other asserted governmental penalty claims which would also need to be satisfied in full prior to any equity recovery. *Third*, DCG's assertion that the settlement negotiations between the Debtors and the NYAG were not arms'-length or in good faith are belied by the multiple months of emails and meeting invites exchanged between the parties and attached as exhibits to the Objection. The Objection should be overruled in its entirety and the Settlement Motion should be approved.

### i.    The NYAG Settlement Does Not Violate 11 U.S.C. § 1129(b).

22.    DCG argues the Settlement Motion cannot be approved because it would violate the "absolute priority rule" of section 1129(b) of the Bankruptcy Code because the NYAG would recover greater than the U.S. dollar equivalent of the NYAG Claims as of the Petition Date. Obj., ¶ 39. Curiously, DCG fails to explain how that is the case and, indeed, its own declarants clearly demonstrate that to be false.

23.    Although the NYAG Claims were filed in an amount "exceeding $1.1 billion," the NYAG Complaint makes clear that the NYAG Claims are now asserted in the amount of at least $3 billion in restitution damages, in addition to other unliquidated damages.[24]

---

[24]    *See also* NYAG Claims, Schedule 1, ¶ 7 ("The [NYAG's] investigation is ongoing. The [NYAG] reserves the right to amend or supplement this proof of claim, including but not limited to seeking additional amounts in disgorgement and restitution.").

24.     As an initial matter, DCG fails to explain how a claim for restitution damages which continue to accrue would be "capped" by the alleged value of such damages on the Petition Date. A party's fraudulent conduct does not cease to harm victims on the day a bankruptcy petition is filed. The NYAG Complaint seeks to recover the *full* value of damages suffered by creditors, which damages did not cease as of the Petition Date, but continue today. The Bankruptcy Code contains no such requirement, including 11 U.S.C. § 502(b), which applies only in the context of a claim objection. That is not the posture of this proceeding.[25]

25.     Indeed, even if section 502(b) of the Bankruptcy Code did apply as DCG proposes, to fully liquidate such unliquidated claim, the Court would be required to estimate the value of such restitution damages.[26] An estimation proceeding of this nature would be extremely costly and time-consuming, requiring expert testimony regarding the potential values in the future of various digital assets and the probability-weighted averages of their values over the next unknown number of years to determine the "dollarized value" as of the Petition Date of the damages suffered by creditors. Given the asserted damages of over $3 billion as of the Petition Date, and the accrual of digital asset values during these Chapter 11 Cases alone, it is possible (if not likely) that a liquidated NYAG Claim would exceed $10 billion. To the benefit of all parties involved, the Debtors and NYAG managed to reach an agreement in the NYAG Settlement, avoiding any such lengthy and costly process.

---

[25]   It should further be noted that, to object to the NYAG Claims, DCG would be required to litigate the merits of the NYAG's allegations of fraudulent conduct by the Debtors and DCG, which it has steadfastly refused to do. *See* Obj., ¶ 60 ("DCG is not seeking here to challenge or litigate the merits of the NYAG;s underlying claims against the Debtors.").

[26]   11 U.S.C. § 502(c) ("There shall be estimated for purposes of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .").

26.     Moreover, even if the NYAG Claims were limited to the over $3 billion asserted in the NYAG Complaint on account of restitution, disgorgement, and other fraud-related damages, the NYAG Settlement provides the NYAG with a recovery materially less than the asserted amount, and not, as DCG supposes without evidence, exceeding 100%.

