UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 23-10063 (SHL)<br><br>Jointly Administered |

**DIRECT TESTIMONY OF ADAM W. VEROST IN SUPPORT OF DIGITAL CURRENCY GROUP, INC.'S AND DCG INTERNATIONAL INVESTMENTS LTD.'S OBJECTION TO CONFIRMATION OF THE AMENDED JOINT PLAN OF GENESIS GLOBAL HOLDCO, LLC, ET AL.**

I, Adam W. Verost, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I submit this Declaration to provide the testimony that I would give at the confirmation hearing of the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd. (together, the "**Debtors**"), filed November 28, 2023 [Docket No. 989], including the supplements to the Amended Plan, filed December 29, 2023 [Docket No. 1117], January 6, 2024 [Docket No. 1131], January 8, 2024 [Docket No. 1137], and January 9, 2024 [Docket No. 1144] (and as may be further amended, supplemented or modified, the "**Amended Plan**"), scheduled to begin on February 26, 2024, in support of Digital Currency Group, Inc.'s and DCG International Investments Ltd.'s (together, "**DCG**") objection to confirmation of the Amended Plan.

2. The statements in this Declaration are, except as otherwise noted, based on information that is publicly available, provided by the Debtors or their advisors, or other interested

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

- 1 -

parties, my personal knowledge, and Ducera's employees working directly with me or under my supervision or direction.[2]

## Background and Qualifications

3.  I have been a Partner in Ducera since June 2015. Before joining Ducera, I held positions at other restructuring advisory firms, including, most recently as a Managing Director, at Perella Weinberg Partners L.P. I have also held positions at Kramer Capital Partners, LLC, Greenhill & Co., and Houlihan Lokey, Inc. I received a Bachelor of Science degree from Indiana University in Finance, Accounting, and International Business.

4.  I have advised on numerous large, complex chapter 11 cases to debtors, creditor groups, asset purchasers, committees, boards of directors, and special committees in a number of bankruptcy matters including, but not limited to: (a) *In re CBL & Associates Properties, Inc., et al.*, Case No. 20-35226 (Bankr. S.D. Tex.); (b) *In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064 (Bankr. D. Neb.); (c) *In re Atari Interactive, Inc.*, Case No. 13-10176 (Bankr. S.D.N.Y.); (d) *In re Masonite Corporation*, Case No. 09-10844 (Bankr. D. Del.); (e) *In re Complete Retreats*, LLC, Case No. 06-50245 (Bankr. D. Conn.); (f) *In re UAL Corporation, et al.*, Case No. 02-B48191 (Bankr. N.D. Ill.); (g) *In re Orius Corp.*, Case No. 05-63876 (Bankr. N.D. Ill.); (h) *In re Stations Holding Co.*, Case No. 02-10882 (Bankr. D. Del.); (i) *In re KCS Energy, Inc.*, Case No. 00-00028 (Bankr. D. Del.); (j) *In re Harnischfeger Industries, Inc.*, Case No. 99-2171 (Bankr. D. Del.); and (k) *In re Core Scientific, Inc.*, Case No. 22-90341 (Bankr. S.D. Tex.).

5.  I hold the Series 7 and Series 63 securities licenses.

6.  I have served as the Co-Chairman of Ducera's Fairness Opinion Committee since its inception.

---

[2] Capitalized terms used herein but otherwise not defined shall have the meanings given to such terms in the Amended Plan.

## Executive Summary

7. As set forth in Section I below, under the "high case" of creditor recoveries (the "**High Case**") detailed in the Debtors' revised recovery analysis, dated January 2024 (the "**Final Recovery Model**"), the Debtors estimate there will be an excess of $900.5 million after all creditors receive 100% of their claims determined in USD as of the Petition Date ("**Excess Value**"). Under the Distribution Principles, the Debtors distribute this Excess Value to crypto-denominated creditors, resulting in creditors receiving a recovery of 131% of their Petition Date Claims.[3]

8. The Excess Value rises to $1.470 billion from $900.5 million if certain adjustments are made to the High Case, including updating for the most recent month-end cryptocurrency prices (January 31, 2024), resulting in creditors receiving a recovery of 150% of their Petition Date Claims.

9. As set forth in Section II below, under the "low case" of creditor recoveries detailed in the Final Recovery Model (the "**Low Case**"), the Debtors estimate that their assets will be less than the estimated amount of creditors' claims by $314 million, resulting in creditors receiving a recovery of 91.6% of their Petition Date Claims.

