WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC. AND DCG INTERNATIONAL INVESTMENTS
LTD.'S OBJECTION TO CONFIRMATION OF THE DEBTORS' AMENDED PLAN**

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219) ("**GGH**"); Genesis Global Capital, LLC (8564) ("**GGC**"); Genesis Asia Pacific Pte. Ltd. (2164R) ("**GAP**," and collectively with GGH and GGC, the "**Debtors**"). For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich St., 38th Floor, New York, NY 10007.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................6

BURDEN OF PROOF ..................................................................................................8

ARGUMENT ...............................................................................................................9

I.    The Amended Plan violates multiple requirements of section 1129 and is
      unconfirmable. ..................................................................................................11

      A.    The Amended Plan is an impermissible cramdown plan that violates
            section 1129(b) of the Bankruptcy Code. ...............................................11

            1.    The Amended Plan does not comply with section 502(b) of the
                  Bankruptcy Code by allowing creditors to recover more than the
                  Petition Date values of their claims. ..............................................13

                  a)    Section 502(b) mandates that the value of a claim is fixed
                        in U.S. dollars as of the Petition Date. ...............................13

                  b)    Section 502(b) of the Bankruptcy Code applies to all kinds
                        of claims, including cryptocurrency claims. .......................16

                  c)    The Distribution Principles allow creditors to recover more
                        than the amount of their claim as of the Petition Date in
                        violation of section 502(b). .................................................19

                  d)    No exception to section 502(b) applies here. .......................20

            2.    The Amended Plan would pay an unlawful amount of interest to
                  general unsecured creditors. ...........................................................21

      B.    The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code. ............24

      C.    The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code. ............25

            1.    The Debtors have breached their fiduciary duties to DCG. .......................27

            2.    The Debtors propose in bad faith a plan that gives a small group of
                  influential creditors favorable treatment through the Setoff
                  Principles. ....................................................................................28

            3.    The Amended Plan impermissibly alters DCG's equity holder
                  rights in violation of applicable law. ..............................................32

            4.    Conditioning DCG's rights on the issuance of a Final Order
                  declaring all creditor claims Unimpaired has no basis in law,
                  equity, or otherwise. ......................................................................34

            5.    The Plan further cuts off DCG's beneficial interests in GGC and
                  GAP. .............................................................................................35

      6.     DCG should have consent rights over the Debtors' Wind-Down..............35

   D.     The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code. ............37

II.    The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law. ...........37

   A.     The Amended Plan improperly assumes and rejects only certain indemnification obligations. .................................................................38

   B.     Allowance of certain creditors' fees and expenses against the Estates. ................39

   C.     Any subordination of DCG Claims is improper. ....................................................39

   D.     The Amended Plan should not require a tax sharing agreement. .........................40

RESERVATION OF RIGHTS .................................................................................................40

CONCLUSION............................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re Aaura, Inc.*,
No. 06-B-01853, 2006 WL 2568048 (Bankr. N.D. Ill. Sept. 1, 2006) .............................16, 17

*In re Adelphia Commc'ns Corp.*,
441 B.R. 6 (Bankr. S.D.N.Y. 2010) ...................................................................................39

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)......................................................................................26, 31

*Am. United Mut. Life Ins. v. City of Avon Park*,
311 U.S. 138 (1940)...........................................................................................................26

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*,
528 F.3d 162 (2d Cir. 2008)..............................................................................................25

*In re Axona Int'l Credit & Com. Ltd.*,
88 B.R. 597 (Bankr. S.D.N.Y. 1988) ................................................................................17

*Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*,
361 B.R. 489 (B.A.P. 8th Cir. 2007)................................................................................14

*Bergquist v. Felland (In re O-Jay Foods Inc.)*,
No. 3-89-281, 1991 WL 378164 (D. Minn. Nov. 21, 1991)...............................................32

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ...........................................................................8, 11

*Cadle Co. v. Mangan (In re Flanagan)*,
503 F.3d 171 (2d Cir. 2007)..............................................................................................14

*In re Celsius Network LLC*,
655 B.R. 301 (Bankr. S.D.N.Y. 2023) ........................................................................13, 19

*Chevron Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
428 B.R. 590 (D. Del. 2010) .............................................................................................32

*In re City Stores Co.*,
21 B.R. 809 (Bankr. S.D.N.Y. 1982) ................................................................................38

*Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
138 B.R. 687 (Bankr. S.D.N.Y. 1992) ..............................................................................30

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)...................................................................................27

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005)....................................................................2, 36

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)...................................................................................12

*In re Dernick*,
    624 B.R. 799 (Bankr. S.D. Tex. 2020) ......................................................26

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019)....................................................8, 37

*In re Dow Corning Corp.*,
    237 B.R. 380 (Bankr. E.D. Mich. 1999) ....................................................23

*EMAK Worldwide, Inc. v. Kurz*,
    50 A.3d 429 (Del. 2012) ............................................................................32

*In re Eriksen*,
    647 B.R. 192 (Bankr. N.D. Ohio 2022) .....................................................16

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms
    and Explosives*,
    984 F.3d 30 (2d Cir. 2020).........................................................................34

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ............................................................11

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999).......................................................................17

*In re FTX Trading Ltd.*,
    No. 23-02297, 2024 WL 204456 (3d Cir. Jan. 19, 2024)..........................17

*In re Genever Holdings, LLC*,
    Case No. 20-12411-JLG, 2021 WL 3919826 (Bankr. S.D.N.Y. 2021)....................................33

*In re Glob. Power Equip. Grp.*,
    No. 06-11045, 2008 WL 435197 (Bankr. D. Del. Feb. 14, 2008), *aff'd*, 400
    B.R. 17 (D. Del. 2009)................................................................................16

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011).......................................................................31

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................................11

*In re Groenleer-Vance Furniture Co.*,
    23 F. Supp. 713 (W.D. Mich. 1938) ....................................................................15

*In re Hansen Bakeries*,
    103 F.2d 665 (3d Cir. 1939) .................................................................................15

*In re Hawker Beechcraft, Inc.*,
    486 B.R. 264 (Bankr. S.D.N.Y. 2013) ...............................................................38

*In re Klaber Bros., Inc.*,
    173 F. Supp. 83 (S.D.N.Y. 1959) .......................................................................38

*LaSalle Nat. Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000) ...............................................................27, 31

*In re LATAM Airlines Group S.A.*,
    No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023) ...........17

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ...........23

*Law v. Siegel*,
    571 U.S. 415 (2014) ............................................................................................16

*In re Lehman Brothers Hldgs. Inc.*,
    602 B.R. 564 (Bankr. S.D.N.Y. 2019) ...............................................................18

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ..............................................................................................16

*In re Madison 92nd St. Assocs. LLC*,
    472 B.R. 189 (Bankr. S.D.N.Y. 2012) ...........................................................22, 23

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*,
    801 F.2d 60 (2d Cir. 1980) ..................................................................................33

*In re MatlinPatterson Global Opportunities Partners II L.P.*,
    644 B.R. 418 (Bankr. S.D.N.Y. 2022) ...............................................................12

*In re Melenyzer*,
    143 B.R. 829 (Bankr. W.D. Tex. 1992) ..............................................................23

*In re Michaelis & Lindeman*,
    196 F. 718 (S.D.N.Y. 1912) ................................................................................15

*Miller v. Mott (In re Team Sys. Int'l, LLC)*,
2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...................................................................11

*Moser v. Encore Cap. Grp., Inc.*,
964 F. Supp. 2d 1224 (S.D. Cal. 2012) ...................................................................................18

*In re MPM Silicones, LLC*,
No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
*aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other
grounds*, 874 F.3d 787 (2d Cir. 2017) ...................................................................................24

*In re Mushroom Transp. Co.*,
382 F.3d 325 (3d Cir. 2004) ...................................................................................................30

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*,
28 F.4th 357 (2d Cir. 2022) ...................................................................................................16

*In re New York City Off-Track Betting Corp.*,
427 B.R. 256 (Bankr. S.D.N.Y. 2010) ...................................................................................14

*Paramount Comm'ns, Inc. v. QVC Network, Inc.*,
637 A.2d 34 (Del. 1994) ..........................................................................................................32

*In re Peak Broadcasting, LLC*,
No. 12-10183 (MFW), 2012 WL 1452359 (Bankr. D. Del. Apr. 20, 2012) ..........................25

*Philbrook v. Glodgett*,
421 U.S. 707 (1975) .................................................................................................................14

*In re Promise Healthcare Grp., LLC*,
No. 18-12491, 2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023) ........................................16

*In re PTM Techs., Inc.*,
No. 10-50980C-11W, 2013 WL 4519306 (Bankr. M.D.N.C. Aug. 26, 2013) ......................24

*In re Quigley Co., Inc.*,
391 B.R. 695 (Bankr. S.D.N.Y. 2008) .....................................................................................9

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*,
404 B.R. 793 (Bankr. M.D. Pa. 2009) ..............................................................................14, 16

*Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*,
640 F.3d 53 (2d Cir. 2011) .......................................................................................................9

*Scully v. US WATS, Inc.*,
238 F.3d 497 (3d Cir. 2001) ...................................................................................................18

*Sears v. Sears (In re Sears)*,
  863 F.3d 973 (8th Cir. 2017) ...........................................................................14

*Sexton v. Dreyfus*,
  219 U.S. 339 (1911)..........................................................................................15

*In re SunEdison, Inc.*,
  575 B.R. 220 (Bankr. S.D.N.Y. 2017) .............................................................11

*In re Tenney Village Co., Inc.*,
  104 B.R. 562 (Bankr. D.N.H. 1989) .................................................................31

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984)................................................................34

*In re Trenton Ridge Invs.*,
  LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011) ..................................................25

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013) .............................................................11

*USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New*
  *England, Inc.)*,
  429 B.R. 437 (Bankr. D. Md. 2010), *aff'd sub nom. TransCanada Pipelines*
  *Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011).............................................17

*Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*,
  637 B.R. 781 (Bankr. D. Del. 2021) ............................................................21, 23

*White v. Lambert*,
  370 F.3d 1002 (9th Cir. 2004) .........................................................................15

*Wilkow v. Forbes, Inc.*,
  241 F.3d 552 (7th Cir. 2001) ...........................................................................34

*In re Young Broadcasting Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010)..................................................................9

*In re Zamora*,
  No. 19-01040 (WLH), 2020 WL 4289926 (Bankr. E.D. Wash. July 27, 2020)......................32

**Statutes**

11 U.S.C. § 365..................................................................................................38, 39

11 U.S.C. § 502(b) ............................................................................... *passim*

11 U.S.C. § 562..................................................................................................21

11 U.S.C. § 550(a) ...............................................................................................14

11 U.S.C. § 704(a)(5)..........................................................................................30

11 U.S.C. § 726(a)(5)......................................................................................22, 23

11 U.S.C. § 1106(a)(1)........................................................................................30

11 U.S.C. § 1109(b) .............................................................................................9

11 U.S.C. § 1123(a)(6)....................................................................................24, 25

11 U.S.C. § 1123(a)(7).........................................................................................35

11 U.S.C. § 1124(1) ............................................................................................34

11 U.S.C. § 1128(b) .............................................................................................9

11 U.S.C. § 1129 ........................................................................................... *passim*

11 U.S.C. § 1129(a) .................................................................................2, 8, 11, 37

11 U.S.C. § 1129(a)(1)..............................................................................10, 24, 25, 39

11 U.S.C. § 1129(a)(3)..................................................................................... *passim*

11 U.S.C. § 1129(a)(7)..............................................................................10, 13, 37

11 U.S.C. § 1129(a)(7)(A)(ii) .................................................................................22

11 U.S.C. § 1129(b) ....................................................................................... *passim*

11 U.S.C. § 1129(b)(2) ........................................................................................34

28 U.S.C. § 1961..................................................................................................22

## Other Authorities

Fed. R. Bankr. P. 9019...........................................................................................12

*In re BlockFi Inc.*,
  No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660..................................18

*In re Celsius Network LLC*,
  No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 27, 2023), Docket No. 3577 .............................18

7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023) ............................................11

*In re FTX Trading Ltd.*,
    No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31 Hr'g Tr.) ........................................4, 17, 18, 19

S. Rep. No. 95-989 (1978). Section 502(b) ....................................................................................15

*In re Voyager Digital Holdings*,
    No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ...........................18

www.coinbase.com/price/bitcoin........................................................................................................7

Digital Currency Group, Inc. ("**DCG**") and DCG International Investments Ltd. ("**DCGI**") submit this objection (the "**Objection**")[2] to the approval of the *Debtors' Amended Joint Chapter 11 Plan* (Docket No. 989) (as amended, modified or supplemented, the "**Amended Plan**")[3] and respectfully states as follows:

## Preliminary Statement

1.      DCG would support a plan that pays creditors one hundred cents on the dollar, and the Estates currently have sufficient assets to do so.  But the Debtors have not proposed such a plan.  Instead, the Debtors, in concert with the UCC and Ad Hoc Group, have devised a cramdown plan that pays unsecured creditors hundreds of millions of dollars *more* than the full amount of their petition date claims—and which disproportionately favors a small controlling group of creditors over others—in violation of the Bankruptcy Code.  It also strips DCG of other valuable economic and corporate governance rights further violating the Bankruptcy Code and demonstrating a lack of good faith.  DCG cannot support such a plan, and the Court should not approve it.

2.      Through the complex and convoluted Distribution Principles, the Amended Plan violates two black letter requirements of the Bankruptcy Code for confirming a cram down plan: (1) senior classes may not receive more than the full value of their claims, and (2) distributions must comply with the absolute priority rule.  Indeed, rather than maximizing the value of the Estates for the benefit of all constituents—as the Debtors' fiduciary obligations to the Estates require—the Amended Plan proposes to grant general unsecured creditors all the upside from the

---

[2]      Unless explicitly stated otherwise, all references to DCG's positions are fully adopted by DCGI.

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Plan Supplement, or the Disclosure Statement (each as defined herein).

increasing market value of the Estates' digital assets through valuation dates and interest rates prohibited by the Bankruptcy Code. The Amended Plan goes further to give certain favored creditors—to the disadvantage of all other creditors and equity holders—an even greater distribution through the lopsided Setoff Principles that minimize the favored creditors' obligations to the Estates while maximizing their payout from the Estates. Certain creditors will be paid a premium, while equity holders receive nothing. Such a result is not fair and equitable to those creditors and equity holders, whose rights are violated by the Amended Plan. The Debtors have sought expediency by proposing a plan that creditors would support, but at the cost of complying with their duties and obligations under the Bankruptcy Code. This, in violation of the principle that "efficiency must not be obtained at the price of diminishing the integrity of the process."[4] The Bankruptcy Code is clear: the Amended Plan may not be confirmed.

3.      The undisputed record demonstrates the Amended Plan does not comport with section 1129 of the Bankruptcy Code because it does not comply with applicable provisions of the Bankruptcy Code and was proposed in bad faith. Section 502(b) of the Bankruptcy Code requires that claims be valued in U.S. dollars as of the petition date. In plain violation of that provision, the Amended Plan proffers a distribution scheme that allows certain unsecured claims to grow to an extreme degree as the Estates' assets increase in value. The Amended Plan does so by valuing certain creditor claims based on the value of the reference assets as of the distribution date under the so-called Distribution Principles: The more the assets of the Estates appreciate, the more those creditors will receive as allowable claims, and the more value they will be permitted to take in excess of their Petition Date claims. These assets are overwhelmingly cryptocurrencies which have increased in value since the Petition Date, and these senior creditors will be the sole

---

[4]      *In re Congoleum Corp.*, 426 F.3d 675, 693 (3d Cir. 2005).

beneficiaries of that appreciation under the Amended Plan.  It is likely no coincidence that this

distribution construct was introduced when cryptocurrency prices began to increase.[5]

4.      If allowed, this unlawful diversion would allow these creditors to take far more than

what is permitted by the Bankruptcy Code.  The Debtors' own financial advisor believes there is

a realistic possibility this unprecedented provision will provide a distribution to creditors of over

$900 million more in value than they would have received had the claims been fixed in U.S. dollars

as of the Petition Date as required by the Bankruptcy Code.  Both the UCC and the Debtors testified

that there is no limit to how high that recovery can go; creditors could end up with 10, 20, or 50

times the dollar value of their allowed claims at the Petition Date.  And the Debtors' financial

advisor could not offer any scenario in which the equity holders would receive any value,

regardless of how much the Estates' assets appreciate in the interim.  This taking of DCG's

interests as the ultimate equity holder of the Debtors comes despite DCG's direct channeling of

hundreds of millions of dollars of liquidity and capital to the Debtors in the year leading up to the

filing of these cases.  Were DCG ultimately to receive some equity value, it would merely be a

return of some of the massive investment DCG made in the Debtors pre-filing.

5.      When asked why they selected an unprecedented recovery scheme that provides an

unlawful distribution to the general unsecured creditors and disregards the valuation method

mandated by the Bankruptcy Code, the Debtors' witnesses could say only that this restructuring is

unique because it involves cryptocurrency.  But they point to no cryptocurrency exception in the

Bankruptcy Code, because no such exception exists.  And this is hardly the first cryptocurrency

bankruptcy filing.  Importantly, every other cryptocurrency case has used the normal claim

valuation mechanism prescribed by the Bankruptcy Code.  Indeed, just days ago, the Bankruptcy

---

[5]      *See* Sciametta Dep. Tr. 185:3–186:9.

Court in the FTX bankruptcy cases overruled objections to the petition date claims valuation proffered by the debtor, stating:  "I conclude that debtors' use of the petition date as the date for determining the value of the digital asset claims is appropriate.  I have no wiggle room on that."[6] The same is true here, and the Debtors are left unable to explain why this Court would have the authority under the Bankruptcy Code to rule differently.

6.      Moreover, the Amended Plan is the product of a gross breach of the fiduciary duties owed by the Debtors and their directors to DCG as the ultimate equity holder in the solvent Debtors and is, therefore, not proposed in good faith.  Because of the unlawful Distribution Principles outlined above, the illustrative waterfall offered in the Amended Plan is a sham, provided to create the illusion that the subordinated creditors and equity interests will receive value after the unsecured claims are paid in full, while deliberately obscuring that under the formulation, the Estates' excess value will instead continually flow to general unsecured creditors.  This scheme is so radical that neither the Debtors' independent director, nor their financial advisor, nor the financial advisor to the UCC—with nearly one hundred years of collective restructuring experience—has ever agreed to or seen anything like it.  Even the independent director of the Debtors claims he was unaware of the operation of the waterfall:  He was seemingly never informed by his financial and legal advisors that there is virtually no cap on the creditors' recovery.

7.      Not surprisingly, the Amended Plan was the product of a clandestine process.  The Debtors engaged in months of back room discussions with the UCC and the Ad Hoc Group, which deliberately excluded DCG, the ultimate equity holder in these solvent Estates.  Even worse, they have hidden their self-dealing behind assertions of common-interest privilege, preventing any

---

[6]     *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr.) (the "**FTX Hearing Transcript**"), (attached hereto as **Exhibit A**) at 15:2–11.

review by the Court. It is no accident that this process resulted in a structure that disenfranchises the equity interests, imposes a distribution plan that gives the general unsecured creditors practically limitless upside potential on the appreciation of digital assets right up through the final distributions, and puts forth a sham waterfall that conceals this fact.

8.      The UCC and Ad Hoc Group also helped themselves—with the Debtors as their accomplice—to a host of other advantages, all at the expense of DCG:

- Granting unsecured creditors post-petition interest at rates not recognized by this District and in violation of 1129(a)(7), as well as an improper sweetener of additional post-Effective Date interest at an arbitrary rate, further siphoning value away from DCG for the benefit of general unsecured creditors;

- Restricting DCG's rights to exercise any rights or remedies as sole equity holder;

- Removing DCG's economic interests, voting interests, and governance rights with respect to GGC or its subsidiaries;

- Removing DCG's rights to any dividends or distributions as a result of its ownership of interests in GGH;

- Removing DCG's right to transfer its interests in GGH or take a worthless stock deduction;

- Limiting DCG's right to appoint the directors of GGH;

- Excluding DCG from the parties who have consent rights over the New Governance Documents; and

- Providing DCG no representation on the various Wind-Down committees set up by the Amended Plan, despite DCG's interests in the Estates.

On top of all of this, a small group of particularly powerful creditors have also inserted favorable setoff provisions that allow them to minimize their obligations to the Debtors while maximizing their recoveries. Put simply, the influential creditors controlling the UCC and Ad Hoc Group have sought to enrich themselves by literally taking value from other stakeholders, and the Debtors caved to their demands in violation of their fiduciary duties.

9.      Again, DCG would fully support a plan that provides a 100% recovery for creditors—par plus post-petition interest.  But rather than move expeditiously to confirm a plan that pays creditors one-hundred cents on the dollar, the UCC and Ad Hoc Group, with the willing participation of the Debtors, conspired to formulate a plan that deliberately—in violation of the Bankruptcy Code, applicable non-bankruptcy law, and the Debtors' fiduciary obligations to equity—disenfranchises the sole equity holder in this fully solvent estate, DCG.  This is the definition of bad faith.

10.      Additionally, the assertion that this distribution scheme is somehow a settlement is completely disingenuous.  If this was truly a settlement, DCG would have been included as one the beneficiaries of the excess value of the Estates and would have, at a minimum, been provided some recovery as equity holder.  Instead, the Debtors, UCC, and Ad Hoc Group took all the additional value and then decided how to allocate it to benefit themselves, leaving nothing for other stakeholders.  That is not a fair settlement among interested parties.

11.      For these reasons, and as discussed below, the Debtors have not met the requirements to confirm a plan under section 1129 of the Bankruptcy Code and, therefore, the Amended Plan should not be confirmed.

## Background

12.      On November 28, 2023, the Debtors filed the Amended Plan, which is supported by the official committee of unsecured creditors (the "**UCC**") and the ad hoc group of Genesis lenders (the "**Ad Hoc Group**") (collectively, the "**Plan Support Parties**").  *See Plan Support Agreement* (Docket No. 1008), filed November 29, 2023; *see also* Nov. 28, 2023 Hr'g Tr. (Docket No. 1148) at 15:22–16:6, 22:20–23:3.

13.      Most significantly, the Amended Plan and its Distribution Principles contemplate distributions to creditors with claims denominated in digital assets in excess of what the

Bankruptcy Code permits. To do so, the Amended Plan allows creditors to recover the cash value as of the Petition Date of the digital assets underlying their bankruptcy claims, but then also allows those same creditors to receive **_additional_** payouts based on the **_current_** value of those digital assets. Distribution Principles at 8–9; B. Geer Dep. Tr. (attached hereto as **Exhibit B**) 102:9–105:5. The higher the value of the digital assets goes, the greater the recovery to the creditors—at no point does the excess value from those digital assets flow to the subordinated creditors or to DCG as the ultimate equity holder. And since the Petition Date, the market values of the digital assets of the Estates have increased significantly. J. Sciametta Dep. Tr. (attached hereto as **Exhibit C**) 228:19–229:15. Indeed, by today's valuation, the market value of certain digital assets has increased dramatically—for example, as of February 4, 2024, the market value of Bitcoin had increased by almost 102.5% since the Petition Date.[7] There is, accordingly, no practical cap on the payout to these creditors.

14. The Debtors, the UCC, and the Ad Hoc Group have, incredibly, admitted all of this—and more. The UCC's own advisor, Mr. Brad Geer, testified that holders of Bitcoin could receive at least double, if not triple, the amount of their claim valued as of the Petition Date, on a dollar-for-dollar basis. Geer Dep. Tr. 104:22–105:5. Mr. Joe Sciametta, the Debtors' financial advisor, likewise agreed with the conclusion that certain creditors could receive triple the value of their Petition Date claim under the Distribution Principles. Sciametta Dep. Tr. 33:14–22. Putting it more concretely, Mr. Sciametta testified that if a creditor's claim based on digital assets was valued at $20 million as of the Petition Date, and the value of those reference assets appreciated to $500 million by the distribution date, that creditor would be entitled to up to $500 million from the Estates, even though that creditor's Petition Date claim was valued only at $20 million, thus

---

[7]    See Disclosure Statement Ex. D at 5; https://www.coinbase.com/price/bitcoin.

establishing an additional $480 million of distributions to creditors senior to subordinated claims and equity. *Id.* at 255:4–256:22.

15.     Perhaps most stunningly, though, is that the Debtors' financial advisor—who was one of the architects of the Amended Plan—could not identify ***any*** scenario in which the equity holders would receive a single penny from the Estates.  Sciametta Dep. Tr. 278:16–279:17.  He additionally admitted that further appreciation of the Estates' assets will be diverted to the creditors through increasing creditor claims. *Id.* at 276:5–17.  Furthermore, the independent director of the special committee of the Debtors conceded that he did not realize there was no cap on the recovery by creditors.  P. Aronzon Dep. Tr. (attached hereto as **Exhibit D**) 59:8–61:9; 88:21–90:8.  No witness could testify as to any other chapter 11 plan—across all of their combined experiences—that distributed assets in this way.  Aronzon Dep. Tr. 63:3–64:11, 88:21–90:8; Geer Dep. Tr. 78:2–17; Sciametta Dep. Tr. 257:4–258:5.

### Burden of Proof

16.     A chapter 11 plan may be confirmed only if it satisfies the requirements of section 1129(a) of the Bankruptcy Code, which include, *inter alia*, that the plan "complies with the applicable provisions of" the Bankruptcy Code, that the plan "has been proposed in good faith," and that holders of an impaired claim or interest either have accepted the plan or will receive at least as much under the plan as they would in a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a). The plan's proponent bears the burden of showing, by a preponderance of the evidence, that all of the applicable elements of section 1129(a) have been satisfied. *See In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019).  Additionally, a plan that is not fully consensual must satisfy the requirements of section 1129(b), which too must be demonstrated by the plan proponent by a preponderance of the evidence. *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018).  The Court also "has an independent duty to ensure that the requirements

of 11 U.S.C. § 1129 are satisfied," whether the plan sustains objections or not. *See, e.g.*, *In re Young Broadcasting Inc.*, 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010) (noting that the court "has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied").

## Argument

17.    The Amended Plan cannot be confirmed because it violates multiple requirements of section 1129 of the Bankruptcy Code.[8]

18.    *First*, the Amended Plan constitutes an impermissible cramdown plan in violation of section 1129(b). The Amended Plan is not fair or equitable to impaired classes that have rejected or are deemed to reject the Amended Plan because the Distribution Principles would pay a premium of approximately $900 million[9] in excess value, if not more, at the expense of subordinated claimholders and equity holders in violation of section 502(b) of the Bankruptcy Code and a bedrock principle of bankruptcy law: the corollary to the absolute priority rule requiring that senior classes of creditors not receive more than full compensation for their allowed claims. Additionally, excess value after the Recovery Cap is reached will flow to general unsecured creditors through payments of interest at rates not permitted in this District or under the

---

[8]    The Bankruptcy Code provides that "[a] party in interest may object to confirmation of a plan." 11 U.S.C. § 1128(b). Section 1109(b) of the Bankruptcy Code further describes "party in interest" to include, among other things, "a creditor" and "an equity security holder." 11 U.S.C. § 1109(b). Section 1109(b) is not intended to be an exclusive list; rather, courts broadly define a party in interest to include anyone with a financial interest, or in some cases a legal interest, in the case. *See Savage & Assocs. v. K & L Gates (In re Teligent, Inc.)*, 640 F.3d 53, 60 (2d Cir. 2011). DCG qualifies as both a creditor and an equity security holder of the Debtors. DCG and DCGI filed proofs of claim against the Debtors. Claim Nos. 464, 487, 511, 478. And DCG is GGH's sole equity holder. Both DCG and DCGI therefore have financial and legal interests in the outcome of these chapter 11 cases and the plan confirmation process. *See id*. Additionally, DCG and DCGI only seek to challenge those portions of the Amended Plan that affect their direct interests. *See In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) (noting that a "party in interest" must still satisfy the general requirements of prudential standing).

[9]    This, according to the Debtors' own advisors. *See* Genesis Global Capital High Case No-Deal Recoveries, Jan. 2024 (attached hereto as **Exhibit E**) at 3; Aronzon Dep. Tr. 33:8–13; Sciametta Dep. Tr. 47:11–48:7, 227:13–228:8 (acknowledging that under certain circumstances there may be over a billion dollars in value excess of creditor claims valued as of the Petition Date).

Bankruptcy Code, further depriving subordinated claimholders and equity holders of value they are entitled to receive under the Bankruptcy Code.

19.    *Second*, and again by violating section 502(b) of the Bankruptcy Code through the Distribution Principles, the Amended Plan fails to comply with section 1129(a)(1) of the Bankruptcy Code.

20.    *Third*, the Amended Plan violates section 1129(a)(3) of the Bankruptcy Code because the Amended Plan and its Distribution Principles have not been proposed in good faith and violate applicable law.  The Amended Plan was designed in secret by a select group of influential creditors—to the exclusion of DCG—to ensure maximum recovery to those creditors, well beyond what is allowed under the Bankruptcy Code.  It also gives a small group of creditors favorable treatment through the Setoff Principles, to the detriment of other creditors and equity holders.  The icing on the cake is a series of provisions that ostensibly keep DCG as existing equity holder while simultaneously stripping it of numerous attendant economic and governance rights, perhaps most significantly its voting rights, as the ultimate equity holder of the Debtors, and in violation of multiple provisions of the Bankruptcy Code and applicable law.

21.    *Fourth*, the Amended Plan violates section 1129(a)(7) because it is not in the best interest of subordinated creditors and equity holders.  As noted, the Amended Plan proposes to impermissibly increase general unsecured creditor recoveries by not tying such recoveries to Petition Date value, and paying interest on claims that is not permitted under the Bankruptcy Code. This leaves junior classes of claims and interests to receive less than they would in a hypothetical liquidation where the distribution scheme follows the Bankruptcy Code.

22.    Lastly, the Amended Plan further disenfranchises DCG of its corporate governance rights and rights as the sole owner of interests in GGH by restricting its right to transfer its interests in GGH and take a worthless stock deduction for tax purposes if and when appropriate.

23.    For these reasons, and as discussed below, the Amended Plan is unconfirmable.

## I.    The Amended Plan violates multiple requirements of section 1129 and is unconfirmable.

24.    A chapter 11 plan may not be confirmed unless it satisfies all requirements of section 1129(a) of the Bankruptcy Code, which includes the requirements of section 1129(b) for a plan that has not been accepted by all classes.  The Debtors' Amended Plan cannot be confirmed because it violates multiple requirements of sections of 1129 of the Bankruptcy Code, namely the cramdown requirements of section 1129(b), as well as sections 1129(a)(1), (3), and (7).

### A.    The Amended Plan is an impermissible cramdown plan that violates section 1129(b) of the Bankruptcy Code.

25.    A cramdown plan is permissible only if, among other things, the plan is "fair and equitable" with respect to classes of claims or interests that are impaired under and have not accepted the plan.  11 U.S.C. § 1129(b).  To be fair and equitable, a plan must comport with (i) the absolute priority rule; and (ii) the principle that no creditor be paid more than it is owed.  *See* 7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023).  "An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation[10] for its claims" because "shareholders are entitled to the surplus."  *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017) (citations omitted).[11]

---

[10]    As discussed herein, the "solvent debtor exception" may allow creditors to recover a certain amount of post-petition interest on their claims before they are considered paid in full.  However, even here, the Debtors have departed from the legally permissible rate to further detrimentally impact DCG's interests, as explained herein.

[11]    *See also In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (same); *In re Tronox Inc.*, 503 B.R. 239, 337 (Bankr. S.D.N.Y. 2013) (same); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (same); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (same); *Miller v. Mott (In re*

26.    Notably, the requirements of section 1129 cannot be avoided by deeming the Amended Plan and Distribution Principles a "settlement" among creditors. There is no settlement where, as here, interested parties were wholly excluded from discussions and the Estates appear to receive nothing in return for these unlawful distributions of value. As recently reiterated by the United States Supreme Court, section 1129(b) cannot be sidestepped by a settlement of only certain parties. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) (finding impermissible a settlement for a structured dismissal that violated the absolute priority rule).[12]

27.    As explained below, the Amended Plan violates section 1129(b) in two ways, either of which is sufficient on its own to deny confirmation.

28.    *First*, for ultimate distributions, the Amended Plan impermissibly values creditors' claims in cryptocurrency as of the date of distribution, rather than in U.S. dollars as of the Petition Date, in violation of section 502(b) of the Bankruptcy Code. As a result of this improper valuation, the Amended Plan proposes to divert nearly $900 million in value—and potentially many millions more if the digital assets continue to appreciate—to creditors, which should instead flow to equity under the Bankruptcy Code. Because the Distribution Principles grant certain creditors more on account of their claims than is allowed under the Bankruptcy Code, the Amended Plan plainly violates the corollary to the absolute priority rule and, as a result, violates section 1129(b).

29.    *Second*, the Amended Plan contemplates the payment of interest to general unsecured creditors at rates not recognized by this District and in excess of what is allowed by

---

*Team Sys. Int'l, LLC)*, 2023 WL 1428572, at *12 (Bankr. D. Del. Jan. 31, 2023) ("[O]nce creditors are paid, any remaining value would be distributed to the debtor, which would presumably dividend that distribution to its equity holders.").

[12]    Even if the Distribution Principles were treated as a settlement pursuant to Bankruptcy Rule 9019—rather than as a plan for distribution—the Court would still have to evaluate whether "the proposed settlement would 'unduly prejudice' a non-settling creditor or other party." *In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 428 (Bankr. S.D.N.Y. 2022).

section 1129(a)(7) of the Bankruptcy Code. This impermissible diversion of Estate assets to creditors likewise violates the absolute priority rule by paying creditors more on account of their claims than what the Bankruptcy Code allows. As a result, the Distribution Principles, as incorporated by the Amended Plan, violate section 1129(b).

