CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' OBJECTION TO MOTION BY**
**CLAIMANTS FOR ENTRY OF AN ORDER, PURSUANT**
**TO 11 U.S.C. §§ 105(A) AND 502(B), ALLOWING UNDISPUTED**
**PRINCIPAL AMOUNT OF CLAIM NOS. 402 AND 405 FOR PURPOSES OF**
**DISTRIBUTION UNDER THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors," and these cases,

collectively, the "Chapter 11 Cases") hereby submit this objection (the "Objection") to the *Motion*

*by Claimants for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(b), Allowing*

*Undisputed Principal Amount of Claim Nos. 402 and 405 for Purposes of Distribution Under the*

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

*Debtors' Amended Joint Chapter 11 Plan* (the "Motion")[2] (ECF No. 1340) and respectfully state as follows:

## PRELIMINARY STATEMENT[3]

1.      Since July 2023, the Debtors have worked diligently to conduct an orderly, transparent, and efficient process to address to the proofs of claims filed in these chapter 11 cases, including by filing twenty-three omnibus claims objections thus far, in order to appropriately size the claims pool in advance of effectiveness of their filed plan of reorganization.  Indeed, almost three months ago, the Debtors sought through one such omnibus claims objection to *allow*, other than those portions that are inconsistent with the Debtors' Books and Records and unsupported by the underlying contractual agreements between the parties and governing law, the very same disputed Claims[4] that the Claimants now seek to allow through a parallel Motion.  Although the Debtors understand the Claimants' desire to receive prompt distributions under the Debtors' plan, the duplicative Motion threatens to burden the Debtors and ultimately this Court by requiring that the same claims be addressed at least twice – which is particularly inappropriate where (as here) arguments regarding the disputed portions of the disputed Claims have been fully briefed.  Further, the Motion, if successful, has the potential to wrest away from the Debtors their control over the claims process by encouraging other holders of disputed Claims to engage in the proverbial race

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion or the *Debtors Reply in Support of the Seventh Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (Modify and Allow as Modified) with Respect to Claim Nos. 402 and 405* (the "Reply") (ECF No. 1188), as applicable.

[3]      Capitalized terms used in this Preliminary Statement shall have the meaning ascribed to them elsewhere in the Objection.

[4]      Consistent with the Court's prior directions, as the Claimants have availed themselves of the Court through the Motion, their names are no longer properly under seal. *See* Feb. 16, 2024 Hr'g Tr. at 31:19-21 ("That is if you inject yourself into it and you want to be an active participant, you can't—you can't be under seal.").  For convenience, this Objection uses the same defined terms as used in prior briefing related to the disputed Claims, but the Debtors note that Claimant No. 402 is Quan Wo and Claimant No. 405 is Digital Finance Group Co.

to the courthouse and seek partial allowance of their claims, even where such claimants are presently engaged with the Debtors in discussions to consensually resolve claims-related disputes.

2.      The relief sought by the Motion would also run directly counter to the recognized interests in fostering consensual resolution of disputes, as it would enable holders of disputed Claims to compel the Debtors to make partial distributions on undisputed portions of those disputed Claims, and allow those claimants to use those distributions to continue to wage battle with the Debtors in a scorched earth strategy.  Recognizing the issues this would cause, in a directly analogous context in the *Lehman Brothers* cases described below, former Judge Peck denied a parallel request by claimants to compel immediate payment of the undisputed portions of claims for these very reasons.  Against these broader, collective interests that benefit all parties-in-interest and this Court, the Claimants' parochial focus should be given no weight and the Motion should be denied with prejudice.

