Jeremy C. Hollembeak
BAIRD HOLM LLP
1700 Farnam St. Ste. 1500
Omaha, NE 68102
Telephone (402) 636-8317
jhollembeak@bairdholm.com

*Counsel to Holders of Claim Nos. 402 & 405*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**CLAIMANTS' REPLY TO DEBTORS' OBJECTION**
**TO MOTION BY CLAIMANTS FOR ENTRY OF AN ORDER, PURSUANT TO**
**11 U.S.C. §§ 105(a) AND 502(b), ALLOWING UNDISPUTED PRINCIPAL AMOUNT**
**OF CLAIM NOS. 402 AND 405 FOR PURPOSES OF DISTRIUBUTION**
**UNDER THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

The respective Claimants holding Filed Claim Nos. 402 and 405 hereby reply to the Debtors' objection (ECF No. 1404, the "Objection") to their motion (ECF No. 1340, the "Motion"[2]) for entry of an order, pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code, allowing the undisputed principal amount of each Filed Claim for purposes of distribution as contemplated under the Debtors' Plan.  For the reasons that follow, the Objection should be overruled and, solely to the extent that the Fee Dispute is not resolved prior to entry of an order confirming the Plan, the Motion should be granted.

---

[1] The "Debtors" in these Chapter 11 Cases are, collectively, Genesis Global Holdco, LLC; Genesis Global Capital, LLC ("GGC"); Genesis Asia Pacific Pte. Ltd. ("GAP").

## **REPLY**

1.      The Motion seeks partial allowance of the Filed Claims in the aggregate petition date-dollarized amount of more than $45 million corresponding to the undisputed principal amount of digital assets borrowed from the Claimants in 2022 and never returned.  The Motion would not impact the remaining portions of the Filed Claims corresponding to certain fees, the amounts of which are subject to the pending Fee Dispute.  That dispute has no prospect of consensual resolution, as the Debtors have repeatedly and unequivocally informed Claimants that they will not agree to allow the Filed Claims in any amount above that stated in their Seventh Omnibus Objection.  Therefore, absent the relief requested in the Motion, no amount of the Filed Claims will be allowed until the Fee Dispute can be adjudicated to a final resolution.  Adjudication of the Fee Dispute has been delayed several times (through no fault of Claimants), and is now unlikely to be completed before the Plan is confirmed and distributions begin on the currently contemplated schedule.

2.      As a result, absent the relief requested in the Motion, Claimants may very soon be forced to wait months longer than their fellow creditors to receive Plan distributions to which no one disputes they are entitled, all because they refuse to capitulate to the Debtors in the Fee Dispute.  Forcing Claimants into that situation is not required by law and it certainly is not fair.  The Debtors do not argue otherwise in their Objection.  Instead, they ask this Court to deny the Motion based entirely on obsequious references to general bankruptcy policies.  Upon consideration of the actual facts and circumstances before the Court, however, the concerns those policies address are not implicated here.  In any event, adherence to those policies would not justify the Debtors' disparate and seemingly punitive treatment of Claimants just because they

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given them in the Motion.

dare to dispute the Debtors' fee calculations.  In short, the Objection should not be sustained.
Here is why:

A.    **The Objection Fails To Meaningfully Address Bases for Relief in Motion**

3.      In their Objection, the Debtors do not address the statutory authority for relief
Claimants request or take issue with any argument thereon in the Motion.  The Court can and
should view that as a concession that partial allowance of the Filed Claims entirely comports
with the authority and instructions embodied in Section 502 of the Bankruptcy Code.

