**Hearing Date and Time: April 16, 2024 at 11:00 A.M. (ET)**
**Response Deadline: April 9, 2024 at 4:00 P.M. (ET)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself<br>and as agent on behalf of the Gemini Lenders,<br><br>       Plaintiff,<br><br>  v.<br><br>GENESIS GLOBAL CAPITAL, LLC,<br><br>       Defendant. | Adv. Proc. No. 23-01192 (SHL) |

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

| | |
|---|---|
| GENESIS GLOBAL CAPITAL, LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 23-01203 (SHL) |
| GEMINI TRUST COMPANY, LLC, individually and as agent on behalf of the Earn Users, and EARN USERS 1-232,824 | |
| Defendants. | |

## NOTICE OF DEBTORS'
## MOTION FOR ENTRY OF AN ORDER APPROVING A
## SETTLEMENT AGREEMENT AMONG THE DEBTORS,
## GEMINI TRUST COMPANY, LLC, THE AD HOC GROUP OF GENESIS
## LENDERS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**PLEASE TAKE NOTICE** that on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Holdco") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on March 19, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "Hearing") on the Motion will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10610 pursuant to the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 44) (the "Case Management Order"). The Hearing will commence on **April 16, 2024, at 11:00 a.m. (Prevailing Eastern Time)**, and will be conducted through Zoom for government.

**PLEASE TAKE FURTHER NOTICE** that parties wishing to register for the Zoom Hearing should use the eCourt Appearances link on the Court's website: https://www.nysb.uscourts.gov/ecourt-appearances. After the deadline to make appearances passes, the Court will circulate by email prior to the Hearing the Zoom links to those persons who

---

[1]    Holdco, and its Debtor and non-Debtor subsidiaries are collectively referred to as the "Company".

made eCourt Appearances, using the email addresses submitted with those appearances. Members of the public who wish to listen to, but not participate in, the Hearing free of charge may do so by calling the following muted, listen-only number: 1-929-205-6099, Access Code: 92353761344#.

PLEASE TAKE FURTHER NOTICE that any objections or responses ("Responses"), if any, to the Motion or the relief requested therein shall be made in writing, filed with the Court no later than **April 9, 2024, at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline"), and served as required by the Case Management Order.

PLEASE TAKE FURTHER NOTICE that where a creditor sends the Court a written Response that is not signed by an attorney, and the creditor does not file the Response on the docket, the creditor must include with its Response a completed Court Communication Form (as defined, and in accordance with the requirements set forth, in the Notice of Protocol for Written Communications to the Bankruptcy Court by Creditors (ECF No. 1094) (the "Written Communications Protocol")) authorizing the Court to file the Response on the Court docket and acknowledging that the creditor's name and any contact information included in the Response as well as in the Court Communication Form will be publicly available. The Court Communication Form is attached as Exhibit A to the Written Communications Protocol. Failure to include a completed Court Communications Form or to consent to this acknowledgement will result in the Response not being filed on the docket or considered by the Court. *See* Written Communications Protocol at 2.

PLEASE TAKE FURTHER NOTICE that if no Responses are timely filed and served with respect to the Motion, the Debtors may, on or after the Response Deadline, submit to the Court an order substantially in the form annexed as **Exhibit A** to the Motion, which order the Court may enter with no further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE copies of the Motion can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov, or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration located at One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165, at https://restructuring.ra.kroll.com/genesis or by calling +1 212 257 5450. Note that a PACER password is needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that the Motion may affect your rights. Please read the Motion carefully and, if you have one available, discuss it with your attorney. (If you do not have an attorney, you should consider consulting with one.)

[*Remainder of page left intentionally blank*]

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Motion, or if you want the Court to hear your position on the Motion, then you or your attorney must attend the Hearing. If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Motion and may enter orders granting the relief requested by the Debtors.

Dated:   March 19, 2024
         New York, New York

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[2]<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself and as agent on behalf of the Gemini Lenders,<br><br>    Plaintiff,<br><br>  v.<br><br>GENESIS GLOBAL CAPITAL, LLC,<br><br>    Defendant. | Adv. Proc. No. 23-01192 (SHL) |

---

[2]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

GENESIS GLOBAL CAPITAL, LLC,

                           Plaintiff,

v.                                                         Adv. Pro. No. 23-01203 (SHL)

GEMINI TRUST COMPANY, LLC,
individually and as agent on
behalf of the Earn Users, and
EARN USERS 1-232,824

                           Defendants.

**DEBTORS' MOTION FOR
ENTRY OF AN ORDER APPROVING
A SETTLEMENT AGREEMENT AMONG THE DEBTORS,
GEMINI TRUST COMPANY, LLC, THE AD HOC GROUP OF GENESIS
<u>LENDERS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION AND VENUE ................................................................................ 4

BACKGROUND ........................................................................................................ 5

A.    The Chapter 11 Cases ................................................................................ 5

B.    History of Dealings Between the Parties .................................................. 5

C.    The Proofs of Claim and the Gemini Adversary Proceedings .............. 7

THE SETTLEMENT AGREEMENT ........................................................................ 9

A.    The Settlement Negotiations ..................................................................... 9

B.    The Principal Terms of the Settlement Agreement ................................ 10

RELIEF REQUESTED .............................................................................................. 17

THE SETTLEMENT AGREEMENT SHOULD BE APPROVED ........................... 18

A.    Basis for Relief .......................................................................................... 18

B.    The Settlement Agreement Falls Well Within the Range of
      Reasonableness .......................................................................................... 21

C.    Gemini Has Authority as Agent to Bind the Gemini Earn Users ......... 25

NOTICE ...................................................................................................................... 26

NO PRIOR REQUEST .............................................................................................. 27

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n (In re Croton River Club, Inc.)*,
  52 F.3d 41 (2d Cir. 1995) ........................................................................................... 20

*In re Ben-Artzi*,
  No. 21-10470 (MG), 2021 WL 5871718 (Bankr. S.D.N.Y. Dec. 10, 2021) ................ 19

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 499 (Bankr. S.D.N.Y. 1991) ........................................................................... 18

*In re Frost Bros., Inc.*,
  No. 91 Civ. 5244 (PNL), 1992 U.S. Dist. LEXIS 18301 (S.D.N.Y. Nov. 30, 1992) ... 18

*In re Lehman Brothers Holdings Inc., et al.*,
  Case No. 08-13555 (SCC) (Bankr. S.D.N.Y. Mar. 22, 2017) (ECF No. 55096) ......... 27

*In re MF Global Inc.*,
  No. 11-2790 (MG) SIPA, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ........ 20

*In re Neshaminy Off. Bldg. Assocs.*,
  62 B.R. 798 (E.D. Pa. 1986) ........................................................................................... 18

*In re Purofied Down Prods. Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993) ................................................................................. 17, 18

*In re Residential Cap., LLC*,
  497 B.R. 720 (Bankr. S.D.N.Y. 2013) ........................................................................... 27

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................................................................... 23

*In re Terrestar Corp.*,
  No. 11-10612 (SHL) (Bankr. S.D.N.Y. Aug. 24, 2012) (ECF No. 593) ................. 18, 22

*In re W.T. Grant Co.*,
  699 F.2d 599 (2d Cir. 1983) ........................................................................................... 18

**Page(s)**

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) ............................................................ 20

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) ............................................................................ 20

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ............................................................................ 19

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) .................................................................... 18, 19

*U.S. v. Energy Res. Co.*,
    495 U.S. 545 (1990) ......................................................................................... 20

*Wells v. John Wiley & Sons, Inc.*,
    No. 14 Civ. 6745 (AT)(AJP), 2016 WL 889786 (S.D.N.Y. Feb. 17, 2016) ............. 25

**Rules and Statutes**

28 U.S.C. § 157 .......................................................................................... 4

28 U.S.C. § 1334 ........................................................................................ 4

28 U.S.C. § 157 .......................................................................................... 5

28 U.S.C. § 1408 ........................................................................................ 5

28 U.S.C. § 1409 ........................................................................................ 5

**Other Authorities**

Fed. R. Bankr. P. 9019 ...................................................................... *passim*

Fed. R. Bankr. P. 1015 ................................................................................ 5

Fed. R. Bankr. P. 1107 ................................................................................ 5

Fed. R. Bankr. P. 1108 ................................................................................ 5

Fed. R. Bankr. P. 1102 ................................................................................ 5

Fed. R. Bankr. P. 547 ................................................................................ 16

Fed. R. Bankr. P. 105 ..................................................................... 1, 5, 17, 20

Genesis Global Capital, LLC ("GGC"), Genesis Asia Pacific Pte. Ltd. ("GAP"), and Genesis Global Holdco, LLC ("GGH" and, collectively with GGC and GAP, the "Debtors" and these cases, collectively, the "Chapter 11 Cases") hereby submit this Motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement agreement between the Debtors, Gemini Trust Company, LLC ("Gemini"), the Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group"), and the Official Committee of Unsecured Creditors for the Chapter 11 Cases (the "Committee" and, together with the Debtors, Gemini, and the Ad Hoc Group, the "Parties") attached hereto as **Exhibit B** (as may be amended by the Parties, the "Settlement Agreement"). [1]   In support of this Motion, the Debtors submit the *Declaration of Thomas Conheeney in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (the "Conheeney Declaration"), filed contemporaneously herewith as **Exhibit C**, and the *Declaration of Thomas Q. Lynch in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (the "Lynch Declaration"), filed contemporaneously herewith as **Exhibit D,** and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      After nearly a year and a half of substantial litigation and settlement discussions, the Debtors come to this Court seeking approval of a settlement agreement by and among the

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

Debtors, Gemini, the Ad Hoc Group, and the Committee that will resolve all issues among the Parties on the terms set forth therein, including, without limitation, (a) the adversary proceeding commenced by Gemini in this Court on October 27, 2023 against the Debtors, and the counterclaims asserted by the Debtors therein, captioned *Gemini Trust Company, LLC, for itself and as agent on behalf of the Gemini Lenders v. Genesis Global Capital, LLC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd.*, Adv. Pro. No. 23-01192 (SHL) (the "GBTC Action"), (b) the adversary proceeding commenced by GGC in this Court on November 21, 2023, captioned *Genesis Global Capital, LLC v. Gemini Trust Company, LLC, individually and as agent on behalf of Earn Users, and Earn Users 1-232,824*, Adv. Pro. No. 23-01203 (SHL) (the "Preference Action" and, together with the GBTC Action, the "Gemini Adversary Proceedings"), (c) the proof of claim numbered 356 filed by Gemini in these Chapter 11 Cases on behalf of the Gemini Lenders (the "Gemini Master Claim"), and (d) the proof of claim numbered 406 filed by Gemini in these Chapter 11 Cases against GGC (the "Gemini Proprietary Claim" and, together with the Gemini Master Claim, the "Proofs of Claim").  Put plainly, the Settlement Agreement is truly a monumental achievement that resolves all Gemini-related issues in these Chapter 11 Cases and paves the way to near-term recoveries of approximately 97% on an in-kind basis to the Gemini Lenders.

2.      As more fully described in the Settlement Agreement,[2] to resolve the Gemini Adversary Proceedings and the Proofs of Claim, the Settlement Agreement provides, among other things, for near-full near-term payment, on an in-kind "coin-for-coin" basis, of the Gemini Lender Claims through a combination of (a) cash of digital assets holding a cumulative value equivalent

---

[2]      Any summary of the Settlement Agreement contained in this Motion is solely for illustrative purposes and is qualified in its entirety by the actual terms and conditions of the Settlement Agreement.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Settlement Agreement, the actual terms and conditions of the Settlement Agreement shall control.

to $50,000,000 contributed directly by Gemini, (b) value up to $50,000,000 (the "DCG Amount")
that may be contributed directly by Digital Currency Group, Inc. ("DCG") or will be passed
through to the Gemini Lenders by the Debtors as a percentage of any amounts ultimately recovered
by the Debtors from DCG, whether through litigation, settlement or otherwise, (c) a distribution
from the Debtors' estates of USD (currently estimated at approximately $114,000,000 in value),
(d) the proceeds of the pledged Gemini GBTC Shares, (e) a distribution from the Debtors' estates
of certain agreed Alt-Coins that are included in the Gemini Master Claim (currently estimated at
approximately $83,000,000 in value), and (f) release by the Debtors of the Gemini Earn Operations
Assets (currently estimated at approximately $19,000,000 in value).  Significantly, the limited
distribution from the Debtors' estates with respect to (c) and (e) consists solely of Alt-Coins that
the Debtors already own and USD, which will (subject to the potential pass-through described in
(b)) facilitate the Debtors' satisfaction of obligations to Gemini and all Gemini Lenders, and will
facilitate the Debtors' efforts to maximize in-kind recoveries for all of the Debtors' creditors under
the Plan, including by preserving the Debtors' BTC and ETH for future distributions to other
constituents under the Plan.

3.      As part of the Settlement Agreement, Gemini would also (a) release any asserted
lien, security interest or constructive trust claims with respect to the Additional GBTC Shares, (b)
assign to the Debtors all claims and causes of action asserted by Gemini against DCG, including
the claims asserted in its proceeding against DCG in the United States District Court for the
Southern District of New York, (c) reduce the Gemini Proprietary Claim (originally asserted for
an amount exceeding $20,000,000, plus certain contingent and unliquidated amounts) to a fixed
amount equal to $7,500,000; *provided, however*, that Gemini may also receive certain amounts
under Section 2.7(b) of the Settlement Agreement, and (d) indemnify the Debtors from any claims

and causes of action asserted by the Gemini Lenders arising from any actions taken in accordance with the Settlement Agreement after the completion of the Genesis Distribution.

4.      The Settlement Agreement is the product of extensive negotiations among the Parties.  Among other benefits, the Settlement Agreement will resolve the Gemini Adversary Proceedings, as well as fix and allow the Proofs of Claim filed by Gemini in these Chapter 11 Cases, thereby eliminating the risks, expenses, and uncertainty associated with protracted litigation with Gemini.  Most importantly, the Settlement Agreement would pave the way to near-term distributions to Gemini Lenders, one of the largest constituencies in these cases, and avoid the necessity of a significant reserve pending further litigation of the Gemini Adversary Proceedings, thus enhancing near-term creditor recoveries for non-Gemini Lender creditors as well.  Entry into the Settlement Agreement is an exercise of the Debtors' sound business judgment and has been approved by the Special Committee of the Board of Directors of Holdco (the "Special Committee"), which, following consultation with the Debtors' legal and financial advisors, has concluded that the Settlement Agreement is in the best interests of the Debtors' estates and their creditors.

5.      Accordingly, and for all of the reasons set forth herein, the Debtors submit that entry into the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' estates.  The Debtors respectfully request that the Court grant the relief requested in this Motion, approve the Settlement Agreement, and enter the Proposed Order.

**JURISDICTION AND VENUE**

6.      The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court" or the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.).  Venue is

4

proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

### A.    The Chapter 11 Cases

7.    On January 19, 2023, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the date of such filing, the "Petition Date"). The Debtors are operating their businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' bankruptcy proceedings have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b). *See Joint Administration Order* (ECF No. 37). No trustee or examiner has been appointed in the Chapter 11 Cases. The Committee was appointed by the United States Trustee for Region 2 on February 3, 2023, pursuant to Section 1102(a) of the Bankruptcy Code. *See Notice of Appointment of Official Committee of Unsecured Creditors* (ECF No. 55).

### B.    History of Dealings Between the Parties

8.    Prior to the Petition Date, GGC entered into certain Master Digital Loan Agreements ("MLAs") with Gemini and certain users of the Gemini platform (each such user, a "Gemini Lender" and, collectively, the "Gemini Lenders"). Pursuant to the MLAs, the Gemini Lenders agreed to lend certain digital assets to GGC, with Gemini acting as custodian and agent for the Gemini Lenders in certain respects (such agreements, the "Gemini Earn Agreements") and the transactional arrangements as set forth in the Gemini Earn Agreements, the "Gemini Earn Program").

9.    On August 15, 2022, GGC entered into a security agreement (the "Security Agreement") with Gemini, as agent for the Gemini Lenders, pursuant to which GGC pledged

approximately 30,000,000 shares of GBTC to secure certain of GGC's obligations under the Gemini Earn Program (such shares, the "Gemini GBTC Shares").

10.    On October 13, 2022, Gemini provided GGC thirty days' notice of its intention to terminate the Gemini Earn Program.

11.    After further negotiations between GGC and Gemini, on November 7, 2022, GGC and Gemini entered into an amendment to the Security Agreement (the "First Amendment"), which obligated GGC to maintain its pledge under the Security Agreement until GGC repaid its obligations under the Gemini Earn Program in full.

12.    Following the First Amendment, Gemini requested that GGC pledge additional collateral to further secure certain of GGC's obligations under the Gemini Earn Program.  On November 10, 2022, GGC, Gemini, and DCG entered into a second amendment to the Security Agreement (the "Second Amendment"), pursuant to which DCG agreed to transfer to GGC approximately 31,000,000 shares of GBTC (the "Additional GBTC Shares"), and GGC in turn agreed to pledge such shares to Gemini for the benefit of Gemini Lenders to secure certain of GGC's obligations under the Gemini Earn Program.

13.    DCG transferred its entire ownership interest in the Additional GBTC Shares to GGC in November 2022.  GGC did not, however, subsequently transfer the Additional GBTC Shares to Gemini but instead continued to hold the Additional GBTC Shares.  *See* Adversary Complaint ¶ 53 (ECF No. 1, Adv. Pro. No. 23-01192); Answer, Affirmative Defenses, and Counterclaims of Genesis Global Capital, LLC, to the Complaint at 26 (ECF No. 10, Adv. Pro. No. 23-01192).  Gemini asserted, among other things, a security interest in the Additional GBTC Shares on behalf of the Gemini Lenders.

14.     On November 16, 2022, GGC announced that it was suspending redemptions by the Gemini Lenders from the Gemini Earn Program and Gemini delivered a notice to GGC stating that Gemini foreclosed on the Gemini GBTC Shares through a private sale for total proceeds of $284,333,194.40.  *See* Adversary Complaint ¶ 43 (ECF No. 1, Adv. Pro. No. 23-01192).

### C.     The Proofs of Claim and the Gemini Adversary Proceedings

15.     On May 22, 2023, Gemini filed (a) the Gemini Master Claim against GGC on behalf of the Gemini Lenders, which asserts, among other things, claims for all of the Master Claim Digital Assets, and (b) the Gemini Proprietary Claim, which asserts, among other things, claims for agent fees, late fees and claims related to GGC's obligation to indemnify Gemini and its affiliates, officers, directors, employees, agents, consultants or other representatives for certain liabilities in accordance with the terms of the Gemini Earn Agreements (in an amount exceeding $20,000,000 plus additional contingent and unliquidated amounts).

16.     On October 27, 2023, Gemini filed the GBTC Action against GGC in the Bankruptcy Court through the Adversary Complaint (ECF No. 1, Adv. Pro. No. 23-01192 (SHL)), seeking declaratory judgments that (a) Gemini properly foreclosed on the Gemini GBTC Shares on November 16, 2022, (b) the Additional GBTC Shares are not property of any of the Debtors' estates, and (c) Gemini has a security interest in, or constructive trust over, the Additional GBTC Shares.

17.     On November 21, 2023, in the GBTC Action, GGC filed (a) a motion to dismiss the claims related to the Additional GBTC Shares (ECF No. 9) and (b) an answer to the claims related to the Gemini GBTC Shares, denying the allegations in support of Gemini's purported foreclosure and asserting a counterclaim that the First Amendment constituted an avoidable constructive fraudulent conveyance (ECF No. 10).

18.     On the same day, GGC filed the Preference Action against Gemini and certain Gemini Lenders in the Bankruptcy Court through the Adversary Complaint (ECF No. 1, Adv. Pro. No. 23-01203 (SHL)).

19.     On December 18, 2023, Gemini filed a motion to dismiss certain of GGC's counterclaims related to the Additional GBTC Shares in the GBTC Action (ECF No. 16).  And on January 5, 2024, Gemini filed a motion to dismiss certain of GGC's counterclaims related to the Gemini GBTC Shares in the GBTC Action (ECF No. 24).

20.     On February 7, 2024, the Bankruptcy Court rendered an opinion in favor of the Debtors with respect to the Debtors' motion to dismiss the claims asserted in the GBTC Action related to the Additional GBTC Shares, wherein the Bankruptcy Court held that Gemini and the Gemini Lenders did not have a valid and perfected lien on, a security interest in, or a constructive trust over the Additional GBTC Shares (ECF No. 35).  The Bankruptcy Court's opinion also dismissed all claims against GGH and GAP without prejudice.  An order implementing the opinion and granting the Debtors' motion to dismiss was entered on February 22, 2024 (ECF No. 44).

21.     On February 28, 2024, the parties announced in open court that they had reached an agreement in principle.  *In re Genesis Global Holdco, LLC*, Case No. 23-10063, Feb. 28, 2024 Hr'g Tr. at 140:15-141:3.  In light of the agreement in principle, the Debtors and Gemini filed a stipulation and proposed order adjourning all pending deadlines *sine die*, in order to permit the parties to document and obtain approval of the Settlement Agreement (ECF No. 46).  An order implementing the stipulation was entered on March 15, 2024 (ECF No. 48).

## THE SETTLEMENT AGREEMENT

### A.    The Settlement Negotiations

22.    Gemini and the Debtors were engaged in discussions, through both their principals and advisors, regarding various disputes relating to the Gemini GBTC Shares and the Debtors' liabilities to Gemini and the Gemini Lenders for more than fifteen months.  Conheeney Decl. ¶ 5.

23.    The Debtors' efforts to reach a resolution consisted of multiple rounds of negotiations between the key stakeholders, both before the Petition Date and at various points during the pendency of the Chapter 11 Cases.  *Id.* ¶ 6.  Most recently, the Debtors and Gemini engaged in numerous discussions, and circulated various term sheets and proposals, in July, September and October 2023.  *Id.*

24.    While all key parties with an economic stake had been involved in and kept apprised of settlement discussions, beginning in December 2023, the Ad Hoc Group became directly involved in the negotiations, and began discussing various proposals with Gemini to resolve the outstanding disputes among the Debtors and Gemini.  *Id.* ¶ 11.  Since that time, the Ad Hoc Group and Gemini have continued to have direct discussions, keeping the Debtors and Committee updated, and obtaining their input as part of the process.  *Id.* ¶¶ 12, 14.  While certain key economic terms were negotiated between the Ad Hoc Group and Gemini, the Debtors and the Committee also participated in the negotiations and obtained important concessions from Gemini and the Ad Hoc Group.  *Id.* ¶ 14.  These efforts led to an agreement in principle among the Debtors, Gemini, the Committee and Ad Hoc Group on February 27, 2024.  *Id.*

25.    The Special Committee approved the proposed agreement in principle on February 28, 2024.  *Id.* ¶ 16.  On the same day, the Parties executed the "Term Sheet" and announced the key terms of the agreement in principle at a hearing before this Court.  *Id.*  Since then, the Parties

and their advisors have worked to convert the Term Sheet into the fulsome terms contained in the Settlement Agreement. *Id.*

26.       The Debtors, with the consent of the Ad Hoc Group, the Committee, and Gemini, have now filed this Motion, seeking this Court's approval of the Settlement Agreement.

**B.    <u>The Principal Terms of the Settlement Agreement</u>**

27.       The principal terms and conditions of the Settlement Agreement are generally as follows:

(a)       **Gemini GBTC Shares.** The Gemini GBTC Shares shall be deemed to have a value equal to the product of: (i) the Effective Date Value of BTC, <u>times</u> (b) 30,905,782 (the number of Gemini GBTC Shares as of the TS Date), <u>times</u> (c) the TS Date (at 11:59PM ET) "bitcoin per share" value provided in the "Key Fund Information" section of the GBTC website (etfs.grayscale.com/gbtc).

(b)       **Gemini Contribution.** No later than five (5) Business Days following the Settlement Effective Date, Gemini shall deposit, for the benefit of the Gemini Lenders, the Gemini Contribution into a segregated account identified on Gemini's records as account number 34162511 and with account name "Gemini Agent Redeem FBO Earn" (the "<u>Redemption Account</u>") with the Gemini Distribution Agent, which Gemini Contribution shall be distributed to the Gemini Lenders on account of the Gemini Master Claim concurrently with the initial distribution of the Gemini Distribution Assets pursuant to the provisions of Section 2.5(b) of the Settlement Agreement.

(c)       **DCG Amount.** Following the Settlement Effective Date, and solely in the event that DCG does not pay or otherwise transfer Fifty Million Dollars ($50,000.000.00) (the "<u>DCG Amount</u>") in the aggregate to Gemini following the TS Date but prior

10

to the Application Date, the Debtors or their successors in interest, on a joint and several basis, shall transfer to the Gemini Distribution Agent, within five (5) Business Days of receipt, six and one-half percent (6.5%) of each USD and of each asset, in each case, that constitutes a DCG Recovery, up to an amount equal, in the aggregate, to the DCG Amount Cap.  Solely for purposes of calculating the DCG Amount Cap and the six and one-half percent (6.5%) portion of any DCG Recovery under Section 2.2 of the Settlement Agreement, the dollar value of any DCG Recovery in a form other than USD shall be equal to: (i) for any DCG Recovery in the form of Digital Assets, the value of such Digital Assets as of the instant of receipt by the Gemini Distribution Agent of such Digital Asset based on the applicable price as provided for in Section 11.11(b) of the Settlement Agreement; (ii) for any DCG Recovery in the form of indebtedness, the face amount of such indebtedness (which face amount, if denominated in the form of Digital Assets, shall be valued (but, for the avoidance of doubt, not transferred) in USD as of the instant of receipt by the Gemini Distribution Agent of such indebtedness); (iii) for any DCG Recovery in the form of securities that have an existing public market, the average closing price for such securities for the ten (10) trading days prior to the day of receipt of such securities by the Gemini Distribution Agent; and (iv) for any DCG Recovery in the form of securities that do not have an existing public market, or any other form of consideration, the fair market value of such securities or other form of consideration as mutually agreed upon in good faith by the Parties and, if the Parties fail to agree on such fair market value within ten (10) calendar days of receipt thereof by the Gemini Distribution Agent, the fair market value as

of the date of delivery to the Gemini Distribution Agent, as determined by the Bankruptcy Court. Any amounts turned over to the Gemini Distribution Agent pursuant to Section 2.2 of the Settlement Agreement shall be used by the Gemini Distribution Agent to deliver the Completion Digital Assets as provided in Section 2.5(c) of the Settlement Agreement.

