Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9              Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    March 18, 2024

17                    9:09 AM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   ART / ANA VARGAS

1    HEARING re ***HYBRID HEARING***

2

3    HEARING re CLOSING ARGUMENTS RE: Doc. #1325 Debtors' Amended

4    Joint Chapter 11 Plan

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4         Attorneys for the Debtors

 5         One Liberty Plaza

 6         New York, NY 10006

 7

 8    BY:  SEAN A. O'NEAL

 9         JANE VANLARE

10         JACK MASSEY

11         THOMAS S. KESSLER

12         JESSICA LIOU

13

14    WEIL, GOTSHAL & MANGES LLP

15         Attorneys for DCG

16         767 Fifth Avenue

17         New York, NY 10153

18

19    BY:  FURQAAN SIDDIQUI

20

21

22

23

24

25
```

```
 1   WEIL, GOTSHAL & MANGES LLP

 2         Attorneys for DCG

 3         2001 M Street NW, Suite 600

 4         Washington, DC 20036

 5

 6   BY:  JOSHUA M. WESNESKI

 7

 8   KATTEN MUCHIN ROSENMAN LLP

 9         Attorneys for Ted Gorisse

10         50 Rockefeller Plaza

11         New York, NY 10020

12

13   BY:  SHAYA ROCHESTER

14         JULIA MOSSE

15

16   HUGHES HUBBARD & REED LLP

17         Attorneys for Gemini Trust Company

18         One Battery Park Plaza

19         New York, NY 10004

20

21   BY:  DUSTIN P. SMITH

22

23

24

25
```

1    MCDERMOTT WILL & EMERY LLP

2        Attorneys for Crypto Creditors Ad Hoc Group

3        340 Madison Avenue

4        New York, NY 10173

5

6    BY:  JOSEPH B. EVANS

7

8    OTTERBOURG PC

9        Attorneys for SOF International, LLC

10        230 Park Avenue

11        New York, NY 10169

12

13    BY:  JAMES V. DREW

14

15    PRYOR CASHMAN LLP

16        Attorneys for Ad Hoc Group of Dollar Lenders

17        7 Times Square

18        New York, NY 10036

19

20    BY:  SETH H. LIEBERMAN

21

22

23

24

25

Page 6

1    PROSKAUER ROSE LLP

2        Attorneys for

3        Eleven Times Square

4        New York, NY 10036

5

6    BY:  BRIAN S. ROSEN

7        JORDAN SAZART

8

9    WHITE & CASE LLP

10        Attorneys Official Committee of Unsecured Creditors

11        1221 Avenue of the Americas

12        New York, NY 10020

13

14    BY:  COLIN WEST

15        J. CHRISTOPHER SHORE

16

17    UNITED STATES DEPARTMENT OF JUSTICE

18        Attorneys for the U.S. Trustee

19        Alexander Hamilton Custom House

20        One Bowling Green

21        New York, NY 10004

22

23    BY:  GREG M. ZIPES

24

25

Page 7

1   MEDINA LAW FIRM LLC

2         Attorneys for BAO Family Holding LLC

3         641 Lexington Avenue, 13th Floor

4         New York, NY 10022

5

6   BY:  ERIC MEDINA

7

8   WESTERMAN BALL EDERER

9   MILLER ZUCKER & SHARFSTEIN, LLP

10         Attorneys for the New York State Office of the

11         Attorney General on behalf of the People of

12         the State of New York

13         1201 RXR Plaza

14         Uniondale, New York 11556

15

16   BY:  THOMAS A. DRAGHI

17

18

19

20

21

22

23

24

25

Page 8

1                   P R O C E E D I N G S

2              THE COURT:  Good morning.  Please be seated.  I'm

3    immediately greeted by a panda with a sweater on the

4    internet.  I have no idea how to react to that.  Good

5    morning.  We are here this morning for the Genesis Global

6    Holdco, LLC, Chapter 11, which is jointly administered and,

7    more particularly, for confirmation closing arguments.

8              So, because this is a non-evidentiary hearing,

9    what that means is we can have people listen on Zoom and I

10   think that all just works just fine this morning, as far as

11   I can tell.  And that's obviously different than the

12   evidentiary portion.

13             All right, so good morning once again.  So, we're

14   here for closing arguments.  And, again, I know there are

15   people who are listening in on Zoom, and we obviously have a

16   packed house as well because I had asked folks who were

17   going to argue to be here in person because it's much easier

18   to have an argument on a complicated case when folks are

19   present.  Interrupting counsel, sort of a question and

20   answer kind of discussion can be difficult enough in person

21   but it's really less than ideal on the internet.

22             So, with that, we'll start how we always do with

23   appearances.  So, let me find out who's here on behalf of

24   the debtor.

25             MR. O'NEAL:  Good morning, Your Honor.  Sean

Page 9

1    O'Neal on behalf of the debtors, Cleary Gottleib.  I'm here

2    with my colleagues Jane Vanlare, Thomas Kessler and Jack

3    Massey.

4              THE COURT:  Good morning.  On behalf of the

5    Official Committee of Unsecured Creditors?

6              MR. WEST:  Good morning, Your Honor.  Colin West

7    at White & Case for the Official Committee.  I'm here with

8    Mr. Shore, Mr. Chris Shore, and Phil Abelson.

9              THE COURT:  Good morning.  On behalf of the ad hoc

10   group?

11             MR. ROSEN:  Good morning, Your Honor.  Brian

12   Rosen, Proskauer Rose, on behalf of the ad hoc committee and

13   I'm here with Mr. Jordan Sazant.

14             THE COURT:  Good morning.  On behalf of PCP?

15             MS. LIOU:  Good morning, Your Honor.  Jessica Liou

16   from Weil Gotshal & Manges on behalf of DCG.  I'm here with

17   Jeffrey Saferstein and Furqaan Siddiqui.

18             THE COURT:  Good morning.  On behalf of the CCAHG

19   -- which means this case has gone on long enough if that

20   acronym rolls off the tongue -- with all due respect to your

21   clients.

22             MR. EVANS:  Oh, Your Honor, Joseph Evans from

23   McDermott Will & Emery on behalf of Crypto Creditors Group.

24   I'm here with my colleagues, Darren Azman, Greer Griffith

25   and Luke Barrett.  Good morning, Your Honor.

1          THE COURT:  All right, good morning.  Let me find

2    out who's here on behalf of Gemini.

3          MR. SMITH:  Good morning, Your Honor.  Dustin

4    Smith from Hughes Hubbard & Reed appearing on behalf of the

5    Gemini Trust Company as agent for the end users.

6          THE COURT:  All right, good morning.  On behalf of

7    the ad hoc group of dollar lenders?

8          MR. LIEBERMAN:  Good morning, Your Honor.  Seth

9    Lieberman of Pryor Cashman here with my colleague Daniel

10   Brenner on behalf of the ad hoc group of dollar lenders.

11         THE COURT:  All right, good morning.  On behalf of

12   the United States Trustee's Office?

13         MR. ZIPES:  Good morning, Your Honor.  Greg Zipes

14   with the U.S. Trustee's Office.

15         THE COURT:  All right, good morning.  And on

16   behalf of SOF?

17         MR. DREW:  Good morning, Your Honor.  James Drew

18   from Otterbourg P.C. on behalf of SOF.

19         THE COURT:  All right, good morning.  On behalf of

20   the New York Attorney General?

21         MR. DRAGHI:  Good morning, Judge.  Tom Draghi from

22   Westerman Ball on behalf of the New York Attorney General's

23   Office.

24         THE COURT:  Good morning.  On behalf of the SEC?

25   They may or may not have someone here in person today.  On

Page 11

1   behalf of New Jersey, which may be in the same situation.

2   On behalf of the Texas Securities Board, same situation.  On

3   behalf of Chainview Capital?  All right.  On behalf of BAO?

4          MR. MEDINA:  Good morning, Your Honor.  Eric

5   Medina on behalf of BAO Family Holdings.

6          THE COURT:  On behalf of, I believe it's Mr.

7   Gorisse, but I may be saying that not quite correctly so

8   please straighten me out.

9          MS. MOSSE:  Good morning, Your Honor.  Julia Mosse

10  from Katten Muchin Rosenman, LLP, on behalf of Ted Gorisse,

11  and with me is my colleague Shaya Rochester.

12         THE COURT:  All right, good morning.  So, with

13  that, let me find out if there are any other appearances

14  that folks need to make this morning that I have missed.

15  All right.  Again, the order of appearances -- there's

16  nothing to be read into that, I just wanted to make sure to

17  get everybody and I'm working off several different lists to

18  make sure I do that.

19         All right, so with that, I know we have lots of

20  discussion on the merits to go but I know we also have

21  probably some preliminary matters to discuss.  So, Mr.

22  O'Neal?

23         MR. O'NEAL:  Thank you, Your Honor.  Sean O'Neal,

24  Cleary Gottleib on behalf of the debtors.  We're here today,

25  obviously, for the closing arguments on confirmation plan.

Page 12

1    I'm going to turn the podium over to Ms. Vanlare here

2    momentarily, but we do have a few housekeeping matters that

3    we'd like to take care of first.  The first one is that we

4    would like to make an oral motion to extend exclusivity.

5    The exclusivity periods expire today, and so we would like

6    to make an oral motion to extend exclusivity periods until

7    14 days after Your Honor either grants or denies

8    confirmation of the plan -- enters an order granting or

9    denying confirmation of the plan.

10           THE COURT:  Do you have anything you want to say

11    in support -- I mean, it's fairly obvious what the standard

12    is --

13           MR. O'NEAL:  Certainly.

14           THE COURT:  -- in terms of making progress.  The

15    fact that we're here today I think evidences that.  But

16    anything else you want to say?

17           MR. O'NEAL:  Your Honor, I thought I'd spend about

18    a minute or two.

19           THE COURT:  Sure.

20           MR. O'NEAL:  Also, I should note that we kind of

21    previewed this with plan support parties -- that would be

22    the creditors committee, the ad hoc group, the dollar group

23    and the New York Attorney General, and none of them have any

24    objections to this concept.  I think the fact that we're

25    here today has shown that we've made substantial progress.

Page 13

1    In addition, since the last extension which was granted on

2    December 5th, we've continued to accomplish a lot on the

3    cases.  The plan has been overwhelmingly approved by all

4    voting classes, as of the voting deadline on January 10th.

5            In addition, we've had great success in settling a

6    few significant claims.  Those claims including the SEC's

7    claims, the New York Attorney General's claim and then, of

8    course, the Gemini claim.

9            In addition, we've been able to substantially

10   narrow issues on confirmation, and you'll find out from Ms.

11   Vanlare today that we've also resolved two of the objections

12   that were mentioned in the last -- or at least one of the

13   objections that was mentioned in the letter that we

14   submitted on Friday.  BAO is now resolved, Your Honor, as is

15   SOF.  We had mentioned BAO in the letter but not SOF.

16           And, in addition, we've been continuing to

17   reconcile claims.  That's been taking quite some time.  So,

18   we think, all in all, you know, that we've shown progress.

19   I should mention too because I know that folks are very

20   interested in this -- we had obtained an order getting

21   authority to sell or redeem Grayscale Bitcoin shares.  We've

22   been actively doing that.  And I can report that, as of

23   today, we've redeemed approximately $600 million worth of

24   GBTC shares.  And we've converted those effectively to BTC,

25   which will be helpful for the distribution process.

Page 14

1          And then I think -- with that, Your Honor, I think

2     the evidence at the confirmation hearing as well as what I

3     just said we believe supports our request.

4          THE COURT:  All right.  Let me hear from any party

5     who'd like to be heard in connection with the request for

6     exclusivity.  All right, let the record reflect that among

7     the large assemblage, no one has risen.  It's not surprising

8     given where we are.  And I find that an extension in

9     exclusivity is entirely appropriate.  Given the

10    circumstances, people disagree about what should happen here

11    but in terms of the progress in the case, I think there

12    really can't be much debate.  So, I find it satisfies all

13    requirements of the law given the current record in the

14    case, which you've highlighted and which has I think been

15    pretty apparent given the recent court proceedings.

16         MR. O'NEAL:  Thank you.  And thank you, Your

17    Honor, for allowing us to do that on an oral basis rather

18    than drafting --

19         THE COURT:  Oh, you'll save some money and I think

20    that may be one thing that everybody in this room is a fan

21    of.  So, that's fine.

22         MR. O'NEAL:  Yeah.

23         THE COURT:  So, I would say to submit an

24    electronic version of the proposed order and just say a

25    final application, and then that way we have that on the

Page 15

1   record.

2          MR. O'NEAL:  Certainly, Your Honor.  Secondly,

3   we'd like to report on Gemini, the Gemini settlement

4   agreement.  You will recall, Your Honor, at the close of the

5   hearing on February 28th, we announced that we had reached a

6   deal in principle.  I'm pleased to announce today that we

7   finalized the settlement documentation and we expect to be

8   filing a 9019 motion today as soon as we possibly can.  A

9   lot of hard work has gone into that over the past few weeks

10  and we're very pleased that we were able to get there.

11         So, we're going to be requesting a hearing for

12  that for April 16th, which will give plenty of time -- more

13  than actually the required amount of notice.  But given the

14  number of Gemini earned users whose interests are at stake,

15  we thought it made sense to provide more than required

16  notice.

17         THE COURT:  All right.

18         MR. O'NEAL:  With that, Your Honor, I'm going to

19  turn the podium over to Ms. Vanlare.

20         THE COURT:  Thank you.

21         MS. VANLARE:  Good morning, Your Honor.  Jane

22  Vanlare, Cleary Gottlieb Steen & Hamilton.  Pleased to be

23  here this morning.

24         THE COURT:  Good morning.

25         MS. VANLARE:  Your Honor, I also have some

Page 16

1    preliminary matters I'd like to address first before going

2    into our closing arguments.  First, we had had some

3    discussions with Your Honor and some correspondence with

4    chambers regarding proposed findings of fact and conclusions

5    of law.  And we've also conferred with various parties in

6    interest, and I believe what we've all agreed to is to

7    submit a single proposed findings of fact and conclusions of

8    law on behalf of the proponents of the plan that would be

9    limited to 60 pages, and then a single joint findings of

10   fact and proposed conclusions of law for the opponents,

11   similarly limited to 60 pages.

12          And based on guidance from Your Honor, we

13   understand that the deadlines would be that the opponents

14   would submit their proposed findings on March 22nd, and the

15   proponents would follow the following Friday, which I

16   believe is the --

17          THE COURT:  29th.

18          MS. VANLARE:  29th, thank you.

19          THE COURT:  All right, thank you very much.  And

20   my thought is to just go through all of these preliminary

21   matters and if anybody wants to chime in -- unless you think

22   we should take them one at a time.  Your call.

23          MS. VANLARE:  I only have one more preliminary

24   matter, which is the exhibits and the evidentiary record.

25   Your Honor, we spoke about it at length at the March 6th

Page 17

1    hearing.  We went through some of the additional exhibits at

2    that hearing.  We then followed with a notice of filing of

3    exhibit lists.  That's at Docket Number 1481.  We followed a

4    similar format where we included the evidentiary record

5    based on what had been discussed and submitted during the

6    hearing on February 26th through the 28th.  And then we also

7    included a separate exhibit of supplemental exhibits, and we

8    went through those.

9            As for the debtors, we don't have anything

10   additional to add, but I do believe that the committee had

11   some objections and wanted to be heard on some of the

12   exhibits.  So, I'll cede the podium so that we can address

13   that issue.

14           THE COURT:  All right, yeah, please.

15           MS. VANLARE:  Thank you.

16           MR. EVANS:  Your Honor, can I approach just for

17   one second, very quick?  It's just on the crypto creditors

18   group.  We plan to submit a 20-pager that was separate from

19   DCG, so they'd have 40, we'd have 20.  So, it's just going

20   to be one brief, it'll be --

21           THE COURT:  Well, what I understand is everybody

22   one side will be 60 pages, everybody else on the other side

23   it'll be 60 pages.  I know that the -- having prepared joint

24   filings in my prior life, I know that that can be a bit of a

25   logistical nightmare.  So, as long as you all have agreed

Page 18

1    that the amount of pages total 60, that's fine.  You know, I

2    really don't care if it's all one heading and one font.  I'm

3    fine with that.  All right, thank you.  Perfectly reasonable

4    question.

5              I once had a case that I think settled because

6    there was such an onerous joint filing requirement at a

7    pretrial conference, and it was I think about 40 pages,

8    people had tilt and they just settled.

9              MR. WEST:  Good morning, Your Honor.  For the

10   record, Colin West of White & Case for the official

11   committee.  There were a number of supplemental exhibits

12   that various parties proposed to put in, including DCG.

13   Conscious of the Court's ability to parse out what's

14   important and afford whatever weight the Court wishes, we

15   were able to narrow our objections down to a single

16   document.  That is DCG's proposed -- or proposal to admit

17   their own motion to dismiss the New York Attorney General

18   complaint filed in the Supreme Court of the State of New

19   York.

20             I don't know if the Court wishes to hear from DCG

21   first about why it should be admitted or whether you'd like

22   to hear from us about our objection but --

23             THE COURT:  Well, let me -- maybe I can be helpful

24   if I just tell you what I would take it for and what I

25   wouldn't take it for.  I, obviously, am not the judge in

1   that case.  That is for the judge in that case to determine

2   what to do with that case, and so DCG can file whatever it

3   wants consistent with those rules and figure that out.  So,

4   I am not going to be looking at that for purposes of the

5   merits of any of that.

6          What I understand, it was provided to me in the

7   sense that just to the extent someone suggested that we

8   don't vigorously dispute what's going on that case, we do.

9   And so that's sort of writ large what I take it for.  If

10  anybody wants to take it for more than that, then we can

11  have a discussion.  But maybe -- do you have an objection

12  with that?

13         MR. WEST:  Well, I think we do or I think I'll

14  just make the point and see where we go.  I think that the

15  statement was made that it was being brought in for

16  completeness, to address a statement that Mr. Shore had made

17  either during opening remarks or during closing related to

18  the settlement motion.

19         But just to clarify, I think Mr. Shore's point in

20  his remarks was that as part of these proceedings, you were

21  not going to hear any argument or any evidence that there

22  was no underlying liability associated with the New York

23  Attorney General's action.  And, in fact, Your Honor did not

24  hear any such argument or evidence.  And that was indeed

25  sort of an agreement that we'd reached prior to the hearing,

Page 20

1    right?  In lieu of document discovery and other discovery

2    associated with the New York Attorney General's complaint,

3    DCG agreed that they were simply not going to be making

4    arguments regarding the merits of that --

5              THE COURT:  Yeah, I mean if people actually went

6    down that road, I probably would've stopped you because it's

7    just -- again, it's not -- someone would have to make a

8    careful and meticulous legal argument to connect why you're

9    making those arguments as to what it has to do with this

10   bankruptcy.  And so, DCG is its own party.  It's not a

11   bankruptcy entity in this case.  And so that's how I

12   understood it.

13             So, I don't think we need to overly complicate it.

14   And I just take it for DCG has its own views about the New

15   York Attorney General lawsuit.  And it's entitled to do

16   that, it's perfectly fine.  And, frankly, it's very, very

17   dangerous thin ice for me to start speculating about the New

18   York Attorney General lawsuit other than what the debtor has

19   brought here for me to consider in the settlement.

20             MR. WEST:  Very well, Your Honor.  Thank you.

21             THE COURT:  All right.  So, let me ask DCG if

22   anything I said struck anybody as problematic.  And, again,

23   just -- I'm happy to have people talk closer to the nearest

24   microphone but just make sure we can pick you up and that

25   the people who are on Zoom can pick you up as well.

Page 21

1              MR. WESNESKI:  Yes, Your Honor.  Joshua Wesneski

2     for DCG, just to say that we agree entirely with the

3     characterization without arguing the merits.  It's just to

4     respond to statements made in opening and closing.  If the

5     Court wishes to look at it, it's Page 92 of day three of the

6     transcript, Line 18.  Thank you.

7              THE COURT:  Thank you very much.  All right, so as

8     many a trial lawyer -- trial judge has said before me

9     (indiscernible) we'll take it for what it's worth in that

10    context.  Thank you very much.

11             MS. VANLARE:  So, with that, Your Honor, we'd like

12    to move the supplemental exhibits as well as the -- well, we

13    believe the other ones are already in evidence -- we'd like

14    to move the supplemental exhibits into the record.

15             THE COURT:  All right.  Do you want to identify

16    them specifically or just since you're saying the statement

17    now, just identify wherever the list is -- ECF, just so

18    we're --

19             MS. VANLARE:  Absolutely.

20             THE COURT:  Belt and suspenders, all squared away.

21             MS. VANLARE:  The supplemental exhibits for

22    confirmation hearing were filed at ETF -- ECF1481.

23             THE COURT:  All right.  Any objections?  All

24    right, hearing none, that obviously is a reflection of all

25    the back and forth among the parties.  Again, I appreciate

Page 22

1    that.  We have lots of important things to decide so we

2    don't need to get bogged down on other things.  So, I

3    appreciate all the work by the professionals to make a nice

4    clean record.  Thank you.

5            MS. VANLARE:  Thank you, Your Honor.  So, with

6    respect to closing arguments, what we would propose is to go

7    through the remaining objections.  So, as Mr. O'Neill noted,

8    we're down to three.

9            THE COURT:  All right, so let me do this.  I just

10   want to get a sense of what the order of proceedings are

11   today, what is contemplated, just so everybody knows.

12           MS. VANLARE:  That's exactly where I was going,

13   Your Honor.

14           THE COURT:  Okay, great.

15           MS. VANLARE:  So, we have, of course, the

16   objection of DCG that still stands, we have the objection of

17   the CCAHG, and then we have the objection of the United

18   States Trustee.  That's been substantially resolved.  There

19   are four issues that, as we indicated in the letter we filed

20   on Friday, we believe they're fairly discrete and so we will

21   address that as well.

22           THE COURT:  All right.

23           MS. VANLARE:  The objection of BAO Family Holdings

24   has been resolved, subject to some representations on the

25   record that will be made by Gemini.  And the objection of

Page 23

1    SOF has been resolved as well as of this morning, and Mr.

2    Drew is here as well.

3              THE COURT:  All right.

4              MS. VANLARE:  So, in terms of the order --

5              THE COURT:  Yeah, well, maybe you're going to

6    answer my question.  I was just trying to figure out what

7    you all have figured out in terms of the parties supporting,

8    the parties objecting and how you want to handle that.

9              MS. VANLARE:  That's exactly where I was going,

10   Your Honor.  So, what we would like to do is handle DCG's

11   objection first.  So, the debtors will make our presentation

12   on the objection.  DCG will, of course, have theirs.  Sorry,

13   before we get to DCG, following the debtors we're going to

14   have the plan proponents also present.  I believe the

15   committee, the ad hoc group and others will have remarks in

16   support of the plan.  The DCG will make their presentation.

17   We'll then have a rebuttal of the issues raised by the DCG

18   objection.

19             After that, we propose to go to the CCAHG group's

20   objection, the McDermott group.  I find that much easier to

21   say.  The McDermott group objection.  So, again, we'll sort

22   of follow the same order.  We'll have the debtors make their

23   presentation.  That's going to involve myself, my colleagues

24   Mr. Kessler and Mr. Massey.  They will handle the Section

25   562 and other issues, and I will handle the releases.  And

Page 24

```
1    then, again, we would propose if anybody wants to -- any of
2    the proponents want to speak, they can join at that time.
3    Then, of course, the McDermott group will have their chance
4    to present their objection, and then we'd have rebuttal.
5            And then we propose to go through -- again, there
6    are really just a handful of discrete issues with the U.S.
7    Trustee.  We can go through them.  Mr. Zipes can present his
8    views on that.  And then I'll conclude with a presentation
9    on the Section 1129 factors, if Your Honor would like that,
10   to the extent not already addressed in the preceding
11   presentations.
12           THE COURT:  All right.  Anybody wish to be heard
13   on order?  It sounds like you all worked this out ahead of
14   time and, again, I appreciate that.  So that all sounds fine
15   to me and we're clearly working off the same list.  I think
16   everything I mentioned I was cutting you off when you were
17   getting ready to mention.  So, that all sounds fine.
18           MS. VANLARE:  Okay.  With that, Your Honor, I
19   think we're ready to proceed with closing arguments.  Your
20   Honor, we do have a presentation that we've prepared and
21   it's simply to help Your Honor follow along with my
22   presentation.
23           THE COURT:  And I understand people are going to
24   share their screen for the presentation so people can follow
25   along --
```

Page 25

1           MS. VANLARE:  Yes, yes.

2           THE COURT:  -- on the comically large screens that

3    we have here.  Yes.

4           MS. VANLARE:  I believe our colleague is ready.

5    Yes, we also have printed copies for Your Honor and for

6    anybody in the courtroom as well.

7           THE COURT:  And I appreciate everybody who's made

8    the technology work seamlessly.  I know I had nothing to do

9    with it.  And I know that can be a bit of a bear.  So, Ms.

10   Vanlare?

11          MS. VANLARE:  Thank you, Your Honor.  I believe

12   we're ready to go.  Okay.

13          THE COURT:  Before you launch in, I just wanted to

14   make sure I had my own list of each of the objections and

15   what I thought was outstanding and to the extent it was

16   outstanding.  And I guess the only other one I think we

17   haven't discussed was Chainview Capital.  It was a

18   reservation of rights regarding setoff.  And Chainview's

19   claim -- I wasn't sure if that was something that was still

20   outstanding or not.  We don't have to deal with it right

21   now, I just didn't want to forget to make sure to clear the

22   decks on that.  Maybe at a break.  That's fine.

23          MS. VANLARE:  Sounds good, Your Honor.

24          THE COURT:  All right, thank you.

25          MS. VANLARE:  We'll work on that.  Great.  Your

Page 26

1    Honor, it's been almost a year and a half since Genesis put

2    up the gates and creditors have not been able to get their

3    money and their digital assets back.  These have been a

4    very, very long year and a half for our creditors who've

5    lost access to their investments, to life savings, who've

6    seen their businesses threatened or destroyed.  We've come a

7    very long way since January of 2023.  We've negotiated

8    multiple deals in principle, we've filed plans, we've filed

9    amended plans, we have spent countless upon countless hours

10   negotiating with various parties in interest in our attempt

11   to try to get to a resolution of these cases so that we can

12   preserve value for creditors and so that we can return

13   assets to our creditors.  We finally got there, Your Honor,

14   with the plan.

15          The distribution principles are a culmination of

16   months and months of negotiations, of careful balancing in

17   order to enable us to get here today.  The plan is

18   overwhelmingly supported by our creditors, as evidenced by

19   the amended voting report at ECF Number 1295.  We stand here

20   and we're finally ready to return the USD and the crypto

21   assets that we owe to our creditors and to conclude these

22   cases.  It's not everything that we owe to our crypto

23   creditors.  We're able to return about 77 percent of those

24   creditors' in kind claims.  We're able to return 100 percent

25   of USD creditor claims under this plan.

Page 27

1          We stand here today ready to conclude these cases

2     and to do so in a way that's almost entirely consensual.

3     Yet, there are a few parties standing in the way.  Today, we

4     ask Your Honor to overrule those objections and approve the

5     plan.  Principal among these objectors and the parties who

6     are standing in the way of our distributions is DCG.  So, as

7     I mentioned, we'll address that first.  We'll then follow

8     with addressing the objection of the CCAHG group or the

9     McDermott group.

10         With respect to DCG's objection, I'll give a brief

11    introduction and then go into the main presentation.  DCG is

12    the equity owner and substantial borrower of the debtors and

13    they've made two primary objections to the plan.  The first

14    objection is that the plan contravenes Section 502(b) of the

15    Bankruptcy Code.  Now, on this point, Your Honor, what DCG

16    would like would lead to an incredibly perverse result.  As

17    the majority equity owner, they'd like to cap obligations to

18    creditors at roughly a third of what they're owed, and to be

19    in a position to take the entirety of that windfall of the

20    bankruptcy.  How --

21         THE COURT:  Let me just ask you in terms of being

22    very precise.  So, a third -- you're saying a third of

23    what's owed in kind, so you had given the 77 percent in kind

24    number and 100 percent USD creditor claim number.  So, what

25    -- do you have an understanding of the precise umbers of

1    what DCG's view is?

2            MS. VANLARE:  So, Your Honor, the third versus

3    two-thirds, that's roughly the appreciation in the price of

4    bitcoin since we filed for bankruptcy.  And obviously

5    there're fluctuations but roughly that's where we are today.

6    So, in other words, if a creditor borrowed a bitcoin from

7    Genesis, as of the petition date, under -- if DCG is -- if

8    their arguments prevail, that creditor would only get a

9    third of that bitcoin.

10           THE COURT:  All right, so the 77 percent would be

11   closer to 33 percent?

12           MS. VANLARE:  The 77 percent, Your Honor, is what

13   we are able to do for our digital creditors if the plan is

14   approved.

15           THE COURT:  Right.

16           MS. VANLARE:  We would very much -- we would love

17   to give our creditors 100 percent.  We'd love to give them

18   everything that they borrowed, all of the digital assets,

19   but there simply are not enough assets in the estate to do

20   that.  So, the plan following, as I mentioned, countless

21   hours and months of negotiations, we were able to achieve a

22   consensual resolution and it's roughly 77 percent.  That's

23   as of -- using pricing as of December 31.  We believe it's

24   an enormous achievement and obviously well in excess of the

25   one-third that would happen if DCG were allowed to prevail

Page 29

1    and if there was another plan.

2            So, as I mentioned, the argument that DCG is

3    propounding would lead to an incredibly perverse result, one

4    that would cap obligations owed to creditors to one-third,

5    roughly.  How do they propose to do this?  By using Section

6    502(b) as a sword.  As a sword that's going to be used to

7    slash creditor recoveries and emerge victorious, stealing

8    away value from creditors and bleeding those creditors dry

9    of their hard-earned investments and all of the appreciation

10   in the value of their assets.  That can't be the right

11   result, Your Honor.

12           THE COURT:  Well, let me ask you -- we've --

13   people have talked a lot in the course of this case about

14   returning customers' assets.  But, again, just in the

15   interest of being precise, there are times when there's an

16   asset and it's not part of the bankruptcy estate, it

17   somebody else's asset.  And then there are times when they

18   have a claim.  I'm assuming that's what's meant here is that

19   creditors have claims -- we're talking about value of their

20   claims.  But certainly if you are a customer, you certainly

21   have a strong view that it's your asset, although that's not

22   the legal basis upon which any of this is proceeding.

23           MS. VANLARE:  That's correct, Your Honor.

24           THE COURT:  All right, thank you.

25           MS. VANLARE:  Three reasons, three categories of

Page 30

1    reasons why Your Honor should not approve this objection.

2    One, the 30 billion in governmental claims.  Your Honor,

3    actually never needs -- does not need to get to Section

4    502(b) to overrule DCG's objection because DCG is out of the

5    money as the equity and lacks standing to object.  And, in

6    fact, if we were to reinstate creditor claims, there's no

7    dispute that equity would have no objection.  And what we're

8    doing with the plan is effectively reinstating and amending

9    the contracts with our creditors and amending with their

10   consent, the consent which they gave us through voting

11   overwhelmingly in favor of the plan.

12           If we were to ignore the governmental claims for a

13   second, it would be an absurd result that if were to

14   reinstate, equity would get no value.  And if we are one

15   dollar short of reinstatement, equity is in line to get over

16   $2 billion worth of value.  That can't be the right result.

17           Secondly, restitution.

18           THE COURT:  Well, let me back on standing.  So,

19   there've been a lot of discussion and lawyers are allowed to

20   argue in the alternative, and sometimes judges actually can

21   as well, but I'm trying to understand the argument here on

22   standing, given the testimony which I believe was that it

23   was -- Mr. Aronzon said it's possible but it seemed to be --

24   if you do the math, it's exceedingly unlikely.  I mean, I

25   think he said something like if crypto did the following

1    things and the other assets did the following things, you

2    could potentially have a window.

3            So, how do I understand the standing argument in

4    the context of that testimony?  Because I don't know that

5    anybody else testified to anything differently on that.

6            MS. VANLARE:  So, Your Honor, I think the question

7    that Mr. Aronzon was asked and was answering is, is there an

8    ability for there to be recoveries beyond the general

9    unsecured claims?  In other words, is it possible that value

10   would flow down beyond the creditor claims, as described in

11   the distribution principles?  And you're absolutely right,

12   Your Honor.  He said yes, there is under certain

13   circumstances, if crypto prices were to fall, etc.

14           But I think below general unsecured claims, as I

15   just mentioned, there's $30 billion worth of subordinated

16   claims.  So, I think you can understand his testimony to be

17   talking about the fact that there may be value that flows

18   down following the general unsecured claims down to the

19   subordinated claims but, of course, there's $30 billion of

20   allowed claims before equity would recover anything.  So, I

21   think given that testimony, I think there's absolutely --

22   it's absolutely consistent with our position that DCG has no

23   standing.

24           THE COURT:  All right.  And I do remember DCG

25   earlier making a comment that the debtors want to treat this

Page 32

1    like a reinstatement.  They can't do that.  That's not

2    something that they can do at this point.  They had been

3    optioned.  They didn't do it so they shouldn't be allowed to

4    do it now.  So, what's your response to that?

5              MS. VANLARE:  Look, I think mathematically

6    speaking, and as I mentioned, we don't have enough assets to

7    reinstate.  We would've loved to do that.  We don't have

8    enough crypto assets to be able to fully reinstate the

9    claims.  But I think that what we're doing with the plan is

10   reinstating the claims -- the contracts as amended.  So, in

11   other words, through the claim treatment in the plan we are

12   effectively amending these contracts.  And, again, creditors

13   showed that they have consented to this claim treatment

14   through overwhelmingly voting in favor of the plan.

15             THE COURT:  So, is there any particular case

16   authority you want me to look at for that notion?

17             MS. VANLARE:  Your Honor, I think it's the statute

18   and it's the fact that we have -- again, I think it's

19   certainly not disputed that reinstatement is well-founded in

20   the statute and in case law, and what we are doing here is

21   something slightly less than reinstatement.  And, given

22   that, whereas if we were to reinstate, equity would have no

23   objection, it can't be the case that they have standing to

24   object because we're not able to get all the way there,

25   we're able to get almost there.

```
1              THE COURT:  So, let me just look at this in a

2    slightly different way.  So, I've also heard -- and I think

3    the ad hoc group sort of seems to have teed this up as a

4    solvent -- un-solvent debtor saying that the sort of solvent

5    debtor exception, invoking that and saying -- and I think,

6    and they can chime in when they come up -- but I think their

7    notion is to look at it -- you used reinstatement sort of as

8    a policy kind of that the Court should be mindful of, and I

9    think they use the solvent debtor exception.  My

10   understanding, right, essentially is sort of different

11   theories to look at what's being accomplished here?

12              MS. VANLARE:  Absolutely.  And that's our view as

13   well. It's in our papers.  That's actually Point Number 3.

14   So, I'll --

15              THE COURT:  No, that's fine.  I'm just trying to -

16   -

17              MS. VANLARE:  No, I'll go there next.  No, because

18   I think that is a critical point of this, and it's really

19   kind of the reverse of the first point, which is either --

20   you know, again, as I think is in the evidence, we are

21   insolvent, given the assets and the liabilities and the

22   sheer magnitude of allowed claims, in which case DCG is out

23   of the money as the equity and has no standing.  Or,

24   alternatively, under their view of the world, which they've

25   said we're solvent, even if that were true, then you are in
```

Page 34

1    the solvent debtor exception line of cases which dictate the

2    fact that creditors are owed their bargained-for rights,

3    which is precisely what we are trying to do with the plan.

4    And the plan is entirely consistent with that body of case

5    law that says, again, unsurprisingly, that creditors recover

6    before equity.  And that's exactly what we're doing here.

7            So, another important point, Section 502(b).  So,

8    we believe that Section 502(b), even if Your Honor were to

9    get past the standing argument, we think that it is

10   absolutely consistent with what we're doing in the plan.

11   First, the valuation, as of the petition date is, in fact,

12   step one of the distribution principles.  Entirely

13   consistent with them.  The plan achieves a pro rata recovery

14   among the creditors as of the petition date.

15           Secondly, Section 502(b) was not intended to be a

16   cap and there's no language in the statute that attempts to

17   codify a cap, the kind that would result here if you were to

18   agree with DCG's version.

19           Thirdly, restitution.  We've said this --

20           THE COURT:  Well, let me back up on that point.

21   So, they -- DCG has cited to a number of other judges in a

22   number of other cases and certainly there's always the

23   corollary, the road to hell is paved with good intentions,

24   right?  The notion that in this case, an argument could be

25   made given the way the contracts read, whether you talk

Page 35

1    about solvent debtor or reinstatement, that this is a just

2    result.  But judges are obviously always concerned about

3    someone saying, well, now that you're going to go that way

4    in terms of how you view 502, notwithstanding what these

5    other judges have said in these other cryptocurrency cases,

6    that opens up the Wild West in terms of thinking about

7    claims (indiscernible) from 502(b).  So, what's your

8    argument on that?

9              MS. VANLARE:  Your Honor, I think it's the idea of

10   restitution.  So, I think none of those cases -- no cases

11   that we're aware of have taken the position that we have and

12   that have really faced this question.  I think, for us

13   again, restitution is core to the case, and what do I mean

14   by that?  So, the digital creditors, they have a claim

15   against us in the digital asset.  They filed claims in the

16   digital asset.  That claim really has two parts.  It has a

17   first part which is the digital asset itself, right, the

18   value of that digital asset as of the petition date.  But

19   there's a second part which is the restitution piece.  It's

20   the damages.  It's a claim for damages for not having that

21   digital asset as of the petition date, which is when we

22   reached our obligations and were unable to return that

23   digital asset.

24              So, in other words, if you look at the claim as

25   having those two parts, it's perfectly consistent with

Page 36

1    Section 502(b).  Both parts are valued as of the petition

2    date, and both are consistent with what we're trying to do

3    in the plan.

4            THE COURT:  But couldn't you make that argument

5    pretty much in any case?  I mean, I suppose you could be

6    arguing for a digital currency exception, in which case the

7    question is why -- what's the principles that make this

8    different for digital currency, as opposed to something

9    else?

10           MS. VANLARE:  I don't think there to be a

11   digital currency exception, Your Honor.  I think that it is,

12   however, true that this case has some unique facts and

13   unique circumstances.  And I'm not sure that there are

14   really other situations -- I'm sure there will be at some

15   point -- but thus far in the cases, they really haven't

16   addressed a situation like this one where creditors lent

17   their digital currency, that then saw an immense

18   appreciation in value such that they really are suffering

19   tremendous damages from the fact that they didn't have

20   access to those digital assets as of the time of filing of

21   the petition date.

22           THE COURT:  Well, I understand that.  Of course,

23   if you hang around this courthouse long enough, you realize

24   that when you think you're never going to see something

25   again, that you almost inevitably do, if you make that

Page 37

```
1    prediction.  So, I guess my question is then -- you can

2    imagine, right -- so, let's take this away from -- you know,

3    people talk about mining cryptocurrency.  Let's talk about

4    actual metals, right?  Metals go up and down, the value of

5    metals.  So, that's why I'm just trying to understand tease

6    out sort of what things look like here in terms of general

7    rules.

8            So, I get the solvent debtor issue, I get the

9    reinstatement argument.  But in terms of saying, hey,

10   there's this other piece of the claim and it sort of wiggles

11   loose of 502(b) because it's this restitution part.  And so

12   I'm just trying to figure out what's the limiting principle?

13           MS. VANLARE:  I think the key point and the key

14   difference here, in addition to what I've described already,

15   is that this is coming up as an objection by equity.  Right?

16   So, it is -- the debtors and all of the creditors, all of

17   the parties in interest -- and, by the way, none of the

18   governmental claims or the subordinated claims have

19   objected, right?  This is coming up as -- and as I'll

20   explain later, really an improper objection by the equity

21   owner in an attempt to derail a plan that has widespread

22   support by all of the various parties in order to try to

23   essentially slash creditor recovers, cap them at a very low

24   amount, in a way again that neither the debtors nor any of

25   the creditors believe is appropriate.
```

1           And that's -- the overall context here is what

2     makes this case very different and why I don't believe that

3     Section 502(b) was ever intended to function in this manner.

4           THE COURT:   I get your point on that.   Because,

5     right, the normal case, there's not enough to pay folks.

6     And, again, you sort of normally have a certain -- using

7     U.S. currencies is sort of the norm.   That's what's in 502.

8           But let me ask you a slightly different question.

9     So, you mentioned restitution.   And certainly that was a

10    word that -- when we got together to talk about this, the

11    settlement and had closing argument on that, which we're not

12    going to redo today obviously.   But the question is how one

13    thing relates to another.

14          Certainly one could imagine a circumstance

15    hypothetically, if you said okay, the AG is entitled to do

16    what it wants to do as a third party with its own claim, own

17    lawsuit, and they can value -- and they've made an argument

18    that restitution is among their laundry list of items that

19    they could seek is number with a bullet.   And so -- and

20    they, as was said at that argument, they essentially turned

21    to the creditors agreement here to say that's what creditors

22    think is a fair way of valuing it.

23          So, but I guess my -- sorry for the long prologue,

24    but what's the notion about saying hey, 502 is 502, treat it

25    as 502?   The claims are what they are under 502 and the

1    government has its claim, and if the settlement is approved

2    and the New York AG's Office can value that restitution as

3    it's valued in consultation with the customer victims, do

4    you end up in the same place without having a 502 problem?

5              MS. VANLARE:  So, I think, Your Honor, we

6    obviously are -- we believe the settlement is a great

7    outcome for the estates.  And you heard our closing

8    arguments and we do think that that is -- we have and

9    continue to urge Your Honor to approve the NYAG settlement.

10             It was actually DCG's pleading ad counsel who said

11   that the settlement moots their confirmation objections.  We

12   don't disagree with that necessarily.  We think that --

13   again, we think you should approve the settlement but,

14   separate and apart from that, we think the plan stands on

15   its own.  And we think you should approve the plan.

16             THE COURT:  Well, I understand, I certainly

17   understand that you're not conceding anything you're asking

18   for for both relief.  Since I have all you nice smart people

19   here, I'm teasing out all the potential pathways.  And so I

20   guess my question is if you view it that way, what would a

21   court in that circumstance, in your view, do?  Would it say,

22   having reached this conclusion, you should all come back and

23   tell me what you think should happen?  Should you just say,

24   Judge, the plan would operate this way?  Or there's -- I

25   certainly am aware there are substantial mechanics.  And

Page 40

1    this is the reason I ask this question and I have a chance

2    to ask you it at this time.  There are substantial

3    complicated mechanics and that's sort of what I'm trying to

4    get at.  What would it mean for those?  Are there collateral

5    consequences?  Or is it as simple as well, restitution here,

6    restitution there?  And you all are the right people to ask.

7              MS. VANLARE:  Understood, Your Honor.  So, I think

8    the answer -- I think what you're asking is if you were to

9    approve the NYAG settlement but not approve the plan, what

10   does the world look like?  Is that the question?

11             THE COURT:  Fairly put, yes.

12             MS. VANLARE:  So, I think the answer to that is we

13   don't have a plan in that case, and we can't make

14   distributions on our claims which would include the NYAG

15   claim because we would not have an approved plan.  So, we

16   would need to go back to the drawing board and in line with

17   -- again, in that hypothetical, Your Honor's ruling on the

18   plan -- we would need to get together with our creditors.

19   And, of course, as the debtors, we would try to come up with

20   the best alternative we can in that circumstance.  And I

21   don't know what that would look like, to be honest.  Again,

22   we'd have to talk to all the various parties in interest,

23   see what people want to do, see if there's another plan to

24   be had.  I don't know, standing here today, what that looks

25   like.

1          THE COURT:  Well, I guess, let me ask a slight

2     variation on that just in terms of the economics, right?

3     So, I understand the mechanics of the plan.  You say, well,

4     Judge, that's a key component of the plan so if that's the

5     pathway, then there's no approved plan.  So, certainly

6     significant distributions, but I'm trying to figure out the

7     economics of what that would mean.

8          MS. VANLARE:  So, again, difficult to say because

9     we don't -- in that case, we would not have a plan.  We'd

10    have to go back to the drawing board, back to negotiation

11    rooms and come up with an alternative.  But I think in terms

12    of -- if what you're asking is if we were then able to get

13    the parties onboard and if we were to propose another plan -

14    - and, again, we have no certainty at all that that is where

15    we'd be able to be -- and you were to approve the NYAG

16    settlement, again, under the terms of the settlement if

17    there are distributions, the distribution on that claim

18    would be consistent with the distribution principles as the

19    kind of overarching global resolution among the creditor

20    body.

21          THE COURT:  All right.

22          MS. VANLARE:  So, we -- I've spoken about 502(b).

23    The other primary objection that DCG has propounded is that

24    the plan was not proposed in good faith.  Your Honor,

25    frankly, we think given the record in these cases, the

1    notion that this was not proposed in good faith or somehow

2    in breach of fiduciary duty is simply preposterous.  As you

3    heard Mr. Aronzon testify, the special committee which

4    consists of highly experienced, highly dedicated

5    professionals, met weekly, sometimes many more times than

6    weekly throughout these cases.

7            There has been extremely broad participation in

8    the case and in the plan process, including by DCG from day

9    one.  Mr. Aronzon's testimony --

10           THE COURT:  Somebody's got a live line on Zoom and

11   so please mute that or we'll mute it here.  Thank you.

12           MS. VANLARE:  I believe Mr. Aronzon testified that

13   DCG has participated throughout these cases.  DCG has also

14   argued that there's no cap on creditor recoveries.  I

15   believe we addressed that earlier in response to Your

16   Honor's excellent question on -- we do believe that there is

17   a -- again, the plan provides for a waterfall, as is

18   customary, and furthermore there is no "sham waterfall" --

19   there's actually a real waterfall with the distribution

20   principles.  And, again, Mr. Aronzon testified to that.

21           So, with that, Your Honor, I will now commence the

22   main presentation and kind of go through in greater detail

23   into these points.  And I'll begin with the standing point.

24   So, as I already mentioned, there are over 30 billion in

25   subordinated claims asserted by governmental units standing

Page 43

1    before there could be any distribution to equity.  That's in

2    Sciametta declaration, Paragraph 15, and in joint exhibit

3    JX94, which has been admitted into the record.  Those are

4    the governmental proofs of claim.

5           At this time, those claims are deemed allowed

6    under Section 502(a).  The debtors' most recent cash and

7    coin report that's dated February 29, 2024 showed an

8    aggregate of approximately 3.3 billion in total assets as of

9    January 31, 2024.  That's at ECF1407.  So, looking at the

10   assets and the liabilities, the debtors are clearly

11   insolvent.

12          Now, in the opening statement DCG made a big to-do

13   about the claims asserted against each of the debtors,

14   right?  They said, well, it's not really 30 billion because

15   you've got claims in there against each of the three

16   debtors.  Now, first, these are all prima facie valid

17   claims.  However, even if you were to essentially ignore

18   two-thirds of that and only count each claim against a

19   single debtor, we're still looking at about 10 billion worth

20   of claims.  So, again, 10 billion of claims, 3.3 billion of

21   assets.  We're nowhere near solvency.  DCG, as a result, is

22   out of the money and lacks standing.

23          The reinstatement point, which we already

24   addressed briefly.

25          THE COURT:  Well, let me back up one second.

Page 44

1              MS. VANLARE:  Sure.

2              THE COURT:  So, what is your understanding of the

3     law when assessing standing the level of certainty?  So, the

4     response I think that DCG had on one of the occasions was to

5     say, well, when it comes time, we'll object to those as

6     well.  Now, I understand as a matter of common sense there's

7     a certain -- it's $10 billion.  We have this number of

8     assets, we have this number of customer claims, it doesn't

9     pass the common sense test.  But let me ask you to delve

10    more specifically into what the case law talks about for

11    purposes of standing and recovery.

12             So, what's your response then to DCG saying, well,

13    we could object to those claims and we would at the

14    appropriate time?

15             MS. VANLARE:  My response would be too late.  We

16    are here today to ask Your Honor to consider the approval of

17    this plan.  Confirmation concludes today -- we hope, today.

18    If not today, tomorrow.  We are here at the confirmation

19    hearing so I think what is before Your Honor is the record

20    that exists today.  And today, these claims have not been

21    objected to.  So, I think as of today, we look at the assets

22    and we look at the claims as they are.

23             The reinstatement under 1124, which we already

24    discussed today, again, I think that the reinstatement under

25    1124 also highlights DCG's lack of standing to object to the

Page 45

1   plan.  And, again, I think the key point here is since DCG

2   would have no recourse, no recourse to object if the debtors

3   had reinstated the creditors' claim in full, it should not

4   and does not have a basis to object to the distribution

5   principles, which provide for something less than

6   reinstatement.

7            THE COURT:  Well, I imagine they're going to say

8   that the Code says what it says.  It doesn't say you can do

9   a partial reinstatement; it says either it's a reinstatement

10  or it's not.  So, it's very much a Manichean black and white

11  view of the world, so you're either in or you're out on

12  reinstatement.  So, what's your view about that?

13           MS. VANLARE:  I think that would be an illogical

14  and impossible reading of the Code.  It cannot be the case

15  that -- and, again, this is why I think it's tied to

16  standing -- it can't be the case that if we had the

17  sufficient assets to reinstate these claims, again, looking

18  to the relationship between the creditors and the equity and

19  what each is entitled to -- it can't be the case that if we

20  have enough money to give all of the assets that were owed

21  to the creditors, DCG has no standing equity, has to stand

22  by and they have to let the creditors recover what they're

23  owed.

24           However, if we owe our creditor -- if we're able

25  to give our creditors just a little bit less -- and, of

Page 46

1    course, here it's not a little, it's substantially less than

2    what they're owed -- but, again, the absurdity of that

3    reading I think is clear.  If you imagine, well, if we had a

4    dollar less than enough, then all of a sudden, oh, sorry,

5    creditors, you don't get the benefit of your bargain and

6    your claims are now reduced by, in this case, two-thirds.

7              THE COURT:  So, in your view, is this where the

8    principle of reinstatement bumps into the solvent debtor

9    exception and all those --

10             MS. VANLARE:  Absolutely.

11             THE COURT:  Right?  That you view these things

12   holistically?

13             MS. VANLARE:  Absolutely.  And it is perfectly

14   consistent -- and I think this argument is perfectly

15   consistent with the solvent debtor exception, again, which I

16   think is part of our argument, a really critical point of

17   our argument that, again, bankruptcy case law and these

18   various pieces are all consistent with the notion that I

19   think is not surprising to any of us, that creditors come

20   before equity.  It's absolute priority, it's fundamental to

21   the bankruptcy scheme.

22             As I mentioned, I think the plan is consistent

23   with Section 502(b).  First, because on their face, the

24   distribution principles provide for a determination of

25   claims as of the petition date.  In fact, that was a

Page 47

1    critical component of the distribution principles.  So, you

2    start by looking at the claims and giving a pro rata

3    distribution as of the petition date, and that's ECF Number

4    1391, Exhibit A, the distribution principles.  Again, this

5    ensures that all creditors' pro rata entitlement is measured

6    from the same point and in the same currency, which, if you

7    look at the legislative history of 502(b), that's perfectly

8    consistent with that.

9            And the cap, which, again, I previewed already.

10   There's no cap in 502(b) as distinct from other sections of

11   502.  Of course, we all are well aware of lease claims,

12   502(b)(6).  We all know that lease claims are capped.

13   There's simply no similar language in 502(b), there's no

14   similar notion of a cap and 502(b) acting as a cap on

15   creditor recoveries.

16           Finally, another point, which is that 502(b), if

17   you look at the language -- and, again, there are many

18   reasons why we don't even get there, but if we do, 502(b)

19   only applies if there's an objection.  Now, for months there

20   were no objections.  I know, of course -- and I know Your

21   Honor knows that DCG, on the eve of the confirmation

22   hearing, filed an omnibus objection to the claims.  I think

23   it's important to point out that that's not a valid

24   objection.  So, in fact, the language of 502(b) doesn't

25   apply here.  And, again, I think it's not surprising because

Page 48

1   it really was never intended to do what they wanted to do

2   here.

3           Why is it not a valid objection?  It was filed as

4   an omnibus objection under Rule 3007.  In fact, the fact

5   that claims are not valued in U.S. dollars is not one of the

6   bases for an objection, for an omnibus claim objection.

7   They relied on a claims order and a different section of

8   that claims order that really only applied to debtor

9   objections.  So, that was not a valid objection.  And,

10  again, it's a technical point but it's not surprising

11  because, again, the Code was never intended to do what they

12  are trying to do here.

13          And, finally, this point that I made earlier that

14  really we are giving people claims as of the petition date.

15  It just should be viewed as having two parts of a claim:

16  one for digital assets, one for damages that people

17  sustained from not having access to the digital assets.

18  That's equal to the appreciation that people have -- that

19  the digital assets at issue, many of them, not all of them,

20  have experienced during these cases.

21          Now DCG relies quite a bit on other crypto cases.

22  They obviously cite Judge Dorsey's dicta recently with

23  respect to 502(b).  Our view is that those cases and Judge

24  Dorsey's position during that hearing is really irrelevant

25  to the issue we're here to discuss today.  None of the other

Page 49

1   crypto cases have tried to do what we're doing here.  We

2   have always said that what we would be doing is returning

3   crypto assets to the extent possible, that we would be

4   making in kind distributions to the extent possible.  We

5   have never said we would dollarize, and I think that's in

6   stark contrast to what other creditors -- sorry, other

7   crypto debtors have done.

8           So, Judge Dorsey -- this issue was never before

9   Judge Dorsey and, of course, it is out of district.  So, I

10  think that -- Your Honor, I don't think that you need to be

11  persuaded by citations, again, to cases which I believe are

12  not relevant.

13          And then, finally, again, the solvency point.  The

14  solvent debtor exception I think is squarely consistent with

15  our plan.  And the solvent debtor exception is the notion

16  that if a debtor can pay its creditors, that it should do so

17  in accordance with their bargained for contractual rights

18  and that the creditors are entitled to them before any

19  recovery to equity.  We think this exception appears clearly

20  in the Second Circuit decision of Ruskin v. Griffiths at 269

21  F.2d 827.  It is wildly accepted throughout case law and

22  certainly in this circuit and in other circuits, both in

23  cases under the Bankruptcy Code and the Bankruptcy Act.

24          THE COURT:  So, and I'll ask the same question to

25  DCG when they come up.  In your view, is it -- is your

Page 50

1    argument to say that -- okay, putting aside the question of

2    solvency, Judge, either it is appropriate for you to look at

3    the world this way:  if the debtors are not solvent, which

4    is our contention, then DCG's out of the money; if they are

5    solvent, DCG can't recover until everyone gets their

6    contractual rights?

7             MS. VANLARE:  That's exactly right.  For the same

8    reason --

9             THE COURT:  But I guess my question is, is that

10   kind of Schrödinger's Cat?  You know, whether it's alive or

11   dead, that you think it's appropriate for a court to use

12   that kind of analysis in a circumstance like this.

13            MS. VANLARE:  I do think so, Your Honor.  I think

14   that you can look at it -- and, again, because under the

15   circumstances of this case, again, we think the evidence is

16   what it is.  The claims are valid and so we're insolvent

17   clearly and indisputably, frankly.  But, again, their

18   argument primarily is that no, wait a second -- and they say

19   this in their pleading -- the debtors are solvent.  And what

20   we're saying is if that is true, what we are doing is

21   entirely consistent with what the case law would dictate in

22   that circumstance.

23            And then lastly on the solvent debtor, so DCG's

24   efforts to restrict payment of post-petition interest to the

25   federal judgment rate also fails.  We think that there is

Page 51

1    significant authority, which we cited in our papers that,

2    again, consistent with the principle that creditors are

3    entitled to the benefit of their bargain, we think that as a

4    result, the contract rate is fair and appropriate.  And

5    that's what the plan and the distribution principles propose

6    to do, which is to give creditors what they're entitled to

7    under their contracts and not limit them to the federal

8    judgment rate.

9              Next, I'd like to address the good faith argument

10   in more detail.  So, under the Bankruptcy Code, the debtor -

11   - and case law, the debtor is required to act with the

12   requisite care, disinterestedness and good faith in

13   negotiating a plan.  Your Honor, the debtors have absolutely

14   met that standard here.

15             In terms of the record before you, we think that

16   testimony from Mr. Aronzon, from Mr. Geer, Aronzon

17   declaration Paragraphs 11 through 58 and Paragraphs 103

18   through 105, the Geer declaration Paragraphs 13 through 26

19   and 43 and 44, the Sciametta declaration, Paragraph 13, and

20   voting report at ECF1295 all support the debtor's good

21   faith.

22             In terms of the various components, the plan was

23   clearly proposed in good faith.  Again, there is ample

24   evidence in the record, in the declarations and in testimony

25   that the plan is the result of months of good faith arm's

Page 52

1    length negotiations between the debtors and a wide, wide

2    range of parties in interest in these Chapter 11 cases.

3    These have included, of course, the Committee of Unsecured

4    Creditors, the ad hoc group, which consists of both dollar

5    and crypto creditors, the dollar creditor group, represented

6    by Pryor Cashman, which is here, and many other parties in

7    interest.  And, of course, last but certainly not least,

8    because, as I mentioned, they have been there from day one,

9    DCG and their counsel.

10            We have negotiated multiple deals, multiple plans,

11   we have been hand-in-hand with creditors and parties in

12   interest trying to get to a resolution that is consensual.

13            THE COURT:  Well, I don't want to be dissenting

14   for a second but, I mean, isn't -- there was clearly points

15   where creditors were profoundly concerned about some of the

16   things the debtors wanted to do, but those involved

17   potential pathways with the parent.

18            Am I missing something that the record -- I mean,

19   I think that does seem to be relevant.  In other words, this

20   is not the first plan.  There were other ideas, and some of

21   them involve reaching resolutions with the parent, and after

22   -- which clearly were -- I don't think anyone had said those

23   were not good faith negotiations between the debtor and the

24   parent, but the creditor body basically said, you know, to

25   quote Hamilton, "You don't have the votes."  We're not going

Page 53

1    to let that go.

2            I mean, am I missing something saying that's

3    relevant to the issue --

4            MS. VANLARE:  No.

5            THE COURT:  -- of good faith?

6            MS. VANLARE:  You're absolutely right, and you're

7    exactly right in terms of what's happened.  That's happened

8    more times than we would've wanted, but, yes, Your Honor.

9    We had the famous February term sheet where we thought we

10   had a deal, and that was -- subsequently fell apart.

11           We had then a formal mediation, multiple rounds of

12   formal mediation.  We had actually filed what we

13   affectionately know as a no-deal plan, the original no-deal

14   plan when we first filed for bankruptcy.  We then had the

15   February term sheet.  We had multiple rounds of mediation.

16   We filed another no-deal plan in June.

17           We then -- following again months and hours of

18   negotiation over the summer, we reached an agreement in

19   principle with the creditors committee, and we couldn't get

20   there with the ad hoc group, and so that fell apart.

21           We then had a toggle plan where we thought we

22   would have -- put before creditors a proposal that included

23   a deal with DCG and that included a no-deal option, and

24   again, we just were never able to get there due to a number

25   of circumstances, including an NYAG complaint and inability

Page 54

1    to reach agreement on some final terms with the parent, with

2    DCG.

3           We then filed the plan that was sort of the main

4    precursor to what's before you today, the no-deal plan, but

5    that was widely supported by creditors in the fall, and that

6    has -- over the course of the last months has seen

7    additional tweaks and iterations as we've tried to get more

8    and more parties on board and have worked out more and more

9    issues.

10          So it's been -- it's been an extremely busy and

11   involved process.  Again, that's included many, many parties

12   with widely divergent views as to how the assets should be

13   distributed, which is why, again, I think it's quite

14   remarkable that we've gotten as far as we have and our here

15   today with a virtually entirely consensual plan, again

16   subject to the two objections.

17          So as I mentioned in terms of the evidentiary

18   cites, which I think are important, again the plan is

19   supported by all creditor constituencies.  Not only is that

20   evident from the parties that are supportive here in the

21   courtroom today but also the voting report at ECF 1295.

22          And DCG has argued that it, again, this idea that

23   it was somehow excluded from the process.  We think that's

24   entirely wrong and not supported by the record.

25          DCG has participated at every step.  And again,

Page 55

1    that's evident from the -- Mr. Aronzon's declaration, Mr.

2    Geer's declaration, and Mr. Aronzon's testimony during the

3    hearing when asked about DCG's involvement.  He said that

4    this is a very hard question to answer because, honestly,

5    DCG has been involved daily, weekly, and monthly.  They're

6    well repressed.  They have great financial assistance.

7    They're very smart guys, and they climbed all over every

8    issue in this case, and then some.  That's what's in the

9    record.

10           And again, as we've already addressed but I'll

11   just provide some evidentiary cites.  In terms of -- you

12   know, I mentioned of course there's the waterfall in the

13   plan that says that equity can recover once creditor claims

14   are paid in full, but also in terms of whether it's possible

15   for there to be distributions following the distribution to

16   unsecured creditors pursuant to the distribution principles.

17           Again, Mr. Aronzon testified before you.  That's

18   on February 26th at page 207.  He said that if crypto prices

19   were to drop, then -- and other assets are monetized or

20   valuable, including the litigation recoveries, we'd probably

21   hit an endpoint on the claims being paid.  And if there was

22   anything left after that, then yes, it would flow down.  So

23   again, that's in the record.

24           Next, in terms of the good faith, the setoff

25   principles filed by the debtors as Exhibit M to the plan

Page 56

1     supplement.  These were put together in consultation with

2     creditor advisors, with -- sorry.  With debtor advisors, and

3     with just -- in discussions with creditor advisors was meant

4     to address the claims of creditors that are subject to the

5     debtor's rights of setoff and a recoupment.

6              They -- DCG's argument that they were created to

7     engender support for the debtor's plan from a select group

8     of creditors is simply -- is not true, and I think it's

9     clear that, again, if you look at the voting report, we have

10    overwhelming support from every class of creditors, so the

11    idea that we needed this to support our plan is simply

12    belied by the record.

13             And also, I would point Your Honor to Sciametta

14    declaration, Paragraph 13, for the fact that the setoff

15    principles are consistently applied to the creditor body.

16             Finally, DCG asserts that the plan was not

17    proposed in good faith because it contains a number of

18    provisions with which DCG disagrees.  We think that that

19    profoundly misstates the good faith standard.  The law is

20    clear that, again, that the good faith standard does not

21    permit courts and other parties to second guess a debtor's

22    business decisions, and we think these objections all fail,

23    but I'll address them briefly.

24             The plan is effectively a liquidating plan, and

25    the wind-down debtors will exist solely for the purpose of

Page 57

1    making distributions to creditors.  In an ordinary

2    liquidating plan, the former equity holders would have no

3    interest in the debtor's post-liquidation.  Now, the plan

4    does have certain provisions relating to the fact that the

5    equity will stay where it is.  Again, this is done for

6    administrative and for tax purposes, and in the event that

7    the creditors are paid in full and rendered unimpaired, the

8    plan provides that, again, DCG's rights would spring back.

9             Some of the other arguments that have been made

10   that I will address --

11            THE COURT:  Let me ask you about the Chapter 7

12   principles.  Right?  We're in a liquidating plan.  There are

13   rules about what happens in a Chapter 7 liquidation, what

14   happens when all creditors are paid.  But being in an 11

15   liquidation, how relevant or not relevant are those

16   principles?

17            MS. VANLARE:  So Your Honor, what I was speaking

18   to really had to do with Chapter 11, liquidating plans.  I

19   think there are many plans of Chapter 11 liquidating plans

20   where --

21            THE COURT:  Oh, I'm not -- I'm not -- yeah.  I

22   guess let me ask a better question.

23            MS. VANLARE:  Mh hmm.

24            THE COURT:  As I understand it in seven, if all

25   creditors are paid, the money goes back to the debtor, and

1    the debtor can -- so the idea is -- at that point, I think a

2    debtor could pay creditors who haven't been -- didn't get

3    the full contractual benefit of their claims.  And I'm

4    trying to figure out as a matter of policy whether Chapter 7

5    liquidation principles are at all relevant or irrelevant

6    here.

7              MS. VANLARE:  So I think what I would say to that

8    is I think the structure of the waterfall obviously is

9    important, and we've respected the structure of the

10   waterfall.  So I think the way I would describe our plan is

11   that the structure is there, and it's -- it's the right one,

12   and it has the typical waterfall.

13             I think as a matter of, again, the record and the

14   factual circumstances, there simply aren't enough assets to

15   flow down, but the structure is there, and I think that

16   speaks to the -- to the good faith, one of the many things

17   that speak to the good faith of the plan and its proposal.

18             A nice segue to my next point, actually, which is

19   the best interest test.  That was raised by DCG objections,

20   so I'll address that next.  Again, I would point Your Honor

21   to the Sciametta -- Mr. Sciametta's declaration in

22   Paragraphs 19 through 24 that discus the liquidation

23   analysis and why we believe that the plan meets the best

24   interest test.

25             DCG is the only party in interest that has

Page 59

1    objected on this ground.  And again, given as I've already

2    described and the cites to the record, DCG is not entitled

3    to any recovery, and so the distributions to equity would be

4    zero in a Chapter 7 liquidation just as they are here.

5           They make other arguments with respect to how the

6    plan purportedly harms their rights as equity.  Again, we

7    think all of them lack merit.  There's a point about

8    indemnification and sort of selective assumption.

9           As we argued in our papers, we actually -- we

10   don't think that's appropriate.  There was no selective

11   assumption.  But in any event, that's been rendered moot by

12   the amended plan that was filed on February 15, which

13   removes from the defined term indemnification obligations,

14   any reference to the debtor's existing corporate governance

15   documents such that, again DCG's objection really is no

16   longer relevant.

17          There's a point around subordination.  The plan

18   provides a reservation of the debtor's or wind-down debtor's

19   rights to subordinate DCG's claims.  That's all it says.

20   It's a provision where we reserve our rights.

21          Tax sharing agreement.  The plan in fact --

22          THE COURT:  Let me back up on that in terms of

23   corporate will -- said reserve the rights.  What does that

24   look like in terms of exercising those rights in the future?

25   What would that --

1              MS. VANLARE:  I --

2              THE COURT:  -- process look like?

3              MS. VANLARE:  I think the way that we had

4    envisioned it is we could -- as part of the claims

5    resolution process, if we determine that it was appropriate,

6    we would seek to subordinate them, and that would be subject

7    to a motion before Your Honor.  But at this time, that

8    hasn't happened.

9              THE COURT:  Alright.

10             MS. VANLARE:  Tax sharing, again, the plan does

11   not compel DCG to enter into plan-sharing agreement, so we

12   think that objection fails as well.

13             There's an objection to the payment of the ad hoc

14   group and the dollar group fees, and I'll note that this is

15   -- this is an objection raised by DCG.  It's also an

16   objection raised by the United States Trustee, so I will

17   address that point here in the context of a response to DCG,

18   but again, I note that this may come up later in our

19   discussion with Mr. Zipes.

20             So our view is that the proposed payment of the ad

21   hoc group restructuring expenses and the dollar group

22   restructuring fees is consistent with the code.  Courts in

23   this district routinely confirm plans providing of such

24   payment if the fees were instrumental to the plan, which we

25   absolutely think that the actions of these ad hoc groups

Page 61

1     were instrumental.

2              In the alternative, the ad hoc group restructuring

3     expenses and the dollar group restructuring expenses and

4     fees meet the substantial contribution standard for

5     allowance under Section 503(b).  We think that each group --

6     and we believe the evidence is clear that each group

7     meaningfully participated in the development of the plan.

8     Neither provided services that were duplicative of another

9     nor of any other party in interest.  And again, their

10    efforts were truly instrumental in trying to get us to a

11    consensual resolution among the creditor body.

12             And in terms of the evidentiary record, Your

13    Honor, I would point you to the Aronzon declaration,

14    paragraphs 59 through 64, 107 through 108, as well as the

15    testimony that Mr. Aronzon provided on February 27th.

16    That's at pages 89 and 90 and then 92 where I think he very

17    clearly testified that the participation of, in that case,

18    the ad hoc group was instrumental to the -- to the plan and

19    to where we are today, and I think those same arguments

20    would apply for the dollar group.

21             THE COURT:  From the debtor's point of view, it

22    appeared to me that there was a more developed record as to

23    the ad hoc group as opposed to the dollar group just given

24    the -- I think it was questioning of Mr. Aronzon done by the

25    ad hoc group, and so let me -- you may have a view on this.

Page 62

1    You may not.  Do you have a view about the state of the

2    evidentiary record in terms of substantial contribution as

3    between those two groups, or that's not really your fight,

4    and you'll let others speak to that?

5              MS. VANLARE:  No, we are -- we are very supportive

6    of the fees being granted to both groups.  I think that the

7    evidentiary record is more than sufficient for both groups.

8              I think that the ad hoc group played an integral

9    role, as I think Your Honor saw their participation

10   throughout these cases.  The dollar group really -- we can't

11   say enough about how critical their participation has been.

12   They represent the ad hoc group.  Obviously, an enormous

13   potion of the creditor body is represented by the ad hoc

14   group.  Their -- they have both digital and dollar

15   creditors.  The dollar group is really an important voice

16   representing only the dollar creditors and were critical in

17   the negotiation of the distribution principles.  And again,

18   that was a negotiation among many parties.  But principally,

19   you've got digital creditors and dollar creditors which had

20   divergent views as to how the distribution mechanics should

21   work.  And so both groups were critical.

22             In terms of the evidentiary record, yes, we had

23   Mr. Aronzon's testimony and response to Mr. Rosen, but we --

24   you know, his declaration which of course is also in the

25   record does address their contributions.  And again, we

Page 63

1    think that both warrant the payment of their fees.

2              THE COURT:  Alright.  Thank you.

3              MS. VANLARE:  Finally, I'll just touch on the

4    distribution principles and the fact that we believe they

5    should be approved and meet the requirements of 9019 as a

6    settlement.  As I -- as I just mentioned, it was a robust

7    negotiation.  You've got dollar creditors who gave up parts

8    of what they had been arguing for.  Crypto creditors gave up

9    the argument that they must be paid in full and kind.  It

10   was a compromise that was forged after a tremendous amount

11   of work by all of the parties.  We think that the Iridium

12   factors are readily satisfied.

13             And again, in terms of the evidentiary record,

14   we'd point Your Honor to Mr. Geer's and Mr. Aronzon's

15   testimony during the hearing, Mr. Geer's declaration, Mr.

16   Aronzon's declaration.  I won't go through the Iridium

17   factors, although I'm happy to do so, but I do think that

18   just broadly speaking, the litigation factors that look to

19   the balance between the litigation's possibility of success

20   and settlement's future benefits, and the likelihood of

21   complex litigation, we think that factor weighs in favor of

22   approval.

23             As I mentioned, of course, there's well-

24   represented and very active parties on all sides.  You see

25   that even today with the McDermott group of crypto creditors

Page 64

1    that are pushing for an in-kind claim recovery, and that was

2    one of the positions that was compromised in the

3    distribution principles.

4           We think that the distribution principles benefit

5    the debtor's estate by resolving consensually these opposing

6    views in what is an untested area of the law.  We think that

7    the interests of the creditors factor is met for all the

8    reasons that we said.  It was -- again, the distribution

9    principles are the result of extensive negotiations.  The

10   breadth of support again is evident both from the

11   declarations by Mr. Geer and Mr. Aronzon that have been

12   submitted and the voting resort.  That's at ECF 1295.

13          And the remaining factors in terms of the

14   competency and experience of counsel we think is

15   demonstrated, and we think that, again, the evidence is

16   clear that the settlement is the product of arm's length

17   bargaining, and that's in the record.

18          Your Honor, at this point, I -- this concludes my

19   prestation on DCG's objections.  Of course, we'll reserve

20   our rights to -- for rebuttal, but I would ask that Your

21   Honor overrule their objection for all the reasons stated.

22   And at this time, I will cede the podium to others who wish

23   to speak in support of the debtor's position on this point.

24   Thank you.

25          THE COURT:  Alright.  Thank you very much.

Page 65

1              Let me hear from the official committee.

2              MR. SHORE:  May I approach, Your Honor?

3              THE COURT:  Please.

4              MR. SHORE:  I have a presentation as well.  I want

5      to note I'm not going to put it up on the screen, and it's

6      going to -- it really just should be looked at by people who

7      are under an NDA right now.  I don't think I'm going to

8      discuss anything that is confidential.  I just didn't want

9      to run afoul of the existing protective order and where we

10     are on the sealing.

11             THE COURT:  Well, we're going to walk through it,

12     so the content will be communicating to all of us.

13             MR. SHORE:  Correct.

14             CLERK:  Can you please state your name for the

15     record?

16             MR. SHORE:  Sure.  It's Chris Shore from White &

17     Case on behalf of the UCC.

18             Let's start on Slide 1, and this is what I'm going

19     to focus my -- all of my comments on today, really.

20             What I see as the central issue of this

21     confirmation trial, which is how does one go about determine

22     the allowed number of crypto-denominated claims for

23     distribution purposes?  There's no argument here that

24     dollar-denominated claims are getting something more than

25     they should or anything else.  They're getting par plus

Page 66

1    accrued to the extent the debtors have the ability to do

2    that.

3         So really what I see is there are two ends of the

4    spectrum.  On the one hand, you have DCG arguing that the

5    only way the Court can do it -- your hands are tied -- is

6    petition date pricing, and with that come associated

7    concepts of 502 capping, equity surplus, full rejections of

8    the contracts.  I'll turn to that as well today.

9         And on the other side, you have the CCAHG [ph.]

10   who insists that the Court can only allow claims using

11   current pricing.  And with that comes concepts of

12   restitution, shortfall, and total nonconsensual

13   reinstatement, and even administrative expense priority.

14        Between those two extremes, the overwhelming

15   majority of creditors -- really all but eight, or maybe

16   seven, or maybe six now, whoever in the ad hoc group --

17   said, "We don't want to litigate those issues.  We

18   understand that there is a range of possible outcomes of

19   that issue," and they have said, "We don't want to litigate

20   it.  And we as the UCC, as fiduciaries for the creditors are

21   fully supportive of them.  We fully see the benefit of

22   settling that issue in what I'll get to is really a form of

23   restitution-lite, which gives them everything the debtors

24   can give without undertaking the obligation to return

25   everybody's coins.

Page 67

1              And that resolves a thorny set of issues involving

2    502, 562, how to treat fraud claims, the debtor's business

3    judgment in all of this, the absolute priority rules.

4              And the reason we know the issues are thorny is

5    because you have two parties here objecting today who are

6    100 percent certain that their position is right and want

7    the Court to deny confirmation because they are so certain

8    that their legal position is correct.

9              But that's not what the creditors want, and I

10   don't think it's fair to say that every creditor must have

11   the Court flip that card over and come to a determination as

12   to the proper way to do this in order to get their

13   distributions out.

14             And the reason it's an oblong on the settlement is

15   something that I wanted to highlight for the Court if we

16   turn to the next slide, page 2.  What's here is the first

17   page of the coin report which was attached to the disclosure

18   statement at Plaintiff's Exhibit 1.  And it shows you two

19   things.

20             For all DCG's talk about the appreciation of

21   Bitcoin, which is what they're really talking about, Bitcoin

22   at the time the deal was cut and solicited was at 26,000 as

23   opposed to 21,000.  So it does seem a little bit unfair that

24   when the -- when the deal was cut and people agreed to the

25   distribution principles, the market was saying at that time

Page 68

1    it's just as likely it's going to go up as it's going to go

2    down, and there's no surplus there.  So it does seem, as I

3    said, a bit unfair for DCG to be protesting, well, now that

4    it's gone up, we have to have people recut the deal.

5            The other thing to point out is that not all coins

6    have appreciated.  Everything in yellow there were coins

7    that had depreciated or declined in value since the petition

8    date.  And if you were a holder of these coins, you were

9    asked under the bar date order to list the coins you were

10   claiming and coin denomination, and lay it out.

11           And the reason we did that is something I said at

12   my first appearance in this case.  Crypto creditors want

13   their coins back regardless of the circumstances.  As crypto

14   creditors will say, "I'd rather just have my Bitcoin back

15   rather than a dollar-denominated claim.  That's tied up in

16   the appreciation or love of the asset.  It's tied up in

17   issues of tax and everything else.  This is a coin-return

18   plan.

19           And for somebody whose claim has -- or the coin

20   has declined in value, that has a real economic effect

21   because under DCG's argument, they would not be paid in full

22   until they got that petition date pricing in the right

23   column whereas what they've agreed to -- or sorry, in the

24   left column -- and what they've agreed to is the -- no.  I

25   got that wrong.  Let me pause.

1          Under the plan, if you denominated one coin and

2     that coin fell, you are -- your claim is capped at the

3     current price, not at the dollar denominated price.  So you

4     are not -- you are paid in full when you get that coin back.

5     So in the most extreme example, under this plan, if Bitcoin

6     had fallen to $10, every Bitcoin holder who denominated

7     their claims in Bitcoin could be repaid in full by the

8     debtors going out and buying $10 Bitcoins and distributing

9     it to the creditors.  But where we were at the time this

10    deal was cut was a fluid market in which people were advised

11    and disclosed pursuant to an approved disclosure statement

12    and told, "This is what you're going to get under this

13    plan."

14          So let's turn to Slide 3.  DCG's objection, that

15    is that the Court must -- 100 percent certain the Court is

16    constrained to apply 502(b) fails for six reasons: waiver,

17    standing, claim objection point -- and I'll go through each

18    of these points in turn, Your Honor.

19          Let's deal with waiver of Section 502(b).  It

20    seems like there was some -- and we're going to be on Slide

21    5.  Seemed like there was some confusion at the closing of

22    the record on the ad hoc -- or sorry, the New York AG

23    settlement as to what was said in opening with respect to

24    mooted arguments.

25          And if you look at the first highlighted point

Page 70

1    down on the bottom there on page 120 in the transcript, Mr.

2    Saferstein said, "I think if the settlement is approved and

3    then this Court were to approve a plan that dollarized the

4    claims, then effectively all the excess value, the estate

5    would -- the estate -- of the estate would be rerouted to

6    creditors and make those arguments moot."

7            And then you quite rightly pointed out because he

8    said, "And then this Court would approve a plan."  You said,

9    "No, actually, that's not my question.  My question is this.

10   What I thought I heard them say is that if I approve the

11   settlement first, then it moots your confirmation

12   objection."  My understanding is that's not something you

13   would agree with, and if you look at the highlighted section

14   at the bottom, I think it actually does moot our objection

15   to the plan because then if they propose a dollarized plan,

16   settlement payment effectively incorporates distribution

17   principles, which you would be overruling, and reroutes the

18   money to creditors.  It's the same effect.

19           When this trial started, DCG said, "What we don't

20   need to consider is a world in which the Court approves the

21   settlement and then reaches the 502(h) issue differently,"

22   which is why I didn't ask -- of all the scenarios I asked

23   Mr. Verost, I did not ask him the scenario of what happens

24   if the Court approves the settlement and does not approve

25   the plan because that was a scenario that was taken off the

Page 71

1    table.

2          So I think the Court would be perfectly

3    appropriate if you approved the New York AG settlement to

4    say at the outset, I don't need to get to the 502 issues

5    because I was told before the evidentiary record opened that

6    that issue would be moot.

7          So let's go to Slide 7 and deal with the standing

8    issue, which is the next hurdle they have to come to before

9    we get to whether or not they're correct that 502 ties this

10   Court's hands.

11         There are really three kinds of standing, and I

12   think some of the arguments keep slipping back and forth.

13   There's obviously statutory standing, that is are you a

14   party in interest under the code who can appear and be

15   heard?  There is constitutional standing:  Are you an

16   aggrieved person?  And three, there is jurisprudential or

17   prudential standing.

18         What we've all really been arguing and why I think

19   the questioning has come out the way it has, has been on

20   prudential standing.  The courts are clear just because

21   you're a party in interest does not mean you have a roving

22   ombudsman role to come in and object to any plan provision

23   that you think runs afoul of the code.  You have standing to

24   affect the plan provisions which affect your economic

25   interest.

Page 72

1            And if you look at the cases, what they're really

2    getting at is, is your ox being gored by this particular

3    plan provision?  And if it's not, you don't get to come in

4    and ruin the plan just because you have a theoretical

5    intellectual exercise you want to perform with respect to a

6    plan provision.

7            The record is clear here that DCG's ox is not

8    being gored by the way the plan allows and then treats the

9    crypto-denominated claims.

10           If you turn to page 8 of the exhibit, I just --

11   actually, I didn't even have -- because I really am math

12   challenged -- if you take out the duplicate claims -- Ms.

13   VanLare said 10 billion.  It's $11.2 billion of claims that

14   are found in JX-94.  Those are the parties whose ox would be

15   gored if what ended up happening here is there were

16   spillover or surplus value.  There's $11 billion of claims

17   that have not been objected to, and I'm going to get to the

18   check-the-box exercise in a bit.  There's not even a check-

19   the-box on this.  There wasn't even a purported omnibus

20   objection filed with respect to the subordinated claims.

21           But their ox is being gored, and far from raising

22   objections, there are subordinated creditors like the New

23   York AG who are supporting the plan treatment which provides

24   a reinstatement like getting as close to restitution as the

25   parties can, and that's, quite frankly, why the UCC is here

Page 73

1    supporting it as a fiduciary for the subordinated creditors

2    and the general unsecured creditors.  It's the fair result.

3              So -- and let's get to a question Your Honor

4    asked.  What about a hypothetical objection in the future?

5    502(a) is clear.  It's deemed -- as of the record today, it

6    is deemed this way.  There was no evidence put on that in

7    the future there are valid objections here and we'll get to

8    it, nor is DCG underwriting the process of keeping this case

9    open or their equity option open while we litigate those

10   claims.  This is the confirmation evidentiary record as it

11   exists today, an $11 billion-plus hurdle.

12             And then if you go to the next page, slide 9, as

13   of the confirmation hearing and the closing of the record,

14   Mr. Verost gave you a figure.  This is the one I think

15   might've been redacted, so I don't want to get -- he gave

16   you a figure.  That's the amount of spillover that would

17   occur if we dollarized all the claims on the petition date

18   according to his analysis.  That's nowhere close to meeting

19   the hurdle.

20             So from a prudential standing position, don't

21   think DCG has the ability to come in and object to the plan

22   provision which doesn't distribute that value to them.  That

23   was somebody else's ox being gored.

24             Now, I do want to make clear that there are many

25   problems with the Verost calculations.  Most fundamentally,

Page 74

1    he violates what I said at the opening was the one plan and

2    the only one plan rule.  Under this plan, there is no excess

3    value.  The debtors have a shortfall.  His assumption that

4    we call it a surplus assumes that if the Court found that

5    502 acted as a cap on non-dollar-denominated claims, there

6    would be as much as this highlighted amount in surplus to be

7    distributed to equity in the hypothetical Plan X that I

8    crossed him on.

9          But as he acknowledged on cross, he just assumed

10   that by the time we got from a denial of confirmation here

11   to the confirmation hearing on Plan X, the crypto prices

12   would hold static, that the subordinated creditors would

13   either vote to support that plan or had their claims reduced

14   to less than the hurdle, that there were -- he assumed there

15   were zero re-organization costs between here and the

16   confirmation hearing of Plan X, the debtor's assets -- which

17   aren't appreciating.  It's just a pot of assets -- are not

18   going to be depleted by all the re-org costs of getting to

19   that Plan X confirmation date.  And he just assumed that

20   there would be no conversion or dismissal of the case.

21         In sum, I'm not -- I think his conclusion with

22   respect to the upper limit of excess value is not reliable

23   in any way.

24         So let's assume that the Court finds that the plan

25   objection, the 502 issue on the ends of the spectrum is not

Page 75

1    moot, and that DCG is at least enough in the money that

2    you're going to find that as a jurisprudential matter, they

3    have standing to object to the treatment of crypto-

4    denominated claims.  And if we --

5              THE COURT:  Well, let me --

6              MR. SHORE:  Yeah.

7              THE COURT:  If I'm --

8              MR. SHORE:  Sure.

9              THE COURT:  Before I lose the thread.

10             MR. SHORE:  Mh hmm.

11             THE COURT:  So when thinking about what, in your

12   view, has been put in play in this case and what hasn't, the

13   -- what you just highlighted is the argument of excess

14   value.  DCG says there's excess value.  Where's it going?

15   Should go to us.  You have the $11 billion that you

16   highlighted of the subordinating claims of the government --

17   various government agencies.

18             Is there -- in your understanding, and I'll ask

19   DCG this as well when they come up.  Is there any other

20   objection that you're aware of that DCG has to the recovery

21   of creditors other than that excess value argument?  In

22   other words, I don't know that I've heard anything else that

23   says there's a problem of the calculations or a problem with

24   entitlement, what the single defining issue is.  Do you

25   value it at petition date, or do you value it at

Page 76

1    distribution date?

2            MR. SHORE:  It's not -- it's not even do you, do

3    it?  Are you constrained by the law to do it only one way

4    with the ad hoc crypto group on the other side saying, "No,

5    you're constrained by the law to do it exactly the opposite

6    way"?  And the creditors are not permitted to settle that

7    issue.  That is, they are so correct that nobody can get the

8    settlement they want, notwithstanding all the benefits of

9    it, notwithstanding the creditors' support for it.  You must

10   determine this issue as a legal basis right now.

11           And as I said, and if you do it and it blows up

12   the plan, well, then so be it.  That is creditors are forced

13   to litigate the issue.  It's not just should you do it this

14   way, but you must, and therefore you must deny confirmation.

15           So let's get to dig in on their 502 argument,

16   which I think is the sole basis for objecting to crypto-

17   denominated claims treatment.

18           Mr. Saferstein was candid at the opening as well.

19   They tried to check the box so that they could not -- they

20   being us -- not raise a technicality that they hadn't

21   expected.  Well, first of all, it's not a technicality.

22   It's what is the predicate to get to Section 502(b) is that

23   such objection is made.

24           And that's important, right, because think of it

25   in a big case like this.  If you didn't have the deemed

Page 77

1    allowed rule and the debtor was forced to come into

2    confirmation and establish the actual amount of claims, it

3    becomes completely unworkable.  It is a tool that helps Your

4    Honor from having to have that kind of evidentiary record.

5              So the question is what is an objection?  An

6    objection is not defined in Section 502, but as Ms. VanLare

7    pointed out, it is defined in the bankruptcy rules.  And if

8    you turn to page 12, they run afoul of three provisions of

9    Rule 3007, which would say that on its face, it is not a

10   valid omnibus objection.

11             First of all, they're trying to use an omnibus

12   objection.  That is an objection to the claim of every

13   single creditor who filed a crypto-denominated claim as

14   required by the bar date order on a substantive basis.  That

15   is that their claim is capped.  Omnibus objections can't do

16   that.

17             Second, it cannot contain more than 100 objections

18   to the claims.  This contains hundreds.  They just said, "To

19   the extent anybody filed a crypto-denominated claim, we're

20   objecting."

21             And third, they didn't list who's affected by that

22   objection.  You've got to -- you've got to.  When you file

23   an omnibus objection, you've got to clearly show, "I'm

24   objecting to proof of claim 347."  They did not do that.  So

25   the check-the-box -- they couldn't even check the box with a

Page 78

1    valid claim objection, so I don't think they even get into

2    Section 502(b).

3          And this is -- look.  At this point, you know,

4    interesting to hear their argument because I'm not sure that

5    I quite understand what was said either in opening or in the

6    -- in their brief, but let's kind of pick it apart.

7          I think what they're saying is if the Court allows

8    a crypto-denominated claim with the possibility of

9    restitution, that runs afoul of Section 502(b).  That is

10   Your Honor is constrained to do what they say.

11         That's wrong, and I think we get there two ways.

12   One is that the solvent debtor cases, Chemtura, is probably

13   the best one on that, which talks about the role of the

14   Court is to enforce creditors' contractual rights.  It

15   shouldn't be a gotcha.  And I think their response is,

16   "Well, wait a minute," that we're talking about code

17   impairment.  And I'm going to come to the code impairment

18   cases.  They don't cite any of them.  I'm not sure they're

19   going to cite them today, but I think, really, that's where

20   their argument is.

21         So we can -- let's go to the next slide.  Let's be

22   clear about this, and I think I put it here for a reason.

23   The record needs to be crystal clear on this.  There is no

24   situation under this plan in which a crypto-denominated

25   claim gets more than their contractual entitlements.

Page 79

1    Period.  The end.  This is not somebody getting paid more

2    than what the debtors promised them.  They are getting paid

3    less than what the debtors promised them.

4            But I think what DCG is getting at are the code

5    impairment cases.  You think about a solvent debtor who

6    tries to use 502(b)(6) and reject leases, and nonetheless

7    make an equity distribution, or the make-whole cases in

8    which the debtors seek to disallow unmatured interest but

9    nonetheless make an equity distribution.  And creditors from

10   the perspective of a UCC lawyer go rightly insane when that

11   happens, saying, "How can you possibly do that to me?

12   That's not fair.  I'm not getting the full entitlement --

13   contractual entitlement."

14           I think that gets answered two ways.  One is that

15   I think it ultimately comes down to the debtor's business

16   judgment.  And two, 502(b), the lead-in does not act as code

17   impairment.

18           If you turn to slide 16, the lead-in to 502(b) has

19   two purposes.  It has a functional purpose, and then it gets

20   to the limiting purpose.  The functional purpose comes with

21   the Court determine -- determine the amount of such claim in

22   lawful currency of the United States as of the date of the

23   filing of the petition, and that allows people to speak the

24   same language for the purpose of running claims analyses and

25   a claims register.  It allows people to compare apples and

Page 80

1    oranges.

2              And then it says, "Except to the extent that," and

3    that's where you get unmatured interest and lease rejection

4    claims for more than two years.  And what the code says is

5    there, the Court is constrained to not allow the -- what the

6    -- is specified there.

7              Now, I'm going to stop here because I said the

8    debtor's business judgment.  That does not mean that a

9    debtor must reject its contracts and clip them for -- or its

10   leases and clip them, nor must it fight a make-whole.  A

11   creditor files a claim for a make-whole and the debtor

12   doesn't object, then the make-whole gets paid.  We don't

13   ever get to the issue of unmatured interest.  There's

14   nothing wrong with the Court approving a plan in which the

15   debtor decided not to object to make-wholes, and nobody else

16   objected to make-wholes, any more than a debtor is

17   prohibited from assuming a lease of nonresidential real

18   property, and curing with years of unpaid rent.

19             But fundamentally what DCG -- the only argument

20   that DCG would have to say the Court is prohibited from

21   allowing this treatment would be if you rewrote Section

22   502(b).  What they're really saying is 502(b) says, "If such

23   objection to the claim is made, the Court after noticing the

24   hearing shall allow us such claim in such amount except to

25   the extent that new subsection 1, the claim is a non-dollar-

Page 81

1    denominated claim, and the allowed amount exceeds the dollar

2    value of that denomination as of the petition date."  It

3    does not require you to clip the claim.

4            They are rewriting Section 502(b), the lead-in to

5    say that under no circumstances may a Court allow a claim

6    for restitution because that's really what we're talking

7    about here, which are the rights of the creditor to receive

8    more than -- more than what is dollar -- what their dollar

9    denomination would be on the petition date.  If that's what

10   Congress had wanted, they could have written that with a new

11   Subsection 1.  It said very clearly, "You must disallow a

12   claim that exceeds the dollar -- non-dollar-denominated

13   claim that exceeds the value of the denomination as of the

14   petition date."

15           And as proof that they're doing it, they hadn't

16   cited a single court that has said that their reading is

17   correct.  The best they come to is Judge Dorsey's decision

18   in FTX.  So if we go to the next slide, I want to just draw

19   Your Honor's attention.  They quote one portion of the

20   transcript that says, "My hands are tied."  But the lead-in

21   -- the lead-in is the Court's being told the plan on file is

22   premised on providing U.S. dollar recoveries to creditors,

23   and therefore necessary for the claims to be dollarized.

24           What's being explained is the business decision

25   for why in that case the debtors were objecting to claims

Page 82

1    that were denominated in coins, and that makes -- it makes

2    an -- it is an appropriate business decision to say, "You

3    know what we're going to do?  We're going to clip the

4    claims," because otherwise they have a mismatch of assets

5    and liabilities.  Their -- they have a plan which is

6    providing dollars to people, but their distributions are

7    going up and down depending upon the value of the claims, so

8    they just unloaded their crypto.

9          That's a business decision, and I can see why

10   Judge Dorsey under that circumstance would say these debtors

11   have exclusivity.  That's their plan going forward.  That's

12   what we're going to do.

13         The debtors just made a different business

14   decision here that they weren't going to do that, that what

15   they were going to do -- and I'll come to the basis for that

16   business decision in a bit.  They were not going to be

17   availing themselves of 502(b), objecting to the claims on a

18   claim-by-claim basis, and then distributing out dollars.

19         Our -- this plan has been from -- again, in my

20   first appearance in the case, people want an in-kind plan

21   here.  They want their coins back.  That was the fundamental

22   bedrock of all the negotiations that occurred was that we

23   were going to have an in-kind plan.

24         Now let's get to that treatment when we talk about

25   the business decision of the debtors here to do something

Page 83

```
 1   different.  And you asked a question about authorities on

 2   this.  If you turn to page 19, part of this -- part of --

 3   part of the argument seemed to be that the debtor can't do

 4   reinstatement-lite.  That a -- if a debtor proposes to

 5   reinstate a class, it must tick through the 1124 factors,

 6   and only if every 1124 factor is filled, that is an

 7   appropriate treatment.

 8             That's not -- if you look at Frontier, Judge

 9   Drain's decision, a reinstated party can agree to less.

10   Obviously.  Same way a party whose contract is assumed can

11   agree to assumption-lite.  However many creditors are in the

12   ad hoc group, they are the only ones who say we don't want

13   to be reinstated, and I'll come to that probably this

14   afternoon as to whether that's their position or not.

15             But reinstatement-lite is permissible under the

16   code because everybody can always agree to a lesser

17   treatment than what the code provides.  The question is does

18   DCG have a roving right to object to the treatment of the

19   crypto-denominated creditors who are agreeing to something

20   less?

21             The closest case we can find -- but it's good

22   because it's a Seventh Circuit case -- says -- it's a

23   prudential standing issue.  A party whose ox isn't being

24   gored can't just object to a contract assumption on modified

25   terms.  The debtor and the non-debtor contractual party are
```

Page 84

1    agreed to do less than full reinstatement or full

2    assumption.

3            So really, I think, the question is what is the

4    debtor's business judgment?  What are the reasons that the

5    debtors decided in this case, why are we going to give the

6    crypto-denominated claims better than what 502(b) under

7    DCG's ruling would require but less than impairment or full

8    reinstatement?

9            In addition to the many reasons that Mr. Aronzon

10   laid out, I want to add one other reason.  The reason that

11   we're doing what we're doing under this plan and why the New

12   York AG is agreeing to what they agreed to, it's the right

13   thing to do.

14           In a case like this, the Court doesn't need to

15   find that there was fraud, but you know that the allegations

16   have been out there.  You know the views of the creditor

17   body.  I'm sure you've gotten e-mails of the views of the

18   creditor body about the many crimes that occur.  In the

19   context of a case like that, getting people back what they -

20   - what they were entitled to is the morally right thing to

21   do, but it's also good for DCG as we pointed out in the

22   testimony.

23           Every coin that gets returned to customers is a

24   coin that isn't the subject of the New York AG's action

25   against DCG.  And I don't think there's anything in the

Page 85

1    record that says that the debtors failed their business

2    judgment in proposing a plan with a claim's treatment

3    supported by all the creditors because they should have

4    shown an unfailing loyalty to DCG and done everything they

5    could to get an equity distributor.

6            THE COURT:  And let me ask you -- I think I've

7    already asked this question, but to the extent there's any

8    daylight left, you understand that the objection of DCG is

9    to the concept of paying this post-petition value, what they

10   call the excess value, and it's not on the basis of any

11   calculation that this is what the customers would be

12   entitled to get if they got the full benefit of their

13   bargain?

14           MR. SHORE:  Correct.  Because the plan solves for

15   that.  It just leads the distribution.  Waterfall ends when

16   they have received the full benefit of the bargain, but they

17   have not said, for example, that the calculation of the

18   coins -- that is, if someone filed an inappropriate proof of

19   claim, claimed too many coins or anything else -- or nor

20   have they attacked the actual filing of crypto-denominated

21   claims.  That issue was resolved when the bar date order was

22   approved without objection from them requiring the parties

23   to list their coins in their -- in their claim form.

24           But this concept that somehow the Debtors are

25   doing something wrong here really gets ultimately

Page 86

1    encapsulated in their --

2           THE COURT:  I'll ask DCG this, but again, my

3    understanding of their objection is that it's improper to do

4    this as a matter of bankruptcy, but if you were to pretend

5    there was no bankruptcy at all, and you went to a federal

6    court and said, "What am I entitled to?  What am I -- what

7    are my breach-of-contract damages?" that's what the -- this

8    is all designed to look at on your little chart in terms of

9    settlement in different --

10          MR. SHORE:  You're asking me the question.  They

11   did not preserve that objection, Your Honor, not in their

12   papers.  Had they put it in their papers, we would've

13   responded to it.

14          One of the things they did put into their papers

15   was that this was a bad faith process, so we responded.  If

16   you look at page 23, more for visual purposes not because we

17   want anybody to read that, we put in page after page from

18   Mr. Geer on the negotiation.  Oh, 21.  Even with glasses, I

19   can't read anything.  Page 21.

20          We put in page after page of testimony from Mr.

21   Geer on the negotiation process, constrained as we were by

22   408 and mediation rule, but the process was laid out there.

23          DCG asked Mr. Geer not a single question about

24   this, nor did they ask him a question or even respond to the

25   fact that DCG, because of the blowout provisions, and, well,

Page 87

1    because another one was -- I guess it was -- both of them

2    were the blowout provision.  You have two term sheets in

3    front of you, Your Honor, that DCG was supportive of, the

4    prepetition one and the deal in principle from August.  None

5    of them had caps on crypto-denominated claims that said you

6    can -- I'm willing to do this deal, but let's be clear.  The

7    moment a crypto-denominated claim exceeds the dollar value

8    at the time of the petition, you're going to have to have

9    that disallowed.

10           And I raise that for the important --

11           MR. SHORE:  Would you remind me, what do they

12   actually say?  I mean, is there anything -- I understand

13   your point that they don't have a cap, but do they

14   affirmatively say under those term sheets what was

15   contemplated?  Is there any language that's particularly

16   enlightening?

17           MR. SHORE:  What was -- what was contemplated was

18   that creditors would receive -- it would be distributed the

19   value of what was being provided by DCG.  There was nothing

20   in -- first of all, there's a TBD on the -- on the

21   distribution principles.  That is how that value will be

22   distributed.  But there was no concept that what DCG was

23   going to do was retain its equity option and that if at any

24   time crypto prices rose to the extent that they could profit

25   from the use of Section 502(b), that was -- that was not in

Page 88

1    there.

2         And I don't raise that because, you know, the

3    obvious answer is, well, no one was thinking about crypto

4    prices going insane like this.  Okay.  But it's also then

5    not appropriate to claim that the debtor is acting in bad

6    faith because it refused to address that situation that DCG

7    didn't even address in its papers.

8         So when I come to the evidence of bad faith, they

9    made a number of allegations, kind of inflammatory ones in

10   their opening brief.  We list it on page 22, talking about a

11   clandestine process and the UCC seeking to enrich

12   themselves, and the UCC trying to disenfranchise them, all

13   loaded words, and they put in zero evidence of any of this.

14   Mr. Verost was on the stand.  Nothing about any of the

15   negotiations.  Nothing to substantiate anything like this.

16        So it seems to me that if there's any bad faith

17   here, it's the bad faith of DCG putting forward an argument

18   to inflame the Court and then refusing to put in any

19   evidence to substantiate it.  Zero.

20        So unless Your Honor has any further questions,

21   I'll turn over the podium, and come back when we get to the

22   ad hoc crypto group.

23        THE COURT:  Thank you.

24        Alright.  It's 11:20. Do people want five minutes?

25   Take a break, and then we'll come back.  Plan for 11:30.

1              Thank you.

2              (Recess)

3              THE COURT:  So --

4              MR. ROSEN:  Your Honor, I think we're waiting for

5    a technological issue here.

6              THE COURT:  All right.

7              MR. ROSEN:  (indiscernible)

8              MALE:  Now it says it's loading on my screen as

9    well.  Before it didn't say that.  Before it said that it

10   was uploaded and ready to go; now it says Loading.

11             MR. ROSEN:  (indiscernible)

12             MALE:  As well as I can.

13             MR. ROSEN:  (indiscernible)

14             THE COURT:  Let me ask what we're waiting for.

15   Are we waiting for screensharing capability?

16             MR. ROSEN:  Yes, sir.

17             THE COURT:  I will say, you know, maybe we just --

18   if that's all we're waiting for, we can brave it and then

19   when it comes back online we can -- yeah, and I think

20   somebody provided me with a hard copy, so -- and these are

21   helpful presentations, obviously, and people will share them

22   and we'll take a look at them, but what people are doing is

23   walking through them anyway, so -- so, I would say let's

24   plow ahead if that doesn't do too much violence to your

25   situation.

Page 90

1          MR. ROSEN:  We were going to use it, Your Honor, I

2    know at some points in time.  Just like Mr. Shore used some

3    testimony, we had some testimony that we were going to put

4    on the screen.

5          THE COURT:  Yeah, well, again, I think you all

6    gave me -- came by chambers this morning with a copy, so I

7    have it, so just -- you might need to add a few extra words

8    in there to make sure you can be understood to the folks who

9    may not have it, but we'll get it -- we'll get it up as soon

10   as possible.

11         MR. ROSEN:  Okay.  Thank you, Your Honor.  For the

12   record, Brian Rosen, Proskauer Rose, on behalf of the Ad Hoc

13   Group.  Your Honor, batting third is a blessing and a curse.

14   A lot of things that were said by Ms. Vanlare and Mr. Shore

15   are things that we were going to say, so we're going to

16   shorten a little bit what we were otherwise going to provide

17   and we'll just go on from there.

18         THE COURT:  All right.  Fair enough.

19         MR. ROSEN:  Thank you, Your Honor.

20         THE COURT:  And certainly if you want to take a

21   break before you sit down to sort of canvass what you have

22   to make sure in the interest of efficiency you haven't

23   dropped anything, that's fine.

24         MR. ROSEN:  I appreciate that, although we did

25   have one really good graphic.  I know that DCG's counsel

Page 91

1     loved it this morning, but we'll see if we can get it up

2     there on the screen.

3              THE COURT:  We'll get it up there.

4              MR. ROSEN:  Okay.  Your Honor, as a court of

5     equity, this court and the code on which it relies are

6     focused on one goal, and that's to fairly distribute what

7     value a debtor may have among its creditors and interest

8     holders in accordance with the priority scheme of the code,

9     and that is exactly what the Ad Hoc Group has strived for

10    the past seventeen months and what we believe the plan

11    currently provides.  Throughout this confirmation hearing as

12    well as the Court's consideration of the proposed compromise

13    and settlement with the New York Attorney General, one word

14    has been repeatedly said and it cuts to the heart of all

15    that matters or that should matter, and that is the word

16    "restitution".  And as you have heard -- oh, there we go.

17    Voila.

18              THE COURT:  Ask and you shall receive.

19              MR. ROSEN:  Thank you, Your Honor.  Page Three --

20              THE COURT:  Oh, don't thank me.  I was not at all

21    responsible for its demise or its return from the dead.

22              MR. ROSEN:  I thought you waved some hands or

23    burned some incense and you got it done for us, so thank

24    you.  So, as you've heard, Your Honor, the plan was -- has

25    been heavily negotiated by the debtors, the Ad Hoc Group,

1    the UCC and other parties in interest over a very prolonged

2    period, all focused on one goal, and that was to return to

3    creditors as much of the assets that they lent as possible.

4    And despite all the complexities of the cryptocurrency

5    industry and the days of testimony and argument, we believe

6    this case is not that complicated.  Creditors have waited

7    almost a year and a half for this moment and this court has

8    the power to return to them their assets that have been

9    withheld not only during this case but also for the two

10   months prior to the commencement.  Given that this is a

11   cryptocurrency case, we thought it might be helpful to build

12   the blockchain, so to speak, of each of the parties'

13   arguments to show how everything fits together, and as

14   you'll see, DCG has a few broken links in its blockchain.

15         As the bankruptcy court -- excuse me, as the code

16   encourages, the debtors and the creditors worked hard to

17   negotiate a plan that accomplishes three basic items.

18   First, it returns to the creditors as much of their fiat or

19   cryptocurrency as they are owed.  Second, it preserves

20   valuable claims and causes of action against DCG and other

21   third parties for their asserted fraudulent and other

22   illegal actions, to try and return the creditors the rest of

23   what they are owed, and third, it places creditors in

24   control of that litigation and of distributing the debtors'

25   complicated asset mix fairly among its creditors in

Page 93

1    accordance with the distribution principles.

2            The plan is a remarkable achievement earned

3    through difficult negotiations between the debtors and their

4    creditors, but those efforts were well worth it, as over 99

5    percent in the claim amount of those voting voted to support

6    the plan.  DCG stands alone in both its opposition to both

7    the plan, and as you heard several weeks ago, the New York

8    Attorney General's settlement.  Having defrauded creditors

9    and caused the debtors' bankruptcy, DCG believes creditors

10   should be satisfied to share their loaned assets, assets

11   which are rightfully creditors, with DCG because those

12   assets have since appreciated in value.  As we have seen,

13   Your Honor, DCG's arguments failed.

14           We heard a lot of testimony several weeks ago, but

15   the single most important part -- point of dispute does not

16   actually require any testimony or factual analysis.  It's

17   purely a legal question.  Specifically, does the bankruptcy

18   code's priority scheme provide for unsecured creditors to

19   receive the full contractual amount they are owed before

20   equity can recover, or only a subset thereof?  And as our

21   brief, as well as those of the debtors and the UCC make

22   clear, creditors' contracts must be respected before equity

23   can recover; otherwise, equity would receive an

24   unjustifiable windfall, and that is the first link in our

25   argument's logical blockchain.

1            Creditors are entitled to the benefit of their

2    bargain, return of the digital assets in US dollars in kind

3    before there can be any recovery to equity.  Just because

4    the value -- just because the value today of the creditors'

5    loaned assets may have appreciated during the case, a

6    creditor owed one Bitcoin is still owed one Bitcoin today,

7    not half or based upon the appreciation since our prior

8    hearing, one third.  Just like a hypothetical creditor

9    entitled to one Honus Wagner card would still be entitled to

10   a full card, not one ripped in half or as DCG would

11   otherwise provide.

12           DCG argues that the debtors' estates are solvent

13   and must return billions of dollars in value to equity,

14   despite neither one, contesting the subordinated government

15   claims asserted in the amount of $15 billion -- and that's

16   if you deduct two of the three duplication New Jersey

17   claims, as was established during the hearing -- nor two,

18   contesting the evidence showing that creditors will at most

19   only be receiving approximately 77 percent of their in kind

20   cryptocurrency claims.  Here, Your Honor, we focus on the

21   Sciametta declaration, as well as the Aronzon testimony.

22   Indeed, making statements about excess value, DCG's

23   financial advisor acknowledged that he never, never even

24   considered such claims when developing his declaration, and

25   that is in his declaration at Note -- I believe Docket No.

Page 95

1    1139, Note 3.  While we've gone into significant detail and

2    argument regarding how DCG is mistaken that the estates are

3    insolvent, I will save the Court's time and I won't repeat

4    our unrebutted arguments regarding how an estate's assets

5    and liabilities are calculated, because the analysis is

6    irrelevant.  Even if the estates were solvent, the plan

7    would be confirmable and DCG's argument would remain without

8    merit.

9            It is a fundamental principle, Your Honor, of the

10   bankruptcy code that equity holders cannot receive any

11   recovery until creditors have been paid in full, and here it

12   is uncontroverted that creditors will not be repaid in full

13   the assets which they lent the debtors.  Courts have made

14   clear that in a solvent debtor case, creditors are entitled

15   to receive the full bargain for contractual rights,

16   including amounts above the petition date value of their

17   claim.  I think Mr. Shore focused on a Second Circuit -- a

18   Seventh Circuit argument.  We focused on one in the Sixth,

19   Your Honor, and there in the Dow Corning case, in a solvent

20   debtor case, the fair and equitable requirement for

21   confirmation of a plan and the absolute priority rule

22   require that absent compelling equitable consideration, a

23   plan must pay creditors in full in accordance with all of

24   their pre-petition contractual rights.

25           This means full repayment -- full payment of each

Page 96

1    claim, including amounts above the petition date value of

2    the claim, such as post-petition interest at the contractual

3    rate, attorneys' fees and other contractual damages.  Courts

4    have held that where a debtor is solvent, creditors are

5    entitled to receive what their contracts provide.  Here,

6    that means honoring the debtors' obligations to return

7    crypto creditors assets in kind.  Holding otherwise, Your

8    Honor, would create a windfall to equity at the creditors'

9    expense.  Creditors are not receiving outside recoveries as

10   DCG argues, but rather are suffering a shortfall of almost

11   $1.5 billion in value, using crypto prices as of last week.

12   Creditors are entitled to and should be able to recover

13   their bargained-for rights before any value can be paid to

14   equity.

15            Further, courts decline to modify negotiated

16   contractual rights, particularly in solvent debtor cases,

17   and there, Your Honor, we cite out of the Southern District

18   of New York General Growth Properties, or otherwise known as

19   GGP, 2011 Westlaw 2974305, July 20, 2011, and also another

20   Southern District case, In Re Sultan Realty, LLC, 2012

21   Westlaw 6681845, December 21st, 2012.  Creditors'

22   contractual rights are clear.  The master borrowing

23   agreements provide that the debtors must return digital

24   assets and/or US dollars to their lenders.  The MBAs do not

25   permit the payment of US dollar value of digital assets.

Page 97

```
 1    They must be returned in kind.  If the Court finds that the
 2    debtors are solvent, which we submit they are not,
 3    creditors' undisputed contractual rights should not be
 4    overridden to provide a windfall to DCG.  Creditors must
 5    receive the digital assets they are entitled to before there
 6    can be any recovery to DCG.
 7              One thing that has been made clear, Your Honor,
 8    throughout this confirmation hearing is that not all
 9    creditors see eye to eye on every issue in the case.  We've
10    heard about the February term sheet.  We heard how when the
11    UCC came in, they had a perspective.  We heard about the
12    agreement in principle.  You heard how the Ad Hoc Group
13    disputed what that was all about, and the ability to move
14    forward with that.  We've heard about the difference of
15    opinion between the dollar creditors and the crypto
16    creditors.  Chief among these, Your Honor, is that very
17    issue:  how to fairly distribute on an in-kind basis among
18    those various creditor constituencies.  And after months of
19    negotiating this issue, what could have been heavily
20    litigated and which continues in part to be litigated by a
21    small subset of crypto creditors -- I think approximately
22    seven people as of today -- was settled by the debtors and
23    their two critical creditor groups.
24              The Ad Hoc Group, representing a majority share of
25    every voting class in the UCC with a statutory obligation to
```

Page 98

1    represent the interests of all creditors -- and this is the

2    second link in our logical blockchain.  As the testimony has

3    made clear, the settlement is in the best interests of the

4    debtors and their estates and should be approved.  As Mr.

5    Aronzon testified, the distribution principles resolved

6    disputes "between and among the creditors, as well as those

7    with the debtors over various legal issues that could have

8    been brought forward and litigate about ownership of

9    assets, security interests, constructive trusts or a number

10   of things."  This is the February 26th transcript, Your

11   Honor, at 212, Lines 9 through 24.

12          The settlement embodied by the distribution

13   principles satisfy all of the Iridium factors to be

14   considered by this court, as demonstrated in the evidence

15   introduced at the trial and presented to the Court:  success

16   of the litigation among the debtors and various creditor

17   constituencies with respect to a multitude of potentially

18   litigable issues, including valuation requirements under the

19   code, including as a result of Section 562 of the code,

20   whether certain assets were subject to constructive trusts

21   or security interests, and more.  All of these issues are

22   complex and novel and would have been extremely costly to

23   litigate to an uncertain outcome, and this was in the

24   Aronzon declaration, Paragraphs 59 and 60.

25          The distribution principles received the approval

Page 99

1    of almost every voting -- of almost all voting creditors in

2    this case, and has received the affirmative vote of the

3    overwhelming majority of every voting class.  Again, the

4    Aronzon declaration, Paragraphs 62 to 63.  The distribution

5    principles were negotiated at arms' length by highly

6    qualified counsel representing the major creditor

7    constituencies in this case and representing creditors of

8    every class.  Again, Aronzon declaration, Paragraph 61.  And

9    ultimately, the principles benefit all creditors by

10   resolving the disputed issues and are supported by the

11   debtors' reasonable business judgment -- Aronzon

12   declaration, Paragraphs 64 through 65.

13             THE COURT:  So, let me jump in here to ask two

14   related questions.  One is, I get the sense that what DCG's

15   argument is from prior statements is that the negotiation,

16   the give and take, took place among the creditors, but not

17   necessarily among the creditors of the estate.  Right?

18   There's this notion of sort of the estate rolling over and

19   saying, "Well, have whatever you want," and that DCG -- and

20   I think it animates their earlier arguments on the AG

21   settlement as well as this, saying, you know, the fights are

22   among the creditors but not necessarily the debtors' driving

23   a hard bargain.  And I guess the related question is, are

24   you aware of any arguments that have been made saying that

25   what's provided for in this plan isn't essentially a formula

Page 100

1    for saying "Here's what you get back for your restitution."?

2              MR. ROSEN:  First, let me go back to the process

3    itself, and I know others have already said it, but it

4    couldn't be farther from the truth that DCG was not involved

5    in the conversation, the mediation process that went on, but

6    even before that, Your Honor.  From November to January to

7    February to that initial term sheet, we were actively

8    engaged with DCG throughout the entire time.  We had many,

9    many meetings with DCG in an effort to try and negotiate the

10   terms of a settlement or a compromising settlement with DCG

11   with respect to the claims and causes of action that might

12   exist, all to bring value back to the estate.  I think as

13   Mr. Shore correctly stated, all of those negotiations, there

14   was never a discussion as to what the distribution of the

15   assets would be among the debtors and the creditors

16   themselves.  It was, "What would DCG give back to the

17   estate?" and not that other component.

18             So, I really -- I'm not offended by it, but I

19   understand their argument.  There was no rolling over by the

20   debtors in this particular case.  It was, "This is what

21   people believe they're entitled to from a contractual

22   standpoint," and I believe the word was used a moment ago

23   from a "moral" standpoint.  People would entitled to recover

24   what they gave in kind, and they should not be prejudiced by

25   the fact that the value continued to increase over time.

Page 101

1           THE COURT:  All right.  So, from your point of

2    view, this is a formulation memorializing what everybody's

3    going to get among creditors.

4           MR. ROSEN:  The debtors did -- the debtors did

5    what debtors are supposed to do, what creditors' committees

6    are supposed to do and major constituents are supposed to

7    do.  They're supposed to find out what would be an

8    appropriate distribution of assets pursuant to a Chapter 11

9    plan, negotiate it out, see if it takes, and the vote

10   obviously showed that people were willing to give and take

11   on all aspects, the dollars versus the crypto.

12          THE COURT:  But I'm assuming, then, if you think

13   about it from the point of view -- your point of view of

14   what's contractually owed, if there's a different settlement

15   with different terms, it just changes how the pie is split

16   up.  It doesn't change the fact that there's a 77 percent

17   recovery.  Maybe it's an 82 percent recovery; maybe it's a

18   745 percent recovery.  I -- I guess I'm just trying to

19   awkwardly get the notion from your point of view.  It

20   doesn't really affect DCG's recovery as an equity holder in

21   any event.

22          MR. ROSEN:  It doesn't, Your Honor.  It still

23   leaves that giant hole that I referred to of the $1.5

24   billion.

25          THE COURT:  All right.

Page 102

1           MR. ROSEN:  The third link, Your Honor, in our

2     logical blockchain is compliance with the bankruptcy code.

3     The settlement embodied by the distribution principles

4     complies with the provisions of the code, including Section

5     502(B).  Section 502(B) provides that upon an objection to a

6     claim, which DCG attempted to interpose on the eve of

7     confirmation, the bankruptcy court shall "determine the

8     amount of such claim as of the petition date," and "shall

9     allow such amount".  There is no limiting language providing

10    for the disallowance of claim amounts above that, except in

11    the enumerated subsections.

12           But the appreciation of cryptocurrency assets owed

13    to the creditors does not meet any of the enumerated

14    subsections to which Section 502 provides a cap, such as

15    502(B)(6), which limits landlords' claims pursuant to a

16    formula.  Section 502(B) does not establish a cap on

17    creditors' recovery.  It sets forth evaluation methodology

18    to provide creditors their pro rata share of the debtors'

19    assets.  That is precisely what the distribution principles

20    here provide.  Creditors receive their pro rata share of

21    recoveries based on the petition date value of their claims.

22    That does not mean they stop being entitled to the return of

23    their loan assets.

24           The first broken link in DCG's argument is simple,

25    Your Honor, and I know that people have already said it

Page 103

1    already, but I'll do it again.  DCG does not have standing

2    to assert their objections to the distribution principles.

3    DCG must have an actual financial stake in the outcome of

4    this case.  One of the primary facts that became clear over

5    these past few weeks is that DCG does not.  DCG spent a lot

6    of time pointing to the duplicative proofs of claim filed by

7    New Jersey's Bureau of Securities, but fails to discuss the

8    remaining subordinated government claims filed in excess of

9    $15 billion.  This includes claims by state and federal

10   securities agencies as well as state law enforcement

11   agencies such as the New York Attorney General, which filed

12   claims on account of its complaint against the debtors and

13   DCG for the fraud perpetrated upon creditors and seeking

14   restitution, disgorgement, and other penalties.  As made

15   evident during --

16           THE COURT:  Can you -- can I ask you -- I don't

17   think there's been a lot of talk about this, but now is as

18   good a time as any.  Certainly there are cases -- other

19   cases where the government gets involved.  I guess they're

20   often criminal cases where there's various sort of

21   complementary ways of approaching victim restitution, right,

22   whether you're talking about Madoff, whether you're talking

23   about Dreier, and complementary ways those processes sort of

24   complement what's going on in the bankruptcy, even if they

25   don't start out that way.  Can you talk about that just to

Page 104

1    put this in context and how these may be similar or how they

2    may be different?

3          MR. ROSEN:  I often go back to a case that I did,

4    Your Honor, which was Enron, and I had a lot of claims that

5    were made against the debtor there, and in that case we did

6    virtually the exact same thing as we've done here.  We

7    agreed to a subordinated claim by the governmental agencies

8    back and to the extent that there was a shortfall, and there

9    was ultimately a distribution to the subordinated level of

10   governmental claims there would be the restitution back.

11   So, I see this as something very similar and I applaud the

12   debtors for going back to that sort of construct and getting

13   the recovery back for creditors, so I don't think this is an

14   abnormal situation.

15         THE COURT:  Thank you.

16         MR. ROSEN:  Thank you.  As I said, Your Honor, the

17   first broken link in their argument was simple.  It was a

18   question of standing, and as made evident during the

19   evidentiary portion of the hearing, the only analysis that

20   DCG's witnesses offered is a simple math exercise that none

21   of the parties dispute, but as noted before, ignores the

22   class of subordinated government claims.  But for DCG to

23   even have a remote possibility of any recovery in these

24   cases, it cannot simply handwave away over $15 billion in

25   claims senior to a recovery for equity.  Mr. Verost's

Page 105

1   testimony makes clear that DCG's entire analysis pretends

2   that these claims don't exist.  Meanwhile, DCG does nothing

3   to contest the merits of these claims, and its witness's

4   analysis shows that even if the Court credits all of DCG's

5   arguments, there would be approximately $2.5 billion in

6   value exceeding the petition date value of general unsecured

7   creditors' claims, far below the more than 15 billion of

8   nongovernmental -- excuse me, nonduplicative asserted

9   governmental penalty claims.

10          The second broken link in DCG's argument, Your

11   Honor, is that it does not contest any of the supporting

12   parties' arguments.  DCG does not argue that creditors are

13   receiving more in cryptocurrency coins than the amount that

14   they lend.  Instead, DCG simply claims that DCG should be

15   entitled to it.  For reasons which we've already gone

16   through today and in the opening arguments, that argument is

17   incorrect.  Perhaps as a throwaway, Your Honor, because it

18   was relegated to I think the next-to-last page in its

19   objection and one paragraph, and also to the US Trustee's

20   argument about the Ad Hoc Group's fees and expenses, we

21   believe that the plan --

22          THE COURT:  Before you jump in there, let me ask -

23   - I have a general sense that there's been marked progress

24   on the substantial -- well, on the US Trustee's Office views

25   about its objections, and I know there are four points

Page 106

1    reserved.  I don't quite have the contours of what's still

2    in play.  I don't want to jump -- jump ahead, but I want to

3    make sure I understand your comments about the fees and

4    expenses in the context of what's still in play and what's

5    not.  That would be helpful.

6         MR. ROSEN:  Sure, and -- but first, Your Honor, I

7    want to point out that we believe that we don't even need to

8    get the substantial contribution, and I know that the Dollar

9    Group is going to get to the same point.  We believe, Your

10   Honor, that we are entitled to those payments pursuant to

11   Section 363 of the bankruptcy code.  The fact that these are

12   all included in the plan support agreement and in the plan

13   itself, the fact that the creditors -- the Ad Hoc Group,

14   which signed on to the plan support agreement, which voted

15   to support the plan, Your Honor.

16        That was consideration being given as part of the

17   execution of the plan support agreement, and we believe that

18   upon the Court's entry of the order confirming the plan that

19   nothing more needs to be done with respect to Section 363 of

20   the bankruptcy code.  This is something that is not novel.

21   It is certainly done in virtually -- I don't want to say

22   "every" but many plan support agreements or restructuring

23   support agreements, and I believe Mr. Aronzon even testified

24   to that aspect of it.  And as far as the narrowing of issues

25   with respect to the US Trustee's side, Your Honor, we've

Page 107

1    tried to answer as many questions as possible to the United

2    States Trustee that they've raised about substantial

3    contribution and whether or not there's other fees and

4    expenses included in our numbers, which they are not, Your

5    Honor, as we've told the United States Trustee.

6            So, if I move on from the 363 side, Your Honor, to

7    the substantial contribution, we believe that we certainly

8    have satisfied the substantial contribution aspect, if in

9    fact we go to that point, and a lot of that was with respect

10   to the questions that I ran through with Mr. Aronzon during

11   his testimony.  Your Honor, if you look on the screen there,

12   on your screen, you can see Page -- I think it's 25, 28.

13   Greg?

14           MR. STEINMAN:  Twenty-six.

15           MR. ROSEN:  Twenty-six.  I was not even close.

16   The Ad Hoc Group was formed, Your Honor, November '22 and

17   we've been involved in this situation since that time and of

18   course our membership has grown significantly.  It started

19   with, I believe, only six members, Your Honor, and currently

20   it's over 85 with claims in excess -- currently, $2.5

21   billion worth of claims, but the plan support agreement was

22   supported by 62 of our members, representing over 2.1

23   billion in petition date values, Your Honor.  The Ad Hoc

24   Group has done a lot during this case.  It's sometimes been

25   very positive through the development of the plan and the

Page 108

1    distribution principles, and most notably, several weeks ago

2    in the development and negotiation of the Gemini settlement.

3    Sometimes we've countered the things that were being done by

4    the UCC and the debtors, but it was to state the position

5    that was espoused by $2.5 billion worth of claims, which is

6    over two-thirds of the amount of claims in this estate, I

7    believe, Your Honor.

8              And we believe that, as was reflected by Mr.

9    Aronzon's testimony -- Jordan, could you flip it -- you can

10   see that we asked -- well, you can see that we asked Mr.

11   Aronzon several questions.  The one here that's on the

12   screen:  "I think you just mentioned previously that you've

13   been involved, and I think you even said one thousand hours

14   or something, about calls with the Ad Hoc Group."  Answer:

15   "It feels like that."  I don't know if that was a slam or

16   not, but "It feels like that."

17             MR. ARONZON:  It wasn't.

18             MR. ROSEN:  "It's a little -- I was being a little

19   facetious, but it certainly feels like that.  It kind of

20   feels like daily conversations about the Ad Hoc Group."

21   That was one testimony.  And then, as a result -- Mr.

22   Aronzon, questioned again, was:  "As a result of its

23   nonsupport of the agreement in principle, was the Ad Hoc

24   Group then the catalyst in connection with moving forward on

25   the no-deal plan?"  Answer:  "It was."  "And is that the

Page 109

1    plan that is currently before the Court for confirmation?"

2    Answer:  "It's some version of it, yes."  Question:  "And do

3    you know what the Ad Hoc Group's role was in connection with

4    the formulation of the distribution principles?"  Answer:

5    "I would say instrumental, and by the way, I would say the

6    same thing of the creditors committee, too."

7            And one more.  "Since before the filing of the

8    petition, we've been dealing..." -- this is Mr. Aronzon

9    stating, "We've been dealing with various groups of

10   creditors, and the Ad Hoc Group is one of those groups.  As

11   I understand it, it is a group that is both dollar-

12   denominated fiat claimants and digital asset crypto

13   claimants, I think of all varieties, as a matter of fact,

14   and as such and given the size of the group in terms of

15   claims, we spent quite a bit of time, frankly, negotiating

16   with that group alongside other groups to try and put an

17   agreement together to settle the various disputes that

18   you've been hearing about for the past few days and would

19   have been the subject of, you know, months and months, a

20   year and a half, almost, of work to try and get some

21   agreement on how to divide up the assets or reorganize

22   Genesis."

23           There's one more.  This was just Mr. Frelinghuysen

24   saying what the Ad Hoc Group had done.  Your Honor, we

25   believe that while there is no need to address the

1    substantial contribution aspect, and we appreciate what the

2    Court said about the need or lack of need to file a motion,

3    we believe that we've satisfied the Section 363 component or

4    could and we certainly believe that we've satisfied the

5    substantial contribution aspect of it.  So, Your Honor,

6    unless the Court has any additional questions for me, that

7    will be my presentation.

8             THE COURT:  All right.  Thank you very much.  I

9    don't have any further questions at this time.

10            MR. ROSEN:  Thank you, sir.

11            THE COURT:  So, let me just get a sense of how

12   many other people are going to be heard on this side of the

13   equation before we hear from DCG.  I see the New York AG and

14   the Dollar Group, so we've got about four or five.  All

15   right.  We'll see where we are at the end of that in terms

16   of time.  Please.

17            MR. DRAGHI:  Good afternoon, Judge.  Tom Draghi

18   from Westerman Ball, counsel to the New York Attorney

19   General's Office.  I feel like I should have a handout or a

20   PowerPoint, but I don't, so -- for the record, Your Honor,

21   the New York Attorney General's Office supports confirmation

22   of the debtors' plan.  Under the plan, the debtors are

23   seeking to make distributions to holders of allowed

24   unsecured claims based on their contractual entitlements

25   with the debtors.  This distribution scheme is consistent

Page 111

1    with the settlement that was negotiated and agreed to by the

2    debtors and the NYAG under which the NYAG will have an

3    allowed unsecured claim in each of the debtors' unsecured

4    classes under the plan based on restitution for losses

5    incurred by the victims that were identified in the amended

6    complaint filed in the state court action.  Here, Your

7    Honor, those victims are the unsecured creditors in these

8    cases.

9         So, I think, Your Honor, one key point for the New

10   York Attorney General's Office is how fair and equitable the

11   proposed plan is, and more to the point, how it's in the

12   best interests of creditors.  I'd like to turn to one

13   question that you asked Debtors' counsel, and that was --

14   you know, you wanted to understand what would happen in the

15   event of the plan not being confirmed and this settlement

16   being approved, and you -- more particularly, you wanted to

17   understand what the economics might be.  And to that, Your

18   Honor, I think unequivocally the economics would be worse

19   for the debtors' creditors if the plan were not confirmed

20   and the settlement agreement were approved.  I echo Ms.

21   Vanlare's comments that the settlement agreement is a

22   standalone document and should be approved regardless, but

23   you've got to look at the costs of administering this estate

24   that are continuing and will continue if this -- if the

25   professions have to go back to, you know, the drawing board

Page 112

1    and start negotiations.

2            The debtors, the creditors' committee, the Ad Hoc

3    Committee, the Dollar Group have done a yeoman's job, they

4    really have, Judge, getting us to this point, but it took a

5    lot.  It took -- you know, you heard Ms. Vanlare saying --

6    you heard, you know, counsel for the committee say how much

7    time was spent in getting the negotiations and, you know,

8    dealing with mediations and different iterations of proposed

9    plans and things of that nature, and it took months and

10   months and months.  Nut every month that passes, Your Honor,

11   is going to be millions and millions of dollars that will be

12   unavailable for unsecured creditors if it turns out that the

13   parties have to go forward with another type of plan and go

14   back to the negotiating drawing board.

15           And then, the other key thing, Your Honor, that

16   you can't lose sight of is the risk associated with

17   cryptocurrency dropping in value.  DCG is asking the Court

18   to have that risk be shifted to the creditor body because if

19   this plan doesn't get confirmed and it takes two, three,

20   four more months for those negotiations for continue for

21   them to try to come up with another iteration of the plan

22   that would be acceptable to the creditors, and again, I

23   reiterate the creditors have all voted in favor of this

24   current plan.  But not only will it be tens of millions of

25   dollars in legal fees, but there's a risk that

1   cryptocurrency could drop in value.  That, Your Honor, when

2   you combine those two attributes, begs for this court to

3   approve and confirm the plan, because it's not only fair and

4   equitable, but certainly the best interests of creditors,

5   and that, Your Honor, is why the US -- I'm sorry, the New

6   York Attorney General's Office supports confirmation.  Thank

7   you.

8           THE COURT:  Thank you.

9           MR. LIEBERMAN:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. LIEBERMAN:  No longer good morning.  Seth

12   Lieberman of Pryor Cashman on behalf of the Ad Hoc Group of

13   Dollar Lenders.  As I mentioned, I'm here today with my

14   colleague, Daniel Brenner.  I think it's a nice segue from

15   the New York Attorney General, who said that our group was

16   doing a yeoman's job in this case, to now take the podium,

17   Your Honor, and as Your Honor may recall, I was last before

18   you in late February for the purpose of delivering my

19   opening statements for the confirmation trial.  At that

20   time, I advised the Court not only about our client and the

21   work that we'd been doing in this case, but as well as the

22   background behind its formation, what really amounts to be

23   the tortured history among the multi month-long negotiations

24   among the different case constituents, my client, Mr.

25   Rosen's client, the UCC, the debtors, regarding the terms of

Page 114

1    the PSA, the underlying distribution principles, and

2    ultimately, the plan that's before Your Honor and we were

3    unequivocal in stating our support of confirmation of this

4    plan.

5          That support was evidenced, Your Honor, just to

6    remind the Court, in our statement in support of

7    confirmation, which can be found at Docket No. 1323.  We

8    were present, as well as many in this courtroom, for several

9    days in late February.  We heard the testimony of the many

10   witnesses, such as Mr. Aronzon, Sciametta, Geer, among

11   others, in support of confirmation.  We bore witness to

12   cross-examination of those very same witnesses from the few

13   parties that at this point oppose confirmation, and after

14   listening to and digesting that testimony and for the

15   reasons that were originally set forth in our statement, the

16   Dollar Lender Group continues to support confirmation of

17   this plan.

18         And to be clear, Your Honor, the Dollar Lender

19   Group respectfully requests that this plan should be

20   confirmed now.  As was mentioned by one of my colleagues

21   that just took the podium, time is not on our side, not the

22   debtors, not the plan supporters, I'd even say not even the

23   plan objectors, and I think Your Honor recognized this in

24   colloquy during the opening statements with one of the plan

25   objectors where Your Honor said on February 26th -- and I'll

Page 115

1    quote the record:  "I understand one of the significant

2    concerns of cryptocurrency of all the customers was to get

3    paid promptly, and with the rising value of cryptocurrency,

4    now is a pretty good time to do that, and that delay risks

5    that set of circumstances."

6           Make no mistake about it, Your Honor, time is our

7    enemy, and given the Court's implicit recognition -- again,

8    Your Honor, that was on February 26th at Page 134, Lines 14

9    through 18.  Given Your Honor's recognition at that point,

10   the Dollar Lender Group respectfully requests that this plan

11   is confirmed now so that it can be consummated and parties

12   in interest, as Ms. Vanlare said, can receive the US dollar

13   and crypto assets that they're entitled for.

14          Your Honor, if the Court would indulge me, I'd

15   like to take a minute -- I've put a lot of red X's in my

16   prepared remarks because most of the other plan supporters

17   have already gotten there, but I'd like to perhaps approach

18   the fee and expense issue a little different than Mr. Rosen

19   did.  I'd like to spend the balance of my remarks dealing

20   with that issue.  It obviously forms the basis of the United

21   States Trustee's plan objection; I know that we're going to

22   deal with that later, but rather than coming up twice, I

23   know that DCG mentioned it in their papers as well, so I

24   thought I would just hit it right now and hopefully we can

25   handle this issue now.

Page 116

1          According to these objections, these objectors

2     posit that Section 503(B) is the exclusive means by which

3     this court can award fees and expenses to non-estate

4     professionals.  For its part, as I mentioned, DCG appears to

5     join in this objection, although their 40-page objection

6     dedicates a single paragraph -- it's Paragraph 93 -- to this

7     issue, wherein it indicates that reimbursement of these fees

8     and expenses is impermissible because the plan is supposedly

9     proposed in bad faith, as we've heard, and that those fees

10    and expenses should require separate court approval.  I

11    think the other parties have already handled the bad faith

12    issue; I'm not going to restate those arguments. And I

13    think, Your Honor, we appreciate the fact that we don't need

14    to necessarily come back here for separate court approval.

15          But suffice to say, Your Honor, these plan

16    objectors are mistaken as to the facts and the law, and I

17    want to set the record straight on these issues.  The gating

18    issue by these plan objectors, again, is that 503 is the

19    only way that Your Honor can grant --

20          THE COURT:  Well, let me just help you out.  I'm

21    aware of what the case law is on this.

22          MR. LIEBERMAN:  Great.

23          THE COURT:  I know that there's lots of decisions

24    about the issue.  I know in our district some of them

25    predate Judge Sullivan's decision in the Lehman case.

Page 117

1              MR. LIEBERMAN:  Yep.

2              THE COURT:  And so, I'm aware of what authorities

3     are out there and whenever you get a District Court decision

4     like that, it's not binding per se.  It's worthy for

5     purposes of its power and persuasion.  That's because

6     different District judges will rule different ways on

7     different issues.  At the same time, one would be remiss to

8     not note that Judge Sullivan now sits in the Second Circuit.

9     So, it certainly is authority that is here in this District,

10    and again, but I'm aware of the other authority that's out

11    there.

12             MR. LIEBERMAN:  I appreciate that, Your Honor.

13    Let me make a few remarks regarding that.  First, we

14    extensively, I think, detailed this issue in our papers --

15    again, that's at Docket No. 1323.  I don't want to recite

16    them.  I want to talk about, maybe, the post-Lehman cases,

17    because again --

18             THE COURT:  All right.

19             MR. LIEBERMAN:  In the face of that decision,

20    what's happened in this circuit since that decision?  And

21    again, Your Honor, what we're really looking for here are

22    arguments outside of 503.  Mr. Rosen mentioned 363.  I think

23    it's 363(B).  Some parties, some courts have cited

24    1123(B)(3), 1123(B)(6), 1129(A)(4), Bankruptcy Rule 9019.

25    Any one of those, we respectfully submit, allow this court

Page 118

1    to make a finding of reimbursement under the plan.  But

2    let's talk about those post-Lehman decisions, Judge, because

3    I think it's extremely important.  We have in this Circuit -

4    - and I'm not going to limit the discussion to that -- we

5    have the Purdue decision.  That's cited in our papers.  We

6    have the Stearns decision.  I think the Stearns decision,

7    Your Honor, is especially interesting.  Judge Chapman at the

8    time -- again, that's a 2019 decision.  Judge Chapman at the

9    time cites -- and I'm going to cite her on the Stearns

10   decision.  She says:  "Where consideration is paid pursuant

11   to a settlement, the Court need not review such payment

12   under Section 503(B) of the bankruptcy code."  That's 607 BR

13   781-793.

14          We cite other decisions, Your Honor.  I was before

15   Your Honor in AMR, way back when.  Obviously, that's -- I

16   don't need to talk about that.  I don't need to talk about

17   Judge Gerber and Adelphia.  I will say, however, that the

18   Adelphia decision was cited positively in the Delaware cases

19   that we cite in our very paper.  So, that's the Mallinckrodt

20   decision.  That's the extraction decision where we annexed

21   the trial transcript, and I take great pride in that, Your

22   Honor, because I argued that against the United States

23   Trustee before Judge Sontchi.  Again, this is all post-

24   Lehman.

25          So, not only have we argued in our papers and I

Page 119

1    think the other parties have argued in their papers by

2    Lehman is just frankly inapplicable here, Your Honor.  The

3    facts in Lehman are just not the facts here.  Neither my

4    client nor Mr. Rosen's client are members of creditors'

5    committees trying to get paid in that capacity.  But putting

6    that aside, I think that the post-Lehman decisions have done

7    a remarkable, and dare I say consistent, job indicating why

8    facts and circumstances such as these allow this court the

9    ability under the myriad of code sections as well as the

10   bankruptcy rule to allow Your Honor to make the decision

11   that Your Honor needs to make in order to enforce the plan

12   provisions as provided.

13          Your Honor, if the Court would indulge me, we

14   believe that that's the authority here, but what does the

15   plan provide and what's the evidence provide, because

16   obviously that's important.  The plan speaks for itself.

17   Obviously, Article 8 of the plan, which Your Honor has

18   before you -- I think the latest iteration of the plan is at

19   Docket No. 1392 -- talks about the settlement release

20   injunction and related provisions.  This is just a sample,

21   Your Honor, of what the plan provides on this issue.  But

22   that article talks about distributions, releases,

23   consideration pursuant to 363, 1123, 9019, the very same

24   code sections and rules that I made reference to.  Now, as

25   the plan objectors may indicate that it's nice that you

Page 120

1    might have the law on your side, it's nice that the plan may

2    provide what the plan provides, but what's the evidence

3    show?  And we all were here to see the evidence that was

4    before Your Honor, and I want to be clear, Your Honor; we're

5    not just talking about the live evidence.  We're talking

6    about the declarations.  The declarations are as important

7    and evidentiary as anything else in this case.

8            I'm not going to read through what so many others

9    already, and we'll probably revisit these between now and

10   the end of the day, about the work that was done by my group

11   and the other groups.  That's -- again, I'm just going to

12   draw the Court's attention to Mr. Aronzon's own words in his

13   declaration, which again is at Docket No. 1330, Exhibit D.

14   I draw the Court's attention to 59 through 64 -- Paragraphs

15   59 through 64 of his declaration.  Specifically, Your Honor,

16   Paragraphs 60 through 62 really talk about the back and

17   forth, the heavy lift by these groups in order to get this

18   deal done.  Mr. Geer's testimony, similarly -- his

19   declaration is at 1355 -- Paragraphs 27 through 37 of that

20   declaration also speak to the hard-fought nature of the same

21   and the Dollar Group's role in those negotiations.

22           Finally, Your Honor, I'd be remiss -- finally on

23   this point.  I have one more after.  On this point, Judge,

24   I'd be remiss if I didn't point out what I think may be the

25   most compelling piece of evidence that we have in this case,

Page 121

1   and that's at Paragraph 107 of Mr. Aronzon's declaration.  I

2   could read it, but I know that everyone will want to get to

3   lunch at some point.  But Paragraph 107 of the Aronzon

4   declaration lays out in great detail the debtors' judgement

5   with respect to the payment of these different Ad Hoc Group

6   and Dollar Group restructuring fees and expenses, how in his

7   estimation, but for our involvement and but for this

8   negotiated deal point being settled, that there never would

9   have been a deal in this case, that deal which eventually

10  culminated into the PSA, the underlying distribution

11  principles, and now here we are with the plan.

12          Mr. Aronzon also testifies, and this will be

13  relevant in a moment, that in his estimation that these

14  parties made a substantial contribution in connection with

15  our very significant role in the case, and that as a result

16  of that, as long -- as well as the debtor exercising their

17  business judgement, that these fees and expenses should be

18  paid.  Your Honor, there are two significant takeaways from

19  those declarations, the Geer and the Aronzon declarations.

20  First, they unequivocally lay out an evidentiary standard

21  for reimbursement of non-estate professional fees and

22  expenses under the plan pursuant to 363(B), the 1123(B)(3)

23  and (B)(6), 1129(A)(4) and Rule 9019.  And second, perhaps

24  most significantly, the testimony is unrefuted.  Not only

25  did no one cross them on these very issues, but in fact, no

Page 122

1    one brought in a witness to the contrary.  Given that, Your

2    Honor, we would submit that this court has the ability to

3    and should make a finding with respect to these other non-

4    503(B) sections, to allow for the payment and reimbursement

5    of these fees and expenses under the plan.

6         A final, and I hope quick, note on 503(B), Your

7    Honor, getting back to Mr. Rosen's point, if the Court does

8    feel compelled -- and we don't believe the Court needs to in

9    any way, shape, or form, but if the Court feels compelled to

10   make an alternative finding under Section 503(B), that

11   again, Your Honor, has more than an ample evidentiary record

12   pursuant to the Geer declaration, the Aronzon declarations,

13   specifically Paragraph 107 of that declaration, to make such

14   a finding.   It provides uncontroverted evidentiary

15   foundation, and to the extent that Your Honor chooses to

16   make that 503(B) finding, the Court has plenty of evidence

17   to do so.

18        In sum, Your Honor, for the reasons set forth in

19   our statement at Docket No. 1323, as well as the reasons

20   laid out on the record today, the Dollar Ad Hoc Group

21   respectfully requests that the Court enter an order

22   confirming this plan.  Thank you, Judge.

23        THE COURT:  Thank you.  All right.  Who's next?

24        MR. SMITH:  Good morning, Your Honor.  Dustin

25   Smith for Hughes Hubbard Reed, appearing on behalf of the

Page 123

1    Gemini Trust Company as agent for the Earn Users.  I

2    recognize that the Court has already heard substantial

3    arguments related to the affirmability of the plan, and I'll

4    avoid prolonging our time here by repeating those.  I will

5    simply say that we agree with points that have been made by

6    the debtors, the UCC, and the Ad Hoc Group in support of the

7    plan.  We believe the plan as drafted is confirmable and we

8    further believe that the plan represents the best and

9    probably only realistic path forward for the creditors of

10   Genesis writ large to get in-kind recoveries on the most

11   expeditious basis possible.

12            Earlier in the confirmation process, we submitted

13   a reservation of rights identifying specific issues that we

14   had with the plan.  We'd like to acknowledge the work of the

15   debtors and their counsel to address these issues and

16   resolve them as we went forward.  As a result, in January,

17   Gemini recommended to its users that they vote in favor of

18   the plan, which they overwhelmingly did.  As such, Gemini

19   has satisfied the requirements of the Gemini acceptance

20   event, which I believe Mr. O'Neal recognized at the hearing

21   in February, and that acceptance event is continuing today.

22   As Mr. O'Neal referenced at the beginning of the hearing, we

23   have reached both the settlement in principle but now a

24   settlement embodied, which we'll be filing shortly.  We look

25   forward to being back here in front of the Court in April to

Page 124

1    voice our support for that motion as well.

2            That being said, one lesson I did learn from my

3    short and inglorious career as a Boy Scout is that you

4    should always be prepared, so while the settlement will

5    resolve the various issues between Gemini and the debtors,

6    including providing for full, coin-for-coin recovery on an

7    expedited basis, that does not affect our current support

8    for the confirmation of plan, which we continue to urge here

9    today.

10           Lastly, as a bit of housekeeping, I know that the

11   debtors requested to address certain issues raised by SOF,

12   that we place some statements on the record, which I'm happy

13   to do here.  And to that end, we -- Gemini can confirm that

14   Gemini in its proprietary capacity has no beneficial

15   interest in the Gemini reserve points as defined in the

16   plan, the Gemini Earn operation assets as defined in the

17   plan, and the GBTC shares, although we note that if the

18   settlement agreement is approved, those will be part of the

19   recoveries that will go out to Gemini lenders.

20           Similarly, we will also confirm that Gemini in its

21   role as the Gemini distribution agent will not be deducting

22   any fees or costs from the distributions that Genesis will

23   make to the Gemini lenders, and additionally, we will not be

24   holding back or otherwise establishing reserve from those

25   funds that will be distributed to those (indiscernible) from

Page 125

1    the debtors for the benefit of Gemini lenders.  Once again,

2    I note that if the settlement agreement is noted, those

3    distributions will be made pursuant to the settlement

4    agreement.

5            Unless Your Honor has any other questions, I will

6    cede the podium to --

7            THE COURT:  All right, I do not.  Thank you very

8    much.

9            MR. SMITH:  Thank you very much.

10           MR. MEDINA:  Good afternoon, Your Honor.  Eric

11   Medina and Medina Law Firm.  I'm here today on behalf of

12   BAO.  Your Honor, I rose this afternoon just to make some

13   very quick comments.  BAO, as Your Honor knows, is an Earn

14   victim, one of over 200,000 people that were victims to a

15   scheme that they got no information about and that

16   ultimately led to a very expensive, very long, drawn-out

17   bankruptcy case, so long that it's been one and a half

18   years.  The Gemini Earn program started in February 2021, so

19   this case has been pending for about two-thirds of the time

20   that the program has actually existed.  We became involved

21   in this case in December of 2023.  I remember my first

22   hearing here.  It was watching Your Honor point the

23   different constituent groups out to different rooms to see

24   if they could try and settle the case.  They didn't.

25           As I stand here today, that's still the case.

Page 126

1    There is no alternate plan.  We are absent the confirmation

2    of this plan, several months away from any kind of

3    resolution that I believe one of the other counsel this

4    morning said very correctly, that "We'll return the coins to

5    the victims that have so sorely and longly waited for them."

6    Your Honor, the basic principle that established this court

7    is very much on the Court's website at the landing page and

8    it says, "This court exists to provide relief to individuals

9    under the bankruptcy code and persons under the bankruptcy

10   laws.  It's designed to protect the interests of creditors

11   and to ensure efficient, fair administration of bankruptcy

12   cases."  This is a liquidating plan -- excuse me, is a

13   liquidating plan in a voluntary case.  It's time to finish

14   this case and it's now time to conclude the matter.

15         I thank the debtors for including comments in the

16   proposed confirmation order, which both protect the rights

17   of BAO and other Gemini Earn victims, and we look forward to

18   seeing the Gemini settlement.  Thank you, Judge.

19         THE COURT:  Thank you.

20         MS. MOSSE:  Good afternoon, Your Honor.  Julia

21   Mosse from Katten Muchin Rosenman on behalf of Ted Gorisse.

22   Your Honor, as I mentioned during the opening, Mr. Gorisse

23   is a creditor.  He is also a member of the official

24   Committee of Unsecured Creditors and a member of the Ad Hoc

25   Group of Genesis Lenders.  Mr. Gorisse supports confirmation

Page 127

1    of the plan in its entirety.  Before I begin, on behalf of

2    our client I'd like to take a moment to commend the hard

3    work of everyone involved in these cases, including the

4    debtors' counsel at Cleary, the UCC's counsel at White and

5    Case, the Ad Hoc Group's counsel at Proskauer and the many

6    other law firms, financial advisors, and professionals

7    who've worked over the past almost year and a half to bring

8    us to this point in these Chapter 11 cases.

9            Your Honor, throughout the confirmation hearing

10   and this morning, we heard a lot about the extensive arms-

11   length negotiations that culminated in the plan that's

12   before the Court today.  As I mentioned, our client supports

13   the plan in its entirety.  That includes all components of

14   the plan, including the distribution principles, the New

15   York Attorney General settlement, and the debtor releases.

16   But as with my opening and as with our client's statement in

17   support of confirmation, which was filed at Docket No. 1351,

18   the focus of my statement today will be on the setoff

19   principles, which are contained in Exhibit M to the plan

20   supplement that was filed on January 9, 2024 at Docket No.

21   1144.

22           During my opening, I addressed two points, Your

23   Honor.  The first, why the setoff principles are fair,

24   reasonable, logically consistent, and should be approved,

25   and second, why DCG's objection to the setoff principles is

Page 128

 1    meritless, and I'd like to come back to those two points

 2    today, Your Honor, now that we have the benefit of the

 3    arguments and evidence educed during the confirmation

 4    hearing.  So, first, the setoff principles should be

 5    approved as part of the plan.  As the debtors stated in the

 6    plan supplement filed at Docket No. 1144, Page 2, the setoff

 7    principles are integral to and are considered part of the

 8    plan.  And as Ms. Vanlare covered in her remarks this

 9    morning -- this is on Page 13 of her presentation -- the

10    setoff principles are an exercise of the debtors' sound

11    business judgment and discretion, and there has been no

12    evidence presented that they were negotiated or proposed in

13    bad faith or with an improper motive.

14            And that's exactly right, Your Honor.  That's what

15    the evidence educed during the confirmation hearing has

16    shown, and in support of that statement, the debtors cite to

17    Mr. Sciametta's declaration, Paragraph 13, where he talks

18    about the setoff principles applying to the full universe of

19    creditors with net claims against the debtors' estate.  Mr.

20    Sciametta also testified at the hearing that the setoff

21    principles consistently apply petition date pricing to all

22    digital assets loaned by a setoff claimant to Genesis, all

23    digital assets borrowed by a setoff claimant from Genesis,

24    and all digital assets pledged as collateral by a setoff

25    claimant to Genesis.  And as explained in our client's

1    statement, and that's at Docket No. 1351, paragraphs 32 to

2    35, the bankruptcy code does not dictate a specific

3    valuation methodology to be applied here.  Instead, courts

4    have discretion to apply valuation methodology based on the

5    specific facts and circumstances of the Chapter 11 case.

6    And that discretion, Your Honor, is not disputed.  Not even

7    DCG disputes that that's the appropriate standard.

8              And here, for at least three reasons, the specific

9    facts and circumstances of these Chapter 11 cases support

10   the debtors' selection of the petition date as the proper

11   valuation date for the setoff principles.  First, using the

12   petition date to value each of Genesis's obligations, the

13   claimant obligations, and the collateral that Genesis is

14   holding on behalf of the setoff claimants is logically

15   consistent.  You're using the same date across the board;

16   there's no cherry-picking.  Second, the consistent use of

17   petition date pricing is also fair and equitable.  By using

18   the petition date pricing to value both the setoff claimants

19   and the debtors' mutual obligations, the setoff principles

20   distribute the substantial appreciation in the value of

21   cryptocurrency since the petition date to both the setoff

22   claimants on their alleged obligations to the debtors and to

23   the debtors' bankruptcy estates on their alleged obligations

24   to the setoff claimants.

25             And third, the debtors could have employed a

Page 130

1    number of different valuation methodologies that would have

2    allocated more of the appreciation in cryptocurrency to the

3    setoff claimants, and you heard this, for example, from Mr.

4    Sciametta, Your Honor, where he testified that if the

5    debtors had used current prices instead of petition date

6    prices to value the collateral pledged by the setoff

7    claimants to Genesis, then the result would have been higher

8    claims by the setoff claimants against the debtors' estates.

9    But the setoff principles don't do that.  Instead, they

10   represent a compromise that strikes a fair balance between

11   the setoff claimants and the debtors' estates.

12            To support approval of the setoff principles, Your

13   Honor, you also have in evidence the declaration of Mr.

14   Aronzon, which is filed at Docket No. 1330.  Mr. Aronzon,

15   who has over 40 years' experience as a lead restructuring

16   advisor, has served as an independent director on numerous

17   boards, testifies in his declaration that as a special

18   committee member he received regular and frequent updates

19   from the debtors' advisors, including Cleary and A&M,

20   regarding many topics, including the plan and claims

21   disputes.  That's in Paragraphs 2 to 3 and 8 of Mr.

22   Aronzon's declaration.  He testifies that based on his

23   experience and discussions with the debtors' advisors, Mr.

24   Aronzon believed the plan maximizes the value of the

25   debtors' estates and provides as meaningful a recovery and

Page 131

1     maximum in-kind distributions to as many of the debtors'

2     stakeholders as possible under the circumstances of these

3     Chapter 11 cases.  That's in Paragraph 9 of Mr. Aronzon's

4     declaration.

5          In Paragraph 10, Mr. Aronzon goes on to state that

6     the plan is the product of extensive good faith arms-length

7     negotiations for more than a year among the debtors and key

8     stakeholders, and implements various settlements on key

9     issues among not only the debtors and the committee, but

10    also the interests of various creditor groups.  Also in

11    Paragraph 10, Mr. Aronzon describes that the debtors, their

12    advisors and the special committee have worked tirelessly in

13    the Chapter 11 cases in an effort to maximize the value of

14    the estates, and in Mr. Aronzon's opinion, the plan

15    represents the best path available to expeditiously conclude

16    these Chapter 11 cases and maximize creditor recovery.

17         And finally, in Paragraphs 103 through 105 of Mr.

18    Aronzon's declaration, he explains why the plan has been

19    proposed in good faith under Section 1129(A)(3) of the

20    bankruptcy code.  Mr. Aronzon states:  "I believe the plan

21    was proposed in good faith with the legitimate and honest

22    purpose of maximizing value of the debtors' estates."

23    That's Paragraph 103, and in Paragraph 104, he again

24    describes the months of good faith, arms-length negotiations

25    with a wide assortment of parties in interest that

Page 132

1    ultimately led to the filing of the plan.

2                THE COURT:  So, let me ask you from your

3    understanding of the evidence what evidence is there, if

4    any, on the other side of the equation in terms of the

5    setoff principles.

6                MS. MOSSE:  None.

7                THE COURT:  All right.

8                MS. MOSSE:  So, that's -- that's exactly what I

9    was just going to say, and Mr. Aronzon's testimony, Mr.

10   Sciametta's declaration, directly refutes DCG's baseless

11   assertion in its confirmation objection and in its opening

12   statements that the setoff principles were proposed in bad

13   faith and in breach of the debtors' fiduciary duties.  DCG

14   had the opportunity and did cross-examine Mr. Aronzon

15   extensively.  They did not ask him a single question about

16   the setoff principles, notwithstanding their accusation that

17   they were proposed in bad faith.  There is no evidence, Your

18   Honor, in the record from which the Court could conclude

19   that the debtors breached their fiduciary duties in

20   connection with the setoff principles, and this goes to the

21   second point that I addressed during the opening, Your

22   Honor, which is that DCG's objection to the setoff

23   principles is meritless.

24               And I will say, Your Honor, that to the extent

25   that others parties, as you heard, have made standing

Page 133

1    objections to DCG's objection, to the extent that DCG lacks

2    standing to object to the plan, it would obviously equally

3    lack standing to object to the setoff principles, which are

4    an integral component of the plan.  But DCG's position with

5    respect to the setoff principles is that rather than

6    consistently applying petition date pricing to both the

7    debtors' and the setoff claimants' obligations, only the

8    setoff claimants obligations to the debtors should be valued

9    using current pricing, while the debtors' obligations to the

10   setoff claimants should be valued using petition date

11   pricing.  Unsurprisingly, given DCG's overall efforts to

12   siphon value away from innocent creditors and into its own

13   pockets, DCG's valuation methodology is extremely

14   unfavorable to the setoff claimants and beneficial only to

15   DCG.

16          And we heard a lot about DCG's misconduct during

17   the course of the hearing.  I said this during my opening,

18   Your Honor.  Regardless of how DCG's misconduct is

19   ultimately adjudicated, DCG should not be permitted to

20   profit from these Chapter 11 cases to the detriment of

21   innocent creditors.  By selecting the current price as the

22   date to value only the claimant obligations to the debtors,

23   DCG would have the setoff claimants' payment obligations to

24   the debtors increase substantially, given the substantial

25   appreciation in the value of the digital assets since the

Page 134

1    petition date.  And similarly, by selecting the petition

2    date as the date to value the setoff claimants' collateral

3    held by Genesis and the setoff claimants' loans to Genesis,

4    which are the debtors' obligations to the claimants, DCG

5    would have the debtors' payment obligations to the setoff

6    claimants be substantially lower than if current pricing

7    were used.

8         DCG has no legal authority to support this unfair

9    valuation approach.  Instead, what it did during its

10   opening, again, without any support educed during the course

11   of the hearing, is that it attempts to impugn the integrity

12   of the debtors and of the setoff claimants, including our

13   clients, by arguing that the debtors simply acquiesced to

14   creditors' demands and gave certain creditors a windfall

15   when agreeing to the setoff principles.  That is not true

16   and there is no evidence to support that.  Had the debtors

17   simply acquiesced to creditor demands, the setoff claimants'

18   claims could have been much higher.  They are not, under the

19   setoff principles.

20        And I'd like, with the Court's indulgence, to use

21   a simple example and then I'll be done, to show the

22   absurdity of DCG's position.  So, if you assume that, Your

23   Honor, before the petition date a setoff claimant loaned one

24   Bitcoin to Genesis, borrowed one Bitcoin from Genesis, and

25   pledged one Bitcoin to Genesis as collateral, so that

Page 135

1    claimant would have a claim against Genesis for two Bitcoin

2    and Genesis would have a claim against the claimant for one

3    Bitcoin.  If you use DCG's approach, the setoff claimant

4    would receive approximately $21,000 in value, which was the

5    petition date price of the one Bitcoin, on account of its

6    loan to Genesis; would get approximately $21,000 in value on

7    account of the one Bitcoin it pledged as collateral to

8    Genesis, so the creditors' claim against Genesis would be

9    approximately $42,000.  At the same time, under DCG's

10   approach, the setoff claimant would be required to pay

11   Genesis over $68,000 in value, which is the current price of

12   one Bitcoin.

13        So, even though the creditors' claim against

14   Genesis is for two Bitcoin and Genesis's claim against the

15   creditor is only for one Bitcoin, under DCG's approach the

16   setoff claimant would get none of the appreciation in the

17   value of the Bitcoin and would instead owe about $26,000 to

18   Genesis.  Conversely, under the setoff principles'

19   consistent use of petition date pricing, the claimant in

20   that example would have a net claim against Genesis for

21   21,000 -- the $42,000 worth of its two Bitcoin, minus 21,000

22   worth of the one Bitcoin, which obviously makes perfect

23   sense given that Genesis only loaned one Bitcoin to the

24   setoff claimant and the setoff claimant had a claim for two

25   Bitcoin against Genesis.  The setoff claimant in the

Page 136

1   example, Your Honor, is not getting a windfall just because

2   it gets more under the setoff principles' consistent use of

3   petition date pricing than under DCG's lopsided approach.

4   There is no basis for treating an innocent creditor in the

5   illogical and unfair manner that DCG proposes.

6          In sum, Your Honor, the evidence shows that the

7   setoff principles are a sound exercise of the debtors'

8   business judgment and DCG has provided no evidence to the

9   contrary.  For all of the reasons I've outlined today and

10  for those set forth in our client's statement in support of

11  confirmation, we respectfully ask the Court to confirm the

12  plan in its entirety, including the setoff principles.

13  Thank you, Your Honor.

14          THE COURT:  Thank you very much.

15          MR. DREW:  Good afternoon, Your Honor.  James

16  Drew, from Otterbourg, on behalf of SOF International.  Very

17  briefly, Your Honor, my objection to the plan has been

18  resolved, so I just wanted to for the voters' sake just make

19  a couple of statements.  First of all, the two statements

20  that Gemini counsel read into the record earlier were

21  acceptable and I appreciate him doing that.  Second of all,

22  I understand that the debtors will be adding a provision in

23  the confirmation order stating that any Gemini settlement

24  will be subject to this court's approval on notice of

25  hearing to Gemini lenders, so that also was appreciated.

Page 137

1    So, with that, SOF is supportive of the plan.

2              THE COURT:  All right.  Thank you very much.  All

3    right, any other party in support of the plan?  All right.

4    So, I believe DCG is up.

5              MS. LIOU:  Your Honor, Jessica Liou from Weil,

6    Gotshal & Manges on behalf of DCG.  We would propose that we

7    actually break for lunch.  It seems like an opportune time

8    to do that, given that it's almost 1 o'clock.

9              THE COURT:  Well, I can't quite gauge exactly how

10   far we're in or we're not, so as a friend of mine who ran

11   the marathon said, "I'm not running to the end.  I'm just

12   running away from the beginning."  So, I do want to -- do

13   want to chat briefly about what schedule makes sense.  I'm

14   open to whatever you all agree upon; I'll wait.  My thought

15   is, again, I don't know how long your presentation's going

16   to be and what kind of rebuttal, and I'd rather just have a

17   sense of how to handicap that.

18             MS. LIOU:  Sure.  Your Honor, just for our

19   information, how long do you have today?

20             THE COURT:  Well, I didn't think we were going to

21   go past 5:00.  It seemed to be beyond the pale, so that's

22   what I was game planning.  So -- (indiscernible discussion)

23   So, here's -- I don't think anything since the break has

24   materially altered the kind of arguments you're going to

25   have.  I think -- I don't think there have been any

1    surprises, so I would propose we just go ahead, just -- it's

2    just easier to handicap once we've put as much mileage in

3    the rearview mirror as we can.  Absent everyone holding

4    hands and suggesting something, but --

5              MS. LIOU:  Okay, that's fine with us, Your Honor,

6    but we would request we take a short ten-minute break.

7              THE COURT:  Well, we just --

8              MS. LIOU:  We just heard several hours of oral

9    argument and I'd love to --

10             THE COURT:  Let's go.  Come on.

11             MS. LIOU:  Okay.

12             THE COURT:  Podium.  Let's go.

13             MS. LIOU:  I do need to use the restroom, but okay

14   --

15             THE COURT:  Again -- okay, restroom's fine.

16             MS. LIOU:  Yes.

17             THE COURT:  I'll be back in five minutes.

18             MS. LIOU:  All right.  Okay, thank you, Your

19   Honor.

20             (Recess)

21             THE COURT:  Good afternoon, please be seated.  All

22   right, and again just to reiterate I'm not trying to give

23   anybody a hard time and certainly not trying to deprive

24   anybody of a restroom break, just the longer I do this job

25   if you haven't gotten through kind of the significant event

Page 139

```
1    in the morning, you know, I don't know how we'll end up

2    going over, but it just -- I've just seen it happen too many

3    times.  So, that's why I want to put as much -- make as much

4    progress as we can before we break.  So, with all that said,

5    Counsel please proceed.

6                MS. LIOU:  Thank you, Your Honor, Jessica Liou

7    from Weil, Gotshal & Manges on behalf of DCG.  And I do want

8    to thank you very briefly for the bathroom break, it was --

9                THE COURT:  Sure, absolutely.

10               MS. LIOU:  -- very helpful.

11               THE COURT:  You should never have to thank me for

12   that.

13               MS. LIOU:  It's the side effect of staying

14   hydrated in this courtroom.  So, I did want to say that I

15   will be arguing the first portion of our plan objection and

16   then turning the podium over to my colleague, Mr. Furqaan

17   Siddiqui.  We've divided up the argument as follows.

18               I will address the plan's distribution principles

19   and how it violates section 1129(b), section 502(b), and the

20   best interest's test.  And that the plan proposes to

21   unlawfully pay post-petition interest on general unsecured

22   claims.  And my colleague, Mr. Furqaan Siddiqui, will

23   address DCG's remaining objections.

24               THE COURT:  All right, proceed.

25               MS. LIOU:  So, Your Honor, you've heard a lot of
```

1    arguments this morning already leading into the afternoon,

2    but I do want to start by paraphrasing Judge Restrepo in the

3    3rd Circuit's recent decision FTX.  Sometimes highly complex

4    cases give rise to straightforward issues.

5            And here, the very straightforward question, the

6    key question for this Court is what is its lone star in

7    evaluating and confirming this plan?  We posit that it's the

8    bankruptcy code.  And to steal a quip from Mr. Shore it's

9    the code, the code, and the code, and nothing but the code.

10           Now, the Debtors have a different perspective as

11   do the other plan supporters.  In their view the overarching

12   goal that this Court should be trying to achieve is to

13   distribute all the digital assets of the estate and its

14   value to the digital asset Creditors.  And in this pursuit

15   the ends effectively justify the means.

16           But here the Debtors bear the burden of proof to

17   demonstrate under section 1129(b), 1129 generally, the plan

18   is fair and equitable to the nonconsenting junior claimants

19   and equity by satisfying the absolute priority rule and its

20   correlate-ity (sic).

21           Section 1129(b)(2)(b)(1) plainly provides that a

22   plan must provide each holder of a claim of such class that

23   they receive or retain on account of such claim property of

24   a value as of the effective date of the plan equal to the

25   allowed amount of such claim, equaled to the allowed amount

Page 141

1    of such claim.

2         What constitutes the allowed amount of a claim is

3    well settled law.  Section 502(b) of the bankruptcy codes

4    says a Creditor cannot receive more than the value of its

5    claim in US dollars on the petition date.

6         THE COURT:  So, let's sort of cut to the chase.

7    The argument that I've heard is that there are unsecured

8    listed for the subordinated governmental Creditors whose

9    claims are unobjected to, so they have allowed claims for

10   purposes of distribution and that those claims far dwarf any

11   remaining value.  So, I guess that's a sub standing, whether

12   you call it a standing, but it's applying the principles of

13   paying Creditors their allowed claims.  So, what's your

14   response to that argument that that leaves DCG out of the

15   money?

16         MS. LIOU:  Your Honor, I would say that it

17   doesn't, that's incorrect for a number of reasons.  Standing

18   as you know is interpreted very generously requiring only

19   that plaintiff identifies stake in the outcome of the

20   litigation.  I think it's very clear and apparent from the

21   record of these proceedings and the active negotiations and

22   also later on objections filed by DCG that we very much

23   believe that we have a stake in the outcome of the

24   litigation.

25         THE COURT:  But standings more specific than that,

Page 142

1    right.  There's different kinds of standings --

2          MS. LIOU:  There are different kinds.

3          THE COURT:  -- and different kinds of issues,

4    right.  So, I don't think anybody begrudges -- well, they

5    may begrudge but DCG has a right to talk about its corporate

6    governance rights and what rights it has as an equity holder

7    and post confirmation and all those things.  And so, I

8    haven't heard anyone raise standing on that.

9          I've heard parties raise standing in connection

10   with the significant amount of subordinated claims that

11   exist that even once you discount for potential double

12   counting you end up with a big number, we've heard eight and

13   we've heard eleven.  And so, that's far in excess of any

14   value that the estate has by itself even before you pay

15   customers.

16         MS. LIOU:  Yes, Your Honor, I do want to address

17   that.  I'm going to address the two ways.  One is I do want

18   to ensure that folks are talking about the right legal

19   standard here.  Because yes there are several components to

20   standing.  But a lot of the recent case law including case

21   law in the 3rd circuit indicates that standing should be

22   interpreted very broadly and that in effect in bankruptcy

23   proceedings if you're a party in interest then you actually

24   do satisfy the requirements for standing.

25         But just to address the factual question that I

Page 143

1    think is what you're getting at, the parties here in the

2    record testimony demonstrates that none of the parties have

3    actually had an opportunity yet to evaluate those

4    governmental claims.  In fact, --

5              THE COURT:  But I have -- I look at what's allowed

6    -- I look at the record I have, right, and this case has

7    been around for a year and a half, so people have had time.

8    And your client has, consistent with its rights, decided to

9    object to certain things and not object to other things.

10   So, what am I missing?

11             MS. LIOU:  Well, just because a claim is deemed

12   allowed does not mean that it cannot be later objected to.

13   As Your Honor knows --

14             THE COURT:  But for purposes of -- do you have any

15   authority for the notion of assessing confirmation that I'm

16   supposed to basically leave that door open?

17             MS. LIOU:  Yes, absolutely, Your Honor.  If you

18   look at the cases for standing it's a very fact intensive

19   analysis.

20             THE COURT:  No, no, no, I'm asking for specific

21   question here about unobjected to claims for purposes for

22   what's allowed or not allowed for purposes of assessing the

23   question of standing.  That's a very specific -- again, what

24   I understand is the other side is saying the argument is

25   that I look at the record as of the confirmation hearing

Page 144

1    date and that that's what I look at for what's -- for

2    interpreting the various bankruptcy code provisions.

3              And so, what I'm hearing you saying is that's not

4    what I'm supposed to look at, that that door remains open.

5    So, I'm asking you what authority you have on that specific

6    question.

7              MS. LIOU:  Yes.  In fact, it's the authority that

8    the Debtors cite themselves and also, we also have separate

9    authority, just one second and I can hall it up, in

10   connection with In re Weinstein Company, 595 B.R. 455,

11   Bankruptcy District of Delaware 2018.  And also, --

12             THE COURT:  So, what is, let's take this one at a

13   time, what is the Weinstein --

14             MS. LIOU:  In re Global Industries Technologies,

15   Inc., 645 F.3d 201.  I mean, the gist of these cases, Your

16   Honor, is that we should not presuppose the outcome at any

17   given point and time.

18             THE COURT:  I'm not -- well, what do they say?

19   What's the holding of the case, that's what I just want to

20   know.  I haven't --

21             MS. LIOU:  Yep.

22             THE COURT:  I haven't looked at those for this

23   particular --

24             MS. LIOU:  Yes, Your Honor.  So, in that

25   particular case, let's start with Weinstein Company

Page 145

1    Holdings.  In that particular case there was a requested

2    determination that a bank claims and means under a

3    prepetition credit agreement and subsequent DIP facility

4    were invalid in whole or in part.

5              And the defendants moved to dismiss the complaint

6    arguing that facts were alleged sufficient to establish an

7    injury in fact to support standing to challenge the extent,

8    validity, and amount of the bank's secured claims.  There,

9    the bankruptcy court held that the court rejects the

10   defendant's assertion that the injuries effectively too

11   remote to give it standing because there are numerous

12   contingencies that must be met before it can recover, which

13   I think effectively what the arguments are here, Your Honor.

14   The question is not whether or not --

15             THE COURT:  How is that -- I'm not following how

16   that's the argument here.

17             MS. LIOU:  Yeah, the question is not for example

18   whether DCG will eventually succeed in disallowing --

19             THE COURT:  No, I'm asking about a much more

20   specific thing, I'm not asking about the ultimate result.

21   I'm asking about the question about what I evaluate for

22   purposes of the record of the confirmation requirements,

23   that's what I'm asking.

24             And so, I under -- and it sounds like that's a

25   litigation issue and there's lots of arguments among lots of

Page 146

1    parties about things and that's sort of similar to DCG's

2    filing, you know, an objection to a claim.  Say, well,

3    there's a lot of issues, Judge, you got to figure it out and

4    it's still an open question as to what the merits of all

5    that are.

6          But what I'm hearing from the other side,

7    correctly or incorrectly, is that Judge there is no such

8    contested issue.  There's nothing that DCG has had a chance

9    to throw its hat in the ring, but for whatever reason it

10   hasn't.

11         And I, you know, at a certain point it, I'm not

12   saying it doesn't matter to me why, but in a certain sense I

13   don't, it's very much a set of black of white on or off

14   issue whether DC has or DCG has, or it hasn't.  And what I'm

15   hearing from the other group of folks is they haven't and

16   therefore for purposes of the confirmation record that's

17   what you have.

18         MS. LIOU:  Your Honor, there are several responses

19   to that if I could actually --

20         THE COURT:  Sure.

21         MS. LIOU:  -- make my way through the several

22   responses.  So, the first is --

23         THE COURT:  But I -- what I'm trying to, I'm

24   sorry, this is the last time --

25         MS. LIOU:  Yeah.

Page 147

1           THE COURT:  -- on this, but I don't generalize

2      statements about we're involved is what I'm sort of --

3      that's not going to be helpful to me.  It's clear DCG has

4      been involved in this case and that's -- but that I'm asking

5      a much more specific question.  So, that's why I'm

6      interrupting.  So, please go ahead.

7           MS. LIOU:  Yes, I understand Your Honor, but I do

8      want to question the very underlying premise which is you

9      have to the deem allowed amount of the claims today to

10     determine whether or not DCG is out of the money.  I don't

11     actually think the case is that the Debtors or the other

12     plans the quoters cite actually support that principle.

13          What it supports is that in the cases that were

14     cited, Drexel and other case whose -- which name escapes me

15     at the moment, is that in those instances equity was

16     hopelessly out of the money and there was absolutely no

17     showing whatsoever that equity could ever be in the money.

18          Here I think the facts are demonstratively

19     different.  You have heard testimony that indicates that

20     there is the possibility of potentially recovering by DCG at

21     some point.  Now, the Debtors could not pinpoint exactly

22     when that would be, but they've admitted on the record that

23     there is that possibility.

24          In addition to that, they have maintained DCG as

25     an equity holder under their plan and their arguments to us

Page 148

1    and to this Court is that they've done so because there

2    existed every possibility that equity could actually recover

3    under this situation.  And as I noted before, there has also

4    been further testimony by Mr. Sciametta --

5              THE COURT:  Well, I'm sorry, you were an equity

6    holder, the question is whether you're going to recover

7    anything.  So, I don't know why you'd be not listed as an

8    equity holder.

9              MS. LIOU:  Well, if we were hopelessly out of the

10   money, Your Honor, and never had an opportunity to recover

11   under the plan, then equity would actually get canceled

12   under the plan like many other plans that exist for

13   insolvent Debtors.  Your Honor, we've also heard --

14             THE COURT:  But wouldn't your client object if

15   that's what the treatment was?  I mean, wouldn't it just be

16   another version of the argument we're having now and say

17   they can't cancel equity interest?

18             MS. LIOU:  Correct, because our view actually is

19   that the estate is solvent, Your Honor, right, by virtue of

20   502(b)'s cap on the value of the digital asset claims.

21   We've also had testimony in this case, Your Honor, as to the

22   facts that the liabilities of the Debtors are not yet fixed.

23   The Debtors are openly on the record objecting to multiple

24   claims here.  And yet, we also know and --

25             THE COURT:  And again, I'm sorry to interrupt you

Page 149

```
 1    but some of these things I'm not seeing.  That's -- there is

 2    always the confirm ensue.  I can't remember having a large

 3    case recently or maybe ever where there wasn't questions

 4    about liabilities that were going to continue after

 5    confirmation.

 6              MS. LIOU:  Correct, Your Honor.

 7              THE COURT:  And so, does that -- well, does that

 8    mean that you can't confirm the plans or what does that mean

 9    for the rules of the road?

10              MS. LIOU:  No, it just means that here there's a

11    substantial likelihood that the large liabilities in the

12    subordinated class actually could be objected to and

13    disallowed and ultimately reduced.  I mean, in the several

14    weeks since we've started this confirmation hearing alone

15    the numbers started from 32 billion, then it was reduced by

16    14.8 billion in the span of a day.  And now, it's gone even

17    further down to about 10 to $11 billion.  If we go another

18    couple of weeks, it may decrease to even more.

19              Your Honor, I also want to answer your question

20    about why DCG itself has not yet objected to these claims.

21    Indeed, and I think Mr. Saferstein noted this to you in his

22    opening, we actually do not have the information needed to

23    mount a credible objection to those claims.  And we've asked

24    for that information from the Debtors, however the Debtors

25    have not provided that.
```

Page 150

1           As you know, as an initial matter the claims

2    themselves were not all publicly available.  We received the

3    claims themselves, the proofs of claim as a part of the plan

4    discovery process.  And so, to the extent that we actually

5    are able to obtain the necessary books and records to object

6    to these claims we would be more than happy to do so.

7           Your Honor, I just want to go back to the point

8    about 502.  Notwithstanding about what you believe about

9    DCG's standing, which we assert that we do have standing

10   here to object, this Court has an independent duty to

11   determine that the plan satisfies all the requirements of

12   1129 including the requirement that it comply with absolute

13   priority rule and its corollary.

14           And that it complies with section 502(b).  It's

15   plain language.  Section 502 defines what portions of a

16   claim may be allowed, i.e., recoverable in bankruptcy.  The

17   plain language of that section provides, "the court after

18   notice and hearing shall determine the amount of such claim

19   in lawful currency of the United States as of the date of

20   the filing of the petition and shall allow such claim in

21   such amounts".

22           The case law unquestionably confirms that 503(b)

23   is mandatory.  Indeed, the word shall appears not just once,

24   but twice in this particular provision.  For example, in the

25   3rd circuit in the FTX Examiner case the court there said

Page 151

1     very obviously that shall means shall, it's a very

2     straightforward analysis.

3            And likewise, Judge Dorsey in FTX concluded the

4     same.  He, in the context of an estimation motion,

5     determined that the court has no discretion to declare

6     otherwise even in a crypto currency case.  And he stated, "I

7     conclude that the Debtors use of the petition date as the

8     date for determining the value of digital asset claims is

9     appropriate.  I have no wiggle room on that.  The code says

10    what it says, and I'm obligated to follow the code".  And he

11    had cited to extensive citations briefed in the many, many

12    objections that were interposed by parties in that case.

13           In addition, Your Honor, to address Mr. Shore's

14    argument that this is inapplicable or Ms. Vanlare's argument

15    that somehow this ruling is irrelevant, I'll note very

16    specifically that Judge Dorsey did not say I'm only

17    obligated to follow 502(b) of the code if the Debtor elects

18    to do so.  He determined that this was a mandatory provision

19    where he had no discretion.

20           Notably, the code draws no distinction as to

21    whether section 502(b) applies only if a Debtor is solvent

22    or insolvent, it applies all the time unless another express

23    provision of the code provides otherwise.  And indeed, this

24    has been the practice of decades of restructuring plans

25    proposed before this Court and other courts and decades of

Page 152

1    practice as indicated by testimony that we've already heard.

2            In over 841 pages of briefing filed, neither the

3    Debtors, UCC, or the AHG the ad hoc group represented by

4    some of the most experienced and sophisticated bankruptcy

5    and restructure counsel out there can point to a single

6    chapter 11 plan, including in the crypto currency context,

7    that has adopted the approach they're advocating here.

8            Even in the context of a liquidating crypto

9    currency platform of which there have been several, none of

10   their chapter 11 plans have proposed to give Creditors

11   anything other than dollarized petition date value of their

12   claims.

13           And collectively, the folks who have testified,

14   Mr. Aronzon at the transcript line 190 -- at page 193, line

15   23 to page 194, line 17, he has 40 years of experience and

16   was co-chair of Mill Bank's restructuring department.  And

17   he served as a professional restructuring independent

18   director and has proposed anywhere from 50 -- has been

19   involved in anywhere from 50 to 100 cases and has never seen

20   this departure from the norm of using petition day

21   evaluations.

22           Mr. Sciametta also testified in the transcript at

23   page 134 on February 27th that he's had 25 years of

24   experience acting as an advisor and has never seen any

25   approach other than petition date value being used to

Page 153

1    determine claims.  Mr. Geer likewise testified on February

2    27th, transcript page 194 to 195 that he's also had 25 years

3    of experience and agreed that claims are traditionally and

4    typically determined as of the petition date based on

5    petition date values.

6           What the Debtors are asking this Court to do is to

7    bless a radical departure from what the bankruptcy expressly

8    permits and from decades of well-established practice.  The

9    Debtors admit openly that they are unable or unwilling to

10   comply with the express provisions of the bankruptcy code

11   that would otherwise commit the Debtors to pay Creditor

12   claims in accordance with the terms of the loan agreements.

13          Number one, they cannot restate the loan

14   agreements because they do not satisfy the express

15   requirements under section 1124 of the bankruptcy code.

16   They acknowledge that openly, Your Honor, throughout the

17   record and even today in closing arguments.  They have also

18   acknowledged that they do not intend to assume the loan

19   agreements under section 365 of the bankruptcy code either

20   as they take the position that they are not executory.

21          And frankly, even if they were the Debtors would

22   be unable to pay the cure required to assume.  The Debtors

23   have openly admitted that the estate would derive no value

24   from actually assuming these agreements or performing in

25   accordance with their terms.  This is because the primary

Page 154

1    unperformed obligation remaining are obligations the Debtors

2    owed to third party Creditors.

3            The Debtors also do not believe that the claims

4    arising under the loan agreements are subject to section 562

5    safe harbor exception.  So, then, being unable or unwilling

6    to live within these express limitations in the bankruptcy

7    code, they ask the Court to create an entirely new, never

8    before seen doctrine unsupported by law that gives them

9    broad discretion to provide Creditors above and beyond what

10   section 502(b) limitations allow.  There is no name for this

11   principle, this unknown principle, but it really is a

12   Frankenstein doctrine cobbled together by the Debtors

13   selecting the best pieces of various legal doctrines, none

14   of which they are able to satisfy entirely.

15           And their argument to you, Your Honor, is that you

16   should exercise your discretion sitting in a court of equity

17   to authorize the Debtors to exercise their discretion to

18   give away all the surplus value in the estate without basis

19   in the code or low to a specific group of Creditors it

20   determines in its discretion should receive that value.

21           And to be clear, because the Debtors themselves

22   have made this clear, the Debtors are not truly distributing

23   assets in kind.  What they are doing is redistributing the

24   existing assets of the estate to a approximate what they and

25   the Creditors have unilaterally determined to be

Page 155

1     appropriate.

2                Indeed, the distribution principles expressly say

3     that they may distribute in kind, they may distribute like

4     kind, or they may distribute nothing of the kind, it's

5     really up to them.  And apart from the guardrails the

6     Debtors and Creditors establish for themselves, the

7     traditional guardrails provided by the bankruptcy code have

8     been discarded.  They argue that fairness and equity demand

9     this outcome --

10               THE COURT:  Well, I -- as I understand it, the

11    guardrail is the contractual obligations.  So, again, I

12    would agree with you about -- I always say I don't magic

13    equity wand, but what I'm hearing is that there's a way to

14    measure what the contractual obligations are if you talk

15    about in kind crypto currency that owed and that that is the

16    cap on recovery.  Does your client believe that there's more

17    that's being given than that contractual return?

18               MS. LIOU:  No, Your Honor, but more is being given

19    than the cap provided under 502(b) and that is problematic

20    from a confirmation perspective.

21               THE COURT:  Well, they cite a couple of things.

22    One of which is there's some discussion of solvent Debtor

23    and that there's case authority for less than fulsome

24    reinstatement, so I'd appreciate your thoughts on either of

25    those.

Page 156

1              MS. LIOU:  Yeah, sure, Your Honor.  We've actually

2     taken a look at the case on the less than full reinstatement

3     or reinstatement light as Mr. Shore calls it.  And in fact,

4     in that particular case there were creditors who entered

5     into individual settlements regarding the treatment of their

6     contracts and consented to waivers under those agreements in

7     order to have those agreements reinstated.

8              I will note that in that particular situation

9     there was no objection mounted by any other party to that

10    proposed treatment for quote/unquote "settlement of issues

11    under the plan".  And so, therefore, I do not actually think

12    that that's a very informative example and applicable to a

13    case where there would be an objection raised.

14             Indeed, I would also posit that that is not the

15    correct approach under the law.  1124 requires that in order

16    to reinstate you have to satisfy very specific standard.

17    And the case law elsewhere in other context exists very

18    explicitly to say that you cannot use a procedural rule like

19    rule 9019 in settlement to insulate yourself from complying

20    with other express provisions of the bankruptcy code itself.

21             You seen this in cases in the context of rule

22    60(b) and whether or not a post-consummation plan

23    modification can be made.  And the case law is incredibly

24    clear and unanimous that you cannot do that.  You cannot use

25    a procedural rule to get around the express bankruptcy code

Page 157

1    requirements.

2         In addition, I will address the solvent Debtor

3    exception.  I do want to start with first that the Debtors

4    and Creditors main argument is that the estate actually is

5    not solvent.  And if the estate truly is not solvent than

6    the solvent Debtor exception does not apply.  I think that's

7    fairly obvious.

8         Second, if the state -- if the estate is solvent

9    and the solvent Debtor exception did apply equitable

10   principles cannot excuse or waive the application of express

11   code language.  I think Judge Walrath in Delaware when she

12   analyzed the similar in Hertz's restricting.  See Judge's

13   Walrath's decisions in, in re Hertz, 637 B.R. 781.

14        There in asserting the prepetition note holder's

15   claim to make whole redemption premium in post-petition

16   interest, the indentured trustees argued that section

17   502(b)(2) and section 502(b)(6) were distinguishable.  They

18   asserted that section 502(b)(6) imposes an absolute cap on a

19   landlord's claim while 502(b)(2) is not absolute and in fact

20   is not effective where the Debtor is solvent.

21        Judge Walrath held the court finds the distinction

22   elusory.  Section 502(b) addresses the allowance of

23   claimants, and the indentured trustees are completing the

24   allowing of claims with the treatment of claims.  If one

25   considers only the allowance issue, the court concludes that

Page 158

1   section 502(b)(2) has absolute as section 502(b)(6) because

2   it disallows all unmatured interest on general unsecured

3   claims.

4           However, those sections do not reinstate the

5   Creditors contract or state law rights to unmatured interest

6   that has been disallowed by section 502(b)(2).  Instead, as

7   discussed below further in her decision sections 112907 and

8   72685 require the treatment of claims in accordance with the

9   mandates of those sections.

10          In sum, she held section 502(b)(2) expressly

11  disallows claims of unsecured Creditors for unmatured

12  interest.  When the Debtor is solvent the bankruptcy code

13  does not waive the application of section 502(b)(2).  I

14  think that holding similarly applies here in the context of

15  502(b)(2) more broadly.

16          Second, the second -- the solvent Debtor exception

17  has only ever been applied to the question of whether to pay

18  post-petition interest on an allowed general unsecured claim

19  and at what rate in a solvent Debtor case.  It have never,

20  never, ever been applied to determine the amount of the

21  allowed general unsecured claim itself, see EG, the Ultra

22  decision, PG Lee, and also the Hertz decision.

23          This makes sense as the solvent Debtor exception

24  is an exception to the general rule that once creditor

25  claims are fixed as of the date a debtor files for

Page 159

1    bankruptcy, they do not accrue interest.  To adopt the

2    Debtor's UCC and (indiscernible) views to expand the solvent

3    Debtor exception beyond its existing limits, it would be an

4    extraordinary application indeed of the Court's equitable

5    powers.

6           Lastly, the great irony here of course is that the

7    solvent debtor exception is a judge made equitable exception

8    that itself rises because of the immutable principle that

9    creditors' claims are fixed as of the petition date.  Your

10   Honor, we would argue that section 502(b) demands that

11   unless otherwise expressly provided in the bankruptcy code,

12   claims must be capped in US dollar value as of the petition

13   date.

14          And indeed, as you've heard, there have been no

15   credible arguments mounted by opposing counsel on the other

16   side to support a view otherwise.  Pardon me, Your Honor,

17   while I just ensure that I've covered all of the key

18   arguments.

19          Lastly, Your Honor, I do want to say that I know

20   that this is not an easy decision for the Court to make in

21   the sense that -- in the sense that there is a concern about

22   the impact to the Creditors here in the Genesis case.

23   However, sometimes the Court is called upon to make very

24   difficult decisions, decisions that may be deemed by many to

25   be viewed as inequitable.  But it is the right decision

Page 160

1    because it's a decision that the code demands.

2            And I'd like to point to a recent decision by

3    Judge Silverstein in the Boy Scouts case where she there

4    denied a creditor motion seeking an order permitting the

5    revocation of the prior ballot election of an expedited

6    distribution treatment, which then entitled the Creditors to

7    an expedited payment of $3,500 under the terms of the

8    chapter 11 plan.

9            The effect of this election was that these

10   Creditors ended up missing out on thousands, if not millions

11   of dollars' worth of distributions under the plan.  But

12   Judge Silverstein recognized even though it was a harsh

13   result and that the circumstances were unfortunate the harsh

14   outcome did not permit her to ignore the plan or law

15   regarding a Creditor's right to amend the plan.

16           Here Your Honor, it is a similar situation.  It is

17   a difficult outcome for sure, but the code is the code is

18   the code.  And 502(b)(2) is mandatory and the Court must

19   apply it as it exists.

20           THE COURT:  So, let me ask you about an ongoing

21   discussion, well, this issue's been talked about, and it has

22   to do with the settlement.  And so, what -- if I approve the

23   settlement what it means or it doesn't mean, and people have

24   been talking about what various people think it means and

25   then as well as what various other people have said that

Page 161

1    they think it means.  And so, let me just hear from you

2    directly what, if anything, you think it if it has an impact

3    on the confirmation issue.

4            MS. LIOU:  Your Honor, I think the impact on the

5    plan is going to be primarily driven by what you decide on

6    502(b).  And so, if what you're asking is you decide in our

7    favor on 502(b) you sustain our objection and yet you

8    approve the New York AG's settlement with the Debtors, our

9    position on that would be, number one, we would disagree

10   that the law actually allows you to approve that settlement.

11           But number two, that the plan is unconfirmable on

12   its face and accordingly we would need to, as Ms. Vanlare

13   indicated, to start from scratch, develop a new plan, and

14   resolicit votes on that new plan.  And I would -- I would

15   not put it beyond the pale, Your Honor, that with the

16   guidance provided by this Court the parties could almost

17   surely with that guidance reach a result that lives within

18   that guidance.

19           THE COURT:  Well, do you -- I asked the other side

20   questions about the economics of it because again the New

21   York AG's Office I think has been consistently clear in

22   saying their view of their claim and what they've decided to

23   settle for is restitution as measured by the contractual

24   obligations owed to these customer victims, in their view.

25   And so, what does it mean in your view as to the economics

Page 162

1    if the settlement is approved and just putting aside the

2    plan for the moment?

3            MS. LIOU:  So, Your Honor, I again I don't

4    actually believe that the economics of the settlement can be

5    approved as is because --

6            THE COURT:  Well, we're not here to reargue that,

7    we argued that so I'm making -- I'm asking you to make the

8    assumption.

9            MS. LIOU:  That it is approved notwithstanding

10   that you would rule in our favor on 502(b)?

11           THE COURT:  No, I'm asking --

12           MS. LIOU:  I'm con -- Yeah.

13           THE COURT:  So, let me invite you into my world.

14   I have a lot cases and I have a lot of motions and I have a

15   lot of things to do.  And so, I do them in a particular

16   order, sometimes that order's debatable and not clear.  But

17   since I have all you nice smart people here, I'm trying to

18   figure out the gigantic game of Tetris that all judges try

19   to figure out in terms of moving things forward.

20           So, I'm asking you to assume that if I went ahead

21   and decided to approve the settlement, what does that mean

22   or not mean for purposes of your confirmation objection?

23   That's my question.

24           MS. LIOU:  For purposes of our confirmation

25   objection --

```
 1                THE COURT:  Yes.

 2                MS. LIOU:  -- it continues to stand as it is

 3      today.

 4                THE COURT:  So, it wouldn't change it.

 5                MS. LIOU:  It's not moot.

 6                THE COURT:  It wouldn't change anything?

 7                MS. LIOU:  Yes, it is not, and I want to make that

 8      very clear because there was some suggestion by Mr. --

 9                THE COURT:  Well, there was some statement by

10      somebody at your firm --

11                MS. LIOU:  Well, --

12                THE COURT:  -- that seemed to indicate something

13      different and --

14                MS. LIOU:  Well, if you actually look a couple of

15      pages later there's an actual express statement and I can

16      actually pull it up --

17                THE COURT:  No, no, I --

18                MS. LIOU:  -- if you would like me to, --

19                THE COURT:  I don't --

20                MS. LIOU:  -- that says we are not waiving our

21      plan objection.

22                THE COURT:  All right.  So, it changes nothing?

23                MS. LIOU:  Yes, correct.

24                THE COURT:  All right, thank you.  That was the

25      only question I had.  Anything else you wanted to add,
```

Page 164

1        Counsel?

2                MS. LIOU:  No, Your Honor, other than we would

3        respectfully request that you sustain our objection.

4                THE COURT:  Okay, thank you.

5                MS. LIOU:  Thank you, Your Honor, I'll turn it

6        over to Mr. Siddiqui.

7                MR. SIDDIQUI:  Good afternoon, Your Honor, Furqaan

8        Siddiqui of Weil, Gotshal & Manges on behalf of DCG.  Today

9        I'm going to present to Your Honor the various reasons why

10       the Debtor's plan has not been proposed in good faith mainly

11       through the structural preclusion of any practical

12       possibility of recovery for DCG, the calculated inclusion of

13       value-distorting provision such as the Setoff Principles,

14       and the stripping of DCG's equity rights while maintaining

15       DCG as a sole equity holder of GGH post effective date.

16               THE COURT:  So, just to make life easy I

17       understand the arguments about where the excess value should

18       go, right.  I know you made the argument that that's bad

19       faith.  I frankly my initial inclination it's people arguing

20       about what's proper and not proper and, but I understand

21       your argument that that also does double duty as bad faith.

22       So, I don't know if there's a whole lot more to say about

23       that particular question.  But I am interest in anything

24       else that you wanted to address.

25               MR. SIDDIQUI:  Yeah, Your Honor, I mean that's

Page 165

1    sort of, you know, where a lot of this emanates from, right?

2    That, you know, one of core tenants of the bankruptcy

3    confirmation is that a plan must be posed in good faith and

4    not by any means forbidden by law.  Here, you know, the good

5    faith requires that, you know, that --

6            THE COURT:  Well, but I think that's what the

7    bankruptcy code says.

8            MR. SIDDIQUI:  Yeah, yeah, yeah.

9            THE COURT:  If it's privative by law and you say

10   well you can't do that and you say can't do that.

11           MR. SIDDIQUI:  Right.

12           THE COURT:  I don't know that every disagreement

13   about whether the code allows you to do something or not

14   turns into a bad faith discussion particularly because

15   whether you agree with it or not, whether I agree with it or

16   not, I think the explanation has been given that they're,

17   the Debtors, are trying to repay customers in kind.  So,

18   which frankly doesn't seem to be a particularly nefarious

19   goal whether or not it's permitted under the code of 502 and

20   all those things is a different question.

21           MR. SIDDIQUI:  Right, yeah, Your Honor.  I don't

22   think that we would, you know, we're sort of lodging any

23   sort of nefarious accusation, it's more so just complying

24   with the bankruptcy code and sort of looking at that in

25   light of the fact that fiduciary duties are owed to the

Page 166

1    estate as whole, right, not just creditors, but also equity

2    holders and you know other stake holders as well and parties

3    in interest.

4          And the amended plan that's before you today, Your

5    Honor, does not consider the rights or interests of DCG

6    whatsoever.  You know, not just through the distribution

7    principles, but also through various other provisions that

8    I'll walk through today.  So, Your Honor, if I may I'm happy

9    to actually just go straight, you know, --

10         THE COURT:  Yeah, please.

11         MR. SIDDIQUI:  -- to the other sections.  All

12   right.  So, starting off with the Setoff Principles.  Your

13   Honor, the Debtors propose Setoff Principles which are

14   attached as Exhibit M to the plan supplement at docket

15   number 1144, artificially depress the value of the estate's

16   assets while inflating select Creditor's claims.  And in

17   effect they forgive significant portions of the Debtor's

18   claims against only a certain number of Creditors.

19         THE COURT:  So, what's the standard I'm supposed

20   to apply in assessing set up principles?

21         MR. SIDDIQUI:  So, Your Honor, it, you know, I

22   think the counsel for Mr. Gorisse was actually right in that

23   it actually is somewhat discretionary, however, when there's

24   a fundamental course on principle here that chapter 11

25   Debtors typically follow and it's the idea that you maximize

Page 167

1    the value of the estate and through these Setoff Principles

2    it very apparent in the numbers themselves that the math --

3    that the Debtors are actually minimizing the value of the

4    asset -- of the estate's assets and maximizing claims

5    against the estate.

6           THE COURT:  But in terms of exercising discretion

7    the argument is made that I'm being asked to take heads you

8    win, tails I lose kind of approach to say even though we're

9    talking about the same asset, I'm going to value it one date

10   for these things and another date in the context of the

11   assets.

12          So, somebody who invested two bitcoins to the

13   prior example suggested it's going end up, you know, in a

14   much worse situation.  So, while I know there's been a lot

15   of discussion about how I'm not entitled to consider

16   equitable principles in lots of other context, I think

17   everybody seems to think that that's the test here.  So,

18   what's your response to that kind of argument that's been

19   made about it being an unfair way to view it?

20          MR. SIDDIQUI:  I mean, Your Honor, that's just

21   sort of, I think, just how bankruptcy works, right?  The

22   chapter 11 Debtor has 502(b).  As of the petition date the

23   claims are capped, as we argue claims are capped as of the

24   petition date.  The amount that is Setoff, the counter party

25   has in terms of its claim against the Debtor is as of the

Page 168

1    petition date.  The Setoff counter party is not a chapter 11

2    Debtor.

3              So, it's unclear why they would be able to utilize

4    section 502(b) to cap their claims as of the petition date

5    when, you know, under the current plan the Debtors don't

6    seem to be doing that either when you look at it conjunction

7    with the distribution principles.

8              And Your Honor, if I may, I mean it's actually not

9    -- it's actually even inconsistent with the way the Debtors

10   have valued other digital asset loan receivables.  If you

11   may recall, you know, DCG and DCGI have certain year term

12   loans that were due to GGC that were paid off as of January

13   5th.  A good portion of those loans were actually in BTC,

14   and the Debtors sought, you know, an -- or commenced an

15   adversary proceeding before Your Honor, which I believe to

16   be --

17             THE COURT:  Do I have that in front of me?  I

18   don't know that I --

19             MR. SIDDIQUI:  I think it's at -- what's the

20   adversary proceeding, 23 --

21             THE COURT:  No, I'm saying in terms of arguments,

22   I'm just trying to -- I'll look later, never mind, sorry.

23             MR. SIDDIQUI:  Okay, yeah.  I mean, Your Honor,

24   the point that I'm trying to make is that, you know, DCG

25   owed or DCGI to be specific owned GGC, BTC, and estate had

Page 169

```
1    that as an asset, that loan receivable.  And the estate did

2    not seek nor did DCGI repay the BTC value as of the petition

3    date.  So it's unclear why the Debtors would now be seeking

4    the petition date value of claims that it has against other

5    setoff counterparties.  And it's just -- not only is it

6    inconsistent with the way that they've acted in this case

7    with respect to other parties and other digital asset loan

8    receivables, but it sort of kind of turns the concept of

9    setoff valuation upside down because it's benefitting a

10   select few influential creditor groups.

11             THE COURT:  Well, but let me ask.  Was there any

12   objection to that?  Again, courts are not -- parties reach

13   lots of conclusions and make lots of determinations and a

14   debtor-in-possession does a lot of things.  Was that issue

15   raised at the time?

16             MR. SIDDIQUI:  You mean by either parity?

17             THE COURT:  By anyone.

18             MR. SIDDIQUI:  Right.  I mean, Your Honor, I don't

19   think that we thought, you know, in our wildest dreams that

20   we could actually pay the Debtor petition date value of BTC.

21   And that's why we were actually also pretty surprised that

22   it's --

23             THE COURT:  Well, I guess my thought is no one is

24   asking you to opine about it.

25             MR. SIDDIQUI:  Yeah, yeah, of course.  I'm just
```

Page 170

1    showing sort of inconsistent sort of, you know, valuation

2    methodologies within this case itself.  Right?  I mean, I

3    think the general point is that Chapter 11 debtors have a

4    duty to maximize the value of the estate, and they can use

5    all the tools in Chapter -- under the Code in their arsenal

6    to do so.  And when it comes to the setoff principles, it

7    seems like they are doing the opposite.  They are minimizing

8    the value of the estate's assets and maximizing the value of

9    claims against them.  And it's for a select group of 21

10   creditors whose names are conveniently redacted.  And it

11   provides about a $288 million windfall to those select few,

12   which actually could go to the general -- the rest of the

13   general unsecured creditor body, hopefully including equity.

14           So with that, Your Honor, we just would like to

15   sort of -- we would request that this Court not approve the

16   setoff principles attached as Exhibit M to the proposed plan

17   for the reasons set forth in our papers and on the record

18   today.

19           THE COURT:  All right.

20           MR. SIDDIQUI:  Next, Your Honor, I would like to

21   go on to the voting rights and the way that the Debtor's

22   plan impermissibly cuts of DCG's voting rights despite the

23   fact that DCG will continue as a sole equity holder of GGH

24   post-effective date.

25           Specifically the plan provides that DCG shall have

Page 171

1    no economic interest, voting interest, or right to

2    influence, direct, or otherwise control GGC or its

3    subsidiaries, nor shall it have a right to transfer its

4    interests in GGH.

5         Now, not only does this violate the Bankruptcy

6    Code, but also violates applicable Delaware law.  As is

7    commonly known, traditional shareholder corporate governance

8    rights are not impacted by the pendency of a Chapter 11

9    case.  In fact, Delaware state law, which is applicable

10   here, Recognizes that the fundamental governance rights

11   possessed by shareholders is the ability to vote for

12   directors that the shareholder wants to oversee the company.

13        THE COURT:  So what are we actually talking about

14   in the context of a liquidating debtor?

15        MR. SIDDIQUI:  Well, Your Honor, I mean, typically

16   you'll have liquidating debtor's plan -- full-on

17   extinguishment of an equity holder's rights and the full-on

18   extinguishment of equity.  Right?  But over here we are

19   being -- we are --

20        THE COURT:  But if that's the norm, isn't this

21   Debtor -- I mean, is this any different than the norm?  I'm

22   just -- again, I heard somebody earlier say that, that the

23   rights weren't -- that you would normally expect to see an

24   extinguishment of rights, and then I think I responded.  But

25   then I think I'd seen objection.  And so I'm not quite

Page 172

1    understanding if that's what's normally and how I'm supposed

2    to understand the objection as to this particular provision,

3    which seems to be, while you're not happy with it, seems to

4    be less draconian than what's normally included in a

5    liquidating plan.

6            MR. SIDDIQUI:  Well, I think it also comes down to

7    sort of -- you know, if the Debtor is sort of hopelessly out

8    of the money and equity is being extinguished, then

9    obviously the rights would naturally follow in terms of

10   being extinguished.  But here, A, I think we're arguing

11   today that we're not hopelessly out of the money.  In fact,

12   it's our position that the Debtor is solvent.  But

13   regardless, the plan before you today, the Debtor is keeping

14   DCG on as the sole equity holder of GGH, but it's stripping

15   all of its rights while keeping it on for -- you know, it's

16   almost like cherry-picking to take advantage of certain tax

17   benefits.  And, Your Honor, that is a problem.

18           THE COURT:  So let me ask what is it that your

19   client wants to be able to do that it can't do, just to sort

20   of put a more blunt point on it?

21           MR. SIDDIQUI:  Yeah.  Sure, Your Honor.  So right

22   now the plan prohibits DCG from electing directors other

23   than from selecting from a list of five candidates selected

24   by the Debtors and certain influential creditor groups.  You

25   know, those directors.  And in no event can DCG terminate

Page 173

1      any member of this new board following the effective date.

2              The plan also contemplates eliminating DCG's right

3      to transfer its interests in GGH and doesn't provide a basis

4      for doing so.  The plan also cuts off DCG's beneficial --

5              THE COURT:  Well, right.  I've certainly seen that

6      in the context of tax issues, right?  Change of control.  So

7      is that the circumstance where there are tax -- because of

8      the tax consequences, or am I missing something?

9              MR. SIDDIQUI:  I mean, it very well may be, Your

10     Honor.  But be that as it may, if we are --

11             THE COURT:  Because bankruptcy courts, we get

12     those kinds of motions all of the time.  They're substantial

13     and they essentially reference the tax consequences of the

14     change of control.  And certainly transferring would I think

15     constitute that kind of an event, right?

16             MR. SIDDIQUI:  Right, Your Honor.  But --

17             THE COURT:  Maybe I'm singing from the wrong sheet

18     of music, but just help me out here.

19             MR. SIDDIQUI:  Yeah.  I think typically, Your

20     Honor, what will happen is they'll have a -- the way that I

21     understand it, Your Honor, is that if we are to maintain our

22     position as the sole equity holder of GGH, then there is no

23     basis to prohibit us from having the rights that an equity

24     holder has.  And the way that -- and actually in fact the

25     way that the Debtors have promulgated in their reply is that

Page 174

```
 1    DCG's rights actually do spring back upon payment in full to

 2    creditors under the distribution principles.  And once

 3    everyone is paid back under the distribution principles, DCG

 4    will have everything it wants back and there's no harm, no

 5    foul.  However, as I think has been stated today and, you

 6    know, two weeks ago during the testimony it's been made

 7    clear by the Debtor's advisors that it really is unclear

 8    when creditors will be paid back in full under the

 9    distribution principles.  Because as has been stated, as

10    claims arise so do -- sorry, as digital asset prices rise,

11    so do the claims themselves.  And to basically kneecap DCG

12    in holding the equity in perpetuity, or at least, you know,

13    there's no sort of timeframe that we know of when we get our

14    rights back --

15             THE COURT:  Well, let me ask you.  So does the

16    resolution of this issue ride on whether I find solvent or

17    insolvent here?

18             MR. SIDDIQUI:  I think, Your Honor, if the Debtor

19    was insolvent and equity was being extinguished, that's one

20    -- perhaps there's a better argument that rights should be

21    extinguished because equity is being extinguished.  But

22    where --

23             THE COURT:  Well, is there an objection to that if

24    that's the determination that it follows the usual path that

25    there's -- if you have an insolvent debtor and the rights
```

Page 175

1       are extinguished as opposed to this -- what's in the plan?

2                MR. SIDDIQUI:  Well, I think, Your Honor, we would

3       respectfully disagree that they are insolvent.  But in the

4       event --

5                THE COURT:  No, I understand that.  But I'm just

6       trying -- again, as you probably can tell, the theme of the

7       day is to tease out different options.  And I really -- you

8       know, because I have all you nice, smart people here to ask

9       these questions.  So my apologies for torturing you and

10      others with hypotheticals.  But that's why I'm asking.  If

11      that's what the determination is, does that moot out that

12      issue.  Because then it's just a question of the equity

13      rights being nonexistent.

14               THE COURT:  I think that DCG would perhaps maybe

15      less sort of -- you know, I think we would have to sort of

16      assess it based on whether or not we in fact believe that

17      the Debtor is solvent.  Right?  Because I think --

18               THE COURT:  No, no.  I'm saying if I made the

19      determination.  I'm not asking you to volunteer for that

20      finding.  I'm just saying if I made that determination, does

21      this moot out that issue?

22               MR. SIDDIQUI:  If you make that determination and

23      the equity is being extinguished, then I guess it would

24      follow that equity's rights should also be extinguished,

25      Your Honor.

Page 176

```
1                THE COURT:  All right.

2                MR. SIDDIQUI:  But here that's not the case today.

3                THE COURT:  No, I understand.

4                MR. SIDDIQUI:  Yeah.  I mean, so going from that,

5      I think that cutting -- keeping DCG as equity holder in name

6      only but basically taking away all of its rights is not only

7      a violation of 1129(a)(3) because it's not proposed in good

8      faith and is a violation of fiduciary duties, but it is

9      actually more specifically a violation of Section

10     1123(a)(7), which requires plan provisions to not only be --

11     to be consistent with the interests of creditors and equity

12     holders and with public policy with respect to the manner of

13     selection of any officer, director, or trustee under the

14     plan.

15                Now, this proposed dismantling of DCG's voting

16     rights, while it might be consistent with what the creditors

17     want, is certainly not consistent with DCG's interest as

18     equity holder, nor is it consistent with Delaware public

19     policy.  And furthermore --

20                THE COURT:  So what are the full array of rights

21     that you think should happen in this context, right?  So if

22     your client stays on, you think they should have the right

23     to sell.  Does that present any problems in terms of if the

24     plan is approved of being able to go forward with the plan?

25                MR. SIDDIQUI:  I think that if there is a
```

Page 177

1    prescribed time limit for the ability to transfer interest,

2    perhaps that's one thing.  Right?  If the plan is approved

3    or not.  But at this moment just not having the right to

4    transfer interest in their own --

5               THE COURT:  No, I understand what the argument is.

6    Again, I'm teasing out options.  So I'm trying to figure out

7    what approval or disapproval means to various arguments that

8    are coming in front of me.  But maybe I'll just leave it

9    there.

10              MR. SIDDIQUI:  Okay, Your Honor.  So another sort

11   of point here is that the Debtor's point in their reply that

12   the plan states that the new governance documents will

13   comply with Section 1123(a)(6), but it actually doesn't mean

14   they do so in practice now.  If you may recall, Section

15   1123(a)(6) explicitly prohibits the issuance of new non-

16   voting shares.

17              Now, Your Honor, while we do understand this is

18   not a new issuance but rather a reinstatement of shares, it

19   practically is the same thing.  Certain of the cases that

20   the Debtors have cited in support of their argument that

21   1123(a)(6) don't apply are actually mischaracterized in a

22   way.  Both In re Texaco, which was cited by this Court and

23   also In re Acequia, decided by the Ninth Circuit explicitly

24   held that Section 1123(a)(6) and Section 1123(a)(7) must be

25   read together.  In fact, the In re Acequia court went to

Page 178

1    explain that when you look at those two provisions together,

2    courts must scrutinize any plan which alters the voting

3    rights or establishes management in connection with a plan

4    of reorganization whether or not the plan provides for the

5    issuance of new securities.  There the court considered the

6    shareholders' interests in participating in the corporation

7    and the overall fairness of the plan provision.  And when

8    you apply that here, you will find that the court -- even

9    though the Debtors are seeking to reinstate and not issue

10   new non-voting securities of DCG, the fact that DCG is

11   unable to exercise really any of its rights -- and I mean

12   any of its rights other than to just choose from a slate of

13   directors that DCG can then never remove until folks are

14   paid back under the distribution principles --

15          THE COURT:  I guess I'm again sort of struggling

16   with what the practical consequences are.  I know what the

17   words mean and the rights you're citing.  But I'm trying to

18   figure out what they mean in the context of this liquidating

19   plan and what is is that your client wants to do in terms of

20   how your client is being harmed.

21          So I get the idea of not being able to sell.

22   Right?  that's pretty straightforward.  And we can debate

23   about the significance of that.  But for the other issues,

24   I'm trying to figure out what it actually -- you're talking

25   about not issuing new shares of a liquidating company.

Page 179

1          MR. SIDDIQUI:  Right.

2          THE COURT:  And so I'm trying to figure out what

3     it is that your client wants to be able to do and how your

4     client's ox is being gored to invoke the language of the

5     standing cases.

6          MR. SIDDIQUI:  Well, I think we should have the

7     ability to -- any rights that we have under Delaware law

8     should maintain here.

9          THE COURT:  I get that.  I get that.  But humor me

10    with explaining what in god's name that means in the context

11    of this liquidating Chapter 11?

12         MR. SIDDIQUI:  To select --

13         THE COURT:  Theoretically you could do a lot of

14    things, but that actually aren't going to happen because

15    you've got a liquidating 11.

16         MR. SIDDIQUI:  Right.

17         THE COURT:  So that's what I'm trying to get at.

18    It seems like an invocation of certain things as a matter of

19    I'm going down the Code, this is a problem, that's a

20    problem, the other problem.  But we're a fairly practical

21    lot here in bankruptcy court and I'm trying to figure out

22    why does it matter.  What is it that this is -- how is this

23    impacting parties' rights?  So I understand the formula.

24    Everything we can't do now that you're taking away from us,

25    that's our objection.  I get it.  But I'm trying to get at

Page 180

1     what the significance of any of that is.

2              MR. SIDDIQUI:  So we would like to have the

3     ability to select a new board without having to choose --

4              THE COURT:  All right.  I give up.  Go on to your

5     next point, please.

6              MR. SIDDIQUI:  Okay.  We would like to --

7     furthermore, Your Honor, I think as sort of stated and I

8     think going off from what you were asking earlier, we

9     believe that DCG should actually also have consultation

10    rights over the Debtor's winddown.  Our argument is that the

11    amended plan is not proposed in good faith because it

12    excludes DCG from certain rights over the winddown including

13    selection of the PA officer and the selection of the members

14    of the --

15             THE COURT:  Well, if you are opposing the plan,

16    which is your right to do, and the customers, who are the

17    creditors, have a very strong view about your client, why

18    does it make sense to have consultation rights?  If there

19    was a request for consultation rights, wouldn't I have -- if

20    there was a grant of consultation rights in the proposed

21    plan, I suspect I would have a lot of objections to that.

22    So why does it make sense in the context, again, of this

23    case that that that be something that happens?

24             MR. SIDDIQUI:  Well, because, Your Honor, if DCG

25    is right that there is excess value in the estates, then

Page 181

1    that would flow to equity.  And therefore DCG should have a

2    role.  Because DCG could receive distributions under the

3    plan, it should have consultation rights over the winddown.

4           THE COURT:  So the consultation rights -- that's

5    an objection that rises or falls in connection with your

6    view about solvency?

7           MR. SIDDIQUI:  Right.

8           THE COURT:  All right.

9           MR. SIDDIQUI:  As of right now, I mean, it hasn't

10   yet been determined.  But there is the possibility.  And

11   because there is the possibility and DCG is a majority part

12   in interest, it should have at least -- not a consent right,

13   but a consultation right over the Debtor's winddown.  We

14   want to have a role here.  We want to have a role in the

15   section of the PA officer and in the selection of the

16   members of the winddown oversight committee.  And in fact,

17   the litigation oversight committee as well.  And for any

18   matters in which the Debtors are --

19          THE COURT:  Isn't the litigation committee going

20   to be suing your client?  I mean, again, that's why I'm

21   asking about these things in the practical consequences of

22   this case.

23          MR. SIDDIQUI:  Your Honor, the same thing with

24   Gemini.

25          THE COURT:  I would imagine if your client was

Page 182

1   asked whether it wants to be sued in connection with its

2   consultation rights, we all know the answer.

3           MR. SIDDIQUI:  This is the same thing with Gemini

4   and the recusal mechanisms that were set in place.  And DCG

5   would properly recuse itself for any matters regarding DCG

6   being a defendant in any of these actions.  But to the

7   extent that there are any other causes of action, I think

8   DCG has an interest in those.  So we would request to be on

9   that as well.

10          THE COURT:  All right.

11          MR. SIDDIQUI:  And, Your Honor, I think in

12  conclusion, these provisions are the result of concerted

13  efforts of the Debtors, the UCC and the Ad Hoc Group to

14  basically deprive DCG of valuable economic and corporate

15  governance rights should result in the plan that violates

16  the Bankruptcy Code.  The Debtors aren't only just stripping

17  DCG of all excess value of the estates for the distribution

18  principles, but are also methodically dismantling DCG's

19  governance and economic rights as GGH's sole equity holder.

20  And when you consider these terms in the totality of

21  circumstances, it demands the conclusion that the amended

22  plan has not been proposed in good faith as required by

23  Section 1129(a)(3) of the Code.  Accordingly, the amended

24  plan should not be confirmed.

25          I actually have two or three more additional minor

Page 183

1    items that I also want to clarify for the Court.

2              We understand with respect to the indemnification

3    obligations, we understand that the Debtor has made some

4    changes to the indemnification obligations definition.  So

5    that, you know, there was no sort of improper cherry-picking

6    on which employees were to be indemnified under the

7    corporate governance documents as long as these obligations

8    are -- as long as the indemnification obligations and what

9    the Debtor are seeking to do is not in violation of Section

10   365 and are being --

11             THE COURT:  Now is the time for you to tell if it

12   is or it isn't.  I don't want to leave here today not

13   knowing the answer to that.

14             MR. SIDDIQUI:  Based on our review, it doesn't

15   seem like they are.  So we have nothing further to add on

16   that point today, Your Honor.

17             THE COURT:  All right.

18             MR. SIDDIQUI:  Lastly on the allowance of creditor

19   fees and expenses against the estate, we would just simply

20   say we join the U.S. Trustee in its objection to the

21   allowance of the Ad Hoc Group and dollar group fees as

22   administrative expense claims.

23             THE COURT:  And that will apply in all cases that

24   Weil may come in front of this court as well, right?  I

25   assume that Weil will take a consistent view about that.

Page 184

1          MR. SIDDIQUI:  Duly noted, Your Honor.  And lastly

2      on the tax sharing agreement.  So, Your Honor, we understand

3      that the Debtors have stated on the record that not

4      withstanding Section 4(b)(1) of the plan, which provides

5      that the winddown debtors will undertake the restructuring

6      by, among other things, executing and delivering a tax

7      sharing agreement with DCG, we would like to clarify in the

8      amended plan that DCG does not have an obligation to enter

9      into a tax sharing agreement with the debtors.  While we

10     have agreed with the Debtors that we will negotiate one in

11     good faith, we have explicitly stated that we don't have an

12     obligation to do so, and we would just like the plan to

13     verify that.

14          THE COURT:  Well, does that depend on what views I

15     take of your corporate governance rights in other contexts?

16     Right?  I mean, I don't want to get all deep dive into tax

17     issues here.  But, right, a group and the obligation to file

18     consolidated return comes up in various bankruptcy cases.  I

19     can think of Global Crossing being one from way back when.

20     And so I don't know what factors trigger into that and what

21     the IRS's views are.  So is it possible that your views on

22     corporate governance may sort of stumble into that?

23          MR. SIDDIQUI:  I think a tax-sharing agreement is

24     sort of a consensual agreement amongst parties whether or

25     not you're in a consolidated agreement.  So I don't think it

Page 185

1    would actually impact that.  Right?  Whether or not we're in

2    a consolidated --

3             THE COURT:  All right.

4             MR. SIDDIQUI:  So with that, without anything

5    further, Your Honor, unless you have any questions, I would

6    like to cede the podium to whoever is next.

7             THE COURT:  All right.  Thank you very much.

8             MR. SIDDIQUI:  Thank you.

9             MS. VANLARE:  Good afternoon, Your Honor.  Jane

10   VanLare, Cleary Gottlieb Steen & Hamilton on behalf of the

11   Debtors.  I'm going to address just a few points made by

12   counsel to DCG.  I will be brief.  And I'll go in reverse

13   order.  I'll address some of the points made by Mr. Siddiqui

14   and then address some of the points made by Ms. Liou.

15            So first on the setoff principles.  Again, Your

16   Honor, it's been articulated earlier by us and others,

17   there's no evidence to substantiate any of the remarks made,

18   including those by Mr. Siddiqui even in his presentation

19   today regarding inflating and creditor claims and selective

20   application.  That's simply not true.  It's not in the

21   record.  In fact, the opposite is in the record as I

22   referred to in my earlier presentation with respect to the

23   fact that the setoff principles are consistently applied.

24            THE COURT:  Well, let me ask you about that.  It

25   seems like the setoff principles -- there may be an argument

Page 186

1    that the setoff principles work in a particular way.  But am

2    I right in understanding that there's a certain amount of

3    happenstance in that in terms of whether -- and I think Mr.

4    Shore had said this is when we entered into a deal, this is

5    where the prices are.  Nobody really knew -- we entered into

6    a deal not really knowing what the prices are going to do.

7    Nobody knows.  And I assume the setoff principles are a

8    similar kind of agreement, meaning that at a certain point

9    people reach that agreement, it is what it is, the prices go

10   up, go down.  And what it actually will mean at the end of

11   the day compared to the alternatives is going to be a

12   function of that.

13            MS. VANLARE:  Yes, Your Honor.  I would say the

14   setoff principles came out of extensive analysis done by

15   counsel to the Debtors by financial advisors to the Debtors,

16   discussions that we had with multiple parties-in-interest.

17   We determined that that was the best approach and exercised

18   our business judgement to do that.  And I think that's in

19   the record.  And there's simply nothing in the record to

20   suggest otherwise.

21            I would also like to address briefly Mr.

22   Siddiqui's citation to the DCGI loans.  And we think that's

23   just simply inapplicable.  That was a payment done pursuant

24   to a settlement.  That was an agreement with the Debtors and

25   furthermore didn't actually include setoff.

```
 1            Secondly, he made a point regarding extinguishing
 2    voting rights, consultation rights.  And I think as Your
 3    Honor aptly pointed out, it is obviously -- would be
 4    incongruous with the fact that potentially the biggest asset
 5    of the Debtors here is litigation against DCG.  And
 6    obviously DCG can't control that.
 7            And we do think that there really is no burden to
 8    them of maintaining the equity as the plan proposes.  And it
 9    can be viewed as a benefit in that the plan does provide
10    that the equity rights will spring back if the creditors are
11    paid in full.
12            THE COURT:  Well, let me ask about the point that
13    -- and I think I was trying to get at it somewhat unartfully
14    in my questioning -- is that it's the selective.  You're
15    sort of in, but you're not in, meaning you're the equity
16    holder, but you don't get those rights as opposed to saying
17    you're out.  And if you're out, you're out.  And we all get
18    that.  And so -- and that seemed to be on questioning sort
19    of the complaint.
20            MS. VANLARE:  Yes.  And I think, Your Honor, the
21    baseline is that they're out.  And so the fact that it's
22    retained I think is actually a benefit to them.  So the --
23            THE COURT:  But what if they don't view it that
24    way?
25            MS. VANLARE:  So I think the fact that, for
```

Page 188

1    example, the restriction in terms of the transfer of GGH

2    interest, that's a continuation of the NOL order.  And so

3    that's something that we are entitled to.  As far as the --

4    they do have certain governance rights or a modified voting

5    right, so to speak, by being able to approve members of the

6    board.  We think that that's actually a response in fact, a

7    partial response to their objection to 1123(a)(6).

8            The other one, which is actually my next point,

9    the other one being that as I think Mr. Siddiqui pointed out

10   or Your Honor pointed out, we're not actually issuing

11   shares.  So it doesn't apply.

12           With respect to Ms. Liou's arguments, first, she

13   said that it's part of the record or Mr. Aronzon had

14   testified that there may be distributions to equity here.

15   And that's not actually what he testified, Your Honor.  And

16   I think you actually pointed this out earlier in my

17   presentation.  When addressing the question of whether it

18   would be possible for value to flow down the waterfall, he

19   did testify that, yes, it is.  And that's on Page 207.  But

20   as we discussed earlier, that doesn't mean it goes down to

21   equity.  We have the billions and billions of dollars of

22   subordinated claims.

23           There was also a point around the subordinated

24   claims and the fact that they haven't been objected to

25   because they haven't had a chance to review the books and

Page 189

```
 1    records.  There is no indication that we have, and certainly

 2    none in the record that there was any attempt made to review

 3    books and records.  As Your Honor pointed out, that was a

 4    strategic decision on their part not to object to those

 5    claims.  And under 502(a), they are deemed allowed as of

 6    today.

 7                Finally, one other point.  Ms. Liou I think was

 8    very complimentary of the Debtors, professionals of Mr.

 9    Aronzon and of other advisors in this case when she noted

10    everyone's years and years of experience.  We do appreciate

11    that, and I think it's correct.  And I think it actually is

12    something that speaks to the fact that this is the right

13    result.  The plan is the right result because all of our

14    hundreds of years of restructuring experience tells us that

15    this is the right approach.

16                Finally, on this point around the code and the

17    statute, you've got to have the statute.  I think it's

18    instructive given DCG's argument that I think everyone

19    agrees, and I think they don't dispute based on their

20    presentation that equity is on the side of this plan.

21    Equitable considerations dictate this plan should be

22    approved.  Efficiency is on the side of this plan.  Again, I

23    think everyone has said, and I don't think they dispute that

24    it's far more efficient, it's the way that we can get

25    distributions to creditors as quickly as possible.
```

```
 1              And so the only argument that they make is that,

 2    well, you can't -- you've got to follow 502(b).  And I'll

 3    quote Ms. Liou.  You can't use a procedural rule to get

 4    around the requirement of the Code.  And I think, Your

 5    Honor, that we have given you and we've cited many ways in

 6    which we are absolutely consistent with the Code, we're

 7    absolutely consistent with 502(b).  I won't recite all the

 8    various arguments we've made.  It's the fact that in fact

 9    there's been no proper objection.  And so again, if we're

10    going to be very strict about the interpretation of 502, it

11    does not apply because there's not been a proper objection

12    to these claims.  Moreover, there's no cap in the language.

13    Again, that's a statutory argument.  We've made other

14    arguments.  So I do think that, again, it's equity, it's

15    efficiency, and it's absolutely the Code, Your Honor.  And

16    with that, we would urge you to overrule DCG's objection and

17    approve the plan.  Thank you.

18              THE COURT:  All right.  Thank you very much.

19              So let me ask if there's anyone else who wishes to

20    be heard to round out the record as to DCG's objection.

21              All right.  Hearing no party wishing to be heard,

22    I think that completes that one of three things we're trying

23    to accomplish today.  I think there's an expectation that

24    the second and third things will be shorter.  So let me ask

25    counsel how you propose to proceed.
```

Page 191

1          MS. VANLARE:  Your Honor, we are ready to keep

2     going.  But obviously --

3          THE COURT:  Well, how long do you think that's

4     going to take?  I'm fine.  I used to do Chapter 13 hearings

5     from morning to sometime about 6:00 and not leave the bench,

6     which my wife considered cruel and unusual punishment to

7     those appearing in front of me.  But I said that was not my

8     rule for them, only for me.

9          So I'm happy to go ahead.  If it's going to take

10    another two hours, I would think it makes sense to take a

11    break.  But we can also see how we go and see where we are

12    at 2:30.

13         MS. VANLARE:  Your Honor, I think our best

14    estimate when looking around, I think our best estimate is

15    that the McDermott Group objection will probably take about

16    an hour.  That's for all the parties.  And then we have the

17    U.S. Trustee objection, which I'm looking at Mr. Zipes, I

18    don't think will take very long.  Maybe 15 minutes would be

19    my estimate.  And then, Your Honor, it's the 1129 factors.

20    And I can be as quick or as long on those as you would like.

21         THE COURT:  Well, let's see how it goes.  I'm game

22    for that.  If somebody does have a medical condition,

23    somebody needs to get some sugar in them, whatever it is, I

24    do not want to compromise anybody's health.  But otherwise

25    we'll plow ahead.

Page 192

1          MR. MASSEY:  Good afternoon, Your Honor.  Jack

2    Massey, Cleary Gottlieb Steen & Hamilton, for the Debtors.

3    I'll be addressing the argument made by the Crypto

4    Creditors' Ad Hoc Group, or I should say the Debtor's

5    argument against that argument that the CCAHG Group's

6    contracts are entitled to admin expense priority.  And then

7    my colleagues, Mr. Kessler, will address the CCAHG's

8    argument that their claims are subject to the 562 safe

9    harbor.

10          Before addressing the argument, I would just like

11    to very briefly discuss the relevant background facts.  The

12    CCAHG is a group of -- as of the most recent 2019 statement,

13    7 creditors.  And that's compared to 85 creditors in the Ad

14    Hoc Group who loaned funds to GGC under master borrowing

15    agreements or MBAs that governed the terms of the lending

16    relationships between those creditors and the CCAHG members.

17    And then term sheet loan agreements that govern the terms of

18    individual loans.

19          The MBAs and the term sheets are joint exhibits.

20    For the record, 5 through 27, 29, 31 through 35, and 37

21    through 52.  These MBAs and term sheets are all very similar

22    to each other and they are very similar to the lending

23    agreements between GGC and many of their other lenders.

24          These seven creditors nevertheless seek different

25    treatment than all of those other creditors on two separate

Page 193

1      theories, as I mentioned.  The idea that their claims are

2      actually admin priority claims and the idea that the

3      contracts are safe harbored.  So I will go now to the admin

4      claims argument.

5              Section 503 provides priority treatment for claims

6      that arise from the actual necessary costs and expenses of

7      preserving the estate.  The classic examples of these are

8      the cost of reorganizing the estate itself in the case of a

9      Debtor that is still an operating business, the cost

10     associated with maintaining that business like purchasing

11     inventory and paying employees.  These are by definition

12     post-petition transactions because pre-petition transactions

13     are transactions with the company before it is a debtor in

14     bankruptcy.  And those kinds of transactions give rise to

15     ordinary prepetition claims.

16             The CCAHG contracts and the transactions that give

17     rise to their claims are clearly those kinds of prepetition

18     contracts.  All of the MBAs and all of the term sheets were

19     executed prior to the petition date.  And that's not a fact

20     in dispute.  But the CCAHG argues that because the contracts

21     are renewed post-petition, that autorenewal transformed all

22     of the Debtor's obligations under the contracts into post-

23     petition obligations.  This is wrong as a matter of law and

24     would lead to a wildly inequitable result with the CCAHG

25     members receiving effectively priority over all other

Page 194

1    creditors, many of whom are similarly situated just because

2    their framework contracts happen to have autorenewal

3    clauses.

4            Courts in this circuit and across the country have

5    consistently held that auto renew clauses like this do not

6    generate new transactions for purposes of determining

7    whether the transaction that gave rise to the relevant claim

8    took place prepetition or post-petition.  One example of

9    this is Judge Kaplan's holding in In re Ditech Holding

10   Corporation.  That's at 630 F. Supp. 3d 554, 557 (S.D.N.Y.

11   2022).  There are many other examples.

12           Instead, course hold that an autorenewal is a

13   continuation of the original contract.  And here the

14   autorenewals bear no characteristics of a new transaction at

15   all.  There was no new property, for instance, exchanged in

16   connection with the autorenewals and neither party agreed to

17   any new or different obligation than what they had been

18   obligated to do previously.

19           And importantly, the MBAs were not even the

20   contracts under which the parties had any of their

21   standalone obligations.  The MBAs merely contained the terms

22   by which the parties would transact if they chose to

23   transact.  And it was the term sheet loan agreements by

24   which the parties actually did transact.  Those were all

25   executed prepetition.  Again, not a disputed fact.  And

Page 195

1    there are no provisions of those term sheets that would

2    renew any of those loans during the period that ended up

3    being the Chapter 11 case or any other period.

4            THE COURT:  So I'm understanding this right, it's

5    the -- the term sheets don't renew?

6            MR. MASSEY:  The term sheets themselves do not

7    renew.

8            THE COURT:  Do not renew.  It's the borrowing

9    agreement that renews.  But again, I think you just said the

10   borrowing agreement is what essentially contemplates the

11   term sheet.

12           MR. MASSEY:  Exactly.

13           THE COURT:  But it isn't a contractual -- I mean,

14   it isn't a binding agreement in and of itself.  You have to

15   take further steps to make that happen.

16           MR. MASSEY:  Exactly.  No loan transactions are

17   effectuated pursuant to the Master Borrowing Agreements.

18   But once a loan transaction is effectuated by way of a term

19   sheet loan agreement, then there are certain obligations --

20           THE COURT:  It's almost an option agreement in

21   some ways.

22           MR. MASSEY:  Exactly.  So the Debtor's position is

23   that the Court can end its analysis there because a

24   prepetition transaction cannot give rise to an admin

25   priority claim, full stop.  And no post-petition transaction

1    took place.  But even if the autorenewals of the MBAs were

2    somehow post-petition transactions, administrative expense

3    priority also requires that the transaction in question

4    provide a concrete, actual benefit to the estate.  The CCAHG

5    here has not argued and cannot argue that the Debtors used

6    the loaned assets in any way and recall that the way that

7    Debtors would have used the assets would have been un-lend

8    them to other borrowers.  And all of that type of activity

9    had ceased before the petition date with respect to the

10   borrowed assets from the CCHG members and all other lenders.

11           So as a result, the assets loaned to GGC, the

12   assets in question essentially, have sat idle in GGC's

13   accounts for the duration of the Chapter 11.

14           The CCAHG then suggested that the Debtors have

15   derived a benefit from being in possession of these loaned

16   assets during the Chapter 11 because the increase in the

17   asset's value creates more value for distribution to the

18   Debtor's other creditors.  This argument is also a red

19   herring.  The CCAHG cites no authority for it and the

20   Debtors are aware of no authority supporting this very

21   specific argument.

22           First of all, the Debtors themselves do not

23   benefit or suffer from the change in value of the assets

24   that they hold, whether that's an increase or a decrease.

25   Any change in value of the assets that the Debtors are

Page 197

1    distributing pursuant to the plan -- I should say that the

2    plan contemplates distribution of are happening in kind.  So

3    the dollar value as of any particular day is neither here

4    nor there for the perspective of the Debtors.

5              And from the perspective of the estates, including

6    the creditors, the estate also do not benefit or suffer from

7    appreciation or depreciation of the assets because the

8    claims by and large are denominated not in U.S. Dollars but

9    in kind.

10             So the CCAHG's argument that the extent of

11   appreciation of their assets should give rise to the admin -

12   - to an admin claim would reach an absurd result in all

13   cases.  There is no principled reason to stop the analysis

14   there.  And by that logic, the Debtor's retention of the

15   assets themselves, not just the appreciation of the asset's

16   value, is creating the very value that is available to the

17   Debtor's other creditors for distribution.  And by that

18   logic, any asset or any value of any asset that's retained

19   by a debtor in Chapter 11 should give rise to an admin

20   claim, which is not what the Code contemplates.

21             Unless Your Honor has any further questions, I'll

22   turn the podium over to Mr. Kessler to discuss the 562

23   argument.

24             THE COURT:  All right.  Thank you very much.

25             MR. KESSLER:  Good afternoon, Your Honor.  Tom

Page 198

1      Kessler from Cleary Gottlieb for the Debtors.  As Mr. Massey

2      mentioned, I will be addressing the CCAHG's argument in the

3      alternative, that if their claims are not administrative

4      expense claims, that they should be valued as of the

5      effective date rather than pursuant to the distribution

6      principles.

7              This argument relies on an assertion that the

8      CCAHG contracts are executory contracts that will be

9      rejected on the effective date pursuant to the plan and that

10     therefore Section 562(a) requires that the claims be valued

11     on the effective date.

12             The argument fails for the simple reason that the

13     CCAHG contracts are not executory and therefore they won't

14     be rejected pursuant to the plan, and 562(a) simply doesn't

15     apply.

16             When courts are faced with assessing whether a

17     contract is executory, they typically assess whether there

18     are material unperformed obligations on the part of both

19     parties.  A typical loan contract therefore is not executory

20     because the lender's only material obligation to make the

21     loan is performed at the outset.  All that's left for the

22     lender to do is receive repayment, which requires no real

23     action by the lender.  They're not obligated to do anything.

24             In their briefing, the CCAHG runs through 19

25     contractual requirements that they clam are material and

Page 199

1   unperformed.  And we discuss in our confirmation brief at

2   length why none of them are sufficient to render the

3   contracts executory.  And I'll recap that just briefly.

4          First, eight of the 19 obligations are obligations

5   of the Debtors, and nobody contests that the Debtors have

6   material unperformed obligations.  After all, they have to

7   repay the loans in question.

8          The next six of the 19 are not obligations at all.

9   They are entirely contingent and triggered only in the event

10   that the parties decide to execute certain forms of loans or

11   undertake certain kinds of agreements which they are under

12   no obligation to do.  So you'll see that most of them have

13   to deal with the treatment of collateral or how call options

14   would work.  But of course none of the loans that the CCAHG

15   has outstanding with the Debtor are collateralized and none

16   of them contain call options.

17          The CCAHG cites solely In re Hawker Beechcraft

18   from Judge Bernstein, which includes the statement

19   "Contingent obligations are sufficient to render a contract

20   executory."  But there were no contingent obligations in

21   that case, to be sure.  Judge Bernstein mentions the concept

22   of contingent obligations in passing in the standards

23   section, and the court ultimately found there that the

24   obligations that were at issue were material solely on the

25   basis that the parties had expressly stated the non-

Page 200

1    performance would render a material breach.

2            By contrast, courts that have looked specifically

3    at contingent obligations and whether they rise to the level

4    of executory have distinguished between true option

5    agreements, those are agreements that obligate a party to

6    perform actions upon their counterparty exercising certain

7    rights as opposed to situations like here where both parties

8    have unfettered discretion as to whether the contingency

9    will ever arise.  We cite many examples of those in our

10   brief.  One of them that I think is the most on point is

11   BNY, Capital Funding v. US Airways.  And that's at 345 B.R.

12   549.

13           So that leaves us with five remaining obligations

14   of the 19.  And those five are the sorts of immaterial

15   provisions that courts routinely reject, including

16   indemnification obligations, confidentiality obligations,

17   and arbitration provisions.  And again, in our brief we go

18   through examples of each of those and how courts have held

19   that they're not enough to render a contract executory.

20           I want to pause for a moment to talk in a bit more

21   depth about an obligation that the CECAHG seems to rely on

22   most heavenly -- heavenly -- heavily.  Your Honor will

23   recall actually it was the sole subject of live testimony at

24   the confirmation hearing, that fact that in order to receive

25   repayment on your loan, you have to have a digital currency

Page 201

1    address and you have to have a coin wallet.

2         To be sure, the series of steps that were

3    described by Dr. Jassin are not obligations of the lenders

4    at all.  He and the other lenders have to have a digital

5    wallet to receive repayment just as any lender of any dollar

6    denominated loan would need to have a bank account.  There

7    has to be somewhere for the funds to go.  But the MBA say

8    nothing about how to go about getting it.  Dr. Jasson

9    himself agreed that the MBAs don't require him to use "any

10   specific methodology to create a coin wallet or a digital

11   currency address."  And whatever his specific views about

12   the best or the safest ways to receive repayment, he also

13   testified that "there are very simple ways of creating a

14   bitcoin wallet.  You can do it on  your phone in less than a

15   minute."  That was during the hearing on February 28th at

16   Page 19, Lines 19 to 20.

17        I will also pause here for a moment to discuss a

18   case that the CCAHG raised in their opening statements.

19   That's In re Texaco, 73 B.R. 960.  Mr. Azman said it was one

20   of the more important cases cited in their brief.  This was

21   a 1987 case involving an indenture agreement where the court

22   examined the potential application of an ipso facto clause

23   and request to lift or modify the automatic stay.

24        As an initial matter, despite the way it was

25   described at opening statements and with due respect to

Page 202

1      Judge Schwartzberg, Texaco was not a tentpole in the body of

2      executory contract law.  The analysis cited by the CCAHG in

3      their brief comes from a single paragraph of a nine-page

4      decision that's largely focused on another issue.  It's been

5      cited 31 times in the last 37 years.  Only 12 times in this

6      district, and rarely for its analysis of what provisions

7      might render an agreement executory.

8             More directly, the case doesn't support what the

9      CCAHG claims.  In a short passage in the opinion, Judge

10     Schwartzberg identifies a slew of obligations of the debtor

11     issuer and the indenture trustee, including reporting

12     obligations, the obligation to commence litigation, and of

13     course the obligation to pay the notes themselves.

14            Now, the CCAHG appears to be drawing some sort of

15     analogy between the ongoing obligations of the indenture

16     trustee and the CCAHG members' needs to take certain

17     administrative steps like furnishing GGC with a wallet

18     address in order to receive repayment on their loans.

19            But that kind of ministerial obligation on the

20     part of the CCAHG member is very different from the kinds of

21     obligations that an indenture trustee like the one in Texaco

22     had for the simple reason that the trustee's role is

23     effectively administrative in nature.  The obligations that

24     are listed in the indenture, subsequent to a note's

25     issuance, are the core of the trustee's duties.  And here

Page 203

1    that's simply not the case with respect to the MBAs, which

2    are focused on the lender's core role of lending assets,

3    which here of course has already happened.

4            So in sum, there are no material unperformed

5    obligations and therefore the contracts are not executory

6    under that typical countryman) test.

7            I'll touch very briefly on the other tests that

8    the CCAHG raises.  The first is the functional approach.  So

9    sometimes courts in this circuit look and see whether the

10   assumption or the rejection of the contract at issue would

11   benefit the Debtor's estate.  The answer here is very clear.

12   Assumption and rejection would not benefit the Debtors.  Of

13   course assumption of the contracts without the kind of

14   modification that is contemplated by the distribution

15   principles would require the Debtors to cure all defaults,

16   which as we've discussed this morning, the Debtors are

17   simply not in a position to do.  We are not in the position

18   to provide lenders with a hundred percent of the loaned

19   assets.  And of course defending on the effective date, the

20   rejection of the contracts could require a higher payment

21   than the partial in-kind recovery we are contemplating under

22   the distribution principles.  And the best evidence of that

23   is that I am standing up here responding to the CCAHG's

24   arguments seemingly compelling us to reject their contracts.

25           The CCAHG also argues somewhat I'm passing that

Page 204

1    the autorenewal clauses standing alone make the contracts

2    executory.  We are aware of no case that supports that

3    conclusion, including the primary case cited by the CCAHG on

4    that point.  That's In re Windstream.  And in fact, in that

5    case the court held that even despite the existence of an

6    autorenewal clause, there was just insufficient record

7    evidence to determine whether the contracts were executory.

8    So it can't be the case that the clause standing alone is

9    sufficient given the analysis that the court in Windstream

10   went on to do.

11        And finally, Your Honor, the CCAHG argues that

12   Section 562 Safe Harbor provision should apply even if Your

13   Honor finds that it doesn't apply based on the express terms

14   of the statute.  This is contrary to basic principles of

15   statutory interpretation.  There is no amount of policy

16   rationale that can overcome the clear inapplicability of

17   statute even if the rationale that the CCAHG offered were

18   somehow relevant to the applicability of 562, it doesn't

19   actually support their desired outcome.

20        So they argue that declining to apply 562 here

21   would incentivize equity owners of crypto businesses to wait

22   for a market downturn, quickly file bankruptcy petitions,

23   and then reap the later upside when the market initially

24   returned.  Of course that's exactly the kind of gamesmanship

25   that the distribution principles seek to avoid.  And of

Page 205

1    course more importantly, they offer no explanation for why

2    the CCAHG members' claim should be treated differently than

3    those of any other creditor in the Debtor's estates.

4              Unless Your Honor has any further questions, I

5    will pass the podium to my partner, Ms. VanLare, to talk

6    about the last section of the CCAHG objection.

7              THE COURT:  All right.  Thank you very much.

8              MR. KESSLER:  Thank you.

9              MS. VANLARE:  Good afternoon.  Once again, Your

10   Honor, Jane VanLare, Cleary Gottlieb Steen & Hamilton, on

11   behalf of the Debtors.  I'm going to address the objection

12   with respect to the releases.

13             I'll note that as we stand here today, the CCAHG

14   is the only party objecting to the Debtor's releases.  The

15   U.S. Trustee does have some objections to certain portions

16   of the exculpation.  But the release is really -- this is

17   the sole objecting party.

18             So first I would just like to note again that the

19   non-debtor releases in this case are purely consensual.  We

20   had an opt-in mechanism.  This was widely publicized and

21   holders of claims granting such releases had the option,

22   purely consensual, had the option to opt in by affirmatively

23   voting in favor of the plan and electing to opt in to

24   granting the releases.

25             So really what's at issue here are the Debtor's

Page 206

1    releases, not non-debtor releases, the Debtor's releases.

2    The standard for the Debtor's releases can be found pursuant

3    to Section 1123(b)(3)(A), which permit Debtor releases under

4    a Chapter 11 plan as a settlement or adjustment of any claim

5    or interest belonging to the Debtor or to the estate.  And

6    the standard for that is business judgement.

7           Your Honor, I posit that we have more than met our

8    business judgement in approving -- in granting Debtor

9    releases such that they should be approved.

10          The Debtors propose to release released parties.

11   That's a defined term under the plan.  They include the

12   Debtors, the Committee and its members, but solely in their

13   capacities as such, the Ad Hoc Group steerco and its

14   members, again, solely in their capacity as such, and each

15   related party.

16          Now, it's important to note the parties that will

17   not be benefitting from the releases under the Debtor's

18   plan.  Former officers and directors of the Debtors who were

19   not employed as of the petition date, DCG parties, Gemini

20   parties, and officers, directors, or employees of the

21   Debtors as to which the Special Committee determined to

22   exclude them from the list.

23          The debtor releases importantly are further

24   limited in scope as they carve out claims arising from

25   fraud, gross negligence, and willful misconduct.

Page 207

1           There's no disagreement among the parties relating

2    the release and exculpation of the Committee and the Ad Hoc

3    Group Steerco members.  Therefore, the sole issue before the

4    Court is the release and exculpation of the Genesis released

5    personnel, i.e. the current and former directors, officers,

6    and employees of the Debtors as of the petition date.

7           Your Honor, I would like to point you to the

8    record.  Again, we think that there's plenty in the record

9    to support the Debtor's business judgement in granting these

10   releases.  First, Mr. Aronzon's declaration.  Secondly, the

11   notice of supplemental disclosure.  This was the proffer

12   that we filed at ECF 1403.  Of course the reasons for the

13   releases and the justifications are described in detail as

14   part of the disclosure statement and the plan supplement,

15   Exhibit F, at ECF 1117.  And furthermore, they are supported

16   by the testimony of Mr. Aronzon, which was extensive.

17          First in terms of just the overall context for the

18   investigation that took place, which of course we describe

19   in the disclosure statement.  But Mr. Aronzon I think

20   testified to it in a way that is worth noting.  He said in

21   describing the process and the investigation that took place

22   as follows.

23          As part of our process, we asked our counsel and

24   our financial advisors to conduct a very extensive

25   interview.  In fact, we put no boundaries on what they had

Page 208

1    to do.  We asked them to put their creditor hats on, put

2    their litigation hats on, and to think about each and every

3    type of claim or cause of action that they could conjure up

4    and dig into our books and records and talk to the relevant

5    parties to determine what claims might exist and against

6    whom."

7              And he further goes on to explain the process.

8    This is Page 27 through 28 of the February 27th hearing

9    before Your Honor.  The process was extensive.  It was led

10   by extremely capable former prosecutors who knew how to

11   conduct investigations.  And as you heard Mr. Aronzon say,

12   there were no limits put on that process.

13             What came out of that, and in support of the

14   release of the Genesis released personnel, the special

15   committee provided a list of justifications for the

16   releases.  These include the significant contribution to the

17   Debtor's restructuring efforts, the knowledge and insights

18   regarding the Debtor's business, which has been and will be

19   critical to the Debtor's litigation against DCG and Gemini

20   and other parties, indemnification obligations of the

21   Debtors pursuant to the Debtor's governing documents, the

22   Special Committee's determination that the Genesis-released

23   personnel engaged in no wrongdoing, the fat that litigating

24   any potential claims would be costly and unlikely to result

25   in any meaningful recovery for the Debtor's estate based on

Page 209

1    the directors and officers insurance coverage and the fact

2    that the releases are limited in the way that I've already

3    articulated.

4              Furthermore, in the weeks leading up to the

5    confirmation hearing, the Debtors negotiated a form of a

6    cooperation agreement with various parties in interest, the

7    form of which was filed at ECF 1391.  And as reflected in

8    the amended plan, the released Genesis personnel will be

9    required to execute the cooperation agreement in order to

10   receive the releases under the amended plan as further

11   consideration and further justification for why the Debtors

12   are absolutely appropriate in exercising their business

13   judgement and granting the releases.

14             So again, I think the evidence in the record is

15   replete.  Mr. Aronzon was cross-examined on all of these

16   issues.  He was cross-examined in detail on the proffer.

17   And that could be found again on the February 27th

18   transcript hearing, Pate 24 through 67.

19             There's also an objection to the inclusion of

20   related parties.  I will note that the inclusion of related

21   parties is extremely common in released parties in this

22   district and others in Chapter 11 plans.  They are routinely

23   approved.  The idea that the CCHG has tried to argue that we

24   need to investigate every single related party, again, all

25   of them are being released in their capacity as such.  It's

Page 210

1    unsupported by the law.  It's impractical and it's

2    completely unnecessary.  Again, we go back to the special

3    investigation that was -- that was conducted.  It entailed

4    extensive interviews, extensive document review, and was

5    conducted by professionals who were imminently capable of

6    conducting such investigations and looking at the facts and

7    analyzing the claims.  Subsequent to that, the special

8    committee as advised by counsel and other advisors was --

9    had an extensive process of evaluating the findings of that

10   investigation.  And as you heard Mr. Aronzon testify, the

11   special committee decided that it was appropriate to grant

12   the debtor releases.

13         With that, Your Honor, I would ask that you

14   approve -- that you overrule the objection of the McDermott

15   Group to the Debtor's releases.

16         THE COURT:  All right.  Thank you very much.  So

17   let me hear from the committee.

18         MR. SHORE:  For the record, Chris Shore from White

19   & Case on behalf of the Committee.

20         Does Your Honor have my deck from this morning?

21         THE COURT:  I do.

22         MR. SHORE:  Okay.  I'm going to try to be quick

23   and practical about this.

24         If you go to Page 1 again.  So to sum up where

25   we've been, we've just spent the first six hours, five hours

Page 211

1    with one party on one side, DCG, saying in this issue of how

2    we go about determining the allowable amount of a crypto-

3    denominated claim, the code is the code, the law is the law.

4    All other positions are frivolous.  Any settlement of that

5    that doesn't impose 502 on everybody is outside the bounds

6    of reasonableness, the plan fails.  I guess that makes

7    sense.  Someone with an equity option is happy to play out

8    the litigation.  Always happy to play out the litigation.

9    You can't do worse than they're doing now if the litigation

10   plays out.  They want you to flip the card on and issue a

11   ruling with respect to exactly what is the right way to

12   value a denominated claim.

13          What we are handling now is the other side of the

14   debate.  The code is the code, the law is the law, all of

15   their parties' positions are frivolous, we want you to turn

16   the card and rule in our favor.  And as the people

17   supporting the settlement and as the fiduciary for the

18   creditors who want the settlement, I kind of have to argue

19   both ways.  And I can see both ways.  I can see DCG's

20   position, I can see the Ad Hoc Crypto Group's position.  I

21   don't think either one of them is right that the other

22   party's positions are frivolous.  These are real issues with

23   real economic consequences for everybody involved depending

24   on which way the card is turned here.

25          What I don't normally like is committee counsel

Page 212

1      arguing against creditors who are taking the position that

2      many of our people in our creditor body feel is their only

3      (indiscernible) group though.

4              And I would like to go back to Page 24 of my deck.

5      This is what I don't understand.  And remember, I asked Your

6      Honor that I thought that there needed to be two questions

7      answered in the context of the Ad Hoc Group's position here.

8      Because I understand the equity option.  What I'm not

9      understanding is this free option.

10             The plan is the plan is the plan, as I've said.

11     The plan has only two options.  For crypto-denominated

12     claims, you get the distribution principles.  For dollar-

13     denominated claims, you get valued as of the petition date.

14     And since there's no other amount beyond that in the form of

15     restitution, that's what you get.  There is no third option.

16     I want to -- I am a crypto-denominated creditor.  I want my

17     contract rejected because it's executory or assumed with

18     everything cured.  And therefore, I get something other than

19     petition date pricing and I recover ahead of the release.

20     That is not an option in the plan.

21             So the first question is do they really want the

22     plan to fail.  Would they rather -- rather than take the

23     distribution principles, would they rather choose the abyss?

24     Let's turn over the card.  We'll see what the judge says

25     with respect to 502 and 556 and executory contracts and

Page 213

1    restitution and everything else.  And we'll take the

2    possibility that we amongst the largest of the bitcoin-

3    denominated claims will get crushed.

4              I guess they're here arguing their objections

5    still.  But again, I don't think their plan objection really

6    reads as I choose the abyss over what we have on the table

7    today.

8              But more importantly on this concept of free

9    options, do they really want their contract to end?  Because

10   we could find a way to do that.  If what we were doing is

11   isolating these eight creditors, the issue is if they --

12   crypto-denominated claims get valued as this date.  Do they

13   want -- did they want a "rejection"?  That is do they want

14   to be treated as if it's an executory contract?  Because if

15   it's an executory contract, it doesn't really end where they

16   say it ends with -- and then you rule that I get the date as

17   of the rejection.

18             And I say that for two reasons.  One, it's not

19   clear that 562 applies.  That is if we go down that road and

20   Your Honor were to rule that 562 does not apply, they're

21   going to be a dollar-denominated creditor, which under this

22   plan gets paid out in petition date pricing.  It's a several

23   hundred million dollar swing in their recovery.  So it's a

24   real choice that has to be made.  But it is a choice that

25   has to be made.  Imagine they were a creditor who said I

Page 214

1    want to compel the Debtor to reject my contract.  We see

2    those every once in a while.  File a motion.  Debtor is not

3    doing what it's supposed to do.  You need to compel them to

4    reject the contract.  I just want to be clear, my motion is

5    only being brought if you agree with me on the calculation

6    of damages.  If you agree with me that it is effective date

7    pricing, I want my contract rejected.  But if you say it's

8    petition date pricing, I don't want my contract rejected.

9    They're just asking you for an advisory opinion.  Spend time

10   and effort, have your staff work all this up, and then I'll

11   decide when you turn over the card.  That's not the way it

12   works.  You are perfectly within -- the Court is perfectly

13   within its rights to say I'm not addressing that issue until

14   you answer me the question; are you willing to end your

15   contractual relationship with the Debtors if I say this

16   contract is not executory?  Or if I say for some other

17   reason 562 does not apply.  Or how about this?  Remember I

18   showed you the date of bitcoin at the time the plan was

19   filed?  It's $26,000.  If they go ahead with this and they

20   say, no, I want to be treated as an executory contract

21   holder, they want to file a rejection damages claim, I can

22   certainly see that people would take the position that the

23   damage calculation is as of the date the motion was filed.

24   Right?  Their position is that the plan constituted a motion

25   to reject the contract as of the effective date of the plan.

Page 215

1   Perfectly within Your Honor's rights even after the Supreme

2   Court's pronouncement to say that we're going to treat it as

3   the rejection motion having been filed as of the date the

4   disclosure statement was filed.  Are they willing to accept

5   the consequences that Your Honor would say you're right,

6   it's an executory contract.  You're right, 562 applies.

7   You're wrong that it's the effective date.  It's actually

8   the date the motion was filed.  That is the date the plan

9   was filed.  Because if they're not wiling to accept those

10  consequences to what sounds like the easy button, oh, you

11  just ruled that it's an executory contract and we're all

12  done and everything is going to be fine.  If they're not

13  willing to accept those consequences, I don't think you

14  should be taking their plan objection seriously.  It just

15  seems like then it's a free option.  Why don't you create

16  some new interesting law for me to use in other cases and I

17  will then decide whether or not I want the distribution

18  principles or I want to be treated as something unlike any

19  other creditor in the case, an island of -- I think it's

20  seven creditors now who want a plan treatment that's not in

21  this plan.

22          THE COURT:  All right.  Anyone else who wishes to

23  be heard on this issue before I hear from CCAHG?

24          All right, let me hear from CCAHG.

25          MR. EVANS:  Your Honor, Joseph Evans from

Page 216

1    McDermott Will & Emery on behalf of the Crypto Creditors Ad

2    Hoc Group.  Good afternoon.

3               THE COURT:  Afternoon.

4               MR. EVANS:  On behalf of the Crypto Group, we have

5    two primary objections to the plan.  First, that crypto

6    claims connected with master borrower agreements, MBAs, are

7    wrongly valued as of the petition date because they are both

8    covered and executory contracts under 11 U.S.C. 562.

9               Second, that the Debtors failed to meet their

10   burden of proving that an unspecified number of releases of

11   insiders are fair, reasonable, and in the best interest of

12   the estate.

13              There has been a lot of discussion today about who

14   our group actually is.  The other law firms here are right;

15   there are seven people left.  They consist of individual

16   investors who trusted Genesis with their bitcoin and ETH.

17   We have no financial institutions, no conglomerates.  These

18   are individual crypto investors who have pushed forward in

19   the face of threats of dollarization, like we just heard,

20   and a pack of big law firms seemingly united against them.

21              At the outset of this case, the UCC said that the

22   plan is a plan, and it's the only plan.

23              THE COURT:  Well, I think their point is to get at

24   the free option, right?

25              MR. EVANS:  Yeah.

1            THE COURT:  So I get -- this sets the floor and

2    then I get -- if I win, I get the upside.  If I lose, I give

3    up noting.  And so that seems to be as I understand the --

4    I don't know how your clients voted or not on the plan.

5            MR. EVANS:  Did not vote on the plan.

6            THE COURT:  They didn't vote.  Okay.  So I think

7    it just is what it is.

8            So as to -- you said executory contracts and

9    releases.  What about administrative claims?

10           MR. EVANS:  Administrative claims.  We hear the

11   Debtor's argument.  We rely on our briefs for the

12   administrative claims.

13           THE COURT:  All right.  But you're still making

14   your argument, but you're not going to address it here

15   today.

16           MR. EVANS:  I'm not going to spend the time today.

17           THE COURT:  All right.

18           MR. EVANS:  So with respect to the plan being the

19   only plan, there is a problem with this plan.  It violates

20   11 U.S.C. 572 and the evidence doesn't support the releases.

21           While the opening argument suggested the plan was

22   the only plan, that it never changed, there have been a lot

23   of changes.  There was an amended plan filed during the

24   confirmation hearing, the NY AG settlement, the Gemini

25   settlement, the SEC settlement, the Texas settlements.

Page 218

1    Change came quite a bit.

2             THE COURT:  Well, I have the plan.  You have your

3    objection.  Let's stick with that given the hour.

4             MR. EVANS:  Okay.  So the crypto creditors are to

5    focus on something else, something that's not going to

6    change.  It's just like a blockchain, it's immutable.  And

7    it's the record, the record, and it's the only record.

8    Admissible evidence only.  We urge the Court to focus on

9    what's in evidence.  And perhaps most importantly, what's

10   not.

11            What is in the record is that the crypto creditors

12   provided admissible evidence with a live witness showing

13   that the MBAs are executory.  They established on cross-

14   examination that the special committee member, Mr. Aronzon,

15   did not have the requisite knowledge of consensual releases.

16   Debtors did nothing to combat that admissible evidence.  No

17   rebuttal evidence for Dr. Jassin, no contemporaneous

18   records, no redirect of Mr. Aronzon.  In the face of one-

19   sided evidence, Debtors relied solely on lawyers' arguments.

20   But lawyers' arguments are not evidence.

21            THE COURT:  Well, are you talking about all your

22   arguments or just particular arguments?  So let's go through

23   them one at a time.

24            MR. EVANS:  Sure.

25            THE COURT:  Because Mr. Aronzon did testify he was

1   cross-examined on the release issue.  And so I have that

2   evidence and it is what it is.  So which one do you want to

3   address first?

4          MR. EVANS:  562.

5          THE COURT:  All right.

6          MR. EVANS:  Our position, as we stated, is the

7   plan violates 11 USC 562.  In order to get there, they need

8   to both be a covered contract and they need to be executory.

9   And the parties have already stipulated that they cover

10  contracts for the purposes of this dispute, so I won't

11  burden the Court with time on this.  But for good measure,

12  we also submitted declarations of Dr. Jassin and Mr.

13  Fernandez with the factual predicate for finding that these

14  are both securities contracts or forthwith contracts.  And

15  the New York AG amended complaint accused Genesis of issuing

16  unregistered securities at Count 3 and Count 10 and so they

17  appear to be in line with the determination that the MBAs

18  constitute securities contracts.

19          I think there's an important question to answer

20  before I get into executory, and it's a question that Your

21  Honor asked us at the first hearing.  What do we want?  What

22  are we asking for?

23          We are asking for a decision by the Court that the

24  plan in its current form cannot be confirmed because it

25  violates --

Page 220

```
 1              THE COURT:  Well, I think you are asking for your

 2    agreements to be deemed executory and then covered by the

 3    safe harbors, right?  That's your argument.

 4              MR. EVANS:  The crypto creditors' MBAs, yes,

 5    that's correct.

 6              THE COURT:  Yeah, right.

 7              MR. EVANS:  That's correct.  And so there's going

 8    to be a discussion of an advisory opinion or -- what we are

 9    asking for is a ruling on whether the plan complies with 11

10    U.S.C. 562.  That's it.

11              THE COURT:  Yes, your -- because other folks who

12    would make this argument have not made this argument.  So

13    it's your clients.

14              MR. EVANS:  Well, yes, Your Honor.  But as the

15    Debtors just said, the crypto MBAs are all the same.  And so

16    the treatment of the master borrower agreements --

17              THE COURT:  But I have people here representing

18    those other people.  So I don't think you get to say what

19    arguments they are making or they're not making.  People

20    make lots of decisions in life, and I wait for those

21    people's lawyers to stand up and tell me what they would

22    like to do.

23              So again, we are talking about your clients, your

24    objection, 562.  Go.  Let's do that.  So why are these

25    executory contracts?
```

Page 221

1          MR. EVANS:  The Debtor's whole argument relies on

2     562 and these arguments not being executory.  There's not

3     been any admissible evidence on their position that they are

4     not executory.

5          THE COURT:  Well, I have the agreements, right?

6          MR. EVANS:  You have the agreements, that's right.

7          THE COURT:  So that's admissible evidence.

8          MR. EVANS:  Similarly odd is that the Debtor's

9     schedules still identify all of the MBAs as executory

10    contracts.

11         THE COURT:  Well, are you arguing that they have

12    waived the issue?  I don't remember seeing that argument.

13    Again, I have the agreements.  My understanding is I should

14    interpret the agreements to figure out whether they are

15    executory.  So let's do that.

16         MR. EVANS:  Let's move there.

17         THE COURT:  Yes, please.

18         MR. EVANS:  We have identified automatic renewal

19    provisions, the Windstream and the NuPage case.  We've also

20    identified 19 obligations that are in the MBAs for the

21    parties which were addressed by the Debtors.  That's at

22    Paragraph 54 of our brief.  But today I want to focus on two

23    key obligations that crypto creditors owe to the Debtors

24    under the MBAs today.  As the Debtors conceded today in oral

25    argument, no party contested the Debtors have material

Page 222

1    unperformed obligations.  The real question is do we have

2    them.

3           First, the digital wallet.  Section 2(c)(1) says

4    that if lenders, that would be us, have not provided the

5    borrower a digital currency address for receiving a

6    repayment of a loan by close of business on the day prior to

7    the maturity date, the recall delivery date or the

8    redelivery day, then such loan would become open loan on

9    said maturity day.

10           And as the Court may recall, we have the testimony

11    of Dr. Jassin describing all the steps that needed to be

12    taken in order to provide what is seemingly pretty simple,

13    digital currency address.

14           A digital wallet is where crypto is stored.  Each

15    digital wallet have multiple digital addresses or can have

16    multiple digital addresses, which is a series of

17    combinations of letters and numbers which tells people where

18    to send crypto.

19           The testimony at trial in this regard is only from

20    Dr. Jassin.  This is on confirmation day two.  He said that

21    Genesis was much different than a crypto exchange like

22    Coinbase where a crypto investor could just click a button

23    that says withdraw.  Genesis had no such function.  Instead,

24    first he had to, quote, "create a private key, which is

25    basically a large random number that has 256 bits of

Page 223

1    entropy," unquote.  Second. The number was converted into

2    the form of a bitcoin private key.  And steps one and two

3    are commonly referred to as a way to create a digital

4    wallet.

5         Third, the bitcoin private key would then get

6    converted into an easy way of writing down the private key

7    and English words.  So that's a 24-word seed phrase.

8         Fourth, you write the seed phrase on a piece of

9    paper or, quote, "since these amounts are significant, he

10   would also engrave these words with the steel plates."  This

11   is commonly referred to as a crypto steel.  And it's a

12   little metal device that holds your seed phrase.

13        Fifth, he would have to find a way to secure the

14   steel plates at different locations in case anything

15   happened.

16        Sixth, once he had that private key secured, he

17   would get the private key converted into a public key.

18        Seventh, from the public key it would get

19   converted into a bitcoin receipt address.  And that's what

20   he provided Genesis for them to be able to finally give him

21   his bitcoin back.

22        The Debtors cross-examined Dr. Jassin and the

23   Debtor's argument today is suggesting, well, you didn't

24   really have to do all that.  He would only have to do --

25   maybe that's what he wanted to do, but he didn't really do

Page 224

1    all that.

2           In response, Dr. Jassin testified, "I described

3    the simplest way to create a secure offline receiving

4    address."  He also testified --

5           THE COURT:  Is there something in the contract

6    that mandates what your client testified to?

7           MR. EVANS:  Yes.

8           THE COURT:  All right.  And what is that and what

9    does it say?

10          MR. EVANS:  The contract says the lender must

11   provide a borrower a digital currency address for receiving

12   a repayment of a loan by close of business on the day prior

13   to the earlier of the maturity date or the recall delivery

14   date.

15          THE COURT:  But the other steps that your client

16   went through in terms of how he would do it.  I understand

17   from his testimony why he was doing what he was doing.  But

18   I think I heard the argument that that wasn't a contractual

19   requirement.  There was a contractual requirement that you

20   just read, but that's a lot less specific than the steps

21   that your client put forth.

22          MR. EVANS:  So that's fair, Your Honor, that the

23   steps that he put forward are not explicitly laid out in the

24   contract.  And what Dr. Jassin testified to was these

25   contracts are only available to crypto holders that would

Page 225

1    pledge a hundred bitcoin or more.  And when you tell a

2    crypto creditor -- a crypto investor that they need to

3    provide a hundred bitcoin or more, these are the minimum

4    steps that they would do to provide a digital currency

5    address.

6            And in fact, Dr. Jassin testified that "there

7    isn't a single one that wouldn't do the things the way that

8    I described."

9            THE COURT:  Well, is he -- he wasn't offered as an

10   expert.

11           MR. EVANS:  Correct.

12           THE COURT:  And so he gave me his opinion as

13   owner, and I'm happy to take it.  But he -- again, I didn't

14   have any expert testimony in this case of that sort.  So I

15   will take it for what his opinion is.  That's fair.

16           MR. EVANS:  That's fair enough, Your Honor.  That

17   was pretty much my next point.

18           After Dr. Jassin testified on day two, there was

19   another confirmation hearing date on day three.  The Debtors

20   could have brought forward one of the dozens of Genesis

21   employees that are currently being paid by Genesis to

22   provide testimony that contradicted Dr. Jassin that said

23   what he did wasn't necessary, that said actually all of our

24   investors do something totally different and it's much

25   easier.

Page 226

1           THE COURT:  That's true.  I mean, I think I

2    understand their position, rightly or wrongly, to be that

3    they made the legal argument about what the contract

4    requires.  I think that's where the parting of the ways was.

5           MR. EVANS:  Right.  And so where we land -- and I

6    think you are exactly right, Your Honor, they are making a

7    legal argument based on the terms of the contract.  We're

8    arguing on the contract plus the witness.

9           But what is the Court left with?  Now there's

10   uncontroverted testimony from Dr. Jasson describing the

11   technical obligations owed by crypto creditors to Genesis.

12          THE COURT:  Well, I am guessing that what I'm

13   going to hear from other folks is that the contract is the

14   contract.  Right?  And that some people's opinions about the

15   contract is not the same as the contract.  And that's sort

16   of blackletter law unless there's an ambiguity in a

17   contract.  So that's as I understand it, regardless of what

18   jurisdiction you're in -- and I imagine this is New York

19   law, but I think all jurisdictions I've had the pleasure of

20   visiting in this job all say the same thing about ambiguity

21   and contracts.

22          MR. EVANS:  The contract requires the crypto

23   creditor or the crypto investor to provide a digital

24   currency address.

25          THE COURT:  Yeah, I got it.

Page 227

1          MR. EVANS:  And what the testimony describes is

2     what needs to be done in order to do that.

3          THE COURT:  It describes his opinion about what

4     needs to be done.  And again, I think that's where there's a

5     difference of opinion as to what's relevant for what I'm

6     looking at.  I'm just trying to be candid instead of teasing

7     through the issues.  I understood the Debtor's position to

8     be the contract says what it says, Mr. Jassin said what he

9     said, and that's where we are.

10          MR. EVANS:  Fair enough.

11          THE COURT:  So let me ask you one question, which

12     is there was a lot of discussion about the -- and citations

13     from a lot of cases about automatic renewal options not

14     constituting executory contracts.  Do you have any case you

15     wanted to point out to the contrary?

16          MR. EVANS:  Both In re Windstream and NuPage, both

17     cited in our brief, descried contracts that had automatic

18     renewal provisions.  And they said that can be an executory

19     contract.  We are not saying there's caselaw that we have

20     that says they must be an executory contract.  And that's

21     one reason why we are not relying solely on that provision

22     for our argument here.

23          THE COURT:  All right.  Anything else on executory

24     contracts?

25          MR. EVANS:  Yes.  There is one provision that I

Page 228

1   would like to point to.  I know the Debtors are focused on

2   the contract, and we are too.  And this was stated in

3   Paragraph 55 of our brief.  And it states, "If either party

4   fails to perform in the event of a hard fork or air drop

5   described in the contract, the non-defaulting party may

6   declare an event of a default and terminate."  Section 5 of

7   the MBAs confer an obligation to the crypto creditors.  This

8   section concerns hard fork.  Hard fork is when a blockchain

9   splits, which will generally result in a new form of that

10  cryptocurrency.  And the classic form of that cryptocurrency

11  as defined in the MBA, a hard fork means a permanent

12  divergence in the blockchain or an air drop or any other

13  event which results in the creation of a new token.  An

14  airdrop under the contract means a distribution of a new

15  token or tokens resulting from the ownership of a

16  preexisting token.  And so what this section describes is

17  that the parties need to do in the event of a hard fork or

18  an air drop.

19          And just to be clear, I know there was some

20  discussion of we're in control of everything, there is not

21  going to be this contingent obligation.  None of the parties

22  here have any control as to whether there is a hard fork or

23  an airdrop.  This is not purely hypothetical.  There have

24  been a number of hard forks and air drops under the Ethereum

25  blockchain.  There have been a couple in the bitcoin

Page 229

1    blockchain.  These things happen.

2            Section 5(a).  In the event of a public

3    announcement of a future hard fork or an air drop in the

4    blockchain for any loaned assets, lender, the crypto

5    creditor shall provide email notification to borrower.

6    Borrower and lender may agree, regardless of loan type,

7    either to terminate a loan without any penalties or for

8    lender to manage the hard fork on behalf of borrower.  This

9    means that if there is a hard fork, the parties may agree

10   that lender, us crypto creditors, have to manage a hard fork

11   to the Debtors.  And if there is a hard fork resulting in

12   new tokens -- that's this air drop concept I was talking

13   about -- Genesis is -- The Debtors, sorry, are entitled to

14   them under other certain circumstances and the crypto

15   creditors are entitled to them in other circumstances.  And

16   both parties have to evaluate who is entitled to these new

17   tokens.

18           Section 5(c).  There are restrictions on market

19   capitalization, 24-hour trading volume.  Where this shakes

20   out is if certain criteria is hit, Genesis needs to transfer

21   the new tokens to the crypto creditors.  If those criteria

22   are not hit, the crypto creditors have to confer ownership

23   of those new tokens back to the Debtors.  Those obligations

24   concerning air drops and hard forks remain to this day.

25           I want to talk about a case that was discussed by

Page 230

1    the Debtors which is In re Hawker Beechcraft.  And In re

2    Hawker Beechcraft described contingent obligations.  And

3    they're right.  We cited this for the purpose of stating

4    that contingent obligations are sufficient to render a

5    contract executory.  And in that instance, there were a

6    number of things that if it happened, the parties had

7    obligations to one another.  And the Debtors distinguished

8    this case saying, well, that was only because in those

9    contracts, those provisions were identified as material.

10   That's the same thing here.  Section 7(d) of the MBAs say

11   not complying with air drops, the new tokens, or the hard

12   fork provisions is a material breach.

13            THE COURT:  So back up for a second.  You're

14   saying if because of an airdrop or hard fork there is new

15   currency created, it's a breach?

16            MR. EVANS:  No.

17            THE COURT:  I thought I heard you use the word

18   breach, but I suggest I misheard.

19            MR. EVANS:  Sorry, sorry.  If either party does

20   not comply with the air drop, hard fork, new token

21   provisions in the MBA, they have described that

22   noncompliance as a material breach.

23            THE COURT:  And where is that?

24            MR. EVANS:  That is Section 7(d).

25            THE COURT:  And what does it say?

Page 231

1          MR. EVANS:  Section 7 is a default section.  It is

2     further understood that any of the following events shall

3     constitute an event of default hereunder against the

4     defaulting party and shall be herein referred to as an event

5     of default or events of default.  Section D describes a

6     "material default by either party in the performance of any

7     of the other agreements, conditions, covenants, provisions,

8     or stipulations contained in this agreement including,

9     without limitation, a failure by either party to abide by

10    its obligations in Section 4 or 5 of the agreement.  And

11    such parties' failure to cure said material default within

12    10 business days.  Section 5 is the section labeled -- let's

13    get the words exactly right.  Hard fork.

14          THE COURT:  All right.

15          MR. EVANS:  So we have the other executory

16    obligations in our brief.  Those are the two I wanted to

17    focus on today.  We do believe that 562 would be the just

18    result here.  The debtor is one of the most crypto companies

19    in the world, attracting some of the highest-value

20    individual crypto investors, many of which are crypto

21    creditors now.  Genesis' balance sheet and a massive asset

22    accumulation was due to crypto investors providing their

23    bitcoin and ETH to it.

24          THE COURT:  Well, it either or isn't an executory

25    contract.  There's lots of people arguing about where the

Page 232

```
1     money should go as a matter of policy.  So I will decide the

2     legal question and let the chips fall where they may.

3               MR. EVANS:  Fair enough.

4               THE COURT:  So what would you like to argue as to

5     releases?

6               MR. EVANS:  And, Your Honor, if I could just have

7     a moment to address the UCC's argument about the horribles

8     that will fall us if we win or lose or assert these claims.

9     If you want me to do releases first, I'll go there.

10              THE COURT:  No, no.  Go ahead, please.  Is there

11    somebody -- is there somebody on the -- there is somebody

12    who's got an open mic.  Open mic moments are always bad,

13    particularly in the law.  So please mute yourself.  Thank

14    you.  It was soft enough I thought maybe I'm hearing things.

15              MR. EVANS:  Okay.

16              THE COURT:  Okay.  Your response to the UCC?

17              MR. EVANS:  Yes.  So the UCC is seemingly taking

18    the position that since the crypto creditors' group has

19    asserted what they believe their rights are under Chapter

20    11, that they are, A, asking for fiat claims, which we're

21    not.  Or B, asking for a resolution where if we lose our

22    objection, then the whole plan gets thrown out and we get

23    treated somehow disparately from everybody else.  Neither of

24    those is what we're asking for and neither of them are

25    supported.
```

Page 233

1           There are classes of creditors identified in the

2    plan.  Bitcoin creditors are class four.  ETH creditors are

3    class five.  That's where all of our group sits.  There's

4    nothing in the plan that says you are a bitcoin creditor

5    unless you object.  And therefore, you are not.  You are an

6    ETH creditor unless you speak up about your rights under

7    Chapter 11, and then you are not.  There is no provision for

8    that.

9           And so all we're doing is objecting to the plan

10   because we believe it does not comply with 11 U.S.C. 562.

11   And we shouldn't be penalized for that.  If we lose, then we

12   lose.  And we get the plan just like everybody else.

13           THE COURT:  Yeah, no.  But I think that's his

14   point.  If you lose, you win.  Right?  You lose, and if the

15   plan is confirmed, you still get the benefit of the

16   distribution principles.  Again, it doesn't matter.  I have

17   to decide what the executory contracts question, and I'll

18   decide that.

19           I think his thought is, as sometimes happens,

20   someone says -- people will point out occasionally in terms

21   of the equity of arguments whether somebody is essentially

22   playing with house money or not.  And so he's made that

23   point.  And it is what it is.  But I still have the

24   executory contract issue to resolve regardless of that

25   phenomenon.

Page 234

1          MR. EVANS:  And it leads us right into the

2     releases.  Because just like parties will object to releases

3     and if they lose on their objection to releases, they don't

4     get given negative status or devalued or...

5          THE COURT:  Well, there is a point that to the

6     extent there's an argument that you make that would lead to

7     a hard stop where otherwise there wouldn't be a hard stop in

8     the case, it is what it is.  So I haven't again figured out

9     what everything looks like in the context of the many

10    objections and arguments made today.  I will.  But I think

11    that is a real thing.  And so I mentioned that only because

12    there has been a discussion about delay and the significance

13    of delay.  So that's a real consideration, a real world

14    consideration.  It doesn't solve lots of legal issues for

15    me, but it's a legitimate, real world consideration for now.

16          So on to releases.

17          MR. EVANS:  The plan seeks to release 176 Genesis

18    personnel and uncapped number of what they have defined as

19    related parties.  This includes six C-suite executives who

20    were employed prior to the petition date.  It also includes

21    the interim CEO, who has been an executive of the company

22    since May of 2020.

23          The Debtors have refused to identify who the

24    related parties are.  And they said it's not common, related

25    parties often don't get disclosed.  We don't know exactly

Page 235

```
1    who they are, but just we're going to be okay, stick with

2    the related parties discussion.  There was a stick with the

3    related parties definition.

4              There was a paragraph in their confirmation brief

5    at 75 that said to the extent there is any concern regarding

6    the identities of related parties, that matter can be

7    addressed if and when a person or entity asserts they are a

8    related party in a litigated context.  Well, that's not a

9    good backstop.

10             So because we don't want to decide who a related

11   party is and who they are not, we --

12             THE COURT:  Well, there's a definition, right?

13   When you say not identified, you mean not identified by

14   name, individual.

15             MR. EVANS:  Correct.  Correct.  And the definition

16   includes, for example, members, managers, employees, agents,

17   consultants, investment bankers, representatives.  There are

18   terms in the related party definition that are exceedingly

19   broad.  And in our view, waiting around to determine for the

20   estate of the litigation trust to determine, hey, I want to

21   sue this third party, let me wait and see if they put

22   forward as an affirmative defense that I've actually

23   released them isn't good enough.

24             THE COURT:  Well, let me ask you about that.  You

25   mentioned litigation.  And I think one of the primary points
```

Page 236

1    and things I think that was added in response to an

2    objection that was made was to include cooperation

3    agreements of people cooperating on litigation because there

4    is in fact a significant litigation or more that are out

5    there.  And so what I understand the Debtor's position to be

6    is that that is value, especially when considering the

7    results of the investigation, and the instances where folks

8    who might otherwise be covered were kicked out based on sort

9    of facts that the Debtors were aware of or other parties

10   made them aware of, and so that's a valuable thing.

11   Because, again, this is a debtor release.  This isn't a

12   third party release.  It's a debtor release.  So the Debtors

13   have made that business judgement about releases and the

14   benefits and the things you're giving up in the context of

15   carveouts for fraud, gross negligence, and willful

16   misconduct.  So what's your basis to say that that's an

17   irrational decision?

18            MR. EVANS:  Fair question.  Just one point of

19   clarification.  The related parties' concern the release in

20   the plans, and then there's also Genesis-released personnel,

21   which is the 176 --

22            THE COURT:  Well, let's start with the Genesis-

23   released personnel.

24            MR. EVANS:  Let's focus on the releases.

25            THE COURT:  Because as I understand it, your

Page 237

1    objection hasn't changed.

2          MR. EVANS:  It has not.

3          THE COURT:  Yeah.  So let's start with the 167.

4          MR. EVANS:  Okay.

5          THE COURT:  Or 176.

6          MR. EVANS:  Let me focus on your first question,

7    which was the Debtor said they are going to cooperate with

8    the estate and cooperate in litigation, isn't that important

9    to you and shouldn't they get releases for that basis.

10   Maybe.

11         Now, what we've seen is a cooperation agreement

12   that was filed midway through the confirmation hearing that

13   said that the employees that are being released will

14   cooperate with litigation.  And if they don't, they're

15   fired.  Right?  That's basically what it says.  Or they

16   won't be on that list.

17         What we don't have and what is not on the record

18   is what their preexisting obligations are.  AS an employe of

19   the company --

20         THE COURT:  But nobody -- I don't think anybody

21   raised this earlier during the trial when we can actually

22   answer these questions.  But it's fine.  So you don't know

23   what their existing obligations are to cooperate.

24         MR. EVANS:  I don't know what their existing

25   obligations are to cooperate.  And three of the things that

Page 238

1    they said they were going to cooperate with were a bunch of

2    -- were regulatory inquiries, many of which have all been

3    resolved.

4          THE COURT:  But don't you run the risk that

5    somebody is going to say that you're supplying your business

6    judgement for the Debtors in the context of this?  I mean...

7          MR. EVANS:  Let me address that point head-on.

8    Because that's an important part of our argument.

9          Our position is that the Special Committee was the

10   body that was tasked with providing prior written consent

11   prior to the releases.  The evidence at trial, the evidence

12   in the record in our view supports the notion that there was

13   no business judgment made.  Because Mr. Aronzon when he made

14   the decision did not have sufficient facts to make a

15   business judgement.  And so I'm not supplanting my business

16   judgement for anyone else.  The body that was tasked with

17   providing written consent --

18         THE COURT:  On that I would disagree with you.

19   You may criticize his business judgement, but you are -- I

20   mean, he literally has statements that he says in my

21   business judgement we think these releases are appropriate.

22   So you are.  I mean, let's just be clear what you're doing.

23   You can make arguments that that's appropriate here, but

24   that is in fact you are taking on his business judgement.  I

25   mean, there's really not a way to sugarcoat that.

Page 239

1            MR. EVANS:  Let me move to why I think the

2      business judgement wasn't supported by the facts in the

3      record.

4            We cross-examined Mr. Aronzon extensively during

5      the course of the examination hearing.  There was a proffer

6      filed 20 minutes before the cross-examination.  And I think

7      what's really important to note here is all the things he

8      didn't know.  All the things that he didn't know when he

9      signed the list of releases on December 29th, 2023 when he

10     stated that he was driving in his car when he agreed to the

11     releases.  He did not --

12           THE COURT:  Let me ask you.  So if he didn't know

13     something and then later, I think as is the case with

14     supplementing the record at my request or my suggestion to

15     provide additional information.  And then those things all

16     turn out the answers to those seven questions.  I think all

17     turned out to be good answers for purposes of your client,

18     meaning resolving issues sort of as you went through.  Does

19     that mean that, again, as a collective business entity and

20     the Debtor, Mr. Aronzon, is the declarant and he is the

21     party who is cross-examined.  But if I ultimately find that

22     there is a reasonable basis for it based on the totality of

23     the record, is it your view that if Mr. Aronzon signed

24     something at a certain point and it's frozen in that time as

25     to what he knew?

Page 240

1          MR. EVANS:  His consent is as good as it was on

2     the day he signed it.

3          THE COURT:  But let me explain to you how court

4     works here.  These issues come up all the time.  And since

5     we try to get at the truth of the matter with as much

6     information as possible, it is quite often the case that

7     people ask questions about these things, whether it's

8     releases or something else and are provided with

9     information.  And in fact that's certainly the exchange

10    that's gone on here with your client and with the U.S.

11    Trustee's Office and with others.  And it is highly

12    problematic as a matter of reaching a proper and just result

13    to sort of play a game of gotcha and freeze things

14    artificially at a moment in time and say, well, when I

15    deposed you, you said X.  So I don't even know how we would

16    mechanically do that.  Because it means, well, we can't make

17    that person available for a deposition until we finish the

18    entire process.  So I guess that back row of people will be

19    deposed while we have a hearing going on.

20          But no, listen, it's an important point.  Because

21    I think your world view on that stands in the way of the

22    process that is pretty common and, frankly, seems to be an

23    appropriate vehicle for getting at the truth.  So...

24          MR. EVANS:  How about I focus on what he knew at

25    the time of the confirmation hearing?

Page 241

1           THE COURT:  Well, but is that your position?  I

2     mean, I want to be clear about exactly what the scope of

3     your objection is.

4           MR. EVANS:  The scope of my objection is when he

5     gave the written consent, which is the only written consent

6     that he ever gave, on December 29th, 2023.

7           THE COURT:  All right.

8           MR. EVANS:  That he didn't have the sufficient

9     factual basis.  My position also is that he didn't have a

10    sufficient factual basis at the confirmation hearing.  And

11    he still doesn't.  At least -- I haven't talked to him

12    recently, but at the confirmation hearing.

13          For example, he testified at the confirmation

14    hearing he did not know prior to the motion in limine we

15    filed on February 21 how many people were being released.

16          THE COURT:  Okay.  But again, you're going back in

17    time.  So if we later got -- so it is irrelevant in your

18    mind that numbers were later provided.

19          MR. EVANS:  If he provided a written consent

20    again, it would be relevant.  But he provided one written

21    consent on December 29th, 2023.

22          THE COURT:  I will tell you that argument I am not

23    going to find persuasive whatever else I do, because I think

24    it is a real enemy to actually reaching just and appropriate

25    results in large cases that are quick-moving and where

Page 242

1    people need to exchange information.  I think freezing

2    things as of a particular date -- and if you remember at the

3    trial I said you've learned these things for purposes of the

4    proffer.  Do you need additional time, would you want to

5    question the witness now.  And I did that because surprise

6    is a legitimate concern.  I get it.  You decided no, I will

7    ask the witness the questions now.  So I am certainly happy

8    to prevent undue surprise and to compromise somebody's

9    ability to ask intelligent questions.  But I will tell you

10   right now, I reject the notion that we're going to play this

11   game of gotcha down the road if additional facts come to

12   light and that I'm supposed to throw them all out.  That's

13   just -- that would wreak a lot of havoc in a lot of cases.

14        MR. EVANS:  Well, let me just focus on then less

15   about the timing and more about knowledge at confirmation.

16        Mr. Aronzon testified that he did not know whether

17   any of the released parties signed loan documents with 3AC.

18   With respect to financial statements, he said that he

19   thought others reviewed financial statements from 3AC.

20        THE COURT:  But am I right in remembering the

21   testimony that there were a number of questions and back and

22   forth where he, for a number of these questions, said nobody

23   who was involved in the decision on things like Three Arrows

24   Capital got a release?  I can't tell you whether someone in

25   their role as a functionary was required to sign but was not

Page 243

1    a decision-making person whether one of those people is

2    released.  Am I remembering that correctly?

3              MR. EVANS:  Your recollection of that piece is

4    correct.  There was words to that effect I think with

5    respect to 3AC.

6              THE COURT:  But then what's your -- if that's the

7    testimony and that's the evidence, what's your point?  That

8    somebody who is being given direction by somebody else who

9    makes the decision and has no independent decision-making

10   authority but whose name ends up on a document, that that

11   precludes them from getting a release?  Doesn't that elevate

12   form over substance?

13             MR. EVANS:  The questions were designed to test

14   whether he had sufficient knowledge of the 3AC loans to

15   issue releases one way or the other.  And so whether he knew

16   who signed the documents --

17             THE COURT:  But I think he answered nobody who was

18   involved in the decision-making process as to the Three

19   Arrows Capital loans got a release.  Your question was a

20   different one.  Your question was is there somebody who may

21   have signed off on a document who did not have decision-

22   making authority.  And he said I can't tell you that because

23   we didn't think that was the relevant question.  And my

24   question to you is does your focus there miss the forest for

25   the trees, whatever metaphor you want to make, elevate form

Page 244

1     over substance.

2            MR. EVANS:  Let me try to get to the forest on the

3     3AC issue, which is 3AC had no audited financial statements.

4     That was a big problem for this bankruptcy estate, for a

5     number of the other crypto bankruptcy estates.  And when we

6     asked Mr. Aronzon whether 3AC had audited financial

7     statements, he says I have no idea.  And so if he is the one

8     that's appointed to make a decision as to whether releases

9     should be given to insiders, he should at least know that.

10    And that was our point of the 3AC cross-examination.

11            THE COURT:  All right.

12            MR. EVANS:  We had similar lines of testimony Your

13    Honor will recall about the BCG notes, whether any of them

14    signed them, whether anyone was involved and to the extent

15    of the -- extending the maturity date of DCG loans, whether

16    released parties were involved in decisions during the tax

17    sharing agreement, and whether any insiders were involved

18    with diligence in relation to the assumption by DCG of the

19    GAP loans.  Similar testimony as to 3AC.

20            THE COURT:  Right.  But I think similar meaning

21    that the question ultimately devolved into whether somebody

22    who had decision-making authority got a release.  And the

23    answers were no, but he couldn't swear that somebody who

24    didn't have their name somewhere mentioned in that corporate

25    structure who works on that stuff.  Right?

Page 245

1          MR. EVANS:  We were given conclusions both in the

2     proffer and by Mr. Aronzon.  We have one fact witness.  That

3     was the only witness offered to us.  And --

4          THE COURT:  No, no.  I'm talking about what the

5     testimony was.

6          MR. EVANS:  Yes.

7          THE COURT:  That the testimony was that nobody who

8     was a decisionmaker on those issues was given a release.

9          MR. EVANS:  That was the conclusion, yes.  And

10    then the cross-examination was designed to test whether he

11    knew whether that was true.

12         THE COURT:  Fair enough.  Fair enough.

13         MR. EVANS:  As another example, there was a line

14    in the proffer that said that the released parties were

15    subject to indemnification by the Debtors and so the claims

16    would be worthless anyway.  And then when asked whether he

17    knew if all of these released persons were subject to

18    indemnification, he said he did not know.  There was also a

19    line in the proffer that said that pursuing the insiders was

20    not financially worthwhile.  We asked whether he reviewed or

21    anyone reviewed any personal financial statements from those

22    insiders, and he said no.

23         And the Debtors had an opportunity to supplement

24    the evidence in the record if they wanted.  They chose not

25    to.  They chose not to do so.  They could have redirected

Page 246

1    Mr. Aronzon.  They could have asked him describe what you

2    knew when you authorized your releases.  Why didn't you

3    think it was necessary to look at the loan documents from

4    3AC or find out whether they were audited financial

5    statements?  What facts did you rely on when coming to this

6    conclusion?  And they didn't do that.  They didn't do that.

7            So the problem with the record here is all we have

8    is a conclusory proffer submitted 20 minutes before his

9    examination --

10           THE COURT:  Well, we had the declaration.  Right?

11           MR. EVANS:  We had the declaration.

12           THE COURT:  Right.  And so there were -- I think

13   the proffer was something that when I asked you what is it

14   that you would like to know, you identified seven topics.

15   They were the topics that were identified in your pleading.

16           MR. EVANS:  Yes.

17           THE COURT:  And we went through them.  And the

18   proffer was the result of trying to answer those questions

19   to provide additional information.

20           MR. EVANS:  Fair enough.  I think it was either

21   seven or nine, but whatever ones we identified, those are

22   the ones that they addressed in the proffer.  We have

23   different views as to whether those are sufficient enough.

24   In our view they were conclusory and --

25           THE COURT:  No, that's fair enough.  I'm just

1    trying to be careful with the record when you say the only

2    evidence -- things like the only evidence we have is the

3    proffer.  So I'm just trying to straighten that out, because

4    that's not accurate.

5            MR. EVANS:  Fair enough.  Fair enough.

6            THE COURT:  What else would you like to tell me?

7    I will say I have an unhealthy-detailed memory about witness

8    testimony.

9            MR. EVANS:  Very good.

10            THE COURT:  My apologies.

11            MR. EVANS:  No, very impressive.  When we started

12   this argument, we urged the Court to focus on the record and

13   the record, because it's the only record.  Admissible

14   evidence only.  With respect to the crypto group's

15   objections, what is in evidence and what is not.  Here's

16   what we believe is in the record.

17            On 562, we have the contracts.  We have a

18   stipulation where the Debtors admit or agreed that the MBAs

19   are covered contracts for the purpose of this dispute.  We

20   have Dr. Jassin's testimony explaining why at least he

21   believed the MBAs are executory.  And we have the contracts

22   themselves, including obligations concerning the digital

23   wallets and the hard forks and the air drop.

24            THE COURT:  I have the 562 argument.  I've got it.

25            MR. EVANS:  And as to the releases, we just went

Page 248

1    through what we believe the record shows with Mr. Aronzon.

2    What's not in the record is any witness from Genesis

3    rebutting Dr. Jassin, anyone else from Genesis saying that

4    what he said about the digital wallets is crazy or unique or

5    specific to him, or redirect Mr. Aronzon to restate what he

6    knew or didn't know at the time and what he knew or didn't

7    know now.

8           Creative arguments from the lawyers, no matter how

9    smart, is not evidence.  Lawyers trying to convince the

10   Court about how the contract actually worked is not

11   evidence.  Empty threats about the parade of horribles that

12   could, may, or maybe will occur if the crypto group is

13   successful or unsuccessful is not evidence.

14          THE COURT:  I got it.  We don't need to repeat

15   everything.  I got it.  I know what's evidence and what

16   isn't.

17          MR. EVANS:  Fair enough.  We believe the

18   admissible evidence at trial supports two conclusions.  One,

19   that the plan cannot be confirmed because it violates 11

20   U.S.C. 562.  And two, that the Debtors failed to meet their

21   burden to support releases for a still unknown number of

22   insiders.

23          THE COURT:  Am I right just the way you said that

24   at the end, you would like the plan not to be confirmed?

25          MR. EVANS:  The plan in its current iteration to

Page 249

1    not be confirmed because of 11 U.S.C. 562 and the releases.

2              THE COURT:  All right.  So go back to negotiate.

3              MR. EVANS:  What we want is a ruling that we're

4    right on 11 U.S.S. 562, the plan can't be confirmed in its

5    current iteration.  And then what would happen practically

6    is --

7              THE COURT:  No, that's fine.  I just -- different

8    people will say here's my argument, here's the problem,

9    Judge, and here's what I want.  And those things can vary.

10   Right?  There's different variations on that.  I want you to

11   fix them as to my client versus I want you to blow the plan

12   up.  There's different ways to look at it.  That's why I

13   want to be very clear what it is you're asking for.

14             MR. EVANS:  I'm not asking Your Honor to redline

15   the plan or the distribution principles.  I know you can't

16   do that.  What we're asking is to apply 11 U.S.C. 562.  In

17   our view it applies here and the plan can't be confirmed in

18   its current iteration on that basis.

19             THE COURT:  Thank you.

20             MR. KESSLER:  Good afternoon, Your Honor.  For the

21   record, Tom Kessler from Cleary Gottlieb for the debtors.

22   Very briefly two points.

23             First on the discussion of the hard fork

24   provision.  As we lay out in our brief and as we discussed,

25   contingent obligations do not necessarily render -- a

Page 250

1    contingent obligation isn't necessarily sufficient on its

2    own to render a contract executory, nor is one performance

3    obligation.  We lay all this out in our brief I think amply,

4    and I'll leave that where it is.

5           On the second piece that was focused on -- I think

6    I may be the only person who hasn't had a chance to say it,

7    so I will say it.  The contract is the contract is the only

8    contract, the contract.  And as Your Honor noted, the

9    contract speaks for itself.

10          I think what's pretty important here if I can

11   direct the Court to an example of these MBAs.  This is JX-

12   017.  It's Dr. Jassin's.  There was some discussion of

13   Section 2(c)(1) and the requirement to provide a digital

14   currency address and to have a wallet at the time that the

15   loan needs to be repaid.

16          I think it's important to know that in that

17   provision, the contract goes on to say that if a lender has

18   not provided to the borrower that digital currency address,

19   then the loan becomes an open loan and the maturity date or

20   the delivery date simply ceases to exist and the loan will

21   be repaid at such time as the digital currency address

22   becomes available.  So it isn't the kind of all-or-nothing

23   composition that was suggested in the presentation this

24   afternoon.

25          And of course I will rely on Your Honor's sharp

1    memory of the presentation of evidence and Dr. Jassin's

2    testimony, but I think he was unequivocal that the steps

3    that he took were his own personal view of how to create a

4    secure coin wallet, that they weren't required under the

5    MBA, and that there were other much simpler, much more

6    ministerial ways to do the same act and achieve the same

7    result.

8              If there's nothing else, I will cede the podium.

9              THE COURT:  All right, thank you.

10             MS. VANLARE:  Your Honor, Jane VanLare.  Very,

11   very briefly.  Just a point about the cooperation

12   agreements.  There was a point made I think about the fact -

13   - some suggestion that perhaps the Genesis-released

14   personnel are already otherwise obligated to do the things

15   that the cooperation agreement would require them to do.

16   And I just note that many of the Genesis-released personnel

17   are no longer with the company.  And obviously those who are

18   still with the company, there's nothing sort of preventing

19   them from leaving.  So I just note that for the Court's

20   consideration with respect to the cooperation agreement.

21             THE COURT:  And does the cooperation agreement

22   specifically address circumstances where someone is no

23   longer employed if this obligation continues to cooperate?

24             MS. VANLARE:  Yes.  Yes, it does, Your Honor.

25             THE COURT:  All right.  It is what it is.  I'm

Page 252

1    just asking for a memory assist on that.  All right.

2         MS. VANLARE:  Other than that, Your Honor, I won't

3    repeat what I already said.  I think there's ample record

4    here to support the Debtor's business judgment in granting

5    the Debtor releases.  Thank you.

6         THE COURT:  All right, thank you.

7         MR. SHORE:  Very briefly, Your Honor.  You

8    mentioned in questioning counsel the concept of paying with

9    house money.  And I want to be perfectly clear about what's

10   going on here.  We have a giant poker game, that's a fine

11   analogy.  But there is no house money.  It's all the

12   creditors' money.  There is one card left to turn over.  Is

13   DCG right or are the Ad Hoc Crypto creditors right?  The

14   Debtors have proposed to chop the pot, and everybody has

15   said let's chop the pot.  You've got two players saying no,

16   what we want to do is we want to go all-in.  DCG wants to

17   take all of the crypto creditors' money and go in against

18   their own interests on the 502 issue and the Ad Hoc Group

19   wants to take all of the dollar denominated creditors' money

20   and go all in.  It's not a fair result to force people to

21   litigate the issue.

22        Now, because my arguments tend to the devilish

23   side and not the heavenly side, I would love to find a way

24   to put those two parties in a room and let them play with

25   each other's money to resolve that issue.  And DCG pays the

Page 253

1     crypto creditors if they lose, and the crypto creditors pay

2     DCG the surplus that is created if their claims are

3     dollarized.  But we don't have a way to do that.

4          And the reason I raise the issue of what did they

5     really want is not to threaten them.  But it's just not as

6     easy as they say, nor is it as easy as DCG says.  For the

7     crypto creditors, if their claims were treated as executory

8     contracts, they would have to file a rejection damages

9     claim.

10          The statute says you value it at the time of the

11    termination.  We're just going to assume that's what the

12    rejection means here, even though rejection is not

13    termination.  But that does not affect the ability of the

14    Court to address the nunc pro tunc issue.  Basically what

15    they are saying is we want you, even though this case has

16    been pending for all this time and there's a whole bunch of

17    legal delay that is not the fault of the other creditors --

18    getting to that (indiscernible) standard in that long

19    section they have on what is an appropriate nunc pro tunc

20    order and what isn't.  It is not clear that the right result

21    here would be that the Court would determine that the

22    rejection damage claim is calculated as of today, $68,000,

23    and not the petition date, $21,000, and not the date the

24    plan was solicited, $27,000.  Everybody has got risk here.

25    And all I'm trying to do as the fiduciary for all the

Page 254

1    creditors is give most of the creditors what they want

2    without taking a position of two non-fiduciaries, one paying

3    an equity option and one playing a free option, to force

4    people to litigate an issue which has dramatic effects on

5    the recoveries.

6          So we ask that Your Honor accept the settlement as

7    is, and we'll move on.

8          THE COURT:  All right.  Anyone else who wishes to

9    be heard on the objection, CCAHG?  All right.  That matter

10   is now addressed.  So two out of three ain't bad, as

11   Meatloaf says.  So we have one more.  And it's the United

12   States Trustee's Office.

13         I know that that objection has been narrowed.  So

14   I'm not sure who the right person to hear from first on that

15   in light of that circumstance.

16         MS. VANLARE:  Your Honor, Jane VanLare, Cleary

17   Gottlieb, on behalf of the Debtors.  I will just briefly

18   summarize what I believe are the outstanding issues and then

19   I will quickly cede the podium to Mr. Zipes so he can

20   describe his position.

21         The first issue is the payment of the Ad Hoc Group

22   counsel's fees.  I won't spend time on it because I think

23   it's been amply addressed both in my presentation as well as

24   various parties.  But that's issue number one.

25         Issue number two is the plan's proposed

Page 255

1    exculpation of non-estate fiduciaries.  And I believe that

2    the only non-fiduciaries who are being exculpated here are

3    the members of the  Ad Hoc Group's Steerco.  We believe

4    those individuals were instrumental in negotiating key

5    aspects of the plan and the Gemini settlement.

6            Also -- sorry, it's the Ad Hoc Group Steerco

7    members and Gemini, but solely as the distribution agent

8    because it's going to be playing the important role of

9    making distributions per the Debtor's request.

10           Your Honor, the --

11           THE COURT:  And that exculpation is tied to

12   everything done in the case.

13           MS. VANLARE:  Correct.  Correct.  It's solely as

14   the distribution agent.

15           THE COURT:  But I mean as well as for the Ad Hoc

16   Steerco, meaning that, again, as exculpation clauses are --

17           MS. VANLARE:  Correct.

18           THE COURT:  -- it's tied to the activities in the

19   case.

20           MS. VANLARE:  That's right.  That's right.  Your

21   Honor, we think that the courts in this district routinely

22   approve exculpations of prepetition conduct that are

23   narrowly tailored as these are.  And therefore we believe

24   that you should overrule the U.S. Trustee's objection on

25   this point.

Page 256

1          The next point is the so-called no liability --

2    it's actually related, the no-liability provision of the

3    plan that exculpates the Gemini distribution agent and its

4    related parties for certain actions taken directly in

5    furtherance of the performance by the Gemini distribution

6    agent of its duties under the plan.  And again, for the

7    reasons I just described, we think that's entirely

8    appropriate given the context and their role.

9          Then the final issue that we have is some -- is I

10   believe the U.S. Trustee has raised a concern that there is

11   some daylight between the releases and exculpations, which

12   are narrowed, and the injunction.  And we don't think that's

13   the case, actually.  And we believe that there is a sentence

14   in the plan which makes this clear, which -- And I'll just

15   read the sentence:  "Further to the maximum extent permitted

16   under applicable law, the confirmation order shall

17   permanently enjoin the commencement of prosecution by any

18   person or entity whether directly, derivatively or

19   otherwise, of any cause of action solely to the extent

20   released or exculpated pursuant to this plan.  Including the

21   enjoined actions against any released party or exculpated

22   party other than the Debtors or the winddown Debtors."

23          So in other words, we believe the plan already

24   makes it clear that the injunction provision isn't meant to

25   go beyond the releases and exculpations.  I believe that's

Page 257

1    the extent of the remaining issues, but I'll let Mr. Zipes

2    comment as to whether or not there is anything else.

3              THE COURT:  All right.  Mr. Zipes?

4              MR. ZIPES:  Good afternoon, Your Honor.  Greg

5    Zipes, with the U.S. Trustee's officed.  Ms. VanLare has

6    accurately summarized the remaining objections.  They are

7    located in Footnote 3 of the letter that Debtors' counsel

8    submitted.  We would elevate that footnote perhaps to the

9    first paragraph of that letter, Your Honor.  But we'll take

10   it in a footnote, and that does adequately summarize our

11   position.

12             Your Honor, I'll be brief.  I can go in whatever

13   order the Court wants, but in the absence of -- I'll just

14   dive into it --

15             THE COURT:  Sure.

16             MR. ZIPES:  -- starting with substantial

17   contribution.  Your Honor, I was a little bit surprised by

18   the turn of events today where the parties -- the

19   professionals started arguing that in fact 503 may not apply

20   at all.  And I'd like to move the conversation back to 503.

21             This Court did cite Lehman, and that's a District

22   Court case that my office had appealed from the Bankruptcy

23   Court.  Judge Sullivan was involved with that.  And

24   basically, in so many words, you can't -- if there's a

25   specific provision that applies, that you can't look to more

Page 258

1    general provisions under the Bankruptcy Code.  That's

2    Supreme Court precedent under RadLAX and other Supreme Court

3    precedent.  503, the issue is slightly different there, Your

4    Honor, in Lehman, but the point is that 503 is the proper

5    place to look if professional fees are being dealt with in

6    the context of ad hoc groups.

7             And Your Honor, we've discussed testimony to a

8    certain degree.  Mr. Aronzon was the witness that the

9    Debtors proffered for better force on the point of whether

10   ad hoc fees were reviewed.  And Mr. Aronzon, under oath --

11   under questioning, said -- the question was, "But you didn't

12   review all the individual fees, did you?"  And he said,

13   "No."

14             And I believe, Your Honor, that the standard for

15   substantial contribution is higher than just these fees were

16   incurred by us.  There has to be, obviously, ad hoc

17   committee professionals or --

18             THE COURT:  Yeah, well, let me ask you about that.

19   So, I think there's a couple of different objections here.

20   But if you look to 503 for a second -- so let's do that.

21   There certainly was a lot of evidence about the activity of

22   the two groups, particularly the ad hoc group.  And there's

23   certain things that I think I've been pointed to that are

24   steps that help bring this case to this point.

25             So I'm thinking particularly if the ad hoc group's

Page 259

1    discussions with New York Attorney General's office and its

2    alleged victims in that lawsuit, not surprising that they

3    would have a conversation.  And certainly, the other thing

4    about a plan support agreement and other things that help

5    essentially gather consensus so that it allows the case to

6    move forward.  And it's sort of beyond simply the parochial.

7    And certainly, the ad hoc group has a sizable number of

8    people and amount.

9            So I can understand if this is sort of a

10   documentation question.  Well, yeah.  I think that may be

11   something that's fixable.  And so the question is basically

12   hearing the testimony, whether there's sort of a still -- a

13   substantive question as a matter of what evidence -- the

14   evidentiary record is about the role of -- let's take the ad

15   hoc group to start -- of the ad hoc group in terms of their

16   substantial contribution.

17           MR. ZIPES:  Your Honor, I think that in the usual

18   context, there would be a showing of substantial

19   contribution.  And then the question would be what do the

20   individual time records show at that point.

21           THE COURT:  All right.

22           MR. ZIPES:  So I --

23           THE COURT:  I think we can probably figure that

24   out.  Because I understand -- somebody can remind me -- I

25   don't have as good a memory for documents as I do for

Page 260

1     witnesses -- what the provision is.  Is it a specific dollar

2     amount?  I think it's an up-to?  Or is it just all fees?

3               MR. ZIPES:  Well --

4               MR. ROSEN:  For the ad hoc group – sorry.

5               MR. ZIPES:  Go ahead.

6               MR. ROSEN:  For the ad hoc group, there is no cap

7     on it, Your Honor.  There was with respect to the Dollar

8     group.

9               THE COURT:  Okay.  I knew there was a cap

10    somewhere.  All right.  So, to me, that's a much more

11    fixable problem.  Again, I'm not going to be naive enough to

12    volunteer and say that you all would be thrilled with that.

13    But I think it may be fixable problem in the sense of

14    sharing what the fees are and having the U.S. Trustee's

15    office take a look.  And if that solves your problem,  I

16    might be inclined to do that.  And if I need to make a

17    ruling, I'll make a ruling.  But would that be something

18    that would fix your problem?  Mr. Zipes?

19              MR. ZIPES:  Your Honor, we think it's important

20    that it be on the record and that there be some --

21              THE COURT:  No, no.  That's fine.

22              MR. ZIPES:  Yes.  And Your Honor --

23              THE COURT:  As I think my earlier harangue, which

24    you all had to listen to, made clear, I recognize cases

25    evolve and we try to make progress where we can.  So, that's

Page 261

1    perfectly fine.

2              MR. ZIPES:  And Your Honor, my office has agreed

3    to arrangements in the past on substantial contribution

4    where we ask that applications be filed and --

5              THE COURT:  Well, I think at this point, I did ask

6    that question about applications earlier.  And I think I was

7    trying to avoid something that was not a meaningful addition

8    to the -- to circumstances.  But the idea of sharing

9    attorneys' fees -- and again, I think the devil's in the

10   details, you can work this out.  I just didn't want to have

11   somebody say in order to check this box, I need to file this

12   piece of paper that says exactly what I just said standing

13   up.  We'll try to avoid that, I would think.

14             MR. ZIPES:  Your Honor, I appreciate that.  One

15   practical issue that I wanted to bring to the Court's

16   attention is just when we review 503 applications,

17   oftentimes they're sort of a recitation that this time is

18   sort of for parochial reasons.  And then this time is for --

19   we believe was a substantial contribution.  And we didn't

20   necessarily get that from --

21             THE COURT:  Well, here's the thing.  That can be

22   awfully hard to separate.  And will say that I tend to look

23   at as to whether a substantial contribution has been made

24   because I think it is awfully hard to tell, particularly as

25   you're going forward, as to exactly how things are going to

Page 262

1    come together.  And so I think at the end of the day, if you

2    look and say you all did things that contributed to the

3    holding of hands in the context of an agreement.

4            So, for example, I think I had this conversation

5    with someone in your office in connection with the AMR,

6    American Airlines case, and unions having an agreement to

7    get compensated.  And it was clear, once you reached the end

8    of the case, that the Union had played just a central role

9    to lead to all sorts of good progress.  But I do think there

10   were times when the Union stood up and said the Debtors are

11   wrong; this is terrible.  And so I don't -- no one tried to

12   make a thing to parse it out because, frankly, in those

13   relationships, you sort of have to go through some of those

14   other things to get to the progress.

15           So I'm not -- my thought is if they're reasonable

16   fees, they're reasonable fees, because I think that I don't

17   know that the statute for substantial contribution

18   necessarily requires that I parse it out and put it into

19   individual boxes.  It requires that I find that there's a

20   substantial contribution.

21           So, but again, I think the devil's in the details.

22   I think there is, based on what I've gotten thus far, much

23   like the American Airlines case, I have a pretty good sense

24   of what people have been doing.  And I think your office

25   does too.  Your office has been involved.

Page 263

1              MR. ZIPES:  Agreed, Your Honor.

2              THE COURT:  So, what my thought would be for

3      people to sit down and try to document that, provide

4      attorneys' fees.  Whether it's providing samples, whether

5      it's providing some of the description of tasks, I'm sure

6      you could work through that.  Some of that's already in the

7      record.

8              MR. ZIPES:  It is.

9              THE COURT:  Yeah.

10             MR. ZIPES:  It is, Your Honor.  And we have gotten

11     cooperation from the parties.  There's just this underlying

12     -- and maybe it was because this was an issue pushed to the

13     end -- but, Your Honor, we basically agree with the Court.

14             I just want to know that it would be an issue

15     possibly if this Court -- and if the parties are adhering to

16     position -- that it's anything other than substantial

17     contribution.  But that's --

18             THE COURT:  Yeah, I don't think we -- listen, as

19     exciting as it would be to write another opinion on 503 and

20     substantial contribution, I really don't want to stand in

21     the way of an appropriate results you all are -- you know,

22     again, and sort of I'm taking, frankly, my lead from you

23     all, because it's pretty clear people have been

24     communicating.  They've been cooperative.  Nobody sort of

25     wants to stand on ceremony.  And again I'm sure there's a

Page 264

1  fascinating 503 opinion to write.  But I've written a couple

2  of those and I don't have a particular desire to necessarily

3  write another one, as fascinating as it would be.

4          So again, my hope is to reach a just result.  And

5  so that's why I think I flagged it for folks when we started

6  confirmation to -- because I appreciate the additional

7  evidentiary record that was provided because I think that

8  was very helpful for everybody involved, including myself.

9          MR. ZIPES:  Your Honor, I'll move on because I

10 understand.  These are points that are important and

11 oftentimes, Your Honor, you'll see that my office is the

12 only one standing up at confirmation raising some of these

13 issues.  But, so my office believes they are important to

14 raise and they --

15         THE COURT:  No, no.  Again, that's fine.  That's

16 fine.  And I know we're talking about this being done sort

17 of at the end and the people literally are at the end.

18         MR. ZIPES:  Yep.

19         THE COURT:  Sometimes that's the right spot to

20 deal with something like substantial contribution after

21 you've had sort of the full record and discussions about

22 things.  So --

23         MR. ZIPES:  And let me move on, Your Honor --

24         THE COURT:  Sure.

25         MR. ZIPES:  -- to the no liability provision,

Page 265

1     which is an exculpation provision as well.  But this, Your

2     Honor, goes to a post-effective date entity that -- and

3     asking for sort of approval of this Court.  And we just

4     think that exculpation provisions generally of this nature

5     are no liability provisions, and as of the effective date

6     under 1125.  So that --

7              THE COURT:  I can see the timing point from your

8     office's perspective.  I guess my understanding is what's

9     being asked is that Gemini, to the extent it's assisting the

10    Debtors in the estate and getting distributions out, doesn't

11    want to be sued for doing that.  And so that's a bit

12    unusual.

13             But I do think, given that we're talking about so

14    many Gemini Earn Users, and Gemini's role as the agent, that

15    it's an effective and efficient and appropriate thing to do.

16    And since it is essentially effectuating the plan, I don't

17    know that it's really post-effective date.  Because I think

18    what it's doing is part of making the plan effective.  Maybe

19    somebody can straighten me out if I've got it wrong on that.

20             MR. ZIPES:  Your Honor -- and I think that would

21    be the Debtors' position.  They probably don't want to

22    straighten you out on that one.  But the -- I will also

23    state that there's no temporal limit, regardless.  So this

24    could be --

25             THE COURT:  All right.

1           MR. ZIPES:  -- This could be --

2           THE COURT:  I think we could make it a task limit.

3    Make it very clear what it is.  I'm not interested in

4    expanding the scope of traditional exculpation clauses

5    beyond what actually relates to the case.  So let me make

6    that clear.  And that's -- I don't think I would be doing

7    that.  But again, if they are -- the proposals for them to

8    distribute the value that exists under the plan to folks

9    with whom they have a relationship and it's going to lead to

10   a lot less problems in the case, it does seem unfair to put

11   them on the chopping block for being sued.  So that would be

12   my take on that.  I think that that's fair.

13          I don't -- I also don't think it violates the

14   policy concerns about expanded exploration because of what

15   they'd be doing.  So, what they're doing, I think is what

16   makes this different.

17          MR. ZIPES:  And Your Honor, I would just note the

18   unusual aspect of that and the fact that oftentimes these

19   are dealt with in post-effective date governance documents

20   that are not necessarily under the Court's purview.  And

21   that's --

22          THE COURT:  Yeah.  And that's fair.  I think it is

23   an unusual circumstance.  I would agree.

24          MR. ZIPES:  Your Honor, and on the exculpation

25   point as well, this is something that this Court has heard

Page 267

1    from my office.  We would cite Washington Mutual, and there

2    are some non-estate fiduciaries being exculpated under the

3    plan, which includes Gemini distribution for that matter.

4    But Your Honor, that's another injection of ours.

5                 THE COURT:  Yeah.  And again, I think my answer

6    would be similar.  If they are doing things -- we're talking

7    about exculpation -- again, if they're doing things that are

8    contemplated by the plan that need doing again, I understand

9    Gemini's role here is unique.  And so I would take a -- my

10   suggestion would be for the parties -- for you to sit down

11   with folks and look at what actually is being done by these

12   folks.  So I think a Gemini distribution agent makes a lot

13   of sense to me.

14                 And the ad hoc steering group, my understanding is

15   that that's really in connection with their efforts for

16   which we're talking about substantial contribution.  Or am I

17   missing something?  Or is there something different than

18   that?

19                 MR. ZIPES:  I think, Your Honor, we can work that

20   out.  But I'm asking that the parties -- we ultimately --

21   they agreed to file something online in that regard so it's

22   part of the public record, but --

23                 THE COURT:  Yeah, that's fine.  I think we can put

24   that into the confirmation order.  I mean, or some other

25   thing to plan separately, whatever it is.  I think that

Page 268

1    that's -- that would -- if it's a record that you want, I

2    think that that's something that would be fairly -- that box

3    can be fairly easily checked, I would think.

4              MR. ZIPES:  Your Honor, I'll move on, because --

5    under the injunction provision, Your Honor, the injunction

6    provision has a sentence in it -- and oftentimes this is

7    worked out, and unfortunately, again, it wasn't prior to the

8    confirmation.  I know the Debtors in good faith tried to

9    come to an agreement with my office and we just didn't get

10   there.

11             There's a specific sentence in the injunction.

12   It's listed in our objection as well, Your Honor.  And it

13   basically bootstraps the injunction, which goes to assisting

14   the discharge in this case.  And it applies it to

15   exculpations.  And we get that from the language in the

16   injunction, which has been flagged by Debtors' counsel.  It

17   is in our objection.  It's in the injunction language as

18   well.

19             THE COURT:  Have they described your concern

20   accurately in saying that this is a concern, that there's

21   daylight between the releases and exculpations of the

22   injunction?  Is that the issue?

23             MR. ZIPES:  Your Honor, the issue is that it might

24   be appropriate for exculpations, but it's not appropriate

25   under the injunction provision.  It's extending an

Page 269

1    injunction to acts that wouldn't apply under --

2              THE COURT:  Well, I mean, if the injunction -- if

3    the releases and exculpations are going to mean anything,

4    they need to be enforceable, right?  I mean --

5              MR. ZIPES:  They're enforceable under their own

6    provisions, the exculpation provision.  There's no need to

7    bring them in and confuse matters with any injunction

8    language as well.

9              THE COURT:  But I guess my thought is I don't --

10   then it's -- I mean, then it's, I guess, at worst redundant.

11   And if I was going to apply the redundancy rule to plans --

12             [LAUGHTER]

13             THE COURT:  -- and confirmation orders, I'd have

14   to quit my day job.  So I guess my thought is, I don't --

15   yeah, as long as -- I mean, my view is, as long as it does

16   not grant some additional license, some additional daylight,

17   and we all know the tried and true language --

18   notwithstanding anything else in the plan, the confirmation,

19   or wherever it is, this is coextensive with releases and

20   exculpation.  So...

21             MR. ZIPES:  Your Honor, to the extent that it's a

22   hypothetical and a hypothetical situation arising, but it is

23   covered -- it's not properly an injunction --

24             THE COURT:  Yeah.  I suppose there's an

25   interesting law review article to be written on that.  I,

Page 270

```
 1    again, don't want to be the one to write it.  So if it

 2    doesn't -- if it's non-substantive, I think we can -- again,

 3    I'm not troubled by it.  It is -- does, in your point, does

 4    seem to be a bit belt and suspenders.  But again, there's a

 5    lot litigation in this case, and so to the extent belt and

 6    suspenders makes it very clear what the protections are, and

 7    they aren't, that's probably not the worst thing.

 8              MR. ZIPES:  Okay.  And then, Your Honor, I think

 9    our last point -- and again, Your Honor -- again, this is

10    the end result of a lot of negotiations and a lot of things

11    haven't been changed already.  I mean, these are just --

12    this is language that my office felt was important and we --

13    we drew a line in the sand on these.

14              Your Honor, the final point, I think, is the issue

15    of what happens to claims that are -- that have been listed

16    in the schedules as disputed, contingent, unliquidated, and

17    for which no proof of claim has been filed.  And here, the

18    plan is finding that finding that they shall be deemed

19    disallowed and shall be expunged.  And again, Your Honor,

20    just as a matter of --

21              THE COURT:  Oh, well, that one, I think, you have

22    me on.  Yeah, I think there's a process for claims allowance

23    and disallowance, and it is what it is and I don't think we

24    should change that in the plan.  I don't know that that's -

25    I don't know that I want creditors to have to worry about
```

Page 271

1   looking for that kind of a provision in the plan.

2          MR. ZIPES:  And that -- and we just ask that they

3   track the appropriate bankruptcy rule language relating to

4   claims objections.

5          THE COURT:  Yeah.  I mean, unless I'm missing

6   something, just -- surprise is not a good thing for anybody

7   and...

8          MS. VANLARE:  Your Honor, I can address that one

9   point.  Jane VanLare, Cleary Gottlieb.  So I think with

10  respect to the claims language, what we had proposed -- and

11  I don't think we've just had a chance to finalize it -- but

12  we had proposed adding into the language that Mr. Zipes just

13  referenced, the clause "subject to bankruptcy Rule

14  3003(c)(3)", to make clear that we're consistent with the

15  rules and we're not trying to do anything that would not

16  otherwise be permissible.

17         THE COURT:  Yeah.  I guess the only thing I would

18  say is, since there are a lot of individuals who are reading

19  this, that even if that's technically correct, it may not be

20  sufficiently transparent.  So I'd ask you to come up with

21  some language that's transparent.  Nobody should have to

22  read that and say what point; what does that mean for me?

23  But I think on the substance, it sounds like -- I can't see

24  you, Mr. Zipes.

25         MR. ZIPES:  (indiscernible)

Page 272

```
 1              THE COURT:  On the substance of it, I think we're

 2    all in agreement.  I think that that's just an important

 3    thing to get right.

 4              MS. VANLARE:  Your Honor, I don't have anything

 5    else to say with respect to the other points, other than on

 6    the substantial contribution, the fees.  Just to clarify for

 7    the record that Mr. Aronzon may not be the one reviewing

 8    time details.  I don't think that would be customary.  But

 9    the time details were provided to the Debtors and Debtors-

10    in-house counsel.  So I just note that.

11              But I heard what you said, and we obviously take

12    your --

13              THE COURT:  Fair enough.

14              MS. VANLARE:  -- take --

15              THE COURT:  Fair enough.  And listen, I'm not -- I

16    know these kinds of things from this side of the bench can

17    seem easy and then they become a morass.  And that's not my

18    intent.  So if people -- you talk to each other, and if you

19    need some direction or some assistance, I'm happy to provide

20    it.

21              MS. VANLARE:  Mm hmm.

22              THE COURT:  We can have a quick call about that.

23    I'm not trying to just say, it's your problem, good luck,

24    and you know, a month later you're still haggling over that.

25    That would not be a very good result.
```

Page 273

1      MS. VANLARE:  So I have nothing further on Mr.
2  Zipes comments.  I do want to just make one clarification
3  point for the record that's been brought to my attention.
4      So, with respect to something I said earlier, I do
5  want to clarify the DCG did request as part of confirmation
6  discovery information about the governmental claims, and we
7  provided those claims in response to that discovery.  So I
8  do want to make sure that the record is clear.
9      THE COURT:  All right.  And is that --
10      MS. LIOU:  Your Honor?
11      THE COURT:  Yes.
12      MS. LIOU:  Sorry.  Jessica Liou, for the record,
   Weil Gotshal & Manges, on behalf of DCG.  That's right.  And
13  I think that was consistent with my earlier statement that
14  the proofs of claim themselves were provided to us, but
15  nothing in addition to that.  Privilege was claimed over the
16  rest of the materials.
17      THE COURT:  Right.  Although, I guess they are
18  claims of governmental entities, right, as opposed to the
19  Debtors' claims, right?  So, in the sense that the Debtors
20  are responding to the government allegations.  So, another -
21  - it's a little different than asking somebody, you're a
22  plaintiff, it's your lawsuit, what's the basis for your
23  lawsuit?  It's a little different to say.
24      MS. LIOU:  Understood.  It's just a quandary we

Page 274

1    were all dealing with, where we were not in a position

2    without any information, records, correspondence, to be in a

3    position to file a proof of claim -- an objection to the

4    proofs of claim.

5             THE COURT:  Yeah.  All right.  All right.

6             MR. ROSEN:  Can I take one minute, sir?

7             THE COURT:  Sure.

8             MR. ROSEN:  Thank you.  Your Honor, again for the

9    record, Brian Rosen, Proskauer Rose, on behalf of the ad hoc

10   group.  Just to address something that Mr. Zipes said.  The

11   arguments -- meaning the non-503, the 363, they have been

12   raised previously in the papers extremely eloquently by Mr.

13   Lieberman and the Dollar Group.  We mentioned it as well.

14            THE COURT:  And so let me make it clear, as the

15   Judge, I reserve my rights on those issues.  But what I try

16   not to do is to -- if something can be resolved, to have a

17   very interesting issue linger and then you will have to deal

18   with it later.  That just seems to be an unfortunate result.

19            MR. ROSEN:  I appreciate that.  With respect to

20   the substantial contribution, as Ms. VanLare said, we have

21   been providing to the Debtors on a regular basis all of our

22   time records and our outstandings.  We also provided, as

23   requested by Mr. Zipes in February, copies of a

24   representative amount.  We also provided him with the total

25   run rate, so we knew exactly what amount is outstanding.  So

Page 275

1    we're not trying to catch anybody by surprise here, Your

2    Honor.  I just wanted that to be clear for the record.

3            Also, I hate to carry --

4            THE COURT:  (indiscernible)

5            MR. ROSEN:  I hate to carry the water for Gemini,

6    but in the Gemini agreement that we've all been working

7    really hard to negotiate, there is a provision in there with

8    respect to them being appointed as the distribution agent on

9    behalf of the Debtors and everybody else.  To me, it's akin

10   to an indenture trustee making distributions pursuant to a

11   plan, and they would be exculpated for those distributions.

12           THE COURT:  Yep.  Yep.  No, I got it.

13           MR. ROSEN:  Thank you, Your Honor.

14           THE COURT:  Thank you.  Yeah.  And since I'm

15   hearing sort of an agreement on the substantial contribution

16   of the two entities, that's why I'm sort of going that way.

17   It seems to be the appropriate path of least resistance for

18   everybody.  So, you have enough things to litigate than to

19   create potential issues down the road.

20           All right.  So let me ask if there's anything else

21   from the Debtors this afternoon?

22           MS. VANLARE:  Your Honor, the only remaining

23   portion of our presentation is the 1129 factors, which I'm

24   happy to go through, if you'd like --

25           THE COURT:  Well, let me ask if it's significantly

1    different than the brief -- the 1129 -- because I do have

2    proposed findings of fact and conclusions of law that went

3    through 1129.  We all know it's a glorious speech.  But I --

4              [LAUGHTER]

5              THE COURT:  -- I did look at that before I came

6    out.  Certainly, I don't want to cut you off if there's some

7    particular issue that you wanted to identify, or if there's

8    some stakeholder here who says we'd like to hear what

9    Debtors have to say on X.  Again, because surprise is not a

10   good thing in making an appropriate record.

11             But with the papers that I have and the papers

12   that I will receive, I don't know that it's necessarily the

13   best use of all your time.

14             MS. VANLARE:  I was looking forward to going

15   (indiscernible) --

16             [LAUGHTER]

17             MS. VANLARE:  I don't believe there's anything

18   different.

19             THE COURT:  All right.  All right.  So, anything

20   additional from the Committee?

21             MR. SHORE:  No, Your Honor.

22             THE COURT:  All right.  From the ad hoc group?

23             MR. ROSEN:  No, Your Honor.  Thank you.

24             THE COURT:  All right.  Anything else from any

25   other party who is a plan proponent?  Don't mean to group

Page 277

1    people together, but just in the interest of expediency?

2    Anything else from DCG?

3           MS. LIOU:  No, Your Honor.

4           THE COURT:  All right.  And by the, looking at the

5    clock, this is why I was concerned about time, because it

6    seems inexorable that things always take a little longer.

7    But thank you.  I appreciate you being flexible this

8    morning.

9           MS. VANLARE:  Your Honor, I'm just reminded of

10   something, a point that you had raised earlier.  Chainview

11   Capital, or the Chainview reservation or rights.  We did

12   reach out to your counsel during the hearing and they

13   confirmed they have no issues.

14          THE COURT:  Okay, thank you.  That was actually on

15   my list, which I was going to get to after canvassing the

16   room.  Anything else from any other party?

17          All right, so I did have a short list. Chainview

18   Capital was actually on it.  Also a request to order the

19   transcript of today.  And I think I have a hard copy of

20   everybody's presentation who had one.  To the extent -- I do

21   think the ad hoc group had a couple of extra slides.

22          MR. SAZAT:  It wasn't extra slides.  It's content

23   that appears only if you play it on PowerPoint.

24          THE COURT:  Ah.

25          MR. SAZAT:  But on a printed out copy, it just

Page 278

```
 1    looks overlapping and --

 2            THE COURT:  Okay.

 3            MR. SAZAT:  -- looks nonsensical.

 4            THE COURT:  All right.  We have an electronic

 5    copy.  And I look forward to nothing more than --

 6            [LAUGHTER]

 7            THE COURT:  -- the presentation coming alive.

 8    Once again.

 9            MR. SAZAT:  Hit slideshow.  That's

10    (indiscernible).

11            THE COURT:  All right.

12            MR. SAZAT:  You don't have to have a streaming

13    service, Your Honor.  can skip over the (indiscernible)

14    slide if you don't want to (indiscernible).

15            THE COURT:  All right.  Well...  And that's maybe

16    the best part.  Nothing personal.  All right.  Unless

17    there's nothing else from any other party, want to thank you

18    all for your flex -- oh.

19            MR. O'NEAL:  One thing.  I'm sorry, Your Honor.

20            THE COURT:  Of course.

21            MR. O'NEAL:  Sorry, almost.  It's the exclusivity

22    extension.  I'm just thinking that because it expires today,

23    we're going to be submitting an order.  Everybody's reviewed

24    it.

25            THE COURT:  Okay.
```

1           MR. O'NEAL:  But would you be able to --

2           THE COURT:  I'm going to so order the record on

3     that --

4           MR. O'NEAL:  Thank you, Your Honor.

5           THE COURT:  -- so you don't have any concerns.

6     Absolutely.

7           MR. O'NEAL:  Mr. Kessler appreciates that.

8           THE COURT:  No, that's fine.  You can get it to me

9     tomorrow.  That would be just fine.

10          MR. O'NEAL:  Call off the plan.

11          [LAUGHTER]

12          THE COURT:  Thank you all.  I will thank you all

13    for regular presentations as well as for your flexibility.

14    I know I interrupted a lot of folks a lot of times.  It's

15    invaluable to get your thinking on things in real time, so I

16    don't go back there and say, I should have asked the

17    following questions.  I know it does violence to people's

18    presentations, I say this all the time.  I know you have

19    beautiful speeches prepared.  But like you probably suspect,

20    and it is true, that I already have your beautiful speech,

21    which is your brief.  And the ability to go back and forth

22    is very, very useful.  So...

23          And I used to think when I argued in front of the

24    Second Circuit that sometimes if I get a hard time from

25    somebody, I'm like, well, I know exactly where they stand

Page 280

1    (indiscernible) exactly address the kind of concerns that

2    were raised.  So there is that benefit.  And again, I do

3    appreciate it.  Very, very helpful presentations all the way

4    around.

5            And with that, I will bid you all a good evening

6    and thank you very much.

7            ALL:  Thank you, Your Honor.

8            (Whereupon these proceedings were concluded at

9    4:06 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 281

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6        *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  March 20, 2024