**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
Facsimile: (202) 857-0940
Joshua M. Wesneski

*Attorneys for Digital Currency Group, Inc.*
*and DCG International Investments Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**DIGITAL CURRENCY GROUP, INC. AND**
**DCG INTERNATIONAL INVESTMENTS LTD.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN**
**OPPOSITION TO CONFIRMATION OF THE DEBTORS' AMENDED PLAN**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R) (collectively, the "**Debtors**").  For the purpose of these chapter 11 cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## **TABLE OF CONTENTS**

FINDINGS OF FACT ........................................................................................................1

    I.      The Claims Against the Estates .........................................................................1

          A.     The Digital Asset Creditor Claims ...............................................1

          B.     The Government Claims .................................................................2

          C.     DCG's Claims ................................................................................3

    II.     The Development of the Amended Plan ............................................................3

          A.     The Role of the Genesis Special Committee .................................3

          B.     The Debtors, UCC, and Ad Hoc Group Excluded DCG from Negotiations Regarding the Distribution Principles. ...................4

          C.     The Debtors Did Not Analyze All Issues Relevant to the Amended Plan ...............................................................................5

    III.    The Terms and Effects of the Amended Plan ...................................................5

          A.     The Distribution Principles ............................................................5

          B.     Classes Entitled to Recovery .........................................................8

          C.     Setoff Principles .............................................................................9

          D.     Additional Plan Terms .................................................................10

CONCLUSIONS OF LAW ..............................................................................................11

    I.      DCG Has Standing to Raise Plan Objections ..................................................11

    II.     The Distribution Principles Violate Section 502(b) ........................................16

          A.     Section 502(b) Caps Digital Assets Claims ................................17

          B.     The Solvent Debtor Exception Does Not Permit Recovery Above the Section 502(b) Cap ..................................................................26

          C.     The Distribution Principles Cannot Be Approved Under Rule 9019 ........29

    III.    The Amended Plan Cannot Be Confirmed .......................................................32

          A.     The Amended Plan Violates Section 1129(a)(7) .........................32

          B.     The Amended Plan Violates Section 1129(b) ..............................33

          C.     The Amended Plan Violates Section 1129(a)(1) .........................34

          D.     The Amended Plan Violates Section 1129(a)(3) .........................35

          E.     The Amended Plan Pays an Illegal Rate of Post-petition Interest ...........38

CONCLUSION .................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 53 Stanhope LLC*,
    625 B.R. 573 (Bankr. S.D.N.Y. 2021) ....................................................................27

*In re Aaura, Inc.*,
    No. 06-B-01853, 2006 WL 2568048 (Bankr. N.D. Ill. Sept. 1, 2006) ...................22

*Ad Hoc Comm. of Holders of Trade Claims v. Pacific Gas and Electric Co. (In re PG&E Corp.)*,
    46 F.4th 1047 (9th Cir. 2022) ...............................................................................28

*AI Int'l Holdings (BVI) Ltd. v. MUFG Union Bank, N.A. (In re Weinstein Co. Holdings, LLC)*,
    595 B.R. 455 (Bankr. D. Del. 2018) ......................................................................12

*In re Am. Cap. Equip.*,
    LLC, 688 F.3d 145 (3d Cir. 2012) .........................................................................36

*In re Axona Int'l Credit & Com. Ltd.*,
    88 B.R. 597 (Bankr. S.D.N.Y. 1988), *as amended* (Aug. 11, 1988) ......................21

*In re Best Products Co., Inc.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) .....................................................................35

*In re Boy Scouts of Am. and Del. BSA LLC*,
    642 B.R. 504 (Bankr. D. Del. 2022) ......................................................................29

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ...................................................................33

*In re Celsius Network LLC*,
    655 B.R. 301 (Bankr. S.D.N.Y. 2023) ...................................................................22

*Century Indemnity Co. v. Congoleum Corp. (In re Congoleum Corp.)*,
    426 F.3d 675 (3d Cir. 2005) ..................................................................................12

*Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    138 B.R. 687 (Bankr. S.D.N.Y. 1992) ...................................................................36

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005) ....................................12

*Czyzewksi v. Jevic Holding Corp.*,
  580 U.S. 451 (2017)..................................................................................................30

*Danvers Motor Co. v. Ford Motor Co.*,
  432 F.3d 286 (3d Cir. 2005)....................................................................................11

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019).....................................................................32

*In re Dow Corning Corp.*,
  237 B.R. 380 (Bankr. E.D. Mich. 1999)...................................................................39

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 717 (Bankr. S.D.N.Y.), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992) ................14

*In re Drexel Burnham Lambert Grp., Inc.*,
  140 B.R. 347 (S.D.N.Y. 1992)..................................................................................14

*EMAK Worldwide, Inc. v. Kurz*,
  50 A.3d 429 (Del. 2012) ..........................................................................................35

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...........................................................................33

*Finanz AG Zurich v. Banco Economico S.A.*,
  192 F.3d 240 (2d Cir. 1999)......................................................................................21

*In re FTX Trading Ltd.*,
  91 F.4th 148 (3d Cir. 2024) ......................................................................................20

*Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*,
  506 B.R. 29 (Bankr. E.D.N.Y. 2014)........................................................................30

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011)..........................................................................12, 13, 36

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ......................................................................33

*In re Keyworth*,
  47 B.R. 966 (Bankr. D. Colo. 1985) .........................................................................18

*Kohn v. Leavitt-Berner Tanning Corp.*,
  157 B.R. 523 (N.D.N.Y. 1993)..................................................................................23

*In re LATAM Airlines Group S.A.*,
  No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023)....................21, 22

*In re LATAM Airlines Grp. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ...................................................................30

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) .........26, 27, 39, 40

*Law v. Siegel*,
571 U.S. 415 (2014) ..............................................................................................22, 27

*In re Lehman Brothers Hldgs. Inc.*,
602 B.R. 564 (Bankr. S.D.N.Y. 2019) ...................................................................22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..............................................................................................14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..............................................................................................12

*In re Madison 92nd St. Assocs. LLC*,
472 B.R. 189 (Bankr. S.D.N.Y. 2012) ...........................................................38, 39, 40

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*,
801 F.2d 60 (2d Cir. 1980) ....................................................................................37

*In re MatlinPatterson Glob. Opportunities Partners II L.P.*,
644 B.R. 418 (Bankr. S.D.N.Y. 2022) ...................................................................31

*In re Melenyzer*,
143 B.R. 829 (Bankr. W.D. Tex. 1992) .................................................................39

*MF Global Inc. v. Giddens (In re MF Global Inc.)*,
466 B.R. 244 (Bankr. S.D.N.Y. 2012) ...................................................................30

*In re Miami Metals I, Inc.*,
603 B.R. 531 (Bankr. S.D.N.Y. 2019) ...................................................................32

*Miller v. Mott (In re Team Sys. Int'l, LLC)*,
2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...............................................33

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ............................................................................30, 31

*In re Mushroom Transp. Co.*,
382 F.3d 325 (3d Cir. 2004) ..................................................................................36

*In re New York City Off-Track Betting Corp.*,
427 B.R. 256 (Bankr. S.D.N.Y. 2010) ...................................................................20

*Off. Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*,
   456 F.3d 668 (6th Cir. 2006) .................................................................................28

*In re Orseno*,
   390 B.R. 350 (Bankr. N.D. Ill. 2008) ....................................................................18

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).................................................................................12

*S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*,
   404 B.R. 793 (Bankr. M.D. Pa. 2009) .............................................................17, 18

*In re Sapphire Dev., LLC*,
   523 B.R. 1 (D. Conn. 2014) .................................................................................12

*SC SJ Holdings, LLC v. Pillsbury Winthrop Shaw Pittman LLP (In re SC SJ Holdings, LLC)*,
   No. 21-10549 (JTD), 2023 WL 2598842 (D. Del. Mar. 22, 2023)...................22, 29

*Smart World Techs., LLC v. Juno Online Servs (In re Smart World Techs., LLC)*,
   423 B.R. 166 (2d Cir. 2005).................................................................................29

*Southern Blvd. Inc. v. Martin Paint Stores (In re Martin Paint Stores)*,
   207 B.R. 57 (Bankr. S.D.N.Y. 1997).....................................................................11

*Southland Corp. v. Kilgore & Kilgore (In re Southland Corp.)*,
   19 F.3d 1084 (5th Cir. 1994) ...............................................................................18

*In re SunEdison, Inc.*,
   575 B.R. 220 (Bankr. S.D.N.Y. 2017)...................................................................33

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D. N.J. 2010) .....................................................................35

*In re Teligent, Inc.*,
   417 B.R. 197 (Bankr. S.D.N.Y. 2009)...................................................................12

*In re Teligent, Inc.*,
   640 F.3d 53 (2d Cir. 2011)...................................................................................13

*The Renco Grp., Inc. v. Wilmington Tr., Nat'l Ass'n (In re Magnesium Corp. of Am.)*,
   583 B.R. 637 (Bankr. S.D.N.Y. 2018)...................................................................14

*TLA Claimholders Grp. S.A. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)*,
   55 F.4th 377 (2d Cir. 2022) ......................................................................20, 24, 26

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................................14

*In re Tronox Inc.*,
   503 B.R. 239 (Bankr. S.D.N.Y. 2013) ..............................................................33

*In re Ultra Petroleum Corp.*,
   624 B.R. 178 (Bankr. D. Tex. 2020), *aff'd*, 51 F.4th 138 (5th Cir. 2022) ..................26, 27, 28

*USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.)*,
   429 B.R. 437 (Bankr. D. Md. 2010), *aff'd sub nom. TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011) ..........................................21

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...........................................................................11, 13

*Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*,
   637 B.R. 781 (Bankr. D. Del. 2021) ....................................................... *passim*

*In re Young Broadcasting Inc.*,
   430 B.R. 99 (Bankr. S.D.N.Y. 2010) ................................................................16

## Statutes

11 U.S.C. § 502 ...............................................................24, 27, 28, 36

11 U.S.C. § 523 ...............................................................................23

11 U.S.C. § 1109 ..........................................................................11, 14

11 U.S.C. § 1123 ..........................................................................34, 38

11 U.S.C. § 1129 ...........................................................16, 32, 33, 34, 35, 39

28 U.S.C. § 1961 .............................................................................39

28 U.S.C. § 2075 .............................................................................29

## Other Authorities

7 *Collier on Bankruptcy* (16th ed. 2023) ...........................................................33

Fed. R. Bankr. P. 3007 ...................................................................17, 19

Fed. R. Bankr. P. 9019 ...................................................................... *passim*

Digital Currency Group, Inc. and DCG International Investments Ltd. (collectively, "**DCG**") submit these proposed Findings of Fact and Conclusions of Law in opposition to the *Debtors' Amended Joint Chapter 11 Plan* (Docket No. 1392) (as amended, modified, or supplemented the "**Amended Plan**").[1]

## <u>FINDINGS OF FACT</u>

### I.    The Claims Against the Estates

1.    On January 19, 2023, Genesis Global Holdco, LLC ("**GGH**") and its wholly owned subsidiaries, Genesis Asia Pacific Pte. Ltd. ("**GAP**"), and Genesis Global Capital, LLC ("**GGC,**" and together with GGH and GAP, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy (the date of such filing, the "**Petition Date**"). Amended Voluntary Petition, Consolidated Corporate Ownership Statement at 7 (Docket No. 27).

