**McDermott Will & Emery LLP**
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**McDermott Will & Emery LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors*
*Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC., *et al.*,[1] | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>(Jointly Administered) |

### GENESIS CRYPTO CREDITORS AD HOC GROUP'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT RELEVANT TO SECTION 562 AND
ADMINISTRATIVE EXPENSE CLAIMS...................................................................... 1

I.    THE GENESIS CONTRACTS ......................................................................... 1
II.   OVERVIEW OF THE PROVISIONS OF THE GENESIS CONTRACTS
RELEVANT TO THE MEMBERS' OBJECTION............................................... 2

    A.    The Auto-Renewal Provision....................................................... 2
    B.    Obligations Owing Under the Genesis Contracts by Members and
        the Debtors .................................................................................... 2

            i.    Member's Obligation to Provide a Digital Currency
                Address to Genesis........................................................... 3
            ii.   Member's Obligations in the Event of a Hard Fork or Air
                Drop ................................................................................. 5
            iii.  Member's Other Contractual Obligations........................ 6

III.   OTHER RELEVANT FACTS................................................................. 7

PROPOSED CONCLUSIONS OF LAW RELEVANT TO SECTION 562 AND
ADMINISTRATIVE EXPENSE CLAIMS........................................................................ 7

I.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT VIOLATES
SECTION 562 BY FAILING TO VALUE THE MEMBERS' CLAIMS
AS OF THE EFFECTIVE DATE............................................................ 7

    A.    The Genesis Contracts Are Covered Contracts .......................... 7
    B.    The Genesis Contracts Are Executory Contracts........................ 8
    C.    The Plan Provides for the Rejection of Executory Contracts Not
        Assumed, So the Genesis Contracts Will Be Rejected ............................ 12

II.   CLAIMS UNDER THE GENESIS CONTRACTS ARE ENTITLED TO
ADMINISTRATIVE EXPENSE PRIORITY ....................................... 12
III.  THE CCAHG'S CLAIMS CANNOT BE DOLLARIZED AS THE UCC
URGES ............................................................................................... 13

PROPOSED FINDINGS OF FACT RELEVANT TO THE RELEASES .................. 14

IV.  THE DEBTORS' RELEASES ............................................................. 14

    A.    The Special Committee's Investigation and Written Consent
        Approving the Debtors' Releases ................................................ 14
    B.    Justifications for the Debtors' Releases ..................................... 17

PROPOSED CONCLUSIONS OF LAW RELEVANT TO THE RELEASES.......................... 17

V.      THE DEBTORS' RELEASES ARE NOT A VALID EXERCISE OF THE
        DEBTORS' BUSINESS JUDGMENT, ARE NOT IN THE BEST
        INTERESTS OF THE ESTATE, AND DO NOT PROVIDE ADEQUATE
        CONSIDERATION TO THE ESTATE ............................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Avianca Holdings S.A.*,
    618 B.R. 684 (Bankr. S.D.N.Y. 2020) ................................................................................10

*In re Bluman*,
    125 B.R. 359 (Bankr. E.D.N.Y. 1991) ................................................................................9

*In re Bradlees Stores, Inc.*,
    No. 00-16033 (BRL), 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001) ..................................9

*In re Charter Commc'ns Operating LLC*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................................18

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr N.J. 2007) ...............................................................................19, 20

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010
    WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d
    496 (2d Cir. 2010) ..............................................................................................................18

*In re Hawker Beechcraft, Inc.*,
    486 B.R. 264 (Bankr. S.D.N.Y. 2013) ................................................................................10

*In re Helm*,
    335 B.R. 528 (Bankr. S.D.N.Y. 2006) ................................................................................8

*In re Ideal Mortg. Bankers, Ltd.*,
    539 B.R. 409 (Bankr. E.D.N.Y. 2015) ................................................................................8

*Lebetkin v. Giray*,
    2021 WL 2965323 (2d Cir. July 14, 2021) ........................................................................13

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) ................................................................................18

*In re NanoDynamics, Inc.*,
    735 F. App'x 762 (2d Cir. 2018) ...........................................................................8, 10, 11

*In re Residential Cap., LLC*,
    2013 WL 12161584, at *15 (Bankr. S.D.N.Y. Dec. 11, 2013) ...........................................19

*In re Riodizio, Inc.*,
    204 B.R. 417 (Bankr. S.D.N.Y. 1997) ................................................................................8

*In re Tribune Co.*,
    464 B.R. 126 (Bankr D. Del. 2011) ...................................................................19

*Wallach v. Smith*,
    No. 15-CV-1080(LJV), 2017 WL 2957829 (W.D.N.Y. July 11, 2017), *aff'd*
    *sub nom. In re NanoDynamics, Inc.*, 735 F. App'x 762 (2d Cir. 2018) .................................10

*In re Westinghouse Elec. Co. LLC*,
    2019 WL 4555990 (Bankr. S.D.N.Y. Sep. 19, 2019) .............................................12

*In re Windstream Holdings, Inc.*,
    634 F. Supp. 3d 99 (S.D.N.Y. 2022)...................................................................11

**Statutes**

11 U.S.C. § 503(b) ...............................................................................................12

11 U.S.C. § 562....................................................................................1, 2, 7, 13

11 U.S.C. § 1123.................................................................................................17, 18

**Other Authorities**

H.R. Rep. No. 95-595 (1977)................................................................................8

The Genesis Crypto Creditors Ad Hoc Group (the "CCAHG"), through their undersigned attorneys, hereby submits these Proposed Findings of Fact and Conclusions of Law.[2]

### PROPOSED FINDINGS OF FACT RELEVANT TO SECTION 562 AND ADMINISTRATIVE EXPENSE CLAIMS

## I.   THE GENESIS CONTRACTS

1.   The CCAHG consists of individual creditors ("Member(s)" or "Lender(s)") who participated in what the Debtors termed a "lending and borrowing service" (the "Genesis Investment Program"). *See* Amended Disclosure Statement at pp. 25-26.

