Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW SUBMITTED BY PLAN PROPONENTS AND SUPPORTERS IN
SUPPORT OF CONFIRMATION OF THE DEBTORS' AMENDED
JOINT CHAPTER 11 PLAN OF GENESIS GLOBAL HOLDCO, LLC *ET AL.***

---

[1]     The Genesis Debtors in the above-captioned cases, along with the last four digits of each Genesis Debtor's tax identification number as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of the above-captioned cases, the service address for the Genesis Debtors is 175 Greenwich Street, Floor 38, New York, New York, 10007.

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ................................................................................ 1

FINDINGS OF FACT .......................................................................... 6

    I.     Negotiations of The Plan and Distribution Principles ................ 6

    II.    The Distribution Principles ..................................................... 8

    III.   The Debtors' Assets & Liabilities .......................................... 10

    IV.   Reinstatement .................................................................... 13

    V.    Liquidation Analysis ........................................................... 13

    VI.   Setoff Principles ................................................................. 14

    VII.  The Ad Hoc Group and Dollar Group Contributions ............... 14

    VIII. CCAHG Loan Term Sheet Agreements ............................... 15

    IX.   Release, Exculpation and Injunction Provisions....................... 17

CONCLUSIONS OF LAW ................................................................... 20

I.    DCG's Objection Is Overruled ................................................. 20

    A.    DCG Lacks Standing to Object to the Distribution
         Principles............................................................................ 20

    B.    Even If the Debtors Were Solvent, the Distribution
         Principles Are Appropriate. .................................................. 24

    C.    The Plan and the Distribution Principles Comport with
         Section 502(b) .................................................................... 26

    D.    The Plan Complies with Applicable Non-Bankruptcy Law
         and Other Provisions of the Bankruptcy Code .......................... 30

         i.     The Plan Was Proposed in Good Faith ........................... 30

         ii.    DCG's Remaining Arguments Are Overruled ............... 35

II.   The CCAHG's Objection Is Overruled...................................... 40

**Page**

|   | A. | The CCAHG Claims Are Not Administrative Expense Claims | 40 |
|---|----|-----|----|
|   | B. | The Plan Properly Values the CCAHG Members' Claims as of the Petition Date Because Section 562(a) Does Not Apply | 42 |
| III. |   | The Plan's Releases and Exculpation Provisions Are Appropriate and Are Approved | 48 |
| IV. |   | The Distribution Principles Embody Broad Creditor Consensus and Are Approved Under Bankruptcy Rule 9019 | 52 |
| CONCLUSION |   |   | 56 |

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anchor Resol. Corp. v. State St. Bank & Trust Co. of Conn. (In re Anchor Resol. Corp.),*
   221 B.R. 330 (Bankr. D. Del. 1998) .......................................................................45

*BNY, Cap. Funding LLC v. US Airways, Inc.,*
   345 B.R. 549 (E.D. Va. 2006) ................................................................................48

*Comm'n of Dep't of Pub. Utilities v. N.Y., N.H. & H.R. Co.,*
   178 F.2d 559 (2d Cir. 1949) ...................................................................................24

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ................................................................................................53

*Dallemagne v. Khan,*
   No. 19-CV-7934 (JGK) (OTW), 2020 BL 451278 (S.D.N.Y. Nov. 18, 2020) .......29

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.,*
   679 F.2d 264 (1st Cir. 1982) ..................................................................................25

*EMAK Worldwide, Inc. v. Kurz,*
   50 A.3d 429 (Del. 2012) .........................................................................................33

*Fin. of Am. LLC v. Mortgage Winddown LLC (In re Ditech Holding Corp.),*
   630 F.Supp.3d 554 (S.D.N.Y. 2022) ......................................................................41

*Freeman v. J. Reg. Co.,*
   452 B.R. 367 (S.D.N.Y. 2010) ...............................................................................22

*Houston SportsNet Fin., L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports*
   *Network, L.P.),*
   886 F.3d 523 (5th Cir. 2018) ..................................................................................34

*In re AMR Corp.,*
   497 B.R. 690 (Bankr. S.D.N.Y. 2013) ....................................................................36

*In re Asia Glob. Crossing, Ltd.,*
   404 B.R. 335 (S.D.N.Y. 2009) ...............................................................................29

**Page(s)**

*In re Ben-Artzi*,
No. 21-10470 (MG), 2021 WL 5871718 (Bankr. S.D.N.Y. Dec. 10, 2021) ..........................54

*In re Bethlehem Steel Corp.*,
479 F.3d 167 (2d Cir. 2007)..................................................................41

*In re Bradlees Stores, Inc.*,
No. 02 Civ. 0896 (WHP), 2003 WL 76990 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F.
App'x 166 (2d Cir. 2003) .................................................................42, 46

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018)......................................................40

*In re Calpine Corp.*,
No. 05–60200 (BRL), 2008 WL 3154763 (Bankr. S.D.N.Y. Aug. 4, 2008)..........................49

*In re Capmark Fin. Grp., Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) .........................................................56

*In re Carter*,
220 B.R. 411 (Bankr. D.N.M. 1998) .........................................................24

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009).....................................................52, 55

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................55

*In re CIS Corp.*,
142 B.R. 640 (S.D.N.Y. 1992)................................................................41

*In re Columbia Gas Sys., Inc.*,
146 B.R. 106 (D. Del. 1992), *aff'd sub nom. In re Columbia Gas Sys. Inc.*, 50 F.3d
233 (3d Cir. 1995).........................................................................44

*In re Cont'l Airlines Corp.*,
110 B.R. 276 (Bankr. S.D. Tex. 1989) .......................................................25

*In re Country Club Ests. at Aventura Maint. Ass'n, Inc.*,
227 B.R. 565 (Bankr. S.D. Fla. 1998) .......................................................41

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ........................................................49

**Page(s)**

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...................................................................55

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...................................................................54

*In re Dow Corning Corp.*,
456 F.3d 668 (6th Cir. 2006) ................................................................................24

*In re Drexel Burnham Lambert Grp., Inc.*,
134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...................................................................49

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 717 (Bankr. S.D.N.Y. 1992) ...................................................................21

*In re Fast*,
318 B.R. 183 (Bankr. D. Colo. 2004) ...................................................................24

*In re Frontier Comm'ns Corp.*,
No. 20-22476 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) ........................................24

*In re FTX Trading Ltd.*,
No. 22-11068 (JTD) (Bankr. D. Del.) .....................................................................30

*In re Gencarelli v. UPS Cap. Bus. Credit*,
501 F.3d 1 (1st Cir. 2007) .....................................................................................25

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ...................................................................38

*In re Glob. Crossing Ltd.*,
295 B.R. 726 (Bankr. S.D.N.Y. 2003) ...................................................................31

*In re Hawker Beechcraft, Inc.*,
486 B.R. 264 (Bankr. S.D.N.Y. 2013) ...................................................................47

*In re Hibbard Brown & Co.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) .....................................................................54

*In re ICS Cybernetics, Inc.*,
111 B.R. 32 (Bankr. N.D.N.Y. 1989) .....................................................................43

*In re James Wilson Assoc.*,
965 F.2d 160 (7th Cir. 1992) ................................................................................24

**Page(s)**

*In re Johns-Manville, Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)...........................................................................21, 22, 38

*In re JPA No. 111 Co., Ltd.*,
    No. 21-12075 (DSJ), 2022 WL 298428 (Bankr. S.D.N.Y. Feb. 1, 2022) ...............................32

*In re Key3Media Grp. Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005) .........................................................................................56

*In re L&N Twins Place LLC*,
    No. 17-22758, 2019 WL 5258096 (Bankr. S.D.N.Y Oct. 15, 2019) (Lane, J.), *vacated
    on other grounds*, 2020 WL 7211235 (S.D.N.Y. Dec. 4, 2020)..............................................26

*In re LATAM Airlines Grp. S.A.*,
    55 F.4th 377 (2d Cir. 2022) ...................................................................................................23

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022).........................25

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023).........................26

*In re Magnesium Corp. of Am.*,
    583 B.R. 637 (Bankr. S.D.N.Y. 2018) ...................................................................................22

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ......................................................................................36

*In re MatlinPatterson Glob. Opportunities Partners II L.P.*,
    644 B.R. 418 (Bankr. S.D.N.Y. 2022) ...................................................................................53

*In re Mesa Air Group, Inc.*,
    No. 10-10018 (MG), 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011) ................33

*In re MF Glob. Inc.*,
    No. 11-2790 (MG), 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012)............................55

*In re Monge Oil Corp.*,
    83 B.R. 305 (Bankr. E.D. Pa. 1988) ................................................................................45, 48

*In re New Power Co.*,
    313 B.R. 496 (Bankr. N.D. Ga. 2004) ....................................................................................24

**Page(s)**

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015)...........................................................49, 50, 56

*In re Old Carco LLC*,
424 B.R. 633 (Bankr. S.D.N.Y. 2010).......................................................................42

*In re PG&E Corp.*,
46 F.4th 1047 (9th Cir. 2022) ...................................................................................25

*In re Purofied Down Prods. Corp.*,
150 B.R. 519 (S.D.N.Y. 1993)....................................................................................54

*In re Quigley Co.*,
391 B.R. 695 (Bankr. S.D.N.Y. 2008) ......................................................................20

*In re Residential Cap., LLC*,
No. 12–12020 (MG) 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013)...................50, 52

*In re Robert L. Helms Constr. & Dev. Co., Inc.*,
139 F.3d 702 (9th Cir. 1998) .....................................................................................48

*In re Sakowitz Inc.*,
110 B.R. 268 (Bankr. S.D. Tex. 1989) ......................................................................25

*In re Soup Kitchen Int'l., Inc.*,
506 B.R. 29 (Bankr. E.D.N.Y. 2014)..........................................................................56

*In re Spectrum Inf. Tech., Inc.*,
190 B.R. 741 (Bankr. E.D.N.Y. 1996)........................................................................45

*In re SRC Liquidation LLC*,
No. 15-10541 (BLS), 2019 Bankr. LEXIS 2851 (Bankr. D. Del. Sept. 12, 2019)..................21

*In re Stearns Holdings, LLC*,
No. 19-12226 (SCC) (Bankr. S.D.N.Y. Nov. 13, 2019)...........................................52

*In re SunEdison, Inc.*,
575 B.R. 220 (Bankr. S.D.N.Y. 2017).......................................................................38

*In re Synergy Pharms. Inc.*,
621 B.R. 588 (Bankr. S.D.N.Y. 2020).......................................................................37

*In re Teligent, Inc.*,
417 B.R. 197 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. In re Teligent Servs., Inc.*, No.

**Page(s)**

09 CIV. 09674 (PKC), 2010 WL 2034509 (S.D.N.Y. May 13, 2010), *aff'd sub nom.*
*In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011)......................................................................22

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ......................................................................................54

*In re Trib. Co. Fraudulent Conv. Litig.*,
946 F.3d 66 (2d Cir. 2019)......................................................................................................43

*In re Trident Holding Co., LLC*,
No. 19-10384 (SHL) (Bankr. S.D.N.Y Sept. 18, 2019).........................................................52

*In re Ultra Petrol. Corp.*,
51 F.4th 138 (5th Cir. 2022) ...................................................................................................25

*In re United Merchs. & Mfrs., Inc.*,
674 F.2d 134 (2d Cir. 1982)....................................................................................................24

*In re W.T. Grant Co.*,
699 F.2d 599 (2d Cir. 1983).....................................................................................................54

*In re Westinghouse Elec. Co. LLC*,
No. 17-10751 (MEW), 2019 WL 4555990 (Bankr. S.D.N.Y. Sept. 19, 2019) ......................42

*In re Windstream Holdings, Inc.*,
634 F. Supp. 3d 99 ............................................................................................................48, 52

*Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*,
374 B.R. 516 (S.D.N.Y. 2007)................................................................................................54

*Koelbl v. Glessing (In re Koelbl)*,
751 F.2d 137 (2d Cir. 1984).....................................................................................................31

*Lebetkin v. Giray*,
No. 20-1374, No. 20-4229, 2021 WL 2965323 (2d Cir. July 14, 2021) .................................42

*Martinez v. Accelerant Media, LLC*,
No. 20-CV-9366 (GBD) (OTW), 2024 BL 18605 (S.D.N.Y. Jan. 19, 2024).........................29

*Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*
478 F.3d 452 (2d Cir. 2007) ...................................................................................................54

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994).................................................................................................50

**Page(s)**

*Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*,
   163 B.R. 927 (Bankr. E.D.N.Y. 1994) ........................................................................45

*Olah v. Baird (In re Baird)*,
   567 F.3d 1207 (10th Cir. 2009) ...............................................................................45

*Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*,
   266 B.R. 575 (S.D.N.Y. 2001) ................................................................................41

*Ret. Sys. of the State of Haw. v. Osborne (In re THC Fin. Corp.)*,
   686 F.2d 799 (9th Cir. 1982) ..................................................................................45

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959) ...................................................................................25

*The People of the State of New York v. Gemini Trust Co. et. al.*,
   Index No. 452784/2023 ..............................................................................................7

*Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*,
   925 F.2d 566 (2d Cir. 1991) ...................................................................................41

*Young v. Rosenberg*,
   No. 14cv9377, 2017 WL 3267769 (S.D.N.Y. Aug. 1, 2017) ..................................29

**Statutes**

11 U.S.C. § 363 .........................................................................................................15, 36

11 U.S.C. § 365 .........................................................................................................24, 36

11 U.S.C § 501 ................................................................................................................28

11 U.S.C. § 502 ........................................................................................................ *passim*

11 U.S.C. § 503 .........................................................................................................37, 41

11 U.S.C. § 562 ........................................................................................................ *passim*

11 U.S.C. § 1109 .......................................................................................................20, 22

11 U.S.C. § 1121 ...............................................................................................................8

11 U.S.C. § 1123 ...................................................................................................... *passim*

11 U.S.C § 1124 ..............................................................................................................23

**Page(s)**

11 U.S.C. § 1129 ................................................................................................ *passim*

28 U.S.C. § 3302 ............................................................................................................. 22

**Other Authorities**

Fed. R. Bankr. P. 3001 .................................................................................................... 28

Fed. R. Bankr. P. 3007 ............................................................................. 3, 23, 26, 27

Fed. R. Bankr. P. 3008 .................................................................................................... 27

Fed. R. Bankr. P. 7052 ...................................................................................................... 1

Fed. R. Bankr. P. 9014 ...................................................................................................... 1

Fed R. Bankr. P. 9019 ................................................................................... *passim*

Genesis Global Holdco LLC ("GGH") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), the Official Committee of Unsecured Creditors (the "Committee"), the Ad Hoc Group of Genesis lenders represented by Proskauer Rose LLP (the "Ad Hoc Group"), and the Ad Hoc Group of Dollar Lenders (the "Dollar Group") hereby jointly submit these proposed Findings of Fact and Conclusions of Law in support of the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 1392 (as amended, modified or supplemented, the "Plan").[2]

## INTRODUCTION[3]

Over the course of the last several months, the Debtors and their advisors have worked diligently to resolve outstanding issues with respect to the Plan. Two primary objections, however, remain: that asserted by DCG and that asserted by the CCAHG.[4] For the reasons discussed below, these objections are overruled, and the Plan is confirmed. For the avoidance of doubt, to the extent that a particular objection or issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled.

DCG lacks standing to object to the Plan, and therefore this Court need not reach the merits of DCG's objections. As the evidence demonstrated, the Debtors are not solvent given that the claims asserted against the Debtors are tens of billions of dollars greater than the value of their assets. Consequently, DCG, in its capacity as holder of equity interests in the Debtors, lacks a direct stake in the Distribution Principles and fails to satisfy the requirements of prudential

---

[2]  The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Bankruptcy Rule 7052, made applicable to this proceeding under Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[3]  Capitalized terms used in this Introduction shall have the meaning ascribed to them below.

[4]  For the reasons noted below, *see* ¶¶ 58–59 and 58-59, *infra*, the objection of the Office of the United States Trustee to the payment of certain fees and expenses to the Ad Hoc Group and the Dollar Group is also overruled.

standing.  The same result is true with respect to DCG and DCGI in their capacity as creditors of

the Debtors.  DCG's objections to the Plan are rooted in DCG's status as an equity holder, not in

either DCG's or DCGI's interest as creditors, and standing is properly considered on an issue-by-

issue basis.  In any event, for DCG's dollar-denominated claims, DCG would functionally receive

the same treatment under the Distribution Principles as it would under DCG's proposed alternative

methodology.  DCGI likewise does not have standing to object to the Plan and Distribution

Principles on account of its Alt-Coin-Denominated Claim because DCGI (1) is not adversely

affected by the Distribution Principles and (2) does not have standing to object to the treatment of

third parties such as subordinated creditors or equity interests.[5]

In the alternative, if the Debtors were solvent, the Bankruptcy Code and its

equitable principles require the Debtors to provide creditors the full benefit of their contractual

bargain with the Debtors before subordinated creditors and equity holders are entitled to a

recovery.  Indeed, this is precisely what the Plan seeks to do by using the bankruptcy voting process

to amend and reinstate the prepetition agreements between the Debtors and their creditors.  As

DCG would have no standing to object to full reinstatement of such agreements, DCG similarly

lacks standing to object to amending and reinstating.

