**K&L GATES LLP**

Robert T. Honeywell
Carly S. Everhardt
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 536 – 3900

*Counsel to GPD Holdings LLC d/b/a CoinFlip*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL RESPONSE AND MEMORANDUM OF LAW OF**
**GPD HOLDINGS LLC D/B/A COINFLIP AS TO DEBTOR' TWENTY-THIRD**
**OMNIBUS OBJECTION (NON-SUBSTANTIVE) TO CERTAIN CLAIMS**
**PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)**

K&L GATES LLP
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 536 – 3900
Counsel to GPD Holdings LLC d/b/a CoinFlip

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................. 1

I.    BACKGROUND .............................................................................................. 3

      A.    The Loan Agreement ............................................................................... 3

      B.    The Term Sheets ..................................................................................... 6

      C.    The Loan Agreement Termination............................................................ 7

      D.    The Debtors' Chapter 11 Filing and CoinFlip's Claim ............................ 8

II.   ARGUMENT ................................................................................................... 11

      A.    Debtor GGC Breached the Loan Agreement .......................................... 11

      B.    CoinFlip is Entitled to Setoff Using the Termination Date as the
           Valuation Date ....................................................................................... 12

      C.    The Debtor Cannot Claim Loan Fees and Late Fees under the
           Loan Agreement for the Period after It was Terminated ....................... 16

      D.    CoinFlip is Entitled to 9% in New York Prejudgment Interest for
           the Period During Which the Debtors Have Wrongfully Retained
           Its Collateral. ........................................................................................ 18

      E.    CoinFlip is Entitled to Have Its Allowed Claim Denominated in
           the Same Digital Asset or Currency Type as its Posted Collateral. ......... 19

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arcapita Bank B.S.C.(c)*,
  633 B.R. 207 (Bankr. S.D.N.Y. 2021), *aff'd*, 640 B.R. 604 (S.D.N.Y. 2022) ................18, 19

*Brushton-Moira Cent. Sch. Dist. V. Fed H. Thomas Assocs., P.C.*,
  91 N.Y.2d 256, 692 N.E.3d 551, 669 N.Y.S.3d 520 (1998)....................................15

*In re Delta Air Lines*,
  341 B.R. 439 (Bankr. S.D.N.Y. 2006) ...................................................................12

*In re Genesis Global Holdco, LLC*,
  Adv. No. 23-01192 2024 WL 478062 (Bankr. S.D.N.Y. Feb. 7, 2024)...................7

*Gumbel v. Pitkin*,
  124 U.S. 131 (1888)................................................................................................17

*J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.*,
  32 N.Y. 2d 425, 345 N.Y.S.2d 993, 299 N.E.2d 243 (1973)..................................15

*Kaminsky v. Herrick, Feinstein LLP*,
  2008 NY Slip Op 9934, 59 A.D.3d 1, 870 N.Y.S.2d 1 (App. Div. 1st Dept.)........15

*In re Lehman Bros. Holdings Inc.*,
  602 B.R. 564 (Bankr. S.D.N.Y. 2019) ..............................................13, 14, 15, 16

*Mindspirit, LLC v. Evalueserve Ltd.*,
  No. 15-Civ-6065(PGG), 346 F. Supp. 3d 552 (S.D.N.Y. 2018).............................13

*In re Nw. Bay Partners*,
  No. 19-10615, 2021 Bankr. LEXIS 1123 (Bankr. N.D.N.Y. Apr. 27, 2021) ..........17

*Pieciak v. Crow LLP*,
  No. 2:21-CV-00273, 2022 WL 10010523 (D.Vt. Oct. 17, 2022)...........................17

*Rus, Inc. v. Bay Indus., Inc.*,
  322 F. Supp. 2d 302 (S.D.N.Y. 2003).....................................................................11

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
  No. 1:21-CV-02857-LAP, 2023 WL 7151717 (S.D.N.Y. Oct. 31, 2023)........11, 12

*Wall St. Sys. Sweden Ab v. Hertz Global Holdings, Inc.*,
  14-cv-7819 (KBF) (S.D.N.Y. Jan. 13, 2015).........................................................16

*In re Waterscape Resort LLC*,
    544 B.R. 507 (Bankr. S.D.N.Y. 2016) ......................................................................................12

*Wells Fargo Tr. Co. v. Fast Colombia S.A.S.*,
    No. 23-CV-603(PGG)(RWL), 2023 WL 8591953 at *4 (S.D.N.Y. Oct. 16,
    2023), *report and recommendation adopted*, No. 23-CV-603(PGG)(RWL),
    2023 WL 8433128 (S.D.N.Y. Dec. 5, 2023) ...........................................................................13

**Statutes**

11 U.S.C. ..........................................................................................................................................8

11 U.S.C. § 502 ..................................................................................................................1, 3, 10, 14

11 U.S.C. § 502(b) ..........................................................................................................................19

11 U.S.C. § 562 ........................................................................................................................14, 15

GPD Holdings LLC d/b/a CoinFlip ("CoinFlip"), by its undersigned counsel, hereby files this supplemental response (the "Supplemental Response") to the Debtors' *Twenty-Third Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Objection"), and respectfully represents to the Court as follows:

## PRELIMINARY STATEMENT

The central dispute between the Debtors, including Debtor Genesis Global Capital, LLC ("GGC"), and CoinFlip is over which date is the correct date for valuing the parties' mutual obligations under a digital asset loan agreement for setoff purposes, as applied to the digital assets lent by GGC to CoinFlip (the "Loaned Assets") and the collateral posted by CoinFlip with GGC (the "Posted Collateral"). CoinFlip asserts that the appropriate valuation date is the date that CoinFlip terminated the loan agreement on November 17, 2022 (the "Termination Date"), based on GGC's breach of contract when it refused to return excess Collateral owed to CoinFlip. The parties have stipulated that CoinFlip's written termination notice on that date terminated the loan agreement. CoinFlip thus asserts that its net damages for GGC's breach should be valued as of that date, as required by New York law.

