**Objection Deadline:** May 1, 2024 at 4:00 p.m. (Prevailing Eastern Time)
**Hearing Date:** May 8, 2024, at 11:00 a.m. (Prevailing Eastern Time)

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>(Jointly Administered) |

**NOTICE OF DEBTORS' MOTION**
**TO ESTIMATE DCG'S COUNTERCLAIM**
**AGAINST THE DEBTORS UNDER BANKRUPTCY**
**CODE SECTIONS 502(c) AND 105(a)**

      **PLEASE TAKE NOTICE** that, on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC and its affiliates Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and the cases, the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

PLEASE TAKE FURTHER NOTICE that a hearing (the "Hearing") has been scheduled for **May 8, 2024, at 11:00 a.m. (Prevailing Eastern Time)** before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York pursuant to the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 44, the "Case Management Order"), at which Hearing the *Motion to Estimate DCG's Counterclaim Against the Debtors Under Bankruptcy Code Sections 502(c) and 105(a)* (the "Motion") will be heard. The Hearing will be conducted only through Zoom for government.

PLEASE TAKE FURTHER NOTICE that parties wishing to register for the Zoom hearing should use the eCourt Appearances link on the Court's website: https://www.nysb.uscourts.gov/ecourt-appearances. After the deadline to make appearances passes, the Court will circulate by email prior to the Hearing the Zoom links to those persons who made eCourt Appearances, using the email addresses submitted with those appearances. Members of the public who wish to listen to, but not participate in, the Hearing free of charge may do so by calling the following muted, listen-only number: 1-929-205-6099, Access Code: 92353761344#.

PLEASE TAKE FURTHER NOTICE that copies of the Motion can be viewed and/or obtained: (i) by accessing the Court's website at www.nysb.uscourts.gov or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, at https://restructuring.ra.kroll.com/genesis/ or by calling +1 888-524-2017. Note that a PACER password is needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that the relief requested in the Motion may affect your rights. Please read the below pleadings to be heard at the Hearing carefully and, if you have one available, discuss them with your attorney. (If you do not have an attorney, you should consider consulting with one.)

PLEASE TAKE FURTHER NOTICE that any responses or objections ("Objections"), if any, to the Motion or the relief requested therein shall be made in writing and (a) filed with the Court no later than **May 1, 2024 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline") and (b) served as required by the Case Management Order.

PLEASE TAKE FURTHER NOTICE that, if you oppose the relief requested in the Motion, or if you want the Court to hear your position on the Motion, then you or your attorney must timely file an Objection and attend the Hearing. If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Motion and may enter orders granting the relief requested by the Debtors.

Dated:    April 24, 2024
          New York, New York

*/s/ Luke A. Barefoot*

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel for the Debtors*
*and Debtors-in-Possession*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>(Jointly Administered) |

**MOTION TO ESTIMATE DCG'S
COUNTERCLAIM AGAINST THE DEBTORS UNDER
BANKRUPTCY CODE SECTIONS 502(c) AND 105(a)**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| JURISDICTION AND VENUE | | 4 |
| BACKGROUND | | 5 |
| I. | GAP-3AC Lending and Borrowing Relationship, 2022 DCG Assignment and Assumption of GAP's Interests, and 3AC Claims and Settlement Agreement | 5 |
| II. | DCG's Failure to Timely Assert or Disclose its Counterclaim | 10 |
| III. | Disputed Claims Under the Plan and the Debtors' Assets | 16 |
| IV. | The Assertion of the Counterclaim | 16 |
| RELIEF REQUESTED | | 18 |
| BASIS FOR RELIEF | | 18 |
| I. | The Value of the Counterclaim Must be Estimated Pursuant to Section 502(c)(2) or, in the Alternative, Section 502(c)(1) of the Bankruptcy Code. | 18 |
| | A. Section 502(c)(2) Requires Estimation of Claims that Seek Equitable Remedies for Breach of Performance. | 18 |
| | B. In the Alternative, this Court Should Estimate the Counterclaim Under Section 502(c)(1) as an Unliquidated Claim, the Liquidation of Which Would Unduly Delay Distributions to Creditors. | 20 |
| II. | The Counterclaim Should Be Estimated at Zero for Purposes of Allowance, Distribution, and Reserves. | 23 |
| | A. The Counterclaim Was Not Timely Asserted | 25 |
| | i. As the Counterclaim is Asserted as an Affirmative Claim, the Counterclaim is Untimely Because it Was Not Asserted Prior to the Bar Date | 26 |
| | ii. To the Extent the Counterclaim is Asserted as a Claim for Setoff, the Counterclaim is Untimely | |

**Page**

Because it Was Not Asserted in DCG's Timely-
Filed Proofs of Claim. ........................................................ 29

B.    The Counterclaim is Based on an Erroneous Reading of the
July 2022 GAP-DCG A&A Agreement. ..................................... 30

C.    The Parties' Contemporaneous Communications and Other
Actions Support GGC's Reading of the Contractual
Language ........................................................................... 33

D.    The Counterclaim is Barred by the Doctrines of Judicial
Estoppel, Estoppel by Laches, and Equitable Estoppel. ............ 35

i.    The Counterclaim is Barred by the Doctrine of
Judicial Estoppel ...................................................... 36

ii.   The Counterclaim is Barred by the Doctrine of
Equitable Estoppel .................................................... 38

iii.  The Counterclaim is Barred by the Doctrine of
Estoppel by Laches .................................................... 39

III.   Request For Waiver, to the Extent Necessary, of Local Rule 9014-
2 ...................................................................................................... 39

RESERVATION OF RIGHTS ..................................................................... 40

NOTICE ................................................................................................... 40

NO PRIOR REQUEST .............................................................................. 40

CONCLUSION ......................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agra v. Dolci (In re Major Model Mgmt. Inc.)*,
   No. 22-10169 (MG), 2023 WL 5338580 (Bankr. S.D.N.Y. Aug. 18, 2023)................ 26

*Bernstein v. IDT Corp.*,
   76 B.R. 275 (S.D.N.Y. 1987)........................................................................ 29-30

*Bridgeway Corp. v. Citibank*,
   201 F.3d 134 (2d Cir. 2000)........................................................................ 36

*Conopco, Inc. v. Campbell Soup Co.*,
   95 F.3d 187 (2d Cir. 1996)........................................................................ 39

*DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*,
   No. 17-cv-962 (JMF), 2019 WL 13414939 (S.D.N.Y. Mar. 11, 2019)....................... 31

*Gemini Tr. Co., LLC v. Genesis Glob. Cap., LLC (In re Genesis Glob. Holdco, LLC)*,
   No. 23-10063 (SHL), 2024 WL 478062 (Bankr. S.D.N.Y. Feb. 7, 2024)................... 32

*In re 929485 Fla., Inc.*,
   No. 8:19-BK-09424-CED, 2021 WL 1556133 (Bankr. M.D. Fla. Apr. 20, 2021)....... 19

*In re Aargus Polybag Co., Inc.*,
   172 B.R. 586 (Bankr. N.D. Ill. 1994) ........................................................... 28

*In re Adelphia Bus. Sols., Inc.*,
   341 B.R. 415 (Bankr. S.D.N.Y. 2003)........................................................... 21

*In re AMR Corp.*,
   No. 11-15463 (SHL), 2021 WL 2954824 (Bankr. S.D.N.Y. Jul. 14, 2021)......... *passim*

*In re Chateaugay Corp.*,
   156 B.R. 391 (S.D.N.Y. 1993)..................................................................... 23

*In re Chemtura Corp.*,
   448 B.R. 635 (Bankr. S.D.N.Y. 2011)................................................. 20, 23, 24

*In re Denby Stores*,
   86 B.R. 768 (Bankr. S.D.N.Y. 1988)........................................................ 28, 29

**Page(s)**

*In re Enron Corp.*,
No. 01-16034 (AJG), 2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) ................ 22

*In re FRG, Inc.*,
121 B.R. 710 (Bankr. E.D. Pa. 1990) ........................................................... 26

*In re FV Steel and Wire Co.*,
372 B.R. 446 (Bankr. E.D. Wis. 2007) ......................................................... 23

*In re John Q. Hammons Fall 2006, LLC*,
No. 16-21142, 2017 WL 4638439 (Bankr. D. Kan. Oct. 13, 2017) ............................ 19

*In re Lane*,
68 B.R. 609 (Bankr. D. Haw. 1986) ............................................................. 24

*In re Lionel L.L.C.*,
No. 04-17324, 2007 WL 2261539 (Bankr. S.D.N.Y. Aug. 3, 2007).......................... 20

*In re Manhattan Jeep Chrysler Dodge, Inc.*,
599 B.R. 247 (Bankr. S.D.N.Y. 2019)......................................................... 28

*In re Orama Hosp. Grp., Ltd.*,
601 B.R. 340 (Bankr. D.N.J. 2019) ............................................................ 19

*In re Residential Cap., LLC*,
No. 12-12020 (MG), 2015 WL 2375979 (Bankr. S.D.N.Y. May 15, 2015) ................ 36

*In re Rhythms NetConnections Inc.*,
300 B.R. 404 (Bankr. S.D.N.Y. 2003)................................................... 36

*In re RNI Wind Down Corp.*,
369 B.R. 174 (Bankr. D. Del. 2007) .................................................... 20

*In re Teigen*,
228 B.R. 720 (Bankr. D.S.D. 1998).............................................................. 21

*In re Thelen LLP*,
No. 09-15631 (MEW), 2015 WL 4999972 (Bankr. S.D.N.Y. Aug. 21, 2015) ............ 29

*In re Thomson McKinnon Secs., Inc.*,
191 B.R. 976 (Bankr. S.D.N.Y. 1996).......................................................... 24

*In re Windsor Plumbing Supply Co., Inc.*,
170 B.R. 503 (Bankr. E.D.N.Y. 1994)......................................................... 24

**Page(s)**

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)................................................................................. 32

*Mendelsohn v. Dalton Sch., Inc. (In re Molina)*,
    657 B.R. 172 (Bankr. E.D.N.Y. 2023)............................................................ 25

*Metro Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990)........................................................................... 32

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*,
    419 F.3d 115 (2d Cir. 2005)........................................................................... 26

*Reciprocal Merch. Servs., Inc. v. All Advert. Assocs., Inc.*,
    163 B.R. 689 (S.D.N.Y. 1994)........................................................................ 38

*Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*,
    486 B.R. 75 (S.D.N.Y. 2012), *aff'd sub nom. In re Lyondell Chem. Co.*, 542 F. App'x
    41 (2d Cir. 2013)............................................................................................. 18

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*,
    151 F. App'x 46 (2d Cir. 2005) ...................................................................... 25

*Tri-Star Pictures v. Leisure Time Prods., B.V.*,
    17 F.3d 38 (2d Cir. 1994)............................................................................... 39

