WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui

2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
Facsimile: (202) 857-0940
Joshua M. Wesneski

*Attorneys for Digital Currency Group, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, et al.,[1] | Case No. 23-10063 (SHL) |
| Debtor. | (Jointly Administered) |

**DIGITAL CURRENCY GROUP, INC.'S OPPOSITION TO THE DEBTORS'
MOTION TO ESTIMATE DCG'S COUNTERCLAIM
UNDER BANKRUPTCY CODE SECTIONS 502(c) AND 105(a)**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ....................................................................................3

AGREED UPON SCHEDULE AND LIMITATIONS TO BRIEFING ON THE
MOTION TO ESTIMATE ........................................................................................11

ARGUMENT ...........................................................................................................12

I.      DCG'S PROOFS OF CLAIM PROPERLY ENCOMPASSED DCG'S
        COUNTERCLAIM.......................................................................................12

II.     ESTIMATION IS NOT APPROPRIATE GIVEN THE IMMINENT
        RESOLUTION OF DCG'S COUNTERCLAIM...........................................15

        A.      The Debtors' Motion to Estimate Is Purely a Litigation Tactic and
                There Is No Undue Delay in the Debtors' Administration of These
                Chapter 11 Cases.................................................................................16

        B.      Estimation of DCG's Counterclaim Under Section 502(c)(2) Is
                Unnecessary in Light of the Upcoming Hearing on the
                Counterclaim.......................................................................................18

III.    THE DEBTORS' INTERPRETATION OF THE JULY 2022
        ASSIGNMENT AND ASSUMPTION AGREEMENT IS BASED ON AN
        ERRONEOUS READING OF THE AGREEMENT ........................................19

        A.      The Reading Advanced by the Debtors Is Inconsistent with GGC's
                Litigating Position in the Adversary Proceeding......................................20

        B.      DCG Is Permitted to Assert the Counterclaim Pursuant to Fed. R.
                Civ. P. 8 and Fed. R. Bankr. P. 7008 ........................................................23

IV.     THE DEBTORS' JUDICIAL ESTOPPEL, EQUITABLE ESTOPPEL
        AND ESTOPPEL BY LACHES ARGUMENTS FAIL.......................................25

        A.      DCG's Interpretation of the Assignment and Assumption
                Agreement Has Remained Consistent .......................................................25

        B.      The Debtors' Theories of Estoppel Do Not Bar DCG's
                Counterclaim.......................................................................................25

                1.      Judicial Estoppel ..........................................................................25

                2.      Equitable Estoppel ........................................................................26

                3.      Estoppel by Laches .......................................................................28

V.      LOCAL RULE 9014-2 SHOULD NOT BE WAIVED.......................................29

CONCLUSION........................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Pataki*,
185 F.3d 35 (2d Cir. 1999)..................................................................................24

*Agassi v. Planet Hollywood Int'l, Inc.*,
269 B.R. 543 (D. Del. 2001)..............................................................................14

*Alston v. 1749-1753 First Ave. Garage Corp.*,
2013 WL 3340484 (E.D.N.Y. July 2, 2013)......................................................29

*AT&T Corp. v. Atos IT Sol. & Servs., Inc.*,
2023 WL 8878935 (S.D.N.Y. Dec. 22, 2023) ...................................................22

*Babitt v. Vebeliunas (In re Vebeliunas)*,
332 F.3d 85 (2d Cir. 2003).................................................................................27

*In re Bloomingdale Partners*,
160 B.R. 101 (Bankr. N.D. Ill. 1993) ...............................................................13

*Broad. Music, Inc. v. Liberman Broad., Inc.*,
2016 WL 3919654 (S.D.N.Y. July 14, 2016) ....................................................29

*Butner v. United States*,
440 U.S. 48 (1979).............................................................................................18

*Clear Channel Outdoor, LLC v. City of New Rochelle*,
2022 WL 17249412 (S.D.N.Y. Nov. 28, 2022)..................................................27

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795 (1999)...........................................................................................26

*Cole v. Macklowe*,
99 A.D. 3d 595 (1st Dep't 2012) .......................................................................22

*In re DeFlora Lake Dev. Assocs., Inc.*,
571 B.R. 587 (Bankr. S.D.N.Y. 2017)...............................................................26

*In re Dow Corning Corp.*,
211 B.R. 545 (Bankr. E.D. Mich. 1997)............................................................16

*Gaia House Mezz LLC, v. State St. Bank & Tr. Co.*,
720 F.3d 84 (2d Cir. 2013).................................................................................27

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,
    2015 WL 3504208 (S.D.N.Y. June 2, 2015) ..........................................................25

*Ikelionwu v. United States*,
    150 F.3d 233 (2d Cir. 1998)...............................................................................29

*Kearney v. A'hearn*,
    210 F. Supp. 10 (S.D.N.Y. 1961), *aff'd*, 309 F.2d 487 (2d Cir. 1962) ...................24

*Est. of Lennon ex rel. Lennon v. Screen Creations, Ltd.*,
    939 F. Supp. 287 (S.D.N.Y. 1996).......................................................................28

*In re LightSquared Inc.*,
    2014 WL 5488413 (Bankr. S.D.N.Y. Oct. 30, 2014) .............................................18

*Prince v. Suffolk Cnty. Dep't of Health Serv.*,
    1996 WL 393528 (S.D.N.Y. July 12, 1996) ..........................................................26

*In re RNI Wind Down Corp.*,
    369 B.R. 174 (Bankr. D. Del. 2007) ....................................................................18

*In re SemCrude, L.P.*,
    443 B.R. 472 (Bankr. D. Del. 2011) ...............................................................14, 15

*State Farm Mut. Auto. Ins. Co. v. Kalika*,
    2006 WL 6176152 (E.D.N.Y. Mar. 16, 2006).......................................................29

*In re Statewide Realty Co.*,
    159 B.R. 719 (Bankr. D.N.J. 1993) .....................................................................16

*Sunnyside Dev. Co. v. Bank of N.Y.*,
    2008 WL 463722 (S.D.N.Y. Feb. 19, 2008)..........................................................25

*Unicorn Crowdfunding Inc. v. New St. Enter., Inc.*,
    2019 WL 2450911 (S.D.N.Y. June 12, 2019) .......................................................24

*United States v. Hussein*,
    178 F.3d 125 (2d Cir. 1999)...............................................................................26

**Statutes & Rules**

11 U.S.C. § 101 ....................................................................................................14

11 U.S.C. § 501 ....................................................................................................13

11 U.S.C. § 502 ...............................................................................................16, 18

Fed. R. Bankr. P. 3001 ..........................................................................................13

Fed. R. Bankr. P. 7008........................................................................................................23, 24

Fed. R. Bankr. P. 7013..............................................................................................................24

Fed. R. Bankr. P. 7026..............................................................................................................30

Fed. R. Civ. P. 8....................................................................................................................23, 24

Fed. R. Civ. P. 12......................................................................................................................29

Fed. R. Civ. P. 13......................................................................................................................24

Fed. R. Civ. P. 26......................................................................................................................30

Local Rule 9014-2................................................................................................................29, 30

**Treatises**

4 COLLIER ON BANKRUPTCY ¶ 502.02, Lexis (16th ed. 2024) ............................................13

## PRELIMINARY STATEMENT

1.      GGC initiated an adversary proceeding against DCG based on a reading of the

Assignment and Assumption Agreement that, taken to its logical conclusion, entitles DCG to the

collateral pledged by 3AC that was foreclosed upon by GAP and any proceeds thereof.  If DCG is

found to have assumed the liabilities arising out of these foreclosed assets as GGC alleges, under

the plain language of the Assignment and Assumption Agreement (as well as basic notions of

equity and common sense), DCG also should receive title to those assets.  Hence, DCG filed a

counterclaim in response to GGC's adversary Complaint in which DCG requested that relief (the

"Counterclaim").

2.      The Debtors disagree and have filed two largely identical motions to dispose of

DCG's Counterclaim—a motion to estimate DCG's Counterclaim in the main Chapter 11 Cases

and a motion to dismiss DCG's Counterclaim in the adversary proceeding.  The Debtors argue that

the Counterclaim is untimely because it was not filed before the Bar Date, that the Counterclaim

must be estimated pursuant to the Bankruptcy Code, and that it is based on an erroneous reading

of the Assignment and Assumption Agreement and barred by several doctrines of estoppel.  The

Debtors are wrong on all accounts.

