**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    <u>FOR PUBLICATION</u>
------------------------------------------------------------------x
In re                                                                        Chapter 11

GENESIS GLOBAL HOLDCO, LLC, *et al.*                  Case No. 23-10063 (SHL)

                                        Debtors.          (Jointly Administered)
------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for the Debtors*
One Liberty Plaza
New York, New York 10006
By:     Sean A. O'Neal, Esq.
        Luke A. Barefoot, Esq.
        Jane VanLare, Esq.
        Thomas S. Kessler, Esq.
        Andrew Weaver, Esq.
        Rishi N. Zutshi, Esq.

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for Digital Currency Group, Inc. and DCG International Investments Ltd.*
767 Fifth Avenue
New York, New York 10153
By:     Jeffrey D. Saferstein, Esq.
        Jonathan D. Polkes, Esq.
        Caroline Hickey Zalka, Esq.
        Jessica Liou, Esq.
        Furqaan Siddiqui, Esq.

        -and-

2001 M Street NW, Suite 600
Washington, DC 20036
By:     Joshua M. Wesneski, Esq.

**MCDERMOTT WILL & EMERY LLP**
*Counsel for the Genesis Crypto Creditors Ad Hoc Group*
One Vanderbilt Avenue
New York, New York 10017-3852
By:    Darren Azman, Esq.
        Joseph B. Evans, Esq.
        J. Greer Griffith, Esq.
        Lucas B. Barrett, Esq.

        -and-

333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
By:    Gregg Steinman, Esq.
        Kelly Shami, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee*
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Suite 515
New York, New York 10004
By:    Greg Zipes, Esq.
        Tara Tiantian, Esq.

**PROSKAUER ROSE LLP**
*Counsel for the Ad Hoc Group of Genesis Lenders*
Eleven Times Square
New York, New York 10036
By:    Brian S. Rosen, Esq.

        -and-

70 West Madison, Suite 3800
Chicago, Illinois 60602
By:    Jordan E. Sazant, Esq.

**WHITE & CASE LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1221 Avenue of the Americas
New York, New York 10020
By:    J. Christopher Shore, Esq.
        Philip Abelson, Esq.
        Colin T. West, Esq.
        Michele J. Meises, Esq.

-and-

200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352
By:     Amanda Parra Criste, Esq.

**KATTEN MUCHIN ROSENMAN LLP**
*Counsel for Teddy André Amadéo Gorisse*
50 Rockefeller Plaza
New York, New York 10020-1605
By:     Steven Reisman, Esq.
        Shaya Rochester, Esq.
        Julia Mosse, Esq.

        -and-

2029 Century Park East
Suite 2600
Los Angeles, California 90067-3012
By:     Patrick Smith, Esq.

**PRYOR CASHMAN LLP**
*Counsel for the Ad Hoc Group of Dollar Lenders*
7 Times Square
New York, New York 10036-6569
By:     Seth H. Lieberman, Esq.
        Matthew W. Silverman, Esq.
        Daniel I. Brenner, Esq.

**WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP**
*Counsel for the New York State Office of the Attorney General on behalf of the People of
the State of New York*
1201 RXR Plaza
Uniondale, New York 11556
By:     Thomas A. Draghi, Esq.
        William C. Heuer, Esq.
        Alexandra Troiano, Esq.

**HUGHES HUBBARD & REED LLP**
*Counsel for Gemini Trust Company, LLC*
One Battery Park Plaza
New York, New York 10004
By:     Anson B. Frelinghuysen, Esq.
        Dustin P. Smith, Esq.
        Erin E. Diers, Esq.
        Elizabeth A. Beitler, Esq.

**OTTERBOURG P.C.**
*Counsel for SOF International, LLC*
230 Park Avenue
New York, New York 10169
By:    James V. Drew, Esq.

**MEDINA LAW FIRM LLC**
*Counsel for BAO Family Holding LLC*
641 Lexington Avenue
Thirteenth Floor
New York, New York 10022
By:    Eric S. Medina, Esq.

**U.S. SECURITIES AND EXCHANGE COMMISSION**
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326
By:    William M. Uptegrove, Esq.

        -and-

100 F Street, N.E.
Washington, D.C. 20549
By:    Therese A. Scheuer, Esq.

**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
*Counsel for the New Jersey Bureau of Securities*
570 Broad Street
Newark, New Jersey 07102
By:    Jeffrey Bernstein, Esq.

        -and-

225 Liberty Street, 36th Floor
New York, New York 10281
By:    Virginia T. Shea, Esq.

**TEXAS STATE SECURITIES BOARD AND TEXAS DEPARTMENT OF BANKING**
Bankruptcy & Collections Division
P.O. Box 12548
Austin, Texas 78711-2548
By:    Layla D. Milligan, Esq.
       Roma N. Desai, Esq.
       Sean Flynn, Esq.
       Stephanie Eberhardt, Esq.

**THE LAW OFFICES OF RICHARD J. CORBI PLLC**
*Counsel for Chainview Capital Fund*
1501 Broadway, 12th Floor
New York, New York 10036
By:      Richard J. Corbi, Esq.

## Table of Contents

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 6

I.      Debtors' Prepetition Business Operations ............................................................... 6

II.     Bankruptcy Filing and Plan Negotiations ............................................................. 10

III.    The NYAG Action and the NYAG Settlement Agreement ..................................... 16

IV.     The Settlement Motion ......................................................................................... 22

V.      The Plan ............................................................................................................... 23

VI.     The Request for Confirmation and Objections ..................................................... 31

DISCUSSION ................................................................................................................. 35

I.      The NYAG Settlement Motion ............................................................................. 35

        A. Legal Standard ............................................................................................... 35

        B. The NYAG Settlement Agreement Satisfies the Iridium Factors ..................... 38

        C. DCG's Remaining Arguments as to the NYAG Settlement ............................. 50

            1.  Privilege ................................................................................................... 50

            2.  Sub Rosa Plan ......................................................................................... 52

II.     Confirmation of the Plan ..................................................................................... 60

        A. Settlement Among Creditors .......................................................................... 60

        B. DCG's Standing to Object to the Distribution Principles ............................... 67

        C. DCG's Other Objections to Confirmation ..................................................... 84

            1.  Setoff Principles ....................................................................................... 84

            2.  Corporate Governance ............................................................................. 89

        D. CCAHG's Objections to Confirmation .......................................................... 95

            1.  Administrative Priority ............................................................................. 95

            2.  Executory Contracts ................................................................................. 99

            3.  Debtor Releases ...................................................................................... 105

            a.  Motion in Limine .................................................................................... 108

            b.  CCAHG's Substantive Objection ............................................................ 113

        E. UST Objections ........................................................................................... 119

            1.  Exculpation ............................................................................................ 119

            2.  Substantial Contribution ........................................................................ 125

        F. Confirmation Requirements ......................................................................... 128

CONCLUSION .............................................................................................................. 129

i

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two hotly contested matters in the above-captioned cases. The first is the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1275][1] (the "NYAG Settlement Motion"), which seeks approval of a settlement between the above-captioned debtors (collectively, the "Debtors")[2] and the Office of the New York Attorney General ("NYAG") under Rule 9019 of the Federal Rules of Bankruptcy Procedure.[3] The second is confirmation of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1392] (as further amended and supplemented, the "Plan").

An evidentiary hearing was held on both the NYAG Settlement Motion and confirmation of the Plan from February 26, 2024 through February 28, 2024, with closing arguments on the NYAG Settlement Motion taking place on February 28, 2024 and closing arguments on confirmation of the Plan on March 18, 2024 (collectively, the "Evidentiary Hearing"). *See generally* Hr'g Tr. (Feb. 26, 2024) [ECF No. 1674]; Hr'g Tr. (Feb. 27, 2024) [ECF No. 1679]; Hr'g Tr. (Feb. 28, 2024) [ECF No. 1675]; Hr'g Tr. (Mar. 18, 2024) [ECF No. 1508]. This *Memorandum of Decision* constitutes the Court's findings of fact and conclusions of law for both the NYAG Settlement Motion and confirmation of the Plan. For the reason set forth in more

---

[1]    Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Case No. 23-10063.

[2]    The Debtors are Genesis Global Holdco, LLC ("Holdco"), Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific PTE. Ltd. ("GAP"). *See Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC, in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* ¶ 1 [ECF No. 1330, Ex. D] (the "Aronzon Confirmation Declaration"). Holdco owns 100% of the interest in GGC, GAP and Holdco's other, non-debtor subsidiaries. *See id.*

[3]    The settlement consists of entry into a *Stipulation and Consent to Judgment and Order* and a *Judgment on Consent* (together, the "NYAG Settlement Agreement"). A copy of the *Stipulation and Consent to Judgement* is attached as Exhibit C to the NYAG Settlement Motion and a copy of the *Order and Judgement on Consent* is attached as Exhibit D to the NYAG Settlement Motion.

1

detail below, the Court will approve the NYAG Settlement Motion and confirm the Plan over the objections filed against each.

As to the settlement, the Court finds that the NYAG Settlement Agreement is reasonable given all of the facts and circumstances in the record.  The NYAG Settlement Agreement resolves, solely with respect to the Debtors, an action commenced by NYAG in the Supreme Court of the State of New York, County of New York, styled *The People of the State of New York v. Gemini Trust Co. et al.*, Case No. 452784/2023 (the "NYAG Action").  It also provides for allowance of proofs of claim numbered 855, 856 and 857 filed by NYAG in the Debtors' Chapter 11 cases.  *See generally* SEC/NYAG Ex. 16 (the "NYAG Claims").[4]  Both the NYAG Claims and the NYAG Action allege, among other things, that the Debtors and certain other co-defendants used fraudulent practices and engaged in fraudulent and illegal acts to defraud their investors, who are the customers holding unsecured claims in these cases.  The NYAG Settlement Motion is supported by various creditor groups in these cases, including the Official Committee of Unsecured Creditors appointed in the Debtors' bankruptcy cases (the "Committee"), an Ad Hoc Group of the Debtors' lenders holding approximately $2.5 billion in claims asserted against the Debtors (the "Ad Hoc Group") and NYAG itself.[5]  Only Digital Currency Group, Inc. ("DCG")—the Debtors' equity holder and a co-defendant in the NYAG

---

[4]     The parties' exhibits for the NYAG Settlement Motion and confirmation of the Plan are designated as follows: exhibits relating to the NYAG Settlement Motion are designated as "SEC/NYAG Ex. ___"; joint exhibits are designated as "JX Ex. ___"; public documents are designated as "Pleading Ex. ___"; supplemental exhibits are designated as "Supp Ex. ___"; Debtors' exhibits are designated as "D Ex. ___"; Digital Currency Group, Inc.'s exhibits are designated as "P Ex. ___".

[5]     *See New York State Office of the Attorney General's Statement in Support of the Debtors' Motion to Approve a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1364] (the "NYAG Settlement Statement"); *Statement of the Official Committee of Unsecured Creditors in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1365] (the "Committee Settlement Statement"); *Reply of the Ad Hoc Group of Genesis Lenders in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1366] (the "Ad Hoc Settlement Reply").

Action—objects to the settlement.[6]  DCG presents only a conclusory argument as to the substantive terms of the NYAG Settlement Agreement, instead focusing on its contention that there was an inadequate process used to reach the result.  But the record here is more than sufficient to justify both the process and actual terms of the NYAG Settlement Agreement itself.  In overruling DCG's objection, the Court ultimately concludes that its objection is a result oriented one based on DCG's lack of recovery as an equity holder under the Plan.  But as discussed below, there are nowhere near enough assets to provide any recovery to DCG in these cases.  In the end, DCG has not presented any basis for concluding that the NYAG Settlement Agreement is anything but reasonable and appropriate.

As to confirmation, the Court finds that the Plan should be confirmed because it satisfies all requirements of applicable law.  Broadly speaking, the Plan provides for all of the Debtors' limited assets to be paid to its unsecured creditors.  Like the NYAG Settlement Agreement, the Plan enjoys the wide support of the creditors here, including the Committee, the Ad Hoc Group, the Ad Hoc Dollar Group and one of the Debtors' individual investors named Teddy André Amadéo Gorisse (collectively, the "Plan Proponents").[7]  The Court has three remaining

---

[6]     The NYAG Settlement Motion is objected to by DCG and DCG International Investments Ltd. ("DCGI").  *See Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1341] (the "DCG Settlement Objection").  For purpose of brevity, the Court refers to these objecting parties together as DCG.

[7]     *See Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 1330] (the "Debtors' Confirmation Memorandum"); *Amended Statement in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan, Reply of DCG's Plan Confirmation Objection and Reservation of Rights* [ECF No. 1351] (the "Gorisse Confirmation Statement"); *Omnibus Memorandum of Points and Authorities of the Ad Hoc Group of Genesis Lenders in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1321] (the "Ad Hoc Group Confirmation Memorandum"); *Statement of the Ad Hoc Group of Dollar Lenders in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1323] (the "Ad Hoc Dollar Lenders Confirmation Statement"); *The Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [ECF No. 1326] (the "Committee Confirmation Memorandum").

objections to confirmation: 1) DCG; 2) the Genesis Crypto Creditors Ad Hoc Group

("CCAHG"); and (3) the Office of the United States Trustee (the "UST").[8]  In approving the

Plan, several principles of restructuring are particularly important.  The first is the concept of

standing, which determines "whether the litigant is entitled to have the court decide the merits of

the dispute or of particular issues" and involves "both constitutional limitations on federal-court

jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498

(1975).  The second is the absolute priority rule, which provides "that a reorganization plan may

not give 'property' to the holders of any junior claims or interests 'on account of' those claims or

interests, unless all classes of senior claims either receive the full value of their claims or give

their consent." *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d

79, 88 (2d Cir. 2011) (quoting 11 U.S.C. § 1129(b)(2)(B)).  More specifically, the doctrine

"forbids a debtor's equity holders from recovering value from the estate before all creditors are

paid." *TLA Claimholders Grp. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)*,

55 F. 4th 377, 387 (2d Cir. 2022).  The result here also implicates the principles behind the

solvent debtor exception, which generally provides that an equity holder may not recover any

value until after creditors receive the full benefit of their contractual bargain.

These principles provide essential context to the Court's rejection of the confirmation

objection of the Debtors' equity holder, DCG.[9]  DCG objects to the way the claims of unsecured

creditors are valued under the mechanics for distributions in the Plan (the "Distribution

---

[8]      *See The Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific PTE, Ltd.* [ECF No. 1356] (the "CCAHG Confirmation Objection"); *Digital Currency Group, Inc. and DCG International Investments Ltd.'s Objection to Confirmation of the Debtors' Amended Plan* [ECF No. 1389] (the "DCG Confirmation Objection"); *Objection of the United States Trustee to the Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1202] (the "UST Confirmation Objection").

[9]      DCG is Holdco's corporate parent and the Debtors' largest borrower.  *See* Aronzon Confirmation Decl. ¶ 12.

Principles"),[10] arguing that the claims should instead be valued in U.S. dollars as of the date of filing of the Debtors' bankruptcy.  But DCG has objected to a plan in which it has no economic stake.  The record here clearly establishes that there is not sufficient value in the Debtors' estates to provide DCG a recovery as equity holder after unsecured creditors are paid.  In short, the Debtors are insolvent.  Given the size of the creditor claims, DCG is out of the money as an equity holder by billions of dollars, even if the Court valued creditor claims using the method DCG proposes.  These economics confirm what the Plan is:  a settlement among creditors about how to divide limited assets given that all creditors will not be paid in full.  The settlement avoids extensive and uncertain warfare on that issue among these varying creditor groups, some of whose contracts provide for a return of the cryptocurrency they lent the Debtors, while others provide for payment in U.S. dollars.  DCG cannot complain that unsecured creditors are being paid before equity, as such creditors are entitled to be paid before equity may receive any recovery.  Lastly, the Court rejects DCG's claim of bad faith in the Debtors' negotiations and the conduct of these cases as flatly inconsistent with the extensive record here, which includes contentious communications with DCG along the way.

The Court also finds that CCAHG's objection to the Plan lacks merit.  Contrary to their contentions, members of CCAHG are not entitled to be treated as administrative creditors under Section 503(b) of the Bankruptcy Code or treated as parties to executory contracts under Section 365 of the Bankruptcy Code.  The Court also rejects CCAHG's argument that the releases being provided by the Debtors under the Plan are not an appropriate exercise of the Debtors' business judgment.  Finally, the Court rejects the objection of the UST to the exculpation provisions of the Plan as these provisions are appropriately tethered to actions taken to fully consummate the Plan.

---

[10]    A detailed description of the Distribution Principles is attached as Exhibit A to the Plan.

The Court does not rule on the UST's objection to the payment of the attorneys' fees for two groups of creditors because the factual record here is not sufficiently developed for a ruling on that issue.

## BACKGROUND

As the facts relevant to the NYAG Settlement Motion and confirmation of the Plan significantly overlap, the Court will present all the relevant facts as one narrative.

### I.    Debtors' Prepetition Business Operations

Prior to their bankruptcy filing, the Debtors and their subsidiaries and affiliates (collectively, the "Company") were in the business of trading, borrowing and lending digital assets and fiat currency to and from institutional and individual customers. *See Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2 ¶¶ 6, 9 [ECF No. 17] (the "Islim First Day Declaration").*[11] The Debtors' lending and borrowing services allowed customers to loan digital assets to the Company and also provided institutional funds with access to liquidity. *See id.* ¶ 17. Customers could enter into individualized loan terms and structures, with loans made through a number of digital assets, including Stablecoins, Bitcoin and Ethereum. *See id.* ¶ 18. These loans were governed by individually negotiated Master Loan Agreements ("MLAs"), which set out the terms of the customers' lending relationship with the Debtors, including repayment upon termination of their loans. *See Declaration of Bradley Geer in Support of the Official Committee of Unsecured*

---

[11]    The Court is permitted to take judicial notice of public filings on its own docket in a bankruptcy case, as well as those filed in other cases, such as the NYAG Action. *See Fed. R. Evid. 201; Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 n. 17 (S.D.N.Y. 2004) ("The Court can take judicial notice of matters of public record . . . including filings in related lawsuits . . . .") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)); *Katzenstein v. VIII SV5556 Lender, LLC (In re St. Vincent's Cath. Med. Ctrs. of New York)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010).

*Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* ¶ 13 [ECF No. 1355] (the "Geer Confirmation Declaration").  Important for these cases, customers were entitled under the MLAs to receive repayment of the same loaned assets (either U.S. dollars, cryptocurrency or other digital assets); if loans had been made in a specified cryptocurrency, the terms of the MLAs explicitly required that the Debtors return "Digital Currency of the same quantity and type as the Digital Currency" that had been loaned.  *Id.* (quoting Geer Confirmation Decl. Ex. A (Master Loan Agreement, dated Aug. 3, 2021 [CCAHG00000004]) at CCAHG00000006; Ex. B (Master Loan Agreement, dated Apr. 10, 2021 [CCAHG00000119]) at CCAHG00000121).

As an important part of its lending business, GGC was involved with a cryptocurrency investment platform offered by Gemini Trust Company, LLC ("Gemini") called the Gemini Earn Program.  *See* SEC/NYAG Ex. 73, *Amended Complaint* ¶ 1, *The People of the State of New York v. Gemini Trust Co. et al.*, Case No. 452784/2023 [NYSCEF[12] No. 17] (the "NYAG Amended Complaint").  Under the program, the users of Gemini Earn (collectively, the "Gemini Earn Users") could choose to passively invest their digital assets with GGC, with Gemini serving as an agent to the Gemini Earn Users.  *See id.*; *see also Gemini Trust Company, LLC's Response and Reservation of Rights with Respect to Confirmation of the Debtors' Amended Joint Chapter 11 Plan* ¶ 1 [ECF No. 1239]; NYAG Amended Compl. ¶ 47.  Within months of the launch of Gemini Earn in February 2021, GGC held several billion dollars of Gemini Earn User assets. *See id.*

In summer 2022, digital asset hedge fund Three Arrows Capital Ltd. ("3AC") commenced liquidation proceedings.  *See* Islim First Day Decl. ¶ 28.  GAP, one of the Debtors,

---

[12]    "NYSCEF" stands for the NYS Courts Electronic Filing system.

had extended approximately $2.4 billion in cash and digital assets to 3AC. *See id.* ¶ 31. When

3AC defaulted on these loans, GAP foreclosed on the collateral that had been pledged by 3AC,

which by that time had a reduced value of approximately $1.2 billion. *See id.* The NYAG

Action asserts that these losses created a "structural hole" in the Debtors' lending business that

impaired their ability to repay open term liabilities. *See* NYAG Amended Compl. ¶ 8.[13] The

NYAG Action asserts that, as a direct result, DCG assumed $1.1 billion of the remaining $1.2

billion in a payable that GAP owed to GGC in connection with the 3AC lending relationship.

*See* Islim First Day Decl. ¶ 32. DCG evidenced this assumed payable with a $1.1 billion

promissory note in favor of GGC that had a 10 year maturity and a fixed interest rate of 1% (the

"DCG Note"). *See id.* The NYAG Action characterizes the DCG Note as an illiquid obligation

and asserts that the structural hole in the Debtors' finances remained unchanged, despite GGC

reporting the DCG Note as an asset on its balance sheet, and that the DCG Note's terms were not

disclosed to the Debtors' investors. *See* NYAG Amended Compl. ¶¶ 10, 13.

The NYAG Action alleges that the Defendants sought to "conceal [the] more than $1

billion in losses" and had conspired to falsely represent the Debtors' capital structure and

financial circumstances. *See* NYAG Amended Compl. ¶¶ 8, 9. The NYAG Action states that

this included assurances to counterparties and the public that GGC was "well-capitalized" and

that DCG had "absorbed the losses" from the Debtors. *See* NYAG Amended Compl. ¶ 11. The

NYAG Action asserts that public statements made by the Debtors, DCG, and the CEOs of both

the Debtors and DCG (Soichiro Moro and Barry E. Silbert)[14] were false and inaccurate and were

---

[13]     Relatedly, the NYAG Action alleges that the Debtors' loans were highly concentrated among a small
handful of counterparties and were extremely undercollateralized. *See* NYAG Amended Compl. ¶¶ 96, 99-100.

[14]     Mr. Silbert was the CEO, founder and beneficial owner of DCG, one of three members of DCG's board of
directors and is the single largest shareholder of DCG. *See* NYAG Amended Compl. ¶ 31. Mr. Silbert was also the
founder of the Debtors. *See id.* Mr. Moro served as the CEO of the Debtors and their non-Debtor affiliates from at
least February 2, 2021 through August 17, 2022. In addition, Mr. Silbert and Mr. Moro served on the board of

designed to prevent or avoid withdrawals from current lenders and to attract new lenders in order to maintain the liquidity that the Debtors had on hand.  *See* NYAG Amended Compl. ¶ 9.

As the digital assets industry began to experience significant disruptions during the latter half of 2022, a general decline in investor confidence in digital asset markets took a severe toll on the Debtors' business operations.  *See* Islim First Day Decl. ¶¶ 28-30.  The Debtors began to experience unprecedented withdrawals, which led GGC and GAP to pause all lending and borrowing as of November 16, 2022.  *See* Islim First Day Decl. ¶¶ 30, 36-39; Geer Confirmation Decl. ¶ 8.  At some point thereafter, NYAG commenced an investigation into the circumstances of the freeze.  Around this time, a Special Committee of the Board of Directors of Holdco (the "Special Committee") was formed for the purpose of, among other things, (i) evaluating on behalf of Holdco or its subsidiaries various strategic alternatives or transactions involving the Company that affected its liquidity or balance sheets (collectively, the "Special Matters"), including, without limitation, the commencement of any financing, sale, restructuring, reorganization, liquidation, or other strategic alternatives or any transaction involving DCG; (ii) addressing issues of real or potential conflicts; (iii) conducting investigations; and (iv) acting on behalf of, and binding, the Company with respect to any Special Matters.[15]  *See Declaration of Paul Aronzon in  Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* ¶ 7 [ECF No. 19] (the "Aronzon First Day Declaration"); Aronzon Confirmation Decl. ¶ 7.

---

directors of Genesis Global Trading, Inc., which heard matters pertaining to Holdco and GGC through June 30, 2022, since during that period Holdco and GGC had no independent board of directors.  *See* NYAG Amended Compl. ¶¶ 26, 28, 31.

[15]    The Special Committee is the final decision maker with respect to Special Matters.  *See* Aronzon Confirmation Decl. ¶ 8.

Also in November 2022, the Company began negotiations with various parties in the hope of consensually restructuring its obligations without the need to file a Chapter 11 bankruptcy. *See* Aronzon Confirmation Decl. ¶ 11. At this time, the Debtors engaged in extensive discussions with various ad hoc creditor groups, including the Ad Hoc Group, as well as DCG and Gemini (as agent for the Gemini Earn Users). *See id.*; Geer Confirmation Decl. ¶ 9. The Debtors also facilitated discussions among the advisors to the Ad Hoc Group, Gemini and DCG, resulting in the exchange of more than ten iterations of various term sheets and proposals. *See* Aronzon Confirmation Decl. ¶ 12.

## II.      **Bankruptcy Filing and Plan Negotiations**

When the parties did not reach an out-of-court resolution, the Debtors commenced the above-captioned Chapter 11 cases on January 19, 2023 (the "Petition Date"). *See id.* ¶ 13; NYAG Settlement Motion ¶ 7. After the Petition Date, the Debtors continued their discussions among the Ad Hoc Group, Gemini and DCG. *See* Aronzon Confirmation Decl. ¶ 12. On January 20, 2023, the Debtors filed a standalone *Debtors' Joint Chapter 11 Plan* [ECF No. 20] (the "Initial Plan") to provide a framework for a confirmable plan that did not include a global settlement. *See id.* ¶ 13. In early February 2022, the UST appointed the Committee, the only other fiduciary in these Chapter 11 cases besides the Debtors.[16] *See id.* ¶¶ 14, 15.

Before proposing the Plan now before the Court, the Debtors conducted extensive negotiations with all the various constituents and reached various tentative agreements. But none of them stuck. For example, the Debtors, the Ad Hoc Group, Gemini and DCG reached a non-binding agreement in principle on February 10, 2023, which was set forth in a Restructuring

---

[16]      The Committee is statutorily tasked with advancing the collective interests of all of the Debtors' unsecured creditors. 11 U.S.C. §§ 1102, 1103.

Term Sheet filed with the Court.  *See id.* ¶ 16; Geer Confirmation Decl. ¶ 10; *Notice of Filing of the Restructuring Term Sheet* [ECF No. 80] (the "February Term Sheet").  The February Term Sheet contemplated the restructuring of the more than $1.6 billion in DCG's then existing obligations to the Debtors in exchange for a release of DCG and its non-Debtor affiliates, and their officers, directors and shareholders, all of which was subject to the completion of the Debtors' investigation into their potential causes of action against DCG.  *See* Geer Confirmation Decl. ¶ 10 (citing February Term Sheet, Ex. A at 17 and n.20).  The February Term Sheet provided for the monetization of the Genesis platform through a sale or winddown, or in the absence of a sale, an equitization of Holdco resulting in GGC receiving 100% of the equity interest in reorganized Holdco.  *See id.*  It further proposed to convert debt owed by DCG and DCGI into a second lien term loan due June 2024 and convert the DCG Note to $575 million in convertible preferred stock.  *See id.*  Under the February Term Sheet, it was understood that all assets of the estate, including DCG's contributions, whether denominated in cryptocurrency or U.S. dollars, would be distributed to the Debtors' customers, which were almost exclusively customers with outstanding loan balances.  *See id.* ¶ 11.  The February Term Sheet also explicitly contemplated in-kind payments to creditors consistent with their contractual entitlement.  *See id.*

The Ad Hoc Group and Gemini played active roles in negotiations with DCG.  *See* Aronzon Confirmation Decl. ¶ 16.  But given the timing of the Committee's appointment, the February Term Sheet had been negotiated without involvement or input from the Committee. *See* Geer Confirmation Decl. ¶ 12.  After the Committee's appointment, it commenced an investigation into the prepetition affairs that led to the Debtors' bankruptcy, including DCG's role in certain transactions that took place throughout 2022.  *See id.* ¶ 14.  As the investigation progressed, the Committee determined that the February Term Sheet—and DCG's contribution

under it—did not provided sufficient consideration for the releases to be provided to DCG.  *See*

*id.* ¶ 15.  After due diligence, the Committee also found that the agreement encompassed by the

February Term Sheet included certain unresolved matters.  *See id.*  In short, the Committee did

not think the February Term Sheet with DCG was a good deal for creditors.[17]

Over the next several months, negotiations continued between the Debtors, DCG, and the

Ad Hoc Group, including the exchange of proposals and counterproposals.  *See* Geer

Confirmation Decl. ¶ 16.  In the spring of 2023, the Court approved mediation among the

Debtors, DCG, the Committee, the Ad Hoc Group and Gemini (collectively, the "Mediation

Parties").  *See* Aronzon Confirmation Decl. ¶ 19; *Order Appointing Mediator* [ECF No. 279].

The Debtors' goal was to reach a consensual resolution prior to the May 2023 maturity of

approximately $627 million in unsecured loans owed by DCG to Debtor GGC.  *See* Aronzon

Confirmation Decl. ¶ 18.  In-person mediation sessions were held on two days with the mediator

and the Mediation Parties—which included DCG—but did not result in a resolution prior to May

9, 2023, which was the first maturity dates under the DCG loans.  *See* Aronzon Confirmation

Decl. ¶ 21; Geer Confirmation Decl. ¶ 17.  Following the formal mediation sessions, the

Mediation Parties continued discussions with a goal of resolving disputes relating to the DCG

Note and loans, certain litigation claims and other matters.  *See id.*

In mid-May 2023, the Debtors delivered a notice of default for the non-payment of

approximately $627 million in loans that were due from DCG and DCGI to the Debtors on May

9, 10, and 11, 2023.  *See id.* ¶ 34.  The Debtors also prepared to file turnover actions to pursue

their legal remedies, but decided against filing such litigation at that time after discussions with

---

[17]    The Ad Hoc Group also abandoned its support of the February Term Sheet after receiving additional
information concerning the prepetition conduct that had led to the Debtors' bankruptcy filing.  *See* Aronzon
Confirmation Decl. ¶ 17; Geer Confirmation Decl. ¶ 12.

creditor representatives who expressed concerns that filing an action would deter DCG from engaging in discussions regarding a potential settlement. *See id.* ¶ 35. In late May 2023, the Debtors' Special Committee met with the Committee, the Ad Hoc Group and Gemini to discuss outstanding issues relating to the terms of a plan. *See* Aronzon Confirmation Decl. ¶ 22. Subsequent discussions among the Mediation Parties also took place, with the Debtors and their advisors in frequent communication with DCG and creditor representatives and advisors in attempts to create a platform for a consensual resolution. *See id.*

On June 13, 2023, the Debtors filed a proposed plan [ECF No. 427] (the "June Plan") that provided for, among other things: (a) distribution of the Debtors' digital assets and cash on hand to creditors, and (b) the pursuit of causes of action after the effective date of the plan, including potential preference and litigation claims against DCG, with litigation proceeds to be used to augment creditor recoveries. *See id.* ¶ 23; Geer Confirmation Decl. ¶ 18. While the Debtors continued to pursue a consensual plan, the June Plan was meant to provide a path to emergence should a global resolution with DCG not be achieved. *See* Aronzon Confirmation Decl. ¶ 24.

In addition to continued settlement discussions between the Debtors and various parties, members of the Committee and the Ad Hoc Group began principal-to-principal discussions with DCG. *See* Aronzon Confirmation Decl. ¶¶ 25-26; Geer Confirmation Decl. ¶ 19. These discussions culminated in early June with an agreement in principle between DCG and the Committee on various economic issues (the "Initial Agreement in Principle"). *See* Aronzon Confirmation Decl. ¶ 27. Under the Initial Agreement in Principle, DCG agreed to issue a new first lien term loan facility and a new second lien facility and to also enter into an agreement providing for the partial repayment of its loans to GGC in satisfaction of its existing liabilities to the Debtors. *See id.* But this agreement did not have the support of either the Ad Hoc Group or

Gemini.  *See id.*  Additionally, issues remained outstanding with DCG, including with respect to claims asserted by 3AC against the Debtors (the "3AC Liability Issues").  *See id.* ¶ 28.

On July 14, 2023, NYAG filed the NYAG Claims, asserting claims against the Debtors "exceeding an estimated $1.1 billion in restitution, plus additional amounts in disgorgement of ill-gotten gains and damages, as well as injunctive and equitable relief" pursuant to New York law.  *See* NYAG Settlement Motion ¶ 8; NYAG Claims, Schedule 1 at ¶ 1.  The NYAG Claims were filed by NYAG to preserve its claims against the Debtors while NYAG continued its investigation.  *See* Proof of Claim No. 857, Schedule 1 at ¶ 2, n.3.

