CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>       Debtor. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>(Jointly Administered) |
| Genesis Global Capital, LLC,<br><br>       Plaintiff,<br><br> -against-<br><br>Digital Currency Group, Inc.,<br><br>       Defendant. | Adv. Pro. No. 24-01312 (SHL) |

**PLAINTIFF'S REPLY IN SUPPORT OF (I) MOTION TO
ESTIMATE DCG'S COUNTERCLAIM AGAINST THE DEBTORS
UNDER BANKRUPTCY CODE SECTIONS 502(c) AND 105(a) AND (II) MOTION
TO DISMISS COUNTERCLAIM AGAINST GENESIS GLOBAL CAPITAL, LLC**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................................... ii

REPLY ..................................................................................................................... 3

I.      THE COUNTERCLAIM IS UNTIMELY AND MUST
        BE DISMISSED.............................................................................................. 3

                a.      The Proofs of Claim make no reference to DCG's
                        alleged entitlement to the Foreclosed Assets or an
                        alleged breach of contract............................................................ 4

                b.      DCG's vague reservation of rights is not
                        sufficiently particularized as to encompass
                        the Counterclaim......................................................................... 7

                c.      Merely attaching the July A&A Agreement to the
                        Proofs of Claim does not preserve all possible
                        claims based thereon.................................................................... 9

II.     DCG'S INTERPRETATION OF THE PLAIN LANGUAGE OF
        THE AGREEMENT FAILS. ............................................................................ 10

III.    THE DOCTRINES OF JUDICIAL ESTOPPEL, EQUITABLE
        ESTOPPEL, AND ESTOPPEL BY LACHES BAR
        THE COUNTERCLAIM.................................................................................. 13

                a.      Judicial Estoppel......................................................................... 15

                b.      Equitable Estoppel....................................................................... 15

                c.      Estoppel by Laches...................................................................... 17

IV.     DCG'S OPPOSITION TO THE MOTION TO ESTIMATE
        IS BASELESS................................................................................................ 17

CONCLUSION........................................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agassi v. Planet Hollywood Int'l, Inc.*,
    269 B.R. 543 (D. Del. 2001)...................................................................    10

*In re Calpine Corp.*,
    No. 07 Civ 8493 (JGK), 2007 U.S. Dist. Lexis 86514 (S.D.N.Y. Nov. 21, 2007).......    9

*In re Denby Stores*,
    86 B.R. 768 (Bankr. S.D.N.Y. 1988) ........................................................    6

*In re Enron Corp.*,
    419 F.3d 115 (2d Cir. 2005)...................................................................    8

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2023 Bankr. LEXIS 1330 (Bankr. S.D.N.Y. May 19, 2023).....    9, 10

*In re Res. Cap., LLC*,
    No. 12-12020 (MG), 2015 Bankr. LEXIS 1596 (Bankr. S.D.N.Y. May 11, 2015).....    10

*In re SemCrude*,
    443 B.R. 472 (Bankr. D. Del. 2011)..........................................................    8, 10

**Rules and Statutes**

Local Rule 9014-2 .......................................................................................    18

1.      Through its *Opposition to Genesis Global Capital, LLC's Motion to Dismiss DCG's Counterclaim* (the "DCG MTD Opp.") (Adv. ECF No. 26)[2] and *Opposition to the Debtors' Motion to Estimate DCG's Counterclaim Under Bankruptcy Code Sections 502(c) and 105(a)* (the "DCG MTE Opp." and together with the DCG MTD Opp., the "Opposition Briefs") (ECF No. 1688), DCG attempts to present GGC's interpretation of the July A&A Agreement as a surprise and its Counterclaim as an obligatory response thereto.  This narrative is flatly contradicted by the record of the proceedings before this Court.  GGC's commencement of this Adversary Proceeding to assert its claims under the July A&A Agreement did not come as a surprise to DCG—it was previewed many times, including in the 3AC Settlement Agreement, to which DCG was a party, and in the Disclosure Statement, to which DCG provided a direct rebuttal.  But the "surprise" narrative, even if true, does not create exceptions to the numerous legal hurdles that the Counterclaim faces and fails to surmount.

2.      First, the Counterclaim is untimely.  DCG's strained reading of its Proof of Claim does nothing to mask that nowhere in the Proofs of Claim did DCG suggest that it might have an entitlement to the Foreclosed Assets.  Neither its broad and generic reservations of rights, nor its attachment of the contract at issue, creates a free option to later assert a claim that was not specifically preserved in the Proof of Claim.  Moreover, there is no exception to the Bar Date for claims that a party could have asserted, and had all of the facts and information available to assert, but simply failed to do so until late in the case.  And, contrary to DCG's unsupported suggestion, there is no exception when the untimely claim is styled as a counterclaim in an adversary proceeding.

