**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) CONFIRMING THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN AND (II) GRANTING RELATED RELIEF

WHEREAS, the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") having:

a.    commenced, on January 19, 2023 (the "***Petition Date***"), the Chapter 11 Cases[2] (the "***Chapter 11 Cases***") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

b.    filed, on January 20, 2023, the *Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* [ECF No. 17] (the "***Islim First Day Declaration***");

c.    filed, on January 20, 2023, the *Declaration of Paul Aronzon in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* [ECF No. 19] (the "***Aronzon First Day Declaration***");

d.    filed, on January 20, 2023, the *Declaration of Michael Leto in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* [ECF No. 28] (the "***Leto First Day Declaration***," and together with the Islim First Day Declaration and the Aronzon First Day Declaration, the "***First Day Declarations***");

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan. The rules of interpretation set forth in Article I.B of the Plan apply.

e.      continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

f.      filed, on January 20, 2023, the *Debtors' Joint Chapter 11 Plan* [ECF No. 20];

g.      obtained, on April 4, 2023, the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [ECF No. 200] (the "***Bar Date Order***");

h.      filed, on June 13, 2023, a revised plan [ECF No. 427] and the *Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 429] (as amended, modified, or supplemented from time to time, the "***Disclosure Statement***");

i.      filed, on June 29, 2023, the *Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 461] (as amended, modified, or supplemented from time to time, the "***Disclosure Statement Motion***");

j.      filed, on October 24, 2023, a further revised plan [ECF No. 838];

k.      filed, on October 25, 2023, a further revised Disclosure Statement [ECF No. 839];

l.      filed, on November 4, 2023, a further revised (i) plan [ECF No. 886] and (ii) Disclosure Statement [ECF No. 887];

m.      filed, on November 7, 2023, a further revised (i) plan [ECF No. 897] and (ii) Disclosure Statement [ECF No. 900];

n.      filed, on November 17, 2023, a further revised (i) plan [ECF No. 948] and (ii) Disclosure Statement [ECF No. 950];

o.      filed, on November 20, 2023, an amended notice (the "***Amended Disclosure Statement Hearing Notice***") setting forth, among other things, the date and time set for the hearing to consider the adequacy of the Disclosure Statement (the "***Disclosure Statement Hearing***") and the deadlines for filing objections to the Disclosure Statement [ECF. No. 958];

p.      filed, on November 27, 2023, a further revised (i) plan [ECF No. 979] and (ii) Disclosure Statement [ECF No. 980];

q.      filed, on November 28, 2023, the solicitation version of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989] (as subsequently amended, modified, or supplemented, the "***Plan***");

r.      obtained, on December 6, 2023, the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 1027] (the "***Disclosure Statement Order***");

s.      filed, on December 6, 2023, the solicitation version of the Disclosure Statement [ECF. No. 1031];

t.      distributed, in accordance with the Disclosure Statement Order, (i) the solicitation version of the Disclosure Statement; (ii) the Plan; (iii) the ballots (the "***Ballots***") for voting on the Plan to Classes 3, 4, 5, and 6 against GGH, Classes 3, 4, 5, 6, and 7 against GGC and Classes 3, 4, 5, and 6 against GAP under the Plan (collectively, the "***Voting Classes***"); and (iv) the Notices of Non-Voting Status (as defined in the Disclosure Statement Order);

u.      served, on December 6, 2023, the notice (the "***Confirmation Hearing Notice***") setting forth, among other things, the date and time set for the hearing to consider the Confirmation of the Plan (the "***Confirmation Hearing***") and the deadlines for filing objections to the Plan upon all known Holders of Claims and the parties on the Debtors' master service list and posted the Confirmation Hearing Notice on the Debtors' public website for the Chapter 11 Cases;

v.      caused notice of the Confirmation Hearing to be published on December 14, 2023, in *USA Today* [ECF No. 1065] and *The New York Times* [ECF No. 1066] (together, the "***Confirmation Hearing Publication Notices***");

w.      filed, on December 29, 2023, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117] (the "***First Plan Supplement***");

x.      filed, on January 6, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1131] (the "***Second Plan Supplement***");

y.      filed, on January 8, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1137] (the "***Third Plan Supplement***");

z.      filed, on January 9, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1144] (the "***Fourth Plan Supplement***");

aa.     filed, on January 25, 2024, the *Declaration of Alex Orchowski on Behalf of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Chapter 11 Plan* [ECF No. 1295] (the "***Voting Report***"), which was amended on February 12, 2024 (the "***Amended Voting Report***" and, together with the Voting Report, the "***Voting Reports***") and which includes a tabulation of votes cast on the Plan by timely and properly completed Ballots received by Kroll Restructuring Administration LLC

3

("***Kroll***") in its capacity as the Solicitation Agent for the Debtors in the Chapter 11 Cases;

bb.    filed, on February 15, 2024, a further revised Plan [ECF No. 1325];

cc.    filed, on February 16, 2024, the *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 1330] (the "***Debtors' Confirmation Brief***"), which includes the *Declaration of Joseph J. Sciametta, Managing Director of Alvarez & Marsal North America LLC, in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan*, as Exhibit C attached thereto (the "***Sciametta Confirmation Declaration***"), and the *Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC, in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan*, as Exhibit D attached thereto (the "***Aronzon Confirmation Declaration***"); and the Committee (as defined below) having filed, on February 15, 2024, *The Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [ECF No. 1326] (the "***Committee's Confirmation Brief***") and the *Declaration of Bradley Geer in Support of the Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [ECF No. 1327] (the "***First Geer Declaration***"); and the Committee having filed, on February 21, 2024, the *Declaration of Bradley Geer in Support of the Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [ECF No. 1355] (the "***Second Geer Declaration***" and, together with the Sciametta Confirmation Declaration, the Aronzon Confirmation Declaration, and the First Geer Declaration, "***Confirmation Declarations***"); and the Ad Hoc Group having filed, on February 15, 2024, the *Omnibus Memorandum of Points and Authorities of the Ad Hoc Group in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1321] (the "***AHG's Confirmation Brief***"); and Teddy André Amadéo Gorisse having filed, on February 21, 2024, his *Amended Statement in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan, Reply to DCG's Plan Confirmation Objection and Reservation of Rights* [ECF No. 1351] (the "***Gorisse Brief***" and, together with the Debtors' Confirmation Brief, the Committee's Confirmation Brief, and the AHG's Confirmation Brief, the "***Confirmation Briefs***");

dd.    filed, on February 24, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1379] (the "***Fifth Plan Supplement***");

ee.    filed, on February 26, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1391] (the "***Sixth Plan Supplement***");

ff.      filed, on February 26, 2024, a further revised Plan [ECF No. 1392];

gg.      filed, on March 29, 2024, the *Proposed Findings of Fact and Conclusions of Law Submitted by Plan Proponents and Supporters in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC* et al. [ECF No. 1540] (the "***Proposed Findings of Fact and Conclusions of Law***");

hh.      filed, on April 9, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1561] (the "***Seventh Plan Supplement***");

ii.      filed, on May 6, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1661] (the "***Eighth Plan Supplement***");

jj.      filed, on May 24, 2024, a further revised Plan [ECF No. 1712], a copy of which is attached hereto as **Exhibit A**;

kk.      filed, on May 29, 2024, the *Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1720] (the "***Ninth Plan Supplement***," and, collectively with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, and the Eighth Plan Supplement, the "***Plan Supplement***").

WHEREAS the Bankruptcy Court having:

a.      entered, on April 4, 2023, the Bar Date Order;

b.      set November 28, 2023, as the voting record date (the "***Voting Record Date***") for Holders of all Claims eligible to vote under the Plan;

c.      entered, on December 6, 2023, the Disclosure Statement Order;

d.      set December 9, 2023 (or as soon as reasonably practicable thereafter) as the solicitation mailing deadline;

e.      set January 10, 2024 at 4:00 p.m. (prevailing Eastern Time) as the deadline by which Ballots were required to be received by the Debtors' Solicitation Agent (the "***Voting Deadline***"), which the Debtors subsequently extended for various parties with the Court's approval;

f.      set January 25, 2024 as the deadline (the "***Voting Certification Filing Deadline***") for the Debtors to file the Voting Report;

g.      set January 29, 2024 at 4:00 p.m. (prevailing Eastern Time) as the deadline for parties in interest to file objections to the Plan (the "***Confirmation Objection Deadline***"), which the Debtors subsequently extended for certain parties with the Court's approval;

h.  reviewed the Plan, the Confirmation Briefs, the Confirmation Declarations, the Plan Supplement, the Voting Reports, the Confirmation Hearing Publication Notices, the Proposed Findings of Fact and Conclusions of Law, and all pleadings, exhibits, statements, and responses regarding Confirmation, including any and all objections, declarations, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

i.  held the Confirmation Hearing beginning on February 26, 2024, and continuing on February 27, 2024, February 28, 2024, and March 18, 2024;

j.  closed the record of the Confirmation Hearing on March 18, 2024;

k.  heard the statements, arguments, and objections, as applicable, made by counsel in respect of Confirmation of the Plan;

l.  considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation of the Plan;

m.  taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in the Chapter 11 Cases;

n.  overruled any and all objections to the Plan, Confirmation, and all statements and reservations of right not consensually resolved, withdrawn, or waived unless otherwise indicated herein;

o.  rendered, on May 17, 2024, a memorandum of decision confirming the Plan [ECF No. 1691] (the "***Memorandum Decision***").

**NOW**, **THEREFORE**, the Bankruptcy Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation, including the Confirmation Briefs and the Confirmation Declarations, and all evidence proffered, admitted, or adduced by counsel at the Confirmation Hearing and the entire record of the Chapter 11 Cases, including the Memorandum Decision, establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following Findings of Fact and Conclusions of Law, and Orders:

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**IT IS HEREBY DETERMINED AND FOUND THAT:**

**A.      Findings and Conclusions.**

1.      The findings and conclusions set forth herein, on the record of the Confirmation Hearing, and in the Memorandum Decision constitute the Bankruptcy Court's findings of fact and conclusions of law under Bankruptcy Rule 7052, made applicable to this proceeding under Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.      Jurisdiction, Venue, and Core Proceeding.**

2.      The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to section 1334 of title 28 of the United States Code and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue is proper in this District pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Confirmation of the Plan is a core proceeding within the meaning of section 157(b)(2) of title 28 of the United States Code, and the Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.

**C.      Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.  As such, the Debtors are proper proponents of the Plan.

**D.** **Commencement and Joint Administration of the Chapter 11 Cases.**

4. On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By prior order of the Bankruptcy Court, the Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [ECF No. 37]. The Debtors have operated their businesses and managed their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. On February 3, 2023, the U.S. Trustee appointed the Official Committee of Unsecured Creditors [ECF No. 55] (the "*Committee*") in the Chapter 11 Cases.

**E.** **Judicial Notice.**

5. The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

**F.** **Notice.**

6. Due, timely, proper, and adequate notice of the Disclosure Statement, the Plan, the Ballots, the Plan Supplement, the proposed assumption of Executory Contracts and Unexpired Leases, and the Confirmation Hearing, together with the Voting Deadline and the Confirmation Objection Deadline, has been provided substantially in accordance with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Rules, including as set forth in the Voting Reports.

7. Such notice (including the Confirmation Hearing Notice, the Confirmation Hearing Publication Notices, the Plan Supplement Notices and notice of the Plan Modifications) comported with the orders of this Court, including the Disclosure Statement Order, and was appropriate and

satisfactory based upon the facts and circumstances of the Chapter 11 Cases and pursuant to sections 1125 and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3018, and 3020, and other applicable law and rules. Because such transmittal and service were adequate and sufficient, no other or further notice is necessary or shall be required, and due, proper, timely, and adequate notice of the Confirmation Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and applicable non-bankruptcy law.

**G.    Solicitation.**

8.    In accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and all other applicable rules, laws, and regulations applicable to such solicitation, the Debtors, through their Solicitation Agent, and, to the extent described in the Disclosure Statement Order, Gemini, served Ballots and associated documents on all Holders of Claims against and Interests in the Debtors, as appropriate, as follows: (a) for all Holders of Claims in the Non-Voting Classes (as defined in the Disclosure Statement Order) and Holders of Disputed Claims in the Voting Classes, the Confirmation Hearing Notice and the applicable Notice of Non-Voting Status (as defined in the Disclosure Statement Order); (b) for all parties in Classes 3 through 6 against GGH and GAP and Classes 3 through 7 against GGC, (i) the Confirmation Hearing Notice, (ii) the Disclosure Statement Order (without exhibits, except for the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order) attached thereto as Exhibit 1), (iii) the Disclosure Statement (with exhibits, including the Plan), and (iv) the applicable Ballot or Gemini Lenders' Ballot (as defined in the Disclosure Statement Order), including if served on a provisional basis. *See* ECF Nos. 1194 and 1313. The Debtors also have served notice of the Plan Supplement (the "***Plan Supplement Notices***"), *see* ECF Nos. 1156, 1182, 1189, 1225, 1465,

1542, 1627, and 1683 and the Plan, *see* ECF Nos. 1037, 1385, 1465, and 1723, as required by and deemed sufficient and appropriate in the Disclosure Statement Order.

9.      Each eligible Holder of a Claim in the Voting Classes received a Ballot.  The form of the Ballots adequately addressed the particular needs of the Chapter 11 Cases and was appropriate for the Holders of Claims in each Voting Class.  The instructions on each Ballot advised that, for the Ballot to be counted, the Ballot had to be properly executed, completed, and delivered to Kroll, in its capacity as the Voting Agent for the Debtors in the Chapter 11 Cases (the "***Voting Agent***"), so that it was actually received by the Voting Agent on or before the applicable Voting Deadline.  The period during which the Debtors solicited acceptances of the Plan was a reasonable period of time for Holders of Claims in the Voting Classes to make an informed decision to accept or reject the Plan.

10.      The Debtors were not required to solicit votes from Class 1 (Other Priority Claims) and Class 2 (Secured Claims) against GGH, GAP, and GGC, as each such Class is Unimpaired under the Plan and, thus, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

11.      The Debtors were not required to solicit votes from Class 9 against GGH (Intercompany Claims), Classes 10 and 11 against GGC (Intercompany Claims and Intercompany Interests, respectively), and Classes 9 and 10 against GAP (Intercompany Claims and Intercompany Interests, respectively), as each Holder of Claims or Interests, as applicable, in such Classes is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

12.      The Debtors were not required to solicit votes from Holders of Claims and Interests in Class 7 against GGH (Subordinated Claims), Class 8 against GGH (Government Penalty Claims), Class 10 against GGH (Interests), Class 8 against GGC (Subordinated Claims), Class 9

against GGC (Government Penalty Claims), Class 7 against GAP (Subordinated Claims), and Class 8 against GAP (Government Penalty Claims) (collectively, the "***Deemed Rejecting Classes***"), as the Holders of Claims or Interests in such Classes are Impaired and, for purposes of solicitation, are presumed to not receive distributions on account of their Claims or Interests under the Plan and, thus, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

13.     As described in and as evidenced by the Voting Reports, the transmittal and service of the Solicitation Materials (all of the foregoing, the "***Solicitation***") was timely, adequate, and sufficient under the circumstances and no other or further Solicitation was or shall be required. The Solicitation complied with the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order), was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable rules, laws, and regulations.

**H.     Voting.**

14.     The Voting Reports filed with the Bankruptcy Court certify the method and results of the Ballots tabulated for the Voting Classes. As set forth in the Amended Voting Report, the Plan has been overwhelmingly accepted by the Holders of Claims in the Voting Classes and each Voting Class accepted the Plan or shall be presumed to accept the Plan pursuant to Article III.H of the Plan. As evidenced by the Voting Reports, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order), and the Local Rules. Furthermore, Gemini, in its role prescribed in the Disclosure Statement Order, has acted in good faith and in a manner consistent with the Disclosure

Statement Order, including the Solicitation and Voting Procedures, in providing the Gemini
Voting Statement (as defined in the Disclosure Statement Order).

I.      **Plan Supplement.**

15.     On December 29, 2023, the Debtors filed the First Plan Supplement, consisting of
(a) the Schedule of Assumed Executory Contracts and Unexpired Leases, (b) an exhibit identifying
the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee,
(c) an exhibit identifying the intercompany claims that shall constitute Excluded Claims, (d) an
exhibit identifying the Retained Causes of Action, (e) the Digital Assets Conversion Table, and (f)
the Justifications for Exculpated & Released Parties.[3]  On January 6, 2024, the Debtors filed the
Second Plan Supplement, consisting of (g) an exhibit disclosing the identity and affiliations of the
PA Officer and (h) an exhibit disclosing the identity of the candidates for the New Board.[4]  On
January 8, 2024, the Debtors filed the Third Plan Supplement, consisting of (i) the Plan
Administration Agreement, (j) the Litigation Oversight Committee Bylaws, (k) the Wind-Down
Oversight Committee Bylaws, and (l) the New Governance Documents.[5]  On January 9, 2024, the
Debtors filed the Fourth Plan Supplement, consisting of (m) the Setoff Principles for Allowance
of Certain Claims (the "***Setoff Principles***").[6]  On February 23, 2024, the Debtors filed the Fifth
Plan Supplement, consisting of (n) the Gemini Reserve Principles and (o) the Gemini Lender
Distribution Principles, and including revised versions of the Plan Administration Agreement,
Litigation Oversight Committee Bylaws, and Wind-Down Oversight Committee Bylaws.[7]  On

---

[3]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1117].

[4]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1131].

[5]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1137].

[6]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1144].

[7]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1379].

February 26, 2024, the Debtors filed the Sixth Plan Supplement, consisting of (p) a form cooperation agreement to be entered into by Genesis Personnel being released under the Plan (the "Cooperation Agreement").[8]  On April 9, 2024, the Debtors filed the Seventh Plan Supplement, consisting of (q) a revised version of the Plan Administration Agreement, (r) a blackline of the Plan Administration Agreement against the version of the Plan Administration Agreement filed in the Fifth Plan Supplement, and (s) an exhibit disclosing the identity, affiliations, and compensation of the GAP Director.[9]  On May 6, 2024, the Debtors filed the Eighth Plan Supplement, consisting of (t) an updated list of the Members of the Litigation Oversight Committee and Wind-Down Oversight Committee, (u) a revised version of the Plan Administration Agreement, (v) a changed pages blackline of the Plan Administration Agreement against the version of the Plan Administration Agreement filed in the Seventh Plan Supplement, (w) revised Litigation Oversight Committee Bylaws, (x) a changed pages blackline of the Litigation Oversight Committee Bylaws against the version of the Litigation Oversight Committee Bylaws filed in the Fifth Plan Supplement, (y) revised Wind-Down Oversight Committee Bylaws, and (z) a changed pages blackline of the Wind-Down Oversight Committee Bylaws against the version of the Wind-Down Oversight Committee Bylaws filed in the Fifth Plan Supplement.[10]  On May 29, 2024, the Debtors filed the Ninth Plan Supplement regarding persons who may be employed by the PA Officer, the Wind-Down Oversight Committee or the Litigation Oversight Committee following the Plan Effective Date.[11]

---

[8]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1391].

[9]     *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1561]

[10]    *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1661].

[11]    *See Notice of Filing of Plan Supplement for the Debtors' Amended Joint Chapter 11 Plan* [ECF No. 1720].

16.     All such materials in the Plan Supplement comply with the terms of the Plan, the filing and notice of the Plan Supplement was proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all applicable law, and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan as if set forth in full therein, *provided* that Exhibit N (Gemini Reserve Principles) and Exhibit O (Gemini Lender Distribution Principles) are null and void as of the date of entry of this Confirmation Order as a result of the occurrence of the Gemini/Genesis Settlement Effective Date.  Subject to the terms of the Plan, the Debtors reserve the right to, and may, alter, amend, update, supplement, or modify the Plan Supplement before the Effective Date, *provided* that any such alteration, amendment, update, supplement, or modification shall be in compliance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the terms of this Confirmation Order.

**J.      Modifications of the Plan.**

17.     Pursuant to and in compliance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors proposed certain modifications to the Plan, including, without limitation, those modifications, amendments, and supplements made to the Plan in connection with the Gemini/Genesis Settlement Agreement, as reflected herein, in the Plan Supplement, and/or in the revised Plan filed with the Bankruptcy Court prior to entry of this Confirmation Order (collectively, the "***Plan Modifications***"); *provided*, *however*, that, due to the occurrence of the Gemini/Genesis Settlement Effective Date on May 9, 2024, any provisions of the Plan that are conditioned on the non-occurrence of the Gemini/Genesis Settlement Effective Date by the Gemini/Genesis Settlement Outside Date are not applicable.  In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (a) constitute material modifications of the Plan pursuant to section 1127 of the Bankruptcy Code, (b) cause the Plan to fail to meet the requirements of sections

14

1122 or 1123 of the Bankruptcy Code, (c) materially and adversely affect or change the treatment of any Claims or Interests, (d) require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes of any Holders of any Claims or Interests under section 1126 of the Bankruptcy Code, or (e) require that Holders of Claims in the Voting Classes be afforded an opportunity to change their previously cast acceptances of the Plan, satisfying section 1127 of the Bankruptcy Code.  Under the circumstances, the form and manner of notice of the proposed Plan Modifications are adequate, and no other or further notice of the proposed Plan Modifications is necessary or required.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  The Holders of Claims in the Voting Classes are not permitted to change their respective acceptances to rejections as a consequence of the Plan Modifications.

**K.      Bankruptcy Rule 3016.**

18.      In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the Plan proponents.  The release, injunction, and exculpation provisions of the Plan are set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

**L.      Burden of Proof: Confirmation of the Plan.**

19.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Each witness who testified and/or submitted a Confirmation Declaration on behalf of the Debtors

or the Committee in connection with Confirmation was credible, reliable, and qualified to testify and/or submit such Confirmation Declaration as to the topics addressed in his or her testimony.

**M.    Compliance with Bankruptcy Code Requirements:  Section 1129(a)(1).**

20.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, more particularly:

(i)    Proper Classification: Sections 1122 and 1123(a)(1).

21.    In addition to Administrative Expense Claims and Priority Tax Claims, which need not be designated, Article III of the Plan designates ten (10) Classes of Claims and Interests for GGH and GAP and eleven (11) Classes of Claims and Interests for GGC.  Each Class comprises only Claims or Interests that are substantially similar to the other Claims or Interests, as the case may be, in each such Class.  The various Classes are all based on valid business, factual, or legal considerations.  More generally, Secured Claims, General Unsecured Claims, and Interests are each classified separately from each other.  General Unsecured Claims are separately classified based on types of digital asset and/or fiat currencies Holders of General Unsecured Claims were contractually entitled to receive from the respective Debtor and such Holders' relationship with the respective Debtor.  Intercompany Claims occupy their own Class, as do Interests in GGH and Intercompany Interests in GGC and GAP, respectively.  The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)    Specified Unimpaired Classes: Section 1123(a)(2).

22.    Article III of the Plan specifies that Claims in the following Classes are Unimpaired under the Plan (the "***Unimpaired Classes***"), thereby satisfying section 1123(a)(2) of the Bankruptcy Code:

| Debtor | Class | Claim or Interest | Status |
|--------|-------|-------------------|--------|
| GGH | 1 | Other Priority Claims | Unimpaired |
| GGH | 2 | Secured Claims | Unimpaired |

| | | | |
|---|---|---|---|
| GGH | 9 | Intercompany Claims | Impaired or Unimpaired |
| GGC | 1 | Other Priority Claims | Unimpaired |
| GGC | 2 | Secured Claims | Unimpaired |
| GGC | 10 | Intercompany Claims | Impaired or Unimpaired |
| GGC | 11 | Intercompany Interests | Impaired or Unimpaired |
| GAP | 1 | Other Priority Claims | Unimpaired |
| GAP | 2 | Secured Claims | Unimpaired |
| GAP | 9 | Intercompany Claims | Impaired or Unimpaired |
| GAP | 10 | Intercompany Interests | Impaired or Unimpaired |

(iii)    Specified Treatment of Impaired Classes: Section 1123(a)(3).

23.    Article III of the Plan specifies that the Claims in the following Classes are Impaired under the Plan, and describes the treatment of such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code:

| Debtor | Class | Claim or Interest | Status |
|---|---|---|---|
| GGH | 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired |
| GGH | 4 | BTC-Denominated Unsecured Claims | Impaired |
| GGH | 5 | ETH-Denominated Unsecured Claims | Impaired |
| GGH | 6 | Alt-Coin-Denominated Unsecured Claims | Impaired |
| GGH | 7 | Subordinated Claims | Impaired |
| GGH | 8 | Government Penalty Claims | Impaired |
| GGH | 9 | Intercompany Claims | Impaired or Unimpaired |
| GGH | 10 | Interests | Impaired |
| GGC | 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired |
| GGC | 4 | BTC-Denominated Unsecured Claims | Impaired |
| GGC | 5 | ETH-Denominated Unsecured Claims | Impaired |
| GGC | 6 | Alt-Coin-Denominated Unsecured Claims | Impaired |
| GGC | 7 | Gemini Lender Claims | Impaired |
| GGC | 8 | Subordinated Claims | Impaired |
| GGC | 9 | Government Penalty Claims | Impaired |

| GGC | 10 | Intercompany Claims | Impaired or Unimpaired |
|-----|----|----|----|
| GGC | 11 | Intercompany Interests | Impaired or Unimpaired |
| GAP | 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired |
| GAP | 4 | BTC-Denominated Unsecured Claims | Impaired |
| GAP | 5 | ETH-Denominated Unsecured Claims | Impaired |
| GAP | 6 | Alt-Coin-Denominated Unsecured Claims | Impaired |
| GAP | 7 | Subordinated Claims | Impaired |
| GAP | 8 | Government Penalty Claims | Impaired |
| GAP | 9 | Intercompany Claims | Impaired or Unimpaired |
| GAP | 10 | Intercompany Interests | Impaired or Unimpaired |

(iv)     No Discrimination: Section 1123(a)(4).

24.     Article III of the Plan, as further set forth in the Distribution Principles, provides for the same rights and treatment by the Debtors of each Allowed Claim or Allowed Interest in each respective Class unless the Holder of a particular Allowed Claim or Allowed Interest has agreed to a less favorable treatment of such Allowed Claim or Allowed Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v)     Adequate Means for Plan Implementation: Section 1123(a)(5).

