**PRYOR CASHMAN LLP**
Seth H. Lieberman
Matthew W. Silverman
Daniel I. Brenner
7 Times Square
New York, New York 10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
slieberman@pryorcashman.com
msilverman@pryorcashman.com
dbrenner@pryorcashman.com

*Attorneys to the Ad Hoc Group of Dollar Lenders*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>Jointly Administered |

**APPLICATION OF THE AD HOC GROUP OF DOLLAR LENDERS FOR ENTRY OF
AN ORDER, PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4), FOR
ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES
AND ACTUAL, NECESSARY EXPENSES IN MAKING A SUBSTANTIAL
CONTRIBUTION TO THESE CASES**

The Ad Hoc Group of Dollar Lenders (the "Dollar Ad Hoc Group") in the above-captioned Chapter 11 Cases hereby files this application (the "Application") for entry of an order, pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code"), for the allowance and reimbursement of reasonable professional fees and actual, necessary

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

expenses in the amount of $300,000.00 (the "Substantial Contribution Claim")[2] for making a substantial contribution to the Debtors' cases, and upon the *Declaration of Seth H. Lieberman, Esq. in Support of the Application of the Ad Hoc Group of Dollar Lenders for Entry of an Order, Pursuant to §§ 503(b)(3)(D) and 503(b)(4), for Allowance and Reimbursement of Reasonable Professional Fees and Actual, Necessary Expenses in Making a Substantial Contribution to These Cases* (the "Lieberman Declaration"), a copy of which is attached hereto as **Exhibit A**, respectfully states as follows:

## PRELIMINARY STATEMENT

1.   On May 17, 2024, the Court issued a *Memorandum of Decision* [Dkt. No. 1691] (the "Decision") which, among other things, confirmed the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 1392] (the "Plan"). The Decision provides that "any party seeking a finding of substantial contribution shall submit evidence of its fees incurred in making a substantial contribution, together with an explanation of the tasks for which it is seeking compensation." Decision at 128, FN 107.[3] The Decision invites parties seeking a finding of substantial contribution to submit "any other additional evidentiary support to justify its request." *Id*.

---

[2] As discussed more fully herein, the Plan (as defined herein), in accordance with and subject to the PSA (as defined herein), provides for payment of all accrued, but unpaid, documented fees and expenses of the Dollar Ad Hoc Group up to a cap of $300,000. To date, the Dollar Ad Hoc Group has incurred fees and expenses in excess of $440,000, including fees and expenses it believes would otherwise satisfy the standard for substantial contribution under the Bankruptcy Code. For the avoidance of doubt, however, the Dollar Ad Hoc Group seeks reimbursement only of $300,000, consistent with the Plan and the PSA.

[3] Attached hereto as **Exhibit B** is a categorized Summary of Work Performed and Time Allocated by Pryor Cashman LLP ("Pryor Cashman"). The time allocation is estimated because at the outset of its engagement Pryor Cashman did not expect that it would need to bill each task individually, and as a result many time entries contain blocks of several tasks related to different categories of work. The estimates are a good faith effort, after having reviewed each time entry, at estimating the amount of time dedicated to each category of work.

In addition, contemporaneous with the filing of this Application, Pryor Cashman has provided the Court for *in camera* review unredacted time records for services rendered to, and expenses incurred by, Pryor Cashman on behalf of the Dollar Ad Hoc Group in connection with the substantial contributions it made during these cases. Pryor Cashman will also provide the Debtors, the U.S. Trustee, and the Official Committee of Unsecured Creditors time records partially redacted to protect attorney-client privilege.

2

Specifically, the Court noted that in reviewing the parties' submissions, it will look to their "involvement in seminal events in these bankruptcy cases, such as the negotiation of the Plan at issue here, as well as the previous plans and terms sheets that predated it[.]" Decision at 128.

2. The Dollar Ad Hoc Group formed in or around July 2023, retaining Pryor Cashman to represent it as counsel in connection with the Debtors' restructuring. *See Verified Statement Pursuant to Bankruptcy Rule 2019 of the Ad Hoc Group of Dollar Lenders* [Dkt. No. 1150] at ¶ 3. Since then, the Dollar Ad Hoc Group has been actively involved in adding significant value to these cases by engaging in exhaustive negotiations and collaboration among the Debtors, their creditors, and other stakeholders to facilitate the development of a consensual plan that provides a fair and equitable distribution of the Debtors' assets. Lieberman Declaration ¶ 8.

