Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | **Related Docket Nos. 1548 & 1735** |

**DEBTORS' REPLY IN SUPPORT OF THE**
**TWENTY-EIGHTH OMNIBUS OBJECTION**
**(NON-SUBSTANTIVE) TO CERTAIN CLAIMS PURSUANT TO 11 U.S.C. § 502 AND**
**FED. R. BANKR. P. 3007 (NO LIABILITY AND INSUFFICIENT DOCUMENTATION)**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors," and these cases, the "Chapter 11 Cases") hereby submit this reply (the "Reply") in support of the *Debtors' Twenty-Eighth Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability and Insufficient Documentation)* (ECF No. 1548, the "Objection"), and in opposition to *Claimant TAFL's Response to Debtors' Non-Substantive Objection to Claim Nos. 323, 324, 325, 468, 488, and 502* (ECF No. 1735, the "Response").[1] In support of this Reply, the Debtors submit the *Supplemental Declaration of Adrian Gariboldi in Support of the Debtors' Reply in Support of the Twenty-Eighth Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability and Insufficient Documentation)* (the "Supplemental Gariboldi Declaration"), attached hereto as Exhibit A and incorporated by reference, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Three Arrows Fund Claims fail to allege sufficient facts to state a plausible claim for relief against the Debtors under any theory of liability. Although TAFL asserts that its claims should be afforded *prima facie* validity under the Bankruptcy Code and Rules, the law is clear that they have failed to provide sufficient information to warrant such treatment. TAFL attempts to paper over the inadequacy of its claims with various arguments that all fail, in addition to asserting new purported facts in their Response, a tactic that itself is procedurally improper and should be rejected outright—particularly where TAFL claimed it would amend its claim in advance of the hearing on the Objection but has, as of the filing of this Reply, failed to do so. But

---

[1]    Capitalized terms used but not otherwise defined in this Reply shall have the meaning ascribed to them in the Objection or Response, as applicable.

even if the new "facts" TAFL raises were appropriate and could be used to assess the facial validity

of its filed claims, such facts do nothing to plausibly state a cause of action by TAFL against the

Debtors.

2.      Most critically, TAFL does not (and cannot) demonstrate that TAFL purportedly

had any sort of relationship with the Debtors, whether memorialized in a written agreement or

otherwise, that would give rise to claim against *the Debtors*.  Indeed, TAFL does not, because it

cannot, even allege that GAP or any Debtor had any knowledge that the 3AC collateral GAP

foreclosed upon may have been, in TAFL's view, TAFL's property.  And, in the absence of such

allegations, TAFL cannot and does not articulate or even identify any claim or cause of action

against any of the Debtors or how any of the allegations it makes could even give rise to any such

claim.  Similarly, TAFL relies solely on evidence that certain transactions between GAP and 3AC

involved GBTC in support of speculative and conclusory allegations that the Debtors somehow

violated the CEA as a result of such transactions (again, without specifying how, even if its

suggestions were true, they could give rise to liability between TAFL and the Debtors).

3.      The Objection is scheduled to be heard at a sufficiency hearing, and what TAFL

has put forth is manifestly insufficient to state any claim against the Debtors.  Instead, what TAFL

has attempted to allege, if anything, is a claim against its affiliate, 3AC.  This Court is not the

proper forum for the determination of such claim (if any).[2]  TAFL seemingly acknowledges this

in the number of pages in its Response devoted to 3AC and its relationship with the Debtors on

the one hand, and, on the other hand, 3AC's separate relationship with TAFL.  There is simply no

allegation of a nexus between the Debtors and TAFL, no allegation that the Debtors had any

---

[2]      *See In re Three Arrows Fund, Ltd. (In Liquidation)*, Case No. 24-10210, Mar. 7, 2024 Hr'g Tr. at 23:25–24:1
(directing TAFL and 3AC to resolve disputes regarding 3AC assets allegedly belonging to TAFL in BVI Court).

knowledge of TAFL's purported ownership of the collateral, and, as such, no factual basis whatsoever to assert any claim against any Debtor. Indeed, TAFL does not even actually assert that any of the collateral posted by 3AC was in fact its property; instead, it only suggests based on inference and speculation that "it is at least plausible that some of the collateral foreclosed upon by the Debtors was not actually [3AC's] property to post or pledge." Response ¶¶ 32, 42. Thus, at the sufficiency hearing stage, TAFL's claims fail.

4.     In any event, regardless of the insufficiency of TAFL's claims against GAP and GGC, none of the Three Arrows Fund Claims could lie against Holdco. TAFL makes no specific allegations concerning Holdco, nor can it. As demonstrated in TAFL's Response, the transactions underlying the Three Arrows Fund Claims (which the Debtors submit are not properly plead nor sufficient to state a plausible claim) were between GAP and 3AC or between GGC and 3AC, not between 3AC and Holdco. Indeed, Holdco was not party to any contract with 3AC, and conducted no lending or borrowing service or other business operations that could have given rise to the liabilities asserted in the Three Arrows Fund Claims. Therefore, the Three Arrows Fund Claims against Holdco should be disallowed and expunged on this additional basis.

5.     For the foregoing reasons, and as set forth in further detail below, the Debtors respectfully submit that the Objection should be sustained and the Response overruled.

## BACKGROUND[3]

6.     On April 4, 2024, the Debtors filed the Objection to disallow the Three Arrows Fund Claims on the grounds that they (i) fail to sufficiently specify, or with respect to Claim Nos. 323, 324, and 325, do not specify at all, the basis of the alleged liability against the Debtors or provide adequate supporting documentation to enable the Debtors and their advisors to ascertain

---

[3]     The background detailed in the Objection is incorporated herein in its entirety. *See* Objection ¶¶ 2–25.

their validity; and (ii) are otherwise inconsistent with or contradict the Debtors' Books and Records in that they are not reflected in the Debtors' Books and Records. *See* Objection ¶ 30; Objection, Kinealy Decl. ¶¶ 6–7. Specifically, the Debtors argued the Three Arrows Fund Claims must be disallowed because they contain no information indicating there was any relationship between TAFL and any of the Debtors, and the Debtors' Books and Records do not reflect any transactions with TAFL. *See* Objection ¶¶ 31–35; Objection, Kinealy Decl. ¶¶ 6–7.

7.      In a letter dated April 17, 2024, TAFL issued certain document requests to the Debtors, requesting materials including any and all documents and communications evidencing any transactions between the Debtors and any 3AC-affiliated entities. Supplemental Gariboldi Decl., Ex. A-1. In a letter dated April 19, 2024, the Debtors issued certain document requests to TAFL, requesting materials including any and all documents and communications regarding (i) any agreements or other contractual arrangements between TAFL and the Debtors; (ii) any representations made to TAFL by the Debtors regarding TAFL's Grayscale-related claims; and (iii) any materials TAFL intended to rely upon in response to the Objection. Supplemental Gariboldi Decl., Ex. A-2. On April 22, 2024, counsel for the Debtors and counsel for TAFL held a meet and confer during which the parties agreed to a discovery and briefing timetable and set a document production deadline of May 15, 2024. Supplemental Gariboldi Decl., Ex. A-3. On May 3, 2024, the Debtors provided to TAFL a production of approximately 6,000 documents. Supplemental Gariboldi Decl., Ex. A-4. Included in this production were certain pledge agreements between GAP and 3AC and between GGC and 3AC wherein 3AC represented and warranted to the Debtors that they "own[ed] all Collateral free and clear of any set-off, claim, restriction, lien, security interest or encumbrance . . . and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto." Supplemental Gariboldi

Decl., Ex. A-6, at 6, 22.  In a letter dated May 15, 2024, TAFL indicated they did not have any documents in their possession responsive to the Debtors' document requests.  Supplemental Gariboldi Decl., Ex. A-5.

8.    On May 31, 2024, TAFL filed its Response to the Objection.  TAFL readily admits that, in addition to opposing the Objection, the Response is intended to "cure" the Three Arrows Fund Claims (implicitly admitting the insufficient nature of those claims).  Response ¶ 21.  Specifically, TAFL asserts that certain documents provided to TAFL by the Debtors through informal discovery subsequent to the filing of the Objection demonstrate their claims have *prima facie* validity.  *See id*.

9.    First, TAFL suggests—but does not actually state or demonstrate—that it is "plausible" that some portion of the Disputed Collateral belonged to TAFL, and not 3AC, that those assets were improperly pledged to GAP by 3AC, and that GAP's foreclosure on those assets gives rise to unspecified causes of action by TAFL against the Debtors.  *See* Response ¶¶ 3, 15.  TAFL maintains that its inability to show the existence of any transactions between itself and the Debtor is of no moment because, based on the timing of 3AC's posting of the Disputed Collateral to 3AC, it is possible some unspecified portion of the collateral foreclosed upon was TAFL's property and not 3AC's.  *See* Response ¶¶ 28–32.  TAFL bases this argument entirely on the transaction history between 3AC and GAP and between 3AC and GGC, which—although it was already public record based on the pleadings associated with the 3AC Claims Objection, *see* 3AC Claims Objection—the Debtors provided to TAFL following the filing of the Objection.  *See id*.  Notably, TAFL does not anywhere suggest that the Debtors had any knowledge that any of the

collateral pledged by 3AC could have belonged to TAFL, nor do they identify any cause of action that would give rise to liability on the part of the Debtors.

10.    Second, TAFL argues the Debtors pitched to TAFL's representatives Grayscale investment products that were in reality disguised "Bitcoin commodity swap transactions," in violation of the Commodity Exchange Act. *See* Response ¶¶ 23–24. TAFL posits these claims are plausible merely because GAP and 3AC transacted in GBTC, and again as the sole supporting evidence points to the transaction history between 3AC and GAP and between 3AC and GGC. *See* Response ¶¶ 33–38.

## ARGUMENT

### I.    TAFL FAILED TO PLAUSIBLY ALLEGE ANY CLAIM AGAINST THE DEBTORS IN THE THREE ARROWS FUND CLAIMS

11.    The Three Arrows Fund Claims fail to allege any facts, let alone sufficient facts, that could give rise to a liability of the Debtors to be afforded *prima facie* validity. As such, TAFL maintains the burden to show that its claims are valid. As TAFL admits in its Response, the sufficiency of the Three Arrows Fund Claims are determined under the federal pleading standard that would similarly govern a complaint in a civil proceeding. *See* Response ¶ 19 ("[A] proof of claim must allege sufficient fact to state a claim for relief that is plausible on its face."); *see also In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure. . . . The Claimant must assert 'enough facts to state a claim to relief that is plausible on its face.'") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2006)). The legal standard of review at a sufficiency hearing, as provided in the Claims Procedures Order, is equivalent to the standard applied to a

motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[4]  Claims Procedures

Order  ¶ 2(a).  And under this standard, none of the Three Arrows Fund Claims allege facts

sufficient to state a claim for relief against the Debtors that is facially plausible; indeed, they fail

to even identify the ostensible cause of action.

12.    First, Claim Nos. 323, 324, and 325 (the so-called "Wrongful Foreclosure Claims")

fail because they include no detail at all.   These Wrongful Foreclosure Claims asserted

unliquidated amounts merely on the basis of "[c]laims from loan agreements and/or

investments between Debtor, creditor and/or creditor's affiliates."  *See* Objection ¶ 25; Objection,

Kinealy Decl., Exs. 1, 2, 3.  Beyond that, they contain no supporting materials or information

whatsoever to identify such "claims," "loan agreements" or "investments."  *See id.*  Indeed, the

Debtors' Books and Records indicate the Debtors only transacted with 3AC and never transacted

with TAFL.  *See* Objection, Kinealy Decl. ¶¶ 5–6.  Moreover, when the Debtors requested that

TAFL produce any documents evidencing transactions between TAFL and the Debtors, TAFL

admitted that it had no such documents.  *See* Supplemental Gariboldi Decl., Ex. A-5.  In other

words, the Wrongful Foreclosure Claims allege no facts at all to state a claim, let alone what the

---

[4]      In filing the Objection, the Debtors initiated a contested matter, which is governed by Bankruptcy Rule 9014. *See Pleasant v. TLC Liquidation Tr. (In re Tender Loving Care Health Servs., Inc.)*, 562 F.3d 158, 162 (2d Cir. 2009). While Bankruptcy Rule 9014 does not explicitly provide for the application of Bankruptcy Rule 7012, which incorporates the legal standard of review applied to Fed. R. Civ. P. Rule 12(b)(6) motions, the bankruptcy court "may at any stage in a particular matter direct that one or more of the other Rules in Part VII should apply." Fed. R. Bankr. P. 9014.  Here, the Court did so in the Claims Procedure Order by referencing Bankruptcy Rule 7012(b) in its description of non-evidentiary hearings regarding contested claims. *See* Claims Procedure Order ¶ 2(a).  Courts have routinely applied Bankruptcy Rule 7012 in this context. *See In re Roman Cath. Diocese of Rockville Ctr., New York*, 2023 WL 3158940, at *5 (Bankr. S.D.N.Y. May 1, 2023) (applying the standard for a motion to dismiss for failure to state a claim because the claim objection procedures order provided that Bankruptcy Rule 7012(b) is the applicable legal standard for a Sufficiency Hearing); *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2022 WL 14964188, at *7 (Bankr. S.D.N.Y. Oct. 26, 2022) (same); *In re Salvatore*, 586 B.R. 371, 375–76 (Bankr. D. Conn. 2018) (same).

nature of that purported claim would be, against the Debtors that rises even close to the "plausibility" standard set forth in *Twombly*.