27.     Firstly, DCG's assertion that the settlement "simply hands over to the NYAG (and ultimately unsecured creditors) all residual value left in the Debtors' estates after unsecured creditors are paid in full in accordance with the plan" mischaracterizes the nature of the calculation of the NYAG Claim.  Nowhere in the NYAG Settlement is there a reference to "residual" or "excess" value.  Instead, the NYAG Settlement provides the NYAG with an allowed claim in the amount equal to its asserted restitution damages (i.e., the value of the illegally-withheld and fraudulently-earned fiat and cryptocurrency assets held by the Debtors), then *reduces* that allowed claim on a dollar-for-dollar basis by all amounts paid to creditors in accordance with the Plan.  To the extent creditors receive payment in full in accordance with their prepetition contractual entitlements, the NYAG would have *no claim at all*.  If creditors are not paid in full in accordance with their prepetition contractual rights, the NYAG Settlement nonetheless reduces the NYAG Claim only to the unrecovered amount, instead of the full asserted amount of greater than $3 billion.  DCG chooses to mischaracterize the terms of the NYAG Settlement because engaging with the actual terms described herein and in the NYAG Settlement demonstrate clearly that it is an unqualified benefit to the Debtors' estates and in the best interests of all parties.  By limiting the NYAG Claims to only unrecovered amounts owed, and eliminating all other theories of liability, the NYAG Settlement actually materially enhances DCG's chances of recovery on account of its equity interests.

28.    Moreover, even if DCG were correct on all its theories, the NYAG Settlement *still* would not provide the NYAG with a recovery exceeding 100% on account of the NYAG Claims. As described in the *Direct Testimony Declaration of Adam W. Verost in Support of Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1343] (the "<u>Verost Declaration</u>"), the "Excess Value" that would be recovered by the NYAG through the NYAG Settlement ranges between ███████████████████████ in the "low" and "high" case, respectively.[27]  Both the "low" case and "high" case estimated recoveries are ███ ████████ less than the asserted amount of the NYAG Claims.  DCG does not even attempt to argue how this could violate the absolute priority rule.

29.    Instead, DCG deflects and improperly attributes the NYAG's recovery on the NYAG Claims to the other general unsecured creditors on the basis that, pursuant to the NYAG Settlement, the NYAG is appropriately establishing a victims' fund to use its recoveries to provide restitution to DCG's fraud victims.  DCG further asserts this cannot be approved as it would violate the Supreme Court's holding in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).  DCG misapplies the Supreme Court's holding in *Jevic*.

30.    In *Jevic*, the Supreme Court held that a debtor could not enter into a structured dismissal that would provide a recovery to general unsecured creditors without paying certain wage claims entitled to priority pursuant to section 507 of the Bankruptcy Code because

---

[27]    The Ad Hoc Group has significant disagreement with the methodology used by DCG in the Verost Declaration, and believes that any such "Excess Value" above the Petition Date value of Claims is significantly lower than asserted by DCG, but for purposes of this Reply, even taking such calculations at face value will show the error of DCG's argument.

bankruptcy courts cannot "approve a structured dismissal that provides for distributions that do not follow ordinary priority rules without the affected creditors' consent." *Jevic*, 580 U.S. 451, 464 (2017).  That is not the case here.

31.     The NYAG Settlement, just like the Plan, strictly follows the priority scheme established by Congress in the Bankruptcy Code.  All secured, administrative, and priority claims will be paid in full.  Then, general unsecured claims will receive payment in full up to their contractual entitlements, and any excess thereafter will be paid to satisfy subordinated claims.  To the extent there is any additional excess value once such subordinated claims have been paid in full, all such value will be paid to equity holders.  The NYAG Settlement does not disturb this priority scheme in any way.  Instead, the NYAG is merely committing to use its rightful recovery (if any) under such priority scheme to establish a victims' fund.  DCG cannot tell the NYAG what it must do with its recovery once it has received it pursuant to the Plan.

32.     *Jevic* specifically limited its application to circumstances where a structured dismissal does not follow the ordinary priority rules *without the affected creditors' consent*.  DCG is not the affected creditor in this case, the NYAG is.  And, it is unquestionable that the NYAG Settlement's victims' fund would be established with the NYAG's consent.  DCG fails to explain how it could possibly be an affected creditor of the NYAG Settlement where (a) the NYAG is agreeing to receive *less* than it is otherwise claiming an entitlement to receive, (b) the NYAG is voluntarily using its recovery to make creditors whole, and (c) in any case, there are another $30 billion of subordinated government claims that must be satisfied before DCG can receive any recovery.