10. The difference between the Debtors' High Case and Low Case is a function of several different assumptions, the largest of which is the treatment of the Gemini claim. Gemini purports to have foreclosed on collateral pre-petition. The High Case assumes that Gemini's foreclosure on this collateral was improper and calculates Gemini's net position assuming current prices[4] for the collateral receivable. In the Low Case, the Debtors make the opposite assumption—that Gemini's pre-petition foreclosure was proper and, accordingly, that Gemini's net claim is

---

[3] Total claims determined as of the Petition Date in USD will be referred to as "**Petition Date Claims**."
[4] Represented by prices as of December 31, 2023 in the Final Recovery Model.

reduced by collateral valued as of the date of Gemini's purported foreclosure (November 16, 2023). The differing treatment of Gemini's claim in the High Case and Low Case results in a variance of $785.6 million.[5]

11. The $314 million shortfall in the Low Case is eliminated and there is Excess Value of $659 million if certain adjustments are made to the Low Case, including updating for the most recent month-end pricing (January 31, 2024), resulting in creditors receiving a recovery of 118% of their Petition Date Claims.

12. Finally, as set forth in Section III below, the definition of the Recovery Cap and other terms of the Distribution Principles and Setoff Principles materially reduce, if not wholly eliminate, the possibility of reaching the Recovery Cap through digital asset price appreciation. The Debtors' proposal thus materially reduces, if not wholly eliminates, the possibility of digital asset price appreciation creating Excess Value for distribution to holders of subordinated claims and equity.

### I.    High Case No-Deal Recoveries

13. The first page of the Final Recovery Model states that the Debtors prepared the Final Recovery Model to represent the Debtors' "estimate of the expected cash and assets, including Digital Assets, available for distribution" based on "assumptions [the Debtors and their advisors believe] to be reasonable" in a high and low case.[6] The Final Recovery Model prices digital assets as of December 31, 2023,[7] as a proxy for current prices.

14. I understand as follows with respect to the High Case of the Final Recovery Model:

---

[5] Comprised of $765.6 million of additional claims in the Low Case (GENESIS_CONF_00004284 at 91 ("Dollarized Claims," Gemini Column)), and $20 million less of collateral receivable when compared to the High Case (GENESIS_CONF_00004284 at 89 ("Net Collateral Receivable – GGC," Total Column)).
[6] GENESIS_CONF_00004284 at 85.
[7] GENESIS_CONF_00004284 at 86, n.1.

a. The Debtors estimate total distributable assets of $3.815 billion.[8]

b. The Debtors estimate Petition Date Claims are $2.914 billion.[9]

c. The Debtors estimate that all creditors will recover, in full, the amount of all Petition Date Claims.[10]

d. After payment in full of all Petition Date Claims, the Debtors estimate that $900.5 million is available for additional distributions by the Debtors.[11]

e. Applying the Distribution Principles, the Debtors estimate that, in addition to recovering the full amount of the Petition Date Claims, crypto-denominated creditors will receive an additional "In-Kind Recovery" of $900.5 million.[12]

f. In total, the Debtors estimate a distribution of $3.815 billion to creditors, including $900.5 million of distributions in excess of Petition Date Claims, resulting in creditors receiving a 131% recovery on Petition Date Claims.

| Debtors' High Case Distributions in Excess of Petition Date Claims | |
|---|---|
| ($ in millions) | |
| Total Distributions in Debtors' High Case | $3,815 |
| (-) Petition Date Claims in Debtors' High Case | (2,914) |
| **Distributions to Creditors in Excess of Petition Date Claims** | **$901** |
| | |
| Total Distributions in Debtors' High Case | $3,815 |
| (/) Petition Date Claims in Debtors' High Case | 2,914 |
| **Total Distributions as a Percentage of Petition Date Claims** | **131%** |

15. Excess Value increases to $1.470 billion from $900.5 million, and distributions as a percentage of Petition Date Claims increase to 150% from 131%, if the following updates or modifications are applied to the Debtors' analysis: (1) digital assets are priced as of January 31, 2024, (2) the Setoff Principles use January 31, 2024 prices to value loans receivable, and (3) the

---

[8] GENESIS_CONF_00004284 at 86 ("Total Distribution after Rebalancing," Total Column).
[9] The Debtors refer to Petition Date Claims as Dollarized Claims in the Final Recovery Model. GENESIS_CONF_00004284 at 87 ("Petition Date Dollarized Claims," Total Column).
[10] GENESIS_CONF_00004284 at 86 ("Total Recovery on Dollarized Claims %," Total Column).
[11] GENESIS_CONF_00004284 at 86 ("Total Recovery on Incremental In-Kind Claims," Total Column).
[12] *Id.*; Sciametta Dep. Tr. 47:11-48:7.

Luno claim is excluded, given that the Debtors have reserved their rights to seek subordination of the claim.

16.     *Pricing Update*. The Debtors' High Case values digital assets using December 31, 2023 prices and estimates Excess Value of $900.5 million. I calculate that the Excess Value increases by approximately $218 million to $1.119 billion as a result of applying January 31, 2024 asset prices.[13] Under the Distribution Principles, in addition to the distribution of $2.914 billion on account of Petition Date Claims, this $1.119 billion is also distributed to creditors, resulting in a 138% recovery on Petition Date Claims.