> **1.    The Amended Plan does not comply with section 502(b) of the Bankruptcy Code by allowing creditors to recover more than the Petition Date values of their claims.**

30.    The Amended Plan violates section 502(b) because it proposes to pay creditors based on the value of their claims for digital assets as of the distribution date, rather than in lawful currency of the United States ("**U.S. dollars**") as of the Petition Date. Although creditors' initial pro rata distributions are based on their claims being valued as of the Petition Date, *see* Distribution Principles at 4, the Recovery Cap for each creditor floats with the underlying asset prices, *see* Distribution Principles at 8–9. That is, claims are effectively being valued at the average price of the asset during the 15-day period before and after the date the Confirmation Order is entered (termed the "**Initial Conversion Rate**"), or at a later distribution date, not the Petition Date. *Id.* Put differently, the Distribution Principles would allow certain creditors, whose claims are based on digital assets that have significantly appreciated in value since the Petition Date, to recover more than the value of their claims in U.S. dollars as of the Petition Date.

> a)    *Section 502(b) mandates that the value of a claim is fixed in U.S. dollars as of the Petition Date.*

31.    Section 502(b) is unambiguous: A bankruptcy court "shall allow" a claim against which an objection has been raised only in "the amount of such claim in lawful currency of the United States of the date of the filing of the petition."[13]  11 U.S.C. § 502(b). There are two

---

[13]    Although section 502(b) only explicitly refers to determination of claims that have been objected to, courts value claims as of the petition date in U.S. dollars in other contexts, such as allowance of claims for plan distributions.

elements to this mandate.  First, a claim is valued as of "the date of the filing of the petition."  *Id.*[14]

Second, that valuation is to be made in U.S. dollars, not in some other denomination.  *See, e.g.*,

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*, 404 B.R. 793, 799 (Bankr. M.D. Pa. 2009) (converting

claim in Canadian dollars to U.S. dollars based on the petition date exchange rate).

32.     The meaning of section 502(b) is clear on its face, and "[i]n the usual case, if the

words of a statute are unambiguous, judicial inquiry should end, and the law

is interpreted according to the plain meaning of its words."  *In re New York City Off-Track Betting*

*Corp.*, 427 B.R. 256, 268 (Bankr. S.D.N.Y. 2010) (quoting *Devine v. U.S.*, 202 F.3d 547, 551 (2d

Cir. 2000)).  In any event, other sources of statutory meaning reinforce the plain language of

section 502(b).

33.     *First*, other sections of the Bankruptcy Code support strict application of section

502(b).  *See Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) (noting that, in interpreting one part

of a statute, "we must not be guided by a single sentence or member of a sentence, but look to the

provisions of the whole law, and to its object and policy").  For example, section 550(a) of the

Bankruptcy Code—which governs what the trustee or debtor-in-possession can recover for the

benefit of the estate through avoidance claims—states that the trustee may recover "the property

transferred, or, if the court so orders, the value of such property."  11 U.S.C. § 550(a).  Thus, unlike

section 502(b), section 550(a) allows the bankruptcy court to disburse from the estate ***either*** the

---

*See, e.g.*, *In re Celsius Network LLC*, 655 B.R. 301, 312 (Bankr. S.D.N.Y. 2023) ("Whether under a chapter 11 plan or liquidation, creditors are entitled to their share of the value of the Debtors' Estates on the Petition Date.").

[14]     *See also Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 179 (2d Cir. 2007) ("A plain reading of [section 502(b)] suggests that the bankruptcy court should determine whether a creditor's claim is enforceable against the debtor as of the date the bankruptcy petition was filed."); *Sears v. Sears (In re Sears)*, 863 F.3d 973, 978 (8th Cir. 2017) ("When a party in interest objects to a creditor's claim, the bankruptcy court 'shall determine the amount of such claim . . . as of the date of the filing of the petition.'" (citation omitted)); *Bellamy's Inc. v. Genoa Nat'l Bank (In re Borden)*, 361 B.R. 489, 497 (B.A.P. 8th Cir. 2007) ("The petition date controls the allowance of claims in bankruptcy.").

"property transferred" or "the value of such property." *Id.* By expressly allowing for alternative valuation methodologies in this section while limiting section 502(b) to the value of the claim as of the petition date, Congress evinced its intent that section 502(b) be ***strictly applied***. *See White v. Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004) ("It is axiomatic that when Congress uses different text in 'adjacent' statutes it intends that the different terms carry a different meaning.").

34.     *Second*, valuing assets as of the petition date is consistent with historical practice. The prior statute providing for allowance of claims—section 57(d) of the 1898 Bankruptcy Act—was ambiguous as to the date and methodology for valuation of claims: "Claims which have been duly proved shall be allowed, upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest, or their consideration to be continued for cause by the court upon its own motion." The Supreme Court, however, interpreted section 57(d) as incorporating the "English rule" that claims in bankruptcy are "fixe[d] the moment . . . the petition is filed." *Sexton v. Dreyfus*, 219 U.S. 339, 345 (1911). Such a rule, the Court explained, "simply fixes the moment when the affairs of the bankrupt are supposed to be wound up." *Id.* at 344. Courts thereafter repeatedly affirmed that "the rights of the creditors of a bankrupt become fixed on the date of the filing of the bankruptcy petition." *In re Hansen Bakeries*, 103 F.2d 665, 666–67 (3d Cir. 1939).[15]

35.     When section 502(b) was enacted as part of the Bankruptcy Reform Act of 1978, it was intended to codify the notion that "bankruptcy operates as the acceleration of the principal amount of all claims against the debtor" as of the petition date. S. Rep. No. 95-989 at 63 (1978).

---

[15]     *See also In re Groenleer-Vance Furniture Co.*, 23 F. Supp. 713, 715 (W.D. Mich. 1938) ("[T]he rights of creditors become fixed at the moment of bankruptcy and that they then acquire a right in rem against the [debtor's] assets."); *In re Michaelis & Lindeman*, 196 F. 718, 719 (S.D.N.Y. 1912) ("[T]here must come a time as of which claims against a bankrupt's estate are to be liquidated and stated. . . . [T]his time has been fixed as the date of filing petition").

Section 502(b) thus carries through the principle, recognized in *Sexton*, that a bankruptcy fixes the creditors' rights as of the date of the petition, and those rights are not subject to diminishment—or enlargement—based on post-petition changes. *See Aaura*, 2006 WL 2568048, at *4 (noting that the plain language of section 502(b) incorporates the understanding articulated in *Sexton*).

36.    *Third*, fixing creditors' rights based on the U.S. dollar value of their claims as of the petition date furthers the purpose of the Bankruptcy Code. By fixing value as of the time of the petition, the petition date provides "a 'day of reckoning,' consolidating the debtors' present and future obligations into one moment for prompt resolution." *In re Promise Healthcare Grp., LLC*, No. 18-12491, 2023 WL 3026715, at *5 (Bankr. D. Del. Apr. 20, 2023). The petition "freezes all parties' rights as they existed on the petition date." *Id.*[16] This frees the bankruptcy estate—and the creditors—from the unpredictability of the markets, while also preventing creditors from obtaining a windfall.[17]

> b)    *Section 502(b) of the Bankruptcy Code applies to all kinds of claims, including cryptocurrency claims.*

37.    The clear mandate of section 502(b) cannot be evaded on grounds of equity or convenience. *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code"). The term "shall" "normally creates an obligation impervious to judicial discretion." *Lexecon Inc.*

---

[16]    *See also In re Glob. Power Equip. Grp.*, No. 06-11045, 2008 WL 435197, at *5 (Bankr. D. Del. Feb. 14, 2008) (noting that section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars" (citation omitted)), *aff'd*, 400 B.R. 17 (D. Del. 2009).

[17]    *See, e.g.*, *In re Eriksen*, 647 B.R. 192, 195 (Bankr. N.D. Ohio 2022) ("Section 502(b) makes it clear that the time for determination of a claim is 'as of the date of the filing of the petition,' not some indeterminate later time depending on post-petition developments in the law and the facts and estate administration."); *In re LeBlanc*, 404 B.R. at 799 ("[Section] 502(b) specifically bars the fluctuation of the proof of claim value due to exchange rates in effect post-petition."); *Aaura*, 2006 WL 2568048, at *4 n.5 (Section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to the United States dollars").

*v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 27 (1998); *see also N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 28 F.4th 357, 371 (2d Cir. 2022) ("The word 'shall' in a statute, indicates a command."). Applying the Bankruptcy Code, the Third Circuit recently held that a provision directing that a court "shall" appoint an examiner was non-discretionary. *See In re FTX Trading Ltd.*, No. 23-02297, 2024 WL 204456, at *4 (3d Cir. Jan. 19, 2024); ("'[S]hall' signals when a court must follow a statute's directive regardless of whether it agrees with the result." (citation omitted)). The same principles apply here—a court has *no* discretion to deviate from the valuation principles of section 502(b), no matter the perceived equity or fairness of those principles. Doing so, as in *FTX Trading*, would be reversible error.

38.    Section 502(b) applies to all kinds of claims. For example, claims denominated in foreign currencies are converted to U.S. dollars at the prevailing exchange rate as of the petition date. *See, e.g.*, *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir. 1999) (observing that, under U.S. bankruptcy law, claims in foreign currency are determined by converting them to U.S. dollars as of the petition date).[18]

39.    Likewise, claims stated in commodities (like gold) are valued in U.S. dollars as of the petition date, explaining that the denomination of claims in U.S. dollars is consistent with the clear reading of section 502(b) of the Bankruptcy Code, which "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars."

---

[18]    *See also In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *8 (Bankr. S.D.N.Y. May 19, 2023) (applying the accepted market rate "in effect as of the applicable Petition Date" to conversion of Brazilian currency to U.S. dollars); *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.)*, 429 B.R. 437, 492 (Bankr. D. Md. 2010) ("[U]nder the plain meaning of 11 U.S.C. § 502(b), the Court shall use the exchange rate in effect on the Petition Date to convert the claim to U.S. dollars."), *aff'd sub nom. TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011); *In re Axona Int'l Credit & Com. Ltd.*, 88 B.R. 597, 608 n.19 (Bankr. S.D.N.Y. 1988), *as amended* (Aug. 11, 1988) (noting that section 502(b) refers to the date of the entry of the order for relief as the appropriate date for conversion of foreign currency claims).

*See In re Aaura, Inc.*, No. 06-B-01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1, 2006). The same goes for securities. *See In re Lehman Brothers Hldgs. Inc.*, 602 B.R. 564, 586–87 (Bankr. S.D.N.Y. 2019) (holding that, if the 11 U.S.C. § 562 exception does not apply to a securities contract, "the [assets] must be valued on or about the Petition Date pursuant to section 502").[19]

40.     Cryptocurrency is no different. Debtors and bankruptcy courts have repeatedly and consistently valued claims based on digital assets as of the applicable petition date in recent large chapter 11 cases.[20] In fact, just days ago, the *FTX Trading* bankruptcy court squarely rejected the same valuation method set forth in the Amended Plan. Overruling objections by creditors without hearing argument, the court stated: "[T]he [Bankruptcy] [C]ode is very clear. The [C]ode says that a claim is to be determined in U.S. dollars as of the petition date." FTX Hearing Transcript at 14:23–25. The court acknowledged there was "no wiggle room on that," and that some creditors' view that such valuation was "unfair to them because the value may have increased" did not alter

---

[19]   Indeed, the same rule applies in the context of breach-of contract actions, where courts have held that damages must be measured at the date of the breach, in order to "avoid[] the speculativeness and hindsight problems attendant to" a theory of recovery based on a later valuation date. *Scully v. US WATS, Inc.*, 238 F.3d 497, 512 (3d Cir. 2001). Thus, "[i]f a plaintiff is permitted to select any point during the period between the breach and the end of the litigation to value his [claim], he not only injects uncertainty and speculation into the damages calculation, he also gets 'the benefit of hindsight, thereby putting him in a better position than if the breach . . . had never occurred.'" *Moser v. Encore Cap. Grp., Inc.*, 964 F. Supp. 2d 1224, 1226 (S.D. Cal. 2012) (internal quotation marks omitted). The same rationale applies in the bankruptcy context: Any recovery to creditors beyond that available at the petition date would rest on speculation and hindsight, and potentially leave creditors better off than had there been no bankruptcy at all.

[20]   *See, e.g.*, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023), Docket No. 1660 ("As is required by section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Digital Assets (based in United States dollars pursuant to the Digital Assets Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11.59 p.m. UTC. This process is generally referred to as a 'dollarization.' Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the Bankruptcy Code."); *In re Voyager Digital Holdings*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 5, 2023), Docket No. 1138 ("Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code."); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 27, 2023), Docket No. 3577 ("[T]he value of a Claim denominated in Cryptocurrency shall be calculated by converting the value of the Claim into Cash as of the Petition Date . . . .").

the court's "obligat[ion] to follow the [Bankruptcy] [C]ode." *Id.* at 15:10–11.  On that basis, the *FTX Trading* court concluded that "use of the petition date as the date of determining the value of digital asset claims is appropriate." *Id.* at 15:7–10.  There can be no more on-point precedent than that.[21]  And, in contrast to the Amended Plan, because creditor claims in *FTX Trading* are measured by their petition date value, the waterfall distribution mechanics would allow recoveries to flow to equity holders after creditors are paid in full based on such value.[22]  The priority scheme designed by Congress is clear and must be followed, regardless of who holds the equity.[23]

> c)    *The Distribution Principles allow creditors to recover more than the amount of their claim as of the Petition Date in violation of section 502(b).*

41.    Although section 502(b) requires claims to be valued as of the Petition Date, the Distribution Principles incorporated in the Amended Plan allow creditors whose claims were denominated in digital assets (*e.g.*, cryptocurrency) to recover from the Estates based on the value of those digital assets at or around the time of distribution, inflating the value of their claims by hundreds of millions of dollars.  Distribution Principles at 8–9.  That distribution mechanism squarely contravenes section 502(b), and significantly, the Debtors' own financial advisor and independent director each testified they have never, in their years of combined experience as bankruptcy professionals, seen a date other than the Petition Date used for valuation of claims.  Aronzon Dep. Tr. 73:9–19; Sciametta Dep. Tr. 257:4-258:5.  That experience is consistent with

---

[21]    Notably, both the debtors and the official committee of unsecured creditors in FTX acknowledged that section 502(b) mandates valuation of claims as of the petition date.  *See In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Dec. 27, 2023), Docket No. 5202 ¶¶ 11–13; Docket No. 5619 at ¶¶ 2, 4.

[22]    *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Dec. 16, 2023), Docket No. 4861 ¶ 4.3.

[23]    The *FTX Trading* court's ruling follows *In re Celsius Network LLC*, wherein Judge Glenn noted, "[w]hether under a chapter 11 plan or liquidation, creditors are entitled to their share of the *value* of the Debtors' Estates on the Petition Date."  655 B.R. at 312 (emphasis in original).

the precedent cited above, in which commodities, securities, foreign currencies, and cryptocurrencies were all valued as of the petition date.

42.     In deposition testimony, the only explanation for this remarkable departure from law and practice is that this case involves cryptocurrency.  *See* Aronzon Dep. Tr. 73:9–75:17; Sciametta Dep. Tr. 257:4–258:23.  That is no answer:  As noted above, cryptocurrency is treated like other assets for purposes of section 502(b).

43.     But here, the Debtors have turned section 502(b) on its head.  Multiple witnesses openly admitted that the Distribution Principles could result in creditors receiving many multiples over the actual value of their claims as of the Petition Date.  Mr. Geer testified that as consequence of the Distribution Principles, instead of receiving recoveries on account of their claims valued as of the Petition Date, creditors senior in the waterfall could receive, on a dollar-for-dollar basis, double-to-triple the amount of the permissible value of their claims.  Geer Dep. Tr. 94:13–105:5. Likewise, Mr. Joe Sciametta, the Debtors' financial advisor, testified that if a creditor had a claim denominated in Bitcoin valued at $20 million on the Petition Date and the value of those reference assets subsequently increased to $500 million, the creditor would be entitled to up to $500 million worth of digital assets under the Distribution Principles, even though his Petition Date claim was only valued at $20 million.  It is entirely impermissible for creditors—using Mr. Sciametta's hypothetical above—to receive $480 million of value in excess of their allowed prepetition claims, all at the expense of subordinated creditors and equity holders, which likely would receive *nothing*.  This is a clear violation of section 502(b), and the Court cannot sanction such a result.

    d)     *No exception to section 502(b) applies here.*

44.     To date, with one minor exception, no party supporting the Amended Plan has formally or specifically articulated any arguments as to why section 502(b) should not apply here. Instead, it appears to be a results-driven determination; proponents of the Amended Plan dislike

the result that section 502(b) requires, so they ignore it.  As the only exception, in an objection to

the Disclosure Statement,[24] the ad hoc group of "crypto creditors" (the "**Crypto Creditors**

**Group**") stated, among other things, that "dollarizing" crypto claims runs afoul of section 562 of

the Bankruptcy Code, such that those claims cannot be valued using Petition Date pricing.[25]

45.     Ahead of its confirmation objection, the Crypto Creditors Group had not specified

why it believes the section 562 safe harbor applies to its members' agreements for loans of digital

currencies.  Moreover, the Amended Plan itself does not apply section 562 to any subset of claims

in the Amended Plan, suggesting that the Plan Support Parties do not agree with the Crypto

Creditors' Group's view.  Indeed, there is no basis to find that there has been, or will be, a rejection,

liquidation, termination, or acceleration of any contracts held by the Crypto Creditors Group, much

less that those contracts are protected by section 562 of the Bankruptcy Code.

46.     DCG reserves its right to reply to any specific arguments raised by the Crypto

Creditors Group or any other party that asserts the section 562 safe harbor applies to any claims

asserted against the Debtors.

> **2.     The Amended Plan would pay an unlawful amount of interest to
> general unsecured creditors.**

47.     The Bankruptcy Code only provides for payment of post-petition interest to

unsecured creditors when a debtor is solvent.  *See Wells Fargo Bank, N.A. v. Hertz Corp. (In re*

*Hertz Corp.)*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (holding that both unimpaired and impaired

creditors are entitled to post-petition interest at the federal judgment rate before any distribution

---

[24]   *Amended Disclosure Statement with Respect to the Amended Joint Plain of Genesis Global Holdco, LLC* et al.,
*Under Chapter 11 of the Bankruptcy Code* (Docket No. 839) (as amended, modified, or supplemented from time
to time, the "**Disclosure Statement**").

[25]   *Objection of the Genesis Crypto Creditors Ad Hoc Group to Debtors' Disclosure Statement Motion* (Docket No.
982), at 2.

can be made to equity); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y.

2012).  To the extent the Estates are insolvent, general unsecured creditors are not entitled to

interest on their claims under the Bankruptcy Code.

48.    Even if the Estates are solvent, the Amended Plan must still be rejected because it

seeks to pay general unsecured creditors a greater interest rate on their claims than what the

Bankruptcy Code allows.  The Debtors submit that "[a]ll unsatisfied Allowed General Unsecured

Claims shall, from the Petition Date, accrue interest at the rate (inclusive of both the loan fee and

the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the

relevant Holder" under the Distribution Principles.  Distribution Principles at 9.  Such interest only

factors into each holder's pro rata share once the Recovery Cap for all unsecured claimants has

been met.  *Id.*  However, the proper measure of interest here—assuming the Estates are solvent—

is not the contract rate, but rather the federal judgment rate under 28 U.S.C. § 1961.

49.    Where a bankruptcy estate is solvent, the right of unsecured creditors to receive

post-petition interest arises under section 726(a)(5) of the Bankruptcy Code.  *See* 11 U.S.C.

§ 726(a)(5).  Section 726(a)(5) is made applicable to the chapter 11 cases by virtue of section

1129(a)(7)(A)(ii), which imposes a "best interests test."  *See* 11 U.S.C. 1129(a)(7)(A)(ii).  The

best interests test requires that, for a plan to be confirmed, dissenting members of a class must

receive, as of the effective date of the plan, the value of their allowed claims that is not less than

the amount such creditors would receive if the debtor was liquidated under chapter 7 on such date.

*See* 11 U.S.C. § 1129(a)(7)(A)(ii).  Section 726(a)(5) of the Bankruptcy Code provides that, after

payment of all amounts due under sections 726(a)(1) through (a)(5), post-petition interest is

payable on all allowed unsecured claims "at the legal rate" from the petition date until the payment

of such claims.  *Id.* § 726(a)(5).

50.    Numerous courts have recognized that "the legal rate of interest" referred to in section 726(a)(5) is the federal interest rate applicable to judgments.[26]  Moreover, a bankruptcy claim is the equivalent of a money judgment, and the use of the federal judgment rate assures equitable treatment among creditors, is efficient, and practical.  *Madison 92nd St. Assocs.*, 472 B.R. at 200.

51.    By contrast, "neither the Bankruptcy Code nor the Legislative History expressly state that unimpaired creditors are entitled to their contract rate of interest." *Hertz Corp.*, 637 B.R. at 800; *see also LATAM Airlines*, 2022 WL 2206829, at *20.  "Instead, the Legislative History provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11 debtor case to receive post-petition interest only in accordance with sections 1129(a)(7) and 726(a)(5)."  *LATAM Airlines*, 2022 WL 2206829, at *20.  Accordingly, in the event the Debtors are solvent, unsecured creditors should receive the federal judgment rate of post-petition interest.

52.    In what appears to be a sweetener for unsecured creditors who are not paid in full within a certain amount of time under the Amended Plan, the Debtors propose to pay certain claimants *additional* interest on the "unpaid portion" of their claims, accruing (arbitrarily) at the federal judgment rate, if they do not receive distributions sufficient to reach the Recovery Cap within two years of the Effective Date (termed "**Post-Effective Date Interest**").  *See* Distribution Principles at 9.  And, because the Recovery Cap improperly values claims around the time of confirmation or later distributions, this provision would permit unsecured creditors to receive

---

[26]    *See In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y. 2012); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *20 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *motion to certify appeal denied*, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *aff'd*, 643 B.R. 756 (S.D.N.Y. 2022), *aff'd*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom.*, *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023); *see also In re Dow Corning Corp.*, 237 B.R. 380, 387 (Bankr. E.D. Mich. 1999); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D. Tex. 1992); *In re Hertz Corp.*, 637 B.R. at 801.

interest on amounts far exceeding the Petition Date valued claim to which they are entitled. There is no authority under the Bankruptcy Code to support the additional interest.

* * *

53.   Because the Amended Plan would provide greater recoveries to general unsecured creditors than they are entitled—by (i) failing to dollarize claims in accordance with section 502(b), and (ii) paying unsecured creditors Post-Petition Interest and Post-Effective Date Interest to which they are not entitled—it is not "fair and equitable" with respect to DCG's interests. The Amended Plan is therefore unconfirmable.

**B.      The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code.**

54.   As discussed, section 502(b) of the Bankruptcy Code requires payment of creditor claims valued as of the Petition Date. The Amended Plan's Distribution Principles allow distributions to creditors in excess of their Petition Date-valued claims. This is a clear violation of section 502(b) and renders the Amended Plan unconfirmable.[27]

55.   Additionally, the Debtors' Amended Plan seeks to prevent DCG, which will continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its fundamental right to elect directors under Delaware law. *See* Amended Plan at Section IV.B.9 (requiring that DCG select a new board solely from candidates selected by the Debtors and certain influential creditor groups). The Bankruptcy Code rejects such a reallocation of voting rights. Section 1123(a)(6) prohibits the issuance of new, non-voting equity securities. *See* 11 U.S.C.

---

[27]    *See In re PTM Techs., Inc.*, No. 10-50980C-11W, 2013 WL 4519306, at *5 (Bankr. M.D.N.C. Aug. 26, 2013) (finding a plan was unconfirmable under section 1129(a)(1) by violating section 502(b)(2)); *In re MPM Silicones, LLC*, No. 14-22503 (RDD), 2014 WL 4436335, at *2 (Bankr. S.D.N.Y. Sept. 9, 2014) (noting that section 1129(a)(1) requires compliance with applicable provisions in the Bankruptcy Code, including section 510(a)), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2017).

§ 1123(a)(6).[28]  By stripping DCG of its voting rights—including those regarding election of directors—the Amended Plan effectively seeks to convert DCG's membership interests into non-voting shares, which is expressly prohibited by section 1123(a)(6).  For this reason too, the Amended Plan is unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

### C.     The Amended Plan violates section 1129(a)(3) of the Bankruptcy Code.

56.     The Court need go no further to reject the Amended Plan—the two independent violations of section 1129 outlined above are more than sufficient to sustain this objection.  But those violations—and the impermissible distribution of value to creditors they contemplate—arise out of another fundamental problem with the Amended Plan:  It was not proposed in good faith.  The Debtors' calculated (and surreptitious) inclusion of such value-distorting provisions—with full knowledge of the consequences for equity holders—the stripping of DCG's equity rights, and the exclusion of DCG from any negotiations or discussions regarding the Amended Plan provide an independent ground to reject the Amended Plan.

57.     One of the core tenets of bankruptcy confirmation is that a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S. Code § 1129(a)(3).  "Good faith," as used in this section, is not defined in the Bankruptcy Code, but the term is generally interpreted to mean that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008).  "In assessing whether a plan complies with [section] 1129(a)(3)'s good faith standard, a bankruptcy court must examine the totality of the circumstances."  *In re Trenton Ridge Invs.*, LLC, 461 B.R. 440, 468

---

[28]     *See also In re Peak Broadcasting, LLC*, No. 12-10183 (MFW), 2012 WL 1452359, *4 (Bankr. D. Del. Apr. 20, 2012) (requiring each reorganized debtor being formed as a limited liability company to include language in its charter and bylaws that prohibits the issuance of non-voting equity securities under section 1123(a)(6)).

(Bankr. S.D. Ohio 2011). Importantly, "[t]he burden of proof is on Debtors to show by a preponderance of the evidence that the Plan was proposed in good faith." *In re Dernick*, 624 B.R. 799, 811 (Bankr. S.D. Tex. 2020). Furthermore, the U.S. Supreme Court has emphasized that bankruptcy courts must ensure both the process and practical impact of a plan are fair, equitable and open before confirming the plan. *See Am. United Mut. Life Ins. v. City of Avon Park*, 311 U.S. 138, 146 (1940).

58.     A chapter 11 plan should not be confirmed where, instead of negotiating at arm's length with creditors, a debtor aligns with creditors in a way that potentially increases the extent of liabilities owed by the estate and causes injury to third-parties. *See, e.g.*, *In re Am. Cap. Equip.*, *LLC*, 688 F.3d 145, 158–59 (3d Cir. 2012) (finding a chapter 11 plan violated section 1129(a)(3) where the debtor was incentivized to side with plaintiffs in increasing claim values, to the detriment of the debtor's insurers).

59.     Likewise here, the Amended Plan is not the product of good faith, because, among other reasons, it impermissibly inflates claim values. The Debtors' own financial advisor could not identify any scenario under which any of the Estates' assets would actually flow to equity holders, as it would instead continually flow to satisfy creditors' ever-increasing claims. That construct is in plain violation of section 502(b), but even if it were not, a plan that is intentionally designed to provide no practical cap on the amount that creditors can recover while potentially leaving subordinated creditors and equity holders with ***nothing***, no matter how much value is in the estate, cannot possibility have been designed and proposed in good faith.

60.     It is little surprise that the Amended Plan contains these one-sided provisions. The Distribution Principles are the product of several months of closed-door negotiations between the Debtors, the UCC, and the Ad Hoc Group—without DCG. Geer Dep. Tr. 93:16–94:4; Sciametta

Dep. Tr. 196:22–197:4.  Instead of working with DCG, the Debtors, the UCC, and the Ad Hoc

Group have worked in concert to develop a chapter 11 plan that provides for unprecedented

distributions to creditors that the Bankruptcy Code does not support.  The Debtors caved to creditor

pressure rather than standing up for what is right.  Documents reveal that the Debtors' counsel was

concerned with "putting a spotlight" on the excess distributions to creditors and suggested changes

to the language of the Distribution Principles to conceal them.  November 8, 2023 Email re:

Genesis | Distribution Principles (attached hereto as **Exhibit F**).  It is clear now that this effort was

designed to deprive DCG of the recovery to which it is entitled under the Bankruptcy Code.  Not

one witness identified a single chapter 11 bankruptcy plan that distributed assets this way.

61.      The Amended Plan also seeks to disenfranchise DCG in a myriad of other ways,

including stripping DCG of essentially all its rights in its capacity as an equity holder with no legal

authority to do so.  In short, the Amended Plan renders DCG an equity holder in name only.  This

kind of naked seizure of equity holder rights in direct contravention of law and public policy is the

very definition of bad faith.  Because the Amended Plan was not proposed in good faith and

violates numerous principles of law, it should be rejected.

### 1.      The Debtors have breached their fiduciary duties to DCG.

62.      First and foremost, in proposing the Amended Plan, the Debtors have breached their

fiduciary duties owed to DCG.  "[T]he fiduciary duty of the trustee runs to shareholders as well as

to creditors."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

Accordingly, "[t]he debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest

of the estate as a whole, including its creditors, equity interest holders and other parties in interest."

*LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000).

63.      The Amended Plan gives no consideration to the rights or interests of DCG

whatsoever.  Not only did the Debtors exclude DCG from participating in the plan negotiations

entirely, but they knowingly proposed a plan that structurally precludes any practical possibility of recovery for DCG.  If the value of the Estates' digital assets continues to rise, creditor claims will continue to balloon, devouring value in excess of the creditor's Petition Date claims and leaving no extra value for equity holders.  Worse still, the independent director of the special committee of the Debtors—who acknowledged his fiduciary duties to DCG, as an equity holder (Aronzon Dep. Tr. 21:7–23:5, 38:2–6)—was not aware that the Amended Plan allowed such unrestricted recovery by creditors, Aronzon Dep. Tr. 59:8–61:9; 88:21–90:8.  Failing to understand how a transaction affects stakeholders is a breach of fiduciary obligation.

64.    To be clear, DCG would not be objecting to a distribution plan that contemplated a 100% recovery for creditors and would support such a plan.  DCG is objecting to the Amended Plan because the Debtors, the UCC, and the Ad Hoc Group have tied themselves in knots to formulate Distribution Principles that avoid making distribution to DCG.

65.    Moreover, as set forth in more detail below, the Amended Plan purports to divest DCG of virtually all of its rights as an equity holder.  And the Debtors have failed to object to a number of large governmental claims, seemingly to preserve the argument that the Debtors' estates are insolvent at the plan confirmation stage and to justify limiting DCG's recoveries.  Debtors in possession must make difficult decisions when formulating a plan, some of which will benefit some parties to the detriment of others.  But where, as here, the proposed plan gives **no** consideration to the interests of equity holders, it cannot be confirmed.

### 2.    The Debtors propose in bad faith a plan that gives a small group of influential creditors favorable treatment through the Setoff Principles.

66.    The Debtors' proposed Setoff Principles for Allowance of Certain Claims, as embodied in Exhibit M to the Plan Supplement (Docket No. 1144) (the "**Setoff Principles**"), violate the Bankruptcy Code and applicable law, and were proposed in bad faith in violation of

section 1129(a)(3).    As explained below, if implemented as the Debtors intend, the Setoff

Principles would provide a select group of only twenty-one creditors—presently unknown to the

public due to the Debtors' extensive redactions—with a collective windfall of $288 million of

additional claims, with **one** creditor to receive ████████ of additional claims prohibited by law.

Setoff Principles, Ex. 1.  The Court should not sanction this result.

67.    Pursuant to the Setoff Principles, the Debtors may set off (a) the value of any debt

owed to a Debtor by a creditor entitled to receive distributions under the Amended Plan against

the value of any collateral that the creditor delivered to the applicable Debtor to secure a loan (to

the extent not yet returned), or (b) any claim entitled to receive distributions under the Amended

Plan against the value of any debt owed by the holder of such claim to the applicable Debtor, and

all digital asset values in (a) and (b) "shall be determined as set forth in the Digital Assets

Conversion Table."  *See* Setoff Principles at 1.  The Digital Assets Conversion Table, in turn,

provides a list of digital assets along with their corresponding Petition Date prices.  *See* Setoff

Principles Ex. 1.

68.    In plain language, in a scenario where a party is owed a digital asset from the Debtor

on account of a loan payable by the Debtor, and the same party also owes to the Debtor a digital

asset on account of a loan receivable by the Debtor, under the Setoff Principles, the Debtor is

obligated to value the loan receivable using Petition Date pricing and set off the value of the loan

receivable against the loan payable.  Since Petition Date prices are lower than current prices, this

process inappropriately values loans receivable (importantly, these are assets of the Debtor) at less

than current value and, by reducing the set off, allows parties greater claims against the Debtor.

In other words, the Debtors are artificially depressing the value of the Estates' assets, while

inflating the creditor's claim—in effect, forgiving a significant portion of the Debtors' claim against the creditor.

69.     This approach compounds other deficiencies of the Debtors' Amended Plan, specifically insofar as the increased claim resulting from the Setoff Principles is entitled through the Distribution Principles to receive more than 100% of its Petition Date claim valued in U.S. dollars.  Here, the application of the Debtors' Setoff Principles would not only create $288 million of excess claims for twenty-one creditors—including ███████ for just *one* creditor who has served in a position of influence as member of the UCC—but also allows those creditors to receive distributions greater than the additional $288 million of claims.  Sciametta Dep. Tr.  115:4–116:10.

70.     This outcome is truly bizarre and fundamentally at odds with the Debtors' fiduciary duties to maximize value of the Estates, and it exemplifies the Debtors' unprincipled conduct throughout this process.  Chapter 11 debtors are obligated to ***maximize*** the value of the estate as a whole—not ***minimize*** the value of the estate and ***maximize*** the value of certain creditors' residual deficiency claims to the detriment of the overall estate.  *See Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992) (trustees have routine duties "to minimize the pre-petition claims against the estate"); *see also In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004) (citations and internal quotation marks omitted) ("Along with [the powers of a trustee], comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.  The debtor-in-possession's fiduciary duty to maximize includes the duty to protect and conserve property in its possession for the benefit of creditors.").