## BACKGROUND RELEVANT TO THE OBJECTION

3.      Prior to the Petition Date, each of the Claimants entered into a Master Loan Agreement with the Debtors, pursuant to which each of the Claimants agreed to lend certain quantities of digital assets to the applicable Debtor.  Each of the MLAs further specified a Late Fee and a Loan Fee (both as defined in the applicable MLA) that would be payable to the applicable Claimant by the applicable Debtor according to the plain terms of the applicable MLA.[5]

4.      On November 29, 2023, the Debtors filed the *Debtors' Seventh Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (Modify and Allow as Modified)* (the "Seventh Omnibus Objection") (ECF No. 999) to

---

[5]      Fulsome discussion of the prepetition lending relationships between the Parties can be found in paragraphs four through fourteen of the Reply, which the Debtors do not repeat here in the interest of efficiency and judicial economy.

modify the amount asserted in, and *allow as modified*, certain Claims, including the disputed Claims, on the grounds that such asserted amounts were inconsistent with the Debtors' Books and Records and that the Claimants otherwise failed to provide any evidence to support the asserted amounts. *See* Seventh Omnibus Objection ¶ 16. While the Debtors do not dispute the principal amounts asserted in the Dispute Claims, the Debtors and the Claimants disagree about how the Late Fees and Loan Fees are to be calculated under the terms of the MLAs and applicable New York law. *See* Reply ¶ 15.

5.      On December 21, 2023, the Claimants filed their *Response in Opposition to Debtors' Objections to Claim No. 402 and 405 in Seventh Omnibus Objection* (the "Omnibus Objection Response")[6] (ECF No. 1076) and on February 1, 2024, filed the *Claimants' Sur-Reply to Debtors' Reply in Support of the Seventh Omnibus Objection (Non-Substantive to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (Modify and Allow as Modified) With Respect to Claim Nos. 402 and 405* (ECF No. 1223). As set forth in further detail in the extensive briefing filed on the issue, the Debtors and the Claimants dispute the methodology for the calculation of both the Loan Fees and the Late Fees under the terms of the MLAs, a difference that amounts to, on an aggregate basis, over 10 million digital assets on an in-kind basis asserted against the Debtors. *See* Reply ¶¶ 16-17.

6.      On February 20, 2024, the Claimants filed the Motion, seeking to bifurcate the filed disputed Claims between principal and interest, so that notwithstanding that the dispute between the Debtors and the holders of disputed Claims is now fully briefed, an order would be entered allowing the principal amount of their claim and compel the Debtors to make distributions on that portion, while litigation over the disputed portion of the disputed Claims would continue.

---

[6]      The Debtors filed the Reply on January 23, 2024.

The inefficiency of this approach is underscored by the fact that the Claimants have proposed to have a hearing on the Motion on March 6, 2024, the very same day that the Seventh Omnibus Objection (and the aforementioned briefing on the underlying dispute) is scheduled to be heard on the merits by this Court.

**<u>RESPONSE</u>**

7.      At bottom, the Motion seeks to force this Court to consider, and the Debtors or any other party in interest who chooses to file a responsive pleading, at least two parallel requests for relief on the exact same claims.  As the Court is aware, the dispute underlying the Claims is already the subject of extensive briefing, and both the instant Motion and the Seventh Omnibus Objection are scheduled to be heard by the Court the very same day.  These facts plainly demonstrate the degree of inefficiency and waste to estate and judicial resources that the relief sought by the Motion poses.  Tellingly, the Claimants provide no legal basis to seek such treatment, *see* Reply ¶¶ 16-17; Omnibus Objection Response ¶¶ 23-26, as the sole judicial opinion cited by the Claimants supports the Debtors' position, not the Claimants.  In *In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011), the objecting noteholders argued that the debtors should provide for "either payment of the undisputed portion of their claims, or for the outstanding amount of the [notes]" less certain fees. *Id.* at 211.  The court squarely rejected this assertion on multiple bases, including the text of section 502(a), "which provides that a proof of claim is allowed if, but only if, a party in interest does not object." *Id.* at 212.  Of course, the disputed Claims are subject to the pending Seventh Omnibus Objection, and so Judge Gerber's reasoning should equally apply to the Motion.  Similarly, granting the Motion would incentivize other claimants to seek relief from the Court multiple times: first to seek to compel the Debtors through motion practice to make an initial distribution on one or more undisputed portions and then returning to the Court to

continue litigating over other disputed portions. Such a result would be inconsistent with the interests of judicial economy and the economic and efficient administration of estate resources.