4.      The Court should also note the short shrift the Debtors give to the numerous Plan
provisions explicitly contemplating the partial allowance of claims.  In discussion relegated to a
single footnote, the Debtors insist that language was "designed to address certain master claims
in these cases on behalf of multiple individual creditors, such as the one filed by the Ad Hoc
Group, where individual aspects of discrete Claims filed by multiple individual claimants may be
addressed separately."  Obj. ¶ 8, n.7.  But the Debtors do not explain why the application of
generally applicable Plan language should be limited by the Debtors' supposed drafting
intentions – particularly given such language, unlike so many other places in the Plan, includes
no reference to the "Ad Hoc Group" or any other party in a position to file a master claim that
would have made the Debtors' intentions clear.[3]  Moreover, the Debtors' own actions have
belied their supposed "design."  For example, the Debtors' recently reached agreement with
Gemini concerning the treatment of Gemini's propriety claim (i.e. *not* its master claim on behalf
of Earn Users).  The stipulation embodying that agreement, which the parties presented to this
Court for approval, explicitly contemplates that "Gemini shall be entitled to receive distributions
on account of the Allowed portion of the Gemini Propriety Claim, if any, in accordance with

---

[3] Had the Plan actually included such limiting language, Claimants may not have voted to accept it.

Article VI.A of the Plan" – the same article of the Plan cited by Claimants in the Motion.[4]

Clearly, therefore, the Plan language at issue is not limited to master claims.[5]

5.     Finally, the Debtors' attempt to turn the *General Motors* decision in their favor is
unavailing.  Obj. ¶ 7.  Yes, in that case Judge Gerber denied the request of certain noteholders to
have their claims partially allowed for purposes of distribution under a plan about to be
confirmed.  *In re Motors Liquidation Co.*, 447 B.R. 198, 211–12 (Bankr. S.D.N.Y. 2011).  Based
on that general scenario alone, the Debtors insist "Judge Gerber's reasoning should equally apply
to the Motion."  Obj. ¶ 7.  But the Debtors tellingly make no effort to address the distinguishing
facts in that case, which Claimants highlighted in their Motion (¶ 19, n.7) that the *entirety* of
those noteholders claims were subject to dispute, and that Judge Gerber explicitly mused in his
opinion that he may have reached a different result if there was an "*undisputed portion of either
claim that could or should otherwise be entitled to a distribution under the plan*."  *Id.* (emphasis
added).  On that basis, *General Motors* supports the Motion being granted, not denied.

**B.     The Debtors' Reliance on General Bankruptcy Policies Is Misplaced**

6.     The Debtors' Objection relies entirely on general bankruptcy policies as supposed
justification for denying the Motion.  But they make no attempt to ground those policies in the
facts and circumstances before the Court as required to make a persuasive argument those
policies would be undermined if the Motion is granted.  The fact is, none of the concerns

---

[4] *See* Stipulation and Order By and Between The Debtors and Gemini Trust Company, LLC Regarding
the Gemini Proprietary Claim (Claim No. 406) (ECF No. 1376), attached hereto as **Exhibit B**, ¶ 4.

[5] In fact, the Debtors even agreed to a procedure whereby Gemini is entitled to seek an expedited
determination by this Court of any dispute regarding certain portions of their proprietary claim in advance
of any Plan distribution.  *Id.*, ¶ 4.  Apparently, the key to partial allowance under the Plan is vigorously
opposing the Debtors and prosecuting adversary proceedings on numerous issues throughout that
bankruptcy case, causing the expenditure of millions in estate professional fees, rather than serving on the
UCC and supporting the Debtors' efforts.

underlying those policies is implicated here.  Thus, the Debtors have erected strawmen that his Court should see right through.

7.       First, the Debtors suggest granting the Motion would create a slippery slope that "would be inconsistent with the interests of judicial economy and the economic and efficient administration of estate resources."   Obj. ¶ 7.   But the Debtors completely ignore the circumstances under which the Motion was brought, including that Claimants made clear it was only asking the Court to make a ruling in the event the Fee Dispute – which began with the Debtors objection to the Filed Claims in November of 2023 – was not finally resolved in time for confirmation of the Plan for which closing arguments are scheduled on March 18, 2024. Moreover, the Debtors make no effort to justify these general policy interests causing great prejudice[6] to two of the estate's largest creditors, one of whom has served the estate on the UCC and both of whom played a role in the Plan being "overwhelmingly supported" but all of its voting creditor classes.