(d)    **Gemini Earn Operations Assets.**  No later than five (5) Business Days following the Settlement Effective Date, Gemini shall transfer the Gemini Earn Operations Assets to the Redemption Account to be distributed to the Gemini Lenders on account of the Gemini Master Claim concurrently with the initial distribution of the Gemini Distribution Assets pursuant to the provisions of Section 2.5(b) of the Settlement Agreement.

(e)    **Genesis Distribution.**  No later than the five (5) Business Days following the Settlement Effective Date, GGC shall deliver to the Gemini Distribution Agent, for distribution to the Gemini Lenders, (i) the Genesis Alt-Coin Distribution and (ii) an amount of USD equal to (A) the MCDA Value minus (B) the sum of (1) the Gemini Contribution, (2) the DCG Amount, (3) the Gemini GBTC Value, (4) the Effective Date Value of the Genesis Alt-Coin Distribution to the extent made in accordance with the purposes of Section 2.4(a)(i) of the Settlement Agreement, and (5) the Effective Date Value of the Gemini Earn Operations Assets.

(f)    **Digital Asset Rebalance.**  The Gemini Distribution Agent, in its sole and absolute discretion and acting on behalf of the Debtors, is authorized to monetize or otherwise convert the Gemini Contribution, the Gemini GBTC Shares, the Genesis Distribution, the Gemini Reserved Coins, the Gemini Earn Operations Assets, and

the DCG Receipts, if any, for the purpose of satisfying through in-kind delivery to the greatest extent possible the Gemini Master Claim (the monetization described in this sentence, the "Digital Asset Rebalance").

(g)      **Distributions on Account of Gemini Master Claim.**  Following the Settlement Effective Date and the consummation of the Genesis Distribution, the Gemini Distribution Agent shall distribute, from time to time promptly upon its receipt thereof, but in no event later than fifteen (15) Business Days thereafter, in accordance with the provisions of the Settlement Agreement, the Gemini Distribution Assets on behalf of the Debtors to the Gemini Lenders in satisfaction of their claims, reducing the Gemini Master Claim on a coin-for-coin basis with respect to each Digital Asset so delivered to the Gemini Lenders; provided, however, that the Gemini Distribution Assets shall not include the Completion Digital Assets, which assets shall be distributed in accordance with the provisions of Section 2.5(c) of the Settlement Agreement.  The Gemini Distribution Agent shall deliver the Completion Digital Assets on behalf of the Debtors to the Gemini Lenders in its sole and absolute discretion; provided, however, that, if the Gemini Distribution Agent receives DCG Receipts that, in the aggregate, are in value (for such other assets, as determined in accordance with the provisions of Section 2.2 of the Settlement Agreement) equal to or greater than Ten Million Dollars ($10,000,000.00) or a multiple of Ten Million Dollars ($10,000,000.00), the Gemini Distribution Agent shall distribute to the Gemini Lenders in satisfaction of their claims, within thirty (30) days of such receipt, a portion of the Completion Digital Assets equal to the quotient of (y) Ten Million Dollars ($10,000,000.00) or

13

the applicable multiple thereof divided by (z) Fifty Million Dollars
($50,000,000.00).  Following the distribution of the Gemini Distribution Assets in
accordance with the provisions of Section 2.5(b) of the Settlement Agreement and
of the Completion Digital Assets in accordance with the immediately preceding
sentence, neither Gemini nor the Gemini Distribution Agent shall have any further
obligations to the Gemini Lenders with respect to the Gemini Master Claim.

(h)     **Assignment of Litigation Claims and Proceeds.**  From and after the Application
Date, Gemini shall not settle any claims or Causes of Action against DCG without
the prior written consent of the Debtors, the AHG and the UCC, which consent
shall not be unreasonably withheld, conditioned, or delayed.  On the Settlement
Effective Date and provided that DCG has not, as of such date, consummated a
settlement of claims that Gemini or the Debtors maintain against DCG, Gemini
shall irrevocably transfer, assign, grant and convey to GGC, or its successor in
interest, for the benefit of GGC's creditors, all of Gemini's right, title and interest
in and to any and all claims and Causes of Action that Gemini has asserted, or that
could have been asserted, in the DCG Action, including any rights and defenses
relating to such claims and Causes of Action, the facts underlying the DCG Action
and any claims related to the DCG Action for indemnification arising from or
relating to the Gemini Contribution or with respect to potential joint tortfeasor
obligations.

(i)     **Gemini Proprietary Claim.**  On the Plan Effective Date, the Gemini Proprietary
Claim shall be Allowed, as defined in the Plan, as a general unsecured claim against
GGC in the amount of Seven Million Five Hundred Thousand Dollars

($7,500,000.00) (and for the purpose of the Plan be classified as a Class 3 general unsecured claim); provided, however, that, in no event shall the Gemini Proprietary Claim be afforded any lesser treatment under the Plan, any other chapter 11 plan that may be proposed or effectuated in the Chapter 11 Cases, or in a liquidation under chapter 7 of the Bankruptcy Code than any other similarly situated general unsecured claim.  Gemini shall receive distributions on the Gemini Proprietary Claim from the Debtors or the Wind-Down Debtors (as appropriate) pursuant to the Plan, including the Distribution Principles, as defined in the Plan.  In the event that the aggregate amount of DCG Recoveries exceeds $769,230,769.00 (such amounts, "Incremental DCG Recoveries"), the Debtors or their successors in interest, on a joint and several basis, shall transfer to Gemini, within five (5) Business Days of receipt by the Debtors, one and one-half percent (1.5%) of each such Incremental DCG Recovery up to an amount equal, in the aggregate, to Ten Million Dollars ($10,000,000.00).  For purposes of Section 2.7(b) of the Settlement Agreement, the dollar value of any DCG Recovery or Incremental DCG Recovery in a form other than USD shall be determined in a manner consistent with the second sentence of Section 2.2 of the Settlement Agreement.  Gemini shall waive all other claims it holds in its individual capacity against the Debtors, including, without limitation, any claims for substantial contribution or other fees and expenses incurred by Gemini, as agent or otherwise, in connection with the Chapter 11 Cases, the Gemini Master Claim, and the Gemini Proprietary Claim.

(j)    **Gemini Adversary Proceedings.**  On the Settlement Effective Date, the Gemini Adversary Proceedings shall be dismissed, with prejudice.  Within seven (7) days

of the Settlement Effective Date, the Parties shall take any and all action reasonably necessary to effectuate such dismissal and the waiver of their respective claims asserted in the Gemini Adversary Proceedings, including, without limitation, filing notices of dismissal with the Bankruptcy Court.  For the avoidance of doubt, on the Settlement Effective Date, the Debtors shall be deemed to have released and waived all claims and Causes of Action that may be asserted against any Gemini Lenders (including with respect to Gemini Lenders with zero or *de minimis* balances as of the Petition Date, but with non-zero or non-*de minimis* balances as of the applicable preference period) pursuant to section 547 of the Bankruptcy Code by the Debtors and the Debtors' Estates, including, without limitation, any successors in interest.

(k)   **Gemini Master Claim**.  Within one (1) Business Day of the Application Date, the Debtors shall seek the adjournment of the presentment date of the Master Claim Stip to a date and time contemporaneous with the Bankruptcy Court's determination of the Application.  Upon approval of the Master Claim Stip by a Final Order of the Bankruptcy Court, the Gemini Master Claim shall be Allowed, as defined in the Plan, as a general unsecured claim against GGC for the Master Claim Digital Assets (and for the purpose of the Plan be classified as a Class 7 general unsecured claim) with distributions on account of the Gemini Master Claim strictly limited to those provided for in the Settlement Agreement.

(l)   **Authorization.**  The Approval Order shall (i) include a determination by the Bankruptcy Court that Gemini has the authority to bind the Gemini Lenders to the Settlement Agreement and its terms pursuant to the terms of the Gemini Earn Agreements; (ii) confirm that the Gemini Lenders are bound by the terms of the

Settlement Agreement; and (iii) provide authority for Gemini to effectuate, as agent

for the Gemini Lenders and as the Gemini Distribution Agent: (A) the monetization

of the Gemini GBTC Shares (to the extent not previously authorized pursuant to

the Trust Asset Order), (B) the Digital Asset Rebalance, and (C) the distributions

and other transactions contemplated by the Settlement Agreement.

(m)    **Mutual Releases.**  As set forth in greater detail in the Settlement Agreement, the

Settlement Agreement provides for the mutual release of all claims of the Debtor

Releasors, the AHG, the SteerCo Members, and the Committee against the Gemini

Releasees, on the one hand, and of the Gemini Releasors against the Debtor

Releasees, the AHG, the SteerCo Members, and the Committee, on the other hand,

except as set forth therein, including for claims to enforce the Parties' obligations

under the Settlement Agreement.

(n)    **Indemnification**.  As set forth in greater detail in the Settlement Agreement, the

Settlement Agreement provides for the indemnification by Gemini of the Debtors,

their successors in interest and their respective Related Parties from any claims and

causes of action asserted by the Gemini Lenders arising from any actions taken in

accordance with the Settlement Agreement after completion of the Genesis

Distribution to the extent such actions were taken after the date of entry of the

Approval Order.

## RELIEF REQUESTED

28.    The Debtors have determined, in consultation with their advisors, that the

Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors'

estates.  By this Motion, the Debtors seek entry of an order substantially in the form attached hereto

as **Exhibit A**, approving the Settlement Agreement pursuant to section 105(a) of the Bankruptcy

Code and rule 9019 of the Bankruptcy Rules.

## THE SETTLEMENT AGREEMENT SHOULD BE APPROVED

### A.    Basis for Relief

29.    Bankruptcy Rule 9019 permits a debtor-in-possession to enter into compromises

and settlements with the approval of the Bankruptcy Court.  *See* Bankruptcy Rule 9019(a).  In

order to approve a compromise or a settlement under Bankruptcy Rule 9019(a), the bankruptcy

court must find that the compromise or settlement is "in the best interests of the estate."  *In re*

*Purofied Down Prods. Corp.*, 150 B.R. 519, 523 (S.D.N.Y. 1993) (quotations and citation

omitted); *see also* Stipulation and Agreed Order ¶ 1, *In re Terrestar Corp.*, No. 11-10612 (SHL)

(Bankr. S.D.N.Y. Aug. 24, 2012) (ECF No. 593) (approving a settlement providing for pre-

confirmation distribution under Bankruptcy Rule 9019).  In making this finding, the bankruptcy

court should form an informed and independent judgment as to whether a proposed compromise

is in the best interests of the debtor's estate.  *Id.*  The settlement need not result in the best possible

outcome for the debtor but must only not "fall below the lowest point in the range of

reasonableness."  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y.

1991) (quotations and citation omitted).

30.    In determining whether a compromise or settlement should be approved under

Bankruptcy Rule 9019(a), the bankruptcy court should not substitute its own judgment for that of

the debtor.  *See In re Neshaminy Off. Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).  In fact, the

bankruptcy court may consider the opinions of the debtor-in-possession or the trustee that the

settlement is fair and reasonable.  *See Nellis v. Shugrue*, 165 B.R. 115, 122–23 (S.D.N.Y. 1994).

Furthermore, the bankruptcy court need not conduct a "mini-trial" to decide the numerous issues

of law and fact raised by the settlement, but rather must "canvass the issues and see whether the

settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Purofied Down Prods.*, 150 B.R. at 522 (citations omitted); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Frost Bros., Inc.*, No. 91 Civ. 5244 (PNL), 1992 U.S. Dist. LEXIS 18301, at *16 (S.D.N.Y. Nov. 30, 1992); Memorandum Decision, *In re Genesis Global Holdco LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y, October 6, 2023), ECF No. 781 (the "FTX Settlement Order"). This requirement "reflect[s] the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims," *Purofied Down Prods.*, 150 B.R. at 522–23, and the fact that settlements are "favored and, in fact, encouraged" in bankruptcy. *Nellis*, 165 B.R. at 123 (citation omitted).

31.     In the Second Circuit, bankruptcy courts apply the following factors in determining whether a settlement is fair and equitable:

  (a)   the balance between the litigation's possibility of success and the settlement's future benefits;

  (b)   the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

  (c)   the "paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

  (d)   whether other parties in interest support the settlement;

  (e)   the "competency and experience of counsel" who support the settlement;

(f)    the "nature and breadth of releases to be obtained by officers and directors";
and

(g)    the "extent to which the settlement is the product of arm's length
bargaining."

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d
452, 462 (2d Cir. 2007).

32.    Where most or all of the factors are satisfied, a settlement should be approved.  *See
In re Ben-Artzi*, No. 21-10470 (MG), 2021 WL 5871718 (Bankr. S.D.N.Y. Dec. 10, 2021)
(approving a settlement where most but not all of the Iridium factors were satisfied).  In particular,
the business judgment of the debtor in recommending the settlement should be factored into the
court's analysis.  *In re MF Global Inc.*, No. 11-2790 (MG) SIPA, 2012 WL 3242533, at *5 (Bankr.
S.D.N.Y. Aug. 10, 2012) (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating
LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).  "While the
bankruptcy court may consider the objections lodged by parties in interest, such objections are not
controlling. . . . [T]he bankruptcy court must still make informed and independent judgment." *In
re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

33.    Additionally, under section 105 of the Bankruptcy Code, the Court has broad
discretion to "carry out the provisions of this title."  11 U.S.C. § 105(a); *see also Croton River
Club, Inc. v. Half Moon Bay Homeowners Ass'n (In re Croton River Club, Inc.)*, 52 F.3d 41, 45
(2d Cir. 1995) (holding that bankruptcy courts have broad equity power to manage the affairs of
debtors); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d
1132, 1136 (2d Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke
equitable principles to achieve fairness and justice in the reorganization process.").

34.     The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2023). Such power conforms to the Court's inherent equitable authority. *See, e.g., U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

**B.      The Settlement Agreement Falls Well Within the Range of Reasonableness**

35.     It is well within the range of reasonableness for the Debtors to enter into the Settlement Agreement, which is the result of good faith and arm's-length negotiations over the course of many months. *See* Conheeney Decl. ¶¶ 5-6, 10-12, 14-16, 23. The Debtors, acting under the oversight of the Special Committee and following consultation with the Debtors' advisors and their creditors, have concluded that the Settlement Agreement is fair and equitable, reasonable and in the best interests of the Debtors' estates and, thus, should be approved. *Id.* ¶¶ 17, 22. The Debtors submit that each of the *Iridium* factors weigh heavily in favor of the Court's approval of the Settlement Agreement.

36.     *First*, the Settlement Agreement eliminates the downside risk of an adverse outcome for the Debtors in the GBTC Action. Conheeney Decl. ¶ 19; *see also* FTX Settlement Order at 19-20 (holding "specific analysis and details of the resulting conclusions of the Genesis Debtors in consultation with their counsel about the value of each claim" is not necessary, and that the Court is not required to "conduct a 'mini-trial' to determine the merits of the underlying litigation."). Pursuant to the Settlement Agreement, the Gemini GBTC Shares are valued using a measurement period starting on the TS Date (i.e., approximating their current price) rather than the price of such shares at the time of Gemini's purported foreclosure on November 16, 2022. Conheeney Decl. ¶ 19. If Gemini had prevailed in the GBTC Action with respect to the Gemini GBTC Shares, the Gemini Lenders would have had a substantial deficiency claim against the Debtors' estates under the terms of the Plan. *Id.* In addition, the Settlement Agreement also caps

21

the Gemini Proprietary Claim at $7,500,000, *id.* ¶ 20; *provided, however*, that Gemini may also receive certain amounts under Section 2.7(b) of the Settlement Agreement. Moreover, the Settlement Agreement provides for Gemini to release any claimed lien, security interest in or constructive trust over the Additional GBTC shares, eliminating the prospect of an adverse determination for the Debtors on appeal. *See* Ex. B, Settlement Agreement § 3.2. Thus, although the Settlement Agreement also eliminates the possibility of certain litigation outcomes that would be more favorable to the Debtors and less favorable to the Gemini Lenders—including the possible scenario in which GGC were to succeed on its claim to claw back the Gemini GBTC Shares, in which case the Gemini Lenders would be left with an entirely unsecured claim—the Settlement Agreement has a substantial benefit to the Debtors' estates by resolving the risk associated with further litigation of the GBTC Action.

37.     Additionally, the Settlement Agreement provides that Gemini will indemnify and hold harmless the Debtors and their successors in interest from any and all claims and causes of action asserted by the Gemini Lenders against the Debtors and their successors in interest, and their respective Related Parties, arising from any actions taken by the Indemnified Parties in accordance with the Settlement Agreement during the period from and after entry of the Approval Order, further limiting the potential risk to the Debtors' estates. Conheeney Decl. ¶ 20.

38.     The Settlement Agreement also facilitates the making of in-kind distributions of the Debtors' Alt-Coins to the extent that there are matching Alt-Coin-denominated claims held by the Gemini Lenders. Conheeney Decl. ¶ 20; *see also In re Terrestar Corp.*, No. 11-10612 (SHL) (Bankr. S.D.N.Y. Aug. 24, 2012) (ECF No. 593) (approving a settlement providing for pre-confirmation distribution under Bankruptcy Rule 9019). And the Settlement Agreement also provides for Gemini to contribute $50 million in value to reduce the Gemini Master Claim on a

dollar-for-dollar basis. *See* Ex. B, Settlement Agreement § 2.1. It also provides the Debtors'

estates with other additional consideration, including Gemini's assignment of claims it has against

DCG to the Debtors' estates and the reduction of the allowed amount of the Gemini Proprietary

Claim. *See* Ex. B, Settlement Agreement §§ 2.6, 2.7.

39.    *Second*, the Settlement Agreement will allow the Debtors to avoid extensive

litigation costs that would be incurred in protracted and complex litigation against Gemini.

Conheeney Decl. ¶ 21. Any litigation would entail significant professional fees, including but not

limited to discovery (which is currently stayed but, up until an agreement in principle was reached,

was actively ongoing with respect to the GBTC Action), preparation of experts, motion practice,

trial and potential appeals.[3] *Id.* Moreover, any such litigation would significantly distract, and has

distracted, the Debtors at a time when there are other priorities to maximize recoveries for

creditors, including confirmation and implementation of the Plan. *See id.* If approved, the

Settlement Agreement would fully and finally resolve the Gemini Adversary Proceedings (which

will be dismissed with prejudice) and the Proofs of Claim, permitting the Debtors and their

advisors to focus resources and attention on other claims and, if the Plan is confirmed, on beginning

to make distributions to creditors. *Id.* Courts routinely approve settlements that resolve litigation,

saving the estate in professionals' fees. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 309-310

(Bankr. S.D.N.Y. 2016) ("Moreover, the benefits of the Settlement strongly outweigh the

likelihood of success and any rewards of litigation, particularly given the sizable costs of litigation,

---

[3]    Indeed, the Debtors' advisors alone have already incurred in excess of $2,000,000 in connection with the
Gemini Adversary Proceedings (ECF Nos. 1019, 1043, 1222, 1416, and 1459, Case No. 23-10063 (SHL)). With
further discovery remaining – including fact depositions, expert reports, and expert depositions – as well as probable
summary judgment motions and a potential trial, the additional fees expected would be at least as much as those
already incurred and likely more.

the risk of damage to the Debtors' business, and the depletion of asset value which would likely result from remaining in chapter 11 during any such protracted litigation.").

40.    *Third*, pursuant to the Settlement Agreement, the Debtors' BTC and ETH will be preserved for future distributions under the Plan (if confirmed) or any future Chapter 11 plan (if the Plan is not confirmed).

41.    In addition, the Settlement Agreement paves the way for material distributions to the Gemini Lenders, one of the largest constituents in the Chapter 11 cases.  *See* Conheeney Decl. ¶¶ 19-21.  Absent a settlement, making such distributions under the Plan (if confirmed) would be delayed while the parties continued the litigation of the Gemini Adversary Proceedings, particularly with respect to the value of the Gemini GBTC Shares.  *See id.* ¶¶ 19, 21.  Additionally, a significant reserve of distributable assets may have been necessary pending a final order regarding the Additional GBTC Shares, which reserve would have materially reduced near-term recoveries by non-Gemini Lender creditors.  By contrast, the Settlement Agreement enables such distributions in the near term, which is particularly important given pricing volatility.  *See id.* ¶ 21.

42.    *Fourth*, the Settlement Agreement is supported by the Ad Hoc Group and the Committee.

43.    *Fifth*, the Parties are represented by sophisticated and experienced professionals— highly regarded law firms and financial advisors with significant restructuring, litigation, and other relevant experience.  Conheeney Decl. ¶ 23.

44.    *Finally*, the Settlement Agreement is the product of arm's length negotiations among the Parties.  After months of negotiations and litigation, the Parties reached the resolution reflected in the Settlement Agreement, as discussed in detail in the Conheeney Declaration.  *See, e.g.*, Conheeney Decl. ¶¶ 5-6, 10-12, 14-16, 23; *see also* FTX Settlement Order at 20-21 (holding

24

the Court had "an appropriate evidentiary basis to review and approve" the agreement at issue given the Genesis Debtors and their restructuring professionals had "conducted a thorough analysis of all the claims", and the settlement negotiations were "primarily handled on behalf of the Genesis Debtors by their counsel in consultation with the independent Special Committee and the Company's senior management.").

45.     Accordingly, the Debtors submit that the settlement and compromise embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and equitable and should be approved.

## C.    Gemini Has Authority as Agent to Bind the Gemini Earn Users

46.     Gemini, as the duly authorized agent of the Gemini Lenders under the MLAs and Gemini Earn Agreements, has the authority to enter into the Settlement Agreement on behalf of the Gemini Lenders.  *See* Lynch Decl., Ex. 2, MLAs § VI(b) (providing that "[The Gemini] Lender represents, which representation shall continue during the term of [the MLA] and any Loan hereunder, that it . . . (ii) has duly appointed [Gemini] as its agent to act on [the Gemini] Lender's behalf for all purposes under [the MLA]."); *id.* at § VIII(a) (providing that "Upon the occurrence and during the continuation of any Event of Default" Gemini, acting on behalf of a Gemini Lender, "may, at its option … (3) exercise all other rights and remedies available to the [Gemini Lender] hereunder, under applicable law, or in equity."); *see also* Lynch Decl., Ex. 1, Gemini Earn Program Terms and Authorization Agreement at § 13 (providing that "[Gemini] shall be entitled to exercise any rights and remedies under the [MLA] on [the Gemini Lender's] behalf, and will be fully protected in acting in any manner [Gemini] deem[s] reasonable and appropriate.").  Pursuant to the terms of the MLAs and Gemini Earn Agreements, Gemini may therefore enter into the Settlement Agreement on the Gemini Lenders' behalf, and thereby bind the Gemini Lenders to the terms of the Settlement Agreement.  *See id.*; *see also Wells v. John Wiley & Sons, Inc.*, No. 14 Civ.

6745 (AT)(AJP), 2016 WL 889786, at *7 n.13 (S.D.N.Y. Feb. 17, 2016) (holding "it was clear by the contract's written terms that [an agent licensor of principal's photographs] possessed actual authority to enter into the settlement agreement with [a third party licensee]" who allegedly violated a separate licensing agreement.).

**NOTICE**

47.     The Debtors have provided notice of this Motion in accordance with the procedures set forth in the Case Management Order.

48.     As was authorized by this Court in connection with service of notice of the bar dates for submitting proofs of claim and with service of notice of the Disclosure Statement Hearing on Gemini and the Gemini Lenders, the Debtors request that the Court (i) authorize the Debtors to give notice of the hearing on this Motion and the deadline to file responses by serving the *Notice of Debtors' Motion for Entry of an Order Approving a Settlement Agreement with Gemini Trust Company, LLC* on Gemini and not the individual Gemini Lenders, (ii) authorize and direct Gemini to provide notice of the hearing on this Motion to the Gemini Lenders by posting on the Gemini Earn Program's website (www.gemini.com/earn), supplemented solely by an email to each Gemini Lender (the "Gemini 9019 Motion Notice"), and (iii) find that Gemini's dissemination of the of the Gemini 9019 Motion Notice solely by email as provided for herein satisfies both the Debtors' and Gemini's notice requirements with respect to the Gemini Lenders.  The Gemini 9019 Motion Notice shall be served on each Gemini Lender on or before March 19, 2024.

49.     The Gemini 9019 Motion Notice, attached hereto as **Exhibit E**, shall contain a link to the Motion and a cover email describing certain terms of the Settlement Agreement, including the distributions on account of the proposed allowed Gemini Master Claim. The Gemini 9019 Motion Notice shall refer the Gemini Lenders to their individual account pages that may be accessed through the Gemini Earn Program's website (https://exchange.gemini.com/signin) and

the Gemini mobile app so that they may confirm their digital assets owed to them and proposed to

be allowed and distributed on pursuant to the Settlement Agreement. Moreover, the Gemini 9019

Motion Notice shall urge all Gemini Lenders to carefully review the Settlement Agreement and

the provide the deadline for responses to this Motion.