### A.    The Digital Asset Creditor Claims

2.    The Ad Hoc Group of Lenders of GGC (the "**Ad Hoc Group**" or "**AHG**") was formed in November 2022 and is comprised of members holding approximately $2.5 billion in claims against GGC, including in amounts specified in Bitcoin and Ethereum. *See* PLEADING-001 at 49; AHG Confirmation Brief (Docket No. 1321) at 9; Feb. 27, 2024 Hr'g Tr. ("**Day 2 Tr.**") (Sciametta) at 90:9–24.

3.    The Official Committee of Unsecured Creditors (the "**UCC**") was formed on February 3, 2023 and consists of creditors that lent both U.S. dollars and digital assets to the Debtors. PLEADING-001 at 49; UCC Confirmation Brief (Docket No. 1326) at 7.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Plan Supplement, or the Disclosure Statement (each as defined herein).

4.      Both the Ad Hoc Group and the UCC represent creditors with claims denominated in digital assets ("**digital asset creditors**").

B.      **The Government Claims**

5.      Between February 27, 2023 and July 18, 2023, twelve government entities, including two federal and 10 state agencies, filed twenty-seven proofs of claim against the Debtors, asserting claims of approximately $32.9 billion.  PLEADINGS-001 at 67; *see generally* JX-094. Certain of these asserted claims are duplicative of each other.  *See, e.g.*, JX-094 at 244 n.2.

6.      For example, the New Jersey Bureau of Securities (the "**NJ Bureau**") filed three proofs of claim on July 17, 2023, each for approximately $8.6 billion against each of the Debtors. JX-094 at 234–89.  The Debtors' calculation of $32 billion in purported governmental claims assumes that the NJ Bureau's aggregate claim against the Debtors is approximately $25.6 billion. *See generally* JX-094.

7.      In the addendum to its proof of claim, the NJ Bureau stated that its "claim is being filed against each of the Debtors . . . [but] the Bureau believes that all of its claims are likely against Genesis Global Capital, LLC . . . [and only] fil[ed] its claim against each Debtor to preserve all claims against the Debtors as expansively as possible."  JX-094 at 244 n.2.  During the Confirmation Hearing, counsel for the NJ Bureau confirmed that its claim is "not tripled," nor "intended to imply a $24 billion claim," but is a "net penalty claim" for approximately $8.5 billion. Day 1 Tr. (Bernstein) at 154:2–8; *see also* Day 2 Tr. (Sciametta) at 161:14–162:21.

8.      Likewise, the New York Attorney General (the "**NYAG**") filed three proofs of claim on July 14, 2023, each for approximately $1.1 billion in restitution plus disgorgement against each of the Debtors.  JX-94 at 85–129.  Yet Mr. Aronzon testified that the NYAG's proof of claim was worth only "a billion and change."  Feb. 26, 2024 Hr'g Tr. ("**Day 1 Tr.**") (Aronzon) at 244:3–

15. Nonetheless, the $32 billion in purported governmental claims assumes that the NYAG's aggregate claim against the Debtors is $3.3 billion. *See generally* JX-094.

9. The Hawaii Department of Commerce and Consumer Affairs also filed three proofs of claim on July 17, 2023, each for approximately $588.3 million against each of the Debtors. JX-094 at 174–232.

10. When the obvious duplicate and triplicate claims are removed, the government claims assert approximately $11,264,050,000 in claims against the Debtors.

### C. DCG's Claims

11. On May 22, 2023, DCG filed four proofs of claim against the Estates, reserving its rights to assert additional claims, defenses, remedies and causes of action against the Debtors. *See* P-006; P-007; P-008; P-009.

12. In proofs of claim numbered 464, 487, 511, respectively, DCG claimed an undisclosed amount from GAP, GGH, and GGC for (1) any amount recovered from DCG by the Joint Liquidators appointed in the Three Arrows Capital Ltd. liquidation proceeding in the British Virgin Islands, and (2) any amount arising if DCG is found liable in certain pending litigations. *See* P-006; P-007; P-008.

13. In Proof of Claim numbered 478, DCG International Investments Ltd. asserted a claim against GGC for $3,400,518.46. *See* P-009.

## II. The Development of the Amended Plan

### A. The Role of the Genesis Special Committee

14. In November 2022, GGH formed a special committee of its Board of Directors (the "**Special Committee**"). DECLARATION-008 ¶ 7.

15. The Special Committee's purpose is twofold: (1) to "evaluate on behalf of GGH or its subsidiaries various strategic alternatives or transactions involving the Company that affect the

liquidity or balance sheet of the Company (collectively, the 'Special Matters'), including, without limitation, the commencement of any financing, sale, restructuring, reorganization, liquidation, or other strategic alternatives or any transaction involving DCG"; and (2) to "act on behalf of, and bind, the Company with respect to Special Matters as described in the Special Committee Charter." DECLARATION-008 ¶ 7.

16.     The Special Committee is comprised of two independent directors: Paul Aronzon ("**Mr. Aronzon**") and Thomas Conheeney ("**Mr. Conheeney**").  Day 1 Tr. at 180:25–181:4.

17.     As the only two members of the Special Committee, Mr. Aronzon and Mr. Conheeney are the sole and ultimate decision-makers for the Debtors on the Special Matters. DECLARATION-008, ¶ 8; Day 1 Tr. (Aronzon) at 181:5–12, 181:21–24; *see also* Day 2 Tr. (Aronzon) at 72:17–73:12.

**B.     The Debtors, UCC, and Ad Hoc Group Excluded DCG from Negotiations Regarding the Distribution Principles.**

18.     As the independent directors of the Special Committee, Mr. Aronzon and Mr. Conheeney owe fiduciary duties to the Estates, the corporate entity and its stakeholders, which includes DCG.  Day 1 Tr. (Aronzon) at 182:18–183:1.

19.     On November 28, 2023, the Debtors, UCC, and the Ad Hoc Group (collectively, the "**Plan Proponents**"), entered into a "Plan Support Agreement (No Deal)" with the Debtors in connection with the Amended Plan.  D-027.

20.     The Amended Plan was heavily negotiated among the Plan Proponents.  Day 2 Tr. (Aronzon) at 88:9–17, 89:15–90:8; JX-072.

21.     The Debtors did not include DCG in negotiations regarding the Distribution Principles.  Day 1 Tr. (Aronzon) at 211:24–213:20.  Mr. Aronzon confirmed that the Distribution

Principles were "the byproduct of negotiations . . . between creditor groups" and that DCG was not involved in those discussions. Day 1 Tr. (Aronzon) at 211:24–213:20.

**C.    The Debtors Did Not Analyze All Issues Relevant to the Amended Plan**

22.    Although Mr. Aronzon understood that the Amended Plan must comply with the applicable sections of the Bankruptcy Code, his direct testimony in support of the Amended Plan did not address whether or how the Amended Plan satisfies the requirements of section 502(b). Day 1 Tr. (Aronzon) at 182:10–14, 199:22–202:15; DECLARATION-008 ¶¶ 65–135.

23.    Neither the Debtors' financial advisor (Joseph J. Sciametta) nor the UCC's financial advisor (Bradley Geer) analyzed the government claims or considered how they would impact recoveries under the Amended Plan. DECLARATION-007 ¶ 15; DECLARATION-005 ¶ 7. In fact, they had no understanding of the amount of government claims that would ultimately be allowed and never reviewed any of the underlying proofs of claim. Day 2. Tr. (Sciametta) at 160:7–161:5; 161:14–163:17, 164:2–165:18, 166:7–20; 201:14–202:1; Day 2 Tr. (Geer) at 201:14–202:1.

**III.    The Terms and Effects of the Amended Plan**

**A.    The Distribution Principles**

24.    The Amended Plan outlines the wind down of the Debtors and their Estates and seeks to distribute the Debtors' assets to creditors in accordance with the Distribution Principles. DECLARATION-008 ¶¶ 9, 59.

25.    The Distribution Principles consist of five steps intended to "maximize in-kind and like-kind distributions to creditors to Holders of Allowed General Unsecured Claims on a *pro rata* basis." PLEADING-024 ¶ 13.

26.    Pursuant to the Distribution Principles, digital asset creditors are entitled to two forms of recoveries: (1) recovery on a dollarized basis, and (2) recovery on an incremental basis

in digital assets.  Digital asset creditors will first recover the value of their claims, determined as of the Petition Date, in U.S. dollars ("dollarized Petition Date claim").  Once 100% recovery is reached for dollarized Petition Date claims for all general unsecured creditors, then digital asset creditors will receive an additional payout based on the value of their digital assets as of the distribution date.  *See* DECLARATION-007 ¶ 17; Day 1 Tr. (Aronzon) at 183:14–16, 186:18–187:4; Day 2 Tr. (Sciametta) at 115:22–117:14.  The Distribution Principles do not require that all claims be repaid in-kind.  PLEADING-022, Ex. A at 110–11.

27.    The incremental recoveries in digital assets allow digital asset creditors to receive value in excess of their dollarized Petition Date claims.  DECLARATION-006 ¶ 7.  There are, however, not enough digital assets in the Estates to provide complete in-kind recovery to all digital asset creditors.  Day 2 Tr. (Sciametta) at 155:5–156:5.  Accordingly, the Debtors cannot reinstate the digital asset creditors' contracts.  Day 1 Tr. at 38:19–39:6, 41:20–24; Confirmation Hr'g Tr. at 32:5–9 (Mar. 18, 2024).