2.   The Members executed Master Borrow Agreements ("MBA(s)") with Genesis Global Capital, LLC ("Genesis" or "Borrower").  *See* JX-017; JX-012; JX-020; JX-046; JX-022; JX-008; JX-005; JX-025.

3.   The MBAs set forth each parties' obligations and responsibilities and provided that Genesis could ask a Member to execute a transaction. *Id.*; Jassin Decl. ¶ 15.  For example, the MBAs state that "subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to

---

[2]   Factual citations herein are to the: (1) Declaration of Dr. Basem M. Jassin, M.D., in Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of Reorganization and exhibits attached thereto [Docket No. 1356-1] ("Jassin Decl."); (2) Declaration of Isaac Fernandez in Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of Reorganization and exhibits attached thereto [Docket No. 1356-2] ("Fernandez Decl."); (3) Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC, in Support of Confirmation of the Debtors' Chapter 11 Plan [Docket No. 1330] ("Aronzon Declaration"); (4) Transcript of the Deposition of Paul Aronzon, January 31, 2024 (the "Aronzon Dep. Tr."); (5) Limited Stipulation and Order Between the Debtors and the Crypto Creditor Ad Hoc Group ("Covered Contracts Stipulation"), which was entered into evidence as SUPP-011 ("SUPP-011"); (6) Master Borrow Agreement between Genesis Global Capital, LLC and Dr. Basem M. Jassin, dated June 18, 2021, which was entered into evidence as JX-017 ("JX-017"); (7) Master Borrow Agreement between Genesis Global Capital, LLC and Isaac Fernandez, dated April 10, 2021, which was entered into evidence as JX-012 ("JX-012"); (8) Summary of Assets and Liabilities Schedules - Non-Individual [Docket No. 146] (as amended by [Docket No. 1090], "Schedules"); (9) Transcripts of the Confirmation Hearing dated February 26, 27, and 28, 2024, and March 18, 2024 ("Day 1 Tr.," "Day 2 Tr.," "Day 3 Tr.," and "Day 4 Tr.," respectively); (10) The Debtors Amended Joint Chapter 11 Plan [Docket No. 1392] (the "Plan"); (11) Notice of Filing of Plan Supplement for The Debtors' Amended Joint Chapter 11 Plan [Docket No. 1117] (the "Plan Supplement"); and (12) Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC Et Al., Under Chapter 11 of the Bankruptcy Code [Docket No. 1031] (the "Amended Disclosure Statement").

Borrower, and Borrower will pay a Loan Fee and return such U.S. Dollars or Digital Currency to Lender upon the termination of the Loan."  JX-017 Recitals.

4.      If a Member accepted an offer from Genesis, the Member and Genesis would execute "term sheets" ("Term Sheets", and together with the MBAs, the "Genesis Contract(s)"). The Term Sheets set forth specific transaction terms, including the principal amount of crypto, yield, and maturity dates.  *See* JX-011; JX-015; JX-019; JX-024; JX-029; JX-031; JX-032; JX-033; JX-038; JX-039; JX-041; JX-042; JX-043; JX-044; JX-045; JX-047; JX-048; JX-049; JX-050; JX-051; JX-052.  The yield was referred to as a "Loan Fee" in the MBAs, and the parties specified the yield for a transaction in a Term Sheet, which Genesis would pay to a Member in in-kind crypto.  *See*  JX-017 § III(a), (c); *see, e.g.*, JX-033; JX-039; JX-042.

5.      On January 31, 2024, this Court entered the So Ordered Stipulation between the Debtors and the CCAHG, which established the fact that the Genesis Contracts "qualify as Covered Contracts for purposes of the application of 11 U.S.C. § 562."  SUPP-011 ¶ 1.

## II.    OVERVIEW OF THE PROVISIONS OF THE GENESIS CONTRACTS RELEVANT TO THE MEMBERS' OBJECTION

### A.    The Auto-Renewal Provision

6.      The Genesis Contracts automatically renew "for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period." *See* JX-017 § XXIII.

### B.    Obligations Owing Under the Genesis Contracts by Members and the Debtors

7.      The Debtors' counsel admits that "nobody contests that the Debtors have material unperformed obligations."  Day 4 Tr. 199:5-6.  For example, Genesis owes the Members crypto, yield, and late fees under the Genesis Contracts.  *See* JX-017 §§ II(c)(i), (d), III(a)-(b).

-2-

> ### i. *Member's Obligation to Provide a Digital Currency Address to Genesis*

8.      The MBA defines "Digital Currency Address" as "an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency." *See* JX-017 § I.

9.      In order for a Member to obtain repayment from Genesis of crypto, yield, and any late fees owed under the Genesis Contracts, a Member was contractually required to create a cryptographically secure digital currency address for delivery of the payment:

> (i) Loan Repayment. [U]pon the . . . Maturity Date . . . [Genesis] shall repay the entirety of the Loan Balance to [the Member] by Close of Business. If [the Member] **has not provided to [Genesis] a Digital Currency Address for receiving the repayment of a Loan** by Close of Business on the day prior to the . . . Maturity Date . . . , then such Loan will become an Open Loan[3] on said Maturity Date . . . , and no additional Loan Fees shall be accrued after the Maturity Date.

*See* JX-017 § II(c)(i) (emphasis added).