Even if DCG did have standing to object to the Plan and the Distribution Principles,

DCG's arguments nonetheless fail on the merits.  <u>First</u>, the Plan and the Distribution Principles

are consistent with section 502(b).  By its plain terms, section 502(b) is applicable only where "an

objection to a claim is made."  Here, DCG engaged in what itself called a "check the box" exercise

by filing an "omnibus objection" to the Debtors' entire pool of Digital Asset-denominated claims,

---

[5]    Any arguments made by DCG with respect to Postpetition Interest likewise fail. Any Postpetition Interest
that either DCG or DCGI would receive on account of their filed claims is not reduced or precluded by the Distribution
Principles themselves and, in any event, the Debtors are insolvent and so either entity would not recover Postpetition
Interest even under DCG's alternative valuation methodology.

which fails to comply with the strictures of Bankruptcy Rule 3007.  Contrary to DCG's assertions, DCG's objection to the Plan, or statements made in the Debtors' Disclosure Statement regarding DCG's issues with the Plan's terms, cannot be properly construed as an omnibus objection to thousands of claims without complying with critical protections, including individualized identification and notice, afforded to creditors by the Bankruptcy Code and the Bankruptcy Rules.

Further, section 502(b) by its plain terms does not impose a cap on the distributions that creditors would be entitled to receive.  Valuation of claims as of the Petition Date is the starting point of the Distribution Principles, and the Plan achieves a *pro rata* recovery among creditors. Restitution to creditors is at the core of these cases, as the Plan and the Distribution Principles provide creditors with the Digital Assets and restitution for the Digital Assets held by the Debtors during the pendency of these cases, a result entirely consistent with section 502(b).

Second, the Plan and Distribution Principles comport with section 1129.  As noted, the Plan complies with section 502(b), so DCG's objection that the Plan fails to satisfy sections 1129(a)(1), 1129(a)(3), and 1129(a)(7) on that basis is overruled.  Moreover, the proposed payment of Post-Petition Interest and Post-Effective Date Interest as part of the Distribution Principles is consistent with the equitable principles underpinning the "solvent debtor" exception.  DCG's objection on the basis of section 1129(b), which is premised on these same arguments, likewise fails.  DCG has offered no evidence to substantiate a finding that the Debtors violated section 1129(a)(3) through their adoption of the proposed Setoff Principles, which DCG does not dispute should properly be understood as an exercise of the Debtors' business judgment.  Nor does DCG dispute that, in assessing the Setoff Principles, this Court has discretion to apply a case-specific valuation methodology.  Plan provisions restricting certain of DCG's rights as equity holder of the Debtors are consistent with liquidating plans of this type and do not rise to the level of violating

-3-

either section 1123(a)(7) or 1129(a)(3), and, therefore, DCG's objections to the same are overruled.

The Plan and Distribution Principles properly treat the claims of the CCAHG, and therefore, the CCAHG's objections are overruled. <u>First</u>, the CCAHG Members' claims are not administrative expense claims because the CCAHG Members did not engage in any postpetition transactions with, or provide any actual postpetition benefit to, the Debtors' Estates. All of the loans between GGC and the CCAHG Members were executed prepetition, and there is no evidence that any of the loaned assets were used by the Debtors' Estates during these cases. The CCAHG offers no evidentiary or legal support for its theory that an increase in the value of the loaned assets constitutes a benefit to the Debtors' Estates, an argument they no longer press in their post-hearing submission. Moreover, the auto-renewal clauses in the CCAHG MBAs do not transform these prepetition loans into postpetition transactions. <u>Second</u>, section 562(a) is not applicable to the CCAHG's Members' claims and, therefore, the Plan and Distribution Principles properly value their claims. That statutory provision only applies when an executory contract has been rejected, but here, however, the CCAHG Agreements are not executory because there is no material performance remaining by the CCAHG Members as lenders, and the Debtors' sole remaining obligations are to repay the loaned assets in-kind. The CCAHG's arguments, on the basis of an alleged requirement to provide a digital wallet address, are unavailing. As the CCAHG's witness conceded and the CCAHG MBAs make clear, there are multiple ways of obtaining a Digital Currency Address and, in any event, the failure to obtain one is not a default under the loan agreements, and does not defeat their purpose.

The Plan contemplates releases of certain claims and causes of action by the Debtors and certain non-Debtors against a group of specified individuals and entities, *i.e.*, the

"Released Parties," as well as the exculpation of the "Exculpated Parties" from the incurrence of liability for any claims relating to these cases. The Non-Debtor Releases are purely consensual as Holders of Claims entitled to vote on the Plan were required to expressly "opt in" to releases by voting in favor of the Plan and electing to opt-in to granting releases; and their validity is not contested.

The sole remaining objection to the Debtor Releases is that of the CCAHG, which is overruled. The CCAHG seeks to replace its business judgment for that of the Debtors' through unsupported statements regarding the findings of the investigation performed at the direction of the Special Committee, the scope of the Released Parties and the benefits conferred by each of the Released Parties throughout these cases and upon emergence. Additionally, the Debtors narrowed the scope of the Debtor Releases and enhanced the benefit provided thereby to the Debtors' Estates in resolving the *Reservation of Rights of the Ad Hoc Group of Genesis Lenders to Confirmation of the Debtors' Amended Joint Chapter 11 Plan*[6] by (1) reducing the number of Genesis Released Personnel entitled to the Debtor Release, and (2) conditioning such Debtor Release on the execution of and compliance with the Cooperation Agreement.

The record before the Court, including evidence presented through (i) the Aronzon Declaration, (ii) the proffer in direct response to factual questions raised by the CCAHG, (iii) the cross-examination of Mr. Aronzon by the CCAHG, (iv) the Plan Supplement, (v) the Disclosure Statement, and (vi) the Cooperation Agreement, demonstrates that the grant of Debtor Releases is a sound exercise of the Debtors' business judgment.

---

[6]    ECF No. 1240.

Finally, the Distribution Principles satisfy the standard of Bankruptcy Rule 9019, are fair and equitable, in the best interest of the Estates, and a sound exercise of the Debtors' business judgment, and all objections are overruled.

For the reasons set forth herein, all objections to the Plan are hereby OVERRULED and the Plan is CONFIRMED.

## FINDINGS OF FACT[7]

### I.    Negotiations of the Plan and Distribution Principles

1.    The Debtors have sought a consensual plan since before commencement of these cases and have worked in good faith with various creditor groups, including Gemini and DCG to reach a global settlement.[8]  Indeed, the Debtors were engaged in negotiations with their creditors, DCG, and other parties on a "near continuous basis since December 2022."[9]

2.    These negotiations included a multi-day mediation, taking place across four months, among the Debtors, DCG, the Committee, the Ad Hoc Group, Gemini, and other parties in interest.[10]  DCG participated at every step of this process.[11]  In August 2023, the mediation culminated in an "agreement in principle" between the Debtors, the Committee, and DCG (the

---

[7]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and the Distribution Principles incorporated therein.

[8]    *See Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC, in Support of Confirmation of the Debtors' Chapter 11 Plan*, ECF No. 1330, Ex. D (the "Aronzon Decl.")  ¶¶ 11–13; Hr'g Tr. 89:21–24, Feb. 27, 2024 (P. Aronzon).

[9]    *Declaration of Bradley Geer in Support of the Official Committee of Unsecured Creditors' Memorandum in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto*, ECF No. 1355 (the "Geer Decl.") ¶ 7.

[10]    Aronzon Decl. ¶¶ 18–33; Geer Decl. ¶¶ 16, 17, 19.

[11]    *See* Hr'g Tr. 211:24–212:8, Feb. 26, 2024 (P. Aronzon) ("…DCG has been involved daily, weekly, monthly. They're well-represented, they have great financial assistance, they're very smart guys and they climbed all over every issue in this case and then some."); Aronzon Decl. ¶¶ 11–12, 16–33, 44–58; Geer Decl. ¶¶ 13–26, 43–44.

"<u>August Agreement</u>"), which contemplated maximum in-kind recoveries and did not contain any U.S. dollar cap on Digital Asset recoveries.[12]

3.      Over the course of the negotiations, the Debtors, in consultation with the creditor groups and other parties in interest, proposed in good faith various iterations of what would ultimately become the Plan—each of which contemplated that creditors would receive in-kind recoveries to the maximum extent possible up to their full contractual entitlements.[13]  At no point did DCG raise any concerns with these facets of the Plan.  In fact, there is ample uncontested evidence that DCG was prepared to support (and even facilitate) a plan premised on in-kind distributions to creditors, regardless of fluctuations in the price of the underlying Digital Assets.[14]

4.      After months of non-stop negotiations among the creditors, the Debtors, and DCG, it became clear that a global settlement was no longer feasible, including because the Debtors and the Committee could not reach an agreement with DCG as to the terms of the new debt to be issued by DCG as part of the settlement and due to insufficient support for the settlement by the creditor body.[15]  Additionally, in late October 2023, the New York Attorney General

---

[12]     *See* Geer Decl. ¶¶ 19, 21–22 ("Nothing in the now-published August Agreement contemplated that creditor recoveries would be capped at the U.S. dollar value of crypto-denominated claims as of the Petition Date, or that any value in excess of the Petition Date price due to crypto market fluctuations would be distributed to holders of subordinate claims or equity."); *see also Notice of Mediation Termination*, ECF No. 625.  The same is true of the non-binding term sheet entered into between the Debtors, DCG, Gemini, and the Ad Hoc Group on February 10, 2023 (the "<u>February Term Sheet</u>").  *See Notice of Filing of the Restructuring Term Sheet*, ECF No. 80, Ex. A.  The February Term Sheet similarly contemplated that all the assets of the estate would be distributed to creditors, without regard to any right of DCG to receive recoveries in excess of the U.S. dollar value of Claims denominated in Digital Assets as of the Petition Date.  *See id.* at 1; Geer Decl. ¶ 11.

[13]     *See* Aronzon Decl. ¶¶ 10–56; Geer Decl. ¶¶ 11, 18, 22–23.

[14]     *See, e.g.*, Geer Decl. ¶ 20 ("Close to half of DCG's debt consideration [under the February Term Sheet] would be repaid in digital assets to facilitate distributions based on creditors' contractual entitlements."), ¶ 22 ("DCG was prepared to support a plan under which Crypto Creditors would receive in-kind distributions . . . with no recoveries to subordinated creditors or equity resulting from crypto price increases"), ¶ 44 ("[T]hroughout the time DCG participated in settlement discussions, there was no dispute that all recoveries would be distributed to general unsecured creditors regardless of any movement in crypto prices").

[15]     *See* Aronzon Decl. ¶¶ 18–33, 44–52; Geer Decl. ¶¶ 24–26; Hr'g Tr. 91:5–92:5, Feb. 27, 2024 (P. Aronzon); *See also Declaration of Jordan E. Sazant in Support of Ad Hoc Group of Genesis Lenders' (I) Objection to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and*

("NYAG") commenced an action against the Debtors and other defendants in the Supreme Court

of the State of New York, County of New York[16] (the "NYAG Action"),[17] further necessitating

the Debtors' shift to the current Plan structure.

5.      The Debtors consulted in good faith and engaged in arm's-length

negotiations with the Ad Hoc Group, the Committee, and other parties in interest when drafting

and revising the Distribution Principles.[18]  Negotiations over the Distribution Principles began

during the summer of 2023 and continued until November 17, 2023, when the Debtors filed the

Distribution Principles with their *Amended Disclosure Statement with Respect to the Amended

Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (as

amended, modified or supplemented, the "Disclosure Statement").[19]  Shortly thereafter, the

Debtors, the Committee, and certain members of the Ad Hoc Group and the Dollar Group entered

into the Plan Support Agreement (the "PSA"), the signatories of which collectively hold more than

$2.1 billion in claims.[20]

## II.    The Distribution Principles

6.      The final Distribution Principles represent a hard-fought settlement between

key creditor constituencies, including the Committee, the Ad Hoc Group, and the Dollar Group,

resulting from the parties' months-long negotiations and more than one thousand iterations of

---

*Solicit Acceptances Thereto and Granting Related Relief, and (II) Cross-Motion to Terminate the Debtors' Exclusive Periods Pursuant to 11 U.S.C. § 1121(d)(1)*, ECF No. 814.

[16]    *The People of the State of New York v. Gemini Trust Co. et. al.*, Index No. 452784/2023.

[17]    *See* Aronzon Decl. ¶¶ 50–51.

[18]    Hr'g Tr. 212:4–24, Feb. 26, 2024 (P. Aronzon); Aronzon Decl. ¶ 61 ("The key parties in interest . . . engaged in numerous meetings and calls and exchanged numerous drafts of the Distribution Principles until agreement was finally reached."); Geer Decl. ¶¶ 27, 31–33.

[19]    ECF No. 950.  *See* Aronzon Decl. ¶ 61; Geer Decl. ¶¶ 16, 34.

[20]    *See Notice of Filing of Plan Support Agreement*, ECF No. 1008; Aronzon Decl. ¶ 62.

potential recovery models.[21]  The Debtors and their advisors were active participants in the negotiation of the Distribution Principles to ensure that they were fair, reasonable, and settled ongoing disputes among creditor groups, including but not limited to disputes about ownership of assets, security interests, and constructive trusts, litigation over which would have imposed significant expenses on the Debtors' Estates.[22]

7.     Consistent with the Debtors' earlier iterations of a chapter 11 plan, the February Term Sheet and August Agreement with DCG, and discussions between all parties in interest throughout these cases, the Plan and the Distribution Principles seek to maximize in-kind creditor recoveries.[23]  Neither the Plan nor the Distribution Principles alter the denomination of Claims based on loaned Digital Assets.[24]  The Plan separately classifies Claims based on their asset denomination.[25]

8.     The Distribution Principles entitle creditors to receive up to (but no more than) one-hundred percent (100%) of the "in-kind Claim Assets" underlying their claims.[26]

---

[21]    *See* Hr'g Tr. 209:22–210:5, Feb. 27, 2024 (B. Geer) ("[I]t took us 1,200 iterations of [the Committee's] recovery model to . . . agree on this set of distribution principles . . . ."); *id.* at 92:19–24; Geer Decl. ¶¶ 27–37; Aronzon Decl. ¶¶ 59–64; JX-072.

[22]    *See* Hr'g Tr. 212:9–24, Feb. 26, 2024 (P. Aronzon).

[23]    *See* Distribution Principles at 6 (describing the process by which allocable assets will be allocated to "maximize 'in-kind' and 'like kind' recoveries"); Geer Decl. ¶¶ 11, 19–23, 35–37; Aronzon Decl. ¶ 9; Hr'g Tr. 200:25–201:2, Feb. 27, 2024 (B. Geer).

[24]    The Bar Date Order and the Proof of Claim form instructed creditors to provide the quantity and type of cryptocurrency owed by the Debtors in their proofs of claim, which permitted the creditors to file their claims based on their contractual entitlement under their respective MBAs.  *See* ECF No. 200 ¶ 4(e) ("Each Proof of Claim must: . . . (ii) set forth (A) for any Prepetition Claim based on cryptocurrency, the number and type of units of each cryptocurrency held by the claimant as of the Petition Date."); *id.* at Ex. A § 7.

[25]    *See* Plan Art. III.

[26]    Distribution Principles at 8; Geer Decl. ¶ 37; Hr'g Tr. 192:22–193:9, Feb. 27, 2024 (B. Geer) ("There is an upside governor, if you will, in the distribution principles that caps recoveries once a creditor reaches its total quantity lent, meaning it receives back the total quantity that it has lent under the distribution principles, at which point that class's pro rata share goes to zero.").  The record does not demonstrate that under the Distribution Principles there is no "cap" for Digital Asset creditors.  *See, e.g.*, Geer Decl. ¶ 37 (describing the "Recovery Cap" under the Distribution Principles); Hr'g Tr. 204:19–205:9, Feb. 27, 2024 (B. Geer).  Any mischaracterizations made by DCG regarding the testimony of Mr. Aronzon on this point is similarly belied by the record.  *See* Hr'g Tr. 207:11–22, Feb. 26, 2024 (P. Aronzon) ("If crypto prices drop . . . and the other assets are monetized or valuable, including the litigation recoveries,

9.      Applying the Distribution Principles to the illustrative recovery analysis prepared by Alvarez & Marsal North America, LLC based on December 31, 2023 pricing for the Debtors' assets and liabilities (the "<u>Revised Recovery Analysis</u>"), Holders of Claims denominated in Digital Assets would receive in-kind recoveries of only approximately 77%.[27]  The evidence is undisputed that the Debtors do not have enough assets to provide 100% of in-kind assets to Claims denominated in Digital Assets.[28]

10.      The Plan—which includes the Distribution Principles—garnered overwhelming support from every class of creditors entitled to vote.[29]  Specifically, more than 82% of the voting members of each voting class voted to accept the Plan.[30]

## III.      The Debtors' Assets & Liabilities

11.      As of December 31, 2023, Claims denominated in Digital Assets asserted against the Debtors are in the range of approximately $4.75 billion to $5.4 billion (based on their U.S. dollar equivalent as of such date).[31]

---

you'd probably hit an endpoint on the claims being paid. And if there was anything left after that, yes, it would flow down."); *see also id.* at 210:9–211:21.