Conversely, the Debtors, apparently attempting to take advantage of subsequent upswings in the market value of the Loaned Assets since the contract was terminated, contend that the appropriate valuation date is either the date of their Chapter 11 bankruptcy filing, January 19, 2023 (the "Petition Date"), or as late as the date the Debtors objected to CoinFlip's proof of claim, February 15, 2024 (the "Objection Date"), or even later. To further maximize its setoff claim, the Debtors are even attempting to collect interest and late fees under the loan agreement, despite the fact that *GGC breached the contract* – not CoinFlip. The Debtors even go so far as to assert a claim for interest and late fees *in digital assets* under the loan agreement, to further take advantage

1

of market upswings and, in effect, collect the USD equivalent of 203% in interest on its loans to CoinFlip (as detailed below).

If the digital assets are valued as of the Termination Date, as they should be under New York law, then setoff of the parties' mutually owed obligations would result in a net claim of $648,327.41 in CoinFlip's favor ($4,793,449.01 in Posted Collateral less Loaned Assets, interest and late fees then due, totaling $4,145,121.60). With the addition of $10,275.76 in pre-judgment interest at 9% under New York C.P.L.R. § 5004 from the Termination Date through the Petition Date, CoinFlip is entitled to a net claim of $658,603.17 as of the Petition Date.

If the digital assets are valued as of the Petition Date, setoff of the parties' mutually owed obligations (Loaned Assets against Posted Collateral) would result in a net claim of $27,571.54 owed to CoinFlip. However, the Debtors assert that interest and late fees under the loan agreement would result in a net claim in the Debtors' favor of $96,840.59 – again, despite the fact that the loan agreement had previously been terminated, which the parties do not dispute. And if the digital assets are valued as of the Objection Date, the setoff of the parties' mutually owed obligations (Loaned Assets against Posted Collateral) results in a net claim in the Debtors' favor of $4,862,498.58 – on top of which the Debtor asserts an *additional $8,415,276.45* in interest and late fees, for a total net claim of $13,277,775.03 in the Debtors' favor. In other words, on a loan balance owed to GGC that the parties agree had a value of $4,145,121.60 on the Termination Date – which was more than covered by CoinFlip's Posted Collateral on that date – the Debtors are now attempting to collect over twice that amount (203%) in interest and late fees alone, and over three times that amount in total even *after* accounting for CoinFlip's Posted Collateral.

The Court should not countenance the Debtors' attempt to game post-petition market price fluctuations after it was the Debtor GGC that breached the parties' loan agreement. Under New

York law and basic bankruptcy principles, the parties' respective obligations must be valued as of the date the contract was terminated, and CoinFlip's bankruptcy claim should equal that net amount plus post-judgment interest through the Petition Date. Then CoinFlip's claim should receive the treatment provided by the Debtors' Chapter 11 plan, as payment-in-kind and/or cash payment as applicable.

## I.      BACKGROUND

The parties have stipulated to certain facts related to this dispute, in their *Stipulation by and among the Debtors and GPD Holdings LLC d/b/a CoinFlip Regarding the Debtors' Twenty-Third Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* [ECF No. 1541] (the "Stipulation"),[2] and have also stipulated to the admissibility of the following exhibits to the CoinFlip POC:[3]

| | |
|---|---|
| Exhibit A | CoinFlip MLA (the "Loan Agreement") |
| Exhibit B | Term Sheets |
| | Ex. B-1: LTC Term Sheet |
| | Ex. B-2: ETH Term Sheet |
| | Ex. B-3: BTC Term Sheet |
| Exhibit C | CoinFlip's Margin Refund Demand |
| Exhibit D | Exchange on Margin Refund Demand (the "Telegram Exchange") |
| Exhibit E | CoinFlip's Termination Notice |
| Exhibit F | CoinFlip's Follow-Up to Termination Notice (the "Second Notice") |

### A.      The Loan Agreement

CoinFlip and Debtor GGC entered into the Loan Agreement on November 19, 2019. Pursuant to the Loan Agreement, CoinFlip could borrow varying amounts of digital assets or U.S. dollars from GGC, in exchange for a "financing fee" that was defined as a "Loan Fee" – which the

---

[2] Capitalized terms used but not defined herein have the meaning set forth in the Stipulation.

[3] Unless otherwise indicated, exhibit references herein ("Exhibit __" or "Ex. __") are to the exhibits to the CoinFlip POC.

parties have stipulated was also referred to as a "Borrow Fee" in the Term Sheets. Loan Agreement

§ III(a); Stipulation, at 2. The Loan Agreement also provided for "Late Fees" of 10% as follows:

> For each Calendar Day in excess of the Maturity Date or the Recall Delivery
> Day (whichever is applicable) in which Borrower has not returned the
> entirety of the Loaned Assets or failed to timely pay any outstanding Loan
> Fee in accordance with section III(c), Borrower shall incur an additional
> nominal fee (the "Late Fee") of a 10% (annualized, calculated daily) on all
> outstanding portions of the Loaded [sic] Digital Currencies and Loan Fees.