**Rules and Statutes**

11 U.S.C. § 502............................................................................................ *passim*

11 U.S.C. § 544.................................................................................................. 8

11 U.S.C. § 547.................................................................................................. 8

28 U.S.C. § 157............................................................................................... 1, 4

28 U.S.C. § 1334............................................................................................. 1, 4

28 U.S.C. § 1408............................................................................................. 1, 4

28 U.S.C. § 1409............................................................................................. 1, 4

U.C.C. § 9-102(a)(12)......................................................................................... 31

<u>**Page(s)**</u>

<u>**Other Authorities**</u>

Local Rule 9014-2.................................................................................................... *passim*

The Debtors hereby submit this motion (this "Motion") seeking entry of an order, in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 502(c) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), (i) estimating at $0.00, for the purposes of allowance, reserves, and distributions, the Counterclaim asserted by Digital Currency Group, Inc. ("DCG"), (ii) waiving, to the extent necessary, the requirements of Local Rule 9014-2, and (iii) granting such other related relief as the Court deems just and proper.  In support of this motion, the Debtors submit the *Declaration of Louis M. Cherrone, Director of Alvarez & Marsal North America, LLC in Support of the Debtors' Motion to Estimate DCG's Counterclaim Against the Debtors Under Bankruptcy Code Sections 105(a) and 502(c)* (the "Cherrone Decl.") and the *Declaration of Miranda Hatch in Support of the Debtors' Motion to Estimate DCG's Counterclaim Against the Debtors Under Bankruptcy Code Sections 502(c) and 105(a)* (the "Hatch Decl."), both filed contemporaneously herewith, and respectfully represent as follows:

### PRELIMINARY STATEMENT

1.      For the past several months, DCG has worked to frustrate the Debtors' basic goal of maximizing the distribution of estate assets to the creditors.  The Counterclaim, filed nearly ten months after the Bar Date and while confirmation of the Debtors' Plan is *sub judice*, represents an eleventh-hour final attempt to redirect additional estate assets into DCG's pockets and to delay confirmation and consummation of the Debtors' Plan.  Contrary to the positions that DCG has consistently taken and on which the Debtors have relied, the Counterclaim now claims that the Debtors breached the July 2022 A&A Agreement by not paying over to DCG the Foreclosed Assets that had been applied to the 3AC Loan prior to its execution, and seeks turnover of those assets or their proceeds to DCG.  The value of those assets currently stands in excess of *$4 billion*.

2.      The Counterclaim is baseless, and is barred by order of this Court, the plain text of the agreements at issue, and multiple equitable doctrines:  It was asserted almost ten months after

the Bar Date; relies on an erroneous, illogical reading of the relevant contractual language; finds

no support in the actions or statements of the parties prior to or after that contract's execution; is

diametrically inconsistent with the positions that DCG has taken throughout these cases, including

express statements about the meaning of the precise contractual language now at issue; and is

barred by the doctrines of judicial estoppel, equitable estoppel, and estoppel by laches.  GGC has

sought to dismiss the Counterclaim on these grounds.

3.      DCG purportedly seeks to enforce the terms of the July 2022 A&A Agreement,

ignoring the plain language of that agreement.  The July 2022 A&A Agreement was prepared by

DCG and executed by the parties to paper over a balance sheet deficit exceeding $1 billion

following 3AC's collapse and failure to repay the approximately $2.4 billion it owed to the

Debtors.  The Debtors promptly foreclosed on the $1.2 billion of Foreclosed Assets, and

transferred the net remaining claim against 3AC to DCG in exchange for a $1.1 billion promissory

note accruing 1% interest payable in-kind and maturing 10 years later.  DCG's belated claim to

the Foreclosed Assets is either incorrect and contrary to the terms of the July 2022 A&A

Agreement, or unquestionably avoidable as a fraudulent transfer to an insider.  Accordingly, its

baseless last-ditch effort to prevent distributions should be summarily dismissed.

4.      DCG purports to seek relief in the form of "specific performance" by GGC in the

form of "turnover to DCG [of] the $1.2 billion of collateral foreclosed upon by GAP."

Counterclaim ¶ 36; Prayer for Relief ¶ 2.  But the Counterclaim elides the fact that the $1.2 billion

figure refers to the value of the Foreclosed Assets *as of June 2022*, when the crypto markets were

near their nadir.  The quantities of GBTC, BTC, and ETH that constituted the Foreclosed Assets

are now worth more than *$4.3 billion*.  Cherrone Decl. ¶ 12.  The Debtors' total distributable assets

have a current market value of approximately $4.4 billion, and the total pool of Allowed Claims

that will receive distributions pursuant to the plan is estimated between approximately $2.9 billion and $3.7 billion.  Cherrone Decl. ¶¶ 13-14.  To set a reserve for the full $4.3 billion in value claimed by DCG, therefore, would require that the Debtors set aside nearly *all* estate assets and make no distributions to creditors pending resolution of the Counterclaim.  Such a result would be deeply inequitable, given that it would force creditors to await final determination of DCG's last-ditch, meritless grab at estate assets even after confirmation of the Plan.  In order to avoid such a scenario, the Debtors hereby request that this Court estimate the value of the Counterclaim at $0.00 for allowance, distribution and reserve purposes pursuant to Section 502(c)(2) or, in the alternative, 502(c)(1), avoiding the need for GGC to take a reserve in connection with such claim, which will permit the Debtors to move forward with distributions if and when the Court approves the Plan and it becomes effective.

5.      To the extent this Court promptly dismisses the Counterclaim as an untimely or otherwise improper claim against GGC—which GGC believes this Court should do—the Counterclaim will not interfere with the Debtors' distributions to their creditors.  However, to the extent this Court does *not* promptly dismiss the Counterclaim, or to the extent this Court enters an order approving the Debtors' proposed Plan ahead of its decision on the Motion to Dismiss, the Debtors and all of their creditors could be unfairly prejudiced by a delay in nearly all distributions to creditors, because of a bogus claim ginned up by DCG at the last minute.

6.      For the reasons described herein, the Counterclaim is eminently amenable to estimation under Section 502(c)(2), because the Counterclaim asserts a right to payment through the equitable remedy of specific performance on account of a claimed breach of contract.  In the alternative, the Counterclaim may be estimated pursuant to Section 502(c)(1), because it seeks specific performance rather than a liquidated dollar figure, and the liquidation of the claim is likely

to cause undue delay to distributions.  Adjudication of the claim poses an existential threat to the

Debtors' ability to make prompt distributions, and the parties are already in possession of all the

documents and other information necessary to make the necessary showings to this Court

regarding the likelihood of the claim's success on the merits.

7.      Finally, because DCG has been in possession of all relevant documents and

information for months or years, as applicable, briefing of the present Motion requires no

discovery practice.  Documents relating to the contractual agreement that is the basis of the claim,

the related contractual agreements, and email and other communications relating to their

negotiation, and all other documents that could conceivably be relevant to the litigation of the

Counterclaim, were subject to discovery over the course of 2022 and 2023 as part of the regulatory

investigations, as well as the Special Committee's investigation of their transactions with DCG in

connection with these cases, as well as discovery practice in connection with the litigation of

3AC's claims against the Debtors.  As such, and because of the time-sensitive nature of the relief

requested, GGC respectfully requests that this Court waive Local Rule 9014-2 and permit the

present Motion to be heard on regular notice at the hearing scheduled for May 8, 2024.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are

sections 105(a), 502(c)(1), and 502(c)(2) of the Bankruptcy Code.

## BACKGROUND[1]

I.    **GAP-3AC Lending and Borrowing Relationship, 2022 DCG Assignment and Assumption of GAP's Interests, and 3AC Claims and Settlement Agreement**

10.    Between January 2019 and the default of Three Arrows Capital, Ltd.'s ("3AC") in June 2022, GGC or Genesis Asia Pacific Pte. Ltd. ("GAP"), as applicable, and 3AC had a lending and borrowing relationship governed by a Master Loan Agreement GGC and 3AC executed on January 10, 2019 (the "2019 GGC MLA") and a Master Loan Agreement GAP and 3AC executed separately on January 24, 2020 (the "2020 GAP MLA", and together with the 2019 GGC MLA, the "MLAs"). Complaint ¶ 9; Counterclaim ¶ 11.

11.    On July 20, 2020, GGC and GAP executed an Assignment and Assumption of Master Loan Agreement (the "2020 GAP-GGC A&A Agreement"), pursuant to which GGC assigned to GAP all of its "right, title, benefit, privileges and interest in" and all of its "burdens, obligations and liabilities in connection with" the 2019 GGC MLA, including the 3AC Loans and related Pledge Agreements (as defined herein), and GAP assumed and agreed to observe and perform "all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities . . . in connection with" the 2019 GGC MLA. Thereafter, GGC had no remaining lending relationship with 3AC, and the Debtors' entire lending relationship with 3AC was through GAP. Complaint ¶ 10; *see* Counterclaim ¶ 12.

12.    Prior to 3AC's default and collapse, its borrowings from GAP were secured by pledges and/or delivery of 35,585,040 Grayscale Bitcoin Trust shares ("GBTC"), 33,348.03 Bitcoin ("BTC"), 17,455.73 Ether ("ETH"), 2,739,043.83 AVAX tokens ("AVAX"), and 13,583,265 NEAR tokens ("NEAR"). *See Debtors' Second Omnibus Objection (Substantive) to*

---

[1]    Given that the grounds for relief in this Motion substantially overlap with GGC's *Memorandum of Law in Support of Plaintiff's Motion to Dismiss Counterclaim Against Genesis Global Capital, LLC* (AP ECF No. 14), this section is substantially similar to the Background section therein.

*Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P.*

*3007 (No Liability)* (ECF No. 658, the "3AC Claim Objection") ¶ 58.  On June 13, 2022, GAP

exercised remedies against the GBTC, BTC, and ETH collateral (the "Foreclosed Assets") after

serving a notice of default on 3AC (the "Foreclosure").  *See* Counterclaim ¶ 13, 3AC Claim

Objection ¶ 59.

13.    On June 30, 2022, subsequent to the Foreclosure in satisfaction of $1.2 billion of

3AC's outstanding debt, GAP executed an Assignment and Assumption Agreement with DCG

(the "June 2022 GAP-DCG A&A Agreement"), pursuant to which GAP assigned to DCG "all of

the rights and obligations in relation to the Assumed Liability," which Assumed Liability was an

agreed-upon aggregate principal amount of $1.1 billion, "after giving effect to all repayments and

recoveries in respect" of the 3AC Loans.  June 2022 GAP-DCG A&A Agreement at 1.  The June

2022 GAP-DCG A&A Agreement was executed contemporaneously with a $1.1 billion

promissory note from DCG to GGC (the "Promissory Note") for the amount of the Assumed

Liability originally payable from GAP to GGC (*i.e.*, the remaining balance on the 3AC Loans after

application of the value of the Foreclosed Assets).  *See* Disclosure Statement § IV.C.iii.