3.      First, DCG's Proofs of Claim expressly encompass and preserve DCG's

Counterclaim.  Not only did DCG make specific references to the Assignment and Assumption

Agreement in its Proofs of Claim, but it also attached the Agreement and reserved all of its rights

to assert additional claims against the Debtors.  The Debtors' suggestion that the Counterclaim is

a "new" claim that they became aware of only by virtue of the Counterclaim filing is directly

controverted by the record.  DCG repeatedly informed the Debtors throughout the Chapter 11

Cases that it was not waiving any of its rights under the Assignment and Assumption Agreement,

and that the Agreement "was a contract for forward-looking liabilities, not for the assumption of

liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon." *See infra* pp. 7–8.

4.　　　　Second, the Debtors' motion to estimate is unnecessary because it is duplicative of GGC's motion to dismiss and seeks the same relief.  Given the overlap in the legal issues raised in both the motion to dismiss and the motion to estimate, the parties agreed to brief both motions simultaneously to ensure that all non-evidentiary issues could be addressed in tandem.  With briefing on the motion to estimate and motion to dismiss scheduled to be completed on May 23, 2024, and a hearing on both motions to be scheduled a few weeks thereafter (subject to the Court's availability), the Court's resolution of DCG's Counterclaim is imminent and will not delay the administration of these Chapter 11 Cases.

5.　　　　Third, DCG's interpretation of the Assignment and Assumption Agreement has never wavered; the Counterclaim is simply an alternate legal theory that DCG has every right to assert under the Federal Rules of Civil Procedure and the Bankruptcy Rules in order to protect itself from the risk of an inequitable judgment.  Over the course of the past year, in multiple public statements, including in DCG's Proofs of Claim, DCG has remained consistent in its interpretation of the Agreement, which it believes was harmonious with the parties' shared understanding.  It was GGC's filing of the adversary proceeding—not DCG's Counterclaim—that broke from that shared understanding, with GGC seeking to hold DCG liable for the turnover of assets of which DCG has never been in possession and the avoidance of a transfer to which it was not a party.  GGC's filing of the adversary proceeding and its untenable interpretation of the Agreement required DCG to file the Counterclaim in order to protect its rights.  If GGC had not initiated the adversary proceeding, there would have been no need for DCG to file the Counterclaim.

6.　　　　Equally, DCG's assertion of the Counterclaim in response to the adversary

proceeding is precisely the reason why the Debtors' judicial estoppel, equitable estoppel and estoppel by laches arguments fail. DCG never concealed or misrepresented its position concerning the Assignment and Assumption Agreement and instead has consistently set forth its view that it did not assume liability for GGC's predecessor's unlawful misconduct under the Agreement.

7.      DCG opposes the motion to estimate and asks this Court to deny this wholly unnecessary motion practice.

## FACTUAL BACKGROUND

8.      From January 2019 to June 2022, GGC or GAP, as applicable, engaged in a lending and borrowing relationship with cryptocurrency investment firm Three Arrows Capital ("3AC"). This trading relationship was governed by a series of Master Loan Agreements (the "MLAs") and Pledge Agreements: the January 10, 2019 MLA; January 24, 2020 MLA; May 28, 2020 Pledge Agreement; November 16, 2021 Pledge Agreement; and January 27, 2022 Pledge Agreement. Compl. ¶¶ 9–10, Adv. Proc. ECF No. 1. GGC was the original counterparty to the January 10, 2019 MLA with 3AC, but on July 20, 2020, GGC executed the Assignment and Assumption of Master Loan Agreement with GAP, pursuant to which GAP assumed all of GGC's "right, title, benefit, privileges and interest in" and "burdens, obligations and liabilities" in connection with the January 10, 2019 MLA and related Pledge Agreements. *Id.* ¶ 10.

9.      In June 2022, 3AC defaulted on approximately $2.3 billion in loans to GAP ("3AC Loans"). After serving 3AC with a notice of default on June 13, 2022, GAP foreclosed on approximately $1.2 billion of collateral pledged by 3AC to secure its loans. 3AC thereafter commenced liquidation proceedings in the British Virgin Islands on June 27, 2022.

10.     On July 14, 2022, DCG and GAP entered into the Assignment and Assumption Agreement, pursuant to which DCG assumed all of GAP's "right, title, benefit, privileges and interest in and to" and "burdens, obligations and liabilities in connection with, the Assigned

Interests." Assignment and Assumption Agreement ¶ 2.    The Assigned Interests include all of

GAP's "lending activities with Counterparty [3AC], including any outstanding loans" and "rights

and obligations under the Pledge Agreements and related Collateral under the Agreements and the

Pledge Agreements."    *Id.* at 1.    Following execution of the Assignment and Assumption

Agreement, GAP did not transfer to DCG the collateral it foreclosed upon that had been pledged

by 3AC or any proceeds of the foregoing.

11.    On January 19, 2023, each of the Debtors filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.    On May 22, 2023, 3AC filed three proofs of claim, to which

the Debtors objected.    Debtors' First Omnibus Objection (Substantive) to Claim Nos. 523, 526 and

527, ECF No. 530.    3AC later amended its claims on August 18, 2023 (the "3AC Amended

Claims"), to which the Debtors again objected.    Debtors' Second Omnibus Objection (Substantive)

to Claim Nos. 523, 526, 527, 981, 982 and 990, ECF No. 658.

12.    The 3AC Amended Claims sought to "recover, and avoid certain transfers of,

assets and of purported interests therein that are either the property of the 3AC estate or subject to

avoidance under BVI or U.S. law."    3AC Proofs of Claim ¶ 25, ECF No. 658-1.    There are two

categories contained within the 3AC Amended Claims: "(1) recovery of assets subject to purported

foreclosure where the Debtors had no valid and enforceable security interest over such assets, and

(2) avoidance of preferential transfers under BVI law."    *Id.* ¶ 26.

13.    The first category of claims in the 3AC Amended Claims is characterized as

"Turnover and Conversion Claims."    Compl. ¶ 14, Adv. Proc. ECF No. 1.    According to 3AC,

GAP foreclosed on approximately $1.2 billion of 3AC's assets consisting of BTC, GBTC, Ether

and other tokens in June 2022 (the "Foreclosed Assets"), even though it lacked a valid and

enforceable security interest.    3AC Proofs of Claim ¶¶ 27, 34–35, ECF No. 658-1 ("[T]he Debtors

did not have a valid and enforceable security interest on the [3AC] Seized Assets. Accordingly, such assets rightfully belong to 3AC, and the Debtors' purported foreclosure on such assets means that the Debtors took possession or control of assets 'to which the company [3AC] appears to be entitled.'"). Counterclaim ¶ 13, Adv. Proc. ECF No. 8. The second category of claims in the 3AC Amended Claims is characterized as "Preference Claims." Compl. ¶ 14, Adv. Proc. ECF No. 1. The Preference Claims assert that GGC accepted the transfer of loan payments and various digital and other assets from 3AC in May and June 2022, during the period 3AC was allegedly insolvent. 3AC Proofs of Claim ¶¶ 28–32, 38–39, 43–44, ECF No. 658-1; Counterclaim ¶ 18, Adv. Proc. ECF No. 8.

14.    On May 22, 2023, DCG likewise filed Proofs of Claim against each of the Debtors. DCG Proofs of Claim Nos. 464, 487, and 511. In its Proofs of Claim, DCG explained the purpose of executing the Assignment and Assumption Agreement: "As recovery on GAP's loans to 3AC was highly uncertain, DCG effectively assumed the Debtors' risk of loss on their remaining loans to 3AC with no obligation to do so." *Id.* ¶ 9. DCG also recognized that 3AC sought to recover "certain cryptocurrency assets on which GAP foreclosed in June of 2022 (the 'Disputed Collateral')" and stated "GAP did not transfer to DCG the Disputed Collateral, other assets of 3AC it foreclosed on, or any proceeds of the foregoing." *Id.* ¶ 10. DCG attached the Assignment and Assumption Agreement to its Proofs of Claim as an exhibit. *See* Ex. C to DCG Proofs of Claim 464, 487, and 511.