In the aftermath of the filing of the NYAG Claims, the Mediation Parties continued to engage in discussions and the Court extended the mediation period several times, including two more in-person meetings, through August 23, 2023.  *See* Aronzon Confirmation Decl. ¶¶ 29-31; Geer Confirmation Decl. ¶ 19.  After no further progress was made in these sessions, the mediation terminated on August 23, 2023, and the Debtors publicly filed the terms of the last proposed agreement among the Debtors, the Committee and DCG, which included the Initial Agreement in Principle, with all parties reserving their rights as to the 3AC Liability Issue.  *See* Aronzon Confirmation Decl. ¶ 33; *see also* Notice of Mediation Termination, Ex. 1 [ECF No. 625] (the "Agreement in Principle").  The Agreement in Principle remained subject to further negotiation and definitive documentation.  *See* Geer Confirmation Decl. ¶ 19.  Nothing in the Agreement in Principle contemplated that creditor recoveries would be capped at the U.S. dollar value of crypto-denominated claims as of the Petition Date, or that any value in excess of the Petition Date price due to fluctuations in the digital currency market would be distributed to holders of subordinated claims or equity.  *See id.* ¶ 21.  There were no caps on recoveries for crypto creditors beyond the contractual entitlement under their respective MLAs.  *See id.* ¶ 22.

14

The Agreement in Principle also contained a "Distribution Mechanic" agreed upon between the Committee and the Debtors that contemplated initial distributions would be "in-kind distributions to the extent possible." *Id.* (quoting Agreement in Principle at 4). For longer term distributions, "coin-denominated creditors would bear the upside and downside risk of coin price fluctuations post-settlement date." *Id.* Like the other potential settlements before it, the parties ultimately did not move forward with the Agreement in Principle, but continued to negotiate. *See id.* ¶¶ 44-46.

In addition to settlement negotiations among the larger group of interested parties, the Debtors and DCG were directly engaged. In early September 2023, the Debtors filed turnover actions against DCG. *See* Adv. Pro. Nos. 23-01168 and 23-01169 (together, the "Turnover Actions"); Aronzon Confirmation Decl. ¶ 36. Shortly thereafter, the Debtors and DCG entered in a partial repayment agreement (as amended, the "Partial Repayment Agreement"), providing for a limited forbearance by GGC with regard to DCG's obligations to GGC; under the Partial Repayment Agreement, DCG would make certain payments to GGC in satisfaction of certain obligations under the DCG loans and DCGI loans. *See* Aronzon Confirmation Decl. ¶ 37 (citing Adv. Pro. No. 23-01168, ECF No. 4; Adv. Pro. No. 23-01169, ECF No. 6). By October 29, 2023, the Debtors had a right to terminate the Partial Repayment Agreement because of the failure to satisfy certain conditions of the agreement as of that date. *See id.* ¶ 38. Rather than terminate the Partial Repayment Agreement, however, the Debtors continued to negotiate with DCG with the goal of reaching a consensual resolution and obtain repayment of the DCG loans. *See id.* ¶ 38. On November 28, 2023, the Debtors and DCG entered into an amendment to the Partial Repayment Agreement that provided for modified repayment terms, including the grant

of collateral and a consent judgment against DCG for the full undisputed amounts owed under the loans. *See id.* ¶ 39-40.[18] The Turnover Actions remain pending. *See id.* ¶ 43.

### III.    The NYAG Action and the NYAG Settlement Agreement

The status of these cases changed significantly when, on October 19, 2023, NYAG filed the NYAG Action against the Debtors, DCG, Mr. Moro, Mr. Silbert and Gemini (collectively, the "Defendants"), asserting losses of more than $1 billion by the Gemini Earn Users. *See* NYAG Settlement Motion ¶ 9; SEC/NYAG Ex. 17 ¶ 2 (the "NYAG Initial Complaint"). In its NYAG Initial Complaint, NYAG alleged violations of New York General Business Law § 352, *et seq.* (the "Martin Act"), which authorizes NYAG to seek "direct restitution of any moneys or property obtained directly or indirectly by . . . fraudulent practice[s]." N.Y. GBL § 353(3). "The intent of [the Martin Act] is that property derived by means of fraudulent practices shall go back, as far as possible, to the person from whom it was obtained." *People v. Barrington & Co.*, 137 N.Y.S.2d 54, 56 (Sup. Ct., N.Y. Cty. 1954). NYAG also sued under Executive Law § 63(12), which authorizes NYAG to recover restitution on behalf of aggrieved individuals. *See, e.g.*, *State v. Ford Motor Co., Inc.*, 526 N.Y.S.2d 637, 639-40 (App. Div. 3d Dep't 1988). Under the statute, NYAG's right to restitution is "liberally construed," and courts are given wide latitude to establish appropriate restitution procedures based on factors that include "unjust enrichment and the relative advantages and burdens of fashioning a restitution remedy." *State v. Maiorano*, 592 N.Y.S.2d 409 (App. Div. 2d Dep't 1993); *State v. Ford Motor Co.*, 526 N.Y.S.2d 637, 640 (App. Div. 3d Dep't 1988). Disgorgement is another remedy available under both the Martin Act and Executive Law § 63(12). *See People v. Greenberg*, 27 N.Y.3d 490, 4978 (2016). NYAG may

---

[18]    The Court entered the consent judgments on December 22, 2023 without opposition from creditor constituencies. *See id.* (citing Adv. Pro. No. 23-01168, ECF No. 18; Adv. Pro. No. 23-01169, ECF No. 19).

seek disgorgement under these statutes even in "the absence of loss to individuals or independent claims for restitution." *People v. Ernst & Young, LLP*, 980 N.Y.S.2d 456, 457 (App. Div. 1st Dep't 2014). "Although disgorged profits may be distributed to defrauded consumers, the primary purpose of disgorgement is to deter violations of . . . law[] by depriving violators of their ill-gotten gains." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (internal citations and quotations omitted). Under a disgorgement theory, NYAG is entitled to seek for the Debtors to repay all of its profits to the extent those profits were derived from the loans of the customers that the Debtors then lent to other parties. *See S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), *as amended* (Nov. 26, 2013) ("The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.") (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)); *see also S.E.C v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (requiring the disgorgement of profits received from the wrongdoing).

The filing of the NYAG Action was not welcomed by the Debtors. One day prior to the filing of the NYAG Initial Complaint, the Debtors sent a letter to NYAG stating, among other things, that NYAG "does not yet possess all the relevant facts" with regard to the claims that intended to bring and pledging to "fully cooperate with [NYAG]." Letter of Jason Gottlieb, dated October 18, 2023, attached as Ex. C to DCG Settlement Objection (the "Oct. 18 Letter"). The Oct. 18 Letter noted that NYAG had declined to discuss its theories of liability with the Debtors. *See id.* The Oct. 18 Letter also noted that the Debtors were in the midst of discussions with the Committee and the Ad Hoc Group that could be impacted by a lawsuit filed by NYAG and requested that NYAG engage substantively with the Debtors on the issues before taking action. *See id.* Despite this, NYAG proceeded to file the NYAG Initial Complaint.

After the NYAG Initial Complaint was filed, the Debtors and NYAG commenced

settlement negotiations to explore the possibility of resolving the NYAG Action and the NYAG

Claims.  *See* Aronzon Settlement Decl. ¶ 5.  These negotiations were primarily handled on behalf

of the Debtors by their bankruptcy counsel.  *See* Aronzon Settlement Decl. ¶ 6.  Debtors' counsel

regularly consulted with the Special Committee and the senior management of the Debtors and

their non-Debtor subsidiaries to update them regarding the process and progress of the

negotiations.  *See* Aronzon Settlement Decl. ¶ 6.

On November 1, 2023, NYAG proposed a *Stipulation and Consent to Judgment*, under

which the NYAG Claims would be allowed and the Debtors would consent to a judgment on the

NYAG Initial Complaint "in the amount of [the full amount of Gemini Earn claim] in restitution

to [Gemini Earn Investors and other creditors as determined and identified in the Genesis

Bankruptcy Proceeding]."  *See Stipulation and Consent to Judgement* at Bates

Genesis_DCG_9019_00000103 attached as Ex. E to DCG Settlement Objection.  The draft also

called for extensive cooperation and detailed factual admissions regarding the allegations in the

NYAG Action.  *See Stipulation and Consent to Judgment* at Bates

GENESIS_DCG_9019_00000104, 106, attached as Ex. E to DCG Settlement Objection.  On

November 5, 2023, the Debtors responded with a counterproposal that provided for the NYAG

Claims to be satisfied by the treatment that creditors would receive under a confirmed Chapter

11 plan, eliminated any factual admissions, and limited the cooperation that the Debtors would

provide to NYAG.  *See Stipulation and Consent to Judgment* at Bates

Genesis_DCG_9019_00000309-313, GENESIS_DCG_9019_00000312-313, attached as Ex. F

to DCG Settlement Objection.  A settlement was not reached at this time.

As the settlement discussions continued, so did NYAG's investigation.  In connection
with its investigation, NYAG engaged in discussions with counsel to the Ad Hoc Group, which
represents customers owning approximately $2.5 billion in claims asserted against Debtor GGC,
including majorities in amount of USD, BTC and ETH claims asserted against GGC.  *See* Ad
Hoc Settlement Reply ¶¶ 13, 18.  NYAG also interviewed members of the Ad Hoc Group to
gather information regarding the prepetition conduct of the Debtors and DCG, and the
representations made to creditors in connection with their issuance and maintenance of loans to
GGC.  *See id.*

Once the Debtors became aware that NYAG intended to amend its NYAG Initial
Complaint to expand the proposed relief, the Debtors reached out to reestablish discussions.  *See
Debtors' Reply in Support of Motion for Entry of an Order Approving a Settlement Agreement
Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1367] (the
"Debtors' Settlement Reply"), Exs. 9, 14 (Emails Between Debtors' Counsel and NYAG dated
January 9, 2024 and January 24, 2024); *Stipulation Extending Time to Answer or Respond to
Amended Complaint* at 1, *The People of the State of New York v. Gemini Trust Co. et al.*, Case
No. 452784/2023 (N.Y. Sup. Ct. Jan. 12, 2024) [NYSCEF No. 14] (setting deadline for
amendment to NYAG Initial Complaint).  Over a period of three weeks, the Debtors and NYAG
traded settlement proposals that would reduce the Debtors' potential liability under the NYAG
Action, including: (a) eliminating additional damages beyond creditors' claimed contractual
entitlements; (b) providing for NYAG to establish a victims' fund to provide restitution to
creditors from any recoveries it may receive; and (c) eliminating significant unnecessary
litigation expenses.  *See* DCG Settlement Objection at Exs. J-R.  NYAG also consulted with
counsel to the Ad Hoc Group and solicited the Group's opinions as to whether the proposal

would be supported by the creditors on whose behalf NYAG was prosecuting the NYAG Action.
*See, e.g.,* DCG Settlement Objection at Ex. B (email between counsel to the Ad Hoc Group and counsel to NYAG).

The Debtors and NYAG subsequently reached agreement on the terms of the NYAG Settlement Agreement, which was approved by the Special Committee on February 7, 2024, with the NYAG Settlement Agreement being executed and the NYAG Settlement Motion filed the following day. *See* DCG Settlement Objection ¶¶ 22-23 (citing Ex. T to DCG Settlement Objection (January 31, 2024 to February 7, 2024 Emails re: Genesis Call); *see also* Debtors' Settlement Reply, Ex. 24 (February 7, 2024 Email from Debtors' Counsel to NYAG), Ex. 25 (February 8, 2024 Email from Debtors' Counsel to NYAG). In summary, the NYAG Settlement Agreement provides for the NYAG Action to be resolved solely with respect to the Debtors. In exchange, the NYAG Claims will be allowed in an amount equal to (x) the total amount of third party, allowed general unsecured claims asserted against the Debtors (calculated as of the date of distributions), minus (y) all recoveries paid to those creditors under a plan of reorganization. The NYAG Claims will be paid only after payment in full of all other allowed administrative expenses, secured, priority, intercompany and general unsecured claims, with NYAG thereby agreeing to receive payment only if all general unsecured creditors of the Debtors are made whole. In addition, NYAG has agreed that any recoveries it receives on its NYAG Claims will be used to repay creditors on account of their fraud damages through the establishment of a Victim's Fund, as opposed to being retained by the government. The NYAG Settlement Agreement contains two other provisions that are particularly relevant to the treatment of unsecured creditors:

- the NYAG Claim Amount shall be calculated as if any allowed claim based on a loan or investment denominated in a digital asset is converted into the equivalent U.S. dollar

value using the price of the applicable digital asset on the applicable distribution calculation date, which shall be no earlier than thirty (30) days before the applicable distribution date.

- any distributions that NYAG receives for its claims will be turned over to holders of allowed general unsecured claims against the Debtors on a pro rata basis through a Victims' Fund.

*See* NYAG Settlement Motion ¶ 13.[19]  Rather than establish its own methodology for determining the amount to go to customer victims who lent different kinds of assets, the NYAG Settlement Agreement provides that distributions from the Victims' Fund will be made in a manner consistent with the Distribution Principles to compensate such holders of allowed claims for the full and fair amounts of their actual losses.  *See id.*  As more fully discussed below, the Distribution Principles provide a structure for distributions under the Debtors' Plan that allocates assets to creditors by claim denomination and values these assets for distribution purposes.  *See* Geer Confirmation Decl. ¶ 35.  The Distribution Principles contemplate "like-kind" distributions, which are made consistent with the terms of the creditors' prepetition agreements.  *See id.* Additionally, once approved by the Court, the NYAG Settlement Agreement shall be binding on NYAG and the Debtors regardless of whether the Court confirms the Plan.  *See id.*  Notably, nothing in the NYAG Settlement Agreement releases any claims that NYAG may have against the other Defendants (i.e., Gemini, DCG, Mr. Moro, and Mr. Silbert).  *See id.*

---

[19]    The NYAG Settlement Agreement also provides that:

- the Debtors are permanently restrained and enjoined from violation of the Martin Act, Article 23-A of the General Business Law, General Business Law § 359-e, and Executive Law § 63(12) and from directly or indirectly conducting or transacting business in the State of New York.

- NYAG will not object to the Plan proposed by the Debtors in their Chapter 11 cases, or any other chapter 11 plan, provided that in each case such plan is consistent with the NYAG Settlement Agreement.

*See* NYAG Settlement Motion ¶ 13.

As a result of its continued investigation and notwithstanding the settlement in principle, NYAG amended the NYAG Initial Complaint on February 9, 2024, expanding its focus to include not only injuries suffered by the Gemini Earn Users but also all creditors that had invested assets directly with the Debtors, including, for instance, members of the Ad Hoc Group. This led to an increase of the damages asserted in the NYAG Claims to over $3 billion.  *See* NYAG Amended Compl. ¶ 17.

## IV.    The Settlement Motion

In support of the NYAG Settlement Motion, the Debtors filed the *Declaration of Paul Aronzon in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* (the "Aronzon Settlement Declaration").[20]  Mr. Aronzon also testified on cross-examination and re-direct during the Evidentiary Hearing.  Mr. Aronzon is a member of the Special Committee.  *See* Aronzon Settlement Decl. ¶ 2.  He has over 40 years of experience as an advisor in corporate reorganizations, including advising companies, boards and board committees, independent directors, sponsors, debtors, creditors, parties acquiring debt, assets or companies and other parties in corporate transactions.  *See id.*

The NYAG Settlement Motion is supported by the Committee, the Ad Hoc Group and NYAG.[21]  The only objection to the NYAG Settlement Motion is by DCG, which argues that the NYAG Settlement Agreement violates Sections 1129 and 502(b) of the Bankruptcy Code,

---

[20]    A copy of the Aronzon Settlement Declaration is attached as Exhibit B to the NYAG Settlement Motion.

[21]    *See New York State Office of the Attorney General's Statement in Support of the Debtors' Motion to Approve a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1364] (the "NYAG Settlement Statement"); *Statement of the Official Committee of Unsecured Creditors in Support of Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1365] (the "Committee Settlement Statement"); Ad Hoc Settlement Reply.

constitutes a *sub rosa* plan and fails to meet the standard necessary to approve a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.  In support of the DCG Settlement Objection, DCG submitted the *Direct Testimony Declaration of Adam W. Verost in Support of Digital Currency Group, Inc.'s and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF Nos. 1343, 1388] (the "Verost Settlement Declaration").  Mr. Verost is a partner at Ducera Partners, LLC and has held positions at other restructuring advisory firms and advised on numerous large, complex Chapter 11 cases to debtors, creditor groups, asset purchasers, committees, boards of directors, and special committees.  *See Direct Testimony of Adam W. Verost in Support of Digital Currency Group, Inc.'s and DCG International Investments Ltd.'s Objection to Confirmation of the Amended Joint Plan of Genesis Global Holdco, LLC, Et Al.* ¶ 3-4 [ECF No. 1328, 1387] (the "Verost Confirmation Declaration").  Mr. Verost also testified further during cross-examination and re-direct at the Evidentiary Hearing.[22]

## V.    **The Plan**

The filing of the NYAG Action fundamentally altered the parties' expectations with respect to ongoing negotiations of a plan and the Debtors' most viable path out of bankruptcy.  *See* Geer Confirmation Decl. ¶ 24.  Due to the NYAG Action, the Debtors turned their focus to a liquidating plan that included a wind-down of the Debtors and retaining—rather than selling or settling—any causes of action against DCG, DCGI and others.  *See* Aronzon Confirmation Decl. ¶ 51.

---

[22]    DCG also submitted the *Direct Testimony of Jason Brown in Support of Digital Currency Group, Inc.'s and DCG International Investments Ltd.'s Objection and Reservation of Rights to Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [ECF No. 1342], but that testimony was subsequently withdrawn.  *See* Hr'g Tr. 12:20-13:1 (Feb. 28, 2024).

After the filing of the NYAG Action, the Debtors continued to engage in settlement discussions with DCG, the Committee and the Ad Hoc Group, with all parties meeting in early November 2023 to discuss the status of negotiations. *See* Aronzon Confirmation Decl. ¶¶ 52-53. Having considered the potential risks posed by the NYAG Action to DCG's ability to perform any settlement, the Debtors, the Committee, and the Ad Hoc Group ultimately determined to move forward with an amended version of the June Plan, which the Debtors had seen as the path forward if no settlement could be reached with DCG. *See* Geer Confirmation Decl. ¶ 25. On November 17, 2023, the Debtors filed the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 950] (the "Disclosure Statement"). *See* Aronzon Confirmation Decl. ¶ 54. The Disclosure Statement included a description of the Distribution Principles as an exhibit.

In late November 2023, the principals and advisors for the Debtors, DCG, the Committee and the Ad Hoc Group met in person to discuss DCG's financial position and projections. *See id.* ¶ 55. A member of the Special Committee was also in attendance. *See id.* The next day Mr. Aronzon met with Committee members and the Ad Hoc Group Steering Committee to discuss plan-related topics, including a possible deal with DCG. *See id.*

On November 28, 2023, the Debtors, the Committee and certain other creditors (the "PSA Creditors") entered into a plan support agreement (the "PSA"), which provides, among other things, that subject to receipt of a disclosure statement that was approved by this Court and the terms of the PSA, the PSA Creditors agreed to vote, and the Committee agreed to encourage unsecured creditors to vote, to accept the Plan (subject to the Plan including certain conditions specified in the PSA). *See generally Notice of Filing of Plan Support Agreement* [ECF No. 1008]. On the same day, the Debtors filed the Plan, which again included the Distribution

Principles as an exhibit.  *See* Aronzon Confirmation Decl.  ¶ 56.  In early December, principles

and advisors for the Debtors, a member of the Special Committee, DCG, the Committee and the

Ad Hoc Group again met to further discuss a possible deal with DCG.  *See id.* ¶ 57; Geer

Confirmation Decl. ¶ 26.  Subsequent meetings also took place in person, including in late

January 2024.  *See* Aronzon Confirmation Decl. ¶ 58.

The Distribution Principles in the Plan signify a comprehensive settlement among

creditors on how to divide up the limited estate assets among the diverse and adverse groups of

unsecured creditors.  The Distribution Principles reconcile the positions of the Debtors and

numerous opposing creditor groups, including the Committee, the Ad Hoc Group and an Ad Hoc

Group of the Debtors' lenders that primarily holds claims denominated in U.S. dollars and

stablecoin (the "Ad Hoc Dollar Group").  *See* Aronzon Confirmation Decl. ¶ 60; Geer

Confirmation Decl. ¶ 34.  While the Distribution Principles were being negotiated, the Special

Committee authorized the Debtors' advisors to speak with the various creditor groups involved

in the process to help achieve a fair and reasonable outcome and ensure that the Distribution

Principles were supported by both the law and the nature of the Debtors' business.  *See* Aronzon

Confirmation Decl. ¶ 59.  The Distribution Principles were designed to address a number of

complicated legal and business issues over which there was significant dispute.  *See id.*  The

Special Committee reviewed the Distribution Principles and also received presentations from the

Debtors' advisors describing how the Distribution Principles operated.  *See id.*

Negotiations regarding the Distribution Principles began with key creditor constituencies

in the summer of 2023 and continued until mid-November, when the Debtors filed the

Distribution Principles with their Disclosure Statement.  *See id.* ¶ 61.  The complexity of these

negotiations reflected the fact that the various creditor groups represented holders of claims

denominated in different types of assets, including fiat currency and assorted cryptocurrency. *See id.* ¶ 61; Geer Confirmation Decl. ¶ 33. These parties took opposing views on the appropriate way to satisfying creditor claims. *See* Aronzon Confirmation Decl. ¶ 61. The key parties in interest, including the Committee, the Ad Hoc Group and their respective advisors, engaged in numerous meetings and calls and exchanged numerous drafts of the Distribution Principles until an agreement was finally reached. *See id.*

The mechanics of distributions were of particular significance because of the substantial volatility in cryptocurrencies lent to and held by the Debtors, including BTC and ETH, relative to the U.S. dollar. *See* Geer Confirmation Decl. ¶ 28. This challenge was complicated by the change in digital asset prices over the timeline of the Debtors' bankruptcy cases. For instance, the price of BTC and ETH was $21,084 and $1,551, respectively, on the Petition Date. *See id.* As of November 17, 2023, when the parties reached settlement on the Distribution Principles, the price of BTC and ETH was $36,597 and $1,961, respectively. *See id.* Under the MLAs, the Debtors are contractually obligated to return to creditors whose claims are denominated in cryptocurrency approximately 63,858 BTC and 449,210 ETH coins,[23] but as of February 15, 2024, the Debtors only had on hand approximately 12,632 BTC and 118,765 ETH coins, resulting in a large shortfall (the "Coin Shortfall"). Even if the Debtors were to convert their U.S. dollars or other assets into coins, the Debtors' available assets are still insufficient to pay all creditors the full amount of their claims in the currency in which customers are contractually entitled to be repaid (the "Total Claims Shortfall").[24] *See* Geer Confirmation Decl. ¶ 29. As of

---

[23]    This discussion includes only BTC and ETH, the two digital assets in which the Debtors have their largest contractual obligations, but the shortfall issue also refers to creditor obligations denominated in certain alternative coins, collective known as "Alt-coins." *See* Geer Confirmation Decl. ¶ 28 n.9.

[24]    This excludes the Debtors' litigation claims, the value of which is unknown. *See* Geer Confirmation Decl. ¶ 29 n.11.

February 15, 2024, the Total Claims Shortfall, after conversion of available assets to digital assets, is estimated to be greater than $900 million in U.S. dollar equivalent. *See id.* ¶ 30. As the conversion price of BTC and ETC increases, the Total Claims Shortfall will grow, since fewer coins will be able to be purchased with each available U.S. dollar. *See id.*

The negotiation of the Distribution Principles was essentially a negotiation of how to address the Total Claims Shortfall so that no one group of the Debtors' customers was unduly favored or prejudiced by the manner and form of distributions under the Debtors' Plan. *See id.* ¶ 29. The discussions during negotiations of the Distribution Principles by the Debtors and the various creditor groups covered issues concerning the distribution mechanics under the Plan, including how the value of assets would be determined for calculating overall recovery rates, any definitive recovery cap, what would happen if a recovery cap was met, prepetition interest and how it would accrue and post-effective date interest. *See* Geer Confirmation Decl. ¶ 31. The parties with recoveries at stake took differing positions during negotiations. *See id.* ¶ 32. Those creditors whose claims were denominated in cryptocurrency took the position that they were entitled to the full quantity of cryptocurrency that they had lent to the Debtors under their respective MLAs. *See id.* Creditors whose claims were denominated in U.S. dollars took the position that all claims, whether denominated in U.S. dollars or digital assets, should be determined using the dollar-equivalent value based on the price as of the Petition Date.[25] *See id.* The settlement embodied in the Distribution Principles was ultimately designed to address

---

[25] A third position has been asserted by customers such as CCAHG, which argues that their claims are entitled to administrative priority status. *See* Geer Decl. ¶ 32 (citing CCAHG Confirmation Objection ¶¶ 20-25); *see infra* at 96-99. This would only exacerbate the Coin Shortfall problem because the shortfall would have to be entirely filled before any unsecured creditors whose claims were denominated in U.S. dollars could recover. *See* Geer Decl. ¶ 32.

disparity among unsecured creditors by maximizing their ability to recover up to their full

contractual entitlements.  *See id.* ¶ 35.

The Distribution Principles consist of a multi-step process that allocates assets to

creditors by claim denomination and values these assets for distribution purposes.  *See* Geer

Confirmation Decl. ¶ 35.  The Distribution Principles contemplate "like-kind" distributions,

which are made consistent with the terms of the creditors' prepetition agreements.  *See id.*  These

are critical because they do not trigger upfront taxes for U.S. holders whose underlying claims

have appreciated, whereas a recovery in a form other than that lent to the Debtors is expected to

trigger taxable gain.  *See id.*  The Distribution Principles also reduce the negative impact that the

increase in value of digital assets since the Petition Date would have on creditors whose claims

are denominated in cryptocurrency, including BTC, ETH and certain Alt-Coins.  *See id.*  Due to

the increase in value, those creditors would otherwise receive less of their contractual entitlement

(i.e., fewer of their coins back) without the negotiated settlement embodied in the Distribution

Principles.  *See id.*

Under the Distribution Principles, the following five steps are used to determine the

amount of distribution that creditors will receive on account of their respective allowed claims:

| Distribution Principles[26] | |
|---|---|
| **Step** | **Description** |
| Step 1:<br><br>Individual Claim Value | Each Allowed General Unsecured Claim is valued as of the Petition Date for asset allocation purposes only, reduced by certain collateral held by the claimant (calculated as of the Effective Date) and payable offsets (calculated as of the Petition Date). |

---

[26]    Capitalized terms used in this chart but not otherwise defined in this Memorandum of Decision shall have the meanings ascribed to such terms in the Plan.

| Step 2: Pro Rata Share | Each Holder's *Pro Rata* Share is its respective Individual Claim Value divided by the aggregate of the Individual Claim Values (from Step 1). |
|---|---|
| Step 3: Valuing Allocable Assets | The value of the full pool of the Debtors' assets that will be allocated to Holders of Allowed General Unsecured Claims is based on each Holder's *Pro Rata* Share and is calculated for each Distribution Date based on the prescribed time period for such date.[27] |
| Step 4: Allocating Allocable Assets | This step determines the **order** in which the Debtors' Cash, Digital Assets, GBTC Shares, and ETHE Shares will be allocated on each Distribution Date based on the converted asset values from Step 3. |
| Step 5: Distributions | In order to maximize recoveries, to the extent that the Allocable Assets allocated to Holders of Allowed General Unsecured Claims consist of assets having the same denomination as the Claims ("Matching Assets"), such Matching Assets will be distributed to such Holders.<br><br>To the extent the Debtors' assets that have been allocated for distribution consist of assets having different denominations from the Holders' Claims ("Mis-Matching Assets"), the PA Officer, as applicable, will endeavor to engage in market transactions and distribute the proceeds to the relevant Holders. To the extent such transactions are not able to be completed, the PA Officer will engage in liquidation transactions or distribute Mis-Matching Assets. |

*See* Geer Confirmation Decl. ¶ 36.

The Distribution Principles were achieved through a settlement that allows holders of claims denominated in digital assets to potentially receive an additional amount based on their contractual entitlement.  *See* Geer Confirmation Decl. ¶ 37.  Key to this settlement was the

---

[27]     The Initial Distribution Date, which is anticipated to occur on or around the Effective Date, uses the following calculation: (i) Distributable Assets (as defined in the Plan) are valued using the "Average Price" of such asset in U.S. dollars during the period 15 days before and after entry of the Confirmation Order; (ii) GBTC Shares/ETHE Shares: The same conversion rate is applied, minus certain costs incurred when monetizing such shares for distribution.  *See* Geer Confirmation Decl. ¶ 36 n.14.

Subsequent Distributions will operate as follows: (i) Distributable Assets will be valued based on a 7-day time-weighted average price; (ii) GBTC Shares/ETHE Shares: The same conversion rate is applied, minus certain costs incurred when monetizing such shares for distribution. Assets allocated after the Initial Distribution Date will be allocated *pro rata* with no conversion rate and will instead be allocated in Step 4.  *See id.*

agreement among all unsecured creditors to a "Recovery Cap," under which no holder of an
allowed general unsecured claim can receive post-petition interest or penalties that would result
in distributions exceeding 100% of the principal debt underlying their claim, unless or until all
general unsecured creditors have received their full contractual entitlement under their MLAs
(i.e., repayment of the fully quantity of coins that they are owed).  *See id.*  Once a claimant has
received 100% of their full prepetition principal debt entitlements (including holders of Fiat or
Stablecoin denominated creditors), then their *Pro Rata* Share under Step 2 of the Distribution
Principles is reduced to zero for any future distributions until all other holders of allowed claims
have received 100% of the prepetition principal debt obligations they are owed by the Debtors.
*See id.*  The parties to the settlement on the Distribution Principles agreed that if holders of
allowed Fiat or Stablecoin denominated claims did not receive 100% repayment of their
principal prepetition debt within two years of the effective date of the Plan, they will be entitled
to and start accruing interest at the federal judgment rate on the unpaid portions of their claims.
*See id.*

Due to the price of digital assets at the time that the Distribution Principles were
negotiated, it was not anticipated that any creditors—including both those holding claims in
dollars or in crypto—would be paid the full balance of their loans in their respective currencies.
*See* Geer Confirmation Decl. ¶ 29.  But due to the increase in price of digital assets after the time
a resolution was reached, it is currently anticipated that those creditors whose claims are
denominated in U.S. dollars will be receiving 100% of their loan balance (deferring payment of

post-petition interest), and those creditors whose claims are denominated in cryptocurrency will bear the Total Claims Shortfall.[28]  *See id.*

## VI.    <u>The Request for Confirmation and Objections</u>

With respect to confirmation of the Plan, numerous objections and reservations of rights were filed, all of which have been resolved[29] except for the objections of DCG, CCAHG and the UST.  *See* CCAHG Confirmation Objection; DCG Confirmation Objection; UST Confirmation Objection.  The Debtors oppose the remaining objections, and additional statements in support of confirmation of the Plan have been filed by the Plan Proponents.  *See Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 1330] (the "Debtors' Confirmation Memorandum"); Gorisse Confirmation Statement; Ad Hoc Group Confirmation Memorandum; Ad Hoc Dollar Lenders Confirmation Statement; Committee Confirmation Memorandum.

Direct testimony on confirmation of the Plan was submitted by declaration for the following witnesses: (1) Paul Aronzon; (2) Alex Orchowski, a Director of Solicitation at Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent and administrative advisor; (3) Joseph J. Sciametta, a Managing Director with Alvarez & Marsal North America,

---

[28]    *See supra* n.24.  The Total Claims Shortfall does not include the Debtors' litigation claims, the amount of which is currently unknown.  *See* Geer Confirmation Decl. ¶ 11.

[29]    *See Objection of SOF International, LLC to Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1218]; *Reservation of Rights of the U.S. Securities and Exchange Commission to Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1219]; *Reservation of Rights of the New York State Office of the Attorney General with Respect to the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1232]; *Response and Reservation of Rights of the New Jersey Bureau of Securities* [ECF No. 1235]; *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Amended Joint Chapter 11 Plan* [ECF No 1236]; *Reservation of Rights of Chainview Capital Fund* [ECF No. 1237]; *Gemini Trust Company, LLC's Response and Reservation of Rights with Respect to Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1239]; *Reservation of Rights of the Ad Hoc Group of Genesis Lenders to Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1240]; *Objection and Reservation of Rights Regarding Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1252] (the "BAO Confirmation Objection").