---

[2]      As used herein, citations to "Adv. ECF No. __" refer to the DCG Adversary Proceeding docket.

3.     Second, the plain and unambiguous language of the July A&A Agreement simply does not support the interpretation that DCG advances. By that agreement, DCG was assigned the Assigned Interests, which included the "Collateral" under the MLAs and the Pledge Agreements. Because the Foreclosure took place more than a month prior to the execution of the July A&A Agreement, the Foreclosed Assets—which had been Collateral prior to the Foreclosure, but ceased to be Collateral by operation of the Foreclosure—were by definition excluded from the Assigned Interests. And, as set forth in the Motion to Estimate, this is the only logical reading, because the very purpose of the July A&A Agreement and the related Promissory Note was to allow the parties to claim, and publicly proclaim, that the "hole" in the Debtors' balance sheet left by 3AC's collapse had been filled. If DCG was all along secretly entitled to the property that the Debtors had already foreclosed on (then worth $1.2 billion), then this would have made the hole much larger, not smaller.

4.     Indeed, DCG fundamentally *agrees* with GGC's reading of the assignment of rights language, but protests that its Counterclaim is merely an outgrowth of GGC's interpretation of the adjacent assumption of liabilities provision, which is the basis for GGC's affirmative claim in the Complaint. Essentially, DCG's position is that if GGC is right that the assumption provision is broad enough to cover 3AC's claims against the Debtors and resulting settlement liability, then consistency dictates that the assignment language must be given the same broad interpretation, thereby validating DCG's Counterclaim. But, in so arguing, DCG appears to be under the mistaken belief that the expansive phrase "in connection with the Assigned Interests" applies to the assignment of rights to DCG. In fact, the phrase "in connection with" – which indeed is to be interpreted broadly – applies *only to DCG's assumption of liabilities*. DCG entire "goose vs.

-2-

gander" argument is thus refuted by a plain reading of the relevant provision, which makes clear that DCG's assumption of liabilities was materially broader than the assignment of rights to DCG.

5.      Furthermore, the Counterclaim is barred by multiple equitable doctrines—judicial and equitable estoppel, and estoppel by laches—all stemming from the fact that DCG had ample if not infinite opportunities to raise the Counterclaim, or the theory underlying it, during the nearly two years after GAP's breach supposedly took place.  It chose not to, and instead made repeated representations to the Debtors, the Court, and the Debtors' creditors relating to its interpretation of the July A&A Agreement, all of which conspicuously omitted its purported claim to the Foreclosed Assets.

6.      GGC respectfully submits that its Motion to Dismiss the Counterclaim may be granted in full as a matter of law on any of the above bases: The fact that it was untimely asserted, the fact that it improperly interprets the underlying contract language, and the fact that it is barred by three equitable doctrines.  However, to the extent the Court elects to defer final adjudication of the Counterclaim on the merits for any reason, the Debtors have also submitted the Motion to Estimate, seeking to estimate the Counterclaim at $0 for purposes of allowance, distribution, and reserves, in light of this Court's approval of the Debtors' Plan and the Debtors' intention to begin promptly making distributions thereunder.

## REPLY[3]

## I.      THE COUNTERCLAIM IS UNTIMELY AND MUST BE DISMISSED.

7.      DCG simply failed to preserve the Counterclaim by timely asserting it in the Proofs of Claim.  DCG relies on references in the Proofs of Claim to a potential claim by DCG against

---

[3]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Debtors' *Motion to Dismiss Counterclaim Against Genesis Global Capital, LLC* (Adv. Proc. No. 24-01312, ECF No. 14) or the *Motion to Estimate DCG's Counterclaim Against the Debtors Under Bankruptcy Code Sections 502(c) and 105(a)* (ECF No. 1618).

the Debtors for contribution, subrogation, or indemnification for any liability owed by DCG to 3AC, suggesting that this somehow encompasses its newfound claim for turnover of the Foreclosed Assets. This theory of liability, which depends on potential claims asserted by 3AC against DCG, is entirely distinct from the claim DCG independently asserts against GGC in the Counterclaim. As such, the Counterclaim is untimely.

8.    DCG further argues that the Counterclaim could not have been timely asserted because it could not have been brought in the absence of GGC's claim in this adversary proceeding. This is also false: DCG has asserted the Counterclaim not as a claim for judgment reduction, which is what DCG's own rationale would require, but as an affirmative claim seeking specific performance by the Debtors to turn over the Foreclosed Assets or their proceeds. In any event, as a creditor that submitted timely Proofs of Claim, DCG is barred from asserting the claim at this late date, given that the claim is not based on new or previously unknown facts and is not otherwise the subject of a motion to allow on the basis of excusable neglect. In addition, having filed Proofs of Claim without asserting the Counterclaim, DCG is not eligible for any exception to the requirement that setoff claims by creditors who otherwise filed Proofs of Claim must be raised prior to the Bar Date.