25.     The Plan, including the Distribution Principles attached thereto as Exhibit A, and the various documents and agreements set forth in the Plan Supplement, provide adequate and proper means for implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.  Among other things, Article IV of the Plan, the Distribution Principles, and the Plan Supplement: (a) provide for the sources of consideration for Plan distributions and the establishment of reserves; (b) provide, through the Distribution Principles, for the equitable calculation of distributions across Claims denominated in fiat currency and different types of Digital Assets; (c) provide for the vesting of all assets in each of the appropriate Wind-Down

Debtors free and clear of all Liens, Claims, charges, or other Encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims, Allowed Government Penalty Claims, and Allowed Subordinated Claims); (d) authorize the amendment of the certificates of incorporation and bylaws of the Wind-Down Debtors; (e) provide for the appointment of the officers and directors of the Wind-Down Debtors, including the PA Officer, the New Board, and the GAP Director, and the members of the Litigation Oversight Committee and Wind-Down Oversight Committee; (f) provide for the cancellation of all notes, instruments, certificates, and other documents, including credit agreements and indentures, unless otherwise provided in the Plan; (g) provide for the exemption from registration under the Securities Act of any Securities issued under the Plan (to the extent set forth in the Plan); (h) provide, through the Setoff Principles, for the equitable setoff and allowance of certain Claims; (i) provide for the preservation of Causes of Action and the appointment of the Litigation Oversight Committee and the PA Officer to pursue such Retained Causes of Action; and (j) provide for the reinstatement or discharge of Intercompany Claims and Intercompany Interests (to the extent set forth in the Plan) and the settlement of intercompany accounts.

(vi)    Voting Power of Equity Securities: Section 1123(a)(6).

26.    Article IV.B.8 of the Plan provides that the Wind-Down Debtors' New Governance Documents shall include prohibitions on the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. Article IV.B.9 of the Plan, which provides, among other things, that (a) the candidates for appointment to the New Board are limited to those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and (b) DCG shall provide written notice to the Debtors or the Wind-Down Debtors, as applicable, of the Persons selected by DCG for appointment to the New Board no later than

fifteen (15) calendar days after the entry of this Confirmation Order is consistent with and does not violate section 1123(a)(6).

(vii)    Designation of Directors and Officers: Section 1123(a)(7).

27.    Article IV.A.2 and Article IV.B.9 of the Plan outline the manner of selecting the PA Officer and the New Board, which accords with applicable corporate law, the Bankruptcy Code, the interests of creditors and equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.  Article IV.B.9 of the Plan, which provides, among other things, that (a) the candidates for appointment to the New Board are limited to those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and (b) DCG shall provide written notice to the Debtors or the Wind-Down Debtors, as applicable, of the Persons selected by DCG for appointment to the New Board no later than fifteen (15) calendar days after the entry of this Confirmation Order is consistent with and does not violate section 1123(a)(7).

(viii)    Impairment / Unimpairment of Classes: Section 1123(b)(1).

28.    The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Specifically, Article III of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

(ix)    Assumption and Rejection of Executory Contracts and Unexpired Leases: Section 1123(b)(2).

29.    The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  In accordance with the provisions of sections 365 and 1123(b)(2) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Supplement, or this Confirmation Order, Article V.A of the Plan provides that all Executory Contracts or Unexpired Leases shall be rejected as of the

Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is any date other than the Effective Date.  The prepetition master borrow agreements and associated loan term sheet agreements entered into between GGC and the members of the CCAHG (as defined in the Proposed Findings of Fact and Conclusions of Law) are not executory contracts and, therefore, are not subject to the provisions of sections 365 and 1123(b)(2).

    (x)    <u>Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action: Section 1123(b)(3)</u>.

30.    The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan (including the Distribution Principles and the compromises and settlements set forth in the Plan Supplement, including the Setoff Principles), and the distributions, releases, and other benefits provided thereunder, constitute good-faith compromises and settlements of all Claims and Interests and controversies resolved pursuant to the Plan.  All of the compromises and settlements of all such Claims, Interests, and controversies embodied in the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, were developed and proposed in good faith, were negotiated at arms' length, were not the

result of collusion or of a breach of the Debtors' fiduciary duties, are in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests, are fair, equitable, and reasonable, and are a sound exercise of the Debtors' business judgment. The foregoing includes, without limitation, the settlement of Claims, Causes of Action, and controversies embodied in the Distribution Principles, the Setoff Principles, the GGC/GGH Settlement in Article IV.C of the Plan, and the GAP/GGC Settlement in Article IV.D of the Plan.

31.    Article VIII.D of the Plan describes certain releases granted by the Debtors and their Estates (the "***Debtor Releases***") against a group of specified individuals and entities (the "***Released Parties***"). The Debtors' proposal of the Debtor Releases followed an exhaustive, months-long independent internal investigation conducted by the Special Committee and its advisors as well as arm's-length negotiations with the Released Parties. Moreover, in order to further ensure that the Estates can continue to benefit from the Released Parties' knowledge and information, the Debtors modified the Plan to provide releases only to those Genesis Personnel who agree to cooperate with assisting with litigation of the Retained Causes of Action by the Wind-Down Debtors by executing the Cooperation Agreement.

32.    For the reasons set forth in the Memorandum Decision and on the record of the Chapter 11 Cases and the evidence proffered, admitted, or adduced at the Confirmation Hearing, the Debtor Releases (a) are an essential component and means of implementing the Plan; (b) are an integral and non-several element of the Plan and the transactions incorporated therein; (c) confer substantial benefits on the Debtors' Estates; (d) are in exchange for the good and valuable consideration provided by the Released Parties; (e) are a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (f) are materially beneficial to and in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (g) are fair,

equitable, and reasonable; (h) are given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (i) are a bar to any of the Debtors, the Wind-Down Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to such releases.  For all of the above-discussed reasons, the Debtor Releases represent a valid settlement of any claims the Debtors and their estates may have against the Released Parties, pursuant to section 1123(b)(3)(A).

33.    Article VIII.D of the Plan describes certain releases granted by certain non-Debtors (the "***Non-Debtor Releases***") of the Released Parties.  With respect to the Non-Debtor Releases, any granting of such releases required express "opt in" consent by Holders of Claims eligible to vote on the Plan, such that only Holders of Claims who affirmatively (i) voted in favor of the Plan, and (ii) elected to opt in to granting releases are deemed to have granted Non-Debtor Releases pursuant to the Plan.  The Non-Debtor Releases are fully consensual because the Debtors widely publicized the Non-Debtor Releases and the accompanying opt-in mechanism, including by reproducing the full text of the Non-Debtor Releases in bold-face type in the Plan, Disclosure Statement, Ballots, and Notices of Non-Voting Status.  Holders were also provided clear instructions on how to opt in to the Non-Debtor Releases and were expressly advised to review the Solicitation Materials and seek legal advice on the consequences of opting in to the Non-Debtor Releases.

34.    The Non-Debtor Releases (a) are an essential component and means of implementing the Plan; (b) are an integral and non-severable element of the Plan and the transactions incorporated therein; (c) confer substantial benefits on the Debtors' Estates; (d) are in exchange for the good and valuable consideration provided by the Released Parties for the reasons set forth in Exhibit F of the Plan Supplement and otherwise as stated on the record at the

Confirmation Hearing; (e) are a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (f) are materially beneficial to and in the best interests of the Debtors, their Estates and all Holders of Claims and Interests; (g) are fair, equitable, and reasonable; (h) are given and made after due notice and opportunity for hearing; and (i) are a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases except as expressly set forth in the Plan.

35.    The Debtor Releases and the Non-Debtor Releases are integral to the Plan because the Released Parties, *inter alia*, facilitated participation in both the formation of the Plan and the chapter 11 process generally, and their continued cooperation is necessary for implementation and administration of the Plan.  As such, the Debtor Releases and the Non-Debtor Releases offer certain protections to parties that participated constructively in the Debtors' chapter 11 process by, among other things, supporting the Plan.

36.    The contributions by the Released Parties were and will continue to be instrumental to the Debtors' ability to prosecute the Chapter 11 Cases and the Retained Causes of Action in order to maximize recoveries for the Debtors' estates, and such contributions justify the approval of the Debtor Releases and the Non-Debtor Releases.

37.    The exculpation, described in Article VIII.F of the Plan (the "***Exculpation***"), is appropriate under applicable law because it was proposed in good faith and is appropriately limited in scope.  The Exculpated Parties played critical roles in and made significant contributions to the Chapter 11 Cases, and participated in good faith in formulating and negotiating the Plan.  The exculpation provisions of the Plan are essential to the Plan.  For the avoidance of doubt, nothing in Article VIII.F of the Plan shall, nor shall it be deemed to, release or exculpate (a) any Exculpated Party for any act or omission after the Effective Date or (b) any DCG Party.

38.    The injunction provision set forth in Article VIII.G of the Plan is necessary to implement, preserve, and prevent actions against the Debtors, the Wind-Down Debtors, the Exculpated Parties, and the Released Parties, and by extension the compromise and settlement upon which the Plan is founded, and is narrowly tailored to achieve this purpose.

39.    The terms of the release, exculpation, and injunction provisions are consistent with the Bankruptcy Code and section 1123(b) of the Bankruptcy Code is satisfied.

40.    Article IV.B.14 of the Plan appropriately provides that in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Wind-Down Debtors shall retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates (including any Causes of Action that belong to the Other Genesis Entities), whether arising before or after the Petition Date, including any Retained Causes of Action, unless such Causes of Action are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court or any other court.  The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

41.    The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against the property of the Estates described in Article VIII.C of the Plan (the "***Lien Release***") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

(xi)    <u>Modification of Rights: Section 1123(b)(5)</u>.

42.    The Plan modifies the rights of Holders of Claims or Interests, as applicable, as permitted by section 1123(b)(5) of the Bankruptcy Code.

(xii)     Additional Plan Provisions: Section 1123(b)(6).

43.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (a) distributions to Holders of Allowed Claims and Interests (other than Gemini Lender Claims) pursuant to the Distribution Principles, (b) resolution of Disputed Claims, (c) allowance of certain Claims, including pursuant to the Setoff Principles, and (d) retention of Court jurisdiction, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.  The failure to address any provisions of the Bankruptcy Code specifically in this Confirmation Order shall not diminish or impair the effectiveness of this Confirmation Order.

(xiii)     Cure of Defaults: Section 1123(d).

44.     Article V.C of the Plan provides for the satisfaction of any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned by the Debtors pursuant to the Plan by payment of the cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as practicable thereafter, subject to the limitations set forth in Article V.C of the Plan or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

**N.     Debtors' Compliance with the Bankruptcy Code: Section 1129(a)(2).**

45.     The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

    a.   is an eligible debtor under section 109 of the Bankruptcy Code, and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

    b.   complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable

non-bankruptcy law, rule and regulation, the Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Materials and related documents and notices, and in soliciting and tabulating the votes on the Plan.

**O.    Plan Proposed in Good Faith: Section 1129(a)(3).**

46.    The Plan (including the Distribution Principles, the Plan Supplement, including the Setoff Principles, and all other documents and agreements necessary to effectuate the Plan) was negotiated, developed, and proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In so determining, the Bankruptcy Court has considered the facts and record of the Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases, and examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan, and the process leading to Confirmation.  The Plan is the result of months of good-faith, arm's-length negotiations between the Debtors and a wide assortment of parties in interest in these Chapter 11 Cases, including DCG, the Committee, the Ad Hoc Group, the Dollar Group (as defined in the PSA), and Gemini.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of maximizing recoveries of their stakeholders in accordance with the absolute priority rule.

47.    Further, the Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each integral to the Plan and necessary for the Debtors' successful implementation of the Plan.

**P.    Payment for Services or Costs and Expenses: Section 1129(a)(4).**

48.    The Debtors have satisfied section 1129(a)(4) of the Bankruptcy Code.  Any payment made or to be made by the Debtors for services or for costs and expenses of the Professionals in connection with the Chapter 11 Cases, or in connection with the Plan and incident

to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable. All such costs and expenses of the Professionals shall be paid in accordance with the Plan, and all other estimated costs and expenses of the Professionals shall be escrowed in the Professional Fee Escrow Account no later than the Effective Date.

**Q.    Directors, Officers, and Insiders: Section 1129(a)(5).**

49.    The Debtors have complied with the requirements of section 1129(a)(5) of the Bankruptcy Code. Article IV.A.2, Article IV.A.3, Article IV.A.4, and Article IV.B.9 of the Plan describe the manner in which the PA Officer, the Wind-Down Oversight Committee, the Litigation Oversight Committee, the New Board, and the GAP Director, respectively, shall be identified or determined. Moreover, an exhibit identifying the PA Officer was filed as Exhibit G of the Plan Supplement, an updated exhibit identifying the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee was filed as Exhibit T of the Plan Supplement, a list of the five (5) candidates proposed to serve as directors of the New Board (subject to appointment by DCG in accordance with the Plan) was filed as Exhibit H to the Plan Supplement, and an exhibit identifying the GAP Director was filed as Exhibit S of the Plan Supplement. The Plan therefore provides the necessary disclosure of the identities and affiliations of each of the individuals that will serve as officers and directors of the Wind-Down Debtors and satisfies the requirements of section 1129(a)(5)(A) of the Bankruptcy Code. The selection and appointment of the PA Officer, the Wind-Down Oversight Committee, the Litigation Oversight Committee, the New Board, and the GAP Director in accordance with the Plan was and is consistent with the interests of Holders of Claims and Interests and with public policy, in compliance with section 1129(a)(5) of the Bankruptcy Code.

50.    As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each

person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically.  As such, the Debtors are not required to make any "insider" disclosure as contemplated by section 1129(a)(5)(B).  For these reasons, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**R.      No Rate Changes: Section 1129(a)(6).**

51.      Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Cases.  The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

**S.      Best Interest of Creditors: Section 1129(a)(7).**

52.      The Plan, including the Distribution Principles and the Setoff Principles, satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached to the Disclosure Statement as Exhibit C and the other evidence related thereto in support of the Plan that was proffered, admitted, or adduced at the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of an Impaired Claim or Interest against a Debtor either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if such Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code as of the Effective Date.

**T.      Acceptance by Certain Classes: Section 1129(a)(8).**

53.      Section 1129(a)(8) requires acceptance by each Class of Claims or Interests that is Impaired by the Plan.  As described in the Voting Reports, the Classes of Impaired Claims entitled to vote on the Plan voted overwhelmingly to accept the Plan.  Holders of Claims or Interests in the

Deemed Rejecting Classes are Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As such, the Debtors do not meet the requirement of section 1129(a)(8). Notwithstanding the foregoing, the Plan is confirmable because, with respect to each of the Deemed Rejecting Classes, section 1129(b) of the Bankruptcy Code is satisfied as set forth below.

**U.  Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code: Section 1129(a)(9).**

54.     As required by section 1129(a)(9) of the Bankruptcy Code, Article II of the Plan provides for payment in full of Allowed Administrative Expense Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims and Article III of the Plan provides for payment in full of Allowed Other Priority Claims. Therefore, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

**V.  Acceptance by at Least One Impaired Class: Section 1129(a)(10).**

55.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Reports, each of the Voting Classes—Classes 3, 4, 5, and 6 against GGH, Classes 3, 4, 5, 6, and 7 against GGC, and Classes 3, 4, 5, and 6 against GAP, which are Impaired—voted or is presumed to accept the Plan in accordance with section 1126 of the Bankruptcy Code, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code).

**W.  Feasibility: Section 1129(a)(11).**

56.     The Plan contemplates the liquidation of the Debtors. As such, the Debtors need not demonstrate feasibility to satisfy section 1129(a)(11).

**X.      Payment of Fees: Section 1129(a)(12).**

57.      The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article II.D of the Plan provides for the payment of all fees due and payable by the Debtors and/or the Wind-Down Debtors under 28 U.S.C. § 1930(a).

**Y.      Continuation of Employee Benefits: Section 1129(a)(13).**

58.      The Plan provides for costs and expenses of administration of the Debtors' Estates pursuant to section 1114(e)(2) of the Bankruptcy Code to be classified as an Administrative Expense Claim to be paid in accordance with Article II.A of the Plan.  Therefore, the Plan complies with Section 1129(a)(13) of the Bankruptcy Code.

**Z.      Non-Applicability of Certain Sections: 1129(a)(14), (15), and (16).**

59.      Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.  The Debtors (a) are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation, (b) are not individuals, and (c) are each a moneyed business or commercial corporation.

**AA.     "Cram Down" Requirements: Section 1129(b).**

60.      The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes are deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code.  The evidence in support of the Plan that was proffered, admitted, or adduced at or prior to the Confirmation Hearing is reasonable, persuasive, credible, and accurate, has not been controverted by other evidence, and establishes that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to each such Deemed Rejecting Class.   The Plan has been proposed in good faith, is reasonable, and meets the

requirements that (a) no Holder of any Claim or Interest that is junior to each such Deemed Rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest and (b) no Holder of a Claim in a Class senior to such Deemed Rejecting Classes is receiving more than 100% on account of its Claim. *Third*, the Plan does not discriminate unfairly with respect to such Deemed Rejecting Classes because similarly situated Holders of Claims and Interests will receive substantially similar treatment on account of their Claims and Interests irrespective of Class. *Fourth*, to the extent Intercompany Claims and/or Intercompany Interests are Impaired, the Holders of such Claims and Interests are Plan proponents and accordingly not dissenting creditors or shareholders for whom section 1129(b)(1)'s requirements would need to be satisfied. Accordingly, the Plan satisfies the requirement of section 1129(b)(1) and (2) of the Bankruptcy Code. The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

## BB.    Only One Plan: Section 1129(c).

61.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed with respect to each Debtor in each of the Chapter 11 Cases.

## CC.    Principal Purpose of the Plan: Section 1129(d).

62.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

## DD.    Not Small Business Cases: Section 1129(e).

63.    The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**EE.     Good Faith Solicitation: Section 1125(e).**

64.     Based on the record before the Bankruptcy Court in the Chapter 11 Cases, including evidence proffered, admitted, or adduced at or prior to the Confirmation Hearing, (i) the Debtors and the other Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order (including the Solicitation and Voting Procedures), and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the development of the Plan, all their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and (ii) to the extent that any Digital Asset is deemed to be a "security" by the SEC or any Governmental Unit, to the extent that section 1125(e) of the Bankruptcy Code applies, the Debtors and each of their respective Affiliates, agents (including, for the avoidance of doubt, Gemini in its role prescribed in the Disclosure Statement Order), representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold, and in the distribution of Digital Assets, under the Plan, and, therefore, none of such parties or individuals shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation set forth in Article VIII.F of the Plan.

**FF.    Satisfaction of Confirmation Requirements.**

65.    For the reasons set forth herein and in the Memorandum Decision, as well as all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with confirmation of the Plan, and all evidence and arguments made, proffered, admitted, or adduced at the Confirmation Hearing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**GG.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

66.    Without limiting or modifying the rights of any party set forth in Article X.A or Article X.B of the Plan, each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article IX.B of the Plan.

**HH.    Implementation.**

67.    The terms of the Plan, including the Plan Supplement, and all exhibits and schedules thereto, including the Distribution Principles and the Setoff Principles, and all other documents filed in connection with the Plan, and/or executed or to be executed in connection with the transactions contemplated by the Plan, and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications (collectively, the "***Plan Documents***") are incorporated by reference and constitute essential elements of the Plan and this Confirmation Order; *provided, however*, that the Gemini Reserve Principles and the Gemini Lender Distribution Principles, included as Exhibits N and O in the Plan Supplement, are deemed null and void given the occurrence of the Gemini/Genesis Settlement Effective Date.  Consummation of each such Plan Document is in the best interests of the Debtors, the Debtors' Estates, and Holders of Claims and Interests, and such Plan Documents (including, for the avoidance of doubt, the Distribution Principles and the Setoff Principles) are

hereby approved.  The Debtors have exercised reasonable business judgment in determining to enter into the Plan Documents, and the Plan Documents (including, for the avoidance of doubt, the Distribution Principles and the Setoff Principles) have been negotiated in good faith, at arm's-length, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

## II.    New Governance Documents.

68.    The Debtors have exercised sound business judgment in amending the operating agreements of GGH and GGC and the constitution of GAP and have provided adequate notice thereof.  The New Governance Documents have been negotiated in good faith and at arm's length and are deemed to have been made in good faith and for legitimate business purposes.  The terms and conditions of the New Governance Documents are fair and reasonable.

## JJ.    Plan Administration Agreement.

69.    The PA Officer was selected in accordance with the Plan.  The Debtors have exercised sound business judgment in determining to enter into the Plan Administration Agreement and have provided adequate notice thereof.  The Plan Administration Agreement has been negotiated in good faith and at arm's length and is deemed to have been made in good faith and for legitimate business purposes.  The terms and conditions of the Plan Administration Agreement are fair and reasonable.

## KK.    Wind-Down Oversight Committee.

70.    The Debtors, Committee, and Ad Hoc Group have exercised sound business judgment in establishing the Wind-Down Oversight Committee and negotiating the Wind-Down Oversight Committee Bylaws and have provided adequate notice thereof.  The Wind-Down Oversight Committee Bylaws have been negotiated in good faith and at arm's length and are

35

deemed to have been made in good faith and for legitimate business purposes. The terms and conditions of the Wind-Down Oversight Committee Bylaws are fair and reasonable.

**LL.    Litigation Oversight Committee.**

71.    The Debtors, Committee, and Ad Hoc Group have exercised sound business judgment in establishing the Litigation Oversight Committee and negotiating the Litigation Oversight Committee Bylaws and have provided adequate notice thereof. The Litigation Oversight Committee Bylaws have been negotiated in good faith and at arm's length and are deemed to have been made in good faith and for legitimate business purposes. The terms and conditions of the Litigation Oversight Committee Bylaws are fair and reasonable.

**MM.    Plan Support Agreement.**

72.    The PSA has been negotiated in good faith and at arm's length and is deemed to have been made in good faith and for legitimate business purposes. The terms and conditions of the PSA are fair and reasonable.

**NN.    Good Faith.**

73.    The Debtors, the Committee and its members (solely in their capacities as such), the members of the Ad Hoc Group SteerCo (solely in their capacities as such), Gemini (solely in its capacity as the Gemini Distribution Agent), and the other Released Parties and Exculpated Parties acted in good faith and will be acting in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby in accordance with the Plan; and (b) take the actions authorized and directed by this Confirmation Order. The entry of this Confirmation Order shall constitute the Bankruptcy Court's finding and determination that (a) each Released Party's in-Court efforts to develop, negotiate, and propose the Plan were, with respect to each other Released Party and any other Person, in good faith and not by any means forbidden by law and (b) the settlements reflected in the Plan are (i) in the best

36

interests of the Debtors and their Estates, (ii) fair, equitable, and reasonable, and (iii) approved by

the Bankruptcy Court pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy

Rule 9019.

**OO.    Retention of Jurisdiction.**

74.    The Bankruptcy Court may properly, and upon the Effective Date shall, retain

jurisdiction over all matters arising in or related to, the Chapter 11 Cases and the Plan, including

the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

## ORDER

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, THAT:**

75.    **Findings of Fact and Conclusions of Law**.  The above-referenced findings of fact

and conclusions of law are hereby incorporated by reference as though fully set forth herein and

shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable to this proceeding under Bankruptcy Rule 9014. To the extent any of the foregoing

findings of fact constitute conclusions of law, they are deemed as such.  To the extent any of the

foregoing conclusions of law constitute findings of fact, they are deemed as such.

76.    **Confirmation of the Plan**.  The Plan is approved in its entirety and **CONFIRMED**

under section 1129 of the Bankruptcy Code.  The documents contained in or contemplated by the

Plan, including, without limitation, the Plan Documents (including, for the avoidance of doubt, the

Distribution Principles and the Setoff Principles) are hereby authorized and approved.  The terms

of the Plan, including the Distribution Principles, and the Plan Supplement, including the Setoff

Principles, are incorporated by reference into and are an integral part of this Confirmation Order;

*provided*, *however*, that, notwithstanding anything to the contrary in the Plan, the Plan Supplement,

or this Confirmation Order, due to the occurrence of the Gemini/Genesis Settlement Effective Date

on May 9, 2024, the Gemini Reserve Principles and the Gemini Lender Distribution Principles are deemed null and void and shall be of no force and effect. The failure to specifically describe, include, or refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan is confirmed in its entirety, except as expressly modified herein, the Plan Documents (including, for the avoidance of doubt, the Distribution Principles) are approved in their entirety, and all are incorporated herein by this reference.

77. **Objections**. All objections to Confirmation of the Plan and other responses, comments, statements, or reservation of rights, if any, in opposition to the Plan that have not been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order are overruled on the merits.

78. **Plan Classification Controlling.** The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

79. **Confirmation Hearing Notice**. The Confirmation Hearing Notice, the Confirmation Hearing Publication Notices, and any other notice filed or otherwise published by the Debtors in connection with Confirmation of the Plan complied with the terms of the Disclosure

Statement Order, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and are approved in all respects.

80.   **Solicitation**.  The solicitation of votes on the Plan complied with the Solicitation and Voting Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and applicable non-bankruptcy law, and is approved in all respects.

81.   **Plan Modifications**.  The modifications, amendments, and supplements made to the Plan (including the Plan Supplement and those modifications, amendments, and supplements made to the Plan in connection with the Gemini/Genesis Settlement Agreement) following the solicitation of votes thereon constitute technical changes and do not materially adversely affect or change the proposed treatment of any Claims or Interests.   After giving effect to such modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The filing of the Plan and proposed form of this Confirmation Order with the Bankruptcy Court on May 24, 2024, which contain such modifications, and the disclosure of such modifications on the record at the Confirmation Hearing constitute due and sufficient notice thereof.  Accordingly, such modifications do not require additional disclosure or re-solicitation of votes under sections 1125, 1126, or 1127 of the Bankruptcy Code or Bankruptcy Rule 3019, nor do they require that the Holders of Claims in the Voting Classes be afforded an opportunity to change their previously cast votes on the Plan.  The Holders of Claims in the Voting Classes who voted to accept the solicitation version of the Plan are deemed to accept the Plan as modified.  The Plan, as modified, is, therefore, properly before this Court and all votes cast with respect to the

Plan prior to such modification shall be binding and shall apply with respect to the Plan. Nothing herein shall be construed to limit or prohibit the Debtors, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, from further modifying the Plan prior to the Effective Date in accordance with section 1127(b) of the Bankruptcy Code.

82.     **No Action Required.**  No action of the respective directors, equity holders, managers, or members of the Debtors or the Wind-Down Debtors (as applicable) is required to authorize the Debtors or the Wind-Down Debtors (as applicable) to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, or any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, the Wind-Down Oversight Committee Bylaws, and the other Plan Documents (including, for the avoidance of doubt, the Distribution Principles).