3. At the time the Dollar Ad Hoc Group was formed, the Chapter 11 Cases had been pending for over six months and were effectively at an impasse. *See Declaration of Paul Aronzon, Member of the Special Committee of Board of Directors of Genesis Global Holdco, LLC, in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* ¶¶ 17, 27 [Dkt. No. 1330, Ex. D] (the "Aronzon Declaration") (acknowledging instances where restructuring proposals were abandoned or otherwise failed to gain key creditor support). More to the point, the Debtors had conducted extensive restructuring negotiations with various creditor groups since at least November 2022 but were unable to garner sufficient support across their creditor constituencies. *See* Aronzon Declaration ¶ 11. For example, by the time the Dollar Ad Hoc Group was formed, the Debtors had engaged with numerous parties in interest, including several ad hoc creditor groups and DCG; however, every tentative agreement reached among these parties failed for lack of creditor support. *See generally* Aronzon Declaration ¶¶ 11-13, 16-17, 22-27.

4. Disillusioned by the lack of progress, and the negative impact that a prolonged stay in bankruptcy would have on the Debtors' assets given the volatile nature of cryptocurrency prices,

3

the Dollar Ad Hoc Group formed in or around July 2023 with the hope that it could expedite the plan process and facilitate a consensual restructuring. Lieberman Declaration ¶ 7. Specifically, the Dollar Ad Hoc Group believed that it could achieve this result by acting as a counterweight to the outsized voice of holders of claims denominated in digital assets within the membership of other ad hoc groups and focusing the creditor body on a plan that would optimize distributions for all creditors. *Id.* ¶ 7.

5.      Beginning in the summer of 2023, Pryor Cashman, on behalf of the Dollar Ad Hoc Group, engaged in extensive discussions with professionals for the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and the Ad Hoc Group represented by Proskauer Rose LLP (the "Ad Hoc Group"), including at the continued mediation sessions held in August 2023. These discussions continued through 2023 and into 2024, centering on the development of a plan that would be acceptable to a majority of the Debtors' diverse creditor body. *Id.* ¶ 8. Throughout that time, the Dollar Ad Hoc Group provided valuable feedback to the Debtors, the Committee, and their respective professionals, taking an active role in the development of the Distribution Principles and the execution of a plan support agreement (the "PSA"). *See* Aronzon Declaration ¶ 107. The PSA provides, among other things, that the PSA Creditors (as defined therein) agree to vote to accept the Plan. *See generally Notice of Filing of Plan Support Agreement* [Dkt. No. 1008]. The support for the Plan embodied in the PSA, which the Dollar Ad Hoc Group helped develop and of which each member of the Dollar Ad Hoc Group was a signatory, was critical in driving these cases toward confirmation of a consensual plan. *See* Aronzon Declaration ¶ 107 ("Without the cooperation and direct involvement of . . . the [Dollar Ad Hoc Group] in the negotiations, the many settlements reached in the case, including with Committee, would not have been achieved. Without the settlements, the Debtors would not have been able to reach the comprehensive resolutions contemplated in the Plan, including the Distribution Principles . . . .").

6. As a result of the Dollar Ad Hoc Group's efforts, these estates have benefited significantly, including, without limitation, by resolving intercreditor disputes among various creditor groups representing holders of claims denominated in different types of assets, including fiat currency and assorted cryptocurrency, *see* Aronzon Declaration ¶ 61; *Declaration of Bradley Geer in Support of the Official Committee of Unsecured Creditors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan and Omnibus Response to Objections Thereto* [Dkt. No. 1355] (the "Geer Declaration") ¶ 35, formulating and refining the Distribution Principles, *see* Aronzon Declaration ¶ 107; Geer Declaration ¶¶ 27, 34, negotiating the settlement embodied in the PSA, Aronzon Declaration ¶ 62, and developing a Plan that was confirmed by this Court, Aronzon Declaration ¶ 60.

7. The targeted efforts and significant involvement of the Dollar Ad Hoc Group drove meaningful results in these cases and are precisely the type of contributions for which the Bankruptcy Code mandates reimbursement. In fact, recognizing the Dollar Ad Hoc Group's contributions, the Debtors themselves agreed that the Dollar Ad Hoc Group had made a substantial contribution and incorporated reimbursement of its fees and expenses (up to $300,000) into the Plan. *See* Aronzon Declaration ¶ 107; Plan Art. III.E.

8. For the reasons set forth herein, the Dollar Ad Hoc Group should be granted an allowed substantial contribution claim in the amount of $300,000, consistent with the terms of the Plan and the PSA. The Dollar Ad Hoc Group respectfully submits that, in light of its critical role in facilitating a predominantly consensual plan, and the additional value realized by the estates as a result of its efforts, this amount is reasonable.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over these cases and this Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these proceedings and this Application is proper in this District

5

pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory predicates for the relief sought herein are sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

## RELIEF REQUESTED

11. The Dollar Ad Hoc Group seeks entry of an order in these Chapter 11 Cases, pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, allowing a substantial contribution administrative expense claim in the amount of $300,000.