13.    Second, Claim Nos. 468, 488 and 502 (the so-called "CEA Claims") fail because they fail to plausibly allege any facts giving rise to claims against the Debtors. The CEA Claims assert unliquidated amounts on the basis of "[l]oan agreements and/or investments," and each includes an identical addendum alleging that the Debtors and certain of their non-Debtor affiliates (i) "enter[ed] into Bitcoin commodity swaps with counterparties even though [none] of the [Debtors] was a swap dealer registered with the [Commodities Future Trading Commission];" that (ii) the "[Debtors] violated the Commodity Exchange Act ("CEA") by not registering as swap dealers;" and that TAFL (iii) "suffered actual damages from the Bitcoin and other digital asset swaps with [the Debtors], and those entities are liable to [TAFL] for their violations of the [CEA]." *See* Objection ¶ 25; Objection, Kinealy Decl., Exs. 4, 5, 6.

14.    Quite notably, the CEA Claims do not allege (1) that the alleged transactions were with TAFL (indeed, they allege that such transactions were with 3AC); (2) any relationship between TAFL and the Debtors; (3) the manner in which TAFL specifically was purportedly harmed beyond mere conclusory statements that "TAFL suffered actual damages";[5] or (4) that the Debtors had any knowledge of TAFL's purported ownership of the Disputed Collateral. The lack of any allegations of this nature is particularly damning in light of the fact that both the Debtors and 3AC have now produced documents to TAFL—and in the case of the Debtors, TAFL has had such documents for six weeks. *See* Supplemental Gariboldi Decl., Ex. A-4. Despite this, TAFL has been unable to point the Court to a single instance of a relationship between any of the Debtors

---

[5]    *See* Objection, Kinealy Decl., Ex. 4, Claim No. 468 ¶ 11; Objection, Kinealy Decl., Ex. 5, Claim No. 488 ¶ 11; Objection, Kinealy Decl., Ex. 6, Claim No. 502 ¶ 11.

or TAFL or any knowledge by any Debtors of TAFL's purported ownership of the Disputed

Collateral.[6] Indeed, in the Pledge Agreements between 3AC and the Debtors, 3AC warranted that

it "own[ed] all Collateral free and clear." *See* Supplemental Gariboldi Decl., Ex. A-6. Instead,

TAFL relies on speculation, which cannot be the basis for a plausible claim—particularly when

no cause of action is even identified.[7] Even in its Response, TAFL does not actually claim that

any of the collateral pledged by 3AC to the Debtors belonged to it or identify which collateral

forms the basis for its claims—it instead only speculates that based on the trading history between

the Debtors and 3AC it is somehow "plausible that some of the collateral foreclosed upon by the

Debtors was not actually TACL's property to post or pledge." Response ¶¶ 32, 44. *See also In re

Genesis Global Holdco, LLC*, Case No. 23-10063, Aug. 2, 2023 Hr'g Tr. at 30:13–30:23 (Lane, J:

"[T]his lack of specificity is going to manifest itself, if not here, then in discovery. . . . [T]he

Debtors are going to say . . . how are we supposed to handle discovery if we don't really know

what the claim is. . . . [Notice pleading is] designed to say well, we know what we're fighting

---

[6]     In addition to providing TAFL *all* of the materials previously produced to 3AC, *see* Supplemental Gariboldi Decl., Ex. A-4, the details of the Debtors' transactions with 3AC were already publicly available to TAFL through the pleadings regarding the Debtors' dispute with 3AC and the resolution of the 3AC Claims. Such filings include the *Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "3AC Claims Objection"), which attached documentation regarding the Disputed Collateral and described in depth the lending relationship between the GAP and 3AC and between GGC and 3AC, as well as the *Notice of Debtors' Executed Settlement Agreement Between the Debtors and the Joint Liquidators of Three Arrows Capital, Ltd.* (ECF No. 972, the "Notice of Settlement Agreement"), which provided for objections to entry of the Settlement Agreement, and to which TAFL declined to object. *See* Notice of Settlement Agreement at 2.

[7]     TAFL cites only the CEA as the source of law for its alleged claims. But absent any relationship between TAFL and the Debtors or some sort of manipulation of the market by the Debtors, any such claim would belong to 3AC, the party with which the Debtors transacted. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 537 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ("[B]uyers and sellers of commodities can sue a trader who was not their counterparty only under section 22(a)(1)(D), which requires that the violation of the CEA 'constitute[] a manipulation of the price of any such contract or the price of the commodity underlying such contract.'"). Any such claims were released pursuant to the Debtors settlement agreement with 3AC. *See* Notice of Settlement Agreement, Ex. A, at 12–13 (releasing Debtors from all claims in relation to the 3AC Proofs of Claim or any other claim that could have been asserted by 3AC).

about, so we know what information to exchange."). This speculation falls well short of pleading sufficient facts to plausibly state a claim.[8]

15.    TAFL, of course, disagrees and maintains that it has stated a claim, and the Debtors are wrong to argue that TAFL's failure to attach supporting *documentation* is not fatal to the Three Arrows Fund Claims.   Response at ¶¶ 8–9.   TAFL, however, misunderstands the Debtors' argument.  It is not only TAFL's literal failure to identify any agreement that dooms its claims (though, of course, such failure is relevant); instead, it is the fact that the Three Arrows Fund Claims lack any factual support or reference to any documents that would give rise to a claim against any Debtor.  And, again, the fact that TAFL has had in its possession thousands of documents produced by the Debtors and 3AC and has not yet sought to amend its claims—despite claiming it would—further supports the fact that the Three Arrows Fund Claims lack any support and should be expunged.[9]

## II. THE RESPONSE CANNOT, AND DOES NOT, CURE THE INSUFFICIENCIES OF THE THREE ARROWS FUND CLAIMS

16.    As noted above, the Three Arrows Fund Claims are facially insufficient, should not be afforded *prima facie* validity, and should be expunged and disallowed in full.  Yet TAFL, through its Response, functionally—and impermissibly—seeks to amend the Three Arrows Fund Claims to "cure" the implicitly acknowledged deficiencies.  *See* Response ¶¶ 20–21.  Doing so is procedurally improper, and for the reasons explained below, any facts alleged solely for the first time in the Response should be disregarded.  But even if the Court were to consider the allegations

---

[8]    Aside from lengthy statutory citations, notably TAFL does not cite to any specific provision giving it a right of action to pursue claims against the Debtors, even if they did sufficiently allege the nature of the damages they purportedly incurred vis-à-vis the Debtors.

[9]    To the extent TAFL seeks to amend its claims after this Reply is filed, the Court should not countenance such gamesmanship and delay.  TAFL has had ample opportunity between when it filed its Response on May 31 and the deadline (June 11) to file a motion seeking leave to amend such that it could be heard at the June 25 hearing.

in the Response, TAFL nonetheless fails to allege facts sufficient to state a plausible claim against the Debtors.

### A.    TAFL may not amend the Three Arrows Fund Claims via the Response.

17.    TAFL may not use its Response to effectively amend its insufficient Three Arrows Fund Claims.   TAFL agrees that a proof of claim analogizes to a complaint.  *See* Response ¶ 19 (citing federal pleading standards as applicable to proofs of claim).   Extending the analogy, a claimant cannot amend its proof of claim in response to a claim objection, just as a claimant may not amend a complaint in response to a motion to dismiss.  *See Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *1 (S.D.N.Y. Sept. 25, 2014), *aff'd*, 614 F. App'x 32 (2d Cir. 2015) ("[I]t is axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss.") (quotations omitted).[10]  To allow otherwise would upend the very infirmities that the *Twombly* pleading standard, and indeed the procedures for any civil litigation, seek to prevent—namely, ensuring that parties have proper notice of the allegations against which they must prepare a defense.  Claimants cannot file barebones proofs of claim, marshal additional factual support only when a debtor has objected to its claim, and then force a debtor to expend additional resources to rebut facts and allegations for which it had no notice.[11]

---

[10]    TAFL's sole citation to *In re Ditech Holding Corp.* for the proposition that the Court may take judicial notice of documentation not attached to a proof of claim is inapposite.  *See* Response ¶ 20; *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2024 WL 2232435, at *2 (Bankr. S.D.N.Y. May 16, 2024).  The plaintiff in *In re Ditech* appeared *pro se*, and the admission of additional documentation not attached to the proof of claim was not disputed. *Id.*  Further, TAFL is not merely asking the Court to take judicial notice of facts related to the Three Arrows Fund Claims, it is asking the Court to consider such facts to determine the sufficiency of the Three Arrows Fund Claims as and when they were filed, which goes far beyond the situation in *In re Ditech*.

[11]    Even if TAFL could effectively amend its proof of claim through its Response, the thinness of the Response demonstrates that such an amendment would be futile.

**B.** **The Response fails to state or even identify any cognizable cause of action against the Debtors, despite TAFL having had access to thousands of documents produced by the Debtors.**

18.    Even if the Response did properly amend the Three Arrows Fund Claims (and it does not), the Response relies on speculation and conjecture, which are insufficient to render any claims asserted against the Debtors plausible.

19.    Regarding the Wrongful Foreclosure Claims, TAFL merely "contends" that, based on its interpretation of the trading history between the Debtors and 3AC, some unspecified portion of the Disputed Collateral could "plausibly" have TAFL property because (i) TAFL purportedly issued shares from TAFL investors to an account controlled by 3AC on January 31, 2022, and (ii) 3AC posted collateral to the Debtors subsequent to that date.  Response ¶¶ 30–32.  At best, this amounts to no more than speculation, and still wholly fails to identify (1) any basis for a relationship between TAFL and the Debtors that would give rise to any Debtor liability to TAFL or (2) the Debtors knowledge at the time of TAFL's alleged ownership of the property.[12]

20.    Moreover, TAFL identifies no cause of action against the Debtors stemming from its foreclosure on the Disputed Collateral beyond asserting that "No one can give what they do not have."  Response ¶ 39.  As discussed *supra*, the Debtors have never transacted with TAFL, *see supra* ¶¶ 12–14, and, crucially, TAFL has not alleged that the Debtors knew or would have had

---

[12]    Nor is TAFL's failure in this respect the result of a lack of cooperation from the Debtors.  Throughout the Response, TAFL claims that its investigation has been "hamper[ed]" by the 3AC Liquidators, or that information relevant to TAFL's claims has been "kept from TAFL and the [TAFL] JLs."  *See* Response at ¶¶ 1, 13–14.  Although it does not do so explicitly, TAFL seems to suggest that certain alleged information asymmetries are relevant to determining the validity of the otherwise inadequate Three Arrows Fund Claims or that the controlling pleading standards should be relaxed.  *See* Response ¶¶ 3–4, 14.  But as discussed *supra* ¶¶ 7, 15, TAFL has long had in its possession the materials integral to this dispute.

Further, TAFL also incorrectly asserts that 3AC did not receive approval from the BVI Court to enter into the Settlement Agreement.  *See* Response ¶ 3.  The Debtors filed notice on the docket of the Chapter 11 Cases on January 2, 2024 that the BVI Court entered under seal an order approving the Settlement Agreement on December 22, 2023.  *See Notice of Effective Date of Debtors' Executed Settlement Agreement Between the Genesis Debtors and the Joint Liquidators of Three Arrows Capital, Ltd.* (ECF No. 1118).

reason to know that any assets contained in the Disputed Collateral were the property of TAFL. To the contrary, in each of the Pledge Agreements, which governed pledges of collateral in connection with the 3AC Loans, 3AC warranted to the Debtors that it "own[ed] all Collateral free and clear of any set-off, claim, restriction, lien, security interest or encumbrance . . . and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto." *See* Supplemental Gariboldi Decl., Ex. A-6, at 6, 22.    While TAFL speculates it is conceivable that some unspecified portion of the assets contained in the Disputed Collateral belonged to TAFL, Response ¶ 32, TAFL fails to actually assert any facts —nor does it hint at any knowledge of the Debtors—that would give rise to an unidentified cause of action against the Debtors as opposed to a claim against 3AC.

21.    With respect to TAFL's CEA Claims, the Response offers only speculative statements regarding the plausibility of its allegations that the Debtors engaged in "disguised" swap transactions, and still fails to plead any grounds for liability owed by the Debtors to TAFL. Response ¶ 24.    TAFL supports its assertion that the Debtors "had in their possession documentation sufficient to render TAFL's Claims plausible when they filed the objection" by claiming that 3AC "was trading in . . . GBTC," and that 3AC used GBTC as collateral for loans made to 3AC by the Debtors.  *See* Response ¶¶ 37–38.  These statements, along with TAFL's conclusory assertions regarding the Debtors' alleged engagement in illicit swap transactions, demonstrate neither (i) a relationship between TAFL and the Debtors such that the Debtors would have liability to TAFL, nor (ii) any harm to TAFL sufficient to sustain the CEA Claims.[13]

---

[13]     Moreover, any conceivable CEA based claim (any of which would fail on the merits) would belong to 3AC as the direct transacting party with the Debtors, and as noted in fn. 7, *supra*, such claims were released.