33.     The NYAG Settlement does not violate either sections 1129(b) or 502(b) of the Bankruptcy Code, and does not violate the Supreme Court's holding in *Jevic*, and should be approved over DCG's Objection.

> **ii.     The Settlement Motion Should be Approved as a Fair and Equitable Settlement of the NYAG Claims.**

34.     DCG further asserts that the Settlement Motion cannot be approved because the NYAG Settlement does not satisfy the *Iridium* factors considered for approval of a settlement pursuant to Bankruptcy Rule 9019.  DCG does so largely on the theory that the Debtors did not sufficiently negotiate (or actually litigate) with the NYAG before entering into the NYAG Settlement.  DCG's argument is belied by the very documents it attaches in support of its Objection.

35.     Bankruptcy Rule 9019 provides that a court may approve a debtor's "compromise and settlement" after notice and a hearing.  Bankruptcy Rule 9019(a).  Courts apply a deferential business judgment standard to the approval of settlements pursuant to Bankruptcy Rule 9019, which merely requires the court to ensure the settlement does not fall below the lowest point in the range of reasonableness in terms of benefits to the debtor.  Courts should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'" when determining whether to approve a settlement pursuant to Bankruptcy Rule 9019.  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). The approval of a settlement is within the court's broad discretion, which "discretion should be exercised in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  Settlements are favored by courts, and they will rarely be set aside.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged.").

36.    Courts in the Second Circuit apply an eight-factor test to determine whether a proposed settlement is within the 'range of reasonableness' sufficient for its approval:

> (1) the probability of success in litigation, with due consideration for the uncertainty of fact and law; (2) the difficulties in collecting any litigated judgment; (3) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (4) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (5) the competence and experience of counsel who support the settlement; (6) the relative benefits to be received by members of any affected class; (7) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and (8) the debtor's informed judgment that the settlement is fair and reasonable.

*In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).[28]  The Ad Hoc Group respectfully submits that each of the above factors either weighs in favor of approval of the NYAG Settlement or is inapplicable to the current circumstances.

37.    ***Probability of Success in Litigation, Complexity, and Likely Cost/Duration***.  DCG asserts the Debtors did not sufficiently weigh the benefits of potential success in litigating the NYAG Complaint and objecting to the NYAG Claims, but the record belies that fact.  *First*, aside from the significant evidence in support of the NYAG Complaint, litigating the merits of the NYAG Complaint would be extremely costly and time-consuming for the Debtors' estates. Indeed, the Debtors have already spent close to $500,000 on special counsel fees alone relating to this matter, in which they have still yet to even file an answer.  Protracted litigation of the merits of the NYAG's claims for fraud would cost multitudes greater than that amount for an outcome that is uncertain at best.  Indeed, the Ad Hoc Group believes there is a significant likelihood that the Debtors would lose any such litigation and so will DCG, for that matter, should it choose to litigate the NYAG Complaint as asserted against it.  Moreover, the Debtors have attested to these

---

[28]    *See also In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d. Cir. 2007) (adopting a substantively identical seven-factor test).

benefits in support of the Settlement Motion.  *See* Settlement Motion, Ex. B, ¶¶ 10-11.  The Debtors appropriately balanced the uncertainty of litigation outcomes.  On the one hand, the Debtors considered the likelihood of a litigation loss, which would have resulted in an additional $3 billion or more in claims asserted against the estates, and which may not have been subordinated to general unsecured creditors.  On the other hand, the Debtors considered a litigation victory, which would have provided no greater benefit to the estate than the NYAG Settlement because the NYAG Settlement only contemplates providing a recovery to the NYAG from assets the Debtors currently propose to distribute directly to creditors pursuant to the Plan.