17.     *Setoff Principles*. I understand that the Debtors have proposed Setoff Principles that would govern the calculation of net claims when a holder of a claim that is entitled to receive a distribution from the Debtors also owes a debt to the Debtors.[14] For these counterparties, the Setoff Principles determine the value of digital assets owed to the Debtors as of the Petition Date, rather than as of current pricing.[15] Given the appreciation of digital assets since the Petition Date, this decreases the value of the assets used for setoff and thereby increases the net claims against the Debtors. The Debtors calculate that the Setoff Principles increase Petition Date Claims by $288 million relative to a calculation that values the relevant loans receivable as of December 31, 2023 (the date Debtors use as a proxy for current pricing to value other assets).[16]

18.     *Luno Claim*. The Debtors include a $63 million "Luno claim" in Petition Date

---

[13] The Debtors state it is their practice when updating the recovery analysis to use month-end pricing. Sciametta Dep. Tr. 223:21-224:3. I calculated the value of the Debtors' digital assets (including loans receivable and collateral receivable) based upon prices as of January 31, 2024 for all digital assets valued in excess of $1 million as of December 31 2023. My calculations reflect an update to the pricing on 99% of the Debtors' digital assets as of December 31, 2023.
[14] *See* GENESIS_DCG_CONF_00000373 at 78; *see also* Amended Plan Supplement filed January 9, 2024, at 5 [Docket No. 1144].
[15] Sciametta 72:16-23; GENESIS_DCG_CONF_00000373 at 78.
[16] GENESIS_DCG_CONF_00000382; Sciametta Dep. Tr. 73:15-21. *See also* Sciametta Dep. Tr. 91:3-11.

Claims.[17] I understand, however, that the Debtors have stated that they have reserved all rights to subordinate the Luno claim[18] and, as such, this claim would be excluded from the Debtors' $2.914 billion of Petition Date Claims.

19. In sum, I calculate that Excess Value increases to $1.470 billion from $900.5 million and the recovery on Petition Date Claims increases to 150% from 131%, as follows:



20. Excess Value would further increase if, for example, (1) the Debtors' reserve of $67 million for Illustrative Additional Claims is not used[20] or (2) there is increased recovery on intercompany receivables as a result of price appreciation on digital assets held by non-Debtor entities.

II.     **Low Case No-Deal Recoveries**

21. I further understand as follows with respect to the Low Case of the Final Recovery Model:

---

[17] GENESIS_CONF_00004284 at 87, n.3.
[18] *See* Amended Plan, Section III.K
[19] Reflects Debtors' estimated impact of using December 31, 2023 pricing. Impact of additional update to January 31, 2024 pricing included in "Update for January 31, 2024 Pricing" column.
[20] *See* GENESIS_CONF_00004284 at 87. The Debtors include $67 million of Illustrative Additional Claims that are "just a reserve," for claims that are "probably less than a million dollars" and disputed claims. Sciametta Dep. Tr. 53:3-54:12; 55:23-56:15.

      a. The Debtors estimate total distributable assets of $3.409 billion.[21]

      b. The Debtors estimate Petition Date Claims of $3.723 billion.[22]

      c. The Debtors estimate that creditors will recover $3.409 billion, $314 million less than Petition Date Claims, resulting in a 91.6% recovery on Petition Date Claims.[23]

22. Excess Value increases to $150 million from negative $314 million, and the recovery on Petition Date Claims increases to 104% from 91.6%, if the following updates or modifications are applied to the Debtors' analysis: (1) digital assets are priced as of January 31, 2024, (2) the Setoff Principles use January 31, 2024 prices to value loans receivable, and (3) the Luno claim is excluded given that the Debtors have indicated it is a subordinated claim.

      a. *Pricing Update*. Updating the Debtors' Low Case analysis with digital asset pricing as of January 31, 2024, increases Excess Value by $113 million.

      b. *Setoff Principles/Luno Claim*. The impact of unwinding the Setoff Principles and eliminating the Luno claim is the same in the Low and High Cases. These adjustments would increase Excess Value in the Low Case by $288 million and $63 million, respectively.

23. *Mirana*. In the Low Case, the Debtors value collateral receivable (an asset of the Debtors) from Mirana, a UCC member,[24] using Petition Date pricing instead of December 31, 2023 pricing, resulting in the elimination of $102 million of assets and the addition of a $31 million claim payable to Mirana.[25]

24. *Gemini*. In the Low Case, the Debtors do not include a calculation for Gemini's

---

[21] GENESIS_CONF_00004284 at 91.
[22] GENESIS_CONF_00004284 at 91.
[23] GENESIS_CONF_00004284 at 91; Sciametta Dep. Tr. 49:3-16.
[24] Notice of Appointment of Official Committee of Unsecured Creditors, dated February 3, 2023 [Docket No. 53].
[25] Sciametta Dep. Tr. 154:19-155:17; 165:3-25.