71.     The Debtors are required under the Bankruptcy Code to "examine proofs of claims and object to the allowance of any claim that is improper . . . if a purpose would be served."  11 U.S.C. §§ 704(a)(5), 1106(a)(1).  By acquiescing to the select creditors' demands, the Debtors—

through the Setoff Principles—have turned the concept of setoff valuation upside down for the benefit of a select few and have completely abdicated any sense of duty to the Estate as a whole. *See LaSalle Nat. Bank*, 82 F. Supp. at 292 (noting chapter 11 debtors have a fiduciary duty to act in the best interest of the estate as a whole, including equity interest holders).

72.    Other courts have also struck down similar attempts by debtors to pay unreasonably high amounts to certain parties.  In *In re Global Indus. Techs., Inc*., the Third Circuit ruled a bankruptcy court must ensure a trust created under a plan is negotiated fairly between a debtor and its creditors and does not negatively impact a third party (in that case, insurers) by increasing the number of claims or permitting the payment of skeptically high claim amounts.  645 F.3d 201, 212–15 (3d Cir. 2011).  It is patently improper for a debtor to simply acquiesce to creditors' demands and give up defenses to those creditors' claims.[29]

73.    It seems clear that these inequitable Setoff Principles were devised, in large part, to engender support for the Debtors' Amended Plan by one particularly influential creditor sitting on the UCC.  The Debtors' own 30(b)(6) witness, Mr. Sciametta, testified that in his 20 years of practice, he has never seen this approach to setoff.  *See* Sciametta Dep. Tr. 95:23–96:16.  Indeed, as Mr. Sciametta had to acknowledge when shown the relevant communications, it was the goal of counsel to this influential creditor to have the Setoff Principles filed well-before the voting deadline.  *See* Sciametta Dep. Tr. 125:7–128:15.

74.    The conveniently redacted nature of the Setoff Principles further underscores the Debtors' unprincipled conduct.  The Debtors have a duty to both their creditors and to this Court

---

[29]    *See In re Tenney Village Co., Inc*., 104 B.R. 562, 567–68 (Bankr. D.N.H. 1989) (denying approval of a financing agreement under which debtors agreed to cede control to their lenders over critical issues, and waived their defenses to the lenders' claims, stating that the plan "would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit"); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 158–59 (3d Cir. 2012) (reiterating that a court cannot confirm a plan that prejudices parties-in-interest because of the debtors' failure to oppose creditors appropriately).

to provide full and complete disclosure with respect to important facts and relevant information. *See In re Zamora*, No. 19-01040 (WLH), 2020 WL 4289926, at *5 (Bankr. E.D. Wash. July 27, 2020) ("full disclosure, transparency, and candor by all parties is necessary to protect the fairness and integrity of the process").  Although the Debtors might argue that they are simply protecting the identities of these creditors, there is no reason that the $288 million of value going to just a small handful of creditors is hidden from the Court and other creditors.

75.    Ultimately, these Setoff Principles demonstrate yet another attempt by the Debtors—in violation of their fiduciary obligations to the Estates—to siphon significant value away from the general creditor body, as well as equity, in violation of the "primary goal of the Bankruptcy Code to ensure equal and fair treatment among similarly situated creditors," *Chevron Products Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 428 B.R. 590, 594 (D. Del. 2010), as well as the spirit of the Bankruptcy Code which requires debtors to treat all claimants and interest-holders "fairly, equally and in accordance with the priority of their claims under law." *Bergquist v. Felland (In re O-Jay Foods Inc.)*, No. 3-89-281, 1991 WL 378164, at *16 (D. Minn. Nov. 21, 1991).  Accordingly, the Amended Plan should not be confirmed.  If the Debtors want to propose setoffs, each should be brought to the Court with all of the facts laid out so the Court and all other parties in interest can consider the impact to the Estates.  The Setoff Principles hide the true facts.

> ### 3.    The Amended Plan impermissibly alters DCG's equity holder rights in violation of applicable law.

76.    The Amended Plan is not proposed in good faith also because it impermissibly purports to alter DCG's rights as an equity holder of the Debtors.  "Shareholder voting rights are sacrosanct" under Delaware law.  *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). "The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *Id.*  Delaware courts therefore "have consistently acted

to protect stockholders from unwarranted interference with such rights." *Paramount Comm'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994).

77.    Delaware public policy protecting equity holders does not lose force simply because the Debtors are in bankruptcy. "Post-petition, the Debtor[s'] state law governance rights persist" and are "unaffected by a chapter 11 filing." *In re Genever Holdings, LLC*, Case No. 20-12411-JLG, 2021 WL 3919826, *13 (Bankr. S.D.N.Y. 2021). The Second Circuit has expressly held that shareholders' rights to govern the debtor is a "prerogative ordinarily uncompromised by reorganization," and the "law of this circuit direct that the shareholders' natural wish to participate in this matter of corporate governance be respected." *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1980).

78.    As noted, the Debtors' Amended Plan seeks to prevent DCG, which will continue as the Debtors' sole equity holder of GGH post-Effective Date, from exercising its fundamental right to elect directors under. *See* Amended Plan at Section IV.B.9. This elimination of DCG's rights is in direct contravention of Delaware law, and it cannot be squared with the Bankruptcy Code's requirement that director election rights be allocated consistent with public policy.

79.    The Amended Plan further seeks to burden DCG, as sole equity holder of GGH, by preventing DCG from transferring its interests in GGH and taking a worthless stock deduction with respect to its interests in GGH if and when it would otherwise be entitled to do so under applicable tax law. If DCG is not able to claim its worthless stock deduction at the appropriate time, it could result in a permanent loss of such deduction and loss of a valuable tax attribute that DCG is otherwise entitled. This would be tantamount to a permanent injunction. Denying DCG its rights to appoint directors, transfer its interests, and claim tax deductions when allowable is the epitome of bad faith.

**4.    Conditioning DCG's rights on the issuance of a Final Order declaring
all creditor claims Unimpaired has no basis in law, equity, or otherwise.**

80.    The Amended Plan's systematic evisceration of DCG's rights as an equity holder
is not saved by the illusory provision that "restores" certain of DCG's rights upon the issuance of
a "Final Order" declaring that all creditor claims are "Unimpaired," and in fact, this provision
exacerbates the Amended Plan's defects.

81.    As discussed above, the absolute priority rule requires that senior classes of
creditors be paid in full before any payments are made to junior interests.  *See* 11 U.S.C.
§ 1129(b)(2).  But nothing in section 1129 requires senior classes to be ***unimpaired*** before junior
classes may receive distributions, let alone that such a determination must be made by a final order
from a court of competent jurisdiction.  Section 1129 requires only that creditors be paid in full.[30]
And had Congress intended "paid in full" to mean the same thing as "unimpaired," it would have
said so.  *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms and
Explosives*, 984 F.3d 30, 44 (2d Cir. 2020).

82.    "Unimpairment" is an entirely different concept:  A claim remains "impaired"
unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim
or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  By restricting
payment of DCG's claims until the senior classes claims are judicially declared to be
"unimpaired," the Amended Plan seeks to apply an impermissibly high standard for resolution of
creditor claims (and one that otherwise conflicts with the Amended Plan's treatment of creditor

---

[30]    *See, e.g.*, *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984) (emphasis added) ("[A]
plan must provide either that an impaired non-accepting class of creditors be ***paid in full*** with respect to their
claims, or that no interest junior to that class of creditors receive any distribution under the plan with respect to
the junior claimants' prepetition claims or interests."); *Wilkow v. Forbes, Inc.*, 241 F.3d 552, 554 (7th Cir. 2001)
(emphasis added) ("[C]reditors may insist on priority of payment: secured creditors must be ***paid in full*** before
unsecured creditors retain any interest, and unsecured creditors must be ***paid off*** before equity holders retain an
interest.").

classes as impaired), to the clear detriment of DCG.  The Debtors have no reasonable basis—in law, equity, or otherwise—to impose this high burden as a prerequisite for DCG to receive any distributions on account of its Interests in GGH.

### 5. The Plan further cuts off DCG's beneficial interests in GGC and GAP.

83.     The Debtors also have no basis in law, equity, or otherwise for their proposed treatment of Intercompany Interests in GGC and Intercompany Interests in GAP.  *See* Amended Plan §§ III.C.11, III.D.10.  DCG is the sole equity holder of GGH, and GGC and GAP are wholly-owned subsidiaries of GGH.  Holders of Intercompany Interests in GGC and GAP are treated the same as holders of Interests in GGH.  Therefore, the Amended Plan essentially cuts off DCG's beneficial interests in GGC and GAP by cutting off GGH's Interests.

### 6. DCG should have consent rights over the Debtors' Wind-Down.

84.     Finally, the Amended Plan is not proposed in good faith because it excludes DCG from certain rights over the Wind-Down, including the selection of the PA Officer[31] and the selection of members of the Wind-Down Oversight Committee.[32]  Section 1123(a)(7) of the Bankruptcy Code requires plan provisions to be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).  Because DCG could receive distributions under the Amended Plan (once

---

[31]    *See* Amended Plan at Section IV.A.2 ("The PA Officer shall be selected by mutual consent of the Committee and PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and shall be identified in the Plan Supplement.").

[32]    *See* Amended Plan at Section IV.A.3 ("The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement.").

the unlawful claim valuations are corrected), it should have consent and consultation rights over the Wind-Down, regardless of the Debtors' solvency.

85.    As discussed herein, the Amended Plan is improperly structured to preclude DCG from receiving any recoveries as sole equity holder of GGH in any plausible scenario.  But assuming the Amended Plan is revised to comply with the Bankruptcy Code's priority scheme, and that the Debtors are solvent such that creditors are paid in full, the residual value of the bankruptcy estate should flow to DCG.  In that scenario, DCG would be the only party with an interest in maximizing the value of the Debtors' Estates, because the creditors would be paid in full regardless of how the Wind-Down is administered.  Because the Debtors are solvent, DCG should be given consent rights over the appointment of certain individuals in charge of the Wind-Down.  Such consent rights would not encompass the Litigation Oversight Committee for matters in which the Debtors are bringing claims against DCG, but they should encompass selection of the PA Officer and the Wind-Down Oversight Committee in the event the Debtors are solvent.

*  *  *

86.    It is no wonder the concerted efforts of the Debtors, the UCC, and the Ad Hoc Group to deprive DCG of valuable economic and corporate governance rights has resulted in a plan that violates the Bankruptcy Code.  *In re Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").  The Debtors are not only stripping DCG of all excess value of the Estates through Distribution Principles that violate the Bankruptcy Code, but also are methodically dismantling DCG's governance and economic rights as GGH's sole equity holder.  Although a debtor may desire quick emergence from bankruptcy, it cannot achieve that goal by capitulating to creditor demands and imposing harm on third parties.  "[E]fficiency must not be obtained at the price of diminishing the

integrity of the process." *Congoleum Corp.*, 426 F.3d at 693. When considering both the process of proposing the Amended Plan, as well its terms, the totality of the circumstances demands the conclusion that the Amended Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code. Accordingly, the Amended Plan should not be confirmed.

        **D.**      **The Amended Plan violates section 1129(a)(7) of the Bankruptcy Code.**

87.      Section 1129(a)(7) provides that a plan may not be confirmed over the objection of a holder of an impaired class of claims or interests unless that holder will receive from the estate at least as much as it would receive if the debtor were liquidated under chapter 7. *See* 11 U.S.C. § 1129(a)(7); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 606–07 (Bankr. S.D.N.Y. 2019).

88.      As discussed above, the Amended Plan proposes to distribute assets of the Estates to creditors in excess of what they are entitled by: (1) failing to value claims as of the Petition Date in U.S. dollars, as required by section 502(b); and (2) proposing to pay interest at excessive rates not allowed by the Bankruptcy Code. Because senior classes of creditors receive more on account of their claims than they would be entitled to in a chapter 7 liquidation, the Amended Plan fails to satisfy the best interests test as to junior classes of creditors and interest holders, which are entitled to residual value.

* * *

89.      The Debtors' plan does not comply with the requirements of section 1129 of the Bankruptcy Code. Specifically, the Amended Plan is unconfirmable as it violates the cram down requirements of section 1129(b), and sections 1129(a)(1), (3), and (7).

**II.**    **The Amended Plan further disenfranchises DCG through non-compliance with multiple provisions of the Bankruptcy Code and applicable non-bankruptcy law.**

90.      The Amended Plan also violates both bankruptcy law and applicable non-bankruptcy law in ways that further render it unconfirmable under sections 1129(a).

A.    **The Amended Plan improperly assumes and rejects only certain indemnification obligations.**

91.    Under section 365 of the Bankruptcy Code, executory contracts must be assumed or rejected in their entirety.[33]  The Amended Plan expressly treats Indemnification Obligations[34] for Persons who served as an employee, director, or officer of the Debtors (collectively, the "**Debtor Employees**") as of the Petition Date as executory contracts assumed by the Debtors.  *See* Amended Plan § V.D.  However, the Amended Plan carves out Debtor Employees who are also DCG Parties[35]—which includes current and former employees of DCG, DCGI, and each of their respective Affiliates and subsidiaries—from the assumed Indemnification Obligations.  *See id.*

92.    The Debtors cannot cherry-pick those Indemnification Obligations they wish to assume.  The Indemnification Obligations contained in the Debtors' corporate governance documents[36] must be assumed or rejected in their entirety, meaning the Debtors cannot alter the

---

[33]    *See In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) ("Nevertheless, because a debtor must assume or reject an entire contract, and cannot cherry-pick the provisions it does not like, a court must consider the entire agreement."); *In re City Stores Co.*, 21 B.R. 809, 812 (Bankr. S.D.N.Y. 1982) ("An executory contract cannot be rejected in part and assumed in part."); *In re Klaber Bros., Inc.*, 173 F. Supp. 83, 85 (S.D.N.Y. 1959) (citing *Collier on Bankruptcy*, 14th Ed., Vol. 8, p. 163) ("An executory contract cannot be rejected in part, and assumed in part.  The Debtor, or the trustee, is not free to retain the favorable features of the contract, and reject only the unfavorable ones.").

[34]    "***Indemnification Obligations***" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for any Persons who served as an employee, director, or officer of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, other than any Persons who are also DCG Parties or Gemini Parties.

[35]    "***DCG Parties***" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; provided that DCG Parties shall not include any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date.

[36]    The Corporate Governance Documents include:  (1) Constitution of Genesis Asia Pacific Pte. Ltd. (attached hereto as **Exhibit G**), (2) Genesis Global Capital, LLC Amended and Restated Operating Agreement (attached

assumed Indemnification Obligations as to some individuals covered under the applicable executory contract, but not all. Because the Amended Plan contemplates carving out indemnification obligations in violation of section 365 of the Bankruptcy Code, the Amended Plan is unconfirmable pursuant to 1129(a)(1).

**B.    Allowance of certain creditors' fees and expenses against the Estates.**

93.    Section II.E the Amended Plan proposes to allow as Administrative Expense Claims the fees and expenses incurred by the Ad Hoc Group and the Dollar Group (up to $300,000). DCG objects to such allowance, whether under authority of section 503(b)(3)(D) (which requires notice and a hearing, and that the creditor has made a "substantial contribution" to the chapter 11 cases), or under section 1129(a)(4) (which requires that any such expenses be subject to court approval as reasonable). *See generally*, *In re Adelphia Commc'ns Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010). It is not reasonable to pay out of the Estates the fees and expenses of these creditor groups given their limited contributions to the Estates themselves and the bad faith under which the Amended Plan was constructed, and the Amended Plan fails to satisfy section 1129(a)(4) by not requiring court approval of the fees and expenses. Accordingly, the plan violates section 1129(a)(1) of the Bankruptcy Code and is unconfirmable.

**C.    Any subordination of DCG Claims is improper.**

94.    The Amended Plan includes a reservation of rights for the Debtors or Wind-Down Debtors to seek to subordinate DCG Claims. *See* Amended Plan, Section III.K. DCG intends to vigorously defend against any attempts to subordinate the DCG Claims, which, for clarity, also seems to include personal funds deposited by DCG employees in GGC for no apparent reason other than the employees' affiliation with DCG.

---

hereto as **Exhibit H**), and (3) the Genesis Global Holdco, LLC Operating Agreement (attached hereto as **Exhibit I**).

95.     Furthermore, this generalized subordination attempt would also seek to subordinate all the claims asserted by the DCG Parties in the proofs of claim filed on May 22, 2023, including approximately $52.5 million owed to DCG by GGC in connection with the Luno Setoff and approximately $3.4 million of collateral owed to DCGI by GGC in connection with a November 2022 loan.  DCG and DCGI will vigorously defend against any subordination attempts.

**D.     The Amended Plan should not require a tax sharing agreement.**

96.     Article IV.B.1 of the Amended Plan states: "On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including . . . the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any."  While DCG has agreed to negotiate a tax sharing agreement in good faith with the Debtors, DCG has no obligation to do so and in fact has reserved all rights with respect to entry into such an agreement.  Therefore, the Amended Plan should not require that DCG enter into a tax sharing agreement and should be revised accordingly.

## Reservation of Rights

97.     DCG and DCGI expressly reserve all rights to raise any and all further objections to the Debtors' Amended Plan and Distribution Principles at any time up to and including the confirmation hearing.

## Conclusion

WHEREFORE, for the reasons set forth above, DCG and DCGI respectfully request that the Court deny confirmation of the Amended Plan.

Dated: February 5, 2024
      New York, New York

Respectfully submitted,

/s/ Jeffrey D. Saferstein
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
      Jeffrey.Saferstein@weil.com
      Jonathan.Polkes@weil.com
      Caroline.Zalka@weil.com
      Jessica.Liou@weil.com
      Furqaan.Siddiqui@weil.com

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**<u>EXHIBIT A</u>**

**FTX Hearing Transcript**

1

1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3    IN RE:                       .   Chapter 11
                                  .   Case No. 22-11068 (JTD)
4    FTX TRADING LTD., *et al.,*  .
                                  .   (Jointly Administered)
5           Debtors.             .
     . . . . . . . . . . . . . . .
6                                 .
     FTX TRADING LTD., WEST       .
7    REALM SHIRES SERVICES, INC.,.
     AND ALAMEDA RESEARCH LTD.,   .
8                                 .
            Plaintiffs,           .
9                                 .
            -against-             .   Adv. Pro. No. 23-50759 (JTD)
10                                .
     MIRANA CORP., BYBIT FINTECH .
11   LTD., TIME RESEARCH LTD.,    .
     SIN WEI "SEAN" TAN, WEI LIN .
12   "GERMAINE" TAN, WEIZHENG YE,.
     AND NASHON LOO SHUN LIANG,   .
13                                .
            Defendants.           .
14   . . . . . . . . . . . . . . .
                                  .
15   ALAMEDA RESEARCH LLC, FTX    .   Adv. Pro. No. 23-50419 (JTD)
     TRADING LTD., WEST REALM     .
16   SHIRES, INC., AND WEST       .
     REALM SHIRES SERVICES INC.   .
17   (D/B/A FTX.US),              .
                                  .
18          Plaintiffs,           .
                                  .
19      v.                        .   Courtroom No. 5
                                  .   824 North Market Street
20   DANIEL FRIEDBERG,            .   Wilmington, Delaware 19801
                                  .
21          Defendant.            .   Wednesday, January 31, 2024
     . . . . . . . . . . . . . . .   10:30 a.m.
22

23                    TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
24                UNITED STATES BANKRUPTCY JUDGE

25

2

1 | APPEARANCES:

2 | For the Debtors:            Adam Landis, Esquire
   |                            LANDIS RATH & COBB LLP
3 |                            919 Market Street
   |                            Suite 1800
4 |                            Wilmington, Delaware 19801

5 |                            Andrew Dietderich, Esquire
   |                            Brian Glueckstein, Esquire
6 |                            Alexa Kranzley, Esquire
   |                            SULLIVAN & CROMWELL LLP
7 |                            125 Broad Street
   |                            New York, New York 10004

8 |
   | For the U.S. Trustee:       Jonathan Lipshie, Esquire
9 |                            Linda Richenderfer, Esquire
   |                            Benjamin Hackman, Esquire
10 |                           OFFICE OF THE UNITED STATES TRUSTEE
    |                           844 King Street, Suite 2207
11 |                           Lockbox 35
    |                           Wilmington, Delaware 19801

12 |
    | For the Official
13 | Committee:                 Kenneth Pasquale, Esquire
    |                            Kris Hansen, Esquire
14 |                           PAUL HASTINGS LLP
    |                           200 Park Avenue
15 |                           New York, New York 10166

16 | For the Joint Official
    | Liquidators of FTX:       Brett Bakemeyer, Esquire
17 |                            WHITE & CASE LLP
    |                            1221 6th Avenue
18 |                            New York, New York 10020

19 | (APPEARANCES CONTINUED)

20 | Audio Operator:             Dana L. Moore, ECRO

21 | Transcription Company:      Reliable
    |                            The Nemours Building
22 |                            1007 N. Orange Street, Suite 110
    |                            Wilmington, Delaware 19801
23 |                            Telephone: (302)654-8080
    |                            Email:  gmatthews@reliable-co.com
24 |
    | Proceedings recorded by electronic sound recording,
25 | transcript produced by transcription service.

<u>APPEARANCES (CONTINUED)</u>:

For Aurus Tech LTD:         David Klauder, Esquire
                           BIELLI & KLAUDER, LLC
                           1204 North King Street
                           Wilmington, Delaware 19801

                           Thomas Bielli, Esquire
                           BIELLI & KLAUDER, LLC
                           1095 Spruce Street
                           Philadelphia, Pennsylvania 19103

For TMSI:                  Mark Minuti, Esquire
                           SAUL EWING LLP
                           1201 North Market Street
                           Suite 2300
                           Wilmington, Delaware 19801

For MAPS Vault:            Dennis O'Donnell, Esquire
                           DLA PIPER (US) LLP
                           1251 Avenue of the Americas
                           New York, New York 10020

For BOBA Foundation:       John Weiss, Esquire
                           PASHMAN STEIN WALDER HAYDEN P.C.
                           Court Plaza South, East Wing
                           21 Main Street
                           Suite 200
                           Hackensack, New Jersey 07601

For Steadview Capital:     Douglas Mintz, Esquire
                           SCHULTE ROTH & ZABEL
                           555 13th Street, NW
                           Suite 6W
                           Washington, DC 20004

For Foundation
Serendipity/Elements:      Kurt Gwynne, Esquire
                           REED SMITH LLP
                           1201 North Market Street
                           Suite 1500
                           Wilmington, Delaware 19801

For Michael Lusk:          Michael Lusk, Esquire
                           MICHAEL LUSK ATTORNEY AT LAW
                           1030 Noble Street
                           Anniston, Alabama

1                                    INDEX

2    BENCH RULING:                                                    PAGE

3        JUDGE'S RULING ON IRS ESTIMATION MOTION                      7

4
     MOTIONS:                                                         PAGE
5
     Agenda
6    Item 24: Update Regarding Chapter 11 Cases                       17

7    Agenda
     Item 25: Motion of Debtors to Estimate Claims                    34
8            Based on Digital Assets
             [D.I. 5202; Filed 12/27/23]
9
             Court's Ruling:                                          128
10

11   EXAMINATIONS:                                                    PAGE

12       EDWARD MOSLEY
         Cross-examination by Mr. Bielli                              39
13       Cross-examination by Mr. Gwynne                              46
         Redirect examination by Mr. Glueckstein                      58
14
         KEVIN LU
15       Direct examination by Mr. Glueckstein                        64

16       SABRINA HOWELL
         Direct examination by Mr. Glueckstein                        69
17       Cross-examination by Mr. Bielli                              73

18
     DECLARATIONS:                                                    PAGE
19
     1) Edward Mosley                                                 37
20
     2) Sabrina Howell                                                72
21

22

23

24

25

1          (Proceedings commence at 10:34 a.m.)

2          (Call to Order of the Court)

3          THE COURT:  Good morning, everyone.  Thank you.

4  Please be seated.

5          Before we begin, Mr. Landis, I want to lay out how

6  we are going to proceed today.  First, I am going to give the

7  ruling that I said I would give on the burden of proof issue

8  for the IRS estimation hearing.  We will do that first and

9  get that out of the way.

10          As for timing, today we will take a break for

11 lunch at 12:10. I have an internal meeting I have to attend.

12 We will take an hour lunch break and then we will come back.

13 We will end at 5 p.m. today. I am assuming we will finish

14 today, but if we don't I have tomorrow and Friday available

15 so we can continue the hearing if we need to.

16          Today, for this hearing, we took a little bit

17 different approach on access to the Zoom.  Under our new

18 procedures parties and counsel have access to the live Zoom.

19 They can see the proceedings on the Zoom call.  Those who are

20 not participants normally would sign up and receive a

21 telephone number to dial in.  In this case we have, and

22 because we expected a large number of people interested, a

23 YouTube channel and those who tried to sign up for the phone

24 number received an email saying go to the YouTube channel.

25          During the course of the hearing, if we have --

1   correct," D.I. 5410 at 4.  That case acknowledges one example

2   of a Court treating a proof of claim as though it were an

3   assessment but the Court ultimately refused to attach the

4   presumption of correctness to the proof of claim precisely

5   because "There had been no prepetition IRS tax assessment,"

6   1990 Westlaw 299418 at 6, Bankruptcy Eastern District of

7   Pennsylvania, February 8th, 1990.

8          For these reasons I disagree with the United

9   States contention that all reasonable IRS estimates made

10  without formal assessments are entitled to a presumption of

11  correctness.  Claim estimation of bankruptcy is an imprecise

12  process that is neither designed nor intended to yield exact

13  numbers.  Nevertheless, I conclude that the IRS bears the

14  burden of substantiating suggested estimation of the debtors'

15  tax liabilities where there has been no formal assessment.

16         Any questions?

17      (No verbal response)

18         THE COURT:  One other issue before we get started.

19  On the question of the estimation hearing for today I

20  received a number of objections that the debtors selection of

21  the petition date as the date for determining the value of

22  the digital assets that are being estimated today is

23  inappropriate because it's unfair; however, the code is very

24  clear.  The code says that a claim is to be determined in

25  U.S. dollars as of the petition date. I think that is Section

1  502(b).

2          Its no different in the context of a determination

3  of the validity of a claim as it is for the estimation

4  hearing under 502(c).  There are limited exceptions to this

5  requirement, none of which are applicable here and,

6  therefore, based on the filings that I received, and the

7  objections that I reviewed, the debtors' position as well, I

8  conclude that the debtors' use of the petition date as the

9  date for determining the value of the digital asset claims is

10  appropriate.  I have no wiggle room on that. The code says

11  what it says and I am obligated to follow the code.

12          I understand those who have filed objections,

13  mostly, I think all of them were pro se litigants, feel that

14  this is unfair to them because of value of certain of the

15  digital assets may have increased since the filing of the

16  petition date.  The opposite is also true, some of the

17  digital assets decreased in value since the petition date.

18  Congress determined that we have to pick a date and they

19  chose the petition date.  And, therefore, I am bound by that

20  obligation under 502.

21          So, all objections to the timing of the date upon

22  which the debtors chose to determine the estimated value of

23  the claims are overruled on that basis; therefore, I don't

24  need to hear argument on those issues.

25          Mr. Landis.

## **<u>EXHIBIT B</u>**

**January 24, 2024 B. Geer Deposition Transcript Excerpt**

Page 1

1       UNITED STATES BANKRUPTCY COURT

2       SOUTHERN DISTRICT OF NEW YORK

3  _____

                                    |

4  In re:                           |

                                    |

5  Genesis Global Holdco,   |Case No. 23-10063 (SHL)

   LLC, et al.,                     |

6                                   |

                Debtors.   |

7  _____|

8

9           CONTAINS CONFIDENTIAL EXHIBITS

10      REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF

11   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12                 OF THE DEBTORS

13    by and through their corporate representative

14                   BRAD GEER

15

            Wednesday, January 24, 2024

16             9:06 a.m. to 1:24 p.m.

17                Pages 1 to 130

18

19

20

21

22

23

24   JOB NO.:        NY 6429964

25   REPORTED BY:    Merilee Johnson, RDR, CRR, CRC, RSA

Page 2

```
 1                A P P E A R A N C E S
           (All appearing remotely via videoconference)
 2
 3    ON BEHALF OF DIGITAL CURRENCY GROUP, INC., and DCG
      INTERNATIONAL INVESTMENTS LTD.:
 4
      WEIL GOTSHAL & MANGES LLP
 5    BY:   Caroline Zalka, Esq.
            Brigit Crosbie, Esq.
 6          Jennifer Lau, Esq.
            Jeffrey D. Saferstein, Esq.
 7          Furqaan Siddiqui, Esq,
            767 Fifth Avenue
 8          New York, New York 10153
            Phone:  (212) 310-8000
 9          Email:  Caroline.Zalka@weil.com
            Email:  Brigit.Crosbie@weil.com
10          Email:  Jennifer.Lau@weil.com
            Email:  Jeffrey.Saferstein@weil.com
11          Email:  Furqaan.Siddiqui@weil.com
12
      ON BEHALF OF THE OFFICAL COMMITTEE OF UNSECURED
13    CREDITORS and THE WITNESS:
14    WHITE & CASE, LLP
      BY:   Colin West, Esq.
15          Sequoia Kaul, Esq.
            Jade Yoo, Esq.
16          1221 Avenue of the Americas
            New York, New York 10020
17          Phone:  (212) 819-8433
            Email:  Cwest@WhiteCase.com
18          Email:  Sequoia.Kaul@WhiteCase.com
            Email:  Jade.Yoo@WhiteCase.com
19
      - and -
20
      WHITE & CASE, LLP
21    BY:   Amanda Parra Criste, Esq.
            200 South Biscayne Boulevard
22          Suite 4900
            Miami, Florida 33131
23          Phone:  (305) 371-2700
            Email:  AParraCriste@WhiteCase.com
24
25    (Appearances continued on next page.)
```

```
 1                  A P P E A R A N C E S
                         (Continued)
 2
     ON BEHALF OF THE DEBTORS:
 3
     CLEARY GOTTLIEB STEEN & HAMILTON LLP
 4   BY:    Jane VanLare, Esq.
            Andrew Weaver, Esq.
 5          Michael Weinberg, Esq.
            One Liberty Plaza
 6          New York, New York 10006
            Phone:  (212) 225-2000
 7          Email:  JVanLare@cgsh.com
            Email:  AWeaver@cgsh.com
 8          Email:  MWeinberg@cgsh.com
 9
     ON BEHALF OF GEMINI TRUST COMPANY, LLC:
10
     HUGHES HUBBARD & REED LLP
11   BY:    J. Scott Sanders, II, Esq.
            One Battery Park Plaza
12          15th Floor
            New York, New York 10004
13          Phone:  (212) 837-6000
            Email:  Scott.Sanders@HughesHubbard.com
14
15   ON BEHALF OF THE AD HOC GROUP OF GENESIS LENDERS:
16   PROSKAUER ROSE LLP
17   BY:    William D. Dalsen, Esq.
            Genesis G. Sanchez Tavarez, Esq.
            One International Place
18          Boston, Massachusetts 02110
            Phone:  (617) 526-9600
19          Email:  WDalsen@Proskauer.com
            Email:  GSanchezTavarez@Proskauer.com
20
     - and -
21
     PROSKAUER ROSE LLP
22   BY:    Jordan Sazant, Esq.
            70 West Madison
23          Suite 3800
            Chicago, Illinois 60602
24          Phone:  (312) 962-9550
            Email:  JSazant@Proskauer.com
25
     (Appearances continued on next page.)
```

Page 4

```
 1              A P P E A R A N C E S
                   (Continued)
 2
 3   ON BEHALF OF THE AD HOC GROUP OF GENESIS LENDERS
     (Continued):
 4
     - and -
 5
     PROSKAUER ROSE LLP
 6   BY:   Megan R. Volin, Esq.
           Eleven Times Square
 7         (Eighth Avenue & 41st Street)
           New York, New York 10036
 8         Phone:  (212) 969-3000
           Email:  MVolin@Proskauer.com
 9
10   ON BEHALF OF TEDDY GARIESE:
11   KATTAN MUCHIN ROSENMAN LLP
     BY:   Shaya Rochester, Esq.
12         Julia B. Mosse, Esq.
           50 Rockefeller Plaza
13         New York, New York 10020
           Phone:  (212) 940-8800
14         Email:  Shaya.Rochester@Katten.com
           Email:  Julia.Mosse@Katten.com
15
16   ON BEHALF OF THE U.S. TRUSTEE'S OFFICE:
17   U.S. TRUSTEE'S OFFICE
     BY:   Greg Zipes, Esq.
18         Rachel Siegel, Esq.
           One Bowling Green
19         Suite 515
           New York, New York 10004
20
21   ALSO APPEARED:
22         David Cumming
           Rijul Malik, Houlihan Lokey
23         Adam Verost, Ducera
           Brian Ciccone, Videographer
24
25
```

Page 5

1                          I N D E X

2

3   WITNESS: BRAD GEER                                    PAGE

4   Examination by Ms. Zalka........................ 12

5

6   CAUTION or INSTRUCTIONS NOT TO ANSWER:

7           Page 32, Line 14

8           Page 33, Line 21

9           Page 40, Line 20

10          Page 45, Line 19

11          Page 46, Line 16

12          Page 52, Line 8

13          Page 52, Line 19

14          Page 54, Line 13

15          Page 58, Line 14

16          Page 59, Line 9

17          Page 66, Line 17

18          Page 67, Line 12

19          Page 72, Line 24

20          Page 73, Line 20

21          Page 74, Line 23

22          Page 84, Line 25

23          Page 85, Line 24

24          Page 86, Line 18

25          Page 92, Line 7

Page 6

1   CAUTION or INSTRUCTIONS NOT TO ANSWER (Continued):
2          Page 94, Line 7
3          Page 101, Line 18
4          Page 117, Line 15
5          Page 119, Line 4
6          Page 121, Line 10
7          Page 122, Line 10
8          Page 123, Line 16
9

10   SPECIAL INSTRUCTIONS or REQUESTS: (None.)
11

12                    E X H I B I T S
13

14   EXHIBITS MARKED AND FIRST REFERRED TO:          PAGE
15   Exhibit 1      Amended Notice of Deposition       16
                    Subpoena
16
     Exhibit 2      Distribution Principles            22
17
     Exhibit 3      Email chain, top-dated             42
18                  7/28/2023, Subject:
                    Genesis/Distribution Mechanic
19                  CONFIDENTIAL
                    GEN_UCC_00000045 to 47
20
     Exhibit 4      Email chain, top-dated             48
21                  8/04/2023, Subject: Another
                    Effort
22                  CONFIDENTIAL
                    GEN_UCC_00000077 to 80
23
     Exhibit 5      Genesis - Thought Chart            48
24                  HIGHLY CONFIDENTIAL
                    GEN_UCC_00000081 to 85
25

Page 7

| | | |
|---|---|---|
| EXHIBITS (Continued): | | PAGE |
| Exhibit 6 | Email chain, top-dated 10/23/2023, Subject: GGH - Dist Mechanics<br>CONFIDENTIAL<br>MC-Genesis-000176 | 60 |
| Exhibit 7 | Email, dated 10/23/2023, Subject: GGH - Dist Mechanics<br>Professionals' Eyes Only<br>AM-GEGCB_0014872 | 60 |
| Exhibit 7A | Genesis Working Draft - 10/22/23, Settlement Discussion - Subject to F.R.E. Rule 408 and Similar Rules<br>Professionals' Eyes Only<br>AM-GEGCB_0014873 | 60 |
| Exhibit 8 | Email chain, top-dated 10/25/2023, Subject: Gensis \| Draft Distribution Principles<br>Professionals' Eyes Only<br>GENESIS_CONF_00000539 to 542 | 64 |
| Exhibit 8A | Annex A, Distribution Principles<br>Professionals' Eyes Only<br>GENESIS_CONF_00000543 to 548 | 64 |
| Exhibit 8B | Annex A, Distribution Principles<br>Professionals' Eyes Only<br>GENESIS_CONF_00000549 to 556 | 64 |
| Exhibit 9 | Email chain, top-dated 11/08/2023, Subject: Genesis \| Distribution Principles<br>CONFIDENTIAL<br>MC-Genesis-000301 to 303 | 83 |
| Exhibit 9A | Annex A, Distribution Principles<br>CONFIDENTIAL<br>MC-Genesis-000304 to 313 | 83 |
| Exhibit 9B | Annex A, Distribution Principles<br>CONFIDENTIAL<br>MC-Genesis-000314 to 321 | 83 |

Page 8

1   EXHIBITS (Continued):                        PAGE
2   Exhibit 10     High Case No-Deal Recoveries,     105
                   January 2024
3                  Professionals' Eyes Only
                   GENESIS_CONF_00004284 to 4294
4
    Exhibit 11     Email chain, top-dated            109
5                  10/22/2023, Subject:
                   Distribution Models
6                  Professionals' Eyes Only
                   AM_GEGCB_0014862 to 14868
7
    Exhibit 12     Notice of Filing of Plan          124
8                  Supplement for the Debtors'
                   Amended Joint Chapter 11 Plan
9
           (Exhibits to be attached to transcript.)
10
11  REPORTER'S NOTE:  All quotations from exhibits are
    reflected in the manner in which they were read
12  into the record and do not necessarily indicate an
    exact quote from the document.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1              (PROCEEDINGS, 01/24/2024, 9:06 a.m.)