8.      Further, the Debtors are estate fiduciaries in the best position to oversee and manage the claims objection process efficiently and in its entirety, consistent with the notice and hearing procedures approved by the Court in the *Revised Order Pursuant to 11 U.S.C § 105(a) and Fed. R. Bank. P. 3007 (I) Establishing Claims Objection and Notice Procedures (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* (ECF No. 498). Allowing the Motion threatens to open the floodgates to inject pure chaos into the claims allowance process, which has been proceeding in a rational and organized manner, instead forcing the Court to deal with seriatim motions from claimants based on the narrow interests of individual creditors.[7] In contrast, the Debtors are aware of the totality of facts and circumstances that may be implicated as a result of the treatment or allowance of one claim for the entire estate: a perspective that would be diminished if individual creditors were able to coopt the claims allowance process as the Motion contemplates.

9.      Finally, allowing claimants to subvert the claims allowance process in order to seek distribution on portions of disputed Claims contradicts the general public policy favoring settlements in bankruptcy. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D 46, 53 (S.D.N.Y. 1993) (noting that courts "should recognize that, as a matter of sound policy, settlements

---

[7]      In the absence of other authority, the Motion also erroneously asserts that language in the Debtors' Plan contemplating partial allowance of claims supports the Claimants' requested relief. *See* Motion ¶¶ 20-22. However, the language cited by the Claimants was designed to address certain master claims filed in these cases on behalf of multiple individual creditors, such as the one filed by the Ad Hoc Group, where individual aspects of the discrete Claims filed by different individual claimants may be addressed separately. *See, e.g., Debtors' Motion (I) for Relief from Automatic Stay, to the Extent Applicable, to Allow for Setoff of Mutual Obligations and (II) to Allow Certain Claims in Connection Therewith* (ECF No. 1374) (modifying and allowing certain liabilities of the Ad Hoc Group Master Claim separate and apart from the remainder of the master claim). In any event, nothing in the Plan *requires* the Debtors to allow claims in part, it merely provides procedural clarifications if that were to occur, as it has with respect to master claims filed on behalf of numerous individual claimants.

of disputed claims are encouraged"). If the present Claimants are allowed to compel the Debtors to make partial distributions on their Claims, it is inevitable that other claimants will seek to make similar end-runs around the claims allowance process and rush to the Court for piecemeal allowances. This would work to erode creditor incentives to negotiate and compromise, keystones of the bankruptcy process.

10.    Courts in this district have previously denied motions of exactly this nature for the same reasons stated above. *See In re Lehman Bros. Holding, Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (Dec. 3, 2008 Hr'g Tr.) ("Lehman Hr'g Tr.") (relevant excerpts from such hearing are attached hereto as Exhibit A). In *In re Lehman Bros.*, Moody's Corporation ("Moody's") sought a motion to compel payment of an "undisputed" cure amount of $2.1 million from Barclays Capital Inc. ("BarCap"), who had purchased certain of the debtors' businesses, while it continued to work through a smaller disputed amount with BarCap.[8] Lehman Hr'g Tr. 20:11-20. The court denied the motion, noting first that while "[t]his is a particular dispute . . . it arises in the context of a whole class of comparable disputes." Lehman Hr'g Tr. 26:20-22; *see also id.* at 27: 18-20 ("it makes no sense on the present record…to require Barclays at this juncture to make any payment at all."). *Second*, the court reasoned that "piecemeal adjudications are to be avoided," and allowing such a motion would effectively force the court to "end up doing twice what we might not have had to be done at all." Lehman Hr'g Tr. 27:14-16; 22:10-11. *Third*, and finally, the court stated that "the parties are still engaged in good faith discussions." Lehman Hr'g Tr. 27:14-16. For those reasons, the court denied Moody's motion without prejudice. Lehman

---

[8]    The *Lehman Brothers* court also pointedly noted that Moody's was not the only counterparty seeking relief of this kind and that a similarly situated party, IBM, had withdrawn an identical motion after ongoing negotiations resolved the issue without intervention from the court. Lehman Hr'g Tr. 22:13-23:6.