8.       Second, the Debtors insist that granting the Motion "would open the floodgates to inject pure chaos into the claims allowance process."   Obj. ¶ 8.   The Debtors' hyperbolic language cannot gloss over their failure to ground this statement in the reality of this case. Tellingly, the Debtors do not say how many partially disputed claims there are at this point in the case, and Claimants suspect there are few if any with undisputed portions even approaching the

---

[6] To give the Court a sense of the prejudice even a few months' delay in distributions could cause if Claimants are not able to receive initial Plan distributions and reinvest them into the crypto market, DOT – the digital asset underlying Filed Claim No. 405 – recently surged by over 6% in a single 24-hour period (which certainly puts the reasonableness of the Late Fee disputes of 1% per day vs. 1% per year into perspective as well).  *See* https://ambcrypto.com/polkadot-what-traders-need-to-know-as-dot-surges-by-6/#:~:text=However%2C%20things%20got%20better%20in,75%25%20over%20the%20last%20day, last visited March 4, 2024.  Moreover, last week analyst predicted DOT was poised for 90% surge in March.  *See* https://coinpedia.org/price-analysis/polkadot-dot-price-poised-for-90-surge-in-march-analyst-maps-next-levels/, last visited March 4, 2024.

$45 million at issue here.  Moreover, there is no reason that in granting the Motion, the Court cannot make clear that it did so under the unique facts and circumstances underlying the request, and that it will not serve as precedent for other creditors with partially disputed claims (assuming there are any) unless the entire principal portion of their claims is undisputed and the dispute is isolated to fees or other minority portions of their claim.

9.      Finally, the Debtors suggest granting the Motion would undermine the policy of encouraging settlements in bankruptcy.  Obj. ¶ 9.  The Debtors theorize that if the Court starts allowing undisputed portions of claims, it will enable creditors to "wage battle with the Debtors in a scorched earth strategy" over the disputed portion.  Obj. ¶ 2.  Again, the Debtors' hyperbole belies reality.  Claimants have acted with the utmost respect for the Debtors and the Court concerning bandwidth and not preventing other matters in these cases from moving forward as quickly as they can. Nor have Claimants taken an unreasonable position in the Fee Dispute and refused to compromise.  Rather, it the party refusing to compromise here is and has always been the Debtors.  The Motion arises in that specific set of circumstances and an order granting it can be cabined in those circumstances as well.  Moreover, the premise underlying the Debtors' suggestion – that it promotes bankruptcy settlement to empower estate representatives to use the prospect of withholding all distributions as leverage over the creditors in disputes over a small portion of their claim – has no basis in the law, is certainly not equitable, and only promotes settlements and prevents piecemeal adjudication in the sense that it gives so much bargaining power to one party it makes it nearly impossible economically for the other party to do anything but capitulate.  Surely that is not what bankruptcy policy is intended to promote.

C.    **The Debtors' Reliance on Lehman Hearing Transcript is Also Misplaced**

10.    Finally, even if either of the Debtors' policy arguments were applicable here, neither would find any support in Judge Peck's December 8, 2008 oral ruling in the *Lehman Bros.* case ("Lehman Ruling"), contained in the hearing transcript attached as Exhibit A to the Objection.  The circumstances underlying that ruling are so different from those underlying the present dispute to lend that ruling any relevance here.  Among other distinctions, the Lehman Ruling was not about allowing a claim so it could be paid by the debtor under a plan, but about compelling a non-bankrupt purchaser of the debtor's assets (Barclays) to pay a cure amount in connection with contracts it assumed as part of the purchase … in one of the most hastily put together 363 sales … in *the* largest bankruptcy case in U.S. history.  As the Court may recall, Lehman Brothers commenced a surprise free-fall chapter 11 case on September 15, 2008.[7]  Just two days later, on September 17, 2008, the debtors filed their Sale motion which contemplated the assumption and assignment of Moody's contracts.  *Id.*, ¶ 5.  And just two days after that, on September 19, 2008, the debtors posted a list of assumed contracts, indicating a proposed cure amount owing to Moody's of approximately $2.1 million.  *Id.*, ¶ 6.  That same day, Moody's filed a limited objection to the sale on the basis that it wasn't sure which contracts the debtors were proposing for assumption and assignment, and then on October 2, 2008, Moody's filed an amended objection asserting the cure amount should be approximately $3.3 million, for which it supplied Barclays with invoices the next day.  *Id.*, ¶¶ 7, 9-10.  Thereafter, on November 10, 2008, Moody's filed the Moody's Motion seeking immediate payment from Barclays of