50.    The Debtors and Gemini believe that the form of the Gemini 9019 Motion Notice

is sufficient and effective notice in satisfaction of federal and state due process requirements and

other applicable law to put the Gemini Lenders on notice of the Motion, the Settlement Agreement,

and the assets proposed to be returned to them pursuant to the terms of the Settlement Agreement.

The notice program proposed herein is similar to the notice programs that RMBS trustees utilized

to provide notice to investors of settlements entered into by RMBS trustees on behalf of such

investors respectively in the Lehman Brothers Holdings Inc. and Residential Capital, LLC chapter

11 cases before this Court. *See In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (SCC)

(Bankr. S.D.N.Y. Mar. 22, 2017) (ECF No. 55096); *In re Res. Cap., LLC*, 497 B.R. 720, 744

(Bankr. S.D.N.Y. 2013) (the "robust notice program . . . designed by the Garden City Group,

ensured that all investors were provided with notices by distributing notices to all registered

holders of RMBS by mail and posting the notices and other information on the Trustee Website .

. . [,] was reasonably calculated to provide notice to all investors, . . . [and] fully satisfie[d] New

York and federal due process requirements.") (internal citations omitted).

51.    The Debtors submit that, in light of the nature of the relief requested, no other or

further notice need be provided.

### **NO PRIOR REQUEST**

52.    No prior motion for the relief requested herein has been made to this or any other

court.

*[Remainder of page left intentionally blank]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein the Debtors respectfully request that this Court (a) enter an order, substantially in the form attached hereto as **Exhibit A**, and (b) grant such other and further relief as is just and proper.

Dated:    March 19, 2024
           New York, New York

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and*
*Debtors-in-Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself<br>and as agent on behalf of the Gemini Lenders,<br><br>        Plaintiff,<br><br>    v.<br><br>GENESIS GLOBAL CAPITAL, LLC,<br><br>        Defendant. | Adv. Proc. No. 23-01192 (SHL) |
| GENESIS GLOBAL CAPITAL, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>GEMINI TRUST COMPANY, LLC,<br>individually and as agent on<br>behalf of the Earn Users, and<br>EARN USERS 1-232,824<br><br>        Defendants. | Adv. Pro. No. 23-01203 (SHL) |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

## ORDER APPROVING SETTLEMENT
## AGREEMENT AMONG THE DEBTORS, GEMINI TRUST
## COMPANY, LLC, THE AD HOC GROUP OF GENESIS LENDERS
## AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Upon the Motion[2] of Genesis Global Holdco, LLC ("Genesis") and its affiliated

debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (the "Chapter 11 Cases") for entry of an order (this "Order") pursuant to Rule 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the settlement and

compromise attached to the Motion as **Exhibit B** (as such agreement may be amended by the

Parties, the "Settlement Agreement") entered into by and among (i) the Debtors, (ii) Gemini Trust

Company, LLC ("Gemini"), on behalf of itself and on behalf of the Gemini Lenders, (iii) the Ad

Hoc Group of Genesis Lenders represented by Proskauer Rose LLP (the "Ad Hoc Group"), and

(iv) the Official Committee of Unsecured Creditors (the "Committee"); and upon the *Declaration*

*of Tom Conheeney in Support of Debtors' Motion for Entry of an Order Approving a Settlement*

*Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis*

*Lenders, and the Official Committee of Unsecured Creditors* (the "Conheeney Declaration")

attached to the Motion as **Exhibit C**; and the Court having jurisdiction to decide the Motion and

the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended*

*Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of

the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b), and

that the Court may enter a final order consistent with Article III of the United States Constitution;

and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the relief sought in the Motion and the opportunity for a hearing thereon having

---

[2]     All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

been provided in accordance with the Case Management Order and as to the Gemini Lenders in accordance with the procedures described in the Motion (*see Affidavit of Compliance*, ECF No. ___); such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on April [●], 2024 (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and the Court having overruled objections to the Motion (if any); and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The Debtors have demonstrated sound business judgment for entering into the Settlement Agreement, and the Debtors' entry into the Settlement Agreement is a valid exercise of their business judgment.

B.      The terms of the Settlement Agreement evidence good faith, arms-length negotiations and are fair and equitable.

C.      The settlement is plainly within the range of reasonableness and in the best interests of the Debtors and their estates and the creditors in this case.

D.      Based on the record before the Court, the Debtors have demonstrated good and sufficient basis for the Court to approve the Motion and the Debtors' entry into and performance under the Settlement Agreement.

E.      The Gemini Lenders have been provided good and adequate notice of the Motion and sufficient opportunity to be heard.  Notice of the Motion being duly and properly

served on the Gemini Lenders by Gemini, in accordance with the manner described in the Motion, shall constitute sufficient, adequate, and timely notice to the Gemini Lenders of this Settlement Agreement under the circumstances of these Chapter 11 Cases. No other or further notice need be provided.

F.      Gemini has the authority to bind the Gemini Lenders pursuant to the terms of the Gemini Earn Agreements, and the Gemini Lenders are bound by the terms of the Settlement Agreement.

G.      Each of the releases provided for in the Settlement Agreement (i) is within the Court's jurisdiction; (ii) is essential to administering the Debtors' estates; (iii) is an integral element of the Settlement Agreement and/or to its effectuation; (iv) confers material benefits on, and is in the best interests of, the Debtors' estates; and (v) is important to the overall objectives of the Settlement Agreement.

H.      The Settlement Agreement reflects an integrated and comprehensive settlement of the Parties' respective claims against each other, including Gemini acting as agent on behalf of the Gemini Lenders as to the Gemini Master Claim, and each component and provision contained therein and in this Order is an integral part thereof. The entry of this Order is necessary for the Settlement Agreement to become effective and achieve its goals, which are in the best interests of the Debtors' estates.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      Pursuant to Bankruptcy Rule 9019(a), the Settlement Agreement is approved, and the Debtors are authorized to enter into and perform under the Settlement Agreement.

3.      The provisions of the Settlement Agreement are incorporated herein by reference and shall be effective and binding as though fully set forth herein.  In the event of any conflict between the Settlement Agreement and this Order, the terms of this Order shall govern.

4.      As set forth in the Settlement Agreement, on the Settlement Effective Date, the Gemini Proprietary Claim against GGC shall be ALLOWED in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000) as a U.S. Dollar-denominated general unsecured claim and receive distributions thereon from the Debtors or the Wind-Down Debtors (as applicable) pursuant to the Plan or any other chapter 11 plan that may be proposed or effectuated the Chapter 11 Cases, or in a liquidation under chapter 7 of the Bankruptcy Code; *provided, however*, in the event that the aggregate amount of DCG Recoveries exceeds $769,230,769.00 (such amounts, "Incremental DCG Recoveries"), the Debtors or their successors in interest, on a joint and several basis, are authorized to transfer to Gemini, within five (5) Business Days of receipt by the Debtors, one and one-half percent (1.5%) of each such Incremental DCG Recovery up to an amount equal, in the aggregate, to Ten Million Dollars ($10,000,000.00); and, *provided, further*, that, for purposes of Section 2.7(b) of the Settlement Agreement, the dollar value of any DCG Recovery or Incremental DCG Recovery in a form other than USD shall be determined in a manner consistent with the second sentence of Section 2.2 of the Settlement Agreement.

5.      Notwithstanding anything to the contrary in the Plan, distributions to the Holders of Allowed Gemini Lender Claims on account of the Gemini Master Claim shall be strictly limited to the amounts provided under the Settlement Agreement.  The following Settlement Effective Date valuations shall be utilized for implementation of the Settlement Agreement:[3]

---

[3]      Upon agreement by the Parties to the Settlement Agreement, the Debtors will update the Court with the amounts below in advance of the hearing on the Motion.

    a.   MCDA Value: $[●];

    b.   Gemini GBTC Value: $[●];

    c.   TS Date (at 11:59PM ET) "bitcoin per share" value provided in the "Key Fund Information" section of the GBTC website (etfs.grayscale.com/gbtc): [●]

    d.   Effective Date Value of the Genesis Alt-Coin Distribution: $[●];

    e.   Effective Date Value of the Gemini Earn Operations Assets: $[●]; and

    f.   Genesis USD Distribution: $[●].

6.      As set forth in the Settlement Agreement, on the Settlement Effective Date, the Gemini Adversary Proceedings shall be dismissed with prejudice, and the Parties shall take any and all action reasonably necessary, including, without limitation, filing notices of dismissal with the Bankruptcy Court within seven (7) days of the date thereof, to effectuate such dismissals.

7.      As set forth in the Settlement Agreement, the Gemini Distribution Agent is hereby duly appointed as an agent of the Debtors' estates solely for purposes of effectuating the Settlement Agreement as provided therein.  The Gemini Distribution Agent is authorized and directed to distribute the Gemini Distribution Assets and, subject to Section 2.5(c) of the Settlement Agreement, the Completion Digital Assets to the Gemini Lenders in full satisfaction of each Individual Earn Obligation.

8.      All distributions made by the Gemini Distribution Agent to the Gemini Lenders, including, without limitation, the Gemini Distribution Assets and the Completion Digital Assets, shall constitute distributions from the Debtors' estates on account of the Gemini Master Claim for all purposes.

9.      As set forth in the Settlement Agreement, the Gemini Distribution Agent, in its sole and absolute discretion and acting on behalf of the Debtors, is authorized to monetize or otherwise convert the Gemini Contribution, the Gemini GBTC Shares, the Genesis Distribution, the Gemini Reserved Coins, the Gemini Earn Operation Assets, and the DCG Receipts, if any, to obtain Master Claim Digital Assets for the purpose of satisfying through in-kind delivery to the greatest extent possible the Gemini Master Claim.

10.     The Parties are authorized to take any action as may be necessary or appropriate to implement, effectuate, and fully perform any and all obligations under the Settlement Agreement, including, without limitation, to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement, effectuate, and fully perform under the Settlement Agreement.

11.     The releases set forth in the Settlement Agreement are hereby approved in all respects and shall be effective on the Settlement Effective Date.

12.     Following the distribution of the Gemini Distribution Assets in accordance with Section 2.5(b) of the Settlement Agreement and the distribution of the Completion Digital Assets in accordance with Section 2.5(c) of the Settlement Agreement, neither Gemini nor the Gemini Distribution Agent shall have any further obligations to the Gemini Lenders with respect to the Gemini Master Claim.

13.     Upon completion of the Genesis Distribution in accordance with the provisions of Section 2.4 of the Settlement Agreement, the obligations of the Debtors with respect to the Gemini Master Claim shall be limited to the payments and deliveries (if any) to be made in accordance with Section 2.2 of the Settlement Agreement.

7

14.     The failure to specifically include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Parties' entry into the Settlement Agreement and implementation of the transactions contemplated therein be approved in their entirety.

15.     All persons, as defined in the Bankruptcy Code, are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Parties to carry out the transactions contemplated under the Settlement Agreement pursuant to and subject to the terms of the Settlement Agreement.

16.     Nothing contained in any subsequent settlement, or in any other order, decision, judgment, nor any act of any Party, shall alter, conflict with, or derogate from the provisions of the Settlement Agreement or this Order, except pursuant to (i) a successful appeal or certiorari from this Court or (ii) an order of this Court approving an amendment or modification to the Settlement Agreement as agreed by the Parties in accordance with the Settlement Agreement's terms.

17.     This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, their creditors, successors, and assigns, and any affected third parties, notwithstanding the subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) this Order likewise shall be binding.

18.     The Debtors' claims agent, Kroll Restructuring Administration LLC, and the clerk of this Court are authorized to take all actions necessary and appropriate to give effect to this Order.

19.    This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).  To the extent applicable, Bankruptcy Rule 6004(h) is hereby waived.

20.    This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the Motion, the Settlement Agreement, or the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2024
       New York, New York


                                        _____
                                        HON. SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Settlement Agreement**

**EXECUTION VERSION**

<br>

# SETTLEMENT AGREEMENT

## BY AND AMONG

## GENESIS GLOBAL CAPITAL, LLC,

## GENESIS GLOBAL HOLDCO, LLC,

## GENESIS ASIA PACIFIC PTE. LTD.,

## THE AD HOC GROUP OF GENESIS LENDERS

## GEMINI TRUST COMPANY, LLC

## AND

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT, dated as of March 18, 2024, by and among (a) Genesis Global Capital, LLC ("**GGC**"), Genesis Global Holdco, LLC ("**GGH**"), and Genesis Asia Pacific Pte. Ltd. ("**GAP**"), (b) the Ad Hoc Group of Genesis Lenders represented by Proskauer Rose LLP (the "**AHG**"), (c) the Official Committee of Unsecured Creditors, solely with respect to itself, and not with respect to any of its individual members (the "**UCC**"), appointed in the Debtors' Chapter 11 Cases, as defined below, and (d) Gemini Trust Company, LLC ("**Gemini**"), on behalf of itself and the Gemini Lenders, as defined below. Each of the foregoing shall be referred to as a "**Party**" and collectively as the "**Parties**".  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS

A.      On January 19, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the jointly administered cases captioned *In re Genesis Global Holdco, LLC et al.*, Case No. 23-10063 (SHL) (the "**Chapter 11 Cases**").

B.      Prior to the Petition Date, GGC entered into certain Master Digital Loan Agreements with Gemini and certain users of Gemini (each such user a "**Gemini Lender**" and collectively the "**Gemini Lenders**") pursuant to which such Gemini Lenders agreed to lend certain digital assets to GGC, with Gemini acting as custodian and agent for such users in certain respects (such agreements, the "**Gemini Earn Agreements**" and the transactional arrangements as set forth in the Gemini Earn Agreements, the "**Gemini Earn Program**").

C.      Through the Gemini Earn Program, the Gemini Lenders agreed, among other things, to lend Digital Assets to GGC in exchange for the return of such Digital Assets upon the request or at the expiration of a specified period and the payment by GGC of specified fees pursuant to the terms of the relevant Gemini Earn Agreement.

D.      On August 15, 2022, GGC entered into a security agreement (as may be amended, restated or modified from time to time, the "**Security Agreement**") with Gemini, as agent for the Gemini Lenders, pursuant to which GGC pledged 30,905,782 shares of the Grayscale Bitcoin Trust, a trust managed and operated by DCG ("**GBTC**") to secure GGC's obligations to the Gemini Lenders pursuant to the Gemini Earn Agreements (the "**Gemini GBTC Shares**").

E.      On November 10, 2022, GGC, Gemini and GGC's parent company, Digital Currency Group, Inc. ("**DCG**") entered into a second amendment to the Security Agreement (the "**Second Amendment**"), pursuant to which DCG agreed to deliver an additional 31,180,804 shares of GBTC (the "**Additional GBTC Shares**") to GGC against which Gemini has asserted among other things, a security interest on behalf of the Gemini Lenders.

F.      GGC breached the Second Amendment by failing to deliver the Additional GBTC Shares to Gemini.

G.      On November 16, 2022 (the "**Suspension Date**"), GGC announced that it was suspending redemptions by the Gemini Lenders from the Gemini Earn Program and Gemini purported to foreclose on the Gemini GBTC Shares for total proceeds of $284,333,194.40.

H.      As of the date hereof, redemptions have not resumed and the Gemini Lenders continue to be unable to access the Master Claim Digital Assets.

I.      On February 3, 2023, the United States Trustee filed the Notice of Appointment of Official Committee of Unsecured Creditors (ECF No. 53), thereby appointing creditors to serve on the UCC.

J.      Pursuant to an order of the Bankruptcy Court, (i) Gemini, as agent on behalf of the Gemini Lenders, filed Proof of Claim No. 356 against GGC (the "**Gemini Master Claim**") which asserts, among other things, claims for all of the Master Claim Digital Assets, and (ii) Gemini, in its individual capacity, filed Proof of Claim No. 406 against GGC (the "**Gemini Proprietary Claim**"), which asserts, among other things, claims for agent fees and late fees and claims related to GGC's obligation to indemnify Gemini and its affiliates, officers, directors, employees, agents, consultants or other representatives for certain liabilities in accordance with the terms of the Gemini Earn Agreements.

K.      On July 7, 2023, Gemini commenced litigation against DCG and Barry Silbert, by filing a complaint, captioned *Gemini Trust Company, LLC v. Digital Currency Group, Inc., et al.*, Case No. 1:23-cv-06864-LJL (S.D.N.Y.), asserting causes of action premised on, among other things, fraud and aiding and abetting fraud (the "**DCG Action**").

L.      On October 27, 2023, Gemini filed an adversary proceeding in the Bankruptcy Court against GGC through the Adversary Complaint, ECF No. 1, Adv. Pro. 23-01192 (SHL) (the "**GBTC Action**") seeking declaratory judgments from the Bankruptcy Court that (i) Gemini properly foreclosed on the Gemini GBTC Shares on November 16, 2022, (ii) the Additional GBTC Shares are not property of any of the Debtors' estates, and (iii) Gemini has a security interest in, or constructive trust over, the Additional GBTC Shares.

M.      On November 21, 2023, GGC filed (i) (a) a motion to dismiss the claims asserted in the GBTC Action related to the Additional GBTC Shares and (b) an answer to the claims asserted in the GBTC Action related to the Gemini GBTC Shares, denying the allegations in support of Gemini's purported foreclosure and asserting that the agreement extending Gemini's obligation to return the Gemini GBTC Shares constituted an avoidable constructive fraudulent conveyance, and (ii) an adversary proceeding in the Bankruptcy Court against Gemini and certain Gemini Lenders through the Adversary Complaint, ECF No. 1, Adv. Pro. 23-01203 (SHL) (the "**Gemini Preference Action**").

N.      On November 28, 2023, the Debtors, members of the AHG and the UCC entered into a Plan Support Agreement (ECF No. 1008).

O.      On December 6, 2023, the Bankruptcy Court entered the Disclosure Statement Order approving the solicitation of the Debtors' Amended Joint Chapter 11 Plan, dated November 28, 2023 (ECF No. 989, and as amended at ECF Nos. 993, 1325 and 1392, and as it may be further amended, modified, or supplemented, the "**Plan**" ).

P.      On December 18, 2023, Gemini filed a motion to dismiss GGC's counterclaims related to the Additional GBTC Shares.

Q.      On January 5, 2024, Gemini filed a motion to dismiss GGC's counterclaims related to the Gemini GBTC Shares.

R.      On February 7, 2024, the Bankruptcy Court rendered an opinion in favor of the Debtors with respect to the Debtors' motion to dismiss the claims asserted in the GBTC Action related to the Additional GBTC Shares wherein it held that Gemini and the Gemini Lenders did not have a valid and perfected lien on, a security interest in or a constructive trust over the Additional GBTC Shares.

S.      On February 26, 2024, the Debtors filed the *Stipulation and Order by and Between the Debtors and Gemini Trust Company, LLC on Behalf of Gemini Lenders, Allowing the Gemini Master Claim (Claim No. 356)* (ECF No. 1393), which, upon approval by a Final Order of the Bankruptcy Court, among other things, would allow the Gemini Master Claim against GGC for the Master Claim Digital Assets (the "**Master Claim Stip**").

T.      Following months of arm's length good faith negotiation and to avoid unnecessary and costly litigation, on February 28, 2024 (the "**TS Date**"), the Parties executed the *Term Sheet Regarding Gemini Claims* (the "**Term Sheet**") in which they agreed to resolve all issues among them, including, without limitation, the GBTC Action and Gemini Preference Action, and among GGC and all of the Gemini Lenders, and to execute this Settlement Agreement, consistent with the terms and conditions of the Term Sheet.

NOW, THEREFORE, the Parties, in consideration of the foregoing and the terms, conditions, agreements, representations and covenants set forth herein, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1      **Recitals**.  The recitals set forth above are incorporated by reference, are accepted as true by the Parties, and are made a part of the agreement among the Parties.

Section 1.2      **Definitions**. The following definitions shall apply to and constitute part of this Settlement Agreement and all schedules, exhibits and annexes hereto:

"**Alt-Coins**" shall mean, collectively, any and all Digital Assets other than BTC, ETH, or Stablecoins.

"**Application**" shall mean the application to be filed seeking entry of an order, pursuant to Rule 9019 of the Bankruptcy Rules, approving the compromise and settlement set forth in this Settlement Agreement.

"**Application Date**" shall mean the date on which the Application is filed with the Bankruptcy Court.

4

"**Approval Order**" shall mean an order approving this Settlement Agreement entered by the Bankruptcy Court that meets the requirements set forth in Sections 4.1 and 5.1(c) hereof, which order shall be in form and substance reasonably acceptable to the Parties.

"**Avoidance Actions**" shall mean any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

"**BTC**" shall mean bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

"**Business Day**" shall mean any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Causes of Action**" shall mean, whether asserted against a Debtor or any other Person or Entity, any action, claim, cause of action, controversy, third-party claim, dispute, proceeding, demand, right, action, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" also includes: (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of fiduciary duty, or violation of state or federal law, including securities laws, negligence, and gross negligence; (iii) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or interests; (iv) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including any action under section 542 of the Bankruptcy Code or any Avoidance Actions); (v) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any state or foreign law fraudulent transfer or similar claim.

"**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

5

"**Completion Digital Assets**" shall mean an amount of each Master Claim Digital Asset type equal to the product of each such Master Claim Digital Asset multiplied by the Redemption Completion Percent.

"**DCG Amount Cap**" shall mean the difference calculated in USD between (i) Fifty Million Dollars ($50,000,000.00), minus (ii) any DCG Receipts.

"**DCG Note**" shall mean that certain promissory note, dated as of June 30, 2022, issued by DCG to GGC, in the original principal amount of One Billion One Hundred Million Dollars ($1,100,000,000.00), bearing interest at the rate of one percent (1%) per annum, which interest may, at DCG's option, be payable in kind.

"**DCG Party**" shall mean, collectively, DCG, DCG International Investments Ltd., and each of their respective affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; provided, however, that DCG Parties shall not include any Genesis Personnel, as defined in the Plan.  For the avoidance of doubt, a "DCG Party" may also be an Excluded Party.

"**DCG Receipts**" shall mean any value paid directly by DCG to Gemini on behalf of the Gemini Lenders, as a result of the DCG Action and/or DCG Recoveries that the Debtors or their successors in interest transfer to the Gemini Distribution Agent in accordance with the provisions of Section 2.2 hereof.

"**DCG Recoveries**" shall mean any dollar amounts, any indebtedness, and any other assets, received from time to time following the TS Date by the Debtors, or their successors in interest, from DCG, any DCG Party, or on behalf of, or at the direction of, any DCG Party whether through litigation, settlement, or otherwise, including for the avoidance of doubt and without limitation any recovery by any Debtor with respect to payments or proceeds, if any, related to (a) the DCG Note, (b) the claims and Causes of Action assigned in accordance with the provisions of Section 2.6 hereof, and (c) the claims and Causes of Action asserted in Case Nos. 23-BK-01168, 23-01169, and 24-01312 pending in the Bankruptcy Court.

"**Debtor Releasees**" shall mean, collectively, each Debtor and, solely in their capacities as such, its respective Related Parties; provided, however, that "Debtor Releasees" shall not include any DCG Parties or any Excluded Parties.

"**Debtor Releasors**" shall mean, collectively, each Debtor on behalf of itself, and solely in their capacities as such, its respective Related Parties.

"**Debtors**" shall mean, collectively, GGH, GGC, and GAP; provided, however, that, except as otherwise specifically provided in this Settlement Agreement to the contrary, references in this Settlement Agreement to the Debtors from and after the Plan Effective Date shall mean the Wind-Down Debtors to the extent context requires.

"**Digital Asset**" shall mean a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including Stablecoins, digital coins, and tokens, such as security tokens, utility tokens, and nonfungible tokens, and governance tokens.

"**Effective Date Value**" shall mean, with respect to the applicable Digital Asset, an amount in USD equal to a fraction, (A) the numerator of which is the sum of the price in USD of the applicable Digital Asset determined as of 6:00 p.m. EST on March 1, 2024, plus such price determined as of the expiration of every one-minute period thereafter and until 5:59 p.m. EDT on March 11, 2024, and (B) the denominator of which is 14,340.

"**Entity**" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

"**ETH**" shall mean ether, the native Digital Asset of the Ethereum blockchain, as described in https://ethereum.org/en/what-is-ethereum/.

"**Excluded Party**" shall mean, in their individual capacities, (i) Barry Silbert, (ii) Mark Murphy, (iii) Michael Kraines, and (iv) Ducera Partners LLC and its affiliates and subsidiaries, and any current or former employee, officer, or director of Ducera Partners LLC or its affiliates and subsidiaries who was engaged by, or performed services for, DCG, DCG International Investments Ltd., or any of their respective affiliates and subsidiaries during the one (1)-year period prior to the Petition Date. For the avoidance of doubt, an Excluded Party may also be a DCG Party.

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court or another court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which is in full force and effect and has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for writ of certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or writ of certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, for the avoidance of doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; and, provided further, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"**GBTC Replacement Assets**" shall mean Digital Assets obtained by the Gemini Distribution Agent using the proceeds of the Gemini GBTC Shares monetized, sold, or redeemed by the Gemini Distribution Agent, pursuant to the Trust Asset Order.

"**Gemini Adversary Proceedings**" shall mean, collectively, (a) the Gemini Preference Action; and (b) the GBTC Action.