28.    The Debtors' estimated creditor recoveries under the Distribution Principles are illustrated in the Revised Recovery Analysis, which was prepared by the Debtors' financial advisor, Alvarez & Marsal.  DECLARATION-007 ¶ 12.  The Revised Recovery Analysis reflects December 31, 2023 pricing for digital assets in two scenarios: (1) the high case, and (2) the low case.[2]  DECLARATION-007 ¶ 12, 14; JX-087.

29.    In the high case, the Revised Recovery Analysis estimates that general unsecured creditors will receive 100% of their dollarized Petition Date claims, totaling $2.914 billion.  JX-087 at 3; Day 1 Tr. (Aronzon) at 188:8–18; Day 2 Tr. (Sciametta) at 118:4–121:2.  After these distributions, there will be an estimated additional $900.5 million in value available in the high

---

[2]    The difference between the high case and the low case is primarily attributable to assumptions concerning the value of Gemini GBTC shares and the value of the DCG Note.  DECLARATION-007 ¶ 14.

case for distribution to digital asset creditors through incremental recoveries in digital assets. The distribution of this excess value would result in digital asset creditors receiving a recovery of 131% of their Petition Date claims. JX-087 at 3; DECLARATION-006 ¶ 7; Day 2 Tr. (Sciametta) at 121:3–122:6.

30.     In the low case, the Revised Recovery Analysis estimates a shortfall of $314 million, meaning general unsecured creditors will receive 91.6% of the value of their dollarized Petition Date claims. JX-087 at 8; Day 2 Tr. (Sciametta) at 122:21–123:24.

31.     Given the volatility in digital asset pricing, both the value of the Debtors' assets and the value of digital asset creditors' claims could materially shift, and the estimated recoveries shown in the Revised Recovery Analysis could substantially change. DECLARATION-007 ¶ 16.

32.     Applying February 20, 2024 pricing, there would be $2.146 billion of excess value in the high case and $496 million of excess value in the low case, in comparison to the $900.5 million of excess value in the high case and a $314 million shortfall in the low case using December 31, 2023 pricing. NYAG/SEC Pleadings TAB 5 ¶¶ 4–7; Day 2 Tr. (Sciametta) at 124:23–128:4, 136:14–138:10.

33.     Under the Distribution Principles, any increase in excess value, including due to changes in digital asset pricing, flows to digital asset creditors in the form of digital asset distributions valued in excess of their Petition Date claims. *See* Day 1 Tr. (Aronzon) at 225:5–11; Day 2 Tr. (Sciametta) at 127:5–12.

34.     There is effectively no cap on recoveries to digital asset creditors. Although the Distribution Principles technically limit creditor recoveries to 100% of their in-kind claims, there is no realistic scenario under the Distribution Principles in which digital asset creditors would

receive 100% recovery for their in-kind claims.  PLEADING-022, Ex. A at 8; Day 1 Tr. (Aronzon) at 204:10–205:11.

35.     As the price of digital assets and the value of creditor claims rise, the Distribution Principles provide digital asset creditors with the potential to receive double, treble, or even higher multiples of the value of their dollarized Petition Date claim.  *See* Day 2 Tr. (Sciametta) at 131:18–134:8.

36.     Mr. Aronzon testified that it is typical for claims under a chapter 11 plan to be dollarized as of the petition date with no potential for an additional round of recovery.  Day 1 Tr. (Aronzon) at 195:5–12.  Mr. Aronzon has never in the history of his 45-year career valued claims using a date other than the petition date.  Day 1 Tr. (Aronzon) at 195:2–4, 194:10–17.  Mr. Sciametta and Mr. Geer both testified that in their respective 25-year careers, they have never seen any approach other than valuing claims as of the petition date.  Day 2 Tr. (Sciametta) at 134:14–136:13; Day 2 Tr. (Geer) at 194:24–195:3, 195:11–16, 203:5–19.

**B.     Classes Entitled to Recovery**

37.     As the sole equity holder of GGH, DCG is the "sole Holder of Interests classified in Class 10 for GGH" and therefore entitled to any available recoveries after all allowed claims against the Debtors have been paid in full.  DECLARATION-008 ¶¶ 127–28; PLEADING-001, Ex. E; PLEADING-022 § III.A.1; Day 1 Tr. (Aronzon) at 229:6–11.

38.     As explained above, however, the mechanics of the Distribution Principles prevent the distribution of any value from the Estates to subordinated creditors or to DCG, because by design, digital asset creditors holding general unsecured claims will receive additional value from the Estates as the value of the Debtors' digital assets increases.  Day 1 Tr. (Aronzon) at 206:21–207:22; Day 2 Tr. (Sciametta) at 165:19–166:1.

39.     This result renders meaningless any "protections" afforded to subordinated creditors or equity holders.  Day 1 Tr. (Aronzon) at 208:3–14.  Mr. Aronzon testified that had he known the Amended Plan contemplated such distribution, he "very well may" have changed his view on whether he supported the Amended Plan.  Day 1 Tr. (Aronzon) at 210:9–211:21.

### C.     Setoff Principles

40.     The Amended Plan also includes Setoff Principles, which allow the Debtors to set off certain creditors' claims.  PLEADING-005.  Specifically, the Setoff Principles apply where the Debtors have a loan payable to a creditor with a claim against the Estates and the Debtors, in turn, are owed a loan receivable from that same creditor.  Day 2 Tr. (Sciametta) at 139:14–18.  In these circumstances, the Setoff Principles provide for the Debtors, applying the Petition Date value of the loan receivable, loan payable and the collateral, to set off the value of the loan receivable against the loan payable, resulting in a net claim against the Estates.[3]  PLEADING-005; JX-092; Day 2 Tr. (Sciametta) at 138:11–142:23, 182:20–183:8, 184:11–185:4.

41.     The application of the Setoff Principles results in twenty-one (21) creditors holding an estimated net claim of $395 million against the Debtors in the high case of the Revised Recovery Analysis.  JX-092; PLEADING-005; Day 2 Tr. (Sciametta) at 139:15–143:3.

42.     The Setoff Principles represent the only instance in which the Debtors value their assets as of the Petition Date rather than as of the date of distribution or setoff.  Day 2 Tr. (Sciametta) at 149:6–151:2.

43.     Because the value of the Debtors' assets is lower as of Petition Date pricing than as of current pricing, the Setoff Principles value the Debtors' assets (the loans receivable) at less than

---

[3]     The Setoff Principles do not apply to instances where the set off would result in a net asset to the estate.  Day 2 Tr. (Sciametta) at 138:11–154:3 ("there are some instances where the set-off -- where the application resulted in a net asset, in which case the set-off principles didn't apply").

current value, which gives rise to higher claims against the estate. Day 2 Tr. (Sciametta) at 143:24–146:20.

44.     When valuing the Debtors' assets using pricing as of December 31, 2023, instead of Petition Date pricing, the net claim against the Debtors reduces from $395 million to $106 million. JX-092; Day 2 Tr. (Sciametta) at 143:3–23.

45.     The net claims against the Debtors under the Setoff Principles would further decrease if current pricing was used to value the Debtors' assets. Day 2 Tr. (Sciametta) at 146:23–147:22.

**D.    Additional Plan Terms**

46.     The Amended Plan grants all general unsecured creditors post-petition interest at the rate set forth in their master loan agreement, as well as post-Effective Date interest at the federal judgment rate. PLEADING-022, Ex. A at 9.

47.     The Amended Plan removes DCG's right as the sole remaining equity holder of GGH post-Effective Date to elect and terminate directors to the GGH board of directors, and instead requires DCG to select from a slate of directors chosen by the UCC and the PSA Majority Creditors, in consultation with the Debtors. PLEADING-022 § IV.B.9.

48.     The Amended Plan prevents DCG from transferring its equity interests in GGH and taking a worthless stock deduction with respect to its interests in GGH. PLEADING-022 § III.B.10.

49.     The Amended Plan excludes DCG from consultation regarding the selection of the PA Officer and the selection of members of the Wind-Down Oversight Committee and Litigation Oversight Committee. PLEADING-022 § IV.A.

50.     The Amended Plan carves out DCG parties (current and former employees of DCG, DCGI, and each of their respective affiliates and subsidiaries) from the Debtors' assumed Indemnification Obligations.  PLEADING-022 § V.D.

51.     The Amended Plan requires DCG to negotiate a tax sharing agreement with the Debtors.  PLEADING-022 § IV.B.1.

## CONCLUSIONS OF LAW

52.     For the reasons set forth below, the Amended Plan violates the Bankruptcy Code and cannot be confirmed.

### I.    DCG Has Standing to Raise Plan Objections

53.     Standing to object to confirmation of a debtor's reorganization plan is governed by section 1128(b) of the Bankruptcy Code, which provides that "part[ies] in interest may object to confirmation of a plan."  11 U.S.C. § 1128(b).  Section 1109(b) further provides that:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, *an equity security holder*, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

54.     Although section 1109(b) provides that a party in interest may raise and be heard on any issue in a case, to object to the confirmation of a reorganization plan in bankruptcy court, a party must meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution.  *See Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005); *Southern Blvd. Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 61 (Bankr. S.D.N.Y. 1997) (citing *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)).

55.     "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish Article III standing, a party must show (1) an injury in fact that is actual or imminent rather than conjectural or hypothetical, (2) the injury is "fairly traceable" to the conduct complained of, and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation omitted).

56.     The Article III standing standard is met as long as the party alleges a "specific, identifiable trifle of injury" or a "personal stake in the outcome of [the] litigation." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (citing *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686–90, 690 n. 14 (1973), *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir.2000)); *see also Century Indemnity Co. v. Congoleum Corp. (In re Congoleum Corp.)*, 426 F.3d 675, 685 (3d Cir. 2005) ("Article III standing need not be financial and only need be fairly traceable to the alleged illegal action.").

57.     "Generally, a 'party in interest' with respect to a particular issue will also meet the requirement for Article III standing with respect to that issue. . . .  Thus, the inquiries overlap." *In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) (citation omitted);[4] *see also In re Sapphire Dev., LLC*, 523 B.R. 1, 6 (D. Conn. 2014) (citing *Global Indus.*, 645 F.3d at 210–11) ("Article III standing and standing under the Bankruptcy Code are effectively coextensive."). Moreover, bankruptcy standing has been interpreted broadly, allowing any party who might be implicated by a debtor's reorganization plan to object to the confirmation of such a plan at the trial level. *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004), *as amended* (Feb. 23, 2005); *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000); *AI Int'l*

---

[4]     Although the *Teligent* court ultimately held that the objector to a settlement motion did not have standing, that party was not a party in interest in the case, was merely a potential debtor of Teligent's debtor, and did not have any stake in the outcome of the settlement motion. *Id.* at 210.