10.     Dr. Jassin referred to a "Digital Currency Address" as a "Bitcoin receipt address" in his testimony. Day 2 Tr. 247:21-22. He testified that under the MBA he had to provide a "Bitcoin receipt address" to Genesis in order for Genesis to deliver his crypto back to him. *Id.* Tr. 247:19-22. He explained that this was necessary because a Member could not log into his or her Genesis account and click a button that says "withdraw." *Id.* at 251:04-24. He testified that this feature made it "impossible for Genesis to ever be hacked." *Id.*

11.     To satisfy the contractual obligation of providing Genesis with a digital currency address, Dr. Jassin testified about a series of technical steps he had to complete:

a) *First*, he "would have to create a private key, which is basically a large random number that has 256 bits of entropy." Day 2. Tr. 248:06-248:8.
b) *Second*, that number "would get converted into the format of a Bitcoin private key." *Id* at 248:08-10.

---

[3] The MBA defines "Open Loan" as "a Loan without a Maturity Date where [the Crypto Creditor] has a Prepayment Option and [Genesis] has a Call Option." *See* JX-017 § I.

c) *Third*, that "[BTC] private key would then get converted into an easy way of writing down the private key in English words, so that's 24 [seed] words[] [*i.e.*, seed words]." *Id* at 248:10-12

d) *Fourth*, he testified that "[u]sually you write [the 24 seed words] down on a piece of paper. But then, since these amounts are significant, I would also engrave [these words] into steel plates". *Id* at 248:12-15

e) *Fifth*, he "would have to find a way to secure the steel plates at different locations in case anything happened at one location, if there was a fire or something like that." *Id* at 248:15-19.

f) *Sixth*, "once [he had] the private key secured", he would "then get [the private key] converted into a public key." *Id* at 248:20-22.

g) *Seventh*, "from the public key, it would get converted to a Bitcoin receipt address, and that's what [he] would provide to Genesis for them to be able to finally give [him] [his] Bitcoin back." *Id*. at 248:22-249:1.

h) *Eighth*, Dr. Jassin testified that after he would provide Genesis with a Bitcoin receipt address, "usually what they would do, because the amounts are significant, is they would send a test transaction" before sending the rest of the amount owed. *Id.* at 250:12-23.

12.    Dr. Jassin testified that this process is "the simplest way to create a secure offline receiving address that you are sure is not going to be hacked." Day 3 Tr. 22:14-16. He testified that he discussed this process with the other Members and

> there isn't a single one that wouldn't do things the way that I described . . . – what I described is not unique to me. This is just the best practice way. And I mentioned that I picked the simplest way. I didn't talk about pass[words] or encryption. There is a way to encrypt what I described yesterday. I didn't mention it. I mentioned only one seed, one plate. There are people that create five. They split the seed so that you create five and you need three out of the five or five out of seven. That's a lot more complicated. I just picked the simplest way to create a secure receipt address for large amounts of bitcoin. *Id.* 21:16-22:05.

13.    Dr. Jassin testified that he would "not" provide Genesis with a receiving digital address at the time he executed the Term Sheet because of security risks. Day 2 Tr. 249:02-22.

14.    He explained that this multi-step process was necessary given that "the amounts that [he] loaned were significant." *Id.* 247:24-249:01. He further explained on cross-examination that all Members' loans with Genesis were significant because "the minimum amount of a Genesis loan is at least 100 Bitcoins." Day 3 Tr. 18:3-4. As a result, "everybody who was a customer of Genesis is at least lending a hundred bitcoin. That is a significant amount of bitcoin. You are not going to

follow [less secure] practices that you would follow when receiving $10 of bitcoin when you want to be receiving a hundred bitcoin." *Id.* at 21:11-15.

15.    Neither the Debtors nor any other parties had a witness testify to provide any testimony that would contradict Dr. Jassin's testimony. *See* Day 2 Tr. and Day 3 Tr.

### ii.    *Member's Obligations in the Event of a Hard Fork or Air Drop*

16.    The MBA defines "Hard Fork" as "a permanent divergence in the Blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token)." JX-017 § I.  In other words, as explained by the CCAHG's counsel, a "[h]ard fork is when a blockchain splits, which will generally result in a new form of that cryptocurrency…There have been a number of hard forks . . . under the Ethereum blockchain.  There have been a couple in the [B]itcoin blockchain." Day 4 Tr. 228:8-229:1.[4]

17.    The MBA defines "Airdrop" as:

[A] distribution of a new token or tokens resulting from the ownership of a preexisting token.  For the purposes of Section V, an "Applicable Airdrop" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "Non-Applicable Airdrop" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.  *See* JX-017 § I.

18.    The Members' contractual obligations under the MBA in the event of a Hard Fork or Airdrop are set forth in Section V:

a)    "Notification.  In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower." *See* JX-017 § V(a).

---

[4]    *See* Katelyn Peters, *A History of Bitcoin Hard Forks*, Investopedia (June 2, 2023), https://www.investopedia.com/tech/history-bitcoin-hard-forks/; *History of Ethereum Hard Forks*, CoinLoan (Apr. 21, 2023), https://coinloan.io/blog/history-of-ethereum-hard-forks/.

b) "<u>No Immediate Termination of Loans Due to Hard Fork.</u> In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding loans will not be automatically terminated. Borrower and Lender may agree, regardless of the Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on behalf of Borrower. . . ." *See* JX-017 § V(b).

c) Section V(c), "<u>Lender's Right to New Tokens</u>", explains how if there is a Hard Fork resulting in "New Tokens" – the Debtors are entitled to them under certain circumstances and the Members are entitled to them in other circumstances. Accordingly, both parties need to evaluate who is entitled to the New Tokens and the Members either need to give ownership to the Debtors or vice versa. Then, if criteria is hit, the Debtors need to transfer New Tokens to the Members. If not, the Members have to confer ownership of the New Tokens to the Debtors. *See* JX-017 § V(c); Day 4 Tr. 229:18: ("Section 5(c). There are restrictions on market capitalization, 24-hour trading volume. Where this shakes out is if certain criteria is hit, Genesis needs to transfer the new token to the crypto creditors. If those criteria are not hit, the crypto creditors have to confer ownership of these new tokens back to the Debtors. These obligations concerning air drops and hard forks remain to this day.").