[27]      *Declaration of Joseph J. Sciametta, Managing Director of Alvarez & Marsal North America LLC in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan,* ECF No. 1330 (the "<u>Sciametta Decl.</u>") ¶¶ 5, 18.

[28]      *See* Geer Decl. ¶¶ 28–30 (describing the current "Coin Shortfall" and "Total Claims Shortfall," in which "the Debtors' available assets are insufficient to pay all creditors the full amount of their claims in the currency in which customers are contractually entitled to be repaid").

[29]      *Amended Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Chapter 11 Plan*, ECF No. 1295 (the "<u>Amended Voting Report</u>").

[30]      *Id.*

[31]      *See* <u>Sciametta Decl.</u>, Ex. 1.  On May 22, 2023, the Ad Hoc Group filed a master proof of claim consisting of Claims denominated in U.S. dollars as well as claims denominated in Digital Assets.  *See* Claim No. 447, Addendum, Ex. A.

12.    In addition, various governmental units filed claims against the Debtors in the amount of at least $33 billion.[32] This figure does not include an additional $2 billion that NYAG asserts in its amended complaint in the NYAG Action.[33] Moreover, some of these proofs of claims assert both liquidated and unliquidated amounts.[34]

13.    On February 8, 2024, the Debtors filed a motion (the "NYAG Settlement Motion")[35] for an order approving the settlement agreement with NYAG (the "NYAG Settlement Agreement"), to resolve (a) solely as to the Debtors, the NYAG Action, and (b) the allowance of proofs of claim numbered 855, 856, and 857 filed by NYAG in these Chapter 11 Cases.[36] The NYAG Settlement Agreement provides that NYAG shall have an allowed general unsecured claim against each of GAP, GGH, and GGC, which shall be paid only after payment in full of all other allowed administrative expense, secured, priority, Intercompany Claims, and general unsecured claims (subject to certain exceptions set forth in the NYAG Settlement Agreement).[37] Any distributions that NYAG receives will be turned over from a victims' fund to holders of allowed general unsecured claims on a pro rata basis and in a manner consistent with the Distribution

---

[32]    *See Governmental Proofs of Claim*, JX-094; Hr'g Tr. 162:22–163:22, Feb. 27, 2024 (J. Sciametta). Excluding duplicate claims and the NYAG claim, the total amount of governmental unit claims would be over $10 billion. *See* JX-094.

[33]    *See Debtors' Reply in Support of Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* ¶ 15, ECF No. 1367.

[34]    *See, e.g.*, JX-094, Claim Nos. 768, 769, 770, 889, 891, 893; Hr'g Tr. 154:10–15, Feb. 26, 2024 (J. Bernstein, New Jersey Bureau of Securities) ("[T]here is a restitution claim in the Bureau's claim, but it's simply not liquidated. It's the penalty claim that was 8.5 billion."). DCG's contention that neither the Debtors' nor the Committee's financial advisors analyzed the government claims is entirely belied by the record. *See* Hr'g Tr. 222:17–223:1, Feb. 26, 2024 (P. Aronzon) (discussing the Plan's treatment of government claims); Hr'g Tr. 201:10–19, Feb. 27, 2024 (B. Geer) (confirming that although he did not review the governmental proofs of claim, "BRG, and counsel for the Committee have looked at the claims.").

[35]    *Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General*, ECF No. 1275.

[36]    NYAG Settlement Motion ¶ 1.

[37]    NYAG Settlement Motion ¶ 3.

Principles to compensate such holders of allowed claims for the full and fair amounts of their actual losses.[38]

14.    As of the commencement of the Plan Confirmation Hearing on February 26, 2024, no objection to any of the Governmental Proofs of Claim had been filed, and therefore those proofs of claim are deemed Allowed.[39]   No holder of a Governmental Proof of Claim objected to the Plan or the Distribution Principles.   In addition to NYAG, several other governmental entities—the Securities and Exchange Commission, the Texas Department of Banking, the Texas Securities Board, and the New Jersey Bureau of Securities—have agreed to have their claims subordinated to the full in-kind recoveries of other General Unsecured Creditors.[40]

15.    As of January 31, 2024, the Debtors' assets are valued in the aggregate at approximately $3.3 billion.[41]   Consequently, the Debtors are insolvent because their liabilities are far greater than their assets.[42]

---

[38]    NYAG Settlement Motion ¶ 3.  Indeed, DCG has acknowledged that approval of the NYAG Settlement Agreement renders its objections moot.  Hr'g Tr. 118:4–10, Feb. 28, 2024; *Letter to the Honorable Sean H. Lane Regarding Request for Emergency Chambers Conference Regarding Debtors' Material Motions and Motions to Shorten Notice*, ECF No. 1279 ("[I]f the Court approves the Debtors' agreement with the NYAG as set forth in the NYAG Motion . . . [t]his would render moot the key disputed issue teed up for this Court's consideration at the Confirmation Hearing . . . .").

[39]    *See* Sciametta Decl. ¶ 15.

[40]    *See Order Approving a Settlement Agreement Between Genesis Global Capital, LLC and the U.S. Securities and Exchange* Commission, ECF No. 1467; *Stipulation and Order between the Debtors and the Texas State Securities Board and the Texas Department of Banking*, ECF No. 1469; *Stipulation and Order by and between the Debtors and the New Jersey Bureau of Securities*, ECF No. 1468.

[41]    *Notice of Filing of Cash and Coin Report*, ECF No. 1407.

[42]    *See* Sciametta Decl. ¶ 15.  Neither DCG nor the CCAHG has offered any credible evidence to the contrary.  Indeed, DCG's only witness, Adam Verost, testified that the Debtors' estates currently hold "Excess Value" above the U.S. dollar equivalent of Claims valued as of the Petition Date.  *See Declaration of Adam Verost*, ECF No. 1343, ¶ 4; *Declaration of Adam Verost*, ECF No. 1387, ¶¶ 7–8.  Not only is Mr. Verost's conclusion premised on the existence of a hypothetical alternative plan not before this Court, but it also fails to take into account that the current subordinated claims hurdle—even assuming DCG's alternative reality in which the Distribution Principles are absent from the Plan—far exceeds the high-end of DCG's estimated "excess."  *See* Hr'g Tr. 224:22–225:10, 226:10-227:2, 227:17–228:25, 229:10-13, Feb. 27, 2024 (A. Verost); JX-094.  In fact, Mr. Verost testified that he "did not address the government penalty claims," and had not "tried to consider the plan" currently on file "or tried to parse it" in terms

### IV.    Reinstatement

16.    The Debtors are contractually obligated to the holders of General Unsecured Claims to return the full amount of Digital Assets lent to the Debtors pursuant to their prepetition master loan agreements or master borrow agreements (collectively, the "MBAs"), in addition to fees calculated based on the value of that unreturned property (as well as late fees in certain instances).[43]

17.    By voting to accept the Plan, the creditors consented to an amendment of their underlying contracts to provide for in-kind recoveries to the extent possible and to limit any distributions to the amounts specified in the Plan, thereby effectively resulting in the amendment and reinstatement of their underlying MBAs.[44]   By effectively amending and reinstating these contractual obligations, the Plan preserves creditors' rights to receive as much of their loaned assets as possible, while eliminating any recourse for shortfall that would exist in a full reinstatement.[45]

### V.    Liquidation Analysis

18.    As set forth in the Liquidation Analysis, conversion of these cases to chapter 7 could cause the Debtors' Estates to incur additional costs in the range of $75 million to $81 million.[46]   In addition, a chapter 7 trustee would be unlikely to have the requisite knowledge of the Debtors' businesses and assets to maximize proceeds, further reducing potential recoveries.[47]

---

of whether the Debtors have sufficient assets to provide creditors' full in-kind recoveries as contemplated by the Distribution Principles.  *See* Hr'g Tr. 233:21–234:11, Feb. 27, 2024.

[43]    Hr'g Tr. 105:02–13, Feb. 27, 2024 (P. Aronzon); *Template Master Loan Agreement*, JX-002; *Template Master Borrow Agreement*, GENESIS_DCG_00017220.

[44]    *See* Plan Art. III.A–D.

[45]    *See id.*

[46]    *See Liquidation Analysis*, ECF No. 993, Ex. C (the "Liquidation Analysis") ¶ 22; *see also* Sciametta Decl. ¶ 22; Hr'g Tr. 169:22–170:14, Feb. 27, 2024 (J. Sciametta).

[47]    *See* Sciametta Decl. ¶ 23.

## VI.   <u>Setoff Principles</u>

19.    There is no evidence in the record that the Setoff Principles were developed and proposed in bad faith, with collusion, and at anything other than arm's-length, that the Setoff Principles are an improper exercise of the Debtors' business judgment, or the result of a breach of the Debtors' fiduciary duties.[48]

## VII.   <u>The Ad Hoc Group and Dollar Group Contributions</u>

20.    The Ad Hoc Group represents creditors holding approximately $2.5 billion in claims denominated in fiat and Digital Assets valued as of the Petition Date.[49]  The Ad Hoc Group has substantially contributed to these cases, and the development, negotiation, and confirmation of the Plan.[50]  Among other things, the Ad Hoc Group has negotiated the terms of, and drafted, the PSA, negotiated and developed the terms of the Plan and the Distribution Principles, and assisted with developing and reaching the settlement between the Debtors and NYAG, as well as the proposed settlement with Gemini.[51]  Additionally, with the Ad Hoc Group's assistance, the Debtors were able to obtain signatures of holders of claims in an amount exceeding $2 billion, all of which voted to accept the Plan, which includes a provision directing the payment of the Ad Hoc Group Restructuring Expenses.[52]  The decision to provide for payments of the Ad Hoc Group's fees, which was a requirement under the PSA and was consideration provided for the

---

[48]      *See, e.g.,* Aronzon Decl. ¶¶ 2–3, 8, 10, 103–105; Sciametta Decl. ¶ 13; Hr'g Tr. 182:9–186:6, Feb. 27, 2024. The Plan includes the Setoff Principles contained in the Plan Supplement.  *See* ECF No. 1144 at 2 (stating that the Setoff Principles are "integral to, and are considered part of, the Plan."); *see also* Aronzon Decl. ¶ 4 (defining the Plan to include any supplements to the Plan).

[49]      Ad Hoc Group Reservation ¶ 2.

[50]      *See* Aronzon Decl. ¶¶ 59–64, 107–108; Hr'g Tr. 89:10–90:12, Feb. 27, 2024 (P. Aronzon).

[51]      *See id.*; *see also* Hr'g Tr. 149:2–11, Feb. 28, 2024  (Gemini counsel thanking the Ad Hoc Group principals and counsel for brokering the proposed Gemini settlement).

[52]      *See id.*; *see also* Amended Voting Report, Ex. A.

signatures of holders of claims in an amount exceeding $2 billion, was the result of sound business judgment and arms-length negotiations.[53]

      21.     Similarly, the Dollar Group has substantially contributed to these cases, and the development, negotiation, and confirmation of the Plan, including by, among other things, assisting with negotiation and development of the terms of the Plan and Distribution Principles.[54] Additionally, with the Dollar Group's assistance, the Debtors were able to obtain signatures of Holders of more than $450 million of Fiat-or-Stablecoin-Denominated Unsecured Claims, all of which were members of the Ad Hoc Group and voted to accept the Plan, including the payment of the Dollar Group Restructuring Fees and Expenses.[55] The decision to provide payment of the Dollar Group's fees was the result of sound business judgment and arms-length negotiation.[56]

## VIII.   **CCAHG Loan Term Sheet Agreements**

      22.     Prior to the Petition Date, each of the members of the Crypto Creditors Ad Hoc Group (the "CCAHG,"[57] and the members thereof, the "CCAHG Members") and GGC entered into CCAHG MBAs and certain associated loan term sheet agreements prior to the Petition

---

[53]    See Aronzon Decl. ¶¶ 59–64, 107–108, Hr'g Tr. 89:19-90:12, Feb. 27, 2024 (P. Aronzon) (confirming there is no evidence of improper inducement or incentives to support the Plan); See DCG Obj. ¶ 104; *Objection of the United States Trustee to the Confirmation of the Debtors' Amended Joint Chapter 11 Plan*, ECF No. 1202 (the "UST Objection" or "UST Obj.") at 15–18. The Ad Hoc Group and the Dollar Group have urged approval of Administrative Expense Claims on the basis of section 363 of the Bankruptcy Code as well, Hr'g Tr. 106:6–20, Mar. 18, 2024 (B. Rosen), *Statement of the Ad Hoc Group of Dollar Lenders in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan*, ECF No. 1323 ¶ 10–15, but based upon this Court's ruling that each has satisfied the standard for substantial contribution, the Court need not address that point.

[54]    See Aronzon Decl. ¶¶ 59–64, 107–108, Hr'g Tr. 89:15–90:8, Feb. 27, 2024 (P. Aronzon).

[55]    See id.; see also Amended Voting Report, Ex. A.

[56]    See Aronzon Decl. ¶¶ 59–64, 107–108, Hr'g Tr. 89:19–90:12, Feb. 27, 2024.

[57]    The CCAHG initially consisted of 11 creditors holding crypto-denominated Claims. *See Verified Statement to Bankruptcy Rule 2019 of the Genesis Crypto Creditors Ad Hoc Group*, ECF No. 976. As of the close of the Confirmation Hearing, the CCAHG consisted of 7 members. *See Fifth Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of the Genesis Crypto Creditors Ad Hoc Group*, ECF No. 1490. Each of the CCAHG Members abstained from voting on the Plan. Hr'g Tr. 217:1–7, Mar. 18, 2024 (counsel for the CCAHG confirming the CCAHG members "[d]id not vote on the plan.").

Date (the "Term Sheets" and, together with the CCAHG MBAs, the "CCAHG Agreements").[58] The CCAHG MBAs are identical to each other in all respects relevant to the issues raised in the CCAHG Objection, and are materially identical to the MBAs of other Genesis lenders who voted to accept the Plan.[59]

23. The main purpose of each of the CCAHG Agreements is to "initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower [GGC], and Borrower will pay a Loan Fee and return such U.S. Dollars or Digital Currency to Lender…".[60] The CCAHG MBAs did not obligate the applicable lender to issue any specific loan, rather the extension of any individual loan was "in [Lenders] sole and absolute discretion" and to be "on terms acceptable to Lender as set forth in a corresponding Loan Term Sheet."[61]

24. No provision of the CCAHG Agreements provide for the renewal of any individual loan to GGC by a CCAHG Member beyond its original term.[62] None of the loans provided by the CCAHG Members are collateralized.[63] No party asserts that a Hard Fork or an Airdrop (each as defined in the CCAHG Agreements) has occurred following the execution of any Term Sheets. No party asserts that any of the CCAHG Members and GGC exchanged any property, or agreed to any new or different obligations, after the Petition Date. There is no evidence that the assets that were loaned pursuant to the CCAHG Agreements provided any benefit

---

[58]   JX-005–027, 029, 031–035, 037–052.

[59]   JX-005–027, 029, 031–035, 037–052.

[60]   *See, e.g.*, JX-005 (Recitals). Almost every CCAHG Agreement presented in JX-005–027, 029, 031–035, 037–052 contains only two Recitals. The first recital makes clear that the purpose of the agreement is to conduct loan transactions with GGC. The second recital simply states that the proceeds of any such loans received by GGC will be used for its lending business.

[61]   *See, e.g.*, JX-005 (§ II.(a)).

[62]   JX-005–027, 029, 031–035, 037–052.

[63]   JX-024, 029, 032–035–, 37–45, 47–52.

to GGC or any other Debtor after the Petition Date.  There is no evidence that the Debtors took any action that had the effect of inducing any postpetition transaction with the CCAHG Members.

25.    The CCAHG MBAs provide that, in order to receive repayment of loaned assets, a CCAHG Member as Lender must provide a Digital Currency Address.  If no Digital Currency Address is provided by the Lender upon the relevant loan's maturity, the loan does not default, but instead, converts to an Open Loan.[64]  The CCAHG MBAs do not specify any process or means for the creation of a Digital Currency Address or a coin wallet.[65]  There are multiple means of creating a Digital Currency Address and a coin wallet, which are necessary to receive Digital Assets in repayment of a loan such as those extended to GGC by the CCAHG Members.[66]

## IX.    Release, Exculpation and Injunction Provisions

26.    Debtors' counsel, Cleary Gottlieb Steen & Hamilton LLP ("Cleary") performed an internal investigation on behalf of the Special Committee (the "Investigation") into a wide array of prepetition conduct, transactions and relationships, including potential preferential transfers and fraudulent conveyances.[67]  The Special Committee determined the scope of the Investigation and received regular updates on the status of the Investigation, including with regards to potential Debtor releases.[68]

---

[64]    JX-005–027, 029, 031–035, 037–052.

[65]    Hr'g Tr. 18:22–19:5, Feb. 28, 2024 (B. Jassin).

[66]    JX-005–027, 029, 031–035, 037–052; Hr'g Tr.  18:22–19:5, Feb. 28, 2024 (B. Jassin).