Loan Agreement § III(c) (emphasis in original). The Loan Agreement defined the "Maturity Date"

as "the pre-determined future date upon which a Loan becomes due in full." *Id.*, § I (definition of

"Maturity Date"). It defined the "Recall Delivery Day" as the 14th business day after GGC sent a

demand for repayment on any loan in which GGC had a "Call Option," including "Open Loans"

– which the Loan Agreement defined as those without a Maturity Date. *Id.*, § II(c)(ii) (definition

of "Recall Delivery Day"); *id.*, § I (definitions of "Call Option" and "Open Loan").

The lending procedures under the Loan Agreement required CoinFlip to initiate its lending

requests via electronic mail to GGC proposing the following terms: (i) whether U.S. dollars or

Digital Currency (as defined in the Loan Agreement), and if Digital Currency, the type, (ii) the

amount of U.S. dollars or Digital Currency, (iii) whether the loan would be a "Fixed Term Loan,"

a "Term Loan with a Prepayment Option," or an "Open Loan," (iv) the "Loan Effective Date," and

(v) the "Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option)." *Id.*, §

II(b). Each such loan was documented by a term sheet, which governed in the event of any conflict

with the Loan Agreement, as follows:

> The specific and final terms of a Loan shall be memorialized using the Loan
> Term Sheet. ***In the event of a conflict of terms between this Master Loan
> Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet
> shall govern.***

*Id.*, § II(b) (emphasis added).

4

The Loan Agreement further provided for certain collateral requirements, again subject to the term sheets:

> ***Unless otherwise agreed by the parties in the Loan Term Sheet***, the Collateral shall initially be 120% of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.

*Id.*, § IV(a) (emphasis added). The Loan Agreement further provided for margin calls to maintain this 120% loan-to-collateral ratio, but allowed the parties to vary this ratio by term sheets:

> ***The parties may modify this standard in the Loan Term Sheet*** by (i) setting a different ratio of the value of the Loaned Assets and Collateral or (ii) the creation of a Margin Call rate to be indicated on the Loan Term Sheet….

*Id.* § IV(c) (emphasis added).

The Loan Agreement also provided that the Collateral would be valued in U.S. Dollars but returned in kind on loan termination, as follows:

> For the avoidance of doubt, ***upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited***, net of any Additional Collateral or Margin Call adjustments (as defined below in Section IV(c)).

*Id.* (emphasis added).

The Loan Agreement also provided for netting and setoff as remedies by the non-defaulting party, as follows:

> Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, ***all Loans hereunder constitute a single business and contractual relationship*** and have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and ***the obligations to make any such payments, deliveries, and other transfers may be applied against each other and netted***. In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in

5

respect of each Loan hereunder, and that ***a default in the performance of
any such obligation by Borrower or by Lender (the "Defaulting Party")
in any Loan hereunder shall constitute a default by the Defaulting Party
under all such Loans*** hereunder, and (b) ***the non-defaulting Party shall be
entitled to set off claims*** and apply property held by it in respect of any Loan
hereunder against obligations owing to it in respect of any other Loan with
the Defaulting Party.

*Id.*, § XVII (emphasis added).

In addition to the express right of setoff, the Loan Agreement provides "the non-defaulting

Party … any rights otherwise available to it under any other agreement or ***applicable law***." *Id.*,

§ IX(f) (emphasis added).

The parties do not dispute that New York law governs the Loan Agreement. *Id.* § XIII;

Stipulation, at 3.

### B.    The Term Sheets

Each of the Term Sheets provided that the loans thereunder were "Open Term" loans with

no maturity date and varying Loan Fees, referred to as "Borrow Fees."  *See* Ex. B-1 (LTC Term

Sheet, with a Loan Fee of "10.50% annual"); Ex. B-2 (ETH Term Sheet, with a Loan Fee of

"8.00% annual"); Ex. B-3 (BTC Term Sheet, with a Loan Fee of "5.50% annual").  Therefore, for

the "Recall Delivery Day" to apply as a basis to trigger Late Fees on these "Open Loans," GGC

was required to send a demand for repayment on such loans.  There is no evidence in the record

that GGC ever sent any such notice.  To the contrary, CoinFlip terminated the Loan Agreement,

as detailed below.

In addition, the Term Sheets modified the 120% margin requirement in the Loan

Agreement.  The LTC Term Sheet and ETH Term Sheet left blanks by the word "Collateral," and

stated "0.00% of loan value (on a net loan basis)" next to the words "Margin Limit," "Margin

Refund," and "Initial Margin Requirement."  *See* Ex. B-1 (LTC Term Sheet) and Ex. B-2 (ETH

Term Sheet).  For the third loan, the BTC Term Sheet stated the following:

| | |
|---|---|
| Collateral: | 61 BTC, 466 ETH, 1,800 LTC |
| Margin Limit: | 35% of loan value (on a net loan basis) |
| Margin Refund: | 65% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 50% of loan value (on a net loan basis) |

*See* Ex. B-3 (BTC Term Sheet); Stipulation, at 2-3.  The terms "Margin Limit," "Margin Refund," and "Initial Margin Requirement" are not defined in the Loan Agreement, so they should be given their plain meaning consisting with the parties' intend in the remainder of the contract.  *In re Genesis Global Holdco, LLC*, Adv. No. 23-01192 (SHL), 2024 WL 478062 at *5-6 (Bankr. S.D.N.Y. Feb. 7, 2024).