14.    On July 14, 2022, GAP and DCG executed an Assignment and Assumption

Agreement (the "July 2022 GAP-DCG A&A Agreement"), pursuant to which GAP assigned to

DCG beneficial interests in all of the "right, title, benefit, privileges and interest in" and all of the

"burdens, obligations and liabilities in connection with" (i) GAP's lending activities with 3AC,

including all outstanding loans (the "3AC Loans"); (ii) the MLAs, which governed the 3AC Loans;

and (iii) the related Pledge Agreements dated May 28, 2020, November 16, 2021 and January 27,

2022, each as amended, restated, supplemented or otherwise modified, which governed pledges of

collateral in connection with the 3AC Loans (collectively the "Pledge Agreements" and together

with the 3AC Loans and the MLAs, the "Assigned Interests"), and DCG assumed and agreed to observe and perform "all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities . . . in connection with the Assigned Interests." Complaint ¶ 11; July 2022 GAP-DCG A&A Agreement ¶ 2; *see also* Counterclaim ¶ 14. ████████████ ████████████████████████████████ *See* Ex. 6.

15.    On August 15, 2022, GGC entered into a security agreement with Gemini Trust Company, LLC, pursuant to which GGC pledged 30,905,782 shares of GBTC to secure certain of its obligations under the Gemini Earn Program (the "Gemini GBTC Shares"). Gemini Settlement Motion ¶ 9; Disclosure Statement at § IV.C.

16.    On January 19, 2023, each of the Debtors in the above-captioned cases (the "Chapter 11 Cases") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

17.    On May 22, 2023, 3AC filed proofs of claim nos. 523, 526 and 527 (the "3AC Initial Claims") in these Chapter 11 Cases, to which the Debtors objected. *See Debtors' First Omnibus Objection (Substantive) to Claim Nos. 523, 526 and 527 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (ECF No. 530). On August 18, 2023, 3AC filed amended proofs of claim nos. 981, 982 and 990 (the "3AC Amended Claims," collectively with the 3AC Initial Claims, the "3AC Claims"), to which the Debtors also objected. *See Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (ECF No. 658, the "Renewed 3AC Claim Objection"); *see also* Complaint ¶ 13; Counterclaim ¶¶ 17-18.

18.    The 3AC Amended Claims asserted (i) turnover claims under U.S. and BVI law and conversion claims under New York law with respect to collateral that was transferred to the Debtors to secure 3AC's obligations but that 3AC alleged was not properly pledged (the "Turnover

and Conversion Claims"),[2] (ii) preference claims under BVI law for margin or principal repayments in connection with the 3AC Loans (the "Preference Claims" and, together with the Turnover and Conversion Claims, the "3AC Loan-Related Claims"),[3] (iii) "potential" strong-arm claims under Bankruptcy Code section 544 to avoid any purportedly unperfected security interest with respect to the 3AC Loans (the "Potential Strong-Arm Claims"), and (iv) "potential" preference claims under Bankruptcy Code section 547 for margin or principal repayments in connection with the 3AC Loans (the "Potential Preference Claims" and, together with the Potential Strong-Arm Claims, the "3AC Potential Claims").  *See* 3AC Amended Claims ¶¶ 37, 45, 50, 56, 65.  In short, (i) the Turnover and Conversion Claims and Potential Strong-Arm Claims sought damages in respect of the Foreclosed Assets, which had been pledged by 3AC to GAP pursuant to the Pledge Agreements and foreclosed upon in June 2022, and (ii) the Preference Claims and Potential Preference Claims sought avoidance of transfers made by 3AC to GAP pursuant to its obligations under the MLAs and the Pledge Agreements.  Complaint ¶ 14.  These MLAs and Pledge Agreements were the only agreements that governed the lending and borrowing relationship between GAP and 3AC.  Complaint ¶ 15; *see* Renewed 3AC Claim Objection ¶ 77; *see also Declaration of A. Derar Islim in Support of Debtors' Second Omnibus Objection (Substantive) to Claims No. 981, 982, and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (ECF No. 658) ¶¶ 7-10.

19.    Following extensive negotiations, the Debtors, DCG, 3AC and the joint liquidators

---

[2]    The Turnover and Conversion Claims sought:  (i) approximately 13,780.04 BTC; (ii) approximately 17,455 ETH; (iii) four categories of tokens that were converted into BTC, comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 ETH (collectively, the "Substituted Collateral"); and (iv) approximately 9.2 million GBTC.  *See* 3AC Amended Claims ¶¶ 37, 50.

[3]    The Preference Claims sought:  (i) interest payments by 3AC to GAP totaling approximately $18 million between June 2 and June 3, 2022; (ii) a loan repayment by 3AC to GAP on May 6, 2022 in the amount of 115,000 USDC; (iii) 13,172,000 GBTC transferred as collateral; and (iv) the Substituted Collateral.  *See* 3AC Amended Claims ¶ 45.

of 3AC, Messrs. Russell Crumpler and Christopher Farmer (the "Joint Liquidators"), entered into

a settlement agreement, dated as of November 22, 2023 (ECF No. 972, the "3AC Settlement

Agreement"), resolving the disputes between the Debtors and 3AC concerning the claims asserted

in the 3AC Amended Claims and expressly preserving the Debtors' right to seek payment from

DCG on account of the July 2022 GAP-DCG A&A Agreement. Complaint ¶ 17; *see* Counterclaim

¶ 21. On November 9, 2023, the Debtors sought approval of the Settlement Agreement by filing

the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry*

*of an Order Approving Settlement Agreement with the Joint Liquidators of Three Arrows Capital,*

*Ltd.* (ECF No. 906, the "3AC Settlement Motion").

20.     The 3AC Settlement Motion and the 3AC Settlement Agreement made express that

the Debtors reserved rights to assert a claim that DCG is liable for 3AC's allowed claim based on

the July 2022 GAP-DCG A&A Agreement. *See* 3AC Settlement Motion at 25. This express

preservation of liability was also discussed at the hearing on the 3AC Settlement Motion. *See* Nov.

30, 2023 Hr'g Tr. 12:2-9 (L. Barefoot: "[W]hile the settlement provides for a global resolution of

the claims as between the Genesis debtors and Three Arrows Capital, it expressly preserves any

and all claims that the Genesis debtors have against their parent, DCG. So the [D]ebtors' claims

that any liability associated with the Three Arrows Capital loans were assumed by DCG pursuant

to the terms of the assumption and assignment agreement, are in no way compromised by the terms

of the proposed settlement."). Nowhere in the record regarding the 3AC Settlement Motion did

DCG suggest that it believed it had any affirmative claims against GGC under the same July 2022

GAP-DCG A&A Agreement.

21.     On November 30, 2023, this Court approved the 3AC Settlement Agreement and

entered the *Order Approving Settlement Agreement Between the Genesis Debtors and the Joint*

*Liquidators of Three Arrows Capital, Ltd.* (ECF No. 1012, the "3AC Settlement Order"), authorizing an allowed claim in favor of 3AC in the amount of $33,000,000 (the "Allowed 3AC Claim Amount") and preserving the Debtors' right to obtain payment from DCG on account of such claim.  Following approvals from the BVI Court, on January 2, 2024, the Debtors filed the *Notice of Effective Date of Debtors' Executed Settlement Agreement Between the Genesis Debtors and the Joint Liquidators of Three Arrows Capital, Ltd*. (ECF No. 1118).  Complaint ¶ 18.

22.    Consistent with paragraph 6 of the 3AC Settlement Order, which authorized the Debtors "to take any action as may be necessary or appropriate to implement, effectuate, and fully perform under the Settlement Agreement in accordance with this Order," and as permitted by the terms of the July 2022 GAP-DCG A&A Agreement, GAP and GGC entered into an Assignment Agreement on February 7, 2024 (the "2024 GGC-GAP A&A Agreement"), by which GAP assigned all rights and obligations under the July 2022 GAP-DCG A&A Agreement from GAP to GGC.[4]  *See* 2024 GGC-GAP A&A Agreement ¶ 2; Complaint ¶ 20; Counterclaim ¶¶ 24-25.

## II.    DCG's Failure to Timely Assert or Disclose its Counterclaim

23.    On April 4, 2023, the Court entered the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* (ECF No. 200, the "Bar Date Order"), establishing, as relevant here, May 22, 2023 at 4:00 p.m. as the final deadline for filing proofs of claim based on prepetition claims (the "Bar Date").

24.    On May 22, 2023, DCG filed proofs of claim nos. 464, 487 and 511 against Holdco, GGC and GAP (the "Proofs of Claim"), in which DCG reserved rights and defenses (including

---

[4]    The July 2022 GAP-DCG A&A Agreement contains no conditions or restrictions on assignment.

rights of subrogation or indemnity) in respect of claims that could arise from the Joint Liquidators'

lawsuit against GGC, GAP and DCG in the British Virgin Islands, among other unrelated claims

against the Debtors. *See* Counterclaim ¶ 19. While DCG's Proofs of Claim discuss GAP's valid

foreclosure on the Foreclosed Assets, the Proofs of Claim do not include any mention of the claim

now asserted in the Counterclaim regarding DCG's purported entitlement to the Foreclosed Assets,

which is an independent claim for breach of contract under the July 2022 GAP-DCG A&A

Agreement and which stands separate and apart from any claims that the Joint Liquidators' may

have successfully asserted against DCG in the British Virgin Islands.

25.    On June 13, 2023, the Debtors filed the *Disclosure Statement with Respect to the*

*Amended Joint Plan of Genesis Global Holdco, LLC et al.* (ECF No. 429, the "June Disclosure

Statement"). The June Disclosure Statement did not include any response from DCG to the

Debtors' disclosures.

26.    On October 25, 2023, the Debtors filed the *Amended Disclosure Statement with*

*Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al. Under Chapter 11 of the*

*Bankruptcy Code* (ECF No. 839, the "October Disclosure Statement"). The October Disclosure

Statement, at DCG's request, included an exhibit drafted by DCG (the "Initial Disclosure

Statement Response") stating DCG's position on all of the Debtors' assertions in the October

Disclosure Statement.

27.    On October 31, 2023, DCG filed *Digital Currency Group, Inc.'s Limited Objection*

*and Reservation of Rights to the Debtors' Amended Disclosure Statement* (ECF No. 867, the

"Disclosure Statement Objection"), in which DCG stated that the October Disclosure Statement—

even including the Initial Disclosure Statement Response—did not "sufficiently set forth the risks

of pursuing certain causes of action against DCG as a source of substantial recoveries under the

Amended Plan." The Disclosure Statement Objection set forth DCG's views of the Proposed

Recoveries for creditors under the Debtors' Plan as compared to the "Agreement in Principle,"

both of which failed to account for or disclose DCG's claims to the Foreclosure Assets. Disclosure

Statement Objection ¶ 4. The Disclosure Statement Objection proposed specific additions to the

body of the October Disclosure Statement (the "Inline DCG Disclosure Statement Additions"), in

addition to the Initial Disclosure Statement Response (which was already incorporated) and

asserted that in the absence of the Inline DCG Disclosure Statement Additions, the Disclosure

Statement failed to provide adequate information.