15.    DCG's Proofs of Claim specifically stated that DCG "may assert claims against the Debtors under law and equity, including without limitation, fraud, misrepresentation, negligence and breach of contract." DCG Proofs of Claim 464, 487, and 511 ¶ 11. DCG expressly reserved its right to "assert any additional claims, defenses, remedies, and causes of action . . .

against the Debtors." *Id.* ¶ 15.  Further, DCG stated the "filing of the Proof of Claim is not and

shall not be deemed . . . a waiver or election of any rights and remedies DCG has or may have

under the Assignment and Assumption Agreement, the 2032 Promissory Note, the ARMLA, the

MLA, related term sheets dated May 9, 2022, May 10, 2022, and November 10, 2022, the 3AC

MLAs, or any other prepetition agreement(s) with any of the Debtors." *Id.* ¶ 17.

16.     On November 22, 2023, 3AC, the Joint Liquidators, the Debtors, and DCG entered

into a settlement agreement (the "Settlement Agreement") that resolved 3AC's claims against the

Debtors' estate and granted 3AC an allowed general unsecured claim (the "Allowed 3AC Claim")

in the chapter 11 proceeding against GGC for $33 million (the "Allowed 3AC Claim Amount").

Settlement Agreement ¶ 1(a), ECF No. 972.  On November 30, 2023, the Court approved the

Settlement Agreement and entered an Order authorizing the Allowed 3AC Claim for $33 million.

Order Approving Settlement Agreement at 2, ECF No. 1012.  Under the Settlement Agreement,

DCG preserved any claims or causes of action that it has against any of the Debtors:

> Notwithstanding any other provision of this Settlement Agreement, for
> the avoidance of doubt, DCG, their subsidiaries and affiliates do not
> release, and expressly preserve fully and to the same extent as if this
> Settlement Agreement had not been executed, any claims or causes of
> action that DCG and any of their subsidiaries and affiliates has against
> any of the Genesis Debtors or any of the Genesis Debtors' past, present
> and future agents, heirs, affiliates, employees, founders, executives,
> officers, directors, equity holders, executors, administrators, liquidators,
> conservators, attorneys, advisors, successors and assigns.

Settlement Agreement ¶ 2(e)(vi), ECF No. 972.

17.     In the Settlement Agreement, DCG disclaimed any obligation under the

Assignment and Assumption Agreement for liability stemming from GAP's foreclosure of the

3AC collateral: "DCG disputes that it assumed GAP's obligations regarding the foreclosure of

related Collateral under the Agreements and the Pledge Agreements (all as defined in the A&A

Agreement) in connection with DCG's entry into the A&A Agreement." *Id.* at 1.  DCG advanced

the same position in the Motion to Approve the Settlement Agreement, "DCG disputes and expressly reserves all defenses and objections to any claim that i[t] assumed Genesis' obligations regarding the $1.2 billion of the 3AC Debtor's collateral upon which Genesis foreclosed prior to DCG's entry into the GAP-DCG Assignment and Assumption Agreement." Nov. 9, 2023 Mot. to Approve Settlement Agreement at 5 n.6, ECF No. 906.

18.    In addition to the above statements in DCG's Proofs of Claim, the Settlement Agreement, and Motion to Approve the Settlement Agreement, DCG has consistently maintained its position regarding the liabilities and obligations it assumed under the Assignment and Assumption Agreement at numerous points throughout the past year. In its response to the Debtors' October 25, 2023 Disclosure Statement, DCG stated:

> DCG disputes that it assumed Genesis' obligations regarding the $1.2 billion of 3AC collateral upon which Genesis foreclosed prior to DCG's entry into the 3AC Loan Assignment and Assumption Agreement. The 3AC Loan Assignment and Assumption Agreement was a contract for forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon . . . . [R]eading the 3AC Loan Assignment and Assumption Agreement together with the Note and June 2022 Assignment Agreement makes clear that DCG was only assuming 'rights and obligations' in relation to the 'Assumed Liability,' which is defined narrowly as the $1.1 billion loan receivable from 3AC remaining following Genesis' foreclosure on the 3AC collateral, and no other obligations. Therefore, DCG did not assume Genesis' liabilities arising from the allegedly wrongful foreclosure of property, the proceeds of which foreclosure DCG did not receive and DCG did not otherwise benefit from Genesis' foreclosure of the 3AC collateral in any shape or form.

Oct. 25, 2023 Am. Disclosure Statement Ex. E, at Section V, ECF No. 839.

19.    Shortly thereafter, DCG disclosed the same position in its Objection to the Amended Disclosure Statement: "DCG disputes that it has any liability . . . for the $1.2 billion of collateral GAP foreclosed upon following the 3AC Default (*see* Section V.A) to 3AC or any

7

liability to the Debtors in the event that the joint liquidators' claims are successful." Oct. 31, 2023

DCG's Objection to Amended Disclosure Statement Ex. A, at 46–47, ECF No. 867.

20.     DCG continued to make clear in its responses to subsequent Amended Disclosure

Statements that it disputed its assumption of liability for the Debtors' misconduct in connection

with the Foreclosed Assets:

> DCG disputes that it assumed Genesis' obligations regarding the $1.2 billion of 3AC collateral upon which Genesis foreclosed prior to DCG's entry into the 3AC Loan Assignment and Assumption Agreement. The 3AC Loan Assignment and Assumption Agreement was a contract for forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon . . . . [R]eading the 3AC Loan Assignment and Assumption Agreement together with the Note and June 2022 Assignment Agreement makes clear that DCG was only assuming 'rights and obligations' in relation to the 'Assumed Liability,' which is defined narrowly as the $1.1 billion loan receivable from 3AC remaining following Genesis' foreclosure on the 3AC collateral, and no other obligations. Furthermore, and consistent with the intention of the parties to the 3AC Loan Assignment and Assumption Agreement, DCG did not receive any of the proceeds from Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure. All proceeds and benefits associated with Genesis' foreclosure of the 3AC collateral went to Genesis. In addition to the legal arguments supporting the fact that DCG did not assume Genesis' liabilities arising from the allegedly wrongful foreclosure of property, it would also be both inequitable and unjust for DCG to be liable for a foreclosure of collateral that it did not receive or benefit from in any shape or form.

Nov. 17, 2023 Am. Disclosure Statement Ex. F, at Section VI, ECF No. 950; Dec. 6, 2023 Am.

Disclosure Statement Ex. F, at Section VI, ECF No. 1031.

21.     On February 7, 2024, GAP and GGC executed the Assignment and Assumption

of 2022 Assignment and Assumption Agreement (the "2024 Assignment Agreement"), pursuant

to which GAP assigned to GGC "all of its rights and obligations under the 2022 Assignment

Agreement."  2024 Assignment Agreement at 1, ECF 1262.  The 2024 Assignment Agreement

similarly states that, under the Assignment and Assumption Agreement between GAP and DCG, "Assignor [GAP] assigned, contributed, transferred and set over to Counterparty [DCG] all right, title, benefit, privileges and interest in and to, and all burdens, obligations and liabilities in connection with, the Assigned Interests." *Id.* at 1.

22.     On February 7, 2024, GGC initiated an adversary proceeding against DCG. Compl., Adv. Proc. ECF No. 1. Espousing an interpretation of the Assignment and Assumption Agreement contrary to the parties' understanding of the Agreement, the adversary proceeding sought declaratory judgment that, pursuant to the Assignment and Assumption Agreement, DCG is liable for the Allowed 3AC Claim of $33 million and that GGC is entitled to pre-judgment interest in the event that GGC pays the Allowed 3AC Claim Amount and is later reimbursed by DCG. Compl., ¶¶ 22–29, Adv. Proc. ECF No. 1.