LLC, the Debtors' financial advisors; (4) Adam W. Verost, a Partner at Ducera Partners, LLC;

(5) Bradley Geer, a Managing Director in the financial restructuring group of Houlihan Lokey,

the Committee's investment banker; (6) Dr. Bassem Jassin, a customer of the Debtors and

member of CCAHG; and (7) Isaac Fernandez, a customer of the Debtors and member of

CCAHG.[30]  Additionally, Mr. Aronzon, Mr. Sciametta, Mr. Greer, Mr. Verost and Dr. Jassin

testified further during cross-examination and redirect at the Evidentiary Hearing.  *See* Hr'g Tr.

175:5-265:22 (Feb. 26, 2024); Hr'g Tr. 37:8-80:25; 84:21-95:6; 100:18-107:16; 107:19-121:18;

126:22-200:14; 203:4-225:10; 231:1-255:15; 260:4-265:3 (Feb. 27, 2024); Hr'g Tr. 16:5-23:5

(Feb. 28, 2024).  The parties also submitted dozens of exhibits in support of their pleadings.  *See*

*Notice of Filing of Exhibit Lists* [ECF No. 1481].

DCG's objection to confirmation revolves around one central contention: it contends that

the claims of unsecured creditors must be calculated using their value in U.S. dollars on the

Petition Date.  According to DCG, any post-petition increase in the value of the cryptocurrency

held by the Debtors should not be passed along to the unsecured creditors who lent the

cryptocurrency to the Debtors, but instead should be available to DCG as the equity holder.  *See,*

*e.g.,* DCG Confirmation Objection ¶¶ 1-2 (complaining that the Plan strips DCG of valuable

economic rights and favors certain creditors so that equity holders receive nothing); ¶ 4 (DCG

asserting that the Debtors' financial advisor admitted there is no scenario under which equity

---

[30]      *See* Aronzon Confirmation Declaration; *Amended Declaration of Alex Orchowski of Kroll Restructuring
Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended
Chapter 11 Plan* [ECF No. 1295; ECF No. 1330, Ex. B] (the "Orchowski Voting Declaration"); *Declaration of
Joseph J. Sciametta, Managing Director of Alvarez & Marsal North America LLC in Support of Confirmation of the
Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1330, Ex. C] (the "Sciametta Confirmation Declaration");
Verost Confirmation Declaration; Geer Confirmation Declaration; *Declaration of Basem Jassin in Support of the
Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of
Reorganization* [ECF No. 1356, Ex. A] (the "Jassin Confirmation Declaration"); *Declaration of Isaac Fernandez in
Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11
Joint Plan of Reorganization* [ECF No. 1356, Ex. B] (the "Fernandez Confirmation Declaration").

holders would receive any value regardless of the amount of appreciation of the Debtors' assets).[31]

In short, DCG contends that—as equity holder—it is entitled to receive the benefit from the increase in cryptocurrency prices that has occurred since the Petition Date while the creditors—who were entitled under their contracts to receive back the cryptocurrency they lent the Debtors—would not. This is of crucial importance given the significant rise of cryptocurrency prices since the Petition Date, which has resulted in an increase in the value of estate assets by approximately $1 billion. *See* Hr'g Tr. 134:22-135:18 (Feb. 27, 2024) (J. Sciametta testifying that there is an additional $900.5 million available for in-kind distribution over the amount of the Petition Date claims).

---

[31]    DCG's filings make it clear that its objection to the Distribution Principles is based upon DCG's status as an equity holder. *See* DCG Confirmation Objection ¶ 6 (complaining that under the Plan, the estate's excess value will "continually" flow to unsecured creditors instead of equity interests); ¶ 8 (complaining that the Committee and Ad Hoc Group obtained unfair advantage by, among other things, removing DCG's rights to dividends or distributions as a result of its ownership of interests in Holdco); ¶ 9 (complaining that the Plan "disenfranchises the sole equity holder in this fully solvent estate, DCG"); ¶ 10 (asserting that if the distribution scheme were truly a settlement, it would provide at least some recovery to equity); ¶ 13 (asserting that the Distribution Principles provide for greater recovery to creditors while preventing excess value from flowing to DCG as the ultimate equity holder); ¶ 15 (asserting that the Debtors' financial advisor could not identify any scenario where equity holders would receive payment from the estates); ¶ 18 (asserting that the Plan is not fair or equitable to impaired classes because it would pay approximately $900 million in excess value to creditors at the expense of subordinated claimholders and equity holders); ¶ 20 (complaining that the Plan keeps DCG as the existing equity holder while stripping DCG of its economic and governance rights); ¶ 21 (asserting that the Plan violates Section 1129(a)(7) because it is not in the best interests of equity holders); ¶ 22 (complaining that the Plan disenfranchises DCG of its corporate governance rights by restricting DCG's rights to transfer its interests in Holdco and preventing DCG from taking a worthless stock deduction); ¶ 43 (arguing that it is impermissible for creditors to receive more than $480 million dollars of value more than their Petition Date claim at the expense of equity holders); ¶ 55 (complaining that the Plan prevents DCG from exercising its "fundamental" right to elect directors); ¶¶ 59-60 (asserting that the Plan contains one-sided provisions that were the product of negotiations from which DCG was omitted, the result of which is to prevent value from flowing to equity); ¶ 62 (asserting that the Debtors have breached their fiduciary duties to DCG as the Debtors' equity holder); ¶ 64 (stating that the Debtors, the Committee, and the Ad Hoc Group have "tied themselves in knots" to formulate Distribution Principles that avoid making distributions to DCG); ¶ 75 (complaining that the Setoff Principles are designed to siphon value away from the general creditor body and equity); ¶¶ 78-79 (asserting the Plan strips DCG of its corporate governance rights); ¶¶ 80–82 (asserting that Plan provisions that provide for the restoration of DCG's rights after all creditor claims are unimpaired creates an unrealistically high burden for DCG to regain its rights); ¶ 83 (asserting that the Plan cuts off DCG's interest in GAP and GGC through the Plan's treatment of holders of intercompany interests); ¶¶ 84-85 (asserting that the Plan was not proposed in good faith because it excludes DCG from certain rights over the wind-down of the Debtors); ¶¶ 91-92 (complaining about the Plan's exclusion of DCG from the parties to whom Debtors' owe indemnification obligations); ¶ 96 (asserting that the Plan unlawfully requires DCG to enter into a tax sharing agreement with the Debtors).

By passing along to creditors the post-petition increase in value in the cryptocurrency held by the Debtors, DCG contends that the Plan violates the Bankruptcy Code in numerous ways, including: (1) the valuation principles in Section 502(b); (2) the good faith requirement of Section 1129(a)(3); and (3) the fair and equitable requirement of Section 1129(b).  DCG also objects to the way valuation is handled in the Plan's Setoff Principles—namely, the way that the Plan treats the claims of creditors where the Debtors also hold claims against those same creditors.[32]  In addition to its views on valuation, DCG also objects to the Plan's proposed changes to DCG's corporate governance rights, including most notably its ability to vote to select directors, take tax deductions, and address other tax issues.

As for CCAHG's objection, it first contends that its members' claims that arise under the loan agreements—the MLAs—should be treated as administrative expenses under Section 503(b)(1)(A) of the Bankruptcy Code because they provided a post-petition benefit to the Debtors' estates.  Second, CCAHG contends that its members' claims are executory contracts that should be valued on the date that the Debtors reject the MLAs because they constitute forward contracts or securities contracts under Section 562(a) of the Bankruptcy Code.  Third and finally, CCAHG argues that the releases proposed by the Debtors to certain individuals under the Plan are not a valid exercise of the Debtors' business judgment and are not in the best interests of the Debtors' estates.

Finally, there is the objection of the UST.  While some of the UST's objections to confirmation have been resolved, two issues remain outstanding.[33]  First, the UST objects to

---

[32]     The *Setoff Principles for Allowance of Certain Claims* (the "Setoff Principles") are a negotiated agreement for the treatment of mutual obligations owed by the Debtors and Certain Creditors of the Estate.  *See generally Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1144], Exhibit M ("Plan Supplement Ex. M").

[33]     *See Letter, dated March 15, 2024, Regarding Outstanding Objections to the Debtors' Joint Amended Chapter 11 Plan* at 2 n.3 [ECF No. 1483].

various aspects of the Plan's exculpation provisions, including: (i) the proposed exculpation of

certain non-estate fiduciaries; (ii) the exculpation of Gemini in its role as distribution agent and

certain related parties for certain actions taken directly in furtherance of the performance of its

duties under the Plan after the effective date of the Plan; and (iii) the Plan language enjoining

"any Causes of Action solely to the extent released or exculpated pursuant to this Plan, including

the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or

the Wind-Down Debtors." *See* UST Confirmation Objection at 7, 9-14, 16-18. Secondly, the

UST objects to the payment of the legal fees and expenses of the Ad Hoc Group and Dollar

Group as administrative expenses without a showing of a substantial contribution under Section

503(b). *See id.*

## DISCUSSION

### I.    The NYAG Settlement Motion

#### A. Legal Standard

Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a

hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The

decision to approve or deny a particular compromise or settlement involving a bankruptcy estate

lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp.,*

*Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see*

*also Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). As a general matter, "[s]ettlements

and compromises are favored in bankruptcy as they minimize costly litigation and

further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey*

*& LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (quoting *In re MF Global Inc.*, 2012

WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012)); *see also Motorola, Inc. v. Official Comm.*

of Unsecured Creditors (*In re Iridium Operating LLC*), 478 F.3d 452, 455 (2d Cir. 2007) (stating

that settlements are important in bankruptcy because they "help clear a path for the efficient

administration of the bankrupt estate"); 10 Collier on Bankruptcy ¶ 9019.01 (16th ed. 2024)

(highlighting that "compromises [] are favored in bankruptcy").  A court may exercise its

discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown &

Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

       To approve a proposed settlement under Rule 9019, a court must determine that it is fair,

equitable, and in the best interests of the estate. *See Protective Comm. for Indep. Stockholders of

TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Assoc. v. Am.

Nat'l Bank & Trust Co. of Chi.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y.

1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *MF Global Inc.*, 2012 WL 3242533, at *5; *In re Mrs.

Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002).  In so doing,

however, the court need not conduct a "mini-trial" or decide the numerous issues of law and fact

raised by a compromise or settlement, but must only "canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness." *In re Dewey & LeBoeuf

LLP*, 478 B.R. at 640 (quoting *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr.

S.D.N.Y. 2005)).  "To be approved, '[t]he settlement need not be the best that the debtor could

have obtained.'" *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016)

(quoting *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007)).  "Indeed,

'[i]f courts required settlements to be perfect, they would seldom be approved.'" *Id.* (quoting

*Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*,

787 F.3d 173, 180 (3d Cir. 2015)).  "Rather, 'there is a range of reasonableness with respect to a

settlement—a range which recognizes the uncertainties of law and fact in any particular case and

the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.*

at 257-58 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

In the Second Circuit, the *Iridium* decision directs courts to balance the following seven

interrelated factors in deciding whether a settlement is fair and equitable:

(1) the balance between the litigation's possibility of success and the settlement's
future benefits;

(2) the likelihood of complex and protracted litigation, "with its attendant expense,
inconvenience, and delay," including the difficulty in collecting on the judgment;

(3) "the paramount interests of the creditors," including each affected class's relative
benefits "and the degree to which creditors either do not object to or affirmatively
support the proposed settlement";

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and "[t]he experience
and knowledge of the bankruptcy court judge" reviewing the settlement;

(6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining."

*Iridium*, 478 F.3d at 462.

When evaluating the necessary facts, a court may rely on the opinion of the debtor,

parties to the settlement, and professionals. *In re Dewey & LeBoeuf LLP*, 478 B.R. at 641. *See*

*In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Purified Down Prods.*

*Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). In particular, "the business judgment of the debtor in

recommending the settlement should be factored into the court's analysis." *MF Global Inc.*,

2012 WL 3242533, at *5 (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating*

*LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)). "While the

bankruptcy court may consider the objections lodged by parties in interest, such objections are

not controlling . . . . [T]he bankruptcy court must still make informed and independent

judgment." *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

### B.    The NYAG Settlement Agreement Satisfies the Iridium Factors

For the reasons discussed below, the Court finds that the NYAG Settlement Agreement

falls well above the lowest point in the range of reasonableness and that each of the applicable

*Iridium* factors weigh in favor of approving the NYAG Settlement Agreement.[34]

With respect to the first and second *Iridium* factors, the Court finds that the Debtors have

appropriately balanced the possibility of success of the NYAG Action and the future benefits of

the NYAG Settlement Agreement against the likelihood of protracted and costly litigation.

Specifically, Mr. Aronzon testified that the terms of the NYAG Settlement Agreement provide

significant near-term benefits to both the Debtors and their creditors in contrast with the

uncertainty and expense of litigating the NYAG Action and the NYAG Claims.  *See* Aronzon

Settlement Decl. ¶ 8.  Mr. Aronzon opined that the treatment and amount of the NYAG Claims

provided for in the NYAG Settlement Agreement, which is limited to restitution, was reasonable

in comparison to the potential risk of an adverse judgment in the NYAG Action.[35]  *See* Aronzon

Settlement Decl. ¶ 9.

DCG claims that the NYAG Settlement Agreement provides the Debtors with "no value,"

and that the Debtors would be no worse off than if they had litigated the claims to judgment and

lost.  *See* DCG Settlement Objection ¶ 59.  But this is clearly not the case.  Mr. Aronzon testified

that litigation of the NYAG Action could potentially result in civil penalties, disgorgement of

---

[34]    The Court finds that the sixth *Iridium* factor, "the nature and breadth of releases to be obtained by officers and directors," is inapplicable to the issues in the NYAG Settlement Agreement.  *Iridium*, 478 F.3d at 462.

[35]    Indeed, the Committee suggests that, based on its own independent investigation of the Debtors' prepetition conduct, it believes the underlying claims of the NYAG Action have merit.  *See* Committee Settlement Statement ¶ 5.  The Ad Hoc Group similarly believes that there is a significant likelihood that the Debtors, along with DCG, would lose such litigation.  *See* Ad Hoc Group Reply ¶ 38.

profits, pre-judgment interest and injunctive relief that far exceed the amounts in which the

NYAG Claims are being allowed under the NYAG Settlement Agreement.  *See* Aronzon

Settlement Decl. ¶ 9; NYAG Amended Compl. at 67.  He explained that the Debtors "got

tremendous benefits and buy-in through the negotiation process . . . like the elimination of

penalties, or the elimination of disgorgement.  I mean, I don't know how much money we made

in the time frame using these assets, but anything that we would have profited by if that

disgorgement were to come into play could be called into question."  Hr'g Tr. 117:25-118:8

(Feb. 27, 2024).

The NYAG Claims, which were filed on an unsubordinated basis, also could have

significantly diluted unsecured creditor recoveries absent the settlement.  Instead, the NYAG

Settlement Agreement provides NYAG with an allowed claim that is subordinated to other

general unsecured creditors and is also reduced on a dollar-for-dollar basis for every dollar of

distributions that is received by the creditor pool.[36]  *See* Hr'g Tr. 97:16-18 (Feb. 28, 2024); Hr'g

Tr. 217:24-218:1 (Feb. 26, 2024).  Even if the Debtors had successfully litigated the NYAG

Action, therefore, the benefit to the estates would likely have been no more than would have

been achieved under the NYAG Settlement Agreement.  Given the terms of the NYAG

Settlement Agreement, the Debtors are not required to pay a single dollar that would not

ultimately flow back to the creditors of their estates.  *See* Hr'g Tr. 117:11-15 (Feb. 27, 2024)

(Mr. Aronzon testifying that "the benefit is that the claim reduces itself as we make

---

[36]     The Debtors' proposed subordination of government claims is not unique to the Debtors' bankruptcy proceedings.  Similar agreements between bankruptcy debtors and governmental entities have occurred in other cryptocurrency cases.  *See In re BlockFi Inc.*, Case No. No. 22-19361 (Bankr. D.N.J. June 22, 2022) [ECF No. 1099]; *In re BlockFi Inc.*, Case No. 22-19361 (Bankr. D.N.J. Sep. 27, 2023) [ECF No. 1613]; *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (Bankr. S.D.N.Y. Oct. 6, 2023) [ECF No. 1595]; *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. July 26, 2023) [ECF No. 3095]; *In re FTX Trading Ltd.*, Case. No. 22-11068 (Bankr. D. Del.) [ECF No. 6908].

contributions.  The subordination is extremely valuable, as is the commitment to continue to pay creditors if there are other recoveries.").  Nor are the Debtors required to admit or deny the allegations in the NYAG Action, which would result in adverse collateral consequences.  *See* Hr'g Tr. 60:24-61:7 (Feb. 28, 2024) (statement of counsel that the Debtors' ability to avoid admitting or denying the allegations in the NYAG Action benefitted the Debtors); *see also* Hr'g Tr. 108:5-22 (Feb. 27, 2024) (Mr. Aronzon confirming that the NYAG Settlement Agreement does not require the Debtors to admit or deny liability, which he characterized as a benefit to the non-Debtor defendants in the NYAG Action).

Mr. Aronzon also testified that the NYAG Settlement Agreement will allow the Debtors to avoid the extensive litigation costs[37] from protracted litigation with NYAG with respect to both the NYAG Action and the priority of the NYAG Claims.[38]  *See* Aronzon Settlement Decl. ¶ 10.  Such litigation would result in significant professional fees, including discovery, preparation of experts, motion practice, trial and a post-trial remedies phase.  *See id*.  Litigation is also likely to significantly delay creditor recoveries, thwarting the hopes of the Debtors and their creditors for a speedy return of value to customers.  *See* Aronzon Settlement Decl. ¶ 10; *see also* Hr'g Tr. 260:19-22 (Feb. 26, 2024) (Mr. Aronzon testifying that litigating the NYAG Action could cost tens of millions of dollars and take multiple years).[39]  Mr. Aronzon contrasted the time and expense of litigation with a full and final resolution of all issues related to the NYAG Action and

---

[37]    Mr. Aronzon testified that the Special Committee went through an analysis with the Debtors' counsel as to what the timeframe and expenses of litigating the NYAG Claims would theoretically be.  *See* Hr'g Tr. 261:4-7 (Feb. 26, 2024).  The Ad Hoc Group notes that the Debtors have already accrued approximately $500,000 in special counsel fees on the NYAG Action, in which an answer has yet to even be filed.  *See* Ad Hoc Group Reply ¶ 38.

[38]    *See, e.g.*, 11 U.S.C. § 726(a)(4) (providing for subordination of penalty claims to other allowed unsecured claims).

[39]    A persistent theme in these cases has been the creditors' desire for a prompt resolution of these Chapter 11 cases, a goal that would be thwarted by the need to litigate the NYAG Action to conclusion. *See* Islim First Day Decl. ¶ 40 (noting that the Debtors filed the Chapter 11 cases to "incentivize all stakeholders to move expeditiously toward a consensual resolution that avoids the costs and uncertainty of litigation.").

the NYAG Claims—as well as any objection that NYAG had to the Plan—all of which would permit the Debtors and their advisors to focus resources and attention on other claims, confirm a plan of reorganization and begin to make distributions to creditors.  *See* Aronzon Settlement Decl. ¶ 11.  Indeed, the NYAG Settlement Agreement provides the fastest process for distributions to be made to creditors, as NYAG has agreed not to object to confirmation of the Plan, including any of the transactions contemplated thereunder, despite the request for injunctive relief in the NYAG Action.  *See* NYAG Settlement Motion ¶ 13.

The Special Committee of the Debtors—in consultation with the Debtors' restructuring professionals—has conducted a thorough analysis of the risks associated with the NYAG Action and the benefits of the NYAG Settlement Agreement.  The Court believes it is appropriate to rely on their business judgment in deciding to resolve this dispute without further litigation.  The Court also concludes that the testimony provided by Mr. Aronzon is credible and persuasive in describing the process for settling here.  Specifically, Mr. Aronzon testified that the settlement negotiations were handled on behalf of the Debtors by the Debtors' bankruptcy counsel, which regularly consulted with the Special Committee and the senior management of the Debtors and Holdco's non-Debtor subsidiaries regarding the process and progress of the negotiations.  *See* Aronzon Settlement Decl. ¶ 6; Hr'g Tr. 239:8-13, 247:14-248:5 (Feb. 26, 2024).  Mr. Aronzon also testified that the Debtors, acting under the oversight of their independent Special Committee and their advisors, determined that the NYAG Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Debtors' estates.  *See* Aronzon Settlement Decl. ¶¶ 7-11.  This was bolstered by Mr. Aronzon's testimony at the hearing that during the process the Special Committee worked extensively with their restructuring experts and examined the relevant factors, including the basis of the claims in the NYAG Action, potential litigation

timeframe and expenses, the remedies that were being sought in the NYAG Action and the

benefits provided by the NYAG Settlement Agreement to the Debtors and their creditors and

other parties in interest.  *See* Hr'g Tr. 222:3-8, 239:14-18, 250:4-16, 260:17-261:7, 262:7-9 (Feb.

26, 2024); Hr'g Tr. 108:5-109:3, 109:17-111:19, 112:8-113:17, 115:3-22 (Feb. 27, 2024).

The Court also finds that the third and fourth *Iridium* factors, which consider the

paramount interests of creditors and whether creditors and other parties support the settlement, to

weigh in favor of approving the NYAG Settlement Agreement.  The NYAG Settlement

Agreement provides for the Debtors' creditors to receive restitution—as close to full recovery as

possible on what they are due on their contracts—which provide for the return of what they lent

the Debtors.  To the extent that the Debtors' customers do not receive under their own claim

what they are entitled to under the contracts they had with the Debtors, the NYAG Settlement

Agreement provides that NYAG will turn over any recoveries it realizes on its allowed claims to

the customers through a Victims' Fund.[40]

No creditor has objected to the NYAG Settlement Agreement.  Instead, the Committee—

which has a fiduciary duty to act in the interests of all unsecured creditors—and the Ad Hoc

Group representing over $2.4 billion of claims, have strenuously and actively advocated for its

approval.  Nor has there been an objection from any of the multiple governmental entities, whose

more junior penalty claims against the Debtors would be subordinated to NYAG under the Plan.

Indeed, the only objection has come from DCG.  Notably, however, DCG does not present any

evidence or argument that the calculation of the NYAG Claims or the structure of the NYAG

Settlement Agreement is improper under New York law.  Rather, DCG's objection is made from

---

[40]     While DCG argues that "the Debtors have simply given away the residual value of their estates" to NYAG,
DCG Settlement Objection ¶ 3, this is not the case.  As more fully discussed below, there is no residual value for
equity here given that the creditors, including the governmental units, are owed far more than the assets that are
available for distribution. *See infra* at 68-85.

the vantage point of an equity holder that believes the NYAG Settlement Agreement will affect its chance to see a recovery in the Debtors' bankruptcy cases.[41]  But that is not a basis for disrupting an otherwise reasonable settlement.  *See In re Adelphia Communs. Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) ("[T]he approval of a settlement cannot be regarded as a counting exercise.  Rather, it must be considered in light of the *reasons* for any opposition, and the more fundamental factors—such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk . . . ." (emphasis in original).  Moreover, the Court notes that NYAG has asserted a claim of over $3 billion against the Debtors and there are currently more than $30 billion of other governmental claims that are senior to DCG's recovery as an equity holder.  *See generally* Government Proofs of Claim, JX-94.  Indeed, for DCG to hypothetically receive a recovery in these cases, the planets would need to align, so to speak.

DCG complains about the methodology for the calculation of NYAG's Claims—that is, the NYAG Settlement Agreement's incorporation of the Distribution Principles as a way to measure the claims of creditor victims.  Said another way, DCG complains that creditor recovery is being measured against the creditor contractual rights, including the creditors' rights to receive back the cryptocurrency they lent the Debtors.  But NYAG specifically has stated that it has "long made clear to the Debtors that it is seeking restitution for victims in these proceedings" and that "the distribution mechanics set forth in the NYAG Settlement Agreement are intended to compensate those victims *for the full extent of their losses* as efficiently as possible."  NYAG Settlement Statement ¶¶ 5, 8 (emphasis added).  Mr. Aronzon testified that when deliberating

---

[41]    Ironically, it is possible that DCG itself may tangentially benefit from the NYAG Settlement Agreement. Mr. Aronzon testified that the Debtors are not required to admit liability in the NYAG Settlement Agreement which could, in fact, provide a benefit to the other Defendants, including DCG.  *See* Hr'g Tr. 108:12-22 (Feb. 27, 2024). Moreover, Mr. Aronzon testified that, hypothetically, any restitution provided by the Debtors to its creditors would theoretically reduce the restitution amount owed by the other Defendants, including DCG, to alleged customer victims.  *See* Hr'g Tr. 113:12-17, 115:3-15 (Feb. 27, 2024).

regarding settlement with NYAG, it was his understanding that NYAG's demand for restitution was seeking to repay creditors the amounts owed under their contracts with the Debtors, which means a return of the cryptocurrency loaned to the Debtors.  *See* Hr'g Tr. 109:17-20, 100:16-11:12 (Feb. 27, 2024).  Indeed, Mr. Aronzon testified that NYAG was seeking the same restitution damages from the other Defendants.  *See id.* at 112:8-12.[42]

Indeed, NYAG's goal dovetails with the Debtors' own goal to pay back their creditors in full and in-kind consistent with the MLAs here.  *See, e.g.,* Oct. 18 Letter (Debtors expressing desire to maximize creditor recoveries); Hr'g Tr. 64:25-65:6 (Sept. 6, 2023); Hr'g Tr. 32:21-33:4 (Oct. 24, 2023) [ECF No. 841]; Hr'g Tr. 40:9-41:11 (Nov. 28, 2023) [ECF No. 1148]; Hr'g Tr. 196:5-17, 197:22-25, 198:12-16 (Feb. 26, 2024) (Mr. Aronzon testifying that "one of the things that we thought about there, and we thought about it from the very beginning of my engagement, was how to handle the creditors who had handed us assets—cash, coins, different sorts of things—to be used in our business . . . . The people who gave us their assets, they own them. Yes, they gave them to us to invest.  They're basing their claims on the amount for the value of the assets that they gave to us . . . .  [Y]ou heard a lot of people talk about restitution and honoring the contracts and the benefit of the bargain.  That's the reason for the deviation in thinking out of the box about how to handle these claims."); Hr'g Tr. 45:10-16 (Feb. 26, 2024) (Debtors' counsel in opening argument noting that the Debtors' plan was always to keep digital assets and distribute them to creditors).  DCG makes much of the fact that some of these governmental claims may be duplicates.  For example, DCG notes that the Texas Securities Board claim is really in the sum of $8 to 9 billion rather than $24 to 29 billion.  Even if that is

---

[42]    Even to the extent one could agree that NYAG is not entitled to this measure of restitution, it is not unreasonable to settle on such terms given that NYAG has agreed to forego seeking more drastic relief such as disgorgement of all of the Debtors' profits.

true, it does not matter given the total claims figures here.  *See Adelphia*, 327 B.R. at 165.  Said

another way, governmental claims of $8 to 9 billion easily exceeds—by itself—the total assets

available in these cases several times over.  *See infra* at 68-85.

Additionally, the fifth and seventh *Iridium* factors, the competency and experience of

counsel and the extent to which the settlement was the product of arms' length bargaining,

support approval of the NYAG Settlement Agreement.  The Debtors are represented by Cleary

Gottlieb Steen & Hamilton LLP and Morrison Cohen LLP.  NYAG is itself clearly experienced

with the prosecution and settlement of Martin Act and Executive Law § 63(12) claims, and is

represented by Westerman Ball Ederer Miller Zucker & Sharfstein, LLP in the Debtors'

bankruptcy cases.  Thus, both sides are represented by highly experienced and competent

counsel.

DCG suggests that the Debtors did not make a material effort to negotiate the terms of the

NYAG Settlement Agreement and that the record does not reflect sufficient "written advocacy"

due to inadequate evidence of emails and conferences between NYAG and the Debtors.  *See*

DCG Settlement Objection ¶ 10.[43]  In sum, it argues that there is not enough communication and

spirited confrontation to reflect a fulsome negotiation process.  But considering the extensive

history of negotiations detailed above, the Court disagrees.  Settlement negotiations were

handled by Debtors' counsel, who then reported back to the Special Committee, with discussions

also occurring between Debtors' counsel and individual Special Committee members.  *See* Hr'g

---

[43]     For example, DCG argues that after initial drafts were exchanged between the Debtors and NYAG in early
November, "[n]o further drafts or substantive proposals in any form were exchanged between the parties" until the
end of January.  DCG Settlement Objection ¶¶ 12-13.  It also points to the fact that on January 25, 2024, the Debtors
summarized for NYAG certain key terms for a new proposal, which terms essentially remained unchanged in the
drafts exchanged by the parties before the final settlement was reached.  *See* DCG Settlement Objection ¶¶ 17-18
(citing Ex. J to DCG Settlement Objection (January 24 Emails re: Genesis); Ex. K to DCG Settlement Objection
(January 31, 2024 to February 3, 2024 Emails re: Genesis Call); Ex. L to DCG Settlement Objection (February 2,
2024 Draft Stipulation and Consent to Judgment)).

Tr. 239:4-240:12 (Feb. 26, 2024).  Mr. Aronzon stated that conversations between NYAG and

Debtors' counsel had taken place as far back as July and August of 2023 when NYAG filed its

NYAG Claims so that the Debtors could get an understanding of what NYAG's claims were.

*See* Hr'g Tr. 240:7-12, 250:4-10 (Feb. 26, 2024).  The letter sent by Debtors' counsel to NYAG

prior to the filing of the NYAG Initial Complaint reflects as much, noting regular meetings

between Genesis and NYAG.  *See* Oct. 18 Letter.  At the authorization of the Special Committee,

there also were several exchanges between the parties in November 2023 to engage with NYAG

and determine a path to settlement.  *See* Hr'g Tr. 239:11-21, 240:7-241:1, 250:11-16 (Feb. 26,

2024).

DCG complains of an ensuing "lull" of two months.  *See* DCG Settlement Objection ¶

16.  But in fact, multiple meetings and correspondence actually took place during this period.

*See* Debtors' Settlement Reply, Exs. 14, 19, 20-25; *see also* Hr'g Tr. 247:14-248:23 (Feb. 26,

2024) (Mr. Aronzon testifying as to conversations between November 6, 2023 and January 25,

2024).  Specifically, the parties had two calls on or about November 7 and 9, 2023 regarding the

settlement proposals and then another call on or about December 15, 2023 to follow-up on the

earlier settlement discussions and another on January 11, 2024 regarding NYAG's intent to file

the NYAG Amended Complaint.  *See* DCG Settlement Objection ¶ 12 (citing Ex. I to DCG

Settlement Objection (October 26, 2023 to December 13, 2023 Emails re: Genesis (For

Settlement Purposes Only)); Ex. J to DCG Settlement Objection (January 24 Emails re:

Genesis)).

Contrary to DCG's suggestion, the increased settlement discussions in late January 2024

are also not surprising or problematic.  The record indicates that settlement talks picked up steam

once NYAG announced its intention to amend its NYAG Initial Complaint, an unsurprising fact

46

given the potential additional claims being contemplated by NYAG.  DCG suggests that the
increased settlement discussions between the Debtors and NYAG in January 2024 was the result
of DCG "disclosing" that it intended to object to the Debtors' Plan and the discussions were a
scheme to secure "insurance" against such Plan objection.  *See* DCG Settlement Objection ¶ 83.
But that linkage makes little sense.  The Debtors already knew of DCG's intent to object to the
Plan since at least October 31, 2023, when DCG filed an objection to the Debtors' Disclosure
Statement.  *See* ECF No. 867.  DCG's suggestion is also undermined by the actual events in
January 2024.  Ten days after entry of an order setting a February 9, 2024 deadline for NYAG to
amend its complaint, counsel to the Debtors and DCG met on January 22, 2024 to discuss "AG
Case Strategy."  *See* Debtors' Settlement Reply, Ex. 12; *Stipulation Extending Time to Answer
or Respond to Amended Complaint* at 1, *The People of the State of New York v. Gemini Trust Co.
et al.*, Case No. 452784/2023 (N.Y. Sup. Ct. Jan. 12, 2024) (setting deadline for amendment of
NYAG Initial Complaint).  Only a few days after that call, both the Debtors and DCG (together
with Gemini) reached out to NYAG to discuss "a potential settlement."  *See* Debtors' Settlement
Reply, Ex. 14 (January 24, 2024 Email Between Debtors' Counsel and NYAG), Ex. 15 (January
24-26, 2004 Emails Between DCG's Counsel and NYAG).  Debtors' counsel also had informed
counsel to DCG in the end of January 2024 that the Debtors were in dialogue with NYAG
regarding settlement.  *See* Hr'g Tr. 265:7-22 (Feb. 26, 2024).  Indeed, there is no requirement
that settlement negotiations take place over a given period of time or be documented in a
particular way.  *See, e.g., In re Nortel Networks, Inc.*, 522 B.R. 491, 515 (Bankr. D. Del. 2014)
(finding that "ten days . . . is sufficient time in which to negotiate a settlement agreement, even
regarding a matter as multifaceted as the [now-settled] [d]ispute.").  The Court concludes that the
settlement discussions here ran on a logical timeline, with initial discussions to frame out the

parties' position and increased negotiations based on looming events that would propel the

litigation forward, including the amendment of NYAG's Initial Complaint and the scheduled

confirmation hearing in February 2024.