### a.  The Proofs of Claim make no reference to DCG's alleged entitlement to the Foreclosed Assets or an alleged breach of contract.

9.    Even broadly construed, DCG's Proofs of Claim do not encompass the Counterclaim. The Proofs of Claim contain not a single mention of DCG's now-asserted entitlement to the Foreclosed Assets, or its newfound theory that GAP breached the July A&A Agreement. The only reference to the July A&A Agreement in the Proofs of Claim is followed by a single sentence discussing DCG's view of the cumulative effect of the June A&A Agreement, the Promissory Note, and the July GAP-DCG A&A Agreement, which conspicuously omits any

notion that DCG believed it also obtained the rights to more than $1.2 billion in assets that were

unrelated to the Debtors' "remaining loans" to 3AC.  Proofs of Claim ¶ 9.

10.    What DCG did include in its Proofs of Claims related to 3AC and any related claims

expressly limited DCG's claims against the Debtors to scenarios where:

> [T]he Joint Liquidators—or any successors that represent the interests of
> 3AC and/or its creditors—recover any property or value *from DCG* or setoff
> any amounts against DCG's claims against 3AC in the BVI Proceeding, or
> any other proceeding involving 3AC, related to or on account of the
> Disputed Collateral or otherwise relating to assets on which GAP foreclosed
> or the Debtors' loans to 3AC, DCG may be entitled to recover such amounts
> from the Debtors through common law rights of contribution,
> reimbursement, and/or subrogation, and DCG may assert claims against the
> Debtors under law and equity, including without limitation, fraud,
> misrepresentation, negligence and breach of contract. DCG reserves the
> right to amend the Proof of Claim to the extent any contingent and/or
> unliquidated claims associated with the BVI Proceeding, the 3AC BVI
> Lawsuit, or any other proceeding involving 3AC, become fixed and/or
> liquidated.

Proofs of Claim ¶ 11 (emphasis added).  This language includes no mention of a purported

entitlement to the Foreclosed Assets, and no allegation of a breach of the July A&A Agreement.

Indeed, DCG does not, and cannot, point to any language in its Proofs of Claim that preserves the

Counterclaim, instead pointing to language in the Proofs of Claim that merely states the

uncontroversial fact that GAP did not transfer the Foreclosed Assets to DCG in connection with

the July A&A Agreement.  DCG MTD Opp. ¶ 27.  This statement of fact does not preserve the

Counterclaim; to the contrary, it makes clear that DCG had all of the facts available to it to assert

an entitlement to the Foreclosed Assets under the July A&A Agreement and failed to do so.  *See*

*In re Denby Stores*, 86 B.R. 768, 777 (Bankr. S.D.N.Y. 1988) (finding an exception to a creditor's

failure to raise a claim in chapter 7 proceeding where that failure arose from a "good faith mistake"

and did not prejudice the debtor, such as where the claimant became aware of new facts after filing

a proof of claim).  DCG does not argue that there has been any good faith mistake; instead it seems

to argue that it should be exempt from the requirement to assert all claims before the Bar Date because DCG could not possibly have foreseen the claim asserted in GGC's Complaint, and therefore could not possibly have asserted its Counterclaim until it was filed. This is nonsensical.[4]

11.     In particular, DCG argues that, because the Counterclaim "fully depends upon the contract interpretation" advanced by GGC in this adversary proceeding, it could not have filed the Counterclaim at any time prior to GGC initiating this action. DCG MTD Opp. ¶ 32. This is simply not the law, which requires that any creditor that files a proof of claim must assert *all* claims therein (or in amended versions thereof filed prior to the bar date), and may not assert new claims after that date. To hold otherwise would nullify the concept of a bar date entirely, permitting creditors to cook up new theories and file new claims until the eve of confirmation and afterward. And, once again, DCG is not merely asserting a right of setoff (which would be time-barred in any event); it is affirmatively seeking the turnover of more than $4 billion in property from the Debtors, dwarfing GGC's $33 million claim against DCG. In assessing timeliness, it makes no difference that DCG's massive claim is styled as a counterclaim in this Adversary Proceeding, and DCG provides no authority to the contrary.