83.     **Binding Effect**.  On the date of and after entry of this Confirmation Order, in accordance with section 1141(a) of the Bankruptcy Code and subject to the occurrence of the Effective Date and notwithstanding Bankruptcy Rules 3020(e), 6004(d), 6004(h), or otherwise, the terms of the Plan, the Plan Documents (including, for the avoidance of doubt, the Distribution Principles and the Setoff Principles), and this Confirmation Order shall be immediately effective (and/or adopted, where applicable) and enforceable and deemed binding upon the Debtors or the Wind-Down Debtors (as applicable), and any and all Holders of Claims or Interests and such Holder's respective heirs, executors, administrators, successors or assigns, Affiliates, officers,

directors, managers, agents, representatives, attorneys, beneficiaries, or guardians (regardless of whether or not (a) the Holders of such Claims or Interests voted to accept or reject, or are deemed to have accepted or rejected, the Plan or (b) the Holders of such Claims or Interests are entitled to a distribution under the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases (including the releases set forth in Article VIII of the Plan), waivers, exculpations, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan. The Plan and the Plan Documents (including, for the avoidance of doubt, the Distribution Principles) constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms.  Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and the Plan Documents (including, for the avoidance of doubt, the Distribution Principles), and any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

84.    **Effectiveness of All Actions**.  All actions contemplated by the Plan, including all actions pursuant to, in accordance with, or in connection with the Plan Documents (including, for the avoidance of doubt, the Distribution Principles and the Setoff Principles), are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the Debtors or the Wind-Down Debtors (as applicable).

85.     **Plan Implementation**.

(a)     Pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, on or, unless specifically provided otherwise herein or the Plan, prior to the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors or the Wind-Down Debtors (as applicable), in accordance with Article IV of the Plan, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Distribution Principles, including (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Debtors or the Wind-Down Debtors (as applicable) determine are necessary or appropriate and that are not inconsistent with the Plan.

(b)     Except as set forth in the Plan, upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including (i) the appointment of the New Board, the PA Officer, the GAP Director, and the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee, (ii) the implementation of the Restructuring, (iii) the re-vesting of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the transactions and distributions contemplated under the Plan and the Distribution Principles, including any rebalancing of Distributable Assets or other Monetization Transactions, (iv) the rejection, assumption, or assumption and assignment, as appropriate, of any Executory Contracts and Unexpired Leases, and all other actions contemplated by the Plan and the Definitive

Documents. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors.

(c)     On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Wind-Down Debtors to the extent not previously authorized by the Bankruptcy Court. To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the Debtors or the Wind-Down Debtors (as applicable), this Confirmation Order shall, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the Debtors or the Wind-Down Debtors (as applicable).

(d)     All such transactions effected by the Debtors during the pendency of the Chapter 11 Cases from the Petition Date through the Confirmation Date (or as otherwise contemplated by this Confirmation Order) are approved and ratified, subject to the satisfaction of any applicable terms and conditions to effectiveness of such transactions and the occurrence of the Effective Date.

86.     **The Wind-Down Debtors' Activities.**     The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the Debtors' Assets. The Wind-Down

Debtors shall not conduct business operations and shall be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Debtors' Beneficiaries. Each Wind-Down Debtor shall be managed by the PA Officer and the New Board, which shall consult with or be directed by the Wind-Down Oversight Committee and the Litigation Oversight Committee, in accordance with the applicable New Governance Documents, the Plan Administration Agreement, the Wind-Down Oversight Committee Bylaws, and the Litigation Oversight Committee Bylaws, and shall be subject to the Wind-Down Budget. On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement. In the event of any conflict between the terms of Article IV.A of the Plan and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

87.    **PA Officer.** The appointment of the PA Officer is hereby approved, and the PA Officer's duties shall commence as of the Effective Date; *provided* that nothing herein shall be construed to limit the PA Officer's ability to confer with the Debtors and other parties in interest in advance of the Effective Date. The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries in accordance with and pursuant to the Distribution Principles and shall serve as the successor to and representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates (including any Causes of Action that belong to the Other Genesis Entities) that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

88.    The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the PA Officer and the Wind-Down Debtors'

Beneficiaries shall be as set forth in the Plan Administration Agreement. Pursuant hereto and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.

89.     In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan and the Plan Administration Agreement, and (ii) the date on which the PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement and the Wind-Down Oversight Committee Bylaws), or is otherwise unable to serve; *provided*, *however*, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the Wind-Down Oversight Committee shall elect a successor to be appointed by the New Board to serve as a PA Officer in accordance with the Plan Administration Agreement. If the Wind-Down Oversight Committee does not elect a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

90.     **Wind-Down Oversight Committee**. The appointment of the Wind-Down Oversight Committee is hereby approved, and the Wind-Down Oversight Committee's responsibilities shall commence as of the Effective Date; *provided* that nothing herein shall be construed to limit the ability of the members of the Wind-Down Oversight Committee to confer with the Debtors, the PA Officer, and other parties in interest  in advance of the Effective Date. The Wind-Down Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the execution of Monetization Transactions, and distribution or other disposition of the Distributable Assets in accordance with the Plan (including the Distribution

Principles) and the Plan Administration Agreement and (ii) approving any material amendments

to the Distribution Principles in accordance with the Wind-Down Oversight Committee Bylaws.

For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee

shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of

doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive

distributions pursuant to the Plan. Vacancies on the Wind-Down Oversight Committee shall be

filled by the unanimous consent of the remaining member or members of the Wind-Down

Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed,

in accordance with the Wind-Down Oversight Committee Bylaws. If a vacancy on the Wind-

Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring,

the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the

appointment of a Person selected by a majority of the Members (or if no Person has the approval

of a majority of the members of the Wind-Down Oversight Committee, the Person with the support

of a plurality of such members), with such Person's prior written consent, to the Wind-Down

Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an

order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight

Committee for cause.

91.     The Wind-Down Oversight Committee Bylaws, substantially in the form filed with

the Plan Supplement, are hereby approved in their entirety, and the Wind-Down Debtors are

authorized to adopt the Wind-Down Oversight Committee Bylaws. On the Effective Date, the

Wind-Down Oversight Committee shall be deemed to have adopted the Wind-Down Oversight

Committee Bylaws, which shall require the membership of the Wind-Down Oversight Committee

to at all times, except as otherwise provided in the Wind-Down Oversight Committee Bylaws

(including, without limitation, with respect to the occurrence of a Gemini Recovery Event or a USD Recovery Event), include the following: (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Member, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member (unless a Gemini Recovery Event has occurred), and (v) the Wind-Down Oversight Crossover Member; *provided*, *however*, that the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

92.    **Litigation Oversight Committee**. The appointment of the Litigation Oversight Committee is hereby approved, and the Litigation Oversight Committee's responsibilities shall commence as of the Effective Date; *provided* that nothing herein shall be construed to limit the ability of the members of the Litigation Oversight Committee to confer with the Debtors, the PA Officer, and other parties in interest  in advance of the Effective Date.  The Litigation Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the strategy and pursuit of Retained Causes of Action, including the selection, management, and direction of counsel and other advisors retained to investigate, analyze, and pursue the Retained Causes of Action, (ii) approving settlements on account of any Retained Causes of Action, and (iii) managing the Litigation Reserve.  For the avoidance of doubt, in advising the PA Officer, the Litigation Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims

and Interests that are entitled to receive distributions pursuant to the Plan. Vacancies on the Litigation Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Litigation Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Litigation Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person selected by a majority of the Members (or if no Person has the approval of a majority of the members of the Litigation Oversight Committee, the Person with the support of a plurality of such members), with such Person's prior written consent, to the Litigation Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Litigation Oversight Committee for cause.

93.    The Litigation Oversight Committee Bylaws, substantially in the form filed with the Plan Supplement, are hereby approved in their entirety, and the Wind-Down Debtors are authorized to adopt the Litigation Oversight Committee Bylaws. On the Effective Date, the Litigation Oversight Committee shall be deemed to have adopted the Litigation Oversight Committee Bylaws, which shall require the membership of the Litigation Oversight Committee to at all times, except as otherwise provided in the Litigation Oversight Committee Bylaws (including, without limitation, with respect to the occurrence of a Gemini Earn Recovery Event or a USD Recovery Event), include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member, (iv) at least one (1) Litigation Oversight Crossover Member; and (v) at least one (1) Litigation Oversight Gemini Lender Member (unless a Gemini Recovery Event occurs); *provided*, *however*, that the Litigation Oversight Committee Bylaws shall

expressly provide that the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413; and, *provided*, *further*, that upon the occurrence of a USD Recovery Event, the Litigation Oversight Fiat-or-Stablecoin Members shall be deemed to resign their positions, and the Litigation Oversight Committee shall be reduced to five (5) members.

94.     **Plan Administration Agreement**.   The Plan Administration Agreement, substantially in the form filed with the Plan Supplement, is hereby approved in its entirety, and the Debtors are authorized to enter into the Plan Administration Agreement.

95.     **Reports to Be Filed by the PA Officer.**  The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

96.     Due to the occurrence of the Gemini/Genesis Settlement Effective Date on May 9, 2024, notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Gemini Distribution Agent shall not be appointed as agent for the Debtors and the Wind-Down Debtors to make or facilitate distributions to Gemini Lenders pursuant to the Plan and, as such, the second

paragraph of Article IV.A.6 of the Plan shall be deemed null and void and shall be of no force and effect as of the date of entry of this Confirmation Order.

97.     **Fees and Expenses of the Wind-Down Debtors**.   The Wind-Down Debtors' Expenses, as set forth in the Plan, shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.   The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.   The PA Officer, on behalf of the Wind-Down Debtors, may employ (with the consent of the Wind-Down Oversight Committee or the Litigation Oversight Committee, as applicable), without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors or other parties in interest) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Plan Administration Agreement.   For the avoidance of doubt, the PA Officer, the Wind-Down Oversight Committee, and the Litigation Oversight Committee may employ the same professionals to the extent appropriate, as determined by each in its reasonable discretion and in accordance with the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws, as applicable.

98.     **Settlement of Claims by the PA Officer**.   Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy

Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; *provided, however*, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; *provided further* that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided in the Plan and in the Plan Administration Agreement.

99.     **Sales of Assets by the Wind-Down Debtors**.  The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets (except for Retained Causes of Action, GBTC shares, ETHE shares, and ETCG shares) on any terms it deems reasonable, subject to the Distribution Principles, without further order of the Bankruptcy Court.  The PA Officer may conduct any Monetization Transactions of Retained Causes of Action without further order of the Bankruptcy Court, but only to the extent the PA Officer has obtained the prior consent of the New Board and the Litigation Oversight Committee's Consent, subject to the provisions of the Plan Administration Agreement.  The PA Officer may conduct any Monetization Transactions of GBTC shares, ETHE shares, or ETCG shares without further order of the Bankruptcy Court and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable to such shares, but only in accordance with the Distribution Principles.  Upon the sale, liquidation, transfer, or other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts (and such proceeds shall become and be deemed to be Distributable Assets).  Due to the occurrence of the Gemini/Genesis

Settlement Effective Date on May 9, 2024, notwithstanding anything herein or in the Plan to the contrary, there shall be no Additional GBTC Shares Reserve or Gemini GBTC Shares Reserve.

100.    **Monetization and Rebalancing of Assets by the Gemini Distribution Agent**. Due to the occurrence of the Gemini/Genesis Settlement Effective Date on May 9, 2024, notwithstanding anything to the contrary in the Plan, the Gemini Distribution Agent shall not be appointed as agent for the Debtors and the Wind-Down Debtors to make or facilitate distributions to Gemini Lenders pursuant to the Plan and, as such, the second paragraph of Article VI.B.1 of the Plan shall be deemed null and void and shall be of no force and effect.

101.    **Dissolution of the Wind-Down Debtors**.  On and after the Effective Date, the Wind-Down Debtors shall be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors, subject to the remaining provisions of Article IV.A.14 of the Plan, shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.  As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.

102.    Upon making all distributions provided for under the Plan, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any jurisdiction in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Plan, shall be deemed to have cancelled all Interests pursuant to the Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date; *provided*, however, that subject to orders of the

Bankruptcy Court and applicable law, the Debtors, the Wind-Down Debtors, DCG and each of its non-Debtor subsidiaries reserve all rights and defenses against each other (as applicable) regarding the imposition of any taxes on the Debtors, the Wind-Down Debtors, DCG or its non-Debtor subsidiaries based on or with respect to the income, conduct, or assets of the Debtors or the Wind-Down Debtors.

103.    The Wind-Down Debtors shall dissolve on the earlier of the date on which: (i) (a) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Plan, and the PA Officer has fully performed all other duties and functions as set forth under the Plan, the Confirmation Order, and/or the Plan Administration Agreement and (b) the Chapter 11 Cases of the Debtors have been closed; or (ii) the PA Officer determines in his, her, or its reasonable judgment, with notice to the New Board and in consultation with the Wind-Down Oversight Committee, that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Plan, the Confirmation Order, and/or the Plan Administration Agreement.  After (x) the final distributions pursuant to the Plan, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction.  The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.  Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of

any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

104.    **Establishment of Appropriate Escrow Accounts and Reserves**.  In accordance with the terms of the Plan, on or before the Effective Date, the Debtors shall establish and hold in trust in a segregated account: (i) the Claims Reserve for each Debtor, (ii) the Professional Fee Escrow Account, (iii) the Litigation Reserve, (iv) the Wind-Down Reserve for each Wind-Down Debtor, and (v) the Disputed Claims Reserve for each applicable Wind-Down Debtor.

105.    **Sources of Consideration for Plan Distributions; Digital Asset Rebalancing**. The Wind-Down Debtors shall make distributions in accordance with the Plan (and the Distribution Principles) from Distributable Assets, the Claims Reserve, the Disputed Claims Reserve, and the Professional Fee Escrow Account, as applicable.

106.    The Debtors and the Wind-Down Debtors, in consultation with the Wind-Down Oversight Committee, shall, to the maximum extent permitted by law, be authorized to rebalance their Cash and Digital Assets to enable the Debtors or the Wind-Down Debtors, as applicable, to make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such respective Claims are denominated.  The Debtors and the Wind-Down Debtors, to the maximum extent permitted by law, and subject to the Distribution Principles, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided, however*, that the Debtors, the Wind-Down Debtors, or the Disbursing Agent, as applicable, shall not be required to make any distribution in the form of Digital Assets to any Holder that has not provided to the Debtors, the Wind-Down Debtors, or the Disbursing Agent, as applicable, all information necessary to facilitate a particular distribution to such Holder.

107.    The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

108.    **Vesting of Assets**.  Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or therein, on the Effective Date: all Assets in each Estate, including all books, records, electronically stored information (including documents and communications), Retained Causes of Action, and any Assets owned or acquired by any of the Debtors, including all assets of GGT that relate to the Debtors, shall vest in each applicable Wind-Down Debtor free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims, Allowed Government Penalty Claims, and Allowed Subordinated Claims), including any prohibition on assignability or transfer under applicable non-bankruptcy law.  The vesting of Assets pursuant to the Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors as if the asset or right was still held by the Debtors.  On and after the Effective Date, except as otherwise provided in the Plan, the New Governance Documents, or the Plan Administration Agreement, each Wind-Down Debtor may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable.

109.    Notwithstanding any prohibition on assignability or transfer under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such additional Assets shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code.  All such Assets shall automatically vest in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims, Allowed Government Penalty Claims, and Allowed Subordinated Claims pursuant to the terms of the Plan).

110.    Except as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary to cancel and/or extinguish such Liens and/or security interests.

111.    On and after the Effective Date, the Wind-Down Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors.  The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred,

assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate

notice that such Lien, Claim, encumbrance, or other interest is being extinguished, and no notice,

other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s)

or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of

the property vested in accordance with Article IV.B.5 of the Plan shall be conclusively deemed to

have consented to the transfer, assignment, and vesting of such property to or in the Wind-Down

Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to

confirmation of the Plan, except as otherwise provided in the Plan.

112.   **Cancellation of Existing Securities and Agreements**.  On the Effective Date,

except to the extent otherwise provided in the Plan: (a) all Interests, and each certificate, share,

note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or

indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the

Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors

and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the

obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures,

certificates of designation, bylaws, or certificate or articles of incorporation or similar documents

governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other

instruments or documents evidencing or creating any indebtedness or obligation of, or Claims

against or Interests in, the Debtors shall be released; *provided* that, notwithstanding the releases

set forth in Article VIII of the Plan, this Confirmation Order, or the occurrence of the Effective

Date, any indenture or agreement that governs the rights of the Holder of a Claim or Interest shall

continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed

Interests to receive distributions under the Plan as provided therein, including the Distribution

Principles; *provided further* that, absent the consent of the Debtors and the Committee's Consent (or, following the Effective Date, the consent of the Wind-Down Debtors and the Wind-Down Oversight Committee's Consent), nothing in Article IV.B.6 of the Plan shall effectuate a cancellation of any Intercompany Interests, Intercompany Claims (except for claims settled as part of the GAP/GGC Settlement or the GGC/GGH Settlement), or Interests.

113.    Notwithstanding anything to the contrary in Article IV.B.6 of the Plan, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, or releases provided for in Article IV.B.6 of the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained in the Plan shall be deemed to cancel, terminate, or release the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

114.    **New Governance Documents**.   On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

115.    **Directors and Officers of the Wind-Down Debtors**.   As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically. The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG

shall only be entitled to appoint those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors; and, *provided*, *further*, that DCG shall provide written notice to the Debtors or the Wind-Down Debtors, as applicable, of the Persons selected by DCG for appointment to the New Board no later than fifteen (15) calendar days after the entry of this Confirmation Order; and, *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace any member of the New Board who needs to be replaced by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board. The New Board shall govern each of the Wind-Down Debtors and consult with the Wind-Down Oversight Committee on various matters identified in the Plan and the Plan Administration Agreement.

116.    **Preservation of Causes of Action.**    In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates (including any Causes of Action that belong to the Other Genesis Entities), whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan, all rights in any Retained

Causes of Action shall vest in the Wind-Down Debtors as of the Effective Date, and may be pursued by the PA Officer in accordance with the provisions of the Plan and the Plan Administration Agreement.

117.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action against such Entity. The Debtors or the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court or any other court, including pursuant to Article VIII of the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance shall any Cause of Action preserved pursuant to Article IV.B.14 of the Plan include (a) any claim or Cause of Action with respect to, or against, a Released Party or Exculpated Party, subject in all respects to Article VIII of the Plan, or (b) any Resolved Preference Claims.

118.    In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity (including any Causes of Action that belong to the Other Genesis Entities) shall vest in the

applicable Wind-Down Debtor.  The applicable Wind-Down Debtors, through their authorized agents or representatives (including the PA Officer), shall retain and may exclusively enforce any and all such Causes of Action.  The Wind-Down Debtors shall have the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Litigation Oversight Committee) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the Litigation Oversight Committee's Consent.

119.    **Substitution in Pending Legal Actions.**  On the Effective Date, the Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset (including any Causes of Action that belong to the Other Genesis Entities) without the need for filing any motion for such relief.

120.    **Insurance.**  The Wind-Down Debtors shall be authorized to obtain directors', managers', and officers' liability insurance policies. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Wind-Down Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory

Contracts, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full force and effect in accordance with their terms.

121.    **Executory Contracts and Unexpired Leases.**  On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is any date other than the Effective Date.

122.    Entry of this Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and

assignment under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases with the Committee's Consent and the Wind-Down Oversight Committee's Consent, as applicable, at any time on or prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties. Any party that wishes to object to any such alteration, amendment, modification, or supplement to the Schedule of Assumed Executory Contracts and Unexpired Leases must file and serve a written objection with the Bankruptcy Court in accordance with the Case Management Order within thirty (30) days of receiving notice of such alteration, amendment, modification, or supplement to the Schedule of Assumed Executory Contracts and Unexpired Leases.

123. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

124. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with

respect thereto.    Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

125.    For the avoidance of doubt, nothing in the Schedules shall in any way be construed as or deemed to be evidence of or reflect an admission on behalf of any of the Debtors that any of the Debtors' master lending agreements or master borrowing agreements, or the loan term sheets associated therewith, shall constitute Executory Contracts.

126.    All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court and served on the Debtors or the Wind-Down Debtors, as applicable, no later than thirty (30) days after the later of (a) the effective date of the rejection of the applicable Executory Contract or Unexpired Lease and (b) the date of entry of an order of the Bankruptcy Court approving the rejection of the applicable Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property (as applicable), without the need for any objection by the Debtors or the Wind-Down Debtors, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in the Proof of Claim, if

any, to the contrary.   All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

127.   The Indemnification Obligations shall remain in full force and effect and shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall not indemnify (i) employees, directors, or officers of the Debtors for any claims or Causes of Action arising out of or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct or (ii) any current or former employees, directors, or officers of the Debtors that are also DCG Parties.

128.   To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Wind-Down Debtors on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors.

129.   **Distributions**.  The procedures governing distributions contained in Article VI of the Plan and the Distribution Principles shall be, and hereby are, approved in their entirety.

130.   **Claims Register**.  Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, or the

PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

131.    A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim, or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, or applicable non-bankruptcy law. On or after the Confirmation Date, the Holder of a Claim (other than an Administrative Expense Claim, a Claim for rejection damages for which the applicable objection deadline has not passed, or a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or the Debtors or the Wind-Down Debtors, as applicable, to File or amend a Claim. Any new or amended Claim (other than Administrative Expense Claims, Claims for rejection damages for which the applicable objection deadline has not passed, or Professional Fee Claims) filed after the Confirmation Date without such prior authorization shall not appear on the Claims Register and shall be deemed Disallowed in full and expunged without any action required of the Debtors or the Wind-Down Debtors and without the need for any court order.

132.    **Late Filed Claims**.  On the Effective Date and unless the Chapter 11 Cases subsequently convert to Chapter 7, any Claim that has been listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, shall be deemed Disallowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court unless, with respect to any such Claim, the Bankruptcy Court for cause extends the time within which a Proof of Claim may be filed.  Except as provided in the Plan or this Confirmation Order, in an order of the Bankruptcy Court, or

otherwise agreed, any and all Proofs of Claim Filed after the applicable bar date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless at or prior to the Confirmation Hearing such late Claim has been Allowed by a Final Order.

133. **Professional Compensation**. The provisions governing compensation of Professionals set forth in Article II.B of the Plan are approved in their entirety. All final requests for payment of Professional Fee Claims through and including the Effective Date shall be Filed no later than sixty (60) days after the Effective Date. Objections to any Professional Fee Claim shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and the requesting Professional no later than twenty (20) days after such final request for payment of Professional Fee Claims is Filed with the Bankruptcy Court.

134. **Restructuring Fees and Expenses**. Consistent with the Memorandum Decision, the provisions of which are incorporated herein, on or before June 7, 2024, the Ad Hoc Group and any other party seeking a substantial contribution finding shall submit evidence of its fees incurred in making such substantial contribution, together with an explanation of the tasks for which it is seeking compensation (each, a "Fee Statement"). Within fourteen (14) days of the Filing of a Fee Statement, the U.S. Trustee shall File a detailed statement or response to such Fee Statement, which statement or response shall state its position on the Fee Statement, including a detailed list of any tasks (and related compensation) that it contests and the basis for any such objection. Within seven (7) days after the submission by the U.S. Trustee, the applicable party shall File any replies thereto. If the Court enters an order determining the amount of Ad Hoc Group Restructuring Expenses and Dollar Group Restructuring Fees and Expenses allowable pursuant to section 503(b)

of the Bankruptcy Code (the "Fee Order") prior to the Effective Date, the subject fees and expenses Allowed thereunder shall be payable in full in Cash on the Effective Date.  If the Fee Order is entered after the Effective Date, the subject fees and expenses Allowed thereunder shall be payable in full in Cash no later than five (5) Business Days following entry of the Fee Order.

135.    **Subordination.**    Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  The Debtors and the Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the DCG Claims and/or the Excluded Party Claims.

136.    **Compromise and Settlement of Claims, Interests, and Controversies**. Consistent with the Memorandum Decision and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, including the Distribution Principles and the Setoff Principles, the general settlement and/or release of Claims, Interests, and controversies described in Article VIII of the Plan, the GAP/GGC Settlement described in Article IV.C of the Plan, and the

GGC/GGH Settlement described in Article IV.D of the Plan, and the distributions, releases, and other benefits provided thereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

137.     The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, subject to any applicable consent rights and procedures set forth in the Plan or this Confirmation Order.

138.     **Release, Exculpation, and Injunction Provisions**.  All injunction, release, and exculpation provisions set forth in the Plan, including, but not limited to, those contained in Articles VIII.C, VIII.D, VIII.E, VIII.F, and VIII.G of the Plan, are approved and shall be effective and binding on all persons and entities to the extent provided therein.

139.     **No Discharge**.  Nothing in the Plan or this Confirmation Order grants the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

140.     **Governmental Entities**.  Notwithstanding any language to the contrary contained in the Disclosure Statement, the Plan and/or this Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing

its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

141.    The enforcement of any money judgment by the SEC or other Governmental Units against the Debtors or the Wind-Down Debtors shall be subject to the Plan and any applicable stipulations and orders of the Court.  In addition, the SEC and other Governmental Units reserve their rights to amend any Filed Proofs of Claim and the Debtors and the Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

142.    Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or this Confirmation Order, or any findings announced in connection with the Plan, the Disclosure Statement, or this Confirmation Order, nothing in the Plan, the Disclosure Statement, or this Confirmation Order shall constitute a finding under either federal or state (including New York State) securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC or other Governmental Units to challenge transactions involving crypto tokens on any basis is expressly reserved.  The Bankruptcy Court is not making any findings as to the availability of any exemptions under the securities laws.

143.    Nothing in this Confirmation Order, the Plan, any amendments thereto, or related documents, discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) of the State of Texas or New Jersey (a "***Texas or New Jersey Governmental Unit***") that is not a Claim as defined in 11 U.S.C. § 101(5); (ii) any Claim of a Texas or New Jersey Governmental Unit against the Debtors arising on or after the Confirmation Date; (iii) any liability to a Texas or New Jersey Governmental Unit under police and regulatory statutes or regulations that any Entity would be subject to as the owner or operation of property

after the Confirmation Date; or (iv) any liability to a Texas or New Jersey Governmental Unit on the part of any Person other than the Debtors.  Nor shall anything in this Confirmation Order enjoin or otherwise bar a Texas or New Jersey Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence; *provided*, *however*, that any Claim of any Governmental Unit arising before the Petition Date shall remain subject to the Bar Date Order and nothing in this Confirmation Order or the Plan shall modify in any respect the Bar Date Order.