### The Ad Hoc Dollar Group's Participation Substantially Contributed to the Success of the Debtors' Chapter 11 Cases

12. Section 503(b)(3)(D) permits a court to allow, as an administrative expense, the actual and necessary expenses incurred by a creditor that makes a substantial contribution to a chapter 11 case. Section 503(b)(4) provides for reimbursement of reasonable compensation for services rendered, and for reimbursement of actual and necessary expenses incurred, by an attorney of such an entity. The "substantial contribution" test under section 503(b)(3)(D) "is intended to promote meaningful creditor participation in the reorganization process." In re Dana Corp., 390 B.R. 100, 107-108 (Bankr. S.D.N.Y. 2008). "To qualify for administrative priority status under section 503, the contribution must be (i) substantial, (ii) directly benefit the estate – and not merely a class of creditors or interest holders – and (iii) not duplicative of services performed by others." In re Synergy Pharms. Inc., 621 B.R. 588, 609 (Bankr. S.D.N.Y. 2020). Services that warrant a substantial contribution award "generally take the form of constructive contributions in key reorganizational aspects, when but for the role of the creditor, the movement towards final reorganization would have been substantially diminished." In re AMR Corp., 2014 WL 3855320, at *2 (Bankr. S.D.N.Y. Aug. 5, 2014) (quoting In re D.W.G.K., Inc., 84 B.R. 684, 690 (Bankr. S.D. Cal. 1988). While efforts undertaken by creditors solely to benefit their own interests do not satisfy

6

the substantial contribution test, courts recognize that "section 503(b)(3)(D) focus on process as much as on contribution, on the movant's substantial contribution in the case – that is, the entire chapter 11 case" regardless of motive. In re Bayou Group., LLC, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010.

13. The Dollar Ad Hoc Group's contribution to the success of these cases is precisely of the sort contemplated by section 503. At the time the group was formed, the Debtors faced a quagmire. Various parties-in-interest had attempted to reach consensus on a path forward in Chapter 11 for the better part of a year with very little to show for it. *See* Aronzon Declaration ¶ 11 (recounting the Debtors' engagement with numerous parties in interest since at least November 2022). Tentative agreements had been reached over the course of the negotiations, but for various reasons "none of them stuck." Decision at 10.

14. One key reason for the lack of progress on a consensual plan was the inability of the Debtors to secure the support of their creditor base, which consisted mainly of customers with outstanding loan balances. *See* Aronzon Declaration ¶¶ 27, 48 (noting the lack of support for several of the Debtors' restructuring proposals). The claims of these creditors were denominated in U.S. Dollars as well as an assortment of digital currencies each with varying degrees of underlying volatility. The Ad Hoc Group, representing creditors holding approximately $2.5 billion in claims, was comprised of creditors holding claims denominated in a wide array of currencies. *See Verified Statement Pursuant to Bankruptcy Rule 2019 of Ad Hoc Group of Genesis Lenders* [Dkt. No. 114]. Although the Ad Hoc Group's membership made up a large portion of the Debtors' creditor body, the interests of its members were often diametrically opposed when it came to how claims of different denominations would be treated under an eventual chapter 11 plan.

15. Enter the Dollar Ad Hoc Group. From its inception, the Dollar Ad Hoc Group made clear to the other case parties that it did not intend to duplicate efforts of the Ad Hoc Group,

7

or any other case professional for that matter, and would instead take a surgical approach to guiding the parties toward a solution to the opposing interests of the Ad Hoc Group's membership that would result in a plan that was supported by the vast majority of the Debtors' creditors.

16. Over the course of several months, the Dollar Ad Hoc Group was directly involved in the negotiation and development of the Distribution Principles which form the lynchpin of the Plan. *See* Aronzon Declaration ¶ 61 (outlining the course of negotiations over the Distribution Principles, the parties involved, and the key issues); *see also* Geer Declaration ¶ 31 ("The Distribution Principles were heavily negotiated by the various creditor groups and the Debtors."). These negotiations were particularly nuanced, "and the Distributions Principles were designed to address a variety of complex legal and business issues over which there was significant debate." Aronzon Declaration ¶ 59.

17. As a direct result of the Dollar Ad Hoc Group's substantial involvement, the Debtors were able to secure support for the Distribution Principles which underpin the Plan. This support is represented in the more than $2.1 billion in claims of creditors who are party to the PSA, which includes the members of the Dollar Ad Hoc Group. *See* Aronzon Declaration ¶ 62. The development of the Distribution Principles and the settlement embodied in the PSA enabled the Debtors to break the logjam among their creditor body and garner enough support to move these cases to confirmation, a point which was underscored by the Court. *See* Hr'g Tr. 259:3-6 (March 18, 2024) (Lane, J.) ("[T]he other thing about a plan support agreement and other things that help essentially gather consensus so that it allows the case to move forward[.]").