### C.    No Claims Lie Against Holdco.

22.    Finally, regardless of the merit (or lack thereof) of the claims against GAP and GGC, based on TAFL's own allegations, none of the Three Arrows Fund Claims could in any event lie against Holdco.  Holdco conducted no lending or borrowing service or other business operations that could have given rise to the liabilities asserted in the Three Arrows Fund Claims.  *See* 3AC Claims Objection ¶¶ 15, 45.  Further, the transactions TAFL points to at the heart of this dispute were between GAP and 3AC or between GGC and 3AC.  *See* Response ¶¶ 26–38.  Indeed, the fact that the Three Arrows Fund Claims against Holdco are substantively identical to the Proofs of Claim against GAP and GGC speaks volumes:  TAFL makes no allegations concerning specific transactions with or conduct by Holdco (nor could it) because there are none.  *Compare* Kinealy Decl., Exs. 3, 4 *with* Kinealy Decl., Exs. 1, 2, 5, 6.  Therefore, the Three Arrows Fund Claims against Holdco should be disallowed and expunged.

*[Rest of page intentionally left blank.]*

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Objection, the Debtors respectfully request that this Court sustain the Objection, overrule the Response, enter the proposed order attached to the Objection as Exhibit A and grant such other and further relief as the Court deems just and proper.

Dated:    June 18, 2024                       /s/ Luke A. Barefoot
         New York, New York          Sean A. O'Neal
                                        Luke A. Barefoot
                                        Jane VanLare
                                        Thomas S. Kessler
                                        CLEARY GOTTLIEB STEEN &
                                        HAMILTON LLP
                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone: (212) 225-2000
                                        Facsimile: (212) 225-3999

                                        *Counsel to the Debtors*
                                        *and Debtors-in-Possession*

## **EXHIBIT A**

**Supplemental Gariboldi Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF ADRIAN GARIBOLDI**
**IN SUPPORT OF DEBTORS' TWENTY-EIGHTH OMNIBUS OBJECTION**
**(NON-SUBSTANTIVE) TO CERTAIN CLAIMS PURSUANT TO 11 U.S.C. § 502 AND**
**FED. R. BANKR. P. 3007 (NO LIABILITY AND INSUFFICIENT DOCUMENTATION)**

I, Adrian Gariboldi, make this declaration pursuant to 28 U.S.C. § 1746 and state as

follows:

**BACKGROUND**

1.      I am an associate at the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel

to the Debtors in the above-captioned Chapter 11 Cases.

2.      I respectfully submit this supplemental declaration (the "Supplemental Gariboldi

Declaration") in further support of the *Debtor's Twenty-Eighth Omnibus Objection (Non-*

*Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No*

*Liability and Insufficient Documentation)* (ECF No. 1548, the "Objection") and the *Debtors' Reply*

*in Support of the Twenty-Eighth Omnibus Objection (Non-Substantive) to Certain Claims*

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification
number as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia
Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175
Greenwich Street, Floor 38, New York, NY 10007.

*Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability and Insufficient Documentation)* (the "Reply").[2]

3.        A true and correct copy of a letter from counsel for the TAFL Joint Liquidators to counsel for the Debtors requesting the production of certain documents (the "TAFL's April 17, 2024 Letter"), dated April 17, 2024, is attached hereto as Exhibit A-1.

4.        A true and correct copy of a letter from counsel for the Debtors to counsel for the TAFL Joint Liquidators requesting the production of certain documents (the "Debtors' April 19, 2024 Letter"), dated April 19, 2024, is attached hereto as Exhibit A-2.

5.        A true and correct copy of email correspondence from counsel for the Debtors to counsel for the TAFL Joint Liquidators memorializing the meet and confer between the Debtors and TAFL on April 22, 2024 (the "April 22, 2024 Meet and Confer Memorialization"), is attached hereto as Exhibit A-3.

6.        A true and correct copy of a letter from counsel for the Debtors to counsel for the TAFL Joint Liquidators regarding the Debtors' production of documents to TAFL (the "Debtors' May 3, 2024 Production Letter"), dated May 3, 2024, is attached hereto as Exhibit A-4.

7.        A true and correct copy of correspondence from counsel for the TAFL Joint Liquidators to counsel for the Debtors regarding the Debtors' requests for production of documents (the "TAFL's May 15, 2024 Letter") dated May 15, 2024, is attached hereto as Exhibit A-5.

8.        A true and correct copy of the pledge agreement between 3AC and the Debtors, which governed pledges of collateral in connection with the 3AC Loans (the "Pledge

---

[2]        Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Objection and Reply, as applicable.

2

Agreements"), attached to the 3AC Claims Objection as Exhibit X, is attached hereto as Exhibit

A-6.

*** 

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed on June 18, 2024          */s/ Adrian Gariboldi*_____
                                    Adrian Gariboldi

3

## **EXHIBIT A-1**

**TAFL's April 17, 2024 Letter**



Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

John A. Pintarelli
tel: +1.212.858.1213
john.pintarelli@pillsburylaw.com

April 17, 2024

Via Email

Luke A. Barefoot (lbarefoot@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

Re:    *In re Genesis Global Holdco, LLC, et al.*,
       **Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.)**

Dear Luke:

We represent Paul Pretlove, David Standish, and James Drury in their capacities as the duly appointed joint liquidators and recognized foreign representatives of Three Arrows Fund, Ltd (In Liquidation) ("**TAFL**"), creditor of Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.

I write regarding the Debtors' Objection filed at ECF No. 1548 to TAFL's proofs of claim numbers 323, 324, 325, 468, 488, and 502. We intend to file a response.

We would like to discuss with you scheduling for the resolution of this contested matter, including certain discovery TAFL would like to take concerning the Debtors' Objection. To move things along quickly, we've provided our discovery requests informally below. Please let us know if a formal request for production is required. For the avoidance of doubt, these requests apply to documents within the possession, custody, or control of the Debtors and any of their bankruptcy professionals.

1. "2019 GGC MLA" (as defined in Objection ¶ 11) and any related pledge agreements or other ancillary agreements;

2. "2020 GAP MLA" (as defined in Objection ¶ 11) and any related pledge agreements or other ancillary agreements;

3. Assignment and Assumption of Master Loan Agreement dated July 20, 2020 (referenced in Objection ¶ 12);

Luke A. Barefoot
April 17, 2024
Page 2

4.  Pledge Agreements dated May 28, 2020, November 16, 2021, and January 27, 2022 (referenced in Objection ¶ 15);

5.  "2022 GAP-DCG A&A Agreement" (as defined in Objection ¶ 15);

6.  Unredacted copy of the "Settlement Agreement" (as defined in Objection ¶ 18) (redacted copy filed at ECF No. 906);

7.  Emails/Communications from May 22, 2023 to November 22, 2023 among any one or more of Three Arrows Capital, Ltd. (In Liquidation); Three Arrows Capital Pte. Ltd.; Three Arrows Fund, LP.; or TAFL (collectively, the "**Three Arrows Entities**") on the one hand and DCG or any Debtor on the other hand relating to the Settlement Agreement; and

8.  Documents evidencing transfers from January 19, 2019 to January 19, 2023 between any one or more of the Three Arrows Entities on the one hand and DCG or any Debtor on the other hand.

Once you've had the opportunity to assess the request, please reach out to schedule a meeting to discuss (1) any issues you may have with the requests and (2) rescheduling the response deadline and hearing date to allow adequate time for discovery.

Very truly yours,

*/s/ John A. Pintarelli*

John A. Pintarelli

Enclosures:    n/a

cc:            Sean A. O'Neal (soneal@cgsh.com)
               Jane VanLare (jvanlare@cgsh.com)
               Thomas S. Kessler (tkessler@cgsh.com)
               Patrick E. Fitzmaurice (patrick.fitzmaurice@pillsburylaw.com)
               Hugh M. McDonald (hugh.mcdonald@pillsburylaw.com)
               Rahman Connelly (rahman.connelly@pillsburylaw.com)
               L. James Dickinson (james.dickinson@pillsburylaw.com)

## **EXHIBIT A-2**

**Debtors' April 19, 2024 Letter**

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

| AMERICAS | ASIA | EUROPE & MIDDLE EAST | |
|---|---|---|---|
| NEW YORK | BEIJING | ABU DHABI | LONDON |
| SAN FRANCISCO | HONG KONG | BRUSSELS | MILAN |
| SÃO PAULO | SEOUL | COLOGNE | PARIS |
| SILICON VALLEY | | FRANKFURT | ROME |
| WASHINGTON, D.C. | | | |

CRAIG B. BROD
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
DAVID H. BOTTER
JORGE U. JUANTORENA
DAVID LEINWAND
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
ALAN M. LEVINE
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
DEBORAH NORTH
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU

ROGER A. COOPER
LILLIAN TSU
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
RISHI ZUTSHI
JANE VANLARE
AUDRY X. CASUSOL
ELIZABETH DYER
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOHN A. KUPIEC
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
ELANA S. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN

ARON M. ZUCKERMAN
KENNETH S. BLAZEJEWSKI
MARK E. MCDONALD
F. JAMAL FULTON
PAUL V. IMPERATORE
CLAYTON SIMMONS
CHARLES W. ALLEN
JULIA L. PETTY
HELENA K. GRANNIS
SUSANNA E. PARKER
THOMAS S. KESSLER
JONATHAN MENDES DE OLIVEIRA
BRANDON M. HAMMER
KYLIEN BARZA
NICKOLAS BOGDANOVICH
MATTHEW S. BRIGHAM
      RESIDENT PARTNERS

JUDITH KASSEL
BOAZ S. MORAG
HEIDE H. ILGENFRITZ
ANDREW WEAVER
CATHERINE S. GRIMM
JOHN V. HARRISON
LAURA BAGARELLA
JONATHAN D.W. GIFFORD
DAVID W.S. YUDIN
KARA A. HAILEY
ANNA KOGAN
BRIAN J. MORRIS
CARLOS S. WALLANCE
ALEXANDER JANGHORBANI
JOSHUA PANAS
CHARITY E. LEE
      RESIDENT COUNSEL

D: +1 212 225 2829
lbarefoot@cgsh.com

April 19, 2024

<u>VIA EMAIL</u>

John A. Pintarelli
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Steet
New York, NY 10019

<u>**Re:  In re: Genesis Global Holdco, LLC, et al., Case No. 23-10063 (SHL)
(Bankr. S.D.N.Y.)**</u>

John:

We write on behalf of Genesis Global Holdco, LLC, Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), in response to your letter dated April 17, 2024 regarding the proofs of claim numbered 323, 324, 325, 468, 488, and 502 filed by Three Arrows Fund, Ltd (In Liquidation) ("<u>TAFL</u>," and such proofs of claim, the "<u>TAFL Claims</u>"), the Debtors' objection to the TAFL Claims at ECF No. 1548 (the "<u>Objection</u>"), and the informal discovery requests from TAFL to the Debtors (the "<u>TAFL Requests</u>").

The Debtors are amenable to discussing scheduling on the Debtors' Objection and the related TAFL Requests.  In addition, the Debtors would like to discuss their own discovery requests to TAFL, which are provided, informally, below.  For the avoidance of doubt, these requests apply to documents within the possession, custody, or control of TAFL and/or any of their bankruptcy professionals, whether in the United States, the British Virgin Islands, or elsewhere.

1. Any and all agreements or other contractual arrangements (whether in the form of documents or communications) between TAFL and the Debtors, including but not limited to those that relate to the TAFL Claims;

Ms. Zalka, p. 2

2. Any and all documents and communications regarding representations allegedly made to TAFL by the Debtors regarding the Grayscale Arbitrage (as defined in the TAFL Claims);

3. Any and all documents and communications that TAFL intends to rely upon in their anticipated response to the Objection.

        The Debtors expressly reserve all rights regarding the TAFL Requests and the requests provided above.

        Sincerely,

cc:    Patrick E. Fitzmaurice (patrick.fitzmaurice@pillsburylaw.com)
       Hugh M. McDonald (hugh.mcdonald@pillsburylaw.com)
       Rahman Connelly (rahman.connelly@pillsburylaw.com)
       L. James Dickinson (james.dickinson@pillsburylaw.com)
       Sean A. O'Neal (soneal@cgsh.com)
       Jane VanLare (jvanlare@cgsh.com)
       Thomas S. Kessler (tkessler@cgsh.com)
       David Z. Schwartz (dschwartz@cgsh.com)

# EXHIBIT A-3

**April 22, 2024 Meet and Confer Memorialization**

| | |
|---|---|
| **From:** | Gariboldi, Adrian |
| **To:** | Dickinson, L. James; Pintarelli, John A.; Fitzmaurice, Patrick E.; McDonald, Hugh M.; Connelly, Rahman |
| **Cc:** | Barefoot, Luke A.; Schwartz, David Z.; Lenox, Brad; Ross, Katharine; Fike, Deandra; Finnegan, Madeline |
| **Subject:** | TAFL - Meet & Confer Between the Genesis Debtors and TAFL 4.22.2024 |
| **Date:** | Monday, April 22, 2024 4:48:40 PM |

Pillsbury team,

Below is a memorialization of our meet and confer this afternoon.