38.    DCG objects primarily on the basis that the Debtors' witnesses in deposition would not provide detailed responses subject to attorney-client privilege regarding their deliberations.  As the Ad Hoc Group knows well, this Court has already ruled that the Debtors are not required to provide such privileged information in support of a settlement and that a description of the process undertaken by the Debtors is sufficient evidence to satisfy this factor.  *See Memorandum of Decision* [ECF No. 781] (providing that the Debtors had satisfied the *Iridium* factors regarding the balance of the risks and benefits of settlement via testimony of the settlement process undertaken by the Debtors, and that the Court "is not required to delve into privileged matters" to make its independent judgment that such standard has been satisfied).

39.    Additionally, the NYAG Settlement provides substantial benefits to the Debtors and their estates by reducing the NYAG Claim from over $3 billion to merely the difference between creditors' contractual entitlements and their recoveries pursuant to the Plan.  DCG hand waves these benefits away by mischaracterizing the nature of the NYAG Settlement and stating without justification that "the NYAG [Settlement] simply takes all residual value of the Debtors' estates—if any—left after distribution to the unsecured creditors, gifts it to the NYAG, and then

redistributes those assets back to the unsecured creditors." Obj., ¶ 59.  As described above, DCG's
misrepresentation of the true nature of the NYAG Settlement is unavailing.

40.    For these reasons, the Ad Hoc Group submits the NYAG Settlement satisfies
factors 1 and 3 of the *Purofied* test.

41.    **Extent of Creditor Support**.  No creditor has objected to the NYAG Settlement,
and the vast majority of creditors in all classes, as members of the Ad Hoc Group, affirmatively
support the Settlement Motion.  More tellingly, none of the other governmental subordinated
claims that would otherwise recover *pari-passu* with the NYAG Claims have objected to the
Settlement Motion.  For this reason, the fourth *Purofied* factor is satisfied.

42.    **Competence of Counsel and Arms'-Length Negotiations.**  The NYAG Settlement
is the result of months of arms'-length negotiation between the Debtors, represented by Cleary
Gottlieb Steen & Hamilton LLP and Morrison Cohen LLP, both highly experienced and well-
qualified, and the NYAG.  There is no dispute that the NYAG Settlement was negotiated by
competent and experienced counsel, and, therefore, it satisfies factors 5 and 7 of the *Purofied* test.
And, given the Debtors' entry into the NYAG Settlement in their reasonable business judgment,
factor 8 is satisfied as well.

43.    **Benefits to Affected Creditors**.  The NYAG Settlement benefits all parties by
avoiding costly litigation, eliminating non-restitutionary claims asserted by the NYAG, and
providing that recovery on such claims will be contributed to a victims' fund to the extent
necessary to provide creditors with recovery of their fraudulently taken fiat and cryptocurrency
assets.  The only other affected creditors are other governmental claimants, none of which have
objected to the Settlement Motion.  And although DCG is not affected by the Settlement Motion
because of the extreme unlikelihood that the other $30 billion in asserted governmental penalty

claims are satisfied such that a recovery may be available to DCG on its equity interests, it nonetheless also benefits from the NYAG Settlement because the reduction of the NYAG Claims by ███████████████, as detailed in the Verost Declaration, unquestionably benefits DCG and enhances its likelihood of recovery.  The Ad Hoc Group respectfully submits that the NYAG Settlement satisfies factor 6 of the *Purofied* test.

44.    For these reasons, the NYAG Settlement is a reasonable settlement and the Settlement Motion should be approved by this Court pursuant to Bankruptcy Rule 9019.

## **CONCLUSION**

45.    For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court overrule the Objection, approve the Settlement Motion, and grant such other and further relief as is just.

[*Remainder of Page Intentionally Left Blank*]

Dated: February 25, 2024
     New York, New York

**PROSKAUER ROSE LLP**

*/s/ Brian S. Rosen*
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: brosen@proskauer.com


-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Email:  jsazant@proskauer.com

*Counsel to the Ad Hoc Group of
Genesis Lenders*