Total In-Kind Recovery on Total Amount of In-Kind Claims, despite having calculated this metric in the High Case. Using December 31, 2023 pricing, the Debtors acknowledge that Gemini creditors receive approximately $271 million in excess of their in-kind claims.[26] I calculate that updating for January 31, 2024 pricing, would result in an additional $104 million of value—$375 million in total—to Gemini creditors in excess of their in-kind claims. The $375 million, if retained by the Debtors, would increase creditor recoveries by a corresponding amount under the Distribution Principles.

25.    In sum, I calculate that Excess Value increases to $659 million from negative $314 million and creditor recovery increases to 118% of Petition Date Claims from 91.6% of Petition Date Claims, as follows:



---

[26] The Debtors acknowledge that Gemini creditors recover $1.771 billion, though the combination of a $701 distribution and $1.070 billion of collateral value, relative to in-kind claims of $1.500 billion. Sciametta Dep. Tr. 149:2-21; 151:17-152:11.

[27] Reflects Debtors' estimated impact of using December 31, 2023 pricing. Impact of additional update to January 31, 2024 pricing included in "Update for January 31, 2024 Pricing" column.

### III. Impact of Distribution Principles on Claims and Recoveries

26. The Distribution Principles establish a Recovery Cap equal to 100% of the in-kind Claim Assets underlying such Holders' Allowed Unsecured Claims.[28] Excess Value is not distributed to holders of subordinated claims and equity unless and until the Recovery Cap is reached.

27. Mathematically, the definition of the Recovery Cap and other terms of the Distribution Principles and Setoff Principles materially reduce, if not wholly eliminate, the possibility of reaching the Recovery Cap through digital asset appreciation; and thus operate to materially reduce, if not wholly eliminate, the possibility of digital asset price appreciation creating Excess Value for distribution to holders of subordinated claims and equity.

28. By formulaically linking the Debtors' liabilities to the Debtors' assets, the Distribution Principles mathematically reduce the possibility of reaching the Recovery Cap through digital price appreciation.

   a. For example, with every price-driven increase in the value of the Debtors' BTC assets, the Debtors' in-kind BTC liability within the Recovery Cap is recalculated using the same increased BTC price.

   b. Generally, this causes the liability to increase proportionally with assets; e.g., a 5% increase in BTC price increases both the Debtors' BTC assets by 5% and BTC liabilities by 5%.

   c. Since asset growth must chase an increasing dollar value of the Recovery Cap, the possibility of reaching the Recovery Cap is reduced relative to a fixed dollar value Recovery Cap.

---

[28] Amended Plan, Exhibit A, Distribution Principles, at 8 [Docket No. 989].

29. The interaction between the Distribution Principles and Setoff Principles also mathematically reduces the possibility of reaching the Recovery Cap through digital price appreciation.

   a. The Setoff Principles fix the calculated value of certain loans receivable at Petition Date value.[29]

   b. Consequently, if prices of digital assets increase and cause in-kind liabilities to increase, the loans receivable remain fixed at their stipulated value, unable to appreciate to offset the in-kind liability growth.

30. Under certain circumstances, by formulaically linking the Debtors' liabilities to the Debtors' assets, the Distribution Principles mathematically eliminate the possibility of reaching the Recovery Cap through digital price appreciation.

   a. For example, if the Debtors are "short" an asset (i.e., in-kind liabilities are greater than in-kind assets), the growth of in-kind liabilities caused by price increases will outpace the growth of assets caused by price increases. If the price doubles: the asset value doubles, the in-kind claims double, and the shortfall of assets to liabilities doubles.

   b. The Final Recovery Model shows the Debtors to be short both BTC and ETH, before and after the proposed asset rebalancing.[30] These figures reflect various setoffs and other adjustments.

   c. The Debtors' detailed liquidity file[31] and loan book[32] show the Debtors to be short at least with respect to ETH. If Gemini is successful in its efforts to fix at $284

---

[29] Amended Plan Supplement filed January 9, 2024, at 5 [Docket No. 1144].
[30] GENESIS_CONF_00004284 at 86, 91.
[31] GENESIS_DCG_CONF_00000380.
[32] AM_GEGCB_0014545.

million the value of the collateral it holds, the Debtors will also be effectively short BTC pro forma for the fixing of collateral.

*   *   *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 15, 2024
    New York, New York

By: /s/ Adam W. Verost
Adam W. Verost
**Ducera Partners, LLC**
11 Times Square, 36th Floor
New York, NY 10036
Telephone: (212) 671-9757
Email: averost@ducerapartners.com