2                 THE VIDEOGRAPHER:  Good morning.  We're

3       going on the record at 9:07 a.m. Central Standard

4       Time on January 24, 2024.

5                 This is Media Unit No. 1 of the

6       recorded deposition of Brad Geer, taken by counsel

7       in the matter of Genesis Global Holdco, LLC,

8       et al., filed in the United States Bankruptcy

9       Court, Southern District of New York, Case No.

10      23-10063 (SHL).

11                This deposition is being held via

12      remote Zoom.  My name is Brian Ciccone,

13      representing Veritext Legal Solutions, and I am the

14      videographer.  The court reporter is Merilee

15      Johnson, also from Veritext Legal Solutions.

16                Will the attorneys please announce

17      their appearances for the record.

18                MS. ZALKA:  Thank you, Brian.  This is

19      Caroline Zalka from Weil Gotshal, and with me in

20      the room is Jeffrey Saferstein, Furqaan Siddiqui,

21      Jennifer Lau, Brigit Crosbie, and Adam Verost from

22      Ducera.

23                MR. WEST:  Colin West from White & Case

24      on behalf of the Official Committee of Unsecured

25      Creditors, and on behalf of the witness.  And I'll

Page 10

1    let my colleagues introduce themselves.

2                    MS. VANLARE:  Jane VanLare --

3                    Apologies.  Go ahead, Sequoia.

4                    MS. KAUL:  Sequoia Kaul, also from

5    White & Case, on behalf of the Official Committee

6    of Unsecured Creditors and the witness.

7                    MS. YOO:  And Jade Yoo from

8    White & Case as well.

9                    MS. VANLARE:  Jane VanLare, Cleary

10   Gottlieb Steen & Hamilton, on behalf of the

11   debtors.

12                   MR. WEAVER:  Andrew Weaver, Cleary

13   Gottlieb Steen & Hamilton, on behalf of the

14   debtors.

15                   MR. SANDERS:  Scott Sanders, Hughes

16   Hubbard & Reed, on behalf of Gemini Trust Company,

17   LLC.

18                   MR. DALSEN:  This is William Dalsen

19   from Proskauer Rose on behalf of the Ad Hoc Group

20   of Genesis Lenders.

21                   MS. SANCHEZ TAVAREZ:  This is Genesis

22   Sanchez Tavarez from Proskauer Rose on behalf of

23   Genesis Lenders.

24                   MS. SAZANT:  Jordan Sazant, Proskauer

25   Rose, also on behalf of the Ad Hoc Group of Genesis

Page 11

1   Lenders.

2          MS. PARRA CRISTE:  Amanda Parra Criste,

3   White & Case, on behalf of the UCC as well as the

4   witness.

5          MR. ROCHESTER:  Shaya Rochester from

6   Katten Muchin Rosenman on behalf of Teddy Gorisse.

7   And with me is my partner Julia Mosse.

8          THE VIDEOGRAPHER:  Is that everyone?

9          MR. ZIPES:  It's Greg Zipes and Rachel

10  Siegel with the U.S. Trustee's Office.  And we

11  don't expect to ask any questions.

12         MS. ZALKA:  Could I just confirm that

13  everybody's announced kind of all of the respective

14  attendees that are in their rooms, if any

15  additional people?

16         (No response.)

17         THE VIDEOGRAPHER:  And we just had a

18  dial-in just come in, with no name.

19         Okay.  We have someone that just dialed

20  in.  It's just a phone number.  I don't know who

21  that person is.  And we have another attendee just

22  coming in now.

23         MS. ZALKA:  Can whoever just dialed in

24  announce themselves?

25         THE VIDEOGRAPHER:  He's still signing

```
                                               Page 12
 1   in.

 2              MS. ZALKA:  Got it.

 3              THE VIDEOGRAPHER:  Okay.  Is it

 4   Rijul --

 5              MR. WEST:  You also have, not an

 6   attorney, Rijul Malik, from Houlihan Lokey, also

 7   attending.

 8              MR. CUMMING:  And David Cumming, Colin.

 9   Sorry, was on mute.

10              MR. WEST:  Sorry.  And David Cumming.

11              THE VIDEOGRAPHER:  And then Michael

12   Weinberg just signed on.

13              MS. VANLARE:  Michael Weinberg is with

14   Cleary Gottlieb, on behalf of the debtors.

15              THE VIDEOGRAPHER:  Okay.  All right.

16   Are we ready to begin?  I think that's everyone.

17              Would the court reporter please swear

18   in the witness.

19                        BRAD GEER,

20   duly affirmed, was examined and testified as follows:

21                        EXAMINATION

22   BY MS. ZALKA:

23      Q.   Good morning, Mr. Geer.  We didn't get a

24   chance to meet before.  I'm Caroline Zalka from

25   Weil Gotshal on behalf of DCG.  I'm going to be
```

Page 78

1    BY MS. ZALKA:

2        Q.   Mr. Geer, based on your 25 years of

3    experience, am I correct -- I'm just going back to

4    your actual language.  Based on your 25 years of

5    experience, do you agree that claims are

6    traditionally and typically determined as of the

7    petition date based on the petition-date values?

8                MR. WEST:  Objection to form.  The

9    question has been asked and answered.

10               You can answer the question.

11       A.   Subject to the caveats I provided, yes.

12       Q.   Okay.  And the caveats you provided were

13   that in your view this is, quote, a not traditional

14   case and that you're aware of one other instance

15   where a, quote, similar issue had come up.  Is that

16   correct?

17       A.   Yes.

18       Q.   But those are the only two caveats to your

19   25 years of experience?

20               MR. WEST:  Objection to form.

21   BY MS. ZALKA:

22       Q.   Okay.

23       A.   That I can think of sitting here right now,

24   yes.

25       Q.   So what was the one other instance in your

Page 93

1    certain assets were monetized, GBTC being the

2    largest such asset.  And the -- in a -- as a

3    general matter, the U.S. dollar creditors wanted

4    earlier monetization and greater certainty, and the

5    bitcoin creditors in particular were willing to

6    hold the asset longer to see if the discount to net

7    asset value would close and/or ride the upside, if

8    you will, longer.

9              So I think that's probably what the --

10   why -- or why the reference to governance in the

11   par- -- in the section that talks about classes as

12   well.

13        Q.   Okay.  Can you pull up Exhibit 2 again?  So

14   these are the final distribution principles.

15        A.   Okay.

16        Q.   Okay.  In connection with the development

17   of the distribution principles, did you have any

18   conversation concerning the impact of the

19   distribution principles on DCG's equity value?

20        A.   No.

21        Q.   Concept never came up?  Not once?

22        A.   Never came up.

23        Q.   So it's your testimony that the UCC has

24   never considered the potential for -- let me try

25   that again.

Page 94

1           Is it your testimony that the UCC has never

2     considered the potential for DCG to receive any

3     form of residual equity value?

4        A.   Correct.

5              MR. WEST:  Hold on.  Yeah, he's given

6     an answer, but just --

7              It may be moot at this point, but I

8     don't want you to disclose -- obviously, this would

9     be exclusive of any communications with counsel.

10             But he's answered.

11             MS. ZALKA:  Okay.

12    BY MS. ZALKA:

13       Q.   Okay.  So I just want to talk with you

14    concerning how the distribution principles that the

15    UCC was involved in negotiating work.  So I put

16    before you Exhibit 2, which is the final

17    distribution principles.  So I want to walk through

18    an example, and you can explain how it works.

19             So let's assume that the debtor has two

20    denominations of creditors:  USD and bitcoin.

21    Okay?

22       A.   Okay.

23       Q.   And then as of the petition date, the value

24    of the bitcoin is $1.

25             The U.S. dollar creditor holds $100; the

Page 95

1    bitcoin creditor holds 25 bitcoin.  And if at any

2    point you need me to stop, let me know.  So what

3    would the value of their petition-date claims be in

4    that scenario?

5              MR. WEST:  Object to form.

6         A.   I'm sorry.  The --

7         Q.   And if you want to take notes, you can.

8    But if the U.S. dollar creditor holds $100; the

9    bitcoin creditor holds 25 bitcoin.  So what's the

10   value of their petition-date claims?

11        A.   Okay.  So, I'm sorry.  The USD creditor has

12   a claim of how much?

13        Q.   $100.

14        A.   $100.  Okay.

15        Q.   The bitcoin --

16        A.   And bitcoin has how many bitcoin?

17        Q.   25 bitcoin.  And as of the petition date,

18   the value of the bitcoin is $1.

19        A.   Okay.

20              MR. WEST:  So, Caroline, just to

21   clarify, are you asking -- because it relates to

22   whether this is testimony given on behalf of the

23   committee or Mr. Geer himself, it sounds like

24   you're asking how the distribution principles work.

25   So if you're asking for the committee's

Page 96

1    understanding of that, that's fine.

2              But I just want to make sure:  When you

3    ask what the petition date value of the claims are,

4    you're asking specifically how the distribution

5    principles would -- would treat them?

6              MS. ZALKA:  Yeah.  I'm asking in

7    Mr. Geer's capacity as a designated 30(b)(6)

8    witness on behalf of the committee.

9    BY MS. ZALKA:

10       Q.   So, so far we have value of bitcoin is $1;

11   U.S. creditor holds $100; bitcoin creditor holds 25

12   bitcoin.

13             So would you agree with me the value of

14   their petition-date claims as of the petition date

15   is $125?

16       A.   In aggregate, you mean?

17       Q.   Yeah.

18       A.   Yeah.

19       Q.   $100 for the US- --

20       A.   That's using petition-date pricing, yes.

21       Q.   Yep.  And so assume that at the time of

22   distribution the estate has $100 and 10 bitcoin.

23   Okay?  And as of the distribution date, the value

24   of the bitcoin is $5.

25       A.   I'm sorry.  Has 10 bitcoin worth how much?

Page 97

1      Q.    $5.

2      A.    Okay.

3      Q.    So the value of the estate at distribution

4    would be $150?

5      A.    Yes.

6      Q.    Okay.  So obviously $150 is greater than

7    the $125 of petition-date claims, right?

8      A.    Mathematically that is correct.

9      Q.    Okay.  So the math works so that there's

10   $25 -- right? -- of additional value of the -- at

11   the estate at distribution beyond the value of the

12   petition-date claims.

13          Under the distribution principles, what

14   happens to the $25?

15               MR. WEST:  Object -- objection to form,

16   and I will object.  The witness cannot answer this

17   question on behalf of the committee because the

18   hypothetical that you're posing is a

19   counterfactual, so it's not covered by the

20   distribution principles.  But if you want to ask

21   Mr. Geer to walk through the hypothetical with you

22   in his personal capacity, you can do that.

23   BY MS. ZALKA:

24      Q.    Under the distribution principles, what

25   happens to the $25 of excess value of the estate?

Page 98

1              (Indiscernible crosstalk clarified by

2              the court reporter.)

3              MR. WEST:  The same one that I gave to

4      the last question, and that's just on the record.

5      BY MS. ZALKA:

6          Q.   Okay.  So, Mr. Geer, what happens to the

7      $25 under the distribution principles?

8          A.   The -- well, under the distribution

9      principles, first, you need to calculate the

10     claimed value.  And then the pro rata share of each

11     claim, which, in this case, under your example, USD

12     would be $100 over $125.  And BTC, using the

13     petition-date pricing you provided, would be $25

14     over $125, so 4/5 and 1/5.

15              So if you have $150 of value to distribute,

16     then you apply those ratios to the value that's

17     distributable up until the point where USD reaches

18     $100.

19         Q.   And then what?

20         A.   And then the 4/5 that I mentioned goes to

21     zero.  BTC would get a ratio of a hundred percent

22     of the balance at that point as compared to -- you

23     said, I think, it had on deposit 25 bitcoin.

24              I don't know how creditor -- well,

25     creditors had 25 bitcoin on deposit as of the

Page 99

1   petition date, so they would continue to collect

2   until receiving 25 bitcoin.

3        Q.   So in this scenario, at the end of the day,

4   applying distribution principles, how much does

5   each of these creditors get?

6             MR. WEST:  Object to form.  Same

7   objection.

8        A.   Can I use my calculator?

9        Q.   Yes.  Absolutely.

10       A.   Okay.  What is the -- I'm sorry.  What is

11   the price of BTC at the time of distribution or the

12   effective date?

13       Q.   So the price of the bitcoin at the time of

14   distribution would be $5.  So basically, again,

15   just to recap.  USD creditor has $100; bitcoin

16   creditor holds 25 bitcoin.  At the time of

17   distribution, there's -- the value of the bitcoin

18   is $5.  And the estate has $100 and 10 bitcoin.  So

19   the value of distribution is $150.

20       A.   Yep.  Okay.  And I'm sorry.  Your question

21   again was what do BTC team creditors get?

22       Q.   Yeah.  That one BTC creditor.

23       A.   I'm calculating it 10 bitcoin versus

24   25 bitcoin that it had lent to the company.

25       Q.   And what's the value of the bitcoin?

Page 100

1      A.    Well, you told me the value of the bitcoin

2   was $5.

3      Q.    Yeah.  So my question is, basically:  Based

4   on what the assets are that are available for

5   distribution relative to the petition-date value of

6   the claims, how much of each of these creditors

7   getting at the end of the day?

8                MR. WEST:  Object to form.

9      A.    A U.S. dollar creditor's getting $100, and

10  a BTC creditor's getting $40 on an in-kind basis.

11     Q.    $40 or $50?

12     A.    I calculated 40 percent recovery on an

13  in-kind basis.

14     Q.    Can you just walk me through how you got to

15  that, the 40 percent recovery?

16     A.    Okay.  So we started with the U.S. dollar

17  claim of $100 and a BTC claim of 25 BTC -- a

18  quantity of BTC each worth $1.  Using petition-date

19  pricing, that gives us $25 of BTC claims.  When

20  added to the $100 of USD claims gives us $125 of

21  claims in aggregate.

22          Then I calculated the pro rata share, so I

23  took -- for the USD, I took 100 divided by 125;

24  and, for the BTC, I took 25 divided by 125.

25     Q.    And what's the -- sorry.  Go ahead.

Page 101

1      A.    Yeah.  And I simplified that to 4/5 for USD

2   and 1/5 for BTC.

3      Q.    So in dollars, at distribution, how much is

4   the BTC holder getting?

5              MR. WEST:  Objection to form.

6      A.    In dollars at the distri- -- point of

7   distribution?

8      Q.    Mm-hmm.

9      A.    10 BTC, and you're saying that, I think,

10  the price of BTC is $5?

11     Q.    Mm-hmm.

12     A.    So on a U.S. dollar-equivalent basis, $50

13  U.S. dollar-equivalent.

14     Q.    Okay.  So at the end of the day, the value

15  that the bitcoin holder is getting under the

16  distribution principles is $50, correct?

17             MR. WEST:  Objection -- object to form.

18  And same objection as earlier.

19     A.    Under -- yeah, that's what the math --

20  that's what the math works out to be.

21     Q.    Right.  And so, again, I'm just a lawyer

22  doing math.  But that's double what the value of

23  the petition-date claim was, correct?

24             MR. WEST:  Object to form.

25     A.    Well, I -- the -- the issue here, as I've

Page 102

1    discussed, is that the crypto creditor's view is

2    that they're entitled to the quantity of coin they

3    had left, which is -- in your example is 25.  And

4    this example gets them back 10.  So they lent 25,

5    and they get back 10 in this proposal -- or in this

6    example.

7            So they're getting, you know, 40 percent of

8    what they lent to the company back.

9        Q.   Mr. Geer, my question's very simple, all

10   right?  I said -- we all agree that the value of

11   the petition-date claim in my hypothetical was 25

12   for the bitcoin holder.  And you just testified

13   that the distribution principles result in that

14   bitcoin holder getting $50 as of the date of

15   distribution.

16           So they're getting double the value of the

17   petition-date claim on a dollar basis.

18       A.   On a U.S. dollar --

19             MR. WEST:  Object to form.

20             (Indiscernible crosstalk clarified by

21             the court reporter.)

22   BY MS. ZALKA:

23       Q.   Mr. Geer, could you repeat your question --

24   could you repeat your answer?

25       A.   I said --

Page 103

1            (Indiscernible crosstalk clarified by

2            the court reporter.)

3            MR. WEST:  Hold on.  Hold on.  I want

4  to make sure -- I know Ms. Zalka isn't asking the

5  witness to speak before I get a chance to get my

6  objection in.  I just want to note my objection,

7  which is an objection to form.

8            And you can answer the question, Brad.

9      A.   On a U.S. dollar-equivalent basis, yes.

10  The 10 bitcoin in this example that the bitcoin

11  creditor would receive is worth U.S. dollars 50 --

12  50 U.S. dollars.

13      Q.   So in this example, the bitcoin holder

14  would receive bitcoin worth $50, which is double

15  the U.S. dollar value of their petition-date claim?

16      A.   Yes.  And this example highlights the heart

17  of the issue that I've been talking about.  And the

18  math you suggest is correct, but it -- it does

19  highlight the challenge that we've been told to

20  deal with for months.

21      Q.   And so in my example, is the bitcoin

22  holder -- could they continue to recover additional

23  rounds of value, or are they capped somehow?

24            MR. WEST:  Object to form.

25      A.   The paragraph I referred to previously,

Page 104

1   which I believe is -- let's find it here.  Sorry.

2   It's very hard to scroll this document.  So

3   limitation on recoveries -- "Limitation on

4   Recoveries" paragraph would -- the recovery cap

5   would cap any creditor's recovery at 100 percent of

6   their in-kind claim amount.

7       Q.   What is the -- what is the 100 percent of

8   the in-kind claim amount here?

9       A.   In this example, it's 100 U.S. dollars and

10  25 bitcoin.

11      Q.   And it's 25 bitcoin valued as of the

12  distribution date?

13              MR. WEST:  Object to form.

14      A.   It's a quantity.

15      Q.   So no matter what the value is of the

16  bitcoin at the time of distribution, it could

17  result, then, in a dollar basis getting double or

18  triple what their petition-date value is, right?

19              MR. WEST:  Objection to form.

20      A.   I'm sorry.  Rephrase that -- or could you

21  repeat the question?

22      Q.   Yes.  So am I correct, then, that based on

23  the distribution date value of the bitcoin, it is

24  possible that on a dollar basis, the bitcoin holder

25  would be getting double or triple or even more than

Page 105

1    that on a dollar basis as compared to their

2    petition-date claim?

3        A.   Yes.  Mathematically --

4             MR. WEST:  Object to the form.

5        A.   -- that's how that works.

6        Q.   Okay.

7             MS. ZALKA:  Let's go to tab 25.

8             (Exhibit 10 was marked for

9             identification.)

10   BY MS. ZALKA:

11       Q.   And for the record, this is being

12   introduced as Exhibit No. 10, bearing

13   Bates No. Genesis_CONF_00004284 through 4294.

14            Just let me know when you're ready,

15   Mr. Geer.

16       A.   It's still loading here.  Okay.

17            (Reviewing document.)

18            Okay.  I've got the document.

19       Q.   Do you recognize Exhibit 10?

20       A.   I don't.

21       Q.   Okay.  I'll represent to you this is the

22   final recovery analysis that was produced by the

23   debtors yesterday, dated January 2024.  So have you

24   ever seen this document before?

25       A.   I haven't.

# **EXHIBIT C**

**January 30, 2024 J. Sciametta Deposition Transcript Excerpt**

PROFESSIONALS' EYES ONLY

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------------- x

4    In re:

5    GENESIS GLOBAL HOLDCO, LLC, et al.,

6         DEBTORS.

7              CASE NO. 23-10063 (SHL)

8    --------------------------------------------- x

9         * PROFESSIONALS' EYES ONLY *

10

             January 30, 2024

11           10:13 a.m.

12

13

14

15       DEPOSITION of JOSEPH SCIAMETTA, taken

16    pursuant to Notice, before Fran Insley, at Weil

17    Gotshal & Manges, LLP, 767 Fifth Avenue, New

18    York, NY, a Notary Public of the States of New

19    York and New Jersey.

20

21

22

23

24

25

PROFESSIONALS' EYES ONLY

Page 2

1    A P P E A R A N C E S:

2         CLEARY GOTTLIEB STEEN & HAMILTON LLP

3              Attorneys for DEBTORS and THE

4              WITNESS

5              One Liberty Plaza

6              New York, New York 10006

7         BY:  JANE VANLARE, ESQ.

8              ANDREW WEAVER, ESQ.

9              MICHAEL WEINBERG, ESQ.

10             RICHARD MINOTT, ESQ.

11             MIRANDA HATCH, ESQ. (via Zoom)

12             HOORI KIM, ESQ. (via Zoom)

13             Phone:  (212) 225-2000

14

15         PROSKAUER ROSE LLP

16             Attorneys for the AD HOC GROUP OF

17             GENESIS LENDERS

18             One International Place

19             Boston, Massachusetts 02110

20        BY:  GENESIS G. SANCHEZ TAVAREZ, ESQ.

21             (via Zoom)

22             Phone:  (617) 526-9600

23

24

25

PROFESSIONALS' EYES ONLY

Page 3

1

2          A P P E A R A N C E S: (continued)

3

4                    MEDINA LAW FIRM

5                             Attorneys for BAO FAMILY HOLDINGS

6                             641 Lexington Avenue, 12th Floor

7                             New York, New York 10022

8                    BY:  ERIC MEDINA, ESQ.

9                             Email:  emedina@medinafirm.com

10

11

12                    WEIL GOTSHAL & MANGES LLP

13                             Attorneys for DIGITAL CURRENCY

14                             GROUP, INC., and DCG INTERNATIONAL

15                             INVESTMENTS LTD

16                             767 Fifth Avenue

17                             New York, New York 10153

18                    BY:  CAROLINE ZALKA, ESQ.

19                             BRIGIT CROSBIE, ESQ.

20                             JENNIFER LAU, ESQ.

21                             JEFFREY D. SAFERSTEIN, ESQ.

22                             FURQAAN SIDDIQUI, ESQ.

23                             Phone: (212) 310-8000

24                             Email:  Caroline.Zalka@weil.com

25

PROFESSIONALS' EYES ONLY

Page 4

1

2      A P P E A R A N C E S: (continued)

3

4          WHITE & CASE LLP

5                  Attorneys for THE OFFICIAL COMMITTEE

6                  OF UNSECURED CREDITORS

7                  1221 Avenue of the Americas

8                  New York, New York 10020

9          BY:   ARIELL BRANSON, ESQ.

10                 SEQUOIA KAUL, ESQ. (via Zoom)

11                 Phone:  (212) 819-8433

12                 Email:  Ariell.Branson@WhiteCase.com

13                  -and-

14         WHITE & CASE LLP

15                 Attorneys for THE OFFICIAL COMMITTEE

16                 OF UNSECURED CREDITORS

17                 200 South Biscayne Blvd, Ste. 4900

18                 Miami, Florida 33131

19         BY:   COLIN WEST, ESQ. (via Zoom)

20                 AMANDA PARRA CRISTE, ESQ. (via Zoom)

21                 Phone: (305) 371-2700

22                 Email: AParraCriste@WhiteCase.com

23                 Email:  Sequoia.Kaul@WhiteCase.com

24

25

PROFESSIONALS' EYES ONLY

Page 5

1

2      A P P E A R A N C E S: (continued)

3          KATTAN MUCHIN ROSENMAN LLP

4               Attorneys for TEDDY GARIESE

5               50 Rockefeller Plaza

6               New York, New York 10020

7          BY:  SHAYA ROCHESTER, ESQ. (via Zoom)

8               JULIA B. MOSSE, ESQ. (via Zoom)

9               Phone: (212) 940-8800

10              Email: Shaya.Rochester@Katten.com

11

12

13         MCDERMOTT WILL & EMERY

14              Attorneys for the CRYPTO CREDITORS

15              and AD HOC GROUP

16              One Vanderbilt Avenue

17              New York, New York 10017

18         BY:  GREER GRIFFITH, ESQ.

                Email:  GGriffith@mwe.com

19

20      ALSO PRESENT:

21      ADAM VEROST, DUCERA PARTNERS

22      HOWARD BRODSKY, VIDEOGRAPHER

23                      oOo

24

25

PROFESSIONALS' EYES ONLY

Page 6

1

2      --------------- I N D E X -------------------

3      WITNESS                EXAMINATION BY            PAGE

4      JOSEPH SCIAMETTA   MS. ZALKA                      8

5                         MS. GRIFFITH                 279

6      --------------- E X H I B I T S ---------------

7      Exhibit 1 Amended Notice of Taking

8                Deposition                             11

9      Exhibit 2 Schedule of Claims                     16

10     Exhibit 3 Recovery Model January 2024            34

11     Exhibit 4 Bates 378                              63

12     Exhibit 2 (Remarked)                             65

13     Exhibit 5 E-mail                                 95

14     Exhibit 6 Range of Recoveries                   188

15     Exhibit 7 The Plan Supplement                   280

16               (Exhibits produced.)

17

18     INSTRUCTION NOT TO ANSWER:

19     Page 113, Line 20

20     Page 162, Line 22

21

22

23

24

25

PROFESSIONALS' EYES ONLY

Page 7

1           THE VIDEOGRAPHER:  Good morning.

2      Here begins the video recorded virtual

3      remote 30(b)(6) deposition of Joe

4      Sciametta appearing on behalf of the

5      Debtors in this matter from this location

6      at Weil, Gotshal & Manges, LLP, 767 Fifth

7      Avenue, New York, New York 10153.  This

8      deposition is taken by the defendants In

9      Re: Genesis Global Holdco, LLC, et al.,

10     Debtors Case No. 23-10063 (SHL) in the

11     United States Bankruptcy Court for the

12     Southern District of New York.

13           Today is Tuesday, January 30, 2024.

14     The time is 10:13 a.m. Eastern Standard

15     time.  My name is Howard Brodsky.  I am

16     the legal video specialist in association

17     with Veritext Legal Solutions with offices

18     located in San Francisco, California.  The

19     court reporter is Fran Insley in

20     association with Veritext.

21           Counsel have stipulated that the

22     court reporter shall enter all appearances

23     for this proceeding into the stenographic

24     court record and they further stipulated

25     and agreed that the court reporter may

PROFESSIONALS' EYES ONLY

Page 8

1          take the deponent's oath.

2                  Will the court reporter please swear

3          in the witness.

4     J O S E P H   S C I A M E T T A,

5          having been first duly sworn by the

6          Notary Public, was examined and

7          testified as follows:

8     EXAMINATION BY MS. ZALKA:

9          Q.    Good morning, Mr. Sciametta.

10         A.    Good morning.

11         Q.    I may call you Joe, if that's okay?

12         A.    That's perfectly fine.

13         Q.    I'm Caroline Zalka, for the record.

14    Obviously, we've met this morning prior to the

15    deposition.

16                So, can you just state your full

17    name and address for the record?

18         A.    Joseph Sciametta, ███████████████

19    ██████████████████████

20         Q.    And you've been deposed before?

21         A.    I have, yes.

22         Q.    Roughly how many times?

23         A.    Twice.

24                MS. VANLARE:   Caroline, I'm sorry,

25         just before we begin, can we stipulate on

PROFESSIONALS' EYES ONLY

                                                    Page 33

1       could receive.

2              Q.    Okay.  So, I guess all else being

3       equal, other than the value of Bitcoin between

4       the date of the petition date and the date of

5       distribution, am I correct that in this

6       scenario that we have been discussing, the

7       $1,000 US dollars and the 1,000 Bitcoins, that

8       under the distribution principles, that

9       creditor could receive double what the petition

10      date value of the Bitcoin was at the time of

11      distribution?

12                   MS. VANLARE:  Objection.

13             A.    If there were sufficient assets.

14             Q.    And in fact, if the price of Bitcoin

15      travels, right, between petition date and

16      distribution date, again, assuming there is

17      sufficient assets, they could receive triple

18      the value of the petition date claim under the

19      distribution principles; is that correct?

20                   MS. VANLARE:  Objection.

21             A.    We haven't looked at that scenario

22      but that would probably be correct.

23             Q.    But mathematically, you would agree

24      with me that that's just how the distribution

25      principles work, right?

**Page 47**

1              MS. VANLARE:  Objection.

2        A.     Yes.

3        Q.     Okay.  And if you go one section up

4    in the blue shaded box, there is a line that

5    says "Total Recovery on Incremental In-kind

6    Claims."  Do you see that?

7        A.     Yes, I do.

8        Q.     And that reference says 900.5.  Do

9    you see that?

10       A.     Yes, I do see that.

11       Q.     Okay.  So, now, tell me what the

12   managing 900.5 represents.

13       A.     The 900.5 represents, under our

14   plan, under the distribution principles, after

15   the payment of petition date valued claims, the

16   next in line for payment would be in-kind

17   claims, which are the claims whose value has

18   appreciated since the petition date.

19       Q.     Okay.  So, after all the creditors

20   receive their petition date dollarized claims

21   under the high case scenario, there is an

22   additional $900.5 million that applies to the

23   distribution principles would be available for

24   distributions; is that correct?

25              MS. VANLARE:  Objection.

PROFESSIONALS' EYES ONLY

Page 48

1        A.    Yes.

2        Q.    Okay.  So, the 900.5 is the excess

3   value that remains after creditors receive the

4   petition date dollarized claim at 100 percent

5   level?

6            MS. VANLARE:  Objection.

7        A.    Correct.

8        Q.    Okay.  So, let's go to page 8, which

9   is the low case.  Okay.  So, it's called low

10  case, and we will get to that, but first on the

11  numbers.  So, you'll see it shows at the bottom

12  it shows a 91.6 percent recovery on dollarized

13  claims.

14       A.    Yes, I see that.

15       Q.    So, if you look above on dollarized

16  claims, which has the 3722.7 number.

17       A.    Yes, I see that.

18       Q.    Okay.  So, what does that represent

19  in the low case?

20       A.    In the low case, that is the assumed

21  value of claims valued at petition date

22  pricing.

23       Q.    Okay.  And you'll see on the total

24  recovery on dollarized claims, that is the

25  3408.6?

PROFESSIONALS' EYES ONLY

Page 95

1          Q.    What is their basis to argue for

2     higher claims, as you understand it?

3              MS. VANLARE:  Objection.

4          A.    I believe they want to apply -- I

5     shouldn't say "they."  I'm not familiar with

6     all of them, but I think at least in one

7     instance that I'm aware of, the creditor wants

8     to -- believes that petition date pricing

9     should apply also to other rows in the chart

10    and would result in a net higher claim.

11         Q.    Other than that one creditor, any

12    other instance that you can recall sitting here

13    today where there was a creditor advocating for

14    something even higher in terms of net claim

15    than what's set forth in the setoff principles?