Hr'g Tr. 28:20.  This Court should follow the instructive reasoning of Judge Peck and deny the instant Motion for the same reasons.

## **CONCLUSION**

WHEREFORE, for the reasons set forth within, the Debtors respectfully request that the Court (i) deny the Motion and (ii) grant such other and further relief as the Court may deem just or proper.

Dated: February 28, 2024
    New York, New York

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and*
*Debtors-in-Possession*

**<u>Exhibit A</u>**

Excerpts from *In re Lehman Bros. Holdings, Inc.* Dec. 3, 2008 Hearing Transcript

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP)

Adv. Pro. No. 08-01610 (FHLB of Pittsburgh v. LBSF and

JPMorgan Chase Bank, N.A.)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

    Debtor.

- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        December 3, 2008

        10:00 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

1

2    HEARING re Debtors' Motion for Authorization to Pay Pre-

3    Petition Art-Handler Claims

4

5    HEARING re Debtors' Motion for Authorization to Advance Certain

6    Legal Costs to Former Employees

7

8    HEARING re Debtor's Motion Approving the Sale of Debtors'

9    Aircraft Pursuant to a Sale and Purchase Agreement

10

11   HEARING re Motion of DnB Nor Bank ASA for Relief from the

12   Automatic Stay to Effect Setoff or, in the Alternative,

13   Adequate Protection

14

15   HEARING re Motion of Moody's Corporation for an Order

16   (i)Compelling Payment of Undisputed Portion of Cure Amount;

17   (ii)Compelling Payment for Services Provided Post-Petition; and

18   (iii)Scheduling a Hearing for this Court to Determine the

19   Disputed Cure Amount

20

21   HEARING re Federal Home Loan Bank of Pittsburgh v. Lehman

22   Brothers Special Financing and JPMorgan Chase Bank, N.A.

23

24

25

2



1

2    HEARING re SIPC Trustee's Motion for Entry of an Order

3    Approving the Rejection of a Certain Nonresidential Real

4    Property Sublease and Abandonment of Related Personal Property

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1      Honor.  Actually, there's the Moody's motion which --

2          THE COURT:  Are you handling that?

3          MR. WAISMAN:  Barclays will be handling that.

4          THE COURT:  Oh, okay.

5          MR. WAISMAN:  So perhaps we could proceed with that

6   motion first, then to the status conference and then over to

7   the SIPC portion of the agenda.

8          THE COURT:  That's fine.

9          MR. WAISMAN:  Thank you, Your Honor.

10         MR. LUCAS:  Your Honor, with respect to DnB, could we

11  take that at the end of the calendar --

12         THE COURT:  Yes.

13         MR. LUCAS:  -- after the LB matter.  We're trying to

14  work out some stipulated facts.

15         THE COURT:  We're taking DnB at the end of the

16  calendar.

17         MR. LUCAS:  Okay.

18         THE COURT:  We're doing Moody's now, I think.

19         MR. LUCAS:  Yes.

20         MR. BELMONTE:  Good morning, Your Honor.  I'm

21  Christopher Belmonte from Satterlee Stevens and I represent

22  Moody's.  My associate Pam Bosswick is right behind me.

23         Your Honor, this is a motion to compel payment of the

24  undisputed portion of the cure amount.  Your Honor, Moody's

25  represents a very important segment of the business that was

18

1   bought by Barclays.  It issues rating services on issues.

2   They're approaching one hundred issues.  It also offers,

3   through its Moody's analytics division, the research tools and

4   analysis.

5       These are all designated closing contracts.  There

6   was some three or four pages on the chart that were Moody's

7   contracts.  The cure amount which was listed in the chart as

8   well was some 2.1 million dollars.  Moody's has continued to

9   render these rating services since the petition date and since

10  the closing date on September 22nd and has yet to be paid

11  anything at all for these rating services.  Without these

12  rating services, Your Honor, the issues cannot trade.  If

13  Moody's terminates these services, it's obligated to report to

14  various regulatory authorities, like the SEC, that it's no

15  longer rating these issues.