---

[7] *See* Motion of Moody's Corporation for an Order (i) Compelling Payment of Undisputed Portion of Cur Amount; (II) Compelling Payment for Services Provided Post-Petition; and (III) Scheduling A hearing For This Court To Determine The Disputed Cure Amount, *In re Lehman Bros. Holding, Inc.*, No. 08-13555 (JPM) (Bankr. S.D.N.Y. filed Nov. 10, 2008) (attached hereto as **Exhibit  C**, the "Moody's Motion"), ¶ 3.

$2.1 million, which Moody's called the "undisputed portion" of its cure entitlement.  But when the motion came on for hearing on December 8, 2008, it was clear from Mr. Barefoot's argument (as counsel for Barclays) that Barclays did not agree at that time that the $2.1 million was undisputed.  *See* Ex. A. to Objection, Lehman Hr'g Tr. at 24:3-5.  Moreover, counsel for Moody's conceded the parties had engaged in "recent discussions" and took no issue with Mr. Barefoot's representation that those discussions were not at an impasse and that the parties were "continuing to engage in good faith negotiations and are involved in active settlement discussions."  *Id*., Lehman Hr'g Tr. at 20:21-22 and 24:10-12.

11.     Here, in stark contrast, the Debtors do *not* dispute the portion of the Filed Claims the Motion seeks to allow.  Further, regarding the disputed portions of the Filed Claims the Motion does not seek to allow which are subject to the pending Fee Dispute, the parties are *not* "engage[d] in good faith negotiations" and are *not* "involved in active settlement discussions." The parties are at an impasse.  And it is an impasse entirely of the Debtors making, as they have repeatedly and unequivocally told Claimants they will not agree to allow any more of the Filed Claims than the amount set forth in their Seventh Omnibus Objection.  Moreover, Claimants have brought the Motion 13 months into this bankruptcy case, on the precipice of Plan confirmation and initial distributions, and only after the preliminary hearing on the Fee Dispute was delayed more than two months from its original hearing date of January 3, 2024.

12.     To put it bluntly, this Court is not ruling on the Motion less than three months into the largest bankruptcy case in U.S. history and in need of sending a signal to other parties who may clog the docket with partial allowance requests on the order of a few million dollars.  As noted above, it is not even clear how many other disputed claims are left in this case, particularly claims whose undisputed amounts exceed $45 million.  Moreover, the Debtors' own

unwillingness to compromise makes clear that denying the Motion will not promote settlements in bankruptcy, but rather embolden the Debtors (and estate representatives in future cases) to refuse to engage in negotiations and pursue consensual resolutions to disputes whenever they decide the counter-party isn't necessary to achieve their ends.  In short, if the Lehman Ruling has any persuasive effect on this matter, its contrasting facts and circumstances should weighs in.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Objection should be overruled and the Motion should be granted.

Dated: Omaha, Nebraska
    March 4, 2024.

*/s/ Jeremy C. Hollembeak*
Jeremy C. Hollembeak
BAIRD HOLM, LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
jhollembeak@bairdholm.com

*Counsel to Holders of Claim Nos. 402 and 405*

**EXHIBIT B**

Stipulation and Order By and Between The Debtors and Gemini Trust Company, LLC Regarding the Gemini Proprietary Claim (Claim No. 406) (ECF No. 1376)

## **EXHIBIT C**

Motion of Moody's Corporation for an Order (i) Compelling Payment of Undisputed Portion of
Cur Amount; (II) Compelling Payment for Services Provided Post-Petition; and (III) Scheduling
A hearing For This Court To Determine The Disputed Cure Amount, *In re Lehman Bros.
Holding, Inc.*, No. 08-13555 (JPM) (Bankr. S.D.N.Y. filed Nov. 10, 2008)

6301721.2