"**Gemini Contribution**" shall mean either (a) Fifty Million Dollars ($50,000,000.00), (b) Digital Assets having a value of Fifty Million Dollars ($50,000,000.00) as of the instant of deposit, or (c) a combination of USD and Digital Assets having a value of Fifty Million Dollars ($50,000,000.00) as of the instant of deposit.

"**Gemini Distribution Agent**" shall mean (a) Gemini or (b) any Person or Entity appointed by Gemini, with the prior written consent of the Debtors, the UCC and the AHG, solely, in respect of both (a) and (b), in the capacity set forth in Section 10.1 hereof.

"**Gemini Distribution Assets**" shall mean the USD and Digital Assets acquired by the Gemini Distribution Agent from the proceeds of (a) the Digital Asset Rebalance referenced in Section 2.5 hereof, (b) the Gemini Contribution, (c) the Genesis Distribution, and (d) any DCG Receipts.

"**Gemini Earn Operations Assets**" shall mean the USD and the amount and type of Digital Assets held by Gemini and owned by the Debtors, and as set forth on Schedule "B" annexed hereto.

"**Gemini GBTC Value**" shall mean the product of: (a) the Effective Date Value of BTC, times (b) 30,905,782 (the number of Gemini GBTC Shares as of the TS Date), times (c) the TS Date (at 11:59PM ET) "bitcoin per share" value provided in the "Key Fund Information" section of the GBTC website (etfs.grayscale.com/gbtc).

"**Gemini Releasees**" shall mean Gemini and, solely in their capacities as such, its past and present officers, directors, principals, employees, successors, attorneys, and insurers.

"**Gemini Releasors**" shall mean Gemini and, solely in their capacities as such, its officers, directors, shareholders, employees, subsidiaries, agents, attorneys and representatives.

"**Gemini Reserved Coins**" shall mean those Digital Assets, identified on Exhibit D to the Gemini Master Claim and which are set forth on Schedule "C" annexed hereto, that Gemini holds on behalf of the Gemini Lenders.

"**Gemini Retention Costs**" shall mean, collectively, all fees and expenses attributable to the retention of the Gemini GBTC Shares from and after the TS Date.

"**Individual Earn Obligation**" shall mean, for each Gemini Lender, the amount of Digital Assets owed, as of the Suspension Date, pursuant to the Gemini Earn Agreement to which such Gemini Lender is a party, as such amount is listed as a "pending redemption" on such Gemini Lender's Earn account page at https://exchange.gemini.com/signin as of the date of the Application.

"**Master Claim Digital Assets**" shall mean the type and quantity of Digital Assets set forth on Schedule "A" annexed hereto.

"**MCDA Value**" shall mean the Effective Date Value of the Master Claim Digital Assets.

"**Other Genesis Entities**" shall mean, collectively, the following subsidiaries of GGH other than GGC and GAP: Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited, GGC International Limited, GGA International Limited, Genesis Global Markets Limited, GSB 2022 I LLC, GSB 2022 II LLC, and GSB 2022 III LLC.

"**Person**" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Plan Effective Date**" shall mean the date the Plan or any other chapter 11 plan that may be proposed or effectuated in the Chapter 11 Cases is declared effective in accordance with its terms.

"**Redemption Completion Percent**" shall mean an amount equal to the quotient of (i) Fifty Million Dollars ($50,000,000.00) divided by (ii) the MCDA Value.

"**Related Party**" shall mean, in their capacities as such, with respect to any entity, such entity's predecessors, successors and assigns, parents, subsidiaries, affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees; provided, however, that "**Related Party**" shall not include any DCG Party or any Excluded Party.

"**Settlement Effective Date**" shall mean the date upon which the conditions set forth in ARTICLE V hereof are satisfied or otherwise waived, in writing, by the Parties.

"**Stablecoin**" shall mean a type of Digital Asset designed to reduce price volatility through either (i) pegging the value of the Digital Asset to a reserve asset, such as a fiat currency, exchange-traded commodity, or another Digital Asset, or (ii) algorithmically regulating the supply of the Digital Asset.

"**SteerCo Members**" shall mean the members of the steering committee of the AHG as of the date hereof.

"**Trust Asset Order**" shall mean that certain Order (I) Authorizing, but Not Directing, the Sale of Trust Assets and (II) Granting Related Relief (ECF No. 1314).

"**USD**" or "**$**" or "**U.S. Dollars**" shall mean the lawful currency of the United States of America.

"**Wind-Down Debtors**" shall mean, collectively, GGC, GAP, and GGH, or any successor thereto, by merger, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, in each case on and after the Plan Effective Date to, among other things, effectuate the wind down of such Debtors' estates following the Plan Effective Date.

9

The following terms are defined where indicated in this Settlement Agreement:

Term                                                                                      Section

Additional GBTC Shares ................................................................. Recitals
Agreed Values ...............................................................................5.1(b)
AHG ............................................................................................ Preamble
Authorizations ................................................................................ 7.4
Bankruptcy Code ........................................................................... Recitals
Bankruptcy Court........................................................................... Recitals
Chapter 11 Cases ........................................................................... Recitals
DCG .............................................................................................. Recitals
DCG Action ................................................................................... Recitals
DCG Amount ................................................................................. 2.2
Digital Asset Rebalance .................................................................2.5(a)
GAP............................................................................................... Preamble
GBTC ............................................................................................ Recitals
GBTC Action ................................................................................. Recitals
Gemini ........................................................................................... Preamble
Gemini Earn Agreements ............................................................... Recitals
Gemini Earn Program .................................................................... Recitals
Gemini GBTC Shares ..................................................................... Recitals
Gemini Lender ............................................................................... Recitals
Gemini Lenders .............................................................................. Recitals
Gemini Master Claim...................................................................... Recitals
Gemini Preference Action............................................................... Recitals
Gemini Proprietary Claim .............................................................. Recitals
Genesis Alt-Coin Distribution ........................................................2.4(a)(i)
Genesis Distribution........................................................................2.4(a)(ii)
Genesis USD Distribution ...............................................................2.4(a)(ii)
GGC .............................................................................................. Preamble
GGH .............................................................................................. Preamble
Incremental DCG Recoveries .........................................................2.7(b)
Indemnified Parties ........................................................................ 3.3
Losses............................................................................................. 3.3
Master Claim Stip ......................................................................... Recitals
Parties............................................................................................ Preamble
Party .............................................................................................. Preamble
Petition Date.................................................................................. Recitals
Plan ............................................................................................... Recitals
Proceeding...................................................................................... 3.3
Redemption Account ...................................................................... 2.1
Second Amendment........................................................................ Recitals
Security Agreement ........................................................................ Recitals
Suspension Date............................................................................. Recitals
Term Sheet ..................................................................................... Recitals
TS Date ......................................................................................... Recitals

## ARTICLE II

## PAYMENTS AND DISTRIBUTIONS

Section 2.1    Gemini Contribution.  No later than five (5) Business Days following the Settlement Effective Date, Gemini shall deposit, for the benefit of the Gemini Lenders, the Gemini Contribution into a segregated account identified on Gemini's records as account number 34162511 and with account name "Gemini Agent Redeem FBO Earn" (the "**Redemption Account**") with the Gemini Distribution Agent, which Gemini Contribution shall be distributed to the Gemini Lenders on account of the Gemini Master Claim concurrently with the initial distribution of the Gemini Distribution Assets pursuant to the provisions of Section 2.5(b) hereof.

Section 2.2    DCG Amount.  Following the Settlement Effective Date, and solely in the event that DCG does not pay or otherwise transfer Fifty Million Dollars ($50,000.000.00) (the "**DCG Amount**") in the aggregate to Gemini following the TS Date but prior to the Application Date, the Debtors or their successors in interest, on a joint and several basis, shall transfer to the Gemini Distribution Agent, within five (5) Business Days of receipt, six and one-half percent (6.5%) of each USD and of each asset, in each case, that constitutes a DCG Recovery, up to an amount equal, in the aggregate, to the DCG Amount Cap. Solely for purposes of calculating the DCG Amount Cap and the six and one-half percent (6.5%) portion of any DCG Recovery hereunder, the dollar value of any DCG Recovery in a form other than USD shall be equal to: (i) for any DCG Recovery in the form of Digital Assets, the value of such Digital Assets as of the instant of receipt by the Gemini Distribution Agent of such Digital Asset based on the applicable price as provided for in Section 11.11(b) hereof; (ii) for any DCG Recovery in the form of indebtedness, the face amount of such indebtedness (which face amount, if denominated in the form of Digital Assets, shall be valued (but, for the avoidance of doubt, not transferred) in USD as of the instant of receipt by the Gemini Distribution Agent of such indebtedness); (iii) for any DCG Recovery in the form of securities that have an existing public market, the average closing price for such securities for the ten (10) trading days prior to the day of receipt of such securities by the Gemini Distribution Agent; and (iv) for any DCG Recovery in the form of securities that do not have an existing public market, or any other form of consideration, the fair market value of such securities or other form of consideration as mutually agreed upon in good faith by the Parties and, if the Parties fail to agree on such fair market value within ten (10) calendar days of receipt thereof by the Gemini Distribution Agent, the fair market value as of the date of delivery to the Gemini Distribution Agent, as determined by the Bankruptcy Court.  Any amounts turned over to the Gemini Distribution Agent pursuant to this Section 2.2 shall be used by the Gemini Distribution Agent to deliver the Completion Digital Assets as provided in Section 2.5(c) hereof.

Section 2.3    Gemini Earn Operations Assets.  No later than five (5) Business Days following the Settlement Effective Date, Gemini shall transfer the Gemini Earn Operations Assets to the Redemption Account to be distributed to the Gemini Lenders on account of the Gemini Master Claim concurrently with the initial distribution of the Gemini Distribution Assets pursuant to the provisions of Section 2.5(b) hereof.

11

Section 2.4    Genesis Distribution.

(a)    No later than five (5) Business Days following the Settlement Effective Date, GGC shall deliver to the Gemini Distribution Agent, for distribution to the Gemini Lenders:

(i)    the number and type of Alt-Coins set forth on Schedule "D" annexed hereto (the "**Genesis Alt-Coin Distribution**"); and

(ii)    an amount in USD equal to (i) the MCDA Value minus (ii) the sum of (A) the Gemini Contribution, (B) the DCG Amount, (C) the Gemini GBTC Value, (D) the Effective Date Value of the Genesis Alt-Coin Distribution to the extent made in accordance with Section 2.4(a)(i) hereof, and (E) the Effective Date Value of the Gemini Earn Operations Assets (the "**Genesis USD Distribution**" and together with the Genesis Alt-Coin Distribution, the "**Genesis Distribution**").

(b)    Upon completion of the Genesis Distribution in accordance with the provisions of this Section 2.4 hereof, the obligations of the Debtors with respect to the Gemini Master Claim shall be limited to the payments and deliveries if any to be made in accordance with Section 2.2 hereof and as otherwise set forth in this Settlement Agreement.

Section 2.5    Digital Asset Rebalance and Gemini Distribution Assets.

(a)    The Gemini Distribution Agent, in its sole and absolute discretion and acting on behalf of the Debtors, is authorized to monetize or otherwise convert the Gemini Contribution, the Gemini GBTC Shares, the Genesis Distribution, the Gemini Reserved Coins, the Gemini Earn Operations Assets, and the DCG Receipts, if any, for the purpose of satisfying through in-kind delivery to the greatest extent possible the Gemini Master Claim (the monetization described in this sentence, the "**Digital Asset Rebalance**").

(b)    Following the Settlement Effective Date and the consummation of the Genesis Distribution, the Gemini Distribution Agent shall distribute, from time to time promptly upon its receipt thereof, but in no event later than fifteen (15) Business Days thereafter, in accordance with the provisions of this Settlement Agreement, the Gemini Distribution Assets on behalf of the Debtors to the Gemini Lenders in satisfaction of their claims, reducing the Gemini Master Claim on a coin-for-coin basis with respect to each Digital Asset so delivered to the Gemini Lenders; provided, however, that the Gemini Distribution Assets shall not include the Completion Digital Assets, which assets shall be distributed in accordance with the provisions of Section 2.5(c) hereof.

(c)    The Gemini Distribution Agent shall deliver the Completion Digital Assets on behalf of the Debtors to the Gemini Lenders in its sole and absolute discretion; provided, however, that, if the Gemini Distribution Agent receives DCG Receipts that, in the aggregate, are in value (for such other assets, as determined in accordance with the provisions of Section 2.2 hereof) equal to or greater than Ten Million Dollars ($10,000,000.00) or a multiple of Ten Million Dollars ($10,000,000.00), the Gemini Distribution Agent shall distribute to the Gemini Lenders in satisfaction of their claims, within thirty (30) days of such receipt, a portion of the Completion Digital Assets equal to the quotient of (y) Ten Million Dollars ($10,000,000.00) or

the applicable multiple thereof divided by (z) Fifty Million Dollars ($50,000,000.00). Following the distribution of the Gemini Distribution Assets in accordance with the provisions of <u>Section 2.5(b)</u> hereof and of the Completion Digital Assets in accordance with the immediately preceding sentence, neither Gemini nor the Gemini Distribution Agent shall have any further obligations to the Gemini Lenders with respect to the Gemini Master Claim.

Section 2.6    <u>Assignment of Litigation Claims and Proceeds</u>.    From and after the Application Date, Gemini shall not settle any claims or Causes of Action against DCG without the prior written consent of the Debtors, the AHG and the UCC, which consent shall not be unreasonably withheld, conditioned, or delayed.  On the Settlement Effective Date and provided that DCG has not, as of such date, consummated a settlement of claims that Gemini or the Debtors maintain against DCG, Gemini shall irrevocably transfer, assign, grant and convey to GGC, or its successor in interest, for the benefit of GGC's creditors, all of Gemini's right, title and interest in and to any and all claims and Causes of Action that Gemini has asserted, or that could have been asserted, in the DCG Action, including any rights and defenses relating to such claims and Causes of Action, the facts underlying the DCG Action and any claims related to the DCG Action for indemnification arising from or relating to the Gemini Contribution or with respect to potential joint tortfeasor obligations.

Section 2.7    <u>Gemini Proprietary Claim</u>.

(a)    On the Plan Effective Date, the Gemini Proprietary Claim shall be Allowed, as defined in the Plan, as a general unsecured claim against GGC in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (and for the purpose of the Plan be classified as a Class 3 general unsecured claim); <u>provided</u>, <u>however</u>, that, in no event shall the Gemini Proprietary Claim be afforded any lesser treatment under the Plan, any other chapter 11 plan that may be proposed or effectuated in the Chapter 11 Cases, or in a liquidation under chapter 7 of the Bankruptcy Code than any other similarly situated general unsecured claim.  Gemini shall receive distributions on the Gemini Proprietary Claim from the Debtors or the Wind-Down Debtors (as appropriate) pursuant to the Plan, including the Distribution Principles, as defined in the Plan.

(b)    In the event that the aggregate amount of DCG Recoveries exceeds $769,230,769.00 (such amounts, "**Incremental DCG Recoveries**"), the Debtors or their successors in interest, on a joint and several basis, shall transfer to Gemini, within five (5) Business Days of receipt by the Debtors, one and one-half percent (1.5%) of each such Incremental DCG Recovery up to an amount equal, in the aggregate, to Ten Million Dollars ($10,000,000.00). For purposes of this Section 2.7(b), the dollar value of any DCG Recovery or Incremental DCG Recovery in a form other than USD shall be determined in a manner consistent with the second sentence of Section 2.2 hereof.

(c)    Gemini shall waive all other claims it holds in its individual capacity against the Debtors, including, without limitation, any claims for substantial contribution or other fees and expenses incurred by Gemini, as agent or otherwise, in connection with the Chapter 11 Cases, the Gemini Master Claim, and the Gemini Proprietary Claim.

13

(d)      Nothing in this Settlement Agreement shall affect Gemini's rights or entitlements pursuant to: (a) *the Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 1027]; or (b) Article VI.B.2 of the Plan (which article shall, solely as to matters pertaining to the Gemini Distribution Agent, not be amended without Gemini's Consent, as defined in the Plan).

Section 2.8    Gemini Adversary Proceedings.  On the Settlement Effective Date, the Gemini Adversary Proceedings shall be deemed dismissed, with prejudice.  Within seven (7) Business Days of the Settlement Effective Date, the Parties shall take any and all action reasonably necessary to effectuate such dismissal and the waiver of their respective claims asserted in the Gemini Adversary Proceedings, including, without limitation, the filing of notices of dismissal with the Bankruptcy Court.  For the avoidance of doubt, on the Settlement Effective Date, the Debtors shall be deemed to have released and waived all claims and Causes of Action that may be asserted against any Gemini Lenders (including with respect to Gemini Lenders with zero or de minimis balances as of the Petition Date, but with non-zero or non-de minimis balances as of the applicable preference period) pursuant to section 547 of the Bankruptcy Code by the Debtors and the Debtors' Estates, including, without limitation, any successors in interest.

Section 2.9    Gemini Master Claim.  Within one (1) Business Day after the Application Date, the Debtors shall seek the adjournment of the presentment date of the Master Claim Stip to a date and time contemporaneous with the Bankruptcy Court's determination of the Application. Upon approval of the Master Claim Stip by a Final Order of the Bankruptcy Court, the Gemini Master Claim shall be deemed Allowed, as defined in the Plan, as a general unsecured claim against GGC for the Master Claim Digital Assets (and for the purpose of the Plan be classified as a Class 7 general unsecured claim) with distributions on account of the Gemini Master Claim strictly limited to those provided for in this Settlement Agreement.

## ARTICLE III

## RELEASE OF CLAIMS AND INDEMNIFICATION

Section 3.1    Debtors/UCC/AHG and SteerCo Releases.  As of the Settlement Effective Date, without the need for the execution and delivery of additional documentation or the entry by the Bankruptcy Court of any order other than the Approval Order becoming a Final Order, the Debtor Releasors, the AHG (for itself and on behalf of the SteerCo Members, but not with respect to any other AHG members), and the UCC hereby release, waive, acquit and forever discharge the Gemini Releasees and each of them, from any and all accounts, actions, agreements, bonds, bills, causes of action, claims, contracts, controversies, costs, covenants, damages, disputes, debts, executions, judgments, lawsuits, liabilities, obligations, promises, reckonings, specialties, suits, sums of money, trespasses, variances, of whatever kind, nature, character or description, including, without limitation, claims for monies, damages, costs, expenses, losses and attorneys', accountants' and experts' fees and expenses, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, which the Debtor Releasors, the AHG (as an Entity), the SteerCo Members, or the UCC may have or may hereafter claim to have, or which might have been alleged, against the Gemini Releasees from the beginning of

time up to and including the Settlement Effective Date, including, for the avoidance of doubt, (i) any claims resulting from Gemini's purported foreclosure on the Gemini GBTC Shares, and (ii) any claims related to the Gemini Reserved Coins and the Gemini Earn Operations Assets; provided, however, that this release shall not cover obligations reflected in this Settlement Agreement, which obligations shall survive this release subject to the provisions of this Settlement Agreement.

Section 3.2    Gemini Releases.  As of the Settlement Effective Date, without the need for the execution and delivery of additional documentation or the entry by the Bankruptcy Court of any order other than the Approval Order becoming a Final Order, the Gemini Releasors hereby release, waive, acquit and forever discharge the Debtor Releasees, the AHG, the SteerCo Members, and the UCC, and each of them, from any and all accounts, actions, agreements, bonds, bills, causes of action, claims, contracts, controversies, costs, covenants, damages, disputes, debts, executions, judgments, lawsuits, liabilities, obligations, promises, reckonings, specialties, suits, sums of money, trespasses, variances, of whatever kind, nature, character or description, including, without limitation, claims for monies, damages, costs, expenses, losses and attorneys', accountants' and experts' fees and expenses, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, which the Gemini Releasors may have or may hereafter claim to have, or which might have been alleged, against the Debtor Releasees, the AHG, the SteerCo Members, or the UCC from the beginning of time up to and including the Settlement Effective Date; provided, however, that this release shall not cover: (i) the Gemini Proprietary Claim; (ii) obligations reflected in this Settlement Agreement, which claims and obligations shall survive this release subject to the provisions of this Settlement Agreement; and (iii) Claims or Causes of Action assigned to the Debtors pursuant to the terms hereof.

Section 3.3    Indemnification.  In the event that any of the Debtors or their successors in interest or respective Related Parties (the "**Indemnified Parties**") becomes involved in any claim, suit, action, or proceeding commenced by any Gemini Lender against any Indemnified Party after the completion of the Genesis Distribution in accordance with the provisions of Section 2.4 hereof arising from any action taken by any Indemnified Party in accordance with this Settlement Agreement (collectively, a "**Proceeding**"), Gemini shall indemnify such Indemnified Party for any losses and reasonable and documented legal expenses caused by such Proceeding ("**Losses**"), except to the extent that that such Losses (a) resulted from the gross negligence, fraud or willful misconduct of an Indemnified Party as determined by a Final Order of a court of competent jurisdiction or (b) relate solely to an appeal taken from the Approval Order.  The total aggregate amount of Gemini's indemnification obligations for any Losses under this Settlement Agreement shall be limited to and not exceed the U.S. Dollar value of the Genesis Distribution actually made in accordance with Section 2.4 hereof (calculated using the Effective Date Value of the Genesis Alt-Coin Distribution and the dollar amount of the Genesis USD Distribution). Gemini shall have no indemnification obligation for any Proceeding based in whole or in part on actions taken by any Indemnified Party prior to the date of entry of the Approval Order.  If any Proceeding shall be brought, threatened or asserted against an Indemnified Party in respect of which indemnity or contribution may be sought against Gemini, the Indemnified Party shall promptly notify Gemini in writing, but in any event within twenty-one (21) days from the date on which the Indemnified Party is provided notice of any such Proceeding, and the failure to provide such notice to Gemini shall relieve Gemini of any and all

indemnification obligations to such Indemnified Party pursuant to this Settlement Agreement solely with respect to such Proceeding. Gemini, upon written notice to such Indemnified Party, may elect to assume the defense of such Proceeding, at Gemini's own expense, with counsel of its choice. Such Indemnified Party shall have the right, at its sole expense, to employ separate counsel in any such Proceeding and to participate in the defense thereof. Gemini shall have the right to at its sole discretion settle, compromise, or consent to the entry of a judgment in any pending or threatened Proceeding without requiring the consent of any Indemnified Party so long as such settlement, compromise, or consent includes an explicit and unconditional release from the settling, compromising, or consenting party of the applicable Indemnified Party from all liability arising out of such Proceeding. No Indemnified Party seeking indemnification under this Settlement Agreement shall, without Gemini's prior written consent settle, compromise, or consent to the entry of any judgment or otherwise seek to terminate any Proceeding in respect of which indemnification may be sought under this Settlement Agreement. In no event will Gemini be required to pay, pursuant to the indemnification provisions set forth in this Section 3.3 hereof, (x) fees and expenses for more than one firm of attorneys representing each Indemnified Party in any jurisdiction in any one legal action or group of related legal actions or (y) with respect to the fees and expenses incurred by an Indemnified Party prior to the date on which such Indemnified Party notifies Gemini in writing of the applicable Proceeding, fees and expenses incurred by such Indemnified Party in connection with such Proceeding in excess of Ten Thousand Dollars ($10,000.00).

## ARTICLE IV

### APPROVAL ORDER

Section 4.1    Entry and Effect of Approval Order. Effective upon the execution of this Settlement Agreement, (i) GGC shall use its reasonable efforts to seek entry of the Approval Order by the Bankruptcy Court (and to defend against any action to appeal, repeal, vacate or modify the Approval Order as so entered), (ii) Gemini, the AHG, and the UCC shall reasonably cooperate with GGC to obtain entry and finality of the Approval Order, and (iii) no Party shall take any action inconsistent with this Settlement Agreement (other than to enforce this Settlement Agreement) or cause the Approval Order to be appealed.

## ARTICLE V

### CONDITIONS TO EFFECTIVENESS

Section 5.1    Except as otherwise provided herein, the consummation of the transactions contemplated by this Settlement Agreement shall be conditioned upon the following conditions being satisfied or waived, in writing, by the Parties:

(a)    the Bankruptcy Court shall have entered the Approval Order and the Approval Order shall have (i) not been stayed or vacated (including during the pendency of a determination as to such stay or vacatur) or (ii) become a Final Order;

(b)    the Parties shall have agreed in writing on the Gemini GBTC Value, the MCDA Value, the Effective Date Value of the Genesis Alt-Coin Distribution, the Effective Date Value

16

of the Gemini Earn Operations Assets, and the TS Date (at 11:59PM ET) "bitcoin per share" value provided in the "Key Fund Information" section of the GBTC website (etfs.grayscale.com/gbtc) (collectively, the "**Agreed Values**"), or, to the extent there shall have been any dispute among the Parties as to the Agreed Values that is not resolved within ten (10) days, such dispute shall have been resolved by the Bankruptcy Court; and

(c)     the Approval Order shall (i) include a determination by the Bankruptcy Court that Gemini has the authority to bind the Gemini Lenders to this Settlement Agreement and its terms pursuant to the terms of the Gemini Earn Agreements; (ii) confirm that the Gemini Lenders are bound by the terms of this Settlement Agreement; and (iii) provide authority for Gemini to effectuate, as agent for the Gemini Lenders and as the Gemini Distribution Agent: (A) the monetization of the Gemini GBTC Shares (to the extent not previously authorized pursuant to the Trust Asset Order), (B) the Digital Asset Rebalance, and (C) the distributions and other transactions contemplated by this Settlement Agreement.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.1    GBTC Shares.   The Parties agree that: (a) Gemini failed to foreclose on the Gemini GBTC Shares; (b) the Debtors owned, and will own, the Gemini GBTC Shares, the Additional GBTC Shares, the GBTC Replacement Assets, the Gemini Earn Operations Assets and any DCG Recoveries that the Debtors and their successors in interest transfer to the Gemini Distribution Agent in accordance with the provisions of Section 2.2 hereof, from the date such assets were acquired until such assets are delivered to the Gemini Lenders by the Gemini Distribution Agent on behalf of the Debtors; (c) until delivered to the Gemini Lenders by the Gemini Distribution Agent on behalf of the Debtors under this Agreement, Gemini's and the Gemini Lenders' interest in the Gemini GBTC Shares and the GBTC Replacement Assets is and has been solely as collateral for the Gemini Master Claim; and (d) the Gemini Contribution is being made in satisfaction of certain claims that the Debtors have against Gemini related to the Gemini Earn Program.