*Holdings (BVI) Ltd. v. MUFG Union Bank, N.A. (In re Weinstein Co. Holdings, LLC)*, 595 B.R. 455, 465 (Bankr. D. Del. 2018) (citing *Global Indus. Techs.*, 645 F.3d at 211) ("The question is not whether the Plaintiff will win in litigation, but whether the Plaintiff has a legally protected interest that could be affected by the Defendants receiving more than the value of their liens.")).

58.     DCG, as the sole equity holder of GGH, is a "party in interest" as defined by section 1109(b) of the Bankruptcy Code.  Moreover, DCG meets the Article III standing requirements. "When a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed.  In short, they at least have bankruptcy standing." *Glob. Indus.*, 645 F.3d at 204.

59.     Furthermore, "anyone holding a direct financial stake in the outcome of the case should have an opportunity to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." *In re Teligent, Inc.*, 640 F.3d 53, 60 (2d Cir. 2011) (citation and internal quotation marks omitted).  Because the Distribution Principles decrease the amount of proceeds distributable to DCG on account of its equity interests, DCG has a clear financial stake in the outcome of the bankruptcy proceeding and interests affected by the Amended Plan and, thus, has bankruptcy standing.

60.     Prudential standing refers to the requirement that even "[w]hen the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499.  Given that DCG is raising objections in defense of its own legal rights and interests, and not on behalf of third-parties, DCG meets the requirements for prudential standing and no further analysis is required on this point.  Moreover, courts "cannot

limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). If DCG has constitutional standing, and has standing under section 1109(b), judge-made prudential standing doctrines cannot be used to deprive DCG of its opportunity to object in accordance with the Bankruptcy Code.

61.     The Plan Proponents' reliance on a chapter 7 case, *The Renco Grp., Inc. v. Wilmington Tr., Nat'l Ass'n (In re Magnesium Corp. of Am.)*, 583 B.R. 637 (Bankr. S.D.N.Y. 2018), and *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717 (Bankr. S.D.N.Y.), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992), is misplaced.

62.     The Plan Proponents cite to these cases for the proposition that, where equity in a debtor is worthless, an equity holder has no stake in what amounts to the settlement of a controversy between creditors. *See* PLEADING-024 ¶¶ 25 n.20, 26; UCC Confirmation Brief ¶ 44; AHG Confirmation Brief at 16–17. The *Drexel* court noted the "enormity" of the gap between the debtors' liabilities and assets, but summarily determined that the equity holder lacked standing to object to the debtors' plan without any analysis as to whether there was any likelihood that the gap could shrink after confirmation. 138 B.R. at 719. Significantly, on appeal, the district court found that the objector ***did*** have standing, citing to 11 U.S.C. § 1109(b) and *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984) (impaired shareholder class voting against plan that would wipe out their equity interest had standing to object to fairness of plan, though objections overruled). *In re Drexel Burnham Lambert Grp., Inc.*, 140 B.R. 347 (S.D.N.Y. 1992). At bottom, *Magnesium* and *Drexel* simply stand for the proposition that whether an equity holder has a reasonable possibility of recovering on account of its equity interests is a fact-specific analysis and must be assessed on a case-by-case basis.

63.     Here, the facts demonstrate that DCG has a reasonable possibility of recovering on account of its equity interests in these proceedings.  Specifically:  (1) the value of the Debtors' assets is subject to significant fluctuation, and may continue to increase materially as it has during the chapter 11 cases; (2) if DCG wins on its dollarization arguments, it would vastly increase the likelihood that the Debtors are solvent; and (3) only a few very large governmental claims need be objected to successfully or otherwise disallowed or reduced through resolution for equity to recover under the Amended Plan.  In other words, the Court cannot conclude that there is no reasonable likelihood that DCG would never recover on account of its equity interest under the Amended Plan based on an arbitrary snapshot in time of the then asserted claims.  To do so would effectively impose a claims objection deadline on DCG before it has had an opportunity to take discovery on those claims, which would be particularly onerous in light of the section 502(b) dispute.  Moreover, DCG should not be deprived of standing as a result of the Debtors' strategic decision to not object to the governmental claims so as to create the appearance of a significant delta between general unsecured claims and equity interests, particularly when coupled with the Debtors' refusal to provide DCG with the information that would allow DCG to analyze and object to the government claims.  Confirmation Hr'g Tr. 273:1–274:4 (Mar. 18, 2024).

64.     Alternatively, DCG has standing to object to the Distribution Principles as a creditor of the Debtors.  DCG has filed four proofs of claim against the Debtors.  *Supra* ¶ 11.  The Distribution Principles affect DCG's rights as a creditor in at least two ways.  *First*, should the Debtors subordinate DCG's claims, *see* PLEADING-022 § III.K, it would have the effect of placing those claims directly behind general unsecured claims in the distribution waterfall, which distributions would be directly impacted should the Distribution Principles become effective and balloon the amounts paid to holders of digital asset claims above what is permitted.  *Second*,

because there is no realistic scenario under which the digital asset creditors will receive 100% recovery as defined by the Distribution Principles (even though there are sufficient assets to pay dollarized Petition Date claims), the Distribution Principles reduce (and likely eliminate) the likelihood of DCG recovering post-petition interest.

65.     The Debtors' March 15, 2024 objection to DCG's proofs of claim has no effect on DCG's standing to object to confirmation of the Amended Plan.  To hold otherwise would further allow the Debtors to game the system to arbitrarily deprive a party of standing to raise legitimate disputes by objecting to claims held by parties who object to the Amended Plan (like DCG), while withholding objections to claims held by parties supportive of the Amended Plan (for example, subordinated government penalty claims).

66.     The Distribution Principles directly impact DCG's economic interests under the Amended Plan and accordingly DCG has standing to be heard on its objection to confirmation of the Amended Plan.[5]

## II.     The Distribution Principles Violate Section 502(b)

67.     The Amended Plan is a cramdown plan under section 1129 of the Bankruptcy Code. A cramdown plan is permissible only if, among other things, the plan is "fair and equitable" with respect to classes of claims or interests that are impaired under and have not accepted the plan.  11 U.S.C. § 1129(b).  To be fair and equitable, a plan must comport with (1) the absolute priority rule; and (2) the principle that no creditor be paid more than it is owed.  Section 502(b) of the Bankruptcy Code determines when a creditor's claim is paid in full.

---

[5]     Even if DCG lacked standing, the Court "has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied . . . ."  *In re Young Broadcasting Inc.*, 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010).

A.     **Section 502(b) Caps Digital Assets Claims**

  1.     **Section 502(b) applies to claims against the Debtors based on digital assets.**

68.     The Plan Proponents argue that section 502(b) does not apply to limit claims based in digital assets unless DCG properly objected to such claims.  The Court rejects these arguments and finds that section 502(b) applies for three reasons.

69.     *First*, DCG is not objecting to digital asset claims themselves, but rather the methodology for valuing claims under the Amended Plan for purposes of distribution under the Distribution Principles.  And DCG is not required to file an objection to each digital asset claim to do so.  On February 5, 2024,[6] DCG filed a lengthy objection to the Amended Plan and Distribution Principles' payment of digital asset claims in excess of Petition Date value, which put all parties on notice of its position.  The Court will not require that DCG file an individual claim objection to each of the hundreds of thousands of digital asset claims to invoke section 502(b).

70.     *Second*, DCG has objected to the digital asset claims.  Section 502(b) and Bankruptcy Rule 3007 do not require that a claim objection take on any particular form, as long as it is in writing, filed with the Court, and such notice has been provided.  Fed. R. Bankr. P. 3007(a)(1) ("An objection to the allowance of a claim and a notice of objection that substantially conforms to the appropriate Official Form shall be filed and served at least 30 days before any scheduled hearing on the objection or any deadline for the claimant to request a hearing."); *see also S.B.R. Inv., Ltd. v. LeBlanc (In re LeBlanc)*, 404 B.R. 793, 797–98 (Bankr. M.D. Pa. 2009) ("While no specific objection to that claim was filed, it appears that the spirit of the Federal Rules, specifically Federal Rule of Bankruptcy Procedure 3007(b), would suggest that the answer to this

---

[6]     DCG filed an amended objection to confirmation on February 6, 2024 (Docket No. 1257), and a further amended objection on February 26, 2024 (Docket No. 1389).

complaint challenging the liability of the Debtor to SBR, be taken as the equivalent of an objection to the SBR claim."); *In re Orseno*, 390 B.R. 350, 353 (Bankr. N.D. Ill. 2008) ("Neither the Bankruptcy Code or Federal Rules of Bankruptcy procedure require an objection to claim to take a particular form other than it be made in writing and filed with the court.") (citations omitted).[7]

71.     Despite the UCC's suggestion, *see* UCC Closing Demonstrative at 12, claims that violate the Bankruptcy Code are objectionable, regardless of whether that basis is explicitly enumerated in Bankruptcy Rule 3007(d).   Additionally, the Court's Claims Procedures Order modified Bankruptcy Rule 3007 to permit, among other things, objections to claims "pursuant to Section 502(b) of the Bankruptcy Code to establish the U.S. Dollar amount of the claim."[8]  Claims Procedures Order ¶ 1(a)(xii).  Although the Claims Procedures Order in certain places only refers to omnibus objections by the Debtors, in other places it refers to omnibus objections by any party in interest.  *See, e.g.*, *id.* ¶ 1(b) ("The decision of Debtors, ***or any party in interest***, to pursue an objection (individually or on an omnibus basis) with respect to a proof of claim . . .").

72.     As noted, DCG's objection to confirmation of the Amended Plan put all parties on notice of its position.  Further, the Debtors' Disclosure Statement—notice of which was provided to all creditors—included DCG's objection to creditors recovering more than the Petition Date value of their claims.  *See* PLEADING-001 at 300.  The Disclosure Statement also emphasized that "dollarization" of the digital asset claims was subject to a high level of uncertainty and may

---

[7]     Courts have allowed claims objections in the context of an adversary answer, *LeBlanc*, 404 B.R. at 797–98, letter brief requested by the bankruptcy court, *Southland Corp. v. Kilgore & Kilgore (In re Southland Corp.)*, 19 F.3d 1084, 1087 (5th Cir. 1994), and a memorandum brief in response to claimant's objection to the debtors' claim of exempt property, *In re Keyworth*, 47 B.R. 966 (Bankr. D. Colo. 1985).