19.    The Genesis Contracts identify as an "Event of Default":

A material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days. *See* JX-017 § VII(d).

### iii.    Member's Other Contractual Obligations

20.    Other examples of contractual obligations owed by the Members include:

a) For open term contracts, the Members had the ability to leave the contracts open as long as they liked and had to exercise the call option to get Genesis to pay the principal and profit. *See* JX-017 §§ (I) and (II)(c)(ii).

b) The Members are required to indemnify and hold harmless Genesis from any third-party claim arising out of the transactions (except for claims based on Genesis's bad faith, gross negligence, or willful misconduct). JX-017 § XXII.

c) The Members (and Genesis) are bound to arbitrate any dispute arising out of or relating to the Genesis Contracts. JX-017 § XI.

d) The Members (and Genesis) have obligations with respect to Confidential Information that survive for a period of three years from the date of the Agreement. *See* JX-017 § XII(b) and (e).

### III.    OTHER RELEVANT FACTS

21.    The Debtors identified the Genesis Contracts on their Schedules of Assets and Liabilities as executory contracts.  *See* Schedules at 55-210.

22.    The Plan classifies unsecured claims based on the asset in which the claims are denominated.  *See* Plan Art. III(C).  To the extent the Members' claims are denominated in BTC, ETH, and USDC, they are assigned to the classes containing substantially similar claims—classes 3, 4, and 5 respectively.  *Id.*

**PROPOSED CONCLUSIONS OF LAW RELEVANT TO SECTION 562
AND ADMINISTRATIVE EXPENSE CLAIMS**

### I.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT VIOLATES SECTION 562 BY FAILING TO VALUE THE MEMBERS' CLAIMS AS OF THE EFFECTIVE DATE

23.    Pursuant to Bankruptcy Code section 562, the Members' claims must be valued as of the date of the rejection of their Genesis Contracts – i.e., the effective date – because the Genesis Contracts are executory Covered Contracts.  *See* 11 U.S.C. § 562(a). Section 562(a) provides, in relevant part, "[i]f the trustee rejects a . . . securities contract (as defined in section 741) [or] forward contract . . .  damages shall be measured as of . . . the date of such rejection."

#### A.    The Genesis Contracts Are Covered Contracts

24.    The first requirement of Section 562 – whether the Genesis Contracts are Covered Contracts – is not in dispute.  The Debtors conceded that the Genesis Contracts are Covered Contracts in the So Ordered Stipulation filed with the Court.  *See* SUPP-011. Moreover, no party has introduced *any* evidence or argument that the Genesis Contracts are not Covered Contracts.

25.    The Jassin and Fernandez Decls. additionally provide admissible factual support to establish that the MBAs are securities contracts or forward contracts.  *See* Jassin Decl. ¶¶ 15-20, 27; Fernandez Decl. ¶¶ 17-21, 25. The Amended Complaint filed against Genesis by the New York

Attorney General on February 9, 2024, also alleges that Genesis issued unregistered securities – the
MBAs – and violated the Martin Act and New York's blue sky securities law.  *See* P-014.

### B.   The Genesis Contracts Are Executory Contracts

26.   The Bankruptcy Code does not define "executory contract."  Nor has the Second
Circuit formally adopted a test to determine whether a contract is executory.  *See In re
NanoDynamics, Inc.*, 735 F. App'x 762, 764 (2d Cir. 2018).

27.   Courts within the Second Circuit have applied three different tests to determine
whether a contract is executory.  The first test is the most restrictive test – *i.e.*, the so-called
"Countryman test," which states "an executory contract [is] one that is not so fully performed that a
breach by either side would constitute a material breach of the contract."  *In re Helm*, 335 B.R. 528,
534 (Bankr. S.D.N.Y. 2006). The second test is the "some performance due" test, derived from
legislative history stating that the definition of "executory contract" "generally includes contracts on
which performance remains due to some extent on both sides."  *In re Riodizio, Inc.*, 204 B.R. 417,
420 (Bankr. S.D.N.Y. 1997) (quoting H.R. Rep. No. 95-595, at 347 (1977)).  The third test is the
"functional approach," which is "a more flexible" test that recognizes that a contract is executory
"even though there may be material obligations outstanding on the part of only one of the parties to
the contract" if its assumption or rejection would benefit the estate and its creditors.  *In re Ideal
Mortg. Bankers, Ltd.*, 539 B.R. 409, 437 (Bankr. E.D.N.Y. 2015) (quotation marks and citation
omitted).  The Genesis Contracts are executory under all three tests.

28.   Under the *Countryman* test, a contract is executory if a breach of an obligation
constitutes a material breach.  *See Riodizio, Inc.*, 204 B.R. at 421.  Under New York law, which
governs the Genesis Contracts, *see* JX-017 §XI, a material breach is "one which would justify the
other party to suspend his own performance, or a breach which is so substantial as to defeat the

purpose of the entire transaction." *In re Bradlees Stores, Inc.*, 2001 WL 1112308, at *7 (S.D.N.Y. Sept. 20, 2001) (quotation marks and citation omitted).

29.     It is undisputed that the Debtors have unperformed material obligations under the Genesis Contracts. *See supra* ¶ 6. *See, e.g.*, JX-017 §II(d).

30.     Accordingly, the question this Court must decide if it were to apply the *Countryman* test is whether there are any material obligations on the part of the Members, which is established by the evidence in the record. The answer is "yes" – Members owe multiple obligations. *First*, the MBA requires that Members provide Genesis with a "Digital Currency Address" to receive repayment. JX-017 § II(c)(i). The failure to do so "by Close of Business on the day prior to the . . . Maturity Date" results in "such Loan [becoming] an Open Loan on said Maturity Date . . . , and no additional Loan Fees shall be accrued after the Maturity Date." *Id.*

31.     This means that if a Member does not provide Genesis with a Digital Currency Address by a date certain, the Member's Term Sheet will convert from a fixed-term transaction to an open-term transaction, and yield will stop accruing. *Id.* Since the purpose of entering into a Term Sheet with a fixed maturity date was for the Member to receive in-kind repayment of their principal plus yield on the maturity date, a Member's breach of his or her contractual obligation here would "defeat the purpose of the entire transaction." *See Bradlees Stores*, 2001 WL 1112308, at *7.