[67]    Hr'g Tr. 27:7–28:3, Feb. 27, 2024 (P. Aronzon) ("[W]e ask[ed] our counsel and our financial advisors to conduct a very extensive interview.  In fact, we put no boundaries on what they had to do.  We ask them to put their creditor hats on, put their litigation hats on, and to think about each and every type of claim or cause of action that they could conjure up, and dig into our books, records, and talk to the relevant parties to determine what claims might exist, and against whom.").  The CCAHG's assertion that Mr. Aronzon was not aware of modifications to the Genesis Released Personnel list is contradicted by the record.  *See* Aronzon Decl. ¶ 83, Ex. 3; Disclosure Statement, Sec. VI.F; *see also* Hr'g Tr. 33:21–34:4, Feb. 27, 2024 (P. Aronzon).

[68]    Hr'g Tr. 27:7–28:18, Feb. 27, 2024 (P. Aronzon) ("[W]e had interim reports along the way, . . . we had weekly meetings, sometimes we had multiple meetings per week, we would receive updates on the investigation, and we would be able to ask questions, and give direction or guidance about pursuit and the like.").

27.     Upon consideration of the findings of the Investigation, the Special Committee consented to the grant of Debtor Releases as a sound exercise of the Debtors' business judgment.[69]

28.     The Special Committee considered the findings of the Investigations performed by Cleary and determined (i) the Debtors have no colorable claims against the Genesis Released Personnel, or (ii) the potential benefits of pursuit of such claims would be outweighed by the benefits of the releases, including the Cooperation Agreement required to be executed by each of the Genesis Released Personnel.[70]   The release and exculpation provisions exclude liabilities arising out of gross negligence, fraud, or willful misconduct.[71]

29.     The release and exculpation provisions also exclude certain parties from the Released Parties, namely (i) former officers, directors and employees of the Debtors who were not employed as of the Petition Date, (ii) the DCG Parties, (iii) the Gemini Parties, and (iv) any other officers, directors or employees of the Debtors, or other Excluded Parties, excluded from the list of Released Parties, thus preserving claims against these parties.[72]

---

[69]     Hr'g Tr. 28:4–11, Feb. 27, 2024 (P. Aronzon) ("At the end of that process, we went through a series of meetings where we looked at the claims that had been identified, . . . where colorable claims exist, or claims that might be worthy of pursuit, and at the end of the process, we had to sign off on sort of a final list."); *id.* 28:22–30:11; *see also* Aronzon Decl. ¶ 83. In support of the Debtor Releases and exculpations, the Special Committee provided justifications for inclusion of the Genesis Released Personnel and provided the names of such parties to the Committee, the Ad Hoc Group, and the CCAHG on a professionals'-eyes-only basis. *See* Plan Supplement, ECF No. 1117, Ex. F. Following discussions with the Ad Hoc Group, the Debtors reduced the list of Genesis Released Personnel. Hr'g Tr. 66:9–13, Feb. 27, 2024; Hr'g Tr. 82:3–7, Feb. 27, 2024. Citing to wholly irrelevant portions of the hearing transcript, the CCAHG falsely claims that Mr. Aronzon was not aware of modifications to the Genesis Released Personnel list, *see* CCAHG FoF, at ¶ 49, *but see* Hr'g Tr. 66:13, Feb. 27, 2024 (P. Aronzon) (when asked whether the Special Committee signed off on a final list, Mr. Aronzon responded "[n]o, it's continuing to evolve.").

[70]     *See* Hr'g Tr. 28:4–23, 34:8–10, Feb. 27, 2024 (P. Aronzon); *see also* Hr'g Tr. 82:8–22, Feb. 27, 2024; *see also* Hr'g Tr. 82:8–22, Feb. 27, 2024. Unable to point to any evidence of bad faith, the CCAHG instead cites to testimony from Mr. Aronzon's deposition, which is taken out of context and, more importantly, not part of the evidentiary record before this Court.

[71]     *See* Plan Art. VIII.D; Plan Art. VIII.E; Plan Supplement, ECF No. 1117, Ex. F; Hr'g Tr. 55:6–21, Feb. 27, 2024 (P. Aronzon).

[72]     *See* Aronzon Decl. ¶ 83, Ex. 2; Disclosure Statement, Sec. III.W.

30.    At the Confirmation Hearing, the Debtors made a proffer with additional facts regarding the Debtor Releases in direct response to six topics raised by the CCAHG in its *Motion in Limine to Preclude Evidence Regarding the Proposed Releases and the Special Committee Investigation.*[73]  Mr. Aronzon testified as to the Debtor Releases, including the contents of the proffer made by the Debtors on the Debtor Releases, during cross-examination by the CCAHG during the Confirmation Hearing.[74]  Among other things, Mr. Aronzon testified that the Genesis Released Personnel did not have decision-making authority regarding certain prepetition conduct, transactions and business engagements, including the decision to enter into transactions with Three Arrows Capital, the DCG Note, the DCG Loans, and other agreements.[75]  The Debtors' governing documents require each Debtor entity to indemnify the Genesis Released Personnel for any claims that are not found to be the result of fraud, gross negligence or willful misconduct as determined by a final order of a court of competent jurisdiction.[76]

31.    The Cooperation Agreements executed (or to be executed) by the Genesis Released Personnel confer significant benefits to the Wind-Down Debtors by guaranteeing access to particularized knowledge and information possessed by the Genesis Released Personnel, which will be critical to the resolution of the Retained Causes of Action.[77]  Article VIII.F of the Plan provides for the exculpation of the "Exculpated Parties" for acts or omissions involving the preparation or filing of the Chapter 11 Cases, or involving the Chapter 11 Cases.  The Exculpated

---

[73]    ECF No. 1350.  Hr'g Tr. 9:1–14:12, Feb. 27, 2024; *see also* Notice of Supplemental Disclosure, ECF No. 1403.

[74]    *See* Hr'g Tr. 24:5–67:8, Feb. 27. 2024.

[75]    *See* Hr'g Tr. 43:23–50:1, Feb. 27, 2024 (P. Aronzon).

[76]    *See* Plan Supplement, ECF No. 1117; *see also* Hr'g Tr. 51:16–54:5, Feb. 27, 2024 (P. Aronzon).

[77]    Hr'g Tr. 79:3–24, Feb. 27, 2024; *see* Notice of Supplemental Disclosure, ECF No. 1403; s*ee also* Plan Art. I.A.193; Plan Supplement, ECF No. 1391, Ex. P.

Parties played critical roles in and made significant contributions to these cases and participated in good faith in formulating and negotiating the Plan.[78]

32.    The injunction provided by Article VIII.G of the Plan is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the discharge, the Debtor Releases, the Non-Debtor Release for those Holders of Claims or Interests that granted the Non-Debtor Release, and the exculpation provision set forth in Article VIII.G of the Plan.[79]

## CONCLUSIONS OF LAW

### I.    DCG's Objection Is Overruled

#### A.    DCG Lacks Standing to Object to the Distribution Principles

33.    Although section 1109(b) of the Bankruptcy Code "grants a broad right to all parties in interest to participate" in a bankruptcy proceeding, a party in interest "must still satisfy the general requirements of the standing doctrine."[80]    The standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."[81] In a bankruptcy proceeding, "[p]rudential limitations on standing play an especially important role."[82]    Courts must "decide questions of standing, particularly, in multi-party, multi-issue confirmation proceedings, on an issue-by-issue basis."[83]    Only parties that are "adversely affected by provisions of a plan may raise an objection to confirmation based on such provisions."[84]    In other words, courts generally will only hear "the arguments of parties who have a direct stake in

---

[78]    *See* Aronzon Decl. ¶¶ 87–88; Plan Art. VIII.F; Plan Art. I.A.95.

[79]    *See* Aronzon Decl. ¶ 90; Plan Art. VIII.G.

[80]    *In re Quigley Co.*, 391 B.R. 695, 702–03 (Bankr. S.D.N.Y. 2008) (quoting *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997)).

[81]    *Id.* at 701–02  (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

[82]    *Id.* at 702–03.

[83]    *Id.*

[84]    *See In re Johns-Manville, Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986).

the consequences of a proceeding," requiring that a party be "directly 'aggrieved' by the construction of a provision of the Plan" to challenge it.[85]

34.    Here, DCG lacks prudential standing to challenge the Distribution Principles.  As set forth below and given the size and composition of the Debtors' claims pool, DCG cannot establish that modifying the Distribution Principles in the manner it suggests would result in any recovery on account of DCG's equity interests, or otherwise redress DCG's asserted injury, *even if* DCG were to prevail on its section 502(b) argument.

35.    Even if the Court were to adopt DCG's proposed distribution methodology, there are over $33 billion[86] in Claims asserted by governmental entities—in addition to the approximately $4.75 billion to $5.4 billion in Claims denominated in Digital Assets—that would have priority over DCG's equity interests in the Debtors.[87]  As of the commencement of the Plan Confirmation Hearing, no party in interest had filed an objection seeking to disallow or reclassify any of the Government Proofs of Claim.[88]  Similarly, no party in interest had filed a valid objection to disallow or otherwise limit Digital Asset Claims.[89]  Thus, based on the evidentiary record at

---

[85]    *Id.* at 624 (citation omitted).  *See also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 721 (Bankr. S.D.N.Y. 1992) (holding that, where equity in a debtor was worthless, an equity holder had "no stake" in what amounts to the settlement of a controversy between creditors).  Courts have held that standing is not established when an objecting party's recoveries hinge on remote and hypothetical redressability.  *See In re SRC Liquidation LLC*, No. 15-10541 (BLS), 2019 Bankr. LEXIS 2851, at *14 (Bankr. D. Del. Sept. 12, 2019) (holding an unsecured creditor did not have standing, among other reasons, because its requested relief would require the creditor to "jump several lofty hurdles to even approach the chance to receive . . . proceeds").

[86]    Without NYAG's claim, and excluding duplicate claims, the total amount of governmental unit claims would still be at least $10 billion.  *See supra* note 32.  However, this figure is likely an underestimation, as (a) some governmental units filed partially or fully unliquidated claims (e.g., disgorgement and restitution) and (b) this figure does not include the additional $2 billion  asserted in NYAG's amended complaint in the NYAG Action.  *See supra* ¶ 12.

[87]    *See supra* ¶¶ 11–12.

[88]    *See supra* ¶ 14.

[89]    *See infra* ¶¶ 43–45.

confirmation, such Claims are prima facie valid and deemed allowed at the amount asserted under

section 502(a).  Thus, the Debtors are plainly insolvent.[90]

36.    As a consequence of the foregoing, DCG as an equity holder has no

economic interest in, and therefore lacks standing to object to, the Distribution Principles.[91]

Likewise, DCG's status as equity holder alone cannot confer standing on the basis that it is a "party

in interest" as defined under section 1109(b) of the Bankruptcy Code.[92]

37.    To the extent that DCG is a Holder of Claims in Class 3 at each of the

Debtors on account of its asserted Fiat-or-Stablecoin Denominated Unsecured Claims, it similarly

lacks standing to challenge the Distribution Principles in that capacity.  As a preliminary matter,

claim numbers 464, 487 and 511 filed by DCG are subject to a claims objection filed by the

Debtors, which is scheduled to be heard on April 16, 2024.[93]  Even if DCG's claims were valid,

both DCG's and DCGI's objections to the Plan are plainly driven by DCG's status as equity holder

of the Debtors and not by their status as creditors – as noted above, a party must be directly

aggrieved by the specific issue it seeks to challenge and, if so, is granted standing only for that

---

[90]    *See supra* ¶¶ 11–15; 28 U.S.C. § 3302(a) (a debtor is insolvent where the "sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation").

[91]    *See e.g.*, *In re Magnesium Corp. of Am.*, 583 B.R. 637, 650 (Bankr. S.D.N.Y. 2018) ("[A]n equity holder . . . lacks standing to object to claims against the estate unless there is a reasonable possibility of a surplus after all claims against the debtor's estate are paid in full."); *c.f. Freeman v. J. Reg. Co.*, 452 B.R. 367, 372 (S.D.N.Y. 2010) (equity holders lacked prudential standing to appeal a confirmation order when "the equity holders would clearly not have recovered anything in this case," and thus "the creditors' rights and interests [were] the only ones implicated by the Confirmation Order"). Even if the Debtors were solvent, the Court would still hold that the Distribution Principles are appropriate as a means to provide creditors with the full benefit of their bargain.

[92]    *See In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) ("Generally, a 'party in interest' with respect to a particular issue will also meet the requirement for Article III standing *with respect to that issue*. . . . A party in interest must still satisfy the prudential limitations on standing, and cannot raise the rights of a third party even though it has a financial stake in the case." (emphasis added)).  *See also In re Johns-Manville Corp.*, 68 B.R. at 624 (limiting standing to only those "parties who have a direct stake in the consequences of a proceeding."); *aff'd sub nom. In re Teligent Servs., Inc.*, No. 09 CIV. 09674 (PKC), 2010 WL 2034509 (S.D.N.Y. May 13, 2010), *aff'd sub nom. In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011).

[93]    *See Debtors' Twenty-Seventh Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability and Co-Liability Contingent)*, ECF No. 1477.

issue. In any event, DCG would stand to receive the same treatment under the Distribution Principles as it would under its own proposed methodology.[94]

38.     The Debtors' right to reinstate prepetition contracts pursuant to section 1124 further reinforces DCG's lack of standing. Here, holders of general unsecured claims entered into prepetition agreements whereby they agreed to lend digital assets to the Debtors.[95] Had the Debtors fully reinstated these agreements, the Debtors would have been required by section 1124 to make the creditors whole.[96] DCG would have no basis at all to object to such full reinstatement. Although the Plan does not fully reinstate the creditors' claims, the Plan and Distribution Principles effectively reinstate such claims with consented-to modifications. This consent in evidenced by the fact that the Plan has been overwhelmingly accepted by each voting class of creditors and by virtue of the collective action nature of the chapter 11 voting process. The Plan amends and reinstates the prepetition lending agreements to preserve creditors' rights to receive as much of their borrowed assets as possible.[97] If DCG would have no basis to object were the Debtors to engage in "full" reinstatement, it necessarily has no basis to object to the Debtors' Distribution Principles that, with the consent of the creditor counterparties, do not fully "cure" the affected claims.[98]

---

[94]     *See supra* note 5.

[95]     *See supra* ¶ 16.

[96]     *See In re LATAM Airlines Grp. S.A.*, 55 F.4th 377, 385–86 (2d Cir. 2022) (citing 11 U.S.C. § 1124(2)(A)–(C)).

[97]     *See supra* ¶ 5; Confirmation Order, *In re Frontier Comm'ns Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020), ECF No. 1005 (confirming plan that included claims settlement under which certain classes of creditors consented to reinstatement subject to modifications).

[98]     *Cf. Comm'n of Dep't of Pub. Utilities v. N.Y., N.H. & H.R. Co.*, 178 F.2d 559, 564 (2d Cir. 1949) ("The greater includes the lesser, unless something to the contrary appears."); *see also In re James Wilson Assoc.*, 965 F.2d 160 (7th Cir. 1992) (holding that a creditor with no interest in a lease could not protest that the debtor violated Bankruptcy Code section 365(d)(4) where the debtor, with the lessor's consent, assumed the lease as modified).

B.      Even If the Debtors Were Solvent, the Distribution Principles Are Appropriate.

39.      In the alternative, even if the Debtors were solvent and DCG were to have

standing to assert its objections, the Distribution Principles fully comport with the well-established

principle that creditors of solvent debtors are entitled to the full benefit of their bargain.[99]  In *Dow

Corning*, the Sixth Circuit found that "where an estate is solvent, in order for a plan to be fair and

equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition

interest, before equity holders may participate in any recovery.'"[100]  The Sixth Circuit, in

considering equitable principles with a solvent debtor, also held that "unsecured creditors may

recover their attorneys' fees, costs and expenses from the estate of a solvent debtor where they are

permitted to do so by the terms of their contract and applicable non-bankruptcy law."[101]

40.      The equitable principles motivating the *Dow Corning* decision are echoed

in decisions of other courts.[102]

---

[99]      *In re Dow Corning Corp.*, 456 F.3d 668, 678 (6th Cir. 2006), ("[t]he legislative history of the Bankruptcy Code makes clear that equitable considerations operate differently when the debtor is solvent" and that "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.").

[100]      *Id.* at 678 (quoting 140 Cong. Rec. H10,752–01, H10,768 (1994)).

[101]      *Id.* at 683; *see also In re United Merchs. & Mfrs., Inc.,* 674 F.2d 134, 137 (2d Cir. 1982) ("[T]he case law does not support a distinction between secured and unsecured creditors who seek to recover collection costs in bankruptcy."); *In re Fast,* 318 B.R. 183, 194 (Bankr. D. Colo. 2004) ("The Court is persuaded that an unsecured creditor is not, completely and unqualifiedly, precluded from asserting a claim for postpetition attorney's fees if it is provided for by contract."); *In re New Power Co.,* 313 B.R. 496, 510 (Bankr. N.D. Ga. 2004) ("Neither § 506(b) nor the *Timbers* decision bar unsecured creditors' from asserting a contractual or statutory claim for attorneys' fees as an unsecured claim."); *In re Carter,* 220 B.R. 411, 418 (Bankr. D.N.M. 1998) ("[I]nterest is appropriately awarded to an unsecured creditor when there is a solvent debtor and there is a surplus produced by the estate. The same is true regarding attorneys fees."); *In re Cont'l Airlines Corp.,* 110 B.R. 276, 280 (Bankr. S.D. Tex. 1989) ( "[C]reditors should be entitled to the recovery of attorney fees in instances where the Debtor is solvent and they would be entitled to attorney fees under state law for litigation over the validity and amount of their claim but for the filing of the bankruptcy case."); *In re Sakowitz Inc.,* 110 B.R. 268, 270 (Bankr. S.D. Tex. 1989) ("This Court is further of the opinion that attorney fees should be allowed where the Debtor is solvent (before and after the allowance) due to policy considerations akin to those with respect to the allowance of interest postpetition.").