### C.    The Loan Agreement Termination

On November 16, 2022, CoinFlip emailed GGC informing it that the collateral-to-loan value on the three loans was 129.25% and requesting a "margin refund of $3,079,787.97."  *See* Ex. C (Margin Refund Demand); Stipulation, at 3.

The following day on November 17, 2022, CoinFlip and GGC exchanged messages on Telegram, a messaging application, regarding the Margin Refund Demand. During the exchange, GGC unequivocally refused to comply with CoinFlip's Margin Refund Demand:

| | |
|---|---|
| *CoinFlip:* | Hey Team, did you see our email that was sent over last night about the margin refund request? |
| *GGC:* | … email received. Genesis has paused all withdrawals. Our management team expects to provide an update next week regarding the plan for the lending business |
| *CoinFlip:* | Ok. Also paused margin refunds? |
| *GGC:* | Correct. |

Ex. D (Telegram Exchange).

Later that day, CoinFlip sent GGC its Termination Notice, citing multiple Events of Default under the Loan Agreement and notifying GGC that it was terminating the contract based on events

7

of default under Sections VIII(h), VIII(c) and VIII(k) of the Loan Agreement.  *See* Ex. E (Termination Notice).  The parties do not dispute that the Termination Notice terminated the Loan Agreement on November 17, 2022.  *See* Stipulation, at 5 ¶ 2; *id.*, at 6 ¶ 3(b) (referring to the termination of the Loan Agreement on the Termination Date); *id.*, at 7 ¶ 3(c) (same).   In its Termination Notice, CoinFlip again demanded the return of its Collateral and offered to return the Loaned Assets and pay all outstanding Loan Fees, but received no response.  *See* Ex. E.

On January 5, 2023, CoinFlip sent GGC a letter entitled "*Follow-up to Notice of Termination*," again restating its demand for the return of its Collateral in exchange for return of the Loaned Assets and payment of outstanding Loan Fees, or alternatively for setoff of the parties' mutual obligations.  *See* Ex. F.  CoinFlip again received no response.

### D.    The Debtors' Chapter 11 Filing and CoinFlip's Claim

On January 19, 2023 (the Petition Date), the Debtors filed for protection under chapter 11 of the Bankruptcy Code.

On May 22, 2023, CoinFlip timely filed a bankruptcy claim, which it later timely amended on July 7, 2023, as claim no. 810 (the CoinFlip POC).  *See* Stipulation, at 4.  The CoinFlip POC asserts a claim for the amount owed to CoinFlip after setoff of the parties' mutual obligations under the Loan Agreement – *i.e.*, the value of the Posted Collateral less the value of the Loaned Assets, in each case determined as of the Termination Date – plus pre-judgment interest at 9% under New York C.P.L.R. § 5004 for the period from the Termination Date through the Petition Date. CoinFlip POC, Addendum ¶ 18 (citing the calculation on Ex. G thereto).  CoinFlip has agreed to adjust these values as provided in the Stipulation.  *See* Stipulation, ¶ 3(a).

On January 9, 2024, the Debtors filed the Setoff Principles as Exhibit M to the *Plan Supplement for the Debtors' Amended Plan* [ECF No. 1144].  The Setoff Principles provide that

if the Debtors effect a setoff pursuant to Article IV.B.16 of the Plan, then the value of the applicable digital assets will be determined as of the Petition Date based on the Digital Assets Conversion Table. *See* Setoff Principles. However, the Setoff Principles expressly apply only to certain claims listed on Exhibit 1 thereto, which does not include the CoinFlip POC. *Id.*, Exhibit 1.

On February 15, 2024 (the Objection Date), the Debtors filed their Twenty-Third Omnibus Objection [ECF No. 1315], which objected to the CoinFlip POC, asserting that the Debtors have "***no remaining liability owed to the creditor*** after setoff of amounts owed to the Debtors by the creditor." Twenty-Third Omnibus Objection, Ex. 1 (emphasis added); *id.*, Proposed Order, Ex. 1. The Debtors further state that "***[r]egardless of the valuation date*** that the Debtors employ, ***the claimants simply have no net claim as against the Debtors' estates*** and their claims should be expunged on that basis." Twenty-Third Omnibus Objection, ¶ 1 (emphasis added).

On February 26, 2024, the Debtors filed their amended Plan.[4] Section IV.B.16 of the Plan provides, among other things, that the Debtors may set off "the value of any debt owed by the Holder of [a] Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor." But such provision provides no guidance on the date on which such values are determined. Section IV.B.16 further authorizes the Debtors to compromise or settle such claims "based upon the individual circumstances of certain Holders of Claims who may have setoff rights or other rights with respect to Loan Collateral posted with the Debtors."

On March 7, 2024, CoinFlip filed its *Response and Reservation of Rights of GPD Holdings LLC d/b/a CoinFlip to Debtors' Twenty-Third Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* [ECF No. 1436].

---

[4] *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1392].

On March 11, 2024, the Debtors adjourned the Twenty-Third Omnibus Objection as to the CoinFlip POC [ECF No. 1454].