28.    On November 7 and 17, the Court held a hearing to consider the approval of the

October Disclosure Statement and addressed DCG's Disclosure Statement Objection. DCG rose

to object on the grounds that the October Disclosure Statement should not be approved without

the addition of the Inline DCG Disclosure Statement Additions. The Court held that including a

link to the Disclosure Statement Response at each location that DCG felt demanded inclusion of

their perspective would "solve that issue." *See* Nov. 7, 2023 Hr'g Tr. 74:10-11.

29.    On November 17, 2023, the Debtors filed the *Amended Disclosure Statement with

Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al.* (ECF No. 950, the

"November 17 Disclosure Statement") which included a revised version of the Initial Disclosure

Statement Response (such revised version, the "Disclosure Statement Response") and, in

accordance with the Court's direction, included links throughout to the Disclosure Statement

Response. DCG's Disclosure Statement Response specifically addresses the Debtors' statements

in connection with the July 2022 GAP-DCG A&A Agreement, stating, in direct contradiction to

the position DCG now takes in the Counterclaim: "[C]onsistent with the intention of the parties

to the 3AC Loan Assignment and Assumption Agreement, DCG did not receive any of the

proceeds from Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure." Disclosure Statement Response, Section VI. On November 28, 2023, the Debtors filed the *Amended Chapter 11 Plan* (ECF No. 989, as amended, including in the version filed as ECF No. 1392, the "Plan").

30.    On December 6, 2023, the Bankruptcy Court entered the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (ECF No. 1027, the "Disclosure Statement Order"), and on December 6, 2023, the Debtors filed a final solicitation version of the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (ECF No. 1031, the "Disclosure Statement") which included the Disclosure Statement Response at Exhibit F. On the basis, *inter alia*, of the submission by DCG, the Court approved the Disclosure Statement for solicitation on December 6, 2023. *See* Disclosure Statement Order.

31.    On February 2, 2024, the Debtors filed the *Motion Seeking Entry of an Order Authorizing, But Not Directing, (I) the Sale of Trust Assets and (II) Granting Related Relief* (ECF No. 1227, the "Asset Sale Motion"), requesting that this Court authorize (i) the sale of various GBTC and other assets, including the GBTC that comprised the Foreclosed Assets, and (ii) Gemini's sale of the Gemini GBTC Shares (which were among the Foreclosed Assets prior to the pledge and transfer to Gemini). *See* Asset Sale Motion ¶ 13 (noting that the assets subject to the Asset Sale Motion include GBTC shares "obtained by GGC as a result of its exercise of remedies in connection with the default of Three Arrows Capital, Ltd."); *id.* at ¶¶ 28, 31 (discussing the Debtors' view that it is in the best interests of the estates for Gemini to receive authority to sell the

Gemini GBTC Shares). The Asset Sale Motion further stated that such Foreclosed Assets "are not the subject of any asserted interest by Gemini or any other party." Asset Sale Motion ¶ 13. On February 9, 2024, DCG filed the *Objection and Reservation of Rights to Debtors' Motion Seeking Entry of an Order Authorizing, but Not Directing, (I) the Sale of Trust Assets and (II) Granting Related Relief* (ECF No. 1285, the "Asset Sale Objection"), objecting to the proposed sales not on the grounds of the purported rights to the Foreclosed Assets that it asserts in the Counterclaim, but rather on the basis that the sale of such assets should await the outcome of the Plan. Asset Sale Objection ¶ 1. Nowhere in its objection did DCG assert or suggest that it believed it had any interests in the assets sought to be sold, much less that GGC was in breach of any obligation to deliver those assets to DCG, for which it now seeks specific performance in its Counterclaim. On February 14, 2024, the Court held a hearing to consider the Asset Sale Motion (the "Asset Sale Motion Hearing"). DCG was the only objector to the Asset Sale Motion. While DCG advanced numerous arguments in support of its objection at the Asset Sale Motion Hearing, at no point did DCG suggest that it had any interest in the GBTC component of the Foreclosed Assets.[5] On February 15, 2024, the Court entered the *Order (I) Authorizing, But Not Directing, the Sale of Trust Assets and (II) Granting Related Relief* (ECF No. 1314, the "Asset Sale Order").

32.    On February 6, 2024, DCG filed an *Objection to Confirmation of the Debtors' Amended Plan* (ECF No. 1257, the "Confirmation Objection"), in which DCG raised extensive objections to the Plan, including on the purported basis that the Debtors were solvent based on the

---

[5]    Importantly, during the hearing, the Court admonished DCG's counsel for not disclosing DCG's economic interest in management fees attributable to the GBTC that comprised a portion of the Foreclosed Assets, making DCG's failure to disclose their now-asserted interest in the *ownership* of such GBTC all the more incredible. *See* Feb. 14, 2024 Hr'g Tr. 41:22-42:20 (Judge Lane: "[DCG is] getting—they have a monetary interest in the continuation of the existing relationship. That's undisputed. It's, frankly, a bit surprising that it's not at least addressed in the objection. That's kind of playing with fire, frankly, but there's a whole host of disputes and litigation, and there's a pending confirmation objection, and it makes clear that DCG has an interest in pursuing its own agenda, its own interest").

Debtors' estimate of $2.914 billion in general unsecured claims. Confirmation Objection ¶¶ 6-7, Feb. 27, 2024 Hr'g Tr. 133:20-22; *Direct Testimony of Adam W. Verost in Support of Digital Currency Group, Inc.'s and DCG International Investments Ltd.'s Objection to Confirmation of the Amended Joint Plan of Genesis Global Holdco, LLC, et al.* (ECF No. 1344, the "Verost Decl.") ¶¶ 16, 19 ($2.914 billion claims pool). Nowhere in DCG's 40 pages of briefing on its Confirmation Objection and at no point during oral argument did DCG mention that it asserted an additional claim for $1.2 billion in relation to the Foreclosed Assets (or approximately $4 billion based on today's value), including in connection with any discussion of DCG's Proofs of Claim. Nor did DCG's sole witness, Mr. Adam Verost—who filed three separate declarations and gave live testimony during the confirmation hearing—provide any suggestion that DCG asserted (or could assert) any claims against the Debtors for delivery of the Foreclosed Assets or their proceeds to DCG. *See generally* Verost Decl. In short, throughout the confirmation proceedings, when the value of the Debtors' assets and liabilities was expressly put at issue by DCG's own objection asserting an entitlement to an equity recovery from the Debtors, DCG never disclosed the massive claim against the Debtors it now asserts in the Counterclaim. To the contrary, all of DCG's arguments were premised on the general unsecured claims pool of $3 billion—not the claims pool of at least $4.2 billion as of the Petition Date (or over $7 billion at current valuations) that would exist under DCG's new Counterclaim theory.

33. The Court held an evidentiary hearing on February 26, 27, and 28, 2024 to consider the confirmation of the Plan, with closing arguments held on March 18, 2024. The evidentiary record for confirmation of the Plan was closed after closing arguments. As of the date hereof, the confirmation of the Plan is under consideration by this Court.

34. On March 19, 2024, the Debtors filed the *Motion for Entry of an Order Approving*

*a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors (*ECF No. 1499, the "Gemini Settlement Motion").  DCG did not oppose the Gemini Settlement Motion, which sought to grant authority to Gemini to distribute the Gemini GBTC Shares.  The Court approved the Gemini Settlement Motion on April 19, 2024 (ECF No. 1598, the "Gemini Settlement Order").

### III.    Disputed Claims Under the Plan and the Debtors' Assets

35.    The Plan provides that, as of each Distribution Date, the Debtors shall hold in trust in a Disputed Claims Reserve "for distributions on account of Disputed Claims that are subsequently Allowed after such Distribution Date."  Plan Art. VII.I (all terms as defined in the Plan).   The Plan defines "Disputed Claims" as claims as defined in section 101(5) of the Bankruptcy Code (which includes claims for "an equitable remedy for breach of performance . . . whether or not . . . reduced to judgment") that are "not yet Allowed" or "Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable."  *See* Plan Art. I(A)(72).

36.    As of February 29, 2024, the Debtors are in possession of cash and other assets with a total value of approximately $4.4 billion, which includes $808.4 million in cash and U.S. treasury bonds, digital assets currently valued at approximately $1.3 billion, and $2.3 billion in brokerage assets.  *See Notice of Filing of Cash and Coin Report* (ECF No. 1533, the "February 2024 Cash and Coin Report") at 5.

### IV.    The Assertion of the Counterclaim

37.    On February 7, 2024, consistent with the prior reservations of rights and descriptions of its claims in the Disclosure Statement, GGC commenced an adversary proceeding by filing the *Adversary Complaint* (*Genesis Global Capital, LLC v. Digital Currency Group, Inc.*,

Adv. Pro. 24-01312 (SHL) (Bankr. S.D.N.Y. Feb. 7, 2024) ("DCG AP")[6] (Adv. ECF No. 1, the "Complaint"), requesting that this Court provide declaratory relief (i) finding that the $33,000,000 Allowed 3AC Claim Amount must be paid by DCG or (ii) alternatively, if GGC pays such amount, finding that DCG shall reimburse GGC for such payment, plus interest thereon to the date of reimbursement.

38.     On March 11, 2024, DCG filed the *Answer and Affirmative Defenses of Digital Currency Group, Inc. to Genesis Global Capital, LLC's Adversary Complaint* (Adv. ECF No. 5, the "Answer"), in which DCG admitted all material facts alleged in the Complaint, including that the July 2022 GAP-DCG A&A Agreement governs this dispute, and generally referred the Court to the documents for their contents. *See* Answer ¶¶ 9-21. On March 15, 2024, GGC filed the *Notice of Proposed Case Management Plan and Scheduling Order* (Adv. ECF No. 6, the "Proposed Scheduling Order") for briefing for motions for judgment on the pleadings to be filed by both parties, scheduled to be completed on May 30, 2024. Proposed Scheduling Order ¶ 5. The Proposed Scheduling Order did not include a hearing date and the Court stated at the March 19, 2024 omnibus hearing that it would set a hearing date after briefing is completed. *See* Mar. 19, 2024 Hr'g Tr. 45:3-23. On April 1, 2024, DCG filed its *Amended Answer, Affirmative Defenses, and Counterclaim of Digital Currency Group, Inc. to Genesis Global Capital, LLC's Adversary Complaint* (Adv. ECF No. 8, the "Amended Answer"), which included a Counterclaim (the "Counterclaim") seeking turnover of the Foreclosed Assets on grounds that GGC's failure to do so constitutes a breach of the July 2022 GAP-DCG A&A Agreement. *See* Amended Answer ¶ 36.

39.     On April 4, 2024, GGC filed its *Motion for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)* (Adv. ECF No. 9, the "Rule 12(c) Motion"), requesting that

---

[6]   As used herein, citations to "Adv. ECF No. ___" refer to the DCG AP docket.

this Court enter judgment on the pleadings on both counts of GGC's Complaint.