23.     In response to GGC's claim for declaratory judgment, DCG filed its Counterclaim on April 1, 2024, pointing out the logical conclusion of GGC's contractual interpretation of the Agreement: "Taking GGC's allegations and construction of the contract as true, if DCG assumed responsibility for the Allowed 3AC Claim Amount related to the 3AC Loans, it also assumed the 'right' and 'title' to the collateral foreclosed upon by GGC's predecessor in interest related to the 3AC Loans." Counterclaim at 16, Adv. Proc. ECF No. 8. The Counterclaim asserts a claim for breach of the Assignment and Assumption Agreement against GGC and seeks specific performance of GGC's obligations under the Agreement, including transfer of the collateral foreclosed upon by GAP and any proceeds of the foregoing. *See id.*

24.     GGC moved for judgment on the pleadings on April 4, 2024, (GGC's Mot. for J. on the Pleadings, Adv. Proc. ECF. No. 9), and moved to dismiss DCG's Counterclaim on April 22, 2024. Mot. to Dismiss, Adv. Proc. ECF. No. 14. DCG opposed GGC's motion for judgment

on the pleadings and cross-moved for judgment on the pleadings on April 29, 2024. DCG's Opp'n to GGC's Mot. for J. on the Pleadings, Adv. Proc. ECF. No. 19. Yet again, DCG advanced its consistent position disputing its assumption of liability under the Assignment and Assumption Agreement for the Foreclosed Assets in its opposition and cross-motion for judgment on the pleadings:

a.  "DCG assumed the liabilities flowing from GAP's contractual rights and obligations under the MLAs and Pledge Agreements; DCG did not assume, however, any liability arising from GAP's extra-contractual conduct." *Id.* ¶ 17.

b.  "[T]he Allowed 3AC Claim Amount is not a liability 'in connection with the Assigned Interests.'" *Id.* ¶ 20.

c.  "The obligations GAP and GGC incurred as a result of the unlawful foreclosure and preferential transfers were not assumed by DCG, because they arose outside the operation of the MLAs and Pledge Agreements." *Id.* ¶ 21.

d.  "DCG assumed only *prospective* rights and liabilities for the amounts not yet paid in connection with the Assignment and Assumption Agreement. . . . GAP had already unlawfully taken the 3AC Seized Assets by the time the Assignment and Assumption Agreement was executed, and thus could not transfer that existing obligation to DCG pursuant to a clause requiring DCG to assume *prospective* liabilities." *Id.* ¶ 24.

e.  "It is surprising for GGC to now claim DCG is liable for the return of the 3AC Seized Assets, given that those assets have never been transferred to DCG. If it really were the case that the Assignment and Assumption Agreement saddled DCG with any obligations arising out of the allegedly ultra vires seizure of those

assets, then GAP would have transferred the 3AC Seized Assets to DCG. It defies logic that DCG would have assumed liability for the 3AC Seized Assets without demanding receipt of the corresponding assets. Put otherwise, if the 'Assigned Interests' include GAP's liability for the 3AC Seized Assets, then they must also include the 3AC Seized Assets themselves, and DCG should have taken 'title' to those assets and received the assets upon execution of the Assignment and Assumption Agreement. . . . That GAP did not—and that no party before now has even intimated such an interpretation—is evidence that GGC's made-for-litigation interpretation defies any reasonable reading of the contract." *Id.* ¶ 27.

f.  "GGC cannot resolve the fundamental conflict: If the 3AC Amended Claims seeking return of the 3AC Seized Assets are "in connection" with the Assigned Interests, then so too must be the assets themselves. It would make no sense to hold that the underlying subject matter of a claim is beyond the scope of the assignment even though the claim itself was transferred to DCG." *Id.* ¶ 31.

DCG's Opp'n to GGC's Mot. for J. on the Pleadings ¶¶ 17–31, Adv. Proc. ECF No. 19.

25.     While the parties' interpretation of the Assignment and Assumption Agreement and DCG's Counterclaim were being litigated in the adversary proceeding, the Debtors filed a motion to estimate DCG's Counterclaim in the Chapter 11 proceedings on April 24, 2024. Mot. to Estimate, ECF No. 1618 ("MTE").

## AGREED UPON SCHEDULE AND LIMITATIONS TO BRIEFING ON THE MOTION TO ESTIMATE

26.     Subsequent to the Debtors' filing the motion to estimate, the parties met and conferred regarding an appropriate schedule for briefing on the cross-motions for judgment on the pleadings, the motion to estimate and the motion to dismiss. *See* Joint Letter and Proposed Order

at 2, ECF No. 1633. The parties later filed a joint letter and submitted their proposed briefing

schedule to align the simultaneous briefing of the motion to estimate, motion to dismiss, and cross-

motions for judgment on the pleadings. *Id.* Given the overlap of substantive issues regarding the

Agreement raised in the adversary proceeding and in the Debtors' motion to estimate, the parties

agreed to limit briefing on the motion to estimate to the non-evidentiary issues raised in the motion

to dismiss. *Id.* The Court ordered the parties' proposed schedule. Scheduling Order at 2, ECF

No. 1650. Following discussion with the parties at the May 8, 2024 hearing, the Court set a status

conference on May 30, 2024 to schedule a hearing "to consider the relief sought in the Motion to

Dismiss and the Motion to Estimate." *Id.*; *see* Notice of Status Conference at 2, ECF No. 1666.

Therefore, the issues presented to the Court in connection with the motion to estimate are restricted

to non-evidentiary based legal grounds that overlap with the legal arguments presented in the

motion to dismiss. The parties have agreed to stay all discovery on the motion to estimate and the

motion to dismiss pending the Court's resolution of the motions. *See* Joint Letter and Proposed

Order at 2, ECF No. 1633.

## ARGUMENT

## I.    DCG'S PROOFS OF CLAIM PROPERLY ENCOMPASSED DCG'S COUNTERCLAIM

27.    The Debtors' assertion that DCG's Counterclaim is untimely because it was not

alleged in DCG's Proofs of Claim—and thus not asserted before the Bar Date—is incorrect.

DCG's Proofs of Claim include and preserve its Counterclaim. DCG referenced the Assignment

and Assumption Agreement in its Proofs of Claim and attached the Agreement as an exhibit to the

Proofs of Claim. *See* Ex. C to DCG Proofs of Claim Nos. 464, 487, and 511. Furthermore, DCG

asserted that "GAP did not transfer to DCG the Disputed Collateral, other assets of 3AC it

foreclosed on, or any proceeds of the foregoing" and included in its Proofs of Claim that "DCG

may assert claims against the Debtors under law and equity, including without limitation, fraud, misrepresentation, negligence and breach of contract." DCG Proofs of Claim Nos. 464, 487, and 511 ¶¶ 10, 11. There is no need for DCG to meet an "excusable neglect" exception to assert its Counterclaim, as the Debtors suggest, because there has been no neglect.

28.    DCG additionally reserved all of its rights "to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for breach of contract, conversion, constructive trust, fraud, misrepresentation, or similar claims" and further "reserve[d] all rights to amend, modify, supplement, reclassify, or otherwise revise its Proof of Claim at any time and in any respect, including without limitation, as necessary or appropriate to provide additional detail regarding the claims set forth in [the Proof of Claim][.]" DCG Proofs of Claim Nos. 464, 487, and 511 ¶ 15. DCG also stated that the "filing of the Proof of Claim is not and shall not be deemed . . . a waiver or election of any rights and remedies DCG has or may have under the Assignment and Assumption Agreement, the 2032 Promissory Note, the ARMLA, the MLA, related term sheets dated May 9, 2022, May 10, 2022, and November 10, 2022, the 3AC MLAs, or any other prepetition agreement(s) with any of the Debtors." *Id.* ¶ 17.

29.    The Bankruptcy Code and Bankruptcy Rules do not prescribe the level of specificity required in proofs of claim. *See* 11 U.S.C. § 501(a); Fed. R. Bankr. P. 3001(a); *see also In re Bloomingdale Partners,* 160 B.R. 101, 107 (Bankr. N.D. Ill. 1993) ("the [Bankruptcy] Rules do not demand that a creditor plead its proof of claim with specificity or precision."). To comply with the provisions of the Bankruptcy Code and the Bar Date Order entered in these Chapter 11 Cases, DCG needed only to file a proof of claim that set forth a "claim." *See* 4 COLLIER ON BANKRUPTCY ¶ 502.02[1][c], Lexis (16th ed. 2024). A "claim" is defined under the Bankruptcy Code as, *inter alia*, a "right to payment, whether or not such right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

30.     Here, DCG stated in its Proofs of Claim that it "may assert claims against the Debtors under law and equity, including without limitation, fraud, misrepresentation, negligence and breach of contract"—the contract at issue, the Assignment and Assumption Agreement, was appended to the Proofs of Claim.  Multiple courts have held that proofs of claim which included appended contracts with a debtor are sufficient for the purpose of allowing such plaintiffs to pursue all of their rights arising under such contracts against the debtor.  *See In re SemCrude, L.P.*, 443 B.R. 472, 478–79 (Bankr. D. Del. 2011); *see also Agassi v. Planet Hollywood Int'l, Inc*., 269 B.R. 543, 549–50 (D. Del. 2001).