DCG admits that it was also in separate settlement negotiations with NYAG.

Interestingly, these settlement discussions actually ran a similar course to the Debtors' settlement

discussions, and this only confirms the appropriateness of the Debtors' negotiations.  *See* DCG

Settlement Objection ¶ 14.  Similar to the Debtors, DCG engaged in correspondence and

meetings with NYAG prior to and just after the NYAG Initial Complaint was filed.  *See* Debtors'

Settlement Reply, Ex. 6 (August 11, 2023 DCG Presentation to NYAG), Ex. 7 (Correspondence

and DCG Letter Submission to NYAG dated Sept. 22, 2023), Ex. 8 (November 21, 2023 Email,

Executed Stipulation Extending Time to Answer or Respond to Complaint).  And just like the

Debtors, DCG again reached out to NYAG in late January when the parties became aware of

NYAG's intent to amend the NYAG Initial Complaint, reinvigorating settlement discussions

with NYAG.  *See* January 9, 2024 Email between NYAG and DCG's Counsel, attached as Ex. 9

to Debtors' Settlement Reply; January 24-26, 2024 Emails Between DCG's Counsel and NYAG,

attached as Ex. 15 to Debtors' Settlement Reply.  In fact, the Debtors had concerns regarding the

proposals that DCG was making to NYAG, and whether such proposals had sufficient support

from the Debtors and their creditors.  *See* January 31, 2024 Emails Between Debtors' Counsel

and DCG's Counsel, attached as Ex. 10 to Debtors' Settlement Reply.  The Debtors suggest that

these separate but simultaneous negotiations by the Debtors and DCG created a race to reach a

settlement with NYAG.  *See* Debtors' Settlement Reply ¶¶ 27-28.  In sum, the record shows that

after an unsuccessful initial round of negotiations—and on the eve of NYAG filing its NYAG

Amended Complaint and DCG's simultaneous efforts to reach settlement with NYAG—the

Debtors negotiated in good faith, which reached a reasonable conclusion on the parties' common ground desire to maximize recoveries to creditors.

The Court also finds persuasive that the aspersions cast by DCG on the settlement process are vigorously disputed by NYAG itself, a governmental entity that is responsible for enforcing New York law on behalf of the People of the State of New York, which represents that the NYAG Settlement Agreement was negotiated at arms' length and in good faith, and which stands by the integrity of the process.  *See* NYAG Settlement Statement ¶¶ 1-2, 8.[44]  Given the entire record, therefore, the Court finds that the Debtors easily satisfy the *Iridium* factors as to the settlement process.[45]

DCG makes much of the fact that counsel to the Ad Hoc Group met with NYAG, stating that the Ad Hoc Group "inserted itself into the negotiation of the [Settlement] Agreement to advance its own parochial interests."  DCG Settlement Objection ¶ 4.  But the Ad Hoc Group represents the Debtors' customers who hold more than $2.4 billion in unsecured claims against the Debtors.  As such, the Ad Hoc Group members are the very alleged victims on whose behalf NYAG has sued.  As such, there is nothing surprising or nefarious about NYAG's discussion with the Ad Hoc Group or the fact that the NYAG Settlement takes into account their views.  Failure to do so would, in fact, be improper and a miscarriage of justice.  As the Debtors correctly note, "[i]f consultation with creditor groups regarding a potential value-maximizing settlement is collusion, then all debtors, in all cases, are guilty of collusion."  Debtors' Settlement Reply ¶ 31.

---

[44]     *See, e.g., In re Texaco Inc.*, 84 B.R. 893, 901, 902 (Bankr.S.D.N.Y.1988) (considering "[t]he extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion").

[45]     In rejecting DCG's contention that the NYAG Settlement Agreement was not the result of a good-faith, arms' length process, the Court specifically finds that DCG has failed to provide any credible evidence to support its assertion of bad faith or of an inappropriate process.

In sum, and for all the foregoing reasons, the Court finds that the balance of the relevant *Iridium* factors strongly weigh in favor of approving the NYAG Settlement Agreement. The Court also finds that the NYAG Settlement Agreement is fair, equitable, and in the best interests of the estate and falls within the range of reasonableness and therefore meets the standard for approval under Bankruptcy Rule 9019(a).

### C.  DCG's Remaining Arguments as to the NYAG Settlement

#### 1.  Privilege

DCG argues that the Debtors have failed to meet the standard for approval of the NYAG Settlement Agreement under Bankruptcy Rule 9019 because the Debtors asserted privilege as to communications between the Special Committee and counsel. Specifically, they complain that the Debtors have failed to show that they adequately weighed the possibility of NYAG's success and resulting damages against the future benefits of the NYAG Settlement Agreement. They argue that "not a scrap of evidence was produced" to show that the Special Committee assessed, or was provided with an assessment of, the *likelihood* of success of the NYAG claims and what damages could be recovered. *See* DCG Settlement Objection ¶ 63. DCG suggests that, without the details about the precise percentage of likelihood of success discussed with counsel, the Court does not have the information necessary to approve the NYAG Settlement Agreement. *See* DCG Settlement Objection ¶ 67.

But as this Court has previously held in the context of other settlement agreements in these same bankruptcy cases, the Court disagrees. *See In re Genesis Glob. Holdco, LLC*, 2023 WL 6543250 (Bankr. S.D.N.Y. Oct. 6, 2023). In reviewing the Debtors' decision to enter into the NYAG Settlement Agreement, "the Court need only consider the legal positions underlying the disputed claims. The Court is not required to delve into privileged matters . . . ." *In re*

*Health Diagnostic Lab., Inc.*, 2016 Bankr. LEXIS 3724, *15-16 (Bankr. E.D. Va. Oct. 14, 2016).[46]  Nor is it "'necessary for the Debtors to waive the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood they would win on the claims being settled . . . .  It is sufficient to present the Court with legal positions asserted by each side and the facts relevant to those issues.  The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable.'"  *Id.* at *16 (quoting *In re Washington Mutual, Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011)); *see also In re Lee Way Holding Co.*, 120 B.R. 881, 897 (Bankr. S.D. Ohio 1990) (approving settlement where trustee's counsel "reviewed documents which . . . [were] successfully withheld . . . under assertions of privilege").  The Debtors should not be required to reveal their candid litigation assessment to the world in the context of seeking settlement approval, which would put the Debtors at a severe disadvantage if the NYAG Settlement Agreement was not approved.  The Debtors have adequately described the process they undertook to reach the settlement, while avoiding putting at issue the substance of the Debtors' deliberations with counsel in the process.[47]

DCG is essentially advocating for a standard of review that is higher than that set forth in existing case law under Rule 9019.  In making an evaluation under Bankruptcy Rule 9019, in fact, "[t]he reviewing court need not conduct its own investigation concerning the reasonableness of the settlement and may credit and consider the opinion of the Trustee and counsel that the

---

[46]    The attorney/client privilege issue is particularly significant in this case, where DCG is a co-Defendant in the NYAG Action and was involved in separate settlement negotiations with NYAG.

[47]    For this reason, DCG's reliance on *U.S. v. Doe (In re Grand Jury Proc.)*, 219 F.3d 175, 182 (2d Cir. 2000), is misplaced.  Additionally, the other cases cited by DCG on the issue of attorney client privilege are inapplicable to the circumstances at hand.  *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) only discusses the legal maxim that privilege cannot be used as both a sword and a shield, but is otherwise irrelevant to the fact pattern of this case.  And *In re DiStefano*, 2022 WL 4086979, at *6-7 (Bankr. N.D.N.Y. Sept. 6, 2022) fails to approve a settlement because the basic facts had not been disclosed to the court, which is not the circumstance here.

settlement is fair and equitable." *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-523 (S.D.N.Y. 1993) (internal citations and quotations omitted); *In re Dewey & LeBoeuf*, 478 B.R. at 641 (in evaluating the necessary facts, a court may rely on the opinion of the debtor, parties to the settlement, and professionals). The Court need not "conduct a 'mini-trial' to determine the merits of the underlying litigation. Rather, the court's responsibility is 'to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Dewey & LeBoeuf*, 478 B.R. at 641 (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 609 (2d Cir. 1983)). This policy "reflect[s] the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *Purofied Down*, 150 B.R. at 522-23.

### 2. Sub Rosa Plan

DCG asserts that the NYAG Settlement Agreement amounts to an impermissible *sub rosa* plan. *See* DCG Settlement Objection ¶¶ 53-54. "It is well-established that courts may not approve settlements that have the effect of a *sub rosa* plan and accomplish an end run around the protection granted creditors in Chapter 11 of the Bankruptcy Code." *In re Miami Metals I, Inc.*, 603 B.R. 531, 536 (Bankr. S.D.N.Y. 2019) (quoting *In re Biolitec, Inc.*, 528 B.R. 261, 272 (Bankr. D.N.J. 2014)). *Sub rosa* plans are prohibited to prevent a debtor in possession from "enter[ing] into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'" *Iridium*, 478 F.3d at 466 (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir.1983)). Said another way, the doctrine prohibits efforts to "restrict any rights afforded to creditors in the [C]hapter 11 process, such as the right to vote on a proposed plan of

reorganization in the manner they see fit." *In re Tower Auto. Inc.*, 241 F.R.D. 162, 166 (S.D.N.Y. 2006).

"Factors that can turn a settlement agreement into a *sub rosa* plan include (1) the agreement has the practical effect of dictating the debtor's reorganization; (2) the agreement infringes creditor voting rights on the debtor's reorganization; (3) the agreement disposes of large assets belonging to the debtor; and (4) the agreement forced creditors to waive their claims against the debtor." *Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II, LLC)*, 2011 WL 134893, at *11–12 (D. Conn. Jan. 14, 2011) (citing *In re Cajun Elec. Power Co-op., Inc*., 119 F.3d 349, 355 (5th Cir. 1997)).  Nevertheless, "courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a '*sub rosa* plan' objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan of reorganization." *In re Tower Auto.*, 241 F.R.D. at 169.

Applying these standards here, the Court rejects DCG's *sub rosa* argument.  As a procedural matter, DCG's argument fails.  The Debtors' Plan is being litigated and decided by the Court at the same time as the NYAG Settlement Agreement.  To the extent that DCG raises objections to confirmation, these are being addressed in that context.  Moreover, the NYAG Settlement Agreement here also does not restrict any creditor's right to vote on the Plan or otherwise control the plan process.  It is noteworthy that the *sub rosa* objection is coming from DCG, who is not entitled to vote on the Plan as an equity holder.  The NYAG Settlement Agreement also has not restricted any of DCG's process rights as an equity holder: it has fully participated in these proceedings by filing objections to both the NYAG Settlement Agreement and the Plan.  Nor does the approval of the NYAG Settlement Agreement necessarily require

53

confirmation of the Plan proposed by the Debtors.  If the current version of the Plan is not

confirmed, then under another plan, a Chapter 7 liquidation, or a dismissal, funds will flow out of

the estate, the claims of general unsecured creditors will be paid, and then NYAG's Claim will

be paid.  *See* Hr'g Tr. 233:18-234:6 (Feb. 26, 2024) (P. Aronzon testimony).

To the extent that DCG's *sub rosa* argument rests on the fact that these bankruptcy cases

will not return any value to equity, that is not a basis for scuttling the NYAG Settlement

Agreement.  But such a result simply would be a function of the waterfall of distributions under

the Plan and the value of the assets in the estate.  DCG complains that the NYAG Settlement

Agreement will have the effect of giving the creditors the appreciation in the value of the

cryptocurrency since the Petition Date, rather than potentially leaving that value for an equity

recovery.  Such a result is a function of the fact that NYAG has sought restitution here.  That

restitution is measured by the benefit of the bargain owed to the customer victims, which in turn

means measuring the value of the "in-kind" distributions owed by the Debtors to the customers.[48]

So if a hypothetical customer was supposed to receive back the 100 Bitcoin that it lent to the

Debtors—but did not receive back because of the alleged fraud—the measure of restitution is

100 Bitcoin.  And as already discussed, the NYAG Action threatens the Debtors with a

potentially much larger set of damages beyond restitution—including disgorgement and

penalties—with no guarantee that such other damages would be used to compensate the Debtors'

customers as opposed to simply being kept by New York State.[49]

---

[48]    Restitution is designed to return parties to the positions they occupied prior to the alleged fraud.  *See New York City Econ. Dev. Corp. v. T.C. Foods Imp. & Exp. Co.*, 2006 WL 1132350 at *3 (Sup. Ct. Queens Cty. 2006), *aff'd*, 46 A.D.3d 778 (2007) ("The object of restitution is to restore the status quo ante—to put the parties back into the position they were in."); *see also People by James v. Image Plastic Surgery, LLC*, 210 A.D.3d 444, 445 (App. Div. 1st Dept. 2022).

[49]    Notably, the payment of customer victims as part of the NYAG Settlement Agreement and these bankruptcy cases serves to lessen the damages that NYAG can assert in the NYAG Action against all Defendants, including DCG.  The same would not necessarily be true for a settlement to be paid and retained by NYAG for

In rejecting DCG's *sub rosa* argument, the Court finds very instructive the decision in *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005). In that case, the *Adelphia* debtors settled extensive litigation asserted by numerous government entities in several related and wide ranging agreements. Like the NYAG Settlement Agreement here, the agreement in *Adelphia* provided that the government's claims were subordinated and the monies paid to the government would be used to fund a victims' restitution fund. *See id.* at 157. The unsecured creditors in *Adelphia* objected that the money recovered by the government could be used to provide distributions to "victims who are equity security holders, or to investors of debt securities who, if they asserted claims in these [C]hapter 11 cases" would recover only after unsecured creditors. *Id.* at 168 (also raising the concern that the SEC would in essence be trying to recover a penalty that would be subordinate to normal unsecured creditors under the Bankruptcy Code). In assessing the objection, the *Adelphia* court assumed that the government "will indeed distribute the value [received in settlement] as the unsecured creditors fear." *Id.* at 168. The *Adelphia* court further assumed that paying such equity holders before unsecured creditors under any plan of reorganization would violate the absolute priority rule.

Notwithstanding these assumptions, the *Adelphia* court overruled the objection of unsecured creditors. It noted that equity holders and other victims would not be sharing in assets of the estate under a plan. Rather, the victims would be "sharing in a fund to be created and owned by the Government, sharing in assets the Government would be obtaining as a consequence of the totality of its bargaining power in this case . . . . " *Id*. at 168-69. Thus, while the equity holder would have to satisfy the absolute priority rule when seeking to share in the

disgorgement or penalties. Said another way, the Debtors and NYAG could have settled in a way that would have not benefited the customers or in a way that would not potentially benefit DCG.

assets of the estate under a plan, that was not true for the process of the settlement.  *See id.*

Instead, the issue for settlement was a "rather easy one": whether the settlement of the

controversy between the government and the debtors was inappropriate or unlawful.  *Id.* at 169.

The *Adelphia* court noted that a similar conclusion had been reached in other cases.  *See id.*

(citing *In re WorldCom*, Case No. 02-13533 (AJG), ECF No. 8125 (Bankr. S.D.N.Y. Aug. 6,

2003)).

        This Court agrees with the framing of the issues set forth in the *Adelphia* decision.  The

question here is whether the NYAG Settlement Agreement reflects a reasonable compromise

between the parties in the litigation when considering all the *Iridium* factors, including "the

totality of [the Government's] bargaining power" here.  And like in *Adelphia*, NYAG is the party

that decides how its NYAG Settlement Agreement proceeds should be distributed.  *See id.* at

168-69 (holding that the process of the government distributing proceeds of a settlement was

removed from the process of distributing assets in a bankruptcy court and the requirements of the

absolute priority rule).  NYAG's decision to return all the funds it will receive to the customers is

neither surprising nor improper as it comports with the fundamental goal of NYAG in bringing

its lawsuit.  *See* NYAG Settlement Statement ¶ 1 ("The NYAG supports approval of the NYAG

Settlement Agreement because it helps the NYAG achieve a principal objective in these

proceedings—restitution to victims for the full amount of their losses as alleged in the NYAG's

amended complaint.").  Why would NYAG want the proceeds of the NYAG Settlement

Agreement to go to any party other than the customer victims?  To put an even finer point on the

question, why would NYAG want any settlement proceeds to be given to DCG, which is a

Defendant in the NYAG Action and a party that NYAG contends participated in the fraud

perpetrated on the customer victims here?  Indeed, the NYAG Settlement Agreement here

presents fewer concerns than the one in *Adelphia*.  In *Adelphia*, the victims were equity holders

who would recover—indirectly through the government—before unsecured creditors recovered

in full.  Thus, the equity holders who were the *Adelphia* victims were recovering under the

settlement notwithstanding that unsecured creditors were not paid in full and, therefore, could

argue that the settlement was inconsistent with the absolutely priority rule.  The opposite is true

here.  The NYAG Claims here—as well as any customer claims—are all unsecured claims in

these bankruptcy cases and thus are entitled to recover in full under the absolute priority rule

before any recovery to equity holder DCG.[50]

Admittedly, there is one specific factual wrinkle here that was not present in *Adelphia*:

the use of the Distribution Principles (as defined in the Plan) as a method for calculating the

amounts owed to individual customer victims.  But given the facts of this case, the Court finds

that there is nothing improper about NYAG deciding to use the Distribution Principles as the

method to calculate a fair and proper "in-kind" recovery owed to customer victims under their

lending contracts.  The Distribution Principles were, in fact, the result of extensive bargaining

among these very same customers in these bankruptcy cases, with the goal to arrive at an

appropriate compensation methodology when considering the differences among the contracts

that customers had with the Debtors.  *See, e.g.,* Committee Confirmation Mem. at 2 (describing

the Distribution Principles as "an arms'-length, hard-fought claims settlement between

substantially all customers and the Debtors . . . [that] fundamentally provides for the estates'

---

[50]      For this reason, the Court also rejects DCG's argument that the NYAG Settlement Agreement violates the
principles laid out in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).  The *Jevic* court held that when a case
filed under Chapter 11 of the Bankruptcy Code is dismissed, any distribution made in connection with that dismissal
must accord with the absolute priority rule set forth in the Bankruptcy Code.  *See id.* at 455.  The principles of *Jevic*
are not implicated given that the payments to the customers and NYAG—both of whom are unsecured creditors—
will occur before any payment can be received by DCG as an equity holder.  Moreover, as *Adelphia* makes clear, a
settlement under Rule 9019 does not necessarily implicate the absolute priority rule.  *See In re Adelphia*, 327 B.R. at
169; *see also In re Iridium*, 478 F.3d at 466 (noting that if a settlement in some way impairs the rule of priorities, the
parties must come before the bankruptcy court with specific and credible grounds to justify that deviation).

assets to be allocated equitably among customers, while capping their distributions at their full

contractual customer entitlements."). The adoption of the Distribution Principles by NYAG thus

resolves for New York State the difficult and complex question of restitution methodology, an

issue that NYAG would otherwise have to resolve before any victim could be compensated by

NYAG. The customers arrived at the Distribution Principles in these bankruptcy cases to avoid

just such a protracted and expensive fight on this question. It is eminently reasonable and proper

for NYAG to decide to use the methodology that has been agreed upon by the customers for

measuring the damages suffered as a result of the alleged fraud.

Indeed, in instances where alleged fraud occurs and there are bankruptcy proceedings as

well as proceedings where the government seeks restitution for victims, coordination and

consultation between the parties involved in the various litigations often takes place, as it should.

The most well-known of such instances of coordination are the cases involving Bernard Madoff,

which included the bankruptcy case of his broker-dealer entity and Mr. Madoff's criminal case.

But there are others. For example, the case of *Gowan v. Patriot Group, LLC (In re Dreier LLP),*

452 B.R. 391 (Bankr. S.D.N.Y. 2011), involved an individual convicted of conducting a Ponzi

scheme and his law firm used to perpetrate the fraud. Given the various overlapping legal

proceedings, the bankruptcy court approved a settlement agreement providing for coordination

between government entities entitled to forfeiture of the debtors' assets, the trustee in the

involuntary Chapter 7 case of the individual debtor and the trustee of the Chapter 11 case of the

estate of the debtor corporate entity. *See id.* at 414. In another instance in the same case, the

*Dreier* court found that the coordination agreement between the government and the trustees

"provide[d] substantial benefits," allowing trustees to pursue fraudulent transfer litigation

"without interference from the Government or competition with the forfeiture laws." *In re*

*Dreier*, 429 B.R. 112, 127 (Bankr. S.D.N.Y. 2010). In another case, a debtor was convicted of

securities fraud, bank fraud, and money laundering, and the government obtained an order

mandating the forfeiture of the debtor's assets. *In re Bennett*, 2007 WL 2480524 (Bankr.

N.D.N.Y. Aug. 28, 2007). Given the various different avenues for compensating the creditor

victims, the government and the trustee of the debtor's estates reached an agreement wherein the

government would recognize the trustee's superior rights to certain property based on the

trustee's role "as representatives of the victims and creditors" of the debtor. *Id.* at *2-*3 (Bankr.

N.D.N.Y. Aug. 28, 2007). Cooperation between a debtor and the government is not limited to

fraud schemes; agreements to resolve a government's claims against a debtor can also be found

in instances where a debtor is alleged to be liable for environmental damages. *See In re

ASARCO LLC*, 2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009) (approving a settlement

agreement between debtors and the government to resolve the government's claims for

environmental damage caused by the debtors). In *ASARCO*, the court found the settlement

reasonable because, among other things, the settlement "satisfactorily compensates the public for

the actual (and anticipated) costs of remedial and response measures" and "conserve[s] resources

for cleanup rather than for litigation and appropriately place[s] the fair burden of the cleanup

costs on the party that contributed to the hazardous waste problem." *Id.* at *43-*44. Notably,

the *ASARCO* court rejected the assertion that the agreement constituted a "*sub rosa*" plan

because the settlement did not "restrict creditors rights, dictate the terms of ASARCO's ultimate

plan of reorganization, or dispose of substantially all of the Debtors' assets." *Id.* at *48.

## II.    **Confirmation of the Plan**

### A.  *Settlement Among Creditors*

Central to the Plan are the Distribution Principles, which govern the distribution of the

Debtors' assets to creditors.  As already discussed above, the Distribution Principles embody a

settlement between the Debtors and the vast majority of their various creditor constituencies—

including the Committee, the Ad Hoc Group and the Ad Hoc Dollar Group.  The Distribution

Principles are a compromise of disparate positions among creditors, specifically those holding

U.S. dollar claims (who sought to value claims and make distributions based on Petition Date

valuations) versus those creditors holding cryptocurrency denominated claims (who sought to

value claims and make distributions based on values as of the date of distribution).  As discussed

above, the Distribution Principles incorporate five steps that establish the mechanics for claims

valuation, allocation and distribution of estate assets, and are intended to maximize in-kind and

like-kind distributions to unsecured creditors on a *pro rata* basis.  As is clear from the extensive

negotiations detailed above, the Distribution Principles are the result of hard-fought and arms'

length negotiations that took place over many months and resolve numerous difficult

intercreditor disputes regarding distributions under the Plan.[51]

DCG suggests that Rule 9019 is the inappropriate standard to use in consideration of the

Distribution Principles.  But courts have held that plan settlements of non-debtor claims are

---

[51]    There are numerous examples of the disagreements among creditor groups that arose during the long period of negotiations in the Debtors' cases.  For instance, at the beginning of the Debtors' cases, while members of the Ad Hoc Group representing claims of approximately $601 million signed onto the February Term Sheet, a number of other Ad Hoc Group members refused to do so and the February Term Sheet was ultimately abandoned.  *See* Aronzon Confirmation Decl. ¶ 17; Geer Confirmation Decl. ¶ 12.

In another example, while negotiating the Agreement in Principle with the Committee and DCG, the Debtors also continued to work on an amended plan in parallel.  *See* Aronzon Confirmation Decl. ¶ 46.  In response to input from the Ad Hoc Group and other creditors, the Debtors developed an amended plan that allowed creditors to express their preference for which plan the Debtors would pursue based on a majority of votes from claims across all classes: (a) a plan that would liquidate the Debtors' estates, distribute existing assets and provide for future distributions as outlined in the Agreement in Principle, or (b) an alternative plan that would liquidate the Debtors,

evaluated under the same standards that govern settlements under Bankruptcy Rule 9019.  *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (using standard for Rule 9019 in approving settlement of creditor's claim under a plan).  Section 1123 of the Bankruptcy Code explicitly states that a Chapter 11 plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate" and "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. §§ 1123(b)(3)(A), (b)(6); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) ("Courts analyze settlements under [S]ection 1123 by applying the same standard applied under Bankruptcy Rule 9019 . . . ."); *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to [S]ection 1123(b)(3)(A) of the Bankruptcy Code or pursuant to separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995)).  "Compromises are a normal part of the process of reorganization" and "are favored because they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Sabine*, 555 B.R. at 256 (internal citations and quotations omitted).

Applying the standards under Rule 9019 here, the Court finds that the Distribution Principles are fair and equitable, in the best interest of the Debtors' estate and an exercise of the

---

distribute existing assets and permit the commencement of litigation against DCG, with the distribution of funds recovered from such litigation to creditors (the "Creditor Choice Plan").  *See id.* ¶ 47.  Although initially received favorably, creditor sentiment towards the Creditor Choice Plan changed quickly and it became the focus of debate in October 2023 between the Committee, the Ad Hoc Group, an additional creditor group represented by Brown Rudnick LLP and the Debtors.  *See id.* ¶ 48.  Ultimately, the creditors express dissatisfaction with the approach of the Creditor Choice Plan and the Debtors were also unable to reach an agreement with DCG on the final terms of the debt facilities contemplated by the Agreement in Principle.  *See id.* ¶¶ 48-49.

Debtors' sound business judgment, and that the *Iridium* factors—previously set forth above—weigh conclusively in favor of approving the Distribution Principles.

As to the first and second *Iridium* factors, the Court finds that the Distribution Principles appropriately balance the possibility of success of any potential litigation between the parties and the future benefits against the likelihood of protracted and costly litigation.  The Debtors have sought a consensual plan from the earliest days of their Chapter 11 cases.  *See* Aronzon Confirmation Decl. ¶ 16.  As detailed above, this process involved months of continuous negotiations among the Debtors, DCG and the various creditor constituencies.  At the conclusion of these negotiations, it became clear to the Debtors that a global settlement with DCG was no longer possible and the Debtors then toggled to the current "no deal" plan structure.  *See* Aronzon Confirmation Decl. ¶¶ 18-33, 44-52.  Against that backdrop, the Debtors, the Committee and numerous creditor constituencies entered into the PSA based on the Debtors' prosecution of a plan reflecting the Distribution Principles.  *See generally Notice of Filing of Plan Support Agreement.*  The Distribution Principles clearly benefit the Debtors' estates by providing certainty in the Debtors' cases, paying creditors all the value in the estates, and resolving as consensually as possible the differing and diametrically-opposed creditor views in various untested areas of the law.  Moreover, the Distribution Principles reduce the number of parties and positions against which the Debtors would have to litigate in order to achieve a confirmable plan.

During negotiations, all creditors understood there were insufficient assets to fully compensate all creditors and each different group of creditors held strong views regarding the valuation of claims based on different asset classes, the entitlement to the appreciation of the assets that were held by the Debtors' estates, and the applicable law to resolve these and other

issues.[52]  Digital asset creditors initially sought full in-kind recoveries while U.S. dollar creditors sought to receive distributions in U.S. dollars on an expedited basis.  On the extremes of these positions, the Dollar Creditor Group argued that all claims should be "dollarized" as of the Petition Date and that it was entitled to share equally in any post-petition interest thereafter, while some crypto-denominated creditors argued that they were entitled to receive distributions based on the cryptocurrency values when distributed to creditors and to recover in full in-kind based on coin quantity at the same rate as all other creditors.  Still others—including CCAHG— claimed their claims were entitled to administrative expense priority on account of the appreciation of the assets held by the Debtors during the Chapter 11 cases because all appreciation was the result of such creditors having lent their cryptocurrency to the Debtors prepetition.

The Distribution Principles reflect a compromise that allows U.S. dollar creditors to receive near-term distributions that are funded in part by the monetization of certain digital assets, while digital asset creditors will receive "in-kind" distributions to the maximum extent possible.  Absent agreement on the mechanics for distribution of the Debtors' assets and valuation methodologies regarding creditors' claims, there would have been extensive, complex

---

[52]    For example, cryptocurrency denominated claimants have consistently framed their position in these cases as seeking a speedy return of their property.  *See, e.g.*, Hr'g Tr. 92:6-10 (Mar. 18, 2024) (counsel to Ad Hoc Group noting that "this court has the power to return to [creditors] their assets that have been withheld not only during this case but also for the two months prior to the commencement."); *id.* at 123:8-11 (counsel to Gemini noting that it believed "the plan represents the best and probably only realistic path forward for the creditors of Genesis writ large to get in-kind recoveries on the most expeditious basis possible."); *see also* Hr'g Tr. 86:13-16 (Feb. 26, 2024) (counsel to Gemini noting they "have 232,000 Earn users who have been . . . without their assets, like all the other claims in this case since November of . . . two years ago. . . .").  The Court has not been asked to rule upon any questions about the ownership of cryptocurrency assets in these cases, an issue that can be complex and contentious. *See In re Celsius Network LLC*, 647 B.R. 631, 651 (Bankr. S.D.N.Y. 2023) (holding that, based on the specific contracts at issue, the assets deposited in accounts with the debtors were property of the debtors' estates and account holders were unsecured creditors based on language of the terms of contract, which determined the rights and relationship between the debtors and their account holders); *cf. In re Miami Metals I, Inc.*, 634 B.R. 249 (Bankr. S.D.N.Y. 2021) (resolving a dispute as to who owned precious metals deposited by customers with the debtors).

and lengthy litigation regarding distribution of the Debtors' assets, with the resulting litigation costs reducing the amount available for creditor recoveries. Disputed issues include the nature of the Debtors' contracts with its creditors and the loaned assets under those contracts, the impact of Sections 502, 562 and other provisions of the Bankruptcy Code, and other issues. The disputes are complex and the outcome for any party is unknown. In addition to expense and uncertainty, litigation of these matters would cause delay. Such a delay is particularly of concern to all creditors here given the volatility of cryptocurrency prices. The cost of litigating such disputes would severely deplete estate assets without any guarantee of a commensurate benefit to creditors. All this weighs towards approval of the settlement. *See, e.g., In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) (first factor satisfied where conflicting case law made the outcome of litigation uncertain); *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 160 (Bankr. S.D.N.Y. 2005) (approving settlement where "[the debtor] faces litigation risks of extraordinary magnitude" and "[t]he Settlement Agreements provide the Debtors with certainty").