12.     Even if DCG had advanced an excusable neglect argument, which it has not, this exception would not be available because DCG has for almost two years had access to all information that is relevant to its Counterclaim. Putting aside that DCG is a party to the July A&A Agreement that forms the basis of the Counterclaim and has first-hand knowledge of the events leading up to its execution, including the Debtors' response to the 3AC default, the Foreclosure on

---

[4]     In its opposition to the Motion to Estimate, DCG likewise argues that the Counterclaim is timely given that it is asserting the Counterclaim "for the sole purpose of preserving its rights under the Assignment and Assumption Agreement in the adversary proceeding." DCG MTE Opp. ¶ 52. Here again DCG fails to account for the significance of the Bar Date, simply stating that "a Counterclaim does not arise until a claim is filed." *Id.* This fundamentally misconstrues the facts and law at issue.

the assets at issue, the June A&A Agreement and the issuance of the accompanying Promissory Note, and the negotiation of the July A&A Agreement itself, these events were also the subject of extensive discovery between May and October 2023 in which DCG took part and to which it has maintained access throughout these cases. DCG has made vague reference to documents that were withheld from the Debtors' productions because they were privileged, but does not explain how those documents could possibly have influenced its interpretation of the plain language of the July A&A Agreement that forms the basis for its affirmative Counterclaim. On the basis of the many documents that it did possess for the two years that elapsed before it brought this Counterclaim, DCG could have timely asserted its Counterclaim, but it did not do so at any point, and still has not done so.

**b. DCG's vague reservation of rights is not sufficiently particularized as to encompass the Counterclaim.**

13.    DCG further attempts to salvage its Counterclaim by pointing to broad reservations of rights included in its Proofs of Claim. DCG MTD Opp. ¶ 27-28. While DCG included two different reservations of rights in its Proofs of Claim, see DCG Proofs of Claim ¶¶ 11, 15, neither of those reservations enable DCG to unilaterally extend the Bar Date to bring claims that were not timely asserted. DCG alleges that a generic reservation of rights in its Proofs of Claim to "assert claims against the Debtors under law and equity, including without limitation, fraud, misrepresentation, negligence and breach of contract" covers the present case. DCG MTD Opp. ¶ 28. But such a broad reservation of rights cannot operate to effectively nullify the effect of the Bar Date Order. *See infra* ¶ 15. In any event, DCG fails to contextualize this reservation, which comes on the heels of language limiting it to scenarios where the Joint Liquidators recover any property or value from DCG or setoff any amounts against DCG's claims against 3AC. *See* Proofs of Claim ¶ 11.

14.    DCG next points to even broader language by which it "reserve[d] all rights to amend, modify, supplement, reclassify, or otherwise revise its Proof of Claim at any time and in any respect, including without limitation, as necessary or appropriate to provide additional detail regarding the claims set forth in [the Proof of Claim][.]" Proofs of Claim ¶ 15. Far from providing additional detail, the Counterclaim asserts an entirely new theory of liability. Similarly, at base, no magic words that DCG included in its Proofs of Claim can provide it with the ability to assert new claims at any time beyond the Bar Date in contravention of the Bar Date Order.

15.    DCG also seemingly contends that courts allow parties to freely amend their proofs of claim as long as such boilerplate reservations of rights are included, taking an overly expansive view of the law in this regard.  DCG MTD Opp. ¶ 32.  Even DCG's own authorities are very clear that an amendment to a proof of claim after the Bar Date "must be scrutinized to assure that it is not an attempt to file a new claim," *In re SemCrude*, 443 B.R. 472, 477 (Bankr. D. Del. 2011), and that a boilerplate reservation of rights does not hold the door open for any claim a creditor later seeks to file (quotations and citation omitted). *See In re Enron Corp.*, 419 F.3d 115, 120 (2d Cir. 2005) (affirming bankruptcy court's denial of motion to allow late-filed claim in spite of a reservation of rights to "reserve [] the right to amend, supplement, or otherwise modify" the original proof of claim) (quotations and citation omitted). If DCG's interpretation of its reservation of rights were to prevail, creditors would effectively have *carte blanche* to amend their proofs of claim at any time and assert new claims no matter how unrelated those claims might be to the claims it originally asserted, as long as they originally included a blanket, boilerplate reservation of rights.

-8-

**c. Merely attaching the July A&A Agreement to the Proofs of Claim does not preserve all possible claims based thereon.**

16.     DCG argues that simply attaching the July A&A Agreement to its Proofs of Claim was tantamount to an assertion of the Counterclaim, and presumably any other possible claim it could have invented on the basis of that agreement. DCG MTD Opp. ¶ 31. Again, the law could not be clearer that attaching an agreement to a proof of claim is not sufficient to preserve any and all claims related to that agreement. This Court recently rejected an argument by claimholders that attaching the debt document itself to a proof of claim was sufficient to establish a claim for certain default charges. *See In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2023 Bankr. LEXIS 1330, at *27 (Bankr. S.D.N.Y. May 19, 2023) (holding that proofs of claim did not encompass claims for post-default charges "[e]ven with the attached Debt Instruments, [and] the broad reservation of rights language in the . . . [C]laims"); *see also In re Calpine Corp.*, No. 07 Civ 8493 (JGK), 2007 U.S. Dist. Lexis 86514, at *9 (S.D.N.Y. Nov. 21, 2007) (holding that "catch-all language in . . . Original Claims and the attached Indentures" did not put the Debtors on notice of conversion right claims given that the "Original Claims did not mention the Noteholders' conversion rights or any alleged breach of those rights").