144.    Further, nothing in this Confirmation Order, the Plan, any amendments thereto, or related documents, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Confirmation Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Texas or New Jersey Governmental Unit.  Nothing in this Confirmation Order shall affect any setoff or recoupment rights of any Texas or New Jersey Governmental Unit.  Nothing in this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or to adjudicate any defense asserted under this Confirmation Order.

145.    Any and all state regulatory orders and regulatory judgments issued to or against the Debtors prior to, during, or after these Chapter 11 Cases are not discharged, released, or otherwise affected by confirmation of the Plan.  For the avoidance of doubt, the State of Texas and State of New Jersey and their agencies opt out of any and all releases provided in the Plan. The Claims of the State of Texas and its agencies shall be addressed as reflected in the Stipulation & Order entered at ECF No. 1469 and the Claims of the State of New Jersey and its agencies shall be addressed as reflected in the Stipulation & Order entered at ECF No. 1468.

146.    **Tax Withholding**.  In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and

payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

147.    **Payment of Statutory Fees**.  On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors in Cash.  After the Effective Date, each Wind-Down Debtor shall pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its respective Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first.  The Wind-Down Debtors shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

148.    **Documents, Mortgages, and Instruments**.  Each federal, state, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, or instruments necessary or appropriate to effectuate, implement, or consummate the Plan.

149.    **Return of Deposits**.  All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of "adequate assurance" of performance pursuant to section 366 of the Bankruptcy Code during the Chapter 11 Cases are directed to return such deposits or other form of adequate assurance of performance to the Wind-Down Debtors promptly following the occurrence of the Effective Date, if not returned or applied earlier.

150.    **Filing and Recording**.  This Confirmation Order is binding upon and shall govern the acts of all Persons or Entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and Entities, who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (if any), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any sale, liquidation, or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any Assets to the Wind-Down Debtors and any rebalancing of Distributable Assets, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

151.    **Continued Effect of Stays and Injunctions**.  Unless otherwise provided in the Plan, this Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

152.    **Authorization to Consummate**.  The Debtors are authorized to consummate the Plan and the Restructuring at any time after entry of this Confirmation Order subject to satisfaction,

or waiver in accordance with Article IX.B of the Plan, of the conditions precedent to the Effective Date set forth in Article IX of the Plan.

153. **Conditions Precedent to the Effective Date**. The Plan shall not become effective unless and until the conditions set forth in Article IX.A of the Plan have been satisfied or waived pursuant to Article IX.B of the Plan.

154. **Nonseverability of Plan Provisions upon Confirmation**. Subject to Article XII.H of the Plan, each term and provision of the Plan is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, the Committee's Consent, the Ad Hoc Group's Consent, and solely to the extent that (i) the treatment of Gemini Lender Claims, (ii) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (iii) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing); and (c) nonseverable and mutually dependent.

155. **Post-Confirmation Modifications**. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or

reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or this Confirmation Order, the Debtors shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) of any alteration, amendment, or modification of the Distribution Principles.

156. **Lead Securities Plaintiffs Matters**. Until the entry of a final order of judgment or settlement in the securities class action pending in the United States District Court for the District of Connecticut under the caption, *William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex Sopinka, individually and on behalf of all others similarly situated v. Digital Currency Group, Inc. and Barry Silbert*, Case No. 3:23-cv-00082 (the "***Securities Litigation***"), the Debtors and any transferees, successors, and/or assigns (including the Wind-Down Debtors and PA Officer) of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object potentially relevant to the Securities Litigation, wherever stored (collectively, the "***Potentially Relevant Books and Records***") shall preserve and maintain such Potentially Relevant Books and Records, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records without providing counsel to the lead plaintiff(s) in the Securities Litigation at least sixty (60) days' advance written notice and an opportunity to object and be heard by a court of competent jurisdiction. In the event the lead plaintiff(s) timely object(s) to any such destruction, abandonment, or transfer, the Potentially Relevant Books and Records shall be preserved until the earlier of (a) a final order of the Bankruptcy Court or other court of competent jurisdiction

regarding the disposition of the Potentially Relevant Books and Records, and (b) the date the party in possession, custody, or control of such Potentially Relevant Books and Records provides originals or true copies thereof to counsel for the lead plaintiff(s) in the Securities Litigation.

157. **Gemini Matters**. Until the entry of a Final Order of judgment or dismissal with prejudice in any and all litigations, arbitrations, or regulatory proceedings related to or arising from the Gemini Earn Program to which Gemini is party (collectively, the "***Earn Actions***"), the Debtors, the Wind-Down Debtors, the PA Officer, and any transferee or custodian of the Debtors shall preserve and maintain all documents relating to the Gemini Earn Program, all communications between the Debtors and Gemini, and all documents related to inter-company obligations among the Debtors, the Other Genesis Entities, and/or the DCG Parties (collectively, the "***Gemini Litigation Documents***") as subject to a duty to preserve them under the Federal Rules of Civil Procedure, federal law, and analogous state law and shall not destroy, abandon, transfer, or otherwise render unavailable such Gemini Litigation Documents without providing counsel to Gemini (c/o Anson B. Frelinghuysen, Esq., Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York New York 10004, email: anson.frelinghuysen@hugheshubbard.com; and Jack Baughman, Esq., Baughman Kroup Bosse PLLC, One Liberty Plaza, 46th Floor, New York, New York 10006, email: jbaughman@bkbfirm.com) and counsel to BAO Family Holdings LLC ("***BAO***") (c/o Eric S. Medina, Esq., Medina Law Firm LLC, 641 Lexington Avenue, Thirteenth Floor, New York, New York 10022, email: Emedina@medinafirm.com) at least sixty (60) days' advance written notice and an opportunity to object and be heard by a court of competent jurisdiction. In the event Gemini or BAO or another interested party timely objects to any such destruction, abandonment, or transfer, the Gemini Litigation Documents shall be preserved until the earlier of (a) a final order of the Bankruptcy Court or other court of competent jurisdiction

regarding the disposition of the Gemini Litigation Documents and (b) the date the party in possession, custody, or control of such Gemini Litigation Documents provides originals or true copies thereof to counsel for Gemini and/or BAO, as applicable, in the applicable Earn Actions. For the avoidance of doubt, the injunction set forth in Article VIII.G of the Plan shall not affect in any manner any rights of Gemini or BAO to seek and obtain Gemini Litigation Documents through discovery in the Earn Actions, or the defenses of the Debtors, the Wind-Down Debtors, the PA Officer, or any transferee or custodian of the Debtors with respect to any such discovery.

158. **Gemini Lender Claim Matters**. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, no Gemini Lender, including BAO, is releasing under the Plan any claim it has or may have against any of the Gemini Parties, any DCG Parties or any of the Excluded Parties. Notwithstanding anything to the contrary in the Plan, if the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, compromise or settle (i) any claims or Causes of Action asserted in the adversary proceeding filed by Gemini in the Bankruptcy Court against GGC through the Adversary Complaint, ECF No. 1, Adv. Pro. 23-01192 (SHL) (the "*GBTC Action*"), (ii) the claim asserted by Gemini on behalf of the Gemini Lenders against GGC and assigned Claim No. 356 or the amount of any offsets or reductions thereto or (iii) any other claim or Cause of Action that the Debtors or Gemini may have against each other (each, a "*Gemini Settlement*"), the Debtors or the Wind-Down Debtors, as applicable, and Gemini shall provide the Gemini Lenders and their respective counsel (if known) at least twenty-one (21) days' advance written notice and an opportunity to object and be heard by the Bankruptcy Court, including to the extent any such Gemini Settlement occurs on or after the Effective Date; *provided* that the Debtors and Gemini already have agreed, and the Court has hereby determined, that the foregoing notice requirement has been fully satisfied by the Debtors' filing of the *Debtors' Motion for Entry of an Order*

*Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* [ECF No. 1499] and the Bankruptcy Court's entry of the Gemini/Genesis Settlement Order. Due to the occurrence of the Gemini/Genesis Settlement Effective Date on May 9, 2024, and notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Holders of Allowed Gemini Lender Claims against GGC shall be entitled to receive payments or transfers solely pursuant to the Gemini/Genesis Settlement Agreement as set forth in Article III.C.7.b of the Plan.

159. **Reversal/Stay/Modification/Vacatur of Confirmation Order**. Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

160. **Protection Against Discriminatory Treatment**. Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors, deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors, or condition such a grant to, or discriminate with respect to such a grant against, the

Wind-Down Debtors or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code or has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

161.   **Applicable Non-Bankruptcy Law.**  The provisions of this Confirmation Order, the Plan, and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

162.   **Waiver of Filings**.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Bankruptcy Court or the Office of the United States Trustee for the Region 2 for the Southern District of New York (the "***U.S. Trustee***") (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

163.   **Dissolution of Statutory Committees**.  On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Bankruptcy Court with respect to (a) the preparation and prosecution of any final fee applications of the Committee's Professionals and (b) all final fee applications Filed with the Bankruptcy Court.

164.   **Notice of Entry of the Confirmation Order and Occurrence of Effective Date**. The Debtors or the Wind-Down Debtors, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the

"*Notice of Confirmation*") in accordance with Bankruptcy Rules 2002 and 3020(c) on all parties

served with the Confirmation Hearing Notice seven (7) Business Days after the Effective Date;

*provided* that no notice of any kind shall be required to be mailed or made upon any Entity to

whom the Debtors mailed notice of the Confirmation Hearing, but received such notice returned

marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order

expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or

are otherwise aware, of that Entity's new address.  Service of the Notice of Confirmation in the

time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the

particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and

3020(c).  No further notice shall be necessary.

165.    No later than ten (10) Business Days after the Effective Date, the Wind-Down

Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one

occasion in The New York Times (national edition) and CoinDesk.  Mailing and publication of

the Notice of Confirmation in the time and manner set forth in this paragraph will be good,

adequate, and sufficient notice under the particular circumstances and in accordance with the

requirements of Bankruptcy Rules 2002 and 3020(c). No further notice is necessary.

166.    **Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to

be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

167.    **Effect of Non-Occurrence of Conditions to Effective Date**.  If the Effective Date

does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or

the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against

or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other

Entity; (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any

Holders of Claims or Interests, or any other Entity in any respect; or (iv) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

168. **References to Particular Plan Provisions**. References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan or this Confirmation Order.

169. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

170. **Effect of Conflict**. This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. In the event of any inconsistency between the Plan, the Disclosure Statement, or any Final Order (other than this Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing, including the Distribution Principles but excluding the Plan Supplement), the terms of the Plan shall control; *provided*, *however*, that, consistent with Paragraph 20 of the Gemini/Genesis Settlement Order, in the event of any inconsistency between the Plan and Gemini/Genesis Settlement Agreement (including the Gemini/Genesis Settlement Order), the Gemini/Genesis Settlement Agreement (including the Gemini/Genesis Settlement Order) shall control in all respects. Consistent with Paragraph 20 of the Gemini/Genesis Settlement Order, nothing in this Confirmation Order, the Plan, or the Plan Supplement shall alter or derogate from the provisions of the Gemini/Genesis Settlement Order or the Gemini/Genesis Settlement Agreement. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or this Confirmation Order); *provided*,

*however*, that the Gemini Reserve Principles and the Gemini Lender Distribution Principles, included as Exhibits N and O in the Plan Supplement, are deemed null and void.  In the event of an inconsistency between this Confirmation Order, the Plan, and the Plan Supplement, this Confirmation Order shall control.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless otherwise expressly stated herein or by further order of the Court.

171.   **Final Order.**  This Confirmation Order is a Final Order, and the period in which an appeal must be filed shall commence upon the entry hereof on the docket of the Chapter 11 Cases.

172.   **Retention of Jurisdiction**.  Except as set forth in the Plan or this Confirmation Order, the Bankruptcy Court may properly and, upon the Effective Date, shall retain jurisdiction over all matters arising in and under, and related to, the Chapter 11 Cases and the implementation of this Confirmation Order, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**Dated: May 31, 2024**                                     */s/ Sean H. Lane*
                                                             **United States Bankruptcy Judge**


**# # # END OF ORDER # # #**

**<u>Exhibit A</u>**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

---

## DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

Dated: May 24, 2024

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

| | | |
|---|---|---|
| A. | *Defined Terms* | 1 |
| B. | *Rules of Interpretation* | 32 |
| C. | *Computation of Time* | 32 |
| D. | *Governing Law* | 33 |
| E. | *Reference to Monetary Figures* | 33 |
| F. | *Reference to the Debtors or the Wind-Down Debtors* | 33 |
| G. | *Controlling Document* | 33 |

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

| | | |
|---|---|---|
| A. | *Administrative Expense Claims* | 34 |
| B. | *Professional Compensation* | 34 |
| C. | *Priority Tax Claims* | 36 |
| D. | *Statutory Fees* | 36 |
| E. | *Restructuring Fees and Expenses* | 36 |

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| A. | *Classification of Claims* | 37 |
| B. | *Treatment of Claims Against and Interests in GGH* | 39 |
| C. | *Treatment of Claims Against and Interests in GGC* | 44 |
| D. | *Treatment of Claims Against and Interests in GAP* | 50 |
| E. | *Special Provision Governing Unimpaired or Reinstated Claims* | 54 |
| F. | *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* | 55 |
| G. | *Elimination of Vacant Classes* | 55 |
| H. | *Voting Classes; Presumed Acceptance by Non-Voting Classes* | 55 |
| I. | *Intercompany Interests* | 55 |
| J. | *Controversy Concerning Impairment* | 55 |
| K. | *Subordinated Claims* | 55 |

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

| | | |
|---|---|---|
| A. | *Wind-Down Debtors* | 56 |
| B. | *Means for Implementation* | 63 |
| C. | *GAP and GGC Intercompany Settlement* | 72 |
| D. | *GGC and GGH Intercompany Settlement* | 72 |

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases* ...................... 73
B.   *Claims Based on Rejection of Executory Contracts or Unexpired Leases and
     Deadline by Which to File Proofs of Claim Related Thereto* ........................................... 74
C.   *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ................... 74
D.   *Indemnification Obligations* ........................................................................................... 76
E.   *Insurance Policies* ........................................................................................................... 76
F.   *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ............ 76
G.   *Reservation of Rights* ...................................................................................................... 76

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.   *Timing and Calculation of Amounts to Be Distributed* .................................................... 77
B.   *Disbursing Agent and Gemini Distribution Agent.* .......................................................... 77
C.   *Delivery of Distributions and Undeliverable or Unclaimed Distribution* ....................... 79
D.   *Manner of Payment* .......................................................................................................... 81
E.   *Compliance with Tax Requirements* ................................................................................ 81
F.   *Foreign Currency Exchange Rate* ................................................................................... 82
G.   *Surrender of Cancelled Instruments or Securities* .......................................................... 82
H.   *Allocations* ....................................................................................................................... 82
I.   *No Postpetition Interest on Claims* .................................................................................. 82
J.   *Setoffs and Recoupment* .................................................................................................. 83
K.   *Claims Paid or Payable by Third Parties* ....................................................................... 83

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.   *Allowance of Claims* ........................................................................................................ 84
B.   *Claims and Interests Administration Responsibilities* .................................................... 84
C.   *Estimation of Claims* ....................................................................................................... 85
D.   *Adjustment to Claims or Interests Without Objection* ..................................................... 85
E.   *Time to File Objections to Claims* ................................................................................... 85
F.   *Disallowance of Claims* ................................................................................................... 85
G.   *Amendments to Claims* ..................................................................................................... 86
H.   *No Distributions Pending Allowance* ............................................................................... 86
I.   *Disputed Claims Reserve* ................................................................................................. 87
J.   *Single Satisfaction of Claims* .......................................................................................... 87

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.   *Compromise and Settlement of Claims, Interests, and Controversies* .............................. 88
B.   *Term of Injunctions or Stays* ........................................................................................... 88
C.   *Release of Liens* ............................................................................................................... 88
D.   *Releases by the Debtors* ................................................................................................... 89

E.    *Releases by Releasing Parties* ........................................................................... 90
F.    *Exculpation* ...................................................................................................... 92
G.    *Injunction* ........................................................................................................ 93
H.    *Additional Provisions Regarding Governmental Units* ...................................... 94
I.    *Protection Against Discriminatory Treatment* ................................................... 94
J.    *Recoupment* ...................................................................................................... 94
K.    *Reimbursement or Contribution* ....................................................................... 94
L.    *Document Retention* .......................................................................................... 95

## ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date* ...................................................... 95
B.    *Waiver of Conditions* ....................................................................................... 96
C.    *Substantial Consummation* ............................................................................... 96
D.    *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date* ................................................................................................................... 97

## ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments* ......................................................................... 97
B.    *Effect of Confirmation on Modifications* .......................................................... 97
C.    *Revocation or Withdrawal of the Plan* .............................................................. 98

## ARTICLE XI.
### RETENTION OF JURISDICTION

## ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect* ............................................................................... 100
B.    *Additional Documents* .................................................................................... 101
C.    *Reservation of Rights* ..................................................................................... 101
D.    *Successors and Assigns* .................................................................................. 101
E.    *Service of Documents* ..................................................................................... 101
F.    *Entire Agreement* ........................................................................................... 102
G.    *Exhibits* ......................................................................................................... 103
H.    *Nonseverability of Plan Provisions* ................................................................ 103
I.    *Votes Solicited in Good Faith* ......................................................................... 103
J.    *Request for Expedited Determination of Taxes* ............................................... 104
K.    *Closing of Chapter 11 Cases* .......................................................................... 104
L.    *No Stay of Confirmation Order* ...................................................................... 104
M.    *Waiver or Estoppel* ........................................................................................ 104
N.    *Dissolution of the Committee* ......................................................................... 104

> **THE PLAN IS THE PRODUCT OF EXTENSIVE AND ONGOING NEGOTIATION AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, GEMINI, AND THE AD HOC GROUP OF GENESIS LENDERS, AND REFLECTS SUBSTANTIAL AGREEMENT ON CERTAIN KEY ISSUES.**

## INTRODUCTION

Genesis Global Holdco, LLC and its affiliated debtors, as Debtors and debtors-in-possession in the above-captioned chapter 11 cases, jointly propose this amended chapter 11 plan to address the outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "***3AC***" means Three Arrows Capital, Ltd. and any of its Affiliates.

2.    "***3AC/Genesis Settlement Agreement***" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with the Joint Liquidators of Three Arrows Capital, Ltd.* [Docket No. 906], which was approved by the Bankruptcy Court in the 3AC/Genesis Settlement Order, pursuant to which, among other things, 3AC holds a single Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC in the aggregate amount of $33,000,000, the treatment of which for all purposes under the Plan shall be on the terms and conditions set forth in the 3AC/Genesis Settlement Agreement.

3.    "***3AC/Genesis Settlement Order***" means that certain *Order Approving Settlement Agreement Between the Genesis Debtors and the Joint Liquidators of Three Arrows Capital, Ltd.* [Docket No. 1012].

1

4.      "***Ad Hoc Group***" means the ad hoc group of creditors of GGC represented by Proskauer Rose LLP, which ad hoc group of creditors is comprised of members purporting to hold no less than $2.3 billion in Claims asserted against GGC as of October 20, 2023.

5.      "***Ad Hoc Group Counsel***" means Proskauer Rose LLP.

6.      "***Ad Hoc Group Restructuring Expenses***" means, subject to the terms and conditions of the existing fee reimbursement letters executed by the Debtors, all accrued, but unpaid, documented fees and expenses of the Ad Hoc Group Counsel in connection with the Restructuring.

7.      "***Ad Hoc Group SteerCo***" means the steering committee of the Ad Hoc Group, the composition of which may be modified from time to time.

8.      "***Ad Hoc Group's Consent***" means the consent of the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Ad Hoc Group's Consent pursuant to the Plan, the Ad Hoc Group's Consent shall be deemed granted to the extent the PSA Creditors, through the Ad Hoc Group Counsel, have received written notice of such matter and the PSA Majority Creditors have not, within five (5) Business Days of the Ad Hoc Group Counsel's receipt of such notice, objected in writing to the Person requesting the Ad Hoc Group's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, none of the Ad Hoc Group, the Ad Hoc Group SteerCo, or any of the members of the Ad Hoc Group (including any PSA Creditors) shall have any consent rights with respect to any matter relating to any of the Definitive Documents if the PSA has been terminated by its terms as to all parties thereto.

9.      "***Additional GBTC Shares***" means 31,180,804 GBTC shares held by the Debtors, against which Gemini asserted, among other things, a security interest on behalf of the Gemini Lenders in the GBTC Action, which GBTC Action has been deemed dismissed, with prejudice, upon the Gemini/Genesis Settlement Agreement Effective Date pursuant to the terms of the Gemini/Genesis Settlement Agreement.

10.      "***Additional GBTC Shares Reserve***" means the amount of Additional GBTC Shares that is required to be held in reserve by the Debtors in accordance with the Gemini Reserve Principles; *provided*, *however*, that, notwithstanding anything to the contrary in the Gemini Reserve Principles, upon the occurrence of the Gemini/Genesis Settlement Effective Date, there shall be no Additional GBTC Shares Reserve.

11.      "***Administrative Expense Claim***" means any Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses; (ii) Allowed Professional Fee Claims; (iii) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (iv) unless the PSA has been terminated by its terms as to all parties thereto prior to the Effective Date as a result

of one or more breaches by the PSA Creditors, (a) the Ad Hoc Group Restructuring Expenses and (b) the Dollar Group Restructuring Fees and Expenses.

12.     "*Administrative Expense Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Expense Claims, which: (i) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be sixty (60) days after the Effective Date.

13.     "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that directly or indirectly wholly owns or controls such Entity other than a Debtor, or any other Entity that is directly or indirectly wholly-owned or controlled by such Entity other than a Debtor.

14.     "*Alameda/Genesis Settlement Agreement*" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [Docket No. 603], which was approved by the Bankruptcy Court in the Alameda/Genesis Settlement Order, pursuant to which, among other things, Alameda Research Ltd. holds a single Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC in the aggregate amount of $175,000,000, the treatment of which for all purposes under the Plan shall be on the terms and conditions set forth in the Alameda/Genesis Settlement Agreement.

15.     "*Alameda/Genesis Settlement Order*" means that certain *Order Approving the Settlement Agreement Between the Genesis Entities and the FTX Entities* [Docket No. 806].

16.     "*Allowed*" means, with reference to any Claim or Interest, except as otherwise provided herein, (i) (a) any Claim or Interest arising on or before the Effective Date that is either (x) evidenced by a Proof of Claim or Interest that is, as applicable, timely Filed by the applicable Claims Bar Date, or (y) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed by the applicable Claims Bar Date, and (b) as to which no objection to allowance has been interposed within the time period set forth in the Plan and such Claim or Interest is not Disputed or as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder or (ii) any Claim or Interest expressly allowed under the Plan or by a Final Order of the Bankruptcy Court; *provided* that, notwithstanding the foregoing, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes to the applicable Debtor or Wind-Down Debtor; *provided further* that any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed.

17.     "*Alt-Coin*" means a type of Digital Asset that is not BTC, ETH, or a Stablecoin.

18.     "*Alt-Coin-Denominated Unsecured Claim*" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness

3

with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in an Alt-Coin.

19.    "*Assets*" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

20.    "*Average Price*" means the average price in U.S. dollars of the applicable type of Distributable Asset or the applicable GBTC shares or ETHE shares during the period commencing fifteen (15) calendar days prior to the entry of the Confirmation Order and ending fifteen (15) calendar days following the entry of the Confirmation Order.

21.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

22.    "*Avoidance Recoveries*" means any proceeds arising from Avoidance Actions, including the proceeds from any settlements thereof.

23.    "*Ballots*" means the ballots, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent, approved pursuant to the Disclosure Statement Order and distributed to Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

24.    "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

25.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

27.    "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [Docket No. 200], which set the Claims Bar Date and the Governmental Bar Date.

28.    "*BCH*" means Bitcoin Cash, a Digital Asset that is a fork of BTC created in 2017.

29.     "***Bidding Procedures***" means the procedures governing the Sale Process approved in the *Order Authorizing the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 192], as such procedures may be modified in accordance with their terms.

30.     "***BTC***" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

31.     "***BTC-Denominated Unsecured Claim***" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in BTC.

32.     "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

33.     "***Cash***" or "***$***" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks, and other similar items.

34.     "***Cause of Action***" means, whether asserted against a Debtor or any other Person or Entity, any action, claim, cause of action, controversy, third-party claim, dispute, proceeding, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, a "Cause of Action" includes: (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of fiduciary duty, or violation of state or federal law, including securities laws, negligence, and gross negligence; (iii) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or Interests; (iv) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including any action under section 542 of the Bankruptcy Code or any Avoidance Actions); (v) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any state or foreign law fraudulent transfer or similar claim.

35.     "***Chapter 11 Cases***" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

36.     "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

37.     "***Claims Bar Date***" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim must be Filed for all Claims and Interests (other than for Administrative Expense Claims and Claims held by Governmental Units).

38.     "***Claims Objection Deadline***" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (i) one hundred eighty (180) days after the Effective Date, (ii) ninety (90) days after the Filing of a Proof of Claim, (iii) such other period of limitation as may be fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to a Claim, or (iv) such other date as is established by (a) if such date is on or prior to the date that is one (1) year after the Effective Date, the filing of a notice by the Wind-Down Debtors prior to the then-current Claims Objection Deadline or (b) if such date is after the date that is one (1) year after the Effective Date, an order of the Bankruptcy Court following the filing of a motion by the Wind-Down Debtors prior to the then-current Claims Objection Deadline.

39.     "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

40.     "***Claims Reserve***" means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date and comprised of Cash or Digital Assets, as applicable, according to the Distribution Principles, in the amount of the applicable Claims Reserve Amount, less any portion of such amount that is distributed on the Effective Date pursuant to the Plan, which reserve shall vest in the applicable Wind-Down Debtor as of the Effective Date.

41.     "***Claims Reserve Amount***" means, with respect to each Debtor, the sum of (i) the applicable Priority Claims Reserve Amount, (ii) the applicable Secured Claims Reserve Amount, (iii) the applicable Disputed Claims Reserve Amount for the initial Distribution Date, and (iv) the estimated aggregate face amount of accrued but unpaid Administrative Expense Claims (excluding Professional Fee Claims) against such Debtor as of the Effective Date.

42.     "***Class***" means a category of Claims against or Interests in the Debtors, pursuant to section 1122(a) of the Bankruptcy Code, as set forth in Article III of the Plan.