18. The Dollar Ad Hoc Group's efforts to develop, negotiate, and drive support for the Distribution Principles and the Plan were recognized by professionals for both the Debtors and the Committee in pleadings filed in support of confirmation of the Plan. *See* Aronzon Declaration ¶ 107 (recognizing that "[w]ithout the cooperation and direct involvement of . . . the [Dollar Ad Hoc

8

Group] in the negotiations, the many settlements reached in the case, including with the Committee, would not have been achieved" and "I believe that [the Dollar Ad Hoc Group] ha[s] made a substantial contribution to the Debtors' chapter 11 cases."), Geer Declaration ¶ 27 (detailing the "intensive round of negotiations" with the Dollar Ad Hoc Group among others concerning the distribution mechanics under the Plan).  In fact, the Court has also recognized the active involvement of, and contribution by, the Dollar Ad Hoc Group.  *See Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Amended Joint Chapter 11 Plan and (II) Granting Related Relief* [Dkt. No. 1736] ¶ 46 ("The Plan is the result of ***months of good-faith, arm's length negotiations*** between the Debtors and a wide assortment of parties in interest in these Chapter 11 Cases, including DCG, the Committee, the Ad Hoc Group, ***the Dollar Group*** (as defined in the PSA), and Gemini.") (emphasis added).

19.     Finally, to resolve what it understood to be the U.S. Trustee's opposition to the Plan's fee reimbursement provisions, consistent with the agreement reached among the parties and the Court at the confirmation hearing, on April 18, 2024, counsel for the Dollar Ad Hoc Group provided counsel for the U.S. Trustee invoices for fees and expenses incurred by Pryor Cashman in connection with its representation of the Dollar Ad Hoc Group through March 31, 2024.  *See* Lieberman Declaration, Ex. 1.  Even though the PSA permitted the reimbursement of the Dollar Ad Hoc Group's fees and expenses up to $300,000, *see* PSA § 4.7(a)(iii), the invoices provided to counsel to the U.S. Trustee on April 18, 2024 represented amounts totaling approximately $425,000.  That same day, counsel to the U.S. Trustee acknowledged, "[a]s to the Dollar Group, these fees are capped at $300,000.  I do have to review those fees as well, but that group's total request is approximately $425,000.  ***Effectively, I'd have to find more than $125,000 in objectionable fees, something that is unlikely based on my experience.***"  *See* Lieberman Declaration, Ex. 2 (emphasis added).

9

20.     At bottom, the Dollar Ad Hoc Group's contributions in these cases were substantial and extended beyond those of a creditor solely pursuing its own self-interest.  Without its involvement in the development of the Distribution Principles, the Debtors would have been left negotiating with various creditor groups that did not and could not achieve consensus among their membership and ultimately the creditor body at large.  The Dollar Ad Hoc Group, by and through its counsel, contributed significantly to not only securing improved treatment for all of the Debtors' customer creditors, but also resolving bottlenecks in these cases, thus driving forward the reorganization process for the benefit of all stakeholders.  The fees and expenses incurred by the Dollar Ad Hoc Group in making a substantial contribution to the Debtors' reorganization process were actual and necessary and provided a real and substantial benefit to these estates.  Given the benefit the Dollar Ad Hoc Group's participation and efforts contributed to these cases, the Dollar Ad Hoc Group respectfully submits that this Application should be granted.

## NO PRIOR REQUEST

21.     No previous application for the relief requested herein has been made to this or any other court.

## NOTICE

22.     The Dollar Ad Hoc Group has provided notice of this Application in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* [Dkt. No. 44].  The Dollar Ad Hoc Group submits that, considering the nature of the relief requested, no other or further notice need be provided.

## CONCLUSION

23.     WHEREFORE, the Dollar Ad Hoc Group respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit C**, (i) allowing a substantial contribution claim in the amount of $300,000.00 on behalf of the Dollar Ad Hoc Group as an

allowed administrative claim against the Debtors, and (ii) granting such other and further relief as is just and proper.

Dated: New York, New York
      June 7, 2024                            **PRYOR CASHMAN LLP**

                                            */s/ Seth H. Lieberman*
                                            Seth H. Lieberman
                                            Matthew W. Silverman
                                            Daniel I. Brenner
                                            7 Times Square
                                            New York, NY 10036
                                            Telephone: (212) 421-4100
                                            Email: slieberman@pryorcashman.com
                                                        msilverman@pryorcashman.com
                                                        dbrenner@pryorcashman.com

                                            *Attorneys to the Ad Hoc Group of Dollar Lenders*