Thanks,
Adrian

\*\*\*

**4.22.2024 – Meet & Confer Between the Genesis Debtors and TAFL**

**Attendees**:  John Pintarelli (Pillsbury), Patrick Fitzmaurice (Pillsbury), James Dickinson (Pillsbury), Hugh McDonald (Pillsbury), Rahman Connelly (Pillsbury), Luke Barefoot (CGSH), David Schwartz (CGSH), Brad Lenox (CGSH), Adrian Gariboldi (CGSH), Madeline Finnegan (CGSH)

**TAFL's Discovery Requests**
- The Debtors started by directing TAFL to materials exhibited to the Debtors' Amended Omnibus Objection to Three Arrows Capital's Proofs of Claim (ECF No. 658)
  - On Request No. 1, the Debtors directed TAFL to Exhibit O
  - On Request No. 2, the Debtors directed TAFL to Exhibit P
  - On Request No. 3, the Debtors directed TAFL to Exhibit Q
  - On Request No. 4, the Debtors directed TAFL to Exhibit X
  - On Request No. 5, the Debtors directed TAFL to Exhibit S
- On Request No. 6, the Debtors asked TAFL to articulate the relevancy of the request, explaining the release provision of the settlement as between 3AC and Genesis is unredacted, and the only portions that are redacted are between 3AC and DCG.
  - TAFL maintained that some of what 3AC settled might actually be assets belonging to TAFL, and that one question is the scope of the settlement agreement with 3AC, and whether we think they're covered by the term "3AC Releasing Parties".
    - The Debtors explained their position that the issue is really separate to whether TAFL has a claim against the Debtors in their bankruptcy, that while this may be relevant to potential disputes with 3AC, that does not make it relevant to this claims objection.  The Debtors reiterated that the redacted portions of the settlement agreement are between 3AC and DCG.  The debtors also shared there is a sealing order covering the settlement agreement and that counsel for 3AC has objected to sharing the unredacted version so that TALF should take that up with Latham.  The Debtors agreed that notwithstanding their relevance objections, if the other parties to the settlement agreement (DCG and the 3AC liquidators) had no objection to our sharing the unredacted version, the Debtors would be willing to do so, subject to TAFL's accession to the protective order.

On Request No. 7, the Debtors asked TAFL to articulate the relevancy of the request.

- TAFL stated this request too gets into the issue of what was being settled and whether it included any matters pertaining to TAFL or TAFL's claims, which will inform any response to the Debtors' objection.
  - The Debtors explained that it is unclear how such issues are relevant to TAFL's proofs of claim and, more specifically, the basis of Debtors' objection.  The Debtors also said that what was being settled is clear from the face of the settlement agreement and the underlying publicly filed documents (e.g., the 3AC proofs of claim and the Debtors' claims objections thereto).  The Debtors indicated their intent to rest on their objections, such that TAFL could move to compel these documents.

- On the eighth request, the Debtors laid out various documents exhibited to the Amended Omnibus Objection relevant to the request, including: Ex. T, Ex. U, Ex. V, Ex. Y, Ex. Z, Ex. AA.
  - TAFL asked if the documents exhibited constituted everything the Debtors produced in the litigation with 3AC, saying they understood there was discovery conducted with 3AC.
    - The Debtors indicated they were pointing 3AC to these documents in the interest of efficiency and they would be willing to meet and confer if after reviewing, TAFL had other specific concerns or questions.  Without conceding their relevance, the Debtors also agreed to produce the documents that the Debtors had previously produced to 3AC on the contested claims objection, subject to TAFL's accession to the protective order.
      - TAFL indicated they would accede to any protective order to allow for production.

**Debtors' Discovery Requests**

- TAFL indicated they would follow up with any questions on the Debtors' requests but indicated that they understood them and intended to produce responsive documents in their custody, possession or control.  We also asked TAFL to produce responsive documents on a rolling basis at the earliest possible date, which you agreed to do.

**Scheduling**

- The Debtors agreed to reach out to chambers to seek an adjournment.  The Debtors also proposed a discovery deadline of May 15, proposed May 31 for TAFL response deadline, and a reply deadline of June 18.
  - TAFL indicated that at first blush the schedule sounded reasonable but that they would follow up no later tomorrow with their final position on the proposed schedule.

---

Adrian Gariboldi
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2658
agariboldi@cgsh.com  |  clearygottlieb.com

# **EXHIBIT A-4**

**Debtors' May 3, 2024 Production Letter**

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

| AMERICAS | ASIA | EUROPE & MIDDLE EAST | |
|---|---|---|---|
| NEW YORK | BEIJING | ABU DHABI | LONDON |
| SAN FRANCISCO | HONG KONG | BRUSSELS | MILAN |
| SÃO PAULO | SEOUL | COLOGNE | PARIS |
| SILICON VALLEY | | FRANKFURT | ROME |
| WASHINGTON, D.C. | | | |

CRAIG B. BROD
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
DAVID H. BOTTER
JORGE U. JUANTORENA
DAVID LEINWAND
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
ALAN M. LEVINE
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
DEBORAH NORTH
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU

ROGER A. COOPER
LILLIAN TSU
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
RISHI ZUTSHI
JANE VANLARE
AUDRY X. CASUSOL
ELIZABETH DYER
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOHN A. KUPIEC
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
ELANE O. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN

KENNETH S. BLAZEJEWSKI
MARK E. MCDONALD
F. JAMAL FULTON
JAMES JIAN HU
PAUL V. IMPERATORE
CLAYTON SIMMONS
CHARLES W. ALLEN
JULIA L. PETTY
HELENA K. GRANNIS
SUSANNA E. PARKER
THOMAS S. KESSLER
JONATHAN MENDES DE OLIVEIRA
BRANDON M. HAMMER
KYLIEN BARZA
NICKOLAS BOGDANOVICH
MATTHEW G. BRIGHAM
RESIDENT PARTNERS

JUDITH KASSEL
BOAZ S. MORAG
HEIDE H. ILGENFRITZ
ANDREW WEAVER
CATHERINE S. GRIMM
JOHN V. HARRISON
JONATHAN DW. GIFFORD
DAVID W.S. YUDIN
KARA A. HAILEY
ANNA KOGAN
BRIAN J. MORRIS
CARINA S. WALLANCE
ALEXANDER JANGHORBANI
SWIFT S.O. EDGAR
CHARITY E. LEE
RESIDENT COUNSEL

D: +1 212 225 2829
lbarefoot@cgsh.com

May 3, 2024

VIA EMAIL

John A. Pintarelli
Patrick E. Fitzmaurice
Hugh M. McDonald
Rahman Connelly
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Steet
New York, NY 10019
john.pintarelli@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
hugh.mcdonald@pillsburylaw.com
rahman.connelly@pillsburylaw.com

*Counsel for Three Arrows Fund, Ltd.*

Re:     *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.)

Dear Counsel:

We write on behalf of our clients Genesis Global Holdco, LLC and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), in response to Three Arrows Fund, Ltd.'s ("TAFL") documents requests to the Debtors relayed in your letter dated April 17, 2024 (the "TAFL Requests").  Subject to any responses and objections the Debtors may have, we are producing via secure FTP documents bearing GENESIS_3AC_BVI_00000347 to GENESIS_3AC_BVI_00017199, which together constitute a copy of the productions the

John A. Pintarelli
Patrick E. Fitzmaurice
Hugh M. McDonald
Rahman Connelly, p. 2

Debtors made last year to Three Arrows Capital, Ltd.  For security purposes, the password for the FTP will be provided separately by email.

Please note that the Debtors designate the documents in this production "Confidential," and they are produced as such pursuant to the terms of the April 20, 2023 Stipulation and Confidentiality Agreement and Protective Order, ECF No. 238, and Exhibit A thereto, executed by counsel for TAFL on May 2, 2024.  These documents are made available without waiver of the Debtors' rights, privileges, or protections and without any concession as to admissibility, relevance or otherwise.  The Debtors expressly reserve all rights.

The Debtors are available to meet and confer with TAFL in order to scope further responses to the TAFL Requests.

Sincerely,

*/s/  Luke A. Barefoot*

Luke A. Barefoot
CLEARY  GOTTLIEB  STEEN  &  HAMILTON  LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Counsel  for the Debtors*
*and Debtors-in-Possession*

## **EXHIBIT A-5**

**TAFL's May 15, 2024 Letter**



Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

John A. Pintarelli
tel: +1.212.858.1213
john.pintarelli@pillsburylaw.com

May 15, 2024

<u>Via Email</u>

Luke A. Barefoot (lbarefoot@cgsh.com)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

  Re: ***In re Genesis Global Holdco, LLC, et al.*,**
     **Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.)**

Dear Luke:

I write further to our discussion on April 22nd regarding the proof of claim filed by our clients Paul Pretlove, David Standish, and James Drury in their capacities as the joint liquidators and recognized foreign representatives (the "**JLs**") of Three Arrows Fund Ltd (In Liquidation) ("**TAFL**"), the objection to that proof of claim filed by the debtor, and the parties' document requests to one another. As you know, in general terms, the POC asserts claims against the debtors ("**Genesis**") arising out of various transactions involving certain identified cryptocurrencies and other digital assets.

You know that TAFL was part of the 'Three Arrows Group' that generally operated under a feeder fund/master fund structure. TAFL was one of two feeder funds, and Three Arrows Capital Ltd. ("**TACL**") was the master fund. Typically, under this structure, investors would invest their capital in the feeder fund, the feeder fund would invest substantially all of its capital in the master fund, and the master fund would then make investments pursuant to its mandate. Based on the JLs investigation to date, the Three Arrows Group appears to have generally operated in this fashion with at least two significant exceptions.

First, after January 31, 2022, certain TAFL investors subscribed to shares in TAFL through a deposit of cash into an account or accounts controlled by TACL, and TACL deployed that cash or its value in cryptocurrency or other digital assets, in various investments including, we believe, in transactions with the debtors. We will refer to such transactions here as the Failed Subscription Transactions. The Failed Subscription Transactions were made, without authorization, but involving separate property of TAFL's estate. TAFL's total losses with respect to the Failed Subscription Transactions are estimated to be $159,746,863.04.

Luke A. Barefoot
May 15, 2024
Page 2

Second, certain classes of shares held by investors of Three Arrows were never legally subscribed to at the TACL level, but instead were legally subscribed to at the TAFL level. The assets that TACL acquired with the proceeds of those subscriptions were therefore separate portfolios held in trust by TACL or otherwise in custody for the benefit of TAFL investors subscribed to the relevant share classes. As of January 31, 2022, the value of the investments in these share classes was $246,438,658.17.

The JLs are investigating the extent to which transactions purportedly between TACL and Genesis in fact involved assets that belonged to TAFL, not TACL, or that TACL held in trust for TAFL. This investigation has been hampered by TACL's refusal to provide the JLs with access to TAFL's books and records which TACL's liquidators (the "**TACL JLs**") obtained from the Three Arrows' Group's fund administrator and other sources. However, the JLs have recently entered into an agreement with the TACL JLs to obtain copies of the materials, including TAFL's books and records, and the JLs have recently begun their review of those materials.

In your letter dated April 19, 2024 you made the following requests for production of documents.

1. Any and all agreements or other contractual arrangements (whether in the form of documents or communications) between TAFL and the Debtors, including but not limited to those that relate to the TAFL Claims;

2. Any and all documents and communications regarding representations allegedly made to TAFL by the Debtors regarding the Grayscale Arbitrage (as defined in the TAFL Claims);

3. Any and all documents and communications that TAFL intends to rely upon in their anticipated response to the Objection.

The JLs do not have any documents responsive to categories 1 and 2, though as noted above the JLs believe it likely that, at least as relates to transactions after January 31, 2022, transactions Genesis was involved in with TACL may, in fact, have been transactions between Genesis and TAFL as such transactions involved either TAFL's separate assets or assets that TACL held in trust for TAFL.

As the JLs' investigation continues, the JLs believe it likely that they will further amend their proofs of claim and believe they will be in a position to do so by August 15, 2024. We think the most efficient way to proceed is for further litigation relating to TAFL's claim and any objections Genesis has to that claim to be adjourned until after the claim has been amended. Once you have had a chance to review the amended claim, Genesis can at that time assert any objections it has to the amended claim.

Luke A. Barefoot
May 15, 2024
Page 3


Very truly yours,

*/s/ John A. Pintarelli*

John A. Pintarelli

cc:        David Z. Schwartz (dschwartz@cgsh.com)
            Sean A. O'Neal (soneal@cgsh.com)
            Jane VanLare (jvanlare@cgsh.com)
            Thomas S. Kessler (tkessler@cgsh.com)
            Adrian Gariboldi (agariboldi@cgsh.com)
            Brad Lenox (blenox@cgsh.com)
            Katharine Ross (kross@cgsh.com)
            Deandra Fike (dfike@cgsh.com)
            Finnegan, Madeline (mafinnegan@cgsh.com)
            Patrick E. Fitzmaurice (patrick.fitzmaurice@pillsburylaw.com)
            Hugh M. McDonald (hugh.mcdonald@pillsburylaw.com)
            Rahman Connelly (rahman.connelly@pillsburylaw.com)
            L. James Dickinson (james.dickinson@pillsburylaw.com)

**<u>EXHIBIT A-6</u>**

**Pledge Agreements**

# PLEDGE SUPPLEMENT

**THIS PLEDGE SUPPLEMENT** (as amended, amended and restated, supplemented or otherwise modified from time to time, this "***Supplement***"), dated as of June 16, 2020, is made by **THREE ARROWS CAPITAL LTD** (the "***Pledgor***"), in favor of **GENESIS GLOBAL CAPITAL, LLC** (the "***Secured Party***").  All capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Pledge Agreement (as defined below).