16             MS. VANLARE:  Objection.

17         A.    Not that I'm aware of.

18         Q.    Let's switch to Tab 13.  Exhibit 5.

19    So, can I ask you one follow-up question before

20    we get to that document so -- and this is in

21    your personal experience.

22         A.    Okay.

23         Q.    So, in your personal experience,

24    kind of going back over the last 20 years or so

25    and the various Chapter 11 proceedings, have

PROFESSIONALS' EYES ONLY

Page 96

1     you seen setoff principles work such that the

2     debtor isn't using current pricing?

3                    (Whereupon Exhibit 5 was marked for

4          identification.)

5                    MS. VANLARE:   Objection.

6          Q.     In the net claim process?

7          A.     I don't think I've seen an analogous

8     case that had setoff principles, so no, I have

9     not.

10         Q.     You have -- so, to be clear, in your

11    20 years experience, you've never seen this

12    approve -- this approach to setoff that uses

13    something other than current pricing?

14                   MS. VANLARE:   Objection.

15         A.     I just haven't seen anything

16    analogous, so no.

17         Q.     Okay.  Go back -- you can go back to

18    reading Exhibit 5.  I didn't mean to interrupt

19    you.

20         A.     I'm okay, I'm ready.

21         Q.     Okay.  Do you recognize this

22    document?

23         A.     I believe so, yes.

24         Q.     Is this one of the documents that

25    you reviewed in connection with preparing for

PROFESSIONALS' EYES ONLY

Page 115

1        A.     As we -- can I refer to Exhibit 2?

2        Q.     Yes.  You can look at Exhibit 2,

3    yes.

4        A.     Being that this is counterparty one

5    on Exhibit 2 in the right-hand -- right-hand

6    column is ████████████ variance.  I would

7    assume that that is what Mr. Barefoot was

8    referring to, maybe as of a different date and

9    a different valuation, but generally.

10       Q.     But generally speaking, it's using

11   current pricing -- it's the difference between

12   using current pricing versus present day

13   pricing that we have been discussing here

14   today?

15       A.     I believe that's what he is

16   referring to.

17       Q.     Okay.  And the total variance as set

18   forth for that, for setoff counterparty number

19   one as reflected on Exhibit 2, is how much?

20              MS. VANLARE:  Objection.

21       A.     ████████████████████████████████

22   ████████████████

23       Q.     And the total variance for all

24   setoff counterparties is the 288; is that

25   correct?

Page 116

```
 1                    MS. VANLARE:  Objection.
 2          A.       For all setoff counterparties,
 3     correct.
 4          Q.       Okay.  Do you agree with what
 5     Mr. Barefoot wrote that this is a very -- this
 6     has -- this distinction has a very material
 7     impact on the payment amount?
 8                    MS. VANLARE:  Objection.
 9          A.       I agree it has -- today's pricing
10     has ██████████ variance on the claim.
11          Q.       And do you agree that's a very
12     material impact on the claim amount?
13                    MS. VANLARE:  Objection.
14          A.       Do people have different views of
15     what is material but it was ██████████ impact.
16          Q.       But do you agree that it's -- you
17     personally, do agree that it's a material
18     impact?
19                    MS. VANLARE:  Objection.
20          A.       I don't know that I assessed
21     materiality in this case, but it's ██████████
22     variance.
23          Q.       It's a lot of money, right?
24                    MS. VANLARE:  Objection.
25          A.       (Laughing.)
```

Page 125

1          MS. VANLARE:  I apologize.

2          MS. ZALKA:  Yeah, of course.

3          MS. VANLARE:  I don't see that

4     e-mail.  5:54 p.m. you said?  Oh, yes,

5     sorry.  I see it.

6          MS. ZALKA:  No worries.

7     Q.    And it says, "We would like to get

8     this behind us before the Voting Deadline."

9     What voting deadline is being referenced?

10         MS. VANLARE:  Objection.

11    A.    Well, I don't really know what

12    Mr. Rochester was writing about.  If I could

13    assume, I would assume it was probably the plan

14    voting deadline but I don't know.

15    Q.    Are you aware of any other deadline

16    that was then approaching?

17         MS. VANLARE:  Objection.

18    A.    Not a voting deadline.

19    Q.    Okay.  Were the setoff

20    counterparties or their counsel refusing to

21    agree to the plan and agree to submit their

22    ballots in favor of the plan unless there was a

23    resolution of the claims issue being discussed

24    in the e-mail at 6:05 p.m.?

25         MS. VANLARE:  Objection.

PROFESSIONALS' EYES ONLY

Page 126

1          A.      I'm sorry, could you say that again?

2    I was reading the e-mail.

3          Q.      Sure.  Were the setoff

4    counterparties and their counsel, any of them,

5    refusing to agree to vote in favor of the plan

6    unless the setoff principles negotiation

7    reached a resolution they were comfortable

8    with?

9                  MS. VANLARE:  Objection.

10         A.      Not that I'm aware of.

11         Q.      Do you agree that -- were you aware

12   that they wanted to, quote, get the issue

13   behind them before the voting deadline?

14                 MS. VANLARE:  Objection.

15         A.      I am now that I see it clearly

16   written.  I assume most creditors would want

17   resolution to their claims but I'm not sure the

18   relevance of the voting deadline.

19         Q.      Based on your knowledge and this

20   e-mail, is it fair to say that the setoff

21   counterparties and their counsel, at least some

22   of them, were refusing to agree to vote in

23   favor of the plan until the setoff principles

24   had been resolved?

25                 MS. VANLARE:  Objection.

PROFESSIONALS' EYES ONLY

Page 127

1      A.    I don't believe that was the case.

2      Q.    Okay.  So, what is the reference

3   then to, "We would like to get this behind us

4   before the Voting Deadline so that we could

5   submit our Ballot"?

6      A.    I don't know what Mr. Rochester is

7   referring to.

8      Q.    Sitting here today, does best

9   informed guess based on your extensive work on

10  this case, do you have an understanding as to

11  whether or not what Mr. Rochester is conveying

12  is that they would like to get the setoff

13  principles resolved so that they could actually

14  vote in favor of the plan?

15          MS. VANLARE:  Objection.  Asked and

16     answered.

17     A.    I'm unaware of what Mr. Rochester

18  was saying and confused by his comment.

19     Q.    You don't understand his comment?

20     A.    No.

21     Q.    What don't you understand about it?

22          MS. VANLARE:  Objection.

23     A.    I thought -- I thought his party was

24  subject to a PSA, so I thought they were voting

25  for the plan.  I'm just confused.

PROFESSIONALS' EYES ONLY

Page 128

1          Q.     Well, do you agree with me that he

2     seems to be implying that they would not be in

3     a position to vote in favor of the plan if the

4     voting deadline without knowing the agreed upon

5     claim amount?

6              MS. VANLARE:   Objection.  Asked and

7          answered.

8          A.     I can certainly see that's what the

9     words say, but I'm confused as to why he would

10    write that.

11         Q.     But not disputing that is what the

12    words say?

13             MS. VANLARE:   Objection.

14         A.     I can't dispute it.  It's what the

15    words say.

16         Q.     Okay.  We can move on from

17    Exhibit 5.

18             Okay.  So, we are going to go back

19    to Exhibit No. -- final recovery analysis,

20    Exhibit 3.

21         A.     Okay.

22         Q.     Okay.  So, let's go to the high case

23    on page 4, and now that we've had a chance to

24    go through the setoff principles, I just wanted

25    to confirm a couple of things.

PROFESSIONALS' EYES ONLY

Page 185

1    looked at in-kind.  I would be surprised if it

2    was but I don't know.

3         Q.    So, do you think that the increase

4    in crypto prices in October, late October going

5    into November, and the recovery analyses

6    potentially starting to show more than 100

7    cents on the petition date dollarized basis?

8         A.    In the high case.

9         Q.    In the high case.  Is that just a

10   coincidence that coincided with the waterfall

11   concept being introduced?

12              MS. VANLARE:  Objection.

13        Q.    You can answer.

14        A.    I don't know that is a coincidence.

15        Q.    Probably not a coincidence, right?

16              MS. VANLARE:  Objection.

17        A.    I don't know.  I know that it all

18   happened at the same time.  When we work on the

19   principles, coin prices were rallying, we were

20   having active discussions, and as the

21   distribution principles evolved, the waterfall

22   was introduced, negotiated and -- and ended up

23   in the final principles.

24        Q.    Unlikely that it was a coincidence,

25   right?

PROFESSIONALS' EYES ONLY

Page 186

1        MS. VANLARE:  Objection.  Asked and

2    answered.

3        A.    I don't know.  I think our creditor

4    base largely in general is very bullish on the

5    asset class, and so I can't say it's a

6    coincidence because it's very likely that in --

7    the prices whether or not they may have

8    anticipated it, and we may have ended up at the

9    same place.  So, I --

10        Q.    But that is all just guessing?

11        A.    It is.

12        MS. VANLARE:  Objection.

13        Q.    Based on the debtors involvement in

14    the negotiations in the October to November

15    time period, did any of the creditors tie the

16    introduction of the waterfall to the fact that

17    crypto prices were rising?

18        MS. VANLARE:  Objection.

19        Q.    And by creditors, I'm referring to

20    any of the creditors or their advisors.

21        A.    I'm trying to think through all the

22    conversations we have had.

23        Q.    Yes, of course.

24        A.    I can't recall it being -- I can't

25    recall there being a direct tie.

PROFESSIONALS' EYES ONLY

Page 196

1        which in turn impacts the amount of equity

2        value that may or may not be there for DCG as

3        the equity holder after claims are resolved?

4                MS. VANLARE:   Objection.

5            A.    Correct.  If all claims are

6        resolved, then it could have impact.

7            Q.    Okay.  So.  Why weren't they

8        involved in the negotiations?

9                MS. BRANSON:   Objection.

10           A.    I guess I don't know particularly

11       why they were involved, but it was a

12       negotiation largely, if not solely, amongst the

13       creditors who were receiving distributions on

14       their plan as to how to distribute those

15       assets.

16           Q.    But the debtors were involved,

17       right?  You just said the debtors and their

18       advisors between mid October and November,

19       right?

20           A.    The debtors were also involved,

21       correct.

22           Q.    So, basically all the debtors and

23       the creditors and their advisors were involved

24       in the negotiation of the distribution

25       principles but DCG was executed from those

Page 197

1    communications, correct?

2              MS. VANLARE:   Objection.   Misstates

3        testimony.

4         A.    They weren't included.

5         Q.    Well, it's not like someone just

6    forget to send the calendar invite, right?

7    They were purposely and intentionally excluded

8    from the communications?

9              MS. VANLARE:   Objection.

10        A.    I don't think they were purposely

11   and intentionally excluded.   I know they were

12   not included.

13        Q.    Do you think they were inadvertently

14   excluded?

15             MS. VANLARE:   Objection.

16        A.    Well, I know certain creditors

17   weren't included until they actively engaged

18   in -- and when they did, we certainly took

19   their calls and listened to them and worked

20   with them.

21        Q.    Did the debtors take DCG's calls

22   with respect to the negotiation of the

23   distribution principles?

24             MS. VANLARE:   Objection.

25        A.    I'm not aware if we even received

PROFESSIONALS' EYES ONLY

Page 227

1    on the high case scenario that is set forth in

2    the debtors' recovery analysis, if we use

3    pricing as of today, there is an additional 140

4    plus 124, so --

5         A.    I haven't checked today's pricing

6    but you could be right.

7         Q.    So, more than 260 million of

8    additional value based on the movement in GBTC

9    prices?

10              MS. VANLARE:   Objection.

11        A.    In the high case, that could be

12   right if today's prices -- at today's prices.

13        Q.    Okay.  And that 260 million would be

14   added to the 900 million, right, in the excess

15   of the dollarized petition date claims?

16              MS. VANLARE:   Objection.

17        A.    I believe that's correct.

18        Q.    Okay.  And then assuming with me

19   that post-petition interest is the 200 million,

20   and again, not addressing the government

21   penalty claims, well then, you're now at north

22   of a billion dollars of excess value after

23   100 percent recovery on petition date

24   dollarized claims and then X the amount of

25   post-petition interest, that would flow to DCG

PROFESSIONALS' EYES ONLY

Page 228

1    equity, right?

2            MS. VANLARE:   Objection.

3       Q.    Assuming only petition date

4    dollarized claims are allowed?

5       A.    Obviously, yes.  Assuming that,

6    assuming no government claims, and assuming no

7    PPI, your assumed value, I believe that would

8    be correct.

9       Q.    And you can take a look at the low

10   case if you want, but the question would be, in

11   the low case scenario, right, the $314,000,000

12   shortfall would be reduced by the 260 million,

13   right, because of the increase in GBTC?

14      A.    Sure.

15           MS. VANLARE:   Objection.

16      A.    That would probably be correct,

17   assuming, again, this case scenario also other

18   things, yes.

19      Q.    Okay.  And then are you aware that

20   generally speaking between 12/31 and today

21   Bitcoin has also risen in value?

22      A.    I believe between 12/31 and today

23   it's gone up and it's gone down.  It might be

24   up today though, yes.

25      Q.    Okay.  So, it's up today.

PROFESSIONALS' EYES ONLY

Page 229

1      A.    I should say yesterday.  I actually

2   didn't check prices today but I wouldn't be

3   surprised?

4      Q.    As of yesterday?

5      A.    Yesterday it was probably up, yes.

6      Q.    What about ETH?

7      A.    I don't recall ETH, sorry.

8      Q.    But assume with me its increased

9   relative to today, relative to the 12/31

10  pricing.  I'll represent that to you for the

11  purposes of this.

12     A.    I wouldn't be surprised.

13     Q.    Why wouldn't you be surprised?

14     A.    Because the others have gone up, as

15  you said.

16     Q.    So, in the low case, am I correct

17  that -- let's, again, just using today's prices

18  as opposed to 12/31.  You can take a look at

19  the low case, but -- so, the $314,000,000

20  shortfall would be obviously reduced to -- by

21  the 260 that we just calculated with results

22  from using today's value for GBTC?

23          MS. VANLARE:  Objection.

24     A.    Okay.

25     Q.    So, that is leaving roughly

PROFESSIONALS' EYES ONLY

Page 255

1                    MS. VANLARE:   Objection.

2          A.    I mean, capped only to the value of

3    the claim at current prices.

4          Q.    So, let's say the value of the

5    Bitcoin increased to half a billion dollars?

6          A.    The value of the claims would

7    increase.

8          Q.    And the value of the claims would

9    increase, let's say, if one Bitcoin worth half

10   a billion dollars, then the value of the claim

11   that the creditor would be entitled to under

12   the recovery model that (unintelligible) are

13   advancing would be half a billion dollars for

14   that one Bitcoin, right?

15                    MS. VANLARE:   Objection.

16         A.    I believe that's correct.

17         Q.    And that's regardless of whether or

18   not the petition dates had that Bitcoin valued

19   at 20,000, 50,000, 50 million, correct?

20                    MS. VANLARE:   Objection.

21         Q.    Just how the distribution principles

22   work?

23         A.    I believe that's correct.

24         Q.    Okay.  So, in that scenario under

25   the distribution principles, applying them, one

PROFESSIONALS' EYES ONLY

Page 256

1    Bitcoin worth, let's say, half a billion

2    dollars but the original -- the petition date

3    value of that Bitcoin on a dollarized basis was

4    50 million, that creditor is still getting half

5    a billion dollars under the distribution

6    principles; is that correct?

7              MS. VANLARE:   Objection.

8         A.    Not necessarily.  They would --

9    could get up to that if we had the underlying

10   assets to pay it.

11        Q.    Fair.  They are under the

12   distribution principles, that creditor,

13   assuming that the estate has a value to pay it

14   their max recovery would be purely a function

15   of whatever Bitcoin was being priced at so they

16   would be entitled to, under the distribution

17   principles, just the way the math works, that

18   creditor would receive half a billion dollars

19   for their one Bitcoin on a petition date

20   dollarized claim of 20 million?

21             MS. VANLARE:   Objection.

22        A.    Assuming they were the assets.

23        Q.    Yes.  So, going back to your

24   experience earlier today that we talked about

25   in terms of your 20 -- 20 or 25 years?

Page 257

1        A.      Twenty.

2        Q.      Okay.   Twenty years.

3        A.      Over 20.

4        Q.      So, in your over 20 years of

5    experience in restructurings, have you seen in

6    the Chapter 11 proceeding any approach other

7    than the petition date dollarized, approach

8    being used to determine creditors' claims?

9               MS. VANLARE:   I want to clarify that

10          this is a question for Mr. Sciametta in

11          his personal capacity, not as a 30(b)(6)

12          witness.

13              MS. ZALKA:   Yes.

14       Q.      So, my reference to 20 years of

15   experience was a reference to your personal

16   experience?

17              MS. BRANSON:   Object to form.

18       A.      I would say I have neither seen it

19   nor a situation that is analogous to this, but

20   no, I have not seen it.

21       Q.      But just to be clear, okay, because

22   we can take those in turn, in your 20-plus

23   years of experience as working as an advisor

24   and in connection with Chapter 11 proceedings,

25   you have never seen anything other than

PROFESSIONALS' EYES ONLY

Page 258

1      petition date, U.S. dollars being used to

2      determine claims, correct?

3                MS. VANLARE:  Objection.

4                MS. BRANSON:  Objection.

5           A.    I don't believe that I have.

6           Q.    Okay.  Now, you also said you have

7      never seen anything analogous; is that correct?

8           A.    Yes.

9           Q.    What did you mean by that?

10          A.    I mean, I have not seen a crypto

11     case before first -- first and foremost, I have

12     not seen a crypto case before.  I have not seen

13     a crypto case before.

14          Q.    So, is that the only qualifier

15     you -- when you testified that you had never

16     seen anything other than petition date U.S.

17     dollars being used to determine claims in a

18     Chapter 11 and you qualified it by saying you

19     haven't seen anything analogous before, was

20     that just a reference to you haven't worked on

21     a crypto case before?

22                MS. VANLARE:  Objection.

23          A.    Yes, that's true, yes.

24          Q.    So, you're aware that A&M is the

25     advisor to FTX; is that correct?

PROFESSIONALS' EYES ONLY

Page 276

1    below it.

2          Q.    And what does the 2080 represent?

3          A.    Our estimate of BTC denominated

4    claims valued at 12/31.

5          Q.    So, fair to say is the value of BTC

6    and/or GBTC increases, then both the in-kind

7    claim amount of BTC would increase and the

8    debtors' BDC assets would also increase?

9          A.    Yes, I believe that's correct.

10          Q.    And so, does it follow that under

11    the distributions principles if Bitcoin

12    doubles, for example, both the dollar value of

13    the Bitcoin claims would increase and the

14    dollar value of the Bitcoin assets would

15    increase?

16                MS. VANLARE:  Objection.

17          A.    They would both increase.

18          Q.    Okay.  And same question with

19    respect to ETH, is the in-kind claim amount to

20    ETH greater than the ETH debtors' assets?

21          A.    Yes, they are.

22          Q.    And can you tell me the numbers that

23    you referenced on Exhibit 3 to answer that

24    question?

25          A.    I compared in-kind claims of

PROFESSIONALS' EYES ONLY

Page 278

1     haven't looked at every scenario, but based on

2     the kind of -- both the assets and the claims

3     denominated in these currencies rising together

4     as the prices rise, then am I correct that

5     there is no scenario that you can think of in

6     which the incremental in-kind claims actually

7     get to 100 percent?

8               MS. VANLARE:   Objection.

9         A.    I'm uncomfortable saying that there

10    is no scenario because --

11        Q.    Highly unlikely then?

12              MS. VANLARE:   Objection.

13        A.    I'm not aware of a scenario but I

14    don't -- I can't -- not really comfortable

15    saying no scenario.

16        Q.    Okay.  So, based on how the

17    distribution principles works and how math

18    works, is it fair to say that sitting here

19    today, you're not aware of any scenario under

20    which incremental in-kind claims would receive

21    100 percent given that both assets and claims

22    being denominated in the same cryptocurrency

23    would rise together as those prices rise?

24              MS. VANLARE:   Objection.

25        A.    I'm not aware of any scenario.

PROFESSIONALS' EYES ONLY

Page 279

1          Q.    So, based on how the distribution

2    principles work, is it fair to say that as --

3    based on the math and how the distribution

4    principles work, sitting here today, you're not

5    aware of any scenario under which government

6    penalty claims would receive any value?

7              MS. VANLARE:   Objection.

8          A.    Under the -- correct.

9          Q.    Okay.  And fair to say then just

10   based on the math and how the distribution

11   principles work, there's -- as a result of the

12   distribution principles and the fact that there

13   is in-kind recoveries, there is no scenario

14   under which DCG can receive anything for its

15   equity interest?

16             MS. VANLARE:   Objection.

17         A.    I'm not aware of a scenario.

18         Q.    Subject to redirect with any other

19   questions, I have no further questions for you

20   but others do.

21   EXAMINATION BY MS. GRIFFITH:

22         Q.    Greer Griffith on behalf of the

23   Crypto Creditors Ad Hoc Group.  I'm going to

24   jump in with showing you what I would like to

25   mark as an exhibit, the plan supplement.  I'm

## EXHIBIT D

**January 31, 2024 P. Aronzon Deposition Transcript Excerpt**

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

————————————————————————————————————————

In re:

GENESIS GLOBAL HOLDCO, LLC, et al.,

                      Debtors.


Case No.: 23-10063 (SHL)

————————————————————————————————————————


                            January 31, 2024

                            8:39 a.m.




            VIDEOCONFERENCE DEPOSITION of

PAUL ARONZON, pursuant to Notice, held at

████████ ████ ██████████ ██████ ██████ █████

██████ ██████before Wayne Hock, a Notary

Public of the State of New York.

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
      CLEARY GOTTLIEB STEEN & HAMILTON LLP
 4    Attorneys for Debtors
              One Liberty Plaza
 5            New York, New York 10006
 6    BY:     JANE VANLARE, ESQ.
              jvanlare@cgsh.com
 7            (via videoconference)
              ANDREW WEAVER, ESQ.
 8            aweaver@cgsh.com
              (via videoconference)
 9            HOORI KIM, ESQ.
              hokim@cgsh.com
10            (via videoconference)
              MICHAEL JOHN KOWIAK, ESQ.
11            mkowiak@cgsh.com
              (via videoconference)
12            TIMOTHY WOLFE, ESQ.
              twolfe@cgsh.com
13            (via videoconference)
14
      WEIL, GOTSHAL & MANGES LLP
15    Attorneys for DIGITAL CURRENCY GROUP, INC.
      DCG INTERNATIONAL INVESTMENTS LTD.
16            767 Fifth Avenue
              New York, New York 10153
17
      BY:     JONATHAN D. POLKES, ESQ.
18            jonathan.polkes@weil.com
              (via videoconference)
19            DYLAN RUFFI, ESQ.
              dylan.ruffi@weil.com
20            (via videoconference)
              MILANA BRETGOLTZ, ESQ.
21            milana.bretgoltz@weil.com
              (via videoconference)
22
23
24
25
```

```
                                                    Page 3

 1
 2
     A P P E A R A N C E S: (Continued)
 3
 4       KATTEN MUCHIN ROSENMAN LLP
         Attorneys for TEDDY GORISSE
 5               50 Rockefeller Plaza
                 New York, New York 10020
 6
         BY:     JULIA MOSSE, ESQ.
 7               julia.mosse@katten.com
                 (via videoconference)
 8               SHAYA ROCHESTER, ESQ.
                 shaya.rochester@katten.com
 9               (via videoconference)
10
         WHITE & CASE, LLP
11       Attorneys for OFFICIAL COMMITTEE OF
         UNSECURED CREDITORS
12               1221 Avenue of the Americas
                 New York, New York 10020
13
         BY:     COLIN WEST, ESQ.
14               Cwest@WhiteCase.com
                 (via videoconference)
15               SEQUOIA KAUL, ESQ.
                 sequoia.kaul@whitecase.com
16               (via videoconference)
                 KATHRYN KUETHMAN, ESQ.
17               kathryn.kuethman@whitecase.com
                 (via videoconference)
18
19       HUGHES HUBBARD & REED LLP
         Attorneys for GEMINI TRUST COMPANY, LLC
20               One Battery Park Plaza
                 New York, New York 10004
21
         BY:     J. SCOTT SANDERS, II, ESQ.
22               scott.sanders@hugheshubbard.com
                 (via videoconference)
23
24
25
```

Page 4

```
 1
 2
       A P P E A R A N C E S: (Continued)
 3
 4
          MCDERMOTT WILL & EMERY LLP
 5        Attorney for
                    One Vanderbilt Avenue
 6                  New York, New York 10017
 7        BY:       GREER GRIFFITH, ESQ.
                    ggriffith@mwe.com
 8                  (via videoconference)
                    JOSEPH B. EVANS, ESQ.
 9                  jbevans@mwe.com
                    (via videoconference)
10
11        PROSKAUER ROSE LLP
          Attorneys for THE AD HOC GROUP OF
12        GENESIS LENDERS:
                    70 West Madison
13                  Chicago, Illinois 60602
14        BY:       JORDAN SAZANT, ESQ.
                    jsazant@proskauer.com
15                  (via videoconference)
16
          MEDINA LAW FIRM, LLC
17        Attorneys for BAO FAMILY HOLDINGS, LLC
                    641 Lexington Avenue
18                  New York, New York 10022
19        BY:       ERIC S. MEDINA, ESQ.
                    (via videoconference)
20
21
22
23
24
25
```

Page 5

1

2

A P P E A R A N C E S: (Continued)

3

4

5      ALSO PRESENT:

6

               HOWARD BRODSKY, Videographer
7              (via videoconference)
               ADAM VEROST
8              (via videoconference)
               MATTHEW GIBSON
9              (via videoconference)
10                    *      *      *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1

2          THE VIDEOGRAPHER: Good morning.

3    Here begins the video recorded virtual

4    remote 30(b)(6) deposition of Paul

5    Aronzon appearing on behalf of the

6    debtors in this matter from his

7    location in ███   ███   ███

8          This deposition is being taken

9    by the defendants In Re Genesis Global

10   Holdco LLC, et al., Debtors,

11   Chapter 11 case number 23-10063 (SHL),

12   jointly administered in the United

13   States bankruptcy court for the

14   Southern District of New York.

15          Today is Wednesday, January 31,

16   2024.  The time is approximately 8:39

17   a.m. Mountain Standard Time.

18          My name is Howard Brodsky and I

19   am the legal video specialist in

20   association with Veritext Legal

21   Solutions with offices located in New

22   York, New York.

23          The court reporter is Wayne Hock

24   in association with Veritext.

25          Counsel have stipulated that the

Page 7

```
 1
 2      court reporter shall enter all
 3      appearances into the stenographic
 4      court record for this proceeding, and
 5      have further stipulated and agreed
 6      that the court reporter may take the
 7      deponent's oath remotely.
 8           Will the court reporter please
 9      swear in the witness.
10  P A U L   A R O N Z O N, having
11          been first duly sworn by a
12          Notary Public of the State of
13          New York, upon being examined,
14          testified as follows:
15  EXAMINATION BY
16  MR. POLKES:
17           MS. VANLARE: Before we begin,
18      counsel has also stipulated that an
19      objection by one party is an objection
20      by all parties, and I would ask that
21      the record reflect that.
22           MR. POLKES: I object.  Just
23      kidding, Jane.  We're fine.
24      Q.    Mr. Aronzon, you realize you're
25  under oath?
```

Page 21

                        P. Aronzon

1                    P. Aronzon

2           Okay?

3      A.    Okay.

4      Q.    All right.

5      A.    So the question was -- I'm

6    sorry, I lost track of it.

7      Q.    So as someone who's been an

8    independent director dozens of times, when

9    you're an independent director of a

10   bankrupt entity, to whom do you owe your

11   fiduciary duties?

12     A.    To the company.

13           MR. WEST: Objection form.

14     Q.    I'm going to read you -- before

15   we even do that, Mr. Aronzon, I'm going to

16   read you a quote from a case from

17   Delaware.

18     A.    Okay.

19     Q.    I'm going to ask you if it

20   refreshes your recollection as to the

21   constituents to whom you owe your

22   fiduciary duties as director.

23           Okay?

24     A.    Okay.

25     Q.    Here's the quote.  And for the

```
                                          Page 22

1                      P. Aronzon

2    lawyers, I'm going to read the citation as

3    well.

4              "The debtor in a Chapter 11

5    bankruptcy has a fiduciary duty to act in

6    the best interest of the else state as a

7    whole, including its creditors, equity

8    interest holders, and other parties in

9    interest".  That's from LaSalle National

10   Bank versus Perelman, 82 F. Supp. 2d 279

11   at 292, District of Delaware.

12             Does that statement that I just

13   read you comport with your understanding

14   of your fiduciary duties?

15        A.    It does.

16             MS. VANLARE: Objection to the

17        extent it calls for a legal

18        conclusion.