16      In the closing documents for these issues, and some

17  of these were for two billion dollars, Your Honor, some were

18  for less, Moody's has designated the rating agency for these

19  various issues.  And we're talking senior notes, mezzanine

20  notes, various financial collateralized debt obligations.

21      We recognize, Your Honor, that this is the largest

22  bankruptcy by a factor of ten that's ever been filed in this

23  country.  And we were, we thought, fairly patient.  We were

24  asked several times for copies of invoices.  We've done that.

25  The clients have done that.  I have shared all the information

19

1    that I've been asked to give to work this out.

2         The difference, Your Honor, between the cure amounts

3    that the Barclays people have posted and Lehmans did, which is

4    2.1 million, once we got all the invoices together and we

5    shared those invoices, that number is about a million dollars

6    short.  Our number is 3.1 million.  I'm not asking Your Honor

7    to resolve that difference today.  Nor am I asking Your Honor

8    to compel payment for the post-closing because there's another

9    4 or 500,000 dollars in services that have been rendered by

10   Moody's without one cent of payment on these various issues.

11   The only thing I'm asking Your Honor to do today is to compel

12   the payment of the 2.1 million dollars pending discussions that

13   we're having right now with Barclays to address that million

14   dollar difference.  And it may not be a million dollars, Your

15   Honor.  It may actually be a much smaller number because

16   although invoices were rendered pre-petition, a lot of the

17   invoices are invoiced prospectively.  They're annual rating

18   fees.  So a September invoice goes through next August and

19   ninety-nine percent of that September 1st invoice would be

20   post-petition and post-closing services.

21        Just recently, Your Honor, there have been some

22   discussions between the parties and for the first time, there

23   was an issue raised about signed contracts.  Now, there are

24   very few signed contracts in this area, Your Honor.  There may

25   be two or three signed applications.  This is more often than

20

1    not done with a telephone call.  It's done by e-mail.  And, as

2    I said, there are 130 invoices.  Some are small; some are

3    large.  The larger ones are for a half million dollars or

4    575,000 if it was an initial two billion dollar mezzanine

5    financing, for example.

6         The invoices were rendered.  These are not first time

7    only.  These are situations where Lehman had been paying these

8    invoices for years and years.  And, if necessary, we're happy

9    to share with Barclays the e-mails and things like that that

10   support all this, including the closing documents which I would

11   imagine Barclays, as part of its due diligence, received from

12   Lehman.

13        But, really, all we're asking Your Honor for today is

14   to compel payment of that 2.1 million.  Barclays is unwilling

15   to do that unless we forgive the entire pre-petition invoices,

16   that million dollar delta.  And I'm not asking Your Honor to

17   rule on that difference.  I'm not asking Your Honor to rule on

18   any subsequent amounts.  As to that, we ask that Your Honor

19   give us a date in January.  Hopefully, as an accounting matter,

20   we'll have it resolved by then.  But pending that, Your Honor,

21   since we are performing these services, we think that Barclays

22   should be required to pay at least the 2.1 million dollars that

23   they themselves had this Court approve as the cure amount back

24   in September.

25        THE COURT:  Before I hear from Barclays, I have a

21

1       question for you.

2               MR. BELMONTE:  Yes, sir.

3               THE COURT:  It seems to me that if I were to grant

4       you the relief that you seek that it will have an impact on the

5       negotiations that are ongoing involving the delta, the million

6       dollar difference, which you say may be a smaller amount.  If a

7       negotiation is in process and a party to the negotiation has

8       already recovered two-thirds of everything that could possibly

9       be paid, that might have an impact upon the pending

10      negotiations.  It also seems to me that we end up doing twice

11      what might not have had to be done at all because, under the

12      original sale order, Barclays undertook in good faith to

13      negotiate cure disputes.  You are the only counterparty to any

14      contract who has sought this kind of relief.  What makes

15      Moody's different and special, if anything?

16              MR. BELMONTE:  Well, first --

17              THE COURT:  There is no party to any contract that

18      has sought the relief that you're seeking.