Section 6.2    Tax Treatment.   The Parties agree that, for U.S. federal and applicable state and local income tax purposes: (a) the payment or delivery of (i) the Gemini Contribution, (ii) any DCG Receipts, (iii) any assets delivered to Gemini in accordance with the provisions of Section 2.3 and 2.4 hereof, as agent of the Gemini Lenders, (iv) the Digital Asset Rebalance, and (v) the distribution of the Gemini Distribution Assets and Completion Digital Assets by the Gemini Distribution Agent to the Gemini Lenders pursuant to Section 2.5 hereof shall, collectively, be treated for U.S. federal and applicable state and local tax purposes as distributions from the Debtors to the Gemini Lenders in satisfaction of the Gemini Master Claim; and (b) the Debtors (i) were and will be treated as the owners of the Gemini GBTC Shares until such assets were or are monetized, (ii) were and will be treated as the owners of the GBTC Replacement Assets until such assets are monetized pursuant to the Digital Asset Rebalance, and (iii) will be treated as the owners of the Gemini Distribution Assets from the applicable Digital Asset Rebalance date until such assets are delivered to the Gemini Lenders by the Gemini Distribution Agent on behalf of the Debtors, and that, until delivered to the Gemini Lenders by the Gemini Distribution Agent on behalf of the Debtors pursuant to this Settlement Agreement,

Gemini's and the Gemini Lenders' interest in the assets described in (i) through (iii) shall be solely as collateral for the Gemini Master Claim. The Parties agree to file, and to cause their respective affiliates to file, all tax returns consistent with the preceding sentence and to not take, and to cause their respective affiliates to not take, any position inconsistent therewith unless otherwise required following a determination within the meaning of Section 1313 of the Internal Revenue Code of 1986, as amended.

Section 6.3   <u>IRS Form</u>.  The Gemini Distribution Agent shall deliver to the Debtors an IRS Form W-9, duly executed by the Gemini Distribution Agent, on or before the Settlement Effective Date.

## ARTICLE VII

## <u>REPRESENTATIONS AND WARRANTIES</u>

Representations and Warranties of each Party. Each Party executing this Settlement Agreement hereby represents and warrants to the other Parties that:

Section 7.1   <u>Authority</u>.  Such Party has the requisite corporate, limited liability company or other entity power and authority to, and, in the case of the AHG, its organizing principles authorize it to, and to authorize Proskauer Rose LLP to, on behalf of the AHG as a whole and each of the SteerCo Members individually as if each such SteerCo Member were a Party hereto, execute and deliver this Settlement Agreement, and to perform its obligations hereunder. This Settlement Agreement has been duly authorized, executed and delivered by such Party and, in the case of the AHG, by Proskauer Rose LLP on behalf of the AHG as a whole and each of the SteerCo Members individually, and, assuming the due authorization, execution and delivery hereof by each other Party, this Settlement Agreement constitutes a legal, valid and binding obligation of such Party (including each of the SteerCo Members) enforceable against such Party (including each of the SteerCo Members) in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

Section 7.2   <u>Tax Advice</u>.  No tax advice has been offered or given by such Party in the course of these negotiations, and such Party is relying upon the advice of its own tax consultants with regard to any tax consequences that may arise as a result of the execution of this Settlement Agreement.

Section 7.3   <u>New Information</u>.  The Parties subsequently may discover facts different from or in addition to those now known or believed to be true regarding the subject matter of this Settlement Agreement and agree that this Settlement Agreement shall remain in full force and effect notwithstanding the existence or discovery of any such different or additional facts.

Section 7.4   <u>Authorizations</u>.  Other than the approval by the Bankruptcy Court and entry of the Approval Order, or as otherwise set forth in this Settlement Agreement, no authorizations, approvals, consents or waivers by, or notifications to, a governmental authority, or other person (including but not limited to licenses, notifications, registrations or declarations) (collectively, "**Authorizations**") are required for the execution, delivery or satisfaction by such

Party of this Settlement Agreement or the satisfaction of any of the obligations of such Party contemplated hereby, or, if required, all such Authorizations have been obtained.

## ARTICLE VIII

## COVENANTS

Section 8.1    Covenants of the Debtors.    For so long as this Settlement Agreement remains in effect, each of the Debtors hereby covenants and agrees that it shall, and shall cause its Debtor affiliates and subsidiaries to, support and take any and all actions commercially reasonable, necessary or appropriate to consummate the transactions set forth in this Settlement Agreement, including, but not limited to:

(a)    preparing, and seeking Bankruptcy Court approval of, the Application in compliance with the Bankruptcy Code, the Bankruptcy Rules and other applicable law;

(b)    supporting approval of the Application (and not objecting to, or supporting the efforts of any other Person to oppose or object to, approval of the Application);

(c)    providing counsel to the AHG, the UCC, and Gemini with such information as shall be reasonably requested to evaluate, consider, support and defend, to the extent necessary, this Settlement Agreement, the Application and the transactions contemplated herein, including, without limitation, such information as shall be reasonably requested by such counsel in furtherance of making distributions pursuant hereto, including, without limitation, on an in-kind basis corresponding with the currency denomination of the underlying Gemini Master Claim;

(d)    using commercially reasonable efforts to obtain any required governmental, regulatory, and/or third-party approvals necessary or required for the implementation or consummation of the transactions contemplated herein;

(e)    working cooperatively with the other Parties and their respective counsel to implement the transactions contemplated in this Settlement Agreement;

(f)    executing any document and giving any notice, order, instruction, or direction that is necessary to support, facilitate, implement, or consummate, or otherwise give effect to the transactions contemplated herein;

(g)    reasonably cooperating with the defense of any pending or threatened litigations against any other Party solely to the extent that such litigation or adversary proceeding relates to any of the transactions contemplated herein; and

(h)    in the event that a party files a notice of appeal from the entry of the Approval Order and seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Approval Order.

Section 8.2    Covenants of Gemini.  For so long as this Settlement Agreement remains in effect, Gemini hereby covenants and agrees that it shall, and shall cause its affiliates and subsidiaries to, support and take any and all actions commercially reasonable, necessary or appropriate to consummate the transactions contemplated herein, including, but not limited to:

(a)    unless otherwise agreed to, in writing, by the Parties, not selling, reselling, reallocating, using, transferring, pledging, hypothecating, participating, donating or otherwise encumbering or disposing of, or directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions) assigning, all or any portion of the Gemini Proprietary Claim during the period from the date hereof up to and including the earlier to occur of (i) the Settlement Effective Date and (ii) the termination of this Settlement Agreement in accordance with the provisions of Section 11.15 hereof;

(b)    supporting approval of the Application (and not objecting to, or supporting the efforts of any other person to oppose or object to, approval of the Application);

(c)    providing counsel to the AHG, the UCC, and the Debtors with such information as shall be reasonably requested to evaluate, consider, support and defend, to the extent necessary, this Settlement Agreement, the Application and the transactions contemplated herein, including, without limitation, such information as shall be reasonably requested by such counsel or counsel to the Wind-Down Debtors, as applicable, for tax purposes and in furtherance of Section 6.2 and making distributions pursuant hereto, including, without limitation, on an in-kind basis corresponding with the currency denomination of the underlying Gemini Master Claim;

(d)    executing any document and giving any notice, order, instruction, or direction that is necessary to support, facilitate, implement, or consummate or otherwise give effect to the transactions contemplated herein;

(e)    working cooperatively with the other Parties and their respective counsel to implement the transactions and tax treatment contemplated by this Settlement Agreement;

(f)    reasonably cooperating with the defense of any pending or threatened litigations against any other Party solely to the extent that such litigation or adversary proceeding relates to any of the transactions contemplated herein;

(g)    unless prohibited by applicable law or existing obligations as of the date hereof, providing written notice to counsel to the Debtors, the AHG and the UCC of (A) the occurrence, or failure to occur, of any event, change, effect, occurrence, development, circumstance or change of fact of which Gemini has knowledge, including any action taken by any governmental department, authority or agency, wherein occurrence of failure to occur could reasonably be expected to cause, or has caused, (1) any representation or warranty of Gemini contained herein to be untrue or inaccurate in any material respect or (2) any covenant of Gemini contained herein not to be satisfied in any material respect, or (B) receipt by Gemini of any material written notice from any governmental body alleging that the consent of such governmental body is or may be required in connection with the transactions contemplated herein, promptly upon, but in any event within fourteen (14) days of, obtaining knowledge of any of the foregoing; and

(h)    in the event that a party files a notice of appeal from the entry of the Approval Order and seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Approval Order.

Section 8.3    <u>Covenants of the UCC and the AHG</u>.    For so long as this Settlement Agreement remains in effect, each of the UCC and the AHG, individually on a several and not joint basis, hereby covenants and agrees, solely with respect to itself, and not with respect to any of its individual members (but, for the avoidance of doubt, including the SteerCo Members), that it shall support and take any and all actions commercially reasonable, necessary or appropriate to consummate the transactions set forth in this Settlement Agreement, including, but not limited to:

(a)    supporting approval of the Application (and not objecting to, or supporting the efforts of any other person to oppose or object to, approval of the Application);

(b)    working cooperatively with the other Parties and their respective counsel to implement the transactions contemplated by this Settlement Agreement;

(c)    executing any document and giving any notice, order, instruction or direction that is necessary to support, facilitate, implement, consummate or otherwise give effect to the transactions contemplated herein;

(d)    providing counsel to Gemini, the AHG, the UCC and the Debtors, as applicable, with such information as shall be reasonably requested to evaluate, consider, support and defend, to the extent necessary, this Settlement Agreement, the Application and the transactions contemplated herein, including, without limitation, such information as shall be reasonably requested by such counsel in furtherance of making distributions pursuant hereto, including, without limitation, on an in-kind basis corresponding with the currency denomination of the underlying Gemini Master Claim;

(e)    to the extent that any legal or structural impediment arises that would prevent, hinder or delay the consummation of the transactions contemplated herein, negotiating with the Parties in good faith a resolution to address any such impediment;

(f)    reasonably cooperating with respect to the defense of any pending or threatened litigations against any other Party solely to the extent that such litigation or adversary proceeding relates to any of the transactions contemplated herein; and

(g)    in the event that a party files a notice of appeal from the entry of the Approval Order and seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Approval Order.

# ARTICLE IX

## RESERVATION OF RIGHTS

Section 9.1    Reservation.  Except as otherwise provided in this Settlement Agreement, the Parties hereby reserve all rights with respect to all matters between them (or any of their respective affiliates) not related to this Settlement Agreement or the transactions contemplated hereby, which rights shall not be affected by this Settlement Agreement, by implication or otherwise.  The sole purpose of this Settlement Agreement is to provide for, confirm, and acknowledge the completion of the transactions contemplated in this Settlement Agreement.

Section 9.2    Non-Admissibility.  Neither this Settlement Agreement nor any negotiations or proceedings in connection herewith may be used, and such negotiations and proceedings shall not be admissible, in any proceeding against any Party or its affiliates for any purpose, except to seek Bankruptcy Court approval or to effectuate or otherwise enforce the terms of this Settlement Agreement.  For the avoidance of doubt, in the event the Settlement Effective Date does not occur, each Party agrees that it will not rely on anything set forth in this Settlement Agreement in the GBTC Action.

# ARTICLE X

## MATTERS PERTAINING TO THE GEMINI DISTRIBUTION AGENT

Section 10.1    Authorization to Distribute.  Each of the Debtors irrevocably appoints Gemini as the Gemini Distribution Agent and authorizes Gemini in such capacity to make all distributions to the Gemini Lenders pursuant to this Settlement Agreement, and each of the UCC and the AHG consents to such appointment and authorization.  On behalf of the Debtors, the Gemini Distribution Agent shall distribute the Gemini Distribution Assets and the Completion Digital Assets as set forth in this Settlement Agreement in full satisfaction of each Individual Earn Obligation.  The Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; provided, however, that, in the event that the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors or the Wind-Down Debtors, as applicable.

Section 10.2    Additional Authorization.  Solely to the extent it deems necessary to implement this Settlement Agreement and the transactions contemplated hereby, the Gemini Distribution Agent shall be empowered and directed to: (a) effect all actions and execute on its behalf all agreements, instruments, and other documents necessary to perform its duties under this Settlement Agreement; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to this Settlement Agreement or as deemed by the Gemini Distribution Agent to be necessary and proper to implement the provisions of this Settlement Agreement.

Section 10.3    Monetization.  The Gemini Distribution Agent shall, at its sole discretion and to the maximum extent permitted by law, be authorized to (a) monetize assets distributed or

22

transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (in accordance with the terms of the Trust Asset Order), the Gemini Reserved Coins, the Gemini Earn Operations Assets, and the Genesis Distribution, and (b) rebalance assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares, the Gemini Reserved Coins, the Gemini Earn Operations Assets, and the Genesis Distribution in a manner consistent with the provisions of this Settlement Agreement, in each case, to enable the Gemini Distribution Agent to make distributions in respect of Gemini Lender Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated. The Gemini Distribution Agent, to the maximum extent permitted by law, is authorized to effectuate such rebalancing by buying and selling of Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

Section 10.4    Gemini Fees.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Gemini Distribution Agent (solely in its capacity as Gemini Distribution Agent and solely with respect to its duties in such capacity) on or after the Settlement Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Gemini Distribution Agent (solely in its capacity as such), shall be paid in cash by the Debtors (or, from and after the Plan Effective Date, by the Wind-Down Debtors from the Wind-Down Reserve (as defined in the Plan)); provided, however, that the fees and expenses incurred by the Gemini Distribution Agent shall be subject to and limited by a budget determined in the Debtors' reasonable discretion, with the Committee's Consent, Gemini's Consent, and the Ad Hoc Group's Consent, each as defined in the Plan, and the Gemini Distribution Agent shall not incur any fees and expenses in excess of such budget without the prior written consent of the Debtors or, from and after the Plan Effective Date, the PA Officer, which consent shall not be unreasonably withheld, conditioned, or delayed; and, provided, further, that, if the Parties cannot agree to such budget pursuant to the terms of this Settlement Agreement prior to the objection deadline provided for in the Application, the Parties (or any of them) may seek a determination of the Bankruptcy Court regarding the same.

Section 10.5    Reliance by the Gemini Distribution Agent.  Solely to the extent it deems necessary to implement this Settlement Agreement and the transactions contemplated hereby, the Gemini Distribution Agent (a) shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) reasonably believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person and (b) may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith and in reliance on the advice of any such counsel, accountants, experts or professional advisors.

Section 10.6    Delegation by Gemini Distribution Agent.  Upon five (5) Business Days' prior written notice to counsel to the Debtors, the UCC, and the AHG, the Gemini Distribution Agent may appoint one or more entities under common control with Gemini as agents to assist it in furtherance of the performance by the Gemini Distribution Agent of its duties under this Settlement Agreement; provided, however, that, notwithstanding the appointment of any such

23

agents, the Gemini Distribution Agent shall remain responsible for any and all of its duties and obligations under this Settlement Agreement.

Section 10.7    No Third-Party Beneficiary.    The provisions of this ARTICLE X are solely for the benefit of the Gemini Distribution Agent, the Debtors, the UCC, and the AHG, and no other person shall have rights as a third party beneficiary of any such provisions.

Section 10.8    Non-Waiver of Rights.    For the avoidance of doubt, nothing set forth in this ARTICLE X shall be deemed to waive, prejudice, amend, or otherwise alter Gemini's rights pursuant to the Gemini Earn Agreements or any other agreements between Gemini and the Gemini Lenders.  Such rights are preserved to the fullest extent possible.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    No Admission of Liability.    This Settlement Agreement is not an admission of any liability but is a compromise and settlement and neither this Settlement Agreement, nor any of the communications or proceedings described in the following sentence, shall be treated as, or claimed to be, or to be evidence of, an admission of any liability or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party.  Without limitation of the preceding sentence, all communications (whether oral or in writing) between or among the Parties, their counsel or their respective representatives, and all proceedings relating to, concerning or in connection with this Settlement Agreement, or the matters covered hereby and thereby (whether occurring prior to, on or after the date hereof), shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

Section 11.2    Further Assurances.    Each Party agrees that from time to time it will promptly, and at its sole cost and expense (subject to and in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure), execute and deliver all further agreements, instruments, documents and certificates, and shall make or cause to be made such recordings or registrations and take all further action, as may be necessary or reasonably desirable or as may be reasonably requested by a Party hereto to evidence any of the terms and provisions of this Settlement Agreement.

Section 11.3    Governing Law.    This Settlement Agreement and any disputes arising hereunder or controversies related hereto, shall be construed, performed and enforced in accordance with, and governed by the internal laws, and not the laws of conflicts, of the State of New York that apply to contracts made and performed entirely within such state, except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code.

Section 11.4    Jurisdiction.    The Parties hereby (i) irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court to determine all claims or disputes relating in any way to this Settlement Agreement and (ii) irrevocably and unconditionally waive, to the fullest extent permitted by law, any objection to the laying of venue in the aforesaid courts.

Section 11.5    Waiver of Jury Trial.  EACH PARTY HERETO, FOR ITSELF AND ITS AFFILIATES, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO OR THEIR RESPECTIVE AFFILIATES PURSUANT TO THIS SETTLEMENT AGREEMENT OR IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

Section 11.6    Complete Agreement.  Except as otherwise expressly provided in this Settlement Agreement, this Settlement Agreement constitutes the entire agreement of the Parties with respect to the subject matter of this Settlement Agreement and supersedes all prior negotiations, commitments, course of dealings, agreements, and undertakings, both written and oral, between or on behalf of the Parties with respect to the subject matter of this Settlement Agreement.  Any amendment, modification or supplement to this Settlement Agreement must be in writing, state that it is amending, modifying, or supplementing this Settlement Agreement, as the case may be, and be signed by each of the Parties.

Section 11.7    Assignment.  This Settlement Agreement may not be assigned by any Party without the prior written consent of the others, and any purported assignment in violation hereof will be null and void.

Section 11.8    Successors and Assigns.  The provisions of this Settlement Agreement and the obligations and rights hereunder shall be binding upon, inure to the benefit of and be enforceable by and against the Parties and their respective successors and permitted assigns. Nothing in this Settlement Agreement is intended to or will confer any rights or remedies on any person or entity other than the Parties and their respective successors and permitted assigns.

Section 11.9    Waivers.  The delay or failure of any Party to exercise or enforce any of its rights under this Settlement Agreement will not constitute, or be deemed to be, a waiver of those rights, nor will any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other right.  No waiver of any provision of this Settlement Agreement will be effective unless it is in writing and signed by the Party against which it is being enforced.

Section 11.10    Counterparts.  This Settlement Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to each of the Parties.  This Settlement Agreement may be executed and transmitted to any other party by email of a PDF, which email or PDF shall be deemed to be, and utilized in all respects as, an original, wet-inked document.

Section 11.11    Interpretation.

(a)    The Parties all participated in the negotiation and drafting of this Settlement Agreement. If an ambiguity or question of interpretation should arise, this Settlement Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall

arise favoring or burdening any such Party by virtue of the authorship of any of the provisions in this Settlement Agreement.

(b)   Unless otherwise agreed by the Parties, any Digital Asset to be valued in connection with this Settlement Agreement shall be valued by using (i) with respect to Digital Assets that have real time CME CF rates as of the applicable date, CME CF benchmarks (located at https://www.cmegroup.com/markets/cryptocurrencies/cme-cf-cryptocurrency-benchmarks.html), (ii) with respect to any other Digital Asset other than RLY and TOKE, the Coinbase exchange in the first instance or the Binance exchange, if such Digital Asset is not listed on the Coinbase exchange, (iii) with respect to RLY, using $0.016 per token, and (iv) with respect to TOKE using $1.40 per token, in each of cases (i) and (ii) as finally determined in accordance with the remainder of this Section 11.11(b). The Parties shall work in good faith to determine the Effective Date Value of applicable Digital Assets pursuant to the terms of this Settlement Agreement. If the Parties cannot agree to the Effective Date Value of any Digital Asset pursuant to the terms of this Settlement Agreement prior to the objection deadline provided for in the Application, the Parties (or any of them) may seek a determination of the Bankruptcy Court regarding the same.

(c)   To the extent of any inconsistencies between the provisions of this Settlement Agreement and the Approval Order, on the one hand, and any prior order of the Bankruptcy Court, on the other hand, the provisions of the Approval Order and this Settlement Agreement shall govern in all respects. In the case of any inconsistencies between the provisions of this Settlement Agreement and the Approval Order, the provisions of the Approval Order shall govern in all respects.

Section 11.12   Severability. In the event any one or more of the provisions contained in this Settlement Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal, or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal, or unenforceable provisions.

Section 11.13   Business Days. When calculating the period of time before which, within which, or following which any act is to be done pursuant to this Settlement Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day, and if the period is for five (5) days or fewer, only Business Days shall be counted.

Section 11.14   Titles and Headings. The titles, headings and captions of this Settlement Agreement are for convenience only and are not a part of this Settlement Agreement and do not in any way limit or amplify the terms and provisions of this Settlement Agreement and shall have no effect on its interpretation.

Section 11.15   Outside Date. This Settlement Agreement shall terminate and be of no further force or effect if the Settlement Effective Date has not occurred at the earliest to occur of (a) May 31, 2024 (or such later date as the Parties may agree in writing), and (b) the entry of a

Final Order of the Bankruptcy Court denying the Application and the relief requested therein, in each case, except that the provisions of <u>Section 11.17</u> hereof shall be effective and shall survive such termination.

Section 11.16  <u>Access to Information</u>.  Each of the Parties acknowledges that it has had access to the data and information it requires and has had answered to its satisfaction any questions it has asked, with regard to the meaning and significance of any of the provisions of this Settlement Agreement.

Section 11.17  <u>Fees, Costs and Expenses</u>.  All Gemini Retention Costs, if any, shall be borne by Gemini.  Except for the foregoing sentence or as otherwise provided in this Settlement Agreement, including <u>Sections 3.3</u> and <u>10.4</u> hereof each Party shall (subject to and in accordance with the Bankruptcy Code and Federal Rules of Bankruptcy Procedure) be responsible for the payment of its own costs and expenses (including, without limitation, reasonable attorneys' fees and carrying costs) in connection with the drafting, execution, and implementation of this Settlement Agreement and the transactions contemplated hereby.  Nevertheless, in any action or proceeding to enforce this Settlement Agreement, the prevailing Party shall be entitled to payment of its reasonable costs and expenses (including, without limitation, reasonable attorneys' fees).

Section 11.18  <u>Notices</u>.  All notices, requests, claims, demands and other communications under this Settlement Agreement shall be in English, shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by email with receipt confirmed or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 11.18</u>.

    (a)       If to Gemini, to:

                 Gemini Trust Company, LLC
                 315 Park Avenue South, 18th Floor
                 New York, New York 10010
                 Attn: Gemini Earn

            With a copy (which shall not constitute notice) to:

                 Hughes Hubbard & Reed LLP
                 One Battery Park Plaza
                 New York, New York 10004
                 Attention:     Anson B. Frelinghuysen
                                   Dustin P. Smith
                                     Erin E. Diers
                 Email:          anson.frelinghuysen@hugheshubbard.com
                                   dustin.smith@hugheshubbard.com
                                   erin.diers@hugheshubbard.com

(b)    If to the Debtors, to:

        Genesis Global Capital, LLC
        175 Greenwich Street, Floor 38
        New York, New York 10007
        Attn: A. Derar Islim

With a copy (which shall not constitute notice) to:

        Cleary Gottlieb Steen & Hamilton LLP
        One Liberty Plaza
        New York, New York 10006
        Attention:    Sean A. O'Neal
                    Luke A. Barefoot
                    Jane VanLare
                    Thomas S. Kessler
        Email:      soneal@cgsh.com
                    lbarefoot@cgsh.com
                    jvanlare@cgsh.com
                    tkessler@cgsh.com

(c)    If to the AHG, to:

        Proskauer Rose LLP
        Eleven Times Square
        New York, New York 10036-9299
        Attention:        Brian S. Rosen, Esq.
                    Jordan Sazant, Esq.
        Email:        brosen@proskauer.com
                    jsazant@proskauer.com

(d)    If to the UCC, to:

        White & Case LLP
        1221 Avenue of the Americas
        New York, New York 10020
        Attention:    J. Christopher Shore, Esq.
                    Philip Abelson, Esq.
        Email:        cshore@whitecase.com
                    philip.abelson@whitecase.com

Each Party may, by notice given in accordance herewith to the other Party, designate any further or different address to which subsequent notices, requests, claims, demands and other communications shall be sent.