[8]     *Revised Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 (I) Establishing Claims Objection and Notice Procedures, (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* (Docket No. 498) (the "**Claims Procedures Order**").

not be sustained.   PLEADING-001 at 131.   These objections were sufficient to trigger section 502(b).

73.    In addition, on February 25, 2024, DCG filed an omnibus objection to claims against the Debtors that are denominated in digital assets.[9]   To the extent not already applicable, the Omnibus Digital Claims Objection implicates section 502(b) of the Bankruptcy Code as to all claims asserted against the Debtors that are denominated in digital assets.

74.    *Third*, DCG was not required to object to any claims before they are subjected to the requirements of section 502(b) for purposes of evaluating the Amended Plan's compliance with the Bankruptcy Code.   Bankruptcy Rule 3007 imposes no time limitation on a party in interest's ability to object to claims.   And the Advisory Committee Notes make clear that "deemed allowance" under section 502 is not a bar to a party's ability to file a claim objection after a plan is confirmed, and even after distributions have been made on a "deemed allowed" claim.[10] Contrary to the Plan Proponents' assertions—and consistent with established practice over decades—merely because a claim has not been objected to as of the confirmation hearing does not mean that claim is legitimate.   To hold otherwise would impose a concealed, *de facto* claims objection deadline on parties-in-interest, and would lead to arbitrary and inconsistent results.[11]

---

[9]    *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Omnibus Claims Objection to Claims Against Debtors Based on Digital Assets Pursuant to 11 U.S.C. §§ 105(a), 502 and Fed. R. Bankr. P. 3007* (Docket No. 1382) (the "**Omnibus Digital Claims Objection**").

[10]    "By virtue of the automatic allowance of a claim not objected to, a dividend may be paid on a claim which may thereafter be disallowed on objection made pursuant to this rule. The amount of the dividend paid before the disallowance in such event would be recoverable by the trustee in an adversary proceeding."   Advisory Committee Notes (1983) to Bankruptcy Rule 3007.

[11]    To illustrate, consider a situation where two claimants, each with legitimate, identical proofs of claim asserting two bitcoin owed under unsecured loan agreements.   A party in interest objects to one claim but not the other, purely in error.   Taking the Plan Proponents' position, the claimant who received an objection would be subject to section 502(b), and its claim will be limited to petition date value, while the claimant who did not receive an objection will recover a claim that could be far in excess of the one who received an objection.   Such a result violates the principle of treating similarly situated claims equally.

75.     For these reasons, the Court "shall determine the amount of such claim[s] in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim[s] in such amount." *See* 11 U.S.C. § 502(b).

**2.     Section 502(b) of the Bankruptcy Code requires that claims be valued in dollars as of the Petition Date.**

76.     By the plain language of section 502(b) of the Bankruptcy Code, claims denominated in digital assets, as with any asset, must be valued as of the petition date in U.S. dollars.

77.     Where a statute is clear on its face, the Court must interpret it according to the plain meaning of its words without looking to other sources. *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 268 (Bankr. S.D.N.Y. 2010) ("In the usual case, if the words of a statute are unambiguous, judicial inquiry should end, and the law is interpreted according to the plain meaning of its words.") (quoting *Devine v. U.S.*, 202 F.3d 547, 551 (2d Cir. 2000)). "Section 502 defines what portions of a claim may be 'allowed,' *i.e.*, recoverable in bankruptcy." *TLA Claimholders Grp. S.A. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)*, 55 F.4th 377, 383 (2d Cir. 2022). Section 502(b) is unambiguous and contains two mandates: (a) that a claim be valued as of "the date of the filing of the petition," and (b) that such valuation is to be made in U.S. dollars, not in some other denomination.

78.     The Court has no discretion to reject these mandates. Section 502(b) states that the Court "***shall*** determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and ***shall*** allow such claim in such amount." 11 U.S.C. § 502(b) (emphasis added). "The meaning of the word 'shall' is not ambiguous. It is a word of command . . . that normally creates an obligation impervious to judicial discretion." *In re FTX Trading Ltd.*,

91 F.4th 148, 153 (3d Cir. 2024) (cleaned up).  Allowing claims in excess of petition date value

would render this text meaningless.

79.    The Distribution Principles that comprise the "cornerstone"[12] of the Amended Plan

fail to comply with section 502(b).  Although creditors' initial pro rata distributions are based on

their claims being valued as of the Petition Date, *see* PLEADING-022, Ex. A at 4, the Recovery

Cap for each creditor floats with the underlying asset prices, *see* PLEADING-022, Ex. A at 8–9.

That is, claims are ultimately valued using an average price at either the time the Confirmation

Order is entered, or at a later distribution date, not the Petition Date.  *Id.*  The Distribution

Principles would allow certain creditors, whose claims are based on digital assets that have

significantly appreciated in value since the Petition Date, to recover more than the value of their

claims in U.S. dollars as of the Petition Date, in violation of section 502(b).

80.    The Court's holding is consistent with the universal treatment by courts of claims

denominated in assets other than U.S. dollars.  For example, claims denominated in foreign

currencies are converted to U.S. dollars at the prevailing exchange rate as of the petition date.[13]

Likewise, claims stated in commodities (like gold) are valued in U.S. dollars as of the petition

date, with courts explaining that the denomination of claims in U.S. dollars is consistent with the

clear reading of section 502(b) of the Bankruptcy Code, which "prevents the value of a claim from

---

[12]    *See* UCC Confirmation Brief at 14.

[13]    *See, e.g.*, *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 250 (2d Cir. 1999) (observing that, under U.S. bankruptcy law, claims in foreign currency are determined by converting them to U.S. dollars as of the petition date); *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *8 (Bankr. S.D.N.Y. May 19, 2023) (applying the accepted market rate "in effect as of the applicable Petition Date" to conversion of Brazilian currency to U.S. dollars); *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.)*, 429 B.R. 437, 492 (Bankr. D. Md. 2010) ("[U]nder the plain meaning of 11 U.S.C. § 502(b), the Court shall use the exchange rate in effect on the Petition Date to convert the claim to U.S. dollars."), *aff'd sub nom. TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011); *In re Axona Int'l Credit & Com. Ltd.*, 88 B.R. 597, 608 n.19 (Bankr. S.D.N.Y. 1988), *as amended* (Aug. 11, 1988) (noting that section 502(b) refers to the date of the entry of the order for relief as the appropriate date for conversion of foreign currency claims).

fluctuating by freezing the claim as of the petition date and converting it to United States dollars." *In re Aaura, Inc.*, No. 06-B-01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1, 2006). The same goes for securities. *See In re Lehman Brothers Hldgs. Inc.*, 602 B.R. 564, 586–87 (Bankr. S.D.N.Y. 2019) (holding that, if the 11 U.S.C. § 562 exception does not apply to a securities contract, "the [assets] must be valued on or about the Petition Date pursuant to section 502. . ."). These cases include situations where the debtor owed the non-U.S. dollar asset or currency itself to the creditor, as opposed to the value of the asset. *See id.* at 569 (seeking return of assets including shares of common stock); *LATAM Airlines*, 2023 WL 3574203, at *1, 5 (noting that the debt instruments provided for payments in Brazilian local currency).

81.     None of the Plan Proponents have identified a case where, over the objection of a party-in-interest, a court permitted the valuation of claims at something other than U.S. dollars determined as of the petition date. And there is no reason to depart from this longstanding and well-understood precedent simply because digital assets are involved.[14]

82.     The Court cannot evade the mandates of section 502(b) on grounds of equity or convenience. *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("'[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (citation omitted). And as discussed further below, a procedural rule cannot override an explicit statutory mandate. *See SC SJ Holdings, LLC v. Pillsbury Winthrop Shaw Pittman LLP (In re SC SJ Holdings, LLC)*, No. 21-10549 (JTD), 2023 WL 2598842, *6 (D. Del. Mar. 22, 2023). Any actionable exceptions to section 502(b) must be rooted in federal statute.

---

[14]     *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) (Jan. 31, 2024 Hr'g Tr. at 14:23–25) (Noting, in the context of digital asset claims: "[T]he [Bankruptcy] [C]ode is very clear. The [C]ode says that a claim is to be determined in U.S. dollars as of the petition date."); *In re Celsius Network LLC*, 655 B.R. 301, 312 (Bankr. S.D.N.Y. 2023) ("Whether under a chapter 11 plan or liquidation, creditors are entitled to their share of the value of the Debtors' Estates on the Petition Date.").

83.    Contrary to the Plan Proponents' assertions, "restitution" also does not provide a basis to violate section 502(b).  This is critical, as Congress has invoked restitution elsewhere in the Bankruptcy Code to create exceptions to general provisions.[15]  The Debtors do not assert that the creditors are entitled to turnover of property held by the Debtors to which the creditors have title.  Confirmation Hr'g Tr. 29:12–23 (Mar. 18, 2024).  Rather, the creditors possess unsecured claims against the Debtors' Estates.  Even if creditors are entitled to "restitution" under state law (which none of the Plan Proponents have established through any evidence), that does not provide a basis to bypass section 502(b) when determining the amount of an allowed claim against the Debtors' Estates.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*, 637 B.R. 781, 793–94 (Bankr. D. Del. 2021) (finding that contractual entitlements to unmatured interest, or its equivalent, will be subject to the limitations of section 502(b)(2) with regard to allowance of claims); *Kohn v. Leavitt-Berner Tanning Corp.*, 157 B.R. 523, 527 (N.D.N.Y. 1993) (accepting the amount of a claim based on a state court judgment, but determining the allowed claim against the estate with reference to restrictions such as section 502(b)(6)).

84.    No statutory exception—whether assumption under section 365, application of the section 562 safe harbor, or reinstatement under section 1124—applies that would permit anything but dollarization of claims as of the Petition Date.  *First*, as the Plan Proponents have acknowledged, the relevant customer contracts giving rise to claims against Genesis are not executory.  *See* PLEADING-024 ¶¶ 29–34; AHG Confirmation Brief ¶¶ 29–31; UCC Confirmation Brief ¶¶ 34–35.  Accordingly, the Debtors cannot utilize section 365 of the

---

[15]    Specifically, section 523(a) carves out from the discharge those claims "for any payment of an order of restitution issued under title 18, United States Code" (11 U.S.C. § 523(a)(13)), or any claim that "results, before, on, or after the date on which the petition was filed, from . . . any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor" (11 U.S.C. § 523(a)(19)).