32.     The obligation of the Members to provide Genesis with a Digital Currency Address was not a "ministerial" or "administrative" obligation of the kind that courts reject under the *Countryman* test. *See, e.g.*, *In re Bluman*, 125 B.R. 359, 362 (Bankr. E.D.N.Y. 1991). Dr. Jassin testified about the technical, multiple steps Members must take to provide Genesis with a digital currency address. *See supra* ¶¶10-14. Dr. Jassin testified that the method he described is "the simplest way to create a secure offline receiving address that you are sure is not going to be hacked." *Id.* at 22:14-16. Dr. Jassin explained that the method he described was not unique to him or an outlier

method given the high value of each of the Members' transactions pursuant to the Genesis Contracts, since "the minimum amount of a Genesis loan is at least 100 bitcoins." Day 3 Tr. 18:3-4. No party introduced any evidence that contradicted Dr. Jassin's testimony.

33.    *Second*, the MBA sets forth a series of obligations of Members in the event of a Hard Fork or an Air Drop and further states that a breach of these obligations would constitute a "material default". *See supra* ¶¶ 16-19; JX-017 §§ V, VII(d). "When parties to a contract define a breach of one party's obligations as a terminable breach, such obligations are [also] material obligations." *In re Avianca Holdings S.A.*, 618 B.R. 684, 699 (Bankr. S.D.N.Y. 2020). Thus, the contractual obligations of Members relating to a Hard Fork and an Air Drop are material and render the Genesis Contracts executory. *See Avianca Holdings*, 618 B.R. at 699.

34.    The Members also have a number of other contingent and non-contingent obligations under the MBAs. *See supra* ¶ 20. This Court is not preempted from concluding that to the extent these obligations are contingent, the Genesis Contracts must be found non-executory. *See In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013) ("[C]ontingent obligations are sufficient to render a contract executory.").[5]

35.    Other evidence in the record also supports a finding that the Genesis Contracts are executory. Namely, the Debtors identify and admit the Genesis Contracts are executory in their Schedules. *See* Schedules at 55-210. A debtor's post-petition treatment of a contract as executory can indicate that the contract is executory. *See Wallach v. Smith*, No. 15-CV-1080(LJV), 2017 WL 2957829, at *6 (W.D.N.Y. July 11, 2017), *aff'd sub nom. In re NanoDynamics, Inc.*, 735 F. App'x

---

[5]    The Debtors argued that *Hawker Beechcraft* contained only "a fleeting reference to contingent obligations . . . but there were no contingent obligations at issue in that case." Reply ¶ 57 n.51. But *Hawker Beechcraft* cited the following contingent obligations in its application of the executory contract test: (1) "the buyer must indemnify Hawker *under certain circumstances* in connection with the pilot and crew training program," 486 B.R. at 278 (emphasis added); (2) "*if [the buyer] fails to comply with export control regulations*, it must follow certain protocols with respect to the assignment of its rights," *id.* (emphasis added); (3) "[the customer] was still obligated to pay an Excessive Landing charge if the ratio of flight time to landings fell below a certain number," *id.* at 279 (emphasis added).

762 (2d Cir. 2018). The Second Circuit has held that a debtor "list[ing] the Agreement as an 'executory contract' on its initial bankruptcy filing" is evidence that a contract is executory. *NanoDynamics, Inc.*, 735 F. App'x at 765. Thus, the Debtors' own acknowledgment that the Genesis Contracts are executory supports a finding that the Genesis Contracts are executory.

36.    The automatic renewal provisions also support a finding that the Genesis Contracts are executory. *See supra* ¶ 9; JX-017 § XXIII. Courts in this District have explained that "an automatically renewing subscriber agreement, requiring notice of termination, would be an executory contract subject to the automatic stay" under the Bankruptcy Code. *See In re Windstream Holdings, Inc.*, 634 F. Supp. 3d 99, 108 (S.D.N.Y. 2022). Specifically, the *Windstream* court relied on cases finding that an "evergreen contract" that "continued through both the Petition Date and the Confirmation Date" was an executory contract that must be assumed under the plain terms of the plan at issue. 634 F. Supp. 3d at 108 (citing *NewPage Corporation*, 586 B.R. 551, 564 (Bankr. D. Del. 2018)). As in *Windstream* and *NewPage*, the Genesis Contracts are perpetual evergreen contracts that renew automatically without notice of termination that imposes continuing obligations on the parties despite the filing of the Petition.

37.    Because the Genesis Contracts are executory under the *Countryman* test, they are executory under the "some performance due" test as well. The "some performance due" test is "a less demanding inquiry" than the *Countryman* test because the "some performance due" test does not require an analysis of the materiality of the outstanding obligations. *See NanoDynamics, Inc.*, 735 F. App'x at 764. Under this test, the Members indisputably have "some performance" remaining on obligations in the Genesis Contracts as outlined above, including: (1) providing Genesis with a Digital Currency Address; (2) performing their obligations in the event of a Hard Fork or Airdrop; (3) maintaining confidentiality obligations; (4) indemnifying Genesis in certain cases; and (5) arbitrating any disputes. Courts have found comparative obligations in contracts sufficient to deem

a contract executory.    Courts have found that similar obligations render a contract executory. *See, e.g.*, *In re Texaco*, 73 B.R. 960, 964 (Bankr. S.D.N.Y. 1987) (finding an indenture containing the following comparative administrative obligations to be an executory contract: (1) the commencement of litigation to enforce the indenture; (2) filing proofs of claim; (3) fixing record and payment dates; (4) giving notices of default; (5) submission of reports to Note holders; and (6) filing reports in compliance with the Trustee Indenture Act.