[102]      *See, e.g., In re Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) ("[T]his is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law."); *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.,* 679 F.2d 264, 269 (1st Cir. 1982) ("This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had

41.     As the Debtors are insolvent,[103] DCG's arguments regarding Post-Petition Interest and Post-Effective Date Interest are not properly before the Court but are nonetheless overruled.[104] Even if the Debtors were solvent, the authorities cited by DCG are neither binding nor convincing.  As DCG implicitly concedes, the Second Circuit has not ruled on what rate applies to postpetition interest, and several courts have found that the rate provided for in a creditor's contract should control.[105]  In keeping with the Debtors' intention to provide creditors with the full benefit of their bargain, the Debtors have determined that the contract rate is fair and appropriate, and well in line with cases in this and other Districts.  DCG's characterization of contract rate postpetition interest as a "sweetener" for Holders of Allowed First-or-Stablecoin Denominated Unsecured Claims similarly lacks support.[106]

42.     In sum, the Distribution Principles seek to provide the Debtors' creditors with the benefit of their contractual bargain with the Debtors.  It is therefore fair and equitable, and consistent with the well-reasoned decisions of other courts, for Holders of General Unsecured Claims to receive their bargained-for benefit—full return of the Digital Assets they lent the

---

promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to his advantage."); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("where there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly bargained-for" contractual interest provision); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *23 (Bankr. S.D.N.Y. June 18, 2022) (reasoning that not awarding postpetition interest where a debtor is solvent is "simply untenable and illogical" and "would offend basic tenants of fairness and the purposes of the Bankruptcy Code").

[103]     *See supra* ¶¶ 11–15.

[104]     *See DCG Obj.* ¶¶ 53–59.

[105]     *See In re Ultra Petrol. Corp.*, 51 F.4th 138, 142 (5th Cir. 2022); *In re PG&E Corp.*, 46 F.4th 1047 (9th Cir. 2022) (holding that the solvent-debtor exception requires payment of postpetition interest, presumptively at the contract rate, but remanding the case for determination of the rate).

[106]     *See DCG Obj.* ¶ 52; *see also In re L&N Twins Place LLC,* Case No. 17-22758, Adv. No. 17-08332, 2019 WL 5258096, at * 7 (Bankr. S.D.N.Y Oct. 15, 2019) (Lane, J.) ("Courts have differing views about the appropriate rate of postpetition interest, with various courts looking to the state court judgment rate, the contract rate, or the federal judgment rate. Given all the facts here including the return to equity, the Court concludes that the contractual rate is appropriate, particularly given that neither the Debtor nor [objector] has argued for a different rate.") (*vacated on other grounds*, 2020 WL 7211235 (S.D.N.Y. Dec. 4, 2020)).

Debtors—before any value can flow to DCG. Consequently, DCG has no standing to object to the Plan and the Distribution Principles even if the Debtors were solvent.

C.      The Plan and the Distribution Principles Comport with Section 502(b)

43.      First, section 502(b) is implicated only with respect to claims that are the subject of an objection. Absent an objection from a "party in interest," a filed proof of claim or interest is otherwise deemed allowed.[107] Notably, Bankruptcy Rule 3007(d), which enumerates the bases for omnibus claims objections, does not provide for objections on the basis that claims are denominated in anything other than U.S. dollars.

44.      The claims asserted by creditors were filed in the quantity and denomination such creditors were contractually entitled to receive under their relevant prepetition MBAs.[108] On February 25, 2024, DCG filed *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Omnibus Claims Objection to Claims Against Debtors Based on Digital Assets Pursuant to 11 U.S.C. Sections 105(a), 502 and Fed. R. Bankr. P. 3008* (the "DCG Claims Objection"),[109] seeking entry of an order requiring that each of the "Claims submitted and listed on the Debtors' Schedules . . . based on—or asserted in quantities of—Digital" be "fixed to their Dollarized Value as of the Petition Date."[110] As of the confirmation hearing, no other party had filed an objection to Claims denominated in Digital Assets.

45.      Although DCG frames its February 25th pleading as an "omnibus" objection, the DCG Claims Objection is both substantively and procedurally improper and thus is

---

[107]      11 U.S.C. § 502(a); *see also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *3 (Bankr. S.D.N.Y. May 19, 2023) ("But even where a party in interest objects [to a claim], the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)." (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007)).

[108]      *See* Bar Date Order, ECF No. 200 ¶ 4(e), Ex. A § 7.

[109]      ECF No. 1328.

[110]      DCG Claims Obj. ¶ 1, Ex. A ¶ 1.

irrelevant for the purposes of section 502(b). First, pursuant to paragraph 1(a) of the Claims

Objection Procedures, only the Debtors can file an omnibus objection on the bases enumerated

therein, including "pursuant to Section 502(b) of the Bankruptcy Code to establish the U.S. Dollar

amount of the claim."[111] Further, the DCG Claims Objection otherwise fails to comply with the

procedural requirements of Bankruptcy Rule 3007. Among other things, it fails to "list claimants

alphabetically, provide a cross-reference to claim numbers and, if appropriate, list claimants by

category of claims" and "contain objections to no more than 100 claims."[112] Consequently, the

DCG Claims Objection is not a valid omnibus objection to Claims denominated in Digital

Assets.[113]

46.    Even assuming a valid objection had been filed against the Claims

denominated in Digital Assets, the Distribution Principles nonetheless comport with the plain

language of section 502(b). *First*, the Distribution Principles satisfy the functional requirement of

section 502(b) of ensuring that all claims against the estate are determined on equal footing with

each creditors' pro rata allocation measured from the same point in time and in the same

currency.[114] This is done by Step 1 of the Distribution Principles whereby each creditor's pro rata

---

[111]    *See* Claims Objection Procedures ¶ 1(a)(xii); DCG Claims Objection ¶ 11. Indeed, because the DCG Claims Objection purports to rely on the Debtors' Claims Objection Procedures to object to claims on this basis, DCG implicitly concedes that an objection on such a basis may not be made in an omnibus fashion under Bankruptcy Rule 3007.

[112]    *See* Bankruptcy Rule 3007(e)(2), (6). In addition, DCG has not filed an affidavit of service on the docket with respect to the DCG Omnibus Objection, and its failure to serve each of the affected claimants would similarly be inconsistent with Bankruptcy Rule 3007(a)(1). Even if DCG had properly served the DCG Omnibus Objection, this alone would not cure the other defects in its pleading. *See* DCG's Proposed Findings ¶ 70.

[113]    Nor can DCG be permitted to "bootstrap" a proper claims objection out of DCG's objection to the Plan writ large or out of statements made by DCG in an exhibit to the Disclosure Statement regarding its issues with the Plan. *See* Disclosure Statement, Ex. F.

[114]    The legislative history does not explain Congress's intent in adding "in lawful currency of the United States" to section 502(b). Prior to that amendment, section 502(b) read "if such objection [i.e., an objection pursuant to section 502(a)] to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount." The Distribution Principles are entirely consistent with this requirement, as they provide for distributions to creditors up to the in-kind amount owed to such creditors as of the Petition Date. Notably, neither section 501 of the Bankruptcy Code, which governs the filing of

---

allocation of estate assets is based on the U.S. dollar equivalent of each of the Digital Assets comprising a Claim at a fixed rate and at a fixed time on the Petition Date.[115]

47.     *Second*, the creditors' underlying Claims can be understood as having two constituent elements, both valued as of the Petition Date: (i) a claim to their loaned Digital Assets and (ii) a claim for full restitution resulting from the Debtors' breach of their creditors' respective MBAs.[116]   However the Claims are characterized, they are valued as of the Petition Date and therefore entirely consistent with DCG's reading of section 502(b).[117]

48.     Section 502(b) does not impose a U.S. dollar "cap" on recoveries or operate to restrict a debtor's business judgment in resolving Claims denominated in Digital Assets. Nothing in section 502(b) requires a debtor to reject its leases or object to a make-whole claim— in fact, a debtor has a variety of ways it can exercise its business judgment to resolve a claim.  If Congress had intended to restrict a debtor's ability to provide creditors with restitution, it would

---

proofs of claims, nor Bankruptcy Rule 3001, contain any requirement that a proof of claim be limited to "lawful currency of the United States."  Indeed, the phrase "in lawful currency of the United States" does not appear anywhere else in the Bankruptcy Code at all, nor the Bankruptcy Rules.  So a proof of claim may be filed in something other than "lawful currency of the United States," whether that be foreign currency, property, or anything else.  And under section 502(a), such a claim would be deemed allowed absent an objection.

[115]     Distribution Principles at 2–9.

[116]     *See In re Asia Glob. Crossing, Ltd.*, 404 B.R. 335, 341–43 (S.D.N.Y. 2009) (explaining that a breach of contract claim may be valued as "expectation damages or restitution for the benefits she conferred on the other party," and holding that plaintiff was entitled to recover damages measured as the value of the benefit the debtor's estate had unjustly retained).  Indeed, it is clear that restitution may consist of "a return or restoration of what the defendant has gained in a transaction," which "may be a return of a specific thing or . . . a money substitute for that thing." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 810 (2d Cir. 2023), cert. denied, 144 S. Ct. 352 (2023). And, while the ultimate validity of the fraud allegations against the Debtors are not at issue here, courts in this Circuit have frequently recognize that, "[e]specially where, as here, there are allegations of fraud, restitution is particularly appropriate." *Dallemagne v. Khan*, No. 19-CV-7934 (JGK) (OTW), 2020 U.S. Dist. LEXIS 217282, at *5 (S.D.N.Y. Nov. 18, 2020); *see, e.g.*, *Martinez v. Accelerant Media, LLC*, No. 20-CV-9366 (GBD) (OTW), 2024 U.S. Dist. LEXIS 10232, at *12 (S.D.N.Y. Jan. 19, 2024) (recommending full restitution of payments induced by fraudulent misrepresentations and noting that "investors in a fraudulent enterprise . . . are entitled to claims for restitution" (citing *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 262 (Bankr. S.D.N.Y. 2010)); *Young v. Rosenberg*, No. 14-cv-9377, 2017 WL 3267769, at *2 (S.D.N.Y. Aug. 1, 2017) (restitution damages are appropriate "in a case that smacks of fraud").

[117]     DCG does not object on the ground that the Claims are denominated in Digital Assets—its objection is limited to the argument that section 502(b) *requires* the Debtors to cap recoveries at the U.S. dollar value of the Digital Assets as of the Petition Date.

have included an express limitation among those specifically enumerated in section 502(b) disallowing any non-dollar-denominated claims that exceed the U.S. dollar equivalent of such claims as of the Petition Date. For example, sections 502(b)(6) and (7) expressly provide that certain claims related to rejections of real property leases or damages claims brought by employees for termination are limited based on express valuation methodologies, which language would be unnecessarily duplicative if already contained in section 502(b). Neither the plain text of section 502(b), nor any decisions of other courts in this District require such a result. It is undisputed that the Distribution Principles provide restitution by capping creditors recoveries at the total quantity of the Digital Assets they were owed as of the Petition Date.[118] Exercising their business judgment, the Debtors here have determined to provide in-kind distributions to creditors up to the full quantity of Digital Assets they were owed as of the Petition Date, rather than liquidate all of their assets to U.S. dollars.[119]

49.     For the foregoing reasons, DCG lacks standing to object to the Distribution Principles, but, even if DCG did have standing, DCG's objections to the Plan and Distribution Principles under the theory that either violates section 502(b) of the Bankruptcy Code are

---

[118]    *See* Hr'g Tr. 208:16–21, Feb. 27, 2024 (B. Geer) ("The *quantity* is the cap" (emphasis added)). And, because the Debtors currently have a coin shortfall, creditors will receive less than the full quantity of coin they are owed. Geer Decl. ¶¶ 28–30.

[119]    The Court does not find persuasive DCG's reliance on the decisions made in the chapter 11 cases of other cryptocurrency business in this and other Districts. There is no evidence in the record that the Debtors ever intended to limit recoveries to the Petition Date value of claims, including any deal in principle reached with respect to prior iterations of the Plan. *Supra* ¶ 2–3. To take one example, Judge Dorsey's statements in during a January 31, 2024 hearing in *In re FTX Trading Ltd.* are not relevant to the issues before this Court. *See* Jan. 31, 2024 Hr'g Tr., *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.) ("FTX Hr'g Tr."). First, Judge Dorsey was ruling on an omnibus motion to estimate millions of claims asserted in by holders of hundreds of different cryptocurrencies and other digital assets, which the FTX debtors sought to estimate in U.S. dollars. FTX Hr'g Tr. 85:1–5. Second, unlike the Plan and Distribution Principles here, which seek to maximize in-kind returns to creditors, the FTX debtors' plan "is premised on providing U.S. dollar recoveries to creditors" and, as such, there was never a scenario in which the FTX debtors ever intended to make any in-kind distributions. *See* FTX Hr'g Tr. 83:10–19, 84:16¬20. Accordingly, Judge Dorsey was never asked to determine whether section 502(b) requires a cap on in-kind recoveries, and never made any such determination.

overruled.  Consequently, the Plan also satisfies sections 1129(a)(1), 1129(a)(3), 1129(a)(7), and

1129(b) of the Bankruptcy Code, and DCG's objections on those grounds are similarly overruled

as well.[120]

      D.    <u>The Plan Complies with Applicable Non-Bankruptcy Law and Other Provisions of
the Bankruptcy Code</u>

      i.    <u>The Plan Was Proposed in Good Faith</u>

     50.    The Plan has been proposed in good faith pursuant to section 1129(a)(3).

Section 1129(a)(3) "requir[es] a showing that the plan was proposed with 'honesty and good

intentions.'"[121]  Thus, a plan contravenes the "good faith" requirement only if a debtor failed "to

comply with the key duties—the requisite care, disinterestedness and good faith" when negotiating

its terms, but does not authorize a court "to dictate the *means* to achieve that objective, nor . . . to

substitute its business judgment as to the appropriate means for that of a board."[122]

     51.    As an initial matter, the Plan is driven by the Debtors' business decision to

maximize the return to creditors of the Digital Assets lent—a goal that is well-intentioned and

anything but nefarious.  In addition, the Plan is the result of months of good-faith, arm's-length

negotiations between the Debtors and a wide assortment of parties in interest in these cases.[123]

The Debtors have undertaken negotiations with DCG and various creditors on a "near continuous

basis since December 2022."[124]  Notably, the Debtors negotiated and filed several iterations of the

chapter 11 plan based on feedback received from various creditor groups.[125]  In connection with

---

[120]     *See* DCG Obj. ¶¶ 25–29, 54–65, 84, 87–89.

[121]     *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (citations omitted).

[122]     *In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 n. 58 (Bankr. S.D.N.Y. 2003).

[123]     *Supra* ¶¶ 1–2; Hr'g Tr. 212:4–24, Feb. 26, 2024 (P. Aronzon).

[124]     Geer Decl. ¶ 7.

[125]     *See* Aronzon Decl. ¶ 104; *supra* ¶ 2.

the Plan negotiation process, the Debtors participated in multi-day mediation sessions, across multiple months, with DCG, the Committee, the Ad Hoc Group, Gemini, and other parties in interest, aimed at resolving a wide range of disputes between the parties.[126] DCG has participated at every step of this process.[127] The agreement-in-principle with DCG announced in August 2023 did not reflect any cap on crypto-denominated claims. Rather, what was contemplated was that creditors would receive the value of what DCG provided under the terms of the new debt, some of which was denominated in Digital Assets.[128] It is therefore not appropriate for DCG to claim that the Debtors acted in bad faith by proposing a Plan that was entirely consistent with all the parties' prior discussions. Moreover, the Plan is supported by all creditor constituencies.[129] Thus, there is ample support that the Plan "was filed in a subjectively good-faith effort to maximize recoveries of all stakeholders by making the best of a difficult commercial situation."[130] DCG's conclusory statements to the contrary are plainly contradicted by the evidence.[131]

52. The Plan does not impermissibly alter DCG's rights as an equity holder, nor does it wrongfully exclude DCG from certain rights over the wind-down.[132] The Plan is effectively a liquidating plan, and the Wind-Down Debtors will exist solely to pursue causes of action against DCG and other related parties in an effort to pay creditors in full in kind in accordance with their contractual rights. The Plan provides that DCG will not receive any distribution on account of its

---

[126]    *Supra* ¶ 2.

[127]    *See* Hr'g Tr. 211:24–212:8, Feb. 26, 2024 (P. Aronzon) ("[H]onestly, DCG has been involved daily, weekly, monthly. They're well-represented, they have great financial assistance, they're very smart guys and they climbed all over every issue in this case and then some."); *supra* ¶ 2.