Thereafter, the parties resolved their mutual discovery requests by the Stipulation. As shown in the Stipulation, this dispute centers on two issues: (1) which date is the correct date to value the Loan Assets and Posted Collateral (referred to in the Stipulation as the Valuation Date), and (2) whether the Debtors are entitled to claims for Loan Fees and Late Fees after the Termination Date. As to the Valuation Date, CoinFlip contends that it should be the Termination Date, while the Debtors contend it should be the Petition Date, the Objection Date or a later date. As to Loan Fees and Late Fees, CoinFlip contends that they should not accrue from and after the Termination Date, while the Debtors contend they should continue accrue to the present, notwithstanding that Debtor GGC breached the Loan Agreement prior to the Termination Date.

Due to fluctuations in the value of the Loan Assets and Posted Collateral over time, these two issues will determine which party recovers after setoff of the Posted Collateral (owed to CoinFlip) against the Loaned Assets (owed to Debtor GGC). If valued on the Termination Date, CoinFlip is entitled to a net claim of $658,603.17 as of the Petition Date (inclusive of pre-judgment interest through the Petition Date). Stipulation, ¶ 3(a). If valued on the Petition Date, CoinFlip is entitled to a net claim of $27,571.54; but if Loan Fees and Late Fees are awarded to the Debtors for the period from the Termination Date to the Petition Date, the net claim after setoff is in the Debtors' favor for $96,840.59. *Id.*, ¶ 3(b). And if the digital assets are valued as of the Objection Date, the net claim after setoff is in the Debtors' favor for $4,862,498.58; and if Loan Fees and Late Fees are added to that amount as requested by the Debtors – *i.e.*, calculated as payment in kind – then the Debtor might be awarded an additional $8,415,276.45 in Loan Fees and Late Fees, for a total net claim of $13,277,775.03 in the Debtors' favor. *Id.*, ¶ 3(c).

10

## II.    ARGUMENT

### A.    Debtor GGC Breached the Loan Agreement

Debtor GGC clearly breached the Loan Agreement, resulting in termination of the Loan Agreement.  The parties agreed that a 65% collateral-to-loan value was the "Margin Refund" trigger.  *See* Ex. B-3 (BTC Term Sheet).  CoinFlip alerted GGC that the collateral-to-loan value had reached 129.25% on November 16, 2022, and demanded the return of excess collateral.  *See* Ex. C (Margin Refund Demand).[5]  GGC promptly admitted the next day (November 17, 2022) that it was not honoring any margin refunds, and CoinFlip terminated the Loan Agreement the same day, which the parties do not dispute.  *See* Ex. D (Telegram Exchange); Ex. E (Termination Notice); Stipulation, ¶ 2.

To "plead a cause of action for breach of contract, a plaintiff must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 1:21-CV-02857-LAP, 2023 WL 7151717 at *2 (S.D.N.Y. Oct. 31, 2023).  In instances, such as CoinFlip's Termination Notice and Second Notice, where "one party is ready and able to perform the contract, but the other refuses to do so, it has breached the contract, unless its performance was excused." *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 309 (S.D.N.Y. 2003).

Here, there is no dispute that the Loan Agreement is a valid contract, and the Debtors do not dispute that CoinFlip performed pursuant to the terms of the Loan Agreement.  As evidenced

---

[5] This excess collateral-to-loan ratio is borne out by the stipulated asset values on the next day, Nov. 17. 2022, which show a collateral-to-loan ratio of 115.64%.  Stipulation, ¶ 3(a) (stipulating to a USD value for Posted Collateral of $4,793,449.01, against a loan balance value of $4,145,121.60).

by CoinFlip's multiple attempts to return the Loaned Assets to GGC and recover its Posted Collateral (as shown in the Termination Notice and Second Notice), CoinFlip was prepared to perform its end of the agreement with GGC. GGC was the only party to refuse performance: first, in its Telegram exchange, *see* Ex. D, and then its non-response to CoinFlip's requests for a margin refund. CoinFlip's damages arise from GGC's breach of its contractual duty to return such excess collateral.

For the foregoing reasons, GGC plainly breached the Loan Agreement, entitling CoinFlip to a net claim equal to the value of the Posted Collateral netted against the Loaned Assets, to place CoinFlip in the position it occupied prior to GGC's breach. *See SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 1:21-CV-02857-LAP, 2023 WL 7151717 (S.D.N.Y. Oct. 31, 2023) ("Under New York law, 'damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.'").

## B.    CoinFlip is Entitled to Setoff Using the Termination Date as the Valuation Date

The Court should also find that the Valuation Date for purposes of setoff is the Termination Date, the date when GGC breached the Loan Agreement by refusing CoinFlip's demand for an excess margin refund. CoinFlip's termination through the Termination Notice entitles it to net and set off all obligations under the Loan Agreement as of that date, pursuant to section XVII thereof and New York state law. *See In re Waterscape Resort LLC*, 544 B.R. 507, 526-27 (Bankr. S.D.N.Y. 2016) (describing setoff and recoupment under New York law); *In re Delta Air Lines*, 341 B.R. 439, 443 (Bankr. S.D.N.Y. 2006) ("[t]he setoff right to which the statute applies is exclusively a right under non-bankruptcy or state law. Section 553 does not create a federal right of setoff, nor does it enhance, diminish or otherwise modify any state law right of setoff.").

The Debtors' theory that somehow GGC can breach the express terms of the Loan

Agreement, wrongfully withhold CoinFlip's Collateral, and then time the calculation of damages in order to flip CoinFlip's breach of contract claim on its head – reversing an approximately $659,000 net claim into an approximately $97,000 net *loss* (as of the Petition Date) or even an approximately $13 million net *loss* (as of the Objection Date) – falls flat and reeks of opportunism. To apply any Valuation Date other than the Termination Date deprives CoinFlip of its breach of contract damages and contravenes settled New York law on when to value such damages. The Court should follow that law and find that the correct valuation date for purposes of netting the parties' mutual obligations under the Loan Agreement is the date of breach, November 17, 2022.