40.     On April 17, 2024, GGC filed the *Notice of Presentment of Proposed Scheduling
Order* (Adv. ECF No. 12, the "<u>Proposed Counterclaim Scheduling Order</u>") for briefing on GGC's
motion to dismiss the Counterclaim.  The Proposed Counterclaim Scheduling Orders states that
the Court will set a hearing date following completion of briefing on the motion to dismiss on May
30, 2024.  Proposed Counterclaim Scheduling Order ¶ 5.  On April 22, 2024, GGC filed its *Motion
to Dismiss Counterclaim Against Genesis Global Capital, LLC* (Adv. ECF No. 14, the "<u>Motion to
Dismiss</u>").

<b><u>RELIEF REQUESTED</u></b>

44.     By this Motion, the Debtors request the entry of an order, pursuant to section
502(c)(2), or in the alternative section 502(c)(1), and section 105(a), of the Bankruptcy Code, (i)
estimating, for the purposes of allowance, distribution, and reserves, the unliquidated claim
asserted by DCG in the Counterclaim at $0.00, (ii) waiving the requirements of Local Rule 9014-
2, and (iii) granting such other related relief as the Court deems just and proper.

<b><u>BASIS FOR RELIEF</u></b>

**I.     The Value of the Counterclaim Must be Estimated Pursuant to Section 502(c)(2) or, in the Alternative, Section 502(c)(1) of the Bankruptcy Code.**

    **A.  Section 502(c)(2) Requires Estimation of Claims that Seek Equitable Remedies for Breach of Performance.**

45.     Section 502(c)(2) of the Bankruptcy Code provides that "[t]here shall be estimated
for purposes of allowance under this section . . . any right to payment arising from a right to an
equitable remedy for breach of performance," 11 U.S.C. § 502(c)(2), which courts in this District
have applied in the context of claims for specific performance.  *See Route 21 Assocs. of Belleville,
Inc. v. MHC, Inc.*, 486 B.R. 75, 90 (S.D.N.Y. 2012) (Section 502(c)(2) "requires the estimation of
any claim . . . for which applicable law provides only an equitable remedy, *such as specific*

-18-

*performance.* This subsection requires that all claims against the debtor be converted into dollar amounts." (emphasis in original)), aff'd sub nom. *In re Lyondell Chem. Co.*, 542 F. App'x 41 (2d Cir. 2013); *see also In re 929485 Fla., Inc.*, No. 8:19-BK-09424-CED, 2021 WL 1556133, at *5 (Bankr. M.D. Fla. Apr. 20, 2021) (estimating under section 502(c)(2), for purposes of allowance, claim for right to payment arising from party's right to enforce contract in an action for specific performance); *In re Orama Hosp. Grp., Ltd.*, 601 B.R. 340, 348 (Bankr. D.N.J. 2019) (estimating under section 502(c)(2) a claim "based on debtor's breach of an executory contract"); *In re John Q. Hammons Fall 2006, LLC*, No. 16-21142, 2017 WL 4638439, at *4 (Bankr. D. Kan. Oct. 13, 2017) (ordering estimation of unliquidated breach of contract claim seeking specific performance under section 502(c)(2) as well as 502(c)(1)).

46.     The Counterclaim asserts, for the first time, that "GGC has breached the [July 2022 GAP-DCG A&A Agreement], and continues to breach the [July 2022 GAP-DCG A&A Agreement] by failing to satisfy its obligations," Counterclaim ¶ 35, and seeks equitable relief by way of "a decree ordering specific performance by GGC of its obligations under the [July 2022 GAP-DCG A&A Agreement], including payment of approximately $1.2 billion of collateral foreclosed upon by GAP and any proceeds of the foregoing," Prayer for Relief ¶ 2. Because DCG seeks equitable relief in the form of specific performance for the Foreclosed Assets themselves, section 502(c)(2)'s requirement that equitable claims be estimated squarely applies. This is particularly the case where the value of the remedy sought by DCG would depend on, *inter alia,* a tracing of the Foreclosure Assets and the price(s) at which such assets were sold by the Debtors and/or Gemini, which tracing and valuation has not been done, and which the Debtors and their advisors lack relevant information to perform. Cherrone Decl. ¶¶ 7, 9-10.

47.     Estimation can be used for all purposes, including allowance, distribution, and the

setting of reserves. *In re Chemtura Corp.*, 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011); *In re AMR Corp.,* No. 11-15463 (SHL), 2021 WL 2954824, at *3 (Bankr. S.D.N.Y. Jul. 14, 2021). As such, estimation of the Counterclaim under Section 502(c)(2) for purposes of allowance, distribution, and the setting of reserves is required.

### B. In the Alternative, this Court Should Estimate the Counterclaim Under Section 502(c)(1) as an Unliquidated Claim, the Liquidation of Which Would Unduly Delay Distributions to Creditors.

48.     Section 502(c)(1) of the Bankruptcy Code provides for estimation of "any contingent or unliquidated claim, the fixing of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(l). Estimation by the Court under section 502(c)(1) is mandatory, so long as fixing or liquidation of the claim would "unduly delay" the administration of the case. *See In re Lionel L.L.C.*, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (collecting cases); *In re RNI Wind Down Corp.,* 369 B.R. 174, 191 (Bankr. D. Del. 2007) (noting that the purpose of section 502(c)(1) is to prevent the debtor's estate from "being held hostage by the fixing or liquidation of an unliquidated or contingent claim").

49.     Here, the Counterclaim is unliquidated to the extent that it seeks specific performance in the form of turnover of assets or an unspecified amount consisting of the proceeds of those assets, and has not been reduced to a dollar figure, Prayer for Relief ¶ 2, and any dollar value of the proceeds of those assets is not readily ascertainable. The Debtors are no longer in possession of *any* of the GBTC shares that were among the Foreclosed Assets. Cherrone Decl. ¶ 10. Of those shares, the vast majority—30,905,782 shares of the total 35,585,040 shares that were obtained pursuant to the Foreclosure—were pledged and transferred to Gemini on August 15, 2022, and has not had possession of such shares, nor information regarding any disposition thereof, since that date. Cherrone Decl. ¶ 10. The remainder of the GBTC shares that were among the

Foreclosed Assets were sold by the Debtors subsequent to the entry by this Court of the Trust Asset Sale Order on February 15, 2024. Cherrone Decl. ¶ 8, 10. Neither the Debtors nor their advisors have conducted any tracing or valuation exercise with respect to the disposition of GBTC pursuant to the Trust Assets Sale Order, or with respect to any Foreclosed Assets. Cherrone Decl. ¶ 9. As such, the Counterclaim is not a liquidated claim and is amenable to estimation under section 502(c)(1).

50.     In assessing whether the liquidation of a claim would cause "undue delay" so as to require estimation, courts "consider all the circumstances in the case and, in particular, how long the liquidation process would take compared with the uncertainty due to the contingency question [as well as] [t]he costs and benefits associated with both liquidation and estimation." *In re Teigen*, 228 B.R. 720, 723 (Bankr. D.S.D. 1998) (citations omitted); *see, e.g.*, *In re AMR Corp.*, 2021 WL 2954824, at *5-6 (considering the "real world consequences" of liquidation proceedings as a basis to estimate claims under section 502(c)(1), particularly "that distributions will be delayed for a significant amount of time into the future"); *In re Adelphia Bus. Sols., Inc.*, 341 B.R. at 423 (finding estimation "necessary and appropriate" where liquidation would cause "undue delay" because the debtor was "unable to establish a cash reserve" and "[e]stimation thus is an essential prerequisite to confirmation of the Plan").

51.     Here, the parties are in the process of briefing on GGC's motion to dismiss the Counterclaim, but such briefing will not conclude until May 30, 2024, and no hearing on that motion has yet been set. Proposed Counterclaim Scheduling Order ¶¶ 4-5. In the meantime, if the Court determines that discovery is required to adjudicate the Counterclaim on the merits, and enters its order approving the Plan while discovery remains underway, the Debtors could be required to hold back as part of a Disputed Claims Reserve the full amount asserted in the

-21-

Counterclaim: The Plan provides that, as of each Distribution Date (as defined in the Plan), the Debtors shall hold in trust in a Disputed Claims Reserve "for distributions on account of Disputed Claims that are subsequently Allowed after such Distribution Date." Plan Art. VII.I (all terms as defined in the Plan). The Plan defines "Disputed" Claims by reference to the definition of "claims" in section 101(5) of the Bankruptcy Code (which definition includes claims for "an equitable remedy for breach of performance . . . whether or not . . . reduced to judgment") that are "not yet Allowed" or "Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable." *See* Plan Art. I(A)(72). Accordingly, the Debtors could be required to include assets sufficient to satisfy the Counterclaim in full in a Disputed Claims Reserve for each Distribution Date that takes place prior to this Court's final order dismissing the Counterclaim.[7]

52. For illustrative purposes, if the Debtors had sold all of the Foreclosed Assets on April 21, 2024 (which they did not), the value of the proceeds of such sale would be more than $4.3 billion. Cherrone Decl. ¶ 12. The total estate assets of the Debtors are approximately $4.4 billion. Cherrone Decl. ¶ 13. As such, holding back the full value of the Foreclosed Assets would reduce the Debtors' immediately distributable assets to nearly zero. The possibility that DCG could, by asserting the baseless Counterclaim on the eve of Plan confirmation, force the Debtors to wait to make distributions is precisely the type of "undue delay" that courts avoid through estimation. *In re AMR Corp.*, 2021 WL 2954824, at *6 (granting estimation motion where, absent estimation, "distributions will be delayed for a significant amount of time"); *In re Enron Corp.*, 2006 WL 544463, at *7–8 (granting estimation motion and noting that "because a deferral of a distribution affects the efficient administration of a case, the possibility of such deferral provides

---

[7] The Debtors reserve all rights in this regard, including the right to argue that the Debtors are not required to include any assets in the Disputed Claims Reserve on account of the Counterclaim.

a justification for estimation of a claim"). Estimation is therefore appropriate, necessary, and required to avoid the undue delay to distributions that could result if this Court approves the Plan and the Debtors are otherwise in position to begin making distributions, prior to a final adjudication of the Counterclaim on the merits.

## II.    The Counterclaim Should Be Estimated at Zero for Purposes of Allowance, Distribution, and Reserves.

53.    Bankruptcy courts have broad discretion in estimating claims—both in terms of choosing a process for doing so, and in making the relevant substantive determinations. *See In re Chemtura Corp.,* 448 B.R. at 648–49 ("[T]here are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the [Bankruptcy] Code."); *see In re AMR Corp.*, 2021 WL 2954824, at *4 ("Most importantly, '[a]n estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delaying the matter.'" (internal citation omitted)).