31.     Furthermore, DCG's Counterclaim is not a "new" claim.  DCG not only included language that it may assert such claims in its Proofs of Claim, but also attached the Assignment and Assumption Agreement and reserved its rights to ensure that nothing in the Proofs of Claim would be deemed a waiver of DCG's rights under the Agreement.  DCG repeatedly put the Debtors on notice throughout these Chapter 11 Cases that it was not waiving any of its rights under the Assignment and Assumption Agreement.  For example, the Debtors refer to the Settlement Agreement and the fact that it was "made express that the Debtors reserved rights to assert a claim that DCG is liable for 3AC's allowed claim based on the [Assignment and Assumption Agreement]."  MTE ¶ 20.  But the Debtors omit the fact that DCG *also* reserved all rights against the Debtors in identical language one paragraph below Genesis's reservation of rights in the same Settlement Agreement.[2]  If DCG's Counterclaim was not properly preserved in its Proofs of Claim

---

[2] *See* Settlement Agreement ¶ 2(e)(vi), ECF No. 972 ("Notwithstanding any other provision of this Settlement Agreement, for the avoidance of doubt, DCG, their subsidiaries and affiliates do not release, and expressly preserve fully and to the same extent as if this Settlement Agreement had not been executed, any claims or causes of action that DCG and any of their subsidiaries and affiliates has against any of the Genesis Debtors or any of the Genesis Debtors'

as the Debtors assert, there would be little need for DCG to have reserved its rights against the Debtors in the heavily negotiated Settlement Agreement or throughout these Chapter 11 Cases.

32.     Moreover, the Debtors' position appears to be that DCG is somehow temporally precluded from filing a Counterclaim at any point in these Chapter 11 cases.  As a matter of law and logic, DCG could not file its Counterclaim—that fully depends upon the contract interpretation urged by the Debtors in the adversary proceeding pleading filed on February 7, 2024—before the adversary complaint was filed.  *See* Compl., Adv. Proc. ECF No.1.  And now, because GGC chose to file that claim on February 7, 2024, the Debtors assert that DCG is time-barred from asserting the Counterclaim.  Effectively, the Debtors' position is that DCG is forever precluded from asserting any counterclaim as a result of GGC electing to file its adversary complaint a year and a half into these Chapter 11 Cases.  No law they cite supports that absurdly inequitable result, and to no surprise, courts have in fact held the exact opposite.  *In re SemCrude, L.P.,* 443 B.R. at 478 (rejecting argument that claims in adversary proceeding were "new" and thus should be barred because the claims arose under agreements referenced in proofs of claim filed against the chapter 11 debtor, were appended as exhibits and the proofs of claim included a reservation of rights).

33.     In short, DCG timely asserted its Counterclaim in response to GGC's February 7, 2024 pleading, as it fully and expressly reserved the right to do so in its Proofs of Claim.  *See* DCG Proofs of Claim Nos. 464, 487, and 511; *see also* Counterclaim, Adv. Proc. ECF No. 8. Nothing more was required.

## II.     <u>ESTIMATION IS NOT APPROPRIATE GIVEN THE IMMINENT RESOLUTION OF DCG'S COUNTERCLAIM</u>

34.     Estimation of DCG's Counterclaim at this time is unnecessary and inappropriate

---

past, present and future agents, heirs, affiliates, employees, founders, executives, officers, directors, equity holders, executors, administrators, liquidators, conservators, attorneys, advisors, successors and assigns.").

in these circumstances.  As explained above, the motion to estimate and motion to dismiss are largely duplicative and raise the same legal arguments and claims.  In fact, the motion to estimate copies word for word substantially all of the factual background and arguments set forth in the motion to dismiss.  The parties have agreed that the Court's consideration of the Debtors' motion to estimate is limited at this time to the legal grounds set forth in the Debtors' motion to dismiss.  There is thus no need for the motion to estimate: If the Court denies the Debtors' motion to dismiss on the legal grounds presented, the Court cannot estimate DCG's Counterclaim at zero and the parties have agreed to proceed with discovery (and any disputes related thereto), for purposes of the full motion to estimate.  If the Court grants the Debtors' motion to dismiss, there is no claim to be estimated.

### A.    The Debtors' Motion to Estimate Is Purely a Litigation Tactic and There Is No Undue Delay in the Debtors' Administration of These Chapter 11 Cases

35.    Estimation is unwarranted because GGC has not met its burden to establish that the administration of these Chapter 11 Cases would be unduly delayed absent estimation.  11 U.S.C. § 502(c)(1) (stating that contingent or unliquidated claims are to be estimated to fix the amount of the claim that would otherwise "unduly delay the administration of the case"); *In re Dow Corning Corp.*, 211 B.R. 545, 562 (Bankr. E.D. Mich. 1997); *see also In re Statewide Realty Co.*, 159 B.R. 719, 724-25 (Bankr. D.N.J. 1993).  To determine whether an alleged delay in the administration of the bankruptcy case would be unjustifiable, a court should "perform a kind of cost-benefit analysis by considering the time, costs and benefits" associated with estimation.  *Dow Corning*, 211 B.R. at 563.  In this analysis, "a bankruptcy court must consider the rights of all parties in interest, not just those of the debtor."  *Id*. at 566.

36.    The only purported justification the Debtors have offered in the motion to estimate is a supposed need for "swift consideration of the relief requested in light of the imminent

possibility of unduly delaying distributions to creditors." MTE ¶ 82. However, this is not a protracted, years-long litigation proceeding in a different jurisdiction that might hold up creditor distributions under the Debtors' Plan (if approved) for years to come. As the Court knows, it was *GGC* that initiated the adversary proceeding. In response, DCG filed an amended answer and counterclaim relying on the same legal theory and contract interpretation advanced by GGC in its complaint. *See* Counterclaim, Adv. Proc. ECF No. 8. As set forth in its Counterclaim, if DCG is found to have assumed the liabilities arising out of the Foreclosed Assets—as GGC itself asserts—then under the plain language of the Assignment and Assumption Agreement (as well as basic notions of equity and common sense), DCG also should receive title to those assets.

37.     As this Court is aware, the parties have agreed on a briefing schedule for the express purpose of synchronizing the briefing on GGC's motion to dismiss with the parties' existing schedule for the cross-motions for judgment on the pleadings. *See* Joint Letter and Proposed Order, ECF No. 1633. The parties agreed that briefing on the motion to estimate "shall be limited to the non-evidentiary bases . . . that are also raised in the Motion to Dismiss." Proposed Order at 2, ECF No. 1650. Both motions will be fully briefed, simultaneously, within a week and "[t]his Court shall hold a hearing to consider the relief sought in the Motion to Dismiss and the Motion to Estimate," at a date to be determined at the status conference on May 30, 2024. *Id.*; *see also* Notice of Status Conference at 2, ECF No. 1666.

38.     In light of the fact that GGC is the plaintiff in the adversary proceeding, and this Court has already set an expedited schedule on all briefing in connection with the Counterclaim, estimation is wholly unnecessary. There is no "imminent" threat of delay that would warrant an estimation ruling separate from a ruling on the motion to dismiss the Counterclaim, where, as here, the parties have agreed that the sole issues raised in the motion to estimate before the Court

are those addressed in the motion to dismiss.

39.    Rather than address any pressing need for resolution, the Debtors seek to use estimation not to actually estimate claims against the estate, but to reduce the value of the Counterclaim to $0 based on the same arguments in the motion to dismiss.  Section 502(c), however, "is not a mechanism for reducing the amount of a debtor's liability."  *See In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. D. Del. 2007).  Using estimation to reduce the value of claims is fundamentally inconsistent with what the Bankruptcy Code requires: "the federal bankruptcy court should take whatever steps are necessary to ensure that the [claimant] is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."  *Butner v. United States*, 440 U.S. 48, 56 (1979).  There is no undue delay in administration of these Chapter 11 Cases in light of the imminent briefing and hearing on the merits of DCG's Counterclaim in the adversary proceeding.  For these reasons, the Debtors have failed to meet their burden under Section 502(c)(1).