The third and fourth *Iridium* factors—the paramount interest of creditors and whether creditors and other parties support the settlement—also weighs in favor of approval of the Distribution Principles. To begin with, the Distribution Principles are the result of extensive negotiations between the PSA Creditors—including those represented by the Ad Hoc Dollar Group and the Ad Hoc Group—collectively holding more than $2.1 billion in claims, the Debtors, and the Committee, which is statutorily tasked with advancing the collective interest of all unsecured creditors. *See* Aronzon Confirmation Decl. ¶¶ 11-12, 16, 18-19, 21-22, 26-27, 29-31, 35, 44-46, 52-53, 55, 57-58; Geer Confirmation Decl. ¶¶ 9-10, 16-17, 19, 25-26. As a result of the parties' exhaustive and good faith negotiation efforts, the Plan and the Distribution Principles have the support of the vast majority of every class of cryptocurrency and U.S. dollar

creditors.  Specifically, the Plan has received the affirmative vote of greater than 80% of every single voting class.  *See* Orchowski Voting Decl.; *In re NII Holdings, Inc.*, 536 B.R. 61, 120 (Bankr. S.D.N.Y. 2015) (holding that the fourth *Iridium* factor was satisfied where "the Plan received overwhelming approval from every impaired class of creditors, all of whom will be affected by the Settlement.").  This includes the class of Gemini Earn Users, which is comprised of approximately 232,000 retail customers holding an aggregate of approximately $1.05 billion in asserted claims.  *See generally* Orchowski Voting Decl.  Indeed, all but a very small handful of customers (i.e., members of CCAHG) have made clear their strong approval of the Distribution Principles.[53]

The Court also finds that approval of the Distribution Principles is in the paramount interests of creditors.  The parties have brokered an agreement that compromises the extreme positions that were held by the various creditor constituencies and also reflects the principles and purpose of the Bankruptcy Code to maximize recoveries to creditors.  This compromise clearly benefits the Debtors' estates and their stakeholders.  Approval of the Distribution Principles will also enable the Debtors to emerge from Chapter 11 in an expeditious manner and begin making distributions to creditors that have anxiously been awaiting the return of the assets they loaned to the Debtors since November 2022.

---

[53]     CCAHG has not objected to the Distribution Principles as giving creditors too much, but rather use them as setting a floor for recovery of their members.  *See, e.g.,* Hr'g Tr. 212:4-215:21 (Mar. 18, 2024) (closing argument of counsel to Committee).  As the Committee has pointed out, CCAHG has prosecuted its objection only to seek an even greater recovery than set forth in the Distribution Principles, all the while knowing that the Distribution Principles serve as a floor for their recoveries.  *See id.* 215:14-19 (counsel to the Committee observing that CCAHG's position "just seems like then it's a free option.  Why don't you create some new interesting law for me to use in other cases and I will then decide whether or not I want the distribution principles or I want to be treated as something unlike any other creditor in the case . . . .").

The fifth and the seventh *Iridium* factors,[54] the competency and experience of counsel

and the extent to which the settlement was the product of arms' length bargaining, support

approval of the Distribution Principles.  There is no dispute that all sides—including the Debtors,

the Ad Hoc Group, the Committee and the Ad Hoc Dollar Group—are represented by highly

experienced and competent bankruptcy and litigation counsel with decades of experience in

complex Chapter 11 cases.  Moreover, the settlement is clearly the product of arms' length

negotiations, as is clear from the history of the extensive and complex negotiations and the

disparate positions taken by the parties.  As with its argument regarding the NYAG Settlement

Agreement, DCG suggests that it was wholly excluded from discussions regarding formulation

of the Plan.  But that contention is flatly refuted by the record.  In fact, DCG was involved in

extensive negotiations with the Debtors, the Committee and various creditor constituencies both

pre- and post-petition, regarding resolution of the parties' disputes, and was in fact one of the key

parties to the mediation that took place in these cases.  *See* Aronzon Confirmation Decl. ¶¶ 11-

12, 16; 19, 21-23, 25-27, 29-31, 38-39, 44-46, 52-53, 55, 57-58; Geer Confirmation Decl. ¶¶ 9,

10, 16-19, 26; *see also* Hr'g Tr. 212:1-4  (Feb. 26, 2024) (Mr. Aronzon testifying that "DCG has

been involved daily, weekly, monthly.  They're well-represented, they have great financial

assistance, they're very smart guys and they climbed all over every issue in this case and then

some.").  That DCG was ultimately unable to reach an agreement with the parties-in-interest

does not mean that it was not at the bargaining table.  The parties ultimately went a different

route given the developments in these cases and motivated by, among other things, the filing of

the NYAG Action and its impact on DCG's ability to perform under any settlement that might be

---

[54]        The Court finds the sixth *Iridium* factor irrelevant, as the Distribution Principles do not independently
provide for releases of officers and directors of the Debtors.

reached with the Debtors.  *See* Aronzon Confirmation Decl. ¶ 51; Geer Confirmation Decl. ¶¶

24-25.[55]

DCG's other objection is that the Distribution Principles improperly provide creditors

with too much return at the expense of DCG, as the Debtors' equity holder.  This argument

implicates the issue of DCG's standing, a topic to which the Court now turns.[56]

### B.  DCG's Standing to Object to the Distribution Principles

The Plan Proponents contend that DCG lacks standing to pursue its objections to the

Distribution Principles because DCG is out of the money and thus will not receive a recovery

under the Plan.  DCG disagrees, arguing that they are a party in interest, have a financial stake in

the outcome here and interests that are affected by the Plan.

"[S]tanding is the threshold question in every federal case, determining the power of the

court to entertain the suit."  *In re Gucci,* 126 F.3d 380, 387-88 (2d Cir. 1997) (internal citation

and quotations omitted); *see also Breeden v. Kirkpatrick & Lockhart, LLC*, 268 B.R. 704, 708

(S.D.N.Y. 2001) ("Standing . . . is a threshold issue in all cases since putative plaintiffs lacking

standing are not entitled to have their claims litigated in federal court.") (internal citation

---

[55]    As with the NYAG Settlement Agreement, the Court rejects DCG's argument that the settlement embodied in the Distribution Principles violates the principles laid out in *Czyzewski v. Jevic Holding Corp*., 580 U.S. 451 (2017). *Jevic* specifically related to the phenomenon of class skipping, holding that when a case filed under Chapter 11 of the Bankruptcy Code is dismissed, any distribution made in connection with that dismissal must accord with the absolute priority rule set forth in the Bankruptcy Code. *Id*. at 455.  As noted above, the principles of *Jevic* are not implicated by the payment scheme set forth in the Distribution Principles, which provide principles for the recoveries of unsecured creditors before any payment can be received by DCG as an equity holder.

[56]    Even if DCG had standing to challenge the Distribution Principles, it has repeatedly been held that where large claim holders oppose a settlement, it may still be approved when—as is true here—it is in the "best interests of the estate as a whole." *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (even when the "largest independent claimholders" objected to a settlement, that objection "cannot be permitted to predominate over the best interests of the estate as a whole."); *see also Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l.), Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("[T]he overriding consideration is the [s]ettlement's benefits to the creditor body."); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("[A] debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors[] weigh[] in favor of settlement.").

omitted).  When a plaintiff lacks standing to bring a suit, the court does not have subject matter

jurisdiction to hear their claim.  *See Cent. States Southeast & Southwest Areas Health & Welfare

Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (internal

citations and quotations omitted); *see also* Fed. R. Civ. Pro. 12(b)(1).  A court must therefore

determine a plaintiff's standing to bring its claims prior to reaching the merits of a case.  *See

Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88 (1998).

Section 1128(b) of the Bankruptcy Code provides that "part[ies] in interest may object to

confirmation of a plan."  11 U.S.C. § 1128(b).  Additionally, Section 1109(b) of the Bankruptcy

Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee,

an equity security holders' committee, a creditor, *an equity security holder*, or any indenture

trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11

U.S.C. § 1109(b) (emphasis added).  But while Section 1109(b) "grants a broad right to all

parties in interest to participate" in a matter brought before the Court, a party in interest "must

still satisfy the general requirements of the standing doctrine", including "both constitutional

limitations on federal-court jurisdiction and prudential limitations on its exercise."  *In re Quigley

Co.*, 391 B.R. 695, 702-03 (Bankr. S.D.N.Y. 2008) (internal citations and quotations omitted);

*see also Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 92

(S.D.N.Y. 2010) ("[S]ection 1109(b) of the Bankruptcy Code does not satisfy or replace the

constitutional and prudential limitations on standing.").

Constitutional standing, otherwise known as Article III standing, "'imports justiciability:

whether the plaintiff has made out a 'case or controversy' between himself and the defendant

within the meaning of Art. III.'"  *In re Quigley*, 391 B.R. at 702 (quoting *Warth v. Seldin*, 422

U.S. 490, 498 (1975)).  A court must consider "'whether the plaintiff has 'alleged such a

personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *Id.* (quoting *Warth*, 422 U.S. at 498–99); *accord Singleton v. Wulff,* 428 U.S. 106, 112 (1976) (The first question in the standing inquiry is "whether the plaintiff-respondents allege 'injury in fact,' that is a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction"). "It is well settled that as an irreducible constitutional minimum, Article III standing requires that: (1) the plaintiff suffer an injury in fact; (2) the injury be fairly traceable to the challenged conduct; and (3) the injury will likely be redressed by a favorable decision from the court." *In re Motors Liquidation*, 430 B.R. at 92 (internal citations and quotations omitted). "An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted).

Additionally, a litigant must demonstrate prudential standing, in that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *In re Quigley*, 391 B.R. at 702 (quoting *Warth*, 422 U.S. at 499). Courts should therefore hesitate before resolving a controversy on the basis of a third party's rights that are not involved in the litigation.[57] *See id.* (citing *Singleton*, 428 U.S. at 113). "Prudential limitations on standing play an especially important role in bankruptcy proceedings

---

[57]    The reasons for this are twofold:

> First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not . . . . Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them. The holders of the rights may have a like preference, to the extent they will be bound by the courts' decisions under the doctrine of [s]tare decisis.

*In re Quigley*, 391 B.R. at 702 (quoting *Singleton*, 428 U.S. at 113-14).

[since] [b]ankruptcy is often a zero-sum game in which every creditor may be affected by a

dispute involving the estate and a third party. *In re Quigley*, 391 B.R. at 702-03 (citing *Kane v.*

*Johns–Manville Corp. (In re Johns–Manville Corp.),* 843 F.2d 636, 644 (2d Cir. 1988)).  This is

because

> [p]roceedings would quickly grind to a halt if the court had to hear every party on
> every issue . . . 'Overly lenient standards may potentially over-burden the
> reorganization process by allowing numerous parties to interject themselves into
> the case on every issue, thereby thwarting the goal of a speedy and efficient
> reorganization . . . . Granting peripheral parties status as parties in interest thwarts
> the traditional purpose of bankruptcy laws which is to provide reasonably
> expeditious rehabilitation of financially distressed debtors with a consequent
> distribution to creditors who have acted diligently.'

*In re Quigley*, 391 B.R. at 702-03 (quoting *Krys v. Official Committee of Unsecured Creditors of*

*Refco Inc. (In re Refco, Inc.)*, 505 F.3d 109, 118 (2d Cir. 2007)).

       As a consequence, Section 1109(b) "has been interpreted to mean 'that anyone who has a

legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert

that interest with respect to any issue to which it pertains'" and a party in interest is still required

to meet the standing requirements. *In re Quigley*, 391 B.R. at 703 (quoting *In re James Wilson*

*Assocs.,* 965 F.2d 160, 169 (7th Cir.1992) (Posner, J.)); *see also Savage & Assoc., P.C. v. Mandl*

*(In re Teligent, Inc.)*, 417 B.R. 197, 2010 (Bankr. S.D.N.Y. 2009) (in discussing Section 1109(b),

stating that "a party must show that it has 'a direct financial stake in the outcome of the case.'")

(quoting *Doral Ctr., Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812,

814 (S.D.N.Y. 1997)).  But importantly, while "[a] party in interest may object to confirmation

of a plan [under Section 1128(b) of the Bankruptcy Code], it cannot challenge portions of the

plan that do not affect its direct interests." *In re Quigley*, 391 B.R. at 703;[58] *see also In re Johns-*

---

[58]        Standing plays out in a variety of ways in a confirmation context depending on the facts of a given case.
*See, e.g., Greer v. Gaston & Snow (In re Gaston & Snow),* 1996 WL 694421, at *7 (S.D.N.Y. Dec. 4, 1996) (stating
that creditor that had not argued he would receive more in a Chapter 7 liquidation than under a proposed plan had no
standing to object to the plan based on the contention that it violated the "best interest of the creditors" test as to

*Manville Corp.*, 68 B.R. 618, 623–24 (Bankr. S.D.N.Y. 1986) ("The doctrine of standing serves

to protect the adversarial system which constitutes the cornerstone of American judicial process.

Pursuant to this system, courts generally will only hear the arguments of parties who have a

direct stake in the consequences of a proceeding.  Thus a party who is not directly "aggrieved"

by the construction of a provision of the Plan would lack the requisite standing to be heard."); *In

re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 721 (Bankr. S.D.N.Y. 1992) (holding that

where equity in a Chapter 11 debtor was worthless, an equity holder had "no stake" in a

controversy that had been settled amongst the creditors that did).  Thus, the Court "must assess

whether [a party] has standing not just to raise a general objection to an order, but whether

appellant has standing to advance specific arguments in opposition to that order."  *In re Motors

Liquidation*, 430 B.R. at 92 (citing *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),*

843 F.2d 636, 642–43 (2d Cir. 1988) (holding that, under the prudential standing doctrine,

appellant had standing to raise only certain of his challenges to an order confirming a plan)); *see

also In re Quigley*, 391 B.R. at 705 (citing cases for proposition that "the court should decide

questions of standing, particularly, in multi-party, multi-issue confirmation proceedings, on an

issue-by-issue basis.").  Courts have also held that standing cannot be established where an

---

other creditors); *EFL Ltd. v. Miramar Resources, Inc. (In re Tascosa Petrol. Corp.),* 196 B.R. 856, 863 (Bankr. D. Kan. 1996) (stating that prudential standing limitations prevented a Class 5 creditor from challenging portions of a reorganization plan that did not affect its direct interests and from asserting the rights of a Class 4 under the plan); *In re Evans Prods. Co.,* 65 B.R. 870, 874 (S.D. Fla. 1986) (debtors "have standing only to challenge those parts of a reorganization plan that affects their direct interests" and lack standing "to raise the rights of wrongly classified creditors as a means to attack the overall reorganization plan" that had been proposed by a lender); *In re Simplot,* 2007 WL 2479664, at *10 (Bankr. D. Idaho Aug.28, 2007) (stating that "parties may not assert confirmation objections that relate solely to others, or that go to issues that do not directly and adversely affect them pecuniarily" and limiting standing of entity in which debtor owned stock to specific plan confirmation issues, while rejecting standing to raise others); *In re Orlando Inv., L.P.,* 103 B.R. 593, 596–97 (Bankr. E.D. Pa. 1989) (objectors could not challenge plan releases that only affected other interest holders, stating that "it is difficult to see how the rights of the objectors have been adversely affected by the inequality of treatment proposed by th[e] plan, and difficult to accord them standing to raise this issue."); *In re Johns-Manville Corp.,* 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 843 F.2d 636, 644 (2d Cir. 1988).

objecting party's recoveries are based on remote and hypothetical redressability. *See In re SRC Liquidation LLC*, 2019 Bankr. LEXIS 2851, at *10-*14 (Bankr. D. Del. Sept. 12, 2019) (holding an unsecured creditor did not have standing because, among other reasons, its requested relief would require the creditor to "jump several lofty hurdles to even approach the chance to receive . . . proceeds").

Applying all of these principles here, the Court finds that DCG lacks standing to challenge the Distribution Principles. In short, they have no direct economic interest in the manner in which value is being distributed under this Plan. Given the size and composition of the Debtors' claims pool, DCG cannot establish that modifying the Distribution Principles in the manner that it suggests would result in any recovery for DCG's equity interests, or otherwise redress DCG's asserted injury.

DCG lacks standing because the Debtors are insolvent, as their liabilities significantly exceed their assets. *See* 28 U.S.C. § 3302(a) (a debtor is insolvent where the "sum of the debtor's debts are greater than all of the debtor's assets at a fair valuation."); Sciametta Confirmation Decl. ¶ 15. As of January 31, 2024, the Debtors' assets were valued in the aggregate at approximately $3.3 billion, an amount not in dispute. *See Notice of Filing of Cash and Coin Report* [ECF No. 1407]. This amount is clearly dwarfed by the Debtors' liabilities. As of December 31, 2023, claims asserted against the Debtors that were denominated in Digital Assets range from approximately $4.75 billion to $5.4 billion, based on the U.S. dollar equivalent as of such date.[59] *See* Sciametta Confirmation Decl., Ex. 1.[60] In addition, various

---

[59] The term "Digital Asset" is defined in the Plan as "a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including Stablecoins, digital coins, and tokens, such as security tokens, utility tokens, nonfungible tokens, and governance tokens." Plan, Article I(A)(66).

[60] The Ad Hoc Group filed a master proof of claim consisting of claims denominated in U.S. dollars as well as claims denominated in digital assets. *See* Claim No. 447, Addendum, Ex. A.

governmental units filed claims against the Debtors at least $32 billion, an amount that by itself far exceeds the Debtors' assets that are available for distribution. *See* Governmental Proofs of Claim, JX-094; Sciametta Confirmation Decl. ¶ 15 (stating that the amount of claims asserted by governmental entities by itself far exceeds the amount of assets available for distribution in the Debtors' estates). This figure does not include an additional $2 billion that NYAG asserted in its Amended Complaint filed in the NYAG Action. *See* Debtors' Settlement Reply ¶ 15; *see generally* NYAG Amended Compl.[61] Both claims denominated in Digital Assets and governmental claims have priority over DCG's equity interests in the Debtors, and they would receive distributions before any distributions to equity could be made.

As against these stark numbers, DCG raises several arguments. First, DCG argues that many of the governmental claims are duplicative. But even if the potential duplicate claims of the governmental entities were excluded, the total liquidated amount of governmental unit claims would still be over $11 billion, even without counting the unliquidated amounts of those claims or the full amount of the NYAG Claims in the NYAG Amended Complaint (which included an additional $2 billion in liabilities). *See* Governmental Proofs of Claim, JX-094; Hr'g Tr. 162:22-163.22, Feb. 27, 2024 (J. Sciametta). Standing alone, these governmental claims would exceed the Debtors' assets many times over. DCG has not objected to any of these governmental claims.[62] The Court finds that, when compared to the Debtors' assets, these liabilities pose an

---

[61] Additionally, certain of the governmental unit claims asserted both liquidated and unliquidated amounts. *See, e.g.*, JX-094, Claim Nos. 768, 769, 770, 889, 891, 893 [GENESIS_DCG_CONF_00000024-00000047; 00000295-00000307; 00000321-00000333; 00000347-00000359]; Hr'g Tr. 154:7-10, Feb. 26, 2024 (J. Bernstein, counsel to the New Jersey Bureau of Securities) ("[T]here is a restitution claim in the Bureau's claim, but it's simply not liquidated. It's the penalty claim that was 8.5 billion.").

[62] While DCGs contends that neither the Debtors' nor the Committee's financial advisors analyzed the government claims, this is contradicted by the record. *See* Hr'g Tr. 222:13–223:1, Feb. 26, 2024 (P. Aronzon) (discussing the Plan's treatment of government claims); Hr'g Tr. 215:17-18, Feb. 27, 2024 (B. Geer) (confirming that although he personally did not review the governmental proofs of claim, "BRG, and counsel for the Committee have looked at the claims as well.").

insurmountable hurdle to equity receiving a recovery in these cases.[63]  This is true even if the

Court were to adopt DCG's arguments regarding the valuation of customers' claims under the

Distribution Principles.  While DCG argues that, under its calculations, the Debtors' estates hold

"Excess Value" of $2.497 billion above what is needed to compensate the Debtors' customers in

this case, this is not nearly enough to meet the over $11 billion in governmental claims that sit in

priority above DCG's equity under the absolute priority rule.  *See* Verost Settlement Decl. ¶ 4;

*see also* Verost Confirmation Decl. ¶¶ 7-8; Governmental Proofs of Claim, JX-094; Hr'g Tr.

162:22-163.22, Feb. 27, 2024 (J. Sciametta).

---

[63]      DCG argues that the value of the Debtors' assets are subject to significant fluctuation in the future and may continue to increase.  But such fluctuations are hypothetical.  There is nothing in the record to suggest that it is remotely possible to have the kind of increase necessary to put DCG in the money.  At a constitutional minimum, Article III standing requires an injury in fact that is "(a) concrete and particularized, and (b) actual or imminent, *not conjectural or hypothetical*."  *In re Motors Liquidation*, 430 B.R. at 92 (internal citations and quotations omitted).  The Court cannot put confirmation on hold indefinitely to see what happens to the price of cryptocurrency.  In fact, the price could just as easily decrease.  Indeed, the price of Bitcoin has recently decreased from its historic highs.  *See* Hr'g Tr. 35:4-8 (Apr. 16, 2024) (counsel to the Debtors noting that Bitcoin has dropped from historic high in mid-March of $73,000 per bitcoin to $62,000 per bitcoin as April 16, 2024).  Moreover, the Debtors have begun to divest from their cryptocurrency holdings to reduce the risks with respect to creditor recoveries, thus moving to fix the value of the Debtors' assets.  *See, e.g., Order (I) Authorizing, But Not Directing The Sale of Trust Assets and (II) Granting Related Relief* [ECF No. 1314]; Hr'g Tr. 36:24-37:5 (Apr. 16, 2024) (counsel to the Debtors noting that they were doing a rebalancing of assets and were monetizing digital assets to dollars).

DCG points to the testimony of Paul Aronzon to support an argument for the hypothetical possibility of distributions to equity in the Debtors' cases.  *See, e.g.,* Hr'g Tr. 204:19-25 (Feb. 26, 2024) (Mr. Aronzon testifying that "if the price comes down on crypto—and remember, there are other assets in this estate—there's cash, which will be distributed probably pretty quickly, there are litigation claims and there's a billion-one note.  Depending on the value of those assets and the value of crypto, you could hit a point where a distribution gets made and that is the last distribution that Creditors get.");  *id.* at 207:11-22 (Mr. Aronzon stating that "[i]f crypto prices drop, and I don't know the level they have to drop to—and the other assets are monetized or valuable, including the litigation recoveries, you'd probably hit an endpoint on the claims being paid.  And if there was anything left after that, yes, it would flow down.").  It is true that the Plan has a waterfall built into the distribution of funds and that it is possible for value to flow down the waterfall and recoveries to be received by classes below those of general unsecured creditors.  *See* Hr'g Tr. 229:2-4 (Feb. 26, 2024) (Aronzon testimony); Hr'g Tr. 207:12-18 (Mr. Aronzon testifying that if crypto prices drop, and in light of the other assets in the estate, there could be a scenario in which value flows to creditors that have lower priority than general unsecured creditors).  But once value would flow down past general unsecured creditors, it would reach the subordinated unsecured creditors that consist of the governmental claims discussed above.  Those subordinated unsecured claims number over $11 billion.  The idea that equity could currently receive a recovery on the record presented to the Court is a distortion of Mr. Aronzon's testimony and the Court does not view his testimony as inconsistent with the conclusion that DCG does not have standing with respect to the Distribution Principles.  *Cf.* Aronzon Confirmation Decl. ¶¶ 127-28 ("I understand that DCG . . . is not entitled to any recovery under the Plan unless all Allowed Claims against all of the Debtors or the Wind-Down Debtors, as applicable, have been paid in full in accordance with the Distribution Principles . . . . I also understand DCG's equity interest is at the end of the priority scheme, with no Class below it.").

Second, DCG suggests that it may someday object to these governmental claims in the future, presumably suggesting that the claims may turn out to be much smaller. But the relevant time to ascertain DCG's standing is at the time of confirmation. As of the confirmation hearing, no such objections have been filed to any of the governmental proofs of claim. Based on the evidentiary record before the Court, therefore, such claims are presumed valid and allowed for purposes of confirmation in their asserted amounts under Section 502(a), which provides that a filed proof of claim or interest is deemed allowed absent an objection by a "party in interest". *See* Sciametta Confirmation Decl. ¶ 15; 11 U.S.C. § 502(a); *see also In re LATAM Airlines Grp. S.A.*, 2023 WL 3574203, at *3 (Bankr. S.D.N.Y. May 19, 2023) ("But even where a party in interest objects [to a claim], the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b).") (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007). Indeed, DCG has had ample time to file any such objections. The bar date for governmental entities was July 18, 2023. *See Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* ¶ 4(d) [ECF No. 200] (the "Bar Date Order"). All the governmental claims were filed by that date. That left DCG with approximately eight months to take action on these claims before the confirmation hearing. It never did.[64]

---

[64] At closing, DCG contended that it lacked sufficient information to object to these claims. *See* Hr'g Tr. 149:19-150:6 (Mar. 18, 2024). Such a contention rings hollow given DCG's knowledge of and involvement in the Debtors' business. Indeed, DCG and its CEO are Defendants in the NYAG Action for that reason. Even if DCG lacked information, however, that is no excuse. The Bankruptcy Code provides tools to obtain information about a debtor's assets and liabilities, including confirmation discovery and also information gathering under Bankruptcy Rule 2004. *See* Fed. R. Bankr. P. 2004(b) (allowing examination of "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. In . . . a reorganization case under chapter 11 of the Code . . . , the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or

The Court's conclusion on standing is only further confirmed by the approval of the

NYAG Settlement Agreement. The NYAG Claim sought more than $1.1 billion against each of

the Debtors, and an additional $2 billion was asserted by NYAG in its Amended Complaint filed

in the NYAG Action. *See* Governmental Proofs of Claim, JX-094; Debtors' Settlement Reply ¶

15; *see generally* NYAG Amended Compl. Under the NYAG Settlement Agreement, the

NYAG Claims are allowed as general unsecured claims to be paid after the payment of customer

claims but before any payment to equity. *See* NYAG Settlement Motion ¶¶ 1, 3.[65] In addition to

NYAG, several other governmental entities—including the Securities and Exchange

Commission, the Texas Department of Banking, the Texas Securities Board and the New Jersey

Bureau of Securities—have similarly agreed to subordinate their claims to the full in-kind

recoveries of other general unsecured creditors.[66] But while the governmental claimants have

---

property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given
or offered therefor, and any other matter relevant to the case or to the formulation of a plan."). DCG never sought
any information about these governmental claims or raised any issues as to them at any of the numerous hearings in
these cases, despite DCG's active involvement in these cases since they were filed. Bankruptcy courts are often
asked to address claims or adversary proceedings that must be resolved before confirmation, often on an expedited
basis. *See, e.g., In re AMR Corp.*, 477 B.R. 384 (Bankr. S.D.N.Y. 2012) (consideration of request to abrogate union
collective bargaining agreement under Section 1113 of the Bankruptcy Code prior to consideration of plan
confirmation); *In re AMR Corp.*, 478 B.R. 599 (Bankr. S.D.N.Y. 2012) (same). Indeed, the Court was asked to do
so here, but not as to these governmental claims. *See Genesis Global Holdco, LLC v. Genesis Global Capital, LLC*,
2024 Bankr. LEXIS 303, at *3 n.6 (Bankr. S.D.N.Y. Feb. 7, 2024) (noting that at Debtors' urging, the Court
expedited consideration of the issues in the decision because the claims had a direct bearing on creditor recoveries
under the Debtors' plan of reorganization, which was scheduled for confirmation shortly).

[65]    Perhaps for this reason, DCG at one point conceded that approval of the NYAG Settlement Agreement
would render its confirmation objections moot. *See* Hr'g Tr. 118:3–10 (Feb. 28, 2024) (J. Polkes, Counsel to DCG);
*Letter to the Honorable Sean H. Lane Regarding Request for Emergency Chambers Conference Regarding Debtors'
Material Motions and Motions to Shorten Notice*, ECF No. 1279 ("[I]f the Court approves the Debtors' agreement
with the NYAG as set forth in the NYAG Motion . . . [t]his would render moot the key disputed issue teed up for
this Court's consideration at the Confirmation Hearing . . . ."). DCG later changed its view, making this ruling
necessary. *See, e.g.,* Hr'g Tr. 141:16-24, 142:16-24 (Mar. 18, 2024).

[66]    *See Order Approving a Settlement Agreement Between Genesis Global Capital, LLC and the U.S.
Securities and Exchange* Commission [ECF No. 1467]; *Stipulation and Order between the Debtors and the Texas
State Securities Board and the Texas Department of Banking* [ECF No. 1469]; *Stipulation and Order by and
between the Debtors and the New Jersey Bureau of Securities* [ECF No. 1468].

subordinated their unsecured claims to the unsecured claims of the Debtors' customers, these governmental claims still recover before DCG as equity holder.[67]

Third, DCG seeks standing based on the testimony of its expert Adam Verost, who testified that the Debtors' estates currently hold "Excess Value" of $2.497 billion above what is needed to compensate the Debtors' customers in this case. *See* Verost Settlement Decl. ¶ 4; *see also* Verost Confirmation Decl. ¶¶ 7-8. In reaching his opinion, Mr. Verost relied upon the information supplied by the Debtors but changed one fact: he valued the customer claims in U.S. dollars as of the Petition Date, rather than valuing them under the Distribution Principles.

But Mr. Verost's conclusion suffers from a fatal flaw. He admits that he did not at all account for the more than $11 billion in unobjected to government claims. *See* Hr'g Tr. 238:21-25, 249:8-9 (Feb. 27, 2024) (Mr. Verost. Q: "And in Footnote 3, you state, the record currently available is incomplete with respect to the government penalty claims class. As such, I do not address them in this declaration. That's what you testified to. Correct?" A: "Yes, that's what is in Footnote 3."); Hr'g Tr. 226:10-227:3 (Feb. 27, 2024) (A. Verost); 242:4-10 (Feb. 27, 2024) (Mr. Verost, acknowledging his deposition testimony, Q: "Do you think that the proofs of claims filed by the government penalty claims class are relevant the facts asserted in your declaration [?]" A: "My declaration does not address the government penalty claims class, so no, I do not think they are relevant."); 229:10-13 (Feb. 27, 2024) (A. Verost); *see also* JX-094. Specifically, Mr. Verost testified that he did "not address the government penalty claims," and had not "tried to consider the plan" currently on file "or tried to phrase it" in terms of whether the Debtors have sufficient assets to provide creditors' full in-kind recoveries as contemplated by the Distribution

---

[67]     Given the economics here, the governmental entities holding in excess of $11 billion in subordinated claims would have standing to assert that the customers are recovering too much. But as the governmental entities who hold the subordinated claims are focused on customer victims receiving restitution to the fullest extent possible, the governmental claimants are not objecting.

Principles.  *See* Hr'g Tr. 242:21-23, 248:5-11 (Feb. 27, 2024) (A. Verost); Geer Confirmation

Decl. ¶ 28 (describing the fact that the Debtors do not possess enough coins to pay back creditors

who lent cryptocurrency in-kind).  Indeed, he did not even account for the NYAG Claims or the

NYAG Settlement Agreement, now approved by this Court.  The total value of these

governmental claims far exceeds—several times over—the purported excess value that he

contends exists.  A chart used as a demonstrative in the Committee's closing presentation—and

supported by the evidentiary record—illustrates the total governmental proofs of claim that have

been filed against the Debtors, excluding duplicative claims, and includes both liquidated and

unliquidated amounts.  *See* JX-94; UCC Closing Demonstrative at 8.  That chart sets forth claims

in excess of $11.2 billion.  Mr. Verost does not provide any basis for excluding these

governmental claims from his calculus, nor is the Court aware of any legitimate reason for doing

so.[68]

The evidentiary record here establishes that the Debtors are insolvent.  But it is not clear

that DCG would have an argument even if Debtors were solvent.  As equity, DCG can only

recover if these bankruptcy cases are the rare instance where sufficient assets exist to pay all

creditors in full.  But under that circumstance, these cases would be subject to the solvent debtor

exception.  *See In re PG&E Corp*., 46 F.4th 1047, 1051, 1053 (9th Cir. 2022), *cert. denied sub*

*nom. Pac. Gas & Elec. Co. v. Ad Hoc Comm. of Holders of Trade Claims*, 143 S. Ct. 2492

(2023) (describing a solvent debtor as an "oddity" but noting that the solvent debtor exception is

triggered when that rare situation occurs); *see also In re LATAM Airlines Grp. S.A*., 55 F.4th 377,

387 (2d Cir. 2022), *cert. denied sub nom. TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*,

---

[68]    Mr. Verost also assumes—without explanation—that the Debtors' customers are not entitled to receive
payment in cryptocurrency as set forth in their contracts.   This conclusion once again ignores the NYAG
Settlement, which provides for restitution relief here, including the return of the cryptocurrency lent to the Debtors
by customers consistent with their contracts.