17.     DCG cites to two out-of-district cases in support of its position that merely appending a contract to a proof of claim is "sufficient for the purpose of allowing such plaintiffs to pursue all of their rights arising under such contracts against the debtor." DCG MTD Opp. ¶ 30. In both cases, the court allowed the late-filed claims not merely because the claimant had previously attached the contracts related to the late-filed claims with the original claims, but also because the claimant had already put the debtors on notice through informal proofs of claim. *See In re SemCrude*, 433 B.R. at 479; *Agassi v. Planet Hollywood Int'l, Inc.*, 269 B.R. 543, 550 (D. Del. 2001). But courts in <u>this</u> district have held that the informal claim doctrine does not excuse a

-9-

failure to submit a claim prior to the bar date where the debtors had not previously been put on notice of the claim. *See In re LATAM Airlines*, 2023 Bankr. LEXIS 1330, at *31 (rejecting application of the informal claim doctrine when the bar date had passed and the debtors "were not on notice of the existence of a claim"); *see also In re Res. Cap., LLC*, No. 12-12020 (MG), 2015 Bankr. LEXIS 1596, at *31 (Bankr. S.D.N.Y. May 11, 2015) (rejecting an informal proof of claim argument when the complaint was filed after the bar date had passed). Moreover, DCG does not and cannot argue that the Debtors were on notice of their intent to assert entitlements to the Foreclosed Assets at any point prior to the Counterclaim, much less before the Bar Date. Indeed, DCG has conceded that the opposite is true, arguing that it only conceived of the Counterclaim when GGC filed its Complaint. DCG MTD Opp. ¶ 32.

## II.   DCG'S INTERPRETATION OF THE PLAIN LANGUAGE OF THE AGREEMENT FAILS.

18.    The Opposition Briefs spend substantial space arguing why the Counterclaim is not procedurally barred, and tellingly little space arguing in favor of DCG's substantive argument, that DCG is entitled to the Foreclosed Assets because the plain language of the July A&A Agreement so dictates.

19.    DCG's plain language argument fails because the July A&A Agreement clearly defines the interests to be assigned to and assumed by DCG (the "Assigned Interests") in a way that expressly excludes the Foreclosed Assets. In particular, the Assigned Interests are defined as "all of [GAP's] rights and obligations under the Pledge Agreements and related Collateral under the Agreements and the Pledge Agreements," in addition to all outstanding 3AC Loans. July A&A Agreement at 1. DCG argues that "related Collateral" includes the Foreclosed Assets. But this cannot be the case. By definition, foreclosure transforms collateral into property of the lender, and so it was with the Foreclosed Assets: Upon the Foreclosure by GAP, on June 13, 2022, the

-10-

Foreclosed Assets ceased to be Collateral under the Pledge Agreements and became GAP's property. When the parties executed the July A&A Agreement, the Foreclosed Assets were no longer Collateral, and the reference to "related Collateral" therefore refers only to the assets on which GAP had *not* foreclosed, and which remained Collateral. As such, the fact that GAP never transferred the Foreclosed Assets to DCG could not have been a breach of the July A&A Agreement, and indeed no party asserted that it was until DCG's late-breaking Counterclaim on the basis of this theory.

20.     The recitals to the July A&A Agreement, together with the recitals to the June A&A Agreement, helpfully explain precisely what the parties did and did not intend to accomplish. The recitals to the June A&A Agreement state that the Assumed Liability is calculated *after* application of the Foreclosure proceeds ("the aggregate principal amount of the Intercompany Payables, after giving effect to all recoveries and repayments in respect of the TAC Loans . . . is $1,100,000,000.00"), and the recitals to the July A&A Agreement make direct reference to this earlier agreement, articulating the purpose of the later contract as assigning "all of its lending activities . . . including any outstanding loans … [and] all of its rights and obligations under the Pledge Agreements and related Collateral." DCG expressly acknowledges this purpose in its Disclosure Statement Response, as well as the fact that the July A&A Agreement did not contemplate or require the transfer of the Foreclosed Assets to DCG, stating that "consistent with the intention of the parties to the 3AC Loan Assignment and Assumption Agreement, DCG did not receive any of the proceeds from Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure." Disclosure Statement Response § VI (emphasis added). DCG does not, in the Disclosure Statement Response or anywhere else prior to its Amended Answer asserting the Counterclaim, allow for the possibility of any alternative interpretation of

the contract language that would provide a basis for its Counterclaim, and indeed no tenable alternative reading is available.