43.     "***Committee***" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee on February 3, 2023, as described in further detail in the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 53].

44.     "***Committee Counsel***" shall mean White & Case LLP, in its capacity as counsel to the Committee.

45.     "***Committee's Consent***" means the consent of the Committee (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Committee's Consent pursuant to the Plan, the Committee's Consent shall be deemed granted to the extent the Committee has received written notice of such matter and has not, within five (5) Business Days of the Committee's receipt of such notice, objected in writing to the Person requesting the Committee's Consent as to such matter.

6

46.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

47.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

48.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

49.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, with respect to which the Debtors shall have obtained (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent, and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Confirmation Order is not consistent with the terms set forth in the Plan (including the Distribution Principles and the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing as of the entry of such order).

50.    "*Consummation*" means the occurrence of the Effective Date.

51.    "*Cooperation Agreement*" means, with respect to any Genesis Personnel, a cooperation agreement substantially in the form set forth in Exhibit P of the Plan Supplement.

52.    "*Cure Claim*" means a monetary Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

53.    "*Cure Notice*" means a notice of a proposed amount, including an amount of $0.00, to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (i) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (ii) Cure Claims to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes; *provided* that, if no Cure Claim is listed for any assumed Executory Contract or Unexpired Lease, the Cure Claim shall be $0.00.

54.    "*D&O Liability Insurance Policies*" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of the Debtors and any agreements, documents, and instruments related thereto.

55.    "*DCG*" means Digital Currency Group, Inc.

56.    "*DCG Claim*" means any Claim asserted by, or on behalf of, any of the DCG Parties.

57.    "**DCG Loans**" means, collectively, those certain loans, and all obligations of DCG thereunder, issued under a certain Amended and Restated Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated November 10, 2022 between GGC (as lender) and DCG (as borrower), including (i) that certain loan issued under a loan term sheet originally dated January 24, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the initial principal amount of $100 million due May 11, 2023, (ii) that certain loan issued under a loan term sheet originally dated February 23, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the initial principal amount of $100 million due on May 11, 2023, (iii) that certain loan issued under a loan term sheet dated May 9, 2022 in the initial principal amount of $200 million due on May 9, 2023, and (iv) that certain loan issued under a loan term sheet dated May 10, 2022 in the initial principal amount of $100 million due May 10, 2023.

58.    "**DCG Note**" means that certain unsecured $1.1 billion promissory note, dated as of June 30, 2022 and due on June 30, 2032, issued by DCG to GGC with an interest rate of one percent (1%) per annum, which interest, per the terms of the DCG Note, may be paid in kind at DCG's option.

59.    "**DCG Parties**" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; *provided* that DCG Parties shall not include any Genesis Personnel. For the avoidance of doubt, a DCG Party may also be an Excluded Party.

60.    "**DCG Tax Receivable**" means any receivable relating to taxes that is owed by any DCG Party to any Debtor.

61.    "**DCGI**" means DCG International Investments Ltd.

62.    "**DCGI Loans**" means, collectively, (i) that certain loan issued under a certain Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated June 21, 2019 and loan term sheet originally dated June 22, 2022, as amended by the loan term sheet dated November 10, 2022, by and between GGC (as lender) and DCGI (as borrower) due on May 11, 2023 in the initial principal amount of 4,550.45173345 BTC, (ii) that certain term loan dated September 21, 2020 with an initial principal amount equal to 8,948 BCH, and (iii) that certain term loan dated December 21, 2020 with an initial principal amount equal to 5,107 BCH, in each case, including all obligations of DCGI thereunder.

63.    "**Debtors**" means, collectively, GGH, GGC, and GAP.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors from and after the Effective Date shall mean the Wind-Down Debtors to the extent context requires.

64.    "**Debtors' Fiduciary Duty Action**" means any action that a Debtor takes, or refrains from taking, with ten (10) calendar days advance notice to and in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, upon the good faith determination by

the Special Committee, upon the advice of counsel, that fiduciary obligations of such Debtor under applicable law require such Debtor to take or refrain from taking such action.

65. "*Definitive Documents*" means: (i) the Plan (and any and all exhibits, annexes, and schedules thereto); (ii) the Confirmation Order; (iii) the Disclosure Statement and all other solicitation materials with respect to the Plan; (iv) the Disclosure Statement Order; (v) the Plan Supplement; (vi) the New Governance Documents; (vii) the Plan Administration Agreement; (viii) the Litigation Oversight Committee Bylaws and the Wind-Down Oversight Committee Bylaws; (ix) the Alameda/Genesis Settlement Agreement and the Alameda/Genesis Settlement Order, (x) the 3AC/Genesis Settlement Agreement and the 3AC/Genesis Settlement Order; (xi) the OAG/Genesis Settlement Agreement and any order of the Bankruptcy Court approving the OAG/Genesis Settlement Agreement; (xii) the Gemini/Genesis Settlement Agreement and the Gemini/Genesis Settlement Order; (xiii) the Turnover Actions; (xiv) any new material employment, consulting, or similar agreements; and (xv) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

66. "*Digital Asset*" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including Stablecoins, digital coins, and tokens, such as security tokens, utility tokens, nonfungible tokens, and governance tokens.

67. "*Digital Assets Conversion Table*" means the conversion table showing Digital Asset values in their equivalent U.S. dollar values using the price of the applicable Digital Asset as of 11:11 p.m. (prevailing Eastern time) on the Petition Date, the form of which shall be included in the Plan Supplement.

68. "*Disallowed*" means any Claim or Interest, or any portion thereof, that: (i) has been disallowed by Final Order, settlement, the Plan, or Confirmation; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; or (iii) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; *provided*, *however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

69. "*Disbursing Agent*" means the PA Officer or the Entity or Entities selected by the Debtors, with the Ad Hoc Group's Consent and the Committee's Consent with respect to distributions made on the Effective Date, and thereafter by the PA Officer with the Wind-Down Oversight Committee's Consent, to make or facilitate distributions pursuant to the Plan.

70. "*Disclosure Statement*" means the disclosure statement with respect to the Plan, as may be amended, supplemented, or modified from time to time, subject to the Committee's Consent and the Ad Hoc Group's Consent.

71. "*Disclosure Statement Order* means the *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 1027] (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof), subject to the Committee's Consent and the Ad Hoc Group's Consent.

72. "*Disputed*" means, with respect to any Claim or Interest, that such Claim or Interest (or a portion thereof) (i) is not yet Allowed, (ii) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (iii) is subject to a pending objection that has been Filed and has not been resolved pursuant to a Final Order of the Bankruptcy Court, or (iv) is or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Bar Date Order.

73. "*Disputed Claims Reserve*" means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date, supplemented on or before each Distribution Date, and comprised of Cash or Digital Assets, as applicable, according to the Distribution Principles, in the amount of the applicable Disputed Claims Reserve Amount, which reserve shall vest in the applicable Wind-Down Debtor as of the applicable Distribution Date.

74. "*Disputed Claims Reserve Amount*" means, for each Distribution Date, Distributable Assets in an amount to be determined by the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer for distributions on account of Disputed Claims that are subsequently Allowed after the applicable Distribution Date, in accordance with Article VII.I of the Plan.

75. "*Distributable Assets*" means, in accordance with and pursuant to the Distribution Principles, for each Debtor or Wind-Down Debtor, after the Debtors have made the Required Reserve Payments, such Debtor's or Wind-Down Debtor's (i) Cash, (ii) Digital Assets, and (iii) to the extent allocated to such Debtor or Wind-Down Debtor in the discretion of the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or, following the Effective Date, the discretion of the PA Officer, (a) Avoidance Recoveries, including any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties, (b) proceeds from the Partial Repayment Agreement, (c) proceeds from any Monetization Transactions (subject to the Gemini Reserve Principles, if applicable), and (d) proceeds from the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof; *provided*, *however*, that Digital Assets shall only constitute Distributable Assets (x) on the Effective Date if the Debtors determine, no later than seven (7) Business Days prior to the Effective Date, and in

consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, after considering legal, financial, tax, and other factors in good faith, that such Digital Assets are available for distribution to Holders of Allowed Claims or Interests on the Effective Date or (y) at any time after the Effective Date if the PA Officer determines, with the Wind-Down Oversight Committee's Consent, and after considering legal, financial, tax, and other factors in good faith, that such Digital Assets held by such Wind-Down Debtor are available for distribution to Holders of Allowed Claims or Interests as provided for under the Plan; *provided*, *however*, that, if the Committee or PSA Majority Creditors disagree with the Debtors on whether any Digital Assets held by a Debtor should constitute Distributable Assets of such Debtor on the Effective Date, the Committee or the PSA Majority Creditors may seek a determination from the Bankruptcy Court on an expedited basis.

76.     "*Distribution Calculation Date*" means (i) for the initial Distribution Date, the date determined by the Debtors (in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors), the PA Officer (in consultation with the Wind-Down Oversight Committee), or as designated in a Final Order, and (ii) for each subsequent Distribution Date (if any), such date(s) determined by the PA Officer (in consultation with the Wind-Down Oversight Committee) or as designated in a Final Order.

77.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors, the Wind-Down Debtors, or the PA Officer, in consultation with the Committee, the Ad Hoc Group, or the Wind-Down Oversight Committee, as applicable, on or after the Effective Date upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

78.     "*Distribution Principles*" means the distribution mechanics described in Exhibit A attached to the Plan, which shall be subject to in all respects (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent, and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan (including the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing and the Gemini/Genesis Settlement Effective Date has not yet occurred); *provided* that, for the avoidance of doubt, the calculation of the Individual Claim Value (as defined in the Distribution Principles) asserted against the Debtors' Estates is solely for purposes of allocating the Debtors' Assets to Holders of such Claims under the Plan and does not change the nature or denomination of any Claim and is not intended to operate, nor be construed, as an admission or waiver by any Person as to the value of any Claim denominated in a type of Digital Asset; *provided, however*, that notwithstanding anything to the contrary in the Plan (including the Distribution Principles) or the Confirmation Order, upon the occurrence of the Gemini/Genesis Settlement Effective Date, the Distribution Principles shall not apply to any payments or transfers made on account of the Allowed Gemini Lender Claims, as set forth in Article III.C.7.b of the Plan, and any provisions in the Distribution Principles with respect to the Gemini Lender Claims or the Remainder Gemini Lender Claims shall be deemed null and void and shall be of no force and effect.

79.    "***Distribution Record Date***" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date announced by the Debtors (in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors), the PA Officer (in consultation with the Wind-Down Oversight Committee), or as designated in a Final Order.

80.    "***Dollar Group Counsel***" means Pryor Cashman LLP.

81.    "***Dollar Group Restructuring Fees and Expenses***" means, subject to the terms and conditions of the PSA, all accrued, but unpaid, documented fees and expenses of the Dollar Group Counsel in connection with the Restructuring.

82.    "***Effective Date***" means the date on which: (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX hereof have been satisfied or waived (in accordance with Article IX.B hereof); and (iii) the Plan is declared effective in accordance with its terms; *provided*, *however*, that, if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

83.    "***Enjoined Actions***" has the meaning set forth in Article VIII.G of the Plan.

84.    "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

85.    "***Equity Security***" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

86.    "***Estate***" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

87.    "***ETCG***" means shares of Grayscale Ethereum Classic Trust.

88.    "***ETH***" means ether, the native Digital Asset of the Ethereum blockchain, as described in https://ethereum.org/en/what-is-ethereum/.

89.    "***ETH-Denominated Unsecured Claim***" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in ETH.

90.    "***ETHE***" means that certain Grayscale Ethereum Trust, a trust managed and operated by DCG.

91.    "***Exchange Act***" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

92.    "***Excluded Claim***" means (i) any claim, Cause of Action, or other item expressly provided for or preserved in this Plan and (ii) any claim for intercompany amounts (including any

amounts owed between a Debtor and a subsidiary of GGH that is not a Debtor) as set forth in a schedule to be Filed as an exhibit to the Plan Supplement.

93.     "***Excluded Party***" means, in their individual capacities, (i) Barry Silbert, (ii) Mark Murphy, (iii) Michael Kraines, and (iv) Ducera Partners LLC and its Affiliates and subsidiaries, and any current or former employee, officer, or director of Ducera Partners LLC or its Affiliates and subsidiaries who was engaged by, or performed services for, DCG, DCGI, or any of their respective Affiliates and subsidiaries during the one (1)-year period prior to the Petition Date.  For the avoidance of doubt, an Excluded Party may also be a DCG Party.

94.     "***Excluded Party Claim***" means any Claim asserted by, or on behalf of, any Excluded Party.

95.     "***Exculpated Party***" means (i) the Debtors, (ii) the Committee and its members (solely in their capacities as such), (iii) the members of the Ad Hoc Group SteerCo (solely in their capacities as such), (iv) the Gemini Distribution Agent (solely in its capacity as such and any exculpation limited solely to the extent that the Gemini Distribution Agent is implementing the Plan or the Gemini/Genesis Settlement Agreement), and (v) each Related Party of each Entity described in the foregoing clauses (i)–(iv) (in each case, solely in such Person's capacity as such); *provided* that the Related Parties of the Gemini Distribution Agent shall only be Exculpated Parties in respect of actions that are directly in furtherance of the performance by the Gemini Distribution Agent of its duties under the Plan; *provided further* that, notwithstanding anything to the contrary in the Plan, the DCG Parties shall not be Exculpated Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date shall not be Exculpated Parties; *provided still further* that any Genesis Personnel shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Exculpated Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, who shall not be Exculpated Parties.

96.     "***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

97.     "***Federal Judgment Rate***" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

98.     "***Fiat-or-Stablecoin-Denominated Unsecured Claim***" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in Cash, Foreign Currency, or a Stablecoin.

99.     "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent or the Bankruptcy Court through the PACER or CM/ECF website.

100.    "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

101.     "***Final Order***" means an order or judgment of the Bankruptcy Court or another a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which is in full force and effect and has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for writ of certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or writ of certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, for the avoidance of doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; and, *provided, further*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

102.     "***Foreign Currency***" means any government-issued currency other than Cash and, solely for purposes of the Plan, not including any Digital Assets.

103.     "***GAP***" means Genesis Asia Pacific Pte. Ltd.

104.     "***GAP/GGC Settlement***" means the compromise, settlement, and resolution of Intercompany Claims by and between GAP and GGC pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.C of the Plan.

105.     "***GAP Director***" means the Person selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, which person shall be a resident of Singapore; *provided* that, if the GAP Director needs to be replaced from or after the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any such replacement.

106.     "***GBTC***" means that certain Grayscale Bitcoin Trust, a trust managed and operated by DCG.

107.     "***GBTC Action***" means the adversary proceeding in the Bankruptcy Court filed by Gemini against GGC through the Adversary Complaint, ECF No. 1, Adv. Pro. 23-01192 (SHL), which has been dismissed, with prejudice, upon the Gemini/Genesis Settlement Agreement Effective Date pursuant to the terms of the Gemini/Genesis Settlement Agreement.

108.     "***Gemini***" means Gemini Trust Company, LLC.

109.     "***Gemini/Genesis Settlement Agreement***" means that certain Settlement Agreement substantially in the form attached as Exhibit B to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the*

*Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* [Docket No. 1499], which was approved by the Bankruptcy Court in the Gemini/Genesis Settlement Order, pursuant to which, among other things, the Holders of Allowed Gemini Lender Claims shall receive distributions in full satisfaction of the Gemini Master Claim and in lieu of distributions pursuant to the Plan (including the Distribution Principles and the Gemini Lender Distribution Principles).

110.    "***Gemini/Genesis Settlement Effective Date***" means the "Settlement Effective Date" as defined in the Gemini/Genesis Settlement Agreement, which occurred on May 9, 2024, as stated in that certain *Notice of Settlement Effective Date and Completion of the Genesis Distribution Pursuant to the Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* filed on May 13, 2024 [Docket No. 1676].

111.    "***Gemini/Genesis Settlement Order***" means that certain *Order Approving Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* [Docket No. 1598].

112.    "***Gemini/Genesis Settlement Outside Date***" means May 31, 2024 or such later date as the Parties (as defined in the Gemini/Genesis Settlement Agreement) may agree in writing.

113.    "***Gemini Acceptance Event***" means Gemini has agreed, in writing prior to the Confirmation Hearing, to (i) support the Plan, (ii) not object to, delay, impede, or take any other action that interferes with acceptance or implementation of the Plan, and (iii) encourage the Gemini Lenders to vote to accept the Plan.

114.    "***Gemini Additional Collateral Determination***" means that certain *Order (I) Dismissing Counts II, III, and IV of the Complaint as to All Defendants, (II) Dismissing All Counts as to Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd., and (III) Denying Gemini Trust Company, LLC's Motion to Dismiss Counterclaim IV in Its Entirety and Counterclaims VI and VII as to the Additional GBTC Shares* [*Gemini Trust Company, LLC v. Genesis Global Capital, LLC*, Adv. Proc. No. 23-01192 (SHL), Docket No. 44], approving the Debtors' motion to dismiss the GBTC Action with respect to the Additional GBTC Shares.

115.    "***Gemini Asset Value***" means, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the sum of the value of (i) solely to the extent that the Gemini GBTC Shares Determination is determined in favor of Gemini, the Gemini GBTC Shares, as determined by the Gemini Deficiency Claim Determination, (ii) the Gemini Reserved Coins using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent, (iii) the Gemini Earn Operations Assets using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent, and (iv) solely to the extent that the Gemini Additional Collateral Determination is determined in favor of Gemini, the Additional GBTC Shares as of the Gemini Additional Collateral Determination; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from the calculation of the Gemini Asset Value if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or (y) the Bankruptcy Court enters an order determining that

15

the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated; and *provided*, *further*, that (1) for each Distribution Date prior to the Gemini GBTC Shares Determination, the Gemini GBTC Shares shall be excluded from the calculation of Gemini Asset Value, including for purposes of calculating the Remainder Gemini Lender Claims, and (2) if the Gemini GBTC Shares Determination is determined in favor of Gemini, for each Distribution Date prior to the Gemini Deficiency Claim Determination, distributions under the Plan will be made in accordance with Section 2(c)(ii) of the Gemini Reserve Principles.

116.    "*Gemini Deficiency Claim Determination*" means, solely if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date and the Gemini GBTC Shares Determination is determined in favor of Gemini, the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining the value of the Gemini GBTC Shares (and any counterclaims or defenses thereto) for purposes of determining the Gemini Asset Value and making distributions to Holders of Allowed General Unsecured Claims under the Plan (including the Gemini Reserve Principles and the Gemini Lender Distribution Principles).

117.    "*Gemini Determinations*" means, together, the Gemini Additional Collateral Determination, the Gemini GBTC Shares Determination, and the Gemini Deficiency Claim Determination.

118.    "*Gemini Distribution Agent*" has the meaning ascribed to it in the Gemini/Genesis Settlement Agreement, as approved and appointed by the Gemini/Genesis Settlement Order.

119.    "*Gemini Earn Agreements*" means those certain Master Digital Loan Agreements entered into among GGC, Gemini, and certain users of Gemini pursuant to which such users agreed to lend certain Digital Assets to GGC, with Gemini acting as custodian and agent for such users in certain respects.

120.    "*Gemini Earn Operations Assets*" means the Cash and Digital Assets held by Gemini and, subject to the Gemini/Genesis Settlement Agreement, owed to the Debtors, as set forth on the Gemini Earn Operations Assets Schedule.

121.    "*Gemini Earn Operations Assets Schedule*" means the schedule of Gemini Earn Operations Assets attached as Exhibit H to the Disclosure Statement.

122.    "*Gemini Earn Program*" means the transactional arrangement among GGC, Gemini, and the Gemini Lenders as set forth in the Gemini Earn Agreements.

123.    "*Gemini GBTC Shares*" means the 30,905,782 GBTC shares transferred by GGC to Gemini for the benefit of the Gemini Lenders on or about August 18, 2022, which were purportedly foreclosed upon by Gemini on November 16, 2022.

124.    "*Gemini GBTC Shares Determination*" means, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the entry

16

of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining (i) ownership of the Gemini GBTC Shares, including whether any foreclosure by Gemini took place, or (ii) whether the Gemini GBTC Shares are subject to Avoidance Actions, including, but not limited to, on account of theories of preferential or fraudulent transfers, for purposes of determining whether Gemini (x) is required to apply the value of the Gemini GBTC Shares to satisfy the Allowed Gemini Lender Claims and/or (y) is required to return the Gemini GBTC Shares to the Debtors' Estates for distribution among all Holders of Allowed General Unsecured Claims under the Plan, in each case in accordance with the Gemini Reserve Principles.

125.    "*Gemini GBTC Shares Reserve*" means the amount of Gemini GBTC Shares that is required to be held in reserve by Gemini or the Gemini Distribution Agent in accordance with the Gemini Reserve Principles; *provided*, *however*, that, notwithstanding anything to the contrary in the Gemini Reserve Principles, upon the occurrence of the Gemini/Genesis Settlement Effective Date, there shall be no Gemini GBTC Shares Reserve.

126.    "*Gemini Lender Claim*" means a General Unsecured Claim held by a Gemini Lender in connection with the Gemini Earn Program.

127.    "*Gemini Lender Distribution Principles*" means, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the principles governing the distributions on account of Allowed Gemini Lender Claims described in Exhibit O of the Plan Supplement, which reflect the agreement of the Debtors, Gemini, the Committee, and the Ad Hoc Group.

128.    "*Gemini Lenders*" means the users of Gemini participating in the Gemini Earn Program pursuant to the Gemini Earn Agreements.

129.    "*Gemini Master Claim*" means the Proof of Claim Filed by Gemini against GGC at Claim No. 356.

130.    "*Gemini Parties*" means, collectively, Gemini, its predecessors, successors and assigns, parents, subsidiaries, and Affiliates, and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies and such persons' respective heirs, executors, estates, servants, and nominees.

131.    "*Gemini Preference Action*" means the adversary proceeding seeking to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01203 (SHL) against Gemini and the Gemini Lenders, which has been deemed dismissed, with prejudice, upon the Gemini/Genesis Settlement Agreement Effective Date pursuant to the terms of the Gemini/Genesis Settlement Agreement.

132.    "*Gemini Preference Determination*" means, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the entry

17

of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining whether GGC is entitled to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders.

133.    "*Gemini Recovery Event*" means the payment in full in accordance with the Distribution Principles of the Gemini Lender Claims (after accounting for the Gemini Determinations); *provided*, *however*, that, pursuant to the Gemini/Genesis Settlement Order, notwithstanding anything to the contrary in the Plan, the Gemini Recovery Event shall be deemed to have occurred for purposes of the Plan following the distribution of the Gemini Distribution Assets (as defined in the Gemini/Genesis Settlement Agreement) in accordance with Section 2.5(b) of the Gemini/Genesis Settlement Agreement and the distribution of the Completion Digital Assets (as defined in the Gemini/Genesis Settlement Agreement) in accordance with Section 2.5(c) of the Gemini/Genesis Settlement Agreement.

134.    "*Gemini Reserve Principles*" means, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the principles governing the Additional GBTC Shares Reserve and the Gemini GBTC Shares Reserve described in Exhibit N of the Plan Supplement, which reflect the agreement of the Debtors, Gemini, the Committee, and the Ad Hoc Group.

135.    "*Gemini Reserved Coins*" means those Digital Assets, identified on Exhibit D to the Gemini Master Claim, that Gemini holds on behalf of the Gemini Lenders.

136.    "*Gemini's Consent*" means the consent of Gemini (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on Gemini's Consent pursuant to the Plan, Gemini's Consent shall be deemed granted to the extent Gemini's Counsel has received written notice of such matter and has not, within five (5) Business Days of Gemini Counsel's receipt of such notice, objected in writing to the Person requesting Gemini's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, Gemini shall have no consent rights (i) with respect to any matter relating to any of the Definitive Documents unless the Gemini Acceptance Event has occurred and is continuing and (ii) with respect to any matters pertaining to (a) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (b) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

137.    "*General Unsecured Claim*" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than a Government Penalty Claim, an Intercompany Claim, or a Subordinated Claim).  Any Government Penalty Claims, Intercompany Claims, or Subordinated Claims shall not constitute General Unsecured Claims.

138.    "*Genesis Personnel*" means the current or former employees, officers, or directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer, or director of the Debtors from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement or a similar

18

arrangement (solely in their capacities as such) as of the Petition Date, solely to the extent such Persons were identified, by the Special Committee in a writing to the Ad Hoc Group Counsel and the Committee Counsel on a confidential, professional-eyes-only, basis, on or prior to the Effective Date.

139.    "*Genesis Platform*" means, in consultation with the Committee, one or more of the following:  (i) GGML, (ii) GGCI, and (iii) any other subsidiaries of GGH.

140.    "*GGC*" means Genesis Global Capital, LLC.

141.    "*GGC/GGH Settlement*" means the compromise, settlement, and resolution of Intercompany Claims by and between GGC and GGH pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.D of the Plan.

142.    "*GGCI*" means GGC International Limited.

143.    "*GGH*" means Genesis Global Holdco, LLC.

144.    "*GGML*" means Genesis Global Markets Limited.

145.    "*GGT*" means Genesis Global Trading, Inc.

146.    "*Governmental Bar Date*" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

147.    "*Government Penalty Claims*" means any Claims asserted by Governmental Units for any fine, penalty, forfeiture, or damages to the extent such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss as provided for by section 726(a)(4) of the Bankruptcy Code, including the Claims asserted in Claim Nos. 740, 768, 769, 770, 842, 843, 855, 856, 857, 861, 862, 863, 879, 880, 881, 882, 883, 884, 886, 888, 889, 890, 891, 892, 893, and 894 solely to the extent the classification of such Claims is not otherwise agreed or resolved in accordance with an order of the Bankruptcy Court.

148.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

149.    "*Holder*" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

150.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

151.    "*Indemnification Obligations*" means each of the Debtors' existing indemnification obligations in management agreements, indemnification agreements, or employment contracts for any Genesis Personnel, excluding, for the avoidance of doubt, any Persons who are also DCG Parties or Gemini Parties.  For the avoidance of doubt, the Debtors or Wind-Down Debtors shall not indemnify any Person for any claims or Causes of Action arising

19

out of or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct.

152.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

153.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

154.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

155.     "*Interest*" means any Equity Security in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in such Debtor, whether or not transferable, including any option, warrant, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

156.     "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

157.     "*IRS*" means the Internal Revenue Service.

158.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

159.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

160.     "*Litigation Oversight BTC Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

161.     "*Litigation Oversight Committee*" means an oversight committee of seven (7) members mutually appointed by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, pursuant to Article IV.A.4 of the Plan to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws.