**WHEREAS**, the Pledgor is required under the terms of that certain Pledge Agreement dated as of May 28, 2020, executed by the Pledgor, in favor of the Secured Party (as from time to time amended, restated, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), to cause certain Equity Interests held by it and listed on <u>Supplemental Schedule A</u> attached to this Supplement (the "***Additional Interests***") to be specifically identified as subject to the Pledge Agreement; and

**WHEREAS**, the Pledgor has acquired rights in the Additional Interests and desires to evidence its prior pledge to the Secured Party of the Additional Interests in accordance with the terms of the Master Agreement and the Pledge Agreement;

**NOW, THEREFORE**, in order to induce the Agent and Lenders to maintain the loans advanced pursuant to the Master Agreement, the Pledgor hereby agrees as follows with the Agent:

1.    <u>**Affirmations**</u>.

(a)    The Pledgor hereby reaffirms and acknowledges the pledge and collateral assignment to, and the grant of security interest in, the Additional Interests contained in the Pledge Agreement and pledges and collaterally assigns to the Secured Party a first priority lien and security interest, to secure the performance of all Secured Obligations in (a) the Additional Interests and (b) all proceeds of any of the foregoing.

(b)    The Pledgor hereby acknowledges, agrees and confirms by its execution of this Supplement that the Additional Interests constitute "Equity Interests" under and are subject to the Pledge Agreement, and the items of property referred to in clauses (a) and (b) above (the "***Additional Collateral***") shall collectively constitute "Collateral" under and are subject to the Pledge Agreement.  Each of the representations and warranties with respect to Equity Interests and Collateral contained in the Pledge Agreement is hereby made by the Pledgor with respect to the Additional Interests and the Additional Collateral, respectively.  Attached to this Supplement is a duly completed <u>Supplemental Schedule A</u> (the "***Supplemental Schedule***") supplementing as indicated thereon <u>Schedule A</u> to the Pledge Agreement.  The Pledgor represents and warrants that the information contained on the Supplemental Schedule with respect to such Additional Interests is true, complete and accurate as of the date of its execution of this Supplement.

2.    <u>**Miscellaneous**</u>.   <u>Section 9(i)</u> of the Pledge Agreement is hereby incorporated *mutatis mutandi* in this Agreement as if fully set forth herein.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Pledgor has caused this Supplement to be duly executed by its authorized officer as of the day and year first above written.

PLEDGOR:

THREE ARROWS CAPITAL LTD

By: _____

Name: Kyle Davies

Title:   Chairman

*[Signature Page to Pledge Agreement Supplement]*

Accepted:

**GENESIS GLOBAL CAPITAL, LLC**

By: _Kristopher Johnson_____
Name:  Kristopher Johnson
Title:   Senior Risk Officer

*[Signature Page to Pledge Agreement Supplement]*

## SUPPLEMENTAL SCHEDULE A

### ADDITIONAL PLEDGED EQUITY

| Trust | Pledged Shares | Transaction Advice Number |
|---|---|---|
| Grayscale Bitcoin Trust (BTC) | 2,076,238 | 425243 |

DocuSign Envelope ID: 08E69848-206A-4E0C-9213-37314875F58F

## PLEDGE AGREEMENT

This **PLEDGE AGREEMENT** ("*Agreement*") is entered into as of May 28, 2020, by and between **GENESIS GLOBAL CAPITAL, LLC** ("*Secured Party*") and **THREE ARROWS CAPITAL LTD** ("*Pledgor*").

      **WHEREAS**, Pledgor and Secured Party are entering into that certain Master Loan Agreement dated as of January 10, 2019 (together with any Loan Term Sheet thereunder, and as amended, modified, supplemented, or restated from time to time, the "*Master Agreement*"; unless specified otherwise, capitalized terms used but not defined herein shall have the meanings assigned in the Master Agreement); and

      **WHEREAS**, in connection with the Master Agreement, Pledgor has agreed to grant a security interest in, and pledge and assign as applicable, the Collateral (hereinafter defined) to Secured Party, as herein provided.

      **NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto agree as follows:

1.    **Security Interest**.  To secure the payment and the performance of the Secured Obligations (hereinafter defined), Pledgor hereby pledges, assigns and grants to Secured Party a first priority security interest and lien in all of the following (collectively, the "*Collateral*"): (a) Pledgor's Equity Interests (hereinafter defined) in the trusts listed on Schedule A (as the same may be updated from time to time) (each, a "*Trust*", and collectively, the "*Trusts*"), and the certificates, if any, representing Pledgor's Equity Interests in the Trusts, as such interests may be increased or otherwise adjusted from time to time, including, without limitation, Pledgor's capital accounts, Pledgor's interests in the net cash flow, net profit and net loss, and items of income, gain, loss, deduction and credit of the Trusts, and Pledgor's interests in all distributions made or to be made by the Trusts to Pledgor; (b) all of Pledgor's rights, titles, and interests in the Organizational Documents (hereinafter defined) of the Trusts, Pledgor's rights to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the Organizational Documents of the Trusts, or otherwise to control, manage, or direct the affairs of the Trusts, Pledgor's rights to terminate, amend, supplement, modify or waive performance under, the Organizational Documents of the Trusts, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder, and all of the other economic and non-economic rights, titles and interests of Pledgor as a member of the Trusts and under the Organizational Documents of the Trusts, in each case, whether set forth in the Organizational Documents of the Trusts, by separate agreement or otherwise; and (c) the proceeds of all of the foregoing.

2.    **Secured Obligations**.  "*Secured Obligations*" means, in each case, whether now in existence or hereafter arising: (a) all payment obligations and any applicable interest thereon (including interest accruing after the filing of any bankruptcy or similar petition) and (b) all other fees and commissions (including attorneys' fees in connection with Secured Party's enforcement or protection of its rights under the Master Agreement or any Loan Document), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties, in each case owing by Pledgor to Secured Party under the Master Agreement and any Loan Document, and whether or not evidenced by any note and including interest and fees that accrue after the commencement by or against Pledgor of any proceeding under any bankruptcy or insolvency law or other similar law affecting creditors' rights, naming Pledgor as the debtor in such proceeding, including fees, indemnification obligations, expenses or otherwise, and all costs and expenses of administering or maintaining the Collateral and of enforcing the rights of Secured Party hereunder and under the Master Agreement and the other Loan Documents.

3.    **Consent**.  Grayscale Investments, LLC, as sponsor of each Trust, hereby irrevocably (a) consents to the grant of the security interests by Pledgor described in *Section 1* of this Pledge Agreement, (b) consents to the transfer or conveyance of the Collateral pursuant to Secured Party's exercise of its rights

DocuSign Envelope ID: 08E69848-206A-4E0C-9213-3721A875F587

and remedies under this Agreement or any of the other Loan Documents, at law or in equity, (c) consents to the admission of Secured Party, its nominees, or any other transferee of any Collateral as a shareholder of such Trust, and (d) agrees that all terms and conditions in its Organizational Documents applicable to the pledge of any Collateral, the enforcement thereof, the transfer of any Collateral or the admission of Secured Party or its nominees, or any other transferee of any Collateral as a shareholder of such Trust have been satisfied or waived. Pledgor hereby irrevocably agrees not to vote to amend the Organizational Documents of such Trust to (a) modify any of the provisions thereof which could be adverse to the interests of the Secured Party or any of its successors, assigns or designees or (b) provide that its equity interests are securities governed by Article 8 of the UCC, or otherwise certificate its equity interests, and hereby agrees and acknowledges that any such vote shall be invalid and any such amendment shall be void ab initio.

4.    **Pledgor's Warranties**.  Pledgor represents and warrants to Secured Party as follows:

(a)    Pledgor owns Equity Interests of the Trusts, all of which have been duly and validly issued, are fully paid and non-assessable. None of the Collateral is certificated. Pledgor owns all Collateral free and clear from any set-off, claim, restriction, lien, security interest or encumbrance, except the security interest hereunder and the vesting provisions to which the Collateral is subject, and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto. The execution, delivery and performance by Pledgor of this Agreement have been duly and validly authorized by all necessary company action, and this Agreement constitutes a legal, valid, and binding obligation of Pledgor and creates a security interest which is enforceable against Pledgor in all now owned and hereafter acquired Collateral, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

(b)    Neither the execution and delivery by Pledgor of this Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Pledgor or any contracts or agreements to which Pledgor is a party or is subject, or by which Pledgor, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any lien pursuant to the terms of any such contract or agreement (other than any lien of Secured Party). There is no litigation, investigation or governmental proceeding threatened against Pledgor or any of its properties which if adversely determined would result in a material adverse effect on the Collateral or Pledgor.

(c)    The Equity Interests that are included in the Collateral have not been financed by the Secured Party or its affiliates.

5.    **Pledgor's Covenants.**  Until full payment and performance of all of the Secured Obligations:

(a)    <u>Secured Obligations and this Agreement</u>. Pledgor shall perform all of its agreements herein, in the Master Agreement and in the other Loan Documents.

(b)    <u>Pledgor Remains Liable</u>.  Notwithstanding anything to the contrary contained herein, (i) Pledgor shall remain liable under the contracts and agreements included in the Collateral, if any, to the extent set forth therein to perform all duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Secured Party of any of its rights hereunder shall not release Pledgor from any of its duties or obligations under the contracts and agreements included in the Collateral, if any; and (iii) Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of

DocuSign Envelope ID: 08E69848-206A-4E0C-9213-3721187F55F5

Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)     Collateral.   The security interest in the Collateral granted pursuant to this Agreement is a valid and binding first priority security interest in the Collateral subject to no other liens or security interests, and Pledgor shall keep the Collateral free from all liens and security interests, except those for taxes not yet due and payable and the security interest hereby created. Pledgor shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein adverse to Secured Party.  Secured Party acknowledges that the Collateral is subject to vesting provisions and agrees that any restrictions related to such vesting provisions are not a breach by Pledgor of any obligation under this Agreement or any Loan Document.

(d)     Secured Party's Costs.  Pledgor shall pay all costs necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement (including the preparation of this Agreement), collect the Secured Obligations, and preserve, defend, enforce and collect the Collateral, including but not limited to payment of taxes, assessments, reasonable attorney's fees, legal expenses and expenses of sales.  Whether the Collateral is or is not in Secured Party's possession, and without any obligation to do so and without waiving Pledgor's default for failure to make any such payment, Secured Party, at its option, may pay any such costs and expenses and discharge encumbrances on the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set for the Secured Obligations. Pledgor agrees to reimburse Secured Party on demand for any costs so incurred.

(e)     Financing Statements.  No financing statement, register of mortgages, charges and other encumbrances or similar document covering the Collateral or any part thereof is or shall be maintained at the registered office of Pledgor or on file in any public office (except in favor of Secured Party), and Pledgor will, at the request of Secured Party, join the Secured Party in (i) filing one or more financing statements pursuant to the UCC (as defined below) naming Secured Party as secured party, and/or (ii) executing and/or filing such other documents required under the laws of all jurisdictions necessary or appropriate in the judgment of Secured Party to obtain, maintain and perfect its first priority security interest in, and lien on, the Collateral.

(f)     Information.  Pledgor shall promptly furnish Secured Party any information with respect to the Collateral requested by Secured Party.

(g)     Notice of Changes.  Pledgor is Three Arrows Capital Ltd with its principal place of business and chief executive office located at 7 Temasek Boulevard #21-04, Singapore 038987. Pledgor shall promptly (and in any event at least fifteen (15) Business Days prior) notify Secured Party in writing of (i) any change in his legal name, address, or jurisdiction of formation or (ii) a change in any matter warranted or represented by Pledgor in this Agreement.

(h)     Possession of Collateral.  Pledgor shall deliver all investment securities and other instruments and documents which are a part of the Collateral to Secured Party promptly, or if hereafter acquired, promptly following acquisition, in a form suitable for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank with signatures appropriately guaranteed in form and substance suitable to Secured Party.

(i)     Voting Rights.  After the occurrence of an Event of Default, Secured Party is entitled to exercise all voting rights pertaining to any Collateral. Prior to the occurrence of an Event of Default, Pledgor may vote the Collateral, *provided, however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Secured Party

DocuSign Envelope ID: 08E69848-206A-4E0C-9213-3721187F5F5F

which would (i) be inconsistent with or violate any provision of this Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of any charter document, or other agreement relating to, evidencing, providing for the issuance of, or securing any Collateral, except to the extent any such amendment, modification or waiver would not be reasonably likely to have an adverse effect on Secured Party. If an Event of Default occurs and if Secured Party elects to exercise such right, the right to vote any pledged securities shall be vested exclusively in Secured Party. To this end, Pledgor hereby irrevocably constitutes and appoints Secured Party the proxy and attorney-in-fact of Pledgor, with full power of substitution, to vote, and to act with respect to, any and all Collateral standing in the name of Pledgor or with respect to which Pledgor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred. The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

(j)    Other Parties and Other Collateral.  No renewal or extensions of or any other indulgence with respect to the Secured Obligations or any part thereof, no modification of the document(s) evidencing the Secured Obligations, no release of any security, no release of any person (including any maker, indorser, guarantor or surety) liable on the Secured Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Secured Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under any law, hereunder, or under any other agreement pertaining to the Collateral. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Secured Obligations or seek to realize upon any other security for the Secured Obligations, before foreclosing or otherwise realizing upon the Collateral.