19             You may answer.

20             THE WITNESS:  It does.  And I

21        was going to get into that --

22        Q.    Go ahead, please do.

23        A.    -- but people jumped in.

24        Q.    That's why it's important that

25   you and I keep going.  You can elaborate
```

Page 23

1                        P. Aronzon

2       however you want.

3           A.      I think it's a fair comment and

4       I understand the decision and it is

5       reflective of how I think about this.

6           Q.      As the independent director or

7       one of the two independent directors of

8       Genesis, who chose Cleary Gottlieb to be

9       the counsel to the debtor?

10          A.      I don't know.  It happened

11      before I joined the board.

12          Q.      Okay.

13              Are you the representative of

14      the debtor who acts as the client with

15      Cleary Gottlieb?  In other words, if

16      Cleary wants to report to a client, they

17      report to you and your fellow

18      co-independent; is that correct?

19              MS. VANLARE: Objection.

20              You may answer.

21              THE WITNESS:  Yes, as special

22          committee members basically, yes.

23          Q.      And you have ultimate authority

24      to direct them to take action or not;

25      correct?

Page 33

                    P. Aronzon

1

2       Q.     What's your understanding of

3   what that means?

4       A.     I actually don't -- I don't have

5   a real understanding of it, but like I

6   said, I saw this for the first time on

7   Friday.

8              But what I think it means is,

9   before you make adjustments for differing

10  treatment as established under the plan,

11  there is a surplus of 900.5 I guess that's

12  million dollars under this model and this

13  scenario.

14      Q.     Okay.

15             And I just want to explore --

16  separate and apart from my showing you

17  Exhibit 1, and as the independent director

18  who signed off on the plan, was it your

19  understanding that there was $900 million

20  or more available to creditors in excess

21  of their dollarized claims?

22             MS. VANLARE: Objection.

23             THE WITNESS:  No, that was not

24     my understanding.

25      Q.     Are you surprised to learn that?

Page 38

1                        P. Aronzon

2        Q.      And so you also told me that you

3    have a fiduciary duty to equity along with

4    the other constituents of the estate;

5    correct?

6        A.      Yes.

7        Q.      So what did you do to assure

8    yourself that the equity was being treated

9    fairly in connection with the plan which

10   you approved?

11              MS. VANLARE: Objection.

12              THE WITNESS:  I made sure that

13         the way the plan was drafted that if

14         there is such a surplus, it does go to

15         equity.  The language of the plan

16         provides for that; if claims are paid

17         in full, that it does flow there.  I

18         don't know if the claims will be paid

19         in full.

20       Q.      Are you aware of the fact that

21   yesterday your advisor from Alvarez and

22   Marsal testified that there is no increase

23   in asset value which would ever result in

24   an excess flowing to equity based on the

25   model that you approved?  Are you aware of

Page 59

1                        P. Aronzon

2              THE WITNESS:  I did not ask.

3        Q.    Do you know the value that

4    cryptocurrencies have to reach in order

5    for the creditors ever to be paid in full?

6              MS. VANLARE: Objection.

7              THE WITNESS:  No.

8        Q.    Is there one?  Is there a limit?

9    Is there a value that cryptocurrencies

10   could ever reach under this distribution

11   plan that would trigger the creditors

12   having ever been paid off in full?

13             MS. VANLARE: Objection.

14             THE WITNESS:  I don't know.

15       Q.    If there isn't, then isn't the

16   protection that equity gets what's left

17   over completely meaningless?

18             MS. VANLARE: Objection.

19             THE WITNESS:  It's not

20       meaningless, but making your

21       assumption that there's no number that

22       it could ever hit, I guess it's

23       theoretically possible that you're

24       right.

25       Q.    That I'm right that it would be

Page 60

1                        P. Aronzon
2    a meaningless protection?
3             MS. VANLARE: Objection.
4             THE WITNESS:  They would view it
5        as meaningless if it's impossible to
6        achieve, I assume.
7        Q.    Wouldn't you view it as
8    meaningless as a fiduciary to them?
9             MS. VANLARE: Objection.
10            THE WITNESS:  It doesn't really
11       matter how I view it.
12       Q.    That's nice, but I'm asking you
13   and you have to answer.
14            In your view -- you've been a
15   professional director, you've done this
16   hundreds of times.  In your view -- and
17   you're a professional fiduciary.  In your
18   view, would it be a meaningless protection
19   for the equity if the distribution
20   principles work such that there was no
21   value cryptocurrencies could ever hit that
22   would trigger a full payoff to the
23   creditors?
24            MS. VANLARE: Objection.  Mr.
25       Polkes, please let the witness finish.

Page 61

```
 1                    P. Aronzon
 2            THE WITNESS:  You're only
 3       talking about cryptocurrencies.  There
 4       are other assets that also are in the
 5       estate here.
 6            But if you want to exclude all
 7       the other assets and just focus on
 8       your theoretical commentary, it would
 9       be meaningless, yes.
10       Q.    What does payment in full to the
11  creditors mean to you?
12            MS. VANLARE: Objection.
13            THE WITNESS:  It means that the
14       allowed amount of their claims are
15       paid and, if there's excess, they get
16       interest.  It would have to be
17       determined what rate, but that would
18       be part of the claims process.
19       Q.    Okay.
20            But let's talk then about what
21  you mean by the allowed amount of their
22  claims.
23            What is the allowed amount of
24  their claims to you?
25            MS. VANLARE: Objection.
```

Page 63

                        P. Aronzon

1

2      world allowed.

3      Q.    And I'm going to ask you

4  generally first and then I'm going to ask

5  you in connection with this estate.

6             Generally aren't allowed claims

7  determined based on the dollar value of

8  the claim at the petition date?  Isn't

9  that the standard?

10            MS. VANLARE: Objection.  Calls

11       for a legal conclusion.

12            THE WITNESS:  I'm to answer

13       that?

14            MS. VANLARE: Yes.

15            THE WITNESS:  Okay.

16            That is certainly -- I don't

17       know what the right word is, but it's

18       provided for in the code, the

19       bankruptcy code, and there are other

20       time frames that are also applied in

21       different sections of the bankruptcy

22       code.  But generally yes, petition

23       date.

24       Q.    That's not what you did in this

25  estate; is it?

Page 64

1              P. Aronzon

2         MS. VANLARE: Objection.

3         THE WITNESS:  If you're talking

4     about the distribution principles; is

5     that what you're talking about?

6     Q.    Yeah.

7     A.    I believe they start with the

8  petition date but then they make

9  adjustments.

10    Q.    What kind of adjustments?

11    A.    Reallocation of proceeds.

12         MR. POLKES: Do we have the --

13    Q.    The distribution principles I

14  think are up on your screen; right?

15  That's Exhibit 2.

16    A.    Yes.

17    Q.    Why don't you turn to page

18  eight.

19    A.    Okay.

20    Q.    Let me know when you're there.

21    A.    Okay.  Page eight.

22         Does it start with step five at

23  the top?

24    Q.    Yes.

25         And I'm going to ask you about

Page 73

1                    P. Aronzon
2    maybe we would have been stymied.  Maybe
3    you're right.  Maybe we wouldn't have
4    taken a position and then there would have
5    an alternatives that are available to the
6    creditors under the bankruptcy code.
7    Terminating exclusivity and filing this
8    plan anyway is one.
9         Q.    In all your forty-five years of
10   experience both as a Milbank Tweed
11   bankruptcy restructuring lawyer and more
12   recently as an independent director and
13   financial advisor, have you ever
14   participated in a plan that picked in-kind
15   distribution as the maximum allowable
16   creditor cap as opposed to dollarized
17   value as of date of petition?
18             MS. VANLARE: Objection.
19             THE WITNESS:  I don't think so.
20        Q.    So why did you do it here?
21             MS. VANLARE: Objection.
22             THE WITNESS:  As I said earlier,
23        this is a different animal.  There are
24        different assets that make up this
25        estate and different claims to those

Page 74

1                          P. Aronzon

2       assets.  So I've not been in a case

3       where we had this kind of asset.  It's

4       frankly new.  I've been in cases where

5       there are commodities that go up and

6       down but not where the entire claim is

7       based, for instance, on a particular

8       asset.  So this one calls for a

9       different approach.  It just does.

10      Q.    Okay.

11            Why?

12      A.    As I just said, the assets are

13   different.  The claims to ownership or the

14   claims of collateralization are very

15   different here.

16      Q.    Than what, than any other case?

17      A.    Than any other case.  You asked

18   me if I've ever done it before.  I said

19   no.

20      Q.    Just to be clear, is it just

21   because the assets here are crypto?  Is

22   there any other reason?

23            MS. VANLARE: Objection.

24            THE WITNESS:  The fact that

25      there are different rights that flow

Page 75

1                    P. Aronzon

2        from the structure of the transactions

3        here.  I mean, if you look at how

4        the --

5        Q.    Go ahead, I'm sorry.

6        A.    If you look at how the company

7    got let's just say a bitcoin and you look

8    at the rights that flow out of the

9    contracts, there's great disputes here.

10   There's claims of ownership, there's

11   claims of collateral, there's claims of

12   constructive trusts, there's a variety of

13   different interests that creditors have

14   asserted.  We don't usually see things

15   like that in a normal Chapter 11 case or a

16   run-of-the-mill case.  I shouldn't say

17   normal.

18       Q.    So what does that got to do with

19   choosing an in-kind value cap instead of

20   the petition date dollarized cap?

21            MS. VANLARE: Objection.  Asked

22       and answered multiple times.

23            You may answer.

24            THE WITNESS:  I'll say it again,

25       this is a settlement, that is the

Page 88

1                    P. Aronzon

2              In these distribution

3    principles, isn't it a fact that you're

4    designating allowable claims in something

5    other than currency of the United States?

6              MS. VANLARE: Objection.

7         Q.    Isn't that a fact?

8              MS. VANLARE: Objection.

9         Objection to form.  Vague.

10              THE WITNESS:  The claims

11         process, based on these principles,

12         will use the asset to the extent it's

13         in-kind, and there are different types

14         of assets, to do the valuation, I

15         believe.

16         Q.    Including assets which are not

17    currency of the United States; correct?

18              MS. VANLARE: Objection.

19              THE WITNESS:  I think that's

20         right.

21         Q.    Isn't it a fact that not only

22    could the excess value to the creditors

23    over and above the dollarized petition

24    date value be 900.5 million, it could

25    actually be multiples of that by the time

Page 89

1                        P. Aronzon

2     this distribution is over; isn't that

3     true?

4                 MS. VANLARE: Objection.

5                 THE WITNESS:  It varies with the

6          marketplace for the various types of

7          coin.  It could be less, it could be

8          more.

9          Q.    There's no upper limit; is

10    there?

11                MS. VANLARE: Objection.

12                THE WITNESS:  I don't know if

13         there's an upper limit.

14         Q.    And just to be clear, in your

15    forty-five years of experience, you've

16    never seen anything other than a petition

17    date U.S. dollar value be used to

18    determine claims?

19                MS. VANLARE: Objection.  Asked

20         about three times.

21         Q.    Okay.

22                So you can tell me I'm correct;

23    yeah?

24                MS. VANLARE: Objection.  Asked

25         and answered, like I said, at least

Page 90