19              MR. BELMONTE:  I --

20              THE COURT:  Why are you entitled to that relief?  And

21      if I grant you the relief, what happens to everybody else?

22              MR. BELMONTE:  Your Honor, with all respect, I am not

23      the first party.  I also represent IBM.  And we made the

24      identical motion for IBM.

25              THE COURT:  Okay.  You're the only lawyer to do it.

22

1      MR. BELMONTE:  And, in fact, Your Honor, the

2      undisputed portion was paid by Barclays and they're continuing

3      along these very lines that we're discussing today.  And that

4      was a nine million dollar payment.  And we withdrew that motion

5      pending that payment.

6           THE COURT:  Maybe you should withdraw this one, too.

7           MR. BELMONTE:  If I get the payment, I'd be happy to,

8      Your Honor.  There was a nine million dollar payment made and

9      the negotiations are ongoing.  Your Honor, we're not asking for

10     the Court to take my number or to take Moody's number.  This

11     was Barclays' number.  This is something that was put forward

12     by them.  And the other difference, Your Honor, here is that

13     we're just continuing to perform services on an ongoing basis

14     and not being paid as we go forward for those services.  And

15     that, I think, is a very compelling reason, Your Honor, to have

16     at least the cure amount paid while these negotiations

17     continue.

18          THE COURT:  I'll hear from Barclays.

19          MR. BAREFOOT:  Good morning, Your Honor.  Luke

20     Barefoot of Cleary Gottlieb Steen & Hamilton LLP for Barclays

21     Capital.  Your Honor, we certainly recognize the centrality of

22     the services to the business that Barclays has purchased that

23     Moody's is providing.  And it's for that very reason that we

24     designated them as closing date contracts.  But there are at

25     least three reasons why, at least at this juncture, their

23

1   motion and the relief that they're seeking is premature and

2   inappropriate.

3          First, they take as a starting premise that the 2.1

4   million dollar proposed cure amount is undisputed.  That's

5   simply not the case.  They also are asking for piecemeal

6   adjudication of their cure amounts which is not consistent with

7   what the Court's procedure is in the sale order outline and

8   would also be detrimental not only to the negotiations but to

9   interest of judicial economy.

10         There's also no impasse yet.  We're continuing to

11  engage in good faith negotiations and are in active settlement

12  discussions.  So we may ultimately be able to resolve this

13  without any Court involvement and are hopeful that we'll be

14  able to do so.

15         So just to take each of those in turn, Moody's sole

16  reason for asking for payment of the 2.1 million dollar amount

17  is based on the amount that was proposed in the cure schedules.

18  But that amount is not undisputed.  Since the closing date

19  schedules were put together in great haste, Moody's and

20  Barclays have worked together to review, as Moody's said, the

21  hundreds of invoices that represent their cure claims and to

22  try to link those up with the existing executory contracts that

23  have been assigned to Barclays.  We're still very much in the

24  process of resolving those issues.  But, at least to date, we

25  haven't been able to correlate all of the invoices with

24

1    contracts that are being assumed and assigned to Barclays.  And

2    it may ultimately be the case that we're able to get there.

3    But it also may ultimately be the case that there are invoices

4    which are simply wholly separate from the contracts that we're

5    curing.

6          We just received some information from Moody's last

7    night on this point and are continuing to work with them.  But

8    the procedures that the Court has ordered provide that parties

9    are to meet and confer in good faith and only if an impasse is

10   reached would we proceed to have the Court determine the cure

11   amount as a whole rather than have parties come back to the

12   Court multiple times while negotiations are still proceeding to

13   try to resolve the amount that may have -- or to resolve or to

14   compel payment of the amount that was posted only to come back

15   to the Court later to have a full evidentiary hearing on the

16   full quantum of what they're entitled to.  And at this point,

17   it's premature to require payment of the 2.1 million where we

18   haven't even determined if that amount is due and owing.

19         THE COURT:  Is there an undisputed sum?

20         MR. BAREFOOT:  There is a sum that Barclays, to date,

21   has been able to validate and correspond to the existing

22   contracts.