Section 11.19    <u>Reconciliation</u>.  For all purposes of this Settlement Agreement, whenever the Parties have agreed herein to reconcile, deliver a statement or supporting documentation regarding, or otherwise confirm any valuations or costs, including, but not limited to, whether

transactions effected or costs incurred, estimated or otherwise calculated in connection with this Settlement Agreement were effected, incurred, estimated or calculated in the manner described and permitted in this Settlement Agreement, as promptly as practicable after any reasonable request from any Party, the other Party shall provide such requesting Party with the requested information and documentation (to the extent not previously provided) regarding the reconciliation.

Section 11.20 <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Settlement Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a breach, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

*[Remainder of this Page Left Intentionally Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be duly executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers or counsels of the undersigned and not in any other capacity as of the day and year first above written.

**GENESIS GLOBAL CAPITAL, LLC,**
   **as Debtor-in-Possession**

_____

By:    A. Derar Islim

Title:  Interim CEO & COO


**GENESIS GLOBAL HOLDCO, LLC,**
   **as Debtor-in-Possession**

_____

By:    A. Derar Islim

Title:  Interim CEO & COO


**GENESIS ASIA PACIFIC PTE. LTD.,**
   **as Debtor-in-Possession**

_____

By:    A. Derar Islim

Title:  Interim CEO & COO


[Signature page to Settlement Agreement]

DocuSign Envelope ID: 785C57E7-1BFC-4A52-B7E9-CDCF73A231DB
23-10063-shl    Doc 1499    Filed 03/19/24    Entered 03/19/24 01:33:40    Main Document
Pg 79 of 149

2

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be duly executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers or counsels of the undersigned and not in any other capacity as of the day and year first above written.

**GEMINI TRUST COMPANY, LLC**

*William Costello*
DC00DB0503494DA...

By:   William Costello

Title:   General Counsel

[Signature page to Settlement Agreement]

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be duly executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers or counsels of the undersigned and not in any other capacity as of the day and year first above written.

**AD HOC GROUP OF GENESIS LENDERS AND THE STEERCO MEMBERS**
By: Proskauer Rose LLP

By:    Brian S. Rosen

Title:   Counsel to the Ad Hoc Group

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be duly executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers or counsels of the undersigned and not in any other capacity as of the day and year first above written.

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
By: White & Case LLP

By:    Philip Abelson

Title:    Counsel to the UCC

[Signature page to Settlement Agreement]

**Schedule A**
**Master Claim Digital Assets**

| Digital Asset | Units |
|---|---|
| Gemini Dollar (GUSD) | 378,963,105.111637000000 |
| Bitcoin (BTC) | 14,241.767518673100 |
| Ethereum (ETH) | 157,884.191586515000 |
| USD Coin (USDC) | 15,694,470.234901300000 |
| Polygon (MATIC) | 14,617,460.371256800000 |
| Litecoin (LTC) | 126,590.633340705000 |
| Filecoin (FIL) | 2,295,445.901742260000 |
| DogeCoin (DOGE) | 114,141,309.057946000000 |
| Chainlink (LINK) | 1,306,220.731968990000 |
| ApeCoin (APE) | 1,083,458.011673830000 |
| Solana (SOL) | 239,496.734849671000 |
| Bitcoin Cash (BCH) | 40,106.379834507500 |
| Fantom (FTM) | 16,027,223.584427100000 |
| Multi Collateral Dai (DAI) | 4,573,802.535216000000 |
| Decentraland (MANA) | 5,586,393.844999090000 |
| Uniswap (UNI) | 507,243.765408451000 |
| Curve DAO Token (CRV) | 3,144,261.996871840000 |
| Aave (AAVE) | 33,277.296732579300 |
| Basic Attention Token (BAT) | 9,406,123.735154100000 |
| Amp (AMP) | 408,812,195.228347000000 |
| Zcash (ZEC) | 43,921.433272904600 |
| PAX Gold (PAXG) | 999.906079028488 |
| The Graph (GRT) | 16,926,257.353306000000 |
| 1inch Network (1INCH) | 2,571,655.928916420000 |
| Maker (MKR) | 1,309.210468617600 |
| Yearn.Finance (YFI) | 118.773281046844 |
| Axie Infinity (AXS) | 89,586.323396913800 |
| SushiSwap (SUSHI) | 585,754.223252295000 |
| Tezos (XTZ) | 660,421.437224852000 |
| Compound (COMP) | 13,756.469860659500 |
| Storj (STORJ) | 1,794,404.618972310000 |
| 0x (ZRX) | 2,716,083.669645340000 |
| Synthetix (SNX) | 224,684.486250125000 |
| Kyber Network Crystal v2 (KNC) | 434,557.459494704000 |

| Digital Asset | Units |
|---|---|
| Loopring (LRC) | 1,141,110.271514830000 |
| Orchid (OXT) | 3,614,593.168068090000 |
| Balancer (BAL) | 32,186.930547282200 |
| Injective (INJ) | 129,803.779558489000 |
| Livepeer (LPT) | 24,515.251042653200 |
| Alchemix (ALCX) | 7,138.759682025570 |
| UMA (UMA) | 57,806.911104417800 |
| Bancor (BNT) | 248,483.322109086000 |
| Chiliz (CHZ) | 658,916.409909894000 |
| SKALE (SKL) | 2,076,382.163687750000 |
| Rally (RLY) | 3,147,130.555520140000 |
| Tokemak (TOKE) | 16,319.073445615400 |
| Fetch.ai (FET) | 23,244.263558341400 |
| Ribbon Finance (RBN) | 15,443.415506174800 |
| Ankr (ANKR) | 38,207.304075000100 |
| TerraClassicUSD (USTC) | 543.022155397682 |

**Schedule B**
**Gemini Earn Operations Assets**

| Digital Asset | Units |
|---|---|
| BTC | 1.38270 |
| ETH | 4.64575 |
| USD | 269,311.00000 |
| USDC | 72,127.31886 |
| GUSD | 274,102.04000 |
| MATIC | 73,552.74577 |
| FIL | 332,985.31171 |
| LTC | 1,165.82731 |
| DOGE | 4,606,063.19593 |
| LINK | 1,317.89547 |
| FTM | 5,109,069.44386 |
| APE | 68,634.66171 |
| BCH | 4,395.32359 |
| SOL | 1,624.51050 |
| DAI | 1,492.05438 |
| MANA | 24,935.37266 |
| UNI | 7,080.56741 |
| CRV | 4,826.58716 |
| AAVE | 641.98830 |
| BAT | 4,212.11402 |
| AMP | 12,697,252.08387 |
| ZEC | 109.83631 |
| PAXG | 17.54432 |
| GRT | 511,348.28867 |
| 1INCH | 471,446.59138 |
| MKR | 34.06493 |
| YFI | 4.81534 |
| AXS | 2,425.10230 |
| SUSHI | 14,755.07914 |
| XTZ | 39,173.36133 |
| LRC | 1,555,797.01249 |
| COMP | 358.93908 |
| STORJ | 28,979.50844 |
| ZRX | 31,743.96452 |
| ANKR | 23,205,161.51570 |
| FET | 1,965,621.49805 |
| SNX | 23,465.59673 |
| KNC | 1,727.79251 |
| REN | 4,238,653.73172 |

| | |
|---|---|
| OXT | 94,912.56191 |
| BAL | 3,030.37812 |
| INJ | 6,601.47982 |
| ALCX | 1,602.68169 |
| LPT | 232.63711 |
| UMA | 2,638.51827 |
| SKL | 1,904,756.72718 |
| BNT | 22,566.62684 |
| CHZ | 32,785.72092 |
| RLY | 2,519,625.42696 |
| TOKE | 8,289.07956 |
| MIR | 90.35325 |
| LUNA | 61,360.59601 |
| UST | 13,263.57257 |
| RBN | 9,805.34161 |

**Schedule C**
**Gemini Reserved Coins**

| Digital Asset | Units |
|---|---|
| AMP | 2372748.82360466 |
| BTC | 457.38311096658 |
| DAI | 1855610.30953864 |
| DOGE | 38333429.4643998 |
| FIL | 0.0000000008 |
| LINK | 109377.21071585 |
| MATIC | 1183437.45997726 |
| SOL | 16525.673988333 |
| USDC | 19581426.1658155 |
| YFI | 2.544557412717 |

**Schedule D**
**Genesis Alt-Coin Distribution**

| Digital Asset | Units |
|---|---|
| 1INCH | 907,468.57922 |
| AAVE | 32,330.8563 |
| ALCX | 5,536.07799202557 |
| AMP | 396,114,943.144477 |
| APE | 1,014,823.34996383 |
| AXS | 75,833.1265 |
| BAL | 28,181.70738 |
| BAT | 9,193,158.15078 |
| BCH | 18,751.88641 |
| BNT | 225,916.695269086 |
| CHZ | 626,130.688989894 |
| COMP | 13,397.5307806595 |
| CRV | 2,889,385.75604 |
| DOGE | 3.18286999966949 |
| FIL | 1,962,460.59003226 |
| FTM | 6,712,090.82830862 |
| GRT | 16,414,909.064636 |
| INJ | 123,202.299738489 |
| KNC | 384,938.04589 |
| LINK | 50,970.86483 |
| LPT | 24,282.6139326532 |
| LTC | 7,275.78739 |
| MANA | 5,561,458.47233909 |
| MATIC | 1,198,516.00958303 |
| MKR | 352.39877 |
| OXT | 3,519,680.60615809 |
| PAXG | 969.91188 |
| RBN | 5,638.0738961748 |
| RLY | 627,505.12856014 |
| SKL | 171,625.43650775 |
| SNX | 201,218.889520125 |
| SOL | 9,812.2441 |
| STORJ | 891,004.27616 |
| SUSHI | 570,999.144112295 |

| | |
|---|---|
| TOKE | 8,029.9938856154 |
| UMA | 55,168.3928344178 |
| UNI | 244,032.10679 |
| XTZ | 621,248.075894852 |
| YFI | 113.957941046844 |
| ZEC | 12,177.06899 |
| ZRX | 2,684,339.70512534 |

# **Exhibit C**

## **Conheeney Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, et al.,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | |
| GEMINI TRUST COMPANY, LLC, for itself and as agent on behalf of the Gemini Lenders, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 23-01192 (SHL) |
| GENESIS GLOBAL CAPITAL, LLC, | |
| Defendant. | |
| | |
| GENESIS GLOBAL CAPITAL, LLC, | |
| Plaintiff, | |
| v. | |
| GEMINI TRUST COMPANY, LLC, individually and as agent on behalf of the Earn Users, and EARN USERS 1-232,824 | Adv. Pro. No. 23-01203 (SHL) |
| Defendants. | |

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors 175 Greenwich Street, Floor 38, New York, NY 10007.

## DECLARATION OF THOMAS CONHEENEY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AMONG THE DEBTORS, GEMINI TRUST COMPANY, LLC, THE AD HOC GROUP OF GENESIS LENDERS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

I, Thomas Conheeney, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I submit this declaration (the "Declaration")[2] in support of the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (the "Motion"), filed concurrently with this Declaration.

## BACKGROUND

2.      I am a member of the Special Committee of the Board of Directors (the "Special Committee") of Genesis Global Holdco, LLC ("Holdco," and together with Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd., the "Debtors," and together with the Debtors and Holdco's non-Debtor subsidiaries, the "Company"). I have held my current title since November 2022.

3.      I am generally familiar with the day-to-day operations and affairs of the Debtors, and have been directly involved in overseeing the Debtors' operations and restructuring efforts since the initiation of the Chapter 11 Cases. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge attained while working with the Debtors; my discussions with members of the Special Committee of the Board of Directors of Holdco; discussions with other members of the Debtors' team and the Debtors' other advisors; my review of relevant documents; and my views based upon my professional experience.

---

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2

4.      To the extent that the Debtors learn that any information provided herein is materially inaccurate, the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge, information and belief.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

A.      **The Settlement Process**

5.      The Debtors and Gemini, through both their principals and advisors, were engaged in discussions regarding various disputes relating to the Gemini GBTC Shares before the Petition Date.  These discussions continued, and increasingly focused on the pledged collateral, immediately in the wake of Gemini's purported foreclosure on the Gemini GBTC Shares.  Since the Petition Date, the Debtors and their advisors have continued to seek a resolution of ongoing disputes with Gemini.

6.      The Debtors' efforts in this regard included multiple rounds of negotiations amongst the key stakeholders, occurring both before the Petition Date and at various points throughout the pendency of the Chapter 11 Cases.  On February 10, 2023 the Debtors announced an agreement in principle that contemplated a settlement of certain disputes with Gemini, which was subsequently abandoned.  Following the abandonment of the February 2023 agreement in principle, the Debtors and Gemini continued to engage in discussions, notably exchanging various drafts and counterproposals in July 2023, September 2023 and October 2023.

7.      On October 27, 2023, Gemini filed the GBTC Action against GGC in the Bankruptcy Court through the Adversary Complaint (ECF No. 1, Adv. Pro. No. 23-01192 (SHL)), seeking declaratory judgments that (i) Gemini properly foreclosed on the Gemini GBTC Shares on November 16, 2022, (ii) the Additional GBTC Shares are not property of any of the Debtors'

estates, and (iii) Gemini has a security interest in, or constructive trust over, the Additional GBTC Shares.

8.    On November 21, 2023, in the GBTC Action, GGC filed (i) a motion to dismiss the claims related to the Additional GBTC Shares (ECF No. 9) and (ii) an answer to the claims related to the Gemini GBTC Shares, denying the allegations in support of Gemini's purported foreclosure and asserting as a counterclaim that the First Amendment's obligation to require GGC to pledge the collateral until an indefinite date when all obligations to the Gemini Lenders had been discharged constituted an avoidable constructive fraudulent conveyance (ECF No. 10). On the same date, GGC filed the Preference Action against Gemini and certain Gemini Lenders in the Bankruptcy Court through an Adversary Complaint (ECF No. 1, Adv. Pro. No. 23-01203 (SHL)).

9.    On December 18, 2023, Gemini filed a motion to dismiss GGC's counterclaims related to the Additional GBTC Shares in the GBTC Action (ECF No. 16).

10.    While the parties proceeded to litigate the Gemini Adversary proceedings, including in the first instance, the cross motions to dismiss claims and counterclaims concerning the Additional GBTC shares that were never delivered to Gemini, both discovery and settlement discussions continued.

11.    While all key parties with an economic stake had been involved in and kept apprised of settlement discussions, following unsuccessful attempts to reach a resolution, the Debtors encouraged the Ad Hoc Group to commence direct negotiations with Gemini. In response to this suggestion, the Ad Hoc Group representatives began making formal proposals to the Debtors and Gemini in December 2023, while consulting and keeping all parties apprised of the progress.

12.     Since that time, the Debtors, the Ad Hoc Group, the Committee, and Gemini (together, the "Parties") engaged in further negotiations to explore the possibility of a settlement agreement to resolve the Gemini Adversary Proceedings and the Proofs of Claim.  At the direction of the Special Committee, the Debtors' advisors participated in certain of these discussions and provided input to Gemini and the Ad Hoc Group.  The Special Committee was kept informed of these discussions.

13.     On February 7, 2024, the Court issued a memorandum opinion in the GBTC Action dismissing Gemini's claims that it had a valid and perfected lien on, security interest in or constructive trust over the Additional GBTC Shares (ECF No. 35).  The memorandum opinion also dismissed without prejudice all claims against GAP and GGH.  An order implementing the opinion and granting the Debtors' motion to dismiss was entered on February 22, 2024 (ECF No. 44).

14.     Over the past few months and weeks, including the period both before and after the February 7, 2024 memorandum decision, the Ad Hoc Group and Gemini continued to have direct discussions, while keeping the Debtors and Committee updated and obtaining their input as part of the process.  Although key economic terms were initially negotiated between the Ad Hoc Group and Gemini, the Debtors and the Committee also participated in the negotiations and obtained important concessions from Gemini and the Ad Hoc Group.  These efforts resulted in the Parties reaching an agreement in principle on February 27, 2024.

15.     Settlement negotiations were primarily handled on behalf of the Debtors by the Debtors' counsel, Cleary Gottlieb Steen & Hamilton LLP, who regularly consulted with the Special Committee as well as the Company's senior management and kept the Special Committee

updated about the process and progress of negotiations as well as developments in the Gemini Adversary Proceedings.

16.     The Special Committee approved the proposed agreement in principle on February 28, 2024.  On the same day, the Parties announced the key terms of the agreement in principle at a hearing before the Bankruptcy Court.  Since that time the Parties and their advisors have worked to document the agreement in principle, which has resulted in the Settlement Agreement.

17.     In this case, after consultation with the Debtors' advisors, the Special Committee has concluded that the Settlement Agreement is fair and equitable, reasonable and in the best interests of the Debtors' estates and, thus, should be approved.

**B.     The Settlement Agreement**

18.     The terms of the Settlement Agreement provide significant and near-term benefits to the Debtors and their creditors, in contrast to the uncertainty and expense of continued litigation of the Gemini Adversary Proceedings and various disputes concerning the Proofs of Claim.

19.     The Settlement Agreement maximizes creditor recoveries and eliminates the potential risk of an adverse judgment against the Debtors following litigation of the Gemini Adversary Proceedings.  Under the Settlement Agreement, the Gemini GBTC Shares are valued to approximate their current price, as compared to their price at the time of Gemini's purported foreclosure on November 16, 2022, which Gemini previously asserted should be used to value the Gemini GBTC Shares.  If Gemini had prevailed in the GBTC Action with respect to the validity of their foreclosure over such shares, Gemini would assert that the Gemini Lenders would have had a substantial deficiency claim against the Debtors' estates.  Continuing to litigate the GBTC Action also would have caused significant delay in making fulsome and prompt distributions to creditors, including the Gemini Lenders.  Moreover, if the Debtors had lost the litigation over this

issue, recoveries of general unsecured creditors other than the Gemini Lenders would be negatively impacted.

20.     Further, the distribution from the Debtors to the Gemini Lenders under the Settlement Agreement is substantially less than the Debtors' had previously proposed to Gemini in prior settlement offers.  The Settlement Agreement also has the benefit of capping the Gemini Proprietary Claim at a significant discount to the value originally asserted by Gemini.  Moreover, the Settlement Agreement provides that Gemini shall indemnify and hold harmless the Debtors and their successors in interest from any and all claims and causes of action asserted by the Gemini Lenders against the Debtors, their successors in interest, and their respective Related Parties, arising from any actions taken by the Indemnified Parties in accordance with the Settlement Agreement during the period from and after entry of the Approval Order, further limiting the potential risk to the Debtors' estates.  In addition, the Settlement Agreement facilitates the Debtors' making of in-kind distributions of alt-coins, to the extent that there are matching alt-coin-denominated claims held by the Gemini Lenders.

21.     The Settlement Agreement will also allow the Debtors to avoid extensive litigation costs that would be incurred in protracted and complex litigation against Gemini.  Any litigation would entail significant professional fees, including but not limited to potential discovery, preparation of experts, motion practice, and potentially trial and a post-trial remedies phase.  Any such litigation would significantly distract the Debtors at a time where there are other priorities to maximize recoveries for creditors, including confirmation and consummation of the Chapter 11 Plan.  If approved, the Settlement Agreement would fully and finally resolve the GBTC Action and the Proofs of Claim, permitting the Debtors and their advisors to focus resources and attention on other claims, confirmation and consummation of the Plan and on beginning to make

distributions to creditors. More importantly, if litigation were to continue, it would delay the

Debtors' ability to make material distributions for the benefit of the Gemini Lenders, particularly

with respect to the value of the Gemini GBTC Shares. By contrast, the Settlement Agreement

enables such distributions in the near term, which is particularly important given pricing volatility.

22.    The Debtors have exercised their informed business judgment to determine that the

Settlement Agreement is fair and reasonable and in the best interest of the Debtors.

23.    The Settlement Agreement is the product of significant efforts by the Parties and is

the product of more than a year of arm's length negotiations. The Parties are represented by

sophisticated and experienced professionals—highly regarded law firms and financial advisors

with significant restructuring, litigation, and other relevant experience. The Settlement Agreement

is fair and equitable, reasonable and in the best interests of the Debtors' estates.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Executed on March 19, 2024
New York, New York

*/s/ Thomas Conheeney*
Thomas Conheeney
Member of the Special Committee of the
Board of Directors
Genesis Global Holdco, LLC

**<u>Exhibit D</u>**

**Lynch Declaration**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself and as agent on behalf of the Gemini Lenders,<br><br>          Plaintiff,<br><br>     v.<br><br>GENESIS GLOBAL CAPITAL, LLC,<br><br>          Defendant. | Adv. Proc. No. 23-01192 (SHL) |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

|  |  |
|---|---|
| GENESIS GLOBAL CAPITAL, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>GEMINI TRUST COMPANY, LLC,<br>individually and as agent on<br>behalf of the Earn Users, and<br>EARN USERS 1-232,824<br><br>        Defendants. | Adv. Pro. No. 23-01203 (SHL) |

**DECLARATION OF THOMAS Q. LYNCH
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
APPROVING A SETTLEMENT AGREEMENT AMONG THE DEBTORS,
GEMINI TRUST COMPANY, LLC, THE AD HOC GROUP OF GENESIS
LENDERS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

I, Thomas Q. Lynch, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am an associate at the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel to the Debtors in the above-captioned cases.

2.      I respectfully submit this declaration in support of the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (the "Motion").[2]

3.      A true and correct copy of the Gemini Earn Program Terms and Authorization Agreement is attached hereto as Exhibit 1.

---

[2]      Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Motion.

4.      A true and correct unexecuted copy of a Master Digital Asset Loan Agreement by

and between GGC, as borrower, Gemini, as authorized agent of a Gemini Lender, and a Gemini

Lender is attached hereto as <u>Exhibit 2</u>.


Dated: March 19, 2024                    Respectfully submitted,
        New York, New York

                                         _____
                                         Thomas Q. Lynch
                                         tlynch@cgsh.com
                                         CLEARY GOTTLIEB STEEN &
                                         HAMILTON LLP
                                         One Liberty Plaza
                                         New York, New York  10006
                                         T: 212-225-2000
                                         F: 212-225-3999

                                         *Counsel to the Debtors and
                                         Debtors-in-Possession*

## Exhibit 1

**Gemini Earn Program Terms and Authorization Agreement**

# Gemini Earn Program Terms and Authorization Agreement

Last updated: December 14, 2022

---

Gemini Earn (the "Program") is a program that allows customers ("you" or "your") of Gemini Trust Company, LLC ("Gemini," "we," "us" or "our") to lend certain Digital Assets that you custody with us. In order to participate in the Program, you must agree to this Terms of Service and Authorization Agreement ("Authorization Agreement") and enter into one or more Master Loan Agreements ("Loan Agreements") with the borrowers disclosed on <u>Schedule A</u> ("Borrowers"). By choosing to participate in our Program, you acknowledge that you have read, understood and agreed to this Authorization Agreement.

# 1. PROGRAM RISKS

- YOUR AVAILABLE DIGITAL ASSETS WILL LEAVE OUR CUSTODY, AND YOU ACCEPT THE RISK OF LOSS ASSOCIATED WITH LOAN TRANSACTIONS, UP TO, AND INCLUDING, TOTAL LOSS OF YOUR AVAILABLE DIGITAL ASSETS.
    - We are not a depository institution, and our Program does not offer a depository account. Participating in our Program may put your Digital Assets at risk.
    - Loans made through our Program may not be secured. As a Lender, you understand that you have exposure to Borrower credit risk. Borrowers are not required to post collateral to you or to us, however, they may require collateral to secure loans that they themselves make.

- Transactions in Digital Assets may carry added risk compared to lending of other types of assets because transactions in cryptocurrency are in many cases irreversible. Funds may not be recoverable in the event of errors or fraudulent activity.
- We are not a principal to any Loan, and we have no obligation or ability to return the Loaned Digital Assets from your Borrower in the event of a Borrower default.
- The Borrower is not required to custody or maintain the Loaned Digital Assets with us or any other Gemini-controlled account. You understand that we cannot be and are not responsible for any Digital Assets once they leave our custody.
- You understand that Loans are not insured by us or any governmental program or institution and that we do not assume any market or investment risk of loss associated with your Participation in our Program. Your Available Digital Assets may decline in value during the term of a Loan or the applicable callback period.
- Loan Fees are variable and subject to change. Loan Fees may decline over time and we cannot guarantee that you will earn any particular rate of return on your Available Digital Assets by making Loans.
- You are responsible for determining any taxes you may owe as a result of your participation in our Program. You should consult a tax advisor if you have questions about the tax implications of our Program or any other digital asset transactions.

# 2. Participation in our Program

By participating in our Program, you represent and affirm that you are at least 18 years old, have the legal capacity to enter into this Authorization Agreement, and agree to be legally bound by the terms and conditions of this Authorization Agreement in their entirety.

You agree and understand that this Authorization Agreement is subject to the terms and conditions set forth in our User Agreement, which also govern this Authorization Agreement. In case of conflict, the User Agreement shall control. You further agree and understand that the defined terms used in this

Authorization Agreement, if defined in our User Agreement, shall have the meanings set forth in our User Agreement.

You agree and understand that we may change this Authorization Agreement from time to time. Your continued participation in the Program following any change or update shall constitute your agreement to the amended Authorization Agreement, and you agree to be legally bound by its terms and conditions as amended. You should, therefore, read this Authorization Agreement from time to time. You further agree and understand that we have the right to require your affirmative assent and continuing acceptance of this Authorization Agreement, from time to time, as a condition of your use of the Program. If you do not agree to be bound by this Authorization Agreement, you should not and cannot participate in the Program.