Bankruptcy Code to assume such contracts or propose to cure any defaults arising thereunder. Further, even if such contracts were executory, they are not assumed by the Debtors pursuant to the Amended Plan.  The Amended Plan provides that all executory contracts are deemed rejected unless designated on the Schedule of Assumed Executory Contracts and Unexpired Leases, or if the contract was previously assumed or rejected, expired by its terms, or is the subject of a pending motion to reject.  PLEADING-022 § V.A.  The Schedule of Assumed Executory Contracts and Unexpired Leases does not list any loan agreements as being assumed.  PLEADING-002.

85.    *Second*, the safe harbor under section 562(a)—which, under certain circumstances, could result in valuation of claims at a time different than the petition date—does not apply here. No party, including the CCAHG, has asserted that the contract counterparties to Genesis were qualifying participants under section 562(a).  *See* SUPP-010 ¶ 2.  Accordingly, the only way in which section 562(a) could apply is if the contracts were rejected by the Debtors, and otherwise qualified as safe harbored contracts.  As discussed herein, the contracts are not executory and cannot be rejected, and therefore section 562(a) does not apply on that basis alone.

86.    *Finally*, the Plan Proponents have suggested that the Distribution Principles are akin to reinstatement, and since DCG could not validly object to reinstatement if the Amended Plan provided for it, they cannot object to the Distribution Principles.  That is incorrect.  Pursuant to section 1124(2) of the Bankruptcy Code, reinstatement of a loan agreement would require the Debtors to, among other things, "cure the default, reinstate the maturity of the claim, and compensate the creditor for damages resulting from reliance on the prospect of receiving accelerated payment." *In re LATAM Airlines Grp. S.A.*, 55 F.4th 377, 385–86 (2d Cir. 2022) (citing 11 U.S.C. §§ 1124(2)(A)–(C)).  As the Debtors acknowledge, they cannot do so.  PLEADING-024

¶¶ 28–29. Accordingly, the Debtors cannot use reinstatement under section 1124(2) to avoid section 502(b).

87.     Further, failure to satisfy the express reinstatement requirements of section 1124 of the Bankruptcy Code cannot be ignored by arguing that the Distribution Principles constitute the deemed consent of every single digital asset creditor to an across-the-board modification of their state law contractual rights pursuant to Bankruptcy Rule 9019. *See* UCC Closing Demonstrative at 19 (citing *In re Frontier Commons Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) (Docket No. 1005)). Nor could Bankruptcy Rule 9019 be utilized to overcome the statutory requirements of section 1124. *Infra* ¶ 99.

88.     The Court's holding regarding section 502(b) is not affected by the line of cases regarding claims for amounts due in the future. *See* AHG Confirmation Brief at 20–21 (citing *In re Oakland Homes Corp.*, 449 F.3d 588, 596–97 (3d Cir. 2006)). These cases only concern the issue of whether amounts owed by a debtor in the future should be discounted to present value, which is inapposite to the present dispute on valuation of claims that are currently due and denominated in digital assets.

89.     Similarly, the Plan Proponents' references to limitations found in the subsections of section 502(b) (*e.g.*, the statutory caps set forth in sections 502(b)(6) and (b)(7), *see* PLEADING-024 ¶ 32; UCC Confirmation Brief ¶¶ 46–47) do nothing to discount the explicit mandates of section 502(b) to dollarize as of the Petition Date. The limitations in section 502(b) and its subsections are cumulative, not exclusive: section 502(b) creates the starting point (*i.e.*, dollarization as of the petition date) at which each exception begins. The Court further rejects that DCG is impermissibly seeking "equitable disallowance" of creditor claims. *See* UCC Confirmation Brief ¶ 48 n.47. DCG seeks to invoke the general requirement of section 502(b) that

requires dollarization as of the Petition Date, which has just as much force as the specific

exceptions contained in section 502(b).

90.     For all the reasons stated, section 502(b) demands that claims be dollarized as of

the Petition Date, which requirement is violated by the Distribution Principles.

**B.      The Solvent Debtor Exception Does Not Permit Recovery Above the Section 502(b) Cap**

91.     The Plan Proponents assert that the "solvent debtor" exception may permit creditors

to recover more than the Petition Date value of their claims.  But the solvent debtor exception is

limited to the allowance of post-petition interest, which itself is tied to the immutable principle

that creditors' claims are fixed as of the Petition Date.  11 U.S.C. § 502(b); *In re Ultra Petroleum

Corp.*, 624 B.R. 178, 195–96 (Bankr. D. Tex. 2020), *aff'd*, 51 F.4th 138 (5th Cir. 2022) ("Over the

centuries, courts developed a solvent-debtor exception to the general bankruptcy rule that interest

stops accruing on the petition date.").

92.     Pursuant to the solvent debtor exception, in spite of the prohibition against

allowance of unmatured interest under section 502(b)(2), an unsecured creditor of a solvent debtor

may recover post-petition interest on account of its claim before equity recovers anything.[16]

Importantly, because the solvent debtor concept is an exception to the disallowance of unmatured

interest as part of an unsecured creditor's claim, the principle "cannot override express provisions

of the [Bankruptcy] Code."  *Hertz*, 637 B.R. at 794; *see also Ultra*, 624 B.R. at 200 (explaining

that the solvent debtor exception "must be applied within the parameters of the Bankruptcy Code").

Moreover, "a bankruptcy court cannot use equitable principles to modify express language of the

---

[16]     *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *18 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *motion to certify appeal denied*, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *aff'd*, 643 B.R. 756 (S.D.N.Y. 2022), *aff'd*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom.*, *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023);

Code." *Hertz*, 637 B.R. at 798–99; *see also Ultra*, 624 B.R. at 200 (citing *Siegel*, 571 U.S. at 423)

("A bankruptcy court is undoubtedly forbidden from exercising equitable powers 'in contravention

of the Code.'")). Accordingly, "when a debtor is solvent, the Bankruptcy Code does not waive the

application of section 502(b)(2)." *Hertz*, 637 B.R. at 799.

93. The solvent debtor exception must therefore be rooted in statute. Namely, it derives

from the "best interests" test in section 1129(a)(7) of the Bankruptcy Code, which requires a

creditor's treatment under a chapter 11 plan must at least equal what the creditor would receive in

a chapter 7 case, which in turn entitles creditors to payment of post-petition interest at the "legal

rate" before distributions to the debtor's interest holders, under section 726(a)(5) of the Bankruptcy

Code. *See In re 53 Stanhope LLC*, 625 B.R. 573, 578–79 (Bankr. S.D.N.Y. 2021); *LATAM

Airlines*, 2022 WL 2206829, at *23 (finding that the solvent debtor exception survived the

enactment of the Bankruptcy Code only through sections 1129(a)(7) and 726(a)(5)); *Hertz*, 637

B.R. at 800 ("The Bankruptcy Code expressly codified the solvent debtor exception in section

506(b) as to oversecured creditors and in section 1129(a)(7) and 726(a)(5) as to unsecured

creditors.").

94. The solvent debtor exception can go no further. By its plain language, section

502(b) of the Bankruptcy Code mandates digital asset claims be valued as of the Petition Date. To

the extent the Debtors here are solvent and the unsecured loan agreements provide for the payment

of interest, customers may receive interest on their Petition Date valued claim pursuant to section

726(a)(5). But the underlying valuation and allowance of the claims is not altered.

95. The Debtors, the UCC, and the AHG interpret the solvent debtor exception to be

akin to reinstatement under section 1124 of the Bankruptcy Code. However, "section 1124(1)

does not mandate that unimpaired creditors receive all of their contract rights where those rights

are expressly disallowed by section 502(b)." *Hertz*, 637 B.R. at 799 (citing *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003)). Instead, "sections 1129(a)(7) and 726(a)(5) require the treatment of claims in accordance with the mandates of those sections which courts have concluded require the payment of ***post-petition interest only*. . . .**" *Id.* at 793 (emphasis added).

96.      With limited exceptions not applicable here,[17] the solvent debtor exception has generally been applied to the question of whether to pay post-petition interest on an allowed general unsecured claims and at what rate in a solvent debtor case. *See, e.g.*, *Ultra*, 624 B.R.at 184 ("the solvent-debtor exception entitles the Class 4 Claimants to post-petition interest."). It has otherwise not been applied to determine the amount of an allowed general unsecured claim in a way inconsistent with section 502(b). This makes sense, as the solvent debtor exception is an exception to the general rule that once creditor claims are fixed as of the date a debtor files for bankruptcy, they do not accrue interest. *Ad Hoc Comm. of Holders of Trade Claims v. Pacific Gas and Electric Co. (In re PG&E Corp.)*, 46 F.4th 1047, 1053 (9th Cir. 2022) ("The default rule in bankruptcy law is that interest ceases to accrue on a claim once a debtor has filed for bankruptcy.") (citing *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911); 11 U.S.C. § 502(b)(2)). To adopt the Debtors', UCC's, and AHG's view would be to expand the solvent debtor exception beyond its limits.

---

[17]     *See Off. Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 683 (6th Cir. 2006) (holding that unsecured creditors could recover default interest, as well as post-petition attorneys' fees, costs and expenses from the estate of a solvent debtor where permitted to do so by the terms of their contract and applicable nonbankruptcy law). *But see Hertz*, 637 B.R. at 798 n.30 (noting that *Dow Corning* was premised on section 1129(b), and that it is "contrary to the many cases that conclude that impaired creditors are only entitled to post-petition interest at the federal judgment rate under sections 1129(a)(7) and 726(a)(5)."). *In re Chemtura Corp.*, cited by the Plan Proponents, considered no-call and make-whole provisions in the solvent debtor context, but in any event only decided the reasonableness of a settlement without ruling on the merits of the no-call and make-whole provisions in bankruptcy. 439 B.R. 561, 606 (Bankr. S.D.N.Y. 2010).

**C.     The Distribution Principles Cannot Be Approved Under Rule 9019**

**1.     Rule 9019 is not the appropriate standard to evaluate whether the Distribution Principles should be approved.**

97.     The Plan Proponents argue that the Distribution Principles should be approved as a settlement among creditors pursuant to Bankruptcy Rule 9019.  The Court rejects this for three reasons.