38.    Finally, the Genesis Contracts are executory under the functional approach.  "Under this approach, the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate." *In re Gen. Dev. Corp.*, 84 F.3d 1364, 1375 (11th Cir. 1996).  Rejection of the Genesis Contracts offers an enormous benefit to the estates because it allows the Debtors to retain crypto Genesis received under the Genesis Contracts and use that crypto to pay all of its creditors.

### C.    The Plan Provides for the Rejection of Executory Contracts Not Assumed, So the Genesis Contracts Will Be Rejected

39.    Article V(A) of the Plan, "Assumption and Rejection of Executory Contracts and Unexpired Leases," provides that all executory contracts not otherwise assumed "shall be deemed rejected as of the Effective Date."  PLEADING-022 Art. V(A). The Genesis Contracts have not been previously assumed or rejected by the Debtors.  Therefore, the Genesis Contracts will be rejected on the Effective Date of the Plan.

## II.    CLAIMS UNDER THE GENESIS CONTRACTS ARE ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY

40.    Claims that are based on "the actual, necessary costs and expenses of preserving the estate" are entitled to allowance as administrative expenses of the Debtors. *See* 11 U.S.C. § 503(b)(1)(A). Transactions with the debtor that provide a benefit to the debtors' estates are allowed as administrative expenses. *See In re Westinghouse Elec. Co. LLC*, No. 17-10751, 2019 WL

-12-

4555990, at \*8 (Bankr. S.D.N.Y. Sep. 19, 2019).  As noted above, the Genesis Contracts were evergreen contracts that renewed post-petition due to the Genesis Contracts' automatic renewal provisions.  *See* JX-017 § XXIII.  The renewal of the contracts thus constituted a post-petition transaction with the Debtors that benefited the Debtors' estates.

41.     The post-petition transaction was induced by the Debtors.  A finding of inducement by the debtor requires: (i) the performance of services in good faith; (ii) the acceptance of the services by the person to whom they are rendered; (iii) an expectation of compensation therefor; and (iv) the reasonable value of the services. *Lebetkin v. Giray*, 2021 WL 2965323, at \*3 (2d Cir. July 14, 2021). Here, the Members have performed under the Genesis Contracts by providing the Debtors with the ability to: (i) retain their crypto; (ii) obtain the benefit of the increase in crypto prices; and (iii) use that crypto to increase potential recoveries.  They have done so with the good-faith expectation that they would be compensated for allowing their crypto to be used.  The Debtors have accepted this performance by permitting the Genesis Contracts to renew and retaining the Members' crypto.  Thus, the Debtors induced the Members' performance.

## III.   THE CCAHG'S CLAIMS CANNOT BE DOLLARIZED AS THE UCC URGES

42.     The Official Committee of Unsecured Creditors has suggested that the Members' claims should be measured in U.S. Dollars solely because the CCAHG filed a Plan objection.  *See* Day 1 Tr. 66:15-67:7; Day 4 Tr. 213: 8-22 ("[D]o they really want their contract to end?  Because we could find a way to do that.  If what we were doing is isolating these eight creditors . . . if we go down that road and Your Honor were to rule that 562 does not apply, they're going to be a dollar-denominated creditor, which under this plan gets paid out in petition date pricing.").  That position not only is inappropriate, but also is inconsistent with the Plan and the Bankruptcy Code.

43.     The Plan classifies unsecured claims based on the asset in which the claims are denominated.  *See* Plan Art. III(C).  To the extent the Members' claims are denominated in BTC,

-13-

ETH, and USDC, there is no basis for excluding them from the classes containing substantially similar claims—the classes the Members have already been classified in—classes 3, 4, and 5 respectively. *See id.* To do otherwise constitutes unfair treatment of similarly situated creditors in violation of the Bankruptcy Code. *See* 11 USC § 1129(b)(1) ("[T]he court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims."); *Matter of Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("[T]he [unfair discrimination] standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes."). Further, there is no provision in the Plan providing for different treatment of claims based on the making of a Plan objection.

### **PROPOSED FINDINGS OF FACT RELEVANT TO THE RELEASES**

## IV.    **THE DEBTORS' RELEASES**

44.    The Plan contains broad releases of: (1) the Released Parties,[6] including a list of 176 current and former executives, directors, managers, officers, and employees of the Debtors ("Released Genesis Personnel"),[7] and (2) an uncapped number of Related Parties of the Released Parties. *See* Plan, Art. 1(A)(192) and (193), Art. VIII(D); *see also* Plan Supplement, Ex. F.

### A.    **The Special Committee's Investigation and Written Consent Approving the Debtors' Releases**

45.    The Special Committee investigation (the "Special Committee Investigation") was conducted by Cleary "[a]t the request of the Special Committee." *See* Amended Disclosure

---

[6]    The Plan defines "Released Party" as "(i) the Debtors, (ii) the Ad Hoc Group SteerCo and its members (solely in their capacities as such), (iii) the Committee and its members (solely in their capacities as such), and (iv) each ***Related Party of each Entity described in the foregoing clauses (i)–(iii)*** (in each case, solely in its capacity as such); provided, however, that, notwithstanding anything to the contrary in the Plan, neither the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date shall be Released Parties; and, provided, further, that any Genesis Personnel shall be a Released Party only (x) ***with the prior written consent and justifications of the Special Committee*** . . . . *See* Plan, Art. I(A)(193) (emphasis added).

[7]    "Released Genesis Personnel" is defined in the Plan Supplement, Ex. F.

Statement, Art. VI(F).  The "Special Committee" is comprised of two members, Paul Aronzon and
Thomas Conheeney.  *See* Plan, Art. I(A)(211).