[128]    *See supra* ¶ 2.

[129]    *See* Amended Voting Report.

[130]    *In re JPA No. 111 Co., Ltd.*, No. 21-12075 (DSJ), 2022 WL 298428, at *9 (Bankr. S.D.N.Y. Feb. 1, 2022).

[131]    *See supra* ¶¶ 1–5.

[132]    DCG's objection on the grounds that its rights are conditioned on the issuance of a Final Order declaring all creditor claims Unimpaired is also overruled. *See* DCG Obj. ¶ 80-82.

equity interests in GGH until all Holders of Allowed Claims have been paid in full under the Distribution Principles and that DCG will continue to hold the equity in GGH for administrative convenience.  As such, unless and until those claims have been paid in full, the Plan limits DCG's rights vis-à-vis its interests in GGH.  One of those limits is a provision that potential members of the New Board shall be limited to those identified on a list of candidates selected by the Committee, with the consent of the Ad Hoc Group and in consultation with the Debtors.  This is a standard mechanism for ensuring that the Wind-Down Debtors are operated for the benefit of creditors until they are paid in full, and does not amount to a violation of section 1123(a)(6) or (7).  Likewise, it is permissible for the Plan to exclude DCG from certain rights over the wind-down, including the selection of the PA Officer and the Litigation Oversight Committee because those parties will be involved in making decisions concerning the assertion and prosecution of claims against DCG and related parties, while also responding to various continuing regulatory inquiries related to DCG and related parties.[133]

53.    Further, the Plan provides that DCG's rights will spring back upon all creditors being paid in full.  It would contravene the basic principles underlying the Bankruptcy Code to permit the equity holder in insolvent, liquidating entities to continue to exercise control over the entities—potentially to the detriment of their creditors. Once creditors are repaid in full, DCG's rights as equity holder will spring back.  Though DCG argues that this could "effectively

---

[133]    *See In re Mesa Air Group, Inc.*, No. 10-10018 (MG), 2011 Bankr. LEXIS 3855, *7, 32–33 (Bankr. S.D.N.Y. Jan. 20, 2011) (finding that new board comprised of six members proposed by an unsecured creditors committee and three members proposed by debtors was not at odds with section 1123(a)(7)).  DCG argues that these restrictions are inconsistent with Delaware public policy, which provides that a "fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).  However, DCG has voting rights even prior to payment in full of creditors because it can choose three directors from a slate of five.  DCG points to no prohibition in Delaware law against the minor limitation imposed by this provision.  In addition, DCG argues that it should have consent and consultation rights over the wind-down because it could receive distributions under the Plan.  Again, there is no evidence to support this contention in the record given the sizeable governmental claims that sit above DCG's claims. *See supra* ¶ 35.

constitute a permanent injunction against DCG, which could have tax, liability, and other consequences for DCG," there is no evidence of such consequences in the record.

54.     There is also no evidence in the record to support DCG's contention that the Setoff Principles were developed and proposed in bad faith, through collusion, or that the Debtors breached their fiduciary duties in connection with the Setoff Principles.[134]  The creditors listed on Exhibit 1 to the Setoff Principles (the "Setoff Claimants") represent the "full universe of creditors subject to the Setoff Principles for which the exercise of setoff rights would result in a net claim against the Debtors."[135]  There is no evidence that the Debtors, through the Setoff Principles or otherwise, have impermissibly sought to benefit any Setoff Claimant over any other creditor, nor is there any evidence that the Debtors have proposed the Setoff Principles in order to improperly engender support for the Plan.  Indeed, testimony at trial disclosed that if the Setoff Principles were not approved and creditors assert an entitlement to a current valuation of the collateral they deposited with the Debtors, such creditors' net claims against the Debtors would increase.[136]  Additionally, creditors in every Class voted overwhelmingly in support of the Plan.[137]

55.     The Bankruptcy Code does not dictate that a specific valuation methodology be applied to value the Setoff Claimants' and Debtors' mutual obligations.  Instead, this Court has discretion to apply an equitable, case-specific valuation methodology that takes into account the specific facts and circumstances of the Chapter 11 Cases.[138]  DCG does not dispute

---

[134]     *See supra* ¶ 19.

[135]     Sciametta Decl. ¶ 13.

[136]     *See* Hr'g Tr. 185:10–186:6, Feb. 27, 2024 (J. Sciametta).

[137]     *See* Amended Voting Report.

[138]     *See, e.g., Houston SportsNet Fin., L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l Sports Network, L.P.)*, 886 F.3d 523, 528–32 (5th Cir. 2018) (holding that courts have broad discretion to set the appropriate date for valuation of collateral).

this standard.[139]  Here, the Setoff Principles represent the Debtors' position on what they believe, in consultation with their advisors, was an appropriate and equitable approach to address the obligations owed to and by the Setoff Claimants, given the myriad of legal and factual issues at issue in these cases.  For at least three reasons, the specific facts and circumstances of these cases support the Debtors' selection of the Petition Date as the proper valuation date for the Setoff Principles.  <u>First</u>, the valuation methodology in the Setoff Principles is logically consistent.  Each of the loan receivables, loan payables and collateral subject to the Setoff Principles are valued as of the Petition Date.  <u>Second</u>, the consistent use of Petition Date pricing is fair and equitable.  By using the same Petition Date pricing to value the mutual obligations of both the Setoff Claimants and the Debtors, the Setoff Principles distribute the substantial appreciation in the value of digital assets since the Petition Date to both the Setoff Claimants (on their alleged obligations to the Debtors) and to the Debtors' estates (on their alleged obligations to the Setoff Claimants).  <u>Third</u>, the Debtors could have employed a number of different valuation methodologies that would have allocated more of the appreciation in Digital Assets to the Setoff Claimants.[140]  The Setoff Principles, however, do not use those valuation methodologies and instead represent a compromise that strikes a fair balance between the Setoff Claimants and the Debtors' estates.  Thus, the Court finds that the Setoff Principles are fair and appropriate under the facts and circumstances of these cases and represent a sound exercise of the Debtors' business judgment, and any objection to the Setoff Principles is hereby overruled without the need for any further hearing.

---

[139]    Hr'g Tr. 128:25–129:7, 166:11–167:19, Mar. 18, 2024.

[140]    *See* Hr'g Tr. 185:10–186:6, Feb. 27, 2024.

56.    For the foregoing reasons, DCG's objections to the Plan on the basis of section 1129(a)(3) are overruled.[141]

    ii.    <u>DCG's Remaining Arguments Are Overruled</u>

57.    The Plan complies with section 365 of the Bankruptcy Code, as all executory contracts are assumed or rejected in their entirety.  As no individual agreements between the Debtors and any DCG Party are assumed under the terms of the Plan, there is no violation of section 365 with respect to such individual agreements.  Further, the New Governance Documents will control the operations of each of the Wind-Down Debtors, rendering any governance concerns under the previous structure moot.[142]  DCG's objections to the contrary are overruled.[143]

58.    The Debtors' proposed payment of the Ad Hoc Group Restructuring Expenses and the Dollar Group Restructuring Fees and Expenses is consistent with the Bankruptcy Code.  Section 1129(a)(4), together with section 1123(b)(6), contemplate payments to non-estate professionals "as part of a plan of reorganization to be put before creditors for approval."[144] Section 1129(a)(4) specifically "endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual resolution and get a plan approved."[145]  Consequently, as creditors have voted overwhelmingly to support the Plan, including the provision challenged by DCG and the U.S. Trustee, payment of the Ad Hoc Group Restructuring Expenses and the Dollar Group Restructuring Fees and Expenses is permitted under

---

[141]    *See* DCG Obj. ¶¶ 56–86.  Further, for the reasons set forth herein, DCG lacks standing to challenge the Setoff Principles.  *See supra* ¶¶ 33-38.  As discussed elsewhere herein, DCG's argument that the Debtors have breached their fiduciary duty to DCG is similarly overruled.  *See* DCG Obj. ¶¶ 62-65.

[142]    *See* Plan, Art. IV.B.4; New Governance Documents.

[143]    *See* DCG Obj. ¶ 101–103.

[144]    *In re AMR Corp.*, 497 B.R. 690, 695 (Bankr. S.D.N.Y. 2013).

[145]    *Id.*; *see also In re Mallinckrodt PLC*, 639 B.R. 837, 906 (Bankr. D. Del. 2022).

section 1129(a)(4) and section 1123(b)(6).[146]  DCG and the U.S. Trustee's objections to the contrary are overruled.[147]

59.    In the alternative, the Ad Hoc Group Restructuring Expenses and the Dollar Group Restructuring Fees and Expenses meet the "substantial contribution" standard for allowance of administrative expenses under section 503(b)(3)(D).  "To qualify for administrative priority status under section 503, the contribution must be (i) substantial, (ii) directly benefit the estate – and not merely a class of creditors or interest holders – and (iii) not duplicative of services performed by others."[148]  Both the Ad Hoc Group and the Dollar Group have satisfied this standard,[149] and consequently DCG and the U.S. Trustee's objections are similarly overruled on this ground as well.[150]

60.    The Plan does not subordinate the DCG Claims.[151]  The Plan provides merely for a reservation of the Debtors' or the Wind-Down Debtors' rights to seek to subordinate

---

[146]    *See id.* at 696.

[147]    *See* DCG Obj. ¶ 104; *Objection of the United States Trustee to the Confirmation of the Debtors' Amended Joint Chapter 11 Plan*, ECF No. 1202 (the "UST Objection" or "UST Obj.") at 15–18.  The Ad Hoc Group and the Dollar Group have urged approval of Administrative Expense Claims on the basis of section 363 of the Bankruptcy Code as well, Hr'g Tr. 106:6–20, Mar. 18, 2024 (B. Rosen), *Statement of the Ad Hoc Group of Dollar Lenders in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan*, ECF No. 1323 ¶ 10–15, but based upon this Court's ruling that each has satisfied the standard for substantial contribution, the Court need not address that point.

[148]    *In re Synergy Pharms. Inc.*, 621 B.R. 588, 609 (Bankr. S.D.N.Y. 2020).

[149]    *See supra* ¶¶ 5–6.

[150]    *See* DCG Obj. ¶ 104; UST Obj. at 15–18.  Three additional issues raised in the UST Objection remained outstanding as of closing arguments of the Confirmation Hearing: (i) the Plan's proposed exculpation of non-estate fiduciaries; (ii) the "No Liability" provision in Article VI.B.3 of the Plan that exculpates the Gemini Distribution Agent and its Related Parties for certain actions taken directly in furtherance of the performance by the Gemini Distribution Agent of its duties under the Plan after the Effective Date; and (iii) the Plan language enjoining "any Causes of Action solely to the extent released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors," *Letter to the Honorable Sean H. Lane from Jane VanLare, dated March 15, 2024 regarding outstanding objections to the Debtors' Joint Amended Chapter 11 Plan*, ECF No. 1483; UST Obj. 7, 10–11, 16–17.  The Court resolved these issues through colloquy during the Confirmation Hearing.  Hr'g Tr. 264:23–270:7.  For the avoidance of doubt, these are formally overruled.

[151]    *See* Plan, Art. III.K; DCG Obj. ¶¶ 94–95.

the DCG Claims. DCG does not provide any support for why this reservation is improper (or otherwise renders the Plan in violation of any law), and thus DCG's objection on that basis is overruled.[152]

61. Additionally, the Plan does not compel DCG to enter into any specific tax sharing agreement with Genesis Global Holdco or the Wind-Down Debtors. Article IX of the Plan specifies conditions precedent to occurrence of the Effective Date. In contrast, Article IV.B.1, which contains reference to "execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG," merely enumerates the means for implementation of the Plan. Although the Wind-Down Debtors have an obligation to execute and deliver a tax sharing agreement, it is not a condition to Plan effectiveness nor does it impose any obligation related thereto on DCG. DCG does not specify what bankruptcy or non-bankruptcy law Article IV.B.1 of the Plan purportedly violates. Consequently, for the foregoing reasons, DCG's objection is overruled.[153]

62. In addition, section 1129(b) of the Bankruptcy Code is satisfied. Section 1129(b)(1)'s requirement that a plan does not "discriminate unfairly" ensures that a dissenting class does not receive a relative value less than the value given to all other similarly situated classes.[154] A plan will be found to unfairly discriminate in violation of section 1129(b)(1) of the Bankruptcy Code only where similar classes are treated differently without a reasonable basis for the disparate treatment.[155] There is no unfair discrimination where separate classes containing

---

[152]    *See* DCG Obj. ¶¶ 94–95.

[153]    DCG Obj. ¶ 96.

[154]    *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014) (citing *In re Johns-Manville Corp.*, 68 B.R. at 636); *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017) ("[T]he unfair discrimination test assures fair treatment among classes of the same priority level[.]").

[155]    *See Johns-Manville Corp.*, 68 B.R. at 636.

different types of claims or interests are treated differently,[156] and, in any case, each of the voting classes of unsecured creditors has voted in favor of the Plan and consented to its treatment thereunder, so there can be no unfair discrimination among those classes.[157]

63.    A plan is considered "fair and equitable" under section 1129(b)(2)(B)(ii) of the Bankruptcy Code with respect to an impaired, non-consenting class of unsecured claims where no holder of any claim or interest junior to that class "receive or retain under the plan on account of such junior claim or interest any property."[158] With respect to an impaired, non-consenting class of interests, the Bankruptcy Code provides that a plan is fair and equitable where no holder of any interest junior to that class will "receive or retain under the plan on account of such junior interest in any property."[159]

64.    Section 1129(b)'s requirements also are satisfied as to DCG's Interests in GGH. First, the Plan does not unfairly discriminate against DCG. DCG is the sole Holder of the Interests classified in Class 10 for GGH and is not entitled to any recovery under the Plan unless all Allowed Claims against all of the Debtors or the Wind-Down Debtors, as applicable, have been paid in full in accordance with the Distribution Principles. The nature of DCG's Interest is distinct from that of all other GGH Classes—indeed, no other GGH Classes include equity interests at all. In addition, DCG's treatment under the Plan is the same as for the equity Classes for GGC and

---

[156]    *See id.*

[157]    *See, e.g.*, *In re Aegion Pharmaceuticals, Inc.*, 605 B.R. 22, 32-33 (Bankr. S.D.N.Y. 2019) (overruling objection on unfair discrimination grounds because objecting party was classified in a class that voted in favor of the plan and the "'unfair discrimination' and 'fair and equitable' requirements of [the Bankruptcy Code] apply 'with respect to each class of claims or interests that is impaired, *and has not accepted*, the plan.").

[158]    11 U.S.C. § 1129(b)(2)(B)(ii).

[159]    *Id.* § 1129(b)(2)(C)(ii).

GAP. As such, the Plan does not discriminate unfairly with respect to such interests, and DCG's objection on that basis is overruled.[160]

65.    Second, the Plan is fair and equitable as to DCG because there are no interests junior to the DCG Interests. DCG's equity interest is at the bottom of the priority scheme, with no Class below it, and will receive any residual value upon the repayment in full of creditors' allowed claims. Where there is no equity class that is junior to the class in question, the plan is fair and equitable as to such class and the requirement of section 1129(b)(2)(C)(ii) is satisfied.[161] In addition, under the Plan, no senior Class will receive more than they are owed as the Debtors' Digital Asset creditors will not be paid in full under the Plan absent significant litigation and other recoveries on account of the Retained Causes of Action.[162] As such, the Plan is fair and equitable, and DCG's objections to the contrary are overruled.[163]

66.    The Plan also satisfies the best interests test with respect to all impaired classes as is amply established by the Liquidation Analysis prepared by the Debtors' financial advisors.[164] As an equity holder, DCG would not receive any recoveries in a hypothetical liquidation given the $33 billion in subordinated claims asserted by Governmental Units and between $4.75 billion to $5.46 billion in Claims denominated in Digital Assets that have higher priority than DCG's equity interest.[165] Because all creditors and interest holders, including DCG on account of its fiat or alt denominated claims, receive at least as much under the Plan as they

---

[160]    *See* DCG Obj. ¶¶ 25–46.

[161]    *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) ("Because the estates are insolvent, no creditor class is receiving more than 100% of its claims and no class below Equity (there is no such class) will receive or retain property under the Plan, the Plan is fair and equitable with respect to Equity.").

[162]    *See* Aronzon Decl. ¶ 128; Hr'g Tr. 204:19–205:9, Feb. 27, 2024 (B. Geer).

[163]    *See* DCG Obj. ¶¶ 25–46, 53.

[164]    *See supra* ¶ 18.

[165]    *See supra* ¶ 35; Hr'g Tr. 201:9–15, 202:8–14, Feb. 27, 2024 (B. Geer).

would in liquidation, the Plan satisfies section 1129(a)(7).  For the foregoing reasons, DCG's objection is overruled.[166]

## II.    **The CCAHG's Objection Is Overruled**

A.    The CCAHG Claims Are Not Administrative Expense Claims[167]

67.    In order to receive administrative expense priority pursuant to 11 U.S.C. § 503(b)(1)(A), a claim must meet two criteria:  (1) it must arise from a postpetition transaction[168] and (2) the transaction underlying the asserted claim must provide a "concrete, discernable benefit" to the estate.[169]

68.    With respect to the first criterion, all of the transactions between the CCAHG Members and GGC took place prior to the Petition Date.[170]  As such, the CCAHG Claims are pre-petition claims.[171]  No party contends that the CCAHG Members and the Debtors engaged in any post-petition loans or other exchange of property on or after the Petition Date.  The auto-renewals of the CCAHG MBAs do not transform the MBAs into post-petition transactions, nor does their operation act as a standalone post-petition transaction.  The auto-renewal of a contract with a debtor in chapter 11 merely continues the existing, pre-petition agreement between two parties, including all outstanding obligations thereunder.[172]

---

[166]    *See* DCG Obj. ¶¶ 87–88.