With respect to the calculation of such damages, "it is settled Second Circuit law that in a breach of contract case, damages are calculated ***at the time of the breach.***" *Wells Fargo Tr. Co. v. Fast Colombia S.A.S.*, No. 23-CV-603(PGG)(RWL), 2023 WL 8591953 at *4 (S.D.N.Y. Oct. 16, 2023), *report and recommendation adopted*, No. 23-CV-603(PGG)(RWL), 2023 WL 8433128 (S.D.N.Y. Dec. 5, 2023) (emphasis added); *see also Mindspirit, LLC v. Evalueserve Ltd.*, No. 15-Civ-6065(PGG), 346 F. Supp. 3d 552, 593 (S.D.N.Y. 2018) ("Under New York law, a breach of contract claim generally 'accrues when the contract is first breached.'"). The duty to calculate damages at or near the moment of breach is no different in bankruptcy proceedings. *See In re Lehman Bros. Holdings Inc.*, 602 B.R. 564, 587 (Bankr. S.D.N.Y. 2019) (holding that under New York law, damages should be calculated near the time of breach when the aggrieved party acquires enforcement rights).

In *Lehman Bros.*, this Court decided a strikingly similar dispute between debtor Lehman Brothers International (Europe) ("LBIE") and claimant SRM Global Master Fund Limited Partnership, a hedge fund ("SRM"). Prior to LBIE and certain affiliates filing for chapter 11 bankruptcy on September 15, 2008, the parties executed a series of contracts: a Prime Brokerage

Agreement dated May 9, 2008 (the "PBA"); an ISDA Master Agreement dated May 12, 2008 (the "ISDA"); and a guaranty of LBIE's obligations by its parent company, Lehman Brothers Holdings, Inc. ("LBHI"). *In re Lehman Bros. Holdings Inc.*, 602 B.R. at 571.

Pursuant to the PBA, SRM delivered 5,094,060 shares of common stock of Virgin Media, Inc. ("Virgin Media Shares") and 3,000,000 shares of Charter Communications, Inc. (collectively, the "Segregated Assets") to LBIE, as well as $8,893,650.00 of margin cash (collectively, the "SRM Collateral"). *Id*. at 572. SRM later terminated the ISDA, and on November 6, 2008 (the "PBA Termination Date") it terminated the PBA, due to multiple breaches thereunder by LBIE. *Id*. SRM asserted, *inter alia*, breach of contract claims against LBIE for failure to timely return its SRM Collateral, and the parties settled for an undisclosed amount. *Id*. at 573.

SRM later filed a proof of claim seeking the increased value of its Segregated Assets after becoming aware of the substantial increase in value of the Virgin Media Shares due to a merger. *Id.* at 573, n. 10. The claim sought recovery against LBHI on a theory of guaranty liability. *Id.* at 585. SRM argued it should be entitled to the value of the Virgin Media Shares as of the date it settled its dispute with LBIE (the "LBIE Settlement Date"), which would yield it a $264 million claim. *Id.* at 570. Conversely, LBIE argued that sections 502 and 562 of the Bankruptcy Code required a valuation as of either the Petition Date or the PBA Termination Date, but in any event, not the LBIE Settlement Date. *Id*. at 580.

The Court rejected SRM's arguments, holding that "SRM's claims against LBHI as guarantor became fixed at the time LBIE . . . breached its obligations under the PBA." *Id*. at 586. And though the Court was initially called to determine the amount of the Segregated Assets claim in the context of the safe harbor damages provisions of Section 562 of the Bankruptcy Code, it concluded that even if section 562 did not apply, the claim should be valued when the cause of

14

action accrued, not later after the value of the claim increased based on market movements in the

price of the underlying assets:

> From a practical perspective, had LBHI's bankruptcy case concluded several years ago, LBHI would have been entitled to fix the amount of SRM's claim, if any, at that time. ***The Bankruptcy Code does not permit a claimant to delay a determination of its debtor counterparty's liability from the time of the claimant's termination of the parties' securities contract until the value of its claim becomes more beneficial to the claimant***. Once the claimant terminates, damages become fixed…

*Id.* at 587 (emphasis added). The Court found that "SRM's proposed valuation date for the

Segregated Assets . . . has no basis in law[,]" disallowed and expunged SRM's claim, sustained

the Debtor's objection, and overruled any further arguments not addressed in its order. *Id.* at 600.

It further held that to hold otherwise just because the breaching party was in bankruptcy "defies

common sense that [a counterparty] would … be permitted to collect … several years of post-

termination increase in the value of the [underlying] [a]ssets." *Id.* at 587.