54.    Because estimation is not a final adjudication of a claim on the merits, the process by which a court may estimate a claim is necessarily something short of a full-blown evidentiary hearing.  Rather, estimation requires only that the court consider "sufficient evidence on which to base a reasonable estimate of the claim." *In re AMR Corp.*, 2021 WL 2954824, at *4.  In this vein, courts have "broad discretion as to estimation matters," with wide latitude in limiting discovery and relaxing the rules of evidence.  *See In re Chateaugay Corp.*, 156 B.R. 391, 402 n.14, 403 (S.D.N.Y. 1993).  Courts have held that in the estimation context, the substance of the claim, rather than procedural formalities, is of paramount importance in the bankruptcy court's consideration of a claim to be estimated, *see In re FV Steel and Wire Co*., 372 B.R. 446, 453 (Bankr. E.D. Wis. 2007), and a court may use its discretion in ordering a particular process for fixing the value of a

claim to be estimated for purposes of allowance and plan distribution, *In re AMR Corp.*, 2021 WL 2954824, at *4.  *See* July 20, 2023 Hr'g Tr. 15:4-10 (Judge Lane regarding FTX estimation motion: "[W]here an estimation does give you and is sort of in the classic estimation wheelhouse of shortening procedures and shortening time and getting you decisions.").

55.     In this District, courts frequently estimate claims "based on the probability of the success of various potential outcomes if decided on the merits."  *In re Chemtura*, 448 B.R. at 650; *see also In re Thomson McKinnon Secs., Inc.*, 191 B.R. 976, 990 (Bankr. S.D.N.Y. 1996) ("An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact.").  Such procedural flexibility allows courts to expediently estimate claims, such as engaging in "a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel."  *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994); *see also In re Lane*, 68 B.R. 609, 613 (Bankr. D. Haw. 1986) (estimating claims after "review[ing] the numerous pleadings and briefs of the debtor and [the creditors]").

56.     The Counterclaim is uniquely amenable to an expedited estimation process.  The parties are, and have been for months to years, in possession of relevant documentation.  The Counterclaim is purely a contractual claim, based on the language of the July 2022 GAP-DCG A&A Agreement, and its viability can therefore be determined on the basis of a review of that contractual language, which itself is not complex.  DCG has put forth a belated, counter-textual reading of that agreement that it asserts entitles it to a claim for the Foreclosed Assets; GGC interprets the contract as it should be interpreted, relying on the plain terms of the operative language.  GGC's reading is also supported by the agreement's recitals as well as the parties' contemporaneous intentions, understandings, and actions.  As such, it is possible under these unique circumstances for the Court to review the contractual language at issue and make a

determination as to its significance, on the basis of a limited evidentiary record including the July 2022 GAP-DCG A&A Agreement itself and the June Agreements to which it relates.

57.    The same can be said for the Debtors' alternative arguments that the Counterclaim should be estimated at zero based on its untimeliness or on the doctrines of judicial estoppel, equitable estoppel and laches.  The Court can determine the timeliness of the claim simply by comparing the language in DCG's Proofs of Claim with the relief sought in the Counterclaim itself. Similarly, the Debtors' arguments for various forms of estoppel are based on proceedings and submissions before this Court, of which the Court can take judicial notice and with which this Court is already intimately familiar.  *See, e.g.*, *Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (noting that courts "are empowered to take judicial notice of public filings," including bankruptcy court dockets); *Mendelsohn v. Dalton Sch., Inc. (In re Molina)*, 657 B.R. 172, 183 (Bankr. E.D.N.Y. 2023) (noting that, on a motion to dismiss, courts may take judicial notice of prior court proceedings and collecting cases).

### A.  The Counterclaim Was Not Timely Asserted

58.    DCG's Counterclaim does not by its own terms limit the relief sought to potential setoff or judgment reduction, and instead affirmatively seeks specific performance directing payment of the Foreclosed Assets to DCG.  Counterclaim ¶ 36; Prayer for Relief ¶ 2.  Regardless, the Counterclaim is barred as untimely under any circumstances because it was not asserted prior to the Bar Date, is not based on new or previously unknown facts and is not otherwise the subject of a motion to allow on the basis of excusable neglect.  In addition, having filed Proofs of Claim without asserting the Counterclaim, DCG is not eligible for any exception to the requirement that setoff claims by creditors who otherwise filed Proofs of Claim must be raised prior to the Bar Date. The Debtors are entitled to estimation of the Counterclaim at zero because DCG has not even

sought—let alone obtained—approval to file a late filed claim on the basis of excusable neglect. There is no claim before the Court that can be estimated at any amount other than zero.

> **i.    As the Counterclaim is Asserted as an Affirmative Claim, the Counterclaim is Untimely Because it Was Not Asserted Prior to the Bar Date**

59.     DCG's Counterclaim, which is asserted as an affirmative claim, is untimely because neither the Counterclaim nor any similar claim was included in any of DCG's Proofs of Claim or otherwise asserted prior to the Bar Date.  DCG may not compensate for its failure to timely assert the Counterclaim prior to the Bar Date through an adversary proceeding commenced after the Bar Date.  *See Agra v. Dolci (In re Major Model Mgmt. Inc.)*, No. 22-10169 (MG), 2023 WL 5338580, at *6 (Bankr. S.D.N.Y. Aug. 18, 2023) (barring a claim raised in litigation made over one year after the applicable bar date when the party "took no action" to file a proof of claim related to that claim); *In re FRG, Inc.*, 121 B.R. 710, 714 (Bankr. E.D. Pa. 1990) ("Clearly, a creditor cannot circumvent the temporal proscription of a bar date by the facile device of filing an adversary proceeding against a debtor after the bar date has run.").

60.     Although the Counterclaim asserts that DCG's Proofs of Claim sufficiently preserved the present claim, the language DCG relies on does not come close to asserting a claim to the Foreclosed Assets under the July 2022 GAP-DCG A&A Agreement.  *See* Counterclaim ¶¶ 19-20.  DCG points to two paragraphs of its Proof of Claim in support of this assertion.  *First*, DCG points to a generic reservation of rights in its Proofs of Claim to "assert any additional claims, defenses, remedies and causes of action" against the Debtors.  Proofs of Claim ¶ 13.  Needless to say, reserving the right to assert a claim is not the same as asserting it, and does not render the later-asserted claim timely—otherwise bar dates would have no significance at all.  *See Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 120 (2d Cir. 2005) (affirming bankruptcy court's denial of motion to allow late-filed claim in spite of a reservation of

rights to "reserve[] the right to amend, supplement, or otherwise modify" the original proof of claim) (quotations and citations omitted). *Second*, DCG points to paragraph 11 of its Proofs of Claim, in which DCG alludes to potential claims against the Debtors based on "common law rights of contribution, reimbursement, and/or subrogation" "[i]n the event the Joint Liquidators . . . recover any property or value from DCG or setoff any amounts against DCG's claims against 3AC in the BVI Proceeding or any other proceeding involving 3AC." Proofs of Claim ¶ 11. This language is expressly limited to a scenario in which 3AC "recover(s) any property or value from DCG." *Id.* Here, DCG, through the Counterclaim, seeks to recover from GGC based on a supposed breach of the July 2022 GAP-DCG A&A Agreement that allegedly occurred immediately after (and has been continuing since) the execution of that agreement in July 2022. The Counterclaim has nothing whatsoever to do with any claim for contribution, reimbursement, or subrogation arising from a recovery by 3AC of property or value from DCG. Indeed, DCG does not allege any such initial recovery by 3AC against DCG. More significantly, the Proofs of Claim assert no entitlement to the Foreclosed Assets and no claim for breach of the July 2022 GAP-DCG A&A Agreement. The only mention of that agreement in the Proofs of Claim is followed by a single sentence discussing DCG's view of the cumulative effect of the June 2022 GAP-DCG A&A Agreement and the Promissory Note (together the "June Agreements"), and the July 2022 GAP-DCG A&A Agreement—*i.e.*, DCG's assumption of "the Debtors' risk of loss on their remaining loans to 3AC" and the incurrence of the $1.1 billion obligation—conspicuously omitting any notion that DCG believed it also obtained the rights to more than $1.2 billion in assets that were unrelated to the Debtors' "*remaining* loans" to 3AC. See Proofs of Claim ¶ 9.

61.    Courts allow a single exception to the requirement that claims must be timely asserted: Where the failure to file a new claim is the result of "excusable neglect," which typically

does not include inadvertence, mistake, or carelessness. *See In re Enron Corp.*, 419 F.3d at 126 ("[I]nadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect.") (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993)); *cf. In re Denby Stores*, 86 B.R. 768, 777 (Bankr. S.D.N.Y. 1988) (finding an exception to a creditor's failure to raise a claim in chapter 7 proceeding where that failure arose from a "good faith mistake" and did not prejudice the debtor, such as where the claimant became aware of new facts after filing a proof of claim). Whether the excusable neglect exception applies is an equitable determination to be made by the Court, considering the danger of prejudice to the debtor, length of delay and impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith. *See In re Enron Corp.*, 419 F.3d at 122. As a threshold matter, DCG cannot obtain affirmative relief in the form of a finding of excusable neglect through opposition to a motion. *See In re Manhattan Jeep Chrysler Dodge, Inc.*, 599 B.R. 247, 255 (Bankr. S.D.N.Y. 2019) ("A person who wishes to obtain relief on grounds of excusable neglect ought to act promptly in seeking that relief."); *see also In re Aargus Polybag Co., Inc.*, 172 B.R. 586, 590 (Bankr. N.D. Ill. 1994) ("On procedural grounds, [claimant] failed to satisfy the requirements of Rule 9006(b)(1) when it made its request … in a responsive pleading instead of a motion.").

62.    In any event, as detailed above, there has been no good faith mistake or omission by DCG. *See supra* ¶¶ 23–34. DCG has, for almost two years, had access to all information that is relevant to the Counterclaim. Putting aside that DCG is a party to the July 2022 GAP-DCG A&A Agreement that forms the basis of the Counterclaim and has first-hand knowledge of the events leading up to its execution, including the Debtors' response to the 3AC default, the Foreclosure on the assets at issue, the June 2022 GAP-DCG A&A Agreement and the issuance of the accompanying Promissory Note, and the negotiation of the July 2022 GAP-DCG A&A

Agreement itself, these events were also the subject of extensive discovery between May and October 2023 in which DCG took part and to which it has maintained access throughout these cases.  DCG could have sought leave to amend the Proofs of Claim or raised the claim at numerous junctures in these proceedings but did the opposite.  Indeed, as discussed further below, in the Disclosure Statement, DCG expressly took a position that is directly contrary to the position it now takes in the Counterclaim, making clear that DCG failed to raise the claim earlier not because of some mistake or lack of information, but simply because it believed, correctly, that no such claim is colorable in light of the plain language of the agreement or because it made a tactical litigation decision to lay in wait.  Because DCG failed to timely assert the Counterclaim, it is barred from now raising it as an affirmative claim.

> ### ii.   To the Extent the Counterclaim is Asserted as a Claim for Setoff, the Counterclaim is Untimely Because it Was Not Asserted in DCG's Timely-Filed Proofs of Claim.