**B.    Estimation of DCG's Counterclaim Under Section 502(c)(2) Is Unnecessary in Light of the Upcoming Hearing on the Counterclaim**

40.    Next, the Debtors assert that this Court must estimate DCG's Counterclaim under Section 502(c)(2), which provides that "[t]here shall be estimated for purpose of allowance under this section . . . any right to payment arising from a right to an equitable remedy for breach of performance."  11 U.S.C. § 502(c)(2).  However, bankruptcy courts have broad discretion in determining how to estimate an equitable claim.  *See In re LightSquared Inc*., 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014) ("[I]t is within [the court's] sound discretion and not the obligation of [the court] to estimate a claim.") (citation and internal quotation marks omitted).  Neither the Bankruptcy Code nor the Bankruptcy Rules establish the means by which to estimate claims, and therefore bankruptcy courts apply whatever method is best suited to the particular

contingencies at issue.

41.     Here, the parties agreed that the overlapping issues raised in the motion to estimate and the motion to dismiss would be briefed simultaneously and addressed in tandem. *See* April 29, 2024 Joint Letter at 2, ECF No. 1633. To the extent there are arguments for estimation that go beyond the legal arguments set forth in the motion to dismiss, those issues have been bifurcated, and the motion to estimate is limited to the same contractual grounds as the arguments in the motion to dismiss. *See id.* If, following the Court's decision on the motion to estimate and the motion to dismiss, there are remaining issues to resolve, they will necessarily involve questions of fact. Therefore, the parties reserved their rights to obtain discovery in connection with the motion to estimate after the legal questions are settled.

42.     Finally, the Debtors argue that "'[t]his subsection requires that all claims against the debtor be converted into dollar amounts.'" MTE ¶ 45 (citation omitted). If the Court is inclined to estimate the Counterclaim, DCG requests that the Court exercise its broad discretion to estimate the Counterclaim *after* the merits hearing using the valuation methodology the Court deems appropriate that is consistent with the Court's upcoming ruling on Plan confirmation.

## III.   THE DEBTORS' INTERPRETATION OF THE JULY 2022 ASSIGNMENT AND ASSUMPTION AGREEMENT IS BASED ON AN ERRONEOUS READING OF THE AGREEMENT

43.     If this Court elects to address the merits of the Debtors' motion to estimate (as limited to the agreed-upon legal grounds), it should be denied because the Debtors' proposed interpretation of the Agreement is inconsistent with the position GGC has taken in the adversary proceeding against DCG, where it seeks to saddle DCG with $33 million in turnover and avoidance liability without ever having transferred to DCG the assets that are the subject of that liability.

**A.    The Reading Advanced by the Debtors Is Inconsistent with GGC's Litigating Position in the Adversary Proceeding**

44.    Contrary to the Debtors' claim, its interpretation of the Assignment and Assumption Agreement is unmistakably at odds with GGC's broad reading of the phrase "in connection with" advanced in its motion for judgment on the pleadings in the adversary proceeding.    GGC's Mot. for J. on the Pleadings ¶¶ 22–25, Adv. Proc. ECF No. 9.    DCG's Counterclaim is simply the logical consequence of the "plain meaning" of the Agreement endorsed in the adversary proceeding by GGC—the same contractual interpretation that the Debtors now argue against.    *Id.* ¶¶ 21–25; *see* MTE ¶¶ 64–65.

45.    The Debtors posit that "DCG bears the liability for all amounts due to 3AC in connection with the 3AC Loan-Related Claims" (Compl. ¶ 16, Adv. Proc. ECF No. 1), including "liability for the $33 million Allowed 3AC Claim Amount (*i.e.*, the settled amount to which the 3AC Loan-Related Claims were ultimately reduced)," but that DCG has no right to the Foreclosed Assets from which the 3AC Loan-Related Claims and Allowed 3AC Claim Amount arise.    *See* MTE ¶ 65 n.9.    This contractual reading is clearly illogical.    The applicable provision of the Agreement conveys equally, and together, all "right, title, benefit, privileges and interest in and to" and all "burdens, obligations and liabilities in connection with" the Assigned Interests.    *See* Assignment and Assumption Agreement ¶ 2.    Fully aware of the glaring inconsistency of their interpretation, the Debtors bury their feeble response in a footnote:

> The only natural, logical reading of the contract is that DCG would be entitled to any Collateral obtained after the date of the assignment (for example, the NEAR and AVAX Collateral on which the Debtors did not foreclose prior to the date of the July 2002 [sic] GAP-DCG A&A Agreement), and would likewise be liable for any claims by 3AC in connection with the 3AC Loans.

MTE ¶ 65 n.9.

46.    The Debtors fail to offer any support or further explanation for this "natural,

logical" reading of the contract, and an interpretation of a contract is not natural or logical just because the Debtors assert it is. In fact, it defies logic that DCG would have assumed liability for the Foreclosed Assets without demanding receipt of the corresponding assets. Put otherwise, if the "Assigned Interests" include GAP's liability for the Foreclosed Assets, then they must also include the Foreclosed Assets themselves, and DCG should have taken "title" to those assets and received the assets upon execution of the Assignment and Assumption Agreement.

47.    According to the Debtors, however, once 3AC's pledged collateral was foreclosed upon by GAP, it was, in effect, "converted to outright title to the assets" and "ceased to be Collateral under the MLAs and Pledge Agreements." MTE ¶ 65. Because "the Foreclosed Assets became property of the Debtors" and "were no longer 'Collateral' under the MLAs or Pledge Agreements . . . the Foreclosed Assets did not form part of the Assigned Interests and therefore were not contemplated to be delivered to DCG." *Id.*

48.    As defined in the Assignment and Assumption Agreement, "Assigned Interests" are "all of [GAP's] lending activities with [3AC], including any outstanding loans" and "all of [GAP's] rights and obligations under the Pledge Agreements and related Collateral under the Agreements and the Pledge Agreements." Assignment and Assumption Agreement at 1. Setting aside that the Debtors' collateral conversion theory is not substantiated by the express language of the MLAs, Pledge Agreement, or Assignment and Assumption Agreement, the Debtors' argument nonetheless misses the point. Regardless of whether the Foreclosed Assets are considered "Collateral" within the meaning of the Agreement or "property of the Debtors," they are assets obtained and held "in connection with" the 3AC loans and lending activities (i.e. Assigned Interests). Under the Assignment and Assumption Agreement, DCG assumed "all of [GAP's] rights and obligations" under the MLAs and Pledge Agreements, and because GAP's right to

foreclose on 3AC's collateral flowed directly from the MLAs and Pledge Agreements, the "right, title, benefit, privileges and interest in" the Foreclosed Assets was assigned to DCG.  *See* Assignment and Assumption Agreement ¶ 2.  If, as GGC argues, the Allowed 3AC Claims are in connection with the "Assigned Interests," so too are the Foreclosed Assets, and DCG would be entitled to the assets.  *See* Compl. ¶ 16, Adv. Proc. ECF No. 1.

49.     Indeed, GGC has argued in the adversary proceeding that "Courts in this Circuit routinely construe the phrase 'in connection with' broadly" (GGC's Mot. for J. on the Pleadings ¶ 22, Adv. Proc. ECF No. 9), but the Debtors here conversely advance a theory of interpretation that attempts to carve out the Foreclosed Assets from the "Assigned Interests."  MTE ¶ 64 ("[T]he Foreclosed Assets are not part of the Assigned Interests.").  The Debtors cannot offer a broad interpretation of the contract in one forum and simultaneously argue against the logical conclusion of that interpretation in another.  *See AT&T Corp. v. Atos IT Sol. & Servs., Inc.*, 2023 WL 8878935, at *8 (S.D.N.Y. Dec. 22, 2023) ("The Court must also be mindful of the 'well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties.'") (quoting *Cole v. Macklowe*, 99 A.D. 3d 595, 596 (1st Dep't 2012)).