143 S. Ct. 2609 (2023) (stating that when a plan will return value to equity, the solvent debtor

exception is triggered). Some courts have concluded that, under the solvent debtor exception,

unsecured creditors are entitled to the full contractual benefit of their bargains before equity can

recovery anything. *See Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524,

528 (7th Cir. 1986) (in a case where the debtor is solvent, "the task for the bankruptcy court is

simply to enforce creditors' rights according to the tenor of the contracts that created those

rights."); *see also Off. Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow

Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("[A]bsent compelling equitable

considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the

creditors' contractual rights."). Applying that principle here would mean that the customers who

lent their cryptocurrency to the Debtors are entitled to return of the cryptocurrency in full with

interest before DCG could receive a single cent. *See* Geer Confirmation Decl. ¶ 13, Ex. A, B

(terms of the MLA requiring that the Debtors return "Digital Currency of the same quantity and

type as the Digital Currency" that had been loaned). Notably, no party—not even DCG—

contends that there is sufficient value here to accomplish that goal and have any value left over

to distribute to equity. *See* Hr'g Tr. 103:23-104:5 (counsel for DCG stating "what [the Debtors

are] seeking to do is effectively reinstate [the contracts with their customers] and they can't do it

. . . . But they can't reinstate here. They don't have the coin.").[69]

Fourth and finally, even to the extent that there were no governmental claims to bar

DCG's standing, DCG could not assert an objection based on Section 502(b) unless it had

---

[69]     To be clear, the exact contours of the solvent debtor exception are subject to debate. *Compare In re The Hertz Corp.*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (holding that unimpaired creditors are only entitled to receive post-judgment interest at the federal judgment rate) *with In re Ultra Petroleum Corp.*, 624 B.R. 178, 203–04 (Bankr. S.D. Tex. 2020) (holding that creditors must receive post-petition interest at the contract rate). The Court need not parse the extent of the doctrine here having found that the Debtors are insolvent by billions of dollars.

presented a valid claim objection to the customer claims. *See* 11 U.S.C. § 502(b) ("*[I]f such objection to a claim is made*, the court, after notice and a hearing, shall determine the amount of such claim . . . .") (emphasis added). DCG has failed to present such a valid objection. The day prior to the start of the Evidentiary Hearing, DCG did file an objection to the customers' Digital Asset claims seeking to fix those claims at their dollarized value as of the Petition Date. *See Digital Currency Group, Inc. and DCG International Investments Ltd.'s Omnibus Claims Objection to Claims Against Debtors Based on Digital Assets Pursuant to 11 U.S.C. Sections 105(a), 502 and Fed. R. Bankr. P. 3007* [ECF No. 1382] (the "DCG Claims Objection"). But while the DCG Claims Objection is framed as an "omnibus" claims objection, it is both substantively and procedurally improper. It fails to comply with Rule 3007 of the Federal Rules of Bankruptcy Procedure, which does not provide for objections on the basis that claims are denominated in anything other than U.S. dollars. *See generally* Fed. R. Bankr. P. 3007(d).[70] Additionally, the DCG Claims Objection fails to comply with the procedural requirements for an omnibus objection under Rule 3007. *See* Fed. R. Bankr. P. 3007(e)(2),(6) (requiring that claims be listed "alphabetically, provide a cross-reference to claim numbers and, if appropriate, list claimants by category of claims" and "contain objections to no more than 100 claims."). Indeed, the DCG Claims Objection fails to state the number of claims to which it is objecting or identify the claimants and their claim numbers, though there are hundreds of claims denominated in Digital Assets that were filed against the Debtors.[71] Nor does DCG appear to have served the

---

[70]     *See id.* (setting forth the particular basis that may form the basis of an omnibus objection, including that the claims are duplicates, filed in the wrong care, amended, untimely, satisfied, in improper form, or about the amount for priority).

[71]     The DCG Claims Objection purports to rely on this *Court's Revised Order Pursuant to 11 U.S.C. 105(a) and Fed. R. Bankr. P. 3007 (I) Establishing Claims Objection and Notice Procedures, (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* [ECF No. 498] (the "Claims Objection Procedures") to object to the Digital Asset claims. *See* DCG Claims Objection ¶¶ 11-12. But the Claims Objection Procedures specifically

DCG Claims Objection on the claimants that are impacted.  Specifically, DCG did not file an

affidavit of service on the docket with respect to the DCG Claims Objection, and failed to serve

each of the affected claimants.  *See* Bankruptcy Rule 3007(a)(1).[72]

For all these reasons then, the Court finds that DCG as an equity holder has no economic

interest in, and therefore lack Article III standing to object to, the Distribution Principles.[73]  *See*

*e.g.*, *In re Magnesium Corp. of Am.*, 583 B.R. 637, 650 (Bankr. S.D.N.Y. 2018) ("[A]n equity

holder . . . lacks standing to object to claims against the estate unless there is a reasonable

possibility of a surplus after all claims against the debtor's estate are paid in full."); *cf. Freeman*

*v. J. Reg. Co.*, 452 B.R. 367, 372 (S.D.N.Y. 2010) (equity holders lacked prudential standing to

appeal a confirmation order when "the equity holders would clearly not have recovered anything

in this case," and thus "the creditors' rights and interests [were] the only ones implicated by the

Confirmation Order"); *In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009)

("Generally, a 'party in interest' with respect to a particular issue will also meet the requirement

for Article III standing *with respect to that issue* . . . . A party in interest must still satisfy the

prudential limitations on standing, and cannot raise the rights of a third party even though it has a

financial stake in the case." (emphasis added)), *aff'd sub nom. In re Teligent Servs., Inc.*, 2010

---

provides that only the Debtors can file an omnibus objection on the bases enumerated therein . . . ."  *See* Claims
Objection Procedures ¶ 1(a)(xii).

[72]      DCG argues that creditors were put on notice by DCG's objection to confirmation and certain statements
included in the Debtors' Disclosure Statement.  *See Digital Currency Group, Inc. and DCG International
Investments Ltd.'s Proposed Findings of Fact and Conclusions of Law in Opposition to Confirmation of the
Debtors' Amended Plan* ¶ 72 [ECF No. 1515] (the "DCG Findings of Fact").  While DCG cites to cases in which
courts have allowed claims objections in the context of an adversary answer or a responsive brief, none of these
involved an omnibus claims objection, which is specifically governed by the requirements under Rule 3007(d).
Rather, the cases relied upon by DCG involve situations where the claimant was a direct party to the litigation at
issue and was clearly put on notice of the opposition to their claim.  *See, e.g., S.B.R. Inv., Ltd. v. Leblanc (In re
LeBlanc)*, 404 B.R. 793, 797-98 (Bankr. M.D. Pa. 2004).

[73]      The Court does, however, find that DCG has standing to pursue certain other objections to the Plan that
impact its interests, such as certain changes to the Debtors' corporate governance provisions which have a direct
impact upon DCG.  These issues are more fully discussed below.

WL 2034509 (S.D.N.Y. May 13, 2010), *aff'd sub nom. In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011); *see also In re Johns-Manville Corp.*, 68 B.R. at 624 (limiting standing to only those "parties who have a direct stake in the consequences of a proceeding.").

In its proposed findings, DCG also states —in one paragraph of its 48 page submission— that it has standing based on its claims as an unsecured creditor. See DCG Findings of Fact ¶ 64. But DCG did not argue this position at the opening or closing of the trial or present any evidence or argument on this point during the trial.[74]  This was true notwithstanding the clear and persistent arguments by Debtors and others that DCG had no standing. *See, e.g.*, Hr'g Tr., 41:1-4 (Feb. 26, 2024) (Opening argument) (Debtors' counsel arguing that DCG has no standing because it is an out of money as an equity holder); Hr'g Tr., 29:25-30:16 (March 18, 2024) (Closing argument) (Debtors' counsel arguing that DCG's objection should be overruled because it lacks standing as an out of the money equity holder); *id.* 103:1-105:9 (Ad Hoc Group counsel explaining how DCG is out of the money as equity and thus lacks standing).  In the face of these arguments at trial, DCG consistently made one point and one point only:  that it had a standing as an equity holder.  Hr'g Tr.,103:6-117:17 (Feb. 26, 2024 ) (Court asking DCG to respond to other sides' standing argument that it is out of the money and DCG responding that it wants to be in the waterfall for recovery after all creditor claims were paid); Hr'g Tr., 141:6-149:25 (March 18, 2024) (Closing argument) (DCG's counsel explaining that it might be in the money if there were successful objections to various government claims in the future).  With DCG not having argued at trial about having standing as a creditor, it was understandable that no other party addressed

---

[74]     Admittedly, DCG's forty page initial objection briefly mentions its status as a creditor in one footnote but only in a conclusory fashion.  See DCG Confirmation Objection at 9 n.8 (noting that DCG is both a creditor and equity holder, and therefore DCG has an interest in the outcome of these cases).  The Objection does not provide any explanation of how the Distribution Principles impact DCG in its capacity as a creditor, despite claiming in the same footnote that DCG "only seek[s] to challenge those portions of the Amended Plan that affect its interests."  *Id.*

this issue at trial.  Based on this record, it would be improper for DCG to now seek to make a

new argument on this issue at this very late date.

In any event, DCG's belated argument also fails on the facts here.  DCG explains its

position that it has standing as a creditor in two sentences in its findings, neither of which

provides a basis for standing.  DCG Findings of Fact, ¶ 64.  In its first sentence, DCG

hypothesizes that if the Debtors were to subordinate DCG's claims, it would place DCG behind

other general unsecured creditors and impact its distributions on its claims.  *See id.*  But as

nothing in the Chapter 11 Plan subordinates DCG's claims, there is no basis for standing here.

*See* Plan, Art. III.K.  In its second sentence, DCG maintains that "because there is no realistic

scenario under which the digital asset creditors will receive 100% recovery as defined by the

Distribution Principles (even though there are sufficient assets to pay dollarized Petition Date

Claims), the Distribution Principles reduce (and likely eliminate) the likelihood of DCG

recovering post-petition interest."[75]  *See* DCG Findings of Fact ¶ 64.  But DCG is wrong.  For

the reasons discussed in detail above, the Debtors here are hopelessly insolvent—by billions of

dollars—regardless of whether one uses the Distribution Principles to value claims (as the

Debtors propose) or one values claims on the Petition date (as DGC urges).  Given these

economics, the Distribution Principles do not—indeed, cannot—impact the likelihood of DCG

---

[75]    DCG's newfound view about its entitlement to post-petition interest is surprising given DCG's prior view
that any post-petition interest awarded here is improper.  *See* DCG Confirmation Objection ¶¶ 47-52; *see id.* ¶  8
(arguing that the Committee and the Ad Hoc Group "also helped themselves—with the Debtors as their
accomplice—to a host of other advantages, all at the expense of DCG [including] [g]ranting unsecured creditors
post-petition interest at rates not recognized by this District and in violation of 1129(a)(7), as well as an improper
sweetener of additional post-Effective Date interest at an arbitrary rate, further siphoning value away from DCG for
the benefit of general unsecured creditors.")   In its one sentence on post-petition interest, DCG does not explain
how its most recent position on post-petition interest can be reconciled with its prior view.

receiving post-petition interest because the entire body of unsecured creditors—which includes the governmental claimants—will never receive a full recovery.[76]

### C.  DCG's Other Objections to Confirmation

#### 1.  Setoff Principles

DCG also asserts that the Plan violates Section 1129(a)(3) because the Setoff Principles were not proposed in good faith.  According to DCG, the Setoff Principles "provide a select group of only twenty-one creditors . . . with a collective windfall of $288 million of additional claims, with one creditor to receive $192 million of additional claims prohibited by law" to the detriment of other creditors and equity holders.  DCG Confirmation Objection ¶ 66.

The Setoff Principles apply to creditors with claims against the estate where the estate also owes an obligation to those creditors.  *See* Hr'g Tr. 139:14-18 (Feb. 27, 2024).  More specifically, the Setoff Principles apply to twenty-one creditors where the mutual obligations result in a net claim against the Debtors.  *See* Sciametta Confirmation Decl. ¶ 13.  For these creditors, the Setoff Principles provide a method for calculating the obligations owed by the creditors and the Debtors to each other so that the customer's net claim can be valued.  *See generally* Plan Supplement Ex. M.  Stated generally, the Setoff Principles fix the valuation date for all claims—both the customers' obligations owed to the Debtors and the Debtors' obligations

---

[76]    DCG's failure to provide details about the impact of the Distribution Principles on its claims is not merely the failure to check a box; such information is critical to understanding and framing the issue of its standing, which is a fact based inquiry.  This is particularly important here given that at least some of DCG's claims appear to be contingent claims based on litigation outcomes.  *See Order Granting Debtors' Twenty-Seventh Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability and Co-Liability Contingent)*, dated April 19, 2024 [ECF No. 1603] (granting without opposition an objection to certain aspects of DCG's claims, including, but not limited to, contingent claims pursuant to Section 502(e)(1)(B) of the Bankruptcy Code); *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000) (for Article III standing, a party must show injury that is "concrete and particularized, and actual or imminent, as opposed to conjectural or hypothetical.") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

owed to the customers—at the Petition Date price of the cryptocurrency.[77]  *See id.*  The Setoff

Principles do not apply to instances where the setoff would result in a net asset to the estate.  *See*

Hr'g Tr. 153:24-154:2 (Feb. 27, 2024).

DCG contends that the Setoff Principles improperly use the Petition Date to value loan

receivables, which are assets of the Debtors.  DCG complains that valuing these claims held by

the Debtors using the Petition Date—rather than a later date when these assets had a higher

value—violates the Debtors' fiduciary duty to maximize the value of the estate.  *See* DCG

Confirmation Objection ¶¶ 68, 70-71.  DCG notes that if the loan receivables were valued using

pricing as of December 31, 2023—instead of Petition Date pricing—the net setoff claims against

the Debtors reduce from $395 million to $106 million; those claims would decrease even further

if current pricing were used.  *See* Hr'g Tr. 156:13-159:2 (Feb. 27, 2024).[78]  The Debtors and the

Committee support the Setoff Principles.  *See* Debtors' Confirmation Mem. ¶ 40 (noting that the

Setoff Principles reflect the Debtors' position on what they believe was appropriate and equitable

approach); Committee Confirmation Mem. ¶ 53 (finding the Setoff Principles to be a valid

exercise of the Debtors' business judgment).  In addition, a creditor who also sits on the

Committee filed a brief specifically in support of the Setoff Principles.  *See* Gorisse

Confirmation Statement; *see also Notice of Appointment of Official Committee of Unsecured*

*Creditors* [ECF No. 53].  Mr. Gorisse asserts that the Setoff Principles are a "reasonable,

---

[77]     More specifically, the Setoff Principles are calculated as: (a) the value of any debt owed to a Debtor by a Holder of a Claim entitled to receive distributions under the Plan against the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan (to the extent that the applicable Debtors' failure to return such Loan Collateral gives rise to a Claim entitled to receive distributions under the Plan), or (b) any Claim entitled to receive distributions under the Plan against the value of any debt owed by the Holder of such Claim to the applicable Debtor, then all digital asset values in (a) and (b) shall be determined as set forth in the Digital Assets Conversion Table.  *See* Plan Supplement, Ex. M.

[78]     DCG posits that the Setoff Principles were devised "to engender support for the Debtors' Amended Plan by one particularly influential creditor sitting on the [Committee]."  DCG Confirmation Objection ¶ 73.

logically consistent and fundamentally fair method for netting the mutual obligations owed by and to the Debtors and the affected creditors."  Gorisse Confirmation Statement ¶ 2.

As a threshold matter, DCG lacks standing to object to the Setoff Principles.  Once again, the Setoff Principles do not implicate DCG's economic interests for the reasons set forth above. *See In re Quigley Co., Inc.,* 391 B.R. at 703 (a party "cannot challenge portions of the plan that do not affect its direct interests.").  As with DCG's objection to the Distribution Principles, the Debtors' entire claims pool is so large that—even if the Court adopted the methodology proposed by DCG for setoff—there is still insufficient value in the estate for DCG to receive a distribution as an equity holder.  This is true many times over even if the Court sustained DCG's objection to both the Distribution Principles and the Setoff Principles.[79]

But even independently assessing the Setoff Principles, the Court disagrees that the Setoff Principles violate the Bankruptcy Code.  *See* DCG Confirmation Objection ¶ 66.   When assessing the value of a creditor's interest in estate property, the Bankruptcy Code provides that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a)(1).  Indeed, the legislative history of the statute confirms that "[c]ourts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case."  H.R. REP. 95-595, 356.  Courts across the country have also refused to adopt a single method for such

---

[79]    As discussed above, the Debtors' assets are valued in the aggregate at approximately $3.3 billion, with DCG's claimed "Excess Value" of $2.497 billion eclipsed by the governmental claims of over $11 billion.  *See* Sciametta Confirmation Decl., Ex. 1; *Notice of Filing of Cash and Coin Report* [ECF No. 1407]; Verost Settlement Decl. ¶ 4; Governmental Proofs of Claim, JX-094; Hr'g Tr. 162:22-163.22, Feb. 27, 2024 (J. Sciametta)..  Changing the Setoff Principles as DCG urges would result in a reduction of $288 million in the Debtors' liability for setoff claims.  *See* DCG Confirmation Objection ¶ 66.  This would not be nearly enough to affect DCG's treatment as an equity holder.

valuation. *See, e.g., In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) ("The

circumstances will dictate the assignment of the burden of proof on the question of value.")

(internal citations and quotations omitted); *In re Cason*, 190 B.R. 917, 925 (Bankr. N.D. Ala.

1995) ("Section 506(a) allows the court great discretion for the determination of the valuation

date . . . The statute makes it clear that there can be several valuations in the course of a case.");

*Davis v. Int'l Bank of Com. (In re Diamond Beach VP, LP)*, 551 B.R. 590, 609 (S.D. Tex. 2016).

As the Fifth Circuit has explained:

> We conclude that a court is not required to use either the petition date or the
> effective date. Courts have the flexibility to select the valuation date so long as
> the bankruptcy court takes into account the purpose of the valuation and the
> proposed use or disposition of the collateral at issue.

*Matter of Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 528 (5th Cir. 2018); *see also In re*

*Sears Holding Corp.,* 51 F.4th 53, 61 n.4 (2d Cir. 2022) ("It is not settled that the Petition Date is

the appropriate time at which to value the collateral. But the bankruptcy court is entitled to

deference as to the appropriate time at which to value the collateral.") (internal citations

omitted).

Applying the Court's discretion here, the Court concludes that the Setoff Principles are an

appropriate, consistent, and fair way to value these claims. The Court concludes that, by

choosing one date to value both the obligations of the Debtors and the creditors, the Setoff

Principles reflect an approach that values consistency and avoids any argument of unfair

treatment in their compensation to creditors. Notably, no creditors have objected to the Setoff

Principles. In fact, the vast majority of creditors who are not impacted by the Setoff Principles

voted in favor of the Plan, thus supporting Mr. Gorisse's assertion that "[t]he Setoff Principles . .

. represent a compromise that strikes a fair balance between the Setoff Claimants and the

Debtors' estates." Gorisse Confirmation Statement ¶ 2; *see also* Debtors' Confirmation Memo. ¶

40.[80]  The Court finds no support for DCG's allegations that the Setoff Principles are a product

of collusion or designed solely for the improper purpose of gaining unlawful or nefarious support

for the creditor body, nor does DCG identify any such evidence in the record.  Had the Debtors

blindly acquiesced to the demands of the creditors, it would seem much more likely that the

Setoff Principles would seek to value the creditor's claims at current prices, thus inflating their

value, while utilizing the Petition Date pricing for the Debtors' claims against the customer,

minimizing the reduction to the customers' claims.  *See* Gorisse Confirmation Statement ¶ 39.[81]

The case on which DCG most heavily relies, *In re Global Indus. Techs*., *Inc.*, 645 F.3d

201 (3d Cir. 2011), is inapposite.  The *Global Industry Technologies* case involved the debtor's

creation of a trust, which was to be funded with proceeds from insurance policies, to address

claims raised by creditors who were allegedly harmed by exposure to silica in the debtor's

products.  *See id.* at 204-05.  The bankruptcy court determined that the insurance companies

whose policies were at issue lacked standing to object to confirmation of the debtor's plan of

reorganization.  *See id.*  In reversing that ruling, the Third Circuit found that, in light of the

suspect nature of the formation of the silica claims trust—including "nonfrivolous allegations of

collusion" between the debtor and claimants' counsel to buy votes by paying for "ginned-up

silica claims"—and the vastly increased potential exposure to the insurance companies, the

insurance companies had standing to object to confirmation of a plan.  *Id.* at 214-15.  The record

---

[80]    The circumstances of Mr. Gorisse's claim against the Debtors is helpful to understanding the fairness of using one date for valuing all claims for purposes of setoff.  Mr. Gorisse entered into several loan transactions with GGC involving cryptocurrency; as part of one of those transactions, Mr. Gorisse delivered ETH tokens to GGC as collateral.  *See* Gorisse Confirmation Statement ¶¶ 9, 13.  After GGC announced it was unilaterally suspending repayment of its loan obligations, Mr. Gorisse attempted to exercise the callable option—which would oblige GGC to return the collateral to the creditor—on five separate occasions, but GGC refused to comply.  *See id.* ¶¶ 16-18. Had GGC returned the collateral, Mr. Gorisse's claim would not be subject to setoff as he would have been made whole, or at least suffered less damages, prior to the Petition Date.

[81]    Ironically, DCG's position about using a later valuation date for the Setoff Principles is inconsistent with its position that all claims must be valued at the Petition Date.

here does not support allegations of such collusion or inflated claims or reflect an impact on the objecting party.

     2.  <u>Corporate Governance</u>

DCG contends that the Plan violates Section 1129(a)(3), which requires that "[t]he plan [be] proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). More specifically, DCG complains that the Plan improperly divests DCG of "virtually all" of its rights as an equity holder.  DCG Confirmation Objection ¶¶ 65, 76-86.  DCG identifies a variety of specific restrictions imposed on it by the Plan, the most prominent of which is that the Plan prevents DCG from exercising its "fundamental right" as an equity holder to elect directors under Delaware law.  DCG Confirmation Objection ¶ 55.[82]  In support of its argument, DCG relies on cases that stand for the unremarkable proposition that governance rights continue unaffected by a petition for reorganization.  *See* DCG Confirmation Objection ¶ 77 (citing *In re Genever Holdings, LLC*, 2021 WL 3919826, at *13 (Bankr. S.D.N.Y. Sept. 1, 2021); *see also Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1986) ("[S]hareholders' right to govern their corporation [is] a prerogative ordinarily uncompromised by reorganization.").  In particular, DCG relies on *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429 (Del. 2012), which held that "[s]hareholder voting rights are sacrosanct.  The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm."  *Emak Worldwide,* 50 A.3d at 433.

---

[82]    *See also* DCG Confirmation Objection ¶ 55 (noting that rather than freely electing directors to the Holdco board, DCG is required to select directors from a preapproved slate chosen by the Committee and Ad Hoc Group in consultation with the Debtors).  DCG also complains that the Plan prohibits DCG from transferring its equity interest in Holdco and taking a worthless stock deduction with respect to DCG's interest in Holdco; excludes DCG from consultation rights in the selection of the PA Officer, members of the Wind-Down Oversight Committee, and Litigation Oversight Committee; requires DCG to negotiate a tax sharing agreement with the Debtors; and carves out DCG parties from the Debtors' assumed indemnification obligations.  *See id.* ¶¶ 79, 84, 91-92, 96.

Notably, DCG does not point to any restriction in either the Bankruptcy Code or

Delaware state law that prohibits a debtor from changing governance rights as part of a plan of

reorganization.  In fact, the governing law of Delaware explicitly allows a corporation in

bankruptcy to "constitute or reconstitute and classify or reclassify its board of directors, and

name, constitute or appoint directors and officers in place of or in addition to all or some of the

directors or officers then in office."  Del. Code Ann. tit. 8, § 303(b); *see* Islim First Day Decl. ¶ 7

(noting that Debtors are governed by Delaware corporate law).   Not surprisingly then, courts in

this district have confirmed plans of reorganization that contain voting restrictions and controls

on the composition of the proposed board of the company.  *See In re K.G. IM, LLC*, 620 B.R.

469, 482 (Bankr. S.D.N.Y. 2020) ("[T]he Debtors' rights under state law and the applicable

operating agreements to alter their management structure postpetition is an appropriate exercise

of their governance rights and permissible under the Bankruptcy Code . . . neither Delaware law

nor the Bankruptcy Code gives the [the objecting party] special rights to block the exercise or

transfer of governance rights in the absence of appointment of a [C]hapter 11 trustee."); *see also*

*In re Mesa Air Grp., Inc.*, 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011).

Courts from other jurisdictions have reached the same conclusion.  *See Matter of*

*Federated Dep't Stores, Inc.*, 133 B.R. 886, 891 (S.D. Ohio 1991) (holding that "[t]he plain

language of [Del. Code Ann. tit. 8, § 303] clearly contemplates the restructuring of shareholder

voting rights."); *see also In re Teton Energy Corp.*, 2010 WL 2822056, at *21 (Bankr. D. Del.

Jan. 20, 2010) (confirming a plan of reorganization that provided for the resignation of the

existing board and the election of a new board identified in the plan); *In re Accuride Corp.*, 2010

WL 5093173, at *14 (Bankr. D. Del. Feb. 18, 2010) (confirming a plan of reorganization that

includes appointment of a board of directors specified in the plan).  The reasoning of the court in

90

*Federated Department Stores* is particularly illuminating.  It observed that the rights of shareholders are contractual and "[b]ankruptcy, by its very nature, provides the Debtor the opportunity to alter rights and obligations established pre-petition . . . parties cannot apply and consider state law alone without regard to the overriding concerns and fairness considerations involved in a bankruptcy situation." *Federated Dep't Stores, Inc.*, 133 B.R. at 891-92 (internal citations omitted).  And of particular relevance here, the plan of reorganization in *Federated Department Stores* specifically restricted the rights of certain shareholders to appoint board members.  *See id.*

The cases cited by DCG do not provide otherwise and, in fact, are simply not on point. They address markedly different facts or making generic statements about corporate principles that are not relevant here.  For example, the decision in *EMAK* addressed a dispute about a fee award to a common shareholder's counsel after the common shareholders successfully challenged an attempt by the corporation's preferred shareholders to take control of the corporation's board.  *See generally EMAK*, 50 A.3d 429.  The question before the court in *EMAK* was whether the actions by the common shareholders brought value to the corporation.  *See id.* at 432-33.  The *EMAK* court underscored the value of shareholders' rights to demonstrate the corporate benefit of the common shareholders' actions to preserve voting rights.  *See id.* at 433. But the *EMAK* court did not address at all whether shareholder's rights can be modified during a bankruptcy or what obligations a bankruptcy debtor has to its shareholders.

Given the record, the Court also strongly disagrees with DCG's contention that the proposed changes to corporate governance rights here constitutes bad faith or violate Section 1123(a)(7) of the Bankruptcy Code, which requires that plan provisions be consistent with the interests of creditors and equity security holders "with respect to the manner of selection of any

office, director, or trustee under the plan." 11 U.S.C. § 1123(a)(7).  Indeed, the Court finds that

the limitations on DCG's rights as the equity holder are inherently sensible and reasonable.  The

Plan is a liquidating plan with the goal of maximizing recoveries to unsecured creditors who

were allegedly harmed by DCG's conduct.[83]  As the Debtors are no longer an operating business,

the focus now is on maximizing distributions to creditors and ensuring prompt distribution.  The

contemplated focus of post-confirmation activity under this "No Deal" Plan is litigation aimed at

DCG, making it particularly inappropriate to hand control of the post-petition Debtors to DCG to

supervise such activities.  *See* Plan ¶ 199 (including in the definition of "Retained Causes of Action"

all claims against the DCG Parties); *see also Proposed Findings of Fact and Conclusions of Law

Submitted by Plan Proponents and Supporters in Support of Confirmation of the Debtors' Amended

Joint Chapter 11 Plan of Genesis Global Holdco et al.* [ECF No. 1540] ¶ 52 ("Plan Proponents'

Findings of Fact") (noting that the PA Officer and Litigation Oversight Committee will be involved

in making decisions about the prosecution of claims against DCG while also responding to regulatory

inquiries about DCG).  Placing the governance of the Wind-Down Debtors in the hands of an

independent committee is logical and appropriate given that the Debtors will cease to operate and

their post-confirmation activities will be litigation aimed at maximizing creditor recoveries.[84]

DCG also argues that the Plan violates the prohibition on the issuance of nonvoting

equity securities found in Section 1123(a)(6).  *See* DCG Confirmation Objection ¶ 55.  Because

---

[83]     *See, e.g., Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1137], Exhibit J
(stating that the Litigation Oversight Committee is formed for the purpose of "oversee[ing] the commencement,
management, settlement, compromise or other disposition of the Retained Causes of Action in accordance with the
Plan."); *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1137], Exhibit K  (stating that
the purpose of the Wind-Down Oversight Committee is to "oversee the Wind-Down Debtors' wind-down activities
in accordance with the Plan (including the Distribution Principles).").

[84]     In this vein, the Court does not find problematic the provisions of the Plan that prevent DCG from
transferring its interest in Holdco or taking a worthless stock deduction based on that interest.  These provisions do
not violate applicable law and accord with the principle of maintaining the status quo while the Debtors are
liquidated.

it is prohibited for exercising its rights to elect directors under Delaware law, DCG contends that

the Plan "effectively seeks to convert DCG's interests into non-voting shares." *Id.* But the Court

disagrees. In fact, the Plan does not provide for the issuance of nonvoting equity securities,

making Section 1123(a)(6) inapplicable. DCG's argument also ignores that DCG is entitled to

elect directors; it must simply do so with restrictions. *See* Plan, Article IV(B)(7), *see also Plan

Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1137], Exhibit L ¶ 6

("Plan Supplement, Ex. L").[85]

DCG also objects to the Plan's provision for a tax sharing agreement, taking umbrage at

the Plan's purported requirement that DCG enter into a tax sharing agreement with the Debtors.

DCG Confirmation Objection ¶ 96. But the Plan does not include such a requirement. Rather,

the Plan states that the Debtors—not DCG—"shall undertake the Restructuring, including: . . .

the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax

attributes and tax costs between the Debtors and DCG and of Definitive Documents not

otherwise included in the foregoing, if any." Plan, Article IV(B)(1). This provision does not

require DCG to enter into an agreement; instead, it merely requires that the Debtors undertake to

enter into such an agreement, something that the Debtors must do to comply with applicable law.

Given DCG's representation that it has agreed to negotiate a tax sharing agreement in good faith,

*see* DCG Confirmation Objection ¶ 96, the Court sees no conflict with the Plan's statement that

Debtors will undertake to do the same.

---

[85]     Relatedly, DCG complains that the Plan provides for DCG's pre-reorganization corporate rights to spring
back upon payment in full to all other creditors is meaningless, because the restrictions on DCG's rights could
"theoretically last in perpetuity." DCG Findings of Fact ¶ 123; DCG Confirmation Objection ¶¶ 80-82. But it
makes sense as a theoretical matter for DCG's rights to be restored if there ever comes a time when DCG would no
longer have a conflict of interest in the running of the post-confirmation Debtors.

The Court is similarly unpersuaded by DCG's argument that the Plan improperly treats Intercompany Interests in GGC and GAP.[86]  As Holders of Intercompany Interests in GGC and GAP are treated the same as holders of Interests in GGH (namely DCG), DCG argues that the Plan improperly cuts off DCG's beneficial interests in GGC and GAP.  *See* DCG Confirmation Objection ¶ 83.  But as specified in the Plan, the holders of Intercompany Interests—who are, in essence, equity holders—are appropriately paid only after all other allowed claims.  *See* Plan, Article III(C)(11), Article III(D)(10).  Further, the Plan provides that holders of Intercompany Interests will continue to hold those interests.  *See id.*  This treatment is consistent with the absolute priority rule and merely maintains the status quo.

With regard to DCG's objection to the subordination of DCG's claims, this too fails.  As DCG itself acknowledges, the Plan merely provides for a reservation of rights for the Debtors or Wind-Down Debtors to seek to subordinate DCG claims.  *See* DCG Confirmation Objection ¶ 94 (citing Plan, Article III(K)).  Accordingly, it is premature to consider an objection related to subordination, as no request has been made to subordinate DCG's claims and DCG retains all of its rights if that issue arises in the future.

Finally, DCG complains about the Debtors excluding DCG from indemnification obligations of the Debtors set forth in the Plan.  *See* DCG Confirmation Objection ¶¶ 91-92.  DCG contends that the Debtors cannot pick and choose whom to indemnify under existing corporate governance contracts because such executory contracts must be assumed or rejected in their entirety.  *Id.*  As the Debtors correctly note, however, the corporate governance documents from which DCG accuses the Debtors of "cherry-picking" obligations are superseded by the new

---

[86]     The Plan defines "Intercompany Interest" as "any Interest in a Debtor held by another Debtor."  Plan, Article I(A)(148).

corporate governance documents, which contain a new indemnity clause. *See, e.g.,* Plan Supplement, Ex. L. In fact, during closing arguments, DCG conceded that the new corporate governance documents mooted the argument that the Debtors were "cherry-picking" indemnification obligations. *See* Hr'g Tr. 183:2-16 (Mar. 18, 2024) (counsel to DCG conceding that the Debtors' revised corporate governance documents do not violate Section 365).[87] For the reasons discussed above, the Debtors are well within their rights to issue new corporate governance documents, even if they include a new indemnification provision that does not include DCG (a party who will be the target of post-confirmation litigation).[88]

### D. *CCAHG's Objections to Confirmation*

CCAHG has objected to confirmation on a variety of bases. For the reasons set forth below, however, the Court finds that all of CCAHG's arguments lack merit.