21.     DCG essentially concedes the point, arguing that it does not actually believe in the contractual interpretation advanced in the Counterclaim, but that such interpretation is consistent with GGC's interpretation in the Complaint, such that if GGC's claim succeeds, so too must DCG's Counterclaim.  But there is no inconsistency whatsoever in GGC's position.  GGC has simply never taken a position with respect to the key term "Collateral" that is different from the one it takes in its Motion to Dismiss.   For example, GGC has never argued – nor could it – that DCG assumed the liability associated with the 3AC Claims because those claims sought the return of "Collateral" as defined under the agreements governing the 3AC Loans.  Rather, GGC's claim is that DCG is liable because DCG assumed the "'burdens, obligations, and liabilities *in connection with*" the Assigned Interests (i.e., all rights and obligations under the MLAs and Pledge Agreements), and because the 3AC Loan-Related Claims are asserted in direct connection with the MLAs and Pledge Agreements, DCG bears the liability for all amounts due to 3AC in connection with the 3AC Loan-Related Claims."  Complaint ¶ 16 (quoting July A&A Agreement).  That is, DCG assumed all liabilities "in connection with" the relevant loan and pledge agreements, which agreements formed the "entire lending and borrowing relationship between GAP and 3AC."  Complaint ¶ 15.  Because the 3AC Claims were clearly "in connection with" that relationship, DCG is liable for the Allowed 3AC Claim Amount.

22.     Indeed, DCG does not attempt to argue that GGC has ever taken an inconsistent position with respect to the contractual term "Collateral."   Instead, DCG makes the superficial argument that because GGC interprets the assumption of liabilities provision "broadly," then GGC must be bound by a similarly broad interpretation of the assignment of *rights* provision:  "If the

-12-

3AC Amended Claims seeking return of the Foreclosed Assets are 'in connection with' the
Assigned Interests, then so too must be the assets themselves." DCG MTD Opp. ¶ 34. But this
argument betrays a fundamental, obvious misreading of the July A&A Agreement. Namely, the
phrase "in connection with" simply does not apply to the assignment of rights to DCG, but rather
only to the assumption of obligations by DCG:

> Assignor hereby assigns, contributes, transfers and sets over (collectively, the
> "Assignment") to Assignee all of Assignor's right, title, benefit, privileges, and interest *in
> and to*, and all of Assignor's burdens, obligations, and liabilities *in connection with*, the
> Assigned Interests. Assignee hereby accepts the Assignment and assumes and agrees to
> observe and perform all of the duties, obligations, terms, provisions, and covenants, and to
> pay and discharge all of the liabilities of Assignor to be observed, paid or discharged from
> and after the date hereof, *in connection with* the Assigned Interests.

July A&A Agreement at 2 (emphasis added). Thus, it is clear that DCG narrowly obtained rights
"in and to" the Assigned Interests (i.e., rights to the (remaining) Collateral and rights in the relevant
agreements), while DCG broadly assumed all obligations "in connection with" the Assigned
Interests. The difference is critical, and courts have repeatedly held that "in connection with" is
to be interpreted broadly. *See Plaintiff's Motion for Judgment on the Pleadings Under Federal
Rule of Civil Procedure 12(c)* ¶ 22. Thus, in arguing that GGC is taking inconsistent positions,
DCG simply ignores the actual words of the contract.

## III. THE DOCTRINES OF JUDICIAL ESTOPPEL, EQUITABLE ESTOPPEL, AND ESTOPPEL BY LACHES BAR THE COUNTERCLAIM.

23. Throughout its oppositions to the Motion to Dismiss and Motion to Estimate, DCG
professes that GGC's claim in this proceeding comes as complete surprise to DCG, that it had no
formal or informal notice that GGC believed it had such claim or would ever bring it, and that this
is the reason it did not raise (or even mention) the Counterclaim sooner. While this rationale does
not create an exception to any of the equitable doctrines that GGC raises, it is also belied by the
record before the Court. This generalized "surprise" defense fails to account for the fact that DCG

-13-

brought the Counterclaim as an *affirmative* claim; it would only have explanatory value to the extent DCG had asserted the Counterclaim as a claim for judgment reduction. DCG's argument, which is that could not have thought of the interpretation of the contract underlying *its own affirmative Counterclaim* until GGC filed its complaint, amounts to a claim that DCG was somehow incapable of forming its own legal theory that ostensibly entitles it to multiple billions of dollars' worth of assets on the grounds of a putative breach that took place years ago, until GGC gave it the idea by asserting its own claim. If this were the case, and DCG's Counterclaim were simply the logical outgrowth of contract interpretation advanced by GGC, then the claim would rightly be limited to one for setoff or judgment reduction—not as an affirmative claim.[5]

24.    DCG also argues that the equitable doctrines asserted by GGC do not apply because its position on the interpretation of the agreement has remained consistent. As support for this statement, it points to its repeated assertions that "it did not assume liability for GAP's unlawful seizure of the Foreclosed Assets, or for the 3AC Amended Claims arising from GAP's wrongdoing." DCG MTE Opp. ¶ 54, DCG MTD Opp. ¶ 50. This is a misdirection: DCG's position on *GGC's* claim in these cases—that DCG is liable for the $33 million Allowed 3AC Claim—is irrelevant to the Counterclaim, and its statement of that position did not once include a disclosure of the potential existence of the Counterclaim. GGC's equitable defenses to DCG's *Counterclaim*—for turnover of the Foreclosed Assets worth more than $4 billion—are that DCG is judicially and equitably estopped, and barred by the doctrine of laches, from asserting the Counterclaim.