162.     "*Litigation Oversight Committee Bylaws*" means the bylaws to be adopted by the Litigation Oversight Committee on the Effective Date, which shall set forth the governance of the Litigation Oversight Committee and its members, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent, and in substantially the form included in the Plan Supplement.

163.     "*Litigation Oversight Committee's Consent*" means the consent of the Litigation Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Litigation Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Litigation Oversight Committee's Consent pursuant

to the Plan, the Litigation Oversight Committee's Consent shall be deemed granted to the extent the Litigation Oversight Committee has received written notice of such matter and has not, within five (5) Business Days of the Litigation Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Litigation Oversight Committee's Consent as to such matter.

164.    "*Litigation Oversight Crossover Member*" means at least one (1) member of the Litigation Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

165.    "*Litigation Oversight ETH Member*" means the one (1) member of the Litigation Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

166.    "*Litigation Oversight Fiat-or-Stablecoin Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims; *provided*, *however*, that such positions shall be eliminated from the Litigation Oversight Committee upon the occurrence of a USD Recovery Event.

167.    "*Litigation Oversight Gemini Lender Member*" means at least one (1) member of the Litigation Oversight Committee (unless a Gemini Recovery Event occurs), the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in either (i) BTC or (ii) such other Digital Asset denomination (which Digital Asset denomination will not consist solely of Stablecoin or Alt-Coin) as jointly determined by the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) and the Committee.

168.    "*Litigation Reserve*" means the Cash and/or Digital Assets allocated in the Wind-Down Budget with respect to the litigation of any Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties, the amount of which shall be up to $70 million, subject to the Wind-Down Oversight Committee's Consent and the Litigation Oversight Committee's Consent with respect to both the amount and denomination.  For the avoidance of doubt, all fees and expenses incurred by the Litigation Oversight Committee, including through its retention of professionals (if any), shall be satisfied through the Litigation Reserve.

169.    "*Loan Collateral*" means collateral in the form of Digital Assets provided in connection with any loan taken or extended by the Debtors; *provided*, *however*, that the Additional GBTC Shares and the Gemini GBTC Shares shall not constitute Loan Collateral for purposes of Article IV.B.16 of the Plan.

170.    "*Local Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

171.    "*Monetization Transaction*" means any transaction that results in the sale, monetization, or liquidation of any of the assets of the Debtors or the Wind-Down Debtors (including any assets transferred from any Other Genesis Entities), including any such transaction

performed by the Gemini Distribution Agent with respect to the Gemini GBTC Shares, the Gemini Earn Operations Assets, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), or any assets of the Debtors or the Wind-Down Debtors distributed to the Gemini Distribution Agent.

172. "*New Board*" means the three (3)-member board of Wind-Down GGH, as determined pursuant to Article IV.B.7 of the Plan and the Plan Supplement. For the avoidance of any doubt, the New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors; and, *provided*, *further*, that DCG shall provide written notice to the Debtors or the Wind-Down Debtors, as applicable, of the Persons selected by DCG for appointment to the New Board no later than five (5) calendar days after the Confirmation Date; and, *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace any member of the New Board who needs to be replaced by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board.

173. "*New Governance Documents*" means the organizational and corporate governance documents of the Wind-Down Debtors and each of their subsidiaries, including certificates of incorporation, certificates of formation, certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents), which shall be in form and substance reasonably acceptable to the Debtors, subject to the Committee's Consent and the Ad Hoc Group's Consent.

174. "*OAG*" means the New York State Office of the Attorney General.

175. "*OAG/Genesis Settlement Agreement*" means that certain settlement agreement between OAG and the Debtors, as described in that certain Stipulation and Consent to Judgment and that certain Order and Judgment on Consent attached as Exhibit C and Exhibit D, respectively, to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between the Debtors and the New York State Office of the Attorney General* [Docket No. 1275], pursuant to which, if the OAG/Genesis Settlement Agreement is approved by a Final Order of the Bankruptcy Court, among other things, OAG would hold a single Allowed General Unsecured Claim against each of the Debtors in the aggregate amount of the OAG Claims Amount that, notwithstanding anything to the contrary in the Plan (including the Distribution Principles), would be paid after payment in full in accordance with the Distribution Principles of all Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Intercompany Claims and other Allowed General Unsecured Claims against the Debtors (subject to the exceptions set forth in the OAG/Genesis Settlement Agreement) on the terms and conditions set forth in the OAG/Genesis Settlement Agreement, including that any distributions made in respect of the OAG Claims Amount would be turned over to the Holders of Allowed General Unsecured Claims against the Debtors in a manner consistent with the Distribution Principles (in accordance with, and subject to the exceptions set forth in, the

OAG/Genesis Settlement Agreement).  For the avoidance of doubt, OAG is not a Releasing Party and does not release any claim it has or may have against any of the Other Defendants (as defined in the OAG/Genesis Settlement Agreement) or, except to the extent provided in the OAG/Genesis Settlement Agreement, against the Debtors.

176.    "*OAG Claims Amount*" shall have the meaning ascribed to it in the OAG/Genesis Settlement Agreement.

177.    "*Other Genesis Entities*" means, collectively, the following subsidiaries of GGH other than GGC and GAP: Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited, GGC International Limited, GGA International Limited, Genesis Global Markets Limited, GSB 2022 II LLC, GSB 2022 III LLC and GSB 2022 I LLC.

178.    "*Other Priority Claim*" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

179.    "*PA Officer*" means the Person or Entity appointed pursuant to Article IV.A of the Plan (or any successor), in his or her capacity as such.

180.    "*Partial Repayment Agreement*" means that certain Partial Repayment Agreement, dated September 12, 2023 and filed at ECF No. 4, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Case No. 23-01168 (Bankr. S.D.N.Y. Sept. 12, 2023), and ECF No. 6, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Case No. 23-01169 (Bankr. S.D.N.Y. Sept. 12, 2023), entered into by and among GGC, DCG, and DCGI, as it may be amended, modified, or supplemented from time to time, including as amended pursuant to that certain Amendment to Partial Repayment Agreement, dated November 28, 2023 and filed at ECF No. 11, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Case No. 23-01168 (Bankr. S.D.N.Y. Nov. 28, 2023), and ECF No. 11, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Case No. 23-01169 (Bankr. S.D.N.Y. Nov. 28, 2023).

181.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

182.    "*Petition Date*" means January 19, 2023.

183.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, including, for the avoidance of doubt, the Distribution Principles.  For the avoidance of doubt, subject to the terms of Article X.A hereof, any alterations, amendments, or modifications to the Plan are subject to the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification).

184.    "***Plan Administration Agreement***" means that certain agreement by and among the Wind-Down Debtors and the PA Officer, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors, the Committee, and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), and in substantially the form included in the Plan Supplement.

185.    "***Plan Supplement***" means the forms of documents effectuating the Restructuring, each of which shall be subject to the Committee's Consent and the Ad Hoc Group's Consent, including, to the extent applicable, (i) the New Governance Documents, (ii) the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, and the Wind-Down Oversight Committee Bylaws, (iii) an exhibit disclosing the identity and affiliations of the PA Officer and any Person proposed to serve on the New Board or proposed to serve as an officer of any of the Wind-Down Debtors, (iv) the Schedule of Assumed Executory Contracts and Unexpired Leases, (v) an exhibit identifying the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee, (vi) an exhibit identifying the intercompany claims that shall constitute Excluded Claims, (vii) an exhibit identifying Retained Causes of Action, (viii) the Gemini Reserve Principles, (ix) the Gemini Lender Distribution Principles, (x) the form of the Cooperation Agreement, and (xi) the Digital Assets Conversion Table, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline or as soon as reasonably practicable thereafter.

186.    "***Preference Claims***" means all claims and Causes of Action that may be asserted pursuant to section 547 of the Bankruptcy Code by the Debtors and the Debtors' Estates, including, without limitation, any successors in interest thereto.

187.    "***Priority Claims Reserve Amount***" means, with respect to each Debtor, the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Expense Claims, against such Debtor that are either (i) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code or (ii) asserted to be entitled to such priority in a Proof of Claim validly submitted on or before the Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims.

188.    "***Priority Tax Claim***" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

189.    "***Professional***" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

190.    "*Professional Fee Claim*" means a Claim for the compensation of any Professional and the reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been previously paid pursuant to an order of the Bankruptcy Court, including, for the avoidance of doubt, any costs, fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring.

191.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B hereof.

192.    "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.B hereof.

193.    "*Proof of Claim*" means a timely-filed proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

194.    "*PSA*" means that certain Plan Support Agreement (No Deal) entered into by and among (a) the Debtors, (b) certain Holders of Allowed General Unsecured Claims, and (c) the Committee, dated as of November 20, 2023.

195.    "*PSA Creditors*" means, collectively, the Holders of Allowed General Unsecured Claims who are parties to the PSA at any given time.

196.    "*PSA Majority Creditors*" means, collectively, as of the relevant date, PSA Creditors holding in excess of fifty percent (50%) of the aggregate principal amount of asserted General Unsecured Claims held or controlled by PSA Creditors.

197.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

198.    "*Related Party*" means, in their capacities as such, with respect to any Entity, such Entity's predecessors, successors and assigns, parents, subsidiaries, Affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees; *provided* that, for the avoidance of doubt, with respect to the Gemini Distribution Agent, the term "Related Party" shall include any Entity that is under common control with the Gemini Distribution Agent.

199.    "*Released Party*" means (i) the Debtors, (ii) the Ad Hoc Group SteerCo and its members (solely in their capacities as such), (iii) the Committee and its members (solely in their capacities as such), and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such); *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, neither the DCG Parties nor any of the former employees, officers, or directors of the Debtors as of the Petition Date shall be Released Parties; and, *provided*, *further*, that any Genesis Personnel shall be a Released Party only (x) with the prior written consent

25

and justifications of the Special Committee, which justifications shall be set forth in the Plan Supplement and which Persons shall be provided to the Ad Hoc Group Counsel and the Committee Counsel on a confidential, professional-eyes-only, basis, with the express exception of any current or former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, which Persons shall not be Released Parties, and (y) to the extent that such Genesis Personnel has executed a Cooperation Agreement.

200.    "*Releasing Party*" means each of the following: (i) all Released Parties and (ii) all Holders of Claims who affirmatively (a) cast a timely Ballot to accept the Plan with respect to any Claim held by such Holder (regardless of whether any such Holder casts a timely ballot to reject the Plan with respect to any other separately-classified Claims) and (b) indicate on such Ballot that they opt in to the release provisions in Article VIII of the Plan.

201.    "*Remainder Gemini Lender Claims*" shall have the meaning ascribed to it in the Distribution Principles; *provided, however*, that notwithstanding anything to the contrary in the Plan (including the Distribution Principles) or the Confirmation Order, upon the occurrence of the Gemini/Genesis Settlement Effective Date, the Distribution Principles shall not apply to any payments or transfers made on account of the Allowed Gemini Lender Claims, as set forth in Article III.C.7.b of the Plan, and any provisions in the Distribution Principles with respect to the Gemini Lender Claims or the Remainder Gemini Lender Claims shall be deemed null and void and shall be of no force and effect.

202.    "*Required Reserve Payments*" means the Debtors' payments to fund, in accordance with the terms of this Plan and on or prior to the Effective Date, (i) the Claims Reserves, (ii) the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount, (iii) the Wind-Down Reserves, and (iv) the Litigation Reserve.

203.    "*Resolved Preference Claims*" means, if a Class of Claims entitled to vote on the Plan votes to accept the Plan, any Preference Claims against (i) any Holder of Claims in such Class (excluding any DCG Party, Excluded Party, or officer or director of the Debtors who did not have such position as of or after the Petition Date) or (ii) any Person (excluding any DCG Party, Excluded Party, or officers or directors of the Debtors who did not have such position as of or after the Petition Date) that is not entitled to vote on the Plan because it received payment in full on its claims against the Debtors prior to the Petition Date and whose claims, if they had not been paid in full prior to the Petition Date, would be Claims in such Class.

204.    "*Restructuring*" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, or contemplated by the Plan.

205.    "*Retained Causes of Action*" means those Causes of Action, if any, that belong to the Debtors or their Estates under section 1123(b)(3) of the Bankruptcy Code (including any Causes of Action that belong to the Other Genesis Entities) and are preserved and retained by the Wind-Down Debtors under the Plan, including any Preference Claims (other than the Resolved Preference Claims), and are not released, waived, or transferred to another Person pursuant to the Plan, which shall include (but not be limited to) (i) all such Causes of Action or other claims against any of the Gemini Parties, any of the Excluded Parties, or any of the DCG Parties and (ii)

26

any other Causes of Action or other claims identified in a schedule attached to the Plan Supplement. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the Retained Causes of Action shall not include (x) any claim or Cause of Action belonging solely to a Holder of a Claim (other than a Debtor or an Other Genesis Entity), including any such claim or Cause of Action that is based on gross negligence, fraud, or willful misconduct of another Person, or (y) any Resolved Preference Claims

206.    "*Sales Process*" means the marketing and sales process for the Genesis Platform conducted pursuant to the Bidding Procedures.

207.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors or the Wind-Down Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time prior to the Effective Date, which shall be in form and substance subject to the Committee's Consent.

208.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

209.    "*SEC*" means the United States Securities and Exchange Commission.

210.    "*SEC/Genesis Settlement Agreement*" means that certain settlement agreement between the SEC and GGC, as described in the Consent of Genesis Global Capital, LLC, in the form attached as Exhibit C, and Final Judgment as to Genesis Global Capital, LLC, in the form attached as Exhibit D, to the *Debtors' Motion for Entry of an Order Approving a Settlement Agreement Between Genesis Global Capital, LLC and the U.S. Securities and Exchange Commission* [Docket No. 1220], pursuant to which, if the SEC/Genesis Settlement Agreement is approved by a Final Order of the Bankruptcy Court, among other things, the SEC would hold a single Allowed General Unsecured Claim against GGC in the aggregate amount of $21,000,000 that, notwithstanding anything to the contrary in the Plan (including the Distribution Principles), would be paid after payment in full in accordance with the Distribution Principles of all Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Intercompany Claims and other Allowed General Unsecured Claims against GGC on the terms and conditions set forth in the SEC/Genesis Settlement Agreement.

211.    "*Secured Claim*" means a Claim (i) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law, as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code, or (iii) Allowed, pursuant to a Final Order of the Bankruptcy Court, as a secured Claim.

212. "*Secured Claims Reserve Amount*" means, with respect to each Debtor, the aggregate amount of Claims against such Debtor that are deemed by Final Order of the Bankruptcy Court to be a Secured Claim.

213. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

214. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

215. "*Solicitation Agent*" means Kroll Restructuring Administration LLC, the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

216. "*Solicitation Materials*" means all solicitation materials in respect of the Plan together with the Disclosure Statement, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent.

217. "*Special Committee*" means that certain Special Committee of the Board of Directors of GGH, established on November 18, 2022, comprised of Paul Aronzon and Thomas Conheeney.

218. "*Stablecoin*" means a type of Digital Asset designed to reduce price volatility through either (i) pegging the value of the Digital Asset to a reserve asset, such as a fiat currency, exchange-traded commodity, or another Digital Asset, or (ii) algorithmically regulating the supply of the Digital Asset.

219. "*Subordinated Claim*" means any Claim against a Debtor (i) arising from (a) rescission of a purchase or sale of a Security in any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim or (ii) that is equitably or otherwise subordinated, including pursuant to section 510(c) of the Bankruptcy Code.

220. "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

221. "*Turnover Actions*" means, collectively, the adversary proceedings seeking turnover of certain property from DCG and DCGI pursuant to section 542(b) of the Bankruptcy Code by filing the *Complaint*, ECF No. 1, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. No. 23-01168 (Bankr. S.D.N.Y. Sept. 6, 2023) against DCG and the *Complaint*, ECF No. 1, *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Adv. Pro. No. 23-01169 (Bankr. S.D.N.Y. Sept. 6, 2023) against DCGI.

222. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (i) accepted such distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (ii) given

notice to the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, of an intent to accept such distribution within one year of receipt; (iii) responded to the Debtors', the Wind-Down Debtors', the PA Officer's, the Disbursing Agent's, or the Gemini Distribution Agent's, as applicable, requests for information necessary to facilitate such distribution prior to the deadline included in such request for information; or (iv) timely taken any other action necessary to facilitate such distribution.

223.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

224.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, and in accordance with the Distribution Principles or Reinstatement.

225.    "*Unsecured*" means, with respect to a Claim, not a Secured Claim.

226.    "*USD Recovery Event*" means the allocation or distribution, in accordance with the Distribution Principles, to Holders of Fiat-or-Stablecoin Denominated Unsecured Claims of Distributable Assets, the value of which is equal to the amount of such Holders' Fiat-or-Stablecoin Denominated Unsecured Claims.

227.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

228.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

229.    "*Voting Deadline*" means the date established by the Disclosure Statement Order by which the Solicitation Agent must actually receive an otherwise valid vote on the Plan for such vote to count as a vote to accept or reject the Plan, subject to Article XII.H of the Plan.

230.    "*Wind-Down Accounts*" means the bank accounts to be held in the name of the Wind-Down Debtors that are created pursuant to Article IV.A of the Plan.

231.    "*Wind-Down Budget*" means that certain budget governing the fees, expenses, and disbursements required to fund the Wind-Down Debtors' Expenses until all distributions required to be made from the Wind-Down Debtors under the Plan are made, which shall be in form and substance reasonably acceptable to (i) prior to the Effective Date, the Debtors and with respect to which the Debtors shall have obtained (a) the Committee's Consent, (b) the Ad Hoc Group's Consent, and (c) solely as to matters pertaining to the Gemini Distribution Agent (if any), Gemini's Consent and (ii) from and after the Effective Date, the PA Officer and with respect to which the PA Officer shall have obtained (a) the Wind-Down Oversight Committee's Consent and (b) solely as to matters pertaining to the Gemini Distribution Agent (if any), Gemini's Consent.

232.    "*Wind-Down Debtor Parties*" means the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and solely in their capacities as

such, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives.

233.    "***Wind-Down Debtors***" means Wind-Down GGC, Wind-Down GAP, and Wind-Down GGH, or any successor thereto, by merger, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.A hereof to, among other things, effectuate the wind down of such Debtors' Estates following the Effective Date, commence, litigate, and settle the Retained Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan, and make distributions pursuant to the terms of the Plan and the Plan Administration Agreement; *provided*, *however*, that, for the avoidance of doubt, the Wind-Down Debtors shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

234.    "***Wind-Down Debtors' Assets***" means, for each Wind-Down Debtor, all Assets of the applicable Debtor's Estate.

235.    "***Wind-Down Debtors' Beneficiaries***" means Holders in respect of their Allowed Claims or Allowed Interests that are entitled to receive distributions from the Wind-Down Debtors pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

236.    "***Wind-Down Debtors' Expenses***" means, for each Wind-Down Debtor, any and all reasonable and documented fees, costs, and expenses incurred by such Wind-Down Debtor or the PA Officer (or any Disbursing Agent, Person, Entity, or professional engaged by the applicable Wind-Down Debtor or the PA Officer to effect distributions or otherwise assist the PA Officer with his or her duties under the Plan Administration Agreement) in connection with any of their duties under the Plan and the Plan Administration Agreement, including any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses, and the U.S. Trustee Fees, or costs to maintain certain assets while they are held.

237.    "***Wind-Down GAP***" means GAP on and after the Effective Date.

238.    "***Wind-Down GGC***" means GGC on and after the Effective Date.

239.    "***Wind-Down GGH***" means GGH on and after the Effective Date.

240.    "***Wind-Down Oversight BTC Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

241.    "***Wind-Down Oversight Committee***" means an oversight committee of seven (7) members mutually appointed by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), pursuant to Article IV.A.3 of

the Plan to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan and the Wind-Down Oversight Committee Bylaws.

242. "***Wind-Down Oversight Committee Bylaws***" means the bylaws to be adopted by the Wind-Oversight Committee on the Effective Date, which shall set forth the governance of the Wind-Down Oversight Committee and its members, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent, and in substantially the form included in the Plan Supplement.

243. "***Wind-Down Oversight Committee's Consent***" means the consent of the Wind-Down Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Wind-Down Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Wind-Down Oversight Committee's Consent pursuant to the Plan, the Wind-Down Oversight Committee's Consent shall be deemed granted to the extent the Wind-Down Oversight Committee has received written notice of such matter and has not, within five (5) Business Days of the Wind-Down Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Wind-Down Oversight Committee's Consent as to such matter.

244. "***Wind-Down Oversight Crossover Member***" means at least one (1) member of the Wind-Down Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

245. "***Wind-Down Oversight ETH Member***" means at least one (1) member of the Wind-Down Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

246. "***Wind-Down Oversight Fiat-or-Stablecoin Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims.

247. "***Wind-Down Oversight Gemini Lender Member***" means at least one (1) member of the Wind-Down Oversight Committee (unless a Gemini Recovery Event occurs), the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in either (i) BTC or (ii) such other Digital Asset denomination (which Digital Asset denomination will not consist solely of Stablecoin or Alt-Coin) as jointly determined by the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) and the Committee.

248. "***Wind-Down Reserve***" means, with respect to each Wind-Down Debtor, the amount set forth in the Wind-Down Budget to pay the Wind-Down Debtors' Expenses incurred in connection with making distributions or otherwise carrying out the PA Officer's duties under the Plan; *provided* that the Wind-Down Reserve shall exclude any Wind-Down Debtors' Expenses budgeted in connection with the Wind-Down Debtors' pursuit of the Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the

DCG Parties, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve. For the avoidance of doubt, all fees and expenses incurred by the Litigation Oversight Committee, including through its retention of professionals (if any), will be satisfied through the Litigation Reserve.

B.      *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) the words "include" and "including" and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (10) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any effectuating provisions may be interpreted by the Debtors (or after the Effective Date, the Wind-Down Debtors or the PA Officer) in their or its sole discretion in a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity; and (14) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business

Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Wind-Down Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Unless otherwise expressly provided herein, references to Digital Assets denoted with a U.S. dollar value or "$" refer to the value of such Digital Assets in Cash as of the Petition Date, utilizing the conversion rates provided in the Digital Assets Conversion Table.

F.      *Reference to the Debtors or the Wind-Down Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.  References to the Wind-Down Debtors mean the Wind-Down Debtors or the PA Officer, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing, including the Distribution Principles but excluding the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order, the Plan, and the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and statutory fees under section 1930 of the

Judicial Code have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.    *Administrative Expense Claims*

Except with respect to Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or, from and after the Effective Date, the applicable Wind-Down Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed, but in any event no later than ninety (90) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; (d) such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; and (e) such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date. Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors or, from and after the Effective Date, the Wind-Down Debtors a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or, from and after the Effective Date, the Wind-Down Debtors, or their respective assets or property. Objections to such requests, if any, must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors (if not the objecting party) and the requesting party no later than ninety (90) days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim that has been previously Allowed.

B.    *Professional Compensation*

1.    Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors no later than sixty (60) days after the Effective Date. Each such final request shall be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the

34

Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash up to their full Allowed amount to the Professionals by the Disbursing Agent for the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.

If the Professional Fee Escrow Account is insufficient to pay the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Wind-Down Debtors, without any further notice to or action, order, or approval of the Bankruptcy Court. Obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and the requesting Professional no later than twenty (20) days after such final request for payment of Professional Fee Claims is Filed with the Bankruptcy Court.

### 2. Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" calculated in Article II.B.3 of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates of the Debtors or of the Wind-Down Debtors. After all Allowed Professional Fee Claims have been irrevocably paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Wind-Down Debtors in accordance with Article IV.B.2.b of the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Effective Date, the Debtors shall request from Professionals estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such reasonable, good faith estimate to the Debtors in writing via e-mail two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### 4. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective

Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter (including if such Allowed Priority Tax Claim will not be due and payable until after the Effective Date) or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

D.      *Statutory Fees*

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash.

After the Effective Date, each Wind-Down Debtor shall pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its respective Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first.  The Wind-Down Debtors shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

E.      *Restructuring Fees and Expenses*

Unless the PSA has been terminated by its terms as to all parties thereto prior to the Effective Date as a result of one or more breaches by the PSA Creditors, (i) the Ad Hoc Group Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date pursuant to (and subject to) the terms and conditions of the existing fee reimbursement letters executed by the Debtors, without the need to file a proof of such Claim and without further order of the Bankruptcy Court and (ii) the Dollar Group Restructuring Fees and Expenses incurred up to and including the Effective Date shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the PSA, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.