(k)    Waivers by Pledgor.  Pledgor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Secured Obligations; waives notice of any change in financial condition of any person liable for the Secured Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Secured Obligations; and agrees that maturity of the Secured Obligations and any part thereof may, be accelerated, extended or renewed only in accordance with the Master Agreement. Pledgor waives any right to require that any action be brought against any other person or to require that resort be had to any other security or to any balance of any deposit account. Pledgor further waives any right of subrogation or to enforce any right of action against any other pledgor until the Secured Obligations are paid in full.

(l)    Further Assurances.  Pledgor agrees that, from time to time upon the written request of Secured Party, Pledgor will execute and deliver such further documents (including, without limitation, the delivery of a Pledge Supplement in the form of Exhibit A with respect to any additional Trusts and a control agreement with respect to the Collateral) and diligently perform such other acts and things in any jurisdiction (including, without limitation, Singapore) as Secured Party may reasonably request to fully effect the purposes of this Agreement, to further assure the first priority status of the Lien granted pursuant hereto or to enable Secured Party to exercise or enforce its rights under this Agreement or under the Master Agreement with respect to the Collateral or the collateral posted under the Master Agreement.

6.    **Power of Attorney**.  Pledgor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the name of Pledgor or in its own name, to take after the occurrence of an Event of Default and from time to time thereafter, any and all action and to execute any and all documents and instruments which Secured Party at any time and from time to time deems necessary or desirable to

4

accomplish the purposes of this Agreement, including, without limitation, selling, in the manner set forth herein, any of the Collateral on behalf of Pledgor as agent or attorney in fact for Pledgor and applying the proceeds received therefrom in Secured Party's discretion; *provided, however*, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall Secured Party be liable to Pledgor for failure to take any action hereunder and, upon request, Secured Party shall promptly furnish Pledgor with a written summary of all sales hereunder. This appointment shall be deemed a power coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

7.    **Rights and Powers of Secured Party**.  Upon the occurrence of an Event of Default, Secured Party, without liability to Pledgor, may: vote the Collateral; take control of proceeds, including stock received as dividends or by reason of stock splits; take control of funds generated by the Collateral, such as cash dividends, interest and proceeds, and use same to reduce any part of the Secured Obligations and exercise all other rights which an owner of such Collateral may exercise; and, at any time, transfer any of the Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or for any act or omission on the part of Secured Party, its officers, agents or employees, except for any act or omission arising out of their own willful misconduct or fraud. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

8.    **Default.**

(a)    <u>Event of Default</u>.  As used herein, "***Event of Default***" means any "Event of Default" under the Master Agreement with respect to which Pledgor is the Defaulting Party.

(b)    <u>Rights and Remedies</u>.  If any Event of Default occurs, in each and every such case, Secured Party may, without (i) presentment, demand, or protest, (ii) notice of default, dishonor, demand, non-payment, or protest, (iii) notice of intent to accelerate all or any part of the Secured Obligations, (iv) notice of acceleration of all or any part of the Secured Obligations, or (v) notice of any other kind, all of which Pledgor hereby expressly waives (except for any notice required under this Agreement, any other Loan Document, or which may not be waived under applicable law), at any time thereafter exercise and/or enforce any of the following rights and remedies, at Secured Party's option:

(i)    *Acceleration*.  The Secured Obligations under the Master Agreement and the other Loan Documents shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under the Master Agreement shall, at Secured Party's option, immediately cease and terminate.

(ii)    *Liquidation of Collateral*.  Sell, or instruct any agent or broker to sell, all or any part of the Collateral in a public or private sale, direct any agent or broker to liquidate all or any part of any account and deliver all proceeds thereof to Secured Party, and apply all proceeds to the payment of any or all of the Secured Obligations in such order and manner as Secured Party shall, in its discretion, choose.

(iii)    *Uniform Commercial Code*.  All of the rights, powers and remedies of a secured creditor under the Uniform Commercial Code ("***UCC***") as the same may, from time to time, be in effect in the State of New York, *provided, however*, in any event that, by reason of mandatory provisions of Law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code (or other similar Law) as in effect in a jurisdiction (whether within or outside the United States)

DocuSign Envelope ID: 08E69848-206A-4E0C-9212-3721A875F5EF

other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code (or other similar Law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions, and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral (including, without limitation, the right to sell, transfer, pledge or redeem any and all of the Collateral, which right shall be exercised in a commercially reasonable manner) as if Secured Party was the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right).

Pledgor specifically understands and agrees that any sale by Secured Party of all or any part of the Collateral pursuant to the terms of this Agreement may be effected by Secured Party at times and in manners which could result in the proceeds of such sale being significantly and materially less than what might have been received if such sale had occurred at different times or in different manners, and Pledgor hereby releases Secured Party and its officers and representatives from any and all obligations and liabilities arising out of or related to the timing or manner of any such sale; provided, however, that any such sale shall be conducted in a commercially reasonable manner. If, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, Secured Party may offer and sell such Collateral in a transaction exempt from registration under federal securities law, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral. Any notice made shall be deemed reasonable if sent to Pledgor at the address set forth in *Article XIV* of the Master Agreement at least ten (10) days prior to (i) the date of any public sale or (ii) the time after which any private sale or other disposition may be made.

Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third party, exercises reasonable care in the selection of the bailee or other third party, and the Secured Party need not otherwise preserve, protect, insure or care for any Collateral. Secured Party shall not be obligated to preserve any rights Pledgor may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.

      (iv)    *Deficiencies*. If any Secured Obligations remain after the application of the proceeds of the Collateral, Secured Party may continue to enforce its remedies under this Agreement or the other Loan Documents to collect the deficiency.

      (v)    *Excess*. Not in limitation of any of Secured Party's rights hereunder, under the Loan Documents or under applicable law, if the proceeds of the Collateral exceed the amount of the Secured Obligations (any such exceeds, the "***Excess Proceeds***"), the Excess Proceeds will be delivered to Pledgor in accordance with the terms of the Master Agreement.

9.    **General.**

      (a)    <u>Parties Bound</u>. Secured Party's rights hereunder shall inure to the benefit of its successors and assigns, and in the event of any assignment or transfer of any of the Secured Obligations or the Collateral, Secured Party thereafter shall be fully discharged from any

DocuSign Envelope ID: 08E69848-206A-4E0C-9212-3721875F5E57

responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Secured Obligations or the Collateral not so assigned or transferred. Secured Party may assign all or a portion of its rights and obligations under this Agreement only in connection with the assignment of its rights and obligations under the Master Agreement in circumstances permitted by the Master Agreement. Pledgor may not assign any of its rights and obligations under this Agreement to any person or entity without the prior written consent of Secured Party. All representations, warranties and agreements of Pledgor shall be binding upon the personal representatives, heirs, successors and assigns of Pledgor.

(b)    Discretion by Secured Party.  Any determinations made by Secured Party shall be made, in each case, in its sole discretion exercised in good faith unless otherwise stated herein.

(c)    Termination.  This Agreement shall remain in full force and effect until all of the Secured Obligations and any other amounts payable hereunder are indefeasibly paid and performed in full and the Loan Documents are terminated.

(d)    Waiver.  No delay of Secured Party in exercising any power or right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Secured Party of any right hereunder or of any default by Pledgor shall be binding upon Secured Party unless in writing, and no failure by Secured Party to exercise any power or right hereunder or waiver of any default by Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default. Each right, power and remedy of Secured Party as provided for herein related to the Secured Obligations, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

(e)    Definitions.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 8 and/or 9 definitions apply.  The following terms, when used in this Agreement, shall have the meanings assigned to them below:

(i)    "*Equity Interests*" means, with respect to any corporation, limited liability company, trust, joint venture, association, company, partnership or other entity, all of the shares of capital stock thereof (or other ownership or profit interests therein), all of the warrants, options or other rights for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of shares of capital stock thereof (or other ownership or profit interests therein), all of the securities convertible into or exchangeable for shares of capital stock thereof (or other ownership or profit interests therein) or warrants, rights or options for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of such shares (or such other interests), and all of the other ownership or profit interests in such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity (including partnership, member or trust interests therein), whether voting or nonvoting, whether economic or non-economic, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

(ii)    "*Organizational Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable

DocuSign Envelope ID: 08E69848-206A-4E0C-9213-3721187F5F57

constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the limited liability company agreement or operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable governmental authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

(f)    Notice.  All notices and other communications to Pledgor under this Agreement shall be in writing and shall be delivered in accordance with *Article XIV* of the Master Agreement to Pledgor at its address set forth in *Article XIV* of the Master Agreement or at such other address in the United States as may be specified by Pledgor in a written notice delivered to Lender at such office as Lender may designate for such purpose from time to time in a written notice to Pledgor.

(g)    Modifications.  No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Pledgor and Secured Party.  The provisions of this Agreement shall not be modified or limited by course of conduct or usage of trade.

(h)    Severability.  In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(i)    Applicable Law.  This Agreement is a "Loan Document" with respect to Pledgor for purposes of, and is entered into in connection with, the Master Agreement, and shall be governed by, construed and interpreted in accordance with the governing law set forth in *Article XIII* of the Master Agreement.

(j)    Financing Statement.  Pledgor hereby irrevocably authorizes Secured Party (or its designee) at any time and from time to time to file in any jurisdiction any financing or continuation statement and amendment thereto or any registration of charge, mortgage or otherwise, containing any information required under the UCC or the Law of any other applicable jurisdiction, necessary or appropriate in the judgment of Secured Party to perfect or evidence its first priority security interest in and lien on the Collateral.  Pledgor hereby irrevocably ratifies and approves any such filing, registration or recordation in any jurisdiction by Secured Party (or its designee) that has occurred prior to the date hereof, of any financing statement, registration of charge, mortgage or otherwise.  Pledgor agrees to provide to the Secured Party (or its designees) any and all information required under the UCC or the law of any other applicable jurisdiction for the effective filing of a financing statement and/or any amendment thereto or any registration of charge, mortgage or otherwise.

(k)    Release of Security Interest Upon Satisfaction of Master Agreement Obligations. Upon the termination of all Loans (as defined under the Master Agreement) pursuant to the terms of the Master Agreement and full and final satisfaction of all obligations under the Master Agreement (except for those obligation that expressly survive termination of the Loans), the parties irrevocably agree that (i) the security interest, lien, pledge, and assignment of the Collateral hereunder, together with all rights and powers of the Secured Party hereunder, shall immediately be deemed to be void and (ii) the Secured Party shall immediately return to the Pledgor all Collateral in its possession or control.

DocuSign Envelope ID: 08F69848-206A-4E0C-9213-3721A875F5E7

**NOTICE OF FINAL AGREEMENT**. THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.

[Signature Pages Follow]

9

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives as of the date first above written.


**PLEDGOR:**

**THREE ARROWS CAPITAL LTD**

By: _____
Name:
Title:

**Consented to with respect Section 3 of the Pledge Agreement:**

**GRAYSCALE INVESTMENTS, LLC, as Sponsor to the Trusts**

By: _____
*Michael Sonnenshein*
Name:
Title:

**SECURED PARTY:**

**GENESIS GLOBAL CAPITAL, LLC**

By: _____
*Arianna Pretto-Sakmann*
Name:
Title:

[Signature Page to Pledge Agreement]

**Schedule A**

| Trust | Pledged Shares | Transaction Advice Number |
|---|---|---|
| Grayscale Bitcoin Trust (BTC) | 1,190,275 | 435858 |
| Grayscale Bitcoin Trust (BTC) | 519,657 | 434382 |
| Grayscale Bitcoin Trust (BTC) | 415,862 | 437197 |
| **Total** | **2,125,794** | |

**<u>Exhibit A</u>**

Pledge Supplement

DocuSign Envelope ID: 6E431B0F-71B8-4C1A-85BC-68C4F5665A23

# PLEDGE SUPPLEMENT

**THIS PLEDGE SUPPLEMENT** (as amended, amended and restated, supplemented or otherwise modified from time to time, this "***Supplement***"), dated as of June 4, 2020, is made by **THREE ARROWS CAPITAL LTD** (the "***Pledgor***"), in favor of **GENESIS GLOBAL CAPITAL, LLC** (the "***Secured Party***"). All capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Pledge Agreement (as defined below).

**WHEREAS**, the Pledgor is required under the terms of that certain Pledge Agreement dated as of May 28, 2020, executed by the Pledgor, in favor of the Secured Party (as from time to time amended, restated, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), to cause certain Equity Interests held by it and listed on <u>Supplemental Schedule A</u> attached to this Supplement (the "***Additional Interests***") to be specifically identified as subject to the Pledge Agreement; and

**WHEREAS**, the Pledgor has acquired rights in the Additional Interests and desires to evidence its prior pledge to the Secured Party of the Additional Interests in accordance with the terms of the Master Agreement and the Pledge Agreement;

**NOW, THEREFORE**, in order to induce the Agent and Lenders to maintain the loans advanced pursuant to the Master Agreement, the Pledgor hereby agrees as follows with the Agent:

1.     <u>**Affirmations**</u>.