```
 1                      P. Aronzon
 2      three times.
 3              THE WITNESS:  I have never seen
 4      a case like this, so no, I've not seen
 5      dates other than the petition date
 6      used except in connection with certain
 7      circumstances that are under the code
 8      arising in different scenarios.
 9              MR. POLKES: Okay.
10              We've been going for a while,
11      should we take a break now.
12              It's 12:15 Eastern.  I don't
13      know if people want to -- let's make
14      this a half an hour.
15              Does that sound right?
16              You guys okay with that, lawyer?
17      Paul, are you okay with that?  We'll
18      come back at a quarter to 1:00 New
19      York time.
20              THE WITNESS:  That's fine.  It's
21      10:15 in the morning here, so I can
22      keep going if you want.
23              MR. POLKES: We can make it a
24      shorter break.  I don't mean fifteen
25      minutes.
```

## **EXHIBIT E**

**Genesis Global Capital High Case No-Deal Recoveries**

Genesis Global Capital

## High Case No-Deal Recoveries

January 2024

**Exhibit
0001**

Aronzon

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004284

**Disclaimer**

In connection with developing the Debtors' Amended Joint Chapter 11 Plan (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Amended Plan"), the Debtors, with the assistance of their advisors, prepared the following illustrative recovery analysis under the Amended Plan (the "Revised Recovery Analysis"). The Revised Recovery Analysis reflects the Debtors' good faith estimate of the expected cash and assets, including Digital Assets, available for distribution from the Wind-Down Debtors after the transactions contemplated by the Amended Plan.

While the Revised Recovery Analysis has been prepared based on Digital Asset prices as of a select date, there can be no assurances that future assets prices could be significantly higher or lower than the range of prices reflected in the Revised Recovery Analysis, and as such, actual recoveries could be materially different than those reflected in the Revised Recovery Analysis.  Although the Debtors and their advisors have prepared the Revised Recovery Analysis, and related Financial Projections, in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors and their advisors can provide no assurance that such assumptions will be realized.
As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Revised Recovery Analysis should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Revised Recovery Analysis should not be regarded as a representation or warranty by the debtors, the wind-down debtors, or any other person as to the accuracy of the revised recovery analysis, or the related financial projections, or that the Revised Recovery Analysis will be realized. Nothing contained in the Revised Recovery Analysis shall constitute a waiver or admission by the debtors in any respect, including without limitation, with respect to matters involving objections to claims, substantive consolidation, equitable subordination, defenses, any asserted rights of or purported exercise of foreclosure, setoff or recoupment, or any other relevant applicable laws, and the debtors reserve all rights and defenses relating to any of the assumptions made herein. The Revised Recovery Analysis were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants (the "AICPA"), the Financial Accounting Standards Board (the "FASB"), or the rules and regulations of the Securities and Exchange Commission. Furthermore, the Revised Recovery Analysis has not been audited, reviewed, or subjected to any procedures designed to provide any level of assurance by the debtors' independent public accountants.

While The Revised Recovery Analysis presents both near-term and long-term assets and related distributions, the Company nor advisors have assessed the timing of potential distributions as part of this Revised Recovery Analysis and make no representations with respect to the timing of distributions. The presentation of near-term and long-term assets in the Revised Recovery Mosel has been presented as such for comparative purposes only, as depicted in prior versions of various recovery analyses.

GENESIS_CONF_00004285

**Genesis Global Capital**
*Illustrative No Deal High Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - High Case

### No Deal High Case - Summary of Recoveries ($mm)

| Recoveries by Class | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| Near-Term Distribution After Rebalancing[1] | $864.7 | $734.8 | $333.1 | $99.4 | $ - | $2,032.0 |
| (+) Long-Term Distribution After Rebalancing[2] | 758.6 | 644.7 | 292.2 | 87.2 | - | 1,782.7 |
| **Total Distribution After Rebalancing** | **$1,623.2** | **$1,379.5** | **$625.4** | **$186.7** | **$ -** | **$3,814.7** |
| Dollarized Claims[3] | $1,240.1 | $1,053.8 | $477.7 | $142.6 | - | $2,914.2 |
| Incremental In-Kind Claims[4] | 0.0 | 1,026.5 | 212.6 | 150.8 | 450.8 | 1,840.7 |
| **Total Amount of In-Kind Claims** | **$1,240.1** | **$2,080.3** | **$690.4** | **$293.4** | **$450.8** | **$4,754.9** |
| Total Recovery on Dollarized Claims $ | $1,240.1 | $1,053.8 | $477.7 | $142.6 | $ - | $2,914.2 |
| Total Recovery on Incremental In-Kind Claims $ | - | 502.2 | 104.0 | 73.8 | 220.5 | 900.5 |
| **Total In-Kind Recovery $[5]** | **$1,240.1** | **$1,556.0** | **$581.8** | **$216.4** | **$220.5** | **$3,814.7** |
| *Total Recovery on Dollarized Claims %* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| *Total Recovery on Incremental In-Kind Claims %* | *0.0%* | *48.9%* | *48.9%* | *48.9%* | *48.9%* | *48.9%* |

**Notes:**
(1)   Digital assets in wallets priced as of 12/31/23 - BTC ($42,288), ETH ($2,281), GBTC ($34.6); No Deal scenario assumes no opt-in benefit to creditors
(2)   Assumes high end of an NPV range for a 9 year 1% PIK interest note
(3)   Gemini reflected as their own class on a net basis; Assumes negotiated set-off at 12/31 prices ($34.62 per share for total collateral value of $1,070 million)
(4)   Reflects current values associated with 3rd party net claims repriced to 12/31; Gemini assumes both borrows and GBTC set-off priced as of 12/31
(5)   Total In-Kind Recovery for digital creditors, excluding Gemini, would be ~77% on the Total Amount of In-Kind Claims (inclusive of the Total Recovery on Incremental In-Kind Claims percentage).  For Gemini, the Total In-Kind Recovery would be ~85% on the Total Amount of In-Kind Claims as Gemini claim is comprised of both digital and USD/Stable Coin denominated claims (assuming a 100% recovery on ~$1.05 billion of dollarized claims via GBTC collateral)

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004286

**Genesis Global Capital**
*Illustrative No Deal High Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - High Case

### Illustrative Petition Date Claims ($mm)

| Petition Date Claims | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| GGC 3rd Party Claims[1] | $934.7 | $1,017.4 | $455.0 | $129.6 | $ - | $2,536.8 |
| (+) GGC Interco Claims[2] | 11.0 | 32.4 | 22.7 | 9.4 | - | 75.4 |
| (+) GAP Claims[3] | 19.3 | 4.0 | - | 3.6 | - | 27.0 |
| (+) Illustrative Additional Claims[4] | 275.0 | - | - | - | - | 275.0 |
| **Total Petition Date Claims** | **$1,240.1** | **$1,053.8** | **$477.7** | **$142.6** | **$ -** | **$2,914.2** |
| (x) Illustrative Opt-In % | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| Illustrative Opt-In Claims | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| Petition Date Claims Prior to Opt-In | $1,240.1 | $1,053.8 | $477.7 | $142.6 | $ - | $2,914.2 |
| (+/-) Opt-In Claims[5] | - | - | - | - | - | - |
| **Petition Date Dollarized Claims** | **$1,240.1** | **$1,053.8** | **$477.7** | **$142.6** | **$ -** | **$2,914.2** |
| Incremental In-Kind Claims[6] | 0.0 | 1,026.5 | 212.6 | 150.8 | 450.8 | 1,840.7 |
| **Total Non-Dollarized Claims** | **1,240.1** | **2,080.3** | **690.4** | **293.4** | **450.8** | **4,754.9** |

**Notes:**

(1)  Assumes Gemini collateral set-off using $34.62 GBTC price (total of $1070 million) while all other liabilities are priced as of 1/19/23

(2)  No Deal scenario assumes $63mm residual Luno claim is included

(3)  Excludes Mirana's claim of ~$31 million which is subject to dispute

(4)  Includes $175mm FTX claims and $100mm of contingency claims (inclusive of 3AC claims)

(5)  No Deal scenario assumes no opt-in benefit to creditors

(6)  Reflects current values associated with 3rd party net claims repriced to 12/31; Gemini assumes both borrows and GBTC set-off priced as of 12/31

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004287

**Genesis Global Capital**
*Illustrative No Deal High Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - High Case

### Near-Term Distribution ($mm)

| Near-Term Assets | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| GGC Liquid Assets as of 12/31/23 | $809.2 | $533.0 | $270.9 | $117.4 | $ - | $1,730.5 |
| (+) GBTC Near-Term Distribution[1] | - | 239.7 | - | - | - | 239.7 |
| (+) ETHE Near-Term Distribution[1] | - | - | 60.3 | - | - | 60.3 |
| (+) GAP Liquid Assets | 0.1 | 0.4 | 0.0 | 0.0 | - | 0.5 |
| (+) GAP Interco Receivables | 5.2 | - | - | - | - | 5.2 |
| (+) GGCI Intercompany Receivable | 92.9 | - | - | - | - | 92.9 |
| (+) GGH Receivable (includes GGML roll-up) | 70.5 | - | - | - | - | 70.5 |
| (-) Case Expenses | (74.1) | - | - | - | - | (74.1) |
| (-) Wind-Down & Distribution Expenses | (53.5) | - | - | - | - | (53.5) |
| (-) Litigation Reserve | (40.0) | - | - | - | - | (40.0) |
| (+) DCG May Loans[2] | - | - | - | - | - | - |
| **Near-Term Distribution Before Rebalancing** | **$810.2** | **$773.2** | **$331.2** | **$117.4** | **$ -** | **$2,032.0** |
| (+/-) Rebalancing[3] | 54.4 | (38.4) | 1.9 | (18.0) | - | (0.0) |
| (-) Funding of Opt-In Premium[4] | - | - | - | - | - | - |
| **Remaining Near-Term Distribution to Non-Opt-In Claim** | **$864.7** | **$734.8** | **$333.1** | **$99.4** | **-** | **$2,032.0** |
| | | | | | | |
| **Near-Term Recovery by Class** | | | | | | |
| Near-Term Distribution After Rebalancing | $864.7 | $734.8 | $333.1 | $99.4 | $ - | $2,032.0 |
| (/) Petition Date Claims After Opt-In | 1,240.1 | 1,053.8 | 477.7 | 142.6 | - | 2,914.2 |
| *Near-Term Recovery % by Class* | *69.7%* | *69.7%* | *69.7%* | *69.7%* | *0.0%* | *69.7%* |

**Notes:**
(1) Assumes the maximum number of GBTC/ETHE shares that can be liquidated in the near term equals 1% of the respective total shares outstanding
(2) Reflects full paydown of DCG loans matured in May 2023; final payment received on 1/6/24 and reflected in liquid assets
(3) Reflects the rebalancing required to equalize recoveries across classes; Assumes no near-term opt-in distribution
(4) No funding of opt-in premium in a no-deal plan

PROFESSIONALS' EYES ONLY                                                                 GENESIS_CONF_00004288

**Genesis Global Capital**
*Illustrative No Deal High Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - High Case

### Long-Term Distribution ($mm)

| Long-Term Assets | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| GBTC/ETHE/ETCG Long-Term Distribution[1] | - | $1,004.5 | $144.6 | - | - | $1,149.1 |
| (+) DCG Promissory Note NPV[2] | 356.0 | - | - | - | - | 356.0 |
| (+) Net Third-Party Loans Receivable | (0.0) | 0.1 | 114.8 | 1.0 | - | 115.8 |
| (+) Net Collateral Receivable - GGC | - | 20.0 | - | - | - | 20.0 |
| (+) Net Collateral Receivable - GAP | - | 53.5 | 48.7 | - | - | 102.2 |
| (+) Interest Receivable | 0.1 | 0.2 | 2.1 | 0.2 | - | 2.6 |
| (+) Moonalpha Recovery | 37.0 | - | - | - | - | 37.0 |
| **Long-Term Distribution Before Reallocation** | **$393.0** | **$1,078.3** | **$310.2** | **$1.2** | **$ -** | **$1,782.7** |
| (+/-) GBTC/ETHE Reallocation | $489.0 | ($589.0) | $43.8 | $56.2 | - | ($0.0) |
| (+/-) DCG Promissory Note NPV Reallocation | (204.5) | 128.7 | 58.4 | 17.4 | - | - |
| (+/-) Net Third-Party Loans Reallocation | 49.3 | 41.8 | (95.8) | 4.6 | - | (0.0) |
| (+/-) Net Collateral Receivable - GGC | 8.5 | (12.8) | 3.3 | 1.0 | - | (0.0) |
| (+/-) Net Collateral Receivable - GAP | 43.5 | (16.5) | (32.0) | 5.0 | - | (0.0) |
| (+/-) Interest Receivable Reallocation | 1.0 | 0.7 | (1.7) | (0.0) | - | (0.0) |
| (+/-) Moonalpha Recovery Reallocation | (21.2) | 13.4 | 6.1 | 1.8 | - | (0.0) |
| **Total Reallocations[3]** | **$365.6** | **($433.6)** | **($18.0)** | **$86.0** | **$ -** | **($0.0)** |
| **Adjusted Long-Term Distribution After Reallocation** | | | | | | |
| GBTC/ETHE Long-Term Distribution | $489.0 | $415.5 | $188.4 | $56.2 | - | $1,149.1 |
| DCG Promissory Note NPV | 151.5 | 128.7 | 58.4 | 17.4 | - | 356.0 |
| Net Third-Party Loans Receivable | 49.3 | 41.9 | 19.0 | 5.7 | - | 115.8 |
| Net Collateral Receivable - GGC | 8.5 | 7.2 | 3.3 | 1.0 | - | 20.0 |
| Net Collateral Receivable - GAP | 43.5 | 37.0 | 16.8 | 5.0 | - | 102.2 |
| Interest Receivable | 1.1 | 1.0 | 0.4 | 0.1 | - | 2.6 |
| Moonalpha Recovery | 15.7 | 13.4 | 6.1 | 1.8 | - | 37.0 |
| **Long-Term Distribution After Reallocation** | **$758.6** | **$644.7** | **$292.2** | **$87.2** | **$ -** | **$1,782.7** |

Notes:
(1) GBTC and ETHE/ETCG illustratively reflected as BTC and ETH assets, respectively
(2) Based on high end of an NPV range for a 9 year 1% PIK interest note
(3) Reflects the pro-rata allocation of assets to claims based on petition date claim amounts

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004289

Genesis Global Capital

## Low Case No-Deal Recoveries

**January 2024**

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004290

**Genesis Global Capital**
*Illustrative No Deal Low Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - Low Case

### No Deal Low Case - Summary of Recoveries ($mm)

| Recoveries By Class | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| Near-Term Distribution After Rebalancing[1] | $692.9 | $582.1 | $260.8 | $78.4 | $417.9 | $2,032.0 |
| (+) Long-Term Distribution After Rebalancing[2] | 469.4 | 394.3 | 176.7 | 53.1 | 283.1 | 1,376.6 |
| **Total Distributions After Rebalancing** | **$1,162.3** | **$976.4** | **$437.4** | **$131.5** | **$701.0** | **$3,408.6** |
| Dollarized Claims[3] | $1,269.4 | $1,066.4 | $477.7 | $143.6 | $765.6 | $3,722.7 |
| Incremental In-Kind Claims[4] | - | 1,039.1 | 212.6 | 152.6 | 341.6 | 1,745.8 |
| **Total Amount if In-Kind Claims** | **$1,269.4** | **$2,105.5** | **$690.4** | **$296.2** | **$1,107.2** | **$5,468.6** |
| Total Recovery on Dollarized Claims $ | $1,162.3 | $976.4 | $437.4 | $131.5 | $701.0 | $3,408.6 |
| Total Recovery on Incremental In-Kind Claims $ | - | - | - | - | - | - |
| **Total In-Kind Recovery $** | **$1,162.3** | **$976.4** | **$437.4** | **$131.5** | **$701.0** | **$3,408.6** |
| *Total Recovery on Dollarized Claims %* | *91.6%* | *91.6%* | *91.6%* | *91.6%* | *91.6%* | *91.6%* |
| *Total Recovery on Incremental In-Kind Claims %* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |

**Notes:**

(1)   Digital assets in wallets priced as of 12/31/23 - BTC ($42,288), ETH ($2,281), GBTC ($34.6); Low case assumes no opt-in distribution

(2)   Assumes low range of NPV on the 9-year 1% PIK interest DCG promissory note

(3)   Gemini reflected as their own class on a net basis; Assumes set-off at 11/16 prices ($9.20 per share for total collateral value of $284 million)

(4)   Reflects current values associated with 3rd party net claims repriced to 12/31

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004291

**Genesis Global Capital**
*Illustrative No Deal Low Case Creditor Recoveries - No Opt-In*

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - Low Case

### Illustrative Petition Date Claims ($mm)

| Petition Date Claims | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| GGC 3rd Party Claims[1] | $935.0 | $1,025.8 | $455.0 | $130.6 | $765.6 | $3,312.2 |
| (+) GGC Interco Claims[2] | 12.9 | 32.4 | 22.7 | 9.4 | - | 77.3 |
| (+) GAP Claims[3] | 46.4 | 8.1 | - | 3.6 | - | 58.2 |
| (+) Illustrative Additional Claims[4] | 275.0 | - | - | - | - | 275.0 |
| **Total Petition Date Claims** | **$1,269.4** | **$1,066.4** | **$477.7** | **$143.6** | **$765.6** | **$3,722.7** |
| (x) Illustrative Opt-In % | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| Illustrative Opt-In Claims | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| Petition Date Claims Prior to Opt-In | $1,269.4 | $1,066.4 | $477.7 | $143.6 | $765.6 | $3,722.7 |
| (+/-) Opt-In Claims[5] | - | - | - | - | - | - |
| **Petition Date Claims After Opt-In** | **$1,269.4** | **$1,066.4** | **$477.7** | **$143.6** | **$765.6** | **$3,722.7** |
| **Incremental In-Kind Claims[6]** | **-** | **1,039.1** | **212.6** | **152.6** | **341.6** | **1,745.8** |
| **Total Non-Dollarized Claims** | **1,269.4** | **2,105.5** | **690.4** | **296.2** | **1,107.2** | **5,468.6** |

**Notes:**
(1)   Assumes Gemini collateral set-off using $9.20 GBTC price (total of $284 million) while all other liabilities are priced as of 1/19/23
(2)   No Deal scenario assumes $63mm residual Luno claim is included
(3)   Includes Mirana's claim of ~$31 million which is subject to dispute
(4)   Includes $175mm FTX claims and $100mm of contingency claims (inclusive of 3AC claims)
(5)   No Deal scenario assumes no opt-in benefit to creditors
(6)   Reflects current values associated with 3rd party net claims repriced to 12/31

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004292

**Attorney Work Product | Prepared at the Direction of Counsel**
**Confidential Draft | Subject to Change**

**Genesis Global Capital**
*Illustrative No Deal Low Case Creditor Recoveries - No Opt-In*

| No Deal - Low Case | | | | | | |
|---|---|---|---|---|---|---|

| Near-Term Distribution ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| **Near-Term Assets** | **USD/Stable** | **BTC** | **ETH** | **Alt Coin** | **Gemini** | **Total** |
| GGC Liquid Assets as of 12/31/23 | $809.2 | $533.0 | $270.9 | $117.4 | $ - | $1,730.5 |
| (+) GBTC Near-Term Distribution[1] | - | 239.7 | - | - | | 239.7 |
| (+) ETHE Near-Term Distribution[1] | - | - | 60.3 | - | | 60.3 |
| (+) GAP Liquid Assets | 0.1 | 0.4 | 0.0 | 0.0 | | 0.5 |
| (+) GAP Interco Receivables | 5.2 | - | - | - | | 5.2 |
| (+) GGCI Intercompany Receivable | 92.9 | - | - | - | | 92.9 |
| (+) GGH Receivable (includes GGML roll-up) | 70.5 | - | - | - | | 70.5 |
| (-) Case Expenses | (74.1) | - | - | - | | (74.1) |
| (-) Wind-Down & Distribution Expenses | (53.5) | - | - | - | | (53.5) |
| (-) Litigation Reserve | (40.0) | - | - | - | | (40.0) |
| (+) DCG May Loans[2] | - | - | - | - | | - |
| **Near-Term Distribution Before Rebalancing** | **$810.2** | **$773.2** | **$331.2** | **$117.4** | **$ -** | **$2,032.0** |
| (+/-) Rebalancing[3] | (117.4) | (191.1) | (70.4) | (39.0) | 417.9 | - |
| (-) Funding of Opt-In Premium | - | - | - | - | | - |
| **Remaining Near-Term Distribution to Non-Opt-In Claim** | **$692.9** | **$582.1** | **$260.8** | **$78.4** | **$417.9** | **$2,032.0** |
| | | | | | | |
| **Near-Term Recovery by Class** | | | | | | |
| Near-Term Distribution After Rebalancing | $692.9 | $582.1 | $260.8 | $78.4 | $417.9 | $2,032.0 |
| (/) Petition Date Claims After Opt-In | 1,269.4 | 1,066.4 | 477.7 | 143.6 | 765.6 | 3,722.7 |
| *Near-Term Recovery % by Class* | *54.6%* | *54.6%* | *54.6%* | *54.6%* | *54.6%* | *54.6%* |

Notes:
(1)   Assumes the maximum number of GBTC/ETHE shares that can be liquidated in the near term equals 1% of the respective total shares outstanding
(2)   Reflects full paydown of DCG loans matured in May 2023; final payment received on 1/6/24 and reflected in liquid assets
(3)   Reflects the rebalancing required to equalize recoveries across classes

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004293

Attorney Work Product | Prepared at the Direction of Counsel
Confidential Draft | Subject to Change

## No Deal - Low Case

### Long-Term Distribution ($mm)

| Long-Term Assets | USD/Stable | BTC | ETH | Alt Coin | Gemini | Total |
|---|---|---|---|---|---|---|
| GBTC/ETHE/ETCG Long-Term Distribution[1] | - | $1,004.5 | $144.6 | - | - | $1,149.1 |
| (+) DCG Promissory Note NPV[2] | 109.0 | - | - | - | - | 109.0 |
| (+) Net Third-Party Loans Receivable | - | 0.1 | 114.8 | 1.0 | - | 115.9 |
| (+) Interest Receivable | 0.1 | 0.2 | 2.1 | 0.2 | - | 2.6 |
| **Long-Term Distribution Before Reallocation** | **$109.1** | **$1,004.8** | **$261.5** | **$1.2** | **$ -** | **$1,376.6** |
| (+/-) GBTC/ETHE Reallocation | $391.8 | ($675.4) | $2.9 | $44.3 | $236.3 | - |
| (+/-) DCG Promissory Note NPV Reallocation | (71.8) | 31.2 | 14.0 | 4.2 | 22.4 | - |
| (+/-) Net Third-Party Loans Reallocation | 39.5 | 33.1 | (99.9) | 3.4 | 23.8 | - |
| (+/-) Interest Receivable Reallocation | 0.8 | 0.5 | (1.8) | (0.1) | 0.5 | 0.0 |
| **Total Reallocations[3]** | **$360.3** | **($610.5)** | **($84.8)** | **$51.9** | **$283.1** | **$0.0** |
| **Adjusted Long-Term Distribution After Reallocation** | | | | | | |
| GBTC/ETHE Long-Term Distribution | $391.8 | $329.2 | $147.5 | $44.3 | $236.3 | $1,149.1 |
| DCG Promissory Note NPV | 37.2 | 31.2 | 14.0 | 4.2 | 22.4 | 109.0 |
| Net Third-Party Loans Receivable | 39.5 | 33.2 | 14.9 | 4.5 | 23.8 | 115.9 |
| Interest Receivable | 0.9 | 0.8 | 0.3 | 0.1 | 0.5 | 2.6 |
| **Long-Term Distribution After Reallocation** | **$469.4** | **$394.3** | **$176.7** | **$53.1** | **$283.1** | **$1,376.6** |

**Notes:**

(1)  GBTC and ETHE/ETCG illustratively reflected as BTC and ETH assets, respectively

(2)  Based on low end of an NPV range for a 9 year 1% PIK interest note

(3)  Reflects the pro-rata allocation of assets to claims based on petition date claim amounts

PROFESSIONALS' EYES ONLY

GENESIS_CONF_00004294

## **EXHIBIT F**

**November 8, 2023 Email re: Genesis | Distribution Principles**

## [EXT] RE: Genesis | Distribution Principles

| | |
|---|---|
| **From:** | "Parra Criste, Amanda" <aparracriste@whitecase.com> |
| **To:** | "Mitchell, Alec" <almitchell@cgsh.com>; "Weinberg, Michael" <mdweinberg@cgsh.com>; "Sazant, Jordan" <jsazant@proskauer.com>; "Rosen, Brian S." <brosen@proskauer.com>; "Abelson, Philip" <philip.abelson@whitecase.com>; "Sciametta, Joe" <jsciametta@alvarezandmarsal.com>; "Volin, Megan R." <mvolin@proskauer.com>; "Cascante, Sam" <scascante@alvarezandmarsal.com>; "DiYanni, Michael (External)" <michael.diyanni@moelis.com>; "Renzi, Mark (External)" <mrenzi@thinkbrg.com>; "Geer, Brad (External)" <bgeer@hl.com>; "Malik, Rijul (External)" <rmalik@hl.com> |
| **Cc:** | "O'Neal, Sean A." <soneal@cgsh.com>; "VanLare, Jane" <jvanlare@cgsh.com>; "Hammer, Brandon M." <bhammer@cgsh.com> |
| **Date:** | Wed, 08 Nov 2023 16:06:55 +0000 |
| **Attachments:** | Comparison of Genesis - DS Schedule - Distribution Principles (CGSH 11.7.23) and Genesis - DS Schedule (No Deal) - Distribution Principles-125439672-v6.pdf (174.43 kB); Genesis - DS Schedule (No Deal) - Distribution Principles-125439672-v6.docx (48.65 kB) |

**External: Exercise caution with links & attachments**

---

Hi all,

Attached is a revised draft of the Distribution Principles (redline against the draft we received from Cleary yesterday). While this markup reflects comments from the UCC members, we are sending them this draft contemporaneously, and need to reserve for their final review.
To help with the review of our markup and explain some of our comments, we have summarized the changes as follows:

1. GBTC and ETH Shares: We want it to be clear that these are not Digital Assets, so we removed some language that may suggest they could be.
2. Bottom-Line Explanation: Our UCC members asked for a "bottom-line" summary of how the distribution principals propose GBTC/ETH to be allocated to crypto claims, so we have added an explanation upfront.
3. Gemini Reserve: We believe these mechanics work even if we have to reserve for Gemini, but we should discuss how we will account for a potential reserve in the context of what GBTC or BTC will be liquidated to make initial distributions to USD.
4. Pre-Effective Date Liquidation and Rebalancing: Because some monetization and rebalancing may be happening prior to the Effective Date, we've expanded some of the language to ensure the Debtors are authorized to conduct such transactions, subject to the applicable consultation rights.
5. Initial Conversion Rate: For GBTC, we should consider whether average proceeds of GBTC monetization done prior to the effective date is a better conversion rate.
6. Subsequent Conversion Rate: We believe the conversion rate for Un-Distributable Assets (GBTC/ETHE shares) should be based on average disposition price, as it is a better indicator of value.
7. Governance: Based on UCC member comments, we tried to clarify some of the governance/consent rights of the "representatives of relevant Holders" throughout. Open to suggestions on how we can further improve without bogging the DP's down.
8. Limitations on Recoveries: Conceptually, we have no issue with the approach. However, we are concerned about putting a spotlight on the USD v. Crypto recovery caps. We have revised to keep the same concept, but made it more general – after any Holder receives over 100% *in kind*, their pro rata share goes to zero (subject to the post-effective date interest provision). We think this gets us to the same result without having to draw a distinction.
9. Asset Monetization Agreement: The main issue here is the reference to "Classes" as defined in the Plan does not match with the "buckets" under the Distribution Principles (e.g., Gemini Lender claims are separately classified but belong to BTC, USD, or ETH "classes" and therefore represented by the BTC, USD, and ETH members on the WDOC, respectively). The UCC is not on board with Gemini having a seat on the WDOC so we need to make it clear that the Gemini Lender Claims are represented by the other "Claim asset class" representatives on the WDOC. Open to further suggestions here as well as creditors are hyper-focused on governance.

Happy to have a call to discuss any of these.

**Amanda Parra Criste** | Associate

T +1 305 995 5275 **M** +1 786 385 7993 **E** aparracriste@whitecase.com

White & Case LLP | Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900 | Miami, FL 33131-2352

---

**From:** Mitchell, Alec <almitchell@cgsh.com>
**Sent:** Sunday, November 5, 2023 2:34 PM
**To:** Weinberg, Michael <mdweinberg@cgsh.com>; Sazant, Jordan <JSazant@proskauer.com>; Rosen, Brian S. <brosen@proskauer.com>; Abelson, Philip <philip.abelson@whitecase.com>; Sciametta, Joe <JSciametta@alvarezandmarsal.com>; Volin, Megan R. <MVolin@proskauer.com>; Parra Criste, Amanda <aparracriste@whitecase.com>; Cascante, Sam <scascante@alvarezandmarsal.com>; DiYanni, Michael (External) <Michael.DiYanni@moelis.com>; Renzi, Mark (External) <mrenzi@thinkbrg.com>; Geer, Brad (External) <bgeer@hl.com>
**Cc:** O'Neal, Sean A. <soneal@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Hammer, Brandon M. <bhammer@cgsh.com>
**Subject:** RE: Genesis | Distribution Principles

All,
We wanted to share an updated draft in the interest of time. The attached remains subject to ongoing review.
Best,
-Alec

---

**Alec Mitchell**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2535
almitchell@cgsh.com | clearygottlieb.com

**From:** Weinberg, Michael <mdweinberg@cgsh.com>
**Sent:** Friday, November 3, 2023 7:48 PM
**To:** Sazant, Jordan <JSazant@proskauer.com>; Rosen, Brian S. <brosen@proskauer.com>; philip.abelson@whitecase.com; Sciametta, Joe <JSciametta@alvarezandmarsal.com>; Volin, Megan R. <MVolin@proskauer.com>; Parra Criste, Amanda <aparracriste@whitecase.com>; Cascante, Sam <scascante@alvarezandmarsal.com>; DiYanni, Michael <Michael.DiYanni@moelis.com>; Renzi, Mark (External) <mrenzi@thinkbrg.com>; Geer, Brad (External) <bgeer@hl.com>
**Cc:** O'Neal, Sean A. <soneal@cgsh.com>; VanLare, Jane <jvanlare@cgsh.com>; Mitchell, Alec <almitchell@cgsh.com>; Hammer, Brandon M.

CONFIDENTIAL

<bhammer@cgsh.com>
**Subject:** RE: Genesis | Distribution Principles
[Copying in a few others who are involved in this work stream and deleting the earlier email thread]
All,
We think it would be helpful to schedule a call tomorrow with this group to discuss the distribution principles. The Cleary team is available tomorrow after noon ET; please let us know what times work for you.
Best,
Mike

.........

**Michael Weinberg**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mstefanick@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2856
mdweinberg@cgsh.com | clearygottlieb.com

**From:** Weinberg, Michael
**Sent:** Friday, November 3, 2023 6:35 PM
**To:** 'Sazant, Jordan' <JSazant@proskauer.com>; Rosen, Brian S. <brosen@proskauer.com>; philip.abelson@whitecase.com; O'Neal, Sean A. <soneal@cgsh.com>
**Cc:** VanLare, Jane <jvanlare@cgsh.com>; Bremer, Sabrina <sabremer@cgsh.com>; Volin, Megan R. <MVolin@proskauer.com>; Parra Criste, Amanda <aparracriste@whitecase.com>
**Subject:** RE: Plan Comments
Thanks, Jordan. Can you let us know who supports the attached, including whether it has support across the BTC, ETH and USD/stablecoin creditor constituencies?
Best,
Mike

―――

**Michael Weinberg**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mstefanick@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2856
mdweinberg@cgsh.com | clearygottlieb.com

**From:** Sazant, Jordan <JSazant@proskauer.com>
**Sent:** Friday, November 3, 2023 5:33 PM
**To:** Rosen, Brian S. <brosen@proskauer.com>; Weinberg, Michael <mdweinberg@cgsh.com>; philip.abelson@whitecase.com; O'Neal, Sean A. <soneal@cgsh.com>
**Cc:** VanLare, Jane <jvanlare@cgsh.com>; Bremer, Sabrina <sabremer@cgsh.com>; Volin, Megan R. <MVolin@proskauer.com>; Parra Criste, Amanda <aparracriste@whitecase.com>
**Subject:** RE: Plan Comments
Good evening, all,
In addition to the below, please see attached for a revised copy of the Distribution Principles. These remain subject to further internal Proskauer review. Please let us know if you have any questions or would like to discuss.
Thanks,
Jordan
**Jordan Sazant**
Associate



70 West Madison Street
Suite 3800
Chicago, IL 60602-4342
d 312.962.3534
f 312.962.3551
jsazant@proskauer.com

Bankruptcy and Creditor Debtor
Rights/Insolvency
and Reorganization Law

greenspaces
Please consider the environment before printing this email.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "Firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities. Our external privacy statement is available at:
https://www.clearygottlieb.com/footer/privacy-statement

================================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If

you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here.

===============================================================================

MC-Genesis-000303

## **Exhibit G**

**Constitution of Genesis Asia Pacific Pte. Ltd.**

THE COMPANIES ACT (CHAPTER 50)
A PRIVATE COMPANY LIMITED BY SHARES
CONSTITUTION OF
GENESIS ASIA PACIFIC PTE. LTD.

1. The name of the company is **GENESIS ASIA PACIFIC PTE. LTD.**

2. The registered office of the company is situated in the Republic of Singapore.

      **3 FRASER STREET #05-25**
      **DUO TOWER**
      **Singapore 189352**

3. The liability of the members is limited.

4. The share capital of the company is

| Currency | Amount of Issued Share Capital |
| --- | --- |
| **SINGAPORE, DOLLARS** | **1000** |

5. We, the persons whose names and occupations are set out in this Constitution, desire to form a company in pursuance of this Constitution and we each agree to take the number of shares in the capital of the company set out against our respective names.

| Name of Subscribers | Occupation of Subscribers | Number of Shares Allotted | Class of shares | Currency |
| --- | --- | --- | --- | --- |
| GENESIS GLOBAL HOLDCO, LLC | | 1000 | Ordinary | SINGAPORE, DOLLARS(SGD) |

Dated this:   16/01/2020

*Interpretation*

6.—(1)  In this Constitution —

"Act" means the Companies Act (Cap. 50);

"board of directors" means the board of directors of the company;

"directors" means the directors of the company;

"electronic register of members" means the electronic register of members kept and maintained by the Registrar for private companies under section 196A of the Act;

"general meeting" means a general meeting of the company;

"member" means a member of the company;

"Registrar" has the same meaning as in section 4(1) of the Act;

"seal" means the common seal of the company;

"secretary" means a secretary of the company appointed under section 171 of the Act.

(2)  In this Constitution —

(*a*)    expressions referring to writing include, unless the contrary intention appears, references to printing, lithography, photography and other modes of representing or reproducing words in a visible form; and

(*b*)    words or expressions contained in this Constitution must be interpreted in accordance with the provisions of the Interpretation Act (Cap. 1), and of the Act in force as at the date at which this Constitution becomes binding on the company.

*Share capital and variation of rights*

7.—(1)  Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares but subject to the Act, shares in the company may be issued by the directors.

(2)  Shares referred to in paragraph (1) may be issued with preferred, deferred, or other special rights or restrictions, whether in regard to dividend, voting, return of capital, or otherwise, as the directors, subject to any ordinary resolution of the company, determine.

8.—(1)  If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the company is being wound up, be varied with —

(*a*)    the consent in writing of the holders of 75% of the issued shares of that class; or

(*b*)    the sanction of a special resolution passed at a separate general meeting of the holders of the shares of the class.

(2)  The provisions of this Constitution relating to general meetings apply with the necessary modifications to every separate general meeting of the holders of the shares of the class referred to in paragraph (1), except that —

(*a*)   the necessary quorum is at least 2 persons holding or representing by proxy one-third of the issued shares of the class; and

(*b*)   any holder of shares of the class present in person or by proxy may demand a poll.

(3)  Section 184 of the Act applies with the necessary modifications to every special resolution passed at a separate general meeting of the holders of the shares of the class under paragraph (1).

9.   The rights conferred upon the holders of the shares of any class issued with preferred or other rights are, unless otherwise expressly provided by the terms of issue of the shares of that class, treated as being varied by the creation or issue of further shares which ranks equally with the shares of that class.

10.   The company may on any issue of shares pay any brokerage that is permitted by law.

11.—(1)  Except as required by law, no person is to be recognised by the company as holding any share upon any trust.

(2)  Except as required by law or by this Constitution, the company is not bound by or compelled in any way to recognise —

(*a*)   any equitable, contingent, future or partial interest in any share or unit of a share; or

(*b*)   any other rights in respect of any share or unit of share,

other than the registered holder's absolute right to the entirety of the share or unit of share.

(3)  Paragraph (2) applies even when the company has notice of any interest or right referred to in paragraph (2)(*a*) or (*b*).

12.—(1)  Every person whose name is entered as a member in the electronic register of members is entitled without payment to receive a certificate under the seal of the company in accordance with the Act.

(2)  In respect of a share or shares held jointly by several persons, the company is not bound to issue more than one certificate, and delivery of a certificate for a share to one of several joint holders is sufficient delivery to all such holders.

*Lien*

13.—(1)  The company has a first and paramount lien on —

(*a*)   every share (that is not a fully paid share) for all money (whether presently payable or not) called or payable at a fixed time in respect of that share; and

(*b*)   all shares (other than fully paid shares) registered in the name of a single person for all money presently payable by the person or the person's estate to the company.

(2)  The company's lien, if any, on a share extends to all dividends payable on the share.

(3)  The directors may at any time declare any share to be wholly or partly exempt from paragraph (1) or (2), or both.

14.—(1)  Subject to paragraph (2), the company may sell, in any manner as the directors think fit, any shares on which the company has a lien.

(2)  No sale may be made under paragraph (1) unless —

(*a*)   a sum in respect of which the lien exists is presently payable;

(*b*)   a notice in writing, stating and demanding payment of the amount in respect of which the lien exists as is presently payable, has been given by the company to the registered holder for the time being of the share, or the person entitled to the share by reason of the death or bankruptcy of the registered holder of the share; and

(*c*)   a period of 14 days has expired after the giving of the notice in sub-paragraph (*b*).

15.—(1)  To give effect to any sale of shares under regulation 14, the directors may authorise any person to transfer the shares sold to the purchaser of the shares.

(2)  Subject to regulations 25, 26 and 27, the company must lodge a notice of transfer of shares in relation to the shares sold to the purchaser with the Registrar.

(3)  The purchaser of any shares referred to in paragraph (1) is not bound to see to the application of the purchase money, and the purchaser's title to the shares is not affected by any irregularity or invalidity in the proceedings with respect to the sale of the shares.

16.—(1)  The proceeds of any sale of shares under regulation 14 received by the company must be applied in payment of any part of the amount in respect of which the lien exists as is presently payable.

(2)  Any remaining proceeds from the sale of shares must (subject to any lien for sums not presently payable as existed upon the shares before the sale but which have become presently payable) be paid to the person entitled to the shares at the date of the sale.

*Calls on shares*

17.—(1)  The directors may from time to time make calls upon the members in respect of any money unpaid on their shares, other than in accordance with the conditions of the allotment of the shares, if both of the following conditions are met:

(*a*)   no call is payable at less than one month after the date fixed for the payment of the last preceding call;

(*b*)   at least 14 days' notice specifying the time or times and the place of payment is given by the company to the members.

(2)  Each member must pay to the company at the time or times and place specified in the notice referred to in paragraph (1)(*b*) the amount called on the member's shares.

(3)  The directors may revoke or postpone a call.

18.—(1)  A call is treated as having been made at the time when the resolution of the directors authorising the call was passed.

(2)  A call may be required to be paid by instalments.

19. The joint holders of a share are jointly and severally liable to pay all calls in respect of the share.

20.—(1) If a sum called in respect of a share is not paid before or on the day appointed for payment of the sum, the person from whom the sum is due must pay interest on the sum for the period beginning on the day appointed for payment of the sum to the time of actual payment of the sum at such rate not exceeding 8% per annum as the directors may determine.

(2) The directors may waive, wholly or in part, the payment of the interest referred to in paragraph (1).

21.—(1) Any sum which, by the terms of issue of a share, becomes payable on allotment or at any fixed date is to be treated as a call duly made and payable on the date on which, by the terms of issue of the share, the sum becomes payable.

(2) In the case of non-payment of any sum referred to in paragraph (1), all the provisions of this Constitution as to payment of interest and expenses and forfeiture apply as if the sum had become payable by virtue of a call duly made and notified.

22. The directors may, on the issue of shares, differentiate between the holders as to the amount of calls to be paid and the times of payment.

23.—(1) The directors may, if they think fit, receive in advance from any member (if the member is willing) all or any part of the money uncalled and unpaid upon any shares held by the member.

(2) Upon the company receiving the money referred to in paragraph (1), the directors may (until the amount would, but for the advance, become payable) pay interest to the member at such rate not exceeding (unless the company in general meeting otherwise directs) 8% per annum as may be agreed upon between the directors and the member.

*Transfer of shares*

24.—(1) Subject to this Constitution, any member may transfer all or any of the member's shares by instrument in writing in any usual or common form or in any other form which the directors may approve.

(2) The instrument of transfer must be executed by or on behalf of the transferor and the transferor remains the holder of the shares transferred until the name of the transferee is entered in the electronic register of members.

25.—(1) To enable the company to lodge a notice of transfer of shares with the Registrar under section 128(1)(*a*) of the Act, the following items in relation to the transfer of shares must be delivered by the transferor to the registered office of the company:

(*a*)  the instrument of transfer;

(*b*)  a fee not exceeding $1 as the directors from time to time may require;

(*c*)  the certificate of the shares to which the instrument of transfer relates;

(*d*)  any other evidence as the directors may reasonably require to show the right of the transferor to make the transfer.

(2)  Upon receipt of the items referred to in paragraph (1), the company must, subject to regulation 26, lodge with the Registrar a notice of transfer of shares in accordance with section 128 of the Act and retain the instrument of transfer referred to in regulation 24.

26.  The directors may decline to lodge a notice of transfer of shares with the Registrar if —

(*a*)  the shares are not fully paid shares;

(*b*)  the directors do not approve of the transferee; or

(*c*)  the company has a lien on the shares.

27.  The lodging of any notice of transfer of shares with the Registrar for the purpose of updating the electronic register of members may be suspended at any time and for any period as the directors may from time to time determine, but not for more than a total of 30 days in any year.

### *Transmission of shares*

28.—(1)  Where a sole holder of shares of the company dies, the company may recognise only the legal personal representatives of the deceased as having any title to the deceased's interest in the shares.

(2)  Where a joint holder of shares of the company dies, the company may recognise only the survivor or survivors of the deceased as having any title to the deceased's interest in the shares.

(3)  Nothing in paragraph (2) releases the estate of the deceased from any liability in respect of any share which had been jointly held by the deceased with other persons.

29.—(1)  Any person becoming entitled to a share in consequence of the death or bankruptcy of a member may, upon such evidence being produced as may from time to time properly be required by the directors, elect to —

(*a*)  be registered as holder of the share in the electronic register of members; or

(*b*)  nominate another person to be registered as the transferee of the share in the electronic register of members.

(2)  Despite paragraph (1), the directors have the same right to decline or suspend the lodging of a notice of transfer of shares with the Registrar for the purpose of updating the electronic register of members under regulations 26 and 27 as they would have had in the case of a transfer of the share by the member referred to in paragraph (1) before the death or bankruptcy of the member.

30.—(1)  If a person becoming entitled to a share in consequence of the death or bankruptcy of a member elects to be registered as holder of the share in the electronic register of members, the person must deliver or send to the company a notice in writing signed by the person stating that the person elects to be registered in the electronic register of members as the holder of the share.

(2)  If a person becoming entitled to a share in consequence of the death or bankruptcy of a member elects to nominate another person to be registered as the transferee of the share in the electronic register of members, the person must execute a transfer to that other person a transfer of the share.

(3)  All the limitations, restrictions, and provisions of this Constitution relating to the right to transfer and the lodging of a notice of transfer by the company in relation to any transfer of shares are applicable to any notice referred to in paragraph (1) or transfer referred to in paragraph (2), as if the death or bankruptcy of the member concerned had not occurred and the notice or transfer were a transfer signed by the member.

31.—(1)  Where the registered holder of any share dies or becomes bankrupt, the personal representative of the registered holder or the assignee of the registered holder's estate, as the case may be, is, upon the production of such evidence as may from time to time be properly required by the directors, entitled to the same dividends and other advantages, and to the same rights (whether in relation to meetings of the company, or to voting, or otherwise), that the registered holder would have been entitled to if the registered holder had not died or become bankrupt.

(2)  Where 2 or more persons are jointly entitled to any share in consequence of the death of the registered holder, they are, for the purposes of this Constitution, treated as joint holders of the share.

### *Forfeiture of shares*

32.  If a member fails to pay any call or instalment of a call on the day appointed for payment of the call or instalment of the call, the directors may, as long as any part of the call or instalment remains unpaid, serve a notice on the member requiring payment of the unpaid part of the call or instalment, together with any interest which may have accrued.

33.  The notice under regulation 32 must —

(*a*)  name a day (not earlier than 14 days after the date of service of the notice) on or before which the payment required by the notice is to be made; and

(*b*)  state that, in the event of non-payment at or before the time appointed, the shares in respect of which the call was made is liable to be forfeited.

34.—(1)  If the requirements of a notice referred to in regulation 33 are not complied with, any share in respect of which the notice was given may, at any time after the notice is given but before the payment required by the notice has been made, be forfeited by a resolution of the directors passed for the purpose of forfeiting the share.

(2)  Forfeiture under paragraph (1) includes all dividends declared in respect of the forfeited shares and not paid before the forfeiture.

35.  A forfeited share may be sold or otherwise disposed of on any terms and in any manner as the directors think fit, and, at any time before a sale or disposition, the forfeiture may be cancelled on any terms as the directors think fit.

36.—(1)  A person whose shares have been forfeited ceases to be a member in respect of the forfeited shares.

(2)  Despite paragraph (1), the person referred to in that paragraph remains liable to pay to the company all money which, at the date of forfeiture, was payable by the person to the company in respect of the shares (together with

interest at the rate of 8% per annum beginning on the date of forfeiture on the money for the time being unpaid if the directors think fit to enforce payment of such interest).

37.  A statutory declaration in writing that the declarant is a director or the secretary of the company, and that a share in the company has been forfeited on a date stated in the declaration, is conclusive evidence of the facts stated in the declaration as against all persons claiming to be entitled to the share.

38.—(1)  The company may receive the consideration, if any, given for a forfeited share on any sale or disposition of the forfeited share and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of (called in this regulation the transferee).

(2)  Upon the company executing a transfer of the share in favour of the transferee, the company must lodge a notice of transfer of share with the Registrar under section 128 of the Act for the purpose of updating the electronic register of members to reflect the transferee as the registered owner of the forfeited share.

(3)  The transferee is not bound to see to the application of the purchase money, if any, and the transferee's title to the share is not affected by any irregularity or invalidity in the proceedings with respect to the forfeiture, sale, or disposal of the share.

39.  The provisions of this Constitution as to forfeiture apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time as if the sum had been payable by virtue of a call duly made and notified.

*Conversion of shares into stock*

40.  The company may by ordinary resolution passed at a general meeting convert any paid-up shares into stock and reconvert any stock into paid-up shares.

41.—(1)  Subject to paragraph (2), the holders of stock may transfer the stock or any part of the stock in the same manner, and subject to the same regulations, by which the shares from which the stock arose might, prior to conversion, have been transferred.

(2)  The directors may from time to time fix the minimum amount of stock transferable and restrict or forbid the transfer of fractions of that minimum.

42.—(1)  Subject to paragraph (2), the holders of stock have, according to the amount of the stock held by the holders, the same rights, privileges and advantages in relation to dividends, voting at meetings of the company and other matters as if they held the shares from which the stock arose.

(2)  No privilege or advantage (except participation in the dividends and profits of the company and in the assets on winding up) is to be conferred by any aliquot part of stock on the holder of such stock which would not, if existing in shares, have conferred that privilege or advantage on the holder of such stock.

43. Provisions of this Constitution applicable to paid-up shares apply to stock, and references to "share" and "shareholder" in this Constitution are to be read as if they were references to "stock" and "stockholder", respectively.

*Alteration of capital*

44. The company may from time to time by ordinary resolution do any of the following:

(*a*)   consolidate and divide all or any of its share capital;

(*b*)   subdivide its shares or any of them such that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share is the same as it was in the case of the share from which the reduced share is derived;

(*c*)   cancel the number of shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person or which have been forfeited, and diminish the amount of its share capital by the number of the shares so cancelled.

45.—(1)   Subject to any direction to the contrary that may be given by the company in general meeting, all new shares must, before issue, be offered to all persons who, as at the date of the offer, are entitled to receive notices from the company of general meetings, in proportion, or as nearly as the circumstances admit, to the amount of the existing shares to which they are entitled.

(2)   The offer must be made by notice specifying the number of shares offered, and limiting a time within which the offer, if not accepted, is treated to be declined.

(3)   After the expiration of the time referred to in paragraph (2), or upon the person to whom the offer is made declining the shares offered, the directors may dispose of those shares in any manner as they think is the most beneficial to the company.

(4)   The directors may dispose of any new shares which (by reason of the ratio which the new shares bear to shares held by persons entitled to an offer of new shares) cannot, in the opinion of the directors, be conveniently offered under this regulation.

46.   The company may, by special resolution and with any consent required by law, reduce its share capital in any manner.

*General meeting*

47.—(1)   An annual general meeting of the company must be held in accordance with the provisions of the Act.

(2)   All general meetings other than the annual general meetings are called extraordinary general meetings.

48.—(1)   An extraordinary general meeting may be requisitioned by —

(*a*)   any director, whenever the director thinks fit; or

(*b*)   any requisitionist as provided for by the Act.

(2)   Upon a requisition being made under paragraph (1), an extraordinary general meeting must be convened.

49.—(1)  Subject to the provisions of the Act relating to special resolutions and any agreement amongst persons who are entitled to receive notices of general meetings from a company, at least 14 days' notice (exclusive of the day on which the notice is served or treated to be served, but inclusive of the day for which notice is given) of any general meeting must be given to persons entitled to receive notices of general meetings from the company.

(2)  A notice of a general meeting must specify the following:

(*a*)  the place at which the general meeting is held;

(*b*)  the date and time of the general meeting;

(*c*)  in case of special business to be transacted at the general meeting, the general nature of that business.

50.—(1)  All business that is transacted at an extraordinary general meeting is special business.

(2)  All business that is transacted at an annual general meeting is special business, except —

(*a*)  the declaration of a dividend;

(*b*)  the consideration of the financial statements, the reports of the auditors and the statements of the directors;

(*c*)  the election of directors in the place of retiring directors; and

(*d*)  the appointment and fixing of the remuneration of the auditors.

*Proceedings at general meetings*

51.—(1)  No business is to be transacted at any general meeting unless a quorum of members is present at the time when the meeting proceeds to business.

(2)  Except as otherwise provided in this Constitution, 2 members present in person form a quorum.

(3)  In this regulation, "member" includes a person attending as a proxy or as representing a corporation or a limited liability partnership which is a member.

52.  If within half an hour after the time appointed for a general meeting a quorum is not present, the meeting —

(*a*)  in the case where the meeting is convened upon the requisition of members, is dissolved; or

(*b*)  in any other case, is adjourned to the same day in the next week at the same time and place, or to another day and at another time and place as the directors may determine.

53.  The chairman of a general meeting is —

(*a*)  where the board of directors has appointed a chairman amongst the directors, the chairman; or

(*b*)  where —

(i)  the chairman of the board of directors is unwilling to act as the chairman of the general meeting;

(ii)  the chairman is not present within 15 minutes after the time appointed for the holding of the general meeting; or

(iii)  the board of directors has not appointed a chairman amongst the directors,

the member elected by the members present for the purpose of being the chairman of the general meeting.

54.—(1)  The chairman may, with the consent of a general meeting at which a quorum is present, and must if so directed by a general meeting, adjourn the general meeting from time to time and from place to place.

(2)  No business is to be transacted at any adjourned meeting other than the business left unfinished at the general meeting from which the adjournment took place (called in this regulation the original general meeting).

(3)  There is no need to give any notice of an adjourned meeting or of the business to be transacted at an adjourned meeting unless the adjourned meeting is to be held more than 30 days after the date of the original general meeting.

55.—(1)  At any general meeting, a resolution put to the vote of the meeting must be decided on a show of hands unless a poll is (before or on the declaration of the result of the show of hands) demanded —