23         THE COURT:  What's that amount?

24         MR. BAREFOOT:  I believe and I haven't been -- the

25   negotiations have primarily been proceeding on a business-to-

25

1    business person level which makes the most sense, but I believe

2    that amount is in the neighborhood of 600,000 dollars. That

3    said, we did receive just yesterday from Moody's additional

4    signed executory contracts and invoices that may be associated

5    with those contracts. So that amount is still very much in

6    flux.

7        THE COURT: Okay.

8        MR. BAREFOOT: So we would ask that Moody's motion at

9    least for the time being be denied or, at minimum, be adjourned

10   to allow these discussions to continue.

11       THE COURT: All right. Thank you. Is there anything

12   more from Moody's?

13       MR. BELMONTE: Just one point of clarification, Your

14   Honor. The 2.1 million was without prejudice. If Your Honor

15   finds if there is an impasse and a dispute that it was only two

16   million or a million and a half, Moody's is fully prepared to

17   disgorge the difference. And, Your Honor, the only other point

18   of significance is that Moody's is continuing to render these

19   services without any compensation whatsoever. That's all.

20       THE COURT: Okay. This is a particular dispute but

21   it arises in the context of a whole class of comparable

22   disputes. The particular dispute is the amount properly to be

23   paid as a cure amount to Moody's in connection with the

24   assumption by Barclays of Lehmans' contracts with Moody's.

25   Moody's asserts that there is an undisputed 2.1 million dollars

26

1   due because that amount appeared on the cure schedule prepared

2   by Barclays.  Barclays, through counsel, asserts that not so

3   fast.  Just because the number appeared on a schedule doesn't

4   mean it's an agreed amount.  And now that we're in

5   negotiations, we're prepared, in effect, to review everything

6   invoice by invoice.

7        It's unclear, based upon the statements made by

8   counsel, whether or not there is an undisputed sum of 600,000

9   dollars due or if it actually might be a somewhat larger sum as

10  a result of recently delivered information provided by Moody's

11  to Barclays.

12       Barclays makes three arguments.  One, that the cure

13  amount is still disputed even as to the 2.1 million dollars.

14  Two, piecemeal adjudications are to be avoided.  And three, the

15  parties are still engaged in good faith discussions and no

16  impasse has yet been reached.

17       I find that each of these arguments is sound and that

18  it makes no sense on the present record, which isn't a record

19  at all, it's simply assertions of counsel, to require Barclays

20  at this juncture to make any payment at all.

21       Furthermore, while Moody's is indisputably an

22  important counterparty to contracts assumed as part of the sale

23  of assets to Barclays approved in September, Moody's position

24  is really no different from that of any other party that has

25  asserted an objection to the cure amount properly payable as a

27

1   consequence of the assumption and assignment of closing

2   contracts to Barclays.

3        Furthermore, for reasons that I suggested in my

4   questions to Moody's counsel, I consider inappropriate, when

5   negotiations are ongoing, to give half a loaf or two-thirds of

6   a loaf to one party to negotiations and simply leave the

7   balance for further disposition.  The parties should engage, as

8   they have been engaged, in ongoing discussions to reach an

9   overall resolution if that's possible.  And if they can't reach

10  such a resolution, we should have a proceeding, either

11  alternative dispute resolution proceeding or judicial

12  proceeding, to resolve differences.

13       As to the issue raised by Moody's counsel concerning

14  prejudice to his client in connection with the failure to make

15  ongoing payments, the denial of this particular motion is

16  certainly without prejudice to any claims that he may have that

17  Barclays is acting unreasonably or not in good faith in

18  connection with their failure to make payments under these

19  obligations.

20       Motion denied without prejudice.  What's next?

21       MR. WAISMAN:  Your Honor, the next matter appears on

22  page 3 of the agenda letter, number 6.  This is the adversary

23  proceeding of the Federal Home Loan Bank of Pittsburgh.  This

24  is a pre-trial conference.

25       MR. SHANAHAN:  Good morning, Your Honor.  Nolan

28