## 3. Appointment of Gemini as Your Agent

You hereby appoint and authorize Gemini as your agent to transfer on your behalf Digital Assets which you own and designate as available for lending by using the "Earn" function of the Program user interface, or that you otherwise transfer into our Program, and are listed as supported by the Program on Schedule B (in each case, "Available Digital Assets"), to Borrowers in accordance with the terms of this Agreement. We shall have the responsibility and authority to do or cause to be done all acts we shall determine to be desirable, necessary, or appropriate to implement and administer your authorization to lend Available Digital Assets through our Program. You acknowledge and agree that we are acting as a fully disclosed agent and not as principal in connection with the lending of your Available Digital Assets through our Program.

All lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit.

3

We may, but are not required to, maintain a "liquidity reserve" on your behalf of up to thirty percent (30%) of your Available Digital Assets ("Reserve") in order to more quickly fund your Loan callback and withdrawal requests. We may maintain a Reserve by withholding any amount of Available Digital Assets you designate for a Loan. You appoint and authorize Gemini to adjust such Reserve from time to time based on demand and activity in the Program, number of available Borrowers, or any other criteria set by us in our reasonable discretion. Available Digital Assets that we hold as your Reserve will not be provided to a Borrower in any Loan, and will not accrue Loan Fees. We will exclude any Reserve, if applicable, from the calculation or the interest rate and/or other Loan Fees presented to you at the time a Loan is made. A Reserve is not collateral and will not be reinvested on your behalf.

## 4. Digital Asset Loan Agreements

In order to participate in our Program, you must enter into one or more Loan Agreements with Borrowers which set forth the terms for loans of your Available Digital Assets ("Loans"). We will present you with each available Loan Agreement for your electronic signature through the Program user interface. You are ultimately responsible for your adherence to the terms of a Loan Agreement, and you should review the terms carefully before you make any Loans.
Certain terms of individual Loans, such as the Loan's interest rate and term, may be negotiated at the time a Loan is made. You will be required to acknowledge the terms of each Loan electronically before we may disburse your Available Digital Assets to a Borrower.

## 5. Making Loans to Borrowers

Borrowers are your sole counterparty in our Program. You authorize us, upon your instruction through our Program user interface, to effect Loans with any Borrower with whom you have acknowledged and entered into a Loan Agreement. We shall

4

not be responsible for any statements, representations, warranties, or covenants made by any Borrower in connection with any Loan or for any Borrower's performance of or failure to perform the terms of any Loan under the applicable Loan Agreement or any related agreement, including the failure to return any borrowed Digital Assets to you or to make any required payments to you. We shall be responsible for determining whether any Loan shall be made, and for negotiating and establishing the terms of each such Loan within the parameters identified by you and the applicable Loan Agreement. We shall have the authority to terminate any Loan in our discretion, at any time and without prior notice to you. In the event of a default (within the meaning of the applicable Loan Agreement) by a Borrower on any Loan, we shall be entitled to exercise any rights and remedies on your behalf with respect thereto, and will be fully protected in acting in any manner it deems reasonable and appropriate. Upon notice to us, you have the right to direct us to initiate action to terminate any Loan made under this Authorization Agreement in accordance with the terms of the Loan Agreement. You acknowledge that we administer our Program for other customers of Gemini. We will allocate digital asset lending opportunities among our customers, using methods established by us from time to time. We do not represent or warrant that any amount or percentage of your Available Digital Assets will in fact be loaned to Borrowers. You acknowledge and agree that you shall have no claim against Gemini and we shall have no liability arising from, based on, or relating to, loans allocated to other customers, the terms of loans negotiated for other customers, or loan opportunities not made available to you, whether or not we have made fewer or more loans for any other customer, and whether or not any loan allocated to another customer, or loan opportunity not made available to you, could have resulted in Loans made under this Authorization Agreement.

You further acknowledge and agree that, under the applicable Loan Agreements, Borrowers will not be required to return any Available Digital Assets delivered as a Loan ("Loaned Digital Assets") immediately upon receipt of notice from us terminating the applicable Loan, but instead will be required to return such Loaned

5

Digital Assets within such period of time following such notice as is specified in the applicable Loan Agreement, but not later than the customary settlement period.

## 6. Transfer of Information to Borrowers

In order to borrow your Available Digital Assets and pay Loan Fees to you, Borrowers, their affiliates or their respective service providers may require certain identifying information from you. You authorize us to share with Borrowers your Gemini account information and personally identifying information hereunder solely for the purposes of facilitating Loans and paying Loan Fees to you. This information may include, but is not limited to, your name, date of birth, and state and country of residence. Borrowers may store, access, transfer or use your personal information differently than we do. You should review each of your Borrowers' privacy policies to familiarize yourself with their terms. If you do not wish to share personally identifying information with Borrowers, you should not participate in our Program.

## 7. Distributions, Staking and Voting Rights with Respect to Loaned Digital Assets

Forks and Airdrops on Loaned Digital Assets and Available Digital Assets are subject to our User Agreement. In the event of a Fork or Airdrop, we may terminate or call back affected Loans on your behalf. If we, in our sole discretion, determine to support a Forked Network during the term of a Loan, and the distribution of new tokens can be definitively calculated according to the distribution method, you will receive the benefit and ownership of any incremental tokens generated as a result of the Fork or Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day

following the occurrence the Fork or Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Digital Assets (defined as the total value of the Loaned Digital Assets) (calculated as a 30-day average on such date).

- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Fork or Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Digital Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, Gemini shall mutually agree upon another data source with the Borrower).

If the above criteria are met, New Tokens will be delivered to you according to the procedures set forth in the applicable Loan Agreement. We are not responsible for notifying you of any upcoming or planned Fork, Airdrop, or any other distributions on your Loaned Digital Assets. You acknowledge that the tax treatment of any payments of distributions from a Borrower to you in substitution of receiving such distribution directly may differ, and that you are solely responsible for calculating any resulting tax liabilities.

You acknowledge that you will not be entitled to participate in any staking functionality, delegation, voting, or other governance functions with respect to Digital Assets that are transferred into our Program or have been delivered to a Borrower in connection with a Loan.

# 8. Loan Fees

(a) Loan Fees. Fees or other income received from a Borrower in connection with Loans ("Loan Fees") shall be regularly credited to your Program account, on a recurring basis established by us, after deducting any applicable payments to Gemini as compensation for its services under this Authorization Agreement as

set forth below. Then-current Loan Fees will be provided through the Program user interface for your review and approval before you authorize a new Loan. Unless otherwise specified by the Loan Agreement, Loan Fees will be paid in-kind, in the form of the Loaned Digital Asset. Any taxes required to be withheld at source from Loan Fees may be deducted from the amount credited to your Program account as described in this Paragraph (a), and to the extent that such amount is less than the amount of such taxes, then you shall be responsible for any shortfall.

(b) Notice of Rate Changes. Certain Loan Fees, including interest rates, may be variable and subject to change during the term of a Loan according to the Loan Agreement. As a result, your Loan Fees may increase or decrease from month to month, leading to a higher or lower rate of return on your Loaned Digital Assets. Borrowers participating in the Program will update their interest rates no more than once every thirty (30) days. We will notify you through the Program website and/or user interface of the available interest rates for each Available Digital Asset in the applicable month.

(c) Right to Debit or Set Off. We may at any time charge or debit any of your accounts maintained by or on behalf of Gemini in any capacity (or set off any amounts otherwise payable or creditable to any such account) to pay any amounts due to us under this Authorization Agreement. You acknowledge that whenever we exercise our rights under this Paragraph (b) with respect to your obligations to Gemini, we are acting in a principal capacity on our own behalf and not on your behalf.

(d) Rewards and Promotions. We may from time to time offer rewards, referral fees or promotional credits that are expressed in our Program user interface as higher Loan Fees for an Available Digital Assets ("Rewards"). Unless otherwise noted, Rewards are not offered to you by any Borrower and may be modified or terminated in our sole discretion at any time. You are responsible for any tax reporting obligation arising from Rewards credited to your Program account.

8

# 9. Agent Fees

The fees associated with our services under our Program are disclosed at
https://www.gemini.com/fees/gemini-earn-fees ("Agent Fees"), which we will
deduct from Loan Fees as described in Section 8. Agent Fees may be changed
from time to time by us upon notice to you by email or through the Program user
interface. By continuing to participate in our Program following such change, you
acknowledge and agree to such updated Agent Fees.

# 10. Additional Program Terms and Conditions

*General.* Your participation in our Program shall at all times be subject to our User
Agreement. While there is currently no minimum amount of Available Digital Assets
required to participate in our Program, we may, in our sole discretion, require a
minimum balance in the future.

*Calling Back Loans.* The terms of each Loan will be set forth in the Loan
Agreement with the Borrower, and your rights and obligations as a lender under
these agreements may vary. However, we will require that all Borrowers agree that
Loans will be callable at any time unless otherwise agreed with our customers. As
a result, you may request a return, in whole or in part, of your loaned Available
Digital Assets at any time.

Once you request a return of your Available Digital Assets through our Program
user interface, you will generally receive these Digital Assets within five (5)
business days. However, repayment terms are set forth in the Loan Agreement
and the terms of your Loan Agreement may provide for a longer repayment period.
While Available Digital Assets are in the process of being returned, they will not be
available for trading, transfers or withdrawals. Withdrawals from our Program to
external addresses are subject to additional verification by us. While withdrawals
from our Program to your Gemini Account are currently free and unlimited, we

reserve the right to limit the frequency of withdrawals and/or charge an administrative fee in the future.

*Borrower Capacity.* We do not guarantee that a Borrower will seek a Loan for your Available Digital Assets on terms you find acceptable, or at all. If at any time the Available Digital Assets in our Program exceed Loan demand from Borrowers, lending opportunities will be allocated according to methods established by us from time to time. We may, but are not required to, maintain a waitlist if Borrower capacity is oversubscribed. A waitlist is not a guarantee that your Available Digital Assets will be Loaned to a Borrower.

*Delisting; Regulatory Changes.* Unless otherwise agreed between you and the Borrower, Loans are generally open-term and will continue earning Loan Fees until called back by you. However, your Loan Agreement may specify certain events that allow the Borrower to repay and terminate a Loan immediately: such as a good faith belief that holding or borrowing an Available Digital Asset could violate applicable law. Similarly, we may terminate any outstanding Loans if we determine to delist a loaned Digital Asset from our Exchange. Review your Loan Agreement(s) for details on when and how Loans may be terminated.

# 11. Standard of Care and Indemnification

We shall use reasonable care in the performance of our duties hereunder consistent with that exercised by custodians generally in the performance of duties arising from acting as agent for clients in asset lending transactions. You agree to indemnify us and hold us harmless from any loss or liability (including the reasonable fees and disbursements of counsel) incurred by us in rendering services hereunder or in connection with any breach of the terms of this Authorization Agreement, except such loss or liability which results from our gross negligence or willful misconduct.

Notwithstanding any express provision to the contrary herein, we shall not be liable for any indirect, consequential, incidental, special, punitive or exemplary

damages, even if we have been apprised of the likelihood of such damages occurring.

You acknowledge that in the event that your participation in our Program generates income, we may be required to withhold tax or may claim such tax from you as is appropriate in accordance with applicable law.

# 12. Representations and Warranties

Each party hereto represents and warrants that (a) it has and will have the legal right, power and authority to execute and deliver this Authorization Agreement, to enter into the transactions contemplated hereby, and to perform its obligations hereunder; (b) it has taken all necessary action to authorize such execution, delivery, and performance; (c) this Authorization Agreement constitutes a legal, valid, and binding obligation enforceable against it; and (d) the execution, delivery, and performance by it of this Authorization Agreement will at all times comply with all applicable laws and regulations.

You represent and warrant that (a) you are in compliance with our User Agreement, (b) you have made your own determination as to (and you acknowledge that we are making no representation or warranty as to) the tax and accounting treatment of any Loan, including any Loan Fees or other remuneration or other funds received with respect thereto; (c) you are the legal and beneficial owner of (or exercise complete discretion over) all Available Digital Assets free and clear of all liens, claims, security interests and encumbrances; and (d) all transactions you authorize through our Program are carried out for your own account and not on behalf of any other person or entity.

# 13. Borrower Default

We act as your authorized agent under this Authorization Agreement with respect to facilitating your Loans to Borrowers. However, your Available Digital Assets leave our custody during the term of a Loan and the applicable callback period. The loan of Available Digital Assets to a Borrower cannot be reversed by us at our own discretion or our customer's direction. We do not insure, indemnify, or otherwise guarantee the return of your Digital Assets that have been loaned to a Borrower.

Your counterparty in each Loan transaction is a Borrower, and you alone bear the risk of loss of your loaned Digital Assets principal should a Borrower default. Your remedies in the event of a Borrower default will be determined by the applicable Loan Agreement. These remedies may be limited or, in some cases, unavailable in the event of a Borrower default. We shall be entitled to exercise any rights and remedies under the Loan Agreement on your behalf, and will be fully protected in acting in any manner we deem reasonable and appropriate. If the Borrower does not return the Loaned Digital Assets, it may not be possible to recover the assets from the Borrower, and we shall have no obligation to pursue such recovery on your behalf.

# 14. Continuing Agreement; Termination; Remedies

It is the intention of the parties hereto that this Authorization Agreement shall constitute a continuing agreement in every respect and shall apply to each and every Loan, whether now existing or hereafter made. We may terminate this Authorization Agreement immediately if (a) we, in our sole discretion, determine to suspend or terminate our Program; (b) we, in our sole discretion, determine that you have violated any portion of our User Agreement; or (c) upon the default of you or any Borrower under the terms of an applicable Loan Agreement. Following such termination, no further Loans shall be made hereunder on your behalf, and we shall, within a reasonable time after termination of this Authorization

Agreement, terminate any and all outstanding Loans. The provisions hereof shall continue in full force and effect in all other respects until all Loans have been terminated and all obligations satisfied as herein provided.

You may also end your participation in our Program at any time by requesting a return of all of your Available Digital Assets to your Gemini Account; provided, however, that this Authorization Agreement shall continue in full force and effect.

## 15. Agents and Subcontractors

We may use such agents, including sub-custodians, third party custodians and our affiliates, as we deem appropriate to carry out our duties under this Authorization Agreement. Our sole liability for the acts or omissions of any agent shall be limited to liability arising from our failure to use reasonable care in the selection of such agent.

## 16. Force Majeure

We shall not be responsible for any losses, costs, or damages suffered by you resulting directly or indirectly from war, riot, revolution, terrorism, pandemic, acts of government or other causes beyond our reasonable control or apprehension.

## 17. Miscellaneous

This Authorization Agreement supersedes any other agreement between you and Gemini or any representations made by you or Gemini to each other, whether oral or in writing, concerning Loans. This Authorization Agreement shall not be assigned by you without our prior written consent. Subject to the foregoing, this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, representatives, successors, and permitted

assigns. This Authorization Agreement shall be governed and construed in accordance with the laws of The State of New York.

# 18. Dispute Resolution

You and Gemini agree and understand that any controversy, claim, or dispute arising out of or relating to this Authorization Agreement or your relationship with Gemini — past, present, or future — shall be settled solely and exclusively by binding arbitration held in the county in which you reside, or another mutually agreeable location, including remotely by way of video conference administered by National Arbitration and Mediation ("NAM") and conducted in English, rather than in court. You and Gemini expressly agree that any dispute about the scope of this Authorization Agreement to arbitrate and/or the arbitrability of any particular dispute shall be resolved in arbitration in accordance with this section. You and Gemini expressly agree that an arbitrator may issue all appropriate declaratory and injunctive relief necessary to ensure the arbitration of disputes (but only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim). You and Gemini agree to keep any arbitration strictly confidential.

You and Gemini agree that this arbitration provision applies not just to disputes between you and Gemini but also to (a) disputes with Gemini and any other party named or added as a co-defendant along with Gemini at any time, and (b) disputes in which a party is named as a defendant involving claim(s) arising from or related to this Authorization Agreement, even if Gemini is not named or added as a defendant. Any such co-defendant or defendant is a third-party beneficiary entitled to enforce this arbitration provision.

You and Gemini agree that the arbitrator shall have the authority to order any remedies, legal or equitable, which a party could obtain from a court of competent jurisdiction in an individual case based on the claims asserted, and nothing more.

The arbitrator shall not award punitive or exemplary damages to either party, unless such remedies would otherwise be available under applicable law. You and Gemini agree that this arbitration provision evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. s. 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this arbitration provision, and the FAA shall preempt all state laws to the fullest extent permitted by the law. You and Gemini agree that good-faith, informal efforts to resolve disputes often can result in a prompt, low-cost and mutually beneficial outcome. Therefore, a party who intends to seek arbitration must first send to the other a written Notice of Dispute ("Dispute Notice"). Any Dispute Notice to Gemini must be sent to support@gemini.com ("Notice Address"). Any Dispute Notice to you by Gemini will be sent to the email address registered with your Gemini Account. Any Dispute Notice must include (a) the name, address, and email address of the party providing the Dispute Notice; (b) a description of the nature and basis of the claim or dispute, including any relevant facts regarding Gemini or your use of Gemini; (c) an explanation of the specific relief sought, including the total damages sought, if any, and the basis for the damage calculations; (d) a signed statement from the party providing the Dispute Notice verifying the accuracy of the contents of the Dispute Notice; and (e) if the dispute is from you, and you have retained an attorney, a signed statement from you authorizing Gemini to disclose your account details to your attorney if necessary in resolving your claim or dispute. Any Dispute Notice from you must be individualized, meaning it can only concern your dispute and no other person's dispute. And any Dispute Notice from Gemini must be individualized, meaning it can only concern you and no other person. You also agree that, after sending a Demand Notice to Gemini, at Gemini's request you will personally participate in a discussion by telephone with Gemini to discuss whether an agreement can be reached to resolve the claim before arbitration is initiated. If

you are represented by counsel, you agree that you will personally attend the telephone conference with your counsel. Gemini also agrees to participate in such a telephone discussion at your request. Any informal dispute resolution conferences shall be individualized, such that a separate conference must be held each time either party intends to commence individual arbitration; multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference, unless mutually agreed to by the parties. You agree that compliance with these informal dispute resolution procedures is a condition precedent to commencing arbitration, and that the arbitrator shall dismiss any arbitration filed without fully and completely complying with these informal dispute resolution procedures.

If you and Gemini do not reach an agreement to resolve a claim within 60 days after a Demand Notice is received, you or Gemini may commence an arbitration proceeding; except that, if either you or Gemini send the other an incomplete Dispute Notice, the 60-day period begins only after a complete Dispute Notice is received, and if either you or Gemini request a telephone discussion, the 60-day period begins only after the discussion has occurred. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in these informal dispute resolution procedures.

Should any dispute proceed to arbitration, you and Gemini agree that any such arbitration shall be conducted in accordance with the prevailing NAM rules and procedures (including Comprehensive Dispute Resolution Rules and Procedures and/or the Supplemental Rules for Mass Arbitration Filings, as applicable) ("NAM Rules"), with the following exceptions to the NAM Rules if in conflict:

- The arbitration shall be conducted by one neutral arbitrator;
- Each side agrees to bear its own attorney's fees, costs, and expenses, unless such remedies would otherwise be available under applicable law, or unless the arbitrator finds that a claim, counterclaim, or defense is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)); and

- All pleadings submitted in arbitration are subject to the standards set forth in Federal Rule of Civil Procedure 11, which, among other things, permits sanctions to be imposed where pleadings are submitted for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.
- The arbitrator may issue orders (including subpoenas to third parties, to the extent permitted by law) allowing the parties to conduct discovery sufficient to allow each party to prepare that party's claims and/or defenses, taking into consideration that arbitration is designed to be a speedy and efficient method for resolving disputes. For example, the arbitrator shall apply the Apex Doctrine and preclude depositions of either party's current or former high-level officers absent a showing that the officer has unique, personal knowledge of discoverable information and less burdensome discovery methods have been exhausted.

Additionally, if, at any time, 25 or more similar demands for arbitration are asserted against either party or their related parties by the same or coordinated counsel or entities ("Mass Filing"), the additional protocols set forth below shall apply:

- NAM's Mass Filing Rules shall apply if the parties' dispute is deemed by NAM, in its sole discretion pursuant to the NAM Rules and this Dispute Resolution section, to be part of a Mass Filing.
- Any Mass Filing shall be subject to a bellwether proceeding intended to reach a fair and speedy resolution of all claims included in the Mass Filing. In any Mass Filing, NAM shall select 15 demands for arbitration to proceed ("Bellwether Arbitrations"). While the Bellwether Arbitrations are adjudicated, no other demand for arbitration that is part of the Mass Filings may be filed, processed, or adjudicated, and no filing fees for such a demand for arbitration shall be due from either party to the administrator. Any applicable statute of limitations regarding such a demand for arbitration shall remain tolled beginning when the Mass Filing claimant first provided the other party with its Dispute Notice, as defined above.
- Following the resolution of the Bellwether Arbitrations, the parties shall engage in a global mediation of all remaining demands for arbitration comprising the Mass Filing. The mediation shall be administered by NAM. If the parties are unable to resolve the remaining demands for arbitration comprising the Mass Filing within 30 days following the mediation, the

remaining demands for arbitration comprising the Mass Filing shall be administered by NAM on an individual basis pursuant to the NAM Rules. You and Gemini agree to abide by all decisions and awards rendered in such proceedings and you and Gemini agree that such decisions and awards rendered by the arbitrator shall be final and conclusive, except for any appeal rights under the FAA.

To the extent you or Gemini seek emergency relief in connection with any controversy, claim, or dispute arising out of or relating to this Authorization Agreement or the breach thereof, or your relationship with Gemini, you and Gemini agree that this Authorization Agreement restricts you or Gemini from seeking emergency relief from any court, including without limitation temporary restraining orders and/or preliminary injunctions, and you and Gemini agree that, to the extent either party breaches this Authorization Agreement by seeking such relief from a court, that party shall be responsible for paying the opposing party's attorneys' fees in opposing such relief, and the arbitrator shall render an award of such attorneys' fees at the earliest possible time after such fees are incurred. Notwithstanding the foregoing obligation to settle disputes through arbitration, you or Gemini may assert claims, if they qualify, in small claims (or an equivalent) court in New York County or any United States county where you live. However, if the claims are transferred, removed or appealed to a different court, they shall be subject to arbitration.

You and Gemini agree that you or Gemini may, without inconsistency with this arbitration provision, apply to any court for an order enforcing the arbitral award. You and Gemini irrevocably and unconditionally agree to waive any objection that you or Gemini may now or hereafter have to the laying of venue of any action or proceeding relating to enforcement of the arbitral award in the federal or state courts located in the State of New York.

You and Gemini agree that all such controversies, claims, or disputes shall be settled in this manner in lieu of any action at law or equity. In arbitration the parties waive their rights to have a jury trial.

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR
FOR ANY OTHER REASON LITIGATION PROCEEDS IN COURT THEN THE PARTIES
AGREE THAT YOU AND GEMINI:

- TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS AND
  REGULATIONS, HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY
  JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION,
  PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO
  THIS AUTHORIZATION AGREEMENT OR THE SERVICES THAT GEMINI
  PROVIDES OR ANY OTHER MATTER INVOLVING US HERETO, AND
- SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE
  FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW
  YORK AND YOU AGREE NOT TO INSTITUTE ANY SUCH ACTION OR
  PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.

You and Gemini agree to arbitrate solely on an individual basis, and agree and
understand that this Authorization Agreement does not permit class action or
private attorney general litigation or arbitration of any claims brought as a plaintiff
or class member in any class or representative arbitration proceeding or litigation
("Representative and Class Action Waiver"). The arbitral or other tribunal may not
consolidate more than one person or entity's claims and may not otherwise
preside over any form of a representative or class proceeding. Nothing in this
paragraph shall be construed to prohibit settlements on a class-wide or
representative basis.

If any portion of this arbitration clause is held to be invalid or unenforceable, the
remaining portions will nevertheless remain in force. In any case in which (1) the
dispute is filed as a class or representative action and (2) there is a final judicial
determination that all or part of the Representative and Class Action Waiver is
unenforceable, the class and/or representative action to that extent must be
litigated in a civil court of competent jurisdiction, but the portion of the
Representative and Class Action Waiver that is enforceable shall be enforced in
arbitration. Additionally, if a court determines that a public injunctive relief claim
may proceed notwithstanding the Representative and Class Action Waiver, and
that determination is not reversed on appeal, then the public injunctive relief claim

will be decided by a court after any individual claims are arbitrated, and the parties will ask the court to stay the public injunctive relief claim until the other claims have been finally concluded in arbitration.

You agree that this section of this Authorization Agreement has been included to rapidly and inexpensively resolve any disputes with respect to the matters described herein, and that this section shall be grounds for stay or dismissal of any court action commenced by you with respect to a dispute arising out of such matters.

# 19. Modification

We reserve the right to update this Authorization Agreement from time to time, including the Schedules attached hereto, and will notify you of material updates via email or through our Program user interface. Your continued participation in our Program indicates your acceptance to the Authorization Agreement, as updated.

Notwithstanding the forgoing, you acknowledge and agree that we may increase the number of Digital Assets supported in the Program on Schedule B at any time and without notice to you.