98.     *First*, the proper standard by which the Court must consider the Distribution Principles, as incorporated by the Amended Plan, is section 1129 of the Bankruptcy Code, not Bankruptcy Rule 9019.  "Not every resolution of a disagreement in a bankruptcy case is a settlement for purposes of Bankruptcy Rule 9019," and that includes resolutions that "are not truly settlement agreements, but rather consensual resolutions of Plan terms or resolutions of confirmation objections."  *In re Boy Scouts of Am. and Del. BSA LLC*, 642 B.R. 504, 562 (Bankr. D. Del. 2022).  For instance, Bankruptcy Rule 9019 does not apply to trust distribution procedures, or a settlement of the classification and treatment of claims.  *See id.* at 626–27.

99.     *Second*, procedural rules cannot overcome the requirements of the Bankruptcy Code.  28 U.S.C. § 2075 (bankruptcy rules "[s]hall not abridge, enlarge, or modify any substantive right"); *see also Smart World Techs., LLC v. Juno Online Servs (In re Smart World Techs., LLC)*, 423 F.3d 166, 181 (2d Cir. 2005) ("Where a conflict between a Rule and a statutory provision exists, of course, the Rules Enabling Act requires that we apply the statutory provision."); *SC SJ Holdings*, 2023 WL 2598842, *6 ("A rule can do no more than 'define the process' by which the substantive rights set forth in the Code can be effected.") (quoting *Branchburg Plaza Associates L.P. v. Fesq (In re Fesq)*, 153 F.3d 113, 116 (3d Cir. 1998), *cert denied* 526 U.S. 1018 (1999)).

100.     *Third*, the notion that the Distribution Principles can be approved as a settlement runs afoul of the Supreme Court's *Jevic* decision.  *See Czyzewksi v. Jevic Holding Corp.*, 580 U.S.

451 (2017).  As explained herein, the Distribution Principles violate multiple provisions of the
Bankruptcy Code, including the corollary to the absolute priority rule under section 1129(b),
section 1129(a)(1), and section 1129(a)(7).  Accordingly, as in *Jevic*, the Debtors here seek
approval of a distribution scheme that would violate the Bankruptcy Code.  The Distribution
Principles are not a potentially allowable ***interim*** distribution that furthers "significant
[Bankruptcy] Code-related objectives that the priority-violating distributions serve." *Id.* at 467–
68.  Relatedly, and for many of the same reasons, had the Distribution Principles been submitted
separately from the Amended Plan, they would have been struck as an improper *sub rosa* plan.  *In
re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 812 (Bankr. S.D.N.Y. 2020) ("A debtor cannot enter
into a transaction that 'would amount to a *sub rosa* plan of reorganization' or an attempt to
circumvent chapter 11 requirements for confirmation of a plan of reorganization.") (quoting
*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d
452, 466 (2d Cir. 2007) (citation omitted)).

### 2. Even if Rule 9019 applies, it is not satisfied with respect to the Distribution Principles.

101.    The proponents of a Bankruptcy Rule 9019 settlement bear the burden of proof and
persuasion in seeking court approval.  *See MF Global Inc. v. Giddens (In re MF Global Inc.)*, 466
B.R. 244, 248 (Bankr. S.D.N.Y. 2012) (the settlement proponent bears the burden "to persuade the
court that the settlement is in the best interests of the estate.").  A debtor may not carry that burden
simply by invoking its business judgment:  it is incumbent on the bankruptcy court to
independently assess whether the settlement is "fair, equitable, and in the best interests of the
estate." *Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*, 506 B.R. 29, 36–37
(Bankr. E.D.N.Y. 2014) (quoting *In re Residential Capital, LLC,* 497 B.R. 720, 749 (Bankr.
S.D.N.Y. 2013)).

102.    The Second Circuit has articulated seven factors that a bankruptcy court should

consider when evaluating a Bankruptcy Rule 9019 settlement:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, with its
> attendant expense, inconvenience, and delay, including the difficulty in collecting
> on the judgment; (3) the paramount interests of the creditors, including each
> affected class's relative benefits and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement; (4) whether other parties
> in interest support the settlement; (5) the competency and experience of counsel
> supporting, and [t]he experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to be obtained by
> officers and directors; and (7) the extent to which the settlement is the product of
> arm's length bargaining.

*Iridium*, 478 F.3d at 462 (citations and internal quotation marks omitted).

103.    Moreover, as the Second Circuit stated in *Iridium*, "[i]n the Chapter 11 context,

whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will

often be the dispositive factor" on whether to approve a Bankruptcy Rule 9019 settlement.  *Id.* at

464.  As discussed herein, the Amended Plan violates the corollary to the absolute priority rule

requiring that creditors not recover more than the full amount of their claim, which amount is

defined by section 502(b).  Given the weight of this factor, the Court cannot approve the

Distribution Principles under the Bankruptcy Rule 9019 standard.

104.    Finally, the Court would not approve the Distribution Principles on the separate but

related basis that they negatively impact the rights of DCG, a non-settling third party.   In

considering a settlement under Bankruptcy Rule 9019, the Court must consider the settlement's

effect on non-settling third parties.  *See In re MatlinPatterson Glob. Opportunities Partners II*

*L.P.*, 644 B.R. 418, 426 (Bankr. S.D.N.Y. 2022) (citing *In re Masters Mates & Pilots Pension*

*Plan and IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where the rights of third parties are

affected, however, their interests too must be considered")).  "[T]he Second Circuit has explicitly

instructed that when the rights of non-settling parties are implicated by the terms of a settlement,

the court cannot approve it without considering the interests of those non-settling parties." *In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019) (citations and internal quotation marks omitted).

105.    Here, as demonstrated above, DCG's substantive rights are unduly impaired by the Distribution Principles.  Given the Court's holding that claims must be dollarized as of the Petition Date under section 502(b), the Distribution Principles would result in a significant overpayment of creditors with claims based on digital assets that have increased in value since these chapter 11 cases were filed.  DCG, as ultimate equity holder, is entitled to residual value if the Debtors are solvent, and that entitlement is frustrated by the Distribution Principles.

## III.    The Amended Plan Cannot Be Confirmed

### A.    The Amended Plan Violates Section 1129(a)(7)

106.    The Amended Plan does not satisfy the best interests test.

107.    Section 1129(a)(7) provides that a plan may not be confirmed over the objection of a holder of an impaired class of claims or interests unless that holder will receive from the estate at least as much as it would receive if the debtor were liquidated under chapter 7.  *See* 11 U.S.C. § 1129(a)(7); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 606–07 (Bankr. S.D.N.Y. 2019).

108.    The Amended Plan proposes to distribute assets of the Estates to creditors in excess of what they are entitled by: (1) failing to value claims as of the Petition Date in U.S. dollars, as required by section 502(b); and (2) as discussed below, proposing to pay interest at excessive rates not allowed by the Bankruptcy Code.  Because senior classes of creditors receive more on account of their claims than they would be entitled to in a chapter 7 liquidation, the Amended Plan fails to satisfy the best interests test as to junior classes of creditors and interest holders, which are entitled to residual value.  Put differently, junior classes of claims and interests will receive less than they would in a hypothetical liquidation where the distribution scheme follows the Bankruptcy Code.

**B.      The Amended Plan Violates Section 1129(b)**

109.     The Debtors may not cramdown the Amended Plan on DCG.

110.     As noted, a cramdown plan is permissible only if the plan is "fair and equitable" with respect to classes of claims or interests that are impaired under and have not accepted the plan.  11 U.S.C. § 1129(b).  To be fair and equitable, a plan must comport with (1) the absolute priority rule; and (2) the principle that no creditor be paid more than it is owed.  *See* 7 *Collier on Bankruptcy* ¶ 1129.03[4][a] (16th ed. 2023).  "An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims" because "shareholders are entitled to the surplus."  *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017) (citations omitted).[18]  The Amended Plan violates section 1129(b) in two ways.

111.     *First*, as discussed above, the Amended Plan impermissibly values creditors' claims in cryptocurrency as of the date of distribution, rather than in U.S. dollars as of the Petition Date, in violation of section 502(b) of the Bankruptcy Code.  As a result of this improper valuation, the Amended Plan would potentially divert nearly $2.146 billion of excess value in the high case and $496 million of excess value in the low case (using digital asset prices as of February 20, 2024)— and potentially many millions more if the digital assets continue to appreciate—to creditors, which should instead flow to equity under the Bankruptcy Code.  Because the Distribution Principles grant certain creditors more on account of their claims than is allowed under the Bankruptcy Code, the Amended Plan violates the corollary to the absolute priority rule and, as a result, violates section 1129(b).

---

[18]     *See also In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (same); *In re Tronox Inc.*, 503 B.R. 239, 337 (Bankr. S.D.N.Y. 2013) (same); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (same); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (same); *Miller v. Mott (In re Team Sys. Int'l, LLC)*, 2023 WL 1428572, at *12 (Bankr. D. Del. Jan. 31, 2023) ("[O]nce creditors are paid, any remaining value would be distributed to the debtor, which would presumably dividend that distribution to its equity holders.").

112.     *Second*, the Amended Plan contemplates the payment of interest to general unsecured creditors at rates not recognized by this District and in excess of what is allowed by section 1129(a)(7) of the Bankruptcy Code.  This impermissible diversion of Estate assets to creditors likewise violates the absolute priority rule by paying creditors more on account of their claims than what the Bankruptcy Code allows.  As a result, the Amended Plan violates section 1129(b).

### C.     The Amended Plan Violates Section 1129(a)(1)

113.     The Amended Plan violates section 1129(a)(1) of the Bankruptcy Code, which requires that both the Amended Plan and the Plan Proponents comply with all applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(1).

114.     *First*, and for the reasons stated above, the Amended Plan does not comply with section 502(b).

115.     *Second*, the Amended Plan does not comply with section 1123(a)(7), which requires that the Amended Plan be "consistent with the interests of creditors and equity security holders and with public policy" with respect to the manner and selection of any officer, director or trustee under the Amended Plan and any successors thereto.  *See* 11 U.S.C. § 1123(a)(7).  The Amended Plan restricts DCG from exercising its voting rights in GGH, notwithstanding the fact that DCG shall remain the sole equity holder of GGH after the Plan Effective Date.  Specifically, the Amended Plan contemplates that DCG may only appoint the New Board from "a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors" and that "in no event shall DCG be entitled to terminate any member of the New Board."  PLEADING-022 art. IV(B)(9).  This restriction is not consistent with DCG's interests as equity holder, and it does not comport with Delaware public policy.  *See EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("The fundamental

governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm.").