46.    Cleary interviewed "approximately twelve current and former employees allocated to
the Company," as part of the Special Committee Investigation. *Id.*, despite the Released Genesis
Personnel list identifying 176 individuals.  Mr. Aronzon did not participate in a single interview.  *See*
Day 2 Tr. 34:11-15.

47.    The Debtors' releases require the Special Committee's "written consent."  *See* Plan,
Art. I(A)(193); Day 2 Tr. 27:23-29:18.  Mr. Aronzon testified that the "only time" he provided
consent to approve the Debtors' releases was at some point "prior to December 29, 2023," following
a conference call he had while he was driving, despite having "the right to continue to do it [give
written consent] through the process here."  *See* Day 2 Tr. 30:04-31:11.

48.    Mr. Aronzon was deposed on January 31, 2024, more than a month after he provided
written consent authorizing the Debtors' releases.  *See* Aronzon Dep. Tr.  Mr. Aronzon testified that
he did not know whether there was "more than a hundred" or "more than five hundred" individuals
on the Released Genesis Personnel list.  *See* Aronzon Dep. Tr. 215:6-216:12.  He also refused to
answer questions seeking factual information about the proposed Debtors' releases and the Special
Committee Investigation no less than 94 times based on improper privilege objections.  *See The
Genesis Crypto Creditors Ad Hoc Group's Motion in Limine to Preclude Evidence Regarding the
Proposed Releases and the Special Committee Investigation* [Docket No. 1350] (the "MIL").

49.    The CCAHG learned the Released Genesis Personnel had been during the Plan
Confirmation Hearing.  *See* Day 2 Tr. 84:03-87:19.  Mr. Aronzon's testimony indicated he similarly
did not know the list of Released Genesis Personnel had been revised at the time he was cross-
examined.  *Id.* at 25:17-23, 56:22-57:19.

-15-

50.     Mr. Aronzon testified "many" individuals on the Released Genesis Personnel list were "low-level employees," despite the list including 6 C-Suite Executives, 7 Managing Directors, 15 Directors, 8 Senior Vice Presidents, 23 Vice Presidents, and 15 Assistant Vice Presidents.[8]  *Id.* at 61:7-18; 64:3-10; 65:7-13; 65:22-66:1; 66:4-8; 66:12-15; 66:19-21.

51.     Twenty minutes before Mr. Aronzon's cross-examination, the Debtors shared a conclusory proffer with counsel for the CCAHG, which they later filed on the docket in the form of a Supplemental Disclosure.  *See Notice of Supplemental Disclosure* [Docket No. 1403] (the "Supplemental Disclosure").  The Supplemental Disclosure states it "reflect[s] the testimony that Paul Aronzon, a member of the Special Committee, would provide if designated to testify as a corporate representative." *Id.* at 3.  The Supplemental Disclosure contains six conclusory allegations about the absence of certain claims and justifications for the releases.  *Id.* at 4-6.

52.     Mr. Aronzon's testimony indicated that he did not know or could not provide critical information about the proposed releases, the Special Committee Investigation, the justifications for the releases, or the conclusions in the Supplemental Disclosure.  *See Day 2. Tr. 25:5-68:8.*  He responded that "he did not know" or "did not believe so, but I'm not 100%" at least 17 times in response to questions about the releases.  For example:

a)  Mr. Aronzon testified that was not "100%" sure whether individuals being released conducted diligence or reviewed financial statements in connection with 3AC.  He also testified that "he believed" individuals reviewed financial statements from 3AC even though 3AC had no financial statements.  *See id.* at 43:19-44:11; 45:18-46:7.

b)  When asked whether released individuals signed any of the notes or other agreements with DCG, Mr. Aronzon testified "I don't know."  *Id.* at 46:11-47:7.

c)  Mr. Aronzon testified "I don't think so" when asked whether released individuals were involved in the decision to extend the DCG Loans' maturity date.  *Id.* at 47:8-48:1.

---

[8]  The number of Managing Directors, Directors, and Vice Presidents is slightly different than it was when CCAHG's counsel questioned Mr. Aronzon during cross-examination because the Debtors' counsel had not yet provided the revised Released Genesis Personnel list.  *See* Day 2 Tr. 84:03-87:19.

-16-

d)  When asked whether insiders being released were involved in decisions concerning the tax sharing agreement, Mr. Aronzon testified "Not 100%, no." *Id.* at 48:2-49:12.

e)  Mr. Aronzon testified "I don't know that" when asked whether insiders being released were involved with diligence in relation to the assumption by DCG of the GAP loans. *Id.* at 49:13-51:6.

f)  Mr. Aronzon didn't know the financial status of the released insiders. *Id.* at 55:18-20.

g)  Mr. Aronzon testified that he signed off on releasing himself. *Id.* at 68:1-6.

**B.      Justifications for the Debtors' Releases**

53.     The Debtors' provide two conclusory justifications for the Debtors' releases:

(1) "The Released Genesis Personnel provided services to the estate after the Petition Date and have contributed to the Debtors' restructuring efforts" ("Providing Services Justification"), and

(2) "The Released Genesis Personnel also have knowledge and insight into the Debtors' business and transactions that may be critical to the resolution of litigation against the DCG Parties and the Gemini Parties, as well as various regulatory and enforcement matters relating to the Debtors' prepetition business" ("Knowledge and Insight Justification").
*See* Plan Supplement, Ex. F; Supplemental Disclosure at 6.

54.     Mr. Aronzon refused to testify about whether all of the individuals on the Released Genesis Personnel list had the "knowledge and insight" described as a justification for the releases, whether any of the individuals have overlapping "knowledge and insight," and whether any of the individuals refused to cooperate if not given releases. *See* Aronzon Dep. Tr. 211:14-215:05.