[167]    The CCAHG did not propose any findings of fact or conclusions of law with respect to this issue, and as such it is not clear to the Court whether the CCAHG continues to press this argument.

[168]    *See In re Bethlehem Steel Corp.*, 479 F.3d 167, 172–73 (2d Cir. 2007) (holding that administrative expense priority can only arise from postpetition transaction).

[169]    *See In re CIS Corp.,* 142 B.R. 640, 644 (S.D.N.Y. 1992) (holding no administrative expense status because "estate derived no concrete, discernible benefit from its actual use of the computer equipment").

[170]    *See*  JX-005-027, 029, 031-035, 037-052.

[171]    *See Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) ("[T]he clear weight of case law in this Circuit . . . recognizes that contract-based bankruptcy claims arise at the time the contract is executed.").

[172]    *See Fin. of Am. LLC v. Mortgage Winddown LLC (In re Ditech Holding Corp.)*, 630 F.Supp.3d 554, 564 & n.44 (S.D.N.Y. 2022) (holding postpetition renewal of prepetition agreement does not necessarily constitute

69.     The CCAHG's cited caselaw providing that an administrative priority claim arises only where a debtor has induced a creditor to take part in a transaction does not support the argument the CCAHG advances. For example, the court in *In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010), emphasized that "[t]he services performed by the claimant must have been 'induced' by the debtor-in-possession, *not the prepetition debtor*" (emphasis added). Taking for granted that any transaction must have been induced by one party or the other, the *Old Carco* court emphasizes that the transaction must have been induced *postpetition*. The record contains no evidence of inducement of any sort that took place postpetition. There is no evidence that the Debtors induced the CCAHG Members to effectuate the auto-renewals of the MBAs—indeed, it is difficult to understand how either party might have "induced" an automatic renewal, which, by definition, takes place without any action by the parties.[173]

70.     With respect to the second criterion, there is no evidence that the Debtors' estates derived a benefit from the retention of the CCAHG Members' loaned assets during these Chapter 11 Cases.[174]

---

postpetition transaction and that bankruptcy court "was correct to suggest that an '*automatically* renewed service agreement' would not result in a postpetition breach claim under an executory contract"); *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 570 (2d Cir. 1991) ("Renewal normally involves a continuation of the relationship on essentially the same terms and conditions as the original contract.") (citation omitted); *In re Country Club Ests. at Aventura Maint. Ass'n, Inc.*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998) (collecting cases and "adopt[ing] the majority position that a contract which is renewed [postpetition] pursuant to an automatic renewal provision is merely a continuation of the original contract" and holding that auto-renewal does not constitute a separate transaction or render the prepetition contract a postpetition transaction).

[173]     The CCAHG purports to cite *Lebetkin v. Giray*, No. 20-1374, No. 20-4229, 2021 WL 2965323, at *3 (2d Cir. July 14, 2021) for the factors that support a finding of inducement, but the factors that the CCAHG quotes are expressly described at the cited pincite as the factors that support a claim in quantum meruit. The CCAHG does not explain what actions by the Debtors supposedly induced the renewal of the MBAs or how inducement is applicable to an auto-renewal of a contract, nor does the CCAHG cite any authority suggesting that the concept of inducement is even relevant to auto-renewal clauses.

[174]     JX-24, 29, 32-35, 37-45 47-52; *cf. In re Bradlees Stores, Inc.*, No. 02 Civ. 0896 (WHP), 2003 WL 76990, at *2 (S.D.N.Y. Jan. 9, 2003) (finding no "actual, postpetition benefit" because claim arose from prepetition contract and no merchandise was accepted postpetition), *aff'd*, 78 F. App'x 166 (2d Cir. 2003); *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW), 2019 WL 4555990, at *10 (Bankr. S.D.N.Y. Sept. 19, 2019) (holding that automatically renewing letters of credit provided no benefit to the estate because any benefit flowed from prepetition agreements).

71.     To the extent the loaned assets increased in value, such increase does not constitute a benefit to the estate for these purposes.[175]  Because the Plan is a liquidating plan, any increase in value of the loaned assets, together with any increase in value of assets borrowed from other creditors, will be made available for distribution to the Debtors' creditor body, including the CCAHG Members, in accordance with the absolute priority rule.  Moreover, the CCAHG Claims are claims for the loaned assets themselves, and, therefore, there is no benefit to the estate based on the value of those assets.

B.      **The Plan Properly Values the CCAHG Members' Claims Because Section 562(a) Does Not Apply**

72.     Section 562(a) applies to the rejection of certain executory contracts and the acceleration, termination, or liquidation of such contracts.[176]  Accordingly, section 562(a) provides no basis for determining that non-executory contracts should be subject to rejection, nor that contracts that are not rejected, accelerated, terminated, or liquidated should be entitled to the treatment section 562 lays out.[177]  Because the text of section 562 is unambiguous, the analysis starts and ends with section 562's requirements.[178]  The CCAHG does not contend that the CCAHG Agreements have been or will be accelerated, terminated, or liquidated; instead it argues

---

[175]    *Cf. In re ICS Cybernetics, Inc.*, 111 B.R. 32, 38 (Bankr. N.D.N.Y. 1989) (denying administrative expense status because "[t]he keeping of inventory in order to assure availability to potential customers . . . does not typically rise to the level of actual use" required for granting administrative priority status).

[176]    *See* 11 U.S.C. § 562(a).  Pursuant to the stipulation between the parties, the Court assumes without deciding that the CCAHG Agreements are among the types of agreements covered by section 562.  *See Limited Stipulation and Order Between the Debtors and the Crypto Creditor Ad Hoc Group*.  ECF 1216.

[177]    *See* 11 U.S.C. § 562.

[178]    *See In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 96 (2d Cir. 2019) ("The Supreme Court has repeatedly held that where . . . courts are interpreting the meaning of a statutory provision, they should not allow extrinsic evidence of Congressional purpose to alter the plain meaning of the statute.").  For this reason, the public policy rationales that the CCAHG puts forth in support of its view that section 562(a) should apply to their claims, despite the statute's facial inapplicability, are irrelevant.  In any event, the Court has considered the CCAHG's policy concerns and finds them to be without merit.

that the CCAHG Agreements are executory and will be rejected by operation of Article V.A. of the Plan.

73.     Courts in this Circuit generally apply one of three tests to determine whether a contract is executory: (i) the "some due performance" test, which requires both parties to have remaining unperformed obligations, (ii) the Countryman test, which requires both parties to have remaining performance obligations that would constitute a material breach of the contract if not performed, and (iii) the "functional" test, which asks whether the debtor's estate would benefit from the hypothetical assumption or rejection of the contracts.  The CCAHG fails to meet its burden of proving that the CCAHG Agreements meet any of the three tests: (i) there is no remaining performance due to GGC by the CCAHG Members as lenders (failing the "some due performance" test), (ii) there are no remaining obligations by the CCAHG Members that would "constitute a material breach" of the contract (failing the Countryman test), and (iii) the estate would not benefit from the hypothetical assumption or rejection of the CCAHG Agreements (failing the "functional" test).[179]

74.     As relevant to the first two tests, it is undisputed that the Debtors continue to have material unperformed obligations under the CCAHG Agreements—namely, the obligation to return the loaned assets.  The CCAHG Members, by contrast, have performed all their material obligations under the contracts.  All obligations of the CCAHG Members that remain unperformed are below the materiality threshold applied by courts in this Circuit and elsewhere for purposes of determining whether a contract is executory.  None of these obligations, if breached, would

---

[179]     *See In re Columbia Gas Sys., Inc.*, 146 B.R. 106, 109-10 (D. Del. 1992) (holding non-debtor seeking to prove contract is executory bears burden) *aff'd sub nom. In re Columbia Gas Sys. Inc.*, 50 F.3d 233 (3d Cir. 1995).

frustrate the fundamental purpose of the CCAHG Agreements, which is for creditors to loan assets to the Debtors and the Debtors to repay such loans in-kind with interest.[180]

75.     The CCAHG lists nineteen provisions of the CCAHG Agreements that they describe as "substantial, material obligations."[181]  Eight of these provisions are obligations solely on the part of GGC and are therefore irrelevant.[182]  Of the eleven obligations remaining, five "obligations" on the part of the lenders do not rise to the level of materiality that courts require to render a contract executory.[183]  The six remaining purported executory terms are not obligations at all, or do not appear in the MBAs.[184]

76.     The fact that a CCAHG Member must furnish a Digital Currency Address (as defined in the MBAs) to receive repayment on a digital asset loan, MBA § II(c)(i), is not a contractual requirement at all.  Indeed, the MBAs expressly provide that, if on the relevant Maturity Date, Recall Delivery Day, or Redelivery Day, a CCAHG Member has not provided a Digital Currency Address, the relevant loan will "become an Open Loan . . . and no additional Loan Fees shall be accrued."[185]  The CCAHG argues that this conversion to an Open Loan would

---

[180]     *See supra* ¶ 23; *see Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) ("[A] breach is material if it is so substantial as to defeat the purpose of the transaction or so severe as to justify the other party's suspension of performance.") (citations omitted).

[181]     *See* CCAHG Obj. ¶ 54.

[182]     *See , e.g.,* JX-005 §§ II(b), II(c)(i), III(b), III(a), II(c)(ii), II(e), III(e), XVII.

[183]     *See , e.g.,* JX-005 §§ XII (confidentiality), XXII (indemnification), II(c)(i) (maintenance of account), XVII (non-assignment), XI (mandatory arbitration); *see also In re Spectrum Info. Techs., Inc.*, 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996) (confidentiality clause in separation agreement "do[es] not rise to a level of material future performance" and therefore contract is not executory); *see also Anchor Resol. Corp. v. State St. Bank & Trust Co. (In re Anchor Resol. Corp.)*, 221 B.R. 330, 337 (Bankr. D. Del. 1998) (holding confidentiality clause not sufficient to render contract executory); *Emps.' Ret. Sys. of the State of Haw. v. Osborne (In re THC Fin. Corp.)*, 686 F.2d 799, 804 (9th Cir. 1982) (holding indemnification agreement not to be executory); *Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1212 (10th Cir. 2009) (holding cooperation clause does render insurance agreement executory); *In re Monge Oil Corp.*, 83 B.R. 305, 309 (Bankr. E.D. Pa. 1988) (holding arbitration clause does not render contract executory).

[184]     *See , e.g.,* JX-005 §§ IV(e), VIII(a), IV(c), VI, II(c)(ii).

[185]     *Id.*

"defeat the purpose of the entire transaction."[186]   The Court disagrees.   The purpose of the transactions as evidenced by the relatively simple recitals of each CCAHG MBA, is to effectuate transactions whereby the CCAHG Members loan digital assets to GGC and receive fees in exchange for such loans.[187]   It happens that repayment of such loans cannot take place in the absence of a Digital Currency Address belonging to the CCAHG Member, just as a dollar-denominated loan cannot be repaid without bank routing information and the existence of a bank account in the control of the lender.   In the event the repayment details are not provided, (i) the conversion of the relevant loan into an open-term loan merely ensures that the contractual relationship between the parties does not terminate before GGC is able to return the loaned assets; and (ii) the provision that loan fees shall cease accruing ensures only that a lender cannot unilaterally force GGC to continue paying for the privilege of retaining assets that it is unable to return, beyond the agreed maturity of the loan.[188]   Neither of these provisions defeats the purpose of the transaction; they merely preserve the status quo until the lender completes the necessary steps to receive their repayment.

77.   Moreover, the CCAHG MBAs do not, by their terms, require the creation of a Digital Currency Address at all, and the operative provisions of the CCAHG MBAs make no mention of coin wallets; the CCAHG strays even further from the contract language where they suggest that the MBAs require any specific *method* of creating a Digital Currency Address or coin wallet.   There are no such requirements.

---

[186]      *See Genesis Crypto Creditors Ad Hoc Group's Proposed Findings of Fact and Conclusions of Law* (the "CCAHG Findings"), ECF No. 1516, ¶ 31 (citing *In re Bradlees Stores, Inc.*, No. 02 Civ. 0896 (WHP), 2003 WL 76990, at *2 (S.D.N.Y. Jan. 9, 2003)).

[187]      *See supra* ¶ 23.

[188]      *See, e.g.*, JX-005 § II(c)(1).

78.     Because the Court finds that the CCAHG MBAs do not *require* the creation of a Digital Currency Address at all, it need not reach the CCAHG's argument that the creation of such Digital Currency Addresses is sufficiently burdensome on the CCAHG Members as Lenders so as to impose a material obligation on them.  In any event, the Court can easily dispose of the CCAHG's claim that Dr. Jassin provided unrebutted testimony on the purportedly necessary steps to create a Digital Currency Address because Dr. Jassin himself rebutted his own testimony, conceding that there are multiple means of creating a Digital Currency Address.[189]

79.     The CCAHG MBAs also contain numerous obligations that are purely contingent, and for which the triggering events have not occurred (and the parties control whether any such triggering events occur).[190]  These include the obligations of the parties in the event any of the underlying loans are collateralized (which none were), and the obligations of the parties in the event of a "Hard Fork" or an "Airdrop."[191]  The fact that these purely contingent obligations

---

[189]     *Compare* Hr'g Tr. 248:24–249:6, Feb. 27, 2024 (B.Jassin), *with* Hr'g Tr. 18:9–19:5, Feb. 28, 2024 (B. Jassin).

[190]     In its briefing, the CCAHG suggests that the Debtors mischaracterized the relevant holding of *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013), pointing to three "contingent obligations" analyzed by the court "in its application of the executory contract test."  The first two of these were provisions of aircraft purchase agreements relating to (1) a buyer's indemnification obligation and (2) a requirement to assign rights upon the buyer's failure to comply with certain export control regulations.  The court observed that "[o]rdinarily, the materiality of these promises would be a question of fact requiring a trial," but that "[h]ere, the parties contractually agreed that the buyer's material breach of any term, even an immaterial term," would entitle the purchaser to terminate.  *Id*.  No such provision exists in the CCAHG MBAs, and the *Hawker Beechcraft* court's observations are therefore irrelevant to this Court's analysis.  The third contingent obligation to which the CCAHG points in accusing the Debtors of mischaracterizing *Hawker Beechcraft* is a provision of an entirely different contract, a customer support agreement, that the court observes is executory for the reason the CCAHG cites (an obligation of the buyer or customer to pay an Excessive Landing Charge if certain events took place), *as well as for several other reasons*, including the buyer's obligations to submit reports, pay other charges, maintain a logbook, and other obligations. *Id.* at *279.  The *Hawker Beechcraft* court does not analyze whether the obligation to pay the Excessive Landing Charge is a contingent obligation and does not describe it as such, and in any event does not rely on this single obligation in its single-paragraph discussion of why the customer support agreements are executory.

[191]     JX-24, 29, 32–35, 37–45 47–52.  In the event of a Hard Fork or an Airdrop, the CCAHG Members are not obligated to take any action absent agreement of the parties.  Section V(b) provides that, under such circumstances, "Borrower and Lender *may agree* . . . either (i) to terminate the Loan . . . or (ii) for Lender to manage the Hard Fork.") (emphasis added).  If the parties do not agree to option (i) or (ii), GGC will remain in possession of the assets and therefore, by default, will manage the Hard Fork, requiring no action on the part of the CCAHG Member as Lender.  As such, any obligation of a CCAHG Member in connection with a Hard Fork is purely voluntary and contingent on agreement by both the Lender and the Borrower.

remain unperformed by the CCAHG Members does not render the contracts executory.[192] Therefore, the CCAHG Agreements are not executory under the "some performance" or the "Countryman" test.

80.     Analysis of the CCAHG Agreements using the "functional approach" to determine whether a contract is executory yields the same result:  the estate would derive no value from rejecting or assuming them, so they cannot be considered executory for this purpose.  On the one hand, depending upon asset values as of the Plan Effective Date, rejection by the Debtors of the CCAHG Agreements could necessitate a higher payment than the partial, in-kind recovery contemplated by the Distribution Principles; payments to the CCAHG Members beyond what is contemplated by the Distribution Principles provides no benefit to the estates.  On the other hand, the hypothetical assumption of the CCAHG Agreements would require the Debtors to cure all defaults, which would mean returning 100% of the loaned assets, and which is by definition not a benefit to the estates.