See also *Kaminsky v. Herrick, Feinstein LLP*, 2008 NY Slip Op 9934, 59 A.D.3d 1, 12,

870 N.Y.S.2d 1, 9 (App. Div. 1st Dept.) ("[t]he proper measure of damages for breach of contract

is determined by the loss sustained or gain prevented at the time and place of breach" and that

"[t]he rule is precisely the same when the breach of contract is nondelivery of shares of stock.";

quoting *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (N.Y. 1971)); *Brushton-Moira Cent.*

*Sch. Dist. V. Fed H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.3d 551, 553, 669

N.Y.S.3d 520, 522 (1998) ("[t]he Appellate Division erred, however, in holding that damages are

to be measured as of the date of trial. It has long been recognized that the theory underlying

damages is to make good or replace the loss caused by the breach of contract.")**;** *J.M. Rodriguez*

*& Co. v. Moore-McCormack Lines, Inc.*, 32 N.Y. 2d 425, 434, 345 N.Y.S.2d 993, 1000, 299

N.E.2d 243, 247 (1973) (the measure of damages for breach of a contract for delivery of cloves was "the market value of the cloves when the breach of duty occurred.").

Like SRM in *Lehman Bros.*, the Debtors in this dispute seek to recover a windfall by timing their damages measurement to take advantage of market movements in the price of the assets underlying CoinFlip's claim – months and even years after the original breach of contract claim accrued. To use the Petition Date, the Objection Date or a later date as the Valuation Date would contravene established New York and Second Circuit precedent on the timing for calculation of breach of contract damages, which must occur on the date of breach or as near to such date as possible.

Thus, the Termination Date is the appropriate Valuation Date for purposes of netting the parties' claims under the Loan Agreement.

### C.    The Debtor Cannot Claim Loan Fees and Late Fees under the Loan Agreement for the Period after It was Terminated

The Debtors further assert that they are entitled to Loan Fees and Late Fees accruing on the Loaned Assets beginning on the Termination Date up through and including the Valuation Date determined by the Court, *despite* not disputing that the contract was properly terminated on the Termination Date. In so doing, the Debtors are attempting to claim the benefits of the Loan Agreement while simultaneously refusing to perform its obligations (failing to return the Collateral to CoinFlip). The Court should not allow the Debtors to pick and choose which provisions they can take advantage of and which they can ignore. Moreover, New York law does not permit a contract counterparty to claim the benefits of a contract beyond the date of its termination, particularly when that same counterparty is in breach of the contract.

As an initial matter "[w]hen a contract is terminated . . ., the rights and obligations thereunder cease." *Wall St. Sys. Sweden Ab v. Hertz Global Holdings, Inc.*, 14-cv-7819 (KBF)

(S.D.N.Y. Jan. 13, 2015). Moreover, courts in this Circuit have held that "a party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him . . . ." *Pieciak v. Crow LLP*, No. 2:21-CV-00273, 2022 WL 10010523 at *10 (D.Vt. Oct. 17, 2022).

The Debtors do not dispute that the Loan Agreement was terminated by CoinFlip's Termination Notice on November 17, 2022. *See* Stipulation, ¶ 2. Accordingly, the Debtors cannot now claim that GGC is entitled to Loan Fees and Late Fees accruing after the Termination Date without somehow proving that the Loan Agreement is still operative or effective. But it is not and has not been in effect ever since it was terminated. The Court should find that the Debtors are not entitled to Loan Fees or Late Fees after the Termination Date for this reason alone.

Even assuming, *arguendo,* the Loan Agreement was not terminated on the Termination Date, Debtor GGC is the breaching party. "[B]ankruptcy courts are courts of equity that apply equitable principles in the administration of bankruptcy proceedings." *In re Nw. Bay Partners*, No. 19-10615, 2021 Bankr. LEXIS 1123 at *18 (Bankr. N.D.N.Y. Apr. 27, 2021) (citing *Forman v. Amboy Nat'l Bank (In re Price)*, 361 B.R. 68, 79 (Bankr. D. N.J. 2007). It is deeply inequitable to delay a non-breaching counterparty's recovery on its own assets, only to later effect setoff when the debtor counterparty is finally "in the money," leaving the aggrieved party owing $96,840.59 (as of the Petition Date) or the simply astounding sum of $13,277,775.03 (as of the Objection Date) – which is exactly what the Debtors are requesting here by their calculation of Loan Fees and Late Fees. The Debtors should not be permitted to so benefit when the Debtor GGC is the wrongdoer. The Supreme Court stated over a century ago, "[i]t is a cardinal maxim that no one shall be allowed in a court of justice to take advantage of his own wrong." *Gumbel v. Pitkin*, 124 U.S. 131, 146 (1888). The Debtors' proposed setoff amounts here are precisely the kind of inequity the Supreme Court sought to prevent.

Therefore, equity demands this Court bar Debtor from any claim or entitlement to Loan Fees or Late Fees under the Loan Agreement. Breaching parties cannot and should not profit from their wrongdoing.

**D.    CoinFlip is Entitled to 9% in New York Prejudgment Interest for the Period During Which the Debtors Have Wrongfully Retained Its Collateral.**

Finally, CoinFlip is entitled to prejudgment interest at the New York statutory rate of nine percent (9%), accruing from the date of breach by Debtor GGC (the Termination Date).

While prejudgment interest is within the discretion of the Court, it should be awarded absent a sound reason to deny it, applying the law governing the underlying claims. *In re Arcapita Bank B.S.C.(c)*, 633 B.R. 207, 210 (Bankr. S.D.N.Y. 2021), *aff'd*, 640 B.R. 604, 631-33 (S.D.N.Y. 2022). The parties do not dispute that New York law governs the Loan Agreement, Stipulation at 3, so the New York statutory rate of 9% should apply here. *See* New York C.P.L.R. § 5004.