63.     Even if the Counterclaim were limited to rights of setoff (which on its face it is not), such claim would be similarly barred because DCG filed Proofs of Claim in these cases and did not timely raise it.  In general, a creditor waives the right to make a claim for setoff if it files a proof of claim without asserting the right.  *In re Denby Stores, Inc*., 86 B.R. at 777 (recognizing a "general rule that a creditor will be deemed to have waived [a] right of setoff if [the creditor] files a proof of claim in bankruptcy without asserting the right.").  This general rule does not apply where the party seeking to assert the right of setoff did not file any proof of claim in the bankruptcy proceeding.  Courts reason that a creditor who seeks no affirmative recovery *from* a debtor should not be barred from raising defensive counterclaims in a suit later initiated *by* the debtor.  *See In re Thelen LLP*, No. 09-15631 (MEW), 2015 WL 4999972, at *7 (Bankr. S.D.N.Y. Aug. 21, 2015); *see also Bernstein v. IDT Corp*., 76 B.R. 275, 281 (S.D.N.Y. 1987) ("Counterclaims and set-offs

may be asserted in a plenary suit notwithstanding the fact that no proof of claim had been filed in Bankruptcy Court. A creditor may be content not to file such a claim as long as no affirmative relief is sought from it by the bankrupt, but once the Trustee asserts a claim against the creditor, equity requires that the creditor be permitted to assert authorized counterclaims."). DCG's Counterclaim does not fall within this exception. DCG has filed Proofs of Claim and has been extremely active in pursuing claims and recoveries from the Debtors throughout these Chapter 11 Cases, albeit not in respect of the Counterclaim (until now). Therefore, DCG's Counterclaim, even if it had been asserted only for purposes of setoff, is time-barred.

**B. The Counterclaim is Based on an Erroneous Reading of the July 2022 GAP-DCG A&A Agreement.**

64.     Under the plain terms of the operative provision of the July 2022 GAP-DCG A&A Agreement, the Foreclosed Assets are not part of the Assigned Interests. Further, the recitals to that agreement and the Disclosure Statement Response make clear that the parties did not intend otherwise.

65.     The July 2022 GAP-DCG A&A Agreement defines the Assigned Interests as "all of [GAP's] rights and obligations under the Pledge Agreements and related Collateral under the Agreements and the Pledge Agreements," in addition to all outstanding 3AC Loans. July 2022 GAP-DCG A&A Agreement at 1. The Foreclosure took place prior to the execution of that agreement, on June 13, 2022, upon which date the Debtors' security interest in the Foreclosed Assets was converted to outright title to the assets, the Foreclosed Assets ceased to be Collateral under the MLAs and Pledge Agreements,[8] the loan balances under the MLAs and Pledge

---

[8]     *See* 2020 GAP MLA § IX(a) ("Upon the occurrence and during the continuation of any Event of Default by the Borrower, the Lender may, at its option . . . transfer any Collateral from the collateral account to Lender's operating account . . ."); 2020 GAP MLA § IX(b) ("On the occurrence of any Event of Default . . . this Agreement and any and all Loans made pursuant to this Agreement shall be terminated immediately and become due and payable, and Lender shall have immediate right to the Collateral to the fullest extent permitted herein and by law.").

Agreements were reduced accordingly, and the Foreclosed Assets became property of the Debtors. *See* U.C.C. § 9-102(a)(12) ("'Collateral' means the property subject to a security interest."); *see also DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*, No. 17-cv-962 (JMF), 2019 WL 13414939, at *7 (S.D.N.Y. Mar. 11, 2019) (finding that once a purchaser acquired the relevant assets, "those assets no longer constituted Collateral within the meaning of the [agreement]."). Because the Foreclosed Assets were no longer "Collateral" under the MLAs or Pledge Agreements on the date of the execution of the July 2022 GAP-DCG A&A Agreement (a fact that DCG was well aware of), the Foreclosed Assets did not form part of the Assigned Interests and therefore were not contemplated to be delivered to DCG.[9]

66.    The recitals to the July 2022 GAP-DCG A&A Agreement also clearly evidence the parties' understanding that the assignment would be forward-looking, and that the quantum of Assigned Interests reflected the present net balance of the 3AC Loans after the Foreclosure.  The recitals state that through the agreement, GAP "wishes to assign to [DCG] all of its lending activities with [3AC], including any outstanding loans" as well as "all of its rights and obligations under the Pledge Agreements and related Collateral under the Agreements and Pledge Agreements."  July 2022 GAP-DCG A&A Agreement at 1.  DCG's own Disclosure Statement Response acknowledges this intention, stating "[C]onsistent with the intention of the parties to the 3AC Loan Assignment and Assumption Agreement, DCG did not receive any of the proceeds from

---

[9]    Contrary to DCG's assertion, see Counterclaim at 16, GGC's reading of the July 2022 GAP-DCG A&A Agreement excluding DCG's Counterclaim is in no way inconsistent with GGC's assertion in the Complaint that DCG's assumption of liability for the 3AC Loan-Related Claims includes liability for the $33 million Allowed 3AC Claim Amount (i.e., the settled amount to which the 3AC Loan-Related Claims were ultimately reduced).  The only natural, logical reading of the contract is that DCG would be entitled to any Collateral obtained after the date of the assignment (for example, the NEAR and AVAX Collateral on which the Debtors did not foreclose prior to the date of the July 2002 GAP-DCG A&A Agreement), and would likewise be liable for any claims by 3AC in connection with the 3AC Loans.  Furthermore, DCG has not asserted its Counterclaim as a claim in the alternative or as a claim purely for judgment reduction, such that if the claim asserted in GGC's Complaint fails, DCG's Counterclaim would also fall away.  If DCG had sought to plead in the alternative in this way, it would have been required to do so from the outset—including in its additions to the Disclosure Statement.

Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure."
Disclosure Statement Response § VI (emphasis added).

67.    Thus, the July 2022 GAP-DCG A&A Agreement is clear and unambiguous on its
face as to its intended scope.  When a contract is "complete, clear and unambiguous on its face,"
it must be enforced according to the plain meaning of its terms." *Gemini Tr. Co., LLC v. Genesis
Glob. Cap., LLC (In re Genesis Glob. Holdco, LLC)*, No. 23-10063 (SHL), 2024 WL 478062, at
*6 (Bankr. S.D.N.Y. Feb. 7, 2024) (citation omitted).  If an agreement "on its face is reasonably
susceptible to only one meaning, a court is not free to alter the contract."  *Law Debenture Tr. Co.
of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (quoting *Greenfield v. Philles
Recs.*, 98 N.Y.2d 562, 570 (2002));  *see also Metro Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d
884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely
because the parties urge different interpretations in the litigation.").

68.    Furthermore, the reading suggested by DCG in its Amended Answer and
Counterclaim is illogical.  The collective purpose of the June 2022 GAP-DCG A&A Agreement,
the Promissory Note, and the July 2022 GAP-DCG A&A Agreement was an assumption by DCG
of the Intercompany Payables associated with the outstanding 3AC Loans post-Foreclosure as well
as all future liabilities associated with the 3AC Loans, and an assignment to DCG of the right to
pursue claims against 3AC arising from the 3AC Loans.  The amount of the Promissory Note ($1.1
billion) was the amount that the parties agreed represented the remaining liability payable from
GAP to GGC on account of the outstanding 3AC Loans as of June 30, 2022, which reflected
approximately a $1.2 billion reduction based on the application of the Foreclosed Assets more than
two weeks prior.  *See* June 2022 GAP-DCG A&A Agreement ("[T]he parties agree that the
aggregate principal amount of the Intercompany Payables, after giving effect to all repayments

-32-

and recoveries in respect of the [3AC] Loans (and taking into account the value of any potential

realization on any [3AC] Collateral) . . . is $1,100,000,000.00 (the 'Assumed Liability')")"..

69.     By its Counterclaim, however, DCG asserts that the net effect of the June 2022

GAP-DCG A&A Agreement, the Promissory Note, and the July 2022 GAP-DCG A&A

Agreement was to make the hole in GGC's balance sheet even larger than it was after 3AC's

collapse because, in effect, DCG asserts that it received an immediate right to the Foreclosed

Assets valued at $1.2 billion in exchange for a $1.1 billion promissory note payable ten years later.

Such a reading cannot be reconciled with the terms or intent of the agreements previously

recognized by DCG.  In the Disclosure Statement Response, in its own words and in an effort to

provide "adequate information" to every reader of the Disclosure Statement, Nov. 7, 2023 Hr'g

Tr. 71:5, DCG stated: "The 3AC Loan Assignment and Assumption Agreement was a contract for

forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in

which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully

foreclosed upon."  Ex. F, Disclosure Statement at 300.  DCG stated further that, "consistent with

the intention of the parties to the 3AC Loan Assignment and Assumption Agreement DCG did not

receive any of the proceeds from Genesis' foreclosure of the 3AC Collateral and did not otherwise

benefit from such foreclosure."  *Id.* (emphasis added).  DCG's own prior statements concerning

the purpose and effect of the July 2022 GAP-DCG A&A Agreement thus contradict the theory of

liability it now asserts in the Counterclaim.

### C.  The Parties' Contemporaneous Communications and Other Actions Support GGC's Reading of the Contractual Language

70.     The July 2022 GAP-DCG A&A Agreement, which was executed on July 14, 2022,

is properly understood as a companion to the two prior agreements—the June Agreements—which

were both executed on June 30, 2022.  In the June 2022 GAP-DCG A&A Agreement, GAP

assigned to DCG all of its remaining rights and obligations in connection with the $1.1 billion in

Intercompany Payables to GGC arising from the Debtors' 3AC lending relationship; in exchange,

DCG issued the Promissory Note to GGC in the amount of $1.1 billion.  Approximately two weeks

later, the parties entered into the July 2022 GAP-DCG A&A Agreement, by which GAP assigned

to DCG its rights and obligations under the 3AC Loans—most notably the right to pursue claims

against the BVI liquidating estate of 3AC for outstanding loan balances under the 3AC Loans.  *See*

Complaint ¶ 11; Counterclaim ¶ 14; July 2022 GAP-DCG A&A Agreement ¶ 2.

71.    

*See* Exs. 1, 2.

*See* Ex. 1.[10]

72.    Furthermore, the actions of the parties before and after the execution of the July

2022 GAP-DCG A&A Agreement are entirely inconsistent with the idea that either party believed

that any rights to the Foreclosed Assets were granted to DCG.  Within days of the Foreclosure,

GAP had moved the Foreclosed Assets from its own accounts to accounts held by GGC, and as

such, it was no longer in possession of the Foreclosed Assets (and had no rights in those assets to

assign) when it executed the July 2022 GAP-DCG A&A Agreement nearly a month later.  *See* Ex.

2.  Furthermore, GGC is aware of no instance in which DCG asserted a desire to obtain an interest

---

[10]

*See* Ex. 4.

in the Foreclosed Assets, either formally or informally, or requested that they be transferred to DCG for any purpose, until the filing of the Amended Answer.  To the contrary, as discussed below, DCG has at all times espoused an interpretation of the June Agreements and the July 2022 GAP-DCG A&A Agreement that is completely inconsistent with its newly-claimed entitlement to the Foreclosed Assets.