50.     The Debtors argue that DCG's theory of liability asserted in the Counterclaim is contradicted by DCG's prior statements regarding the purpose and effect of the Assignment and Assumption Agreement.  Not so.  It is the Debtors—not DCG—that espouse a new theory directly at odds with the parties' understanding of the Agreement.  *See* MTE ¶ 69.  Prior to the filing of the Adversary Complaint, DCG believed its understanding of the Assignment and Assumption Agreement to be consistent with the Debtors': the assignment would be forward-looking, and DCG assumed prospective rights and liabilities for the amounts not yet paid in connection with the

Agreement. *See* MTE ¶ 66; DCG's Opp'n to GGC's Mot. for J. on the Pleadings ¶ 24, Adv. Proc. ECF No. 19. However, the Adversary Complaint advocated an entirely different position: that DCG should be on the hook for the $33 million 3AC Claim Amount as a result of GGC's predecessor's unlawful seizure of the Foreclosed Assets. *See generally* Compl., Adv. Proc. ECF No. 1. DCG asserted the Counterclaim solely in response to the erroneous reading of the Assignment and Assumption Agreement advanced by GGC in the Adversary Complaint that, if accepted by the Court, would require DCG to pay the $33 million 3AC Claim Amount and by extension, require GGC to turn over the Foreclosed Assets and related proceeds.

51.    The Debtors argue that they are "aware of no instance in which DCG asserted a desire to obtain an interest in the Foreclosed Assets, either formally or informally, or requested that they be transferred to DCG for any purpose, until the filing of the Amended Answer." MTE ¶ 72. And they are right. Indeed, there are no such instances because DCG understood (and believed the Debtors to share the same understanding) that "[t]he 3AC Loan Assignment and Assumption Agreement was a contract for forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon." *Id.* ¶ 69 (quoting Disclosure Statement at 300). But now, the Debtors are trying to have it both ways—reap the benefits of the Foreclosed Assets (which they currently estimate to be worth more than $4.3 billion (*id.* ¶ 75 n.11)), and shake down DCG for the $33 million 3AC Claim Amount. The entire reason DCG asserted the Counterclaim was to preserve its rights. Without GGC's filing of the Adversary Complaint, there would be no need for the Counterclaim.

**B.    DCG Is Permitted to Assert the Counterclaim Pursuant to Fed. R. Civ. P. 8 and Fed. R. Bankr. P. 7008**

52.    Contrary to the Debtors' claim of untimeliness, there was no sooner opportunity for

DCG to assert its Counterclaim.  A counterclaim does not arise until a claim is filed.  *See generally*, Fed. R. Civ. P. 13 and Fed. R. Bankr. P. 7013; *see also Kearney v. A'hearn*, 210 F. Supp. 10, 20 (S.D.N.Y. 1961) ("It is self-evident that in order to have a counterclaim there must first be a claim against the party asserting the counterclaim."), *aff'd*, 309 F.2d 487 (2d Cir. 1962).  Therefore, it would have been impossible for DCG to assert the Counterclaim earlier.  And this is precisely why all of the Debtors' complaints that DCG should have referenced the Counterclaim against GGC in filings or hearings outside the adversary proceeding—*e.g.*, in its Disclosure Statement Responses and Objection (MTE ¶¶ 26–30), its Asset Sale Objection (*id.* ¶ 31), its Plan Confirmation Objection (*id.* ¶ 32), and during oral argument on the Plan confirmation (*id.*)—are unavailing.  DCG asserted its Counterclaim for the sole purpose of preserving its rights under the Assignment and Assumption Agreement in the adversary proceeding.

53.    The Debtors criticize DCG in a footnote for not asserting its Counterclaim "as a claim in the alternative or as a claim purely for judgment reduction, such that if the claim asserted in GGC's Complaint fails, DCG's Counterclaim would also fall away.  If DCG had sought to plead in the alternative in this way, it would have been required to do so from the outset."  MTE ¶ 65 n.9.  That is not the law.  DCG is permitted to plead separate claims "regardless of consistency." Fed. R. Civ. P. 8(d)(3).  "A party may state as many separate claims or defenses as it has, regardless of consistency."  *Unicorn Crowdfunding Inc. v. New St. Enter., Inc.*, 2019 WL 2450911, at *5 (S.D.N.Y. June 12, 2019); *see also* Fed. R. Bankr. P. 7008 (applying Fed. R. Civ. P. 8 to adversary proceedings).  Additionally, DCG is not required to plead its Counterclaim in the alternative.  *See Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) ("Although these allegations were not specifically pleaded as 'in the alternative,' we have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in

favor of the nonmoving party."); *Growblox Scis., Inc. v. GCM Admin. Servs., LLC,* 2015 WL 3504208, at *9 (S.D.N.Y. June 2, 2015) (same).

## IV.   THE DEBTORS' JUDICIAL ESTOPPEL, EQUITABLE ESTOPPEL AND ESTOPPEL BY LACHES ARGUMENTS FAIL

### A.   DCG's Interpretation of the Assignment and Assumption Agreement Has Remained Consistent

54.   DCG's interpretation of the Assignment and Assumption Agreement has remained consistent in all public statements it has previously made concerning the obligations and liabilities it assumed under the Agreement. Over the past year, DCG has repeatedly asserted that it did not assume liability for GAP's unlawful seizure of the Foreclosed Assets, or for the 3AC Amended Claims arising from GAP's wrongdoing. *See supra* pp. 5–11.

55.   These statements, including those made in DCG's Opposition to GGC's Motion for Judgment on the Pleadings and Cross-Motion for Judgment on the Pleadings (*see* DCG's Opp'n to GGC's Mot. for J. on the Pleadings ¶¶ 17–31, Adv. Proc. ECF No. 19), demonstrate the consistency of DCG's position. DCG's disagreement with any potential argument asserted by the Debtors that it assumed liability for the wrongful foreclosure of 3AC's pledged collateral is cemented in its interpretation of the Assignment and Assumption Agreement. Contrary to the Debtors' claims (MTE ¶ 75), DCG has not taken inconsistent factual positions throughout the course of the bankruptcy proceedings that would warrant the application of any equitable remedy to bar DCG's Counterclaim. *See supra* pp. 5–11.

### B.   The Debtors' Theories of Estoppel Do Not Bar DCG's Counterclaim

#### 1.   *Judicial Estoppel*

56.   The Debtors have failed to demonstrate that the "rather narrow[]" remedy of judicial estoppel is warranted. *Sunnyside Dev. Co. v. Bank of N.Y.*, 2008 WL 463722, at *3 (S.D.N.Y. Feb. 19, 2008). "A party invoking [the judicial estoppel] doctrine 'must show that (1)

the party against whom judicial estoppel is being asserted advanced an inconsistent factual position

in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some

manner.'" *In re DeFlora Lake Dev. Assocs., Inc.*, 571 B.R. 587, 599 (Bankr. S.D.N.Y. 2017)

(quoting *United States v. Hussein*, 178 F.3d 125, 130 (2d Cir. 1999)). "A judicial estoppel

argument requires the Court to find that the [party] asserted facts in the prior proceeding that are

inconsistent with the facts alleged in the complaint before the Court." *Id.* at 600 (quoting *Prince

v. Suffolk Cnty. Dep't of Health Serv.,* 1996 WL 393528, at *6 (S.D.N.Y. July 12, 1996)).

57.    Judicial estoppel does not preclude DCG from asserting its Counterclaim because

the doctrine does not bar parties from pleading alternate legal theories. *See id.* at 600. "Judicial

estoppel applies to inconsistent factual positions, not alternative legal theories of the case," because

the Federal Rules of Civil Procedure permit a party "to 'state as many separate claims or defenses

as the party has regardless of consistency.'" *Id.* at 599 (quoting *Cleveland v. Policy Mgmt. Sys.

Corp.*, 526 U.S. 795, 805 (1999)). DCG's Counterclaim is another legal theory advancing an

interpretation of the Assignment and Assumption Agreement: GGC's claims in the adversary

proceeding and DCG's Counterclaim succeed or fail together, such that DCG cannot be liable for

the Allowed 3AC Claim Amount without also being entitled to the collateral that is the subject of

the 3AC Amended Claims. *See* Counterclaim ¶¶ 26–28, Adv. Proc. ECF No. 8. The Debtors'

argument that DCG has taken an "inconsistent" position and should therefore be judicially

estopped from setting forth an alternate legal theory of its case mischaracterizes both the facts and

the law. MTE ¶¶ 76–79.

### 2.    *Equitable Estoppel*

58.    The Debtors have similarly failed to show that DCG's Counterclaim is barred by

the doctrine of equitable estoppel. To prevail on a theory of equitable estoppel, a party must

demonstrate "(1) an act constituting a concealment of facts or misrepresentation; (2) an intention

or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment." *Clear Channel Outdoor, LLC v. City of New Rochelle*, 2022 WL 17249412, at *5 (S.D.N.Y. Nov. 28, 2022) (quoting *Gaia House Mezz LLC, v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013)).

59.     The Debtors' equitable estoppel argument fails on the first element because DCG never concealed or misrepresented its position that it did not assume liability for GGC's predecessor's wrongdoing under the Assignment and Assumption Agreement. *See, e.g.*, Am. Disclosure Statement, Ex. F, § VI, ECF No. 950 ("DCG disputes that it assumed Genesis' obligations regarding the $1.2 billion of 3AC collateral upon which Genesis foreclosed prior to DCG's entry into the 3AC Loan Assignment and Assumption Agreement.").  As previously explained, DCG's Counterclaim did not arise until GGC initiated the adversary proceeding against DCG. *See supra* pp. 23–24.  Therefore, the Debtors cannot premise a claim for equitable estoppel upon the fact that DCG brought its Counterclaim in response to the adversary proceeding filed against DCG. *See Gaia House Mezz LLC*, 720 F.3d at 90 ("[A] party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak.") (citing *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 94 (2d Cir. 2003)).

60.     The Debtors further fail to demonstrate that they detrimentally relied on DCG's statements regarding its assumed liability under the Assignment and Assumption Agreement.  The Debtors argue that they would be "hugely prejudiced" if the Counterclaim were not dismissed. MTE ¶ 80.  However, the pertinent question under the doctrine of equitable estoppel is whether the Debtors detrimentally changed their position *in reliance* on DCG's alleged misrepresentation or omission. *See Gaia House Mezz LLC*, 720 F.3d at 92 ("Even if [plaintiff] had been able to

demonstrate reasonable reliance on a misrepresentation or omission by [defendant], its claim still fails because it did not demonstrate that the alleged misrepresentations caused it to change its position to its substantial detriment.").  The Debtors have alleged no facts suggesting that they would have put forth a different Plan if DCG had brought its Counterclaim earlier (which it could not have done).  Indeed, it is illogical to suggest that DCG should have asserted its Counterclaim before GGC initiated the adversary proceeding seeking to pin liability on DCG for the 3AC Amended Claims.  *See supra* pp. 23–24.

61.     Finally, the Debtors' invocation of equitable estoppel to dismiss DCG's Counterclaim should be rejected as an improper effort to unilaterally revise the terms of the Assignment and Assumption Agreement to impose liability on DCG for GAP's misconduct in connection with the Foreclosed Assets, while simultaneously denying DCG any benefit from those assets.   Under the Debtors' inconsistent and illogical interpretation of the Assignment and Assumption Agreement, DCG is liable for GAP's wrongful conduct in connection with the Foreclosed Assets, but GGC is entitled to reap the benefits of those same assets.  Equity cannot allow the Debtors to interpret the 3AC Amended Claims as "in connection with" the Assigned Interests only when that reading allows the Debtors to escape liability for their own wrongdoing.  *See Est. of Lennon ex rel. Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996) (holding that under the doctrine of unclean hands, equitable remedies are unavailable to a party "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.") (internal quotation marks and citation omitted).

### 3.     *Estoppel by Laches*

62.     Laches does not bar DCG's Counterclaim because "[t]he defense of laches is an affirmative defense which 'properly should be raised in the defendant's answer and not upon a

motion to dismiss.'"  *Alston v. 1749-1753 First Ave. Garage Corp*., 2013 WL 3340484, at *4

(E.D.N.Y. July 2, 2013) (quoting *State Farm Mut. Auto. Ins. Co. v. Kalika*, 2006 WL 6176152, at

*8 (E.D.N.Y. Mar. 16, 2006)).  "A party asserting the defense of laches must establish that: (1) the

[complainant] knew of the [party's] misconduct; (2) the [complainant] inexcusably delayed in

taking action; and (3) the [party] was prejudiced by the delay."  *Broad. Music, Inc. v. Liberman*

*Broad., Inc.*, 2016 WL 3919654, at *2 (S.D.N.Y. July 14, 2016) (quoting *Ikelionwu v. United*

*States*, 150 F.3d 233, 237 (2d Cir. 1998)).  Here, the Debtors can make no plausible argument for

DCG's delay because the Counterclaim could not be asserted until after GGC initiated the

adversary proceeding.  *See supra* pp. 23–24.

63.    Further, "[d]ismissing on the grounds of laches pursuant to Fed. R. Civ. P. 12(b)(6)

is anomalous because: 'a ruling on the [movant's] defense of laches would necessarily involve a

fact-intensive analysis and balancing of equities that would require the Court to consider matters

outside of the pleadings that are in dispute.'"  *Broad. Music,* 2016 WL 3919654, at *2 (quoting

*Alston*, 2013 WL 3340484, at *4).  DCG's Counterclaim did not arise until GGC initiated the

adversary proceeding, and DCG timely asserted its Counterclaim within the timeframe permitted

under the Federal Rules.  *See supra* pp. 23–24.  Because there was no inexcusable delay in bringing

the Counterclaim, the Debtors' laches argument is meritless.  *See* MTE ¶ 81.

## V.    <u>LOCAL RULE 9014-2 SHOULD NOT BE WAIVED</u>

64.    The Debtors' request for waiver of Local Rule 9014-2 is rendered moot by the

parties' subsequent agreement limiting the motion to estimate to the non-evidentiary grounds set

forth in the Motion to Dismiss, and staying all discovery pending the Court's resolution of those

purely legal arguments.  *See supra* p. 19.  Under the agreement, all discovery and discovery-related

disputes are stayed pending the Court's resolution of the overlapping legal issues in the motion to

estimate and motion to dismiss.  *See* Joint Letter and Proposed Order at 2, ECF No. 1633.

Therefore, the Debtors' argument that discovery is not required because DCG already has access to all the relevant information (MTE ¶ 82) no longer applies to the instant motion to estimate. *See infra* p. 30.

65.     To be clear, however, discovery is necessary to resolve the evidentiary-based grounds that may remain following the Court's decision.  The Debtors' conclusory assertion that "the parties have been in possession of all information and documents that could conceivably be relevant to this dispute for quite some time," (MTE ¶ 82) is wrong.  DCG has never served requests for production or interrogatories to the Debtors, negotiated search terms and custodians, or taken a single deposition in connection with the Assignment and Assumption Agreement.  Pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, DCG is entitled to do so.  *See* Fed. R. Civ. P. 26; Fed. R. Bankr. P. 7026.

66.     The Debtors argue that the regulatory and Special Committee investigations, as well as the litigation of 3AC's claims have uncovered all conceivably relevant information and documents.  But the scope of discovery in these proceedings is not clear; indeed, the Debtors provide no specifics on the categories of documents produced, custodians searched, terms and time periods used, and the list goes on.  Moreover, during the litigation of 3AC's claims, it is DCG's understanding that the Debtors objected to producing documents related to the Assignment and Assumption Agreement and 3AC threatened to move to compel, which dispute remained outstanding at the time of the Settlement Agreement.  Further, DCG presumes that a significant number of the Debtors' internal documents concerning the Agreement involved communications with lawyers that they may claim as privileged, but DCG is yet to receive a privilege log from the Debtors.  In short, DCG has not obtained all information and documents relevant to this dispute, and Local Rule 9014-2 cannot be waived.

## CONCLUSION

For all the foregoing reasons, DCG respectfully requests that the Court deny the Debtors'

motion to estimate DCG's Counterclaim and award such further or other relief as the Court deems

just and proper.

Dated: May 16, 2024
    New York, New York

WEIL, GOTSHAL & MANGES LLP

*/s/ Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jonathan D. Polkes
Caroline Hickey Zalka
Jessica Liou
Furqaan Siddiqui
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
Email: jeffrey.saferstein@weil.com
      jonathan.polkes@weil.com
      caroline.zalka@weil.com
      jessica.liou@weil.com
      furqaan.siddiqui@weil.com

Joshua M. Wesneski
2001 M Street NW, Suite 600
Washington, DC 20036
Tel: (202) 682-7248
Fax: (202) 857-0940
Email: joshua.wesneski@weil.com