### 1. <u>Administrative Priority</u>

CCAHG first objects that its claims should be classified as administrative expenses and paid accordingly. Section 503 of the Bankruptcy Code defines administrative expenses, which include the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Administrative expenses "receive highest priority in corporate bankruptcy proceedings." *Fin. of Am. LLC v. Mortg. Winddown LLC (In re Ditech Holding Corp.)*, 630 F. Supp. 3d 554, 559 (S.D.N.Y. 2022) (internal citations and quotations omitted). Administrative priority is given to certain expenses "to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors." *Tr. of Amalgamated Ins.*

---

[87] Presumably, it would be a breach of the Debtors' fiduciary duty to creditors if they agree to indemnify DCG against the litigation against DCG that is contemplated by the Plan.

[88] In addition to the issues specifically discussed above, the Court concludes that DCG has not presented any meritorious arguments that justify denial of confirmation of the Plan.

*Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (internal citations omitted).  The

administrative expense priority "is based upon the premise that the operation of the business by a

debtor-in-possession benefits pre-petition creditors; therefore, any claims that result from that

operation are entitled to payment prior to payment to 'creditors for whose benefit the continued

operation of the business was allowed.'"  *In re Old Carco LLC*, 424 B.R. 633, 641 (Bankr.

S.D.N.Y. 2010) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d

950, 954 (1st Cir. 1976)).  Affording priority to these claims "encourag[es] third parties, who

might otherwise be reluctant to deal with a debtor-in-possession, to transact such business."  *Id.*

(citing *McFarlin's,* 789 F.2d at 101).

     "A claim will be afforded priority under [Section] 503 if the debt both (1) 'arise[s] from a

transaction with the debtor-in-possession' and (2) is 'beneficial to the debtor-in-possession in the

operation of the business.'"  *Matter of Jartran, Inc*., 732 F.2d 584, 587 (7th Cir. 1984) (quoting

*In re Mammoth Mart*, 536 F.2d at 954).  But, as "the presumption in bankruptcy cases is that the

debtor's limited resources will be equally distributed among his creditors, statutory priorities are

narrowly construed."  *Houbigant, Inc. v. ABC Mercantile, Inc. (In re Houbigant, Inc.)*, 188 B.R.

347, 355 (Bankr. S.D.N.Y. 1995), *corrected* (Nov. 8, 1995) (quoting *McFarlin's*, 789 F.2d at

100).  Thus, a claimant bears the burden of establishing that its claim is entitled to administrative

priority.  *In re Old Carco*, 424 B.R. at 642.

     In seeking administrative priority, CCAHG relies on the fact that the loan agreements

between CCAHG's members and the Debtors provide for automatic renewals, and that CCAHG

members' loans automatically renewed after the Petition Date.  *See generally* CCAHG

Confirmation Objection ¶¶ 20-21; *see also* Jassin Confirmation Decl. Ex. B, Section XXIII;

Fernandez Confirmation Decl. Ex. B, Section XXIII.  CCAHG alleges that the Debtors

benefitted from these post-petition renewals because the Debtors were able to retain CCAHG's cryptocurrency, obtain the benefit of the increase in the cryptocurrency prices, and use the cryptocurrency to increase the potential recoveries of the Debtors' creditors.  The Debtors, the Committee, and the Ad Hoc Group all strongly disagree that CCAHG members' claims are entitled to administrative treatment.  *See* Debtors' Confirmation Mem. ¶¶ 47-51; Ad Hoc Group Confirmation Mem. at 27-28; Committee Confirmation Mem. ¶¶ 56-61.

The Court finds that CCAHG's claims are not entitled to administrative priority.  Simply put, the automatic renewals of the MLAs do not constitute post-petition transactions.  It is well established that a contract that automatically renews without a material change to the terms of the contract is not a new contract but, rather, merely a continuation of the existing contract.  *See Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) ("[A]utomatic renewals [are] not creations of new contracts.").  Accordingly, an automatic renewal of a contract is insufficient to create a post-petition transaction that justifies status as an administrative claim.  *See In re Westinghouse Elec. Co. LLC*, 2019 WL 4555990, at *10 (Bankr. S.D.N.Y. Sept. 19, 2019) (rejecting administrative treatment for claims arising from letters of credit that were in place prior to the bankruptcy filing but continued in force according to their pre-bankruptcy terms); *see also In re Country Club Ests. at Aventura Maint. Ass'n, Inc*., 227 B.R. 565, 566 (Bankr. S.D. Fla. 1998).

Even if the automatic renewal of the loans might be considered a post-petition transaction, however, CCAHG has not established that its members provided a benefit to the Debtors that would justify status as administrative creditors.  Congress afforded certain types of claims administrative priority "to incentivize entities to do business with the debtor in possession so as to rehabilitate the business for the benefit of all creditors."  *In re Ditech*, 630 F. Supp. 3d at

97

559-60 (internal citations and quotations omitted). "A speculative benefit or the mere potential for benefit is not enough." *Id.* at 560 (internal citations and quotations omitted); *see also In re Bradlees Stores, Inc.*, 2003 WL 76990, at *2 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 16 (2d Cir. 2003) ("Administrative priority status for pre-petition contracts . . . is only proper where the pre-petition contract provides an *actual* post-petition benefit to the estate.") (internal citations and quotations omitted) (emphasis added). Importantly, the debtor must have induced the performance by the creditor. *In re Old Carco*, 424 B.R. at 642; *see also Matter of Jartran*, 732 F.2d at 587 ("To serve the policy of the priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor.") (emphasis in original); *In re Chateaugay Corp.*, 156 B.R. 391, 399 (S.D.N.Y. 1993), *aff'd,* 10 F.3d 944 (2d Cir. 1993); *In re REFCO, Inc.*, 2008 WL 140956, at *6 (S.D.N.Y. Jan. 14, 2008), *aff'd in part, appeal dismissed in part sub nom. In re Refco Inc.*, 331 F. App'x 12 (2d Cir. 2009).

The Debtors here did not induce CCAHG members to provide services post-petition to allow them to continue operating the business; rather, all transactions related to the loan occurred prepetition. And while CCAHG asserts that mere retention of the cryptocurrency by the Debtors constitutes a benefit to the estate, it is unclear how the retention this constitutes an "actual benefit" rather than merely "the loss a creditor might experience by virtue of the debtor's possession of its property." *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 36 (Bankr. N.D.N.Y. 1989). Mere retention of property provided prior to a bankruptcy does not confer a benefit on a debtor in possession. *In re Westinghouse*, 2019 WL 4555990, at *10 (finding that where letters of credit were extended prepetition, any benefit inured to the debtors before the bankruptcy filing).

While CCAHG cites to the significant increase in cryptocurrency value since the Petition Date, that increase has not benefited the Debtors' business.  Indeed, the Debtors are not continuing their business, having chosen to liquidate.  Not surprisingly then, nothing in the record indicates that the Debtors used the retained cryptocurrency post-petition to engage in its lending business to earn additional income.  Rather, the cryptocurrency has been frozen and only by virtue of market forces outside the control of any party has its value increased.  In the end, the benefit from the increase in cryptocurrency prices will go directly to the creditors under the Plan.

2.  Executory Contracts

CCAHG next asserts that the contracts between its members and the Debtors are covered by the safe harbor provisions of Section 562 of the Bankruptcy Code, which would mean that CCAHG's claims should be valued as of the date of rejection of the contracts (i.e., the effective date of the Plan).  *See* CCAHG Confirmation Objection ¶ 3.  But before the Court needs to address whether the safe harbors of Section 562 apply, the Court must first decide the threshold question of whether the contracts between CCAHG members and the Debtors are executory contracts subject to rejection or assumption under Section 365.  If CCAHG contracts are not executory, the safe harbors of Section 562 do not apply.  *See* CCAHG Confirmation Objection ¶¶ 26-27; Debtors' Confirmation Mem. ¶¶ 52, 61; Ad Hoc Group Confirmation Mem. at 31; Committee Confirmation Mem. ¶ 65.

The Bankruptcy Code does not provide a definition of executory contract.  *In re Avianca Holdings S.A.*, 618 B.R. 684, 695 (Bankr. S.D.N.Y. 2020).  The Second Circuit has generally defined an executory contract "as one 'on which performance remains due to some extent on both sides.'"  *In re Calpine Corp.*, 2008 WL 3154763, at *3 (Bankr. S.D.N.Y. Aug. 4, 2008) (quoting *COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379

(2d Cir. 2008)).  Courts within the Second Circuit have used three slightly different tests to

determine whether a contract is executory.  One widely accepted test is the "Countryman"

standard, articulated by Professor Vern Countryman, where a contracted is executory "if the

'obligations of both the bankrupt and the other party to the contract are so far unperformed that

the failure of either to complete performance would constitute a material breach excusing

performance of the other.'"  *In re Majestic Cap., Ltd.*, 463 B.R. 289, 299 (Bankr. S.D.N.Y. 2012)

(quoting *In re Spectrum Info. Techs.*, 193 B.R. 400, 403-04 (Bankr. E.D.N.Y. 1996)).  "The

Second Circuit has also employed a less demanding inquiry characterized as the 'some

performance due' test, which defines an executory contract as one 'on which performance

remains due to some extent on both sides.'"  *In re NanoDynamics, Inc.*, 735 F. App'x 762, 764

(2d Cir. 2018) (quoting *Eastern Air Lines, Inc. v. Ins. Co. of Penn. (In re Ionosphere Clubs,

Inc.)*, 85 F.3d 992, 998-99 (2d Cir. 1996)).  Finally, "some advocate a functional analysis which

eliminates the requirement of executoriness" and instead "the question of whether a contract is

executory is determined by the benefits that assumption or rejection would produce for the

estate."  *In re Riodizio*, Inc., 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997) (internal citations

omitted).  Whether a contract is executory is determined as of the Petition Date.  *Id.* at 421.

CCAHG asserts that, under any of the three tests, CCAHG's contracts are executory.[89]

CCAHG Confirmation Objection ¶ 51.  The Debtor, the Committee, and the Ad Hoc Group all

strongly disagree.  *See, e.g.,* Committee Confirmation Mem. ¶¶ 65-66; Debtors' Confirmation

Mem. ¶ 53; Ad Hoc Group Confirmation Mem. at 29.

---

[89]     Examples of the MLAs into which CCAHG members entered with the Debtors are annexed to the Jassin
Confirmation Declaration and the Fernandez Confirmation Declaration as exhibits.

Given the factual record here, the Court concludes that CCAHG's contracts are not

executory.  First, the Court rejects CCAHG's argument that the automatic renewal provisions

makes these executory contracts.  *See* CCAHG Confirmation Objection ¶ 52 (relying on

*Windstream Holdings, Inc. v. Charter Comm'ns Inc. (In re Windstream Holdings, Inc.*), 634 F.

Supp. 3d 99, 108 (S.D.N.Y. 2022)).  CCAHG misreads the holding of *Windstream*, which in fact

concluded that "there is an insufficient record basis to conclude that Windstream's customer

contracts were the sort of automatically renewing contracts that would be considered executory."

*In re Windstream,* 634 F. Supp. 3d at 108; *see also In re Baird*, 567 F.3d 1207, 1212 (10th Cir.

2009) (rejecting the assertion that an automatically renewing policy was inherently executory).

Said another way, the *Windstream* court rejected the notion that the automatic renewal provision

by itself made a contract executory.  This is not a surprising conclusion given that an automatic

renewal provision merely continues the contract under the same terms that existed previously.

Turning then to evaluating the actual terms of these CCAHG contracts, the Court

concludes that any outstanding obligations here are not sufficiently material to make the

contracts executory under the Countryman test or the "some performance due" test.  The

question of whether an obligation is material is a factual issue to be determined under state law.

*In re Helm*, 335 B.R. 528, 535 (Bankr. S.D.N.Y. 2006).  The MLAs are governed by New York

State law.  *See* MLA § XI.  Under New York law, a material provision is one that "goes to the

root of the agreement between the parties, and [whose breach] is so substantial that it defeats that

object of the parties in making the contract."  *In re Helm*, 335 B.R. at 535. *(*quoting *Wechsler v.

Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414 (S.D.N.Y.2004)).

CCAHG lists nineteen contractual provisions that it asserts constitute outstanding

material obligations owed by both parties to the contract.  CCAHG Confirmation Objection ¶ 54.

Of these nineteen obligations identified by CCAHG, the Court finds that only one obligation is truly material—the obligation to repay the principal amount of the transactions to the members. *See, e.g.,* MLA at 1 ("Whereas . . . [GGC] may, from time to time, seek to initiate a transaction pursuant to which [the customer] will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S. Dolars or Digital Currency to the [customer] upon the termination of the Loan . . . "). However, a contract is not executory when the only outstanding obligation is to repay a loan. *See In re Gen. Growth Props., Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011) ("[The debtor] does not assert that the [note] is an executory contract . . . accepting the obvious fact that the only obligation remaining to be performed by [the debtor] under the [note] is repayment and that loan agreements are generally not considered to be executory contracts."); *see also In re Calpine Corp.*, 2008 WL 3154763, at *4 (Bankr. S.D.N.Y. Aug. 4, 2008) ("[T]here is no performance remaining due from [the debtor] under the Loan Agreement. [The debtor] already has lent [the borrower] the funds called for under the Loan Agreement, the loan matured [ ] and [the debtor] is seeking . . . to collect funds owed under [the borrower's] repayment obligation."); *In re Teligent, Inc.*, 268 B.R. 723, 732 (Bankr. S.D.N.Y. 2001). In reaching this conclusion, the Court once again is guided by the fact that the Debtors' principal business was borrowing and lending, and the principle purpose of the MLA was for GGC to borrow fiat or digital currency from the lender. *See generally* MLA; *see also* Islim First Day Decl. ¶ 12 ("The Debtors engage in lending, borrowing and certain trading services . . . ."). CCAHG does not—and cannot—dispute that its members performed their material obligations under the MLA when they loaned cryptocurrency to the Debtors. Thus, the only material obligation remaining on the part of the Debtors was to repay the amounts borrowed together with the contractual rate of interest specified in the MLA.

Seven of the obligations identified by CCAHG are merely incident to the main objective of borrowing and repayment.  For example, the Debtors' entitlement to request a transaction from the lender and the lender's obligation to accept the request to enter into a term sheet, the requirement that the Debtors pay a late fee for each day that they fail to repay the loan after the maturity date, the requirement for the Debtors to "provide yield" at the agreed upon rate and schedule, and the ability of the lender to leave open contracts with an open term as long as they like only further define the contours of the material obligations of borrowing and repayment.  In assessing whether these obligations are material, the Court looks to *In re Chateaugay Corp.*, 102 B.R. at 350, which found that where agreements have "achieved their structured purposes" and "any obligations which still may exist pursuant to [the agreement] are [ ] extremely passive in nature," a contract is not subject to assumption or rejection under Section 365.  At heart, the MLAs here are agreements "pursuant to which Genesis could request a transaction of a specific amount of cryptocurrency or U.S. dollars with a specified maturity date in return for fixed profits"—in other words, a loan.  *See* Jassin Confirmation Decl. ¶ 15.  While the material obligation to repay the loans to CCAHG members unquestionably remains, the Court declines to find material the terms that merely define that obligation, particularly where the MLA does not designate them as such.

Several other obligations cited by CCAHG, such the lender's right to demand additional collateral for the loan or the lender's right to retain collateral if the Debtors refuse to return cryptocurrency to the Debtors, are contingent obligations.  *See, e.g.,* MLA § IV(a) ("*If* agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency) (emphasis added).  Contingent obligations that are subject to certain conditions precedent are immaterial until the conditions precedent are met.  *See BNY, Cap. Funding LLC v.*

*US Airways, Inc.*, 345 B.R. 549, 552-53 (E.D. Va. 2006); *see also In re Chateaugay Corp.*, 102

B.R. 335, 346 (Bankr. S.D.N.Y. 1989) (finding that contingent obligations are insufficient to

render a contract executory).

The remaining obligations identified are ministerial in nature. For example, CCAHG

identifies provisions of the MLAs related to indemnity, arbitration, confidentiality, and

assignment provisions as material. But the Court disagrees with this characterization. One of

these requirements was discussed in depth by the parties: the requirement that a lender create a

cryptographically secure wallet address to receive funds from the Debtor in repayment of the

loan as an outstanding, allegedly material, obligation that would be owed by CCAHG member.

CCAHG Confirmation Objection ¶ 54(l). Dr. Jassin, a member of CCAHG, provided live

testimony concerning the steps he would take to create a cryptographically secure wallet address.

*See* Hr'g Tr. 246:15-247:17 (Feb. 27, 2024). And while Dr. Jassin stated that the process he

described is the "best practice[], standard procedure", *see* Hr'g Tr. 17:5 (Feb. 28, 2024), Dr.

Jassin on cross-examination admitted that nothing in the MLA required use of a specific

methodology to create a digital currency address. *See* Hr'g Tr. 18:23-19:2 (Feb. 28, 2024).

Accordingly, while the process Dr. Jassin described might be advisable, it is not material to the

contract as it is not required by the contract or even discussed in the contract itself.[90]

The Court also concludes that the MLAs are also not executory under the "functional"

test because the Debtors would not benefit from either rejection or assumption. As the Debtors

correctly note, both assumption and rejection would require the Debtors to pay a higher amount

to CCAHG members than the Debtors would be required to pay if CCAHG members received

---

[90]     Dr. Jassin also admitted that there are other ways to create digital currency addresses that there are much
simpler. *See* Hr'g Tr. 249:21-250:1 (Feb. 27, 2024) (Dr. Jassin stating that with a Coinbase account, a user can
simply "click a button" to withdraw cryptocurrency and have it sent to the user's address).

the same distribution as all other similarly situated creditors.  Assumption would require the

Debtors to cure the default—namely, return all loaned assets plus the loan fee—while rejection

would require a higher payment than the partial recovery contemplated by the Plan.

Lastly, CCAHG relies upon the fact that the Debtors listed the MLAs between CCAHG

members and the Debtors as executory contracts on the Debtors' schedules of assets and

liabilities.  CCAHG Confirmation Objection ¶ 53.  But the fact that a debtor lists a contract on its

schedules as executory does not constitute an admission of that fact if the schedules also contain

an explicit reservation that listing a contract as executory does not constitute an admission about

the status of the contract.  *In re Calpine Corp.*, 2008 WL 3154763, at *7 (Bankr. S.D.N.Y. Aug.

4, 2008).  Here, the Debtors' schedules include exactly such a disclaimer.  *See, e.g., Summary of

Assets and Liabilities Schedules - Non-Individual (Genesis Global Capital, LLC)* at 13 [ECF No.

146] ("Listing a contract or agreement on Schedule G does not constitute an admission that such

contract is an executory contract or that such contract or agreement was in effect on the Petition

Date or is valid or enforceable.").  Thus, "the determination of whether a contract is executory, is

an issue for the Court to decide." *In re Calpine*, 2008 WL 3154763, at *7.

Having found that CCAHG MLAs are not executory contracts, the Court need not reach

the remainder of CCAHG's argument that the MLAs are entitled to treatment under the safe

harbor provisions of Section 562.

### 3.  Debtor Releases

The last target of CCAHG's objection is the releases being provided by the Debtor under

the Plan (the "Debtor Releases").  *See* Plan, Article I(A)(193) (defining released parties); Plan,

Article I(A)(132) (defining Genesis personnel); Plan, Article VIII(D).  Importantly, the Debtor

Releases are not so-called "third party releases," which involve the release of claims held by

third parties against persons who are not the debtor.  The validity of such third party releases is the subject of ongoing debate and litigation.  *See In re Purdue Pharma, L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. 2021), *vacated by* 635 B.R. 26 (S.D.N.Y. 2021), *rev'd* 69 F.4th 45 (2d Cir. 2023), *cert. granted*, 144 S. Ct. 44 (2023).  Rather, the Debtor Releases here involve the release of potential claims held only by the Debtors, a decision that is assessed under the business judgment standard.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (noting distinction between third party releases and debtor's release of non-debtors); *see also* 11 U.S.C. § 1123(b)(3)(A) (noting that the content of a plan may provide for the settlement or adjustment of any claim belonging to the debtor or the estate).  The Debtors contend that such releases provide a substantial benefit to the Debtors' estates, are in exchange for valuable consideration, and reasonable.

The Plan defines "Released Party" to include: (i) the Debtors, (ii) the Ad Hoc Group Steer Co. and its members (solely in their capacities as such), (iii) the Committee and its members (solely in their capacities as such), and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such).  *See* Plan Article I(A)(193).  Notably, the Debtor Releases do not include any of the Debtors' claims against the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date, which is consistent with the litigation that may be pursued by the estate against such parties.

In addition to these defined categories, the term "Released Party" also includes former and current employees who received approval to be included in this category only after an investigation conducted by the Debtors' Special Committee and its professionals.  *See* Aronzon Confirmation Decl. ¶¶ 83-84 (discussing the releases to current and former employees of

Genesis); *Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117],

Exhibit F ("Plan Supplement, Ex. F")[91] (addressing the rationale for providing the releases); Hr'g

Tr. 40:10-42:1 (Feb. 27, 2024) (Mr. Aronzon testifying about the Special Committee's process of

identifying potential claims against former and current employees and finalizing a list of the

employees who would receive releases).  In support of the Debtor Releases, the Debtors

submitted the Aronzon Confirmation Declaration and offered further live testimony from Mr.

Aronzon at the Evidentiary Hearing.

    The Debtor Releases originally drew objections from four parties: 1) the Ad Hoc Group;

2) the UST; 3) BAO Family Holding LLC ("BAO"), and 4) CCAHG.  *See* Ad Hoc Group

Confirmation Mem. at 35, 36; UST Confirmation Objection at 13; BAO Confirmation Objection

¶¶ 7-8; CCAHG Confirmation Objection ¶¶ 64-79.  After the filing of these objections, the

Debtors added a provision to require that any Genesis personnel (both former and current) who

are being released must sign a cooperation agreement.  *See* Hr'g. Tr. 50:9-13 (Feb. 26, 2024).

The cooperation agreement requires the Released Party to provide "full cooperation . . . in good

faith with respect to any matters relating to your duties and responsibilities (including, without

limitation, providing any necessary information to the Company Group, the [Wind-down

Oversight Committee] and the [Litigation Oversight Committee]) as reasonably requested by the

Company, the [Wind-down Oversight Committee] or the [Litigation Oversight Committee]."

*See Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1391], Exhibit

P (the "Cooperation Agreement").  In addition, the released personnel "will cooperate fully with

the Company Group, the [Wind-down Oversight Committee] and the [Litigation Oversight

Committee] in its prosecution, defense of or other participation in any investigation,

---

[91]    Plan Supplement, Ex. F is also annexed to the Aronzon Confirmation Declaration as Exhibit 1.

107

administrative, judicial or other proceeding arising from any internal and/or external charge, complaint or other action which has been or may be filed." *Id.*

In light of these changes, the Ad Hoc Group, the UST and BAO withdrew their objections to the Debtor Releases. *See* Hr'g Tr. 49:9-11 (Feb. 26, 2024); Hr'g Tr. 138:8-10 (Feb. 28, 2024); Hr'g. Tr. 22:23-25, 205:13-16 (Mar. 18, 2024). But CCAHG's objection remains. CCAHG raises two arguments. First, it argues that the Debtors should be precluded from presenting any evidence in support of the Debtor Releases, contending that the Debtors improperly invoked attorney client privilege to shield details about the justification for the Debtor Releases. Second, CCAHG contends that the Debtors have not adequately justified the Debtor Releases.

a. Motion *in Limine*

As a threshold matter, CCAHG complains that Mr. Aronzon was directed during his deposition before the Evidentiary Hearing not to answer numerous questions—based on privilege—regarding the scope and basis of the Debtor Releases, in particular as to the investigation of the Special Committee that the Debtor cites to justify the Debtor Releases. *See The Genesis Crypto Creditors Ad Hoc Group's Motion* in Limine *to Preclude Evidence Regarding the Proposed Releases and the Special Committee Investigation Motion* [ECF No. 1350] at 2 (the "Motion *in Limine*") ("Debtors wrongly claim that the facts are cloaked in privilege because the Special Committee, who conducted zero interviews [of these employees], learned all the facts supporting the [Debtor] Releases from [its counsel] Cleary"). In short, CCAHG contends that the Debtors cannot use a claim of privilege as a shield (to bar discovery

on the Debtor Releases) while also using the protected facts as a sword (to justify the Debtor

Releases).[92]

It is well established that a court may preclude evidence where a party is using privilege

to shield discovery on a topic while simultaneously relying upon that privileged information as a

sword to justify its position at trial.  *See, e.g., In re Residential Capital, LLC*, 491 B.R. 63, 68

(Bankr. S.D.N.Y. 2013).  Thus, CCAHG would be correct in its position about excluding this

evidence if the factual record froze at the end of Mr. Aronzon's deposition.  But it did not.

Consistent with the Court's role in managing evidentiary proceedings and consistent with the

goal of reaching the merits of the parties' disputes where possible, the Court addressed

CCAHG's concerns about the lack of information.  *Cf.* Fed. R. Evid. 611 (court should exercise

reasonable control over the mode and order of examining witnesses so as to, among other things,

make those procedures effective at determining the truth).  More specifically, the Court asked

CCAHG to identify the information that it still needed to assess the Debtor Releases.  *See* Hr'g.

Tr. 168:5-11 (Feb. 26, 2024).[93]  The Court's inquiry was aimed at curing any unfair potential

---

[92]     While the Motion *in Limine* was filed in advance of the Confirmation Hearing, the Court took the matter
under advisement during the trial so as to address it in the context of the full record.  *See* Hr'g Tr. 18:21-19:8;
172:14-24 (Feb. 26, 2024); Hr'g. Tr. 68:1-5 (Feb. 27, 2024).  A trial court may reserve decision on an *in limine*
motion until trial, so that the motion is reviewed in the "appropriate factual context."  *Nat'l Union Fire Ins. Co. of
Pittsburgh, PA v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996); *see Serby v. First Alert, Inc.*, 2015
WL 4494827 (E.D.N.Y. July 22, 2015) (the risk of juror confusion or potential prejudice is not a factor in a bench
trial, negating the usefulness of motions *in limine*); *In re Watkins*, 343 Fed. Appx. 245 (9th Cir. 2009) (finding
bankruptcy court did not abuse its discretion by not granting debtor's motion *in limine*, explaining that in a bench
trial, an advanced ruling to exclude evidence is generally superfluous and unnecessary).  As the Ninth Circuit Court
of Appeals has explained:

> Because the judge rules on this evidentiary motion, in the case of a bench trial, a threshold ruling
> is generally superfluous.  It would be, in effect, 'coals to Newcastle,' asking the judge to rule in
> advance on prejudicial evidence so that the judge would not hear the evidence.

*U.S. v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009), *cert. denied*, 556 U.S. 1252 (2009); *see also Off. Comm. of
Unsecured Creditors v. Isr. Disc. Bank of New York (In re Oak Rock Fin., LLC)*, 560 B.R. 635, 637-38 (Bankr.
E.D.N.Y. 2016).

[93]     *See also* Hr'g Tr. 170:19-23 (Feb. 26, 2024) (Court: "whenever there's an objection based on sharing
information, the first thing judges always ask is what information can you share that might, at the very least, narrow

109

prejudice to CCAHG from the Debtors' invocation of privilege. *See* Fed. R. Civ. P. 37 (addressing failure to make disclosures or cooperate in discovery); *Scott v. IBM Corp.*, 196 F.R.D. 233, 247 n.9 (D.N.J. 2000) (noting that exclusion of evidence under Rule 37(c) is not appropriate unless the party failed to disclose or supplement in bad faith or unless the resulting prejudice cannot be cured). The Court's approach was also informed by the practical reality that bankruptcy is litigation in real time. In a Chapter 11 case such as this, the parties are continuing to negotiate the details on a Chapter 11 plan in the days leading up to the hearing and during the hearing as well. For example, numerous objections to confirmation in these cases were resolved by changes made by the Debtors to the proposed Plan. *See* Hr'g Tr. 138:8-10 (Feb. 28, 2024). Indeed, this approach occurred with other parties in connection with the Debtor Releases, where objections were resolved by changes made by the Debtors after objections had been filed.

Disclosure was the path here to address CCAHG's concerns. In response to the Court's inquiry at the Evidentiary Hearing, CCAHG identified six questions to which it wanted answers regarding the Debtor Releases. These six questions were as follows:

1. Whether any of the released insiders withdrew assets within the 90-day period prior to the petition date.
2. Whether released insiders participated in lending funds to Three Arrows Capital.
3. Whether released insiders have consulting or other arrangements with DCG.
4. Whether released insiders participated in the decision making or were involved with Debtor's lending to any DCG-owned entity.
5. Whether released insiders made the decision to not liquidate GBTC Grayscale ETF shares at an opportunistic time.
6. What benefit any of the Genesis insiders would deliver to the estate in exchange for being released.

Hr'g. Tr. 168:12-23 (Feb. 26, 2024).[94]

---

the scope of the objection?"); *see id.* 168:9-10 (Feb. 26, 2024) ("So, the question is what is it that you want to know?").

[94]     These six questions were the same areas that CCAHG had identified as problematic in its Motion *in Limine*. *See* Motion *in Limine* at 2-3.

At the Court's urging, Debtor's counsel provided detailed answers to each of these questions the next day in advance of Mr. Aronzon's testimony. *See* Hr'g. Tr. 24:8-27:13 (Feb. 27, 2024). The answers were in the form of an evidentiary proffer that "reflect[ed] the testimony that Paul Aronzon, a member of the Special Committee, would provide if designated to testify as a corporate representative on behalf of the Debtors under Fed. R. Civ. P. 30(b)(6)." *Id.* at 24:8-27:13.[95]

The proffer provided comprehensive answers to each of the six questions posed by CCAHG, all of which provided reassurance about potential issues identified by CCAHG. The answers to the questions were as follows:

1. No Released Genesis Personnel withdrew funds within the 90 days before the Petition Date. In any event, preference causes of actions against creditors are being waived pursuant to the Plan as a result of all classes voting in support of the Plan.

2. The Debtors are not aware of any Released Genesis Personnel having lent funds to Three Arrows Capital. To the extent that this question is asking about the decision by the Debtors to lend funds to Three Arrows Capital, the individuals responsible for that decision were not employed by the Debtors as of the Petition Date and are not among the Released Genesis Personnel.

3. The Debtors are not aware of consulting or similar arrangements between any Released Genesis Personnel and DCG. DCG is best positioned to confirm that fact.

4. The individuals responsible for the decision to lend to DCG and its affiliates were not employed by the Debtors as of the Petition Date and are not among the Genesis Released Personnel. Following its appointment on November 18, 2022, the Special Committee made all decisions with respect to the DCG Loans in consultation with creditor constituencies.

5. No Released Genesis Personnel were responsible for the decision not to liquidate GBTC Grayscale shares before the Petition Date. Following its appointment on November 18, 2022, the Special Committee made all decisions with respect to the GBTC Grayscale ETF shares in consultation with creditor constituencies. Before the ETF conversion, the Debtors requested

---

[95]    At the Court's suggestion, the Debtors also provided this same information in written form on the docket so that it would be available for all interested parties, even ones who were not attending the Evidentiary Hearing. *See Notice of Supplemental Disclosure* [ECF No. 1403].

consent from the Committee and the Ad Hoc Group to sell the shares, but they
were not willing to give that consent. The Debtor filed a motion seeking
permission to sell or redeem the shares on February 2, 2024 after the ETF
conversion. See Debtors' Motion Seeking Entry of an Order Authorizing, but
not Directing, (I) the Sale of Trust Assets and (II) Granting Related Relief,
ECF No. 1227.

6. This question is already addressed in Exhibit 1 to Mr. Paul Aronzon's
Declaration, which is also Exhibit F to the Plan Supplement, [ECF No. 1117].
Specifically, that disclosure notes:

- The Released Genesis Personnel provided services to the estate after
the Petition Date and have contributed to the Debtors' restructuring
efforts.

- The Released Genesis Personnel also have knowledge and insight into
the Debtors' business and transactions that may be critical to the
resolution of litigation against the DCG Parties and the Gemini Parties,
as well as various regulatory and enforcement matters relating to the
Debtors' prepetition business.

In addition, following discussions with various creditor groups, the
Debtors have now incorporated a requirement that Released Genesis
Personnel must execute cooperation agreements.

Notice of Supplemental Disclosure at 3.

The evidentiary proffer as to these six issues was read into the record prior to Mr.

Aronzon taking the witness stand. *See* Hr'g. Tr. 22:6-9, 24:8-27:13 (Feb. 27, 2024). After being

provided with this additional information, CCAHG requested the opportunity to cross-examine

Mr. Aronzon. *See id.* at 31:14-17. But before that cross-examination began, however, the Court

asked whether CCAHG would be ready to go forward with the cross-examination immediately,

in the event that CCAHG felt that it needed additional time to address the additional information

provided in the proffer. *See id.* at 32:21-22. CCAHG replied that it was ready to proceed. *See*

*id.* at 32:23-24.

CCAHG then proceeded to cross-examine Paul Aronzon at great length, including asking

numerous questions about the information contained in the proffer. *See* Hr'g. Tr. 37:8- 80:25

(Feb. 27, 2024). For example, CCAHG questioned Mr. Aronzon as to whether the proposed

released parties had any dealings with Three Arrows Capital (Number 2 in the list of questions

and proffered answers). *See id.* at 56:8-58:17. Similar questions and answers were provided on

other topics. Given the extensive additional information provided to CCAHG as to each of the

six subjects it identified and CCAHG's opportunity to conduct cross-examination on those

additional facts, the Court concludes that CCAHG's request to bar the testimony of Mr. Aronzon

should be denied.[96]

### b. CCAHG's Substantive Objection

When reviewing releases in a debtor's plan, courts consider whether such releases are in

the best interest of the debtor's bankruptcy estate. *See JPMorgan Chase Bank, N.A. v. Charter

Commc'ns. Operating, LLC (In re Charter Commc'ns.)*, 419 B.R. 221, 229 (Bankr. S.D.N.Y.

2009). Settling such claims is in the best interest of the Debtors' estates where "the benefits of

settling such claims outweigh any potential benefit from pursuing such claims in light of, among

other things, the cost and risk involved in litigation." *In re Residential Cap., LLC*, 2013 Bankr.

LEXIS 5683, at *47-48 (Bankr. S.D.N.Y. Dec. 11, 2013). The factors to consider when

determining the validity of debtor releases include whether they are: (1) in exchange for the good

and valuable consideration provided by the released parties; (2) a good faith settlement and

compromise of the claims released by the debtors' release; (3) in the best interests of the debtors,

the estates, and all stakeholders; (4) fair, equitable, and reasonable; (5) given and made after due

---

[96] CCAHG did complain that the proffer did not provide factual information. *See* Hr'g. Tr. 51:25-52:1 (Feb. 27, 2024) (CCAHG stating that "[o]ur position is that what we received through the proffer are conclusions, not facts."). But the Court disagreed. *See id.* at 52:6-12 (Court: "a proffer is not an attorney statement, it's a statement that a witness can testify to the following. And it's designed to move things along as an evidentiary matter so people can say, okay, I understand now, that's a factual proffer. So a proffer is factual. It's not a legal conclusion."). The Court's review of the proffer after the hearing only confirms the Court's initial conclusion. The proffer answers each of the specific factual inquiries that CCAHG had about the Debtor Releases. Having asked those six questions—and received answers to each—CCAHG cannot now complain that the questions were problematic.

notice and opportunity for a hearing; and (6) a bar to the debtors, and any holder of a claim or equity interest or other entity who would have been legally entitled to assert such claim or equity interest on behalf of any of the debtors or any of their estates from asserting any claim or cause of action released pursuant to the debtors' release. *Id.*

When assessing the proposed Debtor Releases under the business judgment standard, the Court is mindful that "[t]he business judgment rule 'bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 795 (Bankr. S.D.N.Y. 2012), *adopted in part*, 499 B.R. 276 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 43 (2d Cir. 2014) (quoting *Auerbach v. Bennett*, 47 N.Y.2d 619, 629, (N.Y. 1979)). "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *In re Quigley Co., Inc.*, 437 B.R. 102, 157 (Bankr. S.D.N.Y. 2010) (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)). In sum, "the Court should not substitute its business judgment for that of the Debtors." *In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009).

CCAHG argues that there is not a sufficient factual basis to justify the Debtor Releases. *See* Hr'g. Tr. 241:4-15 (Mar. 18, 2024). But the Court disagrees. The Court concludes that the Debtors have satisfied the business judgment standard for the Debtor Releases here. Crucial to the Debtor Releases, the Debtors have determined that none of the Released Parties have claims against the Debtors:

> [t]he Special Committee's investigation has not identified wrongdoing on the part of the Released Genesis Personnel that would give rise to Claims or Causes of Action that are likely to provide value to the Debtors' Estates and Any surviving Claims against the Released Genesis Personnel would be costly and unlikely to result in significant recoveries for the Debtors' Estates because of very limited

114

directors and officers insurance coverage, which at present provides no more than $8.7 million in coverage.

*See* Plan Supplement, Exhibit F.  Mr. Aronzon explained the extensive method used to determine what claims, if any, existed against the individuals in question:

> So as part of our process, we ask our counsel and our financial advisors to conduct a very extensive interview.  In fact, we put no boundaries on what they had to do.  We ask them to put their creditor hats on, put their litigation hats on, and to think about each and every type of claim or cause of action that they could conjure up, and dig into our books, records, and talk to the relevant parties to determine what claims might exist, and against whom.  So you start with the process part. They were given wide range, and they did their job, and they spent many, many, many months doing so.  At the end of that process, which took, like I said many months, and you know, we had interim reports along the way, as I think I mentioned yesterday, we had weekly meetings, sometimes we had multiple meetings per week, we would receive updates on the investigation, and we would be able to ask questions, and give direction or guidance about pursuit and the like.  At the end of that process, we went through a series of meetings where we looked at the claims that had been identified, and I think some of this is mentioned in the disclosure statement, where colorable claims exist, or claims that might be worthy of pursuit, and at the end of the process, we had to sign off on sort of a final list.

Hr'g. Tr. 40:10-41:14 (Feb. 27, 2024); Hr'g. Tr. 49:21-25 (Feb. 26, 2024) ("The Special Committee under the leadership of Lev Dassin, former U.S. attorney for the Southern District of New York, acting.  He did an investigation with our team.  And that team in that investigation did not reveal any viable claim worth pursuing against any of the release personnel."); *see* Plan Supplement, Exhibit F.

During CCAHG's lengthy cross-examination of Mr. Aronzon, CCAHG stressed that Mr. Aronzon did not personally conduct interviews of the employees that were part of the investigation:

> Q. You didn't conduct any interviews of any of these persons, did you?
> A. Personally?
> Q. Personally.
> A. That's not what directors do.  And no.

> Q. Okay, and no.  And Cleary conducted the interviews.  Isn't that right?
> A. Cleary conducted the interviews.  There may have been other folks involved,
> I'm not sure.  But Cleary was in charge of this.

Hr'g. Tr. 46:17-47:1 (Feb. 27, 2024).  But contrary to CCAHG's insinuation, there is no requirement that Mr. Aronzon personally conduct these interviews.  It is enough that he and other executives of the Debtors were appraised of the results of the interviews as part of the decision-making process on whether or not to provide releases.  *See id*. at 47:4-10 (referencing more than two dozen interviews and Cleary's time spent with Mr. Aronzon, the CEO, the CFO, and the General Counsel of Genesis).

CCAHG also repeatedly stressed that there were instances when Mr. Aronzon did not know details about the exact scope of the job responsibilities for the Released Parties.  For example, CCAHG noted Mr. Aronzon's lack of knowledge about specific tasks relating to 3AC that were performed by parties being released.  But CCAHG has missed the forest for the trees.  Mr. Aronzon testified as to the larger and more important point that none of the persons receiving a Debtor Release had any decision-making responsibility at the Debtors as to 3AC.  When questioned if there were any released parties responsible for conducting diligence as to 3AC, Mr. Aronzon put all these facts in context when asked:

> Q: Were any of the persons that are released parties responsible for conducting
> diligence, meaning the 3AC, or the ultimate decision to issue loans?
> A: I don't believe so, but I'm not 100%.  And here's why I say that.  We have
> people who work for us today, who were here on the petition day, and they may
> have processed term sheets or something.  They're not in a policymaking position
> or decision-making position about credit and extensions of loans, but I believe
> that there are people who probably were in the processing department that did
> some of this.

Hr'g. Tr. 56:8-20 (Feb. 27, 2024).  The same is true for other specific conduct as to which

CCAHG inquired, such as the job responsibilities of Released Parties regarding loans to DCG.[97]

In each instance, Mr. Aronzon testified as to the crucial point: none of the Released Parties had

any decision making responsibilities in that area.  *See*, *e.g.*, Hr'g. Tr. 62:15-16 (Feb. 27, 2024)

(Mr. Aronzon testifying that folks involved in decision making as to the DCG loans are not being

released); *see also* Hr'g. Tr. 62:21 (Feb. 27, 2024).  CCAHG did not provide a cogent

explanation as to why the specific details on which it focused would undermine the Debtors'

business judgment given Mr. Aronzon's testimony that: 1) the Released Parties do not have

decision making capacity in these areas; and 2) the Debtors do not possess any claims against the

Released Parties.

In reaching its decision to grant these Debtor Releases, the Court is also persuaded that

the Debtor Releases will provide a benefit to the Debtors by virtue of the Cooperation

Agreements.  Indeed, there is a provision that a failure to cooperate may result in the Debtors

making a request to the Court to have any such release be voided *ab initio*.  *See* Cooperation

Agreement ¶ 1.  Although CCAHG downplays the significance of these Cooperation

Agreements, CCAHG did not always view them negatively.  As CCAHG's counsel stated in

their opening statement: "[W]e are actually the ones who came up with the cooperation

agreement concept.  We were trying to resolve our objection on the releases, and we offered that

if some of the Genesis employees were to sign cooperation agreements, we would be

comfortable with that."  Hr'g. Tr. 126:11-16 (Feb. 26, 2024).  While CCAHG complains that

---

[97]     As to the DCG loans, CCAHG once again focused on Mr. Aronzon's knowledge of specific details that do
not bear on whether the Released Party had a decision making role.  *See* Hr'g Tr. 59:16-19 (Feb. 27, 2024) (when
asked whether released individuals signed any of the notes or other agreements with DCG, Mr. Aronzon testified "I
don't know."); *Id.* at 63:15-19 (Mr. Aronzon testified "I don't know that" when asked whether insiders being
released were involved with diligence in relation to the assumption by DCG of the GAP loans).

these Debtor Releases now have been offered to all employees, that is clearly not the case. CCAHG ignores certain limiting language from the definition, which tailors any release to an individual's work for the Debtors.  *See* Plan, Article I(a)(193).   And by its own language, the Debtor Releases do not cover "[f]ormer officers and directors of the Debtors who were not employed as of the petition date, DCG parties, Gemini parties, and officers, directors, or employees of the Debtors as to which the Special Committee determined to exclude them from the list."  Hr'g. Tr. 206:16-22 (Mar. 18, 2024); *cf.* Hr'g Tr. 96:23-97:2 (Feb. 27, 2024) (Debtor's counsel stating "we will not be adding any more names to the list of Genesis released personnel, though we do continue to reserve the right to remove names, in our sole and absolute discretion.").[98]  CCAHG further argues that the Cooperation Agreement does not support the Debtors' position because the persons involved may already have an obligation to cooperate with the Debtors by virtue of their employment or corporate positions with the Debtors.  *See Genesis Crypto Creditors Ad Hoc Group's Proposed Findings of Fact and Conclusions of Law* [ECF No. 1516] ¶ 60 ("CCAHG Findings of Fact").  But CCAHG has not provided any evidence that this is, in fact, true.  No questions were asked during cross-examination regarding the job descriptions of any of the Genesis released personnel and whether their duties overlapped with the consideration provided in the Cooperation Agreement.  Thus, the Court rejects this argument as nothing more than unsupported speculation.

Having assessed all of the arguments raised by CCAHG, the Court concludes that none provide a basis for denying the Debtor Releases.  Accordingly, CCAHG's Motion *in Limine* is denied and its objection to the Debtor Releases is overruled.

---

[98]     Consistent with the normal practice, the Debtor Releases here also carve out any gross negligence, willful misconduct, or fraud as determined by the Court.  *See* Hr'g. Tr. 50:2-3 (Feb. 26, 2024).

### E.  UST Objections

The objections by the UST cover two topics, neither of which stand in the way of confirmation.

#### 1.  Exculpation

Exculpation provisions are designed to "insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring."  *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (allowing exculpation for acts or omissions in connection with the bankruptcy case and plan of reorganization).  The UST objects to the exculpation provision in the Plan, asserting that it improperly exculpates conduct that is yet to occur and parties whose duties will not commence until after the effective date of the Plan.  *See* UST Confirmation Objection at 9-14.[99]  The UST also objects to the exculpation of the Gemini Distribution Agent and Disbursing Agents through a "no liability" provision, which the UST characterizes as a "prospective exculpation."  *Id.* at 10-11.  The UST further contends that the definition of "Exculpated Parties" improperly includes non-estate fiduciaries, including members of the Ad Hoc Group Steering Committee, the Plan Administrator, members of the Wind-down Oversight Committee, members of the Litigation Oversight Committee, the Gemini Distribution Agent, and "related parties" to each of these.  *Id.* at 11 (citing Plan, Article I(A)(95)).  Given the significant revisions to the exculpation provisions during the Evidentiary Hearing and the entire record, the Court overrules the UST's exculpation objection.[100]

---

[99]    The only other objection to the exculpation provisions in the plan was raised by BAO Family Holding LLC.  *See* BAO Confirmation Objection at 12-13.  However, the BAO Confirmation Objection was resolved prior to closing arguments.  *See Letter from Jane VanLare*, dated March 15, 2024 [ECF No. 1483].

[100]    During closing arguments at the Evidentiary Hearing, the UST indicated that its objections regarding the exculpation clause could be resolved.  *See* Hr'g Tr. 267:19-22 (Mar. 18, 2024).  This did not seem surprising given the significant revisions since the UST filed its objection, many of which would appear to directly address the

The UST first objects to the temporal limits of the exculpation clause, asserting that

exculpation clauses should not extend past the effective date of the plan.  *See* UST Confirmation

Objection at 10.  Notwithstanding the UST's view, exculpation may be appropriate even for

actions taken after the effective date.  *See In re Ditech Holding Corp.,* 2021 WL 3716398, at *9

(Bankr. S.D.N.Y. Aug. 20, 2021).  In any event, the Debtors revised the exculpation provision

after the UST filed its objection to make it clear that only acts undertaken on or before the

effective date of the Plan are subject to exculpation.  *See* Plan, Article VIII(F).  Given the entire

record—including this revision—the Court finds that the time period subject to exculpation here

is within the well-settled temporal bounds of appropriate exculpation.

Second, the UST contends that exculpation must be limited only to estate fiduciaries.  *See*

UST Confirmation Objection at 11 (citing *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51

(Bankr. D. Del. 2011)).  But once again, since the UST's objection was filed, the Debtors have

narrowed the parties covered by the exculpation clause.  *See* Plan, Article I(A)(95) (removing

from the definition of exculpated parties the Plan Administrator, members of the Wind-down

Oversight Committee, members of the Litigation Oversight Committee).[101]  The only remaining

non-fiduciaries covered by the exculpation provision are the members of the Ad Hoc Group

steering committee, solely in their capacities as such, and the Gemini Distribution Agent, solely

in its capacity and with any exculpation limited solely to the extent that the Gemini Distribution

Agent is implementing the Plan.  *See* Plan, Article I(A)(95).  As to these parties, the Court rejects

---

concerns raised by the UST.  Despite these revisions, however, the UST objection remains outstanding.  *See Letter from Sean O'Neal to the Court*, dated April 24, 2024 [ECF No. 1617]; *Letter from the UST to the Court*, dated April 25, 2024 [ECF No. 1622].  Accordingly, the Court is constrained to address the full range of arguments in the UST Confirmation Objection.

[101]    With the revised Plan's removal of the Plan Administrator, members of the Wind-down Oversight Committee, members of the Litigation Oversight Committee, and their related employees from the definition of exculpated parties, the Plan amendments also render moot the UST's concerns about exculpating parties whose roles only begin after the effective date of the Plan.  *See* UST Confirmation Objection at 11-12.

the UST's position.  It is well established in this district that, under the proper circumstances,

exculpation is not limited to estate fiduciaries.  *See Aegean Marine Petroleum Network*, 599 B.R.

at 721.  As the *Aegean* court helpfully explained:

> a proper exculpation provision is a protection not only of court-supervised
> fiduciaries, but also of court-supervised and court-approved transactions. If this
> Court has approved a transaction as being in the best interests of the estate and
> has authorized the transaction to proceed, then the parties to those transactions
> should not be subject to claims that effectively seek to undermine or second-guess
> this Court's determinations.

*Id.*; *see also In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June

18, 2022), *corrected*, *and motion to certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y.

July 26, 2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 756 (S.D.N.Y.

2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022*), aff'd

sub nom. In re LATAM Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom. TLA

Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023).  Echoing *Aegean*, the

court in *LATAM* explained that exculpation may cover parties who are not estate fiduciaries when

these parties have played significant roles in the case that justify such treatment:

> Exculpated Parties who are not estate fiduciaries are entitled to benefit from a
> broad exculpation provision.  They have been actively involved in all aspects of
> these Chapter 11 Cases and have made significant contributions to the success of
> these cases.  In the absence of gross negligence or intentional wrongdoing on their
> parts, the Court will extend the Exculpation clause to the Exculpated Parties who
> are not estate fiduciaries, to bar claims against them as set forth in the Exculpation
> clause, and based on the negotiation, execution, and implementation of
> agreements and transactions that were approved by the Court.

*Id.* at *50.

The Ad Hoc Group Steering Committee is precisely the kind of party who is entitled to

exculpation give its extensive contributions to the case.  *See generally* PSA; *see also* Hr'g Tr.

106:15-18 (Feb. 27, 2024) (Mr. Aronzon describing the Ad Hoc Group as "instrumental" in the

development of the Distribution Principles).  The Court also that the Ad Hoc Group made a

strong showing to support a finding of substantial contribution to the reorganization process, a

point which the UST appeared to concede.  *See* Hr'g Tr. 258:18-259:19 (Mar. 18, 2024) (in

response to an observation by the Court that the Ad Hoc Group had been involved in reaching

consensus regarding the Plan and finalizing the AG settlement, the UST stated "I think that in the

usual context, there would be a showing of substantial contribution"); *see also* Hr'g Tr. 20:3-6

(April 16, 2024) [ECF No. 1594].  Parties who made substantial contributions to the

reorganization process and whose inclusion in the exculpation provision was a critical

component in forming a plan have been found to be entitled to exculpation.  *See In re Stearns*

*Holdings, LLC*, 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019); *In re Klaynberg*, 2023 WL 5426748,

at *17 (Bankr. S.D.N.Y. Aug. 22, 2023); *cf. In re Worldcom, Inc.*, 2003 WL 23861928, at *28

(Bankr. S.D.N.Y. Oct. 31, 2003) (finding it appropriate to bargain for inclusion in an exculpation

provision in order to reach a consensual plan).  This result is only further confirmed by the

record developed regarding the Ad Hoc Group's role in negotiating the NYAG Settlement

Agreement.  *See, e.g.,* Hr'g Tr. 86:10-18 (Feb. 28, 2024) (counsel for NYAG stating that the Ad

Hoc Group sought to ensure that creditors would get the full value of what they were entitled to

as creditors/victims).

 With regard to the Gemini Distribution Agent,[102] that party will be exculpated for actions

that the Gemini Distribution Agent is required to take to effectuate the terms of the Plan,

something that is contemplated by the Plan.  Indeed, the Plan specifically sets forth the

---

[102] The Gemini Distribution Agent means "Gemini or an entity appointed by Gemini . . . to make or facilitate
distributions to Gemini [Earn Users] pursuant to the Plan."  Plan, Article I(A)(113).

significant role of the Gemini Distribution Agent in carrying out the transactions contemplated

by the Plan, with the Gemini Distribution Agent

> empowered and directed to . . .  (a) effect all actions and execute all agreements,
> instruments, and other documents necessary to perform its duties under the Plan . .
> . and exercise such other powers as may be vested in the Disbursing Agent or the
> Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the
> Plan, the Distribution Principles, and the Gemini Lender Distribution Principles,
> or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be
> necessary and proper to implement the provisions of the Plan, the Distribution
> Principles, and the Gemini Lender Distribution Principles.

Plan, Article VI(B)(1).  All of the actions to be taken by the Gemini Distribution Agent—and

exculpated here—are prescribed by the terms of the Plan or taken solely in furtherance of the

Plan.  It would be perverse to hold parties liable "for doing things that the Court authorized them

to do and that the Court decided were reasonable things to do."  *Aegean Marine Petroleum

Network*, 599 B.R. at 721; *see also In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 135

(Bankr. S.D.N.Y. 2023) (noting the UST's request to enter a confirmation order that will compel

certain parties to undertake the transactions that the plan required while making those same

parties liable for the actions they were required to take to be "absurd.").  The Court further notes

that tasking the Gemini Distribution Agent with the responsibility to make distributions to the

Gemini Earn Users is inherently sensible.  Gemini already has a relationship with the Gemini

Earn Users and a platform through which the Gemini Earn Users can be reached and

distributions received.  Requiring the Debtors or another estate fiduciary to take on the role of

making distributions to the Gemini Earn Users would merely add expense and potential

complications, and further delay creditor recoveries.  Indeed, no party—including the UST—has

objected to the role of the Gemini Distribution Agent under the Plan.[103]

---

[103]    The UST also takes umbrage at the inclusion of "Related Parties" to the definition of parties entitled to
exculpation. *See* UST Confirmation Objection at 12.  The Court retains jurisdiction to determine the appropriate

Finally, the UST objects to the inclusion of a sentence in the injunction provision of the Plan providing that "to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors."  Plan, Article VIII(G).  The UST characterizes this as a "hidden third party release."  UST Confirmation Objection at 14-15.  The Court disagrees.  The language to which the UST objects merely reiterates and incorporates the protections of the exculpation provision—effectively a "belt and suspenders" approach to enforcing the exculpation provision and the previously discussed Debtor Releases.  At closing argument, counsel for the UST conceded that the language at issue would be "appropriate for exculpations, but [is] not appropriate under the injunction provision." Hr'g Tr. 268:23-25 (Mar. 18, 2024).  This distinction elevates form over substance, and the Court sees no issue in ensuring that the terms of the exculpation provision have an enforcement mechanism in the injunction provision of the Plan.

In sum, the Court finds the exculpation provisions in the Plan to be appropriate given the overall facts of these cases and well within the bounds of exculpation clauses routinely approved by the courts of this District.  The exculpation provision of the Plan is limited, applying only to restructuring activities subject to the supervision of the Court, such as the formulation, negotiation, solicitation, and implementation of the Plan, as well as actions related to the various

---

scope of "Related Parties", which the Court will construe in the context of rulings above that exculpation covers only work done in connection with these bankruptcy cases and the Plan.

settlement agreements (such as the settlement agreement between the Debtors and the Securities

and Exchange Commission).  *See* Plan, Article VIII(F).

2.  Substantial Contribution

The Plan provides for payment of the legal fees for the Ad Hoc Group and Ad Hoc Dollar

Group (up to a cap of $300,000) as administrative expenses of the estate.[104]  *See* Plan, Article

II(E).  The UST objects, asserting that such a payment is permissible only if these parties are

found to have made a substantial contribution under 11 U.S.C § 503(b).[105]  *See* UST

Confirmation Objection at 16-18.  The UST also insists that any request for payment based on a

substantial contribution must be made through a separate application.  *See Letter from the UST to*

*the Court*, dated April 25, 2024 [ECF No. 1622] ("[T]he United States Trustee continues to

assert that the reimbursement from the Debtors' estate of attorney fees and costs to a creditor

must be pursuant to an application under 11 U.S.C. 503(b)(3). The testimony of a witness or

argument in a motion about the contribution made by a creditor and the sending of time records

to the United States Trustee cannot substitute for a properly filed application . . . .").  The

Debtors, the Ad Hoc Group, and the Ad Hoc Dollar Group all assert the payments are

appropriate as a negotiated compromise under the Plan and, in any event, based on the

substantial contribution of these parties.  *See* Debtors' Confirmation Mem. ¶¶ 43-44; Ad Hoc

Dollar Lenders Confirmation Statement ¶¶ 10-15; Ad Hoc Group Confirmation Mem. at 34-35.

---

[104]     The PSA also provided for the payment of professional fees to Kirkland & Ellis, LLP, a provision to which
the UST objected.  *See* PSA Article IV, § 4.7(a)(iii); UST Confirmation Objection at 4, 17-18.  However, the Plan
itself does not provide for payment of fees to Kirkland & Ellis, LLP.  Based on the most recent filings, this concern
no longer appears to be a live dispute.  But to the extent that there is an outstanding dispute on this issue, the parties
should inform the Court.

[105]     DCG also object to the payment of the Ad Hoc Group and Ad Hoc Dollar Group fees.  *See* DCG
Confirmation Objection ¶ 93.

Turning to the issue of substantial contribution,[106] Section 503(b) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under [S]ection 502(f) of this title, including . . . the actual, necessary expenses . . . incurred by . . . a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under [S]ection 1102 of this title, in making a substantial contribution in a case under [C]hapter 9 or 11 of this title."  11 U.S.C. § 503(b)(3)(D).  The Court believes that the procedural requirements for relief have been satisfied here.  First, parties have been given notice of the issue.  The proposed payment of these fees was extensively briefed prior to the Evidentiary Hearing, including under both theories advanced by the requesting parties.  Second, the matter was addressed at the Evidentiary Hearing.  Indeed, the Ad Hoc Group elicited testimony at the Evidentiary Hearing on the question of substantial contribution, asking Mr. Aronzon questions about the role of the Ad Hoc Group, and the Ad Hoc Group also presented argument on the issue.  *See* Hr'g Tr. 100:18-107:14 (Feb. 27, 2024);  *see also* Hr'g Tr. 107:6-110:5 (Mar. 18, 2024) (counsel to the Ad Hoc Group discussing the evidence offered to support a finding of substantial contribution by the Ad Hoc Group).

Given this procedural posture, the Court suggested that the parties could simply address the issue of substantial contribution without the need for the filing of an additional formal motion.  *See* Hr'g Tr. 24:19-25:23 (Feb. 26, 2024) (the Court suggesting that, since the issue had

---

[106]      The UST strenuously asserts that Section 503(b) is the "exclusive avenue" for payment of these legal fees as administrative expenses.  *See* UST Confirmation Objection at 17 (quoting *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283, 289 (S.D.N.Y. 2014) (disallowing payment of fees through an agreement negotiated as part of a plan and requiring an application for payment under Section 503); *but see In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 9-10 (Bankr. S.D.N.Y. 2010) (holding that fees may be paid where the provision for fees is an element of a Chapter 11 reorganization plan); *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019) (stating that payment of fees need not be reviewed under Section 503(b) if the fees are to be paid as part of global settlement approved by the court).  Given the record here and the fact that *Lehman* is the only recent appellate decision in this district addressing this issue, the Court believes that the best course of action here is to analyze these fees as a matter of substantial contribution.

been raised and addressed in pleadings, a formal motion was not necessary). The UST appeared

to agree with that view. For example, the following exchange took place during opening

statements for the Evidentiary Hearing:

> The Court: [m]y comments were directed to trying to resolve the procedural
> question about filing a motion . . . . I think we're all on notice of the issue. And
> so, I was just trying to—in the interest of efficiency—allow us to tee up the issue
> to talk about it now as opposed to having to say, well, someone needs to file a
> motion . . . .
> [Counsel for the UST]: Your Honor, I appreciate that. And that was my
> understanding as well. Bottom line, we will review the time records and see.

Hr'g Tr. 146:14-147:11 (Feb. 26, 2024); *see also* Hr'g Tr. 261:5-14 (Mar. 18, 2024). Indeed, the

UST also appeared to concede that, as least as to the Ad Hoc Group, a showing of substantial

contribution had already been made and the only remaining question was the amount of fees

being sought. *See* Hr'g Tr. 258:18-259:20 (Mar. 18, 2024). In an effort to resolve the UST's

objection, both the Ad Hoc Dollar Group and the Ad Hoc Group agreed to provide their time

records to the UST. *See Letter from Sean O'Neal to the Court*, dated April 24, 2024 [ECF No.

1617]; *see also* Hr'g Tr. 263:2-11 (Mar. 18, 2024) (the Court noting that information about

substantial contribution was already in the record and the UST stating that they had received

cooperation from the parties with regard to providing information).

Despite the provision of the requested information, however, the UST now takes a

strikingly different position by insisting that it now won't review the very time records that it

previously requested. *See Letter from the UST to the Court*, dated April 25, 2024 (stating that

the UST "will not review such [time] records in the absence of a properly filed application."").

As a result, any progress on the issue has stalled since the Evidentiary Hearing. Regrettably, this

leaves the Court without the record needed to make a ruling on this issue. The Court had

previously indicated its preliminary view that, at least as to the Ad Hoc Group, it appears that the

127

Ad Hoc Group had made a substantial contribution and the remaining question was solely the

extent of the fees to be reimbursed under the substantial contribution framework. *See* Hr'g Tr.

22:3-10 (April 16, 2024). However, the Court does not have a sufficient record to determine

what fees were incurred for services that benefitted the entire case, as compared with the fees

incurred solely for the parochial interests of the specific creditor. *See, e.g., In re Granite

Partners*, 213 B.R. 440, 445-47 (Bankr. S.D.N.Y. 1997) (discussing factors for assessing

substantial contribution). Accordingly, the Court regrettably has no choice but to defer a ruling

on this issue to a later date. But as it is important to bring this matter to a prompt resolution, the

Court will order the parties to provide additional submissions to enhance and clarify the

record.[107] In reviewing the parties' submissions, the Court will look to the Ad Hoc Group and

Ad Hoc Dollar Group's involvement in seminal events in these bankruptcy cases, such as the

negotiation of the Plan at issue here, as well as the previous plans and terms sheets that predated

it, and the settlement of major litigation, such as the dispute with Gemini and the NYAG Action.

*See id.*

### F.   Confirmation Requirements

Having overruled the confirmation objections of DCG, CCAHG, and the UST, the Court

addresses the remaining requirements for confirmation. In short, the Court finds that the Plan

---

[107]    The parties should submit the following:

- within 21 days, any party seeking a finding of substantial contribution shall submit evidence of its fees incurred in making a substantial contribution, together with an explanation of the tasks for which it is seeking compensation. Parties are also free to submit any other additional evidentiary support to justify its request;
- within 14 days after the submission directed above, the UST shall submit a detailed statement of its position on the requests, including a detailed list of any tasks (and related compensation) that it contests and why; and
- within 7 days after the UST submission, parties shall submit any replies to respond to the issues raised by the UST.

meets all relevant provision of applicable law, including the provisions of Section 1129 and 1123.

With regard to the requirements of Section 1123, the Court finds that the Plan designates classes of claims, designates classes of claims that are impaired under the plan and specifies the treatment of the classes that are impaired, and provides for the same treatment of each claim in a particular class.  *See generally* Plan, Articles II, III.  The Plan also provides for adequate means for implementation, particularly in light of the fact that this is a liquidating plan and the Plan provides for distribution of assets to creditors.  *See, e.g.*, Distribution Principles; Plan, Article IV.  The Debtors' new governance documents explicitly prohibit the issuances of nonvoting equity securities.  *See* Plan Supplement, Ex. L.

The Plan also meets the requirements for confirmation of a plan found in Section 1129.  As discussed extensively above, the Plan has been proposed in good faith, as exemplified by the extensive, arms' length negotiations between the Debtors, multiple creditor constituencies, and the equity holder.  The Court also finds that the Plan and the Debtors, as plan proponents, have complied with all applicable provisions of the Bankruptcy Code.

## **CONCLUSION**

For the reasons stated above, the NYAG Settlement Motion is approved and Plan is confirmed.  The Debtors should settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Files docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to DCG, CCAHG, and the UST.

Dated: White Plains, New York
        May 17, 2024

_____
        */s/ Sean H. Lane*
        UNITED STATES BANKRUPTCY JUDGE

129