---

[5]    As discussed *supra*, even if DCG had asserted only a setoff claim, such setoff claim would be barred because DCG filed a timely proof of claim and did not include the claim therein.

### a. **Judicial Estoppel**

25.    DCG argues that judicial estoppel does not bar its claim because it represents a novel *legal* theory, but not a novel *factual* position.  In so doing, DCG distorts the underlying history almost beyond recognition and does not directly address the single, narrow basis on which GGC argues the doctrine applies.

26.    DCG is judicially estopped from asserting the Counterclaim because DCG insisted on adding to the Debtors' Disclosure Statement a lengthy Disclosure Statement Response, which, among other things, included factual statements by DCG regarding the parties' views on their respective rights and obligations under the June A&A Agreement.  Motion to Dismiss ¶¶ 42–45.  Specifically, DCG's Disclosure Statement Response described the agreement as a contract "for forward-looking liabilities," and that "consistent with the intention of the parties . . . DCG did not receive any of the proceeds from Genesis' foreclosure."  *Id.* ¶ 44.  This is not an assertion of a claim or a legal argument; this is a statement, which purports to be factual information, regarding the position DCG would take in response to the Debtors' claims under the July A&A Agreement, which statement is for the benefit of the Debtors' creditors as they consider how to vote on the Plan.  DCG now argues that the position that GGC has taken all along (regarding DCG's liability for 3AC's claim), which is contained in the precise section of the Disclosure Statement to which the above language is responding, leads to a novel implication that DCG did not see fit to disclose in its Disclosure Statement Response.  Because the Court relied on DCG's representations in that document in approving the Disclosure Statement, the doctrine of judicial estoppel bars DCG from now seeking to reverse its position.

### b. **Equitable Estoppel**

27.    DCG's argument against the application of equitable estoppel relies largely on an argument that DCG *could not* have disclosed the theory underlying its Counterclaim because that

theory did not arise until GGC's Complaint was filed. This argument ignores the numerous occasions on which that GGC represented that it believed that DCG would be liable for the 3AC claim, and the perhaps even more numerous occasions on which DCG's revelation of its corollary theory—that if it were liable for the $33 million Allowed 3AC Claim, it must also be entitled to the more than $4 billion in collateral to which the 3AC Claims related in part—would have been highly relevant to the parties' actions. As discussed at length in the Motion to Dismiss and the Motion to Estimate, those occasions include (i) the 3AC Settlement Agreement, which included express statements by the Debtors and by 3AC relating to the Debtors' view that the July A&A Agreement allocated liability for the claim to DCG; (ii) DCG's attack on the Debtors' Plan, which included extensive analysis of the Debtors' assets and claims pool and at no point mentioned a potential additional $4 billion claim[6]; (iii) DCG's objection to the Asset Sale Motion, which did not dispute the Debtors' representation that the assets (including the Foreclosed Assets) were not subject to any claims by any party; and (iv) the Gemini Settlement Motion, by which the Debtors sought authority for Gemini to distribute, *inter alia*, the Foreclosed Assets.

28.    That the Debtors detrimentally relied on DCG's failure to disclose its claim at all of these junctures is self-explanatory—the tripartite 3AC Settlement Agreement relied on the parties' shared understandings of their respective positions as documented in the agreement itself; the Debtors' Plan was premised on a claims pool that would have been twice as large if DCG had

---

[6]    DCG provides no explanation for its failure to include, or account for, the existence of the Counterclaim in its Confirmation Objection, in support of which it submitted detailed evidence through the Verost Declaration regarding supposed "excess" equity value in the Debtors. The Verost Declaration completely failed to account for the existence of the Counterclaim, despite being offered in support of the proposition that the Debtors were solvent upon filing their Amended Plan. *See* Verost Declaration, Confirmation Objection ¶¶ 13–25. By the time of the evidentiary hearing on the Amended Plan (the "Confirmation Hearing"), GGC had already brought this Adversary Proceeding. Yet in his testimony at the Confirmation Hearing, Verost again neglected to raise the Counterclaim. If DCG's theory that it could not have brought the Counterclaim until GGC initiated the Adversary Proceeding were true, which it is not, assuredly Verost would have raised DCG's claim to the Foreclosed Assets in his analysis of the Debtors' claims pool. DCG offers no explanation of why he did not do so.

timely asserted the Counterclaim; and the Debtors could not have sold the Foreclosed Assets if they had been subject to a claim for turnover by DCG. DCG's assertion that the Debtors have not shown that they would have done anything different if DCG had revealed its claim earlier is risible.

### c. Estoppel by Laches

29.    DCG suggests that there are insufficient facts in the record to permit the Court to consider a defense of laches, but fails to point to any specific facts that would be relevant. Instead, DCG again repeats its mantra that the Counterclaim could not possibly have been asserted earlier, because it exists only in relation to the contract interpretation set forth in GGC's Complaint. Even if this were true, which it is not, the case law cited by DCG requires an "inexcusabl[e] delay[] in taking action" and prejudice to the other party. DCG MTD Opp. ¶ 58; DCG MTE Opp. ¶ 62. The applicability of the doctrine of laches here does not hinge on whether DCG formally brought its Counterclaim earlier; it likely would not be available if DCG had even informed the Debtors, or their creditors, of its intention to bring the Counterclaim in the event the Debtors brought their anticipated (and thoroughly previewed) claim against DCG for the 3AC Allowed Claim Amount. But DCG did not bring the claim, *or* disclose it, and it has not made any tenable argument for why its delay is excusable. As such, the doctrine of laches bars the Counterclaim.

## IV.    DCG'S OPPOSITION TO THE MOTION TO ESTIMATE IS BASELESS[7]

30.    DCG asserts that the relief sought by the Motion to Estimate is "duplicative," "unnecessary," and "purely a litigation tactic," but fails to engage with the reason that the Debtors have sought estimation, the function that estimation would serve, or the particular procedural scenario faced by the Debtors that necessitates estimation. On Friday, May 17, 2024, the Court

---

[7]    In light of the Court's scheduling of a non-evidentiary status conference regarding the Motion to Dismiss and Motion to Estimate for May 30, 2024, the Debtors respectfully withdraw their request for waiver of Local Rule 9014-2. *See Notice of Status Conference Scheduled for May 30, 2024* (ECF No. 24); *see also* Motion to Estimate ¶ 82.

issued its decision confirming the Debtors' Plan and overruling DCG's and others' objections. *See Memorandum of Decision Re: (1) Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General and (2) Confirmation of the Debtors' Amended Joint Chapter 11 Plan* (ECF No. 1691, the "Confirmation Decision"). As such, the Debtors are now in a position to imminently begin making distributions to their creditors, and it is essential that DCG's baseless Counterclaim not be permitted to have any prospect of interference with that process.

31.     Estimation provides a means by which a court which has not yet ruled on the final merits of a claim can nonetheless ensure that a debtor may proceed apace in the administration of its case. In a case such as this, it provides temporal relief, preventing a single claimant from holding distributions hostage on a meritless claim should the Court not have the opportunity to fully rule on the merits. That is the outcome that the Debtors seek to permit the Court to effectuate, in its discretion, in the event that it does not immediately grant the Motion to Dismiss. DCG argues that there has been no showing of undue delay, DCG MTE Opp. ¶ 38, which simply ignores the Debtors' arguments on that topic, and separately argues that the Court should use its discretion to estimate the Counterclaim *after* it has heard the dispute on the merits, *id.* ¶ 42, which would defeat the purpose of the interim relief of estimation.

32.     DCG also argues that the Motion to Estimate is duplicative of the Motion to Dismiss because it deals with much of the same subject matter. This argument is disingenuous: A motion to estimate *necessarily* deals with the same subject matter as the underlying litigation, in asking the court to consider the relevant arguments in a summary, non-final proceeding that weighs the strength of those arguments and their likelihood of success without conducting a full-blown adjudication on the merits. The Debtors seek to estimate the Counterclaim at $0 because

-18-

they have shown—in thorough substantive briefing on the issues presented by the Counterclaim—that it is overwhelmingly unlikely that the Court will ultimately find *both* that the Counterclaim was timely filed *and* that the Counterclaim finds grounding in the relevant contract language. As such, while the Debtors believe that the record on the Motion to Dismiss provides the Court with ample grounds to dismiss the Counterclaim in full on the merits without any further proceedings, the Debtors have presented the Court with the alternative interim relief of estimation in light of the Plan confirmation and intention to imminently begin making distributions.

## **CONCLUSION**

33. For all the foregoing reasons, the Debtors respectfully requests that the Court (i) dismiss the Counterclaim, and/or (ii) enter the Proposed Order attached as Exhibit A to the Debtors' Motion to Estimate, and to award such further or other relief as the Court deems just and proper.

Dated: May 23, 2024
     New York, New York

Respectfully submitted,

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Counsel to the Debtors and Debtors-in-Possession*