36

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      Classification of Claims Against and Interests in GGH

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Interests | Impaired | Deemed to Reject |

37

2. <u>Classification of Claims Against and Interests in GGC</u>

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Gemini Lender Claims | Impaired | Entitled to Vote |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

3.      Classification of Claims Against and Interests in GAP

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

B.    *Treatment of Claims Against and Interests in GGH*

1.    Class 1 — Other Priority Claims

a.    *Classification*: Class 1 consists of all Other Priority Claims against GGH.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGH will, at the option of GGH or Wind-Down GGH, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGH, in each case, or as soon as reasonably practicable thereafter.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Secured Claims

a.      *Classification*: Class 2 consists of all Secured Claims against GGH.

b.      *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGH or Wind-Down GGH, as applicable, such Holder of an Allowed Secured Claim against GGH will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGH, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGH Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.      *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.      Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

a.      *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

b.      *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

40

4.      Class 4 — BTC-Denominated Unsecured Claims

a.      *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGH.

b.      *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed BTC-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

5.      Class 5 — ETH-Denominated Unsecured Claims

a.      *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGH.

b.      *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed ETH-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 — Alt-Coin-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGH.

    b.    *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

7.    <u>Class 7 — Subordinated Claims</u>

    a.    *Classification*: Class 7 consists of all Subordinated Claims against GGH.

    b.    *Treatment*: The Subordinated Claims against GGH shall be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GGH, and the Subordinated Claims against GGH will not receive any distribution on account of such Subordinated Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty Claims against GGH.

    c.    *Voting*: Class 7 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 7 Subordinated Claims against GGH shall not receive any distribution on account of such Subordinated Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.    <u>Class 8 — Government Penalty Claims</u>

    a.    *Classification*: Class 8 consists of the Government Penalty Claims against GGH.

    b.    *Treatment*: The Government Penalty Claims against GGH shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGH, and the Government Penalty Claims against GGH will not receive any distribution on account of such Government Penalty Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGH; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGH should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

    c.    *Voting*: Class 8 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GGH shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.    <u>Class 9 — Intercompany Claims</u>

    a.    *Classification*: Class 9 consists of all Intercompany Claims against GGH.

    b.    *Treatment*: All Intercompany Claims (subject to the GGC/GGH Settlement) against GGH will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

    c.    *Voting*: Class 9 is Unimpaired/Impaired under the Plan. Holders of Class 9 Intercompany Claims against GGH are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.    <u>Class 10 — Interests</u>

    a.    *Classification*: Class 10 consists of all Interests in GGH.

    b.    *Treatment*: (i) Holders of Interests in GGH shall not receive any distribution on account of such Interests unless all Allowed Claims against all of the Debtors or the Wind-Down Debtors, as applicable, have been paid in full in accordance with the Distribution Principles and (ii) all Interests in GGH shall, solely for Plan administrative purposes, continue to be held by the Holders of such Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, unless all Allowed Claims against all of the Debtors or the Wind-Down Debtors, as applicable, have been paid in full in

accordance with the Distribution Principles, the Holders of Interests in GGH shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests (other than those limited voting rights expressly set forth in Article IV.B.7 of the Plan), or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGH.

c.    *Voting*: Class 10 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 10 Interests in GGH shall not receive any distribution on account of such Interests and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

C.    *Treatment of Claims Against and Interests in GGC*

1.    Class 1 — Other Priority Claims

a.    *Classification*: Class 1 consists of all Other Priority Claims against GGC.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGC will, at the option of the GGC or Wind-Down GGC, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGC, in each case, or as soon as reasonably practicable thereafter.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGC are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Secured Claims

a.    *Classification*: Class 2 consists of all Secured Claims against GGC.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGC or Wind-Down GGC, as applicable, such Holder of an Allowed Secured Claim against GGC will receive (i) payment in full in Cash, payable on the later of the Effective Date

and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGC, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGC Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGC are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

a.    *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

b.    *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

4.    Class 4 — BTC-Denominated Unsecured Claims

a.    *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGC.

b.    *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of

45

the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

5.      <u>Class 5 — ETH-Denominated Unsecured Claims</u>

a.      *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGC.

b.      *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed ETH-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

6.      <u>Class 6 — Alt-Coin-Denominated Unsecured Claims</u>

a.      *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGC.

b.      *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article

46

VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.     *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

7.     <u>Class 7 — Gemini Lender Claims</u>

a.     *Classification*: Class 7 consists of all Gemini Lender Claims (however denominated) against GGC.

b.     *Treatment if the Gemini/Genesis Settlement Effective Date occurs*: Each Holder of an Allowed Gemini Lender Claim against GGC shall receive payments or transfers from the Gemini Distribution Agent on account of its respective Allowed Gemini Lender Claim pursuant to the Gemini/Genesis Settlement Agreement. Notwithstanding anything to the contrary in the Plan, pursuant to the Gemini/Genesis Settlement Order, upon completion of the Genesis Distribution as defined in, and in accordance with, the Gemini/Genesis Settlement Agreement, the obligations of the Debtors with respect to the Gemini Master Claim shall be limited to the payments and deliveries (if any) to be made in accordance with Section 2.2 of the Gemini/Genesis Settlement Agreement.

c.     *Treatment if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date*: Each Holder of an Allowed Gemini Lender Claim against GGC shall (x) have the amount of its Allowed Gemini Lender Claim reduced by its pro rata share of the Gemini Asset Value in accordance with the Gemini Lender Distribution Principles and (y) after accounting for the foregoing reduction, receive the treatment provided to such Holder under the Distribution Principles and the Gemini Lender Distribution Principles; *provided*, *however*, that (i) for each Distribution Date prior to the Gemini GBTC Shares Determination, the Gemini GBTC Shares shall be excluded from the calculation of Gemini Asset Value, including for purposes of calculating the Remainder Gemini Lender Claims and (ii) if the Gemini GBTC Shares Determination is determined in favor of Gemini, for each Distribution Date prior to the Gemini Deficiency Claim Determination, distributions under the Plan will be made in accordance with Section 2(c)(ii) of the Gemini Reserve Principles. Allowed Gemini Lender Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order,

47

solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Gemini Lender Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Gemini Lender Claims other than the right to receive distributions pursuant to the Plan.

d. *Voting*: Class 7 is Impaired under the Plan. Holders of Class 7 Gemini Lender Claims against GGC will be entitled to vote to accept or reject the Plan.

8. <u>Class 8 — Subordinated Claims</u>

a. *Classification*: Class 8 consists of all Subordinated Claims against GGC.

b. *Treatment*: The Subordinated Claims against GGC shall be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GGC, and the Subordinated Claims against GGC will not receive any distribution on account of such Subordinated Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty Claims against GGC.

c. *Voting*: Class 8 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 8 Subordinated Claims against GGC shall not receive any distribution on account of such Subordinated Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9. <u>Class 9 — Government Penalty Claims</u>

a. *Classification*: Class 9 consists of the Government Penalty Claims against GGC.

b. *Treatment*: The Government Penalty Claims against GGC shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGC, and the Government Penalty Claims against GGC will not receive any distribution on account of such Government Penalty Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGC; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGC should not be

48

subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

c.    *Voting*: Class 9 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 9 Government Penalty Claims against GGC shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

10.    <u>Class 10 — Intercompany Claims</u>

a.    *Classification*: Class 10 consists of all Intercompany Claims against GGC.

b.    *Treatment*:  All Intercompany Claims (subject to the GAP/GGC Settlement and the GGC/GGH Settlement) against GGC will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

c.    *Voting*: Class 10 is Unimpaired/Impaired under the Plan.  Holders of Class 10 Intercompany Claims against GGC are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

11.    <u>Class 11 — Intercompany Interests</u>

a.    *Classification*: Class 11 consists of all Intercompany Interests in GGC.

b.    *Treatment*: Holders of Intercompany Interests in GGC shall not receive any distribution on account of such Intercompany Interests unless all Allowed Claims against GGC are paid in full in accordance with the Distribution Principles. All Intercompany Interests in GGC shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GGC shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGC.

*Voting*: Class 11 is Impaired under the Plan. Holders of Class 11 Intercompany Interests in GGC are proponents of the Plan within the

49

meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

D.   *Treatment of Claims Against and Interests in GAP*

1.   Class 1 — Other Priority Claims

a.   *Classification*: Class 1 consists of all Other Priority Claims against GAP.

b.   *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GAP will, at the option of GAP or Wind-Down GAP, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GAP, in each case, or as soon as reasonably practicable thereafter

c.   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 — Secured Claims

a.   *Classification*: Class 2 consists of all Secured Claims against GAP.

b.   *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GAP or Wind-Down GAP, as applicable, such Holder of an Allowed Secured Claim against GAP will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GAP, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GAP Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.   *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

50

3.      <u>Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims</u>

     a.      *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

     b.      *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

     c.      *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

4.      <u>Class 4 — BTC-Denominated Unsecured Claims</u>

     a.      *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GAP.

     b.      *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

     c.      *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

51

5.      <u>Class 5 — ETH-Denominated Unsecured Claims</u>

a.      *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GAP.

b.      *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed ETH-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

6.      <u>Class 6 — Alt-Coin-Denominated Unsecured Claims</u>

a.      *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GAP.

b.      *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.      *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

7.      <u>Class 7 — Subordinated Claims</u>

    a.      *Classification*: Class 7 consists of all Subordinated Claims against GAP.

    b.      *Treatment*: The Subordinated Claims against GAP shall be subordinated to the General Unsecured Claims, Intercompany Claims, and Government Penalty Claims against GAP, and the Subordinated Claims against GAP will not receive any distribution on account of such Subordinated Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Government Penalty Claims against GAP.

    c.      *Voting*: Class 7 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 7 Subordinated Claims against GAP shall not receive any distribution on account of such Subordinated Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.      <u>Class 8 — Government Penalty Claims</u>

    a.      *Classification*: Class 8 consists of the Government Penalty Claims against GAP.

    b.      *Treatment*: The Government Penalty Claims against GAP shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GAP, and the Government Penalty Claims against GAP will not receive any distribution on account of such Government Penalty Claims until after payment in full in accordance with the Distribution Principles of all Allowed General Unsecured Claims and Allowed Intercompany Claims against GAP; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GAP should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

    c.      *Voting*: Class 8 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GAP shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.       Class 9 — Intercompany Claims

    a.       *Classification*: Class 9 consists of all Intercompany Claims against GAP.

    b.       *Treatment*: All Intercompany Claims (subject to the GAP/GGC Settlement) against GAP will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

    c.       *Voting*: Class 9 is Unimpaired/Impaired under the Plan.  Holders of Class 9 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.      Class 10 — Intercompany Interests

    a.       *Classification*: Class 10 consists of all Intercompany Interests in GAP.

    b.       *Treatment*: Holders of Intercompany Interests in GAP shall not receive any distribution on account of such Intercompany Interests unless all Allowed Claims against GAP are paid in full in accordance with the Distribution Principles. All Intercompany Interests in GAP shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GAP shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GAP.

    c.       *Voting*: Class 10 is Impaired under the Plan. Holders of Class 10 Intercompany Interests in GAP are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

E.       *Special Provision Governing Unimpaired or Reinstated Claims*

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' or the Wind-Down Debtors' claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

54

F.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B–D of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not contain an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.      *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by Holders of such Claims or Interests in such Class but such Class shall not constitute the sole impaired accepting Class for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code.

I.      *Intercompany Interests*

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' or the Wind-Down Debtors' agreement under the Plan to make certain distributions to Holders of Allowed Claims.

J.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

K.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the

Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. The Debtors and the Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the DCG Claims and/or the Excluded Party Claims.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Wind-Down Debtors*

    1.    <u>The Wind-Down Debtors' Activities</u>

The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the Debtors' Assets. The Wind-Down Debtors will not conduct business operations and will be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Debtors' Beneficiaries. Each Wind-Down Debtor shall be managed by the PA Officer and the New Board, which shall consult with or be directed by the Wind-Down Oversight Committee and the Litigation Oversight Committee, in accordance with the Plan Administration Agreement and the applicable New Governance Documents and shall be subject to the Wind-Down Budget.

On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement. In the event of any conflict between the terms of this Article IV.A and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

    2.    <u>PA Officer</u>

The PA Officer shall be selected by mutual consent of the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the PA Officer shall be approved in the Confirmation Order, and the PA Officer's duties shall commence as of the Effective Date. The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries in accordance with and pursuant to the Distribution Principles and shall serve as the successor to and representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates (including any Causes of Action that belong to the Other Genesis Entities) that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the PA Officer and the Wind-Down Debtors' Beneficiaries shall be as set forth in the Plan Administration Agreement. Pursuant hereto and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.

In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan and the Plan Administration Agreement, and (ii) the date on which the PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement and the Wind-Down Oversight Committee Bylaws), or is otherwise unable to serve; *provided*, *however*, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the Wind-Down Oversight Committee shall elect a successor to be appointed by the New Board to serve as a PA Officer in accordance with the Plan Administration Agreement. If the Wind-Down Oversight Committee does not elect a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

3.    The Wind-Down Oversight Committee

The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement. On the Effective Date, the Wind-Down Oversight Committee shall be deemed to have adopted the Wind-Down Oversight Committee Bylaws, which shall require the membership of the Wind-Down Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Member, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member (unless a Gemini Recovery Event has occurred), and (v) the Wind-Down Oversight Crossover Member; *provided*, *however*, that the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

The Wind-Down Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the distribution or other disposition of the Distributable Assets in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement and (ii) approving any material amendments to the Distribution Principles in accordance with the Wind-Down Oversight Committee Bylaws. For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan. Vacancies on the Wind-Down Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Wind-Down Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed, in accordance with the Wind-Down Oversight Committee Bylaws. If a vacancy on the Wind-Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the

57

PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Wind-Down Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause.

4.      The Litigation Oversight Committee

The Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel) shall mutually appoint, in consultation with the Debtors, a committee of seven (7) members identified in the Plan Supplement to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws. On the Effective Date, the Litigation Oversight Committee shall be deemed to have adopted the Litigation Oversight Committee Bylaws, which shall require the membership of the Litigation Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member, (iv) at least one (1) Litigation Oversight Crossover Member; and (v) at least one (1) Litigation Oversight Gemini Lender Member (unless a Gemini Recovery Event occurs); *provided*, *however*, that the Litigation Oversight Committee Bylaws shall expressly provide that the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413; and, *provided*, *further*, that upon the occurrence of a USD Recovery Event, the Litigation Oversight Fiat-or-Stablecoin Members shall be deemed to resign their positions, and the Litigation Oversight Committee shall be reduced to five (5) members.

The Litigation Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the strategy and pursuit of Retained Causes of Action, including the selection, management, and direction of counsel and other advisors retained to investigate, analyze, and pursue the Retained Causes of Action, (ii) approving settlements on account of any Retained Causes of Action, and (iii) managing the Litigation Reserve. For the avoidance of doubt, in advising the PA Officer, the Litigation Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan. Vacancies on the Litigation Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Litigation Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Litigation Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Litigation Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Litigation Oversight Committee for cause.

5.        Plan Administration Agreement

The Plan Administration Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the PA Officer; (ii) the payment of other expenses of the Wind-Down Debtors by the PA Officer; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the PA Officer within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Wind-Down Debtors and the Debtors and the payment of taxes or other obligations owed by the Wind-Down Debtors and the Debtors; (vi) the PA Officer's orderly liquidation of the Wind-Down Debtors' Assets subject to the oversight of the New Board and the Wind-Down Oversight Committee as set forth herein; and (vii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action and any other claims, rights, or causes of action assigned to the Wind-Down Debtors subject to the oversight of the Litigation Oversight Committee as set forth herein.

6.        Reports to Be Filed by the PA Officer

The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, for each reporting period until the Gemini Distribution Agent shall have completed its final distribution to the Gemini Lenders, the Gemini Distribution Agent shall provide to the PA Officer, for inclusion in its semi-annual report, information (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) pertaining to (i) the aggregate distributions, by Asset type, received by the Gemini Distribution Agent from the Estates on behalf of the Allowed Gemini Lender Claims, and (ii) the aggregate distributions, by Asset type, made by the Gemini Distribution Agent directly to the Gemini Lenders on behalf of their Allowed Gemini Lender Claims.

7.        Fees and Expenses of the Wind-Down Debtors

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.  The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.  The PA Officer, on behalf of the Wind-Down Debtors, may employ (with the consent of the Wind-Down Oversight Committee or the Litigation Oversight Committee, as applicable), without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further

59

order of the Bankruptcy Court, subject to any limitations and procedures established by the Plan Administration Agreement. For the avoidance of doubt, the PA Officer, the Wind-Down Oversight Committee, and the Litigation Oversight Committee may employ the same professionals to the extent appropriate, as determined by each in its reasonable discretion and in accordance with the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws, as applicable.

8. <u>Liability of the Wind-Down Debtors; Indemnification</u>

The Plan Administration Agreement and the New Governance Documents may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and/or other parties. Any such indemnification shall be the sole responsibility of the Wind-Down Debtors and payable solely from the Wind-Down Debtors' Assets.

The Wind-Down Debtor Parties shall not be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers, and authority conferred, or in good faith believed to be conferred, by the Plan Administration Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud. Subject to the Plan Administration Agreement, the PA Officer shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the New Board shall be entitled to enjoy all of the rights, powers, immunities, and privileges provided in the New Governance Documents. The PA Officer or the New Board, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, none of the Wind-Down Debtor Parties shall be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the any of the Wind-Down Debtor Parties, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor Parties shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth in the Plan, and no implied covenants or obligations shall be read into the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws against any of them. The Wind-Down Debtors shall promptly, upon submission of invoices therefor, pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party and which arises out of or due to such Wind-Down Debtor Party's duties, acts, or omissions, or the consequences of such duties, acts, or omissions, with respect to the implementation of the Plan or otherwise in connection with the affairs of the Wind-Down Debtors, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; *provided*, *however*, that no expenses will be paid to a Wind-Down Debtor Party to the extent such expenses result from

such Wind-Down Debtor Party's violation of the Plan or the Confirmation Order, willful misconduct, gross negligence, or actual fraud.

9.    Tax Treatment

The Debtors will not issue an IRS Form 1099-B to any Holder of a Claim in respect of any return of Digital Assets to such Holder, to the extent the Holder receives Digital Assets of the same type as those deposited with a Debtor in an amount not in excess of the amount of such Digital Assets so deposited, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Internal Revenue Code or as the result of a change in law.

10.    Insurance; Bond

The PA Officer may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Debtors under the Plan Administration Agreement.  Unless otherwise agreed by the New Board, the PA Officer shall not be required to serve with a bond; *provided*, *however*, that, if a bond is required, the terms of such bond must be approved by the New Board and the cost and expense of such bond shall be paid by the Wind-Down Debtors.

11.    Settlement of Claims

Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; *provided, however*, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; *provided further* that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided herein and in the Plan Administration Agreement.

12.    Sales of Assets by the Wind-Down Debtors

The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets (except for Retained Causes of Action, GBTC shares, ETHE shares, and ETCG shares) on any terms it deems reasonable, without further order of the Bankruptcy Court.  The PA Officer may conduct any Monetization Transactions of Retained Causes of Action without further order of the Bankruptcy Court, but only to the extent the PA Officer has obtained the prior consent of the New Board and the Litigation Oversight Committee's Consent, subject to the provisions of the Plan Administration Agreement.  Subject to subsection (a) below, the PA Officer may conduct any Monetization Transactions of GBTC shares, ETHE shares, or ETCG shares without further order of the Bankruptcy Court and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable to such shares, but only in

accordance with the Distribution Principles.  Upon the sale, liquidation, transfer, or other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts (and such proceeds shall become and be deemed to be Distributable Assets).

### a.    Additional GBTC Shares Reserve

If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Additional GBTC Shares Reserve shall be governed by the Gemini Reserve Principles. Upon the occurrence of the Gemini/Genesis Settlement Effective Date, there shall be no Additional GBTC Shares Reserve.

### b.    Gemini GBTC Shares Reserve

If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini GBTC Shares Reserve shall be governed by the Gemini Reserve Principles. Upon the occurrence of the Gemini/Genesis Settlement Effective Date, there shall be no Gemini GBTC Shares Reserve.

### 13.    Abandonment of Assets by the Wind-Down Debtors

With five (5) Business Days' prior notice to the New Board, the Wind-Down Oversight Committee, and, with respect the abandonment of any Retained Cause of Action, the Litigation Oversight Committee, the PA Officer may abandon any Wind-Down Debtors' Assets that the PA Officer determines in his, her, or its reasonable discretion to be of *de minimis* value or burdensome to the Wind-Down Debtors, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtors prior to the Effective Date.

### 14.    Dissolution of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors, subject to the remaining provisions of this Article IV.A.14 shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.  As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.

Upon making all distributions provided for under the Plan, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any jurisdiction in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Plan, shall be deemed to have cancelled all Interests pursuant to the Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The Wind-Down Debtors shall dissolve on the earlier of the date on which: (i) (a) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Plan, and the PA Officer has fully performed all other duties and functions as set forth under the Plan, the Confirmation Order, and/or the Plan Administration Agreement and (b) the Chapter 11 Cases of the Debtors have been closed; or (ii) the PA Officer determines in his, her, or its reasonable judgment, with notice to the New Board and in consultation with the Wind-Down Oversight Committee, that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Plan, the Confirmation Order, and/or the Plan Administration Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states. Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

B.    *Means for Implementation*

    1.    Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan or as otherwise agreed by the Debtors with the Committee's Consent and the Ad Hoc Group's Consent; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities (if any), which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any; (7) the implementation of the terms and conditions of the Alameda/Genesis Settlement Agreement, the OAG/Genesis Settlement Agreement (if approved by a Final Order of the Bankruptcy Court), the 3AC/Genesis Settlement Agreement, and the SEC/Genesis Settlement Agreement (if approved by a Final Order of the Bankruptcy Court); and (8) all other actions that the Debtors or the Wind-Down Debtors, as applicable, determine to be necessary or appropriate,

63

including making filings or recordings that may be required by applicable law.  The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, and 1123 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Distribution Principles and the Monetization Transactions.

    2.    <u>Segregated Accounts for Plan Distributions</u>

    a.    Claims Reserve

The Claims Reserve for each Debtor shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions and/or payment in accordance with the terms of Articles II and III of the Plan.  Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Claims Reserve after all applicable distributions are made to Holders of Allowed Claims entitled to the Cash or Digital Assets in such applicable Claims Reserve under the Plan and (ii) any surplus Cash or Digital Assets in the applicable Claims Reserve, which surplus shall be determined by the PA Officer based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Secured Claims that remain unpaid as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).  With respect to any portion of the Claims Reserve that consists of Cash, prior to the applicable Distribution Date for such Cash, the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, shall have the authority to invest such Cash in U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940 or money market funds containing only such U.S. Government securities.

    b.    Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind-Down Debtors solely for distributions or payments in accordance with the terms of Article II of the Plan.  Each Wind-Down Debtor shall be entitled to its pro rata share (based on the percentage of the Professional Fee Reserve Amount funded by such Entity or the applicable Debtor) of any Cash held in the Professional Fee Escrow Account after all Allowed Professional Fee Claims are satisfied in full in Cash and any such remaining Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

    c.    Litigation Reserve

The Litigation Reserve shall be held in a separate segregated account from the Wind-Down Reserve and used by the Wind-Down Debtors to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action; *provided, however*, that the Litigation Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' other wind down efforts, which expenses shall be paid from the Wind-Down Reserve unless otherwise ordered by the Bankruptcy Court. The Wind-Down Debtors shall be entitled to any

(i) Cash held in the Litigation Reserve after all Retained Causes of Action have been settled or determined by a Final Order and (ii) surplus Cash in the Litigation Reserve, which surplus shall be determined by the PA Officer in consultation with the Litigation Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles) unless otherwise ordered by the Bankruptcy Court. With respect to any portion of the Litigation Reserve that consists of Cash, the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer, in consultation with the Litigation Oversight Committee, shall have the authority to invest such Cash in U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940 or money market funds containing only such U.S. Government securities.

d.    Wind-Down Reserve

The Wind-Down Reserve for each Wind-Down Debtor shall be held in trust in a segregated account by such Wind-Down Debtor to pay the applicable Wind-Down Debtors' Expenses; *provided, however*, that the Wind-Down Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve. Each Wind-Down Debtor shall be entitled to any (i) Cash held in the applicable Wind-Down Reserve after all Wind-Down Debtors' Expenses of such Wind-Down Debtor have been paid and (ii) surplus Cash in the applicable Wind-Down Reserve, which surplus shall be determined by the PA Officer in consultation with the Wind-Down Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles). With respect to any portion of the Wind-Down Reserve that consists of Cash, the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, shall have the authority to invest such Cash in U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940 or money market funds containing only such U.S. Government securities.

3.    <u>Sources of Consideration for Plan Distributions; Digital Asset Rebalancing</u>

The Wind-Down Debtors shall make distributions under and in accordance with the Plan from Distributable Assets, the Additional GBTC Shares Reserve (subject to the Gemini Reserve Principles if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date), the Gemini GBTC Shares Reserve (subject to the Gemini Reserve Principles if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date), the Claims Reserve, the Disputed Claims Reserve, and the Professional Fee Escrow Account, as applicable.

The Debtors and the Wind-Down Debtors shall, in consultation with the Wind-Down Oversight Committee and to the maximum extent permitted by law, be authorized to rebalance their Cash and Digital Assets to enable the Debtors or the Wind-Down Debtors, as applicable, to make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such respective Claims are denominated. The Debtors and the Wind-Down

65

Debtors, to the maximum extent permitted by law, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided, however*, that the Debtors, the Wind-Down Debtors, or the Disbursing Agent, as applicable, shall not be required to make any distribution in the form of Digital Assets to any Holder that has not provided to the Debtors, the Wind-Down Debtors, or the Disbursing Agent, as applicable, all information necessary to facilitate a particular distribution to such Holder.

The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

4. <u>Corporate Existence</u>

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Governance Documents.

5. <u>Vesting of Assets</u>

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date: all Assets in each Estate, including all books, records, electronically stored information (including documents and communications), Retained Causes of Action and any Assets owned or acquired by any of the Debtors, including all assets of GGT that relate to the Debtors, shall vest in each applicable Wind-Down Debtor free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims, Allowed Government Penalty Claims, and Allowed Subordinated Claims), including any prohibition on assignability or transfer under applicable non-bankruptcy law. The vesting of Assets pursuant to the Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors as if the asset or right was still held by the Debtors. On and after the Effective Date, except as otherwise provided in the Plan, the New Governance Documents, or the Plan Administration Agreement, each Wind-Down Debtor may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable.

Notwithstanding any prohibition on assignability or transfer under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such additional Assets shall be treated as if they were transferred to (as applicable) and vested in the

applicable Wind-Down Debtor as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code. All such Assets shall automatically vest in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims pursuant to the terms of the Plan).

Except as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary to cancel and/or extinguish such Liens and/or security interests.

On and after the Effective Date, the Wind-Down Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors. The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with this Article IV.B.5 shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

6.    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (a) all Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released; *provided* that, notwithstanding the releases set forth in Article VIII of the Plan, the Confirmation Order, or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein, including the Distribution Principles; *provided further* that, absent the consent of the Debtors and the Committee's Consent (or, following the Effective Date, the consent of the Wind-

67

Down Debtors and the Wind-Down Oversight Committee's Consent), nothing in this Article IV.B.6 shall effectuate a cancellation of any Intercompany Interests, Intercompany Claims (except for claims settled as part of the GAP/GGC Settlement or the GGC/GGH Settlement), or Interests.

Notwithstanding anything to the contrary in this Article IV.B.6, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article IV.B.6 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, or release the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

7.     Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the appointment of the New Board, the PA Officer, the GAP Director, and the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee; (2) the implementation of the Restructuring; (3) the re-vesting of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the transactions and distributions contemplated under the Plan and the Distribution Principles, including any rebalancing of Distributable Assets; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (5) all other actions contemplated by the Plan and the Definitive Documents. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Wind-Down Debtors to the extent not previously authorized by the Bankruptcy Court. The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors; and, *provided*, *further*, that DCG shall provide written notice to the Debtors or the Wind-Down Debtors, as applicable, of the Persons selected by DCG for appointment to the New Board no later than five (5) calendar days after the Confirmation Date. The authorizations and approvals contemplated by this Article IV.B.7 shall be effective notwithstanding any requirements under non-bankruptcy law.

8.      New Governance Documents

To the extent required under the Plan or applicable non-bankruptcy law, the Wind-Down Debtors shall, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Wind-Down Debtors may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

9.      Directors and Officers of the Wind-Down Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically.  The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of five (5) candidates selected by the Committee and the PSA Majority Creditors (as represented by the Ad Hoc Group Counsel), in consultation with the Debtors; *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace any member of the New Board who needs to be replaced by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board.  The New Board shall govern each of the Wind-Down Debtors and consult with the Wind-Down Oversight Committee on various matters identified in the Plan and the Plan Administration Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board and the GAP Director.  If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of each of the Wind-Down Debtors.

10.    <u>Effectuating Documents; Further Transactions</u>

On and after the Effective Date, the Wind-Down Debtors, their respective officers, the PA Officer, and the members of the New Board are, subject to the New Governance Documents and the Plan Administration Agreement, authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan (if any) in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

11.    <u>Reserved</u>

12.    <u>Exemption from Certain Taxes and Fees</u>

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (if any), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any sale, liquidation, or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any Assets to the Wind-Down Debtors and any rebalancing of Distributable Assets, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

13.    <u>Exemption from Registration Requirements</u>

Any Securities offered, issued, or distributed pursuant to the Plan will be so offered, issued, or distributed pursuant to an exemption from registration under the Securities Act and all rules and regulations promulgated thereunder, including sections 4(a)(1) and 4(a)(2), Rule 506 of Regulation D, Regulation S, and/or Rule 144.

Notwithstanding anything to the contrary in the Plan, no Person other than the Wind-Down Debtors shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether any Securities are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

14.    <u>Preservation of Causes of Action</u>

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates (including any Causes of Action that belong to the Other Genesis Entities),

70

whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. Notwithstanding anything to the contrary herein, all rights in any Retained Causes of Action shall vest in the Wind-Down Debtors as of the Effective Date, and may be pursued by the PA Officer in accordance with the provisions of this Plan and the Plan Administration Agreement. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action against such Entity. The Debtors or the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court or any other court, including pursuant to Article VIII of the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.B.14 include (a) any claim or Cause of Action with respect to, or against, a Released Party or Exculpated Party, subject in all respects to Article VIII of the Plan, or (b) any Resolved Preference Claims.

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity (including any Causes of Action that belong to the Other Genesis Entities) shall vest in the applicable Wind-Down Debtor. The applicable Wind-Down Debtors, through their authorized agents or representatives (including the PA Officer), shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Litigation Oversight Committee) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the Litigation Oversight Committee's Consent. The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset (including any Causes of Action that belong to the Other Genesis Entities) without the need for filing any motion for such relief.

15.     Director and Officer Liability Insurance

The Wind-Down Debtors shall be authorized to obtain directors', managers', and officers' liability insurance policies. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Wind-Down Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full force and effect in accordance with their terms.

16.     Offsetting of Collateral

For purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Plan, the Debtors and the Wind-Down Debtors are authorized, but shall not be required, to set off (i) any Claim against the Debtors with the value of any Loan Collateral that the applicable Debtor delivered to the Holder of such Claim, (ii) the value of any debt owed by the Holder of such Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor, and/or (iii) any Claim against a Debtor with the value of any debt owed by the Holder of such Claim to the applicable Debtor; *provided*, *however*, that, based upon the individual circumstances of certain Holders of Claims who may have setoff rights or other rights with respect to Loan Collateral posted with the Debtors, to compromise or settle such rights, including with respect to the value of such Loan Collateral, the Debtors have proposed the Setoff Principles for Allowance of Certain Claims attached as Exhibit M to the Plan Supplement, with respect to which the Debtors shall file a motion with the Bankruptcy Court to be heard upon notice and an opportunity for a hearing.

C.      *GAP and GGC Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GAP and provides for GGC to make a settlement contribution to GAP in an amount necessary for (i) Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC, (ii) Allowed BTC-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed BTC-Denominated Unsecured Claims against GGC, (iii) Allowed ETH-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed ETH-Denominated Unsecured Claims against GGC, and (iv) Allowed Alt-Coin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Alt-Coin-Denominated Unsecured Claims against GGC.

D.      *GGC and GGH Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GGH and

provides for GGC or Wind-Down GGC, as applicable, to receive the proceeds of any Monetization Transaction(s) allocated to any portion of the Genesis Platform other than GGT.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is any date other than the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.   Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases with the Committee's Consent and the Wind-Down Oversight Committee's Consent, as applicable, at any time on or prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.   Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any

73

"change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim Related Thereto*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property (as applicable), without the need for any objection by the Debtors or the Wind-Down Debtors, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in the Proof of Claim, if any, to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease assumed by the Debtors, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind-Down Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such**

**assumption and cure amount, and any such objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be $0.00.

Any Cure Claim shall be deemed fully satisfied, and released upon payment by the Debtors or the Wind-Down Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; and, *provided*, *further*, that nothing herein shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Wind-Down Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease (subject to the Committee's Consent and the Ad Hoc Group's Consent) prior to the resolution of any such dispute; *provided*, *however*, that such Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; and, *provided*, *further*, that, following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Indemnification Obligations*

The Indemnification Obligations shall remain in full force and effect and shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall not indemnify (i) employees, directors, or officers of the Debtors for any claims or Causes of Action arising out of or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct or (ii) any current or former employees, directors, or officers of the Debtors that are also DCG Parties.

E.      *Insurance Policies*

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Wind-Down Debtors on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors.

F.      *Modifications*, *Amendments*, *Supplements*, *Restatements*, *or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Wind-Down Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Wind-Down Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

76

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan (including the Distribution Principles), on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim or a Disallowed Claim, shall, with respect to the portion of the Claim that is an Allowed Claim, receive the full amount of the distributions that the Plan (including the Distribution Principles) provides for Allowed Claims in each applicable Class and in the manner provided in the Plan (including the Distribution Principles).  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan and subject to the Distribution Principles.  Notwithstanding any provision of the Plan to the contrary, to the extent a Claim is disallowed by an order of the Bankruptcy Court, the Disbursing Agent or the Gemini Distribution Agent, as applicable, shall not be required to reserve any amount for payment of such Claim, regardless of whether the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has not expired or whether an appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing is pending with respect to such order.

Except as otherwise provided in the Plan (including the Distribution Principles), Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Disbursing Agent and Gemini Distribution Agent.*

All distributions under the Plan shall be made by the Disbursing Agent and, in the case of distributions on Allowed Gemini Lender Claims, the Gemini Distribution Agent.  The Disbursing Agent and the Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent or the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

1.    <u>Powers of the Disbursing Agent and the Gemini Distribution Agent</u>

The Disbursing Agent and, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini Distribution Agent, as

applicable, shall be empowered and directed to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) take all actions required of it by the Distribution Principles; (d) employ professionals to represent it with respect to its responsibilities; and (e) exercise such other powers as may be vested in the Disbursing Agent or the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, the Distribution Principles, and the Gemini Lender Distribution Principles, or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be necessary and proper to implement the provisions of the Plan, the Distribution Principles, and the Gemini Lender Distribution Principles.

If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini Distribution Agent shall, at its sole discretion and to the maximum extent permitted by law, be authorized to (i) enter into a Monetization Transaction of assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in the Gemini Reserve Principles), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, and (ii) rebalance the Cash and Digital Assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in the Gemini Reserve Principles), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, in each case, to enable the Gemini Distribution Agent to make distributions in respect of Gemini Lender Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated; *provided*, *however*, that in no event shall the Gemini Distribution Agent be authorized to provide any Holder of an Allowed Claim with any lesser treatment than such Holder was entitled to under the Plan.  If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini Distribution Agent, to the maximum extent permitted by law, is authorized to effectuate such rebalancing by buying and selling of Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

2.    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent or, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini Distribution Agent (each solely in its capacity as such solely with respect to its duties in such capacity) on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such), as applicable, shall be paid in Cash by the Wind-Down Debtors from the Wind-Down Reserve; *provided*, *however*, that the fees and expenses incurred by the Disbursing Agent and the Gemini Distribution Agent, as applicable, shall be subject to and limited by the Wind-Down Budget; and, *provided*, *further*, that the amount of fees and expenses budgeted for the Gemini Distribution Agent in the Wind-Down Budget, if any, shall be determined in the Debtors' reasonable discretion, with the Committee's Consent, Gemini's Consent, and the Ad Hoc Group's

Consent, and the Gemini Distribution Agent shall not incur any fees and expenses in excess of the Wind-Down Budget without the prior written consent of the PA Officer, which consent shall not be unreasonably withheld, conditioned, or delayed.

3.    <u>No Liability</u>

Except on account of gross negligence, fraud, or willful misconduct, the Gemini Distribution Agent and its Related Parties (solely in their capacities as such and solely in respect of actions that are directly in furtherance of the performance by the Gemini Distribution Agent of its duties under the Plan or the Gemini/Genesis Settlement Agreement) shall be exculpated and have no (a) liability to any party for actions taken in accordance with the Plan or the Gemini/Genesis Settlement Agreement or in reliance upon information provided to it in accordance with the Plan or the Gemini/Genesis Settlement Agreement or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Plan or the Gemini/Genesis Settlement Agreement.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distribution*

1.    <u>Delivery of Distributions on Allowed Claims and Allowed Interests</u>

a.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent and the Gemini Distribution Agent, as applicable, shall have no obligation to recognize any transfer of Claims or Interests occurring after the close of business on the Distribution Record Date.

b.    Delivery of Distributions in General

Subject to the Distribution Principles and except as otherwise provided in the Plan (including in Article VI.C.1.c hereof), the Disbursing Agent shall make distributions to Holders of Allowed Claims (other than Gemini Lender Claims) and Allowed Interests (if any) as of the Distribution Record Date at the address (physical address or digital wallet, as applicable) for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Wind-Down Debtors. Holders of Claims may notify the Disbursing Agent by e-mail of any changes to their address for receipt of distributions.

c.    Delivery of Distributions on Claims Denominated in Digital Assets

Subject to the Distribution Principles, the Debtors and the Wind-Down Debtors shall use commercially reasonable efforts, subject to applicable law and the terms of this Plan, to provide recoveries in respect of Claims denominated in Digital Assets in the like-kind form of Digital Asset

in which such Claims are denominated, including by buying Digital Assets with the Debtors' or Wind-Down Debtors' Cash, selling Digital Assets for Cash, or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided*, *however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder; and, *provided*, *further*, that, upon the request of a Holder of an Allowed Fiat-or-Stablecoin Denominated Claim or the Gemini Distribution Agent, on behalf of any Holder of Allowed Gemini Lender Claims in respect of its Claims to the extent denominated in Cash, Foreign Currency, or Stablecoin, the Debtors or the Wind-Down Debtors, as applicable, shall use commercially reasonable efforts, subject to applicable law (including any regulatory or tax considerations) and the terms of this Plan, to provide recoveries to such Holder in Cash in respect of such Allowed Fiat-or-Stablecoin Denominated Claim or Allowed Gemini Lender Claim; and, *provided*, *further*, that, notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors or the Wind-Down Debtors, as applicable, shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) before buying or selling any type of Digital Asset other than BTC or ETH.

        d.      Delivery of Distributions on Gemini Lender Claims.

If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, subject to the Distribution Principles, for purposes of distributions and treatment under the Plan only (and not for voting purposes), Gemini shall be deemed to be the Holder of all Gemini Lender Claims and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims. As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims in accordance with the Gemini Lender Distribution Principles. In addition, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution to the Gemini Lenders, the Gemini Reserved Coins, and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in the Gemini Reserve Principles), the proceeds of such Monetization Transaction of Gemini GBTC Shares, in each case to the Holders of Allowed Gemini Lender Claims in accordance with the Gemini Lender Distribution Principles. If the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from such dollar-for-dollar reduction if (x) mutually

80

agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

e.    Minimum Distributions

Subject to the Distribution Principles and the Gemini Lender Distribution Principles, as applicable, no distribution shall be made by the Disbursing Agent or the Gemini Distribution Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250, *provided*, *however*, that the Gemini Distribution Agent may elect to make such distributions to Gemini Lenders in its sole discretion.

2.    <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that (a) any distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, shall have determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall be deemed to be "Distributable Assets" and distributed to Holders of Allowed Claims in accordance with the Plan and the Distribution Principles (it being understood that, for purposes of this Article VI.C, the Claim underlying such unclaimed distribution shall be treated as Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred and shall not be entitled to any distributions under the Plan.

D.    *Manner of Payment*

At the option of the Disbursing Agent or the Gemini Distribution Agent, as applicable, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements.

E.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall

81

be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in Foreign Currency shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable Foreign Currency as published in The Wall Street Journal, National Edition, on the Petition Date.

G.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving a full and final distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

H.      *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

I.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan (including the Distribution Principles), or the Confirmation Order, or required by applicable

82

bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment*

The Debtors or the Wind-Down Debtors may, but shall not be required to, set off against, or recoup from, any Allowed Claim against a Debtor any claim, right, or Cause of Action of any nature whatsoever that the applicable Debtor or Wind-Down Debtor may have against the Holder of such Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor or Wind-Down Debtor of any such Claim it may have against the Holder of such Allowed Claim.

K.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Wind-Down Debtors shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full in accordance with the Distribution Principles on account of such Claim from a party that is not a Debtor or a Wind-Down Debtor; *provided* that, for the avoidance of doubt, if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, the amount attributed to the Gemini GBTC Shares or any proceeds thereof for purposes of this Article VI.K.1 shall be as determined by the Gemini Deficiency Claim Determination; *provided*, *however*, that the Debtors or the Wind-Down Debtors shall provide twenty-one (21) days' written notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or the Wind-Down Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

2.      Claims Payable by Insurers

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Wind-Down Debtors, as applicable.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then

immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims*

On or after the Effective Date, the Wind-Down Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, if applicable, the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  Any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed for any purpose hereunder.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

Notwithstanding anything in this Plan to the contrary, (1) Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code, and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable Holder.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors, pursuant to the Confirmation Order, shall together have the sole authority to, with five (5) days prior notice to the Wind-Down Oversight Committee: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, *provided* that any settlement or compromise of a Disputed Claim that results in an Allowed Claim equal to or

greater than $5 million shall require the Wind-Down Oversight Committee's Consent; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Claim are preserved as if the Chapter 11 Cases had not been commenced.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Wind-Down Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Wind-Down Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after entry of the Bankruptcy Court order estimating such Claim. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section

85

522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtors.

**ON THE EFFECTIVE DATE AND UNLESS THE CHAPTER 11 CASES SUBSEQUENTLY CONVERT TO CHAPTER 7, ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT UNLESS, WITH RESPECT TO ANY SUCH CLAIM, THE BANKRUPTCY COURT FOR CAUSE EXTENDS THE TIME WITHIN WHICH A PROOF OF CLAIM MAY BE FILED.**

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN ALLOWED BY A FINAL ORDER.**

G.    *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed without the Bankruptcy Court's prior approval shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made on account of any Claim to the extent that all or any portion of such Claim is a Disputed Claim, including if an objection to such Claim or portion thereof is Filed as set forth in this Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan for such Allowed portion notwithstanding that another portion of such Claim is a Disputed Claim.

I.      *Disputed Claims Reserve*

On each Distribution Date, the Disputed Claims Reserve shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after such Distribution Date.  All taxes imposed on assets or income of the Disputed Claims Reserve shall be payable by the Disbursing Agent from the assets of the Disputed Claims Reserve.  Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Disputed Claims Reserve after all Disputed Claims have been resolved and (ii) any surplus Cash or Digital Assets in the applicable Disputed Claims Reserve, which surplus shall be determined by the PA Officer based on the amount of Disputed Claims that remain unresolved as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).  With respect to any portion of the Disputed Claims Reserve that consists of Cash, the Debtors, in consultation with the Committee and, through the Ad Hoc Group Counsel, the PSA Creditors, or, from and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, shall have the authority to invest such Cash in U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940 or money market funds containing only such U.S. Government securities.

For the Disputed Claims Reserve, the Debtors or the Wind-Down Debtors, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to the Disputed Claims Reserve, for all U.S. federal income tax purposes, the beneficiaries of the any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that such Disputed Claims Reserve would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or fund's assets and then contributed such interests to such account or fund. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors or Wind-Down Debtors would be required to comply with the relevant rules.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim in accordance with, and except as provided in, the Distribution Principles.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan (including the Distribution Principles), and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, subject to any applicable consent rights and procedures set forth herein.

B.    *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

C.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Plan Supplement, or in any other contract, instrument, agreement, or document created pursuant to the Plan or the Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Wind-Down Debtors or the PA Officer.**

From and after the Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under this Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Wind-Down Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.   The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

D.     *Releases by the Debtors*

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, their Estates, and the Wind-Down Debtors (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Person or its estate, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract,**

89

instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, the OAG/Genesis Settlement Agreement, the SEC/Genesis Settlement Agreement, the Gemini/Genesis Settlement Agreement, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.D shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

E.    *Releases by Releasing Parties*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, to the fullest extent allowed by applicable law, each Releasing Party hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases each Debtor, Estate, Wind-Down Debtor, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its successors, assigns, or representatives claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, the OAG/Genesis Settlement Agreement, the SEC/Genesis Settlement Agreement, the Gemini/Genesis Settlement Agreement, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of the Debtors or the Wind-Down Debtors on account of any Allowed Claims that are treated under the Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party.  Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.E shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.  For the avoidance of doubt, OAG is not a Releasing Party and does not release any claim it has or may have against the Other Defendants (as defined in the OAG/Genesis Settlement Agreement) or, except to the extent provided in the OAG/Genesis Settlement Agreement, against the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Releasing Parties set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions

contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties for the reasons set forth in Exhibit F of the Plan Supplement and otherwise as stated on the record at the Confirmation Hearing; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases except as expressly set forth in the Plan.

F.    *Exculpation*

Except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, the OAG/Genesis Settlement Agreement (except as otherwise provided therein with respect to the Debtors), the SEC/Genesis Settlement Agreement, the Gemini/Genesis Settlement Agreement, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in-court restructuring efforts, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit or consummation of any Monetization Transactions during the Chapter 11 Cases, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of

acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.F shall, nor shall it be deemed to, release or exculpate (i) any Exculpated Party for any act or omission after the Effective Date or (ii) any DCG Party.

G.      *Injunction*

From and after the Effective Date through and until the date on which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed to Holders of Claims or otherwise in accordance with the terms of the Plan and the Plan Administration Agreement and the Plan has been fully administered, except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, together with their respective present or former employees, agents, officers, directors, principals, and Affiliates, are enjoined from taking any of the following actions against, as applicable, the Debtors or the Wind-Down Debtors (collectively, the "*Enjoined Actions*"): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action in the Bankruptcy Court to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors.  Nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

H.      *Additional Provisions Regarding Governmental Units*

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

The enforcement of any money judgment by the SEC or other Governmental Units against the Debtors or the Wind-Down Debtors shall be subject to the Plan. In addition, the SEC and other Governmental Units reserve their rights to amend any Filed Proofs of Claim and the Debtors and the Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, or any findings announced in connection with the Plan, the Disclosure Statement, or the Confirmation Order, nothing in the Plan, the Disclosure Statement, or the Confirmation Order shall constitute a finding under either federal or state (including New York State) securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC or other Governmental Units to challenge transactions involving crypto tokens on any basis is expressly reserved. The Bankruptcy Court is not making any findings as to the availability of any exemptions under the securities laws.

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors, deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors, or condition such a grant to, or discriminate with respect to such a grant against, the Wind-Down Debtors or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code or has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

J.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is

contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

L.      *Document Retention*

On and after the Effective Date, all of the Debtors' books, records, electronically stored information, and other documents shall become the books, records, electronically stored information, and other documents of the Wind-Down Debtors.  The Wind-Down Debtors or the PA Officer may maintain documents in accordance with the Debtors' existing standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors or the PA Officer; *provided*, *however*, that the Wind-Down Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, or other documents without providing advance notice to the SEC (c/o William M Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment, and with the permission of the PA Officer or authorization from the Bankruptcy Court; *provided further* that, nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtors, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency; *provided further* that the Debtors and the Wind-Down Debtors shall not be permitted to destroy or otherwise abandon any documents relevant to the Retained Causes of Action without the Ad Hoc Group's Consent and the Committee's Consent prior to the Effective Date or the Litigation Oversight Committee's Consent from and after the Effective Date.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1.      the Confirmation Order, with respect to which the Debtors shall have obtained the Committee's Consent, the Ad Hoc Group's Consent, and, to the extent applicable, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing), shall have been entered, and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

2.      the New Governance Documents, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent, and the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

3.      all other Definitive Documents shall have been effected or executed and delivered in accordance with the terms of the Plan;

4.      all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

5.      all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

6.      each Claims Reserve shall have been funded in an amount equal to the applicable Claims Reserve Amount, with the Committee's Consent and the Ad Hoc Group's Consent;

7.      if the Gemini/Genesis Settlement Effective Date does not occur on or prior to the Gemini/Genesis Settlement Outside Date, (a) the Gemini Determinations shall have occurred or (b) the Gemini Additional Collateral Determination shall have occurred and the Gemini GBTC Shares Reserve shall have been established by Gemini or the Gemini Distribution Agent in the manner provided for in the Plan (including the Gemini Reserve Principles);

8.      each Wind-Down Reserve and the Litigation Reserve shall have been funded in the amounts set forth in the Wind-Down Budget, with the Committee's Consent and the Ad Hoc Group's Consent; and

9.      the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Reserve Amount.

B.      *Waiver of Conditions*

The Debtors, with the Committee's Consent, the Ad Hoc Group's Consent, and, solely with respect to Article IX.A.1 and Article IX.A.7 of the Plan (solely with respect to Article IX.A.1, if the Gemini Acceptance Event has occurred and is continuing), Gemini's Consent, may waive any of the conditions precedent to the Effective Date of the Plan set forth in Article IX.A at any time, without any notice to any other parties in interest, any further notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.    *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including the Distribution Principles) prior to Confirmation (including any exhibit or Plan Supplement) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) of any alteration, amendment, or modification of the Distribution Principles.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan in accordance with Article X.A of the Plan occurring after the solicitation thereof but before entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent, and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such revocation or withdrawal) or in the exercise of the Debtors' Fiduciary Duty Action, to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and the authority and power to adjudicate all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction, power, and authority to:

1.     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured, unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.     resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5. consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6. adjudicate, decide, or resolve any motions, adversary proceedings (including the Turnover Actions), contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7. adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8. adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10. enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13. resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

15. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan (including the Distribution Principles) or any transactions contemplated therein;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter involving the Wind-Down Debtors or relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     enter an order concluding or closing the Chapter 11 Cases;

23.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Wind-Down Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Wind-Down Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or the Committee with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or the Committee with respect to the Holders of Claims or Interests.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtors, as applicable, shall be served on:

| | |
|---|---|
| **The Debtors or the Wind-Down Debtors** | **Genesis Global Holdco, LLC** <br> 175 Greenwich Street, Floor 38 <br> New York, NY 10007 <br> Attn:  A. Derar Islim |
| **Attorneys to the Debtors** | **Cleary Gottlieb Steen & Hamilton LLP** <br> One Liberty Plaza <br> New York, NY 10006 <br> Attn:  Sean A. O'Neal <br>        Luke A. Barefoot <br>        Jane VanLare |
| **Committee** | **White & Case LLP** <br> 1221 Avenue of the Americas <br> New York, NY 10020-1095 |

101

|  | Attn:  Christopher Shore<br>Philip Abelson<br>Michele J. Meises |
|---|---|
|  | Southeast Financial Center<br>200 South Biscayne Blvd, Suite 4900<br>Miami, FL 33131<br>Attn: Amanda Parra Criste |
| **Ad Hoc Group** | **Proskauer Rose LLP**<br>Eleven Times Square<br>New York, NY 100363-8299<br>Attn:  Brian S. Rosen |
|  | 70 West Madison<br>Suite 3800<br>Chicago, IL 60602<br>Attn:  Jordan E. Sazant |
| **Litigation Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **Wind-Down Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **PA Officer** | **Berkeley Research Group, LLC**<br>99 High Street, 27th Floor<br>Boston, MA 02110<br>Attn:  Mark Renzi |
| **Gemini Distribution Agent** | **Hughes Hubbard & Reed LLP**<br>One Battery Park Plaza<br>New York, New York 10004<br>Attn:  Anson B. Frelinghuysen<br>Dustin P. Smith<br>Erin E. Diers |

F.    *Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/genesis/ or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

H.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, the Committee's Consent, the Ad Hoc Group's Consent, and solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares (subject to the Gemini Determinations), or (c) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan (including the Gemini Lender Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing); and (3) nonseverable and mutually dependent. Notwithstanding anything to the contrary in the Plan, if an order of the Bankruptcy Court (including the Confirmation Order) or applicable law at any time renders the release and waiver of Resolved Preference Claims under the Plan invalid, void, or otherwise unenforceable, prior to confirmation of the Plan, (A) the Debtors shall provide Holders of Claims that submitted a Ballot to accept or reject the Plan a notice regarding such determination and the opportunity to change their vote to accept or reject the Plan, (B) such Holders shall have twenty-one (21) days from the receipt of such notice to change their votes to accept or reject the Plan, and (C) in the event that any such Holder does not tender a replacement Ballot, such Holder's original vote with respect to the Plan shall remain in full force and effect.

I.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and to the extent that any Digital Asset is deemed to be a "security" by the SEC or any Governmental Unit, to the extent that section 1125(e) of the Bankruptcy Code applies, the Debtors and each of their respective Affiliates,

agents (including, for the avoidance of doubt, Gemini in its role prescribed in the Disclosure Statement Order), representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold, and in the distribution of Digital Assets, under the Plan and any previous plan, and, therefore, none of such parties or individuals shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

J.    *Request for Expedited Determination of Taxes*

The Debtors or the Wind-Down Debtors, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

K.    *Closing of Chapter 11 Cases*

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

M.    *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors' or the Wind-Down Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or a pleading Filed with the Bankruptcy Court or the Solicitation Agent prior to the Confirmation Date.

N.    *Dissolution of the Committee*

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Bankruptcy Court with respect to (1) the preparation and prosecution of any final fee

104

applications of the Committee's Professionals and (2) all final fee applications Filed with the Bankruptcy Court.

\* \* \* \*

Respectfully submitted, as of the date first set forth below,

Dated:      May 24, 2024
            Park City, Utah

GENESIS GLOBAL HOLDCO, LLC
on behalf of itself and all other Debtors


*/s/ Paul Aronzon*
Paul Aronzon
Member of the Special Committee

**<u>Exhibit A</u>**

**Distribution Principles**