    (a)    The Pledgor hereby reaffirms and acknowledges the pledge and collateral assignment to, and the grant of security interest in, the Additional Interests contained in the Pledge Agreement and pledges and collaterally assigns to the Secured Party a first priority lien and security interest, to secure the performance of all Secured Obligations in (a) the Additional Interests and (b) all proceeds of any of the foregoing.

    (b)    The Pledgor hereby acknowledges, agrees and confirms by its execution of this Supplement that the Additional Interests constitute "Equity Interests" under and are subject to the Pledge Agreement, and the items of property referred to in clauses (a) and (b) above (the "***Additional Collateral***") shall collectively constitute "Collateral" under and are subject to the Pledge Agreement. Each of the representations and warranties with respect to Equity Interests and Collateral contained in the Pledge Agreement is hereby made by the Pledgor with respect to the Additional Interests and the Additional Collateral, respectively. Attached to this Supplement is a duly completed <u>Supplemental Schedule A</u> (the "***Supplemental Schedule***") supplementing as indicated thereon <u>Schedule A</u> to the Pledge Agreement. The Pledgor represents and warrants that the information contained on the Supplemental Schedule with respect to such Additional Interests is true, complete and accurate as of the date of its execution of this Supplement.

2.     <u>**Miscellaneous**</u>.   <u>Section 9(i)</u> of the Pledge Agreement is hereby incorporated *mutatis mutandi* in this Agreement as if fully set forth herein.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the Pledgor has caused this Supplement to be duly executed by its authorized officer as of the day and year first above written.

**PLEDGOR:**

**THREE ARROWS CAPITAL LTD**

By: _____

Name: Kyle Davies

Title:   Chairman

*[Signature Page to Pledge Agreement Supplement]*

Accepted:

**GENESIS GLOBAL CAPITAL, LLC**

By: _Kristopher Johnson_ _____
Name:  Kristopher Johnson
Title:   Senior Risk Officer

*[Signature Page to Pledge Agreement Supplement]*

DocuSign Envelope ID: 6E431B0F-71B8-4C1A-85BC-68C43F665AA2

## SUPPLEMENTAL SCHEDULE A

ADDITIONAL PLEDGED EQUITY

| Trust | Pledged Shares | Transaction Advice Number |
|---|---|---|
| Grayscale Ethereum Trust | 116,326 | 413615 |
| Grayscale Ethereum Trust | 104,133 | 338169 |
| Grayscale Ethereum Trust | 95,169 | 413169 |
| Grayscale Ethereum Trust | 56,259 | 340230 |
| Grayscale Ethereum Trust | 40,637 | 341025 |
| Grayscale Ethereum Trust | 34,404 | 342822 |
| **Total** | **446,928** | |

# PLEDGE AGREEMENT

This **PLEDGE AGREEMENT** ("*Agreement*") is entered into as of November 16, 2021 by and between **GENESIS ASIA PACIFIC PTE. LTD.** ("*Secured Party*") and **THREE ARROWS CAPITAL LTD** ("*Pledgor*").

      **WHEREAS**, Pledgor and Secured Party are entering into that certain Master Loan Agreement dated as of January 24, 2020 (together with any Loan Term Sheet thereunder, and as amended, modified, supplemented, or restated from time to time, the "*Master Agreement*"; unless specified otherwise, capitalized terms used but not defined herein shall have the meanings assigned in the Master Agreement); and

      **WHEREAS**, in connection with the Master Agreement, Pledgor has agreed to grant a security interest in, and pledge and assign as applicable, the Collateral (hereinafter defined) to Secured Party, as herein provided.

      **NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto agree as follows:

1.    **Security Interest**.  To secure the payment and the performance of the Secured Obligations (hereinafter defined), Pledgor hereby pledges, assigns and grants to Secured Party a first priority security interest and lien in all of the following (collectively, the "*Collateral*"): (a) Pledgor's Equity Interests (hereinafter defined) in the trusts (each, a *"Trust"*, and collectively, the "*Trusts*") listed on Schedule A (as the same may be updated from time to time) held in Account No. 11345090 with TradeStation (together with all renewals, extensions, and replacements of and substitutions for such account, including, but not limited to, any replacement account created as a result of the occurrence of an expiration date, the "*Account*"), and the certificates, if any, representing Pledgor's Equity Interests in the Trusts, as such interests may be increased or otherwise adjusted from time to time, including, without limitation, Pledgor's capital accounts, Pledgor's interests in the net cash flow, net profit and net loss, and items of income, gain, loss, deduction and credit of the Trusts, and Pledgor's interests in all distributions made or to be made by the Trusts to Pledgor; (b) all of Pledgor's rights, titles, and interests in the Organizational Documents (hereinafter defined) of the Trusts, Pledgor's rights to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the Organizational Documents of the Trusts, or otherwise to control, manage, or direct the affairs of the Trusts, Pledgor's rights to terminate, amend, supplement, modify or waive performance under, the Organizational Documents of the Trusts, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder, and all of the other economic and non-economic rights, titles and interests of Pledgor as a member of the Trusts and under the Organizational Documents of the Trusts, in each case, whether set forth in the Organizational Documents of the Trusts, by separate agreement or otherwise; (c) all cash, financial assets, investment property, securities entitlements, and securities maintained from time to time in the Account, and (d) the proceeds of all of the foregoing.

2.    **Secured Obligations**.  "*Secured Obligations*" means, in each case, whether now in existence or hereafter arising: (a) all payment obligations and any applicable interest thereon (including interest accruing after the filing of any bankruptcy or similar petition) and (b) all other fees and commissions (including attorneys' fees in connection with Secured Party's enforcement or protection of its rights under the Master Agreement or any Loan Document), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties, in each case owing by Pledgor to Secured Party under the Master Agreement and any Loan Document, and whether or not evidenced by any note and including interest and fees that accrue after the commencement by or against Pledgor of any proceeding under any bankruptcy or insolvency law or other similar law affecting creditors' rights, naming Pledgor as the debtor in such proceeding, including fees, indemnification obligations, expenses or otherwise, and all costs and expenses of administering or maintaining the Collateral and of enforcing the rights of Secured Party hereunder and under the Master Agreement and the other Loan Documents.

3.      **Pledgor's Warranties**.  Pledgor represents and warrants to Secured Party as follows:

(a)      Pledgor owns Equity Interests of the Trusts, all of which have been duly and validly issued, are fully paid and non-assessable. None of the Collateral is certificated. Pledgor owns all Collateral free and clear from any set-off, claim, restriction, lien, security interest or encumbrance, except the security interest hereunder and the vesting provisions to which the Collateral is subject, and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto. The execution, delivery and performance by Pledgor of this Agreement have been duly and validly authorized by all necessary company action, and this Agreement constitutes a legal, valid, and binding obligation of Pledgor and creates a security interest which is enforceable against Pledgor in all now owned and hereafter acquired Collateral, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

(b)      Neither the execution and delivery by Pledgor of this Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Pledgor or any contracts or agreements to which Pledgor is a party or is subject, or by which Pledgor, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any lien pursuant to the terms of any such contract or agreement (other than any lien of Secured Party). There is no litigation, investigation or governmental proceeding threatened against Pledgor or any of its properties which if adversely determined would result in a material adverse effect on the Collateral or Pledgor.

(c)      The Equity Interests that are included in the Collateral have not been financed by the Secured Party or its affiliates.

4.      **Pledgor's Covenants**.  Until full payment and performance of all of the Secured Obligations:

(a)      Secured Obligations and this Agreement. Pledgor shall perform all of its agreements herein, in the Master Agreement and in the other Loan Documents.

(b)      Pledgor Remains Liable.  Notwithstanding anything to the contrary contained herein, (i) Pledgor shall remain liable under the contracts and agreements included in the Collateral, if any, to the extent set forth therein to perform all duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Secured Party of any of its rights hereunder shall not release Pledgor from any of its duties or obligations under the contracts and agreements included in the Collateral, if any; and (iii) Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)      Collateral.  The security interest in the Collateral granted pursuant to this Agreement is a valid and binding first priority security interest in the Collateral subject to no other liens or security interests, and Pledgor shall keep the Collateral free from all liens and security interests, except those for taxes not yet due and payable and the security interest hereby created. Pledgor shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein adverse to Secured Party.  Secured Party acknowledges that the Collateral is subject to vesting provisions and agrees that any restrictions related to such vesting provisions are not a breach by Pledgor of any obligation under this Agreement or any Loan Document.

(d)    <u>Secured Party's Costs</u>.  Pledgor shall pay all costs necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement (including the preparation of this Agreement), collect the Secured Obligations, and preserve, defend, enforce and collect the Collateral, including but not limited to payment of taxes, assessments, reasonable attorney's fees, legal expenses and expenses of sales.  Whether the Collateral is or is not in Secured Party's possession, and without any obligation to do so and without waiving Pledgor's default for failure to make any such payment, Secured Party, at its option, may pay any such costs and expenses and discharge encumbrances on the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set for the Secured Obligations. Pledgor agrees to reimburse Secured Party on demand for any costs so incurred.

(e)    <u>Financing Statements</u>.  No financing statement, register of mortgages, charges and other encumbrances or similar document covering the Collateral or any part thereof is or shall be maintained at the registered office of Pledgor or on file in any public office (except in favor of Secured Party), and Pledgor will, at the request of Secured Party, join the Secured Party in (i) filing one or more financing statements pursuant to the UCC (as defined below) naming Secured Party as secured party, and/or (ii) executing and/or filing such other documents required under the laws of all jurisdictions necessary or appropriate in the judgment of Secured Party to obtain, maintain and perfect its first priority security interest in, and lien on, the Collateral.

(f)    <u>Information</u>.  Pledgor shall promptly furnish Secured Party any information with respect to the Collateral requested by Secured Party.

(g)    <u>Notice of Changes</u>.  Pledgor is Three Arrows Capital Ltd with its principal place of business and chief executive office located at 7 Temasek Boulevard #21-04, Singapore 038987. Pledgor shall promptly (and in any event at least fifteen (15) Business Days prior) notify Secured Party in writing of (i) any change in his legal name, address, or jurisdiction of formation or (ii) a change in any matter warranted or represented by Pledgor in this Agreement.

(h)    <u>Possession of Collateral</u>.  Pledgor shall deliver all investment securities and other instruments and documents which are a part of the Collateral to Secured Party promptly, or if hereafter acquired, promptly following acquisition, in a form suitable for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank with signatures appropriately guaranteed in form and substance suitable to Secured Party.

(i)    <u>Voting Rights</u>.  After the occurrence of an Event of Default, Secured Party is entitled to exercise all voting rights pertaining to any Collateral. Prior to the occurrence of an Event of Default, Pledgor may vote the Collateral, *provided, however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Secured Party which would (i) be inconsistent with or violate any provision of this Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of any charter document, or other agreement relating to, evidencing, providing for the issuance of, or securing any Collateral, except to the extent any such amendment, modification or waiver would not be reasonably likely to have an adverse effect on Secured Party. If an Event of Default occurs and if Secured Party elects to exercise such right, the right to vote any pledged securities shall be vested exclusively in Secured Party. To this end, Pledgor hereby irrevocably constitutes and appoints Secured Party the proxy and attorney-in-fact of Pledgor, with full power of substitution, to vote, and to act with respect to, any and all Collateral standing in the name of Pledgor or with respect to which Pledgor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred. The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

3

DocuSign Envelope ID: 7A8B6647-D2BB-4C5E-9D98-C29E5E3B9253

(j)    <u>Other Parties and Other Collateral</u>.  No renewal or extensions of or any other indulgence with respect to the Secured Obligations or any part thereof, no modification of the document(s) evidencing the Secured Obligations, no release of any security, no release of any person (including any maker, indorser, guarantor or surety) liable on the Secured Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Secured Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under any law, hereunder, or under any other agreement pertaining to the Collateral. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Secured Obligations or seek to realize upon any other security for the Secured Obligations, before foreclosing or otherwise realizing upon the Collateral.

(k)    <u>Waivers by Pledgor</u>.  Pledgor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Secured Obligations; waives notice of any change in financial condition of any person liable for the Secured Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Secured Obligations; and agrees that maturity of the Secured Obligations and any part thereof may, be accelerated, extended or renewed only in accordance with the Master Agreement. Pledgor waives any right to require that any action be brought against any other person or to require that resort be had to any other security or to any balance of any deposit account. Pledgor further waives any right of subrogation or to enforce any right of action against any other pledgor until the Secured Obligations are paid in full.

(l)    <u>Further Assurances</u>.  Pledgor agrees that, from time to time upon the written request of Secured Party, Pledgor will execute and deliver such further documents (including, without limitation, the delivery of a Pledge Supplement in the form of Exhibit A with respect to any additional Trusts and a control agreement with respect to the Collateral) and diligently perform such other acts and things in any jurisdiction (including, without limitation, Singapore) as Secured Party may reasonably request to fully effect the purposes of this Agreement, to further assure the first priority status of the Lien granted pursuant hereto or to enable Secured Party to exercise or enforce its rights under this Agreement or under the Master Agreement with respect to the Collateral or the collateral posted under the Master Agreement.

5.    **Power of Attorney**.  Pledgor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the name of Pledgor or in its own name, to take after the occurrence of an Event of Default and from time to time thereafter, any and all action and to execute any and all documents and instruments which Secured Party at any time and from time to time deems necessary or desirable to accomplish the purposes of this Agreement, including, without limitation, selling, in the manner set forth herein, any of the Collateral on behalf of Pledgor as agent or attorney in fact for Pledgor and applying the proceeds received therefrom in Secured Party's discretion; *provided, however*, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall Secured Party be liable to Pledgor for failure to take any action hereunder and, upon request, Secured Party shall promptly furnish Pledgor with a written summary of all sales hereunder. This appointment shall be deemed a power coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

6.    **Rights and Powers of Secured Party**.  Upon the occurrence of an Event of Default, Secured Party, without liability to Pledgor, may: vote the Collateral; take control of proceeds, including stock received as dividends or by reason of stock splits; take control of funds generated by the Collateral, such as cash dividends, interest and proceeds, and use same to reduce any part of the Secured Obligations and exercise all other rights which an owner of such Collateral may exercise; and, at any time, transfer any of the

DocuSign Envelope ID: 7A8B6647-D2BB-4C55-9D98-C29E5E3B90F3

Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or for any act or omission on the part of Secured Party, its officers, agents or employees, except for any act or omission arising out of their own willful misconduct or fraud. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

7.    **Default**.

      (a)    <u>Event of Default</u>.  As used herein, "***Event of Default***" means any "Event of Default" under the Master Agreement with respect to which Pledgor is the Defaulting Party.

      (b)    <u>Rights and Remedies</u>.  If any Event of Default occurs, in each and every such case, Secured Party may, without (i) presentment, demand, or protest, (ii) notice of default, dishonor, demand, non-payment, or protest, (iii) notice of intent to accelerate all or any part of the Secured Obligations, (iv) notice of acceleration of all or any part of the Secured Obligations, or (v) notice of any other kind, all of which Pledgor hereby expressly waives (except for any notice required under this Agreement, any other Loan Document, or which may not be waived under applicable law), at any time thereafter exercise and/or enforce any of the following rights and remedies, at Secured Party's option:

      (i)    *Acceleration*.  The Secured Obligations under the Master Agreement and the other Loan Documents shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under the Master Agreement shall, at Secured Party's option, immediately cease and terminate.

      (ii)    *Liquidation of Collateral*.  Sell, or instruct any agent or broker to sell, all or any part of the Collateral in a public or private sale, direct any agent or broker to liquidate all or any part of any account and deliver all proceeds thereof to Secured Party, and apply all proceeds to the payment of any or all of the Secured Obligations in such order and manner as Secured Party shall, in its discretion, choose.

      (iii)    *Uniform Commercial Code*.  All of the rights, powers and remedies of a secured creditor under the Uniform Commercial Code ("***UCC***") as the same may, from time to time, be in effect in the State of New York, *provided*, *however*, in any event that, by reason of mandatory provisions of Law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code (or other similar Law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code (or other similar Law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions, and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral (including, without limitation, the right to sell, transfer, pledge or redeem any and all of the Collateral, which right shall be exercised in a commercially reasonable manner) as if Secured Party was the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right).

      Pledgor specifically understands and agrees that any sale by Secured Party of all or any part of the Collateral pursuant to the terms of this Agreement may be effected by Secured Party at times and in manners

which could result in the proceeds of such sale being significantly and materially less than what might have been received if such sale had occurred at different times or in different manners, and Pledgor hereby releases Secured Party and its officers and representatives from any and all obligations and liabilities arising out of or related to the timing or manner of any such sale; provided, however, that any such sale shall be conducted in a commercially reasonable manner. If, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, Secured Party may offer and sell such Collateral in a transaction exempt from registration under federal securities law, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral. Any notice made shall be deemed reasonable if sent to Pledgor at the address set forth in ***ARTICLE XV*** of the Master Agreement at least ten (10) days prior to (i) the date of any public sale or (ii) the time after which any private sale or other disposition may be made.

Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third party, exercises reasonable care in the selection of the bailee or other third party, and the Secured Party need not otherwise preserve, protect, insure or care for any Collateral. Secured Party shall not be obligated to preserve any rights Pledgor may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.

      (iv)    *Deficiencies*. If any Secured Obligations remain after the application of the proceeds of the Collateral, Secured Party may continue to enforce its remedies under this Agreement or the other Loan Documents to collect the deficiency.

      (v)    *Excess*. Not in limitation of any of Secured Party's rights hereunder, under the Loan Documents or under applicable law, if the proceeds of the Collateral exceed the amount of the Secured Obligations (any such exceeds, the "***Excess Proceeds***"), the Excess Proceeds will be delivered to Pledgor in accordance with the terms of the Master Agreement.

8.    **General.**

      (a)    <u>Parties Bound</u>. Secured Party's rights hereunder shall inure to the benefit of its successors and assigns, and in the event of any assignment or transfer of any of the Secured Obligations or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Secured Obligations or the Collateral not so assigned or transferred. Secured Party may assign all or a portion of its rights and obligations under this Agreement only in connection with the assignment of its rights and obligations under the Master Agreement in circumstances permitted by the Master Agreement. Pledgor may not assign any of its rights and obligations under this Agreement to any person or entity without the prior written consent of Secured Party. All representations, warranties and agreements of Pledgor shall be binding upon the personal representatives, heirs, successors and assigns of Pledgor.

      (b)    <u>Discretion by Secured Party</u>. Any determinations made by Secured Party shall be made, in each case, in its sole discretion exercised in good faith unless otherwise stated herein.

(c)    Termination.  This Agreement shall remain in full force and effect until all of the Secured Obligations and any other amounts payable hereunder are indefeasibly paid and performed in full and the Loan Documents are terminated.

(d)    Waiver.  No delay of Secured Party in exercising any power or right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Secured Party of any right hereunder or of any default by Pledgor shall be binding upon Secured Party unless in writing, and no failure by Secured Party to exercise any power or right hereunder or waiver of any default by Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default. Each right, power and remedy of Secured Party as provided for herein related to the Secured Obligations, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

(e)    Definitions.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 8 and/or 9 definitions apply.  The following terms, when used in this Agreement, shall have the meanings assigned to them below:

(i)    "*Equity Interests*" means, with respect to any corporation, limited liability company, trust, joint venture, association, company, partnership or other entity, all of the shares of capital stock thereof (or other ownership or profit interests therein), all of the warrants, options or other rights for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of shares of capital stock thereof (or other ownership or profit interests therein), all of the securities convertible into or exchangeable for shares of capital stock thereof (or other ownership or profit interests therein) or warrants, rights or options for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of such shares (or such other interests), and all of the other ownership or profit interests in such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity (including partnership, member or trust interests therein), whether voting or nonvoting, whether economic or non-economic, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

(ii)    "*Organizational Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the limited liability company agreement or operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable governmental authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

(f)    Notice.  All notices and other communications to Pledgor under this Agreement shall be in writing and shall be delivered in accordance with **ARTICLE XV** of the Master

DocuSign Envelope ID: 7A8B6647-D2BB-4CE5-9D98-CE9E5E3B89F3

Agreement to Pledgor at its address set forth in **ARTICLE XV** of the Master Agreement or at such other address in the United States as may be specified by Pledgor in a written notice delivered to Lender at such office as Lender may designate for such purpose from time to time in a written notice to Pledgor.

(g)    Modifications.   No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Pledgor and Secured Party.  The provisions of this Agreement shall not be modified or limited by course of conduct or usage of trade.

(h)    Severability.   In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(i)    Applicable Law.   This Agreement is a "Loan Document" with respect to Pledgor for purposes of, and is entered into in connection with, the Master Agreement, and shall be governed by, construed and interpreted in accordance with the governing law set forth in **ARTICLE XIII** of the Master Agreement.

(j)    Financing Statement.   Pledgor hereby irrevocably authorizes Secured Party (or its designee) at any time and from time to time to file in any jurisdiction any financing or continuation statement and amendment thereto or any registration of charge, mortgage or otherwise, containing any information required under the UCC or the Law of any other applicable jurisdiction, necessary or appropriate in the judgment of Secured Party to perfect or evidence its first priority security interest in and lien on the Collateral.  Pledgor hereby irrevocably ratifies and approves any such filing, registration or recordation in any jurisdiction by Secured Party (or its designee) that has occurred prior to the date hereof, of any financing statement, registration of charge, mortgage or otherwise.  Pledgor agrees to provide to the Secured Party (or its designees) any and all information required under the UCC or the law of any other applicable jurisdiction for the effective filing of a financing statement and/or any amendment thereto or any registration of charge, mortgage or otherwise.

(k)    Release of Security Interest Upon Satisfaction of Master Agreement Obligations. Upon the termination of all Loans (as defined under the Master Agreement) pursuant to the terms of the Master Agreement and full and final satisfaction of all obligations under the Master Agreement (except for those obligation that expressly survive termination of the Loans), the parties irrevocably agree that (i) the security interest, lien, pledge, and assignment of the Collateral hereunder, together with all rights and powers of the Secured Party hereunder, shall immediately be deemed to be void and (ii) the Secured Party shall immediately return to the Pledgor all Collateral in its possession or control.

**NOTICE OF FINAL AGREEMENT.   THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.**

[Signature Pages Follow]

8

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives as of the date first above written.

<u>**PLEDGOR:**</u>

**THREE ARROWS CAPITAL LTD**

By: _____

Name:  Kyle Davies

Title:  Director

<u>**SECURED PARTY:**</u>

**GENESIS ASIA PACIFIC PTE. LTD.**

By: _____

Name:  Kristopher Johnson

Title:  Authorized Signatory

[Signature Page to Pledge Agreement]

DocuSign Envelope ID: 7A8B6647-D2BB-4C5E-9D98-CE9F5F3B99F3

## Schedule A

| Trust | Pledged Shares | TradeStation Account Number |
|---|---|---|
| Grayscale Bitcoin Trust | 13,241,612 | 11345090 |

**Exhibit A**

Pledge Supplement

[See Attached.]

# PLEDGE SUPPLEMENT

**THIS PLEDGE SUPPLEMENT** (as amended, amended and restated, supplemented or otherwise modified from time to time, this "***Supplement***"), dated as of [_____], 20[__], is made by **THREE ARROWS CAPITAL LTD** (the "***Pledgor***"), in favor of **GENESIS ASIA PACIFIC PTE. LTD.** (the "***Secured Party***").  All capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Pledge Agreement (as defined below).

**WHEREAS**, the Pledgor is required under the terms of that certain Pledge Agreement dated as of [__], executed by the Pledgor, in favor of the Secured Party (as from time to time amended, restated, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), to cause certain Equity Interests held by it and listed on <u>Schedule A</u> attached to this Supplement (the "***Additional Interests***") to be specifically identified as subject to the Pledge Agreement; and

**WHEREAS**, the Pledgor has acquired rights in the Additional Interests and desires to evidence its pledge to the Secured Party of the Additional Interests in accordance with the terms of the Master Agreement and the Pledge Agreement;

**NOW, THEREFORE**, in order to induce the Agent and Lenders to maintain the loans advanced pursuant to the Master Agreement, the Pledgor hereby agrees as follows with the Agent:

1.    <u>**Additional Collateral**</u>.

(a)    The Pledgor hereby reaffirms and acknowledges the pledge and collateral assignment to, and the grant of security interest in, the Additional Interests contained in the Pledge Agreement and pledges and collaterally assigns to the Secured Party a first priority lien and security interest, to secure the performance of all Secured Obligations in (a) the Additional Interests and (b) all proceeds of any of the foregoing.

(b)    The Pledgor hereby acknowledges, agrees and confirms by its execution of this Supplement that the Additional Interests constitute "Equity Interests" under and are subject to the Pledge Agreement, and the items of property referred to in clauses (a) and (b) above (the "***Additional Collateral***") shall collectively constitute "Collateral" under and are subject to the Pledge Agreement.  Each of the representations and warranties with respect to Equity Interests and Collateral contained in the Pledge Agreement is hereby made by the Pledgor with respect to the Additional Interests and the Additional Collateral, respectively.  Attached to this Supplement is a duly completed <u>Schedule A</u> (the "***Replacement Schedule***") replacing in its entirety <u>Schedule A</u> to the Pledge Agreement.  The Pledgor represents and warrants that the information contained on the Replacement Schedule with respect to the Collateral is true, complete and accurate as of the date of its execution of this Supplement.

2.    <u>**Miscellaneous**</u>.  <u>Section 8(i)</u> of the Pledge Agreement is hereby incorporated *mutatis mutandi* in this Agreement as if fully set forth herein.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the Pledgor has caused this Supplement to be duly executed by its authorized officer as of the day and year first above written.

**PLEDGOR:**

**THREE ARROWS CAPITAL LTD**

By: _____
Name:
Title:

*[Signature Page to Pledge Agreement Supplement]*

Accepted:

**GENESIS ASIA PACIFIC PTE. LTD.**


By: _____
Name:
Title:

*[Signature Page to Pledge Agreement Supplement]*

DocuSign Envelope ID: 7A8B6647-D2BB-4C5E-9D98-CE9E5E3B89F3

## **REPLACEMENT SCHEDULE A**

## PLEDGED EQUITY

*[Signature Page to Pledge Agreement Supplement]*