(*a*)  by the chairman;

(*b*)  by at least 3 members present in person or by proxy;

(*c*)  by any member or members present in person or by proxy and representing not less than 5% of the total voting rights of all the members having the right to vote at the meeting; or

(*d*)  by a member or members holding shares in the company conferring a right to vote at the meeting being shares on which an aggregate sum has been paid up equal to not less than 5% of the total sum paid up on all the shares conferring that right.

(2)  Unless a poll is demanded, a declaration by the chairman that a resolution has on a show of hands been carried or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book containing the minutes of the proceedings of the company is conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against the resolution.

(3)  The demand for a poll may be withdrawn.

56.—(1)  Subject to paragraph (2), if a poll is demanded it must be taken in such manner and either at once or after an interval or adjournment or otherwise as the chairman directs.

(2)  A poll demanded on the election of a chairman or on a question of adjournment must be taken immediately.

(3)  The result of the poll is a resolution of the meeting at which the poll was demanded.

57.  In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded is entitled to a second or casting vote.

58.—(1)  Subject to any rights or restrictions for the time being attached to any class or classes of shares, at meetings of members or classes of members, each member entitled to vote may vote in person or by proxy or by attorney.

(2)  On a show of hands every member or representative of a member who is present in person has one vote.

(3)  On a poll every member present in person or by proxy or by attorney or other duly authorised representative has one vote for each share the member holds.

59.—(1)  In the case of joint holders, the vote of the senior who tenders a vote, whether in person or by proxy, is accepted to the exclusion of the votes of the other joint holders.

(2)  For the purposes of paragraph (1), seniority is to be determined by the order in which the names stand in the electronic register of members.

60.  A member who is mentally disordered or whose person or estate is liable to be dealt with in any way under the law relating to mental capacity may vote, whether on a show of hands or on a poll, by a person who properly has the management of the estate of the member, and any such person may vote by proxy or attorney.

61.  No member is entitled to vote at any general meeting unless all calls or other sums presently payable by the member in respect of shares in the company have been paid.

62.—(1)  No objection may be raised as to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered.

(2)  Any objection made in due time must be referred to the chairman of the meeting, whose decision is final and conclusive.

(3)  Every vote not disallowed at the meeting is valid for all purposes.

63.—(1)  The instrument appointing a proxy must be in writing, in the common or usual form and —

(*a*)   where the appointer is a corporation or a limited liability partnership, either under seal or under the hand of an officer or attorney duly authorised; or

(*b*)   in any other case, under the hand of the appointer or of the attorney of the appointer duly authorised in writing.

(2)  A proxy may but need not be a member of the company.

(3)  The instrument appointing a proxy is treated as conferring authority to demand or join in demanding a poll.

64.  Where an opportunity of voting for or against a resolution is to be conferred on members, the instrument appointing a proxy may be in the following form or such other form as the board of directors may approve:

 "I/We*, [name(s)], of [address(es)], being a member/members* of the abovenamed company, appoint [name] of [address], or failing him/her, [name] of [address], as my/our* proxy to vote for me/us* on my/our* behalf at the [annual or extraordinary, as the case may be] general meeting of the company, to be held on [date], and at any adjournment of the meeting.

Signed on [date].

This form is to be used in favour of/against* the resolution.

*Delete whichever is not applicable. [Unless otherwise instructed, the proxy may vote as he or she thinks fit.]".

65.—(1)  The following documents must be deposited at the registered office of the company, or at such other place in Singapore as is specified in the notice convening the meeting by the time specified in paragraph (2) for the

(*a*)  the instrument appointing a proxy;

(*b*)  the power of attorney or other authority, if any, under which the instrument appointing the proxy is signed, or a notarially certified copy of that power of attorney or authority.

(2)  For the purposes of paragraph (1), the time is —

(*a*)  in the case of a poll, not less than 24 hours before the time appointed for the taking of the poll; or

(*b*)  in any other case, not less than 72 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

(3)  An instrument of proxy is not valid if paragraph (1) is not complied with.

66.—(1)  Subject to paragraph (2), a vote given in accordance with the terms of an instrument of proxy or attorney is valid despite —

(*a*)  the previous death or mental disorder of the principal;

(*b*)  the revocation of the instrument or of the authority under which the instrument was executed; or

(*c*)  the transfer of the share in respect of which the instrument is given.

(2)  Paragraph (1) does not apply if an intimation in writing of such death, mental disorder, revocation, or transfer has been received by the company at its registered office before the commencement of the meeting or adjourned meeting at which the instrument is used.

*Directors: Appointment, etc.*

67.—(1)  At the first annual general meeting of the company, all the directors must retire from office.

(2)  At every annual general meeting subsequent to the first annual general meeting of the company, one-third of the directors for the time being, or, if their number is not 3 or a multiple of 3, then the number nearest one-third, must retire from office.

68.  A retiring director is eligible for re-election.

69.  The directors to retire in every year must be those who have been longest in office since their last election, but, as between persons who became directors on the same day, those to retire must (unless they otherwise agree among themselves) be determined by lot.

70.—(1)  The company at the meeting at which a director retires may fill the vacated office by electing a person to fill the vacated office.

(2)  If the company does not fill the vacated office, the retiring director is, if he or she offers himself or herself for re-election and is not disqualified under the Act from holding office as a director, treated as re-elected, unless —

(*a*)  at that meeting it is expressly resolved not to fill the vacated office; or

(*b*)  a resolution for the re-election of that director is put to that meeting and lost.

71.  The company may from time to time by ordinary resolution passed at a general meeting increase or reduce the number of directors, and may also determine in what rotation the increased or reduced number is to go out of office.

72.—(1)  The directors have power at any time, and from time to time, to appoint any person to be a director, either to fill a casual vacancy or as an addition to the existing directors, but the total number of directors must not at any time exceed the number fixed in accordance with this Constitution.

(2)  Any director appointed under paragraph (1) holds office only until the next annual general meeting, and is then eligible for re-election.

(3)  Any director appointed under paragraph (1) must not be taken into account in determining the directors who are to retire by rotation at the next annual general meeting.

73.—(1)  The company may by ordinary resolution remove any director before the expiration of his or her period of office, and may by an ordinary resolution appoint another person in place of the removed director.

(2)  The person appointed in place of the removed director is subject to retirement at the same time as if the person had become a director on the day on which the director in whose place the person is appointed was last elected a director.

74.—(1)  The remuneration of the directors is, from time to time, to be determined by the company in general meeting.

(2)  The remuneration of the directors is treated as accruing from day to day.

(3)  The directors may also be paid all travelling, hotel, and other expenses properly incurred by them in attending and returning from meetings of the directors or any committee of the directors or general meetings of the company or in connection with the business of the company.

75.  The shareholding qualification for directors may be fixed by the company in general meeting.

76.  The office of director becomes vacant if the director —

(*a*)  ceases to be a director by virtue of the Act;

(*b*)  becomes bankrupt or makes any arrangement or composition with his or her creditors generally;

(*c*)  becomes prohibited from being a director by reason of any order made under the Act;

(*d*)  becomes disqualified from being a director by virtue of his or her disqualification or removal or the revocation of his or her appointment as a director, as the case may be, under —

(i)  section 148, 149, 149A, 154, 155, 155A or 155C of the Act;

(ii)  section 50 or 54 of the Banking Act (Cap. 19);

(iii)  section 47 of the Finance Companies Act (Cap. 108);

(iv)  section 57 of the Financial Advisers Act (Cap. 110);

(v)  section 31, 31A, 35ZJ or 41(2)(*a*)(ii) of the Insurance Act (Cap. 142);

(we)    section 30AAI of the Monetary Authority of Singapore Act (Cap. 186);

(vii)   section 12A of the Money-changing and Remittance Businesses Act (Cap. 187);

(viii)  section 22 of the Payment Systems (Oversight) Act (Cap. 222A);

(ix)    section 44, 46Z, 81P, 81ZJ, 97 or 292A of the Securities and Futures Act (Cap. 289); or

(x)     section 14 of the Trust Companies Act (Cap. 336);

(*e*)   being a director of a Registered Fund Management Company as defined in the Securities and Futures (Licensing and Conduct of Business) Regulations (Cap. 289, Rg 10), he or she has been removed by the Registered Fund Management Company as director in accordance with those Regulations;

(*f*)   becomes mentally disordered and incapable of managing himself or herself or his or her affairs or a person whose person or estate is liable to be dealt with in any way under the law relating to mental capacity;

(*g*)   subject to section 145 of the Act, resigns his or her office by notice in writing to the company;

(*h*)   for more than 6 months is absent without permission of the directors from meetings of the directors held during that period;

(*i*)   without the consent of the company in general meeting, holds any other office of profit under the company except that of managing director or manager; or

(*j*)   is directly or indirectly interested in any contract or proposed contract with the company and fails to declare the nature of his or her interest in manner required by the Act.

### *Powers and duties of directors*

77.—(1)  The business of a company is managed by or under the direction or supervision of the directors.

(2)  The directors may exercise all the powers of a company except any power that the Act or this Constitution requires the company to exercise in general meeting.

78.  Without limiting the generality of regulation 77, the directors may exercise all the powers of the company to do all or any of the following for any debt, liability, or obligation of the company or of any third party:

(*a*)   borrow money;

(*b*)   mortgage or charge its undertaking, property, and uncalled capital, or any part of the undertaking, property and uncalled capital;

(*c*)   issue debentures and other securities whether outright or as security.

79.  The directors may exercise all the powers of the company in relation to any official seal for use outside Singapore and in relation to branch registers of debenture holders kept in any place outside Singapore.

80.—(1)  The directors may from time to time by power of attorney appoint any corporation, firm, limited liability partnership or person or body of persons, whether nominated directly or indirectly by the directors, to be the attorney or attorneys of the company for the purposes and with the powers, authorities, and discretions (not exceeding those vested in or exercisable by the directors under this Constitution) and for a period and subject to any conditions as the directors may think fit.

(2) Any powers of attorney granted under paragraph (1) may contain provisions for the protection and convenience of persons dealing with the attorney as the directors think fit and may also authorise the attorney to delegate all or any of the powers, authorities, and discretions vested in the attorney.

81.  All cheques, promissory notes, drafts, bills of exchange, and other negotiable instruments, and all receipts for money paid to the company, must be signed, drawn, accepted, endorsed, or otherwise executed, as the case may be, by any 2 directors or in such other manner as the directors from time to time determine.

82.—(1)  The directors must cause minutes to be made of all of the following matters:

(*a*)  all appointments of officers to be engaged in the management of the company's affairs;

(*b*)  names of directors present at all meetings of the company and of the directors;

(*c*)  all proceedings at all meetings of the company and of the directors.

(2)  The minutes referred to in paragraph (1) must be signed by the chairman of the meeting at which the proceedings were held or by the chairman of the next succeeding meeting.

### *Proceedings of directors*

83.—(1)  The directors may meet together for the despatch of business, adjourn and otherwise regulate their meetings as they think fit.

(2)  A director may at any time summon a meeting of the directors.

(3)  The secretary must, on the requisition of a director, summon a meeting of the directors.

84.—(1)  Subject to this Constitution, questions arising at any meeting of directors must be decided by a majority of votes and a determination by a majority of directors is for all purposes treated as a determination of the directors.

(2)  In case of an equality of votes the chairman of the meeting has a second or casting vote.

85.—(1)  A director must not vote in respect of any transaction or proposed transaction with the company in which the director is interested, or in respect of any matter arising from such transaction or proposed transaction.

(2)  If a director referred to in paragraph (1) does vote in respect of any transaction or proposed transaction referred to in that paragraph, the director's vote must not be counted.

86.  The quorum necessary for the transaction of the business of the directors may be fixed by the directors, and unless so fixed is 2.

87.—(1)  Subject to paragraph (2), the directors may act despite any vacancy in their body.

(2)  If and so long as the number of directors is reduced below the number fixed by this Constitution as the necessary quorum of directors, the continuing directors or director may not act except for the purpose of increasing the number of directors to that number or for the purpose of summoning a general meeting of the company.

88.—(1)  The directors may elect a chairman of their meetings and determine the period for which the chairman

(2)  If no chairman is elected, or if at any meeting the chairman is not present within 10 minutes after the time appointed for holding the meeting, the directors present may choose one of their number to be chairman of the meeting.

89.—(1)  The directors may delegate any of their powers to committees consisting of any member or members of their body as the directors think fit.

(2)  Any committee formed under paragraph (1) must in the exercise of the delegated powers conform to any regulation that may be imposed on it by the directors.

90.—(1)  A committee may elect a chairman of its meetings.

(2)  If no chairman is elected, or if at any meeting the chairman is not present within 10 minutes after the time appointed for holding the meeting, the members present may choose one of their number to be chairman of the meeting.

91.—(1)  A committee may meet and adjourn as it thinks proper.

(2)  Questions arising at any meeting must be determined by a majority of votes of the members present, and in the case of an equality of votes the chairman has a second or casting vote.

92.  All acts done by any meeting of the directors or of a committee of directors or by any person acting as a director is as valid as if every such person had been duly appointed and was qualified to be a director, even if it is afterwards discovered that —

(*a*)  there was some defect in the appointment of any director or person acting as a director; or

(*b*)  the directors or person acting as a director or any of them were disqualified.

93.—(1)  A resolution in writing, signed by all the directors for the time being entitled to receive notice of a meeting of the directors, is as valid and effectual as if it had been passed at a meeting of the directors duly convened and held.

(2)  Any resolution in writing under paragraph (1) may consist of several documents in like form, each signed by one or more directors.

94.  Where the company has only one director, the director may pass a resolution by recording it and signing the record.

*Managing directors*

95.—(1)  The directors may from time to time appoint one or more of their body to the office of managing director for such period and on such terms as they think fit and, subject to the terms of any agreement entered into in any particular case, may revoke any such appointment.

(2)  A director appointed under paragraph (1) is not, while holding the office of managing director, subject to retirement by rotation or to be taken into account in determining the rotation of retirement of directors, but his or her appointment automatically determines if he or she ceases from any cause to be a director.

96.  A managing director may, subject to the terms of any agreement entered into in any particular case, receive remuneration by one or more of the following ways as the directors may determine:

(*a*)   salary;

(*b*)   commission;

(*c*)   participation in profits.

97.  The directors may entrust to and confer upon a managing director any of the powers exercisable by them upon such terms and conditions and with such restrictions as they think fit, and either collaterally with or to the exclusion of their own powers, and may from time to time revoke, withdraw, alter, or vary all or any of those powers.

*Alternate directors and substitute directors*

98.—(1)  Any director (called in this regulation the appointer) may, with the approval of the board of directors, appoint any person, whether a member of the company or not, to be an alternate or substitute director in the appointer's place for any period as the appointer thinks fit.

(2)  Any person holding office as an alternate or substitute director is entitled to notice of meetings of the directors and to attend and vote at meetings of the directors, and to exercise all the powers of the appointer in the appointer's place.

(3)  An alternate or substitute director —

(*a*)   is not required to hold any shares to qualify him or her for appointment; and

(*b*)   must vacate office if the appointer vacates office as a director or removes the appointee from office.

(4)  Any appointment or removal under this regulation must be effected by notice in writing under the hand of the director making the appointment or removal.

*Associate directors*

99.—(1)  The directors may from time to time appoint any person to be an associate director and may from time to time cancel any such appointment.

(2)  The directors may fix, determine and vary the powers, duties and remuneration of any person appointed as an associate director.

(3)  A person appointed as an associate director —

(*a*)   is not required to hold any shares to qualify him or her for appointment; and

(*b*)   does not have any right to attend or vote at any meeting of directors except by the invitation and with the consent of the directors.

*Secretary*

100.—(1)  The secretary must be appointed by the directors in accordance with the Act for any term, at any remuneration, and upon any conditions as the directors think fit.

*Seal*

101.—(1)  The directors must provide for the safe custody of the seal.

(2)  The seal must only be used by the authority of the directors or of a committee of the directors authorised by the directors to use the seal.

(3)  Every instrument to which the seal is affixed must be signed by a director and must be countersigned by the secretary or by a second director or by another person appointed by the directors for the purpose of countersigning the instrument to which the seal is affixed.

*Financial statements*

102.—(1)  The directors must —

(*a*)  cause proper accounting and other records to be kept;

(*b*)  distribute copies of financial statements and other documents as required by the Act; and

(*c*)  determine whether, to what extent, at what times and places, and under what conditions or regulations the accounting and other records of the company are open to the inspection of members who are not directors.

(2)  No member (who is not a director) has any right of inspecting any account or book or paper of the company except as conferred by statute or authorised by the directors or by the company in general meeting.

*Dividends and reserves*

103.  The company in general meeting may declare dividends, but any dividend declared must not exceed the amount recommended by the directors.

104.  The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the company.

105.  No dividend is to —

(*a*)  be paid otherwise than out of profits; or

(*b*)  bear interest against the company.

106.—(1)  The directors may, before recommending any dividend —

(*a*)  set aside out of the profits of the company sums as they think proper as reserves; or

(*b*)  carry forward any profits which they may think prudent not to divide, without placing the profits to reserve.

(2)  The reserves set aside under paragraph (1)(*a*) —

(*a*)  are, at the discretion of the directors, to be applied for any purpose to which the profits of the company may be properly applied; and

(*b*)  may, pending any application under sub-paragraph (*a*) and at the discretion of the directors, be employed in the business of the company or be invested in any investments (other than shares in the company) as the directors may from time to time think fit.

107.—(1)  Subject to the rights of persons, if any, entitled to shares with special rights as to dividend, all dividends must be declared and paid by reference to the amounts paid or credited as paid on the shares in respect of which the dividend is paid.

(2)  For the purposes of paragraph (1), no amount paid or credited as paid on a share in advance of calls is to be treated for the purposes of this regulation as paid on the share.

(3)  All dividends must be apportioned and paid proportionately to the amounts paid or credited as paid on the shares during any portion or portions of the period in respect of which the dividend is paid.

(4)  If any share is issued on terms providing that it ranks for dividend as from a particular date, that share ranks for dividend accordingly.

108.  The directors may deduct from any dividend payable to any member all sums of money, if any, presently payable by the member to the company on account of calls or otherwise in relation to the shares of the company.

109.—(1)  Any general meeting declaring a dividend or bonus may by resolution direct payment of the dividend or bonus wholly or partly by the distribution of specific assets, including —

(*a*)  paid-up shares of any other company;

(*b*)  debentures or debenture stock of any other company; or

(*c*)  any combination of any specific assets,

and the directors must give effect to the resolution.

(2)  Where any difficulty arises with regard to a distribution directed under paragraph (1), the directors may do all or any of the following:

(*a*)  settle the distribution as they think expedient;

(*b*)  fix the value for distribution of the specific assets or any part of the specific assets;

(*c*)  determine that cash payments be made to any members on the basis of the value fixed by the directors, in order to adjust the rights of all parties;

(*d*)  vest any specific assets in trustees as may seem expedient to the directors.

110.—(1)  Any dividend, interest, or other money payable in cash in respect of shares may be paid by cheque or warrant sent through the post directed —

(*a*)  in the case of joint holders —

(i)      to the registered address of the joint holder who is first named on the electronic register of members; or

(ii)     to a person or to an address as the joint holders may in writing direct; or

(*b*)  in any other case —

(i)      to the registered address of the holder; or

(ii)     to a person or to an address as the holder may in writing direct.

(2)  Every cheque or warrant made under paragraph (1) must be made payable to the order of the person to whom it is sent.

(3)  Any one of 2 or more joint holders may give effectual receipts for any dividends, bonuses, or other money payable in respect of the shares held by them as joint holders.

*Capitalisation of profits*

111.—(1)  The company in general meeting may, upon the recommendation of the directors, resolve to capitalise any part of the amount for the time being standing to the credit of any of the company's reserve accounts or to the credit of the profit and loss account or otherwise available for distribution.

(2)  The amount capitalised under paragraph (1) is set free for distribution amongst the members who would have been entitled to the amount had it been distributed by way of dividend and in the same proportions subject to the following conditions:

(*a*)  the capitalised amount must not be paid in cash;

(*b*)  the capitalised amount must be applied in or towards either or both of the following:

(i)  paying up any amounts for the time being unpaid on any shares held by the members respectively;

(ii)  paying up in full unissued shares or debentures of the company to be allotted, distributed and credited as fully paid up to and amongst such members in the same proportions.

112.—(1)  Whenever a resolution under regulation 111(1) has been passed, the directors must —

(*a*)  make all appropriations and applications of the undivided profits resolved to be capitalised by the resolution;

(*b*)  make all allotments and issues of fully-paid shares or debentures, if any; and

(*c*)  do all acts and things required to give effect to the resolution.

(2)  The directors have full power to —

(*a*)  make provision by the issue of fractional certificates or by payment in cash or otherwise as they think fit for the case of shares or debentures becoming distributable in fractions; and

(*b*)  authorise any person to enter on behalf of all the members entitled to the distribution into an agreement with the company providing —

(i)  for the allotment to the members respectively, credited as fully paid up, of any further shares or debentures to which they may be entitled upon the capitalisation; or

(ii)  for the payment up by the company on the member's behalf of the amounts or any part of the amounts remaining unpaid on their existing shares by the application of their respective proportions of the profits resolved to be capitalised,

and any agreement made under such authority is effective and binding on all members entitled to the distribution.

*Notices*

113.—(1)  A notice may be given by the company to any member either personally or by sending it by post to the member —

(*a*)   at the member's registered address; or

(*b*)   if the member has no registered address in Singapore, to the address, if any, in Singapore supplied by the member to the company for the giving of notices to the member.

(2)  Where a notice is sent by post, service of the notice is treated as effected by properly addressing, prepaying, and posting a letter containing the notice.

(3)  Where a notice is sent by post, service of the notice is treated as effected —

(*a*)   in the case of a notice of a meeting, on the day after the date of its posting; and

(*b*)   in any other case, at the time at which the letter would be delivered in the ordinary course of post.

114.—(1)  A notice may also be sent or supplied by the company by electronic means to a member who has agreed generally or specifically that the notice may be given by electronic means and who has not revoked that agreement.

(2)  Where the notice is given by electronic means, service of the notice is treated as effected properly by sending or supplying it to an address specified for the purpose by the member generally or specifically.

115.  A notice may be given by the company to the joint holders of a share by giving the notice to the joint holder first named in the electronic register of members in respect of the share.

116.—(1)  A notice may be given by the company to the persons entitled to a share in consequence of the death or bankruptcy of a member by sending it through the post in a prepaid letter addressed to the persons by —

(*a*)   name;

(*b*)   the title of representatives of the deceased, or assignee of the bankrupt; or

(*c*)   any like description.

(2)  The notice referred to in paragraph (1) may be given —

(*a*)   at the address, if any, in Singapore supplied for the purpose by the persons claiming to be so entitled; or

(*b*)   if no address in Singapore has been supplied, by giving the notice in any manner in which notice might have been given if the death or bankruptcy had not occurred.

117.—(1)  Notice of every general meeting must be given in any manner authorised in regulations 113 to 116 to —

(*a*)   every member;

(*b*)   every person entitled to a share in consequence of the death or bankruptcy of a member who, but for his or her death or bankruptcy, would be entitled to receive notice of the meeting; and

(*c*)   the auditor for the time being of the company.

(2)  No other person is entitled to receive notices of general meetings.

*Winding up*

118.—(1) If the company is wound up, the liquidator may, with the sanction of a special resolution of the company —

(*a*)   divide amongst the members in kind the whole or any part of the assets of the company, whether they consist of property of the same kind or not;

(*b*)   set a value as the liquidator considers fair upon the property referred to in sub-paragraph (*a*);

(*c*)   determine how the division of property is to be carried out as between the members or different classes of members; and

(*d*)   vest the whole or any part of the assets of the company in trustees upon such trusts for the benefit of the contributories as the liquidator thinks fit.

(2)   No member is compelled to accept any shares or other securities on which there is any liability.

*Indemnity*

119.   Every officer of the company is to be indemnified out of the assets of the company against any liability (other than any liability referred to in section 172B(1)(*a*) or (*b*) of the Act) incurred by the officer to a person other than the company attaching to the officer in connection with any negligence, default, breach of duty or breach of trust.

120.   Every auditor is to be indemnified out of the assets of the company against any liability incurred by the auditor in defending any proceedings, whether civil or criminal, in which judgment is given in the auditor's favour or in which the auditor is acquitted or in connection with any application under the Act in which relief is granted to the auditor by the Court in respect of any negligence, default, breach of duty or breach of trust.

## **Exhibit H**

**Genesis Global Capital, LLC Amended and Restated Operating Agreement**

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

# GENESIS GLOBAL CAPITAL, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

This Amended and Restated Operating Agreement (this "Agreement") of Genesis Global Capital, LLC, a Delaware limited liability company (the "Company"), having an address at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310, is entered into as of January 19, 2022, by Genesis Global Holdco, LLC, a Delaware limited liability company ("Holdco") and any other individual who, or entity that, shall become a member of the Company in accordance with the terms hereof (hereinafter each individually referred to as a "Member" and collectively as the "Members").

**WHEREAS**, the Company was formed on November 28, 2017, pursuant to and in accordance with the Limited Liability Company Act of the State of Delaware (as amended from time to time, the "Act") and an Operating Agreement of the Company dated November 28, 2017 (the "Existing Agreement"); and

**WHEREAS**, the parties hereto desire to conduct a limited liability company pursuant to and in accordance with the Act.

**NOW THEREFORE**, in consideration thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to amend and restate the Existing Agreement as follows:

1.    **Name**. The name of the limited liability company is Genesis Global Capital, LLC.

2.    **Term.** The term of the Company shall be perpetual, unless the Company is dissolved at the election of the Managing Member (as defined below) at any time. The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member shall not cause a dissolution of the Company if the Managing Member elects to continue the business of the Company and there remains at least one Member.

3.    **Purpose.** The purpose and nature of the business to be conducted by the Company is to conduct any business that may be lawfully conducted by a limited liability company organized pursuant to the Act, and to do anything necessary or incidental with respect to the foregoing.

4.    **Members.** The names of the Members are as set forth on Schedule A attached hereto, as may be amended from time to time.

5.    **Management.** Holdco shall be the Company's Managing Member. The business and affairs of the Company shall be managed by the Managing Member. The Managing Member may not be involuntarily removed or replaced at any time by the Members. The Managing Member shall have the exclusive power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including, without limitation, all powers, statutory or otherwise, possessed by members under the Act.

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

6.    **Officers.**

(a)    The Managing Member shall appoint a chief executive officer (the "CEO"). Each of the Managing Member or the CEO may hire other employees and appoint other officers of the Company, with such titles, authority and responsibilities as may be determined by the Managing Member or the CEO, to oversee the daily operation of the Company. Such employees and officers shall be subject to removal by the Managing Member or the CEO at any time. The Managing Member, the CEO and any employee or officer authorized by the Managing Member or the CEO, is authorized to execute, deliver and file, in the name of and on behalf of the Company, any and all documents, agreements, certificates, receipts, instruments, forms, letters, or similar documents and to do or cause to be done any other actions as the Managing Member or the CEO, or such authorized employee or officer, may deem necessary or desirable to further the interests of the Company, except as may be limited by the Act or the terms of this Agreement.

(b)    Notwithstanding the foregoing, none of the CEO or any officer or employee may take any of the following actions without the written consent of the Managing Member:

(i)    the sale, pledge or other disposition or encumbrance of substantially all of the assets of the Company or the merger or other business combination of the Company with or into another person or entity;

(ii)    changes in the basic nature of the Company's purpose, expansion into new lines of business, acquisitions, or new ventures involving the Company, in each case if substantially different from the existing business of the Company;

(iii)    the filing of any petition in bankruptcy by the Company;

(iv)    the dissolution, winding up or liquidation of the Company;

(v)    any amendment to the Certificate of Formation or this Agreement;

(vi)    any other matter required under the Act or this Agreement.

7.    **Capital Contributions.** Each Member has contributed to the capital of the Company such amounts as may be reflected in the books and records of the Company. The Members are not required to make any additional capital contributions to the Company.

8.    **Capital Accounts; Allocation of Profits and Losses; Tax Classification.**

(a)    A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the regulations promulgated under Section 704 of the Internal Revenue Code of 1986, as amended.

(b)    The Company's profits and losses, if any, shall be allocated among the Members in the same proportions as the percentage interest of such Member set forth opposite such Member's name on Schedule A hereto (for each such Member, its "Percentage Interest").

-2-

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

(c)    For U.S. federal income tax purposes, the Company is intended to be classified as a partnership at such times that the Company has two or more Members, and as a disregarded entity at such times that the Company has one Member.

**9.    Distributions.** Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Managing Member in its sole discretion. Such distributions shall be made to the Members in the same proportions as their then respective Percentage Interests.

**10.    Assignments.** A Member may not assign or pledge in whole or in part his or her limited liability company interest without the prior written consent of the Managing Member (which may be withheld in its sole discretion), provided that subject to applicable securities and other laws, a Member may assign his or her economic interest in the Company to a third party who is reasonably acceptable to the Managing Member. In such event, such third party assignee shall not have any voting or approval rights or be recognized as a substitute Member without the prior written consent of the Managing Member (which may be withheld in its sole discretion). Notwithstanding the foregoing, the Managing Member may assign, in whole or in part, its limited liability company interest in the Company.

**11.    Bank Accounts; Checks and Notes.** The Managing Member and any individual authorized in writing by the Managing Member are, and each acting alone is, hereby authorized and directed (a) to establish on behalf of the Company account(s) at one or more banks and brokers which may be selected in its discretion, and (b) on the Company's behalf to sign checks, drafts or other orders for the payment of money, acceptances, notes or other evidences of indebtedness.

**12.    Withdrawal by a Member; Resignation of the Managing Member.**

(a)    No Member shall be entitled to withdraw all or any portion of his or her capital account without the prior written consent of the Managing Member, which may be withheld in its sole discretion.

(b)    The Managing Member shall have the right to resign as such upon at least ten (10) days' prior written notice to the Company, in which case the Members, acting by a majority-in-interest, may appoint a successor(s) prior to such resignation. In addition, in the event of the dissolution or winding up of the Managing Member, the Members (including the Managing Member, or a successor designated by the Managing Member), acting by a majority-in-interest, may appoint a successor(s) at the time of such dissolution or winding up.

**13.    Admission of Additional Members.** One or more additional members of the Company may be admitted to the Company with the consent of the Managing Member upon such terms as the Managing Member shall determine in its sole discretion.

**14.    Liability of Members.** The Members shall not have any liability for the obligations or liabilities of the Company except to the extent required under the Act.

**15.    Indemnification and Exculpation of Managing Member, Employees and Officers.** None of the Managing Member or any current or former officer or employee of the Company shall be liable for any breach of duty in such capacity, except that if a judgment or other

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

final adjudication adverse to the Managing Member or such officer or employee, as the case may be, establishes that such acts or omissions constituted gross negligence or willful misconduct. The Company shall indemnify and hold harmless the Managing Member and each current and former officer and employee of the Company against any loss, damage or expense (including, without limitation, attorneys' fees, including those incurred in enforcing this indemnity) incurred by the Managing Member or such officer or employee as a result of any act performed or omitted on behalf of the Company or in furtherance of its interests, except to the extent that it is finally determined that the Managing Member or such officer or employee acted in a manner that constituted gross negligence or willful misconduct. The Company shall, at the request of the Managing Member or such officer or employee, advance amounts and/or pay expenses as incurred in connection with the Company's indemnification obligation contained in this Section.

16.    **Partnership Representative.** With respect to any tax year that the Company is treated as a partnership for tax purposes, the Managing Member shall at all times constitute, and have full powers and responsibilities of, the "Partnership Representative." In the event the Company shall be the subject of an income tax audit by any federal, state, local or foreign authority, to the extent the Company is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Partnership Representative shall be authorized to act for, and its decisions shall be final and binding upon, the Company and each Member (including any person who ceases being a Member), and the Partnership Representative shall be indemnified and held harmless by the Company and each Member for any action so taken by him in accordance with Section 15 above. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company to the extent of available Company funds, and any excess shall be paid by the Members individually in proportion to their respective Percentage Interests. The Partnership Representative shall have authority to make any and all decisions, including but not limited to special elections, under such audit rules, as well as any similar rules in respect of state, local and foreign taxes. The Partnership Representative shall have the power to designate a "designated individual" as described in Treasury Regulation Section 301.6223-1(b)(3)(ii) and references to the Partnership Representative herein shall be deemed to include such designated individual.

17.    **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, all rights and remedies being governed by said laws. If any provision of this Agreement conflicts with a default rule under the Act, this Agreement shall govern.

18.    **Amendments.** This Agreement may not be amended without the written consent of all of the Members.

19.    **Successors and Assigns.** This Agreement is binding upon, and inures to the exclusive benefit of, the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

20.    **Gender; Pronouns; Headings.** The use of any gender herein shall be deemed to be or include the other genders and the use of the singular herein shall be deemed to be or include the plural (and vice-versa), wherever appropriate. The headings herein are inserted only as a matter of

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

convenience and reference, and in no way define, limit or describe the scope of this Agreement, or the intent of any provisions hereof.

**21.    Counterparts; E-mail and Facsimile Signatures.** This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart of this Agreement shall for all purposes be deemed a fully executed instrument. The delivery of a signed counterpart by facsimile, e-mail or other electronic transmission shall be binding on the signatory.

**22.    Amendment and Restatement.** Upon the effectiveness of this Agreement, the terms and provisions of the Existing Agreement shall be and hereby are amended and restated in their entirety, and superseded in all respects, by the terms and provisions of this Agreement.

*[Signature Page Follows]*

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

MANAGING MEMBER:
GENESIS GLOBAL HOLDCO, LLC

By: _Michael Moro_ _____

Name: S. Michael Moro
Title: CEO

DocuSign Envelope ID: 8D5A3FE8-2279-4095-88E6-0DD3E1E58A3F

## SCHEDULE A

## GENESIS GLOBAL CAPITAL, LLC

### Operating Agreement

| Name | Percentage Interest |
| --- | --- |
| **Genesis Global Holdco, LLC**<br>250 Park Avenue South<br>5th Floor<br>New York, New York 10003 | 100% |

**<u>Exhibit I</u>**

**Genesis Global Holdco, LLC Operating Agreement**

# GENESIS GLOBAL HOLDCO, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

This Amended and Restated Operating Agreement (this "Agreement") of Genesis Global Holdco, LLC, a Delaware limited liability company (the "Company"), having an address at 250 Park Avenue South, 5th Floor, New York, New York 10003, is entered into as of July 19, 2022, by Digital Currency Group, Inc., a Delaware corporation (the "Parent") and any other individual who, or entity that, shall become a member of the Company in accordance with the terms hereof (hereinafter each individually referred to as a "Member" and collectively as the "Members").

WHEREAS, the Company was formed on November 28, 2017, pursuant to and in accordance with the Limited Liability Company Act of the State of Delaware (as amended from time to time, the "Act") and an Operating Agreement of the Company dated November 28, 2017 (the "Existing Agreement"); and

WHEREAS, the parties hereto desire to conduct a limited liability company pursuant to and in accordance with the Act.

NOW THEREFORE, in consideration thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to amend and restate the Existing Agreement as follows:

1. **Name**. The name of the limited liability company is Genesis Global Holdco, LLC.

2. **Term.** The term of the Company shall be perpetual, unless the Company is dissolved at the election of the Board (as defined below) at any time. The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member shall not cause a dissolution of the Company if the Board elects to continue the business of the Company and there remains at least one Member.

3. **Purpose.** The purpose and nature of the business to be conducted by the Company is to conduct any business that may be lawfully conducted by a limited liability company organized pursuant to the Act, and to do anything necessary or incidental with respect to the foregoing.

4. **Members.** The names of the Members and their respective percentage interests in the Company ("Percentage Interests") are as set forth on Schedule A attached hereto, as may be amended from time to time.

5. **Management.**

(a) The business and affairs of the Company shall be managed by a Board of Directors (the "Board"). The size of the Board shall be set by the Members, but shall consist of at least three (3) directors (each, a "Director"). Each director shall be designated one of: a parent Director (each, a "Parent Director"), a Genesis Director (each, a "Genesis Director") or an independent Director (each, an "Independent Director"). Each Director shall serve as a "manager" of the Company within the meaning of the Act and the Board shall have overall management responsibility of the Company.

DocuSign Envelope ID: 058C6802-EC66-491D-AA52-AE6B0F40A89A

(b)      The affirmative vote or written consent given by a majority in number of the Directors shall constitute the approval of the Board; *provided*, *however*, that the unanimous affirmative vote or written consent of the Parent Directors shall be required for the approval of the following matters (and the Company will not take any of the following actions without such approval):

(i)      the sale, pledge or other disposition or encumbrance of substantially all of the assets of the Company or the merger or other business combination of the Company with or into another person or entity;

(ii)      changes in the basic nature of the Company's purpose, expansion into new lines of business, acquisitions, or new ventures involving the Company, in each case if substantially different from the existing business of the Company;

(iii)      the filing of any petition in bankruptcy by the Company;

(iv)      the dissolution, winding up or liquidation of the Company;

(v)      any amendment to the Certificate of Formation or this Agreement;

(vi)      any other matter required under the Act or this Agreement.

(c)      Except as otherwise expressly provided herein to the contrary, no person other than a person authorized by the Board (or, to the extent authorized to do so under the terms of this Agreement, the CEO) shall have authority to bind the Company in any way.

(d)      Each Director shall devote such time, resources and attention to the Company in order to carry out his or her duties hereunder as he or she shall determine to be necessary or appropriate in his or her discretion.

6.      **Officers.** The Board shall appoint a chief executive officer (the "CEO"). Each of the Board or the CEO may hire other employees and appoint other officers of the Company, with such titles, authority and responsibilities as may be determined by the Board or the CEO, to oversee the daily operation of the Company. Such employees and officers shall be subject to removal by the Board or the CEO at any time. The CEO and any employee or officer authorized by the Board or the CEO, is authorized to execute, deliver and file, in the name of and on behalf of the Company, any and all documents, agreements, certificates, receipts, instruments, forms, letters, or similar documents and to do or cause to be done any other actions as the Board or the CEO, or such authorized employee or officer, may deem necessary or desirable to further the interests of the Company, except as may be limited by the Act or the terms of this Agreement.

7.      **Capital Contributions.** Each Member has contributed to the capital of the Company such amounts as may be reflected in the books and records of the Company. The Members are not required to make any additional capital contributions to the Company.

8.      **Tax Classification.** For U.S. federal income tax purposes, the Company is intended to be classified as an association taxable as a corporation.

-2-

DocuSign Envelope ID: 058C6802-EC66-491D-AE52-AE6B0F40A89A

9.    **Distributions.** Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Board in its sole discretion. Such distributions shall be made to the Members in the same proportions as their then respective Percentage Interests.

10.    **Assignments.** A Member may not assign or pledge in whole or in part his or her limited liability company interest without the prior written consent of the Board (which may be withheld in its sole discretion), provided that subject to applicable securities and other laws, a Member may assign his or her economic interest in the Company to a third party who is reasonably acceptable to the Board. In such event, such third party assignee shall not have any voting or approval rights or be recognized as a substitute Member without the prior written consent of the Board (which may be withheld in its sole discretion). Notwithstanding the foregoing, the Board may assign, in whole or in part, its limited liability company interest in the Company.

11.    **Bank Accounts; Checks and Notes.** The Board and any individual authorized in writing by the Board are, and each acting alone is, hereby authorized and directed (a) to establish on behalf of the Company account(s) at one or more banks and brokers which may be selected in its discretion, and (b) on the Company's behalf to sign checks, drafts or other orders for the payment of money, acceptances, notes or other evidences of indebtedness.

12.    **Resignation of a Director.** Each Director shall have the right to resign as such upon written notice to the Company, in which case the Members, acting by a majority-in-interest, may appoint a successor(s) prior to such resignation.

13.    **Admission of Additional Members.** One or more additional members of the Company may be admitted to the Company with the consent of the Board upon such terms as the Board shall determine in its sole discretion.

14.    **Liability of Members and Members of the Board**. The Members and the Directors on the Board shall not have any liability for the obligations or liabilities of the Company except to the extent required by the Act.

15.    **Indemnification and Exculpation of Board, Employees and Officers.** None of the Directors or any current or former officer or employee of the Company shall be liable for any breach of duty in such capacity, except that if a judgment or other final adjudication adverse to the Directors or such officer or employee, as the case may be, establishes that such acts or omissions constituted gross negligence or willful misconduct. The Company shall indemnify and hold harmless the Directors and each current and former officer and employee of the Company against any loss, damage or expense (including, without limitation, attorneys' fees, including those incurred in enforcing this indemnity) incurred by such Director, officer or employee as a result of any act performed or omitted on behalf of the Company or in furtherance of its interests, except to the extent that it is finally determined that such Director, officer or employee acted in a manner that constituted gross negligence or willful misconduct. The Company shall, at the request of such Director, officer or employee, advance amounts and/or pay expenses as incurred in connection with the Company's indemnification obligation contained in this Section.

16.    **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, all rights and remedies being governed by said laws.

DocuSign Envelope ID: 058C6892-EC66-491D-AA52-AEEB0F40A39A

If any provision of this Agreement conflicts with a default rule under the Act, this Agreement shall govern.

**17.     Amendments.** This Agreement may not be amended without the written consent of all of the Members.

**18.     Successors and Assigns.** This Agreement is binding upon, and inures to the exclusive benefit of, the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

**19.     Gender; Pronouns; Headings.** The use of any gender herein shall be deemed to be or include the other genders and the use of the singular herein shall be deemed to be or include the plural (and vice-versa), wherever appropriate. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement, or the intent of any provisions hereof.

**20.     Counterparts; E-mail and Facsimile Signatures.** This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart of this Agreement shall for all purposes be deemed a fully executed instrument. The delivery of a signed counterpart by facsimile, e-mail or other electronic transmission shall be binding on the signatory.

**21.     Amendment and Restatement.** Upon the effectiveness of this Agreement, the terms and provisions of the Existing Agreement shall be and hereby are amended and restated in their entirety, and superseded in all respects, by the terms and provisions of this Agreement.

*[Signature Page Follows]*

-4-

12135511.8 - 07/18/22

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

PARENT:
DIGITAL CURRENCY GROUP, INC.

By: _____
   *BARRY SILBERT*
   7160392D4AC14BA...
Name: Barry Silbert
Title: CEO

-5-

SCHEDULE A

**GENESIS GLOBAL HOLDCO, LLC**

Operating Agreement

| Name | Percentage Interest |
|------|---------------------|
| **Digital Currency Group, Inc.** | 100% |
| 262 Harbor Drive, 3rd Floor | |
| Stamford, CT 06902 | |

-6-