# Schedule A

## Approved Borrowers

Genesis Global Capital, LLC

# Schedule B

## Digital Assets Supported by the Program

1Inch (1INCH)

Aave (AAVE)

Alchemix (ALCX)

Flexacoin (AMP)

Ankr (ANKR)

ApeCoin (APE)

Axie Infinity (AXS)

Balancer (BAL)

Basic Attention Token (BAT)

Bitcoin Cash (BCH)

Bancor (BNT)

Bitcoin (BTC)

Chiliz (CHZ)

Compound (COMP)

Curve (CRV)

Dai (DAI)

Dogecoin (DOGE)

Ether (ETH)

Fetch.ai (FET)

Filecoin (FIL)

Fantom (FTM)

The Graph (GRT)

Gemini dollar (GUSD)

Injective Protocol (INJ)

Kyber Network (KNC)

Chainlink (LINK)

Livepeer (LPT)

Loopring (LRC)

Litecoin (LTC)

Decentraland (MANA)

Polygon (MATIC)

Maker (MKR)

Orchid (OXT)

PaxGold (PAXG)

Ribbon Finance (RBN)

Ren (REN)

Rally (RLY)

Skale (SKL)

Synthetix (SNX)

Solana (SOL)

Storj (STORJ)

Sushiswap (SUSHI)

Tokemak (TOKE)

Uma (UMA)

Uniswap (UNI)

USD Coin (USDC)

Tezos (XTZ)

Yearn.finance (YFI)

Zcash (ZEC)

0x (ZRX)

## __Exhibit 2__

**Master Digital Asset Loan Agreement**

## <u>MASTER DIGITAL ASSET LOAN AGREEMENT</u>

This Master Digital Asset Loan Agreement ("<u>Agreement</u>") is made on this [date of Lender onboarding] by and between Genesis Global Capital, LLC ("<u>Genesis</u>" or "<u>Borrower</u>"), a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 Gemini Trust Company, LLC ("<u>Gemini</u>" or "<u>Custodian</u>") a trust company organized and existing under the laws of the State of New York with its principal place of business at 315 Park Avenue South, 18th Floor, New York, NY 10010, acting as the authorized agent of a customer of Custodian which accepts the terms of this Agreement and direct Custodian to lend their assets hereunder (the "<u>Lender</u>" and, together with Genesis and Gemini, the "<u>Parties</u>").

## <u>RECITALS</u>

**WHEREAS**, Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets;

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Custodian will facilitate the lending of Digital Assets on behalf of Lender to Borrower, and Borrower will pay a Loan Fee and return such Digital Assets to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Asset lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## I.     <u>Definitions</u>

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "***Applicable Airdrop***" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Asset held at a specified time.  A "***Non-Applicable Airdrop***" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Asset, or a distribution that depends on a wallet of the relevant Digital Asset meeting a threshold requirement.

"***Borrower***" means Genesis Global Capital, LLC.

"***Borrower Email***" means lend@genesiscap.co.

"***Business Day***" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

1

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Digital Asset*" means Digital Asset that the Borrower includes in any Offered Loan Terms, and that is available for trading on the Gemini Exchange.

"*Digital Asset Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Asset.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date.

"*Gemini Earn Platform*" means a service and accompanying user interface offered by Custodian whereby a Lender may authorize Custodian, as custodian of Lender's Digital Assets, to negotiate one or more loan agreements on the Lender's behalf for the purpose of lending certain of Lender's Digital Assets to one or more borrowers at Lender's direction.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Loan*" means a loan of Digital Assets made pursuant to and in accordance with this Agreement.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees and Late Fees, and for a particular Loan, as defined in Section III.

"*Loaned Assets*" means any Digital Asset amount transferred in a Loan hereunder until such Digital Asset (or identical Digital Asset) is transferred back to Lender hereunder, except that, if any new or different Digital Asset is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Asset shall be deemed to become Loaned Assets in addition to the former Digital Asset for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section X, such term shall include Digital Asset of the same quantity and type as the Digital Asset, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*Open Term Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Term*" means the period from the date Loaned Assets are delivered to Borrower through the date such Loan's Loaned Assets are repaid in full.

## II.  **General Loan Terms.**

(a) <u>Offers of Loans to Lender</u>

Custodian will provide to Lender on the Gemini Earn Platform the current terms on which Borrower has offered to enter into Loans (the "Offered Loan Terms"), which shall be delivered by Borrower to Custodian. Offered Loan Terms may include the types of Digital Assets which the Borrower will borrow, the rates and Loan types of such Digital Assets it will borrow, and maximum amounts it will borrow from all lenders on the Gemini Earn Platform. Custodian will promptly update the Gemini Earn Platform to reflect any change in the Offered Loan Terms communicated by Borrower to Custodian. For the avoidance of doubt, no erroneous or contrary information provided by Custodian to Lender, whether on the Gemini Earn Platform or otherwise, shall obligate Borrower to enter into Loans on terms other than those specified in the Offered Loan Terms then in effect.

(b) <u>Loan Procedure</u>

During the Term of this Agreement, on any Business Day Lender may direct Custodian, via the Gemini Earn Platform to notify Borrower on its behalf for each Digital Asset and Loan type listed in the applicable Offered Loan Terms whether it will lend additional Digital Assets at the current Loan Fee or whether it requests a return of Digital Assets (if applicable). For any Digital Assets Lender will lend, it shall deliver such Digital Assets according to the time and manner specified, and to a Digital Asset Address provided by, Custodian. For any Digital Assets Lender requests to be returned, Borrower shall return such Digital Assets within three Business Days to a Digital Asset Address provided by Custodian.  Upon receipt of the Loaned Assets, Custodian shall include a record of the Loan, including all the terms of the Loan, in a log of all Lender's Loans accessible to Lender and Borrower.

(c) <u>Loan Repayment Procedure</u>

Loans will be Open Term Loans unless otherwise specified. For Open Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian within three Business Days after the request by Lender pursuant to Section II(b) above. For Fixed Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian at the time indicated in the Offered Loan Terms, unless Borrower and Lender agree to extend the Fixed Term Loan for another Fixed Term Loan under the then-current Offered Loan Terms, or an Open Term Loan.  If Custodian has not provided to Borrower a Digital Asset Address for receiving the repayment of a Loan by 5:00 p.m. New York time on the day prior to the earlier of the Maturity Date or the Recall Delivery Day (defined below), then such Loan will become an Open Term Loan on said Maturity Date or Recall Delivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Recall Delivery Day.

Custodian shall notify Borrower to the extent Custodian determines in its sole discretion that it shall no longer support custody, trading or ancillary services for a particular Digital Asset.  The date of such notice will be deemed the Recall Request Day for any Loan Balance comprised of such Digital Assets.

3

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

    (i)    the Maturity Date;

    (ii)    for an Open Term Loan, the repayment of the Loan Balance by Borrower prior to the Maturity Date;

    (iii)    the occurrence of an Event of Default as defined in Section VIII; however, Lender, or Custodian on behalf of Lender, shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

    (iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

In the event of a termination of a Loan, any Loaned Assets
shall be redelivered immediately to a Digital Asset Address provided by Custodian and any fees or owed shall be payable by Borrower immediately to a Digital Asset Address provided by Custodian. In the event of a termination of a Loan pursuant to Section II(d)(iv), Borrower shall pay an additional Loan Fee until (i) the end of the then-current monthly loan period or (ii) the Maturity Date of such Loan (whichever is shorter) at the then-current interest rate on the amount of the Loan terminated.

(e) <u>Redelivery in an Illiquid Market</u>

If Gemini and each of the three other highest-volume Digital Asset exchanges that report prices for the applicable Digital Asset (as measured by the 30-day average daily trading volume of the applicable Digital Asset on the Loan Date) (these such exchanges, the "<u>Liquidity Exchanges</u>") cease or suspend trading as of in the Loaned Assets on the Maturity Date or the Recall Delivery Day, whichever applicable, Borrower and Custodian will engage in good faith negotiations to reach agreement on a substitute form of repayment for the affected loans or to otherwise temporarily suspend the requirement for Borrower to return the Loaned Assets, and such negotiation shall be binding on Lender.

**III.**    **<u>Loan Fees and Transaction Fees.</u>**

4

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as set forth in the Offered Loan Terms. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Assets are transferred to Borrower to the date on which such Loaned Assets are repaid in their entirety to Lender.

Unless otherwise specified in the Offered Loan Terms, (i) Loan Fees shall be based on a monthly interest rate, which may be updated on the first day of each calendar month upon at least five (5) days advance notice by Borrower to Custodian; (ii) no minimum amount of Loaned Assets shall be required for a Loan to accrue a Loan Fee; (iii) Loan Fees shall be calculated using the "daily balance method", meaning the applicable monthly interest rate shall be applied to the principal and interest that has accrued on the Loaned Assets each day; (iv) Loan Fees shall at all times be greater than 0% APY; and (v) Loan Fees shall be paid monthly by Borrower to a Digital Asset Address provided by Custodian as agent for Lender. Upon receipt, Custodian shall be solely responsible for paying Loan Fees to Lenders, and Lender will have no recourse to Borrower for such Loan Fees.

Borrower shall calculate any Loan Fees (which may be aggregated across all outstanding Loans from Lender) owed on a daily basis and provide Custodian with the calculation, and information relied upon to support the calculation, upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Assets. If Custodian believes any Loan Fee was calculated in error, Custodian shall present its own Loan Fee calculation and the Borrower and Custodian shall cooperate in good faith to decide a mutually agreeable calculation. The calculation of any Loan Fees accepted by Custodian shall be final and binding upon Lender.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Assets.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any accrued but unpaid Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) promptly following the end of the calendar month in which the Loan was outstanding, but in any even no later than three (3) Business Days after the end of such month or (ii) the termination of all Loans hereunder (the "Payment Due Date"). The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in writing, in the same Loaned Assets that were borrowed, on the same blockchain and of the same type that was loaned by the Lender during the Loan.

## IV.  **Hard Fork**

(a) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Custodian, in behalf of Lender, may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Custodian to manage the Hard Fork on the behalf of Borrower.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Asset to Custodian and Custodian transfers said Digital Asset back to Borrower pursuant to this section.

(b) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Asset protocol or an Applicable Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome in Borrower's reasonable discretion, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate reasonably selected by Borrower at the time of repayment, or (ii) returning the borrowed Digital Asset so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this

Section V shall continue for any New Tokens that meet the criteria in this subsection (b) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

**V.** **Representations and Warranties.**

The Parties hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Assets or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section VI.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of Loaned Assets and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Each Party represents and warrants that it has all necessary governmental and other consents, approvals and licenses to perform its obligations hereunder.

7

(i) Each Party represents and warrants that it has made its own independent decisions to enter into any Loan and as to whether the Loan is appropriate or proper for it based upon its own judgement and upon advice from such advisers (other than another Party) as it has deemed necessary. It is not relying on any communication (written or oral) of the other Parties as investment advice or as a recommendation to enter into any Loan, it being understood that information and explanations related to the terms and conditions of a Loan will not be considered investment advice or a recommendation to enter into that Loan.

(j) Each Party represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of any Loan. It is also capable of assuming, and assumes, the risks of that Loan. The other Parties are not acting as a fiduciary for or an adviser to it in respect of any Loan.

(k) Lender represents and warrants that it has, or will have at the time of the transfer of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(l) Lender represents and warrants that the Loaned Assets have not been or will not be obtained, directly or indirectly, from or using the assets of any: (i) "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (ii) any "plan" as defined in Section 4975(e)(1) of the U.S. Internal Revenue Code of 1986; or (iii) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the U.S. Department of Labor's plan asset regulation, Title 29 of the Code of Federal Regulations, Section 2510.3-101.

(m) Lender represents and warrants that it is in compliance with applicable laws and regulations, except where Lender's failure to so comply would not have a material effect on Borrower.

(n) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(o) Borrower has furnished to Lender, or will furnish to Lender within seven (7) Business Days after demand by Lender, its most recent statement required to be furnished to customers pursuant to Rule 17a-5(c) under the Securities Exchange Act of 1934.

(p) Custodian represents and warrants that it has been duly authorized by Lender to (i) enter into this Agreement and the Loans contemplated by this Agreement; and (ii) perform the obligations set forth herein on behalf of Lender.

8

**I.**    **Appointment of Custodian as Agent**

a.  Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

b.  Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:
   (i)  has received and reviewed a copy of this Agreement;
   (ii) has duly appointed Custodian as its agent to act on Lender's behalf for all purposes under this Agreement;
   (iii)has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;
   (iv)is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and
   (v)  has taken all necessary action to authorize such appointment of Custodian and such performance by it.

c.  Custodian represents and warrants that it is in compliance with applicable laws and regulations, except where Custodian's failure to so comply would not have a material effect on the other Parties.

d.  Lender agrees and acknowledges that Borrower's delivery to Custodian of any Loaned Assets in accordance with the terms of this Agreement and Exhibit A will fully discharge Borrower's obligations with respect to such Loaned Assets and that, thereafter, Custodian will be the only Party to which Lender may have recourse for such Loaned Assets. Subject to the terms of the Gemini Earn Platform and any other applicable agreements between Lender and Custodian, Custodian agrees to promptly deliver to Lender all Loaned Assets so received from Borrower.

**VI.**    **Default**

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a)  the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have two Business Days to cure such default;

(b)  the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens in accordance with Section V, however, Borrower shall have three Business Days to cure such default;

(c)  a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including

9

without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(e) any representation or warranty made by either Party in this Agreement that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

(f) any representation or warranty of Custodian in Exhibit A proves to be incorrect or untrue in any material respect as of the date of making thereof or during the term of any Loan, or Custodian shall fail to perform in any material respect Custodian's covenants in Exhibit A, which shall be deemed an Event of Default by Lender, provided, however, Custodian shall have ten Business Days to cure such default.

## VII. <u>Remedies</u>

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Custodian acting on behalf of the Lender may, at its option: (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Custodian's operating account to hold on behalf of itself and the Lender, to the extent necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity. If any Event of Default by Borrower under Sections VII(a) or (b), persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(c) or (d), the Custodian acting on behalf of the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender or Custodian, the Borrower may, at its option exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity. If any Event of Default by Lender under Section VII (e) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (c) or (d), the Borrower may, at its option, terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

10

## VIII.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## IX.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets, and termination of this Agreement.

## X.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XI.    Confidentiality.

(a)   Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b)   Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a

11

Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XII.   __Notices.__

Any notices or right exercisable by Lender(s) hereunder may also be exercised by Custodian in its capacity as authorized agent for Lender(s). Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Custodian, as authorized agent for Lender:
Gemini Trust Company, LLC
315 Park Avenue South, 18th Floor
New York, NY 10010
Attn: Gemini Earn
Email: legal@gemini.com

Borrower:
Genesis Global Capital, LLC

12

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: General Counsel
Email: legal@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIII. **Modifications.**

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XIV. **Single Agreement**

The Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, the Parties hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, the Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XV. **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all applicable Offered Loan Terms constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVII shall be construed to conflict with or negate Section XV above.

### XVI. **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Party may assign this Agreement or any rights or duties hereunder without the prior written consent of each of Custodian and Borrower. Notwithstanding the foregoing, in the event of a change of control of Custodian or Borrower, prior written consent shall not be required so long as such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in

13

any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVII. <u>Severability of Provisions.</u>

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. <u>Counterpart Execution.</u>

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX. <u>Relationship of Parties.</u>

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationships of Borrower, Custodian and Lender.

## XX. <u>No Waiver.</u>

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXI. <u>Indemnification.</u>

(a) *By Custodian*. Custodian hereby agrees to indemnify, defend and hold harmless Borrower, its affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all liabilities, losses, costs, damages, expenses or causes of action, of whatever character, including but not limited to

14

reasonable attorneys' fees (collectively, "Liabilities"), to the extent arising out of or relating to any pending or threatened claim, action, proceeding or suit (each, a "Claim") by any third party based on, arising out of or relating to Custodian breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Custodian's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower in any material respect of its obligations under this Agreement.

(b) *By Borrower*. Borrower hereby agrees to indemnify, defend and hold harmless Lender, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Borrower's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Borrower's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Lender or Custodian in any material respect of their obligations under this Agreement.

(c) *By Lender*. Lender hereby agrees to indemnify, defend and hold harmless Borrower, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Lender's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Lender's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower or Custodian in any material respect of their obligations under this Agreement.

## XXII. <u>Term and Termination.</u>

This Agreement may be terminated by any Party by providing thirty days' written notice to the other Parties.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIII. <u>Miscellaneous.</u>

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

I.    **Intent.**

Each Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:


By: _____
Name:
Title:

CUSTODIAN:

GEMINI TRUST COMPANY, LLC


By: _____
Name:
Title:

BORROWER:

GENESIS GLOBAL CAPITAL, LLC


By: _____
Name: Kristopher Johnson
Title: Senior Risk Officer

## EXHIBIT A

### Gemini Trust Company, LLC Acting as Agent

This Exhibit sets forth the terms and conditions governing all Loans in which Gemini Trust Company, LLC is acting as agent ("Agent") for a third party ("Principal"). Unless otherwise defined, capitalized terms used but not defined in this Exhibit shall have the meanings assigned in the Master Digital Asset Loan Agreement of which it forms a part (such agreement, together with all exhibits thereto, the "Agreement").

1. **Additional Representations, Warranties and Covenants.** In addition to the representations and warranties set forth in the Agreement, Agent hereby makes the following representations, warranties and covenants, which shall continue during the term of any Loan:

    (a) Principal (i) acknowledged electronically or in writing receiving a counterpart of the Agreement, (ii) has duly authorized Agent to deliver Digital Assets comprising any Loaned Assets for the Loans contemplated by the Agreement and to perform the obligations of Lender under such Loans, and (iii) has taken all necessary action to authorize such execution and delivery by Agent and such performance by it;

    (b) Principal has specifically directed Agent, through the Gemini Earn Platform, to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets, and has not authorized Agent to exercise discretion in the determining the amount, timing or selection of any Loan on Principal's behalf;

    (c) Agent will provide in a timely manner with a written confirmation or other notification of each Loan and, upon a Principal's request, promptly provide Principal with any records of the Loans made on its behalf;

    (d) Agent will provide Principal with a statement, at least quarterly, containing a description of all lending activity on Principal's behalf during the preceding period, including all Loans made on behalf of Principal, all Digital Assets returned and Loan Fees paid to Principal (net fees and expenses charged to Principal), and the amount of Loans outstanding at the beginning and end of the period; and

    (e) Agent will assist Borrower in obtaining from Principal such information regarding Principal as Borrower may reasonably request; provided, however, that Agent shall not have any obligation to provide Borrower with confidential information regarding Principal.

2. **Identification of Principal.** Agent agrees to provide Borrower, prior to any Loan under the Agreement, with the ability to access the name of the specific Principal for which it will act as Agent under the Agreement. If Agent fails to provide access to the identify of such Principal prior to any Loan under the Agreement,, or Borrower shall determine in its reasonable discretion that any Principal identified by Agent is not acceptable to it, Borrower may reject and rescind any Loan with such Principal, return to Agent any Loaned Assets previously transferred to Borrower and refuse any further performance under such Loan;

18

provided, however, that (A) Borrower shall promptly (and in any event within one Business Day of notice of the specific Principal) notify Agent of its determination to reject and rescind such Loan and (B) to the extent that any performance was rendered by Lender under any Loan rejected by Borrower, Lender shall remain entitled to any fees or other amounts that would have been payable to it with respect to such performance if such Loan had not been rejected.

3. **Netting of Deliveries.** On each Business Day, at such times and in such manner as may be mutually agreed by Agent and Borrower, Agent will sum together the aggregate amount of each Digital Asset to be delivered to Borrower, and subtract therefrom the aggregate amount of such Digital Asset to be delivered by Borrower to Agent, in each case on behalf of Agent's Principals in accordance with the Agreement (the "**Net Settlement Amount**"). If the Net Settlement Amount for a Digital Asset is: (i) positive, Agent will deliver the Net Settlement Amount of such Digital Asset to Borrower or, (ii) negative, Borrower will deliver the Net Settlement Amount to Agent, in each case in accordance with the Agreement. Upon delivery of the Net Settlement Amount, Borrower and each Principal shall be fully discharged from liability for the obligations, if any, corresponding to such Net Settlement Amount and Agent shall be solely responsible and liable for delivering to each Principal the amount of such Digital Asset to which such Principal is entitled to under the Agreement.

4. **Limitation of Agent's Liability.** The Parties expressly acknowledge that if the representations and warranties of Agent under the Agreement, including this Exhibit, are true and correct in all material respects during the term of any Loan and Agent otherwise complies with the provisions of this Exhibit, then:

   (a) Agent's obligations under the Agreement shall not include a guarantee of performance by its Principal;

   (b) Borrower's remedies shall not include a right of setoff against obligations, if any, of Agent arising in other transactions in which Agent is acting as principal; and

   (c) Following an Event of Default by Borrower, the Principal to the Loan(s) subject to such Event of Default may proceed directly as Lender against Borrower and not be obligated to join Agent or any other Principal as a condition precedent to initiating such proceeding.

**4. Interpretation of Terms.** All references to "Lender" or "Borrower," as the case may be, in the Agreement shall, subject to the provisions of this Exhibit (including, among other provisions, the limitations on Agent's liability in Section 3 of this Exhibit), be construed to reflect that (i) Principal shall have, in connection with any Loan or Loans entered into by Agent on its behalf, the rights, responsibilities, privileges and obligations of a "Lender" directly entering into such Loan or Loans with Borrower under the Agreement, and (ii) Principal has designated Agent as its sole agent for performance of Lender's obligations to Borrower and for receipt of performance by Borrower of its obligations to Lender in connection with any Loan or Loans under the Agreement (including, among other things, as Agent for Principal in connection with transfers of Loaned Assets and as agent for giving and receiving all notices under the Agreement). Both Agent and its Principal shall be deemed "Parties" to the Agreement and all

19

references to a "Party" or "either Party" in the Agreement shall be deemed revised accordingly (and any Default by Agent under the Agreement shall be deemed a Default by Lender).

**<u>Exhibit E</u>**

**Gemini 9019 Motion Notice**

**Gemini Email**

**Subject: Notice - Settlement Agreement Between Genesis and Gemini**

Hi [NAME],

We are writing to provide you with an update and required notice. Today, Genesis asked the Bankruptcy Court to approve the "settlement in principle" announced on February 28, 2024, which provides for a global settlement with Genesis and other creditors in the Genesis Bankruptcy that will, if approved by the Bankruptcy Court, result in **all Earn users receiving 100% of their digital assets back in kind in the near term and then the as recoveries are received from Digital Currency Group, Inc. (DCG)**.

This notice marks the start of the required Bankruptcy Court approval process necessary for the "settlement in principle" to become effective. **No action is required on your part to benefit from the terms of the settlement.**

As a reminder, this settlement means, for example, that if you had lent one bitcoin in the Earn program (as of November 16, 2022 — the date Genesis suspended redemptions), you will receive one bitcoin back. And it means that **you will receive any and all appreciation of your assets since you lent them into the Earn program.** If approved, we will be returning over $2 billion in value (at today's prices) — $900 million more than when Genesis halted withdrawals.

You can find Genesis's Motion to Approve the Settlement here [link to PDF], and you can also find Gemini's Statement in Support of the Settlement here [link to PDF]. The settlement itself is Exhibit B to the Motion and starts on page 49 of the Motion PDF.

**This required notice is intended to provide you with information regarding the settlement, your recoveries under it, and your right to object to the settlement. Unless you object to the settlement you will be legally bound to its terms pursuant to the Proposed Order attached as Exhibit A to the Motion, which include:**

- **Gemini distribution authorization.** The settlement authorizes Gemini to expedite the delivery of your digital assets in kind upon the effectiveness of the settlement. Per the settlement, the return of your digital assets will not be dependent on the outcome or timing of the Genesis Bankruptcy Plan.
- **Initial distribution amount and timeline.** The settlement provides that the initial distributions to you will be approximately 97% of the digital assets owed to you as of the suspension date (November 16, 2022) and that they will occur within a few weeks of the Bankruptcy Court approving the settlement. Your remaining asset balance will be credited in kind to you as recoveries are received from DCG. As part of this settlement Gemini is contributing $50 million to Earn users' recoveries, inclusive of the $40 million referenced in the February 28, 2024 Earn update.

- **Adversary proceeding.** The settlement also resolves the Initial Collateral and Additional Collateral Adversary Proceeding (see February 9, 2024, November 22, and October 27, 2023 updates on the Earn page) and resolves the preference claims against Earn Users. The settlement provides that Genesis waives all preference claims and causes of action against all Earn users.

The Motion here [link to PDF] contains additional information on the terms of the settlement. We encourage you to read the settlement carefully.

**Again, no action is required on your part <u>unless you object to the settlement</u>.** In that case, objections are due by April 9, 2024 at 4 and must comply with the instructions in the Notice of Motion here [link to PDF]. Creditors who send the Bankruptcy Court an objection that is not signed by an attorney and is not filed on the Bankruptcy Court's docket must comply with the requirements set forth in the Notice of Protocol for Written Communications to the Bankruptcy Court by Creditors, as outlined on page 2 of the Notice of Motion (see December 29, 2023 update on the <u>Earn update page</u>).

The Bankruptcy Court will consider approval of the settlement at a hearing scheduled for April 16, 2024 at 11. Details for attending the hearing will be posted to the Earn page once they are made available. The settlement will not become effective until it has been approved by the Bankruptcy Court.

As a reminder, you can view the assets that will be returned to you if the settlement is approved by logging into your Gemini account through the Gemini website or the Gemini mobile app and clicking on "pending balance." The settlement provides that all of your assets listed in the "pending balances" will be restored in kind, with approximately 97% being distributed initially and the remainder in full, upon receipt of recoveries from DCG.

Further updates regarding timelines will continue to be posted to the <u>Earn update page</u> as they become available.

We truly appreciate your patience and support while we continue to advance this process to conclusion.

**Gemini Earn Update**

Same content.