### D.   The Amended Plan Violates Section 1129(a)(3)

#### 1.   The Amended Plan was not proposed in good faith.

116.   The Amended Plan violates section 1129(a)(3).  Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). The plan proponent bears the burden of establishing "good faith" under section 1129(a)(3).  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D. N.J. 2010).  In evaluating whether a plan is proposed in "good faith" under section 1129(a)(3), courts consider whether "there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *In re Best Products Co., Inc.*, 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994) (quoting *Texaco*, 84 B.R. at 907).

117.   Here, the Amended Plan provides creditors with distributions in excess of their Petition Date-valued claims, in violation of section 502(b).  A chapter 11 plan is not proposed in good faith where it disregards the requirements of the Bankruptcy Code.

118.   Furthermore, the Amended Plan is not a product of good faith because it is designed to provide no practical cap on the amount that certain creditors can recover, while potentially leaving equity holders with nothing, no matter how much value is in the Debtors' Estates.  As fiduciaries of the Estates, with duties that run to the Estates as a whole—including to equity—the Debtors have put forth a plan that likely provides no recovery to DCG.  Such a plan cannot have been proposed in good faith.

#### 2.   The Setoff Principles were proposed in bad faith and run counter to the Debtors' duty to maximize the value of the Estates' assets.

119.   The Setoff Principles violate section 1129(a)(3) by seeking to provide a select few creditors with windfall recoveries at the expense of the Debtors' Estates.

120.     The Setoff Principles value the Debtors' loan receivables—which are assets of the

Estates—at Petition Date values, yet the Amended Plan seeks to make distributions to creditors

above Petition Date values through the Distribution Principles.  *See* PLEADING-005 at 1.

121.     This outcome is inconsistent with the Debtors' fiduciary duties to maximize value

of the Estates.  Chapter 11 debtors are obligated to maximize the value of the estate as a whole—

not minimize the value of the estate and maximize the value of certain creditors' claims to the

detriment of the overall estate.[19]  Other courts have also struck down similar attempts by debtors

to pay unreasonably high amounts to certain parties.  *See In re Global Indus. Techs., Inc*., 645 F.3d

201, 212–15 (3d Cir. 2011) (noting that a trust created under a plan must be negotiated fairly

between a debtor and its creditors and cannot negatively impact a third party by increasing the

number of claims or permitting the payment of skeptically high claim amounts).  It is improper for

a debtor to acquiesce to certain creditors' demands and give up defenses to those creditors' claims

to the detriment of the Estates.  *In re Am. Cap. Equip*., LLC, 688 F.3d 145, 158–59 (3d Cir. 2012)

(reiterating that a court cannot confirm a plan that prejudices parties-in-interest because of the

debtors' failure to oppose creditors appropriately).  The Setoff Principles thus have not been

proposed in good faith and therefore violate section 1129(a)(3).

### 3.     The Amended Plan impermissibly alters DCG's equity holder rights in violation of applicable law.

122.     The Amended Plan impermissibly alters DCG's rights as sole equity holder of GGH

by preventing DCG from transferring its interests in GGH or taking a worthless stock deduction

---

[19]     *See Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992) (trustees have routine duties "to minimize the pre-petition claims against the estate"); *see also In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (citations and internal quotation marks omitted) ("Along with [the powers of a trustee], comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate. The debtor-in-possession's fiduciary duty to maximize includes the duty to protect and conserve property in its possession for the benefit of creditors.").

with respect to its interests in GGH, and by denying DCG the right to appoint and remove directors. Such provisions have no basis in law or equity, and thus have not been proposed in good faith.

123.   The Second Circuit has held that shareholders' rights to govern the debtor is a "prerogative ordinarily uncompromised by reorganization," and the "law of this circuit directs that the shareholders' natural wish to participate in this matter of corporate governance be respected." *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1980).  The Amended Plan proposes to restrict DCG's corporate governance and equity rights, which purportedly will be returned to DCG upon payment in full to creditors in accordance with the Distribution Principles.  PLEADING-022 § III.B.10  This means the restrictions on DCG's rights could theoretically last in perpetuity, which would effectively constitute a permanent injunction against DCG, which could have tax, liability, and other consequences for DCG.  There is no good faith basis to forcibly restrict an equity holder's **corporate governance** rights upon full payment to creditors where the plan seeks to maintain the equity holder's ownership of a corporation.

### 4.   The Amended Plan cuts off DCG's beneficial interests in GGC and GAP.

124.   There is no basis for the proposed treatment of Intercompany Interests in GGC and Intercompany Interests in GAP.  *See* PLEADING-022 §§ III.C.11, III.D.10.  DCG is the sole equity holder of GGH, and GGC and GAP are wholly-owned subsidiaries of GGH.  The Amended Plan proposes to treat Holders of Intercompany Interests in GGC and GAP the same as holders of Interests in GGH.  Therefore, the Amended Plan essentially cuts off DCG's beneficial interests in GGC and GAP by cutting off GGH's Interests.  There is no basis for cutting off such interests. Accordingly, this proposed treatment does not meet section 1129(a)(3)'s good faith requirements.

**5.      DCG should have consultation rights over the Debtors' Wind-Down.**

125.    The Amended Plan has not been proposed in good faith because it excludes DCG from any role over the Wind-Down, including consultation rights with respect to the selection of the PA Officer and the selection of members of the Wind-Down Oversight Committee and the Litigation Oversight Committee.

126.    Section 1123(a)(7) of the Bankruptcy Code requires plan provisions to be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Because DCG could receive distributions under the Amended Plan, DCG should have consent and consultation rights over the Wind-Down, including with respect to the selection of the PA Officer and the selection of members of the Wind-Down Oversight Committee and the Litigation Oversight Committee. Such consent rights shall not encompass the Litigation Oversight Committee for matters in which the Debtors are bringing claims against DCG.

**E.      The Amended Plan Pays an Illegal Rate of Post-petition Interest**

127.    The Bankruptcy Code only provides for payment of post-petition interest to unsecured creditors when a debtor is solvent.  *See Hertz*, 637 B.R. at 801 (holding that both unimpaired and impaired creditors are entitled to post-petition interest at the federal judgment rate before any distribution can be made to equity); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 200 (Bankr. S.D.N.Y. 2012).  To the extent the Estates are insolvent, general unsecured creditors are not entitled to interest on their claims under the Bankruptcy Code.

128.    Even if the Estates are solvent, the Amended Plan seeks to pay general unsecured creditors a greater interest rate on their claims than what the Bankruptcy Code allows.  The Debtors submit that "[a]ll unsatisfied Allowed General Unsecured Claims shall, from the Petition Date,

accrue interest at the rate (inclusive of both the loan fee and the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the relevant Holder" under the Distribution Principles.  PLEADING-022, Ex. A at 9.  Such interest only factors into each holder's pro rata share once the Recovery Cap for all unsecured claimants has been met.  *Id.*  However, the proper measure of interest here—assuming the Estates are solvent—is not the contract rate, but rather the federal judgment rate under 28 U.S.C. § 1961.

129.    Where a bankruptcy estate is solvent, section 726(a)(5) allows unsecured creditors to receive post-petition interest.  *See* 11 U.S.C. § 726(a)(5).  Section 726(a)(5) is made applicable to the chapter 11 cases by virtue of section 1129(a)(7)(A)(ii), which imposes a "best interests test." *See* 11 U.S.C. § 1129(a)(7)(A)(ii).  The best interests test requires that, for a plan to be confirmed, dissenting members of a class must receive, as of the effective date of the plan, the value of their allowed claims that is not less than the amount such creditors would receive if the debtor was liquidated under chapter 7 on such date.  *See* 11 U.S.C. § 1129(a)(7)(A)(ii).  Section 726(a)(5) of the Bankruptcy Code provides that, after payment of all amounts due under sections 726(a)(1) through (a)(5), post-petition interest is payable on all allowed unsecured claims "at the legal rate" from the petition date until the payment of such claims.  *Id.* § 726(a)(5).

130.    "[T]he legal rate of interest" referred to in section 726(a)(5) is the federal interest rate applicable to judgments.[20]  Moreover, a bankruptcy claim is the equivalent of a money judgment, and the use of the federal judgment rate assures equitable treatment among creditors, is efficient, and practical.  *Madison 92nd St. Assocs.*, 472 B.R. at 200.

---

[20]    *See Madison 92nd*, 472 B.R. at 200; *LATAM Airlines*, 2022 WL 2206829, at *20; *see also In re Dow Corning Corp.*, 237 B.R. 380, 387 (Bankr. E.D. Mich. 1999); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D. Tex. 1992); *Hertz*, 637 B.R. at 801.

131.    By contrast, "neither the Bankruptcy Code nor the Legislative History expressly state that unimpaired creditors are entitled to their contract rate of interest." *Hertz*, 637 B.R. at 800; *see also LATAM Airlines*, 2022 WL 2206829, at *20. "Instead, the Legislative History provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11 debtor case should receive post-petition interest only in accordance with sections 1129(a)(7) and 726(a)(5)." *LATAM Airlines*, 2022 WL 2206829, at *20. Accordingly, in the event the Debtors are solvent, unsecured creditors should receive the federal judgment rate of post-petition interest.

132.    Separately, the Debtors have included a sweetener for unsecured creditors in the event Allowed Fiat-or-Stablecoin Denominated Unsecured Claims are not satisfied in full within two years of the Effective Date under the Amended Plan, the Debtors propose to pay unsecured creditors *additional* interest on the "unpaid portion" of their claims, accruing (arbitrarily) at the federal judgment rate (termed "**Post-Effective Date Interest**"). *See* PLEADING-022, Ex. A at 9. Because the Recovery Cap improperly values claims around the time of confirmation or later distributions, this provision would permit unsecured creditors to receive interest on amounts far exceeding the Petition Date valued claim to which they are entitled.

133.    The Debtors have failed to cite any authority to support this additional payment of interest and the Court is aware of none. Accordingly, unsecured creditors are not entitled to and should not receive Post-Effective Date Interest.

## **CONCLUSION**

134.    For the foregoing reasons, confirmation of the Debtors' Amended Plan is DENIED.

Dated: March 22, 2024
      New York, New York

Respectfully submitted,

*/s/ Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Zalka
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:   (212) 310-8000
Fax:   (212) 310-8007
      Jeffrey.Saferstein@weil.com
      Jonathan.Polkes@weil.com
      Caroline.Zalka@weil.com
      Jessica.Liou@weil.com
      Furqaan.Siddiqui@weil.com

Joshua M. Wesneski
**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Tel:   (202) 682-7248
Fax:   (202) 857-0940
      Joshua.Wesneski@weil.com

*Attorneys for Digital Currency Group, Inc.
and DCG International Investments Ltd.*