### PROPOSED CONCLUSIONS OF LAW RELEVANT TO THE RELEASES

**V.      THE DEBTORS' RELEASES ARE NOT A VALID EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT, ARE NOT IN THE BEST INTERESTS OF THE ESTATE, AND DO NOT PROVIDE ADEQUATE CONSIDERATION TO THE ESTATE**

55.     Bankruptcy Code section 1123(b) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A). *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009).

-17-

56.    Courts have held that releases must represent "a valid exercise of the debtor's business judgment" and be "fair, reasonable and in the best interests of the estate." *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010); *Charter Commc'ns*, 419 B.R. at 257. Before making a determination about the Debtors' releases, the Court must inform itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *In re Motors Liquidation Co.*, 555 B.R. 355, 365 (Bankr. S.D.N.Y. 2016) (quotation marks and citation omitted). The written authorization of the releases provided by the Special Committee was not an informed one, as reflected in the testimony of Mr. Aronzon.

57.    Here, the evidence clearly demonstrates that the Special Committee lacked crucial information to be able to determine whether the Debtors' releases are "fair, reasonable, and in the best interests of the estate" both when the Special Committee provided written consent to authorize the releases *and* presently as of the Plan Confirmation Hearing. *See supra* ¶¶ 45-54.

58.    The conclusory Supplemental Disclosure does nothing to remedy these glaring knowledge gaps, particularly since Mr. Aronzon was unable to answer key questions during his cross-examination about the conclusions in the Supplemental Disclosure despite being the witness proffering the testimony.[9] *See id.*; Supplemental Disclosure at 3.

59.    The overly broad "Related Party" definition is similarly problematic because it provides releases to a laundry list of related parties of: (1) the Debtors, (2) the Ad Hoc Group Steerco

---

[9]    The Supplemental Disclosure also only addresses six examples of key facts sought to test the proprietary of the releases. *See* Supplemental Disclosure at 4-6. These six facts were never intended to represent the entire "universe" of facts that are needed to assess whether the Debtors' releases are fair, reasonable, and in the best interests of the estate. Rather, they were representative examples of the types of information that the CCAHG requested when the Court asked counsel for the CCAHG about the "key facts." *See* Day 1 Tr. 168:11-169:2. The MIL and transcripts from the Aronzon Deposition and Plan Confirmation Hearing make it abundantly clear these six areas of inquiry are not the end-all, be-all. *See* Aronzon Dep. Tr.; MIL; Day 2 Tr. 25:5-68:8.

and its members, and (3) the Committee and its members, including, for example, their predecessors, successors and assigns, parents, subsidiaries, Affiliates, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, etc., without there being evidence in the record demonstrating how releasing this uncapped number of individuals and entities benefits the estate.  *See supra* ¶¶ 53-54; Plan, Art. I(A)(192).  The evidence in the record highlights the risk of these releases as it sets up the estate to be in a situation in the future where a target responds with an affirmative defense that it is a "Related Party" and the estate has to expend additional resources to combat this affirmative defense. Day 2 Tr. 60:09-61:06.

60.     In considering whether releases are in the best interest of the Debtors' estate, the Court must also consider whether a party being released is contributing to the estate commensurate in value to what the estate is surrendering.  *See, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 188 (Bankr. D. Del. 2011) (finding that releases are not fair when "[t]here is no basis in the record to support any finding that a 'substantial contribution' has been made by the Debtors' Related Persons or that a release is necessary to the reorganization."); *In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. N.J. 2007) (declining to confirm a release noting "the Debtors' Representatives have not contributed any assets to the reorganization.").  *See contra In re Residential Cap., LLC*, 2013 WL 12161584, at *15 (Bankr. S.D.N.Y. Dec. 11, 2013) (finding that the Debtor Releases were a "valid exercise of the Debtors' business judgment" because they were in exchange for "good and valuable consideration").  Here, the benefits of the Debtors' releases do not outweigh the benefit that could be achieved through litigating claims.  Moreover, there is no evidence in the record that any monetary contributions are being made to the estate by any party receiving a release.

61.     The Providing Services Justification fails as a matter of law because it is well-established that services provided to the estate in the course of the obligations already owed to the

estate as part of employees' jobs and/or officers and directors' obligations are not a meaningful contribution that justify releases. *See In re Aegean Marine Petroleum Network*, 599 B.R. 717, 729 (Bankr. S.D.N.Y. 2019) ("[T]he directors did what they were paid to do, and that does not mean they are entitled to releases."); *Congoleum Corp.*, 362 B.R. at 193 ("Debtors claim that the officers and directors of Congoleum have contributed by 'negotiat[ing] the consensual [Plan] in the face of substantial . . . opposition' . . . . That justification is unpersuasive because the officers and directors have been paid millions of dollars post-petition to do just that.").

62.     The Knowledge and Insight Justification is wholly speculative and unsupported by evidence in the record.  Although there is a potential that those being released may prove helpful to the resolution of litigation, there also is a potential that they may not.  In the latter situation, these individuals would be getting a release in exchange for providing *no* contribution or value to the estate. There also is no evidence in the record that all the individuals who will be getting releases have the "knowledge and insight" described as a justification nor any evidence about whether the individuals have overlapping knowledge.  *See supra* ¶ 53.  There also is no evidence indicating whether any of the Released Genesis Personnel said that they would refuse to cooperate if they were not given releases.  *See supra* ¶ 53.  Accordingly, there is no basis in the record to support any finding that a substantial contribution is being made by the Debtors' releases or that they are in the best interests of the estates.

Dated:  March 22, 2024
         New York, New York

**MCDERMOTT WILL & EMERY LLP**

*/s/ Darren Azman*_____
Darren Azman
Joseph B. Evans
J. Greer Griffith
Lucas B. Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com
E-mail: ggriffith@mwe.com
E-mail: lbarrett@mwe.com

*- and -*

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Genesis Crypto*
*Creditors Ad Hoc Group*