81.     The presence of an automatic renewal clause does not change this analysis, because such a clause standing alone is insufficient to render a contract executory.[193]

82.     The Debtors' identification of the CCAHG Agreements as executory contracts on their Schedule G of their Schedules and Statements of Financial Affairs does not render the CCAHG Agreements executory, because whether a contract is executory is a matter of

---

[192]     *See BNY, Cap. Funding LLC v. US Airways, Inc.*, 345 B.R. 549, 553 (E.D. Va. 2006) (contract granting option to debtor not executory because debtor could freely choose not to exercise and not perform); *In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d 702, 706 (9th Cir. 1998) (contingent obligations not executory unless performance is due as of the petition date); *In re Monge Oil Corp.*, 83 B.R. 305, 307 (Bankr. E.D. Pa. 1988) (brokerage agreement not executory where "debtor was free to invest corporate funds with [broker] but had no obligation to do so"); *see also see also* JX-005, 007–008, 012, 017, 020, 022, 025–026, 046 § II(a) (granting either party the right to refuse future loans in their "sole and absolute discretion").

[193]     *See In re Windstream Holdings, Inc.*, 634 F. Supp. 3d 99, 108 (court could not assess whether the agreements "were *the sort of automatically renewing contracts that would be considered executory*.") (emphasis added); *see also In re Baird*, 567 F.3d 1207, 1212 (10th Cir. 2009) (automatically renewing insurance policy not executory).

law, not fact, and a debtor's characterization of a contract on Schedule G is in any event not an admission of fact.[194]  In fact, the Global Notes to GGC's schedules make clear that "[l]isting a contract or agreement on Schedule G does not constitute an admission that such contract is an executory contract . . . ."[195]

83.     The CCAHG Agreements are not executory under each of the three tests for executory contracts.  Thus, they are not subject to the provisions of the Plan governing the rejection of executory contracts and, accordingly, not subject to section 562.  Therefore, the CCAHG Claims are properly valued pursuant to the Plan and Distribution Principles.[196]

## III.     The Plan's Releases and Exculpation Provisions Are Appropriate and Are Approved

84.     Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a debtor may grant releases under a chapter 11 plan as "the settlement or adjustment of any claim or interest belonging to the debtor or the estate."[197]  The settlement must not "fall below the lowest point in the range of reasonableness."[198]  Further, the grant of releases must be found to be a "valid exercise of [the debtor's] business judgment";[199] however, the court need not conduct a "mini-trial" to

---

[194]     *See In re Calpine Corp.*, No. 05–60200 (BRL), 2008 WL 3154763, at *7 (Bankr. S.D.N.Y. Aug. 4, 2008) (holding that inadvertent listing on Schedule G is not an admission because "the determination of whether a contract is executory, is an issue for the Court to decide").

[195]     ECF No. 146, ¶ 3(r).

[196]     Even if the Court were to determine that the CCAHG Agreements are executory, it is unclear whether that would be properly considered an objection to the Plan, rather than a dispute regarding the costs of cure or quantum of rejection damages.  On that score, the Court notes that the Debtors have reserved the ability to seek to reject executory contracts as of a date other than the Plan's effective date, Plan Art. V.A, and have noted that any rejection damages arising from rejection of the CCAHG Agreements would be treated as Class 3 claims.  *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code*, ECF No. 1330, ¶ 58 n.52.  Because the Court finds the CCAHG Agreements are not executory, it need not address these issues..

[197]     *See In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).

[198]     *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

[199]     *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009).

decide whether such releases are within the best interests of the estates, and "the settlement need not be the best that debtor could have obtained."[200]   While the court must exercise its own independent judgment, "the judge is not required to assess the minutia of each and every claim."[201]

85.     The releases contained in Article VIII of the Plan (i) are an essential component and means of implementing the Plan; (ii) are an integral and non-severable element of the Plan and the transactions incorporated therein; (iii) confer substantial benefits on the Debtors' Estates; (iv) are in exchange for good and valuable consideration provided by the Released Parties; (v) are a good-faith settlement and compromise of the Claims and Causes of Action released by the Plan; (vi) are materially beneficial to and in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (vii) are fair, equitable and reasonable; (viii) are given and made after due notice and opportunity for hearing; and (ix) are a bar to the Debtors asserting any Claim or Causes of Action released pursuant to Article VIII of the Plan.[202]

86.     The grant of the Debtor Releases is an exercise of the Debtors' sound business judgment and an appropriate settlement pursuant to section 1123(b)(3)(A).  The Debtor Releases represent a "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[203]   The Released Parties have provided, and will continue to provide, substantial benefits to the Estates and Wind-Down Debtors through contributions throughout these cases and

---

[200]    *See In re NII Holdings, Inc.*, 536 B.R., at 99 (citation omitted).

[201]    *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).

[202]    *See* Plan Supplement, ECF No. 1117, Ex. F; Aronzon Decl. ¶ 83, Ex. 2, Disclosure Statement, Sec. III.W.

[203]    *See In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) (holding that standards for approval of settlement under § 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  The CCAHG relies on two Third Circuit cases regarding "substantial contribution" of the released parties.  *See* the CCAHG Findings ¶ 60.  As routinely recognized by courts in the Second Circuit, the Debtors need only show the releases are a "valid exercise of the Debtors' business judgment" in exchange for "good and valuable consideration."  *In re Residential Cap., LLC*, No. 12–12020 (MG) 2013 WL 12161584, at *15 (Bankr. S.D.N.Y. Dec. 11, 2013); *see* Plan Supplement, Ex. F [ECF No. 1117] and Ex. P [ECF No. 1391] (justification for the Debtor Releases).

the execution of the Cooperation Agreements.[204]  The Cooperation Agreements ensure that the Wind-Down Debtors are able to leverage the knowledge and insights of the Genesis Released Personnel into the Debtors' business and transactions that may be critical to the resolution of litigation against various parties, as well as various regulatory and enforcement actions relating to the Debtors' prepetition businesses.[205]  Such contributions of the Released Parties and their respective Related Parties justify the inclusion of these parties in the Debtor Releases as a sound exercise of the Debtors' business judgment.

87.    In further support of the exercise of the Debtors' business judgment, the Special Committee provided justifications for the release of the Genesis Released Personnel, including, among other things, no colorable claims against the Genesis Released Personnel that would be of value to the Debtors' Estates, indemnification obligations of the Debtors, limited directors and officers insurance coverage, express carveout of claims arising from gross negligence, fraud or willful misconduct.   Mr. Aronzon also testified extensively about the process the Debtors undertook in conducting the Investigation.[206]  The Debtors also supplemented the record through a proffer with additional facts regarding the Debtor Releases in direct response to topics raised by the CCAHG. [207]

88.    The contributions by the Released Parties were and will continue to be instrumental to the Debtors' ability to prosecute these cases and the Retained Causes of Action in

---

[204]     *See* Hr'g Tr. 79:3–24, Feb. 27, 2024 (P. Aronzon).

[205]     *Id.*

[206]     *See supra* ¶¶ 28–31; Plan Supplement, ECF No. 1117.

[207]     *See supra* ¶ 30.

order to maximize recoveries for the Debtors' estates, and are precisely the kind of contributions that justify the approval of the Debtor and Non-Debtor Release.[208]

89.     The scope of Released Parties and Related Parties is appropriately-tailored to exclude liabilities arising from fraud, gross negligence, or willful misconduct and solely apply to parties and Entities that have made and will continue to make meaningful contributions to these cases, the Debtors, and the Wind-Down Debtors.[209]  The list of Genesis Released Personnel was also reduced following discussions between the Debtors and the Ad Hoc Group.[210]

90.     The release and exculpation provisions are further narrowly-tailored to expressly exclude (i) former officers, directors and employees of the Debtors who were not employed as of the Petition Date, (ii) the DCG Parties, (iii) the Gemini Parties, and (iv) any other officers, directors or employees of the Debtors excluded from the list of Released Parties, thus preserving claims against these parties.[211]

91.     The scope of the Exculpated Parties and the exculpation is appropriate and comports with applicable bankruptcy law.[212]

---

[208]     *See In re Trident Holding Co., LLC*, No. 19-10384 (SHL) (Bankr. S.D.N.Y Sept. 18, 2019) [ECF No. 928] (approving releases, including third-party releases, for parties who made contributions to the reorganization, including the debtors' officers, directors and employees); *see also In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) (approving release on the grounds that "most of the Debtor Releasees have indemnification rights such that any claims by the Debtors against them would ultimately lead to claims being asserted against the Debtors").

[209]     The CCAHG contends the Debtor Releases are "overly broad," which is belied by the evidentiary record regarding, among other things, (i) the limitation in the scope of Released Parties; (ii) the carve out of liability arising from fraud, gross negligence and willful misconduct; and (iii) the requirement that the Genesis Released Personnel execute Cooperation Agreements in order to receive releases.  *See supra* ¶¶ 27–28; Aronzon Decl. ¶ 83, Ex. 2, Sec. III.W., at 22.

[210]     Hr'g Tr. 82:3–7, Feb. 27, 2024.

[211]     *See* Aronzon Decl. ¶ 83, Ex. 2, Sec. III.W., at 22.

[212]     *See* Order at 26, *In re Residential Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF No. 6065] (confirming plan that contained exculpations for non-debtor parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC) [ECF No. 459] (Bankr. S.D.N.Y. Nov. 13, 2019) (finding exculpation provision "was essential to the promotion of good-faith plan negotiations that might not otherwise have occurred had the negotiating parties faced the risk of future collateral attacks from other parties"); *see also In re*

## IV.    **The Distribution Principles Embody Broad Creditor Consensus and Are Approved Under Bankruptcy Rule 9019**

92.    The Debtors and their advisors have sought to resolve complicated intercreditor disputes over distributions under the Plan.  Indeed, the Distribution Principles represent a compromise of disparate positions, including creditors holding dollar claims (who sought to value claims and make distributions on Petition Date valuations), on the one hand, and creditors holding crypto-denominated claims (who sought to value claims and make distributions at Distribution Date valuations) on the other.  For the reasons set forth herein, the Court approves the Distribution Principles under Bankruptcy Rule 9019, concluding that the Distribution Principles are fair and equitable, in the best interest of the estates, and a sound exercise of the Debtors' business judgment.[213]

---

*Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [ECF No. 2243] (confirming plan containing exculpation provision extending to appropriately-tailored prepetition conduct).

[213]    The Court concludes that DCG's reliance on *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) in opposing the approval of the Distribution Principles under Bankruptcy Rule 9019 is unavailing. *Jevic* merely stands for the proposition that a structured dismissal is not a means by which a debtor can effectuate a distribution that runs afoul of ordinary priority rules (there, the proposed dismissal would have skipped middle-priority creditors in favor of senior and junior creditors).  580 U.S. at 454–55.  Here, the Distribution Principles do not "skip" any class of creditors that would ordinarily be entitled to receive distributions, or otherwise propose distributions outside of ordinary priority principles.  Similarly, *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418 (Bankr. S.D.N.Y. 2022) actually *supports* the propriety of the settlement embodied by the Distribution Principles. There, a non-settling creditor argued that, among other things, the settlement was unduly prejudicial to its rights and that the settlement amount was so high that it represented an improper and excessive payoff to obtain support from the consenting creditors.  The court indeed said that, although it "must be sensitive to whether the proposed settlement would 'unduly prejudice' a non-settling creditor or other party," "'undue prejudice' cannot be the same thing as strategic advantage or disadvantage; in this as in many cases, multiple parties are jockeying to maximize their recoveries and best advance their competing interests, and the Court is unaware of case law deeming that dynamic alone to constitute the sort of 'undue prejudice' that might preclude approving a proposed settlement." *MatlinPatterson*, 644 B.R. at 426–27.  And, most importantly, the court approved the settlement notwithstanding these objections under the *Iridium* factors after the parties agreed to revise a procedural provision in the settlement.

93.     Courts may approve a compromise or settlement after notice and a hearing.[214]  Plan settlements of non-debtor claims are determined under the same standards that govern Bankruptcy Rule 9019 settlements.[215]

94.     A settlement approved through a plan must be "fair and equitable, and in the best interests of the estate."[216]  A court has significant discretion to determine whether a settlement satisfied these standards, and that decision will not be disturbed absent a clear abuse of discretion.[217]  In addition, a bankruptcy court should exercise its discretion "in light of the general public policy favoring settlements."[218]  In its evaluation, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"[219]

95.     The Second Circuit applies the seven "*Iridium*" factors in determining whether a proposed settlement is "fair and equitable."[220]  Where most or all of the factors are satisfied, a settlement should be approved.[221]  When evaluating the necessary facts, a court "may

---

[214]     *See* Fed. R. Bankr. P. 9019(a).

[215]     *See In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (considering settlement of creditor's claim under a plan under Bankruptcy Rule 9019 standards).

[216]     *In re Ditech Holding Corp.*, 606 B.R. 544, 623 (Bankr. S.D.N.Y. 2019).

[217]     *See, e.g., id.* at 623.  *See also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted).

[218]     *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

[219]     *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits) (citation omitted).

[220]     *In re Ditech*, 606 B.R. at 623–24 (citing *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

[221]     *See In re Ben-Artzi*, No. 21-10470 (MG), 2021 WL 5871718 (Bankr. S.D.N.Y. Dec. 10, 2021).

rely on the opinion of the debtor, parties to the settlement, and the professionals."[222]  In particular, the "business judgment of the debtor in recommending the settlement should be factored into the court's analysis."[223]

96.    The applicable *Iridium* factors decisively weigh in favor of approving the Distribution Principles.  The first and second *Iridium* factors require balancing the possibility of success of potential litigation, including its complexity, cost, inconvenience and delay, against a settlement's future benefits.  Here, the Debtors have sought a consensual plan from the earliest days of these cases.[224]  After months of non-stop negotiations among the creditors, the Debtors and DCG, when it became clear that a global settlement was no longer feasible, the Debtors toggled to the current plan.[225]  Indeed, the PSA was premised on the Debtors' prosecution of a plan that sought to effectuate the Distribution Principles.[226]  For these reasons, the Distribution Principles benefit the Debtors' Estates by providing certainty and an administrable path forward, resolving as consensually as possible differing and often diametrically-opposed creditor interests in an untested area of the law.  In other words, the Distribution Principles reduce the number of parties and positions against which the Debtors would have to litigate confirmation of their Plan and reflects a fair compromise of the various creditor positions regarding the allowance and treatment of their claims without disadvantaging one creditor group at the expense of another.

---

[222]    *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012).  *See In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010);  *Purified Down Prods. Corp.*, 150 B.R. at 522–23.

[223]    *See In re MF Glob. Inc.*, No. 11-2790 (MG), 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).

[224]    *See supra* ¶ 1.

[225]    *See supra* ¶ 2–4.

[226]    *See supra* ¶¶ 5–7; Aronzon Decl. ¶ 62.

97.    The third *Iridium* factor similarly weighs in favor of approval of the Distribution Principles.  The Distribution Principles are not only supported, but also are the result of extensive negotiations with the Committee, which is statutorily tasked with advancing the collective interest of all unsecured creditors, and the PSA Creditors (including those represented by the Dollar Creditor Group and the Ad Hoc Group), collectively holding more than $2.1 billion in Claims.[227]  The Distribution Principles are also supported overwhelmingly by the class of Gemini Earn Users, comprised of approximately 232,000 retail customers holding an aggregate of approximately $1.05 billion in asserted claims.[228]  Although DCG purports to object to the settlement of these parties' disputes through the Distribution Principles, courts have repeatedly held that, even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole."[229]

98.    The Distribution Principles also satisfy the fourth *Iridium* factor, which is breadth of support.  Beyond the express support of the Committee and the PSA Creditors, the Plan—which includes the Distribution Principles—obtained overwhelming support from every Class of creditor entitled to vote.[230]  All but a handful of customers (i.e., the members of the CCAHG) have made clear their strong approval of the Distribution Principles.[231]

---

[227]    Aronzon Decl. ¶ 62.

[228]    *See* Amended Voting Report.

[229]    *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

[230]    *See In re NII Holdings, Inc.*, 536 B.R. 61, 119–20 (Bankr. S.D.N.Y. 2015) (finding that the fourth *Iridium* factor was satisfied where "the Plan received overwhelming approval from every impaired class of creditors, all of whom will be affected by the Settlement."); Amended Voting Report.

[231]    The remaining *Iridium* factors weigh in favor of approval of the Distribution Principles. The Distribution Principles do not independently provide releases for officers and directors of the Debtors.  Each of the parties

99.    In sum, the Distribution Principles represent the product of hard-fought negotiations between different stakeholder groups with different interests to provide certainty in a complex and untested area of law.  For these reasons, the Distribution Principles fall far above the "lowest range of reasonableness," are fair and equitable, and a sound exercise of the Debtors' good business judgment.

## **CONCLUSION**

100.    For the foregoing reasons, all objections to the Plan are OVERRULED and the Plan is hereby CONFIRMED.

Dated:  March 29, 2024
        New York, New York

                                        */s/ Jane VanLare*
                                        Sean A. O'Neal
                                        Luke A. Barefoot
                                        Jane VanLare
                                        Thomas S. Kessler
                                        Andrew Weaver
                                        CLEARY GOTTLIEB STEEN &
                                        HAMILTON LLP
                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone: (212) 225-2000
                                        Facsimile: (212) 225-3999

                                        *Counsel to the Debtors and*
                                        *Debtors-in-Possession*

---

negotiating the Distribution Principles were represented by counsel with decades of experience in high-stakes chapter 11 cases and the Distribution Principles are clearly the product of arm's-length negotiations. *See supra* ¶¶ 1–8.