The Second Circuit has set out its guidance for awarding prejudgment interest as follows:

> The suitability of that postjudgment rate for an award of prejudgment interest will depend on the circumstances of the individual case, and the court need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government. The court may, for example, consider whether the plaintiff would have invested the money at some higher rate ... or it may take into account the rate of interest the defendant would have had to pay to borrow the money it withheld from the plaintiff ....

*Arcapita*, 633 B.R. at 212 (citing *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139–40 (2d Cir. 2000).

Here, the equities support the award of prejudgment interest from the date of Debtor GGC's breach of the Loan Agreement through and including the date on which the Court determines the allowed amount of CoinFlip's claim. CoinFlip has been deprived of the benefit of its Collateral since the Termination Date, when it could have invested the Collateral for its own benefit

elsewhere.

As CoinFlip is asserting that the appropriate Valuation Date is the Termination Date, it is seeking prejudgment interest through the Petition Date for purposes of determining the value of its bankruptcy claim as of the Petition Date, in accordance with standard bankruptcy principles. *See* 11 U.S.C. § 502(b) (on a claim objection being filed, the bankruptcy court must "determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition").  However, to the extent the Court determines that a later Valuation Date is appropriate – thus giving the Debtors the benefit of upswings in the market price of the Loaned Assets – and/or determines that the Debtors are entitled to Loan Fees and Late Fees accruing past the Petition Date, then CoinFlip asserts that it would be deeply inequitable, for setoff purposes, to deny it prejudgment interest for purposes of calculating such setoff *when the Debtors have had the economic benefit of CoinFlip's Collateral ever since the Termination Date* in November 2022.  In other words, as the purpose of prejudgment interest is to award "delayed damages," *Arcapita*, 633 B.R. at 211, it should be awarded to CoinFlip for its breach of contract damages from GGC's wrongful detention of its Collateral, regardless of the Valuation Date selected by the Court.

**E.    CoinFlip is Entitled to Have Its Allowed Claim Denominated in the Same Digital Asset or Currency Type as its Posted Collateral**

CoinFlip further asserts that since its Posted Collateral was in various types of digital assets or currency – specifically, 61 BTC, 466 ETH, 1,806 LTC and 750,000 USD, *see* Ex. B-3 (BTC Term Sheet), Stipulation at 2 – then its allowed claim should likewise be denominated in the same digital assets and currency, on a *pro rata* basis using the same market values as on the Termination Date.

The Plan treats bankruptcy claims against GGC according to the denomination of the assets held by the Debtors, and provides for them to receive the Plan treatment set forth in the

"Distribution Principles" based on such denominations.  *See* Plan, § III.C.3 ("Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims"); *id.*, § III.C.4 ("Class 4 — BTC-Denominated Unsecured Claims"); *id.*, § III.C.5 ("Class 5 — ETH-Denominated Unsecured Claims"); *id.*, § III.C.6 ("Class 6 — Alt-Coin-Denominated Unsecured Claims").   In turn, the "Distribution Principles" set forth in Plan Exhibit A propose to maximize in-kind distributions based on such claim denominations:

> Certain provisions of these Distribution Principles apply to Holders of Allowed General Unsecured Claims whose Claims are denominated in the same asset (such asset, a "**Claim Asset**," and such group, a "**Denomination Group**"), even though such Holders may not be part of the same Class for purposes of the Amended Plan.
>
> ***One of the goals of these Distribution Principles is to maximize "in-kind" distributions, i.e., distributions to Holders of Allowed General Unsecured Claims in the Claim Assets of their claims***, including by (1) allocating Distributable Assets among Holders of Allowed General Unsecured Claims using the respective Claim Assets and, (2) as necessary, supplementing such allocation with allocations of "like-kind" assets, *i.e.*, assets that reference the Claim Assets.

Plan, Ex. A (Distribution Principles), at 2 (bold in original; additional emphasis added).

CoinFlip respectfully requests that the Court, on allowing the CoinFlip POC, allocate the allowed amounts thereof to different digital asset or USD denominations, *pro rata* based on the amounts originally posted as Collateral under the Loan Agreement, using the same market values as on the Termination Date.  CoinFlip asserts that this would be a fair method of allocating the allowed amounts of its bankruptcy claim consistent with the above-referenced provisions of the Plan (§§ III.C.3 through III.C.6) and the Distribution Principles.

## CONCLUSION

Based on the foregoing, CoinFlip respectfully requests that the Court: (i) overrule the Debtors' Twenty-Third Omnibus Objection as to the CoinFlip POC; (ii) affirm CoinFlip's right to set off the parties' mutual debts under the Loan Agreement using the Termination Date as the Valuation Date; (iii) allow the CoinFlip POC in full in the amount of $658,603.17 as of the Petition Date, including prejudgment interest through such date; (iv) affirm that the Debtors are not entitled to any Loan Fees, Late Fees or other amounts under the Loan Agreement after the Termination Date; (v) allocate the allowed amount of the CoinFlip POC to the denominations of digital assets and currency as originally posted under the Loan Agreement, *pro rata* based on their market values as of the Termination Date; and (vi) grant such further relief the Court deems equitable and proper.

Date**:** April 9, 2024

Respectfully submitted,

 */s/ Robert T. Honeywell*
**K&L GATES LLP**
Robert T. Honeywell
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 536 - 3900
E-mail: Robert.Honeywell@klgates.com
-and-
Carly S. Everhardt
200 S. Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 539 – 3341
Email: Carly.Everhardt@klgates.com

*Counsel to GPD Holdings LLC d/b/a CoinFlip*