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 3 at 2 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 5 ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

74.    The parties' communications and actions before and after the July 2022 GAP-DCG A&A Agreement contain no evidence whatsoever that any party contemplated that the Foreclosed Assets were part of the assignment to DCG or that DCG would ever have a claim to those assets, for the simple reason that the contract did not so provide, nor was it intended to.

**D. The Counterclaim is Barred by the Doctrines of Judicial Estoppel, Estoppel by Laches, and Equitable Estoppel.**

75.    Despite the obvious and monumental implications of an additional claim against

GGC valued in excess of $4 billion,[11] prior to the Amended Answer, DCG did not once assert a purported interest in the Foreclosed Assets. Indeed, DCG successfully argued before this Court that its views concerning its rights and obligations under the July 2022 GAP-DCG A&A Agreement—which are at odds with the very existence of the Counterclaim—had to be included in the Disclosure Statement to provide creditors with adequate information to evaluate the Plan. As such, in addition to being untimely and belied by the plain language of the July 2022 GAP-DCG A&A Agreement, DCG should be barred from pursuing its Counterclaim under the doctrines of judicial estoppel, estoppel by laches, and equitable estoppel.

### i.    The Counterclaim is Barred by the Doctrine of Judicial Estoppel

76.    Judicial estoppel is appropriate where (1) the party seeking to make a claim has previously taken an inconsistent position regarding the claim, and (2) the Court has adopted that position in some manner. *See In re Rhythms NetConnections Inc.*, 300 B.R. 404, 410–11 (Bankr. S.D.N.Y. 2003); *see also Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000) ("In this Circuit, '[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceedings and (2) that position was adopted by the first tribunal in some manner.'"). As an equitable doctrine, judicial estoppel "prevents a party from prevailing on one phase of a case on an argument and then adopting a contradictory argument in another phase." *In re Rhythms NetConnections*, 300 B.R. at 410–11. Courts in the Second Circuit have dismissed late-asserted and previously undisclosed claims in bankruptcy proceedings on the basis of judicial estoppel. *See, e.g., In re Residential Cap.*, LLC, No. 12-12020 (MG), 2015 WL 2375979, at *8 (Bankr. S.D.N.Y. May 15, 2015) (collecting cases).

---

[11]    The Counterclaim asks for the return of the collateral or the proceeds of that collateral. Assuming that the Debtors had sold all of the collateral on April 21, 2024 date (which, for the avoidance of doubt, they did not), the proceeds of such collateral would be worth in excess of $4.3 billion. *See* Cherrone Decl. ¶ 12.

The Counterclaim, which has remained undisclosed until now and finds contradiction in almost every position DCG has taken during the life of these Chapter 11 Cases, easily meets the standard for judicial estoppel.  As noted, DCG's Counterclaim is entirely inconsistent with the position it advanced in its Disclosure Statement Response, which DCG asserted creditors were required to know in order to have adequate information to vote on the Plan, and which position the Court adopted by including DCG's Disclosure Statement Response in the Disclosure Statement.[12]

77.     According to DCG, the Disclosure Statement Response includes DCG's views regarding, among other things, every misstatement or omission DCG believed was contained in the Disclosure Statement itself.  DCG represented to this Court that such information must be included in the Disclosure Statement in order for it to provide creditors with adequate information to consider the Plan.  *See* Nov. 7, 2023 Hr'g Tr. 71:3-13, J. Saferstein for DCG ("[W]e think that given that this is the key element of this plan is litigation, creditors when they're voting on it in order to have adequate information should know both sides.  Right?  They should say we like this plan or we don't like this plan because of the litigation... We think it provides adequate information to creditors to see both sides and the risks. By voting in favor of this plan, what are they voting on and what are the risks to them").

78.     The Disclosure Statement Response addresses the July 2022 GAP-DCG A&A Agreement directly, in a section entitled "DCG Response to Alleged Claims Under the Assignment and Assumption Agreement."  Ex. F, Disclosure Statement at 300; *see also* Amended Disclosure Statement § VI.F.i.e (directing creditors to the Disclosure Statement Response "for DCG's position

---

[12]     Although DCG's Disclosure Statement Objection made a vague and generalized reference to potential counterclaims *by* DCG to the myriad litigation claims *against* DCG that the Debtors described in the Disclosure Statement, this reference was not in any way linked or proximate to any discussion or mention of the July 2022 GAP-DCG A&A Agreement, or the 3AC Claims.  *See* Disclosure Statement Objection ¶ 20.  This generalized statement in the Disclosure Statement Objection does nothing to undermine the very clear disclosure DCG insisted be included in the Disclosure Statement regarding the meaning of the July 2022 GAP-DCG A&A Agreement.  *See infra* ¶¶ 44, 47.

on the Assignment and Assumption Agreement"). In language that directly contradicts the very basis of the Counterclaim, DCG described the July 2022 GAP-DCG A&A Agreement as "a contract for forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon." *Id*. DCG went on to state that, "consistent with the intention of the parties to the 3AC Loan Assignment and Assumption Agreement, *DCG did not receive any of the proceeds from Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure*." *Id.* (emphasis added). The Court relied on the full contents of the Disclosure Statement, including the extensive Disclosure Statement Response by DCG, in finding that creditors were provided adequate factual information for purposes of soliciting the Plan, and entered the Disclosure Statement Order on that basis. The doctrine of judicial estoppel dictates that DCG cannot now be permitted to reverse its prior position. *See Reciprocal Merch. Servs., Inc. v. All Advert. Assocs., Inc.*, 163 B.R. 689, 696 (S.D.N.Y. 1994) (The purpose of judicial estoppel is to "prevent[] litigants from playing 'fast and loose' with the courts." ) (citing *In re Galerie des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1986)).[13]

79.     DCG's failure to raise the Counterclaim regarding the Foreclosed Assets until now, despite having convinced the Court to include in the Disclosure Statement a description of its view of the July 2022 A&A Agreement that forecloses the Counterclaim, is exactly the type of inequitable gamesmanship that the doctrine of judicial estoppel is designed to prevent.

### ii.     The Counterclaim is Barred by the Doctrine of Equitable Estoppel

---

[13]     This is particularly the case where both the Disclosure Statement and the 3AC Settlement Motion made plain the Debtors' intention to seek to recover from DCG any liability it had in respect of the 3AC Claims on the basis of the July 2022 GAP-DCG A&A Agreement. *See* 3AC Settlement Motion at 25; Disclosure Statement at 43 ("[P]ursuant to the 3AC Loan Assignment and Assumption Agreement, DCG is liable for any and all amounts that may be due in connection with the 3AC Loan-Related Claims.").

80.    The Counterclaim is barred by the doctrine of equitable estoppel for the reasons articulated in the Motion to Dismiss at ¶¶ 46–52.  For the convenience of the Court, the Debtor's arguments on this point are incorporated by reference and are not repeated here.

### iii.    The Counterclaim is Barred by the Doctrine of Estoppel by Laches

81.    Estoppel by laches is an equitable defense that prevents a party from unreasonably delaying their assertion of a known claim, such that later permitting the claim to be brought would prejudice the defendant.  *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) (stating that to prevail on the affirmative defense of laches, a party must show that they have "been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim").  The determination of whether laches applies and bars relief is "entirely within the discretion of the trial court."  *Id.* at 193; *see also Tri-Star Pictures v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994) (same).  As discussed at length supra, DCG has had near-infinite opportunities to assert the Counterclaim over the course of these Chapter 11 Cases and has waited until now—after the Debtors have proposed and defended a Plan that is workable only if the Debtors are not required to account for the subsequently-asserted Counterclaim.  Allowing DCG to assert its Counterclaim at this late stage would be massively prejudicial not only to GGC, but also to the other Debtors, their creditors and many other stakeholders.  Therefore, in addition to the myriad reasons detailed above, DCG's Counterclaim is properly dismissed as barred by the doctrine of estoppel by laches.

## III.    Request For Waiver, to the Extent Necessary, of Local Rule 9014-2

82.    As discussed herein above, the parties have been in possession of all information and documents that could conceivably be relevant to this dispute for quite some time.  The relevant agreements were executed almost two years ago, and the email communications surrounding those agreements (to the extent not already in possession of DCG or GGC, respectively) were sought

over the course of 2022 and 2023 as part of the regulatory investigations conducted by the Debtors prior to and during these Chapter 11 Cases, as well as the Debtors' and the Special Committee's investigation of their transactions with DCG in connection with these cases, and discovery practice in connection with the litigation of 3AC's claims against the Debtors. As such, and in light of the need for swift consideration of the relief requested in light of the imminent possibility of unduly delaying distributions to creditors, GGC has noticed this Motion for hearing on regular notice, on May 8, 2024. GGC respectfully requests that this Court hold an evidentiary hearing on the merits of the Motion on such date, after DCG has had the opportunity to submit its opposition and any relevant evidentiary support and GGC has had the chance to respond.

## RESERVATION OF RIGHTS

83.    The Debtors reserve their rights in all regards related to the Counterclaim. Nothing in this Motion shall be deemed an admission by the Debtors of any matter, including liability, allowance, or disallowance of any claim against the Debtors.

## NOTICE

84.    The Debtors have provided notice of this Motion in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures*, ECF No. 44. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

85.    No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

86.    WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the Proposed Order and such other and further relief as is just.

-40-

Dated: April 24, 2024
      New York, New York

Respectfully submitted,

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel for the Debtors*
*and Debtors-in-Possession*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al*., | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

### ORDER ESTIMATING DCG'S COUNTERCLAIM AGAINST THE
### DEBTORS UNDER BANKRUPTCY CODE SECTIONS 502(c) AND 105(a)

Upon the Motion[1] of Genesis Global Holdco, LLC ("Holdco") and its affiliated

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

approval pursuant to sections 105(a) and 502(c) of the Bankruptcy Code to estimate the amount of

DCG's Counterclaim against the Debtors at $0.00 for purposes of allowance and distribution all

as described more fully in the Motion; and the Court having jurisdiction over this matter pursuant

to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United

States District Court for the Southern District of New York dated January 31, 2012; and the Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Court

may enter a final order consistent with Article III of the United States Constitution; and the Court

having found that venue of this proceeding and the Motion in this district is proper pursuant to 28

U.S.C. §§ 1408  and 1409; and the Court having held an evidentiary hearing (the "Hearing") to

consider the relief requested in the Motion, and the Court having found that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in

interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a

hearing on the Motion was appropriate and no other notice need be provided; and the Court having

---

[1]     All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

1

determined that the legal bases set forth in the Motion and on the record of the Hearing establish

just cause for the relief granted herein; and all objections to the Motion (if any) having been

withdrawn or overruled; and upon all of the proceedings had before the Court; and after due

deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      The requirements of Local Rule 9014-2 are hereby WAIVED as applicable.

3.      The Counterclaim is hereby estimated pursuant to 11 U.S.C. § 502(c)(2), for

purposes of allowance and distribution, in the amount of $0.00, and the Debtors are not required

to establish a reserve on account of the Counterclaim.

4.      The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: _____, 2024
        New York, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE